UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| THE HONORABLE BARBARA J. HOUSER (RET.), IN HER CAPACITY AS TRUSTEE OF THE BSA SETTLEMENT TRUST,<br><br>      Plaintiff,<br><br>v.<br><br>AILLIANZ GLOBAL RISKS US INSURANCE COMPANY; ALLIED WORLD ASSURANCE COMPANY, LTD, *et al*.<br><br>      Defendants. | Civ. Action No. 3:23-cv-01592-S |

**APPENDIX IN SUPPORT OF UNDERSIGNED DEFENDANTS' MOTION TO DISMISS THE COMPLAINT**

**APPENDIX IN SUPPORT OF UNDERSIGNED DEFENDANTS' MOTION TO DISMISS THE COMPLAINT**

| Ex. | Description | Pages |
|---|---|---|
| 1 | Declaration of Joseph G. Davis in Support of Undersigned Defendants' Motion to Dismiss the Complaint | App.001-004 |
| 2 | Third Modified Fifth Amended Chapter 11 Plan Of Reorganization for Boy Scouts of America and Delaware BSA, LLC filed in *In re Boy Scouts of Am.*, Case No. 20-10343 (LSS) (Bankr. D. Del. 2022). D.I. 10296 | App.005-158 |
| 3 | Trust Distribution Procedures filed in *In re Boy Scouts of Am.*, Case No. 20-10343 (LSS) (Bankr. D. Del. 2022). Bankr. D.I. 10296 | App.159-234 |
| 4 | Excerpts of BSA's September 29, 2021 Amended Disclosure Statement filed in *In re Boy Scouts of Am.*, Case No. 20-10343 (LSS) (Bankr. D. Del. 2022). Bankr. D.I. 6431 | App.235-238 |
| 5 | March 10, 2022 Declaration Of Bruce Griggs In Support Of Confirmation Of The Plan filed in *In re Boy Scouts of Am.*, Case No. 20-10343 (LSS) (Bankr. D. Del. 2022). Bankr. D.I. 9273 | App.239-261 |
| 6 | March 19, 2022 Declaration Of Nancy Gutzler In Support Of Confirmation Of The Plan filed in *In re Boy Scouts of Am.*, Case No. 20-10343 (LSS) (Bankr. D. Del. 2022). Bankr. D.I. 9398 | App.262-304 |
| 7 | November 9, 2017 Complaint of National Surety Corporation filed in *National Surety Corporation v. Boy Scouts of America, et al.*, No. 2017-CH-14975 (Cook Cty., Ill.). | App.305-321 |
| 8 | August 2, 2023 Order filed in *National Surety Corporation v. Boy Scouts of America, et al.*, No. 2017-CH-14975 (Cook Cty., Ill.). | App.322-323 |
| 9 | August 3, 2023 Notice of Order or Dismissal filed in *Boy Scouts of Am., Aloha Council, et al. v. Insurance Company of North Am. et al.*, Case No. DC-18-11896 (192nd Judicial Dist., Dallas Cty., TX) | App.324-325 |
| 10 | July 27, 2023 National Surety Corporation Motion for Leave to File Amended Complaint in *National Surety Corporation v. Boy Scouts of America, et al.*, No. 2017-CH-14975 (Cook Cty., Ill.). | App.326-332 |
| 11 | February 18, 2020 Chapter 11 Voluntary Petition of BSA and Delaware BSA, LLC filed in *In re Boy Scouts of Am.*, Case No. 20-10343 (LSS) (Bankr. D. Del. 2022). Bankr. D.I. 1 | App.333-350 |
| 12 | October 2, 2023 Motion for Approval of Amendment of the TDPs filed in *In re Boy Scouts of Am.*, Case No. 20-10343 (LSS) (Bankr. D. Del. 2022). Bankr. D.I. 11514 | Appx.351-397 |
| 13 | Insurer Declarations in support of Undersigned Defendants' Motion to Dismiss the Complaint | App.398-427 |

# EXHIBIT 1

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| THE HONORABLE BARBARA J. HOUSER (RET.), IN HER CAPACITY AS TRUSTEE OF THE BSA SETTLEMENT TRUST, <br><br>                    Plaintiff, <br><br> v. <br><br> ALLIANZ GLOBAL RISKS US INSURANCE COMPANY; ALLIED WORLD ASSURANCE COMPANY, LTD, *et al.* <br><br>                    Defendants. | Civ. Action No. 3:23-cv-01592-S <br><br> **DECLARATION OF JOSEPH G. DAVIS IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS THE COMPLAINT** |

I, Joseph G. Davis, declare as follows:

      1.     I am a partner in the law firm of Willkie Farr & Gallagher LLP, counsel for defendants New Hampshire Insurance Company, American Home Assurance Company, National Union Fire Insurance Company of Pittsburgh, Pa., Landmark Insurance Company, Lexington Insurance Company, Consolidated National Insurance Company, and The Insurance Company of the State of Pennsylvania. I have personal knowledge of the matters stated herein or I have reason to believe they are true and could testify competently to them if called as a witness.

      2.     I submit this declaration in support of the Undersigned Defendants' Motion to Dismiss the complaint in the above-captioned action filed by plaintiff the Honorable Barbara J. Houser, in her capacity as Trustee of the BSA Settlement Trust (the "**Trustee**").

3.      Pursuant to Local Rule 7.1(i), the Undersigned Defendants are simultaneously submitting an appendix (the "**MTD Appendix**") containing Exhibits that are referred to in the Motion to Dismiss.  This declaration is included as Exhibit 1 to the MTD Appendix.

4.      MTD Appendix Exhibit 2 is a true and correct copy of the Third Modified Fifth Amended Chapter 11 Plan Of Reorganization for Boy Scouts of America ("BSA") and Delaware BSA, LLC (the "**Plan**") filed in *In re Boy Scouts of Am. and Del. BSA LLC,* Case No. 20-10343 (LSS)(the "**Bankruptcy Proceeding**"), located at Bankr. D.I. 10296, without exhibits for purposes of this declaration.[1]

5.      MTD Appendix Exhibit 3 is a true and correct copy of the September 22, 2022 Trust Distribution Procedures the "**TDP**s"), located at Bankr. D.I. 10296.

6.      MTD Appendix Exhibit 4 is a true and correct copy of excerpts of BSA's September 29, 2021 Amended Disclosure Statement, located at Bankr. D.I. 6431.

7.      MTD Appendix Exhibit 5 is a true and correct copy of the March 10, 2022 Declaration Of Bruce Griggs In Support Of Confirmation, located at Bankr. D.I. 9273.

8.      MTD Appendix Exhibit 6 is a true and correct copy of the March 19, 2022 Declaration Of Nancy Gutzler In Support Of Confirmation, located at Bankr. D.I. 9398.

9.      MTD Appendix Exhibit 7 is a true and correct copy of the Complaint filed by National Surety Corporation on November 9, 2017 in the Circuit Court of Cook County, Illinois (the "**Illinois Court**") initiating the proceeding captioned *National Surety Corporation v. Boy Scouts of America, et al.*, No. 2017-CH-14975 (Cook Cty., Ill.) (the "**Illinois Action**").

---

[1] References to "Bankr. D.I." indicate docket numbers in the Bankruptcy Proceeding.

10.    MTD Appendix Exhibit 8 is a true and correct copy of an August 2, 2023 Order of the Illinois Court in the Illinois Action.

11.    MTD Appendix Exhibit 9 is a true and correct copy of an August 3, 2023 Notice of Order or Dismissal in the action captioned *Boy Scouts of America, Aloha Council, et al. v. Insurance Company of North America et al.*, Case No. DC-18-11896 (192nd Judicial Dist., Dallas Cty., TX).

12.    MTD Appendix Exhibit 10 is a true and correct copy of National Surety Corporation's July 27, 2023 Notice of Motion for Leave to File an Amended Complaint filed in the Illinois Action.

13.    MTD Appendix Exhibit 11 is a true and correct copy of BSA and Delaware BSA, LLC's February 18, 2020 Chapter 11 Voluntary Petition, located at Bankr. D.I. 1.

14.    MTD Appendix Exhibit 12 is a true and correct copy of the Trustee's October 02, 2023 Motion for Approval of Amendment of the TDPs, located at Bankr. D.I. 11514.

15.    I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: 10/6/23

Joseph G. Davis

3

# EXHIBIT 2

<u>**Exhibit A**</u>

**Plan of Reorganization**

*[Filed at D.I. 10296]*

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>BOY SCOUTS OF AMERICA AND<br>DELAWARE BSA, LLC,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 20-10343 (LSS)<br><br>(Jointly Administered) |

**THIRD MODIFIED FIFTH AMENDED CHAPTER 11 PLAN OF REORGANIZATION**
**(WITH TECHNICAL MODIFICATIONS) FOR**
**BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC**

WHITE & CASE LLP
Jessica C. Lauria (admitted *pro hac vice*)
1221 Avenue of the Americas
New York, New York 10020
Telephone:  (212) 819-8200
Email:  jessica.lauria@whitecase.com

– and –

WHITE & CASE LLP
Michael C. Andolina (admitted *pro hac vice*)
Matthew E. Linder (admitted *pro hac vice*)
Laura E. Baccash (admitted *pro hac vice*)
Blair M. Warner (admitted *pro hac vice*)
111 South Wacker Drive
Chicago, Illinois 60606
Telephone: (312) 881-5400
Email: mandolina@whitecase.com
        mlinder@whitecase.com
        laura.baccash@whitecase.com
        blair.warner@whitecase.com

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Derek C. Abbott (No. 3376)
Andrew R. Remming (No. 5120)
Paige N. Topper (No. 6470)
1201 North Market Street, 16th Floor
P.O. Box 1347
Wilmington, Delaware 19899-1347
Telephone:  (302) 658-9200
Email: dabbott@morrisnichols.com
        aremming@morrisnichols.com
        ptopper@morrisnichols.com

*Attorneys for the Debtors and Debtors in Possession*

Dated: September 6, 2022
        Wilmington, Delaware

---

[1]  The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are as follows:  Boy Scouts of America (6300); and Delaware BSA, LLC (4311).  The Debtors' mailing address is 1325 W. Walnut Hill Ln., Irving, TX 75038.

# TABLE OF CONTENTS

Article I. Definitions and Rules of Interpretation....................................................................... 1

    A.    Definitions................................................................................................. 1

    B.    Interpretation; Application of Definitions and Rules of Construction ............... 53

    C.    Reference to Monetary Figures.................................................................. 53

    D.    Consent Rights....................................................................................... 53

    E.    Controlling Document.............................................................................. 54

Article II. Administrative Expense and Priority Claims ............................................................ 54

    A.    Administrative Expense Claims.................................................................. 54

    B.    Priority Tax Claims.................................................................................. 57

Article III. Classification and Treatment of Claims and Interests ............................................. 57

    A.    Classification of Claims and Interests ......................................................... 57

    B.    Treatment of Claims and Interests............................................................. 58

    C.    Elimination of Vacant Classes ................................................................... 66

    D.    Cramdown.............................................................................................. 66

Article IV. Settlement Trust ..................................................................................................... 67

    A.    Establishment of the Settlement Trust........................................................ 67

    B.    Purposes of the Settlement Trust............................................................... 67

    C.    Transfer of Claims to the Settlement Trust.................................................. 67

    D.    Transfer of Settlement Trust Assets to the Settlement Trust........................... 68

    E.    Settlement Trustee .................................................................................. 71

    F.    Claims Administrators.............................................................................. 71

    G.    Settlement Trust Advisory Committee ........................................................ 71

    H.    Future Claimants' Representative ............................................................... 72

    I.    Trust Distribution Procedures .................................................................. 72

    J.    Post-Effective Date Contributing Chartered Organizations. ........................... 72

    K.    Post-Effective Date Settling Insurance Companies. ...................................... 73

    L.    Settlement Trust Expenses........................................................................ 73

    M.    Reimbursement by Settlement Trust .......................................................... 74

    N.    [Reserved]............................................................................................. 74

    O.    Assignment of Claims and Defenses ........................................................... 75

    P.    Investment Guidelines.............................................................................. 75

    Q.    Excess Settlement Trust Assets.................................................................. 75

    R.    Document Appendix ................................................................................ 75

App.008

| | | |
|---|---|---|
| S. | Privileged Information | 75 |
| T. | No Liability | 75 |
| U. | U.S. Federal Income Tax Treatment of the Settlement Trust | 75 |
| V. | Institution and Maintenance of Legal and Other Proceedings | 76 |
| W. | Settlement Trust Discovery | 76 |
| X. | Notation on Claims Register Regarding Abuse Claims | 76 |

Article V. Means for Implementation of the Plan ............................................................... 76

| | | |
|---|---|---|
| A. | General | 76 |
| B. | Operations of the Debtors between Confirmation and the Effective Date | 76 |
| C. | BSA Governance Documents | 77 |
| D. | Continued Legal Existence of BSA | 77 |
| E. | Reorganized BSA's Directors and Senior Management | 77 |
| F. | [Reserved] | 77 |
| G. | Due Authorization | 77 |
| H. | Reinstatement of Interests | 77 |
| I. | Restatement of Indebtedness | 77 |
| J. | Cancellation of Liens | 78 |
| K. | Effectuating Documents and Further Transactions | 78 |
| L. | Sources of Consideration for Distributions | 78 |
| M. | Calculation of Minimum Unrestricted Cash and Investments | 79 |
| N. | Resolution of Abuse Claims | 79 |
| O. | Funding by the Settlement Trust | 80 |
| P. | Core Value Cash Pool | 80 |
| Q. | Creditor Representative | 80 |
| R. | Residual Cash in Core Value Cash Pool | 80 |
| S. | Compromise and Settlement of Claims, Interests and Controversies | 80 |
| T. | Payment of Coalition and Pfau/Zalkin Restructuring Expenses | 88 |
| U. | Good-Faith Compromise and Settlement | 89 |
| V. | Restated Debt and Security Documents | 90 |
| W. | Foundation Loan | 92 |
| X. | BSA Settlement Trust Note | 93 |
| Y. | DST | 94 |
| Z. | Pension Plan | 94 |
| AA. | Single Satisfaction of Allowed General Unsecured Claims | 94 |

App.009

BB.  Exemption from Certain Transfer Taxes and Recording Fees............................ 95
CC.  Non-Monetary Commitments .................................................................... 95

Article VI. Executory Contracts and Unexpired Leases ............................................... 95
A.  Assumption and Rejection of Executory Contracts and Unexpired Leases ......... 95
B.  Rejection Damages Claims........................................................................ 96
C.  Cure of Defaults under Executory Contracts and Unexpired Leases ................. 96
D.  Dispute Resolution.................................................................................. 97
E.  Contracts and Leases Entered into After the Petition Date ........................... 98
F.  Insurance Policies ................................................................................... 98
G.  Compensation and Benefits Programs......................................................... 99
H.  Restoration Plan and Deferred Compensation Plan...................................... 99
I.  Workers' Compensation Program .............................................................. 99
J.  Indemnification Obligations .................................................................... 100
K.  Gift Annuity Agreements and Life-Income Agreements................................ 100
L.  Modifications, Amendments, Supplements, Restatements, or Other
    Agreements.......................................................................................... 100
M.  Reservation of Rights.............................................................................. 101
N.  Nonoccurrence of Effective Date; Bankruptcy Code Section 365(d)(4).......... 101

Article VII. Provisions Governing Distributions ....................................................... 101
A.  Applicability......................................................................................... 101
B.  Distributions Generally .......................................................................... 101
C.  Distributions on Account of Certain Claims Allowed as of the Effective Date. 101
D.  Distributions on Account of Allowed General Unsecured Claims .................. 101
E.  Distributions on Account of Disputed Claims Allowed After the Effective
    Date.................................................................................................... 101
F.  Rights and Powers of Disbursing Agent..................................................... 102
G.  Delivery of Distributions and Undeliverable or Unclaimed Distributions ........ 102
H.  Undeliverable and Non-Negotiated Distributions ....................................... 103
I.  Manner of Payment under the Plan ........................................................... 103
J.  Satisfaction of Claims ............................................................................ 103
K.  Minimum Cash Distributions.................................................................... 103
L.  Postpetition Interest............................................................................... 103
M.  Setoffs................................................................................................. 104
N.  Claims Paid or Payable by Third Parties .................................................... 104
O.  Compliance with Tax Requirements and Allocations.................................... 105

Article VIII. Procedures for Resolving Contingent, Unliquidated, and Disputed Claims ......... 105

    A.    Applicability ................................................................................................ 105

    B.    Allowance of Claims .................................................................................. 105

    C.    Claims Administration Responsibilities ................................................... 105

    D.    Estimation of Claims ................................................................................. 106

    E.    No Distributions Pending Allowance ....................................................... 106

    F.    Distributions after Allowance ................................................................... 106

    G.    Disputed Claims Reserve .......................................................................... 106

    H.    Adjustment to Claims Register without Objection ................................... 107

    I.    Time to File Objections to Claims ............................................................ 107

    J.    Treatment of Untimely Claims ................................................................. 108

Article IX. Conditions Precedent to Confirmation and Effective Date ................................... 108

    A.    Conditions Precedent to Confirmation of the Plan ................................... 108

    B.    Conditions Precedent to the Effective Date .............................................. 112

    C.    Waiver of Conditions Precedent .............................................................. 113

    D.    [Reserved]. ................................................................................................ 114

    E.    *Vacatur* of Confirmation Order; Non-Occurrence of Effective Date ............... 114

Article X. Effect of Plan Confirmation ................................................................................. 115

    A.    Vesting of Assets in Reorganized BSA .................................................... 115

    B.    Retention of Certain Causes of Action ..................................................... 115

    C.    Binding Effect .......................................................................................... 115

    D.    Post-Confirmation Interim Injunction and Stays ..................................... 116

    E.    Discharge ................................................................................................. 116

    F.    **Channeling Injunction** ........................................................................... 117

    G.    Provisions Relating to Channeling Injunction .......................................... 121

    H.    **Insurance Entity Injunction** .................................................................. 123

    I.    **Injunction against Interference with Plan** ............................................. 126

    J.    **Releases** ................................................................................................. 126

    K.    **Exculpation** ............................................................................................ 132

    L.    **Injunctions Related to Releases and Exculpation** ................................. 132

    M.    Insurance Provisions ................................................................................ 133

    N.    Judgment Reduction ................................................................................. 133

    O.    Reservation of Rights ............................................................................... 134

    P.    Disallowed Claims ................................................................................... 135

Q.    No Successor Liability ........................................................................ 135
R.    Indemnities........................................................................................ 135
S.    The Official Committees and the Future Claimants' Representative................ 136

Article XI. Retention of Jurisdiction................................................................ 136
A.    Jurisdiction........................................................................................ 136
B.    General Retention.............................................................................. 137
C.    Specific Purposes.............................................................................. 137
D.    Courts of Competent Jurisdiction...................................................... 140

Article XII. MISCELLANEOUS PROVISIONS ............................................ 140
A.    Closing of Chapter 11 Cases............................................................ 140
B.    Amendment or Modification of the Plan ........................................... 140
C.    Revocation or Withdrawal of Plan .................................................... 141
D.    Request for Expedited Determination of Taxes................................. 141
E.    Non-Severability of Plan Provisions ................................................. 142
F.    Notices................................................................................................ 142
G.    Notices to Other Persons .................................................................. 143
H.    Governing Law................................................................................... 143
I.    [Reserved].......................................................................................... 143
J.    Timing of Distributions or Actions .................................................. 143
K.    Deemed Acts...................................................................................... 143
L.    Entire Agreement............................................................................... 144
M.    Plan Supplement................................................................................ 144
N.    Withholding of Taxes......................................................................... 144
O.    Payment of Quarterly Fees ............................................................... 144
P.    Effective Date Actions Simultaneous................................................ 144
Q.    Consent to Jurisdiction...................................................................... 144

App.012

## EXHIBITS

| | |
|---|---|
| Exhibit A | Trust Distribution Procedures |
| Exhibit B | Settlement Trust Agreement |
| Exhibit C | Contributing Chartered Organization Settlement Contribution |
| Exhibit D | Contributing Chartered Organizations |
| Exhibit E | Foundation Loan Facility Term Sheet |
| Exhibit F | Local Council Settlement Contribution |
| Exhibit G | Local Councils |
| Exhibit H | Related Non-Debtor Entities |
| Exhibit I | Insurance Settlements |
| Exhibit I-1 | Hartford Insurance Settlement Agreement |
| Exhibit I-2 | Century and Chubb Companies Insurance Settlement Agreement |
| Exhibit I-3 | Zurich Insurance Settlement Agreement |
| Exhibit I-4 | Clarendon Insurance Settlement Agreement |
| Exhibit J | Chartered Organization Settlements |
| Exhibit J-1 | [Reserved] |
| Exhibit J-2 | United Methodist Settlement Agreement |
| Exhibit J-3 | Roman Catholic Settlement Agreement |
| Exhibit K | Chartered Organizations That Are Debtors In Bankruptcy |
| Exhibit L | Youth Protection Program |

## SCHEDULES

| | |
|---|---|
| Schedule 1 | Artwork |
| Schedule 2 | BSA Insurance Policies |
| Schedule 3 | Local Council Insurance Policies |
| Schedule 4 | Oil and Gas Interests |

## PLAN SUPPLEMENT DOCUMENTS

Amended BSA Bylaws
Assumed Contracts and Unexpired Leases Schedule
BSA Settlement Trust Note
Creditor Representative
Directors and Officers of Reorganized BSA
Document Appendix
DST Agreement
DST Note
Forms of Claimant Trust Distribution Procedures Releases
Foundation Loan Agreement
Leaseback Requirement Agreement
Rejected Contracts and Unexpired Leases Schedule
Restated 2010 Bond Documents
Restated 2012 Bond Documents
Restated Credit Facility Documents
Restated Security Agreement
Settlement Trust Advisory Committee
Changes to Local Council Settlement Contributions

# INTRODUCTION

Boy Scouts of America and Delaware BSA, LLC, the non-profit corporations that are debtors and debtors in possession in the above-captioned chapter 11 cases, hereby propose this plan of reorganization pursuant to section 1121(a) of the Bankruptcy Code. Capitalized terms used herein shall have the meanings ascribed to such terms in Article I.A. The Plan provides for the global resolution of Abuse Claims against the Debtors, Related Non-Debtor Entities, Local Councils, Contributing Chartered Organizations, Settling Insurance Companies, and their respective Representatives. The Debtors are the proponents of the Plan within the meaning of section 1129 of the Bankruptcy Code. The Plan is also proposed in accordance with the JPM / Creditors' Committee Term Sheet, pursuant to which the Debtors, the Creditors' Committee and JPM have agreed to take certain actions to support the prosecution and consummation of the Plan. The Coalition, the Tort Claimants' Committee, and the Future Claimants' Representative also support the Plan. Reference is made to the Disclosure Statement for a discussion of the Debtors' history, charitable mission, operations, projections for those operations, risk factors, and certain related matters. The Disclosure Statement also provides a summary and analysis of the Plan. YOU ARE URGED TO READ THE DISCLOSURE STATEMENT AND THE PLAN WITH CARE IN EVALUATING HOW THE PLAN WILL AFFECT YOUR CLAIM(S) BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.

## ARTICLE I.

## DEFINITIONS AND RULES OF INTERPRETATION

A.   <u>Definitions</u>.   The capitalized terms used in the Plan shall have the respective meanings set forth below.

1.   "<u>2010 Bond</u>" means The County Commission of Fayette County (West Virginia) Commercial Development Revenue Bond (Arrow WV Project) Series 2010B in an aggregate principal amount of $50,000,000, issued by the Bond Issuer pursuant to the 2010 Bond Agreement, the proceeds of which were loaned to the BSA pursuant to the 2010 Note.

2.   "<u>2010 Bond Agreement</u>" means that certain Bond Purchase and Loan Agreement dated as of November 5, 2010, by and among the Bond Issuer, JPM, the BSA and Arrow, as amended, restated, supplemented or otherwise modified from time to time.

3.   "<u>2010 Bond Claim</u>" means any Claim against the Debtors arising under, derived from, or based upon the 2010 Bond Documents, including any Claim for obligations, indebtedness, and liabilities of the BSA arising pursuant to any of the 2010 Bond Documents, whether now existing or hereafter arising, whether direct, indirect, related, unrelated, fixed, contingent, liquidated, unliquidated, joint, several, or joint and several, including the obligation of the BSA to repay the 2010 Note, interest on the 2010 Note, and all fees, costs, expenses and obligations of any kind or character due or recoverable from the Debtors under the 2010 Bond Documents.

4.  "2010 Bond Documents" means collectively, the 2010 Bond, the 2010 Bond Agreement, the 2010 Note, the Prepetition Security Documents (2019), the Prepetition Security Agreement (2020) (in the case of the Prepetition Security Documents (2019) and the Prepetition Security Agreement (2020), solely as such documents and agreements pertain to obligations under the other 2010 Bond Documents), and all documentation executed and delivered in connection therewith, as amended, restated, supplemented or otherwise modified from time to time.

5.  "2010 Credit Agreement" means that certain Credit Agreement dated as of August 11, 2010, by and between the BSA, as borrower, and JPM, as lender, as amended by that certain First Amendment to Credit Agreement dated as of November 5, 2010, that certain Second Amendment to Credit Agreement dated as of November 11, 2011, that certain Third Amendment to Credit Agreement dated as of March 9, 2012, that certain Fourth Amendment to Credit Agreement dated as of April 25, 2016, that certain Fifth Amendment to Credit Agreement dated as of March 2, 2017, that certain Sixth Amendment to Credit Agreement dated as of February 15, 2018, and that certain Seventh Amendment to Credit Agreement, dated as of March 21, 2019, pursuant to which JPM agreed to make term loans to the BSA in an aggregate amount of $25,000,000 and agreed to make revolving loans to the BSA and issue letters of credit on behalf of the BSA in an aggregate amount not to exceed $75,000,000.

6.  "2010 Credit Facility Claim" means any Claim against the Debtors arising under, derived from, or based upon the 2010 Credit Facility Documents, including any Claim for obligations, indebtedness, and liabilities of the BSA arising pursuant to any of the 2010 Credit Facility Documents, whether now existing or hereafter arising, whether direct, indirect, related, unrelated, fixed, contingent, liquidated, unliquidated, joint, several, or joint and several, including the obligation of the BSA to pay principal and interest, and all fees, costs, expenses and other obligations of any kind or character due or recoverable under the 2010 Credit Facility Documents.

7.  "2010 Credit Facility Documents" means, collectively, the 2010 Credit Agreement, the Prepetition Security Documents (2019), the Prepetition Security Agreement (2020) (in the case of the Prepetition Security Documents (2019) and the Prepetition Security Agreement (2020), solely as such documents and agreements pertain to obligations under the other 2010 Credit Facility Documents), and all documentation executed and delivered in connection therewith, as amended, restated, supplemented or otherwise modified from time to time.

8.  "2010 Note" means that certain Promissory Note – 2010B executed by the BSA, as borrower, and payable to the order of the Bond Issuer in the original principal amount of $50,000,000, which note was pledged by the Bond Issuer to JPM pursuant to the 2010 Bond Agreement to secure the repayment of the 2010 Bond, as amended, restated, supplemented or otherwise modified from time to time.

9.  "2012 Bond" means The County Commission of Fayette County (West Virginia) Commercial Development Revenue Bond (Arrow WV Project), Series 2012, in an aggregate principal amount of $175,000,000, issued by the Bond Issuer pursuant to the

2

2012 Bond Agreement, the proceeds of which were loaned to the BSA pursuant to the 2012 Note.

10.     "2012 Bond Agreement" means that certain Bond Purchase and Loan Agreement dated as of March 9, 2012, between the Bond Issuer, JPM, the BSA and Arrow, as amended, restated, supplemented or otherwise modified from time to time.

11.     "2012 Bond Claim" means any Claim against the Debtors arising under, derived from, or based upon the 2012 Bond Documents, including any Claim for obligations, indebtedness, and liabilities of the BSA arising pursuant to any of the 2012 Bond Documents, whether now existing or hereafter arising, whether direct, indirect, related, unrelated, fixed, contingent, liquidated, unliquidated, joint, several, or joint and several, including the obligation of the BSA to repay the 2012 Note, interest on the 2012 Note, and all fees, costs, expenses and obligations of any kind or character due or recoverable from the Debtors under the 2012 Bond Documents.

12.     "2012 Bond Documents" means collectively, the 2012 Bond, the 2012 Bond Agreement, the 2012 Note, the Prepetition Security Documents (2019), the Prepetition Security Agreement (2020) (in the case of the Prepetition Security Documents (2019) and the Prepetition Security Agreement (2020), solely as such documents and agreements pertain to obligations under the other 2012 Bond Documents), and all documentation executed and delivered in connection therewith, as amended, restated, supplemented or otherwise modified from time to time.

13.     "2012 Note" means that certain Promissory Note – 2012, executed by the BSA, as borrower, and payable to the order of the Bond Issuer in the original principal amount of $175,000,000, which note was pledged by the Bond Issuer to JPM pursuant to the 2012 Bond Agreement to secure the repayment of the 2012 Bond, as amended, restated, supplemented or otherwise modified from time to time.

14.     "2019 RCF Agreement" means that certain Credit Agreement, dated as of March 21, 2019, by and between the BSA, as borrower, and JPM, as lender, pursuant to which JPM agreed to make revolving loans to the BSA and issue letters of credit on behalf of the BSA in an aggregate amount not to exceed $71,500,000, the maturity date of which was extended pursuant to that certain Consent to Extension of Maturity Date dated as of January 16, 2020.

15.     "2019 RCF Claim" means any Claim against the Debtors arising under, derived from, or based upon the 2019 RCF Documents, including any Claim for obligations, indebtedness, and liabilities of the BSA arising pursuant to any of the 2019 RCF Documents, whether now existing or hereafter arising, whether direct, indirect, related, unrelated, fixed, contingent, liquidated, unliquidated, joint, several, or joint and several, including the obligation of the BSA to pay principal and interest, and all fees, costs, expenses and other obligations of any kind or character due or recoverable under the 2019 RCF Documents.

16.    "2019 RCF Documents" means, collectively, the 2019 RCF Agreement, the Prepetition Security Documents (2019), the Prepetition Security Agreement (2020) (in the case of the Prepetition Security Documents (2019) and the Prepetition Security Agreement (2020), solely as such documents and agreements pertain to obligations under the other 2019 RCF Documents), and all documentation executed and delivered in connection therewith, as amended, restated, supplemented or otherwise modified from time to time.

17.    "Abuse" means sexual conduct or misconduct, sexual abuse or molestation, sexual exploitation, indecent assault or battery, rape, pedophilia, ephebophilia, sexually related psychological or emotional harm, humiliation, anguish, shock, sickness, disease, disability, dysfunction, or intimidation, any other sexual misconduct or injury, contacts or interactions of a sexual nature, including the use of photography, video, or digital media, or other physical abuse or bullying or harassment without regard to whether such physical abuse or bullying is of a sexual nature, between a child and an adult, between a child and another child, or between a non-consenting adult and another adult, in each instance without regard to whether such activity involved explicit force, whether such activity involved genital or other physical contact, and whether there is or was any associated physical, psychological, or emotional harm to the child or non-consenting adult.

18.    "Abuse Claim" means a liquidated or unliquidated Claim against a Protected Party (including the Settling Insurance Companies), a Limited Protected Party, or an Opt-Out Chartered Organization or any of their respective Representatives (in their capacities as such) that is attributable to, arises from, is based upon, relates to, or results from, directly, indirectly, or derivatively, alleged Scouting-related Abuse that occurred prior to the Petition Date, including any such Claim that seeks monetary damages or other relief, under any theory of law or equity whatsoever, including vicarious liability, alter ego, *respondeat superior*, conspiracy, fraud, including fraud in the inducement, any negligence-based or employment-based theory, including negligent hiring, selection, supervision, retention or misrepresentation, any other theory based upon, or directly or indirectly related to any insurance relationship, the provision of insurance or the provision of insurance services to or by any Protected Parties, or misrepresentation, concealment, or unfair practice, breach of fiduciary duty, public or private nuisance, gross negligence, willful misconduct, or any other theory, including any theory based on or related to public policy or any act or failure to act, or failure to warn by a Protected Party, a Limited Protected Party, an Opt-Out Chartered Organization, any of their respective Representatives (in their capacities as such) or any other Person for whom any Protected Party, Limited Protected Party, or Opt-Out Chartered Organization is alleged to be responsible (including any such Claim that has been asserted or may be amended to assert in a proof of claim alleging Abuse, whether or not timely filed, in the Chapter 11 Cases, or any such Claim that has been asserted against the Settlement Trust), including any proportionate or allocable share of liability based thereon. Abuse Claims include any Future Abuse Claims, any Indirect Abuse Claims, any Opt-Out Chartered Organization Abuse Claim, any Post-1975 Chartered Organization Abuse Claim and Pre-1976 Chartered Organization Abuse Claim and any other Claim that is attributable to, arises from, is based upon, relates to, or results from, alleged Scouting-related Abuse regardless of whether, as of the Petition Date, such Claim was barred by any applicable statute of limitations. For the avoidance of doubt, (i) a Claim alleging Abuse shall not be an "Abuse Claim" against a Protected Party, Limited

4

Protected Party, or Opt-Out Chartered Organization or any of their respective Representatives if such Claim is unrelated to Scouting (except as provided in (iii) below, including the portion of any Mixed Claim that is unrelated to Scouting); (ii) a Claim alleging Abuse shall be an "Abuse Claim" against a Protected Party, Limited Protected Party, or Opt-Out Chartered Organization or any of their respective Representatives (in their capacity as such) if such Claim is related to Scouting (including the portion of any Mixed Claim that is related to Scouting); (iii) any portion of a Mixed Claim alleging Abuse involving the Debtors, Reorganized BSA, Related Non-Debtor Entities, Local Councils, or their respective Representatives (in their capacities as such) is necessarily Scouting-related and shall be considered an Abuse Claim; and (iv) any Claim against the Debtors, Reorganized BSA, Related Non-Debtor Entities, Local Councils, or their respective Representatives (in their capacities as such) alleging Abuse is necessarily Scouting-related and shall be considered an Abuse Claim.

19.   "Abuse Claims Settlement" has the meaning ascribed to such term in Article V.S.

20.   "Abuse Insurance Policies" means, collectively, the BSA Insurance Policies, and the Local Council Insurance Policies.  Abuse Insurance Policies do not include Non-Abuse Insurance Policies or Postpetition Insurance Policies.

21.   "Accrued Professional Fees" means, as of any date, and regardless of whether such amounts are billed or unbilled, all of a Professional's or Coalition Professional's accrued fees and reimbursable expenses for services rendered in the Chapter 11 Cases up to and including such date, whether or not such Professional or Coalition Professional has then filed an application for the Allowance and payment of such fees and expenses: (a) to the extent that any such fees and expenses have not been previously paid by the Debtors; and (b) after each Professional has applied to such accrued fees and expenses the balance of any retainer that has been provided by the Debtors to such Professional, if applicable.  No amount of a Professional's or Coalition Professional's fees or expenses denied by a Final Order of the Bankruptcy Court shall constitute Accrued Professional Fees.

22.   "Ad Hoc Committee" means the Ad Hoc Committee of Local Councils of the Boy Scouts of America.

23.   "Administrative Expense Claim" means any right to payment from the Debtors that constitutes a cost or expense of administration incurred during the Chapter 11 Cases of the kind specified under 503(b) of the Bankruptcy Code and entitled to priority under sections 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses of preserving the Estates or continuing the operations of the Debtors incurred during the period from the Petition Date to the Effective Date; (b) the Hartford Administrative Expense Claim and, if applicable in accordance with the Hartford Insurance Settlement Agreement, the Hartford Additional Administrative Expense Claim; (c) Professional Fee Claims; and (d) Quarterly Fees.

5

24.    "Affiliate" has the meaning ascribed to such term in section 101(2) of the Bankruptcy Code.  With respect to any Person that is not a Debtor in the Chapter 11 Cases, the term "Affiliate" shall apply to such Person as if the Person were a Debtor.

25.    "Affirmation Order" means an order of the District Court determining any request for affirmation of any findings of fact and conclusions of law of the Bankruptcy Court with respect to all provisions for which the Bankruptcy Court may not have authority to enter a final order, which shall be in form and substance acceptable to (a) the Debtors, the Ad Hoc Committee, the Coalition, the Tort Claimants' Committee, the Future Claimants' Representative, the Settling Insurance Companies, and (b) the Creditors' Committee and JPM in accordance with their respective consent rights under the JPM / Creditors' Committee Term Sheet.

26.    "Allowed" has the following meanings for Non-Abuse Claims:

a.    with respect to any Claim that is asserted to constitute an Administrative Expense Claim: (i) a Claim that represents an actual and necessary cost or expense of preserving the Estates or continuing the operations of the Debtors incurred during the period from the Petition Date to the Effective Date for which a request for payment is filed, (A) to the extent such Claim is determined by the Debtors to constitute an Administrative Expense Claim or allowed by a Final Order of the Bankruptcy Court or (B) as to which no objection to allowance has been interposed and not withdrawn within the applicable period fixed by the Plan or applicable law; (ii) other than with respect to a Professional Fee Claim, a Claim that arises during the period from the Petition Date to the Effective Date for which a request for payment is filed that is Disputed by the Debtors, which Claim is allowed in whole or in part by a Final Order of the Bankruptcy Court to the extent that such allowed portion is determined by a Final Order to constitute a cost or expense of administration under sections 503(b) and 507(a)(1) of the Bankruptcy Code; (iii) a Claim that arises during the period from the Petition Date to the Effective Date in the ordinary course of the Debtors' non-profit operations that is determined by the Debtors to constitute an Administrative Expense Claim; (iv) a Professional Fee Claim, to the extent allowed by a Final Order of the Bankruptcy Court; or (v) any Claim that is expressly allowed as provided in Article II.A.1;

b.    with respect to any 2010 Credit Facility Claim, 2019 RCF Claim, 2010 Bond Claim, or 2012 Bond Claim, any such Claim that is expressly allowed as provided under Article III; and

c.    with respect to any Priority Tax Claim, Other Priority Claim, Other Secured Claim, Convenience Claim, General Unsecured Claim, Non-Abuse Litigation Claim, or any portion of any of the foregoing, a Claim that is: (i) listed in the Schedules as not being disputed, contingent or unliquidated and with respect to which no contrary or superseding Proof of Claim has been filed, and that has not been paid pursuant to an order of this Court prior to the Effective Date; (ii) evidenced by a Proof of Claim filed on or before the applicable Bar Date, not listed in the Schedules as disputed, contingent or unliquidated, and as to which no

6

objection has been filed on or before the Claims Objection Deadline; (iii) not the subject of an objection to Allowance, which Claim (A) was filed on or before the Claims Objection Deadline and (B) has not been settled, waived, withdrawn or Disallowed pursuant to a Final Order; or (iv) expressly Allowed (x) pursuant to a Final Order, (y) pursuant to an agreement between the holder of such Claim and the Debtors or Reorganized BSA, as applicable, or (z) pursuant to the terms of the Plan.  For the avoidance of doubt, the holder of a Claim evidenced by a Proof of Claim filed after the applicable Bar Date shall not be treated as a creditor with respect to such Claim for the purposes of voting and distribution.

"Allowance" and "Allowing" have correlative meanings.

27.   "Amended BSA Bylaws" means the amended and restated bylaws of the BSA, substantially in the form contained in the Plan Supplement.

28.   "Arrow" means Arrow WV, Inc., a West Virginia non-profit corporation.

29.   "Arrow Collateral Assignment" means that certain Collateral Assignment of Promissory Note and Credit Line Deed of Trust, dated as of March 21, 2019, by and between the BSA, as assignor, and JPM, as lender, pursuant to which BSA assigned the Arrow Intercompany Note and Arrow Deed of Trust to JPM to secure the obligations under the 2010 Credit Facility Documents, the 2019 RCF Documents, the 2010 Bond Documents, and the 2012 Bond Documents.

30.   "Arrow Deed of Trust" means that certain Credit Line Deed of Trust, dated as of June 30, 2010, made and executed by Arrow, as grantor, to Leslie Miller-Stover, as trustee, for the benefit of the BSA, as amended by that certain First Amendment to Credit Line Deed of Trust, dated as of March 21, 2019.

31.   "Arrow Intercompany Note" means that certain Amended and Restated Promissory Note dated as of March 21, 2019, issued by Arrow to the BSA in an original principal amount of $350,000,000.

32.   "Artwork" means the artwork listed on Schedule 1.

33.   "Assumed Contracts and Unexpired Leases Schedule" means the schedule of Executory Contracts or Unexpired Leases to be assumed by the BSA under the Plan and the Cure Amount for each such Executory Contract or Unexpired Lease, as set forth in the Plan Supplement, as may be amended, modified, or supplemented from time to time in accordance with the terms hereof.

34.   "Avoidance Actions" means any and all actual or potential avoidance, recovery, subordination or other Claims, causes of action or remedies that may be brought by or on behalf of the Debtors or their Estates or other authorized parties in interest under the Bankruptcy Code or applicable non-bankruptcy law, including Claims, Causes of Action or remedies under sections 502, 510, 542, 544, 545, 547 through 553, and 724(a) of the Bankruptcy Code, or under similar or related local, state, federal, or foreign statutes or common law, including preference and fraudulent transfer and conveyance laws, in each

7

case whether or not litigation to prosecute such Claim(s), Cause(s) of Action or remedy(ies) were commenced prior to the Effective Date.

35.     "<u>Bankruptcy Code</u>" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as in effect on the Petition Date.

36.     "<u>Bankruptcy Court</u>" means the United States Bankruptcy Court for the District of Delaware or such other court having jurisdiction over the Chapter 11 Cases.

37.     "<u>Bankruptcy Rules</u>" means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under 28 U.S.C. § 2075, as applicable to the Chapter 11 Cases, and the general, local, and chambers rules of the Bankruptcy Court, each as amended from time to time.

38.     "<u>Bar Date</u>" means (a) November 16, 2020 for any Claim (other than an Administrative Expense Claim or a Claim of a Governmental Unit), or (b) August 17, 2020 for any Claim of a Governmental Unit, in each case as established by the Bar Date Order.

39.     "<u>Bar Date Order</u>" means the *Order, Pursuant to 11 U.S.C. §§ 502(b)(9), Bankruptcy Rules 2002 and 3003(c)(3), and Local Rules 2002-1(e), 3001-1, and 3003-1, (I) Establishing Deadlines for Filing Proofs of Claim, (II) Establishing the Form and Manner of Notice Thereof, (III) Approving Procedures for Providing Notice of Bar Date and Other Important Information to Abuse Survivors, and (IV) Approving Confidentiality Procedures for Abuse Survivors*, entered by the Bankruptcy Court on May 26, 2020 at Docket No. 695, as amended, modified or supplemented by order of the Bankruptcy Court from time to time.

40.     "<u>Bond Issuer</u>" means The County Commission of Fayette County (West Virginia) in its capacity as the issuer under the 2010 Bond Agreement and the 2012 Bond Agreement.

41.     "<u>BSA</u>" means Boy Scouts of America, a congressionally chartered non-profit corporation under title 36 of the United States Code.

42.     "<u>BSA Cash Sharing Amount</u>" means (a) if the Warehouse and Distribution Center has been sold prior to the Effective Date and (b) if the amount of Unrestricted Cash and investments to be retained by Reorganized BSA after the calculation of Net Unrestricted Cash and Investments is greater than $39,000,000 if the Effective Date occurs before May 1, 2022 or $28,000,000 if the Effective Date occurs before June 1, 2022 or $19,000,000 if the Effective Date occurs after June 1, 2022, an amount equal to 50% of the difference between the amount of Unrestricted Cash and Investments to be retained by Reorganized BSA and the foregoing thresholds, capped at $7,000,000.

43.     "<u>BSA Charter</u>" means the congressional charter of the BSA, enacted on June 15, 1916, as amended.

44.     "<u>BSA Insurance Policies</u>" means any and all known and unknown contracts, binders, certificates or Insurance Policies currently or previously in effect at any time on

8

or before the Petition Date naming the Debtors, or either of them, or any predecessor, subsidiary, or past or present Affiliate of the Debtors, as an insured (whether as the primary or an additional insured), or otherwise alleged to afford the Debtors insurance coverage, upon which any claim could have been, has been, or may be made with respect to any Abuse Claim, including the policies listed on <u>Schedule 2</u>. Notwithstanding the foregoing, BSA Insurance Policies shall not include: (a) any policy providing reinsurance to any Insurance Company; (b) any Non-Abuse Insurance Policy; (c) any Local Council Insurance Policy; or (d) any Postpetition Insurance Policy.

45.    "<u>BSA Settlement Trust Contribution</u>" means:

a.    all of the Net Unrestricted Cash and Investments;

b.    the BSA Settlement Trust Note, in the principal amount of $80,000,000, subject to the terms of <u>Article V.S.3</u>;

c.    the BSA's right, title and interest in and to the Artwork, which are deemed to be valued at approximately $59,000,000, and the rights to any insurance or the proceeds thereof with respect to missing, damaged, or destroyed Artwork, if any;

d.    (i) if the Warehouse and Distribution Center is not sold prior to the Effective Date, all of the BSA's right, title and interest in and to the Warehouse and Distribution Center, subject to the Leaseback Requirement, or the proceeds of a third-party sale-leaseback of the Warehouse and Distribution Center for fair market value, which is valued at approximately $11,600,000 or (ii) if the Warehouse and Distribution Center is sold prior to the Effective Date, the BSA Cash Sharing Amount, if any;

e.    the BSA's right, title and interest in and to the Oil and Gas Interests, which are valued at approximately $7,600,000;

f.    the Insurance Assignment;

g.    the Debtors' Settlement Trust Causes of Action; and

h.    the assignment of any and all Perpetrator Indemnification Claims held by the BSA.

For the avoidance of doubt, the BSA Settlement Trust Contribution shall not include: (i) the proceeds of the Foundation Loan Facility; or (ii) any Causes of Action against Released Parties or holders of General Unsecured Claims, Non-Abuse Litigation Claims, or Convenience Claims released by the Debtors and their Estates under <u>Article X.J</u>.

46.    "<u>BSA Settlement Trust Note</u>" means the secured, interest-bearing promissory note in the principal amount of $80,000,000, substantially in the form contained in the Plan Supplement, to be issued to the Settlement Trust by Reorganized BSA on the Effective Date in accordance with <u>Article V.S.3</u> and <u>Article V.X</u>.

9

47.  "<u>Business Day</u>" means any day, other than a Saturday, Sunday or "legal holiday" as such term is defined in Bankruptcy Rule 9006(a).

48.  "<u>Cash</u>" means legal tender of the United States of America.

49.  "<u>Cash Collateral Order</u>" means the *Final Order (I) Authorizing the Debtors to Utilize Cash Collateral Pursuant to 11 U.S.C. § 363; (II) Granting Adequate Protection to the Prepetition Secured Party Pursuant to 11 U.S.C. §§ 105(a), 361, 362, 363, 503, and 507; and (III) Granting Related Relief*, entered by the Bankruptcy Court on April 15, 2020 at Docket No. 433.

50.  "<u>Causes of Action</u>" means any claims, interests, damages, remedies, causes of action, demands, rights, actions (including Avoidance Actions), suits, obligations, liabilities, accounts, defenses, offsets, powers, privileges, licenses, liens, indemnities, guaranties, and franchises of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, liquidated or unliquidated, choate or inchoate, secured or unsecured, capable of being asserted, directly or derivatively, matured or unmatured, suspected or unsuspected, in contract, tort, law, equity, or otherwise, whether arising before, on, or after the Petition Date.  Causes of Action also include: (a) all rights of setoff, counterclaim, or recoupment and claims under contracts or for breaches of duties imposed by law or in equity; (b) the right to object to or otherwise contest Claims or Interests; (c) such claims and defenses as fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of the Bankruptcy Code; and (d) any claim under any local, state, federal or foreign law, including any fraudulent transfer or similar claim.

51.  "<u>Century</u>" means (a) Century Indemnity Company, as successor to CCI Insurance Company, as successor to Insurance Company of North America and Indemnity Insurance Company of North America; (b) Century Indemnity Company as successor to CIGNA Specialty Insurance Company f/k/a California Union Insurance Company; (c) Insurance Company of North America; and (d) and each of their past, present and future direct or indirect parents, subsidiaries, affiliates and controlled entities, and each of their respective officers, directors, stockholders, members, partners, managers, employees, attorneys, agents, experts, consultants, predecessors, successors and assigns, each in their capacity as such; provided that the term "Century" shall not include the foregoing persons and entities in their capacities as contractual obligors under: (i) Non-Abuse Insurance Policies (including but not limited to D&O Liability Insurance Policies) except to the extent of a request for coverage and/or any Claims or Causes of Action related to, arising from or in connection with Abuse Claims, any actions, settlements entered into, omissions or positions taken in connection with the Debtors' Chapter 11 Cases and related proceedings and any extra-contractual claims related to, arising from or connected with actions or omissions occurring prior to the Effective Date, including the Settling Insurers' (as defined in the Century and Chubb Companies Settlement Agreement) performance of their obligations under such policies whether for defense, settlement of claims or otherwise and (ii) Postpetition Insurance Policies, except for any Claims or Causes of Action related to, arising from or in connection with any actions, settlements entered into, omissions or positions taken in connection with the Debtors' Chapter 11 Cases and related proceedings

10

and any extra-contractual claims related to, arising from or connected with actions or omissions occurring prior to the Effective Date, including the Settling Insurers' performance of their obligations under such policies whether for defense, settlement of claims or otherwise.

52.     "Century and Chubb Companies Insurance Settlement" has the meaning ascribed to such term in Exhibit I.

53.     "Century and Chubb Companies Insurance Settlement Agreement" means that certain settlement agreement by and between the Century and Chubb Companies, the Debtors, the Ad Hoc Committee, the Coalition, the Future Claimants' Representative, and certain state court counsel to holders of Direct Abuse Claims, as such agreement is described in the term sheet appended to the *Seventh Mediator's Report* [D.I. 7745] filed on December 14, 2021, and as such agreement may be subsequently set forth in and superseded by a definitive written settlement agreement that is consistent with such term sheet and executed by all of the parties thereto (and any additional parties that execute a joinder thereto).  The executed Century and Chubb Companies Insurance Settlement Agreement was filed on the docket of the Chapter 11 Cases and attached hereto as Exhibit I-2.  Pending such execution, the term sheet shall serve as the description of the applicable agreement.

54.     "Century and Chubb Companies Policies" shall have the meaning set forth for "Settling Insurers' Policies" in the Century and Chubb Companies Insurance Settlement Agreement; provided, however, that such policies shall not include (a) Non-Abuse Insurance Policies, except to the extent of a request for coverage and/or any Claims or Causes of Action related to, arising from or in connection with Abuse Claims, any actions, omissions or positions taken in connection with the Chapter 11 Cases and related proceedings and any extra-contractual claims related to, arising from or connected with actions or omissions occurring prior to the Effective Date, including the Settling Insurers' performance of their obligations under such policies whether for defense, settlement of claims or otherwise or (b) Postpetition Insurance Policies, except for any Claims or Causes of Action related to, arising from or in connection with any actions, omissions or positions taken in connection with the Debtors' Chapter 11 Cases and related proceedings and any extra-contractual claims related to, arising from or connected with actions or omissions occurring prior to the Effective Date, including the Settling Insurers' performance of their obligations under such policies whether for defense, settlement of claims or otherwise.

55.     "Century and Chubb Companies Settlement Contribution" shall mean the "Settlement Amount" as defined in the Century and Chubb Companies Insurance Settlement Agreement, which is equal to Eight Hundred Million Dollars ($800,000,000).

56.     "Channeling Injunction" means the permanent injunction provided for in Article X.F with respect to (a) Abuse Claims against the Protected Parties, (b) Post-1975 Chartered Organization Abuse Claims against the Limited Protected Parties, (c) Abuse Claims against the Limited Protected Parties that are covered under any insurance policy issued by the Settling Insurance Companies (as determined pursuant to Section X.F.3), and

11

(d) Opt-Out Chartered Organization Abuse Claims against the Opt-Out Chartered Organizations, to be issued pursuant to the Confirmation Order.[2]

57.     "Chapter 11 Cases" means the cases filed by the Debtors under chapter 11 of the Bankruptcy Code, which are jointly administered under Case No. 20-10343 (LSS).

58.     "Chartered Organizations" means each and every civic, faith-based, educational or business organization, governmental entity or organization, other entity or organization, or group of individual citizens, in each case presently or formerly authorized by the BSA to operate, sponsor or otherwise support one or more Scouting units.

59.     "Chartered Organization Contribution" shall mean the Supplemental LC Contribution and the Settlement Growth Payment contributed by the Local Councils and the Reorganized BSA as consideration to facilitate the protections to certain Chartered Organizations, including with respect to the Post-Confirmation Interim Injunction.

60.     "Chubb Companies" means (a) Westchester Fire Insurance Company; (b) Westchester Surplus Lines Insurance Company; (c) Industrial Insurance Company of Hawaii; (d) Chubb Custom Insurance Company; (e) Federal Insurance Company; (f) Pacific Indemnity Company; (g) Texas Pacific Indemnity Company; (h) U.S. Fire Insurance Company, to the extent policies were assumed by or novated to Westchester Fire Insurance Company; (i) International Insurance Company to the extent policies were assumed by or novated to Westchester Fire Insurance Company; (j) Industrial Indemnity Company; (k) Pacific Employers Insurance Company; (l) The North River Insurance Company, but only to the extent policies were assumed by or novated to Westchester Fire Insurance Company prior to the Effective Date; (m) Aetna Insurance Company; (n) American Foreign Insurance Association; (o) Chubb Atlantic Indemnity Ltd.; (p) INA Insurance Company of Illinois; and (q) each of their past, present and future direct or indirect parents, subsidiaries, affiliates and controlled entities, and each of their respective officers, directors, stockholders, members, partners, managers, employees, attorneys, agents, experts, consultants, predecessors, successors and assigns, each in their capacity as such provided that the term "Chubb" shall not include the foregoing persons and entities in their capacities as contractual obligors under: (i) Non-Abuse Insurance Policies (including but not limited to D&O Liability Insurance Policies) except to the extent of a request for coverage and/or any Claims or Causes of Action related to, arising from or in connection with Abuse Claims, any actions, settlements entered into, omissions or positions taken in connection with the Debtors' Chapter 11 Cases and related proceedings and any extra-contractual claims related to, arising from or connected with actions or omissions occurring prior to the Effective Date, including the Settling Insurers'

---

[2]     For the avoidance of doubt, in the case of insureds and co-insureds that are Opt-Out Chartered Organizations, the terms "covered' or "coverage" as used in the Channeling Injunctions and releases herein shall be subject to the maximum dollar limits included in the applicable policies issued by the Settling Insurance Companies. With respect to any other insured or co-insured under a policy issued by the Settling Insurance Companies (including Protected Parties and Limited Protected Parties), the terms "covered" or "coverage" shall be without reference to the dollar limits of such policies and the entirety of the Abuse Claims against such insured and co-insured shall be channeled and released subject to Article IV.C.1 hereof.

performance of their obligations under such policies whether for defense, settlement of claims or otherwise and (ii) Postpetition Insurance Policies, except for any Claims or Causes of Action related to, arising from or in connection with any actions, settlements entered into, omissions or positions taken in connection with the Debtors' Chapter 11 Cases and related proceedings and any extra-contractual claims related to, arising from or connected with actions or omissions occurring prior to the Effective Date, including the Settling Insurers' performance of their obligations under such policies whether for defense, settlement of claims or otherwise.

61.     "Claim" means any "claim," as defined in section 101(5) of the Bankruptcy Code, which, for the avoidance of doubt, shall include any Abuse Claim.

62.     "Claimant Representatives" means the Tort Claimants' Committee, the Coalition, the Future Claimants' Representative, and Pfau/Zalkin.

63.     "Claims Administrators" mean the two claims administrators appointed to oversee the administration of claims in accordance with the Settlement Trust Agreement.

64.     "Claims Objection Deadline" means the deadline for filing an objection to any Administrative Expense Claim (other than a Professional Fee Claim), Priority Tax Claim, Other Priority Claim, Other Secured Claim, Convenience Claim, General Unsecured Claim, or Non-Abuse Litigation Claim, which deadline shall be: (a) 180 days after the Effective Date with respect to all such Claims and Interests other than Convenience Claims, General Unsecured Claims, and Non-Abuse Claims, subject to any extensions approved by an order of the Bankruptcy Court; and (b) sixty (60) days after the Effective Date with respect to Convenience Claims, General Unsecured Claims, and Non-Abuse Litigation Claims, subject to any extensions approved by an order of the Bankruptcy Court with the consent of the Creditor Representative (such consent not to be unreasonably withheld); provided, however, that the Debtors shall not be bound by the Claims Objection Deadline with respect to any Claim filed after the Bar Date; provided further, however, that the Claims Objection Deadline shall not apply to Abuse Claims, which shall be administered exclusively in accordance with the Settlement Trust Documents.

65.     "Claims Record Date" means the Voting Deadline, which is the date on which the transfer register for each Class of Non-Abuse Claims against or Interests in the Debtors, as such register is maintained by the Debtors or their agents, shall be deemed closed.

66.     "Claims Register" means the official register of Claims maintained by the Notice and Claims Agent in the Chapter 11 Cases.

67.     "Clarendon" means Clarendon National Insurance Company (as successor in interest by merger to Clarendon America Insurance Company), River Thames Insurance Company Limited (as successor in interest to Union America Insurance Company Limited), and Zurich American Insurance Company (as successor in interest to Maryland Casualty Company, Zurich Insurance Company and American General Fire & Casualty Company); provided that the term "Clarendon" shall not include the foregoing persons and entities in

their capacities as contractual obligors under: (i) Non-Abuse Insurance Policies (including but not limited to D&O Liability Insurance Policies) except to the extent of a request for coverage and/or any Claims or Causes of Action related to, arising from or in connection with Abuse Claims, any actions, omissions or positions taken in connection with the Debtors' Chapter 11 Cases and related proceedings and any extra-contractual claims related to, arising from or connected with actions or omissions occurring prior to the Effective Date, including Clarendon's performance of its obligations under such policies whether for defense, settlement of claims or otherwise and (ii) Postpetition Insurance Policies, except for any Claims or Causes of Action related to, arising from or in connection with any actions, omissions or positions taken in connection with the Debtors' Chapter 11 Cases and related proceedings and any extra-contractual claims related to, arising from or connected with actions or omissions occurring prior to the Effective Date, including Clarendon's performance of its obligations under such policies whether for defense, settlement of claims or otherwise.

68.    "Clarendon Insurance Settlement" has the meaning ascribed to such term in Exhibit I.

69.    "Clarendon Insurance Settlement Agreement" means that certain settlement agreement by and between Clarendon, the Debtors, the Ad Hoc Committee, the Coalition, the Future Claimants' Representative, as joined by certain state court counsel to holders of Direct Abuse Claims, as such agreement was described in the term sheet appended to the *Tenth Mediators' Report* [D.I. 8095] filed on January 3, 2022, and as such agreement has been subsequently set forth in and superseded by a definitive written settlement agreement that is consistent with such term sheet and executed by all of the parties thereto as of February 14, 2022 (and any additional parties that execute a joinder thereto). The executed Clarendon Insurance Settlement Agreement was filed on the docket of the Chapter 11 Cases [D.I. 8907-3] and attached hereto as Exhibit I-4.

70.    "Clarendon Policies" shall have the meaning set forth for such capitalized term in the Clarendon Insurance Settlement Agreement.

71.    "Clarendon Settlement Contribution" shall mean the "Settlement Amount" as defined in the Clarendon Insurance Settlement Agreement, which is equal to Sixteen Million Five Hundred Thousand Dollars ($16,500,000).

72.    "Class" means each category of holders of Claims or Interests as set forth in Article III pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code.

73.    "Coalition" means the Coalition of Abused Scouts for Justice, an *ad hoc* committee composed of thousands of holders of Direct Abuse Claims that filed a notice of appearance in the Chapter 11 Cases on July 24, 2020 at Docket No. 1040.

74.    "Coalition Professionals" means (a) Brown Rudnick LLP, (b) Robbins, Russell, Englert, Orseck & Untereiner LLP, (c) Monzack, Mersky and Browder, P.A., (d) Province, LLC, and (e) Parsons, Farnell & Grein, LLP.

75.     "Coalition Restructuring Expenses" has the meaning ascribed to such term in Article V.T.

76.     "Common-Interest Communications with Insurers" means documents, information, or communications that are subject to the attorney-client privilege, attorney-work product doctrine, or other privilege or protection from disclosure, and are shared between or among (a) the Debtors and/or any Protected Party or Limited Protected Party, on the one hand, and (b) any Insurance Company or its Representatives, on the other hand, including documents that reflect defense strategy, case evaluations, discussions of settlements or resolutions, and communications regarding underlying litigation. Common-Interest Communications with Insurers do not include any communications between or among the Debtors and any Insurance Company relating to matters on which an Insurance Company has denied coverage.

77.     "Compensation and Benefits Programs" means all employment agreements and policies, and all employment, compensation, and benefit plans, policies, savings plans, retirement plans (including the Pension Plan), deferred compensation plans, supplemental executive retirement plans, healthcare plans, disability plans, severance benefit agreements, plans or policies, incentive plans, life and accidental death and dismemberment insurance plans, and programs of the Debtors, and all amendments and modifications thereto, applicable to the Debtors' employees, former employees, retirees, and non-employee directors, and the employees, retirees and non-employee directors of the Local Councils and the Related Non-Debtor Entities.  Notwithstanding the foregoing, the Compensation and Benefits Programs shall not include the Deferred Compensation Plan or the Restoration Plan.

78.     "Compensation Procedures Order" means the *Order (I) Approving Procedures for (A) Interim Compensation and Reimbursement of Expenses of Retained Professionals and (B) Expense Reimbursement for Official Committee Members and (II) Granting Related Relief* entered by the Bankruptcy Court on April 6, 2020 at Docket No. 341, as amended by the *Order Amending the Order (I) Approving Procedures for (A) Interim Compensation and Reimbursement of Expenses of Retained Professionals and (B) Expense Reimbursement for Official Committee Members and (II) Granting Related Relief* entered by the Bankruptcy Court on August 6, 2021 at Docket No. 5899.

79.     "Confirmation" means the entry of the Confirmation Order by the Bankruptcy Court on the docket of the Chapter 11 Cases.  "Confirm," "Confirmed" and "Confirmability" shall have correlative meanings.

80.     "Confirmation Date" means the date on which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases within the meaning of Bankruptcy Rules 5003 and 9021.

81.     "Confirmation Hearing" means the hearing(s) held by the Bankruptcy Court under section 1128 of the Bankruptcy Code at which the Debtors seek entry of the Confirmation Order.

15

82.    "Confirmation Order" means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code, which shall be in form and substance acceptable to (a) the Debtors, the Ad Hoc Committee, the Coalition, the Future Claimants' Representative, the Tort Claimants' Committee, the Settling Insurance Companies (in accordance with their respective Insurance Settlement Agreements), and the Contributing Chartered Organizations, and (b) the Creditors' Committee and JPM in accordance with their respective consent rights under the JPM / Creditors' Committee Term Sheet, as incorporated by reference in Article I.D.

83.    "Contributing Chartered Organization Insurance Action" means any Cause of Action of the Contributing Chartered Organizations, or any of them, under the laws of any jurisdiction, against any Non-Settling Insurance Company, arising from or related to an Abuse Insurance Policy, including: (a) any such Non-Settling Insurance Company's failure to provide coverage or otherwise pay under an Abuse Insurance Policy; (b) the refusal of any Non-Settling Insurance Company to compromise and settle any Abuse Claim under or pursuant to any Abuse Insurance Policy; (c) the interpretation or enforcement of the terms of any Abuse Insurance Policy with respect to any Abuse Claim; (d) any conduct by any Non-Settling Insurance Company that could give rise to extra-contractual damages, or other wrongful conduct under applicable law; or (e) any right to receive proceeds held by such Contributing Chartered Organization with respect to an Abuse Insurance Policy. For the avoidance of doubt, no Cause of Action of the Contributing Chartered Organizations, or any of them, against any Settling Insurance Company shall be deemed an Insurance Action, except for any Cause of Action arising from or related to an Insurance Settlement Agreement.

84.    "Contributing Chartered Organization Insurance Rights" has the meaning ascribed to such term in Article V.S.1.b.

85.    "Contributing Chartered Organization Settlement Contribution" means the following:

a.    the contributions to the Settlement Trust by the Contributing Chartered Organizations, as set forth on Exhibit C, and contributions made after the Effective Date in accordance with Article IV.J;

b.    to the maximum extent permitted by applicable law, any and all of the Contributing Chartered Organizations' rights, titles, privileges, interests, claims, demands or entitlements, as of the Effective Date, to any proceeds, payments, benefits, Causes of Action, choses in action, defense, or indemnity, now existing or hereafter arising, accrued or unaccrued, liquidated or unliquidated, matured or unmatured, disputed or undisputed, fixed or contingent, arising under or attributable to: (i) the Abuse Insurance Policies, the Settling Insurer Policy Rights, the Insurance Settlement Agreements, and claims thereunder and proceeds thereof; (ii) the Insurance Actions; and (iii) the Insurance Action Recoveries;

c.    the waiver, release, and expungement from the Claims Register, as of the Effective Date, of any and all Claims that have been asserted in the Chapter

16

11 Cases by or on behalf of any Contributing Chartered Organization, including any Indirect Abuse Claims, without any further notice to or action, order, or approval of the Bankruptcy Court, and the agreement of each Contributing Chartered Organization not to (i) file or assert any Claim or Claims against the Settlement Trust, the Debtors, or Reorganized BSA arising from any act or omission of the Debtors on or prior to the Confirmation Date or (ii) file or assert any rights or interests in any property transferred to the Settlement Trust under the Plan;

> d.   the Contributing Chartered Organizations' Settlement Trust Causes of Action; and

> e.   the assignment of any and all Perpetrator Indemnification Claims held by the Contributing Chartered Organizations.

86.   "Contributing Chartered Organizations" means the current or former Chartered Organizations listed on Exhibit D hereto and any Chartered Organization made a Protected Party under a Post-Effective Date Chartered Organization Settlement approved by the Bankruptcy Court in accordance with Article IV.J. No Participating Chartered Organization shall be considered a Contributing Chartered Organization based solely on the Participating Chartered Organization Insurance Assignment. Without limiting the foregoing, subject to Confirmation of the Plan and approval of the United Methodist Settlement Agreement by an order of the Bankruptcy Court (including in the Confirmation Order), the United Methodist Entities are Contributing Chartered Organizations and shall be designated as such in the Confirmation Order and the Affirmation Order. No Chartered Organization shall be a Contributing Chartered Organization unless it agrees to provide the assignments and releases as set forth in Sections 9 and 10 of the Century and Chubb Companies Insurance Settlement Agreement.

87.   "Convenience Claim" means any Claim that would otherwise be a General Unsecured Claim that is Allowed in an amount of $50,000 or less; provided that a holder of a General Unsecured Claim that is Allowed in an amount greater than $50,000 may irrevocably elect, as evidenced on the Ballot (as defined in the Voting Procedures) timely and validly submitted by such holder (or other writing acceptable to the Debtors), to have such Claim irrevocably reduced to $50,000 and treated as a Convenience Claim (upon Allowance) for purposes of the Plan, in full and final satisfaction of such Claim; provided further that a General Unsecured Claim may not be subdivided into multiple Convenience Claims. The holder of an Allowed Non-Abuse Litigation Claim may elect to have such Allowed Claim treated as a Convenience Claim solely in accordance with the terms of Article III.B.9. For the avoidance of doubt, the holder of an Abuse Claim (including Direct Abuse Claims and Indirect Abuse Claims) may not elect to have such Claim treated as a Convenience Claim.

88.   "Core Value Cash Pool" means Cash in the aggregate amount of $25,000,000 for purposes of making Distributions to holders of Allowed General Unsecured Claims and, subject to the terms of Article III.B.9, holders of Allowed Non-

Abuse Litigation Claims.   Reorganized BSA shall fund the Core Value Cash Pool in accordance with Article V.P.

89.   "Creditor Representative" means the creditor representative to be appointed as of the Effective Date in accordance with Article V.Q.  The Creditor Representative will be identified in the Plan Supplement.

90.   "Creditor Representative Fee Cap" the maximum amount of reasonable compensation and reimbursement of expenses that shall payable by Reorganized BSA to the Creditor Representative on account of its services, which shall be equal to $100,000.

91.   "Creditors' Committee" means the official committee of unsecured creditors appointed by the United States Trustee in the Chapter 11 Cases under section 1102(a) of the Bankruptcy Code.

92.   "Cure Amount" means, with respect to any Executory Contract or Unexpired Lease sought to be assumed or assumed and assigned by the Debtors, the monetary amount, if any, required to cure the Debtors' defaults under any such Executory Contract or Unexpired Lease (or such lesser amount as may be agreed upon by the non-Debtor party to an Executory Contract or Unexpired Lease) at the time such Executory Contract or Unexpired Lease is assumed by the Debtors pursuant to sections 365 or 1123 of the Bankruptcy Code.

93.   "Cure and Assumption Notice" means the notice of proposed assumption of, and proposed Cure Amount payable in connection with, an Executory Contract or Unexpired Lease (and, to the extent the Debtors seek to assume and assign any such Executory Contract or Unexpired Lease pursuant to the Plan, adequate assurance of future performance within the meaning of section 365 of the Bankruptcy Code), to be served in accordance with Article VI.C.

94.   "D&O Liability Insurance Policies" means all Insurance Policies issued at any time to any of the Debtors and the Local Councils, for directors', managers', and officers' liability (including any "tail policy" or run-off coverage) and all agreements, documents, or instruments relating thereto.

95.   "De Minimis Asset" means any miscellaneous asset that is valued by the Debtors at $10,000 or less and that is located at the premises subject to any Unexpired Leases rejected by the Debtors pursuant to sections 365 or 1123 of the Bankruptcy Code, including furniture and equipment.

96.   "Debtors" means the BSA and Delaware BSA, the non-profit corporations that are debtors and debtors in possession in the Chapter 11 Cases.

97.   "Deferred Compensation Plan" means the Boy Scouts of America 457(b) Plan, a non-qualified deferred compensation plan under section 457(b) of the Internal Revenue Code, which allows eligible BSA and Local Council employees to make elections to defer the payment of a certain amount or percentage of their regular base salary or bonus for future payment.

98.   "Delaware BSA" means Delaware BSA, LLC, a Delaware limited liability company.

99.   "Direct Abuse Claim" means an Abuse Claim that is not an Indirect Abuse Claim.

100.   "Disallowed" means, as to any Administrative Expense Claim, Priority Tax Claim, Other Priority Claim, Other Secured Claim, Convenience Claim, General Unsecured Claim, or Non-Abuse Litigation Claim, any such Claim or portion thereof that: (a) has been disallowed, denied, dismissed, expunged, or overruled pursuant to the terms of the Plan or a Final Order of the Bankruptcy Court or any other court of competent jurisdiction or by a settlement; (b) has been listed on the Schedules at an amount of $0.00 or as contingent, disputed, or unliquidated and as to which a Bar Date has been established but no Proof of Claim has been timely filed or deemed timely filed with the Bankruptcy Court pursuant to either the Bankruptcy Code or any Final Order of the Bankruptcy Court, including the Bar Date Order, or otherwise deemed timely filed under applicable law; or (c) has not been scheduled and as to which a Bar Date has been established but no Proof of Claim has been timely filed, such that the creditor holding such Claim shall not be treated as a creditor with respect to such claim for the purposes of voting and distribution. "Disallowance" and "Disallowing" have correlative meanings.  With respect to any 2010 Credit Facility Claim, 2019 RCF Claim, 2010 Bond Claim, 2012 Bond Claim, Direct Abuse Claim, Indirect Abuse Claim, or Interest, the term "Disallowed" shall not apply.

101.   "Disbursing Agent" means, with respect to all Claims other than Abuse Claims, Reorganized BSA or a Person or Persons selected by the Debtors or Reorganized BSA to make or facilitate Distributions contemplated under the Plan.

102.   "Discharge Injunction" means the injunction issued in accordance with sections 524 and 1141 of the Bankruptcy Code and contained in Article X.E.2 of the Plan.

103.   "Discharges" means the discharges set forth in Article X.E.

104.   "Disclosure Statement" means the disclosure statement for the Plan, including all exhibits and schedules thereto, as the same may be amended, supplemented or otherwise modified from time to time, as approved by the Bankruptcy Court pursuant to section 1125 of the Bankruptcy Code, which is in form and substance acceptable to (a) the Debtors, the Ad Hoc Committee, the Coalition and the Future Claimants' Representative and (b) the Creditors' Committee and JPM in accordance with their respective consent rights under the JPM / Creditors' Committee Term Sheet.

105.   "Disclosure Statement Order" means one or more orders entered by the Bankruptcy Court, in form and substance reasonably acceptable to (a) the Debtors, the Ad Hoc Committee, the Coalition and the Future Claimants' Representative and (b) the Creditors' Committee and JPM in accordance with their respective consent rights under the JPM / Creditors' Committee Term Sheet: (i) finding that the Disclosure Statement (including any amendment, supplement, or modification thereto) contains adequate information pursuant to section 1125 of the Bankruptcy Code; (ii) fixing the amounts of

19

Claims solely for voting purposes and not for purposes of distributions; (iii) approving the Voting Procedures; and (iv) authorizing solicitation of the Plan.

106.   "Disputed" means, as to any Administrative Expense Claim, Priority Tax Claim, Other Priority Claim, Other Secured Claim, Convenience Claim, General Unsecured Claim, or Non-Abuse Litigation Claim, any such Claim (or portion thereof) (a) that is neither Allowed nor Disallowed, (b) that is listed on the Schedules as "disputed," "contingent," or "unliquidated" or (c) for which a Proof of Claim has been filed or a written request for payment has been made to the extent that any party in interest has interposed a timely objection to such Claim, which objection has not been withdrawn or adjudicated pursuant to a Final Order.  The term "Disputed" does not apply to Abuse Claims.

107.   "Disputed Claims Reserve" means the reserve of Cash within the Core Value Cash Pool to be Distributed to holders of Disputed General Unsecured Claims, if and when such Disputed Claims become Allowed, which shall be funded with amounts and on terms acceptable to the Creditor Representative.

108.   "Distribution" means the payment or delivery of Cash, property, or interests in property, as applicable, to holders of Allowed Non-Abuse Claims under the terms of the Plan.  "Distributed" and "Distribution" have correlative meanings.

109.   "Distribution Date" means the dates on which the Disbursing Agent makes a Distribution, or causes a Distribution to be made, from the Core Value Cash Pool to holders of Allowed General Unsecured Claims and, subject to the terms of Article III.B.9, holders of Allowed Non-Abuse Litigation Claims.  Each Distribution Date shall occur as soon as practicable after Reorganized BSA makes each semi-annual installment payment of the Core Value Cash Pool in accordance with Article V.P.

110.   "District Court" means the United States District Court for the District of Delaware.

111.   "Document Appendix" means the document, substantially in the form contained in the Plan Supplement, by and among Reorganized BSA, the Related Non-Debtor Entities, the Local Councils, the Contributing Chartered Organizations, and the Settlement Trust, in form and substance acceptable to the Debtors, the Ad Hoc Committee, the Coalition, the Future Claimants' Representative, and the Tort Claimants' Committee.

112.   "DST" means the Delaware statutory trust established under Article V.Y and the DST Agreement for the purposes set forth therein; provided, that the DST may be any other type of Entity, provided such Entity is not affiliated with Reorganized BSA or the Local Councils under principles of accounting.

113.   "DST Agreement" means the agreement governing the DST, dated as of the Effective Date, the form of which shall be included in the Plan Supplement.

114.   "DST Note" means the non-recourse interest-bearing promissory note in the principal amount of $125,000,000 (as limited by the DST Note Increase ), substantially in

the form contained in the Plan Supplement, to be issued to the Settlement Trust by the DST on the Effective Date in accordance with Article V.Y and the DST Note Mechanics.

115. "DST Note Increase" means the increase of the DST Note from $100 million to an amount sufficient to ensure that the aggregate amount of the Supplemental LC Contribution is achieved. In no circumstance will the DST Note Increase be more than $25 million (for an aggregate amount of $125 million) and, to the extent that the LC Overage is more than $15 million, the DST Note increase may be less than $25 million (though not less than $21 million).

116. "DST Note Mechanics" means the terms of Exhibit F as they relate to the payments that will be made by the DST following the Effective Date.

117. "Effective Date" means the first Business Day on which all of the conditions precedent to the occurrence of the Effective Date set forth in Article IX.B shall have been satisfied or waived pursuant to Article IX.C.

118. "Encumbrance" means, with respect to any property (whether real or personal, tangible or intangible), any mortgage, Lien, pledge, charge, security interest, assignment, or encumbrance of any kind or nature in respect of such property, including any conditional sale or other title retention agreement, any security agreement, and the filing of, or agreement to give, any financing statement under the Uniform Commercial Code or comparable law of any jurisdiction, to secure payment of a debt or performance of an obligation.

119. "Entity" means an entity as defined in section 101(15) of the Bankruptcy Code.

120. "Estate" means, as to each Debtor, the estate created for such Debtor in its Chapter 11 Case under sections 301 and 541 of the Bankruptcy Code upon the commencement of the applicable Debtor's Chapter 11 Case.

121. "Estate Causes of Action" means any and all Causes of Action owned, held, or capable of being asserted by or on behalf of either Debtor or its Estate, whether known or unknown, in law, at equity or otherwise, whenever and wherever arising under the laws of any jurisdiction, including actions that: (a) arise out of or are based on breach of contract, fraudulent conveyances and transfers, breach of fiduciary duty, breach of duty of loyalty or obedience, legal malpractice, recovery of attorneys' fees, turnover of property and avoidance or recovery actions of the Debtors or their respective Estates, including actions that constitute property of the Estate under section 541 of the Bankruptcy Code that are or may be pursued by a representative of the Estates, including pursuant to section 323 of the Bankruptcy Code, and actions, including Avoidance Actions, that may be commenced by a representative of the Estates under section 362 or chapter 5 of the Bankruptcy Code, seeking relief in the form of damages (actual and punitive), imposition of a constructive trust, turnover of property, restitution, and declaratory relief with respect thereto or otherwise; or (b) seek to impose any liability upon, or injunctive relief on, any Protected Party or to satisfy, in whole or in part, any Abuse Claim.

122. "Excess Cash and Investments" means, as of any date on or after the Effective Date, the unrestricted Cash and balance sheet investments owned by Reorganized BSA that are not subject to legally enforceable restrictions on the use or disposition of such assets for a particular purpose.

123. "Excess Cash Sweep" has the meaning ascribed to such term in Article V.V.

124. "Exculpated Parties" means, collectively, the following Persons: (a) the Debtors; (b) the Creditors' Committee; (c) the members of the Creditors' Committee in their capacities as such; (d) the Tort Claimants' Committee; (e) the members of the Tort Claimants' Committee in their capacities as such; (f) the Future Claimants' Representative; (g) all of the Debtors' current officers and directors, and former officers and directors who served in such capacity during any portion of the Chapter 11 Cases; and (h) each of the Debtors', Creditors' Committee's, Tort Claimants' Committee's or Future Claimants' Representative's employees, volunteers, agents, attorneys, financial advisors, accountants, investment bankers, consultants, representatives, and other professionals (each in their capacity as such); provided, however, that no such Person described in the foregoing clause (j) shall be an Exculpated Party unless such Person was employed or engaged in such capacity on or after the Petition Date or, in the case of any professional, was retained in these Chapter 11 Cases by order of the Bankruptcy Court.

125. "Executory Contract" means any executory contract to which BSA is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

126. "Expedited Distribution" means a one-time Cash payment from the Settlement Trust in the amount of $3,500.00, conditioned upon satisfaction of the criteria set forth in the Trust Distribution Procedures.

127. "Fee Examiner" means Justin H. Rucki of Rucki Fee Review, LLC, in his capacity as the fee examiner appointed pursuant to the *Order Appointing Fee Examiner and Establishing Related Procedures for the Review of Applications of Retained Professionals*, entered by the Bankruptcy Court on September 18, 2020 at Docket No. 1342, or any successor appointed by the Bankruptcy Court.

128. "Final Order" means an order or judgment of the Bankruptcy Court (or other court of competent jurisdiction) that has not been reversed, vacated, stayed, modified or amended, and as to which (a) the time to appeal, petition for *certiorari* or move for a new trial, reargument or rehearing has expired and as to which no appeal, petition for *certiorari* or other proceedings for a new trial, reargument or rehearing shall then be pending, or (b) if an appeal, writ of *certiorari*, new trial, reargument or rehearing thereof has been sought, such order or judgment of the Bankruptcy Court (or other court of competent jurisdiction) shall have been affirmed by the highest court to which such order was appealed, or *certiorari* shall have been denied or a new trial, reargument or rehearing shall have been denied with prejudice or resulted in no modification of such order, and the time to take any further appeal, petition for *certiorari* or move for a new trial, reargument or rehearing shall have expired; provided, however, that the possibility that a motion pursuant to section

22

502(j) or 1144 of the Bankruptcy Code or under Rule 59 or Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be filed with respect to such order shall not cause such order to not be a Final Order.

129.   "Florida Sea Base Assignment" means the Assignment of Agreements, Licenses, Permits and Contracts, dated as of March 21, 2019, by and from the BSA, as assignor, and JPM, as assignee, which secures the BSA's obligations under the 2010 Credit Agreement, the 2010 Bond Agreement, the 2012 Bond Agreement, and the 2019 RCF Agreement.

130.   "Florida Sea Base Mortgage" means the Mortgage, Security Agreement, Assignment of Rents and Leases and Fixture Filing, dated as of March 21, 2019, by and from the BSA, as mortgagor, and JPM, as mortgagee, which secures the BSA's obligations under the 2010 Credit Agreement, the 2010 Bond Agreement, the 2012 Bond Agreement, and the 2019 RCF Agreement.

131.   "Foundation" means the National Boy Scouts of America Foundation, a District of Columbia nonprofit corporation.

132.   "Foundation Loan" means the new second-lien term loan lending facility pursuant to which the Foundation, as lender, shall make a term loan to Reorganized BSA, as borrower, in the principal amount of $42,800,000, which is equal to the appraised value of the Summit Bechtel Reserve.   The material terms of the Foundation Loan are set forth on the term sheet attached hereto as Exhibit E, which is qualified in its entirety by reference to the Foundation Loan Agreement.

133.   "Foundation Loan Agreement" means the credit agreement governing the Foundation Loan, dated as of the Effective Date, the form of which shall be included in the Plan Supplement.

134.   "Future Abuse Claim" means any Direct Abuse Claim against any Protected Party, Limited Protected Party, or an Opt-Out Chartered Organization that is attributable to, arises from, is based upon, relates to, or results from, in whole or in part, directly, indirectly, or derivatively, alleged Abuse that occurred prior to the Petition Date but which, as of the date immediately preceding the Petition Date, was held by a Person who, as of such date, (a) had not attained eighteen (18) years of age, or (b) was not aware of such Direct Abuse Claim as a result of "repressed memory," to the extent the concept of repressed memory is recognized by the highest appellate court of the state or territory where the claim arose; provided further, however, that with respect to any Participating Chartered Organization, the term "Future Abuse Claim" shall be limited to Post-1975 Chartered Organization Abuse Claims and Pre-1976 Chartered Organization Abuse Claims that satisfy either (a) or (b), and with respect to any Opt-Out Chartered Organization, the term "Future Abuse Claim" shall be limited to Opt-Out Chartered Organization Abuse Claims that satisfy either (a) or (b). For the avoidance of doubt, no Claim alleging Abuse shall be a "Future Abuse Claim" against a Contributing Chartered Organization, a Participating Chartered Organization, or an Opt-Out Chartered Organization if such Claim is wholly unrelated to Scouting.

App.036

135.   "Future Claimants' Representative" means James L. Patton, Jr., the legal representative appointed by the Bankruptcy Court for holders of Future Abuse Claims, or any successor legal representative appointed by the Bankruptcy Court.

136.   "General Unsecured Claim" means any Claim against the Debtors that is not an Administrative Expense Claim, a Priority Tax Claim, an Other Priority Claim, an Other Secured Claim, a 2010 Credit Facility Claim, a 2019 RCF Claim, a 2010 Bond Claim, a 2012 Bond Claim, a Convenience Claim, a Non-Abuse Litigation Claim, a Direct Abuse Claim, or an Indirect Abuse Claim.   Claims arising under the Deferred Compensation Plan or the Restoration Plan shall be deemed to be General Unsecured Claims.

137.   "Gift Annuity Agreements" mean the charitable gift annuity agreements described in the *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Debtors to (A) Maintain and Administer Prepetition Customer, Scout, and Donor Programs and Practices and (B) Pay and Honor Related Prepetition Obligations, and (II) Granting Related Relief*, filed by the Debtors on the Petition Date at Docket No. 8.

138.   "Governmental Unit" means a governmental unit as defined in section 101(27) of the Bankruptcy Code.

139.   "Hartford" means Hartford Accident and Indemnity Company, First State Insurance Company, Twin City Fire Insurance Company and Navigators Specialty Insurance Company; provided that the term "Hartford" shall not include the foregoing persons and Entities in their capacities as contractual obligors under: (i) the Hartford Non-Abuse Insurance Policies (as defined in the Hartford Insurance Settlement Agreement) except to the extent of a request for coverage and/or any Claims or Causes of Action related to, arising from or in connection with Abuse Claims, any actions, omissions or positions taken in connection with the Debtors' Chapter 11 Cases and related proceedings and any Extra-Contractual Claims (as defined in the Hartford Insurance Settlement Agreement) related to, arising from or connected with actions or omissions occurring prior to the Effective Date, including Hartford's performance of its obligations under such policies whether for defense, settlement of claims or otherwise and (ii) Postpetition Insurance Policies, except for any Claims or Causes of Action related to, arising from or in connection with any actions, omissions or positions taken in connection with the Debtors' Chapter 11 Cases and related proceedings and any Extra-Contractual Claims related to, arising from or connected with actions or omissions occurring prior to the Effective Date, including the Hartford's performance of its obligations under such policies whether for defense, settlement of claims or otherwise.

140.   "Hartford Additional Administrative Expense Claim" means Hartford's administrative expense claim, in addition to the Hartford Administrative Expense Claim, of $23.61 million that Hartford may assert in accordance with the terms and conditions of the Hartford Insurance Settlement Agreement in the event that BSA exercises a Fiduciary Out or takes another Specified Action (as such capitalized terms are defined in the Hartford Insurance Settlement Agreement), which administrative expense claim shall be reserved for prior to distributions to unsecured creditors and to which the Debtors, the Ad Hoc

24

Committee, the Future Claimants' Representative, the Coalition, the Joining State Court Counsel (as defined in the Hartford Insurance Settlement Agreement) and the Joining Local Councils (as defined in the Hartford Insurance Settlement Agreement) shall not object or argue that the claim should be allowed in an amount less than $23.61 million (except as permitted under the Hartford Insurance Settlement Agreement).

141.    "Hartford Administrative Expense Claim" means Hartford's administrative expense claim for the Debtors' alleged breach of the Settlement Agreement and Release between Hartford and the Debtors, dated as of April 15, 2021, in the amount of $2,000,000, which shall be paid in full in Cash to Hartford on, or as soon as reasonably practicable after, the Effective Date in accordance with the Hartford Insurance Settlement Agreement.

142.    "Hartford Insurance Settlement" has the meaning ascribed to such term in Exhibit I.

143.    "Hartford Insurance Settlement Agreement" means that certain settlement agreement by and between Hartford, the Debtors, the Ad Hoc Committee, the Coalition, the Future Claimants' Representative, as joined by certain state court counsel to holders of Direct Abuse Claims and Local Councils that have executed or agree to execute a joinder, as such agreement was described (as a settlement in principle) in the term sheet appended to the *Sixth Mediators' Report* [D.I. 6210] filed on September 14, 2021, and as such agreement has been subsequently set forth in a definitive written settlement agreement that is consistent with such term sheet and was executed by all of the parties thereto as of February 14, 2022 (and any additional parties that execute a joinder thereto). The executed Hartford Insurance Settlement Agreement was filed on the docket of the Chapter 11 Cases [D.I. 8816-1] and attached hereto as Exhibit I-1, as corrected pursuant to the Notice of Errata filed on April 21, 2022 [D.I. 9694].

144.    "Hartford Policies" shall have the meaning set forth for such capitalized term in the Hartford Insurance Settlement Agreement.

145.    "Hartford Protected Parties" means (a) Hartford Accident and Indemnity Company, First State Insurance Company, Twin City Fire Insurance Company, and Navigators Specialty Insurance Company; (b) each of their past, present and future direct or indirect parents, subsidiaries, affiliated Entities, controlled Entities, officers, directors, stockholders, members, partners, managers, employees, attorneys, agents, experts, consultants, predecessors, successors and assigns (each in their capacities as such); and (c) all Representatives of each person or Entity identified in clauses (a) and (b) (each in their capacities as such); provided that the term "Hartford Protected Parties" shall not include the foregoing persons and Entities in their capacities as contractual obligors under: (i) the Hartford Non-Abuse Insurance Policies  as defined in the Hartford Insurance Settlement Agreement) except to the extent of a request for coverage and/or any Claims or Causes of Action related to, arising from or in connection with Abuse Claims, any actions, omissions or positions taken in connection with the Debtors' Chapter 11 Cases and related proceedings and any Extra-Contractual Claims (as defined in the Hartford Insurance Settlement Agreement) related to, arising from or connected with actions or omissions occurring prior to the Effective Date, including the Hartford Protected Parties' performance

App.038

of their obligations under such policies, whether for defense, settlement of claims or otherwise and (ii) Postpetition Insurance Policies, except for any Claims or Causes of Action related to, arising from or in connection with any actions, omissions or positions taken in connection with the Debtors' Chapter 11 Cases and related proceedings and any Extra-Contractual Claims (as defined in the Hartford Insurance Settlement Agreement) related to, arising from or connected with actions or omissions occurring prior to the Effective Date, including the Hartford Protected Parties' performance of their obligations under such policies, whether for defense, settlement of claims or otherwise.

146.  "Hartford Settlement Contribution" shall mean the "Settlement Amount" as defined in the Hartford Insurance Settlement Agreement, which is equal to Seven Hundred Eighty-Seven Million Dollars ($787,000,000).

147.  "Headquarters" means that certain parcel of real property owned by the BSA located at 1325 West Walnut Hill Lane, Irving, Texas 75038, together with the buildings, structures, fixtures, additions, enlargements, extensions, modifications, repairs, replacements and other improvements now or hereafter located thereon.

148.  "Headquarters Assignment" means that certain Assignment of Agreements, Licenses, Permits and Contracts, dated as of March 21, 2019, by and from the BSA, as assignor, and JPM, as assignee, which secures the BSA's obligations under the 2010 Credit Agreement, the 2010 Bond Agreement, the 2012 Bond Agreement, and the 2019 RCF Agreement.

149.  "Headquarters Deed of Trust" means that certain Deed of Trust, Security Agreement, Assignment of Rents and Leases and Fixture Filing, dated as of March 21, 2019, by and between the BSA and JPM.

150.  "High Adventure Base Participant" means a registered Youth Member who has paid the participation fee (which has not been refunded in whole or in part) for attending a BSA program at one of the four high adventure bases (Florida Sea Base, Northern Tier, Philmont or Summit Bechtel Reserve). High Adventure Base Participants do not include Youth Members attending a Jamboree, an Order of the Arrow program, or an event sponsored by the World Organization of the Scouting Movement (WOSM) or a member of WOSM other than the BSA.

151.  "Impaired" means "impaired" within the meaning of section 1124 of the Bankruptcy Code.

152.  "Indemnification Obligations" means each of the Debtors' indemnification obligations in place as of the Effective Date, whether in the bylaws, limited liability company agreements, or other organizational or formation documents, board resolutions, management or indemnification agreements, employment or other contracts, or otherwise, for the past and present directors, officers, employees, attorneys, accountants, investment bankers, and other professionals and agents who provided services to the Debtors before, on, or after the Petition Date.

153.   "Indirect Abuse Claim" means a liquidated or unliquidated Abuse Claim for contribution, indemnity, reimbursement, or subrogation, whether contractual or implied by law (as those terms are defined by the applicable non-bankruptcy law of the relevant jurisdiction), and any other derivative Abuse Claim of any kind whatsoever, whether in the nature of or sounding in contract, tort, warranty or any other theory of law or equity whatsoever, including any indemnification, reimbursement, hold-harmless or other payment obligation provided for under any prepetition settlement, insurance policy, program agreement or contract; provided, however, that any retrospective premiums and self-insured retentions arising out of any Abuse Claims under the Abuse Insurance Policies shall not constitute an Indirect Abuse Claim and shall be treated in accordance with Article IV.D.1.

154.   "Injunctions" means the Discharge Injunction, the Channeling Injunction, the Insurance Entity Injunction, the Post-Confirmation Interim Injunction, the Release Injunctions, and any other injunctions entered by the Bankruptcy Court or the District Court in connection with Confirmation of the Plan.

155.   "Insurance Action" means any claim, Cause of Action, or right of the Debtors, Related Non-Debtor Entities, Local Councils, or any of them, under the laws of any jurisdiction, against any Non-Settling Insurance Company, arising from or related to an Abuse Insurance Policy, including: (a) any such Non-Settling Insurance Company's failure to provide coverage or otherwise pay under an Abuse Insurance Policy; (b) the refusal of any Non-Settling Insurance Company to compromise and settle any Abuse Claim under or pursuant to any Abuse Insurance Policy; (c) the interpretation or enforcement of the terms of any Abuse Insurance Policy with respect to any Abuse Claim; (d) any conduct by any Non-Settling Insurance Company constituting "bad faith" conduct or that could otherwise give rise to extra-contractual damages, or other wrongful conduct under applicable law; (e) Participating Chartered Organization Insurance Action, (f) Contributing Chartered Organization Insurance Action; or (g) any right to receive proceeds held by such Person with respect to an Abuse Insurance Policy or an Insurance Coverage Action.   For the avoidance of doubt, no claim, Cause of Action, or right of the Debtors, Related Non-Debtor Entities, Local Councils, Participating Chartered Organizations or Contributing Chartered Organizations, or any of them, against any Settling Insurance Company shall be deemed an Insurance Action, except for any Cause of Action arising from or related to an Insurance Settlement Agreement.

156.   "Insurance Action Recoveries" means (a) Cash or other proceeds derived from and paid by an Insurance Company pursuant to an Insurance Settlement Agreement and (b) the right to receive the proceeds or benefits of any Insurance Action.

157.   "Insurance Assignment" means (x) the assignment and transfer to the Settlement Trust of (a) the Insurance Actions, (b) the Insurance Action Recoveries, (c) the Insurance Settlement Agreements, and (d) all other rights, claims, benefits, or Causes of Action of the Debtors, Related Non-Debtor Entities, Local Councils, or Contributing Chartered Organizations under or with respect to the Abuse Insurance Policies (but not the policies themselves), and (y) the Participating Chartered Organization Insurance Assignment.   The Insurance Assignment does not include (i) any rights, claims, benefits,

or Causes of Action under or with respect to any Non-Abuse Insurance Policies, including D&O Liability Insurance Policies or (ii) any Local Council Reserved Rights.

158. "Insurance Company" means any insurance company, insurance syndicate, coverholder, insurance broker or syndicate insurance broker, guaranty association, or any other Entity that has issued, or that has any actual, potential, demonstrated, or alleged liabilities, duties, or obligations under or with respect to, any Insurance Policy or Local Council Insurance Policy.

159. "Insurance Coverage Actions" means any and all pending coverage litigation between the BSA and any Insurance Company as of the Effective Date, including: (a) *Boy Scouts of America, et al. v. Insurance Company of North America et al.*, Case No. DC-18-11896, pending in the 192nd Judicial District Court of Dallas County, Texas; (b) *Boy Scouts of America, et al. v. Hartford Accident and Indemnity Co.*, *et al.*, Case No. DC-18-07313, pending in the District Court of Dallas County, 95th Judicial District; (c) *National Surety Corp. v. Boy Scouts of America, et al.*, Case No. 2017-CH-14975, pending in the Circuit Court of Cook County, Illinois, Chancery Division; and (d) *Hartford Accident and Indemnity Co. and First State Ins. Co. v. Boy Scouts of America, et al.*, Adv. Pro. No. 20-50601 (LSS), pending before the Bankruptcy Court.

160. "Insurance Coverage Defense" means, subject to Article X.M, all rights and defenses that any Insurance Company may have under any Insurance Policy and applicable law with respect to a claim seeking insurance coverage or to an Insurance Action, but Insurance Coverage Defenses do not include any defense that the Plan or any of the other Plan Documents do not comply with the Bankruptcy Code. Upon entry of the Confirmation Order in the Chapter 11 Cases determining that the Insurance Assignment is authorized to the extent provided in Article IX.A.3.j, an Insurance Coverage Defense shall not include any defense that the Insurance Assignment is prohibited by the Abuse Insurance Policies or applicable non-bankruptcy law except to the extent provided for in Article IX.A.3.j.

161. "Insurance Entity Injunction" means the injunction described in Article X.H.

162. "Insurance Policies" means any and all known and unknown contracts, binders, certificates or insurance policies currently or previously in effect at any time on or before the Petition Date naming the Debtors, the Local Councils, the Chartered Organizations, or any of them, or any predecessor, subsidiary, or past or present Affiliate of the Debtors, as an insured (whether as the primary or an additional insured), or otherwise alleged to afford the Debtors, the Local Councils, or the Chartered Organizations insurance coverage. Insurance Policies include Abuse Insurance Policies, BSA Insurance Policies, Local Council Insurance Policies, and Non-Abuse Insurance Policies.

163. "Insurance Settlements" mean the settlement agreements with Settling Insurance Companies, as attached hereto as Exhibit I.

164. "Insurance Settlement Agreement" means (a) any settlement agreement entered into after the Petition Date and before the Effective Date by and among (i) any

Insurance Company, on the one hand, and (ii) one or more of the Debtors and/or any other Protected Party or Limited Protected Party, on the other hand, under which an Insurance Policy and/or the Debtors and/or other Protected Parties' or Limited Protected Parties' rights thereunder with respect to Abuse Claims or Non-Abuse Litigation Claims are, subject to Confirmation of the Plan and the entry of a Final Order approving such settlement agreement (which order may be the Confirmation Order), released; and (b) any Post-Effective Date Insurance Settlement entered into during the Insurance Settlement Period by and between (i) any Insurance Company, on the one hand, and (ii) the Settlement Trustee (or the Settlement Trustee and any other Protected Party), on the other hand, under which an Insurance Policy that is subject to the Insurance Assignment and/or the Settlement Trustee's and/or Protected Parties' or Limited Protected Parties' rights thereunder with respect to Abuse Claims or Non-Abuse Litigation Claims are released. All Insurance Settlement Agreements entered into before the Effective Date related to Specified Primary Insurance Policies that release the applicable Insurance Company from liability arising from Non-Abuse Litigation Claims must be acceptable to the Creditors' Committee in accordance with the terms of the JPM / Creditors' Committee Term Sheet; provided, however, that with respect to proposed settlements of any Specified Excess Insurance Policy entered into before the Effective Date, the Creditors' Committee shall have consultation rights.

165.    "Insurance Settlement Period" has the meaning ascribed to such term in Article IV.K.

166.    "Interest" means any "equity security" as defined in section 101(16) of the Bankruptcy Code.

167.    "Internal Revenue Code" means title 26 of the United States Code, 26 U.S.C. §§ 1 et seq., as in effect on the Petition Date, together with all amendments, modifications, and replacements of the foregoing as the same may exist on any relevant date to the extent applicable to the Chapter 11 Cases.

168.    "JPM" means JPMorgan Chase Bank, National Association and any successors and assigns.

169.    "JPM / Creditors' Committee Settlement" has the meaning ascribed to such term in Article V..S.

170.    "JPM / Creditors' Committee Term Sheet" means that certain settlement term sheet appended as Exhibit A to the *First Mediators' Report* filed on March 1, 2021 at Docket No. 2292.

171.    "JPM Exit Fee" means an exit fee to be paid by Reorganized BSA on the Effective Date, in an amount equal to the aggregate principal amount due and owing as of the Effective Date, plus the undrawn amount of any letters of credit then outstanding, under the Restated 2010 Bond Documents, the Restated 2012 Bond Documents and the Restated Credit Facility Documents, multiplied by 0.50%.

172.   "LC Overage" means the total aggregate amount of the Cash Contribution and the Property Contribution, each as defined in Exhibit F appended hereto, that exceeds $500 million.  Notwithstanding anything to the contrary in this paragraph, the LC Overage shall not be less than $15 million.

173.   "Leaseback Requirement" means the requirement that Reorganized BSA be entitled to lease the Warehouse and Distribution Center from the Settlement Trust for fair market value so long as the Settlement Trust holds title to such premises and that any sale or other transfer of the Warehouse and Distribution Center by the Settlement Trust be subject to Reorganized BSA's right to lease such premises from any Person that acquires the Warehouse and Distribution Center from the Settlement Trust (or any subsequent acquirer) for fair market value for a term of not less than two years with four two-year options to renew at the option of Reorganized BSA.  If as of the filing of the Plan Supplement the Bankruptcy Court has not approved a sale of the Warehouse and Distribution Center or if no motion to approve such sale is then pending before the Bankruptcy Court, then an agreement reflecting the terms of the Leaseback Requirement shall be filed with the Plan Supplement.

174.   "Lien" means any "lien" as defined in section 101(37) of the Bankruptcy Code.

175.   "Life-Income Agreement" means the agreements described in the *Supplement to Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Debtors to (A) Maintain and Administer Prepetition Customer, Scout, and Donor Programs and Practices and (B) Pay and Honor Related Prepetition Obligations, and (II) Granting Related Relief*, filed by the Debtors on March 3, 2020 at Docket No. 134.

176.   "Limited Protected Parties" means the Participating Chartered Organizations and all of such Persons' Representatives when acting in such representative capacity; provided, however, that no Perpetrator is or shall be a Limited Protected Party.

177.   "Limited Protected Party Injunction Date" means the twelve (12) month period following the Effective Date, as may be extended pursuant to the Settlement Trust Agreement, to afford Participating Chartered Organizations an opportunity to negotiate an appropriate settlement with the Settlement Trust and become a Contributing Chartered Organization.

178.   "Local Council Insurance Policies" means any and all known and unknown contracts, binders, certificates or insurance policies currently or previously in effect at any time on or before the Petition Date naming the Local Councils, or any of them, or any predecessor, subsidiary, or past or present Affiliate of any Local Council, as an insured (whether as the primary or an additional insured), or otherwise alleged to afford any Local Council insurance coverage, upon which any claim could have been, has been or may be made with respect to any Abuse Claim, including the policies identified on Schedule 3. Notwithstanding the foregoing, Local Council Insurance Policies shall not include: (a) any policy providing reinsurance to any Insurance Company; (b) any Non-Abuse Insurance Policy; (c) any BSA Insurance Policy; or (d) any Postpetition Insurance Policy.

179.   "Local Council Insurance Rights" has the meaning ascribed to such term in Article V.S.1.a.

180.   "Local Council Reserved Rights" (a) any right of a Local Council under any Specified Insurance Policy with respect to any Non-Abuse Litigation Claim and (b) any right of a Local Council or Related Non-Debtor Entity under any Specified Insurance Policy with respect to any Cause of Action against such Local Council or Related Non-Debtor Entity that does not relate to Abuse and remains unresolved as of the Effective Date; provided, that such Local Council, Related Non-Debtor Entity, or applicable claimant provides notice of such claim or Cause of Action to the Debtors, the Coalition, the Tort Claimants' Committee, and the Future Claimants' Representative prior to the Effective Date.

181.   "Local Council Settlement Contribution" means:

a.      the contributions to the Settlement Trust by the Local Councils, as set forth on Exhibit F and as updated in the Plan Supplement;

b.      to the maximum extent permitted under applicable law, any and all of the Local Councils' rights, titles, privileges, interests, claims, demands or entitlements, as of the Effective Date, to any proceeds, payments, benefits, Causes of Action, choses in action, defense, or indemnity, now existing or hereafter arising, accrued or unaccrued, liquidated or unliquidated, matured or unmatured, disputed or undisputed, fixed or contingent, arising under or attributable to: (i) the BSA Insurance Policies, the Insurance Settlement Agreements, and claims thereunder and proceeds thereof (but not the policies themselves, except as otherwise required under the Insurance Settlement Agreements); (ii) the Insurance Actions; and (iii) the Insurance Action Recoveries; provided, however, that the transfer set forth herein will not include the Local Council Reserved Rights;

c.      to the maximum extent permitted under applicable law, any and all of the Local Councils' rights, titles, privileges, interests, claims, demands or entitlements, as of the Effective Date, to any proceeds, payments, benefits, Causes of Action, choses in action, defense, or indemnity, now existing or hereafter arising, accrued or unaccrued, liquidated or unliquidated, matured or unmatured, disputed or undisputed, fixed or contingent, arising under or attributable to: (i) the Local Council Insurance Policies, the Insurance Settlement Agreements, and claims thereunder and proceeds thereof; (ii) the Insurance Actions; and (iii) the Insurance Action Recoveries; provided, however, that the transfer set forth herein will not include the Local Council Reserved Rights;

d.      the waiver, release, and expungement from the Claims Register, as of the Effective Date, of any and all Claims that have been asserted in the Chapter 11 Cases by or on behalf of any Local Council, including any Indirect Abuse Claims, without any further notice to or action, order, or approval of the Bankruptcy Court, and the agreement of each Local Council not to (i) file or assert any Claim or Claims against the Settlement Trust, the Debtors, or Reorganized BSA arising

31

from any act or omission of the Debtors on or prior to the Confirmation Date or (ii) file or assert any rights or interests in any property transferred to the Settlement Trust under the Plan.

        e.      the Local Councils' Settlement Trust Causes of Action; and

        f.      the assignment of any and all Perpetrator Indemnification Claims held by the Local Councils.

    182.   "Local Councils" means, collectively, each and every current or former local council of the BSA, including each and every current local council of the BSA as listed on Exhibit G hereto, "supporting organizations" within the meaning of 26 U.S.C. § 509 with respect to any Local Council, Scouting units (including "troops," "dens," "packs," "posts," "clubs," "crews," "ships," "tribes," "labs," "lodges," "councils," "districts," "areas," "regions," and "territories") associated with any Local Council, and all Entities that hold, own, or operate any camp or other property that is operated in the name of or for the benefit of any of the foregoing.

    183.   "Mediators" means the Honorable Kevin J. Carey (Ret.), Paul A. Finn, and Timothy V.P. Gallagher, who were appointed by the Bankruptcy Court as mediators in the Chapter 11 Cases under the *Order (I) Appointing Mediators, (II) Referring Certain Matters to Mediation, and (III) Granting Related Relief* entered on June 9, 2020 at Docket No. 812, as modified and limited to the time periods set forth in the supplemental order entered on November 17, 2021 at Docket No. 7283 and the second supplemental order entered on December 7, 2021 at Docket No. 7589.

    184.   "Mixed Claim" means a claim that makes allegations of Abuse related to or arising from Scouting as well as Abuse that occurred prior to the Petition Date unrelated to or not arising from Scouting. A claim shall not be treated as a Mixed Claim unless and until Scouting-related Abuse allegations have been asserted through a Proof of Claim, the complaint, sworn discovery or testimony (including by affidavit).

    185.   "Net Unrestricted Cash and Investments" means all of the Unrestricted Cash and Investments as of the Effective Date, which shall include the net proceeds of the sale of Scouting University, which equal approximately $1,902,000, and the net proceeds of the sale of the Warehouse and Distribution Center if it is sold prior to the Effective Date, after Reorganized BSA has received the proceeds of the Foundation Loan, less (a) $25,000,000 (subject to variance as set forth in Article V.M), which shall be funded first from the proceeds of the Foundation Loan, (b) an amount of Cash equal to the JPM Exit Fee, (c) an amount of Cash sufficient to fund all unpaid Allowed Administrative Expense Claims, (d) without duplication, an amount of Cash sufficient to fund the Professional Fee Reserve, (e) an amount of Cash equal to the Creditor Representative Fee Cap, (f) the amount of Cash estimated to be required to satisfy Allowed Priority Tax Claims, Allowed Other Priority Claims, Allowed Secured Claims, and Allowed Convenience Claims, and (g) an amount of Cash sufficient to fund all accrued but unpaid interest and reasonable fees and expenses of JPM as of the Effective Date to the extent not paid pursuant to the Cash Collateral Order.

186. "Non-Abuse Claim" means any Claim against the Debtors that is not an Abuse Claim.

187. "Non-Abuse Insurance Policy" means any and all known and unknown contracts, binders, certificates or Insurance Policies currently or previously in effect at any time on or before the Petition Date naming the Debtors, the Local Councils, the Chartered Organizations, or any of them, or any predecessor, subsidiary, or past or present Affiliate of the Debtors, as an insured (whether as the primary or an additional insured), or otherwise alleged to afford the Debtors, the Local Councils, or the Chartered Organizations insurance coverage, upon which any claim could have been, has been, or may be made with respect to any Non-Abuse Claim and which does not include coverage for Abuse Claims; provided, however, Non-Abuse Insurance Policies, including the D&O Liability Insurance Policies, do not include Abuse Insurance Policies (which Abuse Insurance Policies, for the avoidance of doubt, include the Specified Insurance Policies).

188. "Non-Abuse Litigation Claim" means any Claim that is a prepetition unsecured non-priority Claim against the Debtors relating to pending or threatened litigation against one or both of the Debtors that does not relate to Abuse. For the avoidance of doubt, Non-Abuse Litigation Claims include (a) all personal injury or wrongful death Claims against the Debtors that do not relate to Abuse and (b) all Claims against the Debtors asserted by the Girl Scouts of the United States of America. Non-Abuse Litigation Claims do not include any Administrative Expense Claims that may be asserted by holders of Non-Abuse Litigation Claims.

189. "Non-Settling Insurance Company" means any Insurance Company that is not a Settling Insurance Company.

190. "Northern Tier Assignment" means that certain Assignment of Agreements, Licenses, Permits and Contracts, dated as of March 21, 2019, by and from the BSA, as assignor, and JPM, as assignee, which secures the BSA's obligations under the 2010 Credit Agreement, the 2010 Bond Agreement, the 2012 Bond Agreement, and the 2019 RCF Agreement.

191. "Northern Tier Mortgage" means that certain Mortgage, Security Agreement, Assignment of Rents and Leases and Fixture Filing, dated as of March 21, 2019, by and from the BSA, as mortgagor, and JPM, as mortgagee, which secures the BSA's obligations under the 2010 Credit Agreement, the 2010 Bond Agreement, the 2012 Bond Agreement, and the 2019 RCF Agreement.

192. "Notice and Claims Agent" means Omni Agent Solutions, in its capacity as "claims and noticing agent" for the Debtors, and any successor thereto.

193. "Official Committees" means the Tort Claimants' Committee and the Creditors' Committee.

194. "Oil and Gas Interests" means those certain mineral or royalty interests owned by the BSA, consisting of approximately 1,027 properties located in Alabama, Arkansas, California, Florida, Georgia, Illinois, Louisiana, Michigan, Mississippi,

Nebraska, New Mexico, North Dakota, Oklahoma, Oregon, Texas, South Dakota and Wyoming.  The Oil and Gas Interests include those listed on <u>Schedule 4</u>.

195.  "<u>Opt-Out Chartered Organization Abuse Claims</u>" means any Abuse Claim against an Opt-Out Chartered Organization that is alleged to have occurred prior to the Petition Date (including prior to January 1, 1976) and to the extent that is covered under an insurance policy issued by a Settling Insurance Company.

196.  "<u>Opt-Out Chartered Organization</u>" means a Chartered Organization that is not a Contributing Chartered Organization or a Participating Chartered Organization because such Chartered Organization has (a) objected to confirmation of the Plan or (b) informed Debtors' counsel in writing on or before the confirmation objection deadline that it does not wish to make the Participating Chartered Organization Insurance Assignment.  For the avoidance of doubt, (i) Opt-Out Chartered Organizations shall receive the benefit of the Channeling Injunction applicable to Abuse Claims covered under any insurance policy issued by the Settling Insurance Companies and (ii) Opt–Out Chartered Organizations shall not be required to provide assignments and releases with respect to insurance policies issued directly to an Opt-Out Chartered Organization.  Notwithstanding the foregoing, with respect to any Chartered Organization that is a debtor in bankruptcy as of the Confirmation Date, such Chartered Organization shall be treated as an Opt-Out Chartered Organization and will only be treated as a Participating Chartered Organization if it advises the Debtors' counsel in writing that it wishes to make the Participating Chartered Organization Insurance Assignment, and, for the avoidance of doubt, absent such written advisement, none of such Chartered Organization's rights to or under the Abuse Insurance Policies shall be subject to the Participating Chartered Organization Insurance Assignment, <u>provided</u>, <u>however</u>, that Abuse Claims against such Chartered Organizations shall be subject to the injunction and release applicable to Opt-Out Chartered Organization Abuse Claims.  A list of Chartered Organizations that are debtors in bankruptcy as of the Confirmation Date is attached hereto as <u>Exhibit K</u>.  For the avoidance of doubt, Opt-Out Chartered Organizations, by definition, are not Participating Chartered Organizations, Limited Protected Parties, or Contributing Chartered Organizations. The term "Opt-Out Chartered Organization," on the one hand, and the terms "Participating Chartered Organizations," "Limited Protected Parties," and "Contributing Chartered Organizations," on the other than, are mutually exclusive.

197.  "<u>Other Priority Claim</u>" means any Claim against the Debtors that is entitled to priority in right of payment under section 507(a) of the Bankruptcy Code, other than an Administrative Expense Claim or a Priority Tax Claim.

198.  "<u>Other Secured Claim</u>" means any Secured Claim against the Debtors other than any 2010 Credit Facility Claim, 2019 RCF Claim, 2010 Bond Claim, or 2012 Bond Claim.

199.  "<u>Participating Chartered Organization</u>" means a Chartered Organization (other than a Contributing Chartered Organization, including the United Methodist Entities) that does not (a) object to confirmation of the Plan or (b) inform Debtors' counsel in writing on or before the confirmation objection deadline that it does not wish to make

the Participating Chartered Organization Insurance Assignment.[3]   Notwithstanding the foregoing, with respect to any Chartered Organization that is a debtor in bankruptcy as of the Confirmation Date, such Chartered Organization shall be a Participating Chartered Organization only if it advises Debtors' counsel in writing that it wishes to make the Participating Chartered Organization Insurance Assignment, and, for the avoidance of doubt, absent such written advisement, none of such Chartered Organization's rights to or under the Abuse Insurance Policies shall be subject to the Participating Chartered Organization Insurance Assignment.  A list of Chartered Organizations that are debtors in bankruptcy and whether they have advised the Debtors' counsel that they wish to make the Participating Chartered Organization Insurance Assignment, subject to approval in their bankruptcy cases is attached hereto as Exhibit K.

200.    "Participating Chartered Organization Insurance Action" means any Cause of Action of the Participating Chartered Organizations, or any of them, under the laws of any jurisdiction, against any Non-Settling Insurance Company, arising from or related to an Abuse Insurance Policy related to Abuse Claims that first occurred on or after January 1, 1976, including: (a) any such Non-Settling Insurance Company's failure to provide coverage or otherwise pay under an Abuse Insurance Policy; (b) the refusal of any Non-Settling Insurance Company to compromise and settle any Abuse Claim under or pursuant to any Abuse Insurance Policy; (c) the interpretation or enforcement of the terms of any Abuse Insurance Policy with respect to any Abuse Claim; (d) any conduct by any Non-Settling Insurance Company that could give rise to extra-contractual damages, or other wrongful conduct under applicable law; or (e) any right to receive proceeds held by such Participating Chartered Organization with respect to an Abuse Insurance Policy.  For the avoidance of doubt, no Cause of Action of the Participating Chartered Organizations, or any of them, against any Settling Insurance Company shall be deemed an Insurance Action, except for any Cause of Action arising from or related to an Insurance Settlement Agreement.

201.    "Participating Chartered Organization Insurance Assignment" means, subject to Article IX.A.3.j, any and all of the Participating Chartered Organizations' rights in and to (a) the Participating Chartered Organization Insurance Actions, (b) the Insurance Action Recoveries, (c) the Insurance Settlement Agreements and claims thereunder and proceeds thereof, (d) the Abuse Insurance Policies (but not the policies themselves) issued by Settling Insurance Companies, and (e) Settling Insurer Policy Rights.

202.    "Participating Chartered Organization Insurance Rights" has the meaning ascribed to such term in Article V.S.1.c.

203.    "Participating Chartered Organization Settlement Contribution" means:

a.    to the maximum extent permitted by applicable law, the Participating Chartered Organization Insurance Assignment;

---

[3]   See Article V.S.8 herein with respect to inclusion of Roman Catholic Entities as Participating Chartered Organizations.

b. to the extent of any rights, claims or interests not assigned to the Settlement Trust pursuant to the Participating Chartered Organization Insurance Assignment, the waiver and complete release of (i) each of the Participating Chartered Organization's rights, titles, privileges, interests, claims, demands or entitlements under the Settling Insurance Companies' Abuse Insurance Policies and any Settling Insurer Policy Rights; (ii) any Claim held by the Participating Chartered Organization that is attributable to, arises from, is based upon, relates to, or results from, in whole or part, directly, indirectly, or derivatively (including through any insurance policy issued by the Settling Insurance Companies), alleged Abuse Claims that occurred prior to the Petition Date against the Settlement Trust, the Debtors, Reorganized BSA, the Local Councils, any Contributing Chartered Organization or Settling Insurance Companies; and (iii) any and all Claims that have been asserted in the Chapter 11 Cases by or on behalf of any Participating Chartered Organization, including any Indirect Abuse Claims, without any further notice to or action, order, or approval of the Bankruptcy Court, which Claims shall be expunged from the Claims Register, and the agreement of each Participating Chartered Organization not to (a) file or assert any Claim or Claims against the Settlement Trust, the Debtors, or Reorganized BSA arising from any act or omission of the Debtors, the Local Councils, any Contributing Chartered Organization, or any Participating Chartered Organization on or prior to the Confirmation Date, (b) object to the Document Appendix and obligations thereunder, or (c) file or assert any rights or interests in any property transferred to the Settlement Trust under the Plan, including the proceeds of any settlements paid by a Settling Insurance Company; and

c. the assignment to the Settlement Trust of any and all Perpetrator Indemnification Claims held by the Participating Chartered Organizations.

204. "Pension Plan" means the Boy Scouts of America Retirement Plan for Employees, a single-employer, qualified, defined benefit pension plan that is subject to the Employee Retirement Income Security Act of 1974, as amended, and the Internal Revenue Code, of which BSA is the sponsor.

205. "Perpetrator" means any individual who personally committed or is alleged to have personally committed an act of Abuse that forms the basis for an Abuse Claim. The term "Perpetrator" does not include any individual who did not personally commit or is not alleged to have personally committed an act of Abuse that forms the basis for an Abuse Claim, against whom an Abuse Claim is nevertheless asserted or may be asserted, including by virtue of such individual's position or service as an employee or volunteer of the Debtors or as a Scout participant, or by virtue of such individual's position or service as an employee or volunteer of a Local Council or a Chartered Organization or as a Scout participant.

206. "Perpetrator Indemnification Claim" means a Claim against a Perpetrator for indemnification or contribution arising from or relating to an Abuse Claim.

App.049

207. "Person" has the meaning set forth in section 101(41) of the Bankruptcy Code."

208. "Petition Date" means February 18, 2020.

209. "Pfau/Zalkin" means the law firms of Pfau Cochran Verteris Amala PLLC and the Zalkin Law Firm, P.C.

210. "Philmont Assignment" means that certain Assignment of Agreements, Licenses, Permits and Contracts, dated as of March 21, 2019, by and from the BSA, as assignor, and JPM, as assignee, which secures the BSA's obligations under the 2010 Credit Agreement, the 2010 Bond Agreement, the 2012 Bond Agreement, and the 2019 RCF Agreement.

211. "Philmont Mortgage" means that certain Mortgage, Security Agreement, Assignment of Rents and Leases and Fixture Filing, dated as of March 21, 2019, by and from the BSA, as mortgagor, and JPM, as mortgagee, which secures the BSA's obligations under the 2010 Credit Agreement, the 2010 Bond Agreement, the 2012 Bond Agreement, and the 2019 RCF Agreement.

212. "Plan" means this *Third Modified Fifth Amended Plan of Reorganization (With Technical Modifications) for Boy Scouts of America and Delaware BSA, LLC* filed by the Debtors, as the same may be amended or modified from time to time pursuant to section 1127 of the Bankruptcy Code.

213. "Plan Documents" means, collectively, the Plan, the Disclosure Statement, the Disclosure Statement Order, each of the documents that comprises the Plan Supplement, and all of the exhibits and schedules attached to any of the foregoing. The Plan Documents shall be in form and substance acceptable to (a) the Debtors, the Ad Hoc Committee, the Coalition, the Tort Claimants' Committee, the Future Claimants' Representative, Hartford, the Century and Chubb Companies, Zurich Insurers and Zurich Affiliated Insurers, Clarendon, and any other Settling Insurance Companies all in accordance with their consent rights, and (b) the Creditors' Committee and JPM in accordance with their consent rights under the JPM / Creditors' Committee Term Sheet.

214. "Plan Supplement" means the compilation of documents and forms of documents, agreements, schedules, exhibits, and annexes to the Plan, which the Debtors shall file no later than fourteen (14) days before the Voting Deadline, unless otherwise ordered by the Bankruptcy Court, and additional documents filed with the Bankruptcy Court before the Effective Date as amendments, modifications or supplements to the Plan Supplement. The Plan Supplement will include the following: (a) the Amended BSA Bylaws; (b) the Assumed Contracts and Unexpired Leases Schedule; (c) the form of the BSA Settlement Trust Note; (d) the form of the Document Appendix; (e) the form of the DST Agreement; (f) the form of the DST Note; (g) the name of the Creditor Representative; (h) changes, if any, to Reorganized BSA's directors and officers; (i) the form of the Foundation Loan Agreement; (j) the form of agreement reflecting the terms of the Leaseback Requirement; (k) the Rejected Contracts and Unexpired Leases Schedule; (l)

37

the forms of the Restated 2010 Bond Documents; (m) the forms of the Restated 2012 Bond Documents; (n) the forms of the Restated Credit Facility Documents; (o) the form of the Restated Security Agreement; (p) the names of the initial members of the Settlement Trust Advisory Committee; (q) the form of releases to be executed by a holder of an Abuse Claim with respect to such Abuse Claim as a condition precedent to receiving any proceeds from the Settlement Trust as set forth in the Trust Distribution Procedures; and (r) actual or anticipated changes in Local Council Settlement Contributions; provided that the Plan Documents listed in clauses (b) and (k) of the foregoing sentence will be revised, in the Debtors' discretion, subject to Article VI, to account for any additional Executory Contracts or Unexpired Leases to be assumed or rejected in advance of the Confirmation Hearing. The Plan Supplement shall be served only on those parties that have requested notice in the Chapter 11 Cases pursuant to Bankruptcy Rule 2002 and any party in interest who requests in writing a copy from counsel to the Debtors. Once the Plan Supplement is filed, a copy will also be available for review on the Notice and Claims Agent's website free of charge at https://omniagentsolutions.com/BSA. The Plan Supplement shall be in form and substance reasonably acceptable to the Creditors' Committee, JPM, the Settling Insurance Companies, and the Contributing Chartered Organizations, as applicable.

215. "Post-1975 Chartered Organization Abuse Claims" means any Abuse Claim against a Participating Chartered Organization that relates to Abuse alleged to have first occurred on or after January 1, 1976.

216. "Post-Confirmation Interim Injunction" shall have the meaning ascribed to such term in Article X.D.

217. "Post-Effective Date Chartered Organization Settlement" shall have the meaning ascribed to such term in Article IV.J.

218. "Post-Effective Date Insurance Settlement" shall have the meaning ascribed to such term in Article IV.K.

219. "Postpetition Insurance Policies" means insurance policies issued by the Settling Insurance Companies to the Debtors or the Local Councils and effective on or after the Petition Date, but only to the extent of coverage for Claims and Causes of Action arising from acts or events that first took place after the Petition Date. For the avoidance of doubt, Postpetition Insurance Policies expressly exclude the right to seek coverage for Abuse Claims, including any settlements incorporated into the Plan or settlements entered into by the Settlement Trust.

220. "Pre-1976 Chartered Organization Abuse Claims" means any Abuse Claim that is alleged to have occurred prior to January 1, 1976 that is covered under an insurance policy issued by a Settling Insurance Company.

221. "Prepetition Century and Chubb Companies Claims" means all Claims and Causes of Action of the Debtors against certain of the Century and Chubb Companies including for payment of defense, indemnity costs, and any other potential damages allegedly owed as of the Petition Date.

222.    "Prepetition Debt and Security Documents" means, collectively, the 2010 Credit Facility Documents, the 2019 RCF Documents, the 2010 Bond Documents, the 2012 Bond Documents, the Prepetition Security Documents (2019), and the Prepetition Security Agreement (2020).

223.    "Prepetition Hartford Claims" means all Claims and Causes of Action, known or unknown, that have been or could be asserted by the Debtors or either of them against any Hartford Protected Party for payment of defense and indemnity costs allegedly owed as of the Petition Date.

224.    "Prepetition Security Agreement (2019)" means that certain Third Amended and Restated Security Agreement, dated as of March 21, 2019, by and among the BSA and Arrow, as debtors, JPM, in its capacity as collateral agent, JPM, in its capacity as the lender under each of the 2010 Credit Agreement and the 2019 RCF Agreement, and as holder under each of the 2010 Bond Agreement and the 2012 Bond Agreement.

225.    "Prepetition Security Agreement (2020)" means that certain Consent and Security Agreement dated as of February 3, 2020, by and among Delaware BSA, the BSA, JPM, as collateral agent, and JPM, in its capacity as the lender under the 2010 Credit Agreement and the 2019 RCF Agreement, and as holder under the 2010 Bond Agreement and the 2012 Bond Agreement.

226.    "Prepetition Security Documents (2019)" means, collectively, the Prepetition Security Agreement (2019), the Florida Sea Base Mortgage, the Florida Sea Base Assignment, the Headquarters Deed of Trust, the Headquarters Assignment, the Northern Tier Mortgage, the Northern Tier Assignment, the Philmont Mortgage, the Philmont Assignment, and the Arrow Collateral Assignment.

227.    "Priority Tax Claim" means any Claim of a Governmental Unit against the Debtors that is entitled to priority in payment under section 507(a)(8) of the Bankruptcy Code.

228.    "Privileged Information" means any privileged information that relates, in whole or in part, to any Abuse Claim, including: (a) the Debtors' books and records transferred to the Settlement Trust in accordance with the Document Appendix; (b) any privileged information containing a factual or legal analysis or review of any Abuse Claim; (c) any privileged information evaluating the reasonableness, effectiveness, or Confirmability of the Plan or any other chapter 11 plan filed or that could be filed in the Chapter 11 Cases; (d) any privileged information exchanged by the Debtors or their professionals, on the one hand, and any of the Related Non-Debtor Entities, Local Councils, the Ad Hoc Committee, either Official Committee, the Future Claimants' Representative, or their respective Representatives, on the other hand, related to the Plan, the Plan Documents, or the Abuse Claims; and (e) information shared pursuant to that certain Joint Defense, Common Interest, and Confidentiality Agreement among the BSA, the Ad Hoc Committee, and each Local Council that executed a joinder to said agreement that was acknowledged in writing by the BSA and the Ad Hoc Committee; (f) any privileged information containing a factual or legal analysis of the Debtors' potential

exposure in connection with any Abuse Claim or any litigation related thereto; and (g) any Common-Interest Communications with Insurers.

229.   "Pro Rata" means, at any time, with respect to any Claim, the proportion that the amount of such Claim in a particular Class or group of Classes bears to the aggregate amount of all Claims (including Disputed Claims) in such Class or group of Classes, unless in each case the Plan provides otherwise.

230.   "Pro Rata Share" means the proportion that an Allowed Claim in a particular Class bears to the aggregate amount of all Allowed Claims in that Class.

231.   "Professional" means any Person retained by the Debtors, the Tort Claimants' Committee, the Creditors' Committee, or the Future Claimants' Representative pursuant to a Final Order of the Bankruptcy Court entered under sections 327, 328, 363, or 1103 of the Bankruptcy Code.

232.   "Professional Fee Claim" means any Claim of a Professional or other Person for Allowance by the Bankruptcy Court and payment by the Debtors of compensation for services rendered and/or reimbursement of costs or expenses incurred in the Chapter 11 Cases for the period from the Petition Date to and including the Effective Date under sections 328, 330, 331, or 503(b) of the Bankruptcy Code, including a Claim for reimbursement and/or payment of Coalition Restructuring Expenses under Article V.T.

233.   "Professional Fee Reserve" means a segregated account funded from Unrestricted Cash and Investments on hand of the Debtors as of the Effective Date in an amount equal to the Professional Fee Reserve Amount as of such date, solely for the purpose of paying all Allowed Professional Fee Claims.

234.   "Professional Fee Reserve Amount" means the aggregate Accrued Professional Fees as of the Effective Date, as estimated by the Professionals in accordance with Article II.A.2.

235.   "Proof of Claim" means any proof of claim filed with the Bankruptcy Court or the Notice and Claims Agent pursuant to section 501 of the Bankruptcy Code and Bankruptcy Rules 3001 or 3002 that asserts a Claim against either of the Debtors.

236.   "Protected Parties" means the following Persons: (a) the Debtors; (b) Reorganized BSA; (c) the Related Non-Debtor Entities; (d) the Local Councils; (e) the Contributing Chartered Organizations; (f) the Settling Insurance Companies; and (g) all of such Persons' Representatives; provided, however, that no Perpetrator is or shall be a Protected Party.  Notwithstanding the foregoing, a Contributing Chartered Organization shall be a Protected Party with respect to Abuse Claims only as set forth in the definition of "Abuse Claim."

237.   "Quarterly Fees" means all fees due and payable pursuant to section 1930(a)(6) of title 28 of the United States Code.

238. "Reinstatement" means (a) leaving unaltered the legal, equitable and contractual rights to which a Claim entitles the holder of such Claim or (b) notwithstanding any contractual provision or applicable law that entitles the holder of such Claim to demand or receive accelerated payment of such Claim after the occurrence of a default, (i) curing any such default that occurred before or after the Petition Date, other than a default of a kind specified in section 365(b)(2) of the Bankruptcy Code; (ii) reinstating the maturity of such Claim as such maturity existed before such default; (iii) compensating the holder of such Claim for any damages incurred as a result of any reasonable reliance by such holder on such contractual provision or such applicable law; (iv) if such Claim arises from any failure to perform a nonmonetary obligation, compensating the holder of such Claim (other than the Debtors or an "insider" of the Debtors within the meaning of section 101(31) of the Bankruptcy Code) for any actual pecuniary loss incurred by such holder as the result of such failure; and (v) not otherwise altering the legal, equitable or contractual rights to which such Claim entitles the holder thereof. "Reinstated" has a correlative meaning.

239. "Rejected Contracts and Unexpired Leases Schedule" means the schedule of Executory Contracts or Unexpired Leases to be rejected by the BSA under the Plan, as set forth in the Plan Supplement, as may be amended, modified, or supplemented from time to time.

240. "Rejection Damages Claim" means a Claim for damages alleged to arise from the rejection of an Executory Contract or Unexpired Lease pursuant to section 365 or 1123 of the Bankruptcy Code.

241. "Related Non-Debtor Entities" means the Entities listed on Exhibit H, including non-debtor Affiliates of the Debtors that are directly or indirectly wholly owned by, or subject to the control of, the BSA. For the avoidance of doubt, Related Non-Debtor Entities do not include Local Councils or Chartered Organizations.

242. "Release Injunctions" means the injunctions described in Article X.L.

243. "Rejection Damages Bar Date" has the meaning ascribed to such term in Article VI.B.

244. "Release Date" means the date on which the Confirmation Order becomes a Final Order or, when such term is used with respect to any Insurance Settlement Agreement with a Settling Insurance Company, the term "Release Date" shall have the meaning ascribed to such term in the applicable Insurance Settlement Agreement.

245. "Released Parties" means, collectively, the following Persons, in each case in its or their respective capacities as such: (a) the Debtors; (b) Reorganized BSA; (c) the Related Non-Debtor Entities; (d) the Creditors' Committee; (e) the members of the Creditors' Committee in their capacities as such; (f) the Tort Claimants' Committee; (g) the members of the Tort Claimants' Committee in their capacities as such; (h) the Future Claimants' Representative; (i) the Coalition; (j) JPM; (k) the Settling Insurance Companies; (l) the Contributing Chartered Organizations, including the United Methodist Entities; (m) the Foundation, in its capacity as lender under the Foundation Loan

Agreement; (n) the Ad Hoc Committee; (o) the members of the Ad Hoc Committee in their capacities as such; (p) the Mediators; and (q) all of such Persons' Representatives; provided, however, that no Perpetrator is or shall be a Released Party; provided further, that the definition of "Released Parties" shall in all instances be subject to Article X.J.

246.    "Releases" means the releases set forth in Article X.J.

247.    "Releasing Claim Holder" means, collectively, (a) all holders of Claims that vote to accept the Plan and do not opt out of the releases set forth in Article X.J.4; (b) all holders of Claims that are presumed to accept the Plan, except for holders of such Claims that file a timely objection to the releases set forth in Article X.J.4; and (c) all holders of Claims entitled to vote on the Plan and who vote against the Plan and do not opt out of the releases set forth in Article X.J.4. No holder of a Claim in a Class that is Impaired under the Plan will be deemed a "Releasing Claim Holder" to the extent such holder abstained from voting.

248.    "Reorganized BSA" means the BSA and, as applicable, Delaware BSA, as reorganized pursuant to and under the Plan on or after the Effective Date.

249.    "Representatives" means, with respect to any Person, such Person's (a) predecessors, successors, assigns, subsidiaries, and Affiliates, (b) current and former officers, directors, principals, equity holders, trustees, members, partners, managers, officials, board members, advisory board members, employees, agents, volunteers, attorneys, financial advisors, accountants, investment bankers, consultants, representatives, and other professionals, and (c) respective heirs, executors, estates, and nominees, in each case solely in its capacity as such.

250.    "Restated 2010 Bond Documents" means those certain restated bond documents, including a restated revenue bond, bond purchase agreement, promissory note, security agreement, and all documentation executed and delivered in connection therewith, in each case containing substantially the same terms as the 2010 Bond Documents except that: (a) the amortization schedule attached to the 2010 Bond shall be amended and restated such that (i) interest is payable in monthly installments (at the same rates in the 2010 Bond Documents) beginning on the date that is one month after the Effective Date (as to be specified in the Restated 2010 Bond Documents) and ending on the Restated Maturity Date, and (ii) principal is payable in monthly installments (in the same monthly amounts as the periodic amortization amounts in the 2010 Bond Documents) beginning on the date that is two years after the Effective Date (as to be specified in the Restated 2010 Bond Documents) and ending on the Restated Maturity Date; and (b) the Restated 2010 Bond Documents shall be guaranteed by Arrow. The covenants in the Restated 2010 Bond Documents shall be in form and substance acceptable to JPM and the BSA. The obligations under the Restated 2010 Bond Documents shall be secured by the Restated Security Agreement. The then-current forms of the Restated 2010 Bond Documents shall be filed with the Plan Supplement.

251.    "Restated 2012 Bond Documents" means those certain restated bond documents, including a restated revenue bond, bond purchase agreement, promissory note,

security agreement, and all documentation executed and delivered in connection therewith, in each case containing substantially the same terms as the 2012 Bond Documents except that: (a) the amortization schedule attached to the 2012 Bond shall be amended and restated such that (i) interest is payable in monthly installments (at the same rates in the 2012 Bond Documents) beginning on the date that is one month after the Effective Date (as to be specified in the Restated 2012 Bond Documents) and ending on the Restated Maturity Date, and (ii) principal is payable in monthly installments (in the same monthly amounts as the periodic amortization amounts in the 2012 Bond Documents) beginning on the date that is two years after the Effective Date (as to be specified in the Restated 2012 Bond Documents) and ending on the Restated Maturity Date; and (b) the Restated 2012 Bond Documents shall be guaranteed by Arrow. The covenants in the Restated 2012 Bond Documents shall be in form and substance acceptable to JPM and the BSA. The obligations under the Restated 2012 Bond Documents shall be secured by the Restated Security Agreement. The then-current forms of the Restated 2012 Bond Documents shall be filed with the Plan Supplement.

252.    "Restated Credit Facility Documents" means those certain restated credit facility documents, which shall contain substantially the same terms as the 2010 Credit Facility Documents and the 2019 RCF Documents, as applicable to the 2010 Credit Facility Claims and the 2019 RCF Claims, except that: (a) the revolving credit facilities provided under the 2010 Credit Facility Documents and the 2019 RCF Documents shall be frozen and converted to term loans; (b) the Revolving Maturity Date and the Term Loan Maturity Date (each as defined in the 2010 Credit Facility Documents) and the Maturity Date (as defined in the 2019 RCF Documents) shall be extended to the Restated Maturity Date; (c) interest is payable in quarterly installments (at the same rates in the applicable Prepetition Debt and Security Documents) beginning on the date that is three months after the Effective Date (as to be specified in the Restated Credit Facility Documents) and ending on the Restated Maturity Date; (d) principal is payable in quarterly installments (at 1/40th of the outstanding balance on the Effective Date) beginning on the date that is two years after the Effective Date (as to be specified in the Restated Credit Facility Documents) and ending on the Restated Maturity Date; and (e) the Restated Credit Facility Documents shall be guaranteed by Arrow. The covenants in the Restated Credit Facility Documents shall be in form and substance acceptable to JPM and the BSA. The obligations under the Restated Credit Facility Documents shall be secured by the Restated Security Agreement. The then-current forms of the Restated Credit Facility Documents shall be filed with the Plan Supplement.

253.    "Restated Debt and Security Documents" means, collectively, the Restated 2010 Bond Documents, the Restated 2012 Bond Documents, the Restated Credit Facility Documents, and the Restated Security Agreement. The Restated Debt and Security Documents shall be on terms acceptable to JPM and the BSA, and reasonably acceptable to the Creditors' Committee.

254.    "Restated Maturity Date" means the maturity date applicable to each of the Restated Debt and Security Documents in accordance with the terms thereof, which shall in each case be the date that is ten (10) years after the Effective Date.

255.   "Restated Security Agreement" means that certain restated security agreement, pursuant to which Reorganized BSA and Arrow shall grant blanket first-priority liens on and security interests in all of Reorganized BSA's and Arrow's assets, including all collateral secured by the Prepetition Security Documents (2019), to JPM to secure Reorganized BSA's and Arrow's obligations under the Restated 2010 Bond Documents, the Restated 2012 Bond Documents and the Restated Credit Facility Documents. The then-current form of the Restated Security Agreement shall be filed with the Plan Supplement.

256.   "Restoration Plan" means the Boy Scouts of America Retirement Benefit Restoration Plan, a non-qualified defined benefit retirement plan under section 457(f) of the Internal Revenue Code, which provides supplemental retirement benefits to certain current and former employees of the Debtors or Local Councils.

257.   "Roman Catholic Entities" means each and every (i) Roman Catholic parish, school, diocese, archdiocese, association of religious or lay Persons in the United States or its territories that sponsored, promoted, hosted, was involved with, or provided any support in connection with Scouting activities in any way, including as a social service organization, ministry, camping ministry, or by the use of a camp facility, camp, retreat, or other facilities in connection with Scouting activities, regardless of whether any of the foregoing entities is or was a Chartered Organization at any time or whether such facilities were owned or leased by any of such entities or a third party; (ii) all entities listed or eligible to be listed in the Official Catholic Directory since January 1910, (iii) all Representatives of the foregoing, including their attorneys, any affiliates and the RCAHC. However, no Perpetrator is or shall be a Roman Catholic Entity.[4]

258.   "Roman Catholic Settlement" has the meaning ascribed to such term in Exhibit J.

259.   "Roman Catholic Settlement Agreement" means that certain settlement agreement by and between the Roman Catholic ad hoc committee, the Debtors, Century Indemnity Company, Westchester Fire Insurance Company & Federal Insurance Company, the Ad Hoc Committee, the Coalition, and the Future Claimants' Representative appended to the *Twelfth Mediator's Report* [D.I. 9387] filed on March 17, 2022.

260.   "Schedules" means, with respect to each Debtor, the schedules of assets and liabilities and the statement of financial affairs filed by such Debtor with the Bankruptcy Court pursuant to sections 521 and 1106(a)(2) of the Bankruptcy Code and Bankruptcy Rule 1007, as such schedules and statements may be amended or supplemented from time to time prior to the Effective Date.

261.   "Scouting" means any and all programs, activities and services of any kind in any way, directly or indirectly, associated with, arising from or related to the BSA or the

---

[4]   The channeling injunction and releases provided to the Chartered Organizations not affiliated with the Roman Catholic Church (including other faith-based institutions) and their related entities shall be consistent with the foregoing scope.

BSA's, any Local Council's, any Related Non-Debtor Entity's, or any Chartered Organization's (including their personnel and their affiliates') participation in, involvement in, or sponsorship of, any units or programs offered or previously offered pursuant to the charter of the BSA, including activities such as formal or informal scout meetings, troop activities, jamborees, or interactions of any kind between scouts and other scouts or scout leaders in their capacities as such.

262. "Scouting-related" means anything that is attributable to, arises from, is based upon, results from, or relates to, in whole or in part, directly, indirectly, or derivatively, Scouting.

263. "Scouting Released Claims" has the meaning ascribed to such term in Article X.J.

264. "Scouting University" means that certain parcel of real property owned by the BSA located at 1301 Solana Boulevard, Westlake, Texas 76262, together with the buildings, structures, fixtures, additions, enlargements, extensions, modifications, repairs, replacements and other improvements now or hereafter located thereon, the sale of which was approved pursuant to the *Order, Pursuant to Section 363 of the Bankruptcy Code, Authorizing the Sale of Certain Real Property Located in Westlake Texas*, entered by the Bankruptcy Court on June 14, 2021 at Docket No. 5326.

265. "Secured" means, with respect to any Claim, the extent to which the Claim is: (a) secured by a Lien on property of a Debtor's Estate (i) as set forth in the Plan, (ii) as agreed to by the holder of such Claim and the Debtors, or (iii) as determined by a Final Order in accordance with section 506(a) of the Bankruptcy Code; or (b) subject to any setoff right of the holder of such Claim under section 553 of the Bankruptcy Code, but, with respect to both of the foregoing clauses (a) and (b), only to the extent of the value of the interest of such holder in the Estate's interest in the property securing such Claim or the amount subject to setoff, as applicable.

266. "Settlement of Restricted and Core Asset Disputes" has the meaning ascribed to such term in Article V.S.3.

267. "Settlement Growth Payment" means an annual variable payment by Reorganized BSA, commencing the year after the BSA Settlement Trust Note is paid in full and Reorganized BSA's total outstanding debt under the 2010 Bond Documents, 2010 Credit Facility Documents, 2012 Bond Documents, and 2019 RCF Documents or their replacement and the Foundation Loan is less than $225 million in aggregate, based on growth in membership up to the Settlement Growth Payment Cap. Reorganized BSA's obligation to fund the Settlement Growth Payment shall cease upon the earlier of (a) January 1, 2036 or (b) the cumulative payment in Cash in an amount equal to the Settlement Growth Payment Cap. The Local Councils will reimburse Reorganized BSA for 25% of the amount paid to the Settlement Trust pursuant to the Settlement Growth Payment, with the amount to be assessed by Reorganized BSA to the Local Councils based on their share of membership growth. The Settlement Growth Payment will be calculated as (a) 50% of $72 per paid youth member in Scouts BSA or Cubs Scouts at each year-end in excess of

1,500,000 members and (b) 50% of $45 per paid adult volunteer in Scouts BSA or Cubs Scouts at each year-end in excess of 500,000 volunteers. Calculation of the Settlement Growth Payment will be performed based on year-end membership numbers with a report on the calculations provided by the BSA to the Settlement Trust within 60 days of year-end and payment made within 90 days of year-end. Based on a 5.5% annual growth rate of BSA youth members and adult volunteers, the above Settlement Growth Payment will result in an additional $100 million being contributed to the Settlement Trust by the end of 2036.

268. "Settlement Growth Payment Cap" shall mean the cap of $100 million for the Settlement Growth Payment.

269. "Settlement Trust" means the trust organized under the laws of the state of Delaware and established under Article IV and the Settlement Trust Agreement for the purposes set forth therein, including assuming liability for all Abuse Claims, holding, preserving, maximizing, and administering the Settlement Trust Assets, and directing the processing, liquidation and payment of all compensable Abuse Claims in accordance with the Settlement Trust Documents.

270. "Settlement Trust Advisory Committee" or "STAC" means the committee serving in accordance with Article IV and the Settlement Trust Agreement, which shall have the powers, duties and obligations set forth in the applicable Settlement Trust Agreement. The initial members of the Settlement Trust Advisory Committee shall be identified in the Plan Supplement.

271. "Settlement Trust Agreement" means the Settlement Trust Agreement dated as of the Effective Date, substantially in the form attached hereto as Exhibit B, as the same may be amended or modified from time to time in accordance with the terms thereof, which shall be in form and substance acceptable to (a) the Debtors, the Ad Hoc Committee, the Coalition, the Future Claimants' Representative, and the Tort Claimants' Committee and (b) the Creditors' Committee with respect to the treatment of Non-Abuse Litigation Claims.

272. "Settlement Trust Assets" means the following assets and any income, profits and proceeds realized, received or derived from such assets subsequent to the transfer of such assets to the Settlement Trust:

a. the BSA Settlement Trust Contribution;

b. the Local Council Settlement Contribution;

c. the Chartered Organization Contribution, including the Supplemental LC Contribution, and the Settlement Growth Payment;

d. the Contributing Chartered Organization Settlement Contribution, including the United Methodist Settlement Contribution;

e. the Participating Chartered Organization Settlement Contribution; and

f.      any and all funds, proceeds or other consideration contributed to the Settlement Trust under the terms of any Insurance Settlement Agreement; and

g.      any rights, claims, or assets of a holder of a Direct Abuse Claim that is assigned to the Settlement Trust pursuant to the terms of the Trust Distributions Procedures and Settlement Trust Agreement.

273.    "Settlement Trust Causes of Action" means any Estate Cause of Action and any Cause of Action held by any Local Council or other Person that is or becomes a Protected Party or a Limited Protected Party, which Estate Cause of Action or other such Cause of Action, as applicable, is not otherwise expressly released under the Plan or the Plan Documents, in each case solely attributable to: (a) all defenses to any Abuse Claim, including all defenses under section 502 of the Bankruptcy Code; (b) with respect to Abuse Claims, all rights of setoff, recoupment, contribution, reimbursement, subrogation or indemnity (as those terms are defined by the non-bankruptcy law of any relevant jurisdiction) and any other indirect claim of any kind whatsoever, whenever and wherever arising or asserted; (c) any other Causes of Action with respect to Abuse Claims that either Debtor, any Related Non-Debtor Entity, any Local Council or any other Protected Party or Limited Protected Party would have had under applicable law if the Chapter 11 Cases had not occurred and the holder of such Abuse Claim had asserted such Cause of Action by initiating civil litigation against either Debtor, any Related Non-Debtor Entity, any Local Council or any other Protected Party or Limited Protected Party (including any Causes of Action against co-defendants); and (d) any Cause of Action of either Debtor, any Related Non-Debtor Entity, any Local Council or any other Protected Party or Limited Protected Party, under the laws of any jurisdiction, for reimbursement, indemnity, contribution, breach of contract, or otherwise arising from or relating to any payments made by either Debtor, any Related Non-Debtor Entity, any Local Council or any other Protected Party or Limited Protected Party on account of Abuse Claims on or before the Effective Date. For the avoidance of doubt, Settlement Trust Causes of Action shall not include any claim or Cause of Action by any Settling Insurance Company against its reinsurers or retrocessionaires, in their capacities as such.

274.    "Settlement Trust Documents" means, collectively, (a) the Settlement Trust Agreement, (b) the Trust Distribution Procedures, (c) the Document Appendix, (d) the Confirmation Order, and (e) any other agreements, instruments and documents governing the establishment, administration and operation of the Settlement Trust, which shall be substantially in the forms set forth as exhibits hereto or in the Plan Supplement, as the same may be amended or modified from time to time in accordance with the terms thereof.

275.    "Settlement Trust Expenses" means any liabilities, costs, or expenses of, or imposed upon, or in respect of, the Settlement Trust once established (except for payments to holders of Abuse Claims on account of such Claims). Settlement Trust Expenses shall also expressly include: (a) any and all liabilities, costs, and expenses incurred subsequent to the Effective Date in connection with the Settlement Trust Assets (including the prosecution of any Settlement Trust Causes of Action and Insurance Actions), in each case whether or not any such action results in a recovery for the Settlement Trust; (b) the reasonable documented costs and expenses incurred by Reorganized BSA, the Related

Non-Debtor Entities, the Local Councils, the Ad Hoc Committee, or the Contributing Chartered Organizations in taking any action on behalf of or at the direction of the Settlement Trust, if any, following such Entities' transfer to the Settlement Trust of copies of all records and documents in their possession, custody or control pertaining to Abuse Claims in accordance with the Document Appendix; and (c) reasonable, documented and contractual professional or advisory fees incurred by the Coalition for up to thirty (30) days after the Effective Date in connection with the initial effectuation of the Plan and the Settlement Trust.

276. "Settlement Trustee" means the initial trustee disclosed in a notice filed on the docket of these Chapter 11 Cases by February 18, 2022, or any successor trustee who may subsequently be appointed pursuant to the terms of the Settlement Trust Agreement.

277. "Settling Insurance Company" means any Insurance Company that contributes funds, proceeds or other consideration to or for the benefit of the Settlement Trust pursuant to an Insurance Settlement Agreement that is approved by (a) an order of the Bankruptcy Court (including the Confirmation Order) and is designated as a Settling Insurance Company in the Confirmation Order or the Affirmation Order or (b) the Settlement Trust. Without limiting the foregoing, subject to Confirmation of the Plan and approval of the applicable Insurance Settlement Agreement by an order or orders of the Bankruptcy Court (including in the Confirmation Order), Century, the Chubb Companies, Clarendon, the Hartford Protected Parties, the Zurich Affiliated Insurers and the Zurich Insurers are each Settling Insurance Companies and shall be designated as such in the Confirmation Order and the Affirmation Order.

278. "Settling Insurer Policy Rights" means any and all of the Participating Chartered Organizations' and Contributing Chartered Organizations' rights, titles, privileges, interests, claims, demands or entitlements, as of the Effective Date, to any proceeds, payments, benefits, Causes of Action, choses in action, defense, or indemnity, now existing or hereafter arising, accrued or unaccrued, liquidated or unliquidated, matured or unmatured, disputed or undisputed, fixed or contingent, arising under or attributable to any insurance policies issued by a Settling Insurance Company that cover Abuse Claims with respect to such coverage for Abuse Claims, including the types of claims listed in the definition of Insurance Actions.

279. "Specified Insurance Policy" means any BSA Insurance Policy with an inception date of March 1, 2013 to the present, except for (a) the excess liability policy issued to the BSA by Navigators Specialty Insurance Company for the period from March 1, 2013 to February 28, 2014, and (b) the excess liability insurance policy issued to the BSA by Westchester Fire Insurance Company and Westchester Surplus Lines for the period from March 1, 2013 to February 28, 2019.

280. "Specified Primary Insurance Policy" means any Specified Insurance Policy that is a primary Abuse Insurance Policy. Specified Primary Insurance Policies include primary Abuse Insurance Policies issued by Old Republic Insurance Company for the periods of coverage between March 1, 2013 and February 28, 2019, and by Evanston

Insurance Company for the period of coverage between March 1, 2019 and February 29, 2020, subject to the definition of Postpetition Insurance Policies.

281.   "Specified Excess Insurance Policy" means any Specified Insurance Policy that is an umbrella or excess Abuse Insurance Policy.

282.   "Summit Bechtel Reserve" means the parcels of real property that comprise the Summit Bechtel Family National Scout Reserve, together with the buildings, structures, fixtures, additions, enlargements, extensions, modifications, repairs, replacements and other improvements now or hereafter located thereon.

283.   "Supplemental LC Contribution" means the LC Overage and DST Note Increase.

284.   "TCJC" means The Church of Jesus Christ of Latter-day Saints, a Utah corporation sole, including any affiliates or personnel.

285.   [Reserved]

286.   [Reserved]

287.   [Reserved]

288.   "Tort Claimants' Committee" means the official committee of tort claimants, consisting of survivors of childhood sexual abuse, appointed by the United States Trustee in the Chapter 11 Cases under section 1102(a) of the Bankruptcy Code.

289.   "Trust Distribution Procedures" means the Boy Scouts of America Trust Distribution Procedures for Abuse Claims, substantially in the form attached hereto as Exhibit A, as the same may be amended or modified from time to time in accordance with the terms thereof, which shall be acceptable to (a) the Debtors, the Ad Hoc Committee, the Coalition, the Tort Claimants' Committee, and the Future Claimants' Representative and (b) the Creditors' Committee with respect to the treatment of Non-Abuse Litigation Claims.

290.   "Unexpired Lease" means a lease to which BSA is a party, including any and all pre- and post-petition amendments thereto, that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

291.   "Unimpaired" means any Claim that is not Impaired, including any Claim that is Reinstated.

292.   "United Methodist Entities" means each and every (i) United Methodist local church, federated, or union church, including any Federated Church or Union Church that includes a historically United Methodist Church congregation, that sponsored, promoted, hosted, or provided any support in connection with Scouting activities, regardless of whether such local, union, or federated church is or was a Chartered Organization at any time; (ii) church currently federated or yoked, and which current

49

federated or yoked church includes a current or former United Methodist Church congregation that sponsored, promoted, hosted or provided any support in connection with Scouting activities; (iii) other United Methodist related or affiliated organizations that sponsored, promoted, hosted, or provided any support in connection with Scouting activities, including any social service organization, ministry, camping ministry, camp facility, camp, retreat, or other facilities in the nature of a camp or retreat; (iv) any camp, retreat, or other facility in the nature of a camp or retreat that is not United Methodist related or affiliated, but otherwise promoted, hosted, or provided any support in connection with Scouting Activities for an entity described in (i), (ii) or (iii); (v) all organizations affiliated or related to (i) (ii), (iii) or (iv) including, but not limited to, the United Methodist ad hoc committee, each district, annual conference, and jurisdictional conference of The United Methodist Church, the general, annual conference, district, local church agencies of The United Methodist Church, the Council of Bishops of The United Methodist Church, and the non-jural bodies commonly referred to as "The United Methodist Church," the "Judicial Council of The United Methodist Church," and the "General Conference of The United Methodist Church"; and (vi) all Representatives of the foregoing. However, no Perpetrator is or shall be a United Methodist Entity.

293. "United Methodist Settlement Contribution" shall mean the "United Methodist Settlement Amount" as defined in the United Methodist Settlement Agreement, which is equal to Thirty Million Dollars ($30,000,000).

294. "United Methodist Settlement" has the meaning ascribed to such term in Exhibit J.

295. "United Methodist Settlement Agreement" means that certain term sheet by and between the United Methodist ad hoc committee, the Debtors, the Ad Hoc Committee, the Coalition, the Future Claimants' Representative, and certain state court counsel to holders of Direct Abuse Claims, appended to the *Eighth Mediators' Report* [D.I. 7884] filed on December 21, 2021 and the Addendum to United Methodist Term Sheet, filed on February 18, 2022 [D.I. 8907-4]. The United Methodist Settlement Agreement has been filed on the docket of the Chapter 11 Cases [D.I. 8907-4] and attached hereto as Exhibit J-2.

296. "United States Trustee" means the Office of the United States Trustee for the District of Delaware.

297. "Unrestricted Cash and Investments" means all Cash and balance sheet investments owned by the Debtors as of the date that is immediately prior to the Effective Date, inclusive of the proceeds of the sale of Scouting University and the Warehouse and Distribution Center, if the sale of the Warehouse and Distribution Center is closed prior to the Effective Date, that are not subject to legally enforceable restrictions requiring the use or disposition of such assets for a particular purpose.

298. "Volunteer Screening Database" is the database established and maintained by the BSA to, among other things, track and remove from Scouting volunteer leaders

suspected of having acted in an inappropriate sexual manner with youth participants in Scouting.

299.   "Voting Deadline" means the date by which all Persons entitled to vote on the Plan must vote to accept or reject the Plan.

300.   "Voting Procedures" means those certain procedures and supplemental procedures approved by the Bankruptcy Court for soliciting and tabulating the votes to accept or reject the Plan cast by holders of Claims against the Debtors entitled to vote on the Plan. The Voting Procedures shall be in form and substance reasonably acceptable to the Creditors' Committee as they pertain to Convenience Claims, General Unsecured Claims and Non-Abuse Litigation Claims.

301.   "Warehouse and Distribution Center" means that certain parcel of real property owned by the BSA located at 2109 Westinghouse Boulevard, Charlotte, North Carolina 28269, together with the buildings, structures, fixtures, additions, enlargements, extensions, modifications, repairs, replacements and other improvements now or hereafter located thereon.

302.   "Workers' Compensation Program" means the Debtors' (a) written contracts, agreements, agreements of indemnity, in each case relating to workers' compensation, (b) self-insured workers' compensation bonds, policies, programs, and plans for workers' compensation and (c) workers' compensation insurance issued to or entered into at any time by any of the Debtors.

303.   "Youth Member" means a youth member of the BSA registered as of December 31 of any applicable year in a core program (Cub Scouts, Scouts BSA (in each case under age 18), Sea Scouts, Venturing, or Exploring (in each case under age 21)), whose registration is current as of such date and who has paid the individual annual registration fee (which fee has not been refunded in whole or in part).

304.   "Zurich Affiliated Insurers" means all Zurich North America-affiliated underwriting companies and includes, without limitation, Zurich Insurers and Maryland Casualty Company, American General Fire & Casualty Company, and Zurich American Insurance Company, but only with respect to policies issued on or after January 1, 1987. A list of Zurich North America-affiliated underwriting companies is attached to the Zurich Insurance Settlement Agreement. Zurich Insurers, Zurich Affiliated Insurers, and their Representatives and Released Parties (as defined herein) shall not include such Persons and Entities in their capacities as contractual obligors under: (i) Non-Abuse Insurance Policies (including but not limited to D&O Liability Insurance Policies) except to the extent of a request for coverage and/or any Claims or Causes of Action related to, arising from, or in connection with Abuse Claims, any actions, settlements entered into, omissions, or positions taken in connection with the Debtors' Chapter 11 Cases and related proceedings, and any extra-contractual claims related to, arising from, or connected with actions or omissions occurring prior to the Effective Date, including the Zurich Insurers' and Zurich Affiliated Insurers' performance of their obligations under such policies whether for defense, settlement of claims, or otherwise, and (ii) Postpetition Insurance Policies, except

for any Claims or Causes of Action related to, arising from, or in connection with any actions, settlements entered into, omissions, or positions taken in connection with the Debtors' Chapter 11 Cases and related proceedings, and any extra-contractual claims related to, arising from, or connected with actions or omissions occurring prior to the Effective Date, including the Zurich Insurers' and Zurich Affiliated Insurers' performance of their obligations under such policies whether for defense, settlement of claims, or otherwise.

305.   "Zurich Insurers" means American Zurich Insurance Company, American Guarantee & Liability Insurance Company, and Steadfast Insurance Company; provided that the term "Zurich Insurers" shall not include such Persons and Entities in their capacities as contractual obligors under: (i) Non-Abuse Insurance Policies (including but not limited to D&O Liability Insurance Policies) except to the extent of a request for coverage and/or any Claims or Causes of Action related to, arising from, or in connection with Abuse Claims, any actions, settlements entered into, omissions, or positions taken in connection with the Debtors' Chapter 11 Cases and related proceedings, and any extra-contractual claims related to, arising from, or connected with actions or omissions occurring prior to the Effective Date, including the Zurich Insurers' performance of their obligations under such policies whether for defense, settlement of claims, or otherwise, and (ii) Postpetition Insurance Policies, except for any Claims or Causes of Action related to, arising from, or in connection with any actions, settlements entered into, omissions, or positions taken in connection with the Debtors' Chapter 11 Cases and related proceedings, and any extra-contractual claims related to, arising from, or connected with actions or omissions occurring prior to the Effective Date, including the Zurich Insurers' performance of their obligations under such policies whether for defense, settlement of claims, or otherwise.

306.   "Zurich Insurance Settlement" has the meaning ascribed to such term in Exhibit I.

307.   "Zurich Insurance Settlement Agreement" means that certain settlement agreement by and between the Zurich Insurers, the Debtors, the Ad Hoc Committee, the Coalition, and the Future Claimants' Representative, as joined by certain state court counsel to holders of Direct Abuse Claims and Local Councils that have executed or agree to execute a joinder, as such agreement was described (as a settlement in principle) in the term sheet appended to the *Ninth Mediator's Report* [D.I. 7928] filed on December 22, 2021, and as such agreement has been subsequently set forth in and superseded by a definitive written settlement agreement that is consistent with such term sheet and was executed by all of the parties thereto as of February 14, 2022 (and any additional parties that execute a joinder thereto).  The executed Zurich Insurance Settlement Agreement was filed on the docket of the Chapter 11 Cases [D.I. 8817-2] and attached hereto as Exhibit I-3.

308.   "Zurich Insurer Policies" shall have the meaning set forth for such capitalized term in the Zurich Insurance Settlement Agreement.

309.   "Zurich Insurers Settlement Contribution" shall mean the "Settlement Amount" as defined in the Zurich Insurance Settlement Agreement, which is equal to Fifty-Two Million Five Hundred Thousand U.S. Dollars ($52,500,000).

B.   Interpretation; Application of Definitions and Rules of Construction. For purposes of the Plan, unless otherwise provided herein: (1) whenever from the context it is appropriate, each term, whether stated in the singular or the plural, will include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (2) unless otherwise provided in the Plan, any reference in the Plan to a contract, instrument, release, or other agreement or document being in a particular form or on particular terms and conditions means that such document will be substantially in such form or substantially on such terms and conditions; provided, however, that the rule of interpretation set forth in clause (2) shall not be imputed to any contract, lease, instrument, release, or other agreement as to which JPM or the Creditors' Committee have consent rights pursuant to the JPM / Creditors' Committee Term Sheet, and such consent rights shall be as set forth in the JPM / Creditors' Committee Term Sheet and incorporated herein pursuant to Article I.D; (3) any reference in the Plan to an existing document, schedule or exhibit filed or to be filed means such document, schedule or exhibit, as it may have been or may be amended, modified, or supplemented pursuant to the Plan; (4) any reference to a Person as a holder of a Claim or Interest includes that Person's successors and assigns; (5) unless otherwise stated, all references in the Plan to Articles are references to Articles of the Plan, as the same may be amended or modified from time to time in accordance with the terms hereof; (6) the words "herein," "hereof," "hereto," "hereunder" and other words of similar import refer to the Plan as a whole and not to any particular Article or clause contained in the Plan; (7) subject to the provisions of any contract, certificate of incorporation, by-law, instrument, release, or other agreement or document entered into in connection with the Plan, the rights and obligations arising pursuant to the Plan shall be governed by, and construed and enforced in accordance with the applicable federal law, including the Bankruptcy Code and Bankruptcy Rules; (8) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be; (9) any immaterial effectuating provisions may be interpreted by Reorganized BSA in such a manner that is consistent with the overall purpose and intent of the Plan all without further notice to or action, order, or approval of the Bankruptcy Court or any other Person; (10) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan; (11) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (12) any reference to a Person's "subsidiaries" means its direct and indirect subsidiaries; and (13) in computing any period of time prescribed or allowed by the Plan, unless otherwise expressly provided herein, the provisions of Bankruptcy Rule 9006(a) shall apply.

C.   Reference to Monetary Figures. All references in the Plan to monetary figures shall refer to the legal tender of the United States of America unless otherwise expressly provided.

D.   Consent Rights. Notwithstanding anything herein to the contrary, the consent rights of JPM and the Creditors' Committee, respectively, as set forth in the JPM / Creditors' Committee Term Sheet, with respect to the form and substance of the Plan, all exhibits and schedules to the Plan, the Plan Supplement, and the other Plan Documents, including any amendments, restatements, supplements, or other modifications to such documents, and any

53

consents, waivers, or other deviations under or from any such documents, to the extent they pertain to the treatment of the 2010 Credit Facility Claims, the 2019 RCF Claims, the 2010 Bond Claims, or the 2012 Bond Claims (in the case of JPM) or Convenience Claims, General Unsecured Claims, or Non-Abuse Litigation Claims (in the case of the Creditors' Committee), shall be incorporated herein by this reference (including to the applicable definitions in Article I.A) and fully enforceable as if stated in full herein.  The United Methodist ad hoc committee will have consent rights with respect to any modifications to the Plan, the Settlement Trust Documents, the Confirmation Order relating to the Channeling Injunction, releases by holders of Abuse Claims, and related definitional terms including, for the avoidance of doubt, "Abuse," "Abuse Claim," "Mixed Claim," "Abuse Insurance Policy," "Chartered Organization," "Contributing Chartered Organizations," "Non-Abuse Insurance Policy," and "Protected Parties," but only to the extent that such modifications would affect the United Methodist Entities.  Hartford, the Century and Chubb Companies, the Zurich Insurers and Zurich Affiliated Insurers, Clarendon, and any other Settling Insurance Companies will have consent rights with respect to any modifications to the Plan, the Settlement Trust Documents, the Confirmation Order, and the Affirmation Order, including those relating to the Channeling Injunction, releases by holders of Abuse Claims, insurance, their respective Insurance Settlement Agreements, and related definitional terms, including, for the avoidance of doubt, "Abuse," "Abuse Claim," "Mixed Claim," "Protected Parties," and "Settling Insurance Company," but only to the extent that such modifications would affect the Hartford Protected Parties, the Century and Chubb Companies, the Zurich Insurers and Zurich Affiliated Insurers, Clarendon, or other Settling Insurance Companies, as applicable.  The Coalition, the Future Claimants' Representative, and the Tort Claimants' Committee will have consent rights with respect to any modifications to the Plan, the Settlement Trust Documents, the Confirmation Order, and the Affirmation Order relating to Abuse Claims.

E.     Controlling Document.  In the event of any conflict between the terms and provisions in the Plan (without reference to the Plan Supplement), on the one hand, and the terms and provisions in the Disclosure Statement, the Plan Supplement, any other instrument or document created or executed pursuant to the Plan, or any order (other than the Confirmation Order) referenced in the Plan (or any exhibits, schedules, appendices, supplements, or amendments to any of the foregoing), on the other hand, the Plan (without reference to the Plan Supplement) shall govern and control; provided, however, that (1) in the event of a conflict between Confirmation Order, on the one hand, and any of the other Plan Documents, on the other hand, the Confirmation Order shall govern and control in all respects, and (2) in the event of a conflict between the terms and provisions of the Plan, the Disclosure Statement, the Plan Supplement, or any other Plan Document, on the one hand, and the terms and provisions of any Insurance Settlement Agreement, on the other hand, the terms and provisions of the applicable Insurance Settlement Agreement shall control.

## ARTICLE II.

## ADMINISTRATIVE EXPENSE AND PRIORITY CLAIMS

A.     Administrative Expense Claims.

1.     Administrative Expense Claims Generally.  Except to the extent that a holder of an Allowed Administrative Expense Claim agrees to less favorable treatment

with respect to such Allowed Administrative Expense Claim, each holder of an Allowed Administrative Expense Claim (other than Professional Fee Claims, which are governed by Article II.A.2) shall receive, on account of and in full and complete settlement, release and discharge of, and in exchange for, such Claim, payment of Cash in an amount equal to the unpaid portion of such Allowed Administrative Expense Claim, or such amounts and on other such terms as may be agreed to by the holders of such Claims, on or as soon as reasonably practicable after the later of: (a) the Effective Date; (b) the first Business Day after the date that is thirty (30) calendar days after the date such Administrative Expense Claim becomes an Allowed Administrative Expense Claim; (c) such other date(s) as such holder and the Debtors or Reorganized BSA shall have agreed; or (d) such other date ordered by the Bankruptcy Court; provided, however, that Allowed Administrative Expense Claims that arise in the ordinary course of the Debtors' non-profit operations during the Chapter 11 Cases may be paid by the Debtors or Reorganized BSA in the ordinary course of operations and in accordance with the terms and conditions of the particular agreements governing such obligations, course of dealing, course of operations, or customary practice. Notwithstanding anything to the contrary herein or in the Cash Collateral Order, no Claim on account of any diminution in the value of the Prepetition Secured Parties' interests in the Prepetition Collateral (including Cash Collateral) (as each such capitalized term is defined in the Cash Collateral Order) from and after the Petition Date shall be Allowed unless such Claim is Allowed by a Final Order of the Bankruptcy Court. Notwithstanding anything to the contrary herein, the Hartford Administrative Expense Claim shall be an Allowed Administrative Expense Claim and shall be paid in full in cash to Hartford on, or as soon as reasonably practicable after, the Effective Date.

2.    Professional Fee Claims.

a.    Final Fee Applications.   All Professionals or other Persons requesting the final Allowance and payment of compensation and/or reimbursement of expenses pursuant to sections 328, 330, 331 and/or 503(b) or under Article V.T as described therein, for services rendered during the period from the Petition Date to and including the Effective Date shall file and serve final applications for Allowance and payment of Professional Fee Claims on counsel to the Debtors and the United States Trustee no later than the first Business Day that is forty-five (45) days after the Effective Date. Objections to any Professional Fee Claim must be filed and served on Reorganized BSA and the applicable Professional within twenty-one (21) calendar days after the filing of the final fee application that relates to the Professional Fee Claim (unless otherwise agreed by the Debtors or Reorganized BSA, as applicable, and the Professional requesting Allowance and payment of a Professional Fee Claim). The Fee Examiner shall continue to act in its appointed capacity unless and until all Professional Fee Claims have been approved by order of the Bankruptcy Court, and Reorganized BSA shall be responsible to pay the fees and expenses incurred by the Fee Examiner in rendering services after the Effective Date.

b.    Professional Fee Reserve. On the Effective Date, the Debtors shall establish and fund the Professional Fee Reserve with Cash in an amount equal to the Professional Fee Reserve Amount plus a reasonable cushion amount determined

by the Debtors.  Funds held in the Professional Fee Reserve shall not be considered property of the Debtors' Estates, Reorganized BSA, the Settlement Trust, or the Core Value Cash Pool.   Professional Fees owing on account of Allowed Professional Fee Claims shall be paid in Cash from funds held in the Professional Fee Reserve as soon as reasonably practicable after such Professional Fee Claims are Allowed by a Final Order of the Bankruptcy Court or authorized to be paid under the Compensation Procedures Order; provided, however, that Reorganized BSA's obligations with respect to Allowed Professional Fee Claims shall not be limited by or deemed limited to the balance of funds held in the Professional Fee Reserve.   To the extent the funds held in the Professional Fee Reserve are insufficient to satisfy the Allowed Professional Fee Claims in full, each holder of an Allowed Professional Fee Claim shall have an Allowed Administrative Expense Claim for any deficiency, which shall be satisfied in accordance with Article II.A.1. No Liens, Claims, interests, charges, or other Encumbrances or liabilities of any kind shall encumber the Professional Fee Reserve in any way.  When all Allowed Professional Fee Claims have been paid in full, amounts remaining in the Professional Fee Reserve, if any, shall be transferred (i) to Reorganized BSA to the extent the minimum Unrestricted Cash and Investment levels are lower than indicated in Article V.M, and (ii) thereafter, to the Settlement Trust.

      c.    Professional Fee Reserve Amount.  To be eligible for payment for Accrued Professional Fees incurred up to and including the Effective Date, Professionals shall estimate their Accrued Professional Fees as of the Effective Date and deliver such estimate to the Debtors at least five (5) Business Days prior to the anticipated Effective Date, Coalition Professionals shall provide the Debtors a reasonable estimate of total Coalition Restructuring Expenses in accordance with Article V.T.  If a Professional or Coalition Professional does not provide such estimate, the Debtors may estimate the unbilled fees and expenses of such Professional or Coalition Professional .   The total amount so estimated will constitute the Professional Fee Reserve Amount, provided that such estimate will not be considered an admission or limitation with respect to the fees and expenses of such Professional or Coalition Professional.

      d.    Post-Effective Date Fees and Expenses.   From and after the Effective Date, any requirement that Professionals comply with sections 327 through 331 or 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and Professionals may be employed and paid in the ordinary course of operations without any further notice to or action, order, or approval of the Bankruptcy Court.  For the avoidance of doubt, this includes the fees and expenses of the Tort Claimants' Committee and Future Claimants' Representative arising from an appeal of the Plan after the Effective Date, which fees may only be asserted against the Settlement Trust. The reasonable and documented fees and expenses incurred by the Professionals to the Creditors' Committee after the Effective Date until the complete dissolution of the Creditors' Committee for all purposes in accordance with Article X.R will be paid by Reorganized BSA in the ordinary course of business (and not later than thirty (30) days after submission of invoices).

B.   Priority Tax Claims.   Except to the extent that a holder of an Allowed Priority Tax Claim agrees to less favorable treatment, each holder of an Allowed Priority Tax Claim shall receive on account of and in full and complete settlement, release and discharge of, and in exchange for, such Allowed Priority Tax Claim, at the sole option of the Debtors or Reorganized BSA, as applicable: (1) Cash in an amount equal to such Allowed Priority Tax Claim on or as soon as reasonably practicable after the later of (a) the Effective Date, to the extent such Claim is an Allowed Priority Tax Claim on the Effective Date; (b) the first Business Day after the date that is thirty (30) calendar days after the date such Priority Tax Claim becomes an Allowed Priority Tax Claim; and (c) the date such Allowed Priority Tax Claim is due and payable in the ordinary course as such obligation becomes due; provided, however, that the Debtors reserve the right to prepay all or a portion of any such amounts at any time under this option without penalty or premium; or (2) regular installment payments in Cash of a total value, as of the Effective Date of the Plan, equal to the Allowed amount of such Claim over a period ending not later than five years after the Petition Date.

## ARTICLE III.

## CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

A.   Classification of Claims and Interests.

1.   Grouping of Debtors for Convenience.   The Plan is being proposed as a joint plan of reorganization of the Debtors for administrative purposes only and constitutes a separate chapter 11 plan of reorganization for each Debtor. The Plan is not premised upon the substantive consolidation of the Debtors with respect to the Classes of Claims or Interests set forth in the Plan.

2.   Classification in General.   For purposes of organization, voting, and all matters related to Confirmation, and except as otherwise provided herein, all Claims (other than Administrative Expense Claims and Priority Tax Claims) against and Interests in the Debtors are classified as set forth in this Article III. In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims and Priority Tax Claims described in Article II have not been classified and are excluded from the following Classes. A Claim or Interest is classified in a particular Class only to the extent that the Claim or Interest falls within the description of such Class, and is classified in another Class or Classes to the extent that any remainder of the Claim or Interest falls within the description of such other Class or Classes. Notwithstanding anything to the contrary contained in the Plan, no distribution shall be made on account of any Claim that is not Allowed for distribution purposes (if applicable) or any Claim that has been satisfied, released, or otherwise settled prior to the Effective Date.

3.   Summary of Classification.   The following table designates the Classes of Claims against and Interests in the Debtors and specifies which of those Classes are (a) Impaired or Unimpaired by the Plan; (b) entitled to vote to accept or reject the Plan in accordance with section 1126 of the Bankruptcy Code; or (c) presumed to accept or deemed to reject the Plan.

| Class | Claim | Status | Voting Rights |
|---|---|---|---|
| 1 | Other Priority Claims | Unimpaired | Presumed to Accept; Not Entitled to Vote |
| 2 | Other Secured Claims | Unimpaired | Presumed to Accept; Not Entitled to Vote |
| 3A | 2010 Credit Facility Claims | Impaired | Entitled to Vote |
| 3B | 2019 RCF Claims | Impaired | Entitled to Vote |
| 4A | 2010 Bond Claims | Impaired | Entitled to Vote |
| 4B | 2012 Bond Claims | Impaired | Entitled to Vote |
| 5 | Convenience Claims | Impaired | Entitled to Vote |
| 6 | General Unsecured Claims | Impaired | Entitled to Vote |
| 7 | Non-Abuse Litigation Claims | Impaired | Entitled to Vote |
| 8 | Direct Abuse Claims | Impaired | Entitled to Vote |
| 9 | Indirect Abuse Claims | Impaired | Entitled to Vote |
| 10 | Interests in Delaware BSA | Unimpaired | Presumed to Accept; Not Entitled to Vote |

B.      Treatment of Claims and Interests.

1.      Class 1 – Other Priority Claims.

a.      Classification:  Class 1 consists of all Other Priority Claims.

b.      Treatment:  Except to the extent that a holder of an Allowed Other Priority Claim agrees to less favorable treatment of such Claim, in full and final satisfaction of such Allowed Other Priority Claim, at the sole option of Reorganized BSA: (i) each such holder shall receive payment in Cash in an amount equal to such Allowed Other Priority Claim, payable on or as soon as reasonably practicable after the last to occur of (x) the Effective Date, (y) the date on which such Other Priority Claim becomes an Allowed Other Priority Claim, and (z) the date on which the holder of such Allowed Other Priority Claim and the Debtors or Reorganized BSA, as applicable, shall otherwise agree in writing; or (ii) satisfaction of such Allowed Other Priority Claim in any other manner that renders the Allowed Other Priority Claim Unimpaired, including Reinstatement.

c.      Voting:  Class 1 is Unimpaired, and each holder of an Other Priority Claim is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, holders of Other Priority Claims are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to Other Priority Claims.

2.      Class 2 – Other Secured Claims.

a.      Classification:  Class 2 consists of all Other Secured Claims.  To the extent that Other Secured Claims are Secured by different collateral or different interests in the same collateral, such Claims shall be treated as separate subclasses of Class 2 for purposes of voting to accept or reject the Plan and receiving Distributions under the Plan.

b.      Treatment:  Except to the extent that a holder of an Allowed Other Secured Claim agrees to less favorable treatment of such Claim, in full and final

58

satisfaction of such Allowed Other Secured Claim, each holder of an Allowed Other Secured Claim will receive, at the sole option of Reorganized BSA: (i) Cash in an amount equal to the Allowed amount of such Claim, including the payment of any interest required to be paid under section 506(b) of the Bankruptcy Code, payable on or as soon as reasonably practicable after the last to occur of (x) the Effective Date, (y) the date on which such Other Secured Claim becomes an Allowed Other Secured Claim, and (z) the date on which the holder of such Allowed Other Secured Claim and the Debtors or Reorganized BSA, as applicable, shall otherwise agree in writing; (ii) satisfaction of such Other Secured Claim in any other manner that renders the Allowed Other Secured Claim Unimpaired, including Reinstatement; or (iii) return of the applicable collateral on the Effective Date or as soon as reasonably practicable thereafter in satisfaction of the Allowed amount of such Other Secured Claim.

      c.     Voting: Class 2 is Unimpaired, and each holder of an Other Secured Claim is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.   Therefore, holders of Other Secured Claims are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to Other Secured Claims.

3.     Class 3A – 2010 Credit Facility Claims.

      a.     Classification: Class 3A consists of all 2010 Credit Facility Claims.

      b.     Allowance: On the Effective Date, all 2010 Credit Facility Claims shall be deemed fully Secured and Allowed pursuant to section 506(a) of the Bankruptcy Code, and not subject to any counterclaim, defense, offset, or reduction of any kind, in an aggregate amount not less than $80,762,060 (including $44,299,743 of undrawn amounts under letters of credit issued under the 2010 Credit Facility Documents, provided such letters of credit are not drawn on or before the Effective Date), plus any accrued but unpaid interest and reasonable fees and expenses as of the Effective Date to the extent not paid pursuant to the Cash Collateral Order.   Because all 2010 Credit Facility Claims are deemed fully Secured, there are no unsecured 2010 Credit Facility Claims, and the holders of such Claims do not have or hold any Class 6 Claims against the Debtors on account of any 2010 Credit Facility Claims.

      c.     Treatment: Except to the extent that a holder of an Allowed 2010 Credit Facility Claim agrees to less favorable treatment of such Claim, in full and final satisfaction, settlement, release, and discharge of, and in exchange for an Allowed 2010 Credit Facility Claim, each holder of an Allowed 2010 Credit Facility Claim shall receive a Claim under the Restated Credit Facility Documents in an amount equal to the amount of such holder's Allowed 2010 Credit Facility Claim.

      d.     Voting: Class 3A is Impaired, and each holder of an Allowed 2010 Credit Facility Claim is entitled to vote to accept or reject the Plan.

4.    Class 3B – 2019 RCF Claims.

a.    Classification:  Class 3B consists of all 2019 RCF Claims.

b.    Allowance:  On the Effective Date, all 2019 RCF Claims shall be deemed fully Secured and Allowed pursuant to section 506(a) of the Bankruptcy Code, and not subject to any counterclaim, defense, offset, or reduction of any kind, in an aggregate amount not less than $61,542,720 (including $41,542,720 of undrawn amounts under letters of credit issued under the 2019 RCF Documents, provided such letters of credit are not drawn on or before the Effective Date), plus any accrued but unpaid interest and reasonable fees and expenses as of the Effective Date to the extent not paid pursuant to the Cash Collateral Order.  Because all 2019 RCF Claims are deemed fully Secured, there are no unsecured 2019 RCF Claims, and the holders of such Claims do not have or hold any Class 6 Claims against the Debtors on account of any 2019 RCF Claims.

c.    Treatment:  Except to the extent that a holder of an Allowed 2019 RCF Claim agrees to less favorable treatment of such Claim, in full and final satisfaction, settlement, release, and discharge of, and in exchange for an Allowed 2019 RCF Claim, each holder of an Allowed 2019 RCF Claim shall receive a Claim under the Restated Credit Facility Documents in an amount equal to the amount of such holder's Allowed 2019 RCF Claim.

d.    Voting:  Class 3B is Impaired, and each holder of an Allowed 2019 RCF Claim is entitled to vote to accept or reject the Plan.

5.    Class 4A – 2010 Bond Claims.

a.    Classification:  Class 4A consists of all 2010 Bond Claims.

b.    Allowance:  On the Effective Date, all 2010 Bond Claims shall be deemed fully Secured and Allowed pursuant to section 506(a) of the Bankruptcy Code, and not subject to any counterclaim, defense, offset, or reduction of any kind, in an aggregate amount of not less than $40,137,274, plus any accrued but unpaid interest and reasonable fees and expenses as of the Effective Date to the extent not paid pursuant to the Cash Collateral Order.  Because all 2010 Bond Claims are deemed fully Secured, there are no unsecured 2010 Bond Claims, and the holders of such Claims do not have or hold any Class 6 Claims against the Debtors on account of any 2010 Bond Claims.

c.    Treatment:  Except to the extent that a holder of an Allowed 2010 Bond Claim agrees to less favorable treatment of such Claim, in full and final satisfaction, settlement, release, and discharge of, and in exchange for an Allowed 2010 Bond Claim, each holder of an Allowed 2010 Bond Claim shall receive a Claim under the Restated 2010 Bond Documents in an amount equal to the amount of such holder's Allowed 2010 Bond Claim.

d.      Voting:  Class 4A is Impaired, and each holder of an Allowed 2010 Bond Claim is entitled to vote to accept or reject the Plan.

6.      Class 4B – 2012 Bond Claims.

a.      Classification:  Class 4B consists of all 2012 Bond Claims.

b.      Allowance:  On the Effective Date, all 2012 Bond Claims shall be deemed fully Secured and Allowed pursuant to section 506(a) of the Bankruptcy Code, and not subject to any counterclaim, defense, offset, or reduction of any kind, in an aggregate amount of not less than $145,662,101, plus any accrued but unpaid interest and reasonable fees and expenses as of the Effective Date to the extent not paid pursuant to the Cash Collateral Order.  Because all 2012 Bond Claims are deemed fully Secured, there are no unsecured 2012 Bond Claims, and the holders of such Claims do not have or hold any Class 6 Claims against the Debtors on account of any 2012 Bond Claims.

c.      Treatment:  Except to the extent that a holder of an Allowed 2012 Bond Claim agrees to less favorable treatment of such Claim, in full and final satisfaction, settlement, release, and discharge of, and in exchange for an Allowed 2012 Bond Claim, each holder of an Allowed 2012 Bond Claim shall receive a Claim under the Restated 2012 Bond Documents in an amount equal to the amount of such holder's Allowed 2012 Bond Claim.

d.      Voting:  Class 4B is Impaired, and each holder of an Allowed 2012 Bond Claim is entitled to vote to accept or reject the Plan.

7.      Class 5 – Convenience Claims.

a.      Classification:  Class 5 consists of all Convenience Claims.

b.      Treatment:   In full and final satisfaction, settlement, release, and discharge of, and in exchange for, an Allowed Convenience Claim, each holder of an Allowed Convenience Claim shall receive, on the Effective Date or within thirty (30) days following the date that such Convenience Claim becomes Allowed (if such Claim becomes Allowed after the Effective Date), Cash in an amount equal to 100% of such holder's Allowed Convenience Claim.

c.      Voting:  Class 5 is Impaired, and each holder of a Convenience Claim is entitled to vote to accept or reject the Plan.

8.      Class 6 – General Unsecured Claims.

a.      Classification:  Class 6 consists of all General Unsecured Claims.

b.      Treatment:  Except to the extent that a holder of an Allowed General Unsecured Claim agrees to less favorable treatment of such Claim, in exchange for full and final satisfaction, settlement, release, and discharge of, and in exchange

for, such Allowed General Unsecured Claim, each holder of an Allowed General Unsecured Claim shall receive, subject to the holder's ability to elect Convenience Claim treatment on account of the Allowed General Unsecured Claim, its Pro Rata Share of the Core Value Cash Pool up to the full amount of such Allowed General Unsecured Claim in the manner described in Article VII.

       c.      Voting:   Class 6 is Impaired, and each holder of a General Unsecured Claim is entitled to vote to accept or reject the Plan.

9.      Class 7 – Non-Abuse Litigation Claims.

       a.      Classification: Class 7 consists of all Non-Abuse Litigation Claims.

       b.      Treatment: Except to the extent that a holder of an Allowed Non-Abuse Litigation Claim agrees to less favorable treatment of such Claim, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Non-Abuse Litigation Claim, each holder thereof shall, subject to (i) the holder's ability to elect Convenience Claim treatment as provided in the following sentence and (ii) the terms and conditions of Article IV.D.3 (as applicable), retain the right to recover up to the amount of such holder's Allowed Non-Abuse Litigation Claim from (x) available insurance coverage or the proceeds of any Insurance Policy, including any Abuse Insurance Policy or Non-Abuse Insurance Policy, (y) applicable proceeds of any Insurance Settlement Agreements, and (z) co-liable non-debtors (if any) or their insurance coverage. Solely to the extent that the holder of an Allowed Non-Abuse Litigation Claim fails to recover in full from the foregoing sources on account of such Allowed Claim after exhausting its remedies in respect thereof, such holder may elect to have the unsatisfied portion of its Allowed Claim treated as an Allowed Convenience Claim and receive cash in an amount equal to the lesser of (a) the amount of the unsatisfied portion of the Allowed Non-Abuse Litigation Claim and (b) $50,000.

       c.      Voting:   Class 7 is Impaired, and each holder of a Non-Abuse Litigation Claim is entitled to vote to accept or reject the Plan.

10.     Class 8 – Direct Abuse Claims.

       a.      Classification: Class 8 consists of all Direct Abuse Claims.

       b.      Treatment:

         (i)     The Settlement Trust shall receive, for the benefit of holders of Abuse Claims, the BSA Settlement Trust Contribution, the Local Council Settlement Contribution, the Contributing Chartered Organization Settlement Contribution, the Participating Chartered Organization Settlement Contribution, the Hartford Settlement Contribution (subject to the terms and conditions set forth in the Hartford Insurance Settlement Agreement), the Century and Chubb Companies Insurance Settlement Contribution (subject to the terms and conditions set forth in the Century

and Chubb Companies Insurance Settlement Agreement), the Zurich Insurers Settlement Contribution (subject to the terms and conditions set forth in the Zurich Insurance Settlements Agreement), and the Clarendon Settlement Contribution (subject to the terms and conditions set forth in the Clarendon Insurance Settlement Agreement), and the proceeds of any other applicable Insurance Settlement Agreements.  In addition, each holder of a properly completed non-duplicative proof of claim asserting a Direct Abuse Claim who filed such Claim by the Bar Date or was permitted by a Final Order of the Bankruptcy Court to file a late claim may elect on his or her Ballot to receive an Expedited Distribution, subject to criteria set forth in the Trust Distribution Procedures, in exchange for providing a full and final release in favor of the Settlement Trust, the Protected Parties and the Chartered Organizations.  The Settlement Trust shall make the Expedited Distributions on one or more dates occurring on or as soon as reasonably practicable after the latest to occur of (a) the Effective Date, (b) the date the applicable holders of Direct Abuse Claims who have elected to receive an Expedited Distribution have satisfied the criteria set forth in the Trust Distribution Procedures, and (c) the date upon which the Settlement Trust has sufficient Cash to fund the full amount of the Expedited Distributions while retaining sufficient Cash reserves to fund applicable Settlement Trust Expenses, as determined by the Settlement Trustee.

(ii)      As of the Effective Date, the Protected Parties' liability for all Direct Abuse Claims shall be assumed in full by the Settlement Trust without further act, deed, or court order and shall be satisfied solely from the Settlement Trust as set forth in the Settlement Trust Documents.  Pursuant to the Channeling Injunction set forth in Article X.F, each holder of a Direct Abuse Claim shall have such holder's Direct Abuse Claim against the Protected Parties (and each of them) permanently channeled to the Settlement Trust, and such Direct Abuse Claim shall thereafter be asserted exclusively against the Settlement Trust and processed, liquidated, and paid in accordance with the terms, provisions, and procedures of the Settlement Trust Documents.  Holders of Direct Abuse Claims shall be enjoined from prosecuting any outstanding, or filing any future, litigation, Claims, or Causes of Action arising out of or related to such Direct Abuse Claims against any of the Protected Parties and may not proceed in any manner against any of the Protected Parties in any forum whatsoever, including any state, federal, or non-U.S. court or any administrative or arbitral forum, and are required to pursue such Direct Abuse Claims solely against the Settlement Trust as provided in the Settlement Trust Documents.

(iii)     As of the Effective Date, the Limited Protected Parties' liability for all Post-1975 Chartered Organization Abuse Claims and the Limited Protected Parties' liability for all Pre-1976 Chartered Organization Abuse Claims shall be assumed in full by the Settlement Trust without further act, deed, or court order and shall be satisfied solely from the

Settlement Trust as set forth in the Settlement Trust Documents. Pursuant to the Channeling Injunction set forth in Article X.F, each holder of a Post-1975 Chartered Organization Abuse Claim shall have such holder's Post-1975 Chartered Organization Abuse Claim against the Limited Protected Parties (and each of them) and each holder of a Pre-1976 Chartered Organization Abuse Claim shall have such holder's Pre-1976 Chartered Organization Abuse Claim against the Limited Protected Parties permanently channeled to the Settlement Trust, and such Post-1975 Chartered Organization Abuse Claim and Pre-1976 Chartered Organization Abuse Claim shall thereafter be asserted exclusively against the Settlement Trust and processed, liquidated, and paid in accordance with the terms, provisions, and procedures of the Settlement Trust Documents. Holders of Post-1975 Chartered Organization Abuse Claims and Pre-1976 Chartered Organization Abuse Claims shall be enjoined from prosecuting any outstanding, or filing any future, litigation, Claims, or Causes of Action arising out of or related to such Post-1975 Chartered Organization Abuse Claim and Pre-1976 Chartered Organization Abuse Claim against any of the Limited Protected Parties and may not proceed in any manner against any of the Limited Protected Parties in any forum whatsoever, including any state, federal, or non-U.S. court or any administrative or arbitral forum, and are required to pursue such Post-1975 Chartered Organization Abuse Claims and Pre-1976 Chartered Organization Abuse Claims solely against the Settlement Trust as provided in the Settlement Trust Documents.

(iv)   As of the Effective Date, the Opt-Out Chartered Organizations' liability for all Opt-Out Chartered Organization Abuse Claims shall be assumed in full by the Settlement Trust without further act, deed, or court order and shall be satisfied solely from the Settlement Trust as set forth in the Settlement Trust Documents and subject to the Channeling Injunction set forth in Article X.F herein.

(v)   For the avoidance of doubt, the Protected Parties shall include: (a) the Debtors; (b) Reorganized BSA; (c) the Related Non-Debtor Entities; (d) the Local Councils; (e) the Contributing Chartered Organizations, including the United Methodist Entities; (f) the Settling Insurance Companies; and (g) all of such Persons' Representatives. The Limited Protected Parties shall include the Participating Chartered Organizations.

c.   Voting:  Class 8 is Impaired, and each holder of a Direct Abuse Claim is entitled to vote to accept or reject the Plan.

11.   Class 9 – Indirect Abuse Claims.

a.   Classification:  Class 9 consists of all Indirect Abuse Claims.

b.   Treatment:

64

(i)      As of the Effective Date, the Protected Parties' liability for all Indirect Abuse Claims shall be assumed in full by the Settlement Trust without further act, deed, or court order and shall be satisfied solely from the Settlement Trust as set forth in the Settlement Trust Documents and solely to the extent that an Indirect Abuse Claim has not been deemed withdrawn with prejudice, irrevocably waived, released and expunged in connection with the Local Council Settlement Contribution, the Contributing Chartered Organization Trust Contribution, the Participating Chartered Organization Trust Contribution, or the Insurance Settlement Agreements. Pursuant to the Channeling Injunction set forth in Article X.F, each holder of an Indirect Abuse Claim shall have such holder's Indirect Abuse Claim against the Protected Parties (and each of them) permanently channeled to the Settlement Trust, and such Indirect Abuse Claim shall thereafter be asserted exclusively against the Settlement Trust and processed, liquidated, and paid in accordance with the terms, provisions, and procedures of the Settlement Trust Documents.  Holders of Indirect Abuse Claims shall be enjoined from prosecuting any outstanding, or filing any future, litigation, Claims, or Causes of Action arising out of or related to such Abuse Claims against any of the Protected Parties and may not proceed in any manner against any the Protected Parties in any forum whatsoever, including any state, federal, or non-U.S. court or any administrative or arbitral forum, and are required to pursue such Indirect Abuse Claims solely against the Settlement Trust as provided in the Settlement Trust Documents.

(ii)      As of the Effective Date, the Limited Protected Parties' liability for all Post-1975 Chartered Organization Abuse Claims and the Limited Protected Parties' liability for all Pre-1976 Chartered Organization Abuse Claims shall be assumed in full by the Settlement Trust without further act, deed, or court order and shall be satisfied solely from the Settlement Trust as set forth in the Settlement Trust Documents.  Pursuant to the Channeling Injunction set forth in Article X.F, each holder of a Post-1975 Chartered Organization Abuse Claim shall have such holder's Post-1975 Chartered Organization Abuse Claim against the Limited Protected Parties (and each of them) and each holder of a Pre-1976 Chartered Organization Abuse Claim shall have such holder's Pre-1976 Chartered Organization Abuse Claim against the Limited Protected Parties (and each of them) permanently channeled to the Settlement Trust, and such Post-1975 Chartered Organization Abuse Claim and Pre-1976 Chartered Organization Abuse Claim shall thereafter be asserted exclusively against the Settlement Trust and processed, liquidated, and paid in accordance with the terms, provisions, and procedures of the Settlement Trust Documents. Holders of Post-1975 Chartered Organization Abuse Claims and Pre-1976 Chartered Organization Abuse Claims shall be enjoined from prosecuting any outstanding, or filing any future, litigation, Claims, or Causes of Action arising out of or related to such Post-1975 Chartered Organization Abuse Claim and Pre-1976 Chartered Organization Abuse Claim against any of

the Limited Protected Parties and may not proceed in any manner against any the Limited Protected Parties in any forum whatsoever, including any state, federal, or non-U.S. court or any administrative or arbitral forum, and are required to pursue such Post-1975 Chartered Organization Abuse Claims and Pre-1976 Chartered Organization Abuse Claims solely against the Settlement Trust as provided in the Settlement Trust Documents.

(iii)   As of the Effective Date, the Opt-Out Chartered Organizations' liability for all Opt-Out Chartered Organization Abuse Claims shall be assumed in full by the Settlement Trust without further act, deed, or court order and shall be satisfied solely from the Settlement Trust as set forth in the Settlement Trust Documents and subject to the Channeling Injunction set forth in Article X.F herein.

(iv)   For the avoidance of doubt, the Protected Parties shall include: (a) the Debtors; (b) Reorganized BSA; (c) the Related Non-Debtor Entities; (d) the Local Councils; (e) the Contributing Chartered Organizations, including the United Methodist Entities; (f) the Settling Insurance Companies; and (g) all of such Persons' Representatives. The Limited Protected Parties shall include the Participating Chartered Organizations.

c.   Voting: Class 9 is Impaired, and each holder of an Indirect Abuse Claim is entitled to vote to accept or reject the Plan.

12.   Class 10 – Interests in Delaware BSA.

a.   Classification: Class 10 consists of all Interests in Delaware BSA.

b.   Treatment: On the Effective Date, Interests in Delaware BSA shall be Reinstated so as to maintain the organizational structure of the Debtors as such structure exists on the Effective Date unless implementation of the restructuring requires otherwise.

c.   Voting: Class 10 is Unimpaired. Therefore, holders of Interests in Delaware BSA are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, Holders of Intercompany Interests are not entitled to vote to accept or reject the Plan.

C.   Elimination of Vacant Classes. Any Class of Claims against or Interests in the Debtors that, as of the commencement of the Confirmation Hearing, does not have at least one holder of a Claim or Interest that is Allowed in an amount greater than zero for voting purposes shall be considered vacant, deemed eliminated from the Plan for purposes of voting to accept or reject the Plan, and disregarded for purposes of determining whether the Plan satisfies section 1129(a)(8) of the Bankruptcy Code with respect to that Class.

D.   Cramdown. If any Class is deemed to reject the Plan or is entitled to vote on the Plan and does not vote to accept the Plan, the Debtors may (1) seek Confirmation of the Plan under

66

section 1129(b) of the Bankruptcy Code or (2) amend or modify the Plan in accordance with the terms hereof and the Bankruptcy Code.  If a controversy arises as to whether any Claims are, or any class of Claims is, impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

## ARTICLE IV.

## SETTLEMENT TRUST

A.     Establishment of the Settlement Trust.  The Settlement Trust shall be established on the Effective Date in accordance with the Plan Documents.  The Settlement Trust shall be a "qualified settlement fund" within the meaning of the Treasury Regulations issued under Section 468B of the Internal Revenue Code, with respect to which Reorganized BSA shall timely make an election to treat the Settlement Trust as a "grantor trust" for U.S. federal income tax purposes and, to the extent permitted under applicable law, for state and local income tax purposes.

B.     Purposes of the Settlement Trust.

1.     The purposes of the Settlement Trust shall be to assume liability for all Abuse Claims, to hold, preserve, maximize and administer the Settlement Trust Assets, and to direct the processing, liquidation and payment of all compensable Abuse Claims in accordance with the Settlement Trust Documents.  The Settlement Trust shall resolve Abuse Claims in accordance with the Settlement Trust Documents in a fair, consistent, equitable manner, and on a pro rata basis, in compliance with the terms of the Settlement Trust Documents and to the extent of available Settlement Trust Assets.

2.     In the event of any ambiguity or conflict between the terms of the Settlement Trust Agreement or any related document required or provided for under the Settlement Trust Documents (other than the Confirmation Order), on the one hand, and the terms of the Plan and the Confirmation Order, on the other hand, the terms of the Plan and the Confirmation Order shall control, notwithstanding that the Settlement Trust Agreement and related documents required or provided for under the Settlement Trust Documents may be incorporated in or annexed to the Plan or the Confirmation Order.

C.     Transfer of Claims to the Settlement Trust.

1.     On the Effective Date or as otherwise provided herein, and without further action of any Person, the Settlement Trust shall assume the liabilities, obligations, responsibilities, financial or otherwise, of (a) the Protected Parties for all Abuse Claims, (b) the Limited Protected Parties for all Post-1975 Chartered Organization Abuse Claims and all other Abuse Claims covered under insurance policies issued by the Settling Insurance Companies, (c) the Limited Protected Parties for all Pre-1976 Chartered Organization Abuse Claims, and (d) the Opt-Out Chartered Organizations for the Opt-Out Chartered Organization Abuse Claims.  These assumptions by the Settlement Trust shall not affect (i) the application of the Discharge Injunction or the Channeling Injunction or (ii) any Non-Settling Insurance Company's obligation under any Abuse Insurance Policy or applicable law.

2.      Except as otherwise expressly provided in the Plan, the Settlement Trust Agreement, or the Trust Distribution Procedures, the Settlement Trust shall have control over the Settlement Trust Causes of Action and the Insurance Actions, and the Settlement Trust shall thereby become the estate representative pursuant to section 1123(b)(3)(B) of the Bankruptcy Code with the exclusive right (except as otherwise provided in Article IV.D.4) to enforce each of the Settlement Trust Causes of Action and the Insurance Actions, and the proceeds of the recoveries on any of the Settlement Trust Causes of Action or the Insurance Actions shall be deposited in and become the property of the Settlement Trust, and the Settlement Trust shall have the right to enforce the Plan and any of the other Plan Documents (including the Document Appendix) according to their respective terms, including the right to receive the Settlement Trust Assets as provided in the Plan; provided, however, that (a) the Settlement Trust shall have no other rights against the Protected Parties except to enforce the Plan and any of the other Plan Documents; (b) the Settlement Trust shall have no other rights against the Limited Protected Parties with respect to Post-1975 Chartered Organization Abuse Claims and all other Abuse Claims covered under insurance policies issued by the Settling Insurance Companies except to enforce the Plan and any of the other Plan Documents; (c) the Settlement Trust shall have no other rights against the Opt-Out Chartered Organizations with respect to Opt-Out Chartered Organization Abuse Claims except to enforce the Plan and any of the other Plan Documents; (d) the Settlement Trust Causes of Action and the Insurance Actions shall not include any Claims or Interests fully and finally released, compromised, or settled pursuant to the Plan or any Plan Documents, or any Claims against Settling Insurance Companies released, compromised and settled under the Insurance Settlement Agreements; and (e) for the avoidance of doubt, the Settlement Trust Causes of Action and the Insurance Actions, do not include any rights of the Protected Parties or the Limited Protected Parties, or Opt-Out Chartered Organizations arising under the Channeling Injunction or any of the Injunctions, Releases, or Discharges granted under the Plan and the Confirmation Order.

D.      Transfer of Settlement Trust Assets to the Settlement Trust.

1.      Transfers on the Effective Date.  On the Effective Date, subject to Article IV.D.2, all right, title, and interest in and to the Settlement Trust Assets and any proceeds thereof shall be automatically, and without further act or deed, transferred to, vested in, and assumed by the Settlement Trust free and clear of all Encumbrances or Claims or other interests of any Person, subject to the Channeling Injunction and other provisions of the Plan.  Notwithstanding the foregoing, the Settlement Trust shall satisfy, to the extent required under the relevant policies and applicable law, and in accordance with the Trust Distribution Procedures, any retrospective premiums and self-insured retentions arising out of any Abuse Claims under the Abuse Insurance Policies.  The Debtors and the Local Councils shall establish an appropriate escrow mechanism to ensure that the Cash to be paid to the Settlement Trust by Local Councils on the Effective Date can be paid in a timely manner.

2.      Transfers after the Effective Date.  To the extent any of the Settlement Trust Assets are not transferred to the Settlement Trust by operation of law on the Effective Date pursuant to the Plan, then when such assets accrue or become transferable subsequent to the Effective Date, they shall automatically and immediately transfer to the Settlement

Trust free and clear of all Encumbrances and Claims or other interests of any Person, subject to the Channeling Injunction and other provisions of the Plan. To the extent any Artwork is not physically transferred to the Settlement Trust on the Effective Date, the Debtors or Reorganized BSA and the Settlement Trust shall mutually agree on the terms of the storage and subsequent physical transfer thereof. For the avoidance of doubt, title to the Artwork (and the risk of loss thereof) will transfer to the Settlement Trust on the Effective Date. To the extent that any action of a Protected Party or Limited Protected Party is required to effectuate such transfer, such Protected Party or Limited Protected Party shall promptly transfer, assign, and contribute, such remaining Settlement Trust Assets to the Settlement Trust. In the event a Protected Party or a Limited Protected Party breaches any obligation contained in this section, the Settlement Trust will have no adequate remedy at law and shall be entitled to preliminary and permanent declaratory and injunctive relief. This Article IV.D.2 applies, without limitation, to (a) that portion of the Local Council Settlement Contribution required to be contributed to the Settlement Trust after the Effective Date and (b) the transfer to the Settlement Trust of the Warehouse and Distribution Center, subject to the Leaseback Requirement.

3.      Specified Insurance Policies and Non-Abuse Litigation Claims.

a.      For the avoidance of doubt, no consent of the Settlement Trust shall be required (i) for a court of competent jurisdiction to award a non-consent judgment that is not a default judgment in the underlying lawsuit on a Non-Abuse Litigation Claim, (ii) to trigger the obligation of the Settlement Trust to pay a judgment on a Non-Abuse Litigation Claim to the extent provided in subparagraph (b) below (provided that notice of any such judgment obtained shall be provided as set forth in the first sentence of subparagraph (c) below of this section), or (iii) for Entities other than the Settlement Trust to enter into any post-Effective Date settlement of a Non-Abuse Litigation Claim unless any portion of the recovery under such settlement is contended or sought to be payable from the proceeds of any settled Specified Insurance Policy(ies); provided, however, that a condition of (i) the payment of any judgment by the Settlement Trust as to a Non-Abuse Litigation Claim or (ii) the payment of any settlement of a Non-Abuse Litigation Claim, shall be a release by the holder of such Non-Abuse Litigation Claim of the Debtors, the Local Councils, and any other insureds under applicable Specified Insurance Policies.

b.      Before the Settlement Trust settles any Specified Insurance Policy(ies) under which the holder of a Non-Abuse Litigation Claim is seeking to recover, the holder of a Non-Abuse Litigation Claim may recover up to the full amount of such Claim in the first instance from any such unsettled Specified Primary Insurance Policy(ies) or unsettled Specified Excess Insurance Policy(ies). If and when the Settlement Trust settles one or more Specified Insurance Policies under which the holder of a Non-Abuse Litigation Claim is seeking to recover: (a) the holder of such Non-Abuse Litigation Claim shall remain entitled to recover up to $1,000,000 of such Claim under and payable from (i) any unsettled Specified Primary Insurance Policy(ies) or (ii) from the Settlement Trust in the event that the Settlement Trust has settled the Specified Primary Insurance Policy(ies), subject to

69

the Settlement Trustee's consent as to any settlement as set forth in this section; and (b) any amounts exceeding the remaining limits of liability of the applicable Specified Primary Insurance Policy shall be recoverable from (i) any unsettled Specified Excess Insurance Policy(ies) or (ii) from the Settlement Trust in the event that the Settlement Trust has settled the Specified Excess Insurance Policy(ies) that would otherwise be liable, subject to the Settlement Trustee's consent as to any settlement as set forth in this section; provided, however, that the Settlement Trust shall pay amounts referenced in (a)(ii) or (b)(ii) immediately above only to the extent that a settlement or judgment entitles the holder of the Non-Abuse Litigation Claim to recover from the proceeds of any Specified Insurance Policies up to applicable policy limits and shall have consent rights over any settlement referenced in (a)(ii) or (b)(ii) immediately above (such consent not to be unreasonably withheld). For the avoidance of doubt, to the extent that the Settlement Trust settles a Specified Insurance Policy that was defending against a Non-Abuse Litigation Claim, the Settlement Trust has the right to assume the defense of such Non-Abuse Litigation Claim.

c.      Any holder of a Non-Abuse Litigation Claim who has obtained a judgment implicating a settled Specified Insurance Policy shall serve the Settlement Trust's counsel with a copy of the judgment. Only with respect to a proposed settlement where the Settlement Trust has consent pursuant to paragraph b immediately above of such Non-Abuse Litigation Claim, the Settlement Trust shall have 30 days following receipt of the proposed settlement to object to the proposed settlement. If the Settlement Trust does not object to the proposed settlement within 30 days following such receipt, the Settlement Trust will be deemed to have consented to the settlement. If the Settlement Trust does not consent to any settlement of a Non-Abuse Litigation Claim as to which its consent may not be unreasonably withheld, the holder of the Non-Abuse Litigation Claim may file a motion with the Bankruptcy Court seeking a determination regarding whether the Settlement Trust unreasonably withheld its consent to the proposed settlement. To the extent that the Bankruptcy Court determines that consent was not unreasonably withheld by the Settlement Trust, then the Non-Abuse Litigation Claim may recommence in the tort system.

d.      The Settlement Trustee shall have a duty to treat Direct Abuse Claims and Non-Abuse Litigation Claims that implicate the Specified Insurance Policies fairly and equally. In negotiating any settlements involving Specified Insurance Policies, the Settlement Trustee shall bear in mind the interests of both Direct Abuse Claims and Non-Abuse Litigation Claims in structuring any settlement and use best efforts to maximize recoveries for both constituencies.

e.      Notwithstanding anything to the contrary in the Plan, with respect to any Non-Abuse Litigation Claim that has been asserted or could be asserted against any Local Council, notice of which is provided to the Debtors, the Coalition, the Tort Claimants' Committee, and the Future Claimants' Representative prior to the Effective Date, the rights of the Local Council to recover from the applicable insurer for such Non-Abuse Litigation Claim under the Specified Insurance Policies

up to the applicable coverage limits shall be preserved; <u>provided</u>, <u>however</u>, that if the holder of a Non-Abuse Litigation Claim provides a full and complete written release of any claims that such holder of a Non-Abuse Litigation Claim may have against the Local Council related to the Non-Abuse Litigation Claim, then the Local Council will be deemed to have waived any rights it may have against the Specified Insurance Policy with respect to such Non-Abuse Litigation Claim.

       4.    <u>Settlement Trust Causes of Action</u>.  The transfer of the Settlement Trust Causes of Action to the Settlement Trust, insofar as they relate to the ability to defend against or reduce the amount of Abuse Claims, shall be considered the transfer of a non-exclusive right enabling the Settlement Trust to defend itself against asserted Abuse Claims, which transfer shall not impair, affect, alter, or modify the right of any Person, including the Protected Parties, the Limited Protected Parties, an insurer or alleged insurer, or co-obligor or alleged co-obligor, sued on account of an Abuse Claim or on account of any asserted right relating to any Abuse Insurance Policy, to assert each and every defense or basis for claim reduction such Person could have asserted had the Settlement Trust Causes of Action not been assigned to the Settlement Trust (including any defense or basis for claim reduction that any Insurance Company or other insurer or alleged insurer could have asserted under section 502 of the Bankruptcy Code, applicable non-bankruptcy law, or any Abuse Insurance Policy or other agreement with respect to (a) any alleged liability of the BSA or any Local Council, Contributing Chartered Organization, Participating Chartered Organization or any other insured Person for any Abuse Claim or (b) any alleged liability of any Insurance Company or other insurer or alleged insurer to provide indemnity or defense relating to any Abuse Claim or any alleged extracontractual liability of any Insurance Company or other insurer or alleged insurer relating to any Abuse Claim).

       E.    <u>Settlement Trustee</u>.  There shall be one Settlement Trustee, who shall be appointed by the Bankruptcy Court in the Confirmation Order.  The initial Settlement Trustee shall be disclosed in a notice filed on the docket of these Chapter 11 Cases by February 18, 2022. Any successor Settlement Trustee shall be appointed in accordance with the terms of the Settlement Trust Agreement.  For purposes performing his or her duties and fulfilling his or her obligations under the Settlement Trust and the Plan, the Settlement Trustee shall be deemed to be, and the Confirmation Order shall provide that he or she is, a "party in interest" within the meaning of section 1109(b) of the Bankruptcy Code. The Settlement Trustee shall be the "administrator" of the Settlement Trust as such term is used in Treas. Reg. Section 1.468B-2(k)(3).

       F.    <u>Claims Administrators</u>.  There shall be two Claims Administrators, who shall be appointed by the Bankruptcy Court in the Confirmation Order. The initial Claim Administrators shall be disclosed in a notice filed on the docket of these Chapter 11 Cases by February 18, 2022. Any successor Claims Administrator shall be appointed in accordance with the terms of the Settlement Trust Agreement.  For purposes performing his or her duties and fulfilling his or her obligations under the Settlement Trust and the Plan, the Claims Administrators shall be deemed to be, and the Confirmation Order shall provide that he or she is, a "party in interest" within the meaning of section 1109(b) of the Bankruptcy Code.

       G.    <u>Settlement Trust Advisory Committee</u>.

1.      The Settlement Trust Advisory Committee (the "STAC") shall be composed of seven (7) individuals identified below, three (3) of whom shall be selected by the Coalition, three (3) of whom shall be selected by the Tort Claimants' Committee, and one (1) who shall be selected by Pfau/Zalkin. The STAC members shall be reasonably acceptable to the Debtors and shall have the functions, duties, and rights provided in the Settlement Trust Agreement. Each STAC member shall serve in accordance with the terms and conditions of the Settlement Trust Agreement.

2.      The commencement or continuation of a STAC Tort Election Claim (as defined in Article XII.B of the Trust Distribution Procedures) and the approval of any global settlement after the Effective Date that causes an Insurance Company or a Chartered Organization to become a Protected Party must be approved in accordance with the Settlement Trust Agreement.

H.      Future Claimants' Representative.  The Settlement Trust Agreement shall provide for the continuation of the Future Claimants' Representative to represent the interests of holders of Future Abuse Claims.  The initial Future Claimants' Representative shall be James L. Patton, Jr. so long as he is the Future Claimants' Representative in the Chapter 11 Cases as of the Effective Date.

I.      Trust Distribution Procedures.  On the Effective Date, the Settlement Trust shall implement the Trust Distribution Procedures in accordance with the terms of the Settlement Trust Agreement.  From and after the Effective Date, the Settlement Trustee shall have the authority to administer, amend, supplement, or modify the Trust Distribution Procedures solely in accordance with the terms thereof and the Settlement Trust Agreement.

J.      Post-Effective Date Contributing Chartered Organizations.

1.      Notwithstanding any present exclusionary language in the Plan, after the Effective Date, any Opt-Out Chartered Organization or Participating Chartered Organization as of the Effective Date may become a Protected Party if (a) a financial contribution is made by or on behalf of such Opt-Out Chartered Organization or Participating Chartered Organization, (b) such Opt-Out Chartered Organization or Participating Chartered Organization agrees to provide the assignments and releases applicable to Contributing Chartered Organizations, set forth in the definition of Contributing Chartered Organization Settlement Contribution, and (c) if and to the extent required by BSA, it agrees to cooperate with youth protection, and (d) the Bankruptcy Court, after notice and an opportunity for parties in interest to be heard, approves a settlement agreement between such Chartered Organization and the Settlement Trustee (a "Post-Effective Date Chartered Organization Settlement").  After the Effective Date, the Settlement Trustee and the Future Claimants' Representative  shall have the authority to seek approval of a Post-Effective Date Chartered Organization Settlement in accordance with the Settlement Trust Agreement.  Upon the Bankruptcy Court's entry of a Final Order approving a Post-Effective Date Chartered Organization Settlement, Exhibit C shall be amended by the Settlement Trustee to include such Chartered Organization, and such Chartered Organization (and any related Persons or Representatives, as applicable) shall be deemed to be a Contributing Chartered Organization and a Protected Party for all

purposes hereunder. **A list of Chartered Organizations that may potentially become Contributing Chartered Organization may be accessed at https://omniagentsolutions.com/bsa-SAballots**.

2.    Any Chartered Organization that becomes a Protected Party in accordance with this Article IV.J shall have all of the rights, remedies and obligations of a Protected Party under the Plan, including under the Channeling Injunction, notwithstanding that such Chartered Organization was not a Protected Party under the Plan as of the Effective Date.

K.    Post-Effective Date Settling Insurance Companies.

1.    Notwithstanding any present exclusionary language in the Plan, after the Effective Date, any Insurance Company that is a Non-Settling Insurance Company may, within twelve (12) months of the Effective Date (the "Insurance Settlement Period"), and such Insurance Settlement Period may be extended by the Settlement Trustee with the consent of a majority of the STAC and the Future Claimants' Representative, enter into an Insurance Settlement Agreement with the Settlement Trustee (a "Post-Effective Date Insurance Settlement"); provided, however, that the Settlement Trustee shall file a notice with the Bankruptcy Court within thirty (30) days of entering into any such Post-Effective Date Insurance Settlement, together with an amendment to Exhibit I including such Post-Effective Date Insurance Settlement, and such Insurance Company (and any related Persons or Representatives, as applicable) shall be deemed to be a Settling Insurance Company and a Protected Party for all purposes hereunder and the Settlement Trustee and the Future Claimants' Representative shall have the authority to seek approval of a Post-Effective Date Insurance Settlement in accordance with the Settlement Trust Agreement. The Post-Effective Date Insurance Settlement and amendment shall be deemed binding and effective absent objection by any Person within fifteen (15) calendar days. The Settlement Trustee shall have the sole discretion, upon order of the Bankruptcy Court, to extend the Insurance Settlement Period.

2.    Any Insurance Company that becomes a Protected Party in accordance with this Article IV.K shall have all of the rights, remedies and obligations of a Protected Party under the Plan, including under the Channeling Injunction, notwithstanding that such Insurance Company was not a Protected Party under the Plan as of the Effective Date.

L.    Settlement Trust Expenses. The Settlement Trust shall pay all Settlement Trust Expenses from the Settlement Trust Assets. The Settlement Trust shall bear sole responsibility with respect to the payment of the Settlement Trust Expenses. Additionally, the Settlement Trust shall promptly pay all reasonable and documented Settlement Trust Expenses incurred by any Protected Party for any and all liabilities, costs or expenses as a result of taking action on behalf of or at the direction of the Settlement Trust following the transfer to the Settlement Trust of copies of all records and documents in such Persons' possession, custody or control pertaining to Abuse Claims in accordance with the Document Appendix. To the maximum extent permitted by applicable law, the Settlement Trustee shall not have or incur any liability for actions taken or omitted in his or her capacity as Settlement Trustee, or on behalf of the Settlement Trust, except those acts found by Final Order to be arising out of his or her willful misconduct, bad faith, gross negligence or fraud, and shall be entitled to indemnification and reimbursement for reasonable fees

73

and expenses in defending any and all of his or her actions or omissions in his or her capacity as Settlement Trustee, or on behalf of the Settlement Trust, except for any actions or omissions found by Final Order to be arising out of his or her willful misconduct, bad faith, gross negligence or fraud.  Any valid indemnification claim of the Settlement Trustee shall be satisfied only from the Settlement Trust Assets.

      M.    <u>Reimbursement by Settlement Trust</u>.  From and after the Effective Date, the Settlement Trust shall reimburse, to the fullest extent permitted by applicable law, Reorganized BSA and each of the Local Councils for any documented out-of-pocket, losses, costs, and expenses (including judgments, attorneys' fees, and expenses) incurred by Reorganized BSA or any Local Council after the Effective Date attributable to the defense of a Direct Abuse Claim that is channeled to the Settlement Trust if the holder of such Direct Abuse Claim seeks to hold Reorganized BSA or such Local Council liable for such Direct Abuse Claim in violation of the terms of the Plan or the Confirmation Order; <u>provided</u> that the Settlement Trust's reimbursement obligations to Reorganized BSA and any Local Council for any Direct Abuse Claim shall be capped at and shall not exceed the amount actually payable by the Settlement Trust to the holder of such Direct Abuse Claim under the Trust Distribution Procedures (*i.e.*, the amount paid based on the Settlement Trust payment percentage); provided, further, that any amounts (1) incurred by the Settlement Trust as set forth herein, (2) incurred by the Settlement Trust to enforce the Channeling Injunction against a holder of a Direct Abuse Claim, or (3) that reduce Settlement Trust Assets as a result of the enforcement of the Channeling Injunction shall be deducted on a dollar-for-dollar basis against such holder's distribution from the Settlement Trust on account of such Direct Abuse Claim.  Reorganized BSA and any Local Council shall provide notice to the Settlement Trust within ten (10) business days of the service of any claim or lawsuit filed by a holder of an Abuse Claim that could result in any reimbursement obligations by the Settlement Trust under this provision.  In the event that any litigation asserting an Abuse Claim is filed naming Reorganized BSA or any Local Council as a defendant in violation of the terms of the Plan or the Confirmation Order, the Settlement Trust shall, at the request of Reorganized BSA or such Local Council, promptly appear (1) before the Bankruptcy Court to obtain entry of an order enforcing the Channeling Injunction and (2) in such litigation and seek the dismissal of the case.  Other than this limited reimbursement obligation, the Settlement Trust shall not be required to reimburse or indemnify any Protected Parties or Limited Protected Parties for any claims, liabilities, losses, actions, suits, proceedings, third-party subpoenas, damages, costs and expenses, including any liabilities related to, arising out of, or in connection with any Abuse Claim, except as provided in Article VIII.B of the Hartford Settlement Agreement, Section 20 of the Century Settlement Agreement, Section 17 of the Zurich Settlement Agreement, Section 17 of the Clarendon Agreement, and any comparable provision of another Insurance Settlement Agreement.  Except for the right to seek reimbursement or indemnity set forth in this <u>Article IV.M</u> and except as provided in Article VIII.B of the Hartford Settlement Agreement, Section 20 of the Century Settlement Agreement, Section 17 of the Zurich Settlement Agreement, Section 17 of the Clarendon Agreement, and any comparable provision of another Insurance Settlement Agreement, the Debtors, the Local Councils, the Contributing Chartered Organizations, the Participating Chartered Organizations and any other Person that is or becomes a Protected Party shall be forever barred from seeking compensation from the Settlement Trust for or on account of any Claims arising prior to the Petition Date.

      N.    [Reserved].

O.    <u>Assignment of Claims and Defenses</u>.  Notwithstanding anything herein to the contrary, but subject to the Insurance Settlement Agreements, on the Effective Date, the Debtors, the Local Councils and any other party that is or becomes a Protected Party or a Limited Protected Party shall be deemed to assign any and all Claims and defenses to the Settlement Trust that arise from or relate to Abuse Claims, including any Claims and defenses against co-defendants; <u>provided</u>, <u>however</u>, that with respect to Limited Protected Parties, the foregoing assignment shall be limited to Claims and defenses that arise from or relate to Post-1975 Chartered Organization Abuse Claims and Pre-1976 Chartered Organization Abuse Claims.    Notwithstanding the foregoing, nothing within the Plan or Confirmation Order shall be deemed to provide an assignment of any Claims or defenses to the Settlement Trust with respect to any Claims that have not been assumed by the Settlement Trust and subject to the Channeling Injunction of Article X.F herein; and <u>provided</u> <u>further</u>, that the Settling Insurance Companies shall not assign or be deemed to assign to the Settlement Trust any claim, Cause of Action, or right of recovery against their reinsurers or retrocessionaires, in their capacities as such.

P.    <u>Investment Guidelines</u>.  All monies held in the Settlement Trust shall be invested, subject to the investment limitations and provisions enumerated in the Settlement Trust Agreement.

Q.    <u>Excess Settlement Trust Assets</u>.  To the extent any Settlement Trust Assets remain at such time as the Settlement Trust is dissolved under the terms of the Settlement Trust Documents, any remaining Settlement Trust Assets shall be distributed to Reorganized BSA.

R.    <u>Document Appendix</u>.  Reorganized BSA, the Local Councils, and the Settlement Trust shall enter into the Document Appendix on the Effective Date, substantially in the form contained in the Plan Supplement.  The parties to the Document Appendix shall be bound by the terms thereof.

S.    <u>Privileged Information</u>.  The transfer or assignment of any Privileged Information to the Settlement Trustee shall be subject to the terms of the Document Appendix.

T.    <u>No Liability</u>.  The Protected Parties and the Limited Protected Parties shall neither have nor incur any liability to, or be subject to any right of action by, any Person for any act, omission, transaction, event, or other circumstance in connection with or related to the Settlement Trust, the Settlement Trustee, or the Settlement Trust Documents, including the administration of Abuse Claims and the distribution of Settlement Trust Assets by the Settlement Trust, or any related agreement.

U.    <u>U.S. Federal Income Tax Treatment of the Settlement Trust</u>.  The Settlement Trust shall be a "qualified settlement fund" within the meaning of the Treasury Regulations issued under Section 468B of the Internal Revenue Code.  Reorganized BSA shall make a "grantor trust" election under Treasury Regulation section 1.468B-1(k) with respect to the Settlement Trust for U.S. federal income tax purposes and, to the extent permitted under applicable law, for state and local income tax purposes.  All parties shall report consistently with such grantor trust election. The Settlement Trust shall file (or cause to be filed) statements, returns, or disclosures relating to the Settlement Trust that are required by any Governmental Unit.  The Settlement Trustee shall be responsible for the payment of any taxes imposed on the Settlement Trust or the Settlement Trust

Assets, including estimated and annual U.S. federal income taxes in accordance with the terms of the Settlement Trust Agreement.

V.      Institution and Maintenance of Legal and Other Proceedings.  As of the Effective Date, the Settlement Trust shall be empowered to initiate, prosecute, defend, settle, maintain, administer, preserve, pursue, and resolve all legal actions and other proceedings related to any asset, liability, or responsibility of the Settlement Trust, including the Insurance Actions, Abuse Claims, and the Settlement Trust Causes of Action.  Without limiting the foregoing, on and after the Effective Date, the Settlement Trust shall be empowered to initiate, prosecute, defend, settle, maintain, administer, preserve, pursue, and resolve all such actions, in the name of the Debtors or Reorganized BSA, if deemed necessary or appropriate by the Settlement Trust.  The Settlement Trust shall be responsible for the payment of all damages, awards, judgments, settlements, expenses, costs, fees, and other charges incurred on or after the Effective Date arising from, relating to, or associated with any legal action or other proceeding which is the subject of this Article IV.V and shall pay Indirect Abuse Claims, in accordance with the Trust Distribution Procedures, that may arise from deductibles or other charges.  Furthermore, without limiting the foregoing, the Settlement Trust shall be empowered to maintain, administer, preserve, or pursue the Insurance Actions and the Insurance Action Recoveries.

W.      Settlement Trust Discovery.  The Settlement Trust and holders of Direct Abuse Claims are authorized pursuant to Bankruptcy Rule 2004 and/or other applicable discovery rules to obtain information as set forth in the Document Appendix .  For the avoidance of doubt, the authorization of any discovery request pursuant to this provision shall not be construed to deprive the recipient of such discovery request of any applicable privilege or immunity from discovery. The Settlement Trust and holders of Direct Abuse Claims shall be able to take whatever steps are necessary to enforce such discovery obligations of Chartered Organizations pursuant to Bankruptcy Rule 2004, Civil Rule 45, other court resolution processes, and under bankruptcy law and applicable non-bankruptcy law.

X.      Notation on Claims Register Regarding Abuse Claims.  On the Effective Date, all Abuse Claims filed against the Debtors in the Chapter 11 Cases shall be marked on the Claims Register as "Channeled to the Settlement Trust" and resolved exclusively in accordance with the Trust Distribution Procedures.

## ARTICLE V.

## MEANS FOR IMPLEMENTATION OF THE PLAN

A.      General.  On and after the Confirmation Date, the Debtors shall be empowered and authorized to take or cause to be taken, prior to the Effective Date, all actions consistent with the Plan as may be necessary or appropriate to enable them to implement the provisions of the Plan before, on, or after the Effective Date, including the creation of the Settlement Trust and the preparations for the transfer of the Settlement Trust Assets to the Settlement Trust.

B.      Operations of the Debtors between Confirmation and the Effective Date.  The Debtors shall continue to operate as debtors and debtors in possession during the period from the Confirmation Date to the Effective Date.

C.   <u>BSA Governance Documents</u>.  From and after the Effective Date, Reorganized BSA shall be governed pursuant to the BSA Charter and the Amended BSA Bylaws.  The Amended BSA Bylaws shall contain such provisions as are necessary to satisfy the provisions of the Plan, subject to further amendment thereof after the Effective Date as permitted by applicable law.  Under the BSA Charter, the BSA has no power to issue certificates of stock, its object and purpose being solely of a charitable character and not for pecuniary profit; accordingly, the requirement of section 1123(a)(6) does not apply to the BSA.

D.   <u>Continued Legal Existence of BSA</u> and Delaware BSA.  The BSA shall continue to exist on and after the Effective Date, with all of the powers it is entitled to exercise under applicable law and pursuant to the BSA Charter and the Amended BSA Bylaws, subject to further amendment of the Amended BSA Bylaws after the Effective Date, as permitted by applicable law.  On and after the Effective Date, the Delaware BSA shall be dissolved at the discretion of the Reorganized BSA under any applicable state or federal law.

E.   <u>Reorganized BSA's Directors and Senior Management</u>.  Pursuant to section 1129(a)(5) of the Bankruptcy Code, to the extent that there are anticipated changes in Reorganized BSA's directors and officers, the Debtors will identify any such changes in the Plan Supplement.  On and after the Effective Date, the Amended BSA Bylaws, as such may be amended thereafter from time to time, shall govern the designation and election of directors of Reorganized BSA.

F.   [Reserved]

G.   <u>Due Authorization</u>.  As of the Effective Date, all actions contemplated by the Plan that require corporate action of the Debtors, or either of them, including actions requiring a vote of the National Executive Board or the National Executive Committee of the BSA or the sole member of Delaware BSA, and execution of all documentation incident to the Plan, shall be deemed to have been authorized, approved, and, to the extent taken prior to the Effective Date, ratified in all respects without any requirement of further action by the Bankruptcy Court, members, officers, or directors of the Debtors, Reorganized Debtors, or any other Person.

H.   <u>Reinstatement of Interests</u>.  As of the Effective Date, in accordance with <u>Article III.B.12</u>, Interests in Delaware BSA shall be Reinstated without further action by or order of the Bankruptcy Court, so as to maintain the organizational structure of the Debtors as such structure exists on the Effective Date unless implementation of the restructuring requires otherwise.

I.   <u>Restatement of Indebtedness</u>.

1.   Except as otherwise provided in the Plan, or in any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, and subject to the treatment afforded to holders of Allowed Claims in Class 3A, 3B, 4A, or 4B under <u>Article III</u>, on the Effective Date, all Prepetition Debt and Security Documents, including all agreements, instruments, and other documents evidencing or issued pursuant to the 2010 Credit Facility Documents, the 2019 RCF Documents, the 2010 Bond Documents, the 2012 Bond Documents, or any indebtedness or other obligations thereunder, and any rights of any holder in respect thereof, shall be deemed amended and

restated in the form of the Restated Debt and Security Documents on the terms set forth herein.

      2.     Any provision in any document, instrument, lease, or other agreement that causes or effectuates, or purports to cause or effectuate, a default, termination, waiver, or other forfeiture of, or by, the Debtors as a result of the satisfactions, Injunctions, Releases, Discharges and other transactions provided for in the Plan shall be deemed null and void and shall be of no force or effect.  Nothing contained herein shall be deemed to cancel, terminate, release, or discharge the obligation of the Debtors or any of their counterparties under any Executory Contract or Unexpired Lease to the extent such Executory Contract or Unexpired Lease has been assumed by the Debtors pursuant to a Final Order of the Bankruptcy Court, including the Confirmation Order.

      J.     <u>Cancellation of Liens</u>.  Except as otherwise provided in the Plan, on the Effective Date, any Lien securing any Allowed Secured Claim (other than a Lien securing any Allowed Secured Claim that is Reinstated pursuant to the Plan, including, for avoidance of doubt, the liens securing the Restated Debt and Security Documents) shall be deemed released and the holder of such Allowed Secured Claim shall be authorized and directed to release any collateral or other property of any Debtor (including any cash collateral) held by such holder and to take such actions as may be requested by the Debtors (or Reorganized Debtors, as the case may be) to evidence the release of such Lien, including the execution, delivery, and filing or recording of such releases as may be requested by the Debtors (or Reorganized BSA, as the case may be).

      K.     <u>Effectuating Documents and Further Transactions</u>.  The Chief Executive Officer and President, the Chief Financial Officer, and the General Counsel of the BSA are authorized to execute, deliver, file or record such contracts, instruments, releases, indentures, and other agreements or documents and take or direct such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan in the name of and on behalf of Reorganized Debtors, without the need for any approvals, authorizations, actions, or consents except for those expressly required pursuant to the Plan.

      L.     <u>Sources of Consideration for Distributions</u>.  Distributions under the Plan shall be funded from the following sources:

      1.     the Debtors shall fund Distributions on account of and satisfy Allowed General Unsecured Claims exclusively from the Core Value Cash Pool;

      2.     the Settlement Trust shall fund distributions on account of and satisfy compensable Abuse Claims in accordance with the Trust Distribution Procedures from the Settlement Trust Assets;

      3.     the Debtors shall satisfy 2010 Credit Facility Claims, 2019 RCF Claims, 2010 Bond Claims, and 2012 Bond Claims in accordance with the terms of the Restated 2010 Bond Documents, the Restated 2012 Bond Documents and the Restated Credit Facility Documents, as applicable; and

<div align="center">78</div>

4.     the Debtors shall fund Distributions on account of and satisfy all other Allowed Claims with Unrestricted Cash and Investments on hand on or after the Effective Date in accordance with the terms of the Plan and the Confirmation Order.

M.     <u>Calculation of Minimum Unrestricted Cash and Investments</u>.  The minimum amount of Unrestricted Cash and Investments to be retained by Reorganized BSA on the Effective Date shall be:

1.     $25,000,000 if the Effective Date occurs on or before September 30, 2021;

2.     $37,000,000 if the Effective Date occurs on or after October 1, 2021 but before November 1, 2021;

3.     $36,000,000 if the Effective Date occurs on or after November 1, 2021 but before December 1, 2021;

4.     $40,000,000 if the Effective Date occurs on or after December 1, 2021 but before January 1, 2022;

5.     $57,000,000 if the Effective Date occurs on or after January 1, 2022 but before February 1, 2022;

6.     $41,000,000 if the Effective Date occurs on or after February 1, 2022 but before March 1, 2022;

7.     $55,000,000 if the if the Effective Date occurs on or after March 1, 2022 but before April 1, 2022; and

8.     $54,000,000 if the Effective Date occurs on or after April 1, 2022 but before May 1, 2022; and

9.     $43,000,000 if the Effective Date occurs on or after May 1, 2022, but before June 1, 2022 and

10.    $34,000,000 if the Effective Date occurs on or after June 1, 2022.

Without limiting the foregoing, in accordance with the Hartford Insurance Settlement Agreement and the Allowance of the Hartford Administrative Expense Claim under the Plan, the Net Unrestricted Cash and Investments shall be reduced on a dollar-for-dollar basis equal to fifty percent (50%) of the Allowed Hartford Administrative Expense Claim, or $1,000,000.

N.     <u>Resolution of Abuse Claims</u>.  All Abuse Claims shall be channeled to and resolved by the Settlement Trust in accordance with the Trust Distribution Procedures; <u>provided</u>, that any Non-Settling Insurance Company may, subject to <u>Article X.M</u>, raise any valid Insurance Coverage Defense in response to a demand by the Settlement Trust, including any right of such Non-Settling Insurance Company to assert any defense that could, but for the Settlement Trust's assumption of the liabilities, obligations, and responsibilities of the Protected Parties for Abuse Claims, have been raised by the Debtors or other applicable Protected Party with respect to such Claim.

79

O.     Funding by the Settlement Trust.  The Settlement Trust shall have no obligation to fund costs or expenses other than those set forth in the Plan or the Settlement Trust Documents, as applicable.

P.     Core Value Cash Pool.  Reorganized BSA shall deposit Cash into the Core Value Cash Pool by making four semi-annual installment payments equal to $6,250,000.  Reorganized BSA shall make the first deposit six (6) months after the Effective Date; the second installment on the first anniversary after the Effective Date; the third installment eighteen (18) months after the Effective Date; and the fourth installment on the second anniversary of the Effective Date.

Q.     Creditor Representative; Disbursing Agent.  The Creditor Representative shall be appointed as of the Effective Date.  The Creditor Representative shall be responsible for assisting Reorganized BSA and its professionals in their efforts to efficiently reconcile Convenience Claims, General Unsecured Claims, and Non-Abuse Litigation Claims.  The identity of the Creditor Representative shall be determined by the Creditors' Committee, with the consent of the Debtors (such consent not to be unreasonably withheld).  The Debtors or Reorganized BSA, as applicable, will use commercially reasonable efforts to assist the Creditor Representative in reconciling Convenience Claims, General Unsecured Claims, and Non-Abuse Litigation Claims on or before the applicable Claims Objection Deadline.  The reasonable fees and actual and necessary costs and expenses of the Creditor Representative shall be paid by Reorganized BSA up to the Creditor Representative Fee Cap, and Reorganized BSA shall have no obligation to compensate or reimburse the costs or expenses of the Creditor Representative beyond the amount of the Creditor Representative Fee Cap.  The Disbursing Agent shall have the rights, powers and responsibilities provided in Article VII.  The reasonable fees and actual and necessary costs and expenses of the Disbursing Agent, if any, shall be paid by Reorganized BSA.

R.     Residual Cash in Core Value Cash Pool.  To the extent any Cash remains in the Core Value Cash Pool after all Allowed General Unsecured Claims have been satisfied in full, such remaining Cash shall: (1) first, on account of any Allowed Non-Abuse Litigation Claims that shall not have elected to be treated as an Allowed Convenience Claim under Article III.B.9 to satisfy any deficiency in payments of such Allowed Claims (a) from available insurance coverage, including Abuse Insurance Policies and Non-Abuse Insurance Policies, (b) from applicable proceeds of any Insurance Settlement Agreements, and (c) from co-liable non-debtors (if any) or their insurance coverage; (2) second, to pay interest to holders of Allowed General Unsecured Claims in accordance with Article VII.L; and (3) third irrevocably re-vest in Reorganized BSA.

S.     Compromise and Settlement of Claims, Interests and Controversies.  Pursuant to section 1123(b)(3)(A) of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided under the Plan and the Plan Documents, as of the Effective Date, the provisions of the Plan, including the Abuse Claims Settlement, the Insurance Settlement Agreements, the JPM / Creditors' Committee Settlement, the United Methodist Settlement, the Settlement of Restricted and Core Asset Disputes, and the PSZJ Settlement, set forth in this Article V.S, shall constitute good-faith compromises and settlements of Claims, Interests, and controversies among the parties thereto relating to the contractual, legal, equitable and subordination rights that holders of Claims or Interests may have with respect to any Claim or Interest under the Plan or any Distribution to be made on account of an Allowed Claim.  The Plan shall be deemed a motion, proposed by the Debtors and joined by the parties to the Abuse Claims

Settlement, the Insurance Settlement Agreements, the JPM / Creditors' Committee Settlement, the United Methodist Settlement, the Settlement of Restricted and Core Asset Disputes,  and the PSZJ Settlement, respectively, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise and settlement of all such Claims, Interests, and controversies among the parties thereto, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates, and holders of such Claims and Interests, and is fair, equitable and reasonable.

        1.      <u>Abuse Claims Settlement</u>.   The treatment provided for Abuse Claims, including Post-1975 Chartered Organization Abuse Claims, Pre-1976 Chartered Organization Abuse Claims against the Limited Protected Parties, and Opt-Out Chartered Organization Abuse Claims, under the Plan incorporates and reflects a proposed compromise and settlement of all Scouting Released Claims, including all Abuse Claims against the Protected Parties, all Pre-1976 Chartered Organization Abuse Claims against the Limited Protected Parties, all Post-1975 Chartered Organization Abuse Claims against the Limited Protected Parties and Opt-Out Chartered Organization Abuse Claims against Opt-Out Chartered Organizations (the "<u>Abuse Claims Settlement</u>"), and the Plan constitutes a request for the Bankruptcy Court to authorize and approve the Abuse Claims Settlement.   The following constitute the provisions and conditions of the Abuse Claims Settlement:

        a.      <u>Local Council Settlement Contribution</u>.  The Local Councils shall make, cause to be made, or be deemed to have made, as applicable, the Local Council Settlement Contribution.  If a Local Council is unable to transfer its rights, titles, privileges, interests, claims, demands or entitlements, as of the Effective Date, to any proceeds, payments, benefits, Causes of Action, choses in action, defense, or indemnity, now existing or hereafter arising, accrued or unaccrued, liquidated or unliquidated, matured or unmatured, disputed or undisputed, fixed or contingent, arising under or attributable to (i) the Abuse Insurance Policies, the Insurance Settlement Agreements, and claims thereunder and proceeds thereof; (ii) Insurance Actions, and (iii) the Insurance Action Recoveries (the "<u>Local Council Insurance Rights</u>"), then the Local Council shall, at the sole cost and expense of the Settlement Trust: (a) take such actions reasonably requested by the Settlement Trustee to pursue any of the Local Council Insurance Rights for the benefit of the Settlement Trust; and (b) promptly transfer to the Settlement Trust any amounts recovered under or on account of any of the Local Council Insurance Rights; <u>provided</u>, <u>however</u>, that while any such amounts are held by or under the control of any Local Council, such amounts shall be held for the benefit of the Settlement Trust.

        b.      <u>Contributing Chartered Organization Settlement Contribution</u>. The Contributing Chartered Organizations, including the United Methodist Entities, shall make, cause to be made, or be deemed to have made, as applicable, the Contributing Chartered Organization Settlement Contribution, including the United Methodist Settlement Contribution, as applicable.  If a Contributing Chartered Organization is unable to transfer its rights, titles, privileges, interests, claims, demands or entitlements, if any, as of the Effective Date, to any proceeds,

payments, benefits, Causes of Action, choses in action, defense, or indemnity, now existing or hereafter arising, accrued or unaccrued, liquidated or unliquidated, matured or unmatured, disputed or undisputed, fixed or contingent, arising under or attributable to (i) the Abuse Insurance Policies, the Settling Insurer Policy Rights, the Insurance Settlement Agreements, and claims thereunder and proceeds thereof, (ii) the Insurance Actions, and (iii) the Insurance Action Recoveries (the "Contributing Chartered Organization Insurance Rights"), then the Contributing Chartered Organization shall, at the sole cost and expense of the Settlement Trust: (a) take such actions reasonably requested by the Settlement Trustee to pursue any of the Contributing Chartered Organization Insurance Rights for the benefit of the Settlement Trust; and (b) promptly transfer to the Settlement Trust any amounts recovered under or on account of any of the Contributing Chartered Organization Insurance Rights; provided, however, that while any such amounts are held by or under the control of any Contributing Chartered Organization, such amounts shall be held for the benefit of the Settlement Trust.

c.      Participating Chartered Organization Settlement Contribution. The Participating Chartered Organizations shall make, cause to be made, or be deemed to have made, as applicable, the Participating Chartered Organization Settlement Contribution. If a Participating Chartered Organization is unable to transfer its rights, titles, privileges, interests, claims, demands or entitlements, if any, as of the Effective Date, to any proceeds, payments, benefits, Causes of Action, choses in action, defense, or indemnity, now existing or hereafter arising, accrued or unaccrued, liquidated or unliquidated, matured or unmatured, disputed or undisputed, fixed or contingent, arising under or attributable to (i) the Abuse Insurance Policies, the Settling Insurer Policy Rights, the Insurance Settlement Agreements, and claims thereunder and proceeds thereof, (ii) the Insurance Actions, and (iii) the Insurance Action Recoveries (the "Participating Chartered Organization Insurance Rights"), then the Participating Chartered Organization shall, at the sole cost and expense of the Settlement Trust: (a) take such actions reasonably requested by the Settlement Trustee to pursue any of the Participating Chartered Organization Insurance Rights for the benefit of the Settlement Trust; and (b) promptly transfer to the Settlement Trust any amounts recovered under or on account of any of the Participating Chartered Organization Insurance Rights; provided, however, that while any such amounts are held by or under the control of any Participating Chartered Organization, such amounts shall be held for the benefit of the Settlement Trust.

d.      Claims Deemed Withdrawn with Prejudice. On the Effective Date, any and all Claims that have been asserted in the Chapter 11 Cases by or on behalf of any Local Council, Participating Chartered Organization, Contributing Chartered Organization, or Settling Insurance Company shall be deemed withdrawn with prejudice and irrevocably waived, released and expunged from the Claims Register without any further notice to or action, order, or approval of the Bankruptcy Court, except that any withdrawal, waiver, release or expungement of any Claims asserted by Settling Insurance Companies, and the United Methodist Entities shall be governed by the terms and conditions of the applicable Insurance

82

Settlement Agreements, or the United Methodist Settlement Agreement, respectively. Further, no Local Council, Participating Chartered Organization, Contributing Chartered Organization, or Settling Insurance Company shall file or assert any Claim or Claims against the Debtors or Reorganized BSA arising from any act or omission of the Debtors prior to the Confirmation Date, except as provided otherwise in the Hartford Insurance Settlement Agreement (including with respect to the Hartford Additional Administrative Expense Claim, if applicable).

      e.    <u>Entitlement to Become a Protected Party</u>. Notwithstanding anything to the contrary set forth in the Plan or any other document filed with the Bankruptcy Court: (i) no Local Council shall be treated as a Protected Party under the Plan if any part of the Cash or Property Contribution (as defined on <u>Exhibit F</u>) components of the Local Council Settlement Contribution is not contributed to the Settlement Trust on the Effective Date as described on <u>Exhibit F</u>, it being understood that the Property contribution shall be deemed to have been contributed on the Effective Date for Purposes of this provision when all individual Local Councils that are to make a Property Contribution have provided a notice of intent to contribute property to the Settlement Trust in accordance with the terms of the Property Contribution set forth on <u>Exhibit F</u>; (ii) no Contributing Chartered Organization shall be treated as a Protected Party under the Plan until its Contributing Chartered Organization Settlement Contribution shall have been made; (iii) no Settling Insurance Company shall be treated as a Protected Party under the Plan until such Settling Insurance Company shall have made its contribution to the Settlement Trust pursuant to, and as set forth in, an Insurance Settlement Agreement, except that Hartford Protected Parties, the Century and Chubb Companies, the Zurich Insurers and Zurich Affiliated Insurers, and Clarendon shall each be treated as a Settling Insurance Company and Protected Party as set forth in their respective Insurance Settlement Agreements; and (iv) no Participating Chartered Organization shall be treated as a Protected Party solely based on the Participating Chartered Organization Insurance Assignment. Notwithstanding the foregoing, no Chartered Organization that is a debtor in bankruptcy as of the Confirmation Date (including the Archbishop of Agaña, a Corporation Sole) shall be treated as a Participating Chartered Organization unless it advises Debtors' counsel in writing that it wishes to make the Participating Chartered Organization Insurance Assignment, provided, however, that such Chartered Organizations shall be otherwise deemed an Opt-Out Chartered Organization and Opt-Out Chartered Organization Abuse Claims against such Chartered Organizations shall be Channeled to the Settlement Trust.

      f.    <u>Entitlement to Become a Limited Protected Party</u>. Notwithstanding anything to the contrary set forth in the Plan or any other document filed with the Bankruptcy Court, no Chartered Organization shall be treated as a Limited Protected Party under the Plan if it objects to Confirmation of the Plan or informs Debtors' counsel in writing on or before the deadline to object to Confirmation of the Plan that it does not wish to make the Participating Chartered Organization Insurance Assignment. Notwithstanding the foregoing, no Chartered Organization that is a debtor in bankruptcy as of the Confirmation Date (including the

Archbishop of Agaña, a Corporation Sole) shall be treated as a Participating Chartered Organization unless it advises Debtors' counsel in writing that it wishes to make the Participating Chartered Organization Insurance Assignment, provided, however, that such Chartered Organizations shall be otherwise deemed an Opt-Out Chartered Organization and Opt-Out Chartered Organization Abuse Claims against such Chartered Organizations shall be Channeled to the Settlement Trust.

g.    Opt-Out Chartered Organizations.

(i)    Opt-Out Chartered Organizations by definition are not Participating Chartered Organizations, Limited Protected Parties, or Contributing Chartered Organizations.  The term "Opt-Out Chartered Organization," on the one hand, and the terms Participating Chartered Organizations, Limited Protected Parties and Contributing Chartered Organizations, on the other hand, are mutually exclusive.

(ii)    As a condition to the Effective Date (waiver of which shall require the prior written consent of, among others, the Settling Insurance Companies), on the Release Date (as such term is defined in each Insurance Settlement Agreement), any Opt-Out Chartered Organization shall receive the benefit of the Channeling Injunction and the release of all Abuse Claims that are covered under insurance policies issued by the Settling Insurance Companies.

(iii)    **The Opt-Out Chartered Organizations are barred from asserting rights, claims, liens and interests under and against the Abuse Insurance Policies that were issued by a Settling Insurance Company;, nothing herein, including, without limitation, the Channeling Injunction in Article X.F, shall require an Opt-Out Chartered Organization to provide an assignment or release with respect to its rights under insurance policies issued directly to such organization, including those set forth in Sections 9 and 10 of the Century and Chubb Companies Insurance Settlement Agreement. The rights of the Opt-Out Chartered Organizations provided under insurance policies issued directly to such organization are preserved, provided, that the Settling Insurance Companies and the Opt-Out Chartered Organizations may enforce and rely upon the channeling and release of Abuse Claims against an Opt-Out Chartered Organization as set forth herein, including as set forth in Articles X.F.1 and  X.F.3, for all purposes. All rights and defenses of the Settling Insurance Companies under insurance policies issued directly to an Opt-Out Chartered Organization are preserved.**

(iv)    If, however, a Chartered Organization that is an Opt-Out Chartered Organization wants to become a Contributing Chartered Organization, (i) a financial contribution must be made by or on behalf of such Opt-Out Chartered Organization, (ii) such Chartered Organization

must agree to provide the assignments and releases set forth in Sections 9 and 10 in the Century and Chubb Companies Insurance Settlement Agreement, and (iii) if and to the extent required by the BSA, such Chartered Organization must agree to cooperate with the Child Protection Committee.

(v)     For the avoidance of doubt, and by definition, the applicable Abuse Insurance Policies identified in each of the Insurance Settlement Agreements were issued directly to the BSA and the Local Councils and were not issued directly to the Chartered Organizations.

2.    JPM / Creditors' Committee Settlement.  The treatment provided for under the Plan for Allowed 2010 Credit Facility Claims, Allowed 2019 RCF Claims, Allowed 2010 Bond Claims, Allowed 2012 Bond Claims, Allowed Convenience Claims, Allowed General Unsecured Claims, and Allowed Non-Abuse Litigation Claims, together with the terms and conditions of the JPM / Creditors' Committee Term Sheet, reflects a proposed compromise and settlement by and among the Debtors, the Creditors' Committee and JPM (the "JPM / Creditors' Committee Settlement").[5]  The following constitutes the provisions and conditions of the JPM / Creditors' Committee Settlement:

a.    Allowance and Treatment of 2010 Credit Facility Claims, 2019 RCF Claims, 2010 Bond Claims and 2012 Bond Claims.  The 2010 Credit Facility Claims, the 2019 RCF Claims, the 2010 Bond Claims and the 2012 Bond Claims shall be Allowed in the amounts set forth in Article III.B and receive the treatment afforded to such Claims thereunder.  The Debtors acknowledge and agree that the Claims held by JPM (the 2010 Credit Facility Claims, the 2019 RCF Claims, the 2010 Bond Claims and the 2012 Bond Claims), are core to the Debtors' charitable mission and were incurred in furtherance of the Debtors' charitable mission.

b.    Treatment of Convenience Claims, General Unsecured Claims, and Non-Abuse Litigation Claims.  Convenience Claims, General Unsecured Claims, and Non-Abuse Litigation Claims shall receive the treatment afforded to such Claims under Article III.B.   The Debtors acknowledge and agree that General Unsecured Claims, Convenience Claims, and Non-Abuse Litigation Claims are held by creditors who are core to the Debtors' charitable mission or creditors whose Claims in such Classes, if Allowed, were incurred in furtherance of the Debtors' charitable mission; accordingly, payments by Reorganized BSA under the Plan on account of such Allowed Claims, if applicable, will be made from Cash relating to Reorganized BSA's core assets.

c.    Challenge Period. As of the Effective Date, (i) the Challenge Period (as defined in the Cash Collateral Order) shall be deemed to have expired with respect to the Creditors' Committee; (ii) the Stipulations (as defined in the Cash

---

[5]    In the event of a conflict between the terms and conditions of the Plan, on the one hand, and the terms and conditions of the JPM / Creditors' Committee Term Sheet, on the other hand, the terms of the Plan shall control.

Collateral Order) and other admissions, agreements and releases set forth in the Cash Collateral Order shall be final and binding on the Creditors' Committee. The ability of any other party to bring a Challenge Proceeding (as defined in the Cash Collateral Order) shall be governed by the terms and conditions of the Cash Collateral Order.

3.      Settlement of Restricted and Core Asset Disputes.   As a proposed compromise and settlement of any and all disputes concerning the Debtors' restricted and/or core assets, including the claims asserted in the complaint filed by the Tort Claimants' Committee in the adversary proceeding entitled *Official Tort Claimants' Committee of Boy Scouts of America and Delaware BSA, LLC v. Boy Scouts of America and Delaware BSA, LLC*, Adv. Pro. No. 21-50032 (LSS) (the "Settlement of Restricted and Core Asset Disputes"), the Debtors shall: (a) reduce the minimum amount of Unrestricted Cash and Investments to be retained by Reorganized BSA on the Effective Date from $75,000,000 to $25,000,000 (subject to potential variance as set forth in Article V.M); and (b) issue the BSA Settlement Trust Note to the Settlement Trust as of the Effective Date in accordance with Article V.X.  As further consideration in connection with the Settlement of Restricted and Core Asset Disputes, the Debtors have agreed under the Plan to: (i) fund the Core Value Cash Pool, in the amount of $25,000,000; and (ii) make the BSA Settlement Trust Contribution, including all of the Net Unrestricted Cash and Investments.  The proceeds of the Foundation Loan, in the amount of $42,800,000 (which Reorganized BSA will use exclusively for working capital and general corporate purposes), will permit the Debtors to contribute to the Settlement Trust a substantial amount of core value consideration in Cash on the Effective Date.

4.      Insurance Settlement Agreements.   The Plan incorporates the Insurance Settlement Agreements, which are attached hereto under Exhibit I, and the Plan shall constitute a motion by the Debtors for the Bankruptcy Court to approve the proposed compromises and settlements and assignment and/or sale of the applicable Insurance Policies as set forth in each such Insurance Settlement Agreement, pursuant to sections 363, 503(b), 507(a)(2), 1123 and 1141 of the Bankruptcy Code, as applicable, and Bankruptcy Rule 9019, including approval of (i) the Insurance Settlement Agreements, (ii) the assignment of the Local Council Insurance Policies issued by Settling Insurance Companies to the Debtors and the Estates, as applicable, (iii) the Participating Chartered Organization Insurance Assignment, (iv) the sale by the Debtors and the Estates, and the purchase by the Settling Insurance Companies of the applicable Insurance Policies, free and clear of all liens, claims, encumbrances, interests and rights of any nature, whether at law or in equity, of any Person or Entity as set forth in the Insurance Settlement Agreements, *except* solely with respect to the interests, if any, of the Archbishop of Agaña, (v) the Allowance of the Hartford Administrative Expense Claim, and (vi) certain other settlements, compromises and releases as set forth in the Insurance Settlement Agreements. The Confirmation Order shall constitute the Bankruptcy Court's approval of such motion pursuant to sections 363, 503(b), 507(a)(2), 1123 and 1141 of the Bankruptcy Code, as applicable, and Bankruptcy Rule 9019 and Allowance of the Hartford Administrative Expense Claim and shall include findings of fact and conclusions of law pertaining to such approval, in form and substance acceptable to the Settling Insurance Companies, as applicable, including findings and conclusions designating the Settling Insurance

Companies as good-faith purchasers of the applicable Insurance Policies. Pursuant to the Century and Chubb Companies Insurance Settlement Agreement, upon the release of the Initial Payment (as defined in the Century and Chubb Companies Insurance Settlement Agreement), the Debtors or Reorganized BSA, as applicable, and the Debtors' Estates shall irrevocably release the Prepetition Century and Chubb Companies Claims, even in the case the Confirmation Order is reversed or vacated on appeal following the Effective Date. Pursuant to and subject to the terms of the Hartford Insurance Settlement Agreement, upon Hartford's payment of the Initial Payment (as defined in the Hartford Insurance Settlement Agreement) to the Settlement Trust, the Debtors or Reorganized BSA, as applicable, and the Debtors' Estates shall irrevocably release the Prepetition Hartford Claims, even if the Confirmation Order is reversed or vacated on appeal following the Effective Date.

5.    TCJC.    TCJC is not a Contributing Chartered Organization and shall be a Participating Chartered Organization and shall have all of the rights and obligations associated therewith.

6.    United Methodist Settlement.    The Plan incorporates the United Methodist Settlement Agreement, filed on the docket of the Chapter 11 Cases and attached hereto as Exhibit J-2, and the Plan shall constitute a motion by the Debtors for the Bankruptcy Court to approve all the proposed compromises and settlements set forth in the United Methodist Settlement Agreement other than Section 2(h) therein (the "United Methodist Settlement") pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, including, as provided in the United Methodist Settlement Agreement, payment of the United Methodist Settlement Contribution to the Settlement Trust as a compromise and settlement of all Abuse Claims against United Methodist Entities and certain Claims by United Methodist Entities against the Debtors, Local Councils, and other parties in interest and disputes relating to the Plan. The Confirmation Order shall constitute the Bankruptcy Court's approval of such motion pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019 and shall include findings of fact and conclusions of law pertaining to such approval, in form and substance acceptable to the United Methodist ad hoc committee.

7.    PSZJ Settlement.    The Plan incorporates the compromise and settlement of all claims and disputes the Debtors have, or may have, against the Tort Claimants' Committee and its Representatives, including Pachulski Stang Ziehl & Jones LLP ("PSZJ"), regarding the alleged improper transmittal of communications from Timothy Kosnoff Esq. by PSZJ to thousands of survivors from the official Tort Claimants' Committee's email address, many of whom were not clients of Mr. Kosnoff, and related actions (the "PSZJ Actions"). As part of this compromise and settlement and only upon the Effective Date, (a) the Tort Claimants' Committee and its professionals shall be Exculpated Parties herein and (b) PSZJ shall (i) make a cash contribution of $1,250,000 to the Reorganized BSA to be reserved for the Youth Protection Program and (ii) write-off $750,000 of PSZJ's fees; provided, however, if the Effective Date does not occur, the Debtors and PSZJ reserve all rights and defenses with respect to the PSZJ Actions. The Plan shall constitute a motion by the Debtors for the Bankruptcy Court to approve the proposed PSZJ Settlement pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019. The proposed PSZJ Settlement, with its significant and important $1,250,000 contribution earmarked for the Youth Protection Program, is fair, reasonable and in all parties' best interests.

      8.    <u>Roman Catholic Settlement</u>.  The Plan incorporates the Roman Catholic Settlement Agreement, attached hereto as <u>Exhibit J-3</u>.  Pursuant to the Roman Catholic Settlement, all Roman Catholic Entities, other than those that have specifically opted out of such treatment (and do not withdraw such opt-out) and other than those that are debtors in bankruptcy as of the Confirmation Date that have not advised Debtors' counsel in writing that they wish to make the Participating Chartered Organization Insurance Assignment, shall be treated as Participating Chartered Organizations.

T.    <u>Payment of Coalition and Pfau/Zalkin Restructuring Expenses.</u>

      1.    On or as soon as reasonably practicable after the Effective Date, and subject to the Bankruptcy Court granting a motion filed pursuant to sections 363(b), 1129(a)(4) and 503(b) of the Bankruptcy Code, Bankruptcy Rule 9019, or otherwise applicable bankruptcy and non-bankruptcy law, Reorganized BSA shall reimburse state court counsel for amounts they have paid to the Coalition Professionals for, and/or pay the Coalition Professionals for amounts payable by state court counsel but not yet paid to Coalition Professionals for, reasonable, documented, and contractual professional advisory fees and expenses incurred by the Coalition Professionals (the "<u>Coalition Restructuring Expenses</u>") from the Coalition's inception up to and including the Effective Date, up to a maximum amount equal to the lesser of (x) (a) $950,000 per month for the period from August 16, 2021 up to and including the Effective Date (pro-rated for any partial month), plus (b) $10,500,000 and (y) $21,000,000; <u>provided</u>, <u>however</u>, that, without limiting the foregoing, under no circumstance shall the Debtors or Reorganized BSA have any obligation to (i) pay or reimburse the Coalition, any of its members, or any Persons affiliated with the Coalition for any costs, fees or expenses other than the Coalition Restructuring Expenses or (ii) pay or reimburse any Coalition Restructuring Expenses that constitute transaction, success or similar contingent fees.  The Coalition shall provide the Debtors a reasonable estimate of the total Coalition Restructuring Expenses as of the Effective Date no later than the date that is five (5) Business Days before the anticipated Effective Date.  Notwithstanding anything to the contrary in the Plan, the Coalition Restructuring Expenses shall be subject to the terms of <u>Article II.A.2</u>, with the following modifications: (x) Coalition Professionals shall comply with the procedures and processes set forth in <u>Article II.A.2</u> by filing final fee application(s), which, for attorneys or law firms who are Coalition Professionals, shall include time entry detail, which may be redacted for privilege; and (y) payment or reimbursement of Coalition Restructuring Expenses shall be subject to the review and procedure of the Fee Examiner.  For the avoidance of doubt, the Coalition Professionals shall not be considered retained professionals of the Debtors, the Creditors' Committee, the Tort Claimants' Committee, or the Future Claimants' Representative, and the retention of the Coalition Professionals shall not have been required to satisfy the standards for retention set forth in sections 327, 328 or 1103 of the Bankruptcy Code.  The requirement that a separate motion be filed with the Bankruptcy Court shall not in any way prejudice or limit the payment of the Coalition Restructuring Expenses under the Plan and/or pursuant to sections 363(b), 1129(a)(4) and 503(b) of the Bankruptcy Code, Bankruptcy Rule 9019, or otherwise applicable bankruptcy and non-bankruptcy law or determine what standard should be applied to determine approval of the Coalition Restructuring Expenses; <u>provided</u>, <u>however</u>, that nothing in the Confirmation Order shall make any findings of facts

or conclusions of law regarding whether the Coalition Restructuring Expenses should be approved.

2.      On or as soon as reasonably practicable after the Effective Date, and subject to the Bankruptcy Court granting a motion filed pursuant to sections 363(b), 1129(a)(4) and 503(b) of the Bankruptcy Code, Bankruptcy Rule 9019, or otherwise applicable bankruptcy and non-bankruptcy law, the Settlement Trust shall reimburse state court counsel for amounts they have paid to KTBS Law and Michel Horton (the "Pfau/Zalkin Professionals") for, and/or pay the Pfau/Zalkin Professionals for amounts payable by state court counsel but not yet paid to Pfau/Zalkin Professionals for, reasonable, documented, and contractual professional advisory fees and expenses incurred by the Pfau/Zalkin Professionals (the "Pfau/Zalkin Restructuring Expenses"); provided, however, that, without limiting the foregoing, (i) the the Pfau/Zalkin Restructuring Expenses shall be paid from the Settlement Trust Assets and (ii) the Pfau/Zalkin Restructuring Expenses shall be in an aggregate amount not to exceed $3,500,000. Under no circumstance shall the Debtors or Reorganized BSA have any obligation to pay or reimburse, from the Settlement Trust Assets, the Pfau/Zalkin Professionals, any of its members, or any Persons affiliated with the Pfau/Zalkin Professionals or any Pfau/Zalkin Restructuring Expenses that constitute transaction, success or similar contingent fees. The Pfau/Zalkin Professionals shall provide the Settlement Trust a reasonable estimate of the total Pfau/Zalkin Restructuring Expenses as of the Effective Date no later than the date that is five (5) Business Days before the anticipated Effective Date.   Notwithstanding anything to the contrary in the Plan, the Pfau/Zalkin Restructuring Expenses shall be subject to the terms of Article II.A.2, with the following modifications: (x) Pfau/Zalkin Professionals shall comply with the procedures and processes set forth in Article II.A.2 by filing final fee application(s), which, for attorneys or law firms who are Pfau/Zalkin Professionals, shall include time entry detail, which may be redacted for privilege; and (y) payment or reimbursement of Pfau/Zalkin Restructuring Expenses shall be subject to the review and procedure of the Fee Examiner. For the avoidance of doubt, the Pfau/Zalkin Professionals shall not be considered retained professionals of the Debtors, the Creditors' Committee, the Tort Claimants' Committee, the Coalition, or the Future Claimants' Representative, and the retention of the Pfau/Zalkin Professionals shall not have been required to satisfy the standards for retention set forth in sections 327, 328 or 1103 of the Bankruptcy Code. The requirement that a separate motion be filed with the Bankruptcy Court shall not in any way prejudice or limit the payment of the Pfau/Zalkin Restructuring Expenses under the Plan and/or pursuant to sections 363(b), 1129(a)(4) and 503(b) of the Bankruptcy Code, Bankruptcy Rule 9019, or otherwise applicable bankruptcy and non-bankruptcy law or determine what standard should be applied to determine approval of the Pfau/Zalkin Restructuring Expenses; provided, however, that nothing in the Confirmation Order shall make any findings of facts or conclusions of law regarding whether the Pfau/Zalkin Restructuring Expenses should be approved.

U.      Good-Faith Compromise and Settlement.   The Plan (including its incorporation of the Abuse Claims Settlement, the Insurance Settlements, the JPM / Creditors' Committee Settlement, the United Methodist Settlement, the Settlement of Restricted and Core Asset Disputes, and the PSZJ Settlement), the Plan Documents, and the Confirmation Order constitute a good-faith compromise and settlement of Claims, Interests and controversies based upon the

unique circumstances of these Chapter 11 Cases.  The Plan, the Abuse Claims Settlement, the Insurance Settlements, the JPM / Creditors' Committee Settlement, the United Methodist Settlement, the Settlement of Restricted and Core Asset Disputes, the PSZJ Settlement, the Plan Documents, and the Confirmation Order will be binding as to the matters and issues described therein, but will not be binding with respect to similar matters or issues that might arise in any other litigation or proceeding in which none of the Debtors, Reorganized BSA, the Protected Parties, or the Settlement Trust is a party.

V.   Restated Debt and Security Documents.

1.   On the Effective Date, the Prepetition Debt and Security Documents shall be amended and restated in the form of the Restated Debt and Security Documents, and Reorganized BSA, JPM and Arrow shall, and shall be authorized, to execute, deliver and enter into the Restated Debt and Security Documents as of such date, in principal amounts equal to the Allowed amounts set forth in Article III.B.3, Article III.B.4, Article III.B.5, and Article III.B.6 without the need for any further corporate action or any further notice to or order of the Bankruptcy Court.  The Debtors or Reorganized BSA, as applicable, JPM, and Arrow shall take all actions necessary to continue the Debtors' obligations under the Prepetition Debt and Security Documents, as amended and restated by the Restated Debt and Security Documents and to give effect to the Restated Debt and Security Documents, including surrendering any debt instruments or securities that are no longer applicable under the Restated Debt and Security Documents to the Debtors or Reorganized BSA. Entry of the Confirmation Order shall be deemed approval of the JPM Exit Fee, and Reorganized BSA is authorized and directed to pay the JPM Exit Fee to JPM on the Effective Date.

2.   Except as otherwise modified by the Restated Debt and Security Documents, all Liens, mortgages and security interests securing the obligations arising under the Restated Debt and Security Documents that were collateral securing the Debtors' obligations under the Prepetition Debt and Security Documents as of the Petition Date are unaltered by the Plan, and all such Liens, mortgages and security interests are reaffirmed and perfected with respect to the Restated Debt and Security Documents to the same extent, in the same manner and on the same terms and priorities as they were under the Prepetition Debt and Security Documents, except as the foregoing may be modified pursuant to the Restated Debt and Security Documents.  All Liens and security interests granted and continuing pursuant to the Restated Debt and Security Documents shall be (a) valid, binding, perfected, and enforceable Liens and security interests in the personal and real property described in and subject to such documents, with the priorities established in respect thereof under applicable non-bankruptcy law; (b) granted in good faith and deemed not to constitute a fraudulent conveyance or fraudulent transfer; and (c) not otherwise subject to avoidance, recharacterization, or subordination (whether equitable, contractual or otherwise) under any applicable law.  The Debtors, Reorganized BSA, Arrow, and JPM are authorized to make, and to the extent required by the Restated Debt and Security Documents, the Debtors, Reorganized BSA, Arrow will make, all filings and recordings, and obtain all governmental approvals and consents necessary (but otherwise consistent with the consents and approvals obtained in connection with the Prepetition Debt and Security Documents) to establish, attach and perfect such Liens and security interests under

90

any applicable law (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order and any such filings, recordings, approvals, and consents shall not be required), and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interests to third parties.  For purposes of all mortgages and deposit account control agreements that secured the obligations arising under the Prepetition Debt and Security Documents, the Restated Debt and Security Documents are deemed an amendment and restatement of the Prepetition Debt and Security Documents, and such mortgages and control agreements shall survive the Effective Date, shall not be cancelled, and shall continue to secure Reorganized BSA's obligations under the Restated Debt and Security Documents, except as expressly set forth therein.

     3.     The definitive terms of the Restated Debt and Security Documents shall be (x) acceptable to JPM and the BSA, (y) reasonably acceptable to the Creditors' Committee, and (z) substantially the same as the Prepetition Debt and Security Documents, except that, as to be specified in the Restated Debt and Security Documents:

     a.     the maturity dates under the Restated 2010 Bond Documents, the Restated 2012 Bond Documents, and the Restated Credit Facility Documents will be the Restated Maturity Date;

     b.     principal under the Restated 2010 Bond Documents and the Restated 2012 Bond Documents shall be payable in monthly installments, in the same monthly amounts as the prepetition periodic amortization amounts, beginning on the date that is two (2) years after the Effective Date and ending on the Restated Maturity Date; provided, that the scheduled principal amounts payable under the Restated 2010 Bond Documents and the Restated 2012 Bond Documents shall be reduced, on a pro rata basis, by an amount equal to the Excess Cash and Investments, if any, that are remitted to JPM under the Excess Cash Sweep;

     c.     interest under the Restated 2010 Bond Documents and the Restated 2012 Bond Documents shall be payable in monthly installments, at the currently applicable existing rates in the 2010 Bond Documents and the 2012 Bond Documents, beginning on the date that is one month after the Effective Date and ending on the Restated Maturity Date;

     d.     principal under the Restated Credit Facility Documents shall be payable in quarterly installments, set at 1/40th of the outstanding balance on the Effective Date, beginning on the date that is two (2) years after the Effective Date and ending on the Restated Maturity Date; provided, that the principal amounts payable under the Restated Credit Facility Documents shall be reduced, on a pro rata basis, by an amount equal to the Excess Cash and Investments, if any, that are remitted to JPM under the Excess Cash Sweep;

     e.     interest under the Restated Credit Facility Documents shall be payable in quarterly installments at the applicable existing rates in the Prepetition

Debt and Security Documents, beginning on the date that is three (3) months after the Effective Date and ending on the Restated Maturity Date;

f.    all of the obligations of Reorganized BSA under the Restated Debt and Security Documents shall be secured by first-priority liens on and security interests in all of the assets of Reorganized BSA;

g.    all of the obligations of Reorganized BSA under the Restated Debt and Security Documents shall be guaranteed by Arrow; and

h.    beginning on December 31 of the calendar year that is two (2) years after the Effective Date and continuing on December 31 of each successive calendar year until December 31 of the calendar year that is immediately prior to the calendar year of the Restated Maturity Date, Reorganized BSA shall remit to JPM, as soon as reasonably practicable but in no case later than thirty (30) days of such date, twenty-five percent (25%) of the Excess Cash and Investments in excess of $75,000,000, if any, as of such date, measured on a pro forma basis after having given effect to the principal payment, if any, due on February 15 of the following year under the BSA Settlement Trust Note, if applicable (the "Excess Cash Sweep"), and JPM shall apply any such amounts on a pro rata basis to the unpaid principal balances under the Restated Debt and Security Documents. For the avoidance of doubt, no payments shall be made on account of the Excess Cash Sweep until the last Distribution is made on account of Allowed General Unsecured Claims.

4.    Except as provided for in an Insurance Settlement Agreement, neither any provision of the Plan nor the occurrence of the Effective Date shall alter, amend, or otherwise impair the rights and obligations of the Debtors, Reorganized BSA, JPM, or any applicable Insurance Company holding one or more letters of credit issued by JPM to secure obligations arising under one or more BSA Insurance Policies. Without limiting the foregoing, nothing in the Plan or the Confirmation Order shall preclude any such Insurance Company from exercising any applicable rights on any such letter of credit issued, or other security provided, for the benefit of the Insurance Company in accordance with the terms and conditions of the documents governing such letter of credit or other security, or applying amounts therefrom to any Claim secured by such letter of credit or other security, and the Debtors, Reorganized BSA, and JPM reserve any and all rights with respect to such Insurance Company's exercise of any applicable rights.

W.    Foundation Loan.

1.    On the Effective Date, the Foundation Loan Agreement and any applicable collateral and other loan documents governing the Foundation Loan shall be executed and delivered, and Reorganized BSA shall be authorized to execute, deliver and enter into, the Foundation Loan Agreement and related documentation governing the Foundation Loan without the need for any further corporate action or any further notice to or order of the Bankruptcy Court.

2.      As of the Effective Date, upon the granting of Liens in accordance with the Foundation Loan Agreement and any applicable collateral and other loan documents governing the Foundation Loan, all of the Liens and security interests granted thereunder (a) shall be deemed to have been granted, (b) shall be legal, binding, automatically perfected, non-avoidable, and enforceable Liens on, and security interests in, the applicable collateral as of the Effective Date in accordance with the respective terms of the Foundation Loan Agreement and related documentation, subject to the Liens and security interests set forth in the Restated Debt and Security Documents, as permitted under the Foundation Loan Agreement and related documentation. All Liens and security interests granted pursuant to the Foundation Loan Agreement and related documentation shall be (i) valid, binding, perfected, and enforceable Liens and security interests in the personal and property described in and subject to such documents, with the priorities established in respect thereof under applicable non-bankruptcy law; (ii) granted in good faith and deemed not to constitute a fraudulent conveyance or fraudulent transfer; and (c) not otherwise subject to avoidance, recharacterization, or subordination (whether equitable, contractual or otherwise) under any applicable law. The Debtors, Reorganized BSA, Arrow, and the Foundation are authorized to make, and to the extent contemplated by the Foundation Loan Agreement and related documentation, the Debtors, Reorganized BSA, Arrow will make, all filings and recordings, and obtain all governmental approvals and consents necessary to establish, attach and perfect such Liens and security interests under any applicable law (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order and any such filings, recordings, approvals, and consents shall not be required), and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interest to third parties.

X.      BSA Settlement Trust Note. On the Effective Date, Reorganized BSA shall execute, issue and deliver the BSA Settlement Trust Note to the Settlement Trust and execute and deliver any related documentation governing the BSA Settlement Trust Note, including any related security agreement, without the need for any further corporate action or any further notice to or order of the Bankruptcy Court. The BSA Settlement Trust Note will commence on the Effective Date and will be due ninety-one (91) days after the date that is ten (10) years after the Effective Date and shall bear interest at a rate of 5.5% per annum, payable semi-annually, subject to a payment-in-kind election for the eighteen (18) months immediately following the Effective Date. The obligations of Reorganized BSA under the BSA Settlement Trust Note shall be secured by second-priority liens on and security interests in inventory, accounts receivable (except the Arrow Intercompany Note), Cash and the Headquarters. Principal under the BSA Settlement Trust Note shall be payable in annual installments due on February 15 of each year during the term of the BSA Settlement Trust Note, commencing on February 15 of the second year following the Effective Date. Such annual principal payments shall be equal to the sum of the following calculation: (a) $4,500,000; plus (b) $3.50 multiplied by the aggregate number of Youth Members as of December 31 of the preceding year up to the forecasted number of Youth Members for such year as set forth in the Debtors' five-year business plan; plus (c) $50 multiplied by the aggregate number of High Adventure Base Participants during the preceding calendar year; plus (d) $50 multiplied by the aggregate number of Youth Members in excess of the forecasted number of Youth Members for such year, excluding the portion of the excess that is comprised of members under the ScoutReach program, as set forth in the Debtors' five-year business plan; plus (e) $150

93

multiplied by the aggregate number of High Adventure Base Participants, excluding those attending events with a registration fee of less than $300 (e.g., for non-typical High Adventure Base activities), in excess of the forecasted number of High Adventure Base Participants for such year as set forth in the Debtors' five-year business plan. The forecasted numbers of Youth Members and High Adventure Base Participants referenced in clauses (b), (d) and (e) of the foregoing sentence are included in the Financial Projections attached to the Disclosure Statement. The forecast for years after 2025 shall be deemed to be the forecast for calendar year 2025. The BSA Settlement Trust Note may be prepaid at any time without penalty.

Y.    DST.  The DST shall be established on the Effective Date in accordance with the DST Agreement. The purposes of the DST shall be to: (1) issue the DST Note to the Settlement Trust as of the Effective Date; (2) collect, manage and invest Cash contributed by Local Councils on a monthly basis to an account (and any replacement thereof) owned by the DST in accordance with the DST Note Mechanics; and (3) make annual payments (a) to the Pension Plan or (b) toward principal and interest on the DST Note, as determined in accordance with the DST Note Mechanics and the DST Agreement. In the event of a conflict between the terms or provisions of the Plan and the DST Agreement, the terms of the Plan shall control.

Z.    Pension Plan.  No provision contained in the Plan, Confirmation Order, the Bankruptcy Code (including section 1141 of the Bankruptcy Code), or any other document filed or order entered in the Chapter 11 Cases shall be construed to exculpate, discharge, release or relieve the Debtors, the Local Councils, or any other party, in any capacity, from any liability or responsibility to any Person with respect to the Pension Plan under any law, governmental policy, or regulatory provision. The Pension Plan shall not be enjoined or precluded from enforcing any such liability or responsibility as a result of any of the provisions of the Plan (including those provisions providing for exculpation, satisfaction, release and discharge of Claims against the Debtors), the Confirmation Order, the Bankruptcy Code (including section 1141 of the Bankruptcy Code), or any other document filed or order entered in the Chapter 11 Cases. The Settlement Trust shall not have any liability to any Person on account of the Pension Plan, including liability as a member of a "Controlled Group" as defined in 29 U.S.C. § 1301(a)(14)(A) or on any other basis whatsoever.

As of the Effective Date, Reorganized BSA shall assume and continue the Pension Plan to the extent of its obligations under the Pension Plan and applicable law, including, as applicable, (1) satisfaction of the minimum funding requirements under 26 U.S.C. §§ 412 and 430 and 29 U.S.C. §§ 1082 and 1083, (2) payment of all required Pension Benefit Guaranty Corporation premiums in accordance with 29 U.S.C. §§ 1306 and 1307, and (3) administration of the Pension Plan in all material respects in accordance with the applicable provisions of the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. §§ 1301 et seq., and the Internal Revenue Code. Notwithstanding the foregoing, Reorganized BSA reserves all of its rights under the Pension Plan. All Proofs of Claim filed by the Pension Benefit Guaranty Corporation with respect to the Pension Plan shall be deemed withdrawn on the Effective Date.

AA.    Single Satisfaction of Allowed General Unsecured Claims.  In no event shall any holder of an Allowed General Unsecured Claim recover more than the full amount of its Allowed General Unsecured Claim from the Core Value Cash Pool (plus interest from the Core Value Cash Pool at the federal judgment rate to the extent applicable under the terms hereof), and to the extent

that the holder of an Allowed General Unsecured Claim has received, or in the future receives, payment on account of such Allowed General Unsecured Claim from a party that is not a Debtor or Reorganized BSA, such holder shall repay, return, or deliver to the Core Value Cash Pool any Distribution held by or transferred to such holder to the extent the holder's total recovery on account of its Allowed General Unsecured Claim from the third party and from the Core Value Cash Pool exceeds the amount of such holder's Allowed General Unsecured Claim (plus interest from the Core Value Cash Pool at the federal judgment rate to the extent applicable under the terms hereof).

BB.    Exemption from Certain Transfer Taxes and Recording Fees.    To the maximum extent permitted pursuant to section 1146(a) of the Bankruptcy Code and applicable law, any transfers of property pursuant to the Plan, including any transfers to the Settlement Trust by the Debtors, the Local Councils, the Contributing Chartered Organizations, and the Settling Insurance Companies, and payments by Reorganized BSA to or from the Core Value Cash Pool, shall not be taxed under any law imposing a stamp tax or similar tax.

CC.    Non-Monetary Commitments.    The Debtors will not compromise the safety of the youth, volunteers, and employees. The Debtors are dedicated to becoming the Gold Standard in abuse prevention. Because of this commitment, the Debtors are and will always seek to bolster their abuse prevention efforts. In furtherance of these efforts, the Reorganized BSA shall take the actions set forth in Exhibit L hereto to promote healing and reconciliation and to continue the ongoing efforts to prevent abuse from occurring in Scouting in the future.

## ARTICLE VI.

## EXECUTORY CONTRACTS AND UNEXPIRED LEASES

A.    Assumption and Rejection of Executory Contracts and Unexpired Leases.

1.    On the Effective Date, except as otherwise provided herein, all Executory Contracts and Unexpired Leases shall be deemed assumed by Reorganized BSA without the need for any further notice to or action, order, or approval of the Bankruptcy Court under sections 365 or 1123 of the Bankruptcy Code, except for Executory Contracts or Unexpired Leases: (a) that are identified on the Rejected Contracts and Unexpired Leases Schedule; (b) that previously expired or terminated pursuant to their terms; (c) that the Debtors have previously assumed or rejected pursuant to a Final Order of the Bankruptcy Court; (d) that are the subject of a motion to reject that remains pending as of the Effective Date; (e) as to which the effective date of rejection will occur (or is requested by the Debtors to occur) after the Effective Date; or (f) as to which the Debtors or Reorganized BSA, as applicable, determine, in the exercise of their reasonable business judgment, that the Cure Amount, as determined by a Final Order or as otherwise finally resolved, would render assumption of such Executory Contract or Unexpired Lease unfavorable to Debtors or Reorganized BSA; provided that the Debtors reserve the right to seek enforcement of an assumed or assumed and assigned Executory Contract or Unexpired Lease following the Confirmation Date, including seeking an order of the Bankruptcy Court rejecting such Executory Contract or Unexpired Lease for cause.

2.     Entry of the Confirmation Order shall constitute an order of the Bankruptcy Court approving the assumption or rejection, as applicable, of Executory Contracts or Unexpired Leases pursuant to the Plan, pursuant to sections 365 and 1123 of the Bankruptcy Code. Except as otherwise set forth herein, the assumption or rejection of an Executory Contract or Unexpired Lease pursuant to the Plan shall be effective as of the Effective Date; provided that the rejection of an Unexpired Lease shall be effective as of the later of: (a) the Effective Date; and (b) the date on which the leased premises are unconditionally surrendered to the non-Debtor counterparty to the rejected Unexpired Lease. Reorganized BSA is authorized to abandon any De Minimis Assets at or on the premises subject to an Unexpired Lease that is rejected pursuant to the Plan, and the non-Debtor counterparty to such Unexpired Lease may dispose of any such De Minimis Assets remaining at or on the leased premises on the applicable lease rejection date.

3.     Each Executory Contract or Unexpired Lease assumed pursuant to the Plan or a Final Order of the Bankruptcy Court shall re-vest in and be fully enforceable by Reorganized BSA in accordance with its terms, except as such terms may have been modified by the provisions of the Plan, the Confirmation Order, or any Final Order of the Bankruptcy Court authorizing and providing for its assumption. Any motions to assume Executory Contracts or Unexpired Leases pending on the Effective Date shall be subject to approval by a Final Order on or after the Effective Date but may be withdrawn, settled, or otherwise prosecuted by Reorganized BSA.

B.     Rejection Damages Claims.   Unless otherwise provided by a Final Order of the Bankruptcy Court, all Proofs of Claim for Rejection Damages Claims, if any, shall be filed within thirty (30) days after the latest to occur of: (1) the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection; (2) the effective date of the rejection of such Executory Contract or Unexpired Lease; or (3) the Effective Date (as applicable, the "Rejection Damages Bar Date"). Claims arising from the rejection of an Executory Contract or an Unexpired Lease shall be classified as General Unsecured Claims and subject to the provisions of Article VII and the applicable provisions of the Bankruptcy Code and the Bankruptcy Rules.

C.     Cure of Defaults under Executory Contracts and Unexpired Leases.

1.     Any monetary defaults under each Executory Contract and Unexpired Lease to be assumed pursuant to the Plan shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the Cure Amount in Cash on the Effective Date or in the ordinary course of the Debtors' or Reorganized BSA's non-profit operations, subject to the limitation described below.

2.     Except as otherwise provided in the Plan, the Debtors shall, on or before the date of filing of the Plan Supplement, cause the Cure and Assumption Notices to be served on counterparties to Executory Contracts and Unexpired Leases to be assumed pursuant to the Plan. Any objection by a non-Debtor counterparty to an Executory Contract or Unexpired Lease to the assumption, assumption and assignment, the related Cure Amount, or adequate assurance, must be filed, served, and actually received by the Debtors on or prior to the deadline for filing objections to the Plan (or such later date as may be provided in the applicable Cure and Assumption Notice); provided that each counterparty to an

96

Executory Contract or Unexpired Lease (a) that the Debtors later determine to assume or (b) as to which the Debtors modify the applicable Cure Amount, must object to the assumption or Cure Amount, as applicable, by the earlier of: (i) fourteen (14) days after the Debtors serve such counterparty with a corresponding Cure and Assumption Notice; and (ii) the Confirmation Hearing. **Any counterparty to an Executory Contract or Unexpired Lease that fails to timely object to the proposed assumption of an Executory Contract or Unexpired Lease shall be forever barred, estopped, and enjoined from contesting the Debtors' assumption of the applicable Executory Contract or Unexpired Lease and from requesting payment of a Cure Amount that differs from the amounts paid or proposed to be paid by the Debtors or Reorganized BSA, in each case without the need for any objection by the Debtors or Reorganized BSA or any further notice to or action, order, or approval of the Bankruptcy Court. Reorganized BSA may settle any dispute regarding a Cure Amount without any further notice to or action, order, or approval of the Bankruptcy Court.**

3.     To the maximum extent permitted by law, to the extent any provision in any Executory Contract or Unexpired Lease assumed, or assumed and assigned, pursuant to the Plan restricts or prevents, or purports to restrict or prevent, or is breached or would be deemed breached by, the assumption or assumption and assignment of such Executory Contract or Unexpired Lease (including any change of control or similar provision), then such provision shall be deemed preempted and modified such that neither the Debtors' assumption or assumption and assignment of the Executory Contract or Unexpired Lease nor any of the transactions contemplated by the Plan shall entitle the non-debtor counterparty to terminate or modify such Executory Contract or Unexpired Lease or to exercise any other purported default-related rights thereunder.

4.     **The Debtors' assumption or assumption and assignment of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise, and payment of any applicable Cure Amount in accordance with the procedures set forth in this Article VI.C, shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed, or assumed and assigned, Executory Contract or Unexpired Lease at any time prior to the effective date of assumption. Any and all Proofs of Claim based upon Executory Contracts or Unexpired Leases that have been assumed in the Chapter 11 Cases, including pursuant to the Confirmation Order, shall be deemed Disallowed and expunged as of the later of: (a) the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such assumption; (b) the effective date of such assumption; or (c) the Effective Date, in each case without the need for any objection by the Debtors or Reorganized BSA or any further notice to or action, order, or approval of the Bankruptcy Court.**

D.     Dispute Resolution.  In the event of a timely filed objection regarding: (1) a Cure Amount; (2) the ability of Reorganized BSA or any assignee to provide adequate assurance of future performance within the meaning of section 365 of the Bankruptcy Code under the Executory Contract or Unexpired Lease to be assumed; or (3) any other matter pertaining to assumption or

the requirements of section 365(b)(1) of the Bankruptcy Code, such dispute shall be resolved by a Final Order of the Bankruptcy Court (which may be the Confirmation Order) or as may be agreed upon by the Debtors or Reorganized BSA, as applicable, and the counterparty to the Executory Contract or Unexpired Lease. The Debtors or Reorganized BSA, applicable, shall pay the applicable Cure Amount as soon as reasonably practicable after entry of a Final Order resolving such dispute and approving such assumption, or as may otherwise be agreed upon by the Debtors or Reorganized BSA, as applicable, and the counterparty to the Executory Contract or Unexpired Lease. To the extent that a dispute regarding the applicable Cure Amount is resolved or determined unfavorably to the Debtors, the Debtors may, in their discretion, reject the applicable Executory Contract or Unexpired Lease after such determination, which rejection shall supersede, nullify, and render of no force or effect any earlier assumption or assumption and assignment. Under no circumstances shall the status of payment of a Cure Amount required by section 365(b)(1) of the Bankruptcy Code following the entry of a Final Order resolving the dispute and approving the assumption prevent or delay implementation of the Plan or the occurrence of the Effective Date.

      E.    <u>Contracts and Leases Entered into After the Petition Date</u>. Contracts and leases entered into after the Petition Date by the BSA, including any Executory Contracts and Unexpired Leases assumed by BSA, will be performed by the BSA or Reorganized BSA in the ordinary course of its charitable non-profit operations. Accordingly, such contracts and leases (including any assumed Executory Contract and Unexpired Leases) shall survive and remain unaffected by entry of the Confirmation Order.

      F.    <u>Insurance Policies</u>.

      1.    Notwithstanding anything to the contrary herein, all Insurance Policies issued to or entered into by the Debtors prior to the Petition Date shall not be considered Executory Contracts and shall neither be assumed nor rejected by the Debtors; <u>provided</u>, <u>however</u>, that to the extent any Insurance Policy is determined to be an Executory Contract, then, subject to <u>Article IV.V</u>, and notwithstanding anything contained in the Plan to the contrary, the Plan will constitute a motion to assume such Insurance Policy and pay all future obligations, if any, in respect thereof and, subject to the occurrence of the Effective Date, the entry of the Confirmation Order will constitute approval of such assumption pursuant to section 365(a) of the Bankruptcy Code and a finding by the Bankruptcy Court that each such assumption is in the best interests of the Debtors, their respective Estates and all parties in interest. Unless otherwise determined by the Bankruptcy Court pursuant to a Final Order or agreed by the parties thereto prior to the Effective Date, no payments are required to cure any defaults of any Debtor existing as of the Confirmation Date with respect to any Insurance Policy; and prior payments for premiums or other charges made prior to the Petition Date under or with respect to any Insurance Policy shall be indefeasible. Moreover, as of the Effective Date, all payments of premiums or other charges made by the Debtors on or after the Petition Date under or with respect to any Insurance Policy shall be deemed to have been authorized, approved, and ratified in all respects without any requirement of further action by the Bankruptcy Court. Notwithstanding anything to the contrary contained herein, Confirmation shall not discharge, impair or otherwise modify any obligations assumed by the foregoing assumption, and each such obligation shall be deemed and treated as an Executory Contract

that has been assumed by the Debtors under the Plan as to which no Proof of Claim need be filed.

2.       Notwithstanding anything to the contrary contained in the Plan, entry of the Confirmation Order shall not discharge, impair, or otherwise modify any indemnity obligations assumed as a result of the foregoing assumption of the Insurance Policies that are D&O Liability Insurance Policies (and related documents) issued to the Debtors, and each such indemnity obligations will be deemed and treated as an Executory Contract that has been assumed by the Reorganized BSA under the Plan as to which no Proof of Claim need be filed.

3.       Other than the permissibility of the Insurance Assignment as provided for in Section IX.A.3.j, or as otherwise provided in the Bankruptcy Code, applicable law, the findings made by the Bankruptcy Court in the Confirmation Order or the findings made by the District Court in the Affirmation Order, the rights and obligations of the parties under the Insurance Policies, including the question of whether any breach has occurred, shall be determined under applicable law.

G.       Compensation and Benefits Programs.   Other than those Compensation and Benefits Programs assumed by the Debtors prior to entry of the Confirmation Order, if any, all of the Compensation and Benefits Programs entered into before the Petition Date and not since terminated shall be deemed to be, and shall be treated as though they are, Executory Contracts under the Plan. Entry of the Confirmation Order will constitute the Bankruptcy Court's approval of Reorganized BSA's assumption and continued maintenance and sponsorship of each of such Compensation and Benefits Plan under sections 365 and 1123 of the Bankruptcy Code, and the Debtors' and Reorganized BSA's obligations under the Compensation and Benefits Programs shall survive and remain unaffected by entry of the Confirmation Order and be fulfilled in the ordinary course of the Debtors' and Reorganized BSA's non-profit operations. Compensation and Benefits Programs assumed by the Debtors prior to entry of the Confirmation Order shall continue to be fulfilled in the ordinary course of the Debtors' non-profit operations from and after the date of any order of the Bankruptcy Court authorizing the assumption of such Compensation and Benefits Program. All Claims filed on account of an amounts asserted to be owed under Compensation and Benefits Programs shall be deemed satisfied and expunged from the Claims Register as of the Effective Date without any further notice to or action, order, or approval of the Bankruptcy Court.

H.       Restoration Plan and Deferred Compensation Plan.   On the Effective Date the Restoration Plan and the Deferred Compensation Plan shall be terminated and, to the extent applicable, shall be deemed rejected by Reorganized BSA pursuant to section 365 of the Bankruptcy Code and this Article VI. Claims arising from the Debtors' rejection of the Restoration Plan and the Deferred Compensation Plan shall be treated as General Unsecured Claims hereunder. Holders of Allowed Claims arising from such rejection shall be entitled to a recovery from the Core Value Cash Pool in accordance with the applicable terms of the Plan.

I.       Workers' Compensation Program.   As of the Effective Date, the Debtors and Reorganized BSA shall continue to honor their obligations under: (a) all applicable workers' compensation laws in all applicable states; and (b) the Workers' Compensation Program. All Proofs of Claims on account of workers' compensation, including the Workers' Compensation

Program, shall be deemed withdrawn automatically and without any further notice to or action, order, or approval of the Bankruptcy Court; provided, however, that nothing in the Plan shall limit, diminish, or otherwise alter the Debtors' or Reorganized BSA's defenses, Causes of Action, or other rights under applicable non-bankruptcy law with respect to the Workers' Compensation Programs; provided further, however, that nothing herein shall be deemed to impose any obligations on the Debtors or their insurers in addition to what is provided for under the terms of the Workers' Compensation Programs and applicable state law.

J.  Indemnification Obligations.

1.  Notwithstanding anything in the Plan to the contrary, each Indemnification Obligation shall be assumed by Reorganized BSA effective as of the Effective Date, pursuant to sections 365 and 1123 of the Bankruptcy Code or otherwise, except for any Indemnification Obligation that is or is asserted to be owed to or for the benefit of any Perpetrator.  Subject to the foregoing sentence, each Indemnification Obligation shall remain in full force and effect, shall not be modified, reduced, discharged, impaired, or otherwise affected in any way, and shall survive Unimpaired and unaffected, irrespective of when such obligation arose.  For the avoidance of doubt, this Article VI.J affects only the obligations of the Debtors and Reorganized BSA with respect to any Indemnification Obligations owed to or for the benefit of past and present directors, officers, employees, attorneys, accountants, investment bankers, and other professionals and agents of the Debtors, and shall have no effect on nor in any way discharge or reduce, in whole or in part, any obligation of any other Person owed to or for the benefit of such directors, officers, employees, attorneys, accountants, investment bankers, and other professionals and agents of the Debtors.

2.  All Proofs of Claim filed on account of an Indemnification Obligation to a current or former director, officer, or employee shall be deemed satisfied and expunged from the Claims Register as of the Effective Date to the extent such Indemnification Obligation is assumed (or honored or reaffirmed, as the case may be) pursuant to the Plan, without any further notice to or action, order, or approval of the Bankruptcy Court.

K.  Gift Annuity Agreements and Life-Income Agreements.  The Gift Annuity Agreements and Life-Income Agreements shall be deemed to be, and shall be treated as though they are, Executory Contracts under the Plan, and entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the Debtors' assumption of each of such Executory Contract.

L.  Modifications, Amendments, Supplements, Restatements, or Other Agreements. Unless otherwise provided in the Plan, each Executory Contract or Unexpired Lease that is assumed shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and Executory Contracts and Unexpired Leases related thereto, if any, including easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless the Debtors reject or repudiate any of the foregoing agreements.  Modifications, amendments, and supplements to, or restatements of, prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the

prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

M.      Reservation of Rights.   Neither the inclusion of any Executory Contract or Unexpired Lease on the Schedules, a Cure and Assumption Notice, or the Rejected Executory contracts and Unexpired Leases Schedule, nor anything contained in any Plan Document, shall constitute an admission by the Debtors that a contract or lease is in fact an Executory Contract or Unexpired Lease or that Reorganized BSA has any liability thereunder.  If there is a dispute as of the Confirmation Date regarding whether a contract or lease is or was executory or unexpired at the time of assumption, the Debtors, or, after the Effective Date, Reorganized BSA, shall have thirty (30) days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease, including by rejecting such contract or lease *nunc pro tunc* to the Confirmation Date.

N.      Nonoccurrence of Effective Date; Bankruptcy Code Section 365(d)(4).   If the Effective Date fails to occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to further extend the deadline for assuming or rejecting Unexpired Leases under section 365(d)(4) of the Bankruptcy Code.

## ARTICLE VII.

## PROVISIONS GOVERNING DISTRIBUTIONS

A.      Applicability.  None of the terms or provision of this Article VII shall apply to Abuse Claims, which shall be exclusively processed, liquidated and paid by the Settlement Trust in accordance with the Settlement Trust Documents.

B.      Distributions Generally.  The Disbursing Agent shall make all Distributions to appropriate holders of Allowed Claims in accordance with the terms of the Plan.

C.      Distributions on Account of Certain Claims Allowed as of the Effective Date. Except as otherwise provided in the Plan, on or as soon as practicable after the Effective Date, the Disbursing Agent shall make Distributions in Cash in amounts equal to all Allowed Administrative Expense Claims, Allowed Priority Tax Claims, Allowed Other Priority Claims, Allowed Other Secured Claims, and Allowed Convenience Claims.

D.      Distributions on Account of Allowed General Unsecured Claims.   On each Distribution Date, the Disbursing Agent shall Distribute to each holder of an Allowed General Unsecured Claim an amount equal to such holder's Pro Rata Share of (1) the total balance of the Core Value Cash Pool as of such date, less (2) the balance of the Disputed Claims Reserve.

E.      Distributions on Account of Disputed Claims Allowed After the Effective Date. Distributions on account of any Disputed Claim shall be made to the extent such Claim is Allowed in accordance with the provisions of Article VIII.  Except as otherwise provided in the Plan, the Confirmation Order, another order of the Bankruptcy Court, or as agreed to by the relevant parties, Distributions under the Plan on account of Disputed Claims that become Allowed after the Effective Date shall be made as soon as practicable after the Disputed Claim becomes an Allowed Claim.

F.   Rights and Powers of Disbursing Agent.

1.      The Disbursing Agent shall make all Distributions to the appropriate holders of Allowed Claims in accordance with the terms of the Plan, including this Article VII.  Except as otherwise ordered by the Bankruptcy Court, the Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties.

2.      The Disbursing Agent shall be empowered to: (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (b) make all Distributions contemplated hereby; (c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions hereof.  The Disbursing Agent may request an expedited determination of taxes under section 505(b) of the Bankruptcy Code for all returns for all taxable periods through the date on which final Distributions are made.

G.   Delivery of Distributions and Undeliverable or Unclaimed Distributions.

1.      Claims Record Date.  As of the close of business on the Claims Record Date, the various transfer registers for each of the Classes of Claims as maintained by the Debtors or their agents shall be deemed closed for purposes of determining whether a holder of such a Claim is a record holder entitled to a Distribution under the Plan, and there shall be no further changes in the record holders or the permitted designees with respect to such Claims.  The Debtors or Reorganized BSA, as applicable, shall have no obligation to recognize any transfer or designation of such Claims occurring after the close of business on the Claims Record Date.  With respect to payment of any Cure Amounts or assumption disputes, neither the Debtors nor Reorganized BSA shall have any obligation to recognize or deal with any party other than the non-Debtor party to the applicable Executory Contract or Unexpired Lease as of the close of business on the Claims Record Date, even if such non-Debtor party has sold, assigned, or otherwise transferred its Claim for a Cure Amount.

2.      Delivery of Distributions.  If a Person holds more than one Claim in any one Class, in the Disbursing Agent's sole discretion, all such Claims will be aggregated into one Claim and one Distribution will be made with respect to the aggregated Claim.

3.      Special Rules for Distributions to Holders of Disputed Claims.  Except as otherwise provided in the Plan or agreed to by the relevant parties: (a) no partial payments and no partial Distributions shall be made with respect to a Disputed Claim until all such disputes in connection with such Disputed Claim have been resolved by settlement or Final Order; and (b) any Person that holds both an Allowed Claim and a Disputed Claim shall not receive any Distribution on account of the Allowed Claim unless and until all objections to the Disputed Claim have been resolved by settlement or Final Order or the Disputed Claims have been Allowed or expunged. Any Distributions arising from property Distributed to holders of Allowed Claims in a Class and paid to such holders under the Plan shall also be paid, in the applicable amounts, to any holder of a Disputed Claim in

such Class that becomes an Allowed Claim after the date or dates that such Distributions were earlier paid to holders of Allowed Claims in such Class.

H.      Undeliverable and Non-Negotiated Distributions.

1.      Undeliverable Distributions. If any Distribution to a holder of an Allowed Claim is returned to Reorganized BSA as undeliverable, no further Distributions shall be made to such holder unless and until Reorganized BSA is notified in writing of such holder's then-current address or other necessary information for delivery, at which time such previously undeliverable Distribution shall be made to such holder within ninety (90) days of receipt of such holder's then-current address or other necessary information; provided, however, that any such undeliverable Distribution shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of 180 days after the date of the initial attempted Distribution. After such date, all unclaimed property or interests in property shall revert to Reorganized BSA automatically and without the need for any notice to or further order of the Bankruptcy Court (notwithstanding any applicable non-bankruptcy escheatment, abandoned, or unclaimed property laws to the contrary), and the right, title, and interest of any holder to such property or interest in property shall be discharged and forever barred; provided that Distributions made from the Core Value Cash Pool and returned as undeliverable shall revert to the Core Value Cash Pool.

2.      Non-Negotiated Distributions. If any Distribution to a holder of an Allowed Claim is not negotiated for a period of 180 days after the Distribution, then such Distribution shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code and re-vest in Reorganized BSA or re-vest in the Core Value Cash Pool if such Distribution was made from the Core Value Cash Pool. After such date, all non-negotiated property or interests in property shall revert to Reorganized BSA automatically and without the need for any notice to or further order of the Bankruptcy Court (notwithstanding any applicable non-bankruptcy escheatment, abandoned, or unclaimed property laws to the contrary), and the right, title, and interest of any holder to such property or interest in property shall be discharged and forever barred.

I.      Manner of Payment under the Plan. Except as otherwise specifically provided in the Plan, at the option of Reorganized BSA, any Cash payment to be made hereunder may be made by a check or wire transfer or as otherwise required or provided in applicable agreements or customary practices of Reorganized BSA.

J.      Satisfaction of Claims. Except as otherwise specifically provided in the Plan, any Distributions to be made on account of Allowed Claims under the Plan shall be in complete and final satisfaction, settlement, and discharge of and exchange for such Allowed Claims.

K.      Minimum Cash Distributions. Reorganized BSA shall not be required to make any Distribution of Cash less than twenty dollars ($20) to any holder of an Allowed Claim; provided, however, that if any Distribution is not made pursuant to this Article VII.K, such Distribution shall be added to any subsequent Distribution to be made on behalf of the holder's Allowed Claim.

L.      Postpetition Interest. Except as provided in the Cash Collateral Order or in the following sentence, interest shall not accrue on Impaired Claims; no holder of an Impaired Claim shall be entitled to interest accruing on or after the Petition Date on any such Impaired Claim, and

interest shall not accrue or be paid on any Disputed Claim in respect of the period from the Petition Date to the date a Distribution is made thereon if and after such Disputed Claim becomes an Allowed Claim. Notwithstanding the foregoing, each holder of an Allowed General Unsecured Claim shall accrue interest on the Allowed amount of such Claim at the federal judgment rate applicable on the Effective Date; provided, that such interest shall be payable to each such holder only from the Core Value Cash Pool and only to the extent that the Core Value Cash Pool shall have been sufficient: (1) first, to satisfy the full amount of all Allowed General Unsecured Claims; and (2) second, on account of any Allowed Non-Abuse Litigation Claims that shall not have elected to be treated as an Allowed Convenience Claim under Article III.B.9, to satisfy any deficiency in payments of such Allowed Claims (a) from available insurance coverage, including Abuse Insurance Policies and Non-Abuse Insurance Policies, (b) from applicable proceeds of any Insurance Settlement Agreements, and (c) from co-liable non-debtors (if any) or their insurance coverage. Neither the Debtors nor Reorganized BSA shall have any independent obligation to pay interest for or on account of any Allowed General Unsecured Claims other than from the Core Value Cash Pool in accordance with the terms of this Article VII.L.

M.     Setoffs.  The Debtors and Reorganized BSA may, pursuant to the applicable provisions of the Bankruptcy Code, or applicable non-bankruptcy law, set off against any applicable Allowed Claim (before any Distribution is made on account of such Claim) any and all claims, rights, Causes of Action, debts or liabilities of any nature that the Debtors or Reorganized BSA may hold against the holder of such Allowed Claim; provided, however, that the failure to effect such a setoff shall not constitute a waiver or release of any such claims, rights, Causes of Action, debts or liabilities.

N.     Claims Paid or Payable by Third Parties.

1.     Claims Paid by Third Parties.  A Claim shall be reduced in full, and such Claim shall be Disallowed without an objection to such Claim having to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the holder of such Claim receives payment in full on account of such Claim from a party that is not a Debtor or Reorganized BSA. To the extent a holder of a Claim receives a Distribution on account of such Claim and receives payment from a party that is not a Debtor or Reorganized BSA on account of such Claim, such holder shall repay, return, or deliver any Distribution held by or transferred to such holder to Reorganized BSA to the extent the holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such Distribution under the Plan.

2.     Non-Abuse Litigation Claims Payable from Insurance.  Subject to Article IV.D.3, no Distributions under the Plan shall be made on account of any Allowed Non-Abuse Litigation Claim that is payable pursuant to an Insurance Policy until the holder of such Allowed Non-Abuse Litigation Claim has exhausted all remedies with respect to such insurance policy, including pursuing such insurance through litigation and obtaining entry of a final, non-appealable order. To the extent that one or more of the Insurance Companies satisfies in full or in part an Allowed Non-Abuse Litigation Claim, then immediately upon such satisfaction, the portion of the Claim so satisfied may be expunged from the Claims Register by the Notice and Claims Agent without an objection to such Claim having to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

O.    Compliance with Tax Requirements and Allocations.

1.    In connection with the Plan and all Distributions hereunder, the Disbursing Agent shall comply with all tax withholding and reporting requirements imposed on them by any federal, state or local taxing authority, and all Distributions pursuant to the Plan shall be subject to such withholding and reporting requirements.  Notwithstanding any provision in the Plan to the contrary, the Disbursing Agent shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the Distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding Distributions pending receipt of information necessary to facilitate such Distributions including tax certification forms, or establishing any other mechanisms it believes are reasonable and appropriate.

2.    For tax purposes, Distributions in full or partial satisfaction of Allowed Claims shall be allocated first to the principal amount of Allowed Claims, with any excess allocated to unpaid interest that accrued on such Claim.

## ARTICLE VIII.

## PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED, AND DISPUTED CLAIMS

A.    Applicability.  All Disputed Claims against the Debtors, other than Administrative Expense Claims, shall be subject to the provisions of this Article VIII.  All Administrative Expense Claims shall be determined and, if Allowed, paid in accordance with Article II.  None of the terms or provision of this Article VIII shall apply to Abuse Claims, which shall be exclusively processed, liquidated and paid by the Settlement Trust in accordance with the Settlement Trust Documents.

B.    Allowance of Claims.  After the Effective Date, Reorganized BSA shall have and retain any and all rights and defenses that the Debtors, or either of them, had with respect to any Claim immediately before the Effective Date.  Except as expressly provided in the Plan or in any order entered in the Chapter 11 Cases before the Effective Date (including the Confirmation Order), no Claim shall become an Allowed Claim unless and until such Claim becomes Allowed by Final Order of the Bankruptcy Court or by agreement between the Debtors or Reorganized BSA, on the one hand, and the holder of such Claim, on the other.

C.    Claims Administration Responsibilities.

1.    Except as otherwise expressly provided in the Plan, from and after the Effective Date, Reorganized BSA shall have the authority (a) to file, withdraw, or litigate to judgment objections to Claims; (b) to settle or compromise any Disputed Claim without any further notice to or action, order, or approval by the Bankruptcy Court; and (c) to administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court.

2.    Reorganized BSA shall consult with the Creditor Representative in connection with the reconciliation, settlement and administration of Convenience Claims,

General Unsecured Claims and Non-Abuse Litigation Claims and shall use commercially reasonable efforts to resolve such Claims before the applicable Claims Objection Deadline.

D.     Estimation of Claims.   The Debtors (before the Effective Date) or Reorganized BSA (on and after the Effective Date) may at any time request that the Bankruptcy Court estimate any Disputed Claim pursuant to section 502(c) of the Bankruptcy Code regardless of whether an objection was previously filed with the Bankruptcy Court with respect to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to such Claim, including during the pendency of any appeal relating to any such objection.  In the event that the Bankruptcy Court estimates any Disputed Claim, that estimated amount will constitute either the Allowed amount of such Claim or a maximum limitation on such Claim against any Person.  If the estimated amount of a Claim constitutes a maximum limitation on such Claim, the Debtors (before the Effective Date) or Reorganized BSA (on and after the Effective Date) may elect to pursue any supplemental proceedings to object to any ultimate Distribution on such Claim. All of the objection, estimation, settlement, and resolution procedures set forth in the Plan are cumulative and not necessarily exclusive of one another.   Claims may be estimated and subsequently compromised, objected to, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

E.     No Distributions Pending Allowance.  No Distributions or other consideration shall be paid with respect to any Claim that is a Disputed Claim unless and until all objections to such Disputed Claim are resolved and such Disputed Claim becomes an Allowed Claim by Final Order of the Bankruptcy Court or agreement between the Debtors or Reorganized BSA, on the one hand, and the holder of such Claim, on the other.

F.     Distributions after Allowance.  To the extent that a Disputed Claim (or a portion thereof) becomes an Allowed Claim, Distributions (if any) shall be made to the holder of such Allowed Claim in accordance with the provisions of the Plan.

G.     Disputed Claims Reserve.  The provisions of this Article VIII.G apply only to the extent that any General Unsecured Claims remain Disputed as of any Distribution Date.

1.     If any General Unsecured Claims remain Disputed as of any Distribution Date, the undistributed portion of the Core Value Cash Pool shall be held in a segregated account.  Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary, or the receipt of a determination from the IRS, the Disbursing Agent shall treat the Disputed Claims Reserve as a "disputed ownership fund" governed by Treasury Regulation section 1.468B-9 and, to the extent permitted by applicable law, report consistently with the foregoing for state and local income tax purposes.  All parties (including the Debtors, Reorganized BSA, the Disbursing Agent, and holders of General Unsecured Claims) shall be required to report for tax purposes in a manner consistent with the foregoing.  The Disputed Claims Reserve shall be responsible for payment, out of the assets of the Disputed Claims Reserve, of any taxes imposed on the Disputed Claims Reserve or its assets.

2.     The Debtors or Reorganized BSA, as applicable, with the consent of the Creditor Representative, shall determine the amount of the Disputed Claims Reserve, if applicable, as of the initial Distribution Date, based on the least of: (a) the asserted amount of the Disputed General Unsecured Claims in the applicable Proofs of Claim; (b) the amount, if any, estimated by the Bankruptcy Court pursuant to (i) section 502(c) of the Bankruptcy Code or (ii) Article VIII.D if, after the Effective Date, a motion is filed by Reorganized BSA to estimate such Claim; (c) the amount otherwise agreed to by the Debtors (or Reorganized BSA, if after the Effective Date) and the holders of such Disputed General Unsecured Claims; or (d) any amount otherwise approved by the Bankruptcy Court.  Upon each Distribution Date, Reorganized BSA shall deposit into the Disputed Claims Reserve an amount of Cash equal to the amount sufficient to make the Distributions to which holders of Disputed General Unsecured Claims would be entitled under the Plan as of the applicable Distribution Date if the Disputed General Unsecured Claims were Allowed Claims as of such date.

3.     If a Disputed General Unsecured Claim becomes an Allowed Claim after the first Distribution Date, the Disbursing Agent shall, on the next Distribution Date after the Disputed General Unsecured Claim becomes an Allowed Claim (or, if the Disputed General Unsecured Claim becomes an Allowed Claim after the final Distribution Date, as soon as practicable after Allowance), Distribute to the holder of such Claim, exclusively from the Disputed Claims Reserve, the amount of Cash that such holder would have received in that Distribution and all prior Distributions (if any) if such holder's General Unsecured Claim had been Allowed as of the Effective Date, net of any allocable taxes imposed thereon or otherwise payable by the Disputed Claims Reserve.

4.     If a Disputed Claim is Disallowed, in whole or in part, then on the Distribution Date next following the date of Disallowance, Cash shall be released from the Disputed Claims Reserve and placed in the Core Value Cash Pool, which Cash shall then be unreserved and unrestricted, and which shall be available for Distribution to holders of Allowed General Unsecured Claims.

5.     If any assets remain in the Disputed Claims Reserve after all Disputed General Unsecured Claims have been resolved, such assets shall be placed in the Core Value Cash Pool and distributed Pro Rata to all holders of Allowed General Unsecured Claims on the next Distribution Date (or, if all Disputed General Unsecured Claims are resolved after the final Distribution Date, as soon as practicable thereafter).

H.     Adjustment to Claims Register without Objection.  Any duplicate Proof of Claim that has been paid or satisfied, or any Proof of Claim that is clearly marked as amended or superseded by a subsequently filed Proof of Claim that remains on the Claims Register, may be adjusted or expunged on the Claims Register by the Notice and Claims Agent at the direction of Reorganized BSA upon stipulation between the parties in interest without an objection having to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

I.     Time to File Objections to Claims.  Any objections to Claims must be filed on or before the applicable Claims Objection Deadline, as such deadline may be extended from time to time.  The expiration of the Claims Objection Deadline shall not limit or affect the Debtors' or

Reorganized BSA's rights to dispute Claims asserted in the ordinary course of the Debtors or Reorganized BSA's non-profit operations other than through a Proof of Claim.

J.    <u>Treatment of Untimely Claims</u>.  Except as provided herein or otherwise agreed, any and all creditors that have filed Proofs of Claim after the applicable Bar Date shall not be treated as a creditor with respect to such Claim for the purposes of voting and distribution.

## ARTICLE IX.

## CONDITIONS PRECEDENT TO CONFIRMATION AND EFFECTIVE DATE

A.    <u>Conditions Precedent to Confirmation of the Plan</u>.

Confirmation of the Plan shall not occur unless each of the following conditions precedent has been satisfied or waived in accordance with <u>Article IX.C</u>.

1.    The Bankruptcy Court shall have entered the Disclosure Statement Order, in form and substance reasonably acceptable to the Debtors, the Ad Hoc Committee, the Coalition, the Future Claimants' Representative, Hartford, the Creditors' Committee and JPM.

2.    The Debtors, the Ad Hoc Committee, the Coalition, the Future Claimants' Representative, the Tort Claimants' Committee and the Settling Insurance Companies shall have approved of or accepted the Confirmation Order, and the Creditors' Committee, JPM, and the United Methodist ad hoc committee shall have approved of or accepted the Confirmation Order in accordance with their respective consent rights under the JPM / Creditors' Committee Term Sheet or the United Methodist Settlement Agreement incorporated by reference in <u>Article I.D</u>;

3.    The Bankruptcy Court shall have made such findings and determinations regarding the Plan as shall enable the entry of the Confirmation Order and any other order in conjunction therewith, in form and substance acceptable to the Debtors, in accordance with the requirements of the JPM / Creditors' Committee Term Sheet.[6]  These findings and

---

[6] The findings and determinations set forth in <u>Article IX.A.3.y</u> shall not be binding on the Settling Insurance Companies.  Subject to the preceding sentence of this footnote 6, the findings and determinations set forth in <u>Article IX.A.3.l</u> shall be binding on the Settling Insurance Companies.  The Settling Insurance Companies' agreement in the Insurance Settlement Agreements not to object to entry of such findings and determinations in the Confirmation Order does not indicate the Settling Insurance Companies' support for such findings and determinations, and no party shall argue that the Settling Insurance Companies agreed to or acquiesced in such findings and determinations in any proceeding.  Rather, the Settling Insurance Companies are designated as Protected Parties under the Plan, and as a result, the Settling Insurance Companies take no position on such findings and determinations or on the Trust Distribution Procedures.  The findings and determinations set forth in <u>Article IX.A.3.y</u> shall not be binding on the United Methodist Entities.  The agreement in the United Methodist Settlement Agreement not to object to entry of such findings and determinations in the Confirmation Order does not indicate the United Methodist Entities' support for such findings and determinations, and no party shall argue that the United Methodist Entities agreed to or acquiesced in such findings and determinations in any proceeding.  Rather, the United Methodist Entities are designated as Protected Parties under the Plan, and as a result, the United Methodist Entities take no position on such findings and determinations or on the Trust Distribution Procedures.

determinations are designed, among other things, to ensure that the Injunctions, Releases and Discharges set forth in Article X shall be effective, binding and enforceable, subject to footnote 6 herein, and shall, among other things, provide that:

a.      the Plan complies with all applicable provisions of the Bankruptcy Code, including that the Plan be proposed in good faith and that the Confirmation Order not be procured by fraud;

b.      the Channeling Injunction and the Insurance Entity Injunction are to be implemented in connection with the Settlement Trust and shall be in full force and effect on the Effective Date;

c.      upon the Effective Date, the Settlement Trust shall assume the liabilities of (i) the Protected Parties with respect to Abuse Claims, (ii) the Limited Protected Parties with respect to Post-1975 Chartered Organization Abuse Claims and Pre-1976 Chartered Organization Abuse Claims, and (iii) the Opt-Out Chartered Organizations with respect to Opt-Out Chartered Organization Abuse Claims and have exclusive authority as of the Effective Date to satisfy or defend such Abuse Claims;

d.      the Settlement Trust will be funded with the Settlement Trust Assets;

e.      the Settlement Trust will use the Settlement Trust Assets to resolve Abuse Claims;

f.      the terms of the Discharge Injunction, the Channeling Injunction, the Release Injunctions, and the Insurance Entity Injunction, including any provisions barring actions against third parties, are set out in conspicuous language in the Plan and in the Disclosure Statement;

g.      the Future Claimants' Representative was appointed by the Bankruptcy Court as part of the proceedings leading to the issuance of the Channeling Injunction and the Insurance Entity Injunction for the purpose of, among other things, protecting the rights of persons who might subsequently assert Abuse Claims of the kind that are addressed in the Channeling Injunction and the Insurance Entity Injunction, which will be transferred to and assumed by the Settlement Trust;

h.      the Plan complies with section 105(a) of the Bankruptcy Code to the extent applicable;

i.      the Injunctions are essential to the Plan and the Debtors' reorganization efforts;

j.      (1) the Plan's transfer of rights under BSA Insurance Policies (the "Debtor Policy Assignment") is authorized and permissible notwithstanding any terms of any policies or provisions of applicable law that are argued to prohibit the

assignment or transfer of such rights; (2) the Plan's transfer of rights under Local Council Insurance Policies issued by the Settling Insurance Companies (the "Consensual Policy Assignment") is authorized and permissible; (3) the Plan's transfer of rights under any insurance policies, other than BSA Insurance Policies, issued by Non-Settling Insurance Companies (the "Non-Debtor Policy Assignment"), subject to the savings clause set forth in Article V.S.1, is authorized to the extent permitted under state law, and the enforceability of such transfer of rights shall be determined under the state law applicable to each such policy; (4) with respect to any rights transferred to the Settlement Trust pursuant to (a), (b) or (c) above (collectively, the "Assigned Rights"), the Settlement Trust (1) is a proper defendant for Abuse Claims to assert the liability of the Protected Parties, and (2) is a proper defendant for Post-1975 Chartered Organization Abuse Claims to assert the liability of the Limited Protected Parties; (5) the Settlement Trust's rights under any insurance policies issued by Non-Settling Insurance Companies, including the effect of any failure to satisfy conditions precedent or obligations under such policies (other than, in the case of the BSA Insurance Policies, the terms of any policies or provisions of applicable law that are argued to prohibit the assignment or transfer of such rights), shall be determined under the law applicable to each such policy in subsequent litigation;

k.      the Insurance Settlement Agreements are approved and the Abuse Insurance Policies shall be sold to the respective Settling Insurance Companies free and clear of all liens, claims, encumbrances, interests and rights of any nature, whether at law or in equity, of any Person or Entity, *except* solely with respect to the interests, if any, of the Archbishop of Agaña, and each of the Hartford Protected Parties, the Century and Chubb Companies, the Zurich Insurers and Zurich Affiliated Insurers, Clarendon, and any other Insurance Company that has contributed funds, proceeds or other consideration to or for the benefit of the Settlement Trust pursuant to an Insurance Settlement Agreement is designated as a Settling Insurance Company, and such Insurance Settlement Agreements represent a sound exercise of the Debtors' business judgment, are in the best interest of the Debtors' Estates, comply with section 1123 of the Bankruptcy Code, and are approved pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019;

l.      [Reserved];

m.      the JPM / Creditors' Committee Settlement represents a sound exercise of the Debtors' business judgment, is in the best interest of the Debtors' Estates, complies with section 1123 of the Bankruptcy Code, and is approved pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019;

n.      the Settlement of Restricted and Core Asset Disputes represents a sound exercise of the Debtors' business judgment, is in the best interest of the Debtors' estates, complies with section 1123 of the Bankruptcy Code, and is approved pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019;

o.     the PSZJ Settlement represents a sound exercise of the Debtors'
business judgment, is in the best interest of the Debtors' estates, complies with
section 1123 of the Bankruptcy Code, and is approved pursuant to section 1123 of
the Bankruptcy Code and Bankruptcy Rule 9019;

p.     the Hartford Insurance Settlement, including the sale of the Hartford
Policies, as set forth in the Hartford Insurance Settlement Agreement, free and clear
of all Interests of any person or entity (as such terms are defined in the Hartford
Insurance Settlement Agreement), *except* solely with respect to the interests, if any,
of the Archbishop of Agaña, and the Allowance of the Hartford Administrative
Expense Claim is approved in accordance with sections 363, 503(b), 507(a)(2),
1123 and 1141 of the Bankruptcy Code, Bankruptcy Rule 9019, and the findings of
fact and conclusions of law made by the Bankruptcy Court pursuant to Article
V.S.4;

q.     the Century and Chubb Companies Insurance Settlement, including
the sale of the Century and Chubb Companies Policies, as set forth in the Century
and Chubb Companies Insurance Settlement Agreement, free and clear of all liens,
claims, encumbrances, interests and rights of any nature, whether at law or in
equity, of any person or entity (as such terms are defined in the Century and Chubb
Companies Insurance Settlement Agreement), *except* solely with respect to the
interests, if any, of the Archbishop of Agaña, is approved in accordance with
sections 363, 1123 and 1141 of the Bankruptcy Code, Bankruptcy Rule 9019, and
the findings of fact and conclusions of law made by the Bankruptcy Court pursuant
to Article V.S.4;

r.     the Zurich Insurance Settlement, including the sale of the Zurich
Insurer Policies, as set forth in the Zurich Insurance Settlement Agreement, free
and clear of all interests of any Person or Entity (as such terms are defined in the
Zurich Insurance Settlement Agreement), *except* solely with respect to the interests,
if any, of the Archbishop of Agaña, is approved in accordance with sections 363,
1123 and 1141 of the Bankruptcy Code, Bankruptcy Rule 9019, and the findings of
fact and conclusions of law made by the Bankruptcy Court pursuant to Article
V.S.4;

s.     the Clarendon Insurance Settlement, including the sale of the
Clarendon Policies, as set forth in the Clarendon Insurance Settlement Agreement,
free and clear of all interests of any Person or Entity (as such terms are defined in
the Clarendon Insurance Settlement Agreement), *except* solely with respect to the
interests, if any, of the Archbishop of Agaña, is approved in accordance with
sections 363, 1123 and 1141 of the Bankruptcy Code, Bankruptcy Rule 9019, and
the findings of fact and conclusions of law made by the Bankruptcy Court pursuant
to Article V.S.4;

t.     [Reserved]

111

u.      the United Methodist Settlement is approved in accordance with the findings of fact and conclusions of law made by the Bankruptcy Court pursuant to Article V.S.6;

v.      the PSZJ Settlement is approved in accordance with the findings of fact and conclusions of law made by the Bankruptcy Court pursuant to Article V.S.7;

w.      [Reserved]

x.      [Reserved]

y.      The allowed amount of any Direct Abuse Claim shall be the amount therefor as determined under the Trust Distribution Procedures.  Such allowed amount shall be legally enforceable against the Settlement Trust.  For the avoidance of doubt, the amount of any installment payments, initial payments, or payments based on payment percentages established under the Trust Distribution Procedures or the Settlement Trust Agreement, as determined or as actually paid by the Settlement Trust, are not the equivalent of any Abuse Claimant's allowed amount of its channeled Direct Abuse Claim.  For the further avoidance of doubt, nothing herein determines whether or not any insurer is obligated to pay the amount determined under the Trust Distribution Procedures for an allowed Direct Abuse Claim.

4.      The proceeds of any sale of any Abuse Insurance Policies, including the full settlement amount, shall be contributed to the Settlement Trust "free and clear" of all liens, claims, encumbrances, any other rights of any nature, whether at law or in equity, and other "interest," under sections 363 and 1141 of the Bankruptcy Code, of any additional insured or any other person or Entity in such Abuse Insurance Policies.  Notwithstanding anything to the contrary and for the avoidance of doubt, the Abuse Insurance Policies shall be sold by the Debtors to the applicable Settling Insurance Companies free and clear of all liens, claims, encumbrances, interests or other rights on the Effective Date on the terms and as provided in the applicable Insurance Settlement Agreement.

B.      Conditions Precedent to the Effective Date.

Notwithstanding any other provision of the Plan or the Confirmation Order, the Effective Date shall occur on the first Business Day after entry of the Confirmation Order on which each of the following conditions precedent has been satisfied or waived pursuant to Article IX.C:

1.      (a) the District Court shall have entered the Affirmation Order in form and substance acceptable to (i) the Debtors, the Ad Hoc Committee, the Coalition, the Tort Claimants' Committee, the Future Claimants' Representative, and the Settling Insurance Companies, and (ii) the Creditors' Committee and JPM, consistent with the JPM / Creditors' Committee Term Sheet; (b) no court shall have entered an order staying the occurrence of the Effective Date pending an appeal of the Confirmation Order or the Affirmation Order; and (c) no request for a stay of the occurrence of the Effective Date shall be pending;

2.      the Settlement Trust Assets shall, simultaneously with the occurrence of the Effective Date or as otherwise provided herein, be transferred to, vested in, and assumed by the Settlement Trust in accordance with Article IV and Article V;

3.      the Settlement Trust Documents and other applicable Plan Documents necessary or appropriate to implement the Plan shall have been executed, delivered and, if applicable, filed with the appropriate governmental authorities in compliance with the JPM / Creditors' Committee Term Sheet;

4.      the Restated Debt and Security Documents shall have been duly executed and delivered by all of the Entities that are parties thereto and all conditions precedent (other than any conditions related to the occurrence of the Effective Date) to the effectiveness thereof shall have been satisfied or duly waived in writing in accordance with the terms of the Restated Debt and Security Documents, the closing shall have occurred thereunder, and Reorganized BSA shall have paid the JPM Exit Fee to JPM;

5.      the Foundation Loan Agreement and any applicable collateral and other loan documents governing the Foundation Loan shall have been duly executed and delivered by all of the Entities that are parties thereto and all conditions precedent (other than any conditions related to the occurrence of the Effective Date) to the effectiveness thereof shall have been satisfied or duly waived in writing in accordance with the terms of the Foundation Loan Agreement and related documentation, and the closing shall have occurred thereunder;

6.      the Debtors shall have adequately funded the Professional Fee Reserve so as to permit the Debtors to make Distributions on account of Allowed Professional Fee Claims in accordance with Article II;

7.      the Debtors shall have obtained all authorizations, consents, certifications, approvals, rulings, opinions or other documents that are necessary to implement and effectuate the Plan;

8.      all payments required to be made pursuant to the terms of the Cash Collateral Order shall have been paid;

9.      all actions, documents, and agreements necessary to implement and effectuate the Plan shall have been effected or executed;

10.     the transactions to be implemented on the Effective Date shall be materially consistent with the Plan Documents and the JPM / Creditors' Committee Term Sheet; and

11.     the Debtors shall have filed a notice of occurrence of the Effective Date.

C.      Waiver of Conditions Precedent.  To the fullest extent permitted by law, each of the conditions precedent in this Article IX may be waived or modified, in whole or in part, in the sole discretion of the Debtors; provided, however, that (1) the Creditors' Committee's consent (not to be unreasonably withheld) is required to the extent any such waiver or modification by the Debtors impacts the treatment of General Unsecured Claims, Non-Abuse Litigation Claims, or

113

Convenience Claims; (2) the conditions precedent set forth in <u>Article IX.B.4</u> and <u>Article IX.B.8</u> may be waived or modified by the Debtors only with the prior written consent of JPM; (3) the conditions precedent set forth in <u>Article IX.A.2</u>, <u>Article IX.A.3.p</u> and <u>Article IX.B.1</u> may be waived or modified by the Debtors only with the prior written consent of Hartford, the Coalition, the Tort Claimants' Committee, and the Future Claimants' Representative; (4) the conditions precedent set forth in <u>Article IX.A.2</u>, <u>Article IX.A.3.q</u> and <u>Article IX.B.1</u> may be waived or modified by the Debtors only with the prior written consent of the Century and Chubb Companies, the Coalition, the Tort Claimants' Committee, and the Future Claimants' Representative; (5) the condition precedent set forth in <u>Article IX.A.2</u>, <u>Article IX.A.3.r</u> and <u>Article IX.B.1</u> may be waived or modified by the Debtors only with the prior written consent of the Zurich Insurers and Zurich Affiliated Insurers, the Coalition, the Tort Claimants' Committee, and the Future Claimants' Representative; (6) the condition precedent set forth in <u>Article IX.A.2</u>, <u>Article IX.A.3.s</u> and <u>Article IX.B.1</u> may be waived or modified by the Debtors only with the prior written consent of Clarendon, the Coalition, the Tort Claimants' Committee, and the Future Claimants' Representative; (7) the condition precedent set forth in <u>Article IX.A.3.u</u> may be waived or modified by the Debtors only with the prior written consent of United Methodist ad hoc committee, the Coalition, the Tort Claimants' Committee, and the Future Claimants' Representative; (8) for <u>Article IX.A.3.j</u>, <u>Article IX.A.3.k</u>, <u>Article IX.A.3.l</u>, <u>Article IX.A.3.y</u>, and any waiver or modification that impacts the treatment of Abuse Claims or Settlement Trust Assets, the prior written consent of the Coalition, the Tort Claimants' Committee, Pfau/Zalkin, and the Future Claimants' Representative shall be required as a condition to waiver or modification by the Debtors; (9) the conditions precedent in Article IX.B.1 and <u>Article IX.B.6</u> may be waived or modified by the Debtors only with the prior written consent of the Ad Hoc Committee, the Coalition, the Tort Claimants' Committee, and the Future Claimants' Representative. Any waiver or modification of a condition precedent under this <u>Article IX</u> may be effectuated at any time, without notice, without leave or order of the Bankruptcy Court or the District Court, and without any other formal action other than proceedings to Confirm or consummate the Plan; (10) the condition precedent set forth in <u>Article IX.A.4</u> may be waived or modified by the Debtors only with the prior written consent of the Tort Claimants' Committee, Pfau/Zalkin, the Coalition, and the Future Claimants' Representative. The failure to satisfy or waive any condition precedent to the Effective Date may be asserted by the Ad Hoc Committee, the Coalition, the Tort Claimants' Committee, Pfau/Zalkin, the Future Claimants' Representative, the Settling Insurance Companies, the Creditors' Committee or JPM regardless of the circumstances giving rise to the failure of such condition to be satisfied or waived.

      D.      [Reserved].

      E.      *Vacatur of Confirmation Order; Non-Occurrence of Effective Date.*   If the Confirmation Order is vacated or the Effective Date does not occur within 180 days after entry of the Confirmation Order (subject to extension by the Debtors in their sole discretion), the Plan shall be null and void in all respects, and nothing contained in the Plan or the Disclosure Statement shall (1) constitute a waiver or release of any Causes of Action by or Claims against or Interests in the Debtors or any Person; (2) prejudice in any manner the rights of the Debtors, any holders of a Claim or Interest or any other Person; (3) constitute an admission, acknowledgment, offer, or undertaking by the Debtors, any holders of a Claim or Interest, or any other Person in any respect; or (4) be used by the Debtors or any other Person as evidence (or in any other way) in any litigation, including with respect to the strengths and weaknesses of positions, arguments or claims of any of the parties to such litigation.

# ARTICLE X.

## EFFECT OF PLAN CONFIRMATION

A.   <u>Vesting of Assets in Reorganized BSA</u>.  Except as otherwise expressly provided in the Plan (including with respect to the Core Value Cash Pool and the Restated Debt and Security Documents), on the Effective Date, pursuant to sections 1141(b) and 1141(c) of the Bankruptcy Code, all property comprising the Estates shall vest in Reorganized BSA free and clear of all Liens, Claims, interests, charges, other Encumbrances and liabilities of any kind.  On and after the Effective Date, Reorganized BSA may continue its operations and may use, acquire, or dispose of property, and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval of the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules.

B.   <u>Retention of Certain Causes of Action</u>.  In accordance with section 1123(b)(3) of the Bankruptcy Code, subject to the transfer of the Debtors' Settlement Trust Causes of Action to the Settlement Trust under <u>Article IV.D</u> and the Debtors' and their Estates' release of certain Estate Causes of Action under <u>Article X.J</u>, and except as otherwise provided in the Plan or in any Insurance Settlement Agreements, all Causes of Action that a Debtor may hold against any Person shall vest in Reorganized BSA on the Effective Date.  Thereafter, subject to <u>Article IV.D</u> and <u>Article X.J</u>, Reorganized BSA shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action, whether arising before or after the Petition Date, and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court.  No Person may rely on the absence of a specific reference in the Plan or the Disclosure Statement to any specific Cause of Action as any indication that the Debtors or Reorganized BSA, as applicable, will not pursue any and all available Causes of Action.  The Debtors or Reorganized BSA, as applicable, expressly reserve all rights to prosecute any and all Causes of Action against any Person, except as otherwise expressly provided in the Plan, and, therefore, no preclusion doctrine, including the doctrines of *res judicata*, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise) or laches, shall apply to any Cause of Action upon, after, or as a consequence of Confirmation or the occurrence of the Effective Date.

C.   <u>Binding Effect</u>.  As of the Effective Date, except as expressly set forth herein, all provisions of the Plan, including all agreements, instruments and other documents entered into in connection with the Plan by the Debtors or Reorganized BSA, the Settlement Trust, or the Protected Parties, shall be binding upon the Debtors, the Estates, Reorganized BSA, all holders of Claims against and Interests in the Debtors, each such holder's respective successors and assigns, and all other Persons that are affected in any manner by the Plan, regardless of whether the Claim or Interest of such holder is Impaired under the Plan or whether such holder has accepted the Plan.  Except as otherwise expressly provided in the Plan, all agreements, instruments and other documents filed in connection with the Plan shall be given full force and effect and shall bind all Persons referred to therein on and after the Effective Date, whether or not such agreements are actually issued, delivered or recorded on or after the Effective Date and whether or not such Persons have actually executed such agreement.

D.    Post-Confirmation Interim Injunction and Stays.  All injunctions and stays arising under or entered during the Chapter 11 Cases, whether under sections 105 or 362 of the Bankruptcy Code or otherwise, and in existence on the Confirmation Date shall remain in full force and effect until the latest to occur of, as applicable: the Effective Date, the Release Date (as defined in the applicable Insurance Settlement Agreement or other settlement agreement), and the Limited Protected Party Injunction Date (which Limited Protected Party Injunction Date shall be no later than one (1) year following the Effective Date except as provided in the Settlement Trust Agreement).  To the extent not otherwise in place, pending the occurrence of the Release Date (as defined in the applicable Insurance Settlement Agreement), the United Methodist Release Effective Date (as defined in the United Methodist Settlement Agreement), or other release date set forth in any other settlement agreement, any Claim that would be released or subject to the Channeling Injunction upon the occurrence of conditions set forth herein and in any applicable settlement agreement (including the occurrence of the Release Date or similar defined term (as defined in the applicable settlement agreement) shall be stayed and enjoined pending satisfaction of such conditions (the "Post-Confirmation Interim Injunction").  To the extent not otherwise in place, until the occurrence of the Limited Protected Party Injunction Date, any Claim against a Participating Chartered Organization shall be stayed and enjoined pending satisfaction of such conditions.  The Post-Confirmation Interim Injunction shall permit the filing, but not the prosecution, of the Abuse Claims.  The injunctions and stays referenced in this Article X.D include the preliminary injunction imposed by the *Consent Order Pursuant to 11 U.S.C. §§ 105(a) and 362 Granting the BSA's Motion for a Preliminary Injunction* entered by the Bankruptcy Court on March 30, 2020 (Adv. Pro. No. 20-50527, Docket No. 54).  Solely with respect to the United Methodist Entities, the Post-Confirmation Interim Injunction shall remain in full force and effect until the earliest to occur of the United Methodist Release Effective Date or the United Methodist Release Termination Date (as those terms are defined in the United Methodist Settlement Agreement).

E.    Discharge.

1.    Discharge of the Debtors.  Except as expressly provided in the Plan or the Confirmation Order, the treatment of Claims under the Plan shall be in exchange for, and in complete satisfaction, settlement, discharge, termination and release of, all Claims and Interests of any nature whatsoever against or in the Debtors or any of their assets or properties based upon any act, omission, transaction, occurrence, or other activity of any nature that occurred prior to the Effective Date, and, as of the Effective Date, each of the Debtors shall be deemed discharged and released, and each holder of a Claim or Interest and any successor, assign, and affiliate of such holder shall be deemed to have forever waived, discharged and released each of the Debtors, to the fullest extent permitted by section 1141 of the Bankruptcy Code, of and from any and all Claims, Interests, rights and liabilities, and all debts of the kind specified in section 502 of the Bankruptcy Code, based upon any act, omission, transaction, occurrence, or other activity of any nature that occurred prior to the Effective Date, in each case whether or not (a) a Proof of Claim based upon such debt is filed or deemed filed under section 501 of the Bankruptcy Code, (b) a Claim based upon such debt is Allowed under section 502 of the Bankruptcy Code, (c) a Claim based upon such debt is or has been Disallowed by order of the Bankruptcy Court, or (d) the holder of a Claim based upon such debt is deemed to have accepted the Plan.  Notwithstanding the foregoing, nothing in this Article X.E shall be construed to modify,

reduce, impair or otherwise affect the ability of any holder of an Allowed Non-Abuse Litigation Claim to recover on account of such Allowed Claim in accordance with Article III.B.9 and Article IV.D.3.

2. <u>Discharge Injunction</u>. From and after the Effective Date, except as expressly provided in the Plan or the Confirmation Order, all holders of Claims or Interests of any nature whatsoever against or in the Debtors or any of their assets or properties based upon any act, omission, transaction, occurrence, or other activity of any nature that occurred prior to the Effective Date that are discharged pursuant to the terms of the Plan shall be precluded and permanently enjoined from taking any of the following actions on account of, or on the basis of, such discharged Claims and Interests: (a) commencing or continuing any action or other proceeding of any kind against the Debtors, Reorganized BSA, the Settlement Trust, or its or their respective property; (b) enforcing, attaching, collecting, or recovering by any manner or means of judgment, award, decree or other against the Debtors, Reorganized BSA, the Settlement Trust, or its or their respective property; (c) creating, perfecting or enforcing any Lien or Encumbrance of any kind against the Debtors, Reorganized BSA, the Settlement Trust, or its or their respective property; or (d) commencing or continuing any judicial or administrative proceeding, in any forum and in any place in the world, that does not comply with or is inconsistent with the provisions of the Plan or the Confirmation Order. The foregoing injunction shall extend to the successors and assigns of the Debtors (including Reorganized BSA) and its and their respective properties and interests in property. In accordance with the foregoing, except as expressly provided in the Plan or the Confirmation Order, the Confirmation Order shall be a judicial determination of discharge or termination of all Claims, Interests and other debts and liabilities against or in the Debtors pursuant to sections 105, 524 and 1141 of the Bankruptcy Code, and such discharge shall void any judgment obtained against the Debtors at any time to the extent such judgment relates to a discharged Claim or Interest.

F.   **<u>Channeling Injunction</u>.**

1.   **<u>Terms</u>. Notwithstanding anything to the contrary herein, to preserve and promote the settlements contemplated by and provided for in the Plan, including the Abuse Claims Settlement, the Insurance Settlements, and the United Methodist Settlement, and to supplement, where necessary, the injunctive effect of the Discharge as provided in sections 1141 and 524 of the Bankruptcy Code and as described in this <u>Article X</u>, pursuant to the exercise of the equitable jurisdiction and power of the Bankruptcy Court and the District Court under section 105(a) of the Bankruptcy Code, (a) the sole recourse of any holder of an Abuse Claim against a Protected Party on account of such Abuse Claim shall be to and against the Settlement Trust pursuant to the Settlement Trust Documents, and such holder shall have no right whatsoever at any time to assert such Abuse Claim against any Protected Party or any property or interest in property of any Protected Party, (b) the sole recourse of any holder of a Post-1975 Chartered Organization Abuse Claim against a Limited Protected Party on account of such Post-1975 Chartered Organization Abuse Claim shall be to and against the Settlement Trust pursuant to the Settlement Trust Documents, and such holder shall have no right whatsoever at any time to assert such Post-1975 Chartered Organization Abuse Claim against any Limited Protected Party or any property or**

117

interest in property of any Limited Protected Party, (c) the sole recourse of any holder of an Abuse Claim against a Limited Protected Party if such Abuse Claim is covered under any insurance policy issued by any Settling Insurance Company, shall be to and against the Settlement Trust pursuant to the Settlement Trust Documents, and such holder shall have no right whatsoever at any time to assert such Abuse Claim against any Limited Protected Party or any property or interest in property of any Limited Protected Party, (d) the sole recourse of any holder of an Opt-Out Chartered Organization Abuse Claim against an Opt-Out Chartered Organization on account of such Opt-Out Chartered Organization Abuse Claim shall be to and against the Settlement Trust pursuant to the Settlement Trust Documents, and such holder shall have no right whatsoever at any time to assert such Opt-Out Chartered Organization Abuse Claim against any Opt-Out Chartered Organization or any property or interest in property of any Opt-Out Chartered Organization.  For the avoidance of doubt, the sole recourse for any holder of an Abuse Claim covered by any insurance policy issued by a Settling Insurance Company shall be to and against the Settlement Trust pursuant to the Settlement Trust Documents. Accordingly, on and after the Effective Date, all Persons that have held or asserted, currently hold or assert, or that may in the future hold or assert, any Abuse Claim against the Protected Parties, or any of them, or any Post-1975 Chartered Organization Abuse Claim against the Limited Protected Parties, or any of them, or any Abuse Claim against the Limited Protected Parties (or any of them) if such Abuse Claim is covered under any insurance policy issued by any Settling Insurance Company, or any Opt-Out Chartered Organization Abuse Claim against the Opt-Out Chartered Organizations, or any of them, shall be permanently and forever stayed, restrained and enjoined from taking any action for the purpose of directly, indirectly, or derivatively collecting, recovering, or receiving payment, satisfaction, or recovery from any Protected Party with respect to any such Abuse Claim, or from any Limited Protected Party with respect to any such Abuse Claim if such Abuse Claim is covered under any insurance policy issued by any Settling Insurance Company, or from any Limited Protected Party with respect to any such Post-1975 Chartered Organization Abuse Claim, or from any Opt-Out Chartered Organization with respect to any Opt-Out Chartered Organization Abuse Claim, other than from the Settlement Trust pursuant to the Settlement Trust Documents, including:

     a.     commencing, conducting, or continuing, in any manner, whether directly, indirectly, or derivatively, any suit, action, or other proceeding of any kind (including a judicial, arbitration, administrative, or other proceeding) in any forum in any jurisdiction around the world against or affecting any Protected Party, Limited Protected Party, or Opt-Out Chartered Organization, or any property or interest in property of any Protected Party, Limited Protected Party, or Opt-Out Chartered Organization;

     b.     enforcing, levying, attaching (including any prejudgment attachment), collecting or otherwise recovering, by any manner or means, either directly or indirectly, any judgment, award, decree, or order against or affecting any Protected Party, Limited Protected Party, or Opt-Out Chartered

Organization or any property or interest in property of any Protected Party, Limited Protected Party, or Opt-Out Chartered Organization;

c.      creating, perfecting, or otherwise enforcing in any manner, whether directly or indirectly, any Encumbrance of any kind against any Protected Party, Limited Protected Party, or Opt-Out Chartered Organization, or any property or interest in property of any Protected Party, Limited Protected Party, or Opt-Out Chartered Organization;

d.      asserting, implementing or effectuating any setoff, right of reimbursement, subrogation, indemnity, contribution, reimbursement, or recoupment of any kind, in any manner, directly or indirectly, against any obligation due to any Protected Party, Limited Protected Party, or Opt-Out Chartered Organization, or any property or interest in property of any Protected Party, Limited Protected Party, or Opt-Out Chartered Organization; or

e.      taking any act in any manner, and in any place whatsoever, that does not conform to, or comply with, the provisions of the Plan Documents or the Settlement Trust Documents or with regard to any matter that is within the scope of the matters designated by the Plan to be subject to resolution by the Settlement Trust, except in conformity and compliance with the Settlement Trust Documents with respect to any such Abuse Claim, Post-1975 Chartered Organization Abuse Claim, Pre-1976 Chartered Organization Abuse Claim, or Opt-Out Chartered Organization Abuse Claim.

2.      <u>Limited Protected Party Injunction</u>. The Limited Protected Party Injunction shall stay the prosecution of any Abuse Claim that was commenced prior to or after the Effective Date against a Chartered Organization through the later of (a) forty-five (45) days after the resolution of the Abuse Claim that is subject to the Independent Review under the Trust Distributions Procedures or (b) the Limited Protected Party Injunction Date.

3.      **Protections for Insureds and Co-Insureds of Settling Insurance Companies.** All Abuse Claims against insureds and co-insureds covered under any insurance policies issued by the Settling Insurance Companies shall be channeled under Article X.F.1 and released under Article X.J.6 as provided in the Insurance Settlement Agreements. Solely for purposes of administering the Channeling Injunctions and releases in this Plan and in the Confirmation Order and not for any other purpose, any liability insurance policy (other than an automobile policy or director's and officer's policy) that was issued by the Settling Insurance Companies shall be automatically deemed to "cover" or provide "coverage" for an Abuse Claim against a Chartered Organization if (i) such policy includes the Chartered Organization, by name or by referring to Chartered Organizations categorically as chartered organizations, charters, sponsoring organizations, or sponsors, as insureds or additional insureds, (ii) such policy was in effect when the alleged Abuse underlying such Abuse Claim allegedly took place; and (iii) such policy does not specifically exclude all abuse or molestation, regardless of state of mind; provided,

<u>however</u>, that nothing in the qualifications for coverage specified in subsections (i), (ii), or (iii) of Article X.F.3 of this Plan shall be offered or interpreted as an admission by the Settling Insurance Companies of any fact or issue for any purpose in any other proceeding or litigation or dispute, and shall not be cited as a basis to impose liability on, or increase the liability of, any Settling Insurance Company under any circumstance or any insurance policy. For the avoidance of doubt, nothing herein prevents a Settling Insurance Company or its insureds from seeking to establish that other insurance policies cover Abuse Claims for purposes of applying the Channeling Injunction and Releases. The protections provided under this <u>Article X.F.3</u> shall apply to all insureds and co-insureds covered under insurance policies that are sold back to the Settling Insurance Companies pursuant to the terms hereof or an Insurance Settlement Agreement.

4.      **Reservations.** **Notwithstanding anything to the contrary in this Article X.F, the Channeling Injunction shall not enjoin:**

a.      **the rights of holders of Abuse Claims to assert such Abuse Claims against the Settlement Trust in accordance with the Trust Distribution Procedures, including the ability to pursue the Settlement Trust in the tort system as described in Article XII of the Trust Distribution Procedures;**

b.      **the rights of holders of Abuse Claims to assert such an Abuse Claim against (i) a Limited Protected Party for Abuse Claims that arose prior to January 1, 1976, and are not covered by any insurance policy issued by a Settling Insurance Company and (ii) an Opt-Out Chartered Organization to the extent such Abuse Claim is not covered by any insurance policy issued by a Settling Insurance Company;**

c.      **the rights of holders of Abuse Claims that are not Opt-Out Chartered Organization Abuse Claims to assert such Abuse Claims against any Opt-Out Chartered Organization (unless such Opt-Out Chartered Organization becomes a Protected Party under Article IV.J);**

d.      **the rights of holders of Abuse Claims to assert such Abuse Claims against the Settlement Trust (as to any Abuse Claim) or against the United Methodist Entities (as to any Abuse Claim other than Pre-1976 Chartered Organization Abuse Claim and Post-1975 Chartered Organization Abuse Claims) prior to the United Methodist Release Effective Date (as that term is defined in the United Methodist Settlement Agreement), in each case for the sole purpose of preserving the statute of limitations. For the avoidance of doubt, such actions shall be limited to the commencement of an action against, and serving, as applicable, the Settlement Trust, to which such Claims have been channeled, or the United Methodist Entities;**

e.      **the rights of any Person to assert any Claim, debt, obligation or liability for payment of Settlement Trust Expenses solely against the Settlement Trust in accordance with the Settlement Trust Documents;**

f.       the Settlement Trust from enforcing its rights under the Plan and the Settlement Trust Documents; or

g.       the rights of the Settlement Trust to prosecute any action against any Non-Settling Insurance Company based on or arising from Abuse Insurance Policies that are not the subject of an Insurance Settlement Agreement, subject to any Insurance Coverage Defenses;

h.       the rights of the United Methodist Entities against the Settlement Trust to enforce the terms of the Channeling Injunction as forth in the applicable settlement agreements; or

i.       the rights of the Settling Insurance Companies to enforce the terms of the Channeling Injunction as otherwise set forth herein and in the Insurance Settlement Agreements.

G.       <u>Provisions Relating to Channeling Injunction</u>.

1.       **Abuse Claims Under Policies Issued to Chartered Organizations**.  The release by the Participating Chartered Organizations and Contributing Chartered Organizations of the Settling Insurance Companies from all the Claims and Causes of Action as set forth in each of the Insurance Settlement Agreements (and corresponding rights of the Settling Insurance Companies) are subject to the following:[7]

a.       Such Chartered Organizations are not barred from seeking defense and indemnification for claims that are not Abuse Claims under insurance policies issued by the Settling Insurance Companies directly to such Chartered Organizations, with all parties reserving their rights as to whether such insurance policies apply and to what extent.

b.       Such Chartered Organizations are not barred from seeking defense and indemnification for that portion of Mixed Claims unrelated to Scouting under insurance policies issued by the Settling Insurance Companies directly to such Chartered Organizations, with all parties reserving their rights as to whether such insurance policies apply and to what extent.  All supporting parties to the Plan, as applicable, agree to cooperate to enforce the Post-Confirmation Interim Injunction and the Channeling Injunction to eliminate all or a portion of the Mixed Claims against the applicable Chartered Organizations.

c.       Such Chartered Organizations are not barred from seeking defense and indemnification under insurance policies issued by the Settling Insurance Companies directly to such Chartered Organizations, pending determination by a court of competent jurisdiction as to whether a Claim is a channeled Abuse Claim,

---

[7] As set forth in Article IV.S.1.g(v) above, the insurance policies issued directly to the BSA and the Local Councils were, by definition, not issued to the Chartered Organizations and are not subject to this Article X.G.1.

with all parties reserving their rights as to whether such insurance policies apply and to what extent.

        d.      To the extent a court determines that a claim against such Chartered Organizations is not an Abuse Claim or is not subject to the Post-Confirmation Interim Injunction or the Channeling Injunction in the Plan, such Chartered Organizations may seek defense and indemnification of that claim under insurance policies issued by the Settling Insurance Companies directly to such Chartered Organizations, with all parties reserving their rights as to whether such insurance policies apply and to what extent.

        e.      To the extent a court determines that a claim against such Chartered Organizations is subject to the Post-Confirmation Interim Injunction or the Channeling Injunction in the Plan, the Settling Insurance Companies shall have no further obligations with respect to such claim. For the avoidance of doubt, Participating Chartered Organizations and Contributing Chartered Organizations retain the right to seek coverage from the Settling Insurance Companies under policies issued directly to such Chartered Organizations for defense costs incurred in connection with the enforcement of the injunction with respect to an Abuse Claim until the time the Abuse Claim is determined to be an Abuse Claim by a court.

        f.      The Settlement Trust shall cooperate with any ongoing efforts by such Chartered Organizations and/or the Settling Insurance Companies to establish that the Post-Confirmation Interim Injunction, the Insurance Entity Injunction, and the Channeling Injunction apply.

        g.      The Settling Insurance Companies reserve all rights under their policies with respect to any Claim that is not an Abuse Claim (including the non-Scouting component of any Mixed Claim), none of which rights are waived or released hereunder.

    2.      <u>Modifications</u>. Subject to post-Effective Date settlements between the Settlement Trustee and Chartered Organizations or Insurance Companies under the applicable provisions of <u>Article IV</u>, there can be no modification, dissolution, or termination of the Channeling Injunction, which shall be a permanent injunction.

    3.      <u>Non-Limitation</u>. Nothing in the Plan or the Settlement Trust Documents shall or shall be construed in any way to limit the scope, enforceability, or effectiveness of the Channeling Injunction or the Settlement Trust's assumption of all liability with respect to Abuse Claims.

    4.      <u>Bankruptcy Rule 3016 Compliance</u>. The Debtors' compliance with the requirements of Bankruptcy Rule 3016 shall not constitute or be deemed to constitute an admission that the Plan provides for an injunction against conduct not otherwise enjoined under the Bankruptcy Code.

5.    Enforcement.  Any Protected Party, Limited Protected Party, or Opt-Out Chartered Organization may enforce the Channeling Injunction as a defense to any Claim (in whole or in part) brought against such Protected Party, Limited Protected Party, or Opt-Out Chartered Organization that is enjoined under the Plan as to such Protected Party, Limited Protected Party, or Opt-Out Chartered Organization and may seek to enforce such injunction in a court of competent jurisdiction.

6.    Contribution Claims.  If a Non-Settling Insurance Company asserts that it has rights, whether legal, equitable, contractual, or otherwise, of contribution, indemnity, reimbursement, subrogation or other similar claims directly or indirectly arising out of or in any way relating to such Non-Settling Insurance Company's payment of loss on behalf of one or more of the Debtors in connection with any Abuse Claim against a Settling Insurance Company (collectively, "Contribution Claims"), (a) such Contribution Claims may be asserted as a defense or counterclaim against the Settlement Trust in any Insurance Action involving such Non-Settling Insurance Company, and the Settlement Trust may assert the legal or equitable rights (if any) of the Settling Insurance Company, and (b) to the extent such Contribution Claims are determined to be valid, the liability (if any) of such Non-Settling Insurance Company to the Settlement Trust shall be reduced by the amount of such Contribution Claims.

7.    No Duplicative Recovery.  In no event shall any holder of an Abuse Claim be entitled to receive any duplicative payment, reimbursement, or restitution from any Protected Party, Limited Protected Party or Opt-Out Chartered Organization under any theory of liability for the same loss, damage, or other Claim that is reimbursed by the Settlement Trust or is otherwise based on the same events, facts, matters, or circumstances that gave rise to the applicable Abuse Claim.

8.    District Court Approval.  To the extent necessary, the Debtors shall seek entry of the Affirmation Order, which affirms (a) the Channeling Injunction and the Settlement Trust's assumption of all liability with respect to Abuse Claims and (b) the releases by holders of Abuse Claims for the benefit of the Protected Parties and the Limited Protected Parties, each as set forth in this Article X.

H.    **Insurance Entity Injunction**.

1.    **Purpose.**  **To facilitate the Insurance Assignment, protect the Settlement Trust, and preserve the Settlement Trust Assets, pursuant to the equitable jurisdiction and power of the Bankruptcy Court and the District Court under section 105(a) of the Bankruptcy Code, the Bankruptcy Court shall issue the injunction set forth in this Article X.H (the "Insurance Entity Injunction"); provided, however, that the Insurance Entity Injunction is not issued for the benefit of any Non-Settling Insurance Company, and no Non-Settling Insurance Company is a third-party beneficiary of the Insurance Entity Injunction, except as otherwise specifically provided in any Insurance Settlement Agreement.**

2.    **Terms Regarding Claims against Insurance Companies.  Subject to the terms of Article X.E and Article X.F, except for Opt-Out Chartered Organizations**

123

with respect to Non-Settling Insurance Companies and Participating Chartered Organizations with respect to Non-Settling Insurance Companies coverage for Abuse Claims that arose prior to January 1, 1976, all Persons that have held or asserted, that hold or assert, or that may in the future hold or assert any claim or cause of action (including any Abuse Claim or any claim for or respecting any Settlement Trust Expense) against any Insurance Company based upon, attributable to, arising out of, or in any way connected with any Abuse Insurance Policy or other insurance policy issued by a Settling Insurance Company covering Abuse Claims, whenever and wherever arising or asserted, whether in the United States of America or anywhere else in the world, whether sounding in tort, contract, warranty, or any other theory of law, equity, or admiralty, shall be stayed, restrained, and enjoined from taking any action for the purpose of directly or indirectly collecting, recovering, or receiving payments, satisfaction, or recovery with respect to any such claim or cause of action, including:

   a.   commencing, conducting, or continuing, in any manner, directly or indirectly, any suit, action, or other proceeding of any kind (including a judicial, arbitration, administrative, or other proceeding) in any forum with respect to any such claim, demand, or cause of action against any Insurance Company, or against the property of any Insurance Company, with respect to any such claim, demand, or cause of action (including, for the avoidance of doubt, directly pursuing any suit, action or other proceeding with respect to any such claim, demand, or cause of action against any Insurance Company);

   b.   enforcing, levying, attaching, collecting, or otherwise recovering, by any means or in any manner, whether directly or indirectly, any judgment, award, decree, or other order against any Insurance Company, or against the property of any Insurance Company, with respect to any such claim or cause of action;

   c.   creating, perfecting, or enforcing in any manner, directly or indirectly, any Lien or Encumbrance against any Insurance Company, or the property of any Insurance Company, with respect to any such claim or cause of action; and

   d.   except as otherwise specifically provided in the Plan, asserting or accomplishing any setoff, right of subrogation, indemnity, contribution, or recoupment of any kind, directly or indirectly, against any obligation of any Insurance Company, or against the property of any Insurance Company, with respect to any such claim or cause of action;

provided, however, that: (i) the injunction set forth in this Article X.H shall not impair in any way any (a) actions brought by the Settlement Trust against any Non-Settling Insurance Company, (b) actions brought by Local Councils in connection with any Local Council Reserved Rights, (c) any actions brought by any Chartered Organization relating to an Abuse Claim against a Non-Settling Insurance Company that is not channeled to the Settlement Trust; (d) actions brought by holders of Non-Abuse Litigation Claims consistent

with <u>Article IV.D.3</u>, (e) the rights, if any, of any Opt-Out Chartered Organization under any Abuse Insurance Policy that was issued by a Non-Settling Insurance Company, or (f) except as provided in any applicable Insurance Settlement Agreement, the rights of any co-insured of the Debtors (x) under any Non-Abuse Insurance Policy and (y) as specified under any Final Order of the Bankruptcy Court approving an Insurance Settlement Agreement; and (ii) the Settlement Trust shall have the sole and exclusive authority at any time to terminate, or reduce or limit the scope of, the injunction set forth in this <u>Article X.H</u> with respect to any Non-Settling Insurance Company, in accordance with the Settlement Trust Documents, upon express written notice to such Non-Settling Insurance Company, except that the Settlement Trust shall not have any authority to terminate, reduce or limit the scope of the injunction herein with respect to any Settling Insurance Company.

3.   <u>Reservations</u>.  Notwithstanding anything to the contrary in this <u>Article X.H</u>, the Insurance Entity Injunction shall not enjoin:

a.   the rights of any Person to the treatment accorded them under the Plan, as applicable, including the rights of holders of Abuse Claims to assert such Claims, as applicable, in accordance with the Trust Distribution Procedures, and the rights of holders of Non-Abuse Litigation Claims to assert such Claims, as applicable in accordance with <u>Article IV.D.3</u>;

b.   the rights of any Person to assert any claim, debt, obligation, cause of action or liability for payment of Settlement Trust Expenses against the Settlement Trust;

c.   the rights of the Settlement Trust to prosecute any action based on or arising from Abuse Insurance Policies, except to the extent otherwise released;

d.   the rights of any Person to assert or prosecute (i) an Abuse Claim against an Opt-Out Chartered Organization to the extent that such Claim is not covered under an insurance policy issued by a Settling Insurance Company, or (ii) an Abuse Claim against a Limited Protected Party for Abuse Claims that arose prior to January 1, 1976, and is not covered under an insurance policy issued by a Settling Insurance Company;

e.   the rights of the Settlement Trust to assert any claim, debt, obligation, cause of action or liability for payment against a Non-Settling Insurance Company based on or arising from the Abuse Insurance Policies;

f.   the rights of any Insurance Company to assert any claim, debt, obligation, cause of action or liability for payment against any Non-Settling Insurance Company;

g.   the claims for reinsurance under reinsurance contracts or claims under retrocessional contracts among the Settling Insurance Companies and other insurance companies; or

      h.     the rights of any Insurance Company to assert any claims for contribution, subrogation, indemnification or other similar Cause of Action against the Settlement Trust for the Settling Insurance Companies' alleged share or equitable share, or to enforce subrogation rights, if any, of the defense and/or indemnity obligation for any Abuse Claim, or for any Cause of Action released in any Insurance Settlements.

I.     **Injunction against Interference with Plan.**  Upon entry of the Confirmation Order, all holders of Claims and Interests shall be precluded and enjoined from taking any actions to interfere with the implementation and consummation of the Plan.

J.     **Releases.**

1.     **Releases by the Debtors and the Estates.**

      a.     **Releases by the Debtors and the Estates of the Released Parties.** As of the Effective Date, except for the rights that remain in effect from and after the Effective Date to enforce the Plan and the Confirmation Order, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, the adequacy of which is hereby confirmed, including the actions of the Released Parties to facilitate and implement the reorganization of the Debtors and the settlements embodied in the Plan, including the Abuse Claims Settlement, the JPM / Creditors' Committee Settlement, the Insurance Settlements, and the United Methodist Settlement as an integral component of the Plan, the Debtors, Reorganized BSA, and the Estates shall, and shall be deemed to, expressly, conclusively, absolutely, unconditionally, irrevocably, and forever release and discharge each and all of the Released Parties of and from any and all Estate Causes of Action that do not constitute Settlement Trust Causes of Action, any and all other Claims, Interests, obligations, rights, demands, suits, judgments, damages, debts, remedies, losses and liabilities of any nature whatsoever (including any derivative claims or Causes of Action asserted or that may be asserted on behalf of the Debtors, Reorganized BSA, or the Estates), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, in law, equity, contract, tort or otherwise, based on or relating to, or in any manner arising from, in whole or in part, any act, omission, transaction, event, or other circumstance taking place or existing on or before the Effective Date (including before the Petition Date) in connection with or related to the Debtors, the Estates, their respective assets and properties, the Chapter 11 Cases, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated by the Plan, the business or contractual arrangements between one or both of the Debtors and any Released Party, the restructuring of any Claim or Interest that is treated by the Plan before or during the Chapter 11 Cases, any of the Plan Documents, the JPM / Creditors' Committee Settlement, the Insurance Settlements, the United Methodist Settlement, or any related agreements, instruments, and other documents created or entered into before or during the Chapter 11 Cases or the

126

negotiation, formulation, preparation or implementation thereof, the pursuit of Confirmation, the administration and implementation of the Plan, the solicitation of votes with respect to the Plan, the Distribution of property under the Plan, or any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date related or relating to the foregoing. Notwithstanding anything to the contrary in the foregoing, the releases set forth in this <u>Article X.J.1</u> shall not, and shall not be construed to: (a) release any Released Party from Causes of Action arising out of, or related to, any act or omission of such Released Party that is a criminal act or that constitutes fraud, gross negligence or willful misconduct; or(b) release any post-Effective Date obligations of any Person under the Plan Documents or any document, instrument, or agreement executed to implement the Plan.

  b. <u>Releases by the Debtors and the Estates of Certain Avoidance Actions.</u> As of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, including the actions of Creditors' Committee and its members in their respective capacities as such in facilitating and implementing the reorganization of the Debtors, as an integral component of the Plan, the Debtors, Reorganized BSA, and the Estates shall, and shall be deemed to, expressly, conclusively, absolutely, unconditionally, irrevocably, and forever release and discharge each and all holders of General Unsecured Claims, Non-Abuse Litigation Claims, and Convenience Claims of and from any and all Avoidance Actions.

  2. <u>Releases by the Debtors and the Estates of the Local Councils, the Contributing Chartered Organizations, the Participating Chartered Organizations, the Opt-Out Chartered Organizations and the Settling Insurance Companies.</u> In furtherance of the Abuse Claims Settlement, on the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, the Debtors, on their own behalf and as representatives of their respective Estates, and Reorganized BSA, are deemed to irrevocably and unconditionally, fully, finally, and forever waive, release, acquit, and discharge each and all of the Local Councils, the Contributing Chartered Organizations, the Participating Chartered Organizations, the Opt-Out Chartered Organizations, and the Settling Insurance Companies of and from any and all claims, causes of action, suits, costs, debts, liabilities, obligations, dues, sums of money, accounts, reckonings, bonds, bills, covenants, contracts, controversies, agreements, promises, damages, judgments, executions and demands whatsoever, of whatever kind or nature (including those arising under the Bankruptcy Code), whether known or unknown, suspected or unsuspected, in law or in equity, which the Debtors, their Estates, or Reorganized BSA have, had, may have, or may claim to have: (a) against any of the Local Councils and Contributing Chartered Organizations with respect to any Abuse Claims, (b) against any of the Participating Chartered Organizations with respect to any Post-1975 Chartered Organization Abuse Claims, (c) against any of the Participating Chartered Organizations with respect to any Pre-1976 Chartered Organization Abuse Claims, (d) against any of the Opt-Out Chartered Organizations with respect to any Opt-Out Chartered Organization Abuse Claims, and (e) against any Settling Insurance Company with

respect to any coverage for Abuse Claims and all other claims and causes of action specified in the applicable Insurance Settlement Agreements (collectively, the "Scouting Released Claims"). For the avoidance of doubt, the rights of Settling Insurance Companies that are assigned to the Settlement Trust are not released. Notwithstanding anything to the contrary in the foregoing, the releases set forth in this Article X.J.2 shall not, and shall not be construed to release any post-Effective Date obligations of any Person under the Plan Documents or any document, instrument, or agreement executed to implement the Plan. For the avoidance of doubt, in the event of any conflict or inconsistency between this Article X.J.2 and the preceding Article X.J.1, this Article X.J.2 shall control.

3. **Releases by Holders of Abuse Claims.** As of the Effective Date, except for the rights that remain in effect from and after the Effective Date to enforce the Plan and the Confirmation Order, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, the adequacy of which is hereby confirmed, including the actions of the Protected Parties and the Limited Protected Parties to facilitate and implement the reorganization of the Debtors, including the settlements embodied in the Plan, including the Abuse Claims Settlement, as an integral component of the Plan, and except as otherwise expressly provided in the Plan or the Confirmation Order, to the maximum extent permitted under applicable law, as such law may be extended subsequent to the Effective Date, all holders of Abuse Claims shall, and shall be deemed to, expressly, conclusively, absolutely, unconditionally, irrevocably, and forever discharge and release: (a) each and all of the Protected Parties and their respective property and successors and assigns of and from all Abuse Claims and any and all Claims and Causes of Action whatsoever, whether known or unknown, asserted or unasserted, derivative or direct, foreseen or unforeseen, in law, equity, or otherwise, whether for tort, fraud, contract, veil piercing or alter-ego theories of liability, successor liability, contribution, indemnification, joint liability, or otherwise, arising from or related in any way to such Abuse Claims; (b) each and all of the Limited Protected Parties and their respective property and successors and assigns of and from all Post-1975 Chartered Organization Abuse Claims and any and all Claims and Causes of Action whatsoever, whether known or unknown, asserted or unasserted, derivative or direct, foreseen or unforeseen, in law, equity, or otherwise, whether for tort, fraud, contract, veil piercing or alter-ego theories of liability, successor liability, contribution, indemnification, joint liability, or otherwise, arising from or related in any way to such Post-1975 Chartered Organization Abuse Claims; (c) each of the Participating Chartered Organizations with respect to any Pre-1976 Chartered Organization Abuse Claims and their respective property and successors and assigns of and from all Pre-1976 Chartered Organization Abuse Claims and any and all Claims and Causes of Action whatsoever, whether known or unknown, asserted or unasserted, derivative or direct, foreseen or unforeseen, in law, equity, or otherwise, whether for tort, fraud, contract, veil piercing or alter-ego theories of liability, successor liability, contribution, indemnification, joint liability, or otherwise, arising from or related in any way to such Pre-1976 Chartered Organization Abuse Claims; and (d) each and all of the Opt-Out Chartered Organizations and their respective property and successors and assigns of and from all Opt-Out Chartered Organization Abuse

Claims and any and all Claims and Causes of Action whatsoever, whether known or unknown, asserted or unasserted, derivative or direct, foreseen or unforeseen, in law, equity, or otherwise, whether for tort, fraud, contract, veil piercing or alter-ego theories of liability, successor liability, contribution, indemnification, joint liability, or otherwise, arising from or related in any way to such Opt-Out Chartered Organization Abuse Claims; provided, however, that the releases set forth in this Article X.J.3 shall not, and shall not be construed to: (i) release any post-Effective Date obligations of any Person under the Plan Documents or any document, instrument, or agreement executed to implement the Plan; or (ii) modify, reduce, impair or otherwise affect the ability of any holder of an Abuse Claim to recover on account of such Claim in accordance with Article III.B.10 or Article III.B.11, as applicable.  For the avoidance of doubt, holders of Abuse Claims covered by any insurance policy issued by a Settling Insurance Company shall, and shall be deemed to, release and discharge the Settling Insurance Companies for such Claims.  The releases in Article X.J.4 shall not, and shall not be deemed to, limit the releases in Article X.J.3.

4.    <u>Releases by Holders of Claims</u>.  As of the Effective Date, except for the rights that remain in effect from and after the Effective Date to enforce the Plan and the Confirmation Order, for good and valuable consideration, the adequacy of which is hereby confirmed, including the actions of the Released Parties to facilitate and implement the reorganization of the Debtors and the settlements embodied in the Plan, including the JPM / Creditors' Committee Settlement, the Insurance Settlements, and the United Methodist Settlement, as an integral component of the Plan, and except as otherwise expressly provided in the Plan or the Confirmation Order, to the maximum extent permitted under applicable law, as such law may be extended subsequent to the Effective Date, all Releasing Claim Holders shall, and shall be deemed to, expressly, conclusively, absolutely, unconditionally, irrevocably, and forever release and discharge each and all of the Released Parties of and from any and all Claims, Interests, obligations, rights, demands, suits, judgments, damages, debts, remedies, losses and liabilities of any nature whatsoever (including any derivative claims or Causes of Action asserted or that may be asserted on behalf of the Debtors, Reorganized BSA, or the Estates), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, in law, equity, contract, tort or otherwise, based on or relating to, or in any manner arising from, in whole or in part, any act, omission, transaction, event, or other circumstance taking place or existing on or before the Effective Date (including before the Petition Date) in connection with or related to the Debtors, the Estates, their respective assets and properties, the Chapter 11 Cases, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated by the Plan, the business or contractual arrangements between one or both of the Debtors and any Released Party, the restructuring of any Claim or Interest that is treated by the Plan before or during the Chapter 11 Cases, any of the Plan Documents, the JPM / Creditors' Committee Settlement, the Insurance Settlements, the United Methodist Settlement, or any related agreements, instruments, and other documents created or entered into before or during the Chapter 11 Cases or the negotiation, formulation, preparation or implementation thereof, the pursuit of

Confirmation, the administration and implementation of the Plan, the solicitation of votes with respect to the Plan, the Distribution of property under the Plan, or any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date related or relating to the foregoing; provided, however, that the releases set forth in this Article X.J.4 shall not, and shall not be construed to: (a) release any Released Party from Causes of Action arising out of, or related to, any act or omission of such Released Party that is a criminal act or that constitutes fraud, gross negligence or willful misconduct; (b) release any post-Effective Date obligations of any Person under the Plan Documents or any document, instrument, or agreement executed to implement the Plan; or (c) modify, reduce, impair or otherwise affect the ability of any holder of an Allowed Non-Abuse Litigation Claim to recover on account of such Allowed Claim in accordance with Article III.B.9. Notwithstanding the foregoing or anything to the contrary herein, (i) with respect to holders of Allowed General Unsecured Claims or Allowed Non-Abuse Litigation Claims, nothing in the Plan or the release set forth in Article X.J.4 shall, or shall be construed to, release any such claims or Causes of Action against any Local Council, Chartered Organization, or Insurance Company (subject to Article IV.D.3) and (ii) nothing in the Plan or the release set forth in Article X.J.4 shall, or shall be construed to, release any claims or Causes of Action asserted by Century and Chubb Companies against Sidley Austin LLP ("Sidley") related to Sidley's representation of the Debtors and/or Century and Chubb Companies.

     5.    **Releases Among Contributing Chartered Organizations and Settlement Parties.**

     a.    In furtherance of the Abuse Claims Settlement, as of the date that the Confirmation Order and Affirmation Order become Final Orders, except for the rights that remain in effect from and after the Effective Date to enforce the Plan, the Confirmation Order, and the terms of the United Methodist Settlement Agreement, for good and valuable consideration, the adequacy of which is hereby confirmed, each of the Contributing Chartered Organizations, including the United Methodist Entities, shall, and shall be deemed to, expressly, conclusively, absolutely, unconditionally, irrevocably, and forever release and discharge the Debtors, Reorganized BSA, the Related Non-Debtor Entities, the Local Councils, the other Protected Parties, the Limited Protected Parties, the Settling Insurance Companies, the Future Claimants' Representative, the Coalition, the Tort Claimants' Committee, the Settlement Trust, and each of its and their respective Representatives (collectively, the "Settlement Parties"), of and from any and all Claims, Interests, obligations, rights, demands, suits, judgments, damages, debts, remedies, losses and liabilities of any nature whatsoever (including any derivative claims or Causes of Action asserted or that may be asserted on behalf of the Debtors, Reorganized BSA, or the Estates), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, in law, equity, contract, tort or otherwise, based on or relating to, or in any manner arising from, in whole or in part, any act, omission, transaction, event, or other circumstance taking place or

existing on or before the date that the Confirmation Order and Affirmation Order become Final Orders (including before the Petition Date) in connection with or related to (i) Abuse Claims, (ii) the Chapter 11 Cases, (iii) the Plan, or (iv) any Claims relating to the Debtors or the Related Non-Debtor Entities that were or could have been asserted by the Contributing Chartered Organizations against the Settlement Parties or any of them.

b.      In furtherance of the Abuse Claims Settlement, as of the date that the Confirmation Order and Affirmation Order become Final Orders, except for the rights that remain in effect from and after the Effective Date to enforce the Plan, the Confirmation Order, and the terms of the United Methodist Settlement Agreement, for good and valuable consideration, the adequacy of which is hereby confirmed, each of the Settlement Parties shall, and shall be deemed to, expressly, conclusively, absolutely, unconditionally, irrevocably, and forever release and discharge each of the Contributing Chartered Organizations, including the United Methodist Entities, of and from any and all Claims, Interests, obligations, rights, demands, suits, judgments, damages, debts, remedies, losses and liabilities of any nature whatsoever, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, in law, equity, contract, tort or otherwise, based on or relating to, or in any manner arising from, in whole or in part, any act, omission, transaction, event, or other circumstance taking place or existing on or before the date that the Confirmation Order and Affirmation Order become Final Orders (including before the Petition Date) in connection with or related to (i) Abuse Claims, (ii) the Chapter 11 Cases, (iii) the Plan, or (iv) any Claims relating to the Debtors or the Related Non-Debtor Entities that were or could have been asserted by the Settlement Parties against the Contributing Chartered Organizations or any of them.

6.      Releases Relating to Settling Insurance Companies.  Notwithstanding anything to the contrary, the releases of Settling Insurance Companies and certain other parties, and the releases by Settling Insurance Companies, each as set forth in the Insurance Settlement Agreements, are incorporated by reference as if fully set forth herein, and control and supplement any release otherwise contained herein. Nothing herein shall reduce the scope of any such releases as set forth in the Insurance Settlement Agreements.  In addition, nothing in this Plan will release claims under reinsurance contracts or retrocessional contracts between or among the Settling Insurance Companies and other insurance companies.

7.      [Reserved].

8.      Releases Relating to the United Methodist Entities.  The releases to the United Methodist Entities, and the releases by the United Methodist Entities, each as set forth in the United Methodist Settlement Agreement, are incorporated by reference as if fully set forth herein and shall not be interpreted as limiting any release, injunction, or similar benefit to the United Methodist Entities set forth herein.

131

K.   **Exculpation**.   From and after the Effective Date, none of the Exculpated Parties shall have or incur any liability to, or be subject to any right of action by, any Person for any act, omission, transaction, event, or other circumstance occurring on or after the Petition Date up to and including the Effective Date in connection with, relating to or arising out of the Chapter 11 Cases, the negotiation of the Plan Documents, the JPM / Creditors' Committee Settlement, the Insurance Settlements, the United Methodist Settlement Agreement, the Releases and Injunctions, the pursuit of Confirmation of the Plan, the administration, consummation and implementation of the Plan or the property to be Distributed under the Plan, or the management or operation of the Debtors (except for any liability that results primarily from such Exculpated Party's gross negligence, bad faith or willful misconduct).   In all respects, each and all such Exculpated Parties shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under, or in connection with, the matters referenced in the preceding sentence.   Notwithstanding the foregoing or any provision of the Plan to the contrary, Sidley shall not be an Exculpated Party with respect to any claims by Century and the Chubb Companies against Sidley related to Sidley's representation of the Debtors and/or Century and the Chubb Companies.

L.   **Injunctions Related to Releases and Exculpation**.

1.   **Injunction Related to Releases**.   As of the Effective Date, all holders of Claims that are the subject of **Article X.J** are, and shall be, expressly, conclusively, absolutely, unconditionally, irrevocably, and forever stayed, restrained, prohibited, barred and enjoined from taking any of the following actions against any Released Party or its property or successors or assigns on account of or based on the subject matter of such Claims, whether directly or indirectly, derivatively or otherwise: (a) commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding (including any judicial, arbitral, administrative or other proceeding) in any forum; (b) enforcing, attaching (including any prejudgment attachment), collecting, or in any way seeking to recover any judgment, award, decree, or other order; (c) creating, perfecting or in any way enforcing in any matter, directly or indirectly, any Lien or Encumbrance; and/or (d) setting off, seeking reimbursement or contributions from, or subrogation against, or otherwise recouping in any manner, directly or indirectly, any amount against any liability or obligation that is discharged under **Article X.E** or released under **Article X.J**; **provided, however**, that the injunctions set forth in this **Article X.L.1** shall not, and shall not be construed to, enjoin any holder of a Claim that is only the subject of **Article X.J.4** (and no other release set forth in **Article X.J** including **Articles X.J.6** and **X.J.7** from taking any action arising out of, or related to, any act or omission of a Released Party that is a criminal act or that constitutes fraud, gross negligence or willful misconduct.

2.   **Injunction Related to Exculpation**.   As of the Effective Date, all holders of Claims that are the subject of **Article X.K** are, and shall be, expressly, conclusively, absolutely, unconditionally, irrevocably, and forever stayed, restrained, prohibited, barred and enjoined from taking any of the following actions against any Exculpated Party on account of or based on the subject matter of such Claims, whether directly or indirectly, derivatively or otherwise: (a) commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding (including any

**judicial, arbitral, administrative or other proceeding) in any forum; (b) enforcing, attaching (including any prejudgment attachment), collecting, or in any way seeking to recover any judgment, award, decree, or other order; and/or (c) creating, perfecting or in any way enforcing in any matter, directly or indirectly, any Lien or Encumbrance; provided, however, that the injunctions set forth in this Article X.L.2 shall not, and shall not be construed to, enjoin any Person that is the subject of Article X.K from taking any action arising out of, or related to, any act or omission of a Exculpated Party that is a criminal act or that constitutes fraud, gross negligence or willful misconduct. Notwithstanding anything set forth in this paragraph, any set off right with respect to an assumed Executory Contract or Unexpired Lease shall be governed by applicable law, including the terms of such assumed Executory Contract or Unexpired Lease.**

M.    Insurance Provisions.

      1.    Except for the Debtor Policy Assignment (and subject to Article IX.A.3.j.5 herein), or as otherwise provided in the Bankruptcy Code, applicable law, the findings made by the Bankruptcy Court in the Confirmation Order, or the findings made by the District Court in the Affirmation Order, nothing in the Plan shall modify, amend, or supplement, or be interpreted as modifying, amending, or supplementing, the terms of any Insurance Policy issued by a Non-Settling Insurance Company or rights or obligations under such Insurance Policy to the extent such rights and obligations are otherwise available under applicable law, and the rights and obligations, if any, of any Non-Settling Insurance Company relating to or arising out of the Plan Documents, including the Plan, the Confirmation Order, and the Affirmation Order, or any provision thereof, shall be determined pursuant to the terms and provisions of the Insurance Policies and applicable law.

      2.    No provision of the Plan, other than those provisions contained in the applicable Injunctions contained in Article X of the Plan, shall be interpreted to affect or limit the protections afforded to any Settling Insurance Company by the Channeling Injunction and the Insurance Entity Injunction.

      3.    Nothing in this Article X.M is intended or shall be construed to preclude otherwise applicable principles of *res judicata* or collateral estoppel from being applied against any Person.

N.    Judgment Reduction.

      1.    Without limiting the Discharges, Releases and Injunctions set forth above, if any Person, including a holder of an Abuse Claim ("Plaintiff"), asserts a Cause of Action against any other Person arising from or relating to Abuse that is the subject of a Proof of Claim filed against the Debtors in the Chapter 11 Cases, regardless of whether such Cause of Action may be asserted pursuant to the Bankruptcy Code or is in the nature of or sounding in contract, tort, warranty or any other theory of law or equity whatsoever (each such Cause of Action, an "Abuse Cause of Action"), and such Abuse Cause of Action results in a determination by the court or tribunal hearing the Abuse Cause of Action

(including by a jury empaneled by such court or tribunal) that any Person who is not a Protected Party or a Limited Protected Party (each, a "Specified Person") is liable in damages to Plaintiff, then, prior to final entry of any judgment, order or arbitration award ("Judgment") in such Abuse Cause of Action, Plaintiff shall provide notice and a copy of the Confirmation Order to the Trial Court. Such court or tribunal shall determine whether the Abuse Cause of Action gives rise to any Cause of Action on which any Protected Party or Limited Protected Party would have been liable to Plaintiff in the absence of the Plan and Confirmation Order. The court or tribunal shall reduce any Judgment against a Specified Person by an amount equal to the "Judgment Reduction Amount," which shall equal the greatest amount such Specified Person would be entitled, under applicable non-bankruptcy law, to set off or credit against the Judgment if such Protected Party or Limited Protected Party were not entitled to the benefits of the Discharges, Releases, or Injunctions set forth herein. For the avoidance of doubt, a Limited Protected Party may be a Specified Person entitled to the judgment reduction provided for in this Article X.N with respect to an Abuse Cause of Action arising from or relating to Abuse that is not the subject of a Post-1975 Chartered Organization Abuse Claim.

2.      Nothing herein shall prejudice or operate to preclude the right of any Specified Person to (a) provide notice of the Confirmation Order to any court or tribunal hearing an Abuse Cause of Action, (b) raise any issues, claims or defenses regarding the Judgment Reduction Amount, including the contractual liability and/or relative or comparative fault of any Person, including any Protected Party or Limited Protected Party, in any court or tribunal hearing any Abuse Cause of Action in accordance with applicable law or procedure, or (c) take discovery of Protected Parties or Limited Protected Parties in accordance with applicable law or procedure; provided, however, that nothing herein shall in any way modify or affect the Discharges, Releases or Injunctions. For the avoidance of doubt, nothing herein shall (i) be deemed to entitle a Plaintiff to more than a single satisfaction with respect to any Abuse Cause of Action or (ii) prejudice or operate to preclude the rights of any Specified Person to assert any claims or causes of action that have not been discharged, released, or enjoined under the Plan or Confirmation Order.

3.      Each Plaintiff is hereby enjoined and restrained from seeking relief or collecting judgments against any Specified Person in a manner that fails to conform to the terms of this Article X.N.

4.      If any Plaintiff enters into a settlement with any Person with respect to one or more causes of action based upon, arising from, or related to an Abuse Cause of Action, then such Plaintiff shall cause to be included, and in all events, the settlement shall be deemed to include, a dismissal, release and waiver of any Abuse Cause of Action with respect to such settlement.

O.      Reservation of Rights.  Notwithstanding any other provision of the Plan to the contrary, no provision of this Article X shall be deemed or construed to satisfy, discharge, release or enjoin claims by the Settlement Trust, Reorganized BSA, or any other Person, as the case may be, against (1) the Settlement Trust for payment of Abuse Claims in accordance with the Trust Distribution Procedures, (2) the Settlement Trust for the payment of Settlement Trust Expenses, or (3) any Insurance Company that has not performed under an Insurance Policy (to the extent

such Insurance Policy is not the subject of an Insurance Settlement Agreement) or an Insurance Settlement Agreement.

P.     Disallowed Claims.  On and after the Effective Date, the Debtors and Reorganized BSA shall be fully and finally discharged of any and all liability or obligation on any and all Disallowed Claims, and any order Disallowing a Claim that is not a Final Order as of the Effective Date solely because of a Person's right to move for reconsideration of such order pursuant to section 502 of the Bankruptcy Code or Bankruptcy Rule 3008 shall nevertheless become and be deemed to be a Final Order on the Effective Date.

Q.     No Successor Liability.  Except as otherwise expressly provided in the Plan, Reorganized BSA does not, pursuant to the Plan or otherwise, assume, agree to perform, pay or indemnify any Person, or otherwise have any responsibility for any liabilities or obligations of the Debtors relating to or arising out of the operations of or assets of the Debtors, whether arising prior to, on or after the Effective Date.  Neither the Debtors, Reorganized BSA, nor the Settlement Trust is, or shall be deemed to be, a successor to any of the Debtors by reason of any theory of law or equity (except as otherwise provided in Article IV.C), and none shall have any successor or transferee liability of any kind or character; provided, however, that Reorganized BSA and the Settlement Trust shall assume and remain liable for their respective obligations specified in the Plan and the Confirmation Order.

R.     Indemnities.

1.     Prepetition Indemnification and Reimbursement Obligations.  The respective obligations of the Debtors to indemnify and reimburse Persons who are or were directors, officers or employees of the Debtors on the Petition Date or at any time thereafter up to and including the Effective Date, against and for any obligations pursuant to the bylaws, applicable state or non-bankruptcy law, or specific agreement or any combination of the foregoing, shall, except with respect to any Perpetrator: (a) survive Confirmation of the Plan and remain unaffected thereby; (b) be assumed by Reorganized BSA as of the Effective Date; and (c) not be discharged under section 1141 of the Bankruptcy Code, irrespective of whether indemnification or reimbursement is owed in connection with any event occurring before, on or after the Petition Date.  In furtherance of, and to implement the foregoing, as of the Effective Date, Reorganized BSA shall obtain and maintain in full force insurance for the benefit of each and all of the above-indemnified directors, officers and employees, at levels no less favorable than those existing as of the date of entry of the Confirmation Order, and for a period of no less than three (3) years following the Effective Date.

2.     Plan Indemnity.  In addition to the matters set forth above and not by way of limitation thereof, Reorganized BSA shall indemnify and hold harmless all Persons who are or were officers or directors of the Debtors on the Petition Date or at any time thereafter up to and including the Effective Date on account of and with respect to any claim, cause of action, liability, judgment, settlement, cost or expense (including attorneys' fees) on account of claims or Causes of Action threatened or asserted by any third party against such officers or directors that seek contribution, indemnity, equitable indemnity, or any

similar claim, based upon or as the result of the assertion of primary claims against such third party by any representative of the Debtors' Estates.

3. <u>Limitation on Indemnification</u>. Notwithstanding anything to the contrary set forth in the Plan or elsewhere, neither the Debtors, Reorganized BSA, the Local Councils, nor the Contributing Chartered Organizations, as applicable, shall be obligated to indemnify or hold harmless any Person for any claim, cause of action, liability, judgment, settlement, cost or expense that results primarily from (i) such Person's bad faith, gross negligence or willful misconduct or (ii) an Abuse Claim.

S. <u>The Official Committees and the Future Claimants' Representative</u>. Except as otherwise described in the Settlement Trust Documents with respect to the Future Claimants' Representative, the Official Committees and the Future Claimants' Representative shall continue in existence until the Effective Date, and after the Effective Date for the limited purposes of prosecuting requests for payment of Professional Fee Claims for services rendered and reimbursement of expenses incurred prior to the Effective Date. The Debtors shall pay the reasonable fees and actual and necessary expenses incurred by the Official Committees and the Future Claimants' Representative up to the Effective Date, and after the Effective Date solely for the purposes set forth in the preceding sentence, in accordance with the Compensation Procedures Order, the Fee Examiner Order, and the terms of the Plan, including <u>Article II</u>. As of the Effective Date, subject to continuation of the Official Committees for the limited purposes described above as to Professional Fee Claims and unless extended by order (which may be sought by motion), the members of the Official Committees shall be released and discharged from all further authority, duties, responsibilities, liabilities, and obligations involving the Chapter 11 Cases and the Official Committees shall be dissolved. Neither the Debtors nor Reorganized BSA have any obligation to pay fees or expenses of any Professional retained by the Official Committees or the Future Claimants' Representative that are earned or incurred before the Effective Date to the extent such fees or expenses (or any portion thereof) qualify as Settlement Trust Expenses, in which case such fees and expenses (or the applicable portion thereof) shall be paid by the Settlement Trust in accordance with the Settlement Trust Documents.

## ARTICLE XI.

## RETENTION OF JURISDICTION

A. <u>Jurisdiction</u>. Until the Chapter 11 Cases are closed, the Bankruptcy Court shall retain the fullest and most extensive jurisdiction that is permissible, including the jurisdiction necessary to ensure that the purposes and intent of the Plan are carried out. Except as otherwise provided in the Plan or the Settlement Trust Agreement, the Bankruptcy Court shall retain jurisdiction to hear and determine all Claims against and Interests in the Debtors, and to adjudicate and enforce the Insurance Actions, the Settlement Trust Causes of Action, and all other Causes of Action which may exist on behalf of the Debtors. Nothing contained herein shall prevent Reorganized BSA or the Settlement Trust, as applicable, from taking such action as may be necessary in the enforcement of any Estate Cause of Action, Insurance Action, Settlement Trust Cause of Action, or other Cause of Action which the Debtors have or may have and which may not have been enforced or prosecuted by the Debtors, which actions or other Causes of Action shall survive Confirmation of the Plan and shall not be affected thereby except as specifically

provided herein. Nothing contained herein concerning the retention of jurisdiction by the Bankruptcy Court shall be deemed to be a finding or conclusion that (1) the Bankruptcy Court in fact has jurisdiction with respect to any Insurance Action, (2) any such jurisdiction is exclusive with respect to any Insurance Action, or (3) abstention or dismissal of any Insurance Action pending in the Bankruptcy Court or the District Court as an adversary proceeding is or is not advisable or warranted, so that another court can hear and determine such Insurance Action(s). Any court other than the Bankruptcy Court that has jurisdiction over an Insurance Action shall have the right to exercise such jurisdiction.

      B.    <u>General Retention</u>. Following Confirmation of the Plan, the administration of the Chapter 11 Cases will continue until the Chapter 11 Cases are closed by a Final Order of the Bankruptcy Court. The Bankruptcy Court shall also retain jurisdiction for the purpose of classification of any Claims and the re-examination of Claims which have been Allowed for purposes of voting, and the determination of such objections as may be filed with the Bankruptcy Court with respect to any Claims. The failure by the Debtors or Reorganized BSA to object to, or examine, any Claim for the purposes of voting, shall not be deemed a waiver of the rights of the Debtors, Reorganized BSA, or the Settlement Trust, as the case may be, to object to or reexamine such Claim in whole or part.

      C.    <u>Specific Purposes</u>. In addition to the foregoing, the Bankruptcy Court shall retain jurisdiction over all matters arising out of, or relating to, the Chapter 11 Cases and the Plan, including jurisdiction to:

      1.    modify the Plan after Confirmation pursuant to the provisions of the Bankruptcy Code and the Bankruptcy Rules;

      2.    correct any defect, cure any omission, reconcile any inconsistency or make any other necessary changes or modifications in or to the Plan, the Trust Documents or the Confirmation Order as may be necessary to carry out the purposes and intent of the Plan, including the adjustment of the date(s) of performance in the Plan in the event the Effective Date does not occur as provided herein so that the intended effect of the Plan may be substantially realized thereby;

      3.    assure performance by the Settlement Trust and the Disbursing Agent of their respective obligations to make distributions under the Plan;

      4.    enforce and interpret the terms and conditions of the Plan, the Plan Documents, the Settlement Trust Documents, the DST Agreement, and any Insurance Settlement Agreements;

      5.    enter such orders or judgments, including injunctions (a) as are necessary to enforce the title, rights and powers of Reorganized BSA and the Settlement Trust, (b) to execute, implement, or consummate the provisions of the Plan, the Confirmation Order, and all contracts, instruments, releases and other agreements or documents created in connection with the Plan or the Confirmation Order, and (c) as are necessary to enable holders of Claims to pursue their rights against any Person that may be liable therefor pursuant to applicable law or otherwise;

      6.    hear and determine any and all motions, adversary proceedings, contested or litigated matters, and any other matters and grant or deny any applications involving the Debtors

<div align="center">137</div>

that may be pending on the Effective Date (which jurisdiction shall be non-exclusive as to any such non-core matters);

7.    hear and determine any motions or contested matters involving taxes, tax refunds, tax attributes, tax benefits and similar or related matters, including contested matters arising on account of transactions contemplated by the Plan, or relating to the period of administration of the Chapter 11 Cases;

8.    hear and determine all applications for compensation of Professionals and reimbursement of expenses under sections 328, 330, 331, or 503(b) of the Bankruptcy Code;

9.    hear and determine any Causes of Action arising during the period from the Petition Date to the Effective Date, or in any way related to the Plan or the transactions contemplated hereby, against the Debtors, Reorganized BSA, the Settlement Trust, the DST, and their respective Representatives;

10.    hear and determine any and all motions for the rejection, assumption or assignment of Executory Contracts or Unexpired Leases and the Allowance of any Claims resulting therefrom;

11.    hear and determine such other matters and for such other purposes as may be provided in the Confirmation Order;

12.    hear and determine the Allowance and/or Disallowance of any Claims, including Administrative Expense Claims, against or Interests in the Debtors or their Estates, including any objections to any such Claims or Interests, and the compromise and settlement of any Claim, including Administrative Expense Claims, against or Interest in the Debtors or their Estates;

13.    hear and resolve disputes concerning any reserves under the Plan or the administration thereof;

14.    hear and determine all questions and disputes regarding title to the assets of the Debtors, their Estates or the Settlement Trust;

15.    enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason or in any respect modified, stayed, reversed, revoked or vacated, or if distributions pursuant to the Plan or under the Settlement Trust Documents are enjoined or stayed;

16.    hear and determine all questions and disputes regarding, and to enforce, the Abuse Claims Settlement;

17.    hear and determine any Insurance Action, any Settlement Trust Cause of Action and any similar claims, Causes of Action; provided, that (i) this Court's jurisdiction over any such Insurance Action, Settlement Trust Cause of Action, or similar claims, Causes of Action shall be solely to the extent such actions involve bankruptcy issues or issues that are directly related to or arise out of the Plan Documents or Confirmation Order, (ii) such retention of jurisdiction shall not constitute a waiver of any rights of a Non-Settling Insurance Company to seek to remove or withdraw the reference of any Insurance Action filed after the Effective Date; and (iii) any

matter involving a Settling Insurance Company shall be governed by the applicable Insurance Settlement Agreement;

18.    hear and determine any other matters related hereto, including the implementation and enforcement of all orders entered by the Bankruptcy Court in the Chapter 11 Cases;

19.    resolve any disputes concerning whether a Person had sufficient notice of the Chapter 11 Cases, the Disclosure Statement, any solicitation conducted in connection with the Chapter 11 Cases, the Bar Date established in the Chapter 11 Cases, or any deadline for responding or objecting to a Cure Amount, in each case, for the purpose of determining whether a Claim or Interest is discharged hereunder or for any other purpose;

20.    enter in aid of implementation of the Plan such orders as are necessary, including the implementation and enforcement of the Injunctions, Releases, and Discharges described herein, including the Channeling Injunction;

21.    hear a petition for relief by a Specified Person or any other party in interest in the event that a court or tribunal hearing an Abuse Cause of Action fails to apply the judgment reduction provisions of Article X.N;

22.    approve any Post-Effective Date Chartered Organization Settlement and determine the adequacy of notice of a motion by the Settlement Trustee to approve such a settlement;

23.    approve any extension of the Insurance Settlement Period, approve any Post-Effective Date Insurance Settlement and determine the adequacy of notice of a Post-Effective Date Insurance Settlement provided by the Settlement Trustee;

24.    hear and determine any questions and disputes pertaining to, and to enforce, the Abuse Claims Settlement, including the Local Council Settlement Contribution, the Contributing Chartered Organization Settlement Contribution, including the United Methodist Settlement Contribution, the Participating Chartered Organization Settlement Contribution, the Hartford Settlement Contribution, the Century and Chubb Companies Settlement Contribution, the Zurich Insurers Settlement Contribution, and the Clarendon Settlement Contribution;

25.    hear and determine any questions and disputes pertaining to, and to enforce, the JPM / Creditors' Committee Settlement;

26.    hear and determine any questions and disputes pertaining to, and to enforce, the Insurance Settlement Agreements;

27.    [Reserved]

28.    hear and determine any questions and disputes pertaining to, and to enforce, the United Methodist Settlement;

29.    hear and determine any questions and disputes pertaining to, and to enforce, the PSZJ Settlement;

30.     hear and determine all questions and disputes regarding matters pertaining to the DST Agreement;

31.     hear and determine all questions and disputes regarding matters pertaining to discovery rights of the Settlement Trust and the related agreements that include, but not limited to, the Plan, the Plan Documents, Settlement Trust Agreement, Trust Distribution Procedures, and Document Appendix;

32.     enter a Final Order or decree concluding or closing the Chapter 11 Cases; and

33.     to enter and implement such orders as may be necessary or appropriate if any aspect of the Plan, the Settlement Trust, or the Confirmation Order is, for any reason or in any respect, determined by a court to be inconsistent with, to violate, or insufficient to satisfy any of the terms, conditions, or other duties associated with any Abuse Insurance Policies; provided, however, that (a) such orders shall not impair the Insurance Coverage Defenses or the rights, claims, or defenses, if any, of any Insurance Company that are set forth or provided for in the Plan, the Plan Documents, the Confirmation Order, or any other Final Orders entered in the Debtors' Chapter 11 Cases, (b) this provision does not, in and of itself, grant this Court jurisdiction to hear and decide disputes arising out of or relating to the Abuse Insurance Policies, and (c) all interested parties, including any Insurance Company, reserve the right to oppose or object to any such motion or order seeking such relief.

As of the Effective Date, notwithstanding anything in this Article XI to the contrary, the Restated Debt and Security Documents and any documents related thereto shall be governed by the jurisdictional provisions thereof and the Bankruptcy Court shall not retain jurisdiction with respect thereto.

D.     Courts of Competent Jurisdiction.  To the extent that the Bankruptcy Court is not permitted under applicable law to preside over any of the foregoing matters, the reference to the "Bankruptcy Court" in this Article XI shall be deemed to be replaced by the "District Court."  If the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter arising out of the Plan, such abstention, refusal, or failure of jurisdiction shall have no effect upon and shall not control, prohibit, or limit the exercise of jurisdiction by any other court having competent jurisdiction with respect to such matter.

## ARTICLE XII.

## MISCELLANEOUS PROVISIONS

A.     Closing of Chapter 11 Cases.   After each Chapter 11 Case has been fully administered, Reorganized BSA shall file with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court to close such Chapter 11 Case.

B.     Amendment or Modification of the Plan.

1.     Plan Modifications. Subject to the terms of the JPM / Creditors' Committee Term Sheet and the Insurance Settlement Agreements, the Debtors reserve the right, in

accordance with the Bankruptcy Code and the Bankruptcy Rules, to amend or modify the Plan prior to the entry of the Confirmation Order, including amendments or modifications to satisfy section 1129(b) of the Bankruptcy Code, and after entry of the Confirmation Order, the Debtors may, upon order of the Bankruptcy Court, amend, modify or supplement the Plan in the manner provided for by section 1127 of the Bankruptcy Code or as otherwise permitted by law, in each case without additional disclosure pursuant to section 1125 of the Bankruptcy Code unless section 1127 of the Bankruptcy Code requires additional disclosure.  In addition, after the Confirmation Date, so long as such action does not materially and adversely affect the treatment of holders of Allowed Claims pursuant to the Plan, the Debtors may remedy any defect or omission or reconcile any inconsistencies in the Plan or the Confirmation Order with respect to such matters as may be necessary to carry out the purposes or effects of the Plan, and any holder of a Claim that has accepted the Plan shall be deemed to have accepted the Plan as amended, modified, or supplemented. All amendments to the Plan (a) must be reasonably acceptable to JPM and the Creditors' Committee to the extent they pertain to the treatment of the 2010 Credit Facility Claims, the 2019 RCF Claims, the 2010 Bond Claims, or the 2012 Bond Claims (in the case of JPM) or Convenience Claims, General Unsecured Claims, or Non-Abuse Litigation Claims (in the case of the Creditors' Committee), (b) shall not be inconsistent with the terms of the Insurance Settlement Agreements, and (c) shall not be inconsistent with the terms of the United Methodist Settlement Agreement.  The designation of Chartered Organizations as Contributing Chartered Organizations or Participating Chartered Organizations and the designation of Non-Settling Insurance Companies as Settling Insurance Companies after the Effective Date in accordance with Article IV.J or Article IV.K shall not be a modification or amendment to the Plan and instead is an act that may be done to effectuate the terms of the Plan.

2.     Other Amendments.  Before the Effective Date, the Debtors may make appropriate technical adjustments and modifications to the Plan and the documents contained in the Plan Supplement without further order or approval of the Bankruptcy Court.

C.     Revocation or Withdrawal of Plan.  The Debtors reserve the right to revoke or withdraw the Plan prior to the Effective Date.  If the Plan has been revoked or withdrawn prior to the Effective Date, or if Confirmation of the Plan or the occurrence of the Effective Date does not occur, then: (1) the Plan shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount any Claim or Interest or Class of Claims or Interests), assumption of executory contracts or unexpired leases affected by the Plan, and any document or agreement executed pursuant to the Plan, including the Settlement Trust Documents, shall be deemed null and void (except that the Insurance Settlement Agreements shall remain in full force and effect to the extent provided in such agreements in accordance with their terms); and (3) nothing contained in the Plan shall (i) constitute a waiver or release of any Claim against, or any Interest in, the Debtors or any other Person; (ii) prejudice in any manner the rights of the Debtors or any other Person; or (iii) constitute an admission of any sort by the Debtors or any other Person.

D.     Request for Expedited Determination of Taxes.  The Debtors and Reorganized BSA, as applicable, shall have the right to request an expedited determination under section 505(b)

of the Bankruptcy Code with respect to tax returns filed, or to be filed, for any and all taxable periods ending after the Petition Date to and including the Effective Date.

E.    <u>Non-Severability of Plan Provisions</u>.  If, before the entry of the Confirmation Order, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court, at the request of the Debtors, shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired or invalidated by such holding, alteration, or interpretation, except as provided in the Insurance Settlement Agreements with respect to the Settling Insurance Companies, as applicable.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is (1) valid and enforceable pursuant to its terms, (2) integral to the Plan and may not be deleted or modified without the consent of the Debtors or Reorganized BSA (as the case may be), and (3) nonseverable and mutually dependent.

F.    <u>Notices</u>.  All notices, requests, and demands to or upon the Debtors or Reorganized BSA to be effective shall be in writing (including by email transmission) and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered, addressed as follows:

> Boy Scouts of America
> 1325 W. Walnut Hill Lane
> Irving, Texas 75015
> Attn: Joseph Zirkman, General Counsel
> Email: Joseph.Zirkman@scouting.org
>
> with copies to:
>
> White & Case LLP
> 1221 Avenue of the Americas
> New York, New York 10020
> Attn: Jessica C. Lauria
> Email: jessica.lauria@whitecase.com
>
> – and –

White & Case LLP
111 South Wacker Drive, Suite 5100
Chicago, Illinois 60606
Attn: Michael C. Andolina
        Matthew E. Linder
Email: mandolina@whitecase.com
        mlinder@whitecase.com

– and –

Morris, Nichols, Arsht & Tunnell LLP
1201 North Market Street, 16th Floor
P.O. Box 1347
Wilmington, Delaware 19899-1347
Attn: Derek C. Abbott
Email: dabbott@morrisnichols.com

G.    Notices to Other Persons.  After the occurrence of the Effective Date, Reorganized
BSA has authority to send a notice to any Person providing that to continue to receive documents
pursuant to Bankruptcy Rule 2002, such Person must file a renewed request to receive documents
pursuant to Bankruptcy Rule 2002; provided, however, that the U.S. Trustee need not file such a
renewed request and shall continue to receive documents without any further action being
necessary.  After the occurrence of the Effective Date, Reorganized BSA is authorized to limit the
list of Persons receiving documents pursuant to Bankruptcy Rule 2002 to the U.S. Trustee and
those Persons that have filed such renewed requests:

H.    Governing Law.  Except to the extent that the Bankruptcy Code or other federal
law is applicable, or to the extent an exhibit hereto or a schedule in the Plan Supplement or any
other Plan Document provides otherwise, the rights, duties, and obligations arising under the Plan
shall be governed by, and construed and enforced in accordance with, the laws of the State of
Delaware, without giving effect to the principles of conflict of laws thereof; provided, however,
that governance matters relating to Reorganized BSA shall be governed by the laws of the District
of Columbia.

I.    [Reserved].

J.    Timing of Distributions or Actions.  In the event that any payment, Distribution,
act or deadline under the Plan is required to be made or performed or occurs on a day that is not a
Business Day, then such payment, Distribution, act or deadline shall be deemed to occur on the
next succeeding Business Day, but if so made, performed or completed by such next succeeding
Business Day, shall be deemed to have been completed or to have occurred as of the required date.

K.    Deemed Acts.  Whenever an act or event is expressed under the Plan to have been
deemed done or to have occurred, it shall be deemed to have been done or to have occurred by
virtue of the Plan or the Confirmation Order without any further act by any Person.

L.      Entire Agreement.  The Plan Documents set forth the entire agreement and undertakings relating to the subject matter thereof and supersede all prior discussions, negotiations, understandings and documents.  No Person shall be bound by any terms, conditions, definitions, warranties, understandings, or representations with respect to the subject matter hereof, other than as expressly provided for in the Plan or the other Plan Documents or as may hereafter be agreed to by the affected parties in writing.

M.      Plan Supplement.  Any and all exhibits, lists, or schedules referred to herein but not filed with the Plan shall be contained in the Plan Supplement to be filed with the Clerk of the Bankruptcy Court prior to the Confirmation Hearing on the Plan, and such Plan Supplement is incorporated into and is part of the Plan as if set forth in full herein.  The Plan Supplement will be available for inspection in the office of the Clerk of the Bankruptcy Court during normal court hours, at the website maintained by the Notice and Claims Agent (https://cases.omniagentsolutions.com/BSA), and at the Bankruptcy Court's website (ecf.deb.uscourts.gov).

N.      Withholding of Taxes.  The Disbursing Agent, the Settlement Trust or any other applicable withholding agent, as applicable, shall withhold from any assets or property distributed under the Plan any assets or property which must be withheld for foreign, federal, state and local taxes payable with respect thereto or payable by the Person entitled to such assets to the extent required by applicable law.

O.      Payment of Quarterly Fees.  All Quarterly Fees due and payable prior to the Effective Date shall be paid on or before the Effective Date.  The Reorganized BSA shall pay all such fees that arise after the Effective Date, but before the closing of the Chapter 11 Cases, and shall comply with all applicable statutory reporting requirements.

P.      Effective Date Actions Simultaneous.  Unless the Plan or the Confirmation Order provides otherwise, actions required to be taken on the Effective Date shall take place and be deemed to have occurred simultaneously, and no such action shall be deemed to have occurred prior to the taking of any other such action.

Q.      Consent to Jurisdiction.  Upon default under the Plan, Reorganized BSA, the Settlement Trust, the Settlement Trustee, the Official Committees, the Future Claimants' Representative, and the Protected Parties, or any successor thereto, respectively, consent to the jurisdiction of the Bankruptcy Court, and agree that it shall be the preferred forum for all proceedings relating to any such default.

*[Remainder of Page Intentionally Left Blank]*

Dated:  September 6, 2022       Boy Scouts of America
Delaware BSA, LLC

*Roger C. Mosby*
Roger C. Mosby
Chief Executive Officer and President

# EXHIBIT 3

# EXHIBIT A

## TRUST DISTRIBUTION PROCEDURES

# BOY SCOUTS OF AMERICA

## TRUST DISTRIBUTION PROCEDURES FOR ABUSE CLAIMS

### ARTICLE I
### PURPOSE AND GENERAL GUIDELINES

**A.**    **Purpose**.  The purpose of the Settlement Trust is to, among other things, assume liability for all Abuse Claims, to hold, preserve, maximize and administer the Settlement Trust Assets, and to employ procedures to allow valid Abuse Claims as further set forth herein in accordance with section 502 of the Bankruptcy Code and/or applicable law (each, an "**Allowed Abuse Claim**"), determine an allowed liability amount for each Allowed Abuse Claim (the "**Allowed Claim Amount**"), determine payment methodology and direct payment of all Allowed Abuse Claims, and obtain insurance coverage for the Allowed Claim Amount of such Allowed Abuse Claims that are Insured Abuse Claims (as defined below).  These Trust Distribution Procedures (the "**TDP**") are adopted pursuant to the Settlement Trust Agreement by the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**").  These TDP are intended to provide substantially similar treatment for Allowed Abuse Claims, including Future Abuse Claims.  These TDP, inclusive of the various options and elections set forth herein, including the Expedited Distribution Election, the Tort System Alternative and the Independent Review Option, provide the means for resolving all Abuse Claims for which the Protected Parties have or are alleged to have legal responsibility as provided in and required by the Plan, the Confirmation Order, and the Settlement Trust Agreement.  The Settlement Trustee shall implement and administer these TDP in consultation with the Claims Administrators, Future Claimants' Representative, and Trust Professionals with the goals of securing the just, speedy, and cost-efficient determination of every Abuse Claim, providing substantially similar treatment to holders of similar, legally valid and supported Allowed Abuse Claims in accordance with the procedures set forth herein, and obtaining and maximizing the benefits of the Settlement Trust Assets.

**B.**    **General Principles**.  To achieve maximum fairness and efficiency, and recoveries for holders of Allowed Abuse Claims, these TDP are founded on the following principles:

      1.    objective Claim eligibility criteria;

      2.    clear and reliable proof requirements;

      3.    administrative transparency;

      4.    a rigorous review and evidentiary process that requires the Settlement Trustee to determine Allowed Claim Amounts in accordance with applicable law;

      5.    prevention and detection of any fraud; and

      6.    independence of the Settlement Trust and Settlement Trustee.

**C.**    **Payment of Allowed Abuse Claims and Insurance Recoveries**.  Pursuant to the terms of the Plan, the Settlement Trust has assumed the Debtors' legal liability for, and obligation

<div align="center">1</div>

to pay, Allowed Abuse Claims.  The Settlement Trust Assets, including the proceeds of the assigned insurance rights, shall be used to fund distributions to Abuse Claimants under these TDP. The amounts that Abuse Claimants will ultimately be paid on account of their Allowed Abuse Claims will depend on, among other things, the Settlement Trust's ability to liquidate and recover the proceeds of the assigned insurance rights and other causes of action.  The amount of any installment payments, initial payments, or payment percentages established under these TDP or the Settlement Trust Agreement are not the equivalent of (i) any Abuse Claimant's Allowed Claim Amount or (ii) the right to payment that the holder of an Allowed Abuse Claim has against the Debtors and/or Protected Parties, as assumed by the Settlement Trust.

     **D.**    **Sole and Exclusive Method**.  These TDP and any procedures designated in these TDP, including the Individual Review Option, shall be the sole and exclusive methods by which an Abuse Claimant may seek allowance and distribution on an Abuse Claim that is subject to the Channeling Injunction with respect to the Protected Parties.

     **E.**    **Interpretation**.  The terms of the Plan and Confirmation Order shall prevail if there is any discrepancy between the terms of the Plan or Confirmation Order and the terms of these TDP.

     **F.**    **Confidentiality**.  All submissions to the Settlement Trust by an Abuse Claimant shall be treated as confidential and shall be protected by all applicable state and federal privileges, including those directly applicable to settlement discussions.  The Settlement Trust will preserve the confidentiality of such submissions, and shall disclose the contents thereof only to such persons as authorized by the Abuse Claimant, or in response to a valid subpoena of such materials issued by the Bankruptcy Court, a Delaware state court, the United States District Court for the District of Delaware or any other court of competent jurisdiction.  Notwithstanding anything in the foregoing to the contrary, the Settlement Trust may disclose information, documents, or other materials (i) reasonably necessary in the Settlement Trust's judgment to preserve, obtain, litigate, resolve, or settle insurance coverage, or to comply with an applicable obligation under an Insurance Policy, indemnity, or settlement agreement, or to pursue any other claims transferred or assigned to the Settlement Trust by the holder of the Abuse Claim or operation of the Plan and (ii) subject to the consent of a Direct Abuse Claimant or with redactions or other mechanism to preserve the confidentiality of a Direct Abuse Claimant, where the submission contains non-privileged information that is relevant to the Allowed Amount of another Direct Abuse Claimant's Claim. Nothing in these TDP shall be construed to authorize the Settlement Trustee to waive privilege or disseminate documents or other information to any Abuse Claimants or their respective counsel, except as provided for in the Document Appendix.

## ARTICLE II
## DEFINITIONS AND RULES OF INTERPRETATION

     **A.**    **Incorporation of Plan Definitions**.  Capitalized terms used but not defined in these TDP have the meanings ascribed to them in the Plan or the Settlement Trust Agreement and such definitions are incorporated in these TDP by reference.  To the extent that a term is defined in these TDP and the Plan and/or the Settlement Trust Agreement, the definition contained in these TDP controls.

2

**B.**   <u>Definitions</u>.  The following terms have the respective meanings set forth below:

1.   "**Abuse Claim**" shall have the meaning ascribed to it in the Plan, which definition includes Direct Abuse Claims, Indirect Abuse Claims, and Future Abuse Claims.

2.   "**Abuse Claimants**" shall mean the holder of a Direct Abuse Claim, an Indirect Abuse Claim, or a Future Abuse Claim.

3.   "**Base Matrix Value**" shall mean the base case value for each tier of Abuse Type (labeled as such in the Claims Matrix and more specifically defined and described in Article VIII.C) to be used to value Abuse Claims and that may be identified in connection with the description of the Scaling Factors in Article VIII.C.

4.   "**Claims Matrix**" shall mean (as specifically defined and described in Article VIII.B) a table scheduling the six tiers of Abuse Types, and identifying the Base Matrix Value, and Maximum Matrix Value for each tier.

5.   "**CPI-U**" shall mean the Consumer Price Index For All Urban Consumers: All Items Less Food & Energy, published by the United States Department of Labor, Bureau of Labor Statistics.

6.   "**Direct Abuse Claimant**" or "**Survivor**" shall mean the holder of a Direct Abuse Claim or a Future Abuse Claim.

7.   "**Indirect Abuse Claimant**" shall mean the holder of an Indirect Abuse Claim.

8.   "**Exigent Health Claim**" shall mean a Direct Abuse Claim for which the Direct Abuse Claimant has provided a declaration under penalty of perjury from a physician who has examined the Direct Abuse Claimant within one hundred and twenty (120) days of the declaration in which the physician states that there is substantial medical doubt that the Direct Abuse Claimant will survive beyond six (6) months from the date of the declaration.

9.   "**FIFO**" shall mean "first-in-first-out" and refers to the impartial basis for establishing a sequence pursuant to which Abuse Claims shall be determined and paid by the Settlement Trust.

10.   "**FIFO Processing Queue**" shall mean the FIFO line-up on which the Settlement Trust reviews Trust Claims Submissions.

11.   "**Maximum Matrix Value**" shall mean the value for each tier of Abuse Type (labeled as such in the Claims Matrix and more specifically defined and described in Article VIII.B) that represents the maximum Allowed Claim Amount achievable through the matrix calculation for an Allowed Abuse Claim assigned to a given tier after application of the Scaling Factors described in Article VIII.C.

12.   "**Mixed Claim**" shall have the meaning ascribed to it in the Plan.

3

13.     **"Non-BSA Sourced Assets"** shall mean Settlement Trust Assets that represent assets received as a result of or in connection with a global settlement between the Debtors or the Settlement Trust, on the one hand, and a Chartered Organization that is or becomes a Protected Party, on the other hand.  For the avoidance of doubt, Non-BSA Sourced Assets shall not include any assets received from the Debtors, the Local Councils, or any Settling Insurance Companies.

14.     **"Scaling Factors"** shall mean (as specifically defined and described in Article VIII.C) the factors identified to consider with respect to each Abuse Claim and to apply to the Base Matrix Value for the applicable tier of Abuse Type for such Abuse Claim to arrive at its Proposed Allowed Claim Amount.

C.     **Interpretation; Application of Definitions and Rules of Construction**.  For purposes of these TDP, unless otherwise provided herein:  (1) whenever from the context it is appropriate, each term, whether stated in the singular or the plural, will include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (2) any reference to a person as a holder of a Claim includes that person's successors and assigns; (3) the words "herein," "hereof," "hereto," "hereunder," and other words of similar import refer to these TDP as a whole and not to any particular article, section, subsection, or clause; (4) the words "include" and "including," and variations thereof, shall not be deemed to be terms of limitation and shall be deemed to be followed by the words "without limitation;" (5) any effectuating provisions of these TDP may be reasonably interpreted by the Settlement Trustee in such a manner that is consistent with the overall purpose and intent of these TDP without further notice to or action, order, or approval of the Bankruptcy Court; (6) the headings in these TDP are for convenience of reference only and shall not limit or otherwise affect the provisions hereof; (7) in computing any period of time prescribed or allowed by these TDP, unless otherwise expressly provided herein, the provisions of Bankruptcy Rule 9006(a) shall apply; (8) "or" is not exclusive; and (9) all provisions requiring the consent of a person shall be deemed to mean that such consent shall not be unreasonably withheld.

## ARTICLE III
## TDP ADMINISTRATION

A.     **Administration**.  Pursuant to the Plan and the Settlement Trust Agreement, the Settlement Trust and these TDP shall be administered by the Settlement Trustee in consultation with the STAC, which represents the interests of holders of present Abuse Claims in the administration of the Settlement Trust, and the Future Claimants' Representative, who represents the interests of holders of Future Abuse Claims.  The Claims Administrators shall assist the Settlement Trustee in the resolution of Abuse Claims in accordance with these TDP and provide information necessary for the Settlement Trustee to implement these TDP.

B.     **Powers and Obligations**.  The powers and obligations of the Settlement Trustee, the STAC, the Future Claimants' Representative, and the Claims Administrators are set forth in the Settlement Trust Agreement.  The STAC and the Future Claimants' Representative shall have no authority or ability to modify, reject, or influence any claim allowance or Allowed Claim Amount determination under these TDP.

4

    **C.**    **Consent Procedures**. The Settlement Trustee shall obtain the consent of the STAC and the Future Claimants' Representative on any amendments to these TDP pursuant to Article XIV.B below, and on such matters as are otherwise required below and in Article 1.6 of the Settlement Trust Agreement. Such consent shall not be unreasonably withheld.

<div align="center">

**ARTICLE IV**
**CLAIMANT ELIGIBILITY**

</div>

    **A.**    **Direct Abuse Claims**. To be eligible to potentially receive compensation from the Settlement Trust on account of a Direct Abuse Claim, a Direct Abuse Claimant, other than holders of Future Abuse Claims must:

        (1)    have a Direct Abuse Claim;

        (2)    have timely submitted an Abuse Claim Proof of Claim or Trust Claim Submission to the Settlement Trust as provided below; and

        (3)    submit supporting documentation and evidence to the Settlement Trust as provided below.

    Direct Abuse Claims can only be timely submitted as follows:

    (i)    a Direct Abuse Claim for which a Proof of Claim was filed in the Chapter 11 Cases before the Bar Date or if determined timely by the Bankruptcy Court (each a "**Chapter 11 POC**") shall, without any further action by the Abuse Claimant, be deemed a timely submitted Abuse Proof of Claim to the Settlement Trust;

    (ii)    a Direct Abuse Claim alleging abuse against a Local Council (a) for which, as of the time the Claim is submitted to the Settlement Trust in accordance with the Settlement Trustee's designated procedures, a pending state court action had been timely filed under state law naming the Local Council as a defendant or (b) which is submitted to the Settlement Trust at a time when the Claim would be timely under applicable state law if a state court action were filed against the Local Council on the date on which the Direct Abuse Claim is submitted to the Settlement Trust, shall be deemed a timely submitted Abuse Proof of Claim to the Settlement Trust; or

    (iii)    a Direct Abuse Claim alleging abuse against any Protected Party other than a Local Council (a) for which, as of the time the Claim is submitted to the Settlement Trust in accordance with the Settlement Trustee's designated procedures, a pending state court action had been timely filed under state law naming the Protected Party as a defendant or (b) which is submitted to the Settlement Trust at a time when the Claim and would be (x) timely under applicable state law if a state court action were filed against the Protected Party on the date on which the Direct Abuse Claim is submitted to the Settlement Trust and (y) meets any applicable deadline that may be set by the Bankruptcy Court in connection with such Protected Party becoming a Protected Party in accordance with the Plan and Confirmation Order, shall be deemed a timely submitted Abuse Proof of Claim to the Settlement Trust.

    Any Direct Abuse Claim that is not timely submitted based on the foregoing shall be deemed untimely and Disallowed.

<div align="center">5</div>

**B.** **Indirect Abuse Claims.**[1]  To be eligible to receive compensation from the Settlement Trust, an Indirect Abuse Claimant:

(1)    must have an Indirect Abuse Claim that satisfies the requirements of the Bar Date Order (to the extent applicable);

(2)    must have an Indirect Abuse Claim that is not subject to (a) disallowance under section 502 of the Bankruptcy Code, including subsection (e) thereof, (subject to the right of the holder of the Indirect Abuse Claim to seek reconsideration by the Settlement Trustee under section 502(j) of the Bankruptcy Code), or is not otherwise legally invalid, or (b) subordination under sections 509(c) or 510 of the Bankruptcy Code, or otherwise under applicable law; and

(3)    must establish to the satisfaction of the Settlement Trustee or, to the extent applicable, by a final determination in an Insurance Action that:

    (a)    such Indirect Abuse Claimant has paid in full all or the Claim holder's total share of the liability and/obligation of the Settlement Trust to a Direct Abuse Claimant to whom the Settlement Trust would otherwise have had a liability or obligation under these TDP (as to which the holder of the Allowed Indirect Abuse Claim seeks payment);

    (b)    the Indirect Abuse Claimant has forever and fully released the Settlement Trust and the Protected Parties from all liability for or related to the subject Direct Abuse Claim (other than the Indirect Abuse Claimant's assertion of its Indirect Abuse Claim); and

    (c)    the Indirect Abuse Claim is not otherwise subject to a valid defense, including, without limitation, that such Indirect Abuse Claim is barred by a statute of limitations or repose or by other applicable law.

In no event shall any Indirect Abuse Claimant have any rights against the Settlement Trust superior to the rights that the Direct Abuse Claimant to whose claim the Indirect Abuse Claim relates,

---

[1]    Indirect Abuse Claims may include claims for the payment of defense costs, deductibles or indemnification obligations; provided that the Plan's Discharge Injunction, Channeling Injunction, Insurance Entity Injunction and Plan Documents shall not be deemed to preclude a Non-Settling Insurance Company from exercising its rights of setoff and recoupment (to the extent setoff and recoupment are permitted under applicable law) against the Settlement Trust as to any deductible obligation on account of an Abuse Claim that has been or could have been asserted against any Protected Party but for the Discharge Injunction, Channeling Injunction or the Insurance Entity Injunction; provided that, the Settlement Trust and Protected Parties reserve all rights to dispute the ability for a Non-Settling Insurance Company to exercise such rights pursuant to the applicable Insurance Policy, related deductible agreement, the Plan Documents as amended by this section, and any applicable law.

would have against the Settlement Trust, including any rights with respect to timing, amount, percentage, priority, or manner of payment. No Indirect Abuse Claim may be liquidated and paid in an amount that exceeds what the Indirect Abuse Claimant has paid to the related Direct Abuse Claimant or to the Settlement Trust in respect of such claim for which the Settlement Trust would have liability, and in no event shall any Indirect Abuse Claim exceed the Allowed Claim Amount of the related Direct Abuse Claim, *provided that* an Indirect Abuse Claimant may assert against the Settlement Trust an Indirect Abuse Claim for the recovery of defense costs solely to the extent permitted under applicable law.

C. **Future Abuse Claims**. To be eligible to potentially receive compensation from the Settlement Trust on account of a Future Abuse Claim, a Future Abuse Claimant must:

(1)     have a Direct Abuse Claim that arises from Abuse that occurred prior to the Petition Date;

(2)     as of the date immediately preceding the Petition Date, had not attained eighteen (18) years of age or was not aware of such Direct Abuse Claim as a result of "repressed memory," to the extent the concept of repressed memory is recognized by the highest appellate court of the state or territory where the claim arose;

(3)     submit the Future Abuse Claim to the Settlement Trust in accordance with these TDP, (i) at a time when the Claim would be timely under applicable state law if a state court action were filed on the date on which the Future Abuse Claim is submitted to the Settlement Trust, or (ii), if the Future Abuse Claim is not timely under (i) above, it will be eliminated or decreased in accordance with Article VIII.E(iii) below; and

(4)     have not filed a Chapter 11 POC.

Future Abuse Claims that meet the foregoing eligibility criteria shall be treated as Direct Abuse Claims hereunder.

## ARTICLE V
## GENERAL TRUST PROCEDURES

A. **Document Appendix**. As more fully described in the Document Appendix, the Settlement Trustee may require other parties to the Document Appendix and third parties to provide the Settlement Trust with documents, witnesses, or other information as provided therein (the **"Document Obligations"**).

B. **Document Access**. The Settlement Trust shall afford access for Direct Abuse Claimants to relevant, otherwise discoverable non-privileged information and documents obtained by the Settlement Trust pursuant to the Document Appendix to facilitate their submissions with respect to their Direct Abuse Claims. Such access shall include IV files (the Volunteer Screening Database), Troop Rosters, and non-privileged information and documents provided to the Settlement Trust by Direct Abuse Claimants that are not confidential and are relevant to the Allowed Amount of other Direct Abuse Claimants' Claims. A court of competent jurisdiction

shall be able to determine whether allegedly privileged documents should be required to be produced by the Settlement Trust. The Settlement Trust also may perform any and all obligations necessary to recover assigned proceeds under the assigned insurance rights in connection with the administration of these TDP.

C.     **Assignment of Insurance Rights**.   The Bankruptcy Court has authorized the Insurance Assignment pursuant to the Plan and the Confirmation Order, and the Settlement Trust has received the assignment and transfer of the Insurance Actions, the Insurance Action Recoveries, the Insurance Settlement Agreements (if applicable), the Insurance Coverage, and all other rights or obligations under or with respect to the Insurance Policies (but not the policies themselves) in accordance with the Bankruptcy Code. Nothing in these TDP shall modify, amend, or supplement, or be interpreted as modifying, amending, or supplementing, the terms of any Insurance Policy or rights and obligations under any Insurance Policy assigned to the Settlement Trust to the extent such rights and obligations are otherwise available under applicable law and subject to the Plan and Confirmation Order. The rights and obligations, if any, of any Non-Settling Insurance Company relating to these TDP, or any provision hereof, shall be determined pursuant to the terms and provisions of the Insurance Policies and applicable law.   Notwithstanding the foregoing, the Settlement Trust, rather than any Protected Party, shall satisfy, to the extent required under the relevant policies and applicable law, any retrospective premiums, deductibles, and self-insured retentions arising out of any Abuse Claims under the Abuse Insurance Policies. In the event that a Non-Settling Insurance Company pays such self-insured retention and is entitled to reimbursement from the Settlement Trust under applicable law, such Non-Settling Insurance Company shall receive that reimbursement in the form of a set-off against any claim for coverage by the Settlement Trust against that Non-Settling Insurance Company with respect to the relevant Abuse Claim.  Nothing herein shall obligate any Non-Settling Insurance Company to advance any deductible or self-insured retention, unless otherwise required by applicable law.

D.     **Deceased Abuse Survivor**.  The Settlement Trustee shall consider, and if an Allowed Claim Amount is determined, pay under these TDP, the claim of a deceased Direct Abuse Claimant without regard to the Direct Abuse Claimant's death, except that the Settlement Trustee may require evidence that the person submitting the claim on behalf of the decedent is authorized to do so.

E.     **Statute of Limitations or Repose**.  The statute of limitations, statute of repose, and the choice of law determination applicable to an Abuse Claim against the Settlement Trust shall be determined by reference to the jurisdiction where such Abuse Claim was pending on the Petition Date (so long as the Protected Party was subject to personal jurisdiction in that location), or where such Abuse Claim could have been timely and properly filed as asserted by the Abuse Claimant under applicable law.

**ARTICLE VI**
**EXPEDITED DISTRIBUTIONS**

A.     **Minimum Payment Criteria**.  A Direct Abuse Claimant who meets the following criteria may elect to resolve his or her Direct Abuse Claim for an expedited distribution of $3,500 (the "**Expedited Distribution**"): (i) the Direct Abuse Claimant elects to resolve his or her Direct Abuse Claim for the Expedited Distribution in accordance with the Plan and Confirmation Order

8

(the "**Expedited Distribution Election**"); (ii) in connection with the Expedited Distribution Election, the Direct Abuse Claimant has timely submitted to the Settlement Trust a properly and substantially completed, non-duplicative Chapter 11 POC or Future Abuse Claim; and (iii) the Direct Abuse Claimant (or an executor) has personally signed his or her Proof of Claim or Future Abuse Claim attesting to the truth of its contents under penalty of perjury, or supplements his or her Abuse Claim Proof of Claim to so provide such verification. Direct Abuse Claimants that make the Expedited Distribution Election will not have to submit any additional information to the Settlement Trust to receive payment of the Expedited Distribution from the Settlement Trust.

  **B.**  <u>Process and Payment of Expedited Distributions</u>. Direct Abuse Claimants who have properly made the Expedited Distribution Election and who met the criteria set forth in Article VI.A(ii) and (iii) above, shall be entitled to receive their Expedited Payment upon executing an appropriate release, which shall include a release of the Settlement Trust, the Protected Parties, and all Chartered Organizations. The form of release agreement that a Direct Abuse Claimant who makes the Expedited Distribution Election must execute is attached as **Exhibit A**. A Direct Abuse Claimant who does not make the Expedited Distribution Election and a Future Abuse Claimant who does not elect to receive the Expedited Distribution in accordance with the deadlines and procedures established by the Settlement Trust may not later elect to receive the Expedited Distribution. A Direct Abuse Claimant who makes the Expedited Distribution Election (or Future Abuse Claimant who elects to receive the Expedited Distribution) shall have no other remedies with respect to any Direct Abuse Claim he or she has against the Settlement Trust, Protected Parties, Chartered Organizations, or any Non-Settling Insurance Company. Direct Abuse Claimants that make the Expedited Distribution Election (or Future Abuse Claimant who elects to receive the Expedited Distribution) will not be eligible to receive any further distribution on account of their Direct Abuse Claim pursuant to these TDP. The Settlement Trustee shall not seek reimbursement for any Expedited Distribution from any Non-Settling Insurance Company. An Abuse Claim resolved via Expedited Distribution shall not be considered an Insured Abuse Claim (as defined below).

<div align="center">

**ARTICLE VII**
**CLAIMS ALLOWANCE PROCESS**

</div>

  **A.**  <u>Trust Claim Submissions</u>. Each Abuse Claimant that does not make the Expedited Distribution Election may instead elect (1) to pursue recovery from the Settlement Trust pursuant to these TDP must submit his or her Abuse Claim for allowance and potential valuation and determination of insurance status by the Settlement Trustee pursuant to the requirements set forth herein (each, a "**Trust Claim Submission**") or (2) to pursue the Independent Review Option, as set forth therein. In order to properly make a Trust Claim Submission, each submitting Abuse Claimant must (i) complete under oath a questionnaire to be developed by the Settlement Trustee and such signature and oath must be of the Abuse Claimant individually (or of an executor); (ii) produce all records and documents in his or her possession, custody or control related to the Abuse Claim, including all documents pertaining to all settlements, awards, or contributions already received or that are expected to be received from a Protected Party or other sources; and (iii) execute an agreement to be provided or made available by the Settlement Trust with the questionnaire (1) to produce any further records and documents in his or her possession, custody or control related to the Abuse Claim reasonably requested by the Settlement Trustee, (2) consent to and agree to cooperate in any examinations requested by the Settlement Trustee (including by

<div align="center">

9

</div>

healthcare professionals selected by the Settlement Trustee) (a "**Trustee Interview**"); and (3) consent to and agree to cooperate in a written and/or oral examination under oath if requested to do so by the Settlement Trustee. The questionnaire shall be approved by the STAC and the Future Claims Representative but, at a minimum, will require Direct Abuse Claimants to confirm his/her name, date of birth, home address, dates of abuse, frequency of abuse, and level of abuse. The date on which an Abuse Claimant submits (i), (ii) and (iii) above to the Settlement Trust shall be the "**Trust Claim Submission Date**". No recovery will be provided to an Abuse Claimant that does not timely submit a questionnaire. The Abuse Claimant's breach or failure to comply with the terms of his or her agreement made in connection with his or her Trust Claim Submission shall be grounds for disallowance or significant reduction of his or her Abuse Claim. To complete the evaluation of each Abuse Claim submitted through a Trust Claim Submission (each a "**Submitted Abuse Claim**"), the Settlement Trustee also may, but is not required to, obtain additional evidence from the Abuse Claimant or from other parties pursuant to the Document Obligations and shall consider supplemental information timely provided by the Abuse Claimant, including information obtained pursuant to the Document Obligations. Non-material changes to the claims questionnaire may be made by the Settlement Trustee without the consent of the STAC and the Future Claimants' Representative.

  **B.** **Claims Evaluation**. The Settlement Trustee shall evaluate each Trust Claim Submission individually and will follow the uniform procedures and guidelines set forth below to determine, based on the evidence obtained by the Settlement Trust, whether or not a Submitted Abuse Claim should be allowed. After a review of the documentation provided by the Abuse Claimant in his or her Proof of Claim, Trust Claim Submission, materials received pursuant to the Document Obligations, and any follow-up materials or examinations (including, without limitation, any Settlement Trustee Interview), the Settlement Trustee will either find the Abuse Claim to be legally valid and an Allowed Abuse Claim, or legally invalid and a Disallowed Claim.

  **C.** **Settlement Trustee Review Procedures**. The Settlement Trustee must evaluate each Submitted Abuse Claim, including the underlying Proof of Claim, the Trust Claim Submission and/or the Settlement Trustee Interview or any other follow-up, and documents obtained through the Document Obligations, and determine whether such Claim is a legally valid Allowed Abuse Claim, based on the following criteria:

    **1.** **Initial Evaluation Criteria**. The Settlement Trustee shall perform an initial evaluation (the "**Initial Evaluation**") of a Submitted Abuse Claim to determine whether:

     (a) the Abuse Claimant's Proof of Claim or Trust Claim Submission is substantially and substantively completed and signed under penalty of perjury;

     (b) the Direct Abuse Claim was timely submitted to the Settlement Trust under Article IV.A; and

     (c) the Submitted Abuse Claim had not previously been resolved by litigation and/or settlement involving all Protected Parties.

If any of these criteria are not met after such notice and opportunity as the Settlement Trustee deems appropriate to permit any defects in the Submitted Abuse Claim to be corrected, then the Submitted Abuse Claim shall be a Disallowed Claim.

2.   **General Criteria for Evaluating Submitted Abuse Claims**.  To the extent a Submitted Abuse Claim is not disallowed based on the Initial Evaluation, then the Settlement Trustee will evaluate the following factors to determine if the evidence related to the Submitted Abuse Claim is credible and demonstrates, by a preponderance of the evidence, that the Submitted Abuse Claim is entitled to a recovery and should be allowed (the "**General Criteria**"):

(a)   <u>Alleged Abuse</u>.  The Abuse Claimant has identified alleged acts of Abuse that he or she suffered;

(b)   <u>Alleged Abuser Identification</u>.  The Abuse Claimant has either (i) identified an alleged abuser (*e.g.*, by the full name or last name) or (ii) provided specific information (*e.g.*, a physical description of an alleged abuser combined with the name or location of the Abuse Claimant's troop) about the alleged abuser such that the Settlement Trustee can make a reasonable determination that the alleged abuser was an employee, agent or volunteer of a Protected Party, the alleged abuser was a registered Scout, or the alleged abuser participated in Scouting or a Scouting activity and the Abuse was directly related to Scouting activities;

(c)   <u>Connection to Scouting</u>.  The Abuse Claimant has provided information showing (or the Settlement Trustee otherwise determines) (i) that the Abuse Claimant was abused during a Scouting activity or that the Abuse resulted from involvement in Scouting activities, and (ii) that a Protected Party may be negligent or may otherwise bear legal responsibility.

(d)   <u>Date and Age</u>.  The Abuse Claimant has either:  (i) identified the date of the alleged abuse and/or his or her age at the time of the alleged Abuse, or (ii) provided additional facts (*e.g.*, the approximate date and/or age at the time of alleged Abuse coupled with the names of additional scouts or leaders in the troop) sufficient for the Settlement Trustee to determine the date of the alleged Abuse and age of the Abuse Claimant at the time of such alleged Abuse; and

(e)   <u>Location of Abuse</u>.  The Abuse Claimant has identified the venue or location of the alleged Abuse.

11

3.    <u>**Submitted Abuse Claims That Satisfy the General Criteria**</u>. To the extent that a Submitted Abuse Claim meets the evidentiary standard set forth in the General Criteria and the Settlement Trustee has verified such information and determined that no materials submitted or information received in connection with the Submitted Abuse Claim are deceptive or fraudulent, the Submitted Abuse Claim will be, and will be deemed to be, an Allowed Abuse Claim.

4.    <u>**Submitted Abuse Claims That Do Not Satisfy the General Criteria**</u>. If the Settlement Trustee determines that any Submitted Abuse Claim materials provided by an Abuse Claimant include fraudulent and/or deceptive information, the Submitted Abuse Claim will be, and will be deemed to be, a Disallowed Claim. To the extent that a Submitted Abuse Claim – after an opportunity for the Abuse Claimant to discover information from the Settlement Trust as provided in these TDP – does not meet the evidentiary standard set forth in the General Criteria, the Settlement Trustee can disallow such Claim, or request further information from the Abuse Claimant in question necessary to satisfy the General Criteria requirements. If the Settlement Trustee finds that any of the factors set forth in Article VII.C.2(a)-(c) with respect to any Submitted Abuse Claim are not satisfied, the Claim will be *per se* disallowed and will be, and will be deemed to be, a Disallowed Claim.

D.    <u>**Disallowed Claims**</u>. If the Settlement Trustee finds that a Submitted Abuse Claim is a Disallowed Claim, the Settlement Trustee shall provide written notice of its determination to the relevant Abuse Claimant (a "**Disallowed Claim Notice**"). If the Settlement Trustee finds that a Submitted Abuse Claim is a Disallowed Claim, the Settlement Trustee will not perform the Allowed Abuse Claim valuation analysis described below in Article VIII. Abuse Claimants shall have the ability to seek reconsideration of the Settlement Trustee's determination set forth in the Disallowed Claim Notice as described in Article VII.G below.

E.    <u>**Allowed Abuse Claims**</u>. If the Settlement Trustee finds that a Submitted Abuse Claim is an Allowed Abuse Claim, the Settlement Trustee shall utilize the procedures described below in Article VIII to determine the proposed Claims Matrix tier and Scaling Factors for such Abuse Claim (the "**Proposed Allowed Claim Amount**"), and provide written notice of allowance and the Proposed Allowed Claim Amount to the Abuse Claimant (an "**Allowed Claim Notice**" and together with the Disallowed Claim Notice, a "**Claim Notice**") as set forth in Article VII.F below.

F.    <u>**Claims Determination**</u>. If the Abuse Claimant accepts the Proposed Allowed Claim Amount in the Allowed Claim Notice or the reconsideration process set forth below in Article VII.G has been exhausted (and no further action has been taken by the Abuse Claimant in the tort system pursuant to Article XII below), the Proposed Allowed Claim Amount shall become the Allowed Claim Amount for such Claim (a "**Final Determination**"), and the holder of such Allowed Abuse Claim shall receive payment in accordance with Article IX, subject to the Abuse Claimant executing the form of release set forth in Article IX.D, and subject to any further adjustment if the Direct Abuse Claimant exercises the Independent Review Option.

**G.      Reconsideration of Settlement Trustee's Determination**.  An Abuse Claimant may make a request for reconsideration of (i) the disallowance of his or her Submitted Abuse Claim, or (ii) the Proposed Allowed Claim Amount (a "**Reconsideration Request**") within thirty (30) days of receiving a Disallowed Claim Notice or an Allowed Claim Notice (the "**Reconsideration Deadline**").  Any Abuse Claimant who fails to submit a Reconsideration Request to the Settlement Trust by the Reconsideration Deadline shall be deemed to accept the disallowance of the Abuse Claim or the Proposed Allowed Claim Amount.  Each Reconsideration Request must be accompanied by payment of $1,000 as an administrative fee for reconsideration. The Settlement Trustee shall have the authority to waive the administrative fee in appropriate cases, based on the circumstances of the Abuse Claimant.  The Abuse Claimant may submit further evidence in support of the Submitted Abuse Claim with the Reconsideration Request.  The Settlement Trustee will have sole discretion whether to grant the Reconsideration Request.  The decision to grant the Reconsideration Request does not guarantee that the Settlement Trustee will reach a different result after reconsideration.

If the Reconsideration Request is denied, the administrative fee will not be returned, and the Settlement Trustee will notify the Abuse Claimant within thirty (30) days of receiving the request that it will not reconsider the Abuse Claimant's Submitted Abuse Claim.  The Abuse Claimant shall retain the ability to pursue the Settlement Trust in the tort system as described in Article XII below.

If the Reconsideration Request is granted, the Settlement Trustee will provide the Abuse Claimant written notice within thirty (30) days of receiving the Reconsideration Request that it is reconsidering the Abuse Claimant's Submitted Abuse Claim.  The Settlement Trustee will then reconsider the Submitted Abuse Claim—including all new information provided by the Abuse Claimant in the Reconsideration Request and any additional Settlement Trustee Interview—and will have the discretion to maintain the prior determination or find that the Submitted Abuse Claim in question is an Allowed Abuse Claim or should receive a new Proposed Allowed Claim Amount.

If the Settlement Trustee determines upon reconsideration that a Submitted Abuse Claim is an Allowed Abuse Claim and/or should receive a new Proposed Allowed Claim Amount, the Settlement Trustee will deliver an Allowed Claim Notice and return the administrative fee to the relevant Abuse Claimant.  If the Settlement Trustee determines upon reconsideration that the totality of the evidence submitted by the Abuse Claimant does not support changing the earlier finding that the Submitted Abuse Claim is a Disallowed Claim, or that the Claim in question is not deserving of a new Proposed Allowed Claim Amount, the Settlement Trustee's earlier allowance determination and/or Proposed Allowed Claim Amount shall stand and the Settlement Trustee will provide a Claim Notice to the Abuse Claimant of either result within ninety (90) days of the Settlement Trust having sent notice that it was reconsidering the Abuse Claimant's Submitted Abuse Claim.  Thereafter, the Abuse Claimant shall retain the ability to pursue the Settlement Trust in the tort system as described below in Article XII.

**H.      Claim Determination Deferral**.  For a period of up to twelve (12) months from the Effective Date, and by an election exercised at the time of the Trust Submission, Direct Abuse Claimants whose Direct Abuse Claims may be substantially reduced by the Scaling Factor described below in Article VIII.E.(iii) (statute of limitations defense) may elect to defer the determination of their Proposed Allowed Claim Amounts to see if statute of limitations revival

legislation occurs, *provided*, *however*, that this claim determination deferral window shall close for all Direct Abuse Claims twelve (12) months from the Effective Date at which time such Submitted Abuse Claims shall be determined based on then applicable Scaling Factors.

I.    **Prevention and Detection of Fraud**.   The Settlement Trustee shall propose procedures to identify fraudulent claims, taking into account factors the Settlement Trustee deems appropriate (and which may include a cost/benefit analysis) to the Bankruptcy Court for approval. The Settlement Trustee shall work with the Claims Administrators to institute auditing and other procedures to detect and prevent the allowance of Abuse Claims based on fraudulent Trust Claim Submissions. Among other things, such procedures will permit the Settlement Trustee or Claims Administrators to conduct random audits to verify supporting documentation submitted in randomly selected Trust Claim Submissions, as well as targeted audits of individual Trust Claim Submissions or groups of Trust Claim Submissions, any of which may include Settlement Trustee Interviews. Trust Claim Submissions must be signed under the pains and penalties of perjury and to the extent of applicable law, the submission of a fraudulent Trust Claim Submission may violate the criminal laws of the United States, including the criminal provisions applicable to Bankruptcy Crimes, 18 U.S.C. § 152, and may subject those responsible to criminal prosecution in the Federal Courts.

**ARTICLE VIII**
**CLAIMS MATRIX AND SCALING FACTORS**

**Claims Matrix and Scaling Factors**. These TDP establish certain criteria for unliquidated claims seeking compensation from the Settlement Trust, a claims matrix below (the "**Claims Matrix**") that schedules six types of Abuse (the "**Abuse Types**") and designates for each Abuse Type a Base Matrix Value, and Maximum Matrix Value, and certain scaling factors (the "**Scaling Factors**") identified below to apply to the Base Matrix Values to determine the liquidated values for certain unliquidated Abuse Claims. The Abuse Types, Scaling Factors, Base Matrix Values, and Maximum Matrix Values that are set forth in the Claims Matrix have all been selected and derived with the intention of achieving a fair and reasonable Abuse Claim valuation range in light of the best available information, considering the settlement, verdict and/or judgments that Abuse Claimants would receive in the tort system against the Protected Parties absent the bankruptcy. The Settlement Trustee shall utilize the Claims Matrix and Scaling Factors as the basis to determine a Proposed Allowed Claim Amount for each Allowed Abuse Claim that does not receive an Expedited Distribution or become a STAC Tort Election Claim. The Proposed Allowed Claim Amount agreed to by the Direct Abuse Claimant as the Allowed Claim Amount for an Allowed Abuse Claim shall be deemed to be the Protected Parties' liability for such Direct Abuse Claim (*i.e.*, the claimant's right to payment for his or her Direct Abuse Claim), irrespective of how much the holder of such Abuse Claim actually receives from the Settlement Trust pursuant to the payment provisions set forth in Article IX. In no circumstance shall the amount of a Protected Party's legal obligation to pay any Direct Abuse Claim be determined to be any payment percentages hereunder or under the Settlement Trust Agreement (rather than the liquidated value of such Direct Abuse Claim as determined under the TDP).

A.    **Claims Matrix**. The Claims Matrix establishes six tiers of Abuse Types, and provides the range of potential Allowed Claim Amounts assignable to an Allowed Abuse Claim

in each tier.  The first two columns of the Claims Matrix delineate the six possible tiers to which an Allowed Abuse Claim can be assigned based on the nature of the abuse.  The Base Matrix value column for each tier represents the default Allowed Claim Amount for an Allowed Abuse Claim assigned to a given tier prior to application of the Scaling Factors described in Article VIII.D (the "**Base Matrix Value**").  The maximum Claims Matrix value column for each tier represents the maximum Allowed Claim Amount for an Allowed Abuse Claim assigned to a given tier after Claims Matrix review and application of the Scaling Factors described in Article VIII.C (the "**Maximum Matrix Value**").  The ultimate distribution(s) to the holder of an Allowed Abuse Claim that has received a Final Determination may vary upward (in the case of a larger-than-expected Settlement Trust corpus) or downward (in the case of a smaller-than-expected Settlement Trust corpus) from the holder's Allowed Claim Amount based on the payment percentages determined by the Settlement Trustee.  If an Allowed Abuse Claim would fall into more than one tier, it will be placed in the highest applicable tier.  An Abuse Claimant cannot have multiple Allowed Abuse Claims assigned to different tiers.  Commencing on the second anniversary of the Effective Date, the Settlement Trust shall adjust the valuation amounts for yearly inflation based on the CPI-U.  The CPI-U adjustment may not exceed 3% annually, and the first adjustment shall not be cumulative.

| Tier | Type of Abuse | Base Matrix Value | Maximum Matrix Value |
|------|---------------|-------------------|----------------------|
| 1 | Anal or Vaginal Penetration by Adult Perpetrator—includes anal or vaginal sexual intercourse, anal or vaginal digital penetration, or anal or vaginal penetration with a foreign, inanimate object. | $600,000 | $2,700,000 |
| 2 | Oral Contact by Adult Perpetrator—includes oral sexual intercourse, which means contact between the mouth and penis, the mouth and anus, or the mouth and vulva or vagina.<br><br>Anal or Vaginal Penetration by a Youth Perpetrator—includes anal or vaginal sexual intercourse, anal or vaginal digital penetration, or anal or vaginal penetration with a foreign, inanimate object. | $450,000 | $2,025,000 |
| 3 | Masturbation by Adult Perpetrator—includes touching of the male or female genitals that involves masturbation of the abuser or claimant.<br><br>Oral Contact by a Youth Perpetrator—includes oral sexual intercourse, which means contact between the mouth and penis, the mouth and anus, or the mouth and vulva or vagina. | $300,000 | $1,350,000 |

15

| 4 | Masturbation by Youth Perpetrator—includes touching of the male or female genitals that involves masturbation of the abuser or claimant. <br><br> Touching of the Sexual or Other Intimate Parts (unclothed) by Adult Perpetrator. | $150,000 | $675,000 |
|---|---|---|---|
| 5 | Touching of the Sexual or Other Intimate Parts (unclothed) by a Youth Perpetrator. <br><br> Touching of the Sexual or Other Intimate Parts (clothed), regardless of who is touching whom and not including masturbation. <br><br> Exploitation for child pornography. | $75,000 | $337,500 |
| 6 | Sexual Abuse-No Touching. <br><br> Adult Abuse Claims. | $3,500 | $8,500 |

      **B.**   **Scaling Factors**.  After the Settlement Trustee has assigned an Allowed Abuse Claim to one of the six tiers in the Claims Matrix, the Settlement Trustee will utilize the Scaling Factors described below to determine the Proposed Allowed Claim Amount for each Allowed Abuse Claim.   Each Allowed Abuse Claim will be evaluated for each factor by the Settlement Trustee through his or her review of the evidence obtained through the relevant Proof of Claim, Trust Claim Submission and any related or follow-up materials, interviews or examinations, as well as materials obtained by the Settlement Trust or the Direct Abuse Claimant through the Document Obligations.  These scaling factors can increase or decrease the Proposed Allowed Claim Amount for an Allowed Abuse Claim depending on the severity of the facts underlying the Claim.  By default, the value of each scaling factor is one (1), meaning that in the absence of the application of the scaling factor, the Base Matrix Value assigned to a Claim is not affected by that factor.  In contrast, if the Settlement Trustee determines that a particular scaling factor as applied to a given Allowed Abuse Claim is 1.5, the Proposed Allowed Claim Amount for the Allowed Abuse Claim will be increased by 50%, the result of multiplying the Base Matrix Value of the Allowed Abuse Claim by 1.5.  The combined effect of all scaling factors is determined by multiplying the scaling factors together then multiplying the result by the Base Matrix Value of the Allowed Abuse Claim.  *See* Article VIII.F for illustrative example.

      **C.**   **Aggravating Scaling Factors**.  The Settlement Trustee may assign upward Scaling Factors to each Allowed Abuse Claim based on the following categories:

      (i)     **Nature of Abuse and Circumstances**.  To account for particularly severe Abuse or aggravating circumstances, the Settlement Trustee may assign an upward Scaling Factor of up to 1.5 to each Allowed Abuse Claim.  The hypothetical base case scenario for this scaling factor would involve a single incident of Abuse with a single perpetrator with such perpetrator having accessed the victim as an employee or volunteer within BSA-sponsored scouting.  The hypothetical base case is incorporated into the Base Matrix Value in the Claims Matrix' tiers and would

16

not receive an increase on account of this factor. By way of example, aggravating factors that can give rise to a higher scaling factor include the following factors:

a.      Extended duration and/or frequency of the Abuse;

b.      Exploitation of the Abuse Claimant for child pornography;

c.      Coercion or threat or use of force or violence, stalking; and

d.      Multiple perpetrators involved in sexual misconduct.

(ii)    **Abuser Profile**. To account for the alleged abuser's profile, the Settlement Trustee may assign an upward Scaling Factor of up to 2.0 to an Allowed Abuse Claim. This factor is to be evaluated relative to a hypothetical base case scenario involving a perpetrator as to whom there is no other known allegations of Abuse. The hypothetical base case is incorporated into the Base Matrix Value in the Claims Matrix' tiers and would not receive an increase on account of this factor. An upward Scaling Factor may be applied for this category as follows (the Settlement Trustee may only apply the scaling factor of the single highest applicable category listed below):

a.      1.25 if the abuser was accused by at least one (1) other alleged victim of Abuse;

b.      1.5 if the abuser was accused by five (5) or more other alleged victims of Abuse;

c.      2.0 if the abuser was accused by ten (10) or more other alleged victims of Abuse; and

d.      1.25 to 2.0 if there is evidence that the Protected Party knew or should have known (i) the abuser had previously committed or may commit Abuse and failed to take reasonable steps to protect the survivor from that danger, or (ii) of the prior Abuse or the foreseeability of the risk of Abuse and failed to take reasonable steps to protect the survivor from that danger.

(iii)   **Impact of the Abuse**. To account for the impact of the alleged Abuse on the Abuse Claimant's mental health, physical health, inter-personal relationships, vocational capacity or success, academic capacity or success, and whether the alleged Abuse at issue resulted in legal difficulties for the Abuse Claimant, the Settlement Trustee may assign an upward Scaling Factor of up to 1.5. This factor is to be evaluated relative to a hypothetical base case scenario of a victim of Abuse who suffered the typical level of Abuse-related distress within the tier to which the Allowed Abuse Claim was assigned. The hypothetical base case is incorporated into the Base Matrix Values in the Claims Matrix' tiers and would not receive an increase on account of this factor. The Settlement Trustee will consider, along with any and all other relevant factors, whether the Abuse at issue manifested or otherwise led the Abuse Claimant to experience or engage in behaviors resulting from:

a.   Mental Health Issues:  This includes anxiety, depression, post-traumatic stress disorder, substance abuse, addiction, embarrassment, fear, flashbacks, nightmares, sleep issues, sleep disturbances, exaggerated startle response, boundary issues, self-destructive behaviors, guilt, grief, homophobia, hostility, humiliation, anger, isolation, hollowness, regret, shame, isolation, sexual addiction, sexual problems, sexual identity confusion, low self-esteem or self-image, bitterness, suicidal ideation, suicide attempts, and hospitalization or receipt of treatment for any of the foregoing.

b.   Physical Health Issues:  This includes physical manifestations of emotional distress, gastrointestinal issues, headaches, high blood pressure, physical manifestations of anxiety, erectile dysfunction, heart palpitations, sexually-transmitted diseases, physical damage caused by acts of Abuse, reproductive damage, self-cutting, other self-injurious behavior, and hospitalization or receipt of treatment for any of the foregoing.

c.   Interpersonal Relationships:  This includes problems with authority figures, hypervigilance, sexual problems, marital difficulties, problems with intimacy, lack of trust, isolation, betrayal, impaired relations, secrecy, social discreditation and isolation, damage to family relationships, and fear of children or parenting.

d.   Vocational Capacity:  This includes under- and un-employment, difficulty with authority figures, difficulty changing and maintaining employment, feelings of unworthiness, or guilt related to financial success.

e.   Academic Capacity:  This includes school behavior problems.

f.   Legal Difficulties:  This includes criminal difficulties, bankruptcy, and fraud.

**D.    Mitigating Scaling Factors**.  The Settlement Trustee may assign a mitigating Scaling Factor in the range of 0 to 1.0 except as specifically provided below to each Allowed Abuse Claim to eliminate or decrease the Proposed Allowed Claim Amount for such Claim.  Each mitigating factor is to be evaluated relative to a hypothetical base case scenario of a timely asserted Abuse Claim with supporting evidence that demonstrates, by a preponderance of the evidence, Abuse by a perpetrator that accessed the victim as an employee, agent or volunteer of a Protected Party, as a registered Scout or as a participant in Scouting within BSA-sponsored Scouting.  If statute of limitations revival legislation occurs in a particular jurisdiction, the Settlement Trustee may modify the applicable Scaling Factor (as described below) relevant thereto on a go-forward basis and determine Proposed Allowed Claim Amounts for Abuse Claims in such jurisdiction thereafter based on such modified Scaling Factor.  Included in the hypothetical base case scenario is that the applicable period under a statute of limitations or repose for timely asserting such Abuse Claim against any potentially responsible party will not have passed.  The hypothetical base case is incorporated into the Base Matrix Values in the Claims Matrix tiers and would not receive a decrease on account of these factors.  Such factors may include the following:

18

(i)   **Absence of Protected Party Relationship or Presence of a Responsible Party that Is Not a Protected Party**.

a.   <u>Familial Relationship</u>.  A Protected Party's responsibility for a perpetrator may be factually or legally attenuated or mitigated where the perpetrator also had a familial relationship with the Abuse Claimant.  Familial Abuse—even if the perpetrator was an employee, agent or volunteer of a Protected Party, and the Abuse occurred in connection with BSA-related Scouting—should result in a significant reduction of the Proposed Allowed Claim Amount.

b.   <u>Other Non-Scouting Relationship</u>.  A Protected Party's responsibility for a perpetrator may be factually or legally attenuated or mitigated where the perpetrator also maintained a non-familial relationship with the Abuse Claimant through a separate affiliation, such as a school, or a religious organization, even if the perpetrator was an employee, agent or volunteer of a Protected Party, or the Abuse occurred in settings where a Protected Party did not have the ability or responsibility to exercise control.  Factors to consider include how close the relationship was between the perpetrator and the victim outside of their Scouting-related relationship, whether Abuse occurred and the extent of such Abuse outside of their Scouting relationship, and applicable law related to apportionment of liability.  In such event, the Settlement Trustee shall determine and apply a mitigating Scaling Factor that accounts for such other relationship and the related Abuse.  By way of example, if the Settlement Trustee determines after evaluation of an Allowed Abuse Claim and application of all of the other Scaling Factors that the perpetrator, who was an employee, agent or volunteer of a Protected Party for BSA-related Scouting, also was the primary teacher (at a non-Protected Party entity or institution) of the Abuse Claimant outside of BSA-related Scouting, and if numerous incidents of Abuse occurred outside of Scouting before one incident of BSA-related Scouting Abuse occurred, the Settlement Trustee shall apply a mitigating Scaling Factor as a material reduction of the Proposed Allowed Claim Amount.

c.   <u>Other Responsible Non-Protected Party</u>.  The Abuse Claimant may have a cause of action under applicable law for a portion of his or her Direct Abuse Claim against a responsible entity, such as a Chartered Organization, that is not a Protected Party.  By way of example, if the Settlement Trustee determines after evaluation of a Submitted Abuse Claim that (i) a Chartered Organization that is not a Protected Party is responsible under applicable law for a portion of the liability and (ii) a Protected Party(ies) are not also liable for the same portion of the liability) (taking into account the relevant jurisdiction's prevailing law on apportionment of damages), the Settlement Trustee shall apply a final Scaling Factor to account for such non-Protected Party's portion of the liability.

(ii) **Other Settlements, Awards, Contributions, or Limitations**. The Settlement Trustee may consider any further limitations on the Abuse Claimant's recovery in the tort system. The Settlement Trustee also should consider the amounts of any settlements or awards already received by the Abuse Claimant from other, non-Protected Party sources as well as agreed and reasonably likely to be received contributions from other, non-Protected Party sources that are related to the Abuse. By way of example, the Settlement Trustee should assign an appropriate Scaling Factor to Allowed Abuse Claims capped by charitable immunity under the laws of the jurisdiction where the Abuse occurred. Notwithstanding the foregoing, where an Abuse Claimant has obtained a recovery based on the independent liability of a third party for separate instances of Abuse that occurred without connection to Scouting activities, or on the Non-Scouting portion of a Mixed Claim, no mitigating factor or reduction in value will be applied based on that recovery.

(iii) **Statute of Limitations or Repose**. If the evidence provided by the Abuse Claimant or otherwise obtained by the Settlement Trustee results in the Settlement Trustee concluding that the subject Direct Abuse Claim could be dismissed or denied in the tort system as to all Protected Parties against whom the Direct Abuse Claim was timely submitted (as set forth in Articles IV.A) due to the passage of a statute of limitations or a statute of repose, the Settlement Trustee shall apply an appropriate Scaling Factor based on the ranges set forth in Schedule 1 hereof and giving due consideration to any changes in the applicable law; *provided, however,* the Settlement Trustee will weigh the strength of any relevant evidence submitted by the Abuse Claimant to determine whether the statute of limitations could be tolled or deemed timely under applicable law, and may apply a higher Scaling Factor if such evidence demonstrates to the Settlement Trustee that tolling or a finding of timeliness would be appropriate under applicable state law.

(iv) **Absence of a Putative Defendant.** If the Direct Abuse Claim could be diminished because such claim was not timely submitted against BSA or another Protected Party (as set forth in Articles IV.A) (a "**Missing Party**"), such that in a suit in the tort system, such Direct Abuse Claim would be burdened by an "empty chair" defense due to the absence of a Missing Party(ies), the Settlement Trustee shall apply a mitigating Scaling Factor to account for a Missing Party's absence. By way of example, where a timely submitted Direct Abuse Claim was not timely submitted against BSA (*i.e.*, the Abuse Claimant failed to timely file a Chapter 11 POC) but was only timely submitted against the Local Council and/or another Protected Party (as set forth in Articles IV.A(ii) and (iii)), such absence of the BSA due to BSA's discharge would be the basis for such a substantial reduction. Any Direct Abuse Claim that is reduced due to the absence of the BSA under this mitigating Scaling Factor shall only be payable, as reduced, from Settlement Trust Assets contributed by the applicable Local Council or Chartered Organization, pro rata with all other Direct Abuse entitled to share in the Settlement Trust Assets contributed by such Local Council or Chartered Organization.

E. **Allowed Abuse Claim Calculus**. After the Settlement Trustee assigns an Allowed Abuse Claim to a Claims Matrix tier and determines the appropriate Scaling Factors that apply to

20

the Claim, the Proposed Allowed Claim Amount for the Allowed Abuse Claim is the product of the Base Matrix Value of the Claim and the Scaling Factors applied to the Claim. In no event can an Allowed Abuse Claim's Proposed Allowed Claim Amount (or Allowed Claim Amount) exceed the Maximum Matrix Value for the Claim's assigned Claims Matrix tier. By way of example, if an Allowed Abuse Claim is determined by the Settlement Trustee to be a tier 1 claim (Base Matrix Value of $600,000) with a Scaling Factor of 1.5 for the nature and circumstances of the abuse, and a mitigating Scaling Factor of 0.75, and no other Scaling Factors, the Proposed Allowed Claim Amount for the Allowed Abuse Claim would be $675,000, calculated as $600,000 x 1.5 x 0.75 = $675,000. As a further example, if, in addition to the above Scaling Factors, the same Allowed Abuse Claim had an additional aggravating Scaling Factor of 2.0 on account of the abuser's profile, the Proposed Allowed Claim Amount for the Allowed Abuse Claim would be $1,350,000 (calculated as $600,000 x 1.5 x .75 x 2.0).

  **F.** **Optional Chartered Organization Release**. To have the opportunity to exclusively share in any settlement proceeds received from a Chartered Organization that becomes a Protected Party as provided below in Article IX.F, a Direct Abuse Claimant must execute either (i) the conditional release of the Chartered Organization(s) against whom the Abuse Claimant has an Abuse Claim, that will become effective as to that Abuse Claimant if the Chartered Organization(s) against whom the Abuse Claimant conditionally released becomes a Protected Party(ies), in the form attached as **Exhibit B** (the "**Settling Chartered Organizations Release**"), or (ii) the non-conditional release of all Chartered Organizations in the form attached as **Exhibit C** (the "**Voluntary Chartered Organization Release**").

<center>

**ARTICLE IX**
**PAYMENT OF FINAL DETERMINATION ALLOWED ABUSE CLAIM**

</center>

  **A.** **Payment Upon Final Determination**. Only after the Settlement Trustee has established an Initial Payment Percentage in accordance with Section 4.1 of the Settlement Trust Agreement, then once there is a Final Determination of an Abuse Claim pursuant to Article VII.F, the Claimant will receive a payment of such Final Determination based on the Payment Percentage then in effect as described in Article IX.B and IX.C (unless such Claimant has exercised the Independent Review Option, in which case payment will be withheld until that determination is complete). For the purpose of payment by the Settlement Trust, a Final Judicial Determination (as defined in Article XII.H hereof) shall constitute a Final Determination.

  **B.** **Initial Payment Percentage**. After the Claimant accepts the Proposed Allowed Claim Amount and there is a Final Determination of the Abuse Claim, the Settlement Trust shall pay an initial distribution ("**Initial Distribution**") based on the Initial Payment Percentage established by the Settlement Trustee in accordance with the Settlement Trust Agreement.

  **C.** **Supplemental Payment Percentage**. When the Settlement Trustee determines that the then-current estimates of the Settlement Trust's assets and its liabilities, as well as then-estimated value of then-pending Abuse Claims (including estimated Future Abuse Claims), warrant additional distributions on account of the Final Determinations, the Settlement Trustee shall set a Supplemental Payment Percentage in accordance with the Settlement Trust Agreement. Such Supplemental Payment Percentages shall be applied to all Final Determinations that became final prior to the establishment of such Supplemental Payment Percentage. Claimants whose

<center>21</center>

Abuse Claim becomes a Final Determination after a Supplemental Payment Percentage is set shall receive an Initial Distribution equal to the then existing payment percentage. For the avoidance of doubt, the Allowed Claim Amount of each Allowed Abuse Claim after Final Determination shall be deemed to be the Protected Parties' liability for such Allowed Abuse Claim irrespective of how much the holder of such Abuse Claim actually receives from the Settlement Trust pursuant to the payment provisions set forth in this Article IX. For example if the Allowed Claim Amount for an Allowed Abuse Claim that has received a Final Determination is $1,350,000, even if the Settlement Trust distributes less than $1,350,000 to the Abuse Claimant on account of such Allowed Abuse Claim based on application of the Initial Payment Percentage and any Subsequent Payment Percentage(s), the Allowed Claim Amount for the Abuse Claim is still $1,350,000.

D.    **Release**. In order for an Allowed Abuse Claim to receive a Final Determination and for the relevant Abuse Claimant to receive any payment from the Settlement Trust, the Abuse Claimant must submit, as a precondition to receiving any payment from the Settlement Trust, an executed release in the form attached hereto. The form of release agreement that a Direct Abuse Claimant who makes the Expedited Distribution Election must execute is attached as **Exhibit A** hereto. The form of the Settling Chartered Organization Release applicable to an Abuse Claimant who has elected to provide a conditional release to certain Chartered Organizations shall be substantially in the form of **Exhibit B** hereto. The form of the Voluntary Chartered Organization Release applicable to an Abuse Claimant who has selected a Final Determination based on the Proposed Allowed Claim Amount shall be substantially in the form of **Exhibit C** hereto. The form of the release applicable to an Abuse Claimant who has selected a Final Determination based on the Proposed Allowed Claim Amount but who does not elect to execute the Voluntary Chartered Organization Release shall be substantially in the form of **Exhibit D** hereto.

E.    **FIFO Claims Process Queuing and Exigent Health Claims**. The Settlement Trust shall review all Trust Claim Submissions for processing purposes on a FIFO basis as set forth below, except as otherwise provided herein with respect to Expedited Distributions, Exigent Health Claims, or Submitted Abuse Claims electing to defer determination of their Allowed Claim Amounts for up to twelve (12) months from the Effective Date pursuant to Article VII.H above. An Abuse Claimant's position in the FIFO Processing Queue shall be determined as of the Abuse Claimant's Trust Claim Submission Date. If any Trust Claim Submissions are filed on the same date, an Abuse Claimant's position in the applicable FIFO Processing Queue vis-à-vis such other same-day claims shall be determined by the claimant's date of birth, with older Abuse Claimants given priority over younger Abuse Claimants. An Abuse Claimant that seeks recovery on account of an Exigent Health Claim based on an Allowed Claim Amount determined through the matrix shall be moved in front of the FIFO Processing Queue no matter what the order of processing otherwise would have been under these TDP. Following receipt of a Final Determination on account of an Exigent Health Claim, the holder of an Exigent Health Claim shall receive an Initial Distribution from the Settlement Trust (subject to the payment percentages then in effect), within thirty (30) days of executing the release as set forth in Article IX.D above.

F.    **Source Affected Weighting**.

1.    Notwithstanding the Initial Payment Percentage and the Supplemental Payment Percentages applied hereunder, Non-BSA Sourced Assets shall be allocated (after deducting an estimated pro rata share of Settlement Trust expenses and direct expenses related to

the collection of such Non-BSA Sourced Assets) all or in part (the "Source Allocated Portion") only among the holders of Allowed Abuse Claims that (1) could have been satisfied from the source of such Non-BSA Assets absent the Plan's Discharge and Channeling Injunction and (2) are held by Direct Abuse Claimants that execute a conditional release, the form of which is attached as **Exhibit B**, releasing all claims against all Chartered Organizations if the Settlement Trust enters into a global settlement making such Chartered Organization a Protected Party. The Settlement Trustee shall establish separate payment percentages (each, a "Source Allocated Payment Percentage") in accordance with the Settlement Trust Agreement to effectuate the distribution of the Source Allocated Portions of any Non-BSA Sourced Assets.

2.    Solely for purposes of allocating Non-BSA Sourced Assets, if a Direct Abuse Claimant exercises the Independent Review Option, then the claim amount for such Claimant for purposes of allocating the Source Allocated Portion of the United Methodist Settlement shall be based on the lesser of (i) the Allowed Claim Amount determined through the matrix calculation for the applicable tier and after application of the Scaling Factors under Article VIII or (ii) the amount of the Accepted Settlement Recommendation (the **"UMS ASR Source Allocated Portion Claim"**). For all other Direct Abuse Claims with Allowed Abuse Claims against the United Methodist Entities, the claim amount for such Claimant for purposes of allocating the Source Allocated Portion of the United Methodist Settlement shall be based on the amount of Final Determination.

3.    Solely for purposes of allocating Non-BSA Sourced Assets, if an Accepted Settlement Recommendation (as defined in Article XIII.A) results in a Direct Abuse Claimant having an Excess Award Share claim under Article XIII.E that identifies a Chartered Organization (or an affiliate that becomes a Protected Party by virtue of such settlement, together an **"Applicable Chartered Organization"**, but in any case excluding the United Methodists Entities) that provides Non-BSA Sourced Funds, the portion of such Claim to be satisfied from the Source Allocated Portion funded by such settlement shall be based on the lesser of (i) $2,700,000 or (ii) the amount of the Accepted Settlement Recommendation (the **"ASR Source Allocated Portion Claim"**). For all other Direct Abuse Claims with Allowed Abuse Claims against the Applicable Chartered Organization, the claim amount for such Claimant for purposes of allocating the Source Allocated Portion shall be based on the amount of Final Determination.

4.    Once the Settlement Trust has paid in full all (i) Final Determination Allowed Abuse Claim Amounts of Direct Abuse Claimants with a claim against the Applicable Chartered Organization, and (ii) ASR Source Allocated Portion Claims, and UMS ASR Source Allocated Portion Claims, as applicable, then the remainder, if any, of the Source Allocated Portion shall be used to pay Excess Award Shares that identify the Applicable Chartered Organization until all such Accepted Settlement Recommendations are paid in full. If there is a remainder of a Source Allocated Portion after payment of the foregoing amounts, then that remainder shall be distributed to all holders of Allowed Abuse Claims pursuant to the applicable payment percentage. Amounts received by Direct Abuse Claimants on account of the and UMS ASR Source Allocated Portion Claims or the ASR Source Allocated Portion Claims, as applicable, shall not reduce the Excess Award Share; provided, however, that in no event shall a Direct Abuse Claimant receive greater than payment in full of the Excess Award Share.

23

## ARTICLE X
## RIGHTS OF SETTLEMENT TRUST
## AGAINST NON-SETTLING INSURANCE COMPANIES

Pursuant to the Plan, the Settlement Trust has taken an assignment of BSA's and any other Protected Party's (to the extent provided for in the Plan) rights and obligations under the Insurance Policies.  For any Abuse Claim that the Settlement Trustee determines is an Allowed Abuse Claim pursuant to Article VII above, the Settlement Trustee will determine, based on the relevant Trust Claim Submission and any other information submitted in connection with that submission and in the materials obtained through the Document Obligations, whether any Non-Settling Insurance Company issued coverage that is available to respond to such Claim (an "**Insured Abuse Claim**"). The Settlement Trustee may determine that multiple Non-Settling Insurance Companies have responsibility for an Insured Abuse Claim.  The Settlement Trustee shall seek reimbursement for each Insured Abuse Claim that is an Insured Abuse Claim, including the Proposed Allowed Claim Amount, from the applicable Non-Settling Insurance Company(ies) pursuant to the Insurance Policies and applicable law.  The Settlement Trustee shall have the ability to exercise all of the rights and interests in the Insurance Policies assigned to the Settlement Trust as set forth in the Plan, including the right to resolve any disputes with a Non-Settling Insurance Company regarding their obligation to pay some or all of an Insured Abuse Claim, and any all rights with respect to a Responsible Insurer in connection with the Independent Review Option, and to enter into agreements with any Non-Settling Insurance Company to become a Settling Insurance Company, subject to the terms and limitations set forth in the Trust Agreement and Article XIII herein.  The Settlement Trustee will exercise those rights consistent with their duty to preserve and maximize the assets of the Settlement Trust.  The Settlement Trustee will have the ability to request further information from Abuse Claimants in connection with seeking reimbursement for Insured Abuse Claims.

## ARTICLE XI
## INDIRECT ABUSE CLAIMS

**A.**     **Indirect Abuse Claims**.     To be eligible to receive compensation from the Settlement Trust, the holder of an Indirect Abuse Claim must satisfy Article IV.B hereof.  Indirect Abuse Claims that become Allowed Indirect Abuse Claims shall receive distributions in accordance with Article IX hereof and shall be subject to the same liquidation and payment procedures as the Settlement Trust would have afforded the holders of the underlying valid Direct Abuse Claims pursuant to Articles VIII and IX hereof.

**B.**     **Offset**.  The liquidated value of any Indirect Abuse Claim paid by the Settlement Trust shall be treated as an offset to or reduction of the full liquidated value of any related Direct Abuse Claim that might be subsequently asserted against the Settlement Trust as being against any Protected Party(ies) whose liability was paid by the Indirect Abuse Claimant.

C.     **Court Review**.  Within thirty (30) days after an Indirect Abuse Claimant receives written notice from the Settlement Trust of the proposed allowed amount of its Indirect Abuse Claim or denial thereof (the "**Judicial Review Election Deadline**"), an Indirect Abuse Claimant may notify the Settlement Trust of its intention to seek a *de novo* review of the Trustee's determination of its Indirect Abuse Claim in accordance with this TDP (including Article IV.B

24

hereof) by a court of competent jurisdiction (a "**Judicial Review Election**"). Such notification shall be made by submitting a written notice to the Settlement Trustee (a "**Judicial Review Election Notice**") by the Judicial Review Election Deadline. Unless the Settlement Trustee agrees to extend the Judicial Review Election Deadline, an Indirect Abuse Claimant who fails to so submit a Judicial Review Election Notice by the Judicial Review Election Deadline shall be deemed to accept the disallowance of its Indirect Abuse Claim or the Proposed Allowed Claim Amount (as applicable) and shall have no right to seek any further review of its Indirect Abuse Claim. An Indirect Abuse Claimant that makes a Judicial Review Election may not seek costs or expenses against the Settlement Trust in any judicial proceeding commenced on account of its Judicial Review Election and the Settlement Trust may not seek costs or expenses against the Indirect Abuse Claimant. In no event shall the submission and/or filing of a Judicial Review Election Notice entitle the holder of an Indirect Abuse Claim to request or receive treatment different than the treatment provided for under this TDP (including Article IV.B hereof). The *de novo* review provided for herein shall be to determine the allowed amount of the Indirect Abuse Claim under and in accordance with this TDP. All defenses (including, with respect to the Settlement Trust, all defenses that could have been asserted by the Debtors or Protected Parties, except as otherwise provided in the Plan) shall be available to both sides (which may include any Non-Settling Insurance Company) at any judicial proceeding commenced on account of the Indirect Abuse Claimant's Judicial Review Election. Upon entry of final non-appealable order of a court competent jurisdiction fixing the allowed amount of the Indirect Abuse Claim, if any, such Indirect Abuse Claim shall be deemed an "Allowed Indirect Abuse Claim" and paid in accordance with Article IX hereof.

## ARTICLE XII
## TORT SYSTEM ALTERNATIVE

A.    **Remedies after Disallowance or Exhaustion of Claims Allowance Procedures.** Within thirty (30) days after a Direct Abuse Claimant receives an Allowed Claim Notice or Claim Notice on its Proof of Claim following a Reconsideration Request in accordance with Article VII.G (the "**Tort Election Deadline**"), an Abuse Claimant may notify the Settlement Trust of its intention to seek a *de novo* determination of its Abuse Claim by a court of competent jurisdiction (a "**TDP Tort Election Claim**"), subject to the limitations set forth in this Article XII. Such notification shall be made by submitting a written notice to the Settlement Trustee (a "**Judicial Election Notice**") by the Tort Election Deadline. Unless the Settlement Trustee agrees to extend the Tort Election Deadline, Claimants who fail to so submit and/or file a Judicial Election Notice by the Tort Election Deadline shall be deemed to accept the disallowance of their Abuse Claims or the Proposed Abuse Claim Amounts (as applicable) and shall have no right to seek any further review of their Abuse Claims. An Abuse Claimant that asserts a TDP Tort Election Claim may not seek costs or expenses against the Settlement Trust in the lawsuit filed and the Settlement Trust may not seek costs or expenses against the Abuse Claimant. Any recoveries for a TDP Tort Election Claim from outside the Settlement Trust in respect of a Protected Party's liability are payable to the Settlement Trust and the Abuse Claimant shall be paid in accordance with Articles XII.G and IX hereof.

B.    **Supporting Evidence for TDP Tort Election Claims.** TDP Tort Election Claims in the federal courts shall be governed by the rights and obligations imposed upon parties to a contested matter under the Federal Rules of Bankruptcy Procedure, *provided, however,* that an

Abuse Claimant that prosecutes in any court a TDP Tort Election Claim after seeking reconsideration from the Settlement Trust shall not have the right to introduce into evidence to the applicable court any information or documents that (i) were requested by the Settlement Trustee and (ii) were in the possession, custody or control of the Abuse Claimant at the time of a request by the Settlement Trust, but which the Abuse Claimant failed to or refused to provide to the Settlement Trust in connection with the claims evaluation process in these TDP.  The Abuse Claimant's responses to requests by the Settlement Trustee for documents or information shall be subject to Rule 37 of the Federal Rules of Civil Procedure, as applicable under the Federal Rules of Bankruptcy Procedure, and/or any comparable State Rule of Civil Procedure.  An Abuse Claimant shall not have the right to disclose any Proposed Abuse Claim Amount received from the Settlement Trust to any court in connection with a Tort Election Claim.  Subject to the terms of any protective order entered by a court, the Settlement Trustee shall be permitted to introduce as evidence before a court all information and documents submitted to the Settlement Trust under these TDP, and the Abuse Claimant may introduce any and all information and documents that he or she submitted to the Settlement Trust under these TDP.

     **C.**    **Authorization of Settlement Trustee and Settlement Trust Advisory Committee.**  The Settlement Trustee may authorize the commencement or continuation of a lawsuit by a Direct Abuse Claimant in any court of competent jurisdiction against the Settlement Trust to obtain the Allowed Claim Amount of a Direct Abuse Claim (a "**STAC Tort Election Claim**" and together with a TDP Tort Election Claim, "**Tort Election Claims**").  STAC Tort Election Claims shall not be required to exhaust any remedies under these TDP before commencing or continuing such lawsuit.  No Abuse Claimant may pursue a STAC Tort Election Claim without the prior written approval of the Settlement Trustee in accordance with the Settlement Trust Agreement.  Fifty percent (50%) (or less if determined by the Settlement Trustee) of any amounts paid with respect to a judgment for, or a settlement of, a STAC Tort Election Claim by a Non-Settling Insurance Company, as to a policy as to which a Protected Party has assigned relevant insurance rights to the Settlement Trust, shall be paid over to the Settlement Trust.

     **D.**    **Tender to Non-Settling Insurance Company.**  If an Abuse Claimant is authorized to file suit against the Settlement Trust as provided in Article XII.A and XII.C herein, the Settlement Trustee shall determine, based on the Trust Claim Submission and any other information obtained in connection with that submission and materials received in connection with the Document Obligations, whether any Non-Settling Insurance Company issued coverage that is available to respond to the lawsuit (an "**Insured Lawsuit**").  The Settlement Trustee may determine that there are multiple Non-Settling Insurance Companies that have responsibility to defend an Insured Lawsuit.  The Settlement Trustee shall provide notice, and if applicable, seek defense, of any Insured Lawsuit to each Non-Settling Insurance Company from whom the Settlement Trustee determines insurance coverage may be available in accordance with the terms of each applicable Insurance Policy.

     **E.**    **Parties to Lawsuit.**  Any lawsuit commenced under Article XII of these TDP must be filed by the Abuse Claimant in his or her own right and name and not as a member or representative of a class, and no such lawsuit may be consolidated with any other lawsuit.  The Abuse Claimant may assert its Abuse Claim against the Settlement Trust as if the Abuse Claimant were asserting such claim against either the Debtors or another Protected Party and the discharge and injunctions in the Plan had not been issued.  The Abuse Claimant may name any person or

entity that is not a Protected Party, including Non-Settling Insurance Companies to the extent permitted by applicable law.  Abuse Claimants may pursue in any manner or take any action otherwise permitted by law against persons or entities that are not Protected Parties so long as they are not an additional insured or an Insurance Company as to an Insurance Policy issues to the BSA.

F.   **Defenses**.  All defenses (including, with respect to the Settlement Trust, all defenses that could have been asserted by the Debtors or Protected Parties, except as otherwise provided in the Plan) shall be available to both sides (which may include any Non-Settling Insurance Company) at trial.

G.   **Settlement Trust Liability for Tort Election Claims**.  An Abuse Claimant who pursues a Tort Election Claim shall have an Allowed Claim Amount equal to zero if the litigation is dismissed or claim denied.  If the matter is litigated, the Allowed Claim Amount shall be equal to the settlement or final judgment amount obtained in the tort system less any payments actually received and retained by the Abuse Claimant, *provided that*, exclusive of amounts payable pursuant to Article XII.C (in the event such amounts exceed the Maximum Matrix Value in the applicable tier set forth in the Claims Matrix), any amount of such Allowed Claim Amount for a Tort Election Claim in excess of the Maximum Matrix Value in the applicable tier set forth in the Claims Matrix shall be subordinate and junior in right for distribution from the Settlement Trust to the prior payment by the Settlement Trust in full of all Abuse Claims that are Allowed Abuse Claims as liquidated under these TDP (excluding this Article XII).  By way of example, presume (1) there is an Abuse Claimant asserting tier one abuse that achieves a $5 million verdict for his or her STAC Tort Election Claim against the Settlement Trust, and (2) a Non-Settling Insurance Company pays $750,000 in coverage under a policy providing primary coverage, $375,000 of which is paid directly to the Abuse Claimant and $375,000 of which is paid over to the Settlement Trust pursuant to Article XII.C.  Although the unpaid amount of such Allowed Abuse Claim would be $4,625,000, the maximum total payment that the Abuse Claimant can recover from the Settlement Trust (before the non-subordinated portion of all other Abuse Claims that are Allowed Abuse Claims are paid in full) is $2,700,000 (the Maximum Matrix Value in tier one), or an additional $2,325,000, paid pursuant to the terms of Article IX hereof.  For the avoidance of doubt, the limit on the Settlement Trust liability under this Article XII.G shall not apply or inure to the benefit of any Non-Settling Insurance Company, and the Settlement Trust shall be able to obtain coverage, subject to Article X hereof, for the full Allowed Claim Amount obtained by the Abuse Claimant through a Tort Election Claim.

H.   **Settlement or Final Judgment**.  If the Settlement Trust reaches a global settlement making a Protected Party of a Non-Settling Insurance Company or other person or entity involved in a Tort Election Claim or obtains a final judgment in a suit against such person or entity terminating liability for such person or entity to the Abuse Claimant, the Abuse Claimant shall be entitled to proceed with the Tort Election Claim for any reason (*e.g.*, if there are persons or entities that are not Protected Parties to collect from).  Alternatively, the Abuse Claimant can elect to terminate the Tort Election Claim without prejudice and have its Abuse Claim determined through these TDP (*i.e.*, as if no STAC Tort Election Claim had been made), in which event the Abuse Claimant may submit relevant evidence from the Tort Election Claim that the Settlement Trustee shall take into account in evaluating the Abuse Claim under these TDP.  Such Abuse Claimant may be provided other alternatives by the Settlement Trust if it had been pursuing a STAC Tort Election Claim.

27

**I.**     **Payment of Judgments by the Settlement Trust**.  Subject to Article XII.G hereof, if and when an Abuse Claimant obtains a final judgment or settlement against the Settlement Trust in the tort system (a "**Final Judicial Determination**"), such judgment or settlement amount shall be treated for purposes of distribution under these TDP as the Abuse Claimant's Final Determination, and such Allowed Claim Amount shall also constitute the applicable Protected Parties' liability for such Abuse Claim. Within thirty (30) days of executing the release as set forth in Article IX.D above, the Abuse Claimant shall receive an Initial Distribution from the Settlement Trust (assuming an Initial Payment Percentage has been established by the Settlement Trust at that time).    Thereafter, the Abuse Claimant shall receive any subsequent distributions based on any applicable Payment Percentage as determined by the Settlement Trust.

**J.**     **Litigation Results and Other Abuse Claims**.  To the extent that a Final Judicial Determination of an Abuse Claim or changes in applicable law implicate the appropriateness of the Scaling Factors or General Criteria, the Settlement Trustee, subject to the terms of these TDP and the Settlement Trust Agreement and the approval of the Bankruptcy Court or District Court, after appropriate notice and opportunity to object, may appropriately modify the Scaling Factors or General Criteria on a go-forward basis for use in evaluation of Future Abuse Claims and other Abuse Claims as to which no Allowed Claim Amount Final Determination had previously been made.

**K.**     **Tolling of Limitations Period**.  The running of the relevant statute of limitation shall be tolled as to each Abuse Claimant's Abuse Claim from the earliest of (A) as to a Protected Party, the actual filing of the claim against the Protected Party, whether in the tort system or by submission of the claim to the Protected Party pursuant to an administrative settlement agreement; or (B) as to the Debtor, the Petition Date or prior to the Petition Date by an agreement or otherwise.

# ARTICLE XIII
## INDEPENDENT REVIEW OPTION

**A.**     **Direct Abuse Claimant's Independent Review Option**.  Direct Abuse Claimants shall have the opportunity for a Direct Abuse Claimant to have an independent, neutral third party (selected from a panel of retired judges with tort experience maintained by the Settlement Trust) (a "**Neutral**") make a settlement recommendation (the "**Settlement Recommendation**") to the Settlement Trustee seeking to replicate to the extent possible the amount a reasonable jury might award for the Direct Abuse Claim, taking into account the relative shares of fault that may be attributed to any parties potentially responsible for the Direct Abuse Claim under applicable law and applying the same standard of proof that would apply under applicable law (the "**Independent Review Option**").    The Settlement Recommendation determined by the Neutral, if accepted by the Settlement Trustee (an "**Accepted Settlement Recommendation**"), shall be the allowed amount of the Direct Abuse Claim in accordance with the Plan against (i) the Debtors, (ii) other Protected Parties, and (iii) Chartered Organizations.    The Direct Abuse Claimant must assign its Direct Abuse Claim against any Chartered Organization and all other rights and claims arising out of its Direct Abuse Claim to the Settlement Trust as a condition to receiving the Accepted Settlement Recommendation, and the Settlement Trust shall have the right and power to assert and/or resolve any such claims assigned to it consistent with the Plan.    If the Settlement Trustee declines to follow the Neutral's recommendation as to the Allowed Claim Amount for an Independent Review Claim (a "**Recommendation Rejection**"), within forty-five (45) days after

28

the holder being served notice of the Recommendation Rejection, the holder of such Direct Abuse Claim may commence a lawsuit in any court of competent jurisdiction against the Settlement Trust to obtain the Allowed Claim Amount of the Direct Abuse Claim. Such Direct Abuse Claimant shall have an Allowed Claim Amount equal to zero if the litigation is dismissed or claim denied. If the matter is litigated, the Allowed Claim Amount shall be equal to the settlement or final judgment amount obtained in the tort system less any payments actually received and retained by the Direct Abuse Claimant. Notwithstanding the foregoing, any amount of an Accepted Settlement Recommendation or Allowed Claim Amount for an Abuse Claim that proceeds under this Independent Review Option in excess of a multiple of five (5) times the Maximum Matrix Value in the applicable tier set forth in the Claims Matrix shall be subordinate and junior in right for distribution from the Settlement Trust to the prior payment by the Settlement Trust in full of all Direct Abuse Claims that are Allowed Abuse Claims as liquidated under the TDP (excluding Claims liquidated under this provision or under Article XII (regarding Tort Election Claims).

**B.    Time to Select Independent Review Option**. Direct Abuse Claimants, other than Future Abuse Claimants, shall initially have until six (6) months after the Effective Date, to elect to participate in the Independent Review Option. In addition, in order to participate in the Independent Review Option, the Direct Abuse Claimant must complete and submit the Trust Claim Submission by six (6) months after the Effective Date to enable the Settlement Trust to establish reserves. If a Direct Abuse Claimant pursues a non-channeled Chartered Organization and the Settlement Trust settles with the Chartered Organization in question such that claims against it become channeled (a) the Settlement Trust shall provide notice of such settlement to any Direct Abuse Claimants that are pursuing any non-channeled Chartered Organizations and (b) such Direct Abuse Claimants shall have thirty (30) days from notice of the effectiveness of the Settlement Trust's settlement to select the Independent Review Option at that time.

**C.    Excess Award Fund**. The Settlement Trust shall maintain a fund for the sole purpose of funding the portion of Accepted Settlement Recommendations that are in excess of $1 million (the "**Excess Award Fund**"). The Excess Award Fund shall be funded with certain proceeds from the Trust's collection of insurance policy proceeds from non-settling insurers as set forth below.[2]

**D.    Accepted Settlement Recommendation of Less Than $1 Million**. If the Neutral makes an Accepted Settlement Recommendation of $0 due to the statute of limitations or a finding of no liability, the Direct Abuse Claimant shall receive nothing from the Trust and shall remain barred from proceeding against any Protected Party on account of their claim. The Accepted Settlement Recommendation shall supersede the determination of the amount of the claim under the TDP, whether higher or lower, subject to limitations set forth in Article XIII.E below. If the Neutral makes an Accepted Settlement Recommendation of $1 million or less but greater than zero, then the Settlement Recommendation shall be paid by the Settlement Trust in accordance with Article IX, including any applicable payment percentage, and the Direct Abuse Claimant shall receive nothing from the Excess Award Fund.

---

[2] The sources of recovery for the fund or Direct Abuse Claimants are (i) the Debtors' or Local Counsels' non-settled shared insurance policies excess of the primary layer of coverage, and (ii) in the absence of a global settlement making a Chartered Organization a Protected Party, certain Chartered Organizations' separate non-settled insurance rights, collectively referred as Responsible Insurers, as defined below.

**E.     Accepted Settlement Recommendation of $1 Million or More**.  If the Neutral makes an Accepted Settlement Recommendation of $1 million or more, then the Direct Abuse Claimant shall receive (i) an allowed claim against the Settlement Trust equal to $1 million (the **"Trust Share"**), to be paid pursuant to Article IX and subject to any applicable payment percentage from Settlement Trust Assets other than the Excess Award Fund (the **"General Trust"**), and (ii) an allowed claim against the Settlement Trust equal to the amount of the Settlement Recommendation in excess of the Trust Share (the **"Excess Award Share"**) which shall be paid solely and exclusively from the Excess Award Fund as set forth below.

**F.     Costs Paid By Direct Abuse Claimants**.     The costs associated with the independent review shall be paid by the Direct Abuse Claimant and not the Settlement Trust, including the cost of any deposition and mental health exam and the valuation by the Neutral. Such obligation shall be offset by the administrative fee paid by the Direct Abuse Claimant. Recovery of such costs may be sought from any insurer subject to the applicable terms and conditions of any insurer's policy, to the extent such costs constitute reasonable and necessary costs payable under an applicable non-settled insurance policy, and the Settlement Trust may reimburse the Direct Abuse Claimant for such costs to the extent that the non-settled insurance policy reimburses the Settlement Trust.  Any recoveries by the Settlement Trust on account of its own costs will be distributed to Direct Abuse Claimants as set forth below.  If the cost to the Settlement Trustee of processing the Independent Review Option is less than the administrative fees charged, the Settlement Trustee shall reimburse the unused balance to the Direct Abuse Claimant.

**G.     Requirements for Obtaining a Settlement Recommendation**.     To obtain a Settlement Recommendation, each Direct Abuse Claimant who proceeds through the Independent Review shall provide the following:

(i)     Sexual Abuse Survivor Proof of Claim signed and dated by the Direct Abuse Claimant, with completion of all applicable fields, including the substantive narrative of the Abuse and damages (to be completed at the time of submission to the Neutral or after the completion of discovery);

(ii)     Payment to the Settlement Trust of an administrative fee in the amount of $10,000 at the time of the election for Independent Review Option and a further additional administrative fee in the amount of $10,000 immediately prior to the Neutral's review.  The Settlement Trustee shall have the authority to waive administrative fees in appropriate cases, based on the circumstances of the Direct Abuse Claimant. To the extent a Direct Abuse Claimant is dissatisfied with the Settlement Trustee's decision on waiver of fees, such decision will be reviewable by the Bankruptcy Court.  Any Direct Abuse Claimant that elects not to proceed with the Neutral's review after the opportunity to pursue discovery shall not be required to pay the second $10,000 and shall not be precluded from pursuing their claim under the TDP (as if no election to pursue an Independent Review Option had been made);

(iii)     Confirmation that the Direct Abuse Claimant was in a Scouting unit or attended a Scouting related event where the Abuse occurred by:

a)     Direct Abuse Claimant's name on a roster;

b)     evidence that the Direct Abuse Claimant was in a Scouting unit or attended a Scouting-related event where the Abuse occurred (a non-exclusive list of ways of satisfying the showing are: a photograph, a membership card, or document that reflects the Direct Abuse Claimant's rank in a Scouting unit); or

c)     a sworn statement by a third-party witness (who will agree to a deposition by the Neutral, if requested) that the Direct Abuse Claimant was in a Scouting unit or attended a Scouting-related event where the Abuse occurred.

(iv)     Direct Abuse Claimant must provide evidence that the perpetrator was in a Scouting unit, worked or volunteered with a Scouting unit, worked or volunteered with a Local Council, Chartered Organization or the BSA, or worked or volunteered at a Scouting-related event where the Abuse occurred (a non-exclusive list of ways of satisfying the showing are: the perpetrator's name being on a Scouting roster, a photograph of the perpetrator, or a sworn statement by a third party witness who will agree to a deposition if requested by the Neutral);

(v)     Direct Abuse Claimants must provide evidence that the claim is timely under the applicable statute of limitations, including satisfying any recognized exception to the relevant statute of limitation under the applicable state law;

(vi)     Direct Abuse Claimant provides evidence that one or more of the BSA, Local Council or Chartered Organization was negligent or is otherwise liable on account of a Direct Abuse Claim, and evidence regarding the Direct Abuse Claimant's damages (such as medical and counseling records and/or a sworn statement from a family member, significant other, or relative who, in each case, will agree to a deposition by the Neutral) or benchmark judgments or settlements relevant to the damages claimed.  Damages must be supported by an expert report (the cost of which shall be paid by the Direct Abuse Claimant); and

(vii)     Direct Abuse Claimant shall be subject to up to a single sworn six-hour interview, mental health examination or supplemental signed and dated interrogatory responses at the discretion of the Neutral or upon the reasonable request of a Responsible Insurer.

**I.**     **Discovery.** The Direct Abuse Claimant shall be entitled to discovery from the Settlement Trust (as successor to the BSA and Local Councils) and from third parties in accordance with the Document Appendix.

**J.**     **Other Defenses.** In making her determination, the Neutral will consider and apply any defense that would otherwise be available in the tort system.

**K.**     **Insurer Participation**.

31

(i)    The Settlement Trust will provide prompt notice to any potentially responsible non-settling insurer(s) ("Responsible Insurers") of any claim for which the Direct Abuse Claimant has elected the Independent Review Option.

(ii)    Any Responsible Insurer shall be given a reasonable opportunity to participate in the Independent Review. Any Responsible Insurer who chooses to participate may review and comment on the Neutral's evaluation, including attending any interview or deposition. Any Responsible Insurer may raise and present any potentially applicable defenses to the Abuse Claim to the Neutral, at their own expense. Such defenses must be considered and evaluated, as reasonably appropriate, by the Neutral.

(iii)    Upon the Settlement Trustee's receipt of the Settlement Recommendation from the Neutral, the Settlement Trustee shall provide notice and seek consent from any applicable Responsible Insurer.

(iv)    If the Settlement Trustee determines that the Settlement Recommendation is reasonable and the Responsible Insurer refuses to pay all or a portion of the Accepted Settlement Recommendation for which it is responsible, then the Settlement Trustee may exercise any and all rights available to it under applicable law, and the Settlement Trustee expressly reserves any and all rights against the Responsible Insurer, including but not limited to agreeing to the Settlement Recommendation and pursuing the Responsible Insurer for any available remedy including, but not limited to breach of contract and bad-faith.

(v)    The Settlement Trust shall have the right to pursue the Accepted Settlement Recommendation through any appropriate legal mechanisms.

**L.**    **Collection of the Independent Award**. The Trust (as assignee) shall be free to collect on the basis of the Accepted Settlement Recommendation, and associated costs of the Independent Review Option, from any Responsible Insurer that refuses to pay all or a portion of the Accepted Settlement Recommendation for which it is responsible in such a manner as it sees fit, including by seeking coverage for one or more Accepted Settlement Recommendations on a consolidated basis and to enter into comprehensive settlements with any Responsible Insurer. To the extent allowed under applicable state law, the BSA and Local Councils shall reasonably cooperate with the Settlement Trustee in the foregoing (it being understood that the foregoing cooperation shall not require the expenditure of funds), including consenting to entry of a non-recourse judgment limited solely to the recovery of insurance proceeds from any Responsible Insurer to the extent doing so would not violate the terms of the applicable policy or applicable law. In addition, the Settlement Trustee may seek the cooperation of the applicable Chartered Organization. Funds collected from the Responsible Insurer shall be allocated to the survivor and the Excess Award Fund as follows:

(i)    **Collections Applicable to Identified Excess Award Shares**:

(1)    Amounts awarded that are applicable to the expenses incurred by Direct Abuse Claimants in pursuing the Independent Review Option, or that are

32

awarded for any bad faith claim will be allocated 100% to the Direct Abuse Claimant.

(2) Amounts awarded from any policy of a Responsible Insurer that does not have applicable aggregate limits will be allocated 100% to the Direct Abuse Claimant.

(3) Amounts collected in satisfaction of the Accepted Settlement Recommendation from any policy that has applicable aggregate limits shall be awarded 80% to the Direct Abuse Claimant, with the balance contributed to the General Trust until the Direct Abuse Claimant has collected 80% of the Excess Award Share.  Thereafter policy proceeds shall be divided 70% to the Direct Abuse Claimant and 30% to the General Trust until the Direct Abuse Claimant has received the full amount of the Excess Award Share.

(ii) **Settlement with Potentially Responsible Insurers that Fully Release a Policy or Policies**:

(a) 80% of the proceeds derived from a comprehensive settlement with a Responsible Insurer shall be contributed to the Excess Award Fund and 20% of the proceeds derived from a comprehensive settlement with an Responsible Insurer shall be General Trust funds available to pay all Direct Abuse Claimants; provided that once all holders of Excess Award Shares (other than holders of Late Claims (as defined below)) have received (or been reserved for an amount equal to) 80% on account of their Excess Award Shares, 70% shall be contributed to the Excess Award Fund and 30% shall be General Trust funds available to pay all Direct Abuse Claimants.

For the avoidance of doubt, collections from separate insurance of a Chartered Organization received as part of a comprehensive Chartered Organization settlement shall go to the General Trust, for distribution to Direct Abuse Claimants with Direct Abuse Claims pursuant to Article IX.F.

**M.** **Payment of Excess Independent Awards**.  The Excess Award Fund shall be used to pay the Excess Award Shares.  The Excess Award Fund will be allocated and paid on account of such Excess Award Shares subject to a payment percentage calculated specifically for the Excess Award Fund.  Once the Excess Award Shares are paid in full, the remaining funds in the Excess Award Fund shall become General Trust funds available to pay all Allowed Direct Abuse Claims.

**N.** **Administrative Guidelines**.

(i) Direct Abuse Claimants (other than holders of Future Abuse Claims and except as provided immediately below) will have until January 1, 2023, to pay the initial administrative fee and elect to submit their claim for the Independent Review Option.

(ii)    After January 1, 2023, a Direct Abuse Claimant (other than a Future Abuse Claimant) may still elect the Independent Review Option (other than with respect to a Direct Abuse Claimant that was pursuing a Chartered Organization with respect to a Direct Abuse Claim that was not subject to the Channeling Injunction) but shall only be entitled to recover (a) against a Responsible Insurer to the same degree as the Direct Abuse Claimants that filed claims prior to January 1, 2023, (b) from any Excess Award Fund reserved from any settled insurance applicable to their Direct Abuse Claims, or (c) share in a pro rata basis to the same degree as any Direct Abuse Claim submitted prior to January 1, 2023 in any recovery from an insurer that is not settled at the time a determination is made by the Neutral on the Direct Abuse Claim. The Settlement Trustee shall establish a reserve in the Excess Award Fund for Future Abuse Claims that may elect the Independent Review Option and for possible Claims against the Settlement Trust that may arise as a result of a Claimant being enjoined from continuing to seek recovery from a Chartered Organization with respect to a Claim that was not subject to the Channeling Injunction as a result of a comprehensive settlement between the Settlement Trust and the Chartered Organization. Other than reserving for and paying Future Abuse Claims and Direct Abuse Claims that become subject to the Channeling Injunction as a result of a comprehensive settlement between the Settlement Trust and a Chartered Organization on the basis described above, the Settlement Trust will have no duty to reserve or make distributions to any Direct Abuse Claimants who file claims after January 1, 2023 (**"Late Claims"**) except that should the Late Claim be timely pursuant to Section IV.A.ii or iii and exercise the Independent Review Option, the Excess Award Share attributable to such Late Claim may share on a pro rata basis to the same degree as any Direct Abuse Claim submitted prior to January 1, 2023 in any recovery from an insurer that is not settled at the time a Settlement Recommendation is made by the Neutral on the Late Claim. The last date to file a Late Claim for the Independent Review Option shall be January 1, 2026.

(iii)    If a Neutral's Settlement Recommendation determines that a Chartered Organization not protected by the Channeling Injunction is responsible for all or a portion of liability for a Direct Abuse Claim assigned to the Settlement Trust, at the request of the claimant, the Settlement Trustee may in its discretion, assign back to the claimant all rights to pursue the Chartered Organization and its insurers for the allocated portion of liability established through the Independent Review Option. The Direct Abuse Claimant in his discretion may then bring an action in any Court of competent jurisdiction against the Chartered Organization and its insurers to recover the allocated portion of liability and any additional damages, including punitive damages against the Chartered Organization and extracontractual damages against the affected insurers that may be assessed by the Court. Any recovery by way of judgment or settlement will be first applied to reimburse the Direct Abuse Claimant for his fees and expenses in prosecuting the Direct Abuse Claims and the remainder will be allocated in accordance with the Independent Review Option, provided that any punitive or extra-contractual damages shall be awarded solely to the Direct Abuse Claimant.

34

## ARTICLE XIV
## MISCELLANEOUS PROVISIONS

**A.      Non-Binding Effect of Settlement Trust and/or Litigation Outcome.**
Notwithstanding any other provision of these TDP, the outcome of litigation against the Debtors by the holder of an Indirect Abuse Claim shall not be used in, be admissible as evidence in, binding in or have any other preclusive effect in connection with the Settlement Trust's resolution or valuation of an Indirect Abuse Claim.

**B.      Amendments.**   Except as otherwise provided herein, the Settlement Trustee may not amend, modify, delete, or add to any provisions of these TDP without the written consent of the STAC and the Future Claimants' Representative, as provided in the Settlement Trust Agreement, including amendments to modify the system for Tort Election Claims. Nothing herein is intended to preclude the STAC and/or the Future Claimants' Representative from proposing to the Settlement Trustee, in writing, amendments to these TDP.  Notwithstanding the foregoing, absent Bankruptcy Court or District Court approval after appropriate notice and opportunity to object, neither the Settlement Trustee nor the STAC or Future Claimants' Representative may amend these TDP in a material manner, including (i) to provide for materially different treatment for Abuse Claims, (ii) to materially change the system for Tort Election Claimants, (iii) to add an opportunity to make an Expedited Distribution Election for a claim represented by a Chapter 11 POC after the Voting Deadline, (iv) to materially alter the Independent Review Option, or (v) in a manner that is otherwise inconsistent with the Confirmation Order or Plan.  Notwithstanding the foregoing, neither the Settlement Trustee nor the STAC or the Future Claimants' Representative may amend any of the forms of release set forth in Article IX.D without the consent of Reorganized BSA, or remove the requirement of a release in connection with an Expedited Distribution.

**C.      Severability.**   Should any provision contained in these TDP be determined to be unenforceable, such determination shall in no way limit or affect the enforceability and operative effect of any and all other provisions of these TDP.

**D.      Offsets.**   The Settlement Trust shall have the right to offset or reduce the Allowed Claim Amount of any Allowed Abuse Claim, without duplication as to the mitigating factors (*e.g.*, as to other responsible parties) on a dollar for dollar basis based on any amounts paid, agreed, or reasonably likely to be paid to the holder of such Claim on account of such Claim as against a Protected Party (or that reduces the liability thereof under applicable law) from any source other than the Settlement Trust.

**E.      Governing Law.**   These TDP shall be interpreted in accordance with the laws of the State of Delaware. Notwithstanding the foregoing, the evaluation of Abuse Claims under these TDP and the law governing litigation in the tort system shall be the law of the jurisdiction in which the Abuse Claimant files the lawsuit as described in Article XII or the jurisdiction where such Abuse Claim could have been filed under applicable law.

<u>Schedule 1</u>

**Mitigating Scaling Factor Ranges for Statutes of Limitation or Repose by State**

| Legend | |
|---|---|
| <u>Tier</u> | <u>Scaling Factor</u> |
| Open | 1.0 |
| Gray 1 | .50-.70 |
| Gray 2 | .30-.45 |
| Gray 3 | .10-.25 |
| Closed | .01-.10 |

| <u>State</u> | <u>Tier</u> |
|---|---|
| Alabama | Closed |
| Kansas | Closed |
| Oklahoma | Closed |
| Puerto Rico | Closed |
| South Dakota | Closed |
| Utah | Closed |
| Wyoming | Closed |
| ZZ / Federal | Closed |
| Connecticut | Gray 1 |
| DC | Gray 1 |
| Delaware | Gray 1 |
| Georgia | Gray 1 |
| Illinois | Gray 1 |
| Massachusetts | Gray 1 |
| New Mexico | Gray 1 |
| Oregon | Gray 1 |
| Washington | Gray 1 |
| Iowa | Gray 2 |
| Minnesota | Gray 2 |
| New Hampshire | Gray 2 |
| North Dakota | Gray 2 |
| Ohio | Gray 2 |
| Pennsylvania | Gray 2 |

1

| | |
|---|---|
| South Carolina | Gray 2 |
| Tennessee | Gray 2 |
| West Virginia | Gray 2 |
| Alaska | Gray 3 |
| Florida | Gray 3 |
| Idaho | Gray 3 |
| Indiana | Gray 3 |
| Kentucky | Gray 3 |
| Maryland | Gray 3 |
| Michigan | Gray 3 |
| Mississippi | Gray 3 |
| Missouri | Gray 3 |
| Nebraska | Gray 3 |
| Nevada | Gray 3 |
| Rhode Island | Gray 3 |
| Texas | Gray 3 |
| Virgin Islands | Gray 3 |
| Virginia | Gray 3 |
| Wisconsin | Gray 3 |
| Arizona | Open |
| Arkansas | Open |
| California | Open |
| Colorado | Open |
| Guam | Open |
| Hawaii | Open |
| Louisiana | Open |
| Maine | Open |
| Montana | Open |
| New Jersey | Open |
| New York | Open |
| North Carolina | Open |
| Vermont | Open |

2

## EXHIBIT A

### EXPEDITED DISTRIBUTION

### CLAIMANT RELEASE AND INDEMNIFICATION
### IN CONNECTION WITH EXPEDITED DISTRIBUTION
### FROM THE BOY SCOUTS OF AMERICA SETTLEMENT TRUST

To receive payment of an Expedited Award (as defined below) from the Boy Scouts Settlement Trust (the "**Trust**"), an eligible Claimant must execute and submit to the Trustee (as defined below) this Release and Indemnification (the "**Release**"). This Release must be signed by the Claimant or the Claimant's Legal Representative (as defined below). A signature by an attorney for the Claimant or by an attorney for the Claimant's Legal Representative is not sufficient.

If you need assistance, please contact the Claims Administrator by email at [●] or by phone toll-free at [●]. You may also visit the BSA Abuse Survivor Website for additional information.

### DEFINITIONS

The definitions set forth above for the terms "**Trust**" and "**Release**" are specifically incorporated herein by reference as if fully set forth in this section.

All capitalized terms not otherwise defined herein shall have the same meaning ascribed to them in the Chapter 11 Plan (as defined below).

"**Abuse**" means sexual conduct or misconduct, sexual abuse or molestation, sexual exploitation, indecent assault or battery, rape, pedophilia, ephebophilia, sexually related psychological or emotional harm, humiliation, anguish, shock, sickness, disease, disability, dysfunction, or intimidation, any other sexual misconduct or injury, contacts or interactions of a sexual nature, including the use of photography, video, or digital media, or other physical abuse or bullying or harassment without regard to whether such physical abuse or bullying is of a sexual nature, between a child and an adult, between a child and another child, or between a non-consenting adult and another adult, in each instance without regard to whether such activity involved explicit force, whether such activity involved genital or other physical contact, and whether there is or was any associated physical, psychological, or emotional harm to the child or non-consenting adult.

"**Abuse Claim**" means a liquidated or unliquidated Claim against a Protected Party (including the Settling Insurance Companies), a Limited Protected Party, or an Opt-Out Chartered Organization or any of their respective Representatives (in their capacities as such) that is attributable to, arises from, is based upon, relates to, or results from, directly, indirectly, or derivatively, alleged Scouting-related Abuse that occurred prior to the Petition Date, including any such Claim that seeks monetary damages or other relief, under any theory of law or equity whatsoever, including vicarious liability, alter ego, respondeat superior, conspiracy, fraud, including fraud in the inducement, any negligence-based or employment-based theory, including negligent hiring, selection, supervision, retention or misrepresentation, any other theory based upon, or directly or indirectly related to any insurance relationship, the provision of insurance or the provision of insurance services to or by any Protected Parties, or misrepresentation, concealment, or unfair practice, breach of fiduciary duty, public or private nuisance, gross negligence, willful misconduct,

1

or any other theory, including any theory based on or related to public policy or any act or failure to act, or failure to warn by a Protected Party, a Limited Protected Party, an Opt-Out Chartered Organization, any of their respective Representatives (in their capacities as such)  or any other Person for whom any Protected Party, Limited Protected Party, or Opt-Out Chartered Organization is alleged to be responsible (including any such Claim that has been asserted or may be amended to assert in a proof of claim alleging Abuse, whether or not timely filed, in the Chapter 11 Cases, or any such Claim that has been asserted against the Settlement Trust), including any proportionate or allocable share of liability based thereon.  Abuse Claims include any Future Abuse Claims, any Indirect Abuse Claims, any Opt-Out Chartered Organization Abuse Claim and any other Claim that is attributable to, arises from, is based upon, relates to, or results from, alleged Scouting-related Abuse regardless of whether, as of the Petition Date, such Claim was barred by any applicable statute of limitations.  For the avoidance of doubt,  (i) a Claim alleging Abuse shall not be an "Abuse Claim" against a Protected Party, Limited Protected Party, or Opt-Out Chartered Organization or any of their respective Representatives if such Claim is unrelated to Scouting (except as provided in (iii) below, including the portion of any Mixed Claim that is unrelated to Scouting); (ii) a Claim alleging Abuse shall be an "Abuse Claim" against a Protected Party, Limited Protected Party, or Opt-Out Chartered Organization or any of their respective Representatives (in their capacity as such) if such Claim is related to Scouting (including the portion of any Mixed Claim that is related to Scouting); (iii) any portion of a Mixed Claim alleging Abuse involving the Debtors, Reorganized BSA, Non-Debtor Entities, Local Councils, or their respective Representatives (in their capacities as such) is necessarily Scouting-related and shall be considered an Abuse Claim; and (iv) any Claim against the Debtors, Reorganized BSA, Non-Debtor Entities, Local Councils, or their respective Representatives (in their capacities as such) alleging Abuse is necessarily Scouting-related and shall be considered an Abuse Claim.

"**Abuse Insurance Policies**" means, collectively, the BSA Insurance Policies and the Local Council Insurance Policies.  Abuse Insurance Policies do not include Non-Abuse Insurance Policies or Postpetition Insurance Policies.

"**Bankruptcy Court**" means the United States Bankruptcy Court for the District of Delaware, having subject matter jurisdiction over the Chapter 11 Cases and, to the extent of any reference withdrawal made under section 157(d) of title 28 of the United States Code, the District Court.

"**BSA Insurance Policies**" means any and all known and unknown contracts, binders, certificates or Insurance Policies currently or previously in effect at any time on or before the Petition Date naming the Debtors, or either of them, or any predecessor, subsidiary, or past or present Affiliate of the Debtors, as an insured (whether as the primary or an additional insured), or otherwise alleged to afford the Debtors insurance coverage, upon which any claim could have been, has been, or may be made with respect to any Abuse Claim, including the policies listed on Schedule 2 to the Chapter 11 Plan.  Notwithstanding the foregoing, BSA Insurance Policies shall not include: (a) any policy providing reinsurance to any Insurance Company; (b) any Non-Abuse Insurance Policy; (c) any Local Council Insurance Policy; or (d) any Postpetition Insurance Policy.

"**Channeling Injunction**" means the permanent injunction provided for in Article X.F of the Chapter 11 Plan with respect to (a) Abuse Claims against the Protected Parties, (b) Post-1975 Chartered Organization Abuse Claims against the Limited Protected Parties, (c) Abuse Claims against the Limited Protected Parties that are covered under any insurance policy issued by the

2

Settling Insurance Companies (as determined pursuant to Section X.F.3 of the Chapter 11 Plan), and (d) Opt-Out Chartered Organization Abuse Claims against the Opt-Out Chartered Organizations, to be issued pursuant to the Confirmation Order.

"**Chapter 11 Cases**" means the jointly administered cases under chapter 11 of the Bankruptcy Code commenced by the Debtors on the Petition Date in the Bankruptcy Court and currently styled *In re Boy Scouts of America and Delaware BSA, LLC*, Bankruptcy Case No. 20-10343 (LSS) (Jointly Administered).

"**Chapter 11 Plan**" or "**Plan**" means the *Third Modified Fifth Amended Chapter 11 Plan of Reorganization (With Technical Modifications) for Boy Scouts of America and Delaware BSA, LLC*, filed in the Chapter 11 Cases (as the same may be amended or modified), and confirmed by the Bankruptcy Court.

 "**Chartered Organizations**" means each and every civic, faith-based, educational or business organization, governmental entity or organization, other entity or organization, or group of individual citizens, in each case presently or formerly authorized by the BSA to operate, sponsor or otherwise support one or more Scouting units.

"**Claimant**" means the holder of an Abuse Claim who (i) elected to resolve his or her Abuse Claim for the Expedited Distribution in accordance with the Chapter 11 Plan and Confirmation Order, (ii) timely submitted to the Trust a properly and substantially completed, non-duplicative proof of claim or Future Abuse Claim, and (iii) personally signed his or her proof of claim or Future Abuse Claim attesting to the truth of its contents under penalty of perjury, or supplemented his or her proof of claim to so provide such verification.

"**Confirmation Order**" means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code, which shall be in form and substance acceptable to (a) the Debtors, the Ad Hoc Committee, the Coalition, Tort Claimants' Committee, the Future Claimants' Representative, the Settling Insurance Companies (in accordance with their respective Insurance Settlement Agreement), and the Contributing Chartered Organizations, and (b) the Creditors' Committee and JPM in accordance with their respective consent rights under the JPM / Creditors' Committee Term Sheet, as incorporated by reference in Article I.D of the Chapter 11 Plan.

"**Contributing Chartered Organizations**" means the current or former Chartered Organizations listed on Exhibit D to the Plan and any Chartered Organization made a Protected Party under a Post-Effective Date Chartered Organization Settlement approved by the Bankruptcy Court in accordance with Article IV.I in the Plan.  No Participating Chartered Organization shall be considered a Contributing Chartered Organization based solely on the Participating Chartered Organization Insurance Assignment.  Without limiting the foregoing, subject to Confirmation of the Plan and approval of the United Methodist Settlement Agreement by an order of the Bankruptcy Court (including in the Confirmation Order), the United Methodist Entities are Contributing Chartered Organizations and shall be designated as such in the Confirmation Order and the Affirmation Order.  No Chartered Organization shall be a Contributing Chartered Organization unless it agrees to provide the assignments and releases as set forth in Sections 9 and 10 of the Century and Chubb Companies Insurance Settlement Agreement.

3

App.200

"**Debtors**" means Boy Scouts of America and Delaware BSA, LLC, the debtors and debtors-in-possession in the Chapter 11 Cases.

"**Direct Abuse Claim**" means an Abuse Claim that is not an Indirect Abuse Claim—*i.e.*, is not a liquidated or unliquidated Abuse Claim for contribution, indemnity, reimbursement, or subrogation, whether contractual or implied by law (as those terms are defined by the applicable non-bankruptcy law of the relevant jurisdiction), and any other derivative Abuse Claim of any kind whatsoever, whether in the nature of or sounding in contract, tort, warranty or any other theory of law or equity whatsoever, including any indemnification, reimbursement, hold-harmless or other payment obligation provided for under any prepetition settlement, insurance policy, program agreement or contract; *provided, however*, that any retrospective premiums and self-insured retentions arising out of any Abuse Claims under the Abuse Insurance Policies shall not constitute an Indirect Abuse Claim.

"**District Court**" means the United States District Court for the District of Delaware, having jurisdiction in the Chapter 11 Cases.

"**Expedited Award**" means the compensation a Claimant receives on behalf of the Claimant's Abuse Claim as a result of the election to receive the Expedited Distribution in accordance with the Plan and Confirmation Order.

"**Insurance Settlement Agreement**" means (a) any settlement agreement entered into after the Petition Date and before the Effective Date by and among (i) any Insurance Company, on the one hand, and (ii) one or more of the Debtors and/or any other Protected Party or Limited Protected Party, on the other hand, under which an Insurance Policy and/or the Debtors' and/or other Protected Parties' or Limited Protected Parties' rights thereunder with respect to Abuse Claims or Non-Abuse Litigation Claims are, subject to Confirmation of the Plan and the entry of a Final Order approving such settlement agreement (which order may be the Confirmation Order), released; and (b) any Post-Effective Date Insurance Settlement entered into during the Insurance Settlement Period by and between (i) any Insurance Company, on the one hand, and (ii) the Settlement Trustee (or the Settlement Trustee and any other Protected Party), on the other hand, under which an Insurance Policy that is subject to the Insurance Assignment and/or the Settlement Trustee's and/or Protected Parties' or Limited Protected Parties' rights thereunder with respect to Abuse Claims or Non-Abuse Litigation Claims are released. All Insurance Settlement Agreements entered into before the Effective Date related to Specified Primary Insurance Policies that release the applicable Insurance Company from liability arising from Non-Abuse Litigation Claims must be acceptable to the Creditors' Committee in accordance with the terms of the JPM / Creditors' Committee Term Sheet; provided, however, that with respect to proposed settlements of any Specified Excess Insurance Policy entered into before the Effective Date, the Creditors' Committee shall have consultation rights.

"**Legal Representative**" means a personal representative, guardian, conservator, parent (on behalf of a minor), executor of an estate or a similar representative who has been appointed by a court or has other legal authorization to file a proof of claim and/or an Abuse Claim and execute this Release on behalf of the Claimant.

4

"**Limited Protected Parties**" means the Participating Chartered Organizations and all of such Persons' Representatives when acting in such representative capacity; provided, however, that no Perpetrator is or shall be a Limited Protected Party.

"**Local Councils**" means, collectively, each and every current or former local council of the BSA, including each and every current local council of the BSA as listed on Exhibit G to the Plan, "supporting organizations" within the meaning of 26 U.S.C. § 509 with respect to any Local Council, Scouting units (including "troops," "dens," "packs," "posts," "clubs," "crews," "ships," "tribes," "labs," "lodges," "councils," "districts," "areas," "regions," and "territories") associated with any Local Council, and all Entities that hold, own, or operate any camp or other property that is operated in the name of or for the benefit of any of the foregoing.

"**Local Council Insurance Policies**" means any and all known and unknown contracts, binders, certificates or insurance policies currently or previously in effect at any time on or before the Petition Date naming the Local Councils, or any of them, or any predecessor, subsidiary, or past or present Affiliate of any Local Council, as an insured (whether as the primary or an additional insured), or otherwise alleged to afford any Local Council insurance coverage, upon which any claim could have been, has been or may be made with respect to any Abuse Claim, including the policies identified on Schedule 3 to the Chapter 11 Plan. Notwithstanding the foregoing, Local Council Insurance Policies shall not include: (a) any policy providing reinsurance to any Settling Insurance Company; (b) any Non-Abuse Insurance Policy; (c) any BSA Insurance Policy; or (d) any Postpetition Insurance Policy.

"**Mixed Claim**" means a claim that makes allegations of Abuse related to or arising from Scouting as well as Abuse that occurred prior to the Petition Date unrelated to or not arising from Scouting. A claim shall not be treated as a Mixed Claim unless and until Scouting-related Abuse allegations have been asserted through a Proof of Claim, the complaint, sworn discovery or testimony (including by affidavit).

"**Participating Chartered Organization**" means a Chartered Organization (other than a Contributing Chartered Organization, including the United Methodist Entities) that does not (a) object to confirmation of the Plan or (b) inform Debtors' counsel in writing on or before the confirmation objection deadline that it does not wish to make the Participating Chartered Organization Insurance Assignment. Notwithstanding the foregoing, with respect to any Chartered Organization that is a debtor in bankruptcy as of the Confirmation Date, such Chartered Organization shall be a Participating Chartered Organization only if it advises Debtors' counsel in writing that it wishes to make the Participating Chartered Organization Insurance Assignment, and, for the avoidance of doubt, absent such written advisement, none of such Chartered Organization's rights to or under the Abuse Insurance Policies shall be subject to the Participating Chartered Organization Insurance Assignment. A list of Chartered Organizations that are debtors in bankruptcy and may not be Participating Chartered Organizations is attached as Exhibit K to the Plan. For the avoidance of doubt, any Chartered Organization that is a member of an ad hoc group or committee that objects to the confirmation of the Plan shall not be a Participating Chartered Organization.

"**Perpetrator**" means any individual who personally committed or is alleged to have personally committed an act of Abuse that forms the basis for an Abuse Claim; provided for the avoidance of

doubt that the term "Perpetrator" shall only include natural persons and not The Church of Jesus Christ of Latter-day Saints, a Utah corporation sole.  The term "Perpetrator" does not include any individual who did not personally commit or is not alleged to have personally committed an act of Abuse that forms the basis for an Abuse Claim, against whom an Abuse Claim is nevertheless asserted or may be asserted, including by virtue of such individual's position or service as an employee or volunteer of the Debtors or as a Scout participant, or by virtue of such individual's position or service as an employee or volunteer of a Local Council or a Chartered Organization or as a Scout participant.

"**Protected Parties**" means the following Persons: (a) the Debtors; (b) Reorganized BSA; (c) the Related Non-Debtor Entities;  (d) the Local Councils;  (e) the Contributing Chartered Organizations; (f) the Settling Insurance Companies; and (g) all of such Persons' Representatives; provided, however, that no Perpetrator is or shall be a Protected Party.  Notwithstanding the foregoing, a Contributing Chartered Organization shall be a Protected Party with respect to Abuse Claims only as set forth in the definition of "Abuse Claim."

"**Released Parties**" means the Trust, the Trustee, the STAC, the Claims Administrator, the Protected Parties, the Chartered Organizations, including all Chartered Organizations that are not Protected Parties or Limited Protected Parties, and each of their respective predecessors, successors, assigns, assignors, representatives, members, officers, employees, agents, consultants, lawyers, advisors, professionals, trustees, insurers, beneficiaries, administrators, and any natural, legal, or juridical person or entity acting on behalf of or having liability in respect of the Trust, the Trustee, the STAC, the Claims Administrator, the Protected Parties, or the Chartered Organizations.

"**Scouting-related**" means anything that is attributable to, arises from, is based upon, results from, or relates to, in whole or in part, directly, indirectly, or derivatively, Scouting.

"**Settling Insurance Company**" means any Insurance Company that contributes funds, proceeds or other consideration to or for the benefit of the Settlement Trust pursuant to an Insurance Settlement Agreement that is approved by (a) an order of the Bankruptcy Court (including the Confirmation Order) and is designated as a Settling Insurance Company in the Confirmation Order or the Affirmation Order or (b) the Settlement Trust.  Without limiting the foregoing, subject to Confirmation of the Plan and approval of the applicable Insurance Settlement Agreement by an order or orders of the Bankruptcy Court (including the Confirmation Order), Century, the Chubb Companies, Clarendon, the Hartford Protected Parties, the Zurich Affiliated Insurers and the Zurich Insurers are each Settling Insurance Companies and shall be designated as such in the Confirmation Order and the Affirmation Order.

"**STAC**" means the Settlement Trust Advisory Committee appointed to oversee the Trust in accordance with the Chapter 11 Plan and the Trust Agreement.

 "**TDP**" means the Boy Scouts of America Trust Distribution Procedures for Abuse Claims, substantially in the form attached as Exhibit A to the Chapter 11 Plan and filed in the Chapter 11 Cases on August ___, 2022, as may be amended and supplemented thereafter from time to time.

"**Trust Agreement**" means the Settlement Trust Agreement dated as of the Effective Date, substantially in the form attached to the Chapter 11 Plan as Exhibit B, as the same may be amended or modified from time to time in accordance with the terms thereof.

"**Trustee**" means [●] or any other person appointed to serve as trustee under and in accordance with the Trust Agreement.

## RELEASE AND INDEMNIFICATION

A.       In consideration of the benefit of an Expedited Award from the Trust, and without limiting any of the Releases or Injunctions in the Plan, which remain in full force and effect in favor of the Protected Parties, the Limited Protected Parties, and Opt-Out Chartered Organizations (as set forth in the Plan), I, on my own behalf and on behalf of my respective predecessors, successors, assigns, assignors, representatives, attorneys, agents, trustees, insurers, heirs, next of kin, estates, beneficiaries, executors, administrators, and any natural, legal, or juridical person or entity to the extent he, she, or it is entitled to assert any claim on my behalf, including, but not limited to, a Legal Representative, (hereafter "**I**", "**my**" or "**me**"), do hereby voluntarily, intentionally, knowingly, absolutely, unconditionally, irrevocably, and fully waive, release, remit, acquit, forever discharge, and covenant not to knowingly sue or continue prosecution against the Released Parties, or any of them, from and with respect to any and all claims, including, but not limited to, all claims as defined in section 101(5) of the Bankruptcy Code, charges, complaints, demands, obligations, causes of action, losses, expenses, suits, awards, promises, agreements, rights to payment, right to any equitable remedy, rights of any contribution, indemnification, reimbursement, subrogation or similar rights, demands, debts, liabilities, express or implied contracts, obligations of payment or performances, rights of offset or recoupment, costs, expenses, attorneys' and other professional fees and expenses, compensation or other relief, and liabilities of any nature whatsoever whether present or future, known or unknown, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, absolute or contingent, direct or derivative and whether based on contract, tort, statutory, or any other legal or equitable theory of recovery (collectively, "**Released Claims**") arising from, relating to, resulting from or in any way connected to, in whole or in part, my Abuse Claim (solely to the extent asserted against any of the Protected Parties and the Chartered Organizations) and the discharge of the Released Parties' duties and responsibilities under the Trust Agreement, including any agreement, document, instrument or certification contemplated by the Trust Agreement, the TDP, the Chapter 11 Plan, the formulation, preparation, negotiation, execution or consummation of the Trust Agreement, the TDP and the Chapter 11 Plan, and any and all other orders of the District Court or Bankruptcy Court relating to the Released Parties and/or their duties and responsibilities, from the beginning of time through the execution date of this Release. I covenant and agree that I will honor the release as set forth in the preceding sentence and, further, that I will not (i) knowingly institute or continue prosecution of a lawsuit or other action against any Released Party based upon, arising out of, or relating to any Released Claims released hereby, (ii) knowingly participate, assist, or cooperate in any such action, or (iii) knowingly encourage, assist and/or solicit any third party to institute any such action.

B.       Without limiting the foregoing, and notwithstanding anything to the contrary in this Release, the release set forth herein shall not apply in favor of the Trust as to my right to payment of my Award due from the Trust.

7

C.        Without limiting the foregoing, and notwithstanding anything to the contrary in this Release, in consideration of the benefit of the contribution made by each Settling Insurance Company to the Trust pursuant to an Insurance Settlement Agreement and the payment by the Trust to me of the Expedited Award, I do hereby voluntarily, intentionally, knowingly, absolutely, unconditionally, irrevocably, and fully waive, release, remit, acquit, forever discharge, and covenant not to knowingly sue or continue prosecution against (i) each Settling Insurance Company and (ii) any insured, co-insured or other third party (including any Local Council, any other Protected Party, any Limited Protected Party, and any other Chartered Organization) under any Abuse Insurance Policy issued by any Settling Insurance Company or any other insurance policy issued by any Settling Insurance Company, including a policy issued to a Chartered Organization (any such third party, an "**Insured Party Releasee**"), in the case of (i) or (ii) from and with respect to any Abuse Claim.

D.        I, as assignor, hereby transfer and assign to the Trust, as assignee, any rights, claims, benefits, or Causes of Action arising out of or related to my Abuse Claim that are not released herein, (i) and that are against Non-Settling Insurance Companies or (ii) to the extent my Abuse Claim is resolved pursuant to the Independent Review Option under the TDP.

E.        I hereby acknowledge that, pursuant to the Chapter 11 Plan, the Channeling Injunction, and the Confirmation Order, the Debtors have been fully and completely discharged and released, including their respective property and successors and assigns, from any and all liability arising from or related to my Abuse Claim, which liability shall be assumed by the Trust pursuant to the Plan.

F.        I hereby acknowledge that, pursuant to the Chapter 11 Plan, the Channeling Injunction, and the Confirmation Order, the sole recourse of any holder of an Abuse Claim against a Protected Party (or any holder of a Post-1975 Chartered Organization Abuse Claim or Pre-1976 Chartered Organization Abuse Claim against a Limited Protected Party, or any holder of an Opt-Out Chartered Organization Abuse Claim against an Opt-Out Chartered Organization) on account of such Abuse Claim (or Post-1975 Chartered Organization Abuse Claim, Pre-1976 Chartered Organization Abuse Claim, or Opt-Out Chartered Organization Abuse Claim) on account of such Abuse Claim (or Post-1975 Chartered Organization Abuse Claim, Pre-1976 Chartered Organization Abuse Claim, or Opt-Out Chartered Organization Abuse Claim) shall be to and against the Trust and such holder shall have no right whatsoever at any time to assert such Abuse Claim against any Protected Party or any property or interest in property of any Protected Party (or to assert any Post-1975 Chartered Organization Abuse Claim or Pre-1976 Chartered Organization Abuse Claim against a Limited Protected Party or any property or interest in property of any Limited Protected Party, or to assert any Opt-Out Chartered Organization Abuse Claim against an Opt-Out Chartered Organization or any property or interest in property of any Opt-Out Chartered Organization).

G.        I hereby acknowledge that, pursuant to this Release, I am voluntarily providing a release to all Insured Party Releasees and Chartered Organizations, including all Chartered Organizations that are not Protected Parties or Limited Protected Parties, and I shall have no remedies with respect to my Abuse Claim against any Insured Party Releasees and Chartered

8

Organizations, including those that are not Protected Parties and Limited Protected Parties.  This Release does not release claims that have been assigned to the Trust and I acknowledge I will have no personal rights in such assigned claims.

      H.      In further consideration of the benefit of an Expedited Award, I shall indemnify and forever hold harmless, and pay all final judgments, damages, costs, expenses, fines, penalties, interest, multipliers, or liabilities in whatsoever nature, including costs of defense and attorneys' fees of, the Trust, the Trustee, the STAC, and the Claims Administrator arising from my failure to comply with the terms of this Release.

      I. I acknowledge that the Trust is not providing any tax advice with respect to the receipt of the Expedited Award or any component thereof, and I understand and agree that I shall be solely responsible for compliance with all tax laws with respect to the Expedited Award, to the extent applicable.

Claimant or Legal Representative Printed Name:   _____

Claimant or Legal Representative Signature:   _____

Date:   _____

## EXHIBIT B

### CONDITIONAL RELEASE OF CHARTERED ORGANIZATIONS

### CLAIMANT RELEASE AND INDEMNIFICATION IN CONNECTION WITH DISTRIBUTION FROM THE BOY SCOUTS OF AMERICA SETTLEMENT TRUST

To receive payment of an Award (as defined below) from the Boy Scouts Settlement Trust (the "**Trust**") and have the opportunity to share in any settlement proceeds received from a Chartered Organization (as defined below) that is or becomes a Protected Party (as defined below), an eligible Claimant must execute and submit to the Trustee (as defined below) this Release and Indemnification (the "**Release**").  This Release must be signed by the Claimant or the Claimant's Legal Representative (as defined below).  A signature by an attorney for the Claimant or by an attorney for the Claimant's Legal Representative is not sufficient.

If you need assistance, please contact the Claims Administrators by email at [●] or by phone toll-free at [●].  You may also visit the BSA Abuse Survivor Website for additional information.

### DEFINITIONS

The definitions set forth above for the terms "**Trust**" and "**Release**" are specifically incorporated herein by reference as if fully set forth in this section.

All capitalized terms not otherwise defined herein shall have the same meaning ascribed to them in the Chapter 11 Plan (as defined below).

"**Abuse**" means sexual conduct or misconduct, sexual abuse or molestation, sexual exploitation, indecent assault or battery, rape, pedophilia, ephebophilia, sexually related psychological or emotional harm, humiliation, anguish, shock, sickness, disease, disability, dysfunction, or intimidation, any other sexual misconduct or injury, contacts or interactions of a sexual nature, including the use of photography, video, or digital media, or other physical abuse or bullying or harassment without regard to whether such physical abuse or bullying is of a sexual nature, between a child and an adult, between a child and another child, or between a non-consenting adult and another adult, in each instance without regard to whether such activity involved explicit force, whether such activity involved genital or other physical contact, and whether there is or was any associated physical, psychological, or emotional harm to the child or non-consenting adult.

"**Abuse Claim**" means a liquidated or unliquidated Claim against a Protected Party (including the Settling Insurance Companies), a Limited Protected Party, or an Opt-Out Chartered Organization or any of their respective Representatives (in their capacities as such) that is attributable to, arises from, is based upon, relates to, or results from,  directly, indirectly, or derivatively, alleged Scouting-related Abuse that occurred prior to the Petition Date, including any such Claim that seeks monetary damages or other relief, under any theory of law or equity whatsoever, including vicarious liability, alter ego, respondeat superior, conspiracy, fraud, including fraud in the inducement, any negligence-based or employment-based theory, including negligent hiring, selection, supervision, retention or misrepresentation, any other theory based upon, or directly or indirectly related to any insurance relationship, the provision of insurance or the provision of insurance services to or by any Protected Parties, or misrepresentation, concealment, or unfair

1

practice, breach of fiduciary duty, public or private nuisance, gross negligence, willful misconduct, or any other theory, including any theory based on or related to public policy or any act or failure to act, or failure to warn by a Protected Party, a Limited Protected Party, an Opt-Out Chartered Organization, any of their respective Representatives (in their capacities as such)  or any other Person for whom any Protected Party, Limited Protected Party, or Opt-Out Chartered Organization is alleged to be responsible (including any such Claim that has been asserted or may be amended to assert in a proof of claim alleging Abuse, whether or not timely filed, in the Chapter 11 Cases, or any such Claim that has been asserted against the Settlement Trust), including any proportionate or allocable share of liability based thereon.  Abuse Claims include any Future Abuse Claims, any Indirect Abuse Claims, any Opt-Out Chartered Organization Abuse Claim and any other Claim that is attributable to, arises from, is based upon, relates to, or results from, alleged Scouting-related Abuse regardless of whether, as of the Petition Date, such Claim was barred by any applicable statute of limitations.  For the avoidance of doubt,  (i) a Claim alleging Abuse shall not be an "Abuse Claim" against a Protected Party, Limited Protected Party, or Opt-Out Chartered Organization or any of their respective Representatives if such Claim is unrelated to Scouting (except as provided in (iii) below, including the portion of any Mixed Claim that is unrelated to Scouting); (ii) a Claim alleging Abuse shall be an "Abuse Claim" against a Protected Party, Limited Protected Party, or Opt-Out Chartered Organization or any of their respective Representatives (in their capacity as such) if such Claim is related to Scouting (including the portion of any Mixed Claim that is related to Scouting); (iii) any portion of a Mixed Claim alleging Abuse involving the Debtors, Reorganized BSA, Non-Debtor Entities, Local Councils, or their respective Representatives (in their capacities as such) is necessarily Scouting-related and shall be considered an Abuse Claim; and (iv) any Claim against the Debtors, Reorganized BSA, Non-Debtor Entities, Local Councils, or their respective Representatives (in their capacities as such) alleging Abuse is necessarily Scouting-related and shall be considered an Abuse Claim.

"**Abuse Insurance Policies**" means, collectively, the BSA Insurance Policies and the Local Council Insurance Policies.  Abuse Insurance Policies do not include Non-Abuse Insurance Policies or Postpetition Insurance Policies.

"**Award**" means the compensation a Claimant receives on behalf of the Claimant's Abuse Claim.

"**Bankruptcy Court**" means the United States Bankruptcy Court for the District of Delaware, having subject matter jurisdiction over the Chapter 11 Cases and, to the extent of any reference withdrawal made under section 157(d) of title 28 of the United States Code, the District Court.

"**BSA Insurance Policies**" means any and all known and unknown contracts, binders, certificates or Insurance Policies currently or previously in effect at any time on or before the Petition Date naming the Debtors, or either of them, or any predecessor, subsidiary, or past or present Affiliate of the Debtors, as an insured (whether as the primary or an additional insured), or otherwise alleged to afford the Debtors insurance coverage, upon which any claim could have been, has been, or may be made with respect to any Abuse Claim, including the policies listed on Schedule 2 to the Chapter 11 Plan.  Notwithstanding the foregoing, BSA Insurance Policies shall not include: (a) any policy providing reinsurance to any Insurance Company; (b) any Non-Abuse Insurance Policy; (c) any Local Council Insurance Policy; or (d) any Postpetition Insurance Policy.

"**Channeling Injunction**" means the permanent injunction provided for in Article X.F of the Plan with respect to (a) Abuse Claims against the Protected Parties, (b) Post-1975 Chartered Organization Abuse Claims against the Limited Protected Parties, (c) Abuse Claims against the Limited Protected Parties that are covered under any insurance policy issued by the Settling Insurance Companies (as determined pursuant to Section X.F.3 of the Plan), and (d) Opt-Out Chartered Organization Abuse Claims against the Opt-Out Chartered Organizations, to be issued pursuant to the Confirmation Order.

"**Chapter 11 Cases**" means the jointly administered cases under chapter 11 of the Bankruptcy Code commenced by the Debtors on the Petition Date in the Bankruptcy Court and currently styled *In re Boy Scouts of America and Delaware BSA, LLC*, Bankruptcy Case No. 20-10343 (LSS) (Jointly Administered).

"**Chapter 11 Plan**" or "**Plan**" means the *Third Modified Fifth Amended Chapter 11 Plan of Reorganization (With Technical Modifications) for Boy Scouts of America and Delaware BSA, LLC*, filed in the Chapter 11 Cases (as the same may be amended or modified), and confirmed by the Bankruptcy Court.

"**Chartered Organizations**" means each and every civic, faith-based, educational or business organization, governmental entity or organization, other entity or organization, or group of individual citizens, in each case presently or formerly authorized by the BSA to operate, sponsor or otherwise support one or more Scouting units.

"**Claimant**" means the holder of a Abuse Claim who (i) timely submitted an Abuse Claim Proof of Claim or Trust Claim Submission to the Settlement Trust, (ii) has had his or her Abuse Claim channeled to the Trust for evaluation, resolution, and payment pursuant to the Plan and the Channeling Injunction, and (iii) is signing and executing this Release (or on whose behalf this Release is being signed and executed by a Legal Representative).

"**Confirmation Order**" means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code, which shall be in form and substance acceptable to (a) the Debtors, the Ad Hoc Committee, the Coalition, Tort Claimants' Committee, the Future Claimants' Representative, the Settling Insurance Companies (in accordance with their respective Insurance Settlement Agreement), and the Contributing Chartered Organizations, and (b) the Creditors' Committee and JPM in accordance with their respective consent rights under the JPM / Creditors' Committee Term Sheet, as incorporated by reference in Article I.D of the Chapter 11 Plan.

"**Contributing Chartered Organizations**" means the current or former Chartered Organizations listed on Exhibit D to the Plan and any Chartered Organization made a Protected Party under a Post-Effective Date Chartered Organization Settlement approved by the Bankruptcy Court in accordance with Article IV.I of the Plan.  No Participating Chartered Organization shall be considered a Contributing Chartered Organization based solely on the Participating Chartered Organization Insurance Assignment.  Without limiting the foregoing, subject to Confirmation of the Plan and approval of the United Methodist Settlement Agreement by an order of the Bankruptcy Court (including in the Confirmation Order), the United Methodist Entities are Contributing Chartered Organizations and shall be designated as such in the Confirmation Order and the Affirmation Order.  No Chartered Organization shall be a Contributing Chartered

3

Organization unless it agrees to provide the assignments and releases as set forth in Sections 9 and 10 of the Century and Chubb Companies Insurance Settlement Agreement .

"**Debtors**" means Boy Scouts of America and Delaware BSA, LLC, the debtors and debtors-in-possession in the Chapter 11 Cases.

"**Direct Abuse Claim**" means an Abuse Claim that is not an Indirect Abuse Claim—*i.e.*, is not a liquidated or unliquidated Abuse Claim for contribution, indemnity, reimbursement, or subrogation, whether contractual or implied by law (as those terms are defined by the applicable non-bankruptcy law of the relevant jurisdiction), and any other derivative Abuse Claim of any kind whatsoever, whether in the nature of or sounding in contract, tort, warranty or any other theory of law or equity whatsoever, including any indemnification, reimbursement, hold-harmless or other payment obligation provided for under any prepetition settlement, insurance policy, program agreement or contract; *provided, however*, that any retrospective premiums and self-insured retentions arising out of any Abuse Claims under the Abuse Insurance Policies shall not constitute an Indirect Abuse Claim.

"**District Court**" means the United States District Court for the District of Delaware, having jurisdiction in the Chapter 11 Cases.

"**Insurance Settlement Agreement**" means (a) any settlement agreement entered into after the Petition Date and before the Effective Date by and among (i) any Insurance Company, on the one hand, and (ii) one or more of the Debtors' and/or any other Protected Party or Limited Protected Party, on the other hand, under which an Insurance Policy and/or the Debtors and/or other Protected Parties' or Limited Protected Parties' rights thereunder with respect to Abuse Claims or Non-Abuse Litigation Claims are, subject to Confirmation of the Plan and the entry of a Final Order approving such settlement agreement (which order may be the Confirmation Order), released; and (b) any Post-Effective Date Insurance Settlement entered into during the Insurance Settlement Period by and between (i) any Insurance Company, on the one hand, and (ii) the Settlement Trustee (or the Settlement Trustee and any other Protected Party), on the other hand, under which an Insurance Policy that is subject to the Insurance Assignment and/or the Settlement Trustee's and/or Protected Parties' or Limited Protected Parties' rights thereunder with respect to Abuse Claims or Non-Abuse Litigation Claims are released.  All Insurance Settlement Agreements entered into before the Effective Date related to Specified Primary Insurance Policies that release the applicable Insurance Company from liability arising from Non-Abuse Litigation Claims must be acceptable to the Creditors' Committee in accordance with the terms of the JPM / Creditors' Committee Term Sheet; provided, however, that with respect to proposed settlements of any Specified Excess Insurance Policy entered into before the Effective Date, the Creditors' Committee shall have consultation rights.

"**Legal Representative**" means a personal representative, guardian, conservator, parent (on behalf of a minor), executor of an estate or a similar representative who has been appointed by a court or has other legal authorization to file a proof of claim and/or an Abuse Claim and execute this Release on behalf of the Claimant.

4

"**Limited Protected Parties**" means the Participating Chartered Organizations and all of such Persons' Representatives when acting in such representative capacity; provided, however, that no Perpetrator is or shall be a Limited Protected Party.

"**Local Councils**" means, collectively, each and every current or former local council of the BSA, including each and every current local council of the BSA as listed on Exhibit G to the Plan, "supporting organizations" within the meaning of 26 U.S.C. § 509 with respect to any Local Council, Scouting units (including "troops," "dens," "packs," "posts," "clubs," "crews," "ships," "tribes," "labs," "lodges," "councils," "districts," "areas," "regions," and "territories") associated with any Local Council, and all Entities that hold, own, or operate any camp or other property that is operated in the name of or for the benefit of any of the foregoing.

"**Local Council Insurance Policies**" means any and all known and unknown contracts, binders, certificates or insurance policies currently or previously in effect at any time on or before the Petition Date naming the Local Councils, or any of them, or any predecessor, subsidiary, or past or present Affiliate of any Local Council, as an insured (whether as the primary or an additional insured), or otherwise alleged to afford any Local Council insurance coverage, upon which any claim could have been, has been or may be made with respect to any Abuse Claim, including the policies identified on Schedule 3 to the Chapter 11 Plan. Notwithstanding the foregoing, Local Council Insurance Policies shall not include: (a) any policy providing reinsurance to any Settling Insurance Company; (b) any Non-Abuse Insurance Policy; (c) any BSA Insurance Policy; or (d) any Postpetition Insurance Policy.

"**Mixed Claim**" means a claim that makes allegations of Abuse related to or arising from Scouting as well as Abuse that occurred prior to the Petition Date unrelated to or not arising from Scouting. A claim shall not be treated as a Mixed Claim unless and until Scouting-related Abuse allegations have been asserted through a Proof of Claim, the complaint, sworn discovery or testimony (including by affidavit).

"**Non-BSA Sourced Assets**" shall mean Settlement Trust Assets that represent assets received as a result of or in connection with a global settlement between the Debtors or the Trust, on the one hand, and a Chartered Organization that is or becomes a Protected Party, on the other hand, and the proceeds of such assets. For the avoidance of doubt, Non-BSA Sourced Assets shall not include any assets received from the Debtors, the Local Councils, or any Settling Insurance Company.

"**Participating Chartered Organization**" means a Chartered Organization (other than a Contributing Chartered Organization, including the United Methodist Entities) that does not (a) object to confirmation of the Plan or (b) inform Debtors' counsel in writing on or before the confirmation objection deadline that it does not wish to make the Participating Chartered Organization Insurance Assignment. Notwithstanding the foregoing, with respect to any Chartered Organization that is a debtor in bankruptcy as of the Confirmation Date, such Chartered Organization shall be a Participating Chartered Organization only if it advises Debtors' counsel in writing that it wishes to make the Participating Chartered Organization Insurance Assignment, and, for the avoidance of doubt, absent such written advisement, none of such Chartered Organization's rights to or under the Abuse Insurance Policies shall be subject to the Participating Chartered Organization Insurance Assignment. A list of Chartered Organizations that are debtors

5

in bankruptcy and may not be Participating Chartered Organizations is attached as <u>Exhibit K</u> to the Plan. For the avoidance of doubt, any Chartered Organization that is a member of an ad hoc group or committee that objects to the confirmation of the Plan shall not be a Participating Chartered Organization.

"**Perpetrator**" means any individual who personally committed or is alleged to have personally committed an act of Abuse that forms the basis for an Abuse Claim; provided for the avoidance of doubt that the term "Perpetrator" shall only include natural persons and not The Church of Jesus Christ of Latter-day Saints, a Utah corporation sole. The term "Perpetrator" does not include any individual who did not personally commit or is not alleged to have personally committed an act of Abuse that forms the basis for an Abuse Claim, against whom an Abuse Claim is nevertheless asserted or may be asserted, including by virtue of such individual's position or service as an employee or volunteer of the Debtors or as a Scout participant, or by virtue of such individual's position or service as an employee or volunteer of a Local Council or a Chartered Organization or as a Scout participant.

"**Protected Parties**" means the following Persons: (a) the Debtors; (b) Reorganized BSA; (c) the Related Non-Debtor Entities; (d) the Local Councils; (e) the Contributing Chartered Organizations; (f) the Settling Insurance Companies; and (g) all of such Persons' Representatives; provided, however, that no Perpetrator is or shall be a Protected Party. Notwithstanding the foregoing, a Contributing Chartered Organization shall be a Protected Party with respect to Abuse Claims only as set forth in the definition of "Abuse Claim."

"**Release Date**" means the later of (1) the date of execution hereof or (2) the date of (i) a "Final Determination" of my Abuse Claim under the TDP or (ii) the fixing of the liability amount for my Abuse Claim under the TDP, provided, however, the Release Date as to Contributing Chartered Organizations and their related Released Parties shall be the later of the date of execution or the date they become a Contributing Chartered Organization.

"**Released Parties**" means the Trust, the Trustee, the STAC, the Claims Administrators, the Protected Parties, the Contributing Chartered Organizations (including any Chartered Organization that becomes a Contributing Chartered Organization as of such date after the execution of this Release), Participating Chartered Organizations with respect to Post-1975 Chartered Organization Claims and Abuse Claims covered under insurance policies issued by Settling Insurance Companies, Opt-Out Chartered Organizations with respect to Abuse Claims covered under insurance policies issued by Settling Insurance Companies, and each of their respective predecessors, successors, assigns, assignors, representatives, members, officers, employees, agents, consultants, lawyers, advisors, professionals, trustees, insurers, beneficiaries, administrators, and any natural, legal, or juridical person or entity acting on behalf of or having liability in respect of the Trust, the Trustee, the STAC, the Claims Administrators, the Protected Parties, or the Contributing Chartered Organizations.

"**Scouting-related**" means anything that is attributable to, arises from, is based upon, results from, or relates to, in whole or in part, directly, indirectly, or derivatively, Scouting.

"**Settling Insurance Company**" means any Insurance Company that contributes funds, proceeds or other consideration to or for the benefit of the Settlement Trust pursuant to an Insurance

Settlement Agreement that is approved by (a) an order of the Bankruptcy Court (including the Confirmation Order) and is designated as a Settling Insurance Company in the Confirmation Order or the Affirmation Order or (b) the Settlement Trust. Without limiting the foregoing, subject to Confirmation of the Plan and approval of the applicable Insurance Settlement Agreement by an order or orders of the Bankruptcy Court (including in the Confirmation Order), Century, the Chubb Companies, Clarendon, the Hartford Protected Parties, the Zurich Affiliated Insurers and the Zurich Insurers are each Settling Insurance Companies and shall be designated as such in the Confirmation Order and the Affirmation Order.

"**STAC**" means the Settlement Trust Advisory Committee appointed to oversee the Trust in accordance with the Chapter 11 Plan and the Trust Agreement.

"**TDP**" means the Boy Scouts of America Trust Distribution Procedures for Abuse Claims, substantially in the form attached as Exhibit A to the Chapter 11 Plan and filed in the Chapter 11 Cases on August ___, 2022, as may be amended and supplemented thereafter from time to time.

"**Trust Agreement**" means the Settlement Trust Agreement dated as of the Effective Date, substantially in the form attached to the Chapter 11 Plan as Exhibit B, as the same may be amended or modified from time to time in accordance with the terms thereof.

"**Trustee**" means [●] or any other person appointed to serve as trustee under and in accordance with the Trust Agreement.

## RELEASE AND INDEMNIFICATION

A.      In consideration of the benefit of an Award from the Trust, and without limiting any of the Releases or Injunctions in the Plan, which remain in full force and effect in favor of the Protected Parties, the Limited Protected Parties, and Opt-Out Chartered Organizations (as set forth in the Plan), I, on my own behalf and on behalf of my respective predecessors, successors, assigns, assignors, representatives, attorneys, agents, trustees, insurers, heirs, next of kin, estates, beneficiaries, executors, administrators, and any natural, legal, or juridical person or entity to the extent he, she, or it is entitled to assert any claim on my behalf, including, but not limited to, a Legal Representative, (hereafter "**I**", "**my**" or "**me**"), do hereby as of the Release Date voluntarily, intentionally, knowingly, absolutely, unconditionally, irrevocably, and fully waive, release, remit, acquit, forever discharge, and covenant not to knowingly sue or continue prosecution against the Released Parties, or any of them, from and with respect to any and all claims, including, but not limited to, all claims as defined in section 101(5) of the Bankruptcy Code, charges, complaints, demands, obligations, causes of action, losses, expenses, suits, awards, promises, agreements, rights to payment, right to any equitable remedy, rights of any contribution, indemnification, reimbursement, subrogation or similar rights, demands, debts, liabilities, express or implied contracts, obligations of payment or performances, rights of offset or recoupment, costs, expenses, attorneys' and other professional fees and expenses, compensation or other relief, and liabilities of any nature whatsoever whether present or future, known or unknown, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, absolute or contingent, direct or derivative and whether based on contract, tort, statutory, or any other legal or equitable theory of recovery (collectively, "**Released Claims**") arising from, relating to, resulting from or in any way connected to, in whole or in part, my Abuse Claim (solely to the extent asserted against any of the Protected

Parties or any Chartered Organizations that become a Protected Party after the execution of this Release) and the discharge of the Released Parties' duties and responsibilities under the Trust Agreement, including any agreement, document, instrument or certification contemplated by the Trust Agreement, the TDP, the Chapter 11 Plan, the formulation, preparation, negotiation, execution or consummation of the Trust Agreement, the TDP and the Chapter 11 Plan, and any and all other orders of the District Court or Bankruptcy Court relating to the Released Parties and/or their duties and responsibilities, from the beginning of time through the execution date of this Release. I covenant and agree that I will honor the release as set forth in the preceding sentence and, further, that I will not (i) knowingly institute or continue prosecution of a lawsuit or other action against any Released Party based upon, arising out of, or relating to any Released Claims released hereby, (ii) knowingly participate, assist, or cooperate in any such action, or (iii) knowingly encourage, assist and/or solicit any third party to institute any such action.

B.      Without limiting the foregoing, and notwithstanding anything to the contrary in this Release, the release set forth herein shall not apply in favor of the Trust as to my right to full payment of my allowed Direct Abuse Claim, provided means for such payment by the Trust are available under the Plan and the Trust Distribution Procedures.

C.      Without limiting the foregoing, and notwithstanding anything to the contrary in this Release, in consideration of the benefit of the contribution made by each Settling Insurance Company to the Trust pursuant to an Insurance Settlement Agreement and the payment by the Trust to me of the Award, I do hereby as of the Release Date voluntarily, intentionally, knowingly, absolutely, unconditionally, irrevocably, and fully waive, release, remit, acquit, forever discharge, and covenant not to knowingly sue or continue prosecution against (i) each Settling Insurance Company and (ii) any insured, co-insured or other third party (including any Local Council, any other Protected Party, any Limited Protected Party, and any other Chartered Organization) under any Abuse Insurance Policy issued by any Settling Insurance Company or any other insurance policy issued by any Settling Insurance Company, including a policy issued to a Chartered Organization (any such third party, an "**Insured Party Releasee**"), in the case of (i) or (ii) from and with respect to any Abuse Claim.

D.      I, as assignor, hereby transfer and assign to the Trust, as assignee, any rights, claims, benefits, or Causes of Action arising out of or related to my Abuse Claim that are not released herein, (i) and that are against Non-Settling Insurance Companies or (ii) to the extent my Abuse Claim is resolved pursuant to the Independent Review Option under the TDP.

E.      I hereby acknowledge that, pursuant to the Chapter 11 Plan, the Channeling Injunction, and the Confirmation Order, the Debtors have been fully and completely discharged and released, including their respective property and successors and assigns, from any and all liability arising from or related to my Abuse Claim, which liability shall be assumed by the Trust pursuant to the Plan.

F.      I hereby acknowledge that, pursuant to the Chapter 11 Plan, the Channeling Injunction, and Confirmation Order, the sole recourse of any holder of an Abuse Claim against a Protected Party on account of such Abuse Claim shall be to and against the Trust and such holder shall have no right whatsoever at any time to assert such Abuse Claim against any Protected Party or any property or interest in property of any Protected Party.

G.      I hereby acknowledge that, pursuant to the Chapter 11 Plan, the Channeling Injunction, and the Confirmation Order, the sole recourse of (i) any holder of a Post-1975 Chartered Organization Abuse Claim or pre-1976 Chartered Organization Abuse Claim against a Limited Protected Party on account of such Post-1975 Chartered Organization Abuse Claim or pre-1976 Chartered Organization Abuse Claim shall be to and against the Trust and such holder shall have no right whatsoever at any time to assert such Post-1975 Chartered Organization Abuse Claim or pre-1976 Chartered Organization Abuse Claim against any Limited Protected Party or any property or interest in property of any Limited Protected Party, and (ii) any holder of an Opt-Out Chartered Organization Abuse Claim against an Opt-Out Chartered Organization on account of such Opt-Out Chartered Organization Abuse Claim shall be to and against the Trust and such holder shall have no right whatsoever at any time to assert such Opt-Out Chartered Organization Abuse Claim against any Opt-Out Chartered Organization or any property or interest in property of any Opt-Out Chartered Organization.

H.      I hereby acknowledge that, pursuant to this Release, I am voluntarily providing a release as of the Release Date to any Chartered Organization that is currently a Protected Party or becomes a Protected Party after the execution of this Release (or that is an Insured Party Releasee as provided in paragraph C above) and that this Release will not become effective against any Chartered Organization that is not a Contributing Chartered Organization (or Insured Party Releasee) as of the Release Date unless and until such Chartered Organization becomes a Protected Party.

I. I hereby acknowledge that by executing this Release, I will have the opportunity to share in any settlement proceeds received from a Chartered Organization that is or becomes a Protected Party, provided, however, that under the Trust Distribution Procedures, Non-BSA Sourced Assets (which include proceeds received from Chartered Organizations) shall be allocated (after deducting an estimated pro rata share of Trust expenses and direct expenses related to the collection of such Non-BSA Sourced Assets) all or in part only among the holders of Allowed Abuse Claims that (1) could have been satisfied from the source of such Non-BSA Sourced Assets absent the Plan's discharge and Channeling Injunction and (2) are held by Claimants that execute this or a similar Release. This Release does not release claims that have been assigned to the Trust and I acknowledge I will have no personal rights in such assigned claims.

J.      In further consideration of the benefit of an Award, as of the Release Date, I shall indemnify and forever hold harmless, and pay all final judgments, damages, costs, expenses, fines, penalties, interest, multipliers, or liabilities in whatsoever nature, including costs of defense and attorneys' fees of, the Trust, the Trustee, the STAC, and the Claims Administrators arising from my failure to comply with the terms of this Release.

K.      I acknowledge that the Trust is not providing any tax advice with respect to the receipt of the Award or any component thereof, and I understand and agree that I shall be solely responsible for compliance with all tax laws with respect to the Award, to the extent applicable.

9

Claimant or Legal Representative Printed Name:  _____

Claimant or Legal Representative Signature:  _____

Date:  _____

## EXHIBIT C

## NON-CONDITIONAL RELEASE OF CHARTERED ORGANIZATIONS

## CLAIMANT RELEASE AND INDEMNIFICATION IN CONNECTION WITH DISTRIBUTION FROM THE BOY SCOUTS OF AMERICA SETTLEMENT TRUST

To receive payment of an Award (as defined below) from the Boy Scouts Settlement Trust (the "**Trust**") and have the opportunity to share in any settlement proceeds received from a Chartered Organization (as defined below) that is or becomes a Protected Party (as defined below), an eligible Claimant must execute and submit to the Trustee (as defined below) this Release and Indemnification (the "**Release**").  This Release must be signed by the Claimant or the Claimant's Legal Representative (as defined below).  A signature by an attorney for the Claimant or by an attorney for the Claimant's Legal Representative is not sufficient.

If you need assistance, please contact the Claims Administrators by email at [●] or by phone toll-free at [●].  You may also visit the BSA Abuse Survivor Website for additional information.

## DEFINITIONS

The definitions set forth above for the terms "**Trust**" and "**Release**" are specifically incorporated herein by reference as if fully set forth in this section.

All capitalized terms not otherwise defined herein shall have the same meaning ascribed to them in the Chapter 11 Plan (as defined below).

"**Abuse**" means sexual conduct or misconduct, sexual abuse or molestation, sexual exploitation, indecent assault or battery, rape, pedophilia, ephebophilia, sexually related psychological or emotional harm, humiliation, anguish, shock, sickness, disease, disability, dysfunction, or intimidation, any other sexual misconduct or injury, contacts or interactions of a sexual nature, including the use of photography, video, or digital media, or other physical abuse or bullying or harassment without regard to whether such physical abuse or bullying is of a sexual nature, between a child and an adult, between a child and another child, or between a non-consenting adult and another adult, in each instance without regard to whether such activity involved explicit force, whether such activity involved genital or other physical contact, and whether there is or was any associated physical, psychological, or emotional harm to the child or non-consenting adult.

"**Abuse Claim**" means a liquidated or unliquidated Claim against a Protected Party (including the Settling Insurance Companies), a Limited Protected Party, or an Opt-Out Chartered Organization or any of their respective Representatives (in their capacities as such) that is attributable to, arises from, is based upon, relates to, or results from,  directly, indirectly, or derivatively, alleged Scouting-related Abuse that occurred prior to the Petition Date, including any such Claim that seeks monetary damages or other relief, under any theory of law or equity whatsoever, including vicarious liability, alter ego, respondeat superior, conspiracy, fraud, including fraud in the inducement, any negligence-based or employment-based theory, including negligent hiring, selection, supervision, retention or misrepresentation, any other theory based upon, or directly or indirectly related to any insurance relationship, the provision of insurance or the provision of insurance services to or by any Protected Parties, or misrepresentation, concealment, or unfair

1

practice, breach of fiduciary duty, public or private nuisance, gross negligence, willful misconduct, or any other theory, including any theory based on or related to public policy or any act or failure to act, or failure to warn by a Protected Party, a Limited Protected Party, an Opt-Out Chartered Organization, any of their respective Representatives (in their capacities as such)  or any other Person for whom any Protected Party, Limited Protected Party, or Opt-Out Chartered Organization is alleged to be responsible (including any such Claim that has been asserted or may be amended to assert in a proof of claim alleging Abuse, whether or not timely filed, in the Chapter 11 Cases, or any such Claim that has been asserted against the Settlement Trust), including any proportionate or allocable share of liability based thereon.  Abuse Claims include any Future Abuse Claims, any Indirect Abuse Claims, any Opt-Out Chartered Organization Abuse Claim and any other Claim that is attributable to, arises from, is based upon, relates to, or results from, alleged Scouting-related Abuse regardless of whether, as of the Petition Date, such Claim was barred by any applicable statute of limitations.  For the avoidance of doubt,  (i) a Claim alleging Abuse shall not be an "Abuse Claim" against a Protected Party, Limited Protected Party, or Opt-Out Chartered Organization or any of their respective Representatives if such Claim is unrelated to Scouting (except as provided in (iii) below, including the portion of any Mixed Claim that is unrelated to Scouting); (ii) a Claim alleging Abuse shall be an "Abuse Claim" against a Protected Party, Limited Protected Party, or Opt-Out Chartered Organization or any of their respective Representatives (in their capacity as such) if such Claim is related to Scouting (including the portion of any Mixed Claim that is related to Scouting); (iii) any portion of a Mixed Claim alleging Abuse involving the Debtors, Reorganized BSA, Non-Debtor Entities, Local Councils, or their respective Representatives (in their capacities as such) is necessarily Scouting-related and shall be considered an Abuse Claim; and (iv) any Claim against the Debtors, Reorganized BSA, Non-Debtor Entities, Local Councils, or their respective Representatives (in their capacities as such) alleging Abuse is necessarily Scouting-related and shall be considered an Abuse Claim.

 "**Abuse Insurance Policies**" means, collectively, the BSA Insurance Policies and the Local Council Insurance Policies.  Abuse Insurance Policies do not include Non-Abuse Insurance Policies or Postpetition Insurance Policies.

"**Award**" means the compensation a Claimant receives on behalf of the Claimant's Abuse Claim.

"**Bankruptcy Court**" means the United States Bankruptcy Court for the District of Delaware, having subject matter jurisdiction over the Chapter 11 Cases and, to the extent of any reference withdrawal made under section 157(d) of title 28 of the United States Code, the District Court.

"**BSA Insurance Policies**" means any and all known and unknown contracts, binders, certificates or Insurance Policies currently or previously in effect at any time on or before the Petition Date naming the Debtors, or either of them, or any predecessor, subsidiary, or past or present Affiliate of the Debtors, as an insured (whether as the primary or an additional insured), or otherwise alleged to afford the Debtors insurance coverage, upon which any claim could have been, has been, or may be made with respect to any Abuse Claim, including the policies listed on Schedule 2 to the Chapter 11 Plan.  Notwithstanding the foregoing, BSA Insurance Policies shall not include: (a) any policy providing reinsurance to any Insurance Company; (b) any Non-Abuse Insurance Policy; (c) any Local Council Insurance Policy; or (d) any Postpetition Insurance Policy.

2

"**Channeling Injunction**" means the permanent injunction provided for in Article X.F of the Chapter 11 Plan with respect to (a) Abuse Claims against the Protected Parties, (b) Post-1975 Chartered Organization Abuse Claims against the Limited Protected Parties, (c) Abuse Claims against the Limited Protected Parties that are covered under any insurance policy issued by the Settling Insurance Companies (as determined pursuant to Section X.F.3 of the Chapter 11 Plan), and (d) Opt-Out Chartered Organization Abuse Claims against the Opt-Out Chartered Organizations, to be issued pursuant to the Confirmation Order.

"**Chapter 11 Cases**" means the jointly administered cases under chapter 11 of the Bankruptcy Code commenced by the Debtors on the Petition Date in the Bankruptcy Court and currently styled *In re Boy Scouts of America and Delaware BSA, LLC*, Bankruptcy Case No. 20-10343 (LSS) (Jointly Administered).

"**Chapter 11 Plan**" or "**Plan**" means the *Third Modified Fifth Amended Chapter 11 Plan of Reorganization (With Technical Modifications) for Boy Scouts of America and Delaware BSA, LLC*, filed in the Chapter 11 Cases (as the same may be amended or modified), and confirmed by the Bankruptcy Court.

 "**Chartered Organizations**" means each and every civic, faith-based, educational or business organization, governmental entity or organization, other entity or organization, or group of individual citizens, in each case presently or formerly authorized by the BSA to operate, sponsor or otherwise support one or more Scouting units.

"**Claimant**" means the holder of an Abuse Claim who (i) timely submitted an Abuse Claim Proof of Claim or Trust Claim Submission to the Settlement Trust, (ii) has had his or her Abuse Claim channeled to the Trust for evaluation, resolution, and payment pursuant to the Plan and the Channeling Injunction, and (iii) is signing and executing this Release (or on whose behalf this Release is being signed and executed by a Legal Representative).

"**Confirmation Order**" means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code, which shall be in form and substance acceptable to (a) the Debtors, the Ad Hoc Committee, the Coalition, Tort Claimants' Committee, the Future Claimants' Representative, the Settling Insurance Companies (in accordance with their respective Insurance Settlement Agreement), and the Contributing Chartered Organizations, and (b) the Creditors' Committee and JPM in accordance with their respective consent rights under the JPM / Creditors' Committee Term Sheet, as incorporated by reference in Article I.D of the Chapter 11 Plan.

"**Contributing Chartered Organizations**" means the current or former Chartered Organizations listed on Exhibit D to the Plan and any Chartered Organization made a Protected Party under a Post-Effective Date Chartered Organization Settlement approved by the Bankruptcy Court in accordance with Article IV.I in the Plan.  No Participating Chartered Organization shall be considered a Contributing Chartered Organization based solely on the Participating Chartered Organization Insurance Assignment.  Without limiting the foregoing, subject to Confirmation of the Plan and approval of the United Methodist Settlement Agreement by an order of the Bankruptcy Court (including in the Confirmation Order), the United Methodist Entities are Contributing Chartered Organizations and shall be designated as such in the Confirmation Order and the Affirmation Order.  No Chartered Organization shall be a Contributing Chartered

Organization unless it agrees to provide the assignments and releases as set forth in Sections 9 and 10 of the Century and Chubb Companies Insurance Settlement Agreement.

"**Debtors**" means Boy Scouts of America and Delaware BSA, LLC, the debtors and debtors-in-possession in the Chapter 11 Cases.

"**Direct Abuse Claim**" means an Abuse Claim that is not an Indirect Abuse Claim—*i.e.*, is not a liquidated or unliquidated Abuse Claim for contribution, indemnity, reimbursement, or subrogation, whether contractual or implied by law (as those terms are defined by the applicable non-bankruptcy law of the relevant jurisdiction), and any other derivative Abuse Claim of any kind whatsoever, whether in the nature of or sounding in contract, tort, warranty or any other theory of law or equity whatsoever, including any indemnification, reimbursement, hold-harmless or other payment obligation provided for under any prepetition settlement, insurance policy, program agreement or contract; *provided, however*, that any retrospective premiums and self-insured retentions arising out of any Abuse Claims under the Abuse Insurance Policies shall not constitute an Indirect Abuse Claim.

"**District Court**" means the United States District Court for the District of Delaware, having jurisdiction in the Chapter 11 Cases.

"**Insurance Settlement Agreement**" means (a) any settlement agreement entered into after the Petition Date and before the Effective Date by and among (i) any Insurance Company, on the one hand, and (ii) one or more of the Debtors and/or any other Protected Party or Limited Protected Party, on the other hand, under which an Insurance Policy and/or the Debtors' and/or other Protected Parties' or Limited Protected Parties' rights thereunder with respect to Abuse Claims or Non-Abuse Litigation Claims are, subject to Confirmation of the Plan and the entry of a Final Order approving such settlement agreement (which order may be the Confirmation Order), released; and (b) any Post-Effective Date Insurance Settlement entered into during the Insurance Settlement Period by and between (i) any Insurance Company, on the one hand, and (ii) the Settlement Trustee (or the Settlement Trustee and any other Protected Party), on the other hand, under which an Insurance Policy that is subject to the Insurance Assignment and/or the Settlement Trustee's and/or Protected Parties' or Limited Protected Parties' rights thereunder with respect to Abuse Claims or Non-Abuse Litigation Claims are released. All Insurance Settlement Agreements entered into before the Effective Date related to Specified Primary Insurance Policies that release the applicable Insurance Company from liability arising from Non-Abuse Litigation Claims must be acceptable to the Creditors' Committee in accordance with the terms of the JPM / Creditors' Committee Term Sheet; provided, however, that with respect to proposed settlements of any Specified Excess Insurance Policy entered into before the Effective Date, the Creditors' Committee shall have consultation rights.

"**Legal Representative**" means a personal representative, guardian, conservator, parent (on behalf of a minor), executor of an estate or a similar representative who has been appointed by a court or has other legal authorization to file a proof of claim and/or an Abuse Claim and execute this Release on behalf of the Claimant.

**"Limited Protected Parties"** means the Participating Chartered Organizations and all of such Persons' Representatives when acting in such representative capacity; provided, however, that no Perpetrator is or shall be a Limited Protected Party.

**"Local Councils"** means, collectively, each and every current or former local council of the BSA, including each and every current local council of the BSA as listed on Exhibit G to the Plan, "supporting organizations" within the meaning of 26 U.S.C. § 509 with respect to any Local Council, Scouting units (including "troops," "dens," "packs," "posts," "clubs," "crews," "ships," "tribes," "labs," "lodges," "councils," "districts," "areas," "regions," and "territories") associated with any Local Council, and all Entities that hold, own, or operate any camp or other property that is operated in the name of or for the benefit of any of the foregoing.

**"Local Council Insurance Policies"** means any and all known and unknown contracts, binders, certificates or insurance policies currently or previously in effect at any time on or before the Petition Date naming the Local Councils, or any of them, or any predecessor, subsidiary, or past or present Affiliate of any Local Council, as an insured (whether as the primary or an additional insured), or otherwise alleged to afford any Local Council insurance coverage, upon which any claim could have been, has been or may be made with respect to any Abuse Claim, including the policies identified on Schedule 3 to the Chapter 11 Plan. Notwithstanding the foregoing, Local Council Insurance Policies shall not include: (a) any policy providing reinsurance to any Settling Insurance Company; (b) any Non-Abuse Insurance Policy; (c) any BSA Insurance Policy; or (d) any Postpetition Insurance Policy.

**"Mixed Claim"** means a claim that makes allegations of Abuse related to or arising from Scouting as well as Abuse that occurred prior to the Petition Date unrelated to or not arising from Scouting. A claim shall not be treated as a Mixed Claim unless and until Scouting-related Abuse allegations have been asserted through a Proof of Claim, the complaint, sworn discovery or testimony (including by affidavit).

**"Non-BSA Sourced Assets"** shall mean Settlement Trust Assets that represent assets received as a result of or in connection with a global settlement between the Debtors or the Trust, on the one hand, and a Chartered Organization that is or becomes a Protected Party, on the other hand, and the proceeds of such assets. For the avoidance of doubt, Non-BSA Sourced Assets shall not include any assets received from the Debtors, the Local Councils, or any Settling Insurance Company.

**"Participating Chartered Organization"** means a Chartered Organization (other than a Contributing Chartered Organization, including the United Methodist Entities) that does not (a) object to confirmation of the Plan or (b) inform Debtors' counsel in writing on or before the confirmation objection deadline that it does not wish to make the Participating Chartered Organization Insurance Assignment. Notwithstanding the foregoing, with respect to any Chartered Organization that is a debtor in bankruptcy as of the Confirmation Date, such Chartered Organization shall be a Participating Chartered Organization only if it advises Debtors' counsel in writing that it wishes to make the Participating Chartered Organization Insurance Assignment, and, for the avoidance of doubt, absent such written advisement, none of such Chartered Organization's rights to or under the Abuse Insurance Policies shall be subject to the Participating Chartered Organization Insurance Assignment. A list of Chartered Organizations that are debtors

5

in bankruptcy and may not be Participating Chartered Organizations is attached as Exhibit K to the Plan. For the avoidance of doubt, any Chartered Organization that is a member of an ad hoc group or committee that objects to the confirmation of the Plan shall not be a Participating Chartered Organization.

"**Perpetrator**" means any individual who personally committed or is alleged to have personally committed an act of Abuse that forms the basis for an Abuse Claim; provided for the avoidance of doubt that the term "Perpetrator" shall only include natural persons and not The Church of Jesus Christ of Latter-day Saints, a Utah corporation sole. The term "Perpetrator" does not include any individual who did not personally commit or is not alleged to have personally committed an act of Abuse that forms the basis for an Abuse Claim, against whom an Abuse Claim is nevertheless asserted or may be asserted, including by virtue of such individual's position or service as an employee or volunteer of the Debtors or as a Scout participant, or by virtue of such individual's position or service as an employee or volunteer of a Local Council or a Chartered Organization or as a Scout participant.

"**Protected Parties**" means the following Persons: (a) the Debtors; (b) Reorganized BSA; (c) the Related Non-Debtor Entities; (d) the Local Councils; (e) the Contributing Chartered Organizations; (f) the Settling Insurance Companies; and (g) all of such Persons' Representatives; provided, however, that no Perpetrator is or shall be a Protected Party. Notwithstanding the foregoing, a Contributing Chartered Organization shall be a Protected Party with respect to Abuse Claims only as set forth in the definition of "Abuse Claim."

"**Release Date**" means the later of (1) the date of execution hereof or (2) the date of (i) a "Final Determination" of my Abuse Claim under the TDP or (ii) the fixing of the liability amount for my Abuse Claim under the TDP, provided, however, the Release Date as to Contributing Chartered Organizations and their related Released Parties shall be the later of the date of execution or the date they become a Contributing Chartered Organization.

"**Released Parties**" means the Trust, the Trustee, the STAC, the Claims Administrators, the Protected Parties, the Chartered Organizations, including all Chartered Organizations that are not Protected Parties or Limited Protected Parties, and each of their respective predecessors, successors, assigns, assignors, representatives, members, officers, employees, agents, consultants, lawyers, advisors, professionals, trustees, insurers, beneficiaries, administrators, and any natural, legal, or juridical person or entity acting on behalf of or having liability in respect of the Trust, the Trustee, the STAC, the Claims Administrators, the Protected Parties, or the Contributing Chartered Organizations.

"**Scouting-related**" means anything that is attributable to, arises from, is based upon, results from, or relates to, in whole or in part, directly, indirectly, or derivatively, Scouting.

"**Settling Insurance Company**" means any Insurance Company that contributes funds, proceeds or other consideration to or for the benefit of the Settlement Trust pursuant to an Insurance Settlement Agreement that is approved by (a) an order of the Bankruptcy Court (including the Confirmation Order) and is designated as a Settling Insurance Company in the Confirmation Order or the Affirmation Order or (b) the Settlement Trust. Without limiting the foregoing, subject to Confirmation of the Plan and approval of the applicable Insurance Settlement Agreement by an

6

order or orders of the Bankruptcy Court (including in the Confirmation Order), Century, the Chubb Companies, Clarendon, the Hartford Protected Parties, the Zurich Affiliated Insurers and the Zurich Insurers are each Settling Insurance Companies and shall be designated as such in the Confirmation Order and the Affirmation Order.

"**STAC**" means the Settlement Trust Advisory Committee appointed to oversee the Trust in accordance with the Chapter 11 Plan and the Trust Agreement.

"**TDP**" means the Boy Scouts of America Trust Distribution Procedures for Abuse Claims, substantially in the form attached as Exhibit A to the Chapter 11 Plan and filed in the Chapter 11 Cases on August ___, 2022, as may be amended and supplemented thereafter from time to time.

 "**Trust Agreement**" means the Settlement Trust Agreement dated as of the Effective Date, substantially in the form attached to the Chapter 11 Plan as Exhibit B, as the same may be amended or modified from time to time in accordance with the terms thereof.

"**Trustee**" means [●] or any other person appointed to serve as trustee under and in accordance with the Trust Agreement.

## RELEASE AND INDEMNIFICATION

A.      In consideration of the benefit of an Award from the Trust, and without limiting any of the Releases or Injunctions in the Plan, which remain in full force and effect in favor of the Protected Parties, the Limited Protected Parties, and Opt-Out Chartered Organizations (as set forth in the Plan), I, on my own behalf and on behalf of my respective predecessors, successors, assigns, assignors, representatives, attorneys, agents, trustees, insurers, heirs, next of kin, estates, beneficiaries, executors, administrators, and any natural, legal, or juridical person or entity to the extent he, she, or it is entitled to assert any claim on my behalf, including, but not limited to, a Legal Representative, (hereafter "**I**", "**my**" or "**me**"), do hereby as of the Release Date voluntarily, intentionally, knowingly, absolutely, unconditionally, irrevocably, and fully waive, release, remit, acquit, forever discharge, and covenant not to knowingly sue or continue prosecution against the Released Parties, or any of them, from and with respect to any and all claims, including, but not limited to, all claims as defined in section 101(5) of the Bankruptcy Code, charges, complaints, demands, obligations, causes of action, losses, expenses, suits, awards, promises, agreements, rights to payment, right to any equitable remedy, rights of any contribution, indemnification, reimbursement, subrogation or similar rights, demands, debts, liabilities, express or implied contracts, obligations of payment or performances, rights of offset or recoupment, costs, expenses, attorneys' and other professional fees and expenses, compensation or other relief, and liabilities of any nature whatsoever whether present or future, known or unknown, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, absolute or contingent, direct or derivative and whether based on contract, tort, statutory, or any other legal or equitable theory of recovery (collectively, "**Released Claims**") arising from, relating to, resulting from or in any way connected to, in whole or in part, my Abuse Claim (solely to the extent asserted against any of the Protected Parties or any Chartered Organizations) and the discharge of the Released Parties' duties and responsibilities under the Trust Agreement, including any agreement, document, instrument or certification contemplated by the Trust Agreement, the TDP, the Chapter 11 Plan, the formulation, preparation, negotiation, execution or consummation of the Trust Agreement, the TDP and the

<div align="center">7</div>

Chapter 11 Plan, and any and all other orders of the District Court or Bankruptcy Court relating to the Released Parties and/or their duties and responsibilities, from the beginning of time through the execution date of this Release.  I covenant and agree that I will honor the release as set forth in the preceding sentence and, further, that I will not knowingly (i) institute or continue prosecution of a lawsuit or other action against any Released Party based upon, arising out of, or relating to any Released Claims released hereby, (ii) knowingly participate, assist, or cooperate in any such action, or (iii) knowingly encourage, assist and/or solicit any third party to institute any such action.

B.        Without limiting the foregoing, and notwithstanding anything to the contrary in this Release, the release set forth herein shall not apply in favor of the Trust as to my right to full payment of my allowed Direct Abuse Claim, provided means for such payment by the Trust are available under the Plan and the Trust Distribution Procedures.

C.        Without limiting the foregoing, and notwithstanding anything to the contrary in this Release, in consideration of the benefit of the contribution made by each Settling Insurance Company to the Trust pursuant to an Insurance Settlement Agreement and the payment by the Trust to me of the Award, I do hereby as of the Release Date voluntarily, intentionally, knowingly, absolutely, unconditionally, irrevocably, and fully waive, release, remit, acquit, forever discharge, and covenant not to knowingly sue or continue prosecution against (i) each Settling Insurance Company and (ii) any insured, co-insured or other third party (including any Local Council, any other Protected Party, any Limited Protected Party, and any other Chartered Organization) under any Abuse Insurance Policy issued by any Settling Insurance Company or any other insurance policy issued by any Settling Insurance Company, including a policy issued to a Chartered Organization (any such third party, an "**Insured Party Releasee**"), in the case of (i) or (ii) from and with respect to any Abuse Claim.

D.        I, as assignor, hereby transfer and assign to the Trust, as assignee, any rights, claims, benefits, or Causes of Action arising out of or related to my Abuse Claim that are not released herein, (i) and that are against Non-Settling Insurance Companies or (ii) to the extent my Abuse Claim is resolved pursuant to the Independent Review Option under the TDP.

E.        I hereby acknowledge that, pursuant to the Chapter 11 Plan, the Channeling Injunction, and the Confirmation Order, the Debtors have been fully and completely discharged and released, including their respective property and successors and assigns, from any and all liability arising from or related to my Abuse Claim, which liability shall be assumed by the Trust pursuant to the Plan.

F.        I hereby acknowledge that, pursuant to the Chapter 11 Plan, the Channeling Injunction, and the Confirmation Order, the sole recourse of any holder of an Abuse Claim against a Protected Party (or any holder of a Post-1975 Chartered Organization Abuse Claim or Pre-1976 Chartered Organization Abuse Claim against a Limited Protected Party, or any holder of an Opt-Out Chartered Organization Abuse Claim against an Opt-Out Chartered Organization) on account of such Abuse Claim (or Post-1975 Chartered Organization Abuse Claim, Pre-1976 Chartered Organization Abuse Claim, or Opt-Out Chartered Organization Abuse Claim) shall be to and against the Trust and such holder shall have no right whatsoever at any time to assert such Abuse Claim against any Protected Party or any property or interest in property of any Protected Party (or to assert any Post-1975 Chartered Organization Abuse Claim or Pre-1976 Chartered

8

Organization Abuse Claim against a Limited Protected Party or any property or interest in property of any Limited Protected Party, or to assert any Opt-Out Chartered Organization Abuse Claim against an Opt-Out Chartered Organization or any property or interest in property of any Opt-Out Chartered Organization).

G.     I hereby acknowledge that, pursuant to this Release, I am voluntarily providing a release as of the Release Date to all Insured Party Releasees and Chartered Organizations, including all Chartered Organizations that are not Protected Parties or Limited Protected Parties, and as of the Release Date I shall have no remedies with respect to my Abuse Claim against any Insured Party Releasees or Chartered Organizations, including those that are not Protected Parties and Limited Protected Parties. This Release does not release claims that have been assigned to the Trust and I acknowledge I will have no personal rights in such assigned claims.

H.     I hereby acknowledge that by executing this Release, I will have the opportunity to share in any settlement proceeds received from a Chartered Organization that is or becomes a Protected Party (and to any Chartered Organization that is an Insured Party Releasee), provided, however, that under the Trust Distribution Procedures Non-BSA Sourced Assets (which include proceeds received from Chartered Organizations) shall be allocated (after deducting an estimated pro rata share of Trust expenses and direct expenses related to the collection of such Non-BSA Sourced Assets) all or in part only among the holders of Allowed Abuse Claims that (1) could have been satisfied from the source of such Non-BSA Sourced Assets absent the Plan's discharge and Channeling Injunction and (2) execute this or a similar Release.  For the avoidance of doubt, nothing in this Release shall limit or impair my rights to share in any settlement proceeds received by the Trust from a Chartered Organization.

I. In further consideration of the benefit of an Award, as of the Release Date, I shall indemnify and forever hold harmless, and pay all final judgments, damages, costs, expenses, fines, penalties, interest, multipliers, or liabilities in whatsoever nature, including costs of defense and attorneys' fees of, the Trust, the Trustee, the STAC, and the Claims Administrators arising from my failure to comply with the terms of this Release.

J.     I acknowledge that the Trust is not providing any tax advice with respect to the receipt of the Award or any component thereof, and I understand and agree that I shall be solely responsible for compliance with all tax laws with respect to the Award, to the extent applicable.

Claimant or Legal Representative Printed Name:   _____

Claimant or Legal Representative Signature:   _____

Date:   _____

<u>**EXHIBIT D**</u>

**FINAL DETERMINATION**

**CLAIMANT RELEASE AND INDEMNIFICATION IN CONNECTION WITH
DISTRIBUTION FROM THE BOY SCOUTS OF AMERICA SETTLEMENT TRUST**

To receive payment of an Award (as defined below) from the Boy Scouts Settlement Trust (the "**Trust**"), an eligible Claimant must execute and submit to the Trustee (as defined below) this Release and Indemnification (the "**Release**"). This Release must be signed by the Claimant or the Claimant's Legal Representative (as defined below). A signature by an attorney for the Claimant or by an attorney for the Claimant's Legal Representative is not sufficient.

If you need assistance, please contact the Claims Administrators by email at [●] or by phone toll-free at [●]. You may also visit the BSA Abuse Survivor Website for additional information.

**DEFINITIONS**

The definitions set forth above for the terms "**Trust**" and "**Release**" are specifically incorporated herein by reference as if fully set forth in this section.

All capitalized terms not otherwise defined herein shall have the same meaning ascribed to them in the Chapter 11 Plan (as defined below).

"**Abuse**" means sexual conduct or misconduct, sexual abuse or molestation, sexual exploitation, indecent assault or battery, rape, pedophilia, ephebophilia, sexually related psychological or emotional harm, humiliation, anguish, shock, sickness, disease, disability, dysfunction, or intimidation, any other sexual misconduct or injury, contacts or interactions of a sexual nature, including the use of photography, video, or digital media, or other physical abuse or bullying or harassment without regard to whether such physical abuse or bullying is of a sexual nature, between a child and an adult, between a child and another child, or between a non-consenting adult and another adult, in each instance without regard to whether such activity involved explicit force, whether such activity involved genital or other physical contact, and whether there is or was any associated physical, psychological, or emotional harm to the child or non-consenting adult.

"**Abuse Claim**" means a liquidated or unliquidated Claim against a Protected Party (including the Settling Insurance Companies), a Limited Protected Party, or an Opt-Out Chartered Organization or any of their respective Representatives (in their capacities as such) that is attributable to, arises from, is based upon, relates to, or results from, directly, indirectly, or derivatively, alleged Scouting-related Abuse that occurred prior to the Petition Date, including any such Claim that seeks monetary damages or other relief, under any theory of law or equity whatsoever, including vicarious liability, alter ego, respondeat superior, conspiracy, fraud, including fraud in the inducement, any negligence-based or employment-based theory, including negligent hiring, selection, supervision, retention or misrepresentation, any other theory based upon, or directly or indirectly related to any insurance relationship, the provision of insurance or the provision of insurance services to or by any Protected Parties, or misrepresentation, concealment, or unfair practice, breach of fiduciary duty, public or private nuisance, gross negligence, willful misconduct, or any other theory, including any theory based on or related to public policy or any act or failure

1

to act, or failure to warn by a Protected Party, a Limited Protected Party, an Opt-Out Chartered Organization, any of their respective Representatives (in their capacities as such)  or any other Person for whom any Protected Party, Limited Protected Party, or Opt-Out Chartered Organization is alleged to be responsible (including any such Claim that has been asserted or may be amended to assert in a proof of claim alleging Abuse, whether or not timely filed, in the Chapter 11 Cases, or any such Claim that has been asserted against the Settlement Trust), including any proportionate or allocable share of liability based thereon.  Abuse Claims include any Future Abuse Claims, any Indirect Abuse Claims, any Opt-Out Chartered Organization Abuse Claim and any other Claim that is attributable to, arises from, is based upon, relates to, or results from, alleged Scouting-related Abuse regardless of whether, as of the Petition Date, such Claim was barred by any applicable statute of limitations.  For the avoidance of doubt,  (i) a Claim alleging Abuse shall not be an "Abuse Claim" against a Protected Party, Limited Protected Party, or Opt-Out Chartered Organization or any of their respective Representatives if such Claim is unrelated to Scouting (except as provided in (iii) below, including the portion of any Mixed Claim that is unrelated to Scouting); (ii) a Claim alleging Abuse shall be an "Abuse Claim" against a Protected Party, Limited Protected Party, or Opt-Out Chartered Organization or any of their respective Representatives (in their capacity as such) if such Claim is related to Scouting (including the portion of any Mixed Claim that is related to Scouting); (iii) any portion of a Mixed Claim alleging Abuse involving the Debtors, Reorganized BSA, Non-Debtor Entities, Local Councils, or their respective Representatives (in their capacities as such) is necessarily Scouting-related and shall be considered an Abuse Claim; and (iv) any Claim against the Debtors, Reorganized BSA, Non-Debtor Entities, Local Councils, or their respective Representatives (in their capacities as such) alleging Abuse is necessarily Scouting-related and shall be considered an Abuse Claim.

"**Abuse Insurance Policies**" means, collectively, the BSA Insurance Policies, and the Local Council Insurance Policies.  Abuse Insurance Policies do not include Non-Abuse Insurance Policies or Postpetition Insurance Policies.

"**Award**" means the compensation a Claimant receives on behalf of the Claimant's Abuse Claim.

"**Bankruptcy Court**" means the United States Bankruptcy Court for the District of Delaware, having subject matter jurisdiction over the Chapter 11 Cases and, to the extent of any reference withdrawal made under section 157(d) of title 28 of the United States Code, the District Court.

"**BSA Insurance Policies**" means any and all known and unknown contracts, binders, certificates or Insurance Policies currently or previously in effect at any time on or before the Petition Date naming the Debtors, or either of them, or any predecessor, subsidiary, or past or present Affiliate of the Debtors, as an insured (whether as the primary or an additional insured), or otherwise alleged to afford the Debtors insurance coverage, upon which any claim could have been, has been, or may be made with respect to any Abuse Claim, including the policies listed on Schedule 2 to the Chapter 11 Plan.  Notwithstanding the foregoing, BSA Insurance Policies shall not include: (a) any policy providing reinsurance to any Insurance Company; (b) any Non-Abuse Insurance Policy; (c) any Local Council Insurance Policy; or (d) any Postpetition Insurance Policy.

"**Channeling Injunction**" means the permanent injunction provided for in Article X.F of the Chapter 11 Plan with respect to (a) Abuse Claims against the Protected Parties, (b) Post-1975 Chartered Organization Abuse Claims against the Limited Protected Parties, (c) Abuse Claims

against the Limited Protected Parties that are covered under any insurance policy issued by the Settling Insurance Companies (as determined pursuant to <u>Section X.F.3</u> of the Chapter 11 Plan), and (d) Opt-Out Chartered Organization Abuse Claims against the Opt-Out Chartered Organizations, to be issued pursuant to the Confirmation Order.

"**Chapter 11 Cases**" means the jointly administered cases under chapter 11 of the Bankruptcy Code commenced by the Debtors on the Petition Date in the Bankruptcy Court and currently styled *In re Boy Scouts of America and Delaware BSA, LLC*, Bankruptcy Case No. 20-10343 (LSS) (Jointly Administered).

"**Chapter 11 Plan**" or "**Plan**" means the *Third Modified Fifth Amended Chapter 11 Plan of Reorganization (With Technical Modifications) for Boy Scouts of America and Delaware BSA, LLC*, filed in the Chapter 11 Cases (as the same may be amended or modified), and confirmed by the Bankruptcy Court.

"**Chartered Organizations**" means each and every civic, faith-based, educational or business organization, governmental entity or organization, other entity or organization, or group of individual citizens, in each case presently or formerly authorized by the BSA to operate, sponsor or otherwise support one or more Scouting units.

"**Claimant**" means the holder of an Abuse Claim who (i) has satisfied the eligibility criteria section forth in <u>Articles IV and XIII</u> of the Trust Distribution Procedures, (ii) has had his or her Abuse Claim channeled to the Trust for evaluation, resolution, and payment pursuant to the Plan and the Channeling Injunction, and (iii) is signing and executing this Release (or on whose behalf this Release is being signed and executed by a Legal Representative).

"**Confirmation Order**" means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code, which shall be in form and substance acceptable to (a) the Debtors, the Ad Hoc Committee, the Coalition, Tort Claimants' Committee, the Future Claimants' Representative, the Settling Insurance Companies (in accordance with their respective Insurance Settlement Agreement), and the Contributing Chartered Organizations, and (b) the Creditors' Committee and JPM in accordance with their respective consent rights under the JPM / Creditors' Committee Term Sheet, as incorporated by reference in <u>Article I.D</u> of the Plan.

"**Contributing Chartered Organizations**" means the current or former Chartered Organizations listed on Exhibit D to the Plan and any Chartered Organization made a Protected Party under a Post-Effective Date Chartered Organization Settlement approved by the Bankruptcy Court in accordance with <u>Article IV.I</u> in the Plan.  No Participating Chartered Organization shall be considered a Contributing Chartered Organization based solely on the Participating Chartered Organization Insurance Assignment.  Without limiting the foregoing, subject to Confirmation of the Plan and approval of the United Methodist Settlement Agreement by an order of the Bankruptcy Court (including in the Confirmation Order), the United Methodist Entities are Contributing Chartered Organizations and shall be designated as such in the Confirmation Order and the Affirmation Order.  No Chartered Organization shall be a Contributing Chartered Organization unless it agrees to provide the assignments and releases as set forth in Sections 9 and 10 of the Century and Chubb Companies Insurance Settlement Agreement.

"**Debtors**" means Boy Scouts of America and Delaware BSA, LLC, the debtors and debtors-in-possession in the Chapter 11 Cases.

"**District Court**" means the United States District Court for the District of Delaware, having jurisdiction in the Chapter 11 Cases.

"**Insurance Settlement Agreement**" means (a) any settlement agreement entered into after the Petition Date and before the Effective Date by and among (i) any Insurance Company, on the one hand, and (ii) one or more of the Debtors and/or any other Protected Party or Limited Protected Party, on the other hand, under which an Insurance Policy and/or the Debtors and/or other Protected Parties' or Limited Protected Parties' rights thereunder with respect to Abuse Claims or Non-Abuse Litigation Claims are, subject to Confirmation of the Plan and the entry of a Final Order approving such settlement agreement (which order may be the Confirmation Order), released; and (b) any Post-Effective Date Insurance Settlement entered into during the Insurance Settlement Period by and between (i) any Insurance Company, on the one hand, and (ii) the Settlement Trustee (or the Settlement Trustee and any other Protected Party), on the other hand, under which an Insurance Policy that is subject to the Insurance Assignment and/or the Settlement Trustee's and/or Protected Parties' or Limited Protected Parties' rights thereunder with respect to Abuse Claims or Non-Abuse Litigation Claims are released. All Insurance Settlement Agreements entered into before the Effective Date related to Specified Primary Insurance Policies that release the applicable Insurance Company from liability arising from Non-Abuse Litigation Claims must be acceptable to the Creditors' Committee in accordance with the terms of the JPM / Creditors' Committee Term Sheet; provided, however, that with respect to proposed settlements of any Specified Excess Insurance Policy entered into before the Effective Date, the Creditors' Committee shall have consultation rights.

"**Legal Representative**" means a personal representative, guardian, conservator, parent (on behalf of a minor), executor of an estate or a similar representative who has been appointed by a court or has other legal authorization to file a proof of claim and/or an Abuse Claim and execute this Release on behalf of the Claimant.

"**Limited Protected Parties**" means the Participating Chartered Organizations and all of such Persons' Representatives when acting in such representative capacity; provided, however, that no Perpetrator is or shall be a Limited Protected Party.

"**Local Councils**" means, collectively, each and every current or former local council of the BSA, including each and every current local council of the BSA as listed on Exhibit G to the Plan, "supporting organizations" within the meaning of 26 U.S.C. § 509 with respect to any Local Council, Scouting units (including "troops," "dens," "packs," "posts," "clubs," "crews," "ships," "tribes," "labs," "lodges," "councils," "districts," "areas," "regions," and "territories") associated with any Local Council, and all Entities that hold, own, or operate any camp or other property that is operated in the name of or for the benefit of any of the foregoing.

"**Local Council Insurance Policies**" means any and all known and unknown contracts, binders, certificates or insurance policies currently or previously in effect at any time on or before the Petition Date naming the Local Councils, or any of them, or any predecessor, subsidiary, or past or present Affiliate of any Local Council, as an insured (whether as the primary or an additional

4

insured), or otherwise alleged to afford any Local Council insurance coverage, upon which any claim could have been, has been or may be made with respect to any Abuse Claim, including the policies identified on Schedule 3 to the Chapter 11 Plan.  Notwithstanding the foregoing, Local Council Insurance Policies shall not include: (a) any policy providing reinsurance to any Settling Insurance Company; (b) any Non-Abuse Insurance Policy; (c) any BSA Insurance Policy; or (d) any Postpetition Insurance Policy.

"**Mixed Claim**" means a claim that makes allegations of Abuse related to or arising from Scouting as well as Abuse that occurred prior to the Petition Date unrelated to or not arising from Scouting. A claim shall not be treated as a Mixed Claim unless and until Scouting-related Abuse allegations have been asserted through a Proof of Claim, the complaint, sworn discovery or testimony (including by affidavit).

"**Non-BSA Sourced Assets**" shall mean Settlement Trust Assets that represent assets received as a result of or in connection with a global settlement between the Debtors or the Trust, on the one hand, and a Chartered Organization that is or becomes a Protected Party, on the other hand, and the proceeds of such assets.  For the avoidance of doubt, Non-BSA Sourced Assets shall not include any assets received from the Debtors, the Local Councils, or any Settling Insurance Company.

"**Participating Chartered Organization**" means a Chartered Organization (other than a Contributing Chartered Organization, including the United Methodist Entities) that does not (a) object to confirmation of the Plan or (b) inform Debtors' counsel in writing on or before the confirmation objection deadline that it does not wish to make the Participating Chartered Organization Insurance Assignment. Notwithstanding the foregoing, with respect to any Chartered Organization that is a debtor in bankruptcy as of the Confirmation Date, such Chartered Organization shall be a Participating Chartered Organization only if it advises Debtors' counsel in writing that it wishes to make the Participating Chartered Organization Insurance Assignment, and, for the avoidance of doubt, absent such written advisement, none of such Chartered Organization's rights to or under the Abuse Insurance Policies shall be subject to the Participating Chartered Organization Insurance Assignment.  A list of Chartered Organizations that are debtors in bankruptcy and may not be Participating Chartered Organizations is attached as Exhibit K to the Plan.  For the avoidance of doubt, any Chartered Organization that is a member of an ad hoc group or committee that objects to the confirmation of the Plan shall not be a Participating Chartered Organization.

"**Perpetrator**" means any individual who personally committed or is alleged to have personally committed an act of Abuse that forms the basis for an Abuse Claim.  The term "Perpetrator" does not include any individual who did not personally commit or is not alleged to have personally committed an act of Abuse that forms the basis for an Abuse Claim, against whom an Abuse Claim is nevertheless asserted or may be asserted, including by virtue of such individual's position or service as an employee or volunteer of the Debtors or as a Scout participant, or by virtue of such individual's position or service as an employee or volunteer of a Local Council or a Chartered Organization or as a Scout participant.

"**Protected Parties**" means the following Persons: (a) the Debtors; (b) Reorganized BSA; (c) the Related Non-Debtor Entities; (d) the Local Councils; (e) the Contributing Chartered

Organizations; (f) the Settling Insurance Companies; and (g) all of such Persons' Representatives; provided, however, that no Perpetrator is or shall be a Protected Party. Notwithstanding the foregoing, a Contributing Chartered Organization shall be a Protected Party with respect to Abuse Claims only as set forth in the definition of "Abuse Claim."

**"Release Date"** means the later of (1) the date of execution hereof or (2) the date of (i) a "Final Determination" of my Abuse Claim under the TDP or (ii) the fixing of the liability amount for my Abuse Claim under the TDP, provided, however, the Release Date as to Contributing Chartered Organizations and their related Released Parties shall be the later of the date of execution or the date they become a Contributing Chartered Organization.

**"Released Parties"** means the Trust, the Trustee, the STAC, the Claims Administrators, the Protected Parties, the Contributing Chartered Organizations (including any Chartered Organization that becomes a Contributing Chartered Organization as of such date after the execution of this Release), Participating Chartered Organizations with respect to Post-1975 Chartered Organization Claims and Abuse Claims covered under insurance policies issued by Settling Insurance Companies, Opt-Out Chartered Organizations with respect to Abuse Claims covered under insurance policies issued by Settling Insurance Companies, and each of their respective predecessors, successors, assigns, assignors, representatives, members, officers, employees, agents, consultants, lawyers, advisors, professionals, trustees, insurers, beneficiaries, administrators, and any natural, legal, or juridical person or entity acting on behalf of or having liability in respect of the Trust, the Trustee, the STAC, the Claims Administrators, the Protected Parties, or the Contributing Chartered Organizations.

**"Scouting-related"** means anything that is attributable to, arises from, is based upon, results from, or relates to, in whole or in part, directly, indirectly, or derivatively, Scouting.

**"Settling Insurance Company"** means any Insurance Company that contributes funds, proceeds or other consideration to or for the benefit of the Settlement Trust pursuant to an Insurance Settlement Agreement that is approved by (a) an order of the Bankruptcy Court (including the Confirmation Order) and is designated as a Settling Insurance Company in the Confirmation Order or the Affirmation Order or (b) the Settlement Trust. Without limiting the foregoing, subject to Confirmation of the Plan and approval of the applicable Insurance Settlement Agreement by an order or orders of the Bankruptcy Court (including in the Confirmation Order), Century, the Chubb Companies, Clarendon, the Hartford Protected Parties, the Zurich Affiliated Insurers and the Zurich Insurers are each Settling Insurance Companies and shall be designated as such in the Confirmation Order and the Affirmation Order.

**"STAC"** means the Settlement Trust Advisory Committee appointed to oversee the Trust in accordance with the Chapter 11 Plan and the Trust Agreement.

**"TDP"** means the Boy Scouts of America Trust Distribution Procedures for Abuse Claims, substantially in the form attached as Exhibit A to the Chapter 11 Plan and filed in the Chapter 11 Cases on August ___, 2022, as may be amended and supplemented thereafter from time to time.

"**Trust Agreement**" means the Settlement Trust Agreement dated as of the Effective Date, substantially in the form attached to the Chapter 11 Plan as Exhibit B, as the same may be amended or modified from time to time in accordance with the terms thereof.

"**Trustee**" means [●] or any other person appointed to serve as trustee under and in accordance with the Trust Agreement.

## RELEASE AND INDEMNIFICATION

A.        In consideration of the benefit of an Award from the Trust, and without limiting any of the Releases or Injunctions in the Plan, which remain in full force and effect in favor of the Protected Parties, the Limited Protected Parties, and Opt-Out Chartered Organizations (as set forth in the Plan), I, on my own behalf and on behalf of my respective predecessors, successors, assigns, assignors, representatives, attorneys, agents, trustees, insurers, heirs, next of kin, estates, beneficiaries, executors, administrators, and any natural, legal, or juridical person or entity to the extent he, she, or it is entitled to assert any claim on my behalf, including, but not limited to, a Legal Representative, (hereafter "**I**", "**my**" or "**me**"), do hereby as of the Release Date voluntarily, intentionally, knowingly, absolutely, unconditionally, irrevocably, and fully waive, release, remit, acquit, forever discharge, and covenant not to knowingly sue or continue prosecution against the Released Parties, or any of them, from and with respect to any and all claims, including, but not limited to, all claims as defined in section 101(5) of the Bankruptcy Code, charges, complaints, demands, obligations, causes of action, losses, expenses, suits, awards, promises, agreements, rights to payment, right to any equitable remedy, rights of any contribution, indemnification, reimbursement, subrogation or similar rights, demands, debts, liabilities, express or implied contracts, obligations of payment or performances, rights of offset or recoupment, costs, expenses, attorneys' and other professional fees and expenses, compensation or other relief, and liabilities of any nature whatsoever whether present or future, known or unknown, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, absolute or contingent, direct or derivative and whether based on contract, tort, statutory, or any other legal or equitable theory of recovery (collectively, "**Released Claims**") arising from, relating to, resulting from or in any way connected to, in whole or in part, my Abuse Claim (solely to the extent asserted against any of the Protected Parties) and the discharge of the Released Parties' duties and responsibilities under the Trust Agreement, including any agreement, document, instrument or certification contemplated by the Trust Agreement, the TDP, the Chapter 11 Plan, the formulation, preparation, negotiation, execution or consummation of the Trust Agreement, the TDP and the Chapter 11 Plan, and any and all other orders of the District Court or Bankruptcy Court relating to the Released Parties and/or their duties and responsibilities, from the beginning of time through the execution date of this Release.  I covenant and agree that I will honor the release as set forth in the preceding sentence and, further, that I will not knowingly (i) institute or continue prosecution of a lawsuit or other action against any Released Party based upon, arising out of, or relating to any Released Claims released hereby, (ii) knowingly participate, assist, or cooperate in any such action, or (iii) knowingly encourage, assist and/or solicit any third party to institute any such action.

B.        Without limiting the foregoing, and notwithstanding anything to the contrary in this Release, the release set forth herein shall not apply in favor of the Trust as to my right to full payment of my allowed Direct Abuse Claim, provided means for such payment by the Trust are available under the Plan and the Trust Distribution Procedures.

C.      Without limiting the foregoing, and notwithstanding anything to the contrary in this Release, in consideration of the benefit of the contribution made by each Settling Insurance Company to the Trust pursuant to an Insurance Settlement Agreement and the payment by the Trust to me of the Award, I do hereby as of the Release Date voluntarily, intentionally, knowingly, absolutely, unconditionally, irrevocably, and fully waive, release, remit, acquit, forever discharge, and covenant not to knowingly sue or continue prosecution against (i) each Settling Insurance Company and (ii) any insured, co-insured or other third party (including any Local Council, any other Protected Party, any Limited Protected Party, and any other Chartered Organization) under any Abuse Insurance Policy issued by any Settling Insurance Company or any other insurance policy issued by any Settling Insurance Company, including a policy issued to a Chartered Organization (any such third party, an **"Insured Party Releasee"**), in the case of (i) or (ii) from and with respect to any Abuse Claim.

D.      I, as assignor, hereby transfer and assign to the Trust, as assignee, any rights, claims, benefits, or Causes of Action arising out of or related to my Abuse Claim that are not released herein, (i) and that are against Non-Settling Insurance Companies or (ii) to the extent my Abuse Claim is resolved pursuant to the Independent Review Option under the TDP.

E.      I hereby acknowledge that, pursuant to the Chapter 11 Plan, the Channeling Injunction and the Confirmation Order, the Debtors have been fully and completely discharged and released, including their respective property and successors and assigns, from any and all liability arising from or related to my Abuse Claim, which liability shall be assumed by the Trust pursuant to the Plan.

F.      I hereby acknowledge that, pursuant to the Chapter 11 Plan, the Channeling Injunction and the Confirmation Order, the sole recourse of any holder of an Abuse Claim against a Protected Party on account of such Abuse Claim shall be to and against the Trust and such holder shall have no right whatsoever at any time to assert such Abuse Claim against any Protected Party or any property or interest in property of any Protected Party.

G.      I hereby acknowledge that, pursuant to the Chapter 11 Plan, the Channeling Injunction and the Confirmation Order, the sole recourse of any (i) holder of a Post-1975 Chartered Organization Abuse Claim or Pre-1976 Chartered Organization Abuse Claim against a Limited Protected Party on account of such Post-1975 Chartered Organization Abuse Claim or Pre-1976 Chartered Organization Abuse Claim shall be to and against the Trust and such holder shall have no right whatsoever at any time to assert such Post-1975 Chartered Organization Abuse Claim or Pre-1976 Chartered Organization Abuse Claim against any Limited Protected Party or any property or interest in property of any Limited Protected Party, and (ii) holder of an Opt-Out Chartered Organization Abuse Claim against an Opt-Out Chartered Organization on account of such Opt-Out Chartered Organization Abuse Claim shall be to and against the Trust and such holder shall have no right whatsoever at any time to assert such Opt-Out Chartered Organization Abuse Claim against any Opt-Out Chartered Organization or any property or interest in property of any Opt-Out Chartered Organization.

H.      In further consideration of the benefit of an Award, as of the Release Date, I shall indemnify and forever hold harmless, and pay all final judgments, damages, costs, expenses, fines, penalties, interest, multipliers, or liabilities in whatsoever nature, including costs of defense and

8

attorneys' fees of, the Trust, the Trustee, the STAC, and the Claims Administrators arising from my failure to comply with the terms of this Release.

I. I acknowledge that the Trust is not providing any tax advice with respect to the receipt of the Award or any component thereof, and I understand and agree that I shall be solely responsible for compliance with all tax laws with respect to the Award, to the extent applicable.

Claimant or Legal Representative Printed Name: _____

Claimant or Legal Representative Signature: _____

Date: _____

9

# EXHIBIT 4

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | Chapter 11 |
| BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC,[1] | Case No. 20-10343 (LSS) |
| Debtors. | (Jointly Administered) |

## AMENDED DISCLOSURE STATEMENT FOR THE MODIFIED FIFTH AMENDED CHAPTER 11 PLAN OF REORGANIZATION FOR BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC

WHITE & CASE LLP
Jessica C. Lauria (admitted *pro hac vice*)
1221 Avenue of the Americas
New York, New York 10020
Telephone: (212) 819-8200
Email: jessica.lauria@whitecase.com

– and –

WHITE & CASE LLP
Michael C. Andolina (admitted *pro hac vice*)
Matthew E. Linder (admitted *pro hac vice*)
Laura E. Baccash (admitted *pro hac vice*)
Blair M. Warner (admitted *pro hac vice*)
111 South Wacker Drive
Chicago, Illinois 60606
Telephone: (312) 881-5400
Email: mandolina@whitecase.com
        mlinder@whitecase.com
        laura.baccash@whitecase.com
        blair.warner@whitecase.com

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Derek C. Abbott (No. 3376)
Andrew R. Remming (No. 5120)
Paige N. Topper (No. 6470)
1201 North Market Street, 16th Floor
P.O. Box 1347
Wilmington, Delaware 19899-1347
Telephone: (302) 658-9200
Email: dabbott@morrisnichols.com
        aremming@morrisnichols.com
        ptopper@morrisnichols.com

*Attorneys for the Debtors and Debtors in Possession*

Dated: September 29, 2021
        Wilmington, Delaware

---

[1] The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are as follows: Boy Scouts of America (6300); and Delaware BSA, LLC (4311). The Debtors' mailing address is 1325 West Walnut Hill Lane, Irving, Texas 75038.

extending statutes of limitations, or even removing statutes of limitations for survivors of child
sexual Abuse.

The trend of retroactive revisions to limitations periods for Abuse Claims accelerated in
2019, when more than a dozen states (including Arizona, California, District of Columbia,
Montana, New Jersey, New York, and North Carolina) revised their limitations periods to allow
survivors of Abuse to bring Claims that would otherwise have been time-barred.  Shortly before
the Petition Date, a group of plaintiffs filed suit in the U.S. District Court for the District of
Columbia alleging that the District's recent revival-window legislation permits plaintiffs to bring
previously time-barred Claims, regardless of where the Abuse occurred or where the plaintiff
resides.[72]  In addition, prior to the Petition Date, plaintiffs began pursuing a theory that the recently
opened New Jersey statute of limitations allowed the filing of any Claim that arose prior to 1979,
regardless of where the Abuse occurred, since the BSA was headquartered in New Jersey prior to
that date, before its Headquarters moved to Irving, Texas.

These changes in statutes of limitations have dramatically altered the legal landscape for
Abuse Claims.  Specifically, the number of suits alleging Claims from earlier years that would
otherwise have been barred by the applicable limitations period has surged, which is reflected in
the filing of tens of thousands of Abuse Claims in these Chapter 11 Cases.  These suits have forced
the BSA to look backward—past the decades of progress and leadership in youth protection—to
the mid- to late-twentieth century, when the vast majority of the Abuse in Scouting occurred.
Claims alleging Abuse within the last thirty years make up a small fraction of total known Abuse
Claims.[73]  The vast majority of the Claims the BSA is now facing alleged Abuse from the 1960s
to the 1980s.  Fairly compensating survivors that were abused during this period placed
tremendous financial pressure on the BSA and its local partners.

## ARTICLE V. THE CHAPTER 11 CASES

A.    Commencement of the Cases and First Day Relief

On the Petition Date, the Debtors commenced the Chapter 11 Cases by filing voluntary
petitions for relief under chapter 11 of the Bankruptcy Code.  As of the date hereof, the Debtors
have continued, and will continue until the Effective Date, to operate their organization as Debtors-
in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

Also on the Petition Date, the Debtors filed a number of motions seeking typical "first day"
relief in chapter 11 cases authorizing the Debtors to maintain their operations in the ordinary course
(collectively, the "First Day Motions").  This relief was designed to ensure a seamless transition
into the chapter 11 process and allow the Debtors to maintain their operations in the ordinary
course so as to function smoothly while their cases progressed.  The Bankruptcy Court granted
substantially all of the relief requested in the First Day Motions and entered various interim and
final orders authorizing the Debtors to, among other things:

---

[72]   *See Does 1-8 v. Boy Scouts of America*, Case No. 20–00017 (D.D.C.).

[73]   Of the approximately 95,200 pending or asserted Abuse Claims against the BSA, approximately 65,000 claims have
ascertainable dates.  Of the approximately 65,000 dated Claims, approximately 80% involve Claims alleging Abuse that
occurred before 1988.

Without a clear path for removing the Initial Hartford Settlement Agreement from the Plan, the Debtors, the Ad Hoc Committee, Hartford, the Coalition, the Future Claimants' Representative and the Tort Claimants' Committee continued to engage in mediated negotiations regarding the terms of a settlement with Hartford that would be acceptable to the parties.  On August 27, 2021, during those negotiations, the Restructuring Support Agreement expired in accordance with its terms.

These further mediation sessions produced an agreement in principle on new settlement terms (the Hartford Insurance Settlement Agreement) with Hartford that is supported by the Debtors, the Ad Hoc Committee, the Coalition, the Future Claimants' Representative, and State Court Counsel.  Those terms and conditions are set forth in the Hartford Insurance Settlement Agreement, which is incorporated into the Plan.  The terms of the Hartford Insurance Settlement Agreement are summarized below and in the term sheet appended to the *Sixth Mediators' Report* [D.I. 6210] filed on September 14, 2021, which remains subject to definitive documentation in a definitive written settlement agreement that is consistent with such term sheet and executed by all of the parties thereto and any additional joining parties (and which will be attached to the Plan as Exhibit I-1 following such execution and will also be included in the Plan Supplement).  In the event of any inconsistency, the terms set forth in the Hartford Insurance Settlement Agreement (including as set forth in any such definitive written settlement agreement) shall control over the summary of those terms set forth herein.

### a.    **BSA/Hartford Background**

Hartford issued primary and certain umbrella policies to the BSA for the period from September 21, 1971 to January 1, 1978.  Prior to the Petition Date, the BSA and Hartford were engaged in litigation over the scope of coverage provided under the Hartford Policies.  In that litigation, Hartford raised a number of defenses that, if successful, would substantially reduce or even eliminate coverage for the Abuse Claims, including that the BSA has breached conditions to coverage; that the Abuse Claims arise out of a single occurrence under applicable law, which Hartford believes is New Jersey law under its primary policies; and that the BSA and the Local Councils expected or intended the injuries for which they seek coverage.

Hartford has also contended, outside of litigation, that the BSA's access to certain of its policies is significantly limited, including that the BSA released and extinguished its primary policies for January 1, 1976 to January 1, 1978 through a prepetition settlement; that it has no coverage obligations for Abuse Claims that are barred by the applicable statute of limitations; and that at least one of the Hartford primary policies has an applicable aggregate limit for Abuse Claims.

While the Debtors dispute many, if not all, of those contentions, continuing to litigate against Hartford would not only drain the Debtors' limited resources but could also create a substantial risk that Hartford would ultimately pay significantly less toward Abuse Claims than it would under the Hartford Insurance Settlement Agreement—and some risk that Hartford would pay nothing.

The resolution of the coverage dispute reflected in the Hartford Insurance Settlement Agreement was the product of extensive, arm's-length negotiations between the Debtors, the Ad

# EXHIBIT 5

## THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re:<br><br>BOY SCOUTS OF AMERICA AND<br>DELAWARE BSA, LLC[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 20-10343 (LSS)<br><br>(Jointly Administered)<br><br>**Re:  D.I. 9114** |

### DECLARATION OF BRUCE GRIGGS IN SUPPORT OF CONFIRMATION OF THIRD MODIFIED FIFTH AMENDED CHAPTER 11 PLAN OF REORGANIZATION FOR <u>BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC</u>

I, Bruce Griggs, pursuant to 28 U.S.C. § 1749 and under penalty of perjury, hereby declare as follows:

1.      I am over twenty-one (21) years of age, have never been convicted of a felony, and am fully competent to make this declaration (this "<u>Declaration</u>") in support of confirmation of the *Third Modified Fifth Amended Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC*, dated February 15, 2022 [D.I. 8813] (the "<u>Plan</u>") and the *Debtors' (I) Memorandum of Law In Support of Confirmation of Third Modified Fifth Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC and (II) Omnibus Reply to Plan Confirmation Objections* [D.I. 9114] (the "<u>Memorandum</u>").

2.      I am a shareholder partner at the law firm Ogletree Deakins Nash, Smoak & Stewart, P.C. ("<u>Ogletree</u>").  Except as otherwise stated in this Declaration, all facts set forth herein are based on my personal experience and knowledge or information obtained from my review of relevant documents.

---

[1]  The Debtors in these Chapter 11 Cases, together with the last four digits of each Debtor's federal tax identification number, are as follows:  Boy Scouts of America (6300) and Delaware BSA, LLC (4311).  The Debtors' mailing address is 1325 West Walnut Hill Lane, Irving, Texas 75038.

I.      **Retention of Ogletree as NCC**

3.      Ogletree was retained in August 2016 by the Boy Scouts of America as its National Coordinating Counsel ("NCC") with respect to Abuse Claims[2].  I have been the lead attorney at Ogletree responsible for handling that engagement.[3]  Ogletree has served as NCC since its retention and continues to serve as NCC during the Debtors' Chapter 11 Cases.  I currently oversee a team of one lawyer and one paralegal who works exclusively and full time on this engagement. We also have a second practice assistant/paralegal who devotes most of her time to this engagement.   Prior to the bankruptcy filing, our team had as many as six attorneys and three paralegals assigned to the engagement.

4.      In preparation for my role as NCC, I familiarized myself with the BSA's prior defense strategy.  The BSA historically handled Abuse Claims brought against Local Councils, Related Non-Debtor Entities, and Chartered Organizations in a manner that shielded Local Councils, Related Non-Debtor Entities, and Chartered Organizations from both the costs of litigation and the liability incurred in the settlement of Abuse Claims.  Specifically, the BSA would generally administer and litigate Abuse Claims brought against those entities, as well as authorize and fund the payment of any settlement amounts related to such Abuse Claims.  Abuse Claims brought against TCJC were handled differently.  TCJC generally bore its own costs of litigation and at least an equal share of the liability incurred in the settlement of Abuse Claims.

5.      Ogletree was retained as NCC, to implement a more coordinated, uniform approach for investigating, defending, and resolving Abuse Claims.  Rather than have disparate local counsel across the United States handling these matters, Ogletree would lead the overarching strategy and

---

[2] By "Abuse Claim," I am referring, where appropriate, to the prepetition claims alleging sexual abuse that Ogletree handled on behalf of BSA.

[3] JTX Ex. 988 is a true and correct copy of my Ogletree law firm bio.

2

approach to each claim.  Because attorneys representing plaintiffs in Abuse Claims were highly cohesive and would share information, the BSA wanted to ensure that its defense and claim resolution strategies were consistent across the country.

6.     Ogletree's role as NCC was comprehensive.  Working together with local defense counsel in jurisdictions where claims were filed, Ogletree handled all Abuse Claims asserted against the BSA, Local Councils, and/or any Related Non-Debtor Entities[4] that were pending or filed between Ogletree's engagement and the filing of the bankruptcy.  During this time frame, I am not aware of any Abuse Claims that were pending or made against the BSA or any Local Councils or Related Non-Debtor Entities that Ogletree was not involved with.  I am also not aware of any Abuse Claims made against any Chartered Organizations that involved allegations of sexual abuse related to Scouting, which did not include either the BSA or a Local Council as a co-defendant.  I am aware of various Abuse Claims brought against all three—the BSA, Local Councils, and Chartered Organizations.[5]

7.     In total, Ogletree handled approximately 350 Abuse Claims.  As NCC, we resolved approximately 250 of those claims.[6]  The vast majority of the Abuse Claims that we settled (approximately 85%) involved allegations of sexual abuse that occurred over 30 years ago.  The rest involved allegations of sexual abuse occurring within the last 30 years.  Between 2017 and

---

[4]  There seven Related Non-Debtor Entities (as defined in the Plan).  As of the date of the filing of this Declaration, only two of the Related Non-Debtor Entities have been named in pending lawsuits: (1) Learning for Life and (2) National Boy Scouts of America Foundation.  There are 35 lawsuits pending in which Learning for Life is named as a co-defendant and there are 20 lawsuits in which National Boy Scouts of America Foundation is named as a co-defendant.

[5]  As part of discovery in this case, Ogletree produced all the complaints it had in its file relating to Abuse Claims.  Those complaints have been collected as JTX Exs. 8-1 to 8-3.  These complaints were kept in the ordinary course of business.

[6]  JTX Ex. 1003 is a true and correct copy of a spreadsheet prepared by Ogletree summarizing the BSA's settlements between 2016 and 2020.  JTX Ex. 1002 is a true and correct copy of a spreadsheet prepared by Ogletree summarizing the BSA's settlements between 2010 and 2020.  JTX Ex. 386 is a true and correct copy of another spreadsheet prepared by Ogletree describing BSA's settlements between 2016 and 2020.

2019, approximately $160 million was spent by, or on behalf of, the BSA, Local Councils, and Chartered Organizations in resolving Abuse Claims.

8.     The Abuse Claims that Ogletree handled varied widely in terms of the factual circumstances of the abuse and therefore, the valuation of the Abuse Claim. Some Abuse Claims could be resolved for relatively modest sums, and other Abuse Claims involving more serious abuse and facts that established a greater responsibility for scouting would be settled for greater amounts. Notably, the BSA also faced a small set of claims that involved particularly egregious facts and circumstance (such as those presented in the claims relating to the abuse perpetrated by Thomas Hacker) that resulted in particularly high, outlier settlements. The Debtors would expend substantial resources defending against these outlier claims and viewed the claims involving Hacker as an exceptional matters in regards to their settlement values.

## II.     Pre-Petition Responsibilities and Practices

9.     Broadly speaking, Ogletree's role as NCC involved coordinating with local defense counsel across the country to investigate, defend, assess, value, negotiate, and typically settle Abuse Claims asserted against the BSA and/or a Local Council.  This would include (a) doing an initial investigation of the Abuse Claim, (b) retaining and/or recommending local defense counsel on behalf of the BSA, Local Councils, and certain Chartered Organizations, (c) leading and coordinating the defense strategy on behalf of the BSA, Local Councils, and certain Chartered Organizations, (d) communicating with BSA's insurance companies, when applicable, regarding the defense of Abuse Claims, (e) evaluating and recommending settlement amounts, and (f) negotiating settlements of Abuse Claims on behalf of the BSA, Local Councils, and Chartered Organizations.

A.005941
App.243

### A.     Initial Investigation

10.     Ogletree handled the initial investigation of any Abuse Claims that were made against the BSA or a Local Council.  The initial investigations of Abuse Claims were effectively "outsourced" from the BSA to Ogletree, with BSA's legal department providing general oversight.

11.     Ogletree undertook an initial investigation whenever an Abuse Claim was made. This would include circumstances where a complaint was filed, but it could also include circumstances where a pre-litigation demand had been made.  For each asserted Abuse Claim, I would assign an Ogletree lawyer to lead the initial investigation.  That lawyer would gather whatever information he or she could from the BSA, the applicable Local Council, or the applicable Chartered Organization.

12.     As part of the investigation, Ogletree lawyers would also consider any information provided by the claimant, as it was not uncommon that a claimant would voluntarily provide (typically through a claimant's attorney) any information he or she had to corroborate a claim.  The initial investigation would typically focus on (a) the type, duration, and frequency of the abuse that allegedly occurred, (b) the identity of the alleged abuser, (c) the degree of connection between Scouting and the underlying claimant, the alleged abuse, and the alleged abuser, (d) the time frame for that the alleged abuse, and (e) where the alleged abuse occurred.  Ogletree's lawyers would also investigate whether the BSA was aware of any prior acts of abuse by the alleged abuser. Ogletree would also investigate any information regarding the alleged effects of the abuse on the underlying plaintiff.

13.     The purpose of this initial investigation by Ogletree was to find out as much information as we could about strengths and weaknesses of the claim so we could evaluate the BSA's best options for defending and resolving the Abuse Claim.  Because the vast majority of Abuse Claims asserted against the BSA and/or Local Councils would settle, this initial

investigation was an important step toward assigning an initial settlement value to the claim as early as possible.

### B. Selection and Evaluation of Defense Counsel

14.     As part of my NCC responsibilities, I was also directly involved with the selection and evaluation of the local defense counsel who would defend the Abuse Claim in court.  While I was retained directly by the BSA, I was responsible for (or coordinated with insurers with respect to) the selection and evaluation of local defense counsel for the BSA, Local Councils and Chartered Organizations.[7]

15.     When insurance was not available for an Abuse Claim (or the only primary layer insurance available was a matching-deductible policy), I typically was responsible for hiring local defense counsel to defend the BSA and the applicable Local Council and Chartered Organization. When no insurance was available, the BSA paid out of its own pocket for the cost of its defense counsel, and such defense counsel typically also represented the Local Council or the Chartered Organization.

16.     If a non-matching deductible primary-layer insurance company, such as Century, was involved in the Abuse Claim, I frequently consulted with such insurance companies regarding the selection of defense counsel for the BSA, Local Counsel and, in certain situations, Chartered Organizations, in accordance with the respective policies and applicable law.  Even in situations where insurance was available, the BSA's insurers frequently deferred to my judgment and consented to the defense counsel I recommended.

---

[7]  An exception to this would be The Church of Jesus Christ of Latter-Day Saints ("TCJC").  TCJC would usually retain its own independent defense counsel.  When I refer in my declaration to the work I performed relating to Chartered Organizations, I am excluding TCJC.

A.005943
App.245

17.    Generally, the BSA, Local Councils, and the Chartered Organizations (with the exception of TCJC) were defended by the same defense counsel.  It was rare for separate counsel to be retained on behalf of the BSA, Local Councils, and Chartered Organizations.

### C.    Coordinating Defense Strategy

18.    The Abuse Claims asserted against the BSA and the Local Councils typically included several commonalities, which suggested that the BSA should be pursuing a uniform strategy for defending and resolving Abuse Claims across the various jurisdictions.  As NCC, my team at Ogletree worked closely with local defense counsels across the country to develop defense and litigation strategies to defend and ultimately resolve Abuse Claims asserted against the BSA, Local Councils, and Chartered Organizations.    This was particularly important because, as mentioned, the various attorneys that represent sexual abuse claimants were highly cohesive and were willing to share documents and strategies.

19.    Typically, an Abuse Claim was filed jointly against the BSA, the relevant Local Council, and the relevant Chartered Organization.

20.    Because of the nature of the BSA's insurance and the unity of interest between the BSA or the Related Non-Debtor Entity. the Local Council and the Chartered Organization in Scouting (which was reflected by the fact that the BSA would include Local Councils, Related Non-Debtor Entities and Chartered Organizations as Named Insureds and insureds, respectively, on their post-1976 insurance policies,) the BSA typically did not file any sort of comparative indemnity, equitable contribution, or other third-party claims against the applicable Local Council or the applicable Chartered Organization, unless the Abuse Claim alleged abuse outside of the Scouting context. During Ogletree's tenure as NCC, the BSA rarely filed motions to dismiss lawsuits at the pleading stage.  Based on our experience and understanding of the law, motions to dismiss rarely succeeded in resolving an Abuse Claim asserted against the BSA or a Local Council.

7

21.    In litigation, the BSA or a Local Council rarely prevailed on a motion for summary judgment on an Abuse Claim.  Our uniform experience in handling the Abuse Claims for the BSA was that courts were increasingly reluctant to grant dispositive motions filed by the BSA.  I believe that the BSA was successful only on six motions for summary judgment in the hundreds of Abuse Claims that we handled, and only two of those six motions for summary judgment disposed of the entire case – the remaining four motions only disposed of certain claims.

22.    States within the United States have different statutes of limitations that may apply to Abuse Claims.  Statute of limitations defenses are stronger in some states than in others.  Statute of limitations functionally create barriers to claims for plaintiffs.  When applied by the courts, such statutes bar recovery.  At minimum, the existence of such a statute introduces substantial additional costs for the plaintiff, and adds risk to prospective recovery.  That risk is increased depending on the particular statute of limitations adopted by states.  There were certain jurisdictions in which I do not recall seeing a single claim brought against the BSA.  One likely explanation for this is that plaintiffs would not bring claims in jurisdictions where a statute of limitations or repose would present a significant hurdle to recovery.    In my experience, the BSA was sued less frequently in states with strong statute of limitations.  I believe that statute of limitations had a substantial chilling effect on the filing of claims.

23.    As a result, in my experience handling claims on behalf of the BSA, the BSA typically did not have a viable statute of limitations defense to the vast majority of claims that were brought.

24.    Based on my experience, courts are reluctant to grant dispositive motions on a statute of limitations basis, particularly for something like childhood sexual abuse.  Indeed, many of the states that had potentially applicable statutes of limitations also included exceptions (such

8

as discovery exceptions) that would effectively negate a dispositive motion on a statute of limitations defense. Accordingly, in the few circumstances when applicable, we would use the possibility of a statute of limitation defense as an argument to reduce the value of a settlement in negotiations with counsel for underlying plaintiffs, but not as a complete bar to recovery. This is because if we presented the statute of limitations defense and lost, the underlying plaintiffs' settlement demand would likely increase to be more similar to a claim that was not subject to any such defense. For instance, BSA had a statute of limitations defense to Hacker claims, but lost the motion for summary judgment on the defense. BSA took an appeal, and lost again.[8] Consequently, we did not ultimately achieve any discount for the statute of limitations in settling with the plaintiffs.

25.    The BSA believed it had meritorious defenses with respect to certain abuse claims in Idaho based on the statute of limitations. The court, however, essentially articulated a new legal theory based on fraudulent concealment that circumvented the applicable statute of limitations in that case, which prevented the BSA from prevailing on its statute of limitations defense.[9]

26.    When the BSA prevailed on a statute of limitations defense, the BSA and its insurers may still settle the claim, if the circumstances were right. For example, in a case filed in Connecticut, the trial court granted the BSA's motion for summary judgment on the basis that the

---

[8] JTX Ex. 146 is a true and correct copy of a September 30, 2016 Opinion from the Appellate court of Illinois, First District.

[9] JTX Ex. 111 is a true and correct copy of a Memorandum Decision and Order in *Doe v. Presiding Bishop of the Church of Jesus Christ of Latter-Day Saints,* Case No. 1:09-cv-00351-BLW, dated August 31, 2012 denying the BSA's motion for summary judgment. JTX Ex. 133 is a true and correct copy of an Opinion from the Idaho Supreme Court filed August 27, 2015 holding that Idaho's fraud statute of limitations under Idaho Code section 5-218(4) applies to constructive fraud claims, and the discovery rule under that statute applied in determining when a constructive fraud cause of action accrues.

9

claim was untimely under a statute of repose.[10]  Notwithstanding that the motion for summary judgment was granted, the BSA ultimately settled that lawsuit with the consent of its insurer rather than face the cost and risk of an appeal.  The average recovery for each plaintiff in that case was approximately $15,000.[11]

27.     In litigation, the BSA would conduct affirmative discovery.  The affirmative written discovery typically involved interrogatories, requests for production, and requests for admissions.  Typically, local counsel took a deposition of the abuse survivor and, only when warranted by the value of the claims, a medical or psychological examination.  The scope of our affirmative discovery was driven, in large part, by the perceived value of the Abuse Claim.  Simply put, Ogletree recommended more extensive discovery for higher value claims, and less extensive discovery for lower value claims.

28.     As part of our efforts to coordinate a consistent, nationwide defense strategy, Ogletree prepared and provided templates to local defense counsel relating to various pleadings, discovery requests, discovery responses, protective orders, and settlement agreements.  Local counsel then modified or conformed these templates, as necessary, to be consistent with the local rules of any jurisdictions.

29.     We were also responsible for coordinating the responses on behalf of the BSA, Local Councils, Related Non-Debtor Entities, and Chartered Organizations to discovery propounded by the underlying plaintiffs.  Typically, underlying plaintiffs would seek and obtain information related to the Abuse Claim, including Troop Rosters, information relating to the

---

[10] JTX Ex. 174 is a true and correct copy of a Memorandum of Decision re Defendant's Motion for Summary Judgment in *John Doe # 1, et al. v. Boy Scouts of America Corp., et al.*, filed in the Judicial District of Stamford/Norwalk at Stamford on April 20, 2018, which granted the BSA's motion for summary judgment on a statute of repose.  Exhibit 175 is a copy of the court's order relating to that Memorandum of Decision.

[11] JTX Ex. 201 is a true and correct copy of the settlement agreement reached in *John Doe # 1, et al. v. Boy Scouts of America Corp., et al.*, filed in the Judicial District of Stamford/Norwalk at Stamford on April 20, 2018.

10

alleged abuser (including, but not limited to, Volunteer Screening Database ("VSD") files), and information about the BSA's youth protection efforts. Although we filed motions in limine seeking to exclude the admissibility of any VSD files, I do not recall any circumstances where we were able to completely exclude the admission of any VSD files. In several cases, the BSA was required to produce not only the VSD of the alleged perpetrator, but a more significant set of the BSA's VSD files.

30.     If an Abuse Claim could not be resolved in the early stages of litigation, Ogletree and defense counsel occasionally retained an expert to opine on the applicable standard of care and on the BSA's youth protection efforts.

31.     As with the initial investigation, the BSA's purpose in taking this discovery was to evaluate the credibility and value of a claim. Because the BSA did not have much success in having these claims dismissed at the pleading stage or at the motion for summary judgment stage, our discovery efforts were focused primarily on positioning the case towards a favorable settlement, if possible.

32.     The BSA and its Local Councils did not take any Abuse Claims to verdict during Ogletree's tenure as NCC. I am aware of only two Abuse Claims that went to trial between 2010 and 2016. Juries are unique and inconsistent. Settlement provided a more consistent way to value and settle cases. Generally, we did not consider a jury trial to be a favorable forum for claims involving allegations of childhood sexual abuse, both with respect to determinations of liability as well as for determinations of damages.

**D.     Communicating with Insurers**

33.     As NCC, I would communicate with the BSA's insurers to provide status updates, settlement recommendations, and any information they requested about the sexual abuse claim. The vast majority of my communications were with Century and, to a lesser degree, AIG. I also

11

had communications with Hartford regarding the claims asserted in Guam, but Hartford was rarely involved with other claims. Other insurance companies were largely uninvolved with respect to the defense and settlement of Abuse Claims.

34.  For Abuse Claims that could be settled within a primary layer of coverage, the BSA's excess insurance companies rarely provided input into the defense and settlement of the Abuse Claim.

35.  For Abuse Claims that were expected to exceed the primary layer of coverage, I would provide status updates and information to the representatives of the excess insurance companies. However, those excess insurance companies were rarely involved with providing input on defense strategy, and discussions were limited typically to whether or not a proposed settlement was reasonable and whether the underlying abuse occurred during their policy period.

### E.  Valuing and Settling Claims

36.  The vast majority of Abuse Claims that Ogletree handled were resolved through settlement. I was directly involved with evaluating claims and making settlement recommendations to the BSA as well as to the BSA's insurance companies.

37.  When determining whether to settle a claim and the value the claim, I would consider (1) the cost of defending the sexual abuse claim through trial and appeal, (2) the degree of risk that the BSA, the Local Council, or a Chartered Organization could be found liable by a reasonable jury, and (3) the anticipated amount that a reasonably jury could award.

38.  The cost of defending an Abuse Claim through trial was certainly an important factor in determining whether to settle an Abuse Claim. The cost of defending an Abuse Claim through trial can be very expensive.

39.  If an Abuse claimant was willing to accept a settlement offer for an amount less than the cost of defending the case through trial, the BSA would give strong consideration to such

settlement offer, so long as the case appeared credible.  If an Abuse claimant was willing to accept a settlement offer for an amount less than the cost of pursuing a dismissal of the case, the BSA would give strong consideration to that offer irrespective of the credibility of the claim.  Ogletree typically settled cases that could be settled for less than the cost of defending it.  Both the BSA and its insurance companies were typically in agreement regarding the necessity to consider the cost of defense in determining whether to settle a claim, and to settle claims where they could be settled at or less than the cost of defending them.

40.     The cost of defending each Abuse Claim is significant.  When Ogletree was first retained by the BSA, the Firm was paid a set amount per claim for the initial review of the claim on a flat fee basis.  The BSA continued to pay our fees as NCC as none of the BSA's insurance companies agreed to cover such amounts. In addition, either the BSA or the applicable insurance company paid for the local defense counsel hired to defend the lawsuit.  Between the initial investigation of the claim, the cost of discovery, motion practice (when applicable), and the cost of local defense counsel, the cost of defending the underlying Abuse Claims was significant, and certainly much greater than the $3,500 Expedited Distribution.

41.     The risk of an adverse liability finding on the BSA was the most important factor in determining whether to settle a claim and the settlement amount.  To make that determination, I would consider whether the underlying plaintiff could identify the acts of abuse that gave rise to their claim.  I would also consider whether the underlying plaintiff (or the BSA internally) could identify the alleged abuse and abuser.  I do not believe that the BSA or its insurers paid any claims without sufficient information to identify the alleged abuser.  However, I do not recall any situations where the alleged abuser could not be identified by either the claimant or through our investigation.  Particular importance was placed on whether the alleged abuse had a connection to

13

Scouting.   A Notice to the BSA, Local Council, or the Chartered Organization was also important. A claim is stronger if there is evidence that the BSA had notice of the abuser.  When we believed that an underlying plaintiff could establish a claim by a preponderance of the evidence, we generally focused on settlement valuation rather than the dismissal of the claim.  One of the key issues then became the degree to which Scouting was responsible for the harm, meaning the degree of liability to an organization.

42.    When determining the value of a claim, I would also consider the type of abuse. Claims alleging more serious acts of abuse would be valued higher than claims alleging less serious acts of abuse.  The plaintiffs agreed with this consideration, as shown by their willingness to settle less severe abuse cases at lower values than more severe cases. Sometimes the case involved two forms of abuse, such as penetration and oral sex.  In those cases, the value of the case would be driven by the more severe form of abuse.

43.    We also considered if the abuse involved any extended duration or frequency, the existence of any coercion or the threat or use of violence or stalking, and whether the abuse involved multiple perpetrators, all of which could increase the value of a claim.  If an Abuse claimant was exploited for child pornography along with the acts of abuse, this too could increase the value of claims.

44.    In valuing claims, we also considered the abuser profile.  The number of victims of an abuser was important.  A case is stronger when there is more than one victim.  The more victims, the stronger the case.  The reason that we considered cases involving serial abusers as stronger is because there was more opportunity for BSA, the Local Council, or the Chartered Organization to learn of, and then prevent, the abuse.  Additionally, the victims can corroborate each other that there was abuse.  Further, a failure to uncover abuse by a serial abuser increases the risk of a

14

punitive damages award.  We generally valued claims involving serial abusers higher than single abuser cases, though the facts of a given single victim claim could raise the same risks as a serial abuser case.  For instance, a single abuser claim could be as strong or stronger if the abuse was reported and not addressed.  A case against an employee would be stronger than a claim against a volunteer because the institution has more control and contract with employees.

45.    Additionally, I considered the consequences of the abuse.  I considered claims with more serious long-term consequences to be more valuable.  Those long-term consequences could involve adverse effects with respect to the plaintiff's physical health, mental health, employment, and/or criminal history.

46.    We also considered any facts that we believed would tend to reduce the amount a jury might award against the BSA, the Local Councils, and/or the Chartered Organizations, such as whether there was a familial relationship between the abuser and the victim or whether a non-Scouting relationship was implicated by the claim.  And I also considered any statute of limitations defenses.  As noted, it was very difficult to prevail on the defense, but the strength of the statute and the relevant facts impacted the claim value.  The stronger the statute, the lower the value.

47.    In valuing claims and making settlement recommendations, I would often review historical settlements, including settlements to which insurers provided their consent, as a starting point for considering the value of a claim based on the type of abuse.  While I did not perform an economic analysis of prior settlements and establish a "claim matrix" like the one used in the Trust Distribution Procedures ("TDP") under the Plan, I relied on the prior settlements as "comps" for settlement values.

48.    Settlements typically were funded by the BSA and, when the BSA had insurance, its insurance companies.  The settlement would secure releases for the BSA, as well as the

applicable Local Councils and Chartered Organizations. Releases for such parties were critical and a condition to settlement. There likely would have been no settlements without releases to the BSA, the Local Councils, and the Chartered Organizations involved in the Abuse Claim.

## III.    TDP Negotiations

49.    When the Debtors were drafting the initial version of the TDP, I provided the Debtors with (a) factors that I did, and would continue to  evaluate whether an Abuse Claim was legally valid and credible, (b) factors that I did, and would continue to, consider that would inflate the value of an Abuse Claim, and (c) factors that I did and would continue to, consider that would depress the value of the sexual abuse claim. I have reviewed the TDP, and the inputs that I provided to the Debtors regarding these factors have been incorporated into the TDP. We had also provided the Debtors with information concerning our historical settlements with Abuse claimants.

50.    During the course of negotiations of the TDP, counsel for Debtors often would ask me if certain revisions to the TDP were consistent with the BSA's pre-petition settlement practices, so that they could accept, reject, or edit a proposed revision to the draft TDP based on whether the revisions were consistent with the BSA's pre-petition practices for resolving Abuse Claims. I have reviewed the TDP and I did not see anything incorporated into the TDP that was inconsistent with my comments regarding the BSA's pre-petition practices for resolving Abuse Claims.

51.    We also provided the Debtors with information concerning the strength of the statute of limitations defense in each state, including the potential for the passage of a reviver statute that could restore any Abuse Claims that would otherwise be time-barred against the BSA or the Local Councils under the applicable state's law. The TDP are consistent with the information I provided.

16

IV.    **TDP Are Consistent With Pre-Petition Practices**

52.    I have reviewed, and I am generally familiar with, the TDP[12] and the Document

Appendix[13] in the Chapter 11 Cases.  The TDP and the Document Appendix provide a framework

that is generally consistent with the BSA's pre-petition practices for resolving Abuse Claims.

53.    First, the fact that the TDP essentially lead to a settlement offer that can be rejected

or accepted by the sexual abuse claimant is consistent with the BSA's pre-petition practices, where

the vast majority of claims were resolved through settlement, though plaintiffs could have rejected

settlement.  In both cases, the claimant can exit to the tort system.

54.    Second, the Document Appendix provides the Settlement Trustee with the same

documents from the BSA and Local Councils that we had, and would continue to consider, when

investigating an Abuse Claim.

55.    Third, the TDP permit the Settlement Trustee to secure all of the same underlying

factual information that we would obtain from an Abuse claimant.  I view the initial questionnaire

as a discovery tool akin to interrogatories and requests for admissions.  I view the obligation of the

claimant to provide all documents relating to the Abuse Claim in his custody and any other

documents requested by the Settlement Trustee as akin to a request for production.  I view the right

to take an examination under oath of the sexual abuse claimant as akin to the right to take a

deposition.  And I view any testing, including medical and psychological testing, as akin to a right

to an independent medical examination.

56.    The fact that the Settlement Trustee does not have subpoena power over third-party

witnesses does not really impact the analysis of an Abuse Claim.  Because of the nature of Abuse

---

[12] JTX Ex. 1-353 [D.I. 8813] includes a copy of the current version of the TDP.  JTX Ex. 1-427 [D.I. 6443] includes a copy of TDP that was operative at the time of my deposition.

[13] JTX Ex. 1-354 [D.I. 8815] includes a copy of the Document Appendix.

A.005954
App.256

Claims, which occur behind closed doors and without witnesses, coupled with the fact that Abuse claimants are often reluctant to disclose the abuse to third parties, third-party discovery typically yielded little or nothing to the defense or valuation of for a claim for settlement. We generally resolved claims without conducting significant third-party discovery.

57.    Fourth, the Document Appendix appears to provide claimants with access to the same basic discovery beyond they typically received from the BSA, Local Councils, or Chartered Organizations in the ordinary course of discovery.

58.    Fifth, the TDP require an Abuse claimant to satisfy the General Criteria by a preponderance of the evidence. This is the same legal standard that would apply in the tort system to a negligence claim asserted against the BSA, a Local Council, or a Chartered Organization, and the same standard that we used in evaluating whether an Abuse claimant had a credible claim.

59.    Sixth, the methodology for determining whether an Abuse Claim is legally valid is consistent with our pre-petition practices. Based on my work as NCC, if an underlying plaintiff could establish, by a preponderance of evidence, each of the General Criteria, I would have considered that a claim that should be settled because the claimant likely would be able to show negligence by the BSA, Local Council and/or Chartered Organization.

60.    Seventh, the methodology for valuing an Abuse Claim is generally consistent with our prepetition practices. We generally considered the type of abuse and the value of any prior settlements consistent with the matters accounted for in the claims matrix. We would then perform a more individualized assessment of the case based on the specific facts and circumstances, which could result in a greater or reduced settlement valuation. The aggravating factors in the TDP are consistent with the type of information we would consider as increasing the settlement value, and

18

the mitigating factors in the TDP are consistent with the type of information we would consider as decreasing the settlement value of our claim.

61.     Eighth, the treatment of a possible statute of limitation or statute of repose defense is consistent with our prepetition practices.  The availability of a potential statute of limitations defense was a significant factor that we considered in evaluating the strength of a claim in the rare circumstances that we had a viable statute of limitations defense.  The availability of a potential statute of limitations defense is appropriately considered as a mitigating factor that reduces the total value of a claim, rather than as one of the General Criteria that must be satisfied for payment. Historically, statutes of limitation or repose defenses did not prevent settling with or recovering against the BSA, although those defenses likely caused plaintiffs not to file the claims in the first place.

62.     Ninth, the Expedited Distribution is consistent with our pre-petition practices. Based on my work as NCC, if an underlying plaintiff provided all of the information included in a Proof of Claim under oath and offered to settle a claim for $3,500, I would have recommended that BSA and its insurance companies should resolve that claim for that amount.[14]  This is because it would have cost the BSA more than $3,500 in legal fees alone to defend the claim. It is more than likely that the BSA and its insurers would have heeded such advice to save time and resources in litigation. The Expedited Distribution is essentially an early out option, which is a common practice for defendants, that is more cost-effective and efficient than litigating even a clearly invalid claim.  Paying such convenience claims is consistent with historical practices, as approved by insurers.  We frequently settled cases on a convenience basis, and did so with the consent of insurers when there was coverage for the settlement amount.

---

[14] JTX Ex. 1475 is a true and correct copy of a blank Proof of Claim form used in the Chapter 11 cases.

19

63.    Tenth, the Independent Review Option is consistent with our pre-petition practices. My understanding is that the Independent Review Option is a more intricate and adversarial process for resolving higher-value claims.  The BSA did settle certain claims for more than $2.7 million (which I understand is the most a claimant can recovery without electing the Independent Review Option), so including a path to resolve claims for more than $2.7 million is consistent with my pre-petition practices.[15]  When handling claims on a prepetition basis, the scope of discovery we sought on a high-value claim was typically greater than we would experience with lower-value claims.  We would also see greater participation from the insurers when dealing with higher value claims.

64.    For higher value claims (such as the claims alleging abuse by Thomas Hacker), the BSA would seek more expansive discovery from the claimants (such as by taking multiple depositions, requiring a medical examination, and when appropriate, taking more aggressive positions in dispositive motion briefing).  Higher-value claims would generally result in BSA incurring more significant defense costs, as well.  The cost of defending high-value claims like in the Hacker litigation could exceed $1 million between the costs of NCC and local defense counsel. Therefore, it is entirely consistent with my pre-petition practice working as the BSA's NCC that claims involving a potential recovery in excess of $2.7 million would be subject to more exacting standards – whether through heightened discovery, greater insurer participation, and the pursuit of more aggressive legal theories than a lower value claim.  Further, in such cases, plaintiffs would bear significant costs in moving forward, which would typically exceed $20,000.

---

[15] JTX Ex. 1003 is a true and correct copy of a spreadsheet prepared by Ogletree summarizing the BSA's settlements between 2016 and 2020.

65.    Lastly, the TDP are consistent with historical practices because the recovery on any claim is determined by a trier of fact.  The tort system is not a mathematical tool for determining clams and values.  In the tort system, similar claims do not always achieve similar results.  The fundamental feature of the tort system is the broad discretion and judgment of the trier-in-fact in determining what claims will receive recoveries and the amount of those recoveries.  As is the case in the tort system, the trustee has broad discretion to consider all relevant information in determining an appropriate recovery.  I believe that an experienced settlement trustee will be capable of issuing more consistent awards than the varied courts and juries across the country.

*[Remainder of Page Intentionally Left Blank]*

21

I declare under penalty of perjury that the foregoing statements are true and correct.

Executed this 10th day of March, 2022

*/s/ Bruce Griggs*

Bruce Griggs

# EXHIBIT 6

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC[1] | Case No. 20-10343 (LSS) |
| Debtors. | (Jointly Administered) |

## <u>DECLARATION OF NANCY GUTZLER</u>

I, Nancy Gutzler, pursuant to 28 U.S.C. § 1746 and under penalty of perjury, hereby declare as follows:

1.    I am over twenty-one (21) years of age, have never been convicted of a felony, and am fully competent to make this declaration (this "<u>Declaration</u>") in support of confirmation of the *Third Modified Fifth Amended Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC*, dated February 15, 2022 [D.I. 8813] (the "<u>Plan</u>") and the *Debtors' (I) Memorandum of Law In Support of Confirmation of Third Modified Fifth Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC and (II) Omnibus Reply to Plan Confirmation Objections* [D.I. 9114] (the "<u>Memorandum</u>").

2.    Except as otherwise stated in this Declaration, all facts set forth herein are based on my personal experience and knowledge or information obtained from my review of relevant documents.

---

[1]    The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are as follows:  Boy Scouts of America (6300) and Delaware BSA, LLC (4311).  The Debtors' mailing address is 1325 West Walnut Hill Lane, Irving, Texas 75038.

1

## I.    <u>BACKGROUND AND EXPERIENCE</u>

3.    I am currently a Senior Managing Director at KCIC, a nationally recognized firm that focuses on helping corporations manage their mass-tort liabilities, including through evaluating the availability of potential insurance coverage.   I have over 30 years of experience in this role and have helped numerous clients evaluate their potential insurance coverage with respect to mass-tort liabilities.  This includes analysis of claims data, sampling of claims populations, and allocation of claims costs to insurance coverage.

4.    My prior experience includes representing both insurance companies and policyholders, and this provides me with a unique perspective on the management of mass tort claims and the allocation of claims to coverage.[2]

5.    I have previously testified as an expert in multiple cases regarding the allocation of claims to insurance, proof of exhaustion of underlying coverage limits, and calculation of unpaid allocations and associated interest.[3]  I have experience with allocation for many types of mass tort claims—often including allocation of thousands of claims to thousands of insurance policies—and I do not believe the nature of the underlying tort affects my allocation analysis.

6.    I was retained by the Boy Scouts of America and Delaware BSA, LLC (collectively, the "BSA" or the "Debtors") to provide an expert report and opinions related to certain aspects of the BSA insurance coverage and allocation of liability to insurance coverage, including the following issues: (1) the overall insurance program covering the BSA and the Local Councils, including the archeology that was performed to evaluate the scope of potential historical coverage for those insureds; (2) an evaluation of the various settlements with insurers relative to the value of claims allocated to coverage provided by those settling insurers; (3) whether there is a

---

[2]   JTX 1038 [Nancy Gutzler Curriculum Vitae].
[3]   JTX 1038 [Nancy Gutzler Curriculum Vitae].

2

mechanism in place to pay all or substantially all claims arising out of sexual abuse ("Abuse Claims"); and (4) the impact the Article XIII Independent Review Option ("IRO") in the Trust Distribution Procedures ("TDP") has on my analysis and related opinions.[4]

## II.    INSURANCE COVERAGE FOR ABUSE CLAIMS

### A.    Overview of the BSA Insurance Program.

7.    The BSA insurance coverage program has been in existence for more than eight decades and has evolved over the years, with variations in insurance carriers, covered entities, type and amount of limits, and the use of deductibles.[5]  While the characteristics of the BSA's policies varied over time, nearly all of the years have some available coverage for Abuse Claims.[6]  These policies provided both primary and excess coverage with substantial limits in many years of coverage.[7]

8.    The BSA insurance program includes policies that either have a per-occurrence limit or an aggregate limit, or both.[8]  A per-occurrence limit represents how much an insurance policy will pay for any one occurrence (*i.e.*, if each Abuse Claim is a single occurrence and there is no applicable aggregate limit, the policy will pay up to its per-occurrence limit for each Abuse Claim occurring during the policy period).  An aggregate limit represents the overall amount a policy will pay for all occurrences that take place during the policy period; once the applicable

---

[4]    The views expressed herein, including those regarding the BSA and Local Council insurance programs, the appropriateness of any assumptions used in this report, or any other matter, are my own and do not necessarily represent the views of any other party to this case.

[5]    JTX 347 [Revised Exhibit 9 to Gutzler Report]; JTX 10 [BSA and LC Insurance Policies].

[6]    JTX 347 [Revised Exhibit 9 to Gutzler Report]; JTX 10 [BSA and LC Insurance Policies].

[7]    JTX 347 [Revised Exhibit 9 to Gutzler Report]; JTX 10 [BSA and LC Insurance Policies]; JTX 1040 [BSA Coverage Charts (Gutzler-Opening report-Exhibit 3)].

[8]    Policy limits determine how much an insurance policy will pay.  The BSA insurance program includes some policies that have only per-occurrence (or per-person) limits that apply to Abuse Claims and other policies where both per-occurrence limits and aggregate limits apply. JTX 347 [Revised Exhibit 9 to Gutzler Report]; JTX 10 [BSA and LC Insurance Policies].

3

payments made by these policies reach the aggregate limit, the policy will no longer respond to claims.

9.      Between at least 1935 and 1982, the BSA purchased primary insurance policies that provided coverage for Abuse Claims, with the limits of liability subject to a per-person or per-occurrence limit.[9]  While most of these policies also included an aggregate limit, the aggregate limits often were limited to specific types of liability and did not include Abuse Claims.[10]

10.     Starting in 1969 through 1982, the BSA began to procure excess insurance policies. These policies would be applicable once the primary-insurance coverage was exhausted (*i.e.*, the excess policy would "attach" if the value of a claim exceeded the limits of liability available under the primary insurance policy).  The vast majority of these excess policies provided per-occurrence coverage with no aggregate limit, meaning that once the primary policy's per-occurrence limit (generally $500,000) was exhausted by a claim, the excess policy attached to cover any remaining value of the claim.[11]  For policies lacking an aggregate limit or policies with an aggregate limit that does not apply to Abuse Claims, the policies can pay many times the per-occurrence limits without exhausting.

11.     Beginning in 1983, the BSA insurance policies generally had aggregate limits that applied to Abuse Claims (*i.e.*, the aggregate limit was no longer limited to products/completed claims).[12]  These years of coverage have significantly higher limits of coverage than in prior years as the BSA procured sufficient insurance coverage to protect against its potential liabilities and it

---

[9]   JTX 347 [Revised Exhibit 9 to Gutzler Report]; JTX 10 [BSA and LC Insurance Policies].
[10]  For example, many of these policies include aggregate limits for products/completed operations. Products/completed operations are typically applied when a policyholder manufactures a product, and the insurers capped their liability through this aggregate for bodily injury or property damage resulting from that product. Abuse Claims do not constitute a product or completed operation. JTX 10 [BSA and LC Insurance Policies].
[11]  JTX 347 [Revised Exhibit 9 to Gutzler Report]; JTX 10 [BSA and LC Insurance Policies]; JTX 1040 [BSA Coverage Charts (Gutzler-Opening report-Exhibit 3)].
[12]  JTX 10 [BSA and LC Insurance Policies].

4

no longer had that coverage on a non-aggregated, per-occurrence basis.  Notably, just in the post-1982 period, there is approximately $3.6 billion in aggregate limits of liability available (after accounting for all settlements and prior exhaustion).[13]  This $3.6 billion does not include the pre-1983 insurance coverage because such policies generally have only per-occurrence limits (with no aggregate limits), and those limits of liability are accessed by each Abuse Claim triggering those policies in a given policy period, regardless of the number of occurrences during that period.[14]

12.     Starting in 1986 and continuing through 2018, the BSA purchased primary and first-layer excess policies that have deductibles that match the policies' limits of liability, dollar for dollar.[15]  The "matching deductible" policies required the BSA pay or reimburse the deductibles before excess coverage attached to cover the remaining value of a claim to the extent it exceeded the limits of the underlying policies.[16]  I understand the BSA's position is that the primary "matching deductible" policies did not have an aggregate limit for 1986-1987 and 2009-2018, but did include an aggregate limit for 1988-2008.[17]  I understand that certain insurers contest this position.[18]

13.     During these years, the BSA procured significant excess insurance coverage above the "matching deductible" primary and first-layer excess policies.[19]  In most years, the BSA had over $140 million in excess insurance coverage available for a single coverage year.[20]  Although certain of this insurance has been eroded, i.e., used to pay claims pre-petition, and some of this

---

[13]  JTX 347 [Revised Exhibit 9 to Gutzler Report]; JTX 10 [BSA and LC Insurance Policies].

[14]  JTX 347 [Revised Exhibit 9 to Gutzler Report]; JTX 10 [BSA and LC Insurance Policies].

[15]  JTX 10 [BSA and LC Insurance Policies].

[16]  JTX 347 [Revised Exhibit 9 to Gutzler Report]; JTX 10 [BSA and LC Insurance Policies].  The Debtors and certain insurers dispute whether insolvent insureds are required to reimburse the deductible under these policies.

[17]  See, e.g., JTX 1-425 [Amended Disclosure Statement for the Modified Fifth Amended Plan (D.I. 6431)] at 67-68.

[18]  See, e.g., JTX 1-280 [Certain Insurers' DS Objection (D.I. 6062)] at 5-8.

[19]  JTX 10 [BSA and LC Insurance Policies]; JTX 1040 [BSA Coverage Charts (Gutzler-Opening report-Exhibit 3)].

[20]  JTX 10 [BSA and LC Insurance Policies]; JTX 1040 [BSA Coverage Charts (Gutzler-Opening report-Exhibit 3)].

A.006369
App.267

insurance is subject to the settlement agreements with insurers discussed below, there is still significant excess insurance coverage available.[21]

14.      Beginning in 2019 and continuing to the present, the BSA discontinued the use of policies with matching deductibles.[22]

### 1) Coverage Under the BSA Insurance Program for Local Councils

15.      In addition to providing insurance coverage to the BSA, the BSA insurance program also provided insurance coverage to Local Councils beginning in 1971.[23]

16.      Prior to 1971, Local Councils were not insureds under the BSA insurance program; instead, Local Councils purchased independent insurance policies that provided insurance coverage for Abuse Claims, among other things.[24]

17.      Beginning in 1971, the BSA gave Local Councils the opportunity to pay a premium such that a specific Local Council would be added as an additional insured (*i.e.*, a party with rights to the insurance coverage) on the BSA's commercial general-liability insurance policies.[25]  That practice continued from 1971 to 1974, and by 1975 a substantial number of the Local Councils were additional insureds on the BSA's insurance policies.[26]  Nonetheless, certain Local Councils opted not to be included in the BSA insurance-coverage program and continued to purchase coverage independently during this period (that insurance program is discussed below).

18.      Starting in 1975, all Local Councils became insureds under the BSA's insurance program.[27]  Between 1975 and the end of 1977, the Local Councils were additional insureds under

---

[21]  JTX 347 [Revised Exhibit 9 to Gutzler Report]; JTX 10 [BSA and LC Insurance Policies]; JTX 1040 [BSA Coverage Charts (Gutzler-Opening report-Exhibit 3)].
[22]  JTX 347 [Revised Exhibit 9 to Gutzler Report]; JTX 10 [BSA and LC Insurance Policies].
[23]  JTX 347 [Revised Exhibit 9 to Gutzler Report]; JTX 10 [BSA and LC Insurance Policies].
[24]  JTX 347 [Revised Exhibit 9 to Gutzler Report]; JTX 10 [BSA and LC Insurance Policies].
[25]  JTX 10 [BSA and LC Insurance Policies] at BSA-PLAN_00251525.
[26]  JTX 347 [Revised Exhibit 9 to Gutzler Report].
[27]  JTX 347 [Revised Exhibit 9 to Gutzler Report].

6

policies issued by Hartford to the BSA.[28]  And beginning in 1978 and continuing to the present, the BSA implemented its General Liability Insurance Program ("GLIP"), whereby all Local Councils were added as named insureds under insurance policies issued to the BSA.[29]

### 2) Coverage Under the BSA Insurance Program for Chartered Organizations

19.    Beginning in 1976, the BSA amended its insurance policies to provide insurance coverage for Chartered Organizations.  Starting in 1976, the BSA included an endorsement on its Hartford insurance policies that provided that "sponsors" (*i.e.*, Chartered Organizations) would be additional insureds.[30]  Prior to 1976, none of the BSA's insurance policies included such language and neither the named insured nor the definition of insured (or any endorsements) included any reference to "sponsors" or chartered organizations.[31]  Starting in 1978, the BSA specifically included Chartered Organizations as insureds on its insurance policies, albeit with some variation in coverage provided by primary and excess layers.[32]

## B.    Overview of the Local Council Insurance Program.

20.    As noted above, the BSA began to include Local Councils on their insurance program beginning in 1971, with all Local Councils becoming insureds under the BSA's insurance policies in 1975.[33]  KCIC was asked to organize and lead a large-scale search for missing insurance policies purchased by the Local Councils prior to the GLIP in 1978; this is typically referred to as insurance archeology ("Policy Archeology").

---

[28]  JTX 347 [Revised Exhibit 9 to Gutzler Report].
[29]  JTX 10 [BSA and LC Insurance Policies] at BSA-PLAN_00485360.
[30]  JTX 347 [Revised Exhibit 9 to Gutzler Report].
[31]  JTX 10 [BSA and LC Insurance Policies].
[32]  JTX 10 [BSA and LC Insurance Policies] at BSA-PLAN_00485360.
[33]  JTX 10 [BSA and LC Insurance Policies].

A.006371
App.269

1) **KCIC's Policy Archeology Efforts to Locate Local-Council Insurance Policies.**

21.    KCIC's Policy Archeology focused on locating evidence of policies independently issued to Local Councils prior to 1978 (the "Local Council Insurance Policies").[34]   KCIC: (1) conducted extensive searches of the BSA's physical and digital records stretching back to its founding in the early 20th century, (2) coordinated with the Local Councils to search for and locate whether they had Local Council Insurance Policies or secondary evidence[35] of such policies; and (3) through counsel, sought discovery from the insurers regarding the issuance of Local Council Insurance Policies.[36]

22.    Through the Policy Archeology, KCIC located evidence that, from 1965 and ending in January 1972, Insurance Company of North America ("INA")[37] administered a Scout Blanket Liability program ("SBL") for Local Councils through the Park Servicing Organization in New Jersey.[38]   Under the SBL program, a Local Council could apply, choose the desired amount of limits (either $250,000, $500,000, or $1,000,000), and receive a liability insurance policy from INA on the SBL form.[39]   According to the BSA's records, nearly 300 Local Councils participated in this plan through the Park Servicing Organization or a local insurance broker.[40]   The INA SBL

---

[34]  JTX 1045 [Policy Archeology (Gutzler-Opening report-Exhibit 7)].

[35]  Secondary evidence of insurance policies typically refers to a document, board minutes, or other evidence that establishes that a policy was issued by an insurer, notwithstanding that the actual policy cannot be located.  Indeed, in many circumstances, KCIC was able to locate evidence that provided for the specific policy number of a Local Council Insurance Policy, notwithstanding that neither KCIC, the BSA, or Local Council could locate the policy itself. *See, e.g.,* JTX 1045 [Policy Archeology (Gutzler-Opening report-Exhibit 7)]; JTX 1046 [BSA Local Council Insurance Archaeology Guidance (Gutzler-Opening report-Exhibit 7.1)].

[36]  JTX 1045 [Policy Archeology (Gutzler-Opening report-Exhibit 7)].

[37]  Now known as Century Indemnity Company ("Century").

[38]  JTX 1064 [INA Scout Blanket Liability Program Brochure (Gutzler Opening Materials Considered List)]; JTX 1045 [Policy Archeology (Gutzler-Opening report-Exhibit 7)]; JTX 13-5 [Gutzler Opening Materials Considered List].

[39]  JTX 1045 [Policy Archeology (Gutzler-Opening report-Exhibit 7)]; JTX 13-5 at Bates No. BSA-PLAN_01636438 ("TAC Letters from BSA re Liability Insurance 1971.pdf"); JTX 10 [BSA and LC Insurance Policies]; JTX 1064 [INA Scout Blanket Liability Program Brochure (Gutzler Opening Materials Considered List)].

[40]  JTX 13-5 at Bates No. BSA-PLAN_01636433 ("November 1 1971 Letter to Scout Executives.pdf"); JTX 1045 [Policy Archeology (Gutzler-Opening report-Exhibit 7)]; JTX 13-5 [Gutzler Opening Materials Considered List].

program ended in 1972 when INA declined to continue insuring Local Councils on this basis.  INA

did, however, continue to insure some Local Councils through other policies.[41]

23.    In addition to the insurance program established by INA, several other insurers

provided insurance coverage to Local Councils.[42]  Specifically, the Hartford Insurance Group,

through various insurance subsidiaries (collectively, "Hartford") issued policies starting in 1959

and into the late 1970s to various Local Councils.[43]  Likewise, New Hampshire Insurance

Company ("New Hampshire")[44] administered its Local Council insurance program through R.F

Lyons Company in Santa Ana, CA ("R.F. Lyons Program").[45]  A letter to Local Council presidents

indicates that, in 1974, New Hampshire insured "...nearly 10% of the BSA councils and have had

the same general program and underwriters since 1960."[46]

24.    The Policy Archeology also uncovered primary and secondary evidence that the

Local Councils procured insurance policies from various other insurers.  While the number of

policies issued by each insurer varied, Local Councils procured insurance coverage from, among

others, Travelers Insurance Companies through certain of its insurance subsidiaries (collectively,

"Travelers"), Maryland Casualty Company[47], and CNA through certain of its insurance

subsidiaries such as Continental Insurance Company (collectively "CNA Insurance

Companies").[48]

---

[41]  JTX 1045 [Policy Archeology (Gutzler-Opening report-Exhibit 7)]; JTX 347 [Revised Exhibit 9 to Gutzler Report].

[42]  JTX 347 [Revised Exhibit 9 to Gutzler Report]; JTX 10 [BSA and LC Insurance Policies].

[43]  JTX 347 [Revised Exhibit 9 to Gutzler Report]; JTX 10 [BSA and LC Insurance Policies].

[44]  A subsidiary of American International Group ("AIG").

[45]  JTX 1045 [Policy Archeology (Gutzler-Opening report-Exhibit 7)]; JTX 13-5 [Gutzler Opening Materials Considered List].

[46] JTX 13-5 at Bates No. BSA-PLAN_01636435 ("R.F Lyons Letter to Local Councils.pdf").

[47]  Clarendon National Insurance Company ("Clarendon") is the successor to certain policies issued by Maryland Casualty Company.

[48]  JTX 347 [Revised Exhibit 9 to Gutzler Report]; JTX 10 [BSA and LC Insurance Policies].

9

**2) Coverage of Chartered Organizations Under Local Council Policies.**

25.     In the course of its insurance archeology efforts, KCIC also reviewed the Local Council policies and secondary evidence to determine whether Chartered Organizations were included as insureds.  In some instances, Chartered Organizations were included as insureds either under the "Who Is An Insured" provision of the policy or by endorsement.[49]  KCIC's extensive insurance archeology efforts indicate that coverage was available to Chartered Organizations under certain individual policy forms.

26.     For example, the INA (Century) policy form under the SBL explicitly included Chartered Organizations in the definition of insured.[50]  However, Century also issued other policies to Local Councils other than the SBL, some of which did not name Chartered Organizations as insureds or additional insureds in either the insured provision of the policy or by endorsement.[51]

27.     Similarly, the definition of "insured" in the Hartford Local Council policies generally did not reference "Volunteers," "Sponsors," or "Chartered Organizations."[52]  However, certain of the Hartford Local Council policies added sponsors, i.e., Chartered Organizations, as insureds by endorsement.[53]

28.     When possible, KCIC evaluated whether coverage was potentially available for Chartered Organizations based on the terms of policies issued to historically-affiliated Local Councils.[54]  For policies issued by insurers in which only secondary evidence was found, it is

---

[49]  *See, e.g.,* JTX 10 [BSA and LC Insurance Policies] at BSA-PLAN_00258480.
[50]  JTX 1064 [INA Scout Blanket Liability Program Brochure].
[51]  *See, e.g.,* JTX 1157 [Insurance Company of North America - Sioux Council Inc. (Gutzler Rebuttal Materials Considered List)].
[52]  *See, e.g.,* JTX 1155 [Hartford Fire Insurance Co. Policy No. 12CCP500098 (Gutzler Rebuttal Materials Considered List)].
[53]  *See, e.g.,* JTX 1154 [Hartford Pine Tree Council Casualty Insurance Policy No. 04C157992 (Gutzler Rebuttal Materials Considered List)].
[54]  JTX 347 [Revised Exhibit 9 to Gutzler Report]; JTX 10 [BSA and LC Insurance Policies].

difficult to determine with certainty whether Chartered Organizations were insureds under those policies.

29.    KCIC used this information to create coverage charts showing coverage available for the BSA, as well as charts depicting the coverage under policies for insurers that the BSA has settled with, and coverage available from non-settling insurers.[55]

## III.    INSURANCE ALLOCATION

### A.    Allocation Methodology and Purpose.

30.    Having collected extensive information regarding the scope of coverage available to the BSA, Local Councils, and Chartered Organizations under policies issued to the BSA and Local Councils since the 1930s and aggregating that information into a database, I was tasked with modeling the coverage potentially available for Abuse Claims for purposes of evaluating:  (1) the insurance settlements entered into by the various claimant constituencies and the Debtors in relation to the potential coverage available to pay Abuse Claims; and (2) whether sufficient insurance assets are potentially available for payment of all or substantially all of the Abuse Claims pursuant to the mechanism created in the Plan.  In doing so, I relied upon claim information compiled by Makeda Murray of Bates White (the "Tranche VI data") as well as a series of related claim valuation scenarios from Dr. Charles Bates, also of Bates White.[56]  This process is known

---

[55]    JTX 1-361 [Supp. Disclosure re Plan Modification and Chartered Orgs.' Options (D.I. 8904)] at 6 ("To allow Opt-Out Chartered Organizations to determine the non-settled insurance coverage available, the Debtors are providing information reflecting the post1976 settled and non-settled BSA insurance policies and Local Council insurance policies, each of which include coverage to Opt-Out Chartered Organizations for Abuse Claims, at https://omniagentsolutions.com/bsa-ballots." The link directed users to a website with two sets of policy-related information: (1) "Coverage Charts for BSA/LC Insurance Policies" and (2) "Settled/Unsettled Local Council Policy Information").

[56]    JTX 676 [BSA record-level Tranche VI dataset containing 117,037 records: 02 Processed POC 2021.07.06.dta]; JTX 1052 [Expert Report of Charles E. Bates (Dec. 5, 2021)]; JTX 1194 [Supplemental Report of Charles E. Bates]; JTX 1431 [Charles E. Bates Second Supplemental Expert Report, dated March 2, 2022]; JTX 1058 [Bates White BSA valuation model (Tranche 6) (Gutzler Opening Materials Considered List)]; JTX 1601 [Bates White BSA trust simulation model (Tranche VI) -- confidential -- for production.xlsx]; JTX 1602 [Bates White BSA trust simulation model (Tranche VI) -- confidential -- for production.xlsx]; JTX 1603 Bates White BSA valuation model updated (Tranche 6) -- confidential -- for production.xlsx].

A.006375
App.273

as "allocation" or "allocation modeling."[57]  To be clear, this modeling was not done for the purpose of binding non-settling insurers, the TCC, the Coalition, the FCR, or any other entity, including the Settlement Trust, to specific allocation models or requiring this Court to decide coverage issues on the merits, but only to analyze what coverage may be available based upon the analysis of the potential aggregate values for Abuse Claims in this matter.

31.     Three categories of information are needed for allocation modeling: (1) policy information, such as named insureds, policy periods, coverage limits (per-occurrence and aggregate limits), attachment points for a layer, relevant exclusions, and whether defense costs are covered by the policy, and, if so, whether defense costs erode coverage limits; (2) underlying claim information, such as estimated claim values, dates of injury, and parties involved; and (3) methods of allocating, such as which policies are triggered by a particular claim and how claim values can be distributed among multiple triggered policies, with rules governing allocation varying by state or by agreement of the parties.

32.     I describe below how each of these categories of information were incorporated into KCIC's allocation modeling to determine the amount of coverage potentially available to pay Abuse Claims under various aggregate claim valuation scenarios.  This analysis in-turn allowed me to (1) evaluate the insurance settlements entered into by the various claimant constituencies and the Debtors, relative to the value of potential coverage under a given allocation model, and (2) opine as to whether sufficient additional insurance assets may be available through the mechanism created in the Plan to pay all or substantially all of the Abuse Claims.

---

[57] Allocation modeling is used to estimate the value of an insurance program based on a set of assumptions and a certain liability amount; by apportioning the underlying liability (i.e., underlying claims data) to policies according to their terms and applicable law, it is possible to estimate the total value of available coverage based on which policies are triggered and how much coverage those policies provide to claims.  This is a routine analysis that is performed by both insurers and insureds to evaluate the potential coverage available to pay underlying claims.

1)    **Coding Policy Terms to Use for Allocation.**

33.    As noted, *supra*, KCIC collected extensive information regarding policies issued to the BSA and Local Councils since the 1930s and coded that information in a database. Specifically, KCIC added relevant evidence of policy terms to the policy database tracking all available information about the policy, including, the insurer, policy number, limits, dates, named insured, applicable exclusions (if any), Local Council insured, the current Local Council associated with the named insured, the type of coverage (CGL, umbrella, Scout Blanket Liability, automotive, worker's comp, etc.), and the quality of the evidence of the policies' terms.

34.    Where information for a specific policy's coverage period or limits was incomplete, KCIC made certain factual assumptions; these assumptions primarily impacted KCIC's analysis of independent Local Council policies, as opposed to policies issued to the BSA.[58]

35.    Applying these assumptions allowed KCIC to create a comprehensive database of thousands of policies issued to the BSA and Local Councils with data regarding the following fields: whether a specific policy was issued to the BSA or a Local Council (whether a historical predecessor or current Local Council), issuing carrier, policy number, coverage period, attachment point, per-occurrence limit, aggregate limit, whether the policy covered all Local Councils or just specific Local Councils, whether the policy covered Chartered Organizations, whether the policy contained a sexual abuse exclusion, and whether the policy was issued by an insolvent insurer.[59]

2)    **Evaluating Prior Erosion/Exhaustion.**

36.    Prior to performing an allocation, it was necessary for me to determine whether certain policies that are subject to aggregate limits (i.e., a maximum amount available to pay any number of occurrences) were either partially eroded or fully exhausted by prior payments.  KCIC

---

[58]  JTX 1047 [Policy Allocation Assumptions (Gutzler-Opening report-Exhibit 8)].
[59]  JTX 347 [Revised Exhibit 9 to Gutzler Report].

A.006377
App.275

did this by reviewing (1) the BSA's historical records and (2) in certain circumstances, the historical records of insurers identifying their payment of claims.[60]

37.　　The BSA tracks historical and current claims information in an electronic risk management system called Riskonnect, which is maintained by BSA employees. Riskonnect contains key claim-related data going back decades, including claim number, claimant name, dates of loss/dates of abuse, settlement amounts paid, defense expenses paid, claim status, and allegation (abuse vs. non-abuse). However, Riskonnect does not consistently track which settlements and defense costs were billed to certain insurers or paid under certain policies.[61] Thus, in order to determine whether a given policy was eroded or exhausted, it was necessary for KCIC to estimate payments using certain assumptions about which policy the payment was made under.

38.　　KCIC evaluated the prior exhaustion by applying the settlement amounts and related expenses to the applicable insurance coverage, using the first date of abuse to determine which policies provided coverage for a given claim.[62] By utilizing the date of first abuse to apply the entire value of an underlying claim and related defense costs to policies providing coverage in that year (accounting for any deductible paid by the BSA), KCIC was able to estimate how much coverage remained under a given policy's aggregate limit. When a policy's aggregate limit was reached, any remaining value of an underlying claim was paid by the next attaching policy, with this process continuing until the claim was fully paid or no further coverage was available.

39.　　By performing this exhaustion analysis for all underlying claim payments made by the BSA's insurers pre-petition and subtracting those amounts from the aggregate limits of the

---

[60] JTX 1043 [Table of Policies with Prior Exhaustion Amounts (Gutzler-Opening report-Exhibit 5)]; JTX 1044 [Prior Exhaustion (Gutzler-Opening report-Exhibit 6)]; JTX 1063 [Exhaustion Report – All Policies (Excel) - As of 01.22.2021 - Riskonnect data from the BSA (Gutzler Opening Materials Considered List)].

[61] JTX 1063 [Exhaustion Report – All Policies (Excel) - As of 01.22.2021 - Riskonnect data from the BSA (Gutzler Opening Materials Considered List)]; JTX 1044 [Prior Exhaustion (Gutzler-Opening report-Exhibit 6)].

[62] JTX 1044 [Prior Exhaustion (Gutzler-Opening report-Exhibit 6)].

triggered policies, KCIC was able to estimate how much remaining coverage was available to pay Abuse Claims made through this bankruptcy.[63]  KCIC incorporated this erosion and exhaustion data into its allocation modeling for Abuse Claims by only allocating the value of Abuse Clams to policies which had not been exhausted or by pre-petition claim payments.  Where a policy was partially eroded by pre-petition payments, KCIC only allocated the value of Abuse Claims to the remaining available aggregate limit.[64]

### 3)    Incorporating Tranche VI Data into Allocation Models.

40.    Once the policies had been coded and we evaluated the exhaustion/erosion of the available insurance, I then had to take the potential liability and allocate it to the insurance coverage.  In order to conduct the allocation, I relied upon claim information compiled by Makeda Murray of Bates White—the so-called "Tranche VI data"—as well as a series of related valuation scenarios from Dr. Charles Bates, also of Bates White.[65]  The data contains claim-specific details used in allocation, such as claim number, claimant date of birth, the date of first abuse (the "first encounter"), claimant age at first encounter, state where the abuse occurred, the historical name of the Local Council.[66]  The valuation scenarios, which range in aggregate value from $2.4 billion to $7.1 billion, provide different representative distributions of values across those claims which I use for my allocations.[67]

---

[63]  JTX 1043 [Table of Policies with Prior Exhaustion Amounts (Gutzler-Opening report-Exhibit 5)].

[64]  JTX 347 [Revised Exhibit 9 to Gutzler Report].

[65]  JTX 676 [BSA record-level Tranche VI dataset containing 117,037 records: 02 Processed POC 2021.07.06.dta]; JTX 1058 [Bates White BSA valuation model (Tranche 6) (Gutzler Opening Materials Considered List)]; JTX 1601 [Bates White BSA trust simulation model (Tranche VI) -- confidential -- for production.xlsx]; JTX 1602 [Bates White BSA trust simulation model (Tranche VI) -- confidential -- for production.xlsx]; JTX 1603 Bates White BSA valuation model updated (Tranche 6) -- confidential -- for production.xlsx].

[66]  JTX 676 [BSA record-level Tranche VI dataset containing 117,037 records: 02 Processed POC 2021.07.06.dta]; JTX 1058 [Bates White BSA valuation model (Tranche 6) (Gutzler Opening Materials Considered List)]; JTX 1601 [Bates White BSA trust simulation model (Tranche VI) -- confidential -- for production.xlsx]; JTX 1602 [Bates White BSA trust simulation model (Tranche VI) -- confidential -- for production.xlsx]; JTX 1603 Bates White BSA valuation model updated (Tranche 6) -- confidential -- for production.xlsx].

[67]  JTX 1058 [Bates White BSA valuation model (Tranche 6) (Gutzler Opening Materials Considered List)]; JTX 1601 [Bates White BSA trust simulation model (Tranche VI) -- confidential -- for production.xlsx]; JTX 1602

A.006379
App.277

41.    By comparing the Tranche VI data with KCIC's above-mentioned database of policy terms relevant to coverage, it was possible for KCIC to model how much coverage was potentially available based on the details—including the estimated value—of thousands of underlying Abuse Claims.

### 4)    Legal Assumptions Necessary for Allocation.

42.    In order to allocate tens of thousands of underlying claims across thousands of liability policies, it was necessary to incorporate several legal assumptions in the allocation model, including: the trigger date, number of occurrences, the presence of aggregate limits on some policies, and joint-and-several liability for a claim among multiple insureds.  These legal assumptions were adopted on the advice of the Debtors' counsel but are reasonable given the information that I have reviewed.

*The Trigger Date Assumption.*

43.    Regarding the trigger date assumption, KCIC assumed that the date of first encounter would determine which policy year a claim would be allocated to (*e.g.*, primary and excess policies providing coverage on the date of first abuse would potentially be triggered). Where the date of first encounter was unknown (*i.e.* not provided in the proof of claim) but the claimant's date of birth was known, KCIC used the average age of first abuse (10 years old) for claims to calculate the date of first encounter.

44.    The rationale for using the trigger date assumption was based on the First Encounter Agreement (FEA).[68]   The FEA was an agreement entered into between the BSA and Century in 1996 in which it was agreed that the date of "occurrence" pertaining to Abuse Claims would be

---

[Bates White BSA trust simulation model (Tranche VI) -- confidential -- for production.xlsx]; JTX 1603 Bates White BSA valuation model updated (Tranche 6) -- confidential -- for production.xlsx].

[68]   JTX 7 [Data Site Documents] at BSA-PLAN_00510023.

the date of when the first act of Abuse took place—regardless of whether additional acts of Abuse occurred in later policy periods.[69]  While Century and the BSA were the only parties to the FEA, it is my understanding that several (if not most) of the BSA's other insurers ascribed to this agreement and provided coverage according to the first alleged year the Abuse occurred.[70]

45.    Moreover, some of the insurance policies in the later years include a "First Encounter Endorsement," that requires that the only triggered policy is the policy in the year where the abuse first allegedly began.[71]  Because it was custom for the Debtors and a majority of the insurers to adjust claims according to the FEA pre-petition or the policy themselves required it, I believe it was a reasonable assumption to use this as the trigger date for purposes of allocating tens-of-thousands of Abuse Claims across policies issued by dozens of insurers.

46.    By utilizing the date of first encounter as the trigger for my allocation analysis, it was not necessary for KCIC's allocation modeling to consider the end date of abuse.

*The Single Occurrence Assumption.*

47.    As a related legal assumption, KCIC treated each survivor as the occurrence for purposes of allocating Abuse Claims to coverage.  As discussed immediately below, there are various occurrence approaches, but, as noted by counsel, this approach was applied by the BSA pre-petition when seeking insurance coverage and almost all of the BSA's insurers (with the exception of Hartford) adopted this "occurrence" approach.

48.    The approach applied by the BSA and its insurers (except Hartford) pre-petition was to treat each survivor as the "occurrence" under the policy (the "Survivor Approach").[72]  This

---

[69]  JTX 7 [Data Site Documents] at BSA-PLAN_00510023.
[70]  JTX 2958 [Compilation of letters from various insurers regarding the FEA]
[71]  JTX 10 [BSA and LC Insurance Policies] at BSA-PLAN_00492916.
[72]  JTX 7 [Data Site Documents] at BSA-PLAN_00510023; JTX 2958 [Compilation of letters from various insurers regarding the FEA].

17

was regardless of the number of acts of abuse, perpetrators, etc.  This Survivor Approach is in contrast with a multi-occurrence approach, where each instance of abuse is considered a separate "occurrence."  A third "occurrence" approach is that all claims of abuse are considered a "single" occurrence because the occurrence is the BSA's purported negligent supervision (an occurrence approach only espoused by Hartford).[73]

49.    It is my understanding that in the 60+ years that the Debtors and its insurers (except for Hartford) have been adjusting claims, a Survivor Approach was always used to determine the available coverage.[74]

50.    Therefore, I believe it was a reasonable assumption to use the Survivor Approach based on the custom and practice of the Debtors and its insurers prior to the Petition date.

*The Aggregate Limit Assumption.*

51.    With respect to the matching-deductible policies issued to the BSA by Century and Liberty between 1988 and 2008, KCIC assumed that the primary policies included aggregate limits of liability.  In other words, KCIC assumed that these policies had aggregate limits at the primary layer.  KCIC did not assume that policies issued prior to 1988 or after 2008 had aggregate limits.

52.    KCIC recognizes that a dispute exists between the BSA, its primary insurers, and certain other insurers as to the treatment of the deductibles under these policies.[75]  The primary insurers have asserted that, if they are obligated to pay in lieu of the deductible, their obligations are subject to a $1 million aggregate limit of liability.[76]  Other insurers have argued that, if the

---

[73] JTX 182 [Letter from James Ruggeri to Adrian Azer].
[74] JTX 1063 [Exhaustion Report – All Policies (Excel) - As of 01.22.2021 - Riskonnect data from the BSA (Gutzler Opening Materials Considered List)]; In pre-petition litigation and in the adversary proceeding, Hartford has argued that all of the BSA's Abuse Claims—regardless of whether they involve the same perpetrator, whether they occurred at different locations, whether they occurred at different time—constitute a single occurrence.  However, Hartford is the only BSA insurer that has taken this occurrence approach. *See, e.g.,* JTX 182 [Letter from James Ruggeri to Adrian Azer].
[75] JTX 1-425 [Amended Disclosure Statement for the Modified Fifth Amended Plan (D.I. 6431)] at 68.
[76] JTX 1-278 [Liberty Mutual DS Objection (D.I. 6057)] at 5-7.

A.006382
App.280

primary insurer is obligated to pay the $1 million aggregate limit of liability, then a $1 million self-insured retention ("SIR") applies in lieu of the per-occurrence deductible that must be paid by the BSA or Local Councils.[77]

53.    Although KCIC's assumption that the 1988-2008 policies included an aggregate limit was based on the advice of Debtors' counsel, the Debtors have settled with certain excess insurers in these years.[78] These insurers would not have had the incentive to settle at the amounts that they did, but for the risk that the primary insurance policies may be subject to an aggregate limit of liability.

*The Joint-and-Several Assumption.*

54.    Where Abuse Claims implicated both the BSA and one or more Local Council insurance policies, KCIC used assumptions as to apportioning liability jointly and severally between the BSA and Local Councils insurance policies.[79]

55.    Where both Debtor and Local Council policies were triggered by a claim, KCIC apportioned the claim evenly across the number of triggered policies (*e.g.* a claim triggering two such policies would be allocated 50/50).

56.    If one such policy had a lower per-occurrence limit than other triggered policies (i.e. a policy issued to a Local Council reached its limit prior to a policy issued to the BSA, or visa-versa), the claim value would be allocated evenly by the number of policies triggered *until* the lower per-occurrence limit was reached, with the remaining claim value being allocated to policies with per-occurrence limits that had not yet been reached.

---

[77]  JTX 1-280 [Certain Insurers' DS Objection (D.I. 6062)] at 4-14.
[78]  JTX 1-432 [Notice of Eighth and Ninth Mediator's Report Regarding United Methodist Term Sheet and Zurich Term Sheet Including Treatment of Chartered Organizations (D.I. 7929)]; JTX 1-316 [Tenth Mediator's Report (D.I. 8102), including Clarendon Term Sheet].
[79]  JTX 1050 [Claim Allocation Examples (Gutzler-Opening report-Exhibit 11)].

19

57.     This assumption was based on a discussion with the BSA's National Coordinating Counsel and their understanding that a majority of states apply a joint and several liability scheme with respect to allocation of liability for Abuse Claims between co-defendants.

## IV.     EVALUATION OF SETTLEMENTS WITH VARIOUS INSURERS

58.     The KCIC allocation analysis made it possible for me to evaluate the settlements with insurers by comparing their contributions to the Settlement Trust with their potential exposure based on the allocation modeling, taking into consideration discounts, based on litigation risk and solvency risk, that could be applied to the amounts allocated to each insurer.

59.     In a mass tort, with thousands of claims and complex coverage programs (as is the case with the BSA), insurers and insureds may enter into settlement agreements to provide more certainty and to avoid litigation regarding disputes.  Rather than litigating all disagreements to conclusion, both sides reach a compromise on key issues and find a mutually acceptable value.

60.     In my experience, various factors should be considered when evaluating a settlement of insurance coverage, including: (1) litigation risks (e.g. insurance-coverage defenses, estimated value of current claims, prior exhaustion levels, prior settlements); (2) the insurer's financial position; (3) estimates of the value of current claims and evaluation of how those valuations overlap with the potentially available coverage(s); and (4) expense of coverage litigation, including both the actual litigation expense and the time value of money as it relates to delayed payment to the insured.   In my experience, both insurers and insureds take these factors into account when negotiating a settlement amount.

61.     I evaluated settlements between the Debtors and (1) Hartford, (2) Century/Chubb, (3) Zurich, and (4) Clarendon, respectively.

A.006384
App.282

62.    The table below demonstrates the total potential allocation to each category of coverage, including each of the four settled insurers (with Century and Chubb combined) under multiple aggregate claim valuations provided by Dr. Bates:[80]

| Category | $2.4 Billion BW Tort Distribution | $3.0 Billion TDP Distribution | $3.3 Billion TDP Distribution | $3.6 Billion TDP Distribution | $3.6 Billion BW Tort Distribution |
|---|---|---|---|---|---|
| Century/Chubb | $1,250,666,311 | $1,434,919,710 | $1,546,479,054 | $1,884,155,500 | $1,834,263,558 |
| Hartford | $477,535,263 | $698,331,465 | $765,648,955 | $767,419,261 | $716,358,283 |
| Zurich | $73,826,900 | $61,216,969 | $66,183,646 | $74,187,281 | $83,752,366 |
| Clarendon | $3,878,517 | $6,564,759 | $7,434,084 | $9,070,978 | $7,855,750 |
| Other Non-Settled Insurers | $274,448,112 | $321,319,886 | $361,749,271 | $357,745,809 | $400,546,854 |
| Deductible Policies | $148,920,756 | $136,326,124 | $146,370,719 | $172,414,714 | $211,031,107 |
| Insolvent | $5,741,197 | $9,191,418 | $10,741,197 | $18,218,073 | $26,705,962 |
| Uninsured | $164,982,943 | $332,129,668 | $400,928,770 | $316,788,383 | $319,486,120 |
| **Total** | **$2,400,000,000** | **$3,000,000,000** | **$3,305,535,696** | **$3,600,000,000** | **$3,600,000,000** |

63.    As discussed in detail below, there are considerations beyond the total potential allocations reported above that impact the reasonableness assessment of any settlement.

**A.    The Hartford Settlement.**

*Hartford's Insurance Program.*

64.    The Hartford issued primary and some umbrella policies to the BSA from September 21, 1971, to January 1, 1978, and certain additional excess policies including excess policies in 1981 and 1982.[81]  The Hartford policies had a per-person or per-occurrence limit with an aggregate that only applied to products/completed operations claims, i.e., no aggregate limit with respect to Abuse Claims.[82]

---

80    JTX 1186 [Policy Listing with Allocation Results].
81    JTX 347 [Revised Exhibit 9 to Gutzler Report]; JTX 10 [BSA and LC Insurance Policies].
82    JTX 347 [Revised Exhibit 9 to Gutzler Report]; JTX 10 [BSA and LC Insurance Policies].

A.006385
App.283

65.     In 2010, the BSA entered into a settlement with Hartford that resolved certain primary and excess policies that were issued in 1981 and 1982.[83]  Further, in 2011, the BSA entered into a settlement agreement with Hartford that settled coverage with respect to the 1976 and 1977 Hartford primary policies.[84]  It is my understanding that, although Hartford contends that Abuse Claims were released under these policies pursuant to the 2011 settlement agreement, the Local Councils and Chartered Organizations have asserted their right to coverage under those policies were not impacted by this settlement agreement.[85]

66.     Hartford also issued similar primary and umbrella policies to Local Councils; these policies generally had a per-person or per-occurrence limit with no applicable aggregate limit.[86]

*Settlement Considerations.*

67.     The BSA, Hartford, the Ad Hoc Committee, the Future Claimants' Representative, and Coalition agreed in principle on settlement terms as memorialized in the Hartford Insurance Settlement Agreement, the approval of which is incorporated into the Plan.[87]  Pursuant to this settlement, Hartford will contribute $787 million to the Settlement Trust if the Debtors' Plan of Reorganization is confirmed.[88]  In evaluating the Hartford Settlement, I took into account several settlement considerations—including the BSA's contentious coverage disputes with the Hartford.

*Coverage Litigation with Hartford.*

68.     Prior to the Petition Date, the BSA was litigating against Hartford in several jurisdictions across the country.  In 2018, the BSA filed suit against Hartford in Texas state court

---

[83]  JTX 92 [2010 Hartford Settlement] at BSA-Plan_00332125.
[84]  JTX 1481 [2011.08.04 Initial Hartford Settlement Agreement].
[85]  JTX 1-425 [Amended Disclosure Statement for the Modified Fifth Amended Plan (D.I. 6431)] at 67, 71.
[86]  JTX 347 [Revised Exhibit 9 to Gutzler Report]; JTX 10 [BSA and LC Insurance Policies].
[87]  JTX 1-292 [Sixth Mediator's Report with Attachments (includes Hartford and TCJC Term Sheets) (D.I. 6210)].
[88]  JTX 1-292 [Sixth Mediator's Report with Attachments (includes Hartford and TCJC Term Sheets) (D.I. 6210)].

22

A.006386
App.284

for its improper denial of coverage in connection with the Abuse Claims (the "Texas Action").[89] The BSA asserted several claims against Hartford, including (1) declaratory judgment; (2) breach of contract; and (3) bad faith claims.[90]  Hartford counterclaimed: (1) that the BSA breached its duty to cooperate with Hartford under the relevant policies; (2) that Abuse Claims, in general, arise out of a single occurrence, meaning that Hartford would only need to pay the single per-occurrence limit of each triggered policy, regardless of the number of Abuse Claims that occurred and regardless of whether an aggregate limit applied; and (3) that the BSA and Local Councils expected or intended the injuries caused by Abuse Claims.[91]  The BSA was also involved in litigation against Hartford in Illinois, which addressed several of the same coverage issues (the "Illinois Action").[92] It is my understanding that the BSA expended substantial resources fighting with Hartford in both actions.[93]

69.    Further, Hartford filed an adversary proceeding in the Bankruptcy Court, seeking to litigate the same coverage issues.[94]  Finally, I understand that Hartford was actively involved in the BSA's bankruptcy and raised objections that the BSA's proposed Plan violated Hartford's right to raise coverage defenses under its policies.[95]

70.    While the BSA disputed the coverage arguments raised by Hartford, continued litigation would be a drain on the BSA's resources.  Moreover, if Hartford were to succeed on its single occurrence theory, this would result in a ruling that would substantially limit the amount Hartford (and potentially other insurers) would ultimately pay for Abuse Claims.

---

[89]  JTX 181 [Texas Complaint against Hartford]; JTX 3-2 [BSA's Motion to Dismiss Adversary Proceeding (D.I. 22)] at 6, 12-13.
[90]  JTX 181 [Texas Complaint against Hartford] at 6-9.
[91]  JTX 3-2 [BSA's Motion to Dismiss Adversary Proceeding (D.I. 22)] at 6-7, 12-13.
[92]  JTX 162 [Illinois Complaint filed by National Surety]; JTX 3-2 [BSA's Motion to Dismiss Adversary Proceeding (D.I. 22)] at 13.
[93]  JTX 3-2 [BSA's Motion to Dismiss Adversary Proceeding (D.I. 22)] at 13.
[94]  JTX 3-2 [BSA's Motion to Dismiss Adversary Proceeding (D.I. 22)] at 15-16.
[95]  JTX 1-279 [Hartford DS Objection (D.I. 6058)] at 35-38.

A.006387
App.285

*Secondary Evidence v. Primary Evidence.*

71.     I also considered that, while policy evidence for Hartford is generally complete, there are some policies substantiated by only secondary evidence (e.g. coverage evidenced indirectly by certificates of insurance, correspondence, internal BSA records, receipts/invoices for premiums, renewal documents, and schedules of underlying insurance in other policies).[96]  As such, the BSA and Local Councils faced litigation risk that a court could determine that these policies do not exist and/or the terms would limit the available coverage.

72.     Specifically, of the $140 million of per-occurrence limits potentially available to pay Abuse Claims under the Hartford Policies, roughly $26 million worth of per-occurrence limits are based on secondary evidence rather than on the terms in the policies themselves.[97]  In coverage litigation, these policies would be at risk of not providing any coverage for Abuse Claims.

*Allocation to Hartford Policies.*

73.     As indicated by the attached exhibit, KCIC's allocation modeling indicated that the total coverage available for Abuse Claims from Hartford was between $477,535,263 and $767,419,261 based on an aggregate value of Abuse Claim between $2.4 billion and $3.6 billion.[98]

74.     The primary-layer Hartford policies include coverage for defense costs the BSA incurs in defending Abuse Claims.  These defense costs would not erode the limits of those policies, and would therefore be "in addition" to any liability amounts owed by Hartford.

---

[96]  JTX 347 [Revised Exhibit 9 to Gutzler Report]; JTX 10 [BSA and LC Insurance Policies].
[97]  JTX 347 [Revised Exhibit 9 to Gutzler Report]; JTX 10 [BSA and LC Insurance Policies]. Although the original number listed in my report was $16.4 million out of $130 million in per-occurrence limits, that number increases to $26,015,000 and $140 million, respectively, once First State policies are also included. *See* JTX 347 [Revised Exhibit 9 to Gutzler Report].
[98]  *See supra*, ¶ 62 (Solvent Hartford Coverage under the "$2.4 Billion BW Tort Distribution" and the "$3.6 Billion TDP Distribution"); JTX 1186 [Policy Listing with Allocation Results].

A.006388
App.286

*Conclusions Regarding the Hartford Settlement.*

75.     Having evaluated multiple factors potentially affecting the value of the Hartford coverage, I believe there was a reasonable basis for the BSA to agree to release its rights under the Hartford Policies in return for a $787 million contribution to the Settlement Trust.

76.     The BSA's extensive and costly prior coverage litigation with Hartford (including both the pre-petition lawsuits and in the adversary proceeding) indicated that there was a significant risk of protracted coverage litigation with Hartford if a settlement was not reached, with such future litigation expenses consuming a substantial portion of the BSA's resources that could otherwise be used to pay Abuse Claims.  Hartford's involvement as one of the most active insurers lodging objections to the Plan also indicated a risk that the BSA's costs associated with its bankruptcy would increase in the absence of a settlement with Hartford.[99]

77.     Likewise, the coverage defenses raised by Hartford posed a significant risk that coverage litigation could result in rulings that could substantially reduce the value of coverage available under Hartford's policies.  Hartford's assertion that all Abuse Claims are a single occurrence would have dramatically reduced the coverage available under its policies (and potentially other insurers' policies), as would a court ruling that the BSA's secondary evidence of coverage was insufficient to prove that $26.0 million in per-occurrence limits existed.

78.     In consideration of all these significant expenses and risks of coverage litigation, as well as the value of Abuse Claims allocated to Hartford policies in KCIC's allocation modeling, I believe there was a reasonable basis for the BSA to settle with Hartford for $787 million.

---

[99]    *See, e.g.,* JTX 1-279 [Hartford DS Objection (D.I. 6058)]; JTX 1-23 [Hartford Motion for Leave to File Objection to Bar Date Motion (D.I. 651)].

A.006389
App.287

**B.    The Century/Chubb Settlement.**

*Century's Insurance Program.*

79.    Century issued primary and excess policies insurance policies to the BSA beginning as early as 1935 and continuing to 1971, with additional coverage provided between 1978 and 1996.[100]  Chubb issued various excess insurance policies to the BSA between 1985 and 2020.[101]

80.    As noted *supra*, Century also issued significant coverage to the Local Councils prior to 1976 through the SBL and via other policy forms, including some non-SBL policies issued in 1976 and 1977.  Many of these policies are either incomplete or are supported by secondary evidence.

*Settlement Considerations.*

81.    On December 12, 2021, the BSA and the Century and Chubb Companies agreed in principle on settlement terms as memorialized in the Century and Chubb Settlement.  The terms of the agreement are summarized in the Term Sheet.[102]  Pursuant to this settlement, the Chubb and Century companies will pay $800 million to the Settlement Trust to pay Abuse Claims if the Debtors' Plan of Reorganization is confirmed.  In reviewing the settlement, I took into account several considerations, including, among others, pre-petition coverage litigation with Century, solvency concerns, and various coverage risks.

*Coverage Litigation Against Century.*

82.    Prior to the petition date, the BSA and Century were engaged in contentious insurance-coverage litigation in two forums.  The BSA filed an action in Texas state court against, among others, Century (the "Century Texas Action").[103]  However, Century was also litigating

---

[100] JTX 347 [Revised Exhibit 9 to Gutzler Report]; JTX 10 [BSA and LC Insurance Policies].
[101] JTX 347 [Revised Exhibit 9 to Gutzler Report]; JTX 10 [BSA and LC Insurance Policies].
[102] JTX 1-307 [Seventh Mediator's Report, Century and Chubb Companies Term Sheet (D.I. 7745)].
[103] JTX 185 [Texas Complaint against Century, National Surety and Allianz] (This Century Texas Action was separate from the Texas Action filed against Hartford).

coverage issues against the BSA in the Illinois Action referenced above.[104]  In both the Century Texas Action and Illinois Action, I understand that Century served extensive discovery and lodged a series of procedural motions.

83.    In those insurance-coverage actions, Century raised a number of coverage defenses which, if successful, could substantially reduce or even eliminate the coverage available for Abuse Claims under their policies.[105]  Some of the specific coverage defenses raised by Century and Chubb included: (1) that the BSA breached its duty to cooperate under the relevant policies;  (2) that the BSA breached the "consent to settle" and "voluntary settlement" clauses in the relevant policies; and (3) that Century/Chubb have no coverage obligations for Abuse Claims that are barred by the applicable statute of limitations.[106]

84.    While the BSA disputes these coverage defenses, continued litigation would have been a drain on the BSA's resources and could have resulted in a ruling that would limit the amount Century and/or Chubb would ultimately pay for Abuse Claims.

*Century's Participation in the Debtors' Bankruptcy.*

85.    It is my understanding that Century has been actively involved in the Debtors' bankruptcy.[107]  It is also my understanding that the Debtors expended substantial estate resources to respond to each of these objections.

---

[104] JTX 162 [Illinois Complaint filed by National Surety]; JTX 202 [Illinois Century Answer].

[105] *See generally* JTX 202 [Illinois Century Answer].

[106] JTX 1-143 [Century DS Objection (D.I. 3856)] 32-34; JTX 1-180 [Century RSA Objection (D.I. 5707)] at 8, 30 (pages 3 and 25, as numbered in the brief); JTX 1-281 [Century's DS Objection (D.I. 6065)] at 5-9 (pages 1-5, as numbered in the brief).

[107] *See, e.g.*, JTX 1-21 [Century Joinder of Hartford Bar Date Objection (D.I. 656)]; JTX 1-143 [Century DS Objection (D.I. 3856)]; JTX 1-145 [Century DS Objection (D.I. 3857)]; JTX 1-180 [Century RSA Objection (D.I. 5707)]; JTX 1-182 [Century Objection to Payment of Coalition Lawyers (D.I. 5709)]; JTX 1-281 [Century's DS Objection (D.I. 6065)].

A.006391
App.289

*Concerns with Collectability Related to Century.*

86.    I also considered the solvency risks associated with Century and the impact that would have on the Debtors' ability to collect from Century.  In the KCIC allocation modeling, the vast majority of Century's exposure is due to amounts allocated to Century rather than Chubb.[108] Century is a run-off insurer paying claims under policies issued by Insurance Company of North America.[109]  This means that it is a solvent insurance company that manages and pays claims under insurance policies for which Century is responsible, but it is no longer actively underwriting new business.  Century is not an income-generating insurer through the continued receipt of premiums, and there is significant uncertainty regarding the assets available to satisfy Century Indemnity Company's obligations to the Debtors and to Century's other policyholders.

*Secondary Evidence v. Primary Evidence.*

87.    As with Hartford, a significant amount of the value of coverage allocated to Century and Chubb policies issued to the BSA and Local Councils is based on secondary evidence; depending on which aggregate valuation scenario is applied, 12-15% of the total value of coverage provided by the Century and Chubb policies is supported solely by secondary evidence—an amount of coverage worth hundreds of millions of dollars.[110]  To the extent that a court were to determine that this coverage did not exist or limited the availability of the coverage, then Century and Chubb's overall exposure would decrease significantly.

---

[108] JTX 1186 [Policy Listing with Allocation Results].
[109] JTX 356 [Century Indemnity Annual Statement] at 34-36 (explaining that the Insurance Departments of multiple states approved Century's Plan of Restructure, placing it in run-off); JTX 975 [Presentation by KCIC Re Century Settlement Analysis, dated November 21, 2021].
[110] JTX 1186 [Policy Listing with Allocation Results].

A.006392
App.290

88.     Additionally, many of the Century policies consist of independent Local Council policies (rather than policies covering all Local Councils), increasing the likely cost of piecemeal coverage litigation for individual policies.[111]

*Allocation to Century/Chubb Policies.*

89.     As indicated by the attached exhibit, KCIC's allocation modeling indicated that the total coverage available for Abuse Claims under the Century and Chubb policies (combined) was between $1,250,666,311 and $1,884,155,500 based on an aggregate value of Abuse Claims between $2.4 billion and $3.6 billion.[112]

*Conclusions Regarding the Century Settlement.*

90.     Having evaluated multiple factors potentially affecting the value of the Century/Chubb coverage, I believe there was a reasonable basis for the BSA to release its rights under the Century and Chubb Policies in return for an $800 million contribution to the Settlement Trust.

91.     The BSA's extensive and costly pre-petition coverage litigation with Century, as well as Century's litany of objections in the present bankruptcy proceeding, indicate that there was a substantial risk that protracted coverage litigation with Century and Chubb in the absence of a settlement would consume a substantial portion of the BSA's resources that could otherwise be used to pay Abuse Claims.  In addition to the substantial litigation expenses posed by coverage litigation against Century and Chubb, there was also a significant risk that future rulings in favor of Century or Chubb on their coverage defenses could substantially reduce the value of coverage available to pay Abuse Claims.  Likewise, there was a significant risk that rulings against the BSA

---

[111] JTX 347 [Revised Exhibit 9 to Gutzler Report]; JTX 1186 [Policy Listing with Allocation Results].

[112] *See supra*, ¶ 62 (Solvent Century/Chubb Coverage under the "$2.4 Billion BW Tort Distribution" and the "$3.6 Billion TDP Distribution"); JTX 1186 [Policy Listing with Allocation Results].

A.006393
App.291

on its secondary evidence of the terms of Century or Chubb could substantially reduce available coverage.  Further, as noted above, there was some risk regarding the solvency of Century, which would impact any future collectability.

92.    In consideration of all these significant expenses and risks of coverage litigation, as well as the value of Abuse Claims allocated to the Century and Chubb policies in KCIC's allocation modeling, I believe there was a reasonable basis for the BSA to settle with Century and Chubb for $800 million.

## C.    The Zurich Settlement.

### *Zurich's Insurance Program.*

93.    Zurich issued excess-level coverage to the BSA between 1989 and 2018, with underlying matching-deductible policies between 1989 and 2008 that were issued by Century and Liberty Mutual.[113]

### *Settlement Considerations.*

94.    On December 21, 2021, the BSA and the Zurich Insurers agreed in principle on settlement terms as memorialized in the Zurich Settlement Agreement.[114]  Pursuant to this settlement, Zurich will pay $52.5 million to the Settlement Trust to pay Abuse Claims if the Debtors' Plan of Reorganization is confirmed—an amount which reflects a discount on the total estimated value of coverage provided by the Zurich policies under various allocation models.[115]

---

[113] JTX 347 [Revised Exhibit 9 to Gutzler Report]; JTX 1186 [Policy Listing with Allocation Results].

[114] JTX 1-432 [Notice of Eighth and Ninth Mediator's Report Regarding United Methodist Term Sheet and Zurich Term Sheet Including Treatment of Chartered Organizations (D.I. 7929)] at 40 (page 7/28 of D.I. 7929-2).  (As defined in the Term Sheet, "Zurich Insurers" includes "…American Zurich Insurance Company, American Guarantee & Liability Insurance Company, and Steadfast Insurance Company…").

[115] JTX 1-432 [Notice of Eighth and Ninth Mediator's Report Regarding United Methodist Term Sheet and Zurich Term Sheet Including Treatment of Chartered Organizations (D.I. 7929)] at 36 (page 2/28 of D.I. 7929-2).

*Risks of Coverage Litigation.*

95.    Zurich raised a number of the same coverage defenses as the other insurers, which, if successful, would substantially reduce or even eliminate the coverage available for Abuse Claims under their policies.[116]  In addition to these litigation risks based on coverage defenses, a substantial amount of the Zurich coverage would be at risk if the underlying Century and Liberty Mutual matching-deductible policies are determined not to have aggregate limits.  In such a circumstance, the BSA would be required to pay virtually all claims which did not exceed the per-occurrence limit for such matching-deductible policies, regardless of the number of Abuse Claims in the relevant policy term.  If Zurich succeeded in arguing that the matching deductible policies had no aggregate limit, the majority of coverage for Abuse Claims allocated to Zurich's excess policies would be at risk.

96.    While the BSA does not concede that any of these coverage defenses are valid, they are significant risks that had to be weighed in considering the benefits of a comprehensive settlement in contrast to the alternative coverage litigation.

*Allocation to Zurich Policies.*

97.    As indicated by the attached exhibit, KCIC's allocation modeling indicated that the total coverage available for Abuse Claims from Zurich was between $73,826,900 and $74,187,281 based on an aggregate value for Abuse Claim between $2.4 billion and $3.6 billion.[117]

98.    Furthermore, any future defense costs the BSA incurs in defending Abuse Claims would erode the limits of some of the Zurich policies in an amount greater than is reflected in the current allocation modeling.[118]   This means that, in the absence of a settlement, there could

---

[116] *See, e.g.,* JTX 1-172 [Certain Insurers' Objection to Debtors' RSA Motion (D.I. 5684)] at 11-12, 42.
[117] *See supra,* ¶ 62 (Solvent Zurich Coverage under the "$2.4 Billion BW Tort Distribution" and the "$3.6 Billion TDP Distribution"); JTX 1186 [Policy Listing with Allocation Results].
[118] JTX 10 [BSA and LC Insurance Policies].

potentially be less money available to pay Abuse Claims than is reflected in the allocations to Zurich's policies.

*Conclusions Regarding the Zurich Settlement.*

99.    Having evaluated multiple factors potentially affecting the value of the Zurich coverage, I believe there was a reasonable basis for the BSA to agree to release its rights under the Zurich Policies in return for a $52.5 million contribution by Zurich to the Settlement Trust.

100.    Based upon my experience in evaluating insurance coverage settlements, the coverage defenses raised by Zurich posed a considerable risk that coverage litigation could result in rulings which substantially reduced the value of coverage for Abuse Claims available under Zurich's policies.  Furthermore, although not yet raised by Zurich as a coverage defense, the possibility of a court ruling that the matching-deductible policies issued by Zurich had no aggregate limit could risk the majority of excess coverage available to pay Abuse Claims.

101.    I believe there was a reasonable basis for the BSA to settle with Zurich for $52.5 million; any resulting discount in the value of Zurich's policies was appropriate in relation to the risks of coverage litigation based on Zurich's coverage defenses and the risk that a court could rule that the matching-deductible policies underlying Zurich's policies had no aggregate limits.

**D.    The Clarendon Settlement.**

*Clarendon's Insurance Program.*

102.    Clarendon issued primary policies to a number of independent Local Councils from 1957 to 1979, and also issued excess policies to the BSA between 2003 and 2006.[119]

---

[119] JTX 347 [Revised Exhibit 9 to Gutzler Report]; JTX 10 [BSA and LC Insurance Policies].

A.006396
App.294

*Settlement Considerations.*

103.    On September 30, 2021, the BSA and Clarendon agreed in principle on settlement terms as memorialized in the Clarendon Settlement Agreement.  Pursuant to this settlement, Clarendon will pay $16.5 million to the Settlement Trust to pay Abuse Claims if the Debtors' Plan of Reorganization is confirmed.[120]

*Risks of Coverage Litigation.*

104.    The terms of a number of the Clarendon primary policies issued to independent Local Councils are based on secondary evidence, including certificates of insurance, policy listings, and coverage assumed based on continuity of coverage.[121]  There was a risk if the Local Councils were forced to pursue coverage litigation against Clarendon that a court would rule that this secondary evidence was insufficient to prove the existence or terms of the Clarendon policies, reducing the coverage available for Abuse Claims.  In addition, as with Zurich, the Clarendon policies issued to the BSA are excess of years with matching deductibles and, to the extent that those primary policies are not subject to an aggregate limit, then any recovery from Clarendon would be in significant jeopardy.[122]

*Allocation to Clarendon Policies.*

105.    As indicated by the attached exhibit, KCIC's allocation modeling indicated that the total coverage available for Abuse Claims from Clarendon was between $3,878,517 and $9,070,978 based on an aggregate value of Abuse Claim between $2.4 billion and $3.6 billion.[123]

---

[120] JTX 1-316 [Tenth Mediator's Report (D.I. 8102), including Clarendon Term Sheet].
[121] JTX 347 [Revised Exhibit 9 to Gutzler Report].
[122] JTX 1040 [BSA Coverage Charts (Gutzler-Opening report-Exhibit 3)].
[123] *See supra*, ¶ 62 (Solvent Clarendon Coverage under the "$2.4 Billion BW Tort Distribution" and the "$3.6 Billion TDP Distribution"); JTX 1186 [Policy Listing with Allocation Results].

*Conclusions Regarding the Clarendon Settlement.*

106.    In consideration of the amount of Abuse Claims allocated to Clarendon policies under multiple allocation models and the coverage risks noted above, I believe there was a reasonable basis for the BSA to settle with Clarendon for $16.5 million.

## V.    Mechanism to Pay All or Substantially All Abuse Claims

107.    The Debtors requested that I analyze whether the Plan provides a mechanism to pay all or substantially all of the Abuse Claims.  In connection with this analysis, I was specifically asked to calculate the "Unsettled Value," which is the difference between the estimated amount of current contributions to the Settlement Trust (the "Secured Contributions") and various amounts within Dr. Bates's estimated aggregate valuations of Abuse Claims under several of the scenarios he presented within the lower quartile of his full range (the "Estimated Aggregate Value").  I was also asked to consider whether additional sources of funding are available to pay any Unsettled Value.

## A.    Calculating Unsettled Values for Various Estimated Aggregate Values.

108.    I began my analysis by determining the value of Secured Contributions which are currently available to contribute to the Settlement Trust.

109.    My analysis was based on Brian Whittman's analysis of the BSA's assets in his Updated Expert Report, dated December 29, 2021, in which he stated that the BSA will be able to contribute $160 million to the Settlement Trust.[124]  While Mr. Whittman recently revised his estimates to incorporate financial information collected in the months since his Updated Expert

---

[124] JTX 1118 [Updated Expert Report of Brian Whittman] at 40.

Report, he maintains that "there is over $2.7 billion of cash and property that is being contributed to the Settlement Trust under the Plan[,]" including specific items of contributions by the BSA.[125]

110.    The Local Councils will be able to contribute $640 million to the Settlement Trust, including $600 million discussed in Mr. Whittman's report and an additional $40 million that the Local Councils agreed to pay.[126]

111.    In addition to direct contributions from the BSA and Local Councils, the BSA also secured $1.656 billion dollars in funding through its settlements with various insurers, including: $800 million from the Century/Chubb Settlement; $787 million from the Hartford Settlement; $52.5 million from the Zurich Settlement; and $16.5 million from the Clarendon Settlement.[127]

112.    Two groups of Chartered Organizations have also agreed to contribute to the Settlement Trust.  The Church of Jesus Christ of Latter-day Saints (the "TCJC") agreed to contribute $250 million to the Settlement Trust and the Methodist Church agreed to contribute $30 million.[128]

113.    By combining the amounts of these contributions, I determined that the combined value of Secured Contributions to the Settlement Trust is currently $2.7 billion.

114.    After determining the value of Secured Contributions, I compared that value to the total Estimated Aggregate Value based on four separate Abuse Claim valuations described in Dr.

---

[125] Declaration of Brian Whittman in Support of Confirmation of the Third Modified Fifth Amended Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC (D.I. 9280) at 19-21, 23.

[126] JTX 1118 [Updated Expert Report of Brian Whittman] at 72; JTX 1-307 [Seventh Mediator's Report, Century and Chubb Companies Term Sheet (D.I. 7745)] at 2.

[127] See, e.g., JTX 1-307 [Seventh Mediator's Report, Century and Chubb Companies Term Sheet (D.I. 7745)]; JTX 1-292 [Sixth Mediator's Report with Attachments (includes Hartford and TCJC Term Sheets) (D.I. 6210)]; JTX 1-316 [Tenth Mediator's Report (D.I. 8102), including Clarendon Term Sheet]; JTX 1-432 [Notice of Eighth and Ninth Mediator's Report Regarding United Methodist Term Sheet and Zurich Term Sheet Including Treatment of Chartered Organizations (D.I. 7929)].

[128] JTX 1-292 [Sixth Mediator's Report with Attachments (includes Hartford and TCJC Term Sheets) (D.I. 6210)]; JTX 1-432 [Notice of Eighth and Ninth Mediator's Report Regarding United Methodist Term Sheet and Zurich Term Sheet Including Treatment of Chartered Organizations (D.I. 7929)].

A.006399
App.297

Bates's expert reports. These included: (1) the $2.4 billion Estimated Aggregate Value from Dr. Bates's Expert Report under his potential tort distribution; (2) the $3.0 billion rescaled Estimated Aggregate Value from Dr. Bates's Supplemental Report under his potential TDP distribution; (3) the $3.305 billion Estimated Aggregate Value from Dr. Bates's Supplemental Report under his potential TDP distribution; (4) the $3.6 billion Estimated Aggregate Values derived from Dr. Bates's potential tort distribution (as described in his Expert Report); and (5) the $3.6 billion Estimated Aggregate Value from Dr. Bates's Supplemental Report under his potential TDP distribution.[129]

115.    By comparing each Bates White Estimated Aggregate Value scenario (which encompass a range of $2.4 billion to $3.6 billion) to the $2.7 billion in Secured Contributions that I identified, I was able to determine the resulting Unsettled Value that would need to be provided by additional sources of funding in order to pay the Estimated Aggregate Value.

**B.    Identifying Additional Sources of Funding.**

116.    Based on KCIC's allocation modeling, existing sources of Secured Contributions, and my experience with evaluating settlements of mass tort insurance coverage, I believe there is a mechanism in place for the payment of all or substantially all of the Abuse Claims, with additional funding from three sources: (1) additional settlements with insurers for policies that received allocations under KCIC's allocation modeling; (2) settlements with insurers for policies that did not receive allocations under KCIC's allocation modeling; and (3) additional contributions from Chartered Organizations.

---

[129] JTX 676 [BSA record-level Tranche VI dataset containing 117,037 records: 02 Processed POC 2021.07.06.dta]; JTX 1052 [Expert Report of Charles E. Bates (Dec. 5, 2021)]; JTX 1194 [Supplemental Report of Charles E. Bates]; JTX 1431 [Charles E. Bates Second Supplemental Expert Report, dated March 2, 2022]; JTX 1058 [Bates White BSA valuation model (Tranche 6) (Gutzler Opening Materials Considered List)]; JTX 1601 [Bates White BSA trust simulation model (Tranche VI) -- confidential -- for production.xlsx]; JTX 1602 [Bates White BSA trust simulation model (Tranche VI) -- confidential -- for production.xlsx]; JTX 1603 Bates White BSA valuation model updated (Tranche 6) -- confidential -- for production.xlsx].

36

*Funding from Non-Settled Insurers for Policies that Received Allocations.*

117.    Based on Dr. Bates's conclusion that the Estimated Aggregate Value will likely remain in the range of $2.4 to $3.6 billion (the "lower quartile" of the broader range of $2.4 billion to $7.1 billion that he considered), KCIC was able to use allocation modeling to estimate the specific amount of coverage potentially available to pay Abuse Claims under policies issued by solvent Non-Settling Insurers (the "Allocated Non-Settling Insurers").[130]   Specifically, Abuse Claims may trigger these insurers' policies based on the allocation using Dr. Bates' Estimated Aggregate Value.

118.    Depending on which Estimated Aggregate Value (between $3.0 billion and $3.6 billion) is applied, the Allocated Non-Settling Insurers would owe between $321,319,886 and $400,546,854 in estimated coverage for Abuse Claims:[131]

| Category | $2.4 Billion BW Tort Distribution | $3.0 Billion TDP Distribution | $3.3 Billion TDP Distribution | $3.6 Billion TDP Distribution | $3.6 Billion BW Tort Distribution |
|---|---|---|---|---|---|
| Solvent Coverage (Other Non-Settled Insurers) | $274,448,112 | $321,319,886 | $361,749,271 | $357,745,809 | $400,546,854 |

*Funding from Non-Settled Insurers for Policies that Did Not Receive Allocations.*

119.    In addition to the potential Secured Contributions from Allocated Non-Settling Insurers, I believe there is a reasonable possibility for Non-Settled Insurers that do not currently have any claims allocated to certain policies ("NSNA Insurers") in my current allocation to have exposure and/or contribute settlement payments as part of the Settlement Trust.

---

[130] JTX 1194 [Supplemental Report of Charles E. Bates] at 11-12.
[131] JTX 1186 [Policy Listing with Allocation Results]; JTX 1058 [Bates White BSA valuation model (Tranche 6) (Gutzler Opening Materials Considered List)]; JTX 1601 [Bates White BSA trust simulation model (Tranche VI) -- confidential -- for production.xlsx]; JTX 1602 [Bates White BSA trust simulation model (Tranche VI) -- confidential -- for production.xlsx]; JTX 1603 Bates White BSA valuation model updated (Tranche 6) -- confidential -- for production.xlsx].

37

120.    The lack of allocation to NSNA Insurers' policies can occur for a variety of reasons, such as the NSNA Insurers' policies providing higher-level excess coverage in policy years where the limits of lower-level policies are not yet fully exhausted.  This lack of allocation merely indicates that NSNA Insurers are *less likely* than Allocated Non-Settling Insurers to be required to pay out on their policies based on the various representative claim value distributions presented under the Bates White aggregate Abuse Claim scenarios—it does not indicate that NSNA Insurers have no risk under their policies.  They have always had, and continue to have, exposure under their policies.

121.    The table below demonstrates the total limits of coverage potentially available under policies issued to the BSA and Local Councils *by the NSNA Insurers*:[132]

| Insured Parties | $3.0 Billion TDP Distribution | $3.3 Billion TDP Distribution | $3.6 Billion TDP Distribution | $3.6 Billion BW Tort Distribution |
|---|---|---|---|---|
| National | $3,403,171,804 | $3,385,319,620 | $3,347,465,938 | $3,300,999,443 |
| Local | $892,706,824 | $872,205,482 | $943,015,088 | $1,103,845,000 |
| Total | $4,295,878,628 | $4,257,525,102 | $4,290,481,026 | $4,404,844,443 |

122.    Although it is difficult to precisely quantify the expected value of NSNA Insurers' policies without additional information not yet available to any party, my experience from other mass tort insurance coverage settlements indicates that insurers are often willing to settle policies with no current allocation in order to mitigate the risk that their policies would attach under different circumstances and in exchange for a release of liability on those policies.

123.    The IRO described in the TDP could also result in additional allocation to the NSNA Insurers.  By allowing individual claimants to potentially recover an award larger than the

---

[132] JTX 1186 [Policy Listing with Allocation Results]; JTX 347 [Revised Exhibit 9 to Gutzler Report]; JTX 10 [BSA and LC Insurance Policies]; JTX 1058 [Bates White BSA valuation model (Tranche 6) (Gutzler Opening Materials Considered List)]; JTX 1601 [Bates White BSA trust simulation model (Tranche VI) -- confidential -- for production.xlsx]; JTX 1602 [Bates White BSA trust simulation model (Tranche VI) -- confidential -- for production.xlsx]; JTX 1603 Bates White BSA valuation model updated (Tranche 6) -- confidential -- for production.xlsx].

$2.7 million cap under the TDP, the IRO increases the odds that a higher-level excess policy will be triggered for Abuse Claims.[133]

124.    The additional contribution of settlements with NSNA Insurers are a valid and viable part of the mechanism in the Plan to pay all or substantially all of the Abuse Claims.

*Funding from Additional Chartered Organizations.*

125.    In my opinion, it is likely for the BSA to secure additional funding from some of the thousands of Chartered Organizations that have not yet made a monetary contribution to the Settlement Trust.

126.    As noted, *supra*, both the TCJC and the Methodist Church have already contributed a combined $280 million in Secured Contributions to the Settlement Trust as consideration for their treatment as Protected Parties under the Plan's Channeling Injunction.  In other words, the TCJC and Methodist Church were willing to make substantial contributions to the Settlement Trust in return for the full benefits and protections of the Channeling Injunction, thereby shielding themselves from future liability for Abuse Claims.

127.    There are over *41,000* Chartered Organizations in the United States, including numerous other large Chartered Organizations.[134]  Under the current plan these organizations have a temporary reprieve or stay from litigation post emergence by virtue of the Local Council contribution.  But any entity that wants a permanent injunction will need to reach a settlement with the Trust.  There is a potential for non-settling Chartered Organizations to be liable for claims in the event they elect not to become a Contributing Chartered Organization.[135]  This potential liability creates an incentive for many of these remaining Chartered Organizations to follow the lead of the

---

[133] JTX 1-350 [Eleventh Mediators Report (D.I. 8772), including TCC Term Sheet] at 23-27.
[134] JTX 1-425 [Amended Disclosure Statement for the Modified Fifth Amended Plan (D.I. 6431)] at 67-68.
[135] JTX 347 [Revised Exhibit 9 to Gutzler Report]; JTX 676 [BSA record-level Tranche VI dataset containing 117,037 records: 02 Processed POC 2021.07.06.dta].

TCJC and Methodist Church in making a substantial contribution to the Settlement Trust in order to secure additional protections under the Plan's Channeling Injunction.

128.    While it is difficult to quantify the expected value of additional contributions to the Settlement Trust from other Chartered Organizations, the substantial contributions from the TCJC and Methodist Church indicate that contributions from additional Chartered Organizations could reduce the Unsettled Value.

**C.    My Conclusion Regarding Payment of All or Substantially All of the Abuse Claims.**

129.    Although I did not attempt to quantify the expected value of potential funding from settlements with NSNA Insurers or contributions from Chartered Organizations, I believe these additional sources could provide substantial additional contributions to the Settlement Trust.  As noted in the chart in ¶121, *supra*, there are at least $4.3 billion in total limits potentially available to cover Abuse Claims which did not receive allocations under the current aggregate Abuse Claim valuation scenarios; even a small percentage of recovery of the amount of such limits from NSNA Insurers could yield significant additional funding for the Settlement Trust.

130.    Taking all of these potential sources of additional funding into account, I believe there is a mechanism in place for the Settlement Trust to pay all, or substantially all of the Abuse Claims.

## VI.    THE INDEPENDENT REVIEW OPTION

131.    The Debtors requested that I consider whether my analysis would be impacted by the IRO that was incorporated within the revised TDP filed with the Third Modified Fifth Amended Plan.  My conclusion that there is a mechanism in place to pay all or substantially all of the Abuse Claims is only improved by the IRO.

A.006404
App.302

132.    The purpose of the IRO is to provide claimants that believe their Abuse Claim is worth more than the maximum value available under the TDP with the right to have their claim evaluated to potentially receive a higher award than is available through the TDP.[136]

133.    In order to exercise the IRO option, each claimant is required to pay $20,000 to cover the litigation-related expenses incurred by the Settlement Trust in administering the IRO process.[137]  The IRO process is significantly more time-consuming and expensive than the TDP process, but a claimant that prevails on an Abuse Claim through the IRO process could potentially be eligible to receive an award multiple times larger than the maximum value available under the TDP.[138]

134.    One effect of the IRO may be to create additional pressure on non-settling insurers to enter into a settlement with the Trust.  Under the TDP process, Abuse Claimants always had the ability to elect to proceed in the tort system and their recovery was not limited by the TDP values.  Based on my experience, the non-settling insurers would have considered their potential liability for "high value" claims that may proceed in the tort system.  The IRO, however, creates a more direct mechanism for Abuse Claimants to recover on their "high-value" claims and, thereby, may create additional pressure for the non-settling insurers to settle.  Furthermore, as discussed above, over $4 billion of unallocated insurance coverage exists and to the extent the IRO identifies additional high value claims, those claims may be allocated to such insurance.

135.    Therefore, I maintain my opinion that there is a viable mechanism in place for the Settlement Trust to pay all or substantially all of the Abuse Claims.

---

[136]  JTX 1-350 [Eleventh Mediators Report (D.I. 8772), including TCC Term Sheet] at 23.
[137]  JTX 1-350 [Eleventh Mediators Report (D.I. 8772), including TCC Term Sheet] at 24-25.
[138]  JTX 1-350 [Eleventh Mediators Report (D.I. 8772), including TCC Term Sheet] at 23-27.

136.    I declare under penalty of perjury under the laws of the United States, that the foregoing statements are true and correct.

Dated: March 19, 2022                              Respectfully submitted,

_/s/  Nancy Gutzler_____
Nancy Gutzler

42

# EXHIBIT 7

ELECTRONICALLY FILED
11/9/2017 3:08 PM
2017-CH-14973
CALENDAR: 04
PAGE 1 of 16
CIRCUIT COURT OF
COOK COUNTY, ILLINOIS
CHANCERY DIVISION
CLERK DOROTHY BROWN

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, CHANCERY DIVISION

| | | |
|---|---|---|
| NATIONAL SURETY CORPORATION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| BOY SCOUTS OF AMERICA; CHICAGO | ) | No. _____ |
| AREA COUNCIL, INC. BOY SCOUTS OF | ) | |
| AMERICA; CHICAGO AREA COUNCIL, | ) | |
| BOY SCOUTS OF AMERICA, INC.; | ) | |
| ALLIANZ INSURANCE COMPANY n/k/a | ) | |
| ALLIANZ GLOBAL RISKS US INSURANCE | ) | |
| COMPANY; INSURANCE COMPANY OF | ) | |
| NORTH AMERICA; TRAVELERS | ) | |
| CASUALTY AND SURETY COMPANY, | ) | |
| INC. f/n/a AETNA CASUALTY & SURETY | ) | |
| COMPANY; FIRST STATE INSURANCE | ) | |
| COMPANY; TWIN CITY FIRE INSURANCE | ) | |
| CO.; DANIELSON NATIONAL INSURANCE | ) | |
| COMPANY f/n/a MISSION NATIONAL | ) | |
| INSURANCE COMPANY; LANDMARK | ) | |
| INSURANCE COMPANY; COLUMBIA | ) | |
| CASUALTY COMPANY; INTERNATIONAL | ) | |
| INSURANCE GROUP, INC.; ARROWOOD | ) | |
| INDEMNITY COMPANY f/n/a ROYAL | ) | |
| INDEMNITY COMPANY; FEDERAL | ) | |
| INSURANCE COMPANY; UNITED STATES | ) | |
| FIRE INSURANCE COMPANY, INC.; UTICA | ) | |
| MUTUAL INSURANCE COMPANY; | ) | |
| NATIONAL UNION FIRE INSURANCE | ) | |
| COMPANY OF PITTSBURGH, PA; PACIFIC | ) | |
| EMPLOYERS INSURANCE COMPANY; | ) | |
| HARBOR INSURANCE COMPANY; ST. | ) | |
| PAUL FIRE AND MARINE INSURANCE | ) | |
| COMPANY; CHUBB CUSTOM INSURANCE | ) | |
| COMPANY; ST. PAUL SURPLUS LINES | ) | |
| INSURANCE COMPANY; LEXINGTON | ) | |
| INSURANCE COMPANY; JOHN DOE | ) | |
| INSURERS 1-50; JOHN DOE; JOHN DOE 2; | ) | |
| JOHN DOE 3; JOHN DOE 4; JOHN DOE 5; | ) | |
| JOHN DOE 6; JOHN DOE 7; JOHN DOE 8; | ) | |
| JOHN DOE 9; JOHN DOE 10; JOHN DOE 11; | ) | |
| JOHN DOE 12; JOHN DOE 13; JOHN DOE | ) | |

14; JOHN DOE 15; JOHN DOE 16; JOHN      )
DOE 17; AND JOHN DOE 18,                )
                                        )
        Defendants.

## COMPLAINT FOR DECLARATORY RELIEF

Plaintiff National Surety Corporation ("National Surety") alleges the following:

## INTRODUCTION AND SUMMARY

1.      National Surety issued excess liability policies to Defendant Boy Scouts of

America for the policy periods January 1, 1983 to January 1, 1984, and January 1, 1984 to

January 1, 1985.  Defendants Chicago Area Council, Inc. Boy Scouts of America and Chicago

Area Council, Boy Scouts of America, Inc. (collectively, "Chicago Area Council") are additional

named insureds under the policies.  Boy Scouts of America and Chicago Area Council assert

rights under National Surety's policies and are referred to, together, herein as the "Insured."

2.      The Insured has been sued by individuals alleging that the Insured intentionally

permitted, failed to prevent, and concealed alleged sexual abuse by scout leader Thomas Hacker

("Hacker"), in the lawsuit styled *John Doe et al. v. Thomas Hacker et al.*, pending in the Circuit

Court of Cook County, Illinois, Law Division, originally as Case No. 2012-L-013569, and since

assigned the new Case No. 2017-L-007900 (the "Underlying Lawsuits").

3.      The sexual abuse in the Underlying Lawsuits is alleged to have occurred between

1980 and 1988 with respect to a scout troop located in Burbank, Illinois.

4.      Boy Scouts of America is alleged to have intentionally concealed information

relating to the widespread problem of sexual abuse by scout leaders since as early as 1919.

5.      National Surety brings this action to obtain declaratory relief on coverage issues

related to its excess liability policies with respect to the Underlying Lawsuits.  National Surety

seeks a declaration that no coverage exists under its policies with respect to the Underlying

ELECTRONICALLY FILED
11/9/2017 3:08 PM
2017-CH-14975
PAGE 2 of 16

App.307

Lawsuits, and that National Surety owes no duty to defend, pay defense costs, or indemnify the Insured, and for other relief outlined herein.

6.      The Insured has demanded payment from National Surety on the policies.  On information and belief, the Insured disagrees with National Surety regarding coverage interpretations on these issues.

7.      For this reason, National Surety requests coverage interpretations by this Court in a declaratory judgment action.

## PARTIES

8.      Plaintiff National Surety is a corporation organized under the laws of the State of Delaware with its principal place of business and statutory home office in Illinois.  It is now and was at all times relevant to this Complaint licensed or authorized to issue insurance policies in the State of Illinois.

9.      On information and belief, Defendant Boy Scouts of America is a congressionally chartered corporation authorized to do business in Illinois.  Boy Scouts of America asserts rights under policies issued by National Surety and other Insurer Defendants in this action.

10.      On information and belief, Defendant Chicago Area Council is a not-for-profit corporation organized under the laws of the State of Illinois with its principal place of business in Chicago, Illinois.  Chicago Area Council asserts rights under policies issued by National Surety and other Insurer Defendants in this action.

11.      On information and belief, a number of other liability insurers issued policies to the Insured during the 1980 to 1988 time period.  These insurers are listed below.

12.      On information and belief, Allianz Insurance Company, now known as Allianz Global Risks US Insurance Company ("Allianz"), is a corporation organized under the laws of

ELECTRONICALLY FILED
11/9/2017 3:08 PM
2017-CH-14975
PAGE 3 of 16

the State of Illinois with its principal place of business in Chicago, Illinois.  On information and belief, Allianz issued a liability policy to the Insured covering the time period January 1, 1980 to January 1, 1981.

13.    On information and belief, Defendant Insurance Company of North America ("INA") is a corporation organized under the laws of the State of Pennsylvania with its principal place of business in Philadelphia, Pennsylvania.  On information and belief, INA issued liability policies to the Insured covering the time period January 1, 1980 to March 1, 1988.

14.    On information and belief, Travelers Casualty and Surety Company, Inc. (f/n/a Aetna Casualty & Surety Company) ("Travelers") is a corporation organized under the laws of the State of Connecticut with its principal place of business in Hartford, Connecticut.  On information and belief, Travelers issued a liability policy to the Insured covering the time period January 1, 1980 to January 1, 1981.

15.    On information and belief, Transit Casualty Insurance Co. ("Transit") was a corporation organized under the laws of the State of Missouri with its principal place of business in Los Angeles, California.  On information and belief, Transit was declared insolvent and the subsequent receivership has been closed.  Accordingly, Transit is not named as a party herein.

16.    On information and belief, First State Insurance Company ("First State") is a corporation organized under the laws of the State of Connecticut with its principal place of business in Hartford, Connecticut.  On information and belief, First State issued a liability policy to the Insured covering the time period January 1, 1981 to January 1, 1983.

17.    On information and belief, Twin City Fire Insurance Co. ("TC Fire") is a corporation organized under the laws of the State of Indiana with its principal place of business

ELECTRONICALLY FILED
11/9/2017 3:08 PM
2017-CH-14975
PAGE 4 of 16

App.309

in Hartford, Connecticut.  On information and belief, TC Fire issued a liability policy to the Insured covering the time period January 1, 1982 to January 1, 1983.

18.    On information and belief, Danielson National Insurance Company (f/n/a Mission National Insurance Company) ("Danielson") is a corporation organized under the laws of the State of California with its principal place of business in San Diego, California.  On information and belief, Danielson issued a liability policy to the Insured covering the time period January 1, 1984 to January 1, 1985.

19.    On information and belief, Landmark Insurance Company ("Landmark") was a corporation organized under the laws of the State of California with its principal place of business in Boston, Massachusetts.  On information and belief, Landmark has merged with National Union Fire Insurance Company of Pittsburgh, PA, the latter being the surviving entity. On information and belief, Landmark issued a liability policy to the Insured covering the time period January 1, 1985 to March 1, 1986.

20.    On information and belief, Columbia Casualty Company ("Columbia") is a corporation organized under the laws of the State of Illinois with its principal place of business in Chicago, Illinois.  On information and belief, Columbia issued a liability policy to the Insured covering the time period January 1, 1985 to March 1, 1986.

21.    On information and belief, Highlands Insurance Company ("Highlands") was a corporation organized under the laws of the State of Texas with its principal place of business in Lawrenceville, New Jersey.  On information and belief, Highlands is currently in receivership. Accordingly, it is not named as a party herein.

22.    On information and belief, International Insurance Group, Inc. ("IIG"), is a corporation organized under the laws of the State of Delaware.  On information and belief, IIG

ELECTRONICALLY FILED
11/9/2017 3:08 PM
2017-CH-14975
PAGE 5 of 16

App.310

issued a liability policy to the Insured covering the time period January 1, 1985 to March 1, 1986.

      23.     On information and belief, Arrowood Indemnity Company (f/n/a Royal Indemnity Company) ("Arrowood") is a corporation organized under the laws of the State of Delaware with its principal place of business in Charlotte, North Carolina.  On information and belief, Arrowood issued a liability policy to the Insured covering the time period January 1, 1985 to March 1, 1986.

      24.     On information and belief, Federal Insurance Company ("Federal") is a corporation organized under the laws of the State of Pennsylvania.  On information and belief, Federal issued a liability policy to the Insured covering the time period January 1, 1985 to March 1, 1986.

      25.     On information and belief, United States Fire Insurance Company, Inc. ("U.S. Fire") is a corporation organized under the laws of the State of Delaware with its principal place of business in Morristown, New Jersey.  On information and belief, U.S. Fire issued liability policies to the Insured covering the time period March 1, 1986 to March 1, 1987 and March 1, 1987 to March 1, 1988.

      26.     On information and belief, Utica Mutual Insurance Company ("Utica") is a corporation organized under the laws of the State of New York with its principal place of business in New Hartford, New York.  On information and belief, Utica issued a liability policy to the Insured covering the time period March 1, 1986 to March 1, 1987.

      27.     On information and belief, National Union Fire Insurance Company of Pittsburgh, PA ("National Union"), is a corporation organized under the laws of the State of Pennsylvania with its principal place of business in New York, New York.  On information and belief,

ELECTRONICALLY FILED
11/9/2017 3:08 PM
2017-CH-14975
PAGE 6 of 16

National Union issued liability policies to the Insured covering the time periods March 1, 1986 to

March 1, 1987, June 3, 1986 to March 1, 1987, and March 1, 1987 to March 1, 1988.

28.     On information and belief, Pacific Employers Insurance Company ("Pacific

Employers") is a corporation organized under the laws of the State of Pennsylvania with its

principal place of business in Philadelphia, Pennsylvania.  On information and belief, Pacific

Employers issued a liability policy to the Insured covering the time period March 1, 1986 to

March 1, 1987.

29.     On information and belief, Harbor Insurance Company ("Harbor") is a

corporation organized under the laws of the State of Oklahoma with its principal place of

business in Tulsa, Oklahoma.  On information and belief, Harbor issued a liability policy to the

Insured covering the time period May 20, 1986 to March 1, 1987.

30.     On information and belief, St. Paul Fire and Marine Insurance Company ("St.

Paul Fire") is a corporation organized under the laws of the State of Minnesota with its principal

place of business in St. Paul, Minnesota.  On information and belief, St. Paul Fire issued a

liability policy to the Insured covering the time period May 28, 1986 to March 1, 1987.

31.     On information and belief, Chubb Custom Insurance Company ("Chubb") is a

corporation organized under the laws of the State of Delaware with its principal place of business

in Warren, New Jersey.  On information and belief, Chubb issued a liability policy to the Insured

covering the time period June 3, 1986 to March 1, 1987.

32.     On information and belief, St. Paul Surplus Lines Insurance Company ("St. Paul

Surplus") is a corporation organized under the laws of State of Delaware with its principal place

of business in St. Paul, Minnesota.  On information and belief, St. Paul Surplus issued a liability

policy to the Insured covering the time period March 1, 1987 to March 1, 1988.

ELECTRONICALLY FILED
11/9/2017 3:08 PM
2017-CH-14975
PAGE 7 of 16

7

33.    On information and belief, Lexington Insurance Company ("Lexington") is a corporation organized under the laws of the State of Delaware with its principal place of business in Boston, Massachusetts.  On information and belief, Lexington issued a liability policy to the Insured covering the time period March 1, 1987 to March 1, 1988.

34.    Defendants John Doe Insurers 1-50 are insurers, unknown by name to Plaintiff at this time, that issued liability insurance policies to the Insured.  Plaintiff names these John Doe Insurers insofar as they may be alleged to be necessary parties, for the purpose of binding them to the relief sought herein.  Plaintiff will dismiss this action as to any John Doe Insurer that is not necessary to the relief sought herein.

35.    The declarations National Surety seeks in this case may impact the coverage obligations of the Insured's liability insurers other than National Surety.  For this reason, National Surety has joined to this action the Insured's other liability insurers for the years in which the sexual abuse is alleged to have occurred, 1980 to 1988.

36.    Defendants John Doe – John Doe 18 are plaintiffs in the Underlying Lawsuits.  On information and belief, John Doe – John Doe 18 are domiciled in the State of Illinois.  Defendants John Doe – John Doe 18 are joined to bind them to the judgment in this case.

## JURISDICTION AND VENUE

37.    The Court has personal jurisdiction over defendants pursuant to 735 ILCS 5/2-209 because they are domiciled and/or licensed to do business and/or are doing business in the State of Illinois.  In addition, the Court has personal jurisdiction over the out-of-state insurer defendants pursuant to 735 ILCS 5/2-209 because each such defendant is or was transacting business in the State of Illinois within the time periods relevant to the causes of action stated herein and contracted to insure persons, property, or risks located in the State of Illinois.

ELECTRONICALLY FILED
11/9/2017 3:08 PM
2017-CH-14975
PAGE 8 of 16

38.     Venue is proper in Cook County pursuant to 735 ILCS 5/2-101 to 103 because it is a county in which multiple defendants are "doing business."  Further, Plaintiff's causes of action arise out of events that occurred in Cook County with respect to a Boy Scout troop located in Cook County, and the Underlying Lawsuits are all filed in the Circuit Court of Cook County, Law Division.

<div align="center">**NATIONAL SURETY POLICIES**</div>

39.     National Surety issued to Boy Scouts of America a Blanket Excess Liability Policy, No. XLX1484309, in effect for the policy period January 1, 1983 to January 1, 1984 (hereinafter, the "1983-1984 Policy").  A copy of the 1983-1984 Policy is attached hereto as **Exhibit A**.

40.     National Surety issued to Boy Scouts of America a Blanket Excess Liability Policy, No. XLX1484392, in effect for the policy period January 1, 1984 to January 1, 1985 (hereinafter, the "1984-1985 Policy").  A copy of the 1984-1985 Policy is attached hereto as **Exhibit B**.  Together, the 1983-1984 Policy and the 1984-1985 Policy are referred to herein as the "National Surety Policies."

41.     The National Surety Policies are "follow form" excess policies that incorporate, with certain listed exceptions, the terms, conditions, and exclusions of underlying policies issued by INA to Boy Scouts of America for the 1983-1984 and 1984-1985 years, respectively.

42.     Subject to the stated limits of liability, terms, conditions, and exclusions, the National Surety Policies provide indemnity coverage for "occurrence[s]" which take place during the policy period.  An "occurrence" is defined in pertinent part as an "accident . . . which results in Personal Injury . . . neither expected nor intended from the standpoint of the insured."

ELECTRONICALLY FILED
11/9/2017 3:08 PM
2017-CH-14975
PAGE 9 of 16

43.     The National Surety Policies do not provide for a duty to defend, but defense

costs may be reimbursable if incurred with the consent of National Surety, but only in the

proportion that the Insured and National Surety are responsible for the loss.

## UNDERLYING LAWSUITS ALLEGATIONS

44.     John Doe – John Doe 18 assert claims against the Insured in the Underlying

Lawsuits arising out of the alleged sexual abuse of John Doe – John Doe 18 by Thomas Hacker

("Hacker").  A copy of the Third Amended Complaint in the Underlying Lawsuits is attached

hereto as **Exhibit C**.

45.     John Doe – John Doe 18 allege that the Insured knew of Hacker's predatory

tendencies, and of the widespread problem of sexual abuse by scout masters, prior to Hacker's

alleged abuse of John Doe – John Doe 18.  (Third Amended Complaint pp. 12-35.)

46.     John Doe – John Doe 18 allege that, despite this knowledge, the Insured, through

various acts and omissions, permitted, failed to take steps to prevent, and concealed Hacker's

alleged sexual abuse of John Doe – John Doe 18.  (Third Amended Complaint pp. 35-499.)

47.     By way of summary, John Doe – John Doe 18 allege as follows:

(a)  "Since approximately 1919, BOY SCOUTS OF AMERICA has maintained a

group of files known variously as the red files, perversion files, or ineligible volunteer

files (IV Files)."  (Third Amended Complaint p. 27, ¶ 6.)

(b)  "The IV Files . . . document multiple instances of child molesters

volunteering with scouting, molesting a child, being reported to BSA, but then re-gaining

entry into scouting."  (Third Amended Complaint p. 20, ¶ 72.)

(c)  "BSA's 'Ineligible Volunteer Files' contained a file for Mr. Hacker opened in

1970, yet he was able and permitted by BSA to register with the Chicago Area Council in

ELECTRONICALLY FILED
11/9/2017 3:08 PM
2017-CH-14975
PAGE 10 of 16

10

the 1980s and was able to participate in Scouting."  (Third Amended Complaint p. 36, ¶ 124.)

(d)  "BSA knew or should have known that its 'ineligible volunteers' system of keeping track of pedophiles infiltrating its ranks and attempting to eliminate them did not function as it was intended, was flawed, and in many cases ineffective. . . . BSA did nothing to educate or inform Scouts and their parents of the enormity of the pedophile problem, nor did BSA take action to correct its screening and/or education system." (Third Amended Complaint p. 36, ¶ 125.)

(e)  "Instead of addressing the problem by informing parents and scouts of the issue, or by implementing safety programs to prevent abuse, BSA instead concealed the problem by employing a public relations department to combat negative stories about sexual abuse in Scouting."  (Third Amended Complaint pp. 23-24, ¶ 101.)

(f)  "After the BOY SCOUTS OF AMERICA learned that Thomas Hacker molested Chicago Area Council scouts, the BOY SCOUTS OF AMERICA concealed the fact, in the 1970s, it had previously identified Hacker as a child molester and/or abuser but still allowed him to register with the Chicago Area Council."  (Third Amended Complaint pp. 43-44, ¶ 151.)

48.    John Doe – John Doe 18 seek punitive damages against the Insured as a result of the Insured's alleged intentional conduct and fraudulent concealment.  (Third Amended Complaint pp. 23-26.)

ELECTRONICALLY FILED
11/9/2017 3:08 PM
2017-CH-14975
PAGE 11 of 16

## FIRST CAUSE OF ACTION

**Declaration That No Coverage Exists Under National Surety's Policies, And That National Surety Has No Duty To Indemnify The Insured, Because The Insured's Alleged Conduct Is Not An "Accident."**

49.     National Surety incorporates by reference in this First Cause of Action all allegations in this Complaint, including Exhibits attached hereto.

50.     An "occurrence" covered under National Surety's Policies is defined to require an "accident."

51.     The Underlying Lawsuits allege that the Insured knew that Hacker was a predator, and of the widespread problem of sexual abuse by scout masters, and, despite this knowledge, permitted, failed to take steps to prevent, and concealed Hacker's sexual abuse of John Doe – John Doe 18.

52.     The alleged conduct of the Insured in the Underlying Lawsuits does not constitute an "accident."

53.     Accordingly, no coverage exists for the Underlying Lawsuits under National Surety's Policies, and National Surety owes no duty to indemnify the Insured.

WHEREFORE, Plaintiff prays for a declaration that no coverage exists under National Surety's Policies, and that National Surety owes no duty to indemnify the Insured, because the Insured's alleged conduct is not an accident.

## SECOND CAUSE OF ACTION

**Declaration That No Coverage Exists Under National Surety's Policies, And That National Surety Has No Duty To Indemnify The Insured, Because The Insured's Alleged Conduct Was Expected Or Intended.**

54.     National Surety incorporates by reference in this Second Cause of Action all allegations in this Complaint, including Exhibits attached hereto.

ELECTRONICALLY FILED
11/9/2017 3:08 PM
2017-CH-14975
PAGE 12 of 16

12

55.    An "occurrence" covered under National Surety's Policies does not include acts that are expected or intended from the standpoint of the insured.

56.    The Underlying Lawsuits allege that the Insured knew that Hacker was a predator, and of the widespread problem of sexual abuse by scout masters, and, despite this knowledge, permitted, failed to take steps to prevent, and concealed Hacker's alleged sexual abuse of John Doe – John Doe 18.

57.    The alleged conduct of the Insured in the Underlying Lawsuits was expected or intended.

58.    Accordingly, no coverage exists for the Underlying Lawsuits under National Surety's Policies, and National Surety owes no duty to indemnify the Insured.

WHEREFORE, Plaintiff prays for a declaration that no coverage exists under National Surety's Policies, and that National Surety owes no duty indemnify the Insured, because the Insured's alleged conduct was expected or intended.

ELECTRONICALLY FILED
11/9/2017 3:08 PM
2017-CH-14975
PAGE 13 of 16

### THIRD CAUSE OF ACTION

**Declaration That No Coverage Exists Under National Surety's Policies For Punitive Damages, And That National Surety Has No Duty To Indemnify The Insured With Respect To Punitive Damages.**

59.    National Surety incorporates by reference in this Third Cause of Action all allegations in this Complaint, including Exhibits attached hereto.

60.    The Underlying Lawsuits seek punitive damages for the Insured's conduct.

61.    Punitive damages are not insurable.

62.    Accordingly, no coverage exists for punitive damages sought in the Underlying Lawsuits, and National Surety owes no duty to indemnify the Insured with respect to punitive damages.

App.318

WHEREFORE, Plaintiff prays for a declaration that no coverage exists under National Surety's Policies for punitive damages, and that National Surety owes no duty to indemnify the Insured with respect to punitive damages.

### FOURTH CAUSE OF ACTION

**Declaration That Coverage Is Not Available For Underlying Lawsuits In Which Personal Injury Does Not Take Place During The Policy Period.**

63.     National Surety incorporates by reference in this Fourth Cause of Action all allegations in this Complaint, including Exhibits attached hereto.

64.     The National Surety Policies require – for there to be coverage – that Personal Injury occur during the applicable policy period.  There is, accordingly, no coverage under National Surety's Policies for Personal Injury which takes place outside of the applicable policy periods.

WHEREFORE, Plaintiff prays for a declaration that no coverage exists for the Underlying Lawsuits in which there is no personal injury during the policy period, and that National Surety has no duty to indemnify the Insured with respect to the Underlying Lawsuits in which there is no personal injury during the policy periods.

### FIFTH CAUSE OF ACTION

**Declaration That National Surety Has No Duty To Provide Coverage Or Indemnify The Insured Until Underlying Insurance Is Exhausted.**

65.     National Surety incorporates by reference in this Fifth Cause of Action all allegations in this Complaint, including Exhibits attached hereto.

66.     The National Surety Policies are excess policies that respond only when underlying insurance is exhausted.

67.     On information and belief, underlying insurance is not exhausted.

ELECTRONICALLY FILED
11/9/2017 3:08 PM
2017-CH-14975
PAGE 14 of 16

68.    On information and belief, certain of the Insured's other insurers are insolvent, and National Surety's policies would not respond until payments are made exhausting such underlying policies.

WHEREFORE, Plaintiff prays for a declaration that it has no duty to provide coverage or indemnify the Insured unless and until underlying insurance is exhausted.

## SIXTH CAUSE OF ACTION

**Declaration That National Surety Has No Duty To Defend Or Reimburse Defense Costs.**

69.    National Surety incorporates by reference in this Sixth Cause of Action all allegations in this Complaint, including Exhibits attached hereto.

70.    The National Surety Policies do not provide for a duty to defend.

71.    No coverage exists under National Surety's Policies because the Insured's conduct was not an "accident," as set forth in National Surety's First Cause of Action.

72.    No coverage exists under National Surety's Policies because the Insured's conduct was expected or intended, as set forth in National Surety's Second Cause of Action.

73.    No coverage exists under National Surety's Policies with respect to punitive damages, as set forth in National Surety's Third Cause of Action.

74.    No coverage exists under National Surety's Policies with respect to occurrences taking place outside the policy period, as set forth in National Surety's Fourth Cause of Action.

75.    National Surety has no duty to provide coverage unless and until underlying insurance is exhausted, as set forth in National Surety's Fifth Cause of Action.

76.    Because no coverage exists under National Surety's Policies, National Surety has no obligation to reimburse defense costs.

ELECTRONICALLY FILED
11/9/2017 3:08 PM
2017-CH-14975
PAGE 15 of 16

App.320

WHEREFORE, Plaintiff prays for a declaration that National Surety has no duty to defend the Insured or reimburse defense costs, consistent with the relief sought in the First through Fifth Causes of Action set forth above.

### SEVENTH CAUSE OF ACTION

**Declaration Of National Surety's Rights And Obligations Under The Policies.**

77.     National Surety incorporates by reference in this Seventh Cause of Action all allegations in this Complaint, including Exhibits attached thereto.

78.     To the extent not addressed in the preceding Causes of Action, National Surety seeks a declaration concerning its rights and obligations under policies it issued to Boy Scouts of America and/or Chicago Area Council.

WHEREFORE, Plaintiff prays for a declaration establishing its rights and obligations under policies it issued to Boy Scouts of America and/or Chicago Area Council.

ELECTRONICALLY FILED
11/9/2017 3:08 PM
2017-CH-14975
PAGE 16 of 16

Dated:  November 9, 2017                  Respectfully submitted,

                                          /s/ Todd C. Jacobs
                                          Todd C. Jacobs (#6201358)
                                          Melissa A. Carrington (#6305591)
                                          Jeremiah D. Junker (*pro hac* pending)
                                          BRADLEY RILEY JACOBS PC
                                          Firm No. 61684
                                          320 W. Ohio Street, Suite 3W
                                          Chicago, IL 60654
                                          Phone: (312) 281-0295
                                          Fax:    (319) 363-9824
                                          Email: tjacobs@bradleyriley.com
                                                 mcarrington@bradleyriley.com
                                                 jjunker@bradleyriley.com

                                          ATTORNEYS FOR THE PLAINTIFF

16

App.321

# EXHIBIT 8

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, CHANCERY DIVISION

| | | |
|---|---|---|
| NATIONAL SURETY CORPORATION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 17 CH 14975 |
| | ) | |
| THE HONORABLE BARBARA J. HOUSER (RET.), | ) | |
| IN HER CAPACITY AS TRUSTEE OF THE BSA | ) | |
| SETTLEMENT TRUST, ET AL., | ) | |
| | ) | |
| Defendants. | ) | |

ORDER

This case having come before the Court on August 1, 2023, at 10:00 a.m. for status and for presentment of the motions referenced below, and the Court being fully advised:

IT IS HEREBY ORDERED:

1) The Motion to Substitute Pursuant to 735 ILCS 5/2-1008 is granted and the Honorable Barbara J. Houser (Ret.), in her Capacity as Trustee of the BSA Settlement Trust, is substituted as a party in this action in place of the Boy Scouts of America, Inc., and the Chicago Area Council. The caption of the case shall be changed to reflect this substitution.

2) The BSA Settlement Trustee's Renewed Motion to Dismiss (1) National Surety's Complaint and (2) Allianz's Counterclaim Pursuant to 735 ILCS 5/2-619(a)(3), and Plaintiff National Surety Corporation's Motion for Leave to File Amended Complaint, are both entered and continued. Briefs in response to either motion shall be filed by September 15, 2023, and any reply briefs shall be filed by October 6, 2023.

3) The pending Motions and the above-referenced briefing schedule shall not preclude any party from filing a motion to amend its operative pleading to add new claims against the BSA Settlement Trustee.

4) This case is set for clerk's status on October 11, 2023, at 9:15 a.m.

Judge Alixen C. Conlon

AUG 02 2023

Circuit Court – 2140

DATED:

E _____

_____
Circuit Judge

App.323

# EXHIBIT 9

# FELICIA PITRE
## DISTRICT CLERK
## DALLAS COUNTY
### 600 COMMERCE, 1ST FLOOR
### DALLAS, TEXAS 75202-4606

August 03, 2023

ERNEST MARTIN
2323 VICTORY AVE STE 700
DALLAS TX  75219-7673

---

### NOTICE OF ORDER OF DISMISSAL FOR WANT OF PROSECUTION

---

CAUSE NO. DC-18-11896

| | |
|---|---|
| Aloha Council | In the District Court |
|      *Plaintiff(s),* | |
| v. | of Dallas County, Texas |
| Insurance Company of North America | |
|      *Defendant(s)* | 192nd District Court |

**TO WHOM IT MAY CONCERN:**

     In accordance with the provisions of Rule 165 (a) of the Texas Rules of Civil Procedure, you are hereby notified that an Order for Dismissal for Want of Prosecution has been entered and signed on 8/3/2023 in the above-referenced matter.

     Respectfully,
Felicia Pitre, District Clerk

App.325

# EXHIBIT 10

FILED DATE: 7/27/2023 4:08 PM    2017CH14975

FILED
7/27/2023 4:08 PM
IRIS Y. MARTINEZ
CIRCUIT CLERK
COOK COUNTY, IL
2017CH14975
Calendar, 4
23725278

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, CHANCERY DIVISION

NATIONAL SURETY CORPORATION,

    Plaintiff,

    v.

BOY SCOUTS OF AMERICA, *et al.*,

    Defendants.

No. 2017–CH–014975

Judge Alison C. Conlon

Calendar 4

## NOTICE OF MOTION

    **PLEASE TAKE NOTICE** that on **August 1, 2023, at 10:00 a.m.**, or as soon thereafter as counsel may be heard, we shall appear before the Honorable Judge Alison Conlon, or any judge sitting in her stead, in room 2408, via Zoom, Meeting ID Number 974 5431 3798, Password 501494, and shall then and there present **Plaintiff's Motion for Leave to File Amended Complaint,** a copy of which is hereby served upon you

Dated: July 27, 2023

Respectfully submitted,

*/s/ Todd C. Jacobs*
Todd C. Jacobs
John E. Bucheit
**Parker, Hudson, Rainer & Dobbs LLP**
Firm No. 100822
Two N. Riverside Plaza, Suite 1850
Chicago, IL 60606
Ph: (312) 477-3306
Email: tjacobs@phrd.com
Email: jbucheit@phrd.com

Harris B. Winsberg (*pro hac vice* to come)
Matthew Roberts (*pro hac vice* to come)
Drew Stevens (*pro hac vice* to come)

**Parker, Hudson, Rainer & Dobbs LLP**
303 Peachtree St. NE, Suite 3600
Atlanta, GA 30308
Ph: (404) 523-5300
Email: hwinsberg@phrd.com
Email: dstevens@phrd.com

FILED DATE: 7/27/2023 4:08 PM    2017CH14975

Email: mroberts@phrd.com

***Attorneys for Plaintiff National Surety Corporation***

FILED DATE: 7/27/2023 4:08 PM   2017CH14975

## CERTIFICATE OF FILING AND SERVICE

I, Todd C. Jacobs, an attorney, hereby certify that on this 27th day of July 2023, I caused to be filed with the Clerk of the Circuit Court of Cook County, Chancery Division via CM/ECF, a copy of this **Notice of Motion For Leave to File Amended Complaint,** and served a copy of it via electronic mail to the counsel of record listed below.


/s/ *Todd C. Jacobs*

FILED DATE: 7/27/2023 4:08 PM   2017CH14975

## SERVICE LIST

Eugene J. Schiltz
CROTTY & SCHILTZ, LLC,
120 N. LaSalle, 20th floor
Chicago, IL 60602
(312) 444-1000
gschiltz@crottylaw.com

***Attorneys for the Boy Scouts of America,
Inc. and Chicago Area Council***

David S. Osborne
Lauren E. Rafferty
LINDSAY, PICKETT & POSTEL, LLC
10 S. LaSalle Street, Suite 1301
Chicago, Illinois 60603
dosborne@lpplawfirm.com
lrafferty@lpplawfirm.com

***Attorneys for Utica Mutual Insurance Co.***

Daniel G. Litchfield
Laurence J. Tooth
LITCHFIELD CAVO LLP
303 W. Madison Street, Suite 300
Chicago, Illinois 60606
Litchfield@litchfieldcavo.com
tooth@litchfieldcavo.com

***Attorneys for Travelers Casualty and Surety
Co., Inc.,
St. Paul Fire and Marine Insurance Co. and
St. Paul Surplus Lines Insurance Co.***

Ryan S. Smethurst
Daniel Campbell
MCDERMOTT WILL & EMERY LLP
500 N. Capitol Street, NW
Washington, DC 20001
rsmethurst@mwe.com
dcampbell@mwe.com
ChicagoDocketing@mwe.com

***Attorney for Allianz Global Risks US
Insurance Company***

Christopher A. Wadley
WALKER WILCOX MATOUSEK LLP
1 N. Franklin Street, Suite 3200
Chicago, Illinois 60606
cwadley@wwmlawyers.com

***Attorneys for Chubb Custom Insurance,
Federal Insurance Co., Insurance Company
of North America, Pacific Employees
Insurance Co., United States Fire Insurance
Co. and International Insurance Group, Inc.***

Joseph A. Hinkhouse
Phillip Beth
HINKHOUSE WILLIAMS WALSH, LLP
180 N. Stetson Avenue, Suite 3400
Chicago, Illinois 60601
jhinkhouse@hww-law.com
pbeth@hww-law.com

***Attorneys for Lexington Insurance Co.,
Landmark Insurance Co. and
National Union Fire Insurance Co. of
Pittsburgh***

App.330

FILED DATE: 7/27/2023 4:08 PM  2017CH14975

Scott E. Turner
Rita Wilmes
CNA COVERAGE LITIGATION GROUP
333 S. Wabash, 25th Floor
Chicago, Illinois 60604
Scott.Turner@cna.com
Rita.Wilmes@cna.com

**Attorneys for Harbor Insurance Company and Columbia Casualty Company**

Evan M. Smola
HURLEY MCKENNA & MERTZ, P.C.
33 N. Dearborn, Suite 1430
Chicago, Illinois 60602
esmola@hurley-law.com

**Attorneys for John Doe 2 through 18**

Margaret Hupp Fahey
CLAUSEN MILLER PC
10 S. LaSalle Street, Suite 1600
Chicago, Illinois 60603
mfahey@clausen.com

**Attorneys for Arrowood Indemnity Company f/n/a Royal Indemnity Company**

Michael E. Hrinewski
Lorraine M. Armenti
Kevin T. Coughlin
COUGHLIN DUFFY LLP
350 Mount Kemble Ave.
P.O. Box 1917
Morristown, NJ 07962
mhrinewski@coughlinduffy.com
larmenti@coughlinduffy.com
kcoughlin@coughlinduffy.com

**Attorneys for Arrowood Indemnity Company f/n/a Royal Indemnity Company**

Dena Economou
Jocelyn F. Cornbleet
KARBAL, COHEN, ECONOMOU, SILK, DUNNE LLC
150 S. Wacker Dr., Suite 1700
Chicago, Illinois 60606
deconomou@karballaw.com
jcornbleet@karballaw.com

**Attorneys for First State Insurance Company and Twin City Fire Insurance Company**

Ernest Martin, Jr.
HAYNES AND BOONE LLP
2323 Victory Avenue, Suite 700
Dallas, Texas 75219
ernest.martin@haynesboone.com

**Attorneys for Boy Scouts of America and Chicago Area Council**

Adrian C. Azer
HAYNES BOONE, LLP
800 17th Street NW, Suite 500
Washington, D.C. 20006
adrian.azer@haynesboone.com

**Attorneys for Boy Scouts of America and Chicago Area Council**

Eugene J. Schiltz
CROTTY & SCHILTZ, LLC
120 N. LaSalle Street, Floor 20
Chicago, Illinois 60602
gschiltz@crottylaw.com

**Attorneys for Honorable Barbara J. Houser (Ret.), in her capacity as Trustee of the BSA Settlement Trust**

FILED DATE: 7/27/2023 4:08 PM  2017CH14975

Sarah A. Sraders
Wellford H. Winstead
GILBERT LLP
700 Pennsylvania Ave., SE, Suite 400
Washington, DC 20003
sraderss@gilbertlegal.com
winsteadh@gilbertlegal.com

***Attorneys for Honorable Barbara J. Houser (Ret.), in her capacity as Trustee of the BSA Settlement Trust***

App.332

# EXHIBIT 11

**Fill in this information to identify the case:**

United States Bankruptcy Court for the District of Delaware

Case number (*If known*):_____ Chapter 11 _____

☐ Check if this is an
amended filing

<u>Official Form 201</u>

# Voluntary Petition for Non-Individuals Filing for Bankruptcy 04/16

If more space is needed, attach a separate sheet to this form. On the top of any additional pages, write the debtor's name and the case number
(if known).  For more information, a separate document, *Instructions for Bankruptcy Forms for Non-Individuals,* is available.

| | | |
|---|---|---|
| 1. | **Debtor's name** | Boy Scouts of America |

| | | |
|---|---|---|
| 2. | **All other names debtor used in the last 8 years** | BSA |
| | Include any assumed names, trade names, and *doing business as* names | |

| | | |
|---|---|---|
| 3. | **Debtor's federal Employer Identification Number (EIN)** | 22-1576300 |

4. **Debtor's address**

**Principal place of business**

1325 West Walnut Hill Lane
Number     Street

Irving     TX     75038
City     State     ZIP Code

Dallas
County

**Mailing address, if different from principal place of business**

Number     Street

City     State     ZIP Code

**Location of principal assets, if different from principal place of business**

Number     Street

City     State     ZIP Code

| | | |
|---|---|---|
| 5. | **Debtor's website (URL)** | www.scouting.org |
| 6. | **Type of debtor** | ☒ Corporation (including Limited Liability Company (LLC) and Limited Liability Partnership (LLP)) |
| | | ☐ Partnership (excluding  LLP) |
| | | ☐ Other. Specify: _____ |

App.334

Debtor Name <u>Boy Scouts of America</u>                    Case number(*if known*)_____

| | | |
|---|---|---|
| 7. | **Describe debtor's business** | A. *Check one:* |

        ☐ Health Care Business (as defined in 11 U.S.C. § 101(27A))

        ☐ Single Asset Real Estate (as defined in 11 U.S.C. § 101(51B))

        ☐ Railroad (as defined in 11 U.S.C. § 101(44))

        ☐ Stockbroker (as defined in 11 U.S.C. § 101(53A))

        ☐ Commodity Broker (as defined in 11 U.S.C. § 101(6))

        ☐ Clearing Bank (as defined in 11 U.S.C. § 781(3))

        ☒ None of the above

B. *Check all that apply:*

        ☒ Tax-exempt entity (as described in 26 U.S.C. § 501)

        ☐ Investment company, including hedge fund or pooled investment vehicle (as defined in 15 U.S.C. § 80a-3)

        ☐ Investment advisor (as defined in 15 U.S.C. § 80b-2(a)(11))

C. NAICS (North American Industry Classification System) 4-digit code that best describes debtor. See http://www.uscourts.gov/four-digit-national-association-naics-codes.

        <u>8134</u>

| | | |
|---|---|---|
| 8. | **Under which chapter of the Bankruptcy Code is the debtor filing?** | *Check one:* |

        ☐ Chapter 7

        ☐ Chapter 9

        ☒ Chapter 11. *Check all that apply:*

            ☐ Debtor's aggregate noncontingent liquidated debts (excluding debts owed to insiders or affiliates) are less than $2,566,050 (amount subject to adjustment on 4/01/19 and every 3 years after that).

            ☐ The debtor is a small business debtor as defined in 11 U.S.C. § 101(51D). If the debtor is a small business debtor, attach the most recent balance sheet, statement of operations, cash-flow statement, and federal income tax return or if all of these documents do not exist, follow the procedure in 11 U.S.C. § 1116(1)(B).

            ☒ A plan is being filed with this petition.

            ☐ Acceptances of the plan were solicited prepetition from one or more classes of creditors, in accordance with 11 U.S.C. § 1126(b).

            ☐ The debtor is required to file periodic reports (for example, 10K and 10Q) with the Securities and Exchange Commission according to § 13 or 15(d) of the Securities Exchange Act of 1934. File the Attachment to Voluntary Petition for Non-Individuals Filing for Bankruptcy under Chapter 11 (Official Form 201A) with this form.

            ☐ The debtor is a shell company as defined in the Securities Exchange Act of 1934 Rule 12b-2.

        ☐ Chapter 12

| | | |
|---|---|---|
| 9. | **Were prior bankruptcy cases filed by or against the debtor within the last 8 years?** | ☒ No |
| | If more than 2 cases, attach a separate list. | ☐ Yes. District _____ When _____ Case number _____ |
| | | MM / DD / YYYY |
| | | District _____ When _____ Case number _____ |
| | | MM / DD / YYYY |

| | | |
|---|---|---|
| 10. | **Are any bankruptcy cases pending or being filed by a business partner or an affiliate of the debtor?** | ☐ No |
| | | ☒ Yes. Debtor <u>Delaware BSA, LLC</u>            Relationship <u>Subsidiary</u> |
| | List all cases. If more than 1, attach a separate list. | District <u>District of Delaware</u>        When <u>02/18/2020</u> |
| | | MM / DD /YYYY |
| | | Case number, if known _____ |

App.335

Debtor <u>Boy Scouts of America</u>                    Case number *(if known)*_____
      <sub>Name</sub>

| | | |
|---|---|---|
| **11.** | **Why is the case filed in *this* district?** | *Check all that apply:* |

☐ Debtor has had its domicile, principal place of business, or principal assets in this district for 180 days immediately preceding the date of this petition or for a longer part of such 180 days than in any other district.

☒ A bankruptcy case concerning debtor's affiliate, general partner, or partnership is pending in this district.

---

**12. Does the debtor own or have possession of any real property or personal property that needs immediate attention?**

☒ No

☐ Yes. Answer below for each property that needs immediate attention. Attach additional sheets if needed.

**Why does the property need immediate attention? (Check all that apply.)**

☐ It poses or is alleged to pose a threat of imminent and identifiable hazard to public health or safety.

What is the hazard?_____

☐ It needs to be physically secured or protected from the weather.

☐ It includes perishable goods or assets that could quickly deteriorate or lose value without attention (for example, livestock, seasonal goods, meat, dairy, produce, or securities-related assets or other options).

☐ Other_____

**Where is the property?** _____
                   Number    Street

_____

_____
City                  State         ZIP Code

**Is the property insured?**

☐ No

☐ Yes. Insurance agency _____

    Contact       _____

    Phone        _____

---

**Consolidated statistical and administrative information**

**13. Debtors' estimation of available funds**

*Check one:*

☒ Funds will be available for distribution to unsecured creditors.

☐ After any administrative expenses are paid, no funds will be available for distribution to unsecured creditors.

**14. Estimated number of creditors**

| | | |
|---|---|---|
| ☐ 1-49 | ☒ 1,000-5,000 | ☐ 25,001-50,000 |
| ☐ 50-99 | ☐ 5,001-10,000 | ☐ 50,001-100,000 |
| ☐ 100-199 | ☐ 10,001-25,000 | ☐ More than 100,000 |
| ☐ 200-999 | | |

**15. Estimated assets** *

| | | |
|---|---|---|
| ☐ $0-$50,000 | ☐ $1,000,001-$10 million | ☐ $500,000,001-$1 billion |
| ☐ $50,001-$100,000 | ☐ $10,000,001-$50 million | ☒ $1,000,000,001-$10 billion |
| ☐ $100,001-$500,000 | ☐ $50,000,001-$100 million | ☐ $10,000,000,001-$50 billion |
| ☐ $500,001-$1 million | ☐ $100,000,001-$500 million | ☐ More than $50 billion |

---

      * Includes donor restricted and core assets.

App.336

Debtor <u>Boy Scouts of America</u>                    Case number(*if known*)_____
    <sub>Name</sub>

| 16. | **Estimated liabilities** | ☐ $0-$50,000 | ☐ $1,000,001-$10 million | ☒ $500,000,001-$1 billion |
|---|---|---|---|---|
| | | ☐ $50,001-$100,000 | ☐ $10,000,001-$50 million | ☐ $1,000,000,001-$10 billion |
| | | ☐ $100,001-$500,000 | ☐ $50,000,001-$100 million | ☐ $10,000,000,001-$50 billion |
| | | ☐ $500,001-$1 million | ☐ $100,000,001-$500 million | ☐ More than $50 billion |

### Request for Relief, Declaration, and Signatures

**WARNING** -- Bankruptcy fraud is a serious crime. Making a false statement in connection with a bankruptcy case can result in fines up to $500,000 or imprisonment for up to 20 years, or both. 18 U.S.C. §§ 152, 1341, 1519, and 3571.

| 17. | **Declaration and signature of authorized representative of debtor** | The debtor requests relief in accordance with the chapter of title 11, United States Code, specified in this petition. |
|---|---|---|

I have been authorized to file this petition on behalf of the debtor.

I have examined the information in this petition and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on   <u>02/18/2020</u>
           MM / DD / YYYY

✗ _____             <u>Steven P. McGowan</u>
  Signature of authorized representative of debtor     Printed name

Title <u>Secretary and General Counsel</u>

**18. Signature of attorney**

✗ _____     Date   <u>02/18/2020</u>
  Signature of attorney for debtor              MM / DD / YYYY

<u>Derek C. Abbott</u>                 <u>Jessica C.K. Boelter</u>
Printed name

<u>Morris, Nichols, Arsht & Tunnell LLP</u>    <u>Sidley Austin LLP</u>
Firm name

<u>1201 North Market Street</u>            <u>787 Seventh Avenue</u>
Address

<u>Wilmington, DE 19899</u>            <u>New York, NY 10019</u>
City/State/ZIP

<u>(302) 351-9314</u>               <u>(212) 839-5300</u>
Contact phone

<u>dabbott@mnat.com</u>             <u>jboelter@sidley.com</u>
Email Address

<u>3376 (DE)</u>                 <u>5657580 (NY)</u>
Bar number                     Bar number

# BOY SCOUTS OF AMERICA
## NATIONAL EXECUTIVE BOARD

### RESOLUTIONS APPROVING CHAPTER 11 FILING AND RELATED MATTERS

### February 17, 2020

**WHEREAS**, the National Executive Board (the "**Board**") of the Boy Scouts of America, a non-profit corporation chartered by an Act of Congress (the "**Corporation**"), consulted with, considered presentations made by, and reviewed and had the opportunity to ask questions about the materials presented by, the senior leadership of the Corporation and the legal and financial advisors to the Corporation regarding the liabilities, liquidity, and prospects of the Corporation, the strategic alternatives available to the Corporation, and the impact of the foregoing on the Corporation's capability to carry out the mission of Scouting;

**WHEREAS**, the Board consulted with the senior leadership of the Corporation and the legal and financial advisors to the Corporation and has fully considered each of the Corporation's strategic alternatives; and

**WHEREAS**, the Board desires to approve the following resolutions.

**Commencement of Chapter 11 Case and Filing of Plan of Reorganization**

**NOW, THEREFORE, BE IT RESOLVED**, that, in the judgment of the Board, it is desirable and in the best interests of the Corporation, its creditors, and other stakeholders, and in furtherance of the Corporation's mission, that the Corporation file a petition for relief under chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "**Bankruptcy Code**"); and be it further

**RESOLVED**, that each duly appointed officer or duly authorized signatory of the Corporation (each, an "**Authorized Person**" and, collectively, the "**Authorized Persons**") be, and each of them hereby is, authorized and empowered, in the name of the Corporation, to execute and verify a petition for relief under chapter 11 of the Bankruptcy Code and to cause such petition to be filed in the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**"), such petition to be filed at such time as the Authorizing Person executing the petition shall determine and to be in the form approved by the Authorized Person executing such petition, such approval to be conclusively evidenced by the execution, verification, and filing thereof; and be it further

**RESOLVED**, that each of the Authorized Persons be, and hereby is, authorized and empowered, in the name of the Corporation, to execute a chapter 11 plan of reorganization (as such plan may be amended, modified or supplemented from time to time, the "**Plan**"), the form of which has been presented to the Board, which has considered and had the opportunity to ask questions of the senior leadership of the Corporation and the legal and financial advisors to the Corporation regarding the Plan, and to cause the Plan to be filed in the Bankruptcy Court at such time as the Authorizing Person executing the Plan shall determine; and be it further

**RESOLVED**, that each of the Authorized Persons be, and hereby is, authorized, empowered, and directed, in the name of the Corporation, with full power of delegation, to execute, verify, and cause to be filed all petitions, schedules, statements, lists, motions, applications, pleadings, affidavits, declarations, reports, exhibits, and other papers or documents (and any amendments, modifications, and supplements thereto), and to perform such further actions and execute, verify, and cause to be filed such further documentation that such Authorized Person deems necessary, appropriate, or desirable in connection with the Corporation's chapter 11 case (the "**Chapter 11 Case**") and in accordance with these resolutions; and be it further

<u>**Retention of Advisors**</u>

**RESOLVED**, that each of the Authorized Persons be, and hereby is, authorized, empowered, and directed to retain and employ, in the name of the Corporation, subject to Bankruptcy Court approval: (i) the law firm of Sidley Austin LLP, as general bankruptcy counsel; (ii) the law firm of Morris, Nichols, Arsht & Tunnell LLP, as Delaware bankruptcy counsel; (iii) the financial advisory firm of Alvarez & Marsal North America, LLC, as financial advisor; (iv) the legal case administration firm of Omni Agent Solutions, as noticing, claims and solicitation agent; and (v) any other legal counsel, accountants, financial advisors, restructuring advisors, investment bankers, public relations professionals, or other professionals any of the Authorized Persons deems necessary, appropriate, or advisable; each to represent and assist the Corporation in carrying out its duties and responsibilities and exercising its rights under the Bankruptcy Code; and in connection therewith, each of the Authorized Persons be, and hereby is, authorized, empowered, and directed, in the name of the Corporation, in accordance with the terms and conditions hereof, to execute appropriate retention agreements, pay appropriate retainers, fees, indemnities, and expenses, and to cause to be filed appropriate applications for authority to retain such services in the Chapter 11 Case; and be it further

<u>**General Authorization and Ratification**</u>

**RESOLVED**, that each of the Authorized Persons be, and hereby is, authorized, empowered, and directed to take, or cause to be taken, in the name of the Corporation, any and all further actions (including, without limitation, (i) executing, delivering, certifying, filing and/or recording, and performing any and all documents, agreements, instruments, motions, affidavits, declarations, applications for approvals or rulings of governmental or regulatory authorities, or certificates, and (ii) paying fees and expenses in connection with the transactions contemplated by the foregoing resolutions) and to take any and all steps deemed by any such Authorized Person to be necessary, advisable, or desirable to carry out the purpose and intent of each of the foregoing resolutions, and all actions heretofore taken by any such Authorized Person or the Board in furtherance thereof are hereby ratified, confirmed, and approved in all respects; and it is further

**RESOLVED**, that all acts, actions, and transactions relating to the matters contemplated by the foregoing resolutions done in the name of and on behalf of the Corporation, which acts would have been approved by the foregoing resolutions except that such acts were taken before the adoption of these resolutions, are hereby in all respects approved and ratified as the true acts and deeds of the Corporation, with the same force and effect as if each such acts, actions, and transactions had been specifically authorized in advance by resolution of the Board; and it is further

App.339

**RESOLVED**, that the omission from these resolutions of any agreement, document, or other arrangement contemplated by any of the agreements, documents, or instruments described in the foregoing resolutions or any action to be taken in accordance with any requirement of any of the agreements or instruments described in the foregoing resolutions shall in no manner derogate from the authority of the Authorized Persons to take all actions necessary, desirable, advisable, or appropriate to consummate, effectuate, carry out, or further the transactions contemplated by, and the intent and purposes of, the foregoing resolutions; and it is further

**RESOLVED**, that the Board has received sufficient notice of the actions and transactions relating to the matters contemplated by the foregoing resolutions, as required by the governance documents of the Corporation, or hereby waives any right to have received such notice.

*[Signature page follows]*

3

**IN WITNESS WHEREOF**, the undersigned, being the duly elected and qualified Secretary of the Corporation, hereby certifies that the foregoing resolutions were duly adopted by the Board of the Corporation as of the date first written above.

**BOY SCOUTS OF AMERICA**

By:     Steven P. McGowan
Title:  Secretary

*Signature Page to Resolutions of the National Executive Board of the Boy Scouts of America*

<table>
<tr><td colspan="2"><strong>Fill in this information to identify the case:</strong></td></tr>
</table>

Debtor name <u>Boy Scouts of America</u>

United States Bankruptcy Court for the: ____<u>District of Delaware</u>____
(State)

Case number (If known): ___20-_____

Check if this is an
amended filing

       The following is a list of the thirty (30) largest known creditors potentially holding unsecured claims against Boy Scouts of America and Delaware BSA, LLC (collectively, the "Debtors") other than holders of abuse claims (the "Consolidated Top 30 List"). Concurrently with the filing of their petitions, the Debtors have filed a motion seeking authority to file this Consolidated Top 30 List, along with a list of the twenty-five (25) law firms representing the largest numbers of holders of abuse claims against the Debtors, in lieu of a list of the twenty (20) largest unsecured creditors for each of Boy Scouts of America and Delaware BSA, LLC.

       The Consolidated Top 30 List reflects estimated amounts owed by the Debtors as of the Petition Date.  It was produced from the books and records of the Debtors as of the close of business on February 17, 2020.  The Consolidated Top 30 List does not include any person or entity who is now, or formerly was, an "insider" of the Debtors as that term is defined in 11 U.S.C. § 101(31).  The information contained herein shall not constitute an admission of liability by, nor is it binding on, the Debtors.  Moreover, nothing herein shall affect the Debtors' right to challenge the amount or characterization of any claim at a later date.  The Debtors' failure to list a claim as contingent, unliquidated or disputed does not constitute a waiver of the Debtors' right to contest the validity, priority and/or amount of any such claim.

## Official Form 204

# Chapter 11 or Chapter 9 Cases:  List of Creditors Who Have the 30 Largest Unsecured Claims and Are Not Insiders

12/15

A list of creditors, other than holders of abuse claims, holding the 30 largest unsecured claims must be filed in a Chapter 11 or Chapter 9 case. Include claims which the debtor disputes. Do not include claims by any person or entity who is an *insider*, as defined in 11 U.S.C. § 101(31). Also, do not include claims by secured creditors, unless the unsecured claim resulting from inadequate collateral value places the creditor among the holders of the 30 largest unsecured claims.

| Name of creditor and complete mailing address, including zip code[1] | Name, telephone number, and email address of creditor contact | Nature of the claim (for example, trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliquidated, or disputed | Amount of unsecured claim[2] If the claim is fully unsecured, fill in only unsecured claim amount.  If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|
| | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| 1  Williams, Roy L. Address on File | PHONE: On File | Restoration Plan | Unliquidated | | | $2,386,986.12 |
| 2  Mazzuca, Robert J. Address on File | PHONE: On File | Deferred Compensation/ Restoration Plan | Unliquidated | | | $1,609,662.86 |
| 3  Brock, C. Wayne Address on File | PHONE: On File EMAIL: On File | Deferred Compensation/ Restoration Plan | Unliquidated | | | $1,140,755.43 |
| 4  Connelly, Kenneth L. Address on File | PHONE: On File EMAIL: On File | Restoration Plan | Unliquidated | | | $948,559.60 |
| 5  Hoover Jr., C. Michael Address on File | PHONE: On File EMAIL: On File | Restoration Plan | Unliquidated | | | $915,037.28 |
| 6  Ross II, David J. Address on File | PHONE: On File EMAIL: On File | Restoration Plan | Unliquidated | | | $904,795.26 |
| 7  NCS Pearson, Inc. 200 Old Tappen Road Old Tappan, NJ 07675 | ATTN: Bjarne Tellmann TITLE: General Counsel and Chief Legal Officer PHONE: 201-236-5416 EMAIL: bjarne.tellmann@pearson.com | Trade Payable | | | | $714,588.00 |

---

[1] To protect the identities and/or personal contact information of certain individuals listed hereon, the Debtors have redacted such information from this list.  The Debtors are providing an unredacted version of this list to the Court and the Office of the United States Trustee.

[2] Amounts related to Restoration Plan are based on a preliminary actuarial determination.

Debtor      Boy Scouts of America _____      Case number (if known) _____

Name

| Name of creditor and complete mailing address, including zip code[1] | Name, telephone number, and email address of creditor contact | Nature of the claim (for example, trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliquidated, or disputed | Amount of unsecured claim[2] If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|
| | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| 8 Surbaugh, Michael Address on File | PHONE: On File EMAIL: On File | Restoration Plan | Unliquidated | | | $699,388.64 |
| 9 Ratcliffe, Judith Address on File | PHONE: On File | Restoration Plan | Unliquidated | | | $594,295.40 |
| 10 Tuggle, Robert Address on File | PHONE: On File EMAIL: On File | Restoration Plan | Unliquidated | | | $589,471.08 |
| 11 American Engineers & Contractors 224 Datura St, Ste 1012 West Palm Beach, FL 33401 | ATTN: Shiv Shahi TITLE: Owner PHONE: 561-666-9327 EMAIL: shiv@aecbuild.com | Trade Payable | | | | $533,950.84 |
| 12 Ohmstede, Roger A. Address on File | PHONE: On File EMAIL: On File | Restoration Plan | Unliquidated | | | $512,590.29 |
| 13 Varnell, Thomas Address on File | PHONE: On File EMAIL: On File | Deferred Compensation | | | | $397,582.81 |
| 14 Terry, Anne Address on File | PHONE: On File | Restoration Plan | Unliquidated | | | $393,977.68 |
| 15 Lion Brothers Company Inc. 10246 Reisterstown Road Owings Mills, MD 21117 | ATTN: Susan Ganz TITLE: Chief Executive Officer PHONE: 410-363-1000, EXT. 247 EMAIL: sganz@lionbrothers.com | Trade Payable | | | | $355,795.41 |
| 16 Fitzgibbon, Thomas H. Address on File | PHONE: On File EMAIL: On File | Restoration Plan | Unliquidated | | | $353,449.14 |
| 17 McChesney, Donald Address on File | PHONE: On File | Restoration Plan | Unliquidated | | | $328,739.51 |
| 18 Butler, Gary Address on File | PHONE: On File EMAIL: On File | Restoration Plan | Unliquidated | | | $324,387.52 |
| 19 Travis, Hugh Address on File | PHONE: On File EMAIL: On File | Deferred Compensation | | | | $306,816.71 |
| 20 Farmer, Bradley Address on File | PHONE: On File | Restoration Plan | Unliquidated | | | $304,736.45 |
| 21 Stone, Kathy Sue Address on File | PHONE: On File EMAIL: On File | Restoration Plan | Unliquidated | | | $254,068.18 |
| 22 Hunt, Jeffrey Address on File | PHONE: On File EMAIL: On File | Restoration Plan | Unliquidated | | | $237,271.49 |
| 23 Harrington, Thomas Address on File | PHONE: On File EMAIL: On File | Restoration Plan | Unliquidated | | | $228,275.19 |
| 24 Green, John Address on File | PHONE: On File | Restoration Plan | Unliquidated | | | $224,126.37 |
| 25 Quad/Graphics, Inc. N61W23044 Harry's Way Sussex, WI  53089-2827 | ATTN: Joel Quadracci TITLE: Chairman, President & Chief Executive Officer PHONE: 414-566-2200 EMAIL: joel.quadracci@qg.com | Trade Payable | | | | $174,600.00 |
| 26 Blackwell, Raymond L. Address on File | PHONE: On File EMAIL: On File | Restoration Plan | Unliquidated | | | $174,241.06 |

Debtor  <u>Boy Scouts of America</u>                                    Case number *(if known)* _____
         Name

| Name of creditor and complete mailing address, including zip code[1] | Name, telephone number, and email address of creditor contact | Nature of the claim (for example, trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliquidated, or disputed | Amount of unsecured claim[2] If the claim is fully unsecured, fill in only unsecured claim amount.  If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|
| | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| 27  Doe Claimant 2001 c/o Law Offices of Jeffrey E. Martin, LLC 2340 S. Arlington Hts. Rd., Ste 520 Arlington Hts., IL 60005 | PHONE: 847-956-0000 | Litigation | Contingent/ Unliquidated/ Disputed | | | Undetermined |
| 28  Doe Claimant 2002 Address on File | PHONE: On File | Litigation | Contingent/ Unliquidated/ Disputed | | | Undetermined |
| 29  Lehr, Richard Address on File | PHONE: On File EMAIL: On File | Litigation | Contingent/ Unliquidated/ Disputed | | | Undetermined |
| 30  Pension Benefit Guaranty Corporation 1200 K Street N.W. Washington, DC 20005 | ATTN: Patricia Kelly TITLE: Chief Financial Officer PHONE: 202-229-3033 EMAIL: kelly.patricia@pbgc.gov | Pension Guaranty | Contingent/ Unliquidated | | | Undetermined |

<table>
<tr><td colspan="2"><strong>Fill in this information to identify the case:</strong></td></tr>
</table>

Debtor name____Boy Scouts of America_____

United States Bankruptcy Court for the: _____ District of Delaware
(State)

Case number (If known): _____

Check if this is an
amended filing

# Chapter 11 or Chapter 9 Cases:  List of 25 Law Firms With the Largest Number of Representations of Holders of Abuse Claims

12/15

The following is a consolidated alphabetical list of the twenty-five law (25) firms representing the largest numbers of holders of abuse claims against the debtors and debtors in possession (the "Debtors"), based on the number of known pending and asserted claims (the "Top Plaintiffs' Counsel List").[1]  Concurrently with the filing of their petitions, the Debtors have filed a motion seeking authority to file this Top Plaintiffs' Counsel List and a consolidated list of creditors holding unsecured claims against the Debtors other than holders of abuse claims, in lieu of a list of the twenty (20) largest unsecured creditors that would include individual holders of abuse claims for each of Boy Scouts of America and Delaware BSA, LLC.[2] The Top Plaintiffs' Counsel List does not include any person or entity who is now, or formerly was, an "insider" of the Debtors as that term is defined in 11 U.S.C. § 101(31).  The Top Plaintiffs' Counsel List was prepared with information existing as of February 17, 2020.  The Debtors reserve the right to amend the Top Plaintiffs' Counsel List. The information contained in the Top Plaintiffs' Counsel List shall not constitute an admission by, nor shall it be binding on, the Debtors. Moreover, nothing herein shall affect the Debtors' right to challenge the amount or characterization of any claim at a later date.  The Debtors' failure to list a claim as contingent, unliquidated or disputed does not constitute a waiver of the Debtors' right to contest the validity, priority and/or amount of any such claim.

| Name of law firm and complete mailing address, including zip code | Name, telephone number, and email address of law firm contact | Nature of the claim (for example, Trade Payables, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliquidated, or disputed | Amount of unsecured claim If the claim is fully unsecured, fill in only unsecured claim amount.  If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|
| | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| 1 | Andreozzi & Associates, P.C. 111 N. Front Street Harrisburg, Pennsylvania 17101 | ATTN: Nathaniel L. Foote, Esq. PHONE: 717-686-9936 EMAIL: Unknown FAX: 717-525-9143 | Abuse-Related Litigation | Contingent/ Unliquidated/ Disputed | | | Undetermined |
| 2 | AVA Law Group, Inc. 3667 Voltaire Street San Diego , California 92106 | ATTN: Andrew Van Arsdale, Esq. PHONE: 1-866-428-2589 EMAIL: support@ava.law FAX: 619-347-2705 | Abuse-Related Litigation | Contingent/ Unliquidated/ Disputed | | | Undetermined |
| 3 | Bondurant, Mixson & Elmore, LLC One Atlantic Center, 1201 West Peachtree Stree NW, Suite 3900 Atlanta, Georgia 30309 | ATTN: Michael B. Terry PHONE: 404-881-4100 EMAIL: terry@bmelaw.com FAX: 404-881-4111 | Abuse-Related Litigation | Contingent/ Unliquidated/ Disputed | | | Undetermined |
| 4 | Crew Janci LLP 1200 NW Naito Parkway, Suite 500 Portland, Oregon 97209 | ATTN: Stephen Crew PHONE: 503-306-0224 EMAIL: steve@crewjanci.com FAX: 503-467-4940 | Abuse-Related Litigation | Contingent/ Unliquidated/ Disputed | | | Undetermined |

[1] Based on pending litigation and claims identified to the Debtors by attorneys representing certain abuse victims.

[2] This list is in substantially the same form as Official Bankruptcy Form 204 for chapter 11 cases setting forth the list of creditors, other than insiders, who have the 20 largest unsecured claims against a debtor.

ACTIVE 252585100

App.345

Debtor ___Boy Scouts of America___      Case number *(if known)* _____
     Name

| | Name of law firm and complete mailing address, including zip code | Name, telephone number, and email address of law firm contact | Nature of the claim (for example, Trade Payables, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliquidated, or disputed | Amount of unsecured claim. If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|---|
| | | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| 5 | Dumas Law Group, LLC (a/k/a Dumas & Vaughn Attorneys at Law) 3835 NE Hancock Street, Suite GL-B Portland, Oregon 97212 | ATTN: Gilion Dumas PHONE: 503-616-5007 EMAIL: gilion@dumaslawgroup.com FAX: Unknown | Abuse-Related Litigation | Contingent/ Unliquidated/ Disputed | | | Undetermined |
| 6 | Eisenberg Rothweiler, Winkler, Eisenberg & Jeck, P.C. 1634 Spruce Street Philadelphia, Pennsylvania 19103 | ATTN: Stewart Eisenberg, Esq. PHONE: 215-398-7544 EMAIL: Unknown FAX: 215-546-0118 | Abuse-Related Litigation | Contingent/ Unliquidated/ Disputed | | | Undetermined |
| 7 | Green & Gillispie 1 Riverfront Place, Suite 605 North Little Rock, Arkansas 72114 | ATTN: Joshua Gillispie PHONE: 501-244-0700 EMAIL: josh@greenandgillispie.com FAX: 501-244-2020 | Abuse-Related Litigation | Contingent/ Unliquidated/ Disputed | | | Undetermined |
| 8 | Gregg, Hunt, Ahern & Embry Attorneys at Law One Cranberry Hill, #304 Lexington, Massachusetts 02421 | ATTN: Jonathan Barnes PHONE: 617-494-1920 EMAIL: jbarnes@chelaw.com FAX: 617-494-1921 | Abuse-Related Litigation | Contingent/ Unliquidated/ Disputed | | | Undetermined |
| 9 | Hurley McKenna & Mertz P.C. 33 N. Dearborn Street, Suite 1430 Chicago, Illinois 60602 | ATTN: Christopher Hurley PHONE: 312-553-4900 EMAIL: churley@hurley-law.com FAX: 312-553-0964 | Abuse-Related Litigation | Contingent/ Unliquidated/ Disputed | | | Undetermined |
| 10 | Jeff Anderson & Associates, PA 505 Thornall Street, Suite 405 Edison, New Jersey 08837 | ATTN: Jeffrey Anderson PHONE: 909-344-3847 EMAIL: jeff@andersonadvocates.com FAX: Unknown | Abuse-Related Litigation | Contingent/ Unliquidated/ Disputed | | | Undetermined |
| 11 | Kosnoff Law 1321 Upland Drive PMB 4685 Houston, Texas 77043 | ATTN: Timothy Kosnoff, Esq. PHONE: 206-257-3590 EMAIL: tim@kosnoff.com FAX: 206-837-9690 | Abuse-Related Litigation | Contingent/ Unliquidated/ Disputed | | | Undetermined |
| 12 | Law Offices of Mitchell Garabedian100 State Street, 6th FloorBoston, Massachusetts 02109 | ATTN: Mitchell Garabedian PHONE: 617-523-6520 EMAIL: mgarabedian@garabedianlaw.com FAX: 617-523-3687 | Abuse-Related Litigation | Contingent/ Unliquidated/ Disputed | | | Undetermined |
| 13 | Lindsay Hart, LLP 1300 SW 5th Ave, Suite 3400 Portland, Oregon 97201 | ATTN: James L. Dumas PHONE: 503-226-7677 EMAIL: jdumas@lindsayhart.com FAX: Unknown | Abuse-Related Litigation | Contingent/ Unliquidated/ Disputed | | | Undetermined |
| 14 | Lujan & Wolff, LLP 238 Archbishop Flores Street, Suite 300, DNA Building Hagatna, Guam 96910 | ATTN: David Lujan PHONE: 671-477-8064 EMAIL: Unknown FAX: 671-477-5297 | Abuse-Related Litigation | Contingent/ Unliquidated/ Disputed | | | Undetermined |

Official Form 204     **Chapter 11 Case: List of 25 Law Firms With the Largest Number of Representations of Holders of Abuse Claims** page 2

ACTIVE 252585100

Debtor    Boy Scouts of America            Case number *(if known)* _____
      Name

| | Name of law firm and complete mailing address, including zip code | Name, telephone number, and email address of law firm contact | Nature of the claim (for example, Trade Payables, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliquidated, or disputed | Amount of unsecured claim If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|---|
| | | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| 15 | Marsh Law Firm 151 East Post Road, Ste. 102 White Plains, New York 10601 | ATTN: James Marsh PHONE: 929-232-3235 EMAIL: jamesmarch@marsh.law FAX: | Abuse-Related Litigation | Contingent/ Unliquidated/ Disputed | | | Undetermined |
| 16 | Merson Law 150 East 58th St., 34th Floor New York, New York 10155 | ATTN: Jordan Merson PHONE: 212-603-9100 EMAIL: jmerson@mersonlaw.com FAX: 347-441-4171 | Abuse-Related Litigation | Contingent/ Unliquidated/ Disputed | | | Undetermined |
| 17 | Michael G. Dowd 600 Third Ave., 15th Floor New York, New York 10016 | ATTN: Michael G. Dowd PHONE: 212-751-1640 EMAIL: Unknown FAX: Unknown | Abuse-Related Litigation | Contingent/ Unliquidated/ Disputed | | | Undetermined |
| 18 | Paul Mones 13101 Washington Blvd. Los Angeles, California 90066 | ATTN: Paul Mones PHONE: 310-400-5960 EMAIL: pamones@comcast.net FAX: Unknown | Abuse-Related Litigation | Contingent/ Unliquidated/ Disputed | | | Undetermined |
| 19 | Penn Law Group 4200 Northside Parkway, NW, Building One, Suite 100 Atlanta, Georgia 30327 | ATTN: Darren Penn PHONE: 404-961-7655 EMAIL: darren@pennlawgroup.com FAX: Unknown | Abuse-Related Litigation | Contingent/ Unliquidated/ Disputed | | | Undetermined |
| 20 | Pfau, Cochran, Vertetis, Amala PLLC 403 Columbia Street, Ste. 500 Seattle, Washington 98104 | ATTN: Michael Pfau PHONE: 206-451-8260 EMAIL: michael@pcvalaw.com FAX: 206-623-3624 | Abuse-Related Litigation | Contingent/ Unliquidated/ Disputed | | | Undetermined |
| 21 | Rebenack, Aronow, Mascolo, LLP 111 Livingston Avenue New Brunswick , New Jersey 08901 | ATTN: Jay Silvio Mascolo PHONE: 732-247-3600 EMAIL: Jmascolo@ram.law FAX: 732-247-3630 | Abuse-Related Litigation | Contingent/ Unliquidated/ Disputed | | | Undetermined |
| 22 | Robins Kaplan LLP 399 Park Avenue, Suite 3600 New York, New York 10022 | ATTN: Patrick Stoneking PHONE: 212-980-7400 EMAIL: pstoneking@robinskaplan.com FAX: 212-980-7499 | Abuse-Related Litigation | Contingent/ Unliquidated/ Disputed | | | Undetermined |
| 23 | Rubenstein & Rynecki 16 Court Street, Ste. 1717 Brooklyn, New York 11241 | ATTN: Sanford Rubenstein PHONE: 718-522-1020 EMAIL: Unknown FAX: Unknown | Abuse-Related Litigation | Contingent/ Unliquidated/ Disputed | | | Undetermined |
| 24 | Sweeny Reich & Bolz, LLP 1981 Marcus Avenue, Ste. 200 Lake Success, New York 11042 | ATTN: Gerard Sweeney PHONE: 718-459-9000 EMAIL: Unknown FAX: Unknown | Abuse-Related Litigation | Contingent/ Unliquidated/ Disputed | | | Undetermined |
| 25 | Thomas Law Office, PLLC 9418 Norton Commons Blvd., Ste. 200 Louisville, Kentucky 40059 | ATTN: Tad Thomas PHONE: 877-736-4963 EMAIL: tad@thomaslawoffices.com FAX: 502-785-7257 | Abuse-Related Litigation | Contingent/ Unliquidated/ Disputed | | | Undetermined |

Official Form 204      **Chapter 11 Case: List of 25 Law Firms With the Largest Number of Representations of Holders of Abuse Claims** page 3

ACTIVE 252585100

App.347

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| BOY SCOUTS OF AMERICA, | Case No. 20-_____ (___) |
| Debtor. | (Joint Administration Requested) |

## <u>CORPORATE OWNERSHIP STATEMENT</u>

There are no entities to report under rule 7007.1 of the Federal Rules of Bankruptcy Procedure, as the above-captioned debtor and debtor in possession is a non-profit, non-stock tax exempt organization with no equity ownership.

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| BOY SCOUTS OF AMERICA, | Case No. 20-_____ (___) |
| Debtor. | (Joint Administration Requested) |

## LIST OF EQUITY SECURITY HOLDERS

  There are no entities to report under rule 1007(a)(3) of the Federal Rules of Bankruptcy Procedure, as the above-captioned debtor and debtor in possession is a non-profit, non-stock tax exempt organization with no equity ownership.

App.349

---

Fill in this information to identify the case and this filing:

Debtor Name  Boy Scouts of America

United States Bankruptcy Court for the:  ___District of Delaware___
(State)

Case number (*If known*): _____

---

## Official Form 202
## Declaration Under Penalty of Perjury for Non-Individual Debtors          12/15

An individual who is authorized to act on behalf of a non-individual debtor, such as a corporation or partnership, must sign and submit this form for the schedules of assets and liabilities, any other document that requires a declaration that is not included in the document, and any amendments of those documents. This form must state the individual's position or relationship to the debtor, the identity of the document, and the date. Bankruptcy Rules 1008 and 9011.

WARNING -- Bankruptcy fraud is a serious crime. Making a false statement, concealing property, or obtaining money or property by fraud in connection with a bankruptcy case can result in fines up to $500,000 or imprisonment for up to 20 years, or both. 18 U.S.C. §§ 152, 1341, 1519, and 3571.

### Declaration and signature

I am the president, another officer, or an authorized agent of the corporation; a member or an authorized agent of the partnership; or another individual serving as a representative of the debtor in this case.

I have examined the information in the documents checked below and I have a reasonable belief that the information is true and correct:

☐  *Schedule A/B: Assets–Real and Personal Property* (Official Form 206A/B)

☐  *Schedule D: Creditors Who Have Claims Secured by Property* (Official Form 206D)

☐  *Schedule E/F: Creditors Who Have Unsecured Claims* (Official Form 206E/F)

☐  *Schedule G: Executory Contracts and Unexpired Leases* (Official Form 206G)

☐  *Schedule H: Codebtors* (Official Form 206H)

☐  *Summary of Assets and Liabilities for Non-Individuals* (Official Form 206Sum)

☐  *Amended Schedule* _____

☐  *Chapter 11 or Chapter 9 Cases: List of Creditors Who Have the 30 Largest Unsecured Claims and Are Not Insiders* (Official Form 204)

☒  Other document that requires a declaration    List of Creditors Who Have the 30 Largest Unsecured Claims and Are Not Insiders;
Corporate Ownership Statement; List of Equity Security Holders; List of 25 Law Firms with the Largest Number of Representations of
Holders of Abuse Claims

I declare under penalty of perjury that the foregoing is true and correct.

Executed on    02/18/2020                    
               MM / DD / YYYY        X _____
                                     Signature of individual signing on behalf of debtor

                                     Steven P. McGowan
                                     Printed name

                                     Secretary and General Counsel
                                     Position or relationship to debtor

# EXHIBIT 12

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>BOY SCOUTS OF AMERICA AND<br>DELAWARE BSA, LLC,<br><br>Debtors.[1] | Chapter 11<br><br>Case No. 20-10343 (LSS)<br><br>(Jointly Administered) |

**Objection Deadline:  October 9, 2023 at 4:00 p.m. (ET)**
**Hearing Date:  October 17, 2023 at 11:00 a.m. (ET)**

**MOTION BY THE HONORABLE BARBARA J. HOUSER (RET.),**
**IN HER CAPACITY AS TRUSTEE OF THE BSA SETTLEMENT TRUST,**
**FOR APPROVAL OF AMENDMENT OF TRUST DISTRIBUTION PROCEDURES**

The Honorable Barbara J. Houser (Ret.) (the "Trustee"), in her capacity as trustee of the BSA Settlement Trust (the "Settlement Trust"), hereby moves the Court (the "Motion") for an order approving the Trustee's proposed 60-day extension of the deadline for Direct Abuse Claimants to elect the "Independent Review Option" pursuant to the Trust Distribution Procedures ("TDP") under the *Third Modified Fifth Amended Chapter 11 Plan of Reorganization (With Technical Modifications) for Boy Scouts of America and Delaware BSA, LLC*, D.I. 10296 (the "Plan").[2]  In support of the relief requested herein, the Trustee respectfully states and alleges as follows:

---

[1] The Reorganized Debtors in these Chapter 11 Cases, together with the last four digits of Debtor's federal tax identification number, are as follows:  Boy Scouts of America (6300) and Delaware BSA, LLC (4311).  The Reorganized Debtors' mailing address is 1325 West Walnut Hill Lane, Irving, Texas 75038.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Confirmation Order, the Plan, or the Trust Distribution Procedures, as applicable.

## PRELIMINARY STATEMENT

1.      The Independent Review Option ("IRO") under the TDP affords survivors with potentially high value claims the opportunity to obtain a settlement recommendation replicating the amount a reasonable jury might award for the claim in the tort system.  IRO participants must provide substantial evidence supporting their claim and pay a $20,000 administrative fee, the first $10,000 of which is due upon their election to participate in the IRO.  Under the current TDP, the deadline for IRO claimants to elect the IRO, submit a completed Claims Questionnaire with supporting documentation, and pay the first $10,000 fee, is six months from the Effective Date— October 19, 2023.

2.      Recent developments have made clear that survivors may be prejudiced in their ability to determine whether to file IRO claims absent an extension of the IRO election date— namely, the Trustee's discovery that Reorganized BSA had not produced all documents required under the Document Appendix, despite its express representations otherwise.  Because of these deficiencies, Direct Abuse Claimants, or their counsel, have been unable to access certain documents potentially necessary to evaluate the strength of their IRO claims and to complete their Trust Claim Submissions, which are due in just a few weeks.

3.      The Trust expects the additional documents to be uploaded to the Trust's Document Repository by the end of this week—October 6, 2023.  However, this means survivors will have less than two weeks to review a complete document production and build their IRO submissions.  In order to provide survivors with a reasonable opportunity to evaluate and assemble evidence for their IRO claim—before paying a $10,000 administrative fee—the Trustee seeks to extend the deadline for IRO election by 60 days, to December 18, 2023.

2

4.      While the Trustee cannot make "material" amendments to the TDP absent Bankruptcy Court approval, non-material amendments require only the consent of the STAC and FCR.  TDP, Exhibit A to Plan, at Art. XIV.B.  Here, the STAC, the FCR, and Reorganized BSA have agreed that an extension of the deadline to elect the IRO does not require court approval.  The STAC and FCR have consented to the extension.  The Certain Insurers have represented that they do not object to the extension.

5.      The Trustee does not believe that an extension of the deadline to elect the IRO requires this Court's approval.  Nonetheless, out of an abundance of caution and mindful of the difficulties that survivors could face if the Trustee's extension of the deadline were later deemed improper, the Trustee brings this Motion seeking the Court's approval of the extension.

<u>JURISDICTION AND VENUE</u>

6.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157(a).

7.      The basis for this Court's jurisdiction is further set forth in the Confirmation Order, which provides that, "the Court retains exclusive jurisdiction over all matters arising from and relating to the Chapter 11 Cases, the Plan . . . , the Confirmation Opinion, and this Order to the fullest extent permitted under the Bankruptcy Code."  Supplemental Findings of Fact and Conclusions of Law and Order Confirming the Third Modified Fifth Am. Chapter 11 Plan of Reorganization (With Technical Modifications) for BSA, § III.74, (Sept. 8, 2022), D.I. 10316 ("Confirmation Order").  The Plan similarly provides that, "the Bankruptcy Court shall retain jurisdiction over all matters arising out of, or relating to, the Chapter 11 Cases and the Plan, including jurisdiction to . . . modify the Plan after Confirmation pursuant to the provisions of the Bankruptcy Code and the Bankruptcy Rules" and "correct any defect, cure any omission, reconcile

any inconsistency or make any other necessary changes or modifications in or to the Plan, the Trust

Documents or the Confirmation Order as may be necessary to carry out the purposes and intent of

the Plan[.]"  Plan at Art. XI.C.1, 2.

8.       Pursuant to Rule 9013-1(f) of the Local Rules of Bankruptcy Practice and

Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"),

the Trustee consents to the entry of a final order by the Court in connection with this Motion to the

extent it is later determined that the Court, absent consent of the parties, cannot enter a final order

consistent with Article III of the United States Constitution.

9.       Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## FACTUAL BACKGROUND

**A.       The Independent Review Process**

10.       The TDP creates four processes by which Direct Abuse Claims are liquidated and

paid.  One of those processes is known as the "Independent Review Option," or "IRO."

11.       As this Court noted in its opinion confirming the Plan ("Opinion"):

The Independent Review Option contemplates recoveries above the values stated
in the [TDP's] Claims Matrix and is designed to permit Direct Abuse Claimants
with higher value claims to potentially receive a higher award and directly trigger
excess insurance coverage.  Under the Independent Review Option, a Direct Abuse
Claimant can have his claim evaluated by a neutral third party . . .  who makes a
Settlement Recommendation to the Settlement Trustee.  The Neutral's Settlement
Recommendation seeks to replicate the amount a reasonable jury would award
taking into account relative shares of fault and the standard of proof applicable
under applicable state law.

*In re Boy Scouts of Am. & Delaware BSA, LLC*, 642 B.R. 504, 544 (Bankr. D. Del. 2022).

12.       The TDP provides that Direct Abuse Claimants shall have until six months after

the Effective Date—October 19, 2023—to elect to participate in the IRO, to complete a Trust

Claim Submission with supporting documentation for their IRO claim, and to pay an initial

administrative fee of $10,000 (with an additional $10,000 fee to be paid immediately prior to the Neutral's review).  *See* Plan Article XIII.B, G.(ii).

## B.    The Document Appendix

13.    The *Plan Appendix Re: Document Sharing*, D.I. 9698-1 ("Document Appendix") required the Debtors to produce various categories of documents to the Settlement Trustee "[o]n or before the Effective Date of the Plan."  Document Appendix § 1.  The Document Appendix further provides that "[h]olders of Direct Abuse Claims shall be entitled to access from the Settlement Trustee [ ] documents and information they will likely need to in order to obtain compensation under the Plan" (other than "Privileged Information," as that term is defined in the Document Appendix).  *Id.* § 13.

14.    Reorganized BSA made a production to the Trust on the Effective Date that it represented was sufficient to fulfill its obligations under the Document Appendix.[3]  Reorganized BSA and the Settlement Trust had a subsequent meet-and-confer in July 2023 that resulted in Reorganized BSA making a supplemental production of tens of thousands of additional pages.  With this supplemental production, Reorganized BSA again represented that it had fulfilled its obligations under the Document Appendix.  A declaration from the Trustee is attached hereto as **Exhibit A**.

15.    The Trustee uploaded the documents it received from the Debtors to a repository (the "Document Repository") that became accessible to counsel for holders of Direct Abuse Claims on August 17, 2023.

---

[3] Reorganized BSA has represented to the Trustee that it did, in fact, believe that its productions were complete at the time it made them.

DOCS_DE:245151.1 85355/001

16.     Since the Document Repository went live, it has become clear, based on inquiries from survivor counsel, the Trust's own test searches of the Document Repository, and multiple follow-up discussions with Reorganized BSA, that Reorganized BSA had not produced all documents required by the Document Appendix.  Upon learning of this deficiency, the Trustee requested immediate production of all missing documents.

17.     Reorganized BSA has committed to provide all additional documents promptly. The Trustee expects that Reorganized BSA's supplemental production will be uploaded to the Document Repository by the end of this week—October 6, 2023.

**C.     The Trustee's Proposed Extension of the IRO Deadline and Authority to Issue the Extension**

18.     Upon learning that some documents required to be produced under the Document Appendix were outstanding, the Trustee determined that it would be fair, necessary, and advisable to extend the IRO election deadline by 60 days, to December 18, 2023.  The purpose of the 60-day extension is to provide claimants with sufficient time to review the full contents of the Document Repository in order to make an informed judgment as to whether to participate in the IRO process (including payment of the first $10,000 administrative fee) and to provide a completed Trust Claim Submission.

19.     The BSA Settlement Trust Agreement ("Trust Agreement") and TDP permit the Trustee to make non-material amendments to the TDP without Bankruptcy Court approval.  The Trust Agreement provides that, "[e]xcept as required by applicable law or the Trust Documents, the Trustee need not obtain the order or approval of any court in the exercise of any power or discretion conferred [under the Trust Agreement]."  Trust Agreement, Exhibit B to Plan, § 2.1(c). Those powers include "the power to take any and all actions that in the judgment of the Trustee are necessary or advisable to fulfill the purposes of the Trust . . . ." and specifically, the power to

6

"adopt procedures to allow valid Abuse Claims . . . in accordance with the TDP (including adopting procedures to implement the Independent Review Process under the TDP)." *Id.* § 2.1(b), (d)(ii).

20.     The TDP similarly contemplates non-material amendments by the Settlement Trustee without court approval. *See* TDP Article XIV(B) (permitting the Trustee to amend the TDP with the written consent of the STAC and Future Claimants' Representative). Only changes that "amend these TDP in a material manner"—e.g., changes that "materially alter the Independent Review Option," or that alter the TDP "in a manner that is otherwise inconsistent with the Confirmation Order or Plan"—require Bankruptcy Court approval, notice, and an opportunity to object. *Id.*[4]

21.     The Trustee obtained the consent of the STAC and FCR to extend the IRO deadline. The Trustee, the STAC, the FCR, and Reorganized BSA have agreed that an extension of the deadline to elect the IRO does not require Court approval. The Certain Insurers have

---

[4] The full text of Article XIV.B is as follows:

> **B. Amendments**. Except as otherwise provided herein, the Settlement Trustee may not amend, modify, delete, or add to any provisions of these TDP without the written consent of the STAC and the Future Claimants' Representative, as provided in the Settlement Trust Agreement, including amendments to modify the system for Tort Election Claims. Nothing herein is intended to preclude the STAC and/or the Future Claimants' Representative from proposing to the Settlement Trustee, in writing, amendments to these TDP. Notwithstanding the foregoing, absent Bankruptcy Court or District Court approval after appropriate notice and opportunity to object, neither the Settlement Trustee nor the STAC or Future Claimants' Representative may amend these TDP in a material manner, including (i) to provide for materially different treatment for Abuse Claims, (ii) to materially change the system for Tort Election Claimants, (iii) to add an opportunity to make an Expedited Distribution Election for a claim represented by a Chapter 11 POC after the Voting Deadline, (iv) to materially alter the Independent Review Option, or (v) in a manner that is otherwise inconsistent with the Confirmation Order or Plan. Notwithstanding the foregoing, neither the Settlement Trustee nor the STAC or Future Claimants' Representative may amend any of the forms of release set forth in Article IX.D without the consent of Reorganized BSA, or remove the requirement of a release in connection with an Expedited Distribution.

DOCS_DE:245151.1 85355/001

represented that they do not object to any such proposed extension.  The Trustee, out of an abundance of caution, filed this Motion for approval of the extension.

## **RELIEF REQUESTED**

22.     The Trustee seeks entry of the Proposed Order, attached hereto as **Exhibit B**, approving the extension of the IRO election deadline.

## **BASIS FOR RELIEF**

23.     Pursuant to the Confirmation Order and applicable law, this Court has jurisdiction to "make any other necessary changes or modifications in or to the Plan, the Trust Documents or the Confirmation Order as may be necessary to carry out the purposes and intent of the Plan[.]" Plan at Art. XI.C.2.

24.     Here again, the fundamental purpose of the Plan is to value and pay compensable Abuse Claims fairly and equitably.  The Trust cannot carry out that fundamental purpose if survivors are prejudiced in their ability to acquire information that should have been produced pursuant to the Document Appendix so they can determine whether or not to submit claims for evaluation under the IRO.  As a result, the Settlement Trustee, along with the consent of the FCR and STAC, has determined that the most prudent course of action is to provide the holders of Abuse Claims additional time to make the IRO election after the remaining documents are made available to them to review.  This Court should therefore approve the modification of the IRO deadline.

## **NOTICE**

25.     Notice of this Motion has been given to (a) counsel to the Debtors and Reorganized BSA, (b) the Office of the United States Trustee for the District of Delaware, and (c) those persons who have formally appeared in these cases and requested service pursuant to

DOCS_DE:245151.1 85355/001

Bankruptcy Rule 2002.  In light of the nature of the relief requested, the Trustee submits that no

additional notice need be given.  No prior request for the relief requested herein has been made to

this or any other court.

Dated:  October 2, 2023

Wilmington, Delaware                        **PACHULSKI STANG ZIEHL & JONES LLP**

                                            */s/ James E. O'Neill*
                                            Richard M. Pachulski (CA Bar No. 90073)
                                            Debra I. Grassgreen (CA Bar No. 169978)
                                            James E. O'Neill (DE Bar No. 4042)
                                            919 N. Market Street, 17th Floor
                                            P.O. Box 8705
                                            Wilmington, DE  19899-8705 (Courier 19801)
                                            Telephone:  (302) 652-4100
                                            Facsimile:   (302) 652-4400
                                            Email:  rpachulski@pszjlaw.com
                                                       dgrassgreen@pszjlaw.com
                                                       joneill@pszjlaw.com

                                            – AND –

                                            **GILBERT LLP**
                                            Kami E. Quinn (admission *pro hac vice*)
                                            Emily P. Grim (admission *pro hac vice*)
                                            Sarah A. Sraders (admission *pro hac vice*)
                                            700 Pennsylvania Avenue, SE
                                            Suite 400
                                            Washington, DC  20003
                                            Telephone:  (202) 772-2200
                                            Facsimile:   (202) 772-3333
                                            Email:  quinnk@gilbertlegal.com
                                                       grime@gilbertlegal.com
                                                       sraderss@gilbertlegal.com

                                            *Attorneys for the Honorable Barbara J. Houser*
                                            *(Ret.), in her capacity as Trustee of the BSA*
                                            *Settlement Trust*

DOCS_DE:245151.1 85355/001

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| BOY SCOUTS OF AMERICA and DELAWARE BSA, LLC, | Case No. 20-10343 (LSS) |
| Debtors.[1] | (Jointly Administered) |

**Objection Deadline:  October 9, 2023 at 4:00 p.m. (ET)**
**Hearing Date:  October 17, 2023 at 11:00 a.m. (ET)**

**NOTICE OF MOTION BY THE HONORABLE BARBARA J. HOUSER (RET.),**
**IN HER CAPACITY AS TRUSTEE OF THE BSA SETTLEMENT TRUST,**
**FOR APPROVAL OF AMENDMENT OF TRUST DISTRIBUTION PROCEDURES**

**PLEASE TAKE NOTICE** that, on October 2, 2023, the Honorable Barbara J.

Houser (Ret.), Trustee (the "Trustee") of the BSA Settlement Trust (the "Settlement Trust"),

filed the *Motion By the Honorable Barbara J. Houser (Ret.), In Her Capacity as Trustee of the*

*BSA Settlement Trust, for Approval of Amendment of Trust Distribution Procedures* (the

"Motion") with the United States Bankruptcy Court for the District of Delaware, 824 Market

Street, 3rd Floor, Wilmington, Delaware 19801 (the "Bankruptcy Court").  A copy of the Motion

is attached hereto.

**PLEASE TAKE FURTHER NOTICE** that any response or objection to the

Motion must be filed with the Bankruptcy Court on or before **October 9, 2023 at 4:00 p.m.**

**prevailing Eastern Time**.

**PLEASE TAKE FURTHER NOTICE** that at the same time, you must also

serve a copy of the response or objection upon: (i) the Office of the United States Trustee for the

---

[1] The Debtors in these chapter 11 cases, together with the last four digits of Debtors' federal tax identification number, are as follows: Boy Scouts of America (6300) and Delaware BSA, LLC (4311).  The Debtors' mailing address is 1325 West Walnut Hill Lane, Irving, Texas 75038.

District of Delaware: United States Trustee, J. Caleb Boggs Federal Building, 844 North King

Street, Suite 2207, Lockbox #35, Wilmington, DE  19801 (Attn: Timothy J. Fox, Jr., Esq.

(timothy.fox@usdoj.gov@usdoj.gov) and Hannah Mufson McCollum, Esq.

(hannah.mccollum@usdoj.gov)); and (ii) Pachulski Stang Ziehl & Jones LLP, 919 North Market

Street, 17th Floor, P.O. Box 8705, Wilmington, DE  19899-8705 (Courier 19801) (Attn: Richard

M. Pachulski, Esq. (rpachulski@pszjlaw.com) and James E. O'Neill, Esq.

(joneill@pszjlaw.com)).

    **PLEASE TAKE FURTHER NOTICE** THAT IF YOU FAIL TO RESPOND IN

ACCORDANCE WITH THIS NOTICE, THE COURT MAY GRANT THE RELIEF

REQUESTED IN THE MOTION WITHOUT FURTHER NOTICE OR HEARING.

    **PLEASE TAKE FURTHER NOTICE** THAT A HEARING TO CONSIDER

APPROVAL OF THE MOTION WILL BE HELD ON **OCTOBER 17, 2023 AT 11:00 A.M.**

**PREVAILING EASTERN TIME** BEFORE THE HONORABLE LAURIE SELBER

SILVERSTEIN, CHIEF UNITED STATES BANKRUPTCY JUDGE, AT THE UNITED

STATES BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE, 824 MARKET

STREET, 6TH FLOOR, COURTROOM NO. 2, WILMINGTON, DELAWARE 19801.

     *[Remainder of Page Intentionally Left Blank]*

Dated:  October 2, 2023
Wilmington, Delaware

**PACHULSKI STANG ZIEHL & JONES LLP**

*/s/ James E. O'Neill*
Richard M. Pachulski (CA Bar No. 90073)
Debra I. Grassgreen (CA Bar No. 169978)
John W. Lucas (CA Bar No. 271038)
James E. O'Neill (DE Bar No. 4042)
919 N. Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE  19899-8705 (Courier 19801)
Telephone:  (302) 652-4100
Facsimile:  (302) 652-4400
Email: rpachulski@pszjlaw.com
        dgrassgreen@pszjlaw.com
        jlucas@pszjlaw.com
        joneill@pszjlaw.com

– and –

**GILBERT LLP**
Kami E. Quinn (admission *pro hac vice*)
Emily P. Grim (admission *pro hac vice*)
Sarah A. Sraders (admission *pro hac vice*)
700 Pennsylvania Avenue, SE
Suite 400
Washington, DC  20003
Telephone: (202) 772-2200
Facsimile:  (202) 772-3333
Email: quinnk@gilbertlegal.com
        grime@gilbertlegal.com
        sraderss@gilbertlegal.com

*Attorneys for the Honorable Barbara J. Houser*
*(Ret.), in her capacity as Trustee of the BSA*
*Settlement Trust*

App.363

**Exhibit A**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>BOY SCOUTS OF AMERICA AND<br>DELAWARE BSA, LLC,<br><br>Debtors.[1] | Chapter 11<br><br>Case No. 20-10343 (LSS)<br><br>(Jointly Administered) |

**DECLARATION OF THE HONORABLE BARBARA J. HOUSER (RET.), IN SUPPORT OF HER MOTION, IN HER CAPACITY AS TRUSTEE OF THE BSA SETTLEMENT TRUST, FOR APPROVAL OF AMENDMENT OF TRUST DISTRIBUTION PROCEDURES**

I, Barbara J. Houser, declare as follows:

1.      I am the trustee (the "Trustee") of the BSA Settlement Trust (the "Trust").

2.      I am over the age of eighteen years.  This declaration (the "Declaration") is based on my personal knowledge and experience, my review of relevant documents, and my supervision of various people who report to me as Trustee of the Settlement Trust.  If called as a witness, I could and would competently testify to the facts set forth herein.  As Trustee of the Settlement Trust, I am duly authorized to make this Declaration.

3.      The Trust was created by the BSA Settlement Trust Agreement, dated as of April 19, 2023 (the "Settlement Trust Agreement") and pursuant to the *Third Modified Fifth Amended Chapter 11 Plan of Reorganization (with Technical Modifications) for Boy Scouts of America and Delaware BSA, LLC* [Docket No. 10296] (the "Plan").

---

[1] The Reorganized Debtors in these Chapter 11 Cases, together with the last four digits of Debtor's federal tax identification number, are as follows:  Boy Scouts of America (6300) and Delaware BSA, LLC (4311).  The Reorganized Debtors' mailing address is 1325 West Walnut Hill Lane, Irving, Texas 75038.

App.365

4. On April 19, 2023, the Trust received a production of documents from the Reorganized Boy Scouts of America ("Reorganized BSA") in accordance with Reorganized BSA's obligation under the Plan Appendix Re: Document Sharing (the "Document Appendix"). Reorganized BSA represented to the Trust that this production was sufficient to fulfill its obligations under the Document Appendix.

5. On July 14, 2023, my counsel met with representatives from Reorganized BSA to discuss its document production. Following this meeting, the Trust received a supplemental production of documents from Reorganized BSA. Reorganized BSA again represented that its productions were sufficient to fulfill its obligations under the Document Appendix.

6. The Trust uploaded the documents it received from Reorganized BSA to an online repository (the "Document Repository"). On August 17, 2023, the Document Repository became accessible to counsel for holders of Direct Abuse Claims (as that term is defined in the Plan).

7. After August 17, 2023, I received numerous inquiries from counsel for holders of Direct Abuse Claims asking why certain documents were not available in the Document Repository. The Trust also conducted its own searches of the documents in the Document Repository and determined that Reorganized BSA had not produced all of the documents required by the Document Appendix.

8. On September 20, 2023, my counsel met with representatives from Reorganized BSA regarding the deficiencies identified in the document productions. Reorganized BSA committed to remedy the deficiencies and produce additional documents no later than October 6, 2023.

App.366

9.       The Trust Distribution Procedures ("TDP") require claimants to select the

Independent Review Option ("IRO") by October 19, 2023 (the "IRO Deadline").  It is my belief

that claimants have been prejudiced by Reorganized BSA's delay in producing all of the

documents it agreed to produce in the Document Appendix.  I further believe it is unfair to

require claimants to meet the original deadline of October 19, 2023, when documents that may

well be material to their evaluation of the merits of their claims were only made available to

them on or about October 6, 2023.  They should not be expected to make an informed decision

regarding whether to elect the IRO in that brief period.  Because of this, I conclude that it is fair,

necessary, and advisable to extend the October 19, 2023, IRO Deadline by 60 days, to December

18, 2023.

10.       The BSA Settlement Trust Agreement ("Trust Agreement") permits the Trustee to

make non-material amendments to the TDP without Bankruptcy Court approval.  *See* Trust

Agreement § 2.1(c) ("Except as required by applicable law or the Trust Documents, the Trustee

need not obtain the order or approval of any court in the exercise of any power or discretion

conferred [under the Trust Agreement].").  The TDP also permits non-material amendments to

the TDP without court approval if the Trustee has the written consent of the Settlement Trust

Advisory Committee ("STAC") and the Future Claimants' Representative ("FCR").

11.       I have received the required consents from the STAC and the FCR to extend the

IRO Deadline by 60 days.  Those parties have agreed that the extension does not require court

approval.

12.       Similarly, counsel for Reorganized BSA informed me that Reorganized BSA

supports such an extension and that such an extension does not require court approval.

App.367

13.     On September 29, 2023, the Certain Insurers (as those entities have defined themselves in these bankruptcy proceedings) informed my counsel that they did not object to the proposed extension of the IRO Deadline.

14.     Out of an abundance of caution, I directed my counsel to file a motion seeking court approval of the proposed extension of the IRO Deadline.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this 1st day of October 2023 at Crested Butte, Colorado.

Hon. Barbara J. Houser (Ret.)

**Exhibit B**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC, | Case No. 20-10343 (LSS) |
| Debtors.[5] | (Jointly Administered) |
| | **Re: Docket No. _____** |

**ORDER GRANTING MOTION OF THE HONORABLE BARBARA J. HOUSER (RET.), IN HER CAPACITY AS TRUSTEE OF THE BSA SETTLEMENT TRUST, FOR <u>APPROVAL OF AMENDMENT OF TRUST DISTRIBUTION PROCEDURES</u>**

The Honorable Barbara J. Houser (Ret.) (the "Trustee"), in her capacity as trustee of the BSA Settlement Trust (the "Settlement Trust"), filed a motion (the "***Motion***") for an order approving the Trustee's proposed 60-day extension of the deadline for Direct Abuse Claimants to elect the "Independent Review Option" pursuant to the Trust Distribution Procedures ("TDP") under the *Third Modified Fifth Amended Chapter 11 Plan of Reorganization (With Technical Modifications) for Boy Scouts of America and Delaware BSA, LLC*, No. 20-10343 (LSS) (Bankr. D. Del. Sept. 6, 2022), D.I. 10296 (the "***Plan***").

Pursuant to 11 U.S.C. § 105(a), and this United States Bankruptcy Court for the District of Delaware possessing jurisdiction over the Motion pursuant to 28 U.S.C. §§ 157 and 1334, the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware dated February 29, 2012, and Article XI.C of the Plan; and this Court finding that it may enter a final order consistent with Article III of the United States Constitution; and venue in

---

[5] The Reorganized Debtors in these Chapter 11 Cases, together with the last four digits of Debtor's federal tax identification number, are as follows:  Boy Scouts of America (6300) and Delaware BSA, LLC (4311).  The Reorganized Debtors' mailing address is 1325 West Walnut Hill Lane, Irving, Texas 75038.

this District being proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this being a core

proceeding pursuant to 28 U.S.C. § 157(b); and due and proper notice of the Motion having been

provided and it appearing that no other or further notice need be provided; and having considered

the Motion and all papers related thereto heretofore filed; and the relief requested in the Motion

being warranted,

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED THAT:

1. The Motion is GRANTED.

2. Capitalized terms not otherwise defined herein shall have the meanings ascribed to
   such terms in the Motion.

3. The 60-day extension of the deadline to file Independent Review claims is approved.
   The deadline to file Independent Review claims is December 18, 2023.

4. This Court retains jurisdiction to interpret and enforce the Plan and Confirmation
   Order, this Order and other orders entered in the instant case.

DOCS_DE:245151.1 85355/001

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | Chapter 11 |
| BOY SCOUTS OF AMERICA and DELAWARE BSA, LLC, | Case No. 20-10343 (LSS) |
| Debtors.[1] | (Jointly Administered) |

### CERTIFICATE OF SERVICE

I, James E. O'Neill, hereby certify that on the 2nd day of October, 2023, I caused a copy of the following document(s) to be served on the individual(s) on the attached service list(s) in the manner indicated:

**Notice of Motion By the Honorable Barbara J. Houser (Ret.), In Her Capacity as Trustee of the BSA Settlement Trust, for Approval of Amendment of Trust Distribution Procedures**

**Motion By the Honorable Barbara J. Houser (Ret.), In Her Capacity as Trustee of the BSA Settlement Trust, for Approval of Amendment of Trust Distribution Procedures**

*/s/ James E. O'Neill*
James E. O'Neill (Bar No. 4042)

---

[1] The Debtors in these chapter 11 cases, together with the last four digits of Debtors' federal tax identification number, are as follows: Boy Scouts of America (6300) and Delaware BSA, LLC (4311).  The Debtors' mailing address is 1325 West Walnut Hill Lane, Irving, Texas 75038.

Boy Scouts of America and
Delaware BSA, LLC
2002 Service List EMAIL AND FCM
Case No. 20-10343 (LSS)
Document No. 230362.1
010 – First Class Mail
275 – Emails


(Counsel to Tort Claimants Committee)
Richard Pachulski, Esq.
Debra Grassgreen, Esq.
Alan J. Kornfeld, Esq.
James O'Neill, Esq.
Iain A.W. Nasatir, Esq.
Pachulski Stang Ziehl & Jones LLP
919 North Market Street, 17th Floor
Wilmington, DE  19801
**Email:**  rpachulski@pszjlaw.com;
dgrassgreen@pszjlaw.com;
akornfeld@pszjlaw.com;
joneill@pszjlaw.com; inasatir@pszjlaw.com

(Counsel to Honorable Barbara J. Houser
(Ret.), Trustee)
Richard Pachulski, Esq.
Debra Grassgreen, Esq.
James O'Neill, Esq.
John W. Lucas, Esq.
Pachulski Stang Ziehl & Jones LLP
919 North Market Street, 17th Floor
Wilmington, DE  19801
**Email:**  rpachulski@pszjlaw.com;
dgrassgreen@pszjlaw.com;
joneill@pszjlaw.com; jlucas@pszjlaw.com

**FIRST CLASS MAIL**
The County Commission of Fayette County
Attn:  President
P.O. Box 307
Fayetteville, WV  25840

**FIRST CLASS MAIL**
Internal Revenue Service
Centralized Insolvency Operation
P.O. Box 7346
Philadelphia, PA  19101-7346

**FIRST CLASS MAIL**
United States Dept. of Justice
950 Pennsylvania Ave, NW
Room 2242
Washington, DC  20530-0001

**FIRST CLASS MAIL**
John A. Vos
1430 Lincoln Avenue
San Rafael, CA  94901

**FIRST CLASS MAIL**
JPMorgan Chase Bank, NA
Phil Martin
10 S Dearborn Street, 37th Floor
Chicago, IL  60603

**FIRST CLASS MAIL**
William Russell Hill (#875698)
Gulf Correctional Institution
500 Ike Steele Road
Wewahitchka, FL  32465-0010

**FIRST CLASS MAIL**
(Counsel to Jane Doe)
Cindy L. Robinson, Esq.
Doug Mahoney, Esq.
Robinson Mahoney PLLC
1210 Post Road
Fairfield, CT  06824

**FIRST CLASS MAIL**
Lauren Lamendola
CRG Financial LLC
84 Herbert Avenue
Building B – Suite 202
Closter, NJ  07624

1

DOCS_DE:230362.1 85353/002

**FIRST CLASS MAIL**
(Church of Good Shepherd of Dunedin, Florida)
Reverend Whitney Burton-Smith
Church of Good Shepherd
639 Edgewater Drive
Dunedin, FL  34698

**FIRST CLASS MAIL**
(Counsel to Hartford Accident and Indemnity Company, First State Insurance Company, Twin City Fire Insurance Company, Navigators Specialty Insurance Company)
Evan T. Miller, Esq.
Bayard, P.A.
600 N. King Street, Suite 400
Wilmington, DE  19801

**EMAIL**
(Counsel to Certain Claimants)
Tad Thomas, Esq.
Louis C. Schneider, Esq.
Thomas Law Office, PLLC
9418 Norton Commons Blvd, Suite 200
Louisville, KY  40059
**Email:**  tad@thomaslawoffices.com; lou.schneider@thomaslawoffices.com

**EMAIL**
Pension Benefit Guaranty Corp
Patricia Kelly, CFO
Cassandra Burton
Craig Fessenden
Desiree M. Amador
1200 K Street NW
Washington, DC 20005
**Email:**  kelly.patricia@pbgc.gov; burton.cassandra@pbgc.gov; fessenden.craig@pbgc.gov; amador.desiree@pbgc.gov; efile@pbgc.gov

**EMAIL**
(Counsel to the Debtors)
Derek C. Abbott, Esq.
Andrew R. Remming, Esq.
Morris, Nichols, Arsht & Tunnell
1201 N. Market Street
Wilmington, DE  19899
**Email:**  dabbott@mnat.com; aremming@mnat.com

**EMAIL**
(Counsel to the Debtors)
Karim Basaria, Esq.
Sidley Austin
One South Dearborn Street
Chicago, IL  60603
**Email:**  kbasaria@sidley.com

**EMAIL**
(Counsel to Sequoia Council of Boy Scouts, Inc.)
Jan T. Perkins, Esq.
Baker Manock & Jensen, PC
5260 N Palm Ave, Suite 421
Fresno, CA  93704
**Email:**  jperkins@bakermanock.com

**EMAIL**
(Counsel to Chickasaw Council, Boy Scouts of America)
Daniel W. Van Horn, Esq.
Butler Snow LLP
P.O. Box 171443
Memphis, TN 38187-1443
**Email:**  danny.vanhorn@butlersnow.com

**EMAIL**
(Counsel to Chickasaw Council, Boy Scouts of America)
Jason P. Hood, Esq.
Davies Hood PLLC
22 N. Front Street, Suite 620
Memphis, TN  38103-2100
**Email:**  jason.hood@davieshood.com

2

**EMAIL**
(Counsel to Old Republic Insurance
Company)
Margaret M. Anderson, Esq.
Fox Swibel Levin & Carroll LLP
200 W Madison Street, Suite 3000
Chicago, IL  60606
**Email:**  panderson@foxswibel.com

**EMAIL**
(Counsel to Certain Claimants,
Joseph Kaminski and Other Claimants,
Claimant J.M.; Certain Claimants S. H. (SA
Claim No. 21108), R. W. (SA Claim No
70996), R. B. (SA Claim No 24629))
Raeann Warner, Esq.
Thomas Crumplar, Esq.
Jacobs & Crumplar, P.A.
750 Shipyard Drive, Suite 200
Wilmington, DE  19801
**Email:**  raeann@jcdelaw.com;
tom@jcdelaw.com

**EMAIL**
(Counsel to Certain Claimants,
Joseph Kaminski and Other Claimants,
Claimant J.M.; Certain Claimants S. H. (SA
Claim No. 21108), R. W. (SA Claim No
70996), R. B. (SA Claim No 24629))
Thomas S. Neuberger, Esq.
Stephen J. Neuberger, Esq.
The Neuberger Firm
17 Harlech Drive
Wilmington, DE  19807
**Email:**  tsn@neubergerlaw.com
sjn@neubergerlaw.com

**EMAIL**
(Counsel to JPMorgan Chase Bank, NA)
Nora Crawford, Esq.
Norton Rose Fulbright US LLP
1301 Avenue of the Americas
New York, NY  10019-6022
**Email:**
nora.crawford@nortonrosefulbright.com

**EMAIL**
(Counsel to The Church of Jesus Christ of
Latter-day Saints)
Jeffrey E Bjork, Esq.
Kimberly A Posin, Esq.
Nicholas J Messana, Esq.
Latham & Watkins LLP
355 S Grand Ave, Suite 100
Los Angeles, CA  90071-1560
**Email:**  jeff.bjork@lw.com;
kim.posin@lw.com;
nicholas.messana@lw.com

**EMAIL**
(Counsel to The Church of Jesus Christ of
Latter-day Saints)
Adam J Goldberg, Esq.
Latham & Watkins LLP
1271 Avenue of the Americas
New York, NY  10020-1401
**Email:**  adam.goldberg@lw.com

**EMAIL**
(Counsel to Houston Liens, Montgomery
County, Harris County, Orange County,
Cleveland ISD, Fort Bend County)
John P. Dillman, Esq.
Linebarger Goggan Blair & Sampson, LLP
P.O. Box 3064
Houston, TX  77253-3064
**Email:**
houston_bankruptcy@publicans.com

**EMAIL**
(Counsel to Dallas County)
Elizabeth Weller, Esq.
Linebarger Goggan Blair & Sampson, LLP
2777 N. Stemmons Freeway, Suite 1000
Dallas, TX  75207
**Email:**  dallas.bankruptcy@publicans.com

**EMAIL**
(Counsel to Sun Life Assurance Company of Canada)
Paul W Carey, Esq.
Mirick, O'Connell, DeMallie & Lougee, LLP
100 Front Street
Worcester, MA 01608
**Email:**  pcarey@mirickoconnell.com

**EMAIL**
(Counsel to JPMorgan Chase Bank, NA)
Kristian Gluck, Esq.
Ryan Manns, Esq.
Norton Rose Fulbright US LLP
2200 Ross Ave, Suite 3600
Dallas, TX  75201-7932
**Email:**
kristian.gluck@nortonrosefulbright.com;
ryan.manns@nortonrosefulbright.com

**EMAIL**
Office of the U.S. Trustee
Timothy J. Fox, Jr., Esq.
Hannah Mufson McCollum, Esq.
844 King Street, Suite 2207
Lockbox 35
Wilmington, DE  19801
**Email:**  timothy.fox@usdoj.gov;
hannah.mccollum@usdoj.gov

**EMAIL**
(Counsel to National Surety Corporation and Allianz Global Risks US Insurance Company)
David M. Fournier, Esq.
Marcy J. McLaughlin Smith, Esq.
Troutman Pepper Hamilton Sanders LLP
1313 Market Street, Suite 5100
P.O. Box 1709
Wilmington, DE  19899-1709
**Email:**  david.fournier@troutman.com;
marcy.smith@troutman.com

**EMAIL**
(Counsel to The Church of Jesus Christ of Latter-day Saints)
Michael Merchant, Esq.
Richards, Layton & Finger, PA
One Rodney Square
920 N King Street
Wilmington, DE  19801
**Email:**  merchant@rlf.com

**EMAIL**
Sequoia Counsel of Boy Scouts, Inc.
Daphne Ferguson
Tim Thomton
6005 N Tamera Ave
Fresno, CA 93711
**Email:**  daphne.ferguson@scouting.org;
tim.thomton@scouting.org

**EMAIL**
Synchrony Bank
c/o PRA Receivables Management, LLC
Valerie Smith
PO Box 41021
Norfolk, VA 23541
**Email:**  claims@recoverycorp.com

**EMAIL**
(Counsel to The County Commission Of Fayette County)
John Stump, Esq.
Steptoe & Johnson PLLC
Chase Tower - Eighth Floor
707 Virginia Street E.
Charleston, WV  25301
**Email:**  john.stump@steptoe-johnson.com

**EMAIL**

(Counsel to Allianz Global Risks US
Insurance Company; National Surety
Corporation; and Interstate Fire & Casualty
Company)
Harris B. Winsberg, Esq.
Parker, Hudson, Ranier & Dobbs, LLP
303 Peachtree Street NE, Suite 3600
Atlanta, GA  30308
**Email:**  hwinsberg@phrd.com

**EMAIL**

US Attorney for Delaware
David C. Weiss, Esq.
Hercules Building
1313 N. Market Street, Suite 400
Wilmington, DE  19801
**Email:**  usade.ecfbankruptcy@usdoj.gov

**EMAIL**

(Counsel to Ad Hoc Committee of Local
Councils of the Boy Scouts of America)
Richard Mason, Esq.
Douglas Mayer, Esq.
Joseph C. Celentino, Esq.
Wachtell, Lipton, Rosen & Katz
51 W 52nd Street
New York, NY  10019
**Email:**  rgmason@wlrk.com;
dkmayer@wlrk.com;
jccelentino@wlrk.com

**EMAIL**

(Counsel to Sequoia Council of Boy Scouts,
Inc.)
Riley C. Walter, Esq.
Wanger Jones Helsley, PC.
265 E River Park Circle, Suite 310
Fresno, CA  93720
**Email:**  rwalter@wjhattorneys.com

**EMAIL**

(Counsel to JPMorgan Chase Bank, NA)
Matthew Ward, Esq.
Morgan Patterson, Esq.
Womble Bond Dickinson (US) LLP
1313 N Market Street, Suite 1200
Wilmington, DE  19801
**Email:**  matthew.ward@wbd-us.com;
morgan.patterson@wbd-us.com

**EMAIL**

James L. Patton, Jr., Esq.
Robert Brady, Esq.
Edwin Harron, Esq.
Young Conaway Stargatt & Taylor
Rodney Square
1000 N King Street
Wilmington, DE  19801
**Email:**  jpatton@ycst.com;
rbrady@ycst.com;
eharron@ycst.com

**EMAIL**

(Counsel to Boy Scouts of America San
Diego – Imperial Council; Three Harbors
Council Inc. Boy Scouts of America)
Victor Vilaplana, Esq.
Foley & Lardner LLP
3579 Valley Centre Drive, Suite 300
San Diego, CA  92130
**Email:**  vavilaplana@foley.com

**EMAIL**

Steven A. Ginther, Esq.
Missouri Department of Revenue
Bankruptcy Unit
General Counsel's Office
301 W. High Street, Room 670
PO Box 475
Jefferson, City, MO  65105-0475
**Email:**  deecf@dor.mo.gov

DOCS_DE:230362.1 85353/002

**EMAIL**
(Counsel to Chief Seattle Council, Boy
Scouts of America)
Bruce W. Leaverton, Esq.
Karr Tuttle Campbell, P.S.
701 Fifth Avenue, Suite 3300
Seattle, WA  98104
**Email:**  bleaverton@karrtuttle.com

**EMAIL**
(Counsel to Marco Romero, Jr. and Audrey
Romero; The Roman Catholic Diocese of
Brooklyn, New York and The Roman
Catholic Archbishop of Los Angeles;
Roman Catholic Diocese of Dallas, a Texas
nonprofit corporation, and its related BSA-
chartered organizations; Archdiocese of
Galveston-Houston, a corporation sole)
Patrick A. Jackson, Esq.
Faegre Drinker Biddle & Reath LLP
222 Delaware Avenue, Suite 1410
Wilmington, DE  19801-1621
**Email:**  patrick.jackson@faegredrinker.com

**EMAIL**
Deb Secrest
Commonwealth of Pennsylvania
Department of Labor and Industry
Collections Support Unit
651 Boas Street, Room 925
Harrisburg, PA  17121
**Email:**  ra-li-ucts-bankrupt@state.pa.us

**EMAIL**
(Counsel to Pearson Education, Inc.; NCS
Pearson, Inc.)
Jeffrey R. Waxman, Esq.
Eric J. Monzo, Esq.
Morris James LLP
500 Delaware Ave, Suite 1500
Wilmington, DE  19801
Email:  jwaxman@morrisjames.com;
emonzo@morrisjames.com

**EMAIL**
(Counsel to Pearson Education, Inc.;
NCS Pearson, Inc.)
Angela Z. Miller, Esq.
Phillips Lytle LLP
One Canalside
125 Main Street
Buffalo, NY  14203
**Email:**  amiller@phillipslytle.com

**EMAIL**
(Counsel to Waste Management; and
Coalition of Abused Scouts for Justice)
Rachel B. Mersky, Esq.
Monzack Mersky Browder and Hochman,
P.A
1201 N. Orange Street, Suite 400
Wilmington, DE  19801
**Email:**  rmersky@monlaw.com

**EMAIL**
(Counsel for Hartford Accident and
Indemnity Company, First State Insurance
Company, Twin City Fire Insurance
Company, and Navigators Specialty
Insurance Company)
James P. Ruggeri, Esq.
Joshua D. Weinberg, Esq.
Annette P. Rolain, Esq.
Sara K. Hunkler, Esq.
Ruggeri Parks Weinberg LLP
1875 K Street NW, Suite 600
Washington, DC  20006
**Email:** jruggeri@ruggerilaw.com
jweinberg@ruggerilaw.com
arolain@ruggerilaw.com
shunkler@ruggerilaw.com

**EMAIL**
(Counsel to The County of Anderson Texas;
The County of Denton, Texas; Harrison
Central Appraisal District; The County of
Harrison, Texas; The County of Henderson,
Texas; Midland Central Appraisal District;
The County of Milam, Texas; Terry County
Appraisal District; The County of
Williamson, Texas)
Julie Parsons, Esq.
McCreary, Veselka, Bragg & Allen, P.C.
PO Box 1269
Round Rock, TX  78680
**Email:**  julie.parsons@mvbalaw.com

**EMAIL**
(Counsel to National Union Fire Insurance
Company of Pittsburgh, PA; Lexington
Insurance Company; Landmark Insurance
Company; The Insurance Company of the
State of Pennsylvania)
Deirdre M. Richards, Esq.
Fineman Krekstein & Harris P.C.
1300 N. King Street
Wilmington, DE  19801
**Email:**  drichards@finemanlawfirm.com

**EMAIL**
(Counsel to National Union Fire Insurance
Company of Pittsburgh, PA; Lexington
Insurance Company; Landmark Insurance
Company; The Insurance Company of the
State of Pennsylvania)
Susan N.K. Gummow, Esq.
Foran Glennon Palandech Ponzi & Rudloff,
P.C.
222 N. LaSalle Street, Suite 1400
Chicago, IL  60614
**Email:**  sgummow@fgppr.com

**EMAIL**
(Counsel to East Carolina Council BSA,
Inc.)
Paul A. Fanning, Esq.
Ward and Smith, P.A.
PO Box 8088
Greenville, NC  27835-8088
**Email:**  paf@wardandsmith.com

**EMAIL**
(Counsel to Jack Doe, creditor and
defendant)
Bradley L. Rice, Esq.
Nagel and Rice LLP
103 Eisenhower Parkway
Roseland, NJ  07068
**Email:**  brice@nagelrice.com

**EMAIL**
(Counsel to Jane Doe)
Mark L. Desgrosseilliers, Esq.
Chipman, Brown, Cicero & Cole, LLP
Hercules Plaza
1313 North Market Street, Suite 5400
Wilmington, DE  19801
**Email:**  desgross@chipmanbrown.com

**EMAIL**
(Counsel to the Official Committee of
Unsecured Creditors)
Thomas Moers Mayer, Esq.
Rachael Ringer, Esq.
David E. Blabey, Jr., Esq.
Jennifer R. Sharret, Esq.
Megan M. Wasson, Esq.
Kramer Levin Naftalis & Frankel LLP
1177 Avenue of the Americas
New York, NY  10036
**Email:**  tmayer@kramerlevin.com;
rringer@kramerlevin.com;
dblabey@kramerlevin.com;
jsharret@kramerlevin.com;
mwasson@kramerlevin.com

DOCS_DE:230362.1 85353/002

**EMAIL**
(Counsel to the Official Committee of
Unsecured Creditors)
Kurt F. Gwynne, Esq.
Mark W. Eckard, Esq.
Reed Smith LLP
1201 N. Market Street, Suite 1500
Wilmington, DE  19801
**Email:**  kgwynne@reedsmith.com;
meckard@reedsmith.com

**EMAIL**
(Counsel to R.L. and C.L., his wife
(Plaintiffs in State Court action pending in
the Superior Court of New Jersey, Essex
County, Docket No. ESX-L-63-20))
Joseph H. Lemkin, Esq.
Stark & Stark, P.C.
PO Box 5315
Princeton, NJ  08543
**Email:**  jlemkin@stark-stark.com

**EMAIL**
(Counsel to Claimant, J.M.; Certain
Claimants S. H. (SA Claim No. 21108), R.
W. (SA Claim No 70996), R. B. (SA Claim
No 24629))
Gerald D. Jowers, Jr., Esq.
Janet, Janet & Scuggs, LLC
500 Taylor Street, Suite 301
Columbia, SC  29201
**Email:**  gjowers@jjsjustice.com

**EMAIL**
(Counsel to The Roman Catholic
Archbishop of Los Angeles; Roman
Catholic Diocese of Dallas, a Texas
nonprofit corporation, and its related BSA-
chartered organizations; Archdiocese of
Galveston-Houston, a corporation sole)
Ian J. Bambrick, Esq.
Jaclyn C. Marasco, Esq.
Faegre Drinker Biddle & Reath LLP
222 Delaware Ave., Suite 1410
Wilmington, DE  19801-1621
**Email:**  ian.bambrick@faegredrinker.com;
jaclyn.marasco@faegredrinker.com

**EMAIL**
(Counsel to The Roman Catholic Diocese of
Brooklyn, New York and The Roman
Catholic Archbishop of Los Angeles;
Roman Catholic Diocese of Dallas, a Texas
nonprofit corporation, and its related BSA-
chartered organizations; Archdiocese of
Galveston-Houston, a corporation sole)
Michael P. Pompeo, Esq.
Faegre Drinker Biddle & Reath LLP
1177 Avenue of the Americas, 41st Floor
New York, NY  10036-2714
**Email:**
michael.pompeo@faegredrinker.com

**EMAIL**
(Counsel to Jane Doe)
Mark L. Desgrosseilliers, Esq.
Chipman, Brown, Cicero & Cole, LLP
Hercules Plaza
1313 North Market Street, Suite 5400
Wilmington, DE  19801
**Email:**  desgross@chipmanbrown.com

**EMAIL**
(Counsel to Various Tort Claimants)
David M. Klauder, Esq.
Bielli & Klauder, LLC
1204 N. King Street
Wilmington, DE  19801
**Email:** dklauder@bk-legal.com

DOCS_DE:230362.1 85353/002

App.380

**EMAIL**
(Counsel to Various Tort Claimants)
Michael T. Pfau, Esq.
Jason P. Amala, Esq.
Vincent T. Nappo, Esq.
Pfau Cochran Vertetis Amala PLLC
403 Columbia Street, Suite 500
Seattle, WA  98104
**Email:**  michael@pcvalaw.com;
jason@pcvalaw.com;
vnappo@pcvalaw.com

**EMAIL**
(Counsel to IRC Burnsville Crossing, L.L.C.
and The Episcopal Church)
Karen C. Bifferato, Esq.
Jeffrey C. Wisler, Esq.
Connolly Gallagher LLP
1201 N. Market Street, 20th Floor
Wilmington, DE  19801
**Email:**  kbifferato@connollygallagher.com;
jwisler@connollygallagher.com

**EMAIL**
(Counsel to AmTrust North America, Inc.
on behalf of Wesco Insurance Company)
Alan C. Hochheiser, Esq.
Maurice Wutscher, LLP
23611 Chagrin Blvd., Suite 207
Beachwood, OH  44122
**Email:**  ahochheiser@mauricewutscher.com

**EMAIL**
(Counsel to current or future personal injury
claimants represented by the law firm of Andrews &
Thornton)
Anthony M. Saccullo, Esq.
Mary E. Augustine, Esq.
A.M. Saccullo Legal, LLC
27 Crimson King Drive
Bear, DE  19701
**Email:**  ams@saccullolegal.com;
meg@saccullolegal.com

**EMAIL**
(Counsel to current or future personal injury
claimants represented by the law firm of Andrews &
Thornton)
Anne Andrews, Esq.
John C. Thornton, Esq.
Andrews & Thornton
4701 Von Karman Avenue, Suite 300
Newport Beach, CA  92660
**Email:**  aa@andrewsthornton.com;
jct@andrewsthornton.com

**EMAIL**
(Counsel to Allianz Global Risks US
Insurance Company)
Ryan S. Smethurst, Esq.
Margaret H. Warner, Esq.
McDermott Will & Emery LLP
The McDermott Building
500 North Capitol Street, NW
Washington, DC  20001-1531
**Email:**  rsmethurst@mwe.com;
mwarner@mwe.com

**EMAIL**
(Counsel to Oracle America, Inc.)
Shawn M. Christianson, Esq.
Buchalter, A Professional Corporation
425 Market Street, Suite 2900
San Francisco, CA  94105
**Email:**  schristianson@buchalter.com

**EMAIL**
(Counsel to Robert Hernandez Hunter)
David A. Lebowitz, Esq.
Kaufman Lieb Lebowitz & Frick LLP
10 East 40th Street, Suite 3307
New York, NY  10016
**Email:** dlebowitz@kllf-law.com

DOCS_DE:230362.1 85353/002

**EMAIL**
(Counsel to Century Indemnity Company, as
successor to CCI Insurance Company, as
successor to Insurance Company of North
America and Indemnity, et al., Chubb Group
Holdings Inc.)
Stamatios Stamoulis, Esq.
Richard C. Weinblatt, Esq.
Stamoulis & Weinblatt LLC
800 N. West Street, Suite 800
Wilmington, DE  19801
**Email:**  stamoulis@swdelaw.com
weinblatt@swdelaw.com

**EMAIL**
(Counsel to Century Indemnity Company, as
successor to CCI Insurance Company, as
successor to Insurance Company of North
America and Indemnity, et al)
Tancred Schiavnoi, Esq.
Janine Panchok-Berry, Esq.
O'Melveny & Myers LLP
Times Square Tower
7 Times Square
New York, NY  10036-6537
**Email:** tschiavoni@omm.com; jpanchok-
berry@omm.com

**EMAIL**
(Counsel to Arrowood Indemnity Company)
Michael J. Joyce, Esq.
The Law Offices of Joyce, LLC
1225 King St., Suite 800
Wilmington, DE  19801
**Email:** mjoyce@mjlawoffices.com

**EMAIL**
(Counsel to Arrowood Indemnity Company)
Britton C. Lewis, Esq.
Carruthers & Roth, P.A.
235 N. Edgeworth St.
Greensboro, NC  27401
**Email:** bcl@crlaw.com

**EMAIL**
(Counsel to Arrowood Indemnity Company)
Kevin Coughlin, Esq.
Lorraine Armenti, Esq.
Michael Hrinewski, Esq.
Coughlin Duffy, LLP
350 Mount Kemble Ave.
Morristown, NJ  07960
**Email:**  kcoughlin@coughlinduffy.com;
larmenti@coughlinduffy.com;
mhrinewski@coughlinduffy.com

**EMAIL**
(Counsel to Baltimore Area Council Boy
Scouts of America, Inc.)
Todd M. Brooks, Esq.
Whiteford Taylor & Preston LLP
Seven Saint Paul Street, 15th Floor
Baltimore, MD  21202-1626
**Email:** tbrooks@wtplaw.com

**EMAIL**
(Counsel to Baltimore Area Council Boy
Scouts of America, Inc.)
Richard W. Riley, Esq.
Whiteford Taylor & Preston LLP
The Renaissance Centre
405 North King Street, Suite 500
Wilmington, DE  19801
**Email:** rriley@wtplaw.com

**EMAIL**
(Counsel to Texas Workforce Commission)
Texas Attorney General's Office
Bankruptcy & Collections Division
Christopher S. Murphy, Assistant AG
c/o Sherri K. Simpson, Paralegal
P.O. Box 12548
Austin, TX  78711-2548
**Email:**  christopher.murphy@oag.texas.gov;
sherri.simpson@oag.texas.gov

**EMAIL**
(Counsel to Liberty Mutual Insurance
Company)
R. Karl Hill, Esq.
Seitz, Van Ogtrop & Green, P.A.
222 Delaware Avenue, Suite 1500
Wilmington, DE  19801
**Email:**  khill@svglaw.com

**EMAIL**
(Counsel to Liberty Mutual Insurance
Company)
Douglas R Gooding, Esq.
Jonathan D. Marshall, Esq.
Choate, Hall & Stewart LLP
Two International Place
Boston, MA 02110
**Email:**  dgooding@choate.com;
jmarshall@choate.com

**EMAIL**
(Counsel to Liberty Mutual Insurance
Company)
Kim V. Marrkand, Esq.
Nancy D. Adams, Esq.
Laura Bange Stephens, Esq.
Mintz, Levin, Corn, Ferris, Glovsky and
Popeo, P.C.
One Financial Center
Boston, MA 02111
**Email:**  kmarrkand@mintz.com;
ndadams@mintz.com;
lbstephens@mintz.com

**EMAIL**
(Counsel to Ventura County Council of Boy
Scouts of America)
William E. Winfield, Esq.
Nelson Comis Kettle & Kinney LLP
300 E. Esplanade Drive, Suite 1170
Oxnard, CA  93036
**Email:**  wwinfield@calattys.com

**EMAIL**
(Counsel to Courtney and Stephen Knight, Jointly as the Surviving
Parents of E.J.K., a Minor Child, and Stephen Knight as the
Personal Representative of the Estate of E.J.K.; Margaret
Henderson, Personal Representative of the Estate of N.G.H.)
Richard A. Barkasy, Esq.
Schnader Harrison Segal & Lewis LLP
824 N. Market Street, Suite 800
Wilmington, DE  19801-4939
Email:  rbarkasy@schnader.com

**EMAIL**
(Counsel to Chickasaw Council, Boy Scouts
of America, Inc.)
Henry C. Shelton, III, Esq.
Adams and Reese LLP
6075 Poplar Avenue, Suite 700
Memphis, TN  38119
**Email:**  henry.shelton@arlaw.com

**EMAIL**
(Counsel to Nichole Erickson and Mason
Gordon, a minor by his mother Nichole
Erickson; and Betti & Associates Claimants)
James Tobia, Esq.
The Law Office of James Tobia, LLC
1716 Wawaset Street
Wilmington, DE  19806
**Email:**  jtobia@tobialaw.com

**EMAIL**
(Counsel to Great American Assurance Company, f/k/a
Agricultural Insurance Company; Great American E&S
Insurance Company, f/k/a Agricultural Excess and Surplus
Insurance Company; and Great American E&S Insurance
Company)
Bruce W. McCullough, Esq.
Bodell Bové, LLC
1225 N. King Street, Suite 1000
Wilmington, DE  19801
**Email:**  bmccullough@bodellbove.com

11

**EMAIL**
(Counsel to Jorge Vega and to Various
Abuse Victims)
Domenic E. Pacitti, Esq.
Klehr Harrison Harvey Branzburg LLP
919 Market Street, Suite 1000
Wilmington, DE  19801
**Email:**  dpacitti@klehr.com

**EMAIL**
(Counsel to Various Abuse Victims)
Morton R. Branzburg, Esq.
Klehr Harrison Harvey Branzburg LLP
1835 Market Street, Suite 1400
Philadelphia, PA  19103
**Email:**  mbranzburg@klehr.com

**EMAIL**
(Counsel to Various Abuse Victims)
Stephen Crew, Esq.
Peter Janci, Esq.
Crew Janci LLP
1200 NW Naito Parkway, Suite 500
Portland, OR  97209
**Email:**  steve@crewjanci.com;
peter@crewjanci.com

**EMAIL**
(Counsel to Eric Pai, as Administrator of the
Estate of J. Pai)
William D. Sullivan, Esq.
Sullivan Hazeltine Allinson LLC
919 N. Market Street, Suite 420
Wilmington, DE  19801
**Email:**  bsullivan@sha-llc.com

**EMAIL**
(Counsel to Collin County Tax
Assessor/Collector)
Larry R. Boyd, Esq.
Chad Timmons, Esq.
Emily M. Hahn, Esq.
Abernathy, Roeder, Boyd & Hullett, P.C.
1700 Redbud Blvd, Suite 300
McKinney, TX  75069
**Email:**  lboyd@abernathy-law.com;
ctimmons@abernathy-law.com;
ehahn@abernathy-law.com;
bankruptcy@abernathy-law.com

**EMAIL**
(Counsel to Buffalo Trail Council, Inc.)
Michael G. Kelly, Esq.
Kelly, Morgan, Dennis, Corzine & Hansen,
P.C.
PO Box 1311
Odessa, TX  79760-1311
**Email:**  mkelly@kmdfirm.com

**EMAIL**
(Counsel to Maricopa County Treasurer)
Peter Muthig, Esq.
Maricopa County Attorney's Office
Civil Services Division
225 W. Madison Street
Phoenix, AZ  85003
**Email:**  muthigk@mcao.maricopa.gov

**EMAIL**
(Counsel to Oracle America, Inc.)
Amish R. Doshi, Esq.
Doshi Legal Group, P.C.
1979 Marcus Avenue, Suite 210E
Lake Success, NY  11042
**Email:**  amish@doshilegal.com

12

App.384

**EMAIL**
(Special Insurance Counsel to the Future
Claimants' Representative)
Kami Quinn, Esq.
Emily Grim, Esq.
Meredith Neely, Esq.
Rachel Jennings, Esq.
Kyle Dechant, Esq.
Gilbert LLP
700 Pennsylvania Avenue, SE, Suite 400
Washington, DC  20003
**Email:**  quinnk@gilbertlegal.com;
grime@gilbertlegal.com;
neelym@gilbertlegal.com;
jenningsr@gilbertlegal.com;
dechantk@gilbertlegal.com

**EMAIL**
(Counsel to Ector CAD)
Don Stecker, Esq.
Linebarger Goggan Blair & Sampson, LLP
112 E. Pecan Street, Suite 2200
San Antonio, TX  78205
**Email:**
sanantonio.bankruptcy@publicans.com

**EMAIL**
(Counsel to Trennie L. Williams and
Kiwayna H. Williams)
Flordia M. Henderson, Esq.
PO Box 30604
Memphis, TN  38130-0604
**Email:**  flordia@fhendersonlaw.net

**EMAIL**
(Counsel to the TN Dept of Labor – Bureau
of Unemployment Insurance)
Laura L. McCloud, Esq.
c/o TN Attorney General's Office,
Bankruptcy Division
PO Box 20207
Nashville, TN  37202-0207
**Email:**  agbankdelaware@ag.tn.gov

**EMAIL**
(Counsel to Coalition of Abused Scouts for
Justice)
David J. Molton, Esq.
Brown Rudnick LLP
Seven Times Square
New York, NY  10036
**Email:**  dmolton@brownrudnick.com

**EMAIL**
(Counsel to Coalition of Abused Scouts for
Justice)
Sunni P. Beville, Esq.
Tristan G. Axelrod, Esq.
Brown Rudnick LLP
One Financial Center
Boston, MA  02111
**Email:**  sbeville@brownrudnick.com;
taxelrod@brownrudnick.com

**EMAIL**
(Counsel to Stryker Medical)
Danielle Mason Anderson, Esq.
Miller, Canfield, Paddock and Stone, P.L.C.
277 S. Rose Street, Suite 5000
Kalamazoo, MI  49007
**Email:**  andersond@millercanfield.com

**EMAIL**
(Counsel for The Waite and Genevieve
Phillips Foundation)
Jason C. Powell, Esq.
Thomas Reichert, Esq.
The Powell Firm, LLC
1201 N. Orange Street, Suite 500
Wilmington, DE  19801
**Email:**  jpowell@delawarefirm.com;
treichert@delawarefirm.com

**EMAIL**
(Counsel to Certain Sexual Abuse Survivor
Claimants)
Stephen W. Spence, Esq.
Baird Mandalas Brockstedt, LLC
1413 Savannah Road, Suite 1
Lewes, DE  19958
**Email:**  sws@bmbde.com

**EMAIL**
(Counsel to American Zurich Insurance
Company)
Mark D. Plevin, Esq.
Crowell & Moring LLP
Three Embarcadero Center, 26th Floor
San Francisco, CA  94111
**Email:**  mplevin@crowell.com

**EMAIL**
(Counsel to American Zurich Insurance
Company)
Tacie H. Yoon, Esq.
Crowell & Moring LLP
1001 Pennsylvania Ave., N.W.
Washington, DC  20004
**Email:**  tyoon@crowell.com

**EMAIL**
(Counsel to Certain Tort Claimants)
Leander L. James, Esq.
Craig K. Vernon, Esq.
James, Vernon & Weeks, P.A.
1626 Lincoln Way
Coeur d'Alene, ID  83815
**Email:**  ljames@jvwlaw.net;
cvernon@jvwlaw.net

**EMAIL**
(Counsel to Burleson County Tax Office; Luling ISD Tax
Office; Colorado County Tax Office; Fayette County Tax
Office; Milano ISD Tax Office; Gause ISD Tax Office)
John T. Banks, Esq.
Perdue, Brandon, Fielder, Collins & Mott,
L.L.P.
3301 Northland Drive, Suite 505
Austin, TX  78731
**Email:**  jbanks@pbfcm.com

**EMAIL**
(Counsel to Claimant J.M.)
Katherine Barksdale, Esq.
Napoli Shkolnik LLC
919 Market Street, Suite 1801
Wilmington, DE  19801
**Email:**  kbarksdale@napolilaw.com

**EMAIL**
(Counsel to Andrew Van Arsdale and
Timothy Kosnoff)
David E. Wilks, Esq.
Wilks Law, LLC
4250 Lancaster Pike, Suite 200
Wilmington, DE 19805
**Email:**  dwilks@wilks.law

**EMAIL**
(Counsel to Jorge Vega)
Paul Mones, Esq.
Paul Mones PC
13101 Washington Blvd.
Los Angeles, CA 90066
**Email:**  paul@paulmones.com

**EMAIL**
(Fee Examiner)
Justin Rucki
Rucki Fee Review, LLC
1111 Windon Drive
Wilmington, DE  19803
**Email:**  justinrucki@ruckifeereview.com

**EMAIL**
(Counsel to Boy Scouts of America, Hawaii
and Guam Chapter (Aloha Council))
Jerrold K. Guben, Esq.
O'Connor Playdon Guben & Inouye LLP
Makai Tower, 24th Floor
733 Bishop Street
Honolulu, HI  96813
**Email:**  jkg@opgilaw.com

**EMAIL**
(Counsel to Bay-Lakes Council)
Erin A. West, Esq.
Godfrey & Kahn, S.C.
One East Main Street, Suite 500
P.O. Box 2719
Madison, WI 53701-2719
**Email:** ewest@gklaw.com

**EMAIL**
(Counsel to Bay-Lakes Council)
Timothy F. Nixon, Esq.
Godfrey & Kahn, S.C.
200 South Washington Street, Suite 100
Green Bay, WI 54301-4298
Email: tnixon@gklaw.com

**EMAIL**
(Counsel to the Debtors)
Jessica C.K. Boelter, Esq.
White & Case LLP
1221 Avenue of the Americas
New York, NY 10020-1095
**Email:** jessica.boelter@whitecase.com

**EMAIL**
(Counsel to the Debtors)
Michael C. Andolina, Eq.
Matthew E. Linder, Esq.
White & Case LLP
111 South Wacker Drive
Suite 5100
Chicago, IL 60606-4302
**Email:** mandolina@whitecase.com;
mlinder@whitecase.com

**EMAIL**
(Counsel to the Debtors)
Derek C. Abbott, Esq.
Andrew R. Remming, Esq.
Morris Nichols Arsht & Tunnell LLP
1201 North Market Street, 16th Floor
Wilmington, Delaware 19801
**Email:** dabbott@mnat.com;
aremming@mnat.com

**EMAIL**
(Counsel to Old Republic Insurance
Company)
Stephen M. Miller, Esq.
Carl N. Kunz, III, Esq.
Brya M. Keilson, Esq.
Morris James LLP
500 Delaware Ave, Suite 1500
Wilmington, DE  19801
**Email:** smiller@morrisjames.com;
ckunz@morrisjames.com;
bkeilson@morrisjames.com

**EMAIL**
(Counsel to various child sexual abuse tort
claimants)
Daniel R. Lapinski, Esq.
Motley Rice LLC
Woodland Falls Corporate Park
210 Lake Drive East, Suite 101
Cherry Hill, NJ  08002
**Email**: dlapinski@motleyrice.com

**EMAIL**
(Counsel to various child sexual abuse tort
claimants)
Joseph F. Rice, Esq.
Motley Rice LLC
28 Bridgeside Blvd.
Mount Pleasant, SC  29464
**Email:** jrice@motleyrice.com

**EMAIL**
(Counsel to various child sexual abuse tort
claimants)
Kevin D. Swenson, Esq.
Swenson & Shelly, PLLC
107 South 1470 East, Suite 201
St. George, UT  84790
**Email:** kevin@swensonshelley.com

**EMAIL**

(Counsel to Florida Conference of the United Methodist Church; Various Churches in the Conference that are Chartered Organizations; United Methodist Ad Hoc Committee)

Edwin G. Rice, Esq.

Bradley Arant Boult Cummings LLP

100 N. Tampa St, Suite 2200

Tampa, FL  33602

**Email:**  erice@bradley.com

**EMAIL**

(Counsel to Florida Conference of the United Methodist Church and Various Churches in the Conference that are Chartered Organizations)

David N. Rutt, Esq.

Moore & Rutt, P.A.

The Mill

1007 North Orange Street, Suite 446

Wilmington, DE  19801

**Email:**  dnrutt@mooreandrutt.com

**EMAIL**

(Counsel to Florida Conference of the United Methodist Church and Various Churches in the Conference that are Chartered Organizations)

David N. Rutt, Esq.

Moore & Rutt, P.A.

122 N. Market St.

PO Box 554

Georgetown, DE  19947

**Email:**  dnrutt@mooreandrutt.com

**EMAIL**

(Counsel to Simon Kenton Council)

John D. McLaughlin, Jr., Esq.

Ferry Joseph, P.A.

824 North Market Street, Suite 1000

Wilmington, DE  19801

**Email:**  jmclaughlin@ferryjoseph.com

**EMAIL**

(Counsel to Simon Kenton Council)

Daniel R. Swetnam, Esq.

Ice Miller

Arena District

250 West Street

Columbus, OH  43215

**Email:**  daniel.swetnam@icemiller.com

**EMAIL**

(Counsel to Indian Waters Council)

David Barnes, Jr., Esq.

Nelson Mullins Riley & Scarborough LLP

101 Constitution Ave., NW, Suite 900

Washington, DC  20001

**Email:**  david.barnes@nelsonmullins.com

**EMAIL**

(Counsel to The Domestic and Foreign Missionary Society of the Protestant Episcopal Church in the United States of America)

Travis A. McRoberts, Esq.

Squire Patton Boggs (US) LLP

2000 McKinney Ave., Suite 1700

Dallas, TX  75201

**Email:**  travis.mcroberts@squirepb.com

**EMAIL**

(Counsel to The Domestic and Foreign Missionary Society of the Protestant Episcopal Church in the United States of America and The Episcopal Church)

Mark A. Salzberg, Esq.

Squire Patton Boggs (US) LLP

2550 M Street, NW

Washington, DC  20037

**Email:**  mark.salzberg@squirepb.com

**EMAIL**

(Counsel to Unidentified Sexual Abuse Survivor)

Joseph P. Rusnak, Esq.

Tune, Entrekin & White, P.C.

UBS Tower, Suite 1700

315 Deaderick Street

Nashville, TN  37238

**Email:**  jrusnak@tewlawfirm.com

**EMAIL**

(Counsel to Chapelwood United Methodist
Church)
Steven A. Leyh, Esq.
Hoover & Slovacek, LLP
Galleria Tower II
5051 Westheimer, Suite 1200
Houston, TX  77056
**Email:** leyh@hooverslovacek.com

**EMAIL**

(Counsel to St. Stephen's Episcopal Church)
Robert L. Rattet, Esq.
James B. Glucksman, Esq.
Davidoff Hutcher & Citron LLP
605 Third Avenue
New York, NY  10158
**Email**: rlr@dhclegal.com;
jbg@dhclegal.com

**EMAIL**

(Counsel to Various Child Sexual Abuse
Tort Claimants)
Joel M. Walker, Esq.
Nye, Stirling, Hale & Miller LLP
1145 Bower Hill Road, Suite 104
Pittsburgh, PA  15243
**Email:**  jmwalker@nshmlaw.com

**EMAIL**

(Counsel to Clarendon America Insurance
Company; Maryland Casualty Company,
Maryland American General Group, and
American General Fire & Casualty
Company)
Matthew G. Summers, Esq.
Ballard Spahr LLP
919 N. Market Street, 11th Floor
Wilmington, DE  19801-3034
**Email:** summersm@ballardspahr.com

**EMAIL**

(Counsel to Clarendon America Insurance
Company; Maryland Casualty Company,
Maryland American General Group, and
American General Fire & Casualty
Company)
Harry Lee, Esq.
John O'Connor, Esq.
Steptoe & Johnson LLP
1330 Connecticut Avenue, N.W.
Washington, DC  20036
**Email:**  hlee@steptoe.com;
joconnor@steptoe.com

**EMAIL**

(Counsel to Presbyterian Church of
Lakehurst)
Daniel E. Straffi, Jr., Esq.
Straffi & Straffi, LLC
670 Commons Way
Toms River, NJ  08755
**Email:**  bkclient@straffilaw.com

**EMAIL**

(Counsel to The Episcopal Diocese of San
Diego)
James P. Hill, Esq.
Sullivan Hill Rez & Engel, PLC
600 B Street, Suite 1700
San Diego, CA  92101
Email:  hill@sullivanhill.com

**EMAIL**

(Counsel to Catholic Mutual Relief Society
of America; and Roman Catholic Ad Hoc
Committee)
Jeremy W. Ryan, Esq.
Potter Anderson & Corroon LLP
1313 N. Market Street, 6th Floor
Wilmington, DE  19801-6108
**Email:**  jryan@potteranderson.com

**EMAIL**
(Counsel to Eisenbeng, Rothweiler,
Winkler, Eisenberg & Jeck, P.C.)
Daniel K. Hogan, Esq.
Garvan F. McDaniel, Esq.
Hogan McDaniel
1311 Delaware Avenue
Wilmington, DE  19806
**Email:**  dkhogan@dkhogan.com;
gfmcdaniel@dkhogan.com

**EMAIL**
(Counsel to Junell & Associates, PLLC)
John B. Thomas, Esq.
Allison Fisher, Esq.
Hicks Thomas LLP
700 Louisiana Street, Suite 2300
Houston, TX 77002
**Email:**  jthomas@hicks-thomas.com;
afisher@hicks-thomas.com

**EMAIL**
(Counsel to Junell & Associates, PLLC)
Scott D. Cousins, Esq.
Cousins Law LLC
Brandywine Plaza West
1521 W. Concord Pike, Suite 301
Wilmington, DE  19803
**Email:**  scott.cousins@cousins-law.com

**EMAIL**
(Counsel to Bailey Cowan Heckaman
PLLC)
Ian Connor Bifferato, Esq.
The Bifferato Firm, P.A.
1007 N. Orange Street, 4th Floor
Wilmington, DE  19801
**Email:**  cbifferato@tbf.legal

**EMAIL**
(Counsel to D. Miller & Associates PLLC)
Rochelle Guiton, Esq.
D. Miller & Associates, PLLC
2610 W. Sam Houston Pkwy S., Suite 200
Houston, TX  77042
Email:  rochelle@dmillerlaw.com

**EMAIL**
(Counsel to Various Child Sexual Abuse
Tort Claimants)
Aimee H. Wagstaff, Esq.
Andrus Wagstaff, PC
7171 W. Alaska Drive
Lakewood, CO  80226
**Email:**
aimee.wagstaff@andruswagstaff.com

**EMAIL**
(Counsel to Catholic Mutual Relief Society
of America and Roman Catholic Ad Hoc
Committee)
Everett Cygal, Esq.
David Spector, Esq.
Joseph Mark Fisher, Esq.
Neil Lloyd, Esq.
Daniel Schufreider, Esq.
Jin Yan, Esq.
ArentFox Schiff LLP
233 S. Wacker Drive, Suite 7100
Chicago, IL  60606
**Email:**  everett.cygal@afslaw.com;
david.spector@afslaw.com;
mark.fisher@afslaw.com;
neil.lloyd@afslaw.com;
jin.yan@afslaw.com;
daniel.schufreider@afslaw.com

**EMAIL**
(Counsel to Certain Sexual Abuse
Claimants)
Bill Kelleher, Esq.
Fournaris & Mammarella, P.A.
1925 Lovering Avenue
Wilmington, DE  19806
**Email:**  bkelleher@gfmlaw.com

**EMAIL**
(Counsel to Certain Sexual Abuse
Claimants)
Irwin Zalkin, Esq.
Devin Storey, Esq.
Kristian Roggendorf, Esq.
The Zalkin Law Firm, P.C.
10590 W. Ocean Air Drive, #125
San Diego, CA  92130
**Email:**  irwin@zalkin.com;
dms@zalkin.com; kristian@zalkin.com

**EMAIL**
(Counsel to American Zurich Insurance
Company)
Robert D. Cecil, Jr., Esq.
Tybout, Redfearn & Pell
501 Carr Road, Suite 300
PO Box 2092
Wilmington, DE 19899-2092 (Courier
19809)
**Email:**  rcecil@trplaw.com

**EMAIL**
(Counsel to Great American Assurance Company, f/k/a
Agricultural Insurance Company; Great American E&S
Insurance Company, f/k/a Agricultural Excess and Surplus
Insurance Company; and Great American E&S Insurance
Company)
Bruce D. Celebrezze, Esq.
Clyde & Co US LLP
Four Embarcadero Center, Suite 1350
San Francisco, CA  94111
**Email:**  bruce.celebrezze@clydeco.us

**EMAIL**
(Counsel to Great American Assurance Company, f/k/a
Agricultural Insurance Company; Great American E&S
Insurance Company, f/k/a Agricultural Excess and Surplus
Insurance Company; and Great American E&S Insurance
Company)
Konrad R. Krebs, Esq.
Clyde & Co US LLP
200 Campus Drive, Suite 300
Florham Park, NJ  07932
**Email:**  konrad.krebs@clydeco.us

**EMAIL**
(Counsel to Great American Assurance Company, f/k/a
Agricultural Insurance Company; Great American E&S
Insurance Company, f/k/a Agricultural Excess and Surplus
Insurance Company; and Great American E&S Insurance
Company, The Continental Insurance Company and
Columbia Casualty Company)
David Christian, Esq.
David Christian Attorneys LLC
105 W. Madison St., Suite 1400
Chicago, IL  60602
**Email:**  dchristian@dca.law

**EMAIL**
(Attorneys for The Continental Insurance
Company and Columbia Casualty Company)
Maria Aprile Sawczuk, Esq.
GOLDSTEIN & MCCLINTOCK LLLP
501 Silverside Road
Wilmington, DE 19809
**Email:**  marias@goldmclaw.com

**EMAIL**
(Attorneys for The Continental Insurance
Company and Columbia Casualty Company)
Laura McNally
Emily Stone
LOEB & LOEB LLP
321 N. Clark Street, Suite 2300
Chicago, IL 60654
**Email:**  lmcnally@loeb.com;
estone@loeb.com

**EMAIL**
(Counsel to Certain Claimants)
Sommer D. Luther, Esq.
Andrus Wagstaff, PC
7171 W. Alaska Drive
Lakewood, CO  80226
**Email:**  sluther@wagstafflawfirm.com

**EMAIL**
(Counsel to Certain Claimants)
Kimberly A. Dougherty, Esq.
Justice Law Collaborative, LLC
19 Belmont Street
South Easton, MA  02375
**Email:**  kim@justicelc.com

**EMAIL**
(Counsel to the Betti & Associates
Claimants)
Michele M. Betti, Esq.
Law Offices of Betti & Associates
30 Wall Street, 8th Floor
New York, NY  10005
**Email:**  mbettilaw@gmail.com

**EMAIL**
(Counsel to Argonaut Insurance Company
and Colony Insurance Company)
Paul Logan, Esq.
Post & Schell, P.C.
300 Delaware Avenue, Suite 1380
Wilmington, DE  19801
**Email:**  plogan@postschell.com

**EMAIL**
(Counsel to the Roman Catholic Archbishop
of San Francisco)
Iain A. Macdonald, Esq.
Macdonald | Fernandez LLP
221 Sansome Street, 3rd Floor
San Francisco, CA  94104-2323
**Email:**  imac@macfern.com

**EMAIL**
(Counsel to Indian Harbor Insurance
Company, on behalf of itself and as
successor in interest to Catlin Specialty
Insurance Company; General Star Indemnity
Company; Arch Insurance Company)
Kathleen M. Miller, Esq.
Kelly A. Green, Esq.
Smith, Katzenstein & Jenkins LLP
1000 West Street, Suite 1501
Wilmington, DE  19801
**Email:**  kmiller@skjlaw.com;
kag@skjlaw.com

**EMAIL**
(Counsel to Indian Harbor Insurance
Company, on behalf of itself and as
successor in interest to Catlin Specialty
Insurance Company)
Lloyd A. Gura, Esq.
Mound Cotton Wollan & Greengrass LLP
One New York Plaza, 44th Floor
New York, NY  10004
**Email:**  lgura@moundcotton.com

**EMAIL**
(Counsel to Indian Harbor Insurance
Company, on behalf of itself and as
successor in interest to Catlin Specialty
Insurance Company)
Pamela J. Minetto, Esq.
Mound Cotton Wollan & Greengrass LLP
30A Vreeland Road, Suite 210
Florham Park, NJ  07932
**Email:**  pminetto@moundcotton.com

**EMAIL**
(*Pro Per*)
David L. Lynch, Esq.
The Law Office of David L. Lynch, PC
72877 Dinah Shore Drive, Suite 103-126
Rancho Mirage, CA  92270
**Email:**  dlynch@desertelderlaw.com

**EMAIL**
(Counsel to Arch Insurance Company)
Matthew A. Hamermesh, Esq.
Hangley Aronchick Segal Pudlin & Schiller
One Logan Square, 27th Floor
Philadelphia, PA  19103
**Email:**  mhamermesh@hangley.com

**EMAIL**

(Counsel Munich Reinsurance America, Inc., formerly known as American Re-Insurance Company)
Thaddeus J. Weaver, Esq.
Dilworth Paxson LLP
704 King Street, Suite 500
Wilmington, DE  19899-1031
**Email:**  tweaver@dilworthlaw.com

**EMAIL**

(Counsel to the Archdiocese of New York)
Howard Seife, Esq.
Andrew Rosenblatt, Esq.
Norton Rose Fulbright US LLP
1301 Avenue of the Americas
New York, NY  10019-6022
**Email:**
howard.seife@nortonrosefulbright.com;
andrew.rosenblatt@nortonrosefulbright.com

**EMAIL**

(Counsel to Munich Reinsurance America, Inc., f/k/a American Re-Insurance Company)
William E. McGrath, Jr., Esq.
Dilworth Paxson LLP
2 Research Way
Princeton, NJ  08540
**Email:**  wmcgrath@dilworthlaw.com

**EMAIL**

(Counsel to The Norwich Roman Catholic Diocesan Corporation)
Louis T. DeLucia, Esq.
Alyson M. Fiedler, Esq.
Ice Miller LLP
1500 Broadway, Suite 2900
New York, NY  10036
**Email:**  louis.delucia@icemiller.com;
alyson.fiedler@icemiller.com

**EMAIL**

(Counsel to The Norwich Roman Catholic Diocesan Corporation and Dumas & Vaughn, LLC)
Charles J. Brown, III, Esq.
Gellert Scali Busenkell & Brown LLC
1201 N. Orange Street, 3rd Floor
Wilmington, DE  19801
**Email:**  cbrown@gsbblaw.com

**EMAIL**

(Counsel for AVA Law Group, Inc.)
Christopher P. Simon, Esq.
Kevin S. Mann, Esq.
Cross & Simon, LLC
105 N. Market Street, Suite 901
Wilmington, DE  19801
**Email:**  csimon@crosslaw.com;
kmann@crosslaw.com

**EMAIL**

(Counsel to Eric D. Green and Resolutions, LLC)
Rachael A. Rowe, Esq.
Benjamin G. Stewart, Esq.
Keating Muething & Klekamp PLL
One E. Fourth Street, Suite 1400
Cincinnati, OH  45202
**Email:**  rrowe@kmklaw.com;
bgstewart@kmklaw.com

**EMAIL**

(Counsel to Eric D. Green and Resolutions, LLC)
Steven L. Caponi, Esq.
Matthew B. Goeller, Esq.
K&L Gates LLP
600 N. King Street, Suite 901
Wilmington, DE  19801
**Email:**  steven.caponi@klgates.com;
matthew.goeller@klgates.com

**EMAIL**
(Counsel to the Official Committee of
Unsecured Creditors in Bankruptcy Case 19-
00010, Guam) Archbishop of Agana)
Adam Hiller, Esq.
Hiller Law, LLC
300 Delaware Avenue, Suite 210, #227
Wilmington, DE  19801
**Email:**  ahiller@adamhillerlaw.com

**EMAIL**
(Counsel to Verus, LLC)
Sally E. Veghte, Esq.
Klehr Harrison Harvey Branzburg LLP
919 Market St., Ste. 1000
Wilmington, DE 19801
**Email:**  sveghte@klehr.com

**EMAIL**
(Counsel to Verus, LLC)
Morton R. Branzburg, Esq.
Klehr Harrison Harvey Branzburg LLP
1835 Market Street, Suite 1400
Philadelphia, PA 19103
**Email:**  mbranzburg@klehr.com

**EMAIL**
(Counsel to Verus, LLC)
Michael A. Kaplan, Esq.
Rasmeet K. Chahil, Esq.
Lowenstein Sandler LLP
One Lowenstein Drive
Roseland, NJ 07068
**Email:**  mkaplan@lowenstein.com;
rchahil@lowenstein.com

**EMAIL**
(Counsel to Gemini Insurance Company)
Brian A. Sullivan, Esq.
Werb & Sullivan
Legal Arts Building
1225 N. King Street, Suite 600
Wilmington, DE  19801
**Email:**  bsullivan@werbsullivan.com

**EMAIL**
(Counsel to Gemini Insurance Company)
John E.W. Baay II, Esq.
Gieger Laborde & Laperouse LLC
701 Poydras Street, Suite 4800
New Orleans, LA  70139
**Email:**  jbaay@glllaw.com

**EMAIL**
(Counsel to Gemini Insurance Company)
William H. White Jr., Esq.
Kiernan Trebach LLP
1233 20th Street, NW, 8th Floor
Washington, DC  20036
**Email:**  wwhite@kiernantrebach.com

**EMAIL**
(Counsel to National Capital Area Council)
Kevin G. Collins, Esq.
Barnes & Thornburg LLP
1000 N. West Street, Suite 1500
Wilmington, DE  19801
**Email:**  kevin.collins@btlaw.com

**EMAIL**
(Counsel to National Capital Area Council)
James E. Van Horn, Esq.
1717 Pennsylvania Avenue N.W., Suite 500
Barnes & Thornburg LLP
Washington, DC  20006-4623
**Email:**  jvanhorn@btlaw.com

**EMAIL**
Suzanne Elizabeth Smith, Esq.
Porter Malouf, P.A.
PO Box 12768
Jackson, MS  39236
**Email:**  ssmith@portermalouf.com

DOCS_DE:230362.1 85353/002

**EMAIL**
(Counsel to Presbyterian Church at
Woodbury)
Gary F. Seitz, Esq.
Gellert Scali Busenkell & Brown, LLC
1201 N. Orange Street, Suite 300
Wilmington, DE  19801
**Email:**  gseitz@gsbblaw.com

**EMAIL**
(Counesl to Napoli Shkolnik, PLLC)
Paul J. Winterhalter, Esq.
Offit Kurman, P.A.
401 Plymouth Road, Suite 100
Plymouth Meeting, PA  19462
**Email:** pwinterhalter@offitkurman.com

**EMAIL**
(Counsel for Hartford Accident and
Indemnity Company, First State Insurance
Company, Twin City Fire Insurance
Company, and Navigators Specialty
Insurance Company)
Philip D. Anker, Esq.
Wilmer Cutler Pickering Hale and Dorr LLP
7 World Trade Center
250 Greenwich Street
New York, NY  10007
**Email:** Philip.Anker@wilmerhale.com

**EMAIL**
(Counsel for Hartford Accident and
Indemnity Company, First State Insurance
Company, Twin City Fire Insurance
Company, and Navigators Specialty
Insurance Company)
Joel Millar, Esq.
Wilmer Cutler Pickering Hale and Dorr LLP
1875 Pennsylvania Avenue NW
Washington, DC  20006
**Email:** Joel.Millar@wilmerhale.com

**EMAIL**
(Counsel to the Diocese of San Joaquin and
the Protestant Episcopal Bishop of San
Joaquin)
Tracy Green, Esq.
Fennemore Wendel
1111 Broadway, 24th Floor
Oakland, CA  94607-4036
**Email:** tgreen@fennemorelaw.com

**EMAIL**
(Counsel to Del-Mar-Va Council, Inc.;
Capitol Area Council)
Gregory A. Taylor, Esq.
Ashby & Geddes, P.A.
500 Delaware Avenue
P.O. Box 1150
Wilmington, DE  19899
**Email:**  GTaylor@ashbygeddes.com

**EMAIL**
(Counsel to Circle Ten Council)
Heather Lennox, Esq.
Carl E. Black, Esq.
Oliver S. Zeltner, Esq.
Jones Day
901 Lakeside Avenue
Cleveland, OH  44114
**Email:**  hlennox@jonesday.com;
ceblack@jonesday.com;
ozeltner@jonesday.com

**EMAIL**
(Counsel to Circle Ten Council)
Matthew C. Corcoran, Esq.
Jones Day
325 John H. McConnell Boulevard
Columbus, OH  43215
**Email:**  mccorcoran@jonesday.com

23

**EMAIL**
(Counsel to Circle Ten Council)
Mark W. Rasmussen, Esq.
Amanda Rush, Esq.
Jones Day
2727 N. Harwood Street
Dallas, TX  75201
**Email:** mrasmussen@jonesday.com;
asrush@jonesday.com

**EMAIL**
(Counsel to Mallard Law Firm Claimants)
Damian B. Mallard, Esq.
Mallard Perez PLLC
889 N. Washington Blvd.
Sarasota, FL  34236
**Email:** damian@mallardperez.com

**EMAIL**
(Counsel to AWKO Claimants)
Mary Elizabeth Putnick, Esq.
Putnick Legal, LLC, of Counsel to
Aylstock Witkin Kreis & Overholtz, PLLC
17 East Main Street, Suite 200
Pensacola, FL  32502
**Email:** sateam@awkolaw.com;
marybeth@putnicklegal.com

**EMAIL**
(Counsel to Parker Waichman LLP)
J. Cory Falgowski, Esq.
Burr & Forman LLP
1201 N. Market Street, Suite 1407
Wilmington, DE  19801
**Email:** jfalgowski@burr.com

**EMAIL**
(Counsel for the United Methodist Ad Hoc
Committee)
Thomas G. Macauley, Esq.
Macauley LLC
300 Delaware Avenue, Suite 1018
Wilmington, DE 19801
**Email:** tm@macdelaw.com

**EMAIL**
(Counsel to Everest National Insurance
Company)
Nader A. Amer, Esq.
CARLTON FIELDS, P.A.
700 NW 1st Avenue, Suite 1200
Miami, FL 33136
**Email:** namer@carltonfields.com

**EMAIL**
(Counsel for The Grand Lodge for Free and
Accepted Masons of the State of New York)
Bruce Weiner, Esq.
Rosenberg, Musso & Weiner, LLP
26 Court Street, Suite 2211
Brooklyn, NY  11242
**Email:** bweiner@nybankruptcy.net

**EMAIL**
(Counsel to JFHA Claimants)
James F. Humphreys, Esq.
James F. Humphreys & Associates, L.C.
112 Capitol Street, 2nd Floor
Charleston, WV  25301
**Email:** jhumphreys@jfhumphreys.com

**EMAIL**
Paul A. Rubin, Esq.
Hanh Huynh, Esq.
Rubin LLC
11 Broadway, Suite 715
New York, NY  10004
**Email:** prubin@rubinlawllc.com;
hhuynh@rubinlawllc.com

**EMAIL**
(Counsel to The Episcopal Church)
Mark A. Salzberg, Esq.
Squire Patton Boggs (US) LLP
2550 M Street, NW
Washington, DC  20037
**Email:** mark.salzberg@squirepb.com

**EMAIL**
(Counsel to National Surety Corporation)
Todd C. Jacobs, Esq.
John E. Bucheit, Esq.
Parker, Hudson, Rainer & Dobbs LLP
Two N. Riverside Plaza, Suite 1850
Chicago, IL  60606
**Email:**  tjacobs@phrd.com;
jbucheit@phrd.com

25

# EXHIBIT 13

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS

| | |
|---|---|
| THE HONORABLE BARBARA J. HOUSER (RET.), IN HER CAPACITY AS TRUSTEE OF THE BSA SETTLEMENT TRUST, <br><br> Plaintiff, <br><br> v. <br><br> ALLIANZ GLOBAL RISKS US INSURANCE COMPANY; ALLIED WORLD ASSURANCE COMPANY, LTD, *et al.* <br><br> Defendants. | Civ. Action No. 3:23-cv-01592-S <br><br> **DECLARATION OF MARIKAY FISH IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS** |

I, MariKay Fish, declare as follows:

1.      I have personal knowledge of and am competent to testify regarding the matters set forth herein.

2.      I submit this declaration in support of the defendants' Motion to Dismiss the above-captioned action filed by plaintiff the Honorable Barbara J. Houser, in her capacity as Trustee of the Settlement Trust (the "Trustee"). New Hampshire Insurance Company ("New Hampshire"), National Union Fire Insurance Company of Pittsburgh, PA ("National Union"), and American Home Assurance Company ("American Home") are among the defendants in the above-captioned case, and among the defendants moving to dismiss in part the Trustee's Complaint for lack of personal jurisdiction.

3.      I am currently the Senior Vice President at AIG. As part of my roles and responsibilities, I am familiar with the corporate structure of AIG and its subsidiaries, including New Hampshire, American Home, and National Union. I am also familiar with the place of

incorporation, headquarters, and principal place of business for New Hampshire, American Home, and National Union.

4.    New Hampshire is incorporated in Illinois. New Hampshire is headquartered in and has its principal place of business in New York.

5.    American Home (formerly known as American Home Fire Assurance Company) is incorporated in New York. American Home has its headquarters and principal place of business in New York.

6.    National Union (formerly known as National Union Fire Insurance Company of Pittsburgh, Pa. and successor in interest to Landmark Insurance Company) is incorporated in Pennsylvania. National Union is headquartered in and has its principal place of business in New York.

7.    I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: 10/4/23

MariKay Fish

2

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS

THE HONORABLE BARBARA J. HOUSER
(RET.), IN HER CAPACITY AS TRUSTEE
OF THE BSA SETTLEMENT TRUST,

                        Plaintiff,

v.

ALLIANZ GLOBAL RISKS US
INSURANCE COMPANY; ALLIED
WORLD ASSURANCE COMPANY, LTD, *et
al*.

                        Defendants.

Civ. Action No. 3:23-cv-01592-S

**DECLARATION OF NICHOLAS
SCOTT IN SUPPORT OF
DEFENDANTS' MOTION TO
DISMISS**

I, Nicholas Scott, declare as follows:

        1.      I have personal knowledge of and am competent to testify regarding the matters

set forth herein.

        2.      I submit this declaration in support of the defendants' Motion to Dismiss the

above-captioned action filed by plaintiff the Honorable Barbara J. Houser, in her capacity as

Trustee of the Settlement Trust (the "Trustee").  Consolidated National Insurance Company

("Consolidated National") is among the defendants in the above-captioned case, and among the

defendants moving to dismiss in part the Trustee's Complaint for lack of personal jurisdiction.

        3.      I am currently the Managing Director at Everspan Group ("Everspan").  As part

of my roles and responsibilities, I am familiar with the corporate structure of Everspan and its

subsidiaries, including Consolidated National.  I am also familiar with the place of incorporation,

headquarters, and principal place of business for Consolidated National.

4.      Consolidated National (formerly known as American Fidelity Company) is incorporated in Colorado.  Consolidated National is headquartered in and has its principal place of business in New York.

5.      I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.


Dated: October 5, 2023

Nicholas Scott

2

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS

| | |
|---|---|
| THE HONORABLE BARBARA J. HOUSER (RET.), IN HER CAPACITY AS TRUSTEE OF THE BSA SETTLEMENT TRUST,<br><br>                          Plaintiff,<br><br>v.<br><br>ALLIANZ GLOBAL RISKS US INSURANCE COMPANY; ALLIED WORLD ASSURANCE COMPANY, LTD, *et al.*<br><br>                          Defendants. | Civ. Action No. 3:23-cv-01592-S<br><br>**DECLARATION OF BRIAN SNOVER IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS** |

I, Brian Snover declare as follows:

1.     I have personal knowledge of and am competent to testify regarding the matters set forth herein.

2.     I submit this declaration in support of the defendants' Motion to Dismiss the above-captioned action.  Columbia Insurance Company is among the defendants in the above-captioned case, and among the defendants moving to dismiss in part the Trustee's Complaint for lack of personal jurisdiction.

3.     I am currently a director and Senior Vice President at Columbia Insurance Company.  As part of my roles and responsibilities, I am familiar with the corporate structure of Columbia Insurance Company.  I am also familiar with the place of incorporation, headquarters, and principal place of business of Columbia Insurance Company.

4.     Columbia Insurance Company is incorporated in Nebraska.  Columbia Insurance Company is headquartered in and has its principal place of business in Nebraska.

5.    I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: 10/5/2024

Brian Snover

2

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS

| | |
|---|---|
| THE HONORABLE BARBARA J. HOUSER (RET.), IN HER CAPACITY AS TRUSTEE OF THE BSA SETTLEMENT TRUST,<br><br>Plaintiff,<br><br>v.<br><br>ALLIANZ GLOBAL RISKS US INSURANCE COMPANY; ALLIED WORLD ASSURANCE COMPANY, LTD, *et al*.<br><br>Defendants. | Civ. Action No. 3:23-cv-01592-S<br>**DECLARATION OF BRIAN WOLFORD IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS** |

I, Brian Wolford, declare as follows:

1. I have personal knowledge of and am competent to testify regarding the matters set forth herein.

2. I am a Senior Manager for Allstate Insurance Company ("Allstate"). I submit this affidavit in support of the defendants' Motion to Dismiss the above-captioned action. Allstate is among the defendants in the above-captioned case, and among the defendants moving to dismiss in part the Trustee's Complaint for lack of personal jurisdiction.

3. I have been employed by Allstate for 26 years. In my capacity as a Senior Manager, I am responsible for the supervision of claims made by insureds which arise out of a variety of alleged property damage and bodily injury claims. I am also assigned to supervise the handling of the claims in this matter.

4. As part of my roles and responsibilities, I am familiar with the corporate structure of Allstate. I am also familiar with the place of incorporation, headquarters, and principal place of business of Allstate.

{80314485:1}

5.     Allstate is an insurance company organized and existing under Illinois law, with its principal place of business in Northbrook, Illinois.

6.     I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on October 4, 2023

Brian Wolford

DocuSign Envelope ID: 22AE30CE-BD4D-4374-9975-E8739FA2D3B5

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS

| | |
|---|---|
| THE HONORABLE BARBARA J. HOUSER (RET.), IN HER CAPACITY AS TRUSTEE OF THE BSA SETTLEMENT TRUST,<br><br>          Plaintiff,<br><br>v.<br><br>ALLIANZ GLOBAL RISKS US INSURANCE COMPANY; ALLIED WORLD ASSURANCE COMPANY, LTD, *et al*.<br><br>          Defendants. | Civ. Action No. 3:23-cv-01592-S<br><br>**DECLARATION OF BROOKE GREEN IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS** |

I, Brooke Green, declare as follows:

1.      I have personal knowledge of and am competent to testify regarding the matters set forth herein.

2.      I submit this declaration in support of the defendants' Motion to Dismiss the above-captioned action.  Jefferson Insurance Company ("Jefferson") is among the defendants moving to dismiss the Plaintiff's Complaint for lack of personal jurisdiction.

3.      I am currently Chief Claims Officer at Allianz Resolution Management.  In that capacity, I am familiar with the corporate structure of Jefferson.  I am also familiar with the place of incorporation, headquarters, and principal place of business of Jefferson.

4.      Jefferson is incorporated in the State of New York.  Jefferson is headquartered in and has its principal place of business in Virginia.

5.      Jefferson never insured BSA while it was headquartered in Texas, nor any BSA Local Council located in Texas.  No entity has contended otherwise.

6.    I declare under penalty of perjury under the laws of the United States of America

that the foregoing is true and correct.


Dated: 10/5/2023 | 12:12:13 PM PDT

_Brooke Green_

Brooke Green

2

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS

THE HONORABLE BARBARA J. HOUSER
(RET.), IN HER CAPACITY AS TRUSTEE
OF THE BSA SETTLEMENT TRUST,

                              Plaintiff,

v.

ALLIANZ GLOBAL RISKS US
INSURANCE COMPANY; ALLIED
WORLD ASSURANCE COMPANY, LTD, *et
al*.

                              Defendants.

Civ. Action No. 3:23-cv-01592-S

**DECLARATION OF JODI
EBERSOLE IN SUPPORT OF
DEFENDANTS' MOTION TO
DISMISS**

I, Jodi Ebersole, declare as follows:

1.      I have personal knowledge of and am competent to testify regarding the matters

set forth herein.

2.      I submit this declaration in support of the defendants' Motion to Dismiss the

above-captioned action.   The following companies (all together, the "Travelers Defendants") are

among the defendants in the above-captioned case, are listed in this Declaration as named by

Plaintiff, and are among the defendants moving to dismiss the Trustee's Complaint in part for

lack of personal jurisdiction:

        Charter Oak Fire Insurance Company;
        St. Paul Fire and Marine Insurance Company f/k/a St. Paul Insurance Company of
        Illinois;
        St. Paul Mercury Insurance Company;
        Travelers Casualty and Surety Company f/k/a Aetna Casualty and Surety Company;
        The Travelers Companies, Inc. f/k/a Travelers and Phoenix of Hartford Insurance
        Companies;
        The Phoenix Insurance Company;
        The Travelers Indemnity Company f/k/a Gulf Insurance Company;

United States Fidelity and Guaranty Company f/k/a United States Fidelity & Warranty Company; and
Travelers Insurance Company

3.      I am currently the Group General Counsel-Business Insurance at The Travelers Companies, Inc.  As part of my roles and responsibilities, I am familiar with the corporate structure of The Travelers Companies, Inc., which is the ultimate parent company of each of entities identified in paragraph 2 above, except "Travelers Insurance Company".  I am also familiar with the place of incorporation, headquarters, and principal place of business of those entities.

5.      Each of the following entities is incorporated in, headquartered in and has its principal place of business in Connecticut.  The names listed below are listed as they are named in the Complaint:

- The Charter Oak Fire Insurance Company;
- St. Paul Fire and Marine Insurance Company f/k/a St. Paul Insurance Company of Illinois;
- St. Paul Mercury Insurance Company;
- Travelers Casualty and Surety Company f/k/a Aetna Casualty and Surety Company;
- The Travelers Indemnity Company f/k/a Gulf Insurance Company;
- The Phoenix Insurance Company; and
- United States Fidelity and Guaranty Company f/k/a United States Fidelity & Warranty Company.

6.      Travelers Insurance Company is not an existing entity as named in the Complaint. On information and belief, the name of "The Travelers Insurance Company" was changed on May 1, 2006 to MetLife Insurance Company of Connecticut.  It is not currently owned or affiliated with the Travelers Defendants. According to the records of the State of Connecticut Secretary of State, it is incorporated in Connecticut.

2

7.    The Travelers Companies, Inc. is incorporated in Minnesota with its executive
offices in New York.

4.    I declare under penalty of perjury under the laws of the United States of America
that the foregoing is true and correct.

Dated: _10/5/23_

_Jodi Ebersole_
Jodi Ebersole

3

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS

| | |
|---|---|
| THE HONORABLE BARBARA J. HOUSER (RET.), IN HER CAPACITY AS TRUSTEE OF THE BSA SETTLEMENT TRUST,<br><br>　　　　　　　　Plaintiff,<br><br>v.<br><br>ALLIANZ GLOBAL RISKS US INSURANCE COMPANY; ALLIED WORLD ASSURANCE COMPANY, LTD, *et al*.<br><br>　　　　　　　　Defendants. | Civ. Action No. 3:23-cv-01592-S<br><br>**DECLARATION OF KELLY SKINNER IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS** |

I, Kelly Skinner, declare as follows:

　　　1.　　I have personal knowledge of and am competent to testify regarding the matters set forth herein.

　　　2.　　I submit this affidavit in support of the defendants' Motion to Dismiss the above-captioned action.  SPARTA Insurance Company ("SPARTA") is among the defendants in the above-captioned case, and among the defendants moving to dismiss the Trustee's Complaint for, in part, lack of personal jurisdiction.

　　　3.　　I am a Senior Claims Adjuster with A.G. Risk Management Inc.  In that capacity, I have responsibility for administering certain claims for SPARTA, as successor in interest for certain limited purposes to American Employers' Insurance Company ("AEIC").  I have responsibility for administering claims under AEIC policies, including the alleged AEIC policies of insurance named in the Complaint in this action.

4.       As part of my roles and responsibilities, I am familiar with the corporate structure of SPARTA.  I am also familiar with the place of incorporation, headquarters, and principal place of business of SPARTA.

5.       SPARTA is incorporated in Connecticut.  SPARTA is headquartered in and has its principal place of business in Connecticut.

6.       I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: __10/3/23__

_____

Kelly Skinner

2

App.413

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS

| | |
|---|---|
| THE HONORABLE BARBARA J. HOUSER (RET.), IN HER CAPACITY AS TRUSTEE OF THE BSA SETTLEMENT TRUST, <br><br> Plaintiff, <br><br> v. <br><br> ALLIANZ GLOBAL RISKS US INSURANCE COMPANY; ALLIED WORLD ASSURANCE COMPANY, LTD, *et al.* <br><br> Defendants. | Civ. Action No. 3:23-cv-01592-S <br><br> **DECLARATION OF MADELEINE BASS IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS** |

I, Madeleine Bass, declare as follows:

1.    I have personal knowledge of and am competent to testify regarding the matters set forth herein.

2.    I submit this declaration in support of the defendants' Motion to Dismiss the above-captioned action.  Nationwide Affinity Insurance Company of America, Nationwide Mutual Insurance Company, National Casualty Company, and Scottsdale Insurance Company are affiliated with Nationwide Mutual Insurance Company. Wausau General Insurance Company is affiliated with Liberty Mutual Insurance Company. All five entities are among the defendants in the above-captioned case and among the defendants moving to dismiss in part the Trustee's Complaint for lack of personal jurisdiction.

3.    I am currently employed as a claim consultant with Nationwide Indemnity Company, a wholly-owned subsidiary of Nationwide Mutual Insurance Company, and the entity responsible for the handling of claims alleged in this action for the five identified defendant

companies described above.    As part of my roles and responsibilities, I am familiar with the corporate structure of Nationwide Affinity Insurance Company of America, Nationwide Mutual Insurance Company, National Casualty Company, Scottsdale Insurance Company and Wausau General Insurance Company. I am also familiar with the place of incorporation, headquarters, and principal place of business of Nationwide Affinity Insurance Company of America, Nationwide Mutual Insurance Company, National Casualty Company, Scottsdale Insurance Company and Wausau General Insurance Company.

4.      Nationwide Affinity Insurance Company of America is incorporated and existing under the laws of the State of Ohio.  The company is headquartered in and has its principal place of business in Columbus, Ohio.

5.      Nationwide Mutual Insurance Company is incorporated and existing under the laws of the State of Ohio.  The company is headquartered in and has its principal place of business in Columbus, Ohio.

6.      National Casualty Company is incorporated and existing under the laws of the State of Ohio. The company is headquartered in and has its principal place of business in Scottsdale, Arizona.

7.      Scottsdale Insurance Company is incorporated and existing under the laws of the State of Ohio. The company is headquartered in and has its principal place of business in Scottsdale, Arizona.

8.      Wausau General Insurance Company is incorporated and existing under the laws of the State of Wisconsin.  The company is headquartered in and has its principal place of business in Boston, Massachusetts.

2

9.     I declare under penalty of perjury under the laws of the United States of America

that the foregoing is true and correct.

Dated: _Oct 2, 2023_                                    _Madeleine Bass_

                                                           Madeleine Bass

3

App.416

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| THE HONORABLE BARBARA J. HOUSER (RET.), IN HER CAPACITY AS TRUSTEE OF THE BSA SETTLEMENT TRUST,<br><br>Plaintiff,<br><br>v.<br><br>ALLIANZ GLOBAL RISKS US INSURANCE COMPANY ET AL.,<br><br>Defendants. | **DECLARATION**<br><br>Civil Action No.: 3:23-cv-01592-S |

NORMAN J. ORLOWSKI, JR., declares under penalty of perjury and pursuant to

28 U.S.C. § 1746 that the following is true and correct:

1.      I am the president of defendant, ERIE AND NIAGARA INSURANCE

ASSOCIATION ("ENIA"), in the above-referenced action.

2.      I make and submit this declaration in support of ENIA's pre-answer motion

pursuant to Fed. R. Civ. P. 12(b)(2) to dismiss plaintiff's complaint as against ENIA based on lack

of personal jurisdiction.

3.      I am advised and understand that Plaintiff seeks liability insurance coverage

under a policy of insurance alleged to have been issued by ENIA to local BSA council, Cayuga

County Council BSA, for policy period April 5, 1997 to April 5, 1998:

| Erie and Niagara Insurance Association | Erie and Niagara Insurance Association | Longhouse (373): Cayuga County 1924-2009 (366) | 56040399 | 4/5/1997 | 4/5/1998 |
|---|---|---|---|---|---|

(see ECF No. 1-2, at page 12 of 67).

4.      Attached as **Exhibit A** is a true and accurate copy of the declarations page

for that policy.

- 1 -

5.     As this Court can see, that policy was issued by a New York insurer to a New York insured to cover a New York risk.

6.     I have been employed by ENIA since 1992, initially as its vice president and treasurer and, since 2013, as its president.

7.     Given my employment at ENIA since 1992, I am personally knowledgeable of the insurance business ENIA has transacted since that time and to present.

8.     Given my employment and roles as various officers of ENIA, I am also knowledgeable from a review of various business records of ENIA of the history of ENIA's business of property and casualty insurance before 1992.

9.     I am advised and understand that paragraph 37 of Plaintiff's complaint alleges that "Defendant Erie and Niagara Insurance Association is a New York corporation with its principal place of business in New York." ECF No. 1 at page 8 of 31.

10.     I am further advised and understand that paragraph 99 of Plaintiff's complaint alleges that "[t]his Court has personal jurisdiction over each Defendant because each of them is now, or within the time period relevant to the claims asserted herein, or within the time period relevant to the issuance of the Insurance Policies by the Defendants to BSA and/or Local Councils is or has been licensed to do business in Texas; is transacting or has transacted business in Texas; has contracted to insure persons, property, or risks located in Texas; has contractually or otherwise consented to submit to personal jurisdiction in Texas; and/or has other significant contacts with Texas." ECF No. 1 at pages 15-16.

11.     I can attest from personal knowledge as the vice president/treasurer and then president of ENIA and my review of the historical business records of ENIA that ENIA:

a.     has always been licensed to do business only in New York;

b.     has never been licensed to do business in Texas;

c.     is transacting and has transacted business only in New York;

d.     is not transacting and has never transacted business in Texas;

e.     has never contracted to insure persons, property, or risks located in Texas;

f.     has never contractually or otherwise consented to submit to personal jurisdiction in Texas; and

g.     has no contacts, much less significant ones, with Texas.

DATED:     Buffalo, New York
           September 22, 2023

_____
Norman J. Orlowski, Jr.

MURA LAW GROUP, PLLC ● 930 RAND BUILDING ● 14 LAFAYETTE SQUARE ● BUFFALO, NEW YORK 14203
(716) 855-2800 ● FAX (716) 855-2816

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS

| | |
|---|---|
| THE HONORABLE BARBARA J. HOUSER (RET.), IN HER CAPACITY AS TRUSTEE OF THE BSA SETTLEMENT TRUST,<br><br>Plaintiff,<br><br>v.<br><br>ALLIANZ GLOBAL RISKS US INSURANCE COMPANY; ALLIED WORLD ASSURANCE COMPANY, LTD, *et al*.<br><br>Defendants. | Civ. Action No. 3:23-cv-01592-S<br><br>**DECLARATION OF ROBERT L. YOUNG, JR. IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS** |

I, ROBERT L. YOUNG, JR., declare as follows:

1.    I have personal knowledge of and am competent to testify regarding the matters set forth herein.

2.    I submit this declaration in support of the defendants' Motion to Dismiss the above-captioned action. Arrowood Indemnity Company is among the defendants in the above-captioned case, and among the defendants moving to dismiss in part the Trustee's Complaint for lack of personal jurisdiction.

3.    I am currently a Liability Claim Account Specialist at Arrowpoint Capital. As part of my roles and responsibilities, I am familiar with the corporate structure of Arrowood Indemnity Company. I am also familiar with the place of incorporation, headquarters, and principal place of business of Arrowood Indemnity Company.

4.    Arrowood Indemnity Company is incorporated in Delaware. Arrowood Indemnity Company is headquartered in and has its principal place of business in North Carolina.

3046663

5.      I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: October 5, 2023

Robert L. Young, Jr.

2

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| **THE HONORABLE BARBARA J. HOUSER (RET.), IN HER CAPACITY AS TRUSTEE OF THE BSA SETTLEMENT TRUST,** | § § § § § | |
| **Plaintiff,** | § § | **CASE NO. 3:23-cv-01592-S** |
| **v.** | § § § | **DECLARATION OF RYAN L. BARKER IN SUPPORT OFDEFENDANTS'** |
| **ALLIANZ GLOBAL RISKS US INSURANCE COMPANY, *et al.*,** | § § § | **MOTION TO DISMISS** |
| **Defendants** | § | |

**DECLARATION OF RYAN L. BARKER IN SUPPORT OF
DEFENDANT CINCINNATI INSURANCE COMPANY'S MOTION TO DISMISS**

I, Ryan L. Barker, declare as follows:

1.    My name is Ryan L. Barker and I am currently the Casualty Team Leader for Cincinnati Insurance Company ("Cincinnati"), one of the Defendants in this lawsuit. As a part of my roles and responsibilities, I am familiar with Cincinnati's corporate structure and also with the place of incorporation, headquarters, and principal place of business.

2.    I submit this affidavit in support of the Defendants' Motion to Dismiss the above-captioned action. Cincinnati Insurance Company is among the defendants in this matter, and among the defendants moving to dismiss, in part, the Trustee's Complaint for lack of personal jurisdiction.

3.    Cincinnati is incorporated in the state of Ohio. Cincinnati is headquartered in and has its principal place of business in Fairfield, Ohio.

4.      I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated:  October __4th__ 2023.

*Ryan L. Barker*
_____
Ryan L. Barker

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS

| | |
|---|---|
| THE HONORABLE BARBARA J. HOUSER (RET.), IN HER CAPACITY AS TRUSTEE OF THE BSA SETTLEMENT TRUST,<br><br>                                    Plaintiff,<br><br>v.<br><br>ALLIANZ GLOBAL RISKS US INSURANCE COMPANY; ALLIED WORLD ASSURANCE COMPANY, LTD, *et al.*<br><br>                                    Defendants. | Civ. Action No. 3:23-cv-01592-S<br><br>**DECLARATION OF JAMES NEALON IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS** |

I, James Nealon, declare as follows:

1.      I have personal knowledge of and am competent to testify regarding the matters set forth herein.

2.      I submit this declaration in support of the defendants' Motion to Dismiss the above-captioned action.  Erie Family Life Insurance Company is among the defendants in the above-captioned case, and among the defendants moving to dismiss in part the Trustee's Complaint for lack of personal jurisdiction.

3.      I am currently the Senior Vice President of Law at Erie Insurance Group.  As part of my roles and responsibilities, I am familiar with the corporate structure of Erie Family Life Insurance Company.   I am also familiar with the place of incorporation, headquarters, and principal place of business of Erie Family Life Insurance Company.

4.      Erie Family Life Insurance Company is incorporated in the Commonwealth of Pennsylvania.  Erie Family Life Insurance Company is headquartered in and has its principal

place of business in Pennsylvania.  Erie Family Life Insurance Company is primarily engaged in the business of underwriting and selling nonparticipating individual and group life insurance policies, annuities and disability income products.

5.    I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: October 6, 2023

James Nealon

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS

| | |
|---|---|
| THE HONORABLE BARBARA J. HOUSER (RET.), IN HER CAPACITY AS TRUSTEE OF THE BSA SETTLEMENT TRUST,<br><br>                              Plaintiff,<br><br>v.<br><br>ALLIANZ GLOBAL RISKS US INSURANCE COMPANY; ALLIED WORLD ASSURANCE COMPANY, LTD, *et al.*<br><br>                              Defendants. | Civ. Action No. 3:23-cv-01592-S<br><br>**DECLARATION OF JAMES NEALON IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS** |

I, James Nealon, declare as follows:

1.      I have personal knowledge of and am competent to testify regarding the matters set forth herein.

2.      I submit this declaration in support of the defendants' Motion to Dismiss the above-captioned action.  Erie Insurance Exchange is among the defendants in the above-captioned case, and among the defendants moving to dismiss in part the Trustee's Complaint for lack of personal jurisdiction.

3.      I am currently the Senior Vice President of Law at Erie Insurance Group.  As part of my roles and responsibilities, I am familiar with the corporate structure of Erie Insurance Exchange.  I am also familiar with the place of formation, headquarters, and principal place of business of Erie Insurance Exchange.

4.      Erie Insurance Exchange is a reciprocal insurance company formed under the laws of the Commonwealth of Pennsylvania.  Erie Insurance Exchange is headquartered in and has its principal place of business in the Commonwealth of Pennsylvania.

5.      Erie Insurance Exchange is not licensed to write property and casualty insurance policies in Texas and it does not maintain any offices in Texas.

6.      I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: _10/6/23_

_____

James Nealon

2

App.427