UNITED STATES DISTRICT COURT FOR
THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| THE HONORABLE BARBARA J. HOUSER (RET.), IN HER CAPACITY AS TRUSTEE OF THE BSA SETTLEMENT TRUST,<br><br>Plaintiff,<br><br>v.<br><br>AILLIANZ GLOBAL RISKS US INSURANCE COMPANY; ALLIED WORLD ASSURANCE COMPANY, LTD, *et al.*<br><br>Defendants. | Civ. Action No. 3:23-cv-01592-S |

**PLAINTIFF'S CONSOLIDATED APPENDIX IN SUPPORT OF: (1) PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO STAY PENDING RULING IN *HARRINGTON V. PURDUE PHARMA, L.P.*; (2) PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS ON *FORUM NON CONVENIENS* GROUNDS OR DISMISS OR STAY ON ABSTENION GROUNDS; AND (3) PLAINTIFF'S CONSOLIDATED OPPOSITION TO UNDERSIGNED DEFENDANTS', GREAT AMERICAN INSURERS', AND GEMINI'S MOTIONS TO DISMISS THE COMPLAINT**

| Tab | Description | Pages |
|-----|-------------|-------|
| 1 | Motion of the Certain Insurers for Stay of Further Implementation of the Plan Pending Supreme Court Decision in *Purdue*, *National Union Fire Ins. Co. v. Boy Scouts of Am.*, No. 23-1664 (3d Cir. Oct. 10, 2023), ECF No. 116-1 | TrustApp001-038 |
| 2 | List of Defendants that Objected during BSA Bankruptcy Proceedings | TrustApp039-053 |
| 3 | E-mail chain from J. Bullen, Allianz, to K. Quinn, Gilbert, re notification of claims (Aug. 31, 2023 9:37AM ET) | TrustApp054-056 |
| 4 | PJ Moving Insurers: Key Known Contacts with Texas | TrustApp057-059 |
| 5 | Order, *In re Boy Scouts of Am.*, Nos. 23-1666, *et al.* (3d Cir. Nov. 2, 2023), ECF No. 139 | TrustApp060-062 |
| 6 | Opening Brief of Certain Insurers, *National Union Fire Insurance Co. v. Boy Scouts of Am.*, No. 23-1668 (3d Cir. July 24, 2023), ECF No. 67 | TrustApp063-154 |
| 7 | [Proposed] First Amended Complaint for Declaratory Relief, *National Surety Corp. v. Boy Scouts of Am.*, No. 2017-CH-014975 (Ill. Cir. Ct. July 27, 2023) | TrustApp155-227 |
| 8 | [Proposed] Answer and Counterclaims to [Proposed] First Amended Complaint for Declaratory Relief, *National Surety Corp. v. BSA Settlement Trust*, No. 2017-CH-014975 (Ill. Cir. Ct. Sept. 5, 2023) | TrustApp228-364 |
| 9 | Chart Comparing Insurers That Joined Third and Fourth Motions to Stay | TrustApp365-368 |
| 10 | Excerpts of docket sheet in *Continental Ins. Co. v. BorgWarner, Inc.*, No. 04 CH 1708 filed in Cook County, Illinois Chancery Court | TrustApp369-379 |
| 11 | Certain Insurers' Objection to Confirmation of Debtors' Chapter 11 Plan, *In re Boy Scouts of Am.*, No. 20-10343 (LSS) (Bankr. D. Del. Feb. 11, 2022), ECF No. 8793-1 | TrustApp380-488 |
| 12 | Opening Brief of Certain Insurers, *National Union Fire Ins. Co. v. Boy Scouts of Am.*, No. 1:22-cv-01237-RGA (D. Del. Nov. 7, 2022), ECF No. 45 | TrustApp489-613 |

| Tab | Description | Pages |
|-----|------------|-------|
| 13 | Declaration of the Honorable Barbara J. Houser (Ret.), in her Capacity as Trustee of the BSA Settlement Trust dated Nov. 2, 2023 | TrustApp614-618 |
| 14 | Exhibit I (Insurance Settlements) to the Third Modified Fifth Amended Chapter 11 Plan of Reorganization (With Technical Modifications) For Boy Scouts of America and Delaware BSA, LLC, In re Boy Scouts of Am., No. 20-10343 (LSS) (Bankr. D. Del. Sept. 6, 2022), excerpt of ECF 10296 | TrustApp619-621 |

**Nos. 23-1665, 23-1667, 23-1668, 23-1669, 23-1670, 23-1671, 23-1672, 23-1673, 23-1674, 23-1675, 23-1676, 23-1677, 23-1678, 23-1780 (Consolidated)**

# United States Court of Appeals
# for the Third Circuit

IN RE: BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC,
*Debtor,*

NATIONAL UNION FIRE INSURANCE CO. OF PITTSBURGH PA., *et al.,*
*Appellants,*

v.

BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC, *et al.,*
*Appellees.*

Appeal from the United States District Court
for the District of Delaware (No. 22-cv-01237)

## MOTION OF THE CERTAIN INSURERS FOR STAY OF FURTHER IMPLEMENTATION OF THE PLAN PENDING SUPREME COURT DECISION IN *PURDUE*

Deirdre M. Richards
ELLIOT GREENLEAF
1105 N. Market Street,
Suite 1700
Wilmington, DE 19801
(302) 384-9402

Susan N.K. Gummow
FORAN GLENNON
PALANDECH PONZI &
RUDLOFF P.C.
222 N. LaSalle St., Suite 1400
Chicago, Illinois 60601

Theodore J. Boutrous Jr.
Richard J. Doren
Blaine H. Evanson
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, California 90071
(213) 229-7000

Michael A. Rosenthal
James Hallowell
Seth M. Rokosky
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, New York 10166
(212) 351-4000

*Counsel for National Union Fire Insurance Company of Pittsburgh, Pa., Lexington Insurance Company, Landmark Insurance Company, and the Insurance Company of the State of Pennsylvania*

Joseph T. Baio
Christopher J. St. Jeanos
Mitchell J. Auslander
Charles Dean Cording
Patricia O. Haynes
WILLKIE FARR & GALLAGHER LLP
787 Seventh Avenue
New York, NY 10019
(212) 728-8000

*Additional Counsel for National Union Fire Insurance Company of
Pittsburgh, Pa., Lexington Insurance Company, Landmark Insurance
Company, and the Insurance Company of the State of Pennsylvania*

Harris B. Winsberg
Matthew G. Roberts
PARKER, HUDSON, RAINER &
DOBBS LLP
303 Peachtree St. NE, Suite 3600
Atlanta, GA  30308
Telephone: (404) 420-4313

David M. Fournier
Marcy J. McLaughlin Smith
TROUTMAN PEPPER HAMILTON
SANDERS LLP
1313 Market Street, P.O. Box 1709
Wilmington, DE 19899-1709
Telephone: (302) 777-6500

Harris B. Winsberg
Matthew G. Roberts
PARKER, HUDSON, RAINER &
DOBBS LLP
303 Peachtree St. NE, Suite 3600
Atlanta, GA  30308
Telephone: (404) 420-4313

Todd C. Jacobs
John E. Bucheit
PARKER, HUDSON, RAINER &
DOBBS LLP
Two N. Riverside Plaza, Suite 1850
Chicago, IL 60606
Telephone: (312) 447-3306

David M. Fournier
Marcy J. McLaughlin Smith
TROUTMAN PEPPER HAMILTON
SANDERS LLP
1313 Market Street, P.O. Box 1709
Wilmington, DE 19899-1709
Telephone: (302) 777-6500

ii

Margaret H. Warner
Ryan S. Smethurst
Alex M. Spisak
McDERMOTT WILL & EMERY
LLP
The McDermott Building
500 North Capitol Street, NW
Washington, DC 20001-1531
Telephone: (202) 756-8228

*Counsel for Allianz Global Risks
US Insurance Company*

Ronald P. Schiller
Matthew A. Hamermesh
HANGLEY ARONCHICK SEGAL
PUDLIN & SCHILLER
One Logan Square, 27th Floor
Philadelphia, PA 19103
Telephone: (215) 568-6200

Kelly A. Green
SMITH, KATZENSTEIN &
JENKINS LLP
1000 West Street, Suite 501
P.O. Box 410
Wilmington, DE 19899
Telephone: (302) 504-1657

*Counsel for Arch Insurance
Company*

*Counsel for National Surety
Corporation and Interstate Fire &
Casualty Company*

Kathleen K. Kerns
POST & SCHELL, P.C.
Four Penn Center – 13th Floor
1600 John F. Kennedy Boulevard
Philadelphia, PA 19103
Telephone: (215) 587-1000

George R. Calhoun
IFRAH PLLC
1717 Pennsylvania Ave., N.W.
Suite 650
Washington, DC 20006
Telephone: (202) 840-8758

*Counsel for Argonaut Insurance
Company*

iii

TrustApp003

Michael J. Joyce
JOYCE, LLC
1225 King Street, Suite 800
Wilmington, DE 19801
Telephone:  (302) 388-1944

Kevin Coughlin
Lorraine Armenti
Michael Hrinewski
COUGHLIN MIDLIGE &
GARLAND, LLP
350 Mount Kemble Avenue, PO
Box 1917
Morristown, NJ 07962
Telephone:  (973) 267-0058

John M. Flynn
Britton C. Lewis
CARRUTHERS & ROTH, P.A.
235 N. Edgeworth Street
P.O. Box 540
Greensboro, NC  27401
Telephone:  (336) 478-1146

*Counsel for Arrowood
Indemnity Company*

William H. White Jr.
KIERNAN TREBACH LLP
1233 20th Street, NW, 8th Floor
Washington, DC 20036
Telephone: (202) 712-7000

John E.W. Baay II
GIEGER LABORDE &

Maria Aprile Sawczuk, Esq.
GOLDSTEIN & MCCLINTOCK
LLLP
501 Silverside Road, Suite 65
Wilmington, DE 19809
Telephone: (302) 444-6710

Laura McNally, Esq.
LOEB & LOEB LLP
321 N. Clark Street, Suite 2300
Chicago, IL 60654
312-464-3155

David Christian, Esq.
DAVID CHRISTIAN ATTORNEYS
LLC
105 W. Madison St., Suite 1400
Chicago, Illinois 60602
Telephone: (312) 282-5282

*Counsel for Continental Insurance
Company and Columbia Casualty
Company*

Kelly A. Green
SMITH, KATZENSTEIN &
JENKINS LLP
1000 West Street, Suite 501
P.O. Box 410
Wilmington, DE 19899
Telephone: (302) 504-1657

TrustApp004

LAPEROUOSE, LLC
701 Poydras Street, Suite 4800
New Orleans, LA 70139
Telephone: (504) 561-0400

*Counsel for*
*Gemini Insurance Company*

Konrad R. Krebs
CLYDE & CO US LLP
340 Mt. Kemble Ave, Suite 300
Morristown, New Jersey 07960
Telephone: (973) 210-6705

Alexander E. Potente
CLYDE & CO US LLP
150 California Street, 15th Floor
San Francisco, California 94111
Telephone: (415) 365-9800

David Christian
DAVID CHRISTIAN ATTORNEYS
LLC
105 W. Madison St., Suite 1400
Chicago, Illinois 60602
Telephone: (312) 282-5282

Bruce W. McCullough
BODELL BOVE, LLC
1225 N. King St., Suite 1000
Wilmington, DE 19801-3250
Telephone: (302) 655-6749

*Counsel for Great American*
*Assurance Company f/k/a*
*Agricultural Insurance Company,*

Mary E. Borja
Gary P. Seligman
Ashley L. Criss
WILEY REIN LLP
2050 M Street NW
Washington, DC 20036
Phone: (202) 719-7000

*Counsel for General Star Indemnity*
*Company*

Kelly A. Green
SMITH, KATZENSTEIN &
JENKINS LLP
1000 West Street, Suite 501
P.O. Box 410
Wilmington, DE 19899
Telephone: (302) 504-1657

Lloyd A. Gura
Pamela J. Minetto
MOUND COTTON WOLLAN &
GREENGRASS LLP
One New York Plaza 44th Floor
New York, NY 10004
Telephone: (212) 804-4282

*Counsel for Indian Harbor*
*Insurance Company, on behalf of*
*itself and as successor in interest to*
*Catlin Specialty Insurance*
*Company*

v

TrustApp005

*Great American E&S Insurance Company f/k/a Agricultural Excess and Surplus Insurance Company, and Great American E&S Insurance Company*

Douglas R. Gooding
Jonathan D. Marshall
Bryana T. McGillycuddy
CHOATE, HALL &
STEWART LLP
Two International Place
Boston, MA 02110
Telephone: (617) 248-5000

Kim V. Marrkand
MINTZ, LEVIN, COHN, FERRIS,
GLOVSKY AND POPEO PC
One Financial Center
Boston, MA 02111
Telephone: (617) 542-6000

R. Karl Hill
SEITZ, VAN OGTROP &
GREEN, P.A.
222 Delaware Avenue, Suite 1500
Wilmington, Delaware 19801
Telephone: (302) 888-0600

*Counsel for Liberty Mutual Insurance Company, The Ohio Casualty Insurance Company, Liberty Insurance Underwriters, Inc., and Liberty Surplus Insurance Corporation*

Marla S. Benedek
COZEN O'CONNOR
1201 N. Market Street, Suite 1001
Wilmington, DE 19801
Telephone: (302) 295-2024

*Counsel for Traders and Pacific Insurance Company, Endurance American Specialty Insurance Company, and Endurance American Insurance Company*

Louis J. Rizzo, Jr., Esquire
REGER RIZZO & DARNALL LLP
1521 Concord Pike
Brandywine Plaza West Suite 305
Wilmington DE  19803
Telephone: (302) 477-7100

*Counsel for Travelers Casualty and Surety Company, Inc. (f/k/a Aetna Casualty & Surety Company), St. Paul Surplus Lines Insurance Company and Gulf Insurance Company ("Travelers")*

Stephen M. Miller
Carl N. Kunz, III
MORRIS JAMES LLP
500 Delaware Avenue, Suite 1500
Wilmington, Delaware 19801
Telephone: (302) 888-6800

*Counsel for Old Republic Insurance Company*

vi

TrustApp006

## INTRODUCTION

Pursuant to Federal Rule of Appellate Procedure 8(a)(2), the undersigned Certain Insurers[1] move this Court for a stay of further implementation of the Plan pending the United States Supreme Court's forthcoming resolution of *Harrington v. Purdue Pharma, L.P.*, Case No. 23-124 (2023). *Purdue* presents a critical question of bankruptcy law also implicated in this case—the permissibility of non-consensual releases to non-debtors. The outcome of the *Purdue* appeal may determine whether the Plan that is the subject of the Certain Insurers' appeals in this Court can move forward and could have a material impact on the rights of key stakeholders under the Plan.

Since the Plan was confirmed, the Supreme Court has called into question the authority of bankruptcy courts to grant non-consensual releases to non-debtors such as the Local Councils, Chartered Organizations, and Settling Insurers, all of whom received releases under the Plan. On August 10, 2023, the Supreme Court granted certiorari to resolve a circuit split regarding the authority of courts

---

[1] Defined terms have the meanings set forth in the Opening Brief of Certain Insurers (ECF No. 67).

TrustApp007

presiding over bankruptcy cases to grant non-consensual, non-debtor releases. *See* Certiorari Granted, *Purdue*, No. 23A87 (Aug. 10, 2023). The Plan in this action and the plan in *Purdue* are virtually identical in their architecture: both rely on the establishment of settlement trusts funded with contributions from debtors and non-debtors and both provide for non-consensual releases of non-debtors that contribute funds or other assets to the trust.

Expedited briefing in *Purdue* has already commenced: petitioner's brief was filed on September 20, 2023, with respondents' briefs due on October 20, 2023, and reply briefs due 30 days thereafter (or 10 days prior to argument). The Supreme Court scheduled argument in *Purdue* for the December 2023 argument session. The Supreme Court also stayed implementation of the *Purdue* bankruptcy plan, signaling "a fair prospect that the Court would reverse" the Second Circuit decision approving the release to the non-debtors. *See Merrill v. Milligan*, 142 S. Ct. 879, 880 (2022) (Kavanaugh, J., concurring). This Court should follow suit and stay further implementation of the Plan until the Supreme Court has had an opportunity to examine this critical issue.

TrustApp008

The standard for a stay pending appeal is readily met here. Given recent developments in *Purdue* and the Supreme Court's stay of the *Purdue* bankruptcy plan, the district court has now acknowledged a fair prospect that the Supreme Court will declare non-consensual, non-debtor releases, like those in this Plan, impermissible under the Bankruptcy Code. That would undermine the foundation of the Confirmation Order and almost certainly require modifications to the Plan.

Nevertheless, on October 3, 2023, the district court denied the stay motions filed by all Appellants in this case. While the district court acknowledged "that the Supreme Court's grant of stay to consider the issue of non-consensual third-party releases in *Purdue* signals at least a reasonable chance that Claimants may succeed on their challenge to that aspect of BSA's Plan with respect to their own claims" (D.I. 254 at 14 (attached as Exhibit A)), the district court denied a stay, concluding that any harm suffered by Appellants in the absence of a stay was "hypothetical" and not irreparable. *Id.* at 15.

To the contrary, the permissibility of non-consensual, non-debtor releases is an issue that implicates the interests of all Appellants in this appeal, including the Certain Insurers. Since confirmation, the Trustee

3

has sued around 90 non-settling insurers in the United States District Court for the Northern District of Texas asserting rights under insurance policies allegedly issued not just to BSA, but also to the non-debtor Local Councils, arguing that the confirmed Plan abrogates their coverage defenses for abuse claims. Complaint, *Houser v. Allianz*, Case No. 23-01592 (N.D. Tex. July 17, 2023), ECF No. 1 (the "Coverage Complaint"). Under the terms of the Plan, the non-debtor Local Councils sought to assign rights under these policies to the Trust in exchange for broad releases. If the Supreme Court in *Purdue* invalidates the type of releases provided to these non-debtors in the Plan, the assignment of insurance rights by non-debtors may be impacted as well, and the Trustee may lack not only the ability to resolve the underlying abuse claims through the BSA distribution process, but also the authority to pursue insurance recoveries against the Certain Insurers asserting rights of the non-debtors.[2]

---

[2] Several defendants in the action pending in the Northern District of Texas have moved for a stay of that litigation for many of the same reasons that warrant the stay sought herein. *See* Motion to Stay, *Houser v. Allianz*, Case No. 23-01592 (N.D. Tex. July 17, 2023), ECF No. 228. That motion is pending.

4

The Certain Insurers take no position here on the merits of the arguments in the *Purdue* appeal.  But the Court's decisions to consider the third-party release issue in *Purdue* and to grant a stay is plainly a significant development for the appeals in this case since this Court last considered and denied the parties' motions to stay on April 19, 2023.

Before the Trustee takes additional steps to implement the Plan, the reviewing courts and all stakeholders under the Plan should have the benefit of the Supreme Court's impending *Purdue* decision, which will clarify the law on non-consensual, non-debtor releases in bankruptcy plans.  Any decision by the Supreme Court in *Purdue* will also clarify what authority the Settlement Trustee does or does not have to seek coverage from the Certain Insurers. A stay is warranted to preserve the status quo in light of these new developments.

## BACKGROUND

This case involves the Chapter 11 plan of the Boy Scouts of America ("BSA"), which provides in part for resolution of sexual abuse claims (the "Plan").  *See* D.I. 150 at 5 (attached as Exhibit B).[3]  "The Plan 'channels'

---

[3] References to "D.I." refer to filings in the district court. *National Union Fire Insurance et al., v. Boy Scouts of Am. and Del. BSA LLC, et al.*, No. 22-1237-RGA (D. Del.).  References to "Bankr. D.I." refer to filings in the

5

to the Settlement Trust all Abuse Claims against BSA, the Related Non-Debtor Entities, the Local Councils, certain Chartered Organizations, and those covered by insurance policies issued by the Settling Insurance Companies and provides for coextensive non-consensual releases of the channeled Abuse Claims[.]" *Id.* at 5-6. "The Channeling Injunction and Releases are the 'cornerstones of the Plan,' and are necessary to ensure an equitable process by which abuse Survivors' claims will be administered and paid" by the Trust. *Id.* at 6; *see id.* at 19.

On March 28, 2023, the district court affirmed confirmation of the Plan. As relevant here, the Court concluded that the Plan's assignment of insurance rights does not impermissibly abrogate the insurers' contracts and that the Plan was proposed in good faith. *See id.* at 75-79, 123-155. The Certain Insurers and other Appellants filed emergency stay motions, arguing that their appeals raise significant questions and that, in the absence of a stay, BSA may argue it has "substantially consummated" the Plan during the pendency of the appeals, creating a substantial risk that this Court may decline to decide the merits of their

---

Bankruptcy Court. *In re Boy Scouts of Am. and Del. BSA, LLC*, No. 20-10343-LSS (Bankr. D. Del.).

TrustApp012

appeals based on the "equitable mootness" doctrine. *See* D.I. 152 at 2, 7-12.

On April 11, 2023, the district court denied the stay motions, concluding among other things that "the Plan's clear language preserves all of the Insurers' rights and defenses under their policies." D.I. 193 at 7. After granting a temporary emergency stay, this Court ultimately denied a stay pending appeal. ECF No. 25. The Plan became effective on April 19, 2023. *See* Bankr. D.I. 11119. The parties have commenced merits briefing before this Court, with Appellants filing opening briefs on July 24, 2023. This Court subsequently stayed briefing pending resolution of motions by Appellees for extensions of time and for permission to file overlength briefs. *See* ECF No. 69, 78-79, 85, 93.

Notwithstanding the district court's prior findings that the Plan preserves insurers' rights and defenses, on July 17, 2023—one week before Appellants filed their opening brief—the Trustee, acting as assignee of BSA and the Local Councils, filed an action in the United States District Court for the Northern District of Texas against the Certain Insurers seeking a declaration that insurers are liable for full

TrustApp013

coverage for the Abuse Claims, subject only to applicable attachment points and limits of liability. *See* Coverage Compl. ¶¶ 119, 121, 124, 137.

Then, on August 10, 2023, the Supreme Court agreed to hear an appeal in *Purdue* to resolve the question of whether the Bankruptcy Code authorizes a court to approve, as part of a plan of reorganization under Chapter 11 of the Bankruptcy Code, a release that extinguishes claims held by non-debtors against non-debtor third parties, without the claimants' consent. In granting this review, the Supreme Court recalled and stayed the mandate of the Second Circuit that affirmed the confirmation of Purdue's bankruptcy plan. Certiorari Granted, *Purdue*, No. 23A87 (Aug. 10, 2023). The Supreme Court is scheduled to hear argument in *Purdue* on an expedited timeframe during the December 2023 argument session. *Id.*

In light of the Supreme Court's stay order in *Purdue*, on August 16, 2023, the Lujan Claimants and the Dumas & Vaughn Claimants moved this Court for a stay of further implementation of the Plan. ECF 81, 87. This Court denied those motions without prejudice to filing the motions first in the district court. ECF 88. On August 18, 2023, these claimants moved the district court for a stay of further implementation of the Plan.

TrustApp014

D.I. 222 & 223.  On August 25, 2023, the Certain Insurers filed their own motion in the district court seeking a stay on the same grounds.  D.I. 235. The Appellees opposed those motions on September 8, 2023.  D.I. 240.

On October 3, 2023, the district court denied the stay motions.  D.I. 254. Although the district court agreed that Appellants are reasonably likely to succeed on appeal with respect to non-debtor releases, it denied a stay because it concluded that Appellants would not be irreparably harmed and that the balance of harms and public interest weigh against a stay, due primarily to potential delays in distributions to Abuse Claimants.  *Id.* at 15-17.

## ARGUMENT

The Court should stay further implementation of the Plan until the Supreme Court in *Purdue* clarifies the law governing non-consensual, third-parties releases in bankruptcy.  This Court can grant a motion for a "stay of the judgment or order" of the district court pending appeal. Fed. R. App. Proc. 8(a)(1)-(2); *see* Fed. R. Bankr. Proc. 8025(d) (regardless of district court's ability to grant a stay motion, the court of appeals may "stay a judgment pending appeal").

9

The Court considers four factors when evaluating a stay motion: "(1) whether the stay applicant has made a strong showing that it is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *In re S.S. Body Armor I, Inc.*, 927 F.3d 763, 771 (3d Cir. 2019) (alteration and quotation marks omitted). The first two factors are "the most critical." *Id.* at 772 (quoting *Nken v. Holder*, 556 U.S. 418, 434 (2009)). Here, all four factors weigh heavily in favor of a brief stay of further Plan implementation.

## I.   THIS COURT HAS THE AUTHORITY TO STAY FURTHER IMPLEMENTATION OF THE PLAN

Although it exercised jurisdiction, the district court was skeptical that it could grant a stay because a stay would not return the parties to the status quo that existed in April 2023, before the Effective Date. D.I. 254 at 7-8. But implementation of certain portions of the Plan does not undermine this Court's ability to order a stay pending appeal. *See, e.g.*, *In re PWS Holding Corp.*, 228 F.3d 224, 236-37 (3d Cir. 2000) (requested relief would not "necessitate the reversal or unraveling of the entire plan of reorganization"); *In re Thorpe Insulation Co.*, 677 F.3d 869, 883 (9th

TrustApp016

Cir. 2012) ("There are several ways here that Appellants could get some relief without completely upsetting the plan.").

In expressing skepticism about its ability to grant relief, the district court appears to have considered the requested stay as a request to **reverse** parts of the confirmed Plan pending appeal and to **rewind** steps taken thus far to implement the Plan.  But the Certain Insurers are not asking the Court to return the parties to the "state of affairs which existed prior" to the Effective Date (D.I. 254 at 7)—they are simply seeking to pause **further** efforts to implement the Plan, such as processing claims and making distributions, until the Supreme Court issues a decision in *Purdue*, so that this Court will have the opportunity to resolve the pending appeals in accordance with applicable law.

Courts regularly entertain bankruptcy appeals of orders for plans that have gone effective.  *See, e.g., In re One2One Commc'ns, LLC*, 805 F.3d 428, 438 (3d Cir. 2015) (holding that even a substantially consummated plan should be considered "on its merits" on appeal); *Thorpe Insulation*, 677 F.3d at 891 (reversing confirmation of plan that had gone effective and ordering a new trial).  This Court should stay further implementation of the Plan, which remains in its infancy, so that

11

the Court can consider the Plan on its merits, with due consideration of

the Supreme Court's forthcoming ruling in *Purdue*, and in accordance

with applicable law.

## II.    THE CERTAIN INSURERS ARE LIKELY TO SUCCEED ON THE MERITS.

As the district court found, there is now a reasonable chance that

the Supreme Court will invalidate the non-debtor releases that BSA has

described as "essential to the success of the Plan," casting the future of

the present Plan in doubt.  *See Purdue*, Case No. 23-124; D.I. 254 at 14.[4]

In *Purdue*, the United States Solicitor General argues that non-

debtor releases "cannot be reconciled with the Bankruptcy Code."  *See*

Application for Stay, *Purdue*, Case No. 23-124, Appl. No. 23A87, at 18

(July 28, 2023); *see also* Brief for the Petitioner, *Purdue*, Case No. 23-124,

at 33 (Sept. 20, 2023).  The Supreme Court's decision to grant a stay in

*Purdue* necessitated a finding that the appellants had "a ***fair prospect***

that the Court would reverse" confirmation of a plan releasing claims

against non-debtors.    *Merrill*, 142 S. Ct. at 880 (Kavanaugh, J.,

---

[4] The Certain Insurers take no position on the merits of the arguments in the *Purdue* appeal here, but reserve all rights arising from the resolution of that appeal by the Supreme Court.

12

concurring) (emphasis added).  A "fair prospect" that the *Purdue* appeal will succeed means a "reasonable chance" of success in this case as well, because BSA's Plan is structured in the same manner as the plan at issue in *Purdue*.  *See In re S.S. Body Armor I*, 927 F.3d at 772 (movant need only demonstrate "a reasonable chance, or probability, of winning") (quotation omitted)).

Against this backdrop, it is entirely possible that the Supreme Court in *Purdue* will substantially reshape the way in which mass torts are treated in bankruptcy proceedings, with direct implications for the Certain Insurers in this case.  Accordingly, the Court should stay further implementation of the Plan until the Supreme Court issues its ruling.

## III. THE CERTAIN INSURERS WILL BE IRREPARABLY HARMED IN THE ABSENCE OF A STAY.

Contrary to the district court's claims, the Certain Insurers likely will suffer irreparable harm absent a stay as the Trustee continues to implement the Plan despite the forthcoming decision in *Purdue*.

It is undisputed that the hallmark of the Plan is the channeling of all Abuse Claims to the Trust, which is funded in large measure by non-debtors in exchange for releases.  *See* D.I. 150 at 5, 16-17 (describing that the Trust is estimated to contain at least $2.46 billion in non-contingent

TrustApp019

assets, resulting from contributions from non-debtor parties, including the Local Councils ($640 million) and Settling Insurers (more than $1.6 billion)). These contributions were the result of "nearly two years" of mediation (D.I. 150 at 5), but are now subject to a major contingency. Uncertainty abounds regarding what contributions, if any, non-debtors will make to the Trust if, following the Supreme Court's decision in *Purdue*, they are denied the benefit of the releases granted under the present Plan.

The Trustee's standing to pursue claims in litigation against the Certain Insurers arises from these very contributions—the Trustee seeks coverage pursuant to rights under policies that were purportedly assigned to the Trust by non-debtors, including the Local Councils, in exchange for releases. Coverage Compl. ¶¶ 1, 110. The Trustee's lawsuit in the United States District Court for the Northern District of Texas illustrates the point. *See* ECF No. 67 at 3-4, 34. In that action, the Trustee purports to act on behalf of the Local Councils or as their assignee to seek coverage pursuant to rights under policies that were purportedly assigned to the Trust by non-debtors, including the Local Councils, in exchange for releases in the Plan. Coverage Compl. ¶¶ 1,

14

110.  Absent a stay, the Certain Insurers therefore face, at a minimum, the prospect of relitigating costly and wasteful coverage actions in the face of legal uncertainty—harms that cannot be remediated.

Beyond the coverage litigation, the Trustee is taking steps to administer the Trust and begin paying out Claims.  For example, on August 17, 2023, a week after the grant of certiorari in *Purdue*, the Trustee announced that she would open the claims processing portal to all 82,000 Claimants.  "Letter from the Settlement Trustee," Scouting Settlement Trust (Aug. 17, 2023), https://www.scoutingsettlementtrust. com/s.  Distributions to expedited Claimants, for which the Settlement Trust will *not* seek recoveries from any insurers, began on September 19, 2023.  Press Release, Scouting Settlement Trust, Scouting Settlement Trust Begins Payments to Compensate Survivors of Sexual Abuse in Boy Scouts of America (Sept. 19, 2023), https://www.prnewswire.com/news-releases/scouting-settlement-trust-begins-payments-to-compensate-survivors-of-sexual-abuse-in-boy-scouts-of-america-301932494.html.  Several significant deadlines are also upcoming, including the November 2 deadline to submit the claims questionnaire for expedited claims, which the Trustee recently pushed back by a

15

month.        Home,        Scouting        Settlement        Trust,

https://www.scoutingsettlementtrust.com/s/ (last visited Oct. 10, 2023).

Allowing this process to continue risks irreparable harm not only to
the Certain Insurers, but to all parties involved in the Plan.  For non-
expedited Claimants, each Claimant must submit all records regarding
their Claim, complete and sign a questionnaire under oath, and
participate in any requested evaluations.  Plan, Art. VII.  The Trustee
determines whether the evidence submitted by the Claimant "is credible
and demonstrates, by a preponderance of the evidence, that the
Submitted Abuse Claim is entitled to recovery and should be allowed."
Plan, Art. VII.  Once this process is complete for *all* such Claimants, the
Trustee can provide a Proposed Allowed Claim Amount for each Claim,
which Claimants can then accept or dispute.  Plan, Art. VIII.  Not only
has this process just begun, but the Trustee recently told Claimants that
there is not yet even a deadline for the questionnaires from Claimants.
In the event the Supreme Court in *Purdue* strikes down non-consensual,
third-party releases, the scope and extent of claims under consideration
by the Trustee could change because claims against non-debtor parties
currently channeled to the Trust could be removed from the Trust.

TrustApp022

Similarly, the amounts of the distributions made for Abuse Claims are premised on contributions to the Trust that are in question because of the appeal in *Purdue*. If the Supreme Court finds that non-consensual releases to non-debtors are not permissible, the claims distributions in a post-*Purdue* plan may be significantly different than distributions that could be made under the current Plan. D.I. 254 at 14. Continuing the claims distribution process could require significant legal and administrative costs to the Trust and other parties impacted by the bankruptcy—costs that will be wasted if the Plan needs to be restructured based on the Supreme Court's decision in *Purdue*. This Court should stay further implementation of the Plan until the parties have certainty on the scope and amount of the contributions to the Trust from non-debtors and the extent of claims channeled to the Trust.

Finally, the Trustee's actions to effectuate the Plan and begin paying claims from the Trust, while simultaneously seeking payment from the Certain Insurers, exacerbates the risk that BSA will argue, however incorrectly, that the appeals pending before the Third Circuit should be dismissed as equitably moot. *See In re MTE Holdings, LLC*, 2021 WL 4203339, at *4 (D. Del. Sept. 15, 2021).

17

TrustApp023

Contrary to the district court's suggestion (D.I. 254 at 15-16), the risk that the Court will dismiss the Certain Insurers' appeals and deny the Certain Insurers a ruling on the merits relating to important contractual rights and defenses is quintessential "irreparable harm" that warrants a stay.  *See*, *e.g.*, *In re MD Helicopters, Inc.*, 641 B.R. 96, 109 (D. Del. 2022); *In re Los Angeles Dodgers LLC*, 465 B.R. 18, 36 (D. Del. 2011). That risk, and the harm flowing from it, is even clearer now that the Supreme Court has confirmed at least a fair prospect that the present Plan should not have been confirmed.

Moreover, while the Certain Insurers expressly deny that the equitable mootness doctrine could apply here, there is nothing "remote" or "speculative" about BSA's intent to seek a dismissal on mootness grounds or the harm such dismissal would cause the Certain Insurers, given the assignment of rights to seek coverage under their policies and the lack of clear Plan language regarding preservation of the Certain Insurers' contractual rights.  And that is especially true now that the Trustee has alleged in the coverage action that the Plan abrogates the insurers' rights.

18

## IV.    THE BALANCE OF EQUITIES FAVORS A STAY.

While denying a stay of further implementation of the Plan would significantly and irreparably harm the Certain Insurers and the other movants, the balance of equities favors a stay because a brief pause would not cause substantial harm to other parties. *See S.S. In re Body Armor I*, 927 F.3d at 772 (courts balance the equities in granting a stay). The Trustee has already made progress setting up the Trust and can resume her work, altered as necessary by the *Purdue* ruling, after a stay is dissolved. Any delay should be relatively short because the Supreme Court, in addition to expediting briefing, has indicated that it will hear argument in *Purdue* during the upcoming December argument session. *See San Diegans for the Mt. Soledad Nat'l War Mem'l v. Paulson,* 548 U.S. 1301, 1303 (2006) (slight delay insufficient to deny stay pending appeal). Work by the Trustee and others to commence implementation of the Plan will not be lost if the Court grants a stay.

While the district court noted that BSA and others have "relied on the Plan's effectiveness" since April 2023 (D.I. 254 at 16), they did so over the past five months despite knowing that the Supreme Court may grant certiorari in *Purdue* on the issue of non-consensual third-party releases,

19

and in spite of Appellants' attempts to stay Plan implementation before the Plan took effect. Under these circumstances, a pause in further efforts to implement the Plan to properly account for the *Purdue* decision will not unfairly undermine the reasonable expectations of BSA and other supporters of the Plan.

## V.   THE PUBLIC INTEREST WEIGHS IN FAVOR OF A STAY.

The public interest favors entry of the requested stay by allowing for efficient resolution of the serious issues at stake in these appeals. The Supreme Court's decision in *Purdue* implicates weighty questions regarding fundamental interpretation of the Bankruptcy Code and the permissibility of non-debtor releases that are regularly incorporated into mass tort bankruptcy proceedings, including this one. Given that the public has a strong interest in "correct application of the law" (*In re Nw. Missouri Holdings, Inc.*, 2015 WL 3638000, at *3 (D. Del. June 11, 2015)), "especially where property rights are at stake" (*In re Revel AC, Inc.*, 802 F.3d 558, 573 (3d Cir. 2015)), the public has an interest in a short stay so that a BSA plan can be implemented pursuant to the correct governing legal standards. In denying a stay, the district court simply ignored these important public interests.

TrustApp026

Continuing to implement the Plan despite the realistic possibility that the Supreme Court will change the law risks a "one step forward, two steps back" approach that could impose inefficiencies on the process by wasting time and resources of the parties and the judiciary. While the district court suggested that Plan implementation should continue to march on due to the "largely aged" claimant group (D.I. 254 at 17), moving forward in such a fashion, without even a slight pause of a few months, would be imprudent and inconsistent with one of the primary aims of the Bankruptcy Code, which is to preserve the interests of creditors and other stakeholders by maximizing return on debts in an orderly, efficient, and equitable fashion. *Integrated Sols., Inc. v. Serv. Support Specialties, Inc.*, 124 F.3d 487, 493 (3d Cir. 1997).

Moreover, this temporary stay would be entirely consistent with the Trustee's duties to "administer the Abuse Claims, make distributions to holders of allowed Abuse Claims, and manage, protect, and monetize the assets of the Settlement Trust, all for the benefit of the holders of allowed Abuse Claims." Settlement Trust Agreement § 1.2. In upholding her obligations to Abuse Claimants, the Trustee should account for the fact that the Supreme Court has cast doubt upon her rights to retain or collect

21

certain Trust assets and to evaluate and administer certain claims, at least until the *Purdue* appeal is resolved.

Thus, a stay would further the public's interest in preserving and maximizing resources until *Purdue* provides a clear path forward in applying the correct governing law to this bankruptcy.

## VI.   A STAY DOES NOT REQUIRE A BOND.

Should this Court grant a stay of further implementation, a bond is not required.  In the district court, Appellees sought a $6.9 billion bond based on their "prior arguments and evidence submitted" (citing D.I. 164 at 21), but Appellees never provided the Court with anything more than speculation to support such an extraordinary figure. The Trustee sought a bond of $38,191,000 (D.I. 238-2 at 16)—which further undermines Appellees' request for a bond almost 200 times that amount—but that request is equally meritless, because the Trustee can only point to routine administrative costs that the Trust would incur regardless of a brief stay.

## CONCLUSION

For the foregoing reasons, the Court should grant a stay to prevent further implementation of the Plan until the Supreme Court issues its decision in *Purdue*.

TrustApp028

Dated:      October 10, 2023

Respectfully submitted,

By:  /s/ Theodore J. Boutrous Jr.

Deirdre M. Richards
ELLIOT GREENLEAF
1105 N. Market Street,
Suite 1700
Wilmington, DE 19801
Telephone: (302) 384-9402
Facsimile: (302) 384-9399
dmr@elliotgreenleaf.com

Theodore J. Boutrous Jr.
Blaine H. Evanson
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, California 90071
(213) 229-7000
tboutrous@gibsondunn.com
bevanson@gibsondunn.com

Susan N.K. Gummow
FORAN GLENNON
PALANDECH PONZI &
RUDLOFF P.C.
222 N. LaSalle St., Suite 1400
Chicago, Illinois 60601
sgummow@fgppr.com

Michael A. Rosenthal
James Hallowell
Seth M. Rokosky
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, New York 10166
(212) 351-4000
mrosenthal@gibsondunn.com
jhallowell@gibsondunn.com
kmartorana@gibsondunn.com
srokosky@gibsondunn.com

*Counsel for National Union Fire Insurance Company of Pittsburgh, Pa.,
Lexington Insurance Company, Landmark Insurance Company, and the
Insurance Company of the State of Pennsylvania*

23

TrustApp029

Joseph T. Baio
Christopher J. St. Jeanos
Mitchell J. Auslander
Charles Dean Cording
Patricia O. Haynes
WILLKIE FARR & GALLAGHER LLP
787 Seventh Avenue
New York, NY 10019
(212) 728-8000

*Additional Counsel for National Union Fire Insurance Company of
Pittsburgh, Pa., Lexington Insurance Company, Landmark Insurance
Company, and the Insurance Company of the State of Pennsylvania*

TrustApp030

/s/ Harris B. Winsberg
Harris B. Winsberg
Matthew G. Roberts
PARKER, HUDSON, RAINER &
DOBBS LLP
303 Peachtree St. NE, Suite 3600
Atlanta, GA  30308
Telephone: (404) 420-4313

David M. Fournier
Marcy J. McLaughlin Smith
TROUTMAN PEPPER HAMILTON
SANDERS LLP
1313 Market Street, P.O. Box 1709
Wilmington, DE 19899-1709
Telephone: (302) 777-6500

Margaret H. Warner
Ryan S. Smethurst
Alex M. Spisak
McDERMOTT WILL & EMERY
LLP
The McDermott Building
500 North Capitol Street, NW
Washington, DC 20001-1531
Telephone: (202) 756-8228

*Counsel for Allianz Global Risks
US Insurance Company*

/s/ Harris B. Winsberg
Harris B. Winsberg
Matthew G. Roberts
PARKER, HUDSON, RAINER &
DOBBS LLP
303 Peachtree St. NE, Suite 3600
Atlanta, GA  30308
Telephone: (404) 420-4313

Todd C. Jacobs
John E. Bucheit
PARKER, HUDSON, RAINER &
DOBBS LLP
Two N. Riverside Plaza, Suite 1850
Chicago, IL 60606
Telephone: (312) 447-3306

David M. Fournier
Marcy J. McLaughlin Smith
TROUTMAN PEPPER HAMILTON
SANDERS LLP
1313 Market Street, P.O. Box 1709
Wilmington, DE 19899-1709
Telephone: (302) 777-6500

*Counsel for National Surety
Corporation and Interstate Fire &
Casualty Company*

25

TrustApp031

/s/ Ronald P. Schiller
Ronald P. Schiller
Matthew A. Hamermesh
HANGLEY ARONCHICK SEGAL
PUDLIN & SCHILLER
One Logan Square, 27th Floor
Philadelphia, PA 19103
Telephone: (215) 568-6200
E: rschiller@hangley.com
mhamermesh@hangley.com

Kelly A. Green
SMITH, KATZENSTEIN &
JENKINS LLP
1000 West Street, Suite 501
P.O. Box 410
Wilmington, DE 19899
Telephone: (302) 504-1657

*Counsel for Arch Insurance Company*

/s/ Michael J. Joyce
Michael J. Joyce
JOYCE, LLC
1225 King Street, Suite 800
Wilmington, DE 19801
Telephone: (302) 388-1944
Email: mjoyce@mjlawoffices.com

Kevin Coughlin
Lorraine Armenti
Michael Hrinewski
COUGHLIN MIDLIGE &
GARLAND, LLP
350 Mount Kemble Avenue, PO
Box 1917
Morristown, NJ 07962

/s/ Kathleen K. Kerns
POST & SCHELL, P.C.
Kathleen K. Kerns
Four Penn Center – 13th Floor
1600 John F. Kennedy Boulevard
Philadelphia, PA 19103
Telephone: (215) 587-1000
E-mail: kkerns@postschell.com

IFRAH PLLC
George R. Calhoun
1717 Pennsylvania Ave., N.W.
Suite 650
Washington, DC 20006
Phone: (202) 840-8758
E-mail: george@ifrahlaw.com

*Counsel for Argonaut Insurance Company*

/s/ Maria Aprile Sawczuk
Maria Aprile Sawczuk, Esq.
GOLDSTEIN & MCCLINTOCK
LLLP
501 Silverside Road, Suite 65
Wilmington, DE 19809
Telephone: (302) 444-6710
marias@goldmclaw.com

Laura McNally, Esq.
LOEB & LOEB LLP
321 N. Clark Street, Suite 2300
Chicago, IL 60654
Telephone: (312) 464-3155
lmcnally@loeb.com

26

TrustApp032

Telephone:  (973) 267-0058
kcoughlin@cmg.law
larmenti@cmg.law
mhrinewski@cmg.law

John M. Flynn
Britton C. Lewis
CARRUTHERS & ROTH, P.A.
235 N. Edgeworth Street
P.O. Box 540
Greensboro, NC  27401
Telephone:  (336) 478-1146
jmf@crlaw.com
bcl@crlaw.com

*Counsel for Arrowood
Indemnity Company*

/s/ William H. White Jr.
William H. White Jr
KIERNAN TREBACH LLP
1233 20th Street, NW, 8th Floor
Washington, DC 20036
Telephone: (202) 712-7000
Email:
wwhite@kiernantrebach.com

John E.W. Baay II
GIEGER LABORDE &
LAPEROUOSE, LLC
701 Poydras Street
Suite 4800
New Orleans, LA 70139
Telephone: (504) 561-0400

*Counsel for Gemini Insurance
Company*

David Christian, Esq.
DAVID CHRISTIAN ATTORNEYS
LLC
105 W. Madison St., Suite 1400
Chicago, Illinois 60602
Telephone: (312) 282-5282
dchristian@dca.law

*Counsel for Continental Insurance
Company and Columbia Casualty
Company*

/s/ Kelly A. Green
Kelly A. Green
SMITH, KATZENSTEIN &
JENKINS LLP
1000 West Street, Suite 501
P.O. Box 410
Wilmington, DE 19899
Telephone: (302) 504-1657

Mary E. Borja
Gary P. Seligman
Ashley L. Criss
WILEY REIN LLP
2050 M Street NW
Washington, DC 20036
Phone: (202) 719-7000
Email: mborja@wiley.law
gseligman@wiley.law
acriss@wiley.law

*Counsel for General Star Indemnity
Company*

27

TrustApp033

/s/ Konrad R. Krebs
Konrad R. Krebs
CLYDE & CO US LLP
340 Mt. Kemble Ave, Suite 300
Morristown, New Jersey 07960
Telephone: (973) 210-6705
konrad.krebs@clydeco.us

Alexander E. Potente
CLYDE & CO US LLP
150 California Street
15th Floor
San Francisco, California 94111
Telephone: (415) 365-9800
alex.potente@clydeco.us

David Christian
DAVID CHRISTIAN ATTORNEYS
LLC
105 W. Madison St., Suite 1400
Chicago, Illinois 60602
Telephone: (312) 282-5282
dchristian@dca.law

Bruce W. McCullough
BODELL BOVE, LLC
1225 N. King St., Suite 1000
Wilmington, DE 19801-3250
Telephone: (302) 655-6749
bmccullough@bodellbove.com

*Counsel for Great American
Assurance Company f/k/a
Agricultural Insurance Company,
Great American E&S Insurance
Company f/k/a Agricultural
Excess and Surplus Insurance*

/s/ Kelly A. Green
Kelly A. Green
SMITH, KATZENSTEIN &
JENKINS LLP
1000 West Street, Suite 501
P.O. Box 410
Wilmington, DE 19899
Telephone: (302) 504-1657
kgreen@skjlaw.com

MOUND COTTON WOLLAN &
GREENGRASS LLP
Lloyd A. Gura
Pamela J. Minetto
One New York Plaza 44th Floor
New York, NY 10004
Telephone: (212) 804-4282
Email: lgura@moundcotton.com
pminetto@moundcotton.com

*Counsel for Indian Harbor
Insurance Company, on behalf of
itself and as successor in interest to
Catlin Specialty Insurance
Company*

/s/ Marla S. Benedek
Marla S. Benedek
COZEN O'CONNOR
1201 N. Market Street, Suite 1001
Wilmington, DE 19801
Telephone:  (302) 295-2024
mbenedek@cozen.com

TrustApp034

*Company, and Great American*
*E&S Insurance Company*

/s/ Douglas R. Gooding
Douglas R. Gooding
Jonathan D. Marshall
Bryana T. McGillycuddy
CHOATE, HALL & STEWART
LLP
Two International Place
Boston, MA 02110
Telephone: (617) 248-5000
dgooding@choate.com
jmarshall@choate.com
bmcgillycuddy@choate.com

Kim V. Marrkand
MINTZ, LEVIN, COHN, FERRIS,
GLOVSKY AND POPEO PC
One Financial Center
Boston, MA 02111
Telephone: (617) 542-6000
kvmarrkand@mintz.com

R. Karl Hill
SEITZ, VAN OGTROP & GREEN,
P.A.
222 Delaware Avenue, Suite 1500
Wilmington, Delaware 19801
Telephone: (302) 888-0600
khill@svglaw.com

*Counsel to Liberty Mutual*
*Insurance Company, The Ohio*
*Casualty Insurance Company,*
*Liberty Insurance Underwriters,*
*Inc., and Liberty Surplus Insurance*
*Corporation*

*Counsel for Traders and Pacific*
*Insurance Company, Endurance*
*American Specialty Insurance*
*Company, and Endurance*
*American Insurance Company*

/s/ Louis J. Rizzo, Jr.
Louis J. Rizzo, Jr.
REGER RIZZO & DARNALL LLP
1521 Concord Pike Suite 305
Brandywine Plaza West
Wilmington DE  19803
Telephone: (302) 477-7100
lrizzo@regerlaw.com

*Counsel for Travelers Casualty and*
*Surety Company, Inc. (f/k/a Aetna*
*Casualty & Surety Company), St.*
*Paul Surplus Lines Insurance*
*Company and Gulf Insurance*
*Company*

/s/ Stephen M. Miller
Stephen M. Miller (DE ID No. 2610)
Carl N. Kunz, III (DE ID No. 3201)
MORRIS JAMES LLP
500 Delaware Avenue, Ste. 1500
Wilmington, DE  19801
Telephone: (302) 888-6800
Facsimile: (302) 571-1750
Email: smiller@morrisjames.com
Email: ckunz@morrisjames.com

*Counsel for Old Republic Insurance*
*Company*

29

## CERTIFICATION OF BAR MEMBERSHIP

Pursuant to Local R. 28.3(d) and Local R. 46.1(e), I certify that I, Theodore J. Boutrous Jr., am admitted as an attorney and counselor of the United States Court of Appeals for the Third Circuit.

<u>/s/ Theodore J. Boutrous Jr.</u>
Theodore J. Boutrous Jr.
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, California 90071
(213) 229-7000
tboutrous@gibsondunn.com

Dated:    October 10, 2023

30

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(g) and Local R. 31.1, I certify the following:

1. This brief complies with word limitations of Fed. R. App. P. 27 because it contains 4,439 words, excluding those parts exempted by Fed. R. App. P. 32(f).

2. This brief complies with the typeface and type style requirements of Fed. R. App. P. 32(a)(5) and Fed. R. App. P. 32(a)(6) because the brief has been prepared in Century Schoolbook 14-point font using Microsoft Word.

3. This brief complies with the electronic filing requirements of Local R. 31.1(c) because the text of the electronic brief is identical to the text of the paper copies and because CrowdStrike Falcon was run on the file containing the electronic version of this brief and no viruses were detected.

/s/ Theodore J. Boutrous Jr.
Theodore J. Boutrous Jr.
GIBSON, DUNN &
CRUTCHER LLP
333 South Grand Avenue
Los Angeles, California 90071
(213) 229-7000
tboutrous@gibsondunn.com

Dated:     October 10, 2023

TrustApp037

## CERTIFICATE OF SERVICE

I certify that the foregoing was filed with the Clerk using the appellate CM/ECF system on October 10, 2023. All counsel of record are registered CM/ECF users, and service will be accomplished by the CM/ECF system.

<div style="margin-left:50%">

/s/ Theodore J. Boutrous Jr.
Theodore J. Boutrous Jr.
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, California 90071
(213) 229-7000
tboutrous@gibsondunn.com
</div>

Dated:      October 10, 2023

TrustApp038

**List of Defendants that Objected to Bankruptcy Confirmation**
***In re Boy Scouts of America*, No. 20-10343 (Bankr. D. Del.)**

The Allianz Insurers' (I) Objection to the Debtors' Disclosure Statement for their Second
Amended Chapter 11 Plan of Reorganization and (II) Limited Joinder to Certain Objections,
ECF No. 3549 (May 10, 2021)

- Allianz Global Risks US Insurance Company

- National Surety Corporation

- Interstate Fire & Casualty Company

Certain Insurers' Supplemental Objection to Motion for Approval of Debtors' Disclosure
Statement, ECF No. 6052 (August 17, 2021)

- Arrowood Indemnity Company

- Columbia Casualty Company

- The Continental Insurance Company

- Indian Harbor Insurance Company, on behalf of itself and as successor in interest to
  Catlin Specialty Insurance Company

- Munich Reinsurance America, Inc., formerly known as American Re-Insurance Company

- Old Republic Insurance Company

- St. Paul Surplus Lines Insurance Company

- Travelers Casualty and Surety Company, Inc. (f/k/a Aetna Casualty & Surety Company)

- Gulf Insurance Company (n/k/a The Travelers Indemnity Company)

The Allianz Insurers' Joinder to the Certain Insurers' Supplemental Objection to Motion for
Approval of Debtors' Disclosure Statement, ECF No. 6055 (August 17, 2021)

- Allianz Global Risks US Insurance Company

- National Surety Corporation

- Interstate Fire & Casualty Company

Certain Excess Insurers' Supplemental Objection to Debtors' Disclosure Statement for Fourth
Amended Chapter 11 Plan of Reorganization and Joinder, ECF No. 6056 (August 17, 2021)

- Great American Assurance Company (f/k/a Agricultural Insurance Company)

- Great American E&S Insurance Company (f/k/a Agricultural Excess and Surplus
  Insurance Company)

1

TrustApp039

Joinder and Supplemental Objection of Liberty Mutual Insurance Company to the Disclosure
Statement for The Fourth Amended Chapter 11 Plan of Reorganization for Boy Scouts of
America and Delaware BSA, LLC, ECF No. 6057 (August 17, 2021)

- Liberty Mutual Insurance Company, together with its affiliates and subsidiaries
  (collectively, "Liberty")

Certain Insurers' Superseding Objections to the Disclosure Statement for Debtors' Fourth
Amended Plan, ECF No. 6062 (August 17, 2021)

- Allianz Global Risks US Insurance Company

- Arrowood Indemnity Company

- The Continental Insurance Company

- Columbia Casualty Company

- National Surety Corporation

- Interstate Fire & Casualty Company

- General Star Indemnity Company

Reservation of Rights and Objection of Everest National Insurance Company to Debtors' Second
Modified Fifth Amended Chapter 11 Plan of Reorganization, ECF No. 8672 (February 4, 2022)

- Everest National Insurance Company

Objection of Markel Insurers to Second Modified Fifth Amended Chapter 11 Plan of
Reorganization for Boy Scouts of America and Delaware BSA, LLC, ECF No. 8684 (February 4,
2022)

- Markel Service, Incorporated, Claim Service Manager for Alterra Excess & Surplus and
  Evanston Insurance Company

Munich Reinsurance America, Inc., Formerly Known as American Re-Insurance Company's
Joinder to Certain Objections and Separate Objection to the Plan, ECF No. 8685 (February 4,
2022)

- Munich Reinsurance America, Inc., formerly known as American Re-Insurance Company

Old Republic Insurance Company's (A) Joinder to Certain Insurers' Objection to Confirmation
of Debtors' Chapter 11 Plan; (B) Partial Joinder to Allianz Insurers' Objection to the Plan;
(C) Supplemental Objection to the Plan; and (D) Reservation of Rights, ECF No. 8699 (February
4, 2022)

- Old Republic Insurance Company

Joinder By Travelers Casualty and Surety Company, Inc. (FKA Aetna Casualty & Surety
Company), St. Paul Surplus Line[s] Insurance Company and Gulf Insurance Company to Allianz

2

TrustApp040

Insurers' Objection to the Second Modified Fifth Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC and Request for Relief from the Plan Discharge and Injunction Provisions, ECF No. 8700 (February 4, 2022)

- Travelers Casualty and Surety Company, Inc. (f/k/a Aetna Casualty & Surety Company)

- St. Paul Surplus Lines Insurance Company

- Gulf Insurance Company (n/k/a The Travelers Indemnity Company)

Joinder of Traders and Pacific Insurance Company, Endurance American Specialty Insurance Company, and Endurance American Insurance Company to Certain Insurers' Objection to Confirmation of Debtors' Chapter 11 Plan, ECF No. 8703 (February 5, 2022)

- Endurance American Specialty Insurance Company

- Endurance American Insurance Company

Joinder and Objection of Liberty Mutual Insurance Company to the Second Modified Fifth Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC, ECF No. 8763 (February 9, 2022)

- Liberty Mutual Insurance Company, together with its affiliates and subsidiaries (collectively, "Liberty")

Allianz Insurers' Objection to the Second Modified Fifth Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC and Request for Relief from the Plan Discharge and Injunction Provisions, ECF No. 8778-1 (February 10, 2022)

- Allianz Global Risks US Insurance Company

- National Surety Corporation

- Interstate Fire & Casualty Company

Certain Insurers' Objection to Confirmation of Debtors' Chapter 11 Plan, ECF No. 8858-1, (February 16, 2022)

- The Continental Insurance Company

- Columbia Casualty Company

- Indian Harbor Insurance Company on behalf of itself and as successor in interest to Catlin Specialty Insurance Company

- Travelers Casualty and Surety Company, Inc. (f/k/a Aetna Casualty & Surety Company)

- St. Paul Surplus Lines Insurance Company

- Arrowood Indemnity Company

3

TrustApp041

- Gemini Insurance Company

- National Surety Corporation

- Interstate Fire & Casualty Company

- Allianz Global Risks US Insurance Company

- Argonaut Insurance Company

- Colony Insurance Company

- Liberty Mutual Insurance Company

- General Star Indemnity Company

- Great American Assurance Company (f/k/a Agricultural Insurance Company)

- Great American E&S Insurance Company (f/k/a Agricultural Excess and Surplus Insurance Company)

- Arch Insurance Company

- Gulf Insurance Company (n/k/a The Travelers Indemnity Company)

Supplemental Reservation of Rights and Objection of Everest National Insurance Company to Debtors' Third Modified Fifth Amended Chapter 11 Plan of Reorganization, ECF No. 9020 (February 25, 2022)

- Everest National Insurance Company

Certain Insurers' Supplemental Objection to Confirmation of Debtors' Chapter 11 Plan, ECF No. 9033 (February 25, 2022)

- Great American Assurance Company (f/k/a Agricultural Insurance Company)

- Great American E&S Insurance Company (f/k/a Agricultural Excess and Surplus Insurance Company)

- Allianz Global Risks US Insurance Company

- National Surety Corporation

- Interstate Fire & Casualty Company

- Argonaut Insurance Company

- Colony Insurance Company

- Liberty Mutual Insurance Company

- General Star Indemnity Company

4

- Arch Insurance Company

- Indian Harbor Insurance Company, on behalf of itself and as successor in interest to Catlin Specialty Insurance Company

- Travelers Casualty and Surety Company, Inc. (f/k/a Aetna Casualty & Surety Company)

- St. Paul Surplus Lines Insurance Company

- The Continental Insurance Company

- Columbia Casualty Company

- Endurance American Specialty Insurance Company

- Endurance American Insurance Company

- Arrowood Indemnity Company

- Gemini Insurance Company

- Old Republic Insurance Company

- Munich Reinsurance America, Inc., formerly known as American Re-Insurance Company

- Gulf Insurance Company (n/k/a The Travelers Indemnity Company)

Certain Insurers' Objection to Motion to Amend and Supplement The Findings of Fact and Conclusions of Law in the Confirmation Opinion and Objection to Confirmation of Revised Chapter 11 Plan, ECF No. 10247 (August 24, 2022)

- Allianz Global Risks US Insurance Company

- National Surety Corporation

- Interstate Fire & Casualty Company

- Argonaut Insurance Company

- Colony Insurance Company

- Liberty Mutual Insurance Company

- General Star Indemnity Company

- Great American Assurance Company (f/k/a Agricultural Insurance Company)

- Great American E&S Insurance Company (f/k/a Agricultural Excess and Surplus Insurance Company)

- Arch Insurance Company

TrustApp043

- Indian Harbor Insurance Company, on behalf of itself and as successor in interest to Catlin Specialty Insurance Company

- Travelers Casualty and Surety Company, Inc. (f/k/a Aetna Casualty & Surety Company)

- St. Paul Surplus Lines Insurance Company

- Gulf Insurance Company (n/k/a The Travelers Indemnity Company)

- Arrowood Indemnity Company

- Gemini Insurance Company

- Munich Reinsurance America, Inc., formerly known as American Re-Insurance Company

- Old Republic Insurance Company

- Endurance American Specialty Insurance Company

- Endurance American Insurance Company

- Markel Service, Incorporated, Claim Service Manager for Alterra Excess & Surplus and Evanston Insurance Company

6

TrustApp044

**List of Defendants that Objected to Confirmation at the District Court**
***National Union Fire Insurance Co. of Pittsburgh PA et al. v. Boy Scouts of America &***
***Delaware BSA LLC***, No. 22-cv-01237 (D. Del)

Opening Brief on Appeal of The Liberty Insurers and the Allianz Insurers Regarding Treatment of Class 9 Claims and Related Matters, ECF No. 43 (November 7, 2022)

- Allianz Global Risks US Insurance Company

- Liberty Insurance Underwriters, Inc.

- Liberty Mutual Insurance Company

- Liberty Surplus Insurance Corporation

- The Ohio Casualty Insurance Company

- National Surety Corporation

- Interstate Fire & Casualty Company

Opening Brief of Certain Insurers, ECF No. 45 (November 7, 2022)

- National Union Fire Insurance Company of Pittsburgh, Pa.

- Lexington Insurance Company

- The Insurance Company of the State of Pennsylvania

- Allianz Global Risks US Insurance Company

- National Surety Corporation

- Interstate Fire & Casualty Company

- Arch Insurance Company

- Argonaut Insurance Company

- Colony Insurance Company

- Arrowood Indemnity Company

- The Continental Insurance Company

- Columbia Casualty Company

- Gemini Insurance Company

- General Star Indemnity Company

- Indian Harbor Insurance Company, on behalf of itself and as successor in interest to Catlin Specialty Insurance Company

7

- Great American Assurance Company (f/k/a Agricultural Insurance Company)

- Great American E&S Insurance Company (f/k/a Agricultural Excess and Surplus Insurance Company)

- Munich Reinsurance America, Inc., formerly known as American Re-Insurance Company

- Liberty Mutual Insurance Company

- The Ohio Casualty Insurance Company

- Liberty Underwriters Inc.

- Liberty Surplus Insurance Corporation

- Endurance American Specialty Insurance Company

- Endurance American Insurance Company

- Old Republic Insurance Company

- Travelers Casualty and Surety Company, Inc. (f/k/a Aetna Casualty & Surety Company)

- St. Paul Surplus Lines Insurance Company

- Gulf Insurance Company (n/k/a The Travelers Indemnity Company)

Reply Brief of Certain Insurers, ECF No. 109 (December 21, 2022)

- National Union Fire Insurance Company of Pittsburgh, Pa.

- Lexington Insurance Company

- The Insurance Company of the State of Pennsylvania

- Allianz Global Risks US Insurance Company

- National Surety Corporation

- Interstate Fire & Casualty Company

- Arch Insurance Company

- Argonaut Insurance Company

- Colony Insurance Company

- Arrowood Indemnity Company

- The Continental Insurance Company

- Columbia Casualty Company

TrustApp046

- Gemini Insurance Company

- General Star Indemnity Company

- Indian Harbor Insurance Company, on behalf of itself and as successor in interest to Catlin Specialty Insurance Company

- Great American Assurance Company (f/k/a Agricultural Insurance Company)

- Great American E&S Insurance Company (f/k/a Agricultural Excess and Surplus Insurance Company)

- Munich Reinsurance America, Inc., formerly known as American Re-Insurance Company

- Liberty Mutual Insurance Company

- The Ohio Casualty Insurance Company

- Liberty Underwriters Inc.

- Liberty Surplus Insurance Corporation

- Endurance American Specialty Insurance Company

- Endurance American Insurance Company

- Old Republic Insurance Company

- Travelers Casualty and Surety Company, Inc. (f/k/a Aetna Casualty & Surety Company)

- St. Paul Surplus Lines Insurance Company

- Gulf Insurance Company (n/k/a The Travelers Indemnity Company)

Reply Brief of The Liberty Insurers and the Allianz Insurers, ECF No. 111 (December 21, 2022)

- Allianz Global Risks US Insurance Company

- Liberty Insurance Underwriters, Inc.

- Liberty Mutual Insurance Company

- Liberty Surplus Insurance Corporation

- National Surety Corporation

- The Ohio Casualty Insurance Company

9

**List of Defendants that Objected to Confirmation at the Third Circuit**
***In re Boy Scouts of America*, No. 23-1664 (3d Cir. 2023)**

***In re Boy Scouts of America*, No. 23-1673 (3d Cir. 2023)**

Opening Brief on Appeal of Appellants the Allianz Insurers, ECF No. 55 (July 24, 2023)

- Allianz Global Risks US Insurance Company

- Interstate Fire & Casualty Company

- National Surety Corporation

***In re Boy Scouts of America*, No. 23-1668 (3d Cir. 2023)**

Opening Brief of Certain Insurers, ECF No. 67 (July 24, 2023)

- National Union Fire Insurance Company of Pittsburgh, Pa.

- Lexington Insurance Company

- The Insurance Company of the State of Pennsylvania

- Arrowood Indemnity Company

- The Continental Insurance Company

- Columbia Casualty Company

- Gemini Insurance Company

- General Star Indemnity Company

- Great American Assurance Company (f/k/a Agricultural Insurance Company)

- Great American E&S Insurance Company (f/k/a Agricultural Excess and Surplus Insurance Company)

- Indian Harbor Insurance Company, on behalf of itself and as successor in interest to Catlin Specialty Insurance Company

- Endurance American Insurance Company

- Endurance American Specialty Insurance Company

- Liberty Mutual Insurance Company

- The Ohio Casualty Insurance Company

- Liberty Insurance Underwriters, Inc.

- Liberty Surplus Insurance Corporation

10

TrustApp048

- Travelers Casualty and Surety Company, Inc. (f/k/a Aetna Casualty & Surety Company)

- St. Paul Surplus Lines Insurance Company

- Gulf Insurance Company (n/k/a The Travelers Indemnity Company)

- Old Republic Insurance Company

- Arch Insurance Company

- Argonaut Insurance Company

- Colony Insurance Company

11

TrustApp049

**<u>List of Defendants That Attempted to Stay the Bankruptcy Proceedings (District Court)</u>**
***<u>National Union Fire Insurance Co. of Pittsburgh PA et al. v. Boy Scouts of America &</u>***
***<u>Delaware BSA LLC</u>*****<u>, No. 22-cv-01237 (D. Del)</u>**

<u>Motion of the Certain Insurers for Stay of Further Implementation of the Plan Pending Supreme
Court Decision in Purdue, ECF No. 235 (September 15, 2023)</u>

- National Union Fire Insurance Company of Pittsburgh, Pa.

- Lexington Insurance Company

- The Insurance Company of the State of Pennsylvania

- Allianz Global Risks US Insurance Company

- National Surety Corporation

- Interstate Fire Casualty Company

- Arch Insurance Company

- Argonaut Insurance Company

- Colony Insurance Company

- The Continental Insurance Company

- Columbia Casualty Company

- Arrowood Indemnity Company

- General Star Indemnity Company

- Gemini Insurance Company

- Indian Harbor Insurance Company, on behalf of itself and as successor in interest to
  Catlin Specialty Insurance Company

- Great American Assurance Company (f/k/a Agricultural Insurance Company)

- Great American E&S Insurance Company (f/k/a Agricultural Excess and Surplus
  Insurance Company)

- Endurance American Specialty Insurance Company

- Endurance American Insurance Company

- Liberty Insurance Underwriters Inc.

- Liberty Mutual Insurance Company

- Liberty Surplus Insurance Corporation

12

- The Ohio Casualty Insurance Company

- Travelers Casualty and Surety Company, Inc. (f/k/a Aetna Casualty & Surety Company)

- St. Paul Surplus Lines Insurance Company

- Gulf Insurance Company (n/k/a The Travelers Indemnity Company)

- Old Republic Insurance Company

13

TrustApp051

**<u>List of Defendants That Attempted to Stay the Bankruptcy Proceedings (Third Circuit)</u>**
**<u>*In re Boy Scouts of America*, No. 23-1664 (3d Cir. 2023)</u>**

<u>Motion of the Certain Insurers for Stay of Further Implementation of the Plan Pending Supreme
Court Decision in Purdue, ECF No. 116 (October 10, 2023)</u>

- National Union Fire Insurance Company of Pittsburgh, Pa.

- Lexington Insurance Company

- The Insurance Company of the State of Pennsylvania

- Allianz Global Risks US Insurance Company

- National Surety Corporation

- Interstate Fire & Casualty Company

- Argonaut Insurance Company

- Arch Insurance Company

- Arrowood Indemnity Company

- The Continental Insurance Company

- Columbia Casualty Company

- Gemini Insurance Company

- General Star Indemnity Company

- Indian Harbor Insurance Company, on behalf of itself and as successor in interest to
  Catlin Specialty Insurance Company

- Great American Assurance Company (f/k/a Agricultural Insurance Company)

- Great American E&S Insurance Company (f/k/a Agricultural Excess and Surplus
  Insurance Company)

- Endurance American Specialty Insurance Company

- Endurance American Insurance Company

- Liberty Insurance Underwriters Inc.

- Liberty Mutual Insurance Company

- Liberty Surplus Insurance Corporation

- The Ohio Casualty Insurance Company

- Travelers Casualty and Surety Company, Inc. (f/k/a Aetna Casualty & Surety Company)

14

TrustApp052

- St. Paul Surplus Lines Insurance Company

- Gulf Insurance Company (n/k/a The Travelers Indemnity Company)

- Old Republic Insurance Company

15

TrustApp053

**Lloyd, Michael**

| | |
|---|---|
| **From:** | Bullen, Julia (Allianz Resolution Management US) <Julia.Bullen@allianzrm-us.com> |
| **Sent:** | Thursday, August 31, 2023 9:37 AM |
| **To:** | Quinn, Kami E. |
| **Subject:** | RE: BSA Settlement Trust - Insurer Notice Letter (Allianz) |
| **Attachments:** | 2023.07.14_Insurer Notice Letter_BSA Settlement Trust.pdf; Boy Scouts - Allianz Omnibus RoR to July 14 2023 Letter from Settlement Trust. 8.31.23.pdf |

Dear Ms. Quinn:

In response to your July 14, 2023 letter sent on behalf of the BSA Chapter 11 Settlement Trust, which purported to notify Allianz Insurance Company (n/k/a Allianz Global Risks US Insurance Company) ("Allianz") of 82,209 claims by persons who allege that they were sexually abused as children while participating in Boy Scouts of America programs nationwide, please see the attached letter sent on behalf of Allianz.

Should you have any questions, please let me know.

Best,

Julia M. Bullen  (formerly Nesbitt – please note change in email address*)
Claims Specialist – Asbestos, Toxic Tort & Abuse
**Allianz Reinsurance America, Inc. (AZRA)**
**California Independent Adjuster License No. 6004666**

**Allianz Resolution Management® (ARM)**

Letters: P.O. Box 750039, Petaluma, CA 94975-0039
Packages: 1465 North McDowell Blvd, Suite 201, Petaluma, CA 94954
T: 415-899-4111 I  julia.bullen@allianzrm-us.com

**WORKING REMOTELY – Business Hours: Monday – Friday, 8am – 4:30pm Eastern Standard Time**

🌱 Please consider the environment before printing this email.  Allianz is striving for a paperless environment.  Please send correspondence electronically only, unless otherwise requested.

---

**From:** Jennings, Rachel <JenningsR@gilbertlegal.com>
**Sent:** Friday, July 14, 2023 2:27 PM
**To:** tboutrous@gibsondunn.com; rdoren@gibsondunn.com; bevanson@gibsondunn.com; drichards@finemanlawfirm.com; sgummow@fgppr.com; mrosenthal@gibsondunn.com; mkarlan@gibsondunn.com; jhallowell@gibsondunn.com; kmartorana@gibsondunn.com; srokosky@gibsondunn.com; patrick.shea@allianzrm-us.com; newloss@agcs.allianz.com; david.fournier@troutman.com; marcy.smith@troutman.com; Harris Winsberg <hwinsberg@phrd.com>; mroberts@phrd.com; Warner, Margaret <mwarner@mwe.com>; Smethurst, Ryan <rsmethurst@mwe.com>; Spisak, Alex <Aspisak@mwe.com>; Kristy.Roy@allstate.com; laurie.lowe@allstate.com; RWarner@amerisure.com; Tsheldon@amerisure.com; NewClaims@amerisure.com; claims@gamcustom.com; debbie.pena@rtspecialty.com; claims@archinsurance.com; kmiller@skjlaw.com; rschiller@hangley.com; mhamermesh@hangley.com; debbie.pena@rtspecialty.com; claimreporting@colonyspecialty.com; plogan <plogan@postschell.com>; John C. Sullivan <jsullivan@postschell.com>; kkerns@postschell.com; George Calhoun <george@ifrahlaw.com>; alterisclaimsreporting@alterisus.com; Ktaylor@agrminc.com; cwilkerson@brownsims.com; Robert.young@arrowpointcao.com; mjoyce@mjlawoffices.com; kcoughlin@cmg.law; larmenti@cmg.law; mhrinewski@cmg.law; bcl@crlaw.com; jmf@crlaw.com; paul.needham@aspen-insurance.com; cwilkerson@brownsims.com; Casualty.Claims@aspen-insurance.com; Claims@ategrity.com; jmorgenstern@ohaganmeyer.com; mszwajkowski@ohaganmeyer.com; ckunz <ckunz@morrisjames.com>; jonathan.mulvihill@axaxl.com; intlpropcasclaimnewnotices@xlgroup.com; kmiller@skjlaw.com;

1

TrustApp054

lgura@moundcotton.com; Pamela Minetto <pminetto@moundcotton.com>; kristin.gallagher@kennedyslaw.com; jedidiah.vanderklok@kennedyslaw.com; peter.waldron@axiscapital.com; intlpropcasclaimnewnotices@xlgroup.com; kmiller@skjlaw.com; mborja@wiley.law; gseligman@wiley.law; acriss@wiley.law; cusisclaimssupport@catalinare.com; michael_destazio@cinfin.com; policy_service@cinfin.com; lossreport@cnaasap.com; Jeremy.Burton@cna.com; marias@goldmclaw.com; lmcnally@loeb.com; estone@loeb.com; claims@enia.com; Angela.Petrungaro@erieinsurance.com; Shaun.Choffel@erieinsurance.com; customercare@erieinsurance.com; namer@carltonfields.com; Ggidus@carltonfields.com; RDiUbaldo@carltonfields.com; Nvalenza-Frost@carltonfields.com; everestnationalnjclaim@everestre.com; icooper@nicolaidesllp.com; egallagher@nicolaidesllp.com; Taylor_Mahoney@trg.com; AWACUS.GeneralCasualtyClaims@awac.com; newnotices@trg.com; david.fournier@troutman.com; marcy.smith@troutman.com; Harris Winsberg <hwinsberg@phrd.com>; mroberts@phrd.com; tjacobs@phrd.com; jbucheit@phrd.com; dchristian@dca.law; bmccullough@bodellbove.com; bruce.celebrezze@clydeco.us; konrad.krebs@clydeco.us; excessliabilityclaims@gaig.com; CLClaimsReports@LibertyMutual.com; Kim Marrkand <KVMarrkand@mintz.com>; khill@svglaw.com; dgooding@choate.com; jmarshall@choate.com; Kim Marrkand <KVMarrkand@mintz.com>; lbstephens@mintz.com; ddolendi@hww-law.com; expressclaims@willis.com; melorod@gtlaw.com; Asax-bolder@bhfs.com; mpankow@bhfs.com; debbie.pena@rtspecialty.com; newclaims@markelcorp.com; clmsnj@munichreamerica.com; tweaver@dilworthlaw.com; wmcgrath@dilworthlaw.com; jschapp@goldbergsegalla.com; kallen@goldbergsegalla.com; smiller <smiller@morrisjames.com>; ckunz <ckunz@morrisjames.com>; panderson@foxswibel.com; rschultz@foxswibel.com; ahachikian@foxswibel.com; kthomas@foxswibel.com; Malcolm.McGregor@us.qbe.com; Damian.Reber@us.qbe.com; newlossQBE@us.qbe.com; lavonne.elliott@LibertyMutual.com; Kim Marrkand <KVMarrkand@mintz.com>; CLClaimsReports@LibertyMutual.com; CDickson@securitymutual.com; claims@securitymutual.com; mbenedek@cozen.com; rgolenor@enhinsurance.com; lparks-carter@enhinsurance.com; swissreafterhoursclaims@englemartin.com; catlinclaims.atlanta@catlin.com; John.Agnello@ficoh.com; skh@fmhc-law.com; claimsreportsdesk@ficoh.com; lrizzo@regerlaw.com; ezawitos@travelers.com; spmyers@travelers.com; ClaimsNewReport@uticanational.com; ablum@berkleycustom.com; Claims@berkleycustom.com; bsullivan@werbsullivan.com; jbaay@glllaw.com; wwhite@kiernantrebach.com
**Cc:** Quinn, Kami E. <quinnk@gilbertlegal.com>; Grim, Emily P. <grime@gilbertlegal.com>
**Subject:** BSA Settlement Trust - Insurer Notice Letter

**[ External Email ]**
Counsel,

We serve as coverage counsel to the BSA Settlement Trust.  Please see attached, on behalf of the Trustee.  Executed confidentiality agreements should be sent to jenningsr@gilbertlegal.com and ogreys@gilbertlegal.com.

Best regards,

Rachel

# GILBERT LLP

**Rachel Jennings**
JenningsR@gilbertlegal.com
O 202.772.2250

700 Pennsylvania Ave., SE
Suite 400
Washington, DC  20003
**GilbertLegal.com**

This email and any attachments may contain confidential information that is privileged at law. If you are not a named recipient or have received this communication by error, please notify the sender immediately and destroy this email and its attachments, and all copies thereof, without further distributing or copying them.

TrustApp055

CONFIDENTIALITY NOTICE: The information in this message, and any files transmitted with it, is confidential, may be legally privileged, and intended only for the use of the individual(s) named above. Be aware that the use of any confidential or personal information may be restricted by state and federal privacy laws. If you are not the intended recipient, do not further disseminate this message. If this message was received in error, please notify the sender and delete it.

TrustApp056

## **PJ Moving Insurers: Key Known Contacts with Texas**

| Defendant | Registered Texas Insurer, per NAIC | Location(s) and/or Agent(s) in Texas[1] | Website Targets and/or Highlights Texans[2] | Invoked &/or Consented to Jurisdiction in Other Texas Case(s)[3] | Entered into Consent Order(s) with Texas Dep't of Insurance[4] |
|---|---|---|---|---|---|
| Allstate Ins. Co. | X | X | X | X | |
| American Home Assurance Co. | X | | | X | X |

---

[1] The following websites were last accessed by the Trustee on October 30, 2023: https://agents.allstate.com/usa/tx; https://agency.nationwide.com/tx.

[2] The following websites were last accessed by the Trustee on October 30, 2023: https://www.allstate.com/auto-insurance/texas-car-insurance-coverages; https://www.cinfin.com/personal-insurance ("When Texas homeowners and collectors Raymond and Marydel experienced serious tornado damage, Cincinnati's claims team ensured their artwork was professional restored and made it possible for them to feel at home again."); https://www.nationwide.com/personal/insurance/auto/state/texas/; https://www.travelers.com/car-insurance/state-coverages/texas.

[3] A quick search for cases in PACER and opinions in Westlaw revealed the following cases. This list does not include cases filed in Texas state court that did not include an appellate court decision, as those are not available on Westlaw (nor, to the Trustee's counsel's knowledge, in any other centralized database), and in the interests of brevity, it only includes one example for each defendant, rather than all of the dozens and dozens of cases found: *Allstate Ins. Co. v. Weishiemer*, No. H-20-3116 (S.D. Tex.); *Am. Home Assur. Co. v. Medina*, No. 1:21-CV-001236-LY-SH (W.D. Tex.); *Arrowood Indemn. Co. v. Gulf Underwriters Ins. Co.*, Nos. EP-04-CV-432 & EP-08-CV-285-DB (W.D. Tex.); *Charter Oak Fire Ins. Co. v. Shamrock Steel Sales, Inc.*; *Cincinnati Ins. Co. v. RBP Chem. Tech., Inc.*, No. 1:07-CV-699 (E.D. Tex.); *Nationwide Mut. Ins. Co. v. Choi*, No. 4:22-cv-01231 (S.D. Tex.); *Nat'l Cas. Co. v. KT2 LLC*, No. 3:19-CV-1926-E (N.D. Tex.); *Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Bacarella Transp. Servs., Inc.*, No. 3:19-CV-01364-X (N.D. Tex.); *N.H. Ins. Co. v. Dominguez*, No. 1:12-CV-107 (S.D. Tex.); *Scottsdale Ins. Co. v. Discovering Me Academy, LLC*, No. 4:20-CV-2449 (S.D. Tex.); *St. Paul Fire & Marine Ins. Co. v. Flexrod Sales & Servs., Inc.*, No. MO-16-CV-00085-DCG (W.D. Tex.); *St. Paul Mercury Ins. Co. v. Lewis-Quinn Constr.*, No. H-10-5146 (S.D. Tex.); *Travelers Cas. & Sur. Co. of Am. v. Padron*, No. 5:15-CV-200-DAE (W.D. Tex.); *Unlimited Servs., LLC v. Anadarko Petroleum Corp.*, No. 4:19-CV-4414 (S.D. Tex.) (third-party defendant Travelers Companies); *Travelers Prop. Cas. Co. of Am. v. Craigen Marine Contractors, LLC*, No. 1:21-CV-62-DAE (W.D. Tex.) (Travelers Indem. Co. also a plaintiff).

[4] In the interests of brevity, this list only includes one example from each defendant, though many have entered into multiple Texas consent orders: No. 2022-7662, available at https://www.tdi.texas.gov/wc/orders/documents/dwc227662.pdf (Nat'l Union Fire Ins. Co. of Pittsburgh, PA); No. 2022-7394, available at https://www.tdi.texas.gov/wc/orders/documents/dwc227394.pdf (N.H. Ins. Co.); No. 2023-7926, available at https://www.tdi.texas.gov/wc/orders/documents/dwc237926.pdf (The Phoenix Ins. Co.); No. 2023-7753, available at https://www.tdi.texas.gov/wc/orders/documents/dwc237753.pdf (Travelers Cas. & Sur. Co.); No. 2022-7208, available at https://www.tdi.texas.gov/wc/orders/documents/dwc227208.pdf (Arrowood Ins. Co.); No. 2023-8059, available at https://www.tdi.texas.gov/wc/orders/documents/dwc238059.pdf (Charter Oak Fire Ins. Co.); No. 2018-5698, available at https://www.tdi.texas.gov/commissioner/disciplinary-orders/documents/20185698.pdf (Cincinnati Ins. Co.); No. 2018-5408, available at https://www.tdi.texas.gov/commissioner/disciplinary-orders/documents/20185408.pdf (Jefferson Ins. Co.); No. 2023-8166, available at https://www.tdi.texas.gov/commissioner/disciplinary-orders/documents/dwc238166.pdf (Nat'l Cas. Co.); No. 2021-6656, available at https://www.tdi.texas.gov/commissioner/disciplinary-orders/documents/20216656.pdf (Nationwide Mut. Ins. Co.); No. 2021-6949, available at https://www.tdi.texas.gov/wc/orders/documents/dwc216949.pdf (Travelers Indem. Co.).

TrustApp057

| Defendant | Registered Texas Insurer, per NAIC | Location(s) and/or Agent(s) in Texas[1] | Website Targets and/or Highlights Texans[2] | Invoked &/or Consented to Jurisdiction in Other Texas Case(s)[3] | Entered into Consent Order(s) with Texas Dep't of Insurance[4] |
|---|---|---|---|---|---|
| Arrowood Indemnity Co. | X | | | X | X |
| Charter Oak Fire Ins. Co. | X | | | X | X |
| Cincinnati Ins. Co. | X | | X | X | X |
| Columbia Ins. Co. | X | | | | |
| Consolidated National Ins. Co. | | | | | |
| Erie & Niagara Ins. Ass'n | | | | | |
| Erie Family Life | | | | | |
| Erie Ins. Exchange | | | | | |
| Jefferson Ins. Co. | X | | | | X |
| Nationwide Mutual Ins. Co. | X | X | X | X | X |
| National Casualty Co. | X | | | X | X |
| National Union Fire Ins. Co. of Pittsburgh, Pa. | X | | | X | X |
| New Hampshire Ins. Co. | X | | | X | X |
| The Phoenix Ins. Co. | X | | | | X |
| Scottsdale Ins. Co. | X | | | X | |
| SPARTA Ins. Co. | X | | | | |
| St. Paul Fire & Marine Ins. Co. | X | | | X | |
| St. Paul Mercury Ins. Co. | X | | | X | |
| Travelers Casualty & Surety Co. | X | | | X | X |
| The Travelers Companies, Inc. | | | | X | |
| The Travelers Indemnity Co. | X | | X | X | X |

2

| Defendant | Registered Texas Insurer, per NAIC | Location(s) and/or Agent(s) in Texas[1] | Website Targets and/or Highlights Texans[2] | Invoked &/or Consented to Jurisdiction in Other Texas Case(s)[3] | Entered into Consent Order(s) with Texas Dep't of Insurance[4] |
|---|---|---|---|---|---|
| Wausau General Ins. Co. | X | | | | |

3

UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT

BCO-011

**Nos. 23-1664, 23-1665, 23-1666, 23-1667, 23-1668, 23-1669, 23-1670, 23-1671, 23-1672, 23-1673, 23-1674, 23-1675, 23-1676, 23-1677, 23-1678, & 23-1780**

In re: Boy Scouts of America and Delaware BSA LLC

Lujan Claimants,
Appellants is No. 23-1664

Liberty Mutual Insurance Company, The Ohio Casualty
Insurance Company, Liberty Insurance Underwriters, Inc., and
Liberty Surplus Insurance Corporation,
Appellants in No. 23-1665

D&V Claimants,
Appellants in No. 23-1666

The Continental Insurance Company and Columbia Casualty
Company,
Appellants in No. 23-1667

National Union Fire Insurance Co. of Pittsburgh Pennsylvania,
Lexington Insurance Company, Landmark Insurance Company,
and The Insurance Company of the State of Pennsylvania,
Appellants in No. 23-1668

Indian Harbor Insurance Company,
Appellant in No. 23-1669

Old Republic General Insurance Group,
Appellant in No. 23-1670

Travelers Casualty and Surety Company, Inc., St. Paul Surplus
Lines Insurance Company, and Gulf Insurance Company,
Appellants in No. 23-1671

Great American Assurance Company and Great American E&S
Insurance Company
Appellants in No. 23-1672

Allianz Global Risks US Insurance Company, National Surety
Corporation, and Interstate Fire & Casualty Company,
Appellants in No. 23-1673

TrustApp060

Argonaut Insurance Company and Colony Insurance Company
Appellants in No. 23-1674

Gemini Insurance Company,
Appellant in No. 23-1675

General Star Indemnity Company,
Appellant in No. 23-1676

Arrowood Indemnity Company,
Appellant in No. 23-1677

Traders and Pacific Insurance Company, Endurance American
Specialty Insurance Company, and Endurance American
Insurance Company
Appellants in No. 23-1678

Arch Insurance Company,
Appellant in No. 23-1780

(D. Del. No. 1-22-cv-01237)

Present:  SHWARTZ and CHUNG, Circuit Judges

1.  D&V Claimants' Motion to Stay Bankruptcy Plan and Appeals [10/6/23]

2.  Declaration of Gilion C. Dumas in Support of D&V Claimants' Motion [10/6/23]

3.  Certain Insurers' Motion to Stay Further Implementation of Plan pending Supreme Court Decision in Purdue [10/10/23]

4.  Debtors' Motion to Permit Consolidated Overlength Response to Stay Motions [10/12/23]

5.  Lujan Claimants' Motion to Stay Bankruptcy Plan and Stay Appeals [10/13/23]

6.  Motion by BSA Settlement Trust and Trustee for Leave to Respond to Stay Motions and to Exceed Length Limitation [10/17/23]

7.  D&V Claimants' Response to Motion by BSA Settlement Trust and Trustee [10/23/23]

8.  BSA Settlement Trust and Trustee's Overlength Objection to Stay Motions [10/23/23]

9.  Debtors' Overlength Response to Stay Motions [10/23/23]

10. Declaration of Brian Whittman in Support of Debtors' Response [10/23/23]

11. Declaration of Bruce A. Griggs in Support of Debtors' Response [10/23/23]

TrustApp061

12. Declaration of Christopher D. Meidl in Support of Debtors' Response [10/23/23]

13. Settling Insurers' Opposition to Stay Motions [10/23/23]

14. D&V Claimants' Reply in Support of Motion to Stay [10/30/23]

15. Lujan Claimants' Reply in Support of Motion to Stay [10/30/23]

> Respectfully,
> Clerk

_____ORDER_____

     The foregoing D&V and Lujan Claimants' motions to stay the bankruptcy plan and certain insurers' motion to stay further Implementation of plan pending the Supreme Court's ruling in <u>Purdue</u> are denied and the Debtors' motion to permit a consolidated overlength response to the stay motions and the motion by BSA Settlement Trust and Trustee for leave to respond to the stay motions and to exceed the length limitation are granted.  Permission to file overlength briefs in connection with these motions is not permission to file overlength briefs in connection with the appeals in this case.

> By the Court,
>
> <u>s/Patty Shwartz</u>
> Circuit Judge

Dated: November 2, 2023
Sb/cc:   All Counsel of Record

**Nos. 23-1665, 23-1667, 23-1668, 23-1669, 23-1670, 23-1671, 23-1672, 23-1674, 23-1675, 23-1676, 23-1677, 23-1678, 23-1780 (Consolidated)**

# 𝔘nited 𝔖tates 𝔠ourt of 𝔄ppeals
# for the 𝔗hird 𝔠ircuit

IN RE: BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC,
*Debtor,*

NATIONAL UNION FIRE INSURANCE CO. OF PITTSBURGH PA., *et al.,*
*Appellants,*

v.

BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC, *et al.,*
*Appellees.*

Appeal from the United States District Court
for the District of Delaware (No. 22-cv-01237)

## OPENING BRIEF OF CERTAIN INSURERS

Deirdre M. Richards
FINEMAN KREKSTEIN
& HARRIS PC
1300 N. King Street
Wilmington, DE 19801
(302) 538-8331

Susan N.K. Gummow
FORAN GLENNON
PALANDECH PONZI &
RUDLOFF P.C.
222 N. LaSalle St., Suite 1400
Chicago, Illinois 60601

Theodore J. Boutrous Jr.
Richard J. Doren
Blaine H. Evanson
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, California 90071
(213) 229-7000

Michael A. Rosenthal
James Hallowell
Seth M. Rokosky
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, New York 10166
(212) 351-4000

*Counsel for National Union Fire Insurance Company of Pittsburgh,*
*Pa., Lexington Insurance Company, Landmark Insurance Company,*
*and the Insurance Company of the State of Pennsylvania*

Joseph T. Baio
Christopher J. St. Jeanos
Mitchell J. Auslander
Charles Dean Cording
Patricia O. Haynes
WILLKIE FARR & GALLAGHER LLP
787 Seventh Avenue
New York, NY 10019
(212) 728-8000

*Additional Counsel for National Union Fire Insurance Company of
Pittsburgh, Pa., Lexington Insurance Company, Landmark Insurance
Company, and the Insurance Company of the State of Pennsylvania*

Ronald P. Schiller
Matthew A. Hamermesh
HANGLEY ARONCHICK SEGAL
PUDLIN & SCHILLER
One Logan Square, 27th Floor
Philadelphia, PA 19103
Telephone: (215) 568-6200

Kathleen M. Miller
SMITH, KATZENSTEIN &
JENKINS LLP
1000 West Street, Suite 501
P.O. Box 410
Wilmington, DE 19899
Telephone: (302) 652-8400

*Counsel for Arch Insurance
Company*

Kathleen K. Kerns
POST & SCHELL, P.C.
Four Penn Center – 13th Floor
1600 John F. Kennedy Boulevard
Philadelphia, PA 19103
Phone: (215) 587-1000

George R. Calhoun
IFRAH PLLC
1717 Pennsylvania Ave., N.W.
Suite 650
Washington, DC 20006
Phone: (202) 840-8758

*Counsel for Argonaut Insurance
Company and Colony Insurance
Company*

Michael J. Joyce
JOYCE, LLC
1225 King Street, Suite 800
Wilmington, DE 19801
Telephone:  (302) 388-1944

Kevin Coughlin
Lorraine Armenti
Michael Hrinewski
COUGHLIN MIDLIGE &
GARLAND, LLP
350 Mount Kemble Avenue, PO
Box 1917
Morristown, NJ 07962
Telephone:  (973) 267-0058

John M. Flynn
Britton C. Lewis
CARRUTHERS & ROTH, P.A.
235 N. Edgeworth Street
P.O. Box 540
Greensboro, NC  27401
Telephone:  (336) 478-1146

*Counsel for Arrowood
Indemnity Company*

William H. White Jr.
KIERNAN TREBACH LLP
1233 20th Street, NW, 8th Floor
Washington, DC 20036
Telephone: (202) 712-7000

John E.W. Baay II
GIEGER LABORDE &
LAPEROUOSE, LLC
701 Poydras Street
Suite 4800

Maria Aprile Sawczuk, Esq.
GOLDSTEIN & MCCLINTOCK
LLLP
501 Silverside Road, Suite 65
Wilmington, DE 19809
Telephone: (302) 444-6710

Laura McNally, Esq.
LOEB & LOEB LLP
321 N. Clark Street, Suite 2300
Chicago, IL 60654
312-464-3155

David Christian, Esq.
DAVID CHRISTIAN ATTORNEYS
LLC
105 W. Madison St., Suite 1400
Chicago, Illinois 60602
Telephone: (312) 282-5282

*Counsel for Continental Insurance
Company and Columbia Casualty
Company*

Kathleen M. Miller
SMITH, KATZENSTEIN &
JENKINS LLP
1000 West Street, Suite 501
P.O. Box 410
Wilmington, DE 19899
Telephone: (302) 652-8400

Mary E. Borja
Gary P. Seligman
Ashley L. Criss
WILEY REIN LLP
2050 M Street NW
Washington, DC 20036

TrustApp065

New Orleans, LA 70139
Telephone: (504) 561-0400

*Counsel for
Gemini Insurance Company*

Konrad R. Krebs
CLYDE & CO US LLP
340 Mt. Kemble Ave, Suite 300
Morristown, New Jersey 07960
Telephone: (973) 210-6705

Alexander E. Potente
CLYDE & CO US LLP
150 California Street
15th Floor
San Francisco, California 94111
Telephone: (415) 365-9800

David Christian
DAVID CHRISTIAN ATTORNEYS
LLC
105 W. Madison St., Suite 1400
Chicago, Illinois 60602
Telephone: (312) 282-5282

Bruce W. McCullough
BODELL BOVE, LLC
1225 N. King St., Suite 1000
Wilmington, DE 19801-3250
Telephone: (302) 655-6749

*Counsel for Great American
Assurance Company f/k/a
Agricultural Insurance Company,
Great American E&S Insurance
Company f/k/a Agricultural Excess*

Phone: (202) 719-7000

*Counsel for General Star Indemnity
Company*

Kathleen M. Miller
SMITH, KATZENSTEIN &
JENKINS LLP
1000 West Street, Suite 501
P.O. Box 410
Wilmington, DE 19899
Telephone: (302) 652-8400

Lloyd A. Gura
Pamela J. Minetto
MOUND COTTON WOLLAN &
GREENGRASS LLP
One New York Plaza 44th Floor
New York, NY 10004
Telephone: (212) 804-4282

*Counsel for Indian Harbor
Insurance Company, on behalf of
itself and as successor in interest to
Catlin Specialty Insurance
Company*

TrustApp066

*and Surplus Insurance Company,
and Great American E&S
Insurance Company*

Douglas R. Gooding
Jonathan D. Marshall
Bryana T. McGillycuddy
CHOATE, HALL & STEWART
LLP
Two International Place
Boston, MA 02110
Telephone: (617) 248-5000

Kim V. Marrkand
MINTZ, LEVIN, COHN, FERRIS,
GLOVSKY AND POPEO PC
One Financial Center
Boston, MA 02111
Telephone: (617) 542-6000

R. Karl Hill
SEITZ, VAN OGTROP & GREEN,
P.A.
222 Delaware Avenue, Suite 1500
Wilmington, Delaware 19801
Telephone: (302) 888-0600

*Counsel to Liberty Mutual
Insurance Company, The Ohio
Casualty Insurance Company,
Liberty Insurance Underwriters,
Inc., and Liberty Surplus
Insurance Corporation*

Stephen M. Miller
Carl N. Kunz, III
MORRIS JAMES LLP
500 Delaware Avenue, Suite 1500

Marla S. Benedek
COZEN O'CONNOR
1201 N. Market Street, Suite 1001
Wilmington, DE 19801
Telephone:  (302) 295-2024

*Counsel for Traders and Pacific
Insurance Company, Endurance
American Specialty Insurance
Company, and Endurance
American Insurance Company*

Louis J. Rizzo, Jr., Esquire
REGER RIZZO & DARNALL LLP
1521 Concord Pike
Brandywine Plaza West Suite 305
Wilmington DE  19803
Telephone: (302) 477-7100

*Counsel for Travelers Casualty and
Surety Company, Inc. (f/k/a Aetna
Casualty & Surety Company), St.
Paul Surplus Lines Insurance
Company and Gulf Insurance
Company ("Travelers")*

TrustApp067

Wilmington, Delaware 19801
Telephone: (302) 888-6800

*Counsel for Old Republic*
*Insurance Company*

TrustApp068

## CORPORATE DISCLOSURE

Pursuant to Federal Rule of Appellate Procedure 26.1, the undersigned Certain Insurers make the following disclosures:

### <u>AIG</u>

National Union Fire Insurance Company of Pittsburgh, PA (f/k/a National Union Fire Insurance Company of Pittsburg, Pa. and successor in interest to Audubon Indemnity Company, Audubon Insurance Company, National Union Fire Insurance Company of Louisiana, and also Landmark Insurance Company), Lexington Insurance Company (successor in interest to Chartis Select Insurance Company (f/k/a AIG Excess Liability Insurance Company Ltd. and also Starr Excess Liability Insurance Company Ltd.)), and the Insurance Company of the State of Pennsylvania are direct, wholly owned subsidiaries of AIG Property Casualty U.S., Inc., which is a wholly owned subsidiary of AIG Property Casualty Inc., which is a wholly owned subsidiary of American International Group, Inc., which is a publicly held corporation. With the exception of Vanguard Group, Inc., which has stated in its public filings that it is the beneficial owner of more than 10% of American

TrustApp069

International Group, Inc. common stock, no other company has an interest of 10% or more in American International Group, Inc.

## Arch

Arch Insurance Company is a wholly-owned subsidiary of Arch Reinsurance Company, whose ultimate parent is Arch Capital Group Ltd., a publicly traded company.

## Argonaut and Colony

The parent company of Argonaut Insurance Company is Argo Group US, Inc., an indirect subsidiary of Argo Group International Holdings, Ltd., which is a publicly traded corporation. The parent company of Colony Insurance Company is Argonaut Insurance Company, an indirect subsidiary of Argo Group International Holdings, Ltd., which is a publicly traded corporation.

## Arrowood

Arrowood Indemnity Company, formerly known as Royal Indemnity Company, individually and as successor-in-interest to Royal Insurance Company of America ("Arrowood"), is a United States holding company organized under the laws of Delaware, with its principal place of business in Charlotte, North Carolina, and it is 100% owned by

TrustApp070

Arrowpoint Group, Inc., which is 100% owned by Arrowpoint Capital Corp. Neither Arrowpoint Group, Inc. nor Arrowpoint Capital Corp. is a publicly held company, nor is there any publicly held corporation or other corporation that owns 10% or more of Arrowpoint Capital Corp.'s stock.

## CNA

The Continental Insurance Company, a Pennsylvania insurance company is wholly owned by Continental Casualty Company. Continental Casualty Company is wholly owned by The Continental Corporation. The Continental Corporation is wholly owned by CNA Financial Corporation. CNA Financial Corporation has issued shares to the public. Loews Corporation owns the majority of the common stock of CNA Financial Corporation and is publicly traded. No other corporation owns 10% or more of the common stock of CNA Financial Corporation.

Columbia Casualty Company, an Illinois insurance company is wholly owned by Continental Casualty Company. Continental Casualty Company is wholly owned by The Continental Corporation. The Continental Corporation is wholly owned by CNA Financial Corporation. CNA Financial Corporation has issued shares to the public. Loews

iii

Corporation owns the majority of the common stock of CNA Financial Corporation and is publicly traded. No other corporation owns 10% or more of the common stock of CNA Financial Corporation.

## Gemini

Gemini Insurance Company is ultimately owned by W.R. Berkley Corporation, which is a publicly-traded company.

## General Star

General Star Indemnity Company is a wholly-owned subsidiary of General Reinsurance Corporation. GenRe Corporation is the parent corporation of General Reinsurance Corporation, and Berkshire Hathaway, Inc. is the parent corporation of GenRe Corporation. Berkshire Hathaway, Inc. owns 10% or more of General Star Indemnity Company.

## Great American

Great American Assurance Company, f/k/a Agricultural Insurance Company; Great American E&S Insurance Company, f/k/a Agricultural Excess and Surplus Insurance Company; and Great American E&S Insurance Company hereby make the following corporate disclosure statement: Great American E&S Insurance Company is a wholly-owned

iv

subsidiary of Great American Insurance Company. Great American Assurance Company is also a wholly owned subsidiary of Great American Insurance Company. Great American Insurance Company is a wholly-owned subsidiary of American Financial Group, Inc. Shares of American Financial Group, Inc. are publicly traded on the New York Stock Exchange under the symbol AFG.

## Indian Harbor

Indian Harbor Insurance Company ("IHIC"), is a Delaware Corporation with its principal place of business located in Stamford, Connecticut. IHIC is a direct subsidiary of XL Specialty Insurance Company, and is an indirect subsidiary of Greenwich Insurance Company, X.L. America, Inc., XL Financial Holdings (Ireland) Limited, XL Bermuda Ltd, XL Group Ltd, and AXA SA. The ultimate indirect parent of IHIC is AXA SA, a company domiciled in France. AXA SA is a publicly traded company.

## Liberty

The Ohio Casualty Insurance Company, Liberty Insurance Underwriters, Inc., and Liberty Surplus Insurance Corporation state that 100% of the stock of each entity is owned by Liberty Mutual

TrustApp073

Insurance Company.  Liberty Mutual Group Inc. owns 100% of the stock of Liberty Mutual Insurance Company.  No public company owns 10% or more of the stock of The Ohio Casualty Insurance Company, Liberty Insurance Underwriters, Inc., Liberty Surplus Insurance Corporation, or Liberty Mutual Insurance Company.

## Old Republic

Old Republic Insurance Company is owned entirely by Old Republic General Insurance Group, Inc., which is owned entirely by Old Republic International Corporation, a publicly held corporation (NYSE: ORI).  No publicly held corporation owns ten percent or more of the stock of Old Republic International Corporation.

## Traders & Pacific Insurance Co., Endurance American Specialty Insurance Co., and Endurance American Insurance Co.

Traders and Pacific Insurance Company changed its name to Endurance American Specialty Insurance Company in 2006.  Endurance American Specialty Insurance Company is wholly owned by Endurance American Insurance Company.  In turn, Endurance American Insurance Company is a wholly owned subsidiary of Endurance Assurance Corporation, which is a wholly owned subsidiary of Endurance U.S. Holdings Corp.  Further, Endurance U.S. Holdings Corp. is a wholly

TrustApp074

owned subsidiary of Endurance Specialty Insurance Ltd. (Bermuda), which is a wholly owned subsidiary of Sompo International Holdings Ltd. (Bermuda).   Sompo International Holdings Ltd. is a wholly owned subsidiary of Sompo Japan Insurance Inc. (Japan), which is a wholly owned subsidiary of Sompo Holdings, Inc. (Japan), a holding company headquartered in Japan.   No entity owns 10% or more of the stock of Sompo Holdings, Inc.

## **Travelers**

Travelers Casualty and Surety Company, Inc. (f/k/a Aetna Casualty & Surety Company), St. Paul Surplus Lines Insurance Company, and Gulf Insurance Company are 100% owned by Travelers Casualty and Surety Company, which is 100% owned by Travelers Group Holdings Inc., which is 100% owned by Travelers Property Casualty Corp., which is 100% owned by The Travelers Companies, Inc. The Travelers Companies, Inc. is the only publicly held company in the corporate family. No individual or corporation owns 10% or more of the stock of The Travelers Companies, Inc.

TrustApp075

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................. xi

PRELIMINARY STATEMENT .................................................................... 1

JURISDICTIONAL STATEMENT ............................................................. 9

ISSUES PRESENTED .................................................................................. 9

STATEMENT OF RELATED CASES AND PROCEEDINGS ................ 9

STATEMENT OF THE CASE .................................................................... 10

    I.    BSA's Operations and Sexual Abuse Claims .......................... 10

    II.   BSA's Insurance Program ............................................................ 10

    III.  Bankruptcy Filing and Proofs of Claims ................................. 12

    IV.  The Plan and Trust Distribution Procedures ......................... 14

        A.   Drafting and Negotiation of the Plan and Trust
             Distribution Procedures ................................................... 14

        B.   Relevant Provisions of the Final Plan and Trust
             Distribution Procedures ................................................... 19

            1.   Assignment of Insurance Coverage ......................... 19

            2.   Claims Matrix ............................................................. 21

    V.   The Confirmation Order ............................................................. 24

    VI.  District Court Opinion ................................................................ 24

STANDARD OF REVIEW .......................................................................... 26

SUMMARY OF ARGUMENT ................................................................... 27

ARGUMENT ................................................................................................ 29

    I.    The Confirmation Order and Plan Impair the
          Contractual Rights of the Certain Insurers .......................... 29

TrustApp076

A.   The Rights and Obligations of BSA and the Certain Insurers Under the Policies Cannot Change After Bankruptcy. ...................................................................... 29

B.   The Plan Does Not Protect The Certain Insurers' Contractual Rights or Recognize the Contractual Duties Created in the Policies. ....................................... 31

1.   The Courts Below Disregarded Third Circuit Law in Approving a Plan That Does Not Preserve the Certain Insurers' Rights. ......................................... 31

2.   The Plan Language Purporting To Preserve the Certain Insurers' Rights Undermines Them. ......... 41

3.   The Protective Language Originally Proposed by BSA Must Be Added Back to the Plan. .................. 48

4.   The Relief Sought by the Certain Insurers Does Not Require Unraveling the Plan. ............................... 51

II.   The Plan Approved at Confirmation Was Not Proposed by BSA in Good Faith in Its Treatment of the Certain Insurers. ............................................................................... 52

A.   The Bankruptcy Court Failed to Properly Consider the Interests of the Certain Insurers. ........................... 54

B.   The Plan Was Not Proposed in Good Faith as to the Certain Insurers. ............................................................ 56

C.   The Plan Creates a Moral Hazard that Must Be Addressed to Meet the Good Faith Requirement. .......... 57

CONCLUSION ...................................................................... 65

TrustApp077

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re 15375 Mem'l Corp. v. BEPCO, L.P.,*
589 F.3d 605 (3d Cir. 2009) ............................................................. 5, 53

*In re ACandS, Inc.,*
311 B.R. 36 (Bankr. D. Del. 2004) ...................................................... 52

*In re Am Home Mortg. Holdings,*
402 B.R. 87 (Bankr. D. Del. 2009) .......................................... 30, 32, 34

*Am. United Mut. Life Ins. Co. v. City of Avon Park, Fla.,*
311 U.S. 138 (1940) ...................................................................... 53, 60

*In re American Cap. Equip., LLC,*
688 F.3d 145 (3d Cir. 2012) ................................... 6, 52, 53, 54, 55, 63

*Bell Atl. Corp. v. Twombly,*
550 U.S. 544 (2007) ............................................................................ 59

*Central Bank of Denver, N.A. v. First Interstate Bank of
Denver, N.A.,*
511 U.S. 164 (1994) ............................................................................ 59

*In re Combustion Eng'g, Inc.,*
391 F.3d 190 (3d Cir. 2004) ....................................................... passim

*In re Coram Healthcare Corporation,*
271 B.R. 228 (Bankr. D. Del. 2001) ................................................... 53

*In re Crippin,*
877 F.2d 594 (7th Cir. 1989) .............................................................. 29

*In re Fed.-Mogul Glob. Inc.,*
684 F.3d 355 (3d Cir. 2012) ............................................................... 54

*Folger Adam Sec., Inc. v. DeMatteis/MacGregor, J.V.,*
209 F.3d 252 (3d Cir. 2000) ............................................................... 33

x

*In re Global Indus. Techs., Inc.*,
   645 F.3d 201 (3d Cir. 2011) ........................................ 1, 39, 40, 54, 59

*In re Heritage Highgate, Inc.*,
   679 F.3d 132 (3d Cir. 2012) ............................................... 27

*Ind. State Police Pension Tr. v. Chrysler LLC*
   *(In re Chrysler LLC)*,
   576 F.3d 108 (2d Cir. 2009) ............................................... 32

*Landy v. Fed. Deposit Ins. Corp.*,
   486 F.2d 139 (3d Cir. 1973) ............................................... 42

*In re LTL Mgmt. LLC*,
   64 F. 4th 84 (3d. Cir. 2023)........................................ 5, 27, 52, 53, 55

*Medtronic AVE, Inc. v. Advanced Cardiovascular Sys., Inc.*,
   247 F.3d 44 (3d Cir. 2001) ................................................ 34

*Mission Prod. Holdings, Inc. v. Tempnology, LLC*,
   139 S. Ct. 1653 (2019)............................................ 29, 35, 39

*Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
   259 F.3d 154 (3d Cir. 2001) ............................................... 60

*In re PWS Holding Corp.*,
   228 F.3d 224 (3d Cir. 2000) ............................................... 51

*Reserves Dev. LLC v. Crystal Props., LLC*,
   986 A.2d 362 (Del. 2009)................................................. 34

*In re SGL Carbon Corp.*,
   200 F.3d 154 (3d Cir. 1999) ............................................. 4, 52,

*Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp.*,
   872 F.2d 36 (3d Cir. 1989) ............................................. 29, 30

*Spyglass Media Grp. v. Bruce Cohen Prods.*
   *(In re Weinstein Co. Holdings LLC)*,
   997 F.3d 497 (3d Cir. 2021) ........................................ 2, 30, 33

TrustApp079

*In re Tribune Media Co.*,
   799 F.3d 272 (3d Cir. 2015) .................................................................. 52

*In re W.R. Grace & Co.*,
   475 B.R. 34 (Bankr. D. Del. 2012) ...................................................... 53

**Statutes**

11 U.S.C. § 1129(a)(3)............................................................................ 4, 52

**Rules**

Fed. R. Evid. 201(b) ................................................................................ 42

Fed. R. Evid. 201(d) ................................................................................ 42

TrustApp080

## PRELIMINARY STATEMENT

Boy Scouts of America's ("BSA") plan of reorganization (the "Plan") fails to expressly preserve the contractual rights of the undersigned Certain Insurers in violation of federal law, which mandates including "language [that] broadly preserves insurers' pre-petition rights under the subject insurance policies." *In re Combustion Eng'g, Inc.*, 391 F.3d 190, 217 (3d Cir. 2004). The Certain Insurers, major but involuntary participants in the BSA bankruptcy, face a Plan that risks binding them to awards issued to claimants and that fails to preserve the Certain Insurers' pre-petition rights under the subject insurance policies. That significant defect must be remediated for the Plan to move forward.

This Court has repeatedly endorsed the principle of "insurance neutrality"—that the rights and duties of parties to insurance contracts, like any other contracts, do not expand or diminish by the happenstance of bankruptcy. *See id.* at 218; *In re Global Indus. Techs., Inc.*, 645 F.3d 201, 212 (3d Cir. 2011). Treating "insurance neutrality" not as a substantive right but as a mere standing concept, however, both the district court and the bankruptcy court approved a Plan that fails to expressly preserve the rights of the Certain Insurers. They refused to

1

require that the policies be transferred *cum onere*—meaning assignment of the policies with both the benefits and the burdens—from BSA to the Settlement Trust. *See Spyglass Media Grp. v. Bruce Cohen Prods. (In re Weinstein Co. Holdings LLC)*, 997 F.3d 497, 505 (3d Cir. 2021). Instead, they allowed BSA to transfer rights to coverage without expressly requiring the assignment of the policies as a whole, including BSA's obligations, contractual limitations, and exclusions.

The result is a Plan that contains no clear statement that the Certain Insurers' pre-petition contractual rights are preserved. Contrary to Third Circuit law, it says just the opposite—that the Certain Insurers' rights are "subject to the Plan and Confirmation Order." (A. 1017 (TDPs, Art. V.C).) The district court interpreted this language to be "clear" in preserving the Certain Insurers' rights. (A. 117.) At the same time, that court stated that federal law may abrogate the same rights and obligations, without saying which, if any, remain. (A. 176.) Both courts below invited "coverage courts" around the country to "interpret the Plan, the [Trust Distribution Procedures] or any confirmation order" in resolving disputes over the meaning of this language for the Certain Insurers' contractual rights, even though only the policies themselves—

TrustApp082

not the Plan and Confirmation Order—should be interpreted in resolving coverage disputes.  (*Id.*; A. 744.)

The Trustee is already seeking to use the Plan to override the Certain Insurers' contractual defenses to coverage.  Just last week, the Trustee filed a coverage action in Texas federal court that relied on, and misconstrued, the bankruptcy proceeding and the Plan to seek a declaration that the Certain Insurers are liable for the full amount of the Abuse Claims, subject *only* to applicable attachment points and limits of liability, and should be collaterally estopped from raising their contractual coverage defenses.  (Compl. ¶¶ 119, 121.)  In so doing, the Trustee has made clear her intent to rely on the lack of clarity in the Plan to impair the Certain Insurers' contractual rights in subsequent coverage litigation.  This lawsuit further underscores that the meaning of the bankruptcy plan, confirmed by a bankruptcy court, cannot be left to interpretation by courts deciding coverage disputes.  It is the responsibility of the bankruptcy court to ensure that the plan it confirms appropriately preserves the relevant contracts under applicable law.

Earlier proposed versions of the Plan included provisions that expressly protected the rights and defenses available to the Certain

3

Insurers.  (*See, e.g.*, A. 7708-7711 (TDPs, Arts. 2.1, 7.2. 10.1).)  Those provisions—which expressly state that the Trust's awards will have no collateral estoppel, *res judicata*, or preclusive effect on the Certain Insurers—were removed at the insistence of a coalition of claimants' lawyers.  These deletions left the Certain Insurers' rights "subject to" a Plan that establishes streamlined procedures for resolving abuse claims, while failing to assign the policies in their entirety, as has been done in all mass tort bankruptcies of which Appellants are aware, and failing to preserve and protect the Certain Insurers' pre-petition rights to defend against and investigate claims and consent to any settlements.  To ensure the protection of those pre-petition rights, the removed provisions must be added back to the Plan.

The Plan also was not proposed in good faith in its treatment of the Certain Insurers.  *See* 11 U.S.C. § 1129(a)(3).  Good faith is an equitable concept, rooted in the promise of fair treatment for all affected parties drawn into a bankruptcy reorganization.  Fair treatment requires the debtor to propose a plan that preserves the rights of insurers and contractual obligations of the Settlement Trust.  *See In re SGL Carbon Corp.*, 200 F.3d 154, 161 (3d Cir. 1999) (A good faith plan "is fair to rights

4

TrustApp084

and interests of the parties affected.") (internal quotation marks omitted)); *In re LTL Mgmt. LLC*, 64 F. 4th 84, 100 (3d Cir. 2023) ("[T]he culminating determination of whether [the] facts support a conclusion of good faith gets plenary review as 'essentially[] a conclusion of law.'" (quoting *In re 15375 Mem'l Corp. v. BEPCO, L.P.*, 589 F.3d 605, 616 (3d Cir. 2009))).

The need for the express preservation of those rights and obligations is particularly critical in this case.  Unlike in many other mass tort settlement trusts, most of the funding obligations fall on insurance carriers and not on BSA, other responsible wrongdoers, or the reorganized entity.  Yet BSA deleted a provision from the "Purpose" section of the Plan making clear that the Trust Distribution Procedures "are intended to balance the interests" of affected parties, including reorganized BSA, the other Protected Parties, the Abuse Victims, and the Certain Insurers.  (A. 7708 (TDPs, Art. 2.1).)  This provision too must be re-inserted.

Further, the nature of the Trustee's duties is troubling where, as here, there has been a 50-fold increase in the number of claims since the establishment of the bar date; it is estimated that 65% of the filed claims

5

are governed by state laws where the statutes of limitations render the claims untimely; a significant proportion of the claims are likely "fraudulent"; and base matrix values will need to be scaled down by as much as **90%** for most claims to properly align with BSA's pre-bankruptcy settlement practices.  But the Plan does not require the Trustee to consider any of this.  Instead, the Trustee may, but is not required to, "consider any further limitation on Abuse Claimants' recovery in the tort system."  (A. 1029 (TDPs, Art. VIII.D.ii).)

Moreover, the Plan significantly alters the relationship between the former policyholder, BSA, and the insurers that provided coverage for BSA for decades.  The Plan provides that unlike BSA pre-petition, the Trustee owes fiduciary duties to the claimants.  In doing so, the Plan creates a conflict of interest and moral hazard,[1] where the Trustee is duty-bound to compensate claimants and minimize available defenses to the detriment of the Certain Insurers.  *See, e.g.*, *In re American Cap. Equip., LLC*, 688 F.3d 145, 158-59 (3d Cir. 2012) (plan could not satisfy

---

[1] A. 739 n.658 ("A moral hazard is 'the possibility that an insured, once the insurance company is paying for claims or losses, . . . may have less incentive to prevent loss or less incentive to limit the size of losses or claims once they occur.'" (quoting A. 3990 (Harrington).)

6

the good faith requirement where debtor was "financially incentivized" to sabotage its own defenses to the detriment of its insurers).  Both courts recognized that the Certain Insurers' contractual rights protect against such conflicts of interest and mitigate the risk of moral hazard in the non-bankruptcy setting.  The material change in the relationship between the Certain Insurers and their insured only increases the conflict and enhances the need for a plan that contains express and unambiguous language that preserves the Certain Insurers' contractual rights, makes clear that their policies must be enforced per their terms, and assures that the Trustee must balance their interests along with those of other affected parties.

The Certain Insurers seek only minimal, but critical, modifications to the Plan to ensure that their rights are preserved:

- First, the Court should eliminate the language in Article VI.C that renders the Certain Insurers' rights "subject to the terms of the Plan and the Confirmation Order" and applicable law, make clear that the policies should be assigned in their entirety, and add back the two provisions (Articles 7.2 and

TrustApp087

10.1) making clear that the Plan in no way affects, impairs, or prejudices the Certain Insurers' contractual rights.

- Second, the Court should restore the "Purpose" provision that recognizes the Trustee's obligation to balance the rights of the Certain Insurers along with reorganized BSA, the other Protected Parties, and the Abuse Claimants in administering the Trust.

- Third, in determining whether a claimant is entitled to compensation and, if so, in what amount, the Trustee should be *required*, not just permitted, to "consider any further limitation on Abuse Claimants' recovery in the tort system." (A. 1029 (TDPs, Art. VIII.D.ii).)

These modifications are necessary to protect the Certain Insurers from impairment of their rights and to ameliorate the moral hazard that the Plan creates. *Combustion Eng'g*, 391 F.3d at 215. At the same time, the relief would leave undisturbed the provisions of the Plan that serve legitimate Bankruptcy Code purposes, such as rehabilitating the debtor and compensating its claimants.

TrustApp088

## JURISDICTIONAL STATEMENT

The Certain Insurers appeal from a final order of the district court entered on March 28, 2023, affirming the order of the bankruptcy court entered on July 29, 2022. The Certain Insurers filed timely notices of appeal on April 10, 2023. The District Court had subject-matter jurisdiction over the appeal under 28 U.S.C. § 158(a), and this Court has jurisdiction under 28 U.S.C. §§ 158(d) and 1291.

## ISSUES PRESENTED

1. Whether the Plan impermissibly impairs the contractual rights of the Certain Insurers. (*See* A. 113-120.)

2. Whether the Plan was proposed in good faith as required by the Bankruptcy Code, 11 U.S.C. § 1129(a)(3). (*See* A. 172-196.)

## STATEMENT OF RELATED CASES AND PROCEEDINGS

By Clerk's Order, the following appeals have been procedurally consolidated: Nos. 23-1664, 23-1665, 23-1666, 23-1667, 23-1668, 23-1669, 23-1670, 23-1671, 23-1672, 23-1673, 23-1674, 23-1675, 23-1676, 23-1677, 23-1678, & 23-1780. (ECF No. 21.) Other appeals before this Court arising out of the same case include Nos. 21-1792 and 21-2035.

TrustApp089

## STATEMENT OF THE CASE

I.   <u>BSA's Operations and Sexual Abuse Claims</u>

The bankruptcy court recounted BSA's history and structure in detail.  (A. 514-519.)  BSA, a non-profit, is the national organization, and scouting is delivered through approximately 250 Local Councils that recruit Chartered Organizations such as faith-based institutions and civic organizations that sponsor scouting units.  (A. 514, 516-518.)

Before bankruptcy, BSA increasingly became the subject of sexual abuse claims.  (A. 520-522, 533.)  At the time of BSA's bankruptcy filing, BSA had defended approximately 275 lawsuits relating to sexual abuse, and attorneys for alleged abuse victims asserted approximately 1,400 additional claims.  (A. 533.)  With substantial financial contributions from insurers, including some of the Certain Insurers and other insurers that have now settled, BSA spent $150 million defending and settling these claims, with most of that sum spent on "a small number of high value claims."  (A. 572.)

II.   <u>BSA's Insurance Program</u>

BSA has maintained commercial liability insurance since at least 1935.  (A. 523-529.)  These commercial insurance contracts provide certain protections for damages arising from liability for bodily injury

10

and property damage, subject to various terms, conditions, and exclusions. (*See, e.g.*, A. 527-528 (citing two such policies).)

These policies include several important rights and obligations of the parties, which help reduce the moral hazard associated with insurance policies (A. 739):

- **Defense Rights**: Defense rights provide insurers with the right to associate in the defense and investigate claims, as well as the right to defend lawsuits and make any settlements they deem expedient. (*Id.*)

- **Cooperation Obligations**: Cooperation obligations require the insured to assist and cooperate with the insurer in the investigation, defense, and settlement of claims, including by providing relevant materials and testimony. (*Id.*)

- **Consent/No Action Obligations**: Consent obligations require the insured to obtain the insurer's written consent to any settlements and "no-action" conditions obligate the insured to obtain the insurer's consent to a settlement by providing that no action lies against the insurer for breach unless a trial results in a judgment against the insured or the claimant, insured, and insurer have agreed in writing to settle the claim. (*Id.*)

- **Assignment Obligations**: Assignment obligations require the insured to obtain its insurers' consent to an assignment of the contract. (*Id.*)

- **Defenses to and Exclusions from Coverage**: Defenses and exclusions set forth in these policies provide that coverage is not available for, among other things, damages arising from alleged conduct that was not an accident or for punitive damages and in some instances, damages arising from claims

11

for sexual abuse.  (*See, e.g.*, A. 529-532, 23082-23094, 21628-21643.)

- **Arbitration Clauses:** Certain policies also provide that disputes over coverage pursuant to those policies must be resolved in arbitration.  (*See, e.g.*, A. 21591, 21614.)

III.   Bankruptcy Filing and Proofs of Claims

On February 18, 2020, BSA filed a Chapter 11 petition and proposed a plan of reorganization that included a victims compensation trust.  (A. 533-534.)  At the time of the filing, there were approximately 1,700 sexual abuse claims against BSA and its affiliates.   By the November 16, 2020 bar date, approximately 82,000 unique claims were filed.  (A. 536.)

Following the filing, claimants' attorneys engaged in a "massive advertising campaign" to target potential claimants.[2]  (A. 535-536.)  In response to these efforts, BSA (which had not yet agreed to the settlement amount it would pay the claimants) moved the court for an order to prevent false and misleading statements, describing the advertisements as "inflammatory" and noting the "confusion resulting from the inconsistent information between the Debtors' Court-approved notices

---

[2]  The bankruptcy court found that in "many instances," claimants' lawyers submitted proofs of claim that they did not personally review or about which they did not speak with the client.  (A. 723-724.)

TrustApp092

and these law firm advertisements."  (A. 7598-7599, 7617; *see* A. 536.)

After an evidentiary hearing, the bankruptcy court granted that motion and found that at least nine law firms made "false and misleading statements" in advertisements, including statements that: (1) survivors may remain anonymous; (2) described the value of any potential compensation trust; and (3) survivors will never have to be deposed, appear in court, or prove their claims.  (A. 21205-21206, 21208; *see* A. 536.)

BSA's witnesses testified to the several ways in which the claims filed differ from the pre-petition sexual abuse claims.  According to BSA, at least 85% of the claims face such legal hurdles that, but for the bankruptcy, they would never have been filed.  (A. 2791-2793 (Bates), 2931 (Bates).)  These claims are "typically older . . . the highest frequency of them come from periods 50, 60 years ago" and only about 33% identify an abuser's full name. (A. 2676-2678 (Bates).)   87% of claims involve single abusers, which is the "mirror" opposite of claims filed pre-petition. (A. 2932-2933 (Bates); *see* A. 2681 (Murray).)   And for 98%, the "link between the abuser and institutional responsibility is tenuous." (A. 2931 (Bates).)

13

TrustApp093

IV.    <u>The Plan and Trust Distribution Procedures</u>

BSA's plan of reorganization (A. 856-1008 (the "Plan")) creates a trust to benefit abuse survivors, through which all Abuse Claims against the Debtors and Related Non-Debtor Entities will be channeled.  (A. 539-540.)   The Trustee administers those claims in accordance with the Settlement Trust Agreement ("STA") and Trust Distribution Procedures (the "TDPs").  (A. 1091-1133 (STA), 1009-1055 (TDPs), 549.)  The Trustee is selected and overseen by the Settlement Trust Advisory Committee (the "STAC"), comprised of claimants' lawyers earning contingency fees based on Trust awards, and the Future Claimants Representative ("FCR"), who represents future claimants in this and other mass tort cases.  (A. 535, 549, 3944-3955 (Slater), 6800-6803 (Patton).)

A.    <u>Drafting and Negotiation of the Plan and Trust Distribution Procedures</u>

The first draft of the TDPs filed by BSA on April 13, 2021—before BSA conducted negotiations with claimants' counsel—included the following provisions expressly designed to protect the Certain Insurers' rights:

- **Article 2.1**: "[The TDPs] are intended to balance the interests of Reorganized BSA and the other Protected Parties, holders of Abuse Claims, and the Non-Settling Insurance Companies."  (A. 7708 (TDPs, Art. 2.1).)

14

- **Article 7.2**: "**Nothing in the [TDPs] (a) shall affect, impair, or prejudice the rights and defenses of the Non-Settling Insurance Companies in any manner**; (b) shall in any way operate to, or have the effect of, impairing or having any *res judicata*, collateral estoppel, or other preclusive effect on any party's legal, equitable, or contractual rights or obligations under any Non-Settling Insurance Policy in any respect; or (c) shall otherwise determine the applicability or non-applicability of any provision of any non-Settling Insurance Policy and any such rights and obligations shall be determined under Non-Settling Insurance Policies and applicable law. ..."   (A. 7709-7710 (TDPs, Art. 7.1) (emphasis added).)

- **Article 10.1**: "Notwithstanding any other provision of these [TDPs], **a decision by the Settlement Trust to pay or not to pay any Submitted Abuse Claim shall not be used in, be admissible as evidence in, binding in, or have any *res judicata*, collateral estoppel, or other preclusive effect in any lawsuit or other proceeding against any other entity other than the Settlement Trust**. Notwithstanding any other provision of these [TDPs], the outcome of litigation against the Debtors by the holder of an Indirect Abuse Claim shall not be used in, be admissible as evidence in, binding in or have any other preclusive effect in connection with the Settlement Trust's resolution or valuation of an Indirect Abuse Claim."   (A. 7711 (TDPs, Art. 10.1) (emphasis added).)

The Coalition of Abused Scouts for Justice, an ad hoc group representing 65,000 to 70,000 of the 82,000 claimants, and the FCR objected to the draft with these provisions.  (A. 3864, 2152 (Bates), 7307-7311; *see* A. 727-728.)  As one attorney explained, these attorneys were seeking the "holy grail" that they "have been chasing for many years and

15

[that] has never been approved"—claim determinations made to their satisfaction that "will result in individual awards that will be binding on the insurance carriers."   (A. 23754; *see, e.g.*, A. 4608-4609 (Amala) (strategy was to get binding TDPs and then leverage precedent in other bankruptcies that could be used against insurers).)

BSA was aware of the goal of claimants' counsel to use the bankruptcy process to prejudice insurers.  At a hearing in May 2021, BSA's counsel acknowledged that the draft plan's "treatment of insurance" gets "to the [heart] of what is happening in this reorganization case," but warned that "[r]emoving that insurance neutrality language and setting this court or the Delaware District Court up for either a binding estimation battle or a binding trust distribution procedure battle," as the claimants' lawyers were seeking, "is setting us up for ***the most epic battle these courts have ever seen*** between plaintiff lawyers on the one hand and insurers on the other hand."   (A. 8624, 8626) (emphasis added).)

At the same time, BSA preferred a plan that would include a channeling injunction and the broadest possible releases from the abuse claimants, including not only releases for BSA, but also for its Local

16

Councils and Chartered Organizations. (A. 1402-1404 (Desai), 5743-5754.) The result was a requirement that BSA secure the "overwhelming" support and vote of the abuse claimants and their attorneys, in contrast to the Certain Insurers who had no right to vote.

BSA therefore began negotiating with a "particular focus on reaching a consensus with the Abuse Claimants' Representatives." (A. 6674 (Azer), 6804-6805 (Patton); *see* A. 2221 (Azer).) On June 5, 2021, BSA and claimants' lawyers agreed that BSA's contribution to the Trust would be fixed at no more than $250 million in exchange for broad global releases for BSA and the Local Councils. (A. 1480-1482 (Desai); *see, e.g.*, A. 23736.) On June 18, 2021, BSA filed the Third Amended Plan, which removed the insurer protective provisions quoted above and included language proposed by claimants' lawyers that the Certain Insurers' rights were "subject to the Plan and Confirmation Order" and applicable law, purporting to abrogate such protections through confirmation of the plan. (*See* A. 8862 (Art. V.B), 6179, 8867 (Redline, Art. V.B).)

BSA sent the Certain Insurers the new draft of the TDPs on June 25, 2021. (A. 23578-23580.) The Certain Insurers responded that the draft lacked basic protections of the rights that they had contracted for

17

under the insurance policies.  (*See* A. 23581-23586; *see also* A. 2295-2296, 2300-2301, 6690-6691 (Azer).)   In response, BSA stated that engaging with the Certain Insurers would "scuttle the deal between the debtors and the TCC, coalition, and FCR," and "effectively require the debtors to negotiate a new set of TDPs."   (A. 2422, 2164-2166, 2296, 2301-2302 (Azer); *see* A. 24842-24826.)   The protections sought by the Certain Insurers were again removed from the draft by the Coalition and were not included in the final confirmed Plan.  (A. 728.)

At the same time, to implement their goal of binding insurers, the Coalition drafted certain proposed findings, including that:

- "the Plan Documents (including the Plan) and the Confirmation Order shall be binding on all parties in interest consistent with applicable legal doctrines, including the doctrine of *res judicata* and collateral estoppel, and section 1141 of the Bankruptcy Code (and related legal authority)" (A. 685);

- the procedures and criteria in the TDPs "are appropriate and provide for a fair and equitable settlement of Abuse Claims" (*id.*); and

- "the Base Matrix Values in the Trust Distribution Procedures subject to adjustment based on Aggravating Scaling Factors and Mitigating Scaling Factors (each as defined in the Trust Distribution Procedures), are based on and consistent with the Debtors' historical abuse settlements and litigation outcomes" (A. 686).

TrustApp098

BSA did not include these proposed findings initially, but did incorporate similar findings into the Fourth Amended Plan following further negotiations with the Coalition, which was submitted to the bankruptcy court for confirmation. (*See* A. 9025-9027.) The FCR testified that these findings were "important" to "limit the insurers' ability" to re-litigate matters such as "the appropriateness of the values set forth in the TDPs or the processes by which the TDPs were negotiated and developed." (A. 6824-6826 (Patton).) The bankruptcy court would ultimately confirm the Third Modified Fifth Amended Plan following additional changes discussed below. (A. 11194.)

B.   Relevant Provisions of the Final Plan and Trust Distribution Procedures

1.   Assignment of Insurance Coverage

The purpose of the TDPs is, among other things, to "hold, preserve, maximize and administer the Settlement Trust Assets," and to "obtain insurance coverage" for allowed Insured Abuse Claims. (A. 1010 (TDPs, Art. I.A).)

The Trustee is required to act as the fiduciary to the Trust, which "shall succeed to all of the rights and standing of the Debtors with respect to the Aggregate Settlement Consideration in its capacity as a trust

19

administering assets for the benefit of the Beneficiaries." (A. 1093 (STA, § 1.6(a)); *see* A. 718 ("In her role, [the Trustee] owes a fiduciary duty to the Settlement Trust for the benefit of Beneficiaries, that is all holders of Abuse Claims.").)

The Plan provides for an "Insurance Assignment," which is "the assignment and transfer to the Settlement Trust of (a) the Insurance Actions, (b) the Insurance Action Recoveries, (c) the Insurance Settlement Agreements, and (d) ***all other rights, claims, benefits, or Causes of Action*** of the Debtors, Related Non-Debtor Entities, Local Councils, or Contributing Chartered Organizations under or with respect to the Abuse Insurance Policies ***(but not the policies themselves)*** . . . ." (A. 890-891 (Plan, ¶ 157 (emphasis added).)  The TDPs further state that the "Bankruptcy Court has authorized the Insurance Assignment pursuant to the Plan and the Confirmation Order," and the Settlement Trust "has received the assignment and transfer of the Insurance Actions, the Insurance Action Recoveries, the Insurance Settlement Agreements (if applicable), the Insurance Coverage, and all other rights or obligations under or with respect to the Insurance Policies (***but not***

TrustApp100

*the policies themselves*) in accordance with the Bankruptcy Code."
(A. 1017 (TDPs, Art. V.C (emphasis added))).)

Furthermore, the TDPs state that "[n]othing in these TDP shall modify, amend, or supplement, or be interpreted as modifying, amending, or supplementing, the terms of any Insurance Policy or rights and obligations under any Insurance Policy assigned to the Settlement Trust to the extent such rights and obligations are otherwise available under applicable law *and subject to the Plan and Confirmation Order*." (*Id.* (emphasis added).)

> 2.   Claims Matrix

The TDPs require the Trustee to determine the compensation for each Allowed Abuse Claim according to the Claims Matrix.  (A. 549-550.)

To receive compensation, Abuse Claimants must complete and sign under oath a questionnaire, produce all documents related to the Abuse Claims, cooperate in a written and/or oral examination under oath if requested by the Trustee, and sign a release form.  (A. 1018-1023 (TDPs, Art. VII), 550-551.)  The Trustee evaluates the validity of the claims based first on the Initial Evaluation Criteria and then on the General Criteria, which requires a showing of alleged abuse based on a

TrustApp101

preponderance of the evidence. (A. 1018-1023 (TDPs, Art. VII).) The claimant is not required to prove that BSA was negligent or would be found liable, only that BSA "may bear legal responsibility." (A. 1020 (TDPs, Art. VII.C.ii), 551.)

If the Trustee determines that the Claim satisfies the General Criteria, BSA's liability is valued under the Claims Matrix, which sets forth six tiers based on the severity of the abuse. (A. 1023-1025 (TDPs, Art. VIII.A), 551-552.) All claimants who satisfy the General Criteria receive some amount of compensation. Each tier has a Base Matrix Value, ranging from $3,500 to $600,000, and a Maximum Matrix Value, ranging from $8,500 to $2,700,000. (A. 552-553.) The Trustee begins with the Base Matrix Value for each tier and then makes adjustments using Aggravating or Mitigating Scaling Factors. (A. 553.)

One Mitigating Scaling Factor that the Trustee may, but is not required, to consider is "any further limitations on the Abuse Claimant's recovery in the tort system." (A. 1029 (TDPs, Art. VIII.D.ii).) Another Mitigating Scaling Factor is whether the claim is time-barred. (A. 1045-1046 (TDPs, Sched. 1), 747.) In determining the applicable statute of limitations, the Trustee has the discretion to choose between "the

22

TrustApp102

jurisdiction where the Abuse Claim was pending on the Petition Date . . . or where such Abuse Claim could have been timely and properly filed as asserted by the Abuse Claimant under applicable law." (A. 1017 (TDPs, Art. V.E).) The TDPs also do not include a requirement that the Trustee scale down the Base Matrix Values by approximately 90%, which BSA's own expert testified would be necessary to properly value claims. (A. 2941 (Bates).)

The Trustee must administer the Trust in consultation with the STAC and FCR, and the Trustee can be removed for cause by the vote of two-thirds of the STAC with the agreement of the FCR. (A. 1013-1014 (TDPs, Art. III), 1107 (STA, § 5.2(c)).) The TDPs grant the Trustee significant discretion (subject to the oversight of the STAC and FCR). For example, the Trustee may, but is not required to, "disclose information, documents, or other materials . . . reasonably necessary in the Settlement Trust's judgment to preserve, obtain, litigate, resolve, or settle insurance coverage[.]" (A. 1011 (TDPs, Art. II).) And the Trustee may "reasonably interpret[]" any provisions of the TDPs "in such a manner that is consistent with the overall purpose and intent of these

23

TrustApp103

TDP without further notice to or action, order, or approval of the Bankruptcy Court." (A. 1013-1014 (TDPs, Art. III).)

V. <u>The Confirmation Order</u>

On July 29, 2022, the bankruptcy court issued an opinion approving the Plan subject to certain modifications, resulting in the Modified Fifth Amended Plan.

The bankruptcy court removed the proposed findings that the Plan and Confirmation Order shall be binding on all parties, the procedures and criteria in the TDPs "are appropriate and provide for a fair and equitable settlement of Abuse Claims," and the Claims Values resulting from the Claims Matrix in the TDPs are "based on and consistent with the Debtors' historical abuse settlements and litigation outcomes." (A. 685-697.) The bankruptcy court, however, refused to alter language in the Plan making the Certain Insurers' contract rights "subject to" the Plan and Confirmation Order, stating that it "will not anticipate how an insurance coverage court will interpret the Plan, the TDP or any confirmation order that may be entered." (A. 744.)

VI. <u>District Court Opinion</u>

In the district court, the Certain Insurers argued that the Plan fails to sufficiently preserve their rights because it makes them "subject to"

TrustApp104

the Plan and Confirmation Order.  (A. 15185-15195.)   The Certain Insurers also argued that the bankruptcy court's conclusion that the Plan could be confirmed because it preserved insurers' ability to raise defenses in coverage disputes was incorrect because it ignored applicable law and disregarded the harm resulting from the Certain Insurers' inflated exposure under the Plan.  (A. 15197.)

The district court rejected these arguments, finding "no error in the Bankruptcy Court's conclusion that the Insurance Assignment does not impermissibly abrogate Certain Insurers' contracts."  (A. 119.)   The district court concluded that the Plan did not abrogate the obligations under the policies, and that Certain Insurers' "real concern" of later breach of the policies was "speculative."  (A. 116-117.)  The district court determined that the "subject to" language is "clear" in preserving the Certain Insurers' contractual rights.  (A. 117-119.)

The Certain Insurers also argued that the bankruptcy court had erred in confirming a Plan that was not proposed in good faith.  (A. 15168-15183.)  In doing so, the Certain Insurers did not challenge the factual findings made by the bankruptcy court, but rather argued that the relevant factual findings, taken together, do not meet the good faith

25

TrustApp105

requirement, which must be reviewed *de novo*.  (A. 19560-19561, 19719-19720.)   The Certain Insurers argued that substantial evidence precluded the legal conclusion that BSA proposed a plan in good faith as to the Certain Insurers.  (A. 15170-15173, 15176-15183.)

The district court rejected the Certain Insurers' arguments, stating that clear-error review was appropriate because the "Certain Insurers are not really arguing for a different conclusion based on a totality of the circumstances approach," but instead are seeking "different underlying factual findings to support a different conclusion."  (A. 165 (quoting A. 19780-19781).)   The district court accordingly found "no evidence demonstrating clear error in the factual findings underlying the bankruptcy court's good faith determination" and, alternatively, no error under a *de novo* review.  (A. 195-196.)  In reaching this conclusion, the district court focused on the aspects of the Plan that furthered the interests of BSA and did not address the Plan's impact on the Certain Insurers' pre-petition contract rights.  (*See* A. 113-119.)

## STANDARD OF REVIEW

"In reviewing the Bankruptcy Court's determinations, [the Court] exercise[s] the same standard of review as did the District Court.

26

Accordingly, the Bankruptcy Court's findings of fact are reviewed only for clear error, while legal determinations are reviewed *de novo*." *In re Heritage Highgate, Inc.*, 679 F.3d 132, 139 (3d Cir. 2012) (citations omitted). Whether the Plan impermissibly impairs the contractual rights of the Certain Insurers and the culminating determination of whether the facts support a conclusion of good faith are legal determinations subject to *de novo* review. *See LTL*, 64 F.4th at 99.

## SUMMARY OF ARGUMENT

The Plan impermissibly fails to preserve rights and obligations in the Certain Insurers' contracts. Both courts below failed to account for the foundational precept of bankruptcy law that contractual rights cannot be expanded or contracted by happenstance of bankruptcy. As a result, the Plan purports to transfer BSA's insurance-related rights without the concomitant obligations that bind the insured or the rights that protect the insurers. Although the district court concluded that the Plan "clearly" preserves the contracts, neither the Plan language nor the court's opinion achieves that result. Both permit the Trustee to argue in coverage proceedings—indeed, as the Trustee is now doing in her recently filed coverage lawsuit—that only the rights, not the obligations

27

TrustApp107

under the policies were assigned as a result of the confirmed Plan, which was the claimants' admitted intent when they drafted the Plan language. This Court should reverse and require clear language in the Plan preserving all provisions in the implicated insurance contracts.

The Plan also cannot be confirmed in its present form because it was not proposed in good faith in its treatment of the Certain Insurers. Under the Plan, the major anticipated funding sources for the Trust are the Certain Insurers as opposed to BSA, other responsible wrongdoers, and the reorganized entity, as is typically the case. At the same time, the relationship between the Certain Insurers and the entity with whom they contracted has been irrevocably altered, to the detriment of the Certain Insurers. The Certain Insurers are "affected parties" that must be treated fairly and equitably in any plan of reorganization. By granting the requested relief, the Court will restore the contractual relationship between BSA's successor and its insurers, protect the coverage rights and defenses of the Certain Insurers, reorganize BSA, and compensate its claimants.

TrustApp108

## ARGUMENT

I.   <u>The Confirmation Order and Plan Impair the Contractual Rights of the Certain Insurers</u>.

A.   <u>The Rights and Obligations of BSA and the Certain Insurers Under the Policies Cannot Change After Bankruptcy</u>.

It is a foundational precept of bankruptcy law that "[t]he estate cannot possess anything more than the debtor itself did outside bankruptcy." *Mission Prod. Holdings, Inc. v. Tempnology, LLC*, 139 S. Ct. 1653, 1663 (2019). "Whatever limitation[s] on the debtor's property [apply] outside of bankruptcy . . . appl[y] inside of bankruptcy as well." *Id.* And rights and obligations under a contract cannot expand or contract "by happenstance of bankruptcy." *Id.*

Rather, bankruptcy law provides the debtor "with the same rights and defenses" under a pre-petition contract as those held by the debtor before the bankruptcy. *Combustion Eng'g*, 391 F.3d at 245 n.66. Bankruptcy courts "do not have the power to rewrite contracts to allow debtors to continue to perform on more favorable terms" (*In re Crippin*, 877 F.2d 594, 598 (7th Cir. 1989)), and contractual rights cannot be assigned without their concomitant obligations (*see Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp.*, 872 F.2d 36, 39-40 (3d Cir. 1989)

29

(acknowledging "the general principle that a debtor may not reject a contract but maintain its benefits")).

Therefore, executory contracts must be assigned *cum onere* or not at all. *See id.* And where, as here, a contract is considered to be non-executory, the debtor may assign a contract provided that the assignee fulfills the remaining obligations due under that contract. *Spyglass Media*, 997 F.3d at 505. Regardless of whether a contract is executory or non-executory, and assigned under Section 365 or 363 of the Bankruptcy Code, respectively, the assignment does not eliminate contractual duties of the debtor. "[T]he *cum onere* principle applies equally to the transfer of rights and obligations under a non-executory contract[.]" *In re Am. Home Mortg. Holdings*, 402 B.R. 87, 98 (Bankr. D. Del. 2009).

Beyond the *cum onere* requirement, a plan may not operate to modify or impair an insurer's rights under its pre-petition insurance policies. Sometimes referred to as "insurance neutrality," this principle means that a plan that impermissibly abrogates insurance contracts is not confirmable. *See Combustion Eng'g*, 391 F.3d at 218. Insurance neutrality requires preserving insurers' rights and mandates that a plan

TrustApp110

include "language [that] broadly preserves insurers' pre-petition rights under the subject insurance policies and settlements." *Id.* at 217.

    B.   <u>The Plan Does Not Protect The Certain Insurers' Contractual Rights or Recognize the Contractual Duties Created in the Policies</u>.

        1.   The Courts Below Disregarded Third Circuit Law in Approving a Plan That Does Not Preserve the Certain Insurers' Rights.

Both lower courts recognized that the Plan may not abrogate BSA's obligations as policyholder under the insurance policies. (A. 115-117, 761-766.) But the courts committed two legal errors that undermined that conclusion. First, neither court required the assignment of policies *cum onere*. As a result, they confirmed a Plan that purports to transfer BSA's **rights** to the Trust, without an explicit and simultaneous transfer of its **obligations** under the policies. (A. 113-116, 762-65.) Second, both courts held that the Plan need not be "neutral" with respect to the Certain Insurers' pre-petition rights. (A. 191, 729.)

In refusing to include language in the Plan that would clarify that the policies are transferred *cum onere*, the bankruptcy court seized upon dicta in *American Home Mortgage* that "[u]nder the Bankruptcy Code, if a contract is not executory, a debtor may assign, delegate, or transfer rights *and/or* obligations under section 363 of the Bankruptcy Code[.]"

<div align="center">31</div>

(A. 764 (quoting *Am. Home Mortg.*, 402 B.R. at 93) (emphasis added by bankruptcy court).)   But the bankruptcy court in *American Home Mortgage* specifically held that non-executory contracts must be transferred *cum onere*.  402 B.R. at 98.  And the bankruptcy court below recognized (but disregarded) this outcome, acknowledging that the "rights and/or obligations" dicta from *American Home Mortgage* "appears to clash with the statement a non-executory contract must be taken *cum onere*."  (A. 764.)  Nevertheless, the court refused to require transfer of the insurance policies *cum onere* on the basis of *American Home Mortgage* and its analysis was cited approvingly by the district court.  (A. 115.)

A rule that contractual rights can be assigned to a settlement trust under Section 363 while contractual obligations are abrogated would have far-reaching implications for the bankruptcy process.  Section 363 is regularly employed in mass tort bankruptcies to assign insurance policies and effectuate the sale of assets and assignment of many types of commercial contracts, not just insurance policies.  *See, e.g.*, *Ind. State Police Pension Tr. v. Chrysler LLC (In re Chrysler LLC)*, 576 F.3d 108, 115 (2d Cir. 2009) ("§ 363(b) asset sales have become common practice in large-scale corporate bankruptcies.").  The remedy that the Certain

32

Insurers seek here will make clear that the Bankruptcy Code does not permit a debtor to abrogate obligations contained in its pre-petition contracts by purporting to assign only its contractual rights.

Recognizing that bankruptcy laws cannot be used to rewrite contracts, this Court has never permitted a bankruptcy court to sever contractual rights from contractual obligations and permit a partial transfer of contract rights in a bankruptcy plan. Instead, it has held that the Bankruptcy Code requires the opposite—regardless of whether a contract is executory or non-executory, the contract must be transferred *cum onere*, and the buyer must comply with all *post*-assignment obligations. *See Spyglass Media*, 997 F.3d at 505; *see also, e.g., Folger Adam Sec., Inc. v. DeMatteis/MacGregor, J.V.*, 209 F.3d 252 (3d Cir. 2000).[3] It is important for this Court to make clear this rule applies here.

---

[3] This result follows even though the insurance policies were deemed non-executory contracts. In *Spyglass Media*, this Court affirmed a ruling by the bankruptcy court explaining the limited difference between assignment of a non-executory contract under Section 363 versus an executory contract under Section 365: "[T]he difference … is ***simply*** that a sale under 363 does not obligate the buyer to cure . . . prior payment defaults that the debtor would have to, otherwise, be obligated to make" before the transfer. *Lantern Entm't LLC v. Bruce Cohen Prods.* (*In re The Weinstein Co. Holdings LLC*), Adv. Case No. 18-50924, Dkt. No. 44, at 137:7-11 (emphasis added). The bankruptcy court squarely ruled that

TrustApp113

Coverage disputes between the Settlement Trust and the insurers have already commenced by the Trustee's filing a lawsuit against the Certain Insurers in Texas, and uncertainty in this regard is likely to result in fractured and inconsistent rulings in that and future disputes in this and other cases.

The bankruptcy court disregarded this *cum onere* rule in favor of the "common law principle" that "there is a distinction between the assignment of rights under a contract, the delegation of duties under a contract, and the transfer of rights and obligations under a contract." (A. 764.)   But under the common law, contractual obligations must remain with the assignor or transfer to the assignee, absent consent of the obligee (here, the Certain Insurers).  *See, e.g.*, *Reserves Dev. LLC v. Crystal Props., LLC*, 986 A.2d 362, 370 (Del. 2009).  In short, the common law does not abrogate contractual obligations simply because an assignment has occurred.  *See Medtronic AVE, Inc. v. Advanced Cardiovascular Sys., Inc.*, 247 F.3d 44, 60 (3d Cir. 2001) ("Insofar as an assignment touches on the obligations of the other party to the

_____

the *cum onere* principle "applies in both 363, as well as 365."  *Id.* at 136:15-16; *see Am. Home Mortg.*, 402 B.R. at 92-93.

TrustApp114

underlying contract, the assignee simply moves into the shoes of the assignor." (quotation marks omitted)).

The courts below further compounded their error by erroneously concluding that a plan need not be "neutral" with respect to an insurer's contractual rights. Because this Court's decision in *Combustion Engineering* (along with its decision in *Global Industrial*) arose in the standing context, the lower courts dismissed "insurance neutrality" as a mere standing concept. According to the courts below: "Neither of these decisions guarantee an insurance company an 'insurance neutral plan,' rather these decisions recognize that if a plan is not 'insurance neutral,' insurance companies have standing (at either the bankruptcy or the appellate level, as applicable) to be heard." (A. 763; *see* A. 191.)

But insurance neutrality is rooted in the bedrock principle that contractual rights and duties do not expand or contract by the "happenstance of bankruptcy." *Mission Prod.*, 139 S. Ct. at 1663. In *Combustion Engineering*, a case involving the channeling of asbestos claims to a post-confirmation trust, this Court endorsed the principle of insurance neutrality and applied it to modify plan language in much the same way that the Certain Insurers urge here. 391 F.3d at 218.

35

During the *Combustion Engineering* bankruptcy court proceedings, in response to insurer objections that the plan failed to preserve their rights and, accordingly, they should have been given an opportunity to vote on the plan, the bankruptcy court added a "super-preemptory" provision to the plan that expressly preserved the insurers' rights:

> [N]otwithstanding anything to the contrary in this Order, the Plan or any of the Plan Documents, nothing in this Order, the Plan or any of the Plan documents (including any other provision that purports to be preemptory or supervening), shall in anyway [sic] operate to, or have the effect of, impairing the insurers' legal, equitable or contractual rights, if any, in any respect. The rights of insurers shall be determined under the Subject Insurance Policies or Subject Insurance Settlement Agreements as applicable.

*Id.* at 209.

Given the addition of this language, the bankruptcy court held that the objecting insurers did not have bankruptcy standing (*i.e.*, a right to vote on plan confirmation) because their rights were not impaired. *Id.* On appeal, the district court narrowed the super-preemptory provision, limiting it to the insurer's "contractual rights, if any, *in respect of any claims (as defined in Section 101(5) of the Bankruptcy Code)*." *Id.* at 212 (emphasis added by Third Circuit). This amendment responded to

36

TrustApp116

arguments made by the claimants' representatives that the prior reference to "rights" instead of "claims" went further than required to ensure that the insurers' claims in the bankruptcy were unimpaired pursuant to Section 1124(1) of the Bankruptcy Code. *Id.* at 211-12.

On appeal, this Court reversed the district court's narrowing of the super-preemptory provision. While agreeing that the district court's modified language more closely tracked the impairment language of Section 1124(1) "and in that sense more explicitly addresses the insurers' voting argument," this Court explained that, for purposes of the **appellate standing** question before it (as distinct from the **bankruptcy standing** question before the bankruptcy court), "the question is not whether the Plan impaired the **claims** of insurers," but whether it "diminishes their property, increases their burdens, or impairs their *rights*." *Id.* at 218 (emphasis added; internal quotation omitted).

This Court then found that "[a]s originally drafted, the super-preemptory provision made clear that any pre-petition contractual rights remained unaltered[.]" *Id.* However, "by limiting the scope of the super-preemptory provision only to 'claims' and not to broader 'rights,' the

37

District Court exposed the Objecting Insurers" to a potential impairment of their contractual rights.  As this Court further explained:

> Although the District Court found that "***all substantive rights of the insurers were expressly preserved*** under the Plan per the order of" the Bankruptcy Court, it nevertheless altered the language of the provision in a manner the insurers claim was ***adverse to their rights***.  We agree with the insurers on this point.

*Id.* (emphasis added).

Accordingly, this Court held that "the Objecting Insurers have [appellate] standing to challenge this modification."  *Id.*  Importantly, however, after concluding that the insurers had appellate standing, the Court went further, expressly vacating the district court's modification of the super-preemptory provision and "restoring the [super-preemptory] provision as drafted by the Bankruptcy Court."  *Id.*

This outcome—reinstating the bankruptcy court's original language because the district court's modification violated the insurers' rights—simply cannot be reconciled with the bankruptcy and district courts' determination in this case that insurance neutrality is a mere standing concept and is not a requirement for plan confirmation.  Were that the case, in *Combustion Engineering*, this Court would have simply

38

held that insurers had appellate standing and left it at that, declining to take the additional step of restoring the super-preemptory provision added to the plan by the bankruptcy court. *See Global Indus.*, 645 F.3d at 209 n.23 (noting that appellate standing is "standing to appeal the **substance** of the bankruptcy court's decision") (emphasis added)). By taking the additional step, this Court also correctly applied the principle—later confirmed by the Supreme Court's decision in *Tempnology*—that non-abrogation of contractual rights is a fundamental requirement of bankruptcy law. 139 S. Ct. at 1663.

In *Global Industrial*, this Court, sitting *en banc*, revisited the *Combustion Engineering* decision and recognized the importance of insurance neutrality. 645 F.3d at 211. The majority, comprised of six judges, found that despite the plan's inclusion of the same broad "insurance neutrality" language at issue in *Combustion Engineering*, the insurers had nonetheless established bankruptcy standing given that the plan "staggeringly increased" the debtors' pre-petition liability exposure, thereby potentially impairing the insurers' contractual rights, entitling the insurers to demonstrate to the bankruptcy court that the increase was the product of collusion. *Id.* at 212. Although the four-judge dissent

39

disagreed and concluded that the insurers did not have bankruptcy
standing, it did so expressly on the basis that the plan's use of the same
broad "insurance-neutrality" language recognized by *Combustion
Engineering* was sufficient to preserve the insurers' rights and disagreed
with the insurers' argument that they had not been given an adequate
opportunity to demonstrate collusion to the bankruptcy court. *Id.* at 218
(noting that, because the plan included explicit insurance neutrality
provisions, the insurers "have the same full range of contractual rights
to protect their interests for which they bargained at the inception of the
insurance contracts pre-petition"). Thus, the majority and dissenting
opinions both endorsed a plan that includes broad insurance neutrality
protections like those ordered by this Court in *Combustion Engineering*
(and sought by the Certain Insurers here) as critical to effectively
preserving insurers' contractual rights. *Id.* at 215, 218-19.

The Certain Insurers ask this Court to include in the Plan the same
sort of insurance-neutral provisions that were integral to the *Combustion
Engineering* holding. By doing so, the Court will ensure that the Certain
Insurers continue to have the same full range of contractual rights to

40

protect their interests for which they bargained at the inception of the insurance contracts.

> ### 2.     The Plan Language Purporting To Preserve the Certain Insurers' Rights Undermines Them.

Because of the errors below, this Plan purports to transfer BSA's insurance-related rights without its insurance-related obligations and lacks the critical language required by this Court to preserve the Certain Insurers' pre-petition rights. *See Combustion Eng'g*, 391 F.3d at 217. The Certain Insurers' contractual rights are crucial: they include defense rights, such as the right to associate in the defense and investigate claims; cooperation obligations requiring the insured to assist and cooperate in the insurers' investigation; consent-to-settlement rights; express coverage terms and exclusions even though a claim may be valid against the policyholder; and arbitration clauses. (*Supra* at 11-12.) These rights are fundamental to the "bargain" struck between BSA and the Certain Insurers and contained in the insurance contracts. (*Id*.) But none of these rights are recognized anywhere in the Plan.

At the same time, the Trustee filed an action in federal court against the Certain Insurers arguing, however erroneously, that the Certain Insurers' contractual rights and BSA's obligations with respect

TrustApp121

to abuse claims, ordinarily governed by state law, are now abrogated by the confirmed Plan.  (Compl. ¶¶ 119, 121, 124, 137, *Trustee of the BSA Settlement Tr. v. Allianz Global Risks US Ins. Co.,* 3:23-cv-01592, Dkt. No. 1 (N.D. Tex. July 17, 2023) (the "Coverage Complaint").)[4]

The Plan itself provides that the Certain Insurers' rights and BSA's obligations are "subject to the Plan and Confirmation Order" and preserved only "to the extent such rights and obligations are otherwise available under applicable law."  (A. 1017 (TDPs, Art. V.C).)  In other words, the Plan preserves such rights ***to the extent it does not take them away***—a preservation that is, at best, circular and, at worst, illusory.

That the Plan, on its face, fails to preserve the Certain Insurers' rights is no accident: it is what remains of the concerted effort before and at the confirmation hearing, by BSA and the claimants' attorneys, to achieve the "holy grail" of making claim valuations binding on non-

---

[4] The Certain Insurers request that the Court take judicial notice of the filing of the Coverage Complaint because it is a fact that is not subject to reasonable dispute and the Certain Insurers are offering it for the fact of its filing and not for the truth of the allegations therein.  Fed. R. Evid. 201(b), (d); *see Landy v. Fed. Deposit Ins. Corp.*, 486 F.2d 139, 151 (3d Cir. 1973).

TrustApp122

settling insurers notwithstanding their ability to "assert" contractual rights in coverage litigation.  (A. 23753-23761; *see* A. 4708-4709 (Amala).)

Through the newly-filed coverage action, the Trustee has continued to make good on that effort.  The Coverage Complaint seeks a declaration that the Certain Insurers have breached the insurance policies and are obligated to provide full coverage for the Abuse Claims, alleging that the Trustee received the benefit of the insurance policies, but makes no mention of the Certain Insurers' rights or defenses under the policies or the Trustee's corresponding obligations, which the courts below said were preserved.  (*See* Compl. ¶¶ 110, 137.)  Furthermore, in a section entitled "Defendants' Involvement in the Bankruptcy Proceedings," the Coverage Complaint seeks to impair or eliminate the Certain Insurers' rights and defenses as a result of the purported resolution of coverage issues in the bankruptcy proceeding.  Specifically, the Trustee alleges that the Certain Insurers contended in the bankruptcy proceeding that "they had no obligation to cover Abuse Claims because of the terms of their Insurance Policies."  (Compl. ¶ 131.)  In the next sentence, the Trustee states that "the Bankruptcy Court and the District Court rejected Defendants' arguments that the Plan unlawfully impaired their rights under the

TrustApp123

Insurance Policies" (*id.*), arguing that the Certain Insurers' coverage defenses were considered and rejected by the courts below.

While the Certain Insurers did not argue before the bankruptcy court that they had no obligation to cover the Abuse Claims—that is among the issues the coverage court itself must resolve under state law based on the terms of the policies—and the bankruptcy court did not resolve the issue of coverage, the import of the Complaint is clear: the Certain Insurers should be collaterally estopped from arguing that they are not obligated to cover all 82,000 Claims by virtue of their participation in the bankruptcy proceeding. Indeed, the Trustee alleges that the Certain Insurers are precluded from raising and relying upon conditions precedent and exclusions and defenses under the policies. (Compl. ¶ 121.) Taken together, these allegations read into the Plan the very anti-insurer findings the bankruptcy court rejected and attempt to use the bankruptcy process to impair the Certain Insurers' contractual rights in subsequent coverage litigation, underscoring the need for this Plan to include the requested changes, including the language prohibiting the application of *res judicata* and collateral

44

estoppel against the Certain Insurers as a result of their involvement in the bankruptcy proceedings.

This development, while contrary to Third Circuit precedent, is not surprising. When pressed repeatedly at oral argument before the district court, claimants' counsel ***refused to accept*** that the Plan preserves rights and obligations under the Certain Insurers' contracts. (A. 19902-19903 ("I would not say that all of the rights and obligations were transferred to this Settlement Trust.").)

The district court brushed aside the Certain Insurers' concerns and concluded that the "subject to" language is "clear" in preserving insurers' rights. (A. 117.) Specifically, the district court found:

> The plain meaning of this provision is clear that Insurers' rights and obligations under an Insurance Policy are preserved "to the extent such rights and obligations are otherwise available under applicable law." Thus, Insurers keep the whole gamut of permissible contractual rights under state law except, for example, anti-assignment provisions that are not "otherwise available" under the Bankruptcy Code. Similarly, Insurers' rights and obligations under an Insurance Policy are preserved "subject to the Plan and Confirmation Order," which, for example, assign rights under Policies to the Litigation Trust—an assignment not otherwise contemplate [sic] or authorized by the Policies.

45

Case 3:23-cv-01592-S   Document 285   Filed 11/02/23   Page 129 of 624   PageID 6957
Case: 23-1668   Document: 67   Page: 64   Date Filed: 07/24/2023

(*Id.*)

That conclusion was erroneous at the time and is further belied by the Coverage Complaint.  Moreover, the district court ignored the fact that this Plan, in rendering the Certain Insurers' rights "subject to" the Plan, actually says the **opposite** of what the plan said in *Combustion Engineering*, which expressly provided, "Notwithstanding anything to the contrary in this Order, the Plan or any of the Plan Documents, nothing in this Order, the Plan, or the Plan documents . . . shall in any way operate to, or have the effect of, impairing the insurers' legal, equitable, or contractual rights[.]"  391 F.3d at 212.  And while the district court found that the Plan is "clear" in preserving the Certain Insurers' contract rights—a holding that will be important to the Certain Insurers in the coverage litigation—the district court decision introduces ambiguity that should not exist.  As quoted above, the district court found that "Insurers keep the whole gamut of permissible contractual rights under state law except, **for example**, anti-assignment provisions that are not 'otherwise available' under the Bankruptcy Code."  (A. 117 (emphasis added).)  But just as with the Plan's circular language, the

46

exceptions swallow the rule: there is no limit to "examples" of rights and obligations that the Trustee may argue have been abrogated by this Plan.

Indeed, with respect to the Plan's impact on insurance coverage litigation, the courts below did precisely the opposite of what Third Circuit law requires. They contemplated that the Certain Insurers *may be bound* by the awards issued by the Trust depending on how the coverage courts interpret the Plan, TDPs, and confirmation order. (*See* A. 175 (noting that "the Bankruptcy Court held that Certain Insurers *would not necessarily be bound* by the awards issued by the Settlement Trust"); A. 744 ("I will not anticipate *how an insurance coverage court will interpret the Plan, the TDP or any confirmation order* that may be entered.") (emphasis added).) The Trustee is now leveraging this ambiguity by seeking a declaration that, based on the bankruptcy proceedings and the Plan, the Certain Insurers are *obligated* to provide coverage in full for Abuse Claims, subject only to applicable attachment points and limits of liability. (Compl. ¶ 137.) Third Circuit law requires the opposite: that the Certain Insurers *may not* be bound by the awards issued by the Trust, if their rights are not

TrustApp127

honored.  And federal courts must include language in this Plan that guarantees that result.  *See Combustion Eng'g*, 391 F.3d at 217.

> 3.   The Protective Language Originally Proposed by BSA Must Be Added Back to the Plan.

The Plan must therefore include a clear directive that the Certain Insurers' coverage defenses will not be adversely affected by anything in the Plan or anything that took place in the bankruptcy proceedings more generally.  The Plan as initially proposed said as much.  (*See e.g.*, A. 7708-7711 (TDPs, Arts. 2.1, 7.2. 10.1).)  For example, BSA initially drafted the TDPs to protect the Certain Insurers' rights by including Article 7.2, which specified that nothing in the TDPs "shall affect, impair, or prejudice the rights and defenses of the Non-Settling Insurance Companies in any manner." (*See supra* at 15.)  While BSA's motivation to cap its own liability and garner the support of abuse claimants to exit bankruptcy may be understandable, it cannot do so at the expense of the Certain Insurers' contractual rights.  The draft TDPs also included a sentence in Article 10.1, which stated that notwithstanding the TDPs, a decision by the Trust to pay (or not pay) any claim would not be admissible against the Certain Insurers or otherwise have any *res judicata*, collateral estoppel, or preclusive effect.  (*See supra* at 15.)

48

Neither provision, however, ended up in the final version of the TDPs. (*See supra* at 17-18).[5]

 This omission renders the Plan atypical among mass tort bankruptcies.  Insurer protective provisions of the sort proposed—but rejected here—are common features in such bankruptcies, including more recent bankruptcies involving sexual abuse claims.  Typically, they subject the plan to the insurers' contract rights, ***not*** the insurers' contract rights to the plan.  *See, e.g.*, First Amended Joint Plan of Reorganization, Art. 7.15, ECF No. 24657, No. 01-01139, *In re W.R. Grace & Co.*, 446 B.R. 96 (Bankr. D. Del. 2011), *aff'd*, 729 F.3d 311 (3d Cir. 2013) (no plan or plan document provision other than the insurance neutrality section shall in any way operate to, or have the effect of, impairing any Asbestos Insurance Entity's legal, equitable or contractual rights, if any, in any respect).   And they commonly specify that a trustee's claim determinations have no preclusive effect on the insurers.  *See, e.g.,*

---

[5] On a multitude of different topics, the Plan provides "belt-and-suspenders" type provisos making clear that ***other affected parties'*** rights are preserved.  (*See, e.g.*, A. 1014 (TDPs, Art. IV.A.iii); 1044 (TDPs, Art. XIV.A); *see* A. 2250 (Azer) ("We were just trying to use this belt-and-suspenders approach to preserve the contractual rights throughout the provision—throughout the TDP.").)  Not so for the Certain Insurers.

TrustApp129

Fourth Amended Joint Plan of Reorganization, § 10.4.1.2, ECF No. 13660, *In re Fed.-Mogul Glob. Inc.*, No. 01-10578 (JFK), 2007 WL 4180545 (Bankr. D. Del. Nov. 16, 2007), *aff'd*, 684 F.3d 355 (3d Cir. 2012) (no preclusion as to liability, reasonableness of TDPs, consistency with pre-petition procedures, reasonableness of settlement or value, participation or consent of insurers, suffering of an insured loss, or liability or value of the claims).[6]

---

[6] *See also* Amended Composite Plan, Art. 4.4, *In re Global Indus. Techs., Inc.*, 645 F.3d 201 (3rd Cir. 2011), *cert. denied*, 565 U.S. 1014 (2011), *remanded to* No. 02-21626 (JKF), 2013 WL 587366 (Bankr. W.D. Pa. Feb. 13, 2013), ECF No. 10844 (confirming plan containing neutrality provisions preserving all rights, claims and defenses of insurers' under relevant policies and preventing use of issue or claim preclusion regarding treatment of claims by trust); Plan of Reorganization, as Modified through August 3, 2005, Art. 3.2.4.4, No. 03-10495, *Combustion Eng'g*, 391 F.3d 190, ECF No. 2368 (reversing plan confirmation and reinstating super-preemptory insurance neutrality provision stating that plan shall not operate to or have the effect of impairing insurers' rights, which shall be determined under the policies); Modified Fourth Amended Joint Plan of Reorganization, Art. 6.W.9, No. 20-12522, *In re Mallinckrodt PLC*, 639 B.R. 837 (Bankr. D. Del. 2022), ECF No. 7670 (adding language stating plan and any bankruptcy court ruling shall not constitute a determination as to particular coverage issues, which shall be resolved pursuant to the policies and applicable law in subsequent litigation, with all rights preserved).

TrustApp130

4.   The Relief Sought by the Certain Insurers Does Not
     Require Unraveling the Plan.

The relief sought by the Certain Insurers—deleting the "subject to"
provision, assigning the policies in their entirety, and adding back certain
protective language that BSA proposed and then removed—can be
ordered without reversing other aspects of the Plan.   *See Combustion
Eng'g*, 391 F.3d at 218 (modifying language in super-preemptory
provision to broaden reservation of insurers' rights to include not only
"claims" but "rights").   Indeed, the district court agreed that "upon a
successful appeal" it was "conceivable that relief might be fashioned—
such as requiring the transfer of the entire policies—that would not
unravel the entire Plan."   (A. 20334.)

In *In re PWS Holding Corp.*, this Court recognized that an appeal
challenging certain third-party rights did not require unraveling the
entire plan because the relevant language "could be stricken from the
plan without undoing other portions of it."   228 F.3d 224, 236 (3d Cir.
2000).   Because the relief sought here does not implicate any aspects of
the plan that have already been consummated, but simply preserves the
Certain Insurers' rights, these revisions do not "fatally scramble the
plan," nor do they "significantly harm third parties who have justifiably

TrustApp131

relied on plan confirmation." *In re Tribune Media Co.*, 799 F.3d 272, 278 (3d Cir. 2015). They simply conform the Plan to the law and make express what the bankruptcy court and district court stated was already implicit in, and yet clearly missing from, the Plan: the Certain Insurers' contractual rights have been preserved.[7]

II.   The Plan Approved at Confirmation Was Not Proposed by BSA in Good Faith in Its Treatment of the Certain Insurers.

BSA was required to propose a plan "in good faith and not by any means forbidden by law." 11 U.S.C. § 1129(a)(3). Good faith is an equitable concept, rooted in the promise of treatment that is "fair to rights and interests of the parties affected" by a bankruptcy reorganization. *SGL Carbon,* 200 F.3d at 161 (internal quotations omitted); *see LTL*, 64 F.4th at 100 (good faith requirement is "grounded . . . in the equitable nature of bankruptcy"); *Am. Cap. Equip.*, 688 F.3d at 157 (good faith requires "fundamental fairness and justice"); *In re ACandS, Inc.*, 311 B.R. 36, 43 (Bankr. D. Del. 2004) ("[T]he most important feature" of the good faith analysis is "an inquiry into the

---

[7] The Certain Insurers join the Opening Brief on Appeal of the Allianz Insurers.

TrustApp132

'fundamental fairness' of the plan.") (quoting *In re Coram Healthcare Corporation,* 271 B.R. 228, 234 (Bankr. D. Del. 2001)).

Assessing the good faith standard requires examining the terms of the plan and the totality of the circumstances surrounding its proposal. *Am. United Mut. Life Ins. Co. v. City of Avon Park*, *Fla.*, 311 U.S. 138, 145-46 (1940) (good faith requirement imposes a "responsibility" on the court to "scrutin[ize] the circumstances surrounding" plan negotiations); *see, e.g.*, *Am. Cap. Equip.*, 688 F.3d at 156 ("the important point of inquiry is the plan itself"); *In re W.R. Grace & Co.*, 475 B.R. 34, 87 (Bankr. D. Del. 2012) (determining good faith "requires a factual inquiry into the totality of the circumstances surrounding the plan's proposal"); *Coram Healthcare Corp.*, 271 B.R. at 234 (same).

The debtor bears the burden of proving good faith, and this Court examines *de novo* a lower court's ultimate determination of good faith: "[T]he culminating determination of whether [the] findings support a conclusion of good faith gets plenary review as 'essentially[] a conclusion of law.'" *LTL*, 64 F. 4th at 100; *see 15375 Mem'l Corp.*, 589 F.3d at 616.

53

TrustApp133

A.   The Bankruptcy Court Failed to Properly Consider the Interests of the Certain Insurers.

The Bankruptcy Court was required to consider and weigh the interests of the Certain Insurers along with the other interested parties in determining whether the Plan was proposed in good faith. *See Am. Cap. Equip.,* 688 F.3d at 164; *see also In re Fed.-Mogul Glob. Inc.*, 684 F.3d at 361-62 (noting "profoundly serious" concerns raised when a debtor has "sold out [its] insurers") (quoting *Global Indus.*, 645 F. 3d at 214). In *American Capital*, for example, this Court evaluated the impact the proposed plan had on the debtors' insurers and concluded that the plan did not meet the statutory good faith test. 688 F.3d at 156. The Court specifically found that the plan's funding process, among other things, improperly "strip[ped] Insurers of certain procedural and substantive rights." *Id.* at 160.

While the courts below focused on the Plan's rehabilitation of BSA and compensation for abuse victims (A. 166-169, 676-677), these worthy goals do not, by themselves, satisfy the good faith requirement. Because BSA failed to protect the rights of the Certain Insurers as participants fully entitled to good faith treatment under the Plan, the courts below committed reversible error. In *American Capital*, for example, this Court

54

rejected the debtors' argument "that their plan is not in bad faith because it fulfills a purpose of the Bankruptcy Code (namely, maximizing value to creditors)." *Id.* at 163 n. 8.  The Court held:

> [T]he fact that there is at least one valid purpose to the Plan is not dispositive as the Plan could fulfill one specific purpose of the Code and yet be inconsistent with other overarching principles, or with the requirement that objectives and purposes of the Code must be fairly achieved.

*Id.* at 160 n.8.  The Court reiterated this principle most recently in *LTL*, explaining, "Good intentions—such as to protect [the Debtor's] brand or comprehensively resolve litigation—do not suffice alone [to establish good faith]." 64 F. 4th at 93.

A court of equity must also protect the rights of parties swept into a bankruptcy proceeding, including insurers.  *See SGL Carbon*, 200 F.3d at 162; *Am. Cap. Equip.*, 688 F.3d at 164.  This is especially true in mass tort cases like this one:  "an extraordinary" and "emotionally charged" case involving a "lionized institution."  (A. 507.)  Emotions must not trump either the rule of law or the Bankruptcy Code's commitment to treat all affected parties fairly and equitably.  *See, e.g.*, *LTL*, 64 F. 4th at 100 (finding lack of good faith notwithstanding that bankruptcy stemmed from an intent to compensate victims).

TrustApp135

B.   The Plan Was Not Proposed in Good Faith as to the Certain Insurers.

The Plan was not developed and proposed in good faith with respect to the Certain Insurers.  In an earlier proposed plan, BSA expressly noted that the rights of the Certain Insurers were entitled to equal weight and consideration by the Trustee, along with the other constituents, in the administration of the Trust.  Section 2.1 set out the "Purpose" of the Settlement Trust:

> The Trust Distribution Procedures are intended to balance the interests of Reorganized BSA and the other Protected Parties, holders of Abuse Claims, and the Non-Settling Insurance Companies.

Following negotiations among BSA and claimants' representatives (the Coalition, the STAC, and the FCR), the result of which was an agreement that limited BSA's contribution to the Trust, the proposed terms of the plan changed drastically, reflecting a clear bias against the Certain Insurers and the goal to improperly expand the insurers' obligations in the post-bankruptcy environment.  (*Supra* at 15-19.) Specifically, the next proposed plan dropped the protective term that had been included in the "Purpose" provision moving forward.  BSA also included the blatantly improper findings that were designed to bind the Certain Insurers to any determination by the Trustee to pay claimants,

56

TrustApp136

without regard to the contractual rights and coverage defenses afforded under the subject insurance policies.  (*See supra* at 18-19.)  While the bankruptcy court struck these findings, it nonetheless approved a Plan that purports to impair the Certain Insurers' rights and refused to recognize that the interests of the Certain Insurers must be considered and respected in balancing the rights of all parties affected by the Plan.

    C.    <u>The Plan Creates a Moral Hazard that Must Be Addressed to Meet the Good Faith Requirement.</u>

It is especially important to scrutinize the process leading up to the plan proposal because the Plan dramatically changes the relationship between BSA and its remaining insurers to the detriment of the Certain Insurers.  Before the bankruptcy filing, BSA and its insurers were aligned in defending claims, as typically is the case between a policyholder and its insurers, with incentives to limit losses, evaluate and test allegations, and collaborate in litigating or settling claims.

Under the Plan, however, that alignment, including the reciprocal duties to act towards one another in good faith, has been voided.  The Trustee is now a fiduciary for all holders of Abuse Claims and is duty-bound to resolve and pay all claims pursuant to the TDPs (A. 1021 (TDPs, Art. VII.D), even though the TDPs materially lessen the evidentiary

TrustApp137

requirements and legal hurdles (including statute of limitations defenses) that claimants would otherwise have to overcome in the tort system.  While the Trustee may "consider any further limitation on Abuse Claimants' recovery in the tort system" when valuing claims (A. 1029 (TDPs, Art. VIII.D.ii)), and vigorously contest claims as BSA did in the tort system, the Plan does not by its terms require that the Trustee do so.[8]

That is particularly troubling here because, unlike BSA's experience before the bankruptcy, approximately sixty-five percent of claims are from claimants in states where a statute of limitations or repose renders the claim untimely.  (A. 1693-1695, 1700-1701 (Griggs), 2684 (Murray), 4424 (Stern); *see* A. 23701.)  Further, experts on both sides testified that a significant portion of the claims are likely "fraudulent."  (A. 3941-3942 (Conte), 4157 (Treacy); *see* A. 4154-4155 (Treacy) (forty to forty-five percent of such allegations are generally unreliable); 2685-2686 (Murray) (ninety percent or more of claimants

---

[8] This discretionary language stands in stark contrast to many provisions requiring the Trustee to act in the interests of claimants, the STAC and the FCR.  (*See, e.g.*, A. 1107-1108, 1115-1116 (STA §§ 5.2(c), 5.3, 5.13, 5.14).)

TrustApp138

never reported abuse to scouting or law enforcement).)  And BSA's own expert, Dr. Charles Bates, admitted that the Trustee would need to scale down the Base Matrix Values for certain claims **by approximately ninety percent** to render claim awards consistent with BSA's historical litigation outcomes.  (A. 2941 (Bates).)

In addition, there was a massive explosion of claims against BSA following the bankruptcy filing, the false and misleading advertising campaign by a group of claimants' counsel, and the establishment of bar date for the filing of claims, which dramatically increased BSA's pre-petition liability.  *See, e.g.*, *Global Indus.*, 645 F. 3d at 212 (en banc) (noting the number of claims "staggeringly increased—by more than 27 times—the pre-petition liability").  Courts have recognized the proliferation of claims, even dubious ones, can result in substantial pressure to settle, even if the defendants have meritorious defenses.  *See, e.g.*, *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 189 (1994) ("Because of the uncertainty of the governing rules, entities . . . may find it prudent and necessary, as a business judgment, to abandon substantial defenses and to pay settlements in order to avoid the expense and risk of going to trial."); *Bell Atl. Corp. v.*

59

*Twombly*, 550 U.S. 544, 559 (2007) (noting that "the threat of discovery expense will push cost-conscious defendants to settle even anemic cases"); *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 164 (3d Cir. 2001) (describing the "hydraulic pressure on defendants to settle, avoiding the risk, however small, of potentially ruinous liability").

The courts below both found that the explosion of claims ***alone*** does not demonstrate an absence of good faith in the Plan.  (A. 737-738, 185-186.)  But the Certain Insurers are making no such claim.  It is the totality of the circumstances that demonstrates that the Plan was not proposed in good faith.  *See Am. United Mut. Life*, 311 U.S. at 145-46.  And one indisputable fact is that, following the establishment of the bar date, the number of claims ***increased 50-fold*** compared to BSA's pre-petition experience, and BSA needed a supermajority of those 80,000 new claimants to vote for its Plan.  Thus, the process significantly increased the Certain Insurers' liability exposure, irrespective of the reasons for the explosion of claims, and underscores their need for, and entitlement to secure in the Plan itself, clear language that recognizes, preserves, and

60

protects the full array of the Certain Insurers' rights and defenses under the policies.

The combination of all these factors creates the very conflict of interest and moral hazard that must be addressed for a plan to be proposed in good faith. The bankruptcy court recognized that "a moral hazard is the possibility that an insured, once the insurance company is paying for claims or losses . . . may have less incentive to prevent loss or less incentive to limit the size of losses or claims once they occur." (A. 739.) Both courts recognized that insurers' contractual defenses are important to protect against a conflict of interest with insureds in the ordinary, non-bankruptcy setting. (*See* A. 739 ("Professor Harrington testified, generally (and within his expertise), to four key clauses in CGL (commercial general liability) policies that help reduce a 'moral hazard' and permit insurers to offer coverage at lower premiums thereby encouraging the 'take-up' off liability insurance in the business community."); A. 118 (positively referencing testimony regarding commercial general liability policy clauses that help reduce "moral hazard").) But the Plan and TDPs—for all the reasons summarized above—dramatically increase the Trustee's conflict of interest with BSA's

61

insurers, which necessitates express and unambiguous language in the Plan that (1) the Certain Insurers' contractual rights are preserved and unaltered and that BSA's contractual obligations are fully transferred to the Trust notwithstanding anything in the Plan, the TDPs or the Confirmation Order; (2) the principles of *res judicata* and collateral estoppel arising from the bankruptcy proceedings do not limit or alter the insurers' defenses or the Trust's obligations under the policies, and (3) in administering the Trust, the Trustee must balance the interests of the insurers along with those of the Trust, affected parties, and the claimants, all as originally proposed by BSA below.

Otherwise, this moral hazard and conflict of interest, left unaddressed, preclude a proposal in good faith. In *American Capital*, this Court found that (1) the plan provided for tort claims to be paid by a trust funded by an assignment of insurance; (2) the claims would be resolved according to procedures that gave decision-makers "financial[] incentiv[es] to sabotage [the debtor's] own defense" and maximize the claims insurers would be asked to pay; (3) the TDPs would "severely limit[] or eliminat[e] Insurers' ability to take discovery, submit evidence, contest causation, or appeal a decision," and otherwise "strip[] Insurers

TrustApp142

of [their] procedural and substantive rights"; and (4) the case was unlike other bankruptcy cases, where a trust is typically funded by ongoing debtor contributions.  688 F.3d at 150, 158-61.  Even where there was no "collusion" between the debtor and claimants, the Court concluded that the plan was "patently unconfirmable" for lack of good faith because of its treatment of insurers.  *Id.* at 161.[9]  So too here—the Plan's treatment of insurers demonstrates that the Plan was not proposed in good faith.

Remedying the Plan's lack of good faith does not require unscrambling the Plan, remanding the case for more fact-finding, or disturbing the mechanisms for compensating abuse claimants.  First, as noted in Point I, the Court should modify the Plan to eliminate the language in Article V.C of the TDPs that makes the Certain Insurers'

---

[9] Unlike in this case, the plan in *American Capital* was funded in large part by a surcharge taken from asbestos claimants who received compensation under the plan.  This surcharge created a financial incentive for the reorganized debtor to minimize its own defenses against those claimants, whose compensation would trigger potential insurance coverage.  Nonetheless, this Court recognized that: 1) the impact that a plan has on insurers must be considered in evaluating good faith, even in the absence of collusion between the debtor and claimants; and 2) the courts must consider potential conflicts of interest between the debtors' successor-in-interest and its insurers, particularly where insurer contributions as opposed to the ongoing business of the reorganized debtor are the source for future funding of the plan.  *Id.* at 158-61.

63

TrustApp143

rights "subject to the Plan and the Confirmation Order," make clear that the policies are assigned in their entirety, and add the two provisions that BSA initially proposed to preserve and protect the Certain Insurers' contractual rights.   Second, this Court should restore the "Purpose" provision language that recognizes the Trustee's obligation to balance the rights of the Certain Insurers along with reorganized BSA, the other Protected Parties, and the Abuse Victims in administering the Trust. Third, in setting claimants' compensation, the Trustee should be *required* to "consider any further limitation on Abuse Claimants' recovery in the tort system," including the limitation expressly identified by BSA's expert.  (*See* A. 1029 (TDPs, Art. VIII.D.ii).)

Although these straightforward changes may not remedy every defect in the Plan, they will provide the Certain Insurers with meaningful relief.   Such changes would help restore the contractual relationship between BSA and its insurers, protect the bargained-for rights and coverage defenses of the Certain Insurers, and serve the goals of the Bankruptcy Code to reorganize BSA and compensate its claimants, as required under Section 1129(a)(3).

TrustApp144

# CONCLUSION

For the foregoing reasons, the Court should reverse and order the requested modifications to the Plan.

Dated:        July 24, 2023

Respectfully submitted,

By: /s/ Theodore J. Boutrous Jr.

| | |
|---|---|
| Deirdre M. Richards | Theodore J. Boutrous Jr. |
| FINEMAN KREKSTEIN | Blaine H. Evanson |
| & HARRIS PC | GIBSON, DUNN & CRUTCHER LLP |
| 1300 N. King Street | 333 South Grand Avenue |
| Wilmington, DE 19801 | Los Angeles, California 90071 |
| Telephone: (302) 538-8331 | (213) 229-7000 |
| Facsimile: (302) 394-9228 | tboutrous@gibsondunn.com |
| drichards@finemanlawfirm.com | bevanson@gibsondunn.com |
| | |
| Susan N.K. Gummow | Michael A. Rosenthal |
| FORAN GLENNON | James Hallowell |
| PALANDECH PONZI & | Seth M. Rokosky |
| RUDLOFF P.C. | GIBSON, DUNN & CRUTCHER LLP |
| 222 N. LaSalle St., Suite 1400 | 200 Park Avenue |
| Chicago, Illinois 60601 | New York, New York 10166 |
| sgummow@fgppr.com | (212) 351-4000 |
| | mrosenthal@gibsondunn.com |
| | jhallowell@gibsondunn.com |
| | kmartorana@gibsondunn.com |
| | srokosky@gibsondunn.com |

*Counsel for National Union Fire Insurance Company of Pittsburgh, Pa.,
Lexington Insurance Company, Landmark Insurance Company, and the
Insurance Company of the State of Pennsylvania*

TrustApp145

Joseph T. Baio
Christopher J. St. Jeanos
Mitchell J. Auslander
Charles Dean Cording
Patricia O. Haynes
WILLKIE FARR & GALLAGHER LLP
787 Seventh Avenue
New York, NY 10019
(212) 728-8000

*Additional Counsel for National Union Fire Insurance Company of Pittsburgh, Pa., Lexington Insurance Company, Landmark Insurance Company, and the Insurance Company of the State of Pennsylvania*

TrustApp146

/s/ Ronald P. Schiller
Ronald P. Schiller
Matthew A. Hamermesh
HANGLEY ARONCHICK SEGAL
PUDLIN & SCHILLER
One Logan Square, 27th Floor
Philadelphia, PA 19103
Telephone: (215) 568-6200
E: rschiller@hangley.com
mhamermesh@hangley.com

Kathleen M. Miller
SMITH, KATZENSTEIN &
JENKINS LLP
1000 West Street, Suite 501
P.O. Box 410
Wilmington, DE 19899
Telephone: (302) 652-8400
kmiller@skjlaw.com

*Counsel for Arch Insurance
Company*

/s/ Michael J. Joyce
Michael J. Joyce
JOYCE, LLC
1225 King Street, Suite 800
Wilmington, DE 19801
Telephone:  (302) 388-1944
Email:  mjoyce@mjlawoffices.com

Kevin Coughlin
Lorraine Armenti
Michael Hrinewski
COUGHLIN MIDLIGE &
GARLAND, LLP

By:  /s/ Kathleen K. Kerns
POST & SCHELL, P.C.
Kathleen K. Kerns
Four Penn Center – 13th Floor
1600 John F. Kennedy Boulevard
Philadelphia, PA  19103
Telephone: (215) 587-1000
E-mail: kkerns@postschell.com

IFRAH PLLC
George R. Calhoun
1717 Pennsylvania Ave., N.W.
Suite 650
Washington, DC  20006
Phone:  (202) 840-8758
E-mail:  george@ifrahlaw.com

*Counsel for Argonaut Insurance
Company and Colony Insurance
Company*

/s/ Maria Aprile Saczuk
Maria Aprile Sawczuk, Esq.
GOLDSTEIN & MCCLINTOCK
LLLP
501 Silverside Road, Suite 65
Wilmington, DE 19809
Telephone: (302) 444-6710
marias@goldmclaw.com

Laura McNally, Esq.
LOEB & LOEB LLP
321 N. Clark Street, Suite 2300
Chicago, IL 60654
Telephone: (312) 464-3155

67

TrustApp147

350 Mount Kemble Avenue, PO
Box 1917
Morristown, NJ 07962
Telephone:  (973) 267-0058
kcoughlin@cmg.law
larmenti@cmg.law
mhrinewski@cmg.law

John M. Flynn
Britton C. Lewis
CARRUTHERS & ROTH, P.A.
235 N. Edgeworth Street
P.O. Box 540
Greensboro, NC  27401
Telephone:  (336) 478-1146
jmf@crlaw.com
bcl@crlaw.com

*Counsel for Arrowood
Indemnity Company*

lmcnally@loeb.com

David Christian, Esq.
DAVID CHRISTIAN ATTORNEYS
LLC
105 W. Madison St., Suite 1400
Chicago, Illinois 60602
Telephone: (312) 282-5282
dchristian@dca.law

*Counsel for Continental Insurance
Company and Columbia Casualty
Company*

/s/ William H. White Jr.
William H. White Jr
KIERNAN TREBACH LLP
1233 20th Street, NW, 8th Floor
Washington, DC 20036
Telephone: (202) 712-7000
Email:
wwhite@kiernantrebach.com

John E.W. Baay II
GIEGER LABORDE &
LAPEROUOSE, LLC
701 Poydras Street
Suite 4800
New Orleans, LA 70139

/s/ Kathleen M. Miller
Kathleen M. Miller
SMITH, KATZENSTEIN &
JENKINS LLP
1000 West Street, Suite 501
P.O. Box 410
Wilmington, DE 19899
Telephone: (302) 652-8400
Email: kmiller@skjlaw.com

Mary E. Borja
Gary P. Seligman
Ashley L. Criss
WILEY REIN LLP
2050 M Street NW

TrustApp148

Telephone: (504) 561-0400

*Counsel for Gemini Insurance Company*

/s/ Konrad R. Krebs
Konrad R. Krebs
CLYDE & CO US LLP
340 Mt. Kemble Ave, Suite 300
Morristown, New Jersey 07960
Telephone: (973) 210-6705
konrad.krebs@clydeco.us

Alexander E. Potente
CLYDE & CO US LLP
150 California Street
15th Floor
San Francisco, California 94111
Telephone: (415) 365-9800
alex.potente@clydeco.us

David Christian
DAVID CHRISTIAN ATTORNEYS LLC
105 W. Madison St., Suite 1400
Chicago, Illinois 60602
Telephone: (312) 282-5282
dchristian@dca.law

Bruce W. McCullough
BODELL BOVE, LLC
1225 N. King St., Suite 1000
Wilmington, DE 19801-3250
Telephone: (302) 655-6749

Washington, DC 20036
Phone: (202) 719-7000
Email: mborja@wiley.law
gseligman@wiley.law
acriss@wiley.law

*Counsel for General Star Indemnity Company*

/s/ Kathleen M. Miller
SMITH, KATZENSTEIN & JENKINS LLP
Kathleen M. Miller
1000 West Street, Suite 501
P.O. Box 410
Wilmington, DE 19899
Telephone: (302) 652-8400
kmiller@skjlaw.com

MOUND COTTON WOLLAN & GREENGRASS LLP
Lloyd A. Gura
Pamela J. Minetto
One New York Plaza 44th Floor
New York, NY 10004
Telephone: (212) 804-4282
Email: lgura@moundcotton.com
pminetto@moundcotton.com

*Counsel for Indian Harbor Insurance Company, on behalf of itself and as successor in interest to Catlin Specialty Insurance Company*

69

TrustApp149

bmccullough@bodellbove.com

*Counsel for Great American
Assurance Company f/k/a
Agricultural Insurance Company,
Great American E&S Insurance
Company f/k/a Agricultural
Excess and Surplus Insurance
Company, and Great American
E&S Insurance Company*

/s/ *Douglas R. Gooding*
Douglas R. Gooding
Jonathan D. Marshall
Bryana T. McGillycuddy
CHOATE, HALL & STEWART
LLP
Two International Place
Boston, MA 02110
Telephone: (617) 248-5000
dgooding@choate.com
jmarshall@choate.com
bmcgillycuddy@choate.com

Kim V. Marrkand
MINTZ, LEVIN, COHN, FERRIS,
GLOVSKY AND POPEO PC
One Financial Center
Boston, MA 02111
Telephone: (617) 542-6000
kvmarrkand@mintz.com

R. Karl Hill
SEITZ, VAN OGTROP & GREEN,
P.A.
222 Delaware Avenue, Suite 1500
Wilmington, Delaware 19801
Telephone: (302) 888-0600

/s/ Marla S. Benedek
Marla S. Benedek
COZEN O'CONNOR
1201 N. Market Street, Suite 1001
Wilmington, DE 19801
Telephone:  (302) 295-2024
mbenedek@cozen.com

*Counsel for Traders and Pacific
Insurance Company, Endurance
American Specialty Insurance
Company, and Endurance
American Insurance Company*

/s/ Louis J. Rizzo, Jr.
Louis J. Rizzo, Jr.
REGER RIZZO & DARNALL LLP
1521 Concord Pike Suite 305
Brandywine Plaza West
Wilmington DE  19803
Telephone: (302) 477-7100
lrizzo@regerlaw.com

*Counsel for Travelers Casualty and
Surety Company, Inc. (f/k/a Aetna
Casualty & Surety Company), St.
Paul Surplus Lines Insurance*

TrustApp150

khill@svglaw.com

*Counsel to Liberty Mutual Insurance Company, The Ohio Casualty Insurance Company, Liberty Insurance Underwriters, Inc., and Liberty Surplus Insurance Corporation*

*/s/ Stephen M. Miller*
Stephen M. Miller (DE ID No. 2610)
Carl N. Kunz, III (DE ID No. 3201)
MORRIS JAMES LLP
500 Delaware Avenue, Ste. 1500
Wilmington, DE  19801
Telephone: (302) 888-6800
Facsimile: (302) 571-1750
Email: smiller@morrisjames.com
Email: ckunz@morrisjames.com

*Counsel for Old Republic Insurance Company*

*Company and Gulf Insurance Company*

71

TrustApp151

## CERTIFICATION OF BAR MEMBERSHIP

Pursuant to Local R. 28.3(d) and Local R. 46.1(e), I certify that I, Theodore J. Boutrous Jr., am admitted as an attorney and counselor of the United States Court of Appeals for the Third Circuit.

<div align="right">

/s/ Theodore J. Boutrous Jr.
Theodore J. Boutrous Jr.
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, California 90071
(213) 229-7000
tboutrous@gibsondunn.com

</div>

Dated:      July 24, 2023

TrustApp152

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(g) and Local R. 31.1, I certify the following:

1. This brief complies with word limitations of Fed. R. App. P. 32(a) because it contains 12,925 words, excluding those parts exempted by Fed. R. App. P. 32(f).

2. This brief complies with the typeface and type style requirements of Fed. R. App. P. 32(a)(5) and Fed. R. App. P. 32(a)(6) because the brief has been prepared in Century Schoolbook 14-point font using Microsoft Word.

3. This brief complies with the electronic filing requirements of Local R. 31.1(c) because the text of the electronic brief is identical to the text of the paper copies and because CrowdStrike Falcon was run on the file containing the electronic version of this brief and no viruses were detected.

/s/ Theodore J. Boutrous Jr.
Theodore J. Boutrous Jr.
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, California 90071
(213) 229-7000
tboutrous@gibsondunn.com

Dated:       July 24, 2023

TrustApp153

## CERTIFICATE OF SERVICE

I certify that the foregoing was filed with the Clerk using the appellate CM/ECF system on July 24, 2023.  All counsel of record are registered CM/ECF users, and service will be accomplished by the CM/ECF system.


/s/ Theodore J. Boutrous Jr.
Theodore J. Boutrous Jr.
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, California 90071
(213) 229-7000
tboutrous@gibsondunn.com

Dated:      July 24, 2023

TrustApp154

FILED DATE: 7/27/2023 4:08 PM   2017CH14975

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, CHANCERY DIVISION

| | |
|---|---|
| NATIONAL SURETY CORPORATION; INTERSTATE FIRE AND CASUALTY COMPANY; and FIREMAN'S FUND INSURANCE COMPANY, | No. 2017–CH–014975 |
| Plaintiffs, | Hon. Alison C. Conlon |
| v. | |
| BSA SETTLEMENT TRUST; ALLIANZ INSURANCE COMPANY n/k/a ALLIANZ GLOBAL RISKS US INSURANCE COMPANY; AGRICULTURAL EXCESS & SURPLUS INSURANCE COMPANY; AGRICULTURAL INSURANCE COMPANY; ALLIED WORLD ASSURANCE COMPANY (US) INC.; ALLIED WORLD ASSURANCE COMPANY, LTD.; ALLSTATE INSURANCE COMPANY; ALTERRA EXCESS AND SURPLUS INSURANCE COMPANY; AMBASSADOR INSURANCE COMPANY; AMERICAN CASUALTY COMPANY OF READING, PENNSYLVANIA; AMERICAN ECONOMY INSURANCE COMPANY; AMERICAN EXCESS INSURANCE ASSOCIATION; AMERICAN FIDELITY COMPANY; AMERICAN HOME ASSURANCE COMPANY; AMERICAN HOME FIRE ASSURANCE COMPANY; AMERICAN REINSURANCE COMPANY AMERICAN STATES INSURANCE COMPANY; AMERICAN EMPLOYERS' INSURANCE COMPANY; AMERICAN EMPLOYERS' INSURANCE COMPANY OF BOSTON, MASSACHUSETTS; AMERISURE INSURANCE COMPANY; ANCHOR CASUALTY COMPANY; | |

1

TrustApp155

FILED DATE: 7/27/2023 4:08 PM   2017CH14975

ARCH RE INSURANCE COMPANY;
ARGONAUT INSURANCE COMPANY;
ARROWOOD INDEMNITY COMPANY
f/n/a ROYAL INDEMNITY COMPANY;
ASPEN SPECIALTY INSURANCE
COMPANY; ATEGRITY SPECIALTY
INSURANCE COMPANY; AVIVA PLC;
AXIS SPECIALTY INSURANCE
COMPANY; AXIS SURPLUS INSURANCE
COMPANY; BUCKEYE UNION
INSURANCE COMPANY; CALIFORNIA
UNION INSURANCE; CATLIN
SPECIALTY INSURANCE COMPANY;
CHARTER OAK FIRE INSURANCE
COMPANY; CINCINNATI INSURANCE
COMPANY; CNA FINANCIAL
CORPORATION; COLONY INSURANCE
COMPANY; COLUMBIA CASUALTY
COMPANY; THE CONTINENTAL
INSURANCE COMPANY; COLUMBIA
INSURANCE COMPANY; CONTINENTAL
CASUALTY COMPANY;
CRUM & FORSTER INDEMNITY
COMPANY; DANIELSON NATIONAL
INSURANCE COMPANY f/n/a MISSION
NATIONAL INSURANCE COMPANY;
ENDURANCE AMERICAN INSURANCE
COMPANY; ENDURANCE AMERICAN
SPECIALTY INSURANCE COMPANY;
ERIE AND NIAGARA INSURANCE
ASSOCIATION; ERIE FAMILY LIFE
INSURANCE COMPANY; ERIE
INSURANCE EXHCHANGE; EVANSTON
INSURANCE COMPANY; EVEREST
NATIONAL INSURANCE COMPANY;
FIRST SPECIALTY INSURANCE
COMPANY FIRST INSURANCE
COMPANY OF HAWAII, LTD.; GEMINI
INSURANCE COMPANY; GENERAL
INSURANCE COMPANY OF AMERICA;
GENERAL STAR INDEMNITY
COMPANY; GLOBE INDEMNITY
COMPANY; GULF INSURANCE
COMPANY; GREAT AMERICAN
ASSURANCE COMPANY; GREAT
AMERICAN E & S INSURANCE

2

FILED DATE: 7/27/2023 4:08 PM   2017CH14975

COMPANY; GREAT AMERICAN
INSURANCE COMPANY; HARBOR
INSURANCE COMPANY; ILLINOIS
EMPLOYERS INSURANCE OF WAUSAU;
INDIAN HARBOR INSURANCE
COMPANY; JAMESTOWN MUTUAL
INSURANCE COMPANY; JEFFERSON
INSURANCE COMPANY OF NEW YORK;
LANDMARK INSURANCE COMPANY;
LEXINGTON INSURANCE COMPANY;
LIBERTY INSURANCE UNDERWRITERS,
INC.; LIBERTY MUTUAL INSURANCE
COMPANY; LIBERTY SURPLUS
INSURANCE CORPORATION; LONDON
AND EDINBURGH GENERAL
INSURANCE COMPANY LIMITED;
THE MANHATTAN FIRE & MARINE
INSURANCE COMPANY; NATIONAL
CASUALTY COMPANY; NATIONAL
FIRE INSURANCE OF HARTFORD;
NATIONAL UNION FIRE INSURANCE
COMPANY OF PITTSBURGH, PA;
NATIONWIDE MUTUAL INSURANCE
COMPANY; NEW HAMPSHIRE
INSURANCE COMPANY; NORMANDY
REINSURANCE COMPANY LIMITED;
NIAGARA FIRE INSURANCE COMPANY;
THE OHIO CASUALTY INSURANCE
COMPANY; OLD REPUBLIC
INSURANCE COMPANY; PHOENIX
INSURANCE COMPANY; QBE
INSURANCE CORPORTATION; ROYAL
GLOBE INSURANCE COMPANY;
ROYAL INDEMNITY COMPANY;
ROYAL INSURANCE COMPANY OF
AMERICA; SAFECO INSURANCE
COMPANY OF AMERICA; SCOTTSDALE
INSURANCE COMPANY; SECURITY
MUTUAL INSURANCE COMPANY;
ST. PAUL FIRE AND MARINE
INSURANCE COMPANY; ST. PAUL
MERCURY INSURANCE COMPANY;
ST. PAUL SURPLUS LINES INSURANCE
COMPANY; THE INSURANCE
COMPANY OF THE STATE OF

3

TrustApp157

FILED DATE: 7/27/2023 4:08 PM   2017CH14975

PENNSYLVANIA; TRADERS AND
PACIFIC INSURANCE COMPANY;
NORTH RIVER INSURANCE COMPANY;
TRAVELERS INSURANCE COMPANY;
TRAVELERS INDEMNITY COMPANY;
TRANSAMERICA INSURANCE
COMPANY; TRAVELERS (BERMUDA)
LIMITED; TRAVELERS CASUALTY AND
SURETY COMPANY, INC. f/n/a AETNA
CASUALTY & SURETY COMPANY;
UNITED STATES FIDELITY AND
GUARANTY COMPANY; UNITED
STATES FIRE INSURANCE COMPANY;
UNIVERSAL RE-INSURANCE COMPANY
LIMITED; UTICA MUTUAL INSURANCE
COMPANY; XL INSURANCE (DUBLIN)
LTD.; XL EUROPE LIMITED; XL
INSURANCE (BERMUDA) LTD;
FIDELITY AND CASUALTY COMPANY
OF NEW YORK; FIREMAN'S
INSURANCE COMPANY OF NEWARK,
NJ; PACIFIC INSURANCE COMPANY;
WESTERN CASUALTY & SURETY
COMPANY; WINTERTHUR SWISS
INSURANCE COMPANY; YASUDA FIRE
& MARINE INSURANCE COMPANY
(U.K.) LTD.; JOHN DOES 1-18,
    Defendants.

---

**FIRST AMENDED COMPLAINT FOR DECLARATORY RELIEF**

Plaintiffs National Surety Corporation ("National Surety"), Interstate Fire and Casualty

Company ("Interstate"), and Fireman's Fund Insurance Company ("FFIC"; together with National

Surety, and Interstate, collectively, the "National Surety Insurers"), by and through their attorneys,

submit their First Amended Complaint for Declaratory Relief in the above-captioned matter.

## **INTRODUCTION**

1.     This insurance coverage litigation arises out of what has been described as an

"epidemic" of sexual abuse within the Boy Scouts of America ("BSA") that, for more than a

4

FILED DATE: 7/27/2023 4:08 PM  2017CH14975

century, the organization not only knowingly turned a blind eye towards, but also went to great lengths to conceal.

2.      One such case was that of Thomas Hacker, a Chicago-area Scout leader described as "the most prolific child molester in the history of scouting." In the 1960s and early 1970s, Hacker was arrested no less than three times for molesting scouts and other young boys while serving as scoutmaster for troops in Indiana. Although BSA knew of and had documented the abuse, Hacker was permitted to register with the Chicago Area Council and serve as scoutmaster and committee chairman of a local troop from 1981 to 1988. It was later determined that Hacker sexually abused at least 34 boys during this seven-year period. Arrested in 1988, Hacker was eventually convicted of five counts of aggravated criminal sexual assault against three scouts, for which he was sentenced to 100 years in prison.

3.      National Surety filed this coverage action in late 2017 to obtain declaratory relief on coverage issues arising under excess liability policies it issued BSA in the 1980s, after BSA demanded payment for the defense and settlement of claims filed by 18 former scouts abused by Hacker ("Hacker Claims"). In addition to BSA and the Chicago Area Council, National Surety joined to this action other liability insurers ("Other Insurer Parties") for the years in which Hacker's sexual abuse was alleged to have occurred given that the declarations sought potentially impact the coverage obligations of the Other Insurer Parties.

4.      The Hacker Claims were not the first to allege that BSA had, for decades, repeatedly demonstrated a knowing and deliberate indifference to the dangers posed by pedophilia in its ranks. Facts discovered in both the Hacker cases and others brought by former scouts who had suffered sexual abuse reflected that BSA had long known that scouting was exploited by pedophiles to gain access to young boys; that BSA had known with certainty that substantial

TrustApp159

FILED DATE: 7/27/2023 4:08 PM   2017CH14975

numbers of scouts would be abused by scouting volunteers each and every year; and that, since its inception, BSA had known of the unreasonably high risk of sexual abuse by its volunteers, yet chose time and again to conceal the high rates of sexual abuse within in the organization from parents, the authorities, and the general public to protect its reputation and revenue.

5.      As the facts discovered in these underlying cases showed, during the 1920s BSA began secretly compiling reports of volunteers considered ineligible to serve in BSA due to claims of child sexual abuse. By 1935, BSA had accumulated almost 3,000 files on scout leaders dismissed from scouting. By the time National Surety issued its first excess policy in 1981, BSA was removing scout leaders accused of committing sexual abuse at an average rate of one every three days.

6.      In 2010, an Oregon jury awarded a former scout who had been sexually abused by a scoutmaster $18.5 million in punitive damages, prompting increasing numbers of such claims to be filed against BSA throughout the country. By 2020, BSA was facing approximately 1,700 pending and anticipated claims in state and federal courts throughout the country, brought by former scouts who had been sexually abused in connection with scouting. Faced with mounting liabilities, on February 18, 2020 (the "Petition Date") BSA filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq*. (the "Bankruptcy Code"), in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"). BSA's petition for relief commenced case no. 20-10343 (the "Bankruptcy Case") and automatically stayed this coverage action.

7.      While BSA sought bankruptcy protection to resolve its existing and anticipated liabilities, mass tort lawyers ("claimant attorneys") seized on the bankruptcy as a potential windfall opportunity to inappropriately expand BSA's liability. During the eight months following the Petition Date, claimant attorneys throughout the country engaged in a massive, multi-media

TrustApp160

FILED DATE: 7/27/2023 4:08 PM   2017CH14975

advertising campaign, replete with false statements and assurances, to enlist as many claimants ("Abuse Claimants") as they could on a contingency fee basis. By the time the period for filing proofs of claim in the bankruptcy expired in November 2020, over 82,000 claims alleging sexual abuse had been filed in the Bankruptcy Case ("Abuse Claims") – a 6,000% increase from the 1,700 claims BSA faced pre-petition.

8.     This staggering increase in the number of Abuse Claims enabled the claimant attorneys to assert considerable leverage over the outcome of the Bankruptcy Case, which one claimant attorney candidly professed to be a principal objective of their solicitation efforts. The claimant attorneys exercised this leverage through a two-part strategy designed to maximize the Abuse Claimants' (and their own) recoveries.

9.     The first prong of the strategy was to devise and implement a permissive trust distribution process through which the Abuse Claims would be funneled for review, valuation, and payment. This process grossly inflates the value of Abuse Claims and allows recovery for tens of thousands of claims that, according to BSA itself, would never have been filed in the tort system given the legal hurdles they would have faced. This includes some 58,000 Abuse Claims that one of the leading claimant attorneys admits are non-compensable because of statutes of limitation.

10.     The second prong of the claimant attorneys' strategy was to effectuate an assignment of BSA's insurance rights (without the concomitant obligations) to a trust they dominate, and then seeking to bind the National Surety Insurers and the Other Insurer Parties to the trust's valuation awards — a process that is fundamentally at odds with the terms and conditions of BSA's insurance policies that are designed to protect the insured by minimizing its liability. These protective policy terms and conditions include the insurers' right to participate in the defense and settlement of claims as a condition of coverage and their obligation to indemnify judgments, if any,

TrustApp161

FILED DATE: 7/27/2023 4:08 PM   2017CH14975

following an actual trial.  Under the process here, however, the claimant attorneys and now the Settlement Trust (defined below) contend that none of these (or any other) insurer rights and defenses exist, despite the express wording of the insurers' insurance contracts to the contrary.

11.     BSA, for its part, aligned itself with the claimant attorneys, acceding to many of their demands without the agreement or consent of the National Surety Insurers or the Other Insurer Parties. Despite the contractual obligations owed to the National Surety Insurers and Other Insurer Parties under their respective policies, BSA excluded them from its settlement negotiations with the claimant attorneys. In fact, BSA spent months unilaterally negotiating with the claimant attorneys over terms of a plan of reorganization; an assignment of insurance policy rights without the attendant obligations; and a settlement trust with trust distribution procedures that aim to increase greatly the insurers' liability and impair their contractual rights. These actions — and the results thereof — violate BSA's duty to cooperate and its insurers' right to participate in the defense and settlement of claims, among other policy requirements on which coverage is conditioned.

12.     In light of BSA's demand that National Surety reimburse its defense and indemnity costs associated with the Hacker Claims, as well as the Settlement Trust's stated intent to seek coverage for claims alleging bodily injury during the National Surety Insurers' policy periods, this Amended Complaint seeks declarations regarding the parties' rights and obligations under the National Surety, Interstate, and FFIC Policies (defined below). Because the declarations sought may impact the coverage obligations of insurers other than the National Surety Insurers, and the National Surety Insurers largely issued excess policies requiring exhaustion of underlying coverage, the National Surety Insurers have joined to this action BSA's other liability insurers for all years in which the sexual abuse is alleged to have occurred, where information regarding insurance providers is available.

TrustApp162

FILED DATE: 7/27/2023 4:08 PM   2017CH14975

## PARTIES

13.     Plaintiff National Surety is a corporation organized under the laws of the State of Delaware with its principal place of business and statutory home office in Illinois. It is now and was at all times relevant to this complaint licensed and authorized to issue insurance policies in the State of Illinois.

14.     Plaintiff Interstate is a corporation organized under the laws of the State of Illinois with its principal place of business and statutory home office in Illinois. It is now and was at all times relevant to this complaint licensed and authorized to issue insurance policies in the State of Illinois.

15.     Plaintiff FFIC is a corporation organized under the laws of the State of California with its principal place of business and statutory home office in Illinois. It is now and was at all times relevant to this complaint licensed and authorized to issue insurance policies in the State of Illinois.

16.     BSA is a congressionally charted corporation authorized to do business in Illinois. Although confirmation of BSA's plan of reorganization is on pending appeals, BSA has been discharged from its prepetition liability pursuant to that plan.  The plan channels all Abuse Claims against BSA exclusively to the above-referenced settlement trust, as more fully averred below.

17.     Defendant BSA Settlement Trust ("Settlement Trust") is a statutory trust under Chapter 38 of Title 12 of the Delaware Code, 12 Del. C. §§ 3801, *et seq*., created pursuant to the *Third Modified Fifth Amended Chapter 11 Plan of Reorganization (with Technical Modifications) for Boy Scouts of America and Delaware BSA, LLC* ("Plan") as confirmed by the Bankruptcy Court on September 8, 2022.  (Bankruptcy Case Dkt. No. 10316.)  The Settlement Trust was constituted to, among other things: (i) assume all liability for and administer the claims channeled to it,

9

FILED DATE: 7/27/2023 4:08 PM   2017CH14975

including Abuse Claims and inter-insurer claims such as the existing inter-insurer claims in this case; and (ii) receive and accept assignment of the rights under certain of BSA's liability insurance policies. The Settlement Trust – as successor-in-interest to BSA, certain related entities, and certain of BSA's insurers with which BSA settled – asserts rights under policies issued by the National Surety Insurers and Other Insurer Parties in this action.

18.     On information and belief, there are two trustees of the Settlement Trust: (i) Honorable Barbara J. Houser (Ret.) (herein, the "Settlement Trustee"), who is domiciled in and/or a resident or citizen of the State of New Mexico; and (ii) either (a) a natural person who is a resident of the State of Delaware or (b) a legal entity that has its principal place of business in the State of Delaware. (Bankruptcy Case Dkt. No. 10316-1; BSA Settlement Trust Agreement §§ 5.1, 5.11(a).)

19.     This declaratory judgment action involves all the insurers that the Settlement Trust has claimed to be implicated by the Abuse Claims channeled to it (listed below).

20.     On information and belief, Allianz Insurance Company, now known as Allianz Global Risks US Insurance Company, is a corporation organized under the laws of the State of Illinois with its principal place of business in Chicago, Illinois.

21.     On information and belief, Travelers Casualty and Surety Company, Inc. formerly known as Aetna Casualty & Surety Company is a corporation organized under the laws of the State of Connecticut with its principal place of business in Hartford, Connecticut.

22.     On information and belief, Allstate Insurance Company is a corporation organized in the State of Illinois with its principal place of business in Illinois.

23.     On information and belief, Ambassador Insurance Company, now known as Peerless Indemnity Insurance Company, is a corporation organized in the State of Illinois with its principal place of business in Massachusetts.

TrustApp164

FILED DATE: 7/27/2023 4:08 PM   2017CH14975

24.     On information and belief, American Employers' Insurance Company and American Employers' Insurance Company of Boston, Massachusetts, now known as SPARTA Insurance Company, is a corporation organized in the State of Connecticut with its principal place of business in Connecticut.

25.     On information and belief, American Casualty Company of Reading, Pennsylvania is a corporation organized in the State of Pennsylvania with its principal place of business in Illinois.

26.     On information and belief, American Economy Insurance Company is a corporation organized in the State of Indiana with its principal place of business in Massachusetts.

27.     On information and belief, American Home Fire Assurance Company, now known as American Home Assurance Company, is a corporation organized in the State of New York with its principal place of business in New York.

28.     On information and belief, American Excess Insurance Association is a corporation organized in the State of Connecticut with its principal place of business in Connecticut.

29.     On information and belief, American States Insurance Company is a corporation organized in the State of Indiana with its principal place of business in Massachusetts.

30.     On information and belief, American Reinsurance Company, now known as Munich Reinsurance America, Inc., is a corporation organized in the State of Delaware with its principal place of business in New Jersey.

31.     On information and belief, American Fidelity Company, now known as Consolidated National Insurance Company, is a corporation organized in the State of Colorado with its principal place of business in Colorado.

11

TrustApp165

FILED DATE: 7/27/2023 4:08 PM   2017CH14975

32.     On information and belief, Amerisure Insurance Company is a corporation organized in the State of Michigan with its principal place of business in Michigan.

33.     On information and belief, Commercial Union Assurance Company, now known as Aviva plc is a corporation organized in the United Kingdom with its principal place of business in the U.K.

34.     On information and belief, Travelers Insurance Company, now known as Brighthouse Life Insurance Company, is a corporation organized in the State of Delaware with its principal place of business in North Carolina.

35.     On information and belief, Erie and Niagara Insurance Association is a corporation organized in the State of New York with its principal place of business in New York.

36.     On information and belief, Erie Family Life Insurance Company is a corporation organized in the State of Pennsylvania with its principal place of business in Pennsylvania.

37.     On information and belief, Erie Insurance Exchange is a corporation organized in the State of Pennsylvania with its principal place of business in Pennsylvania.

38.     On information and belief, Danielson Insurance Company, formerly known as Mission Insurance Company, is a corporation organized under the laws of the State of California with its principal place of business in California.

39.     On information and belief, Columbia Casualty Company is a corporation organized under the laws of the State of Illinois with its principal place of business in Chicago, Illinois.

40.     On information and belief, Columbia Insurance Company is a corporation organized under the laws of the State of Nebraska with its principal place of business in Nebraska.

41.     On information and belief, Royal Indemnity Company, Globe Indemnity Company, Royal Globe Insurance Company and Royal Insurance Company of America, now known as

12

TrustApp166

FILED DATE: 7/27/2023 4:08 PM   2017CH14975

Arrowood Indemnity Company, is a corporation organized under the laws of the State of Delaware with its principal place of business in Charlotte, North Carolina.

42.    On information and belief, Utica Mutual Insurance Company is a corporation organized under the laws of the State of New York with its principal place of business in New Hartford, New York.

43.    On information and belief, National Union Fire Insurance Company of Pittsburgh, PA, is a corporation organized under the laws of the State of Pennsylvania with its principal place of business in New York.

44.    On information and belief, Landmark Insurance Company, now known as National Union Fire Insurance Company of Pittsburgh, PA, is a corporation organized under the laws of the State of Pennsylvania with its principal place of business in New York.

45.    On information and belief, Harbor Insurance Company; Buckeye Union Insurance Company; Fidelity and Casualty Company of New York; Fireman's Insurance Company of Newark, NJ; Pacific Insurance Company; and Niagara Fire Insurance Company, now known as The Continental Insurance Company, is a corporation organized under the laws of the State of Pennsylvania with its principal place of business in Illinois.

46.    On information and belief, Crum & Forster, now known as Crum & Forster Indemnity Company, is a corporation organized in the State of Delaware with its principal place of business in New Jersey.

47.    On information and belief, St. Paul Fire and Marine Insurance Company is a corporation organized under the laws of the State of Minnesota with its principal place of business in St. Paul, Minnesota.

TrustApp167

FILED DATE: 7/27/2023 4:08 PM   2017CH14975

48.     On information and belief, St. Paul Mercury Insurance Company is a corporation organized under the laws of the State of Connecticut with its principal place of business in Hartford, Connecticut.

49.     On information and belief, St. Paul Surplus Lines Insurance Company is a corporation organized under the laws of State of Delaware with its principal place of business in Hartford, Connecticut.

50.     On information and belief, Lexington Insurance Company is a corporation organized under the laws of the State of Delaware with its principal place of business in Boston, Massachusetts.

51.     On information and belief Argonaut Insurance Company is a corporation organized under the laws of the State of Illinois with its principal place of business in Chicago, Illinois.

52.     On information and belief, The Insurance Company of the State of Pennsylvania is a corporation organized under the laws of the State of Illinois with its principal place of business in New York.

53.     On information and belief, General Star Indemnity Company is a corporation organized under the laws of the State of Delaware with its principal place of business in Connecticut.

54.     On information and belief, California Union Insurance Company, now known as Cigna Specialty Insurance Company, is a corporation organized under the laws of the State of California with its principal place of business in Pennsylvania.

55.     On information and belief, Agricultural Insurance Company and Anchor Casualty Company, now known as Great American Assurance Company, is a corporation organized under the laws of the State of Ohio with its principal place of business in Ohio.

14

FILED DATE: 7/27/2023 4:08 PM   2017CH14975

56.     On information and belief, Liberty Mutual Insurance Company is a corporation organized under the laws of the State of Massachusetts with its principal place of business in Massachusetts

57.     On information and belief, Liberty Surplus Insurance Company is a corporation organized under the laws of the State of New Hampshire with its principal place of business in Massachusetts.

58.     On information and belief, Liberty Insurance Underwriters Inc. is a corporation organized under the laws of the State of Illinois with its principal place of business in Massachusetts.

59.     On information and belief, The Continental Insurance Company is a corporation organized under the laws of the State of Pennsylvania with its principal place of business in Illinois.

60.     On information and belief, Continental Casualty Company, is a corporation organized in the State of Illinois with its principal place of business in Illinois.

61.     On information and belief, Gulf Insurance Company, now known as The Travelers Indemnity Company, is a corporation organized under the laws of the State of Connecticut with its principal place of business in Connecticut.

62.     On information and belief, Agricultural Excess & Surplus Insurance Company, now known as Great American E & S Insurance Company, is a corporation organized under the laws of the State of Ohio with its principal place of business in Ohio.

63.     On information and belief, Great American Insurance Company, is a corporation organized under the laws of the State of Ohio with its principal place of business in Cincinnati, Ohio.

TrustApp169

FILED DATE: 7/27/2023 4:08 PM   2017CH14975

64.     On information and belief, Allied World Assurance Company, Ltd is a corporation organized under the laws of Bermuda with its principal place of business in Bermuda.

65.     On information and belief, Allied World Assurance Company (U.S.) Inc. is a corporation organized under the laws of Delaware with its principal place of business in New York, New York.

66.     On information and belief, XL Insurance (Dublin), Ltd. and XL Insurance (Bermuda) Ltd., now know as XL Bermuda Limited, is a corporation organized under the laws of Bermuda with its principal place of business in Bermuda.

67.     On information and belief, XL Europe Limited, now known as XL Insurance Company SE, is a corporation organized under the laws of Ireland with its principal place of business in Dublin, Ireland.

68.     On information and belief, Axis Specialty Insurance Company is a corporation organized under the laws of the State of Connecticut with its principal place of business in Georgia.

69.     On information and belief, Axis Surplus Insurance Company is a corporation organized under the laws of the State of Illinois with its principal place of business in Georgia.

70.     On information and belief, Traders and Pacific Insurance Company, now known as Endurance American Specialty Insurance Company, is a corporation organized under the laws of the State of Delaware with its principal place of business in New York.

71.     On information and belief, Endurance American Insurance Company is a corporation organized under the laws of the State of Delaware with its principal place of business in New York.

TrustApp170

FILED DATE: 7/27/2023 4:08 PM   2017CH14975

72.      On information and belief, Everest National Insurance Company is a corporation organized under the laws of the State of Delaware with its principal place of business in New Jersey.

73.      On information and belief, Old Republic Insurance Company is a corporation organized under the laws of the State of Pennsylvania with its principal place of business in Chicago, Illinois.

74.      On information and belief, Arch Reinsurance Company is a corporation organized under the laws of the State of Delaware with its principal place of business in Morristown, New Jersey.

75.      On information and belief, The Ohio Casualty Insurance Company is a corporation organized under the laws of the State of New Hampshire with its principal place of business in Boston, Massachusetts.

76.      On information and belief, Catlin Specialty Insurance Company is a corporation organized under the laws of the Oklahoma with its principal place of business in Connecticut.

77.      On information and belief, Alterra Excess and Surplus Insurance Company, now known as Evanston Insurance Company, is a corporation organized under the laws of the State of Illinois with its principal place of business in Illinois.

78.      On information and belief, Gemini Insurance Company is a corporation organized under the laws of the State of Delaware with its principal place of business in Arizona.

79.      On information and belief, First Specialty Insurance Corporation, now known as Swiss Re Corporate Solutions Capacity Insurance Corporation, is a corporation organized under the laws of the State of Missouri with its principal place of business in Jefferson City, Missouri.

TrustApp171

FILED DATE: 7/27/2023 4:08 PM   2017CH14975

80.     On information and belief, First Insurance Company of Hawaii, Ltd. is a corporation organized in the State of Hawaii with its principal place of business in Hawaii.

81.     On information and belief, Illinois Employers Insurance of Wausau, now known as Wausau General Insurance Company, is a corporation organized under the laws of the State of Wisconsin with its principal place of business in Massachusetts.

82.     On information and belief, London and Edinburgh General Insurance Company Limited, now known as London and Edinburgh Insurance Company Limited, is a corporation organized under the laws of the United Kingdom with its principal place of business in United Kingdom.

83.     On information and belief, Jefferson Insurance Company of New York, now known as Jefferson Insurance Company, is a corporation organized under the laws of the State of New York with its principal place of business in Virginia.

84.     On information and belief, Charter Oak Fire Insurance Company is a corporation organized in the State of Connecticut with its principal place of business in Connecticut.

85.     On information and belief, Cincinnati Insurance Company is a corporation organized in the State of Ohio with its principal place of business in Ohio.

86.     On information and belief, CNA, now known as CNA Financial Corporation, is a corporation organized in the State of Delaware with its principal place of business in Illinois

87.     On information and belief, General Casualty Company of America, now known as General Insurance Company of America, is a corporation organized in the State of New Hampshire with its principal place of business in Massachusetts.

TrustApp172

FILED DATE: 7/27/2023 4:08 PM   2017CH14975

88.     On information and belief, Aspen Specialty Insurance Company is a corporation organized under the laws of the State of North Dakota with its principal place of business in Rocky Hill, Connecticut.

89.     On information and belief, Evanston Insurance Company is a corporation organized under the laws of the State of Illinois with its principal place of business in Deerfield, Illinois.

90.     On information and belief, Colony Insurance Company is a corporation organized under the laws of the Commonwealth of Virginia with its principal place of business in Richmond, Virginia.

91.     On information and belief, Indian Harbor Insurance Company is a corporation organized under the laws of the State of Delaware with its principal place of business in Stamford, Connecticut.

92.     On information and belief, Ategrity Specialty Insurance Company is a corporation organized under the laws of the State of Delaware with its principal place of business in Arizona.

93.     On information and belief, General Star Indemnity Company is a corporation organized under the laws of the State of Delaware with its principal place of business in Connecticut.

94.     On information and belief, Jamestown Mutual Insurance Company, now known as QBE Insurance Corporation, is a corporation organized under the laws of the State of Pennsylvania with its principal place of business in Wisconsin.

95.     On information and belief, The Manhattan Fire & Marine Insurance Company, now known as Westport Insurance Corporation, is a corporation organized under the laws of the State of Missouri with its principal place of business in Missouri.

TrustApp173

FILED DATE: 7/27/2023 4:08 PM   2017CH14975

96.     On information and belief, National Casualty Company is a corporation organized under the laws of the State of Ohio with its principal place of business in Ohio.

97.     On information and belief, National Fire Insurance of Hartford, now known as National Fire Insurance Company of Hartford, is a corporation organized under the laws of the State of Illinois with its principal place of business in Illinois.

98.     On information and belief, Nationwide Mutual Insurance Company is a corporation organized under the laws of the State of Ohio with its principal place of business in Ohio.

99.     On information and belief, Western Casualty & Surety Company, now known as Nationwide Affinity Insurance Company of America, is a corporation organized under the laws of the State of Ohio with its principal place of business in Ohio.

100.    On information and belief, New Hampshire Insurance Company is a corporation organized under the laws of the State of Illinois with its principal place of business in New York.

101.    On information and belief, Normandy Reinsurance Company Limited is a corporation organized under the laws of Bermuda with its principal place of business in Bermuda.

102.    On information and belief, Phoenix Insurance Company is a corporation organized under the laws of the State of Connecticut with its principal place of business in Connecticut.

103.    On information and belief, SAFECO Insurance Company of America is a corporation organized under the laws of the State of New Hampshire with its principal place of business in Massachusetts.

104.    On information and belief, Scottsdale Insurance Company is a corporation organized under the laws of the State of Ohio with its principal place of business in Ohio.

TrustApp174

FILED DATE: 7/27/2023 4:08 PM   2017CH14975

105.    On information and belief, Security Mutual Insurance Company is a corporation organized under the laws of the State of New York with its principal place of business in New York.

106.    On information and belief, Winterthur Swiss Insurance Company and Yasuda Fire & Marine Insurance Company (U.K.) Ltd., now known as Tenecom Limited, is a corporation organized under the laws of the United Kingdom with its principal place of business in United Kingdom.

107.    On inform and belief, The North River Insurance Company is a corporation organized under the laws of the State of New Jersey with its principal place of business in New Jersey.

108.    On information and belief, Transamerica Insurance Company, now known as TIG Insurance Company, is a corporation organized under the laws of the State of California with its principal place of business in New Hampshire.

109.    On information and belief, Travelers (Bermuda) Limited is a corporation organized under the laws of the State of Bermuda with its principal place of business in Bermuda.

110.    On information and belief, United States Fidelity and Guaranty Company, formerly known as United States Fidelity & Warranty Company, is a corporation organized under the laws of the State of Connecticut with its principal place of business in Connecticut.

111.    On information and belief, United States Fire Insurance Company, formerly known as U.S. Fire Insurance Company, is a corporation organized under the laws of the State of Delaware with its principal place of business in New Jersey.

112.    On information and belief, Universal Reinsurance Company is a corporation organized under the laws of Bermuda with its principal place of business in Bermuda.

TrustApp175

FILED DATE: 7/27/2023 4:08 PM   2017CH14975

## JURISDICTION AND VENUE

113.   The Court has personal jurisdiction over defendants pursuant to 735 ILCS 5/2-209 because they are domiciled and/or licensed to do business and/or are doing business in the State of Illinois.  In addition, the Court has personal jurisdiction over the out-of-state insurer defendants pursuant to 735 ILCS 5/2-209 because each such defendant is or was transacting business in the State of Illinois within the time periods relevant to the causes of action stated herein and contracted to insure persons, property, or risks located in the State of Illinois.

114.   Venue is proper in Cook County pursuant to 735 ILCS 5/2-101 to 103 because it is a county in which multiple defendants are "doing business."  Further, Plaintiffs' causes of action arise in substantial part out of events that occurred in Cook County with respect to a Boy Scout troop located in Cook County, and each of the Hacker Claims were filed in the Circuit Court of Cook County, Law Division. In addition, thousands of the Abuse Claims filed in the Bankruptcy Case allegedly emanate from Illinois.  Judge Flynn previously denied BSA's motion to dismiss based on forum non-conveniens and the Bankruptcy Court ruled that this Illinois action could proceed.

## FACTUAL ALLEGATIONS

A.   **The National Surety Insurers' Policies[1]**

115.   National Surety issued to BSA excess liability policy, No. XLX1484309, in effect for the policy period January 1, 1983 to January 1, 1984, a copy of which is attached hereto as Exhibit A.

---

[1] Referred to herein separately as "National Surety Policies," "Interstate Policies," or "FFIC Policies" and collectively as "Policies."

TrustApp176

FILED DATE: 7/27/2023 4:08 PM   2017CH14975

116.     National Surety issued to BSA excess liability policy, No. XLX1484392, in effect for the policy period January 1, 1984 to January 1, 1985, a copy of which is attached hereto as Exhibit B.

117.     National Surety issued to BSA excess liability policy, No. XXK2142433, in effect for the policy period January 1, 1990 to January 1, 1991, a copy of which is attached hereto as Exhibit C.

118.     National Surety issued to BSA excess liability policy, No. XXK2178302, in effect for the policy period January 1, 1991 to January 1, 1992, a copy of which is attached hereto as Exhibit D.

119.     National Surety issued to BSA excess liability policy, No. XXK2175018, in effect for the policy period January 1, 1992 to January 1, 1993, a copy of which is attached hereto as Exhibit E.

120.     National Surety issued to BSA excess liability policy, No. XXK00014626451, in effect for the policy period January 1, 1993 to January 1, 1994, a copy of which is attached hereto as Exhibit F.

121.     National Surety issued to BSA excess liability policy, No. XXK00065650605, in effect for the policy period January 1, 1994 to January 1, 1995, a copy of which is attached hereto as Exhibit G.

122.     National Surety issued to BSA excess liability policy, No. XXK00095349775, in effect for the policy period January 1, 1995 to January 1, 1996, a copy of which is attached hereto as Exhibit H.

TrustApp177

FILED DATE: 7/27/2023 4:08 PM   2017CH14975

123.    National Surety issued to BSA excess liability policy, No. CSR2839507, in effect for the policy period January 1, 1996 to January 1, 1997, a copy of which is attached hereto as Exhibit I.

124.    National Surety issued to BSA excess liability policy, No. XXK00095516738, in effect for the policy period January 1, 1996 to January 1, 1997, a copy of which is attached hereto as Exhibit J.

125.    Interstate issued to BSA excess liability policy, No. XUO-1102139, in effect for the policy period January 1, 2001 to January 1, 2002, a copy of which is attached hereto as Exhibit K.

126.    Interstate issued to BSA excess liability policy, No. XUO-1102274, in effect for the policy period January 1, 2002 to January 1, 2003, a copy of which is attached hereto as Exhibit L.

127.    Interstate issued to BSA excess liability policy, No. XSO-1014504, in effect for the policy period January 1, 2003 to January 1, 2004, a copy of which is attached hereto as Exhibit M.

128.    Interstate issued to BSA excess liability policy, No. HFX-1002516, in effect for the policy period January 1, 2007 to January 1, 2008, a copy of which is attached hereto as Exhibit N.

129.    Interstate issued to BSA excess liability policy, No. HFX-1002550, in effect for the policy period January 1, 2008 to January 1, 2009, a copy of which is attached hereto as Exhibit O.

130.    Interstate issued to BSA excess liability policy, No. HFX-1002552, in effect for the policy period January 1, 2008 to January 1, 2009, a copy of which is attached hereto as Exhibit P.

131.    Interstate issued to BSA excess liability policy, No. HFX-00079995585, in effect for the policy period January 1, 2009 to January 1, 2010, a copy of which is attached hereto as Exhibit Q.

TrustApp178

FILED DATE: 7/27/2023 4:08 PM   2017CH14975

132.    Interstate issued to BSA excess liability policy, No. HFX-00082075581, in effect for the policy period January 1, 2009 to January 1, 2010, a copy of which is attached hereto has Exhibit R.

133.    FFIC is alleged to have issued to certain BSA Local Councils liability policies for policy periods in the 1980s, 1990s and 2000s.

134.    Many of the Policies are "follow form" excess policies that incorporate, with certain identified exceptions, the terms, conditions, and exclusions of underlying policies issued.

135.    As excess policies, the Policies respond to and potentially provide coverage only for claims that exceed the per occurrence limits of liability, aggregate limits of liability, and/or self-insured retentions of the underlying policies underlying them.

136.    Subject to the stated limits of liability, terms, conditions, and exclusions, the Policies provide indemnity coverage for an "occurrence," as defined by the Policies. Each Policy defines "occurrence" substantively the same, as an "accident or event" resulting in personal injury during the policy period that is "neither expected nor intended from the standpoint of the insured."

137.    The Policies provide, *e.g.*, that the National Surety Insurers shall have "the right but not the duty to associate with" the policyholder "in the investigation, defense or settlement of any claim made, 'suit' brought or proceedings instituted, to which we think this policy may apply." The Policies also grant the National Surety Insurers the right, at their discretion, to "[i]nvestigate any 'occurrence,' claim, 'suit' or proceeding" or to "[s]ettle any claim, 'suit' or proceeding" to which it believes a policy may apply.

138.    The Policies contain "assistance and cooperation" clauses that, as a condition of coverage, require the policyholder, *e.g.*, to "cooperate with [the insurer] in the investigation,

TrustApp179

FILED DATE: 7/27/2023 4:08 PM   2017CH14975

settlement or defense of any claim or Suit, and take all necessary steps to protect [BSA's] and [the insurer's] interests."

139.    The Policies also contain "no voluntary payment" provisions which prohibit the policyholder, *e.g.,* from "mak[ing] or authoriz[ing] an admission of liability or attempt[ing] to settle or otherwise dispose of any claim or Suit without [the insurer's] written consent."

140.    Finally, the Policies include "no action" clauses which state, *e.g.*, that "[n]o action shall lie against [the insurer] unless, as a condition precedent thereto, [the policyholder] shall have fully complied with all the terms of this policy, nor until the amount of the insured's obligation to pay shall have been finally determined either by a final judgment against the insured or by written agreement of the insured, the claimant and [the insurer]."

## B.    BSA's Underlying Liability

### 1.    BSA's Historical Knowledge of Pedophilia Within the Organization.

141.    As the plaintiffs in the Hacker cases ("Hacker Claimants"), along with other Abuse Claimants, have alleged, BSA has long known that its programs were especially susceptible to widespread sexual abuse.

142.    In the early 1920s, BSA began maintaining a group of files — known internally as the "red files," the "perversion files," and/or the "Ineligible Volunteer Files" (herein, the "Perversion Files") – documenting, among other things, known incidents of sexual abuse by BSA troop leaders, staffers, and volunteers. By as early as 1935, decades before any of the National Surety Policies were issued, BSA had accumulated over 2,900 Perversion Files on scout leaders who were dismissed from scouting for cause, with approximately 1,000 of them for sexual misconduct with scouts.

TrustApp180

FILED DATE: 7/27/2023 4:08 PM   2017CH14975

143.    BSA continued to amass thousands of Perversion Files over the years that followed. By the early 1970s, BSA was opening a new Perversion File at a remarkable rate of one every three days.

144.    The exact number of Perversion Files opened by BSA is unknown. Over a three-year period in the 1970s, BSA destroyed thousands of the files. It has been alleged that BSA potentially destroyed tens of thousands of Perversion Files, although the actual amount is unclear.

145.    BSA secreted away the Perversion Files in locked filing cabinets at its headquarters. Access was limited to a select few director-level employees, including Paul Ernst, BSA's Director of Registration and Subscription Services from 1971 to 1993.

146.    The Perversion Files document numerous instances of BSA leaders, staffers, and volunteers molesting children, being reported to BSA, and then remaining in or eventually regaining entry into scouting.

147.    Until as recently as 1988, it was BSA's policy to merely suspend or give probation to an alleged abuser if BSA deemed the evidence of abuse to be "weak." As a result, known abusers frequently were allowed the opportunity to continue abusing scouts even after BSA had become aware of it.

148.    Indeed, one independent investigation and review of more than 1,200 Perversion Files created between 1970 to 1991 revealed hundreds of cases in which BSA failed to report claims of sexual abuse to the authorities, hid allegations from parents and the public, and/or allowed the abuser to remain with and/or rejoin the organization following reports of their abuse.

149.    In 2019, BSA's then-Chief Executive Scout, Michael Surbaugh, retracted a claim he had made to U.S. Congresswoman Jackie Speier (D-Calif.) that BSA had never knowingly

TrustApp181

FILED DATE: 7/27/2023 4:08 PM   2017CH14975

allowed a sexual predator to work with scouts. In a May 28, 2019 letter to Congresswoman Speier, Surbaugh wrote that:

> When I sent my response to your November 20, 2018 letter, I believed in good faith, and with deeply felt conviction, that BSA would never have knowingly allowed a sexual predator to work with youth. I told you that in my response. Since then, I have learned that my response was incorrect. I have reviewed information that now makes clear to me that decades ago BSA did, in at least some instances, allow individuals return to Scouting even after credible accusations of sexual abuse.

### 2.    The Hacker Claims.

150.    Once such instance was that of former Chicago-area scout leader, Thomas Hacker. In 2012, 18 former scouts identified as John Doe – John Doe 18 brought suit against BSA and the Chicago Area Council alleging that BSA knowingly permitted and/or failed to take steps to prevent Hacker's sexual abuse.

151.    By way of summary, John Doe-John Doe 18 alleged the following:

(a)  "Since approximately 1919, BOY SCOUTS OF AMERICA has maintained a group of files known variously as the red files, perversion files, or ineligible volunteer files (IV Files)."

(b)  "The IV Files . . . document multiple instances of child molesters volunteering with scouting, molesting a child, being reported to BSA, but then re-gaining entry into scouting."

(c)  "BSA's 'Ineligible Volunteer Files' contained a file for Mr. Hacker opened in 1970, yet he was able and permitted by BSA to register with the Chicago Area Council in the 1980s and was able to participate in Scouting."

(d)  "BSA knew or should have known that its 'ineligible volunteers' system of keeping track of pedophiles infiltrating its ranks and attempting to eliminate them did not function as it was intended, was flawed, and in many cases ineffective. . . . BSA did nothing to educate or

TrustApp182

FILED DATE: 7/27/2023 4:08 PM   2017CH14975

inform Scouts and their parents of the enormity of the pedophile problem, nor did BSA take action to correct its screening and/or education system."

(e)   "Instead of addressing the problem by informing parents and scouts of the issue, or by implementing safety programs to prevent abuse, BSA instead concealed the problem by employing a public relations department to combat negative stories about sexual abuse in Scouting."

(f)   "After the BOY SCOUTS OF AMERICA learned that Thomas Hacker molested Chicago Area Council scouts, the BOY SCOUTS OF AMERICA concealed the fact, in the 1970s, it had previously identified Hacker as a child molester and/or abuser but still allowed him to register with the Chicago Area Council."

152.   John Doe – John Doe 18 sought uninsured punitive damages against BSA as a result of its alleged intentional conduct and fraudulent concealment.

153.   BSA moved for summary judgement on the Hacker Claims on the ground they were barred by the statute of limitations. The trial court denied BSA's motion. The appellate court affirmed the trial court's ruling by certified question, holding that fact questions regarding BSA's alleged fraudulent concealment of the claims precluded summary judgment.

154.   Following the appellate court's ruling, BSA settled each of the Hacker Claims prior to its Bankruptcy Case.

**C.   BSA's Violation of the Policies' Assistance and Cooperation, No Voluntary Payment and "No Action" Clauses.**

**1.   The Explosion of Abuse Claims Against BSA in the Bankruptcy Case.**

155.   On the Petition Date, BSA filed in the Bankruptcy Court a voluntary petition for relief under Chapter 11 of the Bankruptcy Code.

TrustApp183

FILED DATE: 7/27/2023 4:08 PM   2017CH14975

156.    The Bankruptcy Court thereafter set November 16, 2020, as the last day by which individuals who believed they had an Abuse Claim against BSA were required to file a "proof of claim."

157.    As of the Petition Date, BSA faced 275 sexual abuse lawsuits pending in state and federal courts across the country and was aware of an additional approximately 1,400 Abuse Claims that had not yet been filed.

158.    By November 16, 2020, however, over 95,000 proofs of claim had been filed for approximately 82,209 individual alleged Abuse Claims.

159.    This 6,000% increase in pending and anticipated Abuse Claims in just over eight months was the direct result of several related factors.

160.    First, claimant attorneys blanketed the country with an extensive, multi-media marketing campaign designed to solicit as many Abuse Claims as possible. The marketing campaign included a number of statements that the Bankruptcy Court later found were false and misleading, including that the Abuse Claimants could remain "anonymous," that their recovery would be "ensured" and "substantial," and that they "[would] never have to be deposed, appear in Court or otherwise prove their claims."

161.    Following the Petition Date, BSA itself made several public statements likewise suggesting that individuals who filed Abuse Claims would be guaranteed to receive compensation.

162.    For example, in an "Open Letter to Victims" published on BSA's website and disseminated through media reports, BSA's National Chair Jim Turley apologized to former scouts for sexual abuse that occurred, admitted that there had been "times in the past" when the organization had "failed the very children we were supposed to protect," and stated that BSA was:

> committed to supporting you and to doing everything in our power to
> prevent [abuse] from happening to others. It is a social and moral obligation

TrustApp184

FILED DATE: 7/27/2023 4:08 PM   2017CH14975

that I and the entire organization take extremely seriously. We believe that all victims should receive our support and compensation – and we have taken decisive action to make that possible.

Specifically, the National Organization of the Boy Scouts of America has initiated a voluntary restructuring to ensure we can equitably compensate all victims of past abuse in our programs, through a proposed Victim's Compensation Trust.

I encourage you, and all victims to come forward and file claims so you can receive compensation from this Trust. We will provide clear notices about how to do so.

I want you to know that *we believe you, we believe in compensating you,* and *we have programs in place to pay for counseling for you and your family* by a provider of choice.

*See*      https://www.bsarestructuring.org/wp-content/uploads/2020/02/BSA_An-Open-Letter-to-Victims.pdf (emphasis in original).

163.    BSA reiterated its intent to ensure Abuse Claimants received compensation in its bankruptcy filings, stating in its first-day "Informational Brief" that it was "steadfast in its commitment to provide equitable compensation to victims of abuse in its Scouting programs."  As more fully explained below, BSA committed to paying substantially all Abuse Claims through its bankruptcy process even though tens of thousands of the Abuse Claims are not compensable in the tort system, as even one of the leading claimant lawyers has admitted.

164.    Second, claimant attorneys filed thousands of proofs of claim *en masse* without properly vetting their factual assertions or, in some cases, without speaking to the clients or even reviewing the forms themselves.

165.    The outcome was a litany of absurdities that would not have occurred with Abuse Claims filed in the tort system. Proofs of claim — signed under penalty of perjury — were filed on behalf of Abuse Claimants who were deceased, who did not authorize their filing, or who were not represented by the firm that filed the proof of claim. In some instances, duplicate proofs of

FILED DATE: 7/27/2023 4:08 PM   2017CH14975

claim with inconsistent allegations were filed on behalf of the same Abuse Claimant. Other attorneys signed and filed proofs of claim that were substantially blank.  In a deposition, one of the claimant attorneys claimed not to have signed proofs of claim under penalty of perjury, even though the hundreds he signed personally stated immediately above his signatures that he was signing the document under penalties of perjury.

166.    When these facts came to light through discovery, BSA did nothing. It neither objected to, nor sought to challenge the validity of, any of the proofs of claim. It likewise failed to join in or otherwise support the National Surety Insurers and Other Insurer Parties' objections. BSA instead agreed to and supported approval of a claims distribution procedure designed to maximize the Abuse Claimants' recoveries.

**2.      85% or More of the Abuse Claims Would Not Have Been Filed in the Tort System.**

167.    As a result of the claimant attorneys' strategy, and BSA's acquiescence thereto, tens of thousands of proofs of claim alleging sexual abuse were filed in the Bankruptcy Case that never would have been brought in the tort system.

168.    BSA and other supporters of the Plan acknowledged in bankruptcy proceedings that 65% of the Abuse Claims filed as proofs of claim in the Bankruptcy Case are from states where the statute of limitations or repose renders them untimely. One lawyer who represents several thousand Abuse Claimants admitted publicly that:

> If this bankruptcy doesn't go through and all of the cases go out to the tort system … 58,473 survivors are in states that have closed statutes. Here's what I say to those people, good luck, because you have to overcome a lot to open a case in a closed state. A heck of a lot ….

169.    Moreover, BSA's claims valuation expert, Dr. Charles Bates, acknowledged that approximately 87% of the Abuse Claims alleged abuse by a "single abuser" (*i.e.,* someone who

TrustApp186

had never been accused of abusing another child), meaning those Abuse Claimants would have considerable difficulty demonstrating that BSA was negligent, likely precluding recovery in the tort system.

170.    Finally, experts for both sides agreed that a significant percentage of the Abuse Claims are likely fraudulent in nature. Dr. Conte, a mental health expert with almost 40 years of experience working with sexual abuse survivors and who was retained by the Official Committee of Tort Claimants (a fiduciary appointed to represent the interests of the Abuse Claimants in the Bankruptcy Case), testified that he believed a "significant portion" of the 82,000 Abuse Claims filed "are probably not real claims."

171.    Another practitioner with expertise in forensic investigations of child sexual abuse shared Dr. Conte's concern about "the number of potential fraudulent claimants in the bankruptcy," testifying that she "worr[ied] about those fraudulent cases preventing the real victims from getting the compensation that they deserve."

172.    Thus, as Dr. Bates concluded, "the vast majority" of the Abuse Claims — or, as he determined, as many as 85% of them — "would not be pursued and not be economically viable in the tort system." According to Dr. Bates, such claims "would receive no compensation … but for a trust set up as part of this bankruptcy proceeding, consistent with the fact that so many of the Abuse Claims were never pursued through litigation."

### 3.    The Trust Distribution Procedures.

173.    The Plan channels (by way of injunction) all Abuse Claims exclusively to the Settlement Trust, which assumes liability for the claims. This channeling injunction, and the Plan more broadly, thus relieves BSA and certain related entities of further liability for Abuse Claims. In exchange, BSA and the related entities agreed, among other things, to (i) contribute a fixed

FILED DATE: 7/27/2023 4:08 PM    2017CH14975

TrustApp187

FILED DATE: 7/27/2023 4:08 PM   2017CH14975

amount of money to the Settlement Trust and (ii) assign to the Settlement Trust their respective rights to any insurance recovery. This bargain allowed BSA to retain many valuable real property assets while contributing only a fraction of the Settlement Trust's funding – funding used to pay Abuse Claims at inflated values, including non-compensable Abuse Claims.

174.    The Settlement Trust is required to resolve and administer the channeled Abuse Claims pursuant to the "trust distribution procedures" ("TDPs") annexed to the Plan. The TDPs govern the review, approval, and liquidation of Abuse Claims; the distribution of payments to Abuse Claimants; and assertion by the Settlement Trust of BSA's alleged insurance rights (assigned to the Settlement Trust).

175.    The self-proclaimed architects of the TDPs were the very constituencies who stand to profit from them. As claimant attorneys represented in court and testified to under oath, the TDPs were designed and drafted by claimant attorneys to serve the interests of the Abuse Claimants at the insurers' expense. As one testified, "the pen" for the TDPs was "wielded in the first instance" by certain claimant attorneys, who maintained control of the document throughout their negotiations with BSA.

176.    In the candid words of another, a principal objective of the TDPs was to achieve the "holy grail" that mass tort lawyers have sought for years: a bankruptcy plan providing for claims determinations at inflated values, which "will result in individual awards binding on" insurers and not subject to challenge in subsequent coverage litigation. Indicative of that objective, claimant attorneys pressed for a draft of the TDPs with a provision expressly stating that "determinations of values of approved Settled Claims and Tort Election Claims shall be binding on Insurers."

FILED DATE: 7/27/2023 4:08 PM   2017CH14975

177.     Rather than rejecting these and similar proposals out of hand, BSA negotiated with a "particular emphasis on reaching a consensus with the Abuse Claimants' Representatives." As the Bankruptcy Court observed, despite BSA's contractual obligation to assist and cooperate with the National Surety Insurers and Other Insurer Parties to minimize BSA's underlying liability, BSA's counsel "negotiate[d] to maximize the value of [BSA's] insurance assets for the benefit of the Settlement Trust and, ultimately, the Abuse Claimants."

178.     To that end, BSA excluded the National Surety Insurers and Other Insurer Parties from its negotiations with the claimant attorneys. Then, without the consent of the National Surety Insurers or any Other Insurer Party, and over their strong objections, BSA reached an agreement with the claimant attorneys for a version of draft TDPs that heavily favored Abuse Claimants.

179.     BSA refused to share these draft TDPs with the National Surety Insurers or any Other Insurer Party until June 2021 — almost five months after the claimant attorneys provided BSA with their initial draft of the document. And even then, BSA represented to the insurers that the draft TDPs were "final." Indeed, by the time BSA shared the draft TDPs with its insurers, the document had been circulated for signature among the claimant attorneys and had already been signed and dated by one of them.

180.     BSA sought to actualize its characterization of the TDP draft as final only six days later, at which point it moved the Bankruptcy Court to approve (among other things) the draft TDPs by way of a "Restructuring Support Agreement." This Restructuring Support Agreement was by and between BSA and the claimant attorneys; neither the National Surety Insurers nor any of the Other Insurer Parties were signatories.

181.     Having excluded the National Surety Insurers and Other Insurer Parties from its negotiations with the claimant attorneys, BSA ultimately agreed to TDPs and a Plan that

TrustApp189

fundamentally alter the economic bargain between insurer and insured by seeking to unilaterally strip the insurers of their bargained-for policy rights. The terms to which BSA agreed, without the consent of the National Surety Insurers or Other Insurer Parties, include:

(a)     An assignment of insurance rights in violation of the policies.

182.    Key to the Plan is its "Insurance Assignment." This Insurance Assignment purports to assign and transfer to the Settlement Trust all "rights, claims, benefits, or Causes of Action" with respect to the insurance policies issued not only to BSA, but also to certain related entities — such as local councils and certain "chartered organizations" — which were not debtors before the Bankruptcy Court.

183.    The Insurance Assignment under the Plan, moreover, purports to transfer and assign only the policy *rights* of the insured; it does not assign the policies themselves. Nor does it purport to clearly assign BSA's contractual obligations to its insurers or any of the insurers' rights as stated in the policies.

(b)     Prejudicial claims review and liquidation processes.

184.    The TDPs create three extrajudicial processes for the evaluation and liquidation of Abuse Claims: (i) an "Expedited Distribution" alternative; (ii) evaluation under a claims matrix ("Matrix Evaluation"); and (iii) the "Independent Review Option" ("IRO").

185.    The first process permits Abuse Claimants to obtain a payout of $3,500 (*i.e.*, an "Expedited Distribution") each, with "a minimal level of review." Any Abuse Claimant who (a) signed and timely filed a "substantially completed" proof of claim and (b) selected the Expedited Distribution alternative in accordance with the Plan is eligible. No additional information is required.

36

FILED DATE: 7/27/2023 4:08 PM   2017CH14975

186.    Abuse Claimants who do not elect an Expedited Distribution may either submit their claim for a Matrix Evaluation or pursue the IRO, each as described below. Both the Matrix Evaluation and the IRO stack the deck in favor of the Abuse Claimants and against the National Surety Insurers and Other Insurer Parties.

(c)    A Matrix Evaluation that inflates the value of Abuse Claims.

187.    The Matrix Evaluation compels the Settlement Trust to pay Abuse Claims at highly inflated values, without the National Surety Insurers or Other Insurer Parties' participation or consent. It does so by employing a bloated "Claims Matrix" to value Abuse Claims and determine the amount the Settlement Trust will pay. The Claims Matrix consists of six, numerical tiers that delineate types of abuse according to severity, providing a "Base Matrix Value" and "Maximum Matrix Value" for each tier, as follows:

| Tier | Type of Abuse | Base Matrix Value | Maximum Matrix Value |
|---|---|---|---|
| 1 | Anal or Vaginal Penetration by Adult Perpetrator – includes anal or vaginal sexual intercourse, anal or vaginal digital penetration, or anal or vaginal penetration with a foreign, inanimate object. | $600,000 | $2,700,000 |
| 2 | Oral Contact by Adult Perpetrator – includes oral sexual intercourse, which means contact between the mouth and penis, the mouth and anus, or the mouth and vulva or vagina.<br><br>Anal or Vaginal Penetration by a Youth Perpetrator – includes anal or vaginal sexual intercourse, anal or vaginal digital penetration with a foreign, inanimate object. | $450,000 | $2,025,000 |

37

FILED DATE: 7/27/2023 4:08 PM   2017CH14975

| Tier | Type of Abuse | Base Matrix Value | Maximum Matrix Value |
|------|---------------|-------------------|----------------------|
| 3 | Masturbation by Adult Perpetrator – includes touching of the male or female genitals that involves masturbation of the abuser or claimant.<br><br>Oral Contact by a Youth Perpetrator – includes oral sexual intercourse, which means contact between the mouth and penis, the mouth and anus, or the mouth and vulva or vagina. | $300,000 | $1,350,000 |
| 4 | Masturbation by Youth Perpetrator – includes touching of the male or female genitals that involves masturbation of the abuser or claimant.<br><br>Touching of the Sexual or Other Intimate Parts (unclothed) by Adult Perpetrator. | $150,000 | $675,000 |
| 5 | Touching of the Sexual or Other Intimate Parts (unclothed) by a Youth Perpetrator<br><br>Touching of the Sexual or Other Intimate Parts (clothed), regardless of who is touching whom and not including masturbation.<br><br>Exploitation for child pornography. | $75,000 | $337,500 |
| 6 | Sexual Abuse – No Touching.<br><br>Adult Abuse Claims. | $3,500 | $8,500 |

188.    The valuations the Claims Matrix ascribes to Abuse Claims are a significant departure from BSA's pre-bankruptcy estimates. In October 2019 — less than four months before the Petition Date — BSA provided a proposed matrix to claimant attorneys, assigning a valuation range of $400,000 – $1 million for the most severe Abuse Claims and $10,000 – $29,000 for the least. BSA believed these figures accurately reflected its historical settlement values prior to the

TrustApp192

FILED DATE: 7/27/2023 4:08 PM   2017CH14975

Bankruptcy Case when Abuse Claims were subject to the adversarial process of the tort system and defended by certain of its insurers.

189.    But once BSA capped its liability for Abuse Claims through the Plan's proposed channeling injunction, it agreed to a Claims Matrix that valued Abuse Claims using far greater amounts—amounts that are highly inflated relative to BSA's pre-bankruptcy abuse claims experience in the tort system. The range of awards in the Claims Matrix for the most severe Abuse Claims, for example, is several times greater than the maximum value BSA previously believed accurately reflected its recent settlement history prior to bankruptcy. Payments for the other designated tiers of abuse were increased by the same or even greater percentages. Indeed, as BSA's Dr. Bates testified, the Settlement Trustee would need to adjust the value of Abuse Claims under the Claims Matrix by as much as 90% to be consistent with BSA's pre-bankruptcy experience in the tort system.

190.    In addition to its inflationary effect, the Matrix Evaluation permits — and in many circumstances, requires — payment of Abuse Claims for which BSA would not otherwise be liable in the tort system. Among other things:

191.    The Matrix Evaluation authorizes payment of Abuse Claims that are time-barred under applicable law. Rather than prohibiting payment of an Abuse Claim that is beyond the applicable statute of limitations or repose, the TDPs merely direct the Settlement Trustee to decrease the amount payable for such time-barred Abuse Claim. Accordingly, the TDPs will require payment of approximately 58,000 (or more) Abuse Claims for which claimant attorneys admit there would be no recovery — and the claim would never even have been brought — in the tort system.

TrustApp193

FILED DATE: 7/27/2023 4:08 PM   2017CH14975

192.     The Matrix Evaluation does not require Abuse Claimants to prove or even plausibly allege that BSA was negligent. Unlike a plaintiff seeking recovery in the tort system, an Abuse Claimant seeking payment under the TDPs' Matrix Evaluation need only show that BSA "*may bear responsibility*" for the abuse alleged. Every Abuse Claimant who satisfies this undefined, minimal standard, is guaranteed payment, even if BSA is not legally liable for the Abuse Claim. According to BSA's expert, Dr. Bates, such claims could account for the vast majority of all Abuse Claims filed "where the link between the abuser and institutional responsibility is tenuous."

(d)     A Matrix Evaluation that impairs the insurers' rights to participate in the settlement and defense of claims.

193.     The Matrix Evaluation also strips the National Surety Insurers and Other Insurer Parties of their right to investigate and defend against Abuse Claims and/or require that any settlements thereof be reasonable by providing that Abuse Claims settled without the insurers' consent are at BSA's own expense.

194.     Under the TDPs, the Settlement Trustee will be solely responsible for reviewing and resolving the Abuse Claims submitted for a Matrix Evaluation. The Matrix Evaluation further grants the Settlement Trustee virtually unfettered discretion to determine, based on limited and ill-defined criteria, whether an Abuse Claim should be allowed, and for what value, based on whatever information the Settlement Trustee deems sufficient or chooses to consider.

195.     The TDPs do not allow the National Surety Insurers or Other Insurer Parties (or anyone else) the opportunity to marshal or present evidence contesting the merits or value of an Abuse Claim submitted for a Matrix Evaluation, or to seek the adjudication of an Abuse Claim in the tort system.

196.     The Matrix Evaluation process does not provide a mechanism for the National Surety Insurers or Other Insurer Parties to: investigate the facts of an Abuse Claim through

40

FILED DATE: 7/27/2023 4:08 PM   2017CH14975

discovery or any other means; seek the dismissal of or otherwise dispute the factual and legal merits of an Abuse Claim; or challenge the amount an Abuse Claimant should be awarded. This stands in stark contrast to the tort system, which affords each of these rights to insurers defending against claims.

197.    The National Surety Insurers and Other Insurer Parties also have no right to appeal or otherwise seek review of the determinations the Settlement Trustee reaches following a Matrix Evaluation. Abuse Claimants are the only parties afforded the right to appeal the outcome of a Matrix Evaluation.

198.    Accordingly, as one BSA witness testified, the TDPs provide for none of the "hallmarks of an adversarial system" through which BSA's policies guarantee its insurers the right to seek an adjudication of claims.

199.    For all of these reasons, the Matrix Evaluation contemplates awards to Abuse Claimants that are not covered under the terms and conditions of the National Surety Insurers' or Other Insurer Parties' policies.

(e)    The IRO and "Document Appendix."

200.    The IRO, an additional claims determination procedure designed by claimant attorneys to maximize their recoveries, is similarly prejudicial.

201.    Under the IRO, a third-party "Neutral" will review certain Abuse Claims and make a recommendation intended to "replicate" what a jury might award in the tort system. The Claims Matrix — specifically including the $2.7 million maximum allowable award — does not apply to this recommended award.

202.    The Neutral who makes the recommendation is selected by the Settlement Trustee, without any consultation with or consent by the National Surety Insurers or Other Insurer Parties.

TrustApp195

FILED DATE: 7/27/2023 4:08 PM   2017CH14975

203.    If the Settlement Trustee approves the Neutral's recommended award, the value of the Abuse Claim becomes the amount of the award. If the Settlement Trustee does not approve the award, the Abuse Claimant may file suit in court.

204.    Like the Matrix Evaluation, the IRO deprives the National Surety Insurers and Other Insurer Parties of the rights under their policies to associate in the defense and settlement of the Abuse Claims. And as with Abuse Claims reviewed using the Matrix Evaluation, no party is tasked with defending or otherwise challenging the claims under the IRO, or the right to challenge claims in the tort system.

205.    Like the Matrix Valuation, the IRO also deprives the National Surety Insurers and Other Insurer Parties of the right under their policies to consent to the payment of claims for which indemnity under the policies may be sought.

206.    In fact, the very purpose of the IRO, as the claimant attorneys who designed it candidly admit, is to target the National Surety Insurers' and BSA's other excess insurers with inflated claims values to access additional insurance proceeds. To that end, the claimant attorneys designed the IRO based on what BSA had paid to settle the Hacker Claims, which BSA's underlying defense counsel testified were (i) highly unusual and unlike other pre-bankruptcy claims in terms of severity and (ii) settled for unusually high sums based on the threat of punitive damages, which are not covered by the National Surety Insurers' Policies or those of BSA's other insurers.

207.    As one claimant attorney represented to the Bankruptcy Court, his and another claimants' firm designed and "undertook principal drafting responsibility for" the IRO for the purpose of "increasing the recovery for so-called high value claims" and "optimizing recoverability of excess insurance assets." The IRO is designed to achieve this objective, he

42

FILED DATE: 7/27/2023 4:08 PM   2017CH14975

explained, by "creat[ing] a mechanism that was not otherwise present to reach layers of excess insurance assets."

208.    In addition to the Matrix Evaluation and IRO, BSA agreed to voluntarily provide the Abuse Claimants with ready access to the evidence they need to support their claims.

209.    This so-called "Document Appendix" to which BSA agreed requires BSA to provide the Settlement Trustee with a trove of documents and information that Abuse Claimants "will likely need to establish the validity and/or amount of their claim in order to obtain compensation under the [TDPs]." The Document Appendix contemplates the provision of all such information to the claimant attorneys before they finalize their clients' submissions to the Settlement Trust, a significant departure from the pleading and contested discovery norms of the tort system.

210.    The information that the Document Appendix requires be provided to the claimant attorneys includes:

- Rosters maintained by local councils.

- Documents maintained by BSA's National Coordinating Council regarding unresolved Abuse Claims.

- BSA's voluntary screening database relating to sexual abuse in scouting.

- Documents necessary to secure insurance rights.

- Documents regarding registration of perpetrators alleged by the proofs of claims.

211.    The Document Appendix further (a) permits the Settlement Trustee and Abuse Claimants to take broad discovery from BSA's "Chartered Organizations" — community-based organizations that organize and operate scouting activities — under FED. R. BANKR. P. 2004 and

43

FILED DATE: 7/27/2023 4:08 PM   2017CH14975

any other applicable discovery rules and (b) grants Abuse Claimants the right to take depositions of BSA and local councils. The Abuse Claimants will have access to prior deposition testimony given by any witnesses.

212.    The Document Appendix also requires the Settlement Trustee to create and maintain a document repository to which Abuse Claimants will have access. The Document Appendix provides that the Settlement Trustee "has no authority to refuse to transmit a document or deposition request from a holder of [an][] Abuse Claim other than as necessary to protect privilege."

213.    These provisions grant claimant attorneys extensive discovery rights before they submit claims to the Settlement Trust, allowing them to mold Abuse Claims to fit the evidence.

214.    The Document Appendix does not afford the National Surety Insurers and Other Insurer Parties any of these same discovery rights.

215.    The National Surety Insurers and Other Insurer Parties did not consent to and, indeed, were not consulted about, the Document Appendix, which is expressly designed to increase their liability and which violates several provisions of the National Surety Insurers' and Other Insurer Parties' insurance policies, such as the duty to assist and cooperate in the defense, investigation and settlement of claims and the insurers' contractual right to access books and records.

(f)    Proposed "Insurance Findings" seeking to bind the insurers to claims awards.

216.    In concert with the claimant attorneys' plan to deprive the National Surety Insurers and Other Insurer Parties of their contractual rights and to bind them to inflated claims determinations, BSA proposed to the Bankruptcy Court several findings ("Insurance Findings") to be included in any order confirming the Plan.

44

FILED DATE: 7/27/2023 4:08 PM   2017CH14975

217.    These included:

- The Plan, TDPs and confirmation order shall be binding on all parties in interest consistent with applicable legal doctrines, including the doctrine of res judicata and collateral estoppel.

- The values of the TDPs are based on and consistent with the Debtors' historical abuse settlements and litigation outcomes.

- The TDPs pertaining to the allowance of Abuse Claims and the criteria pertaining to the calculation of allowed claim amounts, including the Claims Matrix, are appropriate and provide a fair and equitable settlement of Abuse Claims.

- An Abuse Claimant's right to payment is the amount of the Abuse Claim as determined by the TDPs.

- The TDPs and Claims Matrix were proposed in good faith.

218.    The claimant attorneys expressly acknowledged that the Insurance Findings were intended to maximize the National Surety Insurers' and Other Insurer Parties' potential liability for the Abuse Claims.

219.    As the Bankruptcy Court observed, however, the Insurance Findings did not mirror the requirements of the Bankruptcy Code and/or were not required for confirmation of the Plan.

### 4.    The Bankruptcy Court's Confirmation Opinion and Order.

220.    Following a 22-day trial on confirmation of the Plan, the Bankruptcy Court took the matter under advisement. On July 29, 2022, the Bankruptcy Court issued an opinion, declining to confirm the Plan without certain revisions.

221.    The Bankruptcy Court had admonished throughout the proceedings that "no coverage issue is going to be adjudicated" in connection with plan confirmation, and that any coverage defenses the insurers may have arising out of the Plan, the TDPs, or BSA's actions with respect thereto would be preserved for the insurers to raise and a court to decide in future coverage litigation.

TrustApp199

FILED DATE: 7/27/2023 4:08 PM   2017CH14975

222.     To that end, and as a result of the National Surety Insurers' and certain Other Insurer Parties' objections, the Bankruptcy Court refused to enter the disputed Insurance Findings. The Bankruptcy Court recognized that the Insurance Findings were intended "to preclude post-confirmation litigation on the process embodied in the TDP" and its impact on the parties' rights, obligations, and defenses under their respective policies. As the court explained, "[w]hat insurers are obligated to pay under their policies" for claims administered by the Settlement Trust "is an insurance coverage issue that is not before the court."

223.     Although the Bankruptcy Court allowed the assignment of BSA's insurance rights to the Settlement Trust "consistent with applicable state law," it made clear that it was not deciding the "consequences" of that assignment with respect to the National Surety Insurers' and Other Insurer Parties' rights to raise coverage defenses, which the Bankruptcy Court determined is an issue to be decided in insurance coverage litigation where "[e]ach [policy] will need to be interpreted under applicable law in the context of a specific dispute."

224.     Following the Bankruptcy Court's opinion, BSA revised the Plan. The Bankruptcy Court entered a final order confirming the Plan on September 8, 2022.

225.     The United States District Court for the District of Delaware affirmed confirmation of the Plan on March 28, 2023, finding that BSA's insurers "keep the whole gamut of permissible contractual rights under state law."  (District Court Dkt. No. 150 at 76.) Confirmation of the Plan currently is on further appeal to the United States Court of Appeals for the Third Circuit.

## FIRST CAUSE OF ACTION
### Declaration That No Coverage Exists Because The
### Injury Alleged By The Hacker Claimants Was Not An "Accident"

226.     The National Surety Insurers incorporate by reference in this First Cause of Action all allegations of this Amended Complaint, including Exhibits attached hereto.

46

TrustApp200

FILED DATE: 7/27/2023 4:08 PM   2017CH14975

227.    BSA's[2] Plan purports to assign to the Settlement Trust all "rights, claims, benefits, or Causes of Action" of BSA and certain related entities identified by the Plan "under or with respect to" the Policies.

228.    As BSA's successor-in-interest to the Policies, the Settlement Trust stands in BSA's shoes and is subject to the same terms, conditions, obligations, and defenses to coverage thereunder.

229.    An "occurrence" covered under the Policies is defined to require an "accident."

230.    BSA is alleged to have known, since as early as the 1920s, that large numbers of pedophiles are attracted to scouting, that its members are therefore at high risk for sexual abuse, and that it was certain a significant number of scouts would be sexually abused each year.

231.    BSA is alleged to have concealed thousands or even tens of thousands of incidents of sexual abuse within the organization, and that it knowingly and with deliberate indifference failed to take steps necessary to prevent such abuse from occurring.

232.    BSA also failed to disclose its extensive knowledge of the pedophiles and the sexual abuse of children within its organization when it arranged to purchase insurance from the National Surety Insurers and Other Insurer Parties.

233.    The Hacker Claimants allege that BSA knew Hacker was a pedophile with a history of sexually abusing young boys and, despite this knowledge, failed to take steps to prevent, and concealed Hacker's abuse.

---

[2]    As used hereafter in the First Cause of Action – Twenty-Fifth Cause of Action that follow, "BSA" shall include all Local Councils, Chartered Organizations and any other related entities of which the Plan purports to assign the Settlement Trust rights under the Policies.

TrustApp201

FILED DATE: 7/27/2023 4:08 PM   2017CH14975

234.     The Hacker Claimants also were required to prove that BSA had fraudulently concealed their abuse in order to overcome Illinois' statute of limitations applicable to their claims, meaning that they had to prove intentional conduct by BSA in order to establish liability.

235.     The alleged conduct of BSA therefore does not constitute an "accident" within the meaning of the Policies, and as such the injuries that allegedly resulted therefrom do not constitute an "occurrence" for which the Policies provide coverage.

WHEREFORE, Plaintiffs pray for a declaration that no coverage exists under the Policies, and that the National Surety Insurers therefore owe no duty thereunder to indemnify the Settlement Trust for BSA's settlements of the Hacker Claims, because the injuries alleged did not result from an accident for which the Policies provide coverage.

## SECOND CAUSE OF ACTION
**Declaration That No Coverage Exists For The Hacker Claims**
**Because The Injury Alleged Was Expected Or Intended**

236.     The National Surety Insurers incorporate by reference in this Second Cause of Action all allegations of this Amended Complaint, including Exhibits attached hereto.

237.     BSA's Plan purports to assign to the Settlement Trust all "rights, claims, benefits, or Causes of Action" of BSA and certain related entities identified by the Plan "under or with respect to" the Policies.

238.     As BSA's successor-in-interest to the Policies, the Settlement Trust stands in BSA's shoes and is subject to the same terms, conditions, obligations, and defenses to coverage thereunder.

239.     An "occurrence" covered under the Policies does not include injuries that are either expected or intended by the policyholder.

TrustApp202

FILED DATE: 7/27/2023 4:08 PM   2017CH14975

240.    BSA is alleged to have known, since as early as the 1920s, that large numbers of pedophiles are attracted to scouting, that its members are therefore at high risk for sexual abuse, and that it was certain a significant number of scouts would be sexually abused each year.

241.    BSA is alleged to have concealed thousands or even tens of thousands of incidents of sexual abuse within the organization, and that it knowingly and with deliberate indifference failed to take steps necessary to prevent such abuse from occurring.

242.    The Hacker Claimants allege that BSA knew that Hacker was a pedophile with a history of sexually abusing young boys and, despite this knowledge, permitted, failed to take steps to prevent, and concealed Hacker's abuse.

243.    The injuries for which coverage is sought under the Policies were either expected or intended, and therefore do not give rise to an occurrence covered by the Policies.

WHEREFORE, Plaintiffs pray for a declaration that no coverage exists under the Policies, and that the National Surety Insurers therefore owe no duty thereunder to indemnify the Settlement Trust for BSA's settlements of the Hacker Claims, because the underlying injuries alleged were either expected or intended by BSA.

### THIRD CAUSE OF ACTION
**Declaration That The Policies Only Respond To
Hacker Claims Alleging Injury During the Policy Period (Trigger)**

244.    The National Surety Insurers incorporate by reference in this Third Cause of Action all allegations of this Amended Complaint, including Exhibits attached hereto.

245.    BSA's Plan purports to assign to the Settlement Trust all "rights, claims, benefits, or Causes of Action" of BSA and certain related entities identified by the Plan "under or with respect to" the Policies.

49

TrustApp203

FILED DATE: 7/27/2023 4:08 PM   2017CH14975

246.    As BSA's successor-in-interest to the Policies, the Settlement Trust stands in BSA's shoes and is subject to the same terms, conditions, obligations, and defenses to coverage thereunder.

247.    The Policies only provide coverage for injury that occurs during the applicable policy period. There is, accordingly, no coverage under the Policies for injury which takes place outside of applicable policy periods.

WHEREFORE, Plaintiffs pray for a declaration that the Policies only respond to and potentially provide coverage for injuries that occurred during the Policies' policy periods, and the National Surety Insurers therefore owe no duty thereunder to indemnify the Settlement Trust for BSA's settlements of the Hacker Claims which allege injuries that did not occur therein.

<div align="center">

**FOURTH CAUSE OF ACTION**
**Declaration That Any Coverage For The Hacker Claims Must Be**
**Allocated Among All Policies Triggered By The Injury Alleged (Allocation)**

</div>

248.    The National Surety Insurers incorporate by reference in this Fourth Cause of Action all allegations of this Amended Complaint, including Exhibits attached hereto.

249.    BSA's Plan purports to assign to the Settlement Trust all "rights, claims, benefits, or Causes of Action" of BSA and certain related entities identified by the Plan "under or with respect to" the Policies.

250.    As BSA's successor-in-interest to the Policies, the Settlement Trust stands in BSA's shoes and is subject to the same terms, conditions, obligations, and defenses to coverage thereunder.

251.    The Policies only provide coverage for bodily/personal injury that occurs during the applicable policy period. There is, accordingly, no coverage under the Policies for injury which takes place outside of the applicable policy periods.

TrustApp204

FILED DATE: 7/27/2023 4:08 PM   2017CH14975

252.    The Hacker Claimants allege that they suffered bodily/personal injury during multiple policy periods.

253.    Coverage for such claims, if any, must be allocated among all policies in which the injury occurred, including policies issued by now-insolvent insurers and/or any periods for which BSA did not purchase insurance.

WHEREFORE, Plaintiffs pray for a declaration that any coverage under the Policies deemed applicable to the Hacker Claims must be allocated among all policies, including insolvent policies and/or periods for which no coverage exists, triggered by the injuries alleged.

## FIFTH CAUSE OF ACTION
### Declaration That The National Surety Insurers Have No Duty To Provide Coverage For The Hacker Claims Until Underlying Insurance Is Horizontally Exhausted

254.    The National Surety Insurers incorporate by reference in this Fifth Cause of Action all allegations of this Amended Complaint, including Exhibits attached hereto.

255.    BSA's Plan purports to assign to the Settlement Trust all "rights, claims, benefits, or Causes of Action" of BSA and certain related entities identified by the Plan "under or with respect to" the Policies.

256.    As BSA's successor-in-interest to the Policies, the Settlement Trust stands in BSA's shoes and is subject to the same terms, conditions, obligations, and defenses to coverage thereunder.

257.    The Policies are excess policies that respond only when underlying insurance is exhausted.

258.    On information and belief, underlying insurance for each of the policy periods triggered has not been exhausted.

TrustApp205

FILED DATE: 7/27/2023 4:08 PM   2017CH14975

259.     On information and belief, certain insurers that issued coverage underlying the Policies are insolvent. The Policies do not respond until payments are made exhausting such underlying policies.

WHEREFORE, Plaintiffs pray for a declaration that no coverage exists under the Policies, and the National Surety Insurers therefore owe no duty thereunder to indemnify the Settlement Trust for BSA's settlements of the Hacker Claims, unless and until underlying insurance is exhausted.

### SIXTH CAUSE OF ACTION
**Declaration Regarding Exhaustion Of
Underlying Per Occurrence Limits (Number of Occurrences)**

260.     The National Surety Insurers incorporate by reference in this Sixth Cause of Action all allegations of this Amended Complaint, including Exhibits attached hereto.

261.     BSA's Plan purports to assign to the Settlement Trust all "rights, claims, benefits, or Causes of Action" of BSA and certain related entities identified by the Plan "under or with respect to" the Policies.

262.     As BSA's successor-in-interest to the Policies, the Settlement Trust stands in BSA's shoes and is subject to the same terms, conditions, obligations, and defenses to coverage thereunder.

263.     The Policies are excess policies that respond to an occurrence only when the limits of underlying policies for each occurrence have been paid.

264.     On information and belief, certain insurers that issued coverage underlying the Policies are insolvent. The Policies do not respond until payments are made for each occurrence exhausting the per occurrence limits of such underlying policies.

TrustApp206

WHEREFORE, Plaintiffs pray for a declaration that no coverage exists under the Policies, and it therefore owes no duty thereunder to indemnify the Settlement Trust, unless and until underlying limits for each occurrence are exhausted.

<u>SEVENTH CAUSE OF ACTION</u>
**Declaration That There Is No Coverage For Punitive Damages**

265.   The National Surety Insurers incorporate by reference in this Seventh Cause of Action all allegations of this Amended Complaint, including Exhibits attached hereto.

266.   BSA's Plan purports to assign to the Settlement Trust all "rights, claims, benefits, or Causes of Action" of BSA and certain related entities identified by the Plan "under or with respect to" the Policies.

267.   As BSA's successor-in-interest to the Policies, the Settlement Trust stands in BSA's shoes and is subject to the same terms, conditions, obligations, and defenses to coverage thereunder.

268.   The Hacker Claims sought punitive damages based on BSA's alleged conduct.

269.   Punitive damages are not insurable.

270.   Accordingly, no coverage exists for punitive damages sought by the Hacker Claims, or for those portions of the settlements paid to compensate the Hacker Claimants for their punitive damages claims, and the National Surety Insurers owe no duty to indemnify the Settlement Trust with respect to those amounts.

WHEREFORE, Plaintiff prays for a declaration that no coverage exists under the Policies, and that the National Surety Insurers owe no duty to indemnify the Settlement Trust, with respect to punitive damages.

FILED DATE: 7/27/2023 4:08 PM   2017CH14975

TrustApp207

FILED DATE: 7/27/2023 4:08 PM   2017CH14975

## EIGHTH CAUSE OF ACTION
### Declaration That No Coverage Exists For Abuse Claims Paid
### By The Settlement Trust Because The Injury Alleged Was Not An "Accident"

271.    The National Surety Insurers incorporate by reference in this Eighth Cause of Action all allegations of this Amended Complaint, including Exhibits attached hereto.

272.    BSA's Plan purports to assign to the Settlement Trust all "rights, claims, benefits, or Causes of Action" of BSA and certain related entities identified by the Plan "under or with respect to" the Policies.

273.    As BSA's successor-in-interest to the Policies, the Settlement Trust stands in BSA's shoes and is subject to the same terms, conditions, obligations, and defenses to coverage thereunder.

274.    An "occurrence" covered under the Policies is defined to require an "accident."

275.    Abuse Claimants allege that BSA has known, since as early as the 1920s, that large numbers of pedophiles are attracted to scouting, that its members are therefore at high risk for sexual abuse, and that it was certain a significant number of scouts would be sexually abused each year.

276.    BSA is alleged to have concealed thousands of incidents of sexual abuse within the organization, and to have knowingly and with deliberate indifference failed to take steps necessary to prevent such abuse from occurring.

277.    The alleged conduct of BSA does not constitute an "accident" within the meaning of the Policies, and therefore does not constitute an "occurrence" for which the Policies provide coverage.

WHEREFORE, Plaintiffs pray for a declaration that no coverage exists under the Policies, and that the National Surety Insurers therefore owe no duty thereunder to indemnify the Settlement

TrustApp208

FILED DATE: 7/27/2023 4:08 PM   2017CH14975

Trust for payments to Abuse Claimants, because BSA's alleged conduct was not an accident for which the Policies provide coverage.

### NINTH CAUSE OF ACTION
**Declaration That No Coverage Exists For The Settlement Trust's Payments Of Abuse Claims Because The Injury Alleged Was Expected Or Intended**

278.    The National Surety Insurers incorporate by reference in this Ninth Cause of Action all allegations of this Amended Complaint, including Exhibits attached hereto.

279.    BSA's Plan purports to assign to the Settlement Trust all "rights, claims, benefits, or Causes of Action" of BSA and certain related entities identified by the Plan "under or with respect to" the Policies.

280.    As BSA's successor-in-interest to the Policies, the Settlement Trust stands in BSA's shoes and is subject to the same terms, conditions, obligations, and defenses to coverage thereunder.

281.    An "occurrence" covered under the Policies does not include injuries that are either expected or intended by the policyholder.

282.    Abuse Claimants allege that BSA has known, since as early as the 1920s, that large numbers of pedophiles are attracted to scouting, that its members are therefore at high risk for sexual abuse, and that it was certain a significant number of scouts would be sexually abused each year.

283.    BSA is alleged to have concealed thousands of incidents of sexual abuse within the organization, and that it knowingly and with deliberate indifference failed to take steps necessary to prevent such abuse from occurring.

TrustApp209

FILED DATE: 7/27/2023 4:08 PM   2017CH14975

284.    The injuries for which coverage is sought under the Policies by the Settlement Trust were either expected or intended, and therefore do not give rise to an occurrence covered by the Policies.

WHEREFORE, Plaintiffs pray for a declaration that no coverage exists under the Policies, and that the National Surety Insurers therefore owe no duty thereunder to indemnify the Settlement Trust for payments to Abuse Claimants, because the underlying injuries alleged were either expected or intended by BSA.

<div align="center">

**TENTH CAUSE OF ACTION**
**Declaration That The Policies Only Respond to Abuse Claims**
**Alleging Injuries That Occurred During the Policy Period (Trigger)**

</div>

285.    The National Surety Insurers incorporate by reference in this Tenth Cause of Action all allegations of this Amended Complaint, including Exhibits attached hereto.

286.    BSA's Plan purports to assign to the Settlement Trust all "rights, claims, benefits, or Causes of Action" of BSA and certain related entities identified by the Plan "under or with respect to" the Policies.

287.    As BSA's successor-in-interest to the Policies, the Settlement Trust stands in BSA's shoes and is subject to the same terms, conditions, obligations, and defenses to coverage thereunder.

288.    The Policies only provide coverage for injury that occurs during the applicable policy period.  There is, accordingly, no coverage under the Policies for injury which takes place outside of applicable policy periods.

WHEREFORE, Plaintiffs pray for a declaration that the Policies only respond to and potentially provide coverage for injuries that occurred during the applicable policy periods, and

<div align="center">56</div>

FILED DATE: 7/27/2023 4:08 PM   2017CH14975

the National Surety Insurers therefore owe no duty thereunder to indemnify the Settlement Trust for Abuse Claims alleging injuries that did not occur during the Policies' policy periods.

## ELEVENTH CAUSE OF ACTION
### Declaration That Any Coverage For The Abuse Claims Must Be Allocated Among All Policies Triggered By The Injury Alleged (Allocation)

289.   The National Surety Insurers incorporate by reference in this Eleventh Cause of Action all allegations of this Amended Complaint, including Exhibits attached hereto.

290.   BSA's Plan purports to assign to the Settlement Trust all "rights, claims, benefits, or Causes of Action" of BSA and certain related entities identified by the Plan "under or with respect to" the Policies.

291.   As BSA's successor-in-interest to the Policies, the Settlement Trust stands in BSA's shoes and is subject to the same terms, conditions, obligations, and defenses to coverage thereunder.

292.   The Policies only provide coverage for bodily/personal injury that occurs during the applicable policy period. There is, accordingly, no coverage under the Policies for injury which takes place outside of the applicable policy periods.

293.   Abuse Claimants allege that they suffered bodily/personal injury during multiple policy periods.

294.   Coverage for such claims, if any, must be allocated among all policies in which the injury occurred, including policies issued by now-insolvent insurers and/or any periods for which BSA did not purchase insurance.  In addition, coverage for such claims, if any, must be allocated to policies underwritten by insurers that settled during the bankruptcy and whose settlement proceeds the Settlement Trust now holds or will hold.

TrustApp211

FILED DATE: 7/27/2023 4:08 PM   2017CH14975

WHEREFORE, Plaintiffs pray for a declaration that any coverage under the Policies deemed applicable to Abuse Claims must be allocated among all policies, including insolvent policies, periods for which no coverage exists, and/or to the Settlement Trust as respects settled policies, triggered by the injuries alleged.

## TWELFTH CAUSE OF ACTION
### Declaration That The National Surety Insurers Have No Duty To Provide Coverage For Abuse Claims Until Underlying Insurance Is Horizontally Exhausted

295.    The National Surety Insurers incorporate by reference in this Twelfth Cause of Action all allegations of this Amended Complaint, including Exhibits attached hereto.

296.    BSA's Plan purports to assign to the Settlement Trust all "rights, claims, benefits, or Causes of Action" of BSA and certain related entities identified by the Plan "under or with respect to" the Policies.

297.    As BSA's successor-in-interest to the Policies, the Settlement Trust stands in BSA's shoes and is subject to the same terms, conditions, obligations, and defenses to coverage thereunder.

298.    The Policies are excess policies that respond only when underlying insurance is exhausted.

299.    On information and belief, underlying insurance for each of the policy periods triggered has not been exhausted.

300.    On information and belief, certain insurers that issued coverage underlying the Policies are insolvent. The Policies do not respond until payments are made exhausting such underlying policies.

TrustApp212

FILED DATE: 7/27/2023 4:08 PM   2017CH14975

WHEREFORE, Plaintiffs pray for a declaration that no coverage exists under the Policies, and the National Surety Insurers therefore owe no duty thereunder to indemnify the Settlement Trust for the Abuse Claims, unless and until underlying insurance is exhausted.

### THIRTEENTH CAUSE OF ACTION
**Declaration Regarding Exhaustion Of**
**Underlying Per Occurrence Limits (Number of Occurrences)**

301.    The National Surety Insurers incorporate by reference in this Thirteenth Cause of Action all allegations of this Amended Complaint, including Exhibits attached hereto.

302.    BSA's Plan purports to assign to the Settlement Trust all "rights, claims, benefits, or Causes of Action" of BSA and certain related entities identified by the Plan "under or with respect to" the Policies.

303.    As BSA's successor-in-interest to the Policies, the Settlement Trust stands in BSA's shoes and is subject to the same terms, conditions, obligations, and defenses to coverage thereunder.

304.    The Policies are excess policies that respond to an occurrence only when the limits of underlying policies for each occurrence have been paid.

305.    On information and belief, certain insurers that issued coverage underlying the Policies are insolvent. Other insurers that issued primary insurance policies or other insurance policies to BSA lack aggregate limits, such that those policies pay, if at all, on a per-occurrence basis.

306.    Accordingly, the Policies do not respond, if at all, until payments are made for each occurrence exhausting the per occurrence limits of all such underlying policies.

TrustApp213

FILED DATE: 7/27/2023 4:08 PM   2017CH14975

WHEREFORE, Plaintiffs pray for a declaration that no coverage exists under the Policies, and it therefore owes no duty thereunder to indemnify the Settlement Trust, unless and until underlying limits for each occurrence are exhausted.

## FOURTEENTH CAUSE OF ACTION
### Declaration That All Self-Insured Retentions
### Must Be Paid Before The Policies Are Required to Respond

307.    The National Surety Insurers incorporate by reference in this Fourteenth Cause of Action all allegations of this Amended Complaint, including Exhibits attached hereto.

308.    BSA's Chapter 11 Plan of Reorganization purports to assign to the Settlement Trust all "rights, claims, benefits, or Causes of Action" of BSA and certain related entities identified by the Plan "under or with respect to" the Policies.

309.    As BSA's successor-in-interest to the Policies, the Settlement Trust stands in BSA's shoes and is subject to the same terms, conditions, obligations, and defenses to coverage thereunder.

310.    The Policies are excess policies that respond only when the limits of underlying policies have been paid.

311.    Several policies underlying certain of the Policies issued by the National Surety Insurers include self-insured retentions per each occurrence.

312.    A self-insured retention is a dollar amount the policyholder must pay for each occurrence before the policy is required to respond.

313.    The Policies do not respond until payments are made for each occurrence exhausting the self-insured retentions of underlying policies.

TrustApp214

FILED DATE: 7/27/2023 4:08 PM   2017CH14975

WHEREFORE, Plaintiffs pray for a declaration that no coverage exists under the Policies, and the National Surety Insurers therefore owe no duty thereunder to indemnify the Settlement Trust, unless and until all self-insured retentions underlying the Policies are paid.

<div align="center">

**FIFTEENTH CAUSE OF ACTION**
**Declaration Regarding Violation Of The**
**Policies' Assistance And Cooperation Requirements And**
**The National Surety Insurers' Right To Associate In The Defense of Claims.**

</div>

314.    The National Surety Insurers incorporate by reference in this Fifteenth Cause of Action all allegations of this Amended Complaint, including Exhibits attached hereto.

315.    BSA's Plan purports to assign to the Settlement Trust all "rights, claims, benefits, or Causes of Action" of BSA and certain related entities identified by the Plan "under or with respect to" the Policies.

316.    As BSA's successor-in-interest to the Policies, the Settlement Trust stands in BSA's shoes and is subject to the same terms, conditions, obligations, and defenses to coverage thereunder.

317.    As a condition of coverage thereunder, the Policies grant the National Surety Insurers the right to associate with BSA and participate in the defense and settlement of claims for which indemnity under the Policies may be sought.

318.    As a condition of coverage thereunder, the Policies require BSA to cooperate with and assist the National Surety Insurers in the defense and settlement of claims.

319.    BSA violated obligations it owed the National Surety Insurers under the Policies by, among other things: (i) failing to cooperate with and assist the National Surety Insurers and Other Insurer Parties' efforts to defend against and minimize BSA's and/or the Settlement Trust's liability for Abuse Claims; (ii) agreeing to procedures, including the Matrix Evaluation, the IRO and the Document Appendix, for resolving claims that deprive the National Surety Insurers of its

<div align="center">61</div>

FILED DATE: 7/27/2023 4:08 PM   2017CH14975

right to associate with the defense of claims; (iii) agreeing to pay Abuse Claims without the National Surety Insurers' consent; (iv) agreeing to the payment of Abuse Claims for unreasonable claims values; (v) agreeing to the payment of Abuse Claims for which BSA has or would have no legal liability; and (vi) agreeing to procedures for paying Abuse Claims that were intended and designed to increase the National Surety Insurers and Other Insurer Parties' potential coverage liability.

WHEREFORE, Plaintiffs pray for a declaration that there is no coverage under the policies, and the National Surety Insurers therefore owe no duty to indemnify the Settlement Trust, due to BSA's and the Settlement Trust's violation of BSA's duties of cooperation and assistance and the National Surety Insurer's right to associate with the defense of the Abuse Claims.

<u>**SIXTEENTH CAUSE OF ACTION**</u>
**Declaration Of No Coverage For Voluntary Payments**
**To Which The National Surety Insurers Did Not Consent**

320.    The National Surety Insurers incorporate by reference in this Sixteenth Cause of Action all allegations of this Amended Complaint, including Exhibits hereto.

321.    Certain of the Abuse Claims allege abuse for which BSA and/or the Settlement Trust had or has no underlying legal obligation to pay — including, but not limited to, claims barred by applicable statutes of limitations or repose.

322.    The Policies provide, *e.g.*, that BSA shall not, except at its own expense, voluntarily make any payment, assume any obligation, or incur any expense without the National Surety Insurers' consent.

323.    The Plan provides for payments to Abuse Claimants, from the Settlement Trust, for claims that BSA had or would have no legal obligation to pay.

TrustApp216

FILED DATE: 7/27/2023 4:08 PM   2017CH14975

324.     The National Surety Insurers did not consent to such payments and any such payments would not be reasonable.

325.     Under the Policies, coverage is not available for such Abuse Claims.

WHEREFORE, Plaintiffs pray for a declaration that no coverage exists under the Policies, and the National Surety Insurers therefore have no duty to indemnify the Settlement Trust, for claims paid by the Settlement Trust for which BSA had or would not have had any legal obligation to pay.

<div align="center">

**SEVENTEENTH CAUSE OF ACTION**
**Declaration That The National Surety Insurers Have No Duty**
**To Indemnify The Settlement Trust Because Payments**
**Under The TDPs Are Not Losses Covered By The Policies**

</div>

326.     The National Surety Insurers incorporate by reference in this Seventeenth Cause of Action all allegations of this Amended Complaint, including Exhibits hereto.

327.     BSA's Plan purports to assign to the Settlement Trust all "rights, claims, benefits, or Causes of Action" of BSA and certain related entities identified by the Plan "under or with respect to" the Policies.

328.     As BSA's successor-in-interest to the Policies, the Settlement Trust stands in BSA's shoes and is subject to the same terms, conditions, obligations, and defenses to coverage thereunder.

329.     The Policies provide that the National Surety Insurers' liability under the Policies is limited, *inter alia*, to final judgments rendered against BSA following an actual trial, or for settlements pursuant to a written agreement between BSA and a claimant to which the National Surety Insurers consented.

330.     Claims determinations made by the Settlement Trustee are not final judgments rendered against BSA following an actual trial.

<div align="center">63</div>

TrustApp217

FILED DATE: 7/27/2023 4:08 PM   2017CH14975

331.    Claims determinations made by the Settlement Trustee are not settlements to which the National Surety Insurers' consented and under the terms of the Plan are not reasonable.

WHEREFORE, Plaintiffs pray for a declaration that claims determinations made by the Settlement Trustee and/or payments to Abuse Claimants are not final judgments or settlement agreements covered by the Policies, and therefore the National Surety Insurers owe no duty to indemnify the Settlement Trust for such payments or claims determinations.

### EIGHTEENTH CAUSE OF ACTION
**Declaration That Coverage Is Not Available
For Claims Resolved for Unreasonable Values**

332.    The National Surety Insurers incorporate by reference in this Eighteenth Cause of Action all allegations in this Complaint, including Exhibits attached hereto.

333.    BSA's Plan purports to assign to the Settlement Trust all "rights, claims, benefits, or Causes of Action" of BSA and certain related entities identified by the Plan "under or with respect to" the Policies.

334.    As BSA's successor-in-interest to the Policies, the Settlement Trust stands in BSA's shoes and is subject to the same terms, conditions, obligations, and defenses to coverage thereunder.

335.    As set forth in the TDPs and accompanying Claims Matrix, the Settlement Trust contemplates paying Abuse Claims (i) for which BSA has or would have no legal liability or (ii) for values that far exceed reasonable values that BSA settled for and/or insurers paid similar claims prior to BSA's bankruptcy. As BSA's own expert Dr. Bates testified, the Claims Matrix to which BSA agreed exceed its historical settlement values in the tort system by as much as 90%.

336.    The National Surety Insurers did not agree to the claims values contemplated by the TDPs and Claims Matrix under which the Settlement Trustee will pay Abuse Claims.

TrustApp218

FILED DATE: 7/27/2023 4:08 PM   2017CH14975

337.    The National Surety Insurers have no obligation under the Policies to indemnify BSA or the Settlement Trust for unreasonable settlements or other payments made without the National Surety Insurers' consent.

WHEREFORE, Plaintiffs pray for a declaration that no coverage exists, and the National Surety Insurers therefore owe no duty to indemnify the Settlement Trust, for payments to Abuse Claimants that are unreasonable.

## NINETEENTH CAUSE OF ACTION
### Declaration of No Coverage Because BSA Failed To Give Any or Timely Notice of Claims or Occurrences

338.    The National Surety Insurers incorporate by reference in this Nineteenth Cause of Action all allegations of this Amended Complaint, including Exhibits hereto.

339.    BSA's Plan purports to assign to the Settlement Trust all "rights, claims, benefits, or Causes of Action" of BSA and certain related entities identified by the Plan "under or with respect to" the Policies.

340.    As BSA's successor-in-interest to the Policies, the Settlement Trust stands in BSA's shoes and is subject to the same terms, conditions, obligations, and defenses to coverage thereunder.

341.    The Policies provide, *e.g.*, that BSA must "immediately advise" the National Surety Insurers of any claim or occurrence that may result in liability.

342.    The majority of claims for which the Settlement Trust intends to seek indemnity from the National Surety Insurers allege abuse that in many cases happened decades ago.

343.    BSA was aware and had knowledge of thousands of claims and occurrences of sexual abuse potentially resulting in liability since as early as the 1920s.

TrustApp219

FILED DATE: 7/27/2023 4:08 PM   2017CH14975

344.    BSA failed to give the National Surety Insurers notice of the occurrences and/or claims.

WHEREFORE, Plaintiffs pray for a declaration that there is no coverage under the Policies, and the National Surety Insurers therefore owe no duty thereunder to indemnify the Settlement Trust, for any claim or occurrence of sexual abuse of which BSA did not give the National Surety Insurers timely notice.

## TWENTIETH CAUSE OF ACTION
### Declaration Regarding Policies' No Action Clause

345.    The National Surety Insurers incorporate by reference in this Twentieth Cause of Action all allegations of this Amended Complaint, including Exhibits hereto.

346.    BSA's Plan purports to assign to the Settlement Trust all "rights, claims, benefits, or Causes of Action" of BSA and certain related entities identified by the Plan "under or with respect to" the Policies.

347.    As BSA's successor-in-interest to the Policies, the Settlement Trust stands in BSA's shoes and is subject to the same terms, conditions, obligations, and defenses to coverage thereunder.

348.    The Policies state that no action for coverage may lie against the National Surety Insurers with respect to an occurrence unless, as a condition precedent thereto, BSA has fully complied with all terms and conditions of the Policies.

349.    The procedures to which BSA agreed, without the National Surety Insurers' and Other Insurer Parties' consent, under which the Settlement Trustee is required to pay Abuse Claims, including the Matrix Evaluation, the IRO, and the Document Appendix, do not comply with the terms and conditions of the Policies.

66

FILED DATE: 7/27/2023 4:08 PM   2017CH14975

350.    For each and all of the reasons described herein, BSA failed to comply with all terms and conditions of the Policies.

351.    Accordingly, BSA and/or the Settlement Trust have failed to satisfy a necessary and material condition precedent to coverage under the Policies.

WHEREFORE, Plaintiffs pray for a declaration that there is no coverage under the Policies, and the National Surety Insurers therefore owe no duty thereunder to indemnify the Settlement Trust, because any payments made by the Settlement Trust will not comply with the terms and conditions of the Policies.

**TWENTY-FIRST CAUSE OF ACTION**
**Declaration That Coverage Is Not Available Because Of BSA's Failure To**
**Disclose Known Or Anticipated Liabilities For Sexual Abuse Claims**
**During The Underwriting Of The Policies**

352.    The National Surety Insurers incorporate by reference in this Twenty-first Cause of Action all allegations of this Amended Complaint, including Exhibits hereto.

353.    BSA's Plan purports to assign to the Settlement Trust all "rights, claims, benefits, or Causes of Action" of BSA and certain related entities identified by the Plan "under or with respect to" the Policies.

354.    As BSA's successor-in-interest to the Policies, the Settlement Trust stands in BSA's shoes and is subject to the same terms, conditions, obligations, and defenses to coverage thereunder.

355.    As an insured, BSA was required to disclose known or expected liabilities in connection with its application for coverage under the Policies.

356.    BSA was aware and had knowledge of thousands of occurrences of sexual abuse potentially resulting in liability since as early as the 1920s.

TrustApp221

FILED DATE: 7/27/2023 4:08 PM   2017CH14975

357.    At the time BSA first applied for coverage from National Surety in 1983, incidents of sexual abuse within the organization were being reported to BSA at an average rate of one incident every three days.

358.    Records documenting reports of sexual abuse and the perpetrators involved were maintained by BSA beginning no later than the early 1920s. By the early 1980s, BSA had documented and maintained records of thousands of incidents of sexual abuse committed by adult scout leaders and volunteers.

359.    BSA concealed its knowledge of sexual abuse within the organization from the authorities, parents, Congress, the public, and its insurers.

360.    BSA did not disclose and/or mispresented to the National Surety Insurers BSA's known or expected liability for sexual abuse when it applied for insurance from the National Surety Insurers, and thus misrepresented to the National Surety Insurers the nature and extent of the potential liabilities for which it was seeking coverage.

WHEREFORE, Plaintiffs pray for a declaration that there is no coverage under the Policies, and the National Surety Insurers therefore owe no duty thereunder to indemnify the Settlement Trust, because of material misrepresentations BSA made to the National Surety Insurers in connection with the application for and underwriting of coverage under the Policies.

### TWENTY-SECOND CAUSE OF ACTION
**Declaration That The National Surety Insurers Have
No Duty To Indemnify Settlement Trust For Administrative Expenses**

361.    The National Surety Insurers incorporate by reference in this Twenty-second Cause of Action all allegations of this Amended Complaint, including Exhibits hereto.

TrustApp222

FILED DATE: 7/27/2023 4:08 PM   2017CH14975

362.     BSA's Plan purports to assign to the Settlement Trust all "rights, claims, benefits, or Causes of Action" of BSA and certain related entities identified by the Plan "under or with respect to" the Policies.

363.     As BSA's successor-in-interest to the Policies, the Settlement Trust stands in BSA's shoes and is subject to the same terms, conditions, obligations, and defenses to coverage thereunder.

364.     The Policies do not provide for a duty to defend.  BSA's right to indemnity under the Policies may in certain circumstances include reimbursement of costs that, with the National Surety Insurers' consent, are incurred in the defense and settlement of claims.

365.     The Policies provide that reimbursable costs shall not include salaries and expenses of the insured's employees incurred in investigation, adjustment, and/or litigation of claims.

366.     Costs and expenses that are incurred by the Settlement Trust in processing, administering, and liquidating claims are not expenses for which the National Surety Insurers are responsible under the Policies, nor did the National Surety Insurers consent to such expenses.

WHEREFORE, Plaintiffs pray for a declaration that there is no coverage under the Policies, and the National Surety Insurers therefore owe no duty to indemnify the Settlement Trust, for costs and expenses incurred by the Settlement Trust.

## TWENTY-THIRD CAUSE OF ACTION
### Declaration That There Is No Coverage For Punitive Damages

367.     The National Surety Insurers incorporate by reference in this Twenty-third Cause of Action all allegations of this Amended Complaint, including Exhibits attached hereto.

368.     BSA's Plan purports to assign to the Settlement Trust all "rights, claims, benefits, or Causes of Action" of BSA and certain related entities identified by the Plan "under or with respect to" the Policies.

TrustApp223

FILED DATE: 7/27/2023 4:08 PM   2017CH14975

369.    As BSA's successor-in-interest to the Policies, the Settlement Trust stands in BSA's shoes and is subject to the same terms, conditions, obligations, and defenses to coverage thereunder.

370.    The TDPs Claims Matrix assigns values to Abuse Claims to be paid by the Settlement Trust in part based on BSA's alleged knowing, willful or intentional misconduct that formed the basis for prepetition claims for punitive and/or exemplary damages against BSA.

371.    The Policies expressly exclude coverage for punitive and/or exemplary damages are not insurable.

372.    Accordingly, no coverage exists for any portion of an Abuse Claim paid by the Settlement Trust that represents an amount paid for punitive and/or exemplary punitive damages, and the National Surety Insurers owe no duty to indemnify the Settlement Trust with respect to those amounts.

WHEREFORE, Plaintiff prays for a declaration that no coverage exists under the Policies, and that the National Surety Insurers owe no duty to indemnify the Settlement Trust with respect to, the amount of any Abuse Claim paid for punitive damages.

**TWENTY-FOURTH CAUSE OF ACTION**
**Declaration Of No Coverage For Losses Attributable**
**To Parties Who Are Not Insureds Under The Policies**

373.    The National Surety Insurers incorporate by reference in this Twenty-fourth Cause of Action all allegations of this Amended Complaint, including Exhibits hereto.

374.    BSA's Plan purports to assign to the Settlement Trust all "rights, claims, benefits, or Causes of Action" of BSA and certain related entities identified by the Plan "under or with respect to" the Policies.

TrustApp224

FILED DATE: 7/27/2023 4:08 PM   2017CH14975

375.    As BSA's successor-in-interest to the Policies, the Settlement Trust stands in BSA's shoes and is subject to the same terms, conditions, obligations, and defenses to coverage thereunder.

376.    The Policies only provide coverage to entities or individuals identified by the Policies as insureds thereunder.

377.    In most cases, BSA is alleged to share responsibility for alleged abuse with related entities that plan, administer, implement, coordinate, and supervise BSA's programs, including local councils and/or chartering organizations.

378.    The Policies do not provide coverage for such related entities unless they are identified by a Policy as an insured thereunder.

379.    To the extent the Settlement Trust pays a claim for which the liability alleged is attributable, in whole or in part, to a party that is not an insured under the Policies, the portion of any such payment resulting from that party's alleged liability is not be covered by the Policies.

WHEREFORE, Plaintiffs pray for a declaration that there is no coverage under the Policies, and the National Surety Insurers therefore does not owe a duty to indemnify the Settlement Trust, for payments made that are attributable to the alleged liabilities of parties which are not insureds under the Policies.

### TWENTY-FIFTH CAUSE OF ACTION
**Declaration That If Coverage Exists, The National Surety Insurers Are
Entitled to Equitable Subrogation, Contribution, or Judgment Reduction**

380.    The National Surety Insurers incorporate by reference in this Twenty-fifth Cause of Action all allegations of this Amended Complaint, including Exhibits attached hereto.

TrustApp225

FILED DATE: 7/27/2023 4:08 PM   2017CH14975

381.    BSA's Plan purports to assign to the Settlement Trust all "rights, claims, benefits, or Causes of Action" of BSA and certain related entities identified by the Plan "under or with respect to" the Policies.

382.    As BSA's successor-in-interest to the Policies, the Settlement Trust stands in BSA's shoes and is subject to the same terms, conditions, obligations, and defenses to coverage thereunder.

383.    In the event coverage is owing, the National Surety Insurers are entitled to contribution from Other Insurer Parties, settling insurers (through the Settlement Trust), and/or the Settlement Trust under the doctrines of contribution, equitable contribution, subrogation, equitable subrogation, and/or applicable judgment reduction provisions in the Bankruptcy Court's order confirming the Plan.

WHEREFORE, if determined that coverage is owed under one or more of the Policies, Plaintiffs pray for judgment entitling them to contribution, equitable contribution, subrogation, equitable subrogation, and/or judgment reduction from one or more of the Settlement Trust, Other Insurer Parties, and/or settling insurers (through the Settlement Trust).

Dated: July 27, 2023.                          Respectfully Submitted,

                                               /s/ Todd C. Jacobs
                                               Todd C. Jacobs
                                               John E. Bucheit
                                               **Parker, Hudson, Rainer & Dobbs LLP**
                                               Firm No. 100822
                                               Two N. Riverside Plaza, Suite 1850
                                               Chicago, IL 60606
                                               Ph: (312) 477-3306
                                               Email: tjacobs@phrd.com
                                               Email: jbucheit@phrd.com

TrustApp226

FILED DATE: 7/27/2023 4:08 PM   2017CH14975

Harris B. Winsberg (*pro hac vice* to come)
Matthew Roberts (*pro hac vice* to come)
Drew Stevens (*pro hac vice* to come)
**Parker, Hudson, Rainer & Dobbs LLP**
303 Peachtree St. NE, Suite 3600
Atlanta, GA 30329
Ph: (404) 523-5300
Email: hwinsberg@phrd.com
Email: mroberts@phrd.com
Email: dstevens@phrd.com

*Attorneys for Plaintiffs National Surety Corporation, Interstate Fire and Casualty Company, and Fireman's Fund Insurance Company*

TrustApp227

FILED DATE: 9/5/2023 5:46 PM   2017CH14975

# IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

## COUNTY DEPARTMENT, CHANCERY DIVISION

| | |
|---|---|
| NATIONAL SURETY CORPORATION; INTERSTATE FIRE AND CASUALTY COMPANY; FIREMAN'S FUND INSURANCE COMPANY; and AMERICAN INSURANCE COMPANY, | No. 2017–CH–014975 |
| | Hon. Alison C. Conlon |
| Plaintiffs, | |
| v. | |
| BSA SETTLEMENT TRUST; *et al.* | |
| Defendants. | |

## [PROPOSED] FIRST AMENDED COMPLAINT FOR DECLARATORY RELIEF

Defendant Allianz Global Risks US Insurance Company f/k/a Allianz Insurance Company ("Allianz"), for its Answer to National Surety Corporation's ("National Surety") First Amended Complaint for Declaratory Relief, states as follows:

1.     This insurance coverage litigation arises out of what has been described as an "epidemic" of sexual abuse within the Boy Scouts of America ("BSA") that, for more than a century, the organization not only knowingly turned a blind eye towards, but also went to great lengths to conceal.

**ANSWER:**   Admitted.

2.     One such case was that of Thomas Hacker, a Chicago-area Scout leader described as "the most prolific child molester in the history of scouting." In the 1960s and early 1970s, Hacker was arrested no less than three times for molesting scouts and other young boys while serving as scoutmaster for troops in Indiana. Although BSA knew of and had documented the abuse, Hacker

1

TrustApp228

FILED DATE: 9/5/2023 5:46 PM   2017CH14975

was permitted to register with the Chicago Area Council and serve as scoutmaster and committee chairman of a local troop from 1981 to 1988. It was later determined that Hacker sexually abused at least 34 boys during this seven-year period. Arrested in 1988, Hacker was eventually convicted of five counts of aggravated criminal sexual assault against three scouts, for which he was sentenced to 100 years in prison.

**ANSWER:**    Admitted.

3.    National Surety filed this coverage action in late 2017 to obtain declaratory relief on coverage issues arising under excess liability policies it issued BSA in the 1980s, after BSA demanded payment for the defense and settlement of claims filed by 18 former scouts abused by Hacker ("Hacker Claims"). In addition to BSA and the Chicago Area Council, National Surety joined to this action other liability insurers ("Other Insurer Parties") for the years in which Hacker's sexual abuse was alleged to have occurred given that the declarations sought potentially impact the coverage obligations of the Other Insurer Parties.

**ANSWER:**    Admitted.

4.    The Hacker Claims were not the first to allege that BSA had, for decades, repeatedly demonstrated a knowing and deliberate indifference to the dangers posed by pedophilia in its ranks. Facts discovered in both the Hacker cases and others brought by former scouts who had suffered sexual abuse reflected that BSA had long known that scouting was exploited by pedophiles to gain access to young boys; that BSA had known with certainty that substantial numbers of scouts would be abused by scouting volunteers each and every year; and that, since its inception, BSA had known of the unreasonably high risk of sexual abuse by its volunteers, yet chose time and again to conceal the high rates of sexual abuse within in the organization from parents, the authorities, and the general public to protect its reputation and revenue.

TrustApp229

FILED DATE: 9/5/2023 5:46 PM   2017CH14975

**ANSWER:**    Admitted upon information and belief.

5.    As the facts discovered in these underlying cases showed, during the 1920s BSA began secretly compiling reports of volunteers considered ineligible to serve in BSA due to claims of child sexual abuse. By 1935, BSA had accumulated almost 3,000 files on scout leaders dismissed from scouting. By the time National Surety issued its first excess policy in 1981, BSA was removing scout leaders accused of committing sexual abuse at an average rate of one every three days.

**ANSWER:**    Admitted upon information and belief.

6.    In 2010, an Oregon jury awarded a former scout who had been sexually abused by a scoutmaster $18.5 million in punitive damages, prompting increasing numbers of such claims to be filed against BSA throughout the country. By 2020, BSA was facing approximately 1,700 pending and anticipated claims in state and federal courts throughout the country, brought by former scouts who had been sexually abused in connection with scouting. Faced with mounting liabilities, on February 18, 2020 (the "Petition Date") BSA filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq*. (the "Bankruptcy Code"), in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"). BSA's petition for relief commenced case no. 20-10343 (the "Bankruptcy Case") and automatically stayed this coverage action.

**ANSWER:**    Admitted.

7.    While BSA sought bankruptcy protection to resolve its existing and anticipated liabilities, mass tort lawyers ("claimant attorneys") seized on the bankruptcy as a potential windfall opportunity to inappropriately expand BSA's liability. During the eight months following the Petition Date, claimant attorneys throughout the country engaged in a massive, multi-media advertising campaign, replete with false statements and assurances, to enlist as many claimants

TrustApp230

FILED DATE: 9/5/2023 5:46 PM   2017CH14975

("Abuse Claimants") as they could on a contingency fee basis. By the time the period for filing proofs of claim in the bankruptcy expired in November 2020, over 82,000 claims alleging sexual abuse had been filed in the Bankruptcy Case ("Abuse Claims") – a 6,000% increase from the 1,700 claims BSA faced pre-petition.

**ANSWER:**   Admitted.

8.     This staggering increase in the number of Abuse Claims enabled the claimant attorneys to assert considerable leverage over the outcome of the Bankruptcy Case, which one claimant attorney candidly professed to be a principal objective of their solicitation efforts. The claimant attorneys exercised this leverage through a two-part strategy designed to maximize the Abuse Claimants' (and their own) recoveries.

**ANSWER:**   Admitted.

9.     The first prong of the strategy was to devise and implement a permissive trust distribution process through which the Abuse Claims would be funneled for review, valuation, and payment. This process grossly inflates the value of Abuse Claims and allows recovery for tens of thousands of claims that, according to BSA itself, would never have been filed in the tort system given the legal hurdles they would have faced. This includes some 58,000 Abuse Claims that one of the leading claimant attorneys admits are non-compensable because of statutes of limitation.

**ANSWER:**   Admitted.

10.    The second prong of the claimant attorneys' strategy was to effectuate an assignment of BSA's insurance rights (without the concomitant obligations) to a trust they dominate, and then seeking to bind the National Surety Insurers and the Other Insurer Parties to the trust's valuation awards — a process that is fundamentally at odds with the terms and conditions of BSA's insurance policies that are designed to protect the insured by minimizing its liability. These

TrustApp231

FILED DATE: 9/5/2023 5:46 PM   2017CH14975

protective policy terms and conditions include the insurers' right to participate in the defense and settlement of claims as a condition of coverage and their obligation to indemnify judgments, if any, following an actual trial. Under the process here, however, the claimant attorneys and now the Settlement Trust (defined below) contend that none of these (or any other) insurer rights and defenses exist, despite the express wording of the insurers' insurance contracts to the contrary.

> **ANSWER:**   Admitted.

11.   BSA, for its part, aligned itself with the claimant attorneys, acceding to many of their demands without the agreement or consent of the National Surety Insurers or the Other Insurer Parties. Despite the contractual obligations owed to the National Surety Insurers and Other Insurer Parties under their respective policies, BSA excluded them from its settlement negotiations with the claimant attorneys. In fact, BSA spent months unilaterally negotiating with the claimant attorneys over terms of a plan of reorganization; an assignment of insurance policy rights without the attendant obligations; and a settlement trust with trust distribution procedures that aim to increase greatly the insurers' liability and impair their contractual rights. These actions — and the results thereof — violate BSA's duty to cooperate and its insurers' right to participate in the defense and settlement of claims, among other policy requirements on which coverage is conditioned.

> **ANSWER:**   Admitted.

12.   In light of BSA's demand that National Surety reimburse its defense and indemnity costs associated with the Hacker Claims, as well as the Settlement Trust's stated intent to seek coverage for claims alleging bodily injury during the National Surety Insurers' policy periods, this Amended Complaint seeks declarations regarding the parties' rights and obligations under the National Surety, Interstate, and FFIC Policies (defined below). Because the declarations sought may impact the coverage obligations of insurers other than the National Surety Insurers, and the

TrustApp232

FILED DATE: 9/5/2023 5:46 PM   2017CH14975

National Surety Insurers largely issued excess policies requiring exhaustion of underlying coverage, the National Surety Insurers have joined to this action BSA's other liability insurers for all years in which the sexual abuse is alleged to have occurred, where information regarding insurance providers is available.

> **ANSWER:**    Admitted upon information and belief.

## PARTIES

13.    Plaintiff National Surety is a corporation organized under the laws of the State of Delaware with its principal place of business and statutory home office in Illinois. It is now and was at all times relevant to this complaint licensed and authorized to issue insurance policies in the State of Illinois.

> **ANSWER:**    Admitted.

14.    Plaintiff Interstate is a corporation organized under the laws of the State of Illinois with its principal place of business and statutory home office in Illinois. It is now and was at all times relevant to this complaint licensed and authorized to issue insurance policies in the State of Illinois.

> **ANSWER:**    Admitted.

15.    Plaintiff FFIC is a corporation organized under the laws of the State of California with its principal place of business and statutory home office in Illinois. It is now and was at all times relevant to this complaint licensed and authorized to issue insurance policies in the State of Illinois.

> **ANSWER:**    Admitted.

16.    BSA is a congressionally charted corporation authorized to do business in Illinois. Although confirmation of BSA's plan of reorganization is on pending appeals, BSA has been

6

TrustApp233

FILED DATE: 9/5/2023 5:46 PM   2017CH14975

discharged from its prepetition liability pursuant to that plan. The plan channels all Abuse Claims against BSA exclusively to the above-referenced settlement trust, as more fully averred below.

**ANSWER:**   Admitted.

17.   Defendant BSA Settlement Trust ("Settlement Trust") is a statutory trust under Chapter 38 of Title 12 of the Delaware Code, 12 Del. C. §§ 3801, *et seq.*, created pursuant to the *Third Modified Fifth Amended Chapter 11 Plan of Reorganization (with Technical Modifications) for Boy Scouts of America and Delaware BSA, LLC* ("Plan") as confirmed by the Bankruptcy Court on September 8, 2022. (Bankruptcy Case Dkt. No. 10316.) The Settlement Trust was constituted to, among other things: (i) assume all liability for and administer the claims channeled to it, including Abuse Claims and inter-insurer claims such as the existing inter-insurer claims in this case; and (ii) receive and accept assignment of the rights under certain of BSA's liability insurance policies. The Settlement Trust – as successor-in-interest to BSA, certain related entities, and certain of BSA's insurers with which BSA settled – asserts rights under policies issued by the National Surety Insurers and Other Insurer Parties in this action.

**ANSWER:**   Admitted.

18.   On information and belief, there are two trustees of the Settlement Trust: (i) Honorable Barbara J. Houser (Ret.) (herein, the "Settlement Trustee"), who is domiciled in and/or a resident or citizen of the State of New Mexico; and (ii) either (a) a natural person who is a resident of the State of Delaware or (b) a legal entity that has its principal place of business in the State of Delaware. (Bankruptcy Case Dkt. No. 10316-1; BSA Settlement Trust Agreement §§ 5.1, 5.11(a).)

**ANSWER:**   Admitted.

19.   This declaratory judgment action involves all the insurers that the Settlement Trust has claimed to be implicated by the Abuse Claims channeled to it (listed below).

TrustApp234

FILED DATE: 9/5/2023 5:46 PM   2017CH14975

**ANSWER:**    Admitted.

20.    On information and belief, Allianz Insurance Company, now known as Allianz Global Risks US Insurance Company, is a corporation organized under the laws of the State of Illinois with its principal place of business in Chicago, Illinois.

**ANSWER:**    Admitted.

21.    On information and belief, Travelers Casualty and Surety Company, Inc. formerly known as Aetna Casualty & Surety Company is a corporation organized under the laws of the State of Connecticut with its principal place of business in Hartford, Connecticut.

**ANSWER:**    Allianz lacks sufficient information to form a belief as to the truth of the allegations in Paragraph 21 and, therefore, denies them.

22.    On information and belief, Allstate Insurance Company is a corporation organized in the State of Illinois with its principal place of business in Illinois.

**ANSWER:**    Allianz lacks sufficient information to form a belief as to the truth of the allegations in Paragraph 22 and, therefore, denies them.

23.    On information and belief, Ambassador Insurance Company, now known as Peerless Indemnity Insurance Company, is a corporation organized in the State of Illinois with its principal place of business in Massachusetts.

**ANSWER:**    Allianz lacks sufficient information to form a belief as to the truth of the allegations in Paragraph 23 and, therefore, denies them.

24.    On information and belief, American Employers' Insurance Company and American Employers' Insurance Company of Boston, Massachusetts, now known as SPARTA Insurance Company, is a corporation organized in the State of Connecticut with its principal place of business in Connecticut.

TrustApp235

FILED DATE: 9/5/2023 5:46 PM   2017CH14975

**ANSWER:**   Allianz lacks sufficient information to form a belief as to the truth of the allegations in Paragraph 24 and, therefore, denies them.

25.     On information and belief, American Casualty Company of Reading, Pennsylvania is a corporation organized in the State of Pennsylvania with its principal place of business in Illinois.

**ANSWER:**   Allianz lacks sufficient information to form a belief as to the truth of the allegations in Paragraph 25 and, therefore, denies them.

26.     On information and belief, American Economy Insurance Company is a corporation organized in the State of Indiana with its principal place of business in Massachusetts.

**ANSWER:**   Allianz lacks sufficient information to form a belief as to the truth of the allegations in Paragraph 26 and, therefore, denies them.

27.     On information and belief, American Home Fire Assurance Company, now known as American Home Assurance Company, is a corporation organized in the State of New York with its principal place of business in New York.

**ANSWER:**   Allianz lacks sufficient information to form a belief as to the truth of the allegations in Paragraph 27 and, therefore, denies them.

28.     On information and belief, American Excess Insurance Association is a corporation organized in the State of Connecticut with its principal place of business in Connecticut.

**ANSWER:**   Allianz lacks sufficient information to form a belief as to the truth of the allegations in Paragraph 28 and, therefore, denies them.

29.     On information and belief, American States Insurance Company is a corporation organized in the State of Indiana with its principal place of business in Massachusetts.

TrustApp236

FILED DATE: 9/5/2023 5:46 PM 2017CH14975

**ANSWER:** Allianz lacks sufficient information to form a belief as to the truth of the allegations in Paragraph 29 and, therefore, denies them.

30. On information and belief, American Reinsurance Company, now known as Munich Reinsurance America, Inc., is a corporation organized in the State of Delaware with its principal place of business in New Jersey.

**ANSWER:** Allianz lacks sufficient information to form a belief as to the truth of the allegations in Paragraph 30 and, therefore, denies them.

31. On information and belief, American Fidelity Company, now known as Consolidated National Insurance Company, is a corporation organized in the State of Colorado with its principal place of business in Colorado.

**ANSWER:** Allianz lacks sufficient information to form a belief as to the truth of the allegations in Paragraph 31 and, therefore, denies them.

32. On information and belief, Amerisure Insurance Company is a corporation organized in the State of Michigan with its principal place of business in Michigan.

**ANSWER:** Allianz lacks sufficient information to form a belief as to the truth of the allegations in Paragraph 32 and, therefore, denies them.

33. On information and belief, Commercial Union Assurance Company, now known as Aviva plc is a corporation organized in the United Kingdom with its principal place of business in the U.K.

**ANSWER:** Allianz lacks sufficient information to form a belief as to the truth of the allegations in Paragraph 33 and, therefore, denies them.

TrustApp237

FILED DATE: 9/5/2023 5:46 PM   2017CH14975

34.     On information and belief, Travelers Insurance Company, now known as Brighthouse Life Insurance Company, is a corporation organized in the State of Delaware with its principal place of business in North Carolina.

**ANSWER:**   Allianz lacks sufficient information to form a belief as to the truth of the allegations in Paragraph 34 and, therefore, denies them.

35.     On information and belief, Erie and Niagara Insurance Association is a corporation organized in the State of New York with its principal place of business in New York.

**ANSWER:**   Allianz lacks sufficient information to form a belief as to the truth of the allegations in Paragraph 35 and, therefore, denies them.

36.     On information and belief, Erie Family Life Insurance Company is a corporation organized in the State of Pennsylvania with its principal place of business in Pennsylvania.

**ANSWER:**   Allianz lacks sufficient information to form a belief as to the truth of the allegations in Paragraph 36 and, therefore, denies them.

37.     On information and belief, Erie Insurance Exchange is a corporation organized in the State of Pennsylvania with its principal place of business in Pennsylvania.

**ANSWER:**   Allianz lacks sufficient information to form a belief as to the truth of the allegations in Paragraph 37 and, therefore, denies them.

38.     On information and belief, Danielson Insurance Company, formerly known as Mission Insurance Company, is a corporation organized under the laws of the State of California with its principal place of business in California.

**ANSWER:**   Allianz lacks sufficient information to form a belief as to the truth of the allegations in Paragraph 38 and, therefore, denies them.

TrustApp238

FILED DATE: 9/5/2023 5:46 PM   2017CH14975

39.     On information and belief, Columbia Casualty Company is a corporation organized under the laws of the State of Illinois with its principal place of business in Chicago, Illinois.

**ANSWER:**    Allianz lacks sufficient information to form a belief as to the truth of the allegations in Paragraph 39 and, therefore, denies them.

40.     On information and belief, Columbia Insurance Company is a corporation organized under the laws of the State of Nebraska with its principal place of business in Nebraska.

**ANSWER:**    Allianz lacks sufficient information to form a belief as to the truth of the allegations in Paragraph 40 and, therefore, denies them.

41.     On information and belief, Royal Indemnity Company, Globe Indemnity Company, Royal Globe Insurance Company and Royal Insurance Company of America, now known as Arrowood Indemnity Company, is a corporation organized under the laws of the State of Delaware with its principal place of business in Charlotte, North Carolina.

**ANSWER:**    Allianz lacks sufficient information to form a belief as to the truth of the allegations in Paragraph 41 and, therefore, denies them.

42.     On information and belief, Utica Mutual Insurance Company is a corporation organized under the laws of the State of New York with its principal place of business in New Hartford, New York.

**ANSWER:**    Allianz lacks sufficient information to form a belief as to the truth of the allegations in Paragraph 42 and, therefore, denies them.

43.     On information and belief, National Union Fire Insurance Company of Pittsburgh, PA, is a corporation organized under the laws of the State of Pennsylvania with its principal place of business in New York.

TrustApp239

FILED DATE: 9/5/2023 5:46 PM   2017CH14975

**ANSWER:**   Allianz lacks sufficient information to form a belief as to the truth of the allegations in Paragraph 43 and, therefore, denies them.

44.     On information and belief, Landmark Insurance Company, now known as National Union Fire Insurance Company of Pittsburgh, PA, is a corporation organized under the laws of the State of Pennsylvania with its principal place of business in New York.

**ANSWER:**   Allianz lacks sufficient information to form a belief as to the truth of the allegations in Paragraph 44 and, therefore, denies them.

45.     On information and belief, Harbor Insurance Company; Buckeye Union Insurance Company; Fidelity and Casualty Company of New York; Fireman's Insurance Company of Newark, NJ; Pacific Insurance Company; and Niagara Fire Insurance Company, now known as The Continental Insurance Company, is a corporation organized under the laws of the State of Pennsylvania with its principal place of business in Illinois.

**ANSWER:**   Allianz lacks sufficient information to form a belief as to the truth of the allegations in Paragraph 45 and, therefore, denies them.

46.     On information and belief, Crum & Forster, now known as Crum & Forster Indemnity Company, is a corporation organized in the State of Delaware with its principal place of business in New Jersey.

**ANSWER:**   Allianz lacks sufficient information to form a belief as to the truth of the allegations in Paragraph 46 and, therefore, denies them.

47.     On information and belief, St. Paul Fire and Marine Insurance Company is a corporation organized under the laws of the State of Minnesota with its principal place of business in St. Paul, Minnesota.

TrustApp240

FILED DATE: 9/5/2023 5:46 PM   2017CH14975

**ANSWER:**   Allianz lacks sufficient information to form a belief as to the truth of the allegations in Paragraph 47 and, therefore, denies them.

48.   On information and belief, St. Paul Mercury Insurance Company is a corporation organized under the laws of the State of Connecticut with its principal place of business in Hartford, Connecticut.

**ANSWER:**   Allianz lacks sufficient information to form a belief as to the truth of the allegations in Paragraph 48 and, therefore, denies them.

49.   On information and belief, St. Paul Surplus Lines Insurance Company is a corporation organized under the laws of State of Delaware with its principal place of business in Hartford, Connecticut.

**ANSWER:**   Allianz lacks sufficient information to form a belief as to the truth of the allegations in Paragraph 49 and, therefore, denies them.

50.   On information and belief, Lexington Insurance Company is a corporation organized under the laws of the State of Delaware with its principal place of business in Boston, Massachusetts.

**ANSWER:**   Allianz lacks sufficient information to form a belief as to the truth of the allegations in Paragraph 50 and, therefore, denies them.

51.   On information and belief Argonaut Insurance Company is a corporation organized under the laws of the State of Illinois with its principal place of business in Chicago, Illinois.

**ANSWER:**   Allianz lacks sufficient information to form a belief as to the truth of the allegations in Paragraph 51 and, therefore, denies them.

TrustApp241

FILED DATE: 9/5/2023 5:46 PM   2017CH14975

52.     On information and belief, The Insurance Company of the State of Pennsylvania is a corporation organized under the laws of the State of Illinois with its principal place of business in New York.

**ANSWER:**    Allianz lacks sufficient information to form a belief as to the truth of the allegations in Paragraph 52 and, therefore, denies them.

53.     On information and belief, General Star Indemnity Company is a corporation organized under the laws of the State of Delaware with its principal place of business in Connecticut.

**ANSWER:**    Allianz lacks sufficient information to form a belief as to the truth of the allegations in Paragraph 53 and, therefore, denies them.

54.     On information and belief, California Union Insurance Company, now known as Cigna Specialty Insurance Company, is a corporation organized under the laws of the State of California with its principal place of business in Pennsylvania.

**ANSWER:**    Allianz lacks sufficient information to form a belief as to the truth of the allegations in Paragraph 54 and, therefore, denies them.

55.     On information and belief, Agricultural Insurance Company and Anchor Casualty Company, now known as Great American Assurance Company, is a corporation organized under the laws of the State of Ohio with its principal place of business in Ohio.

**ANSWER:**    Allianz lacks sufficient information to form a belief as to the truth of the allegations in Paragraph 55 and, therefore, denies them.

56.     On information and belief, Liberty Mutual Insurance Company is a corporation organized under the laws of the State of Massachusetts with its principal place of business in Massachusetts.

TrustApp242

FILED DATE: 9/5/2023 5:46 PM   2017CH14975

**ANSWER:**   Allianz lacks sufficient information to form a belief as to the truth of the allegations in Paragraph 56 and, therefore, denies them.

57.   On information and belief, Liberty Surplus Insurance Company is a corporation organized under the laws of the State of New Hampshire with its principal place of business in Massachusetts.

**ANSWER:**   Allianz lacks sufficient information to form a belief as to the truth of the allegations in Paragraph 57 and, therefore, denies them.

58.   On information and belief, Liberty Insurance Underwriters Inc. is a corporation organized under the laws of the State of Illinois with its principal place of business in Massachusetts.

**ANSWER:**   Allianz lacks sufficient information to form a belief as to the truth of the allegations in Paragraph 58 and, therefore, denies them.

59.   On information and belief, The Continental Insurance Company is a corporation organized under the laws of the State of Pennsylvania with its principal place of business in Illinois.

**ANSWER:**   Allianz lacks sufficient information to form a belief as to the truth of the allegations in Paragraph 59 and, therefore, denies them.

60.   On information and belief, Continental Casualty Company, is a corporation organized in the State of Illinois with its principal place of business in Illinois.

**ANSWER:**   Allianz lacks sufficient information to form a belief as to the truth of the allegations in Paragraph 60 and, therefore, denies them.

61.   On information and belief, Gulf Insurance Company, now known as The Travelers Indemnity Company, is a corporation organized under the laws of the State of Connecticut with its principal place of business in Connecticut.

TrustApp243

FILED DATE: 9/5/2023 5:46 PM   2017CH14975

**ANSWER:**   Allianz lacks sufficient information to form a belief as to the truth of the allegations in Paragraph 61 and, therefore, denies them.

62.   On information and belief, Agricultural Excess & Surplus Insurance Company, now known as Great American E & S Insurance Company, is a corporation organized under the laws of the State of Ohio with its principal place of business in Ohio.

**ANSWER:**   Allianz lacks sufficient information to form a belief as to the truth of the allegations in Paragraph 62 and, therefore, denies them.

63.   On information and belief, Great American Insurance Company, is a corporation organized under the laws of the State of Ohio with its principal place of business in Cincinnati, Ohio.

**ANSWER:**   Allianz lacks sufficient information to form a belief as to the truth of the allegations in Paragraph 63 and, therefore, denies them.

64.   On information and belief, Allied World Assurance Company, Ltd is a corporation organized under the laws of Bermuda with its principal place of business in Bermuda.

**ANSWER:**   Allianz lacks sufficient information to form a belief as to the truth of the allegations in Paragraph 64 and, therefore, denies them.

65.   On information and belief, Allied World Assurance Company (U.S.) Inc. is a corporation organized under the laws of Delaware with its principal place of business in New York, New York.

**ANSWER:**   Allianz lacks sufficient information to form a belief as to the truth of the allegations in Paragraph 65 and, therefore, denies them.

TrustApp244

FILED DATE: 9/5/2023 5:46 PM   2017CH14975

66.     On information and belief, XL Insurance (Dublin), Ltd. and XL Insurance (Bermuda) Ltd., now known as XL Bermuda Limited, is a corporation organized under the laws of Bermuda with its principal place of business in Bermuda.

**ANSWER:**     Allianz lacks sufficient information to form a belief as to the truth of the allegations in Paragraph 66 and, therefore, denies them.

67.     On information and belief, XL Europe Limited, now known as XL Insurance Company SE, is a corporation organized under the laws of Ireland with its principal place of business in Dublin, Ireland.

**ANSWER:**     Allianz lacks sufficient information to form a belief as to the truth of the allegations in Paragraph 67 and, therefore, denies them.

68.     On information and belief, Axis Specialty Insurance Company is a corporation organized under the laws of the State of Connecticut with its principal place of business in Georgia.

**ANSWER:**     Allianz lacks sufficient information to form a belief as to the truth of the allegations in Paragraph 68 and, therefore, denies them.

69.     On information and belief, Axis Surplus Insurance Company is a corporation organized under the laws of the State of Illinois with its principal place of business in Georgia.

**ANSWER:**     Allianz lacks sufficient information to form a belief as to the truth of the allegations in Paragraph 69 and, therefore, denies them.

70.     On information and belief, Traders and Pacific Insurance Company, now known as Endurance American Specialty Insurance Company, is a corporation organized under the laws of the State of Delaware with its principal place of business in New York.

**ANSWER:**     Allianz lacks sufficient information to form a belief as to the truth of the allegations in Paragraph 70 and, therefore, denies them.

TrustApp245

FILED DATE: 9/5/2023 5:46 PM   2017CH14975

71.     On information and belief, Endurance American Insurance Company is a corporation organized under the laws of the State of Delaware with its principal place of business in New York.

**ANSWER:**     Allianz lacks sufficient information to form a belief as to the truth of the allegations in Paragraph 71 and, therefore, denies them.

72.     On information and belief, Everest National Insurance Company is a corporation organized under the laws of the State of Delaware with its principal place of business in New Jersey.

**ANSWER:**     Allianz lacks sufficient information to form a belief as to the truth of the allegations in Paragraph 72 and, therefore, denies them.

73.     On information and belief, Old Republic Insurance Company is a corporation organized under the laws of the State of Pennsylvania with its principal place of business in Chicago, Illinois.

**ANSWER:**     Allianz lacks sufficient information to form a belief as to the truth of the allegations in Paragraph 73 and, therefore, denies them.

74.     On information and belief, Arch Reinsurance Company is a corporation organized under the laws of the State of Delaware with its principal place of business in Morristown, New Jersey.

**ANSWER:**     Allianz lacks sufficient information to form a belief as to the truth of the allegations in Paragraph 74 and, therefore, denies them.

75.     On information and belief, The Ohio Casualty Insurance Company is a corporation organized under the laws of the State of New Hampshire with its principal place of business in Boston, Massachusetts.

TrustApp246

FILED DATE: 9/5/2023 5:46 PM   2017CH14975

**ANSWER:**   Allianz lacks sufficient information to form a belief as to the truth of the allegations in Paragraph 75 and, therefore, denies them.

76.   On information and belief, Catlin Specialty Insurance Company is a corporation organized under the laws of the Oklahoma with its principal place of business in Connecticut.

**ANSWER:**   Allianz lacks sufficient information to form a belief as to the truth of the allegations in Paragraph 76 and, therefore, denies them.

77.   On information and belief, Alterra Excess and Surplus Insurance Company, now known as Evanston Insurance Company, is a corporation organized under the laws of the State of Illinois with its principal place of business in Illinois.

**ANSWER:**   Allianz lacks sufficient information to form a belief as to the truth of the allegations in Paragraph 77 and, therefore, denies them.

78.   On information and belief, Gemini Insurance Company is a corporation organized under the laws of the State of Delaware with its principal place of business in Arizona.

**ANSWER:**   Allianz lacks sufficient information to form a belief as to the truth of the allegations in Paragraph 78 and, therefore, denies them.

79.   On information and belief, First Specialty Insurance Corporation, now known as Swiss Re Corporate Solutions Capacity Insurance Corporation, is a corporation organized under the laws of the State of Missouri with its principal place of business in Jefferson City, Missouri.

**ANSWER:**   Allianz lacks sufficient information to form a belief as to the truth of the allegations in Paragraph 79 and, therefore, denies them.

80.   On information and belief, First Insurance Company of Hawaii, Ltd. is a corporation organized in the State of Hawaii with its principal place of business in Hawaii.

TrustApp247

FILED DATE: 9/5/2023 5:46 PM   2017CH14975

**ANSWER:**   Allianz lacks sufficient information to form a belief as to the truth of the allegations in Paragraph 80 and, therefore, denies them.

81.   On information and belief, Illinois Employers Insurance of Wausau, now known as Wausau General Insurance Company, is a corporation organized under the laws of the State of Wisconsin with its principal place of business in Massachusetts.

**ANSWER:**   Allianz lacks sufficient information to form a belief as to the truth of the allegations in Paragraph 81 and, therefore, denies them.

82.   On information and belief, London and Edinburgh General Insurance Company Limited, now known as London and Edinburgh Insurance Company Limited, is a corporation organized under the laws of the United Kingdom with its principal place of business in United Kingdom.

**ANSWER:**   Allianz lacks sufficient information to form a belief as to the truth of the allegations in Paragraph 82 and, therefore, denies them.

83.   On information and belief, Jefferson Insurance Company of New York, now known as Jefferson Insurance Company, is a corporation organized under the laws of the State of New York with its principal place of business in Virginia.

**ANSWER:**   Allianz lacks sufficient information to form a belief as to the truth of the allegations in Paragraph 83 and, therefore, denies them.

84.   On information and belief, Charter Oak Fire Insurance Company is a corporation organized in the State of Connecticut with its principal place of business in Connecticut.

**ANSWER:**   Allianz lacks sufficient information to form a belief as to the truth of the allegations in Paragraph 84 and, therefore, denies them.

TrustApp248

FILED DATE: 9/5/2023 5:46 PM   2017CH14975

85.     On information and belief, Cincinnati Insurance Company is a corporation organized in the State of Ohio with its principal place of business in Ohio.

**ANSWER:**     Allianz lacks sufficient information to form a belief as to the truth of the allegations in Paragraph 85 and, therefore, denies them.

86.     On information and belief, CNA, now known as CNA Financial Corporation, is a corporation organized in the State of Delaware with its principal place of business in Illinois.

**ANSWER:**     Allianz lacks sufficient information to form a belief as to the truth of the allegations in Paragraph 86 and, therefore, denies them.

87.     On information and belief, General Casualty Company of America, now known as General Insurance Company of America, is a corporation organized in the State of New Hampshire with its principal place of business in Massachusetts.

**ANSWER:**     Allianz lacks sufficient information to form a belief as to the truth of the allegations in Paragraph 87 and, therefore, denies them.

88.     On information and belief, Aspen Specialty Insurance Company is a corporation organized under the laws of the State of North Dakota with its principal place of business in Rocky Hill, Connecticut.

**ANSWER:**     Allianz lacks sufficient information to form a belief as to the truth of the allegations in Paragraph 88 and, therefore, denies them.

89.     On information and belief, Evanston Insurance Company is a corporation organized under the laws of the State of Illinois with its principal place of business in Deerfield, Illinois.

**ANSWER:**     Allianz lacks sufficient information to form a belief as to the truth of the allegations in Paragraph 89 and, therefore, denies them.

TrustApp249

FILED DATE: 9/5/2023 5:46 PM   2017CH14975

90.     On information and belief, Colony Insurance Company is a corporation organized under the laws of the Commonwealth of Virginia with its principal place of business in Richmond, Virginia.

**ANSWER:**     Allianz lacks sufficient information to form a belief as to the truth of the allegations in Paragraph 90 and, therefore, denies them.

91.     On information and belief, Indian Harbor Insurance Company is a corporation organized under the laws of the State of Delaware with its principal place of business in Stamford, Connecticut.

**ANSWER:**     Allianz lacks sufficient information to form a belief as to the truth of the allegations in Paragraph 91 and, therefore, denies them.

92.     On information and belief, Ategrity Specialty Insurance Company is a corporation organized under the laws of the State of Delaware with its principal place of business in Arizona.

**ANSWER:**     Allianz lacks sufficient information to form a belief as to the truth of the allegations in Paragraph 92 and, therefore, denies them.

93.     On information and belief, General Star Indemnity Company is a corporation organized under the laws of the State of Delaware with its principal place of business in Connecticut.

**ANSWER:**     Allianz lacks sufficient information to form a belief as to the truth of the allegations in Paragraph 93 and, therefore, denies them.

94.     On information and belief, Jamestown Mutual Insurance Company, now known as QBE Insurance Corporation, is a corporation organized under the laws of the State of Pennsylvania with its principal place of business in Wisconsin.

TrustApp250

FILED DATE: 9/5/2023 5:46 PM   2017CH14975

**ANSWER:**   Allianz lacks sufficient information to form a belief as to the truth of the allegations in Paragraph 94 and, therefore, denies them.

95.   On information and belief, The Manhattan Fire & Marine Insurance Company, now known as Westport Insurance Corporation, is a corporation organized under the laws of the State of Missouri with its principal place of business in Missouri.

**ANSWER:**   Allianz lacks sufficient information to form a belief as to the truth of the allegations in Paragraph 95 and, therefore, denies them.

96.   On information and belief, National Casualty Company is a corporation organized under the laws of the State of Ohio with its principal place of business in Ohio.

**ANSWER:**   Allianz lacks sufficient information to form a belief as to the truth of the allegations in Paragraph 96 and, therefore, denies them.

97.   On information and belief, National Fire Insurance of Hartford, now known as National Fire Insurance Company of Hartford, is a corporation organized under the laws of the State of Illinois with its principal place of business in Illinois.

**ANSWER:**   Allianz lacks sufficient information to form a belief as to the truth of the allegations in Paragraph 97 and, therefore, denies them.

98.   On information and belief, Nationwide Mutual Insurance Company is a corporation organized under the laws of the State of Ohio with its principal place of business in Ohio.

**ANSWER:**   Allianz lacks sufficient information to form a belief as to the truth of the allegations in Paragraph 98 and, therefore, denies them.

99.   On information and belief, Western Casualty & Surety Company, now known as Nationwide Affinity Insurance Company of America, is a corporation organized under the laws of the State of Ohio with its principal place of business in Ohio.

TrustApp251

FILED DATE: 9/5/2023 5:46 PM   2017CH14975

**ANSWER:**   Allianz lacks sufficient information to form a belief as to the truth of the allegations in Paragraph 99 and, therefore, denies them.

100.   On information and belief, New Hampshire Insurance Company is a corporation organized under the laws of the State of Illinois with its principal place of business in New York.

**ANSWER:**   Allianz lacks sufficient information to form a belief as to the truth of the allegations in Paragraph 100 and, therefore, denies them.

101.   On information and belief, Normandy Reinsurance Company Limited is a corporation organized under the laws of Bermuda with its principal place of business in Bermuda.

**ANSWER:**   Allianz lacks sufficient information to form a belief as to the truth of the allegations in Paragraph 101 and, therefore, denies them.

102.   On information and belief, Phoenix Insurance Company is a corporation organized under the laws of the State of Connecticut with its principal place of business in Connecticut.

**ANSWER:**   Allianz lacks sufficient information to form a belief as to the truth of the allegations in Paragraph 102 and, therefore, denies them.

103.   On information and belief, SAFECO Insurance Company of America is a corporation organized under the laws of the State of New Hampshire with its principal place of business in Massachusetts.

**ANSWER:**   Allianz lacks sufficient information to form a belief as to the truth of the allegations in Paragraph 103 and, therefore, denies them.

104.   On information and belief, Scottsdale Insurance Company is a corporation organized under the laws of the State of Ohio with its principal place of business in Ohio.

**ANSWER:**   Allianz lacks sufficient information to form a belief as to the truth of the allegations in Paragraph 104 and, therefore, denies them.

TrustApp252

FILED DATE: 9/5/2023 5:46 PM   2017CH14975

105.    On information and belief, Security Mutual Insurance Company is a corporation organized under the laws of the State of New York with its principal place of business in New York.

**ANSWER:**    Allianz lacks sufficient information to form a belief as to the truth of the allegations in Paragraph 105 and, therefore, denies them.

106.    On information and belief, Winterthur Swiss Insurance Company and Yasuda Fire & Marine Insurance Company (U.K.) Ltd., now known as Tenecom Limited, is a corporation organized under the laws of the United Kingdom with its principal place of business in United Kingdom.

**ANSWER:**    Allianz lacks sufficient information to form a belief as to the truth of the allegations in Paragraph 106 and, therefore, denies them.

107.    On inform and belief, The North River Insurance Company is a corporation organized under the laws of the State of New Jersey with its principal place of business in New Jersey.

**ANSWER:**    Allianz lacks sufficient information to form a belief as to the truth of the allegations in Paragraph 107 and, therefore, denies them.

108.    On information and belief, Transamerica Insurance Company, now known as TIG Insurance Company, is a corporation organized under the laws of the State of California with its principal place of business in New Hampshire.

**ANSWER:**    Allianz lacks sufficient information to form a belief as to the truth of the allegations in Paragraph 108 and, therefore, denies them.

109.    On information and belief, Travelers (Bermuda) Limited is a corporation organized under the laws of the State of Bermuda with its principal place of business in Bermuda.

TrustApp253

FILED DATE: 9/5/2023 5:46 PM   2017CH14975

**ANSWER:**   Allianz lacks sufficient information to form a belief as to the truth of the allegations in Paragraph 109 and, therefore, denies them.

110.   On information and belief, United States Fidelity and Guaranty Company, formerly known as United States Fidelity & Warranty Company, is a corporation organized under the laws of the State of Connecticut with its principal place of business in Connecticut.

**ANSWER:**   Allianz lacks sufficient information to form a belief as to the truth of the allegations in Paragraph 110 and, therefore, denies them.

111.   On information and belief, United States Fire Insurance Company, formerly known as U.S. Fire Insurance Company, is a corporation organized under the laws of the State of Delaware with its principal place of business in New Jersey.

**ANSWER:**   Allianz lacks sufficient information to form a belief as to the truth of the allegations in Paragraph 111 and, therefore, denies them.

112.   On information and belief, Universal Reinsurance Company is a corporation organized under the laws of Bermuda with its principal place of business in Bermuda.

**ANSWER:**   Allianz lacks sufficient information to form a belief as to the truth of the allegations in Paragraph 112 and, therefore, denies them.

### JURISDICTION AND VENUE

113.   The Court has personal jurisdiction over defendants pursuant to 735 ILCS 5/2-209 because they are domiciled and/or licensed to do business and/or are doing business in the State of Illinois.  In addition, the Court has personal jurisdiction over the out-of-state insurer defendants pursuant to 735 ILCS 5/2-209 because each such defendant is or was transacting business in the State of Illinois within the time periods relevant to the causes of action stated herein and contracted to insure persons, property, or risks located in the State of Illinois.

TrustApp254

FILED DATE: 9/5/2023 5:46 PM   2017CH14975

**ANSWER:**   Allianz admits that it is domiciled in and does business in Illinois and is subject to this Court's jurisdiction. Allianz lacks sufficient information to form a belief as to the truth of the allegations in Paragraph 113 directed at defendants other than Allianz and, therefore, denies them.

114.   Venue is proper in Cook County pursuant to 735 ILCS 5/2-101 to 103 because it is a county in which multiple defendants are "doing business." Further, Plaintiffs' causes of action arise in substantial part out of events that occurred in Cook County with respect to a Boy Scout troop located in Cook County, and each of the Hacker Claims were filed in the Circuit Court of Cook County, Law Division. In addition, thousands of the Abuse Claims filed in the Bankruptcy Case allegedly emanate from Illinois. Judge Flynn previously denied BSA's motion to dismiss based on forum non-conveniens and the Bankruptcy Court ruled that this Illinois action could proceed.

**ANSWER:**   Admitted.

## FACTUAL ALLEGATIONS

**A.     The National Surety Insurers' Policies[1]**

115.   National Surety issued to BSA excess liability policy, No. XLX1484309, in effect for the policy period January 1, 1983 to January 1, 1984, a copy of which is attached hereto as Exhibit A.

**ANSWER:**   Admitted.

116.   National Surety issued to BSA excess liability policy, No. XLX1484392, in effect for the policy period January 1, 1984 to January 1, 1985, a copy of which is attached hereto as Exhibit B.

---

[1] Referred to herein separately as "National Surety Policies," "Interstate Policies," "FFIC Policies," or "American Policies" and collectively as "Policies.

TrustApp255

FILED DATE: 9/5/2023 5:46 PM   2017CH14975

**ANSWER:**    Admitted.

117.    National Surety issued to BSA excess liability policy, No. XXK2142433, in effect for the policy period January 1, 1990 to January 1, 1991, a copy of which is attached hereto as Exhibit C.

**ANSWER:**    Admitted.

118.    National Surety issued to BSA excess liability policy, No. XXK2178302, in effect for the policy period January 1, 1991 to January 1, 1992, a copy of which is attached hereto as Exhibit D.

**ANSWER:**    Admitted.

119.    National Surety issued to BSA excess liability policy, No. XXK2175018, in effect for the policy period January 1, 1992 to January 1, 1993, a copy of which is attached hereto as Exhibit E.

**ANSWER:**    Admitted.

120.    National Surety issued to BSA excess liability policy, No. XXK00014626451, in effect for the policy period January 1, 1993 to January 1, 1994, a copy of which is attached hereto as Exhibit F.

**ANSWER:**    Admitted.

121.    National Surety issued to BSA excess liability policy, No. XXK00065650605, in effect for the policy period January 1, 1994 to January 1, 1995, a copy of which is attached hereto as Exhibit G.

**ANSWER:**    Admitted.

TrustApp256

FILED DATE: 9/5/2023 5:46 PM   2017CH14975

122.    National Surety issued to BSA excess liability policy, No. XXK00095349775, in effect for the policy period January 1, 1995 to January 1, 1996, a copy of which is attached hereto as Exhibit H.

**ANSWER:**    Admitted.

123.    National Surety issued to BSA excess liability policy, No. CSR2839507, in effect for the policy period January 1, 1996 to January 1, 1997, a copy of which is attached hereto as Exhibit I.

**ANSWER:**    Admitted.

124.    National Surety issued to BSA excess liability policy, No. XXK00095516738, in effect for the policy period January 1, 1996 to January 1, 1997, a copy of which is attached hereto as Exhibit J.

**ANSWER:**    Admitted.

125.    Interstate issued to BSA excess liability policy, No. XUO-1102139, in effect for the policy period January 1, 2001 to January 1, 2002, a copy of which is attached hereto as Exhibit K.

**ANSWER:**    Admitted.

126.    Interstate issued to BSA excess liability policy, No. XUO-1102274, in effect for the policy period January 1, 2002 to January 1, 2003, a copy of which is attached hereto as Exhibit L.

**ANSWER:**    Admitted.

127.    Interstate issued to BSA excess liability policy, No. XSO-1014504, in effect for the policy period January 1, 2003 to January 1, 2004, a copy of which is attached hereto as Exhibit M.

**ANSWER:**    Admitted.

TrustApp257

FILED DATE: 9/5/2023 5:46 PM   2017CH14975

128.    Interstate issued to BSA excess liability policy, No. HFX-1002516, in effect for the policy period January 1, 2007 to January 1, 2008, a copy of which is attached hereto as Exhibit N.

**ANSWER:**    Admitted.

129.    Interstate issued to BSA excess liability policy, No. HFX-1002550, in effect for the policy period January 1, 2008 to January 1, 2009, a copy of which is attached hereto as Exhibit O.

**ANSWER:**    Admitted.

130.    Interstate issued to BSA excess liability policy, No. HFX-1002552, in effect for the policy period January 1, 2008 to January 1, 2009, a copy of which is attached hereto as Exhibit P.

**ANSWER:**    Admitted.

131.    Interstate issued to BSA excess liability policy, No. HFX-00079995585, in effect for the policy period January 1, 2009 to January 1, 2010, a copy of which is attached hereto as Exhibit Q.

**ANSWER:**    Admitted.

132.    Interstate issued to BSA excess liability policy, No. HFX-00082075581, in effect for the policy period January 1, 2009 to January 1, 2010, a copy of which is attached hereto has Exhibit R.

**ANSWER:**    Admitted.

133.    FFIC is alleged to have issued to certain BSA Local Councils liability policies for policy periods in the 1980s, 1990s and 2000s.

**ANSWER:**    Allianz lacks sufficient information to form a belief as to the truth of the allegations in Paragraph 133 and, therefore, denies them.

134.    Many of the Policies are "follow form" excess policies that incorporate, with certain identified exceptions, the terms, conditions, and exclusions of underlying policies issued.

TrustApp258

FILED DATE: 9/5/2023 5:46 PM   2017CH14975

**ANSWER:**    The allegations in Paragraph 134 refer to written documents that speak for themselves, are the best evidence of their contents, and must be read and construed as a whole.  Allianz denies any characterization of those documents that is inconsistent with their contents.

135.    As excess policies, the Policies respond to and potentially provide coverage only for claims that exceed the per occurrence limits of liability, aggregate limits of liability, and/or self-insured retentions of the underlying policies underlying them.

**ANSWER:**    The allegations in Paragraph 135 refer to written documents that speak for themselves, are the best evidence of their contents, and must be read and construed as a whole.  Allianz denies any characterization of those documents that is inconsistent with their contents.

136.    Subject to the stated limits of liability, terms, conditions, and exclusions, the Policies provide indemnity coverage for an "occurrence," as defined by the Policies. Each Policy defines "occurrence" substantively the same, as an "accident or event" resulting in personal injury during the policy period that is "neither expected nor intended from the standpoint of the insured."

**ANSWER:**    The allegations in Paragraph 136 refer to written documents that speak for themselves, are the best evidence of their contents, and must be read and construed as a whole.  Allianz denies any characterization of those documents that is inconsistent with their contents.

137.    The Policies provide, *e.g.*, that the National Surety Insurers shall have "the right but not the duty to associate with" the policyholder "in the investigation, defense or settlement of any claim made, 'suit' brought or proceedings instituted, to which we think this policy may apply." The Policies also grant the National Surety Insurers the right, at their discretion, to "[i]nvestigate

32

FILED DATE: 9/5/2023 5:46 PM   2017CH14975

any 'occurrence,' claim, 'suit' or proceeding" or to "[s]ettle any claim, 'suit' or proceeding" to which it believes a policy may apply.

**ANSWER:**   Admitted.

138.   The Policies contain "assistance and cooperation" clauses that, as a condition of coverage, require the policyholder, *e.g.*, to "cooperate with [the insurer] in the investigation, settlement or defense of any claim or Suit, and take all necessary steps to protect [BSA's] and [the insurer's] interests."

**ANSWER:**   Admitted.

139.   The Policies also contain "no voluntary payment" provisions which prohibit the policyholder, *e.g.,* from "mak[ing] or authoriz[ing] an admission of liability or attempt[ing] to settle or otherwise dispose of any claim or Suit without [the insurer's] written consent."

**ANSWER:**   Admitted.

140.   Finally, the Policies include "no action" clauses which state, *e.g.*, that "[n]o action shall lie against [the insurer] unless, as a condition precedent thereto, [the policyholder] shall have fully complied with all the terms of this policy, nor until the amount of the insured's obligation to pay shall have been finally determined either by a final judgment against the insured or by written agreement of the insured, the claimant and [the insurer]."

**ANSWER:**   Admitted.

**B.**   **BSA's Underlying Liability**

**1.**   **BSA's Historical Knowledge of Pedophilia Within the Organization.**

141.   As the plaintiffs in the Hacker cases ("Hacker Claimants"), along with other Abuse Claimants, have alleged, BSA has long known that its programs were especially susceptible to widespread sexual abuse.

**ANSWER:**   Admitted upon information and belief.

TrustApp260

FILED DATE: 9/5/2023 5:46 PM   2017CH14975

142.    In the early 1920s, BSA began maintaining a group of files – known internally as the "red files," the "perversion files," and/or the "Ineligible Volunteer Files" (herein, the "Perversion Files")– documenting, among other things, known incidents of sexual abuse by BSA troop leaders, staffers, and volunteers. By as early as 1935, decades before any of the National Surety Policies were issued, BSA had accumulated over 2,900 Perversion Files on scout leaders who were dismissed from scouting for cause, with approximately 1,000 of them for sexual misconduct with scouts.

**ANSWER:**    Admitted upon information and belief.

143.    BSA continued to amass thousands of Perversion Files over the years that followed. By the early 1970s, BSA was opening a new Perversion File at a remarkable rate of one every three days.

**ANSWER:**    Admitted upon information and belief.

144.    The exact number of Perversion Files opened by BSA is unknown. Over a three-year period in the 1970s, BSA destroyed thousands of the files. It has been alleged that BSA potentially destroyed tens of thousands of Perversion Files, although the actual amount is unclear.

**ANSWER:**    Admitted upon information and belief.

145.    BSA secreted away the Perversion Files in locked filing cabinets at its headquarters. Access was limited to a select few director-level employees, including Paul Ernst, BSA's Director of Registration and Subscription Services from 1971 to 1993.

**ANSWER:**    Admitted upon information and belief.

146.    The Perversion Files document numerous instances of BSA leaders, staffers, and volunteers molesting children, being reported to BSA, and then remaining in or eventually regaining entry into scouting.

TrustApp261

FILED DATE: 9/5/2023 5:46 PM   2017CH14975

**ANSWER:**     Admitted upon information and belief.

147.     Until as recently as 1988, it was BSA's policy to merely suspend or give probation to an alleged abuser if BSA deemed the evidence of abuse to be "weak." As a result, known abusers frequently were allowed the opportunity to continue abusing scouts even after BSA had become aware of it.

**ANSWER:**     Admitted upon information and belief.

148.     Indeed, one independent investigation and review of more than 1,200 Perversion Files created between 1970 to 1991 revealed hundreds of cases in which BSA failed to report claims of sexual abuse to the authorities, hid allegations from parents and the public, and/or allowed the abuser to remain with and/or rejoin the organization following reports of their abuse.

**ANSWER:**     Admitted upon information and belief.

149.     In 2019, BSA's then-Chief Executive Scout, Michael Surbaugh, retracted a claim he had made to U.S. Congresswoman Jackie Speier (D-Calif.) that BSA had never knowingly allowed a sexual predator to work with scouts. In a May 28, 2019 letter to Congresswoman Speier, Surbaugh wrote that:

> When I sent my response to your November 20, 2018 letter, I believed in good faith, and with deeply felt conviction, that BSA would never have knowingly allowed a sexual predator to work with youth. I told you that in my response. Since then, I have learned that my response was incorrect. I have reviewed information that now makes clear to me that decades ago BSA did, in at least some instances, allow individuals return to Scouting even after credible accusations of sexual abuse.

**ANSWER:**     Admitted upon information and belief.

**2.     The Hacker Claims.**

150.     Once such instance was that of former Chicago-area scout leader, Thomas Hacker. In 2012, 18 former scouts identified as John Doe – John Doe 18 brought suit against BSA and the

TrustApp262

FILED DATE: 9/5/2023 5:46 PM   2017CH14975

Chicago Area Council alleging that BSA knowingly permitted and/or failed to take steps to prevent Hacker's sexual abuse.

> **ANSWER:**   Admitted upon information and belief.

151.   By way of summary, John Doe-John Doe 18 alleged the following:

(a)   "Since approximately 1919, BOY SCOUTS OF AMERICA has maintained a group of files known variously as the red files, perversion files, or ineligible volunteer files (IV Files)."

(b)   "The IV Files . . . document multiple instances of child molesters volunteering with scouting, molesting a child, being reported to BSA, but then re-gaining entry into scouting."

(c)   "BSA's 'Ineligible Volunteer Files' contained a file for Mr. Hacker opened in 1970, yet he was able and permitted by BSA to register with the Chicago Area Council in the 1980s and was able to participate in Scouting."

(d)   "BSA knew or should have known that its 'ineligible volunteers' system of keeping track of pedophiles infiltrating its ranks and attempting to eliminate them did not function as it was intended, was flawed, and in many cases ineffective. . . . BSA did nothing to educate or inform Scouts and their parents of the enormity of the pedophile problem, nor did BSA take action to correct its screening and/or education system."

(e)   "Instead of addressing the problem by informing parents and scouts of the issue, or by implementing safety programs to prevent abuse, BSA instead concealed the problem by employing a public relations department to combat negative stories about sexual abuse in Scouting."

(f)   "After the BOY SCOUTS OF AMERICA learned that Thomas Hacker molested Chicago Area Council scouts, the BOY SCOUTS OF AMERICA concealed the fact, in

TrustApp263

FILED DATE: 9/5/2023 5:46 PM   2017CH14975

the 1970s, it had previously identified Hacker as a child molester and/or abuser but still allowed him to register with the Chicago Area Council."

**ANSWER:**   Admitted.

152.   John Doe-John Doe 18 sought uninsured punitive damages against BSA as a result of its alleged intentional conduct and fraudulent concealment.

**ANSWER:**   Admitted.

153.   BSA moved for summary judgement on the Hacker Claims on the ground they were barred by the statute of limitations. The trial court denied BSA's motion. The appellate court affirmed the trial court's ruling by certified question, holding that fact questions regarding BSA's alleged fraudulent concealment of the claims precluded summary judgment.

**ANSWER:**   Admitted.

154.   Following the appellate court's ruling, BSA settled each of the Hacker Claims prior to its Bankruptcy Case.

**ANSWER:**   Admitted.

**C.   BSA's Violation of the Policies' Assistance and Cooperation, No Voluntary Payment and "No Action" Clauses.**

**1.   The Explosion of Abuse Claims Against BSA in the Bankruptcy.**

155.   On the Petition Date, BSA filed in the Bankruptcy Court a voluntary petition for relief under Chapter 11 of the Bankruptcy Code.

**ANSWER:**   Admitted.

156.   The Bankruptcy Court thereafter set November 16, 2020, as the last day by which individuals who believed they had an Abuse Claim against BSA were required to file a "proof of claim."

**ANSWER:**   Admitted.

TrustApp264

FILED DATE: 9/5/2023 5:46 PM   2017CH14975

157.    As of the Petition Date, BSA faced 275 sexual abuse lawsuits pending in state and federal courts across the country and was aware of an additional approximately 1,400 Abuse Claims that had not yet been filed.

**ANSWER:**    Admitted upon information and belief.

158.    By November 16, 2020, however, over 95,000 proofs of claim had been filed for approximately 82,209 individual alleged Abuse Claims.

**ANSWER:**    Admitted.

159.    This 6,000% increase in pending and anticipated Abuse Claims in just over eight months was the direct result of several related factors.

**ANSWER:**    Admitted upon information and belief.

160.    First, claimant attorneys blanketed the country with an extensive, multi-media marketing campaign designed to solicit as many Abuse Claims as possible. The marketing campaign included a number of statements that the bankruptcy court later found were false and misleading, including that the Abuse Claimants could remain "anonymous," that their recovery would be "ensured" and "substantial," and that they "[would] never have to be deposed, appear in Court or otherwise prove their claims."

**ANSWER:**    Admitted.

161.    Following the Petition Date, BSA itself made several public statements likewise suggesting that individuals who filed Abuse Claims would be guaranteed to receive compensation.

**ANSWER:**    Admitted.

162.    For example, in an "Open Letter to Victims" published on BSA's website and disseminated through media reports, BSA's National Chair Jim Turley apologized to former scouts

TrustApp265

FILED DATE: 9/5/2023 5:46 PM   2017CH14975

for sexual abuse that occurred, admitted that there had been "times in the past" when the organization had "failed the very children we were supposed to protect," and stated that BSA was:

> committed to supporting you and to doing everything in our power to prevent [abuse] from happening to others. It is a social and moral obligation that I and the entire organization take extremely seriously. We believe that all victims should receive our support and compensation – and we have taken decisive action to make that possible.
>
> Specifically, the National Organization of the Boy Scouts of America has initiated a voluntary restructuring to ensure we can equitably compensate all victims of past abuse in our programs, through a proposed Victim's Compensation Trust.
>
> I encourage you, and all victims to come forward and file claims so you can receive compensation from this Trust. We will provide clear notices about how to do so.
>
> I want you to know that *we believe you, we believe in compensating you,* and *we have programs in place to pay for counseling for you and your family* by a provider of choice.

*See*   https://www.bsarestructuring.org/wp-content/uploads/2020/02/BSA_An-Open-Letter-to-Victims.pdf (emphasis in original).

> **ANSWER:**   Admitted.

163.   BSA reiterated its intent to ensure Abuse Claimants received compensation in its bankruptcy filings, stating in its first-day "Informational Brief" that it was "steadfast in its commitment to provide equitable compensation to victims of abuse in its Scouting programs."  As more fully explained below, BSA committed to paying substantially all Abuse Claims through its bankruptcy process even though tens of thousands of the Abuse Claims are not compensable in the tort system, as even one of the leading claimant lawyers has admitted.

> **ANSWER:**   Admitted.

TrustApp266

FILED DATE: 9/5/2023 5:46 PM   2017CH14975

164.    Second, claimant attorneys filed thousands of proofs of claim *en masse* without properly vetting their factual assertions or, in some cases, without speaking to the clients or even reviewing the forms themselves.

**ANSWER:**    Admitted.

165.    The outcome was a litany of absurdities that would not have occurred with Abuse Claims filed in the tort system. Proofs of claim – signed under penalty of perjury – were filed on behalf of Abuse Claimants who were deceased, who did not authorize their filing, or who were not represented by the firm that filed the proof of claim. In some instances, duplicate proofs of claim with inconsistent allegations were filed on behalf of the same Abuse Claimant. Other attorneys signed and filed proofs of claim that were substantially blank.   In a deposition, one of the claimant attorneys claimed not to have signed proofs of claim under penalty of perjury, even though the hundreds he signed personally stated immediately above his signatures that he was signing the document under penalties of perjury.

**ANSWER:**    Admitted upon information and belief.

166.    When these facts came to light through discovery, BSA did nothing. It neither objected to, nor sought to challenge the validity of, any of the proofs of claim. It likewise failed to join in or otherwise support the National Surety Insurers and Other Insurer Parties' objections. BSA instead agreed to and supported approval of a claims distribution procedure designed to maximize the Abuse Claimants' recoveries.

**ANSWER:**    Admitted.

TrustApp267

FILED DATE: 9/5/2023 5:46 PM  2017CH14975

2.      **85% or More of the Abuse Claims Would Not Have Been Filed in the Tort System.**

167.    As a result of the claimant attorneys' strategy, and BSA's acquiescence thereto, tens of thousands of proofs of claim alleging sexual abuse were filed in the Bankruptcy Case that never would have been brought in the tort system.

**ANSWER:**    Admitted upon information and belief.

168.    BSA and other supporters of the Plan acknowledged in bankruptcy proceedings that 65% of the Abuse Claims filed as proofs of claim in the Bankruptcy Case are from states where the statute of limitations or repose renders them untimely. One lawyer who represents several thousand Abuse Claimants admitted publicly that:

> If this bankruptcy doesn't go through and all of the cases go out to the tort system … 58,473 survivors are in states that have closed statutes. Here's what I say to those people, good luck, because you have to overcome a lot to open a case in a closed state. A heck of a lot ….

**ANSWER:**    Admitted.

169.    Moreover, BSA's claims valuation expert, Dr. Charles Bates, acknowledged that approximately 87% of the Abuse Claims alleged abuse by a "single abuser" (*i.e.,* someone who had never been accused of abusing another child), meaning those Abuse Claimants would have considerable difficulty demonstrating that BSA was negligent, likely precluding recovery in the tort system.

**ANSWER:**    Admitted.

170.    Finally, experts for both sides agreed that a significant percentage of the Abuse Claims are likely fraudulent in nature. Dr. Conte, a mental health expert with almost 40 years of experience working with sexual abuse survivors and who was retained by the Official Committee of Tort Claimants (a fiduciary appointed to represent the interests of the Abuse Claimants in the

TrustApp268

FILED DATE: 9/5/2023 5:46 PM   2017CH14975

Bankruptcy Case), testified that he believed a "significant portion" of the 82,000 Abuse Claims filed "are probably not real claims."

> **ANSWER:**   Admitted.

171.    Another practitioner with expertise in forensic investigations of child sexual abuse shared Dr. Conte's concern about "the number of potential fraudulent claimants in the bankruptcy," testifying that she "worr[ied] about those fraudulent cases preventing the real victims from getting the compensation that they deserve."

> **ANSWER:**   Admitted.

172.    Thus, as Dr. Bates concluded, "the vast majority" of the Abuse Claims – or, as he determined, as many as 85% of them – "would not be pursued and not be economically viable in the tort system." According to Dr. Bates, such claims "would receive no compensation … but for a trust set up as part of this bankruptcy proceeding, consistent with the fact that so many of the Abuse Claims were never pursued through litigation."

> **ANSWER:**   Admitted.

**3.      The Trust Distribution Procedures.**

173.    The Plan channels (by way of injunction) all Abuse Claims exclusively to the Settlement Trust, which assumes liability for the claims. This channeling injunction, and the Plan more broadly, thus relieves BSA and certain related entities of further liability for Abuse Claims. In exchange, BSA and the related entities agreed, among other things, to (i) contribute a fixed amount of money to the Settlement Trust and (ii) assign to the Settlement Trust their respective rights to any insurance recovery.  This bargain allowed BSA to retain many valuable real property assets while contributing only a fraction of the Settlement Trust's funding – funding used to pay Abuse Claims at inflated values, including non-compensable Abuse Claims.

TrustApp269

FILED DATE: 9/5/2023 5:46 PM   2017CH14975

**ANSWER:**   Admitted.

174.   The Settlement Trust is required to resolve and administer the channeled Abuse Claims pursuant to the "trust distribution procedures" ("TDPs") annexed to the Plan. The TDPs govern the review, approval, and liquidation of Abuse Claims; the distribution of payments to Abuse Claimants; and assertion by the Settlement Trust of BSA's alleged insurance rights (assigned to the Settlement Trust).

**ANSWER:**   Admitted.

175.   The self-proclaimed architects of the TDPs were the very constituencies who stand to profit from them. As claimant attorneys represented in court and testified to under oath, the TDPs were designed and drafted by claimant attorneys to serve the interests of the Abuse Claimants at the insurers' expense. As one testified, "the pen" for the TDPs was "wielded in the first instance" by certain claimant attorneys, who maintained control of the document throughout their negotiations with BSA.

**ANSWER:**   Admitted.

176.   In the candid words of another, a principal objective of the TDPs was to achieve the "holy grail" that mass tort lawyers have sought for years: a bankruptcy plan providing for claims determinations at inflated values, which "will result in individual awards binding on" insurers and not subject to challenge in subsequent coverage litigation. Indicative of that objective, claimant attorneys pressed for a draft of the TDPs with a provision expressly stating that "determinations of values of approved Settled Claims and Tort Election Claims shall be binding on Insurers."

**ANSWER:**   Admitted.

TrustApp270

FILED DATE: 9/5/2023 5:46 PM    2017CH14975

177.    Rather than rejecting these and similar proposals out of hand, BSA negotiated with a "particular emphasis on reaching a consensus with the Abuse Claimants' Representatives." As the Bankruptcy Court observed, despite BSA's contractual obligation to assist and cooperate with the National Surety Insurers and Other Insurer Parties to minimize BSA's underlying liability, BSA's counsel "negotiate[d] to maximize the value of [BSA's] insurance assets for the benefit of the Settlement Trust and, ultimately, the Abuse Claimants."

**ANSWER:**    Admitted.

178.    To that end, BSA excluded the National Surety Parties and Other Insurer Parties from its negotiations with the claimant attorneys. Then, without the consent of the National Surety Insurers or any Other Insurer Party, and over their strong objections, BSA reached an agreement with the claimant attorneys for a version of draft TDPs that heavily favored Abuse Claimants.

**ANSWER:**    Admitted upon information and belief.

179.    BSA refused to share these draft TDPs with the National Surety Insurers or any Other Insurer Party until June 2021 – almost five months after the claimant attorneys provided BSA with their initial draft of the document. And even then, BSA represented to the insurers that the draft TDPs were "final." Indeed, by the time BSA shared the draft TDPs with its insurers, the document had been circulated for signature among the claimant attorneys and had already been signed and dated by one of them.

**ANSWER:**    Admitted.

180.    BSA sought to actualize its characterization of the TDP draft as final only six days later, at which point it moved the Bankruptcy Court to approve (among other things) the draft TDPs by way of a "Restructuring Support Agreement." This "Restructuring Support Agreement"

TrustApp271

FILED DATE: 9/5/2023 5:46 PM   2017CH14975

was by and between BSA and the claimant attorneys; neither the National Surety Insurers nor any of the Other Insurer Parties were signatories.

**ANSWER:**    Admitted.

181.    Having excluded National Surety Insurers and Other Insurer Parties from its negotiations with the claimant attorneys, BSA ultimately agreed to TDPs and a Plan that fundamentally alter the economic bargain between insurer and insured by seeking to unilaterally strip the insurers of their bargained-for policy rights. The terms to which BSA agreed, without the consent of the National Surety Insurers or Other Insurer Parties, include:

(a)    <u>An assignment of insurance rights in violation of the policies.</u>

**ANSWER:**    Admitted upon information and belief.

182.    Key to the Plan is its "Insurance Assignment." This Insurance Assignment purports to assign and transfer to the Settlement Trust all "rights, claims, benefits, or Causes of Action" with respect to the insurance policies issued not only to BSA, but also to certain related entities – such as local councils and certain "chartered organizations" – which were not debtors before the Bankruptcy Court.

**ANSWER:**    Admitted.

183.    The Insurance Assignment under the Plan, moreover, purports to transfer and assign only the policy *rights* of the insured; it does not assign the policies themselves. Nor does it purport to clearly assign BSA's contractual obligations to its insurers or any of the insurers' rights as stated in the policies.

**ANSWER:**    Admitted.

(b)    <u>Prejudicial claims review and liquidation processes.</u>

TrustApp272

FILED DATE: 9/5/2023 5:46 PM   2017CH14975

184.    The TDPs create three extrajudicial processes for the evaluation and liquidation of Abuse Claims: (i) an "Expedited Distribution" alternative; (ii) evaluation under a claims matrix ("Matrix Evaluation"); and (iii) the "Independent Review Option" ("IRO").

**ANSWER:**    Admitted.

185.    The first process permits Abuse Claimants to obtain a payout of $3,500 (*i.e.*, an "Expedited Distribution") each, with "a minimal level of review." Any Abuse Claimant who (a) signed and timely filed a "substantially completed" proof of claim and (b) selected the Expedited Distribution alternative in accordance with the Plan is eligible. No additional information is required.

**ANSWER:**    Admitted.

186.    Abuse Claimants who do not elect an Expedited Distribution may either submit their claim for a Matrix Evaluation or pursue the IRO, each as described below. Both the Matrix Evaluation and the IRO stack the deck in favor of the Abuse Claimants and against the National Surety Insurers and Other Insurer Parties.

**ANSWER:**    Admitted.

(c)    <u>A Matrix Evaluation that inflates the value of Abuse Claims.</u>

187.    The Matrix Evaluation compels the Settlement Trust to pay Abuse Claims at highly inflated values, without the National Surety Insurers or Other Insurer Parties' participation or consent. It does so by employing a bloated "Claims Matrix" to value Abuse Claims and determine the amount the Settlement Trust will pay. The Claims Matrix consists of six, numerical tiers that delineate types of abuse according to severity, providing a "Base Matrix Value" and "Maximum Matrix Value" for each tier, as follows:

FILED DATE: 9/5/2023 5:46 PM 2017CH14975

| Tier | Type of Abuse | Base Matrix Value | Maximum Matrix Value |
|---|---|---|---|
| 1 | Anal or Vaginal Penetration by Adult Perpetrator – includes anal or vaginal sexual intercourse, anal or vaginal digital penetration, or anal or vaginal penetration with a foreign, inanimate object. | $600,000 | $2,700,000 |
| 2 | Oral Contact by Adult Perpetrator – includes oral sexual intercourse, which means contact between the mouth and penis, the mouth and anus, or the mouth and vulva or vagina.<br><br>Anal or Vaginal Penetration by a Youth Perpetrator – includes anal or vaginal sexual intercourse, anal or vaginal digital penetration with a foreign, inanimate object. | $450,000 | $2,025,000 |
| 3 | Masturbation by Adult Perpetrator – includes touching of the male or female genitals that involves masturbation of the abuser or claimant.<br><br>Oral Contact by a Youth Perpetrator – includes oral sexual intercourse, which means contact between the mouth and penis, the mouth and anus, or the mouth and vulva or vagina. | $300,000 | $1,350,000 |
| 4 | Masturbation by Youth Perpetrator – includes touching of the male or female genitals that involves masturbation of the abuser or claimant.<br><br>Touching of the Sexual or Other Intimate Parts (unclothed) by Adult Perpetrator. | $150,000 | $675,000 |
| 5 | Touching of the Sexual or Other Intimate Parts (unclothed) by a Youth Perpetrator<br><br>Touching of the Sexual or Other Intimate Parts (clothed), regardless of who is touching whom and not including masturbation. | $75,000 | $337,500 |

FILED DATE: 9/5/2023 5:46 PM   2017CH14975

| | | Exploitation for child pornography. | | |
|---|---|---|---|---|
| 6 | | Sexual Abuse – No Touching. Adult Abuse Claims. | $3,500 | $8,500 |

**ANSWER:**   Admitted.

188.    The valuations the Claims Matrix ascribes to Abuse Claims are a significant departure from BSA's pre-bankruptcy estimates. In October 2019 – less than four months before the Petition Date – BSA provided a proposed matrix to claimant attorneys, assigning a valuation range of $400,000 - $1 million for the most severe Abuse Claims and $10,000 - $29,000 for the least. BSA believed these figures accurately reflected its historical settlement values prior to the Bankruptcy Case when Abuse Claims were subject to the adversarial process of the tort system and defended by certain of its insurers.

**ANSWER:**   Admitted upon information and belief.

189.    But once BSA capped its liability for Abuse Claims through the Plan's proposed channeling injunction, it agreed to a Claims Matrix that valued Abuse Claims using far greater amounts—amounts that are highly inflated relative to BSA's pre-bankruptcy abuse claims experience in the tort system. The range of awards in the Claims Matrix for the most severe Abuse Claims, for example, is several times greater than the maximum value BSA previously believed accurately reflected its recent settlement history prior to bankruptcy. Payments for the other designated tiers of abuse were increased by the same or even greater percentages. Indeed, as BSA's Dr. Bates testified, the Settlement Trustee would need to adjust the value of Abuse Claims under the Claims Matrix by as much as 90% to be consistent with BSA's pre-bankruptcy experience in the tort system.

**ANSWER:**   Admitted.

48

FILED DATE: 9/5/2023 5:46 PM   2017CH14975

190.    In addition to its inflationary effect, the Matrix Evaluation permits – and in many circumstances, requires – payment of Abuse Claims for which BSA would not otherwise be liable in the tort system. Among other things:

**ANSWER:**    Admitted.

191.    The Matrix Evaluation authorizes payment of Abuse Claims that are time-barred under applicable law. Rather than prohibiting payment of an Abuse Claim that is beyond the applicable statute of limitations or repose, the TDPs mere direct the Settlement Trustee to decrease the amount payable for such time-barred Abuse Claim. Accordingly, the TDPs will require payment of approximately 58,000 (or more) Abuse Claims for which claimant attorneys admit there would be no recovery – and the claim would never even have been brought – in the tort system.

**ANSWER:**    Admitted.

192.    The Matrix Evaluation does not require Abuse Claimants to prove or even plausibly allege that BSA was negligent. Unlike a plaintiff seeking recovery in the tort system, an Abuse Claimant seeking payment under the TDPs' Matrix Evaluation need only show that BSA "*may* bear responsibility" for the abuse alleged. Every Abuse Claimant who satisfies this undefined, minimal standard, is guaranteed payment, even if BSA is not legally liable for the Abuse Claim. According to BSA's expert, Dr. Bates, such claims could account for the vast majority of all Abuse Claims filed "where the link between the abuser and institutional responsibility is tenuous."

**ANSWER:**    Admitted.

(d)    <u>A Matrix Evaluation that impairs the insurers' rights to participate in the settlement and defense of claims.</u>

193.    The Matrix Evaluation also strips the National Surety Insurers and Other Insurer Parties of their right to investigate and defend against Abuse Claims and/or require that any

49

FILED DATE: 9/5/2023 5:46 PM   2017CH14975

settlements thereof be reasonable by providing that Abuse Claims settled without the insurers' consent are at BSA's own expense.

> **ANSWER:**   Allianz denies that the Matrix Evaluation has the effect of altering Allianz's contractual rights or putative obligations.   Allianz admits the remaining allegations in Paragraph 193.

194.   Under the TDPs, the Settlement Trustee will be solely responsible for reviewing and resolving the Abuse Claims submitted for a Matrix Evaluation. The Matrix Evaluation further grants the Settlement Trustee virtually unfettered discretion to determine, based on limited and ill-defined criteria, whether an Abuse Claim should be allowed, and for what value, based on whatever information the Settlement Trustee deems sufficient or chooses to consider.

> **ANSWER:**   Admitted.

195.   The TDPs do not allow the National Surety Insurers or Other Insurer Parties (or anyone else) the opportunity to marshal or present evidence contesting the merits or value of an Abuse Claim submitted for a Matrix Evaluation, or to seek the adjudication of an Abuse Claim in the tort system.

> **ANSWER:**   Admitted.

196.   The Matrix Evaluation process does not provide a mechanism for the National Surety Insurers or Other Insurer Parties to: investigate the facts of an Abuse Claim through discovery or any other means; seek the dismissal of or otherwise dispute the factual and legal merits of an Abuse Claim; or challenge the amount an Abuse Claimant should be awarded. This stands in stark contrast to the tort system, which affords each of these rights to insurers defending against claims.

> **ANSWER:**   Admitted.

TrustApp277

FILED DATE: 9/5/2023 5:46 PM   2017CH14975

197.    The National Surety Insurers and Other Insurer Parties also have no right to appeal or otherwise seek review of the determinations the Settlement Trustee reaches following a Matrix Evaluation. Abuse Claimants are the only parties afforded the right to appeal the outcome of a Matrix Evaluation.

**ANSWER:**   Allianz denies that the Settlement Trustee's Matrix Evaluation determinations have the effect of altering Allianz's contractual rights or putative obligations.  In addition, Allianz denies that Matrix Evaluation determinations cannot be reviewed by an insurance coverage court, such as this Court.  Allianz admits the remaining allegations in Paragraph 197.

198.    Accordingly, as one BSA witness testified, the TDPs provide for none of the "hallmarks of an adversarial system" through which BSA's policies guarantee its insurers the right to seek an adjudication of claims.

**ANSWER:**   Admitted.

199.    For all of these reasons, the Matrix Evaluation contemplates awards to Abuse Claimants that are not covered under the terms and conditions of the National Surety Insurers' or Other Insurer Parties' policies.

**ANSWER:**   Admitted.

(e)    The IRO and "Document Appendix."

200.    The IRO, an additional claims determination procedure designed by claimant attorneys to maximize their recoveries, is similarly prejudicial.

**ANSWER:**   Admitted.

201.    Under the IRO, a third-party "Neutral" will review certain Abuse Claims and make a recommendation intended to "replicate" what a jury might award in the tort system. The Claims

TrustApp278

FILED DATE: 9/5/2023 5:46 PM    2017CH14975

Matrix – specifically including the $2.7 million maximum allowable award – does not apply to this recommended award.

**ANSWER:**    Admitted.

202.    The Neutral who makes the recommendation is selected by the Settlement Trustee, without any consultation with or consent by the National Surety Insurers or Other Insurer Parties.

**ANSWER:**    Admitted.

203.    If the Settlement Trustee approves the Neutral's recommended award, the value of the Abuse Claim becomes the amount of the award. If the Settlement Trustee does not approve the award, the Abuse Claimant may file suit in court.

**ANSWER:**    Admitted.

204.    Like the Matrix Evaluation, the IRO deprives the National Surety Insurers and Other Insurer Parties of the rights under their policies to associate in the defense and settlement of the Abuse Claims. And as with Abuse Claims reviewed using the Matrix Evaluation, no party is tasked with defending or otherwise challenging the claims under the IRO, or the right to challenge claims in the tort system.

**ANSWER:**    Admitted.

205.    Like the Matrix Valuation, the IRO also deprives the National Surety Insurers and Other Insurer Parties of the right under their policies to consent to the payment of claims for which indemnity under the policies may be sought.

**ANSWER:**    Allianz denies that the Matrix Valuation or the IRO alters Allianz's contractual rights or putative obligations.  Allianz admits the remaining allegations in Paragraph 205.

TrustApp279

FILED DATE: 9/5/2023 5:46 PM   2017CH14975

206.    In fact, the very purpose of the IRO, as the claimant attorneys who designed it candidly admit, is to target the National Surety Insurers' and BSA's other excess insurers with inflated claims values to access additional insurance proceeds. To that end, the claimant attorneys designed the IRO based on what BSA had paid to settle the Hacker Claims, which BSA's underlying defense counsel testified were (i) highly unusual and unlike other pre-bankruptcy claims in terms of severity and (ii) settled for unusually high sums based on the threat of punitive damages, which are not covered by the National Surety Insurers' Policies or those of BSA's other insurers.

**ANSWER:**    Admitted.

207.    As one claimant attorney represented to the Bankruptcy Court, his and another claimants' firm designed and "undertook principal drafting responsibility for" the IRO for the purpose of "increasing the recovery for so-called high value claims" and "optimizing recoverability of excess insurance assets." The IRO is designed to achieve this objective, he explained, by "creat[ing] a mechanism that was not otherwise present to reach layers of excess insurance assets."

**ANSWER:**    Admitted.

208.    In addition to the Matrix Evaluation and IRO, BSA agreed to voluntarily provide the Abuse Claimants with ready access to the evidence they need to support their claims.

**ANSWER:**    Admitted.

209.    This so-called "Document Appendix" to which BSA agreed requires BSA to provide the Settlement Trustee with a trove of documents and information that Abuse Claimants "will likely need to establish the validity and/or amount of their claim in order to obtain compensation under the [TDPs]." The Document Appendix contemplates the provision of all such

TrustApp280

FILED DATE: 9/5/2023 5:46 PM   2017CH14975

information to the claimant attorneys before they finalize their clients' submissions to the Settlement Trust, a significant departure from the pleading and contested discovery norms of the tort system.

**ANSWER:**    Admitted.

210.    The information that the Document Appendix requires be provided to the claimant attorneys includes:

- Rosters maintained by local councils.

- Documents maintained by BSA's National Coordinating Council regarding unresolved Abuse Claims.

- BSA's voluntary screening database relating to sexual abuse in scouting.

- Documents necessary to secure insurance rights.

- Documents regarding registration of perpetrators alleged by the proofs of claims.

**ANSWER:**    Admitted.

211.    The Document Appendix further (a) permits the Settlement Trustee and Abuse Claimants to take broad discovery from BSA's "Chartered Organizations" – community-based organizations that organize and operate scouting activities – under FED. R. BANKR. P. 2004 and any other applicable discovery rules and (b) grants Abuse Claimants the right to take depositions of BSA and local councils. The Abuse Claimants will have access to prior deposition testimony given by any witnesses.

**ANSWER:**    Admitted.

212.    The Document Appendix also requires the Settlement Trustee to create and maintain a document repository to which Abuse Claimants will have access. The Document Appendix provides that the Settlement Trustee "has no authority to refuse to transmit a document

TrustApp281

FILED DATE: 9/5/2023 5:46 PM   2017CH14975

or deposition request from a holder of [an][] Abuse Claim other than as necessary to protect privilege."

**ANSWER:**   Admitted.

213.   These provisions grant claimant attorneys extensive discovery rights before they submit claims to the Settlement Trust, allowing them to mold Abuse Claims to fit the evidence.

**ANSWER:**   Admitted.

214.   The Document Appendix does not afford the National Surety Insurers and Other Insurer Parties any of these same discovery rights.

**ANSWER:**   Admitted.

215.   The National Surety Insurers and Other Insurer Parties did not consent to and, indeed, were not consulted about, the Document Appendix, which is expressly designed to increase their liability and which violates several provisions of the National Surety Insurers' and Other Insurer Parties' insurance policies, such as the duty to assist and cooperate in the defense, investigation and settlement of claims and the insurers' contractual right to access books and records.

**ANSWER:**   Allianz admits that it was not consulted about, not asked to consent to, and did not consent to the Document Appendix.  Allianz admits the remaining allegations in Paragraph 215 upon information and belief.

(f)   Proposed "Insurance Findings" seeking to bind the insurers to claims awards.

216.   In concert with the claimant attorneys' plan to deprive the National Surety Insurers and Other Insurer Parties of their contractual rights and to bind them to inflated claims determinations, BSA proposed to the Bankruptcy Court several findings ("Insurance Findings") to be included in any order confirming the Plan.

FILED DATE: 9/5/2023 5:46 PM   2017CH14975

**ANSWER:**   Admitted.

217.   These included:

- The Plan, TDPs and confirmation order shall be binding on all parties in interest consistent with applicable legal doctrines, including the doctrine of res judicata and collateral estoppel.

- The values of the TDPs are based on and consistent with the Debtors' historical abuse settlements and litigation outcomes.

- The TDPs pertaining to the allowance of Abuse Claims and the criteria pertaining to the calculation of allowed claim amounts, including the Claims Matrix, are appropriate and provide a fair and equitable settlement of Abuse Claims.

- An Abuse Claimant's right to payment is the amount of the Abuse Claim as determined by the TDPs.

- The TDPs and Claims Matrix were proposed in good faith.

**ANSWER:**   Admitted.

218.   The claimant attorneys expressly acknowledged that the Insurance Findings were intended to maximize the National Surety Insurers' and Other Insurer Parties' potential liability for the Abuse Claims.

**ANSWER:**   Admitted.

219.   As the Bankruptcy Court observed, however, the Insurance Findings did not mirror the requirements of the Bankruptcy Code and/or were not required for confirmation of the Plan.

**ANSWER:**   Admitted.

**4.      The Bankruptcy Court's Confirmation Opinion and Order.**

220.   Following a 22-day trial on confirmation of the Plan, the Bankruptcy Court took the matter under advisement. On July 29, 2022, the Bankruptcy Court issued an opinion, declining to confirm the Plan without certain revisions.

**ANSWER:**   Admitted.

TrustApp283

FILED DATE: 9/5/2023 5:46 PM   2017CH14975

221.    The Bankruptcy Court had admonished throughout the proceedings that "no coverage issue is going to be adjudicated" in connection with plan confirmation, and that any coverage defenses the insurers may have arising out of the Plan, the TDPs, or BSA's actions with respect thereto would be preserved for the insurers to raise and a court to decide in future coverage litigation.

**ANSWER:**    Admitted.

222.    To that end, and as a result of the National Surety Insurers' and certain Other Insurer Parties' objections, the Bankruptcy Court refused to enter the disputed Insurance Findings. The Bankruptcy Court recognized that the Insurance Findings were intended "to preclude post-confirmation litigation on the process embodied in the TDP" and its impact on the parties' rights, obligations, and defenses under their respective policies. As the court explained, "[w]hat insurers are obligated to pay under their policies" for claims administered by the Settlement Trust "is an insurance coverage issue that is not before the court."

**ANSWER:**    Admitted.

223.    Although the Bankruptcy Court allowed the assignment of BSA's insurance rights to the Settlement Trust "consistent with applicable state law," it made clear that it was not deciding the "consequences" of that assignment with respect to the National Surety Insurers' and Other Insurer Parties' rights to raise coverage defenses, which the Bankruptcy Court determined is an issue to be decided in insurance coverage litigation where "[e]ach [policy] will need to be interpreted under applicable law in the context of a specific dispute."

**ANSWER:**    Admitted.

224.    Following the Bankruptcy Court's opinion, BSA revised the Plan. The Bankruptcy Court entered a final order confirming the Plan on September 8, 2022.

TrustApp284

FILED DATE: 9/5/2023 5:46 PM   2017CH14975

**ANSWER:**    Admitted.

225.    The United States District Court for the District of Delaware affirmed confirmation of the Plan on March 28, 2023, finding that BSA's insurers "keep the whole gamut of permissible contractual rights under state law."  (District Court Dkt. No. 150 at 76). Confirmation of the Plan currently is on further appeal to the Third Circuit Court of Appeals.

**ANSWER:**    Admitted.

## **FIRST CAUSE OF ACTION**
### **Declaration That No Coverage Exists Because The Injury Alleged By The Hacker Claimants Was Not An "Accident"**

226.    The National Surety Insurers incorporate by reference in this First Cause of Action all allegations of this Amended Complaint, including Exhibits attached hereto.

**ANSWER:**    Allianz incorporates all of its answers to the First Amended Complaint's other allegations in its answer to Paragraph 226.

227.    BSA's[2] Plan purports to assign to the Settlement Trust all "rights, claims, benefits, or Causes of Action" of BSA and certain related entities identified by the plan "under or with respect to" the Policies.

**ANSWER:**    Admitted.

228.    As BSA's successor-in-interest to the Policies, the Settlement Trust stands in BSA's shoes and is subject to the same terms, conditions, obligations, and defenses to coverage thereunder.

**ANSWER:**    Allianz denies that an assignment of BSA's policy rights to the Settlement Trust without an assignment to the Settlement Trust of BSA's corresponding policy duties

---

[2]  As used hereafter in the First Cause of Action – Twenty-Fifth Cause of Action that follow, "BSA" shall include all Local Councils, Chartered Organizations and any other related entities of which the Plan purports to assign the Settlement Trust rights under the Policies.

TrustApp285

FILED DATE: 9/5/2023 5:46 PM   2017CH14975

and obligations is enforceable or legally permissible.   Allianz admits the remaining allegations in Paragraph 228.

229.    An "occurrence" covered under the Policies is defined to require an "accident."

**ANSWER:**    The allegations in Paragraph 229 refer to written documents that speak for themselves, are the best evidence of their contents, and must be read and construed as a whole. Allianz denies any characterization of those documents that is inconsistent with their contents.  Allianz admits the remaining allegations in Paragraph 229.

230.    BSA is alleged to have known, since as early as the 1920s, that large numbers of pedophiles are attracted to scouting, that its members are therefore at high risk for sexual abuse, and that it was certain a significant number of scouts would be sexually abused each year.

**ANSWER:**    Admitted upon information and belief.

231.    BSA is alleged to have concealed thousands or even tens of thousands of incidents of sexual abuse within the organization, and that it knowingly and with deliberate indifference failed to take steps necessary to prevent such abuse from occurring.

**ANSWER:**    Admitted upon information and belief.

232.    BSA also failed to disclose its extensive knowledge of the pedophiles and the sexual abuse of children within its organization when it arranged to purchase insurance from the National Surety Insurers and Other Insurer Parties.

**ANSWER:**    Admitted upon information and belief.

233.    The Hacker Claimants allege that BSA knew Hacker was a pedophile with a history of sexually abusing young boys and, despite this knowledge, permitted, failed to take steps to prevent, and concealed Hacker's abuse.

**ANSWER:**    Admitted.

TrustApp286

FILED DATE: 9/5/2023 5:46 PM   2017CH14975

234.   The Hacker Claimants also were required to prove that BSA had fraudulently concealed their abuse in order to overcome Illinois' statute of limitations applicable to their claims, meaning that they had to prove intentional conduct by BSA in order to establish liability.

**ANSWER:**   Admitted.

235.   The alleged conduct of BSA therefore does not constitute an "accident" within the meaning of the Policies, and as such the injuries that allegedly resulted therefrom do not constitute an "occurrence" for which the Policies provide coverage.

**ANSWER:**   Admitted.

WHEREFORE, Plaintiffs pray for a declaration that no coverage exists under the Policies, and that the National Surety Insurers therefore owe no duty thereunder to indemnify the Settlement Trust for BSA's settlements of the Hacker Claims, because the injuries alleged did not result from an accident for which the Policies provide coverage.

**ANSWER:**   National Surety's "wherefore" clause sets forth no factual allegations to which a response is required.

### SECOND CAUSE OF ACTION
**Declaration That No Coverage Exists For The Hacker Claims
Because The Injury Alleged Was Expected Or Intended**

236.   The National Surety Insurers incorporate by reference in this Second Cause of Action all allegations of this Amended Complaint, including Exhibits attached hereto.

**ANSWER:**   Allianz incorporates all of its answers to the First Amended Complaint's other allegations in its answer to Paragraph 236.

237.   BSA's Plan purports to assign to the Settlement Trust all "rights, claims, benefits, or Causes of Action" of BSA and certain related entities identified by the Plan "under or with respect to" the Policies.

60

FILED DATE: 9/5/2023 5:46 PM   2017CH14975

**ANSWER:**   Admitted.

238.   As BSA's successor-in-interest to the Policies, the Settlement Trust stands in BSA's shoes and is subject to the same terms, conditions, obligations, and defenses to coverage thereunder.

**ANSWER:**   Allianz denies that an assignment of BSA's policy rights to the Settlement Trust without an assignment to the Settlement Trust of BSA's corresponding policy duties and obligations is enforceable or legally permissible.   Allianz admits the remaining allegations in Paragraph 238.

239.   An "occurrence" covered under the Policies does not include injuries that are either expected or intended by the policyholder.

**ANSWER:**   Admitted.

240.   BSA is alleged to have known, since as early as the 1920s, that large numbers of pedophiles are attracted to scouting, that its members are therefore at high risk for sexual abuse, and that it was certain a significant number of scouts would be sexually abused each year.

**ANSWER:**   Admitted upon information and belief.

241.   BSA is alleged to have concealed thousands or even tens of thousands of incidents of sexual abuse within the organization, and that it knowingly and with deliberate indifference failed to take steps necessary to prevent such abuse from occurring.

**ANSWER:**   Admitted upon information and belief.

242.   The Hacker Claimants allege that BSA knew that Hacker was a pedophile with a history of sexually abusing young boys and, despite this knowledge, permitted, failed to take steps to prevent, and concealed Hacker's abuse.

**ANSWER:**   Admitted.

TrustApp288

FILED DATE: 9/5/2023 5:46 PM   2017CH14975

243.   The injuries for which coverage is sought under the Policies were either expected or intended, and therefore do not give rise to an occurrence covered by the Policies.

**ANSWER:**   Admitted.

WHEREFORE, Plaintiffs pray for a declaration that no coverage exists under the Policies, and that the National Surety Insurers therefore owe no duty thereunder to indemnify the Settlement Trust for BSA's settlements of the Hacker Claims, because the underlying injuries alleged were either expected or intended by BSA.

**ANSWER:**   National Surety's "wherefore" clause sets forth no factual allegations to which a response is required.

### THIRD CAUSE OF ACTION
**Declaration That The Policies Only Respond To**
**Hacker Claims Alleging Injury During the Policy Period (Trigger)**

244.   The National Surety Insurers incorporate by reference in this Third Cause of Action all allegations of this Amended Complaint, including Exhibits attached hereto.

**ANSWER:**   Allianz incorporates all of its answers to the First Amended Complaint's other allegations in its answer to Paragraph 244.

245.   BSA's Plan purports to assign to the Settlement Trust all "rights, claims, benefits, or Causes of Action" of BSA and certain related entities identified by the Plan "under or with respect to" the Policies.

**ANSWER:**   Allianz denies that an assignment of BSA's policy rights to the Settlement Trust without an assignment to the Settlement Trust of BSA's corresponding policy duties and obligations is enforceable or legally permissible.   Allianz admits the remaining allegations in Paragraph 245.

TrustApp289

FILED DATE: 9/5/2023 5:46 PM   2017CH14975

246.    As BSA's successor-in-interest to the Policies, the Settlement Trust stands in BSA's shoes and is subject to the same terms, conditions, obligations, and defenses to coverage thereunder.

> **ANSWER:**    Allianz denies that an assignment of BSA's policy rights to the Settlement Trust without an assignment to the Settlement Trust of BSA's corresponding policy duties and obligations is enforceable or legally permissible.   Allianz admits the remaining allegations in Paragraph 246.

247.    The Policies only provide coverage for injury that occurs during the applicable policy period. There is, accordingly, no coverage under the Policies for injury which takes place outside of applicable policy periods.

> **ANSWER:**    The allegations in Paragraph 247 refer to written documents that speak for themselves, are the best evidence of their contents, and must be read and construed as a whole.  Allianz admits the remaining allegations in Paragraph 247.

WHEREFORE, Plaintiffs pray for a declaration that the Policies only respond to and potentially provide coverage for injuries that occurred during the Policies' policy periods, and the National Surety Insurers therefore owe no duty thereunder to indemnify the Settlement Trust for BSA's settlements of the Hacker Claims which allege injuries that did not occur therein.

> **ANSWER:**    National Surety's "wherefore" clause sets forth no factual allegations to which a response is required.

### FOURTH CAUSE OF ACTION
**Declaration That Any Coverage For The Hacker Claims Must Be**
**Allocated Among All Policies Triggered By The Injury Alleged (Allocation)**

248.    The National Surety Insurers incorporate by reference in this Fourth Cause of Action all allegations of this Amended Complaint, including Exhibits attached hereto.

TrustApp290

FILED DATE: 9/5/2023 5:46 PM   2017CH14975

**ANSWER:**   Allianz incorporates all of its answers to the First Amended Complaint's other allegations in its answer to Paragraph 248.

249.   BSA's Plan purports to assign to the Settlement Trust all "rights, claims, benefits, or Causes of Action" of BSA and certain related entities identified by the Plan "under or with respect to" the Policies.

**ANSWER:**   Allianz denies that an assignment of BSA's policy rights to the Settlement Trust without an assignment to the Settlement Trust of BSA's corresponding policy duties and obligations is enforceable or legally permissible.   Allianz admits the remaining allegations in Paragraph 249.

250.   As BSA's successor-in-interest to the Policies, the Settlement Trust stands in BSA's shoes and is subject to the same terms, conditions, obligations, and defenses to coverage thereunder.

**ANSWER:**   Allianz denies that an assignment of BSA's policy rights to the Settlement Trust without an assignment to the Settlement Trust of BSA's corresponding policy duties and obligations is enforceable or legally permissible.   Allianz admits the remaining allegations in Paragraph 250.

251.   The Policies only provide coverage for bodily/personal injury that occurs during the applicable policy period. There is, accordingly, no coverage under the Policies for injury which takes place outside of the applicable policy periods.

**ANSWER:**   The allegations in Paragraph 251 refer to written documents that speak for themselves, are the best evidence of their contents, and must be read and construed as a whole.  Allianz admits the remaining allegations in Paragraph 251.

TrustApp291

FILED DATE: 9/5/2023 5:46 PM    2017CH14975

252.    The Hacker Claimants allege that they suffered bodily/personal injury during multiple policy periods.

**ANSWER:**    Admitted.

253.    Coverage for such claims, if any, must be allocated among all policies in which the injury occurred, including policies issued by now-insolvent insurers and/or any periods for which BSA did not purchase insurance.

**ANSWER:**    Allianz denies that any of the Hacker Claims arises out of an "occurrence" as the Allianz policy issued to BSA defines that term.   Allianz admits the remaining allegations in Paragraph 253.

WHEREFORE, Plaintiffs pray for a declaration that any coverage under the Policies deemed applicable to the Hacker Claims must be allocated among all policies, including insolvent policies and/or periods for which no coverage exists, triggered by the injuries alleged.

**ANSWER:**    National Surety's "wherefore" clause sets forth no factual allegations to which a response is required.

### FIFTH CAUSE OF ACTION
**Declaration That The National Surety Insurers Have No Duty
To Provide Coverage For The Hacker Claims
Until Underlying Insurance Is Horizontally Exhausted**

254.    The National Surety Insurers incorporate by reference in this Fifth Cause of Action all allegations of this Amended Complaint, including Exhibits attached hereto.

**ANSWER:**    Allianz incorporates all of its answers to the First Amended Complaint's other allegations in its answer to Paragraph 254.

255.    BSA's Plan purports to assign to the Settlement Trust all "rights, claims, benefits, or Causes of Action" of BSA and certain related entities identified by the Plan "under or with respect to" the Policies.

TrustApp292

FILED DATE: 9/5/2023 5:46 PM   2017CH14975

**ANSWER:**   Allianz denies that an assignment of BSA's policy rights to the Settlement Trust without an assignment to the Settlement Trust of BSA's corresponding policy duties and obligations is enforceable or legally permissible.   Allianz admits the remaining allegations in Paragraph 255.

256.   As BSA's successor-in-interest to the Policies, the Settlement Trust stands in BSA's shoes and is subject to the same terms, conditions, obligations, and defenses to coverage thereunder.

**ANSWER:**   Allianz denies that an assignment of BSA's policy rights to the Settlement Trust without an assignment to the Settlement Trust of BSA's corresponding policy duties and obligations is enforceable or legally permissible.   Allianz admits the remaining allegations in Paragraph 256.

257.   The Policies are excess policies that respond only when underlying insurance is exhausted.

**ANSWER:**   Admitted.

258.   On information and belief, underlying insurance for each of the policy periods triggered has not been exhausted.

**ANSWER:**   Admitted.

259.   On information and belief, certain insurers that issued coverage underlying the Policies are insolvent. The Policies do not respond until payments are made exhausting such underlying policies.

**ANSWER:**   Admitted.

WHEREFORE, Plaintiffs pray for a declaration that no coverage exists under the Policies, and the National Surety Insurers therefore owe no duty thereunder to indemnify the Settlement

66

TrustApp293

FILED DATE: 9/5/2023 5:46 PM   2017CH14975

Trust for BSA's settlements of the Hacker Claims, unless and until underlying insurance is exhausted.

> **ANSWER:**   National Surety's "wherefore" clause sets forth no factual allegations to which a response is required.

### SIXTH CAUSE OF ACTION
**Declaration Regarding Exhaustion Of
Underlying Per Occurrence Limits (Number of Occurrences)**

260.   The National Surety Insurers incorporate by reference in this Sixth Cause of Action all allegations of this Amended Complaint, including Exhibits attached hereto.

> **ANSWER:**   Allianz incorporates all of its answers to the First Amended Complaint's other allegations in its answer to Paragraph 260.

261.   BSA's Plan purports to assign to the Settlement Trust all "rights, claims, benefits, or Causes of Action" of BSA and certain related entities identified by the Plan "under or with respect to" the Policies.

> **ANSWER:**   Allianz denies that an assignment of BSA's policy rights to the Settlement Trust without an assignment to the Settlement Trust of BSA's corresponding policy duties and obligations is enforceable or legally permissible.   Allianz admits the remaining allegations in Paragraph 261.

262.   As BSA's successor-in-interest to the Policies, the Settlement Trust stands in BSA's shoes and is subject to the same terms, conditions, obligations, and defenses to coverage thereunder.

> **ANSWER:**   Allianz denies that an assignment of BSA's policy rights to the Settlement Trust without an assignment to the Settlement Trust of BSA's corresponding policy duties

TrustApp294

FILED DATE: 9/5/2023 5:46 PM   2017CH14975

and obligations is enforceable or legally permissible.   Allianz admits the remaining allegations in Paragraph 262.

263.    The Policies are excess policies that respond to an occurrence only when the limits of underlying policies for each occurrence have been paid.

**ANSWER:**    Allianz denies that any of the Hacker Claims arise from an "occurrence" as the Allianz policy issued to BSA defines that term.   Allianz admits the remaining allegations in Paragraph 263.

264.    On information and belief, certain insurers that issued coverage underlying the Policies are insolvent. The Policies do not respond until payments are made for each occurrence exhausting the per occurrence limits of such underlying policies.

**ANSWER:**    Allianz denies that any of the Hacker Claims arise from an "occurrence" as the Allianz policy issued to BSA defines that term.   Allianz admits the remaining allegations in Paragraph 264.

WHEREFORE, Plaintiffs pray for a declaration that no coverage exists under the Policies, and it therefore owes no duty thereunder to indemnify the Settlement Trust, unless and until underlying limits for each occurrence are exhausted.

**ANSWER:**    National Surety's "wherefore" clause sets forth no factual allegations to which a response is required.

## SEVENTH CAUSE OF ACTION
### Declaration That There Is No Coverage For Punitive Damages

265.    The National Surety Insurers incorporate by reference in this Seventh Cause of Action all allegations of this Amended Complaint, including Exhibits attached hereto.

**ANSWER:**    Allianz incorporates all of its answers to the First Amended Complaint's other allegations in its answer to Paragraph 265.

68

TrustApp295

FILED DATE: 9/5/2023 5:46 PM   2017CH14975

266.    BSA's Plan purports to assign to the Settlement Trust all "rights, claims, benefits, or Causes of Action" of BSA and certain related entities identified by the Plan "under or with respect to" the Policies.

**ANSWER:**    Allianz denies that an assignment of BSA's policy rights to the Settlement Trust without an assignment to the Settlement Trust of BSA's corresponding policy duties and obligations is enforceable or legally permissible.   Allianz admits the remaining allegations in Paragraph 266.

267.    As BSA's successor-in-interest to the Policies, the Settlement Trust stands in BSA's shoes and is subject to the same terms, conditions, obligations, and defenses to coverage thereunder.

**ANSWER:**    Allianz denies that an assignment of BSA's policy rights to the Settlement Trust without an assignment to the Settlement Trust of BSA's corresponding policy duties and obligations is enforceable or legally permissible.   Allianz admits the remaining allegations in Paragraph 267.

268.    The Hacker Claims sought punitive damages based on BSA's alleged conduct.

**ANSWER:**    Admitted.

269.    Punitive damages are not insurable.

**ANSWER:**    Admitted.

270.    Accordingly, no coverage exists for punitive damages sought by the Hacker Claims, or for those portions of the settlements paid to compensate the Hacker Claimants for their punitive damages claims, and the National Surety Insurers owe no duty to indemnify the Settlement Trust with respect to those amounts.

69

FILED DATE: 9/5/2023 5:46 PM   2017CH14975

**ANSWER:**   Allianz denies that an assignment of BSA's policy rights to the Settlement Trust without an assignment to the Settlement Trust of BSA's corresponding policy duties and obligations is enforceable or legally permissible.   Allianz admits the remaining allegations in Paragraph 270.

WHEREFORE, Plaintiff prays for a declaration that no coverage exists under the Policies, and that the National Surety Insurers owe no duty to indemnify the Settlement Trust, with respect to punitive damages.

**ANSWER:**   National Surety's "wherefore" clause sets forth no factual allegations to which a response is required.

<div align="center">

**EIGHTH CAUSE OF ACTION**
**Declaration That No Coverage Exists For Abuse Claims Paid**
**By The Settlement Trust Because The Injury Alleged Was Not An "Accident"**

</div>

271.   The National Surety Insurers incorporate by reference in this Eighth Cause of Action all allegations of this Amended Complaint, including Exhibits attached hereto.

**ANSWER:**   Allianz incorporates all of its answers to the First Amended Complaint's other allegations in its answer to Paragraph 271.

272.   BSA's Plan purports to assign to the Settlement Trust all "rights, claims, benefits, or Causes of Action" of BSA and certain related entities identified by the Plan "under or with respect to" the Policies.

**ANSWER:**   Allianz denies that an assignment of BSA's policy rights to the Settlement Trust without an assignment to the Settlement Trust of BSA's corresponding policy duties and obligations is enforceable or legally permissible.   Allianz admits the remaining allegations in Paragraph 272.

<div align="center">70</div>

TrustApp297

FILED DATE: 9/5/2023 5:46 PM   2017CH14975

273.    As BSA's successor-in-interest to the Policies, the Settlement Trust stands in BSA's shoes and is subject to the same terms, conditions, obligations, and defenses to coverage thereunder.

**ANSWER:**    Allianz denies that an assignment of BSA's policy rights to the Settlement Trust without an assignment to the Settlement Trust of BSA's corresponding policy duties and obligations is enforceable or legally permissible.    Allianz admits the remaining allegations in Paragraph 273.

274.    An "occurrence" covered under the Policies is defined to require an "accident."

**ANSWER:**    Admitted.

275.    Abuse Claimants allege that BSA has known, since as early as the 1920s, that large numbers of pedophiles are attracted to scouting, that its members are therefore at high risk for sexual abuse, and that it was certain a significant number of scouts would be sexually abused each year.

**ANSWER:**    Admitted.

276.    BSA is alleged to have concealed thousands of incidents of sexual abuse within the organization, and to have knowingly and with deliberate indifference failed to take steps necessary to prevent such abuse from occurring.

**ANSWER:**    Admitted.

277.    The alleged conduct of BSA does not constitute an "accident" within the meaning of the Policies, and therefore does not constitute an "occurrence" for which the Policies provide coverage.

**ANSWER:**    Admitted.

TrustApp298

FILED DATE: 9/5/2023 5:46 PM    2017CH14975

WHEREFORE, Plaintiffs pray for a declaration that no coverage exists under the Policies, and that the National Surety Insurers therefore owe no duty thereunder to indemnify the Settlement Trust for payments to Abuse Claimants, because BSA's alleged conduct was not an accident for which the Policies provide coverage.

**ANSWER:**    National Surety's "wherefore" clause sets forth no factual allegations to which a response is required.

### NINTH CAUSE OF ACTION
**Declaration That No Coverage Exists For The Settlement Trust's Payments Of Abuse Claims Because The Injury Alleged Was Expected Or Intended**

278.    The National Surety Insurers incorporate by reference in this Ninth Cause of Action all allegations of this Amended Complaint, including Exhibits attached hereto.

**ANSWER:**    Allianz incorporates all of its answers to the First Amended Complaint's other allegations in its answer to Paragraph 278.

279.    BSA's Plan purports to assign to the Settlement Trust all "rights, claims, benefits, or Causes of Action" of BSA and certain related entities identified by the Plan "under or with respect to" the Policies.

**ANSWER:**    Allianz denies that an assignment of BSA's policy rights to the Settlement Trust without an assignment to the Settlement Trust of BSA's corresponding policy duties and obligations is enforceable or legally permissible.  Allianz admits the remaining allegations in Paragraph 279.

280.    As BSA's successor-in-interest to the Policies, the Settlement Trust stands in BSA's shoes and is subject to the same terms, conditions, obligations, and defenses to coverage thereunder.

TrustApp299

FILED DATE: 9/5/2023 5:46 PM   2017CH14975

**ANSWER:**   Allianz denies that an assignment of BSA's policy rights to the Settlement Trust without an assignment to the Settlement Trust of BSA's corresponding policy duties and obligations is enforceable or legally permissible.   Allianz admits the remaining allegations in Paragraph 280.

281.   An "occurrence" covered under the Policies does not include injuries that are either expected or intended by the policyholder.

**ANSWER:**   Admitted.

282.   Abuse Claimants allege that BSA has known, since as early as the 1920s, that large numbers of pedophiles are attracted to scouting, that its members are therefore at high risk for sexual abuse, and that it was certain a significant number of scouts would be sexually abused each year.

**ANSWER:**   Admitted.

283.   BSA is alleged to have concealed thousands of incidents of sexual abuse within the organization, and that it knowingly and with deliberate indifference failed to take steps necessary to prevent such abuse from occurring.

**ANSWER:**   Admitted.

284.   The injuries for which coverage is sought under the Policies by the Settlement Trust were either expected or intended, and therefore do not give rise to an occurrence covered by the Policies.

**ANSWER:**   Admitted.

WHEREFORE, Plaintiffs pray for a declaration that no coverage exists under the Policies, and that the National Surety Insurers therefore owe no duty thereunder to indemnify the Settlement

TrustApp300

FILED DATE: 9/5/2023 5:46 PM   2017CH14975

Trust for payments to Abuse Claimants, because the underlying injuries alleged were either expected or intended by BSA.

> **ANSWER:** National Surety's "wherefore" clause sets forth no factual allegations to which a response is required.

## TENTH CAUSE OF ACTION
### Declaration That The Policies Only Respond to Abuse Claims
### Alleging Injuries That Occurred During the Policy Period (Trigger)

285.    The National Surety Insurers incorporate by reference in this Tenth Cause of Action all allegations of this Amended Complaint, including Exhibits attached hereto.

> **ANSWER:** Allianz incorporates all of its answers to the First Amended Complaint's other allegations in its answer to Paragraph 285.

286.    BSA's Plan purports to assign to the Settlement Trust all "rights, claims, benefits, or Causes of Action" of BSA and certain related entities identified by the Plan "under or with respect to" the Policies.

> **ANSWER:** Allianz denies that an assignment of BSA's policy rights to the Settlement Trust without an assignment to the Settlement Trust of BSA's corresponding policy duties and obligations is enforceable or legally permissible.   Allianz admits the remaining allegations in Paragraph 286.

287.    As BSA's successor-in-interest to the Policies, the Settlement Trust stands in BSA's shoes and is subject to the same terms, conditions, obligations, and defenses to coverage thereunder.

> **ANSWER:** Allianz denies that an assignment of BSA's policy rights to the Settlement Trust without an assignment to the Settlement Trust of BSA's corresponding policy duties

TrustApp301

and obligations is enforceable or legally permissible.   Allianz admits the remaining allegations in Paragraph 287.

288.    The Policies only provide coverage for injury that occurs during the applicable policy period.  There is, accordingly, no coverage under the Policies for injury which takes place outside of applicable policy periods.

**ANSWER:**    The allegations in Paragraph 288 are legal conclusions to which no response is required.   To the extent a response is required, Allianz admits the allegations in Paragraph 288.

WHEREFORE, Plaintiffs pray for a declaration that the Policies only respond to and potentially provide coverage for injuries that occurred during the applicable policy periods, and the National Surety Insurers therefore owe no duty thereunder to indemnify the Settlement Trust for Abuse Claims alleging injuries that did not occur during the Policies' policy periods.

**ANSWER:**    National Surety's "wherefore" clause sets forth no factual allegations to which a response is required.

<u>**ELEVENTH CAUSE OF ACTION**</u>
**Declaration That Any Coverage For The Abuse Claims Must**
**Be Allocated Among All Policies Triggered By The Injury Alleged (Allocation)**

289.    The National Surety Insurers incorporate by reference in this Eleventh Cause of Action all allegations of this Amended Complaint, including Exhibits attached hereto.

**ANSWER:**    Allianz incorporates all of its answers to the First Amended Complaint's other allegations in its answer to Paragraph 289.

290.    BSA's Plan purports to assign to the Settlement Trust all "rights, claims, benefits, or Causes of Action" of BSA and certain related entities identified by the Plan "under or with respect to" the Policies.

TrustApp302

FILED DATE: 9/5/2023 5:46 PM   2017CH14975

**ANSWER:**   Allianz denies that an assignment of BSA's policy rights to the Settlement Trust without an assignment to the Settlement Trust of BSA's corresponding policy duties and obligations is enforceable or legally permissible.   Allianz admits the remaining allegations in Paragraph 290.

291.   As BSA's successor-in-interest to the Policies, the Settlement Trust stands in BSA's shoes and is subject to the same terms, conditions, obligations, and defenses to coverage thereunder.

**ANSWER:**   Allianz denies that an assignment of BSA's policy rights to the Settlement Trust without an assignment to the Settlement Trust of BSA's corresponding policy duties and obligations is enforceable or legally permissible.   Allianz admits the remaining allegations in Paragraph 291.

292.   The Policies only provide coverage for bodily/personal injury that occurs during the applicable policy period. There is, accordingly, no coverage under the Policies for injury which takes place outside of the applicable policy periods.

**ANSWER:**   The allegations in Paragraph 292 are legal conclusions to which no response is required. To the extent a response is required, Allianz admits the allegations in Paragraph 292.

293.   Abuse Claimants allege that they suffered bodily/personal injury during multiple policy periods.

**ANSWER:**   Admitted.

294.   Coverage for such claims, if any, must be allocated among all policies in which the injury occurred, including policies issued by now-insolvent insurers and/or any periods for which BSA did not purchase insurance.  In addition, coverage for such claims, if any, must be allocated

TrustApp303

FILED DATE: 9/5/2023 5:46 PM   2017CH14975

to policies underwritten by insurers that settled during the bankruptcy and whose settlement proceeds the Settlement Trust now holds or will hold.

> **ANSWER:**    The allegations in Paragraph 294 are legal conclusions to which no response is required.   To the extent a response is required, Allianz admits the allegations in Paragraph 294.

WHEREFORE, Plaintiffs pray for a declaration that any coverage under the Policies deemed applicable to Abuse Claims must be allocated among all policies, including insolvent policies, periods for which no coverage exists, and/or to the Settlement Trust as respects settled policies, triggered by the injuries alleged.

> **ANSWER:**    National Surety's "wherefore" clause sets forth no factual allegations to which a response is required.

### TWELFTH CAUSE OF ACTION
**Declaration That The National Surety Insurers Have No Duty To Provide Coverage For Abuse Claims Until Underlying Insurance Is Horizontally Exhausted**

295.    The National Surety Insurers incorporate by reference in this Twelfth Cause of Action all allegations of this Amended Complaint, including Exhibits attached hereto.

> **ANSWER:**    Allianz incorporates all of its answers to the First Amended Complaint's other allegations in its answer to Paragraph 295.

296.    BSA's Plan purports to assign to the Settlement Trust all "rights, claims, benefits, or Causes of Action" of BSA and certain related entities identified by the Plan "under or with respect to" the Policies.

> **ANSWER:**    Allianz denies that an assignment of BSA's policy rights to the Settlement Trust without an assignment to the Settlement Trust of BSA's corresponding policy duties

77

FILED DATE: 9/5/2023 5:46 PM   2017CH14975

and obligations is enforceable or legally permissible.   Allianz admits the remaining allegations in Paragraph 296.

297.    As BSA's successor-in-interest to the Policies, the Settlement Trust stands in BSA's shoes and is subject to the same terms, conditions, obligations, and defenses to coverage thereunder.

**ANSWER:**   Allianz denies that an assignment of BSA's policy rights to the Settlement Trust without an assignment to the Settlement Trust of BSA's corresponding policy duties and obligations is enforceable or legally permissible.   Allianz admits the remaining allegations in Paragraph 297.

298.    The Policies are excess policies that respond only when underlying insurance is exhausted.

**ANSWER:**   Admitted.

299.    On information and belief, underlying insurance for each of the policy periods triggered has not been exhausted.

**ANSWER:**   Admitted.

300.    On information and belief, certain insurers that issued coverage underlying the Policies are insolvent. The Policies do not respond until payments are made exhausting such underlying policies.

**ANSWER:**   The allegations in Paragraph 300 are legal conclusions to which no response is required.   To the extent a response is required, Allianz admits the allegations in Paragraph 300.

TrustApp305

FILED DATE: 9/5/2023 5:46 PM   2017CH14975

WHEREFORE, Plaintiffs pray for a declaration that no coverage exists under the Policies, and the National Surety Insurers therefore owe no duty thereunder to indemnify the Settlement Trust for the Abuse Claims, unless and until underlying insurance is exhausted.

**ANSWER:**   National Surety's "wherefore" clause sets forth no factual allegations to which a response is required.

### THIRTEENTH CAUSE OF ACTION
**Declaration Regarding Exhaustion Of
Underlying Per Occurrence Limits (Number of Occurrences)**

301.   The National Surety Insurers incorporate by reference in this Thirteenth Cause of Action all allegations of this Amended Complaint, including Exhibits attached hereto.

**ANSWER:**   Allianz incorporates all of its answers to the First Amended Complaint's other allegations in its answer to Paragraph 301.

302.   BSA's Plan purports to assign to the Settlement Trust all "rights, claims, benefits, or Causes of Action" of BSA and certain related entities identified by the Plan "under or with respect to" the Policies.

**ANSWER:**   Allianz denies that an assignment of BSA's policy rights to the Settlement Trust without an assignment to the Settlement Trust of BSA's corresponding policy duties and obligations is enforceable or legally permissible.   Allianz admits the remaining allegations in Paragraph 302.

303.   As BSA's successor-in-interest to the Policies, the Settlement Trust stands in BSA's shoes and is subject to the same terms, conditions, obligations, and defenses to coverage thereunder.

**ANSWER:**   Allianz denies that an assignment of BSA's policy rights to the Settlement Trust without an assignment to the Settlement Trust of BSA's corresponding policy duties

TrustApp306

FILED DATE: 9/5/2023 5:46 PM   2017CH14975

and obligations is enforceable or legally permissible.   Allianz admits the remaining allegations in Paragraph 303.

304.    The Policies are excess policies that respond to an occurrence only when the limits of underlying policies for each occurrence have been paid.

**ANSWER:**    Admitted.

305.    On information and belief, certain insurers that issued coverage underlying the Policies are insolvent. Other insurers that issued primary insurance policies or other insurance policies to BSA lack aggregate limits, such that those policies pay, if at all, on a per-occurrence basis.

**ANSWER:**    Admitted.

306.    Accordingly, the Policies do not respond, if at all, until payments are made for each occurrence exhausting the per occurrence limits of all such underlying policies.

**ANSWER:**    The allegations in Paragraph 306 are legal conclusions to which no response is required.   To the extent a response is required, Allianz admits the allegations in Paragraph 306.

WHEREFORE, Plaintiffs pray for a declaration that no coverage exists under the Policies, and it therefore owes no duty thereunder to indemnify the Settlement Trust, unless and until underlying limits for each occurrence are exhausted.

**ANSWER:**    National Surety's "wherefore" clause sets forth no factual allegations to which a response is required.

TrustApp307

FILED DATE: 9/5/2023 5:46 PM   2017CH14975

**FOURTEENTH CAUSE OF ACTION**
**Declaration That All Self-Insured Retentions**
**Must Be Paid Before The Policies Are Required to Respond**

307.    The National Surety Insurers incorporate by reference in this Fourteenth Cause of Action all allegations of this Amended Complaint, including Exhibits attached hereto.

**ANSWER:**    Allianz incorporates all of its answers to the First Amended Complaint's other allegations in its answer to Paragraph 307.

308.    BSA's Chapter 11 Plan of Reorganization purports to assign to the Settlement Trust all "rights, claims, benefits, or Causes of Action" of BSA and certain related entities identified by the Plan "under or with respect to" the Policies.

**ANSWER:**    Allianz denies that an assignment of BSA's policy rights to the Settlement Trust without an assignment to the Settlement Trust of BSA's corresponding policy duties and obligations is enforceable or legally permissible.  Allianz admits the remaining allegations in Paragraph 308 upon information and belief.

309.    As BSA's successor-in-interest to the Policies, the Settlement Trust stands in BSA's shoes and is subject to the same terms, conditions, obligations, and defenses to coverage thereunder.

**ANSWER:**    Allianz denies that an assignment of BSA's policy rights to the Settlement Trust without an assignment to the Settlement Trust of BSA's corresponding policy duties and obligations is enforceable or legally permissible.  Allianz admits the remaining allegations in Paragraph 309.

310.    The Policies are excess policies that respond only when the limits of underlying policies have been paid.

**ANSWER:**    Admitted.

TrustApp308

FILED DATE: 9/5/2023 5:46 PM   2017CH14975

311.    Several policies underlying certain of the Policies issued by the National Surety Insurers include self-insured retentions per each occurrence.

**ANSWER:**    Admitted upon information and belief.

312.    A self-insured retention is a dollar amount the policyholder must pay for each occurrence before the policy is required to respond.

**ANSWER:**    Admitted.

313.    The Policies do not respond until payments are made for each occurrence exhausting the self-insured retentions of underlying policies.

**ANSWER:**    Allianz denies that any of the Abuse Claims arose from an occurrence. Allianz admits the remaining allegations in Paragraph 313.

WHEREFORE, Plaintiffs pray for a declaration that no coverage exists under the Policies, and the National Surety Insurers therefore owe no duty thereunder to indemnify the Settlement Trust, unless and until all self-insured retentions underlying the Policies are paid.

**ANSWER:**    National Surety's "wherefore" clause sets forth no factual allegations to which a response is required.

<div align="center">

**FIFTEENTH CAUSE OF ACTION**
**Declaration Regarding Violation Of The**
**Policies' Assistance And Cooperation Requirements And**
**The National Surety Insurers' Right To Associate In The Defense of Claims.**

</div>

314.    The National Surety Insurers incorporate by reference in this Fifteenth Cause of Action all allegations of this Amended Complaint, including Exhibits attached hereto.

**ANSWER:**    Allianz incorporates all of its answers to the First Amended Complaint's other allegations in its answer to Paragraph 314.

TrustApp309

FILED DATE: 9/5/2023 5:46 PM   2017CH14975

315.    BSA's Plan purports to assign to the Settlement Trust all "rights, claims, benefits, or Causes of Action" of BSA and certain related entities identified by the Plan "under or with respect to" the Policies.

> **ANSWER:**    Allianz denies that an assignment of BSA's policy rights to the Settlement Trust without an assignment to the Settlement Trust of BSA's corresponding policy duties and obligations is enforceable or legally permissible.   Allianz admits the remaining allegations in Paragraph 315.

316.    As BSA's successor-in-interest to the Policies, the Settlement Trust stands in BSA's shoes and is subject to the same terms, conditions, obligations, and defenses to coverage thereunder.

> **ANSWER:**    Allianz denies that an assignment of BSA's policy rights to the Settlement Trust without an assignment to the Settlement Trust of BSA's corresponding policy duties and obligations is enforceable or legally permissible.   Allianz admits the remaining allegations in Paragraph 316.

317.    As a condition of coverage thereunder, the Policies grant the National Surety Insurers the right to associate with BSA and participate in the defense and settlement of claims for which indemnity under the Policies may be sought.

> **ANSWER:**    Admitted upon information and belief.

318.    As a condition of coverage thereunder, the Policies require BSA to cooperate with and assist the National Surety Insurers in the defense and settlement of claims.

> **ANSWER:**    Admitted upon information and belief.

319.    BSA violated obligations it owed the National Surety Insurers under the Policies by, among other things: (i) failing to cooperate with and assist the National Surety Insurers and

TrustApp310

FILED DATE: 9/5/2023 5:46 PM   2017CH14975

Other Insurer Parties' efforts to defend against and minimize BSA's and/or the Settlement Trust's liability for Abuse Claims; (ii) agreeing to procedures, including the Matrix Evaluation, the IRO and the Document Appendix, for resolving claims that deprive the National Surety Insurers of its right to associate with the defense of claims; (iii) agreeing to pay Abuse Claims without the National Surety Insurers' consent; (iv) agreeing to the payment of Abuse Claims for unreasonable claims values; (v) agreeing to the payment of Abuse Claims for which BSA has or would have no legal liability; and (vi) agreeing to procedures for paying Abuse Claims that were intended and designed to increase the National Surety Insurers and Other Insurer Parties' potential coverage liability.

   **ANSWER:** Admitted.

   WHEREFORE, Plaintiffs pray for a declaration that there is no coverage under the policies, and the National Surety Insurers therefore owe no duty to indemnify the Settlement Trust, due to BSA's and the Settlement Trust's violation of BSA's duties of cooperation and assistance and the National Surety Insurer's right to associate with the defense of the Abuse Claims.

   **ANSWER:** National Surety's "wherefore" clause sets forth no factual allegations to which a response is required.

<div align="center">

**SIXTEENTH CAUSE OF ACTION**
**Declaration Of No Coverage For Voluntary Payments**
**To Which The National Surety Insurers Did Not Consent**

</div>

   320. The National Surety Insurers incorporate by reference in this Sixteenth Cause of Action all allegations of this Amended Complaint, including Exhibits hereto.

   **ANSWER:** Allianz incorporates all of its answers to the First Amended Complaint's other allegations in its answer to Paragraph 320.

<div align="center">84</div>

FILED DATE: 9/5/2023 5:46 PM   2017CH14975

321.   Certain of the Abuse Claims allege abuse for which BSA and/or the Settlement Trust had or has no underlying legal obligation to pay – including, but not limited to, claims barred by applicable statutes of limitations or repose.

**ANSWER:**   Admitted.

322.   The Policies provide, *e.g.*, that BSA shall not, except at its own expense, voluntarily make any payment, assume any obligation, or incur any expense without the National Surety Insurers' consent.

**ANSWER:**   The allegations in Paragraph 322 refer to written documents that speak for themselves, are the best evidence of their contents, and must be read and construed as a whole.  Allianz admits the remaining allegations in Paragraph 322.

323.   The Plan provides for payments to Abuse Claimants, from the Settlement Trust, for claims that BSA had or would have no legal obligation to pay.

**ANSWER:**   Admitted.

324.   The National Surety Insurers did not consent to such payments and any such payments would not be reasonable.

**ANSWER:**   Admitted upon information and belief.

325.   Under the Policies, coverage is not available for such Abuse Claims.

**ANSWER:**   The allegations in Paragraph 325 are legal conclusions to which no response is required.   To the extent a response is required, Allianz admits the allegations in Paragraph 325.

WHEREFORE, Plaintiffs pray for a declaration that no coverage exists under the Policies, and the National Surety Insurers therefore have no duty to indemnify the Settlement Trust, for

TrustApp312

FILED DATE: 9/5/2023 5:46 PM   2017CH14975

claims paid by the Settlement Trust for which BSA had or would not have had any legal obligation to pay.

> **ANSWER:**   National Surety's "wherefore" clause sets forth no factual allegations to which a response is required.

## SEVENTEENTH CAUSE OF ACTION
### Declaration That The National Surety Insurers Have No Duty To Indemnify The Settlement Trust Because Payments Under The TDPs Are Not Losses Covered By The Policies

326.   The National Surety Insurers incorporate by reference in this Seventeenth Cause of Action all allegations of this Amended Complaint, including Exhibits hereto.

> **ANSWER:**   Allianz incorporates all of its answers to the First Amended Complaint's other allegations in its answer to Paragraph 326.

327.   BSA's Plan purports to assign to the Settlement Trust all "rights, claims, benefits, or Causes of Action" of BSA and certain related entities identified by the Plan "under or with respect to" the Policies.

> **ANSWER:**   Allianz denies that an assignment of BSA's policy rights to the Settlement Trust without an assignment to the Settlement Trust of BSA's corresponding policy duties and obligations is enforceable or legally permissible.   Allianz admits the remaining allegations in Paragraph 327.

328.   As BSA's successor-in-interest to the Policies, the Settlement Trust stands in BSA's shoes and is subject to the same terms, conditions, obligations, and defenses to coverage thereunder.

> **ANSWER:**   Allianz denies that an assignment of BSA's policy rights to the Settlement Trust without an assignment to the Settlement Trust of BSA's corresponding policy duties

TrustApp313

FILED DATE: 9/5/2023 5:46 PM   2017CH14975

and obligations is enforceable or legally permissible.  Allianz admits the remaining allegations in Paragraph 328.

329.    The Policies provide that the National Surety Insurers' liability under the Policies is limited, *inter alia*, to final judgments rendered against BSA following an actual trial, or for settlements pursuant to a written agreement between BSA and a claimant to which the National Surety Insurers consented.

**ANSWER:**    The allegations in Paragraph 329 refer to written documents that speak for themselves, are the best evidence of their contents, and must be read and construed as a whole.  Allianz admits the remaining allegations in Paragraph 329.

330.    Claims determinations made by the Settlement Trustee are not final judgments rendered against BSA following an actual trial.

**ANSWER:**    Admitted.

331.    Claims determinations made by the Settlement Trustee are not settlements to which the National Surety Insurers' consented and under the terms of the Plan are not reasonable.

**ANSWER:**    The allegations in Paragraph 331 presuppose future events or outcomes and, therefore, are not allegations of fact to which a response is required.  To the extent a response is required, Allianz admits the allegations in Paragraph 331.

WHEREFORE, Plaintiffs pray for a declaration that claims determinations made by the Settlement Trustee and/or payments to Abuse Claimants are not final judgments or settlement agreements covered by the Policies, and therefore the National Surety Insurers owe no duty to indemnify the Settlement Trust for such payments or claims determinations.

**ANSWER:**    National Surety's "wherefore" clause sets forth no factual allegations to which a response is required.

TrustApp314

**EIGHTEENTH CAUSE OF ACTION**
**Declaration That Coverage Is Not Available**
**For Claims Resolved for Unreasonable Values**

332.    The National Surety Insurers incorporate by reference in this Eighteenth Cause of Action all allegations in this Complaint, including Exhibits attached hereto.

**ANSWER:**   Allianz incorporates all of its answers to the First Amended Complaint's other allegations in its answer to Paragraph 332.

333.    BSA's Plan purports to assign to the Settlement Trust all "rights, claims, benefits, or Causes of Action" of BSA and certain related entities identified by the Plan "under or with respect to" the Policies.

**ANSWER:**   Allianz denies that an assignment of BSA's policy rights to the Settlement Trust without an assignment to the Settlement Trust of BSA's corresponding policy duties and obligations is enforceable or legally permissible.   Allianz admits the remaining allegations in Paragraph 333.

334.    As BSA's successor-in-interest to the Policies, the Settlement Trust stands in BSA's shoes and is subject to the same terms, conditions, obligations, and defenses to coverage thereunder.

**ANSWER:**   Allianz denies that an assignment of BSA's policy rights to the Settlement Trust without an assignment to the Settlement Trust of BSA's corresponding policy duties and obligations is enforceable or legally permissible.   Allianz admits the remaining allegations in Paragraph 334.

335.    As set forth in the TDPs and accompanying Claims Matrix, the Settlement Trust contemplates paying Abuse Claims (i) for which BSA has or would have no legal liability or (ii) for values that far exceed reasonable values that BSA settled for and/or insurers paid similar claims

FILED DATE: 9/5/2023 5:46 PM   2017CH14975

88

TrustApp315

FILED DATE: 9/5/2023 5:46 PM   2017CH14975

prior to BSA's bankruptcy. As BSA's own expert Dr. Bates testified, the Claims Matrix to which BSA agreed exceed its historical settlement values in the tort system by as much as 90%.

**ANSWER:**   Admitted.

336.   The National Surety Insurers did not agree to the claims values contemplated by the TDPs and Claims Matrix under which the Settlement Trustee will pay Abuse Claims.

**ANSWER:**   Admitted upon information and belief.

337.   The National Surety Insurers have no obligation under the Policies to indemnify BSA or the Settlement Trust for unreasonable settlements or other payments made without the National Surety Insurers' consent.

**ANSWER:**   The allegations in Paragraph 337 are legal conclusions to which no response is required. To the extent a response is required, Allianz admits the allegations in Paragraph 337.

WHEREFORE, Plaintiffs pray for a declaration that no coverage exists, and the National Surety Insurers therefore owe no duty to indemnify the Settlement Trust, for payments to Abuse Claimants that are unreasonable.

**ANSWER:**   National Surety's "wherefore" clause sets forth no factual allegations to which a response is required.

### NINETEENTH CAUSE OF ACTION
**Declaration of No Coverage Because BSA Failed To Give Any or Timely Notice of Claims or Occurrences**

338.   The National Surety Insurers incorporate by reference in this Nineteenth Cause of Action all allegations of this Amended Complaint, including Exhibits hereto.

**ANSWER:**   Allianz incorporates all of its answers to the First Amended Complaint's other allegations in its answer to Paragraph 338.

TrustApp316

FILED DATE: 9/5/2023 5:46 PM    2017CH14975

339.    BSA's Plan purports to assign to the Settlement Trust all "rights, claims, benefits, or Causes of Action" of BSA and certain related entities identified by the Plan "under or with respect to" the Policies.

**ANSWER:**    Allianz denies that an assignment of BSA's policy rights to the Settlement Trust without an assignment to the Settlement Trust of BSA's corresponding policy duties and obligations is enforceable or legally permissible.    Allianz admits the remaining allegations in Paragraph 339.

340.    As BSA's successor-in-interest to the Policies, the Settlement Trust stands in BSA's shoes and is subject to the same terms, conditions, obligations, and defenses to coverage thereunder.

**ANSWER:**    Allianz denies that an assignment of BSA's policy rights to the Settlement Trust without an assignment to the Settlement Trust of BSA's corresponding policy duties and obligations is enforceable or legally permissible.    Allianz admits the remaining allegations in Paragraph 340.

341.    The Policies provide, *e.g.*, that BSA must "immediately advise" the National Surety Insurers of any claim or occurrence that may result in liability.

**ANSWER:**    The allegations in Paragraph 341 refer to written documents that speak for themselves, are the best evidence of their contents, and must be read and construed as a whole.    Allianz admits the remaining allegations of Paragraph 341 upon information and belief.

342.    The majority of claims for which the Settlement Trust intends to seek indemnity from the National Surety Insurers allege abuse that in many cases happened decades ago.

**ANSWER:**    Admitted upon information and belief.

90

TrustApp317

FILED DATE: 9/5/2023 5:46 PM   2017CH14975

343.    BSA was aware and had knowledge of thousands of claims and occurrences of sexual abuse potentially resulting in liability since as early as the 1920s.

**ANSWER:**    Admitted upon information and belief.

344.    BSA failed to give the National Surety Insurers notice of the occurrences and/or claims.

**ANSWER:**    Allianz lacks sufficient information to form a belief as to the truth of the allegations in Paragraph 344 and, therefore, denies them.

WHEREFORE, Plaintiffs pray for a declaration that there is no coverage under the Policies, and the National Surety Insurers therefore owe no duty thereunder to indemnify the Settlement Trust, for any claim or occurrence of sexual abuse of which BSA did not give the National Surety Insurers timely notice.

**ANSWER:**    National Surety's "wherefore" clause sets forth no factual allegations to which a response is required.

### TWENTIETH CAUSE OF ACTION
**Declaration Regarding Policies' No Action Clause**

345.    The National Surety Insurers incorporate by reference in this Twentieth Cause of Action all allegations of this Amended Complaint, including Exhibits hereto.

**ANSWER:**    Allianz incorporates all of its answers to the First Amended Complaint's other allegations in its answer to Paragraph 345.

346.    BSA's Plan purports to assign to the Settlement Trust all "rights, claims, benefits, or Causes of Action" of BSA and certain related entities identified by the Plan "under or with respect to" the Policies.

**ANSWER:**    Allianz denies that an assignment of BSA's policy rights to the Settlement Trust without an assignment to the Settlement Trust of BSA's corresponding policy duties

TrustApp318

and obligations is enforceable or legally permissible.   Allianz admits the remaining allegations in Paragraph 346.

347.   As BSA's successor-in-interest to the Policies, the Settlement Trust stands in BSA's shoes and is subject to the same terms, conditions, obligations, and defenses to coverage thereunder.

**ANSWER:**   Allianz denies that an assignment of BSA's policy rights to the Settlement Trust without an assignment to the Settlement Trust of BSA's corresponding policy duties and obligations is enforceable or legally permissible.   Allianz admits the remaining allegations in Paragraph 347.

348.   The Policies state that no action for coverage may lie against the National Surety Insurers with respect to an occurrence unless, as a condition precedent thereto, BSA has fully complied with all terms and conditions of the Policies.

**ANSWER:**   The allegations in Paragraph 348 refer to written documents that speak for themselves, are the best evidence of their contents, and must be read and construed as a whole. Allianz admits the remaining allegations of Paragraph 348 upon information and belief.

349.   The procedures to which BSA agreed, without the National Surety Insurers' and Other Insurer Parties' consent, under which the Settlement Trustee is required to pay Abuse Claims, including the Matrix Evaluation, the IRO, and the Document Appendix, do not comply with the terms and conditions of the Policies.

**ANSWER:**   Admitted.

350.   For each and all of the reasons described herein, BSA failed to comply with all terms and conditions of the Policies.

TrustApp319

FILED DATE: 9/5/2023 5:46 PM   2017CH14975

**ANSWER:**   Admitted.

351.   Accordingly, BSA and/or the Settlement Trust have failed to satisfy a necessary and material condition precedent to coverage under the Policies.

**ANSWER:**   Admitted.

WHEREFORE, Plaintiffs pray for a declaration that there is no coverage under the Policies, and the National Surety Insurers therefore owe no duty thereunder to indemnify the Settlement Trust, because any payments made by the Settlement Trust will not comply with the terms and conditions of the Policies.

**ANSWER:**   National Surety's "wherefore" clause sets forth no factual allegations to which a response is required.

<div align="center">

**TWENTY-FIRST CAUSE OF ACTION**
**Declaration That Coverage Is Not Available Because Of BSA's Failure To**
**Disclose Known Or Anticipated Liabilities For Sexual Abuse Claims**
**During The Underwriting Of The Policies**

</div>

352.   The National Surety Insurers incorporate by reference in this Twenty-first Cause of Action all allegations of this Amended Complaint, including Exhibits hereto.

**ANSWER:**   Allianz incorporates all of its answers to the First Amended Complaint's other allegations in its answer to Paragraph 352.

353.   BSA's Plan purports to assign to the Settlement Trust all "rights, claims, benefits, or Causes of Action" of BSA and certain related entities identified by the Plan "under or with respect to" the Policies.

**ANSWER:**   Allianz denies that an assignment of BSA's policy rights to the Settlement Trust without an assignment to the Settlement Trust of BSA's corresponding policy duties and obligations is enforceable or legally permissible.   Allianz admits the remaining allegations in Paragraph 353.

TrustApp320

FILED DATE: 9/5/2023 5:46 PM   2017CH14975

354.    As BSA's successor-in-interest to the Policies, the Settlement Trust stands in BSA's shoes and is subject to the same terms, conditions, obligations, and defenses to coverage thereunder.

**ANSWER:**    Allianz denies that an assignment of BSA's policy rights to the Settlement Trust without an assignment to the Settlement Trust of BSA's corresponding policy duties and obligations is enforceable or legally permissible.   Allianz admits the remaining allegations in Paragraph 354.

355.    As an insured, BSA was required to disclose known or expected liabilities in connection with its application for coverage under the Policies.

**ANSWER:**    Admitted.

356.    BSA was aware and had knowledge of thousands of occurrences of sexual abuse potentially resulting in liability since as early as the 1920s.

**ANSWER:**    Allianz denies that any of the Abuse Claims arose from an occurrence as the Allianz policy issued to BSA defines that term.   Allianz admits the remaining allegations in Paragraph 356 upon information and belief.

357.    At the time BSA first applied for coverage from National Surety in 1983, incidents of sexual abuse within the organization were being reported to BSA at an average rate of one incident every three days.

**ANSWER:**    Allianz admits the allegations in Paragraph 357 upon information and belief.

358.    Records documenting reports of sexual abuse and the perpetrators involved were maintained by BSA beginning no later than the early 1920s. By the early 1980s, BSA had

TrustApp321

FILED DATE: 9/5/2023 5:46 PM   2017CH14975

documented and maintained records of thousands of incidents of sexual abuse committed by adult scout leaders and volunteers.

> **ANSWER:**   Allianz admits the allegations in Paragraph 358 upon information and belief.

359.   BSA concealed its knowledge of sexual abuse within the organization from the authorities, parents, Congress, the public, and its insurers.

> **ANSWER:**   Allianz admits the allegations in Paragraph 359 upon information and belief.

360.   BSA did not disclose and/or misrepresented to the National Surety Insurers BSA's known or expected liability for sexual abuse when it applied for insurance from the National Surety Insurers, and thus misrepresented to the National Surety Insurers the nature and extent of the potential liabilities for which it was seeking coverage.

> **ANSWER:**   Allianz admits the allegations in Paragraph 360 upon information and belief.

WHEREFORE, Plaintiffs pray for a declaration that there is no coverage under the Policies, and the National Surety Insurers therefore owe no duty thereunder to indemnify the Settlement Trust, because of material misrepresentations BSA made to the National Surety Insurers in connection with the application for and underwriting of coverage under the Policies.

> **ANSWER:**   National Surety's "wherefore" clause sets forth no factual allegations to which a response is required.

TrustApp322

FILED DATE: 9/5/2023 5:46 PM   2017CH14975

**TWENTY-SECOND CAUSE OF ACTION**
**Declaration That The National Surety Insurers Have**
**No Duty To Indemnify Settlement Trust For Administrative Expenses**

361.    The National Surety Insurers incorporate by reference in this Twenty-second Cause of Action all allegations of this Amended Complaint, including Exhibits hereto.

**ANSWER:**    Allianz incorporates all of its answers to the First Amended Complaint's other allegations in its answer to Paragraph 361.

362.    BSA's Plan purports to assign to the Settlement Trust all "rights, claims, benefits, or Causes of Action" of BSA and certain related entities identified by the Plan "under or with respect to" the Policies.

**ANSWER:**    Allianz denies that an assignment of BSA's policy rights to the Settlement Trust without an assignment to the Settlement Trust of BSA's corresponding policy duties and obligations is enforceable or legally permissible.   Allianz admits the remaining allegations in Paragraph 362.

363.    As BSA's successor-in-interest to the Policies, the Settlement Trust stands in BSA's shoes and is subject to the same terms, conditions, obligations, and defenses to coverage thereunder.

**ANSWER:**    Allianz denies that an assignment of BSA's policy rights to the Settlement Trust without an assignment to the Settlement Trust of BSA's corresponding policy duties and obligations is enforceable or legally permissible.   Allianz admits the remaining allegations in Paragraph 363.

364.    The Policies do not provide for a duty to defend.  BSA's right to indemnity under the Policies may in certain circumstances include reimbursement of costs that, with the National Surety Insurers' consent, are incurred in the defense and settlement of claims.

TrustApp323

FILED DATE: 9/5/2023 5:46 PM   2017CH14975

**ANSWER:**   The allegations in Paragraph 364 refer to written documents that speak for themselves, are the best evidence of their contents, and must be read and construed as a whole.  Allianz admits the remaining allegations in Paragraph 364 upon information and belief.

365.    The Policies provide that reimbursable costs shall not include salaries and expenses of the insured's employees incurred in investigation, adjustment, and/or litigation of claims.

**ANSWER:**   The allegations in Paragraph 365 refer to written documents that speak for themselves, are the best evidence of their contents, and must be read and construed as a whole.  Allianz admits the remaining allegations in Paragraph 365 upon information and belief.

366.    Costs and expenses that are incurred by the Settlement Trust in processing, administering, and liquidating claims are not expenses for which the National Surety Insurers are responsible under the Policies, nor did the National Surety Insurers consent to such expenses.

**ANSWER:**   The allegations in Paragraph 366 refer to written documents that speak for themselves, are the best evidence of their contents, and must be read and construed as a whole.  Allianz admits the remaining allegations in Paragraph 366 upon information and belief.

WHEREFORE, Plaintiffs pray for a declaration that there is no coverage under the Policies, and the National Surety Insurers therefore owe no duty to indemnify the Settlement Trust, for costs and expenses incurred by the Settlement Trust.

**ANSWER:**   National Surety's "wherefore" clause sets forth no factual allegations to which a response is required.

TrustApp324

FILED DATE: 9/5/2023 5:46 PM   2017CH14975

## TWENTY-THIRD CAUSE OF ACTION
### Declaration That There Is No Coverage For Punitive Damages

367.    The National Surety Insurers incorporate by reference in this Twenty-third Cause of Action all allegations of this Amended Complaint, including Exhibits attached hereto.

**ANSWER:**    Allianz incorporates all of its answers to the First Amended Complaint's other allegations in its answer to Paragraph 367.

368.    BSA's Plan purports to assign to the Settlement Trust all "rights, claims, benefits, or Causes of Action" of BSA and certain related entities identified by the Plan "under or with respect to" the Policies.

**ANSWER:**    Allianz denies that an assignment of BSA's policy rights to the Settlement Trust without an assignment to the Settlement Trust of BSA's corresponding policy duties and obligations is enforceable or legally permissible.   Allianz admits the remaining allegations in Paragraph 368.

369.    As BSA's successor-in-interest to the Policies, the Settlement Trust stands in BSA's shoes and is subject to the same terms, conditions, obligations, and defenses to coverage thereunder.

**ANSWER:**    Allianz denies that an assignment of BSA's policy rights to the Settlement Trust without an assignment to the Settlement Trust of BSA's corresponding policy duties and obligations is enforceable or legally permissible.   Allianz admits the remaining allegations in Paragraph 369.

370.    The TDPs Claims Matrix assigns values to Abuse Claims to be paid by the Settlement Trust in part based on BSA's alleged knowing, willful or intentional misconduct that formed the basis for prepetition claims for punitive and/or exemplary damages against BSA.

**ANSWER:**    Admitted.

98

FILED DATE: 9/5/2023 5:46 PM   2017CH14975

371.    The Policies expressly exclude coverage for punitive and/or exemplary damages are not insurable.

**ANSWER:**    Admitted upon information and belief.

372.    Accordingly, no coverage exists for any portion of an Abuse Claim paid by the Settlement Trust that represents an amount paid for punitive and/or exemplary punitive damages, and the National Surety Insurers owe no duty to indemnify the Settlement Trust with respect to those amounts.

**ANSWER:**    Admitted upon information and belief.

WHEREFORE, Plaintiff prays for a declaration that no coverage exists under the Policies, and that the National Surety Insurers owe no duty to indemnify the Settlement Trust with respect to, the amount of any Abuse Claim paid for punitive damages.

**ANSWER:**    National Surety's "wherefore" clause sets forth no factual allegations to which a response is required.

### TWENTY-FOURTH CAUSE OF ACTION
**Declaration Of No Coverage For Losses Attributable
To Parties Who Are Not Insureds Under The Policies**

373.    The National Surety Insurers incorporate by reference in this Twenty-fourth Cause of Action all allegations of this Amended Complaint, including Exhibits hereto.

**ANSWER:**    Allianz incorporates all of its answers to the First Amended Complaint's other allegations in its answer to Paragraph 373.

374.    BSA's Plan purports to assign to the Settlement Trust all "rights, claims, benefits, or Causes of Action" of BSA and certain related entities identified by the Plan "under or with respect to" the Policies.

TrustApp326

FILED DATE: 9/5/2023 5:46 PM   2017CH14975

**ANSWER:**   Allianz denies that an assignment of BSA's policy rights to the Settlement Trust without an assignment to the Settlement Trust of BSA's corresponding policy duties and obligations is enforceable or legally permissible.   Allianz admits the remaining allegations in Paragraph 374.

375.   As BSA's successor-in-interest to the Policies, the Settlement Trust stands in BSA's shoes and is subject to the same terms, conditions, obligations, and defenses to coverage thereunder.

**ANSWER:**   Allianz denies that an assignment of BSA's policy rights to the Settlement Trust without an assignment to the Settlement Trust of BSA's corresponding policy duties and obligations is enforceable or legally permissible.   Allianz admits the remaining allegations in Paragraph 375.

376.   The Policies only provide coverage to entities or individuals identified by the Policies as insureds thereunder.

**ANSWER:**   Allianz denies that the Policies "provide coverage" to the Settlement Trust. Allianz admits the remaining allegations in Paragraph 376.

377.   In most cases, BSA is alleged to share responsibility for alleged abuse with related entities that plan, administer, implement, coordinate, and supervise BSA's programs, including local councils and/or chartering organizations.

**ANSWER:**   Admitted.

378.   The Policies do not provide coverage for such related entities unless they are identified by a Policy as an insured thereunder.

**ANSWER:**   Allianz denies that the Policies "provide coverage" to the Settlement Trust. Allianz admits the remaining allegations in Paragraph 378.

TrustApp327

FILED DATE: 9/5/2023 5:46 PM   2017CH14975

379.    To the extent the Settlement Trust pays a claim for which the liability alleged is attributable, in whole or in part, to a party that is not an insured under the Policies, the portion of any such payment resulting from that party's alleged liability is not covered by the Policies.

**ANSWER:**    Admitted.

WHEREFORE, Plaintiffs pray for a declaration that there is no coverage under the Policies, and the National Surety Insurers therefore does not owe a duty to indemnify the Settlement Trust, for payments made that are attributable to the alleged liabilities of parties which are not insureds under the Policies.

**ANSWER:**    National Surety's "wherefore" clause sets forth no factual allegations to which a response is required.

### TWENTY-FIFTH CAUSE OF ACTION
**Declaration That If Coverage Exists, The National Surety Insurers Are
Entitled to Equitable Subrogation, Contribution, or Judgment Reduction**

380.    The National Surety Insurers incorporate by reference in this Twenty-fifth Cause of Action all allegations of this Amended Complaint, including Exhibits attached hereto.

**ANSWER:**    Allianz incorporates all of its answers to the First Amended Complaint's other allegations in its answer to Paragraph 380.

381.    BSA's Plan purports to assign to the Settlement Trust all "rights, claims, benefits, or Causes of Action" of BSA and certain related entities identified by the Plan "under or with respect to" the Policies.

**ANSWER:**    Allianz denies that an assignment of BSA's policy rights to the Settlement Trust without an assignment to the Settlement Trust of BSA's corresponding policy duties and obligations is enforceable or legally permissible.   Allianz admits the remaining allegations in Paragraph 381.

101

TrustApp328

FILED DATE: 9/5/2023 5:46 PM   2017CH14975

382.    As BSA's successor-in-interest to the Policies, the Settlement Trust stands in BSA's shoes and is subject to the same terms, conditions, obligations, and defenses to coverage thereunder.

**ANSWER:**    Allianz denies that an assignment of BSA's policy rights to the Settlement Trust without an assignment to the Settlement Trust of BSA's corresponding policy duties and obligations is enforceable or legally permissible.   Allianz admits the remaining allegations in Paragraph 382.

383.    In the event coverage is owing, the National Surety Insurers are entitled to contribution from Other Insurer Parties, settling insurers (through the Settlement Trust), and/or the Settlement Trust under the doctrines of contribution, equitable contribution, subrogation, equitable subrogation, and/or applicable judgment reduction provisions in the Bankruptcy Court's order confirming the Plan.

**ANSWER:**    Allianz denies that "coverage is owing" or owed to the Settlement Trust. Allianz admits the remaining allegations in Paragraph 383.

WHEREFORE, if determined that coverage is owed under one or more of the Policies, Plaintiffs pray for judgment entitling them to contribution, equitable contribution, subrogation, equitable subrogation, and/or judgment reduction from one or more of the Settlement Trust, Other Insurer Parties, and/or settling insurers (through the Settlement Trust).

**ANSWER:**    National Surety's "wherefore" clause sets forth no factual allegations to which a response is required.

### GENERAL DENIAL

Allianz denies any and all allegations in National Surety's Complaint that are not specifically admitted herein.

TrustApp329

FILED DATE: 9/5/2023 5:46 PM   2017CH14975

## ALLIANZ'S AMENDED COUNTERCLAIMS

Defendant Allianz Global Risks US Insurance Company f/k/a Allianz Insurance Company ("Allianz") brings these Counterclaims against Defendant Hon. Barbara J. Houser (Ret.) in her capacity as Trustee of the Boy Scouts of America Settlement Trust ("Settlement Trust"), and in support thereof states as follows:

### NATURE OF THE ACTION

1.      This is an insurance coverage dispute. Allianz seeks the Court's declaration that Allianz does not owe defense or indemnity to the Settlement Trust.  Alternatively, to the extent the Court holds that Allianz owes any coverage to the Settlement Trust, Allianz seeks the Court's declaration that it is entitled to contribution or subrogation from the Settlement Trust standing in the shoes of other entities, including without limitation settled insurers.

### JURISDICTION AND VENUE

2.      Allianz is an Illinois corporation with its principal place of business in Chicago, Illinois.

3.      On information and belief, the Trustee is the sole trustee of the Settlement Trust and is a citizen of New Mexico.  The Settlement Trust is a trust organized under Delaware law that is, upon information and belief, administered by the Trustee in New Mexico.

4.      This Court has jurisdiction over the subject matter of this lawsuit pursuant to 735 ILCS 5/2-701.  An actual controversy exists among the parties regarding the nature and extent of Allianz's coverage obligations, if any, to the Settlement Trust.

5.      The Court has personal jurisdiction over defendants pursuant to 735 ILCS 5/2-209 because they are domiciled and/or licensed to do business and/or are doing business in the State of Illinois.  In addition, this Court has personal jurisdiction over the Settlement Trust because it is

TrustApp330

FILED DATE: 9/5/2023 5:46 PM   2017CH14975

handling abuse claims arising in Illinois, including in Cook County, Illinois, and because it is processing insurance claims, including against Allianz, arising from such Illinois abuse claims.

6.       Venue is proper in Cook County pursuant to 735 ILCS 5/2-101 to 103 because it is a county in which multiple defendants are "doing business."  Further, Allianz's causes of action arise in substantial part out of events that occurred in Cook County with respect to a Boy Scout troop located in Cook County, and each of the Hacker Claims were filed in the Circuit Court of Cook County, Law Division.  In addition, thousands of the Abuse Claims filed in the Bankruptcy Case allegedly emanate from Illinois.  Judge Flynn previously denied BSA's motion to dismiss this action based on forum non-conveniens, and the U.S. Bankruptcy Court before which Boy Scouts of America filed for Chapter 11 protection ruled that this Illinois action could proceed.

## BACKGROUND

### The Underlying Hacker and Monroe Lawsuits

7.       Former boy scouts identified as John Does 1 through 18 filed a lawsuit against Thomas Hacker, BSA, and the Chicago Area Council in the Circuit Court of Cook County, Illinois styled John Doe et al. v. Thomas Hacker et al., Case No. 2017-L-007900 ("the Underlying Hacker Lawsuit"), alleging that Hacker sexually abused them.

8.       In 2011, a former boy scout identified as John Doe filed a lawsuit in the Circuit Court of DuPage County, Illinois, styled John Doe et al. v. Boy Scouts of America et al., 2011 L 000790 ("the Underlying Monroe Lawsuit").

9.       In the Underlying Monroe Lawsuit, Plaintiff Doe asserted claims against Gary Monroe, BSA, Three Fires Council, Inc. ("TFC"), Boy Scout Troop 65 ("Troop 65"), and other individual troop leaders and volunteers for alleged injuries caused by Monroe's sexual abuse of

TrustApp331

FILED DATE: 9/5/2023 5:46 PM    2017CH14975

Doe during a three- to four-year period beginning in 1980 while Doe was a member of Troop 65 in Woodbridge, DuPage County, Illinois.

10.     Century Indemnity Company's ("Century")'s predecessor in interest, Insurance Company of North America ("INA"), issued primary liability insurance policies providing coverage to BSA and its Local Councils from January 1, 1980 to January 1, 1985, including INA general liability policy numbers GLP 706452, effective January 1, 1978 to March 1, 1981; ISL 1353, effective January 1, 1981 to January 1, 1982; ISL 1364, effective January 1, 1984; and ISL GO 2931722, effective January 1, 1984 to January 1, 1985 ("the Century Primary Policies").

11.     Each Century Primary Policy, subject to its complete terms and limits, covers sums that the insured becomes legally obligated to pay as damages because of bodily injury caused by an occurrence and taking place during the Century Primary Policies' respective policy periods.

12.     Century or its predecessors in interest also issued umbrella or excess liability insurance policies providing coverage to BSA and its Local Councils from January 1, 1983 to January 1, 1985, including INA excess liability policy numbers XCP 144965, effective January 1, 1983 to January 1, 1984; XCP 144966, effective January 1, 1983 to January 1, 1984; and XCP 145365, effective January 1, 1984 to January 1, 1985 ("the Century Excess Policies").

13.     Each Century Excess Policy follows form to an underlying primary policy.  Subject to their complete terms and limits, the Century Excess Policies cover sums in excess of applicable underlying limits that the insured becomes legally obligated to pay as damages because of bodily injury caused by an occurrence and taking place during the Century Excess Policies' respective policy periods.

14.     BSA and its affiliated Local Council defendants in the Underlying Hacker and Monroe Lawsuits are insureds under the Century Primary and Excess Policies.

TrustApp332

FILED DATE: 9/5/2023 5:46 PM   2017CH14975

15.     On information and belief, Twin City Fire Insurance Company ("Twin City") issued a liability policy providing excess or umbrella coverage to BSA and its Local Councils under policy number TXU 100325, effective January 1, 1982 to January 1, 1983 ("the Twin City Policy").

16.     On information and belief, First State Insurance Company ("First State") issued liability insurance policies providing excess liability coverage to BSA and its Local Councils from January 1, 1981 to January 1, 1983, including policy numbers FS 931255, effective January 1, 1982 to December 31, 1982; and FS 931257, effective January 1, 1982 to December 31, 1982 ("the First State Policies").

17.     On information and belief, the Twin City Policy and the First State Policies, subject to their complete terms and limits, cover sums in excess of applicable underlying limits that the insured becomes legally obligated to pay as damages because of bodily injury caused by an occurrence and taking place during the Twin City Policy and the First State Policies' respective policy periods.

18.     On information and belief, BSA and its Local Council defendants in the Underlying Hacker and Monroe Lawsuits are insureds under the Twin City Policy and the First State Policies.

19.     In 1996, Century and BSA entered into a Settlement Agreement Regarding Sexual Molestation Claims ("the First Encounter Agreement") in which they agreed that, with respect to the Century Policies, "the date of occurrence for all present and future Sexual Molestation Claims shall be determined in accordance with the first encounter rule."

20.     The first encounter rule provided that, for purposes of coverage under the Century Policies:

> …the date of "occurrence" pertaining to any Sexual Molestation claim shall be the date when the first act of Sexual Molestation took place, even if additional acts of

TrustApp333

FILED DATE: 9/5/2023 5:46 PM   2017CH14975

Sexual Molestation or additional Personal Injuries arising therefrom also occurred in subsequent policy periods; and all damages arising out of such additional acts of Sexual Molestation or additional Personal Injuries shall be deemed to have been incurred during the policy year when the first act of Sexual Molestation took place.

21.     On or about May 1, 2018, BSA settled the Monroe Lawsuit with Plaintiff Doe who brought that case ("the Monroe Settlement").

22.     On information and belief, Century and BSA deemed such Plaintiff Doe's injuries to have been incurred during the January 1, 1980, to January 1, 1981, policy period pursuant to the First Encounter Agreement.

23.     On information and belief, Century indemnified BSA and the Local Council defendant in the Underlying Monroe Lawsuit for a portion of the Monroe settlement amount under Century Primary Policy no. GLP 706452, effective January 1, 1978 to January 1, 1981.   On information and belief, Century paid no indemnity for the Monroe Settlement under any other Century Policy.

24.     Under the Allianz Policy, Allianz indemnified BSA for the remainder of the Monroe settlement amount not funded by Century.

25.     On information and belief, Twin City and First State did not pay any portion of the Monroe Settlement.

## The BSA's Bankruptcy

26.     By 2020 and even though it settled the Underlying Hacker and Monroe Lawsuits, BSA was facing approximately 1,700 pending and anticipated child sexual abuse claims in state and federal courts throughout the country, brought by former scouts who alleged they had been sexually abused in connection with scouting.  On February 18, 2020 (the "Petition Date"), BSA filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (the "Bankruptcy Code"), in the United States Bankruptcy Court for the

TrustApp334

FILED DATE: 9/5/2023 5:46 PM   2017CH14975

District of Delaware (the "Bankruptcy Court").  BSA's petition for relief commenced case no. 20-10343 (the "Bankruptcy Case") and automatically stayed this action filed in 2017.

27.     As a result of the bankruptcy proceeding, BSA's insurance rights were purportedly assigned to the Settlement Trust.  During the bankruptcy, some 82,209 persons submitted Proofs of Claim alleging that they were sexually abused during their participation in BSA's scouting programs (collectively, "Abuse Claims").

**The Allianz Policy**

28.     Allianz issued Umbrella Liability Policy number UMB599346 to Boy Scouts of America National, Regional and All Local Councils for the policy period January 1, 1980 to January 1, 1981 ("Allianz Policy").  The Allianz Policy is attached as Exhibit A.

29.     The Allianz Policy's insuring agreement states, in relevant part, as follows:

INSURING AGREEMENTS

      I.     COVERAGE.   The Company hereby agrees, subject to the limitations, terms and conditions hereinafter mentioned, to indemnify the Insured for all sums which the Insured shall be obligated to pay by the reason of the liability

            A.     imposed upon the Insured by law, or

            B.     assumed under contract or agreement by the Named Insured,

      for damages on account of

            A.     Personal Injuries

            B.     Property Damage

            C.     Advertising Liability,

      caused by or arising out of each occurrence anywhere.

Ex. A at ALZ0009.

TrustApp335

FILED DATE: 9/5/2023 5:46 PM   2017CH14975

30.     The Allianz Policy defines "personal injury," in relevant part, as "bodily injury…."
*Id.* at ALZ0013.

31.     The Allianz Policy defines "bodily injury" as "bodily injury, sickness or disease, including death and care and loss of services resulting therefrom sustained by any person."  *Id.*

32.     The Allianz Policy defines "occurrence" as "an accident, including injurious exposure to conditions, which results during the policy period, in personal injury, property damage or advertising liability neither expected nor intended from the standpoint of the Insured."  *Id.*

33.     The Allianz Policy contains the following provision concerning its policy period:

> IV.     POLICY PERIOD, TERRITORY.  This Policy applies to personal injury, property damage or advertising liability which occurs anywhere during the policy period.

*Id.* at ALZ0010.

34.     The Allianz Policy contains the following Assistance and Cooperation condition:

> H.     ASSISTANCE AND COOPERATION. Except as provided in Insuring Agreement H with respect to the exhaustion of the aggregate limits of underlying policies listed in the Schedule of Underlying Insurance, the Company shall not be called upon to assume charge of the settlement or defense of any claim made or suit brought or proceeding instituted against the Insured but the Company shall have the right and shall be given the opportunity to associate with the Insured or the Insured's underlying insurers, or both, in the defense and control of any claim, suit or proceeding relative to any occurrence where the claim or suit involves, or appears reasonably likely to involve the Company, in which event the Insured and the Company shall cooperate in all things in the defense of such claim, suit or proceeding.

*Id.* at ALZ0014-15.

TrustApp336

FILED DATE: 9/5/2023 5:46 PM   2017CH14975

35.      The Allianz Policy's limits of liability provision states, in relevant part, as

follows:

> II.      LIMITS OF LIABILITY-RETAINED LIMIT.  The Company
> shall only be liable for the Ultimate Net Loss resulting from
> any one occurrence in excess of
>
> A.      the limits of the underlying insurance as stated in
> the attached Schedule of Underlying Insurance
> (whether collectible or not) and the applicable
> limits of any other underlying insurance
> collectible by the Insured, less the amount, if
> any, by which any aggregate limit of such
> insurance has been reduced by payment of loss
> during the period of this policy, or
>
> B.      If the insurance afforded by such underlying
> insurance is inapplicable to the occurrence, the
> amount specified in Item 5 of the Declarations as
> the Retained Limit,
>
> hereinafter called the Underlying Limits.
>
> * * *
>
> In the event of reduction or exhaustion of the
> aggregate limits of liability applicable to the
> underlying insurance (listed in the Schedule of
> Underlying Insurance hereof) by reason of losses paid
> thereunder, this policy shall, subject to the terms and
> conditions of the underlying insurance,
>
> (a)      in the event of reduction pay the excess of the
> reduced underlying limit;
>
> (b)      in the event of exhaustion continue in force as
> underlying insurance.

*Id.*

36.      "Underlying insurance" is defined as follows:

> UNDERLYING INSURANCE. Means the insurance
> policies listed in the Schedule of Underlying Insurance
> including any renewal or replacement of such contracts,

TrustApp337

FILED DATE: 9/5/2023 5:46 PM   2017CH14975

and also includes the insurance policies not listed in the Schedule of Underlying Insurance for which notice has been given to the company pursuant to the policy condition entitled "Underlying Insurance-Changes or Additional Coverages during this Policy Period".

*Id.* at ALZ0014.

37.     The Allianz Policy contains the following Maintenance of Underlying Insurance condition:

> MAINTENANCE OF UNDERLYING INSURANCE.
> It is warranted by the Insured that the Schedule of Underlying Insurance or renewals or replacements thereof not more restricted, shall be maintained in force as collectible insurance during the currency of this policy, except for any reduction of the aggregate limits contained therein solely by payment of claims in respect of occurrences happening during the period of this policy. In the event of failure by the insured so to maintain such policies or to meet all conditions and warranties subsequent to loss under such policies, the insurance afforded by this policy shall apply in the same manner it would have applied had such policies been so maintained in force.

*Id.* at ALZ0016.

38.     The Allianz Policy contains the following Other Insurance condition:

> OTHER INSURANCE.  If other valid and collectible insurance with any other insurer is available to the Insured covering a loss also covered by this policy, other than insurance that is in excess of the insurance afforded by this policy, the insurance afforded by this policy shall be in excess of and shall not contribute with such other insurance. Nothing herein shall be construed to make this policy subject to the terms, conditions and limitations of other insurance.

*Id.* at ALZ0015.

39.     The Allianz Policy also contains the following punitive damages exclusion:

> EXCLUSIONS
>
> …

111

TrustApp338

FILED DATE: 9/5/2023 5:46 PM   2017CH14975

> Except insofar as coverage is available to the Insured under
> the underlying insurances set out in the attached schedule,
> this policy shall not apply
>
> …
>
> R.    to punitive or exemplary damages awarded against
> any insured.

*Id.* at ALZ0010.

40.    On information and belief, other insurers such as INA, Travelers, First State, and Twin City issued liability insurance policies for policy periods that include all or portions of the years during, before and after the 1980 period of the Allianz Policy.  Upon information and belief, BSA settled with INA and First State during BSA's Chapter 11 cases and, pursuant to BSA's Plan of Reorganization (to the extent it is legally valid and enforceable as respects non-debtor settling insurers) claims against such settled insurers, including with respect to defense costs, have been channeled to the Settlement Trust.

### COUNT I

### DECLARATORY JUDGMENT
### No Duty to Defend Or Pay Defense Costs

41.    Allianz incorporates all preceding paragraphs as though fully restated herein.

42.    The Allianz Policy provides coverage, in relevant part and subject to its terms, conditions, and exclusions, for sums an Insured is legally obligated to pay by reason of liability imposed by law for damages.

43.    Costs and fees incurred by or on behalf of the Settlement Trust to process Abuse Claims and to render Trust Distribution Procedure awards as respects Abuse Claims are not covered by the Allianz Policy.

44.    Costs and fees incurred by the Settlement Trust to defend Abuse Claims in the

112

TrustApp339

FILED DATE: 9/5/2023 5:46 PM   2017CH14975

tort system, if any such cost and fees are subsequently incurred, are not covered by the Allianz Policy.

45.     The Allianz Policy provides that, except with respect to the exhaustion of the limits of underlying policies listed in the Schedule of Underlying Insurance, Allianz shall not be called upon to assume charge of the defense of any suit brought against the Insured.  Because the limits of the policies underlying the Allianz Policy are not properly exhausted by virtue of BSA's settlements with Century/INA and Hartford/First State/Twin City and because those underlying policies do not contain aggregate limits of liability applicable to Abuse Claims, Allianz has no obligation to defend or to pay defense costs and fees with respect to any Abuse Claim.

WHEREFORE, Allianz prays that the Court:

a.     Find and declare that Allianz has no duty to defend or to pay defense fees and costs incurred by or on behalf of the Settlement Trust in connection with its processing or rendering of awards with respect to Abuse Claims or in connection with the defense of any Abuse Claims in the tort system;

b.     Declare that the policies underlying the Allianz Policy have not been exhausted as respects each Abuse Claim that implicates those underlying policies and that Allianz has no possible obligation under the Allianz Policy (subject also to all of the Allianz policy's terms, conditions and exclusions) unless and until each underlying policy's limits of liability are fully exhausted as respects each Abuse Claim that the Settlement Trust calls upon Allianz to pay;

c.     Award Allianz such other and further relief that the Court deems just and proper.

## COUNT II
## DECLARATORY JUDGMENT

113

**No Occurrence for Underlying Hacker Lawsuit**

46.    Allianz incorporates all preceding paragraphs as though fully restated herein.

47.    Coverage under the Allianz Policy potentially applies only to injury caused by an "occurrence," which the Allianz Policy defines, in relevant part, as an accident resulting in injury neither expected nor intended from the standpoint of the insured.

48.    The plaintiffs in the Underlying Hacker Lawsuit allege that BSA and its Local Council defendants in those cases knew that Hacker was a child abuser and sexual predator and knew of the likelihood that he would affiliate himself with another troop and abuse additional children, but that BSA and the Chicago Area Council failed to take steps to prevent him from doing so and affirmatively concealed the danger that Hacker posed to scouts.

49.    The plaintiffs in the Underlying Hacker Lawsuit further allege that BSA and the Chicago Area Council caused separate injury to the plaintiffs by fraudulently concealing their culpability from the plaintiffs.

WHEREFORE Allianz prays that the Court:

a.    Find that BSA's and the Chicago Area Council's intentional conduct at issue in the Underlying Hacker Lawsuit does not constitute an "occurrence" as defined in the Allianz Policy;

b.    Find and declare that Allianz has no duty to indemnify the Settlement Trust for the amounts paid by BSA and/or the Chicago Area Council to settle the Underlying Hacker Lawsuit; and

c.    Award Allianz such other and further relief that the Court deems just and proper.

**COUNT III**
**DECLARATORY JUDGMENT**

FILED DATE: 9/5/2023 5:46 PM   2017CH14975

TrustApp341

FILED DATE: 9/5/2023 5:46 PM   2017CH14975

**No Injury Alleged in the Underlying Hacker Lawsuit During the
Period of the Allianz Policy**

50.     Allianz incorporates all preceding paragraphs as though fully restated herein.

51.     Subject to all terms, conditions and exclusions in the Allianz Policy, any coverage under the Allianz Policy applies only to injury that takes place during the January 1, 1980 to January 1, 1981 period of the Allianz Policy.

52.     The Third Amended Complaint in the Underlying Hacker Lawsuit alleges that "Hacker became active in the Chicago Area Council of Boy Scouts of America beginning in approximately 1981 or 1982." (National Surety's Complaint Ex. C at 16.)

53.     Except for John Doe 7, the plaintiffs in the Underlying Hacker Lawsuit all allege that Hacker first abused them after January 1, 1981.

54.     John Doe 7 alleges that Hacker abused him between "1980 or 1981 and 1982." (*Id.* at 4.)

55.     The evidence in the Underlying Hacker Lawsuit demonstrates that Hacker's abuse of John Doe 7 began after January 1, 1981.

56.     BSA's counsel previously advised Allianz in writing that BSA believed that Hacker's abuse of John Doe 7 began after January 1, 1981.  BSA later changed its position to contend that Hacker's abuse of John Doe 7's began in 1980.  Upon information and belief, BSA did so because one of its 1981 excess insurers is insolvent.

WHEREFORE Allianz prays that the Court:

a.     Find and declare that the injuries at issue in the Underlying Hacker Lawsuit, including without limitation John Doe 7's alleged injury, did not take place during the period of the Allianz Policy;

b.     Find and declare that Allianz has no duty to indemnify the Settlement

TrustApp342

FILED DATE: 9/5/2023 5:46 PM   2017CH14975

Trust for BSA's settlement of the Underlying Hacker Lawsuit, including without limitation BSA's settlement payment to John Doe 7, due to lack of alleged injury during the period of the Allianz Policy; and

    c.    Award Allianz such other and further relief that the Court deems just and proper.

## COUNT IV
## DECLARATORY JUDGMENT
### No Coverage for Punitive Damages as respects the Underlying Hacker Lawsuit

57.    Allianz incorporates all preceding paragraphs as though fully restated herein.

58.    The Allianz Policy excludes coverage for punitive or exemplary damages.

59.    Punitive damages are not insurable as a matter of law or public policy.

60.    BSA's settlement of the Underlying Hacker Lawsuit, including BSA's settlement with John Doe 7, includes resolution of claims for uninsurance intentional conduct and uninsurable punitive damages.

WHEREFORE, Allianz prays that the Court:

    a.    Find and declare that Allianz has no duty to indemnify the Settlement Trust for the punitive or exemplary damages component of BSA's settlement of the Underlying Hacker Lawsuit, including settlement amount paid to John Doe 7, and declare the amount of that portion of such settlement amounts; and

    b.    Award Allianz such other and further relief that the Court deems just and proper.

## COUNT V
## DECLARATORY JUDGMENT
### In the Alternative – Allocation, Horizontal Exhaustion, and Other Insurance as respects the Underlying Hacker Lawsuit

TrustApp343

FILED DATE: 9/5/2023 5:46 PM   2017CH14975

61.     Allianz incorporates all preceding paragraphs as though fully restated herein.

62.     In the event Hacker's alleged abuse of John Doe 7 is held to have begun during Allianz's policy period, which Allianz disputes as a factual matter, the resulting injuries to John Doe 7 took place during multiple policy periods and John Doe 7's settlement amount must be allocated across all such triggered periods.

63.     Coverage under the Allianz Policy potentially applies only to loss in excess of the limits of underlying insurance, including, without limitation, INA policy number GLP 706452 and any renewal or replacement of that policy.

64.     Under the Allianz Policy's other insurance condition, coverage under the Allianz Policy is excess of and shall not contribute with other valid and collectible insurance available to the Settlement Trust that covers a loss also putatively covered by the Allianz Policy.

65.     Upon information and belief, John Doe 7 alleged multiple instances of abuse by Hacker.

66.     The per occurrence limits of each primary policy on the risk throughout the period of John Doe 7's abuse must exhaust before Allianz has any putative obligation to indemnify the Settlement Trust for any portion of the amount that BSA paid to settle with John Doe 7.

WHEREFORE, Allianz prays that the Court:

a.      Find and declare that Hacker's alleged abuse of John Doe 7 triggers coverage in each policy period during which the abuse happened;

b.      Find and declare that the damages on account of John Doe 7's alleged injuries must be allocated across each triggered policy period;

c.      Find and declare that the limits of all applicable primary insurance in effect during the triggered policy periods must be fully exhausted before the umbrella

117

FILED DATE: 9/5/2023 5:46 PM  2017CH14975

or excess policies in those policy periods owe any indemnity;

       d.     Find and declare that all other valid and collectible insurance available to the Settlement Trust for John Doe 7's injuries must be exhausted before Allianz owes indemnity under the Allianz policy;

       e.     Find and declare the applicable number of occurrences presented by John Doe 7's claim and factual allegations, including due to his multiple incidents of abuse by Hacker; and

       f.     Award Allianz such other and further relief that the Court deems just and proper.

## COUNT VI
## EQUITABLE CONTRIBUTION AND SUBROGATION
### Equitable Contribution and Subrogation Against the Settlement Trust As Respects All Abuse Claims, Including the Underlying Hacker and Monroe Lawsuits

      67.     Allianz incorporates all preceding paragraphs as though fully restated herein.

      68.     In the event Allianz is found to owe indemnity to the Settlement Trust as respects any portion of the amount BSA paid to settle John Doe 7's claims in the Underlying Hacker Lawsuit, as respects Allianz's payment to settle the Underlying Monroe Lawsuit, and as respects payments, if any, by Allianz in response to Settlement Trust award determinations on behalf of and resulting payments to any of the 82,209 abuse claimants, Allianz is entitled to equitable subrogation or contribution from the Settlement Trust as respects shares of those payments borne by other insurers with which the Settlement Trust or BSA has reached settlements, including BSA's past settlements with Century/INA and Harford/First State/Twin City the proceeds of which are held by the Settlement Trust.

      WHEREFORE, Allianz prays that the Court:

       a.     Find and declare that, (i) in the event that Allianz must indemnify the

TrustApp345

FILED DATE: 9/5/2023 5:46 PM   2017CH14975

Settlement Trust for any amount paid to John Doe 7 to settle his claims in the Underlying Hacker Lawsuit, (ii) as respects Allianz's payment toward settlement of the Underlying Monroe Lawsuit, and (iii) as respects any payments by Allianz made in response to determinations by the Settlement Trust relating to any of the other 82,209 abuse claimants, Allianz is entitled to contribution from or subrogation against the Settlement Trust to the extent it holds the proceeds of settlements with other insurers that insured BSA during the period of the pertinent abuse claimant's or abuse claimants' respective periods of alleged injury; and

b.      Award Allianz such other and further relief that the Court deems just and proper.

## COUNT VII
## DECLARATION REGARDING EXHAUSTION OF UNDERLYING PER OCCURRENCE LIMITS (NUMBER OF OCCURRENCES)

69.     Allianz incorporates all preceding paragraphs as though fully restated herein.

70.     BSA's Plan purports to assign to the Settlement Trust all "rights, claims, benefits, or Causes of Action" of BSA and certain related entities identified by the Plan "under or with respect to" the Allianz Policy.  Allianz contests the legality and enforceability of that assignment, which is among the issues being adjudicated on appeals from confirmation of the Plan.

71.     As BSA's purported successor-in-interest to the Allianz Policy, the Settlement Trust stands in BSA's shoes and is subject to the same terms, conditions, obligations, and defenses to coverage thereunder, to the extent the Settlement Trust, in fact, is a proper assignee of the Allianz Policy, which Allianz disputes.

72.     The Allianz Policy is an excess policy that responds to a putative occurrence only once the limits of underlying policies for each such putative occurrence have been fully paid.

TrustApp346

FILED DATE: 9/5/2023 5:46 PM    2017CH14975

73.    The Settlement Trust, to the extent it is a proper assignee of the Allianz Policy, must prove that the per occurrence limits of each insurance policy underlying the Allianz Policy are exhausted fully as respects each Abuse Claim for which the Settlement Trust seeks payment from Allianz.  To date, the Settlement Trust has not proven any such exhaustion of underlying per occurrence limits.  Such proof turns, in part, on a determination concerning the applicable number of occurrences, if any, relating to each Abuse Claim for which the Settlement Trust seeks payment from the Allianz Policy.

WHEREFORE, Allianz prays that the Court:

a.    Declare the applicable number of occurrences, if any, for each Abuse Claim for which the Settlement Trust seeks payment under the Allianz Policy, including without limitation for the abuse claims in the Underlying Hacker and Monroe Lawsuits;

b.    Declare whether the per occurrence limits of liability of each insurance policy underlying the Allianz Policy have been properly exhausted in full for each Abuse Claim for which the Settlement Trust seeks payment under the Allianz Policy, including without limitation for the Underlying Hacker and Monroe Lawsuits; and

c.    Award Allianz such other and further relief that the Court deems just and proper.

## COUNT VIII
## DECLARATION THAT NO COVERAGE EXISTS FOR ABUSE CLAIMS PAID BY THE SETTLEMENT TRUST BECAUSE THE INJURY ALLEGED WAS NOT AN "ACCIDENT"

74.    Allianz incorporates all preceding paragraphs as though fully restated herein.

75.    BSA's Plan purports to assign to the Settlement Trust all "rights, claims, benefits, or Causes of Action" of BSA and certain related entities identified by the Plan "under or with respect to" the Allianz Policy.

TrustApp347

FILED DATE: 9/5/2023 5:46 PM   2017CH14975

76.     As BSA's putative successor-in-interest to the Allianz Policy, the Settlement Trust purports to stand in BSA's shoes and, as such, is subject to the same terms, conditions, obligations, and defenses to coverage thereunder.

77.     An "occurrence" covered under the Allianz Policy is defined in relevant part, as an accident resulting in injury neither expected nor intended from the standpoint of the insured.

78.     Abuse Claimants allege that BSA has known, since as early as the 1920s, that large numbers of pedophiles are attracted to scouting, that its members are therefore at high risk for sexual abuse, and that it was certain a significant number of scouts would be sexually abused each year.

79.     BSA is alleged to have concealed incidents of sexual abuse within the organization, and to have knowingly and with deliberate indifference failed to take steps necessary to prevent such abuse from occurring.

80.     The alleged conduct of BSA does not constitute an "accident" within the meaning of the Allianz Policy, and therefore does not constitute and "occurrence" for which the Allianz Policy provides coverage.

WHEREFORE, Allianz prays that the Court:

a.     Declare that no coverage exists under the Allianz Policy and that Allianz therefore owes no duty thereunder to indemnify the Settlement Trust for payments to Abuse Claimants, because BSA's alleged conduct was not an accident for which the Allianz Policy provides coverage; and

b.     Award Allianz such other and further relief that the Court deems just and proper.

## COUNT IX
## DECLARATION THAT NO COVERAGE EXISTS FOR THE SETTLEMENT

TrustApp348

**TRUST'S PAYMENTS OF ABUSE CLAIMS BECAUSE THE INJURY ALLEGED WAS EXPECTED OR INTENDED**

81.    Allianz incorporates all preceding paragraphs as though fully restated herein.

82.    BSA's Plan purports to assign to the Settlement Trust all "rights, claims, benefits, or Causes of Action" of BSA and certain related entities identified by the Plan "under or with respect to" the Allianz Policy.

83.    As BSA's putative successor-in-interest to the Allianz Policy, the Settlement Trust purports to stand in BSA's shoes and, as such, is subject to the same terms, conditions, obligations, and defenses to coverage thereunder.

84.    An "occurrence" covered under the Allianz Policy is defined in relevant part, as an accident resulting in injury neither expected nor intended from the standpoint of the insured.

85.    Abuse Claimants allege that BSA has known, since as early as the 1920s, that large numbers of pedophiles are attracted to and participate in scouting, that its members are therefore at high risk for sexual abuse, and that it was certain a significant number of scouts would be sexually abused each year.

86.    BSA is alleged to have concealed incidents of sexual abuse within the organization, and to have knowingly and with deliberate indifference failed to take steps necessary to prevent such abuse from occurring.

87.    The injuries for which coverage is sought under the Allianz Policy by the Settlement Trust were either expected or intended, and therefore do not give rise to an occurrence covered by the Allianz Policy.

WHEREFORE, Allianz prays that the Court:

a.    Declare that no coverage exists under the Allianz Policy and that Allianz therefore owes no duty thereunder to indemnify the Settlement Trust for payments to Abuse

TrustApp349

FILED DATE: 9/5/2023 5:46 PM   2017CH14975

Claimants because the underlying injuries alleged were either expected or intended by BSA; and

   b.  Award Allianz such other and further relief that the Court deems just and proper.

<div align="center">

**COUNT X**
**DECLARATION THAT THE ALLIANZ POLICY ONLY RESPONDS TO ABUSE**
**CLAIMS ALLEGING INJURIES THAT OCCURRED DURING THE POLICY**
**PERIOD (TRIGGER)**

</div>

88.  Allianz incorporates all preceding paragraphs as though fully restated herein.

89.  BSA's Plan purports to assign to the Settlement Trust all "rights, claims, benefits, or Causes of Action" of BSA and certain related entities identified by the Plan "under or with respect to" the Allianz Policy.

90.  As BSA's putative successor-in-interest to the Allianz Policy, the Settlement Trust purports to stand in BSA's shoes and, as such, is subject to the same terms, conditions, obligations, and defenses to coverage thereunder.

91.  Subject to all of its other terms, conditions and exclusions, the Allianz Policy only provides coverage for injury that happens during the applicable policy period.  There is, accordingly, no coverage under the Allianz Policy for injury which takes place outside of the applicable policy period.

   WHEREFORE, Allianz prays that the Court:

   a.  Declare that the Allianz Policy only responds to injuries that happened during the period of the Allianz Policy and Allianz, therefore, owes no duty under the Allianz Policy to indemnify the Settlement Trust for Abuse Claims alleging injuries that did not happen during the period of the Allianz Policy; and

<div align="center">

123

</div>

FILED DATE: 9/5/2023 5:46 PM   2017CH14975

b.      Award Allianz such other and further relief that the Court deems just and proper.

## COUNT XI
## DECLARATION THAT ANY COVERAGE FOR ABUSE CLAIMS MUST BE ALLOCATED AMONG ALL POLICIES TRIGGERED BY THE INJURY ALLEGED (ALLOCATION)

92.      Allianz incorporates all preceding paragraphs as though fully restated herein.

93.      BSA's Plan purports to assign to the Settlement Trust all "rights, claims, benefits, or Causes of Action" of BSA and certain related entities identified by the Plan "under or with respect to" the Allianz Policy.

94.      As BSA's putative successor-in-interest to the Allianz Policy, the Settlement Trust purports to stands in BSA's shoes and, as such, is subject to the same terms, conditions, obligations, and defenses to coverage thereunder.

95.      Subject to all of it other terms, conditions and exclusions, the Allianz Policy only provides coverage for injury that happens during the applicable policy period.  There is, accordingly, no coverage under the Allianz Policy for injury which happens outside of the applicable policy period.

96.      Many of the Abuse Claimants allege that they suffered injury during multiple policy periods.

97.      Coverage for such claims, if any, must be allocated among all insurance policies in effect when injury happened, including policies issued by now-insolvent insurers and/or any periods for which BSA did not purchase insurance.  In addition, coverage for such claims, if any, must be allocated to policies underwritten by insurers that settled during the bankruptcy or thereafter and whose settlement proceeds the Settlement Trust holds or will hold.

WHEREFORE, Allianz that the Court:

124

TrustApp351

FILED DATE: 9/5/2023 5:46 PM   2017CH14975

a.      Declare that any coverage under the Allianz Policy deemed applicable to any Abuse Claim must be subject to an allocation among all policies, including insolvent policies, periods for which no coverage exists, and/or to the Settlement Trust as respects settled policies in effect during the period of the Abuse Claimant's alleged injury; and

b.      Award Allianz such other and further relief that the Court deems just and proper.

## COUNT XII
## DECLARATION THAT ALLIANZ HAS NO DUTY TO INDEMNIFY ABUSE CLAIMS UNTIL UNDERLYING INSURANCE IS EXHAUSTED HORIZONTALLY

98.    Allianz incorporates all preceding paragraphs as though fully restated herein.

99.    BSA's Plan purports to assign to the Settlement Trust all "rights, claims, benefits, or Causes of Action" of BSA and certain related entities identified by the Plan "under or with respect to" the Allianz Policy.

100.    As BSA's putative successor-in-interest to the Allianz Policy, the Settlement Trust purports to stand in BSA's shoes and, as such, is subject to the same terms, conditions, obligations, and defenses to coverage thereunder.

101.    The Allianz Policy is an excess policy that responds only when underlying insurance is exhausted.

102.    On information and belief, underlying insurance for each of the policy periods triggered has not been exhausted.

WHEREFORE, Allianz prays that the Court:

a.      Declare that no coverage exists under the Allianz Policy and that Allianz therefore owes no duty thereunder to indemnify the Settlement Trust for the Abuse Claims, unless and until all applicable underlying insurance is exhausted; and

125

TrustApp352

FILED DATE: 9/5/2023 5:46 PM   2017CH14975

b.      Award Allianz such other and further relief that the Court deems just and proper.

<div align="center">

**COUNT XIII**
**DECLARATION REGARDING EXHAUSTION OF UNDERLYING PER OCCURRENCE LIMITS (NUMBER OF OCCURRENCES)**

</div>

103.    Allianz incorporates all preceding paragraphs as though fully restated herein.

104.    BSA's Plan purports to assign to the Settlement Trust all "rights, claims, benefits, or Causes of Action" of BSA and certain related entities identified by the Plan "under or with respect to" the Allianz Policy.

105.    As BSA's putative successor-in-interest to the Allianz Policy, the Settlement Trust purports to stand in BSA's shoes and, as such, is subject to the same terms, conditions, obligations, and defenses to coverage thereunder.

106.    The Allianz Policy is an excess policy that responds to an occurrence only when the limits of underlying policies for each occurrence has been paid in full with respect to that occurrence.

107.    On information and belief, policies issued by other insurers underlying, prior to or subsequent to the Allianz Policy contain limits of liability without aggregates applicable to abuse claims, such that those policies pay, if at all, on a per-occurrence basis.

108.    Accordingly, the Allianz Policy does not respond, if at all, until payments are made for each occurrence exhausting the per occurrence limits of all such underlying policies.

WHEREFORE, Allianz prays that the Court:

a.      Declare that no coverage exists under the Allianz Policy and it therefore owes no duty thereunder to indemnify the Settlement Trust, unless and until the underlying limits for each occurrence are exhausted; and

<div align="center">126</div>

FILED DATE: 9/5/2023 5:46 PM   2017CH14975

b.      Award Allianz such other and further relief that the Court deems just and

proper.

**COUNT XIV**
**DECLARATION REGARDING VIOLATION OF THE ALLIANZ POLICY'S**
**ASSISTANCE AND COOPERATION REQUIREMENTS AND ALLIANZ'S RIGHT**
**TO ASSOCIATE IN THE DEFENSE OF CLAIMS**

109.    Allianz incorporates all preceding paragraphs as though fully restated herein.

110.    BSA's Plan purports to assign to the Settlement Trust all "rights, claims, benefits,

or Causes of Action" of BSA and certain related entities identified by the Plan "under or with

respect to" the Allianz Policy.

111.    As BSA's putative successor-in-interest to the Allianz Policy, the Settlement Trust

purports to stand in BSA's shoes and, as such, is subject to the same terms, conditions, obligations,

and defenses to coverage thereunder.

112.    As a condition of coverage thereunder, the Allianz Policy grants Allianz the right

to associate with BSA and to participate in the defense and settlement of claims for which

indemnity under the Allianz Policy is or may be sought.

113.    As a condition of coverage thereunder, the Allianz Policy requires BSA to

cooperate with and assist Allianz in the defense and settlement of claims.

114.    BSA breached obligations to Allianz under the Allianz Policy by, among other

things: (i) failing to cooperate with and assist Allianz's efforts to defend against and minimize

BSA's and/or the Settlement Trust's liability for Abuse Claims; (ii) agreeing to procedures,

including the Matrix Evaluation, the IRO and the Document Appendix, for resolving claims that

deprive Allianz of its right to associate with the defense of claims; (iii) agreeing to pay Abuse

Claims without Allianz's consent; (iv) agreeing to pay unreasonable claims values to resolve

Abuse Claims; (v) agreeing to pay Abuse Claims for which BSA has or would have no legal

127

TrustApp354

FILED DATE: 9/5/2023 5:46 PM   2017CH14975

liability; (vi) agreeing to procedures for paying Abuse Claims that are intended and designed to increase Allianz's potential liability under the Allianz Policy; (vii) agreeing to pay Abuse Claims in excess of the value of such claims prior to BSA's bankruptcy; (viii) agreeing to pay Abuse Claims without a showing by the claimant of negligence and without any showing that the claim is timely under the applicable statute of limitation or statute of repose; (ix) agreeing to an Independent Review Option proposed by claimants' counsel for the express purpose of targeting unsettled excess insurance, such as the Allianz Policy; (x) agreeing to pay claims through Trust Distribution Procedures that do not require adequate proof, without actual trial, of liability and damages and which lack many of the protections of the tort system, such as document discovery from the claimants, sworn depositions of the claimants, and independent medical exams of the claimants; (xi) agreeing to assign to the Settlement Trust BSA's insurance rights under its insurance policies without also transferring or assigning to the Settlement Trust the duties and obligations under those same insurance policies; and (xii) agreeing to pay all 82,209 abuse claims without putting in place reasonable and objective proof and anti-fraud procedures.

115.   The Settlement Trust is perpetuating and, upon information and belief, will continue to perpetuate BSA's breaches of its duties of assistance and cooperation and Allianz's right to associate.

WHEREFORE, Allianz prays that the Court:

a.   Declare that no coverage exists under the Allianz Policy and Allianz therefore owes no duty to indemnify the Settlement Trust due to BSA's and the Settlement Trust's violation of BSA's duties of cooperation and assistance and Allianz's right to associate with the defense of the Abuse Claims;

b.   Declare that awards by the Settlement Trust to individual Abuse Claimants

TrustApp355

FILED DATE: 9/5/2023 5:46 PM   2017CH14975

are not the result of an actual trial; and

      c.     Award Allianz such other and further relief that the Court deems just and proper.

<div align="center">

**COUNT XVI**
**DECLARATION OF NO COVERAGE FOR VOLUNTARY PAYMENTS TO WHICH ALLIANZ DID NOT CONSENT**

</div>

116.    Allianz incorporates all preceding paragraphs as though fully restated herein.

117.    Certain of the Abuse Claims allege abuse for which BSA and/or the Settlement Trust had or has no underlying legal obligation to pay, including, but not limited to, claims barred by applicable statutes of limitations or repose and claims in which the claimant is unable to establish liability.

118.    The Allianz Policy provides, for example, that BSA shall not, except at its own expense, voluntarily make any payment, assume any obligation, or incur any expense without Allianz's consent.

119.    The Plan provides for payments by the Settlement Trust to Abuse Claimants for claims that BSA had or would have no legal obligation to pay.

120.    Allianz did not consent to any such payments.

121.    Under the Allianz Policy, coverage is not available for such Abuse Claims.

WHEREFORE, Allianz prays that the Court:

      a.     Declare that no such coverage exists under the Allianz Policy and Allianz therefore has no duty to indemnify the Settlement Trust, for claims paid by the Settlement Trust for which BSA had or would not have had any legal obligation to pay; and

      b.     Award Allianz such other and further relief that the Court deems just and proper.

<div align="center">129</div>

FILED DATE: 9/5/2023 5:46 PM   2017CH14975

## COUNT XVII
## DECLARATION THAT ALLIANZ HAS NO DUTY TO INDEMNIFY THE SETTLEMENT TRUST BECAUSE PAYMENTS UNDER THE TRUST DISTRIBUTION PROCEDURES ARE NOT "LOSS"

122.    Allianz incorporates all preceding paragraphs as though fully restated herein.

123.    BSA's Plan purports to assign to the Settlement Trust all "rights, claims, benefits, or Causes of Action" of BSA and certain related entities identified by the Plan "under or with respect to" the Allianz Policy.

124.    As BSA's putative successor-in-interest to the Allianz Policy, the Settlement Trust purports to stand in BSA's shoes and, as such, is subject to the same terms, conditions, obligations, and defenses to coverage thereunder.

125.    The Allianz Policy provides that Allianz's liability, if any, under the Allianz Policy is limited, inter alia, to final judgments rendered against BSA following an actual trial, or for settlements pursuant to a written agreement between BSA and a claimant to which Allianz consented.

126.    Claim determinations by the Settlement Trust are not final judgments rendered against BSA following an actual trial.

127.    Claim determinations by the Settlement Trust are not settlements to which Allianz consented.

WHEREFORE, Allianz prays that the Court:

a.      Declare that claims determinations and/or payments to Abuse Claimants by the Settlement Trust are not judgments after actual trial or settlements with Allianz's consent and, therefore, that Allianz owes no duty to indemnify the Settlement Trust for any such claims determinations or payments; and

130

FILED DATE: 9/5/2023 5:46 PM   2017CH14975

b.      Award Allianz such other and further relief that the Court deems just and proper.

<div align="center">

**COUNT XVIII**
**DECLARATION THAT COVERAGE IS NOT AVAILABLE FOR CLAIMS**
**RESOLVED FOR UNREASONABLE VALUES**

</div>

128.    Allianz incorporates all preceding paragraphs as though fully restated herein.

129.    BSA's Plan purports to assign to the Settlement Trust all "rights, claims, benefits, or Causes of Action" of BSA and certain related entities identified by the Plan "under or with respect to" the Allianz Policy.

130.    As BSA's putative successor-in-interest to the Allianz Policy, the Settlement Trust purports to stand in BSA's shoes and, as such, is subject to the same terms, conditions, obligations, and defenses to coverage thereunder.

131.    As set forth in the Trust Distribution Procedures and accompanying Claims Matrix, the Settlement Trust contemplates paying Abuse Claims (i) for which BSA has or would have no legal liability or (ii) for values that exceed reasonable values that BSA settled for and/or insurers paid similar claims prior to BSA's bankruptcy.  As BSA's own expert Dr. Charles Bates testified, the base values in the Claims Matrix to which BSA agreed exceed its historical settlement values in the tort system by as much as 90%.

132.    Allianz did not agree to the claims values contemplated by the Trust Distribution Procedures and Claims Matrix under which the Settlement Trustee will pay Abuse Claims.

133.    Allianz has no obligation under the Allianz Policy to indemnify BSA or the Settlement Trust for unreasonable settlements or other payments made without Allianz's consent that are not the product of judgment after actual trial.

WHEREFORE, Allianz prays that the Court:

<div align="center">131</div>

FILED DATE: 9/5/2023 5:46 PM   2017CH14975

      a.      Declare that no coverage exists under the Allianz Policy, and Allianz therefore owes no duty to indemnify the Settlement Trust under the Allianz Policy, for payments to Abuse Claimants that are unreasonable; and

      b.      Award Allianz such other and further relief that the Court deems just and proper.

<div align="center">

**COUNT XIX**
**DECLARATION OF NO COVERAGE BECAUSE BSA FAILED TO GIVE ANY OR TIMELY NOTICE OF CLAIMS OR OCCURRENCES**

</div>

134.    Allianz incorporates all preceding paragraphs as though fully restated herein.

135.    BSA's Plan purports to assign to the Settlement Trust all "rights, claims, benefits, or Causes of Action" of BSA and certain related entities identified by the Plan "under or with respect to" the Allianz Policy.

136.    As BSA's putative successor-in-interest to the Allianz Policy, the Settlement Trust purports to stand in BSA's shoes and, as such, is subject to the same terms, conditions, obligations, and defenses to coverage thereunder.

137.    The Allianz Policy requires BSA to "immediately advise" Allianz of any claim or occurrence that may result in liability.

138.    The majority of claims for which the Settlement Trust intends to seek indemnity from Allianz allege abuse that in many cases happened decades ago.

139.    BSA was aware and had knowledge of thousands of claims and occurrences of sexual abuse potentially resulting in liability since as early as the 1920s.

140.    BSA failed to give Allianz timely notice of the occurrences, if any, and/or claims relating to Abuse Claims to be paid by the Settlement Trust.

WHEREFORE, Allianz prays that the Court:

<div align="center">

132

</div>

FILED DATE: 9/5/2023 5:46 PM   2017CH14975

      a.      Declare that no coverage exists under the Allianz Policy and Allianz therefore owes no duty thereunder to indemnify the Settlement Trust for any claim or occurrence of which BSA did not give Allianz timely notice; and

      b.      Award Allianz such other and further relief that the Court deems just and proper.

**COUNT XX**
**DECLARATION REGARDING POLICY'S NO ACTION CLAUSE**

141.    Allianz incorporates all preceding paragraphs as though fully restated herein.

142.    BSA's Plan purports to assign to the Settlement Trust all "rights, claims, benefits, or Causes of Action" of BSA and certain related entities identified by the Plan "under or with respect to" the Allianz Policy.

143.    As BSA's putative successor-in-interest to the Allianz Policy, the Settlement Trust purports to stand in BSA's shoes and, as such, is subject to the same terms, conditions, obligations, and defenses to coverage thereunder.

144.    The Allianz Policy states that no action for coverage may lie against Allianz with respect to a putative occurrence unless, as a condition precedent thereto, BSA has complied fully with all terms and conditions of the Allianz Policy.

145.    The procedures to which BSA agreed without Allianz's consent, under which the Settlement Trustee is required to pay Abuse Claims, including the Matrix Evaluation, the IRO, and the Document Appendix, do not comply with the terms and conditions of the Allianz Policy.

146.    For each and all of the reasons described herein, BSA failed to comply with all terms and conditions of the Policies.

147.    Accordingly, BSA and/or the Settlement Trust have failed to satisfy a necessary and material condition precedent to coverage under the Allianz Policy.

TrustApp360

FILED DATE: 9/5/2023 5:46 PM   2017CH14975

WHEREFORE, Allianz prays that the Court:

a.      Declare that no coverage exists under the Allianz Policy, and Allianz therefore owes no duty thereunder to indemnify the Settlement Trust, because any payments made by the Settlement Trust will not comply with the terms and conditions of the Policies; and

b.      Award Allianz such other and further relief that the Court deems just and proper.

## COUNT XXI
## DECLARATION THAT NO COVERAGE IS AVAILABLE BECAUSE BSA FAILED TO DISCLOSE KNOWN AND ANTICIPATED SEXUAL ABUSE CLAIMS AND LIABILITIES DURING UNDERWRITING OF THE ALLIANZ POLICY

148.    Allianz incorporates all preceding paragraphs as though fully restated herein.

149.    BSA's Plan purports to assign to the Settlement Trust all "rights, claims, benefits, or Causes of Action" of BSA and certain related entities identified by the Plan "under or with respect to" the Allianz Policy.

150.    As BSA's putative successor-in-interest to the Allianz Policy, the Settlement Trust purports to stand in BSA's shoes and, as such, is subject to the same terms, conditions, obligations, and defenses to coverage thereunder.

151.    As an insured, BSA was required to disclose its known or expected liabilities in connection with its application for coverage under the Allianz Policy.

152.    In addition, as an insured, BSA was required to disclose known past sexual abuse claims or suits against it at or before the time of underwriting of the Allianz Policy.

153.    Upon information and belief, BSA was aware and had knowledge of thousands of occurrences of sexual abuse potentially resulting in liability since as early as the 1920s.

154.    At and before the time BSA applied for coverage from Allianz, incidents of sexual

134

TrustApp361

FILED DATE: 9/5/2023 5:46 PM   2017CH14975

abuse within the organization were being reported to BSA at an average rate of incident every three days.

155.    At and before the time BSA applied for coverage from Allianz, BSA was named as a defendant in lawsuits against it arising from sexual abuse of children in scouting.

156.    Records documenting reports of sexual abuse and the perpetrators involved were maintained by BSA beginning   no later than the early 1920s. By the early 1980s, BSA had documented and maintained records of thousands of incidents of sexual abuse committed by adult scout leaders and volunteers.

157.    BSA concealed its knowledge of sexual abuse within the organization from the authorities, parents, Congress, the public, and its insurers.

158.    BSA did not disclose and/or misrepresented to Allianz BSA's known or expected liability and claims and suits against it for sexual abuse when it applied for insurance from Allianz, and thus misrepresented to Allianz the nature and extent of the potential liabilities for which it was seeking coverage.

WHEREFORE, Allianz prays that the Court:

a.    Declare that no coverage exists under the Allianz Policy and Allianz therefore owes no duty thereunder to indemnify the Settlement Trust because of material misrepresentations BSA made to Allianz and BSA's concealment in connection with its application for and underwriting of coverage under the Allianz Policy; and

b.    Award Allianz such other and further relief that the Court deems just and proper.

TrustApp362

FILED DATE: 9/5/2023 5:46 PM   2017CH14975

### COUNT XXII
### DECLARATION THAT NO COVERAGE EXISTS FOR PUNITIVE OR EXEMPLARY DAMAGES

159.     Allianz incorporates all preceding paragraphs as though fully restated herein.

160.     BSA's Plan purports to assign to the Settlement Trust all "rights, claims, benefits, or Causes of Action" of BSA and certain related entities identified by the Plan "under or with respect to" the Allianz Policy.

161.     As BSA's putative successor-in-interest to the Allianz Policy, the Settlement Trust purports to stands in BSA's shoes and, as such, is subject to the same terms, conditions, obligations, and defenses to coverage thereunder.

162.     The Claims Matrix in the Trust Distribution Procedures assigns values to Abuse Claims to be paid by the Settlement Trust in part based on BSA's alleged knowing, willful or intentional misconduct that formed the basis for prepetition claims for punitive and/or exemplary damages against BSA.

163.     The Allianz Policy expressly excludes punitive and/or exemplary damages awarded or assessed against any insured.

164.     Accordingly, no coverage exists for any portion of an Abuse Claim paid by the Settlement Trust that represents an amount paid for punitive and/or exemplary punitive damages and Allianz owes no duty to indemnify the Settlement Trust with respect to those amounts.

WHEREFORE, Allianz prays that the Court:

a.     Declare that no coverage exists under the Allianz Policy, and that Allianz owes no duty to indemnify the Settlement Trust with respect to, the amount of any Abuse Claim paid by the Settlement Trust that represents punitive and/or exemplary damages; and

TrustApp363

FILED DATE: 9/5/2023 5:46 PM   2017CH14975

b.      Award Allianz such other and further relief that the Court deems just

and proper.

## COUNT XXIV
## DECLARATION OF BSA'S LOCAL COUNCILS' RESPECTIVE LIMITS OF LIABILITY UNDER THE ALLIANZ POLICY

165.   Allianz incorporates all preceding paragraphs as though fully restated herein.

166.   Subject to all of its terms, conditions and exclusions, the Allianz Policy provides

coverage to entities or individuals identified by the Allianz Policy as insureds thereunder.

167.   With respect to BSA's Local Councils, the Allianz Policy provides different per-

occurrence limits of liability for various Local Councils as stated in endorsements to or elsewhere

within the Allianz Policy.

WHEREFORE, Allianz prays that the Court:

a.      Declare what per-occurrence limits of liability, if any, exist for each BSA

Local Council as set forth in the Allianz Policy, including without limitation in

endorsements to the Allianz Policy; and

b.      Award Allianz such other and further relief that the Court deems just and

proper.

Dated: [DATE]                                   Respectfully Submitted,

[SIGNATURE]

137

TrustApp364

| Insurers That Joined the Texas Motion to Stay | Insurers That Joined the Delaware Stay Motion |
|---|---|
| Allied World Assurance Company (U.S.) Inc. | Allianz Global Risks US Insurance Company |
| Allstate Insurance Company | Arch Insurance Company |
| American Casualty Company of Reading, Pennsylvania | Argonaut Insurance Company |
| American Home Assurance Company | Arrowood Indemnity Company |
| Arch Insurance Company | Colony Insurance Company |
| Argonaut Insurance Company | Columbia Casualty Company |
| Arrowood Indemnity Company | Endurance American Insurance Company |
| Ategrity Specialty Insurance Company | Endurance American Specialty Insurance Company |
| Charter Oak Fire Insurance Company | Gemini Insurance Company |
| CNA Financial Corporation | General Star Indemnity Company |
| Columbia Casualty Company | Great American Assurance Company, f/k/a Agricultural Insurance Company |
| Columbia Insurance Company | Great American E&S Insurance Company |
| Consolidated National Insurance Company | Great American E&S Insurance Company, f/k/a Agricultural Excess and Surplus Insurance Company |
| Continental Casualty Company | Gulf Insurance Company |
| Crum & Forster Indemnity Company | Indian Harbor Insurance Company, on behalf of itself and as successor in interest to Catlin Specialty Insurance Company |
| Endurance American Insurance Company | Interstate Fire & Casualty Company |
| Endurance American Specialty Insurance Company | Landmark Insurance Company |
| Erie Family Life Insurance Company | Lexington Insurance Company |
| Erie Insurance Exchange | Liberty Insurance Underwriters, Inc. |
| Evanston Insurance Company | Liberty Mutual Insurance Company |
| Everest National Insurance Company | Liberty Surplus Insurance Corporation |
| First Insurance Company of Hawaii, LTD | National Surety Corporation |
| Gemini Insurance Company | National Union Fire Insurance Company of Pittsburgh, Pa. |
| General Star Indemnity Company | Old Republic Insurance Company |
| Indian Harbor Insurance Company, on behalf of itself and as successor in interest to Catlin Specialty Insurance Company | St. Paul Surplus Lines Insurance Company |
| Jefferson Insurance Company | The Continental Insurance Company |
| Lexington Insurance Company | The Insurance Company of the State of Pennsylvania |
| Liberty Insurance Underwriters, Inc. | The Ohio Casualty Insurance Company |

| | |
|---|---|
| Liberty Mutual Insurance Company | Traders and Pacific Insurance Company[1] |
| Liberty Surplus Insurance Corporation | Travelers Casualty and Surety Company, Inc. (f/k/a Aetna Casualty & Surety Company) |
| Munich Reinsurance America Inc., formerly known as American Re-Insurance Company | |
| National Casualty Company | |
| National Fire Insurance Company of Hartford | |
| National Union Fire Insurance Company of Pittsburgh, Pa. | |
| Nationwide Affinity Insurance Company of America | |
| Nationwide Mutual Insurance Company | |
| New Hampshire Insurance Company | |
| Old Republic Insurance Company | |
| Peerless Indemnity Insurance Company | |
| Phoenix Insurance Company | |
| QBE Insurance Corporation | |
| Safeco Insurance Company of America | |
| Scottsdale Insurance Company | |
| Sparta Insurance Company as successor for certain limited purposes to American Employers' Insurance Company | |
| St. Paul Fire and Marine Insurance Company | |
| St. Paul Mercury Insurance Company | |
| St. Paul Surplus Lines Insurance Company | |
| Swiss Re. Corporate Solutions Capacity Insurance Corporation (formerly known as, or otherwise responsible for the liability of, First Specialty Insurance Corporation) | |
| The Cincinnati Insurance Company | |
| The Continental Insurance Company | |
| The Insurance Company of the State of Pennsylvania | |
| The North River Insurance Company | |
| The Ohio Casualty Insurance Company | |
| The Travelers Companies, Inc. | |
| The Travelers Indemnity Company | |
| TIG Insurance Company | |
| Travelers Casualty and Surety Company | |

TrustApp366

| |
|---|
| United States Fidelity and Guaranty Company |
| United States Fire Insurance Company |
| Wausau General Insurance Company |
| Westport Insurance Corporation |

[1] Traders and Pacific Insurance Company ("Traders") is believed to be the predecessor to Endurance American Specialty Insurance Company, and thus, Traders is believed to have signed onto the Texas Motion to Stay, as well.

*Insurers in red text are those which signed onto motions in both actions.

TrustApp368

| 2004CH01708 | CHCAL11 | 01/29/2004 | District 1 |
| --- | --- | --- | --- |

| Plaintiff(s) | Case Type | Defendant(s) | Attorney |
| --- | --- | --- | --- |
| CONTINENTAL CASUALTY CORP | Declaratory Judgment | BORG WARNER INC | GERBER NEAL |
| COLUMBIA CASUALTY COMPANY | | BURNS INTERNATIONAL SERVIC | GRIPPO ELDEN LLC |
| TRANSPORTATION INSURANCE C | | YORK INTERNATIONAL CORPORA | DENA ECONOMOU |
| CONTINENTAL INSURANCE COMP | | FLOWSERVE US INC | OCONNOR COZEN |
| CONTINENTAL CASUALTY CO | | CENTURY INDEMNITY COMPANY | TABET DIVITO & ROTHSTEIN |
| TRANSFER TO LAW DIVISION | | ROYAL INDEMNITYCOMPANY | AMUNDSEN DAVIS, LLC |
| 6/28/21 | | CASUALTY TRAVELERS | CARROLL MCNULTY&KULL LLC |
| GUNTY & MCCARTHY LTD | | CERTAIN UNDERWRITERS LLOYD | STEVEN SEIDMAN |
| | | LONDON | SONNENSCHEIN NATH & ROSEN |
| | | UNIGARD INSURANCE CO | THOMAS CUNNINGHAM |
| | | CASUALTY IMPERIAL | JOHN THIES |
| | | SEATON INSURANCE | DANIEL THIES |
| | | ZURICH LIFE INSURANCE | MARK ZIMMERMAN |
| | | AMERICAN INTERNATIONAL | MITCHEL TORRENCE |
| | | ALLSTATE INSURANCE | |
| | | FIRST STATE INSURANCE | |
| | | TIG INSURANCE COMPANY | |
| | | SAFETY NATIONALCASUALTY | |
| | | RISK EXECUTIVE | |
| | | AMERICAN RE INSURANCE CO | |
| | | UNDERWRITERS ALLIANZ | |
| | | AIU INSURANCE CO | |
| | | GRANITE STATE INS CO | |
| | | NATIONAL UNION FIRS INS | |
| | | AMERICAN HOME ASSURANCE | |
| | | LEXINGTON INS CO | |
| | | FIRE INTERSTATE | |
| | | REINSURANCE MUNICH | |
| | | INSURERS EXCESS | |
| | | CASUALTY TRAVELERS | |
| | | ARROWOOD INDEMNITY COMPANY | |
| | | MEMBER CHARTIS | |
| | | ALLSTATE INSURANCE COMPANY | |
| | | HISCOX INSURANCE COMPANY | |
| | | FIRST STATE INS CO | |
| | | REINSURANCE MUNICH | |
| | | ZURICH INTERNATIONAL | |
| | | BORGWARNER MORSE TEC LLC | |
| | | AIG | |
| | | CNA | |
| | | SHEA ROGAL & ASSOCIATES | |
| | | BROWN DONOHUE | |

TrustApp369

**Future Court Activity:**

| Court Date: 11/9/2023 | Hearing Type: Open Call (Judicial Officer:Mclean Meyerson, Pamela,Calendar, 11) | Time: 2:00 PM | Location: Court Room 2305,Richard J Daley Center |
|---|---|---|---|

**Case Activities:**

| Activity Date: 10/24/2023 | Event Desc: Notice Filed | Comments: Notice of death of retained expert |
|---|---|---|
| Activity Date: 10/11/2023 | Event Desc: Notice Of Filing Filed | Comments: Notice of Filing of Corrected Transcript of the September 26, 2023 Hearing Before Judge Meyerson |
| Activity Date: 10/6/2023 | Event Desc: Notice Of Filing Filed | Comments: Notice of Filing of Transcript of 9/26/23 Hearing before Judge Meyerson |
| Activity Date: 9/28/2023 | Event Desc: Case Assigned to Zoom Hearing - Allowed | Comments: This matter is scheduled for ruling on November 9, 2023 at 2:00 pm via Zoom. This is on Calendar 11 (noted from Court Order dated 9/27/23) |

| **Activity Date:** 9/27/2023 | **Event Desc:** Case Assigned to Zoom Hearing - Allowed | **Comments:** The Court takes the matter under advisement and the status of ruling is scheduled via ZOOM. |
|---|---|---|

| **Activity Date:** 9/22/2023 | **Event Desc:** Memorandu m Filed | **Comments:** TIG Ins. Reply Brief In Support Of Its Motion To Strike Certain Materials - Second Motion To Reconsider |
|---|---|---|

| **Activity Date:** 9/18/2023 | **Event Desc:** Answer/Res ponse/Reply | **Comments:** MORSE TEC LLCS REPLY IN SUPPORT OF ITS MOTION FOR LEAVE TO UPDATE DAMAGES |
|---|---|---|

| **Activity Date:** 9/18/2023 | **Event Desc:** Notice Filed | **Comments:** DECLARATI ON OF THOMAS D. CUNNINGH AM IN SUPPORT OF POLICYHOL DERS OPPOSITIO N TO TIGS MOTION TO STRIKE |
|---|---|---|

| **Activity Date:** 9/18/2023 | **Event Desc:** Answer/Res ponse/Reply | **Comments:** Policyholder s' Opposition to TIG's Motion to Strike |
|---|---|---|

| **Activity Date:** 9/18/2023 | **Event Desc:** Affidavit Filed | **Comments:** REPLY DECLARATION OF THOMAS D. CUNNINGHAM IN SUPPORT OF MORSE TEC LLCS REPLY IN SUPPORT OF ITS MOTION FOR LEAVE TO UPDATE DAMAGES |
|---|---|---|
| **Activity Date:** 9/15/2023 | **Event Desc:** Affidavit In Support Of Motion Filed | **Comments:** Reply Affidavit of Thies in Support of Policyholders' Reply in Support of Motion to Reconsider (Defense Costs) |
| **Activity Date:** 9/15/2023 | **Event Desc:** Answer/Response/Reply | **Comments:** Policyholders' Reply in Support of Their Motion to Reconsider TIG's Obligation to Pay Defense Costs |
| **Activity Date:** 9/12/2023 | **Event Desc:** Strike From The Call - Allowed - | **Comments:** Status hearing currently set for September 25, 2023 at 9:30 am is hereby STRICKEN |

| **Activity Date:** 9/12/2023 | **Event Desc:** Case Assigned to Zoom Hearing - Allowed | **Comments:** The hearing on the Motion and related matters set for September 26, 2023 at 2:00 pm shall be held IN PERSON in Room 2305 of the Daley Center, 50 West Washington, Chicago, Illinois 60602 Those who wish to attend the hearing remotely may do so via Zoom. |
|---|---|---|
| **Activity Date:** 9/12/2023 | **Event Desc:** Motion To - Allowed - | **Comments:** Morse Tec's reply in support of its Motion for Leave to Update Damages (the "Motion") shall be filed on or before September 18, 2023 |
| **Activity Date:** 9/12/2023 | **Event Desc:** Strike From The Call - Allowed - | **Comments:** The hearing presentment of the Motion to Strike, scheduled for September 12, 2023 at 9:30 am is hereby STRICKEN. |

| **Activity Date:** | 9/12/2023 | **Event Desc:** | Answer/Reply/Response - Allowed | **Comments:** | Morse TEC LLC shall file its Response to the Motion to Strike on or before September 18, 2023. TIG Insurance Company shall file its Reply In Support of the Motion to Strike on or before September 22, 2023 |
|---|---|---|---|---|---|
| **Activity Date:** | 9/12/2023 | **Event Desc:** | Agreed Order Entered | **Comments:** | Agreed Order on Briefing Schedule |
| **Activity Date:** | 9/8/2023 | **Event Desc:** | Routine Motion Filed | **Comments:** | Routine Motion for Leave to Withdraw as Counsel |
| **Activity Date:** | 9/8/2023 | **Event Desc:** | Withdrawal Of Attorney From Case - Allowed - | **Comments:** | Clyde & Co US LLP;s Motion to Leave to Withdraw as Counsel for Third-Party Defendant TIG Insurance Company, on behalf of itself and as successor by mergers to International Insurance Company and International Surplus Insurance Company is GRANTED. |

| **Activity Date:** 4/1/2004 | **Event Desc:** Notice Of Motion Filed | **Comments:** Plaintiff: CONTINENTAL |

| **Activity Date:** 4/1/2004 | **Event Desc:** Motion Filed | **Comments:** Plaintiff: CONTINENTAL |

| **Activity Date:** 4/1/2004 | **Event Desc:** Exhibits Filed | **Comments:** Plaintiff: CONTINENTAL |

| **Activity Date:** 4/1/2004 | **Event Desc:** File Amended Pleading(Set For Motion Hearing) | **Comments:** Court Time: 0930 |

| **Activity Date:** 3/15/2004 | **Event Desc:** Return For Random Assignment | **Comments:** Plaintiff: CONTINENTAL CA UALTY CORP Court Room: 2403 |

| **Activity Date:** 3/15/2004 | **Event Desc:** Return For Random Assignment | **Comments:** Litigant: BORG WARNER INC Microfilm Number: CH 40182784 |

| **Activity Date:** 3/15/2004 | **Event Desc:** Change Of Venue - Allowed - | **Comments:** Plaintiff: CONTINENTAL CA UALTY CORP Court Room: 2403 Microfilm Number: CH 40182784 |

**Activity Date:** 3/15/2004    **Event Desc:** Transferred To Presiding Judge    **Comments:** Plaintiff: CONTINENTAL CA UALTY CORP Court Room: 2403 Microfilm Number: CH 40182784

**Activity Date:** 3/12/2004    **Event Desc:** Transferred To Presiding Judge    **Comments:** Plaintiff: CONTINENTAL CA UALTY CORP Court Room: 2405 Microfilm Number: CH 40180472

**Activity Date:** 3/5/2004    **Event Desc:** Appearance Filed - Fee Paid -    **Comments:** Attorney Code: 37472 Attorney Name: HOLLAND & KNIGHT LLP Litigant: YORK INTERNATIONAL Filing Fee: $140.00

**Activity Date:** 3/5/2004    **Event Desc:** Appearance Filed - Fee Paid -    **Comments:** Attorney Code: 90599 Attorney Name: NISEN & ELLIOTT Litigant: BURNS Filing Fee: $140.00

**Activity Date:** 3/5/2004    **Event Desc:** Proof Of Service Filed    **Comments:** Attorney Code: 37472 Attorney Name: HOLLAND & KNIGHT LLP Litigant: YORK INTERNATIONAL

| **Activity Date:** 3/5/2004 | **Event Desc:** Certificate Filed | **Comments:** Attorney Code: 90599 Attorney Name: NISEN & ELLIOTT Litigant: BURNS |
|---|---|---|

| **Activity Date:** 2/27/2004 | **Event Desc:** Certificate Of Mailing Filed | **Comments:** Attorney Code: 34355 Attorney Name: UNGARETTI & HARRIS Litigant: BORG WARNER |
|---|---|---|

| **Activity Date:** 2/27/2004 | **Event Desc:** Certificate Filed | **Comments:** |
|---|---|---|

| **Activity Date:** 2/27/2004 | **Event Desc:** Appearance Filed - Fee Paid - (Jury Demand) | **Comments:** Filing Fee: $230.00 |
|---|---|---|

| **Activity Date:** 2/27/2004 | **Event Desc:** Appearance Filed - Fee Paid - (Jury Demand) | **Comments:** Attorney Code: 34355 Attorney Name: UNGARETTI & HARRIS Litigant: BORG WARNER Filing Fee: $140.00 |
|---|---|---|

| **Activity Date:** 2/26/2004 | **Event Desc:** Certificate Of Mailing Filed | **Comments:** Attorney Code: 34355 Attorney Name: UNGARETTI & HARRIS Litigant: BORGWARNER |
|---|---|---|

**Activity Date:** 2/26/2004    **Event Desc:** Certificate Filed    **Comments:** Attorney Code: 34355 Attorney Name: UNGARETTI & HARRIS Litigant: BORGWARNER

**Activity Date:** 2/26/2004    **Event Desc:** Appearance Filed - Fee Paid -    **Comments:** Attorney Code: 34355 Attorney Name: UNGARETTI & HARRIS Litigant: BORGWARNER Filing Fee: $140.00

**Activity Date:** 2/25/2004    **Event Desc:** Notice Of Motion Filed    **Comments:** Plaintiff: CONTINENTAL

**Activity Date:** 2/25/2004    **Event Desc:** Certificate Of Mailing Filed    **Comments:** Plaintiff: CONTINENTAL

**Activity Date:** 2/6/2004    **Event Desc:** Summons - Retd P.S.    **Comments:** Litigant: FLOWSERVE US

**Activity Date:** 2/6/2004    **Event Desc:** Summons - Retd P.S.    **Comments:** Litigant: BORGWARNER

**Activity Date:** 2/6/2004    **Event Desc:** Summons - Retd P.S.    **Comments:** Litigant: YORK INTERNATIONAL

**Activity Date:** 2/6/2004    **Event Desc:** Certificate Filed    **Comments:** Litigant: BURNS INTERNATIONAL

| **Activity Date:** 2/6/2004 | **Event Desc:** Certificate Filed | **Comments:** Litigant: FLOWSERVE US |
|---|---|---|
| **Activity Date:** 2/6/2004 | **Event Desc:** Certificate Filed | **Comments:** Litigant: BORGWARNER |
| **Activity Date:** 2/6/2004 | **Event Desc:** Certificate Filed | **Comments:** Litigant: YORK INTERNATIONAL |
| **Activity Date:** 2/6/2004 | **Event Desc:** Summons - Retd P.S. | **Comments:** Litigant: BURNS INTERNATIONAL |
| **Activity Date:** 1/29/2004 | **Event Desc:** Case Set On Case Management Call | **Comments:** Court Room: 2405 Court Time: 1030 |
| **Activity Date:** 1/29/2004 | **Event Desc:** Declaratory Judgment Complaint Filed | **Comments:** Litigant: BORG WARNER INC Filing Fee: $271.00 |
| **Activity Date:** 1/29/2004 | **Event Desc:** New Case Filing | **Comments:** |

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | Chapter 11 |
| BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC,[1] | Case No. 20-10343 (LSS) |
| Debtors. | (Jointly Administered) |
|  | **Ref. Docket No. 7832** |

## CERTAIN INSURERS' OBJECTION TO
## <u>CONFIRMATION OF DEBTORS' CHAPTER 11 PLAN</u>

---

[1]    The Debtors in these Chapter 11 Cases, together with the last four digits of each Debtor's federal tax identification number, are as follows: Boy Scouts of America (6300) and Delaware BSA, LLC (4311). The Debtors' mailing address is 1325 West Walnut Hill Lane, Irving, Texas 75038.

TrustApp380

**TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT.................................................................................1

BACKGROUND .................................................................................................8

    A.    Claims Aggregators and Attorney-Signed Proofs of Claim Increase Abuse Claims from 275 Prepetition to Over 82,000................................8

    B.    The Collusive TDPs.................................................................14

        (i)    Inflating Claims Values in Successive Versions of the Claims Matrix .........................................................................15

        (ii)    Aggravating and Mitigating Scaling Factors at the Discretion of the Settlement Trustee ....................................17

            1.    No Evidence of Negligence Required ....................18

            2.    Statutes of Limitations and Repose as a Mitigating Factor Rather than a Bar to Recovery......................20

            3.    Expedited Distributions Without Any Review of Claims.........22

        (iii)    No Vetting of Abuse Claims Through Claimant Interviews or Objective Testing of Claimants ............................23

    C.    The Unbridled Discretionary Authority of a Conflicted Settlement Trustee .................................................................23

    D.    Abrogation of Insurance Policy Terms and Elimination of Insurer Rights and Defenses .........................................................26

        (i)    Coalition Changes to Limit Insurers' Rights .........................27

        (ii)    Proposed Findings Under the Plan Modify Insurers' Contractual Rights.........................................................27

    E.    The Mediation.................................................................29

    F.    Evidentiary Record Submitted by the Debtors and Voting Results...................30

        (i)    Bates Affirmative Report Justifying Base Matrix Values Based Upon Single Abuser Historical Settlements ..........................30

        (ii)    Less Than 48% of Total Direct Abuse Claimants Vote in Favor of the Plan .........................................................31

i

TrustApp381

**TABLE OF CONTENTS**
(*continued*)

Page

(iii)    Bates Rebuttal Report Opines that Single Abuser Claims Must be Reduced by 90% From the Base Matrix Value ...............................33

G.    Settlements with Local Councils, Chartered Organizations and Certain Insurers. ..............................................................................................34

ARGUMENT ............................................................................................................................36

I.    THE PROPOSED CHANNELING INJUNCTION FAILS TO SATISFY THE REQUIREMENTS OF THIRD CIRCUIT LAW. ...........................................................36

A.    Nonconsensual Third-Party Releases Are Authorized Only in Unusual or Extraordinary Circumstances. ..................................................................37

B.    The Impacted Claimants Did Not "Overwhelmingly" Vote to Accept the Plan that Imposes the Channeling Injunction. ....................................38

C.    The Claims of Both Class 8 and Class 9 Will Not Be Paid In Full by the Settlement Trust. .....................................................................................40

D.    The Majority of Beneficiaries of the Channeling Injunction Will Not be Making a "Substantial Contribution" to the Settlement Trust. ...........43

E.    The Remaining *Master Mortgage* Factors Either Do Not Support or Are, at the Very Least, Neutral as to the Issue of Whether Approval of the Channeling Injunction Is Appropriate Under These Facts. ................47

II.    THE PLAN MODIFIES CONTRACT RIGHTS IN VIOLATION OF BANKRUPTCY AND NON-BANKRUPTCY LAW. ..................................................48

A.    The Proposed Plan Seeks to Improperly Determine Coverage Issues Through the Proposed Findings. ...........................................................50

B.    The Plan Alters Certain Insurers' Rights by Materially Increasing Their Liability in a Manner Inconsistent with the Tort System. ...................58

C.    The TDPs Render the Plan Unconfirmable, as They Expressly Rewrite Insurance Policy Terms to Eliminate Insurer Rights and Defenses. ...................61

(i)    The "No Action Clause" ........................................................62

(ii)    SIR/Deductible Rights .........................................................65

(iii)    Indemnification, Contribution, Subrogation and Reinsurance Rights ..................................................................................68

ii

TrustApp382

**TABLE OF CONTENTS**
(*continued*)

**Page**

D.   The Plan Improperly Assigns Non-Debtor Insurance Contracts to the Settlement Trust. .......................................................................................... 69

E.   The Plan Would Abridge Insurers' Constitutional Rights. ................................ 73

III.   GOVERNANCE OF THE SETTLEMENT TRUST IS INCONSISTENT WITH PUBLIC POLICY. .......................................................................................... 75

A.   The Settlement Trustee and STAC Lack any Semblance of Independence. .................................................................................................... 76

(i)   Lack of Impartiality ............................................................... 76

(ii)   Lack of Fraud Prevention Measures and Disinterested Oversight of the Settlement Trust and Settlement Trustee. ................................... 81

IV.   THE PLAN IS NOT PROPOSED IN GOOD FAITH AND CANNOT BE CONFIRMED UNDER 11 U.S.C. § 1129(A)(3). ............................................. 83

A.   The Plan Ensures the Payment of Claims Barred by State Law and Impermissibly Inflates Insurers' Contractual Liabilities. .................................. 85

B.   The Substantive Defects in the Plan are the Result of Self-Dealing Among the Plan Proponents. ........................................................................... 87

CONCLUSION ................................................................................................................. 89

iii

TrustApp383

**TABLE OF AUTHORITIES**

<div align="right">

**Page(s)**
</div>

CASES

*In re 641 Associates, Ltd.*,
  1993 WL 332646 (Bankr. E.D. Pa. Aug. 26, 1993)...................................................44

*In re 710 Long Ridge Rd. Operating Co., II*,
  Case No. 13-13653 (DHS), 2014 Bankr. LEXIS 863 (Bankr. D.N.J. Mar. 5, 2014) ........39, 41

*In re AbitibiBowater Inc.*,
  418 B.R. 815 (Bankr. D. Del. Oct. 27, 2009) ........................................................44

*In re ACandS, Inc.*,
  311 B.R. 36 (Bankr. D. Del. 2004) .........................................................77, 82, 84, 89

*In re Am. Capital Equip., LLC*,
  688 F.3d 145 (3d Cir. 2012).................................................................76, 77, 79, 80

*Am. Sur. Co. v. Baldwin*,
  287 U.S. 156 (1932).........................................................................................68

*Am. United Mut. Life Ins. Co. v. City of Avon Park, Fla.*,
  311 U.S. 138 (1940).........................................................................................82

*In re Amatex Corp.*,
  107 B.R. 856 (E.D. Pa. 1989) *aff'd*
  908 F.2d 961 (3d Cir. 1990)...............................................................................61

*Amatex Corp. v. Aetna Cas. & Sur. Co. (In re Amatex Corp.)*,
  97 B.R. 220 (Bankr. E.D. Pa. 1989), *aff'd sub nom.*,
  *Amatex Corp. v. Stonewall Ins. Co.*,
  102 B.R. 411 (E.D. Pa. 1989) .........................................................................44, 45

*In re American Family Enters.*,
  256 B.R. 377 (D. N.J. 2000) .............................................................................35

*In re Aov Indus.*,
  253 U.S. App. D.C. 186, 792 F.2d 1140 (1986) .....................................................35

*In re Archdiocese of Saint Paul & Minneapolis*,
  578 B.R. 823 (Bankr. D. Minn. 2017) .................................................................34

*ARTRA 524(g) Asbestos Trust v. Fairmont Premier Co.*,
  2011 WL 4684356 (N.D. Ill. 2011) ....................................................................52

TrustApp384

**TABLE OF AUTHORITIES**
(*continued*)

**Page(s)**

*In re Blitz U.S.A., Inc.*,
   2013 WL 6825607 (Bankr. D. Del. Nov. 12, 2013) ...............................................................46

*In re Chatha*,
   2021 WL 3533391 (Bankr. E.D. Cal. Aug. 9, 2021) ...........................................................49

*Cissel v. Am. Home Assur. Co.*,
   521 F.2d 790 (6th Cir. 1975) .........................................................................................44

*In re Combustion Engineering, Inc.*,
   391 F.3d 190 (3d Cir. 2004).....................................................................5, 44, 46, 65, 76, 79

*In re Congoleum Corp.*,
   426 F.3d 675 (3d Cir. 2005)...........................................................................................80

*Covanta Onondaga Ltd. v. Onondaga Cnty. Res. Recovery Agency*,
   318 F.3d 392 (2d Cir. 2003)...........................................................................................49

*In re Crippin*,
   877 F.2d 594 (7th Cir. 1989) .........................................................................................44

*In re Cushman*,
   589 B.R. 469 (Bankr. D. M.E. 2018).............................................................................36

*Deutsche Bank AG, London Branch v. Metromedia Fiber Network, Inc.* (*In re Metromedia Fiber
   Network, Inc.*),
   416 F.3d 136 (2d Cir. 2005)...........................................................................................34

*In re Digerati Techs., Inc.*,
   Case No. 13-33264, 2014 Bankr. LEXIS 2352 (Bankr. S.D. Tex. 2014)...................70, 71, 73

*In re Dow Corning Corp.*,
   198 B.R. 214 (Bankr. E.D. Mich. 1996) .......................................................................51

*In re Dow Corning Corp.*,
   280 F.3d 648 (6th Cir. 2002) .........................................................................................43

*In re Dura Automotive Systems, Inc.*,
   2007 WL 7728109 (Bankr. D. Del. Aug. 15, 2007) .......................................................44

*In re Exide Holdings, Inc.*,
   2021 WL 3145612 (D. Del. July 26, 2021) ...............................................................76, 82

TrustApp385

**TABLE OF AUTHORITIES**
(*continued*)

**Page(s)**

*In re F-Squared Invest. Manag., LLC*,
    546 B.R. 538 (Bankr. D. Del. 2016) ........................................................................36

*Fed. Ins. Co. v. SKMDV Holdings, Inc. (In re Green Jacobson P.C.)*,
    2017 WL 3149333 (Bankr. E.D. Mo. July 24, 2017) ......................................44, 61

*In re Federal-Mogul Glob. Inc.*,
    684 F.3d 355 (3d Cir. 2012)..............................................................................65, 66

*Flintkote Co. v. Aviva PLC (In re Flintkote Co.)*,
    177 F.Supp. 3d 1165 (N.D. Cal. 2016))...........................................................48, 52

*In re Flintkote Co.*,
    No. 04-11300 (MFW), 2015 Bankr. LEXIS 2711 (Bankr. D. Del. Aug. 10, 2015)...............35

*Fuller-Austin Insulation Co. v. Highlands Ins. Co.*,
    135 Cal. App. 4th 958 (2006) ..........................................................................48, 52

*Fulton Boiler Works, Inc. v. Am. Motorists Ins. Co*.,
    828 F. Supp. 2d 481 (N.D.N.Y. 2011).....................................................................67

*In re Genco Shipping & Trading Ltd.*,
    513 B.R. 233 (Bankr. S.D.N.Y. 2014) ...................................................................39

*In re Genesis Health Ventures, Inc.*,
    266 B.R. 591 (Bankr. D. Del. 2001) ......................................................................82

*Gillman v. Cont'l Airlines (In re Cont'l Airlines)*,
    203 F.3d 203 (3d Cir. 2000).............................................................................32, 43

*Glew v. Cigna Group Ins*.,
    590 F. Supp. 2d 395 (E.D.N.Y. 2008) ...................................................................67

*In re Glob. Indus. Techs.*,
    645 F.3d 201 (3d Cir. 2011).....................................................................46, 53, 80

*Granfinanciera, S.A. v. Nordberg*,
    492 U.S. 33, 51-52 (1989)645 F.3d 201 (3d Cir. 2011) ..........................................74

*Gulf Underwriters Ins. Co. v. Burris*,
    674 F.3d 999 (8th Cir. 2012) .................................................................................61

TrustApp386

**TABLE OF AUTHORITIES**
(*continued*)

                                                                                      **Page(s)**

*In re HWA Props., Inc.*,
    544 B.R. 231 (Bankr. M.D. Fla. 2016) ...................................................................39

*Kleenit, Inc. v. Sentry Ins. Co.*,
    486 F. Supp. 2d 121 (D. Mass. 2007) ...................................................................67

*In re Koelbl*,
    751 F.2d 137 (2d Cir. 1984).................................................................................77

*In re Layton*,
    480 B.R. 392 (Bankr. M.D. Fla. 2012) ...................................................................51

*Lindsey v. Normet*,
    405 U.S. 56 (1972).......................................................................................5, 68

*Longview Power, LLC v. First Am. Title Ins. Co. (In re Longview Power, LLC)*,
    515 B.R. 107 (Bankr. D. Del. 2014) ...................................................................48

*Louisville Joint Stock Land Bank v. Radford*,
    295 U.S. 555 (1935)......................................................................................68

*In re Lower Bucks Hosp.*,
    488 B.R. 303 (E.D. Pa. 2013) ...........................................................................39

*In re Mahoney Hawkes, LLP*,
    289 B.R. 285 (Bankr. D. Mass. 2002) ..................................................................39

*In re Mallinckrodt PLC*,
    2022 WL 334245 (Bankr. D. Del. Feb. 3, 2022) .....................................................35

*In re Master Mortgage Investment Fund*,
    168 B.R. 930 (Bankr. W.D. Mo. 1994)....................................................33, 34, 35, 36, 43

*Matsushita Elec. Indus. Co. v. Epstein*,
    516 U.S. 367 (1996)......................................................................................49

*Menard-Sanford v. Mabey (In re A.H. Robins Co.)*,
    880 F.2d 694 (4th Cir. 1989) ...........................................................................35

*Midway Motor Lodge v. Innkeepers' Telemanagement & Equip. Corp.*,
    54 F.3d 406 (7th Cir. 1995) .............................................................................49

*In re Millennium Lab Holdings II, LLC*,
    575 B.R. 252 (Bankr. D. Del. 2017) ....................................................................32

TrustApp387

**TABLE OF AUTHORITIES**
(*continued*)

**Page(s)**

*In re Millennium Lab Holdings II, LLC*,
    945 F.3d 126 (3d Cir. 2019).............................................................................33, 35

*Moody v. Amoco Oil Co.*,
    734 F.2d 1200 (7th Cir. 1984) ...................................................................................44

*Mt. McKinley Ins. Co. v. Corning Inc.*,
    399 F.3d 436 (2d Cir. 2005)......................................................................................48

*Mullins v. Direct Dig., LLC*,
    795 F.3d 654 (7th Cir. 2015) ....................................................................................68

*Nat'l Heritage Found., Inc. v. Highbourne Found.*,
    760 F.3d 344 (4th Cir. 2014) ....................................................................................39

*Northview Motors v. Chrysler Motors Corp.*,
    186 F3d 346 (3d Cir. 1999).......................................................................................50

*Permasteelisa CS Corp. v. Columbia Cas. Co.*,
    377 Fed. App'x 260 (3d Cir. 2010)...........................................................................57

*In re Pittsburgh Corning Corp.*,
    453 B.R. 570 (Bankr. W.D. Pa. 2011) ........................................................45, 46, 65

*In re Purdue Pharma, L.P.*,
    2021 WL 5979108 (S.D.N.Y. Dec. 16, 2021) ............................................33, 39, 51

*In re Rickel Home Centers, Inc.*,
    209 F.3d 291 (3d Cir. 2000)......................................................................................44

*In re Roman Catholic Bishop of Stockton*,
    Case No. 14-20371, 2017 Bankr. LEXIS 102 (Bankr. E.D. Cal. Jan. 10, 2017)....................70

*Roman Catholic Diocese of Rockville Centre v. Arrowood Indemnity Co.*,
    2021 WL 1978560 (Bankr. S.D.N.Y May 17, 2021)................................................48

*Rosciti v. Ins. Co. of Pennsylvania*,
    659 F.3d 92 (1st Cir. 2011).......................................................................................61

*Rose v. Royal Ins. Co.*,
    2 Cal. App. 4th 709 (1991) .......................................................................................58

*Sharon Steel Corp. v. Nat'l Fuel Gas Dist. Corp.*,
    872 F.2d 36 (3d Cir. 1989).......................................................................................44

TrustApp388

**TABLE OF AUTHORITIES**
(*continued*)

<u>Page(s)</u>

*In re SPM Mfg. Corp.*,
    984 F.2d 1305 (1st Cir. 1993) ................................................................................44

*Stern v. Marshall*
    564 U.S. 462 (2011) ............................................................................................64

*In re Thorpe Insulation Co.*,
    677 F.3d 869 (9th Cir. 2012) ....................................................................45, 47, 53

*In re TK Holdings Inc.*,
    Case No. 17-11375-BLS (Bankr. D. Del. Feb. 21, 2018) ................................37, 48

*Travelers v. PG&E*,
    549 U.S. 443 (2007) ....................................................................................75, 78

*Matter of U.S. Brass Corp.*,
    110 F.3d 1261 (7th Cir. 1997) ..............................................................................48

*United States v. Sanford*,
    979 F.2d 1511 (11th Cir. 1992) ............................................................................79

*United States v. Sec. Indus. Bank*,
    459 U.S. 70 (1982) ..............................................................................................68

*In re USA Gymnastics*,
    Case No. 18-09108 (Bankr. S.D. Ind. Dec. 16, 2021) ........................................35

*In re Vista Proppants & Logistics, LLC*,
    Case No. 20-42002, 2020 Bankr. LEXIS 3018 (Bankr. N.D. Tex. Oct. 28, 2020) ................70

*In re Washington Mut., Inc.*,
    461 B.R. 200 (Bankr. D. Del. 2011) ....................................................................82

*In re WR Grace & Co.*,
    729 F.3d 332 (3d Cir. 2013) ................................................................................77

*In re Zenith Electronics Corp.*,
    241 B.R. 92 (Bankr. D. Del. 1999) ......................................................................43

**STATUTES**

11 U.S.C. § 101(14) ..........................................................................................71

11 U.S.C. § 365(e)(1) ........................................................................................44

TrustApp389

**TABLE OF AUTHORITIES**
(*continued*)

**Page(s)**

11 U.S.C. § 365(f)..................................................................................................44

11 U.S.C. § 502......................................................................................................79

11 U.S.C. § 1123(a)(7).....................................................................................6, 70

11 U.S.C. § 1129(a)(1)..........................................................................................43

11 U.S.C. § 1129(a)(3).............................................................................43, 68, 76

11 U.S.C. § 1129(a)(5).....................................................................................6, 70

28 U.S.C. § 157(b)(5)............................................................................................26

**OTHER AUTHORITIES**

4 Collier on Bankruptcy ¶ 1502.03[2][b] (15th ed. 1984)..................................75

Black's Law Dictionary (9th ed. 2009).................................................................76

*Collier on Bankruptcy* ¶ 1129.02 (15th ed. 1984)..............................................78

Wall Street Journal, *Looting the Boy Scouts* (Mar. 2, 2021)..............................53

18 Wright & Miller, Federal Practice and Procedure § 4413 (3d ed. April 2021 Update)............49

TrustApp390

The undersigned insurance carriers (collectively, "Certain Insurers") file this objection ("Objection") to the Debtors' *Second Modified Fifth Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA* [Docket No. 7832] (the "Plan").[2]  In support of this Objection, Certain Insurers respectfully submit as follows:

## PRELIMINARY STATEMENT

1.      The Plan represents an unprecedented attempt by certain members of the plaintiffs' bar to drum up and inflate tens of thousands of abuse claims that would not withstand scrutiny in the tort system, and then leverage these claims to exploit the bankruptcy process in a manner that would pay them potentially billions of dollars in contingency fees.  This massive financial windfall would come primarily at the expense of two groups:  the holders of valid abuse claims, whose recoveries would be greatly diluted by the payment of invalid claims; and insurance companies, whose policies would be completely rewritten and whose due process rights would be trampled in order to provide payment for those same unmeritorious claims.  The proposed Plan, with fatally flawed Trust Distribution Procedures and Proposed Findings at its center, fails to satisfy binding requirements for a broad channeling injunction and non-consensual third-party releases, fundamentally and impermissibly alters the rights and obligations of the insurers under applicable insurance contracts, and falls far short of satisfying multiple threshold standards of Section 1129 of the Bankruptcy Code.  It cannot be confirmed.

2.      The plaintiffs' law firms understood from the outset of the bankruptcy process that the 275 known prepetition Abuse Claims would not provide the firms with enough leverage to control the Debtors' chapter 11 case, increase claim values and payments, or generate a significant

---

[2]      Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Plan or the Trust Distribution Procedures (the "TDPs"), as applicable.

contingency fee recovery.  Realizing the bankruptcy process presented them a unique opportunity, they promised certain and substantial payouts to sign-up additional potential claimants, and asserted all of those claims to wrest control of the bankruptcy from the Debtors.  The plaintiffs' firms then used that control to draft their own claimant-friendly trust distribution procedures, install their own conflicted Settlement Trustee to implement the TDPs, and to draft and require Court approval of Proposed Findings and other Plan provisions that would eviscerate insurers' contractual rights, and obligate insurers to pay inflated claim amounts based on the Settlement Trustee's claim determinations.

3.      The law firms accomplished this by hiring claims aggregators to run mass advertising campaigns and actively solicit claimants, with little or no vetting of claims.  They drafted proofs of claims, often with those same attorneys (rather than the purported claimants) signing the forms.  Some attorneys were signing literally hundreds of claim forms per day.  One lawyer's photocopied signature was pasted to hundreds of proofs of claim, mere seconds apart. This assembly-line operation was intended to generate as many claims as possible, without even a cursory review as to the legitimacy of the claims.  And the gambit was wildly successful, resulting in a *30,000%* increase in claims—275 prepetition claims transformed into 82,200—and billions of dollars in additional purported exposure and resulting plaintiff law firm contingency fees.

4.      Once the necessary claimant retentions were obtained, plaintiffs' law firms asserted their control over the Plan process.  Despite the formation of the TCC by the Office of the United States Trustee, several law firms formed a unified coalition (the "Coalition") to exert leverage over the Debtors.  The Coalition left no question as to its aims, declaring that it "controlled 80% of the claims i.e., our coalition controls the case."  With pen in hand, the Coalition made several key changes to the TDPs.  The Coalition greatly increased the Base Matrix Values—the dollar amounts

TrustApp392

that would serve as the starting points for the Trustee in valuing claims—to a level that is, according to Debtors' *own* expert, Dr. Charles Bates, *ten times* too high.  They eliminated the ability of the Settlement Trustee to dismiss claims that would be time-barred in the tort system. And they dispensed with any required showing of negligence by the Boy Scouts, effectively imposing a strict liability standard on the Debtors.

5.      The result is TDPs that, if approved, would inflate claim liability by tens of billions of dollars and allow tens of thousands of claims that would otherwise be barred in the tort system. Together with the Proposed Findings, the Coalition and FCR seek to bind the insurers to the inflated future payouts as determined under the TDPs.  By Dr. Bates' estimate, approximately 61% of the claims asserted in the bankruptcy would be barred by the applicable statute of limitations if brought as tort claims.  And 87% of the claims would either fail entirely, or should be highly discounted (by a factor of 90% from the Base Matrix Value) as claimants, in the traditional tort system, would likely be unable to prove that the Boy Scouts acted with negligence with respect to single abuser claims.  Yet all of these claims would be paid out under the proposed TDPs.  In the case of single abuser claims, the claims would be paid with *no* discounts from the Base Matrix Values.

6.      Concurrently, the Coalition and FCR were negotiating with the Local Councils, certain Chartered Organizations and the Settling Insurers to generate a $2.7 billion war chest to pay claimants so they could pursue substantially greater and disproportionate recoveries against the Non-Settling Insurers.  However, those settlements necessitated a global release, which meant that the Plan had to incorporate a channeling injunction and third party releases that covered all Boy Scouts' liability, whether it arose at the national, local or chartered organization level.  This presented a new level of complexity and legal difficulty for the Plan Proponents.  The Third Circuit

3

has a strict test for the imposition of this type of injunction and third party releases, which requires compliance with a number of factors, including that the injunction and third party releases be essential to the reorganization of the debtor, that the Plan be overwhelmingly supported by the affected creditors, that the parties that benefit from the injunction and third party releases make a substantial contribution to the funding of the Plan, and that the Plan pay such creditors in full. None of these factors are present in the Debtors' case.

7.     As a final exertion of control, the Coalition and FCR seek both to appoint an ally, Professor Eric Green, as the Trustee, and to afford him practically unfettered discretion in allowing and valuing claims, notwithstanding that this Court previously declined to appoint him as a mediator in this very case due to his ties to claimants' counsel. The plaintiffs' lawyers then created a supervisory board (the "STAC") that would oversee the Trustee, staffed with several of their own ranks, guaranteeing that there would be no independence to any aspect of the Trust's claims-allowance and valuation process. Through these efforts, claimants' counsel ensured that they would control the determination of claims values by the Trust and that such values would be far in excess of what they would otherwise be entitled to in the tort system.

8.     The result of this process is a proposed Plan that violates numerous provisions of the Bankruptcy Code, governing legal standards, and due process. It cannot be confirmed, for a host of reasons.

9.     **_First_**, although the plaintiffs' law firms succeeded in increasing the number of Abuse Claims and in drafting TDPs and related governance mechanisms that facilitate inflated payouts, the Debtors have come up short in obtaining the support required to obtain a channeling injunction and non-consensual third-party releases. Only 73.57% of Direct Abuse Claimants voted to accept the Plan, which is well below the "overwhelming support" required in the non-asbestos

TrustApp394

context (where a 90% or greater approval rate is more typical), or even the 75% that would be required in the asbestos context.  The vote proved even worse for Indirect Abuse Claimants, whose acceptance did not even breach a threshold of 70%.  The Debtors' unambiguous failure to secure the necessary support for these key provisions of the Plan precludes its approval.

10.     Given the deficient vote count, the Debtors now argue that the Abuse Claims will be "paid in full." But the only evidence in support of that proposition is Dr. Bates' claim valuation report referenced above.   Dr. Bates values the claims at $2.4 billion to $3.6 billion, and contends that these amounts will be paid in full by the approximately $2.7 billion in promised contributions to the Settlement Trust plus the contribution of unsettled insurance coverage.  But Dr. Bates' valuation range contradicts the proposed TDPs, and it therefore cannot be used as a basis for the contention that Direct Abuse Claims are "paid in full."  As noted, the TDPs start with base values that are ***ten times higher*** than could be supported by Dr. Bates' valuation range, and does not provide, as is integral to Dr. Bates' valuation, that those Base Matrix Values will be discounted by 90% for the 87% of the claims that are single abuser claims.  That gap will only grow given the TDPs' generous scaling criteria, lax fraud prevention measures, and discretion of a conflicted trustee.  As a result, the Debtors are left with a fatal paradox.  Either the TDPs will improperly value claims, and the Plan cannot be confirmed because it vastly overstates the Debtors actual liability for Abuse Claims.  Or Dr. Bates is wrong, and the Plan cannot be confirmed as it does not provide the "payment in full" for all Direct Abuse Claimants required to support the channeling injunction and third party releases that are a key requirement of the Plan and the contributions to be made to the Settlement Trust.

11.     Dr. Bates opines that the appropriate valuation range is $2.4 billion to $3.6 billion and that range is reflective of the Debtors historic experience in the tort system.  As a result, only

5

by radically reducing the Base Matrix Values, adjusting scaling factors to take account of substantive defenses and procedural safeguards present in the tort system, implementing appropriate fraud prevention measures, and replacing a conflicted governance structure with one that is truly neutral, could the Court approve the TDPs and conclude that the Direct Abuse Claims will be "paid in full."  Absent these adjustments, the Plan simply cannot be confirmed.

12.     Moreover, the additional factors courts in the Third Circuit consider when weighing the propriety of a channeling injunction are similarly absent from this case.  While a "substantial contribution" on the part of a released party may tip the scales in favor of an injunction, here the vast majority of the Chartered Organizations are providing little, if any, of their own contribution. There is also no evidence that the Channeling Injunction is an "essential element" of the Debtors' reorganization, as the Debtors' restructuring advisor previously testified that the prior "Toggle Plan" (which included no third party releases) was fully feasible.  Finally, there is no evidence of an "identity of interest" between the Debtors and the Protected Parties that warrants the extraordinary relief of the Channeling Injunction and third party releases.

13.     *Second*, the Plan and the TDPs impermissibly seek to modify insurer contract rights in contravention of applicable bankruptcy law and due process.  *See*, *e.g.*, *In re Combustion Engineering, Inc.*, 391 F.3d 190, 245 n.66 (3d Cir. 2004); *Lindsey v. Normet*, 405 U.S. 56, 66 (1972).

14.     Far from being "insurance neutral," the Plan attempts through a variety of measures (including, but not limited to, the Proposed Findings that the Coalition and FCR seek to incorporate into the Confirmation Order) to alter the contract rights of the Debtors' insurers, to adjudicate personal injury claims which this Court has neither the legal authority nor factual record to do, and

TrustApp396

to bind the non-settling insurers to that adjudication which is neither required nor appropriate for confirmation of a plan of reorganization under the Bankruptcy Code.

15.     If confirmed, the Plan (and its Proposed Findings) would unlawfully modify the Debtors' insurance contracts by, among other things, depriving the non-settling insurers of their contractual rights, in any post-bankruptcy coverage litigation, to:  (i) raise defenses to the abuse claims (particularly claims that are time-barred or otherwise unrecoverable under the tort system, because, for example, the Debtors were not shown to be negligent and therefore are not legally responsible for the abuse); (ii) approve the settlement of abuse claims; (iii) limit liability to only those losses that Debtors (the insureds) are legally obligated to pay; (iv) apply policy exclusions to any losses; (v) require the payment of self-insured retentions or deductibles prior to the application of insurance policies; and (vi) seek contribution or indemnification and reinsurance claims against the settling parties.

16.     The Plan further modifies the non-settling insurers' contracts by artificially inflating the number and value of abuse claims purportedly subject to coverage, materially increasing the insurers' exposure.  Indeed, this is true even apart from the Proposed Findings, as courts adjudicating coverage issues will have to grapple with the fact that the claim determinations made by the Settlement Trust are the product of a chapter 11 plan confirmed by a federal bankruptcy court.  Finally, the Debtors have provided no legal basis for the Plan's purported assignment to the Settlement Trust of insurance agreements with *non-debtor parties* (i.e. Local Councils and Chartered Organizations).

17.     ***Third***, Settlement Trustee Prof. Green's close relationship with plaintiffs' attorneys prevents his service from meeting the "consistent with public policy" standard required by the Bankruptcy Code.  11 U.S.C. §§ 1123(a)(7); 1129(a)(5).  Those concerns are only heightened here,

7

where Prof. Green is overseen by the STAC, which is also dominated by plaintiffs' attorneys, who will siphon from claimants thirty to forty percent of every dollar the Settlement Trust distributes.

18.     ***Fourth***, once this scheme to control these bankruptcy proceedings is laid bare, there can be no doubt that the Plan is not proposed in good faith and cannot be confirmed under 11 U.S.C. § 1129(a)(3). Plaintiffs' attorneys improperly seized control of these proceedings, drafted the TDPs to permit outsized payments on largely invalid claims for their own gain (and at the expense of insurers and claimants with valid claims), and then appointed their close ally Prof. Green as the Settlement Trustee. A Plan premised on such an improper foundation is not proposed for a proper bankruptcy purpose and should not be confirmed.

19.     For these reasons and those discussed in more detail below, the Plan neither satisfies the requirements of Sections 1129 and 1123 of the Bankruptcy Code, including without limitation, sections 1129(a)(1), (a)(3), (a)(5), and section 1123(a)(7), nor the Third Circuit's requirements for the approval of nonconsensual third-party releases and issuance of a channeling injunction. The Plan cannot be confirmed.

## BACKGROUND

### A.    Claims Aggregators and Attorney-Signed Proofs of Claim Increase Abuse Claims from 275 Prepetition to Over 82,000.

20.     On February 18, 2020 (the "Petition Date") the Debtors filed voluntary petitions for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code"). On the Petition Date, BSA was a defendant in 275 sexual abuse lawsuits and was aware of an additional approximately 1,400 claims that had not yet been filed.[3] By the November 16, 2020 bar date, over 95,000 proofs of claim were filed for over 82,000 individual alleged Abuse Claims.

---

[3]     *Debtors' Information Brief* [Docket No. 4] at pg. 3 (Certain Insurers App. 1).

TrustApp398

21.     This explosion in the number of claims was the direct result of the efforts by certain plaintiffs' lawyers, including a group of plaintiffs' lawyers that founded the Coalition, who pursued an aggressive media advertising campaign with the stated goal of generating a supermajority of claims.  Indeed, Mr. Timothy Kosnoff, one of the founders of the Coalition, acknowledged the goal was to "[k]eep focused on our marketing and media efforts going full tilt in to Nov [2020]" so that "[w]e control 80% of the claims, i.e., our coalition controls the case."[4] Coalition co-founder Mr. Kenneth Rothweiler reiterated that these unprecedented efforts allowed the Coalition to assert control over these Chapter 11 Cases and diminish the importance of the TCC, stating that "the TCC represents about 6,800 survivors.  So they represent 6,800 and we represent 65,000.  And we actually represent more than that when you add all of the survivors and the survivors' lawyers that are not part of the coalition per se but are people that support the coalitions' positions."[5]

22.     The marketing campaign included demonstrably false statements, including that claimants could remain "anonymous," that a recovery was "ensured" and "substantial," and that claimants "will never have to be deposed, appear in Court or otherwise prove their claims,"[6] leading the Court to order a stop to ads containing "false and misleading" information.[7]

---

[4]     *Notice of Filing of Exhibit in Support of the Objection of the Tort Claimants' Committee to Motion of the Coalition of Abused Scouts for Justice for an Order (I) Authorizing the Coalition to File Under Seal Exhibit A to the Amended 2019 Statement and (II) Approving the Sufficiency of the Amended 2019 Statement* [Docket No. 1285] (Ex. 1, Email of Mr. Kosnoff dated June 28, 2020) (Certain Insurers App. 3).

[5]     Sept. 28, 2021 Hearing Tr. at 163:11-17 (Certain Insurers App. 54).

[6]     *Debtors' Motion Pursuant to Section 105(a) of the Bankruptcy Code and ¶ 27 of the Bar Date Order for Entry of an Order (I) Supplementing the Bar Date Order and (II) Granting Related Relief* [Docket No. 1145] (Certain Insurers App. 2).

[7]     *Supplemental Order to Order, Pursuant to 11 U.S.C. § 502(b)(9), Bankruptcy Rules 2002 and 3003(c)(3), and Local Rules 2002-1(e), 3001-1, and 3003-1, (I) Establishing Deadlines for Filing Notice Thereof, (II) Establishing the Form and Manner of Notice Thereof, (III) Approving Procedures for Providing Notice of Bar Date and Other Important Information to Abuse Survivors, and (IV) Approving Confidentiality Procedures for Abuse Survivors* [Docket No. 1331] (Certain Insurers App. 4).

TrustApp399

23.     The Coalition also requested that the Court allow attorneys, rather than claimants, to sign proofs of claim,[8] and after such relief was opposed by each of the Debtors, the TCC and the insurers, the Coalition promised that "[a]ll claims . . . will be thoroughly vetted."[9]  The Court authorized attorneys to sign proofs of claim only after stating that it was concerned that lawyers would sign "proofs of claim forms where they have not done the due diligence necessary to sign it" and that "if we get a thousand signatures by an attorney on proofs of claim forms filed at the last minute, I think that raises questions. I just think it does and we're going to have to deal with it.  So I don't advise that[.]"[10]  Counsel to the Coalition agreed, stating "[i]f there is improper conduct by any attorney, then they're going to have to face the consequence for those actions."[11]

24.     But these repeated warnings were ignored by each of the law firms that Certain Insurers investigated.[12]  Certain Insurers have deposed seven attorneys at Coalition plaintiffs' firms regarding attorney-signed proofs of claim, which revealed the following:

- **Sean Higgins, *Andrews & Thornton*, 1,019 Proofs of Claim Signed:**[13]  Mr. Higgins issued a blanket authorization to affix his signature to proofs of claim any time his firm could not contact the client—which resulted in his signature being added to 1,019 proofs of claim.  Mr. Higgins relied on others to review the information,[14] and had no

---

[8]     *Motion of Coalition of Abused Scouts for Justice for Order Permitting Filing of Proof of Claim Forms Signed by Authorized Counsel in Accordance with Bankruptcy Code Sections 501 and 502, Bankruptcy Rule 3001, and Official Form 410*  [Docket No. 1388] (Certain Insurers App. 5).

[9]     *Corrected Omnibus Reply of the Coalition of Abused Scouts for Justice to Objections to Motion for Oder Permitting Filing of Proof of Claim Forms Signed by Authorized Counsel in Accordance with Bankruptcy Code Sections 501 and 502, Bankruptcy Rule 3001, and Official Form 410*  [Docket No. 1496] ¶ 41 (Certain Insurers App. 6).

[10]     Oct. 14 Hr'g Tr. at 177:21-23 (Certain Insurers App. 57).

[11]     *Id.* at 189:20-190:18.

[12]     If there had been more time for discovery, even more widespread misconduct may have been uncovered. Certain Insurers expressly reserve the right to supplement this Objection with any new information they uncover.

[13]     Sean Higgins Jan. 25, 2022 Deposition Transcript at 107:15-108:13 (Certain Insurers App. 45).

[14]     *Id.* at 107:3-14; 178:9-23 ("I signed as an authorized agent of the law firm, and the law firm is making the attestation."); 190:3-9.

10

personal knowledge regarding any claim or claimant.[15]  Andrews & Thornton relied on a third party, Legal Conversion Center, Inc. for intake, evaluation and retention of clients.[16]  In some cases Andrews & Thornton had never had any contact with the client before the proof of claim was signed and still have been unable to contact the client, but have not withdrawn the claim.[17]

- **Stewart Eisenberg, *Rothweiler, Winkler, Eisenberg & Jeck, P.C.* ("Eisenberg Rothweiler"), 963 Proofs of Claim Signed:**[18] Mr. Eisenberg relied on others to review the information for the 963 proofs of claim with his signature.[19]  Intake was handled primarily by Eisenberg Rothweiler's co-counsel, AVA Law, and Mr. Eisenberg testified that he did not know the details of their intake process.[20]  Notably, Mr. Eisenberg had no personal contact with any of the claimants for whom he signed proofs of claim.[21]  He affixed his signature to 959 of the 963 forms he signed in the week leading up to the bar date, at times at a pace of three proofs of claim in one minute.[22]

- **Jonathan Schulman, *Slater Slater Schulman LLP*, Approximately 400 Proofs of Claim Signed:** Mr. Schulman signed "approximately 400" proofs of claim, without speaking to the vast majority of claimants.[23]  Notably, Mr. Schulman could not recall if he confirmed that his firm had been retained by the claimants for whom he signed and filed proofs of claim.[24]  For one claimant who Mr. Schulman's firm filed a proof of claim, Mr. Schulman was unable to locate any record of the claimant being a client of his firm.[25]

- **Paul Napoli, *Napoli Shkolnik PLLC*, 672 Proofs of Claim Signed:** Mr. Napoli signed 672 proof of claim forms, over 300 of which were substantially blank.[26]  Although Mr. Napoli testified he performed an investigation into all the claims he signed, when asked

---

[15]   *See, e.g., id.* at 111:3-10 ("[T]he firm reviewed the claim form. I did not, in my individual capacity, review every single claim form."); 136:9-10 ("I don't have a specific knowledge of this specific claim form"); 148:12-13 (same); 162:2-3 (same); 177:10-18 (same).

[16]   *Id.* at 43-45; 61:6-14 (Certain Insurers App. 45).

[17]   *Id.* at 75:6-76:3.

[18]   Declaration of Paul J. Hinton [Docket No. 1975-3] (Certain Insurers App. 82).

[19]   Stewart Eisenberg Jan. 31, 2022 Deposition Transcript at 96:21-97:21 ("Q. Did you ever personally speak to the claimant for whom you were planning to sign a proof of claim form? A. No that was done by other people.") (Certain Insurers App. 43).

[20]   *Id*. at 37:21-39:4.

[21]   *Id.* at 97:18-21.

[22]   *Id.* at 104:1-5.

[23]   Jonathan Schulman Feb. 2, 2022 Deposition Transcript at 104:12-14.

[24]   Schulman Dep. Tr. at 106:5-107:12.

[25]   Schulman Dep. Tr. 222:3 ("Q: So, for one of the claimants, you did not have a retainer agreement. . . .A: We had no record of that being our client.").

[26]   *See* Declaration of Paul Hinton [Docket No. 1975-3] (Certain Insurers App. 82); Declaration of Charles Fox, Docket No. 2211-2, p. 2 (Certain Insurers App. 83).

TrustApp401

for examples of what he specifically did to investigate each claim, he could not provide any examples.[27]  When asked if he spoke to each of the claimants on whose behalf he signed claims, he testified he did not.[28]

- **(1) Kenneth Rothweiler, *Eisenberg Rothweiler* and (2) Adam Slater, *Slater Slater Schulman LLP***: Mr. Rothweiler and Mr. Slater were deposed regarding their role on the STAC but each was directed by his counsel not to answer any questions regarding the proofs of claim he signed[29] despite the STAC's role in developing the questionnaire claimants must submit to the trust, *see infra* at 169, and despite the fact that Mr. Slater testified that the STAC's involvement in "the creation of a questionnaire that will be used to assess [his] clients claims . . . could have the appearance" of a conflict of interest.[30]

- **Adam Krause, *Krause & Kinsman LLP*, 2,507 Proofs of Claim Signed:[31]** Mr. Krause's firm relied on four vendors that provided intake services,[32] and then two other vendors for interview and follow-up services.[33]

25.    Despite this Court's clear guidance and the lack of personal knowledge, the attorneys listed above all were willing to attest, in their individual capacities, that (a) "I declare under penalty of perjury that the foregoing statements are true and correct," and (b) "I have examined the information in this Sexual Abuse Survivor Proof of Claim and have a reasonable belief that the information is true and correct"[34]  During their depositions two attorneys, Sean Higgins of Andrews & Thornton and Jonathan Schulman of Slater Slater Schulman, denied that they were personally attesting to anything,[35] and Mr. Higgins even denied that his firm was

---

[27]    *See* Paul Napoli Jan. 31, 2022 Deposition Transcript at 17:17-17:19 ("Q. … Can you provide me with some examples of what that [factual investigation into attorney-signed claims] entailed?  A. Not really, no.") (Certain Insurers App. 84).

[28]    *See* Napoli Dep Tr., at 17:25-18:3 (Q. As part of your investigation, did you speak with each and every one of the claimants? A. No.") (Certain Insurers App. 84).

[29]    Kenneth Rothweiler Jan. 30, 2022 Deposition Transcript at 46:14-48:5 (Certain Insurers App. 49); Adam Slater Feb. 2, 2022 Deposition Transcript at 68:15-71:23; 87:13-87:19 (Certain Insurers App. 86). .

[30]    Slater Dep. Tr. at 68:15-71:23; 87:13-87:19 (Certain Insurers App. 86).

[31]    Declaration of Paul Hinton [Docket No. 1975-3] (Certain Insurers App. 87).

[32]    Adam Krause Jan. 31, 2022 Deposition Transcript at 139:19-141:16 (Certain Insurers App. 85).

[33]    *Id.* at 152:4-156:15.

[34]    Blank Proof of Claim Form Higgins Dep. Tr. Ex. 2 (Certain Insurers App. 45).

[35]    Higgins Dep. Tr. at 107:3-14; 178:9-23 ("I signed as an authorized agent of the law firm, and the law firm is making the attestation."); 190:3-9 ("Q: A – but its you, making the attestation on behalf of the law firm, represents

attesting to the "exact truth" or "complete accuracy" of the factual allegations contained in the proofs of claim that bore his signature, noting that because the alleged incident "happened in 1969 . . . it would be impossible for the firm to vouch for their complete accuracy."[36]

26.     The failure to take seriously the personal attestation led to numerous absurdities. Mr. Napoli signed a blank proof of claim form for a claimant who had died five months before the claim was submitted on his behalf.[37] Mr. Higgins' signature was added to proofs of claim when a different law firm had submitted a claimant-signed form for the same claimant, often with inconsistent allegations.[38] Mr. Schulman's colleague added her signature to proofs of claim for two brothers, both of whom were listed as deceased, where his firm had a record that it had not been retained to represent one of the brothers.[39]

27.     Mr. Higgins testified that all of this is "unsurprising" and "fairly typical" in the mass tort world.[40] And that, in the "nonbankrutpcy" mass tort context, procedures and safeguards typically provide for scrutiny into claims where, as here, the claimant cannot be contacted or the claim lacks any factual basis that lead to their disallowance.[41] Mr. Napoli testified that resolution

---

that there were reasonable efforts to ensure that the information was true and correct, right? A. No. The law firm is making the attestation contained in this document."); 104:8-9 (Certain Insurers App. 45); Schulman Dep. Tr. 123:25 – 125:6 ("Q: You signed three or 400 proof of claim forms in this case personally, right? . . . A: I signed that in my capacity as a representative of" - -  as an authorized representative of the law firm. . . .Q: So, it's your testimony that where it states, ["]Print name on this claim form, Jonathan E. Schulman, Esquire, as attorney . . . that that statement on this proof of claim form is not actually referring to you individually, it's referring to the Slater Slater Schulman law firm? . . . A: That's what I said. It's referring to me as a representative of the law firm. On behalf of the law firm. Not in my individual capacity.") (Certain Insurers App. 45).

   [36]    Higgins Dep. Tr. at 193:3-7 (Certain Insurers App. 45).

   [37]    Napoli Dep. Tr., Ex. 6 (████████obituary, identifying ████████ died in June of 2020); Napoli Dep. Tr. at 46:13 ("A. It's the same ████████, yes. This is what I was telling you. Sometimes people die. And its hard to get ahold of them.") (Certain Insurers App. 84).

   [38]    Higgins Dep. Tr. at 182:1-182:19; 197:4-199:6 (Certain Insurers App. 45).

   [39]    Schulman Dep. Tr. at 225:25-243:15 (Certain Insurers App. 91).

   [40]    Higgins Dep. Tr. at 187:10-188:2 (Certain Insurers App. 45).

   [41]    *Id.* at 76:17-79:3 ("[I]n every mass tort, there is a universe of claimants that, for whatever reason, we had trouble locating or engaging in the continued prosecution of their claim . . . And there are a number of ways that

TrustApp403

of his remaining attorney-signed, blank proof of claim forms would be "up to the judge" or be resolved through the "process" put in place by the Court.[42]

28.     But Mr. Higgins, and other Coalition-affiliated attorneys, designed TDPs[43] that exclude any of those established procedures. *See infra* at ¶¶ 29-57.  Accordingly, justifications that the Settlement Trust will eventually vet their factual assertions ring hollow.[44]

### B.     The Collusive TDPs

29.     Throughout this case, the Coalition has sought to leverage its large number of claims to dictate key provisions of the Debtors' Plan and its TDPs.[45]  And they have wielded that control to place before the Court a Plan, drafted with no insurer input, that will establish a Settlement Trust with TDPs that inflate the amount and number of claims, and eviscerate the insurers' rights to investigate and challenge or consent to resolve those claims.

30.     

---

typically gets dealt with . . . . at what point have we hit the point of this case, I couldn't say.  But, yes, there is an established methodology in all mass torts to deal with these kinds of claims.").

    [42]    Napoli Dep. Tr. at 21:15-16, 21:20-21 (Certain Insurers App. 84).

    [43]    Rothweiler Dep. Tr. at 55:4-56:13 (Certain Insurers App. 49).

    [44]    *See, e.g.,* Slater Dep. Tr. at 80:15-20 ("I think the post Trust formation procedures will be designed, you know, to – to determine if there are any cases that might fall into the category of [] claims that might not be compensated.") (Certain Insurers App. 86).

    [45]    *See, e.g., supra* ¶ 4.

    [46]    ███████████████████████ Deposition Transcript Ex. 25] (Certain Insurers App. 64).

    [47]    Azer Dep. Tr. at 19:5-8; 41:14-20 (Certain Insurers App. 64).

TrustApp404



### (i)    Inflating Claims Values in Successive Versions of the Claims Matrix

31.    The Debtors, the Coalition and the FCR (the "Plan Proponents") attempt to side-step the fact that the Coalition dominated the drafting of the TDPs by asserting that the TDPs are "evidence-based" rather than "negotiated," and are in accordance with "the debtors' historical settlement practices and experience in the tort system"[53] and, for that reason the insurers should be bound by them.[54]  But a review of the record shows that the TDPs are inconsistent with historical settlements, and while drafts were exchanged between the parties, the final version of the TDPs is clearly the product of dominance by the Coalition.

---

[48]    James Patton Nov. 30, 2021 Deposition Transcript at 73:21-74:7 (Certain Insurers App. 48).

[49]    Douglas Kennedy (TCC) Dec. 29, 2021 Deposition Transcript at 365:12-367:7 (Certain Insurers App. 50).

[50]    Anne Andrews Dec. 21, 2021 Deposition Transcript at 52:7-52:23 (Certain Insurers App. 63).

[51]    *Id.* at 145:8-147:13.  The Certain Insurers reject any notion that Brown Rudnick has ever sent anything on their behalf regarding the TDPs in this case.

[52]    ███████████████████████████████████████████████

[53]    Sept. 28, 2021 Hr'g Tr., at 107:8-108:15, 100:19-101:19 (Eric Goodman) (Certain Insurers App. 54). .

[54]    *Joinder of the Coalition of Abused Scouts for Justice, the Official Committee of Tort Claimants, and the Future Claims Representative to, and Brief in Support of, Debtors' Motion for Entry of an Order, Pursuant to Sections 363(b) and 105(a) of the Bankruptcy Code, (I) Authorizing the Debtors to Enter into and Perform Under the Restructuring Support Agreement, and (II) Granting Related Relief* ("Coalition, FCR and TCC Statement ISO RSA") [Docket No. 5680], at ¶ 40 (Certain Insurers App. 11).

TrustApp405

32.     The Coalition's statements that the Debtors imposed the TDPs upon them are belied by the changes that occurred to the claims matrix over time, which inflated claims against the Debtors. ███████████████████████████████████████████████████████████████

███████████ [55]



33.     By contrast, in the current claims matrix,[56] all Base Matrix Values and Maximum Matrix Values have clearly departed from historical experience and increased from the initial claims matrix by orders of magnitude, and the amounts are substantially closer to the amounts included in the initial Coalition TDP term sheet:

| Tier | Type of Abuse | Base Matrix Value | Maximum Matrix Value |
|------|---------------|-------------------|----------------------|
| 1 | Anal or Vaginal Penetration by Adult Perpetrator | $600,000 | $2,700,000 |

---

[55] ███████████████████████████████████████████████████ This chart removes a column from the original that listed examples of cases for each tier.

[56] Plan, Art. VIII.A. This chart has been abridged in the interest of conserving space.

16

TrustApp406

| 2 | Oral Contact by Adult Perpetrator<br><br>Anal or Vaginal Penetration by Youth Perpetrator | $450,000 | $2,025,999 |
|---|---|---|---|
| 3 | Masturbation by Adult Perpetrator<br><br>Oral Contact by a Youth Perpetrator | $300,000 | $1,350,000 |
| 4 | Masturbation by Youth Perpetrator<br><br>Touching of the Sexual or Other Intimate Parts (unclothed) by Adult Perpetrator | $150,000 | $675,000 |
| 5 | Touching of the Sexual or Other Intimate Parts (unclothed) by a Youth Perpetrator<br><br>Touching of the Sexual or Other Intimate Parts (clothed), regardless of who is touching whom and not including masturbation.<br><br>Exploitation for child pornography. | $75,000 | $337,500 |
| 6 | Sexual Abuse – No Touching<br><br>Adult Abuse Claims | $3,500 | $8,500 |

**(ii)    Aggravating and Mitigating Scaling Factors at the Discretion of the Settlement Trustee**

34.    The TDPs require the Settlement Trustee to apply (in his sole discretion) aggravating and mitigating Scaling Factors to the applicable Base Matrix Value, resulting in final Allowed Claim Amounts.[57]   The Debtors claim these factors "are based on evidence regarding the BSA's and other putative Protected Parties' historical abuse settlements, litigation outcomes, and other evidence supporting the Scaling Factors."[58]   But the evidence proves otherwise.  *See infra* at ¶¶ 35-45.

35.    ███████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

---

[57]    TDPs, Art. VIII.C.

[58]    *Id.*

TrustApp407

████████████████████████████████████████████████████████

████████████████████  But negotiations with the Coalition flipped these concepts on their heads: a showing of negligence was no longer required to receive a Base Matrix Value recovery because it was transformed into an aggravating factor, and evidence that a claim was timely was no longer required to recover under the TDPs.  The Coalition also insisted upon, and obtained, a $3,500 "no questions asked" option for *anyone* who asserted a claim.

### 1.    No Evidence of Negligence Required

36.    In the tort system, sexual-abuse plaintiffs have to demonstrate negligence to demonstrate the Debtors' liability.  Under the TDPs, however, a showing of negligence is only an *aggravating* factor that results in payouts to the claimant that exceed the applicable Base Matrix Value.[60]  Thus, claimants who would receive *no payment* on their claims in the tort system would, under the TDPs, still receive at least the Base Matrix Value recovery on their claims; those who could potentially demonstrate negligence would receive a substantial windfall.

37.    The Debtors' *own expert*, Dr. Charles Bates, opined that, where a claimant has alleged abuse by a Boy Scout leader who had never been accused of abusing another child (*i.e.* a single abuser), that claimant would have great difficulty demonstrating that the Debtors were negligent given the lack of the Debtors' knowledge of the risk, likely precluding any recovery in the tort system.[61]  Dr. Bates thus lays bare the fallacy of the Plan Proponents' premise that the

---

[59] ███████████████████████████████████████████████████████
████████████████████████████████████████████████████████

[60]    TDPs § VIII.D.(ii)d.

[61]    *See* Rebuttal Expert Report of Charles E. Bates, PhD ("Bates Rebuttal Report") ¶ 53 ("The Abuse Claims mostly involve abusers who are identified only once and most told no one of their abuse for years and never told Scouting or the police. . . . the BSA settlements for such cases are lower than the repeat abuser claims. This means the chance of a liability finding against the BSA or the liability share of BSA would also be lower for single victim cases.")

TrustApp408

TDPs will mimic recoveries outside of bankruptcy: "The vast majority of Abuse Claims would receive no compensation for their abuse but for a trust set up as part of this bankruptcy proceeding, consistent with the fact that so many of the Abuse Claims were never pursued through litigation."[62]

38.     Dr. Bates further opined that in order for the TDPs to be consistent with the tort system, single abuser claims (87% of Abuse Claims) must be reduced by 90% from the base claim value to reflect "BSA's likely low average responsibility for these Abuse Claims."[63]  If they are not, then abuse claims would be overvalued "manyfold," potentially resulting in what the trust will later contend is aggregate abuse claim liability of $25 billion,[64] roughly 700% of the high range of Dr. Bates' claim-liability estimate.

39.     Earlier drafts of the TDPs recognized that evidence of a viable tort claim (*i.e.*, one requiring proof of negligence) was rightfully a prerequisite to allowance of a claim. ████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

---

(Certain Insurers App. 30); *see also*  Charles E. Bates Jan. 28, 2022 Deposition Transcript at 143:13–146:21 (Certain Insurers App. 92).

[62]     Bates Rebuttal Report ¶ 31 (Certain Insurers App. 30); *see also* Bates Dep. Tr. at 119:16-10 ("I believe that the vast majority of these claims would not be pursued and not be economically viable in the tort system.") (Certain Insurers App. 92); Bates Dep. Tr. at 124:1-16 ("But in terms of the process by which existed prior to the – to the bankruptcy, more than 70,000 [claims] would never have been compensated at all . . . if this process here was to fail and they would wind up back in the tort system").

[63]     Bates Rebuttal Report at ¶¶ 53, 97, 98 ("In contrast to the high fraction of settlements involving claims with repeat abusers, only 13% of Abuse Claims involve identifiable repeat abusers. . . . I set a mitigating scalar for all Single Abuser Cases to 10%, reflective of BSA's likely low average responsibility for these Abuse Claims. . . . These levels . . . are reasonable and appropriate for the Trust to properly account for the tort system values of the Abuse Claims.") (Certain Insurers App. 30).

[64]     Bates Rebuttal Report at ¶ 66 (Certain Insurers App. 30).

TrustApp409



### 2.   Statutes of Limitations and Repose as a Mitigating Factor Rather than a Bar to Recovery

40.    In the tort system, untimely claims asserted in "closed states" are subject to dismissal.  Under the TDPs, however, a claimant whose claim would otherwise be barred by a statute of limitations or statute of repose is subject only to a mitigating Scaling Factor based on the ranges set forth in a Schedule 1 attached to the TDPs.[68]

41.    The Coalition has been clear from the outset that it seeks a plan in which Abuse Claimants with time-barred claims are compensated, with Mr. Rothweiler stating:

   "[H]ere is our common goal and mission: No survivor would be left behind. All survivors would be compensated. Philosophically what we thought, Your Honor, is if someone was sexually abused by a Boy Scout leader in New York, which is an open state, and if someone was sexually abused by a scout leader in Alabama, which is a closed state, it shouldn't make a difference."[69]

42.    Indeed, the Coalition aggressively solicited Abuse Claimant support for its Plan on that basis.  For example, in one of many "town hall" style meetings with claimants, leading attorneys for the Coalition have opined that, absent approval of the TDPs, more than 58,000 of the filed claims are not eligible for compensation under tort law.  *See, e.g.*, Oct. 19, 2021 Coalition

---



68   TDPs, Art. VIII.E(iii).
69   Sept 28 2021 Hr'g Tr. at 163:21-164:5 (Certain Insurers App. 54).

TrustApp410

Town Hall Recording, https://scoutingabusesurvivors.com/events/, 25:00 (K. Rothweiler: "But you start out with the premise you're in a closed state which means you don't have the right to bring a lawsuit because the statute of limitations doesn't allow you to do it. I'm worried about those 58,473 survivors because if the plan is voted down they're going to have a heck of a time getting any compensation at all."); *id.* at 44:26 (A. Slater: "If [the] plan is not approved . . . the only thing you're left with is the tort system and a substantial likelihood the majority of claims could be dismissed and wind up with $0 . . . .").

43.     ████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
███████████████████████     This treatment was slightly modified in the TDPs attached to the Second Amended Plan [Docket No. 2592], filed by the Debtors on April 13, 2021, where time-barred claims were required to be zeroed-out (though the Settlement Trustee was afforded limited discretion to avoid a complete bar where "evidence supporting the Submitted Abuse Claim warrants recovery despite its untimeliness").[71] █████████████████████████████
████████████████████████████████████████████████████████████
███████████████████████████████     The TDPs were accordingly modified and now, under the current TDPs, the Settlement Trustee is prohibited from denying recovery on a conclusively time-barred claim.[73]

---

[70] ██████████████████████████████████

[71] Second Am. Plan, Ex. A, § 5.4 (Certain Insurers App. 8).

[72] ██████████████████████████████████████████████

[73] TDPs, Art. VIII.E(iii).

TrustApp411

### 3.  Expedited Distributions Without Any Review of Claims

44.  ███████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████  ■  The versions of the TDPs proposed after the Coalition and FCR entered into an RSA with the Debtors, including the current version of the Plan, now offer an "expedited payment of $3,500 to holders of all Direct Abuse Claims," again with no question asked.[75]  Notwithstanding the misleading mass marketing efforts, patently false representations made in plaintiffs' lawyers advertisements, and significant irregularities in the claims filing process, every one of the approximately 82,000 claims would thus be entitled to the expedited payment without supporting documentation.  In essence, the TDPs seek to codify the plaintiffs' law firms' statements that a recovery was "ensured" and that claimants "will never have to be deposed, appear in Court or otherwise prove their claims,"[76] and the Plan seeks to have this Court approve these procedures despite the fact that this Court already concluded that those statements were "false and misleading."[77]

45.  These changes ensure inflated claim values far beyond the Debtors' experience in the tort system.  This was the explicitly articulated goal of the Coalition, expressed by Coalition co-founder Andrews & Thornton when objecting to the ability of the Settlement Trustee to reduce

---

[74] ██████████████████████████████████████████████████████████
███████████████████████████████████████████████

[75]  Plan, Art. VI.A.

[76]  *Debtors' Motion Pursuant to Section 105(a) of the Bankruptcy Code and ¶ 27 of the Bar Date Order for Entry of an Order (I) Supplementing the Bar Date Order and (II) Granting Related Relief* [Docket No. 1145] (Certain Insurers App. 2).

[77]  *Supplemental Order to Order, Pursuant to 11 U.S.C. § 502(b)(9), Bankruptcy Rules 2002 and 3003(c)(3), and Local Rules 2002-1(e), 3001-1, and 3003-1, (I) Establishing Deadlines for Filing Notice Thereof, (II) Establishing the Form and Manner of Notice Thereof, (III) Approving Procedures for Providing Notice of Bar Date and Other Important Information to Abuse Survivors, and (IV) Approving Confidentiality Procedures for Abuse Survivors* [Docket No. 1331] (Certain Insurers App. 4).

TrustApp412

recoveries below the Base Matrix Value: ███████████████████████

████████████████████████████████████████████████████ The end

result is that, if the Plan is approved, the Settlement Trust will compensate "tens of thousands of

claims . . . who would never be compensated in the tort [system] and will not receive any

compensation should a Settlement Trust not be set up for that purpose."[78]

<div style="text-align:center">

**(iii)     No Vetting of Abuse Claims Through Claimant Interviews or
Objective Testing of Claimants**

</div>

46.     Despite Coalition attorney Sean Higgins' sworn statement that "the testimony of

the survivor is the single most critical piece of evidence of the case" and that "assessing the

credibility of those allegations is paramount," Higgins Dep. Tr. at 179:9-23, there is no

requirement that the Settlement Trustee interview or otherwise test Abuse Claimants in the process

of evaluating their claims despite the significant issues regarding attorney signed claims that the

limited discovery insurers have been able to conduct has uncovered.[79]  This ensures that, if the

Plan is approved, Abuse Claims, including those where proofs of claim were signed by plaintiffs'

attorneys without personal knowledge, will never be vetted.[80]

<div style="text-align:center">

**C.     The Unbridled Discretionary Authority of a Conflicted Settlement Trustee**

</div>

47.     The Plan provides that the Settlement Trustee will be solely responsible for

reviewing and resolving the approximately 82,200 Direct Abuse Claims, including any late-filed

claims deemed timely by the Settlement Trustee in his sole discretion, and any future claims.  He

---

[78]     Bates Rebuttal Report at ¶ 31 (Certain Insurers App. 30).

[79]     *See supra* ¶¶ 20-28.

[80]     *See* Amended Affirmative Report of Eileen C. Treacy, Ph.D. (the "Treacy Report") ¶ 20 ("To deter fraud, all
claimants should be interviewed. It is standard clinical practice to conduct interviews in the course of evaluating a
sexual abuse allegation, particularly in a civil lawsuit when the allegations are being made many years after the alleged
child sexual abuse and when a potential secondary gain motive may be present.") (Certain Insurers App. 31).  The
TDPs also do not require any objective testing of Abuse Claimants, which is "core to any psychological assessment
of reliability." *Id.* at ¶¶ 27-28.

<div style="text-align:center">23</div>

will also have sole discretion to disburse Settlement Trust assets, which could amount to $3 billion or more.  Under the TDPs, the Settlement Trustee would have virtually unfettered, unilateral authority and discretion over all Settlement Trust operations, with the only system for oversight carried out by the attorneys representing Direct Abuse Claimants, primarily on a contingency fee basis, and by the FCR, who owes a fiduciary duty to all potential future claimants.[81]

48.     Although the Settlement Trustee "will have the ability to request further information from Abuse Claimants in connection with seeking reimbursement for Insured Abuse Claims," he is not required to do so.[82]  The Settlement Trustee is given extremely broad discretion. With whatever documentation (or lack thereof) the Settlement Trustee has and deems sufficient, the Settlement Trustee may assign a value to each Direct Abuse Claim, then seek recovery for potentially insured claims from non-settling insurers for the full amount of that liability.[83]  Under the Plan, only Direct Abuse Claimants have the right to seek a *de novo* determination of their Direct Abuse Claims by a court of competent jurisdiction.[84]  The Debtors' proposed expert witness has emphasized the importance of having an impartial Settlement Trustee appointed to exercise these broad and wide-ranging powers.[85]

49.     But unfortunately, the Settlement Trustee is not impartial.  The proposed Settlement Trustee is Prof. Green, who has already acknowledged his ties to the Coalition and FCR who selected him.  Prof. Green is a close friend of Mr. Patton, the FCR;[86] indeed, the two have gone on

---

[81]   TDPs, Art. III.A; BSA Settlement Trust Agreement, §§ 2.1(d), 5.13.

[82]   Plan, Art. X.

[83]   *Id.*

[84]   Plan, Art. XII.

[85]   Michael Burnett Jan. 17, 2022 Deposition Transcript at 93:22-94:24; 269:6-9 ("Q. So whether the trustee is actually a neutral, independent person is pretty important, isn't it? A. Yes) (Certain Insurers App. 42).

[86]   *Amended Disclosure Statement for the Modified Fifth Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC* [Docket No. 6445], Ex. H, at 3 (Certain Insurers App. 18).

24

family vacations together.[87]  Prof. Green served as a future claims representative in six other mass tort bankruptcies in which he gave work to Mr. Patton by hiring him and his firm for legal representation.[88]  Prof. Green also retained Mr. Patton to represent him in four matters in which Prof. Green served as a court-appointed Monitor.[89]  And before the Coalition selected Prof. Green to serve as the Settlement Trustee,[90] Prof. Green gave work to Coalition counsel by hiring David Molton and his firm, Brown Rudnick LLP, as legal counsel in other future claims representative engagements.[91]

50.    The Coalition and FCR were so steadfastly determined to obtain a substantial role for Prof. Green that they proposed him as Settlement Trustee notwithstanding that this Court had already determined that Prof. Green's relationship with Mr. Patton created an objective appearance of partiality that rendered him an unviable mediator.[92]  After the Court refused to appoint Prof. Green as a mediator, the Coalition pivoted and sought his appointment as the Settlement Trustee.[93] Ken Rothweiler and (likely) Anne Andrews, two of the three Coalition co-founders, met with him in order to vet how he planned to administer the Settlement Trust prior to his appointment.[94]

51.    Prof. Green also has stated that he would not be neutral as Settlement Trustee, as he believes he holds fiduciary duties to only certain trust beneficiaries, i.e. the Direct Abuse

---

[87]    Eric Green Nov. 23, 2021 Deposition Transcript at 69:14-25, 70:1-14 (Certain Insurers App. 44).

[88]    *Id.* at 137:5-10; *Amended Disclosure Statement for the Modified Fifth Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC  [Docket No. 6445], Ex. H., at 2 (Certain Insurers App. 18).*

[89]    *Amended Disclosure Statement for the Modified Fifth Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC* [Docket No. 6445], Ex. H., at 2 (Certain Insurers App. 18).

[90]    Azer Dep. Tr. at 210:18-20; 264:4-265:9 (Certain Insurers App. 64); June 23, 2021 Email Communication by D. Molton, BSA_FCR_005457 (Certain Insurers App. 93).

[91]    Azer Dep. Tr. at 141:14-25, 142:1-12 (Certain Insurers App. 64).

[92]    June 8, 2020 Hr'g Tr. at 55:23-57:24 (Certain Insurers App. 51).

[93]    June 8, 2020 Email from D. Molton to E. Green, RES 5415 (Certain Insurers App. 94).

[94]    Andrews Dep. Tr. at 103:17-20; 104:23-105:4 (Certain Insurers App. 63).

25

Claimants.[95]  Indeed, as the settlement trustee in *TK Holdings*, Prof. Green attempted to use the bankruptcy court to impair insurer contractual rights.  *See infra* at ¶ 114.

    **D.**    **Abrogation of Insurance Policy Terms and Elimination of Insurer Rights and Defenses**

    52.    From the outset, the Coalition and FCR have sought to ensure that the TDPs would bind the insurers and deprive them of their rights to challenge claims asserted against the Debtors and the other Protected Parties.  ███████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████ █

    53.    The Coalition and FCR's insistence on including provisions designed to accomplish this goal has led to significant—and unnecessary—litigation.  ████████████████████

████████████████████████████████████████████████

████████████████████████████████ [97]  The Plan and TDPs now expressly seek to alter the prepetition rights and obligations of the Debtors' insurers by, among other things: (1) eliminating all insurer rights under their Policies to defend claims in an adversarial proceeding and consent to any settlements reached; and (2) attributing binding claim valuations in derogation of the insurers' rights to assume the defense and litigate claim valuation and/or the reasonableness of any claim settlement.  Attached as **Exhibit A** are examples of key policy provisions that are modified and/or breached by the Plan and TDPs.

---

[95]   Green Dep. Tr. at 135:3-22 (Certain Insurers App. 44).

[96]   █████████████████████████████████████████████████

[97]   ████████████████████████████████████████████████
████████████████████████████████████

TrustApp416

(i)     **Coalition Changes to Limit Insurers' Rights**

54.     The claims allowance process established by the Coalition and FCR and agreed to by the Debtors on its face demonstrates the complete exclusion of the insurers from investigating, evaluating, and collaborating with the Settlement Trustee regarding claims. ████████████

████████████████████████████████████████████████████████

███████████████ █ █████████████████████████████████████████

██████████████████████████████████████████ █

55.     ███████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████ ██ ████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████ █

(ii)    **Proposed Findings Under the Plan Modify Insurers' Contractual Rights**

56.     The Plan Proponents also seek court findings and determinations (the "<u>Proposed Findings</u>") that purport to bind the insurers to claim values assigned by the Settlement Trustee and deprive them of any means to challenge his unilateral determinations, including:[102]

> r. the Plan Documents (including the Plan) and the Confirmation Order shall be **binding on all parties in interest consistent with applicable legal doctrines,**



[98] ████████████████████████████████████████████████

[99] ████████████████████████████████████

[100] ████████████████████████

[101] ████████████████████████████████████████████████

[102] Plan, Art. IX.A.3 (emphasis added).

TrustApp417

**including the doctrine of res judicata and collateral estoppel**, and section 1141 of the Bankruptcy Code (and related legal authority);

s. (i) the procedures included in the Trust Distribution Procedures pertaining to the allowance of Abuse Claims and (ii) **the criteria included in the Trust Distribution Procedures pertaining to the calculation of the Allowed Claim Amounts, including the Trust Distribution Procedures' Claims Matrix, Base Matrix Values, Maximum Matrix Values, and Scaling Factors (each as defined in the Trust Distribution Procedures), are appropriate and provide for a fair and equitable settlement of Abuse Claims based on the evidentiary record offered to the Bankruptcy Court** as required by and in compliance with section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, provide adequate and proper means for the implementation of the Plan as required by and in compliance with section 1123 of the Bankruptcy Code, comport with the requirements for the issuance of the Channeling Injunction under section 105(a) of the Bankruptcy Code, and otherwise comply with the Bankruptcy Code and applicable law;

t. **the right to payment that the holder of an Abuse Claim has against the Debtors or another Protected Party or a Limited Protected Party is the amount of such Abuse Claim as determined under the Trust Distribution Procedures** and is not (i) the BSA Settlement Trust Contribution, the Local Council Settlement Contribution, the Contributing Chartered Organization Settlement Contribution, the Participating Chartered Organization Settlement Contribution, the Hartford Settlement Contribution, the Century and Chubb Companies Settlement Contribution, the TCJC Settlement Contribution, contributions by other Settling Insurance Companies, or any component(s) of such contributions, or (ii) the initial or supplemental payment percentages established under the Trust Distribution Procedures to make distributions to holders of Abuse Claims provided, however, that nothing herein shall determine that any insurer is obligated to pay the Debtors' or another Protected Party's or a Limited Protected Party's liability so determined under the Trust Distribution Procedures;

u. the Plan **and the Trust Distribution Procedures** were proposed in good faith and are sufficient to satisfy the requirements of section 1129(a)(3) of the Bankruptcy Code.

57.     As a condition precedent to confirmation, the Plan improperly requires a finding by this Court that all Allowed Claim Amounts are "fair and equitable" based on the evidentiary record offered to the Court *at the time of confirmation* and,[103] thereby, purports to prospectively adjudicate Abuse Claims.[104]  This finding violates the terms of the insurance policies which,

---

[103]  *See also* 28 U.S.C. § 157(b)(5) (lack of jurisdiction).

[104]  Plan, Art. IX.A.3(s).

TrustApp418

assuming coverage exists, require insurers to pay only judgments after an actual trial or settlements consummated with insurers' consent.   When combined with the requested finding that the Confirmation Order and Affirmation Order "shall be binding on all parties in interest,"[105] this finding would almost certainly be misused in post-confirmation coverage litigation,[106] which is its intended result.   For example, Mr. Zalkin, of the Zalkin Law Firm, P.C., stated in Court that "[i]t's been represented in meetings held by sponsors of the RSA and the TDP to the plan that . . . confirmation of the plan would be the equivalent of a litigated plan and that the plan confirmation would operate as a judgment enforceable against the insurers."[107]

**E.**

58.



---

[105]   Plan, Art. IX.A.3(r).

[106]   To the extent that this finding is entered by the Court, Certain Insurers hereby reserve their rights to argue that such finding and/or determinations of individual claims made by the Trustee under the TDPs are not binding in any future coverage proceeding and/or give rise to Certain Insurers' rights to deny coverage.   Indeed, certain representatives of plaintiffs that are not members of the Coalition have recognized that the rewriting of insurance contracts that the TDPs and Insurance Assignment seek to effect may vitiate the parties' rights under those contracts, including the right to seek coverage for Abuse Claims.   *See* Docket No. 5682, at ¶ 38 ("By basic operation of logic, if the rights to an insurance policy are transferred or assigned without approval of the insurers, then there is a distinct risk (depending on each state's common law) that such policies could be voided.").   Certain Insurers expressly reserve the right to assert such arguments in any future coverage proceeding.

[107]   July 7, 2021 Hr'g Tr. at 36:23-37:2 (Certain Insurers App. 97); Oct. 25, 2021 Hr'g Tr. at 10:18–21 (The Court: "It does not appear that these findings have a code or a confirmation-related purpose; rather, even as modified, they appear to be more directed at post-confirmation litigation with insurers.") (Certain Insurers App. 58).

[108]   Oct. 25, 2021 Hr'g Tr. at 7:17-19 (Certain Insurers App. 58).

[109]   Dec. 7, 2021 Hearing Tr. at 13:1-8, 14:12-14 (Certain Insurers App. 61).

TrustApp419

██████████████████████████████████████████████████████

██████████████████████████████████████████ ██

59. More significantly, as discussed herein, *infra* Section IV, the Plan has not been proposed in good faith within the meaning of section 1129(a)(3). Among other infirmities, the Debtors' Plan seeks to bind the insurers to inflated recoveries 10 times or more than the estimate the Debtors have provided for purposes of determining the insures' liability, by proposing TDPs that are inconsistent with historical settlement practices and conflicted Settlement Trust governance. *See supra* at 29-51. Under the totality of the circumstances, the fact of this mediation alone does not help the Plan Proponents show the necessary good faith under Section 1129(a)(3).

**F.    Evidentiary Record Submitted by the Debtors and Voting Results**

      **(i)    Bates Affirmative Report Justifying Base Matrix Values Based Upon Single Abuser Historical Settlements**

60. On December 5, 2021, the Debtors submitted the Affirmative Expert Report of Charles E. Bates, PhD ("Bates Affirmative Report"), which is the only statistical evidence the Debtors have put forward to support their view that the TDPs are consistent with the Debtors' historical settlement practices and experience in the tort system. *See supra* ¶¶ 36-51 Dr. Bates states in the Bates Affirmative Report that he "was asked to help develop the Matrix values." Bates Affirmative Report at ¶ 22. Dr. Bates states further that the "Base Values were generated first with regards to only a subset of the historical resolution values" and that "[t]he historical reference point for Abuse Claims in each tier are ***those that identify a single, as opposed to a repeat abuser***." *Id.* at ¶ 11 (emphasis added).

---

[110] ██████████████████████████████████████████████████
████████████████████████████████████

TrustApp420

61.    The Bates Affirmative Report then shows Dr. Bates' calculation of historical single-abuser claims compared to the Base Matrix Value for each tier of abuse to provide evidence that he developed the TDP Base Matrix Values based on historical settlement values of single abuser claims:

Figure 35: Mean historical tort resolution values for single abuser claims

| Allegation tier[11] | Average historical resolution | Base Value |
|---|---|---|
| 1-Penetration | $673,500 | $600,000 |
| 2-Oral acts | $411,818 | $450,000 |
| 3-Masturbation | $302,333 | $300,000 |
| 4-Unclothed touching | $180,000 | $150,000 |
| 5-Clothed touching | N/A | $75,000 |
| 6-Other | N/A | $3,500 |

*Id.* at ¶ 117.

62.    The Bates Affirmative Report also attempts to justify only one aggravating scaling factor under the TDPs, the Abuser Profile scaling factor, which he states "was developed by looking at the relative impact that having a repeat abuse[r] had on historical claim values as compared to similar claims involving [a] single abuser that were used for the original Base Values." *Id.* at 121.  Dr. Bates opined that, similar to historical settlements, "the average value of repeat abuser penetration claims is . . . nearly double the Base Value for single abuser claims." *Id.*

**(ii)    Less Than 48% of Total Direct Abuse Claimants Vote in Favor of the Plan**

63.    On January 18, 2022, Omni Agent Solutions filed a report [Docket No. 8345] (the "Final Voting Report") that was drafted partially by Omni and partially by counsel to the

TrustApp421

Debtors.[111]  Counsel to the Debtors also assisted Omni with the auditing of ballots and counseled Omni on which ballots to exclude from the Final Voting Report.[112]

64.     Despite Mr. Rothweiler's statements to the Court that the Coalition represented "more than" 65,000 Abuse Claimants, *supra* at ¶ 23, a number he has since increased to "around 70,000,"[113] less than 48% of the approximately 82,200 claimants who have asserted Direct Abuse Claims against BSA (Class 8 under the Plan) voted in favor of the Plan and its broad releases.  *See* Final Voting Report, Ex. A.  Of the 53,596 Class 8 claimants that did vote, only 39,430 or 73.57% of voting creditors voted to accept the Plan.  *Id.*  Accordingly, 42,770 Class 8 claimants have not consented to the proposed non-debtor releases, either by voting no or declining to submit a vote. *Id.*  In addition, 21,174 of the voting Direct Abuse Claimants opted out of the third- party releases contained in the Plan.  *Id.*  At least some of those claimants voted in favor of the Plan, but incorrectly believed that, by opting out of the releases, they retained the ability to pursue their claims against the Protected Parties.[114]  These accepting votes that opted out of the releases would reduce the accepting percentage for purposes of the third party release even further below 73.57%. Of claimants asserting Indirect Abuse Claims (Class 9 under the Plan), only 69.57% of those who voted opted to accept the Plan.  *Id.*

---

[111]   Catherine Nownes-Whitaker Jan. 20, 2022 Deposition Transcript at 58:3-58; 69:17-69:19 (Certain Insurers App. 46).

[112]   *Id.* at 77:19-77:23; 77:23-86:21.

[113]   Rothweiler Dep. Tr. at 53:9-12 (Certain Insurers App. 49).

[114]   *See, e.g., Survivor Letter* [Docket No. 8267] ("Now, I did vote yes on the plan . . . only thing I want noted is that I believe additional charter organizations . . . should be held responsible . . . That is why I x opt out of and reserve my right to file a tort on the church.  I believe my AVA law firm will be handling it, I certainly asking him.") (Certain Insurers App. 28)

TrustApp422

### (iii)   Bates Rebuttal Report Opines that Single Abuser Claims Must be Reduced by 90% From the Base Matrix Value

65.     After the Plan received significantly fewer votes than the Coalition promised, the Debtors reversed course and filed a statement attaching the newly drafted Bates Rebuttal Report and contending that based on Dr. Bates' revised analysis, "the Debtors anticipate payment in full to holders of allowed claims in Class 8 in accordance with the Trust Distribution Procedures." *Debtors' Response to the Official Committee of Tort Claimants' Status Report Re: Second Modified Fifth Amended Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC* [Docket No. 8234] at ¶ 7.

66.     The Bates Rebuttal Report discloses that the Bates Affirmative Report had misclassified numerous repeat abuser settlements as single abuser settlements, and thus only 16 single abuser settlements (with an average settlement value of only $150,000) remained.[115]  Dr. Bates then uses these revised numbers to calculate a range that the Debtors argue results in "payment in full" of all Direct Abuse Claims.

67.     But, while the Bates *Affirmative* Report had stated that "claims involving single abuser [] were used for the original Base Values" and sought to show that TDP Base Matrix values were consistent with single abuser historical settlements, the Bates Rebuttal Report does not calculate new reduced Base Matrix Values based on his revised data.

68.     Instead, Dr. Bates pivots and opines that single abuser Abuse Claims (which are 87% of the total Abuse Claims filed) must be reduced *by 90%* from the Base Matrix Values "reflective of BSA's likely low average responsibility for these Abuse Claims." Bates Rebuttal Report ¶¶ 53, 97, 98.  The Bates Rebuttal Report includes a TDP simulation showing that, if single

---

[115]   Bates Rebuttal Report at ¶ 15.

TrustApp423

abuser Abuse Claims are reduced by 90%, aggregate Abuse Claim liability will be $3.45 billion. *Id.* This is despite the fact that, as Dr. Bates previously recognized, there is no mitigating scaling factor for single abuser claims in the TDPs, *supra* at ¶ 5, and the TDPs clearly state that single abuser settlements are "incorporated into the Base Matrix Value."[116]

69.    Because Dr. Bates now opines that single abuser settlements are inconsistent with the Base Matrix Values, the Debtors are left with ***no statistical support*** for the contention that their TDPs are reflective of their historical settlement practices.  As noted, the Bates Affirmative Report was the ***only*** evidentiary support offered for the Base Matrix Values.  But the Bates Rebuttal Report contradicts this key aspect of the Bates Affirmative Report.  When the dust settles, the Debtors are left with only Dr. Bates' conclusion that the Base Matrix Values are approximately ten times higher than the typical single abuser claimant's recovery in the tort system and a bare and unsupportable contention that the Settlement Trustee will somehow "do the right thing" and reduce what will otherwise be over $25 billion in claims (when the TDP Base Matrix Values and scaling factors are applied as written) down to $3.45 billion.[117]

G.    **Settlements with Local Councils, Chartered Organizations and Certain Insurers.**

70.    During the course of the mediation, the Coalition and FCR reached agreements with the Debtors, the Local Councils, Certain Chartered Organizations and Certain of the Insurers, including the following:

- $250 million from BSA, consisting of cash and investment contributions, a promissory note, and other tangible assets;

- $640 million from Local Councils, consisting of cash, unrestricted property and a promissory note;

---

[116]  TDPs Art. VIII.D.(ii).

[117]  Bates Rebuttal Report at ¶ 25.

TrustApp424

- $250 million in monetary contributions from The Church of Jesus Christ as a Chartered Organization;[118]

- $787 million cash contribution from the Hartford Insurers.[119]

- $800 million cash contribution by Century and the Chubb Companies.[120]

- $30 million cash contribution by the United Methodist Entities.[121]

- $52.5 million cash contribution from American Zurich Insurance Company, American Guarantee & Liability Insurance Company, and Steadfast Insurance Company.[122]

71.    The Coalition and FCR arranged these settlements through a combination of leverage and promises.  For BSA and the Local Councils, the Coalition and FCR leveraged the importance of the vote—which they were ultimately unable to deliver—and promises of cost certainty and continued operations post-bankruptcy.  For the Chartered Organizations and the Settling Insurers, the Coalition leveraged a proposed settlement trustee with unlimited authority, buttressed by highly prejudicial TDPs and Proposed Findings, and promises of a clean slate following application of the Channeling Injunction and third party release.  All of these settlements have one thing in common—the parties left exposed who will make up any difference are the Certain Insurers.

---

[118] *Sixth Mediator's Report* [Docket No.] 6210.

[119] *Id*.

[120] *Seventh Mediator's Report* [Docket No. 7745].

[121] *See Eighth Mediator's Report* [Docket No. 7884].

[122] *See Ninth Mediator's Report* [Docket No. 7928].

TrustApp425

## ARGUMENT

### I.   THE PROPOSED CHANNELING INJUNCTION FAILS TO SATISFY THE REQUIREMENTS OF THIRD CIRCUIT LAW.

72.     The Plan's Channeling Injunction (Section X.F) prohibits holders of Abuse Claims from pursuing claims against *more than 40,000 non-Debtor* Chartered Organizations, Local Councils and other entities that are not debtors in these chapter 11 cases, and in many cases are principally responsible for such claims.  Such claimants are left with claims against the Settlement Trust as their sole recourse, even though many of the non-Debtor released entities will not pay any substantial consideration to the estate, the TDPs have been drafted in a manner that ensures valid Abuse Claims will never be paid in full, and a substantial number of creditors in the affected classes have refused to vote in favor of the Plan.

73.     This Court has recognized that, under applicable Third Circuit precedent, plans of reorganization that contain nonconsensual third-party releases and channeling injunctions can be confirmed only "if they meet the *Continental* standard of fairness and necessity to the reorganization." *In re Millennium Lab Holdings II, LLC*, 575 B.R. 252, 272 (Bankr. D. Del. 2017). Fairness and necessity to the reorganization are "hallmarks of permissible non-consensual releases." *Gillman v. Cont'l Airlines (In re Cont'l Airlines)*, 203 F.3d 203, 213 (3d Cir. 2000).  In subsequent opinions, the Third Circuit has reiterated the need to subject proposed releases to the "exacting standard" of *Continental*, and has instructed "that courts considering such releases do so with caution." *In re Millennium Lab Holdings II, LLC*, 945 F.3d 126, 139 (3d Cir. 2019).

74.     A recent decision by the Southern District of New York has called into question whether nonconsensual third-party releases should *ever* be permissible.  *In re Purdue Pharma, L.P.*, 2021 WL 5979108 (S.D.N.Y. Dec. 16, 2021).  The *Purdue Pharma* court, however, recognized that *Continental* and *Combustion Engineering* remain good law in the Third Circuit.

TrustApp426

*Id.* at \*79.  Indeed, in confirming the plan in Mallinckrodt, Judge Dorsey stated "I am applying the law of the Third Circuit which has recognized that bankruptcy courts do have statutory and constitutional authority to approve a plan of reorganization that contains non-consensual third-party releases, albeit, only in extraordinary cases" *In re Mallinckrodt PLC*, 2022 WL 334245, at \*14 n.69 (Bankr. D. Del. Feb. 3, 2022).  Courts in this Circuit have developed the applicable "exacting standard" primarily by looking to the factors set forth in *In re Master Mortgage Investment Fund*, 168 B.R. 930 (Bankr. W.D. Mo. 1994).  Those factors are:

> (1) Whether there is an "identity of interest between the debtor and the third party, usually an indemnity relationship, such that a suit against the non-debtor is, in essence, a suit against the debtor or will deplete assets of the estate";

> (2) Whether the released party has "contributed substantial assets to the reorganization";

> (3) Whether "[t]he injunction is essential to the reorganization" and whether "without [ ] it, there is little likelihood of success";

> (4) Whether "a substantial majority of the creditors agree to such injunction" and "specifically" whether "the impacted class, or classes, has 'overwhelmingly' voted to accept the proposed plan treatment."; and

> (5) Whether "[t]he plan provides a mechanism for the payment of all, or substantially all, of the claims of the class or classes affected by the injunction."

*Id.* at 935 (collectively, the *Master Mortgage* factors).

**A.    Nonconsensual Third-Party Releases Are Authorized Only in Unusual or Extraordinary Circumstances.**

75.    Because of the potential for abuse, the Third Circuit has consistently held that nonconsensual, third-party releases should be narrowly tailored and authorized only on rare occasions when extraordinary circumstances require them.  *In re Millennium Lab Holdings II, LLC*, 945 F.3d at 139.  Such releases can be utilized "to operate as a bankruptcy discharge arranged without a filing and without the safeguards of the [Bankruptcy] Code."  *Deutsche Bank AG, London Branch v. Metromedia Fiber Network, Inc.* (*In re Metromedia Fiber Network, Inc.*), 416

TrustApp427

F.3d 136, 142 (2d Cir. 2005). The "potential for abuse is heightened when releases afford blanket immunity." *Id.*

76.     That concern is especially relevant here, where a bankruptcy filing by two Debtors would allow seven non-Debtor BSA affiliates, hundreds of non-Debtor Local Councils, and tens of thousands of Chartered Organizations to cleanse **direct**—not derivative—liability without having to file for bankruptcy themselves. And Chartered Organizations' protections are being "bought" by other parties, with the vast majority of Chartered Organizations contributing nothing, showing that the proposed Channeling Injunction is a "device that lends itself to abuse[.]" *Id.*

77.     Moreover, the *Master Mortgage* factors do not support entry of an Order approving the Channeling Injunction, as explained below.

**B.     The Impacted Claimants Did Not "Overwhelmingly" Vote to Accept the Plan that Imposes the Channeling Injunction.**

78.     Garnering overwhelming approval for the Plan is "the single most important factor" when evaluating a channeling injunction. *Master Mortgage*, 168 B.R. at 938. Courts have struck down third-party releases when this factor alone is not met. *See, e.g.*, *In re Archdiocese of Saint Paul & Minneapolis,* 578 B.R. 823, 833 (Bankr. D. Minn. 2017) (refusing to approve third-party releases and channeling injunction based solely on rejection of the plan by sex abuse victims).

79.     Courts interpreting this factor, including several within the Third Circuit, have held that a "substantial majority" or "overwhelming" creditor support means the support of *each* affected creditor class, which in many cases means the support of at least 90 percent of affected creditors:

- *In re Millennium Lab Holdings II, LLC*, 945 F.3d 126, 132 (3d Cir. 2019) (over 93% of pre-petition lenders had agreed to the releases in a prepetition restructuring agreement);

- *In re AOV Indus.,* 792 F.2d 1140, 1143 (D.C. Cir. 1986) (creditors "overwhelmingly" accepted plan with roughly 90% of the creditors in each class voting to accept);

TrustApp428

- *Menard-Sanford v. Mabey (In re A.H. Robins Co.)*, 880 F.2d 694, 700 (4th Cir. 1989) (94% of tort claimants affected by the injunction voted to accept the plan);

- *In re Flintkote Co.,* No. 04-11300 (MFW), 2015 Bankr. LEXIS 2711, at *26 (Bankr. D. Del. Aug. 10, 2015) (finding the plan was overwhelmingly accepted when between 94% and 99% of affected creditors voted in favor of the plan in Section 524(g) context);

- *In re Mallinckrodt PLC,* 2022 WL 334245, at *20 (approving non-consensual third party releases and noting that "the weight of the evidence before me suggests that these releases are not only necessary and fair, but overwhelmingly supported by the creditor body . . . . the fact is that only one single creditor out of hundreds of thousands actually objected to these releases.");

- *In re American Family Enters.*, 256 B.R. 377, 392 (D. N.J. 2000) ("The creditors have overwhelmingly (100% of Plan Classes 5 and 7 and over 99.99% of Plan Class 6) voted in favor of the Plan, and thereby consented to the Channeling Injunction.");

- *Master Mortgage*, 168 B.R. at 938 (Class 5 to recover in full (other than injunction) and voted in favor at 94.8%. Other class impacted by injunction (Class 3A) voted in favor of plan by 96.2%);

- *In re USA Gymnastics*, Case No. 18-09108 [Docket No. 1776] ¶¶ Q., II. (Bankr. S.D. Ind. Dec. 16, 2021) (approving channeling injunction and noting that "[h]olders of Class 6 Abuse Claims [] voted unanimously to accept the Plan").

80.    In the present case, the claimants comprising each of Classes 8 and 9—the two classes impacted by the Channeling Injunction—must vote "overwhelmingly" to approve the Plan. But only 73.57% of Class 8 Claimants who submitted votes and 69.57% of Class 9 Claimants who submitted votes voted in favor of the Plan.  *See* Final Voting Report.  These approval rates fall well short of "overwhelming support,"  particularly when (including the approximately 28,600 Abuse Claimants who didn't vote at all)  less than half of the total Abuse Claimants have affirmatively demonstrated their support for such releases.  *See supra* at ¶¶ 63-64.  Indeed, the approval rates for both Class 8 and Class 9 fall short even of the lower 75% threshold that is required for approval of a plan incorporating an asbestos claims channeling injunction pursuant to Section 524(g)(2)(B)(ii)(IV)(bb) of the Bankruptcy Code.

TrustApp429

81.     In addition, there are serious questions about the validity of the Abuse Claims filed by Coalition plaintiffs' attorneys.  Facts revealed to date are troubling,[123] and proofs of claim signed by these attorneys may not even be entitled to "prima facie validity."[124]  While Certain Insurers are not requesting the designation of votes under section 1126(e) of the Bankruptcy Code as not in good faith at this time, Certain Insurers reserve all rights to move to designate votes in the event the tally in the Final Voting Report is changed.

### C.     The Claims of Both Class 8 and Class 9 Will Not Be Paid In Full by the Settlement Trust.

82.     Under *Master Mortgage*, nonconsensual third-party releases are inappropriate unless the plan "provides a mechanism for payment of all, or substantially all, of the claims of the class or classes affected by the injunction."  168 B.R. at 935.  In the present case, the projected recoveries of the Class 8 and Class 9 creditors whose claims are enjoined by the Channeling Injunction will fall well short of payment in full, because the TDPs will undoubtedly generate claim values that far exceed the values that could be obtained in the tort system.

83.     The Disclosure Statement estimates that recoveries of creditors in Class 8 and Class 9 creditors will be only 10%-21% if such claims total $7.1 billion, with a 31%-63% recovery anticipated if such claims total $2.4 billion. Disclosure Statement, p. 34.[125]  On rebuttal, the Debtors' Abuse Claim expert claims he has "re-examined" his analysis and "now believe[s]" that liability for Direct Abuse Claims is "most likely between $2.4 billion and $3.6 billion."  *Debtors'*

---

[123]  *See supra* at ¶¶ 20-26.

[124]  *See, e.g, In re Cushman*, 589 B.R. 469, 492-93 (Bankr. D. M.E. 2018) (explaining that proof of claim forms were "intended to impose a standard of reasonableness upon 'a real, live person' who was to 'take responsibility for assuring the accuracy of a proof of claim'") (citation omitted)); *In re F-Squared Invest. Manag.,* LLC, 546 B.R. 538, 543 (Bankr. D. Del. 2016) ("Consistent with the treatment of the claim as evidence, the Official Form requires the claimant to sign the form under penalty of perjury.").

[125]  The Disclosure Statement notes that Class 8 Claimants also will receive insurance rights, which, when combined, could "yield up to a 100% recovery."  *Id.*  However, neither the Disclosure Statement nor the updated report by Bates White offers any specific quantitative support for the assertion that insurance rights held by the Settlement Trust could result in such creditors receiving a full or substantially-full recovery.

TrustApp430

*Response to the Official Committee of Tort Claimants' Status Report Re: Second Modified Fifth Amended Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC* [Docket No. 8234] Ex. A.  The Debtors therefore claim that they "anticipate payment in full to holders of allowed claims in Class 8 in accordance with the Trust Distribution Procedures."  *Id.* at ¶ 7.

84.     This conspicuous adjustment of the Debtors' argument is undoubtedly driven by the fact that their previous argument, that the releases are justified because the Plan will receive "overwhelming" support, has not panned out well.  They were forced, therefore, to take the new position that the lack of "overwhelming" support for the Plan can be overcome by the fact that Class 8 claimants should anticipate a recovery in full.  And, in support of that position, they point to Judge Brendan Shannon's ruling in In re TK Holdings Inc., Case No. 17-11375-BLS (Bankr. D. Del. Feb. 21, 2018) [Docket No. 2120].  That case is distinguishable because, although in that case, just over 75% of the claimants voted to accept the Plan (and the releases and channeling provisions contained in it), certain plan proponents (including Honda) were "agreeing to pay in full the value of all [claims] that would be impacted by the Channeling Injunction as it applies to them."  *Memorandum of Law in Support of Confirmation*, TK Holdings (filed Feb. 14, 2018), [Docket No. 20150], at ¶ 110.

85.     No such guarantee exists here.  If the ultimate liability for Direct Abuse Claims exceeds Dr. Bates' revised projected range of liability—which is all but a certainty under the proposed TDPs—no party has agreed to satisfy the difference such that Class 8 claimants will be paid in full.[126]  Indeed, in his rebuttal report, Dr. Bates states for the ultimate Direct Abuse Claim liability calculated under the TDPs to equal his adjusted range, ***nearly 87% of all claims would***

---

[126]   There also is no guarantee for payment in full of Class 9 claims, which are also impacted by the Channeling Injunction.  Even assuming that the updated report by Dr. Bates is accurate, the Debtors do not even attempt to suggest that Class 9 claims will receive similar treatment.

41

*need to receive a downward adjustment of 90% of their Base Matrix Value*.[127]   And, if substantially all of the Abuse Claims are not reduced, then Abuse Claim liability would be overvalued "manyfold," and aggregate Abuse Claim liability will be approximately $25 billion.[128]

86.     This disconnect between the Bates valuation range and the TDPs is fatal to the proposed channeling injunction.   It simply cannot be the case that the Debtors and tens of thousands of non-Debtor entities receive complete protection from all Abuse Claim liability because Dr. Bates' range (which has a high end of $3.6 billion) serves as the factual basis for finding that all Abuse Claims are paid in full, but the TDP structure (which is designed to deliver $25 billion in claims or more) is not only approved but expressly found binding on the Debtors' insurers.

87.     The Debtors will no doubt argue that the conflicted Settlement Trustee will, in fact, ignore the Base Matrix Values, the scaling factor guidelines, and his (and the STAC members') incentives, and cut 87% of the claims by 90%, bringing the TDPs in line with Dr. Bates' valuation range.   But no such result is likely unless this Court orders significant changes to the Base Matrix values, scaling factors, and governance structure of the Trust.   Absent those changes, the claim amounts generated by application of the procedures and guidelines of the TDPs will greatly exceed the Bates valuation range, and any realistic assessment of the value of the assets available to the Settlement Trust, even including the unsettled insurance coverage.   Direct Abuse Claimants will not be "paid in full."

---

[127]   Bates Rebuttal Report ¶¶ 53, 97, 98 (finding that all but 13% of filed proofs of claim are single abuser claims and setting "a mitigating scalar for all Single Abuser Cases to 10%, reflective of BSA's likely low average responsibility for these abuse claims" and "to properly account for the tort system values of the Abuse Claims.") (Certain Insurers App. 30).

[128]   *Id.* at ¶ 66.

TrustApp432

88.     Accordingly, the Debtors have not proposed, through the Plan or otherwise, "a mechanism for payment of all, or substantially all, of the claims of" Class 8 or 9, which means the Channeling Injunction and nonconsensual releases cannot be approved as to Class 8 or 9.  Given these facts, it is not even clear that the Plan could begin to satisfy the *Master Mortgage* test.

**D.     The Majority of Beneficiaries of the Channeling Injunction Will Not be Making a "Substantial Contribution" to the Settlement Trust.**

89.     Another egregious aspect of the proposed Channeling Injunction and third-party releases is that they apply to thousands of organizations that are making "compulsory" and not economically cognizable contributions to the Settlement Trust.  Courts have found a "substantial contribution" to the estate "where the contribution consists of most of the assets of the contributing party," *In re HWA Props., Inc.*, 544 B.R. 231, 241 (Bankr. M.D. Fla. 2016), or where the releasing party both foregoes consideration and contributes value.  *See In re Genco Shipping & Trading Ltd.*, 513 B.R. 233, 272 (Bankr. S.D.N.Y. 2014).

90.     ***Each*** released party must make "a cognizable and valid contribution to the debtor as part of the debtor's reorganization."  *Nat'l Heritage Found., Inc. v. Highbourne Found.*, 760 F.3d 344, 348 (4th Cir. 2014); *see Purdue Pharma*, 2021 WL 5979108, at *129 n.44 ("It is actually not clear what members of the Sackler family are contributing to the settlement and in what amounts.  The record contains some suggestion that the various trusts that are contributing are for the benefit of all members of the family.").  Nor is it permissible for one party to "buy" the releases of another.  *In re 710 Long Ridge Rd. Operating Co., II,* Case No. 13-13653 (DHS), 2014 Bankr. LEXIS 863, at *59 (Bankr. D.N.J. Mar. 5, 2014) ("It is only fair and logical that the consideration required to satisfy the claims affected must be provided by the party actually receiving the release; it is not sufficient that some creditors receive some extra value from another party."); *In re Lower*

43

TrustApp433

*Bucks Hosp.*, 488 B.R. 303, 325 (E.D. Pa. 2013) (third-party release disallowed because all consideration paid to creditors came from a different party than the releasee).

91.     Whether a contribution is "substantial" is not absolute, but must be judged in the context of the total funds needed for a successful reorganization and the contribution to the reorganization relative to each releasing party's financial ability to contribute.  *In re Mahoney Hawkes, LLP*, 289 B.R. 285, 302 (Bankr. D. Mass. 2002).  Here, neither the Local Councils nor the Contributing Chartered Organizations have contributed "substantial" amounts.

92.     Exhibit F of the Plan notes that the Local Councils would contribute $300 million in cash, properties with an appraised value of $200 million, and a $125 million obligation DST Note requiring payments in favor of the Settlement Trust, along with certain rights under various causes of action and insurance policies.  *See* Plan Art. I.168 and Ex. F.  This amount is a fraction of the assets held by the Local Councils, which hold $3.3 billion in net assets, including $1.87 billion in unrestricted funds. *See* Disclosure Statement, Ex. D-1 at 23.  The Debtors have also acknowledged that payment of the DST Note is "not assured," specifically identifying nonpayment of the note as a risk factor in Article X.A.19 of the Disclosure Statement.[129]

93.     With respect to Contributing Chartered Organizations, TCJC is to make a $250 million cash contribution, along with the assignment of insurance rights under shared insurance policies owned by the Debtors and Local Councils,[130] and the United Methodist Entities propose

---

[129]    The TCC has also challenged the adequacy of the Local Councils' contribution on multiple occasions, asserting that the Local Councils "have the financial wherewithal to contribute several multiples of their contingent $600 million offer without endangering the mission of Scouting." *Motion of Official Committee of Tort Claimants for Entry of an Order Terminating the Debtors' Exclusive Periods to File a Plan and Solicit Acceptances Thereof Pursuant to Section 1121 of the Bankruptcy Code* [Docket No. 6625] ("Motion to Terminate Exclusivity"), ¶ 6 (Certain Insurers App. 20).

[130]    S*ee Sixth Mediator's Report* [Docket No. 6210], p. 2 (Certain Insurers App. 15).

TrustApp434

Case 3:23-cv-01592-S   Document 285   Filed 11/02/23   Page 438 of 624   PageID 7266
Case 20-10343-LSS   Doc 8793-1   Filed 02/11/22   Page 57 of 110

to collectively contribute $30 million in cash.[131]  TCJC's contribution of cash and insurance rights does not account for (i) the immense financial resources of TCJC and (ii) the value of the releases to an organization that has had "direct involvement in every aspect of the Scouting program for decades" and thus faces material exposure to Abuse Claims.  *See Motion to Terminate Exclusivity*, ¶ 9.  Similarly, the contribution from the United Methodist Entities cannot currently be assessed on the current record in light of their potential Abuse Claim liability and unrestricted assets (which have not been disclosed).

94.    The "contributions" of all other Contributing Chartered Organizations hardly qualify as "substantial."   With the exception of "Opt-Out Chartered Organizations," the Plan contemplates granting the full benefits of the Channeling Injunction to **all** Chartered Organizations, despite the "Other Chartered Organizations" contributing few meaningful assets, if any.[132]  Instead, thousands of Other Chartered Organizations will get full releases so long as (a) the Local Councils contribute an additional $40 million to the Settlement Trust, (b) the Century and Chubb Companies (and, presumably any other settling insurer) contribute their settlement amount, and (c) the Chartered Organization seeking the benefit of the release contributes its rights to coverage for Boy Scout abuse under its relevant insurance policies to the Settlement Trust (the "Participating Chartered Organization Insurance Assignment").  And, even Opt-Out Chartered Organizations receive the benefit of the releases and channeling provisions as to Boy Scout claims if they have insurance for such claims provided by a settling insurer.

---

[131]   *See Notice of Eighth and Ninth Mediator's Report Regarding United Methodist Term Sheet and Zurich Term Sheet Including Treatment of Chartered Organizations* [Docket No. 7929] (Certain Insurers App. 25).

[132]   *See Seventh Mediator's Report* [Docket No. 7745], Exhibit A, ¶ 16.  The Century and Chubb Companies Insurance Settlement states that Other Chartered Organizations will be entitled to treatment as Contributing Chartered Organizations upon the occurrence of the Supplemental LC Contribution, release of the $800 million settlement amount from the Century and Chubb Companies to the Settlement Trust as contemplated under the Plan and, with respect to Opt-Out Chartered Organizations, a contribution "equivalent in form and Substance" to the Participating Chartered Organization Settlement Contribution.

TrustApp435

95.     Of these three contributions, the first two will not be made by the Other Chartered Organizations but instead by third parties, a fact that has proved fatal to requests that releases and injunctions shield non-contributing parties.  *See In re 710 Long Ridge Rd. Operating Co.*, 2014 Bankr. LEXIS 863, at \*59.  For example, the Seventh Mediator's Report characterizes the $40 million contribution from the Local Councils as having been made "on behalf of" the Chartered Organizations, even though the Chartered Organizations contribute nothing themselves.  Seventh Mediator's Report, p. 2.  The Seventh Mediator's report also claims that the BSA and Local Councils have agreed to contribute, "on behalf of" the Chartered Organizations, an additional $100 million payment attributable to the growth in BSA membership over the coming years "on account of" the Chartered Organizations' continued sponsorship of Scouting units.  See Seventh Mediator's Report, p. 2. This additional $100 million payment must be attributed to the BSA and Local Councils, not the Chartered Organizations, who have agreed to pay nothing.

96.     This leaves the Participating Chartered Organization Insurance Assignment as the sole contribution from the Chartered Organizations in exchange for the Channeling Injunction's releases, which consists of such parties' rights in and to insurance actions, recoveries, claims and proceeds arising from insurance policies pertaining to the Abuse Claims. Plan Art. I.189.  The Debtors rightly characterized these insurance rights as "speculative and limited."[133]  As discussed below, the assignment of the insurance policies (or rights thereunder) is prohibited by applicable law absent the consent of the non-settling insurers—which consent has neither been sought nor is forthcoming based on the proposed Plan and TDPs.

---

[133]  *See Debtors' Omnibus Reply in Support of Debtors' Motion for Entry of an Order (I) Approving the Disclosure Statement and the Form and Manner of Notice, (II) Approving Plan Solicitation and Voting Procedures, (III) Approving Forms of Ballots, (IV) Approving Form, Manner and Scope of Confirmation Notices, (V) Establishing Certain Deadlines in Connection with Approval of the Disclosure Statement and Confirmation of the Plan, and (VI) Granting Related Relief* [Docket No.  4105], ¶¶ 54-55 (Certain Insurers App. 9).

TrustApp436

E.     **The Remaining *Master Mortgage* Factors Either Do Not Support or Are, at the Very Least, Neutral as to the Issue of Whether Approval of the Channeling Injunction Is Appropriate Under These Facts.**

97.     The remaining *Master Mortgage* factors do not support the Channeling Injunction.

98.     ***First***, the Channeling Injunction is not an essential element of the Debtors' reorganization.  The Debtors previously proposed the BSA Toggle Plan, which lacked any third-party releases and provided for resolution of the Abuse Claims and other Claims only *against the Debtors*.  The Debtors' own advisor testified that the BSA Toggle Plan was a feasible plan of reorganization.  *See* Whittman Dec. 7, 2021 Dep. at 223:7- 225:3.

99.     The same advisor testified that "certain [Chartered Organizations] have made statements outside of mediation that have indicated threats to withdraw from scouting . . . if they are unsatisfied with their treatment under the plan,"  but went on to say that those entities represented a minority of all Chartered Organizations.  Whittman Dec. 7 Dep., p. 97:14-21; 101:23- 102:8.  Indeed, even if many of the Chartered Organizations—such as the Methodist Church or the Catholic Church—withdrew from formally partnering with Scouting, these departures would have an immaterial impact on BSA membership.  *See* Whittman Dec. 13 Dep., pp. 78:9-16; 82:20-83:1.

100.     ***Second***, the Debtors must show an "identity of interest between the debtor and the third party . . . such that a suit against the non-debtor is, in essence a suit against the debtor or will deplete assets of the estate."  *Master Mortgage*, 168 B.R. at 935; *see also In re Dow Corning Corp.,* 280 F.3d 648, 658 (6th Cir. 2002).  There is no evidence that each of the non-debtor entities shares an identity of interest with the Debtors.  Although the Debtors previously asserted that there may be indemnification and contribution claims running from the Debtors, the mere obligation to indemnify is not sufficient to authorize third-party releases. *See Gillman v. Cont'l Airlines (In re Cont'l Airlines)*, 203 F.3d 203, 215 (3d Cir. 2000) ("We also take issue with the District Court's

TrustApp437

unsupported conclusion that the [debtors'] obligation to indemnify [the released parties] transforms the release and permanent injunction of Plaintiffs' claims against [the released parties] into a 'key element' of the [debtors'] reorganization.").

## II.   THE PLAN MODIFIES CONTRACT RIGHTS IN VIOLATION OF BANKRUPTCY AND NON-BANKRUPTCY LAW.

101.   A plan cannot be confirmed if it does not "compl[y] with all applicable provisions of this title [11]" or if it is "proposed . . . by any means forbidden by law."[134]  The proposed plan must comply with the Bankruptcy Code itself in addition to any relevant "applicable nonbankruptcy law," including state contract and tort law.[135]

102.   It is a bedrock principle of bankruptcy law that a debtor is not entitled to rewrite prepetition contracts merely because of its status as a debtor in bankruptcy.[136]  Absent express statutory authority providing otherwise, the Debtor may not use the chapter 11 process to renegotiate its bargained-for contractual rights and obligations.[137]

---

[134]   11 U.S.C. § 1129(a)(1), (3).

[135]   *See, e.g.*, *In re Zenith Electronics Corp.*, 241 B.R. 92, 108 (Bankr. D. Del. 1999) ("[T]he Plan must not only comply with the provisions of the Code, but must meet the standards for approval of such a transaction under Delaware corporate law. We agree that section 1129(a)(3) does incorporate Delaware law (as well as any other applicable nonbankruptcy law)."); *In re Amatex Corp.*, 97 B.R. 220, 225-26 (E.D. Pa. 1989) (bankruptcy court cannot "create rights not otherwise available under applicable law" (quotation marks omitted)).

[136]   *See, e.g.*, *In re Crippin*, 877 F.2d 594, 598 (7th Cir. 1989) (holding that "bankruptcy courts do not have the power to rewrite contracts to allow debtors to continue to perform on more favorable terms"); *Moody v. Amoco Oil Co.*, 734 F.2d 1200, 1213 (7th Cir. 1984), *cert. denied*, 469 U.S. 982 (1984) (holding that the Bankruptcy Code is "not intended to expand debtor's rights against others more than they exist at the commencement of the case.") (internal marks omitted); *In re 641 Associates, Ltd.*, 1993 WL 332646 at *8 (Bankr. E.D. Pa. Aug. 26, 1993) ("There is no provision in the Bankruptcy Code allowing a bankruptcy court to disregard state-law contractual rights."); *In re SPM Mfg. Corp.*, 984 F.2d 1305, 1311 (1st Cir. 1993) (bankruptcy courts lack authority to enter orders that "expand the contractual obligations of parties"); *Cissel v. Am. Home Assur. Co.*, 521 F.2d 790, 792 (6th Cir. 1975) (bankruptcy trustee could not obtain recovery from insurer for claims filed against the estate absent a judgment or a written settlement agreement between the policyholder, the claimant, and the insurance company); *Fed. Ins. Co. v. SKMDV Holdings, Inc. (In re Green Jacobson P.C.)*, 2017 WL 3149333 , at *14 (Bankr. E.D. Mo. July 24, 2017) ("Neither the Court nor the parties can rewrite the Policy.").

[137]   Narrow exceptions to this rule exist but are not relevant here.  *See In re Rickel Home Centers, Inc.*, 209 F.3d 291, 298 (3d Cir. 2000) (*ipso facto* clauses under 11 U.S.C. § 365(e)(1)); *In re Dura Automotive Systems, Inc.*, 2007 WL 7728109, at *98 (Bankr. D. Del. Aug. 15, 2007) (certain assignment restrictions under 11 U.S.C. § 365(f)).

TrustApp438

103.    Rather, the Bankruptcy Code "provide[s] a bankruptcy trustee with the same rights and defenses" under a prepetition contract as those held by the debtor prior to bankruptcy.  *In re Combustion Engineering, Inc.*, 391 F.3d 190, 245 n.66 (3d Cir. 2004).  This well-recognized principle takes a number of forms, including the requirement that executory contracts be assumed *cum onere* or not at all,[138] and the restriction on the ability to modify non-executory contracts to increase the obligations of non-debtor contract counterparties.

104.    Not surprisingly, bankruptcy courts regularly reject debtor efforts to rewrite insurance policy contractual terms.  *See, e.g.*, *In re Combustion Eng'g, Inc.*, 391 F.3d at 218 (a plan must preserve "the pre-petition rights and obligations of both the debtor and the insurers under the Plan by preserving for 'any Entity . . . any and all claims, defenses, rights or causes of action' under the subject insurance policies and settlements.").[139]  And they have done so even where a proposed plan would have the real world effect of rewriting the terms of an insurance policy, whether or not the plan expressly seeks to modify express contract language.  *See In re Thorpe Insulation Co.*, 677 F.3d 869, 885 (9th Cir. 2012) (reversing confirmation of a plan and ordering a new trial on the grounds that the plan would "economically affect [the insurers] in substantial ways.").

105.    Courts and litigants often refer to this principle in a shorthand way as a requirement that a plan be "insurance neutral."  But what matters is the principle not the label:  as this Court

---

[138]    *See, e.g.*, *Sharon Steel Corp. v. Nat'l Fuel Gas Dist. Corp.*, 872 F.2d 36, 39-40 (3d Cir. 1989) (acknowledging "the general principle that a debtor may not reject a  contract but maintain its benefits"); *In re AbitibiBowater Inc.*, 418 B.R. 815, 822-23 (Bankr. D. Del. Oct. 27, 2009) ("An executory contract must be assumed or rejected *in toto* . . . A contract will not be bifurcated into parts that will be rejected and those that will not.") (quotation marks and internal citation omitted)).

[139]    *See also In re Pittsburgh Corning Corp.*, 453 B.R. 570, 604-05 (Bankr. W.D. Pa. 2011) (lack of clarity regarding treatment of insurance claims rendered plan unconfirmable); *Amatex Corp. v. Aetna Cas. & Sur. Co. (In re Amatex Corp.)*, 97 B.R. 220, 221 (Bankr. E.D. Pa. 1989), *aff'd sub nom.* 102 B.R. 411 (Bankr. E.D. Pa. 1989) (refusing to order insurers to make lump sum payments "contrary to the terms of their policies.").

TrustApp439

has recognized, a proposed plan that seeks to modify insurance contract terms is not confirmable as a matter of law.[140]  Yet the Plan here seeks to do just that.

**A.    The Proposed Plan Seeks to Improperly Determine Coverage Issues Through the Proposed Findings.**

106.    Bankruptcy courts have long recognized that coverage determinations should be left for other courts appropriately adjudicating coverage issues, and that a plan of reorganization should not affect a debtor's insurance contracts.  In recognition of this principle, most debtors avoid a fight with their insurers entirely and do not seek in any way to modify their insurance contracts.  Instead, they default to "insurance neutral" language in the plan.  Bankruptcy courts thus routinely approve plan language that maintains the status quo and preserves insurer rights and defenses.  In *Combustion Engineering*, for example, the Third Circuit mandated the inclusion of a provision to ensure that insurer rights are protected:

> [N]otwithstanding anything to the contrary in this Order, the Plan or any of the Plan Documents, nothing in this Order, the Plan or any of the Plan documents (including any other provision that purports to be preemptory or supervening), shall in anyway [sic] operate to, or have the effect of, impairing the insurers' legal, equitable or contractual rights, if any, in any respect. The rights of insurers shall be determined under the Subject Insurance Policies or Subject Insurance Settlement Agreements as applicable.[141]

107.    This required language has only been strengthened in recent years.  For example, in *In re Global Industries Technologies, Inc.* ("GIT"), the Third Circuit reversed the confirmation of a plan that contained analogous language to the above provision because the "[p]lan [] triggered [an] explosion of new claims" and thereby created significant administrative costs for the debtors'

---

[140]    *See* May 19, 2021 Hr'g Tr. 168:25-169:3 (The Court: "It's the same as any other contract . . . Certain things the Bankruptcy Code says you can change, like assignability.  Other things, I can't touch a landlord's contract . . . I can't touch an insurance contract . . .  That's contracts."); *Id.* at 228:8-12 ("I don't view an insurance contract any different than any other contract, right?  In the sense that the plan shouldn't do anything to it that the bankruptcy code doesn't say can be done to it.").

[141]    391 F.3d 190, 209 (3d Cir. 2004).

TrustApp440

insurers.[142]  Thus, the language alone was not sufficient when the plan itself, notwithstanding the

insurance neutrality language, changed the risk profile or contractual arrangements of the insurers.

108.    More recent cases in this Circuit have required even more robust protective

language.  *See, e.g., In re Blitz U.S.A.*, Inc., 2013 WL 6825607, ⁋ 6.7 (Bankr. D. Del. Nov. 12,

2013) (". . . the Confirmation order . . . shall not have any . . . preclusive effect on, or otherwise

prejudice, diminish, impair or affect . . . any Non-Participating Insurer's . . . rights or obligations

under any Assigned Blitz Insurance Policies."); *In re Pittsburgh Corning*, 453 B.R. at 585

("nothing in the Confirmation Order or the Plan . . . shall in any way operate to impair, or have the

effect of impairing [the insurers'] legal, equitable, or contractual rights, if any, in any respect").

109.    The current Plan makes no effort to include similar language or protections, and

since entry into the RSA, the Plan Proponents have abandoned even the pretext of preserving

insurer contract rights.  The Plan's Proposed Findings have no purpose except to require this Court

to improperly make binding coverage determinations and prevent Certain Insurers from exercising

their right to have a court resolve coverage disputes at the appropriate time.  As this Court has

noted, "[i]t does not appear that these findings have a code or a confirmation-related purpose;

rather, . . . they appear to be more directed at post-confirmation litigation with insurers."[143]

110.    The Plan's purported "insurance neutrality" provision, in fact, does away with the

very concept.  It provides:  "[e]xcept for the Insurance Assignment, or as otherwise provided in

the Bankruptcy Code, applicable law, **the findings made by the Bankruptcy Court in the**

**Confirmation Order, or the findings made by the District Court in the Affirmation Order**,

nothing in the Plan shall modify, amend, or supplement, or be interpreted as modifying, amending,

---

[142]   *See In re Glob. Indus. Techs.*, 645 F.3d 201, 212-14 (3d Cir. 2011).
[143]   Oct. 25, 2021 Hr'g Tr. 10:18-21 (Certain Insurers App. 58).

TrustApp441

or supplementing, the terms of any Insurance Policy or rights or obligations under an Insurance Policy."  Article X(M) of Plan (emphasis added).

111.    As explained above, Proposed Finding (s) requires that the Court determine that the procedures for claim allowance and criteria for determining "Allowed Claim Amounts" are "appropriate and provide for a fair and equitable settlement of Abuse Claims based on the evidentiary record offered to the Bankruptcy Court."  The Plan Proponents intend for a post-confirmation coverage court to find that the entry of this finding, combined with finding (r), which expressly provides for *res judicata* and/or collateral estoppel effect, results in an immediate and improper determination by *this* Court of the amount of loss, if any, that would otherwise be resolved by the coverage court.  *See Thorpe*, 677 F.3d at 886 (plan not insurance neutral where it "would not necessarily permit the insurers to challenge settlement amounts as reasonable.").

112.    But 28 U.S.C. § 157(b)(5) makes clear that "[t]he district court shall order that personal injury tort . . . claims be tried in the district court in which the bankruptcy case is pending, or the district court in the district in which the claim arose." (emphasis added). Pursuant to section 157(b)(2)(B), this Court does not have jurisdiction to make a finding that claim determinations with respect to the personal injury claims to be presented to the Trust and resolved pursuant to the TDPs are "fair and reasonable," determinations that, realistically, could only be made after a trial of each individual claim.  This point is underscored where, as here, the parties sought to be bound are insurers whose policies, assuming coverage exists, require a judgment or approved settlement for each claim on an individualized basis.

113.    Finding (t) is an attempt to determine insurance coverage in a manner that was rejected by *Fuller-Austin Insulation Co. v. Highlands Ins. Co.*  There, the debtors represented at confirmation that the insurance carriers "simply do not have any interest as affected by this plan

52

of reorganization . . . all of their rights under those policies are unaffected."[144]  But before the California court in the coverage action, the trustee of the Fuller-Austin trust (supported by the very same Eric Green, as Future Claims Representative, who has been proposed as the Trustee of the Settlement Trust here) argued the opposite:  that, at confirmation, the bankruptcy court had preclusively determined that Fuller-Austin's insurers were liable for the full allowed amount of each covered claim.[145]  On appeal, the California Court of Appeal reversed the California Superior Court and rejected this argument and held that the insurers were liable only for amounts actually paid by the Fuller-Austin trust.  Despite the appellate outcome, the fact that appellate reversal was required to reach this outcome demonstrates the real risk that the claimants' misuse of a confirmation order from this Court is not merely theoretical.

114.    More recently, in *Takata*, Prof. Green, the Coalition's proposed Settlement Trustee, unsuccessfully made a similar attempt to have the bankruptcy court decide coverage issues, which the court declined to do because it required an analysis of "the underlying insurance contracts."[146]  The Court should not give the Plan Proponents the opportunity to "end-run" the Court's refusal to determine coverage issues in this fashion.[147]

---

[144]    135 Cal. App. 4th 958, 971 (2006).

[145]    *Id.* at 972.

[146]    *See Eric D. Green v. Mitsui Sumitomo Insurance Company, Lmtd. (In re TK Holdings, Inc.)*, 17-11375-BLS [Docket No. 4608] *Order on Motion to Dismiss Action for Declaratory Judgment*, p. 20 n. 80 (holding that the determination of whether an insurance company was required to pay the liquidated value of a claim or the payment amount required an analysis of the "underlying insurance contracts' payment obligations" rather than being a matter of bankruptcy law) (citing *Flintkote Co.*, 177 F.Supp. 3d at 1176-77 (N.D. Cal. 2016)) (Certain Insurers App. 38).

[147]    Further, coverage disputes are not core proceedings subject to determination by a bankruptcy court. *See*, *e.g.*, *Longview Power, LLC v. First Am. Title Ins. Co. (In re Longview Power, LLC)*, 515 B.R. 107, 115 (Bankr. D. Del. 2014) (rejecting attempt to transform a non-core coverage determination into a core matter by making such determination a condition precedent to confirmation and stating "the Court can see no limiting principle to this argument and it would give debtors unfettered license to confer core status to proceedings by requiring their favorable adjudication in order to confirm a plan."); *Mt. McKinley Ins. Co. v. Corning Inc.*, 399 F.3d 436, 450 (2d Cir. 2005); *Matter of U.S. Brass Corp.*, 110 F.3d 1261, 1268 (7th Cir. 1997); *Roman Catholic Diocese of Rockville Centre v. Arrowood Indemnity Co.*, 2021 WL 1978560, *7 (Bankr. S.D.N.Y May 17, 2021).

TrustApp443

115.    Furthermore, these findings lack any plausible bankruptcy purpose.  Finding (r), a finding that the Plan and Confirmation Order are binding on all parties in interest, makes reference to 11 U.S.C. § 1141 of the Bankruptcy Code, which merely sets forth the binding nature of a confirmation order.  Section 1141 is also self-executing—a finding providing for its effect is unnecessary and redundant.[148]  But, of course, finding (r) goes well beyond the straightforward impact of section 1141, as it purports to bind parties to all of the "Plan Documents," including the TDPs.[149]  Section 1141 makes no reference to any trust distribution procedures.

116.    One can only then conclude that the purpose of finding (r) is to attempt to give *res judicata* effect to improper findings (s) and (t).  On its face, this is improper, particularly in light of the fact that the Proposed Findings are gratuitous and are not required by section 1129 of the Bankruptcy Code and serve no other bankruptcy purpose.   "A court conducting an action cannot predetermine the *res judicata* effect of the judgment; that effect can be tested only in a subsequent action."  *Matsushita Elec. Indus. Co. v. Epstein*, 516 U.S. 367, 396 (1996) (Souter, J., concurring in part, dissenting in part); *see Covanta Onondaga Ltd. v. Onondaga Cnty. Res. Recovery Agency*, 318 F.3d 392, 398 (2d Cir. 2003) ("The first court does not get to dictate to other courts the preclusion consequences of its own judgment. . . ." (quotation marks omitted));  *Midway Motor Lodge v. Innkeepers' Telemanagement & Equip. Corp.*, 54 F.3d 406, 409 (7th Cir. 1995) ("In the law of preclusion ... the court rendering the first judgment does not get to determine that judgment's effect; the second court is entitled to make its own decision."); 18 Wright & Miller, Federal Practice and Procedure § 4413 (3d ed. April 2021 Update) (noting "general rule that a court cannot

---

[148]    *See, e.g., In re Chatha*, 2021 WL 3533391, at *3 (Bankr. E.D. Cal. Aug. 9, 2021).

[149]    Plan, p. 35, Definition 200.

54

TrustApp444

dictate preclusion consequences at the time of deciding a first action," except in limited cases where it seeks to limit the decision's preclusive effect).[150]

117.    With regard to finding (s), the Plan Proponents incorrectly argue that a finding concluding that claim amounts provide for a "fair and equitable settlement" is <u>required</u> by 11 U.S.C. § 1123(b)(6).[151]  But Section 1123(b)(6) merely provides that a plan of reorganization <u>may</u> "include any other appropriate provision not inconsistent with the applicable provisions of this title."   And the reference to the evidentiary record is a transparent attempt to cause a court adjudicating coverage issues to misleadingly conclude that this Court conducted an evidentiary hearing on the allowance of the claims for which insurance coverage is sought – something that this Court has not done and, under the jurisdictional limitations imposed on this Court related to personal injury claims, has no jurisdiction to do.

118.    Further, in Proposed Finding (s), the Plan Proponents seek approval of the TDPs as a settlement under Bankruptcy Rule 9019 and, even more generally, state that the TDPs "otherwise comply with the Bankruptcy Code and applicable law."   But this Court was correct when it informed the Coalition "that I do not believe a plan to be a settlement.  The plan gets imposed on people, it[']s not a settlement." Sept. 28, 2021 Hr'g Tr. at 104:4-8 (Certain Insurers App. 54).

119.    Bankruptcy Rule 9019 is merely a procedural mechanism and cannot alter the substantive rights of non-consenting parties.  Pursuant to 28 U.S.C. § 2075, which implements the Bankruptcy Rules, no Bankruptcy Rule can "abridge, enlarge, or modify any substantive right." *See Northview Motors v. Chrysler Motors Corp*., 186 F3d 346, 351, n.4 (3d Cir. 1999) (noting that

---

[150]   To the extent that this finding is entered by the Court, Certain Insurers hereby reserve their rights to argue that such finding and/or determinations made by the Trustee under the TDPs is not binding in any future coverage proceeding and/or gives rise to Certain Insurers' rights to deny coverage.

[151]   *See, e.g.*, *Joint Objection of the Coalition of Abused Scouts for Justice and the Future Claims Representative to Certain Insurers' (I) Motion to Modify the Confirmation Scheduling Order and (II) Motion for an Expedited Hearing on Same* [Docket No. 7862] (Certain Insurers App. 23).

TrustApp445

"as a matter of law, Bankruptcy Rule 9019(a), a rule of procedure, cannot, by itself, create a substantive requirement of judicial approval"); *In re Layton,* 480 B.R. 392, 399-400 (Bankr. M.D. Fla. 2012) (explaining how the Bankruptcy Rules may not modify a substantive right); *In re Dow Corning Corp.*, 198 B.R. 214, 246 (Bankr. E.D. Mich. 1996) ("Rule 9019, being merely a rule, can do no more than establish a procedural mechanism for exercising a statutory power."). The Debtors cannot use their Plan to "manufacture" authority that they do not have. *See Purdue Pharma*, 2021 WL 5979108, at *40.

120.   Proposed Finding (u) asserts that both the Plan <u>and</u> the TDPs are proposed in good faith. The Coalition and FCR have incorrectly asserted that "[w]hether the TDP is consistent with the Debtors' exposure in the tort system, including their past practices and satisfies the requirements of section 1129(a)(3) are issues that must be litigated in connection with plan confirmation."[152]  That assertion is incorrect.  While section 1129(a)(3) requires that the Plan be proposed in good faith, there is no requirement in that section that a good faith determination be made as to the TDPs and such a determination is unnecessary for confirmation and serves no bankruptcy purpose.  This finding, combined with finding (r), which expressly provides for *res judicata* and/or collateral estoppel effect, invites a determination by this Court, before any Abuse Claims are allowed and paid, that the Settlement Trust will likely later misuse to argue that all future Abuse Claims settlements and payments will be "in good faith" and thereby bind the insurers.  *See* Coalition RSA Joinder at ¶ 39 (arguing that that an insured can settle claims without

---

[152]   Coalition, FCR and TCC Statement ISO RSA at ¶ 45 (Certain Insurers App. 11).  Notably the Plan Proponents have failed their self-imposed test.  According to the Debtors, the TDPs are ***inconsistent*** with "the Debtors' exposure in the tort system, including their past practices,"  precluding a finding the TDPs were proposed in good faith.  *See* Bates Rebuttal Report ¶ 31 (noting that the TDPs and Settlement Trust are designed to compensate "tens of thousands of claims . . . who would never be compensated in the tort and will not receive any compensation should a Settlement Trust not be set up for that purpose.") (Certain Insurers App. 30).

TrustApp446

insurer consent (and bind insurers) provided claims are "reasonable and were paid *in good faith*")
(Certain Insurers App. 11).  The Court should reject that invitation.

121.    More simply, the very structure of the Plan contradicts the Plan Proponents'
argument that the Proposed Findings are necessary for confirmation.  All of the Proposed Findings
are conditions precedent, which are subject to waiver with the consent of all of the Debtors, the
Coalition, and the FCR.  *See* Sept 29, 2021 Hr'g Tr. 104:20-105:1 ("The Court: I'm not going to
approve it as part of the plan. If it's a condition precedent, somebody better waive it. And I did
notice, by the way, because I looked, that all of the conditions precedent, including the five we
spoke about yesterday, are waivable under certain circumstances with certain consents . . . ."); Plan
Art. IX.C.6.  Despite this and other warnings from the Court,[153] the Plan Proponents have refused
to remove these improper and premature overtures for coverage determinations.

122.    When faced with the need to determine complex coverage issues, bankruptcy courts
have deferred such determinations to the relevant coverage courts.[154]  This Court should similarly
reject the Plan Proponents' transparent attempt to enter the Proposed Findings which are not
necessary to confirmation, and which are designed and will be used to bind all parties to inflated
TDP amounts.

---

[153]    *See, e.g.*, Sept. 22 Hr'g Tr. at 89:10-23 (The Court: "I will tell you, I will be looking carefully at the findings,
that the – that the debtors and others are asking me to make, with respect to insurance – to make certain they don't go
further than I'm permitted to go as a bankruptcy court . . . So to the extent that the plan proponents, or those in support
of the plan, are going – to put it in the vernacular, going from pigs to hogs, then there may be an issue.") (Certain
Insurers App. 53); *id.* at 140:7-146:11 (The Court: "I'm hearing it from the coalition, the FCR, are telling me that
these findings are necessary for their clients to support the settlement . . .  for certain of these findings there's no
reference to the code or any provision of the rules . . . with respect to . . . the right to payment . . . is the allowed
amount of such abuse claim, as liquidated in accordance with the distribution procedures . . . this paragraph is probably
the one I find most concerning in terms of not knowing how it might be used later on down the line . . . to the extent
it has to be in this form that is in this condition precedent is something that I might not feel comfortable with in the
way it[']s written . . . to the extent that these particularly findings are gating issues for somebody who is supportive of
this plan, you need to give some thought to my comments.").

[154]    *See, e.g.*, *Fuller-Austin,* 135 Cal. App. 4th at 997; *Flintkote*, 177 F. Supp. 3d at 1180;  *ARTRA 524(g) Asbestos
Trust v. Fairmont Premier Co.*, 2011 WL 4684356, *3 (N.D. Ill. 2011).

TrustApp447

**B.     The Plan Alters Certain Insurers' Rights by Materially Increasing Their Liability in a Manner Inconsistent with the Tort System.**

123.    Even if the adjudication procedures in the TDPs were consistent with the tort system (which, as discussed below, *infra* Section II.C, they are not), the claims explosion generated by attorney marketing campaigns—combined with the TDPs' aggressive base values and scaling factors—would result in a gross inflation of the aggregate claim values, thereby impermissibly and arbitrarily modifying the Debtors' risk profile.

124.    Under controlling Third Circuit law, the fundamental alteration of a debtor's risk profile constitutes an impermissible modification of its insurance policies, just as if the debtor sought to change express contractual language.  In *Global Industry Technologies, Inc.*, the Third Circuit held that a plan was not insurance neutral because it increased the number of claims from 169 prepetition to 4,700 at confirmation (approximately a 2,700% increase in allegedly covered claims) and resulted in a "tangible disadvantage" to insurers.[155]

125.    Rather than the "mere" 2,700% increase in *GIT*, these chapter 11 cases have resulted in an utterly unprecedented 30,000% increase in the number of claims.[156]  This exponential increase was driven by an aggressive and wide-spread advertising campaign and significant shift in the filing threshold by certain plaintiff law firms, including those firms that comprise the Coalition.  That is, numerous plaintiff law firms have been willing to represent and file proofs of claim for claimants whom they would not have been willing to represent prepetition.[157]  And, unlike in *GIT* where the plan was at least facially insurance neutral, this

---

[155]   645 F.3d 201, 214 (3d Cir. 2011); *see In re Thorpe Insulation*, 677 F.3d at 885 (finding that it was error to confirm a plan based on economic effect on the insurers).

[156]   *See* Disclosure Statement § V.N ("there are approximately 82,200 unique, timely Abuse Claims") (Certain Insurers App. 18); *id.* § III.E (there were "approximately 275 civil actions" as of the Petition Date).

[157]   *See* Rebuttal Expert Report of Charles E. Bates, ¶ 70 ("We also have evidence of the selection bias and a change filing threshold for plaintiff law firms, i.e. a change in behavior as to what claims they were willing to represent

58

explosion of claims, coupled with the Proposed Findings and the TDPs that run far afield of the tort system, is an attempt to leverage inflated TDP values in exchange for limited contributions by the Debtors and the Local Councils to the Settlement Trust.

126. Although such an increase in claims is itself grounds to deny the proposed Plan, the TDPs are also designed to radically inflate the value of such claims well beyond what could be expected in the tort system, where damage awards are highly particularized as a result of the need for plaintiffs to prove each element of their claim, including factors that would modify damage awards. When claims that would otherwise proceed through the tort system settle, they do so against the backdrop of this process, and accordingly reflect the judgment of all of the adversarial parties as to the strengths and weaknesses of their case before a neutral third-party authority. Such settlements also reflect the possibility of appeal before another impartial third-party.[158]

127. The TDPs replace these fair procedures with a Claims Matrix, in which each and every Abuse Claim falls into one of six distinct tiers based on the sole discretion of the Settlement Trustee, each with its own base and maximum value. The Settlement Trustee then applies a number of Aggravating Scaling Factors and Mitigating Scaling Factors. These Scaling Factors are then multiplied together, resulting in the final Allowed Claim Amount, if accepted by the Abuse Claimant. But adverse parties have no opportunity to give any input on individual (or aggregate) claims valuations, and only Abuse Claimants have any ability to seek further review of the determination of the Settlement Trustee, who is not neutral or independent.

---

pre- and post-petition in this specific tort and as it relates to claims filed against BSA.") (Certain Insurers App. 30); Wall Street Journal, *Looting the Boy Scouts* (Mar. 2, 2021) (criticizing plaintiff outreach efforts that resulted in this explosion of claims) (Certain Insurers App. 39).

[158] *See* Expert Report of Karen Y. Bitar, ¶ 55 ("Any settlement in the tort system, however, is negotiated against the backdrop of the adjudicative process and the neutral decision-makers described above. Therefore, when a plaintiff or a defendant values his or her case, that valuation is informed by each side's assessment of (i) how a neutral decision-maker is likely to rule on attempts by the defendant to dismiss the case, and (ii) whether a jury will likely find in the plaintiff's favor.") (Certain Insurers App. 32).

TrustApp449

128.    The cumulative effect of these factors, including artificially inflated claims and Base Matrix Values, is to grossly overstate BSA's actual liability and that of the non-Debtor Protected Parties.  As Dr. Bates stated in his rebuttal report, in order to achieve results that are remotely consistent with the tort system, single abuser claims (which make up approximately 87% of the filed claims matrix) would need to be discounted from base claims values *by approximately 90%* resulting in an aggregate Abuse Claim valuation of "most likely" between $2.4 billion to $3.6 billion—in contrast to the range of $24.8 billion that is the low end of the TCC's expert's range when no deduction is applied.[159]  In other words, according to Dr. Bates, the base values set forth in the TDPs are approximately *10 times too high*, unless the Settlement Trustee voluntarily discounts the vast majority of the claims by substantially all of their value—an unlikely result under the current TDPs, which contain no Mitigating Factor that contemplates such a reduction and which explicitly state that settlements for single abuser claims are already incorporated into the Base Matrix Values.  And the TCC, unlike Dr. Bates or the Debtors, is proposed to be involved in Settlement Trust governance.  Even assuming the TDPs permitted the reduction Dr. Bates believes is required to accurately value Abuse Claims (which they do not), such a system for valuing claims is not only absurd, it is vulnerable to significant exploitation—and under no circumstances is it "reasonable."  A reasonable system for valuing claims would *start* with the discounted values as the "base values," (which would then capture the vast majority of claims) and then increase the small minority of multi-abuser claims upwards from there.  The TDPs turn that valuation system on its head.[160]

---

[159]    *Compare* Kathryn McNally Feb. 3, 2022 Deposition Transcript at 313:24-25, *with* Bates Rebuttal Report ¶ 12.

[160]    *See* Rebuttal Report of Marc C. Scarcella, M.A., (the "Scarcella Rebuttal Report") at ¶¶ 18-22.

TrustApp450

C.     **The TDPs Render the Plan Unconfirmable, as They Expressly Rewrite Insurance Policy Terms to Eliminate Insurer Rights and Defenses.**

129.   The proposed Plan is unconfirmable for the additional reason that the TDPs have the impermissible effect of modifying relevant insurance policies.  *See* **Exhibit A**.

130.   As noted by Professor Harrington, "[t]he Plan . . . fundamentally alter[s] the contractual relationship between the Debtors, other Protected Parties, and non-settling insurers. The relationship [is] changed from one of the insured's required assistance and cooperation with insurers in defense and settlement of claims to control costs, to one in which the Settlement Trust, as acting, advised, or controlled by representatives of current and future claimants, seeks to maximize recovery from the non-settling insurers."[161]

131.   Professor Harrington further explains that:

> Overall, the Plan would allow the Settlement Trustee to assert claims against non-settling insurers, including in coverage actions, that the Settlement Trust is entitled to be paid the full Allowed Claim Amount for each Allowed Abuse Claim on the basis that the Bankruptcy Court has determined that the Trust Distribution Procedures are appropriate, fair, equitable, and proposed in good faith, and that the Allowed Claim Amount establishes the amount of the Debtors' or other Protected or Limited Protected Parties' liability. The proviso in condition precedent *s* – that "nothing herein shall determine that any insurer is obligated to pay the . . . liability so determined" – would not preclude the Settlement Trust from making these assertions. Nor would this proviso prevent the Settlement Trust from asserting that non-settling insurers' coverage defenses are constrained by conditions precedent *r*, *s*, and *t*.

*Id.* at pg. 18.

132.   It should be no surprise that the Certain Insurers included in their policies a number of protections to avoid the pitfalls described by Professor Harrington, including:  the right to control the defense of claims, the right to control the settlement of claims, the right to only pay for losses for which the insured is legally liable and coverage exists, the right to apply policy exclusions against any such losses, various rights related to the exhaustion of policies, and the right

---

[161]   Expert Report of Professor Scott E. Harrington, p. 16 (Certain Insurers App. 33).

TrustApp451

to assert contribution, subrogation, indemnification, offset and reinsurance claims against settling parties.  *See, e.g.*, **Exhibit A**.  The Proposed Plan would impermissibly abrogate all of these rights.

133.    In addition, policies routinely contain an "assistance and cooperation" provision that requires the insured to cooperate in the defense of the claim.  Here the first version of the TDPs that the Debtors filed required the Settlement Trustee to comply with insurance policy provisions to the extent necessary to maintain insurance coverage.[162]  ███████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

█████████████████████████████████  Counsel for the Coalition promptly deleted this provision as it applied to the insurance policies in its entirety, and the Debtors never attempted to add it back, thereby ensuring that the Coalition controlled Settlement Trust will be free to breach the terms of the insurance policies.

> (i)    The "No Action Clause"

134.    The Certain Insurers' contractual defense rights include "no action clauses," which require that the relevant insurer indemnify the Debtors (assuming coverage exists) only when an adverse judgment is entered against the insured after an actual trial or when the insurer expressly consents to a settlement.[164]  An example of one such clause is below:

---

[162]  *Second Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC* [Docket No. 2592] , Ex. A, § 3.4 ("The Settlement Trust shall perform all obligations under the Insurance Policies issued by the Non-Settling Insurance Companies in order to maintain coverage and obtain the benefit of coverage under such policies. Such obligations shall include any requirement to share documents, witnesses, or other information with the Non-Settling Insurance Companies, to the extent required under the relevant insurance policies (the **Trust Cooperation Obligations**").") (Certain Insurers App. 8).

[163]  ████████████████████████████████████

[164]  Such clauses are standard and common in policies of the type relevant here.  *See, e.g., Permasteelisa CS Corp. v. Columbia Cas. Co.*, 377 Fed. App'x 260, 265-66, n.2 (3d Cir. 2010) (holding that insurer was not legally obligated to cover costs incurred by insured until the entry of "a final judgment of damages or a settlement agreement . . . involving the insurer as well as the claimant" and that this rule "likely represents the view of a majority of courts").

TrustApp452

> No action shall lie against [the Company] unless, as a condition precedent thereto, there shall have been full compliance with all the terms of this policy, nor until the amount of the Insured's obligation to pay shall have been fully determined either by judgment against the Insured after actual trial or by written agreement of the Insured, the claimant and [the Company].[165]

135.    These clauses provide insurers with a vital ability to contest the reasonableness of attempts to resolve covered claims without the protections afforded by the tort system or where the resolution is consummated without affected insurers' consent.  Should the insured attempt to resolve a covered claim by settlement without insurer consent, the insured may attempt to litigate the reasonableness of that settlement in coverage court.

136.    The TDPs do not contemplate an actual trial involving an adverse judgment against any party; nor have any of the Certain Insurers consented to any of the payments to Abuse Claimants contemplated under the TDPs.[166]  Instead—in contravention of insurers' bargained-for contractual rights—the TDPs impose a process designed and controlled by representatives of present and future claimants, without any role for the insurers or an independent adjudicator.  And yet, despite the presence of "no action" clauses, the TDPs contemplate payment of abuse claims solely on the basis of such settlements, without any opportunity for Non Settling Insurance Companies to challenge the reasonableness of the settlements reached by the Settlement Trust.[167]

137.    The proposed TDPs fail to satisfy these insurance policy provisions because they deviate radically from litigation in coverage courts.  Such deviations include the following:

- The TDPs seek to replace the tort system's adversarial process, where cases are governed by the rules of civil procedure and evidence, parties have the opportunity to take discovery, the plaintiff bears the burden of proof, and the defense has the opportunity to investigate

---

[165]    *See, e.g.*, Liberty Mutual Insurance Company Policy No. TH1-191-409751-114, 03/01/2004 to 03/01/2005, and, for example, following form policy of Lexington Insurance Company Policy No. 3583264, 03/01/2004 to 03/01/2005 ("It is agreed that this policy, except as herein stated, is subject to all conditions, agreements and limitations of and shall follow the underlying policy/ies in all respects, including changes by endorsement. . . .").

[166]    *Rose v. Royal Ins. Co.*, 2 Cal. App. 4th 709, 716 (1991) (consent judgment did not satisfy the requirement of a "judgment after actual trial," which presupposes "a contest of issues" determined by court or jury).

[167]    *See* TDPs § IX (discussing terms for payment of allowed claims).

TrustApp453

and to refute allegations through discovery and to interpose and prove affirmative defenses through pleadings, motion practice and trial. The TDPs instead provide for a non-adversarial process often based on self-reported information, in which there is no expectation that any party would be represented by counsel and the Settlement Trustee has sole discretion to allow claims.

- The TDPs negate the tort requirement that sexual abuse claims against an institution require proof of negligence. Under the TDPs, the Abuse Claimant's ability to prove negligence results in an increase in recovery, and the Abuse Claimant's inability to prove negligence does not bar recovery.[168]

- The TDPs dispense with the tort requirement that a claim be timely. In the tort system, but not under the TDPs, sexual abuse claims against institutions often require careful evaluation of the relevant state law statutes of limitations, as untimely claims are barred as a matter of law.

- The TDPs circumvent tort parties' rights to discovery. In the tort system, parties in interest would have the opportunity to seek discovery, including relevant and probative third-party discovery, consistent with procedural rules. Although the TDPs do allow a limited discretionary mechanism for the Settlement Trustee to collect documents not in the Abuse Claimant's immediate possession, nothing allows Non-Settling Insurance parties either to participate in, or to propound, such discovery. Nor is there any requirement or incentive for the Settlement Trustee to pursue discovery, as he appears to have virtually unchecked authority to require as much, or as little, documentation or support as he chooses. And the plaintiffs' attorneys on the STAC will control the scope of information the Settlement Trustee can collect from their clients when the questionnaire to be included with the Trust Claim Submission is developed. Given the Settlement Trustee's ties to the Coalition and FCR, there is no assurance that he will aggressively test the veracity of claim filings.

- The TDPs do not allow any party in interest to seek to disallow legally invalid Abuse Claims. In the tort system, parties may engage in dispositive pretrial motion practice, including by moving for summary judgment. If an Abuse Claim cannot, as a matter of law, succeed on the merits, a motion for summary judgment will be granted.

- The TDPs do not allow parties in interest to present arguments at all. Should an Abuse Claim survive a motion for summary judgment under tort law, the parties proceed to trial, where evidence is presented and arguments are made to an impartial judge or jury. The TDPs instead empower the Settlement Trustee to resolve claims.

- The TDPs eliminate the ability of defendants to appeal adverse rulings. Once a competent court has rendered a final judgment under tort law, the litigants may choose to exercise

---

[168] *See also* Rebuttal Expert Report of Karen Y. Bitar, ¶ 32 (noting that "in the tort system, the plaintiff must come forward with evidence of negligence to prevail on his or her claim. Under the TDPs, evidence of negligence is an Aggravating Scaling Factor, which may increase the recovery on an allowed claim by between 25% and 100%. Because evidence of negligence is a prerequisite to any recovery in the tort system, there is no reason why evidence of negligence should enhance the value of an allowed claim.") (Certain Insurers App. 34).

their right to appeal such judgment.  The TDPs allow *only* Abuse Claimants to seek review of the Settlement Trustee's Final Determination.[169]

- The TDPs permit one party to unilaterally accept an automatic recovery.  Under the TDPs, Abuse Claimants are entitled to forego even the minimal procedural requirements set forth in the TDPs in favor of a $3,500 Expedited Distribution.  In effect, such an Abuse Claimant may adjudicate, solely in their own discretion, the value of their Abuse Claim.  The tort system provides no equivalent procedure whatsoever, and there are serious reasons to doubt it could constitutionally do so.

138.    The tort system procedures and safeguards provide a vital mechanism for identifying claims that are fraudulent, false, or simply not legally cognizable.  The TDPs do not provide adequate procedures to scrutinize Abuse Claims, nor do they incentivize any party entrusted with authority (much less a party that is not neutral or independent) to do so.  The TDP procedures constitute a direct violation of the Certain Insurers' bargained-for "no action" clauses.

### (ii)    SIR/Deductible Rights

139.    The insurance policies at issue contain various self-insured retention ("SIR") and deductible provisions, each of which requires the insured to make certain payments before they may access any insurance in excess of the applicable SIR or deductible.  Both SIR and deductible contract terms provide the insureds with an incentive to investigate and discover invalid claims to avoid making unnecessary out-of-pocket payments.  However, the Plan negates these negotiated protections from the insurance contracts.

140.    With regard to applicable SIRs, the Plan provides the following proviso to the definition of Indirect Abuse Claims: "*provided*, <u>however</u>, that any retrospective premiums and self-insured retentions arising out of any Abuse Claims under the Abuse Insurance Policies shall not constitute an Indirect Abuse Claim and shall be treated in accordance with <u>Article IV.D.1</u>."[170] For its part, Article IV.D.1. provides that "Notwithstanding the foregoing, the Settlement Trust

---

[169]   *Compare* Expert Report of Karen Y. Bitar, ¶¶ 12-28 *with* ¶¶ 29-44 (Certain Insurers App. 32).

[170]   *See* Plan Art. I.A.142 (emphasis in original).

TrustApp455

shall satisfy, to the extent required under the relevant policies and applicable law, ***and in accordance with the Trust Distribution Procedures***, any retrospective premiums and self-insured retentions arising out of any Abuse Claims under the Abuse Insurance Policies."[171]  The TDPs, however, contemplate that the non-settling insurers will be required to make the upfront SIR payment and then somehow get reimbursed later through setoff, which is very likely to be an illusory recovery.[172]  The lack of a clear requirement in the TDPs for the Settlement Trust to satisfy SIRs renders the purported protections in the Plan illusory and represents yet another impermissible attempt to modify the non-settling insurer contracts.

141.    An insurer is not required to "drop down" and pay any amounts due within the SIR. *See, e.g.*, *Gulf Underwriters Ins. Co. v. Burris,* 674 F.3d 999, 1006 (8th Cir. 2012) ("If there is coverage, [the insurer] will be liable to [the claimant] for any amount above [the retained limit] within the policy limits, but [the insurer] may not be ordered to 'drop down' and pay [the debtor-insured's] self-insured portion of the judgment."); *Rosciti v. Ins. Co. of Pennsylvania*, 659 F.3d 92, 100 (1st Cir. 2011) ("If [the claimants] were to eventually win a judgment in an amount less than [the retained limit], [the insurer] would not be liable for any portion of that judgment."); *In re Amatex Corp.*, 107 B.R. 856, 871 (E.D.Pa. 1989) *aff'd* 908 F.2d 961 (3d Cir. 1990). Accordingly, unless the value of a claim exceeds the applicable SIR, no insurance is available for that claim. Rather than relying on the provisions of the insurance policies at issue, the Plan seeks to shift onto insurers the obligation to satisfy payment of SIRs.  That renders the Plan unconfirmable. *See, e.g.*, *Fed. Ins. Co. v. SKMDV Holdings, Inc. (In re Green Jacobson P.C.)*,

---

[171]    *Id.* Art. IV.D.1 (emphasis added).

[172]    *See* Plan Ex. A, pg. 8 ("In the event that a Non-Settling Insurance Company pays such self-insured retention and is entitled to reimbursement from the Settlement Trust under applicable law, such Non-Settling Insurance Company shall receive that reimbursement in the form of a set-off against any claim for coverage by the Settlement Trust against that Non-Settling Insurance Company with respect to the relevant Abuse Claim.").

TrustApp456

2017 WL 3149333, at *14 (Bankr. E.D. Mo. July 24, 2017) ("Neither the Court nor the parties can rewrite the Policy.").

142.     With regard to deductibles, the Plan does not even attempt to exclude these obligations from the definition of Indirect Abuse Claim.  Rather, the TDPs are clear that "for the avoidance of doubt, Indirect Abuse Claims may include claims for the payment of defense costs, deductibles, or indemnification obligations."[173]  As discussed above (*see supra* n. 138), executory contracts must be assumed *cum onere* or not at all, and a debtor cannot modify non-executory contracts and increase the obligations of counterparties.  To the extent the Debtors are permitted to transfer insurance policies to the Settlement Trust over the objection of insurers, the *whole* contract, with all benefits and burdens, should be transferred.  Accordingly, the Debtors should continue to be bound by their obligations to satisfy deductible obligations before any liability on the part of the non-settling insurers should attach.

143.     Even more troubling is that deductible obligations appear to extend to ***non-debtor*** policies.  The term "Indirect Abuse Claim" incorporates the term "Abuse Claim," which—in turn—contemplates Claims "against a Protected Party, a Limited Protected Party, or an Opt-Out Chartered Organization…."[174]  Accordingly, claims related to deductibles arising from policies issued to ***non-debtor*** local councils and chartered organizations are swept into this definition and afforded Indirect Abuse Claim treatment under the Plan.  Again, this constitutes an impermissible attempt to rewrite the non-settling insurers' contracts to eliminate negotiated protections, and the Court lacks the jurisdiction to make any such modifications to non-debtor contracts.  Accordingly, confirmation of the Plan should be denied.

---

[173]  *See id.*, pg. 6, n. 1.

[174]  *See* Plan Art. I.A.142.

TrustApp457

### (iii)     Indemnification, Contribution, Subrogation and Reinsurance Rights

144.     The Plan and TDPs also improperly interfere with indemnification, contribution, and equitable subrogation among the various insurers.  Rather than allowing such rights to be resolved through ordinary negotiation among the insurers, the Plan requires Non-Settling Insurance Companies to pursue these rights through wasteful, costly, and time-consuming litigation with the Settlement Trust.

145.     As described in detail in the *Allianz Insurers' Objection to the Second Modified Fifth Amended Chapter 11 Plan of Reorganization for the Boy Scouts of America and Delaware BSA, LLC and Request for Relief from the Plan Discharge and Injunction Provisions* (the "Allianz Objection") filed contemporaneously herewith,[175] the definition of Indirect Abuse Claims broadly covers all indemnification, contribution, and equitable subrogation claims that could be brought by non-settling insurers against third party non-debtors, and purports to channel such claims to the Settlement Trust.  The TDPs require the non-settling insurers to first pay the full liability of the Direct Abuse Claims, which, by definition, would exceed the portion of liability that could be attributable to such insurers.  The TDPs then require the non-settling insurers to seek compensation from the Settlement Trust—which compensation will be available only if the non-settling insurers are capable of meeting certain strict requirements set forth in the TDPs, not the least troubling of which is the requirement that the non-settling insurer has complied with the Bar Date Order.  In other words, if a non-settling insurer did not file a proof of claim asserting contingent rights for indemnification, contribution or equitable subrogation against non-debtors by the Bar Date, such non-settling insurer would be on the hook for the entire Direct Abuse Claim liability and yet simultaneously would have its rights to collect on its Indirect Abuse Claim disallowed—even

---

[175]   The Certain Insurers hereby join and incorporate as if set forth in full herein the arguments in the Allianz Objection related to Indirect Abuse Claims and reinsurance rights.

TrustApp458

though its Indirect Abuse Claim could not have arisen until payment was made by the non-settling insurers.  Such provisions defy logic, and are clearly designed to impair insurer contractual rights.

146.    Moreover, the Plan inappropriately limits the rights of non-settling insurers to collect contracted-for reinsurance from settling insurance companies.  The injunction in Article X.H.2 of the Plan provides that no party (including a non-settling insurer) is permitted to pursue any "claims or causes of action" against Abuse Policies issued by a settling insurer—which provision would appear (improperly) to cover reinsurance rights.  Similarly, the injunction in Article X.F.1(d) of the Plan provides that "the sole recourse for any holder of an Abuse Claim [which is broad enough to potentially cover reinsurance claims] covered by an insurance policy issued by a Settling Insurance Company shall be to and against the Settlement Trust pursuant to the Settlement Trust Documents."

147.    The injunction, however, does not prevent pursuit of claims for reinsurance by settling insurers against non-settling insurers,[176] and certain of the Insurance Settlements expressly clarify that such rights are preserved.  Stated simply, a settling insurer can pursue reinsurance while a non-settling insurer cannot pursue reinsurance.  The Plan's attempt to terminate the contractual rights of non-settling insurers against their reinsurers—two non-debtor entities—is not only an impermissible modification of the non-settling insurers' contracts, but issuing such injunction is beyond the bounds of this Court's jurisdiction.  *See Stern v. Marshall* 564 U.S. 462, 502-03 (2011).

**D.    The Plan Improperly Assigns Non-Debtor Insurance Contracts to the Settlement Trust.**

148.    The Plan is unconfirmable for the additional reason that it seeks to assign the contractual rights of non-Debtors, which the Court cannot do under the Bankruptcy Code.

---

[176]   *See* Plan Art. X.H.3(f), providing that "Notwithstanding anything to the contrary in this Article X.H, the Insurance Entity Injunction shall not enjoin…the rights of any Insurance Company to assert any claim, debt obligation, cause of action or liability for payment against any Non-Settling Insurance Company."

TrustApp459

149.    The Plan purports to assign and transfer to the Settlement Trust "(a) the Insurance Actions, (b) the Insurance Action Recoveries, (c) the Insurance Settlement Agreements, and (d) all other rights, claims, benefits, or Causes of Action of the Debtors, Related Non-Debtor Entities, Local Councils, or Contributing Chartered Organizations under or with respect to the Abuse Insurance Policies (but not the policies themselves), and (y) the Participating Chartered Organization Insurance Assignment."[177]    The Insurance Assignment is purportedly "notwithstanding any terms or provisions of the Abuse Insurance Policies that any Insurance Company asserts or may assert otherwise prohibits the Insurance Assignment."

150.    But the Certain Insurers' policies contain standard provisions preventing assignment of the insurers' policy rights without their consent.  Controlling precedent interpreting the doctrine of federal preemption[178] makes clear that, while anti-assignment clauses precluding the assignment of *debtor* insurance rights may be overridden under certain circumstances to implement a section 524(g) plan,[179] bankruptcy courts have no authority under any circumstance to override anti-assignment clauses covering *non-debtor* insurance rights, even in the same contracts.[180]  Even if section 1123(a)(5) preemption should be extended outside of the context of

---

[177]    Plan, p. 26, Definition 146 ("Insurance Assignment").  *See id.*, § IX A.3.J ("the Insurance Assignment is authorized and permissible by applicable law as provided in the Plan, notwithstanding any terms of any policies or provisions of non-bankruptcy law that is argued to prohibit the delegation, assignment, or other transfer of such rights, and the Settlement Trust (i) is a proper defendant for Abuse Claims to assert the liability of the Protected Parties to trigger such insurance rights, (ii) is a proper defendant for Post-1975 Chartered Organization Abuse Claims to assert the liability of the Limited Protected Parties to trigger such insurance rights, and (iii) is a proper defendant for Opt-Out Chartered Organization Abuse Claims to assert the liability of the Opt-Out Chartered Organizations to trigger such insurance rights.").

[178]    Section 1123(a)(5)(B) of the Bankruptcy Code requires that the Plan "provide adequate means for the plan's implementation, such as . . . transfer of all or any part of property of the estate to one or more entities."  11 U.S.C. § 1123(a)(5)(B) (emphasis supplied)

[179]    *See In re Federal-Mogul Glob. Inc.*, 684 F.3d 355, 382 (3d Cir. 2012) ("[W]e hold that the anti-assignment provisions in the relevant insurance policies are preempted by § 1123(a)(5)(B) *to the extent they prohibit transfer to a § 524(g) trust*") (emphasis added).

[180]    *See, e.g.*, *Combustion Eng'g*, 391 F.3d at 218-19 (To the extent the subject insurance policies are jointly held by [the debtor] and a non-debtor, . . . the § 541 preemption of anti-assignment provisions applies only to [the debtor's]

TrustApp460

a section 524(g) trust for **debtor** insurance rights, there is no authority to do so for **non-debtor** rights.  Indeed, the Third Circuit has been clear that it prohibits nonconsensual assignment of **non-debtor** insurance rights and obligations.[181]

151.    In exploring the boundaries of the federal preemption doctrine, the Third Circuit has not articulated a bright-line rule as to when the doctrine can be applied, but it also has explained that **"we do not believe that the scope is limitless**[.]"[182]  It has never recognized that the doctrine is so broad as to achieve the rewriting of contracts or even the assignment of non-debtor insurance rights under contracts that contain anti-assignment clauses.[183]  Even where the doctrine is applied to override certain contractual provisions between a creditor and the **debtor**, the Third Circuit has recognized that a "plan must still comply with all aspects of the Bankruptcy Code and be approved by the bankruptcy court."[184]  Whatever its bounds, the doctrine of "preemption extends only to means that are necessary."[185]

152.    Because of this precedent, the Plan includes a "savings clause" providing that:

If a Local Council is unable to transfer its rights, titles, privileges, interests, claims, demands or entitlements, as of the Effective Date, to any proceeds, payments, benefits, Causes of Action, choses in action, defense, or indemnity, now existing or hereafter arising, accrued or unaccrued, liquidated or unliquidated, matured or unmatured, disputed or undisputed, fixed or contingent, arising under or attributable to (i) the Abuse Insurance Policies, the Insurance Settlement Agreements, and claims thereunder and proceeds

---

interest in the shared policies."); *Pittsburgh Corning*, 417 B.R. at 303 ("Nonetheless, although the insurance is an asset of this estate and will be affected by independent, nonderivative claims against [a non-debtor affiliate], we do not read *Combustion Eng'g* as permitting channeling of those claims.").

[181]  *Fed.-Mogul Glob.*, 684 F.3d at 381 ("Unlike here, the plan at issue in *Combustion Engineering* involved the participation of non-debtor affiliates in the trust in return for a bar against asbestos claims, a provision we ultimately determined exceeded the scope of the  bankruptcy court's jurisdiction.").

[182]  *Federal-Mogul*, 684 F.3d at 374 (emphasis added).

[183]  *Id.*

[184]  *Glob. Indus. Techs.*, 645 F.3d at 381.

[185]  *In re Irving Tanning Co.*, 496 B.R. 644, 663-64 (B.A.P. 1st Cir. 2013) ("[O]nly those means may preempt state law that are sufficient for the implementation of the plan: they must be sufficient to implement the plan, equal to what is required, but also not more than is required.  The requirement of adequacy denies preemptive effect not only to those means that are insufficient but also to those that are superfluous or unnecessary).

thereof; (ii) Insurance Actions, and (iii) the Insurance Action Recoveries (the "Local Council Insurance Rights"), then the Local Council shall, at the sole cost and expense of the Settlement Trust:  (a) take such actions reasonably requested by the Settlement Trustee to pursue any of the Local Council Insurance Rights for the benefit of the Settlement Trust; and (b) promptly transfer to the Settlement Trust any amounts recovered under or on account of any of the Local Council Insurance Rights; provided, however, that while any such amounts are held by or under the control of any Local Council, such amounts shall be held for the benefit of the Settlement Trust.  Plan, § V.S.1(a).[186]

153.    The proposed "saving clause" is intended to avoid the indisputable fact that this Court lacks the jurisdiction to order an assignment of non-debtor policies, by requiring that the Local Councils and Chartered Organizations pursue their rights under the policies on behalf of the Settlement Trust.  But this is a distinction without a difference.  The Local Councils and Chartered Organizations are not debtors, and the Court has no authority to order them to pursue insurance assets.  The Channeling Injunction has the effect of shifting all Direct Abuse Claims against the Local Councils and Chartered Organizations to the Settlement Trust, leaving no liability with the insured and nothing for the insurers to indemnify.  Stated simply, while the savings clause may have all the trappings of a workable concept, it ultimately fails when one closely examines the underlying mechanics.  The Debtors' attempt to bootstrap liability on the part of the insurers through the savings clause is just another misguided attempt to have the non-settling insurers pay exorbitantly in a manner that is not supported by any law.

154.    Not only does the Plan seek to improperly assign the contractual rights of non-debtors, which the Court cannot do under the Bankruptcy Code, but it also seeks to assign the contractual rights of non-Debtors insurance contracts based on inaccurate and misleading information.  The Plan seeks to transfer all Local Council policies to the Settlement Trust,[187] but

---

[186]    *See also* Plan, § V.S.1 (b), (c) (providing identical savings clauses as to the Contributing Chartered Organizations and the Participating Chartered Organizations).

[187] *See* Plan, Schedule 3, Local Council Insurance Policies.

TrustApp462

many of the Local Council policies in the Plan are disputed as to their existence and/or the terms and conditions of the policies.

155.     The Plan contains incorrect, misleading, and unsubstantiated information about Local Council policies that will be contributed to the Settlement Trust.  The Plan fails to disclose that some of the Certain Insurers dispute the existence of many of the policies and further dispute that they have any coverage obligations for any such alleged policies.  Many of the Local Council policies identified in the Plan are based only upon a smattering of secondary evidence which is insufficient to establish the existence and terms of the hundreds of alleged policies.  To prove coverage under a lost policy through secondary evidence, the insured must prove—typically by a preponderance of evidence—both the existence of the policy *and* the terms sufficient to show coverage of the asserted claim. *See, e.g., Fulton Boiler Works, Inc. v. Am. Motorists Ins. Co*., 828 F. Supp. 2d 481, 490 (N.D.N.Y. 2011); *Kleenit, Inc. v. Sentry Ins. Co*., 486 F. Supp. 2d 121, 126 (D. Mass. 2007); *Glew v. Cigna Group Ins*., 590 F. Supp. 2d 395, 411 (E.D.N.Y. 2008).  The Certain Insurers contend the secondary evidence does not prove the existence of the policy or contain policy terms for many of the Local Council policies.

**E.      The Plan Would Abridge Insurers' Constitutional Rights.**

156.     While the Bankruptcy Code can authorize impairment of contractual obligations in limited circumstances (which are not present here), it can do so only in a manner that is constitutional, including complying with the Fifth Amendment, which protects against deprivation of property without just compensation and due process of law.  *See, e.g.*, *United States v. Sec. Indus. Bank*, 459 U.S. 70, 74-75 (1982).

157.     Applying the Bankruptcy Code to permit resolution of coverage issues against non-settling insurers through an omnibus plan confirmation would "abridge" the insurers' due-process rights, which require that they receive "'an opportunity to present every available defense.'"

73

TrustApp463

*Lindsey v. Normet*, 405 U.S. 56, 66 (1972) (quoting *Am. Sur. Co. v. Baldwin*, 287 U.S. 156, 168 (1932)); *see, e.g.*, *Mullins v. Direct Dig., LLC*, 795 F.3d 654, 669-70 (7th Cir. 2015) ("It is certainly true that a defendant has a due process right not to pay in excess of its liability and to present individualized defenses if those defenses affect its liability.") (internal citations omitted).

158.    Indeed, determining coverage issues through plan confirmation may not only deprive insurers of the right to a jury trial in violation of the Seventh Amendment, *see, e.g., Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 51-52 (1989) (right to jury protected in private contract disputes), but it would deny non-settling insurers basic due process protections that an adversarial litigation system would provide in resolving disputed coverage issues.

159.    Allowing plan proponents to force non-settling insurers to pay insurance proceeds under terms and conditions that contradict the language of the policies—such as abrogation of "no-action clauses," SIRs and deductibles, rights to indemnification and contribution, and non-assignment clauses with non-debtors—would violate the Fifth Amendment by depriving the Certain Insurers of critical, bargained-for contractual rights. *Louisville Joint Stock Land Bank v. Radford*, 295 U.S. 555, 589-90, 602 (1935) (bankruptcy statute subject to takings protections).

160.    The Bankruptcy Code expressly provides that a plan cannot be confirmed if it is "proposed . . . by any means forbidden by law." 11 U.S.C. § 1129(a)(3). But regardless, the Court should avoid these serious constitutional questions by rejecting attempts to circumvent and trample the insurers' well-settled rights. *See Sec. Indus. Bank*, 459 U.S. at 78 (explaining the "cardinal principle" that courts must "ascertain whether a construction of the statute is fairly possible by which the constitutional question may be avoided" (quotation marks omitted)).

74

### III.   GOVERNANCE OF THE SETTLEMENT TRUST IS INCONSISTENT WITH PUBLIC POLICY.

161.    A single Settlement Trustee, selected by the Coalition and FCR, will be responsible for reviewing and resolving over 82,000 Abuse Claims and disbursing nearly $3 billion in trust assets to claimants, using the faulty procedures set forth in the TDPs. The Settlement Trustee will have unilateral authority over all Settlement Trust operations, with input only from interested representatives of certain trust beneficiaries who devised the TDPs. *See, e.g.*, TDPs, Art. III.A; BSA Settlement Trust Agreement, §§ 2.1(d), 5.13. The Settlement Trust represents a classic "fox guards the henhouse" approach whereby the Settlement Trustee is beholden only to the STAC and FCR, each of whom is not disinterested and, in the case of the STAC, has substantial financial incentives to maximize recoveries for only certain of the trust beneficiaries, the Abuse Claimants, to the detriment of others, the insurers and Chartered Organizations holding Indirect Abuse Claims. The Court has already expressed concern regarding this proposed structure:

> THE COURT: But it does seem curious that the beneficiaries of the trust influence the procedures under which they receive a distribution, if it's binding on others. And if you go back to just general trust law, a settlor chooses a trustee, a settlor decides the provisions of the trust, and the beneficiary is just a beneficiary.

Sept. 28, 2021 Hr'g Tr. at 73:24-25, 74-1-4 (Certain Insurers App. . The Court should not permit it now.

162.    This governance structure not only invites potential self-dealing, it also violates sections 1129(a)(5) and 1123(a)(7) of the Bankruptcy Code. Section 1129(a)(5)(A) requires that the Debtors disclose "the identity and affiliations of any individual proposed to serve, after confirmation of the plan, as director, officer, or voting trustee of . . . a successor to the debtor under the plan" and that such appointments be "consistent . . . with public policy." Given the language of section 1129(a)(5) tracks closely with the language of section 1123(a)(7) – which allows a plan

75

TrustApp465

to contain only "provisions that are consistent with the interests of creditors and equity security holders and with public policy with respect to the manner of selection of any officer, director, or trustee under the plan and any successor to such officer, director, or trustee" (11 U.S.C. § 1123(a)(7)) – it follows that because the Plan fails to comply with section 1129(a)(5), it likewise fails to comply with section 1123(a)(7).  *See In re Digerati Techs., Inc.*, Case No. 13-33264, 2014 Bankr. LEXIS 2352, at *13 n.2 (Bankr. S.D. Tex. May 27 2014).

163.    Because the Settlement Trust is the successor to the Debtors in respect of Abuse Claims,[188] the Settlement Trust and its administration must be consistent with public policy.  *See, e.g.*, *In re Vista Proppants & Logistics, LLC*, Case No. 20-42002, 2020 Bankr. LEXIS 3018, at *30 (Bankr. N.D. Tex. Oct. 28, 2020) (appointment of litigation trustee consistent with public policy under § 1129(a)(5) due to appropriate disclosures); *In re Roman Catholic Bishop of Stockton*, Case No. 14-20371, 2017 Bankr. LEXIS 102, at *12-13 (Bankr. E.D. Cal. Jan. 10, 2017) (appointment of trustee "consistent . . . with public policy" due to lack of interests adverse to the trust).

### A.      The Settlement Trustee and STAC Lack any Semblance of Independence.

#### (i)      Lack of Impartiality

164.    The Debtors did not provide meaningful input into the appointment of  proposed Settlement Trustee, Prof. Green.[189]    Rather, he was handpicked by the Abuse Claimant Representatives, with whom he enjoys close personal and professional, fee-generating

---

[188]    *See* Plan, Art. X.Q ("Neither the Debtors, Reorganized BSA, nor the Settlement Trust is, or shall be deemed to be, a successor to any of the Debtors by reason of any theory of law or equity (*except as otherwise provided in Article IV.C* [of the Plan.]")) (emphasis added); *Id.* at Art. IV.C.2 (providing that the Settlement Trust shall (i) have control over the Settlement Trust Causes of Action and the Insurance Actions, (ii) become the estate representative pursuant to section 1123(b)(3)(B) with the exclusive right to enforce the Settlement Trust Causes of Action and the Insurance Actions, (iii) obtain the proceeds of the recoveries on any of the Settlement Trust Causes of Action or the Insurance Actions as property of the Settlement Trust, and (iv) have the right to enforce the Plan and any of the other Plan Documents).

[189]    *See, e.g.*, Daniel Ownby July 19, 2021 Deposition Transcript (Certain Insurers App. 47).

TrustApp466

relationships.  At the very least, his appointment results in the appearance of a lack of impartiality. But Prof. Green has also admitted that he does not view the role of Settlement Trustee as "neutral." Green Dep. Tr. at 88:23-25, 89:1-6.  *See In re Digerati Techs., Inc.*, Case No. 13-33264, 2014 Bankr. LEXIS 2352, at *21-22 (Bankr. S.D. Tex. May 27 2014) (including whether an individual is a "disinterested person" among factors to consider as to whether his appointment is "consistent with public policy" under section 1129(a)(5)).[190]

165.    If appointed, Prof. Green will have considerable discretion under the TDPs to implement and enforce the Settlement Trust, including the allowance and valuation of each of the approximately 82,200 filed proofs of claim.  Crucially, this Court already determined that, due to the objective appearance of a lack of impartiality, Prof. Green was not suited to serve as a mediator in this case.  June 8, 2020 Hr'g Tr., 55:23–57:4. ("And I am not going to appoint Prof. Green as requested, and that's not because of any lack of expertise, obviously, or any lack of integrity – he has both – but having read the cases, it seems clear to me that his relationship with Mr. Patton would lead a reasonable person to be concerned about his mediating this case.") (Certain Insurers App. 51).  For the same reason, the Court should not confirm a Plan under which he is the sole Settlement Trustee.

166.    Prof. Green testified that, although he did not agree that his numerous close relationships should have precluded him from serving as a mediator because mediation is non-binding, "[i]f it were arbitration it would be different" and such relationships would constitute a true conflict because "where you are the decisionmaker . . . with essentially no or very limited appeal, and you have to hear evidence or make conclusions of law just sitting like a court, as

---

[190]    The Bankruptcy Code defines "disinterested person" as a person that ". . . does not have an interest materially adverse to the interest of the estate or of any class of creditors or equity security holders, by reason of any direct or indirect relationship to, connection with, or interest in, the debtor, or for any other reason."  11 U.S.C. § 101(14).

TrustApp467

opposed to a mediator or an allocator or an administrator subject to review by a court, its quite different."  Green Dep. Tr. at 79:6-80:18 (Certain Insurers App. 44).  But the TDPs are akin to a binding arbitration process imposed on Certain Insurers without their consent, and concerns about an objective appearance of a lack of impartiality are manifestly heightened due to the Settlement Trustee's broad powers.[191]

167.    Prof. Green's apparent conflicts are just one of many issues with the Plan and TDPs.  Even a neutral Settlement Trustee would be tasked and duty bound to apply the TDPs, and they are designed to inflate valid Abuse Claim values and allow and pay legally invalid claims.  Among other issues, the TDPs expressly state that single abuser settlements are "incorporated into the base value" and only allow the Settlement Trustee to increase recoveries from the Base Matrix Value for repeat abuser settlements (or single abuser settlements with evidence of negligence), *supra* at ¶ 68, do not require evidence of negligence on the part of any Protected Party and prohibit the Settlement Trustee from disallowing claims because they are barred by the statute of limitations. *Supra* at ¶¶ 36-43 .  Accordingly, without material revisions to the TDPs, it appears likely that *any* Settlement Trustee will significantly inflate Abuse Claim liability beyond the Dr. Bates valuation range of $2.4 billion to $3.6 billion.[192]

168.    The STAC is also not independent because it has a vested interest in funding payments to its own clients, the Abuse Claimants.  The five named STAC members—Anne Andrews, Kenneth Rothweiler, Adam Slater, Deborah Levy, and Dennis Reich—essentially

---

[191]   As long as the Plan Proponents continue to seek court approval of the Proposed Findings, the lack of independent oversight of the Settlement Trustee is a paramount concern to Certain Insurers.  But, even if the Proposed Findings were removed, Certain Insurers remain trust beneficiaries, while the parties controlling the trust are not neutral and view Certain Insurers as litigation adversaries rather than trust beneficiaries.

[192]   Scarcella Rebuttal Report at pg. 8 (TDP valuation range "from $13.2 to $20.5 billion depending on how certain Scaling Factors are applied.") (Certain Insurers App. 37); McNally Dep. Tr. at 313:24-25 (low end of valuation range of $24.8 billion) (Certain Insurers App. 100).

TrustApp468

selected themselves.  These members constitute a supermajority and stand to directly receive the largest distribution from the Settlement Trust due to the number of claims they represent.  The retention agreements of the proposed STAC members provide them an undisclosed contingency fee payable from their clients' recoveries.  If Schedule 1 to the Restructuring Support Agreement is accurate, then these firms represent 37,302 Abuse Claimants.[193]  Mr. Slater testified that, if the 5,000 of 14,170 alleged penetration Abuse Claimants Slater Slater Schulman represents receive the Base Matrix Value under the TDPs, then his firm would be entitled to "approximately $3 billion" in contingency fees for only those Abuse Claims,[194]  making the firm one of the largest recipients of Settlement Trust proceeds.[195]  Mr. Rothweiler, whose firm represents even more Abuse Claimants than Mr. Slater, was clear that waiving or reducing any portion of his firm's contingency fee was not a consideration.[196]  The remaining two members are selected by the TCC, who has fiduciary duties to Direct Abuse Claimants only and values Abuse Claim liability at $24 to $30 billion, or 8 to 10 times Dr. Bates' midpoint value.[197]

169.    And the STAC is not merely a consultative body.  Despite these conflicts, the STAC is provided with a consent right over the information that its clients the Abuse Claimants are required to provide to the Settlement Trust.  The TDPs provide that when an Abuse Claimant makes a Trust Claim submission they are required to complete an undisclosed questionnaire, which

---

[193]  *Debtors' Motion for Entry of an Order, Pursuant to Sections 363(b) and 105(a) of the Bankruptcy Code, (I) Authorizing the Debtors to Enter into and Perform Under the Restructuring Support Agreement, and (II) Granting Related Relief* [Docket No. 5466], Ex. 1, Schedule 1 ((1) Slater Slater Schulman LLP: 14,170 claims, (2) Eisenberg Rothweiler, Winkler, Eisenberg & Jeck, P.C.: 16,869 claims, (3) Andrews & Thornton, AAL, ALC: 3,009 claims, (4) Junell & Associates PLLC: 2,918 claims and (5) Reich & Binstock LLC: 336 claims) (Certain Insurers App. 10).

[194]  Slater Dep. Tr. at 61:16-61:21.

[195]  *Id.* at 62:22-63:17.

[196]  Rothweiler Dep. Tr. at 92:8-14 ("Q: You're not willing to waive your entitlement to a contingency fee in this case given the dramatic facts, correct? A. Well I don't know when you say 'considering the dramatic facts.' You're asking me whether I'm willing to waive my fee from my client. The answer is no.").

[197]  *See supra* at ¶ 128.

TrustApp469

will be developed post-confirmation "by the Settlement Trustee and submitted to the STAC and the Future Claimants' Representative for approval."[198] But, "both the STAC and FCR have no express duty to develop a robust and balanced questionnaire regarding their clients' information about allegations of Abuse."[199] The Plan Proponents attempt to delay the development of the questionnaire until post-confirmation and cede authority over its contents to the STAC and FCR is but further evidence of the plan proponents' attempt to abuse the bankruptcy system and risks significantly inflating Abuse Claim liability.[200]

170.    This proposed structure creates an opportunity for self-dealing and leads to a significant "moral hazard" because the FCR and STAC represent the very claimants that stand to benefit from higher valuations.[201] Even proposed STAC member Adam Slater conceded that "the creation of a questionnaire that will be used to assess [his] clients claims . . . could have the appearance" of a conflict of interest in light of both the fiduciary duties owed to his clients and the fact that his firm is one of the largest Settlement Trust beneficiaries.[202] Moreover, the Settlement Trust does not bear any downside risk of overvaluing claims. As structured, the Settlement Trustee would have the power to attempt to tender claims determined by the TDPs to Non-Settling Insurance Companies for payment, providing both the Settlement Trust and the STAC an economic incentive to overvalue claims to maximize insurance recoveries. *See In re Digerati Techs.*, 2014 Bankr. LEXIS 2352 at *21-22 (denying confirmation because plan violated section

---

[198]    TDPs § VII.A.(i).

[199]    Expert Rebuttal Report of Jack F. Williams (the "<u>Williams Report</u>") at ¶ 25 (Certain Insurers App. 98).

[200]    Scarcella Rebuttal Report, at 2.1 ¶ 10 (noting that the "post-confirmation timing" of the development of the questionnaire "exacerbates current uncertainty surrounding the post-confirmation Abuse Claim liability since the parties are not aware of how the Trust Claim Form will be structured nor what information will be required.") (Certain Insurers App. 35).

[201]    Affirmative Expert Report of Marc C. Scarcella, M.A., at 2.4.1 (Certain Insurers App. 36).

[202]    Slater Dep. Tr. at 87:3-12.

TrustApp470

1129(a)(5) wherein proposed officers had interests materially adverse to equity security holders, and such lack of disinterestedness worked against a finding that their post-confirmation positions were "consistent with public policy—particularly since no new independent officers or directors are being appointed under the Plan").[203]

### (ii)   Lack of Fraud Prevention Measures and Disinterested Oversight of the Settlement Trust and Settlement Trustee.

171.   The Settlement Trustee is solely responsible for implementing claims allowance and payment procedures without any meaningful or disinterested oversight.  Any internal control procedures are left to his discretion to develop with very limited checks and balances.  For instance, he will work with a Claims Administrator to institute certain undefined auditing and other procedures to prevent fraud, but he will select the Claims Administrator.  Importantly, not only are these fraud prevention and audit requirements completely undefined, "there is also no role contemplated for an independent entity that is not the Settlement Trustee or an individual selected by the Settlement Trustee in such fraud prevention procedures."  Williams Rebuttal Report at ¶ 26.  Simply put, there is no independent authority that is not the Settlement Trustee or an individual selected by the Settlement Trustee that is responsible for investigating or overseeing him and which procedures he does or does not implement.

172.   This is particularly problematic because the TDPs do not require the Settlement Trust to interview a single Abuse Claimant.[204]  Even Coalition attorney Mr. Higgins concedes that "the testimony of the survivor is the single most critical piece of evidence of the case" and that

---

[203]   Scarcella Rebuttal Report 2.2.2 ("because Abuse Claim valuations will likely be tendered to Remaining Insurers for payment as contemplated in the TDP, the Settlement Trust has an economic incentive to overvalue the Abuse Claims in an attempt to maximize insurance recoveries, subject to and without accounting for the Remaining Insurers' defenses and rights under their policies.") (Certain Insurers App. 36).

[204]   TDPs § VII.B (providing that the Settlement Trustee may, but is not required to, interview any Abuse Claimant).

TrustApp471

"assessing the credibility of those allegations is paramount." *Supra* at ¶ 46.  On this point, Certain Insurers and their expert Dr. Eileen Treacy agree.  *Id.*  Further, discovery into the proofs of claim signed by Coalition plaintiffs' attorneys revealed that every attorney who was deposed signed (or authorized their signature to be affixed to) proof of claim forms for which they had no personal knowledge of the factual allegations therein, stating it was up to the Court and/or the Settlement Trust to determine whether such claims were valid.  *See supra* at ¶ 24.  Accordingly, at a minimum, the Settlement Trust should be required to interview Abuse Claimants whose attorney signed the proof of claim form, and a material percentage of the remaining Abuse Claimants.

173.    The current Settlement Trust structure is contrary to the procedures set forth under the Bankruptcy Code and/or the tort system for investigating and challenging the allowance of claims asserted against an insured.  The Debtors have established an alternative claims resolution process that is far afield from these traditional, reliable procedures.  By devising a process designed to strip away protections that are available—and required—both under the Bankruptcy Code and in the tort system, the Debtors' claims allowance process is contrary to public policy.  *See, e.g.*, *Travelers v. PG&E*, 549 U.S. 443, 450 (2007) ("Any defense to a claim that is available outside of the bankruptcy context is also available in bankruptcy") (citing 4 Collier on Bankruptcy ¶ 1502.03[2][b] at 502–22 (15th ed. 1984)).

174.    Finally, a detailed review of the claims by an independent adjudicator that does not report to representatives of the Abuse Claimants is critical under the unique facts of this case.  Mr. Higgins of Coalition firm Andrews & Thornton has opined that he did not have to attest to and have personal knowledge of the information contained in any of the over 1,000 proof of claim forms including his signature because (according to Higgins) the tort system provides a role for

TrustApp472

courts and adverse parties to disallow such claims.[205]  But, unlike in the tort system, the governance

structure of the Settlement Trust has been designed to ensure that there is no role for an

independent adjudicator or an adverse party to vet these claims.  Mr. Higgins' partner, Anne

Andrews, and other Coalition plaintiffs' attorneys will control the STAC, and the Coalition's

handpicked Settlement Trustee will have sole authority to do so.

175.    While this case involves over 82,000 known Abuse Claims, a comparison to 20

recent mass tort sexual abuse bankruptcies (the "Comparative Cases") shows the Comparative

Cases involved an average of fewer than 230 abuse claims and fewer than 4,600 abuse claims in

the aggregate.  Williams Rebuttal Report at ¶ 30.  "Given the unprecedented volume of claims and

the fact that the Settlement Trust is not closed, it is highly unlikely that a single Settlement Trustee

can reasonably evaluate the Abuse Claims in this case and give any level of reasonable scrutiny to

each Abuse Claim."  *Id.*  Accordingly, the sheer scope of Abuse Claims that would be channeled

make a truly independent governance structure that is not dominated by certain Settlement Trust

beneficiaries particularly important.

## IV.    THE PLAN IS NOT PROPOSED IN GOOD FAITH AND CANNOT BE CONFIRMED UNDER 11 U.S.C. § 1129(A)(3).

176.    Finally, the reorganization plan in this case cannot be confirmed because it was not

"proposed in good faith."  11 U.S.C. § 1129(a)(3).

177.    Courts evaluating "good faith" consider whether the plan "(1) fosters a result

consistent with the Code's objectives, (2) the plan has been proposed with honesty and good

intentions . . . and (3) there was fundamental fairness in dealing with the creditors."  *In re Exide

Holdings, Inc.*, 2021 WL 3145612, at *11 (D. Del. July 26, 2021) (quotation marks omitted).  A

plan is not proposed in good faith if it is the product of, or allows for, collusion, that is: "'[a]n

---

[205]  *See supra* ¶ 25.

TrustApp473

agreement to defraud another or to do or obtain something forbidden by law.'"  *In re Am. Capital Equip., LLC,* 688 F.3d 145, 158 (3d Cir. 2012) (quoting Black's Law Dictionary (9th ed. 2009)).

178.   In *American Capital Equipment*, the Third Circuit held that a plan in an asbestos mass-tort case was "patently unconfirmable" because it was not proposed in good faith.  688 F.3d at 161, 164.  The Court emphasized that, as in this case: (1) mass tort claims would be resolved according to procedures that gave the decisionmakers "financial[] incentiv[es] to sabotage [the debtor's] own defense" and maximize claims insurers would be asked to fund through the trust, and (2) the trust distribution procedures would "severely limit[] or eliminat[e] Insurers' ability to take discovery, submit evidence, contest causation, [or] appeal a decision," and otherwise "strip[] Insurers of [their] procedural and substantive rights."  *Id.* at 158-60.

179.   The Plan in this case is similarly not proposed in good faith.  The Proposed Findings have no statutory basis or legitimate bankruptcy purpose, and instead are designed to preclude parties from challenging the inflated claim values at the expense of non-settling insurers and abuse victims with more meritorious claims.  That is because the Plan and the TDPs are the result of a collusive bargain.  Rather than engage in arms-length negotiations, the Coalition and FCR, with the Debtors' tacit support, devised a plan to inflate the Debtors' claim exposure at least ten-fold to fill the coffers of the Coalition's law firms at the insurers' expense.  In exchange, the Debtors were required to make (according to the Coalition and FCR) only a *de minimis* trust contribution.[206]  For his part, the FCR and his attorneys (who, in this case, have a uniquely small constituency)[207] hope

---

[206]   "[T]he contributions of the Debtors and the Local Councils are only a tiny fraction of the value of the Abuse Claims."  Coalition, FCR and TCC Statement ISO RSA ¶ 33 (Certain Insurers App. 11).

[207]   Dr. Bates has opined that "the number of future Abuse Claims is likely to be small,"  Bates Rebuttal Report ¶ 110, and his valuation uncertainty factors show that he considers repressed memory claimants and claimants that are currently minors, the universe or future claims in this case, to number in the "hundreds."  *Id.* at ¶ 74, Figure 7 (Certain Insurers App. 30).

TrustApp474

to use the unprecedented Proposed Findings to further misuse the bankruptcy process as a springboard for similar findings in other mass tort bankruptcies.

### A. The Plan Ensures the Payment of Claims Barred by State Law and Impermissibly Inflates Insurers' Contractual Liabilities.

180.    As the Plan Proponents know, "the basic federal rule in bankruptcy is that state law governs the substance of claims, Congress having generally left the determination of property rights in the assets of a bankrupt's estate to state law." *Travelers Cas. & Surety Co. of Am.*, 549 U. S. at 451 (quotation marks omitted).  "A claim against the bankruptcy estate, therefore, 'will not be allowed in a bankruptcy proceeding if the same claim would not be enforceable against the debtor outside of bankruptcy.'"  *Combustion Eng'g, Inc.*, 391 F.3d at 245.  This Court must look to applicable state law to determine whether these claims should be allowed.  *See* 11 U.S.C. § 502.

181.    Yet, the TDPs pay claims that would never be paid in the tort system – including claims that are barred by an applicable statute of limitations and claims that do not allege, much less prove, any negligence on the part of the Debtors.  In addition, the TDPs allow claims at amounts far in excess of what those claims would be valued in the tort system.  Finally, the Proposed Findings are expressly designed to improperly bind the insurers to settlements reached by the Settlement Trustee, further stripping the insurers of their rights under state and other law, which conflicts with the Bankruptcy Code's objectives.  *See supra* at Section II.  *See In re Koebl,* 751 F.2d 137, 139 (2d Cir. 1984) ("Section 1129(a)(3) requires that the proposal of a plan comply with all applicable law, not merely the bankruptcy law" (quotation marks omitted)).

182.    These unlawful objectives hardly "discourag[e] debtor misconduct" or "achiev[e] fundamental fairness and justice."  *In re WR Grace & Co.*, 729 F.3d 332, 346 (3d Cir. 2013) (quotation marks omitted).  As the Third Circuit has repeatedly emphasized, the "integrity of the bankruptcy proceeding is called into question" when, as here, debtors and plaintiffs' lawyers ask

TrustApp475

a bankruptcy court to approve a plan that would allow invalid claims and then demand insurers pay them, while stripping insurers of the protections that their policies and the Bankruptcy Code require. *GIT*, 645 F.3d at 212-216; *see also In re Congoleum Corp.*, 426 F.3d 675, 692 (3d Cir. 2005) ("careful scrutiny" is required when the "parties . . . seek the court's imprimatur of a reorganization that will free the debtor of all . . . [tort] liability").

183.     As this Court has suggested, the Proposed Findings do not have a code or confirmation purpose but rather are focused on binding the insurers in post-confirmation coverage litigation. Sept. 28 Hr'g Tr. at 145:5–21 (Certain Insurers App. 54); Oct. 25 Hr'g Tr. at 10:18–21 ("It does not appear that these findings have a code or a confirmation-related purpose; rather, even as modified, they appear to be more directed at post-confirmation litigation with insurers.") (Certain Insurers App. 58).  Truer words could not be spoken.  The Proposed Findings represent an unprecedented and brazen attempt to bind the insurers to inflated claim values provided for under the TDPs and preclude them from challenging the valuation of claims in future coverage litigation.

184.     Indeed, Coalition plaintiffs' law firms engaged in extensive marketing to drum up claims without even bothering to verify their legitimacy.  The Coalition then exploited its control over the drafting process by insisting on payment of time-barred and meritless claims, even though Coalition attorneys conceded a "substantial likelihood" that most claims if brought in the tort system would be "dismissed and wind up with $0."  Indeed, according to the Debtors' own expert, the default payments to claimants under the TDPs are ***approximately ten times*** the typical claimant's recovery in the tort system; and those Base Matrix Values can be reduced only at the sole discretion of a Settlement Trustee hand-picked by the Coalition.  *See supra* at ¶¶ 164-70.  The Plan and TDPs thus "materially alter the quantum of liability that the insurers would be called

TrustApp476

upon to absorb," *Glob. Techs. Indus.*, 645 F.3d at 212, making it all but certain that non-settling insurers will be saddled with risks and liabilities far different from what they bargained for.

185.    The only potential check on the payment of inflated claims is the Settlement Trustee's ability, in his sole discretion, to *consider* reducing claim values on the basis of mitigating factors.  TDPs § VIII.E.  But, this vague provision stands in sharp contrast to the more specific provisions of the TDPs which establish enhanced recovery ranges for proposed aggravating factors such as claims that demonstrate negligence or claims asserted by claimants whose abuser is a repeat offender.  Moreover, the Coalition and FCR's handpicked Settlement Trustee falls far short of the "absolute independence" that the law requires.[208]  Finally, the Plan and TDPs immunize the Settlement Trustee's decisions from judicial review and purport to be binding on all parties other than the Abuse Claimants, who may opt out of the TDPs and litigate in the tort system either before or after receiving a settlement offer.   Under the circumstances, the Plan was hardly proposed "with honesty and good intentions," and cannot be confirmed.  *Exide Holdings, Inc.*, 2021 WL 3145612, at *11.

### B.    The Substantive Defects in the Plan are the Result of Self-Dealing Among the Plan Proponents.

186.    Nor was the plan born out of "fundamental fairness in dealing."   *Id.*   The Bankruptcy Code's good faith requirement imposes a "responsibility" on the Court to "scrutin[ize] [] the circumstances surrounding" plan negotiations, including any "ulterior motives" of plan proponents: "Only after such investigation can the court exercise the informed, independent judgment which is an essential prerequisite for confirmation of a plan."  *Am. United Mut. Life Ins. Co. v. City of Avon Park, Fla.*, 311 U.S. 138, 145-46 (1940) (cleaned up and internal citations omitted).  In deciding whether a plan meets the good faith standard, courts consider the degree of

---

[208]   Sept. 28 Hr'g Tr. at 113:11 (Certain Insurers App. 54).

control that parties exercised over the drafting of plan provisions, *In re Washington Mut., Inc.*, 461 B.R. 200, 240 (Bankr. D. Del. 2011), and hold that a plan is not proposed in good faith where its terms were "largely drafted by, and for the benefit of" a specific faction of creditors to the disadvantage of others. *ACandS, Inc.*, 311 B.R. at 43.

187.    That is precisely the case here. This Court authorized non-settling insurers to take discovery "regarding the *bona fides* of the mediation" and, in particular, the negotiation and drafting of the TDPs. *Id.* at 13:9–14:3. And the results of that discovery were damning. It revealed that the Coalition—a faction of plaintiffs' lawyers with contingency fee arrangements—dominated the drafting for its own "benefit," dictating a number of material changes to the TDPs. *ACandS*, 311 B.R. at 43. Moreover, "[i]t was the [Coalition] that drafted (or more likely directed debtor's counsel in drafting) the prepetition trust, and apparently chose the trustee for the trust . . . and it was the [Coalition] that decided who was going to get what." *Id.*

188.    

[210] Similarly, the Debtors

---

[209] 

[210]

*Declaration of Samuel P. Hershey in Support of Debtors' Objection to Moving Insurers' Motion to Compel and for Additional Relief and in the Alternative Motion in Limine* [Docket No. 5904-12 at 3 (first entry) (Certain Insurers App. 13).

TrustApp478

"consistently stated" they would support the TDPs if the Coalition gave "appropriate concessions," such as eliminating the BSA's $80 million settlement note or agreeing to "a Hartford deal."[211]

189.    The totality of the circumstances demonstrate that there is no basis for a finding that the Plan was proposed in good faith.  Certainly the mediation alone does not demonstrate good faith. Moreover, the final terms of the Plan and TDPs reflect the Coalition's and FCR's total domination of the plan process – from the mediation improprieties, to the flawed TDPs and requirement for the Proposed Findings that are designed to pay inflated claims and to bind the insurers to the appointment of a conflicted trustee to administer the TDPs and adoption of governance measures that clearly favor claimants.  All of these factors raise serious doubts about the integrity of the "process of plan development,"  October 25 Hr'g Tr. at 8:22, and should preclude any finding that the Plan was proposed in good faith.  *See ACandS*, 311 B.R. at 43 ("Given the unbridled dominance of the [Coalition] in the debtor's affairs and actions . . . and the obvious self-dealing that resulted from control of the debtor, it is impossible to conclude that the plan was consistent with the objectives and purposes of the Bankruptcy Code.").

**CONCLUSION**

190.    For the foregoing reasons, the Plan cannot be confirmed.

---

[211] ██████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████

Dated:  February 4, 2022          *Respectfully Submitted*

By: */s/ Deirdre M. Richards*         

**FINEMAN KREKSTEIN & HARRIS PC**
Deirdre M. Richards (DE Bar No. 4191)
1300 N. King Street
Wilmington, DE 19801
Telephone:    (302) 538-8331
Facsimile:    (302) 394-9228
Email: drichards@finemanlawfirm.com

-and-

**FORAN GLENNON PALANDECH PONZI &
RUDLOFF P.C.**
Susan N.K. Gummow (admitted *pro hac vice*)
222 N. LaSalle St., Suite 1400
Chicago, Illinois 60601
Telephone:   (312) 863-5000
Facsimile:    (312) 863-5009
Email: sgummow@fgppr.com

-and-

**GIBSON, DUNN & CRUTCHER LLP**
Michael A. Rosenthal (admitted *pro hac vice*)
James Hallowell (admitted *pro hac vice*)
Keith R. Martorana (admitted *pro hac vice*)
200 Park Avenue
New York, New York 10166
Telephone:   (212) 351-4000
Facsimile:    (212) 351-4035
Email: mrosenthal@gibsondunn.com
 jhallowell@gibsondunn.com
 kmartorana@gibsondunn.com

-and-

**GIBSON, DUNN & CRUTCHER LLP**
Matthew G. Bouslog (admitted *pro hac vice*)
3161 Michelson Drive
Irvine, California 92612
Telephone:   (949) 451-3800
Facsimile:    (949) 451-4220
Email: mbouslog@gibsondunn.com

*Attorneys for the AIG Companies*

**GOLDSTEIN & MCCLINTOCK LLLP**
Maria Aprile Sawczuk (DE #3320)
501 Silverside Road
Wilmington, DE 19809
302-444-6710
marias@goldmclaw.com

-and-

**LOEB & LOEB LLP**
Laura McNally
Emily Stone
321 N. Clark Street, Suite 2300
Chicago, IL 60654
312-464-3155
lmcnally@loeb.com
estone@loeb.com

*Attorneys for The Continental Insurance Company*
*and Columbia Casualty Company*

**SMITH, KATZENSTEIN & JENKINS LLP**
Kathleen M. Miller (No. 2898)
1000 West Street, Suite 1501
P.O. Box 410
Wilmington, DE  19899 [Courier 19801]
Telephone: (302) 652-8400
Facsimile: (302) 652-8405
Email: kmiller@skjlaw.com

and

**MOUND COTTON WOLLAN &**
**GREENGRASS LLP**
Lloyd A. Gura*
Pamela J. Minetto*
One New York Plaza 44th Floor
New York, NY 10004
Tel: (212) 804-4282
Email: lgura@moundcotton.com
pminetto@moundcotton.com
(*Admitted pro hac vice)

*Attorneys for Indian Harbor Insurance Company,
on behalf of itself and as successor in interest to
Catlin Specialty Insurance Company*

**REGER RIZZO & DARNALL LLP**
Louis J. Rizzo, Jr., Esquire (#3374)
1521 Concord Pike, Suite 305
Brandywine Plaza West
Wilmington, Delaware 19803
(302) 477-7100
E-mail: lrizzo@regerlaw.com

*Attorney for Travelers Casualty and Surety
Company, Inc. (f/k/a Aetna Casualty & Surety
Company), St. Paul Surplus Lines Insurance
Company and Gulf Insurance Company*

**JOYCE, LLC**
Michael J. Joyce, Esquire (No. 4563)
1225 King Street, Suite 800
Wilmington, DE 19801
(302)-388-1944
mjoyce@mjlawoffices.com

-and-

**COUGHLIN MIDLIGE & GARLAND, LLP**
Kevin Coughlin, Esquire (*Pro Hac Vice*)
Lorraine Armenti, Esquire (*Pro Hac Vice*)
Michael Hrinewski, Esquire (*Pro Hac Vice*)
350 Mount Kemble Ave.
PO Box 1917
Morristown, NJ 07962
973-267-0058 (Telephone)
973-267-6442 (Facsimile)
larmenti@cmg.law
mhrinewski@cmg.law

-and-

**CARRUTHERS & ROTH, P.A.**
Britton C. Lewis, Esquire (*Pro Hac Vice*)
235 N. Edgeworth St.

P.O. Box 540
Greensboro, NC  27401
(336) 478-1146 (Telephone)
(336) 478-1145 (Facsimile)
bcl@crlaw.com

*Counsel to Arrowood Indemnity Company*

**WERB & SULLIVAN**
Brian A. Sullivan (DE Bar No. 2098)
Legal Arts Building
1225 N. King Street, Suite 600
Wilmington, DE  19801
Telephone: (302) 652-1100
Facsimile: (302) 652-1111
Email: bsullivan@werbsullivan.com

and

**GIEGER LABORDE & LAPEROUSE LLC**
John E.W. Baay II, Esq. (pro hac vice)
701 Poydras Street, Suite 4800
New Orleans, Louisiana 70139
Telephone: (504) 561-0400
Facsimile: (504) 561-0100
Email: jbaay@glllaw.com

and

**KIERNAN TREBACH LLP**
William H. White Jr., Esq. (pro hac vice)
1233 20th Street, NW, 8th Floor
Washington, DC 20036
Direct: 202-712-7042
Fax: 202-712-7100
mail: wwhite@kiernantrebach.com

*Attorneys for Gemini Insurance Company*

TrustApp483

**TROUTMAN PEPPER HAMILTON
SANDERS LLP**
David M. Fournier (DE No. 2812)
Marcy J. McLaughlin Smith (DE No. 6184)
Hercules Plaza, Suite 5100
1313 Market Street
P.O. Box 1709
Wilmington, DE 19899-1709
Telephone:   302.777.6500
Facsimile:    302.421.8390

*-and-*

Harris B. Winsberg (admitted *pro hac vice*)
**PARKER, HUDSON, RAINER & DOBBS**
303 Peachtree Street NE
Suite 3600
Atlanta, GA  30308
Telephone:   404.420.4313
Facsimile:    404.522.8409

*-and-*

**BRADLEY RILEY JACOBS PC**
Todd C. Jacobs (admitted *pro hac vice*)
John E. Bucheit (admitted *pro hac vice*)
Paul J. Esker
500 West Madison Street
Suite 1000
Chicago, IL 60661
Telephone:  312.281.0295


*Attorneys for National Surety Corporation and
Interstate Fire & Casualty Company*

**TROUTMAN PEPPER HAMILTON
SANDERS LLP**
David M. Fournier (DE No. 2812)
Marcy J. McLaughlin Smith (DE No. 6184)
Hercules Plaza
1313 Market Street
Suite 5100
P.O. Box 1709
Wilmington, DE 19899-1709
Telephone:    404.885.3000

*-and-*

**PARKER, HUDSON, RAINER & DOBBS**

Harris B. Winsberg (admitted *pro hac vice*)
303 Peachtree Street NE
Suite 3600
Atlanta, GA  30308
Telephone:     404.420.4313
Facsimile:     404.522.8409


*-and-*

**McDERMOTT WILL & EMERY LLP**
Margaret H. Warner (admitted *pro hac vice*)
Ryan S. Smethurst (admitted *pro hac vice*)
Alex M. Spisak (admitted *pro hac vice*)
The McDermott Building
500 North Capitol Street, NW
Washington, DC 20001-1531
Telephone:     202.756.8228
Facsimile:     202.756.8087

*Attorneys for Allianz Global Risks US Insurance
Company*

**POST & SCHELL, P.C.**
Paul Logan (No. 3339)
300 Delaware Avenue
Suite 1380
Wilmington, DE  19801
Phone:  (302) 251-8856
Fax:  (302) 251-8857
E-mail:  plogan@postschell.com

**IFRAH PLLC**
George R. Calhoun (*pro hac vice*)
1717 Pennsylvania Ave., N.W.
Suite 650
Washington, DC  20006
Phone:  (202) 840-8758
E-mail:  george@ifrahlaw.com

*Attorneys for Argonaut Insurance Company and
Colony Insurance Company*

**SEITZ, VAN OGTROP & GREEN, P.A**
R. Karl Hill (Del. Bar No. 2747)
222 Delaware Avenue
Suite 1500

Wilmington, Delaware 19801
Telephone: (302) 888-0600
Email: khill@svglaw.com

-and-

**CHOATE, HALL & STEWART, LLP**
**SEITZ, VAN OGTROP & GREEN, P.A.**
Douglas R. Gooding (admitted *pro hac vice*)
Jonathan D. Marshall (admitted *pro hac vice*)
Samuel N. Rudman (admitted *pro hac vice*)
Two International Place
Boston, MA 02110
Telephone: (617) 248-5000
dgooding@choate.com
jmarshall@choate.com

-and-

**MINTZ, LEVIN, COHN, FERRIS, GLOVSKY**
**AND POPEO PC**
Kim V. Marrkand (admitted *pro hac vice*)
Laura Bange Stephens (admitted *pro hac vice*)
One Financial Center
Boston, MA 0211
Telephone: (617) 542-6000
kmarrkand@mintz.com
lbstephens@mintz.com

*Counsel to Liberty Mutual Insurance Company*

**SMITH, KATZENSTEIN & JENKINS LLP**
Kathleen M. Miller (No. 2898)
1000 West Street, Suite 501
P.O. Box 410
Wilmington, DE 19899
Telephone: (302) 652-8400
Email: kmiller@skjlaw.com

-and-

**WILEY REIN LLP**
Mary E. Borja (admitted *pro hac vice*)
Gary P. Seligman (admitted *pro hac vice*)
Ashley L. Criss (admitted *pro hac vice*)

2050 M Street NW
Washington, DC 20036
Phone: (202) 719-7000
E-mail:  mborja@wiley.law,
gseligman@wiley.law,
acriss@wiley.law

*Attorneys for General Star Indemnity Company*

**BODELL BOVÉ, LLC**
Bruce W. McCullough  (No.  3112)
1225 N. King Street, Suite 1000
P.O. Box 397
Wilmington, DE 19899-0397
Telephone: (302) 655-6749,
Facsimile: (302) 655-6827
Email: bmccullough@bodellbove.com

- and -

**CLYDE & CO US LLP**
Bruce D. Celebrezze (pro hac vice)
Four Embarcadero Center, Suite 1350
San Francisco, California 94111
Telephone:  (415) 365-980
Facsimile:  (415) 365-9801
Email:    bruce.celebrezze@clydeco.us

Konrad R. Krebs (pro hac vice)
200 Campus Drive | Suite 300
Florham Park, NJ 07932
Telephone:  (973) 210-6700
Facsimile:  (973) 210-6701
Email:    konrad.krebs@clydeco.us

-and –

**DAVID CHRISTIAN ATTORNEYS LLC**
David Christian (pro hac vice)
105 W. Madison St., Suite 1400
Chicago, IL 60602
Telephone: (862) 362-8605
Email:   dchristian@dca.law

*Attorneys for Great American Assurance*
*Company, f/k/a Agricultural Insurance Company;*

TrustApp487

*Great American E&S Insurance Company,*
*f/k/a Agricultural Excess and Surplus Insurance*
*Company; and Great American E&S Insurance*
*Company*

**SMITH, KATZENSTEIN & JENKINS LLP**
Kathleen M. Miller (No. 2898)
1000 North West Street
Suite 1501
P.O. Box 410
Wilmington, DE  19899 (courier 19801)
302-652-8400

-and-

**HANGLEY ARONCHICK SEGAL PUDLIN &**
**SCHILLER**
Ronald P. Schiller (admitted *pro hac vice*)
Matthew A. Hamermesh (admitted *pro hac vice*)
Sharon F. McKee (admitted *pro hac vice*)
Elizabeth C. Dolce (admitted *pro hac vice*)
One Logan Square, 27th Floor
Philadelphia, PA 19103
(215) 568 6200
(215) 568 0300 facsimile
rschiller@hangley.com
mhamermesh@hangley.com
smckee@hangley.com
edolce@hangley.com

*Attorneys for Arch Insurance Company*

TrustApp488

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:  BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC<br><br>Debtors. | Chapter 11<br><br>Bankruptcy Case No. 20-10343-LSS |
| NATIONAL UNION FIRE INSURANCE CO. OF PITTSBURGH, PA, *et al.*,<br><br>Appellants<br><br>-v.-<br><br>BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC,<br><br>Appellees | (Jointly Administered)<br><br><br>Case No. 22-cv-01237-RGA |

## OPENING BRIEF OF CERTAIN INSURERS

Theodore J. Boutrous Jr. (*pro hac vice*)
Richard J. Doren (*pro hac vice*)
Blaine H. Evanson (*pro hac vice*)
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, California 90071
tboutrous@gibsondunn.com
rdoren@gibsondunn.com
bevanson@gibsondunn.com

Deirdre M. Richards
(DE Bar No. 4191)
FINEMAN KREKSTEIN
& HARRIS PC
1300 N. King Street
Wilmington, DE 19801
Telephone: (302) 538-8331
drichards@finemanlawfirm.com

Susan Gummow (*pro hac vice*)
FORAN GLENNON
PALANDECH PONZI &
RUDLOFF P.C.
222 N. LaSalle St., Suite 1400
Chicago, Illinois 60601
sgummow@fgppr.com

*Counsel for National Union Fire Insurance Company of Pittsburgh, Pa.,*
*Lexington Insurance Company, Landmark Insurance Company, and the*
*Insurance Company of the State of Pennsylvania*

(Additional Parties and Counsel on Inside Cover)

Michael A. Rosenthal (*pro hac vice*)
Mitchell A. Karlan (*pro hac vice*)
James Hallowell (*pro hac vice*)
Keith R. Martorana (*pro hac vice*)
Seth M. Rokosky (*pro hac vice*)
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, New York 10166
mrosenthal@gibsondunn.com
mkarlan@gibsondunn.com
jhallowell@gibsondunn.com
kmartorana@gibsondun.com
srokosky@gibsondunn.com

*Additional Counsel for National Union Fire Insurance Company of Pittsburgh, Pa., Lexington Insurance Company, Landmark Insurance Company, and the Insurance Company of the State of Pennsylvania*

David M. Fournier (DE Bar No. 2812)
Marcy J. McLaughlin Smith (DE No. 6184)
TROUTMAN PEPPER HAMILTON SANDERS LLP
Hercules Plaza
1313 Market Street
Suite 5100
P.O. Box 1709
Wilmington, DE 19899-1709
Telephone: 404.885.3000
david.fournier@troutman.com
marcy.smith@troutman.com

-and-

David M. Fournier (DE Bar No. 2812)
Marcy J. McLaughlin Smith (DE No. 6184)
TROUTMAN PEPPER HAMILTON SANDERS LLP
Hercules Plaza, Suite 5100
1313 Market Street
P.O. Box 1709
Wilmington, DE 19899-1709
Telephone: 302.777.6500
Facsimile: 302.421.8390
david.fournier@troutman.com
marcy.smith@troutman.com

-and-

TrustApp490

Harris B. Winsberg (*pro hac vice*)
Matthew G. Roberts (*pro hac vice*)
PARKER, HUDSON, RAINER &
DOBBS LLP
303 Peachtree Street NE
Suite 3600
Atlanta, GA  30308
Telephone: 404.420.4313
Facsimile: 404.522.8409
hwinsberg@phrd.com
mroberts@phrd.com

-and-

Margaret H. Warner (*pro hac vice*)
Ryan S. Smethurst (*pro hac vice*)
Alex M. Spisak (*pro hac vice*)
McDERMOTT WILL & EMERY
LLP
The McDermott Building
500 North Capitol Street, NW
Washington, DC 20001-1531
Telephone: 202.756.8228
Facsimile: 202.756.8087
mwarner@mwe.com
rsmethurst@mwe.com
aspisak@mwe.com

*Counsel for Allianz Global Risks
US Insurance Company*

Harris B. Winsberg (*pro hac vice*)
Matthew G. Roberts (*pro hac vice*)
PARKER, HUDSON, RAINER &
DOBBS LLP
303 Peachtree Street NE
Suite 3600
Atlanta, GA  30308
Telephone: 404.420.4313
Facsimile: 404.522.8409
hwinsberg@phrd.com
mroberts@phrd.com

-and-

Todd C. Jacobs (*pro hac vice*)
John E. Bucheit (*pro hac vice*)
Paul J. Esker (*pro hac vice*)
BRADLEY RILEY JACOBS PC
500 West Madison Street
Suite 1000
Chicago, IL 60661
Telephone: 312.281.0295
tjacobs@bradleyriley.com
jbucheit@bradleyriley.com
pesker@bradleyriley.com

*Counsel for National Surety
Corporation and Interstate Fire &
Casualty Company*

TrustApp491

Kathleen M. Miller (No. 2898)
SMITH, KATZENSTEIN &
JENKINS LLP
1000 West Street, Suite 501
P.O. Box 410
Wilmington, DE 19899
Telephone: (302) 652-8400
kmiller@skjlaw.com

Ronald P. Schiller (*pro hac vice*)
Matthew A. Hamermesh (*pro hac vice*)
HANGLEY ARONCHICK SEGAL
PUDLIN & SCHILLER
One Logan Square, 27th Floor
Philadelphia, PA 19103
T: (215) 568-6200
F: (215) 568-0300
E: rschiller@hangley.com
mhamermesh@hangley.com

*Counsel for Arch Insurance
Company*

Paul Logan (No. 3339)
POST & SCHELL, P.C.
300 Delaware Avenue, Suite
1380
Wilmington, DE  19801
Telephone:  (302) 251-8856
Email:  plogan@postschell.com

John C. Sullivan (*pro hac vice*)
Kathleen K. Kerns (*pro hac vice*)
POST & SCHELL, P.C.
Four Penn Center – 13th Floor
1600 John F. Kennedy
Boulevard
Philadelphia, PA  19103
Telephone:  (215) 587-1000
jsullivan@postschell.com
kkerns@postschell.com

-and-

George R. Calhoun (*pro hac vice*)
IFRAH PLLC
1717 Pennsylvania Avenue,
N.W. Suite 650
Washington, DC  20006
Telephone:  (202) 840-8758
george@ifrahlaw.com

300 Delaware Avenue, Suite
1380
Wilmington, DE  19801
Telephone:  (302) 251-8856
Email:  plogan@postschell.com

*Counsel for Argonaut Insurance
Company and Colony Insurance
Company*

iv

Michael J. Joyce (No. 4563)
JOYCE, LLC
1225 King Street, Suite 800
Wilmington, DE 19801
Telephone:  (302) 388-1944
Email:  mjoyce@mjlawoffices.com

-and-

Kevin Coughlin (*pro hac vice*)
Lorraine Armenti (*pro hac vice*)
Michael Hrinewski (*pro hac vice*)
COUGHLIN MIDLIGE &
GARLAND, LLP
350 Mount Kemble Avenue
PO Box 1917
Morristown, NJ 07962
Telephone:  (973) 267-0058
Facsimile:  973-267-6442
kcoughlin@cmg.law
larmenti@cmg.law
mhrinewski@cmg.law

-and-

Britton C. Lewis
John M. Flynn
CARRUTHERS & ROTH, P.A.
235 N. Edgeworth Street
P.O. Box 540
Greensboro, NC  27401
Telephone:  (336) 478-1146
Facsimile:  (336) 478-1145
jmf@crlaw.com
bcl@crlaw.com


*Counsel for Arrowood*
*Indemnity Company*

Maria Aprile Sawczuk (DE
#3320)
GOLDSTEIN & MCCLINTOCK
LLP
501 Silverside Road
Wilmington, DE 19809
302-444-6710
marias@goldmclaw.com

-and-

Laura McNally (*pro hac vice*)
Emily Stone (*pro hac vice*)
LOEB & LOEB LLP
321 N. Clark Street, Suite 2300
Chicago, IL 60654
312-464-3155
lmcnally@loeb.com
estone@loeb.com


David Christian (*pro hac vice*)
DAVID CHRISTIAN
ATTORNEYS LLC
105 W. Madison St., Suite 1400
Chicago, IL 60602
Telephone:  312-282-5282
dchristian@dca.law


*Counsel for The Continental*
*Insurance Company and*
*Columbia Casualty Company*

v

TrustApp493

Brian A. Sullivan (No. 2098)
WERB & SULLIVAN
LEGAL ARTS BUILDING
1225 N. King Street
Suite 600
Wilmington, Delaware 19801
Telephone: (302) 652-1100
Cell: (302) 757-9932
Facsimile: (302) 652-1111
Email:
bsullivan@werbsullivan.com

John E.W. Baay II (*pro hac vice*)
GIEGER LABORDE &
LAPEROUOSE, LLC
701 Poydras Street
Suite 4800
New Orleans, LA 70139
Tel.: 504-561-0400
Fax: 504-561-1011
Email: jbaay@glllaw.com

-and-

William H. White Jr (*pro hac vice*)
KIERNAN TREBACH LLP
1233 20th Street, NW
8th Floor
Washington, DC 20036
Tel.: 202-712-7000
Fax: 202-712-7100
Email:
wwhite@kiernantrebach.com

*Counsel for Gemini Insurance
Company*

Kathleen M. Miller (DE Bar No.
2898)
SMITH, KATZENSTEIN &
JENKINS LLP
1000 West Street, Suite 501
P.O. Box 410
Wilmington, DE 19899
Telephone: (302) 652-8400
Email: kmiller@skjlaw.com

-and-

Mary E. Borja (*pro hac vice*)
Gary P. Seligman (*pro hac vice*)
Ashley L. Criss (*pro hac vice*)
WILEY REIN LLP
2050 M Street NW
Washington, DC 20036
Phone: (202) 719-7000
Email: mborja@wiley.law
gseligman@wiley.law
acriss@wiley.law

*Counsel for General Star
Indemnity
Company*

TrustApp494

Bruce W. McCullough (No. 3112)
BODELL BOVÉ, LLC
1225 N. King Street, Suite 1000
Wilmington, Delaware 19801-
3250
Telephone: (302) 655-6749
bmccullough@bodellbove.com

-and-

Bruce D. Celebrezze (*pro hac vice*)
CLYDE & CO US LLP
150 California Street | 15th Floor
San Francisco, California 94111
Telephone: (415) 365-9800
Facsimile: (415) 365-9801
bruce.celebrezze@clydeco.us

Konrad R. Krebs (*pro hac vice*)
CLYDE & CO US LLP
340 Mt. Kemble Avenue | Suite
300
Morristown, NJ 07960
Telephone: (973) 210-6700
Facsimile: (973) 210-6701
konrad.krebs@clydeco.us

-and-

David Christian (*pro hac vice*)
DAVID CHRISTIAN
ATTORNEYS LLC
105 W. Madison St., Suite 1400
Chicago, Illinois 60602
Telephone: (312) 282-5282
dchristian@dca.law

Kathleen M. Miller (No. 2898)
SMITH, KATZENSTEIN
& JENKINS LLP
1000 West Street, Suite 1501
P.O. Box 410
Wilmington, DE  19899 [Courier
19801]
Telephone: (302) 652-8400
Facsimile: (302) 652-8405
kmiller@skjlaw.com

and

Lloyd A. Gura (*pro hac vice*)
Pamela J. Minetto (*pro hac vice*)
MOUND COTTON WOLLAN &
GREENGRASS LLP
One New York Plaza 44th Floor
New York, NY 10004
Tel: (212) 804-4282
lgura@moundcotton.com
pminetto@moundcotton.com

*Counsel for Indian Harbor
Insurance Company, on behalf of
itself and as successor in interest
to Catlin Specialty Insurance
Company*

TrustApp495

*Counsel for Great American
Assurance
Company, f/k/a Agricultural
Insurance Company; Great
American E&S Insurance
Company, f/k/a Agricultural
Excess and Surplus Insurance
Company; and Great American
E&S Insurance Company*

R. Karl Hill (DE Bar No. 2747)
SEITZ, VAN OGTROP &
GREEN, P.A.
222 Delaware Avenue
Suite 1500
Wilmington, DE 19801
Telephone: (302) 888-0600
khill@svglaw.com

-and-

CHOATE, HALL & STEWART
LLP
Douglas R. Gooding (*pro hac
vice*)
Jonathan D. Marshall (*pro hac
vice*)
Two International Place
Boston, MA 02110
Telephone: (617) 248-5000
dgooding@choate.com
jmarshall@choate.com

-and-

MINTZ, LEVIN, COHN,
FERRIS, GLOVSKY AND
POPEO PC

Thaddeus J. Weaver (DE Bar. No.
2790)
DILWORTH PAXSON LLP
704 N. King Street, Suite 500
P.O. Box 1031
Wilmington, DE  19899-1031
(302) 571-8867 (telephone)
(302) 351-8735 (facsimile)
tweaver@dilworthlaw.com

-and-

William E. McGrath, Jr. (*pro hac
vice*)
Dilworth Paxson LLP
2 Research Way, Suite 103
Princeton, NJ  08540
(609) 924-6000 (telephone)
(215) 893-8537 (facsimile)
wmcgrath@dilworthlaw.com

*Counsel for Munich Reinsurance
America, Inc., formerly known as
American Re-Insurance Company*

TrustApp496

Kim V. Marrkand (*pro hac vice*)
Laura Bange Stephens (*pro hac vice* forthcoming)
One Financial Center
Boston, MA 02111
Telephone: (617) 542-6000
kvmarrkand@mintz.com
lbstephens@mintz.com

*Counsel for Liberty Mutual Insurance Company, The Ohio Casualty Insurance Company, Liberty Insurance Underwriters, Inc. and Liberty Surplus Insurance Corporation*

Stephen M. Miller (No. 2610)
Carl N. Kunz, III (No. 3201)
Sarah M. Ennis (No. 5745)
MORRIS JAMES LLP
500 Delaware Avenue, Suite 1500
Wilmington, Delaware 19801
Telephone: (302) 888-6800
Facsimile:  (302) 571-1750
smiller@morrisjames.com
ckunz@morrisjames.com
sennis@morrisjames.com

-and-

Margaret M. Anderson
(*pro hac vice*)
Ryan T. Schultz
(*pro hac vice*)
Adam A. Hachikian

Marla S. Benedek (No. 6638)
COZEN O'CONNOR
1201 N. Market Street, Suite 1001
Wilmington, DE 19801
Telephone:  (302) 295-2024
Facsimile:  (302) 250-4498
mbenedek@cozen.com

*Counsel for Traders and Pacific Insurance Company, Endurance American Specialty Insurance Company, and Endurance American Insurance Company*

ix

TrustApp497

(*pro hac vice*)
Kenneth M. Thomas
(*pro hac vice*)
FOX SWIBEL LEVIN &
CARROLL LLP
200 W. Madison Street, Suite
3000
Chicago, Illinois 60606
Telephone: (312) 224-1200
Facsimile:  (312) 224-1201
panderson@foxswibel.com
rschultz@foxswibel.com
ahachikian@foxswibel.com
kthomas@foxswibel.com

*Counsel for Old Republic
Insurance Company*

Louis J. Rizzo, Jr. (DE Bar No.
3374)
REGER RIZZO & DARNALL LLP
1521 Concord Pike Suite 305
Brandywine Plaza West
Wilmington DE  19803
Telephone: (302) 477-7100
Facsimile: (302) 652-3620
lrizzo@regerlaw.com

*Counsel for Travelers Casualty
and Surety Company, Inc. (f/k/a
Aetna Casualty & Surety
Company), St. Paul Surplus
Lines Insurance Company and
Gulf Insurance Company*

x

## CORPORATE DISCLOSURE

Pursuant to Federal Rule of Bankruptcy Procedure 8012, the undersigned Certain Insurers make the following disclosures:

### <u>AIG</u>

National Union Fire Insurance Company of Pittsburgh, PA (f/k/a National Union Fire Insurance Company of Pittsburgh, Pa. and successor in interest to Audubon Indemnity Company, Audubon Insurance Company, National Union Fire Insurance Company of Louisiana, and also Landmark Insurance Company), Lexington Insurance Company (successor in interest to Chartis Select Insurance Company (f/k/a AIG Excess Liability Insurance Company Ltd. and also Starr Excess Liability Insurance Company Ltd.)), and the Insurance Company of the State of Pennsylvania are direct, wholly owned subsidiaries of AIG Property Casualty U.S., Inc., which is a wholly owned subsidiary of AIG Property Casualty Inc., which is a wholly owned subsidiary of American International Group, Inc., which is a publicly held corporation.

### <u>Allianz</u>

Allianz Global Risks US Insurance Company f/k/a Allianz Insurance Company ("<u>AGR US</u>") is an Illinois corporation.  Eighty percent (80%) of the voting common stock of AGR US is held by Allianz

i

TrustApp499

## CORPORATE DISCLOSURE

of America, Inc., which is a wholly-owned subsidiary of Allianz Europe B.V., which, in turn, is a wholly-owned subsidiary of Allianz SE. Twenty percent (20%) of the voting common stock and one hundred percent (100%) of the non-voting preferred stock of AGR US is held by AGCS International Holding B.V., which is a wholly-owned subsidiary of Allianz Global Corporate & Specialty SE, which, in turn, is a wholly-owned subsidiary of Allianz SE. Allianz SE is publicly held.

Interstate Fire & Casualty Company and National Surety Corporation are Illinois corporations and wholly owned subsidiaries of Fireman's Fund Insurance Company ("Fireman's Fund"), an Illinois corporation. Fireman's Fund, in turn, is a wholly owned subsidiary of AGR US, an Illinois corporation. Eighty percent (80%) of the voting common stock of AGR US is held by Allianz of America, Inc., which is a wholly owned subsidiary of Allianz Europe B.V., a wholly owned subsidiary of Allianz SE. Twenty percent (20%) of the voting common stock and one hundred percent (100%) of the non-voting preferred stock of AGR US is held by AGCS International Holding B.V., a wholly owned subsidiary of Allianz Global Corporate & Specialty SE, which, in turn, is a wholly-owned subsidiary of Allianz SE. Allianz SE is publicly held.

TrustApp500

## CORPORATE DISCLOSURE

### Arch

Arch Insurance Company is a wholly-owned subsidiary of Arch Reinsurance Company, whose ultimate parent is Arch Capital Group Ltd., a publicly traded company.

### Argonaut and Colony

Argonaut Insurance Company is a wholly owned subsidiary of Argo Group US, Inc. The ultimate parent of both Argonaut Insurance Company and Argo Group US, Inc. is Argo Group International Holdings, Ltd., a publicly traded company (NYSE: ARGO).

The parent company of Colony Insurance Company is Argonaut Insurance Company, an indirect subsidiary of Argo Group International Holdings, Ltd., which is a publicly traded corporation. The parent company of Argonaut Insurance Company is Argo Group US, Inc., an indirect subsidiary of Argo Group International Holdings, Ltd., which is a publicly traded corporation (NYSE: ARGO).

### Arrowood

Arrowood Indemnity Company, formerly known as Royal Indemnity Company, individually and as successor-in-interest to Royal Insurance Company of America ("Arrowood"), is a United States holding

iii

TrustApp501

## CORPORATE DISCLOSURE

company organized under the laws of Delaware, with its principal place of business in Charlotte, North Carolina, and it is 100% owned by Arrowpoint Group, Inc., which is 100% owned by Arrowpoint Capital Corp.  Neither Arrowpoint Group, Inc. nor Arrowpoint Capital Corp. is a publicly held company, nor is there any publicly held corporation or other corporation that owns 10% or more of Arrowpoint Capital Corp.'s stock.

### Gemini

Gemini Insurance Company is ultimately owned by W.R. Berkley Corporation, which is a publicly-traded company.

### General Star

General Star Indemnity Company is a wholly-owned subsidiary of General Reinsurance Corporation.  GenRe Corporation is the parent corporation of General Reinsurance Corporation, and Berkshire Hathaway, Inc. is the parent corporation of GenRe Corporation.  Berkshire Hathaway, Inc. owns 10% or more of General Star Indemnity Company.

### Great American

Great American Assurance Company, f/k/a Agricultural Insurance Company; Great American E&S Insurance Company, f/k/a Agricultural

iv

TrustApp502

## CORPORATE DISCLOSURE

Excess and Surplus Insurance Company; and Great American E&S Insurance Company hereby makes the following corporate disclosure statement:  Great American E&S Insurance Company is a wholly-owned subsidiary of Great American Insurance Company.   Great American Assurance Company is also a wholly owned subsidiary of Great American Insurance Company.   Great American Insurance Company is a wholly-owned subsidiary of American Financial Group, Inc.   Shares of American Financial Group, Inc. are publicly traded on the New York Stock Exchange under the symbol AFG.

## **Indian Harbor**

Indian Harbor Insurance Company ("IHIC"), is a Delaware Corporation with its principal place of business located in Stamford, Connecticut. IHIC is a direct subsidiary of XL Specialty Insurance Company, and is an indirect subsidiary of Greenwich Insurance Company, X.L. America, Inc., XL Financial Holdings (Ireland) Limited, XL Bermuda Ltd, XL Group Ltd, and AXA SA. The ultimate indirect parent of IHIC is AXA SA, a company domiciled in France.  AXA SA is a publicly traded company.

v

TrustApp503

## CORPORATE DISCLOSURE

### <u>Liberty</u>

The Ohio Casualty Insurance Company, Liberty Insurance Underwriters, Inc., and Liberty Surplus Insurance Corporation state that 100% of the stock of each entity is owned by Liberty Mutual Insurance Company.  Liberty Mutual Group Inc. owns 100% of the stock of Liberty Mutual Insurance Company.  No public company owns 10% or more of the stock of The Ohio Casualty Insurance Company, Liberty Insurance Underwriters, Inc., Liberty Surplus Insurance Corporation, or Liberty Mutual Insurance Company.

### <u>Munich Reinsurance</u>

Munich Reinsurance America, Inc., states that it is a wholly-owned indirect subsidiary of Münchener Rückversicherungs-Gesellschaft A.G. (Munich Reinsurance Company).  The shares of Munich Reinsurance Company are traded on all stock exchanges in Germany under the symbol: MUVGN.DE.

### <u>Old Republic</u>

Old Republic Insurance Company is owned entirely by Old Republic General Insurance Group, Inc., which is owned entirely by Old Republic International Corporation, a publicly held corporation (NYSE: ORI).  No

TrustApp504

## CORPORATE DISCLOSURE

publicly held corporation owns ten percent or more of the stock of Old

Republic International Corporation.

### Traders & Pacific Insurance Co., Endurance American Specialty Insurance Co., and Endurance American Insurance Co.

Traders and Pacific Insurance Company changed its name to

Endurance American Specialty Insurance Company in 2006. Endurance

American Specialty Insurance Company is wholly owned by Endurance

American Insurance Company. In turn, Endurance American Insurance

Company is a wholly owned subsidiary of Endurance Assurance

Corporation, which is a wholly owned subsidiary of Endurance U.S.

Holdings Corp. Further, Endurance U.S. Holdings Corp. is a wholly

owned subsidiary of Endurance Specialty Insurance Ltd. (Bermuda),

which is a wholly owned subsidiary of Sompo International Holdings Ltd.

(Bermuda). Sompo International Holdings Ltd. is a wholly owned

subsidiary of Sompo Japan Insurance Inc. (Japan), which is a wholly

owned subsidiary of Sompo Holdings, Inc. (Japan), a holding company

headquartered in Japan. No entity owns 10% or more of the stock of

Sompo Holdings, Inc.

vii

TrustApp505

## CORPORATE DISCLOSURE

### <u>Travelers</u>

Travelers Casualty and Surety Company, Inc. (f/k/a Aetna Casualty & Surety Company), St. Paul Surplus Lines Insurance Company, and Gulf Insurance Company are 100% owned by Travelers Casualty and Surety Company, which is 100% owned by Travelers Group Holdings Inc., which is 100% owned by Travelers Property Casualty Corp., which is 100% owned by The Travelers Companies, Inc. The Travelers Companies, Inc. is the only publicly held company in the corporate family. No individual or corporation owns 10% or more of the stock of The Travelers Companies, Inc.

TrustApp506

## TABLE OF CONTENTS

<div align="right">Page(s)</div>

PRELIMINARY STATEMENT ..................................................... 1

JURISDICTIONAL STATEMENT ................................................ 8

ISSUES PRESENTED ................................................................ 8

STATEMENT OF THE CASE ..................................................... 9

I.     Statutory Background ...................................................... 9

II.    Factual Background ...................................................... 13

       A.    The Boy Scouts Bankruptcy .................................... 13

             1........ Sexual Abuse and the Boy Scouts of America       13

             2........ BSA's Insurance Policies       15

             3........ Plaintiffs' Lawyers Generate an Explosion of Claims  17

             4........ Plaintiffs' Lawyers Seek the "Holy Grail"       23

                   (a)     The Insurance Assignment ................................ 25

                   (b)     Inflated Payments Under the TDPs .................. 25

                   (c)     Impairment of Contracts ................................. 32

                   (d)     Control over the Settlement Trustee ................ 34

                   (e)     Binding Insurers to Claim Awards .................... 37

                   (f)     Collaborating to Further
                           Prejudice the Certain Insurers ........................... 45

TrustApp507

# TABLE OF CONTENTS

<div align="right">Page(s)</div>

B.    The Confirmation Hearing and Opinion ..............................51

C.    The Court Rejects Further Efforts
to Prejudice Insurers and then Confirms the Plan ..............54

SUMMARY OF ARGUMENT ....................................................56

ARGUMENT .........................................................................58

I.    THE BANKRUPTCY COURT ERRED IN CONFIRMING A
BANKRUPTCY PLAN THAT WAS NOT PROPOSED IN GOOD FAITH........59

    A.    The Bankruptcy Court Erred in Focusing on the Evidence
Piecemeal, Rather Than Employing a "Totality of the
Circumstances" Approach. ....................................................59

    B.    The Bankruptcy Court Erred in Concluding That Certain
Improvements to the Plan Were Sufficient to Remedy a Lack
of Good Faith. .......................................................................68

        1........Improving the Plan at the Court's Direction Does Not
Demonstrate Good Faith.        69

        2........The Bankruptcy Court's Plan Revisions Do Not Cure
the Plan's Defects.        72

    C.    The Bankruptcy Court Inappropriately Relied on the
Testimony of One BSA Witness About His Subjective Beliefs
Regarding the Plan. .............................................................75

<div align="center">x</div>

# TABLE OF CONTENTS

<u>Page(s)</u>

II.    The Plan Abrogates the Certain Insurers' Contractual
Rights.................................................................. 77

    A.    The Plan Cannot Be Confirmed Because It Impermissibly
Alters the Certain Insurers' Contracts.............................. 77

    B.    The Bankruptcy Court Wrongly Relied on its Rejection of the
Proposed Insurance Findings As a Basis to Overlook the
Impairment of the Insurers' Contracts............................. 86

CONCLUSION ...................................................... 90

TrustApp509

## TABLE OF AUTHORITIES

<u>Page(s)</u>

**Cases**

*Amatex Corp. v. Aetna Cas. & Sur. Co. (In re Amatex Corp.),*
   97 B.R. 220 (Bankr. E.D. Pa. 1989) ................................................... 78

*American United Mut. Life Ins. Co. v. City of Avon Park,*
   *Fla.,*
   311 U.S. 138 (1940) .............................................................. 12

*Bell Atlantic Corp. v. Twombly,*
   550 U.S. 544 ...................................................................... 64

*Butner v. United States,*
   440 U.S. 48 (1979) ................................................................ 12

*Central Bank of Denver, N.A. v. First Interstate Bank of*
   *Denver, N.A.,*
   511 U.S. 164 (1994) .............................................................. 64

*Cissel v. Am. Home Assur. Co.,*
   521 F.2d 790 (6th Cir. 1975) ...................................................... 79

*Davis v. Wells Fargo,*
   824 F.3d 333 (3d Cir. 2016) ....................................................... 77

*Fuller-Austin Insulation Co. v. Highlands Ins.,*
   38 Cal. Rptr. 3d 716 (Cal. App. 2006) ............................................. 65

*Hazel-Atlas Glass Co. v. Hartford-Empire Co.,*
   322 U.S. 238 (1944) ............................................................ 6, 71

*In re 47 Hops LLC,* 2020
   WL 2485808 (Bankr. E.D. Wash. May 13, 2020) ...................................... 83

*In re 641 Associates, Ltd.,* 1993
   WL 332646 (Bankr. E.D. Pa. Aug. 26, 1993) ........................................ 79

xii

TrustApp510

*In re AbitibiBowater Inc.*,
   481 B.R. 815 (Bankr. D. Del. Oct. 27, 2009) ...................................... 80

*In re ACandS, Inc.*,
   311 B.R. 36 (Bankr. D. Del. 2004) ...................................................... 66

*In re American Cap. Equip., LLC*,
   688 F.3d 145 (3d Cir. 2012) ..................................... 3, 6, 59, 66, 71, 72

*In re Am. Home Mortg. Holdings*,
   402 B.R. 87 (Bankr. D. Del. 2009) ...................................................... 80

*In re Combustion Eng'g, Inc.*,
   391 F.3d 190 (3d Cir. 2004) ............................................. 65, 78, 79, 81

*In re Congoleum Corp.*,
   426 F.3d 675 (3d Cir. 2005) ............................................................... 11

*In re Coram Healthcare Corp.*,
   271 B.R. 228 (Bankr. D. Del. 2001) .................................................... 66

*In re Crippin*,
   877 F.2d 594 (7th Cir. 1989) .............................................................. 78

*In re Diocese of Camden, N.J.*, 2022
   WL 3369087 (Bankr. D.N.J. Aug. 12, 2022) ...................................... 78

*In re Emerge Energy Servs. L.P.*, 2019
   WL 7634308 (D. Del. Dec. 5, 2019) .............................................. 60, 69

*In re Exide Holdings, Inc.*,
   2021 WL 3145612 (D. Del. July 26, 2021) .......................... 3, 12, 59, 75

*In re Federal-Mogul Global Inc.*,
   684 F.3d 355 (3d Cir. 2012) ......................................................... 11, 60

*In re Genesis Health Ventures, Inc.*,
   266 B.R. 591 (Bankr. D. Del. 2001) .................................................... 70

*In re Global Indus. Techs., Inc.*,
   645 F.3d 201 (3d Cir. 2011) ...................................................... 5, 73, 77

TrustApp511

*In re Grasso*,
    490 B.R. 500 (Bankr. E.D. Pa. 2013) ..................................................69

*In re Green Jacobson P.C.*,
    No. 15-41404-705, 2017 Bankr. LEXIS 2059 (Bankr. E.D.
    Mo. July 24, 2017).............................................................................79

*In re Italian Cook Oil Corp.*,
    190 F.2d 994 (3d Cir. 1951) ..............................................................82

*In re Kaiser Aluminum Corp.*,
    456 F.3d 328 (3d Cir. 2006) ..............................................................11

*In re Lernout & Hauspie Speech Prods. N.V.*,
    308 B.R. 672, 675 (D. Del. 2005)........................................................9

*In re Master Mortgage Inv. Fund*,
    168 B.R. 930 (Bankr. W.D. Mo. 1994) .............................................10

*In re Millennium Lab Holdings II, LLC*,
    242 F. Supp. 3d 322 (D. Del. 2017)....................................................8

*In re Peabody Energy Corp.*,
    582 B.R. 771 (Bankr. E.D. Mo. 2017) ..............................................76

*In re Pittsburgh Corning Corp.*,
    453 B.R. 570 (Bankr. W.D. Pa. 2011) ..............................................78

*In re RTI Holding Co., LLC*, 2021
    WL 4994414 (Bankr. D. Del. 2021) ..................................................70

*In re SGL Carbon Corp.*,
    200 F.3d 154 (3d Cir. 1999) .......................................6, 60, 67, 70, 72

*In re SPM Mfg. Corp.*,
    984 F.2d 1305 (1st Cir. 1993) ...........................................................79

*In re Stewart Foods, Inc.*,
    64 F.3d 141 (4th Cir. 1995)...............................................................80

*In re Thorpe Insulation Co.*,
    677 F.3d 869 (9th Cir. 2012)..............................................................78

xiv

*In re Tribune Co.*,
    464 B.R. 126 (Bankr. D. Del. 2011) ............................................... 11, 85

*In re Weinstein Co. Holdings, LLC*,
    997 F.3d 497 (3d Cir. 2021) ................................................................ 82

*In re Weinstein Co. Holdings, LLC*,
    No. 18-50924 (Bankr. D. Del. 2020) .................................................. 82

*In re WR Grace & Co.*,
    729 F.3d 332, 346 (3d Cir. 2013) ......................................................... 8

*Lindsey v. Normet*,
    405 U.S. 56 (1972) ......................................................................... 6, 87

*Louisville Joint Stock Land Bank v. Radford*,
    295 U.S. 555 (1935) ........................................................................... 83

*Mission Prod. v. Tempnology, LLC*,
    139 S. Ct. 1652 (2019) ...................................................... 4, 79, 82, 83

*Moody v. Amoco Oil Co.*,
    734 F.2d 1200 (7th Cir. 1984) ...................................................... 79, 83

*Mullins v. Direct Dig., LLC*,
    795 F.3d 654 (7th Cir. 2015) .............................................................. 87

*Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
    259 F.3d 154 (3d Cir. 2001) ...................................................... 6, 64, 86

*Sharon Steel Corp. v. Nat'l Fuel Gas Dist. Corp.*,
    872 F.2d 36 (3d Cir. 1989) ................................................................ 80

*Thgh Liquidating LLC*, 2020
    WL 5409002 (D. Del. 2020) .............................................................. 76

*Travelers Cas. & Surety Co. of*
    *Am. v. Pacific Gas & Elec. Co.*,
    549 U.S. 443 (2007) ........................................................................... 79

*United States v. Sec. Indus. Bank*,
    459 U.S. 70 (1982) ....................................................................... 84, 87

TrustApp513

*Young v. United States,*
    535 U.S. 43 (2002) ................................................................................ 11

**Statutes**

11 U.S.C. § 301 ........................................................................................ 8

11 U.S.C. § 363 ...................................................................................... 10

11 U.S.C. § 365 ...................................................................................... 10

11 U.S.C. § 501 ...................................................................................... 10

11 U.S.C. § 1123 .................................................................................... 10

11 U.S.C. § 1126 .................................................................................... 10

11 U.S.C. § 1128 .................................................................................... 11

11 U.S.C. § 1129 ................................................................. 10, 11, 77, 83

**Other Authorities**

Restatement (Second) of Contracts § 317:2 (Westlaw 2022) ................. 81

29 Williston on Contracts § 74:10 (Westlaw 4th ed. 2022) .................... 81

2 Bankr. Law Manual § 11:1 (Westlaw 5th ed. 2022) ............................. 9

Modern Law of Contracts § 21:18 (Westlaw 2022) ................................ 81

Modern Law of Contracts § 21:27 (Westlaw 2022) ................................ 81

TrustApp514

## PRELIMINARY STATEMENT

The bankruptcy court erred in confirming a Chapter 11 reorganization plan for the Boy Scouts of America ("BSA") that was not proposed in good faith and purports to abrogate core rights and obligations in insurance policies issued by the appealing insurers (the "Certain Insurers"), fundamentally altering the economic bargain central to those contracts.

Faced with the prospect of approximately 1,700 claims alleging sexual abuse, BSA sought bankruptcy protection to resolve its liabilities. Mass tort plaintiffs' lawyers, on the other hand, who saw the bankruptcy as an opportunity for a windfall, launched a massive advertising campaign replete with false statements and began enlisting claimants on a contingency-fee basis.  The attorneys themselves signed and filed thousands of proofs of claim in the bankruptcy, under penalty of perjury, that had missing or inaccurate information, often without ever reviewing the forms or contacting the claimants.

The result of this effort was a *6,000% increase* in the number of abuse claims against BSA—to more than *82,000 claims*.  These new claims bear little resemblance to the lawsuits BSA defended prior to the

TrustApp515

bankruptcy.  The vast majority are time-barred, only a third provide an abuser's full name, and, as claimants' own expert recognized, a significant portion are likely fraudulent.  At least 85% face such legal obstacles that they never would have been filed but-for the bankruptcy.

Some of the claimants' attorneys were transparent about their strategy.  One conceded that more than 58,000 of the claims are untimely under applicable statutes of limitation or repose.  Another explained that they were seeking the "Holy Grail" that mass tort plaintiffs' lawyers have been chasing for decades—a bankruptcy plan that would bind insurers in coverage litigation.  With that achieved, insurers would be unable to challenge legally meritless or defensible demands for payment.

In order to garner the necessary votes from claimants to support its reorganization plan, BSA agreed to a "matrix" for valuing claims that is worlds apart from BSA's prepetition claims history, and plan terms that abrogate core obligations of BSA and rights of the insurers under their policies.  The plan that BSA proposed limits BSA's responsibility for decades of abuse, provides an enormous windfall to plaintiffs' lawyers, and leaves insurers holding the bag.

2

TrustApp516

The bankruptcy court modified but ultimately confirmed the plan. This Court should reverse for two independent reasons.

*First*, the bankruptcy court erroneously concluded that the plan was proposed in good faith. *See* 11 U.S.C. § 1129(a)(3). The claimants' lawyers generated a pot of claims that bear no resemblance to prepetition claims, then leveraged those claims to strongarm BSA into seeking to assign its rights without obligations under its insurance contracts. *In re American Cap. Equip.*, 688 F.3d 145, 156, 158 (3d Cir. 2012) (plan must be proposed "with honesty and good intentions").

The bankruptcy court failed to consider the "totality of the circumstances" surrounding the plan's proposal. *In re Exide Holdings, Inc.*, 2021 WL 3145612, at *11 (D. Del. July 26, 2021). It instead took a piecemeal approach, determining that no single aspect of the plan, when viewed in isolation, demonstrated a lack of good faith. The court then compounded that error by emphasizing that the plan had improved in certain respects, placing much emphasis on the court's own decision not to adopt proposed findings that sought to eviscerate insurers' contractual rights, the imposition of a respected former bankruptcy judge as a settlement trustee (in lieu of someone with close ties to lawyers

3

TrustApp517

representing BSA claimants), and testimony by a single BSA attorney that he subjectively believed BSA had acted in good faith. But none of those circumstances comes close to demonstrating that BSA proposed the plan in good faith, and none of them change that a fundamental goal of the plan is to generate claim values that are exponentially larger than BSA's prepetition experience to line the pockets of contingency-fee law firms representing those who asserted claims against BSA. The court should send a clear message that this type of conduct represents a misuse of the bankruptcy process and fails to meet the fundamental requirement that a bankruptcy plan be proposed in good faith.

*Second*, and independent from the manifest lack of good faith in the plan's proposal, the plan impermissibly abrogates insurance contracts. The bankruptcy court declined to engage on this issue because it believed that "insurance neutrality" is merely a "standing concept." But it is a bedrock principle of law that contracts do not expand or contract by "happenstance of bankruptcy." *Mission Prod. v. Tempnology, LLC*, 139 S. Ct. 1652, 1663 (2019). BSA's plan runs afoul of that principle by purporting to assign BSA's *rights* in the insurance contracts, but not BSA's *obligations*. This means, among other things, that the plan does

4

not permit insurers to exercise their rights to control or participate in the defense of claims, or require BSA to cooperate in such a defense, an outcome designed to lead to claim values that are higher than those that would have been produced in the tort system.

The bankruptcy court attempted to sidestep this issue by concluding that insurers can simply raise these arguments in coverage litigation. But while matters of *insurance law* should indisputably be addressed in coverage litigation, *bankruptcy law* requires BSA to demonstrate that the plan takes prepetition insurance contracts as it finds them, without impermissibly altering rights and obligations that are fundamental to the operative insurance contracts, and leading to inflated claim values that insurers are left to contend with. The confirmed plan harms insurers independent of any coverage litigation.

This Court should not tolerate the bad faith, collusion, and outright fraud by claimants' counsel that resulted in this plan—conduct to which BSA was, at best, willfully blind. The Third Circuit has recognized the "profoundly serious" problem that occurs where, as here, a debtor "sold out [its] insurers" by "setting up a system" in which "ginned-up" claims are paid in exchange for claimants voting for the plan. *In re Global Indus.*

TrustApp519

*Techs., Inc.*, 645 F.3d 201, 214 (3d Cir. 2011); *see, e.g.*, *American Cap. Equip.*, 688 F.3d. at 158 ("Collusive plans" not proposed in good faith).

It is plain *why* the plaintiffs' bar is pursuing this playbook in "mass tort" bankruptcies (a playbook they have been trying—and failing—to convince courts to adopt for decades). Pointing an 82,000-claim bazooka at insurers creates a "hydraulic pressure to settle" that serves no legitimate purpose. *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 164 (3d Cir. 2001). The confirmed plan inflates the non-settling insurers' exposure while purporting to gut many of the rights and defenses they bargained for in their contracts. This is an abuse of the bankruptcy system (*In re SGL Carbon Corp.*, 200 F.3d 154, 161-67 (3d Cir. 1999)) and a violation of the insurers' right to due process (*Lindsey v. Normet*, 405 U.S. 56, 66 (1972)).

The harm from this plan extends far beyond the prejudice to the Certain Insurers. The plan inevitably dilutes the claims of the truly victimized claimants by allowing payments for thousands of invalid and questionable claims. And this "tampering with the administration of justice in the manner indisputably shown here involves far more than an injury to a single litigant." *Hazel-Atlas Glass Co. v. Hartford-Empire Co.,*

TrustApp520

322 U.S. 238, 246 (1944).  Debtors and claimants working together to strongarm insurers by inflating claims and circumventing core contractual provisions "is a wrong against the institutions set up to protect and safeguard the public, institutions in which fraud cannot complacently be tolerated consistently with the good order of society."  *Id.*

The Certain Insurers have every desire that BSA exit bankruptcy and that deserving survivors receive compensation.  But that cannot happen through a plan that unfairly enriches claimants and their counsel at the expense of insurers and the integrity of the bankruptcy process.  The purpose of Chapter 11 is to reorganize—not expand—the debtor's assets and to fairly compensate creditors with those assets.  This plan does not do that.  The Court should vacate and remand so that BSA can propose a plan in good faith that does not abrogate insurers' contracts.

TrustApp521

## JURISDICTIONAL STATEMENT

The bankruptcy court confirmed the bankruptcy plan on September 8, 2022 with jurisdiction pursuant to 28 U.S.C. §§ 157(b) and 1334. (A. 282-848.)   The Certain Insurers appealed that final judgment on September 21, 2022.   (A. 10016-10506.)   This Court has jurisdiction pursuant to 28 U.S.C. § 158(a)(1) and Federal Rule of Bankruptcy Procedure 8002(a).

## ISSUES PRESENTED

1.     Did the bankruptcy court erroneously conclude that the plan was proposed in good faith and not by any means prohibited by law?

2.     Did the bankruptcy court erroneously confirm the plan even though it seeks to alter the Certain Insurers' contracts to their detriment?

For both questions, this Court "reviews the Bankruptcy Court's legal determinations de novo, its factual findings for clear error, and its exercise of discretion for abuse thereof."   *In re Millennium Lab Holdings II, LLC*, 242 F. Supp. 3d 322, 336 (D. Del. 2017).   An appeal from a good-faith determination "presents mixed questions of law and fact."   *In re WR Grace & Co.*, 729 F.3d 332, 346 (3d Cir. 2013).   The Court "must accept the Bankruptcy Court's finding of historical or narrative facts unless

8

clearly erroneous, but exercise[s] plenary review of the trial court's choice and interpretation of legal precepts and its application of those precepts to the historical facts." *In re Lernout & Hauspie Speech Prods. N.V.*, 308 B.R. 672, 675 (D. Del. 2005) (quotation marks omitted).

## STATEMENT OF THE CASE

### I.   STATUTORY BACKGROUND

Chapter 11 of the Bankruptcy Code provides "a means by which financially distressed businesses or individuals may restructure their finances and exit bankruptcy by obtaining confirmation of a plan which provides either a continuation of a business, or retention or orderly sale of assets, and exiting bankruptcy relieved of burdensome debts and obligations." 2 Bankr. Law Manual § 11:1 (5th ed. Westlaw 2022).

The case commences with the filing of a petition, which creates an estate that is "comprised of … all legal or equitable interests of the debtor in property as of the commencement of the case." *In re Combustion Eng'g, Inc.*, 391 F.3d 190, 219 (3d Cir. 2004) (quotation marks omitted).  Each creditor may then file a "proof of claim."  11 U.S.C. § 501.

Once the debtor's operations are stabilized, it seeks to resolve creditor claims through a court-approved plan, which sets forth the treatment of all impaired classes of claims and must provide adequate

9

TrustApp523

means for the plan's implementation.  *See* 11 U.S.C. § 1123(a).  The plan may, among other things:  (a) impair a class of claims; (b) provide for sale of property in accordance with applicable non-bankruptcy law; (c) provide for assumption or rejection of executory contracts, subject to conditions; and (d) include other appropriate provisions that comply with the Bankruptcy Code.  *See* 11 U.S.C. § 1123(b); *id.* §§ 363, 365.

After votes are solicited, more than half of voters (and at least two-thirds in amount) of each impaired class must vote to accept the plan.  11 U.S.C. § 1126(a), (c)-(d).  Otherwise, the court may "cram down" the plan on any rejecting class so long as the plan "does not discriminate unfairly" and "is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan."  *Id.* § 1129(b).

In the extraordinary case where the debtor seeks a channeling injunction and third-party releases, courts consider a number of factors, including whether the plan received "overwhelming" support by those affected, typically at least 90%; and whether it provides for the "payment of all, or substantially all, of the claims of the class or classes" affected.  *In re Master Mortg. Inv. Fund, Inc.*, 168 B.R. 930, 935 (Bankr. W.D. Mo. 1994).  (*See* A. 139-140, 156-157.)  Within the framework of asbestos-

TrustApp524

related cases—which often are the model for mass-tort bankruptcies—a "cram down" option is not available.  When coupled with the need for "overwhelming" support, this can allow creditors to exert undue leverage over a bankruptcy.  *See*, *e.g.*, *In re Federal Mogul Global Inc.*, 684 F.3d 355, 361 (3d Cir. 2012).

The bankruptcy court then holds a confirmation hearing.  11 U.S.C. § 1128.  The debtor bears the burden of proving that the plan should be confirmed.  *See*, *e.g.*, *In re Tribune Co.*, 464 B.R. 126, 151-52 (Bankr. D. Del. 2011), *aff'd in part*, 587 B.R. 606 (D. Del. 2018).  "[C]areful scrutiny" is required where, as here, the "parties ... seek the court's imprimatur of a reorganization that will free the debtor of all ... [tort] liability."  *In re Congoleum Corp.*, 426 F.3d 675, 692 (3d Cir. 2005).  The bankruptcy court sits in "equity" (*Young v. United States*, 535 U.S. 43, 50 (2002)), and seeks to bring about the just result (*see, e.g., In re Kaiser Aluminum Corp.*, 456 F.3d 328, 340 (3d Cir. 2006)).

The Bankruptcy Code provides certain requirements that must be satisfied for confirmation.  Among other things, a plan must be "proposed in good faith."  11 U.S.C. § 1129(a)(3).  This is because, although bankruptcy "presents an inviting safe harbor" for "companies that face

11

TrustApp525

massive potential liability and litigation costs," "this lure creates the possibility of abuse which must be guarded against to protect the integrity of the bankruptcy system and the rights of all involved in such proceedings." *SGL Carbon*, 200 F.3d at 169.

The good faith requirement imposes a "responsibility" on the court to "scrutin[ize] the circumstances surrounding" plan negotiations. *American United Mut. Life Ins. Co. v. City of Avon Park, Fla.*, 311 U.S. 138, 145-46 (1940). Thus, "[t]he good-faith determination is a factual inquiry into a totality of the circumstances surrounding the plan's proposal." *Exide*, 2021 WL 3145612, at *11 (quotation marks omitted).

A bankruptcy plan also must comply with the applicable provisions of the Bankruptcy Code and may not be proposed by any means forbidden by law. *See* 11 U.S.C. §§ 1129(a)(1), (3). It is well settled that "[p]roperty interests," such as insurance contracts, "are created and defined by state law. Unless some federal interest requires a different result, there is no reason why such interests should be analyzed differently simply because an interested party is involved in a bankruptcy proceeding." *Butner v. United States*, 440 U.S. 48, 55 (1979). In other words, those interests

12

TrustApp526

neither expand nor contract "by happenstance of bankruptcy." *Mission*

*Prod.*, 139 S. Ct. at 1663.

## II.   FACTUAL BACKGROUND

### A.   The Boy Scouts Bankruptcy

#### 1.   Sexual Abuse and the Boy Scouts of America

"BSA is a non-profit corporation with a mission 'to prepare young

people to make ethical and moral choices over their lifetimes by instilling

in them the values of the Scout Oath and Law.'" (A. 6042 (Whittman).)

BSA charters approximately 250 Local Councils, which recruit Chartered

Organizations like faith-based institutions and civic organizations that

sponsor more than 44,000 scouting units. (A. 6009 (Desai), 6043-6044

(Whittman).)

Over time, BSA became the subject of lawsuits alleging sexual

abuse. In the four years preceding its bankruptcy, BSA defended

approximately 350 abuse lawsuits, the majority of which involved abuse

alleged to have occurred more than 30 years ago. (A. 5940.)

BSA employed a "national coordinating counsel," who hired,

coordinated, and directed local counsel to investigate, defend, and resolve

sexual abuse claims. (A. 1208, 5939, 5941 (Griggs).) BSA regularly

asserted defenses, including that the perpetrator was not an agent of

13

TrustApp527

BSA, that there was no basis for BSA's liability (e.g., no negligence by BSA was shown), and that the claim was time-barred under a statute of limitations or repose.  (A. 1188-1190, 1213-1215, 1229-30 (Griggs); *see* A. 5945 (Griggs) (statute of limitations or repose presented a "significant hurdle" and had a "substantial chilling effect on claims.").)

To develop and pursue these defenses, BSA took appropriate measures such as seeking affirmative discovery, hiring experts, filing motions *in limine*, and developing a damages model.  (A. 1224-1225, 1230-1235, 5947 (Griggs).)  The purpose was to "evaluate the credibility and value of a claim" and position the case "towards a more favorable settlement, if possible."  (A. 5948 (Griggs); *see* A. 5940 (Griggs) (BSA resolved 250 of the 350 cases).)

Most of the money BSA paid to tort claimants stemmed from cases involving serial abusers of multiple victims because the national organization of BSA was more likely to bear institutional responsibility in such cases.  (A. 2237-2239 (Bates).)  "BSA also faced a small set of claims that involved particularly egregious facts and circumstances … that resulted in particularly high, outlier settlements."  (A. 1238-1242, 5941 (Griggs).  Even in those rare, outlier cases, BSA continued to mount

14

TrustApp528

zealous defenses, including by moving for summary judgment (A. 1210-1211, 5945 (Griggs); *see* A. 11766-11767), demanding a jury, and pursuing appeals where appropriate (A. 1235-1236 (Griggs)).

Approximately 90% of BSA's prepetition settlements involved *multiple-victim* abusers, and their value was significantly higher than settlements involving single-victim abusers because the chance of a liability finding against BSA for a multiple-victim abuser was greater given BSA's perceived institutional responsibility.  (*See*, *e.g.*, A. 2414-2423 (Bates).)  As explained below, this was the mirror opposite of the sort of claims filed during the bankruptcy.

### 2.    BSA's Insurance Policies

Prior to its bankruptcy, BSA's settlements were typically funded by BSA and "its insurance companies."  (A. 5952-5953 (Griggs).)  BSA has had liability insurance since at least 1935.  (A. 2856-2857, 6368 (Gutzler).)   Local Councils and Chartered Organizations became additional insureds on some policies, and at times certain Local Councils purchased their own insurance.  (A. 6370-6373 (Gutzler).)

These commercial insurance contracts provide "liability protection to business from suits primarily for bodily injury and property damage

TrustApp529

brought within the tort system." (A. 3477 (Harrington); *see* A. 13383-16334.) They contain "very important" rights and obligations that are "fundamental" to the bargain. (A. 3483-89 (Harrington).) These include:

a. **Defense Rights:** Defense rights provide insurers with the right to associate in the defense and investigate claims, as well as the right to defend lawsuits and make any settlements they deem expedient. (A. 1532-1533 (Burnett), 1677-1678 (Azer), 3483-3485, 3489-3490, 3494-95, 3499 (Harrington); *see* A. 13634, 14502.) These rights are "integral" to the insurance contract because they counteract the "moral hazard" that insurance creates by reducing the policyholder's incentive to limit its losses. (A. 3484-3485 (Harrington).).

b. **Cooperation Obligations:** Cooperation obligations require the insured to assist and cooperate in the insurer's investigation, defense, and settlement of claims, including by providing relevant materials and testimony. (A. 3485-3487, 3491, 3494-3496, 3500 (Harrington).); *see* A. 14506; *see also* A. 1529 (Burnett) ("If the insurer wants to defend the case[, t]he policyholder, at a baseline, has to cooperate ....").) These obligations "support[] the overall rights of insurance companies with regard to defense" and create an "environment where, in principle, the interest of the insured and the insurer become aligned to help control the cost of claims." (A. 3487 (Harrington).)

c. **Consent/No Action Obligations:** Consent obligations require the insured to obtain the insurer's written consent to any settlements (A. 1679 (Azer), 3485-3488, 3492 (Harrington); *see* A. 13638, 14507), and "no-action" conditions obligate the insured to obtain its insurer's consent to a settlement by providing that no action lies against the insurer for breach unless a trial results in a judgment against the insured or the claimant, insured, and insurer have agreed in writing to settle the claim (A. 1535-1538, 3485-3488, 3493, 3496-3497, 3500-3502 (Harrington); *see* A. 13638, 14509.)

16

TrustApp530

d. **Assignment Obligations:**  Assignment obligations require the insured to obtain its insurers' consent to an assignment of the contract.  (A. 3485-3486, 3497, 3502 (Harrington); *See* A. 13639. These mitigate the possibility that an assignment may be made to a party that may be less likely to comply with terms regarding defense, cooperation, and consent.  (A. 3511-3512 (Harrington).)  Insurers underwrite a particular entity; price the coverage for it; and assume it will comply with the rest of their contracts.  (A. 3485-3486 (Harrington).).   The assignee may not have the same incentives to align with the insurer in defense of tort claims.  (A. 3485-3486, 3547-3550 (Harrington).).

The insurers' contracts "anticipate that these claims will be brought within the court system and that they will be adjudicated or settled within the context of the court system."   (A. 3488-3489 (Harrington).)  BSA contends that, prior to its bankruptcy, it routinely complied with its contractual obligations by communicating with insurers, providing information, permitting them to select counsel, and obtaining consent to settle.  (A. 1201-1207, 1276-1277, 5941, 5943, 5948-5949 (Griggs).)

### 3. Plaintiffs' Lawyers Generate an Explosion of Claims

When BSA filed for bankruptcy in February 2020, it was a defendant in approximately 275 pending abuse lawsuits (A. 6053), and was aware of approximately 1,400 additional claimants who had never filed suit.  (A. 10543.)  But by November 16, 2020, BSA's counsel was

17

TrustApp531

surprised to see an unprecedented *6,000%* increase: proofs of claim had been filed for more than *82,000* individual abuse claims. (A. 3434 (Conte), 6243, 6265-68 (Murray), 6282 (Bates).)

This "explosion" resulted from a massive and misleading advertising campaign by the plaintiffs' bar, in which the attorneys sought a multi-billion-dollar payday for themselves by soliciting claimants on a contingency-fee basis. (A. 3434-3435 (Conte), 3436-3439 (Slater), 3445-3446 (Higgins), 3858-3860 (Rothweiler), 3865-3866 (Rothweiler), 3914-3916 (Stern), 3934 (Babin).) The campaign included demonstrably false statements, including that claimants could remain "anonymous," "substantial" recovery was "ensured," and claimants "will never have to be deposed, appear in Court or otherwise prove their claims," leading the bankruptcy court to prohibit "false and misleading" claims solicitations. (A. 11376, 11526-11527.) But by that point, much of the damage had already been done.

These attorneys were transparent about their aims. One noted that their goal was to "keep focused on [the lawyers'] marketing and media efforts going full tilt" so that "[w]e control 80% of the claims, I.e. [sic] our coalition controls the case." (A. 10796.) Another has explained that the

TrustApp532

lawyers opened a "Pandora's Box" of claimants coming forward, with the majority living in states where their claims would be time-barred had they been brought in the tort system.  (A. 3908.)  Another admitted that he represented an astounding 5,000 claimants alleging sexual penetration, which he estimated would yield $1 billion to his firm alone in contingency fees.  (A. 3438-3439 (Slater).)

These attorneys engaged clients in the bankruptcy proceedings whom they never would have accepted outside of bankruptcy court.  (*See* A. 3870-3872 (Rothweiler); *see* A. 3517 (Harrington) ("[B]asic economics ... indicates that many of those claims would not have ... been brought without the bankruptcy.").)  65% of the new claims are from states where a statute of limitations or repose renders the claim untimely.  (A. 1187-1189, 1194-1195 (Griggs), 2178 (Murray), 3918 (Stern); *see* A. 11742.)  In one townhall event, one of the claimants' lawyers candidly admitted:

> If this bankruptcy doesn't go through and all of the cases go out to the tort system .... 58,473 survivors are in states that have closed statutes.  Here's what I say to those people, good luck, because you have to overcome a lot to open a case in a closed state.  A heck of a lot....  So I'm worried about those 58,473 survivors, because if the plan is voted down, they're going to have a heck of a time getting any compensation at all.

(A. 3900-3901 (Rothweiler).)

19

TrustApp533

According to BSA, at least 85% of the claims face such legal hurdles that, but for the bankruptcy, they would never even have been filed.  (A. 2285-2287, 2425, 10797-10811 (Bates) (firm solicited 10,000 claimants whom it initially turned down for statute of limitations reasons).)

Although the proof of claim forms required the signatory to attest to the truth of the claim (*see*, *e.g.*, A. 11596), plaintiffs' attorneys elected to sign thousands of forms themselves,[1] supposedly only on behalf of "[their] firm,"[2] at times without even bothering to review the forms, speak with their clients, or confirm their accuracy.[3]  Despite promising that "[a]ll claims ... will be thoroughly vetted" (A. 8820, 8967), the attorneys often failed to vet them at all.

This led to numerous absurdities and questionable proofs of claim. The attorneys filed thousands of forms with missing or inaccurate

---

[1]  (A. 3710, 3712, 3715 (Schulman) (400), 3873 (Rothweiler) (300), 3920-3922 (Stern) (1,400), 3443-3444 (Slater) (90), 3934 (Babin) (hundreds).)

[2] (A. 3456-3457, 3459 (Higgins), 3712-3713 (Schulman), 3922-3923 (Stern), 3942 (Babin).)

[3] (A. 3449-3463, 3710-3718 (Schulman), 3877-80 (Rothweiler), 3919-3921 (Stern), 3934-3935 (Babin); *see* A. 11596, 11612, 11625.)

[Footnote continued on next page]

20

TrustApp534

information.[4]  One could not remember any details about duplicative, conflicting claims he had filed.  (A. 3459-3461.)  Another admitted that he tried to contact a client multiple times but, hearing no response, submitted an inaccurate form anyway.  (A. 3716, 3718 (Schulman).)  A third conceded that he signed forms despite—even after sending process servers to *his own purported clients*—being unable to locate them, finding them unwilling to sign, or being instructed to stop all contact.  (A. 3926-3933 (Stern).)

The new claims contain "significant" differences from BSA's historical claims indicating a lower recovery.  (A. 2261 (Bates).)  They are "typically older ... the highest frequency of them come from periods 50, 60 years ago."  (A. 2170-2171 (Bates).)  Only about 33% identify an abuser's full name.  (A. 2170-2171 (Bates).)  87% involve single abusers, which is the "mirror" opposite of claims filed prepetition.  (A. 2426-2427 (Bates); *see* A. 2173 (Murray).).  And for 98%, the "link between the abuser and institutional responsibility is tenuous."  (A. 2425 (Bates).)

---

[4] (A. 3453-3463 (Higgins), 3710-3718 (Schulman), 3919-3933 (Stern), 3934-3944 (Babin).)

TrustApp535

Further, a significant portion are likely "fraudulent." (A. 3435-3436 (Conte), 3651 (Treacy); *see, e.g.*, A. 3648-3649 (Treacy) (40 to 45% of such allegations generally unreliable); 2179-80 (Murray) (90% or more of claimants never reported abuse to scouting or law enforcement).)

Once a sufficient number of claimants were retained, the plaintiff lawyers asserted considerable leverage over the outcome of the bankruptcy. Despite the U.S. Trustee's formation of the Tort Claimants' Committee ("TCC"), comprised of plaintiffs' attorneys to represent sexual abuse claimants (A. 8124-8125, 8128-8129, 8138), these other claimants' firms formed a "Coalition of Abused Scouts for Justice" (the "Coalition") that collectively represents 65,000 to 70,000 of the alleged 82,000 direct abuse claimants.[5] This permitted these groups, and the individual representing all future claimants (the "FCR," James Patton, Jr.), to speak with a "loud voice" and exert maximum leverage over BSA, regardless of the legitimacy of their claims. (A. 3862-3863 (Rothweiler).)

---

[5] (A. 3863-3864 (Rothweiler); *see* 3436-3437 (Slater) (14,170), 3445 (Higgins) (10,000), 3704 (Schulman) (15,000), 3862, 3864 (Rothweiler) (16,800), 3914 (Stern) (more than 3,000), 3944 (Babin) (more than 1,000).)

[Footnote continued on next page]

22

TrustApp536

### 4.   Plaintiffs' Lawyers Seek the "Holy Grail"

The plan's centerpiece is the establishment of a settlement trust that will be funded pursuant to the plan and assume liability for abuse claims.   (A. 6303 (Patton).)[6]   A channeling injunction—requiring the "overwhelming" support of claimants (see *supra* at 10-11)—will enjoin all holders of abuse claims from taking any further action on their claims, in exchange for BSA and related entities contributing a relatively small fixed amount to the trust, along with other "insurance rights" from those entities, with the hope that those insurance rights will help fund distributions to the claimants.  (A. 6304 (Patton), 6055-6058 (Whittman); *see* A. 474-478 (Plan, Art. X(F); *see also* A. 77-78.)

The trust will implement the plan's trust distribution procedures ("TDPs") which are "a set of procedures … to review, process, and resolve the Channeled Claims" (A. 6305 (Patton); *see* A. 3503, 3506 (Harrington), and then will distribute assets to claimants, in addition to "seek[ing] recovery of allowed claim amounts from applicable insurance companies" (A. 3507 (Harrington)).  (*See* A. 504-505 (TDPs, Art. I).)

---

[6] The plan draws a distinction between Class 8 "direct" abuse claims and Class 9 "indirect" abuse claims.  Unless otherwise specified, further references to "abuse claims" in this brief refer to Class 8 claims.

TrustApp537

The TDPs were drafted to serve the interests of the claimants'
representatives at the insurers' expense.  (*See*, *e.g.*, A. 3520 (Harrington)
("[W]hat we have is a situation where … two main parties … can design
things to try to increase the size of the pie that can be divided between
them, in some sense, at the expense of other parties who are not given
rights to be involved in the development of the plan.").)

As one attorney explained, the claimant attorneys are seeking the
"holy grail" that "mass tort lawyers have been chasing for many years
and [that] has never been approved"—claim determinations made to
their satisfaction that "will result in individual awards that will be
binding on the insurance carriers."  (A. 12297; *see* A. 4203 (Amala)
(strategy was to get binding TDPs and then leverage precedent in other
bankruptcies); *see also, e.g.*, A. 3528  (Harrington) (FCR testified "that all
of these things should bind insurance companies and should not be able
to be relitigated in some subsequent action"); A. 7569-7570 ("It's been
represented in meetings held by sponsors of the [Restructuring Support
Agreement] and the TDP to the plan that ... confirmation of the plan
would be the equivalent of a litigated plan and that the plan confirmation
would operate as a judgment enforceable against the insurers.").)

<div align="center">24</div>

The route to that "Holy Grail" is set forth below.

### (a)    The Insurance Assignment

The plan provides for an "Insurance Assignment," which includes "the assignment and transfer to the Settlement Trust" of *all* "rights, claims, benefits, or Causes of Action of the Debtors, Related Non-Debtor Entities, Local Councils, or Contributing Chartered Organizations under or with respect to the Abuse Insurance Policies (but not the policies themselves)."   (A. 384 (Plan Art. 1.A.157).)   The plan, however, does not assign the entire insurance "policies."  (A. 384, Plan Art. 1.A.157; *see*, *e.g.*, A. 511, TDPs, Art. V.C).) Nor does it purport to assign any of BSA's contractual *obligations* to its insurers or say anything at all about whether BSA or anyone else remains obligated to comply with those contractual duties.

### (b)    Inflated Payments Under the TDPs

Although the bankruptcy court eventually forced BSA to direct that the Settlement Trustee propose anti-fraud measures (A. 217-219), this was too little too late because the TDPs that BSA proposed contain no requirement to determine the actual merit of the abuse claims.

As explained by Dr. Eileen Treacy, an expert in forensic evaluation

25

of sex crimes, the proofs of claim alone are inadequate for assessing the allegations.   (A. 3605-3622, 3625-3641, 3693 (Treacy).)   Properly assessing reliability would require that claimants be interviewed by an expert in sexual abuse and tested objectively through standardized assessments.  (A. 3622-3625, 3634-3635, 3641, 3650 (Treacy).)  The TDPs are irreparably unreliable from the outset, however, because they contain no such independent assessment requirement.

Instead, abuse claimants who do not elect an "expedited payment" option of $3,500 may pursue recovery by submitting their claim for allowance and valuation by the Settlement Trustee.  (A. 6310 (Patton); see A. 511–517 (TDPs, Art. VI, VII).)   The claimant must complete a simple questionnaire identifying the abuse, alleged abuser, and connection to scouting, and provide any documentation.  (A. 5964, 5966-5969 (Burnett), 6311 (Patton).)

Unlike in the tort system, claimants will not be required to plausibly allege, much less prove, that BSA was negligent; they need only demonstrate by a preponderance of the evidence that BSA "*may* bear legal responsibility." (A. 3992-3993 (Bitar) (emphasis added).)  In other words, a claimant will receive payment from the trust so long as he has

26

alleged a "probability" of a possibility that BSA is legally responsible. (A. 1824-1828 (Azer).)[7]   And unlike in the tort system, the Settlement Trustee cannot refuse to pay on the ground that a claim is time-barred. (*See* A. 523, 539-540 (TDPs, Art. VIII.D.iii, Schedule 1).)

If the Settlement Trustee determines that the claimant has made the requisite minimal showing (*e.g.*, that BSA "may bear" responsibility), the claim is deemed "allowed," and BSA's supposed "liability" is then valued under the Claims Matrix to determine how much the trust will pay in "settlement" of the claim. (A. 3506-3507 (Harrington), 3999, 4004-4005 (Bitar), 5969 (Burnett).)

To determine claim payment, the Claims Matrix includes six tiers (in descending order of severity) that delineate types of abuse. (*See* A. 517-519 (TDPs, Art. VIII).)   For instance, the Base Matrix Value for a sexual penetration claim (the highest tier of abuse) is $600,000; and the Maximum Value is $2,700,000.  The Settlement Trustee begins with the

---

[7] Following the Confirmation Opinion, this language was amended to require that BSA "may be negligent or otherwise bear legal responsibility." (A. 514 TDPs, Art. VII (C)(2)(c).)   The plan does not require a showing of probable actual responsibility and diverges indiscriminately from negligence-based causes of action that were the subject of BSA's prepetition litigation.

27

Base Matrix Value and then (in her sole discretion) makes adjustments upwards or downwards using certain "Scaling Factors." (A. 2336-2339 (Bates), 5975-5986 (Burnett), 6312 (Patton); A. 519 (TDPs, Art. VIII.B).)

Evidence of BSA's negligence is not a *prerequisite* for liability as it would be in the tort system; it is only an "aggravating factor" that is multiplied against the Base Matrix Value to *increase* the claim's value. (A. 3993, 4005-4006 (Bitar).) A statute of limitations defense is not a *bar* to recovery; it is merely a mitigating factor that *reduces* a claim award. (A. 4006 (Bitar); *see* A. 523, (TDPs, Art. VIII.D.iii).) Virtually *every* claimant is paid under the TDPs; there is no scenario in which a claimant who satisfies the minimal "may bear" responsibility standard receives $0. If a claimant is dissatisfied, he may seek a de novo determination in the tort system. (A. 6312 (Patton).). Insurers have no ability to defend the claim in the tort system. (A. 4008-4009 (Bitar).)

BSA has claimed that it worked with its consultant, Bates White, to generate numbers for the Claims Matrix consistent with values the claims "would have received had they been filed as claims in the tort system." (A. 1776-1777 (Azer), 2221 (Bates), 6241-6242 (Murray), 6169-6170 (Azer), 6310 (Patton).) But in reality, the TDPs stem from an

28

"iterative drafting process" between BSA and claimants' lawyers that never included the Certain Insurers.  (A. 6304 (Patton); *see* A. 6175 (Azer).)   Those "on the [claimants'] side, would draft, and frankly, negotiate among [themselves], and then there would be a negotiation with the debtors." (A. 2784 (Patton); *see* A. 2553-2554 (Patton) (Coalition was the "scrivener" or "clearinghouse" for TDPs).)

As a result of this claimant-driven process, BSA's justification for the TDPs has shifted throughout the case.  BSA and the claimants initially asserted that the Base Matrix Values are objective and mechanical because they are based on BSA's "historical abuse settlements and litigation outcomes."  (A. 6310 (Patton), 11061; *see* A. 12923 ("The Plan and TDPs are consistent with the Debtors' (and Insurers') historical practices.").)  But because the evidence in the lead up to trial demonstrated that the Base Matrix values were far too high (*see, e.g.*, A. 2440 (Bates)), BSA now claims that the values do not "tell you anything" and were selected solely "for their utility in using the … scalers … to be able to replicate" BSA's prepetition litigation outcomes (A. 2332-2335 (Bates) ("You have to be able to basically start from a point somewhere in the middle of the range … to reflect the fact that … most of

29

the claims will, to emulate the tort values, be scaled downward from the base matrix value, but that's by design.")).

The plan proponents likewise claimed that the Scaling Factors were "selected and derived based on the Debtors' prepetition experience." (A. 6312 (Patton); *see, e.g.*, (A. 1776-1777 (Azer), 5953 (Griggs), 5977 (Burnett), 6169-6171 (Azer) (BSA used Bates White to provide guidance on quantifying scaling factors based on historical abuse data).) The scaling factor for statutes of limitations, however, was not based on historical data (because few time-barred claims were historically brought). It was "simply the product of the lawyers" negotiating TDPs. (A. 2454 (Bates).)

In any event, it became clear prior to the plan confirmation hearing that the values listed in the Claims Matrix were vastly inflated because conforming claim awards to BSA's prepetition litigation outcomes would require massive discounts to the TDP matrix's base values for essentially all claims. *See, e.g.*, A. 12822, 12840-12841 (Bates Rebuttal Rep. ¶¶ 53, 97-98); A. 2435-2438, 2440-2441, 2444 (Bates) (Trustee must reduce claim awards for the "vast majority" of single-abuser penetration claims by approximately 90%). As a result, BSA now contends that the Scaling

30

Factors were never rooted in prepetition outcomes in the first place and instead were chosen because they permit the Trustee latitude to assign "appropriate values" to make them "consistent with those claims as if they were filed in the tort system." (A. 2223, 2334, 2337, 2348-2349, 2431, 2449 (Bates).)

The TDPs provide no explanation how the Trustee would assign those values consistent with prepetition litigation outcomes, nor any explicit requirement that she do so. According to BSA, the Trustee must assume a "high degree of institutional responsibility" as a baseline so that the Base Matrix Values can be scaled significantly downward. But the TDPs state the contrary—the "hypothetical base case" posits a single-victim abuser. (A. 2438-2439, 2448 (Bates).) Moreover, there is no explicit requirement that the Trustee reduce the "vast majority" of single-abuser penetration claims. Rather than simply update the Claims Matrix to account for proper prepetition values, BSA hopes the Trustee will exercise appropriate discretion pursuant to a catchall factor for "any further limitations on the abuse claimant's recovery in the tort system." (A. 2435-2438, 2440-2441 (Bates).)

TrustApp545

### (c)   Impairment of Contracts

Although BSA's insurance contracts contain important provisions designed to align BSA with its insurers in defense and resolution of claims (see *supra* at 15-17), the plan upends the economic bargain by purporting to assign insurance rights without accounting for core elements of the operative insurance contracts.

For example, the plan provides virtually no opportunity for insurers to associate in the defense against abuse claims.  (A. 1532-1534, 1535-1538 (Burnett).)  Nor does it obligate BSA, or even the Settlement Trustee, to cooperate in such a defense.  (A. 1531-1532 (Burnett).)  To the contrary, the plan does not provide for any party, much less insurers, to conduct an actual defense.

The plan further assigns insurance rights for claims that will never be resolved in the tort system, even though the parties' contracts contemplate actions for payment from insurers only after insurers have consented to settle or after a trial in the tort system.  Indeed, the TDPs differ "dramatically" from the tort system.  (A. 3976-3977 (Bitar); *see, e.g.*, A. 1236, 1264-1268 (Griggs) (TDPs provide for none of the "hallmarks of an adversarial system"), A. 3977, 4016-4017 (Bitar) (no "adversarial

TrustApp546

system, represented by a zealous counsel"), A. 3978 (Bitar) ("[T]hose are important procedural safeguards in my view ...."), 2578 (Patton) (The Plan is "nothing like what happens in a context where there's active litigation and the Boy Scouts stand on one side ... with an insurer joined with them and a claimant and his counsel is on the other side").)[8]

There are accordingly no mechanisms for defense attorneys or insurers to "zealously" defend claims as would be required in the tort system.  (A. 3883-3886 (Rothweiler), 5969 (Burnett).)  And claimants will likely receive greater awards than they would have received in the tort system.  (A. 4016 (Bitar) ("In this particular claim, under the tort system, the plaintiff would get nothing; and under the TDPs, the plaintiff would get $300,000.")); *see* A. 4034, 4050 (Bitar) ("[C]ertain claims that should not go forward go forward, and ... end up costing more because there's not the rigors of the discovery to make the true valuation known.").)

The result, as Wharton Professor Scott Harrington explained, is a plan that fundamentally alters the "economic bargain" in the contracts

---

[8] (*See also, e.g.*, A. 1182-1183, 1208-1225, 1230-1238 (Griggs), 1402-1404, 1406 (Burnett), 3556-3558 (Harrington), 3977-3984, 3987-3989, 3991-3994, 3997-3998, 4000-4003, 4008-4009, 4017 (Bitar).)

33

issued by the insurers.  (A. 3507 (Harrington); *see* A. 3507 (Harrington) ("They change it from one where the policy provisions are designed to align the interest of insureds and insurers" in defending against claims in the tort system to one where "the claim amounts will be determined by another party without the insurers' assistance—or the insureds' assistance and cooperation with insurers—and without insurers having their normal and customary defense rights.").)

### (d)    Control over the Settlement Trustee

The plan also places extraordinary reliance on the independence and discretion of the Settlement Trustee to perform an array of tasks funded by the trust.  (A. 1390-1391, 1394-1395, 1408-1414, 1418-1421, 1423, 1427, 1430-1432, 1488, 1519-1523 (Burnett).  BSA, however, acceded to proposals by the claimants' lawyers to exert dominance over the Settlement Trustee and other aspects of trust governance.  (*See* A. 3756-3761, 3820-3822 (Williams) (explaining the importance to the trust of unbiased corporate governance and preventing fraud).)

The claimant attorneys initially proposed Professor Eric Green as Settlement Trustee.  (A. 11044.)  That proposal was withdrawn after the Certain Insurers objected to Professor Green's extensive personal and

34

TrustApp548

professional connections to the FCR and claimants' counsel.  (A. 8834-8836.)  The claimant attorneys then could not reach sufficient consensus between two candidates, an impasse that was "clearly not a reflection on the qualifications of the candidates.  There was something else afoot." (A. 3771-3772 (Williams), A. 6190 (Azer), A. 1399 (Burnett).)  The impasse ultimately led BSA to appoint the Honorable Barbara J. Houser, the retired former Chief United States Bankruptcy Judge in the Northern District of Texas.

The claimant attorneys designed what BSA calls the "Settlement Trust Advisory Committee" (the "STAC"), responsible for overseeing the Trustee and other trust governance, to be comprised of seven plaintiffs' attorneys from the three firms that founded the Coalition and then subsequently agreed that the TCC and another firm would be represented.  (A. 2548-2549 (Patton), 3886-3888 (Rothweiler), 1394-1395 (Burnett), 3776 (Williams), 6302-6303 (Patton).)

Unlike the Settlement Trustee, who has a fiduciary duty to the Trust for the benefit of direct and indirect abuse claimants (A. 3765-3766 (Williams); *see* A.588-592 (Trust Agreement, § 2.1(b)), the STAC owes no fiduciary duty to the trust; its duty is only to its own clients who are direct

TrustApp549

abuse claimants (A. 3433-A.3441 (Conte), A. 3443  (Slater), 3767-3769 (Williams), 3893-3894 (Rothweiler); *see* A. 612 (Trust Agreement, § 6.2).)

As Professor Jack Williams, an expert in corporate governance, testified at the confirmation hearing, the claimants' attorneys insisted on a number of provisions that permitted the STAC and FCR to control the Settlement Trustee, raising significant governance concerns.  (A. 3761-3762, 3767-3782, 3786-3787, 3810, 3847-3848 (Williams).)  For example, while the plan provides that the Trustee will draft the initial claim questionnaire, the final form would require the STAC's and FCR's consent.  (A. 3786-3787 (Williams), 3987-3988, 4000 (Bitar).)  Thus, the "parties who have a personal interest, as this contingency fee counsel, in having their claims pass through claim review are responsible for establishing what that review will be."  (A. 1482-1484 (Burnett).)

Furthermore, while the plan provided that the Trustee would retain professionals to administer the payment of claims, as well as professionals for her own staff such as legal counsel, those retentions would require supermajority (5/7) consent of the STAC and reasonable consent of the FCR.  (A. 3778-3782 (Williams), 3888-3893 (Rothweiler).)

TrustApp550

Finally, while the Plan provided for the Settlement Trustee to propose appointment of neutrals for purposes of the Independent Review Option, those "neutrals" would require consent of a supermajority of the STAC and reasonable consent of the FCR.  (A. 1256, 1261-1262 (Griggs), 3775-3778 (Williams), 4001 (Bitar).)

In response to Professor Williams's persuasive testimony, the claimants' attorneys filed proposed revisions to the plan relinquishing some control over the Trustee yet retaining consent and consulting rights over many of the same determinations.  (A. 214-215.)

### (e)   Binding Insurers to Claim Awards

BSA and the Coalition were well aware that the TDPs were likely to inflate awards from the trust to the claimants.  Indeed, at the request of the Coalition, BSA inserted a number of proposed plan provisions that, combined with the Claims Matrix, were intended to bind non-settling insurers in coverage litigation to inflated claim payments and deprive insurers of any means to challenge the Trustee's determinations.

BSA was not initially aligned with claimants' lawyers.  Between February and March 2021, the Coalition proposed that determinations of claim values "shall be binding on Insurers," but Hartford (one of BSA's

37

largest primary insurers) disagreed.  (A. 1032-1036 (Desai), 1649-1650, 1686-1698 (Azer), 2553 (Patton); *see* A. 11627-11628, 11633.)  BSA claims it drafted the first set of TDPs, beginning with Hartford's recommendations, the next month.  (A. 1649-1651, 1702-1705, 6171-6173 (Azer).   That draft incorporated elements from BSA's prepetition practices: it required a showing of BSA's tort liability and stated that untimely claims presumptively received no recovery.  (A. 11653.)  BSA then filed its Second Amended Plan, which included a settlement with Hartford and a set of TDPs.  (A. 6173 (Azer), 6298 (Patton).)

The plan, at that point, included purported protections for insurers' rights.  (*See, e.g.*, A. 13124-13125 (TDPs, Art. 7.2) ("[n]othing in the [TDPs] [] shall affect, impair, or prejudice the rights and defenses of the Non-Settling Insurance Companies in any manner …."), A. 13117 (Art. X.M) (plan shall not "in any way operate to, or have the effect of, impairing, altering, supplementing, changing, expanding, decreasing, or modifying [] the rights or obligations of any Insurance Company ….").)

The Coalition and FCR objected to the plan, seeking determinations of abuse claim liability that would bind insurers in coverage litigation.  (A. 7307-7311.)  Insurers objected that the plan could

TrustApp552

not abrogate their contractual rights.  (*See* A. 7199; A. 7211; A. 7229-7233; A. 7262-7263.)

BSA knew that aligning with the claimants' lawyers could forestall its bankruptcy.  At a hearing in May 2021, BSA's counsel acknowledged that the plan's "treatment of insurance" gets "to the [heart] of what is happening" and that "[r]emoving that insurance neutrality language and setting this court or the Delaware District Court up for either a binding estimation battle or a binding trust distribution procedure battle," as the claimants' lawyers were seeking, "is setting us up for *the most epic battle these courts have ever seen* between plaintiff lawyers on the one hand and insurers on the other hand."  (A. 7307, 7311 (emphasis added).)

Despite recognizing this fundamental problem, BSA strongly preferred a plan that included a channeling injunction and the broadest possible releases from the abuse claimants, including not only releases for BSA, but also for its local councils and chartered organizations.  (*See, e.g.*, A. 897-898 (Desai), 5237-5248.)  The result of that chosen course would be a requirement that BSA secure the "overwhelming" support of the abuse claimants and their attorneys, with perhaps as many as 90% voting for BSA's plan.

TrustApp553

Having made this strategic decision, BSA tossed its insurers overboard and began negotiating with a "particular focus on reaching a consensus with the Abuse Claimants' Representatives." (A. 6168 (Azer), 6298-6299 (Patton); *see* A. 1715 (Azer) ("significant amount of back-and-forth").) BSA contends that it sought to preserve insurers' rights during the drafting of its plan through language that BSA felt was "necessary and appropriate" to protect the insurers. (A. 1656-1657, 1705-1715, 1726-1750, 6175-6180 (Azer); *see* A. 11672-11694.) BSA's proposals, however, were nearly always gutted or removed by the claimants' attorneys. (A. 1655-1656, 1754-1761 (Azer), 3530-3531, 3533-3534 (Harrington); *see* A. 11695-11719.) And BSA allowed this to happen.

By June 5, 2021, BSA had agreed with the claimants, as part of its Restructuring Support Agreement, that its contribution to the Settlement Trust would be fixed at no more than $250 million, and that BSA and local councils would emerge favorably from bankruptcy with their global releases if the plan was confirmed. (A. 974-976 (Desai); *see e.g.*, A.11777-11793); *see also* A. 937 (Desai) (BSA's "strengths" include: "We retained all four High Adventure Bases," and "Our local councils come out of bankruptcy with some balance sheet strength.").

40

Days after BSA had capped its exposure, it capitulated to the Coalition's demands and scrapped its proposed insurer protections. (A. 1656-1657 (Azer).) At the same time, it acceded to the Coalition's demand to make remaining protections in the TDPs available only "to the extent such rights and obligations are otherwise available under applicable law and subject to the Plan and Confirmation Order," purporting to abrogate such protections to the extent they were in conflict with other prejudicial provisions in the plan. (A. 6179; *see* A. 13144 (Redline, Art. V.B).)

BSA further agreed to add language to Article X.M of the plan stating that the protections in that provision were effective "[e]xcept for the Insurance Assignment" and "as otherwise provided" in the "Bankruptcy Code," "applicable law," or the "findings" made by the Bankruptcy Court or this Court, again purporting to abrogate such protections to the extent that they conflicted with the plan's broad assignment of insurance rights without obligations or with any other prejudicial provisions inserted into the plan. (A. 1763-1765 (Azer), 3507-3510 (Harrington), 6181-6183 (Azer); *see* A. 490 (Plan, Art. X.M), 13144 (Redline, Art. X.M); *see also* A. 385 Plan Art. I.A.160 (stating that any "Insurance Coverage Defenses" are "subject to <u>Article X.M</u>").)

41

TrustApp555

BSA further accepted the Coalition's demand to propose findings to be made by the bankruptcy court that the claimants hoped would make claim awards under the TDPs binding on insurers in coverage litigation, notwithstanding the rights and obligations for insurance coverage set forth in its insurance contracts.  (A. 3511-3516 (Harrington).)   These findings included:

- The Plan Documents (including the Plan) and the Confirmation Order shall be **binding on all parties in interest consistent with applicable legal doctrines, including the doctrine of res judicata and collateral estoppel**, and section 1141 of the Bankruptcy Code (and related legal authority);

- The procedures included in the Trust Distribution Procedures pertaining to the allowance of Abuse Claims and (ii) **the criteria included in the Trust Distribution Procedures pertaining to the calculation of the Allowed Claim Amounts, including the Trust Distribution Procedures' Claims Matrix, Base Matrix Values, Maximum Matrix Values, and Scaling Factors (each as defined in the Trust Distribution Procedures), are appropriate and provide for a fair and equitable settlement of Abuse Claims based on the evidentiary record offered to the Bankruptcy Court** as required by and in compliance with section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, provide adequate and proper means for the implementation of the Plan as required by and in compliance with section 1123 of the Bankruptcy Code, comport with the requirements for the issuance of the Channeling Injunction under section 105(a) of the Bankruptcy Code, and otherwise comply with the Bankruptcy Code and applicable law;

42

TrustApp556

- **The right to payment that the holder of an Abuse Claim has against the Debtors or another Protected Party or a Limited Protected Party is the amount of such Abuse Claim as determined under the Trust Distribution Procedures** …. ;

- The Plan **and the Trust Distribution Procedures** were proposed in good faith and are sufficient to satisfy the requirements of section 1129(a)(3) of the Bankruptcy Code.

(A. 13175-13179 (Plan, Art. IX.A.3) (emphasis added); s*ee also* A. 13130-13132 (Redline, Art. IX.A.3).) Inclusion of findings in the plan that the TDPs specifically had been proposed in good faith and were appropriate, fair, equitable, and binding on insurers was, at best, superfluous under the Bankruptcy Code.  Indeed, if these findings were adopted, they would have impeded insurers' ability to contest claim awards pursuant to the TDPs in coverage litigation.

Although approval of these findings was a binding "condition precedent" to confirmation, the plan put forward for confirmation made clear that they would *not* apply to parties settling with BSA for fixed amounts prior to confirmation (including any settling insurers). (A. 13175 (Plan, Art. IX.A.3 n.3).)

The claimants' lawyers were transparent as to why they wanted these findings.  The FCR testified that they were "essential" to "limit the

43

insurers' ability" to re-litigate matters such as "the appropriateness of the values set forth in the TDPs or the processes by which the TDPs were negotiated and developed." (A. 6318-6320 (Patton); *see*, *e.g.*, A. 2567 (Patton) (Finding AA necessary to prevent insurers' "abdicat[ing] from their responsibility"), 2601-2602 (Finding W necessary for "no special outs for insurers"), 2605-2606) (Finding Y necessary to avoid a *Fuller-Austin* situation), 2610 (Finding Y necessary to avoid "penalizing" the trust); *see also* (A. 2724 (Patton) (plan proponents seeking to "captur[e] additional insurers").)

Thus, while BSA's plan included generic language arguably purporting to preserve rights and obligations in the insurers' contracts—and claims that it subjectively believed such language was sufficient to protect the rights of insurers "to the extent any such rights exist" (*see*, *e.g.*, A. 6171, 6175, 6183 (Azer))—BSA accepted a number of proposals from the claimant attorneys designed to circumvent those protections.

When the insurers learned that BSA had been negotiating with the claimants, they offered to discuss TDPs that were consistent with their policies (A. 1789-1790, 1794-1795, 6184-6185 (Azer); *see* A. 12901-12905), but BSA responded that doing so would "scuttle the deal between the

44

TrustApp558

debtors and the TCC, coalition, and FCR," and "effectively require the debtors to negotiate a new set of TDPs" (A. 1916, 1658-1660, 1790, 1795-1796 (Azer)).  BSA never meaningfully engaged with the Certain Insurers thereafter.  (A. 6185 (Azer).)  Instead, on June 18, 2021, BSA incorporated the claimant lawyers' demands into the Third Amended Plan.

### (f) Collaborating to Further Prejudice the Certain Insurers

For nearly the next year, BSA acceded to further requests to prejudice non-settling insurers.  In July 2021, BSA filed a Fourth Amended Plan that prohibited the Settlement Trustee from ever denying recovery on a time-barred claim and incorporated the Restructuring Support Agreement, which completed the arrangement between BSA and the claimant representatives.  (A. 6175 (Azer), 6298-6299 (Patton); *see* A. 13162, 13165-13165 (Redline, TDPs Art. VIII(E)(iii), Schedule 1).)  The Fourth Amended Plan required that BSA abandon Hartford and its settlement as well.  (A. 6298-6299 (Patton).)  Hartford objected that the RSA was "collusive" and "designed, at every step, to allow Abuse Claims that would never be allowed—even filed—in the tort system and to force Hartford and the other insurers to pay the wildly inflated bill." (A. 7791.)  Other insurers similarly argued that BSA was colluding and seeking to

45

abrogate insurers' rights.  (*See*, *e.g.*, A. 7612-7789, 7802-7966.) Hartford eventually re-settled with BSA after increasing its contribution to the Settlement Trust, and that settlement was incorporated into the Fifth Amended Plan filed on September 15, 2021.  (A. 6299-6300 (Patton).)  The TCC, however, "remained unpersuaded" by the amount of contributions to the Settlement Trust.  (A. 6300-6302.)

As the Plan moved toward a vote and confirmation hearing, several additional insurers settled (A. 405 (Plan, Art. I(A)(279)) and BSA continued to seek the overwhelming support of claimants for its broad releases under the premise, developed with its expert Bates White, that "the Base Matrix Value column for each tier [in the TDPs] represents the *default Allowed Claim Amount* for an Allowed Abuse Claim assigned to a given tier, *in each case based on historical abuse settlements and litigation outcomes*."  (A. 11061 (emphasis added); *see* A. 12923.)

BSA was forced to make further concessions, however, when Dr. Charles Bates reexamined historical data and discovered far fewer single-victim abuser claims than previously disclosed.  (A. 2306-2311 (Bates).)  Extrapolated into the TDPs, this cut BSA's estimated aggregate liability on direct abuse claims roughly by *half*.  (A. 2311 (Bates).)  For

46

TrustApp560

single-abuser penetration claims alone, the Settlement Trustee would need to scale down the Base Matrix Values in the TDPs by *approximately 90%* to render claim awards consistent with BSA's historical litigation outcomes.  (A. 2435 (Bates).)

On January 18, 2022, claims administrator Omni Agent Solutions reported that of the 53,596 claimants who voted, only 73.6% supported the Plan (A. 11288 (Nownes-Whitaker)), which was  not a "substantial majority," *Master Mortg.*, 168 B.R. at 935.  Shortly thereafter, the TCC filed a report reiterating that the Plan could not be confirmed because the "nondebtor, third-party releases that form the core of the Plan must enjoy the overwhelming support of those parties affected by such releases."  (A. 8244 (citing *Master Mortgage*, 168 B.R. at 930).)

In response, BSA filed a statement attaching a new Bates Rebuttal Report, noting that Dr. Bates revised his estimated range of aggregate liability from $2.4 billion to $7.1 billion to a lower, "more likely" range of between $2.4 and $3.6 billion.  (*See*, *e.g.*, A. 2222 (Bates).)  Given that refined range, BSA "anticipate[d] *payment in full* to holders of allowed claims in Class 8 [abuse claims] in accordance with the Trust Distribution Procedures."  (A. 8277; *see* A. 6399-6400, 6404 (Gutzler).)

47

This conclusion that claimants were "paid in full"—one of the key factors courts consider when determining whether to approve third-party releases—arguably would allow BSA to exit bankruptcy with the plan's releases intact, without additional support of the TCC or additional claimants. *See*, *e.g.*, *Master Mortg.*, 168 B.R. at 935.

Yet the failure of claimants to overwhelmingly approve the plan presented a material risk to confirmation. (A. 6302 (Patton).) The Coalition and FCR, along with BSA, therefore "negotiated with the TCC" to enlist the support of those holdout abuse claimants. (A. 6302–6303 (Patton), 6029-6033 (Desai).) BSA agreed to consult with the claimants groups about how Dr. Bates would testify and committed to limiting the import of his important testimony. (A. 8545-8546, 8617, 8788.)

BSA also once again agreed to several new plan provisions aimed at the insurers. (A. 6202-6203 (Patton).)

First, BSA agreed to insert an additional "insurance finding" into the Plan, asserting (falsely) that the Base Matrix Values were consistent with BSA's prepetition litigation outcomes despite the fact that the refined Bates analysis contradicted the finding. (A. 1773 (Azer), 3515 (Harrington).) BSA's counsel, who would later testify about the supposed

48

intent behind various plan provisions, purportedly never read Dr. Bates's reports and was never informed that Dr. Bates concluded that the Base Matrix Values required a significant discount.  (A. 1780-1782 (Azer).)

Second, BSA agreed to amend the Plan to add an "Independent" Review Option ("IRO") for the claimants to access additional insurance proceeds exceeding the matrix's already-inflated valuations.  (A. 6188–6189 (Azer); *see* A. 531-537 (TDPs, Art. XIII); *see also* A. 13373-13379 (Redline, TDPs, Art XII).)

The plan proponents designed the IRO to target "excess" insurers, contrary to BSA's prepetition practice of working with insurers to limit liability as required by duty of cooperation provisions within their policies, and anticipated that the IRO would create further settlement pressure.  (A. 2922 (Gutzler).)

Under the IRO, a third party (the so-called "Neutral") reviews the claim and makes a recommendation to "replicate" what a jury may award in the tort system without the $2.7 million maximum value in the Claims Matrix.  (A-5990 (Burnett), 6188–6189 (Azer).) If the Settlement Trustee agrees, that amount becomes the allowed amount.  If the Settlement Trustee disagrees, the claimant may file a tort suit.  (A. 5990 (Burnett).)

49

TrustApp563

While the IRO provides for certain, limited insurer participation, it does not provide nearly the same rights and involvement that an insurer would have if those claims were brought in the tort system.  (A. 3518-3519 (Harrington).)  For example, the TDPs do not state that the insurer may be involved in negotiating a settlement, asking questions in an interview or deposition, or supporting defenses raised through investigation or depositions.  (A. 3569-35763 (Harrington).)

The only defined rights provided to the insurers under the IRO are the ability to attend, but not to ask questions or conduct any cross-examination at, any interview or deposition, to "review and comment" on the Neutral's evaluation, and to "present any applicable defenses to . . . the Neutral," without the benefit of discovery in support of any defense. (A. 531-532 (TDPs, Art. XIII.A); *see*, *e.g.*, A. 3518–3519 (Harrington).)

Finally, BSA agreed to a so-called "Document Appendix," which requires BSA to turn over extensive information (including troop rosters, lists of perpetrators, and handbooks) (A. 3984-3987 (Bitar), 5966 (Burnett))—troves of information that BSA likely would not just hand over in the tort system—and which permitted abuse claimants and the Trustee to use extraordinary discovery authority under Bankruptcy Rule

50

TrustApp564

2004 against parties other than BSA.  (A. 6190-6191 (Azer).)  These provisions would permit claimants' attorneys to wield vast discovery power *before* submitting claims to the trust so they can repair defects and facilitate recovery for thousands of claims they filed.

### B.    The Confirmation Hearing and Opinion

The bankruptcy court held a six-week trial beginning in March 2022.  The Certain Insurers and BSA, among others, presented testimony from numerous witnesses, some live and others by declaration or deposition.  The court issued a confirmation opinion on July 29, 2022, declining to confirm the plan unless BSA made significant changes.

The court declined to enter the disputed "Insurance Findings," which the court recognized were intended "to preclude post-confirmation litigation on the process embodied in the TDP."  (A. 179-181; *see* A. at 178-196.)   The court repeatedly explained that it would not enter unnecessary findings and that the legal effect of its ruling would be left for coverage litigation.  (A. 193-194 ("The *res judicata* or collateral estoppel effect of any Order I issue confirming the Plan is for a future court to decide in the context of specific litigation."), A. 194 ("What insurers are obligated to pay under their policies is an insurance coverage

51

TrustApp565

issue that is not before the court.").)  Because "the allowed amount of a claim is a matter of bankruptcy law," the court permitted a finding that "the allowed amount of a claim" is "determined under the TDP," again cautioning that "[w]hether an insurance coverage court will find any relevance to [that] Finding is for that court to consider."  (A. 194-195.)

The court nevertheless concluded that the plan was proposed in good faith.  The facts underlying that ruling are largely undisputed.  But although the law required the court to consider the totality of the evidence, *see*, *e.g.*, *Exide*, 2021 WL 3145612, at *11, the court committed legal error by viewing each of the pieces of evidence supporting a lack of good faith in siloed fashion.  It reasoned that BSA had not colluded with claimant representatives when drafting plan provisions on the sole basis that BSA's counsel testified that he believed that he successfully negotiated with the claimants to protect insurers' rights.  (A. 220-224.) And although the court required, without specifics, the imposition of anti-fraud measures (A. 217-219), the court reasoned that other indications of wrongdoing, when each was viewed in isolation, such as attorneys' misconduct, or an agreement to propose prejudicial findings, did not warrant requiring a new plan (A. 224-242).

TrustApp566

The court further overruled objections to the proposed assignment of BSA's insurance rights because it believed they merely raised issues that should be left for coverage litigation. The court explained that bankruptcy law permits BSA to "transfer [its] property rights consistent with applicable state law." (A. 259.) Yet the court did not analyze whether the assignment is consistent with state law.

To the extent the court even addressed this objection, it reasoned that the "insurance neutrality" sought by the insurers is merely a "standing concept" that does not permit denial of plan confirmation (A. 223, 238, 255-258; *see* A. 191 (finding no reason to consider how TDPs differ from the tort system)), and that the plan will not "necessarily" lead to increased cost or liability to such insurers in any event because the Trustee's future conduct is uncertain and the court would not anticipate "how an insurance coverage court" would resolve coverage litigation (A. 231, 237-238, 259-260.)

Moving to what the court believed was the "real question" in the case—"what is the consequence" of the proposed assignment—the court declined to answer that question because "the many provisions defining obligations are not uniform nor necessarily governed by the same law."

53

TrustApp567

(A. 258-260.)  The court explained that "[e]ach contract will need to be interpreted under applicable law in the context of a specific dispute." (A. 260.)  "If the obligations form the basis for claims, they will be treated accordingly.  If the obligations are conditions precedent, then the Non-Settling Insurance Companies may be able to assert those conditions as a defense to performance." (A. 260.)  Although the court confirmed the plan, the court never concluded that BSA met its burden of demonstrating that the assignment of insurance rights was permissible.

## C.    The Court Rejects Further Efforts to Prejudice Insurers and then Confirms the Plan

After the court's opinion, BSA conferred with the claimant groups about further plan revisions.  (A. 9129-9130.)  It then filed a motion for "supplemental" findings and confirmation of a revised plan.  (A. 9025.)

Continuing their efforts to limit the import of Dr. Bates's testimony, the new provisions included a "supplemental" finding that would have stated that the court's crediting of Dr. Bates's valuation opinions  was "not intended to limit" the liability of non-settling insurers, and a revised finding prejudging what such insurers would be obligated to pay in coverage.  (*See*, *e.g.*, A. 9054.)  BSA provided virtually no justification for these provisions beyond a threadbare mention in an appendix to its reply

TrustApp568

brief. (A. 9029-9042, 9191-202, 9205-9206.) Instead, the claimant groups supported their inclusion. (A. 9217-9244.)

The court heard argument and again declined to confirm the plan without further revisions. D.I. 10288. All argument regarding the Certain Insurers was advanced by the claimant representatives, rather than BSA. (A. 9260 ("[Counsel for the FCR] is going to handle the argument with respect to the certain insurers on behalf of the . . . 'plan supporting parties.'").) The court rejected many such arguments, noting that it would not enter a finding that the "[insurance] assignment is authorized and permissible" "unless we can make sure that it is accurate;" and that the court again had "a problem with" the new insurance findings. (A. 9282-9283, 9289, 9296-9297.)

Following argument, the parties engaged in mediation to conform the proposed findings to the Confirmation Opinion, narrowing certain disputes. (A. 995.) The court then resolved the remaining issues (A. 9948-1001), and entered the Confirmation Order confirming a final plan (A. 282-848). The Certain Insurers appealed.

TrustApp569

## SUMMARY OF ARGUMENT

The bankruptcy court erroneously concluded that the plan was proposed in good faith.  The record makes clear that BSA proposed a plan at the claimants' behest that would dramatically inflate claims and provide a windfall at insurers' expense.  Although much of the evidence standing in isolation itself is sufficient to demonstrate a lack of good faith, the court failed to consider the "totality of the circumstances" in which the plan was proposed,  which clearly demonstrates a lack of good faith, and in doing so committed legal error.

The court then compounded its error by emphasizing that the plan was improved by the removal of prejudicial insurance findings and appointment of a well-regarded Settlement Trustee.  But that "no harm, no foul" analysis is not the proper approach for evaluating the plan, as BSA made such improvements only at the direction of the district court and only after it acted with a lack of good faith.   Furthermore, the improvements do not cure the harm that will result from confirmation of this plan.

The bankruptcy court also emphasized the testimony of one BSA witness about his subjective beliefs regarding the plan.  Whether or not

56

he believed he was protecting insurers' rights, BSA ultimately joined in claimants' efforts to handicap its insurers, which is not good faith.

Even if this Court were inclined to conclude that the plan was proposed in good faith (and it should not), it should reverse for the separate and independent reason that the plan still seeks to impermissibly abrogate insurance contracts. The bankruptcy court erroneously declined to engage with this issue because it believed "insurance neutrality" is merely a "standing concept." But while courts recognize that insurers can challenge a non-neutral plan, that does not mean that a debtor can simply abrogate contractual rights. To the contrary, it is a bedrock principle of law that contractual rights do not expand or contract by happenstance of bankruptcy.

The plan runs afoul of this principle because it seeks to rewrite insurance policies by eviscerating contractual rights and obligations that would apply in the tort system, which functions in every court in this country as an adversarial system to arrive at a just result, and replaces that system with dispute resolution that aligns BSA with the claimants.

Before capitulating to claimants' counsel, BSA attempted to negotiate a plan that expressly protected insurers' rights, but BSA chose

57

to remove any such protections at the insistence of the claimants.  The limited "protections" still in the plan are circular and potentially illusory.

The bankruptcy court also erred in declining to consider whether BSA met its burden on such issues.  Whatever the consequences of BSA's proposed assignment may be, they are entirely separate from whether it is permissible under the Bankruptcy Code, consistent with state law, and it is not.  The current plan inflicts harm on the insurers by inflating their potential exposure and gutting contractual rights—harms that would not exist but-for the erroneous confirmation order.

## ARGUMENT

The bankruptcy court erred in confirming the plan because BSA failed to meet its burden of demonstrating that the plan satisfies the requirements of confirmation.  BSA's plan was designed to inflate claim volume and values, to circumvent BSA's contractual obligations, and to deprive insurers of critical rights, and the plan continues to do just that. This Court should reverse.

TrustApp572

I. **THE BANKRUPTCY COURT ERRED IN CONFIRMING A BANKRUPTCY PLAN THAT WAS NOT PROPOSED IN GOOD FAITH.**

The plan, proposed by BSA at the insistence of plaintiffs' lawyers seeking to inflate claims and expand insurance coverage, was not proposed in good faith.  11 U.S.C. § 1129(a)(3).

A. **The Bankruptcy Court Erred in Focusing on the Evidence Piecemeal, Rather Than Employing a "Totality of the Circumstances" Approach.**

To satisfy the good faith requirement, a plan must facilitate certain objectives such as "giving debtors a fresh start in life, *discouraging debtor misconduct*, [expeditiously distributing] the bankruptcy estate ... , and achieving *fundamental fairness and justice*."  *In re Exide Holdings, Inc.*, 2021 WL 3145612, at *11 (D. Del. July 26, 2021) (emphases added) (quotation marks omitted).  The plan must also have been proposed "*fairly*" (*In re Am. Capital Equip., LLC,* 688 F.3d 145, 156, 158 (3d Cir. 2012) (quotation marks omitted))—that is, "with honesty and good intentions," and result from "fundamental fairness in dealing with the creditors." *Exide*, 2021 WL 3145612, at *11 (quotation marks omitted).

Accordingly, "'[g]ood faith is shown when the plan has been proposed for the purpose of ... preserving the value of the bankruptcy estate, and delivering that value to creditors'"; on the other hand, "'[g]ood

TrustApp573

faith has been found to be lacking if a plan is proposed with ulterior motives.'" *In re Emerge Energy Servs. L.P.*, 2019 WL 7634308, at *16 (Bankr. D. Del. Dec. 5, 2019) (citations omitted). Courts analyzing good faith must consider the "totality of the circumstances surrounding the plan's proposal." *Exide*, 2021 WL 3145612, at *11 (quotation marks omitted).

The lack of good faith giving rise to this plan is precisely the sort of "abuse which must be guarded against to protect the integrity of the bankruptcy system and the rights of all involved in such proceedings." *SGL Carbon*, 200 F.3d at 169. The Third Circuit has recognized the "'profoundly serious'" concerns raised when a debtor has "'sold out [its] insurers" by "'setting up a system'" in which "'ginned-up'" claims are paid in exchange for claimants voting in favor of that plan. *Federal-Mogul*, 684 F.3d at 362 (quoting *Global Indus. Techs.*, 645 F.3d at 214).

That is what took place here. The claimants' lawyers generated an explosion of claims and then leveraged them to strong-arm BSA into proposing a plan designed to dramatically inflate claim payments and provide a windfall to claimants and their counsel at insurers' expense.

TrustApp574

**Explosion of Claims.**   Claimants' attorneys viewed the bankruptcy as an opportunity to enrich themselves and aggressively advertised it to drum up tens of thousands of claims that never would have been brought in the tort system.  They filed untold questionable claims generated by sanctionable conduct to control the bankruptcy and generate potentially billions of dollars in fees.  See *supra* at 17-22

Rather than seek disallowance of such claims, or propose a plan that fairly accounted for its actual liability, BSA baked that lack of good faith *into its plan*.  Throwing its insurers overboard, it reached its own favorable settlement capping its own exposure and retained some of its most valuable assets and then used the bankruptcy to obtain third-party releases for its local councils and chartered organizations that required the overwhelming support of the lawyers' "clients."  See *supra* at 39-40. Everyone would win out in the bankruptcy except for the insurers.

**Inflationary TDPs.**  BSA collaborated with claimants' counsel to insert a labyrinth of provisions that would provide that windfall.  BSA proposed a plan that would require a Settlement Trustee to pay thousands of time-barred and meritless claims that BSA never would have faced, let alone settled, in the tort system.   While the plan

61

proponents were characterizing the TDPs as reflecting BSA's prepetition litigation history, they were proposing to entrust a Settlement Trustee with massive discretion in valuing claims, with enormous discounts required to bring the vast majority of claim awards actually in line with what they would have received in the tort system.  See *supra* at 25-31.

**Impairing Contracts.**  BSA knew that the plan would disregard contracts with its insurers, including the rights of insurers to defend claims and to consent to settlements, and BSA's obligation to cooperate in a defense.  BSA nevertheless proposed a plan that assigned insurance rights, but not the policies or obligations under the insurance contracts. The result would fundamentally alter the economic bargain between the parties.  See *supra* at 32-34.

**Controlling the Trustee.**  BSA acquiesced in claimants' control over the Settlement Trustee, first acceding to the appointment of a trustee with extensive personal and professional relationships with claimants' counsel, then agreeing to dominance exerted in numerous ways by the STAC and FCR (comprised of claimants' lawyers) over the Settlement Trustee's determinations.  See *supra* at 34-37.

TrustApp576

**Binding Insurers.**  BSA joined the claimants' lawyers' decades-long quest for the "Holy Grail"—insurance findings that had the sole and express purpose of binding insurers who had not settled to inflationary formulas in the TDPs, which, by BSA's own admission, bore no relationship to BSA's prepetition litigation outcomes.  These findings had no legitimate bankruptcy purpose, as even the bankruptcy court found in directing BSA to strike them from the plan.  See *supra* at 23-24, 37-45.

**The TCC Settlement.**  To secure overwhelming claimant support, BSA sought an additional court finding intended to bind insurers to the TDPs; agreed to a so-called "independent" review process that targeted excess insurers with uncapped recoveries; agreed to provide claimants' counsel with extraordinary discovery authority to paper over defects in thousands of claims they had signed and filed; and even agreed to downplay BSA's own expert's testimony at trial regarding the likely low amount of aggregate liability from the claims.  See *supra* at 45-51.

**Further Efforts After the Confirmation Opinion.**  Even after the bankruptcy court had already altered certain aspects of the plan, and struck the insurance findings, BSA proposed still more findings at the claimants' insistence regarding insurers' obligations that were expressly

TrustApp577

advocated for by the claimants' attorneys in an attempt to prejudice the insurers.  See also *supra* at 54-55.

<p style="text-align:center">* * *</p>

The plan proponents knew that these mounting, sustained efforts would create a "hydraulic pressure" to settle with BSA and thereby fund a trust for abuse claims irrespective of liability.  *Newton*, 259 F.3d at 164; *see, e.g., Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 189 (1994) ("Because of the uncertainty of the governing rules, entities ... may find it prudent and necessary, as a business judgment, to abandon substantial defenses and to pay settlements in order to avoid the expense and risk of going to trial."); *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 559 (requiring civil plaintiffs to plead plausible claims because "the threat of discovery expense will push cost-conscious defendants to settle even anemic cases").

That pressure is fundamentally inconsistent with the core purpose of the good-faith requirement, which seeks to ensure that a bankruptcy will "*preserv[e]* ... ongoing values in a manner which does equity and is fair to rights and interests of the parties affected."  *SGL Carbon*, 200 F.3d at 161.  The leverage exerted by the claimants' lawyers from the outset

TrustApp578

permitted that constituency to seek a massive windfall and unfairly threaten to strongarm plan objectors into settling before they could ever press their objections at trial.  (*See*, *e.g.*, A. 238 (claiming that insurance neutrality is merely a "standing" doctrine because previous precedent had reached that procedural posture).)

This form of conduct follows a playbook that plaintiffs' lawyers have been seeking to implement for years, and will continue to attempt in other mass tort bankruptcies unless halted by the courts.  *See*, *e.g.*, *Combustion Eng'g*, 391 F.3d at 216-20 (modification of insurance neutrality provisions); *Fuller-Austin Insulation Co. v. Highlands Ins.*, 38 Cal. Rptr. 3d 716, 724 (Cal. App. 2006) (rejecting assertion that plan confirmation was a final adjudication establishing liability for insurance coverage); A. 4203 (Amala) (strategy was to get binding TDPs and then leverage precedent in other bankruptcies); A. 7311 (BSA conceding that claimant lawyers were setting BSA up "for the most epic battle these courts have ever seen between plaintiff lawyers on the one hand and insurers on the other hand"); *supra* at 34-35 (trustee and claimants).

That is why courts have rejected similar attempts to misuse the bankruptcy process.  In *American Capital*, for example, the Third Circuit

TrustApp579

held that a plan in an asbestos case was "patently unconfirmable" because it was not proposed in good faith. *See id.* at 159-61, 164. The Court emphasized that (1) the plan provided for tort claims to be paid by a trust funded by an assignment of insurance rights, (2) the claims would be resolved according to procedures that gave decisionmakers "financial[] incentiv[es] to sabotage [the debtor's] own defense" and maximize the claims insurers would be asked to pay, (3) the TDPs would "severely limit[] or eliminat[e] Insurers' ability to take discovery, submit evidence, contest causation, [or] appeal a decision," and otherwise "strip[] Insurers of [their] procedural and substantive rights"; and (4) the case was unlike an asbestos case, where a trust is typically funded by ongoing debtor contributions. *Id.* at 158-61.

Similarly, in *In re ACandS, Inc.*, a court found that a plan had not been proposed in good faith because it had been drafted primarily by and for the benefit of a prepetition committee and memorialized a prepetition settlement to the detriment of other claimants. 311 B.R. 36, 43 (Bankr. D. Del. 2004); *see also In re Coram Healthcare Corp.*, 271 B.R. 228, 233-40 (Bankr. D. Del. 2001) (conflict of interest between a debtor officer and a creditor "easily" precluded a finding of good faith). The Third Circuit

66

has dismissed cases outright for egregious attempts to use bankruptcies to gain a tactical litigation advantage. *See SGL Carbon*, 200 F.3d at 166-67 (bankruptcy filed to obtain litigation advantage); *In re Integrated Telecom Express, Inc.,* 384 F.3d 108, 120 (3d Cir. 2004) (same).

So too here: BSA repeatedly embraced the demands of claimant representatives who sought to dramatically inflate the number of claims and to bind insurers to gain an advantage in coverage litigation—all in an effort to enrich themselves. While much of this evidence was so egregious that it alone demonstrates a lack of good faith, that bar need not even be cleared because a court must conduct a holistic analysis of the "totality of the circumstances" giving rise to the plan's proposal. *Exide*, 2021 WL 3145612, at *11 (quotation marks omitted).

The bankruptcy court never answered the fundamental question whether the *plan* as proposed was in good faith because it erroneously analyzed the record evidence piecemeal, concluding that certain elements such as the explosion of claims or BSA's proposed findings, did not in isolation demonstrate a lack of good faith. (*See, e.g.*, A. 230 ("I reject out-of-hand the notion that this explosion of claims, alone, could be grounds for denial of confirmation."); *see also* A .223, 228-31, 238, 240-41.) In

67

doing so, the court missed the forest for the trees and confirmed a plan that was likely to inflate the number and value of claims regardless of merit and seeks to hamstring insurers' ability to defend themselves. That is not good faith, and the bankruptcy court committed reversible error in holding otherwise.

BSA did not have to follow this path. BSA could have sought to disallow fraudulent or meritless claims. BSA could have proposed a plan that accounted for insurers' rights. But the strategic decision for BSA to align itself with abuse claimants is no reason to sanction misuse of the bankruptcy process.[9]

## B. The Bankruptcy Court Erred in Concluding That Certain Improvements to the Plan Were Sufficient to Remedy a Lack of Good Faith.

The bankruptcy court compounded its erroneous analysis by emphasizing that certain individual components of the plan have improved in the period prior to confirmation. For example, the court repeatedly emphasized that it had rejected the proposed "insurance

---

[9] In addition to the arguments made herein, the Certain Insurers hereby join in the Opening Brief on Appeal of the Liberty Insurers and the Allianz Insurers Regarding Treatment of Class 9 Claims and Related Matters, which is being filed concurrently herewith.

68

findings," thereby permitting insurers to assert claims and defenses in coverage litigation.  (*See* A. 223-224, 227-228, 231-238, 240-242.)  The court also noted that the TDPs now would be implemented by a well-respected Settlement Trustee.  (*See* A. 223-24, 229, 237-38.)

These changes do not solve the fundamental problem with the proposed plan.  The bankruptcy laws require that a debtor *propose* a plan in good faith (11 U.S.C. § 1129(a)(3))—meaning that the proposal must be designed to further the laudable objectives of the bankruptcy system, not to do the minimum that would satisfy the court.

### 1.    Improving the Plan at the Court's Direction Does Not Demonstrate Good Faith.

The bankruptcy court's reliance on removing some of the worst aspects of this plan was legally erroneous.  *In re Grasso*, 490 B.R. 500, 511 (Bankr. E.D. Pa. 2013) (rejecting a "no harm, no foul" analysis).

A bankruptcy judge determining whether a plan is proposed in good faith is not tasked with simply *removing* portions of the plan that it finds problematic.  If the plan as a whole is proposed with ulterior motives, it should not be confirmed.  *See*, *e.g.*, *In re Emerge Energy Servs. L.P.*, 2019 WL 7634308, at *16 (D. Del. Dec. 5, 2019) ("In determining whether a plan is proposed in good faith, courts … focus[] "'more to the process of

69

TrustApp583

plan development than the content of the plan.'"); *In re RTI Holding Co., LLC*, 2021 WL 4994414, at *9 (Bankr. D. Del. 2021) ("The requirement of § 1129(a)(3) 'speaks more to the process of plan development than to the content of the plan.'" (citation omitted)); *In re Genesis Health Ventures, Inc.*, 266 B.R. 591, 609 (Bankr. D. Del. 2001) ("[G]ood faith looks to the purposes that would be achieved by the plan.").

That is because a Chapter 11 reorganization presents an "inviting safe harbor" for the debtor as well as an opportunity for creditors to preserve assets, but those same benefits create "the possibility of abuse which must be guarded against to protect the integrity of the bankruptcy system and the rights of all involved in such proceedings." *SGL Carbon*, 200 F.3d at 169.  The debtor and creditors understandably may seek to benefit their interests, but the point of Chapter 11 is to preserve the debtor's limited estate and distribute it in an equitable manner.

Courts accordingly make clear that even where a plan provides for a fresh start and expeditious property distribution, it cannot satisfy the good faith requirement unless it was proposed "with honesty and good intentions," in "fundamental fairness," and "discourag[es] debtor

TrustApp584

misconduct." *Am. Capital Equip., LLC,* 688 F.3d at 156, 158. These requirements combat the temptation to abuse the bankruptcy process.

Such concerns implicate more than the particular details of a single plan. Like patent suits, bankruptcy proceedings do "not concern only private parties. There are issues of great moment to the public." *Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, 322 U.S. 238, 246 (1944). And abuse of the Chapter 11 process for delivering a litigation advantage "involves far more than an injury to a single litigant. It is a wrong against the institutions set up to protect and safeguard the public, institutions in which fraud cannot complacently be tolerated consistently with the good order of society." *Id.* Confirming a plan in which the debtor still has yet to act with good intentions and fundamental fairness would merely encourage further "misconduct." *Am. Capital Equip.*, 688 F.3d at 158.

To be sure, the court in this case *improved* the plan by directing BSA to strike the prejudicial findings and permitting insurers to defend themselves in coverage litigation, just as it did when it required the proposal of ani-fraud measures. But the fact that *the bankruptcy court*, not BSA, rejected some of the most egregious aspects of the plan simply illustrates the problem. Likewise, the fact that BSA ultimately proposed

TrustApp585

Judge Houser as Settlement Trustee only after claimants failed to secure the appointment of Professor Green, with whom they had extensive personal and professional relationships, and that BSA continued to acquiesce in their control over the trustee, simply emphasize that BSA has failed to propose a plan that exhibits "fundamental fairness" in dealing with creditors. *Am. Capital Equip., LLC,* 688 F.3d at 156, 158.

The very fact that BSA was forced to improve these and other individual aspects of the plan merely shows that BSA has yet to come to the court with clean hands with respect to the plan as a whole; BSA proposed a plan for illegitimate purposes, and the bankruptcy court was forced to solve (part of) the problem. *See SGL Carbon Corp.*, 200 F.3d at 161 (good faith doctrine stems in part from the "equitable concept of 'clean hands" because "bankruptcy relief is equitable in nature").

### 2. The Bankruptcy Court's Plan Revisions Do Not Cure the Plan's Defects.

In any event, improvements to the plan have not cured the harm it will inflict if the plan remains confirmed.

Because the chicanery that resulted in tens of thousands of meritless or questionable claims was never addressed in this plan, "[t]here is no getting around the fact that pre-bankruptcy Debtors were

72

TrustApp586

facing a few hundred to 1700 Abuse claims and there are now 82,209 Direct Abuse Claims that must be resolved." (A. 230.)

The confirmed plan vastly inflates the insurers' potential exposure while purporting to gut many of insurers' core contractual rights designed to align BSA with its insurers in defense to these dubious claims. Any coverage litigation will follow assessments of liability that are "very different" from the tort system because tens of thousands of claims that would ordinarily be subject to dismissal or never would have been brought still would receive inflated payouts, and insurers must rely upon the Settlement Trustee to dramatically reduce the value of most claims despite Base Matrix Values and other TDP provisions to the contrary. (A. 3994-3995, 4003-4008, 4013-4015, 4024-4026) (Bitar).)

In the meantime, insurers will have no opportunity to participate in a zealous defense, despite their contractual rights, likely resulting in claims that are "very different" than would have been the case in the tort system. (A. 2326 (Bates), 3516-3520 (Harrington), 3976-3979, 3994-3995) (Bitar).) *See Global Indus. Techs.*, 645 F.3d at 212 (plan materially altered the "quantum of liability that the insurers would be called upon to absorb").

73

TrustApp587

All of these circumstances, in their totality, create a "hydraulic pressure" to settle that prejudices insurers as a direct result of the confirmed plan.  See *supra* Pt. I.A.  The good faith requirement was intended to provide a backstop against precisely this sort of abuse.

The bankruptcy court further missed the point that misuse of the bankruptcy process harms individuals who have valid claims in the bankruptcy—here, the bona fide claimants.  As experts on both sides testified, "the truly victimized claimant is put at a disadvantage by the way this has been handled" because the "people who are really deserving are going to end up being hurt by this whole process."  (A. 3435 (Conte)); (*see* A. 3651 (Treacy) (the "real victims in this case deserve to be compensated," but "the people who are fraudulent deserve nothing" and should not be permitted to "dilute" the claim pool at others' expense).)

Put simply: BSA proposed a plan designed not to preserve the value of the estate and deliver value to creditors, but to create a situation where the plan sought insurance payments to the trust for which BSA had never bargained, much of which would line the pockets of the claimants' lawyers.  That is not a good faith plan, and simply removing some of the offending provisions was not enough for this plan to be confirmed.

74

TrustApp588

**C.    The Bankruptcy Court Inappropriately Relied on the Testimony of One BSA Witness About His Subjective Beliefs Regarding the Plan.**

The bankruptcy court also erred by emphasizing the testimony of a single BSA lawyer that he intended to protect insurers' rights from the efforts of the claimants' lawyers.  (*See*, *e.g.*, A. 242 ("Mr. Azer testified that the language is meant to include, but not be limited to, theories of negligence.  One would think this would suffice …."").)  That is not the proper standard for evaluating the plan.  (*See*, *e.g.*, A. 1672 (Azer) (conceding that the Plan's language, not counsel's intent, would be "operative" in future coverage litigation).)

"The term 'good faith' is somewhat misleading.  Though it suggests that the debtor's subjective intent is determinative, this is not the case." *SGL Carbon*, 200 F.3d at 165 (quotation marks omitted).  Instead, it "encompasses several, distinct equitable limitations that courts have placed on Chapter 11 filings.  Courts have implied such limitations to deter filings that seek to achieve objectives outside the legitimate scope of the bankruptcy laws."  *Id.* (quotation marks omitted); *see, e.g., Exide,* 2021 WL 3145612, at *11 (plan must result from "fundamental fairness

75

TrustApp589

in dealing with the creditors," achieve "fundamental fairness and justice," and discourage "debtor misconduct" (quotation marks omitted)).

Whether or not BSA's counsel *thought* he was protecting insurers' rights while negotiating with the plaintiffs' attorneys is irrelevant. What matters is that BSA proposed findings that were concocted by the claimants to abrogate such protections, along with taking numerous other steps designed to prejudice the insurers, at least one occasion unbeknownst to that same counsel. *See supra* at 48-49; *infra* Pt. II.

Thus, regardless of whether a BSA attorney subjectively intended to prejudice the insurers at some point, the totality of the circumstances demonstrate that BSA was complicit in a plan to do just that. *See, e.g.*, *Thgh Liquidating LLC*, 2020 WL 5409002, at *7 (D. Del. 2020) (considering whether "the plan *proponents* (which included the Debtors' secured lenders and the official committee of unsecured creditors) proposed the Plan in good faith" (emphasis added)); *In re Peabody Energy Corp.*, 582 B.R. 771, 783 (E.D. Mo. 2017) (examining the "process employed by the Debtors *and other Plan proponents*, including the mediation process" (emphasis added)). Such a plan has not been proposed fairly and cannot be confirmed.

76

TrustApp590

## II.   THE PLAN ABROGATES THE CERTAIN INSURERS' CONTRACTUAL RIGHTS.

The Court should reverse for the independent reason that the plan is inconsistent with the Bankruptcy Code because it impermissibly abrogates the Certain Insurers' contracts.  *See* 11 U.S.C. §§ 1129(a)(1), (3).  That is a separate legal error requiring reversal.

### A.   The Plan Cannot Be Confirmed Because It Impermissibly Alters the Certain Insurers' Contracts.

In its opinion, the bankruptcy court acknowledged nearly two days of testimony put forward by BSA and the Certain Insurers regarding how the TDPs differ from the tort system contemplated by the contracts, yet dismissed that testimony in a footnote.  (A. 191.)  The court erroneously declined to engage with the plan's real-world impact because the court believed "insurance neutrality" is merely a "standing concept."  (A. 223, 238, 255-258.)

Of course, courts routinely hold that where a plan is not "insurance neutral," insurers have standing to challenge the plan.  *See*, *e.g.*, *Global Indus. Techs.*, 391 F.3d at 209.  But those cases do not stand for the proposition that a Chapter 11 debtor's plan can simply abrogate contractual rights.  *See Davis v. Wells Fargo*, 824 F.3d 333, 348 (3d Cir. 2016) ("standing and merits questions may involve overlapping facts").

77

TrustApp591

To the contrary, courts regularly recognize that insurers are aggrieved when debtors seek to rewrite insurance policy contractual terms. *See*, *e.g.*, *Combustion Eng'g*, 391 F.3d at 218.[10]  And they have done so consistently where a plan would have the real world effect of rewriting the terms of an insurance policy, whether or not it expressly seeks to modify contractual language. *See In re Thorpe Insulation Co.*, 677 F.3d 869, 885 (9th Cir. 2012) (reversing confirmation on the grounds that the plan would "economically affect [insurers] in substantial ways").

That is because it is a bedrock principle that bankruptcy courts "do not have the power to rewrite contracts to allow debtors to continue to perform on more favorable terms." *In re Crippin*, 877 F.2d 594, 598 (7th Cir. 1989).  "Whatever limitation[s] on the debtor's property [apply] outside of bankruptcy ... appl[y] inside of bankruptcy." *Mission Prod.*,

---

[10] *See also*, *e.g.*, *In re Pittsburgh Corning Corp.*, 453 B.R. 570, 604-05 (Bankr. W.D. Pa. 2011) (lack of clarity regarding treatment of insurance claims rendered plan unconfirmable); *Amatex Corp. v. Aetna Cas. & Sur. Co. (In re Amatex Corp.)*, 97 B.R. 220, 221 (Bankr. E.D. Pa. 1989), *aff'd sub nom.*, 102 B.R. 411 (Bankr. E.D. Pa. 1989) (refusing to order insurers to make lump sum payments "contrary to the terms of their policies"); *In re Diocese of Camden, N.J.*, 2022 WL 3369087, at *3-5 (Bankr. D.N.J. Aug. 12, 2022) (insurers sufficiently alleged that plan "stripped of rights and defenses they hold" under insurance policies).

[Footnote continued on next page]

TrustApp592

139 S. Ct. at 1653 (quotation marks omitted).  And bankruptcy courts generally do not have the power to abrogate state law, including state property and contract law.  *See Travelers Cas. & Surety Co. of Am. v. Pacific Gas & Elec. Co.*, 549 U.S. 443, 451 (2007).[11]

Rather, the Bankruptcy Code provides the debtor "with the same rights and defenses" under a prepetition contract as those held by the debtor before the bankruptcy. *Combustion Engineering*, 391 F.3d at 245. This well-recognized principle takes a number of forms, including the requirement that executory contracts be assumed and assigned under

---

[11] *See also*, *e.g.*, *Moody v. Amoco Oil Co.*, 734 F.2d 1200, 1213 (7th Cir. 1984) (Bankruptcy Code is "not intended to expand debtor's rights against others more than they exist at the commencement of the case."); *In re 641 Associates, Ltd.*, 1993 WL 332646 at *8 (Bankr. E.D. Pa. Aug. 26, 1993) ("There is no provision in the Bankruptcy Code allowing a bankruptcy court to disregard state-law contractual rights."); *In re SPM Mfg. Corp.*, 984 F.2d 1305, 1311 (1st Cir. 1993) (bankruptcy courts lack authority to enter orders that "expand the contractual obligations of parties"); *Cissel v. Am. Home Assur. Co.*, 521 F.2d 790, 792 (6th Cir. 1975) (bankruptcy trustee could not obtain recovery from insurer for claims filed against the estate absent a judgment or a written settlement agreement between policyholder, claimant, and insurance company); *In re Green Jacobson P.C.*, No. 15-41404-705, 2017 Bankr. LEXIS 2059, at *14 (Bankr. E.D. Mo. July 24, 2017) ("Neither the Court nor the parties can rewrite the Policy.").

[Footnote continued on next page]

TrustApp593

Bankruptcy Code § 365 *cum onere* or not at all,[12] and the restriction on modifying non-executory contracts through sales under Bankruptcy Code § 363 to increase rights and obligations.[13]  Where a plan threatens to impermissibly modify or impair insurance contracts, some courts refer to this principle as requiring that a plan be "insurance neutral."  But what matters is the principle, not the label: a plan that impermissibly modifies insurance contracts is not confirmable as a matter of law.

In the context of assignments of the debtor's contracts, as in this plan, it is a foundational contractual principle that an assignment of rights may not "materially increase the obligor's [e.g., the insurer's]

---

[12] *See, e.g.*, *Sharon Steel Corp. v. Nat'l Fuel Gas Dist. Corp.*, 872 F.2d 36, 39-40 (3d Cir. 1989) (acknowledging "the general principle that a debtor may not reject a contract but maintain its benefits"); *In re AbitibiBowater Inc.*, 418 B.R. 815, 822-23 (Bankr. D. Del. Oct. 27, 2009) ("An executory contract must be assumed or rejected *in toto* ...  A contract will not be bifurcated into parts that will be rejected and those that will not.") (quotation marks omitted)).

[13] *See, e.g.*, *In re Stewart Foods, Inc.*, 64 F.3d 141, 145 (4th Cir. 1995) ("Because § 365 applies only to executory contracts, a debtor-in-possession does not have the option of rejecting or assuming non-executory contracts and remains bound by the debtor's obligations under those contracts after the bankruptcy's filing."); *In re Am. Home Mortg. Holdings*, 402 B.R. 87, 98 (Bankr. D. Del. 2009) ("[T]he *cum onere* principle applies equally to the transfer of rights and obligations under a non-executory contract pursuant to § 363 of the Bankruptcy Code as to the assumption and assignment of contracts and leases pursuant to § 365.").

TrustApp594

burden or risk under the contract" (29 Williston on Contracts § 74:10 (Westlaw 4th ed. 2022)) or "materially impair [its] chance of obtaining return performance, or materially reduce its value to [the insurer]" (Restatement (Second) of Contracts § 317:2 (Westlaw 2022)).  Thus, while an assignment "carries with it a presumption that the assignee has assumed the assignor's duties of performance," the "most firmly established principle of the law of assignments is that an assignor remains liable to [the insurer] for performing the assignor's duties under a contract."  Modern Law of Contracts §§ 21:18, 21:27 (Westlaw 2022).

The Bankruptcy Code accounts for such fundamental precepts of contract law.  *See Mission Prod.*, 139 S. Ct. at 1663 (explaining that "[t]he estate cannot possess anything more than the debtor itself did outside bankruptcy").  For example, if a contract is executory, the debtor may "fulfill its obligations" and then assign remaining rights *along with obligations* to another party.  *Id.* at 1658 (11 U.S.C. § 365)).[14]  If the contract is non-executory, the debtor may sell the rights under that contract, and remaining *obligations* will be "fulfill[ed]" by the other party.

---

[14] If BSA instead elects to repudiate the contract, the rejection constitutes a breach, and the obligor has a claim against the estate for damages resulting from the debtor's nonperformance.  *Id.* at 1658.

81

TrustApp595

*In re Weinstein Co. Holdings, LLC*, 997 F.3d 497, 505 (3d Cir. 2021) (§ 363)).  In each case, the rights and obligations remain under the contract.

What the debtor may *not* do is assign the rights to executory[15] or non-executory[16] contracts without assuming or assigning corresponding obligations, as BSA seeks to do here.  That would impermissibly modify the debtor's contracts "by happenstance of bankruptcy."  *Mission Prod.*, 139 S. Ct. at 1663; *see, e.g.*, *In re 47 Hops LLC*, 2020 WL 2485808, at *4 (Bankr. E.D. Wash. May 13, 2020) ("Although the bankruptcy law regarding executory contracts is broad, the law does not rewrite contracts wholesale.  For example, the estate representative must address any given contract in its entirety and may not forage among favorable or unfavorable components."); *Weinstein*, 997 F.3d at 505-06 ("[T]he [§ 363] buyer must typically fulfill obligations under the contract it bought after the sale closes, just as it would with any other asset or liability.").

---

[15] *See, e.g.*, *In re Italian Cook Oil Corp.*, 190 F.2d 994, 997 (3d Cir. 1951) ("The trustee may not blow hot and cold.  If he accepts the contract he accepts it *cum onere*.  If he receives the benefits he must adopt the burdens.  He cannot accept one and reject the other.").

[16] *In re Weinstein Co. Holdings, LLC*, No. 18-50924, Dkt. 44 at 137:4-11 (Bankr. D. Del. 2020) ("[T]he concept of a sale free and clear of all liens, claims and interests does not mean that you can sell the benefits of a contract, but not its obligations."), *aff'd*, 997 F.3d at 505.

82

TrustApp596

Indeed, the bankruptcy court implicitly recognized these concepts when it rightly rejected the claimants' suggestion that the "transfer of the insurance rights under the Plan is consistent with" case law involving preemption of "provisions in a private contract that prohibit assignment." (A. 257-258 (citing *Federal Mogul*, 684 F.3d at 363).)  Among other things, the court in that case did not even "have before it the argument made here: whether the rights can be transferred without the correlative obligations."   (A. 258.)   But the court's ruling would not have been necessary if insurer protections were merely a "standing" concept.

Congress recognized that construing the Bankruptcy Code to permit the unilateral impairment of contracts without consent would raise serious constitutional concerns.  *See Louisville Joint Stock Land Bank v. Radford*, 295 U.S. 555, 589-90, 602 (1935) (bankruptcy statute subject to takings protections).  That is why the Bankruptcy Code does not "expand" contractual rights as BSA seeks to do here.  *Moody*, 734 F.2d at 1213.  In light of these constitutional concerns and the Bankruptcy Code's language forbidding confirmation of a plan proposed by "any means forbidden by law" (11 U.S.C. § 1129(a)(3)), the proper course is to reject the attempt to abrogate insurers' contracts and reverse the plan's

83

TrustApp597

confirmation. *See*, *e.g. United States v. Sec. Indus. Bank*, 459 U.S. 70, 78 (1982) (courts must "ascertain whether a construction of the statute is fairly possibly by which the constitutional question may be avoided").

BSA's plan runs afoul of these fundamental principles. The Certain Insurers' insurance policies contemplate resolution of claims through judgments or settlements resulting from an adversarial tort system in which BSA is aligned with its insurers and works with them to mount a zealous defense. (A. 3484-3485, 3487 (Harrington).) But as Professor Harrington, an insurance expert, explained, the plan replaces that system with a mechanism for dispute resolution that "align[s]" BSA with *claimants* and creates an "inherent potential" to benefit them at the insurers' expense (A. 3483, 3487, 3507, 3519 (Harrington)), thereby impairing "key [contractual] rights" (A. 3483, 3485 (Harrington)). See *supra* at 32-34 (impairment of rights and obligations such as insurers' right to defend and insureds' obligations to cooperate in the defense).

The confirmed plan directly prejudices the rights and interests of insurers. It assigns insurance rights without any corresponding obligations, such as BSA's obligation to allow insurers to work with BSA to minimize its liability for abuse claims, whether on statute of

84

TrustApp598

limitations grounds or any other ground arising from the many defects in the plan.  While the court observed that the plan seeks to assign rights from policies with differing terms (A. 258), that is because of the extraordinary breadth of the assignment, and it is BSA's burden to demonstrate that its own plan should be confirmed, not the insurers' burden to prove otherwise.  *See Tribune Co.*, 464 B.R. at 151-52.

BSA recognized the ramifications of proposing such a plan. (A. 7311; *see* A. 7307 (acknowledging that the plan's "treatment of insurance" gets "to the [heart] of what is happening" here).  Before capitulating to claimants' counsel, BSA attempted to negotiate a plan that expressly accounted for such contractual provisions.  But the current plan does not.  BSA chose to remove any such protections at the insistence of the claimants' attorneys to secure support of the creditors.

The plan's few remaining "protections" are not sufficient to safeguard insurers' rights.  Indeed, BSA accepted claimants' proposal to make any such protections *expressly subject to* the "Insurance Assignment"—which seeks to assign the benefits but not the burdens of the contracts—as well as the bankruptcy plan and confirmation order. See *supra* at 25.  That  change rendered the plan's protective language,

TrustApp599

at best, circular and, at worst, illusory.  (*See* A. 1672 (Azer), 3509
(Harrington); *see* A. 490 (Plan, Art. X.M), 511 (TDPs, Art. V.C).)  That
BSA and the claimants could have written the plan more clearly merely
illustrates how BSA failed to meet its burden to put forth a confirmable
plan.

> **B.    The Bankruptcy Court Wrongly Relied on its Rejection
> of the Proposed Insurance Findings As a Basis to
> Overlook the Impairment of the Insurers' Contracts.**

The bankruptcy court again relied on its own rejection of the
proposed insurance findings, and resulting ability of insurers to contest
issues in coverage litigation, to conclude that the plan is confirmable
because the "real question" is not whether the assignment of the debtor's
insurance rights contemplated by the plan abrogates the insurer's
contract rights, but the extent to which, as a consequence of that clear
abrogation, the insurers will actually be harmed.  (A. 258-260.)   The
bankruptcy court's logic appears to be that the answer to this second
question is "no", because insurers have retained the ability to raise the
full panoply of defenses in coverage disputes.  This analysis is flawed.

First, contrary to the bankruptcy court's reasoning, the question in
this case is whether the assignment is permissible under the Bankruptcy

TrustApp600

Code, consistent with state law. *That* question is properly decided by a bankruptcy court, not by a different court deciding a coverage dispute. (*See*, *e.g.*, A. 3546 (Harrington) (The TDPs "eviscerate those rights.... So it will already have happened at that point. What will be determined in a coverage court … would be whether or not that breach should, in fact, resolve or allow the parties seeking recovery to get that money from the insurance company despite the breach.").) The bankruptcy court was required to determine whether the bankruptcy plan is legally permissible before confirming it, but failed to do so. By focusing instead on the opportunity for insurers to raise coverage defenses, the court failed to address their well-founded objection asserted now in the context of plan confirmation (*Lindsey v. Normet*, 405 U.S. 56, 66 (1972); *Mullins v. Direct Dig., LLC*, 795 F.3d 654, 669-70 (7th Cir. 2015))*,* which raises significant "due process" concerns. *United States v. Sec. Indus. Bank*, 459 U.S. 70, 74-75 (1982).

Second, the bankruptcy court overlooked the immediate harm that will be caused by the plan's abrogation of the insurers' contract rights, and cannot be undone by coverage rulings. Regardless of whether the TDPs would bind insurers in other disputes, as BSA proposed, they

TrustApp601

provide for payment on tens of thousands of claims for which there is no guarantee that insurers will ever be afforded an opportunity to align with their insured and work to effect a proper resolution or defense, as required by their contracts.   The result is a plan that, by express design, artificially inflates the Debtor's purported liability, and in doing so, seeks to greatly inflate the insurers' potential exposure and guts their contractual rights, creating a "hydraulic pressure to settle" that exists independent from any outcome in future coverage litigation.   *Newton, Inc.*, 259 F.3d at 164.  These harms would not exist but-for the erroneous confirmation order and cannot, by definition, be ameliorated by decisions in subsequent coverage disputes.  They also explain why the plan, despite the bankruptcy court's rejection of certain of its aspects, continues to enjoy the unanimous support of all the attorneys representing the claimants.

The Court should reverse and remand for BSA to propose a good-faith plan that preserves all rights and obligations under BSA's prepetition insurance contracts.   BSA can easily propose a plan that expressly makes clear that it does not affect any rights and obligations in the operative insurance contracts.  What BSA may not do, however, is

88

use the bankruptcy process to rewrite those contracts without insurers'
consent in order to procure the claimants' votes and emerge from
bankruptcy while retaining some of its most valuable assets.  That result
is inconsistent with the Bankruptcy Code and, unless reversed, will set
bad precedent for years to come.

TrustApp603

## CONCLUSION

The Court should reverse.

Dated:      Wilmington, Delaware
            November 7, 2022

                                        Respectfully Submitted,

                                By:  /s/ Deirdre M. Richards
Theodore J. Boutrous Jr. (*pro hac vice*)    Deirdre M. Richards
Richard J. Doren (*pro hac vice*)            (DE Bar No. 4191)
Blaine H. Evanson (*pro hac vice*)           FINEMAN KREKSTEIN
GIBSON, DUNN & CRUTCHER LLP                  & HARRIS PC
333 South Grand Avenue                       1300 N. King Street
Los Angeles, California 90071                Wilmington, DE 19801
tboutrous@gibsondunn.com                     Telephone: (302) 538-8331
rdoren@gibsondunn.com                        Facsimile: (302) 394-9228
bevanson@gibsondunn.com                      drichards@finemanlawfirm.com

Michael A. Rosenthal (*pro hac vice*)        Susan N.K. Gummow
Mitchell A. Karlan (*pro hac vice*)          (*pro hac vice*)
James Hallowell (*pro hac vice*)             FORAN GLENNON
Keith R. Martorana (*pro hac vice*)          PALANDECH PONZI &
Seth M. Rokosky (*pro hac vice*)             RUDLOFF P.C.
GIBSON, DUNN & CRUTCHER LLP                  222 N. LaSalle St., Suite 1400
200 Park Avenue                              Chicago, Illinois 60601
New York, New York 10166                     sgummow@fgppr.com
mrosenthal@gibsondunn.com
mkarlan@gibsondunn.com
jhallowell@gibsondunn.com
kmartorana@gibsondun.com
srokosky@gibsondunn.com

*Counsel for National Union Fire Insurance Company of Pittsburgh, Pa.,*
*Lexington Insurance Company, Landmark Insurance Company, and the*
*Insurance Company of the State of Pennsylvania*

TrustApp604

/s/ David M. Fournier
David M. Fournier (DE Bar No. 2812)
Marcy J. McLaughlin Smith (DE No. 6184)
TROUTMAN PEPPER HAMILTON SANDERS LLP
Hercules Plaza
1313 Market Street
Suite 5100
P.O. Box 1709
Wilmington, DE 19899-1709
Telephone: 404.885.3000
david.fournier@troutman.com
marcy.smith@troutman.com

-and-

Harris B. Winsberg (*pro hac vice*)
Matthew G. Roberts (*pro hac vice*)
PARKER, HUDSON, RAINER & DOBBS LLP
303 Peachtree Street NE
Suite 3600
Atlanta, GA  30308
Telephone: 404.420.4313
Facsimile: 404.522.8409
hwinsberg@phrd.com
mroberts@phrd.com

-and-

Margaret H. Warner (*pro hac vice*)
Ryan S. Smethurst (*pro hac vice*)
Alex M. Spisak (*pro hac vice*)

/s/ David M. Fournier
David M. Fournier (DE Bar No. 2812)
Marcy J. McLaughlin Smith (DE No. 6184)
TROUTMAN PEPPER HAMILTON SANDERS LLP
Hercules Plaza, Suite 5100
1313 Market Street
P.O. Box 1709
Wilmington, DE 19899-1709
Telephone: 302.777.6500
Facsimile: 302.421.8390
david.fournier@troutman.com
marcy.smith@troutman.com

-and-

Harris B. Winsberg (*pro hac vice*)
Matthew G. Roberts (*pro hac vice*)
PARKER, HUDSON, RAINER & DOBBS LLP
303 Peachtree Street NE
Suite 3600
Atlanta, GA  30308
Telephone: 404.420.4313
Facsimile: 404.522.8409
hwinsberg@phrd.com
mroberts@phrd.com

-and-

Todd C. Jacobs (*pro hac vice*)
John E. Bucheit (*pro hac vice*)
Paul J. Esker (*pro hac vice*)
BRADLEY RILEY JACOBS PC
500 West Madison Street

91

TrustApp605

McDERMOTT WILL & EMERY
LLP
The McDermott Building
500 North Capitol Street, NW
Washington, DC 20001-1531
Telephone: 202.756.8228
Facsimile: 202.756.8087
mwarner@mwe.com
rsmethurst@mwe.com
aspisak@mwe.com

*Counsel for Allianz Global Risks
US Insurance Company*

Suite 1000
Chicago, IL 60661
Telephone: 312.281.0295
tjacobs@bradleyriley.com
jbucheit@bradleyriley.com
pesker@bradleyriley.com

*Counsel for National Surety
Corporation and Interstate Fire &
Casualty Company*

/s/Kathleen M. Miller
Kathleen M. Miller (No. 2898)
SMITH, KATZENSTEIN &
JENKINS LLP
1000 West Street, Suite 501
P.O. Box 410
Wilmington, DE 19899
Telephone: (302) 652-8400
kmiller@skjlaw.com

Ronald P. Schiller (*pro hac vice*)
Matthew A. Hamermesh (*pro hac
vice*)
HANGLEY ARONCHICK SEGAL
PUDLIN & SCHILLER
One Logan Square, 27th Floor
Philadelphia, PA 19103
T: (215) 568-6200
F: (215) 568-0300
E: rschiller@hangley.com
mhamermesh@hangley.com

/s/ Paul Logan
Paul Logan (No. 3339)
POST & SCHELL, P.C.
300 Delaware Avenue, Suite
1380
Wilmington, DE  19801
Telephone:  (302) 251-8856
Email:  plogan@postschell.com

John C. Sullivan (*pro hac vice*)
Kathleen K. Kerns (*pro hac vice*)
POST & SCHELL, P.C.
Four Penn Center – 13th Floor
1600 John F. Kennedy
Boulevard
Philadelphia, PA  19103
Telephone:  (215) 587-1000
jsullivan@postschell.com
kkerns@postschell.com

-and-

George R. Calhoun (*pro hac vice*)

92

TrustApp606

| | |
|---|---|
| *Counsel for Arch Insurance Company* | IFRAH PLLC<br>1717 Pennsylvania Avenue, N.W. Suite 650<br>Washington, DC  20006<br>Telephone:  (202) 840-8758<br>george@ifrahlaw.com<br><br>300 Delaware Avenue, Suite 1380<br>Wilmington, DE  19801<br>Telephone:  (302) 251-8856<br>Email:  plogan@postschell.com<br><br>*Counsel for Argonaut Insurance Company and Colony Insurance Company* |
| /s/ Michael J. Joyce<br>Michael J. Joyce (No. 4563)<br>JOYCE, LLC<br>1225 King Street, Suite 800<br>Wilmington, DE 19801<br>Telephone:  (302) 388-1944<br>Email:  mjoyce@mjlawoffices.com<br><br>-and-<br><br>Kevin Coughlin (*pro hac vice*)<br>Lorraine Armenti (*pro hac vice*)<br>Michael Hrinewski (*pro hac vice*)<br>COUGHLIN MIDLIGE & GARLAND, LLP<br>350 Mount Kemble Avenue<br>PO Box 1917<br>Morristown, NJ 07962<br>Telephone:  (973) 267-0058<br>Facsimile:  973-267-6442<br>kcoughlin@cmg.law<br>larmenti@cmg.law | /s/ Maria Aprile Sawczuk<br>Maria Aprile Sawczuk (DE #3320)<br>GOLDSTEIN & MCCLINTOCK LLP<br>501 Silverside Road<br>Wilmington, DE 19809<br>302-444-6710<br>marias@goldmclaw.com<br><br>-and-<br><br>Laura McNally (*pro hac vice*)<br>Emily Stone (*pro hac vice*)<br>LOEB & LOEB LLP<br>321 N. Clark Street, Suite 2300<br>Chicago, IL 60654<br>312-464-3155<br>lmcnally@loeb.com<br>estone@loeb.com |

93

mhrinewski@cmg.law

-and-

Britton C. Lewis
John M. Flynn
CARRUTHERS & ROTH, P.A.
235 N. Edgeworth Street
P.O. Box 540
Greensboro, NC  27401
Telephone:  (336) 478-1146
Facsimile:  (336) 478-1145
jmf@crlaw.com
bcl@crlaw.com

*Counsel for Arrowood*
*Indemnity Company*

/s / Brian A. Sullivan
Brian A. Sullivan (No. 2098)
WERB & SULLIVAN
LEGAL ARTS BUILDING
1225 N. King Street
Suite 600
Wilmington, Delaware 19801
Telephone: (302) 652-1100
Cell: (302) 757-9932
Facsimile: (302) 652-1111
Email:
bsullivan@werbsullivan.com

John E.W. Baay II (*pro hac vice*)
GIEGER LABORDE &
LAPEROUOSE, LLC
701 Poydras Street
Suite 4800
New Orleans, LA 70139
Tel.: 504-561-0400

David Christian (*pro hac vice*)
DAVID CHRISTIAN
ATTORNEYS LLC
105 W. Madison St., Suite 1400
Chicago, IL 60602
Telephone:  312-282-5282
dchristian@dca.law

*Counsel for The Continental*
*Insurance Company and*
*Columbia Casualty Company*

/s/ Kathleen M. Miller
Kathleen M. Miller (DE Bar No.
2898)
SMITH, KATZENSTEIN &
JENKINS LLP
1000 West Street, Suite 501
P.O. Box 410
Wilmington, DE 19899
Telephone: (302) 652-8400
Email: kmiller@skjlaw.com

-and-

Mary E. Borja (*pro hac vice*)
Gary P. Seligman (*pro hac vice*)
Ashley L. Criss (*pro hac vice*)
WILEY REIN LLP
2050 M Street NW
Washington, DC 20036
Phone: (202) 719-7000

TrustApp608

Fax: 504-561-1011
Email: jbaay@glllaw.com

-and-

William H. White Jr (*pro hac vice*)
KIERNAN TREBACH LLP
1233 20th Street, NW
8th Floor
Washington, DC 20036
Tel.: 202-712-7000
Fax: 202-712-7100
Email:
wwhite@kiernantrebach.com

Counsel for Gemini Insurance
Company
/s/ Bruce W. McCullough
Bruce W. McCullough (No. 3112)
BODELL BOVÉ, LLC
1225 N. King Street, Suite 1000
Wilmington, Delaware 19801-
3250
Telephone: (302) 655-6749
bmccullough@bodellbove.com

-and-

Bruce D. Celebrezze (*pro hac vice*)
CLYDE & CO US LLP
150 California Street | 15th Floor
San Francisco, California 94111
Telephone: (415) 365-9800
Facsimile: (415) 365-9801
bruce.celebrezze@clydeco.us

Konrad R. Krebs (*pro hac vice*)
CLYDE & CO US LLP

Email: mborja@wiley.law
gseligman@wiley.law
acriss@wiley.law

*Counsel for General Star
Indemnity
Company*

/s/Kathleen M. Miller
Kathleen M. Miller (No. 2898)
SMITH, KATZENSTEIN
& JENKINS LLP
1000 West Street, Suite 1501
P.O. Box 410
Wilmington, DE  19899 [Courier
19801]
Telephone: (302) 652-8400
Facsimile: (302) 652-8405
kmiller@skjlaw.com

and

Lloyd A. Gura (*pro hac vice*)
Pamela J. Minetto (*pro hac vice*)
MOUND COTTON WOLLAN &
GREENGRASS LLP
One New York Plaza 44th Floor
New York, NY 10004
Tel: (212) 804-4282

95

340 Mt. Kemble Avenue | Suite
300
Morristown, NJ 07960
Telephone: (973) 210-6700
Facsimile: (973) 210-6701
konrad.krebs@clydeco.us

-and-

David Christian (*pro hac vice*)
DAVID CHRISTIAN
ATTORNEYS LLC
105 W. Madison St., Suite 1400
Chicago, Illinois 60602
Telephone: (312) 282-5282
dchristian@dca.law

*Counsel for Great American
Assurance
 Company, f/k/a Agricultural
 Insurance Company; Great
 American E&S Insurance
 Company, f/k/a Agricultural
 Excess and Surplus Insurance
 Company; and Great American
 E&S Insurance Company*

lgura@moundcotton.com
pminetto@moundcotton.com

 *Counsel for Indian Harbor
 Insurance Company, on behalf of
 itself and as successor in interest
 to Catlin Specialty Insurance
 Company*

/s/ R. Karl Hill
R. Karl Hill (DE Bar No. 2747)
SEITZ, VAN OGTROP &
GREEN, P.A.
222 Delaware Avenue
Suite 1500
Wilmington, DE 19801
Telephone: (302) 888-0600
khill@svglaw.com

-and-

/s/ Thaddeus J. Weaver
Thaddeus J. Weaver (DE Bar. No.
2790)
DILWORTH PAXSON LLP
704 N. King Street, Suite 500
P.O. Box 1031
Wilmington, DE  19899-1031
(302) 571-8867 (telephone)
(302) 351-8735 (facsimile)
tweaver@dilworthlaw.com

96

CHOATE, HALL & STEWART
LLP
Douglas R. Gooding (*pro hac vice*)
Jonathan D. Marshall (*pro hac vice*)
Two International Place
Boston, MA 02110
Telephone: (617) 248-5000
dgooding@choate.com
jmarshall@choate.com

-and-

MINTZ, LEVIN, COHN,
FERRIS, GLOVSKY AND
POPEO PC
Kim V. Marrkand (*pro hac vice*)
Laura Bange Stephens (*pro hac vice* forthcoming)
One Financial Center
Boston, MA 02111
Telephone: (617) 542-6000
kvmarrkand@mintz.com
lbstephens@mintz.com

*Counsel for Liberty Mutual
Insurance Company, The Ohio
Casualty Insurance Company,
Liberty Insurance Underwriters,
Inc. and Liberty Surplus
Insurance Corporation*

/s/ Stephen M. Miller
Stephen M. Miller (No. 2610)
Carl N. Kunz, III (No. 3201)
Sarah M. Ennis (No. 5745)

-and-

William E. McGrath, Jr. (*pro hac vice*)
Dilworth Paxson LLP
2 Research Way, Suite 103
Princeton, NJ  08540
(609) 924-6000 (telephone)
(215) 893-8537 (facsimile)
wmcgrath@dilworthlaw.com

*Counsel for Munich Reinsurance
America, Inc., formerly known as
American Re-Insurance Company*

/s/ Marla S. Benedek
Marla S. Benedek (No. 6638)
COZEN O'CONNOR
1201 N. Market Street, Suite 1001

97

TrustApp611

MORRIS JAMES LLP
500 Delaware Avenue, Suite 1500
Wilmington, Delaware 19801
Telephone: (302) 888-6800
Facsimile:  (302) 571-1750
smiller@morrisjames.com
ckunz@morrisjames.com
sennis@morrisjames.com

-and-

Margaret M. Anderson
(*pro hac vice*)
Ryan T. Schultz
(*pro hac vice*)
Adam A. Hachikian
(*pro hac vice*)
Kenneth M. Thomas
(*pro hac vice*)
FOX SWIBEL LEVIN & CARROLL LLP
200 W. Madison Street, Suite 3000
Chicago, Illinois 60606
Telephone: (312) 224-1200
Facsimile:  (312) 224-1201
panderson@foxswibel.com
rschultz@foxswibel.com
ahachikian@foxswibel.com
kthomas@foxswibel.com

*Counsel for Old Republic
Insurance Company*

Wilmington, DE 19801
Telephone:  (302) 295-2024
Facsimile:  (302) 250-4498
mbenedek@cozen.com

*Counsel for Traders and Pacific
Insurance Company, Endurance
American Specialty Insurance
Company, and Endurance
American Insurance Company*

98

TrustApp612

/s/ Louis J. Rizzo, Jr.
Louis J. Rizzo, Jr. (DE Bar No.
3374)
REGER RIZZO & DARNALL LLP
1521 Concord Pike Suite 305
Brandywine Plaza West
Wilmington DE  19803
Telephone: (302) 477-7100
Facsimile: (302) 652-3620
lrizzo@regerlaw.com

*Counsel for Travelers Casualty
and Surety Company, Inc. (f/k/a
Aetna Casualty & Surety
Company), St. Paul Surplus Lines
Insurance Company and Gulf
Insurance Company*

TrustApp613

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re:<br><br>BOY SCOUTS OF AMERICA AND<br>DELAWARE BSA, LLC,<br><br>Debtors.[1] | Chapter 11<br><br>Case No. 20-10343 (LSS)<br><br>(Jointly Administered) |

## DECLARATION OF THE HONORABLE BARBARA J. HOUSER (RET.), IN HER CAPACITY AS TRUSTEE OF THE BSA SETTLEMENT TRUST

I, Barbara J. Houser, declare as follows:

1.      I am the trustee (the "Trustee") of the BSA Settlement Trust (the "Settlement Trust" or the "Trust").

2.      I am over the age of eighteen years.  This declaration (the "Declaration") is based on my personal knowledge and experience, my review of relevant documents, and my supervision of various people who report to me as Trustee of the Settlement Trust.  If called as a witness, I could and would competently testify to the facts set forth herein.  As Trustee of the Settlement Trust, I am duly authorized to make this Declaration.

3.      The Trust was created by the BSA Settlement Trust Agreement, dated as of April 19, 2023 (the "Settlement Trust Agreement") and pursuant to the *Third Modified Fifth Amended Chapter 11 Plan of Reorganization (with Technical Modifications)* for Boy Scouts of America and Delaware BSA, LLC [Bankr. Docket No. 10296[2]] (the "Plan").

---

[1] The Reorganized Debtors in these Chapter 11 Cases, together with the last four digits of Debtor's federal tax identification number, are as follows:  Boy Scouts of America (6300) and Delaware BSA, LLC (4311).  The Reorganized Debtors' mailing address is 1325 West Walnut Hill Lane, Irving, Texas 75038.

[2] References to the "Bankr. Docket No." refer to filings in *In re Boy Scouts of America and Delaware BSA, LLC*, No. 20-10343-LSS (Bankr. D. Del.).

4.      The Plan was confirmed by the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") pursuant to the *Supplemental Findings of Fact and Conclusions of Law and Order Confirming the Third Modified Fifth Amended Chapter 11 Plan of Reorganization (with Technical Modifications) for Boy Scouts of America and Delaware BSA, LLC* [Bankr. Docket No. 10316[3]] (the "Confirmation Order") and was affirmed by the United States District Court for the District of Delaware (the "District Court") pursuant to an Order dated March 27, 2023 [Dist. Docket No. 151] (the "Affirmation Order").  After the District Court denied requests for a stay of the Affirmation Order and Confirmation Order, *see* [Dist. Docket No. 193], and the United States Court of Appeals for the Third Circuit similarly denied a subsequent request for a stay of the Affirmation Order and Confirmation Order [App. Docket No. 27[4]], the Plan became effective on April 19, 2023 [Bankr. Docket No. 11119] (the "Effective Date").

5.      The Settlement Trust was formed on April 19, 2023 when the Plan became effective.  In addition, on the Effective Date, the more than 82,000 childhood sexual abuse claims (the "Abuse Claims") that were filed in BSA's chapter 11 cases were channeled to the Settlement Trust, and the Settlement Trust assumed the obligations to administer such Abuse Claims.  Nearly 50% of the more than 82,000 Abuse Claims are held by individuals that are 60 years of age or older.

---

[3] References to "Dist. Docket No." refer to filings in *National Union Fire Insurance Company of Pittsburgh, PA v. Boy Scouts of America and Delaware BSA, LLC*, No. 22-1237-RGA (D. Del.).
[4] Reference to "App. Docket No." refer to filings in *In re Boy Scouts of America*, No. 23-1664 (3d Cir.).

TrustApp615

**Claims Administration**

6.      The Plan and Trust Distribution Procedures ("TDP") allow holders of Abuse Claims to select one of three claims processes for resolution of their claims.[5]  One such process is the "Expedited Distribution," whereby a survivor receives a one-time payment of $3,500 in exchange for providing a full and final release of the Trust and other parties.   More than 7,300 claimants have selected to receive an Expedited Distribution.

7.      Claimants who selected Expedited Distribution are required to complete a simple questionnaire on the Trust's website, scoutingsettlementtrust.com.  After completing the questionnaire, claimants will receive a qualification notice and a release form to sign before they receive payment.  To date, more than 4,700 Expedited Distribution claimants have submitted the questionnaire and received qualification notices.  Of those, approximately 500 have returned an executed release and have been paid by the Trust, with a portion of funds held back to satisfy any healthcare-related liens that the Trust is obligated to satisfy on a claimant's behalf.  As these liens are resolved, any remaining hold-back funds will be paid to the Expedited Distribution claimants entitled to receive them.

8.      Claimants may also select the "Standard" or "Matrix" review process.  Pursuant to this process, claimants complete, under oath, a detailed "General Claims Questionnaire" on the Trust's website, submit documents relating to their Abuse Claim, and must agree to cooperate in a written and/or oral examination under oath, if requested.  To date, approximately 1,500 survivors have submitted a General Claims Questionnaire to the Trust.  Under my supervision, the Claims Administrator responsible for administering the Matrix review process, along with individuals at the claims processing firm I hired to assist the Trust in administering

---

[5] The TDP also describe a fourth process, the "Tort System Alternative," which is available to holders of Abuse Claims after they have received a determination from the Trust regarding their claim.

the claims process, has begun the process of evaluating these questionnaires.  That evaluation includes, among other things: (i) ensuring that each survivor satisfies the eligibility criteria set forth in the TDP, (ii) placing each survivor's claim on the appropriate "tier" of abuse specified in the TDP, and (iii) applying mitigating and aggravating factors to each claim in order to value the claim in accordance with the TDP's requirements.  The number of survivors submitting questionnaires to the Trust increases daily and I believe will continue to increase as more survivors seek to have their childhood sexual abuse claims evaluated and, if appropriate, allowed at a specific dollar amount so that the Trust can begin to make payments to them.

9.    Holders of Abuse Claims may also elect to have their Abuse Claims resolved under a third claims processing alternative—the so-called Independent Review Option ("IRO").  Pursuant to this alternative, holders of Abuse Claims are entitled to have a neutral—designated in the TDP as a retired judge with tort experience—evaluate their claims through a process that is designed to replicate what a jury might award to such claimants outside the Settlement Trust process.   A claimant must pay an initial $10,000 administrative fee in order to select the Independent Review option and must file a complaint (setting forth the basis of the claim) within 7 days of this payment.  These claimants also complete a General Claims Questionnaire available on the Trust's website.  To date, 9 claimants have returned their General Claims Questionnaires electing the IRO and have paid their initial $10,000 administrative fee.  Of those 9 claimants, 6 have filed their respective Complaints.  I expect the other 3 Complaints to be timely filed.  In accordance with the procedures specified in the TDP, and as explained further in the Attorney's Guide to the IRO (available on the Trust's website), the Trust will give notice of the claim to the potentially responsible insurers based upon the allegations set forth in the Complaint.  The applicable potentially responsible insurers are given the opportunity to participate in the claimant's

4

IRO process.  The Trust is in the process of appointing neutrals to "preside" over each claimant's IRO process.  At the conclusion of each IRO process, the neutral must make a settlement recommendation to me, and I have the opportunity to either accept the recommendation or reject it.  I expect that the number of claimants electing the IRO and satisfying the other administrative requirements will greatly increase in the coming weeks and months up to the deadline for all such IRO elections to be made, February 16, 2024.

10.     As just noted, and as particularly relevant here, the TDP requires the Trust to provide notice to any potentially responsible insurer of any Abuse Claim for which the claimant has selected the IRO.  The insurers are given a "reasonable opportunity" to participate in the Independent Review process, and the Trustee "shall provide notice and seek consent" from the insurers for any settlement recommendation.

**Notice to Insurers**

11.     On July 14, 2023, the Trust, through counsel, provided notice of all 82,209 Abuse Claims to every insurer of which the Trust was aware and which could potentially provide coverage for the Abuse Claims.

12.     On October 20, 2023, the Trust, through counsel, provided its first notice of an IRO claim to insurers.  Since that date, the Trust has provided notice of the additional five IRO claims to a total of 50 insurers.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this second day of November, 2023 at Fort Collins, CO.

Hon. Barbara J. Houser (Ret.)

5

Case 20-10343-LSS    Doc 10296    Filed 09/06/22    Page 302 of 498

**EXHIBIT I**

**INSURANCE SETTLEMENTS**

**Hartford Insurance Settlement.** The Plan incorporates the Hartford Insurance Settlement Agreement, which was filed on the docket of the Chapter 11 Cases at D.I. 8816-1 and is attached hereto as Exhibit I-1, and the Plan shall constitute a motion by the Debtors for the Bankruptcy Court to approve the proposed compromises and settlements and sale of the Hartford Policies set forth in the Hartford Insurance Settlement Agreement (the "Hartford Insurance Settlement"), pursuant to sections 363, 503(b), 507(a)(2), 1123 and 1141 of the Bankruptcy Code and Bankruptcy Rule 9019, including approval of (i) the Hartford Insurance Settlement Agreement, (ii) the assignment of the Local Council Policies issued by Hartford to the Debtors and the Estates, as applicable, (iii) the Participating Chartered Organization Insurance Assignment, (iv) the sale by the Debtors and the Estates, and the purchase by Hartford, of the Hartford Policies, free and clear of all Interests of any Person or Entity (as such terms are defined in the Hartford Insurance Settlement Agreement; for the avoidance of doubt, the term "interests" as used in Article V.S.4 of the Plan and this description shall have the meaning given to the term "Interests" in the Hartford Insurance Settlement Agreement, rather than as such term is defined in Article I of the Plan), *except* solely with respect to the interests, if any, of the Archbishop of Agaña, (v) the settlement, compromise and release of the Hartford Released Claims (as defined in the Hartford Insurance Settlement Agreement) as provided in the Hartford Insurance Settlement Agreement, (vi) the Allowance of the Hartford Administrative Expense Claim, and (vii) certain other settlements, compromises, and releases as set forth in the Hartford Insurance Settlement Agreement. The Confirmation Order shall constitute the Bankruptcy Court's approval of such motion pursuant to sections 363, 503(b), 507(a)(2), 1123 and 1141 of the Bankruptcy Code and Bankruptcy Rule 9019 and Allowance of the Hartford Administrative Expense Claim and shall include findings of fact and conclusions of law pertaining to such approval, in form and substance acceptable to Hartford, including findings and conclusions designating Hartford as a good-faith purchaser of the Hartford Policies.

**Century and Chubb Companies Insurance Settlement.** The Plan incorporates the Century and Chubb Companies Insurance Settlement Agreement, which was filed on the docket of the Chapter 11 Cases at D.I. 8907-1 and is attached hereto as Exhibit I-2, and the Plan shall constitute a motion by the Debtors for the Bankruptcy Court to approve the proposed compromises and settlements and sale of the Century and Chubb Companies Policies set forth in the Century and Chubb Companies Insurance Settlement Agreement (the "Century and Chubb Companies Insurance Settlement"), pursuant to sections 363, 1123 and 1141 of the Bankruptcy Code and Bankruptcy Rule 9019, including approval of (i) the Century and Chubb Companies Insurance Settlement Agreement, (ii) the assignment of the Local Council Policies issued by the Century and Chubb Companies to the Debtors and the Estates, as applicable, (iii) the Participating Chartered Organization Insurance Assignment, (iv) the sale by the Debtors and the Estates, and the purchase by the Century and Chubb Companies, of the Century and Chubb Companies Policies, free and clear of all liens, claims, encumbrances, interests and rights of any nature, whether at law or in equity, of any Person or Entity (as such terms are defined in the Century and Chubb Companies Insurance Settlement Agreement), *except* solely with respect to the interests, if any, of the Archbishop of Agaña, and (v) certain other settlements, compromises, and releases as set forth in the Century and Chubb Companies Insurance Settlement Agreement. The Confirmation Order shall constitute the Bankruptcy Court's approval of such motion pursuant to sections 363, 1123 and 1141 of the Bankruptcy Code and Bankruptcy Rule 9019 and shall include findings of fact and conclusions of law pertaining to such approval, in form and substance acceptable to the

Century and Chubb Companies, including findings and conclusions designating the Century and Chubb Companies as a good-faith purchaser of the Century and Chubb Companies Policies.

**Zurich Insurance Settlement.**   The Plan incorporates the Zurich Insurance Settlement Agreement, which was filed on the docket of the Chapter 11 Cases at D.I. 8817-2 and is attached hereto as Exhibit I-3, and the Plan shall constitute a motion by the Debtors for the Bankruptcy Court to approve the proposed compromises and settlements and sale of the Zurich Insurer Policies set forth in the Zurich Insurance Settlement Agreement (the "Zurich Insurance Settlement"), pursuant to sections 363, 1123 and 1141 of the Bankruptcy Code and Bankruptcy Rule 9019, including approval of (i) the Zurich Insurance Settlement Agreement, (ii) the Participating Chartered Organization Insurance Assignment, (iii) the sale by the Debtors and the Estates, and the purchase by the Zurich Insurers, of the Zurich Insurer Policies, free and clear of all Interests of any Person or Entity (as such terms are defined in the Zurich Insurance Settlement Agreement; for the avoidance of doubt, the term "interests" as used in Article V.S.4 of the Plan and this description shall have the meaning given to the term "Interests" in the Zurich Insurance Settlement Agreement, rather than as such term is defined in Article I of the Plan), *except* solely with respect to the interests, if any, of the Archbishop of Agaña, and (iv) certain other settlements, compromises, and releases as set forth in the Zurich Insurance Settlement Agreement. The Confirmation Order shall constitute the Bankruptcy Court's approval of such motion pursuant to sections 363, 1123 and 1141 of the Bankruptcy Code and Bankruptcy Rule 9019 and shall include findings of fact and conclusions of law pertaining to such approval, in form and substance acceptable to the Zurich Insurers, including findings and conclusions designating the Zurich Insurers as good-faith purchasers of the Zurich Insurer Policies.

**Clarendon Insurance Settlement.**   The Plan incorporates the Clarendon Insurance Settlement Agreement, which was filed on the docket of the Chapter 11 Cases at D.I. 8907-3 and is attached hereto as Exhibit I-4, and the Plan shall constitute a motion by the Debtors for the Bankruptcy Court to approve the proposed compromises and settlements and sale of the Clarendon Policies set forth in the Clarendon Insurance Settlement Agreement (the "Clarendon Insurance Settlement"), pursuant to sections 363, 1123 and 1141 of the Bankruptcy Code and Bankruptcy Rule 9019, including approval of (i) the Clarendon Insurance Settlement Agreement, (ii) the assignment of the Clarendon Local Council Policies issued by Clarendon to the Debtors and the Estates, as applicable, (iii) the Participating Chartered Organization Insurance Assignment, (iv) the sale by the Debtors and the Estates, and the purchase by Clarendon, of the Clarendon Policies, free and clear of all Interests of any Person or Entity (as such terms are defined in the Clarendon Insurance Settlement Agreement; for the avoidance of doubt, the term "interests" as used in Article V.S.4 of the Plan and this description shall have the meaning given to the term "Interests" in the Clarendon Insurance Settlement Agreement, rather than as such term is defined in Article I of the Plan), *except* solely with respect to the interests, if any, of the Archbishop of Agaña, and (v) certain other settlements, compromises, and releases as set forth in the Clarendon Insurance Settlement Agreement. The Confirmation Order shall constitute the Bankruptcy Court's approval of such motion pursuant to sections 363, 1123 and 1141 of the Bankruptcy Code and Bankruptcy Rule 9019 and shall include findings of fact and conclusions of law pertaining to such approval, in form and substance acceptable to Clarendon, including findings and conclusions designating Clarendon as a good-faith purchaser of the Clarendon Policies.