# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS

| | |
|---|---|
| THE HONORABLE BARBARA J. HOUSER (RET.), IN HER CAPACITY AS TRUSTEE OF THE BSA SETTLEMENT TRUST,<br><br>Plaintiff,<br><br>v.<br><br>ALLIANZ GLOBAL RISKS US INSURANCE COMPANY; ALLIED WORLD ASSURANCE COMPANY (U.S.) INC.; ALLSTATE INSURANCE COMPANY; AMERICAN CASUALTY COMPANY OF READING, PENNSYLVANIA; AMERICAN ECONOMY INSURANCE COMPANY; AMERICAN HOME ASSURANCE COMPANY; AMERICAN STATES INSURANCE COMPANY; AMERISURE INSURANCE COMPANY; ARCH INSURANCE COMPANY; ARGONAUT INSURANCE COMPANY; ARROWOOD INDEMNITY COMPANY; ASPEN SPECIALTY INSURANCE COMPANY; ATEGRITY SPECIALTY INSURANCE COMPANY; AVIVA PLC; AXIS SPECIALTY INSURANCE COMPANY; AXIS SURPLUS INSURANCE COMPANY; BRIGHTHOUSE LIFE INSURANCE COMPANY; CATLIN SPECIALTY INSURANCE COMPANY; CHARTER OAK FIRE INSURANCE COMPANY; THE CINCINNATI INSURANCE COMPANY; COLONY INSURANCE COMPANY; COLUMBIA CASUALTY COMPANY; COLUMBIA INSURANCE COMPANY; CONSOLIDATED NATIONAL INSURANCE COMPANY; CONTINENTAL CASUALTY COMPANY; | Case No. 3:23-cv-01592-S |

THE CONTINENTAL INSURANCE
COMPANY; CRUM & FORSTER
INDEMNITY COMPANY; ENDURANCE
AMERICAN INSURANCE COMPANY;
ENDURANCE AMERICAN SPECIALTY
INSURANCE COMPANY; ERIE AND
NIAGARA INSURANCE ASSOCIATION;
ERIE FAMILY LIFE INSURANCE
COMPANY; ERIE INSURANCE
EXCHANGE; EVANSTON INSURANCE
COMPANY; EVEREST NATIONAL
INSURANCE COMPANY; FIREMAN'S
FUND INSURANCE COMPANY; FIRST
INSURANCE COMPANY OF HAWAII,
LTD.; GEMINI INSURANCE COMPANY;
GENERAL INSURANCE COMPANY OF
AMERICA; GENERAL STAR
INDEMNITY COMPANY; GREAT
AMERICAN ASSURANCE COMPANY;
GREAT AMERICAN E & S INSURANCE
COMPANY; GREAT AMERICAN
INSURANCE COMPANY; INDIAN
HARBOR INSURANCE COMPANY; THE
INSURANCE COMPANY OF THE STATE
OF PENNSYLVANIA; INTERSTATE
FIRE & CASUALTY COMPANY;
JEFFERSON INSURANCE COMPANY;
LEXINGTON INSURANCE COMPANY;
LIBERTY INSURANCE
UNDERWRITERS, INC.; LIBERTY
MUTUAL INSURANCE COMPANY;
LIBERTY SURPLUS INSURANCE
CORPORATION; LONDON AND
EDINBURGH INSURANCE COMPANY
LIMITED; MUNICH REINSURANCE
AMERICA, INC.; NATIONAL
CASUALTY COMPANY; NATIONAL
FIRE INSURANCE COMPANY OF
HARTFORD; NATIONAL SURETY
CORPORATION; NATIONAL UNION
FIRE INSURANCE COMPANY OF
PITTSBURGH, PA; NATIONWIDE
AFFINITY INSURANCE COMPANY OF

AMERICA; NATIONWIDE MUTUAL
INSURANCE COMPANY; NEW
HAMPSHIRE INSURANCE COMPANY;
THE NORTH RIVER INSURANCE
COMPANY; THE OHIO CASUALTY
INSURANCE COMPANY; OLD
REPUBLIC INSURANCE COMPANY;
PEERLESS INDEMNITY INSURANCE
COMPANY; PHOENIX INSURANCE
COMPANY; QBE INSURANCE
CORPORATION; SAFECO INSURANCE
COMPANY OF AMERICA;
SCOTTSDALE INSURANCE COMPANY;
SECURITY MUTUAL INSURANCE
COMPANY; SPARTA INSURANCE
COMPANY; ST. PAUL FIRE AND
MARINE INSURANCE COMPANY; ST.
PAUL MERCURY INSURANCE
COMPANY; ST. PAUL SURPLUS LINES
INSURANCE COMPANY; SWISS RE
CORPORATE SOLUTIONS CAPACITY
INSURANCE CORPORATION;
TENECOM LIMITED; TIG INSURANCE
COMPANY; TRAVELERS CASUALTY
AND SURETY COMPANY; THE
TRAVELERS COMPANIES, INC.; THE
TRAVELERS INDEMNITY COMPANY;
UNITED STATES FIDELITY AND
GUARANTY COMPANY; UNITED
STATES FIRE INSURANCE COMPANY;
UTICA MUTUAL INSURANCE
COMPANY; WAUSAU GENERAL
INSURANCE COMPANY; WESTPORT
INSURANCE CORPORATION; and DOE
DEFENDANTS 1–100,

Defendants.

## FIRST AMENDED COMPLAINT

Pursuant to the Court's August 28, 2025 Order (Dkt. 514), Plaintiff, the Honorable

Barbara J. Houser (Ret.) (the "Trustee"), in her capacity as trustee of the BSA Settlement Trust

(the "Trust"), hereby files this amended complaint (the "First Amended Complaint")[1] against the above-captioned defendants (the "Defendants"), and in support thereof respectfully states and alleges as follows:

## I.    NATURE OF THE ACTION

1.    This is a civil action for a declaratory judgment, breach of contract, and bad faith. The action arises out of an insurance coverage dispute between the Trust, as the assignee to certain insurance policy rights originally issued to the Boy Scouts of America ("BSA") and its Local Councils (defined below) and exclusive holder, pursuant to the Third Modified Fifth Amended Chapter 11 Plan of Reorganization (With Technical Modifications) for Boy Scouts of America and Delaware BSA, LLC (the "Plan"),[2] of all rights under such insurance policies, and Defendants, which are liability insurers that issued or subscribed to insurance policies (collectively, the "Insurance Policies," and each an "Insurance Policy") sold to BSA and Local Councils.

2.    The Defendants have disputed and/or will dispute their obligations to the Trustee under the Insurance Policies to cover claims for personal injuries arising from sexual or other abuse in BSA's Scouting programs (the "Abuse Claims").

3.    Accordingly, in order to effectuate the Trust's purposes, fulfill the Trust's obligations under the Plan, and obtain clarity and finality regarding the Defendants' coverage obligations, the Trustee seeks a declaration that Defendants have breached or will breach the Insurance Policies by refusing to provide coverage under the Insurance Policies for the Abuse

---

[1] Attached as Exhibit A is a redline showing the nature of the amendments made through this First Amended Complaint.
[2] Third Modified Fifth Amended Chapter 11 Plan of Reorganization (With Technical Modifications) for Boy Scouts of America and Delaware BSA, LLC, *In re Boy Scouts of America*, No. 20-10343 (LSS) (Bankr. D. Del. Sept. 6, 2022), ECF No. 10296, *available at* https://casedocs.omniagentsolutions.com/cmsvol2/pub_47373/aeeb7dbb-0270-4442-8db6-f657d052676f_10296.pdf. Descriptions of the Plan herein are subject in all respects to the actual terms of the Plan. Capitalized terms not defined herein have the meaning ascribed to them in the Plan.

Claims.   Additionally, the Trustee seeks compensatory damages, punitive damages, interest, attorneys' fees, and such other relief as this Court deems just and proper.

## II.     PARTIES

4.     The Trustee is the sole trustee for the Trust and is a citizen of New Mexico.  The Trust is a trust organized under Delaware law that is administered in New Mexico.

5.     Defendant Allianz Global Risks US Insurance Company (formerly known as, or otherwise responsible for the liability of, Allianz Insurance Company) is an Illinois corporation with its principal place of business in Illinois.

6.     Defendant Allied World Assurance Company (U.S.) Inc. is a Delaware corporation with its principal place of business in New York.

7.     Defendant Allstate Insurance Company is an Illinois corporation with its principal place of business in Illinois.

8.     Defendant American Casualty Company of Reading, Pennsylvania is a Pennsylvania corporation with its principal place of business in Illinois.

9.     Defendant American Economy Insurance Company is an Indiana corporation with its principal place of business in Massachusetts.

10.     Defendant American Home Assurance Company (formerly known as, or otherwise responsible for the liability of, American Home Fire Assurance Company) is a New York corporation with its principal place of business in New York.

11.     Defendant American States Insurance Company is an Indiana corporation with its principal place of business in Massachusetts.

12.     Defendant Amerisure Insurance Company is a Michigan corporation with its principal place of business in Michigan.

13.    Defendant Arch Insurance Company is a Missouri corporation with its principal place of business in New Jersey.

14.    Defendant Argonaut Insurance Company is an Illinois corporation with its principal place of business in Illinois.

15.    Defendant Arrowood Indemnity Company (formerly known as, or otherwise responsible for the liability of, Royal Indemnity Company, Globe Indemnity Company, Royal Globe Insurance Company, and Royal Insurance Co. of America) is a Delaware corporation with its principal place of business in North Carolina.

16.    Defendant Aspen Specialty Insurance Company is a North Dakota corporation with its principal place of business in Connecticut.

17.    Defendant Ategrity Specialty Insurance Company is a Delaware corporation with its principal place of business in Arizona.

18.    Defendant Aviva plc (formerly known as, or otherwise responsible for the liability of, Commercial Union Assurance Company ("Commercial Union")) is a U.K. corporation with its principal place of business in the U.K.[3]

19.    Defendant Axis Specialty Insurance Company is a Connecticut corporation with its principal place of business in Georgia.

20.    Defendant Axis Surplus Insurance Company is an Illinois corporation with its principal place of business in Georgia.

---

[3] While Aviva has argued in this litigation that it has no relation to and is not responsible for the liability of Commercial Union, its present argument contradicts positions taken in other federal litigation where it has acknowledged its relationship to Commercial Union.  *See, e.g.*, Complaint and Summons, No. 23-cv-07373-KPF, *Aviva, PLC v. Honeywell* (S.D.N.Y. Aug. 18, 2023), ECF 1-1 at 9 (stating that Commercial Union is "part of the Aviva plc group of companies"); Disclosure Pursuant to Rule 7.1, No. 13-cv-00103-LPS, *Flintkote Co. v. Aviva PLC* (D. Del. Apr. 1, 2013), ECF 22 (stating that, "Aviva PLC, [was] formerly known as Commercial Union Assurance Company Ltd.").

21.     Defendant Brighthouse Life Insurance Company (formerly known as, or otherwise responsible for the liability of, Travelers Insurance Company) is a Delaware corporation with its principal place of business in North Carolina.

22.     Defendant Catlin Specialty Insurance Company is a Delaware corporation with its principal place of business in Georgia.

23.     Defendant Charter Oak Fire Insurance Company is a Connecticut corporation with its principal place of business in Connecticut.

24.     Defendant The Cincinnati Insurance Company is an Ohio corporation with its principal place of business in Ohio.

25.     Defendant Colony Insurance Company is a Virginia corporation with its principal place of business in Illinois.

26.     Defendant Columbia Casualty Company is an Illinois corporation with its principal place of business in Illinois.

27.     Defendant Columbia Insurance Company is a Nebraska corporation with its principal place of business in Nebraska.

28.     Defendant Consolidated National Insurance Company (formerly known as, or otherwise responsible for the liability of, American Fidelity Company) is a Colorado corporation with its principal place of business in New York.

29.     Defendant Continental Casualty Company is an Illinois corporation with its principal place of business in Illinois.

30.     Defendant The Continental Insurance Company (formerly known as, or otherwise responsible for the liability of, Buckeye Union Insurance Company; CNA Financial Corporation; Fidelity and Casualty Co. of NY; Fireman's Insurance Company of Newark, NJ; Pacific Insurance

Company; Niagara Fire Insurance Company; and Harbor Insurance Company) is a Pennsylvania corporation with its principal place of business in Illinois.

31.    Defendant Crum & Forster Indemnity Company (formerly known as, or otherwise responsible for the liability of, Crum & Forster) is a Delaware corporation with its principal place of business in New Jersey.

32.    Defendant Endurance American Insurance Company is a Delaware corporation with its principal place of business in New York.

33.    Defendant Endurance American Specialty Insurance Company (formerly known as, or otherwise responsible for the liability of, Traders and Pacific Insurance Company) is a Delaware corporation with its principal place of business in New York.

34.    Defendant Erie and Niagara Insurance Association is a New York corporation with its principal place of business in New York.

35.    Defendant Erie Family Life Insurance Company is a Pennsylvania corporation with its principal place of business in Pennsylvania.

36.    Defendant Erie Insurance Exchange is a Pennsylvania corporation with its principal place of business in Pennsylvania.

37.    Defendant Evanston Insurance Company (formerly known as, or otherwise responsible for the liability of, Alterra Excess & Surplus Insurance Company) is an Illinois corporation with its principal place of business in Illinois.

38.    Defendant Everest National Insurance Company is a Delaware corporation with its principal place of business in New Jersey.

39.    Defendant Fireman's Fund Insurance Company is an Illinois corporation with its principal place of business in Illinois.

40.     Defendant First Insurance Company of Hawaii, Ltd. is a Hawaii corporation with its principal place of business in Hawaii.

41.     Defendant Gemini Insurance Company is a Delaware corporation with its principal place of business in Arizona.

42.     Defendant General Insurance Company of America (formerly known as, or otherwise responsible for the liability of, General Casualty Company of America) is a New Hampshire corporation with its principal place of business in Massachusetts.

43.     Defendant General Star Indemnity Company is a Delaware corporation with its principal place of business in Connecticut.

44.     Defendant Great American Assurance Company (formerly known as, or otherwise responsible for the liability of, Agricultural Insurance Company and Anchor Casualty Company) is an Ohio corporation with its principal place of business in Ohio.

45.     Defendant Great American E & S Insurance Company (formerly known as, or otherwise responsible for the liability of, Agricultural Excess & Surplus Insurance Company) is an Ohio corporation with its principal place of business in Ohio.

46.     Defendant Great American Insurance Company is an Ohio corporation with its principal place of business in Ohio.

47.     Defendant Indian Harbor Insurance Company is a Delaware corporation with its principal place of business in Connecticut.

48.     Defendant The Insurance Company of the State of Pennsylvania is an Illinois corporation with its principal place of business in New York.

49.     Defendant Interstate Fire & Casualty Company is an Illinois corporation with its principal place of business in Illinois.

9

50.    Defendant Jefferson Insurance Company (formerly known as, or otherwise responsible for the liability of, Jefferson Insurance Company of New York) is a New York corporation with its principal place of business in Virginia.

51.    Defendant Lexington Insurance Company is a Delaware corporation with its principal place of business in Massachusetts.

52.    Defendant Liberty Insurance Underwriters Inc. is an Illinois corporation with its principal place of business in Massachusetts.

53.    Defendant Liberty Mutual Insurance Company is a Massachusetts corporation with its principal place of business in Massachusetts.

54.    Defendant Liberty Surplus Insurance Corporation is a New Hampshire corporation with its principal place of business in Massachusetts.

55.    Defendant London and Edinburgh Insurance Company Limited (formerly known as, or otherwise responsible for the liability of, London and Edinburgh General Insurance Company Limited) is a United Kingdom corporation with its principal place of business in the United Kingdom.

56.    Defendant Munich Reinsurance America, Inc. (formerly known as, or otherwise responsible for the liability of, American Re-Insurance Company) is a Delaware corporation with its principal place of business in New Jersey.

57.    Defendant National Casualty Company is an Ohio corporation with its principal place of business in Ohio.

58.    Defendant National Fire Insurance Company of Hartford (formerly known as, or otherwise responsible for the liability of, National Fire Insurance of Hartford) is an Illinois corporation with its principal place of business in Illinois.

59.     Defendant National Surety Corporation is an Illinois corporation with its principal place of business in Illinois.

60.     Defendant National Union Fire Insurance Company of Pittsburgh, PA (formerly known as, or otherwise responsible for the liability of, Landmark Insurance Company) is a Pennsylvania corporation with its principal place of business in New York.

61.     Defendant Nationwide Affinity Insurance Company of America (formerly known as, or otherwise responsible for the liability of, Western Casualty & Surety Company) is an Ohio corporation with its principal place of business in Ohio.

62.     Defendant Nationwide Mutual Insurance Company is an Ohio corporation with its principal place of business in Ohio.

63.     Defendant New Hampshire Insurance Company (formerly known as, or otherwise responsible for the liability of, New Hampshire Life) is an Illinois corporation with its principal place of business in New York.

64.     Defendant The North River Insurance Company (formerly known as, or otherwise responsible for the liability of, North River Insurance Company) is a New Jersey corporation with its principal place of business in New Jersey.

65.     Defendant The Ohio Casualty Insurance Company is a New Hampshire corporation with its principal place of business in Massachusetts.

66.     Defendant Old Republic Insurance Company is a Pennsylvania corporation with its principal place of business in Pennsylvania.

67.     Defendant Peerless Indemnity Insurance Company (formerly known as, or otherwise responsible for the liability of, Ambassador Insurance Company) is an Illinois corporation with its principal place of business in Massachusetts.

68.    Defendant Phoenix Insurance Company is a Connecticut corporation with its principal place of business in Connecticut.

69.    Defendant QBE Insurance Corporation (formerly known as, or otherwise responsible for the liability of, Jamestown Mutual Insurance Company) is a Pennsylvania corporation with its principal place of business in Wisconsin.

70.    Defendant SAFECO Insurance Company of America (formerly known as, or otherwise responsible for the liability of, SAFECO Ins. Co. of America) is a New Hampshire corporation with its principal place of business in Massachusetts.

71.    Defendant Scottsdale Insurance Company is an Ohio corporation with its principal place of business in Ohio.

72.    Defendant Security Mutual Insurance Company is a New York corporation with its principal place of business in New York.

73.    Defendant SPARTA Insurance Company (formerly known as, or otherwise responsible for the liability of, American Employers' Insurance Company and American Employers' Insurance Company of Boston, Massachusetts) is a Connecticut corporation with its principal place of business in Connecticut.

74.    Defendant St. Paul Fire and Marine Insurance Company (formerly known as, or otherwise responsible for the liability of, St. Paul Insurance Company of Illinois) is a Connecticut corporation with its principal place of business in Connecticut.

75.    Defendant St. Paul Mercury Insurance Company is a Connecticut corporation with its principal place of business in Connecticut.

76.    Defendant St. Paul Surplus Lines Insurance Company is a Delaware corporation with its principal place of business in Connecticut.

77. Defendant Swiss Re Corporate Solutions Capacity Insurance Corporation (formerly known as, or otherwise responsible for the liability of, First Specialty Insurance Corporation) is a Missouri corporation with its principal place of business in Missouri.

78. Defendant Tenecom Limited (formerly known as, or otherwise responsible for the liability of, Winterthur Swiss Insurance Company and Yasuda Fire & Marine Ins. Co. (U.K.) Ltd.) is a United Kingdom corporation with its principal place of business in the United Kingdom.

79. Defendant TIG Insurance Company (formerly known as, or otherwise responsible for the liability of, Transamerica Insurance Company) is a California corporation with its principal place of business in New Hampshire.

80. Defendant Travelers Casualty and Surety Company (formerly known as, or otherwise responsible for the liability of, Aetna Casualty and Surety Company) is a Connecticut corporation with its principal place of business in Connecticut.

81. Defendant The Travelers Companies, Inc. (formerly known as, or otherwise responsible for the liability of, Travelers and Phoenix of Hartford Insurance Companies) is a Minnesota corporation with its principal place of business in New York.

82. Defendant The Travelers Indemnity Company (formerly known as, or otherwise responsible for the liability of, Gulf Insurance Company) is a Connecticut corporation with its principal place of business in Connecticut.

83. Defendant United States Fidelity and Guaranty Company (formerly known as, or otherwise responsible for the liability of, United States Fidelity & Warranty Company) is a Connecticut corporation with its principal place of business in Connecticut.

84.     Defendant United States Fire Insurance Company (formerly known as, or otherwise responsible for the liability of, U.S. Fire Insurance Company) is a Delaware corporation with its principal place of business in New Jersey.

85.     Defendant Utica Mutual Insurance Company is a New York corporation with its principal place of business in New York.

86.     Defendant Wausau General Insurance Company (formerly known as, or otherwise responsible for the liability of, Illinois Employers Insurance of Wausau) is a Wisconsin corporation with its principal place of business in Massachusetts.

87.     Defendant Westport Insurance Corporation (formerly known as, or otherwise responsible for the liability of, The Manhattan Fire & Marine Insurance Company) is a Missouri corporation with its principal place of business in Missouri.

88.     Doe Defendants 1–100 are liability insurers that issued or subscribed to Insurance Policy(ies) sold to BSA and/or Local Councils which provide coverage for Abuse Claims, including, but not limited to, those listed in the attached exhibits as issued by Doe Defendants.

### III.    JURISDICTION AND VENUE

89.     The foregoing allegations are incorporated herein by reference.

90.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000, and the parties are citizens of different states.

91.     This Court has personal jurisdiction over each Defendant because each of them is now, or within the time period relevant to the claims asserted herein, or within the time period relevant to the issuance of the Insurance Policies by the Defendants to BSA and/or Local Councils is or has been licensed to do business in Texas; is transacting or has transacted business in Texas; has contracted to insure persons, property, or risks located in Texas; has sought and received

payments from Texas residents in Texas; has contractually or otherwise consented to submit to personal jurisdiction in Texas; and/or has other significant contacts with Texas. Each Defendant therefore has sufficient contacts with Texas that give rise to the present action, has continuous and systematic contacts with Texas, and/or has consented either explicitly or implicitly to the jurisdiction of this Court.[4]

92.    Accordingly, this Court has general personal jurisdiction over Defendants to the extent they have made themselves at home in Texas, whether by soliciting and selling policies in Texas, selling policies to and collecting premiums from Texans, insuring persons and property in Texas, targeting Texas customers, entering into consent orders regulating their Texas conduct, suing in Texas courts, or some combination thereof.

93.    This Court has specific personal jurisdiction over Defendants to the extent Defendants' actions consisting of selling policies in Texas, selling policies to Texans, insuring persons and property in Texas, targeting Texas customers, entering into consent orders regulating their Texas conduct, suing in Texas courts, or some combination thereof, establish minimum contacts with Texas.

94.    This Court has specific personal jurisdiction over Defendants whose policies identify BSA as a named or additional insured.

95.    This Court has specific personal jurisdiction over Defendants whose policies contain service of suit clauses subjecting them to jurisdiction in Texas.

---

[4] While the information already known to the Trustee establishes that the Court has general and specific personal jurisdiction over each of the Defendants, to the extent any Defendant challenges such jurisdiction, the Trustee requests leave to conduct targeted jurisdictional discovery with respect to that particular Defendant or Defendants. The Trustee has alleged with reasonable particularity the possible existence of requisite contacts with the forum state, both for general and specific personal jurisdiction.

96.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) as a substantial part of the events giving rise to the claim occurred in this judicial district.

97.     Declaratory relief is appropriate pursuant to 28 U.S.C. § 2201 and Federal Rule of Civil Procedure 57, as there is a ripe and justiciable controversy between the parties.

## IV.    FACTUAL BACKGROUND

### A.  The Boy Scouts' Abuse Claims

98.     BSA is a non-profit corporation founded in 1910 and chartered by an act of Congress on June 15, 1916.  BSA's mission is to prepare young people for life by instilling in them the values of BSA's Scout Oath and Law and encouraging them to be trustworthy, kind, friendly, and helpful.  Since its inception, more than 130 million Americans have participated in BSA's youth programs, assisted by more than 25 million volunteers.  BSA's national headquarters has been located in Irving, Texas since 1978.

99.     BSA carries out its Scouting programs through charters granted to local councils assigned to specific geographic areas across the United States (collectively, "Local Councils"). These Local Councils recruit and oversee the local organizations that administer BSA's Scouting programs—typically faith-based institutions, clubs, civic associations, educational institutions, businesses, and groups of citizens (collectively, "Chartered Organizations").  BSA, Local Councils, and Chartered Organizations together form an interconnected organizational structure that carries out BSA's mission.

100.    In recent years, BSA, along with its Local Councils and Chartered Organizations, has been named as a defendant in numerous lawsuits alleging injury from sexual abuse in Scouting. The allegations in these claims and complaints range in severity, but all paint a horrific picture of abuse suffered by thousands of children over the course of many decades.  These victims assert

16

various legal theories, generally claiming that BSA, Local Councils, and Chartered Organizations were liable for negligence, gross negligence, negligent retention, negligent supervision, fraudulent concealment, willful and wanton misconduct, constructive fraud, and breach of fiduciary duty.

101.    In 2020, approximately 275 lawsuits asserting Abuse Claims were pending in state and federal courts across the country.  Facing mounting litigation costs and seeking to achieve a global resolution of the Abuse Claims, BSA filed a petition for chapter 11 bankruptcy in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") on February 18, 2020.

## B.  The Bankruptcy Proceedings and Formation of the Trust

102.    After years of negotiations among BSA, its creditors, its insurers, Local Councils, and Chartered Organizations, the Bankruptcy Court issued an order approving the Plan (the "Confirmation Order") on September 8, 2022.  The United States District Court for the District of Delaware (the "District Court") affirmed the Confirmation Order on March 28, 2023.  The Plan became effective on April 19, 2023 (the "Effective Date").  On May 13, 2025, the United States Circuit Court of Appeals for the Third Circuit largely affirmed the Confirmation Order.

103.    During the bankruptcy, 82,209 unique and timely claims were filed alleging injury from sexual abuse in Scouting programs.  The "staggering and apparently unprecedented" number and nature of these claims, as described by the District Court, required sophisticated resolution.

104.    The Plan achieved this resolution through a structure that created the Trust, which assumed liability for the Abuse Claims, as well as certain assets to pay Abuse Claims.  Under the Plan, the Trust is responsible for processing, liquidating, and paying compensable Abuse Claims.  Specifically, the Plan provides that "the sole recourse of any holder of an Abuse Claim against a Protected Party"—which term includes, as relevant here, BSA, Local Councils, and certain

insurance companies that settled with BSA prior to confirmation of the Plan (the "Settling Insurance Companies")—"on account of such Abuse Claim shall be to and against the Settlement Trust[.]" Plan, Art. X.F.1. In other words, "[a]ll Abuse Claims shall be channeled to and resolved by the Settlement Trust[.]" *Id.* Art. V.N.

105.    Pursuant to the releases set forth in the Plan, "all holders of Abuse Claims shall, and shall be deemed to, expressly, conclusively, absolutely, unconditionally, irrevocably, and forever discharge and release . . . each and all of the Protected Parties and their respective property and successors and assigns of and from all Abuse Claims[.]" Plan, Art. X.J.3. As a result, the Trust is the only entity with liability for Abuse Claims asserted against BSA or Local Councils.

106.    In order to resolve the Abuse Claims and compensate BSA's victims, the Plan transferred certain asserts to the Trust—most importantly, the rights under the Insurance Policies as well as proceeds payable under certain settlements reached with insurers during the pendency of the Bankruptcy Case. The Plan transferred to the Trust any claims, causes of action, or rights of BSA and Local Councils against the Defendants arising from or related to the Insurance Policies; the right to receive any proceeds or benefits from these claims, causes of action, or rights; and all other rights, claims, benefits, or causes of action of BSA and Local Councils under or with respect to the Insurance Policies (the "Insurance Rights Transfer").[5] A list of the Insurance Policies issued to BSA and currently known to the Trust (the "BSA Insurance Policies") is attached hereto as **Exhibit B**. A list of the Insurance Policies issued to Local Councils and currently known to the Trust (the "Local Council Insurance Policies") is attached hereto as **Exhibit C**.

---

[5] *See* Plan, § I.A.157 (setting forth the "Insurance Assignment," which includes, but is not limited to, "the assignment and transfer to the Settlement Trust of (a) the Insurance Actions, (b) the Insurance Action Recoveries, . . . and (d) all other rights, claims, benefits, or Causes of Action of [BSA], [or] Local Councils . . . under or with respect to the Abuse Insurance Policies (but not the policies themselves)"); *see also id.* § IX.A.3.j (declaring that the "Plan's transfer of rights under BSA Insurance Policies . . . is authorized and permissible notwithstanding the terms of any policies or provisions of applicable law that are argued to prohibit the assignment or transfer of such rights").

107.     The Plan further provides that the Trust is the sole entity with the right to pursue claims against and seek coverage from the Defendants arising out of or related to the Insurance Policies.  In order to facilitate the Insurance Rights Transfer set forth above, the Plan enjoins "all [p]ersons that have held or asserted, that hold or assert, or that may in the future hold or assert any claim or caused of action . . . against any [i]nsurance [c]ompany based upon, attributable to, arising out of, or in any way connected with any [Insurance Policy]" from "taking any action for the purpose or directly or indirectly collecting, recovering, or receiving payments, satisfaction, or recovery with respect to any such claim or cause of action[.]"  Plan, Art. X.H.2.

108.     The BSA Settlement Trust Agreement (the "Trust Agreement") and the Trust Distribution Procedures (the "TDPs," and with the Trust Agreement, the "Trust Documents"), which are attached to and considered part of the Plan, govern the Trust.  The TDPs make clear that the Trustee is obligated to "determine . . . whether any [Defendant] issued coverage that is available to respond" to an Abuse Claim and, if so, she "shall seek reimbursement for" such Abuse Claim."  TDPs, Art. X.  The Trustee has a "duty to preserve and maximize the assets of the . . . Trust" for the benefit of holders of Abuse Claims.  *Id.*

## C. The Boy Scouts' Insurance Program

### 1. Overview

109.     The Insurance Policies issued to BSA provide general liability coverage for policy periods between 1972 and 2020.  From 1978 onward, the Named Insured in all of these policies, BSA, was headquartered in and a citizen of Texas.  From January 1, 1975 onward, Local Councils were generally listed as additional insureds under these policies.

110.     The Local Council Insurance Policies provide general liability coverage from 1942 until 2019.  Many of the Local Council Insurance Policies list BSA as an additional insured.

19

111.    Based on the evidence the Trust has been able to obtain to date, the Insurance Policies promise in their affirmative grants of coverage, without limitation and with varying wording, to indemnify the insured for, or to pay on the insured's behalf, all damages and defense costs that the insured becomes legally obligated to pay:

      a.  because of personal injury caused by an occurrence during the policy period;

      b.  on account of personal injuries caused by or arising out of an occurrence;

      c.  by reason of bodily injury which occurs after the retroactive date and before the end of the policy period and is caused by an occurrence; or

      d.  pursuant to similar wording.

112.    As a result of the Insurance Rights Transfer, the Trustee is entitled to enforce these promises and to receive the proceeds of the Insurance Policies pursuant to the policies' affirmative grants of coverage.

113.    Under the terms of the Insurance Policies and applicable law, the Insurance Policies provide insurance coverage for BSA's and/or Local Councils' liability and defense costs for or in connection with the Abuse Claims.  Pursuant to the Insurance Rights Transfer, the Trustee is entitled to enforce BSA's and Local Councils' rights to such coverage and to receive the proceeds of the Insurance Policies with respect to BSA's and Local Councils' liability and defense costs for or with respect to the Abuse Claims.

114.    The Abuse Claims trigger the Defendants' coverage obligations under the terms and conditions of the Insurance Policies and applicable law, and the damages and defense costs incurred for or in connection with the Abuse Claims are within the coverage grants of the Insurance Policies because, without limitation, the Abuse Claims seek damages and defense costs that the insured becomes obligated to pay:

a.  because of personal injury caused by an occurrence during the policy period;

b.  on account of personal injuries caused by or arising out of an occurrence;

c.  by reason of bodily injury which occurs after the retroactive date and before the end of the policy period and is caused by an occurrence; or

d.  pursuant to similar wording.

115.  Based on the evidence available to the Trust to date, under the terms of the Insurance Policies and applicable law, each of the Defendants is jointly and severally liable to BSA and/or Local Councils for the full amount of BSA's and/or Local Councils' liability and defense costs for or in connection with the Abuse Claims that trigger their policy periods, subject only to any applicable attachment points and any applicable limits of liability of the Insurance Policies. Pursuant to the Insurance Rights Transfer, the Trustee is entitled to enforce BSA's and Local Councils' rights to such coverage and to receive the proceeds of the Insurance Policies with respect to BSA's and/or Local Councils' liability and defense costs for or with respect to the Abuse Claims.

116.  Throughout the policy periods of the Insurance Policies, the insured risk was located primarily in Texas because, among other reasons, BSA's headquarters was located in Texas.  Texas, with 5,369 Abuse claimants, is second only to California in the number of victims asserting Abuse Claims.

117.  All applicable conditions precedent to coverage or recovery under the Insurance Policies, if any, have been satisfied, compliance with such conditions precedent is excused, such conditions precedent do not apply, or Defendants have waived or are estopped or otherwise precluded from relying on such conditions precedent.

21

118.    Defendants sold the Insurance Policies to BSA and Local Councils in consideration of substantial premiums.  BSA and Local Councils have paid any and all necessary premiums for the Insurance Policies.

119.    Each of the Insurance Policies has been in full force and effect since it was sold to BSA or Local Councils, including at all times material to this First Amended Complaint.

120.    No exclusions or limitations in the Insurance Policies (other than any applicable attachment points and limits of liability) apply to coverage for the Abuse Claims.

2.    Defendants' Pre-Petition Refusals to Provide Coverage

121.    BSA and Local Councils incurred significant defense fees and costs in defending against the pre-petition Abuse Claims.  Many Defendants have disputed their obligations regarding these costs, and have failed to promptly pay BSA's and Local Councils' defense costs and settlements, including costs of BSA's retained national coordinating counsel.

122.    For several years prior to BSA's bankruptcy, BSA and certain Local Councils were engaged in litigation in multiple forums in multiple cases regarding coverage disputes arising from Abuse Claims under certain Defendants' policies.  These coverage actions were limited in scope, involved a small number of Defendants, and concerned coverage for less than one percent of the Abuse Claims that have been asserted and channeled to the Trust for evaluation, processing, and, where appropriate, payment.  The Trust was not a party to any of these actions.

123.    In 2017, Defendant National Surety initiated litigation against BSA and one of the Local Councils in Cook County Circuit Court in Illinois, in the case captioned *National Surety Corporation v. Boy Scouts of America, et al.*, No. 2017-CH-14975 (the "Illinois Action").  National Surety sought declaratory relief regarding its obligations to provide coverage under two of its policies, for Abuse Claims asserted by 18 victims (the "Hacker Victims," so named for the

22

perpetrator who abused them).  National Surety also named several other defendants, including

Defendant Allianz, certain other insurers,[6] and the Hacker Victims themselves.

124.    In 2018, BSA filed a complaint against National Surety, Allianz, and the Settling

Insurance Companies in Dallas County, Texas, in the case captioned *Boy Scouts of America v.*

*Insurance Company of North America, et al.*, No. DC-18-11896 (the "Texas Action").  BSA sought

declaratory and other relief regarding coverage for Abuse Claims asserted by the Hacker Victims

and one other victim.[7]

125.    For years, BSA, National Surety, and Allianz were involved in forum-related

disputes in both the Illinois Action and the Texas Action.  No rulings on the merits were made in

either action before the actions were automatically stayed by the filing of BSA's bankruptcy

petition on February 18, 2020.

126.    Given the piecemeal nature and limited scope of the Illinois Action and the Texas

Action as compared to the comprehensive relief sought in this First Amended Complaint, the

Trustee moved, contemporaneously with the filing of her original Complaint, to dismiss both the

Illinois Action and the Texas Action.

### 3.    Defendants' Involvement in the Bankruptcy Proceedings

127.    During BSA's bankruptcy proceedings, many Defendants filed objections to the

Plan.  Among other things, these Defendants argued that the Plan impermissibly impaired their

rights to assert coverage defenses following confirmation of the Plan.  The Defendants who

---

[6] These insurers included several Settling Insurance Companies, in addition to other insurers named as defendants in this First Amended Complaint.

[7] BSA sought declaratory relief regarding coverage for Abuse Claims generally—in other words, not tied to a specific Abuse Claim—only with respect to policies issued by Insurance Company of North America and Century Indemnity Company.  Both insurers are Settling Insurers and BSA's claims against both entities will be resolved in accordance with the terms of the settlement agreement.  BSA was also engaged in separate pre-petition coverage litigation with other Settling Insurers regarding coverage obligations for Abuse Claims generally; those actions will similarly be resolved in accordance with the terms of the settlement agreement.

opposed the Plan further asserted that they had no obligation to cover Abuse Claims because of the terms of their Insurance Policies, the manner in which Abuse Claims will be evaluated and potentially paid by the Trust, or both, among other defenses. Both the Bankruptcy Court and the District Court rejected Defendants' arguments that the Plan unlawfully impaired their rights under the Insurance Policies and confirmed the plan over the insurers' objections. Nonetheless, these Defendants continued to challenge the Plan, including an appeal of the District Court's decision to the Third Circuit.

128. Despite these Defendants' refusal to acknowledge their coverage obligations under the Insurance Policies, BSA and Local Councils were able to reach agreement with some of their insurers prior to confirmation of the Plan. Twenty-nine of BSA's and Local Councils' insurers paid more than $1.6 billion to resolve their liabilities for Abuse Claims.

129. The Trustee now seeks to resolve the remainder of BSA's and Local Councils' insurance coverage.

**D. The Trust's Processing of Claims.**

130. On the Effective Date, the more than 82,000 childhood sexual abuse claims (the "Abuse Claims") that were filed in BSA's chapter 11 cases were channeled to the Settlement Trust. The Settlement Trust assumed liability for such claims and is required to evaluate and process the Abuse Claims pursuant to the Trust Documents. The Trustee has overseen the Trust's establishment of procedures to administer, evaluate, and process the Abuse Claims. As of September 9, 2025, the Trust has paid $246,299,463 to 31,603 Survivors of sexual abuse in Scouting.

131. At the Trustee's direction and with her active engagement, the firm selected as the Settlement Trust's claims processing firm (the "Claims Processor") established a robust website

for the Settlement Trust.  The website includes a claims processing portal through which all Abuse Claims are being managed and initially evaluated by the applicable "Claims Administrator" in charge of the evaluation of all Abuse Claims submitted to the Settlement Trust, the Claims Processor, and, ultimately, the Trustee.

132.     At the Trustee's direction and with her active engagement, an "Expedited Distribution Questionnaire" was developed.  The Expedited Distribution Questionnaire was made available on August 3, 2023, to more than 7,000 holders of Abuse Claims who elected to release their Abuse Claim in exchange for a flat $3,500 payment.  As of September 9, 2025, the Settlement Trust has issued payments totaling $18,594,043 to 5,607 Abuse Claimants who made this "Expedited Distribution" election and returned a fully executed release to the Settlement Trust.[8]

133.     Claimants who did not elect to receive an Expedited Distribution may choose between two other claims processing options.  One of those options is the so-called "Matrix" claims process, pursuant to which Abuse Claims are evaluated and placed in a "tier" of abuse with a base value and a maximum value for each of six possible tiers.  The criteria for evaluating Matrix claims are set forth in the TDP and are quite complex.  The other claims processing alternative—the so-called Independent Review Option (the "IRO")—allows holders of Abuse Claims to have a neutral—designated in the TDP as a retired judge with tort experience (a "Neutral")—evaluate their claims through a process that is designed to replicate what a jury might award to such Claimants outside the Settlement Trust process.

134.     Approximately 36% of the Matrix Claimant population is 65 years old or older, and nearly 4%—that is, over 2,300 Claimants—are 80 years old or older.  More than 2,000 Claimants

---

[8] Pursuant to the Plan, the Trust may not pursue insurance coverage for such "Expedited Distribution" claims.

who have filed a Matrix Claim with the Trust are deceased. Of those, over 1,900 have not received an initial distribution from the Trust.

      1.   <u>Matrix Claims</u>

135.    At the Trustee's direction and with her active engagement, a detailed "General Claims Questionnaire" for submission by holders of Abuse Claims was developed. The Claimants' answers to the questions set forth in the General Claims Questionnaire allow the Settlement Trust to evaluate the claims consistent with the TDP.

136.    The General Claims Questionnaire was made available to more than 75,000 holders of Abuse Claims, or their counsel of record, on August 17, 2023. On January 31, 2024, the Trustee announced a bar date of May 31, 2024 for the submission of Abuse Claims under the Matrix claims processing option. Shortly after May 31, 2024, the Trustee announced that late Matrix claims would be accepted for processing by the Settlement Trust through July 26, 2024 at 6 pm EDT without an excuse or explanation being required of the submitting Claimant or counsel as to why the May 31, 2024 deadline had been missed. While a Claimant who failed to submit a claims questionnaire to the Settlement Trust by July 26, 2024 at 6 pm EDT may still do so with the Trustee's permission, the standard the Trustee has been applying for permission to be given is that "extraordinary circumstances beyond the claimant's control" prevented the Claimant from submitting a claim by the July 26, 2024 deadline.

137.    As of September 9, 2025, 58,115 Claimants have submitted their Claims Questionnaires to the Settlement Trust for determination under the settlement matrix set forth in the Plan. An additional 75 Claimants have submitted "Future Abuse Claim" eligibility forms, seeking to have their claims evaluated under the separate framework applicable to holders of

Future Abuse Claims, although only 2 of those Claimants have been found eligible to submit a Future Abuse Claim.

138.    As of September 9, 2025, the Settlement Trust has determined the allowed claim amounts for 40,184 Matrix Claimants—approximately 70% of all submitted Matrix claims. The Plan requires that all Claimants sign an irrevocable release before receiving any payment from the Settlement Trust on their allowed claims. As of September 9, 2025, 25,768 Matrix Claimants have returned an irrevocable release to the Settlement Trust which authorizes the Settlement Trust to make an initial distribution to those Claimants on their allowed Abuse Claims. Given the level of funding available to the Trust on the Effective Date of the Plan and the estimated amount of all allowed Abuse Claims, the Trustee set initial distributions at 1.5% of the allowed amount of a given claim. As of September 9, 2025, the Settlement Trust has made initial distributions aggregating $226,402,270 to 25,768 Matrix Claimants with allowed claims. Because releases are received by the Settlement Trust daily and payments are batched, payments will issue to the other Matrix Claimants with allowed claims as soon as possible.

139.    All claims received by the Settlement Trust are processed on a "first in, first out" basis. However, Claimants who have severe health concerns may seek expedited processing of their claims by submitting an Exigent Health Declaration from their physician, stating that there is substantial doubt that the Claimant will survive beyond the next six months. Claimants who submit Exigent Health Declarations are moved to the front of the processing queue. As of September 9, 2025, 148 Claimants have informed the Settlement Trust that they have exigent health circumstances by submitting an executed Exigent Health Declaration. The Settlement Trust has determined 148 Exigent Health claims to date. Of those, 127 Claimants have executed and returned irrevocable releases and have received an initial distribution on their allowed claims.

2.  IRO Claims

140.    As noted previously, the holders of Abuse Claims may elect to have their Abuse Claims resolved under a third claims processing alternative—the IRO.  Pursuant to this alternative, holders of Abuse Claims are entitled to have a retired judge with tort law experience (a "Neutral") evaluate their claims through a process that is designed to replicate what a jury might award to such Claimants outside the Settlement Trust process.  The Settlement Trust has been administering the Independent Review Option under the BSA Plan for the current population of 200 Abuse Claimants who timely (i) elected to have their claims determined through the IRO, and (ii) paid the required administrative fee to the Settlement Trust.  As of September 9, 2025, Neutrals have been engaged by the Settlement Trust and assigned to hear all of those claims.

141.    As of September 5, 2025, 145 IRO Claimants had their IRO hearings held and concluded by the Neutrals engaged by the Settlement Trust and assigned to hear those claims or such Claimants had elected to have their claims submitted to the Neutral based solely on a written record.  The Trustee has received the Neutral's Settlement Recommendation in 102 of those cases and is awaiting the Neutral's Settlement Recommendations in the other cases.  The Trustee has accepted 89 Settlement Recommendations, after asking the Responsible Insurers if they would consent to that Settlement Recommendation.  The Trustee is still evaluating the other Settlement Recommendations received to date.

142.    As of September 5, 2025, all remaining IRO hearings are scheduled to be concluded by year-end 2025.

**E.  The Insurers' Involvement in Claims Processing.**

143.    The Trustee has endeavored to involve the insurers in the evaluation of Matrix and IRO Claims.  As part of those efforts, the Settlement Trust provides regular notice to the insurers

regarding its evaluation of the claims and, in the case of the IRO process, solicits active participation and input from the insurers in the claim determination process.

    1.  <u>Matrix Claims</u>

144.   The Settlement Trust provides notice to the insurers at three significant stages of the evaluation of a Matrix claim.  The first notice, "Responsible Insurer Notice #1," notifies insurers of new Matrix claims as they are submitted to the Settlement Trust.  The second notice, "Responsible Insurer Notice #2," is issued once the Settlement Trust determines that certain claims are potentially covered by an insurer's policy(ies).  The Settlement Trust sends a notice of all such claims to all potentially "Responsible Insurers," which triggers a 21-day period for insurers to provide input on the Settlement Trust's calculation of a proposed award for those claims. Responsible Insurers that have executed a confidentiality agreement with the Settlement Trust have access to the claim file for each claim for which they are potentially responsible.

145.   Once the Settlement Trust has prepared a proposed award letter for a claim determined to be potentially covered by an insurer's policy(ies), the Settlement Trust provides the insurer with "Responsible Insurer Notice #3."  This notice includes a draft calculation for the proposed award, including a breakdown of the applicable mitigating and aggravating factors and the corresponding values assigned by the Trust.  The Responsible Insurers have 7 days to object to this proposed award.

    2.  <u>IRO Claims</u>

146.   Claimants electing the IRO must pay an initial $10,000 administrative fee to the Settlement Trust or request a fee waiver.  Within seven (7) days of paying this fee or receiving a waiver, the Claimant must file a complaint (the "IRO Complaint").  Within twenty-eight (28) days of the filing of the IRO Complaint, the Settlement Trust, acting through its Claims Administrator,

provides written notice to the applicable "Responsible Insurers" that issued policies to the Debtors or Local Councils based upon the allegations set forth in the IRO Complaint. The Claims Administrator for the IRO (Hon. Michael J. Reagan (Ret.)) then selects a Neutral to preside over the IRO process. Responsible Insurers are provided notice of the Neutral's name and, along with other participating parties, afforded an opportunity to challenge the appointment of the Neutral.

147.    Responsible Insurers may elect to participate in the IRO process by filing notice of an intent to participate, an answer to the IRO Complaint, or some other responsive pleading to the IRO Complaint. As of September 9, 2025, insurers have elected to participate in all IRO proceedings.

148.    Responsible Insurers and other parties are afforded the opportunity to participate in discovery in connection with an IRO Claim and have the right to request a sworn interview of the Claimant (up to six hours), a mental health examination, or supplemental signed and dated interrogatory responses from the Claimant.

149.    After the close of discovery in the IRO process, an IRO Claimant has the option of proceeding with a hearing or may submit his Claim for consideration by the Neutral based solely on the written record. The Claimant may, alternatively, elect to switch to the Matrix claims determination process. If the IRO Claimant elects to proceed to have his claim determined through the IRO process, he then pays a second $10,000 administrative fee or may request a fee waiver.

150.    Whether a Claimant proceeds with an IRO Hearing or submits his Claim to the Neutral for consideration based on the written record, the Responsible Insurers may file a brief responding to issues raised in a brief submitted by the Claimant. Defenses asserted by Responsible Insurers are considered in the Neutral's ultimate recommendation regarding settlement (the

"Settlement Recommendation").  The Claimant bears the burden of proof to establish his claims. Responsible Insurers bear the burden of proof to establish their defenses.

151.    For Claims that proceed to an IRO hearing, Responsible Insurers may call witnesses, designate deposition transcript excerpts, introduce exhibits, make evidentiary objections, cross-examine witnesses, and make arguments.

152.    For Claims that proceed based on the written record, Responsible Insurers are afforded the opportunity to make evidentiary objections and submit written arguments.

153.    To date, Responsible Insurers have participated in the resolution of all IRO Claims, irrespective of whether the Claim was evaluated by the Neutral based on the written record or the Neutral held an IRO hearing.

154.    At the conclusion of the IRO process, whether through an IRO hearing or for a claim submitted on the written record, the Neutral submits a Settlement Recommendation to the Trustee.  Notice of the Settlement Recommendation is provided to the Responsible Insurers, who are afforded an opportunity to consent to the Settlement Recommendation.  As of September 5, 2025, the insurers have objected to (i) 88 out of the 89 Settlement Recommendations accepted by the Trustee, and (ii) the 13 Settlement Recommendations currently under review by the Trustee. The sole exception was where the recommendation was to award the Claimant nothing.

## V.    BILLING CLAIMS TO INSURERS

155.    Defendants' prior argument that the claims asserted in this First Amended Complaint are not ripe is wrong.  Beginning in September 2024, the Trust has issued bills to insurers on a quarterly basis, demanding payment of specific amounts for specifically identified individual Abuse Claims.  The total value of the claims billed to the insurers to date (through Q2 2025) is  $12,348,332,122.  As of September 9, 2025, the Trust has not received any unconditional

payment for any Abuse Claim. No insurer has affirmed that it will unconditionally pay any amount for any Abuse Claim for which it has received a demand for payment in compliance with its policies.

156. Nearly all of the Defendants have issued correspondence in response to these demands outlining their coverage defenses and disputing the claims for insurance coverage.

## VI.    CAUSES OF ACTION

### COUNT ONE
### Declaratory Judgment (All Defendants)

157. The preceding paragraphs are set forth herein by reference.

158. Defendants have disputed, declined, or failed to perform fully their coverage obligations with respect to the Abuse Claims or, upon information and belief, will dispute, decline, or fail to perform fully these obligations.

159. Beginning with the Bankruptcy Case, the Defendants have opposed all efforts by BSA, and subsequently by the Trustee, to evaluate and determine the Abuse Claims; to establish criteria and protocols for making such determinations; to obtain insurance coverage under the Insurance Policies for Abuse Claims; and to make payments to Abuse Claimants. Among other things, the substantial majority of the Defendants and/or their affiliated companies filed objections to the Plan and Confirmation Order. Despite that the District Court affirmed the Bankruptcy Court's ruling in all respects, most of the Defendants appealed that ruling and continued to maintain their objections to the Plan to avoid payment of Abuse Claims under the Insurance Policies.

160. Since the Trust began providing written demands to certain of the Insurers for payment in September 2024, not a single Defendant has made a payment to the Trust for any Abuse

Claim.[9]  Nearly all of the Defendants have issued correspondence in which they have disputed their obligations to pay for Abuse Claims and asserted various coverage defenses for Abuse Claims under the Insurance Policies.  Among other purported coverage disputes, the Defendants, in whole or in part, have asserted that:

    a.  Certain of the Insurance Policies are "missing," do not exist, and/or were never issued;

    b.  They have no obligation under their Insurance Policies to pay for the Trust's administration costs in evaluating and determining values for Abuse Claims;

    c.  The Abuse Claims do not comprise an "occurrence," as such term is defined in the Insurance Policies, that triggers the Defendants' coverage obligations;

    d.  The Abuse Claims do not allege "bodily injury," as that term is defined in the Insurance Policies, during the policy periods of the Defendants' individual Insurance Policies that trigger their obligations thereunder; and

    e.  That an Abuse Claim payable under a particular Insurance Policy should actually be paid, or "allocated" to another Insurance Policy.

161.  Accordingly, and in light of these, and other, continuing disputes regarding the Defendants' obligations to make such payments for Abuse Claims, an actual, justiciable, and ripe controversy exists among the parties regarding the nature and extent of the Defendants' payment obligations for Abuse Claims under the Insurance Policies.

---

[9] On August 26, 2025, two days before the Court's status conference in this matter, and subsequently on September 3, 2025, the Liberty Group insurers sent correspondence in which these insurers:  (1) disputed that the vast majority of the Abuse Claims they had received payment demands for were payable under their Insurance Policies; (2) offered to pay a small fraction of the amounts demanded by the Trust for Abuse Claims; but (3) conditioned the majority of their payment upon a purported right to recoup all amounts paid under certain Liberty Group policies based upon their contention that those Insurance Policies are "fronting" policies that did not involve any actual transfer of risk to the Liberty Group insurers.  No other Defendant has paid anything in response to the Trust's demands.

162.    The Trustee asserts and seeks a declaratory judgment that each of the Defendants is obligated under each of the Insurance Policies it issued or subscribed to, including each policy period of each such Insurance Policy, to provide coverage in full for BSA's and/or Local Councils' liability for Abuse Claims that trigger the coverage obligations of the policy in question as set forth above, subject only to any applicable attachment points and any applicable limits of liability of the Insurance Policies in question.

163.    In addition, the Trust respectfully requests specific declarations that:

a.    The Trust has proven the existence and terms of enforceable insurance contracts under certain of the Insurance Policies that the Defendants allege are "missing," and/or were never issued;

b.    The Defendants are obligated under their Insurance Policies to pay for the Trust's administration costs in evaluating and determining values for Abuse Claims;

c.    An Abuse Claim constitutes an "occurrence," as such term is defined in the Insurance Policies, that triggers the Defendants' coverage obligations;

d.    The Abuse Claims allege "bodily injury" or "personal injury," including "mental anguish," as those terms are defined in the Insurance Policies, during the policy periods of the Defendants' individual Insurance Policies that trigger the Defendants' obligations thereunder; and

e.    The Defendants are jointly and severally liable for paying Abuse Claims and such claims can be allocated to and payable under any Insurance Policy chosen by the Trust that has been triggered by a "bodily injury" or "personal injury," including "mental anguish," arising from an "occurrence," during the applicable "policy period," as those terms are defined in the Insurance Policies.

34

164.     Because the Effective Date has occurred, among other things:

    a.  BSA's and Local Councils' liability for Abuse Claims has been channeled exclusively to and assumed by the Trust;

    b.  BSA has been discharged and released from liability for Abuse Claims, except as expressly provided in the Plan and the Confirmation Order;

    c.  BSA's and Local Councils' rights to insurance coverage for Abuse Claims, among other assets, have been transferred to the Trust pursuant to the Insurance Rights Transfer;

    d.  The Trustee is required to "determine . . . whether any [Defendant] issued coverage that is available to respond to [the] Claim . . . [and] shall seek reimbursement"; and

    e.  The Trust is solely responsible for holding, preserving, and maximizing the Insurance Policies, and directing the payment of all compensable Abuse Claims in accordance with the Trust Documents.

165.     The Trustee is entitled to a declaration of the rights and obligations of the parties, pursuant to 28 U.S.C. § 2201 and Federal Rule of Civil Procedure 57, regarding the nature and extent of the Defendants' obligations under the Insurance Policies to pay insurance proceeds in connection with Abuse Claims.

166.     The Trustee does not have another adequate available remedy at law, including because non-declaratory relief would not resolve coverage for future Abuse Claims.

167.     The requested declaratory relief will terminate some or all of the controversy between the Trustee and the Defendants.

## <u>COUNT TWO</u>
**Breach of Contract (American Home Assurance Company, Consolidated National Insurance Company, The Insurance Company of the State of Pennsylvania, Lexington**

Insurance Company, National Union Fire Insurance Company of Pittsburgh, PA, and New
Hampshire Insurance Company)

168.    The preceding paragraphs are set forth herein by reference.

169.    American Home Assurance Company, Consolidated National Insurance Company,
The Insurance Company of the State of Pennsylvania, Lexington Insurance Company, National
Union Fire Insurance Company of Pittsburgh, PA, and New Hampshire Insurance Company
(collectively the "AIG Group") issued and/or are responsible for the Insurance Policies identified
in Exhibits B and C to which they are listed as the Defendant Insurer (the "AIG Insurance
Policies").

170.    The AIG Insurance Policies are each valid and enforceable contracts that remain in
effect.

171.    As the holder of all rights under the AIG Insurance Policies under the Insurance
Transfer, the Trustee has standing to pursue claims under the Insurance Policies issued by the AIG
Group.

172.    BSA, Local Councils, and the Trust have satisfied all conditions precedent under
the Insurance Policies, including the payment of all premiums required by the AIG Insurance
Policies.

173.    The Abuse Claims allege bodily injury, personal injury, and/or mental anguish
occurring in whole or in part during the policy period of the AIG Insurance Policies.

174.    The terms of the AIG Insurance Policies unambiguously require the AIG Group to
indemnify the insured for any amounts the insured becomes legally obligated to pay for the Abuse
Claims.

175.    Alternatively, the terms of the AIG Insurance Policies are ambiguous and must be
construed in favor of coverage for the insured.

36

176.    The Trust has provided notice to the AIG Group of and demanded payment for Abuse Claims that are payable under the AIG Insurance Policies in accordance with the terms of the AIG Insurance Policies.

177.    The AIG Group nevertheless has failed and refuses to pay money due and owing to the Trust.

178.    The AIG Group's refusal to pay the Trust's unpaid indemnity costs is a breach of the AIG Insurance Policies under which the Trust has demanded payment.

179.    Because of the AIG Group's breach, the Trust has been damaged in the amount of its unpaid indemnity.

180.    As a direct and proximate result of the AIG Group's breaches of the AIG Insurance Policies, the Trust has suffered or will suffer substantial monetary damages and may continue to incur such damages in the future.

181.    The Trust has provided the AIG Group with a list of specific claims that are payable under each of the AIG Insurance Policies.

182.    The Trust has billed the AIG Group for these claims that are covered by and payable under the AIG Insurance Policies.

183.    To date, the AIG Group has failed to reimburse the Trust for the Abuse Claims.

184.    The Trust continues to incur unpaid indemnity costs related to Abuse Claims payable under the AIG Insurance Policies.  The Trust's damages will increase, and prejudgment interest will continue to accrue, until the AIG Group pays all sums due.

185.    The AIG Group's delay in paying the Trust's unpaid losses is vexatious and unreasonable.

## COUNT THREE
**Breach of Contract (Allianz Global Risks US Insurance Company, Fireman's Fund Insurance Company, Interstate Fire & Casualty Company, Jefferson Insurance Company, and National Surety Corporation)**

186.    The preceding paragraphs are set forth herein by reference.

187.    Allianz Global Risks US Insurance Company, Fireman's Fund Insurance Company, Interstate Fire & Casualty Company, Jefferson Insurance Company, and National Surety Corporation (collectively the "Allianz Group") issued and/or are responsible for the Insurance Policies identified in Exhibits B and C to which they are listed as the Defendant Insurer (the "Allianz Insurance Policies").

188.    The Allianz Insurance Policies are each valid and enforceable contracts that remain in effect.

189.    As the holder of all rights under the Allianz Insurance Policies under the Insurance Transfer, the Trustee has standing to pursue claims under the Allianz Insurance Policies.

190.    BSA, Local Councils, and the Trust have satisfied all conditions precedent under the Allianz Insurance Policies, including the payment of all premiums required by the Allianz Insurance Policies.

191.    The Abuse Claims allege bodily injury, personal injury, and/or mental anguish occurring in whole or in part during the policy period of the Allianz Insurance Policies.

192.    The terms of the Allianz Insurance Policies unambiguously require the Allianz Group to indemnify the insured for any amounts the insured becomes legally obligated to pay for the Abuse Claims.

193.    Alternatively, the terms of the Allianz Insurance Policies are ambiguous and must be construed in favor of coverage for the insured.

194.    The Trust has provided notice to the Allianz Group of and demanded payment for Abuse Claims that are payable under the Allianz Insurance Policies in accordance with the terms of the Allianz Insurance Policies.

195.    The Allianz Group nevertheless has failed and refuses to pay money due and owing to the Trust.

196.    The Allianz Group's refusal to pay the Trust's unpaid indemnity costs is a breach of the Allianz Insurance Policies to which the Trust has demanded payment.

197.    Because of the Allianz Group's breach, the Trust has been damaged in the amount of its unpaid indemnity.

198.    As a direct and proximate result of the Allianz Group's breaches of the Allianz Insurance Policies, the Trust has suffered or will suffer substantial monetary damages and may continue to incur such damages in the future.

199.    The Trust has provided the Allianz Group with a list of specific claims that are payable under each of the Allianz Insurance Policies.

200.    The Trust has billed the Allianz Group for these claims that are covered by and payable under the Allianz Insurance Policies.

201.    To date, the Allianz Group has failed to reimburse the Trust for the Abuse Claims.

202.    The Trust continues to incur unpaid indemnity costs related to Abuse Claims payable under the Allianz Insurance Policies.  The Trust's damages will increase, and prejudgment interest will continue to accrue, until the Allianz Group pays all sums due.

203.    The Allianz Group's delay in paying the Trust's unpaid losses is vexatious and unreasonable.

## COUNT FOUR
### Breach of Contract (Allied World Assurance Company (U.S.) Inc.)

204.    The preceding paragraphs are set forth herein by reference.

205.    Allied World Assurance Company (U.S.) Inc., ("Allied World") issued and/or is responsible for the Insurance Policies identified in Exhibit B to which it is listed as the Defendant Insurer (the "Allied World Insurance Policies").

206.    The Allied World Insurance Policies are each valid and enforceable contracts that remain in effect.

207.    As the holder of all rights under the Allied World Insurance Policies under the Insurance Transfer, the Trustee has standing to pursue claims under the Allied World Insurance Policies.

208.    BSA, Local Councils, and the Trust have satisfied all conditions precedent under the Allied World Insurance Policies, including the payment of all premiums required by the Allied World Insurance Policies.

209.    The Abuse Claims allege bodily injury, personal injury, and/or mental anguish occurring in whole or in part during the policy period of the Allied World Insurance Policies.

210.    The terms of the Allied World Insurance Policies unambiguously require Allied World to indemnify the insured for any amounts the insured becomes legally obligated to pay for the Abuse Claims.

211.    Alternatively, the terms of the Allied World Insurance Policies are ambiguous and must be construed in favor of coverage for the insured.

212.    The Trust has provided notice to Allied World of and demanded payment for Abuse Claims that are payable under the Allied World Insurance Policies in accordance with the terms of the Allied World Insurance Policies.

213.    Allied World nevertheless has failed and refuses to pay money due and owing to the Trust.

214.    Allied World's refusal to pay the Trust's unpaid indemnity costs is a breach of the Allied World Insurance Policies to which the Trust has demanded payment.

215.    Because of Allied World's breach, the Trust has been damaged in the amount of its unpaid indemnity.

216.    As a direct and proximate result of Allied World's breaches of the Allied World Insurance Policies, the Trust has suffered or will suffer substantial monetary damages and may continue to incur such damages in the future.

217.    The Trust has provided Allied World with a list of specific claims that are payable under the Allied World Insurance Policies.

218.    The Trust has billed Allied World for these claims that are covered by and payable under the Allied World Insurance Policies.

219.    To date, Allied World has failed to reimburse the Trust for the Abuse Claims.

220.    The Trust continues to incur unpaid indemnity costs related to Abuse Claims payable under the Allied World Insurance Policies.  The Trust's damages will increase, and prejudgment interest will continue to accrue, until Allied World pays all sums due.

221.    Allied World's delay in paying the Trust's unpaid losses is vexatious and unreasonable.

## COUNT FIVE
### Breach of Contract (Allstate Insurance Company)

222.    The preceding paragraphs are set forth herein by reference.

223.    Allstate Insurance Company ("Allstate") issued and/or is responsible for the Insurance Policies identified in Exhibit C to which it is listed as the Defendant Insurer (the "Allstate Policies").

224.    The Allstate Insurance Policies are each valid and enforceable contracts that remain in effect.

225.    As the holder of all rights under the Allstate Insurance Policies under the Insurance Transfer, the Trustee has standing to pursue claims under the Allstate Insurance Policies.

226.    BSA, Local Councils, and the Trust have satisfied all conditions precedent under the Allstate Insurance Policies, including the payment of all premiums required by the Allstate Insurance Policies.

227.    The Abuse Claims allege bodily injury, personal injury, and/or mental anguish occurring in whole or in part during the policy period of the Allstate Insurance Policies.

228.    The terms of the Allstate Insurance Policies unambiguously require Allstate to indemnify the insured for any amounts the insured becomes legally obligated to pay for the Abuse Claims.

229.    Alternatively, the terms of the Allstate Insurance Policies are ambiguous and must be construed in favor of coverage for the insured.

230.    The Trust has provided notice to Allstate of and demanded payment for Abuse Claims that are payable under the Allstate Insurance Policies in accordance with the terms of the Allstate Insurance Policies.

231.    Allstate nevertheless has failed and refuses to pay money due and owing to the Trust.

232.    Allstate's refusal to pay the Trust's unpaid indemnity costs is a breach of the Allstate Insurance Policies to which the Trust has demanded payment.

233.    Because of Allstate's breach, the Trust has been damaged in the amount of its unpaid indemnity.

234.    As a direct and proximate result of Allstate's breaches of the Allstate Insurance Policies, the Trust has suffered or will suffer substantial monetary damages and may continue to incur such damages in the future.

235.    The Trust has provided Allstate with a list of specific claims that are payable under each of the Allstate Insurance Policies.

236.    The Trust has billed Allstate for these claims that are covered by and payable under the Allstate Insurance Policies.

237.    To date, Allstate has failed to reimburse the Trust for the Abuse Claims.

238.    The Trust continues to incur unpaid indemnity costs related to Abuse Claims payable under the Allstate Insurance Policies.  The Trust's damages will increase, and prejudgment interest will continue to accrue, until Allstate pays all sums due.

239.    Allstate's delay in paying the Trust's unpaid losses is vexatious and unreasonable.

**COUNT SIX**
**Breach of Contract (Amerisure Insurance Company)**

240.    The preceding paragraphs are set forth herein by reference.

241.    Amerisure Insurance Company ("Amerisure") issued and/or is responsible for the Insurance Policy identified in Exhibit C to which it is listed as the Defendant Insurer (the "Amerisure Insurance Policy").

242.    The Amerisure Insurance Policy is a valid and enforceable contract that remains in effect.

243.     As the holder of all rights under the Amerisure Insurance Policy under the Insurance Transfer, the Trustee has standing to pursue claims under the Amerisure Insurance Policy.

244.     BSA, Local Councils, and the Trust have satisfied all conditions precedent under the Amerisure Insurance Policy, including the payment of all premiums required by the Amerisure Insurance Policy.

245.     The Abuse Claims allege bodily injury, personal injury, and/or mental anguish occurring in whole or in part during the policy period of the Amerisure Insurance Policy.

246.     The terms of the Amerisure Insurance Policy unambiguously require Amerisure to indemnify the insured for any amounts the insured becomes legally obligated to pay for the Abuse Claims.

247.     Alternatively, the terms of the Amerisure Insurance Policy are ambiguous and must be construed in favor of coverage for the insured.

248.     The Trust has provided notice to Amerisure of and demanded payment for Abuse Claims that are payable under the Amerisure Insurance Policy in accordance with the terms of the Amerisure Insurance Policy.

249.     Amerisure nevertheless has failed and refuses to pay money due and owing to the Trust.

250.     Amerisure's refusal to pay the Trust's unpaid indemnity costs is a breach of the Amerisure Insurance Policy.

251.     Because of Amerisure's breach, the Trust has been damaged in the amount of its unpaid indemnity.

252.    As a direct and proximate result of Amerisure's breaches of the Amerisure Insurance Policy, the Trust has suffered or will suffer substantial monetary damages and may continue to incur such damages in the future.

253.    The Trust has provided Amerisure with a list of specific claims that are payable under the Amerisure Insurance Policy.

254.    The Trust has billed Amerisure for these claims that are covered by and payable under the Amerisure Insurance Policy.

255.    To date, Amerisure has failed to reimburse the Trust for Abuse Claims.

256.    The Trust continues to incur unpaid indemnity costs related to Abuse Claims payable under the Amerisure Insurance Policy.  The Trust's damages will increase, and prejudgment interest will continue to accrue, until Amerisure pays all sums due.

257.    Amerisure's delay in paying the Trust's unpaid losses is vexatious and unreasonable.

## COUNT SEVEN
### Breach of Contract (Argonaut Insurance Company)

258.    The preceding paragraphs are set forth herein by reference.

259.    Argonaut Insurance Company ("Argonaut") issued and/or is responsible for the Insurance Policies identified in Exhibit B to which they are listed as the Defendant Insurer (the "Argonaut Insurance Policies").

260.    The Argonaut Insurance Policies are each valid and enforceable contracts that remain in effect.

261.    As the holder of all rights under the Argonaut Insurance Policies under the Insurance Transfer, the Trustee has standing to pursue claims under the Argonaut Insurance Policies.

262.    BSA, Local Councils, and the Trust have satisfied all conditions precedent under the Argonaut Insurance Policies, including the payment of all premiums required by the Argonaut Insurance Policies.

263.    The Abuse Claims allege bodily injury, personal injury, and/or mental anguish occurring in whole or in part during the policy period of the Argonaut Insurance Policies.

264.    The terms of the Argonaut Insurance Policies unambiguously require Argonaut to indemnify the insured for any amounts the insured becomes legally obligated to pay for the Abuse Claims.

265.    Alternatively, the terms of the Argonaut Insurance Policies are ambiguous and must be construed in favor of coverage for the insured.

266.    The Trust has provided notice to Argonaut of and demanded payment for Abuse Claims that are payable under the Argonaut Insurance Policies in accordance with the terms of the Argonaut Insurance Policies.

267.    Argonaut nevertheless has failed and refuses to pay money due and owing to the Trust.

268.    Argonaut's refusal to pay the Trust's unpaid indemnity costs is a breach of the Argonaut  Insurance Policies.

269.    Because of Argonaut's breach, the Trust has been damaged in the amount of its unpaid indemnity.

270.    As a direct and proximate result of Argonaut's breaches of the Argonaut Insurance Policies, the Trust has suffered or will suffer substantial monetary damages and may continue to incur such damages in the future.

271.    The Trust has provided Argonaut with a list of specific claims that are payable under each of the Argonaut Insurance Policies.

272.    The Trust has billed Argonaut for these claims that are covered by and payable under the Argonaut Insurance Policies.

273.    To date, Argonaut has failed to reimburse the Trust for the Abuse Claims.

274.    The Trust continues to incur unpaid indemnity costs related to Abuse Claims payable under the Argonaut Insurance Policies.  The Trust's damages will increase, and prejudgment interest will continue to accrue, until Argonaut pays all sums due.

275.    Argonaut's delay in paying the Trust's unpaid losses is vexatious and unreasonable.

**COUNT EIGHT**
**Breach of Contract (Arrowood Indemnity Company and Royal Indemnity Company)**

276.    The preceding paragraphs are set forth herein by reference.

277.    Arrowood Indemnity Company and Royal Indemnity Company (collectively "Arrowood") issued and/or is responsible for the Insurance Policies identified in Exhibits B and C to which it is listed as the Defendant Insurer (the "Arrowood Insurance Policies").

278.    The Arrowood Insurance Policies are each valid and enforceable contracts that remain in effect.

279.    As the holder of all rights under the Arrowood Insurance Policies under the Insurance Transfer, the Trustee has standing to pursue claims under the Arrowood Insurance Policies.

280.    BSA, Local Councils, and the Trust have satisfied all conditions precedent under the Arrowood Insurance Policies, including the payment of all premiums required by the Arrowood Insurance Policies.

281.    The Abuse Claims allege bodily injury, personal injury, and/or mental anguish occurring in whole or in part during the policy period of the Arrowood Insurance Policies.

282.    The terms of the Arrowood Insurance Policies unambiguously require Arrowood to indemnify the insured for any amounts the insured becomes legally obligated to pay for the Abuse Claims.

283.    Alternatively, the terms of the Arrowood Insurance Policies are ambiguous and must be construed in favor of coverage for the insured.

284.    The Trust has provided notice to Arrowood of and demanded payment for Abuse Claims that are payable under the Arrowood Insurance Policies in accordance with the terms of the Arrowood Insurance Policies.

285.    Arrowood nevertheless has failed and refuses to pay money due and owing to the Trust.

286.    Arrowood's refusal to pay the Trust's unpaid indemnity costs is a breach of the Arrowood Insurance Policies.

287.    Because of Arrowood's breach, the Trust has been damaged in the amount of its unpaid indemnity.

288.    As a direct and proximate result of Arrowood's breaches of the Arrowood Insurance Policies, the Trust has suffered or will suffer substantial monetary damages and may continue to incur such damages in the future.

289.    The Trust has provided Arrowood with a list of specific claims that are payable under each of the Arrowood Insurance Policies.

290.    The Trust has billed Arrowood for these claims that are covered by and payable under the Arrowood Insurance Policies.

291.    To date, Arrowood has failed to reimburse the Trust for the Abuse Claims.

292.    The Trust continues to incur unpaid indemnity costs related to Abuse Claims payable under the Arrowood Insurance Policies.  The Trust's damages will increase, and prejudgment interest will continue to accrue, until Arrowood pays all sums due.

293.    Arrowood's delay in paying the Trust's unpaid losses is vexatious and unreasonable.

## COUNT NINE
## Breach of Contract (Aviva plc)

294.    The preceding paragraphs are set forth herein by reference.

295.    Aviva plc ("Aviva") issued and/or is responsible for the Insurance Policies identified in Exhibit C to which it is listed as the Defendant Insurer (the "Aviva Insurance Policies").

296.    The Aviva Insurance Policies are each valid and enforceable contracts that remain in effect.

297.    As the holder of all rights under the Aviva Insurance Policies under the Insurance Transfer, the Trustee has standing to pursue claims under the Aviva Insurance Policies.

298.    BSA, Local Councils, and the Trust have satisfied all conditions precedent under the Aviva Insurance Policies, including the payment of all premiums required by the Aviva Insurance Policies.

299.    The Abuse Claims allege bodily injury, personal injury, and/or mental anguish occurring in whole or in part during the policy period of the Aviva Insurance Policies.

300.    The terms of the Aviva Insurance Policies unambiguously require Aviva to indemnify the insured for any amounts the insured becomes legally obligated to pay for the Abuse Claims.

49

301.    Alternatively, the terms of the Aviva Insurance Policies are ambiguous and must be construed in favor of coverage for the insured.

302.    The Trust has provided notice to Aviva of and demanded payment for Abuse Claims that are payable under the Aviva Insurance Policies in accordance with the terms of the Aviva Insurance Policies.

303.    Aviva nevertheless has failed and refuses to pay money due and owing to the Trust.

304.    Aviva's refusal to pay the Trust's unpaid indemnity costs is a breach of the Aviva Insurance Policies.

305.    Because of Aviva's breach, the Trust has been damaged in the amount of its unpaid indemnity.

306.    As a direct and proximate result of Aviva's breaches of the Aviva Insurance Policies, the Trust has suffered or will suffer substantial monetary damages and may continue to incur such damages in the future.

307.    The Trust has provided Aviva with a list of specific claims that are payable under each of the Aviva Insurance Policies.

308.    The Trust has billed Aviva for these claims that are covered by and payable under the Aviva Insurance Policies.

309.    To date, Aviva has failed to reimburse the Trust for the Abuse Claims.

310.    The Trust continues to incur unpaid indemnity costs related to Abuse Claims payable under the Aviva Insurance Policies.  The Trust's damages will increase, and prejudgment interest will continue to accrue, until Aviva pays all sums due.

311.    Aviva's delay in paying the Trust's unpaid losses is vexatious and unreasonable.

## COUNT TEN
### Breach of Contract
### (Axis Specialty Insurance Company and Axis Surplus Insurance Company)

312.    The preceding paragraphs are set forth herein by reference.

313.    Axis Specialty Insurance Company and Axis Surplus Insurance Company (collectively the "Axis Group") issued and/or are responsible for the Insurance Policies identified in Exhibit B to which they are listed as the Defendant Insurer (the "Axis Group Insurance Policies").

314.    The Axis Group Insurance Policies are each valid and enforceable contracts that remain in effect.

315.    As the holder of all rights under the Axis Group Insurance Policies under the Insurance Transfer, the Trustee has standing to pursue claims under the Axis Group Insurance Policies.

316.    BSA, Local Councils, and the Trust have satisfied all conditions precedent under the Axis Group Insurance Policies, including the payment of all premiums required by the Axis Group Insurance Policies.

317.    The Abuse Claims allege bodily injury, personal injury, and/or mental anguish occurring in whole or in part during the policy period of the Axis Group Insurance Policies.

318.    The terms of the Axis Group Insurance Policies unambiguously require the Axis Group to defend or reimburse the insured for any defense costs incurred in connection with the Abuse Claims, and to indemnify the insured for any amounts the insured becomes legally obligated to pay for the Abuse Claims.

319.    Alternatively, the terms of the Axis Group Insurance Policies are ambiguous and must be construed in favor of coverage for the insured.

320.    The Trust has provided notice to the Axis Group of and demanded payment for Abuse Claims that are payable under the Axis Group Insurance Policies in accordance with the terms of the Axis Group Insurance Policies.

321.    The Axis Group nevertheless has failed and refuses to pay money due and owing to the Trust.

322.    The Axis Group's refusal to pay the Trust's unpaid indemnity costs is a breach of the Axis Group Insurance Policies.

323.    Because of the Axis Group's breach, the Trust has been damaged in the amount of its unpaid indemnity.

324.    As a direct and proximate result of the Axis Group's breaches of the Axis Group Insurance Policies, the Trust has suffered or will suffer substantial monetary damages and may continue to incur such damages in the future.

325.    The Trust has provided the Axis Group with a list of specific claims that are payable under each of the Axis Group Insurance Policies.

326.    The Trust has billed the Axis Group for these claims that are covered by and payable under the Axis Group Insurance Policies.

327.    To date, the Axis Group has failed to reimburse the Trust for the Abuse Claims.

328.    The Trust continues to incur unpaid indemnity costs related to Abuse Claims payable under the Axis Group Insurance Policies.  The Trust's damages will increase, and prejudgment interest will continue to accrue, until the Axis Group pays all sums due.

329.    The Axis Group's delay in paying the Trust's unpaid losses is vexatious and unreasonable.

## COUNT ELEVEN
### Breach of Contract (The Cincinnati Insurance Company)

330.    The preceding paragraphs are set forth herein by reference.

331.    Cincinnati Insurance Company ("Cincinnati") issued and/or is responsible for the Insurance Policy identified in Exhibit C to which it is listed as the Defendant Insurer (the "Cincinnati Insurance Policy").

332.    The Cincinnati Insurance Policy is a valid and enforceable contract that remains in effect.

333.    As the holder of all rights under the Cincinnati Insurance Policy under the Insurance Transfer, the Trustee has standing to pursue claims under the Cincinnati Insurance Policy.

334.    BSA, Local Councils, and the Trust have satisfied all conditions precedent under the Cincinnati Insurance Policy, including the payment of all premiums required by the Cincinnati Insurance Policy.

335.    The Abuse Claims allege bodily injury, personal injury, and/or mental anguish occurring in whole or in part during the policy period of the Cincinnati Insurance Policy.

336.    The terms of the Cincinnati Insurance Policy unambiguously requires Cincinnati to defend or reimburse the insured for any defense costs incurred in connection with the Abuse Claims, and to indemnify the insured for any amounts the insured becomes legally obligated to pay for the Abuse Claims.

337.    Alternatively, the terms of the Cincinnati Insurance Policy are ambiguous and must be construed in favor of coverage for the insured.

338.    The Trust has provided notice to Cincinnati of and demanded payment for Abuse Claims payable under the Cincinnati Insurance Policy in accordance with the terms of the Cincinnati Insurance Policy.

339.    Cincinnati nevertheless has failed and refuses to pay money due and owing to the Trust.

340.    Cincinnati's refusal to pay the Trust's unpaid indemnity costs is a breach of the Cincinnati Insurance Policy to which the Trust has demanded payment.

341.    Because of Cincinnati's breach, the Trust has been damaged in the amount of its unpaid indemnity.

342.    As a direct and proximate result of Cincinnati's breaches of the Cincinnati Insurance Policy, the Trust has suffered or will suffer substantial monetary damages and may continue to incur such damages in the future.

343.    The Trust has provided Cincinnati with a list of specific claims that are payable under the Cincinnati Insurance Policy.

344.    The Trust has billed Cincinnati for these claims that are covered by and payable under the Cincinnati Insurance Policies.

345.    To date, Cincinnati has failed to reimburse the Trust for the Abuse Claims.

346.    The Trust continues to incur unpaid indemnity costs related to Abuse Claims payable under the Cincinnati Insurance Policy.  The Trust's damages will increase, and prejudgment interest will continue to accrue, until Cincinnati pays all sums due.

347.    Cincinnati's delay in paying the Trust's unpaid losses is vexatious and unreasonable.

### COUNT TWELVE
**Breach of Contract (American Casualty Company of Reading, Pennsylvania, Columbia Casualty Company, Continental Casualty Company, The Continental Insurance Company, and National Fire Insurance Company of Hartford)**

348.    The preceding paragraphs are set forth herein by reference.

349.    American Casualty Company of Reading, Pennsylvania, Columbia Casualty Company, Continental Casualty Company, The Continental Insurance Company, and National Fire Insurance Company of Hartford (collectively the "CNA Group") issued and/or are responsible for the Insurance Policies identified in Exhibits B and C to which they are listed as the Defendant Insurer (the "CNA Group Insurance Policies").

350.    The CNA Group Insurance Policies are each valid and enforceable contracts that remain in effect.

351.    As the holder of all rights under the CNA Group Insurance Policies under the Insurance Transfer, the Trustee has standing to pursue claims under the CNA Group Insurance Policies.

352.    BSA, Local Councils, and the Trust have satisfied all conditions precedent under the CNA Group Insurance Policies, including the payment of all premiums required by the CNA Group Insurance Policies.

353.    The Abuse Claims allege bodily injury, personal injury, and/or mental anguish occurring in whole or in part during the policy period of the CNA Group Insurance Policies.

354.    The terms of the CNA Group Insurance Policies unambiguously require the CNA Group to defend or reimburse the insured for any defense costs incurred in connection with the Abuse Claims, and to indemnify the insured for any amounts the insured becomes legally obligated to pay for the Abuse Claims.

355.    Alternatively, the terms of the CNA Group Insurance Policies are ambiguous and must be construed in favor of coverage for the insured.

356.    The Trust has provided notice to the CNA Group of and demanded payment for Abuse Claims that are payable under the CNA Group Insurance Policies in accordance with the terms of the CNA Group Insurance Policies.

357.    The CNA Group nevertheless has failed and refuses to pay money due and owing to the Trust.

358.    The CNA Group's refusal to pay the Trust's unpaid indemnity costs is a breach of the CNA Group Insurance Policies to which the Trust has demanded payment.

359.    Because of the CNA Group's breach, the Trust has been damaged in the amount of its unpaid indemnity.

360.    As a direct and proximate result of the CNA Group's breaches of the CNA Group Insurance Policies the Trust has suffered or will suffer substantial monetary damages and may continue to incur such damages in the future.

361.    The Trust has provided the CNA Group with a list of specific claims that are payable under each of the CNA Group Insurance Policies.

362.    The Trust has billed the CNA Group for these claims that are covered by and payable under the CNA Group Insurance Policies.

363.    To date, the CNA Group has failed to reimburse the Trust for the Abuse Claims.

364.    The Trust continues to incur unpaid indemnity costs related to Abuse Claims payable under the CNA Group Insurance Policies.  The Trust's damages will increase, and prejudgment interest will continue to accrue, until the CNA Group pays all sums due.

365.    The CNA Group's delay in paying the Trust's unpaid losses is vexatious and unreasonable.

## COUNT THIRTEEN
### Breach of Contract (Columbia Insurance Company)

366. The preceding paragraphs are set forth herein by reference.

367. Columbia Insurance Company ("Columbia") issued and/or is responsible for the Insurance Policies identified in Exhibit C to which it is listed as the Defendant Insurer (the "Columbia Insurance Policies").

368. The Columbia Insurance Policies are each valid and enforceable contracts that remain in effect.

369. As the holder of all rights under the Columbia Insurance Policies under the Insurance Transfer, the Trustee has standing to pursue claims under the Columbia Insurance Policies.

370. BSA, Local Councils, and the Trust have satisfied all conditions precedent under the Columbia Insurance Policies, including the payment of all premiums required by the Columbia Insurance Policies.

371. The Abuse Claims allege bodily injury, personal injury, and/or mental anguish occurring in whole or in part during the policy period of the Columbia Insurance Policies.

372. The terms of the Columbia Insurance Policies unambiguously require Columbia to defend or reimburse the insured for any defense costs incurred in connection with the Abuse Claims, and to indemnify the insured for any amounts the insured becomes legally obligated to pay for the Abuse Claims.

373. Alternatively, the terms of the Columbia Insurance Policies are ambiguous and must be construed in favor of coverage for the insured.

374.     The Trust has provided notice to Columbia of and demanded payment for Abuse Claims that are payable under the Columbia Insurance Policies in accordance with the terms of the Columbia Insurance Policies.

375.     Columbia nevertheless has failed and refuses to pay money due and owing to the Trust.

376.     Columbia's refusal to pay the Trust's unpaid indemnity costs is a breach of the Columbia Insurance Policies to which the Trust has demanded payment.

377.     Because of Columbia's breach, the Trust has been damaged in the amount of its unpaid indemnity.

378.     As a direct and proximate result of Columbia's breaches of the Columbia Insurance Policies, the Trust has suffered or will suffer substantial monetary damages and may continue to incur such damages in the future.

379.     The Trust has provided Columbia with a list of specific claims that are payable under each of the Columbia Insurance Policies.

380.     The Trust has billed Columbia for these claims that are covered by and payable under the Columbia Insurance Policies.

381.     To date, Columbia has failed to reimburse the Trust for the Abuse Claims.

382.     The Trust continues to incur unpaid indemnity costs related to Abuse Claims payable under the Columbia Insurance Policies.  The Trust's damages will increase, and prejudgment interest will continue to accrue, until Columbia pays all sums due.

383.     Columbia's delay in paying the Trust's unpaid losses is vexatious and unreasonable.

## COUNT FOURTEEN
**Breach of Contract (Endurance American Insurance Company and Endurance American Specialty Insurance Company)**

384.    The preceding paragraphs are set forth herein by reference.

385.    Endurance American Insurance Company and Endurance American Specialty Insurance Company (collectively the "Endurance Group")) issued and/or are responsible for the Insurance Policies identified in Exhibit B to which they are listed as the Defendant Insurer (the "Endurance Insurance Policies").

386.    The Endurance Insurance Policies are each valid and enforceable contracts that remain in effect.

387.    As the holder of all rights under the Endurance Insurance Policies under the Insurance Transfer, the Trustee has standing to pursue claims under the Endurance Insurance Policies.

388.    BSA, Local Councils, and the Trust have satisfied all conditions precedent under the Endurance Insurance Policies, including the payment of all premiums required by the Endurance Insurance Policies.

389.    The Abuse Claims allege bodily injury, personal injury, and/or mental anguish occurring in whole or in part during the policy period of the Endurance Insurance Policies.

390.    The terms of the Endurance Insurance Policies unambiguously require the Endurance Group to defend or reimburse the insured for any defense costs incurred in connection with the Abuse Claims, and to indemnify the insured for any amounts the insured becomes legally obligated to pay for the Abuse Claims.

391.    Alternatively, the terms of the Endurance Insurance Policies are ambiguous and must be construed in favor of coverage for the insured.

392.    The Trust has provided notice to the Endurance Group of and demanded payment for Abuse Claims that are payable under the Endurance Insurance Policies in accordance with the terms of the Endurance Insurance Policies.

393.    The Endurance Group nevertheless has failed and refuses to pay money due and owing to the Trust.

394.    The Endurance Group's refusal to pay the Trust's unpaid indemnity costs is a breach of the Endurance Insurance Policies to which the Trust has demanded payment.

395.    Because of the Endurance Group's breach, the Trust has been damaged in the amount of its unpaid indemnity.

396.    As a direct and proximate result of the Endurance Group's breaches of the Endurance Insurance Policies, the Trust has suffered or will suffer substantial monetary damages and may continue to incur such damages in the future.

397.    The Trust has provided the Endurance Group with a list of specific claims that is payable under each of the Endurance Insurance Policies.

398.    The Trust has billed the Endurance Group for these claims that are covered by and payable under the Endurance Group Insurance Policies.

399.    To date, the Endurance Group has failed to reimburse the Trust for Abuse Claims.

400.    The Trust continues to incur unpaid indemnity costs related to Abuse Claims payable under the Endurance Insurance Policies.  The Trust's damages will increase, and prejudgment interest will continue to accrue, until the Endurance Group pays all sums due.

401.    The Endurance Group's delay in paying the Trust's unpaid losses is vexatious and unreasonable.

## COUNT FIFTEEN
### Breach of Contract (Erie and Niagara Insurance Company)

402.    The preceding paragraphs are set forth herein by reference.

403.    Erie and Niagara Insurance Company ("Erie and Niagara") issued and/or are responsible for the Insurance Policy identified in Exhibit C to which they are listed as the Defendant Insurer (the "Erie and Niagara Insurance Policy").

404.    The Erie and Niagara Insurance Policy is a valid and enforceable contract that remains in effect.

405.    As the holder of all rights under the Erie and Niagara Insurance Policy under the Insurance Transfer, the Trustee has standing to pursue claims under the Erie and Niagara Insurance Policy.

406.    BSA, Local Councils, and the Trust have satisfied all conditions precedent under the Erie and Niagara Insurance Policy, including the payment of all premiums required by the Erie and Niagara Insurance Policy.

407.    The Abuse Claims allege bodily injury, personal injury, and/or mental anguish occurring in whole or in part during the policy period of the Erie and Niagara Insurance Policy.

408.    The terms of the Erie and Niagara Insurance Policy unambiguously require Erie and Niagara to defend or reimburse the insured for any defense costs incurred in connection with the Abuse Claims, and to indemnify the insured for any amounts the insured becomes legally obligated to pay for the Abuse Claims.

409.    Alternatively, the terms of the Erie and Niagara Insurance Policy are ambiguous and must be construed in favor of coverage for the insured.

410.    The Trust has provided notice to Erie and Niagara of and demanded payment for Abuse Claims that are payable under the Erie and Niagara Insurance Policy in accordance with the terms of the Erie and Niagara Insurance Policy.

411.    Erie and Niagara nevertheless has failed and refuses to pay money due and owing to the Trust.

412.    Erie and Niagara's refusal to pay the Trust's unpaid indemnity costs is a breach of the Erie and Niagara Insurance Policy.

413.    Because of Erie and Niagara's breach, the Trust has been damaged in the amount of its unpaid indemnity.

414.    As a direct and proximate result of Erie and Niagara's breaches of the Erie and Niagara Insurance Policy, the Trust has suffered or will suffer substantial monetary damages and may continue to incur such damages in the future.

415.    The Trust has provided Erie and Niagara with a list of specific claims that are payable under the Erie and Niagara Insurance Policy.

416.    The Trust has billed Erie and Niagara for these claims that are covered by and payable under the Erie and Niagara Insurance Policy.

417.    To date, Erie and Niagara has failed to reimburse the Trust for the Abuse Claims.

418.    The Trust continues to incur unpaid indemnity costs related to Abuse Claims payable under the Erie and Niagara Insurance Policy.  The Trust's damages will increase, and prejudgment interest will continue to accrue, until Erie and Niagara pays all sums due.

419.    Erie and Niagara's delay in paying the Trust's unpaid losses is vexatious and unreasonable.

## COUNT SIXTEEN
## Breach of Contract (Erie Family Life Insurance Company and Erie Insurance Exchange)

420.    The preceding paragraphs are set forth herein by reference.

421.    Erie Family Life Insurance Company and Erie Insurance Exchange (collectively the "Erie Group") issued and/or are responsible for the Insurance Policies identified in Exhibit C to which they are listed as the Defendant Insurer (the "Erie Insurance Policies").

422.    The Erie Insurance Policies are each valid and enforceable contracts that remain in effect.

423.    As the holder of all rights under the Erie Insurance Policies under the Insurance Transfer, the Trustee has standing to pursue claims under the Erie Insurance Policies.

424.    BSA, Local Councils, and the Trust have satisfied all conditions precedent under the Erie Insurance Policies, including the payment of all premiums required by the Erie Insurance Policies.

425.    The Abuse Claims allege bodily injury, personal injury, and/or mental anguish occurring in whole or in part during the policy period of the Erie Insurance Policies.

426.    The terms of the Erie Insurance Policies unambiguously require the Erie Group to defend or reimburse the insured for any defense costs incurred in connection with the Abuse Claims, and to indemnify the insured for any amounts the insured becomes legally obligated to pay for the Abuse Claims.

427.    Alternatively, the terms of the Erie Insurance Policies are ambiguous and must be construed in favor of coverage for the insured.

428.    The Trust has provided notice to the Erie Group of and demanded payment for Abuse Claims that are payable under the Erie Insurance Policies in accordance with the terms of the Erie Insurance Policies.

429.     The Erie Group nevertheless has failed and refuses to pay money due and owing to the Trust.

430.     The Erie Group's refusal to pay the Trust's unpaid indemnity costs is a breach of the Erie Insurance Policies.

431.     Because of the Erie Group's breach, the Trust has been damaged in the amount of its unpaid indemnity.

432.     As a direct and proximate result of the Erie Group's breaches of the Erie Insurance Policies, the Trust has suffered or will suffer substantial monetary damages and may continue to incur such damages in the future.

433.     The Trust has provided the Erie Group with a list of specific claims that are payable under each of the Erie Insurance Policies.

434.     The Trust has billed the Erie Group for these claims that are covered by and payable under the Erie Insurance Policies.

435.     To date, the Erie Group has failed to reimburse the Trust for the Abuse Claims.

436.     The Trust continues to incur unpaid indemnity costs related to Abuse Claims payable under the Erie Insurance Policies.  The Trust's damages will increase, and prejudgment interest will continue to accrue, until the Erie Group pays all sums due.

437.     The Erie Group's delay in paying the Trust's unpaid losses is vexatious and unreasonable.

## COUNT SEVENTEEN
## Breach of Contract (Evanston Insurance Company)

438.     The preceding paragraphs are set forth herein by reference.

439.    Evanston Insurance Company ("Evanston") issued and/or is responsible for the Insurance Policies identified in Exhibit B to which it is listed as the Defendant Insurer (the "Evanston Insurance Policies").

440.    The Evanston Insurance Policies are each valid and enforceable contracts that remain in effect.

441.    As the holder of all rights under the Evanston Insurance Policies under the Insurance Transfer, the Trustee has standing to pursue claims under the Evanston Insurance Policies.

442.    BSA, Local Councils, and the Trust have satisfied all conditions precedent under the Evanston Insurance Policies, including the payment of all premiums required by the Evanston Insurance Policies.

443.    The Abuse Claims allege bodily injury, personal injury, and/or mental anguish occurring in whole or in part during the policy period of the Evanston Insurance Policies.

444.    The terms of the Evanston Insurance Policies unambiguously require Evanston to defend or reimburse the insured for any defense costs incurred in connection with the Abuse Claims, and to indemnify the insured for any amounts the insured becomes legally obligated to pay for the Abuse Claims.

445.    Alternatively, the terms of the Evanston Insurance Policies are ambiguous and must be construed in favor of coverage for the insured.

446.    The Trust has provided notice to Evanston of and demanded payment for Abuse Claims that are payable under the Evanston Insurance Policies in accordance with the terms of the Evanston Insurance Policies.

447.    Evanston nevertheless has failed and refuses to pay money due and owing to the Trust.

448.    Evanston's refusal to pay the Trust's unpaid indemnity costs is a breach of the Evanston Insurance Policies to which the Trust has demanded payment.

449.    Because of Evanston's breach, the Trust has been damaged in the amount of its unpaid indemnity.

450.    As a direct and proximate result of Evanston's breaches of the Evanston Insurance Policies, the Trust has suffered or will suffer substantial monetary damages and may continue to incur such damages in the future.

451.    The Trust has provided Evanston with a list of specific claims that are payable under each of the Evanston Insurance Policies.

452.    The Trust has billed Evanston for these claims that are covered by and payable under the Evanston Insurance Policies.

453.    To date, Evanston has failed to reimburse the Trust for the Abuse Claims.

454.    The Trust continues to incur unpaid indemnity costs related to Abuse Claims payable under the Evanston Insurance Policies.  The Trust's damages will increase, and prejudgment interest will continue to accrue, until Evanston pays all sums due.

455.    Evanston's delay in paying the Trust's unpaid losses is vexatious and unreasonable.

## COUNT EIGHTEEN
### Breach of Contract (Everest National Insurance Company)

456.    The preceding paragraphs are set forth herein by reference.

457.    Everest National Insurance Company ("Everest") issued and/or is responsible for the Insurance Policies identified in Exhibit B to which it is listed as the Defendant Insurer (the "Everest Insurance Policies").

66

458.    The Everest Insurance Policies are each valid and enforceable contracts that remain in effect.

459.    As the holder of all rights under the Everest Insurance Policies under the Insurance Transfer, the Trustee has standing to pursue claims under the Everest Insurance Policies.

460.    BSA, Local Councils, and the Trust have satisfied all conditions precedent under the Everest Insurance Policies, including the payment of all premiums required by the Everest Insurance Policies.

461.    The Abuse Claims allege bodily injury, personal injury, and/or mental anguish occurring in whole or in part during the policy period of the Everest Insurance Policies.

462.    The terms of the Everest Insurance Policies unambiguously require Everest to defend or reimburse the insured for any defense costs incurred in connection with the Abuse Claims, and to indemnify the insured for any amounts the insured becomes legally obligated to pay for the Abuse Claims.

463.    Alternatively, the terms of the Everest Insurance Policies are ambiguous and must be construed in favor of coverage for the insured.

464.    The Trust has provided notice to Everest of and demanded payment or Abuse Claims that are payable under the Everest Insurance Policies in accordance with the terms of the Insurance Policies issued by Everest.

465.    Everest nevertheless has failed and refuses to pay money due and owing to the Trust.

466.    Everest's refusal to pay the Trust's unpaid indemnity costs is a breach of Everest's policies.

467.    Because of Everest's breach, the Trust has been damaged in the amount of its unpaid indemnity.

468.    As a direct and proximate result of Everest's breaches of the Everest Insurance Policies, the Trust has suffered or will suffer substantial monetary damages and may continue to incur such damages in the future.

469.    The Trust has provided Everest with a list of specific claims that are payable under each of Everest policies.

470.    The Trust has billed Everest for these claims that are covered by and payable under the Everest Insurance Policies.

471.    To date, Everest has failed to reimburse the Trust for the Abuse Claims.

472.    The Trust continues to incur unpaid indemnity costs related to Abuse Claims payable under the Everest Insurance Policies.  The Trust's damages will increase, and prejudgment interest will continue to accrue, until Everest pays all sums due.

473.    Everest's delay in paying the Trust's unpaid losses is vexatious and unreasonable.

## COUNT NINETEEN
### Breach of Contract (First Insurance Company of Hawaii, Ltd.)

474.    The preceding paragraphs are set forth herein by reference.

475.    First Insurance Company of Hawaii, Ltd. ("First Insurance") issued and/or is responsible for the Insurance Policies identified in Exhibit C to which it is listed as the Defendant Insurer (the "First Insurance Policies").

476.    The First Insurance Policies are each valid and enforceable contracts that remain in effect.

477.    As the holder of all rights under the First Insurance Policies under the Insurance Transfer, the Trustee has standing to pursue claims under the First Insurance Policies.

478.    BSA, Local Councils, and the Trust have satisfied all conditions precedent under the First Insurance Policies, including the payment of all premiums required by the First Insurance Policies.

479.    The Abuse Claims allege bodily injury, personal injury, and/or mental anguish occurring in whole or in part during the policy period of the First Insurance Policies.

480.    The terms of the First Insurance Policies unambiguously require First Insurance to defend or reimburse the insured for any defense costs incurred in connection with the Abuse Claims, and to indemnify the insured for any amounts the insured becomes legally obligated to pay for the Abuse Claims.

481.    Alternatively, the terms of the First Insurance Policies are ambiguous and must be construed in favor of coverage for the insured.

482.    The Trust has provided notice to First Insurance of and demanded payment for Abuse Claims payable under the First Insurance Policies in accordance with the terms of the First Insurance Policies.

483.    First Insurance nevertheless has failed and refuses to pay money due and owing to the Trust.

484.    First Insurance's refusal to pay the Trust's unpaid indemnity costs is a breach of the First Insurance Policies to which the Trust has demanded payment.

485.    Because of First Insurance's breach, the Trust has been damaged in the amount of its unpaid indemnity.

486.    As a direct and proximate result of First Insurance's breaches of the First Insurance Policies the Trust has suffered or will suffer substantial monetary damages and may continue to incur such damages in the future.

487.    The Trust has provided First Insurance with a list of specific claims payable under each of First Insurance policies.

488.    The Trust has billed First Insurance for these claims that are covered by and payable under the First Insurance Policies.

489.    To date, First Insurance has failed to reimburse the Trust for the Abuse Claims.

490.    The Trust continues to incur unpaid indemnity costs related to Abuse Claims payable under the First Insurance Policies.  The Trust's damages will increase, and prejudgment interest will continue to accrue, until First Insurance pays all sums due.

491.    First Insurance's delay in paying the Trust's unpaid losses is vexatious and unreasonable.

## COUNT TWENTY
### Breach of Contract (Gemini Insurance Company)

492.    The preceding paragraphs are set forth herein by reference.

493.    Gemini Insurance Company ("Gemini") issued and/or is responsible for the Insurance Policies identified in Exhibit B to which it is listed as the Defendant Insurer (the "Gemini Insurance Policies").

494.    The Gemini Insurance Policies are each valid and enforceable contracts that remain in effect.

495.    As the holder of all rights under the Gemini Insurance Policies under the Insurance Transfer, the Trustee has standing to pursue claims under the Gemini Insurance Policies.

496.    BSA, Local Councils, and the Trust have satisfied all conditions precedent under the Gemini Insurance Policies, including the payment of all premiums required by the Gemini Insurance Policies.

497.    The Abuse Claims allege bodily injury, personal injury, and/or mental anguish occurring in whole or in part during the policy period of the Gemini Insurance Policies.

498.    The terms of the Gemini Insurance Policies unambiguously require Gemini to defend or reimburse the insured for any defense costs incurred in connection with the Abuse Claims, and to indemnify the insured for any amounts the insured becomes legally obligated to pay for the Abuse Claims.

499.    Alternatively, the terms of the Gemini Insurance Policies are ambiguous and must be construed in favor of coverage for the insured.

500.    The Trust has provided notice to Gemini of and demanded payment for Abuse Claims payable under the Gemini Insurance Policies in accordance with the terms of the Gemini Insurance Policies.

501.    Gemini nevertheless has failed and refuses to pay money due and owing to the Trust.

502.    Gemini's refusal to pay the Trust's unpaid indemnity costs is a breach of the Gemini Insurance Policies to which the Trust has demanded payment.

503.    Because of Gemini's breach, the Trust has been damaged in the amount of its unpaid indemnity.

504.    As a direct and proximate result of Gemini's breaches of the Gemini Insurance Policies, the Trust has suffered or will suffer substantial monetary damages and may continue to incur such damages in the future.

505.    The Trust has provided Gemini with a list of specific claims payable under each of the Gemini Insurance Policies.

506.    The Trust has billed Gemini for these claims that are covered by and payable under the Gemini Insurance Policies.

507.    To date, Gemini has failed to reimburse the Trust for the Abuse Claims.

508.    The Trust continues to incur unpaid indemnity costs related to Abuse Claims payable under the Gemini Insurance Policies. The Trust's damages will increase, and prejudgment interest will continue to accrue, until Gemini pays all sums due.

509.    Gemini's delay in paying the Trust's unpaid losses is vexatious and unreasonable.

**COUNT TWENTY-ONE**
**Breach of Contract (General Star Indemnity Company)**

510.    The preceding paragraphs are set forth herein by reference.

511.    General Star Indemnity Company ("General Star") issued and/or is responsible for the Insurance Policies identified in Exhibit B to which it is listed as the Defendant Insurer (the "General Star Insurance Policies").

512.    The General Star Insurance Policies are each valid and enforceable contracts that remain in effect.

513.    As the holder of all rights under the General Star Insurance Policies under the Insurance Transfer, the Trustee has standing to pursue claims under the General Star Insurance Policies.

514.    BSA, Local Councils, and the Trust have satisfied all conditions precedent under the General Star Insurance Policies, including the payment of all premiums required by the General Star Insurance Policies.

515.    The Abuse Claims allege bodily injury, personal injury, and/or mental anguish occurring in whole or in part during the policy period of the General Star Insurance Policies.

516.    The terms of the General Star Insurance Policies unambiguously require General Star to defend or reimburse the insured for any defense costs incurred in connection with the Abuse Claims, and to indemnify the insured for any amounts the insured becomes legally obligated to pay for the Abuse Claims.

517.    Alternatively, the terms of the General Star Insurance Policies are ambiguous and must be construed in favor of coverage for the insured.

518.    The Trust has provided notice to General Star of and demanded payment for Abuse Claims payable under the General Star Insurance Policies in accordance with the terms of the General Star Insurance Policies.

519.    General Star nevertheless has failed and refuses to pay money due and owing to the Trust.

520.    General Star's refusal to pay the Trust's unpaid indemnity costs is a breach of the General Star Insurance Policies to which the Trust has demanded payment.

521.    Because of General Star's breach, the Trust has been damaged in the amount of its unpaid indemnity.

522.    As a direct and proximate result of General Star's breaches of the General Star Insurance Policies, the Trust has suffered or will suffer substantial monetary damages and may continue to incur such damages in the future.

523.    The Trust has provided General Star with a list of specific claims payable under each of the General Star Insurance Policies.

524.    The Trust has billed General Star for these claims that are covered by and payable under the General Star Insurance Policies.

525.    To date, General Star has failed to reimburse the Trust for the Abuse Claims.

526.     The Trust continues to incur unpaid indemnity costs related to Abuse Claims payable under the General Star Insurance Policies.  The Trust's damages will increase, and prejudgment interest will continue to accrue, until General Star pays all sums due.

527.     General Star's delay in paying the Trust's unpaid losses is vexatious and unreasonable.

### COUNT TWENTY-TWO
### Breach of Contract (Great American Assurance Company, Great American E & S Insurance Company, and Great American Insurance Company)

528.     The preceding paragraphs are set forth herein by reference.

529.     Great American Assurance Company, Great American E & S Insurance Company, and Great American Insurance Company (collectively the "Great American Group") issued and/or are responsible for the Insurance Policies identified in Exhibits B and C to which they are listed as the Defendant Insurer (the "Great American Insurance Policies").

530.     The Great American Insurance Policies are each valid and enforceable contracts that remain in effect.

531.     As the holder of all rights under the Great American Insurance Policies under the Insurance Transfer, the Trustee has standing to pursue claims under the Great American Insurance Policies.

532.     BSA, Local Councils, and the Trust have satisfied all conditions precedent under the Great American Insurance Policies, including the payment of all premiums required by the Great American Insurance Policies.

533.     The Abuse Claims allege bodily injury, personal injury, and/or mental anguish occurring in whole or in part during the policy period of the Great American Insurance Policies.

534.     The terms of the Great American Insurance Policies unambiguously require the Great American Group to defend or reimburse the insured for any defense costs incurred in

connection with the Abuse Claims, and to indemnify the insured for any amounts the insured becomes legally obligated to pay for the Abuse Claims.

535.    Alternatively, the terms of the Great American Insurance Policies are ambiguous and must be construed in favor of coverage for the insured.

536.    The Trust has provided notice to the Great American Group of and demanded payment for Abuse Claims that are payable under the Great American Insurance Policies in accordance with the terms of the Great American Insurance Policies.

537.    The Great American Group nevertheless has failed and refuses to pay money due and owing to the Trust.

538.    The Great American Group's refusal to pay the Trust's unpaid indemnity costs is a breach of the Great American Insurance Policies to which the Trust has demanded payment.

539.    Because of the Great American Group's breach, the Trust has been damaged in the amount of its unpaid indemnity.

540.    As a direct and proximate result of the Great American Group's breaches of the Great American Insurance Policies, the Trust has suffered or will suffer substantial monetary damages and may continue to incur such damages in the future.

541.    The Trust has provided the Great American Group with a list of specific claims payable under each of the Great American Insurance Policies.

542.    The Trust has billed the Great American Group for these claims that are covered by and payable under the Great American Insurance Policies.

543.    To date, the Great American Group has failed to reimburse the Trust for the Abuse Claims.

544.    The Trust continues to incur unpaid indemnity costs related to Abuse Claims payable under the Great American Insurance Policies.  The Trust's damages will increase, and prejudgment interest will continue to accrue, until the Great American Group pays all sums due.

545.    The Great American Group's delay in paying the Trust's unpaid losses is vexatious and unreasonable.

### COUNT TWENTY-THREE
**Breach of Contract**
**(Catlin Specialty Insurance Company and Indian Harbor Insurance Company)**

546.    The preceding paragraphs are set forth herein by reference.

547.    Catlin Specialty Insurance Company and Indian Harbor Insurance Company (collectively "Indian Harbor & Catlin") issued and/or are responsible for the Insurance Policies identified in Exhibit B to which they are listed as the Defendant Insurer (the "Indian Harbor/Catlin Insurance Policies").

548.    The Indian Harbor/Catlin Insurance Policies are each valid and enforceable contracts that remain in effect.

549.    As the holder of all rights under the Indian Harbor/Catlin Insurance Policies under the Insurance Transfer, the Trustee has standing to pursue claims under the Indian Harbor/Catlin Insurance Policies.

550.    BSA, Local Councils, and the Trust have satisfied all conditions precedent under the Indian Harbor/Catlin Insurance Policies, including the payment of all premiums required by the Indian Harbor/Catlin Insurance Policies.

551.    The Abuse Claims allege bodily injury, personal injury, and/or mental anguish occurring in whole or in part during the policy period of the Indian Harbor/Catlin Insurance Policies.

552.    The terms of the Indian Harbor/Catlin Insurance Policies unambiguously require Indian Harbor & Catlin to defend or reimburse the insured for any defense costs incurred in connection with the Abuse Claims, and to indemnify the insured for any amounts the insured becomes legally obligated to pay for the Abuse Claims.

553.    Alternatively, the terms of the Indian Harbor/Catlin Insurance Policies are ambiguous and must be construed in favor of coverage for the insured.

554.    The Trust has provided notice to Indian Harbor & Catlin of and demanded payment for Abuse Claims payable under the Indian Harbor/Catlin Insurance Policies in accordance with the terms of the Indian Harbor/Catlin Insurance Policies.

555.    Indian Harbor & Catlin nevertheless have failed and refuses to pay money due and owing to the Trust.

556.    Indian Harbor & Catlin's refusal to pay the Trust's unpaid indemnity costs is a breach of the Indian Harbor/Catlin Insurance Policies to which the Trust has demanded payment.

557.    Because of Indian Harbor & Catlin's breach, the Trust has been damaged in the amount of its unpaid indemnity.

558.    As a direct and proximate result of Indian Harbor & Catlin's breaches of the Indian Harbor/Catlin Insurance Policies, the Trust has suffered or will suffer substantial monetary damages and may continue to incur such damages in the future.

559.    The Trust has provided Indian Harbor & Catlin with a list of specific claims payable under each of the Indian Harbor/Catlin Insurance Policies.

560.    The Trust has billed Indian Harbor & Catlin for these claims that are covered by and payable under the Indian Harbor/Catlin Insurance Policies.

561.    To date, Indian Harbor & Catlin have failed to reimburse the Trust for the Abuse Claims.

562.    The Trust continues to incur unpaid indemnity costs related to Abuse Claims payable under the Indian Harbor/Catlin Insurance Policies.  The Trust's damages will increase, and prejudgment interest will continue to accrue, until Indian Harbor & Catlin pays all sums due.

563.    Indian Harbor & Catlin's delay in paying the Trust's unpaid losses is vexatious and unreasonable.

**COUNT TWENTY-FOUR**
**Breach of Contract (American Economy Insurance Company, American States Insurance Company, General Insurance Company of America, Liberty Insurance Underwriters Inc., Liberty Mutual Insurance Company, Liberty Surplus Insurance Corporation, The Ohio Casualty Insurance Company, Peerless Indemnity Insurance Company, and SAFECO Insurance Company of America)**

564.    The preceding paragraphs are set forth herein by reference.

565.    American Economy Insurance Company, American States Insurance Company, General Insurance Company of America, Liberty Insurance Underwriters Inc., Liberty Mutual Insurance Company, Liberty Surplus Insurance Corporation, The Ohio Casualty Insurance Company, Peerless Indemnity Insurance Company, and SAFECO Insurance Company of America (collectively the "Liberty Group") issued and/or are responsible for the Insurance Policies identified in Exhibits B and C to which they are listed as the Defendant Insurer (the "Liberty Insurance Policies").

566.    The Liberty Insurance Policies are each valid and enforceable contracts that remain in effect.

567.    As the holder of all rights under the Liberty Insurance Policies under the Insurance Transfer, the Trustee has standing to pursue claims under the Liberty Insurance Policies.

568.    BSA, Local Councils, and the Trust have satisfied all conditions precedent under the Liberty Insurance Policies, including the payment of all premiums required by the Liberty Insurance Policies.

569.    The Abuse Claims allege bodily injury, personal injury, and/or mental anguish occurring in whole or in part during the policy period of the Liberty Insurance Policies.

570.    The terms of the Liberty Insurance Policies unambiguously require the Liberty Group to defend or reimburse the insured for any defense costs incurred in connection with the Abuse Claims, and to indemnify the insured for any amounts the insured becomes legally obligated to pay for the Abuse Claims.

571.    Alternatively, the terms of the Liberty Insurance Policies are ambiguous and must be construed in favor of coverage for the insured.

572.    The Trust has provided notice to the Liberty Group of and demanded payment for Abuse Claims payable under the Liberty Insurance Policies in accordance with the terms of the Liberty Insurance Policies.

573.    The Liberty Group nevertheless has failed and refuses to pay money due and owing to the Trust, without conditioning its payment upon a purported right to recoupment from the Trust of all amounts it proposes to pay for Abuse Claims.  Effectively, the Liberty Group has offered to pay the Trust nothing in light of its claim for recoupment.

574.    The Liberty Group's refusal to pay the Trust's unpaid indemnity costs is a breach of the Liberty Insurance Policies.

575.    Because of the Liberty Group's breach, the Trust has been damaged in the amount of its unpaid indemnity.

576.    As a direct and proximate result of Liberty Group's breaches of the Liberty Insurance Policies, the Trust has suffered or will suffer substantial monetary damages and may continue to incur such damages in the future.

577.    The Trust has provided the Liberty Group with a list of specific claims payable under each of the Liberty Insurance Policies.

578.    The Trust has billed the Liberty Group for these claims that are covered by and payable under the Liberty Group Insurance Policies.

579.    To date, the Liberty Group has failed to reimburse the Trust for the Abuse Claims.

580.    The Trust continues to incur unpaid indemnity costs related to Abuse Claims payable under the Liberty Insurance Policies.  The Trust's damages will increase, and prejudgment interest will continue to accrue, until the Liberty Group pays all sums due.

581.    The Liberty Group's delay in paying the Trust's unpaid losses is vexatious and unreasonable.

**COUNT TWENTY-FIVE**
**Breach of Contract**
**(London and Edinburgh Insurance Company Limited and Tenecom Limited)**

582.    The preceding paragraphs are set forth herein by reference.

583.    London and Edinburgh Insurance Company Limited and Tenecom Limited (collectively the "London Insurers") issued and/or are responsible for the Insurance Policies identified in Exhibit B to which Lloyd's London is issued as the "Insurer that Issued the Policy" as each entity is a subscriber to the policy  (the "London Insurance Policy").

584.    The London Insurance Policy is a valid and enforceable contract that remains in effect.

585.    As the holder of all rights under the London Insurance Policy under the Insurance Transfer, the Trustee has standing to pursue claims under the London Insurance Policy.

586.    BSA, Local Councils, and the Trust have satisfied all conditions precedent under the London Insurance Policy, including the payment of all premiums required by the London Insurance Policy.

587.    The Abuse Claims allege bodily injury, personal injury, and/or mental anguish occurring in whole or in part during the policy period of the London Insurance Policy.

588.    The terms of the London Insurance Policy unambiguously require the London Insurers to defend or reimburse the insured for any defense costs incurred in connection with the Abuse Claims, and to indemnify the insured for any amounts the insured becomes legally obligated to pay for the Abuse Claims.

589.    Alternatively, the terms of the London Insurance Policy issued by the London Insurers are ambiguous and must be construed in favor of coverage for the insured.

590.    The Trust has provided notice to the London Insurers of and demanded payment for Abuse Claims payable under the London Insurance Policy in accordance with the terms of the London Insurance Policy.

591.    The London Insurers nevertheless have failed and refuse to pay money due and owing to the Trust.

592.    The London Insurers' refusal to pay the Trust's unpaid indemnity costs is a breach of the London Insurance Policy to which the Trust has demanded payment.

593.    Because of the London Insurers' breach, the Trust has been damaged in the amount of its unpaid indemnity.

594.    As a direct and proximate result of the London Insurers' breaches of the London Insurance Policy, the Trust has suffered or will suffer substantial monetary damages and may continue to incur such damages in the future.

595.    The Trust has provided the London Insurers with a list of specific claims payable under the London Insurance Policy.

596.    The Trust has billed the London Insurers for these claims that are covered by and payable under the London Insurance Policy.

597.    To date, the London Insurers have failed to reimburse the Trust for the Abuse Claims.

598.    The Trust continues to incur unpaid indemnity costs related to Abuse Claims payable under the London Insurers' policies.  The Trust's damages will increase, and prejudgment interest will continue to accrue, until the London Insurers pay all sums due.

599.    The London Insurers' delay in paying the Trust's unpaid losses is vexatious and unreasonable.

## COUNT TWENTY-SIX
## Breach of Contract (Munich Reinsurance America, Inc.)

600.    The preceding paragraphs are set forth herein by reference.

601.    Munich Reinsurance America, Inc. ("Munich Reinsurance") issued and/or is responsible for the Insurance Policies identified in Exhibit C to which it is listed as the Defendant Insurer (the "Munich Reinsurance Insurance Policies").

602.    The Munich Reinsurance Insurance Policies are each valid and enforceable contracts that remain in effect.

603.    As the holder of all rights under the Munich Reinsurance Insurance Policies under the Insurance Transfer, the Trustee has standing to pursue claims under the Munich Reinsurance Insurance Policies.

604.     BSA, Local Councils, and the Trust have satisfied all conditions precedent under the Munich Reinsurance Insurance Policies, including the payment of all premiums required by the Munich Reinsurance Insurance Policies.

605.     The Abuse Claims allege bodily injury, personal injury, and/or mental anguish occurring in whole or in part during the policy period of the Munich Re Insurance Policies.

606.     The terms of the Munich Reinsurance Insurance Policies unambiguously require Munich Reinsurance to defend or reimburse the insured for any defense costs incurred in connection with the Abuse Claims, and to indemnify the insured for any amounts the insured becomes legally obligated to pay for the Abuse Claims.

607.     Alternatively, the terms of the Munich Reinsurance Insurance Policies are ambiguous and must be construed in favor of coverage for the insured.

608.     The Trust has provided notice to Munich Reinsurance of and demanded payment for Abuse Claims payable under the Munich Reinsurance Insurance Policies in accordance with the terms of the Munich Reinsurance Insurance Policies.

609.     Munich Reinsurance nevertheless has failed and refuses to pay money due and owing to the Trust.

610.     Munich Reinsurance's refusal to pay the Trust's unpaid indemnity costs is a breach of the Munich Reinsurance Insurance Policies.

611.     Because of Munich Reinsurance's breach, the Trust has been damaged in the amount of its unpaid indemnity.

612.     As a direct and proximate result of Munich Reinsurance's breaches of the Munich Reinsurance Insurance Policies, the Trust has suffered or will suffer substantial monetary damages and may continue to incur such damages in the future.

613.    The Trust has provided Munich Reinsurance with a list of specific claims payable under each of the Munich Reinsurance Insurance Policies.

614.    The Trust has billed Munich Reinsurance for these claims that are covered by and payable under the Munich Reinsurance Insurance Policies.

615.    To date, Munich Reinsurance has failed to reimburse the Trust for the Abuse Claims.

616.    The Trust continues to incur unpaid indemnity costs related to Abuse Claims payable under the Munich Reinsurance Insurance Policies.  The Trust's damages will increase, and prejudgment interest will continue to accrue, until Munich Reinsurance pays all sums due.

617.    Munich Reinsurance's delay in paying the Trust's unpaid losses is vexatious and unreasonable.

## COUNT TWENTY-SEVEN
**Breach of Contract (Nationwide Mutual Insurance Company, Scottsdale Insurance Company, and Wausau General Insurance Company)**

618.    The preceding paragraphs are set forth herein by reference.

619.    Nationwide Mutual Insurance Company, Scottsdale Insurance Company, and Wausau General Insurance Company (collectively the "Nationwide Group") issued and/or are responsible for the Insurance Policies identified in Exhibit C to which they are listed as the Defendant Insurer (the "Nationwide Insurance Policies").

620.    The Nationwide Insurance Policies are each valid and enforceable contracts that remain in effect.

621.    As the holder of all rights under the Nationwide Insurance Policies under the Insurance Transfer, the Trustee has standing to pursue claims under the Nationwide Insurance Policies.

84

622.    BSA, Local Councils, and the Trust have satisfied all conditions precedent under the Nationwide Insurance Policies, including the payment of all premiums required by the Nationwide Insurance Policies.

623.    The Abuse Claims allege bodily injury, personal injury, and/or mental anguish occurring in whole or in part during the policy period of the Nationwide Insurance Policies.

624.    The terms of the Nationwide Insurance Policies unambiguously require the Nationwide Group to defend or reimburse the insured for any defense costs incurred in connection with the Abuse Claims, and to indemnify the insured for any amounts the insured becomes legally obligated to pay for the Abuse Claims.

625.    Alternatively, the terms of the Nationwide Insurance Policies are ambiguous and must be construed in favor of coverage for the insured.

626.    The Trust has provided notice to the Nationwide Group of and demanded payment for Abuse Claims that are payable under the Nationwide Insurance Policies in accordance with the terms of the Nationwide Insurance Policies.

627.    The Nationwide Group nevertheless has failed and refuses to pay money due and owing to the Trust.

628.    The Nationwide Group's refusal to pay the Trust's unpaid indemnity costs is a breach of the Nationwide Insurance Policies.

629.    Because of the Nationwide Group's breach, the Trust has been damaged in the amount of its unpaid indemnity.

630.    As a direct and proximate result of the Nationwide Group's breaches of the Nationwide Insurance Policies, the Trust has suffered or will suffer substantial monetary damages and may continue to incur such damages in the future.

631.    The Trust has provided the Nationwide Group with a list of specific claims payable under each of the Nationwide Insurance Policies.

632.    The Trust has billed the Nationwide Group for these claims that are covered by and payable under the Nationwide Insurance Policies.

633.    To date, the Nationwide Group has failed to reimburse the Trust for the Abuse Claims.

634.    The Trust continues to incur unpaid indemnity costs related to Abuse Claims payable under the Nationwide Insurance Policies.  The Trust's damages will increase, and prejudgment interest will continue to accrue, until the Nationwide Group pays all sums due.

635.    The Nationwide Group's delay in paying the Trust's unpaid losses is vexatious and unreasonable.

## COUNT TWENTY-EIGHT
### Breach of Contract (Old Republic Insurance Company)

636.    The preceding paragraphs are set forth herein by reference.

637.    Old Republic Insurance Company ("Old Republic") issued and/or is responsible for the Insurance Policies identified in Exhibit B to which it is listed as the Defendant Insurer (the "Old Republic Insurance Policies").

638.    The Old Republic Insurance Policies are each valid and enforceable contracts that remain in effect.

639.    As the holder of all rights under the Old Republic Insurance Policies under the Insurance Transfer, the Trustee has standing to pursue claims under the Old Republic Insurance Policies.

640.    BSA, Local Councils, and the Trust have satisfied all conditions precedent under the Old Republic Insurance Policies, including the payment of all premiums required by the Old Republic Insurance Policies.

641.    The Abuse Claims allege bodily injury, personal injury, and/or mental anguish occurring in whole or in part during the policy period of the Old Republic Insurance Policies.

642.    The terms of the Old Republic Insurance Policies unambiguously require Old Republic to defend or reimburse the insured for any defense costs incurred in connection with the Abuse Claims, and to indemnify the insured for any amounts the insured becomes legally obligated to pay for the Abuse Claims.

643.    Alternatively, the terms of the Old Republic Insurance Policies are ambiguous and must be construed in favor of coverage for the insured.

644.    The Trust has provided notice to Old Republic of and demanded payment for Abuse Claims payable under the Old Republic Insurance Policies in accordance with the terms of the Old Republic Insurance Policies.

645.    Old Republic nevertheless has failed and refuses to pay money due and owing to the Trust.

646.    Old Republic's refusal to pay the Trust's unpaid indemnity costs is a breach of the Old Republic Insurance Policies.

647.    Because of Old Republic's breach, the Trust has been damaged in the amount of its unpaid indemnity.

648.    As a direct and proximate result of Old Republic's breaches of the Old Republic Insurance Policies, the Trust has suffered or will suffer substantial monetary damages and may continue to incur such damages in the future.

649.    The Trust has provided Old Republic with a list of specific claims payable under each of the Old Republic Insurance Policies.

650.    The Trust has billed Old Republic for these claims that are covered by and payable under the Old Republic Insurance Policies.

651.    To date, Old Republic has failed to reimburse the Trust for Abuse Claims.

652.    The Trust continues to incur unpaid indemnity costs related to Abuse Claims payable under the Old Republic Insurance Policies.  The Trust's damages will increase, and prejudgment interest will continue to accrue, until Old Republic pays all sums due.

653.    Old Republic's delay in paying the Trust's unpaid losses is vexatious and unreasonable.

## COUNT TWENTY-NINE
### Breach of Contract (QBE Insurance Corporation)

654.    The preceding paragraphs are set forth herein by reference.

655.    QBE Insurance Corporation ("QBE") issued and/or is responsible for the Insurance Policies identified in Exhibit C to which it is listed as the Defendant Insurer (the "QBE Insurance Policies").

656.    The QBE Insurance Policies are each valid and enforceable contracts that remain in effect.

657.    As the holder of all rights under the QBE Insurance Policies under the Insurance Transfer, the Trustee has standing to pursue claims under the QBE Insurance Policies.

658.    BSA, Local Councils, and the Trust have satisfied all conditions precedent under the QBE Insurance Policies, including the payment of all premiums required by the QBE Insurance Policies.

659.    The Abuse Claims allege bodily injury, personal injury, and/or mental anguish occurring in whole or in part during the policy period of the QBE Insurance Policies.

660.    The terms of the QBE Insurance Policies unambiguously require QBE to defend or reimburse the insured for any defense costs incurred in connection with the Abuse Claims, and to indemnify the insured for any amounts the insured becomes legally obligated to pay for the Abuse Claims.

661.    Alternatively, the terms of the QBE Insurance Policies are ambiguous and must be construed in favor of coverage for the insured.

662.    The Trust has provided notice to QBE of and demanded payment for Abuse Claims payable under the QBE Insurance Policies issued by QBE in accordance with the terms of the QBE Insurance Policies.

663.    QBE nevertheless has failed and refuses to pay money due and owing to the Trust.

664.    QBE's refusal to pay the Trust's unpaid indemnity costs is a breach of the QBE Insurance Policies.

665.    Because of QBE's breach, the Trust has been damaged in the amount of its unpaid indemnity.

666.    As a direct and proximate result of QBE's breaches of the QBE Insurance Policies, the Trust has suffered or will suffer substantial monetary damages and may continue to incur such damages in the future.

667.    The Trust has provided QBE with a list of specific claims payable under each of the QBE Insurance Policies.

668.    The Trust has billed QBE for these claims that are covered by and payable under the QBE Insurance Policies.

89

669.    To date, QBE has failed to reimburse the Trust for the Abuse Claims.

670.    The Trust continues to incur unpaid indemnity costs related to Abuse Claims payable under the QBE Insurance Policies.  The Trust's damages will increase, and prejudgment interest will continue to accrue, until QBE pays all sums due.

671.    QBE's delay in paying the Trust's unpaid losses is vexatious and unreasonable.

**COUNT THIRTY**
**Breach of Contract (Crum & Forster Indemnity Company, The North River Insurance Company, TIG Insurance Company, and United States Fire Insurance Company)**

672.    The preceding paragraphs are set forth herein by reference.

673.    Crum & Forster Indemnity Company, The North River Insurance Company, TIG Insurance Company, and United States Fire Insurance Company (collectively the "Riverstone Group") issued and/or are responsible for the Insurance Policies identified in Exhibit C to which they are listed as the Defendant Insurer ("the "Riverstone Insurance Policies").

674.    The Insurance Policies issued by Riverstone Group are each valid and enforceable contracts that remain in effect.

675.    As the holder of all rights under the Riverstone Insurance Policies under the Insurance Transfer, the Trustee has standing to pursue claims under the Riverstone Insurance Policies.

676.    BSA, Local Councils, and the Trust have satisfied all conditions precedent under the Riverstone Insurance Policies, including the payment of all premiums required by the Riverstone Insurance Policies.

677.    The Abuse Claims allege bodily injury, personal injury, and/or mental anguish occurring in whole or in part during the policy period of the Riverstone Insurance Policies.

678.    The terms of the Riverstone Insurance Policies unambiguously require the Riverstone Group to defend or reimburse the insured for any defense costs incurred in connection

90

with the Abuse Claims, and to indemnify the insured for any amounts the insured becomes legally obligated to pay for the Abuse Claims.

679.    Alternatively, the terms of the Riverstone Insurance Policies are ambiguous and must be construed in favor of coverage for the insured.

680.    The Trust has provided notice to the Riverstone Group of and demanded payment for Abuse Claims that the Trust payable under the Riverstone Insurance Policies in accordance with the terms of the Riverstone Insurance Policies.

681.    The Riverstone Group nevertheless has failed and refuses to pay money due and owing to the Trust.

682.    The Riverstone Group's refusal to pay the Trust's unpaid indemnity costs is a breach of the Riverstone Insurance Policies to which the Trust has demanded payment.

683.    Because of the Riverstone Group's breach, the Trust has been damaged in the amount of its unpaid indemnity.

684.    As a direct and proximate result of the Riverstone Group's breaches of the Riverstone Insurance Policies, the Trust has suffered or will suffer substantial monetary damages and may continue to incur such damages in the future.

685.    The Trust has provided the Riverstone Group with a list of specific claims payable under each of the Riverstone Insurance Policies.

686.    The Trust has billed the Riverstone Group for these claims that are covered by and payable under the Riverstone Insurance Policies.

687.    To date, the Riverstone Group has failed to reimburse the Trust for the Abuse Claims.

688.    The Trust continues to incur unpaid indemnity costs related to Abuse Claims payable under the Riverstone Insurance Policies.  The Trust's damages will increase, and prejudgment interest will continue to accrue, until the Riverstone Group pays all sums due.

689.    The Riverstone Group's delay in paying the Trust's unpaid losses is vexatious and unreasonable.

## COUNT THIRTY-ONE
### Breach of Contract (Security Mutual Insurance Company)

690.    The preceding paragraphs are set forth herein by reference.

691.    Security Mutual Insurance Company ("Security Mutual") issued and/or is responsible for the Insurance Policies identified in Exhibit C to which it is listed as the Defendant Insurer (the "Security Mutual Insurance Policies").

692.    The Security Mutual Insurance Policies are each valid and enforceable contracts that remain in effect.

693.    As the holder of all rights under the Security Mutual Insurance Policies under the Insurance Transfer, the Trustee has standing to pursue claims under the Security Mutual Insurance Policies.

694.    BSA, Local Councils, and the Trust have satisfied all conditions precedent under the Security Mutual Insurance Policies, including the payment of all premiums required by the Security Mutual Insurance Policies.

695.    The Abuse Claims allege bodily injury, personal injury, and/or mental anguish occurring in whole or in part during the policy period of the Security Mutual Insurance Policies.

696.    The terms of the Security Mutual Insurance Policies unambiguously require Security Mutual to defend or reimburse the insured for any defense costs incurred in connection

with the Abuse Claims, and to indemnify the insured for any amounts the insured becomes legally obligated to pay for the Abuse Claims.

697.    Alternatively, the terms of the Security Mutual Insurance Policies are ambiguous and must be construed in favor of coverage for the insured.

698.    The Trust has provided notice to Security Mutual of and demanded payment for Abuse Claims payable under the Security Mutual Insurance Policies in accordance with the terms of the Security Mutual Insurance Policies.

699.    Security Mutual nevertheless has failed and refuses to pay money due and owing to the Trust.

700.    Security Mutual's refusal to pay the Trust's unpaid indemnity costs is a breach of the Security Mutual Insurance Policies to which the Trust has demanded payment.

701.    Because of Security Mutual's breach, the Trust has been damaged in the amount of its unpaid indemnity.

702.    As a direct and proximate result of Security Mutual's breaches of the Security Mutual Insurance Policies, the Trust has suffered or will suffer substantial monetary damages and may continue to incur such damages in the future.

703.    The Trust has provided Security Mutual with a list of specific claims payable under each of the Security Mutual Insurance Policies.

704.    The Trust has billed Security Mutual for these claims that are covered by and payable under the Security Mutual Insurance Policies.

705.    To date, Security Mutual has failed to reimburse the Trust for the Abuse Claims.

706.    The Trust continues to incur unpaid indemnity costs related to Abuse Claims payable under the Security Mutual Insurance Policies.  The Trust's damages will increase, and prejudgment interest will continue to accrue, until Security Mutual pays all sums due.

707.    Security Mutual's delay in paying the Trust's unpaid losses is vexatious and unreasonable.

## COUNT THIRTY-TWO
### Breach of Contract (SPARTA Insurance Company)

708.    The preceding paragraphs are set forth herein by reference.

709.    SPARTA Insurance Company ("SPARTA") issued and/or is responsible for the Insurance Policies identified in Exhibit C to which it is listed as the Defendant Insurer (the "SPARTA Insurance Policies").

710.    The SPARTA Insurance Policies are each valid and enforceable contracts that remain in effect.

711.    As the holder of all rights under the SPARTA Insurance Policies under the Insurance Transfer, the Trustee has standing to pursue claims under the SPARTA Insurance Policies.

712.    BSA, Local Councils, and the Trust have satisfied all conditions precedent under the SPARTA Insurance Policies, including the payment of all premiums required by the SPARTA Insurance Policies.

713.    The Abuse Claims allege bodily injury, personal injury, and/or mental anguish occurring in whole or in part during the policy period of the SPARTA Insurance Policies.

714.    The terms of the SPARTA Insurance Policies unambiguously require SPARTA to defend or reimburse the insured for any defense costs incurred in connection with the Abuse

Claims, and to indemnify the insured for any amounts the insured becomes legally obligated to pay for the Abuse Claims.

715.    Alternatively, the terms of the SPARTA Insurance Policies are ambiguous and must be construed in favor of coverage for the insured.

716.    The Trust has provided notice to SPARTA of and demanded payment for Abuse Claims payable under the SPARTA Insurance Policies issued by SPARTA in accordance with the terms of the SPARTA Insurance Policies.

717.    SPARTA nevertheless has failed and refuses to pay money due and owing to the Trust.

718.    SPARTA's refusal to pay the Trust's unpaid indemnity costs is a breach of the SPARTA Insurance Policies.

719.    Because of SPARTA's breach, the Trust has been damaged in the amount of its unpaid indemnity.

720.    As a direct and proximate result of SPARTA's breaches of the SPARTA Insurance Policies, the Trust has suffered or will suffer substantial monetary damages and may continue to incur such damages in the future.

721.    The Trust has provided SPARTA with a list of specific claims that are payable under the SPARTA Insurance Policies.

722.    The Trust has billed SPARTA for these claims that are covered by and payable under the SPARTA Insurance Policies.

723.    To date, SPARTA has failed to reimburse the Trust for the Abuse Claims.

724.    The Trust continues to incur unpaid indemnity costs related to Abuse Claims payable under the SPARTA Insurance Policies.  The Trust's damages will increase, and prejudgment interest will continue to accrue, until SPARTA pays all sums due.

725.    SPARTA's delay in paying the Trust's unpaid losses is vexatious and unreasonable.

## COUNT THIRTY-THREE
**Breach of Contract (Brighthouse Life Insurance Company, Charter Oak Fire Insurance Company, Phoenix Insurance Company, St. Paul Fire and Marine Insurance Company, St. Paul Surplus Lines Insurance Company, Travelers Casualty and Surety Company, The Travelers Indemnity Company, and United States Fidelity and Guaranty Company)**

726.    The preceding paragraphs are set forth herein by reference.

727.    Brighthouse Life Insurance Company, Charter Oak Fire Insurance Company, Phoenix Insurance Company, St. Paul Fire and Marine Insurance Company, St. Paul Surplus Lines Insurance Company, Travelers Casualty and Surety Company, The Travelers Indemnity Company, and United States Fidelity and Guaranty Company (collectively the "Travelers Group") issued and/or are responsible for the Insurance Policies identified in Exhibits B and C to which they are listed as the Defendant Insurer (the "Travelers Insurance Policies").

728.    The Travelers Insurance Policies are each valid and enforceable contracts that remain in effect.

729.    As the holder of all rights under the Travelers Insurance Policies under the Insurance Transfer, the Trustee has standing to pursue claims under the Travelers Insurance Policies.

730.    BSA, Local Councils, and the Trust have satisfied all conditions precedent under the Travelers Insurance Policies, including the payment of all premiums required by the Travelers Insurance Policies.

731.    The Abuse Claims allege bodily injury, personal injury, and/or mental anguish occurring in whole or in part during the policy period of the Travelers Insurance Policies.

732.    The terms of the Travelers Insurance Policies unambiguously require the Travelers Group to defend or reimburse the insured for any defense costs incurred in connection with the Abuse Claims, and to indemnify the insured for any amounts the insured becomes legally obligated to pay for the Abuse Claims.

733.    Alternatively, the terms of the Travelers Insurance Policies are ambiguous and must be construed in favor of coverage for the insured.

734.    The Trust has provided notice to the Travelers Group of and demanded payment for Abuse Claims that are payable under the Travelers Insurance Policies in accordance with the terms of the Travelers Insurance Policies.

735.    The Travelers Group nevertheless has failed and refuses to pay money due and owing to the Trust.

736.    The Travelers Group's refusal to pay the Trust's unpaid indemnity costs is a breach of the Travelers Insurance Policies.

737.    Because of the Travelers Group's breach, the Trust has been damaged in the amount of its unpaid indemnity.

738.    As a direct and proximate result of the Travelers Group's breaches of the Travelers Insurance Policies, the Trust has suffered or will suffer substantial monetary damages and may continue to incur such damages in the future.

739.    The Trust has provided the Travelers Group with a list of specific claims that are payable under each of the Travelers Insurance Policies.

740.    The Trust has billed the Travelers Group for these claims that are covered by and payable under the Travelers Insurance Policies.

741.    To date, the Travelers Group has failed to reimburse the Trust for the Abuse Claims.

742.    The Trust continues to incur unpaid indemnity costs related to Abuse Claims payable under the Travelers Insurance Policies.  The Trust's damages will increase, and prejudgment interest will continue to accrue, until the Travelers Group pays all sums due.

743.    The Travelers Group's delay in paying the Trust's unpaid losses is vexatious and unreasonable.

### COUNT THIRTY-FOUR
### Bad Faith (Against the "Non-Paying Insurer Defendants", as defined below)

744.    The preceding paragraphs are set forth herein by reference.

745.    The Trust has presented evidence to the Non-Paying Insurer Defendants that policies that provide coverage for Abuse Claims were issued to BSA from at least 1972 through February 18, 2020, and were issued to Local Councils from at least 1942 through 2019. Defendants have not disputed that coverage since 1942 extends to Abuse Claims for which the Trust is legally obligated to pay.

746.    The Trust has provided notice and demanded payment for Abuse Claims that are payable under certain of the Insurance Policies to the Defendants identified and defined in Counts Two through Thirty-Three above, including the AIG Group, the Allianz Group, Allied World, Allstate, Amerisure, Argonaut, Arrowood, Aviva, the Axis Group, Cincinnati, the CNA Group, Columbia, the Endurance Group, Erie & Niagara, the Erie Group, Evanston, Everest, First Insurance, Gemini, General Star, Great American Insurance Group, Indian Harbor & Caitlin, the Liberty Group, the London Insurers, Munich Reinsurance, the Nationwide Group Old Republic QBE, the Riverstone Group. Security Mutual, SPARTA, and the Travelers Group (the "Non-Paying Insurer Defendants").

747.    Notwithstanding the credible evidence of the policies' existence and the lack of any dispute by the Non-Paying Insurer Defendants that coverage extends to Abuse Claims, the Non-

Paying Insurer Defendants thus far have failed to effectuate prompt, fair, and equitable settlements and pay claims billed to them for Abuse Claims for which the Trust is legally obligated to pay.

748.    Among other things, the Non-Paying Insurer Defendants have opposed every determination and valuation of Abuse Claims by the Trust under the IRO (other than a single IRO Claim in which there was no award to the Claimant) and refused to pay any Abuse Claim.

749.    The Trust has provided the Non-Paying Insurer Defendants with significant information about the Trust's determination and valuation of each and every Abuse Claim. This information includes, but is not limited to, an award calculation breakdown, which identifies the Matrix Tier to which an Abuse Claim was assigned and an explanation of all aggravating and mitigating factors that were applied to adjust the award upwards or downwards. This information also includes a booklet that provides information about the methodology used for each part of the award calculation and walks through an example claim to illustrate that methodology.

750.    In refusing to effectuate and pay settlements as set forth above, the Non-Paying Insurer Defendants have failed to deal with the Trust fairly and in good faith.

751.    As a direct and proximate result of the Non-Paying Insurer Defendants' bad faith, the Trust has suffered monetary damages and the Trust is likely to continue to incur such damages in the future.

**COUNT THIRTY-FIVE**
**Violation of Section 541 of the Texas Insurance Code (Against the "Non-Paying Insurer Defendants", as defined above)**

752.    The preceding paragraphs are set forth herein by reference.

753.    Section 541 of the Texas Insurance Code states that it is "an unfair method of competition or an unfair or deceptive act or practice in the business of insurance to engage in the following unfair settlement practices with respect to a claim by an insured or beneficiary":

a.  failing to attempt in good faith to effectuate a prompt, fair, and equitable settlement of a claim with respect to which the insurer's liability has become reasonably clear (Section 541.060(a)(2));

b.  failing to promptly provide to a policyholder a reasonable explanation of the basis in the policy, in relation to the facts or applicable law, for the insurer's denial of a claim or offer of a compromise settlement of a claim (Section 541.060(a)(3));

c.  failing within a reasonable time to affirm or deny coverage of a claim or submit a reservation of rights to a policyholder (Section 541.060(a)(4)); and

d.  refusing to pay a claim without conducting a reasonable investigation with respect to the claim (Section 541.060(a)(7)).

754.    The Trust has presented evidence to the Non-Paying Insurer Defendants that policies that provide coverage for Abuse Claims were issued to BSA from at least 1972 through February 18, 2020, and were issued to Local Councils from at least 1942 through 2019.  The Non-Paying Insurer Defendants have not disputed that coverage since 1942 extends to Abuse Claims for which the Trust is legally obligated to pay.

755.    The Trust has provided notice and demanded payment for Abuse Claims that are payable under certain of the Insurance Policies to the Non-Paying Insurer Defendants identified and defined in Counts Two through Thirty-Four above.

756.    The first Abuse Claims were billed by the Trust to the Non-Paying Insurer Defendants in September 2024.  The most recent bills for Abuse Claims were issued by the Trust to the Non-Paying Insurer Defendants in September 2025.

757.    Notwithstanding the credible evidence of the policies' existence and the lack of any dispute by the Non-Paying Insurer Defendants that coverage extends to Abuse Claims, the Non-

Paying Insurer Defendants thus far have failed to effectuate prompt, fair, and equitable settlements and pay claims billed to them for Abuse Claims for which the Trust is legally obligated to pay.

758.    Among other things, the Non-Paying Insurer Defendants have opposed every determination and valuation of Abuse Claims by the Trust under the IRO (other than a single IRO Claim in which there was no award to the Claimant) and refused to pay any Abuse Claim.

759.    The Trust has provided the Non-Paying Insurer Defendants with significant information about the Trust's determination and valuation of each and every Abuse Claim.  This information includes, but is not limited to, an award calculation breakdown, which identifies the Matrix Tier to which an Abuse Claim was assigned and an explanation of all aggravating and mitigating factors that were applied to adjust the award upwards or downwards.  This information also includes a booklet that provides information about the methodology used for each part of the award calculation and walks through an example claim to illustrate that methodology.

760.    To date, not a single Non-Paying Insurer Defendant has (1) promptly and unconditionally paid any amount for Abuse Claims it has been billed following a reasonable investigation; (2) promptly and unconditionally affirmed that it will provide coverage for any Abuse Claims; (3) promptly provided a reasonable basis for failing to pay any Abuse Claims, following a reasonable and timely investigation of its obligations to pay Abuse Claims under the Insurance Policies; and (4) effectuated the prompt, fair, and equitable resolution of Abuse Claims, including, but not limited to, Abuse Claims determined through the IRO process, where the Non-Paying Insurer Defendants have opposed all but one award by the Trust to an Abuse Claimant.

761.    In their conduct described above and otherwise, the Non-Paying Insurer Defendants have failed to deal with the Trust fairly and in good faith.

762.    As a direct and proximate result of the Non-Paying Insurer Defendants' violations of Section 541 of the Texas Insurance Code, the Trust has suffered monetary damages and the Trust is likely to continue to incur such damages in the future.

### Notice Regarding Additional Claims

763.    Given the Defendants' history in avoiding their obligations for Abuse Claims under the Insurance Policies, as set forth above, the Trustee reasonably anticipates that the Defendants will continue to refuse to pay Abuse Claims submitted by the Trust.  The Trustee expressly reserves the right to amend this First Amended Complaint to set forth additional claims based on such refusals, including, but not limited to, statutory claims under Chapters 541 and 542 of the Texas Insurance Code, in the event of such refusals.

### VII.    JURY DEMAND

764.    The Trustee hereby requests a trial by jury.

### VIII.    PRAYER FOR RELIEF

WHEREFORE, the Trustee respectfully prays that this Court grant the following relief:

a.    Declaratory judgment setting forth the rights and obligations of the Trustee and the Defendants under the Insurance Policies with respect to Abuse Claims;

b.    Declaratory judgment that the Trust has proven the existence and terms of enforceable insurance contracts under certain of the Insurance Policies that the Defendants allege are "missing," and/or were never issued;

c.    Declaratory judgment that the Defendants are obligated under their Insurance Policies to pay for the Trust's administration costs in evaluating and determining values for Abuse Claims;

d.   Declaratory judgment that an Abuse Claim constitutes an "occurrence," as such term is defined in the Insurance Policies, that triggers the Defendants' coverage obligations;

e.   Declaratory judgment that the Abuse Claims allege "bodily injury" or "personal injury," including "mental anguish," as those terms are defined in the Insurance Policies, during the policy periods of the Defendants' individual Insurance Policies that trigger the Defendants' obligations thereunder;

f.   Declaratory judgment that the Defendants are jointly and severally liable for paying Abuse Claims and such claims can be allocated to and payable under any Insurance Policy chosen by the Trust that has been triggered by a "bodily injury" or "personal injury," including "mental anguish," arising from an "occurrence," during the applicable "policy period," as those terms are defined in the Insurance Policies;

g.   Judgment awarding Plaintiff all damages sustained as a result of Defendants' breaches of contract;

h.   Judgment awarding Plaintiff all damages sustained as a result of Defendants' bad faith, including punitive damages, and all other remedies available under the Texas Insurance Code;

i.   Judgment awarding Plaintiff pre-judgment and post-judgment interest as allowed by law;

j.   Judgment awarding Plaintiff all costs of court;

k.   Judgment awarding Plaintiff reasonable attorneys' fees incurred in prosecuting this action; and

l.   Any and all other relief to which Plaintiff may be entitled.

Dated:  September 11, 2025                    Respectfully submitted,

                                             /s/ Jeffrey M. Tillotson
                                             Jeffrey M. Tillotson
                                             **TILLOTSON JOHNSON & PATTON**
                                             1201 Main St., Suite 1300
                                             Dallas, TX 75202
                                             Telephone: (214) 382-3041

                                             - AND -

                                             Kami E. Quinn (admitted *pro hac vice*)
                                             W. Hunter Winstead (admitted *pro hac vice*)
                                             Emily P. Grim (admitted *pro hac vice*)
                                             Michael B. Rush (admitted *pro hac vice*)
                                             **GILBERT LLP**
                                             700 Pennsylvania Avenue, SE
                                             Suite 400
                                             Washington, DC 20003
                                             Telephone: (202) 772-2200
                                             Facsimile:  (202) 772-3333

                                             *Attorneys for the Honorable Barbara J. Houser*
                                             *(Ret.), in her capacity as Trustee of the BSA*
                                             *Settlement Trust*

## CERTIFICATE OF SERVICE

        The undersigned hereby certifies that a copy of this document was forwarded to all counsel of record through the Court's CM/ECF System on September 11, 2025.

                                             /s/ Jeffrey M. Tillotson
                                             Jeffrey M. Tillotson