# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF TEXAS

| | |
|---|---|
| THE HONORABLE BARBARA J. HOUSER (RET.), IN HER CAPACITY AS TRUSTEE OF THE BSA SETTLEMENT TRUST, <br><br>          Plaintiff, <br><br> v. <br><br> ALLIANZ GLOBAL RISKS US INSURANCE COMPANY; *et al.*, <br><br>          Defendants. | Case No. 3:23-cv-01592-S |

**PLAINTIFF'S CONSOLIDATED APPENDIX IN SUPPORT OF: (1) PLAINTIFF'S OPPOSITION TO UNDERSIGNED DEFENDANTS' PARTIAL MOTION TO DISMISS THE AMENDED COMPLAINT; (2) PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT AVIVA PLC'S MOTION TO DISMISS PLAINTIFF'S AMENDED COMPLAINT; AND (3) PLAINTIFF'S OPPOSITION TO NATIONAL SURETY INSURERS' AND ALLIANZ'S MOTION TO DISMISS ON *FORUM NON CONVENIENS* GROUNDS OR TO DISMISS OR STAY ON ABSTENTION GROUNDS, AND PLAINTIFF'S OPPOSITION TO THE ABSTENTION ARGUMENTS RAISED IN THE UNDERSIGNED DEFENDANTS' PARTIAL MOTION TO DISMISS THE AMENDED COMPLAINT**

| Tab | Description | Pages |
|---|---|---|
| 1 | Summary Chart of Insurer Motions and Trust's Responses | TrustApp0001–TrustApp0007 |
| 2 | E-mail chain from M. Rush, Att'y, Gilbert LLP, to J. Kinney, et al., Att'y, DLA Piper (Sept. 30, 2024 12:55 PM ET) | TrustApp0008–TrustApp0020 |
| 3 | Complaint and Summons, No. 23-cv-07373-KPF, *Aviva, PLC v. Honeywell* (S.D.N.Y. Aug. 18, 2023), Dkt. No. 1-1 | TrustApp0021–TrustApp0061 |
| 4 | E-mail chain from M. Rush, Att'y, Gilbert LLP, to J. Kinney, Atty'y, DLA Piper (Feb. 16, 2024 10:06 AM ET) | TrustApp0062–TrustApp0077 |
| 5 | E-mail chain from M. Rush, Att'y, Gilbert LLP, to J. Kinney, Atty'y, DLA Piper (Feb. 13, 2024 11:40 AM ET) | TrustApp0078–TrustApp0090 |
| 6 | *AVIVA PLC*, Gov.UK, https://find-and-update.companyinformation.service.gov.uk/company/02468686 | TrustApp0091–TrustApp0093 |
| 7 | Listing Particulars for Commercial Union plc dated Nov. 18, 1992 | TrustApp0094–TrustApp0157 |
| 8 | Third Modified Fifth Amended Chapter 11 Plan of Reorganization (with Technical Modifications) for Boy Scouts of America and Delaware BSA, LLC, *In re Boy Scouts of America*, No. 20-10343 (LSS) (Sept. 6, 2022), Dkt. No. 10296 (without exhibits) | TrustApp0158–TrustApp0309 |
| 9 | Disclosure Pursuant to Rule 7.1, No. 13-cv-00103-LPS, *Flintkote Co. v. Aviva PLC* (D. Del. Apr. 1, 2013), Dkt. No. 22 | TrustApp0310–TrustApp0310 |
| 10 | E-mail chain from J. Bullen, Claims Specialist, Allianz, to K. Quinn, Att'y, Gilbert (Aug. 15, 2025 11:52 AM ET) | TrustApp0311–TrustApp0313 |
| 11 | Excerpts from Hearing Transcript of Status Conference in *Houser v. Allianz Global Risks US Ins. Co.*, No. 23-cv-01592-S (Aug 28, 2025 N.D. Tex.) | TrustApp0314–TrustApp0319 |
| 12 | Excerpts from Docket for *Cont'l Ins. Co. v. BorgWarner, Inc.*, No. 2004 CH 1708, filed in the Cook County, Illinois Chancery Court in 2004 | TrustApp0320–TrustApp0328 |
| 13 | Chart of Personal Jurisdiction (PJ) Moving Defendants with Insurance Policies Issued to Texas Local Councils | TrustApp0329–TrustApp0330 |
| 14 | List of Insurer Defendants that Objected to Confirmation of the Boy Scouts Plan in the Bankruptcy and District Courts | TrustApp0331–TrustApp0345 |
| 15 | Certain Insurers' Objection to Confirmation of Debtors Chapter 11 Plan, *In re Boy Scouts of Am.*, No. 20-10343-LSS (Bankr. D. Del. Feb. 11, 2022), Dkt. No. 8793-1 | TrustApp0346–TrustApp0454 |

| 16 | Opening Brief of Certain Insurers, *National Union Fire Ins. Co. v. Boy Scouts of Am. (In re Boy Scouts of Am.)*, No. 22-cv-01237-RGA (D. Del. Nov. 7, 2022), Dkt. No. 45 | TrustApp0455–TrustApp0579 |
| 17 | National Casualty Company Policy No. KKO0000021153300 | TrustApp0580–TrustApp0755 |
| 18 | National Fire Insurance of Hartford Policy No. B2097703749 | TrustApp0756–TrustApp0883 |
| 19 | Buckeye Union Insurance Company Policy No. CBPC605151293 | TrustApp0884–TrustApp0901 |
| 20 | Buckeye Union Insurance Company Policy No. CBPC605151296 | TrustApp0902–TrustApp0920 |
| 21 | The Travelers Indemnity Company Policy No. 650198J177AIND88 | TrustApp0921–TrustApp0972 |
| 22 | Personal Jurisdiction (PJ) Moving Defendants: Key Known Contacts with Texas | TrustApp0973–TrustApp0975 |
| 23 | National Fire Insurance Company of Hartford Policy No. B1067481043 | TrustApp0976–TrustApp1040 |

Dated: October 23, 2025

Respectfully submitted,

*/s/Jeffrey M. Tillotson*

Jeffrey M. Tillotson
**TILLOTSON JOHNSON & PATTON**
1201 Main St., Suite 1300
Dallas, TX 75202
Telephone: (214) 382-3041

- AND -

Kami E. Quinn (admitted *pro hac vice*)
W. Hunter Winstead (admitted *pro hac vice*)
Emily P. Grim (admitted *pro hac vice*)
Charles K. Cooper (admitted *pro hac vice*)
Michael B. Rush (admitted *pro hac vice*)
Brittney M. Welch (admitted *pro hac vice*)
**GILBERT LLP**
700 Pennsylvania Avenue, SE
Suite 400
Washington, DC 20003
Telephone: (202) 772-2200
Facsimile:  (202) 772-3333

*Attorneys for the Honorable Barbara J. Houser (Ret.), in her capacity as Trustee of the BSA Settlement Trust*

## CERTIFICATE OF SERVICE

I hereby certify that a true and accurate copy of the foregoing document was e-filed with the Clerk of the Court and will be served via email upon all counsel of record on this 23rd day of October, 2025.

*/s/ Jeffrey M. Tillotson*

Jeffrey M. Tillotson

**Summary of Insurer Motions and Trust's Responses**

| Motion | Argument(s) | Moving Defendant(s) | Trust's Responsive Pleading |
|---|---|---|---|
| No Demand Insurers Motion to Dismiss First Amended Complaint Pursuant to Fed. R. Civ. P. 12(b)(1) (Dkt. Nos. 531, 533) | Ripeness | "No Demand Insurers"[1] | Plaintiff's Opposition to 1) Brief in Support of Motion by Defendants Great American Assurance Company, Great American E&S Insurance Company, Great American Insurance Company, Arrowood Indemnity Company, In Liquidation, Axis Specialty Insurance Company, Axis Surplus Insurance Company, Continental Insurance Company, Endurance American Specialty Company, Endurance American Insurance Company, Everest National Insurance Company, General Star Indemnity Company, Swiss Re Corporate Solutions Capacity Insurance Corporation, and London Market Insurers (Winterthur Swiss and London & Edinburgh) to Dismiss First Amended Complaint Pursuant To Fed. R. Civ. P. 12(B)(6); and 2) Memorandum of Law in Support of Motion of Defendants Arch Insurance Company, Aspen Specialty Insurance Company, and Colony Insurance Company to Dismiss First Amended Complaint Pursuant To Fed. R. Civ. P. 12(B)(1) (Argument, Sections I–II) |
| Excess Insurers Motion to Dismiss First Amended Complaint Pursuant to Fed. R. Civ. P. 12(b)(6) | Failure to State a Claim (Section IV.A, and Section IV.B.1–3) | "Excess Insurers"[2] | Plaintiff's Opposition to Undersigned Defendants' Partial Motion to Dismiss the Amended Complaint (Argument, Section I) |

---

[1] Defined as Arch Insurance Company, Aspen Insurance Company, and Colony Insurance Company.

[2] Defined as Great American Assurance Company; Great American E&S Insurance Company; Great American Insurance Company; Arrowood Indemnity Company, In Liquidation, formerly known as Royal Insurance Company of America; Axis Specialty Insurance Company; Axis Surplus Insurance Company; The Continental Insurance Company, on its own behalf and as successor to Niagara Fire Insurance Company; Endurance American Specialty Company; Endurance American Insurance Company; Everest National Insurance Company; General Star Indemnity Company; Swiss Re Corporate Solutions Capacity Insurance Corporation (formerly known as First Specialty Insurance Corporation); Tenecom Limited (f/k/a/ Winterthur Swiss Ins. Co.); and Catalina Worthing Ins. Ltd (successor to London & Edinburgh Gen. Ins. Co.).

TrustApp0001

| Motion | Argument(s) | Moving Defendant(s) | Trust's Responsive Pleading |
|---|---|---|---|
| (Dkt Nos. 535–36) | Ripeness (Section IV.B.4) | According to a footnote in the Excess Insurers brief, this argument is joined by all moving "Excess Insurers" except for "Axis, CNA, Everest, General Star, Great American and LMI."[3]<br><br>Separately, counsel for Endurance contacted the Trust to advise that Endurance was inadvertently omitted from this footnote and was similarly not joining the ripeness argument. | Plaintiff's Opposition to 1) Brief in Support of Motion by Defendants Great American Assurance Company, Great American E&S Insurance Company, Great American Insurance Company, Arrowood Indemnity Company, In Liquidation, Axis Specialty Insurance Company, Axis Surplus Insurance Company, Continental Insurance Company, Endurance American Specialty Company, Endurance American Insurance Company, Everest National Insurance Company, General Star Indemnity Company, Swiss Re Corporate Solutions Capacity Insurance Corporation, and London Market Insurers (Winterthur Swiss and London & Edinburgh) to Dismiss First Amended Complaint Pursuant To Fed. R. Civ. P. 12(B)(6); and 2) Memorandum of Law in Support of Motion of Defendants Arch Insurance Company, Aspen Specialty Insurance Company, and Colony Insurance Company to Dismiss First Amended Complaint Pursuant To Fed. R. Civ. P. 12(B)(1) (Argument, Sections I–II) |
| FNC Motion to Dismiss on Forum Non Conveniens Grounds or Dismiss or Stay on Abstention Grounds (Dkt. No. 538) | Forum Non Conveniens (Section I) | "FNC Defendants"[4] | Plaintiff's Opposition to National Surety Insurers' And Allianz's Motion to Dismiss on *Forum Non Conveniens* Grounds or to Dismiss or Stay On Abstention Grounds; and Plaintiff's Opposition to the Abstention Arguments Raised in the Undersigned Defendants' Partial Motion to Dismiss the Amended Complaint (Argument, Section II.A) |

---

[3] *See* Dkt. No. 536 at 25 n.8.

[4] Defined (by Trustee) as National Surety Corporation; Interstate Fire & Casualty Company; Fireman's Fund Insurance Company; and Allianz Global Risks US Insurance Company.

TrustApp0002

| Motion | Argument(s) | Moving Defendant(s) | Trust's Responsive Pleading |
|---|---|---|---|
| | Abstention (Section II) | "FNC Defendants" | Plaintiff's Opposition to National Surety Insurers' And Allianz's Motion to Dismiss on *Forum Non Conveniens* Grounds or to Dismiss or Stay On Abstention Grounds; and Plaintiff's Opposition to the Abstention Arguments Raised in the Undersigned Defendants' Partial Motion to Dismiss the Amended Complaint (Argument, Section II. B) |
| Aviva's Motion to Dismiss Plaintiff's Amended Complaint (Dkt. Nos. 539–40) | Lack of Personal Jurisdiction (Section I)<br><br>Failure to State a Claim (Section II) | Aviva plc | Plaintiff's Response in Opposition to Defendant Aviva plc's Motion to Dismiss Plaintiff's Amended Complaint (Argument, Sections I–III) |
| Undersigned Defendants' Partial Motion to Dismiss the Amended Complaint (Dkt. Nos. 542–43) | Failure to State a Claim (Sections I–II) | "Undersigned Defendants" which is not expressly defined in motion/brief | Plaintiff's Opposition to Undersigned Defendants' Partial Motion to Dismiss the Amended Complaint (Argument, Section I) |
| | Lack of Personal Jurisdiction (Section III) | "PJ Moving Defendants"[5] | Plaintiff's Opposition to Undersigned Defendants' Partial Motion to Dismiss the Amended Complaint (Argument, Section II) |

---

[5] Defined as American Casualty Company of Reading, Pennsylvania; American Home Assurance Company; Charter Oak Fire Insurance Company; Cincinnati Insurance Company; Continental Casualty Company; The Continental Insurance Company; Erie Family Life Insurance Company; Erie Insurance Exchange; Jefferson Insurance Company; Nationwide Affinity Insurance Company of America; Nationwide Mutual Insurance Company; National Casualty Company; National Fire Insurance Company of Hartford; National Union Fire Insurance Company of Pittsburgh, Pa; New Hampshire Insurance Company; The Phoenix Insurance Company; Scottsdale Insurance Company; Security Mutual Insurance Company; SPARTA Insurance Company; St. Paul Fire & Marine Insurance Company; St. Paul Mercury Insurance Company; Travelers Casualty and Surety Company; The Travelers Companies, Inc.; The Travelers Indemnity Company; United States Fidelity and Guaranty Company; Wausau General Insurance Company.

TrustApp0003

| Motion | Argument(s) | Moving Defendant(s) | Trust's Responsive Pleading |
|---|---|---|---|
| | Abstention (Section IV) | "Abstention Moving Defendants"[6] | Plaintiff's Opposition to Undersigned Defendants' Partial Motion to Dismiss the Amended Complaint (Argument, Section III), *incorporating* Plaintiff's Opposition to National Surety Defendants' Motion to Dismiss on Forum Non Conveniens Grounds, and Plaintiff's Opposition to Undersigned Defendants' Motion to Dismiss on Abstention Grounds and National Surety Defendants' Motion to Dismiss or Stay on Abstention Grounds (Argument Section II.B) |
| Arrowood Limited Joinder in Undersigned Defendants' Motion to Dismiss the Amended Complaint in Part (Dkt. No. 544) | Lack of Personal Jurisdiction (Section III in Undersigned Defendants' Motion)<br><br>Abstention (Section IV in Undersigned Defendants' Motion) | Arrowood Indemnity Company, In Liquidation | Plaintiff's Opposition to Defendant Arrowood's Limited Joinder in Undersigned Defendants' Motion to Dismiss the Amended Complaint In Part and Supporting Memorandum, *incorporating* Plaintiff's Opposition to Undersigned Defendants' Partial Motion to Dismiss the Amended Complaint. |

---

[6] Defined as American Casualty Company of Reading, Pennsylvania; American Home Assurance Company; CNA Financial Corporation; Consolidated National Insurance Company; Continental Casualty Company; Insurance Company of the State of Pennsylvania; Jefferson Insurance Company; Landmark Insurance Company; Lexington Insurance Company; Munich Reinsurance America Inc.; National Fire Insurance Company of Hartford; National Union Fire Insurance Company of Pittsburgh, Pa.; New Hampshire Insurance Company; and The Continental Insurance Company.

TrustApp0004

| Motion | Argument(s) | Moving Defendant(s) | Trust's Responsive Pleading |
|---|---|---|---|
| Erie and Niagara Insurance Association's Motion to Dismiss the First Amended Complaint (Dkt. Nos. 546–47) | Personal Jurisdiction | Erie and Niagara Insurance Association | Plaintiff's Opposition to Defendant Erie and Niagara Insurance Association's Motion to Dismiss the First Amended Complaint, *incorporating* Plaintiff's Opposition to Undersigned Defendants' Partial Motion to Dismiss the Amended Complaint. |

TrustApp0005

**PAGE INTENTIONALLY BLANK**

TrustApp0006

**PAGE INTENTIONALLY BLANK**

TrustApp0007

**Seymour, Stephanie R.**

| | |
|---|---|
| **From:** | Rush, Michael B. |
| **Sent:** | Monday, September 30, 2024 12:55 PM |
| **To:** | jonathan.kinney@us.dlapiper.com; Gilbert Claims Matrix Team; Winstead, Hunter; Sraders, Sarah |
| **Cc:** | michael.murphy@us.dlapiper.com; John Canoni |
| **Subject:** | BSA Settlement Trust — Supplemental Matrix Notice #2 of Potential Claims Triggering Coverage |

Jonathan:

We write in response to your August 9, 2024 and September 11, 2024 e-mails in which you ask whether the Trustee is willing to voluntarily dismiss Aviva from the coverage action in the Northern District of Texas.  For reasons discussed in prior communications with you and more fully stated in the Trust's Response in Opposition to Aviva PLC's Motion to Dismiss Plaintiff's Complaint (the "Opposition") (Dkt. 316), the Trust again declines to do so.

As stated in the Opposition, the Trust has a good faith belief that Aviva is the successor in interest to Commercial Union Assurance Company ("Commercial Union"), which issued two insurance policies to the Daniel Webster Council, one of BSA's Local Councils.  This position is based on the Trust's review of publicly available corporate records as well as Aviva's prior representations in separate litigation in which it represented to other courts that it was related to (or formally known as) Commercial Union.

Separately, while the Trust has acknowledged to you that the policy evidence it currently possesses in the Document Repository with respect to the Daniel Webster Council is minimal, we have offered to make that available to Aviva, in the same manner as we have offered to make information available to other insurers.  Such access was conditioned on Aviva signing a confidentiality agreement in the same form as every other insurer (including those who have taken the position that the coverage action should be dismissed for various reasons).  In February, Aviva refused to sign the confidentiality agreement and argued that it was broader in scope than was necessary.  While the Trust disagrees with Aviva's position, it notes that Aviva never proposed an alternative confidentiality agreement.

Aviva appears to be under the impression that the Texas court's instruction to take a "hard look" at Aviva's motion to dismiss was an instruction to actually dismiss Aviva.  The Trust disagrees and believes there are sufficient grounds for the Court to deny Aviva's pending motion to dismiss.

Mike

---

**From:** Kinney, Jonathan <jonathan.kinney@us.dlapiper.com>
**Sent:** Wednesday, September 11, 2024 9:16 PM
**To:** Gilbert Claims Matrix Team <GilbertClaimsMatrixTeam@gilbertlegal.com>
**Cc:** Murphy, Michael (New York) <michael.murphy@us.dlapiper.com>; Canoni, John <John.Canoni@us.dlapiper.com>
**Subject:** RE: BSA Settlement Trust — Supplemental Matrix Notice #2 of Potential Claims Triggering Coverage

Counsel,

As set forth in Aviva plc's pending motion to dismiss in the *Houser v. Allianz, et al.* matter in the Northern District of Texas, there are multiple bases on which the BSA Trustee's claims against Aviva must be dismissed.  For the same reasons, Aviva plc is not a "potentially responsible insurer" under any of the alleged policies referenced in the "Aviva – List[s] of Matrix Claims as of" August 27-28 or September 11, 2024, including but not limited to SST Claim Numbers SST-

TrustApp0008

344235, SST-340415, SST-332195, SST-333270, SST-358961, SST-382388, SST-304859, SST-346008, SST-403357, SST-390722, as attached to emails received from the "Insurer Support" email account (attached).

Again, we have not received a response to our August 9, 2024 email asking whether the Trustee is now willing to voluntarily dismiss Aviva from the N.D. Texas litigation. Please let us know where that stands.

Aviva reserves all rights and waives none.

Best regards,
Jon

## Jonathan M. Kinney
Associate

T  +1 212 335 4742
F  +1 212 884 8542
M  +1 973 919 3685
jonathan.kinney@us.dlapiper.com

**DLA Piper LLP (US)**
dlapiper.com



---

**From:** Kinney, Jonathan
**Sent:** Tuesday, August 27, 2024 9:01 AM
**To:** Gilbert Matrix Distro <gilbertclaimsmatrixteam@gilbertlegal.com>
**Cc:** Murphy, Michael (New York) <michael.murphy@us.dlapiper.com>; Canoni, John <John.Canoni@us.dlapiper.com>
**Subject:** RE: BSA Settlement Trust — Supplemental Matrix Notice #2 of Potential Claims Triggering Coverage

Counsel,

As set forth in Aviva plc's pending motion to dismiss in the *Houser v. Allianz, et al.* matter in the Northern District of Texas, there are multiple bases on which the BSA Trustee's claims against Aviva must be dismissed. For the same reasons, Aviva plc is not a "potentially responsible insurer" under any of the alleged policies referenced in the "Aviva – List[s] of Matrix Claims as of" August 13, 16, 19, 21, 22, and 26, 2024, including but not limited to SST Claim Numbers SST-394052, SST-344626, SST-392318, SST-365137, SST-304469, SST-398685, SST-348825, as attached to emails received from the "Insurer Support" email account (attached).

We have not received a response to our August 9 email asking whether the Trustee is now willing to voluntarily dismiss Aviva from the N.D. Texas litigation. Please let us know where that stands.

Aviva reserves all rights and waives none.

Best regards,
Jon

## Jonathan M. Kinney
Associate

TrustApp0009

T +1 212 335 4742
F +1 212 884 8542
M +1 973 919 3685
jonathan.kinney@us.dlapiper.com

**DLA Piper LLP (US)**
dlapiper.com



---

**From:** Kinney, Jonathan
**Sent:** Wednesday, July 10, 2024 8:51 AM
**To:** Gilbert Matrix Distro <gilbertclaimsmatrixteam@gilbertlegal.com>
**Cc:** Murphy, Michael (New York) <michael.murphy@us.dlapiper.com>; Canoni, John <John.Canoni@us.dlapiper.com>
**Subject:** RE: BSA Settlement Trust — Supplemental Matrix Notice #2 of Potential Claims Triggering Coverage

Counsel,

As set forth in Aviva plc's pending motion to dismiss in the *Houser v. Allianz, et al.* matter in the Northern District of Texas, there are multiple bases on which the BSA Trustee's claims against Aviva must be dismissed. For the same reasons, Aviva plc is not a "potentially responsible insurer" under any of the alleged policies referenced in the "Aviva – List[s] of Matrix Claims as of" July 8, 2024, including but not limited to SST Claim Number SST-334625, as attached to an email received from the "Insurer Support" email account (attached).

Aviva reserves all rights and waives none.

Best regards,
Jon


Jonathan Michael Kinney
Associate

T +1 212 335 4742
F +1 212 884 8542
M +1 973 919 3685
jonathan.kinney@us.dlapiper.com

**DLA Piper LLP (US)**
dlapiper.com



---

**From:** Kinney, Jonathan
**Sent:** Monday, July 1, 2024 9:18 AM
**To:** Gilbert Matrix Distro <gilbertclaimsmatrixteam@gilbertlegal.com>
**Cc:** Murphy, Michael (New York) <michael.murphy@us.dlapiper.com>; Canoni, John <John.Canoni@us.dlapiper.com>
**Subject:** RE: BSA Settlement Trust — Supplemental Matrix Notice #2 of Potential Claims Triggering Coverage

Counsel,

TrustApp0010

As set forth in Aviva plc's pending motion to dismiss in the *Houser v. Allianz, et al.* matter in the Northern District of Texas, there are multiple bases on which the BSA Trustee's claims against Aviva must be dismissed.  For the same reasons, Aviva plc is not a "potentially responsible insurer" under any of the alleged policies referenced in the "Aviva – List[s] of Matrix Claims as of" June 13, 17, 18, 19, or 24, 2024, including but not limited to the following SST Claim Numbers, which were attached to emails received from the "Insurer Support" email account (attached):

| |
|---|
| SST-381707 |
| SST-412584 |
| SST-394885 |
| SST-324327 |
| SST-332721 |
| SST-339302 |
| SST-341058 |
| SST-341126 |
| SST-341853 |
| SST-346810 |
| SST-388677 |
| SST-302125 |
| SST-304954 |
| SST-309892 |
| SST-344445 |
| SST-354219 |
| SST-363774 |
| SST-376432 |
| SST-377875 |
| SST-379639 |
| SST-381420 |
| SST-355368 |

Aviva reserves all rights and waives none.

Best regards,
Jon


Jonathan M. Kinney
Associate

T  +1 212 335 4742
F  +1 212 884 8542
M  +1 973 919 3685
jonathan.kinney@us.dlapiper.com

**DLA Piper LLP (US)**
dlapiper.com



TrustApp0011

**From:** Kinney, Jonathan
**Sent:** Sunday, June 2, 2024 11:29 AM
**To:** 'Gilbert Matrix Distro' <gilbertclaimsmatrixteam@gilbertlegal.com>
**Cc:** Murphy, Michael (New York) <michael.murphy@us.dlapiper.com>; Canoni, John <John.Canoni@us.dlapiper.com>
**Subject:** RE: BSA Settlement Trust — Supplemental Matrix Notice #2 of Potential Claims Triggering Coverage

Counsel,

As set forth in Aviva plc's pending motion to dismiss in the *Houser v. Allianz, et al.* matter in the Northern District of Texas, there are multiple bases on which the BSA Trustee's claims against Aviva must be dismissed.  For the same reasons, Aviva plc is not a "potentially responsible insurer" under any of the alleged policies referenced in the "Aviva – List[s] of Matrix Claims as of" May 17, 23, or 24, 2024 (including but not limited to SST Claim Numbers SST-411293, SST-343731, SST-351172), which were attached to emails received from the "Insurer Support" email account (attached).

For the same reasons, Aviva plc is not a potentially responsible insurer with respect to the "proposed award" on a Matrix Claim referenced in the BSA Settlement Trust's "Supplemental Matrix Notice #3," dated May 24, 2024.  Accordingly, Aviva objects to any contention that it is responsible for any Matrix Claim award that the BSA Settlement Trust decides to issue.

Aviva reserves all rights and waives none.

Best regards,
Jon


Jonathan M. Kinney
Associate

T  +1 212 335 4742
F  +1 212 884 8542
M  +1 973 919 3685
jonathan.kinney@us.dlapiper.com

**DLA Piper LLP (US)**
dlapiper.com



---

**From:** Kinney, Jonathan
**Sent:** Thursday, May 16, 2024 10:17 PM
**To:** Gilbert Matrix Distro <gilbertclaimsmatrixteam@gilbertlegal.com>
**Cc:** Murphy, Michael (New York) <michael.murphy@us.dlapiper.com>; Canoni, John <John.Canoni@us.dlapiper.com>
**Subject:** RE: BSA Settlement Trust — Supplemental Matrix Notice #2 of Potential Claims Triggering Coverage

Counsel,

As set forth in Aviva plc's pending motion to dismiss in the *Houser v. Allianz, et al.* matter in the Northern District of Texas, there are multiple bases on which the BSA Trustee's claims against Aviva must be dismissed.  For the same reasons, Aviva plc is not a "potentially responsible insurer" under any of the alleged policies referenced in the "Aviva – List[s] of Matrix Claims as of" May 1, 6, 7, 9, 15, 2024 (including but not limited to SST Claim Numbers SST-416502, SST-

TrustApp0012

307003, SST-395327, SST-395418, SST-399860, SST-400444, SST-409931, SST-341959, SST-339958, SST-340427, SST-348599), which were attached to emails received from the "Insurer Support" email account (attached). Aviva reserves all rights and waives none.

Best regards,
Jon


## Jonathan M. Kinney
Associate

T  +1 212 335 4742
F  +1 212 884 8542
M  +1 973 919 3685
jonathan.kinney@us.dlapiper.com

**DLA Piper LLP (US)**
dlapiper.com



---

**From:** Kinney, Jonathan
**Sent:** Tuesday, April 30, 2024 8:33 PM
**To:** Gilbert Matrix Distro <gilbertclaimsmatrixteam@gilbertlegal.com>
**Cc:** Murphy, Michael (New York) <michael.murphy@us.dlapiper.com>; Canoni, John <John.Canoni@us.dlapiper.com>
**Subject:** RE: BSA Settlement Trust — Supplemental Matrix Notice #2 of Potential Claims Triggering Coverage

Counsel,

As set forth in Aviva plc's pending motion to dismiss in the *Houser v. Allianz, et al.* matter in the Northern District of Texas, there are multiple bases on which the BSA Trustee's claims against Aviva must be dismissed. For the same reasons, Aviva plc is not a "potentially responsible insurer" under any of the alleged policies referenced in the "Aviva – List[s] of Matrix Claims as of" April 22, 26, or 29, 2024 (including but not limited to SST Claim Numbers SST-352843, SST-354802, SST-378801, SST-387946, SST-398237, SST-406725, SST-413756, SST-368824, SST-377210), which were attached to emails received from the "Insurer Support" email account (attached). Aviva reserves all rights and waives none.

Best regards,
Jon


## Jonathan M. Kinney
Associate

T  +1 212 335 4742
F  +1 212 884 8542
M  +1 973 919 3685
jonathan.kinney@us.dlapiper.com

**DLA Piper LLP (US)**
dlapiper.com

TrustApp0013



**From:** Kinney, Jonathan
**Sent:** Monday, April 22, 2024 5:48 PM
**To:** Gilbert Matrix Distro <gilbertclaimsmatrixteam@gilbertlegal.com>
**Cc:** Murphy, Michael (New York) <michael.murphy@us.dlapiper.com>; Canoni, John <John.Canoni@us.dlapiper.com>
**Subject:** RE: BSA Settlement Trust — Supplemental Matrix Notice #2 of Potential Claims Triggering Coverage

Counsel,

As set forth in Aviva plc's pending motion to dismiss in the *Houser v. Allianz, et al.* matter in the Northern District of Texas, there are multiple bases on which the BSA Trustee's claims against Aviva must be dismissed. For the same reasons, Aviva plc is not a "potentially responsible insurer" under any of the alleged policies referenced in the "Aviva – List[s] of Matrix Claims as of" April 12, 16, or 17, 2024 (including but not limited to SST Claim Numbers SST-332547, SST-337469, SST-388889, SST-362240), which were attached to emails received from the "Insurer Support" email account (attached). Aviva reserves all rights and waives none.

Best regards,
Jon


Jonathan M. Kinney
Associate

T  +1 212 335 4742
F  +1 212 884 8542
M  +1 973 919 3685
jonathan.kinney@us.dlapiper.com

**DLA Piper LLP (US)**
dlapiper.com



**From:** Kinney, Jonathan
**Sent:** Thursday, April 11, 2024 9:37 AM
**To:** 'Gilbert Matrix Distro' <gilbertclaimsmatrixteam@gilbertlegal.com>
**Cc:** Murphy, Michael (New York) <michael.murphy@us.dlapiper.com>; Canoni, John <John.Canoni@us.dlapiper.com>
**Subject:** RE: BSA Settlement Trust — Supplemental Matrix Notice #2 of Potential Claims Triggering Coverage

Counsel,

As set forth in Aviva plc's pending motion to dismiss in the *Houser v. Allianz, et al.* matter in the Northern District of Texas, there are multiple bases on which the BSA Trustee's claims against Aviva must be dismissed. For the same reasons, Aviva plc is not a "potentially responsible insurer" under any of the alleged policies referenced in the "Aviva – List[s] of Matrix Claims as of" April 1, 2, 4, or 5, 2024 (including but not limited to SST Claim Numbers SST-347418, SST-352706, SST-370227, SST-321098, SST-398059, SST-356906, SST-364693), which were attached to emails received from the "Insurer Support" email account (attached). Aviva reserves all rights and waives none.

TrustApp0014

Best regards,
Jon

## Jonathan M. Kinney
Associate

T  +1 212 335 4742
F  +1 212 884 8542
M  +1 973 919 3685
jonathan.kinney@us.dlapiper.com

**DLA Piper LLP (US)**
dlapiper.com



---

**From:** Kinney, Jonathan
**Sent:** Friday, March 29, 2024 1:16 PM
**To:** 'Gilbert Matrix Distro' <gilbertclaimsmatrixteam@gilbertlegal.com>
**Cc:** Murphy, Michael (New York) <michael.murphy@us.dlapiper.com>; Canoni, John <John.Canoni@us.dlapiper.com>
**Subject:** RE: BSA Settlement Trust — Supplemental Matrix Notice #2 of Potential Claims Triggering Coverage

Counsel,

As set forth in Aviva plc's pending motion to dismiss in the *Houser v. Allianz, et al.* matter in the Northern District of Texas, there are multiple bases on which the BSA Trustee's claims against Aviva must be dismissed.  For the same reasons, Aviva plc is not a "potentially responsible insurer" under any of the alleged policies referenced in the "Aviva – List[s] of Matrix Claims as of" March 21, 22, or 27, 2024 (including but not limited to SST Claim Numbers SST-300119, SST-347187, SST-359728), which were attached to emails received from the "Insurer Support" email account (attached).  Aviva reserves all rights and waives none.

Best regards,
Jon

## Jonathan M. Kinney
Associate

T  +1 212 335 4742
F  +1 212 884 8542
M  +1 973 919 3685
jonathan.kinney@us.dlapiper.com

**DLA Piper LLP (US)**
dlapiper.com



TrustApp0015

**From:** Kinney, Jonathan
**Sent:** Tuesday, March 19, 2024 9:32 AM
**To:** 'Gilbert Matrix Distro' <gilbertclaimsmatrixteam@gilbertlegal.com>
**Cc:** Murphy, Michael (New York) <michael.murphy@us.dlapiper.com>; Canoni, John <John.Canoni@us.dlapiper.com>
**Subject:** RE: BSA Settlement Trust — Supplemental Matrix Notice #2 of Potential Claims Triggering Coverage

Counsel,

As set forth in Aviva plc's pending motion to dismiss in the *Houser v. Allianz, et al.* matter in the Northern District of Texas, there are multiple bases on which the BSA Trustee's claims against Aviva must be dismissed.  For the same reasons, Aviva plc is not a "potentially responsible insurer" under any of the alleged policies referenced in the "Aviva – List[s] of Matrix Claims as of" March 11 or 13, 2024 (including but not limited to SST Claim Numbers SST-317981, SST-383926, SST-384226, SST-397016), which were attached to emails received from the "Insurer Support" email account (attached).  Aviva reserves all rights and waives none.

Best regards,
Jon


## Jonathan M. Kinney
Associate

T  +1 212 335 4742
F  +1 212 884 8542
M  +1 973 919 3685
jonathan.kinney@us.dlapiper.com

**DLA Piper LLP (US)**
dlapiper.com



---

**From:** Kinney, Jonathan
**Sent:** Monday, March 11, 2024 6:21 AM
**To:** Gilbert Matrix Distro <gilbertclaimsmatrixteam@gilbertlegal.com>
**Cc:** Murphy, Michael (New York) <michael.murphy@us.dlapiper.com>; Canoni, John <John.Canoni@us.dlapiper.com>
**Subject:** RE: BSA Settlement Trust — Supplemental Matrix Notice #2 of Potential Claims Triggering Coverage

Counsel,

As the Trustee is aware, and as set forth at length in motion to dismiss briefing in *Houser v. Allianz Global Risks US Insurance Co., et al.*, No. 23-cv-01592-S (N.D. Tex.) (the "Texas Litigation"), Aviva plc is not an insurance company, did not issue an insurance policy(ies) to Boy Scouts of America or any of its Local Councils or other BSA chartered organizations, and is not liable under any such insurance policies.  As we have previously discussed with counsel for the Trustee on numerous occasions, the Trustee has failed to provide a copy of any insurance policy pursuant to which these Matrix Claims are being noticed.  The Trustee has also failed to provide any other evidence of any such policies.

Although, in the context of discussion concerning the voluntary dismissal of Aviva plc from the Texas Litigation, counsel for the trustee asked whether we would review the alleged Local Council "questionnaire" that is the purported basis for the Trustee's inclusion of Aviva plc in the Texas Litigation (and presumably the basis on which the Trustee is issuing Claims Matrix notices to Aviva plc), we have not received any such evidence to date.

9

TrustApp0016

The Trustee has failed to offer any evidence to suggest that Aviva bears any obligation concerning Claim Nos. SST-354580 and SST-349059 (attached) or under any of the policies at issue in the Texas Litigation.  Aviva reserves all rights and waives none.

Regards,
Jon


Jonathan M. Kinney
Associate

T  +1 212 335 4742
F  +1 212 884 8542
M  +1 973 919 3685
jonathan.kinney@us.dlapiper.com

**DLA Piper LLP (US)**
dlapiper.com



---

**From:** Insurer Support <insurer.support@scoutingsettlementtrust.com>
**Sent:** Friday, March 8, 2024 5:59 PM
**To:** Kinney, Jonathan <jonathan.kinney@us.dlapiper.com>
**Cc:** Gilbert Matrix Distro <gilbertclaimsmatrixteam@gilbertlegal.com>
**Subject:** BSA Settlement Trust — Supplemental Matrix Notice #2 of Potential Claims Triggering Coverage

⚠ EXTERNAL MESSAGE

Counsel:


As coverage counsel to the BSA Settlement Trust (the "Settlement Trust"), we write to provide supplemental notice of Abuse Claims submitted to the Settlement Trust pursuant to the TDP's "Claims Matrix" process ("Matrix Claims"). As you know, the Settlement Trust sends regular notice of newly-filed Matrix Claims to all insurers.  The Settlement Trust has continued to review those new Matrix Claims and has now determined certain of those claims to be potentially covered by your client's policies.  Those claims are identified in the attached report.

1.    **Accessing Claims Information**

Barring unusual circumstances, the Settlement Trust intends to provide potentially responsible insurers 21 days to review Matrix Claims noticed to them before calculating a proposed award, and 7 days to object to a proposed award before sending it to the claimant.  However, our records indicate that your client has not executed the attached confidentiality agreement that was sent to you on you on July 14th, 2023.  As noted previously, execution of that agreement is necessary for us to provide you with more detailed information these Matrix Claims.  To the extent your client wishes to participate in the

10

TrustApp0017

administration of the above-referenced Matrix Claims, please execute and return the agreement **within 48 hours** so that we may provide your client with additional claim information without further delaying the processing of these claims.  To the extent we do not receive an executed confidentiality agreement within that time period, the Settlement Trust will assume that your client has declined to participate in the claims administration process.

2.    **Scope of Notice and Tender**

If you are receiving this notice, the Trust has determined that your client issued at least one policy on Schedule 2 of the Plan ("BSA Insurance Policies") and/or Schedule 3 of the Plan ("Local Council Policies") that:

1.    was in effect during the period of abuse identified for the above-referenced claim(s) (for policies containing no first encounter provision),

2.    was in effect during the first alleged act of molestation for a given claim (for policies containing a first encounter provision), and/or

3.    post-dates the period of abuse but provides coverage for mental anguish without regard for whether bodily injury occurs during the policy period2 and includes no "first encounter" provision.

For Local Council Policies meeting the above criteria, you are receiving this notice only if you issued a policy to any local council (or its predecessors or successors, as applicable) identified in the Claims Questionnaire or other supporting materials for the above-referenced claim(s).

To the extent your client issued or is responsible for other policies issued to BSA or any of the identified local councils that are required to respond to the claim, this letter shall additionally constitute notice under any such policy. The Trustee reserves, and does not waive, any other rights and defenses with respect to the foregoing notice, including the right to amend such notice as additional information becomes available.

Please acknowledge receipt of this notice and provide alternative contact information if you believe you have received this letter in error.  We look forward to continuing our cooperative and constructive working relationship throughout this process.

Regards,

/s/ Kami E. Quinn

Kami E. Quinn

11

[1] Examples of such language include, but are not limited to, the following: "'Personal injury' (1) means bodily injury, shock, mental injury or mental anguish . . . ."; and "'Personal Injury' means, but is not limited to (1) bodily injury, sickness, disease, disability, and mental anguish . . . ."

[2] Third Modified Fifth Amended Chapter 11 Plan of Reorganization (With Technical Modifications) for Boy Scouts of America and Delaware BSA, LLC at 342–405 ("Schedule 2 BSA Insurance Policies" and "Schedule 3 Local Council Insurance Policies"), In re Boy Scouts of America, No. 20-10343 (LSS) (Bankr. D. Del. Sept. 6, 2022), ECF No. 10296.

---------------------------------------------------------------------------------------------------

The information transmitted, including any attachments, is intended only for the person or entity to which it is addressed and may contain confidential and/or privileged material. Any review, retransmission, dissemination or other use of, or taking of any action in reliance upon, this information by persons or entities other than the intended recipient is prohibited, and all liability arising therefrom is disclaimed. If you received this in error, please contact the sender and delete the material from any computer.

The information contained in this email may be confidential and/or legally privileged. It has been sent for the sole use of the intended recipient(s). If the reader of this message is not an intended recipient, you are hereby notified that any unauthorized review, use, disclosure, dissemination, distribution, or copying of this communication, or any of its contents, is strictly prohibited. If you have received this communication in error, please reply to the sender and destroy all copies of the message. To contact us directly, send to postmaster@dlapiper.com. Thank you.

TrustApp0019

# EXHIBIT A
# TO NOTICE OF REMOVAL
# (REDACTED VERSION)

TrustApp0020

INDEX NO. 653428/2023
RECEIVED NYSCEF: 07/18/2023

NYSCEF DOC. NO. 1

*SUPREME COURT OF THE STATE OF NEW YORK*
*COUNTY OF NEW YORK*

---

AVIVA PLC,

COMMERCIAL UNION ASSURANCE COMPANY
LIMITED,

NRG VICTORY REINSURANCE LIMITED,

TENECOM LIMITED,

THE INDEMNITY MARINE ASSURANCE
COMPANY LIMITED,

THE NORTHERN ASSURANCE COMPANY
LIMITED,

THE OCEAN MARINE INSURANCE COMPANY
LIMITED,

THE ROAD TRANSPORT AND GENERAL
INSURANCE COMPANY LIMITED,

THE SCOTTISH LION INSURANCE COMPANY
LIMITED, and

THE YORKSHIRE INSURANCE COMPANY
LIMITED,

           Plaintiffs,

    v.

HONEYWELL INTERNATIONAL INC.,

           Defendant.

Index No. _____

**SUMMONS**

---

**TO THE ABOVE-NAMED DEFENDANT:**

    **YOU ARE HEREBY SUMMONED** and required to serve upon Plaintiffs' attorneys an

answer to the Complaint in this action and to serve a copy of your answer, or, if the Complaint is

1

TrustApp0021

INDEX NO. 653428/2023
RECEIVED NYSCEF: 07/18/2023

NYSCEF DOC. NO. 1

not served with this Summons, to serve a notice of appearance, on the Plaintiffs' attorney within

twenty (20) days after service of this Summons, exclusive of the day of service (or within thirty

(30) days after service is complete if this Summons is not personally delivered to you within the

State of New York); and in case of your failure to appear or answer, judgment will be taken against

you by default for the relief demanded in the Complaint.

The bases for designating New York County as the venue for this action are: pursuant to

CPLR Section 503(c), one or more parties are authorized to transact business in the state of New

York with a principal office located in New York County, and Plaintiffs designate New York

County as the place of trial for this action.

Dated: New York, New York
       July 14, 2023

                                   WOLLMUTH MAHER & DEUTSCH LLP

                                   /s/ Ryan A. Kane
                                   _____

                                   William A. Maher
                                   Ryan A. Kane
                                   Sean P. McGonigle
                                   500 Fifth Avenue, 12th Floor
                                   New York, New York 10110
                                   Telephone: (212) 382-3300
                                   wmaher@wmd-law.com
                                   rkane@wmd-law.com
                                   smcgonigle@wmd-law.com

                                   Attorneys for Plaintiffs

2

TrustApp0022

INDEX NO. 653428/2023

NYSCEF DOC. NO. 1

RECEIVED NYSCEF: 07/18/2023

**To:**

Honeywell International Inc.
Corporation Service Company
80 State Street Albany, NY 12207

TrustApp0023

NYSCEF DOC. NO. 1

INDEX NO. 653428/2023
RECEIVED NYSCEF: 07/18/2023

*SUPREME COURT OF THE STATE OF NEW YORK*
*COUNTY OF NEW YORK*

---

AVIVA PLC,

COMMERCIAL UNION ASSURANCE COMPANY
LIMITED,

NRG VICTORY REINSURANCE LIMITED,

TENECOM LIMITED,

THE INDEMNITY MARINE ASSURANCE
COMPANY LIMITED,

THE NORTHERN ASSURANCE COMPANY
LIMITED,

THE OCEAN MARINE INSURANCE COMPANY
LIMITED,

THE ROAD TRANSPORT AND GENERAL
INSURANCE COMPANY LIMITED,

THE SCOTTISH LION INSURANCE COMPANY
LIMITED, and

THE YORKSHIRE INSURANCE COMPANY
LIMITED,

                    Plaintiffs,

          v.

HONEYWELL INTERNATIONAL INC.,

                    Defendant.

**Index No. _____**
**Complaint**

TrustApp0024

INDEX NO. 653428/2023

NYSCEF DOC. NO. 1

RECEIVED NYSCEF: 07/18/2023

Plaintiffs Aviva plc as holder of rights and obligations under policy subscriptions by Weir SBT A/C; Commercial Union Assurance Company Limited; NRG Victory Reinsurance Limited; Tenecom Limited; The Indemnity Marine Assurance Company Limited; The Northern Assurance Company Limited; The Ocean Marine Insurance Company Limited; The Road Transport and General Insurance Company Limited; The Scottish Lion Insurance Company Limited; and The Yorkshire Insurance Company Limited (collectively, "Plaintiffs") bring this Complaint by and through their attorneys, Wollmuth Maher & Deutsch LLP, against Defendant Honeywell International Inc. ("Honeywell" or "Defendant") for breach of a Settlement Agreement and Release concerning insurance coverage for certain asbestos claims (the "Settlement Agreement") and declaratory judgment as to the parties' rights and obligations under the Settlement Agreement, and hereby allege as follows:

## NATURE OF ACTION

1.    This is an action for breach of contract and declaratory relief arising from Honeywell's breach of its obligations under the Settlement Agreement, which resolved the dispute between Plaintiffs and Honeywell concerning the coverage that Honeywell sought under certain of Plaintiffs' insurance policies (the "Insurance Policies") for Honeywell's payment of underlying asbestos claims concerning the North American Refractories Company ("NARCO"), which was previously owned by Honeywell (the "Asbestos Claims"). The Settlement Agreement obligates Plaintiffs to make a series of installment payments to Honeywell (the "Installment Payments") relating to Honeywell's payment of the Asbestos Claims. Plaintiffs have fully complied with all of their obligations under the Settlement Agreement.

2.    Honeywell also has obligations under the Settlement Agreement. One of Honeywell's most important obligations is to provide Plaintiffs with supporting documentation

TrustApp0025

INDEX NO. 653428/2023
RECEIVED NYSCEF: 07/18/2023

NYSCEF DOC. NO. 1

concerning Honeywell's payment of the underlying Asbestos Claims ("Proper Supporting Documentation," as more fully defined below) so that Plaintiffs can assess the validity of the Asbestos Claims for which Honeywell seeks Installment Payments. The Settlement Agreement imposes multiple obligations on Honeywell to provide Proper Supporting Documentation.

3.    *First*, Honeywell must provide Proper Supporting Documentation to Plaintiffs together with any request that Plaintiffs make an Installment Payment, rendering it a condition precedent to Plaintiffs' obligation to make Installment Payments. To this end, the Settlement Agreement expressly states that the Installment Payments "shall be paid no later than sixty (60) days *after* [Plaintiffs] have received notice from Honeywell and Proper Supporting Documentation (the 'Payment Due Date') that Indemnity Payments or Defense Costs were paid in satisfaction of NARCO Asbestos Claims made by Honeywell and/or the NARCO Trust." (emphasis added).

4.    *Second*, Honeywell also must provide Plaintiffs, on a quarterly basis, a summary report along with Proper Supporting Documentation of its payment of Asbestos Claims (the "Quarterly Documentation").

5.    *Third*, Honeywell must provide Plaintiffs access to its databases and related materials for Asbestos Claims (the "Asbestos Claims Database," as more fully defined below).

6.    Honeywell has failed to provide Plaintiffs with complete Proper Supporting Documentation, Quarterly Documentation and access to the Asbestos Claims Database (including the underlying medical records). In particular, Honeywell has withheld and redacted vital information concerning the underlying Asbestos Claims, including the asbestos claimants' Social Security numbers, names, dates of birth, and dates of death, rendering the data essentially useless for its intended purpose.

TrustApp0026

INDEX NO. 653428/2023
RECEIVED NYSCEF: 07/18/2023

NYSCEF DOC. NO. 1

7.    Plaintiffs eventually discovered the reason for Honeywell's willful breach of its obligations to provide Proper Supporting Documentation, Quarterly Documentation and access to the Asbestos Claims Database. Long after Honeywell executed the Settlement Agreement, Honeywell entered into a separate agreement with the NARCO Trust that restricted access to Asbestos Claims data that Honeywell already was required to provide Plaintiffs under the Settlement Agreement. Rather than honor its obligations under the Settlement Agreement, Honeywell sought to unilaterally rewrite the Settlement Agreement by demanding that Plaintiffs sign a new agreement restricting Plaintiffs' use of the bargained-for claims data. Plaintiffs rightfully refused.

8.    Plaintiffs never agreed to permit Honeywell to provide incomplete Proper Supporting Documentaiton and have repeatedly demanded that Honeywell cure its breaches by producing the contractually required Proper Supporting Documentation and Quarterly Documentation, and by providing Plaintiffs access to the Asbestos Claims Database, but Honeywell has steadfastly refused to comply with its obligations under the Settlement Agreement.

9.    Honeywell's refusal to comply with the Settlement Agreement and satisfy the condition precedent to Plaintiffs' payment obligations should have, but has not, prevented Honeywell from demanding that Plaintiffs continue to make Installment Payments. Given Honeywell's refusal to provide Proper Supporting Documentation, Plaintiffs made the last four Installment Payments, totaling approximately ████████, under express reservations of rights (the "ROR Payments"). In making the ROR Payments, Plaintiffs reserved all their rights and demanded that Honeywell satisfy all conditions precedent to the receipt of Installment Payments under the Settlement Agreement.

3

TrustApp0027

INDEX NO. 653428/2023

NYSCEF DOC. NO. 1                                                    RECEIVED NYSCEF: 07/18/2023

10.    Plaintiffs now bring this action seeking damages, including over ▮▮▮▮ in ROR Payments and the loss of the use of the monies comprising those ROR Payments, as a result of Honeywell's breach of the Settlement Agreement, and declaratory relief determining Honeywell's obligations under the Settlement Agreement. In particular, Plaintiffs seek a declaration that Plaintiffs have not been and are not required to make any Installment Payments until Honeywell satisfies the required condition precedent to Plaintiffs' obligation to make Installment Payments.[1]

## THE PARTIES

11.    Plaintiff Aviva plc is a public limited company organized and existing under the laws of the United Kingdom with its principal place of business in the United Kingdom and is the holder of rights and obligations under policy subscriptions by Weir SBT A/C.

12.    Plaintiff Commercial Union Assurance Company Limited, part of the Aviva plc group of companies, was a limited company organized and existing under the laws of the United Kingdom with its principal place of business in the United Kingdom.

13.    Plaintiff NRG Victory Reinsurance Limited is a private limited company organized and existing under the laws of the United Kingdom with its principal place of business in the United Kingdom.

14.    Plaintiff Tenecom Limited is a private limited company organized and existing under the laws of the United Kingdom with its principal place of business in the United Kingdom.

---

[1] The Settlement Agreement sets forth a procedure for the identification and potential resolution of any disputes before any party may pursue its rights under the Settlement Agreement. Prior to initiating this proceeding, Plaintiffs have complied with that procedure as it relates to this dispute.

4

TrustApp0028

INDEX NO. 653428/2023

RECEIVED NYSCEF: 07/18/2023

NYSCEF DOC. NO. 1

15.    Plaintiff The Indemnity Marine Assurance Company Limited, part of the Aviva plc group of companies, was a limited company organized and existing under the laws of the United Kingdom with its principal place of business in the United Kingdom.

16.    Plaintiff The Northern Assurance Company Limited, part of the Aviva plc group of companies, was a limited company organized and existing under the laws of the United Kingdom with its principal place of business in the United Kingdom.

17.    Plaintiff The Ocean Marine Insurance Company Limited, part of the Aviva plc group of companies, is a private limited company organized and existing under the laws of the United Kingdom with its principal place of business in the United Kingdom.

18.    Plaintiff The Road Transport and General Insurance Company Limited, part of the Aviva plc group of companies, was a limited company organized and existing under the laws of the United Kingdom with its principal place of business in the United Kingdom.

19.    Plaintiff The Scottish Lion Insurance Company Limited is a private limited company organized and existing under the laws of the United Kingdom with its principal place of business in the United Kingdom.

20.    Plaintiff The Yorkshire Insurance Company Limited is a private limited company organized and existing under the laws of the United Kingdom with its principal place of business in the United Kingdom.

21.    Plaintiffs are insurers which did business in the London Insurance Market, which severally subscribed each in its own proportionate share to one or more insurance policies which are covered by the Settlement Agreement.

22.    Defendant Honeywell is a corporation organized under the laws of the State of Delaware, with a current principal place of business in Charlotte, North Carolina.

5

TrustApp0029

INDEX NO. 653428/2023
RECEIVED NYSCEF: 07/18/2023

NYSCEF DOC. NO. 1

23.    Plaintiffs and Defendant are parties to the Settlement Agreement that is the subject of this action.

## JURISDICTION AND VENUE

24.    This Court has jurisdiction over this action pursuant to, *inter alia,* (i) N.Y. C.P.L.R. §§ 301 and 302(a) because Honeywell does and transacts business within the state of New York, and the Settlement Agreement is governed by the laws of the State of New York; and (ii) N.Y. C.P.L.R. § 3001 because Plaintiffs seek a declaratory judgment related to rights and remedies under a contract, the Settlement Agreement, governed by the laws of the State of New York.

25.    Venue is proper in this Court pursuant to CPLR §§ 503(a) and (c) because Plaintiffs have designated New York County and, upon information and belief, Honeywell is a foreign corporation authorized to transact business in the state with its New York office of the corporation located in New York County.

## FACTUAL BACKGROUND

### I.    The Settlement Agreement.

26.    Honeywell is the predecessor-in-interest to NARCO for claims related to the manufacture, distribution and sale of refractory products for use in high-temperature applications, including furnaces, boilers and ladles. Although Honeywell spun off NARCO in 1986, Honeywell defended and indemnified NARCO against asbestos bodily injury claims involving products discontinued prior to the 1986 transaction.

27.    Honeywell and NARCO were subject to numerous claims alleging bodily injury arising from NARCO's refractory business (previously defined as "Asbestos Claims"). In 2002, NARCO filed a Chapter 11 bankruptcy petition in the Western District of Pennsylvania. *See In re N. Am. Refractories Co.*, No. 02-bk-20198 (Bankr. W.D. Pa.).

TrustApp0030

INDEX NO. 653428/2023
RECEIVED NYSCEF: 07/18/2023

NYSCEF DOC. NO. 1

28.    As part of the reorganization plan approved by the bankruptcy court, the Asbestos Claims were channeled to the NARCO Trust, which was funded, in part, through Honeywell's reimbursement of all valid claims paid by the NARCO Trust.

29.    Under the bankruptcy plan, Honeywell is entitled to oversee NARCO Trust activities, and has access to NARCO Trust information, documents and databases.

30.    Plaintiffs severally subscribed to the Insurance Policies under which Honeywell sought coverage for its payments to the NARCO Trust.

31.    Plaintiffs and Honeywell disputed the alleged application of the Insurance Policies to, among other things, the Asbestos Claims.

32.    To resolve those disputes, on February 10, 2004, the parties entered into the Settlement Agreement.

33.    The Settlement Agreement provides that Plaintiffs shall make a schedule of payments, the previously defined Installment Payments, over multiple years coinciding with Honeywell's payments of Asbestos Claims surpassing various thresholds.

34.    The Settlement Agreement is "governed by and shall be construed in accordance with the laws of the State of New York" and provides that "[n]o change or modification of this Agreement shall be valid unless it is made in writing and signed by the Parties."

**II.    Honeywell's Obligations under the Settlement Agreement.**

35.    Honeywell also has ongoing obligations under the Settlement Agreement, including providing Plaintiffs with Proper Supporting Documentation, Quarterly Documentation and access to the Asbestos Claims Database.

36.    *First*, Honeywell must provide Proper Supporting Documentation with its notices requesting Installment Payments as a condition precedent to Plaintiffs' obligation to make any payments. Specifically, Section 3.A of the Settlement Agreement provides that the Installment

7

TrustApp0031

INDEX NO. 653428/2023

NYSCEF DOC. NO. 1

RECEIVED NYSCEF: 07/18/2023

Payments "shall be paid no later than sixty (60) days *after* [Plaintiffs] have received notice from Honeywell and Proper Supporting Documentation (the 'Payment Due Date') that Indemnity Payments or Defense Costs were paid in satisfaction of NARCO Asbestos Claims made by Honeywell and/or the NARCO Trust." (emphasis added).

37.    Proper Supporting Documentation is defined in Section 2.L of the Settlement Agreement as follows:

> "Proper Supporting Documentation" means a detailed report concerning Asbestos Claims on at least a quarterly basis . . . (the "Reports") [which] must include, with respect to Honeywell, NARCO and/or any trusts established as a result of the NARCO Bankruptcy (a "NARCO Trust"): the number of total claims filed, pending or settled; judgments; dismissals; total indemnity paid and total expense, including claims administration expense, paid. For each claim resolved, the report shall set forth: (i) the claimant's name; (ii) claim number; (iii) jurisdiction; (iv) status (open or closed); (v) date of first exposure to a NARCO asbestos-containing product as set forth in the complaint or as reflected by information reasonably available to Honeywell; (vi) the alleged disease and, to the extent reasonably available to Honeywell by exercise of its best efforts, the date of diagnosis; (vii) date of death if applicable; and (viii) the amount of indemnity paid.

38.    *Second*, Section 3.A of the Settlement Agreement also requires that Honeywell furnish quarterly "summary report[s] along with Proper Supporting Documentation . . . until [Plaintiffs] have fulfilled all of their payment obligations hereunder" (previously defined as the "Quarterly Documentation").

39.    *Third*, Section 2.L of the Settlement Agreement further obligates Honeywell to "provide [Plaintiffs] with access to any database(s) that Honeywell and/or NARCO Trust maintains for asbestos-related bodily injury claims" provided that the database contains the items contained in the Proper Supporting Documentation (previously defined as the "Asbestos Claims Database"). Plaintiffs also have "the ability to make electronic copies of the database."

40.    The Asbestos Claims Database "shall be supported by medical records as required for payment pursuant to Honeywell settlement agreements or the NARCO Trust, and [Plaintiffs]

TrustApp0032

INDEX NO. 653428/2023

NYSCEF DOC. NO. 1    RECEIVED NYSCEF: 07/18/2023

will have access to such medical records." *Id.* These records should include documents such as proof of claim forms submitted by claimants to NARCO Trust; claimant affidavits regarding alleged occupational exposure to NARCO asbestos; medical records alleged to support the claimed asbestos-related condition; database information regarding the claim status; spreadsheets of how NARCO Trust calculates claim approval values for claims submitted for individual review; and reports prepared by auditors for claims that NARCO Trust has selected internally for audit.

41.    Section 3.A also gives Plaintiffs "the right, upon reasonable notice, to access and review all documentation relating to NARCO Asbestos Claims that Honeywell or the NARCO Trust gathers or receives for the purpose of making any payments to claimants."

42.    Plaintiffs contracted for the provision of Proper Supporting Documentation and unfettered access to and use of the Asbestos Claims database. Among the potential uses for the database is to protect against reimbursing improper or fraudulent Asbestos Claims, as fraud has become pervasive in the asbestos trust system, and upon information and belief, asbestos claimants have submitted questionable evidence to trusts regarding their alleged asbestos exposure.

43.    Honeywell has even accused the NARCO Trust of improperly paying numerous Asbestos Claims. In 2015, Honeywell commenced an adversary proceeding against the NARCO Trust in connection with the bankruptcy petition in the Western District of Pennsylvania. *See, e.g.,* Complaint, *Honeywell Int'l, Inc. v. N. Am. Refractories Co. Asbestos Personal Injury Settlement Trust,* No. 15-00204-TPA (Bankr. W.D. Pa. July 31, 2015) (ECF No. 61). In that action, Honeywell complained of the NARCO Trust's improper payment of Asbestos Claims. According to Honeywell, the NARCO Trust approved Asbestos Claims based on formulaic, template and boilerplate affidavits that, among other things, (i) omitted any reference to NARCO's refractory products (*i.e.,* "a NARCO *asbestos-containing* product") or NARCO at all, (ii) lacked personal

9

TrustApp0033

INDEX NO. 653428/2023
RECEIVED NYSCEF: 07/18/2023

NYSCEF DOC. NO. 1

knowledge, exposure information or competent supporting evidence or (iii) were submitted to *other* asbestos trusts. *Id.* ¶¶ 172-230.

44.     Although Honeywell's requested relief was denied, in part because the NARCO Trust agreed to change its practices, the Court found that the evidence Honeywell presented "did not reflect well on the Trustees' execution of their duties in implementing the Trust" and that "at the very least the Trust's actions were sloppy." Order, *Honeywell Int'l, Inc. v. N. Am. Refractories Co. Asbestos Personal Injury Settlement Trust*, No. 15-00204-TPA (Bankr. W.D. Pa. Dec. 16, 2015) (ECF No. 265) at 33.

45.     Despite the NARCO Trust's commitment to improve its Asbestos Claim approval process, Honeywell identified recurring breaches of that commitment and filed another action against the NARCO Trust. *See, e.g.*, Complaint, *Honeywell Int'l, Inc. v. N. Am. Refractories Co. Asbestos Personal Injury Settlement Trust*, No. 15-00204-TPA (Bankr. W.D. Pa. Sept. 21, 2021) (ECF No. 404-1). That complaint accused the NARCO Trust of continuing to approve Asbestos Claims with insufficient documentation, in violation of the NARCO Trust's prior agreement with the bankruptcy court. ¶¶ 20-21.

46.     Honeywell relied on NARCO Trust documents in support of these allegations, but it refuses to make those same documents available to Plaintiffs regarding improper payment of Asbestos Claims.

**III.     Honeywell's Breach of the Settlement Agreement.**

47.     Honeywell has failed to provide Plaintiffs with complete Proper Supporting Documentation, Quarterly Documentation and any access to the Asbestos Claims Database, resulting in Honeywell's breach of its obligations under the Settlement Agreement and failure to satisfy the condition precedent to Plaintiffs' obligation to make Installment Payments.

10

TrustApp0034

INDEX NO. 653428/2023

NYSCEF DOC. NO. 1                                      RECEIVED NYSCEF: 07/18/2023

48.    For example, the Asbestos Claims documentation submitted by Honeywell with its requests for Installment Payments failed to include (or redacted) critical information required by the Settlement Agreement, including asbestos claimants' Social Security numbers, names, dates of birth, and dates of death.

49.    Without complete documentation concerning Asbestos Claims, Plaintiffs cannot sufficiently assess the validity of the Asbestos Claims for which Honeywell seeks Installment Payments. Plaintiffs' bargained-for right to obtain documentation to assess the validity of Asbestos Claims is especially important because the Asbestos Claim industry "has shifted . . . into a nebulous world of trusts that evaluate claims and authorize payouts with little outside scrutiny." Dionne Searcey & Rob Barry, *As Asbestos Claims Rise, So Do Worries About Fraud*, WALL ST. J. (Mar. 11, 2013).

50.    An investigation into Asbestos Claims from the late 1980's through 2012 uncovered thousands of applicants who claimed "they were exposed to asbestos working in industrial jobs before they were 12 years old," as well as hundreds of applicants who told some trusts they had the most severe form of asbestos-related cancer but told other trusts or courts that their injuries were less severe. *Id.* And as set forth above, Honeywell itself uncovered evidence that the NARCO Trust was improperly paying Asbestos Claims. Without the ability to review Proper Supporting Documentation and Quarterly Documentation and access the Asbestos Claims Database (with underlying medical records), Plaintiffs cannot determine the validity of the Asbestos Claims for which Honeywell seeks reimbursement.

51.    Plaintiffs repeatedly requested that Honeywell provide complete Proper Supporting Documentation, Quarterly Documentation and access to the Asbestos Claims Database, but

11

TrustApp0035

INDEX NO. 653428/2023
RECEIVED NYSCEF: 07/18/2023

NYSCEF DOC. NO. 1

Honeywell steadfastly refused to provide the documentation required by the Settlement Agreement.

52.    Plaintiffs learned that the reason that Honeywell refused to provide the documentation required by the Settlement Agreements was because, in November 2014, Honeywell and the NARCO Trust entered into their own contract (the "NARCO Confidentiality Agreement") obligating Honeywell to require its insurers (like Plaintiffs) to execute separate agreements in order to access the NARCO Trust's claim data, which is source material for the Proper Supporting Documentation, Quarterly Documentation and Asbestos Claims Database.

53.    Instead of complying with its obligation under the Settlement Agreement, Honeywell sought to unilaterally alter the Settlement Agreement by refusing to provide Plaintiffs the Asbestos Claim documentation they are entitled to receive unless Plaintiffs signed a new confidentiality agreement containing restrictions on the use of the Asbestos Claim documentation that are not contained in the Settlement Agreement.

54.    On December 7, 2015, Honeywell and the NARCO Trust executed an amendment to the NARCO Confidentiality Agreement. That amendment included a new form of insurer agreement which provided that any NARCO Trust material disclosed pursuant to these agreements could only be disclosed to employees engaged in audits, including claim analyses, payment evaluations, and investigations (the "Proposed Insurer Confidentiality Agreement").

55.    These use restrictions are not contained in the Settlement Agreement and Honeywell's refusal to provide complete Proper Supporting Documentation, Quarterly Documentation and any access to the Asbestos Claims Database unless Plaintiffs signed the more restrictive Proposed Insurer Confidentiality Agreement constitutes another breach of the Settlement Agreement.

<center>12</center>

TrustApp0036

INDEX NO. 653428/2023
RECEIVED NYSCEF: 07/18/2023

56.    Plaintiffs are not parties to and did not consent to be bound by or subject to the NARCO Confidentiality Agreement, the amendment thereto or the Proposed Insurer Confidentiality Agreement. Nor has the Settlement Agreement been amended to place new restrictions on Plaintiffs' use of the Proper Supporting Documentation, Quarterly Documentation and access to the Asbestos Claims Database.

57.    Notwithstanding Honeywell's breaches of the Settlement Agreement, Plaintiffs have fully performed all of their obligations under the Settlement Agreement, including making Installment Payments.

58.    Since 2019, Plaintiffs have made the Installment Payments – the previously defined ROR Payments – subject to a full reservation of rights, as Plaintiffs were not required to make the Installment Payments since Honeywell failed to satisfy the condition precedent for Plaintiffs' obligation to make Installment Payments. The ROR Payments made to Honeywell are set forth in Exhibit A hereto.

59.    Plaintiffs made the first ROR Payment totaling approximately ▮▮▮▮▮ on or about February 21, 2019. That ROR Payment included "a full and complete reservation of all rights, claims, and defenses including, without limitation, whether there has been non-compliance with or a breach of the Settlement Agreement, and whether [Plaintiffs'] rights under the Settlement Agreement are being impaired and/or interfered with."

60.    Plaintiffs made subsequent ROR Payments with similar reservations on or about February 28, 2020 (totaling approximately ▮▮▮▮▮), March 17, 2021 (totaling approximately ▮▮▮▮▮ and January 31, 2022 (totaling nearly ▮▮▮▮▮).

61.    Plaintiffs made the most recent ROR Payment totaling approximately ▮▮▮▮▮ on or about February 17, 2023. That ROR Payment also was made "subject to full and express

13

TrustApp0037

INDEX NO. 653428/2023

RECEIVED NYSCEF: 07/18/2023

NYSCEF DOC. NO. 1

reservations of all rights and claims, including the right to seek the return of all past payment Installment payments with interest, declaratory and other appropriate relief, attorneys' fees and costs" [sic].

62.     As a result of Honeywell's breaches of the Settlement Agreement set forth above, Plaintiffs have been deprived of their bargained for rights to receive Proper Supporting Documentation, Quarterly Documentation and access the Asbestos Claims Database, and, in turn, Plaintiffs have suffered damages, including over ███████ in ROR Payments for which Honeywell has never satisfied the condition precedent (and the resulting loss of the use of the monies comprising the ROR Payments).

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
(Breach of Contract – Settlement Agreement §§ 2.L & 3.A)

63.     Plaintiffs repeat and reallege each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

64.     The Settlement Agreement is a valid, enforceable, and binding contract that gives rise to certain obligations on the part of Honeywell to Plaintiffs.

65.     Section 3.A of the Settlement Agreement obligates Honeywell to furnish to Plaintiffs all Proper Supporting Documentation (as defined in Section 2.L), without redaction, as a condition precedent to Plaintiffs' obligation to make Installment Payments to Honeywell under the Settlement Agreement.

66.     Pursuant to Section 3.A of the Settlement Agreement, Plaintiffs are entitled to receive Quarterly Documentation until such time as Plaintiffs have fulfilled all payment obligations arising under the Settlement Agreement.

14

TrustApp0038

NYSCEF DOC. NO. 1

INDEX NO. 653428/2023
RECEIVED NYSCEF: 07/18/2023

67.    Pursuant to Section 2.L of the Settlement Agreement, Plaintiffs also are entitled to access the Asbestos Claims Database.

68.    Honeywell refuses to produce Proper Supporting Documentation, Quarterly Documentation and provide access to the Asbestos Claim Database as required under the Settlement Agreement.

69.    Plaintiffs have demanded that Honeywell provide Plaintiffs the Proper Supporting Documentation, Quarterly Documentation and access to the Asbestos Claims Database.

70.    Plaintiffs have done nothing to prevent Honeywell from providing Plaintiffs with complete Proper Supporting Documentation, Quarterly Documentation and access to the Asbestos Claims Database as required by the Settlement Agreement.

71.    Plaintiffs did not and do not consent to any amendment to the Settlement Agreement, nor to limiting their bargained-for right to obtain the Proper Supporting Documentation, Quarterly Documentation and access to the Asbestos Claims Database.

72.    Honeywell has breached and continues to breach the Settlement Agreement by failing to provide Plaintiffs with full, complete and unredacted Proper Supporting Documentation in conjunction with its billing notices to Plaintiffs and Quarterly Documentation on a quarterly basis and by failing to provide access to the Asbestos Claims Database, and by insisting that Plaintiffs accede to restrictions and limitations not contained in the Settlement Agreement in order to receive such documentation.

73.    Plaintiffs have made the ROR Payments to Honeywell under protest and subject to a full reservation of all rights, despite Honeywell's breaches of the Settlement Agreement.

74.    Plaintiffs have fully performed all of their obligations under the Settlement Agreement.

15

TrustApp0039

NYSCEF DOC. NO. 1

INDEX NO. 653428/2023
RECEIVED NYSCEF: 07/18/2023

75.    As a direct and proximate result of Honeywell's breaches of the Settlement Agreement, Plaintiffs have suffered and continue to suffer damages in an amount to be determined at trial, including, without limitation, the amount of the ROR Payments and interest pursuant to CPLR § 5001 et seq.

## SECOND CAUSE OF ACTION
(Declaratory Judgment)

76.    Plaintiffs repeat and reallege each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

77.    Section 3.A of the Settlement Agreement obligates Honeywell to furnish to Plaintiffs all Proper Supporting Documentation (as defined in Section 2.L) as a condition precedent to Plaintiffs' obligation to make Installment Payments to Honeywell under the Settlement Agreement.

78.    Honeywell has not complied with its obligations to provide full and complete Proper Supporting Documentation in Section 3.A of the Settlement Agreement, resulting in a failure to satisfy the condition precedent for Plaintiffs to make Installment Payments under the Settlement Agreement.

79.    Pursuant to Section 3.A of the Settlement Agreement, Plaintiffs are also entitled to receive Quarterly Documentation until such time as Plaintiffs have fulfilled all Installment Payment obligations under the Settlement Agreement. Pursuant to Section 2.L of the Settlement Agreement, Plaintiffs also are entitled to access the Asbestos Claims Database.

80.    Honeywell has not complied with its obligations in Sections 2.L and 3.A of the Settlement Agreement.

81.    An actual and justiciable controversy exists between Plaintiffs and Honeywell regarding Honeywell's obligations to provide full, complete and unredacted Proper Supporting

16

TrustApp0040

INDEX NO. 653428/2023

RECEIVED NYSCEF: 07/18/2023

Documentation to Plaintiffs as a condition precedent to Plaintiffs' obligations to make Installment Payments under the Settlement Agreement, as well as Honeywell's obligation to furnish Quarterly Documentation and access to the Asbestos Claims Database.

82.    Plaintiffs are entitled to a judicial determination and declaration that (i) no Installment Payments were or are due from Plaintiffs to Honeywell until Honeywell satisfies the condition precedent in Section 3.A of the Settlement Agreement by furnishing complete and unredacted Proper Supporting Documentation to Plaintiffs; (ii) Honeywell is to furnish Quarterly Documentation on a quarterly basis to Plaintiffs as required by Section 3.A of the Settlement Agreement; and (iii) Honeywell is to provide access to the Asbestos Claims Database to Plaintiffs as required by Section 2.L of the Settlement Agreement.

**WHEREFORE**, Plaintiffs pray for relief as follows:

(1)    On Count One, for entry of judgment against Honeywell for damages in an amount to be determined at trial but no less than the ROR Payments, plus interest thereon pursuant to CPLR § 5001 et seq.;

(2)    On Count Two, for entry of judgment declaring that (i) no Installment Payments were or are due from Plaintiffs to Honeywell until Honeywell satisfies the condition precedent in Section 3.A of the Settlement Agreement by furnishing complete and unredacted Proper Supporting Documentation to Plaintiffs; (ii) Honeywell is to furnish Quarterly Documentation on a quarterly basis as required by Section 3.A of the Settlement Agreement; and (iii) Honeywell is to provide access to the Asbestos Claims Database as required by Section 2.L of the Settlement Agreement.;

(3)    On all counts, for entry of judgment in favor of Plaintiffs awarding interest and Plaintiffs' attorney fees and suit costs; and

TrustApp0041

INDEX NO. 653428/2023

NYSCEF DOC. NO. 1

RECEIVED NYSCEF: 07/18/2023

    (4)    On all counts, for entry of judgment in favor of Plaintiffs awarding Plaintiffs such

other and further relief as may be deemed by the Court to be just and proper.

Dated: New York, New York
       July 14, 2023

                By:  _/s/ Ryan A. Kane_____

                William A. Maher
                Ryan A. Kane
                Sean P. McGonigle
                WOLLMUTH MAHER & DEUTSCH LLP
                500 Fifth Avenue
                New York, New York 10110
                Phone: (212) 382-3300
                wmaher@wmd-law.com
                rkane@wmd-law.com
                smcgonigle@wmd-law.com

                *Attorneys for Plaintiffs*

18

TrustApp0042

INDEX NO. 653428/2023

NYSCEF DOC. NO. 1                                    RECEIVED NYSCEF: 07/18/2023

# EXHIBIT A

TrustApp0043

INDEX NO. 653428/2023

NYSCEF DOC. NO. 1

RECEIVED NYSCEF: 07/18/2023

**Plaintiffs' Installment Payments to Honeywell**

| Plaintiffs' Installment Payments | Installment # 4 | Installment # 5 | Installment # 6 | Installment # 7 | Installment # 8 |
|---|---|---|---|---|---|
| NARCO Payment Threshold Coinciding with Plaintiffs' Payment Obligation | ▮ | ▮ | | ▮ | ▮ |
| Approximate Date of Payment | 2/21/2019 | 2/28/2020 | 3/17/2021 | 1/31/2022 | 2/17/2023 |

| | | Installment # 4 | Installment # 5 | Installment # 6 | Installment # 7 | Installment # 8 |
|---|---|---|---|---|---|---|
| 1 | Aviva plc (for WEIR SBT A/C) | | | | | |
| 2 | Commercial Union Assurance Company Limited | | | | | |
| 3 | NRG Victory Reinsurance Limited | | | | | |
| 4 | Tenecom Limited | | | | | |
| 5 | The Indemnity Marine Assurance Company Limited | | | | | |
| 6 | The Northern Assurance Company Limited | | | | | |
| 7 | The Ocean Marine Insurance Company Limited | | | | | |
| 8 | The Road Transport and General Insurance Company Limited | | | | | |
| 9 | The Scottish Lion Insurance Company Limited | | | | | |
| 10 | The Yorkshire Ins. Company Limited | | | | | |

| TOTAL FOR EACH INSTALLMENT | | | | | |
|---|---|---|---|---|---|

TrustApp0044

*PRESENT:* _____ *JSC*

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

At I.A.S. Part _____ of the Supreme
Court of the State of New York, held in
and for the County of New York, at the
Courthouse located at 60 Centre Street,
New York, New York, on the _____
of _____, 2023.

AVIVA PLC,

COMMERCIAL UNION ASSURANCE COMPANY
LIMITED,

NRG VICTORY REINSURANCE LIMITED,

TENECOM LIMITED,

THE INDEMNITY MARINE ASSURANCE
COMPANY LIMITED,

THE NORTHERN ASSURANCE COMPANY
LIMITED,

THE OCEAN MARINE INSURANCE COMPANY
·LIMITED,

THE ROAD TRANSPORT AND GENERAL
INSURANCE COMPANY LIMITED,

THE SCOTTISH LION INSURANCE COMPANY
LIMITED, and

THE YORKSHIRE INSURANCE COMPANY
LIMITED,

    Plaintiffs,

        v.

HONEYWELL INTERNATIONAL INC.,

    Defendant.

Index No. _____
[PROPOSED] ORDER
TO SHOW CAUSE FOR

SEALING ORDER AND
TEMPORARY
RESTRAINING ORDER

**PLEASE TAKE NOTICE**, that upon the Affirmation of Ryan A. Kane, dated July 14,

2023, and the Summons and Complaint, together with the Notice of Hard Copy Submission - E-

Filed Case (EF 20), and sufficient cause appearing therefor,

1

TrustApp0045

And it appearing that no prior application has been made by Plaintiffs for this or similar

relief, ~~it is hereby~~

*LET*

~~ORDERED~~ that Defendant show cause *, BY ITS COUNSEL* before this Court at _____ Part _____,

Room _____, located at 60 Centre Street, New York, New York on the _____ day of

_____, 2023, at _____ a.m./p.m., or as soon as the parties to this action may

be heard, as to why an Order to Commence a New Case Under Seal should not be issued,

pursuant to 22 N.Y.C.R.R. § 216.1(a) and Rule K(3)(a) of the Supreme Court Civil Branch of

New York County's Protocol on Courthouse and County Clerk Procedures for Electronically

Filed Cases, so that any filings made under this docket shall be filed under seal and the file of

this case shall be restricted to all except the parties, their counsel and court personnel; *and for*
*such other and further relief this Court deems just and proper.*

**IT IS FURTHER ORDERED** that, pending the hearing of this Order to Show Cause,
*BEFORE THE JUSTICE TO BE ASSIGNED, THE CLERK OF THE COURT IS DIRECTED TO RESTRICT ACCESS*
*TO THE ENTIRE FILE UNDER THE ABOVE CAPTION    AS TO    (authorized)*
~~the following documents shall be restricted to all~~ except the parties, their counsel and court

personnel;

**IT IS FURTHER ORDERED** that service by hand, e-mail, or overnight mail of a copy

of this Order, together with the papers upon which it is based, upon counsel for Defendant on or

before the ____ day of ____, 2023, shall be deemed good and sufficient service thereof;

**IT IS FURTHER ORDERED** that Defendant shall serve its answering papers, if any,

by hand and e-mail on counsel for Plaintiffs, Ryan A. Kane, Wollmuth Maher & Deutsch LLP,

500 Fifth Avenue, New York, New York 10110 on or before ___ o'clock in the __noon on _____

_____, 2023; and

**IT IS FURTHER ORDERED** that reply papers, if any, be served and filed by hand and

by e-mail on counsel for Defendant on or before _____, o'clock in the _____noon on _____

_____, 2023.                                   *ENTER ;*

2

_____

*JSC*

HON. DEBRA A. JAMES

JUL 17 2023

TrustApp0046

FILED: NEW YORK COUNTY CLERK 07/18/2023 02:39 PM    INDEX NO. 653428/2023

NYSCEF DOC. NO. 3    RECEIVED NYSCEF: 07/18/2023

UCS-840
(rev. 11/24/2022)

# REQUEST FOR JUDICIAL INTERVENTION

**SUPREME** COURT, COUNTY OF **NEW YORK**

Index No: 653428/2023    Date Index Issued: _____

| | For Court Use Only: |
|---|---|
| **CAPTION**    Enter the complete case caption. Do not use et al or et ano. If more space is needed, attach a caption rider sheet. | IAS Entry Date |
| Aviva plc, et al., [See attached caption rider sheet] | |
| Plaintiff(s)/Petitioner(s) | Judge Assigned |
| -against- | |
| Honeywell International Inc., | RJI Filed Date |
| Defendant(s)/Respondent(s) | |

**NATURE OF ACTION OR PROCEEDING**    Check only one box and specify where indicated.

**COMMERCIAL**
- ○ Business Entity (includes corporations, partnerships, LLCs, LLPs, etc.)
- ● Contract
- ○ Insurance (where insurance company is a party, except arbitration)
- ○ UCC (includes sales and negotiable instruments)
- ○ Other Commercial (specify): _____
  *NOTE: For Commercial Division assignment requests pursuant to 22 NYCRR 202.70(d), complete and attach the COMMERCIAL DIVISION RJI ADDENDUM (UCS-840C).*

**TORTS**
- ○ Adult Survivors Act
- ○ Asbestos
- ○ Environmental (specify): _____
- ○ Medical, Dental or Podiatric Malpractice
- ○ Motor Vehicle
- ○ Products Liability (specify): _____
- ○ Other Negligence (specify): _____
- ○ Other Professional Malpractice (specify): _____
- ○ Other Tort (specify): _____

**SPECIAL PROCEEDINGS**
- ○ Child-Parent Security Act (specify): ○ Assisted Reproduction ○ Surrogacy Agreement
- ○ CPLR Article 75 – Arbitration    . [see NOTE in COMMERCIAL section]
- ○ CPLR Article 78 – Proceeding against a Body or Officer
- ○ Election Law
- ○ Extreme Risk Protection Order
- ○ MHL Article 9.60 – Kendra's Law
- ○ MHL Article 10 – Sex Offender Confinement (specify): ○ Initial ○ Review
- ○ MHL Article 81 (Guardianship)
- ○ Other Mental Hygiene (specify): _____
- ○ Other Special Proceeding (specify): _____

**MATRIMONIAL**
- ○ Contested
  *NOTE: If there are children under the age of 18, complete and attach the MATRIMONIAL RJI ADDENDUM (UCS-840M). For Uncontested Matrimonial actions, use the Uncontested Divorce RJI (UD-13).*

**REAL PROPERTY**    Specify how many properties the application includes: _____
- ○ Condemnation
- ○ Mortgage Foreclosure (specify): ○ Residential ○ Commercial
  Property Address: _____
  *NOTE: For Mortgage Foreclosure actions involving a one to four-family, owner-occupied residential property or owner-occupied condominium, complete and attach the FORECLOSURE RJI ADDENDUM (UCS-840F).*
- ○ Partition
  *NOTE: Complete and attach the PARTITION RJI ADDENDUM (UCS-840P).*
- ○ Tax Certiorari (specify): Section:_____ Block:_____ Lot:_____
- ○ Tax Foreclosure
- ○ Other Real Property (specify): _____

**OTHER MATTERS**
- ○ Certificate of Incorporation/Dissolution [see NOTE in COMMERCIAL section]
- ○ Emergency Medical Treatment
- ○ Habeas Corpus
- ○ Local Court Appeal
- ○ Mechanic's Lien
- ○ Name Change/Sex Designation Change
- ○ Pistol Permit Revocation Hearing
- ○ Sale or Finance of Religious/Not-for-Profit Property
- ○ Other (specify): _____

**STATUS OF ACTION OR PROCEEDING**    Answer YES or NO for every question and enter additional information where indicated.

| | YES | NO | |
|---|---|---|---|
| Has a summons and complaint or summons with notice been filed? | ● | ○ | If yes, date filed:    07/14/2023 |
| Has a summons and complaint or summons with notice been served? | ○ | ● | If yes, date served: _____ |
| Is this action/proceeding being filed post-judgment? | ○ | ● | If yes, judgment date: _____ |

**NATURE OF JUDICIAL INTERVENTION**    Check one box only and enter additional information where indicated.
- ○ Infant's Compromise
- ○ Extreme Risk Protection Order Application
- ○ Note of Issue/Certificate of Readiness
- ○ Notice of Medical, Dental or Podiatric Malpractice    Date Issue Joined: _____
- ○ Notice of Motion    Relief Requested: _____    Return Date: _____
- ○ Notice of Petition    Relief Requested: _____    Return Date: _____
- ○ Order to Show Cause    Relief Requested: _____    Return Date: _____
- ○ Other Ex Parte Application    Relief Requested: _____
- ○ Partition Settlement Conference
- ○ Poor Person Application
- ○ Request for Preliminary Conference
- ○ Residential Mortgage Foreclosure Settlement Conference
- ○ Writ of Habeas Corpus
- ● Other (specify):  Request for Judicial Assignment

1 of 4

TrustApp0047

FILED: NEW YORK COUNTY CLERK 07/18/2023 02:39 PM    INDEX NO. 653428/2023

NYSCEF DOC. NO. 3    RECEIVED NYSCEF: 07/18/2023

**RELATED CASES** List any related actions. For Matrimonial cases, list any related criminal or Family Court cases. If none, leave blank. If additional space is required, complete and attach the RJI ADDENDUM (UCS-840A).

| Case Title | Index/Case Number | Court | Judge (if assigned) | Relationship to instant case |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |

**PARTIES** For parties without an attorney, check the "Un-Rep" box and enter the party's address, phone number and email in the space provided. If additional space is required, complete and attach the RJI ADDENDUM (UCS-840A).

| Un-Rep | Parties<br>List parties in same order as listed in the caption and indicate roles (e.g., plaintiff, defendant, 3rd party plaintiff, etc.) | Attorneys and Unrepresented Litigants<br>For represented parties, provide attorney's name, firm name, address, phone and email. For unrepresented parties, provide party's address, phone and email. | Issue Joined<br>For each defendant, indicate if issue has been joined. | Insurance Carriers<br>For each defendant, indicate insurance carrier, if applicable. |
|---|---|---|---|---|
| ☐ | Name: See Attached Rider<br>Role(s): Plaintiff | William A. Maher, Wollmuth Maher & Deutsch LLP<br>500 5th Ave., New York, NY 10110<br>(212) 382-3300; wmaher@wmd-law.com | ○YES ○NO | |
| ☐ | Name: See Attached Rider<br>Role(s): Plaintiff | Ryan A. Kane Wollmuth Maher & Deutsch LLP<br>500 5th Ave., New York, NY 10110<br>(212) 382-3300; rkane@wmd-law.com | ○YES ○NO | |
| ☐ | Name: See Attached Rider<br>Role(s): Plaintiff | Sean P. McGonIgle Wollmuth Maher & Deutsch LLP<br>500 5th Ave., New York, NY 10110<br>(212) 382-3300; smgonigle@wmd-law.com | ○YES ○NO | |
| ☐ | Name: Honeywell International Inc<br>Role(s): Defendant | | ○YES ◉NO | |
| ☐ | Name:<br>Role(s): | | ○YES ○NO | |
| ☐ | Name:<br>Role(s): | | ○YES ○NO | |
| ☐ | Name:<br>Role(s): | | ○YES ○NO | |
| ☐ | Name:<br>Role(s): | | ○YES ○NO | |
| ☐ | Name:<br>Role(s): | | ○YES ○NO | |
| ☐ | Name:<br>Role(s): | | ○YES ○NO | |
| ☐ | Name:<br>Role(s): | | ○YES ○NO | |
| ☐ | Name:<br>Role(s): | | ○YES ○NO | |
| ☐ | Name:<br>Role(s): | | ○YES ○NO | |
| ☐ | Name:<br>Role(s): | | ○YES ○NO | |

I AFFIRM UNDER THE PENALTY OF PERJURY THAT, UPON INFORMATION AND BELIEF, THERE ARE NO OTHER RELATED ACTIONS OR PROCEEDINGS, EXCEPT AS NOTED ABOVE, NOR HAS A REQUEST FOR JUDICIAL INTERVENTION BEEN PREVIOUSLY FILED IN THIS ACTION OR PROCEEDING.

Dated: 07/14/2023

4125118
Attorney Registration Number

*Ryan A. Kane*
Signature

Ryan A. Kane
Print Name

TrustApp0048

FILED: NEW YORK COUNTY CLERK 07/18/2023 02:39 PM
NYSCEF DOC. NO. 3

INDEX NO. 653428/2023
RECEIVED NYSCEF: 07/18/2023

# CAPTION RIDER TO REQUEST FOR JUDICIAL INTERVENTION

TrustApp0049

FILED: NEW YORK COUNTY CLERK 07/18/2023 02:39 PM
NYSCEF DOC. NO. 3

INDEX NO. 653428/2023
RECEIVED NYSCEF: 07/18/2023

*SUPREME COURT OF THE STATE OF NEW YORK*
*COUNTY OF NEW YORK*

---

AVIVA PLC,

COMMERCIAL UNION ASSURANCE COMPANY
LIMITED,

NRG VICTORY REINSURANCE LIMITED,

TENECOM LIMITED,

THE INDEMNITY MARINE ASSURANCE
COMPANY LIMITED,

THE NORTHERN ASSURANCE COMPANY
LIMITED,

THE OCEAN MARINE INSURANCE COMPANY
LIMITED,

THE ROAD TRANSPORT AND GENERAL
INSURANCE COMPANY LIMITED,

THE SCOTTISH LION INSURANCE COMPANY
LIMITED, and

THE YORKSHIRE INSURANCE COMPANY
LIMITED,

Plaintiffs,

v.

HONEYWELL INTERNATIONAL INC.,

Defendant.

---

Index No. **653428/2023** _____

TrustApp0050

**FILED: NEW YORK COUNTY CLERK 07/18/2023 09:48 PM**    INDEX NO. 653428/2023

NYSCEF DOC. NO. 4    RECEIVED NYSCEF: 07/18/2023

SUPREME COURT OF THE STATE OF NEW YORK

COUNTY OF New York _____    x    Index No. _____653428/2023_____

Aviva plc, et al.
_____    RJI No. (if any) _____
                                    Plaintiff(s)/Petitioner(s)
-against-
Honeywell International Inc.,    **COMMERCIAL DIVISION**
_____    **Request for Judicial Intervention Addendum**
                                    Defendant(s)/Respondent(s)    x

**COMPLETE WHERE APPLICABLE** [add additional pages if needed]:

**Plaintiff/Petitioner's cause(s) of action** [check all that apply]:

[X] Breach of contract or fiduciary duty, fraud, misrepresentation, business tort (e.g. unfair competition), or statutory and/or common law violation where the breach or violation is alleged to arise out of business dealings (e.g. sales of assets or securities; corporate restructuring; partnership, shareholder, joint venture, and other business agreements; trade secrets; restrictive covenants; and employment agreements not including claims that principally involve alleged discriminatory practices)

[ ] Transactions governed by the Uniform Commercial Code (exclusive of those concerning individual cooperative or condominium units)

[ ] Transactions involving commercial real property, including Yellowstone injunctions and excluding actions for the payment of rent only

[ ] Shareholder derivative actions — without consideration of the monetary threshold

[ ] Commercial class actions — without consideration of the monetary threshold

[ ] Business transactions involving or arising out of dealings with commercial banks and other financial institutions

[ ] Internal affairs of business organizations

[ ] Malpractice by accountants or actuaries, and legal malpractice arising out of representation in commercial matters

[ ] Environmental insurance coverage

[ ] Commercial insurance coverage (e.g. directors and officers, errors and omissions, and business interruption coverage)

[ ] Dissolution of corporations, partnerships, limited liability companies, limited liability partnerships and joint ventures — without consideration of the monetary threshold

[ ] Applications to stay or compel arbitration and affirm or disaffirm arbitration awards and related injunctive relief pursuant to CPLR Article 75 involving any of the foregoing enumerated commercial issues — without consideration of the monetary threshold

**Plaintiff/Petitioner's claim for compensatory damages** [exclusive of punitive damages, interest, costs and counsel fees claimed]:

$ In excess of $20 Million _____

**Plaintiff/Petitioner's claim for equitable or declaratory relief** [brief description]:

Declaratory judgment declaring Defendant's obligations under a contract.

**Defendant/Respondent's counterclaim(s)** [brief description, including claim for monetary relief]:

**I REQUEST THAT THIS CASE BE ASSIGNED TO THE COMMERCIAL DIVISION. I CERTIFY THAT THE CASE MEETS THE JURISDICTIONAL REQUIREMENTS OF THE COMMERCIAL DIVISION SET FORTH IN 22 NYCRR § 202.70(a), (b) AND (c).**

Dated: 07/14/2023 _____    _Ryan A. Kane_____
                                    SIGNATURE

                                    **Ryan A. Kane**
                                    **PRINT OR TYPE NAME**

1 of 1

TrustApp0051

FILED: NEW YORK COUNTY CLERK 07/18/2023 09:48 PM

INDEX NO. 653428/2023

NYSCEF DOC. NO. 5

RECEIVED NYSCEF: 07/18/2023

***SUPREME COURT OF THE STATE OF NEW YORK***
***COUNTY OF NEW YORK***

AVIVA PLC,

COMMERCIAL UNION ASSURANCE COMPANY
LIMITED,

NRG VICTORY REINSURANCE LIMITED,

TENECOM LIMITED,

THE INDEMNITY MARINE ASSURANCE
COMPANY LIMITED,

THE NORTHERN ASSURANCE COMPANY
LIMITED,

THE OCEAN MARINE INSURANCE COMPANY
LIMITED,

THE ROAD TRANSPORT AND GENERAL
INSURANCE COMPANY LIMITED,

THE SCOTTISH LION INSURANCE COMPANY
LIMITED, and

THE YORKSHIRE INSURANCE COMPANY
LIMITED,

                    Plaintiffs,

          v.

HONEYWELL INTERNATIONAL INC.,

                    Defendant.

Index No. **653428/2023**

TrustApp0052

FILED: NEW YORK COUNTY CLERK 07/18/2023 09:48 PM    INDEX NO. 653428/2023
NYSCEF DOC. NO. 5                                    RECEIVED NYSCEF: 07/18/2023

## RULE 35 DISCLOSURE STATEMENT

Pursuant to Rule 35 of Section 202.70(g) of the Rules of Practice for the Commercial Division, Plaintiffs, through their undersigned attorneys, state the following:

1.     Plaintiff Aviva plc does not have any parent corporation or any publicly held corporation that owns 10% or more of its stock.

2.     Plaintiffs Commercial Union Assurance Co. Limited, The Indemnity Marine Assurance Company Limited, The Northern Assurance Co. Limited, The Ocean Marine Insurance Co. Limited, The Road Transport and General Ins. Co. Ltd., and The Yorkshire Ins. Co. Limited are subsidiaries of or otherwise affiliates of Aviva plc, and Aviva plc does not have any parent corporation or any publicly held corporation that owns 10% or more of its stock.

3.     Plaintiffs NRG Victory Reinsurance Limited, Tenecom Limited, and The Scottish Lion Insurance Company Limited are subsidiaries of or otherwise affiliates of Berkshire Hathaway, Inc., a publicly traded company.

Dated: July 14, 2023

Respectfully Submitted,

WOLLMUTH MAHER & DEUTSCH LLP

By: /s/ Ryan A. Kane

William A. Maher
Ryan A. Kane
Sean P. McGonigle
500 Fifth Avenue
New York, New York 10110
Telephone: (212) 382-3300
wmaher@wmd-law.com
rkane@wmd-law.com
smcgonigle@wmd-law.com

1

TrustApp0053

FILED: NEW YORK COUNTY CLERK 07/18/2023 09:48 PM

NYSCEF DOC. NO. 6

INDEX NO. 653428/2023

RECEIVED NYSCEF: 07/18/2023

*SUPREME COURT OF THE STATE OF NEW YORK*
*COUNTY OF NEW YORK*

---

AVIVA PLC,

COMMERCIAL UNION ASSURANCE COMPANY
LIMITED,

NRG VICTORY REINSURANCE LIMITED,

TENECOM LIMITED,

THE INDEMNITY MARINE ASSURANCE
COMPANY LIMITED,

THE NORTHERN ASSURANCE COMPANY
LIMITED,

THE OCEAN MARINE INSURANCE COMPANY
LIMITED,

THE ROAD TRANSPORT AND GENERAL
INSURANCE COMPANY LIMITED,

THE SCOTTISH LION INSURANCE COMPANY
LIMITED, and

THE YORKSHIRE INSURANCE COMPANY
LIMITED,

            Plaintiffs,

    v.

HONEYWELL INTERNATIONAL INC.,

            Defendant.

---

Index No. <u>653428/2023</u>
**AFFIRMATION OF
RYAN A. KANE**

TrustApp0054

FILED: NEW YORK COUNTY CLERK 07/18/2023 09:48 PM

NYSCEF DOC. NO. 6

INDEX NO. 653428/2023

RECEIVED NYSCEF: 07/18/2023

Ryan A. Kane, an attorney admitted to practice law in the state of New York hereby affirms under the penalty of perjury:

1.      I am a partner of the law firm Wollmuth Maher & Deutsch LLP, attorneys in this action for Aviva plc as holder of rights and obligations under policy subscriptions by Weir SBT A/C; Commercial Union Assurance Company Limited; NRG Victory Reinsurance Limited; Tenecom Limited; The Indemnity Marine Assurance Company Limited; The Northern Assurance Company Limited; The Ocean Marine Insurance Company Limited; The Road Transport and General Insurance Company Limited; The Scottish Lion Insurance Company Limited; and The Yorkshire Insurance Company Limited (collectively, "Plaintiffs"). I am familiar with the facts and circumstances of this matter based on documents and information that have been provided to me.

2.      I respectfully submit this affirmation to request the entry of the accompanying Order to Show Cause, requesting the Court to order, pending the hearing, that the file of this case is restricted to the parties, their attorneys, and authorized court personnel.

3.      The reason for this request is that the papers to be filed in this case contain and reference information that Plaintiffs may be prohibited from disclosing pursuant to certain contractual obligations as described below.

4.      This is an action for breach of contract and declaratory relief arising from Defendant's breach of its obligations under a Settlement Agreement and Release, dated February 10, 2004 (the "Settlement Agreement").

5.      Section 10 of the Settlement Agreement contains a confidentiality provision, which provides in relevant part:

> The Parties agree that all matters relating to the terms, negotiation and implementation of this Agreement shall be confidential and are not to be disclosed except by order of court or agreement, in writing, of the Parties, except that, provided recipients agree to keep such information confidential, the Agreement

2

TrustApp0055

FILED: NEW YORK COUNTY CLERK 07/18/2023 09:48 PM    INDEX NO. 653428/2023

NYSCEF DOC. NO. 6    RECEIVED NYSCEF: 07/18/2023

may be disclosed to: (i) reinsurers of any London Market Insurer directly or through intermediaries; (ii) outside auditors or accountants of any Party; (iii) representatives of a non-party insurer subscribing or allegedly subscribing to one or more of the Subject Insurance Policies, which insurer is, has been or may become insolvent in the future including, without limitation, any liquidators, provisional liquidators, scheme administrators, trustees, or similarly empowered Persons or entities acting for such insurer.

6.    Given that this action involves the terms and implementation of the Settlement Agreement, Plaintiffs respectfully request the case to be filed under seal.

7.    No prior application has been made for the relief requested.

WHEREFORE, Plaintiffs respectfully request that the Court grant their Order to Show Cause in its entirety, along with granting such other and further relief as is just and proper.

Dated: New York, New York
       July 14, 2023

                                        /s/ Ryan A. Kane
                                        Ryan A. Kane

TrustApp0056

FILED: NEW YORK COUNTY CLERK 07/18/2023 09:48 PM INDEX NO. 653428/2023

NYSCEF DOC. NO. 7                                                    RECEIVED NYSCEF: 07/18/2023

# NOTICE OF HARD COPY SUBMISSION -- E-FILED CASE

### (This Form Must be Annexed to Hard Copy Submissions in E-Filed Cases)

SUPREME COURT OF THE STATE OF NEW YORK

COUNTY OF New York

----------------------------------------------------------------x

Aviva plc, et al.,

                                                    **Plaintiff/Petitioner,**

- against -                                                                    Index No. ___**653428/2023**___

Honeywell International Inc.,

                                                    **Defendant/Respondent.**

----------------------------------------------------------------x

When permitted to submit original hard copy documents in e-filed cases, indicate the reason for hard copy submission by checking the relevant box and signing below.

### Non-Participating Counsel

### The attached is a court original unless and until uploaded to NYSCEF.

[ ] In a **consensual** case, I am authorized to and have served on all other parties a declaration of consent to e-filing on behalf of my client, a party to this case.

[ ] In a **mandatory** case, I am exempt from the requirement to e-file because I have filed with the clerk of the court where this action is pending the opt-out form required by the Rules or the court has granted my application upon good cause shown.

### Participating Counsel and Participating Unrepresented Litigants

### Submissions Requiring Subsequent E-Filing (filer is responsible for upload to NYSCEF)

[ ] I am submitting a proposed order to show cause and supporting papers seeking a TRO, together with the required showing that I or my client will be significantly prejudiced by giving notice. If the court directs service in hard copy only, I shall e-file these documents within 3 business days after service.

[ ] I am filing this document in hard copy under the emergency exception and am submitting the required affirmation/affidavit of explanation. I shall, as required by the Rules, e-file these documents within 3 business days thereafter.

[ ] I am filing this document in hard copy because of a technical failure on the e-filing site as defined in the E-Filing Rules. I shall, as required by the Rules, e-file these documents within 3 business days after restoration of normal operations at the site.

[ ] I am submitting an ex parte application pursuant to statute _____. If these documents are served in hard copy only, I shall, as required by the E-Filing Rules, e-file these documents within 3 business days after service.

### Special Applications/Documents (filer may be responsible for upload to NYSCEF)

[x] I am applying for an order ☑sealing / ☐limiting access to document(s) and I am submitting the application in hard copy form, as permitted by court protocol/procedure.

[ ] I am submitting documents for in camera review.

[ ] I am filing an exhibit that cannot be e-filed (Rule 202.5-b(d)(7)).

Dated: 7/14/2023                                    500 Fifth Avenue, 12th Floor _____ (Address)

*Ryan A. Kane* (Signature)                          New York, New York 10110 _____

Ryan A. Kane (Name)                                 (212) 382-3300 _____ (Phone)

WOLLMUTH MAHER & DEUTSCH LLP (Firm Name)            rkane@wmd-law.com _____ (E-Mail)

                                                                                    1/17/18

TrustApp0057

FILED: NEW YORK COUNTY CLERK 07/19/2023 05:43 PM
NYSCEF DOC. NO. 8

INDEX NO. 653428/2023
RECEIVED NYSCEF: 07/19/2023

## WOLLMUTH MAHER & DEUTSCH LLP

500 FIFTH AVENUE
NEW YORK, NEW YORK 10110

TELEPHONE (212) 382-3300
FACSIMILE (212) 382-0050

July 19, 2023

**VIA ECF**
Hon. Adam Silvera
Administrative Justice
60 Centre Street, Room 551
New York, NY 10007

Re:  *Aviva plc, et al. v. Honeywell International Inc.*, No. 653428/2023
Assignment to Commercial Division

Dear Justice Silvera:

We write on behalf of Plaintiffs in the above-referenced action regarding the assignment of this action to the Commercial Division. Plaintiffs previously filed a Commercial Division Request for Judicial Intervention Addendum (the "Commercial Division RJI"). *See* NYSCEF No. 4. As set forth in the Commercial Division RJI, Plaintiffs' cause of action is for breach of contract arising out of business dealings and seeks compensatory damages in excess of $20 million. *Id.* The Commercial Division RJI also discloses that Plaintiffs seek declaratory judgment declaring Defendant Honeywell International Inc.'s obligations under the at-issue contract. *Id.* The at-issue contract is a settlement agreement between the parties, not an insurance policy. Therefore, this action should be eligible for assignment to the Commercial Division pursuant to 22 NYCRR § 202.70 (b)(1).

We understand that the action has not been assigned to the Commercial Division because the clerk's office may have interpreted the complaint as "seeking a declaratory judgment as to insurance coverage for personal injury or property damage[,]" disqualifying it from the Commercial Division under 22 NYCRR § 202.70 (c)(2). However, we respectfully believe the clerk's office misinterpreted the nature of Plaintiffs' request for declaratory relief because, as stated above, the declaratory relief relates to Defendant's obligations under a settlement agreement (*e.g.*, providing documentation that is a prerequisite for Plaintiffs' obligations to make installment payments under settlement agreement), not whether there is insurance coverage for personal injury or property damage. *See* NYSCEF No. 1 at ¶¶ 76-82. Accordingly, Plaintiffs' request for declaratory relief does not fall within the scope of 22 NYCRR § 202.70 (c)(2), and we submit that Plaintiffs' action should be eligible for assignment to the Commercial Division.

We appreciate the Court's attention to this matter.

Respectfully submitted,

*/s/ Ryan A. Kane*
Ryan A. Kane
*Counsel for Plaintiffs*

TrustApp0058

FILED: NEW YORK COUNTY CLERK 07/19/2023 05:43 PM    INDEX NO. 653428/2023
NYSCEF DOC. NO. 8    RECEIVED NYSCEF: 07/19/2023

cc:    Honeywell International Inc.
        (via service with Summons and Complaint)

2

TrustApp0059

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF** New York
-------------------------------------------------------------x
Aviva plc, et al.,

                 Plaintiff/Petitioner,

        - against -                   Index No.   653428/2023
Honeywell International Inc.,

                Defendant/Respondent.
-------------------------------------------------------------x

### NOTICE OF ELECTRONIC FILING
### (Mandatory Case)
(Uniform Rule § 202.5-bb)

**You have received this Notice because:**

     1) The Plaintiff/Petitioner, whose name is listed above, has filed this case using the New York State Courts E-filing system ("NYSCEF"), and

     2) You are a Defendant/Respondent (a party) in this case.

- **If you are represented by an attorney:**
  Give this Notice to your attorney.  (Attorneys: see "Information for Attorneys" pg. 2).

- **If you are not represented by an attorney:**
  **You will be served with all documents in paper and you must serve and file your documents in paper, unless you choose to participate in e-filing.**

  **If you choose to participate in e-filing, you must have access to a computer and a scanner or other device to convert documents into electronic format, a connection to the internet, and an e-mail address to receive service of documents.**

  The **benefits of participating in e-filing** include:

  - serving and filing your documents electronically

  - free access to view and print your e-filed documents

  - limiting your number of trips to the courthouse

  - paying any court fees on-line (credit card needed)

  **To register for e-filing or for more information about how e-filing works:**

- visit: www.nycourts.gov/efile-unrepresented or
- contact the Clerk's Office or Help Center at the court where the case was filed. Court contact information can be found at www.nycourts.gov

TrustApp0060

To find legal information to help you represent yourself visit www.nycourthelp.gov

**Information for Attorneys**
**(E-filing is Mandatory for Attorneys)**

An attorney representing a party who is served with this notice must either:

    1) immediately record his or her representation within the e-filed matter on the NYSCEF site www.nycourts.gov/efile ; or

    2) file the Notice of Opt-Out form with the clerk of the court where this action is pending and serve on all parties. Exemptions from mandatory e-filing are limited to attorneys who certify in good faith that they lack the computer hardware and/or scanner and/or internet connection or that they lack (along with all employees subject to their direction) the knowledge to operate such equipment. [Section 202.5-bb(e)]

For additional information about electronic filing and to create a NYSCEF account, visit the NYSCEF website at www.nycourts.gov/efile or contact the NYSCEF Resource Center (phone: 646-386-3033; e-mail: nyscef@nycourts.gov).

Dated: __7/14/2023_____

Ryan A. Kane
_____
Name
Wollmuth Maher & Deutsch LLP
_____
Firm Name

500 5th Avenue
_____
New York, New York 10110
_____
Address
(212) 382-3300
_____
Phone

rkane@wmd-law.com
_____
E-Mail

To:   Honeywell International Inc.

     Corporation Service Company

     80 State Street, Albany, NY 12207

2/24/20

Index  #                      Page 2  of 2                      EFM-1

TrustApp0061

**Seymour, Stephanie R.**

| | |
|---|---|
| **From:** | Rush, Michael B. |
| **Sent:** | Friday, February 16, 2024 10:06 AM |
| **To:** | jonathan.kinney@us.dlapiper.com; Sraders, Sarah |
| **Cc:** | jtillotson@tillotsonlaw.com; Winstead, Hunter; michael.murphy@us.dlapiper.com |
| **Subject:** | Houser v. Allianz et al. - Quick Call |

Jon:

Can you give us a little more detail as to why Aviva is unwilling to sign the proposed agreement?  If the issue can be fixed with an easy edit and is specific to Aviva, the Trust is willing to consider such edits.

The agreement was negotiated and approved by the majority of insurers months ago, and it is our understanding that Jim Hallowell, AIG's counsel, was coordinating on behalf of all insurers.  Over 100 insurers have signed the agreement to date.

Given the fact that many of the materials that the Trust has been providing insurers access to, including the Local Council questionnaire in question here, have been marked confidential by third parties and are ultimately subject to protective orders entered by the bankruptcy court.  The Trust simply cannot produce them to Aviva, or others, without adequate protections such as the proposed confidentiality order.

Mike



**Michael B. Rush**
rushm@gilbertlegal.com
O 202.772.2405
C 302.379.3285

700 Pennsylvania Ave., SE
Suite 400
Washington, DC  20003
**GilbertLegal.com**

This email and any attachments may contain confidential information that is privileged at law. If you are not a named recipient or have received this communication by error, please notify the sender immediately and destroy this email and its attachments, and all copies thereof, without further distributing or copying them.

**From:** Kinney, Jonathan <jonathan.kinney@us.dlapiper.com>
**Sent:** Thursday, February 15, 2024 11:01 AM
**To:** Rush, Michael B. <rushm@gilbertlegal.com>; Sraders, Sarah <SradersS@gilbertlegal.com>
**Cc:** Jeff Tillotson <jtillotson@tillotsonlaw.com>; Winstead, Hunter <winsteadh@gilbertlegal.com>; Murphy, Michael (New York) <michael.murphy@us.dlapiper.com>
**Subject:** RE: Houser v. Allianz et al. - Quick Call

Thanks for confirming, Michael.

We have reviewed the confidentiality agreement that you sent.  Aviva is willing to comply with the confidentiality terms as stated in the agreement as applicable to the "policy evidence . . . regarding the Daniel Webster LC policy" that you all

1

plan to provide, and solely for the purpose of evaluating that evidence in the context of our ongoing discussion concerning voluntary dismissal of Aviva plc from the N.D. Texas litigation. Based on our conversation last week, we understand that to include a single document – a questionnaire form completed by the Local Council.

The confidentiality agreement provided addresses far more than is required to preserve the confidentiality of the narrow information you all have proposed sharing. Please let us know if the above commitment to preserve the confidentiality of the Local Council questionnaire is sufficient. If it is not, we are of course open to an alternative, appropriately simplified approach, but Aviva will not agree to the confidentiality agreement that was provided.

Thank you.

Best,
Jon

**Jonathan M. Kinney**
Associate

T +1 212 335 4742
F +1 212 884 8542
M +1 973 919 3685
jonathan.kinney@us.dlapiper.com

**DLA Piper LLP (US)**
dlapiper.com



**From:** Rush, Michael B. <rushm@gilbertlegal.com>
**Sent:** Wednesday, February 14, 2024 1:40 PM
**To:** Kinney, Jonathan <jonathan.kinney@us.dlapiper.com>; Sraders, Sarah <SradersS@gilbertlegal.com>
**Cc:** Jeff Tillotson <jtillotson@tillotsonlaw.com>; Winstead, Hunter <winsteadh@gilbertlegal.com>; Murphy, Michael (New York) <michael.murphy@us.dlapiper.com>; Bower, Rockwell <Rockwell.Bower@us.dlapiper.com>
**Subject:** RE: Houser v. Allianz et al. - Quick Call

⚠ EXTERNAL MESSAGE

Confirmed! Thanks!



**Michael B. Rush**
rushm@gilbertlegal.com
O 202.772.2405
C 302.379.3285

700 Pennsylvania Ave., SE
Suite 400
Washington, DC 20003

2

TrustApp0063

**GilbertLegal.com**

This email and any attachments may contain confidential information that is privileged at law. If you are not a named recipient or have received this communication by error, please notify the sender immediately and destroy this email and its attachments, and all copies thereof, without further distributing or copying them.

**From:** Kinney, Jonathan <jonathan.kinney@us.dlapiper.com>
**Sent:** Wednesday, February 14, 2024 11:42 AM
**To:** Rush, Michael B. <rushm@gilbertlegal.com>; Sraders, Sarah <SradersS@gilbertlegal.com>
**Cc:** Jeff Tillotson <jtillotson@tillotsonlaw.com>; Winstead, Hunter <winsteadh@gilbertlegal.com>; Murphy, Michael (New York) <michael.murphy@us.dlapiper.com>; Bower, Rockwell <Rockwell.Bower@us.dlapiper.com>
**Subject:** RE: Houser v. Allianz et al. - Quick Call

Thank you, Michael. We will review and revert. Can you confirm whether this is the same confidentiality agreement that was circulated last night at 7:44 PM EST by the Insurer Support email account? Thanks in advance.


Best,
Jon


## Jonathan M. Kinney
Associate

T  +1 212 335 4742
F  +1 212 884 8542
M  +1 973 919 3685
jonathan.kinney@us.dlapiper.com

**DLA Piper LLP (US)**
dlapiper.com




**From:** Rush, Michael B. <rushm@gilbertlegal.com>
**Sent:** Tuesday, February 13, 2024 11:35 AM
**To:** Kinney, Jonathan <jonathan.kinney@us.dlapiper.com>; Sraders, Sarah <SradersS@gilbertlegal.com>
**Cc:** Jeff Tillotson <jtillotson@tillotsonlaw.com>; Winstead, Hunter <winsteadh@gilbertlegal.com>; Murphy, Michael (New York) <michael.murphy@us.dlapiper.com>; Bower, Rockwell <Rockwell.Bower@us.dlapiper.com>
**Subject:** RE: Houser v. Allianz et al. - Quick Call


⚠ EXTERNAL MESSAGE


Jonathan:

Pursuant to our conversation last week, attached is a copy of the Confidentiality Agreement that other insurers have signed to get access to the Trust's policy evidence. If you can execute this, we can send back the policy evidence we have regarding the Daniel Webster LC policy




TrustApp0064

**Michael B. Rush**
rushm@gilbertlegal.com
O 202.772.2405
C 302.379.3285

700 Pennsylvania Ave., SE
Suite 400
Washington, DC  20003
**GilbertLegal.com**

This email and any attachments may contain confidential information that is privileged at law. If you are not a named recipient or have received this communication by error, please notify the sender immediately and destroy this email and its attachments, and all copies thereof, without further distributing or copying them.

**From:** Kinney, Jonathan <jonathan.kinney@us.dlapiper.com>
**Sent:** Wednesday, February 7, 2024 11:56 AM
**To:** Sraders, Sarah <SradersS@gilbertlegal.com>
**Cc:** Jeff Tillotson <jtillotson@tillotsonlaw.com>; Winstead, Hunter <winsteadh@gilbertlegal.com>; Murphy, Michael (New York) <michael.murphy@us.dlapiper.com>; Bower, Rockwell <Rockwell.Bower@us.dlapiper.com>; Rush, Michael B. <rushm@gilbertlegal.com>
**Subject:** RE: Houser v. Allianz et al. - Quick Call

3:30 PM EST on Friday works for me.  Thank you.

Jonathan M. Kinney
Associate

T  +1 212 335 4742
F  +1 212 884 8542
M  +1 973 919 3685
jonathan.kinney@us.dlapiper.com

**DLA Piper LLP (US)**
dlapiper.com



**From:** Sraders, Sarah <SradersS@gilbertlegal.com>
**Sent:** Wednesday, February 7, 2024 11:52 AM
**To:** Kinney, Jonathan <jonathan.kinney@us.dlapiper.com>
**Cc:** Jeff Tillotson <jtillotson@tillotsonlaw.com>; Winstead, Hunter <winsteadh@gilbertlegal.com>; Murphy, Michael (New York) <michael.murphy@us.dlapiper.com>; Bower, Rockwell <Rockwell.Bower@us.dlapiper.com>; Rush, Michael B. <rushm@gilbertlegal.com>
**Subject:** RE: Houser v. Allianz et al. - Quick Call

⚠ EXTERNAL MESSAGE

Hi Jon,

Friday would be best for us – how about 3:30? If that works, I'll send an invite.

Thanks,

TrustApp0065

Sarah



**Sarah Sraders**
SradersS@gilbertlegal.com
O 202.772.1909

700 Pennsylvania Ave., SE
Suite 400
Washington, DC  20003
**GilbertLegal.com**

This email and any attachments may contain confidential information that is privileged at law. If you are not a named recipient or have received this communication by error, please notify the sender immediately and destroy this email and its attachments, and all copies thereof, without further distributing or copying them.

**From:** Kinney, Jonathan <jonathan.kinney@us.dlapiper.com>
**Sent:** Wednesday, February 7, 2024 10:53 AM
**To:** Sraders, Sarah <SradersS@gilbertlegal.com>
**Cc:** Jeff Tillotson <jtillotson@tillotsonlaw.com>; Winstead, Hunter <winsteadh@gilbertlegal.com>; Murphy, Michael (New York) <michael.murphy@us.dlapiper.com>; Bower, Rockwell <Rockwell.Bower@us.dlapiper.com>; Rush, Michael B. <rushm@gilbertlegal.com>
**Subject:** RE: Houser v. Allianz et al. - Quick Call

Thanks, Sarah.  I am available this afternoon except for 3:00-4:00 PM EST, tomorrow except for 10:00 AM – 12:00 PM EST, and Friday except for 11:00 AM – 3:00 PM.  Please let me know what works for you in those windows.  Thanks.

Best,
Jon

## Jonathan M. Kinney
Associate

T  +1 212 335 4742
F  +1 212 884 8542
M  +1 973 919 3685
jonathan.kinney@us.dlapiper.com

**DLA Piper LLP (US)**
dlapiper.com



**From:** Sraders, Sarah <SradersS@gilbertlegal.com>
**Sent:** Tuesday, February 6, 2024 11:46 AM
**To:** Kinney, Jonathan <jonathan.kinney@us.dlapiper.com>
**Cc:** Jeff Tillotson <jtillotson@tillotsonlaw.com>; Winstead, Hunter <winsteadh@gilbertlegal.com>; Murphy, Michael (New York) <michael.murphy@us.dlapiper.com>; Bower, Rockwell <Rockwell.Bower@us.dlapiper.com>; Rush, Michael B. <rushm@gilbertlegal.com>
**Subject:** RE: Houser v. Allianz et al. - Quick Call

TrustApp0066

⚠ EXTERNAL MESSAGE

Hi Jon,

Apologies for the delay in getting back to you.  We're available to discuss this week – are there any good days and times that would work on your end?

Thanks,

Sarah



**Sarah Sraders**
SradersS@gilbertlegal.com
O 202.772.1909

700 Pennsylvania Ave., SE
Suite 400
Washington, DC  20003
**GilbertLegal.com**

This email and any attachments may contain confidential information that is privileged at law. If you are not a named recipient or have received this communication by error, please notify the sender immediately and destroy this email and its attachments, and all copies thereof, without further distributing or copying them.

**From:** Kinney, Jonathan <jonathan.kinney@us.dlapiper.com>
**Sent:** Friday, January 19, 2024 5:37 PM
**To:** Sraders, Sarah <SradersS@gilbertlegal.com>
**Cc:** Jeff Tillotson <jtillotson@tillotsonlaw.com>; Winstead, Hunter <winsteadh@gilbertlegal.com>; Murphy, Michael (New York) <michael.murphy@us.dlapiper.com>; Bower, Rockwell <Rockwell.Bower@us.dlapiper.com>; Rush, Michael B. <rushm@gilbertlegal.com>
**Subject:** RE: Houser v. Allianz et al. - Quick Call

Hi Sarah,

Just following up on this.  Please let us know when is a good time to connect.  Thanks.

Best,
Jon

## Jonathan M. Kinney
Associate

T  +1 212 335 4742
F  +1 212 884 8542
M  +1 973 919 3685
jonathan.kinney@us.dlapiper.com

**DLA Piper LLP (US)**
dlapiper.com

6

TrustApp0067

**From:** Sraders, Sarah <SradersS@gilbertlegal.com>
**Sent:** Friday, January 12, 2024 11:14 AM
**To:** Kinney, Jonathan <jonathan.kinney@us.dlapiper.com>
**Cc:** Jeff Tillotson <jtillotson@tillotsonlaw.com>; Winstead, Hunter <winsteadh@gilbertlegal.com>; Murphy, Michael (New York) <michael.murphy@us.dlapiper.com>; Bower, Rockwell <Rockwell.Bower@us.dlapiper.com>; Rush, Michael B. <rushm@gilbertlegal.com>
**Subject:** RE: Houser v. Allianz et al. - Quick Call

⚠️ EXTERNAL MESSAGE

Hi Jon,

Thanks for reaching out, and I hope all is well with you, too. We'll confer internally and propose some times for discussion next week.

Best,

Sarah



**Sarah Sraders**
SradersS@gilbertlegal.com
O 202.772.1909

700 Pennsylvania Ave., SE
Suite 400
Washington, DC  20003
**GilbertLegal.com**

This email and any attachments may contain confidential information that is privileged at law. If you are not a named recipient or have received this communication by error, please notify the sender immediately and destroy this email and its attachments, and all copies thereof, without further distributing or copying them.

**From:** Kinney, Jonathan <jonathan.kinney@us.dlapiper.com>
**Sent:** Friday, January 12, 2024 8:57 AM
**To:** Sraders, Sarah <SradersS@gilbertlegal.com>
**Cc:** Jeff Tillotson <jtillotson@tillotsonlaw.com>; Winstead, Hunter <winsteadh@gilbertlegal.com>; Murphy, Michael (New York) <michael.murphy@us.dlapiper.com>; Bower, Rockwell <Rockwell.Bower@us.dlapiper.com>
**Subject:** RE: Houser v. Allianz et al. - Quick Call

Sarah,

I hope all is well with you. I am following up on our conversations prior to Aviva's motion to dismiss, and Judge Scholer's suggestion to consider whether Aviva should remain in the case. Please let us know if the Trustee will voluntarily dismiss Aviva plc from the litigation.

If you'd like to discuss, I have good availability later today or early next week. Thanks very much.

Best,
Jon

TrustApp0068

## Jonathan M. Kinney
Associate

T  +1 212 335 4742
F  +1 212 884 8542
M  +1 973 919 3685
jonathan.kinney@us.dlapiper.com

**DLA Piper LLP (US)**
dlapiper.com

---

**From:** Sraders, Sarah <SradersS@gilbertlegal.com>
**Sent:** Tuesday, October 10, 2023 4:55 PM
**To:** Kinney, Jonathan <jonathan.kinney@us.dlapiper.com>
**Cc:** Jeff Tillotson <jtillotson@tillotsonlaw.com>; Winstead, Hunter <winsteadh@gilbertlegal.com>; Murphy, Michael (New York) <michael.murphy@us.dlapiper.com>
**Subject:** RE: Houser v. Allianz et al. - Quick Call

⚠ EXTERNAL MESSAGE

Hi Jon,

Yes, a November 3 response deadline is fine with us.  Please feel free to file the unopposed extension motion.  Apologies, the day got away from me today, but feel free to give me a call tomorrow whenever works best for you.

Thanks,

Sarah



**Sarah Sraders**
SradersS@gilbertlegal.com
O 202.772.1909

700 Pennsylvania Ave., SE
Suite 400
Washington, DC  20003
**GilbertLegal.com**

This email and any attachments may contain confidential information that is privileged at law. If you are not a named recipient or have received this communication by error, please notify the sender immediately and destroy this email and its attachments, and all copies thereof, without further distributing or copying them.

**From:** Kinney, Jonathan <jonathan.kinney@us.dlapiper.com>
**Sent:** Tuesday, October 10, 2023 9:34 AM
**To:** Sraders, Sarah <SradersS@gilbertlegal.com>
**Cc:** Jeff Tillotson <jtillotson@tillotsonlaw.com>; Winstead, Hunter <winsteadh@gilbertlegal.com>; Murphy, Michael (New York) <michael.murphy@us.dlapiper.com>
**Subject:** RE: Houser v. Allianz et al. - Quick Call

TrustApp0069

Hi All,

Following up on the below and my calls with Sarah last week, could you please let us know if the Trustee agrees to a Nov. 3 response deadline?  If so, we will file an unopposed extension motion.

Second, please let me know if you have time today or tomorrow for another call.  I'm can be available whenever works for you.  Thanks in advance.

Best,
Jon

## Jonathan M. Kinney
Associate

---

T  +1 212 335 4742
F  +1 212 884 8542
M  +1 973 919 3685
jonathan.kinney@us.dlapiper.com

**DLA Piper LLP (US)**
dlapiper.com

---

**From:** Jeff Tillotson <jtillotson@tillotsonlaw.com>
**Sent:** Friday, September 29, 2023 3:58 PM
**To:** Kinney, Jonathan <jonathan.kinney@us.dlapiper.com>; Winstead, Hunter <winsteadh@gilbertlegal.com>
**Subject:** Re: Houser v. Allianz et al. - Quick Call

⚠ EXTERNAL MESSAGE

Jonathan-

I am including the Gilbert firm on here.  One of us will get back to shortly.

Jeff Tillotson



1201 Main Street
Suite 1300
Dallas, Texas 75202

O: 214-382-3040
C: 214-695-5333
jtillotson@tillotsonlaw.com

---

**From:** Kinney, Jonathan <jonathan.kinney@us.dlapiper.com>
**Date:** Friday, September 29, 2023 at 2:42 PM

TrustApp0070

**To:** Jeff Tillotson <jtillotson@tillotsonlaw.com>
**Subject:** RE: Houser v. Allianz et al. - Quick Call

Hi Jeff,

Just following up on this again.  Any chance the CUAC policies have been located?  Also, we will likely file an appearance and move for an extension of time to respond early next week.  Could you please let us know if there are any response date blocks toward the end of October that we could join, and let us know if the Trustee will consent to the extension?  Thanks in advance.

Best,
Jon

## Jonathan M. Kinney
Associate

---

T  +1 212 335 4742
F  +1 212 884 8542
M  +1 973 919 3685
jonathan.kinney@us.dlapiper.com

**DLA Piper LLP (US)**
dlapiper.com

---

**From:** Kinney, Jonathan
**Sent:** Tuesday, September 26, 2023 10:14 AM
**To:** 'Jeff Tillotson' <jtillotson@tillotsonlaw.com>
**Subject:** RE: Houser v. Allianz et al. - Quick Call

Hi Jeff,

Just following up on this.  Have you by any chance received a copy of the policy(ies) from co-counsel?  Thanks again.

Best,
Jon

## Jonathan M. Kinney
Associate

---

T  +1 212 335 4742
F  +1 212 884 8542
M  +1 973 919 3685
jonathan.kinney@us.dlapiper.com

**DLA Piper LLP (US)**
dlapiper.com

---

**From:** Jeff Tillotson <jtillotson@tillotsonlaw.com>
**Sent:** Thursday, September 21, 2023 3:13 PM
**To:** Kinney, Jonathan <jonathan.kinney@us.dlapiper.com>
**Subject:** Re: Houser v. Allianz et al. - Quick Call

⚠ EXTERNAL MESSAGE

TrustApp0071

Jonathan–

I am getting this from my co counsel. Will have it to you soon.

**Jeff Tillotson**



**TILLOTSON JOHNSON & PATTON**

*Note Our New Address::*

1201 Main Street

Suite 1300

Dallas, Texas 75202

Direct: 214-382-3040

Cell:   214-695-5333

jtillotson@tillotsonlaw.com

**From:** Kinney, Jonathan <jonathan.kinney@us.dlapiper.com>
**Sent:** Tuesday, September 19, 2023 10:47 AM
**To:** Jeff Tillotson <jtillotson@tillotsonlaw.com>
**Subject:** RE: Houser v. Allianz et al. - Quick Call

Hi Jeff,

Thanks for your time on the phone this morning. As discussed, I will await from you:

1. Copies of the two Commercial Union Assurance Company policies listed next to Aviva plc in Complaint Exhibit B – a 1/1/1976-1/1/1977 policy with policy number unknown, and a 1/1/1977-1/1/1978 policy with policy number ABD745009.

2. Any existing response deadline blocks in October that Aviva can join.

TrustApp0072

Thanks again, and please don't hesitate to reach out if you have any questions for me.

Best,
Jon

**Jonathan M. Kinney**
Associate

T +1 212 335 4742
F +1 212 884 8542
M +1 973 919 3685
jonathan.kinney@us.dlapiper.com

**DLA Piper LLP (US)**
dlapiper.com

---

**From:** Jeff Tillotson <jtillotson@tillotsonlaw.com>
**Sent:** Monday, September 18, 2023 7:37 PM
**To:** Kinney, Jonathan <jonathan.kinney@us.dlapiper.com>
**Subject:** Re: Houser v. Allianz et al. - Quick Call

⚠ EXTERNAL MESSAGE

Does 10 30?

Jeff Tillotson



1201 Main Street
Suite 1300
Dallas, Texas 75202

O: 214-382-3040
C: 214-695-5333
jtillotson@tillotsonlaw.com

---

**From:** Kinney, Jonathan <jonathan.kinney@us.dlapiper.com>
**Date:** Monday, September 18, 2023 at 6:36 PM
**To:** Jeff Tillotson <jtillotson@tillotsonlaw.com>
**Subject:** RE: Houser v. Allianz et al. - Quick Call

Great – thank you. What time works for you tomorrow morning?

**Jonathan M. Kinney**
Associate

T +1 212 335 4742
F +1 212 884 8542
M +1 973 919 3665

12

TrustApp0073

jonathan.kinney@us.dlapiper.com

**DLA Piper LLP (US)**
dlapiper.com

---

**From:** Jeff Tillotson <jtillotson@tillotsonlaw.com>
**Sent:** Monday, September 18, 2023 7:32 PM
**To:** Kinney, Jonathan <jonathan.kinney@us.dlapiper.com>
**Subject:** Re: Houser v. Allianz et al. - Quick Call


⚠ EXTERNAL MESSAGE


Sure—let's talk tomorrow.  We have no issues with 9-29 of course but let's talk about what else you might need.

Jeff Tillotson



1201 Main Street
Suite 1300
Dallas, Texas 75202

O: 214-382-3040
C: 214-695-5333
jtillotson@tillotsonlaw.com

---

**From:** Kinney, Jonathan <jonathan.kinney@us.dlapiper.com>
**Date:** Monday, September 18, 2023 at 6:05 PM
**To:** Jeff Tillotson <jtillotson@tillotsonlaw.com>
**Subject:** RE: Houser v. Allianz et al. - Quick Call

Thanks, Jeff.  I do have time to speak tomorrow morning.  Just let me know what time works for you, and I will give you a call or send you a Teams link for that time, whichever you prefer.  Initially, the September 29 response deadline that we have seen several other defendants request unopposed may work, but I'd like to discuss potentially a couple more weeks' extension.

Jonathan M. Kinney
Associate

---

T  +1 212 335 4742
F  +1 212 884 8542
M  +1 973 919 3685
jonathan.kinney@us.dlapiper.com

**DLA Piper LLP (US)**
dlapiper.com

---

**From:** Jeff Tillotson <jtillotson@tillotsonlaw.com>
**Sent:** Monday, September 18, 2023 6:37 PM

13

TrustApp0074

**To:** Kinney, Jonathan <jonathan.kinney@us.dlapiper.com>
**Subject:** Re: Houser v. Allianz et al. - Quick Call

⚠ EXTERNAL MESSAGE

Jonathan- do you have time to talk tomorrow am? What date are you requesting to have your answer extended to?

**Jeff Tillotson**



**TILLOTSON JOHNSON & PATTON**

***Note Our New Address:*:**

1201 Main Street

Suite 1300

Dallas, Texas 75202

Direct: 214-382-3040

Cell:    214-695-5333

jtillotson@tillotsonlaw.com

---

**From:** Kinney, Jonathan <jonathan.kinney@us.dlapiper.com>
**Sent:** Monday, September 18, 2023 5:29 PM
**To:** Jeff Tillotson <jtillotson@tillotsonlaw.com>
**Subject:** Houser v. Allianz et al. - Quick Call

Good Afternoon,

TrustApp0075

I am reaching out on behalf of our client, Aviva plc, in connection with the above-captioned matter and to follow up on a message I left with an assistant in your office last week.  Could you please let me know if there is an ideal time to reach you by phone?

In the meantime, we are reaching out to confer as to an extension of time for Aviva's response to the pleadings pursuant to LR 7.1.  We would also be grateful if you could provide a copy of the policy(ies) referenced alongside Aviva plc in Exhibit B to the complaint (at PageID 43) – two Commercial Union Assurance Company policies.

Thanks very much in advance, and please let me know if there is a good time to reach you for a few minutes to discuss.

Best,
Jon

## Jonathan M. Kinney
Associate

---

T   +1 212 335 4742
F   +1 212 884 8542
M  +1 973 919 3685
jonathan.kinney@us.dlapiper.com

**DLA Piper LLP (US)**
1251 Avenue of the Americas
27th Floor
New York, NY  10020-1104



dlapiper.com

The information contained in this email may be confidential and/or legally privileged. It has been sent for the sole use of the intended recipient(s). If the reader of this message is not an intended recipient, you are hereby notified that any unauthorized review, use, disclosure, dissemination, distribution, or copying of this communication, or any of its contents, is strictly prohibited. If you have received this communication in error, please reply to the sender and destroy all copies of the message. To contact us directly, send to postmaster@dlapiper.com. Thank you.

The information contained in this email may be confidential and/or legally privileged. It has been sent for the sole use of the intended recipient(s). If the reader of this message is not an intended recipient, you are hereby notified that any unauthorized review, use, disclosure, dissemination, distribution, or copying of this communication, or any of its contents, is strictly prohibited. If you have received this communication in error, please reply to the sender and destroy all copies of the message. To contact us directly, send to postmaster@dlapiper.com. Thank you.

The information contained in this email may be confidential and/or legally privileged. It has been sent for the sole use of the intended recipient(s). If the reader of this message is not an intended recipient, you are hereby notified that any unauthorized review, use, disclosure, dissemination, distribution, or copying of this communication, or any of its contents, is strictly prohibited. If you have received this communication in error, please reply to the sender and destroy all copies of the message. To contact us directly, send to postmaster@dlapiper.com. Thank you.

The information contained in this email may be confidential and/or legally privileged. It has been sent for the sole use of the intended recipient(s). If the reader of this message is not an intended recipient, you are hereby notified that any unauthorized review, use, disclosure, dissemination, distribution, or copying of this communication, or any of its contents, is strictly prohibited. If you have received this communication in error, please reply to the sender and destroy all copies of the message. To contact us directly, send to postmaster@dlapiper.com. Thank you.

The information contained in this email may be confidential and/or legally privileged. It has been sent for the sole use of the intended recipient(s). If the reader of this message is not an intended recipient, you are hereby notified that any unauthorized review, use, disclosure, dissemination, distribution, or copying of this communication, or any of its contents, is strictly prohibited. If you have received this communication in error, please reply to the sender and destroy all copies of the message. To contact us directly, send to postmaster@dlapiper.com. Thank you.

TrustApp0076

The information contained in this email may be confidential and/or legally privileged. It has been sent for the sole use of the intended recipient(s). If the reader of this message is not an intended recipient, you are hereby notified that any unauthorized review, use, disclosure, dissemination, distribution, or copying of this communication, or any of its contents, is strictly prohibited. If you have received this communication in error, please reply to the sender and destroy all copies of the message. To contact us directly, send to postmaster@dlapiper.com. Thank you.

The information contained in this email may be confidential and/or legally privileged. It has been sent for the sole use of the intended recipient(s). If the reader of this message is not an intended recipient, you are hereby notified that any unauthorized review, use, disclosure, dissemination, distribution, or copying of this communication, or any of its contents, is strictly prohibited. If you have received this communication in error, please reply to the sender and destroy all copies of the message. To contact us directly, send to postmaster@dlapiper.com. Thank you.

The information contained in this email may be confidential and/or legally privileged. It has been sent for the sole use of the intended recipient(s). If the reader of this message is not an intended recipient, you are hereby notified that any unauthorized review, use, disclosure, dissemination, distribution, or copying of this communication, or any of its contents, is strictly prohibited. If you have received this communication in error, please reply to the sender and destroy all copies of the message. To contact us directly, send to postmaster@dlapiper.com. Thank you.

The information contained in this email may be confidential and/or legally privileged. It has been sent for the sole use of the intended recipient(s). If the reader of this message is not an intended recipient, you are hereby notified that any unauthorized review, use, disclosure, dissemination, distribution, or copying of this communication, or any of its contents, is strictly prohibited. If you have received this communication in error, please reply to the sender and destroy all copies of the message. To contact us directly, send to postmaster@dlapiper.com. Thank you.

The information contained in this email may be confidential and/or legally privileged. It has been sent for the sole use of the intended recipient(s). If the reader of this message is not an intended recipient, you are hereby notified that any unauthorized review, use, disclosure, dissemination, distribution, or copying of this communication, or any of its contents, is strictly prohibited. If you have received this communication in error, please reply to the sender and destroy all copies of the message. To contact us directly, send to postmaster@dlapiper.com. Thank you.

The information contained in this email may be confidential and/or legally privileged. It has been sent for the sole use of the intended recipient(s). If the reader of this message is not an intended recipient, you are hereby notified that any unauthorized review, use, disclosure, dissemination, distribution, or copying of this communication, or any of its contents, is strictly prohibited. If you have received this communication in error, please reply to the sender and destroy all copies of the message. To contact us directly, send to postmaster@dlapiper.com. Thank you.

The information contained in this email may be confidential and/or legally privileged. It has been sent for the sole use of the intended recipient(s). If the reader of this message is not an intended recipient, you are hereby notified that any unauthorized review, use, disclosure, dissemination, distribution, or copying of this communication, or any of its contents, is strictly prohibited. If you have received this communication in error, please reply to the sender and destroy all copies of the message. To contact us directly, send to postmaster@dlapiper.com. Thank you.

TrustApp0077

**Seymour, Stephanie R.**

| | |
|---|---|
| **From:** | Rush, Michael B. |
| **Sent:** | Tuesday, February 13, 2024 11:40 AM |
| **To:** | jonathan.kinney@us.dlapiper.com; Sraders, Sarah |
| **Cc:** | jtillotson@tillotsonlaw.com; Winstead, Hunter; michael.murphy@us.dlapiper.com; Rockwell.Bower@us.dlapiper.com |
| **Subject:** | Houser v. Allianz et al. - Quick Call |
| **Attachments:** | BSA Settlement Trust-Confidentiality Agreement.pdf |

Jonathan:

Pursuant to our conversation last week, attached is a copy of the Confidentiality Agreement that other insurers have signed to get access to the Trust's policy evidence.  If you can execute this, we can send back the policy evidence we have regarding the Daniel Webster LC policy



**Michael B. Rush**
rushm@gilbertlegal.com
O 202.772.2405
C 302.379.3285

700 Pennsylvania Ave., SE
Suite 400
Washington, DC  20003
**GilbertLegal.com**

This email and any attachments may contain confidential information that is privileged at law. If you are not a named recipient or have received this communication by error, please notify the sender immediately and destroy this email and its attachments, and all copies thereof, without further distributing or copying them.

**From:** Kinney, Jonathan <jonathan.kinney@us.dlapiper.com>
**Sent:** Wednesday, February 7, 2024 11:56 AM
**To:** Sraders, Sarah <SradersS@gilbertlegal.com>
**Cc:** Jeff Tillotson <jtillotson@tillotsonlaw.com>; Winstead, Hunter <winsteadh@gilbertlegal.com>; Murphy, Michael (New York) <michael.murphy@us.dlapiper.com>; Bower, Rockwell <Rockwell.Bower@us.dlapiper.com>; Rush, Michael B. <rushm@gilbertlegal.com>
**Subject:** RE: Houser v. Allianz et al. - Quick Call

3:30 PM EST on Friday works for me.  Thank you.

Jonathan M. Kinney
Associate

T  +1 212 335 4742
F  +1 212 884 8542
M +1 973 919 3685
jonathan.kinney@us.dlapiper.com

**DLA Piper LLP (US)**
dlapiper.com

1



**From:** Sraders, Sarah <SradersS@gilbertlegal.com>
**Sent:** Wednesday, February 7, 2024 11:52 AM
**To:** Kinney, Jonathan <jonathan.kinney@us.dlapiper.com>
**Cc:** Jeff Tillotson <jtillotson@tillotsonlaw.com>; Winstead, Hunter <winsteadh@gilbertlegal.com>; Murphy, Michael (New York) <michael.murphy@us.dlapiper.com>; Bower, Rockwell <Rockwell.Bower@us.dlapiper.com>; Rush, Michael B. <rushm@gilbertlegal.com>
**Subject:** RE: Houser v. Allianz et al. - Quick Call

⚠ EXTERNAL MESSAGE

Hi Jon,

Friday would be best for us – how about 3:30? If that works, I'll send an invite.

Thanks,

Sarah



**Sarah Sraders**
SradersS@gilbertlegal.com
O 202.772.1909

700 Pennsylvania Ave., SE
Suite 400
Washington, DC  20003
**GilbertLegal.com**

This email and any attachments may contain confidential information that is privileged at law. If you are not a named recipient or have received this communication by error, please notify the sender immediately and destroy this email and its attachments, and all copies thereof, without further distributing or copying them.

**From:** Kinney, Jonathan <jonathan.kinney@us.dlapiper.com>
**Sent:** Wednesday, February 7, 2024 10:53 AM
**To:** Sraders, Sarah <SradersS@gilbertlegal.com>
**Cc:** Jeff Tillotson <jtillotson@tillotsonlaw.com>; Winstead, Hunter <winsteadh@gilbertlegal.com>; Murphy, Michael (New York) <michael.murphy@us.dlapiper.com>; Bower, Rockwell <Rockwell.Bower@us.dlapiper.com>; Rush, Michael B. <rushm@gilbertlegal.com>
**Subject:** RE: Houser v. Allianz et al. - Quick Call

Thanks, Sarah.  I am available this afternoon except for 3:00-4:00 PM EST, tomorrow except for 10:00 AM – 12:00 PM EST, and Friday except for 11:00 AM – 3:00 PM.  Please let me know what works for you in those windows.  Thanks.

Best,
Jon

TrustApp0079

Jonathan M. Kinney
Associate

T  +1 212 335 4742
F  +1 212 884 8542
M  +1 973 919 3685
jonathan.kinney@us.dlapiper.com

**DLA Piper LLP (US)**
dlapiper.com



---

**From:** Sraders, Sarah <SradersS@gilbertlegal.com>
**Sent:** Tuesday, February 6, 2024 11:46 AM
**To:** Kinney, Jonathan <jonathan.kinney@us.dlapiper.com>
**Cc:** Jeff Tillotson <jtillotson@tillotsonlaw.com>; Winstead, Hunter <winsteadh@gilbertlegal.com>; Murphy, Michael (New York) <michael.murphy@us.dlapiper.com>; Bower, Rockwell <Rockwell.Bower@us.dlapiper.com>; Rush, Michael B. <rushm@gilbertlegal.com>
**Subject:** RE: Houser v. Allianz et al. - Quick Call

⚠ EXTERNAL MESSAGE

Hi Jon,

Apologies for the delay in getting back to you.  We're available to discuss this week – are there any good days and times that would work on your end?

Thanks,

Sarah



**Sarah Sraders**
SradersS@gilbertlegal.com
O 202.772.1909

700 Pennsylvania Ave., SE
Suite 400
Washington, DC  20003
**GilbertLegal.com**

This email and any attachments may contain confidential information that is privileged at law. If you are not a named recipient or have received this communication by error, please notify the sender immediately and destroy this email and its attachments, and all copies thereof, without further distributing or copying them.

**From:** Kinney, Jonathan <jonathan.kinney@us.dlapiper.com>
**Sent:** Friday, January 19, 2024 5:37 PM
**To:** Sraders, Sarah <SradersS@gilbertlegal.com>

3

TrustApp0080

**Cc:** Jeff Tillotson <jtillotson@tillotsonlaw.com>; Winstead, Hunter <winsteadh@gilbertlegal.com>; Murphy, Michael (New York) <michael.murphy@us.dlapiper.com>; Bower, Rockwell <Rockwell.Bower@us.dlapiper.com>; Rush, Michael B. <rushm@gilbertlegal.com>
**Subject:** RE: Houser v. Allianz et al. - Quick Call

Hi Sarah,

Just following up on this.  Please let us know when is a good time to connect.  Thanks.

Best,
Jon

## Jonathan M. Kinney
Associate

T  +1 212 335 4742
F  +1 212 884 8542
M  +1 973 919 3685
jonathan.kinney@us.dlapiper.com

**DLA Piper LLP (US)**
dlapiper.com

---

**From:** Sraders, Sarah <SradersS@gilbertlegal.com>
**Sent:** Friday, January 12, 2024 11:14 AM
**To:** Kinney, Jonathan <jonathan.kinney@us.dlapiper.com>
**Cc:** Jeff Tillotson <jtillotson@tillotsonlaw.com>; Winstead, Hunter <winsteadh@gilbertlegal.com>; Murphy, Michael (New York) <michael.murphy@us.dlapiper.com>; Bower, Rockwell <Rockwell.Bower@us.dlapiper.com>; Rush, Michael B. <rushm@gilbertlegal.com>
**Subject:** RE: Houser v. Allianz et al. - Quick Call

⚠ EXTERNAL MESSAGE

Hi Jon,

Thanks for reaching out, and I hope all is well with you, too.  We'll confer internally and propose some times for discussion next week.

Best,

Sarah



**Sarah Sraders**
SradersS@gilbertlegal.com
O 202.772.1909

700 Pennsylvania Ave., SE
Suite 400
Washington, DC  20003
**GilbertLegal.com**

TrustApp0081

This email and any attachments may contain confidential information that is privileged at law. If you are not a named recipient or have received this communication by error, please notify the sender immediately and destroy this email and its attachments, and all copies thereof, without further distributing or copying them.

**From:** Kinney, Jonathan <jonathan.kinney@us.dlapiper.com>
**Sent:** Friday, January 12, 2024 8:57 AM
**To:** Sraders, Sarah <SradersS@gilbertlegal.com>
**Cc:** Jeff Tillotson <jtillotson@tillotsonlaw.com>; Winstead, Hunter <winsteadh@gilbertlegal.com>; Murphy, Michael (New York) <michael.murphy@us.dlapiper.com>; Bower, Rockwell <Rockwell.Bower@us.dlapiper.com>
**Subject:** RE: Houser v. Allianz et al. - Quick Call

Sarah,

I hope all is well with you. I am following up on our conversations prior to Aviva's motion to dismiss, and Judge Scholer's suggestion to consider whether Aviva should remain in the case. Please let us know if the Trustee will voluntarily dismiss Aviva plc from the litigation.

If you'd like to discuss, I have good availability later today or early next week. Thanks very much.

Best,
Jon


Jonathan M. Kinney
Associate

T  +1 212 335 4742
F  +1 212 884 8542
M  +1 973 919 3685
jonathan.kinney@us.dlapiper.com

DLA Piper LLP (US)
dlapiper.com

**From:** Sraders, Sarah <SradersS@gilbertlegal.com>
**Sent:** Tuesday, October 10, 2023 4:55 PM
**To:** Kinney, Jonathan <jonathan.kinney@us.dlapiper.com>
**Cc:** Jeff Tillotson <jtillotson@tillotsonlaw.com>; Winstead, Hunter <winsteadh@gilbertlegal.com>; Murphy, Michael (New York) <michael.murphy@us.dlapiper.com>
**Subject:** RE: Houser v. Allianz et al. - Quick Call

⚠ EXTERNAL MESSAGE

Hi Jon,

Yes, a November 3 response deadline is fine with us. Please feel free to file the unopposed extension motion. Apologies, the day got away from me today, but feel free to give me a call tomorrow whenever works best for you.

Thanks,

Sarah

5

-Jonathan

---

⚠ **EXTERNAL MESSAGE**

---

**Subject:** Re: Houser v. Allianz et al. – Quick Call
**To:** Kinney, Jonathan <jonathan.kinney@us.dlapiper.com>; Winstead, Hunter <winsteadh@gilbertlegal.com>
**Sent:** Friday, September 29, 2023 3:58 PM
**From:** Jeff Tillotson <jtillotson@tillotsonlaw.com>

DLA Piper LLP (US)
jonathan.kinney@us.dlapiper.com
dlapiper.com

T +1 212 335 4742
F +1 212 884 8542
M +1 973 919 3665

Associate

Jonathan M. Kinney

Best,
Jon

Second, please let me know if you have time today or tomorrow for another call. I'm can be available whenever works for you. Thanks in advance.

Following up on the below and my calls with Sarah last week, could you please let us know if the Trustee agrees to a Nov. 3 response deadline? If so, we will file an unopposed extension motion.

Hi All,

**Subject:** RE: Houser v. Allianz et al. – Quick Call
(New York) <michael.murphy@us.dlapiper.com>
**CC:** Jeff Tillotson <jtillotson@tillotsonlaw.com>; Winstead, Hunter <winsteadh@gilbertlegal.com>; Murphy, Michael
**To:** Sraders, Sarah <SradersS@gilbertlegal.com>
**Sent:** Tuesday, October 10, 2023 9:34 AM
**From:** Kinney, Jonathan <jonathan.kinney@us.dlapiper.com>

This email and any attachments may contain confidential information that is privileged at law. If you are not a named recipient or have received this communication by error, please notify the sender immediately and destroy this email and its attachments, and all copies thereof, without further distributing or copying them.

**GilbertLegal.com**
Washington, DC 20003
Suite 400
700 Pennsylvania Ave., SE

O 202.772.1909
SradersS@gilbertlegal.com

**Sarah Sraders**

[×]

I am including the Gilbert firm on here.  One of us will get back to shortly.

Jeff Tillotson



1201 Main Street
Suite 1300
Dallas, Texas 75202

O: 214-382-3040
C: 214-695-5333
jtillotson@tillotsonlaw.com

---

**From:** Kinney, Jonathan <jonathan.kinney@us.dlapiper.com>
**Date:** Friday, September 29, 2023 at 2:42 PM
**To:** Jeff Tillotson <jtillotson@tillotsonlaw.com>
**Subject:** RE: Houser v. Allianz et al. - Quick Call

Hi Jeff,

Just following up on this again.  Any chance the CUAC policies have been located?  Also, we will likely file an appearance and move for an extension of time to respond early next week.  Could you please let us know if there are any response date blocks toward the end of October that we could join, and let us know if the Trustee will consent to the extension?  Thanks in advance.

Best,
Jon

## Jonathan M. Kinney
Associate

T  +1 212 335 4742
F  +1 212 884 8542
M  +1 973 919 3685
jonathan.kinney@us.dlapiper.com

**DLA Piper LLP (US)**
dlapiper.com

---

**From:** Kinney, Jonathan
**Sent:** Tuesday, September 26, 2023 10:14 AM
**To:** 'Jeff Tillotson' <jtillotson@tillotsonlaw.com>
**Subject:** RE: Houser v. Allianz et al. - Quick Call

Hi Jeff,

Just following up on this.  Have you by any chance received a copy of the policy(ies) from co-counsel?  Thanks again.

Best,
Jon

TrustApp0084

## Jonathan M. Kinney
Associate

T  +1 212 335 4742
F  +1 212 884 8542
M  +1 973 919 3685
jonathan.kinney@us.dlapiper.com

**DLA Piper LLP (US)**
dlapiper.com

---

**From:** Jeff Tillotson <jtillotson@tillotsonlaw.com>
**Sent:** Thursday, September 21, 2023 3:13 PM
**To:** Kinney, Jonathan <jonathan.kinney@us.dlapiper.com>
**Subject:** Re: Houser v. Allianz et al. - Quick Call

⚠ EXTERNAL MESSAGE

Jonathan-

I am getting this from my co counsel.  Will have it to you soon.


**Jeff Tillotson**



**TILLOTSON JOHNSON & PATTON**


***Note Our New Address:*:**

1201 Main Street

Suite 1300

Dallas, Texas 75202

Direct: 214-382-3040

Cell:    214-695-5333

jtillotson@tillotsonlaw.com

TrustApp0085

**From:** Kinney, Jonathan <jonathan.kinney@us.dlapiper.com>
**Sent:** Tuesday, September 19, 2023 10:47 AM
**To:** Jeff Tillotson <jtillotson@tillotsonlaw.com>
**Subject:** RE: Houser v. Allianz et al. - Quick Call

Hi Jeff,

Thanks for your time on the phone this morning.  As discussed, I will await from you:

1.  Copies of the two Commercial Union Assurance Company policies listed next to Aviva plc in Complaint Exhibit B – a 1/1/1976-1/1/1977 policy with policy number unknown, and a 1/1/1977-1/1/1978 policy with policy number ABD745009.

2.  Any existing response deadline blocks in October that Aviva can join.

Thanks again, and please don't hesitate to reach out if you have any questions for me.

Best,
Jon

Jonathan M. Kinney
Associate

T  +1 212 335 4742
F  +1 212 884 8542
M  +1 973 919 3685
jonathan.kinney@us.dlapiper.com

**DLA Piper LLP (US)**
dlapiper.com

**From:** Jeff Tillotson <jtillotson@tillotsonlaw.com>
**Sent:** Monday, September 18, 2023 7:37 PM
**To:** Kinney, Jonathan <jonathan.kinney@us.dlapiper.com>
**Subject:** Re: Houser v. Allianz et al. - Quick Call

⚠ EXTERNAL MESSAGE

Does 10 30?

Jeff Tillotson



1201 Main Street
Suite 1300
Dallas, Texas 75202

TrustApp0086

O: 214-382-3040
C: 214-695-5333
jtillotson@tillotsonlaw.com

**From:** Kinney, Jonathan <jonathan.kinney@us.dlapiper.com>
**Date:** Monday, September 18, 2023 at 6:36 PM
**To:** Jeff Tillotson <jtillotson@tillotsonlaw.com>
**Subject:** RE: Houser v. Allianz et al. - Quick Call

Great – thank you. What time works for you tomorrow morning?

Jonathan M. Kinney
Associate

T  +1 212 335 4742
F  +1 212 884 8542
M  +1 973 919 3685
jonathan.kinney@us.dlapiper.com

**DLA Piper LLP (US)**
dlapiper.com

**From:** Jeff Tillotson <jtillotson@tillotsonlaw.com>
**Sent:** Monday, September 18, 2023 7:32 PM
**To:** Kinney, Jonathan <jonathan.kinney@us.dlapiper.com>
**Subject:** Re: Houser v. Allianz et al. - Quick Call

⚠ EXTERNAL MESSAGE

Sure—let's talk tomorrow. We have no issues with 9-29 of course but let's talk about what else you might need.

Jeff Tillotson



1201 Main Street
Suite 1300
Dallas, Texas 75202

O: 214-382-3040
C: 214-695-5333
jtillotson@tillotsonlaw.com

**From:** Kinney, Jonathan <jonathan.kinney@us.dlapiper.com>
**Date:** Monday, September 18, 2023 at 6:05 PM

TrustApp0087

**To:** Jeff Tillotson <jtillotson@tillotsonlaw.com>
**Subject:** RE: Houser v. Allianz et al. - Quick Call

Thanks, Jeff.  I do have time to speak tomorrow morning.  Just let me know what time works for you, and I will give you a call or send you a Teams link for that time, whichever you prefer.  Initially, the September 29 response deadline that we have seen several other defendants request unopposed may work, but I'd like to discuss potentially a couple more weeks' extension.

## Jonathan M. Kinney
Associate

T  +1 212 335 4742
F  +1 212 884 8542
M  +1 973 919 3685
jonathan.kinney@us.dlapiper.com

**DLA Piper LLP (US)**
dlapiper.com

---

**From:** Jeff Tillotson <jtillotson@tillotsonlaw.com>
**Sent:** Monday, September 18, 2023 6:37 PM
**To:** Kinney, Jonathan <jonathan.kinney@us.dlapiper.com>
**Subject:** Re: Houser v. Allianz et al. - Quick Call

⚠ EXTERNAL MESSAGE

Jonathan- do you have time to talk tomorrow am? What date are you requesting to have your answer extended to?

**Jeff Tillotson**



**TILLOTSON JOHNSON & PATTON**

*Note Our New Address:*:

1201 Main Street

Suite 1300

Dallas, Texas 75202

TrustApp0088

Direct: 214-382-3040

Cell:    214-695-5333

jtillotson@tillotsonlaw.com

---

**From:** Kinney, Jonathan <jonathan.kinney@us.dlapiper.com>
**Sent:** Monday, September 18, 2023 5:29 PM
**To:** Jeff Tillotson <jtillotson@tillotsonlaw.com>
**Subject:** Houser v. Allianz et al. - Quick Call

Good Afternoon,

I am reaching out on behalf of our client, Aviva plc, in connection with the above-captioned matter and to follow up on a message I left with an assistant in your office last week.  Could you please let me know if there is an ideal time to reach you by phone?

In the meantime, we are reaching out to confer as to an extension of time for Aviva's response to the pleadings pursuant to LR 7.1.  We would also be grateful if you could provide a copy of the policy(ies) referenced alongside Aviva plc in Exhibit B to the complaint (at PageID 43) – two Commercial Union Assurance Company policies.

Thanks very much in advance, and please let me know if there is a good time to reach you for a few minutes to discuss.

Best,
Jon

## Jonathan M. Kinney
Associate

---

T   +1 212 335 4742              **DLA Piper LLP (US)**
F   +1 212 884 8542              1251 Avenue of the Americas
M  +1 973 919 3685              27th Floor
jonathan.kinney@us.dlapiper.com   New York, NY  10020-1104



dlapiper.com

The information contained in this email may be confidential and/or legally privileged. It has been sent for the sole use of the intended recipient(s). If the reader of this message is not an intended recipient, you are hereby notified that any unauthorized review, use, disclosure, dissemination, distribution, or copying of this communication, or any of its contents, is strictly prohibited. If you have received this communication in error, please reply to the sender and destroy all copies of the message. To contact us directly, send to postmaster@dlapiper.com. Thank you.

The information contained in this email may be confidential and/or legally privileged. It has been sent for the sole use of the intended recipient(s). If the reader of this message is not an intended recipient, you are hereby notified that any unauthorized review, use, disclosure, dissemination, distribution, or copying of this communication, or any of its contents, is strictly prohibited. If you have received this communication in error, please reply to the sender and destroy all copies of the message. To contact us directly, send to postmaster@dlapiper.com. Thank you.

TrustApp0089

The information contained in this email may be confidential and/or legally privileged. It has been sent for the sole use of the intended recipient(s). If the reader of this message is not an intended recipient, you are hereby notified that any unauthorized review, use, disclosure, dissemination, distribution, or copying of this communication, or any of its contents, is strictly prohibited. If you have received this communication in error, please reply to the sender and destroy all copies of the message. To contact us directly, send to postmaster@dlapiper.com. Thank you.

The information contained in this email may be confidential and/or legally privileged. It has been sent for the sole use of the intended recipient(s). If the reader of this message is not an intended recipient, you are hereby notified that any unauthorized review, use, disclosure, dissemination, distribution, or copying of this communication, or any of its contents, is strictly prohibited. If you have received this communication in error, please reply to the sender and destroy all copies of the message. To contact us directly, send to postmaster@dlapiper.com. Thank you.

The information contained in this email may be confidential and/or legally privileged. It has been sent for the sole use of the intended recipient(s). If the reader of this message is not an intended recipient, you are hereby notified that any unauthorized review, use, disclosure, dissemination, distribution, or copying of this communication, or any of its contents, is strictly prohibited. If you have received this communication in error, please reply to the sender and destroy all copies of the message. To contact us directly, send to postmaster@dlapiper.com. Thank you.

The information contained in this email may be confidential and/or legally privileged. It has been sent for the sole use of the intended recipient(s). If the reader of this message is not an intended recipient, you are hereby notified that any unauthorized review, use, disclosure, dissemination, distribution, or copying of this communication, or any of its contents, is strictly prohibited. If you have received this communication in error, please reply to the sender and destroy all copies of the message. To contact us directly, send to postmaster@dlapiper.com. Thank you.

The information contained in this email may be confidential and/or legally privileged. It has been sent for the sole use of the intended recipient(s). If the reader of this message is not an intended recipient, you are hereby notified that any unauthorized review, use, disclosure, dissemination, distribution, or copying of this communication, or any of its contents, is strictly prohibited. If you have received this communication in error, please reply to the sender and destroy all copies of the message. To contact us directly, send to postmaster@dlapiper.com. Thank you.

The information contained in this email may be confidential and/or legally privileged. It has been sent for the sole use of the intended recipient(s). If the reader of this message is not an intended recipient, you are hereby notified that any unauthorized review, use, disclosure, dissemination, distribution, or copying of this communication, or any of its contents, is strictly prohibited. If you have received this communication in error, please reply to the sender and destroy all copies of the message. To contact us directly, send to postmaster@dlapiper.com. Thank you.

The information contained in this email may be confidential and/or legally privileged. It has been sent for the sole use of the intended recipient(s). If the reader of this message is not an intended recipient, you are hereby notified that any unauthorized review, use, disclosure, dissemination, distribution, or copying of this communication, or any of its contents, is strictly prohibited. If you have received this communication in error, please reply to the sender and destroy all copies of the message. To contact us directly, send to postmaster@dlapiper.com. Thank you.

The information contained in this email may be confidential and/or legally privileged. It has been sent for the sole use of the intended recipient(s). If the reader of this message is not an intended recipient, you are hereby notified that any unauthorized review, use, disclosure, dissemination, distribution, or copying of this communication, or any of its contents, is strictly prohibited. If you have received this communication in error, please reply to the sender and destroy all copies of the message. To contact us directly, send to postmaster@dlapiper.com. Thank you.

TrustApp0090

# Cookies on Companies House services

We use some essential cookies to make our services work.

We'd also like to use analytics cookies so we can understand how you use our services and to make improvements.

Accept analytics cookies          Reject analytics cookies

View cookies (/help/cookies)

 **GOV·UK**

**Find and update company information (https://beta.companieshouse.gov.uk/)**

Companies House does not verify the accuracy of the information filed (http://resources.companieshouse.gov.uk/serviceInformation.shtml#compInfo)
Advanced company search (/advanced-search)

# AVIVA PLC

Company number **02468686**

Follow this company

File for this company
(https://beta.companieshouse.gov.uk/company/02468686/authorise?
return_to=/company/02468686)

| Overview | Filing history | People | Charges | More |
| --- | --- | --- | --- | --- |

## Registered office address

TrustApp0091

80 Fenchurch Street, London, United Kingdom, EC3M 4AE

Company status
  Active

Company type
  Public limited Company

Incorporated on
  9 February 1990

# Accounts

Next accounts made up to **31 December 2025**
due by **30 June 2026**

Last accounts made up to **31 December 2024**

# Confirmation statement

Next statement date **16 July 2026**
due by **30 July 2026**

Last statement dated **16 July 2025**

# Nature of business (SIC)

- 70100 - Activities of head offices

# Previous company names

| Name | Period |
|---|---|
| CGNU PLC | 30 May 2000 - 01 Jul 2002 |
| CGU PLC | 02 Jun 1998 - 30 May 2000 |
| COMMERCIAL UNION PLC | 09 Feb 1990 - 02 Jun 1998 |

Tell us what you think of this service (https://www.smartsurvey.co.uk/s/getcompanyinformation/) Is there anything wrong with this page? (/help/feedback?sourceurl=https://find-and-update.company-information.service.gov.uk/company/02468686)

TrustApp0092

Policies Link opens in new tab

Cookies (https://beta.companieshouse.gov.uk/help/cookies)

Contact us Link opens in new tab

Accessibility statement
(https://beta.companieshouse.gov.uk/help/accessibility-
statement)

Developers Link opens in new tab

Built by Companies House                                      © Crown copyright



# NOTICE OF ILLEGIBLE DOCUMENT

# ON THE MICROFICHE RECORD

Companies House regrets that the microfiche record for this company, contain some documents, which are illegible.

The poor quality has been noted, but unfortunately steps taken to improve them were unsuccessful.

Companies House would like to apologise for any inconvenience this may cause



LISTING PARTICULARS dated 18 November 1992





# COMMERCIAL UNION plc

*(Incorporated with limited liability in England and Wales under the Companies Act 1985 with registered number 2468686)*

## Placing of
### 100,000,000 8⅜ per cent.
## Cumulative Irredeemable Preference Shares
## of £1 each at 100 pence per share

Copies of this document, which comprises listing particulars relating to Commercial Union prepared in accordance with the listing rules made under Section 142 of the Financial Services Act 1986, have been delivered for registration to the Registrar of Companies in England and Wales in accordance with Section 149 of that Act.

Application has been made to the London Stock Exchange for the Further New Preference Shares to be admitted to the Official List. It is expected that such admission will become effective and that dealings will commence on 19 November 1992.

The Directors, whose names appear on page 4 of this document, accept responsibility for the information contained in this document. To the best of the knowledge and belief of the Directors (who have taken all reasonable care to ensure that such is the case) the information contained in this document is in accordance with the facts and does not omit anything likely to affect the import of such information.

In connection with this issue, Cazenove may over-allot or effect transactions on the London Stock Exchange which stabilise or maintain the market prices of the Further New Preference Shares and/or the Existing New Preference Shares at levels which might not otherwise prevail on that exchange. Such stabilising, if commenced, may be discontinued at any time.

CAZENOVE & CO.              HOARE GOVETT CORPORATE
                           FINANCE LIMITED



18 November 1992

# Contents

| | | Page |
|---|---|---|
| Definitions | | 3 |
| Directors and Company Secretary | | 4 |
| Part I | Commercial Union Group | 5 |
| | 1.  Description of the Business | 5 |
| | 2.  Current Trading and Prospects | 6 |
| | 3.  Reasons for the Placing | 7 |
| Part II | Description of the Rights Attaching to the Further New Preference Shares | 8 |
| Part III | Financial Information | 13 |
| Part IV | The Placing | 37 |
| Part V | Further Information | 38 |
| Part VI | Third Quarter Results of Commercial Union Group | 57 |

# Expected Timetable of Events

|  |  |
|---|---|
|  | 1992 |
| Official dealings commence, fully paid, for account settlement | 19 November |
| Definitive Further New Preference Share certificates despatched | 27 November |
| Account settlement for initial dealings | 7 December |
|  | 1993 |
| First dividend payment on the Further New Preference Shares | 31 March |

2

TrustApp0096

# Definitions

The following definitions apply throughout this document unless the context requires otherwise:—

| | |
|---|---|
| "Commercial Union" or the "Company" | Commercial Union plc |
| "Commercial Union Group" or the "Group" | Commercial Union plc and its subsidiary undertakings or, in relation to dates or periods prior to 1 June 1990, Commercial Union Assurance Company plc and its subsidiaries |
| "Directors" | the directors of the Company |
| "Irredeemable Preference Shares" | the 200,000,000 cumulative irredeemable preference shares of £1 each in the Company created by a resolution passed on 14 April 1992 |
| "Further New Preference Shares" | the 100,000,000 8⅜ per cent. Irredeemable Preference Shares which are to be issued and subscribed pursuant to the Placing |
| "Existing New Preference Shares" | the 100,000,000 8¾ per cent. Irredeemable Preference Shares issued in May 1992 |
| "New Preference Shares" | the Existing New Preference Shares and the Further New Preference Shares |
| "Existing Preference Shares" | the existing issued 3.5 per cent. cumulative redeemable preference shares of £1 each in the Company |
| the "Ordinary Shares" | the existing ordinary shares of 25p each in the Company |
| the "London Stock Exchange" | The International Stock Exchange of the United Kingdom and the Republic of Ireland Limited |
| the "Placing" | the placing of the Further New Preference Shares as described in this document |
| "Placing Agreement" | an agreement dated 18 November 1992 between the Company, Cazenove and Hoare Govett relating to the Placing |
| "Placing Price" | 100p per Further New Preference Share |
| "Cazenove" | Cazenove & Co. |
| "Hoare Govett" | Hoare Govett Corporate Finance Limited |

In this document, all references to "£", "sterling", "pence" and "p" are to the lawful currency of, and all references to "UK" are to, the United Kingdom.

3

## Directors and Company Secretary

The names of the Directors, each of whose business address is 6 Broadgate, 7th Level, London EC2M 2QS, and their principal outside activities of significance to the Group, are set out below:—

**Directors**
Nicholas Hugo Baring (*Chairman*)
Sir Martin Wakefield Jacomb (*Deputy Chairman*)
Anthony Louis Brend (*Chief Executive*)
John Gordon Thomas Carter (*Executive Director*)
Anthony Blake Wyand (*Executive Director*)
Roger Fauroux (*Non-Executive Director*)
Patrick John Gillam (*Non-Executive Director*)
Ronald Claus Hampel (*Non-Executive Director*)
Prof. Drs. Hendrik Meij (*Non-Executive Director*)
Ian Charles Strachan (*Non-Executive Director*)

N.H. Baring is a director of Barings plc, PosTel Investment Management Limited and the Baring Puma Fund Limited. He is Chairman of the National Gallery Trustees and is a member of the Council of the National Trust.

Sir Martin Jacomb is Chairman of the British Council and of PosTel Investment Management Limited and Deputy Chairman of Barclays Bank PLC. Sir Martin's directorships include the Bank of England, The RTZ Corporation PLC, The Telegraph plc and Marks & Spencer p.l.c.

A.L. Brend is non-executive chairman of British Aviation Insurance Company Limited and Airclaims Group Limited and a director of Trade Indemnity Group PLC.

J.G.T. Carter is a director of British Aviation Insurance Company Limited and Trade Indemnity Group PLC.

R. Fauroux is President d'Honneur de la Compagnie de Saint Gobain.

P.J. Gillam is Chairman of Asda Group plc and Booker Tate Limited and Deputy Chairman of Standard Chartered plc.

R.C. Hampel is Chief Operating Officer and a director of Imperial Chemical Industries PLC and also a director of British Aerospace Public Limited Company.

Prof. Drs. H. Meij is professor in strategic management at the Free University of Amsterdam.

I.C. Strachan is Deputy Chief Executive and a director of The RTZ Corporation PLC.

**Company Secretary**
K.N. Grant

4

TrustApp0098

# PART I – COMMERCIAL UNION GROUP

### 1.  Description of the Business

Commercial Union is the holding company for the Commercial Union Group, whose principal activity is to transact all classes of general insurance and life assurance business in the United Kingdom, Continental Europe, North America and other territories throughout the world.

In the United Kingdom the Group has a wide spread of general insurance business, which includes fire, motor, liability and London market marine insurance. The Group has a limited exposure to residential mortgage guarantee business and its related problems. In Continental Europe, the Group has a spread of personal and commercial insurance business with the Netherlands as its largest single source of general premium income. In North America, the Group's portfolio comprises a balance of risks, both personal and commercial; the former consists mainly of motor insurance and the latter mainly property and motor insurance. Since August 1992, the Group has increased its interest in National Commercial Union Limited, which writes general insurance business in Australia and New Zealand, from 45.67 per cent. to 78.03 per cent.

The Group's life assurance business, covering individual life policies, pension policies and investment-related products, is carried on in many countries throughout the world but with its principal focus of activity in the UK, the Netherlands and France.

The Group also provides a number of financial services related to its core business of insurance, including unit trust and investment management, banking, stockbroking and private client investment management.

Financial highlights of the Commercial Union Group for the years ended 31 December 1989, 1990 and 1991 are set out below. The status of the financial information relating to the Group in this Part is explained in paragraphs 10(h) and 10(i) on pages 55 and 56.

|  | 1991 £m | 1990 £m | 1989 £m |
|---|---|---|---|
| **PREMIUM INCOME (LIFE)** | | | |
| United Kingdom | 384.1 | 360.9 | 318.5 |
| Continental Europe | 802.0 | 668.0 | 594.5 |
| North America | 174.4 | 133.7 | 109.4 |
| Overseas | 0.9 | 1.0 | 1.1 |
|  | 1,361.4 | 1,163.6 | 1,023.5 |
| **PREMIUM INCOME (GENERAL)** | | | |
| United Kingdom | 1,159.6 | 985.9 | 963.7 |
| Continental Europe | 542.5 | 490.4 | 482.0 |
| North America | 872.0 | 809.8 | 929.1 |
| Overseas | 97.2 | 88.8 | 84.6 |
| Group reinsurance retentions | 74.3 | 57.1 | 41.8 |
|  | 2,745.6 | 2,432.0 | 2,501.2 |
| **PREMIUM INCOME (TOTAL)** | 4,107.0 | 3,595.6 | 3,524.7 |

5

TrustApp0099

|                                      | 1991 £m  | 1990 £m  | 1989 £m  |
|--------------------------------------|----------|----------|----------|
| **Operating results before taxation** |          |          |          |
| Life profits                         | 114.3    | 102.0    | 102.0    |
| Non-life operating result            | (182.9)  | (100.6)  | 48.5     |
| Operating (loss)/profit before taxation | (68.6) | 1.4      | 150.5    |
| Total assets                         | 17,554.4 | 15,739.8 | 15,752.3 |
| Total liabilities and provisions     | 16,344.3 | 14,504.8 | 14,044.0 |
| Shareholders' funds                  | 1,210.1  | 1,235.0  | 1,708.3  |

The appraisal value of the Group's life operations is estimated by the Directors to be in excess of the £1,500m which was disclosed in the Group report and accounts for the year ended 31 December 1989 on the basis of independent actuarial advice; of this amount, £557m was included in shareholders' funds at 31 December 1991.

Loan capital and other loans which appear in the Group consolidated balance sheet amounted to £407.2m at 31 December 1991. £100m 10¾ per cent. Guaranteed Bonds due 2002 were issued by the Company in March 1992 and the proceeds were applied principally in the repayment of short-term debt. Loan capital and other loans amounted to £510m at 30 September 1992.

In May 1992, £100 million Existing New Preference Shares were issued by the Company and the proceeds have been used to support the business of the Group.

### 2.  Current Trading and Prospects

Extracted highlights of Commercial Union Group's results for the nine months to 30 September 1992 results are set out below; the full statement is reproduced in Part VI on pages 57 to 62 of this document.



#### "UNAUDITED RESULTS : 9 MONTHS ENDED 30 SEPTEMBER 1992

| Total premium income | £3,761m | (1991 | £3,089m) |
|----------------------|---------|-------|----------|
| Operating profit before taxation | £6.1m | (1991 | loss £42.4m) |
| Operating loss after taxation | £5.7m | (1991 | loss £42.7m) |
| Operating loss per share | 1.3p | (1991 | loss 9.8p) |

**Tony Brend, Chief Executive**, commenting on the results, said:—

"Sustained progress continues to be made in improving profitability and we achieved a pre-tax profit of £19.6m in the third quarter, compared with a loss of £14.8m in 1991. At the 9 months stage the pre-tax profit amounted to £6.1m."

"The favourable trend reflects the extensive actions we have taken to improve general insurance results. There was a strong improvement in our largest territory the United Kingdom, which has continued to see improved general insurance trading conditions, and there were particularly good increases in profits from the United States and Overseas."

"General insurance premiums increased by 12 per cent. mainly reflecting growth in the United Kingdom where we are obtaining substantial premium rate increases and writing new business on a selective basis."

"Life operations made good progress with worldwide new life premiums increasing by 39 per cent. Life profits made a substantial contribution of £82.0m despite the effect of new

6


TrustApp0100

business growth, which increases shareholders' life profits in the future at some expense to current profits."

"Shareholders' funds increased by £96m in the quarter to £1,301m at the end of September, which does not include the value of a substantial part of our life operations."

## FEATURES OF THE RESULTS WERE:—

| GROUP | 1992 £m | 1991 £m | Underlying increase % |
|---|---|---|---|
| Life premiums | 1,298.2 | 945.5 | 27 |
| General insurance premiums | 2,462.5 | 2,143.7 | 12 |
| Life profits | 82.0 | 80.7 | |
| Non-life operating result | (75.9) | (123.1) | |
| Operating profit/(loss) before taxation | 6.1 | (42.4) | |

- Life premiums increased strongly to £1,298.2m, a 27 per cent. increase after adjusting for changes in rates of exchange. New annual premiums increased by 10 per cent. and single premiums by 46 per cent. There was substantial new business growth in the United Kingdom, following the continuing success of a single premium investment bond and in Continental Europe, where new business benefited from marketing initiatives in the Netherlands and from continuing development in France, Italy and Spain.

- Reported life profits benefited from the strengthening of foreign currencies against sterling, although they were lower in underlying terms, particularly in Continental Europe. This reflected the effect of strong new business growth, which increases shareholders' life profits in the future at some expense to current profits.

### 3.   Reasons for the Placing

In May of this year, the Company raised £99.6m of new capital (net of expenses) by the issue of the Existing New Preference Shares in order to increase its capital base. The Company has continued the expansion of its life assurance business and, selectively, has written additional non-life business thereby taking advantage of significant improvements in premium rates in certain general insurance markets.

In order to enable the Group to continue to take advantage of opportunities in these areas, the Directors have decided to make a second issue of irredeemable preference shares, which they believe will be in the best interests of the Company and its ordinary shareholders.

7

TrustApp0101

## PART II — DESCRIPTION OF THE RIGHTS ATTACHING TO THE FURTHER NEW PREFERENCE SHARES

The following are the rights of the Further New Preference Shares and the limitations and restrictions to which they are subject.

### 1.  Priority

The Further New Preference Shares are to rank in all respects *pari passu* with each other and the Existing New Preference Shares but after the Existing Preference Shares and in priority to the Ordinary Shares.

### 2.  Denomination and Form

The Further New Preference Shares will have a nominal value of £1 each and will be issued at 100p per Further New Preference Share fully paid for cash. The Further New Preference Shares will be in registered form.

Transfers of the Further New Preference Shares must be in writing in the usual common form or in such other form as the Directors may approve. The Directors may, in their absolute discretion, decline to register any transfer of Further New Preference Shares (not being fully paid) on which the Company has a lien or in favour of a transferee of whom it does not approve and may also refuse to register a transfer if:—

(i)  the instrument of transfer is not lodged at the Transfer Office, duly stamped, accompanied by the certificate for the Further New Preference Shares to which it relates, or such other evidence as the Directors may reasonably require to show the right of the transferor to make the transfer or, if executed by some other person on the transferor's behalf, the authority of that person to do so, if not previously deposited with the Company;

(ii)  the transfer is in respect of more than one class of share; or

(iii)  in the case of a transfer to joint holders, the number of joint holders to whom the Further New Preference Shares are to be transferred exceeds four.

### 3.  Income

Out of the profits available for distribution and resolved to be distributed, the holders of the Further New Preference Shares shall be entitled, *pari passu* with the holders of the Existing New Preference Shares and in priority to any payment of dividend to the holders of any other class of shares (other than the Existing Preference Shares in issue at the date hereof), to be paid a fixed cumulative preferential dividend, payable in sterling, at the rate of 8⅜ per cent. per annum of the nominal amount of each Further New Preference Share (exclusive of any associated tax credit) which will be payable in equal half-yearly instalments in arrear on 31 March and 30 September in each year (each a "Dividend Payment Date") and the first dividend instalment will be payable on 31 March 1993 in respect of the period from and including 27 November 1992 up to but excluding 31 March 1993, provided that nothing in this paragraph shall prohibit the payment of a dividend on the shares of any other class in the capital of the Company ranking *pari passu* with or after the Further New Preference Shares at a rate not exceeding 0.1p per share in any calendar year.

If any Dividend Payment Date is not a day on which banks in London are open for business (a "Business Day"), then payment of the dividend otherwise payable on such Dividend Payment Date will be made on the next succeeding Business Day and without any interest or other payment in respect of such delay.

8

TrustApp0102

Dividends payable on the Further New Preference Shares in respect of any period shorter or longer than a full dividend period will be calculated on the basis of a 365 day year and the actual number of days elapsed in such period.

Dividends remaining unclaimed after a period of 12 years from the date when they become due for payment shall be forfeited and shall revert to the Company.

## 4.   Capital

(i)  The Further New Preference Shares will not be redeemable, save with the approval of the holders of the Further New Preference Shares to a variation of the rights attached to such shares (as provided in paragraph 8(iii) below).

(ii)  On a return of capital on a winding up, the holders of the Further New Preference Shares shall be entitled to receive *pari passu* with the holders of the Existing New Preference Shares, out of the surplus assets of the Company remaining after payment of its liabilities and the repayment of the amount to which the holders of the Existing Preference Shares are entitled, an amount per Further New Preference Share equal to whichever is the greater of:—

(a)  the nominal amount of a Further New Preference Share together with any premium paid on issue; and

(b)  the price (rounded to 3 decimal places) at which the gross yield (as reported to the Company by three gilt-edged market makers selected by the Directors on the advice of a member of the Securities and Futures Authority Limited or equivalent regulatory authority) on each Further New Preference Share is equal to the mean gross yield on 3½ per cent. War Loan or such Government stock as the Company, with the advice of a member of the Securities and Futures Authority, may agree to be appropriate, calculated by reference to the average of the middle market quotations (as derived from the Daily Official List of the London Stock Exchange) for that stock on the date of the commencement of the winding up, save that such price shall not exceed a sum equal to twice the nominal amount of a Further New Preference Share,

together with, in either case, all arrears and accruals (if any) of the dividend payable thereon, whether or not such dividend has been earned or has become due and payable, to be calculated up to and including the day of the commencement of the winding up.

(iii)  On a return of capital (otherwise than on a winding up or on a redemption or purchase by the Company of shares of any class), the holders of the Further New Preference Shares shall be entitled to receive an amount per Further New Preference Share equal to the nominal amount of a Further New Preference Share with all arrears and accruals (if any) of the dividend payable thereon, whether or not such dividend has been earned or has become due and payable, to be calculated up to and including the day of the return of capital.

(iv)  The Further New Preference Shares (including all other shares of the Company ranking *pari passu* on a winding up) shall rank on a winding up in priority to all other shares of the Company from time to time in issue (other than the Existing Preference Shares in issue at the date hereof).

(v)  If, upon a return of capital on a winding up or otherwise, the amounts available for payment are insufficient to cover the amounts payable in full on the Further New Preference Shares and any other shares expressed to rank *pari passu* therewith as regards participation in assets, then the holders of the Further New Preference Shares and such other shares will share rateably in the distribution of surplus assets (if any) in proportion to the full respective preferential amount to which they are entitled.

9

## 5.  Voting and General Meetings

(i)  The holders of the Further New Preference Shares shall, by virtue of and in respect of their holdings of Further New Preference Shares, have the right to receive notice of, attend, speak and vote at a general meeting of the Company only:—

   (a)  if and when, at the date of the notice convening such meeting, the preferential dividend on such shares for the dividend payment period immediately prior to the notice convening the relevant meeting is in arrears and it, and any arrears or deficiency of dividend in respect of any preceding dividend payment period, has not been paid in full; or

   (b)  if a resolution is to be proposed abrogating, varying or modifying any of the rights or privileges of the holders of the Further New Preference Shares or for the winding up of the Company or for the reduction of capital of the Company (otherwise than on a redemption or purchase of shares), in which case they shall only be entitled to vote on such resolution.

Save as aforesaid, the Further New Preference Shares shall not confer on the holders thereof the right to receive notice of, attend, speak or vote at any general meeting of the Company.

(ii)  Whenever the holders of the Further New Preference Shares are entitled to vote at a general meeting of the Company upon any resolution proposed at such a general meeting, on a show of hands every holder thereof who is present in person or (being a corporation) is present by a representative duly authorised under section 375 of the Companies Act 1985 shall have one vote and on a poll every holder thereof who is present in person or by proxy or (being a corporation) by a duly authorised representative shall have one vote in respect of each complete 25p nominal amount of Further New Preference Shares registered in the name of such holder.

## 6.  Limitations

No Further New Preference Share shall:—

(i)  confer any right to participate in the profits or assets of the Company other than as set out in paragraphs 3 and 4 above;

(ii)  subject to the Statutes, confer any right to participate in any offer or invitation by way of rights or otherwise to subscribe for additional shares in the Company;

(iii)  confer any right of conversion; or

(iv)  confer any right to participate in any issue of bonus shares.

## 7.  Purchase

(i)  Subject to the provisions of the Statutes, the rules of any relevant authority and as provided in paragraph 9 below, the Company may at any time purchase any Further New Preference Shares upon such terms as the Directors shall determine.

(ii)  Upon the purchase of any Further New Preference Shares the nominal amount of such shares comprised in the capital of the Company may thereafter be divided into, and reclassified as, Ordinary Shares without any further resolution or consent.

10

TrustApp0104

## 8. Further Issues and Variation of Rights

(i) Save with such consent or sanction on the part of the holders of the Further New Preference Shares as is required for a variation of the special rights attaching to such shares, the Directors shall not authorise or create, or increase the amount of, any shares of any class or any securities convertible into any shares of any class ranking as regards participation in the profits or assets of the Company (otherwise than on redemption or purchase by the Company of any such share) in priority to the Further New Preference Shares.

(ii) The special rights attaching to the Further New Preference Shares shall not be deemed to be varied by the purchase or redemption of any shares of the Company or by the allotment or issue of any further preference shares (in this paragraph called "Further Preference Shares") ranking as regards participation in the profits and assets of the Company *pari passu* with (but not in priority to) the Further New Preference Shares, provided that, at the date of the allotment of the Further Preference Shares (the "Relevant Date"), the aggregate of the nominal amount (together with any premium paid or payable on issue) (i) of the Further New Preference Shares and (ii) of any other shares ranking *pari passu* with or in priority to the Further New Preference Shares allotted or in issue on the Relevant Date and, immediately following such issue, of the Further Preference Shares would not exceed a sum equal to one quarter of the Share Capital and Consolidated Reserves. Any such Further Preference Shares may either carry rights and restrictions as regards participation in the profits and assets of the Group which are identical in all respects with the Further New Preference Shares or with any other series of Further Preference Shares or rights and restrictions differing therefrom in any respect including (but without prejudice to the generality of the foregoing):—

(a) the rate of and/or the basis of calculation of dividend may differ and may be cumulative or non cumulative;

(b) the Further Preference Shares may rank for dividend from such date as may be provided by the terms of issue thereof and the dates for payment of dividend may differ;

(c) a premium may be payable on a return of capital or there may be no such premium;

(d) the Further Preference Shares may be redeemable on such terms and conditions as may be prescribed by the terms of the issue thereof or may be non-redeemable;

(e) the Further Preference Shares may be convertible into Ordinary Shares or any other class of shares ranking as regards participation in the profits and assets of the Company *pari passu* with or after the Further New Preference Shares in each case on such terms and conditions as may be determined by the terms of issue thereof.

(iii) The rights attached to the Further New Preference Shares may be varied or abrogated with the written consent of the holders of three-quarters in nominal value of the Further New Preference Shares and any shares hereafter issued of the same class then in issue or with the sanction of an extraordinary resolution passed at a class meeting of holders of such shares.

11

TrustApp0105

## 9. Restrictions on the Company

Save with such consent or sanction on the part of the holders of the Further New Preference Shares as is required for a variation of the special rights attached to such shares, the Directors shall not capitalise any part of the profits of the Company available for distribution or purchase or redeem any shares of the Company if either (i) the preferential dividend on the Further New Preference Shares for the dividend payment period immediately prior to the date of the proposed capitalisation, purchase or redemption is in arrears and it, and any arrears or deficiency of dividend in respect of any preceding dividend payment periods, have not been paid in full or (ii) after such capitalisation, purchase or redemption the amount of the profits of the Company available for distribution would be less than ten times the aggregate amount of the annual dividends (exclusive of any associated tax credit) payable on the Further New Preference Shares and any other preference shares then in issue ranking as regards dividends *pari passu* with or in priority to the Further New Preference Shares.

*In addition to the definitions set out on page 3 of this document, words and expressions defined in, or for the purposes of, the Articles of Association of the Company shall bear the same meanings in this Part II. In the event of any conflict between the definitions used in the Articles of Association and those set out on page 3 of this document, the latter shall prevail.*

TrustApp0106

# PART III – FINANCIAL INFORMATION

The following summarises the financial information of the Group for the periods indicated. The information is extracted in all material respects from the published audited consolidated financial statements of the Group for the three years ended 31 December 1991, including the accounting policies described below and the notes on the Group's consolidated accounts for the year ended 31 December 1991. However, the Statements of Source and Application of Funds as reported in the Group accounts for the years ended 31 December 1990 and 1989 have been restated to conform with the basis of presentation adopted for the year ended 31 December 1991.

Commercial Union acquired the whole of the issued share capital of Commercial Union Assurance Company plc in exchange for shares in the Company under a Scheme of Arrangement which became effective on 1 June 1990. The figures for 1989 are for Commercial Union Assurance Company plc and its subsidiaries.

The status of the financial information relating to the Group contained in this part is explained in paragraphs 10(h) and 10(i) on pages 55 and 56.

| PROFIT AND LOSS ACCOUNT | 1991 £m | Year ended 31 December 1990 £m | Consolidated 1989 £m |
|---|---|---|---|
| Investment income net of loan interest (F & 17G) | 271.6 | 243.5 | 276.8 |
| Underwriting result (2) | (462.6) | (344.8) | (245.0) |
| Life profits (G & 5) | 114.3 | 102.0 | 102.0 |
| Associated undertakings' earnings (N) | 8.1 | 0.7 | 16.7 |
| Operating (loss)/profit before taxation (11) | (68.6) | 1.4 | 150.5 |
| Taxation (Q & 8A) | 4.2 | 0.6 | (57.1) |
| Minorities | (0.9) | (0.6) | (1.4) |
| Operating (loss)/profit after taxation (A) | (65.3) | 1.4 | 92.0 |
| Realised investment gains (16) | 49.8 | 20.8 | 81.9 |
| (Loss)/profit attributable to shareholders | (15.5) | 22.2 | 173.9 |
| Dividends (10) | (104.8) | (98.6) | (91.5) |
| Reserve transfer (15) | (120.3) | (76.4) | 82.4 |
| EARNINGS/(LOSS) PER ORDINARY SHARE (39B) | | | |
| Operating (loss)/profit after taxation | (15.00)p | 0.30p | 21.70p |
| (Loss)/profit attributable to shareholders | (3.60)p | 5.20p | 41.10p |
| DIVIDENDS | 23.65p | 23.00p | 21.50p |

*The accounting policies and notes set out on pages 18 to 36 are an integral part of the financial information.*

13

| MOVEMENTS IN SHARE-HOLDERS' FUNDS | £m | 1991 £m | £m | 1990 £m | £m | Consolidated Year ended 31 December 1989 £m |
|---|---|---|---|---|---|---|
| Operating (loss)/profit after taxation | | (65.3) | | 1.4 | | 92.0 |
| Total investment gains less losses after taxation | | | | | | |
|   Realised | 49.8 | | 20.8 | | 81.9 | |
|   Unrealised (16) | 46.7 | | (255.9) | | 220.3 | |
| | | 96.5 | | (235.1) | | 302.2 |
| Foreign exchange gains less losses (15) | | 33.8 | | (146.7) | | 151.1 |
| Adjustments arising on acquisition and disposal of subsidiaries and related items (15) | | (24.0) | | (6.2) | | (7.2) |
| Taxation adjustments | | — | | — | | (27.4) |
| Dividends (10) | | (104.8) | | (98.6) | | (91.5) |
| Shares in lieu of dividends (15) | | 2.5 | | — | | 10.7 |
| Increase in capital (27C) | | 36.4 | | 11.9 | | 9.0 |
| Movements in shareholders' funds | | (24.9) | | (473.3) | | 438.9 |
| Balance at 1 January | | 1,235.0 | | 1,708.3 | | 1,269.4 |
| Balance at 31 December | | 1,210.1 | | 1,235.0 | | 1,708.3 |

*The accounting policies and notes set out on pages 18 to 36 are an integral part of the financial information.*

14

TrustApp0108

## BALANCE SHEET

|  | 1991 £m | 1990 £m | Consolidated At 31 December 1989 £m |
|---|---|---|---|
| **SHAREHOLDERS' FUNDS** | | | |
| Share capital (12) | 111.8 | 109.1 | 108.4 |
| Share premium (13) | 40.6 | 6.9 | 197.1 |
| Capital reserve (14) | 201.4 | 201.4 | — |
| Retained profits and reserves (A & 15) | 333.4 | 441.4 | 670.7 |
| Unrealised gains on investments after taxation (A & 16) | 432.9 | 386.2 | 642.1 |
| Interest in Northern Non-Participation Life fund (P) | 90.0 | 90.0 | 90.0 |
| | 1,210.1 | 1,235.0 | 1,708.3 |
| **REPRESENTED BY:** | | | |
| **INVESTMENTS** | | | |
| Government securities | 1,477.3 | 1,252.7 | 1,792.4 |
| Debentures | 637.1 | 585.1 | 423.2 |
| Preference shares | 36.2 | 37.0 | 60.9 |
| Ordinary shares | 1,119.7 | 1,035.7 | 1,238.7 |
| Cash deposits | 309.1 | 274.2 | 221.5 |
| Property | 365.9 | 395.9 | 387.7 |
| Mortgages and loans | 418.5 | 495.3 | 495.1 |
| Total investments (J, K & 17) | 4,363.8 | 4,075.9 | 4,619.5 |
| LIFE ASSETS | 11,055.3 | 9,802.1 | 9,269.1 |
| Valuation of Northern Non-Participation Life fund (P) | 90.0 | 90.0 | 90.0 |
| **OTHER ASSETS** | | | |
| Associated undertakings (N & 19) | 109.2 | 116.6 | 118.5 |
| Agents, companies and sundry assets (D & 20) | 1,936.3 | 1,655.2 | 1,655.2 |
| **TOTAL ASSETS** | 17,554.4 | 15,739.8 | 15,752.3 |
| **LESS:** | | | |
| **LIABILITIES AND PROVISIONS** | | | |
| GENERAL INSURANCE UNDERWRITING | | | |
| Outstanding claims and provisions (C & 21) | 3,157.6 | 2,825.4 | 2,840.6 |
| Unearned premiums (B, E & 22) | 1,079.3 | 983.3 | 992.9 |
| Total general insurance underwriting | 4,236.9 | 3,808.7 | 3,833.5 |
| LIFE LIABILITIES AND RESERVES | 10,587.6 | 9,396.0 | 8,874.6 |
| OTHER LIABILITIES | | | |
| Loan capital and other loans (L & 23) | 407.2 | 414.5 | 430.7 |
| Agents, companies and sundry liabilities (24) | 1,112.6 | 885.6 | 905.2 |
| **TOTAL LIABILITIES AND PROVISIONS** | 16,344.3 | 14,504.8 | 14,044.0 |
| | 1,210.1 | 1,235.0 | 1,708.3 |

*The accounting policies and notes set out on pages 18 to 36 are an integral part of the financial information.*

15

TrustApp0109

## CASH FLOW STATEMENT

| | £m | 1991 £m | £m | 1990 £m | Consolidated Year ended 31 December £m | 1989 £m |
|---|---|---|---|---|---|---|
| **OPERATING ACTIVITIES** | | | | | | |
| Net cash inflow from operating activities (27A) | | 192.7 | | 259.8 | | 358.5 |
| **SERVICING OF FINANCE** | | | | | | |
| Interest paid | (32.1) | | (33.2) | | (45.5) | |
| Dividends paid | (99.0) | | (95.5) | | (73.4) | |
| Net cash outflow from servicing of finance | | (131.1) | | (128.7) | | (118.9) |
| **TAXATION** | | | | | | |
| Corporation tax paid (including advance corporation tax) | | (30.5) | | (39.6) | | (79.7) |
| **INVESTING ACTIVITIES** | | | | | | |
| (Purchases) less sales of investments, excluding cash deposits (27B) | | | | | | |
| Government securities | (122.1) | | 294.9 | | (100.5) | |
| Debentures | 8.2 | | (217.8) | | (96.8) | |
| Preference shares | 2.5 | | 5.1 | | 20.3 | |
| Ordinary shares | 40.3 | | (65.5) | | (23.9) | |
| Property | 1.9 | | (15.5) | | (10.6) | |
| Mortgages and loans | 83.7 | | (21.7) | | (54.7) | |
| | 14.5 | | (20.5) | | (266.2) | |
| Acquisitions and disposals of subsidiaries and related items | (22.9) | | (12.9) | | (11.4) | |
| Net cash outflow from investing activities | | (8.4) | | (33.4) | | (277.6) |
| Net cash inflow/(outflow) before financing activities | | 22.7 | | 58.1 | | (117.7) |
| **FINANCING ACTIVITIES** | | | | | | |
| Issue of ordinary share capital (27C) | 36.4 | | 11.9 | | 9.0 | |
| Net (decrease)/increase in loan capital and other loans (27C) | (26.1) | | (5.5) | | 42.1 | |
| Net cash inflow from financing activities | | 10.3 | | 6.4 | | 51.1 |
| Increase in cash and cash equivalents (27D) | | 33.0 | | 64.5 | | (66.6) |

*The accounting policies and notes set out on pages 18 to 36 are an integral part of the financial information.*

16

TrustApp0110

## LIFE BALANCE SHEET

| | 1991 £m | 1990 £m | Consolidated At 31 December 1989 £m |
|---|---|---|---|
| LIFE FUNDS (G, 5A & 25) | 9,624.9 | 8,478.7 | 8,162.4 |
| OTHER LIABILITIES | | | |
| Outstanding claims and provisions | 58.4 | 47.9 | 41.9 |
| Agents and companies | 622.6 | 574.9 | 502.6 |
| Loans (23) | 281.7 | 294.5 | 167.7 |
| TOTAL LIFE LIABILITIES AND RESERVES | 10,587.6 | 9,396.0 | 8,874.6 |
| Shareholders' funds in life companies | 467.5 | 406.1 | 394.5 |
| TOTAL LIFE LIABILITIES AND SHAREHOLDERS' FUNDS | 11,055.1 | 9,802.1 | 9,269.1 |
| REPRESENTED BY: | | | |
| INVESTMENTS | | | |
| Government securities | 1,835.3 | 1,503.3 | 1,178.1 |
| Debentures | 1,293.1 | 893.8 | 1,008.6 |
| Preference shares | 99.2 | 17.2 | 23.3 |
| Ordinary shares | 2,916.2 | 2,559.7 | 2,993.5 |
| Cash deposits | 311.8 | 351.7 | 161.3 |
| Property | 1,657.0 | 1,451.7 | 1,375.6 |
| Mortgages and loans | 3,764.6 | 3,698.4 | 3,863.0 |
| Total investments (J, K, 17 & 25) | 11,877.2 | 10,475.8 | 10,603.4 |
| Investment reserves (J) | (1,510.1) | (1,257.2) | (1,799.4) |
| Value of investments after investment reserves | 10,367.1 | 9,218.6 | 8,804.0 |
| OTHER ASSETS | | | |
| Agents and companies | 620.8 | 554.6 | 448.6 |
| Bank balances | 67.2 | 28.9 | 16.5 |
| TOTAL LIFE ASSETS | 11,055.1 | 9,802.1 | 9,269.1 |

## MOVEMENTS IN LIFE FUNDS

| | 1991 £m | Year ended 31 December 1990 £m | Consolidated 31 December 1989 £m |
|---|---|---|---|
| Total life funds at 1 January | 8,478.7 | 8,162.4 | 6,493.0 |
| Adjustments to opening funds (29C) | 108.2 | (348.2) | 699.9 |
| | 8,586.9 | 7,814.2 | 7,192.9 |
| Net premiums | 1,361.4 | 1,163.6 | 1,023.5 |
| Investment income net of loan interest (17H) | 773.3 | 685.8 | 668.5 |
| Transfer from investment reserves (J) | 210.9 | 6.6 | 328.7 |
| | 10,932.5 | 9,670.2 | 9,213.6 |
| Claims, surrenders and annuities (4) | (876.4) | (814.1) | (706.5) |
| Commission and expenses (29C) | (316.7) | (261.2) | (245.3) |
| Taxation (Q & 8C) | (30.1) | (42.0) | (30.1) |
| Shareholders' profits after taxation (G, 5 & 8A) | (84.4) | (74.2) | (69.3) |
| Total life funds at 31 December | 9,624.9 | 8,478.7 | 8,162.4 |

*The accounting policies and notes set out on pages 18 to 36 are an integral part of the financial information.*

17

TrustApp0111

## Accounting Policies

### A. Basis of Results

The consolidated accounts have been prepared in accordance with section 255A of, and the special provisions relating to insurance companies of schedule 9 to, the Companies Act 1985 and with the statement of recommended practice on accounting for insurance business issued by the Association of British Insurers. The accounting policies adopted reflect United Kingdom financial reporting standards and statements of standard accounting practice as considered appropriate for an insurance company.

The profit and loss account reflects all non-life income and expenditure (together with life profits due to shareholders), other than items charged to provisions set up in earlier years and the following items which are taken directly to reserves after taxation:

— unrealised gains and losses on investments;

— gains and losses on movements in rates of exchange;

— adjustments arising on acquisition or disposal of subsidiaries and agencies, including goodwill.

The general insurance underwriting result is determined on an annual basis with the following exceptions:

— London market business in respect of marine and aviation and non-marine non-proportional reinsurance which is accounted for on a three-year fund basis, with the result being determined at the end of the third year;

— London market non-marine proportional reinsurance business which is accounted for on a deferred annual basis, with the result being determined at the end of the second year.

Income and expenditure of life operations is reflected in the movements in life funds except for:

— realised and unrealised investment gains and losses, together with certain other items, which are taken directly to investment reserves. Transfers from these reserves are credited to the movements in life funds on the advice on the Group Actuary;

— acquisition costs which have been deferred in certain overseas life funds, in accordance with local practice.

### B. Premiums

General insurance premiums written reflect business incepted during the year, with the exception of London market marine and aviation, and non-marine proportional and non-proportional reinsurance business which are accounted for when receivable. Life premiums are accounted for when payment falls due, except for investment-linked premiums which are accounted for when received.

General insurance unearned premiums are those proportions of the premiums written in a year that relate to the periods of risk subsequent to the balance sheet date. They are computed principally on either the daily or monthly pro-rata basis.

### C. Claims

General insurance claims incurred comprise all claims occurring during the year, whether reported or not, together with related administrative expenses, and any adjustments to claims outstanding from previous years. Where applicable, deductions are made for salvage

18

and other recoveries. Significant delays are experienced in the notification of certain general insurance claims, particularly in respect of liability and marine business, the ultimate cost of which cannot be known with certainty at the balance sheet date. Life claims reflect the cost of all claims arising during the year.

Outstanding claims and provisions as shown in the consolidated balance sheet are based upon the estimated ultimate cost of all claims incurred but not settled at the date of the balance sheet, whether reported or not, together with related administrative expenses, subject to certain claims which are discounted. This discounting applies in the United States to some workers' compensation claims and, in the Netherlands, to permanent health and injury claims in accordance with industry practice in those countries. Additionally, within the United States, claims provisions in respect of certain discontinued business are determined after taking account of the estimated future investment earnings from matched assets. Outstanding claims and provisions also include the funds in respect of London market marine and aviation and non-marine reinsurance business.

## D.  Deferred Acquisition Costs

Deferred acquisition costs, which are included in agents, companies and sundry assets in the consolidated balance sheet, represent a proportion of commission and other acquisition costs.

## E.  Unexpired Risks

Provision is made for any overall excess of expected claims and deferred acquisition costs over unearned premiums, after taking account of investment income on the relevant general insurance provisions.

## F.  Investment Income

Investment income comprises interest, dividends and rents receivable for the year, after adding back any related tax credit. Interest includes the interest rate differential on forward foreign exchange contracts. No depreciation charge is made in respect of investment property occupied by the Group since such property represents an immaterial proportion of total assets.

## G.  Life Profits and Fund Valuations

Life profits accrue to the Group as a result of annual actuarial valuations of the life funds, which are based on local practice, subject to movements to or from investment reserves made on the advice of the Group Actuary. The profits included in the profit and loss account are stated before taxation, with the related taxation being included in the taxation charge. Within the movements in life funds, the profits are stated after taxation.

## H.  Pension Costs

The Group operates defined-benefit pension schemes covering the majority of employees and contributions are made on a going-concern basis as recommended by actuaries. Where separate pension schemes exist, they are fully funded on a discontinuance actuarial valuation basis. The pension costs, which are included in expenses, are calculated on actuarial valuation methods which give a substantially even charge over the expected service lives of employees.

## I.  Fixed Assets

In the consolidated balance sheet fixed assets, including motor cars and computer equipment, are capitalised and depreciated over the estimated length of their useful lives. The depreciation charge for the year is included in expenses.

19

TrustApp0113

### J.   Investments

Investments are stated at their market values at the end of the year which comprise, for this purpose, stock exchange values for listed securities, directors' valuations for unlisted securities, and redemption values for mortgages and loans. Properties are valued by the directors, acting on advice from qualified members of staff, at open market value with the exception of trading properties, which are included at the lower of cost or directors' valuation.

In the life balance sheet, realised and unrealised investment gains and losses, together with certain other items, are included in the investment reserve, which is deducted from total investments. In addition, movements in investment values for unit-linked operations, where policyholders' benefits are determined by investment performance, are reflected in transfers to or from the investment reserve. Other such transfers are made on the advice of the Group Actuary.

### K.   Financial Instruments

The Group makes use of financial instruments, including forward foreign exchange contracts, interest rate swaps, futures and options, in order to hedge its exposure to movements in exchange rates, interest rates and investment values. The interest rate differential reflected in forward foreign exchange contracts is included in investment income while the effect of currency movements on these contracts is taken direct to reserves. Interest rate swaps are accounted for on an accruals basis with interest paid and received being offset within loan interest. Futures contracts are valued at market value and shown in the balance sheet under the category of investments to which the contracts relate. Purchased options on open contracts are included at market value in the balance sheet under the relevant investment category.

### L.   Loan Capital and Other Loans

Borrowings issued at a discount are included in the consolidated balance sheet at their issue price together with amortised discount to the balance sheet date. The discount, amortised on a compound basis, has been charged to loan interest in the profit and loss account.

### M.   Consolidation of Subsidiary Undertakings

The results of certain subsidiaries, each of which is immaterial, are consolidated on the basis of audited accounts prepared to dates before 31 December 1991. A number of overseas subsidiaries, which do not represent a material part of the Group's income or assets, have not been consolidated but have been treated as investments.

### N.   Associated Undertakings

Companies in which the Group has an equity interest in excess of 20% and not more than 50% and where significant influence is exercised are classified as associated undertakings. Within the consolidated profit and loss account, the appropriate proportion of the operating profit or loss before taxation of these companies is shown as 'associated undertakings' earnings' and that of realised investment gains within that heading. The appropriate proportion of shareholders' funds is included in the consolidated balance sheet at net asset value. A number of associated undertakings, which do not represent a material part of the Group's income or assets, have been treated as investments.

### O.   Goodwill

Goodwill arising on acquisition of subsidiaries and agencies is written off directly to reserves.

20

TrustApp0114

### P.   Value of Northern Non-Participation Life Fund

The value of the shareholders' interest in the existing business of the Northern Non-Participation Life fund, after taking account of taxation, is included in the consolidated balance sheet at the directors' valuation based on the advice of the Group Actuary. No embedded value has been included for other Group life funds, which the directors know to be of substantial value to shareholders.

### Q.   Taxation

The taxation charge in the profit and loss account is based on the taxable profits for the year and includes the amount of taxation attributable to the shareholders' proportion of life profits. In the movements in life funds, the taxation charge is based on the method of assessing taxation for life funds applicable in the relevant territory of operation. Provision is only made for deferred taxation where it is expected that a liability will crystallise in the foreseeable future. No provision is made for taxation that might arise if profits retained by overseas subsidiary and associated undertakings were remitted to the United Kingdom.

### R.   Exchange Rates

Assets, liabilities and revenue transactions in non-sterling currencies are translated into sterling at the relevant rates of exchange ruling at 31 December. The resulting exchange differences are taken direct to reserves.

21

TrustApp0115

## NOTES ON THE ACCOUNTS

### 1.  EXCHANGE RATES

Principal rates of exchange used for translation are:

|  | 1991 | 1990 |
|---|---|---|
| Netherlands | Fls 3.20 | Fls 3.26 |
| United States | $1.87 | $1.93 |
| Canada | C$2.16 | C$2.24 |

### 2.  UNDERWRITING RESULT

The analysis of the general insurance underwriting result is:

|  | £m | 1991 £m | £m | 1990 £m |
|---|---|---|---|---|
| Gross premiums written (B) | | 3,352.4 | | 2,981.7 |
| Outward reinsurance | | (606.8) | | (549.7) |
| Net premiums written | | 2,745.6 | | 2,432.0 |
| Transfer to unearned premiums (B) | | (99.2) | | (70.9) |
| Net premiums earned | | 2,646.4 | | 2,361.1 |
| Gross claims incurred (C) | (2,915.7) | | (2,629.6) | |
| Outward reinsurance | 671.1 | | 717.5 | |
| Net claims incurred | (2,244.6) | | (1,912.1) | |
| Commission | (499.0) | | (435.6) | |
| Expenses | (387.8) | | (379.8) | |
| Transfer to deferred acquisition costs (D) | 22.4 | | 21.6 | |
| | | (3,109.0) | | (2,705.9) |
| Underwriting result (A) | | (462.6) | | (344.8) |

### 3.  GROSS PREMIUMS

(A) The analysis of gross premiums by business segment and class of insurance business is:

|  | 1991 £m | 1990 £m |
|---|---|---|
| **GENERAL** | | |
| Gross premiums written | | |
| Fire | 978.3 | 858.4 |
| Motor | 967.3 | 890.1 |
| Other accident | 885.6 | 810.0 |
| Marine, aviation and transport | 521.2 | 423.2 |
| | 3,352.4 | 2,981.7 |

22

TrustApp0116

Notes on the Accounts

### 3. GROSS PREMIUMS *continued*

| | New business | | | | Total premiums written | |
| | Annualised regular premiums | | Single premiums | | | |
| LIFE | 1991 £m | 1990 £m | 1991 £m | 1990 £m | 1991 £m | 1990 £m |
|---|---|---|---|---|---|---|
| Gross premium written | | | | | | |
| Life | | | | | | |
| — non-linked | 92.4 | 83.8 | 194.7 | 203.2 | 743.6 | 695.3 |
| — linked | 20.3 | 25.5 | 149.2 | 66.2 | 208.7 | 112.2 |
| Annuity: | | | | | | |
| — non-linked | 33.5 | 29.2 | 269.0 | 211.7 | 490.7 | 407.9 |
| — linked | 0.1 | 0.3 | 2.3 | 2.3 | 2.4 | 2.8 |
| Permanent health | 1.9 | 2.0 | 0.2 | — | 11.7 | 9.7 |
| Pension funds management | 2.1 | 1.4 | 2.1 | 12.9 | 10.7 | 19.8 |
| | 150.3 | 142.2 | 617.5 | 496.3 | 1,467.8 | 1,247.7 |

| (B) Life and general premium income by territory of origin is: | 1991 £m | 1990 £m |
|---|---|---|
| United Kingdom | 1,919.4 | 1,659.5 |
| Continental Europe | 1,487.7 | 1,270.3 |
| North America | 1,257.3 | 1,159.9 |
| Overseas | 155.8 | 139.7 |
| | 4,820.2 | 4,229.4 |

(C) It is the nature of commercial insurance business that the risk covered may not be located where it is underwritten. In respect of most of the Group's insurance business, the risk is underwritten where it is located and, therefore, turnover by destination does not differ materially from turnover by origin.

### 4. LIFE CLAIMS, SURRENDERS AND ANNUITIES

Within the movements in life funds, claims, surrenders and annuities comprise:

| | 1991 £m | 1990 £m |
|---|---|---|
| Gross claims, surrenders and annuities | 913.4 | 839.3 |
| Outward reinsurance | (37.0) | (25.2) |
| | 876.4 | 814.1 |

### 5. SHAREHOLDERS' LIFE PROFITS

(A) The Group underwrites life business in many territories through a number of funds as follows:

(i) Commercial Union Life fund, where the 'with profits' policyholders are entitled to at least 90% of the distributed profits, the shareholders receiving the balance.

(ii) Life funds of Delta Lloyd, where the profits, after providing for certain specific prior rights of the policyholders, accrue for the benefit of the shareholders. The bases for determining the prior rights of the policyholders are complex, but are based on criteria which are followed generally in the Netherlands.

(iii) Northern Non-Participation Life fund, where shareholders are entitled to 100% of the distributed profits. New business mainly comprises linked policies where shareholders' profits are derived largely from a management fee and policyholders' benefits are determined by investment performance.

(iv) Other funds in the United Kingdom and overseas which are similar to the above bases.

23

TrustApp0117

**Notes on the Accounts**

### 5. SHAREHOLDERS' LIFE PROFITS  *continued*

(B) Shareholders' profits, before taxation, from life business for the year released to the profit and loss account are:

| | £m | 1991 £m | £m | 1990 £m |
|---|---|---|---|---|
| United Kingdom | | | | |
| Commercial Union Life | | | | |
| — annual | 22.6 | | 20.5 | |
| — special bonus | 3.3 | | — | |
| Northern Non-Participation Life | 16.0 | | 16.0 | |
| Other life | 3.5 | | 2.4 | |
| | | 45.4 | | 38.9 |
| Continental Europe | | | | |
| Delta Lloyd Life | 59.1 | | 55.5 | |
| Other life | 2.8 | | 3.9 | |
| | | 61.9 | | 59.4 |
| North America | | 7.0 | | 3.7 |
| | | 114.3 | | 102.0 |

### 6. DIRECTORS' EMOLUMENTS

| (A) Total emoluments are: | 1991 £ | 1990 £ |
|---|---|---|
| In respect of services as directors | 141,460 | 152,457 |
| Other emoluments (including pension contributions on behalf of executive directors) | 660,607 | 718,489 |
| | 802,067 | 870,946 |

| (B) The emoluments of the individual directors (including the Chairman and highest paid director) fall within the following ranges: | 1991 No. | 1990 No. |
|---|---|---|
| £5,001 – £10,000 | 4 | — |
| £10,001 – £15,000 | 2 | 4 |
| £20,001 – £25,000 | 1 | 2 |
| £50,001 – £55,000 | — | 1 |
| £60,001 – £65,000 | 1 | — |
| £185,001 – £190,000 | 1 | — |
| £190,001 – £195,000 | 1 | 1 |
| £195,001 – £200,000 | — | 1 |
| £245,001 – £250,000 | 1 | — |
| £270,001 – £275,000 | — | 1 |

The emoluments in the table above exclude pension contributions. No performance-related earnings were payable during 1991.

| (C) Chairman's emoluments and highest paid director: | 1991 £ | 1990 £ |
|---|---|---|
| N. H. Baring *(1990 from 17 April 1990)* | 63,622 | 46,904 |
| A. B. Marshall *(1990 to 17 April 1990)* | — | 23,293 |
| Highest paid director | 248,629 | 274,214 |

TrustApp0118

Notes on the Accounts

## 7. AUDITOR'S REMUNERATION

Total remuneration for 1991 of the auditor is £1.434m *(1990 £1.334m)*, of which £0.003m *(1990 £0.003m)* relates to the Company.

## 8. TAXATION

### (A) Profit and loss account

United Kingdom and overseas taxation charged in the profit and loss account comprises:

| | 1991 £m | 1990 £m |
|---|---|---|
| United Kingdom corporation tax at 33.25% (1990 35%) based on taxable profits for the year | (6.6) | (5.0) |
| Tax credit on United Kingdom dividends received | 3.8 | 4.0 |
| Overseas taxation | 15.6 | 12.3 |
| Relief for overseas taxation | — | (13.6) |
| Taxation attributable to shareholders' life profits | 29.9 | 27.8 |
| Associated undertakings | 2.7 | 1.4 |
| | 45.4 | 26.9 |
| Credited to operating result | (4.2) | (0.6) |
| Charged to realised investment gains | 49.6 | 27.5 |
| | 45.4 | 26.9 |

The charge of £45.4m *(1990 £26.9m)* includes deferred taxation relief of £3.8m *(1990 relief £10.1m)* arising from short-term timing differences.

### (B) Balance sheets

The provision for deferred taxation (excluding amounts relating to life business which are given in paragraph (C)), included within agents, companies and sundry liabilities comprises:

| | 1991 £m | Consolidated 1990 £m |
|---|---|---|
| Unrealised gains on investments | 31.8 | 29.1 |
| Provisions and other timing differences | 49.0 | 56.6 |
| Advance corporation tax recoverable | (21.1) | (20.0) |
| | 59.7 | 65.7 |

The potential amount of taxation (excluding amounts relating to life business which are given in paragraph (C)) not expected to become a liability in the foreseeable future, for which provision has not been made, is:

| | 1991 £m | Consolidated 1990 £m |
|---|---|---|
| Unrealised gains on investments | 43.9 | 100.7 |
| Provisions and other timing differences less tax losses carried forward | 52.2 | 9.3 |
| | 96.1 | 110.0 |

### (C) Life

United Kingdom and overseas taxation, charged in the movements in life funds comprises:

| | 1991 £m | 1990 £m |
|---|---|---|
| United Kingdom corporation tax based on profits and income for the year | 9.3 | 11.6 |
| Tax credit on United Kingdom dividends received (net of available reliefs) | 2.8 | 12.8 |
| Overseas taxation | 18.0 | 17.6 |
| | 30.1 | 42.0 |

25

TrustApp0119

Notes on the Accounts

### 8. TAXATION *continued*

The charge of £30.1m *(1990 £42.0m)* includes deferred taxation relief of £4.9m *(1990 relief £11.0m)* arising from short-term timing differences.

The potential amount of taxation, arising on that proportion of unrealised gains on investments, net of investment reserve and other timing differences reflected in these accounts, is £87.0m *(1990 £179.0m)*. No provision is made for this amount in the life balance sheet, except in the case of unit-linked funds, since it is not expected to become a liability in the foreseeable future.

### 9. PARENT COMPANY

The profit attributable to shareholders dealt with in the profit and loss account of Commercial Union for the year ended 31 December 1991, including dividends paid or proposed by subsidiaries, is £102.8m *(1990 £158.2m)*. As permitted by section 230 of the Companies Act 1985, the profit and loss account of the Company has not been included in these accounts.

### 10. DIVIDENDS

| Dividends in the profit and loss account comprise: | 1991 £m | 1990 £m |
|---|---|---|
| Preference | 0.1 | 0.1 |
| Ordinary | | |
| Interim – 9.25p *(1990 9.00p)* | 40.7 | 38.5 |
| Final – 14.40p *(1990 14.00p)* | 63.3 | 60.0 |
| 1990 Final dividend on new shares | 0.7 | — |
| | 104.8 | 98.6 |

### 11. SEGMENTAL INFORMATION ON PROFITS AND NET ASSETS

| (A) The operating (loss)/profit before taxation and net assets by business segment are: | Operating (loss)/profit before taxation | | Net assets | |
|---|---|---|---|---|
| | 1991 £m | 1990 £m | 1991 £m | 1990 £m |
| Life | 114.3 | 102.0 | 557.5 | 496.1 |
| General insurance and non-insurance | (93.9) | (40.8) | 1,724.7 | 1,464.3 |
| Unallocated liabilities (dividends and tax) | — | — | (149.7) | (126.9) |
| Central financing | (89.0) | (59.8) | (922.4) | (598.5) |
| | (68.6) | 1.4 | 1,210.1 | 1,235.0 |

| (B) The operating (loss)/profit before taxation and net assets by territory are: | Operating (loss)/profit before taxation | | Net assets | |
|---|---|---|---|---|
| | 1991 £m | 1990 £m | 1991 £m | 1990 £m |
| United Kingdom | (39.7) | 2.3 | 678.1 | 551.0 |
| Continental Europe | 34.7 | 43.7 | 785.7 | 775.8 |
| North America | 40.0 | 22.5 | 703.0 | 525.7 |
| Overseas | 7.1 | 1.9 | 104.3 | 96.8 |
| Group reinsurance retentions | (21.7) | (9.2) | 11.1 | 11.1 |
| Unallocated liabilities (dividends and tax) | — | — | (149.7) | (126.9) |
| Central financing | (89.0) | (59.8) | (922.4) | (598.5) |
| | (68.6) | 1.4 | 1,210.1 | 1,235.0 |

TrustApp0120

Notes on the Accounts

**11. SEGMENTAL INFORMATION ON PROFITS AND NET ASSETS** *continued*

    Group reinsurance retentions consist of certain reinsurance covers which are retained at Group level rather than being placed in external markets. Central financing comprises external and intra-group borrowings which are not allocated to territories.

**12. SHARE CAPITAL**

| | 1991 £m | 1990 £m |
|---|---|---|
| (A) The share capital of the Company is: | | |
| Authorised | | |
| 1,750,000 3.5% cumulative redeemable preference shares of £1 each | 1.8 | 1.8 |
| 440,072,688 *(1990 429,400,881)* ordinary shares of 25p each | 110.0 | 107.3 |
| 152,927,312 *(1990 163,599,119)* unissued shares of 25p each | 38.2 | 40.9 |
| | 150.0 | 150.0 |
| Issued and paid up | | |
| 1,750,000 3.5% cumulative redeemable preference shares of £1 each, redeemable 1989/2009 | 1.8 | 1.8 |
| 440,072,688 *(1990 429,400,881)* ordinary shares of 25p each | 110.0 | 107.3 |
| | 111.8 | 109.1 |

(B) At 31 December 1991, 86,344 *(1990 91,335)* ordinary shares of 25p each, 5% paid, remained in issue to 13 participants *(1990 15)* under an executive share incentive scheme which was introduced in 1970 and has been discontinued.

(C) The whole or any part (to be determined by drawings) of the 3.5% cumulative redeemable preference shares may be redeemed by the Company at par on or before 1 July 2009, or as soon thereafter as the Company shall be able to comply with the statutory provisions relating to such redemption.

(D) At 31 December 1991, options to subscribe for ordinary shares of 25p each in the Company, granted under the Savings Related Share Option Schemes, were outstanding as follows:

| Year options granted | Subscription price | Number of shares 5 year term | 7 year term | Normally exercisable |
|---|---|---|---|---|
| 1986 | 276.3p | 23,678 | 403,109 | 1991 or 1993 |
| 1987 | 294.3p | 85,797 | 56,654 | 1992 or 1994 |
| 1988 | 305.7p | 142,813 | 83,731 | 1993 or 1995 |
| 1989 | 333.3p | 170,227 | 77,389 | 1994 or 1996 |
| 1990 | 383.2p | 670,497 | 523,587 | 1994 or 1996 |
| 1991 | 426.4p | 639,078 | 340,535 | 1996 or 1998 |

    During 1991, 622 options were exercised by participants under the above Schemes and, accordingly, 447,122 ordinary shares in the Company were issued with an aggregate nomin   value of £111,781.

27

TrustApp0121

**Notes on the Accounts**

**12.  SHARE CAPITAL** *continued*

(E) At 31 December 1991, options to subscribe for ordinary shares of 25p each in the Company, granted under the Executive Share Option Schemes, were outstanding as follows:

| Year option granted | Subscription price | Number of shares | Normally exercisable |
|---|---|---|---|
| 1987 | 329.00p | 286,950 | 1990 to 1997 |
| 1988 | 339.67p | 123,379 | 1991 to 1998 |
| 1989 | 378.00p | 413,031 | 1992 to 1999 |
| 1990 | 468.33p | 196,878 | 1993 to 2000 |
| 1990 | 462.33p | 177,896 | 1993 to 2000 |
| 1990 (Netherlands Scheme) | 504.33p | 514,950 | 1990 to 1995 |
| 1991 | 531.00p | 157,952 | 1994 to 2001 |
| 1991 | 488.67p | 1,300,931 | 1994 to 2001 |
| 1991 (Netherlands Scheme) | 488.67p | 9,918 | 1991 to 1996 |
| 1991 (Netherlands Scheme) | 517.00p | 26,815 | 1991 to 1996 |

During 1991, 11 options were exercised by participants under the above Schemes and, accordingly, 127,969 ordinary shares in the Company were issued with an aggregate nominal value of £31,992.

(F) 487,281 ordinary shares of 25p each, with an aggregate nominal value of £121,820, were issued in lieu of cash dividends as follows:

| Dividend | Price | Shares Issued |
|---|---|---|
| Final 1990, paid 17 May 1991 | 530.0p | 332,900 |
| Interim 1991, paid 15 November 1991 | 531.4p | 154,381 |

(G) During the year, 9,609,435 ordinary shares of 25p each in the Company, with an aggregate nominal value of £2,402,359, were issued pursuant to the exercise of 39,545 warrants attached to the Sfr 200m 4.5% guaranteed bonds issued in 1986 by Commercial Union Finance BV, a wholly-owned subsidiary of the Company. Warrant holders were entitled to subscribe for 243 ordinary shares per Sfr 5,000 bond held at a subscription price of 365p per share. The entitlement to exercise warrants expired on 11 June 1991.

**13.  SHARE PREMIUM**

| Movements in share premium comprise: | 1991 £m | 1990 £m |
|---|---|---|
| Executive Share Option Scheme | 0.4 | 0.6 |
| Savings Related Share Option Schemes | 1.1 | — |
| Sfr 200m 4.5% guaranteed bonds (12G) | 32.3 | — |
| Shares in lieu of dividends | (0.1) | 7.1 |
| Preliminary expenses | — | (0.8) |
| Movements in share premium | 33.7 | 6.9 |
| Balance at 1 January | 6.9 | — |
| Balance at 31 December | 40.6 | 6.9 |

In 1991, the Company revised its treatment of scrip dividends in respect of the 1990 final and 1991 interim dividends, so that the issue of shares in lieu of dividends is considered as a bonus issue under the terms of the Companies Act 1985 and the respective nominal value of the shares issued is charged to the share premium account. This accounting treatment was not used in 1990 as there was no share premium account in the parent company when it was incorporated in February 1990.

28

TrustApp0122

Notes on the Accounts

### 14. CAPITAL RESERVE

The capital reserve arises on the consolidation, under the merger relief provisions of the Companies Act 1985, of Commercial Union Assurance Company plc and represents its share premium account.

### 15. RETAINED PROFITS AND RESERVES

| | | Consolidated |
|---|---|---|
| Movements in retained profits and reserves comprise: | 1991 £m | 1990 £m |
| Profit and loss account transfer | (120.3) | (76.4) |
| Foreign exchange gains less losses (R) | 33.8 | (146.7) |
| Adjustments arising on acquisition and disposal of subsidiaries and related items (O) | (24.0) | (6.2) |
| Shares in lieu of dividends | 2.5 | — |
| Movements in retained profits and reserves | (168.0) | (229.3) |
| Balance at 1 January | 441.4 | 670.7 |
| Balance at 31 December | 333.4 | 441.4 |

Adjustments arising on acquisition and disposal of subsidiaries and related items include a charge of £17.2m in respect of the dilution in the Group's holding in Delta Lloyd Investment Fund NV, as explained in note 17(A).

The shares in lieu of dividends amount of £2.5m is in respect of the transfer to retained profits and reserves from the ordinary dividend account, arising from the treatment of the shares issued in lieu of the 1990 final and 1991 interim dividends, as explained in note 13.

The net cumulative amount of goodwill charged to the Group's retained profits and reserves, attributable to subsidiary undertakings acquired after 1 January 1968 and not subsequently sold, is £14.6m. Similar information relating to subsidiary undertakings acquired before 1968 is not readily available.

### 16. UNREALISED GAINS ON INVESTMENTS, AFTER TAXATION

| Movements in unrealised investment gains after taxation comprise: | £m | 1991 £m | £m | 1990 £m |
|---|---|---|---|---|
| Total gains/(losses) | | | | |
| Securities | 124.2 | | (233.6) | |
| Properties | (27.7) | | (1.5) | |
| | | 96.5 | | (235.1) |
| Less: | | | | |
| Realised gains included in the profit and loss account | | | | |
| Securities | (44.4) | | (17.0) | |
| Properties | (5.4) | | (3.8) | |
| | | (49.8) | | (20.8) |
| Movements in unrealised investment gains after taxation | | 46.7 | | (255.9) |
| Balance at 1 January | | 386.2 | | 642.1 |
| Balance at 31 December | | 432.9 | | 386.2 |

29

TrustApp0123

Notes on the Accounts

## 17. INVESTMENTS

(A) In addition to the principal associated undertakings detailed in note 19, the Group holds investments exceeding 10% of a class of the equity capital of a number of other companies in the United Kingdom and elsewhere. These include a subsidiary's 30.0% shareholding in Midland Life Limited, an authorised life assurance company jointly-owned with Midland Bank plc. These investments do not represent a material part of the assets or investment income of the Group.

The Group's investment in its former subsidiary, Delta Lloyd Investment Fund NV, was diluted during the year to a 24.5% shareholding at 31 December 1991. As a consequence of this dilution, a charge of £17.2m has been made to retained profits and reserves. As this company invests mainly in equities and all dividends received are passed on to the shareholders, the Group's interest has been shown as an investment in these accounts. The economic benefits of ownership of an additional holding of 26.6% belong to the Delta Lloyd Pension Fund.

(B) In carrying on the business of investment, the Group has entered into future commitments, including property development, after 31 December 1991. These amounts are not reflected in the consolidated balance sheets on pages 15 and 17. The Group has in hand a number of property developments which will require expenditure of £33.5m (1990 £25.0m) for general insurance funds and £32.3m (1990 £56.0m) for life funds. Of these amounts, £32.8m (1990 £13.4m) and £21.4m (1990 £41.2m) respectively have been the subject of signed contracts.

(C) Included within debentures in the consolidated balance sheet are interests in United Kingdom leases amounting to £33.6m (1990 £54.7m) and United States leveraged leases of £28.4m (1990 £36.6m). These leases are consolidated to reflect their remaining equity value, which is stated net of non-recourse debt in respect of United States leveraged leases.

(D) Prior to 31 December 1991, the Group sold equity futures, maturing in 1992, amounting to £96.5m (1990 £59.9m) for life and purchased gilts futures amounting to £80.1m (1990 £35.2m) and £125.4m (1990 £45.3m) for general insurance and life respectively. No adjustment has been made to the classification of existing investments to reflect the settlement of these transactions.

(E) The valuation of properties has been undertaken by qualified members of staff reporting to the Managing Director of Commercial Union Properties Limited, who is a Fellow of The Royal Institution of Chartered Surveyors.

(F) During the year, a subsidiary company entered into an agreement to finance certain United Kingdom staff residential mortgages with deposits from a third party on a non-recourse basis. The mortgages and related deposits no longer represent an economic benefit or risk to the Group and consequently have not been included in the consolidated balance sheet. The principal amount of these mortgages at the date of the agreement and the balance as at 31 December 1991 were £124.0m and £122.4m respectively. The interest paid since the date of the agreement, which is included in expenses net of amounts paid by employees, amounted to £1.8m.

| (G) The total non-life investment return is: | 1991 £m | 1990 £m |
|---|---|---|
| Investment income | 332.1 | 306.2 |
| Investment expenses | (12.2) | (15.0) |
| Loan interest | (48.3) | (47.7) |
| Investment income net of loan interest | 271.6 | 243.5 |
| Realised investment gains before taxation | 99.4 | 48.3 |
| Unrealised investment gains/(losses) before taxation | 70.5 | (289.7) |
| Total investment return before taxation | 441.5 | 2.1 |

Investment income net of loan interest is included in the operating result and includes the interest rate differential on forward foreign exchange contracts of £8.3m. The comparative amount for 1990 of £9.2m is included in retained profits and reserves under foreign exchange gains less losses.

30

TrustApp0124

Notes on the Accounts

### 17. INVESTMENTS *continued*

Realised investment gains after taxation are included in the profit attributable to shareholders. Unrealised investment gains less losses after taxation are taken directly to reserves and included in shareholders' funds. Investment income is after charging the net costs of non-insurance activities amounting to £8.0m *(1990 £14.5m)*. The loan interest in respect of loans which are repayable beyond 5 years included above is £4.4m *(1990 £5.1m)*.

(H) In the movements in life funds, investment expenses of £21.6m *(1990 £19.8m)* and loan interest of £25.6m *(1990 £20.2m)* are deducted from investment income. The loan interest in respect of loans which are repayable beyond 5 years included above is £12.7m *(1990 £11.8m)*.

### 18. SUBSIDIARY UNDERTAKINGS

(A) Shares in subsidiaries are valued at net asset value computed in accordance with the Company's accounting policies. The resulting gain over book value of £997.6m *(1990 £1,059.4m)* has been credited to the Company's unrealised gains on investments.

(B) Principal subsidiary undertakings are listed on page 53.

### 19. ASSOCIATED UNDERTAKINGS

(A) The Group's investments in associated undertakings comprise:

| | Share of capital £m | Share of reserves £m | Total £m |
|---|---|---|---|
| Profit for the year after taxation | — | 5.4 | 5.4 |
| Additions | 0.6 | — | 0.6 |
| Foreign exchange gains | — | 0.9 | 0.9 |
| Realised investment gains after taxation | — | 1.4 | 1.4 |
| Unrealised investment losses after taxation | — | (12.7) | (12.7) |
| Dividends received | — | (3.0) | (3.0) |
| Movements in associated undertakings | 0.6 | (8.0) | (7.4) |
| Balance at 1 January | 18.6 | 98.0 | 116.6 |
| Balance at 31 December | 19.2 | 90.0 | 109.2 |

(B) The associated undertakings included above are:

| Company | Class of share | Proportion held | Country of incorporation |
|---|---|---|---|
| Commercial Union Assurance Company of South Africa Limited | Ordinary R0.50 shares | 36.0% | South Africa |
| Compania de Seguros La Republica SA | Ordinary shares – no par value | 31.8% | Chile |
| Hibernian Group Public Limited Company (30.6.91) | Ordinary IR 25p shares | 28.7% | Eire |
| Lion of Kenya Insurance Company Limited (30.9.91) | Ordinary K.Sh 20 shares | 26.8% | Kenya |
| National Commercial Union Limited (30.6.91) | Ordinary A$0.50 shares | 45.7% | Australia |
| Plant Safety Limited | "A" Ordinary £1 shares | 50.0% | England |
| Seguros La Republica SA | Ordinary M.P.s 10,000 shares | 45.6% | Mexico |
| The British Aviation Insurance Company Limited (31.12.90) | Ordinary £1 shares | 29.7% | England |
| The United Nigeria Insurance Company Limited (30.9.91) | Ordinary 50 Kobo shares | 22.0% | Nigeria |

31

TrustApp0125

Notes on the Accounts

**19.  ASSOCIATED UNDERTAKINGS**  *continued*

All associated undertakings are held by subsidiaries. Where the figures included in the accounts are not for the year ended 31 December 1991, the relevant accounting date is shown in brackets. The principal activity of these companies is the transaction of insurance business with the exception of Plant Safety Limited, which carries on the business of engineering plant inspection.

**20.  AGENTS, COMPANIES AND SUNDRY ASSETS**

| Agents, companies and sundry assets comprise: | 1991 £m | 1990 £m |
|---|---|---|
| Agents, companies and others | 1,539.8 | 1,285.4 |
| Deferred acquisition costs (D) | 280.5 | 249.0 |
| Fixed assets (I) | 76.6 | 72.6 |
| Bank balances | 39.4 | 48.2 |
| | 1,936.3 | 1,655.2 |

**21.  OUTSTANDING CLAIMS AND PROVISIONS**

| (A) Outstanding claims and provisions comprise: | 1991 £m | General insurance 1990 £m |
|---|---|---|
| Gross outstanding claims | 4,041.0 | 3,475.9 |
| Outward reinsurance | (883.4) | (650.5) |
| | 3,157.6 | 2,825.4 |

(B) In the United States and the Netherlands, claims on certain classes of business are discounted as follows:

| | Class | Rate | Mean term of liabilities | Treatment of investment income |
|---|---|---|---|---|
| United States | Workers' compensation | 7.5% | 8 years | Profit and loss account |
| | Discontinued business | 9.0% | 4 years | Underwriting result |
| Netherlands | Permanent health and injury | 4.0% | 8 years | Underwriting result |

The effect of discounting these claims is to reduce outstanding claims and provisions by £90.2m *(1990 £93.6m)* and to worsen the operating result before taxation by £6.3m *(1990 £7.6m)*. The United States claims provisions for discontinued business are determined after taking account of the estimated future investment earnings from matched assets.

**22.  UNEARNED PREMIUMS**

| Unearned premiums comprise: | 1991 £m | 1990 £m |
|---|---|---|
| Gross unearned premiums (B) | 1,213.8 | 1,120.3 |
| Outward reinsurance | (134.5) | (137.0) |
| Net unearned premiums | 1,079.3 | 983.3 |
| Unexpired risks (E) | — | — |
| | 1,079.3 | 983.3 |

32

TrustApp0126

Notes on the Accounts

## 23.  LOAN CAPITAL AND OTHER LOANS

| Loan capital and other loans comprise: | 1991 £m | Non-life 1990 £m | 1991 £m | Life 1990 £m |
|---|---|---|---|---|
| 8.75% Canadian sinking fund debenture 1977/1992 | 3.0 | 3.3 | — | — |
| 4.5% Swiss franc 200m bonds 2000 | 72.7 | 74.1 | — | — |
| Medium term notes (average rate 7%) | 16.0 | 46.2 | — | — |
| Commercial paper (average rate 9%) | 55.4 | 82.5 | — | — |
| Deep discount loan stock 1993/1996 (average rate 11%) | 146.3 | 131.1 | — | — |
| Parallel borrowings 1995 (average rate 9%) | 12.7 | 13.5 | — | — |
| Institutional borrowings 1992/2001 (average rate general 9%, life 8%) | 5.4 | 7.1 | 166.3 | 158.1 |
| Other loans | 2.1 | 1.9 | 1.3 | 1.3 |
| Bank borrowings | 93.6 | 54.8 | 114.1 | 135.1 |
| | 407.2 | 414.5 | 281.7 | 294.5 |
| Repayable as follows: | | | | |
| 1 year or less | 170.1 | 171.4 | 122.5 | 54.9 |
| Between 1 and 2 years | 142.1 | 20.2 | — | 80.2 |
| Between 2 and 5 years | 22.2 | 143.8 | 13.5 | — |
| After 5 years | 72.8 | 79.1 | 145.7 | 159.4 |
| | 407.2 | 414.5 | 281.7 | 294.5 |

The Swiss franc bonds were issued with warrants entitling the holders to subscribe for shares in the Company at any time before 11 June 1991. The value attributed to these warrants was Sfr 23.6m (£9.3m) which is being amortised over the full term of the bonds. At 31 December 1991, the unamortised amount was Sfr 16.1m (£6.4m) (1990 Sfr 17.8m (£7.2m)). The bonds are redeemable in total at the option of the issuer at any time on or after 11 June 1991 at a decreasing premium but are shown in the above table as repayable on the due date.

The deep discount loan stock falls due for repayment in three tranches, £140.0m in 1993, £30.0m in 1995 and £6.7m in 1996. The stockholders have options to require all three tranches to be repaid in 1993 or at any time by giving at least 180 days notice. However, repayment before 1993 is not expected but, if made, would be at a reduced amount. In the table above, these loans are included as repayable in the above tranches in 1993, 1995 and 1996 respectively.

Borrowings exclude intra-group loans, certain of which are guaranteed by third parties.

## 24.  AGENTS, COMPANIES AND SUNDRY LIABILITIES

| Agents, companies and sundry liabilities comprise: | 1991 £m | 1990 £m |
|---|---|---|
| Agents, companies and others | 797.5 | 577.2 |
| Proposed ordinary dividend | 63.3 | 60.0 |
| UK and overseas taxation (Q) | 156.2 | 133.7 |
| Deferred taxation (Q&B) | 59.7 | 65.7 |
| Minority interests | 7.3 | 9.8 |
| Bank overdrafts | 28.6 | 39.2 |
| | 1,112.6 | 885.6 |

Bank overdrafts arise substantially from unpresented cheques.

33

TrustApp0127

Notes on the Accounts

## 25. LIFE FUNDS

| | Ben Macdhui Life | | Delta Lloyd Life | | Other life | |
|---|---|---|---|---|---|---|
| The principal life funds of the Group and their constituent investments are: | 1991 £m | 1990 £m | 1991 £m | 1990 £m | 1991 £m | 1990 £m |
| Life funds | 2,535.9 | 2,321.0 | 4,645.1 | 4,159.6 | 2,443.9 | 1,998.1 |
| Investments before investment reserve: | | | | | | |
| Government securities | 720.8 | 659.8 | 649.9 | 459.5 | 464.6 | 384.0 |
| Debentures | 357.5 | 284.0 | 168.2 | 56.9 | 767.4 | 552.9 |
| Preference shares | 7.3 | 4.1 | 79.1 | 3.1 | 12.8 | 10.0 |
| Ordinary shares | 1,960.4 | 1,660.7 | 162.4 | 127.3 | 793.4 | 771.7 |
| Cash deposits | 78.3 | 63.3 | 64.9 | 134.8 | 168.6 | 153.6 |
| Property | 539.2 | 575.3 | 601.8 | 506.6 | 516.0 | 369.8 |
| Mortgages and loans | 95.9 | 97.5 | 3,593.8 | 3,536.1 | 74.9 | 64.8 |
| Total investments | 3,759.4 | 3,344.7 | 5,320.1 | 4,824.3 | 2,797.7 | 2,306.8 |

The directors have been advised by the Group Actuary that the assets of each of the life operations are at least sufficient to meet their respective liabilities at 31 December 1991.

## 26. PENSION COSTS

In the United Kingdom, the Netherlands and the United States, there are pension schemes whose membership comprises 80% of pension scheme members throughout the Group. With the exception of the Netherlands, where the scheme is written in the Delta Lloyd Life fund, the assets of these defined-benefit schemes are held in separate trustee-administered funds.

An actuarial valuation has been carried out for each of these schemes within the last twelve months, using appropriate methods for the respective territories and there are no material surpluses or deficiencies.

In the United Kingdom, the valuation carried out by the Group Actuary as at 31 December 1990 assumed a margin between investment return and salary and pension increases of 1.25% and 4.00% per annum respectively. The assets of the fund at market value amounted to £829.4m and the value of the accrued liabilities was £811.9m. Following advice from the Group Actuary, the employers' contribution rate for 1991 was reduced from 10% to 5% of pensionable salaries.

In the Netherlands, the accruing liabilities each year are secured by means of life assurance contracts in the Delta Lloyd Life fund and the premiums are calculated individually for each member.

For the United States scheme, the valuation carried out by independent actuaries as at 31 December 1990 assumed a margin of 2.9% per annum between investment return and salary increases. The assets of the fund at market value amounted to £27.7m and the value of accrued liabilities was £23.7m. The employers' contribution rate for 1991 was approximately 7% of salaries.

The 1991 pension costs for the Group were £20.9m (1990 £23.3m). There were no significant contributions outstanding or prepaid as at 31 December 1991.

34

TrustApp0128

**Notes on the Accounts**

### 27. CASH FLOW STATEMENT

(A) The reconciliation of operating profit to net cash inflow from operating activities is:

| | £m | 1991 £m | £m | 1990 £m |
|---|---|---|---|---|
| Operating (loss)/profit before taxation | | (68.6) | | 1.4 |
| Adjustments for financing expense and items not involving movements of cash: | | | | |
| General insurance underwriting liabilities and provisions | 353.5 | | 347.0 | |
| Agents and other balances | (66.1) | | (122.2) | |
| (Increase)/decrease in sundry assets and liabilities | (10.8) | | 26.4 | |
| (Profits)/losses retained in associated undertakings | (5.1) | | 2.8 | |
| Profits not yet transferred from life funds | (54.7) | | (39.3) | |
| Loan interest expense | 48.3 | | 47.7 | |
| Tax on franked investment income | (3.8) | | (4.0) | |
| | | 261.3 | | 258.4 |
| Net cash inflow from operating activities | | 192.7 | | 259.8 |

(B) Changes in investments, excluding cash deposits, during the year are:

| | 1991 £m | 1990 £m |
|---|---|---|
| Purchases less sales of investments | (14.5) | 20.5 |
| Foreign exchange gains/(losses) | 71.7 | (377.7) |
| Changes in market value | 195.8 | (239.1) |
| Movements in investments | 253.0 | (596.3) |
| Balance at 1 January | 3,801.7 | 4,398.0 |
| Balance at 31 December | 4,054.7 | 3,801.7 |

Separate figures for purchases and sales of investments are not readily available.

(C) Changes in financing during the year are:

| | Share capital (including share premium and capital reserve) 1991 £m | 1990 £m | Loan capital and other loans 1991 £m | 1990 £m |
|---|---|---|---|---|
| Issue of ordinary share capital | 36.4 | 12.7 | — | — |
| Preliminary expenses | — | (0.8) | — | — |
| New loans drawn down | — | — | 70.0 | 50.3 |
| Repayment of loans | — | — | (96.1) | (55.8) |
| Net cash inflow/(outflow) | 36.4 | 11.9 | (26.1) | (5.5) |
| Foreign exchange losses/(gains) | — | — | 2.7 | (25.2) |
| Amortisation of discounts | — | — | 16.1 | 14.5 |
| Movements in financing | 36.4 | 11.9 | (7.3) | (16.2) |
| Balance at 1 January | 317.4 | 305.5 | 414.5 | 430.7 |
| Balance at 31 December | 353.8 | 317.4 | 407.2 | 414.5 |

35

TrustApp0129

Notes on the Accounts

## 27.  CASH FLOW STATEMENT  *continued*

| (D) Changes in cash and cash equivalents during the year are: | 1991 £m | 1990 £m |
|---|---|---|
| Net cash inflow | 33.0 | 64.5 |
| Foreign exchange gains/(losses) | 3.7 | (28.2) |
| Movements in cash and cash equivalents | 36.7 | 36.3 |
| Balance at 1 January | 283.2 | 246.9 |
| Balance at 31 December | 319.9 | 283.2 |

| (E) Balances of cash and cash equivalents included in the balance sheet comprise: | 1991 £m | 1990 £m | Change in year £m |
|---|---|---|---|
| Cash deposits | 309.1 | 274.2 | 34.9 |
| Cash at bank and in hand | 39.4 | 48.2 | (8.8) |
| Bank overdrafts | (28.6) | (39.2) | 10.6 |
| | 319.9 | 283.2 | 36.7 |

## 28.  ANALYSIS OF STAFF

| The number of persons employed by the Group at 31 December by territorial location is: | 1991 No. | 1990 No. |
|---|---|---|
| United Kingdom | 9,484 | 9,617 |
| Continental Europe | 5,828 | 5,697 |
| North America | 5,152 | 5,242 |
| Overseas | 1,318 | 1,242 |
| | 21,782 | 21,798 |

1990 staff numbers for Overseas have been restated to treat operations on a basis consistent with 1991.

## 29.  GENERAL

(A) The Group has contingent liabilities amounting to £45.2m *(1990 £44.8m)* arising from activities not directly related to insurance. In addition, the Company has guaranteed the overdrafts and borrowings of certain subsidiary and associated undertakings. In the opinion of the directors, no material loss will arise in respect of these guarantees and indemnities.

(B) The calculation of earnings per share is on the 'net' basis using a weighted average of 436.5m *(1990 average of 427.4m)* ordinary shares in issue. The amount of earnings per share shown for operating (loss)/profit after taxation is based on a loss of £65.4m *(1990 profit £1.3m)* and the amount of earnings per share shown for (loss)/profit attributable to shareholders is based on a loss of £15.6m *(1990 profit £22.1m).*

(C) In the movements in life funds, adjustments to opening funds mainly comprise exchange rate adjustments and include £2.5m of development finance. Additionally, commission of £113.9m *(1990 £68.6m)* and expenses of £202.8m *(1990 £192.6m)* have been aggregated and total £316.7m *(1990 £261.2m).* Commission of £113.9m includes £31.4m relating to indemnity commissions which were previously charged over the life of the relevant policies but are now charged when paid.

TrustApp0130

## PART IV – THE PLACING

At the Extraordinary General Meeting of the Company held on 14 April 1992, an ordinary resolution was passed, *inter alia*, (a) to increase the authorised share capital of the Company by the creation of £200,000,000 nominal of Irredeemable Preference Shares and (b) to authorise the Directors to allot and issue up to £200,000,000 nominal of such shares at any time prior to the date of the Annual General Meeting in 1993 or 14 July 1993, whichever is earlier. The terms of, and rights attaching to, the Further New Preference Shares are contained in the resolution passed at the Extraordinary General Meeting and in resolutions of the board of Directors and of a duly authorised committee of the board of Directors held on 17 November 1992 and are summarised in Part II above.

The Directors have decided to issue the Further New Preference Shares at a price of 100 pence per share and have determined that the rate of dividend attaching to the Further New Preference Shares shall be 8¾ per cent. per annum (exclusive of any associated tax credit) which will be payable in half yearly instalments in arrear on 31 March and 30 September in each year except that the first dividend instalment shall be payable on 31 March 1993 in respect of the period from and including 27 November 1992 up to but excluding 31 March 1993.

The Placing is conditional on the Further New Preference Shares being admitted to the Official List by the London Stock Exchange, on such admission becoming effective not later than 9.00 a.m. on 19 November 1992 and on the Placing Agreement becoming unconditional in accordance with its terms.

Under the Placing Agreement, each of Cazenove and Hoare Govett has separately agreed to use reasonable endeavours to procure subscribers for or, to the extent of its failing to procure such subscribers, itself to subscribe for 50,000,000 of the Further New Preference Shares at the Placing Price. The obligations of Cazenove and Hoare Govett are conditional on, *inter alia*, the London Stock Exchange granting permission for the Further New Preference Shares to be admitted to the Official List and such admission becoming effective not later than 19 November 1992.

The Placing Agreement contains certain representations, warranties, undertakings and indemnities given by the Company relating, *inter alia*, to the accuracy of the information contained in this document. Cazenove and Hoare Govett may terminate the Placing Agreement in certain exceptional circumstances (including on the occurrence of a "force majeure" event) prior to admission to listing becoming effective.

The Company has agreed to pay to Cazenove and Hoare Govett a commission to be shared equally, amounting in aggregate to ⅞ per cent. of the nominal amount of, and premium on, the Further New Preference Shares. The Company will also pay to Cazenove and Hoare Govett a sum equal to the expenses, charges and disbursements incurred by them (including reasonable legal fees and any accountancy or other professional fees incurred) in connection with or arising out of the Placing (together with any value added tax payable).

The Placing Price for the Further New Preference Shares will be payable in cash in full on 27 November 1992. It is estimated that the cash proceeds (net of expenses) accruing to the Company from the Placing will amount to approximately £99,040,000.

The Further New Preference Shares will be in registered form. Temporary documents of title will not be issued and definitive certificates for the Further New Preference Shares are expected to be despatched on or about 27 November 1992.

37

TrustApp0131

## PART V — FURTHER INFORMATION

### 1. Incorporation

The Company was incorporated in England and Wales under the Companies Act 1985 as a public limited company on 9 February 1990 with the registered number 2468686. Its then existing issued Ordinary Shares and Existing Preference Shares were admitted to the Official List of the London Stock Exchange on 4 June 1990.

### 2. Share capital of the Company

(i)  As at 16 November 1992 (the latest practicable date before the printing of this document), the authorised and issued share capital of the Company was as follows:—

|  | Authorised | | Issued | |
|---|---|---|---|---|
|  | £ | No. | £ | No. |
| Ordinary Shares of 25p each | 148,250,000 | 593,000,000 | 111,675,608.25 | 446,702,433 |
| Existing Preference Shares of £1 each | 1,750,000 | 1,750,000 | 1,750,000 | 1,750,000 |
| Irredeemable Preference Shares of £1 each | 200,000,000 | 200,000,000 | 100,000,000 | 100,000,000 |

All Existing Preference Shares, Existing New Preference Shares and 446,636,876 Ordinary Shares are fully paid up. 65,557 Ordinary Shares (issued in respect of the Commercial Union Executive Share Scheme which was adopted on 6 April 1970 and was subsequently discontinued) are paid up as to 1.25p each.

(ii)  As at 16 November 1992 (the latest practicable date before the printing of this document), options to subscribe for Ordinary Shares granted under the Commercial Union Executive Share Option Scheme 1987, the Commercial Union Executive Share Option Scheme 1990 and the Commercial Union Netherlands Executive Share Option Scheme were outstanding as follows:—

| Year options granted | Subscription price | Number of shares | Normally exercisable |
|---|---|---|---|
| 1987 | 329.00p | 254,722 | 1990 to 1997 |
| 1988 | 339.67p | 119,181 | 1991 to 1998 |
| 1989 | 378.00p | 282,947 | 1992 to 1999 |
| 1990 | 468.33p | 180,482 | 1993 to 2000 |
| 1990 | 462.33p | 169,245 | 1993 to 2000 |
| 1990 (Netherlands Scheme) | 504.33p | 481,936 | 1990 to 1995 |
| 1991 | 531.00p | 157,952 | 1994 to 2001 |
| 1991 | 488.67p | 1,282,229 | 1994 to 2001 |
| 1991 (Netherlands Scheme) | 488.67p | 9,918 | 1991 to 1996 |
| 1991 (Netherlands Scheme) | 517.00p | 26,815 | 1991 to 1996 |
| 1992 | 411.33p | 36,467 | 1995 to 2002 |
| 1992 (Netherlands Scheme) | 411.33p | 124,126 | 1992 to 1997 |
| 1992 | 495.00p | 126,667 | 1995 to 2002 |
| 1992 | 498.66p | 59,451 | 1995 to 2002 |

38

TrustApp0132

(iii)   As at 16 November 1992 (the latest practicable date before the printing of this document), options to subscribe for Ordinary Shares granted under the Commercial Union Savings Related Share Option Schemes were outstanding as follows:—

| | | Number of shares | | |
|---|---|---|---|---|
| Year option granted | Subscription price | 5 year term | 7 year term | Normally exercisable |
| 1986 | 276.3p | nil | 378,760 | 1993 |
| 1987 | 294.3p | nil | 52,767 | 1994 |
| 1988 | 305.7p | 129,489 | 77,827 | 1993 or 1995 |
| 1989 | 333.3p | 159,751 | 75,373 | 1994 or 1996 |
| 1990 | 383.2p | 644,948 | 510,558 | 1996 or 1998 |
| 1991 | 426.4p | 623,784 | 334,098 | 1996 or 1998 |
| 1992 | 398.2p | 652,500 | 377,007 | 1997 or 1999 |

(iv)   During the three year period preceding the date of this document, the following shares have been issued by the Company or, in respect of that part of the period prior to the Scheme of Arrangement referred to in paragraph (b) below becoming effective, by Commercial Union Assurance Company plc:—

(a)   3 Ordinary Shares were issued to the subscribers on the incorporation of the Company;

(b)   pursuant to a Scheme of Arrangement, which became effective on 1 June 1990, the following shares were issued to the holders of shares in Commercial Union Assurance Company plc at a rate of one share in the Company for each share held:—

    427,412,523 Ordinary Shares, credited as fully paid;
    94,268 Ordinary Shares, credited as 5 per cent. paid; and
    1,750,000 Existing Preference Shares credited as fully paid;

(c)   in October, November and December 1990, an aggregate of 27,803 Ordinary Shares were issued pursuant to an offer made by the Company on 3 September 1990 to acquire shares in Commercial Union Assurance Company plc held by certain participants of the Commercial Union Savings Related Share Option Scheme;

(d)   an aggregate of 9,610,407 Ordinary Shares were issued pursuant to the exercise of 39,549 warrants attached to the Sfr.200,000,000 4.5 per cent. guaranteed bonds issued in 1986 by Commercial Union Finance BV, a wholly-owned subsidiary of the Company;

(e)   an aggregate of 3,196,271 Ordinary Shares were issued in lieu of dividends as follows:—

| Dividend | Price | Shares Issued |
|---|---|---|
| Interim 1990, paid 16 November 1990 | 457.2p | 1,643,608 |
| Final 1990, paid 17 May 1991 | 530.0p | 332,900 |
| Interim 1991, paid 15 November 1991 | 531.4p | 154,381 |
| Final 1991, paid 15 May 1992 | 432.8p | 360,262 |
| Interim 1992, paid 17 November 1992 | 449.4p | 705,120 |

39

TrustApp0133

(f) on 20 May 1992, the Existing New Preference Shares were placed at 100.875 pence per share;

(g) on 20 August 1992, 5,205,784 Ordinary Shares were issued at a price of 433.4p per share to Enemelay Investments Pty. Ltd., a subsidiary of The National Mutual Life Association of Australasia Limited in consideration for the acquisition by Commercial Union Assurance Company plc of 46,492,250 Ordinary Shares in National Commercial Union Limited;

(h) pursuant to the Commercial Union Savings Related Share Option Schemes, 536,804 Ordinary Shares were issued at 276.3p per share, 103,803 Ordinary Shares at 294.3p per share, 21,508 Ordinary Shares at 305.7p per share, 13,170 Ordinary Shares at 333.3p per share and 8,120 Ordinary Shares at 383.2p per share and 1,487 Ordinary Shares at 426.4 pence per share;

(i) pursuant to the Commercial Union Executive Share Option Scheme, 294,548 Ordinary Shares were issued at 329p per share, 24,798 Ordinary Shares at 339.67p per share, 111,110 Ordinary Shares at 378p per share, 1,364 Ordinary Shares at 468.33p per share, 8,651 Ordinary Shares at 462.33p per share, and 494 Ordinary Shares at 488.67p per share;

(j) pursuant to the Commercial Union Netherlands Executive Share Option Scheme, 33,334 Ordinary Shares were issued at 411.33p per share and 47,705 Ordinary Shares were issued at 504.33p per share; and

(k) on 20 April 1990, 963,009 Ordinary Shares of 25p each in Commercial Union Assurance Company plc were issued at 461.4p per share to the Trustees of the Commercial Union Staff Profit Sharing Scheme.

(v) On 14 April 1992 a resolution was passed at the Annual General Meeting of the Company:—

(a) to authorise the Directors, in accordance with Section 80 of the Companies Act 1985, to allot relevant securities (as defined in that Section) up to an aggregate nominal amount of £38,231,828, such authority to expire on 14 July 1993 or the next Annual General Meeting of the Company, whichever is the earlier; and

(b) to authorise the Directors, pursuant to Section 95 of the Companies Act 1985, to allot equity securities (as defined in Section 94 of that Act) for cash pursuant to the authority referred to in sub-paragraph (a) above as if Section 89(1) of that Act did not apply to the allotment, but such power was limited to the allotment of equity securities in connection with a rights issue and the allotment (otherwise than pursuant to a rights issue) of equity securities up to an aggregate nominal amount of £5,500,909.

(vi) On 14 April 1992 a resolution was passed at an Extraordinary General Meeting of the Company, inter alia:—

(a) to increase the authorised share capital of the Company from £150,000,000 to £350,000,000 by the creation of the Irredeemable Preference Shares; and

(b) in addition to and without prejudice to all previous authorities given to the Directors, to authorise the Directors in accordance with Section 80 of the Companies Act 1985 to allot the Irredeemable Preference Shares, such authority to expire at the conclusion of the Annual General Meeting in 1993 or 14 July 1993 whichever is the earlier.

(vii) The Further New Preference Shares are being issued at their par value of £1 each per Further New Preference Share.

40

TrustApp0134

### 3.   Rights attaching to the capital of the Company

The following is a summary of certain rights attaching to the Existing Preference Shares and Ordinary Shares (the rights attaching to the Further New Preference Shares, which are the same in all respects as those attaching to the Existing New Preference Shares, save only as to the ~~premium~~ payable thereon ~~on a winding up~~, are summarised in Part II of this document):—

(a)  *Dividend*    *rate of dividend*

The holders of the Existing Preference Shares are entitled to receive out of the profits of the Company available for dividend a fixed cumulative preferential dividend at a rate of 3.5 per cent. per annum on the capital paid thereon payable half yearly on 1 January and 1 July in every year, but are not entitled to any further participation in profits.

Subject to the rights of the holders of any shares with special rights as to dividends, the holders of the Ordinary Shares are entitled to receive, on a pro rata basis (according to the amounts paid up thereon), such dividend as may be declared or paid by the Directors but no final or interim dividend may be paid otherwise than in accordance with the Statutes.

Dividends remaining unclaimed after a period of twelve years from the date when they become due for payment shall be forfeited and revert to the Company.

(b)  *Capital*

On a return of assets on a liquidation or reduction of capital of the Company, the holders of the Existing Preference Shares are entitled, in priority to any payment on any other class of shares, to payment of the greater of (i) £1 per Existing Preference Share and (ii) a sum per Existing Preference Share equal to the average of the means of the daily quotations (as certified by the auditor of the Company) at which the Existing Preference Shares have been quoted on the London Stock Exchange during the six months immediately preceding the relevant date after deducting from each daily mean any arrears or accruals of dividends, together with, in each case, a sum equal to any arrears or deficiency of the fixed dividend to be calculated down to the date of the return of capital, but are not entitled to any further participation in assets.

In the event of a return of capital on a winding up or otherwise, after payment of all liabilities and subject to the rights of the holders of any shares with preferential rights on a return of capital, the remaining assets of the Company will be divided among the holders of the Ordinary Shares according to the number of Ordinary Shares held by them.

(c)  *Variation of rights*

Subject to Section 125 of the Companies Act 1985, and unless otherwise expressly provided by the terms on which shares of that class are held, all or any of the rights attaching to any class of shares may, whether or not the Company is being wound up, be varied or abrogated with the consent in writing of the holders of not less than three-fourths in nominal value of the issued shares of that class or with the sanction of an extraordinary resolution passed at a separate general meeting of the holders of such shares. The provisions of the Articles of Association relating to general meetings apply to any such meeting, except that the necessary quorum is two persons present in person or by proxy holding or representing not less than one-third in nominal value of the issued shares of the relevant class, and at any adjourned meeting of the holders of shares of that class those holders present (irrespective of the number of shares held by

41

them) will constitute a quorum and any holder present in person or by proxy may demand a poll.

(d) *Voting*

Subject to any special terms as to voting upon which any shares may be issued or may, for the time being, be held, on a show of hands every member who (being an individual) is present in person or (being a corporation) is present by a representative duly authorised under Section 375 of the Companies Act 1985 shall have one vote, and on a poll every member who is present in person or by such a representative or by proxy shall have one vote for every 25p of nominal amount of Existing Preference Shares or 25p Ordinary Shares of which it is the holder provided that none of the holders of the Existing Preference Shares shall have any right as such to receive notice of or to attend or vote at any general meeting of the Company unless at the date of the notice convening the meeting the preferential dividend on the Existing Preference Shares shall be in arrears and unpaid for a period of six months or more or unless a resolution is to be proposed at such meeting for reducing the capital of or winding up the Company or which adversely affects any of the rights or privileges attached to the Existing Preference Shares and so that the said holders shall be entitled to vote only in respect of any such resolution to be so proposed.

(e) *Further Issues*

The creation or issue of further preference shares ("additional shares") ranking in priority to the Existing Preference Shares shall be deemed to be a variation of the special rights and privileges for the time being attached to the Existing Preference Shares. The creation or issue of additional shares ranking either as to dividend or as to capital, *pari passu* with the Existing Preference Shares shall not be deemed to be a variation of the special rights and privileges attached to the Existing Preference Shares provided:—

(1) that at the date of issue thereof the aggregate amount of the capital which will immediately after the issue be paid up on the Existing Preference Shares (including the additional shares but excluding any Existing Preference Shares to be redeemed out of the proceeds of issue) shall not exceed 50 per cent. of the capital of the Company which will immediately after the issue be paid up on all of the share capital of the Company, including the additional shares but excluding any Existing Preference Shares to be redeemed out of the proceeds of issue; and

(2) that no additional share issued as a redeemable preference share shall be issued with or subject to a right of redemption prior in point of time to the Existing Preference Shares.

(f) *Transfer*

The Existing Preference Shares and Ordinary Shares are in registered form. Transfers of shares of the Company must be by instrument of transfer in the usual common form or in any other form which the Directors may approve. The Directors may, in their absolute discretion, decline to register any transfer of shares (not being a fully paid share) on which the Company has a lien or in favour of a transferee of whom it does not approve and may also decline to register a transfer unless:—

(i) the instrument of transfer is lodged at the Transfer Office duly stamped accompanied by the certificate for the shares to which it relates, or such other evidence as the Directors may reasonably require to show the right of the transferor to make the transfer or, if executed by some other person on the transferor's behalf, the authority of that person, if not previously deposited with the Company;

42

TrustApp0136

(ii)   the instrument of transfer is in respect of only one class of share; and

(iii)  in the case of a transfer to joint holders, the number of joint holders to whom the share is to be transferred does not exceed four.

*In addition to the definitions set out on page 3 of this document, words and expressions defined in, or for the purposes of, the Articles of Association of the Company shall bear the same meanings in this paragraph 3 of Part V. In the event of any conflict between the definitions used in the Articles of Association and those set out on page 3 of this document, the latter shall prevail.*

### 4.   Memorandum and Articles of Association

(a)    The Memorandum of Association of the Company provides that the Company's principal object is to acquire the whole or part of the issued share capital of Commercial Union Assurance Company plc and to carry on the business of a holding company. The objects of the Company are set out in full in clause 4 of the Memorandum of Association which is available for inspection at the address set out in paragraph 11 below.

(b)    The Articles of Association of the Company contain, *inter alia*, provisions to the following effect:—

(i)   The Company may by ordinary resolution increase its share capital, consolidate and divide its share capital into shares of a larger amount, sub-divide its share capital into shares of a smaller amount or cancel any unissued shares and diminish the amount of its authorised share capital by the amount of shares so cancelled. The Company may by special resolution reduce its share capital, any capital redemption reserve and any share premium in any way authorised by law. The Company may also, subject to the Statutes (as defined in the Articles of Association), purchase its own shares.

(ii)  (aa) Subject to sub-paragraph (bb) below, the Directors may exercise all the powers of the Company to borrow money, to mortgage or charge its undertaking, property and uncalled capital, or any part thereof, and to issue debentures and other securities, whether outright or as collateral security for any debt, liability or obligation of the Company or of any third party.

(bb) The Directors are required to restrict the borrowings (as defined by the Articles of Association) of the Group so that the aggregate amount for the time being outstanding does not exceed, without the prior sanction of an ordinary resolution of the Company twice the aggregate of the Share Capital and Consolidated Reserves (as defined in the Articles of Association).

43

## 5.   Directors' and other interests

(a)   The beneficial interests of the Directors, including their immediate families, in the Ordinary Shares shown in the register maintained under the provisions of Section 325 of the Companies Act 1985 and persons connected with them (which expression shall be construed in accordance with Section 346 of the Companies Act 1985) as at 16 November 1992 (the latest practicable date before the printing of this document), are set out below:—

|  |  | Ordinary Shares | |
| Name | Fully paid | Executive Option | SAYE Option |
| --- | --- | --- | --- |
| N.H. Baring | 7,697 | — | — |
| A.L. Brend | 9,008 | 206,678 | — |
| J.G.T. Carter | 7,985 | 158,382 | 8,878 |
| R. Fauroux | — | — | — |
| P.J. Gillam | — | — | — |
| R.C. Hampel | 218 | — | — |
| Sir Martin Jacomb | 12,583 | — | — |
| H. Meij | — | — | — |
| I.C. Strachan | — | — | — |
| A.B. Wyand | 15,511 | 128,027 | 5,782 |
|  | 53,002 | 493,087 | 14,660 |

No director has a beneficial interest directly or indirectly in the Existing Preference Shares nor the Existing New Preference Shares.

(b)   Save as disclosed below, the Directors are not aware of any person who is interested directly or indirectly (within the meaning of Part VI of the Companies Act 1985) as at 16 November 1992 (the latest practicable date before the printing of this document) in 3 per cent. or more of the issued share capital of the Company or who could directly or indirectly, jointly or severally, exercise control over the Company.

| | Number of Ordinary Shares | % of issued capital |
| --- | --- | --- |
| Barclays Bank PLC (non-beneficial interest) | 14,510,211 | 3.25 |
| Münchener Rückversicherungs - Gesellschaft | 13,913,972 | 3.11 |

(c)   Mr. A.L. Brend, Mr. J.G.T. Carter and Mr. A.B. Wyand have service contracts with Commercial Union Employment Services Limited as executive directors which were on display at the Annual General Meeting held on 14 April 1992 and have not subsequently been varied. Save as disclosed, there are no service contracts in existence between the Company and any of its Directors, nor are any such contracts proposed.

(d)   The aggregate of the remuneration and benefits in kind granted to the Directors by any member of the Group for the financial year ended 31 December 1991 was £802,067.

(e)   There have been no transactions between the Directors and the Company or any of its subsidiaries in the current financial year or the financial year ended 31 December 1991 which are or were unusual in their nature or conditions or significant to the business of the Group. There are no transactions between the Directors and any member of the

44

TrustApp0138

Group in earlier financial periods which are or were unusual in their nature or conditions or significant to the business of any member of the Group and which remain in some respect outstanding or unperformed.

(f)   As at 16 November 1992 (the latest practicable date before the printing of this document), the Company and its subsidiary undertakings had granted the following mortgage and other loans to Directors and persons connected with them:—

| Name of director | Method of repayment and final instalment maturity date | Rate of interest and when payable | Amount of Loan Outstanding (£) |
|---|---|---|---|
| J.G.T. Carter | Endowment assurance December 1997 | 3%-5% p.a. Monthly | 50,000 |
| A.B. Wyand | Endowment assurance October 2003 Capital instalments February 2004 | 3%-5% p.a. Monthly | 22,991 |

The loans are repayable out of the proceeds of endowment life assurance policies or by capital instalments as indicated. They are repayable on the earliest of maturity of the relevant policy or final instalment date, sale of the mortgaged property or death of the borrower. All loans are fully secured. Additionally, a subsidiary undertaking has made five life assurance policy loans to Mr. A.B. Wyand of which £10,751 is outstanding. These loans have varying maturity dates and are fully secured.

As at 16 November 1992, six officers of the Company had staff house purchase, life assurance policy and other loans from a subsidiary undertaking, amounting in aggregate to £444,081.

### 6.   Commercial Union Employee Share Schemes

**A.   Profit sharing schemes**

(i)   *Commercial Union Staff Profit Sharing Scheme 1982 (the "1982 Profit Sharing Scheme")*

In consequence of a scheme of arrangement (the "Scheme of Arrangement") which took effect on 1 June 1990, the Company was established as the holding company of the Commercial Union Group and the shareholders in Commercial Union Assurance Company plc ("CUA") received shares in the Company at the rate of one share for each share held in CUA. Prior to the Scheme of Arrangement, in 1982, CUA had established the 1982 Profit Sharing Scheme, the terms of which were substantially similar to those of the Company's current Staff Profit Sharing Scheme (the "1991 Profit Sharing Scheme") described below.

Under the terms of the Scheme of Arrangement, shares held by the Trustees pursuant to the 1982 Profit Sharing Scheme were exchanged for equivalent shares in the Company. However, the terms of the 1982 Profit Sharing Scheme continue to apply to these shares, although in all other respects the 1982 Profit Sharing Scheme has been replaced by the 1991 Profit Sharing Scheme operated by the Company.

(ii)   *Commercial Union Staff Profit Sharing Scheme 1990 (the "1990 Profit Sharing Scheme")*

The 1990 Profit Sharing Scheme was adopted in 1990 to be operated once for the year ended 31 December 1990. The 1990 Profit Sharing Scheme was not operated and has been replaced by the 1991 Profit Sharing Scheme described below.

45

TrustApp0139

(iii) *Commercial Union Staff Profit Sharing Scheme 1991 (the "1991 Profit Sharing Scheme")*

The 1991 Profit Sharing Scheme was adopted on 16 April 1991 and is to be approved by the Inland Revenue under the provisions of Schedules 9 and 10 of the Income and Corporation Taxes Act 1988. Previously, employees had been invited to participate in the 1982 Profit Sharing Scheme which was replaced, following the Scheme of Arrangement, by the 1990 Profit Sharing Scheme.

Under the 1991 Profit Sharing Scheme, employees of participating companies may have Ordinary Shares appropriated to them free of charge. Following the end of each financial year, the Company considers whether or not to operate the 1991 Profit Sharing Scheme and if it decides to do so, the Company will invite all eligible employees to participate so as to have Ordinary Shares appropriated to them.

Employees of the Company and participating companies will be eligible if they have completed one year's continuous service and are (a) chargeable to UK tax under Schedule E or (b) are employed in the Channel Islands or the Isle of Man or (c) are employed elsewhere and have been specifically nominated to take part in the 1991 Profit Sharing Scheme.

The amount of profit allocated by the Company is such amount as is determined by application of a criteria agreed between the Company and its employees' recognised representative bodies which may not exceed 5 per cent. of the Group's profit (before tax and exceptional items) for that financial year which in the opinion of the Directors is attributable to the UK operations of the Group.

The Trustees of the 1991 Profit Sharing Scheme use the amount allocated to subscribe for or to purchase Ordinary Shares. If subscribed, the price of the shares will be the higher of (i) the average middle market quotation of the Ordinary Shares as derived from the Official List of the London Stock Exchange over the five dealing days immediately preceding the allocation of funds to the Trustees, and (ii) the nominal value of the Ordinary Shares. If purchased, Ordinary Shares are acquired at the prevailing market price. Once acquired, the Ordinary Shares are then appropriated to participants, although no participant may receive shares of more than £6,000 in value in any single year of assessment. The £6,000 limit may be varied by the Board, but may not exceed the lower of the statutory maximum and £7,500.

Ordinary shares appropriated pursuant to the 1991 Profit Sharing Scheme must normally be held by the Trustees for a minimum of two years after appropriation, during which time they may not be dealt with in any way except in certain limited circumstances including death and cessation of employment by reason of injury, disability or redundancy. If retained for five years the Ordinary Shares will automatically be transferred into the names of the relevant participants.

A participant is the beneficial owner of Ordinary Shares held for him by the Trustees and is entitled to receive dividends and, through the Trustee, to vote and to participate in rights and capitalisation issues, in substantially the same way as other shareholders.

The maximum duration of the Scheme is ten years, ending with any allocation which may be made in respect of the financial year ending 31 December 2000.

**B.  Share option schemes**

(i) *Commercial Union Savings Related Share Option Scheme 1986 (the "1986 SAYE Scheme")*

CUA established the 1986 SAYE Scheme, the terms of which were substantially similar to those of the 1990 SAYE Scheme described below.

Pursuant to the Scheme of Arrangement options granted under the 1986 SAYE Scheme were exchanged for equivalent options over Ordinary Shares. However, the

46

terms of the 1986 SAYE Scheme continue to apply to these options, although in all other respects the 1986 SAYE Scheme has been superseded by the 1990 SAYE Scheme.

(ii) *Commercial Union Executive Share Option Scheme 1987 (the "1987 Executive Scheme")*

CUA established the 1987 Executive Scheme on terms which were substantially similar to the 1990 Executive Scheme described below.

In 1990, options granted under the 1987 Executive Scheme were exchanged for equivalent options over Ordinary Shares, under the terms of the Scheme of Arrangement. However, the terms of the 1987 Executive Scheme continue to apply to these options, although in all other respects the 1987 Executive Scheme has been superseded by the 1990 Executive Scheme.

(iii) *Commercial Union Savings Related Share Option Scheme 1990 (the "1990 SAYE Scheme")*

The 1990 SAYE Scheme is a save-as-you-earn share option scheme, approved by the Inland Revenue under the provisions of Schedule 9 to the Income and Corporation Taxes Act 1988. Invitations to apply for options may be issued by the Directors within 6 weeks of the preliminary announcement of results of the Company for any financial period, provided that no invitation may be made after the seventh anniversary of the adoption of the 1990 SAYE Scheme.

Invitations to apply for options may be made to employees who are contracted to work at least 25 hours per week, who have been continuously so for at least 2 years prior to the date of invitation and who are chargeable to tax under Case 1 of Schedule E. The Directors are also empowered to invite any other full-time employee of any participating company to participate in the 1990 SAYE Scheme. To join the 1990 SAYE Scheme an employee must enter into a savings contract with a savings body approved by the Company, under which monthly contributions from £10 to £250 are agreed to be made for a period of 5 years. At the commencement of the contract, the Company grants to the participant an option to acquire Ordinary Shares after 5 or 7 years with the proceeds of the savings account, at an option price determined as described below. The proceeds of the savings account include a tax free bonus after 5 years and, in the case of a 7 year contract, a further bonus after 7 years. Options are not transferable.

The option price of an Ordinary Share is determined by the Directors and may not be less than the higher of (i) 80 per cent. of the average middle-market quotation of an Ordinary Share as derived from the Official List of the London Stock Exchange over the 3 dealing days immediately following the date of invitation and (ii) where Ordinary Shares are to be issued, the nominal value of an Ordinary Share. The number of Ordinary Shares over which options may be granted to any participating employee must be limited to the maximum which may be purchased out of the repayment proceeds (including any bonuses) from the savings contract.

Options are normally exercisable for a period of 6 months commencing on the fifth or seventh anniversary of the commencement date of the related savings contract. If an option is not exercised by the end of that period, it will lapse. Options may be exercised earlier in specified circumstances such as death, cessation of employment by reason of injury, disability, redundancy or retirement, or the disposal of the business or company for which the participant works.

In the event of an amalgamation, reconstruction or takeover of the Company, participants may either exercise their options or, with the consent of the acquiring party, exchange their options over shares in the acquiring company or a company

47

TrustApp0141

associated with it. Options may also be exercised in the event of the voluntary winding-up of the Company.

Ordinary Shares will be allotted or transferred within 30 days of the date of the exercise of an option.

In the event of any capitalisation or rights issue or any consolidation, sub-division, or reduction of the share capital of the Company, the number of Ordinary Shares under option and the option price may be adjusted by the Directors with the approval of the Inland Revenue, subject to the auditor confirming in writing that such adjustment is, in the auditor's opinion, fair and reasonable.

(iv) *Commercial Union Executive Share Option Scheme 1990 (the "1990 Executive Scheme")*

The 1990 Executive Scheme is approved by the Inland Revenue under the provisions of Schedule 9 to the Income and Corporation Taxes Act 1988.

All employees and Directors who are employed by the Company or one of its participating subsidiaries for at least 25 hours per week are eligible to be nominated by the Directors for participation in this scheme.

Options may be granted within 42 days following the preliminary announcement of the Company's results, although options may be granted at other times if the Directors consider circumstances to be exceptional. No option may be granted more than 7 years after the adoption of the 1990 Executive Scheme.

Options are exercisable for a period of ten years and entitle the optionholder to acquire Ordinary Shares at a price determined by the Directors, being not less than the higher of (i) the average middle market quotation of the Ordinary Shares as derived from the Official List of the London Stock Exchange over the three dealing days immediately preceding the date of grant, and (ii) where Ordinary Shares are to be issued, the nominal value of the Ordinary Shares. Each individual's participation is limited so that the aggregate price payable on the exercise of all options granted to him under the 1990 Executive Scheme, and any other executive share option scheme established by the Company, does not exceed four times his annual remuneration. No consideration is payable upon the grant of an option. Options are not transferable.

Options are normally exercisable after the third anniversary of the date of grant, provided that the optionholder remains a Director or employee. Options may be exercised earlier than this in specified circumstances including death and cessation of employment by reason of injury, disability or redundancy. The Directors may permit an exercise by an optionholder who ceases to be employed in any other circumstances. Options will lapse if not exercised within the relevant exercise period.

In the event of any amalgamation, reconstruction or takeover of the Company, optionholders may either exercise their options or, with the consent of the acquiring party, exchange their options for options over shares in the acquiring company or a company associated with it. Options may also be exercised in the event of the voluntary winding-up of the Company.

Ordinary Shares will be allotted or transferred within 30 days of the date of the exercise of an option.

In the event of any capitalisation or rights issue or any consolidation, sub-division, or reduction of the share capital of the Company, the number of Ordinary Shares under option and the option price may be adjusted by the Directors with the approval of the Inland Revenue, subject to the auditor confirming in writing that such adjustment is, in the auditor's opinion, fair and reasonable.

48

(v) *Commercial Union Netherlands Executive Share Option Scheme 1990 (the "1990 Netherlands Scheme")*

In 1990, the Company established the 1990 Netherlands Scheme, on substantially similar terms as the 1990 Executive Scheme, for the Directors and employees of the Company's subsidiaries in the Netherlands.

All employees and Directors who are employed by a participating company for at least 25 hours per week are eligible to be invited by the Directors of the Company to participate in the 1990 Netherlands Scheme. However, unless the Directors otherwise determine, no option may be granted to any person less than 2 years before his normal retiring age.

Options may be granted within 42 days following the preliminary announcement of the Company's results, although options may be granted at other times if the Directors consider circumstances to be exceptional. No option may be granted more than 7 years after the adoption of the 1990 Netherlands Scheme.

Options are granted for a period of five years and entitle the optionholder to acquire Ordinary Shares at a price determined by the Directors, being not less than the higher of (i) the average middle market quotation of the Ordinary Shares as derived from the Official List of the London Stock Exchange over the three dealing days immediately preceding the date of grant, and (ii) where Ordinary Shares are to be issued, the nominal value of the Ordinary Share. Each individual's participation is limited so that the aggregate price payable on the exercise of all options under the 1990 Netherlands Scheme, and any other executive share option scheme established by the Company, does not exceed four times his annual remuneration. No consideration is payable upon the grant of an option under the 1990 Netherlands Scheme. Options are not transferable.

Under current revenue law and practice in the Netherlands, each participant is liable to a tax charge on the grant of an option under the 1990 Netherlands Scheme. Arrangements exist for each optionholder's employer to lend sufficient funds to the optionholder in order to discharge this tax liability, on terms which provide for the loan to be repaid upon exercise of the relevant option. These arrangements are set out in an ancillary agreement (the "Ancillary Agreement") between each optionholder and his employing company.

Options are exercisable at any time, provided that the optionholder remains a director or employee. Under the Ancillary Agreement each optionholder agrees that, in the event that an option is exercised before the third anniversary of the date of grant, other than upon special circumstances including ceasing employment for specified reasons, the optionholder will place on deposit the value of any difference between the option price and the market value of the Ordinary Shares. If the optionholder leaves his employment for any other reason, before such third anniversary, the deposit will be forfeited to the Company. This deposit may be returned to the optionholder on the earlier of (i) specified reasons including the cessation of his employment by reason of death, retirement, injury, ill-health, disability or redundancy and (ii) the third anniversary of the grant of the option.

Options may be exercised within 6 months of specified circumstances including an optionholder ceasing employment by reason of retirement, injury, disability (including ill-health), redundancy or within 12 months in the event of the death of an optionholder. Options will lapse if not exercised within the exercise period.

In the event of an amalgamation, reconstruction or takeover of the Company, optionholders may either exercise their options or, with the consent of the acquiring

49

TrustApp0143

company or a company associated with it, exchange their options for options over shares in the acquiring company or a company associated with it. Options may also be exercised in the event of the voluntary winding-up of the Company.

Ordinary Shares will be allotted or transferred within 30 days of the date of the exercise of an option provided that, if a deposit is required to be paid under the Ancillary Agreement, the Directors may refuse to allot the Ordinary Shares until they have received notification that the deposit has been paid.

In the event of any capitalisation or rights issue or any consolidation, sub-division or reduction of the share capital or other variation of share capital by the Company, the number of Ordinary Shares under option and the option price may be adjusted by the Directors subject to the auditor confirming in writing that the adjustment is, in the auditor's opinion, fair and reasonable.

(vi) *Commercial Union Executive Share Scheme 1970 (the "1970 Executive Share Scheme")*

This Scheme was adopted by CUA in 1970 and was discontinued in 1973. Under the terms of the 1970 Executive Share Scheme, ordinary shares of CUA were issued, 5 per cent. paid, to certain executives of the Group, in 1970 and 1971. Further ordinary shares of CUA were issued as a result of a capitalisation issue in 1972 and rights issues in 1974 and 1977.

Pursuant to the Scheme of Arrangement, the ordinary shares outstanding under the 1970 Executive Share Scheme were exchanged for equivalent ordinary shares in the Company. Although no replacement scheme has been adopted by the Company, the Articles of Association contain provisions which retain the benefits and restrictions of the 1970 Executive Scheme in respect of ordinary shares still subject to the Scheme.

**Scheme Limits**

The schemes are subject to the following overall limits on the number of Ordinary Shares which may be acquired by subscription:—

(i) in any 10 year period, not more than 10 per cent. of the issued ordinary share capital of the Company from time to time may in aggregate be subscribed under all employee share schemes operated by the Company;

(ii) in any 10 year period, not more than 5 per cent. of the issued ordinary share capital of the Company from time to time may in aggregate be subscribed under all executive share option schemes operated by the Company. In the 4 year period commencing on 21 May 1990, being the date of adoption of the 1990 Netherlands Scheme, not more than 2.5 per cent. of the issued ordinary share capital of the Company from time to time may in aggregate be subscribed under the 1990 Netherlands Scheme and any other executive share option scheme operated by the Company;

(iii) in any 5 year period, not more than 5 per cent. of the issued ordinary share capital of the Company from time to time may in aggregate be subscribed under the employee share schemes operated by the Company and not more than 3 per cent. of the issued ordinary share capital of the Company from time to time may be subscribed under any executive share option scheme. In the 4 year period commencing on 15 March 1990, being the date of adoption of the 1990 Executive Scheme, not more than 2.5 per cent. of the issued ordinary share capital of the Company from time to time may in aggregate be subscribed under the 1990 Executive Scheme and any other executive share option scheme operated by the Company; and

(iv) in any year of assessment, the nominal amount of Ordinary Shares which may be subscribed by the Trustees of the 1991 Profit Sharing Scheme when aggregated with the total amount of any other Ordinary Shares issued by the Company in respect of

50

TrustApp0144

any other profit sharing scheme operated by it, may not exceed 1 per cent. of its issued share capital from time to time.

The schemes are also subject to the following individual limits, fixed by reference to the issued ordinary share capital of the Company:—

(i) the nominal amount of Ordinary Shares which may be purchased or subscribed by the Trustees for the purposes of the 1991 Profit Sharing Scheme may not exceed 42,940,088;

(ii) the total number of Ordinary Shares which may be subscribed under the 1990 SAYE Scheme may not exceed 42,750,679 being 10 per cent. of the issued ordinary share capital of the Company on 5 June 1990;

(iii) the number of Ordinary Shares which may be subscribed under the 1990 Executive Scheme may not exceed 42,750,679 being 10 per cent. of the issued ordinary share capital of the Company on 5 June 1990; and

(iv) the number of Ordinary Shares which may be allocated under the 1990 Netherlands Scheme may not exceed 42,750,679 being 10 per cent. of the issued ordinary share capital of the Company on 5 June 1990.

The limits in this sub-paragraph may be adjusted to take account of rights and capitalisation issues and any sub-division, consolidation or reduction of the Company's share capital.

## 7.  Taxation

(a)  Under current UK taxation legislation, no withholding tax will be deducted from dividends paid by the Company. The Company is generally required to make an advance payment of corporation tax ("ACT") when a dividend is paid. The current ACT rate is 25/75ths of the dividends paid. Consequently, the ACT relating to any dividend currently equals 25 per cent. of the total of the cash dividend and the ACT.

A UK resident individual shareholder receives, imputed to any cash dividend received, a tax credit which, at current rates, is equal to 25/75ths of the dividend paid. The tax credit will satisfy in full a UK resident individual shareholder's liability to basic rate income tax on the dividend plus the tax credit, leaving such shareholder liable to higher rate income tax only (if appropriate). If the individual is not liable to income tax or is liable to income tax at a rate lower than the basic rate, the tax credit may be reclaimed, in whole or in part, from the Inland Revenue.

A UK resident corporate shareholder is not liable to UK corporation tax on any dividend received and the dividend and associated tax credit will represent franked investment income in the hands of such a shareholder.

Shareholders in the Company who are not resident in the UK may be entitled to reclaim from the Inland Revenue a proportion of the tax credit relating to their dividends but such entitlement will depend, in general, upon the provisions of any double taxation agreement or convention which exists between the UK and their country of residence. Shareholders who are resident in countries other than the UK but who are either Commonwealth citizens or citizens of the Republic of Ireland or certain other class of person, are entitled to a tax credit which they may set off against their total UK income tax liability or reclaim in cash to the same extent as if they were resident in the UK. Non-UK resident shareholders may be subject to foreign taxation on dividend income in their country of residence. Any person who is not resident in

51

TrustApp0145

the UK should consult his own tax adviser on the question of the double taxation provisions (if any) applying between his country of residence and the UK.

(b)    A disposal of the Further New Preference Shares may, after taking account of indexation allowance, give rise to a chargeable gain (or allowable loss) for the purposes of UK taxation of capital gains for shareholders who are resident or ordinarily resident in the UK and, in certain cases, non-UK resident shareholders who carry on a trade, profession or vocation in the UK through a branch or agency in connection with which the Further New Preference Shares are held.

(c)    No stamp duty or stamp duty reserve tax ("SDRT") will be payable on the issue of the Further New Preference Shares. Transfers of Further New Preference Shares once registered will be liable to stamp duty generally at the rate of 50p per £100 (or part of £100) of the price paid. Agreements to transfer the Further New Preference Shares may be subject to SDRT also generally at the rate of 50p per £100 (or part of £100) if a transfer of the Further New Preference Shares to which the agreement relates is not executed and duly stamped.

(d)    The Further New Preference Shares are assets situated in the UK for the purposes of UK inheritance tax. A gift of such assets or the death of a holder of such assets may (subject to certain exemptions and reliefs) give rise to a liability to UK inheritance tax, even if the holder is neither domiciled or deemed to be domiciled in the UK. A gift of Further New Preference Shares by an individual ("the donor") to one or more individuals absolutely or to certain trusts and where the donor does not reserve any benefit will, where such gift is made seven years or more before the death of the donor, be exempt from inheritance tax.

**The above summary reflects certain aspects of current law and practice in the UK and may not apply to certain classes of person (such as dealers). Holders of Further New Preference Shares who are in any doubt as to their personal taxation position or who may be subject to tax in any other jurisdiction should consult their professional advisers.**

TrustApp0146

## 8.   Principal subsidiaries and other investments

(a)   The Company's principal subsidiaries are:—

| Company and Registered/ Head Office | Country of Incorporation | Nature of Business | Issued Capital | Paid up | CU owned |
|---|---|---|---|---|---|
| The British & European Reinsurance Company Ltd St. Helen's 1 Undershaft London EC3P 3DQ | UK | Reinsurance | 15,000,000 Ordinary Shares of £1 each | Fully Paid | 100% |
| Commercial Union Assurance Company plc St. Helen's 1 Undershaft London EC3P 3DQ | UK | Insurance | 434,534,597 Ordinary Shares of 25p each | Fully paid | 100% |
| Commercial Union Financial Holdings Ltd. St. Helen's 1 Undershaft London EC3P 3DQ | UK | Holding Company | 10,000,002 Ordinary Shares of £1 each | Fully Paid | 100% |
| Commercial Union Properties Ltd. St. Helen's 1 Undershaft London EC3P 3DQ | UK | Property Investment | 12,350,292 Ordinary Shares of 25p each | Fully Paid | 100% |
| The Northern Assurance Company Ltd. St. Helen's 1 Undershaft London EC3P 3DQ | UK | Assurance | 6,151,610 Ordinary Shares of £1 each | Fully Paid | 100% |
| National Commercial Union Limited 485 La Trobe Street Melbourne Victoria 3000 Australia | Australia | Insurance | 181,081,475 Ordinary Shares of A50 cents each | Fully paid | 78.03% |
| NV Commercial Union Belgium SA Avenue Herrmann Debroux 54 1160 Brussels Belgium | Belgium | Insurance | 163,600 Shares | No Par Value | 99.938% |
| Curepool Ltd Cedar House 41 Cedar Avenue Hamilton Bermuda | Bermuda | Reinsurance | 20,000,000 Ordinary Shares of £1 each; 45,000,000 Ordinary Shares of £1 each 70 pence paid | Fully Paid / 70p Paid | 100% / 100% |
| Commercial Union of Canada Holdings Ltd. P.O. Box 441 Toronto-Dominion Centre Toronto Ontario M5K 1L9 Canada | Canada | Insurance Holding Company | 810,173 Common Shares | No Par Value | 100% |
| Commercial Union France SA 125 Rue du Président Wilson 92593 Le Vallors-Pervet Cedex France | France | Insurance Holding Company | 1,455,285 Shares of FF100 each | Fully Paid | 99.79% |
| Delta Lloyd Verzekeringsgroep NV Spaklerweg 4 1096 BA Amsterdam Holland | Holland | Insurance Holding Company | 3,300,004 Ordinary Shares of Dfl.20 each | Fully Paid | 99.99% |
| Commercial Union Corporation One Beacon Street Boston Mass. 02108 USA | USA | Insurance Holding Company | 7,149 Shares of Common Stock US$1 each | Fully Paid | 100% |

53

TrustApp0147

(b)  The Group has the following shareholdings held on a long-term basis in the issued share capital of the two undertakings as set out below:—

| | | Société Générale | Munich Re |
|---|---|---|---|
| (i) | *Registered Head Office* | 29, Boulevard Haussmann 75009 Paris, France | Münchener Rückversicherungs-Gesellschaft Königstrasse 407 Postfach 401320 D-8000 München 40, Germany |
| (ii) | *Country of Incorporation* | France | Germany |
| (iii) | *Nature of Business* | Banking | Reinsurance |
| (iv) | *Issued Capital* | FFr.2.24bn (£275.0m) at 31 December 1991 | DM655m (£271.2m) at 30 June 1991 |
| (v) | *Paid up* | FFr.2.24bn (£275.0m) at 31 December 1991 | DM337m (£139.5m) at 30 June 1991 |
| (vi) | *% Amount of issued share capital owned by Commercial Union* | 3.9% | (a) 5.1% of Registered DM100 nominal shares (DM50 paid up) (b) 1.4% of Bearer DM50 nominal shares |
| (vii) | *Reserves* | FFr.30.20bn (£3.71bn) at 31 December 1991 | DM1.754bn (£726.3m) at 30 June 1991 |
| (viii) | *Dividends received during year ended 31 December 1991* | FFr.39.0m (£4.79m) | DM3.2m (£1.3m) |
| (ix) | *Dividends received during 9 months ended 30 September 1992* | FFr.45.0m (£5.5m) | Nil (Note (d)) |
| (x) | *Profit after tax* | FFr.3.69bn (£453.0m) (year ended 31 December 1991) | DM104.9m (£43.4m) (year ended 30 June 1991) |
| (xi) | *Market value of Commercial Union Shareholding at 16 November 1992* | £201.3m | £339.3m |

Notes:—

(a)  Where applicable, the figures provided above have been converted into pounds sterling at the spot rate (£1=FFr.8.145 and £1=DM2.415) prevailing at 16 November 1992, as derived from the *Financial Times* (Exchange Cross Rates) published on 17 November 1992.

(b)  The reserves of Munich Re, as set out above, exclude minority interests of DM208m (£86.1m) and special reserves of DM43m (£17.8m).

(c)  The dividends from Société Générale were received in the form of ordinary shares of the company.

(d)  A dividend of DM3.3m (£1.4m) is due from Munich Re in December 1992.

9.  Material contracts

The following contracts, not being contracts entered into in the ordinary course of business, have been entered into by any member of the Group within the two years preceding the date of this document and are, or may be, material:—

(a)  a Subscription Agreement dated 12 March 1992 between (i) the Company and Commercial Union Assurance Company plc (the "Guarantor") and (ii) Kleinwort Benson Limited and others (the "Managers") whereby, *inter alia*, the Company agreed to issue, the Guarantor agreed to guarantee the payment of and the Managers agreed jointly and severally to subscribe and pay for £100,000,000 10¾ per cent. Guaranteed Bonds 2002;

(b)  a Placing Agreement dated 20 May 1992 between (i) the Company and (ii) Cazenove and Hoare Govett (the "Placing Managers") whereby, *inter alia*, the Placing Managers each agreed to procure subscribers or to subscribe for up to £50,000,000 of the Existing New Preference Shares;

(c)  the Placing Agreement referred to in Part IV of this document; and

54

TrustApp0148

(d)    a Share Acquisition Agreement dated 10 July 1992 between (i) the Company (ii) Commercial Union Assurance Company plc (the "Purchaser") (iii) The National Mutual Life Association of Australasia Ltd. and (iv) Enemelay Investments Pty. Ltd. (the "Vendor") whereby, *inter alia*, the Vendor agreed to sell and the Purchaser agreed to purchase 46,492,250 Ordinary Shares in National Commercial Union Limited in consideration of the issue by the Company of 5,205,784 Ordinary Shares to the Vendor.

## 10.    General

(a)    The registered office of the Company is at St. Helen's, 1 Undershaft, London EC3P 3DQ and the principal place of business is 6 Broadgate, 7th Level, London EC2M 2QS.

(b)    (i)  In the years to 31 December 1991, 1990 and 1989, the average number of persons employed by the Group was 21,790, 21,340 and 20,470 respectively.

(ii) The number of persons employed by the Group as at 31 December 1989 by territorial location was:—

| Location | Number of Employees |
|---|---|
| United Kingdom | 8,865 |
| Continental Europe | 5,698 |
| North America | 5,348 |
| Overseas | 971 |
| | 20,882 |

(c)    Neither Commercial Union nor any of its subsidiaries is involved in any legal or arbitration proceedings which may have or have had during the 12 months preceding the date of this document a significant effect on the financial position of the Group, nor so far as the Directors are aware, are any such proceedings pending or threatened against any member of the Group.

(d)    Coopers & Lybrand have given and have not withdrawn their written consent to the issue of this document with the inclusion herein of their name in the form and context in which it is included.

(e)    There has been no significant change in the trading or financial position of the Group since 31 December 1991, the date to which the latest published audited accounts of the Group were made up.

(f)    The expenses of and incidental to the Placing and listing of the Further New Preference Shares, including registration and listing fees, printing, advertising and distribution costs, the commission payable to Cazenove and Hoare Govett and legal, accounting and other professional fees, are estimated to amount to £960,000 (exclusive of value added tax) and are payable by the Company.

(g)    Cazenove and Hoare Govett are members of The Securities and Futures Authority.

(h)    The financial information in relation to Commercial Union contained in this document does not constitute statutory accounts within the meaning of Section 240 of the Companies Act 1985. Statutory accounts of Commercial Union for the three financial years ended 31 December 1989, 1990 and 1991 have been delivered to the Registrar of Companies.

(i)    The auditors of Commercial Union or the former parent company, Commercial Union Assurance Company plc have made a report under Section 235 of the

55

TrustApp0149

Companies Act 1985 on the Statutory accounts of Commercial Union or the former parent company, Commercial Union Assurance Company plc for each of the 3 years ended 31 December 1991 none of which were qualified within the meaning of Section 262 of the Companies Act 1985 or contained a statement made under either Section 237 (2) or (3) of the Companies Act 1985.

### 11.   Documents for inspection

Copies of the following documents will be available for inspection at the offices of Linklaters & Paines, Barrington House, 59-67 Gresham Street, London EC2V 7JA during normal business hours on any weekday (Saturdays and public holidays excepted) for 14 days from the date of this document:—

(a)     the Memorandum and Articles of Association of the Company;

(b)     the consolidated audited accounts of the Group for the two financial periods ended 31 December 1991 and 31 December 1990;

(c)     the material contracts referred to in paragraph 9 above;

(d)     the consent letter referred to in paragraph 10(d) above;

(e)     the service contracts referred to in paragraph 5(c) above; and

(f)     the employee share schemes referred to in paragraph 6 above.

TrustApp0150

## Part VI
### Third Quarter Results of Commercial Union Group

**"UNAUDITED RESULTS : 9 MONTHS ENDED 30 SEPTEMBER 1992**

| | | |
|---|---|---|
| Total premium income | £3,761m | (1991   £3,089m) |
| Operating profit before taxation | £6.1m | (1991   loss £42.4m) |
| Operating loss after taxation | £5.7m | (1991   loss £42.7m) |
| Operating loss per share | 1.3p | (1991   loss 9.8p) |

- Sustained progress produces profit of £6.1m.
- Pre-tax profit of £19.6m in the third quarter (1991 loss £14.8m).
- Improved general insurance results from the United Kingdom, United States and Overseas.
- New life premium growth of 39 per cent.
- Shareholders' funds amounted to £1,301m.

Tony Brend, Chief Executive, commenting on the results, said:—

"Sustained progress continues to be made in improving profitability and we achieved a pre-tax profit of £19.6m in the third quarter, compared with a loss of £14.8m in 1991. At the 9 months stage the pre-tax profit amounted to £6.1m."

"The favourable trend reflects the extensive actions we have taken to improve general insurance results. There was a strong improvement in our largest territory, the United Kingdom, which has continued to see improved general insurance trading conditions, and there were particularly good increases in profits from the United States and Overseas."

"General insurance premiums increased by 12 per cent., mainly reflecting growth in the United Kingdom where we are obtaining substantial premium rate increases and writing new business on a selective basis."

"Life operations made good progress with worldwide new life premiums increasing by 39 per cent. Life profits made a substantial contribution of £82.0m despite the effect of new business growth, which increases shareholders' life profits in the future at some expense to current profits."

"Shareholders' funds increased by £96m in the quarter to £1,301m at the end of September, which does not include the value of a substantial part of our life operations."

Features of the results were:—

| GROUP | 1992 £m | 1991 £m | Underlying increase % |
|---|---|---|---|
| Life premiums | 1,298.2 | 945.5 | 27 |
| General insurance premiums | 2,462.5 | 2,143.7 | 12 |
| | | | |
| Life profits | 82.0 | 80.7 | |
| Non-life operating result | (75.9) | (123.1) | |
| Operating profit/(loss) before taxation | 6.1 | (42.4) | |

- Life premiums increased strongly to £1,298.2m, a 27 per cent. increase after adjusting for changes in rates of exchange. New annual premiums increased by 10 per cent. and single premiums by 46 per cent. There was substantial new business growth in the

57

TrustApp0151

United Kingdom, following the continuing success of a single premium investment bond and in Continental Europe, where new business benefited from marketing initiatives in the Netherlands and from continuing development in France, Italy and Spain.

- Reported life profits benefited from the strengthening of foreign currencies against sterling, although they were lower in underlying terms, particularly in Continental Europe. This reflected the effect of strong new business growth, which increases shareholders' life profits in the future at some expense to current profits.

- General insurance premiums increased by 12 per cent. in underlying terms to £2,462.5m. Growth benefited from a combination of substantial rate increases and selective new business in the United Kingdom. There was an underlying reduction in premiums in the Netherlands due to the transfer of medical expenses business to a third party at the end of 1991. The underwriting result improved to a loss of £302.3m (1991 loss £338.1m), reflecting better results from a number of territories, particularly the United Kingdom and United States.

- Investment income amounted to £212.4m (1991 £209.9m) after charging external loan interest of £35.1m (1991 £37.6m) and the costs of our non-insurance activities of £4.9m (1991 £4.2m). Stronger cash flow helped investment income in the third quarter, although lower interest rates had an adverse effect.

- The profit attributable to shareholders was £216.3m (1991 £10.9m). This was after a tax charge of £11.4m (1991 credit £0.9m) and realised investment gains after taxation of £222.0m (1991 gains £53.6m). Substantial gains were realised in the second quarter on investments in the United Kingdom, including certain investments held for the longer term. The proceeds from these realisations were reinvested so that the composition of the Group's investment portfolio was left substantially unchanged but at a rebased cost. These actions had no material effect on overall shareholders' funds.

- Shareholders' funds at 30 September 1992 amounted to £1,301m (31 December 1991 £1,210m). Significant movements were the £100m preference share issue in May, the beneficial effect of exchange rate changes and provision for the cost of the interim dividend. Shareholders' funds do not include the value of a substantial part of our life operations.

- Over the five years to 30 Sepember 1992, pre-tax movements in realised and unrealised investment values have averaged £48m per annum.

| UNITED KINGDOM | 1992 £m | 1991 £m | Underlying increase % |
|---|---|---|---|
| Life premiums | 452.0 | 286.1 | 58 |
| General insurance premiums | 1,104.2 | 879.4 | 25 |
| Life profits | 32.0 | 31.1 | |
| Non-life operating result | 1.3 | (52.3) | |
| Operating profit/(loss) before taxation | 33.3 | (21.2) | |

- The strong improving trend in results continued, reflecting the benefits flowing from higher premium rates, tight control of expenses and the maintenance of high underwriting standards in our general insurance operations.

- There was strong growth in life premiums with new single premiums increasing by 184 per cent., principally due to the success of our With-Profits Classic Investment Bond. New annual premiums were at similar levels to last year despite the difficult economic conditions. Life profits amounted to £32.0m (1991 £31.1m).

58

TrustApp0152

- General insurance premiums increased by 25 per cent. Significant premium rate increases continued to be achieved in most classes of business, including the London market, and we benefited from the opportunities available to write new business selectively.

- The underwriting loss reduced to £128.6m (1991 loss £157.7m) which was after providing £10m for the City of London bomb damage in the second quarter (£5m was also provided in Group reinsurance retentions). Weather claims were lower, subsidence claims reduced to £14m (1991 £24m) and private motor continued to show better results. Recession-related claims, however, continued at a high level and arson claims accounted for 25 per cent. of industrial fire claim notifications in the third quarter. Theft claims were 29 per cent. higher at £81m and the mortgage guarantee underwriting loss was £12.2m (1991 loss £9.1m). London market marine and aviation business, which is accounted for on the three year basis, produced an underwriting loss of £39.0m (1991 loss £21.0m). London market non-marine business produced an underwriting loss of £23.8m (1991 loss £21.8m).

## CONTINENTAL EUROPE

| NETHERLANDS | 1992 £m | 1991 £m | Underlying increase/ (decrease) % |
|---|---|---|---|
| Life premiums | 446.2 | 347.6 | 10 |
| General insurance premiums | 209.7 | 206.3 | (13) |
| Life profits | 45.2 | 43.3 | |
| Non-life operating result | 9.6 | 10.3 | |
| Operating profit before taxation | 54.8 | 53.6 | |

- Delta Lloyd, our subsidiary in the Netherlands, again made a substantial profit despite continuing competitive pressures on general insurance business and the effect of life new business growth on profits. Movement in the exchange rate benefited reported results.

- There was strong growth in life premiums partly due to a successful marketing campaign for individual business. Life profits were lower in underlying terms due to new business growth.

- There was a 13 per cent. reduction in general insurance premiums, in underlying terms, reflecting the transfer of our medical expenses portfolio to a third party at the end of 1991. The underwriting result showed a small improvement, although there was an increase in large claims in the third quarter.

- Investment income was 18 per cent. lower in underlying terms at £27.2m, reflecting the transfer of medical expenses business.

| OTHER EUROPEAN TERRITORIES | 1992 £m | 1991 £m | Underlying increase % |
|---|---|---|---|
| Life premiums | 241.7 | 166.0 | 26 |
| General insurance premiums | 255.4 | 200.4 | 16 |
| Life profits | (0.8) | 2.0 | |
| Non-life operating result | (32.5) | (22.9) | |
| Operating loss before taxation | (33.3) | (20.9) | |

- There was strong life premium growth reflecting successful development of distribution channels in France, Italy and Spain. New annual premiums increased by

TrustApp0153

46 per cent. and single premiums by 30 per cent., after allowing for movements in rates of exchange.

- Life profits were affected by strong new business growth.

- General insurance markets remain difficult but there are signs that premium rates are starting to improve and that our underwriting and expense containment strategies are beginning to have a beneficial effect.

## NORTH AMERICA

| UNITED STATES | 1992 £m | 1991 £m | Underlying increase % |
|---|---|---|---|
| Life premiums | 115.1 | 112.4 | 4 |
| General insurance premiums | 625.4 | 593.1 | 7 |
| Life profits | 5.2 | 3.8 | |
| Non-life operating result | 30.3 | 11.2 | |
| Operating profit before taxation | 35.5 | 15.0 | |

- An improved profit was achieved in the United States reflecting benefits from management actions, lower claims frequency and a further reduction in the expense ratio.

- The cost of hurricane Andrew amounted to £3m, reflecting our careful control of exposure to the areas affected. Overall weather catastrophe claims for the nine months were slightly lower than the same period last year despite record losses for the industry.

- The increase in general insurance premiums reflected growth in targeted market sectors and the acquisition of the marine book of business of Crum & Forster in October 1991, partly offset by a reduction in exposure to workers' compensation business. Rate increases of 3 per cent. were achieved in personal lines although continued intense competition restricted commercial lines increases to 1 per cent.

- Involuntary business reduced to 7 per cent. (1991 10 per cent.) of total premiums reflecting our strategy to reduce involuntary automobile premiums in Massachusetts and added 2.3 percentage points (1991 2.3pp) to the overall statutory operating ratio.

- Life profits increased to £5.2m (1991 £3.8m). Life premiums were higher following improved sales of annuities and universal life plans during the third quarter.

| CANADA | 1992 £m | 1991 £m | Underlying increase/ (decrease) % |
|---|---|---|---|
| Life premiums | 42.3 | 32.5 | 46 |
| General insurance premiums | 106.1 | 130.1 | (9) |
| Life profits | 0.8 | 0.5 | |
| Non-life operating result | (2.0) | 8.2 | |
| Operating (loss)/profit before taxation | (1.2) | 8.7 | |

- Strong growth in life premiums continued with good sales of annuities.

- General insurance premiums and exposures were lower due to the re-underwriting of certain business and competitive market conditions.

60

TrustApp0154

- The general insurance result continued to be affected by difficult trading conditions and a deterioration in motor results. Investment income reduced reflecting lower interest rates and adverse cash flow.

| OVERSEAS | 1992 £m | 1991 £m | Underlying increase % |
|---|---|---|---|
| Life premiums | 0.9 | 0.9 | 4 |
| General insurance premiums | 109.4 | 78.9 | 13 |
| Life profits | (0.4) | — | |
| Non-life operating result | 17.4 | 3.9 | |
| Operating profit before taxation | 17.0 | 3.9 | |

- Following the increase in our shareholding in our Australian company, National Commercial Union, this company was consolidated as a subsidiary from 24 August 1992. Results are now reported on a current basis, having previously been accounted for six months in arrears. As a consequence, results for the nine months to date include fourteen months for Australia as an associate and one month as a subsidiary. This had the effect of increasing earnings from associates by £2.6m in the nine months.

- There were also higher profits from South Africa and the Far East continued to make a satisfactory contribution to results.

## GROUP REINSURANCE RETENTIONS

- These consist of certain reinsurance covers which are retained by the Group rather than being placed with third parties.

- The operating loss before taxation of £10.5m (1991 loss £18.0m) included a provision of £5m in the second quarter for the cost of bomb damage in the City of London.

## CENTRAL FINANCING CHARGES

- Central financing charges, which includes interest on intra-group loans and external borrowings not specifically allocated to territories, amounted to £89.5m (1991 £63.5m). The increase was due to higher intra-group loans whilst external loan interest of £22.1m was slightly lower than last year.

## UNDERWRITING RESULT

- The analysis of the underwriting result by territory was as follows:—

| | | 1992 £m | 1991 £m |
|---|---|---|---|
| United Kingdom | | (128.6) | (157.7) |
| Continental Europe | — Netherlands | (17.6) | (16.9) |
| | — Other territories | (57.7) | (43.3) |
| North America | — United States | (57.4) | (78.7) |
| | — Canada | (18.3) | (11.6) |
| Overseas | | (3.3) | (4.7) |
| Group reinsurance retentions | | (19.4) | (25.2) |
| | | (302.3) | (338.1) |

61

TrustApp0155

## RATES OF EXCHANGE

- Changes in rates of exchange during the last 12 months had a beneficial effect on the profit before taxation of £4.0m.
- Published figures have been converted at the following rates of exchange:—

| | 30 September 1992 | 30 September 1991 |
|---|---|---|
| Netherlands florin | 2.81 | 3.29 |
| United States dollar | 1.77 | 1.74 |
| Canadian dollar | 2.22 | 1.98 |

## THE UNAUDITED PROFIT AND LOSS ACCOUNT FOR THE 9 MONTHS ENDED 30 SEPTEMBER 1992

| | 9 months 1992 Unaudited £m | 9 months 1991 Unaudited £m | Year 1991 Audited £m |
|---|---|---|---|
| Premium income — life | 1,298.2 | 945.5 | 1,361.4 |
| — general | 2,462.5 | 2,143.7 | 2,745.6 |
| | 3,760.7 | 3,089.2 | 4,107.0 |
| Investment income net of loan interest | 212.4 | 209.9 | 271.6 |
| Underwriting result | (302.3) | (338.1) | (462.6) |
| Associated undertakings' earnings | 14.0 | 5.1 | 8.1 |
| Non-life operating loss | (75.9) | (123.1) | (182.9) |
| Life profits | 82.0 | 80.7 | 114.3 |
| Operating result before taxation | 6.1 | (42.4) | (68.6) |
| Taxation and minorities | (11.8) | (0.3) | 3.3 |
| Operating result after taxation | (5.7) | (42.7) | (65.3) |
| Realised investment gains | 222.0 | 53.6 | 49.8 |
| Profit/(loss) attributable to shareholders | 216.3 | 10.9 | (15.5) |
| Shareholders' funds | 1,301 | 1,324 | 1,210 |
| Earnings per share | | | |
| — operating result after taxation | (1.3)p | (9.8)p | (15.0)p |
| — profit/(loss) attributable to shareholders | 49.0p | 2.6p | (3.6)p |
| Operating result before taxation | | | |
| | £m | £m | £m |
| United Kingdom | 33.3 | (21.2) | (39.7) |
| Continental Europe — Netherlands | 54.8 | 53.6 | 79.5 |
| — Other territories | (33.3) | (20.9) | (44.8) |
| North America — United States | 35.5 | 15.0 | 32.0 |
| — Canada | (1.2) | 8.7 | 8.0 |
| Overseas | 17.0 | 3.9 | 7.1 |
| Group reinsurance retentions | (10.5) | (18.0) | (21.7) |
| Central financing charges — external | (22.1) | (22.9) | (29.8) |
| — intra-group | (67.4) | (40.6) | (59.2) |
| | 6.1 | (42.4) | (68.6) |

62

TrustApp0156

### REGISTERED OFFICE OF THE ISSUER
St. Helen's
1 Undershaft
London EC3P 3DQ


### BROKERS TO THE ISSUE

**Cazenove & Co.**
12 Tokenhouse Yard
London EC2R 7AN

**Hoare Govett Corporate Finance Limited**
4 Broadgate
London EC2M 7LE


### LEGAL ADVISERS

*To the Issuer*
**Linklaters & Paines**
Barrington House
59-67 Gresham Street
London EC2V 7JA

*To Cazenove & Co. and Hoare Govett
Corporate Finance Limited*
**Slaughter and May**
35 Basinghall Street
London EC2V 5DB


### AUDITOR
**Coopers & Lybrand**
Plumtree Court
London EC4A 4HT

### REGISTRAR
**Lloyds Bank Plc**
Registrar Department
The Causeway
Worthing
West Sussex BN99 6DA

63

TrustApp0157

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>BOY SCOUTS OF AMERICA AND<br>DELAWARE BSA, LLC,[1]<br><br>               Debtors. | Chapter 11<br><br>Case No. 20-10343 (LSS)<br><br>(Jointly Administered) |

## THIRD MODIFIED FIFTH AMENDED CHAPTER 11 PLAN OF REORGANIZATION (WITH TECHNICAL MODIFICATIONS) FOR
## BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC

WHITE & CASE LLP
Jessica C. Lauria (admitted *pro hac vice*)
1221 Avenue of the Americas
New York, New York 10020
Telephone: (212) 819-8200
Email: jessica.lauria@whitecase.com

– and –

WHITE & CASE LLP
Michael C. Andolina (admitted *pro hac vice*)
Matthew E. Linder (admitted *pro hac vice*)
Laura E. Baccash (admitted *pro hac vice*)
Blair M. Warner (admitted *pro hac vice*)
111 South Wacker Drive
Chicago, Illinois 60606
Telephone: (312) 881-5400
Email: mandolina@whitecase.com
      mlinder@whitecase.com
      laura.baccash@whitecase.com
      blair.warner@whitecase.com

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Derek C. Abbott (No. 3376)
Andrew R. Remming (No. 5120)
Paige N. Topper (No. 6470)
1201 North Market Street, 16th Floor
P.O. Box 1347
Wilmington, Delaware 19899-1347
Telephone: (302) 658-9200
Email: dabbott@morrisnichols.com
      aremming@morrisnichols.com
      ptopper@morrisnichols.com

*Attorneys for the Debtors and Debtors in Possession*

Dated: September 6, 2022
      Wilmington, Delaware

---

[1]   The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are as follows: Boy Scouts of America (6300); and Delaware BSA, LLC (4311). The Debtors' mailing address is 1325 W. Walnut Hill Ln., Irving, TX 75038.

## TABLE OF CONTENTS

Article I. Definitions and Rules of Interpretation ................................................................... 1
    A.     Definitions .................................................................................................. 1
    B.     Interpretation; Application of Definitions and Rules of Construction ............... 53
    C.     Reference to Monetary Figures ..................................................................... 53
    D.     Consent Rights ........................................................................................... 53
    E.     Controlling Document .................................................................................. 54

Article II. Administrative Expense and Priority Claims ........................................................ 54
    A.     Administrative Expense Claims .................................................................... 54
    B.     Priority Tax Claims ..................................................................................... 57

Article III. Classification and Treatment of Claims and Interests ........................................ 57
    A.     Classification of Claims and Interests .......................................................... 57
    B.     Treatment of Claims and Interests ................................................................ 58
    C.     Elimination of Vacant Classes ..................................................................... 66
    D.     Cramdown .................................................................................................. 66

Article IV. Settlement Trust .................................................................................................. 67
    A.     Establishment of the Settlement Trust ........................................................... 67
    B.     Purposes of the Settlement Trust .................................................................. 67
    C.     Transfer of Claims to the Settlement Trust .................................................... 67
    D.     Transfer of Settlement Trust Assets to the Settlement Trust ............................ 68
    E.     Settlement Trustee ...................................................................................... 71
    F.     Claims Administrators ................................................................................. 71
    G.     Settlement Trust Advisory Committee ........................................................... 71
    H.     Future Claimants' Representative ................................................................. 72
    I.     Trust Distribution Procedures ...................................................................... 72
    J.     Post-Effective Date Contributing Chartered Organizations. ............................ 72
    K.     Post-Effective Date Settling Insurance Companies. ....................................... 73
    L.     Settlement Trust Expenses ........................................................................... 73
    M.     Reimbursement by Settlement Trust ............................................................. 74
    N.     [Reserved]. ................................................................................................ 74
    O.     Assignment of Claims and Defenses ............................................................. 75
    P.     Investment Guidelines ................................................................................. 75
    Q.     Excess Settlement Trust Assets .................................................................... 75
    R.     Document Appendix .................................................................................... 75

TrustApp0159

| | | | |
|---|---|---|---|
| S. | Privileged Information | ....................................................... | 75 |
| T. | No Liability | ...................................................................... | 75 |
| U. | U.S. Federal Income Tax Treatment of the Settlement Trust | ......................... | 75 |
| V. | Institution and Maintenance of Legal and Other Proceedings | ..................... | 76 |
| W. | Settlement Trust Discovery | ........................................... | 76 |
| X. | Notation on Claims Register Regarding Abuse Claims | ..................... | 76 |

Article V. Means for Implementation of the Plan ..................................................... 76

| | | | |
|---|---|---|---|
| A. | General | ............................................................................ | 76 |
| B. | Operations of the Debtors between Confirmation and the Effective Date | ........... | 76 |
| C. | BSA Governance Documents | .......................................... | 77 |
| D. | Continued Legal Existence of BSA | ................................ | 77 |
| E. | Reorganized BSA's Directors and Senior Management | ..................... | 77 |
| F. | [Reserved] | ....................................................................... | 77 |
| G. | Due Authorization | .......................................................... | 77 |
| H. | Reinstatement of Interests | ............................................. | 77 |
| I. | Restatement of Indebtedness | .......................................... | 77 |
| J. | Cancellation of Liens | ..................................................... | 78 |
| K. | Effectuating Documents and Further Transactions | ......................... | 78 |
| L. | Sources of Consideration for Distributions | ................................ | 78 |
| M. | Calculation of Minimum Unrestricted Cash and Investments | ..................... | 79 |
| N. | Resolution of Abuse Claims | ............................................ | 79 |
| O. | Funding by the Settlement Trust | ...................................... | 80 |
| P. | Core Value Cash Pool | ...................................................... | 80 |
| Q. | Creditor Representative | .................................................... | 80 |
| R. | Residual Cash in Core Value Cash Pool | ................................ | 80 |
| S. | Compromise and Settlement of Claims, Interests and Controversies | .............. | 80 |
| T. | Payment of Coalition and Pfau/Zalkin Restructuring Expenses | ......................... | 88 |
| U. | Good-Faith Compromise and Settlement | ................................ | 89 |
| V. | Restated Debt and Security Documents | ................................ | 90 |
| W. | Foundation Loan | ............................................................ | 92 |
| X. | BSA Settlement Trust Note | ............................................... | 93 |
| Y. | DST | ............................................................................... | 94 |
| Z. | Pension Plan | ................................................................. | 94 |
| AA. | Single Satisfaction of Allowed General Unsecured Claims | ..................... | 94 |

TrustApp0160

BB.    Exemption from Certain Transfer Taxes and Recording Fees........................... 95

CC.    Non-Monetary Commitments................................................................... 95

Article VI. Executory Contracts and Unexpired Leases.............................................. 95

A.    Assumption and Rejection of Executory Contracts and Unexpired Leases......... 95

B.    Rejection Damages Claims..................................................................... 96

C.    Cure of Defaults under Executory Contracts and Unexpired Leases ................ 96

D.    Dispute Resolution............................................................................... 97

E.    Contracts and Leases Entered into After the Petition Date .............................. 98

F.    Insurance Policies............................................................................... 98

G.    Compensation and Benefits Programs....................................................... 99

H.    Restoration Plan and Deferred Compensation Plan........................................ 99

I.    Workers' Compensation Program.............................................................. 99

J.    Indemnification Obligations ................................................................... 100

K.    Gift Annuity Agreements and Life-Income Agreements................................. 100

L.    Modifications, Amendments, Supplements, Restatements, or Other
       Agreements....................................................................................... 100

M.    Reservation of Rights........................................................................... 101

N.    Nonoccurrence of Effective Date; Bankruptcy Code Section 365(d)(4)........... 101

Article VII. Provisions Governing Distributions .................................................... 101

A.    Applicability..................................................................................... 101

B.    Distributions Generally ........................................................................ 101

C.    Distributions on Account of Certain Claims Allowed as of the Effective Date. 101

D.    Distributions on Account of Allowed General Unsecured Claims ................... 101

E.    Distributions on Account of Disputed Claims Allowed After the Effective
       Date................................................................................................ 101

F.    Rights and Powers of Disbursing Agent..................................................... 102

G.    Delivery of Distributions and Undeliverable or Unclaimed Distributions ........ 102

H.    Undeliverable and Non-Negotiated Distributions ......................................... 103

I.    Manner of Payment under the Plan ........................................................... 103

J.    Satisfaction of Claims .......................................................................... 103

K.    Minimum Cash Distributions................................................................... 103

L.    Postpetition Interest............................................................................. 103

M.    Setoffs............................................................................................. 104

N.    Claims Paid or Payable by Third Parties .................................................... 104

O.    Compliance with Tax Requirements and Allocations...................................... 105

TrustApp0161

Article VIII. Procedures for Resolving Contingent, Unliquidated, and Disputed Claims......... 105

    A.    Applicability ...................................................................................... 105

    B.    Allowance of Claims .......................................................................... 105

    C.    Claims Administration Responsibilities ........................................... 105

    D.    Estimation of Claims ......................................................................... 106

    E.    No Distributions Pending Allowance ................................................ 106

    F.    Distributions after Allowance ........................................................... 106

    G.    Disputed Claims Reserve ................................................................... 106

    H.    Adjustment to Claims Register without Objection ........................... 107

    I.    Time to File Objections to Claims .................................................... 107

    J.    Treatment of Untimely Claims ......................................................... 108

Article IX. Conditions Precedent to Confirmation and Effective Date .................................. 108

    A.    Conditions Precedent to Confirmation of the Plan .......................... 108

    B.    Conditions Precedent to the Effective Date ..................................... 112

    C.    Waiver of Conditions Precedent ...................................................... 113

    D.    [Reserved] .......................................................................................... 114

    E.    *Vacatur* of Confirmation Order; Non-Occurrence of Effective Date ............... 114

Article X. Effect of Plan Confirmation ................................................................................... 115

    A.    Vesting of Assets in Reorganized BSA ............................................. 115

    B.    Retention of Certain Causes of Action ............................................ 115

    C.    Binding Effect ................................................................................... 115

    D.    Post-Confirmation Interim Injunction and Stays ............................. 116

    E.    Discharge .......................................................................................... 116

    F.    **Channeling Injunction** ................................................................... 117

    G.    Provisions Relating to Channeling Injunction .................................. 121

    H.    **Insurance Entity Injunction** ........................................................... 123

    I.    **Injunction against Interference with Plan** ................................... 126

    J.    **Releases** .......................................................................................... 126

    K.    **Exculpation** .................................................................................... 132

    L.    **Injunctions Related to Releases and Exculpation** ...................... 132

    M.    Insurance Provisions ........................................................................ 133

    N.    Judgment Reduction .......................................................................... 133

    O.    Reservation of Rights ........................................................................ 134

    P.    Disallowed Claims ............................................................................ 135

TrustApp0162

| Q. | No Successor Liability | 135 |
| R. | Indemnities | 135 |
| S. | The Official Committees and the Future Claimants' Representative | 136 |
| Article XI. Retention of Jurisdiction | | 136 |
| A. | Jurisdiction | 136 |
| B. | General Retention | 137 |
| C. | Specific Purposes | 137 |
| D. | Courts of Competent Jurisdiction | 140 |
| Article XII. MISCELLANEOUS PROVISIONS | | 140 |
| A. | Closing of Chapter 11 Cases | 140 |
| B. | Amendment or Modification of the Plan | 140 |
| C. | Revocation or Withdrawal of Plan | 141 |
| D. | Request for Expedited Determination of Taxes | 141 |
| E. | Non-Severability of Plan Provisions | 142 |
| F. | Notices | 142 |
| G. | Notices to Other Persons | 143 |
| H. | Governing Law | 143 |
| I. | [Reserved] | 143 |
| J. | Timing of Distributions or Actions | 143 |
| K. | Deemed Acts | 143 |
| L. | Entire Agreement | 144 |
| M. | Plan Supplement | 144 |
| N. | Withholding of Taxes | 144 |
| O. | Payment of Quarterly Fees | 144 |
| P. | Effective Date Actions Simultaneous | 144 |
| Q. | Consent to Jurisdiction | 144 |

TrustApp0163

**EXHIBITS**

Exhibit A         Trust Distribution Procedures
Exhibit B         Settlement Trust Agreement
Exhibit C         Contributing Chartered Organization Settlement Contribution
Exhibit D         Contributing Chartered Organizations
Exhibit E         Foundation Loan Facility Term Sheet
Exhibit F         Local Council Settlement Contribution
Exhibit G         Local Councils
Exhibit H         Related Non-Debtor Entities
Exhibit I         Insurance Settlements
Exhibit I-1       Hartford Insurance Settlement Agreement
Exhibit I-2       Century and Chubb Companies Insurance Settlement Agreement
Exhibit I-3       Zurich Insurance Settlement Agreement
Exhibit I-4       Clarendon Insurance Settlement Agreement
Exhibit J         Chartered Organization Settlements
Exhibit J-1       [Reserved]
Exhibit J-2       United Methodist Settlement Agreement
Exhibit J-3       Roman Catholic Settlement Agreement
Exhibit K         Chartered Organizations That Are Debtors In Bankruptcy
Exhibit L         Youth Protection Program

**SCHEDULES**

Schedule 1        Artwork
Schedule 2        BSA Insurance Policies
Schedule 3        Local Council Insurance Policies
Schedule 4        Oil and Gas Interests

**PLAN SUPPLEMENT DOCUMENTS**

Amended BSA Bylaws
Assumed Contracts and Unexpired Leases Schedule
BSA Settlement Trust Note
Creditor Representative
Directors and Officers of Reorganized BSA
Document Appendix
DST Agreement
DST Note
Forms of Claimant Trust Distribution Procedures Releases
Foundation Loan Agreement
Leaseback Requirement Agreement
Rejected Contracts and Unexpired Leases Schedule
Restated 2010 Bond Documents
Restated 2012 Bond Documents
Restated Credit Facility Documents
Restated Security Agreement
Settlement Trust Advisory Committee
Changes to Local Council Settlement Contributions

TrustApp0164

## INTRODUCTION

Boy Scouts of America and Delaware BSA, LLC, the non-profit corporations that are debtors and debtors in possession in the above-captioned chapter 11 cases, hereby propose this plan of reorganization pursuant to section 1121(a) of the Bankruptcy Code. Capitalized terms used herein shall have the meanings ascribed to such terms in Article I.A. The Plan provides for the global resolution of Abuse Claims against the Debtors, Related Non-Debtor Entities, Local Councils, Contributing Chartered Organizations, Settling Insurance Companies, and their respective Representatives. The Debtors are the proponents of the Plan within the meaning of section 1129 of the Bankruptcy Code. The Plan is also proposed in accordance with the JPM / Creditors' Committee Term Sheet, pursuant to which the Debtors, the Creditors' Committee and JPM have agreed to take certain actions to support the prosecution and consummation of the Plan. The Coalition, the Tort Claimants' Committee, and the Future Claimants' Representative also support the Plan. Reference is made to the Disclosure Statement for a discussion of the Debtors' history, charitable mission, operations, projections for those operations, risk factors, and certain related matters. The Disclosure Statement also provides a summary and analysis of the Plan. YOU ARE URGED TO READ THE DISCLOSURE STATEMENT AND THE PLAN WITH CARE IN EVALUATING HOW THE PLAN WILL AFFECT YOUR CLAIM(S) BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.

## ARTICLE I.

## DEFINITIONS AND RULES OF INTERPRETATION

A.     Definitions. The capitalized terms used in the Plan shall have the respective meanings set forth below.

    1.     "2010 Bond" means The County Commission of Fayette County (West Virginia) Commercial Development Revenue Bond (Arrow WV Project) Series 2010B in an aggregate principal amount of $50,000,000, issued by the Bond Issuer pursuant to the 2010 Bond Agreement, the proceeds of which were loaned to the BSA pursuant to the 2010 Note.

    2.     "2010 Bond Agreement" means that certain Bond Purchase and Loan Agreement dated as of November 5, 2010, by and among the Bond Issuer, JPM, the BSA and Arrow, as amended, restated, supplemented or otherwise modified from time to time.

    3.     "2010 Bond Claim" means any Claim against the Debtors arising under, derived from, or based upon the 2010 Bond Documents, including any Claim for obligations, indebtedness, and liabilities of the BSA arising pursuant to any of the 2010 Bond Documents, whether now existing or hereafter arising, whether direct, indirect, related, unrelated, fixed, contingent, liquidated, unliquidated, joint, several, or joint and several, including the obligation of the BSA to repay the 2010 Note, interest on the 2010 Note, and all fees, costs, expenses and obligations of any kind or character due or recoverable from the Debtors under the 2010 Bond Documents.

4.      "2010 Bond Documents" means collectively, the 2010 Bond, the 2010 Bond Agreement, the 2010 Note, the Prepetition Security Documents (2019), the Prepetition Security Agreement (2020) (in the case of the Prepetition Security Documents (2019) and the Prepetition Security Agreement (2020), solely as such documents and agreements pertain to obligations under the other 2010 Bond Documents), and all documentation executed and delivered in connection therewith, as amended, restated, supplemented or otherwise modified from time to time.

5.      "2010 Credit Agreement" means that certain Credit Agreement dated as of August 11, 2010, by and between the BSA, as borrower, and JPM, as lender, as amended by that certain First Amendment to Credit Agreement dated as of November 5, 2010, that certain Second Amendment to Credit Agreement dated as of November 11, 2011, that certain Third Amendment to Credit Agreement dated as of March 9, 2012, that certain Fourth Amendment to Credit Agreement dated as of April 25, 2016, that certain Fifth Amendment to Credit Agreement dated as of March 2, 2017, that certain Sixth Amendment to Credit Agreement dated as of February 15, 2018, and that certain Seventh Amendment to Credit Agreement, dated as of March 21, 2019, pursuant to which JPM agreed to make term loans to the BSA in an aggregate amount of $25,000,000 and agreed to make revolving loans to the BSA and issue letters of credit on behalf of the BSA in an aggregate amount not to exceed $75,000,000.

6.      "2010 Credit Facility Claim" means any Claim against the Debtors arising under, derived from, or based upon the 2010 Credit Facility Documents, including any Claim for obligations, indebtedness, and liabilities of the BSA arising pursuant to any of the 2010 Credit Facility Documents, whether now existing or hereafter arising, whether direct, indirect, related, unrelated, fixed, contingent, liquidated, unliquidated, joint, several, or joint and several, including the obligation of the BSA to pay principal and interest, and all fees, costs, expenses and other obligations of any kind or character due or recoverable under the 2010 Credit Facility Documents.

7.      "2010 Credit Facility Documents" means, collectively, the 2010 Credit Agreement, the Prepetition Security Documents (2019), the Prepetition Security Agreement (2020) (in the case of the Prepetition Security Documents (2019) and the Prepetition Security Agreement (2020), solely as such documents and agreements pertain to obligations under the other 2010 Credit Facility Documents), and all documentation executed and delivered in connection therewith, as amended, restated, supplemented or otherwise modified from time to time.

8.      "2010 Note" means that certain Promissory Note – 2010B executed by the BSA, as borrower, and payable to the order of the Bond Issuer in the original principal amount of $50,000,000, which note was pledged by the Bond Issuer to JPM pursuant to the 2010 Bond Agreement to secure the repayment of the 2010 Bond, as amended, restated, supplemented or otherwise modified from time to time.

9.      "2012 Bond" means The County Commission of Fayette County (West Virginia) Commercial Development Revenue Bond (Arrow WV Project), Series 2012, in an aggregate principal amount of $175,000,000, issued by the Bond Issuer pursuant to the

2

2012 Bond Agreement, the proceeds of which were loaned to the BSA pursuant to the 2012 Note.

10.    "2012 Bond Agreement" means that certain Bond Purchase and Loan Agreement dated as of March 9, 2012, between the Bond Issuer, JPM, the BSA and Arrow, as amended, restated, supplemented or otherwise modified from time to time.

11.    "2012 Bond Claim" means any Claim against the Debtors arising under, derived from, or based upon the 2012 Bond Documents, including any Claim for obligations, indebtedness, and liabilities of the BSA arising pursuant to any of the 2012 Bond Documents, whether now existing or hereafter arising, whether direct, indirect, related, unrelated, fixed, contingent, liquidated, unliquidated, joint, several, or joint and several, including the obligation of the BSA to repay the 2012 Note, interest on the 2012 Note, and all fees, costs, expenses and obligations of any kind or character due or recoverable from the Debtors under the 2012 Bond Documents.

12.    "2012 Bond Documents" means collectively, the 2012 Bond, the 2012 Bond Agreement, the 2012 Note, the Prepetition Security Documents (2019), the Prepetition Security Agreement (2020) (in the case of the Prepetition Security Documents (2019) and the Prepetition Security Agreement (2020), solely as such documents and agreements pertain to obligations under the other 2012 Bond Documents), and all documentation executed and delivered in connection therewith, as amended, restated, supplemented or otherwise modified from time to time.

13.    "2012 Note" means that certain Promissory Note – 2012, executed by the BSA, as borrower, and payable to the order of the Bond Issuer in the original principal amount of $175,000,000, which note was pledged by the Bond Issuer to JPM pursuant to the 2012 Bond Agreement to secure the repayment of the 2012 Bond, as amended, restated, supplemented or otherwise modified from time to time.

14.    "2019 RCF Agreement" means that certain Credit Agreement, dated as of March 21, 2019, by and between the BSA, as borrower, and JPM, as lender, pursuant to which JPM agreed to make revolving loans to the BSA and issue letters of credit on behalf of the BSA in an aggregate amount not to exceed $71,500,000, the maturity date of which was extended pursuant to that certain Consent to Extension of Maturity Date dated as of January 16, 2020.

15.    "2019 RCF Claim" means any Claim against the Debtors arising under, derived from, or based upon the 2019 RCF Documents, including any Claim for obligations, indebtedness, and liabilities of the BSA arising pursuant to any of the 2019 RCF Documents, whether now existing or hereafter arising, whether direct, indirect, related, unrelated, fixed, contingent, liquidated, unliquidated, joint, several, or joint and several, including the obligation of the BSA to pay principal and interest, and all fees, costs, expenses and other obligations of any kind or character due or recoverable under the 2019 RCF Documents.

3

TrustApp0167

16.     "2019 RCF Documents" means, collectively, the 2019 RCF Agreement, the Prepetition Security Documents (2019), the Prepetition Security Agreement (2020) (in the case of the Prepetition Security Documents (2019) and the Prepetition Security Agreement (2020), solely as such documents and agreements pertain to obligations under the other 2019 RCF Documents), and all documentation executed and delivered in connection therewith, as amended, restated, supplemented or otherwise modified from time to time.

17.     "Abuse" means sexual conduct or misconduct, sexual abuse or molestation, sexual exploitation, indecent assault or battery, rape, pedophilia, ephebophilia, sexually related psychological or emotional harm, humiliation, anguish, shock, sickness, disease, disability, dysfunction, or intimidation, any other sexual misconduct or injury, contacts or interactions of a sexual nature, including the use of photography, video, or digital media, or other physical abuse or bullying or harassment without regard to whether such physical abuse or bullying is of a sexual nature, between a child and an adult, between a child and another child, or between a non-consenting adult and another adult, in each instance without regard to whether such activity involved explicit force, whether such activity involved genital or other physical contact, and whether there is or was any associated physical, psychological, or emotional harm to the child or non-consenting adult.

18.     "Abuse Claim" means a liquidated or unliquidated Claim against a Protected Party (including the Settling Insurance Companies), a Limited Protected Party, or an Opt-Out Chartered Organization or any of their respective Representatives (in their capacities as such) that is attributable to, arises from, is based upon, relates to, or results from,  directly, indirectly, or derivatively, alleged Scouting-related Abuse that occurred prior to the Petition Date, including any such Claim that seeks monetary damages or other relief, under any theory of law or equity whatsoever, including vicarious liability, alter ego, *respondeat superior*, conspiracy, fraud, including fraud in the inducement, any negligence-based or employment-based theory, including negligent hiring, selection, supervision, retention or misrepresentation, any other theory based upon, or directly or indirectly related to any insurance relationship, the provision of insurance or the provision of insurance services to or by any Protected Parties, or misrepresentation, concealment, or unfair practice, breach of fiduciary duty, public or private nuisance, gross negligence, willful misconduct, or any other theory, including any theory based on or related to public policy or any act or failure to act, or failure to warn by a Protected Party, a Limited Protected Party, an Opt-Out Chartered Organization, any of their respective Representatives (in their capacities as such)  or any other Person for whom any Protected Party, Limited Protected Party, or Opt-Out Chartered Organization is alleged to be responsible (including any such Claim that has been asserted or may be amended to assert in a proof of claim alleging Abuse, whether or not timely filed, in the Chapter 11 Cases, or any such Claim that has been asserted against the Settlement Trust), including any proportionate or allocable share of liability based thereon.  Abuse Claims include any Future Abuse Claims, any Indirect Abuse Claims, any Opt-Out Chartered Organization Abuse Claim, any Post-1975 Chartered Organization Abuse Claim and Pre-1976 Chartered Organization Abuse Claim and any other Claim that is attributable to, arises from, is based upon, relates to, or results from, alleged Scouting-related Abuse regardless of whether, as of the Petition Date, such Claim was barred by any applicable statute of limitations.  For the avoidance of doubt,  (i) a Claim alleging Abuse shall not be an "Abuse Claim" against a Protected Party, Limited

TrustApp0168

Protected Party, or Opt-Out Chartered Organization or any of their respective Representatives if such Claim is unrelated to Scouting (except as provided in (iii) below, including the portion of any Mixed Claim that is unrelated to Scouting); (ii) a Claim alleging Abuse shall be an "Abuse Claim" against a Protected Party, Limited Protected Party, or Opt-Out Chartered Organization or any of their respective Representatives (in their capacity as such) if such Claim is related to Scouting (including the portion of any Mixed Claim that is related to Scouting); (iii) any portion of a Mixed Claim alleging Abuse involving the Debtors, Reorganized BSA, Related Non-Debtor Entities, Local Councils, or their respective Representatives (in their capacities as such) is necessarily Scouting-related and shall be considered an Abuse Claim; and (iv) any Claim against the Debtors, Reorganized BSA, Related Non-Debtor Entities, Local Councils, or their respective Representatives (in their capacities as such) alleging Abuse is necessarily Scouting-related and shall be considered an Abuse Claim.

19.    "Abuse Claims Settlement" has the meaning ascribed to such term in Article V.S.

20.    "Abuse Insurance Policies" means, collectively, the BSA Insurance Policies, and the Local Council Insurance Policies.  Abuse Insurance Policies do not include Non-Abuse Insurance Policies or Postpetition Insurance Policies.

21.    "Accrued Professional Fees" means, as of any date, and regardless of whether such amounts are billed or unbilled, all of a Professional's or Coalition Professional's accrued fees and reimbursable expenses for services rendered in the Chapter 11 Cases up to and including such date, whether or not such Professional or Coalition Professional has then filed an application for the Allowance and payment of such fees and expenses: (a) to the extent that any such fees and expenses have not been previously paid by the Debtors; and (b) after each Professional has applied to such accrued fees and expenses the balance of any retainer that has been provided by the Debtors to such Professional, if applicable.  No amount of a Professional's or Coalition Professional's fees or expenses denied by a Final Order of the Bankruptcy Court shall constitute Accrued Professional Fees.

22.    "Ad Hoc Committee" means the Ad Hoc Committee of Local Councils of the Boy Scouts of America.

23.    "Administrative Expense Claim" means any right to payment from the Debtors that constitutes a cost or expense of administration incurred during the Chapter 11 Cases of the kind specified under 503(b) of the Bankruptcy Code and entitled to priority under sections 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses of preserving the Estates or continuing the operations of the Debtors incurred during the period from the Petition Date to the Effective Date; (b) the Hartford Administrative Expense Claim and, if applicable in accordance with the Hartford Insurance Settlement Agreement, the Hartford Additional Administrative Expense Claim; (c) Professional Fee Claims; and (d) Quarterly Fees.

TrustApp0169

24.     "Affiliate" has the meaning ascribed to such term in section 101(2) of the Bankruptcy Code.  With respect to any Person that is not a Debtor in the Chapter 11 Cases, the term "Affiliate" shall apply to such Person as if the Person were a Debtor.

25.     "Affirmation Order" means an order of the District Court determining any request for affirmation of any findings of fact and conclusions of law of the Bankruptcy Court with respect to all provisions for which the Bankruptcy Court may not have authority to enter a final order, which shall be in form and substance acceptable to (a) the Debtors, the Ad Hoc Committee, the Coalition, the Tort Claimants' Committee, the Future Claimants' Representative, the Settling Insurance Companies, and (b) the Creditors' Committee and JPM in accordance with their respective consent rights under the JPM / Creditors' Committee Term Sheet.

26.     "Allowed" has the following meanings for Non-Abuse Claims:

a.     with respect to any Claim that is asserted to constitute an Administrative Expense Claim: (i) a Claim that represents an actual and necessary cost or expense of preserving the Estates or continuing the operations of the Debtors incurred during the period from the Petition Date to the Effective Date for which a request for payment is filed, (A) to the extent such Claim is determined by the Debtors to constitute an Administrative Expense Claim or allowed by a Final Order of the Bankruptcy Court or (B) as to which no objection to allowance has been interposed and not withdrawn within the applicable period fixed by the Plan or applicable law; (ii) other than with respect to a Professional Fee Claim, a Claim that arises during the period from the Petition Date to the Effective Date for which a request for payment is filed that is Disputed by the Debtors, which Claim is allowed in whole or in part by a Final Order of the Bankruptcy Court to the extent that such allowed portion is determined by a Final Order to constitute a cost or expense of administration under sections 503(b) and 507(a)(1) of the Bankruptcy Code; (iii) a Claim that arises during the period from the Petition Date to the Effective Date in the ordinary course of the Debtors' non-profit operations that is determined by the Debtors to constitute an Administrative Expense Claim; (iv) a Professional Fee Claim, to the extent allowed by a Final Order of the Bankruptcy Court; or (v) any Claim that is expressly allowed as provided in Article II.A.1;

b.     with respect to any 2010 Credit Facility Claim, 2019 RCF Claim, 2010 Bond Claim, or 2012 Bond Claim, any such Claim that is expressly allowed as provided under Article III; and

c.     with respect to any Priority Tax Claim, Other Priority Claim, Other Secured Claim, Convenience Claim, General Unsecured Claim, Non-Abuse Litigation Claim, or any portion of any of the foregoing, a Claim that is: (i) listed in the Schedules as not being disputed, contingent or unliquidated and with respect to which no contrary or superseding Proof of Claim has been filed, and that has not been paid pursuant to an order of this Court prior to the Effective Date; (ii) evidenced by a Proof of Claim filed on or before the applicable Bar Date, not listed in the Schedules as disputed, contingent or unliquidated, and as to which no

6

objection has been filed on or before the Claims Objection Deadline; (iii) not the subject of an objection to Allowance, which Claim (A) was filed on or before the Claims Objection Deadline and (B) has not been settled, waived, withdrawn or Disallowed pursuant to a Final Order; or (iv) expressly Allowed (x) pursuant to a Final Order, (y) pursuant to an agreement between the holder of such Claim and the Debtors or Reorganized BSA, as applicable, or (z) pursuant to the terms of the Plan. For the avoidance of doubt, the holder of a Claim evidenced by a Proof of Claim filed after the applicable Bar Date shall not be treated as a creditor with respect to such Claim for the purposes of voting and distribution.

"Allowance" and "Allowing" have correlative meanings.

27.    "Amended BSA Bylaws" means the amended and restated bylaws of the BSA, substantially in the form contained in the Plan Supplement.

28.    "Arrow" means Arrow WV, Inc., a West Virginia non-profit corporation.

29.    "Arrow Collateral Assignment" means that certain Collateral Assignment of Promissory Note and Credit Line Deed of Trust, dated as of March 21, 2019, by and between the BSA, as assignor, and JPM, as lender, pursuant to which BSA assigned the Arrow Intercompany Note and Arrow Deed of Trust to JPM to secure the obligations under the 2010 Credit Facility Documents, the 2019 RCF Documents, the 2010 Bond Documents, and the 2012 Bond Documents.

30.    "Arrow Deed of Trust" means that certain Credit Line Deed of Trust, dated as of June 30, 2010, made and executed by Arrow, as grantor, to Leslie Miller-Stover, as trustee, for the benefit of the BSA, as amended by that certain First Amendment to Credit Line Deed of Trust, dated as of March 21, 2019.

31.    "Arrow Intercompany Note" means that certain Amended and Restated Promissory Note dated as of March 21, 2019, issued by Arrow to the BSA in an original principal amount of $350,000,000.

32.    "Artwork" means the artwork listed on Schedule 1.

33.    "Assumed Contracts and Unexpired Leases Schedule" means the schedule of Executory Contracts or Unexpired Leases to be assumed by the BSA under the Plan and the Cure Amount for each such Executory Contract or Unexpired Lease, as set forth in the Plan Supplement, as may be amended, modified, or supplemented from time to time in accordance with the terms hereof.

34.    "Avoidance Actions" means any and all actual or potential avoidance, recovery, subordination or other Claims, causes of action or remedies that may be brought by or on behalf of the Debtors or their Estates or other authorized parties in interest under the Bankruptcy Code or applicable non-bankruptcy law, including Claims, Causes of Action or remedies under sections 502, 510, 542, 544, 545, 547 through 553, and 724(a) of the Bankruptcy Code, or under similar or related local, state, federal, or foreign statutes or common law, including preference and fraudulent transfer and conveyance laws, in each

TrustApp0171

case whether or not litigation to prosecute such Claim(s), Cause(s) of Action or remedy(ies) were commenced prior to the Effective Date.

35.    "Bankruptcy Code" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as in effect on the Petition Date.

36.    "Bankruptcy Court" means the United States Bankruptcy Court for the District of Delaware or such other court having jurisdiction over the Chapter 11 Cases.

37.    "Bankruptcy Rules" means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under 28 U.S.C. § 2075, as applicable to the Chapter 11 Cases, and the general, local, and chambers rules of the Bankruptcy Court, each as amended from time to time.

38.    "Bar Date" means (a) November 16, 2020 for any Claim (other than an Administrative Expense Claim or a Claim of a Governmental Unit), or (b) August 17, 2020 for any Claim of a Governmental Unit, in each case as established by the Bar Date Order.

39.    "Bar Date Order" means the *Order, Pursuant to 11 U.S.C. §§ 502(b)(9), Bankruptcy Rules 2002 and 3003(c)(3), and Local Rules 2002-1(e), 3001-1, and 3003-1, (I) Establishing Deadlines for Filing Proofs of Claim, (II) Establishing the Form and Manner of Notice Thereof, (III) Approving Procedures for Providing Notice of Bar Date and Other Important Information to Abuse Survivors, and (IV) Approving Confidentiality Procedures for Abuse Survivors*, entered by the Bankruptcy Court on May 26, 2020 at Docket No. 695, as amended, modified or supplemented by order of the Bankruptcy Court from time to time.

40.    "Bond Issuer" means The County Commission of Fayette County (West Virginia) in its capacity as the issuer under the 2010 Bond Agreement and the 2012 Bond Agreement.

41.    "BSA" means Boy Scouts of America, a congressionally chartered non-profit corporation under title 36 of the United States Code.

42.    "BSA Cash Sharing Amount" means (a) if the Warehouse and Distribution Center has been sold prior to the Effective Date and (b) if the amount of Unrestricted Cash and investments to be retained by Reorganized BSA after the calculation of Net Unrestricted Cash and Investments is greater than $39,000,000 if the Effective Date occurs before May 1, 2022 or $28,000,000 if the Effective Date occurs before June 1, 2022 or $19,000,000 if the Effective Date occurs after June 1, 2022, an amount equal to 50% of the difference between the amount of Unrestricted Cash and Investments to be retained by Reorganized BSA and the foregoing thresholds, capped at $7,000,000.

43.    "BSA Charter" means the congressional charter of the BSA, enacted on June 15, 1916, as amended.

44.    "BSA Insurance Policies" means any and all known and unknown contracts, binders, certificates or Insurance Policies currently or previously in effect at any time on

8

or before the Petition Date naming the Debtors, or either of them, or any predecessor, subsidiary, or past or present Affiliate of the Debtors, as an insured (whether as the primary or an additional insured), or otherwise alleged to afford the Debtors insurance coverage, upon which any claim could have been, has been, or may be made with respect to any Abuse Claim, including the policies listed on Schedule 2. Notwithstanding the foregoing, BSA Insurance Policies shall not include: (a) any policy providing reinsurance to any Insurance Company; (b) any Non-Abuse Insurance Policy; (c) any Local Council Insurance Policy; or (d) any Postpetition Insurance Policy.

       45.    "BSA Settlement Trust Contribution" means:

       a.    all of the Net Unrestricted Cash and Investments;

       b.    the BSA Settlement Trust Note, in the principal amount of $80,000,000, subject to the terms of Article V.S.3;

       c.    the BSA's right, title and interest in and to the Artwork, which are deemed to be valued at approximately $59,000,000, and the rights to any insurance or the proceeds thereof with respect to missing, damaged, or destroyed Artwork, if any;

       d.    (i) if the Warehouse and Distribution Center is not sold prior to the Effective Date, all of the BSA's right, title and interest in and to the Warehouse and Distribution Center, subject to the Leaseback Requirement, or the proceeds of a third-party sale-leaseback of the Warehouse and Distribution Center for fair market value, which is valued at approximately $11,600,000 or (ii) if the Warehouse and Distribution Center is sold prior to the Effective Date, the BSA Cash Sharing Amount, if any;

       e.    the BSA's right, title and interest in and to the Oil and Gas Interests, which are valued at approximately $7,600,000;

       f.    the Insurance Assignment;

       g.    the Debtors' Settlement Trust Causes of Action; and

       h.    the assignment of any and all Perpetrator Indemnification Claims held by the BSA.

For the avoidance of doubt, the BSA Settlement Trust Contribution shall not include: (i) the proceeds of the Foundation Loan Facility; or (ii) any Causes of Action against Released Parties or holders of General Unsecured Claims, Non-Abuse Litigation Claims, or Convenience Claims released by the Debtors and their Estates under Article X.J.

       46.    "BSA Settlement Trust Note" means the secured, interest-bearing promissory note in the principal amount of $80,000,000, substantially in the form contained in the Plan Supplement, to be issued to the Settlement Trust by Reorganized BSA on the Effective Date in accordance with Article V.S.3 and Article V.X.

TrustApp0173

47.    "Business Day" means any day, other than a Saturday, Sunday or "legal holiday" as such term is defined in Bankruptcy Rule 9006(a).

48.    "Cash" means legal tender of the United States of America.

49.    "Cash Collateral Order" means the *Final Order (I) Authorizing the Debtors to Utilize Cash Collateral Pursuant to 11 U.S.C. § 363; (II) Granting Adequate Protection to the Prepetition Secured Party Pursuant to 11 U.S.C. §§ 105(a), 361, 362, 363, 503, and 507; and (III) Granting Related Relief*, entered by the Bankruptcy Court on April 15, 2020 at Docket No. 433.

50.    "Causes of Action" means any claims, interests, damages, remedies, causes of action, demands, rights, actions (including Avoidance Actions), suits, obligations, liabilities, accounts, defenses, offsets, powers, privileges, licenses, liens, indemnities, guaranties, and franchises of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, liquidated or unliquidated, choate or inchoate, secured or unsecured, capable of being asserted, directly or derivatively, matured or unmatured, suspected or unsuspected, in contract, tort, law, equity, or otherwise, whether arising before, on, or after the Petition Date. Causes of Action also include: (a) all rights of setoff, counterclaim, or recoupment and claims under contracts or for breaches of duties imposed by law or in equity; (b) the right to object to or otherwise contest Claims or Interests; (c) such claims and defenses as fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of the Bankruptcy Code; and (d) any claim under any local, state, federal or foreign law, including any fraudulent transfer or similar claim.

51.    "Century" means (a) Century Indemnity Company, as successor to CCI Insurance Company, as successor to Insurance Company of North America and Indemnity Insurance Company of North America; (b) Century Indemnity Company as successor to CIGNA Specialty Insurance Company f/k/a California Union Insurance Company; (c) Insurance Company of North America; and (d) and each of their past, present and future direct or indirect parents, subsidiaries, affiliates and controlled entities, and each of their respective officers, directors, stockholders, members, partners, managers, employees, attorneys, agents, experts, consultants, predecessors, successors and assigns, each in their capacity as such; provided that the term "Century" shall not include the foregoing persons and entities in their capacities as contractual obligors under: (i) Non-Abuse Insurance Policies (including but not limited to D&O Liability Insurance Policies) except to the extent of a request for coverage and/or any Claims or Causes of Action related to, arising from or in connection with Abuse Claims, any actions, settlements entered into, omissions or positions taken in connection with the Debtors' Chapter 11 Cases and related proceedings and any extra-contractual claims related to, arising from or connected with actions or omissions occurring prior to the Effective Date, including the Settling Insurers' (as defined in the Century and Chubb Companies Settlement Agreement) performance of their obligations under such policies whether for defense, settlement of claims or otherwise and (ii) Postpetition Insurance Policies, except for any Claims or Causes of Action related to, arising from or in connection with any actions, settlements entered into, omissions or positions taken in connection with the Debtors' Chapter 11 Cases and related proceedings

TrustApp0174

and any extra-contractual claims related to, arising from or connected with actions or omissions occurring prior to the Effective Date, including the Settling Insurers' performance of their obligations under such policies whether for defense, settlement of claims or otherwise.

52.    "Century and Chubb Companies Insurance Settlement" has the meaning ascribed to such term in Exhibit I.

53.    "Century and Chubb Companies Insurance Settlement Agreement" means that certain settlement agreement by and between the Century and Chubb Companies, the Debtors, the Ad Hoc Committee, the Coalition, the Future Claimants' Representative, and certain state court counsel to holders of Direct Abuse Claims, as such agreement is described in the term sheet appended to the *Seventh Mediator's Report* [D.I. 7745] filed on December 14, 2021, and as such agreement may be subsequently set forth in and superseded by a definitive written settlement agreement that is consistent with such term sheet and executed by all of the parties thereto (and any additional parties that execute a joinder thereto). The executed Century and Chubb Companies Insurance Settlement Agreement was filed on the docket of the Chapter 11 Cases and attached hereto as Exhibit I-2. Pending such execution, the term sheet shall serve as the description of the applicable agreement.

54.    "Century and Chubb Companies Policies" shall have the meaning set forth for "Settling Insurers' Policies" in the Century and Chubb Companies Insurance Settlement Agreement; provided, however, that such policies shall not include (a) Non-Abuse Insurance Policies, except to the extent of a request for coverage and/or any Claims or Causes of Action related to, arising from or in connection with Abuse Claims, any actions, omissions or positions taken in connection with the Chapter 11 Cases and related proceedings and any extra-contractual claims related to, arising from or connected with actions or omissions occurring prior to the Effective Date, including the Settling Insurers' performance of their obligations under such policies whether for defense, settlement of claims or otherwise or (b) Postpetition Insurance Policies, except for any Claims or Causes of Action related to, arising from or in connection with any actions, omissions or positions taken in connection with the Debtors' Chapter 11 Cases and related proceedings and any extra-contractual claims related to, arising from or connected with actions or omissions occurring prior to the Effective Date, including the Settling Insurers' performance of their obligations under such policies whether for defense, settlement of claims or otherwise.

55.    "Century and Chubb Companies Settlement Contribution" shall mean the "Settlement Amount" as defined in the Century and Chubb Companies Insurance Settlement Agreement, which is equal to Eight Hundred Million Dollars ($800,000,000).

56.    "Channeling Injunction" means the permanent injunction provided for in Article X.F with respect to (a) Abuse Claims against the Protected Parties, (b) Post-1975 Chartered Organization Abuse Claims against the Limited Protected Parties, (c) Abuse Claims against the Limited Protected Parties that are covered under any insurance policy issued by the Settling Insurance Companies (as determined pursuant to Section X.F.3), and

TrustApp0175

(d) Opt-Out Chartered Organization Abuse Claims against the Opt-Out Chartered Organizations, to be issued pursuant to the Confirmation Order.[2]

57.    "Chapter 11 Cases" means the cases filed by the Debtors under chapter 11 of the Bankruptcy Code, which are jointly administered under Case No. 20-10343 (LSS).

58.    "Chartered Organizations" means each and every civic, faith-based, educational or business organization, governmental entity or organization, other entity or organization, or group of individual citizens, in each case presently or formerly authorized by the BSA to operate, sponsor or otherwise support one or more Scouting units.

59.    "Chartered Organization Contribution" shall mean the Supplemental LC Contribution and the Settlement Growth Payment contributed by the Local Councils and the Reorganized BSA as consideration to facilitate the protections to certain Chartered Organizations, including with respect to the Post-Confirmation Interim Injunction.

60.    "Chubb Companies" means (a) Westchester Fire Insurance Company; (b) Westchester Surplus Lines Insurance Company; (c) Industrial Insurance Company of Hawaii; (d) Chubb Custom Insurance Company; (e) Federal Insurance Company; (f) Pacific Indemnity Company; (g) Texas Pacific Indemnity Company; (h) U.S. Fire Insurance Company, to the extent policies were assumed by or novated to Westchester Fire Insurance Company; (i) International Insurance Company to the extent policies were assumed by or novated to Westchester Fire Insurance Company; (j) Industrial Indemnity Company; (k) Pacific Employers Insurance Company; (l) The North River Insurance Company, but only to the extent policies were assumed by or novated to Westchester Fire Insurance Company prior to the Effective Date; (m) Aetna Insurance Company; (n) American Foreign Insurance Association; (o) Chubb Atlantic Indemnity Ltd.; (p) INA Insurance Company of Illinois; and (q) each of their past, present and future direct or indirect parents, subsidiaries, affiliates and controlled entities, and each of their respective officers, directors, stockholders, members, partners, managers, employees, attorneys, agents, experts, consultants, predecessors, successors and assigns, each in their capacity as such provided that the term "Chubb" shall not include the foregoing persons and entities in their capacities as contractual obligors under: (i) Non-Abuse Insurance Policies (including but not limited to D&O Liability Insurance Policies) except to the extent of a request for coverage and/or any Claims or Causes of Action related to, arising from or in connection with Abuse Claims, any actions, settlements entered into, omissions or positions taken in connection with the Debtors' Chapter 11 Cases and related proceedings and any extra-contractual claims related to, arising from or connected with actions or omissions occurring prior to the Effective Date, including the Settling Insurers'

---

[2]    For the avoidance of doubt, in the case of insureds and co-insureds that are Opt-Out Chartered Organizations, the terms "covered' or "coverage" as used in the Channeling Injunctions and releases herein shall be subject to the maximum dollar limits included in the applicable policies issued by the Settling Insurance Companies. With respect to any other insured or co-insured under a policy issued by the Settling Insurance Companies (including Protected Parties and Limited Protected Parties), the terms "covered" or "coverage" shall be without reference to the dollar limits of such policies and the entirety of the Abuse Claims against such insured and co-insured shall be channeled and released subject to Article IV.C.1 hereof.

TrustApp0176

performance of their obligations under such policies whether for defense, settlement of claims or otherwise and (ii) Postpetition Insurance Policies, except for any Claims or Causes of Action related to, arising from or in connection with any actions, settlements entered into, omissions or positions taken in connection with the Debtors' Chapter 11 Cases and related proceedings and any extra-contractual claims related to, arising from or connected with actions or omissions occurring prior to the Effective Date, including the Settling Insurers' performance of their obligations under such policies whether for defense, settlement of claims or otherwise.

61.     "Claim" means any "claim," as defined in section 101(5) of the Bankruptcy Code, which, for the avoidance of doubt, shall include any Abuse Claim.

62.     "Claimant Representatives" means the Tort Claimants' Committee, the Coalition, the Future Claimants' Representative, and Pfau/Zalkin.

63.     "Claims Administrators" mean the two claims administrators appointed to oversee the administration of claims in accordance with the Settlement Trust Agreement.

64.     "Claims Objection Deadline" means the deadline for filing an objection to any Administrative Expense Claim (other than a Professional Fee Claim), Priority Tax Claim, Other Priority Claim, Other Secured Claim, Convenience Claim, General Unsecured Claim, or Non-Abuse Litigation Claim, which deadline shall be: (a) 180 days after the Effective Date with respect to all such Claims and Interests other than Convenience Claims, General Unsecured Claims, and Non-Abuse Claims, subject to any extensions approved by an order of the Bankruptcy Court; and (b) sixty (60) days after the Effective Date with respect to Convenience Claims, General Unsecured Claims, and Non-Abuse Litigation Claims, subject to any extensions approved by an order of the Bankruptcy Court with the consent of the Creditor Representative (such consent not to be unreasonably withheld); provided, however, that the Debtors shall not be bound by the Claims Objection Deadline with respect to any Claim filed after the Bar Date; provided further, however, that the Claims Objection Deadline shall not apply to Abuse Claims, which shall be administered exclusively in accordance with the Settlement Trust Documents.

65.     "Claims Record Date" means the Voting Deadline, which is the date on which the transfer register for each Class of Non-Abuse Claims against or Interests in the Debtors, as such register is maintained by the Debtors or their agents, shall be deemed closed.

66.     "Claims Register" means the official register of Claims maintained by the Notice and Claims Agent in the Chapter 11 Cases.

67.     "Clarendon" means Clarendon National Insurance Company (as successor in interest by merger to Clarendon America Insurance Company), River Thames Insurance Company Limited (as successor in interest to Union America Insurance Company Limited), and Zurich American Insurance Company (as successor in interest to Maryland Casualty Company, Zurich Insurance Company and American General Fire & Casualty Company); provided that the term "Clarendon" shall not include the foregoing persons and entities in

13

their capacities as contractual obligors under: (i) Non-Abuse Insurance Policies (including but not limited to D&O Liability Insurance Policies) except to the extent of a request for coverage and/or any Claims or Causes of Action related to, arising from or in connection with Abuse Claims, any actions, omissions or positions taken in connection with the Debtors' Chapter 11 Cases and related proceedings and any extra-contractual claims related to, arising from or connected with actions or omissions occurring prior to the Effective Date, including Clarendon's performance of its obligations under such policies whether for defense, settlement of claims or otherwise and (ii) Postpetition Insurance Policies, except for any Claims or Causes of Action related to, arising from or in connection with any actions, omissions or positions taken in connection with the Debtors' Chapter 11 Cases and related proceedings and any extra-contractual claims related to, arising from or connected with actions or omissions occurring prior to the Effective Date, including Clarendon's performance of its obligations under such policies whether for defense, settlement of claims or otherwise.

68.    "Clarendon Insurance Settlement" has the meaning ascribed to such term in Exhibit I.

69.    "Clarendon Insurance Settlement Agreement" means that certain settlement agreement by and between Clarendon, the Debtors, the Ad Hoc Committee, the Coalition, the Future Claimants' Representative, as joined by certain state court counsel to holders of Direct Abuse Claims, as such agreement was described in the term sheet appended to the *Tenth Mediators' Report* [D.I. 8095] filed on January 3, 2022, and as such agreement has been subsequently set forth in and superseded by a definitive written settlement agreement that is consistent with such term sheet and executed by all of the parties thereto as of February 14, 2022 (and any additional parties that execute a joinder thereto). The executed Clarendon Insurance Settlement Agreement was filed on the docket of the Chapter 11 Cases [D.I. 8907-3] and attached hereto as Exhibit I-4.

70.    "Clarendon Policies" shall have the meaning set forth for such capitalized term in the Clarendon Insurance Settlement Agreement.

71.    "Clarendon Settlement Contribution" shall mean the "Settlement Amount" as defined in the Clarendon Insurance Settlement Agreement, which is equal to Sixteen Million Five Hundred Thousand Dollars ($16,500,000).

72.    "Class" means each category of holders of Claims or Interests as set forth in Article III pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code.

73.    "Coalition" means the Coalition of Abused Scouts for Justice, an *ad hoc* committee composed of thousands of holders of Direct Abuse Claims that filed a notice of appearance in the Chapter 11 Cases on July 24, 2020 at Docket No. 1040.

74.    "Coalition Professionals" means (a) Brown Rudnick LLP, (b) Robbins, Russell, Englert, Orseck & Untereiner LLP, (c) Monzack, Mersky and Browder, P.A., (d) Province, LLC, and (e) Parsons, Farnell & Grein, LLP.

14

75.    "Coalition Restructuring Expenses" has the meaning ascribed to such term in Article V.T.

76.    "Common-Interest Communications with Insurers" means documents, information, or communications that are subject to the attorney-client privilege, attorney-work product doctrine, or other privilege or protection from disclosure, and are shared between or among (a) the Debtors and/or any Protected Party or Limited Protected Party, on the one hand, and (b) any Insurance Company or its Representatives, on the other hand, including documents that reflect defense strategy, case evaluations, discussions of settlements or resolutions, and communications regarding underlying litigation. Common-Interest Communications with Insurers do not include any communications between or among the Debtors and any Insurance Company relating to matters on which an Insurance Company has denied coverage.

77.    "Compensation and Benefits Programs" means all employment agreements and policies, and all employment, compensation, and benefit plans, policies, savings plans, retirement plans (including the Pension Plan), deferred compensation plans, supplemental executive retirement plans, healthcare plans, disability plans, severance benefit agreements, plans or policies, incentive plans, life and accidental death and dismemberment insurance plans, and programs of the Debtors, and all amendments and modifications thereto, applicable to the Debtors' employees, former employees, retirees, and non-employee directors, and the employees, retirees and non-employee directors of the Local Councils and the Related Non-Debtor Entities. Notwithstanding the foregoing, the Compensation and Benefits Programs shall not include the Deferred Compensation Plan or the Restoration Plan.

78.    "Compensation Procedures Order" means the *Order (I) Approving Procedures for (A) Interim Compensation and Reimbursement of Expenses of Retained Professionals and (B) Expense Reimbursement for Official Committee Members and (II) Granting Related Relief* entered by the Bankruptcy Court on April 6, 2020 at Docket No. 341, as amended by the *Order Amending the Order (I) Approving Procedures for (A) Interim Compensation and Reimbursement of Expenses of Retained Professionals and (B) Expense Reimbursement for Official Committee Members and (II) Granting Related Relief* entered by the Bankruptcy Court on August 6, 2021 at Docket No. 5899.

79.    "Confirmation" means the entry of the Confirmation Order by the Bankruptcy Court on the docket of the Chapter 11 Cases. "Confirm," "Confirmed" and "Confirmability" shall have correlative meanings.

80.    "Confirmation Date" means the date on which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases within the meaning of Bankruptcy Rules 5003 and 9021.

81.    "Confirmation Hearing" means the hearing(s) held by the Bankruptcy Court under section 1128 of the Bankruptcy Code at which the Debtors seek entry of the Confirmation Order.

TrustApp0179

82.    "<u>Confirmation Order</u>" means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code, which shall be in form and substance acceptable to (a) the Debtors, the Ad Hoc Committee, the Coalition, the Future Claimants' Representative, the Tort Claimants' Committee, the Settling Insurance Companies (in accordance with their respective Insurance Settlement Agreements), and the Contributing Chartered Organizations, and (b) the Creditors' Committee and JPM in accordance with their respective consent rights under the JPM / Creditors' Committee Term Sheet, as incorporated by reference in <u>Article I.D.</u>

83.    "<u>Contributing Chartered Organization Insurance Action</u>" means any Cause of Action of the Contributing Chartered Organizations, or any of them, under the laws of any jurisdiction, against any Non-Settling Insurance Company, arising from or related to an Abuse Insurance Policy, including: (a) any such Non-Settling Insurance Company's failure to provide coverage or otherwise pay under an Abuse Insurance Policy; (b) the refusal of any Non-Settling Insurance Company to compromise and settle any Abuse Claim under or pursuant to any Abuse Insurance Policy; (c) the interpretation or enforcement of the terms of any Abuse Insurance Policy with respect to any Abuse Claim; (d) any conduct by any Non-Settling Insurance Company that could give rise to extra-contractual damages, or other wrongful conduct under applicable law; or (e) any right to receive proceeds held by such Contributing Chartered Organization with respect to an Abuse Insurance Policy. For the avoidance of doubt, no Cause of Action of the Contributing Chartered Organizations, or any of them, against any Settling Insurance Company shall be deemed an Insurance Action, except for any Cause of Action arising from or related to an Insurance Settlement Agreement.

84.    "<u>Contributing Chartered Organization Insurance Rights</u>" has the meaning ascribed to such term in <u>Article V.S.1.b.</u>

85.    "<u>Contributing Chartered Organization Settlement Contribution</u>" means the following:

a.    the contributions to the Settlement Trust by the Contributing Chartered Organizations, as set forth on <u>Exhibit C</u>, and contributions made after the Effective Date in accordance with <u>Article IV.J;</u>

b.    to the maximum extent permitted by applicable law, any and all of the Contributing Chartered Organizations' rights, titles, privileges, interests, claims, demands or entitlements, as of the Effective Date, to any proceeds, payments, benefits, Causes of Action, choses in action, defense, or indemnity, now existing or hereafter arising, accrued or unaccrued, liquidated or unliquidated, matured or unmatured, disputed or undisputed, fixed or contingent, arising under or attributable to: (i) the Abuse Insurance Policies, the Settling Insurer Policy Rights, the Insurance Settlement Agreements, and claims thereunder and proceeds thereof; (ii) the Insurance Actions; and (iii) the Insurance Action Recoveries;

c.    the waiver, release, and expungement from the Claims Register, as of the Effective Date, of any and all Claims that have been asserted in the Chapter

16

TrustApp0180

11 Cases by or on behalf of any Contributing Chartered Organization, including any Indirect Abuse Claims, without any further notice to or action, order, or approval of the Bankruptcy Court, and the agreement of each Contributing Chartered Organization not to (i) file or assert any Claim or Claims against the Settlement Trust, the Debtors, or Reorganized BSA arising from any act or omission of the Debtors on or prior to the Confirmation Date or (ii) file or assert any rights or interests in any property transferred to the Settlement Trust under the Plan;

       d.     the Contributing Chartered Organizations' Settlement Trust Causes of Action; and

       e.     the assignment of any and all Perpetrator Indemnification Claims held by the Contributing Chartered Organizations.

86.    "Contributing Chartered Organizations" means the current or former Chartered Organizations listed on Exhibit D hereto and any Chartered Organization made a Protected Party under a Post-Effective Date Chartered Organization Settlement approved by the Bankruptcy Court in accordance with Article IV.J. No Participating Chartered Organization shall be considered a Contributing Chartered Organization based solely on the Participating Chartered Organization Insurance Assignment. Without limiting the foregoing, subject to Confirmation of the Plan and approval of the United Methodist Settlement Agreement by an order of the Bankruptcy Court (including in the Confirmation Order), the United Methodist Entities are Contributing Chartered Organizations and shall be designated as such in the Confirmation Order and the Affirmation Order. No Chartered Organization shall be a Contributing Chartered Organization unless it agrees to provide the assignments and releases as set forth in Sections 9 and 10 of the Century and Chubb Companies Insurance Settlement Agreement.

87.    "Convenience Claim" means any Claim that would otherwise be a General Unsecured Claim that is Allowed in an amount of $50,000 or less; provided that a holder of a General Unsecured Claim that is Allowed in an amount greater than $50,000 may irrevocably elect, as evidenced on the Ballot (as defined in the Voting Procedures) timely and validly submitted by such holder (or other writing acceptable to the Debtors), to have such Claim irrevocably reduced to $50,000 and treated as a Convenience Claim (upon Allowance) for purposes of the Plan, in full and final satisfaction of such Claim; provided further that a General Unsecured Claim may not be subdivided into multiple Convenience Claims. The holder of an Allowed Non-Abuse Litigation Claim may elect to have such Allowed Claim treated as a Convenience Claim solely in accordance with the terms of Article III.B.9. For the avoidance of doubt, the holder of an Abuse Claim (including Direct Abuse Claims and Indirect Abuse Claims) may not elect to have such Claim treated as a Convenience Claim.

88.    "Core Value Cash Pool" means Cash in the aggregate amount of $25,000,000 for purposes of making Distributions to holders of Allowed General Unsecured Claims and, subject to the terms of Article III.B.9, holders of Allowed Non-

TrustApp0181

Abuse Litigation Claims.  Reorganized BSA shall fund the Core Value Cash Pool in accordance with Article V.P.

89.    "Creditor Representative" means the creditor representative to be appointed as of the Effective Date in accordance with Article V.Q.  The Creditor Representative will be identified in the Plan Supplement.

90.    "Creditor Representative Fee Cap" the maximum amount of reasonable compensation and reimbursement of expenses that shall payable by Reorganized BSA to the Creditor Representative on account of its services, which shall be equal to $100,000.

91.    "Creditors' Committee" means the official committee of unsecured creditors appointed by the United States Trustee in the Chapter 11 Cases under section 1102(a) of the Bankruptcy Code.

92.    "Cure Amount" means, with respect to any Executory Contract or Unexpired Lease sought to be assumed or assumed and assigned by the Debtors, the monetary amount, if any, required to cure the Debtors' defaults under any such Executory Contract or Unexpired Lease (or such lesser amount as may be agreed upon by the non-Debtor party to an Executory Contract or Unexpired Lease) at the time such Executory Contract or Unexpired Lease is assumed by the Debtors pursuant to sections 365 or 1123 of the Bankruptcy Code.

93.    "Cure and Assumption Notice" means the notice of proposed assumption of, and proposed Cure Amount payable in connection with, an Executory Contract or Unexpired Lease (and, to the extent the Debtors seek to assume and assign any such Executory Contract or Unexpired Lease pursuant to the Plan, adequate assurance of future performance within the meaning of section 365 of the Bankruptcy Code), to be served in accordance with Article VI.C.

94.    "D&O Liability Insurance Policies" means all Insurance Policies issued at any time to any of the Debtors and the Local Councils, for directors', managers', and officers' liability (including any "tail policy" or run-off coverage) and all agreements, documents, or instruments relating thereto.

95.    "De Minimis Asset" means any miscellaneous asset that is valued by the Debtors at $10,000 or less and that is located at the premises subject to any Unexpired Leases rejected by the Debtors pursuant to sections 365 or 1123 of the Bankruptcy Code, including furniture and equipment.

96.    "Debtors" means the BSA and Delaware BSA, the non-profit corporations that are debtors and debtors in possession in the Chapter 11 Cases.

97.    "Deferred Compensation Plan" means the Boy Scouts of America 457(b) Plan, a non-qualified deferred compensation plan under section 457(b) of the Internal Revenue Code, which allows eligible BSA and Local Council employees to make elections to defer the payment of a certain amount or percentage of their regular base salary or bonus for future payment.

TrustApp0182

98.    "Delaware BSA" means Delaware BSA, LLC, a Delaware limited liability company.

99.    "Direct Abuse Claim" means an Abuse Claim that is not an Indirect Abuse Claim.

100.    "Disallowed" means, as to any Administrative Expense Claim, Priority Tax Claim, Other Priority Claim, Other Secured Claim, Convenience Claim, General Unsecured Claim, or Non-Abuse Litigation Claim, any such Claim or portion thereof that: (a) has been disallowed, denied, dismissed, expunged, or overruled pursuant to the terms of the Plan or a Final Order of the Bankruptcy Court or any other court of competent jurisdiction or by a settlement; (b) has been listed on the Schedules at an amount of $0.00 or as contingent, disputed, or unliquidated and as to which a Bar Date has been established but no Proof of Claim has been timely filed or deemed timely filed with the Bankruptcy Court pursuant to either the Bankruptcy Code or any Final Order of the Bankruptcy Court, including the Bar Date Order, or otherwise deemed timely filed under applicable law; or (c) has not been scheduled and as to which a Bar Date has been established but no Proof of Claim has been timely filed, such that the creditor holding such Claim shall not be treated as a creditor with respect to such claim for the purposes of voting and distribution. "Disallowance" and "Disallowing" have correlative meanings.  With respect to any 2010 Credit Facility Claim, 2019 RCF Claim, 2010 Bond Claim, 2012 Bond Claim, Direct Abuse Claim, Indirect Abuse Claim, or Interest, the term "Disallowed" shall not apply.

101.    "Disbursing Agent" means, with respect to all Claims other than Abuse Claims, Reorganized BSA or a Person or Persons selected by the Debtors or Reorganized BSA to make or facilitate Distributions contemplated under the Plan.

102.    "Discharge Injunction" means the injunction issued in accordance with sections 524 and 1141 of the Bankruptcy Code and contained in Article X.E.2 of the Plan.

103.    "Discharges" means the discharges set forth in Article X.E.

104.    "Disclosure Statement" means the disclosure statement for the Plan, including all exhibits and schedules thereto, as the same may be amended, supplemented or otherwise modified from time to time, as approved by the Bankruptcy Court pursuant to section 1125 of the Bankruptcy Code, which is in form and substance acceptable to (a) the Debtors, the Ad Hoc Committee, the Coalition and the Future Claimants' Representative and (b) the Creditors' Committee and JPM in accordance with their respective consent rights under the JPM / Creditors' Committee Term Sheet.

105.    "Disclosure Statement Order" means one or more orders entered by the Bankruptcy Court, in form and substance reasonably acceptable to (a) the Debtors, the Ad Hoc Committee, the Coalition and the Future Claimants' Representative and (b) the Creditors' Committee and JPM in accordance with their respective consent rights under the JPM / Creditors' Committee Term Sheet: (i) finding that the Disclosure Statement (including any amendment, supplement, or modification thereto) contains adequate information pursuant to section 1125 of the Bankruptcy Code; (ii) fixing the amounts of

19

Claims solely for voting purposes and not for purposes of distributions; (iii) approving the Voting Procedures; and (iv) authorizing solicitation of the Plan.

106.    "Disputed" means, as to any Administrative Expense Claim, Priority Tax Claim, Other Priority Claim, Other Secured Claim, Convenience Claim, General Unsecured Claim, or Non-Abuse Litigation Claim, any such Claim (or portion thereof) (a) that is neither Allowed nor Disallowed, (b) that is listed on the Schedules as "disputed," "contingent," or "unliquidated" or (c) for which a Proof of Claim has been filed or a written request for payment has been made to the extent that any party in interest has interposed a timely objection to such Claim, which objection has not been withdrawn or adjudicated pursuant to a Final Order.  The term "Disputed" does not apply to Abuse Claims.

107.    "Disputed Claims Reserve" means the reserve of Cash within the Core Value Cash Pool to be Distributed to holders of Disputed General Unsecured Claims, if and when such Disputed Claims become Allowed, which shall be funded with amounts and on terms acceptable to the Creditor Representative.

108.    "Distribution" means the payment or delivery of Cash, property, or interests in property, as applicable, to holders of Allowed Non-Abuse Claims under the terms of the Plan.  "Distributed" and "Distribution" have correlative meanings.

109.    "Distribution Date" means the dates on which the Disbursing Agent makes a Distribution, or causes a Distribution to be made, from the Core Value Cash Pool to holders of Allowed General Unsecured Claims and, subject to the terms of Article III.B.9, holders of Allowed Non-Abuse Litigation Claims.  Each Distribution Date shall occur as soon as practicable after Reorganized BSA makes each semi-annual installment payment of the Core Value Cash Pool in accordance with Article V.P.

110.    "District Court" means the United States District Court for the District of Delaware.

111.    "Document Appendix" means the document, substantially in the form contained in the Plan Supplement, by and among Reorganized BSA, the Related Non-Debtor Entities, the Local Councils, the Contributing Chartered Organizations, and the Settlement Trust, in form and substance acceptable to the Debtors, the Ad Hoc Committee, the Coalition, the Future Claimants' Representative, and the Tort Claimants' Committee.

112.    "DST" means the Delaware statutory trust established under Article V.Y and the DST Agreement for the purposes set forth therein; provided, that the DST may be any other type of Entity, provided such Entity is not affiliated with Reorganized BSA or the Local Councils under principles of accounting.

113.    "DST Agreement" means the agreement governing the DST, dated as of the Effective Date, the form of which shall be included in the Plan Supplement.

114.    "DST Note" means the non-recourse interest-bearing promissory note in the principal amount of $125,000,000 (as limited by the DST Note Increase ), substantially in

TrustApp0184

the form contained in the Plan Supplement, to be issued to the Settlement Trust by the DST on the Effective Date in accordance with  Article V.Y and the DST Note Mechanics.

115.    "DST Note Increase" means the increase of the DST Note from $100 million to an amount sufficient to ensure that the aggregate amount of the Supplemental LC Contribution is achieved.  In no circumstance will the DST Note Increase be more than $25 million (for an aggregate amount of $125 million) and, to the extent that the LC Overage is more than $15 million, the DST Note increase may be less than $25 million (though not less than $21 million).

116.    "DST Note Mechanics" means the terms of Exhibit F as they relate to the payments that will be made by the DST following the Effective Date.

117.    "Effective Date" means the first Business Day on which all of the conditions precedent to the occurrence of the Effective Date set forth in Article IX.B shall have been satisfied or waived pursuant to Article IX.C.

118.    "Encumbrance" means, with respect to any property (whether real or personal, tangible or intangible), any mortgage, Lien, pledge, charge, security interest, assignment, or encumbrance of any kind or nature in respect of such property, including any conditional sale or other title retention agreement, any security agreement, and the filing of, or agreement to give, any financing statement under the Uniform Commercial Code or comparable law of any jurisdiction, to secure payment of a debt or performance of an obligation.

119.    "Entity" means an entity as defined in section 101(15) of the Bankruptcy Code.

120.    "Estate" means, as to each Debtor, the estate created for such Debtor in its Chapter 11 Case under sections 301 and 541 of the Bankruptcy Code upon the commencement of the applicable Debtor's Chapter 11 Case.

121.    "Estate Causes of Action" means any and all Causes of Action owned, held, or capable of being asserted by or on behalf of either Debtor or its Estate, whether known or unknown, in law, at equity or otherwise, whenever and wherever arising under the laws of any jurisdiction, including actions that: (a) arise out of or are based on breach of contract, fraudulent conveyances and transfers, breach of fiduciary duty, breach of duty of loyalty or obedience, legal malpractice, recovery of attorneys' fees, turnover of property and avoidance or recovery actions of the Debtors or their respective Estates, including actions that constitute property of the Estate under section 541 of the Bankruptcy Code that are or may be pursued by a representative of the Estates, including pursuant to section 323 of the Bankruptcy Code, and actions, including Avoidance Actions, that may be commenced by a representative of the Estates under section 362 or chapter 5 of the Bankruptcy Code, seeking relief in the form of damages (actual and punitive), imposition of a constructive trust, turnover of property, restitution, and declaratory relief with respect thereto or otherwise; or (b) seek to impose any liability upon, or injunctive relief on, any Protected Party or to satisfy, in whole or in part, any Abuse Claim.

21

TrustApp0185

122.    "Excess Cash and Investments" means, as of any date on or after the Effective Date, the unrestricted Cash and balance sheet investments owned by Reorganized BSA that are not subject to legally enforceable restrictions on the use or disposition of such assets for a particular purpose.

123.    "Excess Cash Sweep" has the meaning ascribed to such term in Article V.V.

124.    "Exculpated Parties" means, collectively, the following Persons: (a) the Debtors; (b) the Creditors' Committee; (c) the members of the Creditors' Committee in their capacities as such; (d) the Tort Claimants' Committee; (e) the members of the Tort Claimants' Committee in their capacities as such; (f) the Future Claimants' Representative; (g) all of the Debtors' current officers and directors, and former officers and directors who served in such capacity during any portion of the Chapter 11 Cases; and (h) each of the Debtors', Creditors' Committee's, Tort Claimants' Committee's or Future Claimants' Representative's employees, volunteers, agents, attorneys, financial advisors, accountants, investment bankers, consultants, representatives, and other professionals (each in their capacity as such); provided, however, that no such Person described in the foregoing clause (j) shall be an Exculpated Party unless such Person was employed or engaged in such capacity on or after the Petition Date or, in the case of any professional, was retained in these Chapter 11 Cases by order of the Bankruptcy Court.

125.    "Executory Contract" means any executory contract to which BSA is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

126.    "Expedited Distribution" means a one-time Cash payment from the Settlement Trust in the amount of $3,500.00, conditioned upon satisfaction of the criteria set forth in the Trust Distribution Procedures.

127.    "Fee Examiner" means Justin H. Rucki of Rucki Fee Review, LLC, in his capacity as the fee examiner appointed pursuant to the *Order Appointing Fee Examiner and Establishing Related Procedures for the Review of Applications of Retained Professionals*, entered by the Bankruptcy Court on September 18, 2020 at Docket No. 1342, or any successor appointed by the Bankruptcy Court.

128.    "Final Order" means an order or judgment of the Bankruptcy Court (or other court of competent jurisdiction) that has not been reversed, vacated, stayed, modified or amended, and as to which (a) the time to appeal, petition for *certiorari* or move for a new trial, reargument or rehearing has expired and as to which no appeal, petition for *certiorari* or other proceedings for a new trial, reargument or rehearing shall then be pending, or (b) if an appeal, writ of *certiorari*, new trial, reargument or rehearing thereof has been sought, such order or judgment of the Bankruptcy Court (or other court of competent jurisdiction) shall have been affirmed by the highest court to which such order was appealed, or *certiorari* shall have been denied or a new trial, reargument or rehearing shall have been denied with prejudice or resulted in no modification of such order, and the time to take any further appeal, petition for *certiorari* or move for a new trial, reargument or rehearing shall have expired; provided, however, that the possibility that a motion pursuant to section

22

502(j) or 1144 of the Bankruptcy Code or under Rule 59 or Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be filed with respect to such order shall not cause such order to not be a Final Order.

129.    "Florida Sea Base Assignment" means the Assignment of Agreements, Licenses, Permits and Contracts, dated as of March 21, 2019, by and from the BSA, as assignor, and JPM, as assignee, which secures the BSA's obligations under the 2010 Credit Agreement, the 2010 Bond Agreement, the 2012 Bond Agreement, and the 2019 RCF Agreement.

130.    "Florida Sea Base Mortgage" means the Mortgage, Security Agreement, Assignment of Rents and Leases and Fixture Filing, dated as of March 21, 2019, by and from the BSA, as mortgagor, and JPM, as mortgagee, which secures the BSA's obligations under the 2010 Credit Agreement, the 2010 Bond Agreement, the 2012 Bond Agreement, and the 2019 RCF Agreement.

131.    "Foundation" means the National Boy Scouts of America Foundation, a District of Columbia nonprofit corporation.

132.    "Foundation Loan" means the new second-lien term loan lending facility pursuant to which the Foundation, as lender, shall make a term loan to Reorganized BSA, as borrower, in the principal amount of $42,800,000, which is equal to the appraised value of the Summit Bechtel Reserve.  The material terms of the Foundation Loan are set forth on the term sheet attached hereto as Exhibit E, which is qualified in its entirety by reference to the Foundation Loan Agreement.

133.    "Foundation Loan Agreement" means the credit agreement governing the Foundation Loan, dated as of the Effective Date, the form of which shall be included in the Plan Supplement.

134.    "Future Abuse Claim" means any Direct Abuse Claim against any Protected Party, Limited Protected Party, or an Opt-Out Chartered Organization that is attributable to, arises from, is based upon, relates to, or results from, in whole or in part, directly, indirectly, or derivatively, alleged Abuse that occurred prior to the Petition Date but which, as of the date immediately preceding the Petition Date, was held by a Person who, as of such date, (a) had not attained eighteen (18) years of age, or (b) was not aware of such Direct Abuse Claim as a result of "repressed memory," to the extent the concept of repressed memory is recognized by the highest appellate court of the state or territory where the claim arose; provided further, however, that with respect to any Participating Chartered Organization, the term "Future Abuse Claim" shall be limited to Post-1975 Chartered Organization Abuse Claims and Pre-1976 Chartered Organization Abuse Claims that satisfy either (a) or (b), and with respect to any Opt-Out Chartered Organization, the term "Future Abuse Claim" shall be limited to Opt-Out Chartered Organization Abuse Claims that satisfy either (a) or (b). For the avoidance of doubt, no Claim alleging Abuse shall be a "Future Abuse Claim" against a Contributing Chartered Organization, a Participating Chartered Organization, or an Opt-Out Chartered Organization if such Claim is wholly unrelated to Scouting.

23

135.    "Future Claimants' Representative" means James L. Patton, Jr., the legal representative appointed by the Bankruptcy Court for holders of Future Abuse Claims, or any successor legal representative appointed by the Bankruptcy Court.

136.    "General Unsecured Claim" means any Claim against the Debtors that is not an Administrative Expense Claim, a Priority Tax Claim, an Other Priority Claim, an Other Secured Claim, a 2010 Credit Facility Claim, a 2019 RCF Claim, a 2010 Bond Claim, a 2012 Bond Claim, a Convenience Claim, a Non-Abuse Litigation Claim, a Direct Abuse Claim, or an Indirect Abuse Claim.    Claims arising under the Deferred Compensation Plan or the Restoration Plan shall be deemed to be General Unsecured Claims.

137.    "Gift Annuity Agreements" mean the charitable gift annuity agreements described in the *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Debtors to (A) Maintain and Administer Prepetition Customer, Scout, and Donor Programs and Practices and (B) Pay and Honor Related Prepetition Obligations, and (II) Granting Related Relief*, filed by the Debtors on the Petition Date at Docket No. 8.

138.    "Governmental Unit" means a governmental unit as defined in section 101(27) of the Bankruptcy Code.

139.    "Hartford" means Hartford Accident and Indemnity Company, First State Insurance Company, Twin City Fire Insurance Company and Navigators Specialty Insurance Company; provided that the term "Hartford" shall not include the foregoing persons and Entities in their capacities as contractual obligors under: (i) the Hartford Non-Abuse Insurance Policies (as defined in the Hartford Insurance Settlement Agreement) except to the extent of a request for coverage and/or any Claims or Causes of Action related to, arising from or in connection with Abuse Claims, any actions, omissions or positions taken in connection with the Debtors' Chapter 11 Cases and related proceedings and any Extra-Contractual Claims (as defined in the Hartford Insurance Settlement Agreement) related to, arising from or connected with actions or omissions occurring prior to the Effective Date, including Hartford's performance of its obligations under such policies whether for defense, settlement of claims or otherwise and (ii) Postpetition Insurance Policies, except for any Claims or Causes of Action related to, arising from or in connection with any actions, omissions or positions taken in connection with the Debtors' Chapter 11 Cases and related proceedings and any Extra-Contractual Claims related to, arising from or connected with actions or omissions occurring prior to the Effective Date, including Hartford's performance of its obligations under such policies whether for defense, settlement of claims or otherwise.

140.    "Hartford Additional Administrative Expense Claim" means Hartford's administrative expense claim, in addition to the Hartford Administrative Expense Claim, of $23.61 million that Hartford may assert in accordance with the terms and conditions of the Hartford Insurance Settlement Agreement in the event that BSA exercises a Fiduciary Out or takes another Specified Action (as such capitalized terms are defined in the Hartford Insurance Settlement Agreement), which administrative expense claim shall be reserved for prior to distributions to unsecured creditors and to which the Debtors, the Ad Hoc

24

Committee, the Future Claimants' Representative, the Coalition, the Joining State Court Counsel (as defined in the Hartford Insurance Settlement Agreement) and the Joining Local Councils (as defined in the Hartford Insurance Settlement Agreement) shall not object or argue that the claim should be allowed in an amount less than $23.61 million (except as permitted under the Hartford Insurance Settlement Agreement).

141.    "Hartford Administrative Expense Claim" means Hartford's administrative expense claim for the Debtors' alleged breach of the Settlement Agreement and Release between Hartford and the Debtors, dated as of April 15, 2021, in the amount of $2,000,000, which shall be paid in full in Cash to Hartford on, or as soon as reasonably practicable after, the Effective Date in accordance with the Hartford Insurance Settlement Agreement.

142.    "Hartford Insurance Settlement" has the meaning ascribed to such term in Exhibit I.

143.    "Hartford Insurance Settlement Agreement" means that certain settlement agreement by and between Hartford, the Debtors, the Ad Hoc Committee, the Coalition, the Future Claimants' Representative, as joined by certain state court counsel to holders of Direct Abuse Claims and Local Councils that have executed or agree to execute a joinder, as such agreement was described (as a settlement in principle) in the term sheet appended to the *Sixth Mediators' Report* [D.I. 6210] filed on September 14, 2021, and as such agreement has been subsequently set forth in a definitive written settlement agreement that is consistent with such term sheet and was executed by all of the parties thereto as of February 14, 2022 (and any additional parties that execute a joinder thereto). The executed Hartford Insurance Settlement Agreement was filed on the docket of the Chapter 11 Cases [D.I. 8816-1] and attached hereto as Exhibit I-1, as corrected pursuant to the Notice of Errata filed on April 21, 2022 [D.I. 9694].

144.    "Hartford Policies" shall have the meaning set forth for such capitalized term in the Hartford Insurance Settlement Agreement.

145.    "Hartford Protected Parties" means (a) Hartford Accident and Indemnity Company, First State Insurance Company, Twin City Fire Insurance Company, and Navigators Specialty Insurance Company; (b) each of their past, present and future direct or indirect parents, subsidiaries, affiliated Entities, controlled Entities, officers, directors, stockholders, members, partners, managers, employees, attorneys, agents, experts, consultants, predecessors, successors and assigns (each in their capacities as such); and (c) all Representatives of each person or Entity identified in clauses (a) and (b) (each in their capacities as such); provided that the term "Hartford Protected Parties" shall not include the foregoing persons and Entities in their capacities as contractual obligors under: (i) the Hartford Non-Abuse Insurance Policies  as defined in the Hartford Insurance Settlement Agreement) except to the extent of a request for coverage and/or any Claims or Causes of Action related to, arising from or in connection with Abuse Claims, any actions, omissions or positions taken in connection with the Debtors' Chapter 11 Cases and related proceedings and any Extra-Contractual Claims (as defined in the Hartford Insurance Settlement Agreement) related to, arising from or connected with actions or omissions occurring prior to the Effective Date, including the Hartford Protected Parties' performance

25

of their obligations under such policies, whether for defense, settlement of claims or otherwise and (ii) Postpetition Insurance Policies, except for any Claims or Causes of Action related to, arising from or in connection with any actions, omissions or positions taken in connection with the Debtors' Chapter 11 Cases and related proceedings and any Extra-Contractual Claims (as defined in the Hartford Insurance Settlement Agreement) related to, arising from or connected with actions or omissions occurring prior to the Effective Date, including the Hartford Protected Parties' performance of their obligations under such policies, whether for defense, settlement of claims or otherwise.

146.    "Hartford Settlement Contribution" shall mean the "Settlement Amount" as defined in the Hartford Insurance Settlement Agreement, which is equal to Seven Hundred Eighty-Seven Million Dollars ($787,000,000).

147.    "Headquarters" means that certain parcel of real property owned by the BSA located at 1325 West Walnut Hill Lane, Irving, Texas 75038, together with the buildings, structures, fixtures, additions, enlargements, extensions, modifications, repairs, replacements and other improvements now or hereafter located thereon.

148.    "Headquarters Assignment" means that certain Assignment of Agreements, Licenses, Permits and Contracts, dated as of March 21, 2019, by and from the BSA, as assignor, and JPM, as assignee, which secures the BSA's obligations under the 2010 Credit Agreement, the 2010 Bond Agreement, the 2012 Bond Agreement, and the 2019 RCF Agreement.

149.    "Headquarters Deed of Trust" means that certain Deed of Trust, Security Agreement, Assignment of Rents and Leases and Fixture Filing, dated as of March 21, 2019, by and between the BSA and JPM.

150.    "High Adventure Base Participant" means a registered Youth Member who has paid the participation fee (which has not been refunded in whole or in part) for attending a BSA program at one of the four high adventure bases (Florida Sea Base, Northern Tier, Philmont or Summit Bechtel Reserve). High Adventure Base Participants do not include Youth Members attending a Jamboree, an Order of the Arrow program, or an event sponsored by the World Organization of the Scouting Movement (WOSM) or a member of WOSM other than the BSA.

151.    "Impaired" means "impaired" within the meaning of section 1124 of the Bankruptcy Code.

152.    "Indemnification Obligations" means each of the Debtors' indemnification obligations in place as of the Effective Date, whether in the bylaws, limited liability company agreements, or other organizational or formation documents, board resolutions, management or indemnification agreements, employment or other contracts, or otherwise, for the past and present directors, officers, employees, attorneys, accountants, investment bankers, and other professionals and agents who provided services to the Debtors before, on, or after the Petition Date.

TrustApp0190

153.    "Indirect Abuse Claim" means a liquidated or unliquidated Abuse Claim for contribution, indemnity, reimbursement, or subrogation, whether contractual or implied by law (as those terms are defined by the applicable non-bankruptcy law of the relevant jurisdiction), and any other derivative Abuse Claim of any kind whatsoever, whether in the nature of or sounding in contract, tort, warranty or any other theory of law or equity whatsoever, including any indemnification, reimbursement, hold-harmless or other payment obligation provided for under any prepetition settlement, insurance policy, program agreement or contract; provided, however, that any retrospective premiums and self-insured retentions arising out of any Abuse Claims under the Abuse Insurance Policies shall not constitute an Indirect Abuse Claim and shall be treated in accordance with Article IV.D.1.

154.    "Injunctions" means the Discharge Injunction, the Channeling Injunction, the Insurance Entity Injunction, the Post-Confirmation Interim Injunction, the Release Injunctions, and any other injunctions entered by the Bankruptcy Court or the District Court in connection with Confirmation of the Plan.

155.    "Insurance Action" means any claim, Cause of Action, or right of the Debtors, Related Non-Debtor Entities, Local Councils, or any of them, under the laws of any jurisdiction, against any Non-Settling Insurance Company, arising from or related to an Abuse Insurance Policy, including: (a) any such Non-Settling Insurance Company's failure to provide coverage or otherwise pay under an Abuse Insurance Policy; (b) the refusal of any Non-Settling Insurance Company to compromise and settle any Abuse Claim under or pursuant to any Abuse Insurance Policy; (c) the interpretation or enforcement of the terms of any Abuse Insurance Policy with respect to any Abuse Claim; (d) any conduct by any Non-Settling Insurance Company constituting "bad faith" conduct or that could otherwise give rise to extra-contractual damages, or other wrongful conduct under applicable law; (e) Participating Chartered Organization Insurance Action, (f) Contributing Chartered Organization Insurance Action; or (g) any right to receive proceeds held by such Person with respect to an Abuse Insurance Policy or an Insurance Coverage Action.  For the avoidance of doubt, no claim, Cause of Action, or right of the Debtors, Related Non-Debtor Entities, Local Councils, Participating Chartered Organizations or Contributing Chartered Organizations, or any of them, against any Settling Insurance Company shall be deemed an Insurance Action, except for any Cause of Action arising from or related to an Insurance Settlement Agreement.

156.    "Insurance Action Recoveries" means (a) Cash or other proceeds derived from and paid by an Insurance Company pursuant to an Insurance Settlement Agreement and (b) the right to receive the proceeds or benefits of any Insurance Action.

157.    "Insurance Assignment" means (x) the assignment and transfer to the Settlement Trust of (a) the Insurance Actions, (b) the Insurance Action Recoveries, (c) the Insurance Settlement Agreements, and (d) all other rights, claims, benefits, or Causes of Action of the Debtors, Related Non-Debtor Entities, Local Councils, or Contributing Chartered Organizations under or with respect to the Abuse Insurance Policies (but not the policies themselves), and (y) the Participating Chartered Organization Insurance Assignment.  The Insurance Assignment does not include (i) any rights, claims, benefits,

27

TrustApp0191

or Causes of Action under or with respect to any Non-Abuse Insurance Policies, including D&O Liability Insurance Policies or (ii) any Local Council Reserved Rights.

158.   "Insurance Company" means any insurance company, insurance syndicate, coverholder, insurance broker or syndicate insurance broker, guaranty association, or any other Entity that has issued, or that has any actual, potential, demonstrated, or alleged liabilities, duties, or obligations under or with respect to, any Insurance Policy or Local Council Insurance Policy.

159.   "Insurance Coverage Actions" means any and all pending coverage litigation between the BSA and any Insurance Company as of the Effective Date, including: (a) *Boy Scouts of America, et al. v. Insurance Company of North America et al.*, Case No. DC-18-11896, pending in the 192nd Judicial District Court of Dallas County, Texas; (b) *Boy Scouts of America, et al. v. Hartford Accident and Indemnity Co.*, *et al.*, Case No. DC-18-07313, pending in the District Court of Dallas County, 95th Judicial District; (c) *National Surety Corp. v. Boy Scouts of America, et al.*, Case No. 2017-CH-14975, pending in the Circuit Court of Cook County, Illinois, Chancery Division; and (d) *Hartford Accident and Indemnity Co. and First State Ins. Co. v. Boy Scouts of America, et al.*, Adv. Pro. No. 20-50601 (LSS), pending before the Bankruptcy Court.

160.   "Insurance Coverage Defense" means, subject to Article X.M, all rights and defenses that any Insurance Company may have under any Insurance Policy and applicable law with respect to a claim seeking insurance coverage or to an Insurance Action, but Insurance Coverage Defenses do not include any defense that the Plan or any of the other Plan Documents do not comply with the Bankruptcy Code. Upon entry of the Confirmation Order in the Chapter 11 Cases determining that the Insurance Assignment is authorized to the extent provided in Article IX.A.3.j, an Insurance Coverage Defense shall not include any defense that the Insurance Assignment is prohibited by the Abuse Insurance Policies or applicable non-bankruptcy law except to the extent provided for in Article IX.A.3.j.

161.   "Insurance Entity Injunction" means the injunction described in Article X.H.

162.   "Insurance Policies" means any and all known and unknown contracts, binders, certificates or insurance policies currently or previously in effect at any time on or before the Petition Date naming the Debtors, the Local Councils, the Chartered Organizations, or any of them, or any predecessor, subsidiary, or past or present Affiliate of the Debtors, as an insured (whether as the primary or an additional insured), or otherwise alleged to afford the Debtors, the Local Councils, or the Chartered Organizations insurance coverage. Insurance Policies include Abuse Insurance Policies, BSA Insurance Policies, Local Council Insurance Policies, and Non-Abuse Insurance Policies.

163.   "Insurance Settlements" mean the settlement agreements with Settling Insurance Companies, as attached hereto as Exhibit I.

164.   "Insurance Settlement Agreement" means (a) any settlement agreement entered into after the Petition Date and before the Effective Date by and among (i) any

TrustApp0192

Insurance Company, on the one hand, and (ii) one or more of the Debtors and/or any other Protected Party or Limited Protected Party, on the other hand, under which an Insurance Policy and/or the Debtors and/or other Protected Parties' or Limited Protected Parties' rights thereunder with respect to Abuse Claims or Non-Abuse Litigation Claims are, subject to Confirmation of the Plan and the entry of a Final Order approving such settlement agreement (which order may be the Confirmation Order), released; and (b) any Post-Effective Date Insurance Settlement entered into during the Insurance Settlement Period by and between (i) any Insurance Company, on the one hand, and (ii) the Settlement Trustee (or the Settlement Trustee and any other Protected Party), on the other hand, under which an Insurance Policy that is subject to the Insurance Assignment and/or the Settlement Trustee's and/or Protected Parties' or Limited Protected Parties' rights thereunder with respect to Abuse Claims or Non-Abuse Litigation Claims are released. All Insurance Settlement Agreements entered into before the Effective Date related to Specified Primary Insurance Policies that release the applicable Insurance Company from liability arising from Non-Abuse Litigation Claims must be acceptable to the Creditors' Committee in accordance with the terms of the JPM / Creditors' Committee Term Sheet; provided, however, that with respect to proposed settlements of any Specified Excess Insurance Policy entered into before the Effective Date, the Creditors' Committee shall have consultation rights.

165.    "Insurance Settlement Period" has the meaning ascribed to such term in Article IV.K.

166.    "Interest" means any "equity security" as defined in section 101(16) of the Bankruptcy Code.

167.    "Internal Revenue Code" means title 26 of the United States Code, 26 U.S.C. §§ 1 et seq., as in effect on the Petition Date, together with all amendments, modifications, and replacements of the foregoing as the same may exist on any relevant date to the extent applicable to the Chapter 11 Cases.

168.    "JPM" means JPMorgan Chase Bank, National Association and any successors and assigns.

169.    "JPM / Creditors' Committee Settlement" has the meaning ascribed to such term in Article V..S.

170.    "JPM / Creditors' Committee Term Sheet" means that certain settlement term sheet appended as Exhibit A to the First Mediators' Report filed on March 1, 2021 at Docket No. 2292.

171.    "JPM Exit Fee" means an exit fee to be paid by Reorganized BSA on the Effective Date, in an amount equal to the aggregate principal amount due and owing as of the Effective Date, plus the undrawn amount of any letters of credit then outstanding, under the Restated 2010 Bond Documents, the Restated 2012 Bond Documents and the Restated Credit Facility Documents, multiplied by 0.50%.

29

172.    "LC Overage" means the total aggregate amount of the Cash Contribution and the Property Contribution, each as defined in Exhibit F appended hereto, that exceeds $500 million.  Notwithstanding anything to the contrary in this paragraph, the LC Overage shall not be less than $15 million.

173.    "Leaseback Requirement" means the requirement that Reorganized BSA be entitled to lease the Warehouse and Distribution Center from the Settlement Trust for fair market value so long as the Settlement Trust holds title to such premises and that any sale or other transfer of the Warehouse and Distribution Center by the Settlement Trust be subject to Reorganized BSA's right to lease such premises from any Person that acquires the Warehouse and Distribution Center from the Settlement Trust (or any subsequent acquirer) for fair market value for a term of not less than two years with four two-year options to renew at the option of Reorganized BSA.  If as of the filing of the Plan Supplement the Bankruptcy Court has not approved a sale of the Warehouse and Distribution Center or if no motion to approve such sale is then pending before the Bankruptcy Court, then an agreement reflecting the terms of the Leaseback Requirement shall be filed with the Plan Supplement.

174.    "Lien" means any "lien" as defined in section 101(37) of the Bankruptcy Code.

175.    "Life-Income Agreement" means the agreements described in the *Supplement to Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Debtors to (A) Maintain and Administer Prepetition Customer, Scout, and Donor Programs and Practices and (B) Pay and Honor Related Prepetition Obligations, and (II) Granting Related Relief*, filed by the Debtors on March 3, 2020 at Docket No. 134.

176.    "Limited Protected Parties" means the Participating Chartered Organizations and all of such Persons' Representatives when acting in such representative capacity; provided, however, that no Perpetrator is or shall be a Limited Protected Party.

177.    "Limited Protected Party Injunction Date" means the twelve (12) month period following the Effective Date, as may be extended pursuant to the Settlement Trust Agreement, to afford Participating Chartered Organizations an opportunity to negotiate an appropriate settlement with the Settlement Trust and become a Contributing Chartered Organization.

178.    "Local Council Insurance Policies" means any and all known and unknown contracts, binders, certificates or insurance policies currently or previously in effect at any time on or before the Petition Date naming the Local Councils, or any of them, or any predecessor, subsidiary, or past or present Affiliate of any Local Council, as an insured (whether as the primary or an additional insured), or otherwise alleged to afford any Local Council insurance coverage, upon which any claim could have been, has been or may be made with respect to any Abuse Claim, including the policies identified on Schedule 3. Notwithstanding the foregoing, Local Council Insurance Policies shall not include: (a) any policy providing reinsurance to any Insurance Company; (b) any Non-Abuse Insurance Policy; (c) any BSA Insurance Policy; or (d) any Postpetition Insurance Policy.

30

179.    "Local Council Insurance Rights" has the meaning ascribed to such term in Article V.S.1.a.

180.    "Local Council Reserved Rights" (a) any right of a Local Council under any Specified Insurance Policy with respect to any Non-Abuse Litigation Claim and (b) any right of a Local Council or Related Non-Debtor Entity under any Specified Insurance Policy with respect to any Cause of Action against such Local Council or Related Non-Debtor Entity that does not relate to Abuse and remains unresolved as of the Effective Date; provided, that such Local Council, Related Non-Debtor Entity, or applicable claimant provides notice of such claim or Cause of Action to the Debtors, the Coalition, the Tort Claimants' Committee, and the Future Claimants' Representative prior to the Effective Date.

181.    "Local Council Settlement Contribution" means:

a.    the contributions to the Settlement Trust by the Local Councils, as set forth on Exhibit F and as updated in the Plan Supplement;

b.    to the maximum extent permitted under applicable law, any and all of the Local Councils' rights, titles, privileges, interests, claims, demands or entitlements, as of the Effective Date, to any proceeds, payments, benefits, Causes of Action, choses in action, defense, or indemnity, now existing or hereafter arising, accrued or unaccrued, liquidated or unliquidated, matured or unmatured, disputed or undisputed, fixed or contingent, arising under or attributable to: (i) the BSA Insurance Policies, the Insurance Settlement Agreements, and claims thereunder and proceeds thereof (but not the policies themselves, except as otherwise required under the Insurance Settlement Agreements); (ii) the Insurance Actions; and (iii) the Insurance Action Recoveries; provided, however, that the transfer set forth herein will not include the Local Council Reserved Rights;

c.    to the maximum extent permitted under applicable law, any and all of the Local Councils' rights, titles, privileges, interests, claims, demands or entitlements, as of the Effective Date, to any proceeds, payments, benefits, Causes of Action, choses in action, defense, or indemnity, now existing or hereafter arising, accrued or unaccrued, liquidated or unliquidated, matured or unmatured, disputed or undisputed, fixed or contingent, arising under or attributable to: (i) the Local Council Insurance Policies, the Insurance Settlement Agreements, and claims thereunder and proceeds thereof; (ii) the Insurance Actions; and (iii) the Insurance Action Recoveries; provided, however, that the transfer set forth herein will not include the Local Council Reserved Rights;

d.    the waiver, release, and expungement from the Claims Register, as of the Effective Date, of any and all Claims that have been asserted in the Chapter 11 Cases by or on behalf of any Local Council, including any Indirect Abuse Claims, without any further notice to or action, order, or approval of the Bankruptcy Court, and the agreement of each Local Council not to (i) file or assert any Claim or Claims against the Settlement Trust, the Debtors, or Reorganized BSA arising

31

from any act or omission of the Debtors on or prior to the Confirmation Date or (ii) file or assert any rights or interests in any property transferred to the Settlement Trust under the Plan.

       e.     the Local Councils' Settlement Trust Causes of Action; and

       f.     the assignment of any and all Perpetrator Indemnification Claims held by the Local Councils.

182.    "Local Councils" means, collectively, each and every current or former local council of the BSA, including each and every current local council of the BSA as listed on Exhibit G hereto, "supporting organizations" within the meaning of 26 U.S.C. § 509 with respect to any Local Council, Scouting units (including "troops," "dens," "packs," "posts," "clubs," "crews," "ships," "tribes," "labs," "lodges," "councils," "districts," "areas," "regions," and "territories") associated with any Local Council, and all Entities that hold, own, or operate any camp or other property that is operated in the name of or for the benefit of any of the foregoing.

183.    "Mediators" means the Honorable Kevin J. Carey (Ret.), Paul A. Finn, and Timothy V.P. Gallagher, who were appointed by the Bankruptcy Court as mediators in the Chapter 11 Cases under the *Order (I) Appointing Mediators, (II) Referring Certain Matters to Mediation, and (III) Granting Related Relief* entered on June 9, 2020 at Docket No. 812, as modified and limited to the time periods set forth in the supplemental order entered on November 17, 2021 at Docket No. 7283 and the second supplemental order entered on December 7, 2021 at Docket No. 7589.

184.    "Mixed Claim" means a claim that makes allegations of Abuse related to or arising from Scouting as well as Abuse that occurred prior to the Petition Date unrelated to or not arising from Scouting. A claim shall not be treated as a Mixed Claim unless and until Scouting-related Abuse allegations have been asserted through a Proof of Claim, the complaint, sworn discovery or testimony (including by affidavit).

185.    "Net Unrestricted Cash and Investments" means all of the Unrestricted Cash and Investments as of the Effective Date, which shall include the net proceeds of the sale of Scouting University, which equal approximately $1,902,000, and the net proceeds of the sale of the Warehouse and Distribution Center if it is sold prior to the Effective Date, after Reorganized BSA has received the proceeds of the Foundation Loan, less (a) $25,000,000 (subject to variance as set forth in Article V.M), which shall be funded first from the proceeds of the Foundation Loan, (b) an amount of Cash equal to the JPM Exit Fee, (c) an amount of Cash sufficient to fund all unpaid Allowed Administrative Expense Claims, (d) without duplication, an amount of Cash sufficient to fund the Professional Fee Reserve, (e) an amount of Cash equal to the Creditor Representative Fee Cap, (f) the amount of Cash estimated to be required to satisfy Allowed Priority Tax Claims, Allowed Other Priority Claims, Allowed Secured Claims, and Allowed Convenience Claims, and (g) an amount of Cash sufficient to fund all accrued but unpaid interest and reasonable fees and expenses of JPM as of the Effective Date to the extent not paid pursuant to the Cash Collateral Order.

TrustApp0196

186.    "Non-Abuse Claim" means any Claim against the Debtors that is not an Abuse Claim.

187.    "Non-Abuse Insurance Policy" means any and all known and unknown contracts, binders, certificates or Insurance Policies currently or previously in effect at any time on or before the Petition Date naming the Debtors, the Local Councils, the Chartered Organizations, or any of them, or any predecessor, subsidiary, or past or present Affiliate of the Debtors, as an insured (whether as the primary or an additional insured), or otherwise alleged to afford the Debtors, the Local Councils, or the Chartered Organizations insurance coverage, upon which any claim could have been, has been, or may be made with respect to any Non-Abuse Claim and which does not include coverage for Abuse Claims; provided, however, Non-Abuse Insurance Policies, including the D&O Liability Insurance Policies, do not include Abuse Insurance Policies (which Abuse Insurance Policies, for the avoidance of doubt, include the Specified Insurance Policies).

188.    "Non-Abuse Litigation Claim" means any Claim that is a prepetition unsecured non-priority Claim against the Debtors relating to pending or threatened litigation against one or both of the Debtors that does not relate to Abuse. For the avoidance of doubt, Non-Abuse Litigation Claims include (a) all personal injury or wrongful death Claims against the Debtors that do not relate to Abuse and (b) all Claims against the Debtors asserted by the Girl Scouts of the United States of America. Non-Abuse Litigation Claims do not include any Administrative Expense Claims that may be asserted by holders of Non-Abuse Litigation Claims.

189.    "Non-Settling Insurance Company" means any Insurance Company that is not a Settling Insurance Company.

190.    "Northern Tier Assignment" means that certain Assignment of Agreements, Licenses, Permits and Contracts, dated as of March 21, 2019, by and from the BSA, as assignor, and JPM, as assignee, which secures the BSA's obligations under the 2010 Credit Agreement, the 2010 Bond Agreement, the 2012 Bond Agreement, and the 2019 RCF Agreement.

191.    "Northern Tier Mortgage" means that certain Mortgage, Security Agreement, Assignment of Rents and Leases and Fixture Filing, dated as of March 21, 2019, by and from the BSA, as mortgagor, and JPM, as mortgagee, which secures the BSA's obligations under the 2010 Credit Agreement, the 2010 Bond Agreement, the 2012 Bond Agreement, and the 2019 RCF Agreement.

192.    "Notice and Claims Agent" means Omni Agent Solutions, in its capacity as "claims and noticing agent" for the Debtors, and any successor thereto.

193.    "Official Committees" means the Tort Claimants' Committee and the Creditors' Committee.

194.    "Oil and Gas Interests" means those certain mineral or royalty interests owned by the BSA, consisting of approximately 1,027 properties located in Alabama, Arkansas, California, Florida, Georgia, Illinois, Louisiana, Michigan, Mississippi,

TrustApp0197

Nebraska, New Mexico, North Dakota, Oklahoma, Oregon, Texas, South Dakota and Wyoming.  The Oil and Gas Interests include those listed on <u>Schedule 4</u>.

195.    "<u>Opt-Out Chartered Organization Abuse Claims</u>" means any Abuse Claim against an Opt-Out Chartered Organization that is alleged to have occurred prior to the Petition Date (including prior to January 1, 1976) and to the extent that is covered under an insurance policy issued by a Settling Insurance Company.

196.    "<u>Opt-Out Chartered Organization</u>" means a Chartered Organization that is not a Contributing Chartered Organization or a Participating Chartered Organization because such Chartered Organization has (a) objected to confirmation of the Plan or (b) informed Debtors' counsel in writing on or before the confirmation objection deadline that it does not wish to make the Participating Chartered Organization Insurance Assignment.  For the avoidance of doubt, (i) Opt-Out Chartered Organizations shall receive the benefit of the Channeling Injunction applicable to Abuse Claims covered under any insurance policy issued by the Settling Insurance Companies and (ii) Opt–Out Chartered Organizations shall not be required to provide assignments and releases with respect to insurance policies issued directly to an Opt-Out Chartered Organization.  Notwithstanding the foregoing, with respect to any Chartered Organization that is a debtor in bankruptcy as of the Confirmation Date, such Chartered Organization shall be treated as an Opt-Out Chartered Organization and will only be treated as a Participating Chartered Organization if it advises the Debtors' counsel in writing that it wishes to make the Participating Chartered Organization Insurance Assignment, and, for the avoidance of doubt, absent such written advisement, none of such Chartered Organization's rights to or under the Abuse Insurance Policies shall be subject to the Participating Chartered Organization Insurance Assignment, <u>provided</u>, <u>however</u>, that Abuse Claims against such Chartered Organizations shall be subject to the injunction and release applicable to Opt-Out Chartered Organization Abuse Claims.   A list of Chartered Organizations that are debtors in bankruptcy as of the Confirmation Date is attached hereto as <u>Exhibit K</u>.  For the avoidance of doubt, Opt-Out Chartered Organizations, by definition, are not Participating Chartered Organizations, Limited Protected Parties, or Contributing Chartered Organizations. The term "Opt-Out Chartered Organization," on the one hand, and the terms "Participating Chartered Organizations," "Limited Protected Parties," and "Contributing Chartered Organizations," on the other than, are mutually exclusive.

197.    "<u>Other Priority Claim</u>" means any Claim against the Debtors that is entitled to priority in right of payment under section 507(a) of the Bankruptcy Code, other than an Administrative Expense Claim or a Priority Tax Claim.

198.    "<u>Other Secured Claim</u>" means any Secured Claim against the Debtors other than any 2010 Credit Facility Claim, 2019 RCF Claim, 2010 Bond Claim, or 2012 Bond Claim.

199.    "<u>Participating Chartered Organization</u>" means a Chartered Organization (other than a Contributing Chartered Organization, including the United Methodist Entities) that does not (a) object to confirmation of the Plan or (b) inform Debtors' counsel in writing on or before the confirmation objection deadline that it does not wish to make

TrustApp0198

the Participating Chartered Organization Insurance Assignment.[3]   Notwithstanding the foregoing, with respect to any Chartered Organization that is a debtor in bankruptcy as of the Confirmation Date, such Chartered Organization shall be a Participating Chartered Organization only if it advises Debtors' counsel in writing that it wishes to make the Participating Chartered Organization Insurance Assignment, and, for the avoidance of doubt, absent such written advisement, none of such Chartered Organization's rights to or under the Abuse Insurance Policies shall be subject to the Participating Chartered Organization Insurance Assignment.  A list of Chartered Organizations that are debtors in bankruptcy and whether they have advised the Debtors' counsel that they wish to make the Participating Chartered Organization Insurance Assignment, subject to approval in their bankruptcy cases is attached hereto as <u>Exhibit K</u>.

200.    "<u>Participating Chartered Organization Insurance Action</u>" means any Cause of Action of the Participating Chartered Organizations, or any of them, under the laws of any jurisdiction, against any Non-Settling Insurance Company, arising from or related to an Abuse Insurance Policy related to Abuse Claims that first occurred on or after January 1, 1976, including: (a) any such Non-Settling Insurance Company's failure to provide coverage or otherwise pay under an Abuse Insurance Policy; (b) the refusal of any Non-Settling Insurance Company to compromise and settle any Abuse Claim under or pursuant to any Abuse Insurance Policy; (c) the interpretation or enforcement of the terms of any Abuse Insurance Policy with respect to any Abuse Claim; (d) any conduct by any Non-Settling Insurance Company that could give rise to extra-contractual damages, or other wrongful conduct under applicable law; or (e) any right to receive proceeds held by such Participating Chartered Organization with respect to an Abuse Insurance Policy.  For the avoidance of doubt, no Cause of Action of the Participating Chartered Organizations, or any of them, against any Settling Insurance Company shall be deemed an Insurance Action, except for any Cause of Action arising from or related to an Insurance Settlement Agreement.

201.    "<u>Participating Chartered Organization Insurance Assignment</u>" means, subject to Article IX.A.3.j, any and all of the Participating Chartered Organizations' rights in and to (a) the Participating Chartered Organization Insurance Actions, (b) the Insurance Action Recoveries, (c) the Insurance Settlement Agreements and claims thereunder and proceeds thereof, (d) the Abuse Insurance Policies (but not the policies themselves) issued by Settling Insurance Companies, and (e) Settling Insurer Policy Rights.

202.    "<u>Participating Chartered Organization Insurance Rights</u>" has the meaning ascribed to such term in <u>Article V.S.1.c</u>.

203.    "<u>Participating Chartered Organization Settlement Contribution</u>" means:

a.    to the maximum extent permitted by applicable law, the Participating Chartered Organization Insurance Assignment;

---

[3]    *See* Article V.S.8 herein with respect to inclusion of Roman Catholic Entities as Participating Chartered Organizations.

TrustApp0199

b.    to the extent of any rights, claims or interests not assigned to the Settlement Trust pursuant to the Participating Chartered Organization Insurance Assignment, the waiver and complete release of (i) each of the Participating Chartered Organization's rights, titles, privileges, interests, claims, demands or entitlements under the Settling Insurance Companies' Abuse Insurance Policies and any Settling Insurer Policy Rights; (ii) any Claim held by the Participating Chartered Organization that is attributable to, arises from, is based upon, relates to, or results from, in whole or part, directly, indirectly, or derivatively (including through any insurance policy issued by the Settling Insurance Companies), alleged Abuse Claims that occurred prior to the Petition Date against the Settlement Trust, the Debtors, Reorganized BSA, the Local Councils, any Contributing Chartered Organization or Settling Insurance Companies; and (iii) any and all Claims that have been asserted in the Chapter 11 Cases by or on behalf of any Participating Chartered Organization, including any Indirect Abuse Claims, without any further notice to or action, order, or approval of the Bankruptcy Court, which Claims shall be expunged from the Claims Register, and the agreement of each Participating Chartered Organization not to (a) file or assert any Claim or Claims against the Settlement Trust, the Debtors, or Reorganized BSA arising from any act or omission of the Debtors, the Local Councils, any Contributing Chartered Organization, or any Participating Chartered Organization on or prior to the Confirmation Date, (b) object to the Document Appendix and obligations thereunder, or (c) file or assert any rights or interests in any property transferred to the Settlement Trust under the Plan, including the proceeds of any settlements paid by a Settling Insurance Company; and

c.    the assignment to the Settlement Trust of any and all Perpetrator Indemnification Claims held by the Participating Chartered Organizations.

204.    "Pension Plan" means the Boy Scouts of America Retirement Plan for Employees, a single-employer, qualified, defined benefit pension plan that is subject to the Employee Retirement Income Security Act of 1974, as amended, and the Internal Revenue Code, of which BSA is the sponsor.

205.    "Perpetrator" means any individual who personally committed or is alleged to have personally committed an act of Abuse that forms the basis for an Abuse Claim. The term "Perpetrator" does not include any individual who did not personally commit or is not alleged to have personally committed an act of Abuse that forms the basis for an Abuse Claim, against whom an Abuse Claim is nevertheless asserted or may be asserted, including by virtue of such individual's position or service as an employee or volunteer of the Debtors or as a Scout participant, or by virtue of such individual's position or service as an employee or volunteer of a Local Council or a Chartered Organization or as a Scout participant.

206.    "Perpetrator Indemnification Claim" means a Claim against a Perpetrator for indemnification or contribution arising from or relating to an Abuse Claim.

36

TrustApp0200

207.    "Person" has the meaning set forth in section 101(41) of the Bankruptcy Code."

208.    "Petition Date" means February 18, 2020.

209.    "Pfau/Zalkin" means the law firms of Pfau Cochran Verteris Amala PLLC and the Zalkin Law Firm, P.C.

210.    "Philmont Assignment" means that certain Assignment of Agreements, Licenses, Permits and Contracts, dated as of March 21, 2019, by and from the BSA, as assignor, and JPM, as assignee, which secures the BSA's obligations under the 2010 Credit Agreement, the 2010 Bond Agreement, the 2012 Bond Agreement, and the 2019 RCF Agreement.

211.    "Philmont Mortgage" means that certain Mortgage, Security Agreement, Assignment of Rents and Leases and Fixture Filing, dated as of March 21, 2019, by and from the BSA, as mortgagor, and JPM, as mortgagee, which secures the BSA's obligations under the 2010 Credit Agreement, the 2010 Bond Agreement, the 2012 Bond Agreement, and the 2019 RCF Agreement.

212.    "Plan" means this *Third Modified Fifth Amended Plan of Reorganization (With Technical Modifications) for Boy Scouts of America and Delaware BSA, LLC* filed by the Debtors, as the same may be amended or modified from time to time pursuant to section 1127 of the Bankruptcy Code.

213.    "Plan Documents" means, collectively, the Plan, the Disclosure Statement, the Disclosure Statement Order, each of the documents that comprises the Plan Supplement, and all of the exhibits and schedules attached to any of the foregoing. The Plan Documents shall be in form and substance acceptable to (a) the Debtors, the Ad Hoc Committee, the Coalition, the Tort Claimants' Committee, the Future Claimants' Representative, Hartford, the Century and Chubb Companies, Zurich Insurers and Zurich Affiliated Insurers, Clarendon, and any other Settling Insurance Companies all in accordance with their consent rights, and (b) the Creditors' Committee and JPM in accordance with their consent rights under the JPM / Creditors' Committee Term Sheet.

214.    "Plan Supplement" means the compilation of documents and forms of documents, agreements, schedules, exhibits, and annexes to the Plan, which the Debtors shall file no later than fourteen (14) days before the Voting Deadline, unless otherwise ordered by the Bankruptcy Court, and additional documents filed with the Bankruptcy Court before the Effective Date as amendments, modifications or supplements to the Plan Supplement. The Plan Supplement will include the following: (a) the Amended BSA Bylaws; (b) the Assumed Contracts and Unexpired Leases Schedule; (c) the form of the BSA Settlement Trust Note; (d) the form of the Document Appendix; (e) the form of the DST Agreement; (f) the form of the DST Note; (g) the name of the Creditor Representative; (h) changes, if any, to Reorganized BSA's directors and officers; (i) the form of the Foundation Loan Agreement; (j) the form of agreement reflecting the terms of the Leaseback Requirement; (k) the Rejected Contracts and Unexpired Leases Schedule; (l)

TrustApp0201

the forms of the Restated 2010 Bond Documents; (m) the forms of the Restated 2012 Bond Documents; (n) the forms of the Restated Credit Facility Documents; (o) the form of the Restated Security Agreement; (p) the names of the initial members of the Settlement Trust Advisory Committee; (q) the form of releases to be executed by a holder of an Abuse Claim with respect to such Abuse Claim as a condition precedent to receiving any proceeds from the Settlement Trust as set forth in the Trust Distribution Procedures; and (r) actual or anticipated changes in Local Council Settlement Contributions; provided that the Plan Documents listed in clauses (b) and (k) of the foregoing sentence will be revised, in the Debtors' discretion, subject to Article VI, to account for any additional Executory Contracts or Unexpired Leases to be assumed or rejected in advance of the Confirmation Hearing. The Plan Supplement shall be served only on those parties that have requested notice in the Chapter 11 Cases pursuant to Bankruptcy Rule 2002 and any party in interest who requests in writing a copy from counsel to the Debtors. Once the Plan Supplement is filed, a copy will also be available for review on the Notice and Claims Agent's website free of charge at https://omniagentsolutions.com/BSA. The Plan Supplement shall be in form and substance reasonably acceptable to the Creditors' Committee, JPM, the Settling Insurance Companies, and the Contributing Chartered Organizations, as applicable.

215. "Post-1975 Chartered Organization Abuse Claims" means any Abuse Claim against a Participating Chartered Organization that relates to Abuse alleged to have first occurred on or after January 1, 1976.

216. "Post-Confirmation Interim Injunction" shall have the meaning ascribed to such term in Article X.D.

217. "Post-Effective Date Chartered Organization Settlement" shall have the meaning ascribed to such term in Article IV.J.

218. "Post-Effective Date Insurance Settlement" shall have the meaning ascribed to such term in Article IV.K.

219. "Postpetition Insurance Policies" means insurance policies issued by the Settling Insurance Companies to the Debtors or the Local Councils and effective on or after the Petition Date, but only to the extent of coverage for Claims and Causes of Action arising from acts or events that first took place after the Petition Date. For the avoidance of doubt, Postpetition Insurance Policies expressly exclude the right to seek coverage for Abuse Claims, including any settlements incorporated into the Plan or settlements entered into by the Settlement Trust.

220. "Pre-1976 Chartered Organization Abuse Claims" means any Abuse Claim that is alleged to have occurred prior to January 1, 1976 that is covered under an insurance policy issued by a Settling Insurance Company.

221. "Prepetition Century and Chubb Companies Claims" means all Claims and Causes of Action of the Debtors against certain of the Century and Chubb Companies including for payment of defense, indemnity costs, and any other potential damages allegedly owed as of the Petition Date.

38

222. "<u>Prepetition Debt and Security Documents</u>" means, collectively, the 2010 Credit Facility Documents, the 2019 RCF Documents, the 2010 Bond Documents, the 2012 Bond Documents, the Prepetition Security Documents (2019), and the Prepetition Security Agreement (2020).

223. "<u>Prepetition Hartford Claims</u>" means all Claims and Causes of Action, known or unknown, that have been or could be asserted by the Debtors or either of them against any Hartford Protected Party for payment of defense and indemnity costs allegedly owed as of the Petition Date.

224. "<u>Prepetition Security Agreement (2019)</u>" means that certain Third Amended and Restated Security Agreement, dated as of March 21, 2019, by and among the BSA and Arrow, as debtors, JPM, in its capacity as collateral agent, JPM, in its capacity as the lender under each of the 2010 Credit Agreement and the 2019 RCF Agreement, and as holder under each of the 2010 Bond Agreement and the 2012 Bond Agreement.

225. "<u>Prepetition Security Agreement (2020)</u>" means that certain Consent and Security Agreement dated as of February 3, 2020, by and among Delaware BSA, the BSA, JPM, as collateral agent, and JPM, in its capacity as the lender under the 2010 Credit Agreement and the 2019 RCF Agreement, and as holder under the 2010 Bond Agreement and the 2012 Bond Agreement.

226. "<u>Prepetition Security Documents (2019)</u>" means, collectively, the Prepetition Security Agreement (2019), the Florida Sea Base Mortgage, the Florida Sea Base Assignment, the Headquarters Deed of Trust, the Headquarters Assignment, the Northern Tier Mortgage, the Northern Tier Assignment, the Philmont Mortgage, the Philmont Assignment, and the Arrow Collateral Assignment.

227. "<u>Priority Tax Claim</u>" means any Claim of a Governmental Unit against the Debtors that is entitled to priority in payment under section 507(a)(8) of the Bankruptcy Code.

228. "<u>Privileged Information</u>" means any privileged information that relates, in whole or in part, to any Abuse Claim, including: (a) the Debtors' books and records transferred to the Settlement Trust in accordance with the Document Appendix; (b) any privileged information containing a factual or legal analysis or review of any Abuse Claim; (c) any privileged information evaluating the reasonableness, effectiveness, or Confirmability of the Plan or any other chapter 11 plan filed or that could be filed in the Chapter 11 Cases; (d) any privileged information exchanged by the Debtors or their professionals, on the one hand, and any of the Related Non-Debtor Entities, Local Councils, the Ad Hoc Committee, either Official Committee, the Future Claimants' Representative, or their respective Representatives, on the other hand, related to the Plan, the Plan Documents, or the Abuse Claims; and (e) information shared pursuant to that certain Joint Defense, Common Interest, and Confidentiality Agreement among the BSA, the Ad Hoc Committee, and each Local Council that executed a joinder to said agreement that was acknowledged in writing by the BSA and the Ad Hoc Committee; (f) any privileged information containing a factual or legal analysis of the Debtors' potential

TrustApp0203

exposure in connection with any Abuse Claim or any litigation related thereto; and (g) any Common-Interest Communications with Insurers.

229.    "Pro Rata" means, at any time, with respect to any Claim, the proportion that the amount of such Claim in a particular Class or group of Classes bears to the aggregate amount of all Claims (including Disputed Claims) in such Class or group of Classes, unless in each case the Plan provides otherwise.

230.    "Pro Rata Share" means the proportion that an Allowed Claim in a particular Class bears to the aggregate amount of all Allowed Claims in that Class.

231.    "Professional" means any Person retained by the Debtors, the Tort Claimants' Committee, the Creditors' Committee, or the Future Claimants' Representative pursuant to a Final Order of the Bankruptcy Court entered under sections 327, 328, 363, or 1103 of the Bankruptcy Code.

232.    "Professional Fee Claim" means any Claim of a Professional or other Person for Allowance by the Bankruptcy Court and payment by the Debtors of compensation for services rendered and/or reimbursement of costs or expenses incurred in the Chapter 11 Cases for the period from the Petition Date to and including the Effective Date under sections 328, 330, 331, or 503(b) of the Bankruptcy Code, including a Claim for reimbursement and/or payment of Coalition Restructuring Expenses under Article V.T.

233.    "Professional Fee Reserve" means a segregated account funded from Unrestricted Cash and Investments on hand of the Debtors as of the Effective Date in an amount equal to the Professional Fee Reserve Amount as of such date, solely for the purpose of paying all Allowed Professional Fee Claims.

234.    "Professional Fee Reserve Amount" means the aggregate Accrued Professional Fees as of the Effective Date, as estimated by the Professionals in accordance with Article II.A.2.

235.    "Proof of Claim" means any proof of claim filed with the Bankruptcy Court or the Notice and Claims Agent pursuant to section 501 of the Bankruptcy Code and Bankruptcy Rules 3001 or 3002 that asserts a Claim against either of the Debtors.

236.    "Protected Parties" means the following Persons: (a) the Debtors; (b) Reorganized BSA; (c) the Related Non-Debtor Entities; (d) the Local Councils; (e) the Contributing Chartered Organizations; (f) the Settling Insurance Companies; and (g) all of such Persons' Representatives; provided, however, that no Perpetrator is or shall be a Protected Party.  Notwithstanding the foregoing, a Contributing Chartered Organization shall be a Protected Party with respect to Abuse Claims only as set forth in the definition of "Abuse Claim."

237.    "Quarterly Fees" means all fees due and payable pursuant to section 1930(a)(6) of title 28 of the United States Code.

TrustApp0204

238.    "Reinstatement" means (a) leaving unaltered the legal, equitable and contractual rights to which a Claim entitles the holder of such Claim or (b) notwithstanding any contractual provision or applicable law that entitles the holder of such Claim to demand or receive accelerated payment of such Claim after the occurrence of a default, (i) curing any such default that occurred before or after the Petition Date, other than a default of a kind specified in section 365(b)(2) of the Bankruptcy Code; (ii) reinstating the maturity of such Claim as such maturity existed before such default; (iii) compensating the holder of such Claim for any damages incurred as a result of any reasonable reliance by such holder on such contractual provision or such applicable law; (iv) if such Claim arises from any failure to perform a nonmonetary obligation, compensating the holder of such Claim (other than the Debtors or an "insider" of the Debtors within the meaning of section 101(31) of the Bankruptcy Code) for any actual pecuniary loss incurred by such holder as the result of such failure; and (v) not otherwise altering the legal, equitable or contractual rights to which such Claim entitles the holder thereof.  "Reinstated" has a correlative meaning.

239.    "Rejected Contracts and Unexpired Leases Schedule" means the schedule of Executory Contracts or Unexpired Leases to be rejected by the BSA under the Plan, as set forth in the Plan Supplement, as may be amended, modified, or supplemented from time to time.

240.    "Rejection Damages Claim" means a Claim for damages alleged to arise from the rejection of an Executory Contract or Unexpired Lease pursuant to section 365 or 1123 of the Bankruptcy Code.

241.    "Related Non-Debtor Entities" means the Entities listed on Exhibit H, including non-debtor Affiliates of the Debtors that are directly or indirectly wholly owned by, or subject to the control of, the BSA.  For the avoidance of doubt, Related Non-Debtor Entities do not include Local Councils or Chartered Organizations.

242.    "Release Injunctions" means the injunctions described in Article X.L.

243.    "Rejection Damages Bar Date" has the meaning ascribed to such term in Article VI.B.

244.    "Release Date" means the date on which the Confirmation Order becomes a Final Order or, when such term is used with respect to any Insurance Settlement Agreement with a Settling Insurance Company, the term "Release Date" shall have the meaning ascribed to such term in the applicable Insurance Settlement Agreement.

245.    "Released Parties" means, collectively, the following Persons, in each case in its or their respective capacities as such: (a) the Debtors; (b) Reorganized BSA; (c) the Related Non-Debtor Entities; (d) the Creditors' Committee; (e) the members of the Creditors' Committee in their capacities as such; (f) the Tort Claimants' Committee; (g) the members of the Tort Claimants' Committee in their capacities as such; (h) the Future Claimants' Representative; (i) the Coalition; (j) JPM; (k) the Settling Insurance Companies; (l) the Contributing Chartered Organizations, including the United Methodist Entities; (m) the Foundation, in its capacity as lender under the Foundation Loan

41

Agreement; (n) the Ad Hoc Committee; (o) the members of the Ad Hoc Committee in their capacities as such; (p) the Mediators; and (q) all of such Persons' Representatives; provided, however, that no Perpetrator is or shall be a Released Party; provided further, that the definition of "Released Parties" shall in all instances be subject to Article X.J.

246.    "Releases" means the releases set forth in Article X.J.

247.    "Releasing Claim Holder" means, collectively, (a) all holders of Claims that vote to accept the Plan and do not opt out of the releases set forth in Article X.J.4; (b) all holders of Claims that are presumed to accept the Plan, except for holders of such Claims that file a timely objection to the releases set forth in Article X.J.4; and (c) all holders of Claims entitled to vote on the Plan and who vote against the Plan and do not opt out of the releases set forth in Article X.J.4.  No holder of a Claim in a Class that is Impaired under the Plan will be deemed a "Releasing Claim Holder" to the extent such holder abstained from voting.

248.    "Reorganized BSA" means the BSA and, as applicable, Delaware BSA, as reorganized pursuant to and under the Plan on or after the Effective Date.

249.    "Representatives" means, with respect to any Person, such Person's (a) predecessors, successors, assigns, subsidiaries, and Affiliates, (b) current and former officers, directors, principals, equity holders, trustees, members, partners, managers, officials, board members, advisory board members, employees, agents, volunteers, attorneys, financial advisors, accountants, investment bankers, consultants, representatives, and other professionals, and (c) respective heirs, executors, estates, and nominees, in each case solely in its capacity as such.

250.    "Restated 2010 Bond Documents" means those certain restated bond documents, including a restated revenue bond, bond purchase agreement, promissory note, security agreement, and all documentation executed and delivered in connection therewith, in each case containing substantially the same terms as the 2010 Bond Documents except that: (a) the amortization schedule attached to the 2010 Bond shall be amended and restated such that (i) interest is payable in monthly installments (at the same rates in the 2010 Bond Documents) beginning on the date that is one month after the Effective Date (as to be specified in the Restated 2010 Bond Documents) and ending on the Restated Maturity Date, and (ii) principal is payable in monthly installments (in the same monthly amounts as the periodic amortization amounts in the 2010 Bond Documents) beginning on the date that is two years after the Effective Date (as to be specified in the Restated 2010 Bond Documents) and ending on the Restated Maturity Date; and (b) the Restated 2010 Bond Documents shall be guaranteed by Arrow.  The covenants in the Restated 2010 Bond Documents shall be in form and substance acceptable to JPM and the BSA.  The obligations under the Restated 2010 Bond Documents shall be secured by the Restated Security Agreement.  The then-current forms of the Restated 2010 Bond Documents shall be filed with the Plan Supplement.

251.    "Restated 2012 Bond Documents" means those certain restated bond documents, including a restated revenue bond, bond purchase agreement, promissory note,

TrustApp0206

security agreement, and all documentation executed and delivered in connection therewith, in each case containing substantially the same terms as the 2012 Bond Documents except that: (a) the amortization schedule attached to the 2012 Bond shall be amended and restated such that (i) interest is payable in monthly installments (at the same rates in the 2012 Bond Documents) beginning on the date that is one month after the Effective Date (as to be specified in the Restated 2012 Bond Documents) and ending on the Restated Maturity Date, and (ii) principal is payable in monthly installments (in the same monthly amounts as the periodic amortization amounts in the 2012 Bond Documents) beginning on the date that is two years after the Effective Date (as to be specified in the Restated 2012 Bond Documents) and ending on the Restated Maturity Date; and (b) the Restated 2012 Bond Documents shall be guaranteed by Arrow. The covenants in the Restated 2012 Bond Documents shall be in form and substance acceptable to JPM and the BSA. The obligations under the Restated 2012 Bond Documents shall be secured by the Restated Security Agreement. The then-current forms of the Restated 2012 Bond Documents shall be filed with the Plan Supplement.

252. "Restated Credit Facility Documents" means those certain restated credit facility documents, which shall contain substantially the same terms as the 2010 Credit Facility Documents and the 2019 RCF Documents, as applicable to the 2010 Credit Facility Claims and the 2019 RCF Claims, except that: (a) the revolving credit facilities provided under the 2010 Credit Facility Documents and the 2019 RCF Documents shall be frozen and converted to term loans; (b) the Revolving Maturity Date and the Term Loan Maturity Date (each as defined in the 2010 Credit Facility Documents) and the Maturity Date (as defined in the 2019 RCF Documents) shall be extended to the Restated Maturity Date; (c) interest is payable in quarterly installments (at the same rates in the applicable Prepetition Debt and Security Documents) beginning on the date that is three months after the Effective Date (as to be specified in the Restated Credit Facility Documents) and ending on the Restated Maturity Date; (d) principal is payable in quarterly installments (at 1/40th of the outstanding balance on the Effective Date) beginning on the date that is two years after the Effective Date (as to be specified in the Restated Credit Facility Documents) and ending on the Restated Maturity Date; and (e) the Restated Credit Facility Documents shall be guaranteed by Arrow. The covenants in the Restated Credit Facility Documents shall be in form and substance acceptable to JPM and the BSA. The obligations under the Restated Credit Facility Documents shall be secured by the Restated Security Agreement. The then-current forms of the Restated Credit Facility Documents shall be filed with the Plan Supplement.

253. "Restated Debt and Security Documents" means, collectively, the Restated 2010 Bond Documents, the Restated 2012 Bond Documents, the Restated Credit Facility Documents, and the Restated Security Agreement. The Restated Debt and Security Documents shall be on terms acceptable to JPM and the BSA, and reasonably acceptable to the Creditors' Committee.

254. "Restated Maturity Date" means the maturity date applicable to each of the Restated Debt and Security Documents in accordance with the terms thereof, which shall in each case be the date that is ten (10) years after the Effective Date.

TrustApp0207

255.    "Restated Security Agreement" means that certain restated security agreement, pursuant to which Reorganized BSA and Arrow shall grant blanket first-priority liens on and security interests in all of Reorganized BSA's and Arrow's assets, including all collateral secured by the Prepetition Security Documents (2019), to JPM to secure Reorganized BSA's and Arrow's obligations under the Restated 2010 Bond Documents, the Restated 2012 Bond Documents and the Restated Credit Facility Documents. The then-current form of the Restated Security Agreement shall be filed with the Plan Supplement.

256.    "Restoration Plan" means the Boy Scouts of America Retirement Benefit Restoration Plan, a non-qualified defined benefit retirement plan under section 457(f) of the Internal Revenue Code, which provides supplemental retirement benefits to certain current and former employees of the Debtors or Local Councils.

257.    "Roman Catholic Entities" means each and every (i) Roman Catholic parish, school, diocese, archdiocese, association of religious or lay Persons in the United States or its territories that sponsored, promoted, hosted, was involved with, or provided any support in connection with Scouting activities in any way, including as a social service organization, ministry, camping ministry, or by the use of a camp facility, camp, retreat, or other facilities in connection with Scouting activities, regardless of whether any of the foregoing entities is or was a Chartered Organization at any time or whether such facilities were owned or leased by any of such entities or a third party; (ii) all entities listed or eligible to be listed in the Official Catholic Directory since January 1910, (iii) all Representatives of the foregoing, including their attorneys, any affiliates and the RCAHC. However, no Perpetrator is or shall be a Roman Catholic Entity.[4]

258.    "Roman Catholic Settlement" has the meaning ascribed to such term in Exhibit J.

259.    "Roman Catholic Settlement Agreement" means that certain settlement agreement by and between the Roman Catholic ad hoc committee, the Debtors, Century Indemnity Company, Westchester Fire Insurance Company & Federal Insurance Company, the Ad Hoc Committee, the Coalition,  and the Future Claimants' Representative appended to the *Twelfth Mediator's Report* [D.I. 9387] filed on March 17, 2022.

260.    "Schedules" means, with respect to each Debtor, the schedules of assets and liabilities and the statement of financial affairs filed by such Debtor with the Bankruptcy Court pursuant to sections 521 and 1106(a)(2) of the Bankruptcy Code and Bankruptcy Rule 1007, as such schedules and statements may be amended or supplemented from time to time prior to the Effective Date.

261.    "Scouting" means any and all programs, activities and services of any kind in any way, directly or indirectly, associated with, arising from or related to the BSA or the

---

[4]    The channeling injunction and releases provided to the Chartered Organizations not affiliated with the Roman Catholic Church (including other faith-based institutions) and their related entities shall be consistent with the foregoing scope.

TrustApp0208

BSA's, any Local Council's, any Related Non-Debtor Entity's, or any Chartered Organization's (including their personnel and their affiliates') participation in, involvement in, or sponsorship of, any units or programs offered or previously offered pursuant to the charter of the BSA, including activities such as formal or informal scout meetings, troop activities, jamborees, or interactions of any kind between scouts and other scouts or scout leaders in their capacities as such.

262.    "Scouting-related" means anything that is attributable to, arises from, is based upon, results from, or relates to, in whole or in part, directly, indirectly, or derivatively, Scouting.

263.    "Scouting Released Claims" has the meaning ascribed to such term in Article X.J.

264.    "Scouting University" means that certain parcel of real property owned by the BSA located at 1301 Solana Boulevard, Westlake, Texas 76262, together with the buildings, structures, fixtures, additions, enlargements, extensions, modifications, repairs, replacements and other improvements now or hereafter located thereon, the sale of which was approved pursuant to the *Order, Pursuant to Section 363 of the Bankruptcy Code, Authorizing the Sale of Certain Real Property Located in Westlake Texas*, entered by the Bankruptcy Court on June 14, 2021 at Docket No. 5326.

265.    "Secured" means, with respect to any Claim, the extent to which the Claim is: (a) secured by a Lien on property of a Debtor's Estate (i) as set forth in the Plan, (ii) as agreed to by the holder of such Claim and the Debtors, or (iii) as determined by a Final Order in accordance with section 506(a) of the Bankruptcy Code; or (b) subject to any setoff right of the holder of such Claim under section 553 of the Bankruptcy Code, but, with respect to both of the foregoing clauses (a) and (b), only to the extent of the value of the interest of such holder in the Estate's interest in the property securing such Claim or the amount subject to setoff, as applicable.

266.    "Settlement of Restricted and Core Asset Disputes" has the meaning ascribed to such term in Article V.S.3.

267.    "Settlement Growth Payment" means an annual variable payment by Reorganized BSA, commencing the year after the BSA Settlement Trust Note is paid in full and Reorganized BSA's total outstanding debt under the 2010 Bond Documents, 2010 Credit Facility Documents, 2012 Bond Documents, and 2019 RCF Documents or their replacement and the Foundation Loan is less than $225 million in aggregate, based on growth in membership up to the Settlement Growth Payment Cap. Reorganized BSA's obligation to fund the Settlement Growth Payment shall cease upon the earlier of (a) January 1, 2036 or (b) the cumulative payment in Cash in an amount equal to the Settlement Growth Payment Cap. The Local Councils will reimburse Reorganized BSA for 25% of the amount paid to the Settlement Trust pursuant to the Settlement Growth Payment, with the amount to be assessed by Reorganized BSA to the Local Councils based on their share of membership growth. The Settlement Growth Payment will be calculated as (a) 50% of $72 per paid youth member in Scouts BSA or Cubs Scouts at each year-end in excess of

TrustApp0209

1,500,000 members and (b) 50% of $45 per paid adult volunteer in Scouts BSA or Cubs Scouts at each year-end in excess of 500,000 volunteers. Calculation of the Settlement Growth Payment will be performed based on year-end membership numbers with a report on the calculations provided by the BSA to the Settlement Trust within 60 days of year-end and payment made within 90 days of year-end. Based on a 5.5% annual growth rate of BSA youth members and adult volunteers, the above Settlement Growth Payment will result in an additional $100 million being contributed to the Settlement Trust by the end of 2036.

268. "Settlement Growth Payment Cap" shall mean the cap of $100 million for the Settlement Growth Payment.

269. "Settlement Trust" means the trust organized under the laws of the state of Delaware and established under Article IV and the Settlement Trust Agreement for the purposes set forth therein, including assuming liability for all Abuse Claims, holding, preserving, maximizing, and administering the Settlement Trust Assets, and directing the processing, liquidation and payment of all compensable Abuse Claims in accordance with the Settlement Trust Documents.

270. "Settlement Trust Advisory Committee" or "STAC" means the committee serving in accordance with Article IV and the Settlement Trust Agreement, which shall have the powers, duties and obligations set forth in the applicable Settlement Trust Agreement. The initial members of the Settlement Trust Advisory Committee shall be identified in the Plan Supplement.

271. "Settlement Trust Agreement" means the Settlement Trust Agreement dated as of the Effective Date, substantially in the form attached hereto as Exhibit B, as the same may be amended or modified from time to time in accordance with the terms thereof, which shall be in form and substance acceptable to (a) the Debtors, the Ad Hoc Committee, the Coalition, the Future Claimants' Representative, and the Tort Claimants' Committee and (b) the Creditors' Committee with respect to the treatment of Non-Abuse Litigation Claims.

272. "Settlement Trust Assets" means the following assets and any income, profits and proceeds realized, received or derived from such assets subsequent to the transfer of such assets to the Settlement Trust:

        a.      the BSA Settlement Trust Contribution;

        b.      the Local Council Settlement Contribution;

        c.      the Chartered Organization Contribution, including the Supplemental LC Contribution, and the Settlement Growth Payment;

        d.      the Contributing Chartered Organization Settlement Contribution, including the United Methodist Settlement Contribution;

        e.      the Participating Chartered Organization Settlement Contribution; and

      f.      any and all funds, proceeds or other consideration contributed to the Settlement Trust under the terms of any Insurance Settlement Agreement; and

      g.      any rights, claims, or assets of a holder of a Direct Abuse Claim that is assigned to the Settlement Trust pursuant to the terms of the Trust Distributions Procedures and Settlement Trust Agreement.

273.      "<u>Settlement Trust Causes of Action</u>" means any Estate Cause of Action and any Cause of Action held by any Local Council or other Person that is or becomes a Protected Party or a Limited Protected Party, which Estate Cause of Action or other such Cause of Action, as applicable, is not otherwise expressly released under the Plan or the Plan Documents, in each case solely attributable to: (a) all defenses to any Abuse Claim, including all defenses under section 502 of the Bankruptcy Code; (b) with respect to Abuse Claims, all rights of setoff, recoupment, contribution, reimbursement, subrogation or indemnity (as those terms are defined by the non-bankruptcy law of any relevant jurisdiction) and any other indirect claim of any kind whatsoever, whenever and wherever arising or asserted; (c) any other Causes of Action with respect to Abuse Claims that either Debtor, any Related Non-Debtor Entity, any Local Council or any other Protected Party or Limited Protected Party would have had under applicable law if the Chapter 11 Cases had not occurred and the holder of such Abuse Claim had asserted such Cause of Action by initiating civil litigation against either Debtor, any Related Non-Debtor Entity, any Local Council or any other Protected Party or Limited Protected Party (including any Causes of Action against co-defendants); and (d) any Cause of Action of either Debtor, any Related Non-Debtor Entity, any Local Council or any other Protected Party or Limited Protected Party, under the laws of any jurisdiction, for reimbursement, indemnity, contribution, breach of contract, or otherwise arising from or relating to any payments made by either Debtor, any Related Non-Debtor Entity, any Local Council or any other Protected Party or Limited Protected Party on account of Abuse Claims on or before the Effective Date. For the avoidance of doubt, Settlement Trust Causes of Action shall not include any claim or Cause of Action by any Settling Insurance Company against its reinsurers or retrocessionaires, in their capacities as such.

274.      "<u>Settlement Trust Documents</u>" means, collectively, (a) the Settlement Trust Agreement, (b) the Trust Distribution Procedures, (c) the Document Appendix, (d) the Confirmation Order, and (e) any other agreements, instruments and documents governing the establishment, administration and operation of the Settlement Trust, which shall be substantially in the forms set forth as exhibits hereto or in the Plan Supplement, as the same may be amended or modified from time to time in accordance with the terms thereof.

275.      "<u>Settlement Trust Expenses</u>" means any liabilities, costs, or expenses of, or imposed upon, or in respect of, the Settlement Trust once established (except for payments to holders of Abuse Claims on account of such Claims). Settlement Trust Expenses shall also expressly include: (a) any and all liabilities, costs, and expenses incurred subsequent to the Effective Date in connection with the Settlement Trust Assets (including the prosecution of any Settlement Trust Causes of Action and Insurance Actions), in each case whether or not any such action results in a recovery for the Settlement Trust; (b) the reasonable documented costs and expenses incurred by Reorganized BSA, the Related

47

Non-Debtor Entities, the Local Councils, the Ad Hoc Committee, or the Contributing Chartered Organizations in taking any action on behalf of or at the direction of the Settlement Trust, if any, following such Entities' transfer to the Settlement Trust of copies of all records and documents in their possession, custody or control pertaining to Abuse Claims in accordance with the Document Appendix; and (c) reasonable, documented and contractual professional or advisory fees incurred by the Coalition for up to thirty (30) days after the Effective Date in connection with the initial effectuation of the Plan and the Settlement Trust.

276. "Settlement Trustee" means the initial trustee disclosed in a notice filed on the docket of these Chapter 11 Cases by February 18, 2022, or any successor trustee who may subsequently be appointed pursuant to the terms of the Settlement Trust Agreement.

277. "Settling Insurance Company" means any Insurance Company that contributes funds, proceeds or other consideration to or for the benefit of the Settlement Trust pursuant to an Insurance Settlement Agreement that is approved by (a) an order of the Bankruptcy Court (including the Confirmation Order) and is designated as a Settling Insurance Company in the Confirmation Order or the Affirmation Order or (b) the Settlement Trust. Without limiting the foregoing, subject to Confirmation of the Plan and approval of the applicable Insurance Settlement Agreement by an order or orders of the Bankruptcy Court (including in the Confirmation Order), Century, the Chubb Companies, Clarendon, the Hartford Protected Parties, the Zurich Affiliated Insurers and the Zurich Insurers are each Settling Insurance Companies and shall be designated as such in the Confirmation Order and the Affirmation Order.

278. "Settling Insurer Policy Rights" means any and all of the Participating Chartered Organizations' and Contributing Chartered Organizations' rights, titles, privileges, interests, claims, demands or entitlements, as of the Effective Date, to any proceeds, payments, benefits, Causes of Action, choses in action, defense, or indemnity, now existing or hereafter arising, accrued or unaccrued, liquidated or unliquidated, matured or unmatured, disputed or undisputed, fixed or contingent, arising under or attributable to any insurance policies issued by a Settling Insurance Company that cover Abuse Claims with respect to such coverage for Abuse Claims, including the types of claims listed in the definition of Insurance Actions.

279. "Specified Insurance Policy" means any BSA Insurance Policy with an inception date of March 1, 2013 to the present, except for (a) the excess liability policy issued to the BSA by Navigators Specialty Insurance Company for the period from March 1, 2013 to February 28, 2014, and (b) the excess liability insurance policy issued to the BSA by Westchester Fire Insurance Company and Westchester Surplus Lines for the period from March 1, 2013 to February 28, 2019.

280. "Specified Primary Insurance Policy" means any Specified Insurance Policy that is a primary Abuse Insurance Policy. Specified Primary Insurance Policies include primary Abuse Insurance Policies issued by Old Republic Insurance Company for the periods of coverage between March 1, 2013 and February 28, 2019, and by Evanston

48

TrustApp0212

Insurance Company for the period of coverage between March 1, 2019 and February 29, 2020, subject to the definition of Postpetition Insurance Policies.

281.    "Specified Excess Insurance Policy" means any Specified Insurance Policy that is an umbrella or excess Abuse Insurance Policy.

282.    "Summit Bechtel Reserve" means the parcels of real property that comprise the Summit Bechtel Family National Scout Reserve, together with the buildings, structures, fixtures, additions, enlargements, extensions, modifications, repairs, replacements and other improvements now or hereafter located thereon.

283.    "Supplemental LC Contribution" means the LC Overage and DST Note Increase.

284.    "TCJC" means The Church of Jesus Christ of Latter-day Saints, a Utah corporation sole, including any affiliates or personnel.

285.    [Reserved]

286.    [Reserved]

287.    [Reserved]

288.    "Tort Claimants' Committee" means the official committee of tort claimants, consisting of survivors of childhood sexual abuse, appointed by the United States Trustee in the Chapter 11 Cases under section 1102(a) of the Bankruptcy Code.

289.    "Trust Distribution Procedures" means the Boy Scouts of America Trust Distribution Procedures for Abuse Claims, substantially in the form attached hereto as Exhibit A, as the same may be amended or modified from time to time in accordance with the terms thereof, which shall be acceptable to (a) the Debtors, the Ad Hoc Committee, the Coalition, the Tort Claimants' Committee, and the Future Claimants' Representative and (b) the Creditors' Committee with respect to the treatment of Non-Abuse Litigation Claims.

290.    "Unexpired Lease" means a lease to which BSA is a party, including any and all pre- and post-petition amendments thereto, that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

291.    "Unimpaired" means any Claim that is not Impaired, including any Claim that is Reinstated.

292.    "United Methodist Entities" means each and every (i) United Methodist local church, federated, or union church, including any Federated Church or Union Church that includes a historically United Methodist Church congregation, that sponsored, promoted, hosted, or provided any support in connection with Scouting activities, regardless of whether such local, union, or federated church is or was a Chartered Organization at any time; (ii) church currently federated or yoked, and which current

49

TrustApp0213

federated or yoked church includes a current or former United Methodist Church congregation that sponsored, promoted, hosted or provided any support in connection with Scouting activities; (iii) other United Methodist related or affiliated organizations that sponsored, promoted, hosted, or provided any support in connection with Scouting activities, including any social service organization, ministry, camping ministry, camp facility, camp, retreat, or other facilities in the nature of a camp or retreat; (iv) any camp, retreat, or other facility in the nature of a camp or retreat that is not United Methodist related or affiliated, but otherwise promoted, hosted, or provided any support in connection with Scouting Activities for an entity described in (i), (ii) or (iii); (v) all organizations affiliated or related to (i) (ii), (iii) or (iv) including, but not limited to, the United Methodist ad hoc committee, each district, annual conference, and jurisdictional conference of The United Methodist Church, the general, annual conference, district, local church agencies of The United Methodist Church, the Council of Bishops of The United Methodist Church, and the non-jural bodies commonly referred to as "The United Methodist Church," the "Judicial Council of The United Methodist Church," and the "General Conference of The United Methodist Church"; and (vi) all Representatives of the foregoing. However, no Perpetrator is or shall be a United Methodist Entity.

293.     "United Methodist Settlement Contribution" shall mean the "United Methodist Settlement Amount" as defined in the United Methodist Settlement Agreement, which is equal to Thirty Million Dollars ($30,000,000).

294.     "United Methodist Settlement" has the meaning ascribed to such term in Exhibit J.

295.     "United Methodist Settlement Agreement" means that certain term sheet by and between the United Methodist ad hoc committee, the Debtors, the Ad Hoc Committee, the Coalition, the Future Claimants' Representative, and certain state court counsel to holders of Direct Abuse Claims, appended to the *Eighth Mediators' Report* [D.I. 7884] filed on December 21, 2021 and the Addendum to United Methodist Term Sheet, filed on February 18, 2022 [D.I. 8907-4]. The United Methodist Settlement Agreement has been filed on the docket of the Chapter 11 Cases [D.I. 8907-4] and attached hereto as Exhibit J-2.

296.     "United States Trustee" means the Office of the United States Trustee for the District of Delaware.

297.     "Unrestricted Cash and Investments" means all Cash and balance sheet investments owned by the Debtors as of the date that is immediately prior to the Effective Date, inclusive of the proceeds of the sale of Scouting University and the Warehouse and Distribution Center, if the sale of the Warehouse and Distribution Center is closed prior to the Effective Date, that are not subject to legally enforceable restrictions requiring the use or disposition of such assets for a particular purpose.

298.     "Volunteer Screening Database" is the database established and maintained by the BSA to, among other things, track and remove from Scouting volunteer leaders

TrustApp0214

suspected of having acted in an inappropriate sexual manner with youth participants in Scouting.

299. "Voting Deadline" means the date by which all Persons entitled to vote on the Plan must vote to accept or reject the Plan.

300. "Voting Procedures" means those certain procedures and supplemental procedures approved by the Bankruptcy Court for soliciting and tabulating the votes to accept or reject the Plan cast by holders of Claims against the Debtors entitled to vote on the Plan. The Voting Procedures shall be in form and substance reasonably acceptable to the Creditors' Committee as they pertain to Convenience Claims, General Unsecured Claims and Non-Abuse Litigation Claims.

301. "Warehouse and Distribution Center" means that certain parcel of real property owned by the BSA located at 2109 Westinghouse Boulevard, Charlotte, North Carolina 28269, together with the buildings, structures, fixtures, additions, enlargements, extensions, modifications, repairs, replacements and other improvements now or hereafter located thereon.

302. "Workers' Compensation Program" means the Debtors' (a) written contracts, agreements, agreements of indemnity, in each case relating to workers' compensation, (b) self-insured workers' compensation bonds, policies, programs, and plans for workers' compensation and (c) workers' compensation insurance issued to or entered into at any time by any of the Debtors.

303. "Youth Member" means a youth member of the BSA registered as of December 31 of any applicable year in a core program (Cub Scouts, Scouts BSA (in each case under age 18), Sea Scouts, Venturing, or Exploring (in each case under age 21)), whose registration is current as of such date and who has paid the individual annual registration fee (which fee has not been refunded in whole or in part).

304. "Zurich Affiliated Insurers" means all Zurich North America-affiliated underwriting companies and includes, without limitation, Zurich Insurers and Maryland Casualty Company, American General Fire & Casualty Company, and Zurich American Insurance Company, but only with respect to policies issued on or after January 1, 1987. A list of Zurich North America-affiliated underwriting companies is attached to the Zurich Insurance Settlement Agreement. Zurich Insurers, Zurich Affiliated Insurers, and their Representatives and Released Parties (as defined herein) shall not include such Persons and Entities in their capacities as contractual obligors under: (i) Non-Abuse Insurance Policies (including but not limited to D&O Liability Insurance Policies) except to the extent of a request for coverage and/or any Claims or Causes of Action related to, arising from, or in connection with Abuse Claims, any actions, settlements entered into, omissions, or positions taken in connection with the Debtors' Chapter 11 Cases and related proceedings, and any extra-contractual claims related to, arising from, or connected with actions or omissions occurring prior to the Effective Date, including the Zurich Insurers' and Zurich Affiliated Insurers' performance of their obligations under such policies whether for defense, settlement of claims, or otherwise, and (ii) Postpetition Insurance Policies, except

TrustApp0215

for any Claims or Causes of Action related to, arising from, or in connection with any actions, settlements entered into, omissions, or positions taken in connection with the Debtors' Chapter 11 Cases and related proceedings, and any extra-contractual claims related to, arising from, or connected with actions or omissions occurring prior to the Effective Date, including the Zurich Insurers' and Zurich Affiliated Insurers' performance of their obligations under such policies whether for defense, settlement of claims, or otherwise.

305.    "Zurich Insurers" means American Zurich Insurance Company, American Guarantee & Liability Insurance Company, and Steadfast Insurance Company; provided that the term "Zurich Insurers" shall not include such Persons and Entities in their capacities as contractual obligors under: (i) Non-Abuse Insurance Policies (including but not limited to D&O Liability Insurance Policies) except to the extent of a request for coverage and/or any Claims or Causes of Action related to, arising from, or in connection with Abuse Claims, any actions, settlements entered into, omissions, or positions taken in connection with the Debtors' Chapter 11 Cases and related proceedings, and any extra-contractual claims related to, arising from, or connected with actions or omissions occurring prior to the Effective Date, including the Zurich Insurers' performance of their obligations under such policies whether for defense, settlement of claims, or otherwise, and (ii) Postpetition Insurance Policies, except for any Claims or Causes of Action related to, arising from, or in connection with any actions, settlements entered into, omissions, or positions taken in connection with the Debtors' Chapter 11 Cases and related proceedings, and any extra-contractual claims related to, arising from, or connected with actions or omissions occurring prior to the Effective Date, including the Zurich Insurers' performance of their obligations under such policies whether for defense, settlement of claims, or otherwise.

306.    "Zurich Insurance Settlement" has the meaning ascribed to such term in Exhibit I.

307.    "Zurich Insurance Settlement Agreement" means that certain settlement agreement by and between the Zurich Insurers, the Debtors, the Ad Hoc Committee, the Coalition, and the Future Claimants' Representative, as joined by certain state court counsel to holders of Direct Abuse Claims and Local Councils that have executed or agree to execute a joinder, as such agreement was described (as a settlement in principle) in the term sheet appended to the *Ninth Mediator's Report* [D.I. 7928] filed on December 22, 2021, and as such agreement has been subsequently set forth in and superseded by a definitive written settlement agreement that is consistent with such term sheet and was executed by all of the parties thereto as of February 14, 2022 (and any additional parties that execute a joinder thereto).  The executed Zurich Insurance Settlement Agreement was filed on the docket of the Chapter 11 Cases [D.I. 8817-2] and attached hereto as Exhibit I-3.

308.    "Zurich Insurer Policies" shall have the meaning set forth for such capitalized term in the Zurich Insurance Settlement Agreement.

52

309.   "<u>Zurich Insurers Settlement Contribution</u>" shall mean the "Settlement Amount" as defined in the Zurich Insurance Settlement Agreement, which is equal to Fifty-Two Million Five Hundred Thousand U.S. Dollars ($52,500,000).

B.    <u>Interpretation; Application of Definitions and Rules of Construction</u>. For purposes of the Plan, unless otherwise provided herein: (1) whenever from the context it is appropriate, each term, whether stated in the singular or the plural, will include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (2) unless otherwise provided in the Plan, any reference in the Plan to a contract, instrument, release, or other agreement or document being in a particular form or on particular terms and conditions means that such document will be substantially in such form or substantially on such terms and conditions; <u>provided</u>, <u>however</u>, that the rule of interpretation set forth in clause (2) shall not be imputed to any contract, lease, instrument, release, or other agreement as to which JPM or the Creditors' Committee have consent rights pursuant to the JPM / Creditors' Committee Term Sheet, and such consent rights shall be as set forth in the JPM / Creditors' Committee Term Sheet and incorporated herein pursuant to <u>Article I.D</u>; (3) any reference in the Plan to an existing document, schedule or exhibit filed or to be filed means such document, schedule or exhibit, as it may have been or may be amended, modified, or supplemented pursuant to the Plan; (4) any reference to a Person as a holder of a Claim or Interest includes that Person's successors and assigns; (5) unless otherwise stated, all references in the Plan to Articles are references to Articles of the Plan, as the same may be amended or modified from time to time in accordance with the terms hereof; (6) the words "herein," "hereof," "hereto," "hereunder" and other words of similar import refer to the Plan as a whole and not to any particular Article or clause contained in the Plan; (7) subject to the provisions of any contract, certificate of incorporation, by-law, instrument, release, or other agreement or document entered into in connection with the Plan, the rights and obligations arising pursuant to the Plan shall be governed by, and construed and enforced in accordance with the applicable federal law, including the Bankruptcy Code and Bankruptcy Rules; (8) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be; (9) any immaterial effectuating provisions may be interpreted by Reorganized BSA in such a manner that is consistent with the overall purpose and intent of the Plan all without further notice to or action, order, or approval of the Bankruptcy Court or any other Person; (10) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan; (11) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (12) any reference to a Person's "subsidiaries" means its direct and indirect subsidiaries; and (13) in computing any period of time prescribed or allowed by the Plan, unless otherwise expressly provided herein, the provisions of Bankruptcy Rule 9006(a) shall apply.

C.    <u>Reference to Monetary Figures</u>.  All references in the Plan to monetary figures shall refer to the legal tender of the United States of America unless otherwise expressly provided.

D.    <u>Consent Rights</u>.  Notwithstanding anything herein to the contrary, the consent rights of JPM and the Creditors' Committee, respectively, as set forth in the JPM / Creditors' Committee Term Sheet, with respect to the form and substance of the Plan, all exhibits and schedules to the Plan, the Plan Supplement, and the other Plan Documents, including any amendments, restatements, supplements, or other modifications to such documents, and any

53

consents, waivers, or other deviations under or from any such documents, to the extent they pertain to the treatment of the 2010 Credit Facility Claims, the 2019 RCF Claims, the 2010 Bond Claims, or the 2012 Bond Claims (in the case of JPM) or Convenience Claims, General Unsecured Claims, or Non-Abuse Litigation Claims (in the case of the Creditors' Committee), shall be incorporated herein by this reference (including to the applicable definitions in Article I.A) and fully enforceable as if stated in full herein.  The United Methodist ad hoc committee will have consent rights with respect to any modifications to the Plan, the Settlement Trust Documents, the Confirmation Order relating to the Channeling Injunction, releases by holders of Abuse Claims, and related definitional terms including, for the avoidance of doubt, "Abuse," "Abuse Claim," "Mixed Claim," "Abuse Insurance Policy," "Chartered Organization," "Contributing Chartered Organizations," "Non-Abuse Insurance Policy," and "Protected Parties," but only to the extent that such modifications would affect the United Methodist Entities.  Hartford, the Century and Chubb Companies, the Zurich Insurers and Zurich Affiliated Insurers, Clarendon, and any other Settling Insurance Companies will have consent rights with respect to any modifications to the Plan, the Settlement Trust Documents, the Confirmation Order, and the Affirmation Order, including those relating to the Channeling Injunction, releases by holders of Abuse Claims, insurance, their respective Insurance Settlement Agreements, and related definitional terms, including, for the avoidance of doubt, "Abuse," "Abuse Claim," "Mixed Claim," "Protected Parties," and "Settling Insurance Company," but only to the extent that such modifications would affect the Hartford Protected Parties, the Century and Chubb Companies, the Zurich Insurers and Zurich Affiliated Insurers, Clarendon, or other Settling Insurance Companies, as applicable.  The Coalition, the Future Claimants' Representative, and the Tort Claimants' Committee will have consent rights with respect to any modifications to the Plan, the Settlement Trust Documents, the Confirmation Order, and the Affirmation Order relating to Abuse Claims.

       E.     <u>Controlling Document</u>.  In the event of any conflict between the terms and provisions in the Plan (without reference to the Plan Supplement), on the one hand, and the terms and provisions in the Disclosure Statement, the Plan Supplement, any other instrument or document created or executed pursuant to the Plan, or any order (other than the Confirmation Order) referenced in the Plan (or any exhibits, schedules, appendices, supplements, or amendments to any of the foregoing), on the other hand, the Plan (without reference to the Plan Supplement) shall govern and control; <u>provided</u>, <u>however</u>, that (1) in the event of a conflict between Confirmation Order, on the one hand, and any of the other Plan Documents, on the other hand, the Confirmation Order shall govern and control in all respects, and (2) in the event of a conflict between the terms and provisions of the Plan, the Disclosure Statement, the Plan Supplement, or any other Plan Document, on the one hand, and the terms and provisions of any Insurance Settlement Agreement, on the other hand, the terms and provisions of the applicable Insurance Settlement Agreement shall control.

## ARTICLE II.

## ADMINISTRATIVE EXPENSE AND PRIORITY CLAIMS

       A.     <u>Administrative Expense Claims</u>.

       1.     <u>Administrative Expense Claims Generally</u>.  Except to the extent that a holder of an Allowed Administrative Expense Claim agrees to less favorable treatment

TrustApp0218

with respect to such Allowed Administrative Expense Claim, each holder of an Allowed Administrative Expense Claim (other than Professional Fee Claims, which are governed by Article II.A.2) shall receive, on account of and in full and complete settlement, release and discharge of, and in exchange for, such Claim, payment of Cash in an amount equal to the unpaid portion of such Allowed Administrative Expense Claim, or such amounts and on other such terms as may be agreed to by the holders of such Claims, on or as soon as reasonably practicable after the later of: (a) the Effective Date; (b) the first Business Day after the date that is thirty (30) calendar days after the date such Administrative Expense Claim becomes an Allowed Administrative Expense Claim; (c) such other date(s) as such holder and the Debtors or Reorganized BSA shall have agreed; or (d) such other date ordered by the Bankruptcy Court; provided, however, that Allowed Administrative Expense Claims that arise in the ordinary course of the Debtors' non-profit operations during the Chapter 11 Cases may be paid by the Debtors or Reorganized BSA in the ordinary course of operations and in accordance with the terms and conditions of the particular agreements governing such obligations, course of dealing, course of operations, or customary practice. Notwithstanding anything to the contrary herein or in the Cash Collateral Order, no Claim on account of any diminution in the value of the Prepetition Secured Parties' interests in the Prepetition Collateral (including Cash Collateral) (as each such capitalized term is defined in the Cash Collateral Order) from and after the Petition Date shall be Allowed unless such Claim is Allowed by a Final Order of the Bankruptcy Court. Notwithstanding anything to the contrary herein, the Hartford Administrative Expense Claim shall be an Allowed Administrative Expense Claim and shall be paid in full in cash to Hartford on, or as soon as reasonably practicable after, the Effective Date.

> 2.    Professional Fee Claims.

> a.    Final Fee Applications. All Professionals or other Persons requesting the final Allowance and payment of compensation and/or reimbursement of expenses pursuant to sections 328, 330, 331 and/or 503(b) or under Article V.T as described therein, for services rendered during the period from the Petition Date to and including the Effective Date shall file and serve final applications for Allowance and payment of Professional Fee Claims on counsel to the Debtors and the United States Trustee no later than the first Business Day that is forty-five (45) days after the Effective Date. Objections to any Professional Fee Claim must be filed and served on Reorganized BSA and the applicable Professional within twenty-one (21) calendar days after the filing of the final fee application that relates to the Professional Fee Claim (unless otherwise agreed by the Debtors or Reorganized BSA, as applicable, and the Professional requesting Allowance and payment of a Professional Fee Claim). The Fee Examiner shall continue to act in its appointed capacity unless and until all Professional Fee Claims have been approved by order of the Bankruptcy Court, and Reorganized BSA shall be responsible to pay the fees and expenses incurred by the Fee Examiner in rendering services after the Effective Date.

> b.    Professional Fee Reserve. On the Effective Date, the Debtors shall establish and fund the Professional Fee Reserve with Cash in an amount equal to the Professional Fee Reserve Amount plus a reasonable cushion amount determined

TrustApp0219

by the Debtors. Funds held in the Professional Fee Reserve shall not be considered property of the Debtors' Estates, Reorganized BSA, the Settlement Trust, or the Core Value Cash Pool. Professional Fees owing on account of Allowed Professional Fee Claims shall be paid in Cash from funds held in the Professional Fee Reserve as soon as reasonably practicable after such Professional Fee Claims are Allowed by a Final Order of the Bankruptcy Court or authorized to be paid under the Compensation Procedures Order; provided, however, that Reorganized BSA's obligations with respect to Allowed Professional Fee Claims shall not be limited by or deemed limited to the balance of funds held in the Professional Fee Reserve. To the extent the funds held in the Professional Fee Reserve are insufficient to satisfy the Allowed Professional Fee Claims in full, each holder of an Allowed Professional Fee Claim shall have an Allowed Administrative Expense Claim for any deficiency, which shall be satisfied in accordance with Article II.A.1. No Liens, Claims, interests, charges, or other Encumbrances or liabilities of any kind shall encumber the Professional Fee Reserve in any way. When all Allowed Professional Fee Claims have been paid in full, amounts remaining in the Professional Fee Reserve, if any, shall be transferred (i) to Reorganized BSA to the extent the minimum Unrestricted Cash and Investment levels are lower than indicated in Article V.M, and (ii) thereafter, to the Settlement Trust.

c.    Professional Fee Reserve Amount. To be eligible for payment for Accrued Professional Fees incurred up to and including the Effective Date, Professionals shall estimate their Accrued Professional Fees as of the Effective Date and deliver such estimate to the Debtors at least five (5) Business Days prior to the anticipated Effective Date, Coalition Professionals shall provide the Debtors a reasonable estimate of total Coalition Restructuring Expenses in accordance with Article V.T. If a Professional or Coalition Professional does not provide such estimate, the Debtors may estimate the unbilled fees and expenses of such Professional or Coalition Professional . The total amount so estimated will constitute the Professional Fee Reserve Amount, provided that such estimate will not be considered an admission or limitation with respect to the fees and expenses of such Professional or Coalition Professional.

d.    Post-Effective Date Fees and Expenses. From and after the Effective Date, any requirement that Professionals comply with sections 327 through 331 or 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and Professionals may be employed and paid in the ordinary course of operations without any further notice to or action, order, or approval of the Bankruptcy Court. For the avoidance of doubt, this includes the fees and expenses of the Tort Claimants' Committee and Future Claimants' Representative arising from an appeal of the Plan after the Effective Date, which fees may only be asserted against the Settlement Trust. The reasonable and documented fees and expenses incurred by the Professionals to the Creditors' Committee after the Effective Date until the complete dissolution of the Creditors' Committee for all purposes in accordance with Article X.R will be paid by Reorganized BSA in the ordinary course of business (and not later than thirty (30) days after submission of invoices).

TrustApp0220

B.    <u>Priority Tax Claims</u>.  Except to the extent that a holder of an Allowed Priority Tax Claim agrees to less favorable treatment, each holder of an Allowed Priority Tax Claim shall receive on account of and in full and complete settlement, release and discharge of, and in exchange for, such Allowed Priority Tax Claim, at the sole option of the Debtors or Reorganized BSA, as applicable: (1) Cash in an amount equal to such Allowed Priority Tax Claim on or as soon as reasonably practicable after the later of (a) the Effective Date, to the extent such Claim is an Allowed Priority Tax Claim on the Effective Date; (b) the first Business Day after the date that is thirty (30) calendar days after the date such Priority Tax Claim becomes an Allowed Priority Tax Claim; and (c) the date such Allowed Priority Tax Claim is due and payable in the ordinary course as such obligation becomes due; <u>provided</u>, <u>however</u>, that the Debtors reserve the right to prepay all or a portion of any such amounts at any time under this option without penalty or premium; or (2) regular installment payments in Cash of a total value, as of the Effective Date of the Plan, equal to the Allowed amount of such Claim over a period ending not later than five years after the Petition Date.

## ARTICLE III.

## CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

A.    <u>Classification of Claims and Interests</u>.

1.    <u>Grouping of Debtors for Convenience</u>.  The Plan is being proposed as a joint plan of reorganization of the Debtors for administrative purposes only and constitutes a separate chapter 11 plan of reorganization for each Debtor.  The Plan is not premised upon the substantive consolidation of the Debtors with respect to the Classes of Claims or Interests set forth in the Plan.

2.    <u>Classification in General</u>.  For purposes of organization, voting, and all matters related to Confirmation, and except as otherwise provided herein, all Claims (other than Administrative Expense Claims and Priority Tax Claims) against and Interests in the Debtors are classified as set forth in this <u>Article III</u>.  In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims and Priority Tax Claims described in <u>Article II</u> have not been classified and are excluded from the following Classes.  A Claim or Interest is classified in a particular Class only to the extent that the Claim or Interest falls within the description of such Class, and is classified in another Class or Classes to the extent that any remainder of the Claim or Interest falls within the description of such other Class or Classes.  Notwithstanding anything to the contrary contained in the Plan, no distribution shall be made on account of any Claim that is not Allowed for distribution purposes (if applicable) or any Claim that has been satisfied, released, or otherwise settled prior to the Effective Date.

3.    <u>Summary of Classification</u>.  The following table designates the Classes of Claims against and Interests in the Debtors and specifies which of those Classes are (a) Impaired or Unimpaired by the Plan; (b) entitled to vote to accept or reject the Plan in accordance with section 1126 of the Bankruptcy Code; or (c) presumed to accept or deemed to reject the Plan.

57

TrustApp0221

| Class | Claim | Status | Voting Rights |
|---|---|---|---|
| 1 | Other Priority Claims | Unimpaired | Presumed to Accept; Not Entitled to Vote |
| 2 | Other Secured Claims | Unimpaired | Presumed to Accept; Not Entitled to Vote |
| 3A | 2010 Credit Facility Claims | Impaired | Entitled to Vote |
| 3B | 2019 RCF Claims | Impaired | Entitled to Vote |
| 4A | 2010 Bond Claims | Impaired | Entitled to Vote |
| 4B | 2012 Bond Claims | Impaired | Entitled to Vote |
| 5 | Convenience Claims | Impaired | Entitled to Vote |
| 6 | General Unsecured Claims | Impaired | Entitled to Vote |
| 7 | Non-Abuse Litigation Claims | Impaired | Entitled to Vote |
| 8 | Direct Abuse Claims | Impaired | Entitled to Vote |
| 9 | Indirect Abuse Claims | Impaired | Entitled to Vote |
| 10 | Interests in Delaware BSA | Unimpaired | Presumed to Accept; Not Entitled to Vote |

B.     <u>Treatment of Claims and Interests</u>.

1.     <u>Class 1 – Other Priority Claims</u>.

    a.     <u>Classification</u>:  Class 1 consists of all Other Priority Claims.

    b.     <u>Treatment</u>:  Except to the extent that a holder of an Allowed Other Priority Claim agrees to less favorable treatment of such Claim, in full and final satisfaction of such Allowed Other Priority Claim, at the sole option of Reorganized BSA: (i) each such holder shall receive payment in Cash in an amount equal to such Allowed Other Priority Claim, payable on or as soon as reasonably practicable after the last to occur of (x) the Effective Date, (y) the date on which such Other Priority Claim becomes an Allowed Other Priority Claim, and (z) the date on which the holder of such Allowed Other Priority Claim and the Debtors or Reorganized BSA, as applicable, shall otherwise agree in writing; or (ii) satisfaction of such Allowed Other Priority Claim in any other manner that renders the Allowed Other Priority Claim Unimpaired, including Reinstatement.

    c.     <u>Voting</u>:  Class 1 is Unimpaired, and each holder of an Other Priority Claim is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, holders of Other Priority Claims are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to Other Priority Claims.

2.     <u>Class 2 – Other Secured Claims</u>.

    a.     <u>Classification</u>:  Class 2 consists of all Other Secured Claims.  To the extent that Other Secured Claims are Secured by different collateral or different interests in the same collateral, such Claims shall be treated as separate subclasses of Class 2 for purposes of voting to accept or reject the Plan and receiving Distributions under the Plan.

    b.     <u>Treatment</u>:  Except to the extent that a holder of an Allowed Other Secured Claim agrees to less favorable treatment of such Claim, in full and final

TrustApp0222

satisfaction of such Allowed Other Secured Claim, each holder of an Allowed Other Secured Claim will receive, at the sole option of Reorganized BSA: (i) Cash in an amount equal to the Allowed amount of such Claim, including the payment of any interest required to be paid under section 506(b) of the Bankruptcy Code, payable on or as soon as reasonably practicable after the last to occur of (x) the Effective Date, (y) the date on which such Other Secured Claim becomes an Allowed Other Secured Claim, and (z) the date on which the holder of such Allowed Other Secured Claim and the Debtors or Reorganized BSA, as applicable, shall otherwise agree in writing; (ii) satisfaction of such Other Secured Claim in any other manner that renders the Allowed Other Secured Claim Unimpaired, including Reinstatement; or (iii) return of the applicable collateral on the Effective Date or as soon as reasonably practicable thereafter in satisfaction of the Allowed amount of such Other Secured Claim.

    c.    Voting:  Class 2 is Unimpaired, and each holder of an Other Secured Claim is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.   Therefore, holders of Other Secured Claims are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to Other Secured Claims.

3.    Class 3A – 2010 Credit Facility Claims.

    a.    Classification:  Class 3A consists of all 2010 Credit Facility Claims.

    b.    Allowance:  On the Effective Date, all 2010 Credit Facility Claims shall be deemed fully Secured and Allowed pursuant to section 506(a) of the Bankruptcy Code, and not subject to any counterclaim, defense, offset, or reduction of any kind, in an aggregate amount not less than $80,762,060 (including $44,299,743 of undrawn amounts under letters of credit issued under the 2010 Credit Facility Documents, provided such letters of credit are not drawn on or before the Effective Date), plus any accrued but unpaid interest and reasonable fees and expenses as of the Effective Date to the extent not paid pursuant to the Cash Collateral Order.  Because all 2010 Credit Facility Claims are deemed fully Secured, there are no unsecured 2010 Credit Facility Claims, and the holders of such Claims do not have or hold any Class 6 Claims against the Debtors on account of any 2010 Credit Facility Claims.

    c.    Treatment:  Except to the extent that a holder of an Allowed 2010 Credit Facility Claim agrees to less favorable treatment of such Claim, in full and final satisfaction, settlement, release, and discharge of, and in exchange for an Allowed 2010 Credit Facility Claim, each holder of an Allowed 2010 Credit Facility Claim shall receive a Claim under the Restated Credit Facility Documents in an amount equal to the amount of such holder's Allowed 2010 Credit Facility Claim.

    d.    Voting:  Class 3A is Impaired, and each holder of an Allowed 2010 Credit Facility Claim is entitled to vote to accept or reject the Plan.

TrustApp0223

4.    Class 3B – 2019 RCF Claims.

    a.    Classification: Class 3B consists of all 2019 RCF Claims.

    b.    Allowance: On the Effective Date, all 2019 RCF Claims shall be deemed fully Secured and Allowed pursuant to section 506(a) of the Bankruptcy Code, and not subject to any counterclaim, defense, offset, or reduction of any kind, in an aggregate amount not less than $61,542,720 (including $41,542,720 of undrawn amounts under letters of credit issued under the 2019 RCF Documents, provided such letters of credit are not drawn on or before the Effective Date), plus any accrued but unpaid interest and reasonable fees and expenses as of the Effective Date to the extent not paid pursuant to the Cash Collateral Order. Because all 2019 RCF Claims are deemed fully Secured, there are no unsecured 2019 RCF Claims, and the holders of such Claims do not have or hold any Class 6 Claims against the Debtors on account of any 2019 RCF Claims.

    c.    Treatment: Except to the extent that a holder of an Allowed 2019 RCF Claim agrees to less favorable treatment of such Claim, in full and final satisfaction, settlement, release, and discharge of, and in exchange for an Allowed 2019 RCF Claim, each holder of an Allowed 2019 RCF Claim shall receive a Claim under the Restated Credit Facility Documents in an amount equal to the amount of such holder's Allowed 2019 RCF Claim.

    d.    Voting: Class 3B is Impaired, and each holder of an Allowed 2019 RCF Claim is entitled to vote to accept or reject the Plan.

5.    Class 4A – 2010 Bond Claims.

    a.    Classification: Class 4A consists of all 2010 Bond Claims.

    b.    Allowance: On the Effective Date, all 2010 Bond Claims shall be deemed fully Secured and Allowed pursuant to section 506(a) of the Bankruptcy Code, and not subject to any counterclaim, defense, offset, or reduction of any kind, in an aggregate amount of not less than $40,137,274, plus any accrued but unpaid interest and reasonable fees and expenses as of the Effective Date to the extent not paid pursuant to the Cash Collateral Order. Because all 2010 Bond Claims are deemed fully Secured, there are no unsecured 2010 Bond Claims, and the holders of such Claims do not have or hold any Class 6 Claims against the Debtors on account of any 2010 Bond Claims.

    c.    Treatment: Except to the extent that a holder of an Allowed 2010 Bond Claim agrees to less favorable treatment of such Claim, in full and final satisfaction, settlement, release, and discharge of, and in exchange for an Allowed 2010 Bond Claim, each holder of an Allowed 2010 Bond Claim shall receive a Claim under the Restated 2010 Bond Documents in an amount equal to the amount of such holder's Allowed 2010 Bond Claim.

60

       d.    <u>Voting</u>:  Class 4A is Impaired, and each holder of an Allowed 2010 Bond Claim is entitled to vote to accept or reject the Plan.

6.    <u>Class 4B – 2012 Bond Claims</u>.

       a.    <u>Classification</u>:  Class 4B consists of all 2012 Bond Claims.

       b.    <u>Allowance</u>:  On the Effective Date, all 2012 Bond Claims shall be deemed fully Secured and Allowed pursuant to section 506(a) of the Bankruptcy Code, and not subject to any counterclaim, defense, offset, or reduction of any kind, in an aggregate amount of not less than $145,662,101, plus any accrued but unpaid interest and reasonable fees and expenses as of the Effective Date to the extent not paid pursuant to the Cash Collateral Order.  Because all 2012 Bond Claims are deemed fully Secured, there are no unsecured 2012 Bond Claims, and the holders of such Claims do not have or hold any Class 6 Claims against the Debtors on account of any 2012 Bond Claims.

       c.    <u>Treatment</u>:  Except to the extent that a holder of an Allowed 2012 Bond Claim agrees to less favorable treatment of such Claim, in full and final satisfaction, settlement, release, and discharge of, and in exchange for an Allowed 2012 Bond Claim, each holder of an Allowed 2012 Bond Claim shall receive a Claim under the Restated 2012 Bond Documents in an amount equal to the amount of such holder's Allowed 2012 Bond Claim.

       d.    <u>Voting</u>:  Class 4B is Impaired, and each holder of an Allowed 2012 Bond Claim is entitled to vote to accept or reject the Plan.

7.    <u>Class 5 – Convenience Claims</u>.

       a.    <u>Classification</u>:  Class 5 consists of all Convenience Claims.

       b.    <u>Treatment</u>:  In full and final satisfaction, settlement, release, and discharge of, and in exchange for, an Allowed Convenience Claim, each holder of an Allowed Convenience Claim shall receive, on the Effective Date or within thirty (30) days following the date that such Convenience Claim becomes Allowed (if such Claim becomes Allowed after the Effective Date), Cash in an amount equal to 100% of such holder's Allowed Convenience Claim.

       c.    <u>Voting</u>:  Class 5 is Impaired, and each holder of a Convenience Claim is entitled to vote to accept or reject the Plan.

8.    <u>Class 6 – General Unsecured Claims</u>.

       a.    <u>Classification</u>:  Class 6 consists of all General Unsecured Claims.

       b.    <u>Treatment</u>:  Except to the extent that a holder of an Allowed General Unsecured Claim agrees to less favorable treatment of such Claim, in exchange for full and final satisfaction, settlement, release, and discharge of, and in exchange

TrustApp0225

for, such Allowed General Unsecured Claim, each holder of an Allowed General Unsecured Claim shall receive, subject to the holder's ability to elect Convenience Claim treatment on account of the Allowed General Unsecured Claim, its Pro Rata Share of the Core Value Cash Pool up to the full amount of such Allowed General Unsecured Claim in the manner described in Article VII.

        c.     Voting:  Class 6 is Impaired, and each holder of a General Unsecured Claim is entitled to vote to accept or reject the Plan.

9.     Class 7 – Non-Abuse Litigation Claims.

        a.     Classification:  Class 7 consists of all Non-Abuse Litigation Claims.

        b.     Treatment:  Except to the extent that a holder of an Allowed Non-Abuse Litigation Claim agrees to less favorable treatment of such Claim, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Non-Abuse Litigation Claim, each holder thereof shall, subject to (i) the holder's ability to elect Convenience Claim treatment as provided in the following sentence and (ii) the terms and conditions of Article IV.D.3 (as applicable), retain the right to recover up to the amount of such holder's Allowed Non-Abuse Litigation Claim from (x) available insurance coverage or the proceeds of any Insurance Policy, including any Abuse Insurance Policy or Non-Abuse Insurance Policy, (y) applicable proceeds of any Insurance Settlement Agreements, and (z) co-liable non-debtors (if any) or their insurance coverage. Solely to the extent that the holder of an Allowed Non-Abuse Litigation Claim fails to recover in full from the foregoing sources on account of such Allowed Claim after exhausting its remedies in respect thereof, such holder may elect to have the unsatisfied portion of its Allowed Claim treated as an Allowed Convenience Claim and receive cash in an amount equal to the lesser of (a) the amount of the unsatisfied portion of the Allowed Non-Abuse Litigation Claim and (b) $50,000.

        c.     Voting:  Class 7 is Impaired, and each holder of a Non-Abuse Litigation Claim is entitled to vote to accept or reject the Plan.

10.    Class 8 – Direct Abuse Claims.

        a.     Classification:  Class 8 consists of all Direct Abuse Claims.

        b.     Treatment:

        (i)     The Settlement Trust shall receive, for the benefit of holders of Abuse Claims, the BSA Settlement Trust Contribution, the Local Council Settlement Contribution, the Contributing Chartered Organization Settlement Contribution, the Participating Chartered Organization Settlement Contribution, the Hartford Settlement Contribution (subject to the terms and conditions set forth in the Hartford Insurance Settlement Agreement), the Century and Chubb Companies Insurance Settlement Contribution (subject to the terms and conditions set forth in the Century

62

and Chubb Companies Insurance Settlement Agreement), the Zurich Insurers Settlement Contribution (subject to the terms and conditions set forth in the Zurich Insurance Settlements Agreement), and the Clarendon Settlement Contribution (subject to the terms and conditions set forth in the Clarendon Insurance Settlement Agreement), and the proceeds of any other applicable Insurance Settlement Agreements. In addition, each holder of a properly completed non-duplicative proof of claim asserting a Direct Abuse Claim who filed such Claim by the Bar Date or was permitted by a Final Order of the Bankruptcy Court to file a late claim may elect on his or her Ballot to receive an Expedited Distribution, subject to criteria set forth in the Trust Distribution Procedures, in exchange for providing a full and final release in favor of the Settlement Trust, the Protected Parties and the Chartered Organizations. The Settlement Trust shall make the Expedited Distributions on one or more dates occurring on or as soon as reasonably practicable after the latest to occur of (a) the Effective Date, (b) the date the applicable holders of Direct Abuse Claims who have elected to receive an Expedited Distribution have satisfied the criteria set forth in the Trust Distribution Procedures, and (c) the date upon which the Settlement Trust has sufficient Cash to fund the full amount of the Expedited Distributions while retaining sufficient Cash reserves to fund applicable Settlement Trust Expenses, as determined by the Settlement Trustee.

(ii)    As of the Effective Date, the Protected Parties' liability for all Direct Abuse Claims shall be assumed in full by the Settlement Trust without further act, deed, or court order and shall be satisfied solely from the Settlement Trust as set forth in the Settlement Trust Documents. Pursuant to the Channeling Injunction set forth in Article X.F, each holder of a Direct Abuse Claim shall have such holder's Direct Abuse Claim against the Protected Parties (and each of them) permanently channeled to the Settlement Trust, and such Direct Abuse Claim shall thereafter be asserted exclusively against the Settlement Trust and processed, liquidated, and paid in accordance with the terms, provisions, and procedures of the Settlement Trust Documents. Holders of Direct Abuse Claims shall be enjoined from prosecuting any outstanding, or filing any future, litigation, Claims, or Causes of Action arising out of or related to such Direct Abuse Claims against any of the Protected Parties and may not proceed in any manner against any of the Protected Parties in any forum whatsoever, including any state, federal, or non-U.S. court or any administrative or arbitral forum, and are required to pursue such Direct Abuse Claims solely against the Settlement Trust as provided in the Settlement Trust Documents.

(iii)    As of the Effective Date, the Limited Protected Parties' liability for all Post-1975 Chartered Organization Abuse Claims and the Limited Protected Parties' liability for all Pre-1976 Chartered Organization Abuse Claims shall be assumed in full by the Settlement Trust without further act, deed, or court order and shall be satisfied solely from the

TrustApp0227

Settlement Trust as set forth in the Settlement Trust Documents. Pursuant to the Channeling Injunction set forth in Article X.F, each holder of a Post-1975 Chartered Organization Abuse Claim shall have such holder's Post-1975 Chartered Organization Abuse Claim against the Limited Protected Parties (and each of them) and each holder of a Pre-1976 Chartered Organization Abuse Claim shall have such holder's Pre-1976 Chartered Organization Abuse Claim against the Limited Protected Parties permanently channeled to the Settlement Trust, and such Post-1975 Chartered Organization Abuse Claim and Pre-1976 Chartered Organization Abuse Claim shall thereafter be asserted exclusively against the Settlement Trust and processed, liquidated, and paid in accordance with the terms, provisions, and procedures of the Settlement Trust Documents. Holders of Post-1975 Chartered Organization Abuse Claims and Pre-1976 Chartered Organization Abuse Claims shall be enjoined from prosecuting any outstanding, or filing any future, litigation, Claims, or Causes of Action arising out of or related to such Post-1975 Chartered Organization Abuse Claim and Pre-1976 Chartered Organization Abuse Claim against any of the Limited Protected Parties and may not proceed in any manner against any of the Limited Protected Parties in any forum whatsoever, including any state, federal, or non-U.S. court or any administrative or arbitral forum, and are required to pursue such Post-1975 Chartered Organization Abuse Claims and Pre-1976 Chartered Organization Abuse Claims solely against the Settlement Trust as provided in the Settlement Trust Documents.

(iv)    As of the Effective Date, the Opt-Out Chartered Organizations' liability for all Opt-Out Chartered Organization Abuse Claims shall be assumed in full by the Settlement Trust without further act, deed, or court order and shall be satisfied solely from the Settlement Trust as set forth in the Settlement Trust Documents and subject to the Channeling Injunction set forth in Article X.F herein.

(v)    For the avoidance of doubt, the Protected Parties shall include: (a) the Debtors; (b) Reorganized BSA; (c) the Related Non-Debtor Entities; (d) the Local Councils; (e) the Contributing Chartered Organizations, including the United Methodist Entities; (f) the Settling Insurance Companies; and (g) all of such Persons' Representatives. The Limited Protected Parties shall include the Participating Chartered Organizations.

c.    Voting: Class 8 is Impaired, and each holder of a Direct Abuse Claim is entitled to vote to accept or reject the Plan.

11.    Class 9 – Indirect Abuse Claims.

a.    Classification: Class 9 consists of all Indirect Abuse Claims.

b.    Treatment:

64

(i)      As of the Effective Date, the Protected Parties' liability for all Indirect Abuse Claims shall be assumed in full by the Settlement Trust without further act, deed, or court order and shall be satisfied solely from the Settlement Trust as set forth in the Settlement Trust Documents and solely to the extent that an Indirect Abuse Claim has not been deemed withdrawn with prejudice, irrevocably waived, released and expunged in connection with the Local Council Settlement Contribution, the Contributing Chartered Organization Trust Contribution, the Participating Chartered Organization Trust Contribution, or the Insurance Settlement Agreements.  Pursuant to the Channeling Injunction set forth in Article X.F, each holder of an Indirect Abuse Claim shall have such holder's Indirect Abuse Claim against the Protected Parties (and each of them) permanently channeled to the Settlement Trust, and such Indirect Abuse Claim shall thereafter be asserted exclusively against the Settlement Trust and processed, liquidated, and paid in accordance with the terms, provisions, and procedures of the Settlement Trust Documents.  Holders of Indirect Abuse Claims shall be enjoined from prosecuting any outstanding, or filing any future, litigation, Claims, or Causes of Action arising out of or related to such Abuse Claims against any of the Protected Parties and may not proceed in any manner against any the Protected Parties in any forum whatsoever, including any state, federal, or non-U.S. court or any administrative or arbitral forum, and are required to pursue such Indirect Abuse Claims solely against the Settlement Trust as provided in the Settlement Trust Documents.

(ii)      As of the Effective Date, the Limited Protected Parties' liability for all Post-1975 Chartered Organization Abuse Claims and the Limited Protected Parties' liability for all Pre-1976 Chartered Organization Abuse Claims shall be assumed in full by the Settlement Trust without further act, deed, or court order and shall be satisfied solely from the Settlement Trust as set forth in the Settlement Trust Documents.  Pursuant to the Channeling Injunction set forth in Article X.F, each holder of a Post-1975 Chartered Organization Abuse Claim shall have such holder's Post-1975 Chartered Organization Abuse Claim against the Limited Protected Parties (and each of them) and each holder of a Pre-1976 Chartered Organization Abuse Claim shall have such holder's Pre-1976 Chartered Organization Abuse Claim against the Limited Protected Parties (and each of them) permanently channeled to the Settlement Trust, and such Post-1975 Chartered Organization Abuse Claim and Pre-1976 Chartered Organization Abuse Claim shall thereafter be asserted exclusively against the Settlement Trust and processed, liquidated, and paid in accordance with the terms, provisions, and procedures of the Settlement Trust Documents.  Holders of Post-1975 Chartered Organization Abuse Claims and Pre-1976 Chartered Organization Abuse Claims shall be enjoined from prosecuting any outstanding, or filing any future, litigation, Claims, or Causes of Action arising out of or related to such Post-1975 Chartered Organization Abuse Claim and Pre-1976 Chartered Organization Abuse Claim against any of

65

the Limited Protected Parties and may not proceed in any manner against any the Limited Protected Parties in any forum whatsoever, including any state, federal, or non-U.S. court or any administrative or arbitral forum, and are required to pursue such Post-1975 Chartered Organization Abuse Claims and Pre-1976 Chartered Organization Abuse Claims solely against the Settlement Trust as provided in the Settlement Trust Documents.

(iii)    As of the Effective Date, the Opt-Out Chartered Organizations' liability for all Opt-Out Chartered Organization Abuse Claims shall be assumed in full by the Settlement Trust without further act, deed, or court order and shall be satisfied solely from the Settlement Trust as set forth in the Settlement Trust Documents and subject to the Channeling Injunction set forth in <u>Article X.F</u> herein.

(iv)    For the avoidance of doubt, the Protected Parties shall include: (a) the Debtors; (b) Reorganized BSA; (c) the Related Non-Debtor Entities; (d) the Local Councils; (e) the Contributing Chartered Organizations, including the United Methodist Entities; (f) the Settling Insurance Companies; and (g) all of such Persons' Representatives. The Limited Protected Parties shall include the Participating Chartered Organizations.

c.    <u>Voting</u>:  Class 9 is Impaired, and each holder of an Indirect Abuse Claim is entitled to vote to accept or reject the Plan.

12.    <u>Class 10 – Interests in Delaware BSA</u>.

a.    <u>Classification</u>:  Class 10 consists of all Interests in Delaware BSA.

b.    <u>Treatment</u>:  On the Effective Date, Interests in Delaware BSA shall be Reinstated so as to maintain the organizational structure of the Debtors as such structure exists on the Effective Date unless implementation of the restructuring requires otherwise.

c.    <u>Voting</u>:  Class 10 is Unimpaired. Therefore, holders of Interests in Delaware BSA are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, Holders of Intercompany Interests are not entitled to vote to accept or reject the Plan.

C.    <u>Elimination of Vacant Classes</u>.  Any Class of Claims against or Interests in the Debtors that, as of the commencement of the Confirmation Hearing, does not have at least one holder of a Claim or Interest that is Allowed in an amount greater than zero for voting purposes shall be considered vacant, deemed eliminated from the Plan for purposes of voting to accept or reject the Plan, and disregarded for purposes of determining whether the Plan satisfies section 1129(a)(8) of the Bankruptcy Code with respect to that Class.

D.    <u>Cramdown</u>.  If any Class is deemed to reject the Plan or is entitled to vote on the Plan and does not vote to accept the Plan, the Debtors may (1) seek Confirmation of the Plan under

TrustApp0230

section 1129(b) of the Bankruptcy Code or (2) amend or modify the Plan in accordance with the terms hereof and the Bankruptcy Code. If a controversy arises as to whether any Claims are, or any class of Claims is, impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

## ARTICLE IV.

## SETTLEMENT TRUST

A.    Establishment of the Settlement Trust. The Settlement Trust shall be established on the Effective Date in accordance with the Plan Documents. The Settlement Trust shall be a "qualified settlement fund" within the meaning of the Treasury Regulations issued under Section 468B of the Internal Revenue Code, with respect to which Reorganized BSA shall timely make an election to treat the Settlement Trust as a "grantor trust" for U.S. federal income tax purposes and, to the extent permitted under applicable law, for state and local income tax purposes.

B.    Purposes of the Settlement Trust.

1.    The purposes of the Settlement Trust shall be to assume liability for all Abuse Claims, to hold, preserve, maximize and administer the Settlement Trust Assets, and to direct the processing, liquidation and payment of all compensable Abuse Claims in accordance with the Settlement Trust Documents. The Settlement Trust shall resolve Abuse Claims in accordance with the Settlement Trust Documents in a fair, consistent, equitable manner, and on a pro rata basis, in compliance with the terms of the Settlement Trust Documents and to the extent of available Settlement Trust Assets.

2.    In the event of any ambiguity or conflict between the terms of the Settlement Trust Agreement or any related document required or provided for under the Settlement Trust Documents (other than the Confirmation Order), on the one hand, and the terms of the Plan and the Confirmation Order, on the other hand, the terms of the Plan and the Confirmation Order shall control, notwithstanding that the Settlement Trust Agreement and related documents required or provided for under the Settlement Trust Documents may be incorporated in or annexed to the Plan or the Confirmation Order.

C.    Transfer of Claims to the Settlement Trust.

1.    On the Effective Date or as otherwise provided herein, and without further action of any Person, the Settlement Trust shall assume the liabilities, obligations, and responsibilities, financial or otherwise, of (a) the Protected Parties for all Abuse Claims, (b) the Limited Protected Parties for all Post-1975 Chartered Organization Abuse Claims and all other Abuse Claims covered under insurance policies issued by the Settling Insurance Companies, (c) the Limited Protected Parties for all Pre-1976 Chartered Organization Abuse Claims, and (d) the Opt-Out Chartered Organizations for the Opt-Out Chartered Organization Abuse Claims. These assumptions by the Settlement Trust shall not affect (i) the application of the Discharge Injunction or the Channeling Injunction or (ii) any Non-Settling Insurance Company's obligation under any Abuse Insurance Policy or applicable law.

TrustApp0231

2.      Except as otherwise expressly provided in the Plan, the Settlement Trust Agreement, or the Trust Distribution Procedures, the Settlement Trust shall have control over the Settlement Trust Causes of Action and the Insurance Actions, and the Settlement Trust shall thereby become the estate representative pursuant to section 1123(b)(3)(B) of the Bankruptcy Code with the exclusive right (except as otherwise provided in <u>Article IV.D.4</u>) to enforce each of the Settlement Trust Causes of Action and the Insurance Actions, and the proceeds of the recoveries on any of the Settlement Trust Causes of Action or the Insurance Actions shall be deposited in and become the property of the Settlement Trust, and the Settlement Trust shall have the right to enforce the Plan and any of the other Plan Documents (including the Document Appendix) according to their respective terms, including the right to receive the Settlement Trust Assets as provided in the Plan; <u>provided</u>, <u>however</u>, that (a) the Settlement Trust shall have no other rights against the Protected Parties except to enforce the Plan and any of the other Plan Documents; (b) the Settlement Trust shall have no other rights against the Limited Protected Parties with respect to Post-1975 Chartered Organization Abuse Claims and all other Abuse Claims covered under insurance policies issued by the Settling Insurance Companies except to enforce the Plan and any of the other Plan Documents; (c) the Settlement Trust shall have no other rights against the Opt-Out Chartered Organizations with respect to Opt-Out Chartered Organization Abuse Claims except to enforce the Plan and any of the other Plan Documents; (d) the Settlement Trust Causes of Action and the Insurance Actions shall not include any Claims or Interests fully and finally released, compromised, or settled pursuant to the Plan or any Plan Documents, or any Claims against Settling Insurance Companies released, compromised and settled under the Insurance Settlement Agreements; and (e) for the avoidance of doubt, the Settlement Trust Causes of Action and the Insurance Actions, do not include any rights of the Protected Parties or the Limited Protected Parties, or Opt-Out Chartered Organizations arising under the Channeling Injunction or any of the Injunctions, Releases, or Discharges granted under the Plan and the Confirmation Order.

D.      <u>Transfer of Settlement Trust Assets to the Settlement Trust</u>.

1.      <u>Transfers on the Effective Date</u>.  On the Effective Date, subject to <u>Article IV.D.2</u>, all right, title, and interest in and to the Settlement Trust Assets and any proceeds thereof shall be automatically, and without further act or deed, transferred to, vested in, and assumed by the Settlement Trust free and clear of all Encumbrances or Claims or other interests of any Person, subject to the Channeling Injunction and other provisions of the Plan.  Notwithstanding the foregoing, the Settlement Trust shall satisfy, to the extent required under the relevant policies and applicable law, and in accordance with the Trust Distribution Procedures, any retrospective premiums and self-insured retentions arising out of any Abuse Claims under the Abuse Insurance Policies.  The Debtors and the Local Councils shall establish an appropriate escrow mechanism to ensure that the Cash to be paid to the Settlement Trust by Local Councils on the Effective Date can be paid in a timely manner.

2.      <u>Transfers after the Effective Date</u>.  To the extent any of the Settlement Trust Assets are not transferred to the Settlement Trust by operation of law on the Effective Date pursuant to the Plan, then when such assets accrue or become transferable subsequent to the Effective Date, they shall automatically and immediately transfer to the Settlement

Trust free and clear of all Encumbrances and Claims or other interests of any Person, subject to the Channeling Injunction and other provisions of the Plan. To the extent any Artwork is not physically transferred to the Settlement Trust on the Effective Date, the Debtors or Reorganized BSA and the Settlement Trust shall mutually agree on the terms of the storage and subsequent physical transfer thereof. For the avoidance of doubt, title to the Artwork (and the risk of loss thereof) will transfer to the Settlement Trust on the Effective Date. To the extent that any action of a Protected Party or Limited Protected Party is required to effectuate such transfer, such Protected Party or Limited Protected Party shall promptly transfer, assign, and contribute, such remaining Settlement Trust Assets to the Settlement Trust. In the event a Protected Party or a Limited Protected Party breaches any obligation contained in this section, the Settlement Trust will have no adequate remedy at law and shall be entitled to preliminary and permanent declaratory and injunctive relief. This Article IV.D.2 applies, without limitation, to (a) that portion of the Local Council Settlement Contribution required to be contributed to the Settlement Trust after the Effective Date and (b) the transfer to the Settlement Trust of the Warehouse and Distribution Center, subject to the Leaseback Requirement.

       3.      Specified Insurance Policies and Non-Abuse Litigation Claims.

       a.      For the avoidance of doubt, no consent of the Settlement Trust shall be required (i) for a court of competent jurisdiction to award a non-consent judgment that is not a default judgment in the underlying lawsuit on a Non-Abuse Litigation Claim, (ii) to trigger the obligation of the Settlement Trust to pay a judgment on a Non-Abuse Litigation Claim to the extent provided in subparagraph (b) below (provided that notice of any such judgment obtained shall be provided as set forth in the first sentence of subparagraph (c) below of this section), or (iii) for Entities other than the Settlement Trust to enter into any post-Effective Date settlement of a Non-Abuse Litigation Claim unless any portion of the recovery under such settlement is contended or sought to be payable from the proceeds of any settled Specified Insurance Policy(ies); provided, however, that a condition of (i) the payment of any judgment by the Settlement Trust as to a Non-Abuse Litigation Claim or (ii) the payment of any settlement of a Non-Abuse Litigation Claim, shall be a release by the holder of such Non-Abuse Litigation Claim of the Debtors, the Local Councils, and any other insureds under applicable Specified Insurance Policies.

       b.      Before the Settlement Trust settles any Specified Insurance Policy(ies) under which the holder of a Non-Abuse Litigation Claim is seeking to recover, the holder of a Non-Abuse Litigation Claim may recover up to the full amount of such Claim in the first instance from any such unsettled Specified Primary Insurance Policy(ies) or unsettled Specified Excess Insurance Policy(ies). If and when the Settlement Trust settles one or more Specified Insurance Policies under which the holder of a Non-Abuse Litigation Claim is seeking to recover: (a) the holder of such Non-Abuse Litigation Claim shall remain entitled to recover up to $1,000,000 of such Claim under and payable from (i) any unsettled Specified Primary Insurance Policy(ies) or (ii) from the Settlement Trust in the event that the Settlement Trust has settled the Specified Primary Insurance Policy(ies), subject to

TrustApp0233

the Settlement Trustee's consent as to any settlement as set forth in this section; and (b) any amounts exceeding the remaining limits of liability of the applicable Specified Primary Insurance Policy shall be recoverable from (i) any unsettled Specified Excess Insurance Policy(ies) or (ii) from the Settlement Trust in the event that the Settlement Trust has settled the Specified Excess Insurance Policy(ies) that would otherwise be liable, subject to the Settlement Trustee's consent as to any settlement as set forth in this section; provided, however, that the Settlement Trust shall pay amounts referenced in (a)(ii) or (b)(ii) immediately above only to the extent that a settlement or judgment entitles the holder of the Non-Abuse Litigation Claim to recover from the proceeds of any Specified Insurance Policies up to applicable policy limits and shall have consent rights over any settlement referenced in (a)(ii) or (b)(ii) immediately above (such consent not to be unreasonably withheld). For the avoidance of doubt, to the extent that the Settlement Trust settles a Specified Insurance Policy that was defending against a Non-Abuse Litigation Claim, the Settlement Trust has the right to assume the defense of such Non-Abuse Litigation Claim.

c.      Any holder of a Non-Abuse Litigation Claim who has obtained a judgment implicating a settled Specified Insurance Policy shall serve the Settlement Trust's counsel with a copy of the judgment. Only with respect to a proposed settlement where the Settlement Trust has consent pursuant to paragraph b immediately above of such Non-Abuse Litigation Claim, the Settlement Trust shall have 30 days following receipt of the proposed settlement to object to the proposed settlement. If the Settlement Trust does not object to the proposed settlement within 30 days following such receipt, the Settlement Trust will be deemed to have consented to the settlement. If the Settlement Trust does not consent to any settlement of a Non-Abuse Litigation Claim as to which its consent may not be unreasonably withheld, the holder of the Non-Abuse Litigation Claim may file a motion with the Bankruptcy Court seeking a determination regarding whether the Settlement Trust unreasonably withheld its consent to the proposed settlement. To the extent that the Bankruptcy Court determines that consent was not unreasonably withheld by the Settlement Trust, then the Non-Abuse Litigation Claim may recommence in the tort system.

d.      The Settlement Trustee shall have a duty to treat Direct Abuse Claims and Non-Abuse Litigation Claims that implicate the Specified Insurance Policies fairly and equally. In negotiating any settlements involving Specified Insurance Policies, the Settlement Trustee shall bear in mind the interests of both Direct Abuse Claims and Non-Abuse Litigation Claims in structuring any settlement and use best efforts to maximize recoveries for both constituencies.

e.      Notwithstanding anything to the contrary in the Plan, with respect to any Non-Abuse Litigation Claim that has been asserted or could be asserted against any Local Council, notice of which is provided to the Debtors, the Coalition, the Tort Claimants' Committee, and the Future Claimants' Representative prior to the Effective Date, the rights of the Local Council to recover from the applicable insurer for such Non-Abuse Litigation Claim under the Specified Insurance Policies

TrustApp0234

up to the applicable coverage limits shall be preserved; <u>provided</u>, <u>however</u>, that if the holder of a Non-Abuse Litigation Claim provides a full and complete written release of any claims that such holder of a Non-Abuse Litigation Claim may have against the Local Council related to the Non-Abuse Litigation Claim, then the Local Council will be deemed to have waived any rights it may have against the Specified Insurance Policy with respect to such Non-Abuse Litigation Claim.

4.    <u>Settlement Trust Causes of Action</u>.  The transfer of the Settlement Trust Causes of Action to the Settlement Trust, insofar as they relate to the ability to defend against or reduce the amount of Abuse Claims, shall be considered the transfer of a non-exclusive right enabling the Settlement Trust to defend itself against asserted Abuse Claims, which transfer shall not impair, affect, alter, or modify the right of any Person, including the Protected Parties, the Limited Protected Parties, an insurer or alleged insurer, or co-obligor or alleged co-obligor, sued on account of an Abuse Claim or on account of any asserted right relating to any Abuse Insurance Policy, to assert each and every defense or basis for claim reduction such Person could have asserted had the Settlement Trust Causes of Action not been assigned to the Settlement Trust (including any defense or basis for claim reduction that any Insurance Company or other insurer or alleged insurer could have asserted under section 502 of the Bankruptcy Code, applicable non-bankruptcy law, or any Abuse Insurance Policy or other agreement with respect to (a) any alleged liability of the BSA or any Local Council, Contributing Chartered Organization, Participating Chartered Organization or any other insured Person for any Abuse Claim or (b) any alleged liability of any Insurance Company or other insurer or alleged insurer to provide indemnity or defense relating to any Abuse Claim or any alleged extracontractual liability of any Insurance Company or other insurer or alleged insurer relating to any Abuse Claim).

E.    <u>Settlement Trustee</u>.  There shall be one Settlement Trustee, who shall be appointed by the Bankruptcy Court in the Confirmation Order.  The initial Settlement Trustee shall be disclosed in a notice filed on the docket of these Chapter 11 Cases by February 18, 2022. Any successor Settlement Trustee shall be appointed in accordance with the terms of the Settlement Trust Agreement.  For purposes performing his or her duties and fulfilling his or her obligations under the Settlement Trust and the Plan, the Settlement Trustee shall be deemed to be, and the Confirmation Order shall provide that he or she is, a "party in interest" within the meaning of section 1109(b) of the Bankruptcy Code.  The Settlement Trustee shall be the "administrator" of the Settlement Trust as such term is used in Treas. Reg. Section 1.468B-2(k)(3).

F.    <u>Claims Administrators</u>.  There shall be two Claims Administrators, who shall be appointed by the Bankruptcy Court in the Confirmation Order.  The initial Claim Administrators shall be disclosed in a notice filed on the docket of these Chapter 11 Cases by February 18, 2022. Any successor Claims Administrator shall be appointed in accordance with the terms of the Settlement Trust Agreement.  For purposes performing his or her duties and fulfilling his or her obligations under the Settlement Trust and the Plan, the Claims Administrators shall be deemed to be, and the Confirmation Order shall provide that he or she is, a "party in interest" within the meaning of section 1109(b) of the Bankruptcy Code.

G.    <u>Settlement Trust Advisory Committee</u>.

71

1.      The Settlement Trust Advisory Committee (the "STAC") shall be composed of seven (7) individuals identified below, three (3) of whom shall be selected by the Coalition, three (3) of whom shall be selected by the Tort Claimants' Committee, and one (1) who shall be selected by Pfau/Zalkin. The STAC members shall be reasonably acceptable to the Debtors and shall have the functions, duties, and rights provided in the Settlement Trust Agreement. Each STAC member shall serve in accordance with the terms and conditions of the Settlement Trust Agreement.

2.      The commencement or continuation of a STAC Tort Election Claim (as defined in Article XII.B of the Trust Distribution Procedures) and the approval of any global settlement after the Effective Date that causes an Insurance Company or a Chartered Organization to become a Protected Party must be approved in accordance with the Settlement Trust Agreement.

H.      <u>Future Claimants' Representative</u>.  The Settlement Trust Agreement shall provide for the continuation of the Future Claimants' Representative to represent the interests of holders of Future Abuse Claims.  The initial Future Claimants' Representative shall be James L. Patton, Jr. so long as he is the Future Claimants' Representative in the Chapter 11 Cases as of the Effective Date.

I.      <u>Trust Distribution Procedures</u>.  On the Effective Date, the Settlement Trust shall implement the Trust Distribution Procedures in accordance with the terms of the Settlement Trust Agreement.  From and after the Effective Date, the Settlement Trustee shall have the authority to administer, amend, supplement, or modify the Trust Distribution Procedures solely in accordance with the terms thereof and the Settlement Trust Agreement.

J.      <u>Post-Effective Date Contributing Chartered Organizations</u>.

1.      Notwithstanding any present exclusionary language in the Plan, after the Effective Date, any Opt-Out Chartered Organization or Participating Chartered Organization as of the Effective Date may become a Protected Party if (a) a financial contribution is made by or on behalf of such Opt-Out Chartered Organization or Participating Chartered Organization, (b) such Opt-Out Chartered Organization or Participating Chartered Organization agrees to provide the assignments and releases applicable to Contributing Chartered Organizations, set forth in the definition of Contributing Chartered Organization Settlement Contribution, and (c) if and to the extent required by BSA, it agrees to cooperate with youth protection, and (d) the Bankruptcy Court, after notice and an opportunity for parties in interest to be heard, approves a settlement agreement between such Chartered Organization and the Settlement Trustee (a "<u>Post-Effective Date Chartered Organization Settlement</u>").  After the Effective Date, the Settlement Trustee and the Future Claimants' Representative  shall have the authority to seek approval of a Post-Effective Date Chartered Organization Settlement in accordance with the Settlement Trust Agreement.  Upon the Bankruptcy Court's entry of a Final Order approving a Post-Effective Date Chartered Organization Settlement, <u>Exhibit C</u> shall be amended by the Settlement Trustee to include such Chartered Organization, and such Chartered Organization (and any related Persons or Representatives, as applicable) shall be deemed to be a Contributing Chartered Organization and a Protected Party for all

72

purposes hereunder. **A list of Chartered Organizations that may potentially become Contributing Chartered Organization may be accessed at https://omniagentsolutions.com/bsa-SAballots**.

2.      Any Chartered Organization that becomes a Protected Party in accordance with this Article IV.J shall have all of the rights, remedies and obligations of a Protected Party under the Plan, including under the Channeling Injunction, notwithstanding that such Chartered Organization was not a Protected Party under the Plan as of the Effective Date.

K.      Post-Effective Date Settling Insurance Companies.

1.      Notwithstanding any present exclusionary language in the Plan, after the Effective Date, any Insurance Company that is a Non-Settling Insurance Company may, within twelve (12) months of the Effective Date (the "Insurance Settlement Period"), and such Insurance Settlement Period may be extended by the Settlement Trustee with the consent of a majority of the STAC and the Future Claimants' Representative, enter into an Insurance Settlement Agreement with the Settlement Trustee (a "Post-Effective Date Insurance Settlement"); provided, however, that the Settlement Trustee shall file a notice with the Bankruptcy Court within thirty (30) days of entering into any such Post-Effective Date Insurance Settlement, together with an amendment to Exhibit I including such Post-Effective Date Insurance Settlement, and such Insurance Company (and any related Persons or Representatives, as applicable) shall be deemed to be a Settling Insurance Company and a Protected Party for all purposes hereunder and the Settlement Trustee and the Future Claimants' Representative  shall have the authority to seek approval of a Post-Effective Date Insurance Settlement in accordance with the Settlement Trust Agreement. The Post-Effective Date Insurance Settlement and amendment shall be deemed binding and effective absent objection by any Person within fifteen (15) calendar days. The Settlement Trustee shall have the sole discretion, upon order of the Bankruptcy Court, to extend the Insurance Settlement Period.

2.      Any Insurance Company that becomes a Protected Party in accordance with this Article IV.K shall have all of the rights, remedies and obligations of a Protected Party under the Plan, including under the Channeling Injunction, notwithstanding that such Insurance Company was not a Protected Party under the Plan as of the Effective Date.

L.      Settlement Trust Expenses.  The Settlement Trust shall pay all Settlement Trust Expenses from the Settlement Trust Assets.  The Settlement Trust shall bear sole responsibility with respect to the payment of the Settlement Trust Expenses.  Additionally, the Settlement Trust shall promptly pay all reasonable and documented Settlement Trust Expenses incurred by any Protected Party for any and all liabilities, costs or expenses as a result of taking action on behalf of or at the direction of the Settlement Trust following the transfer to the Settlement Trust of copies of all records and documents in such Persons' possession, custody or control pertaining to Abuse Claims in accordance with the Document Appendix.  To the maximum extent permitted by applicable law, the Settlement Trustee shall not have or incur any liability for actions taken or omitted in his or her capacity as Settlement Trustee, or on behalf of the Settlement Trust, except those acts found by Final Order to be arising out of his or her willful misconduct, bad faith, gross negligence or fraud, and shall be entitled to indemnification and reimbursement for reasonable fees

TrustApp0237

and expenses in defending any and all of his or her actions or omissions in his or her capacity as Settlement Trustee, or on behalf of the Settlement Trust, except for any actions or omissions found by Final Order to be arising out of his or her willful misconduct, bad faith, gross negligence or fraud. Any valid indemnification claim of the Settlement Trustee shall be satisfied only from the Settlement Trust Assets.

M.     Reimbursement by Settlement Trust.  From and after the Effective Date, the Settlement Trust shall reimburse, to the fullest extent permitted by applicable law, Reorganized BSA and each of the Local Councils for any documented out-of-pocket, losses, costs, and expenses (including judgments, attorneys' fees, and expenses) incurred by Reorganized BSA or any Local Council after the Effective Date attributable to the defense of a Direct Abuse Claim that is channeled to the Settlement Trust if the holder of such Direct Abuse Claim seeks to hold Reorganized BSA or such Local Council liable for such Direct Abuse Claim in violation of the terms of the Plan or the Confirmation Order; provided that the Settlement Trust's reimbursement obligations to Reorganized BSA and any Local Council for any Direct Abuse Claim shall be capped at and shall not exceed the amount actually payable by the Settlement Trust to the holder of such Direct Abuse Claim under the Trust Distribution Procedures (i.e., the amount paid based on the Settlement Trust payment percentage); provided, further, that any amounts (1) incurred by the Settlement Trust as set forth herein, (2) incurred by the Settlement Trust to enforce the Channeling Injunction against a holder of a Direct Abuse Claim, or (3) that reduce Settlement Trust Assets as a result of the enforcement of the Channeling Injunction shall be deducted on a dollar-for-dollar basis against such holder's distribution from the Settlement Trust on account of such Direct Abuse Claim. Reorganized BSA and any Local Council shall provide notice to the Settlement Trust within ten (10) business days of the service of any claim or lawsuit filed by a holder of an Abuse Claim that could result in any reimbursement obligations by the Settlement Trust under this provision. In the event that any litigation asserting an Abuse Claim is filed naming Reorganized BSA or any Local Council as a defendant in violation of the terms of the Plan or the Confirmation Order, the Settlement Trust shall, at the request of Reorganized BSA or such Local Council, promptly appear (1) before the Bankruptcy Court to obtain entry of an order enforcing the Channeling Injunction and (2) in such litigation and seek the dismissal of the case. Other than this limited reimbursement obligation, the Settlement Trust shall not be required to reimburse or indemnify any Protected Parties or Limited Protected Parties for any claims, liabilities, losses, actions, suits, proceedings, third-party subpoenas, damages, costs and expenses, including any liabilities related to, arising out of, or in connection with any Abuse Claim, except as provided in Article VIII.B of the Hartford Settlement Agreement, Section 20 of the Century Settlement Agreement, Section 17 of the Zurich Settlement Agreement, Section 17 of the Clarendon Agreement, and any comparable provision of another Insurance Settlement Agreement. Except for the right to seek reimbursement or indemnity set forth in this Article IV.M and except as provided in Article VIII.B of the Hartford Settlement Agreement, Section 20 of the Century Settlement Agreement, Section 17 of the Zurich Settlement Agreement, Section 17 of the Clarendon Agreement, and any comparable provision of another Insurance Settlement Agreement, the Debtors, the Local Councils, the Contributing Chartered Organizations, the Participating Chartered Organizations and any other Person that is or becomes a Protected Party shall be forever barred from seeking compensation from the Settlement Trust for or on account of any Claims arising prior to the Petition Date.

N.     [Reserved].

TrustApp0238

O.    Assignment of Claims and Defenses.  Notwithstanding anything herein to the contrary, but subject to the Insurance Settlement Agreements, on the Effective Date, the Debtors, the Local Councils and any other party that is or becomes a Protected Party or a Limited Protected Party shall be deemed to assign any and all Claims and defenses to the Settlement Trust that arise from or relate to Abuse Claims, including any Claims and defenses against co-defendants; provided, however, that with respect to Limited Protected Parties, the foregoing assignment shall be limited to Claims and defenses that arise from or relate to Post-1975 Chartered Organization Abuse Claims and Pre-1976 Chartered Organization Abuse Claims.  Notwithstanding the foregoing, nothing within the Plan or Confirmation Order shall be deemed to provide an assignment of any Claims or defenses to the Settlement Trust with respect to any Claims that have not been assumed by the Settlement Trust and subject to the Channeling Injunction of Article X.F herein; and provided further, that the Settling Insurance Companies shall not assign or be deemed to assign to the Settlement Trust any claim, Cause of Action, or right of recovery against their reinsurers or retrocessionaires, in their capacities as such.

P.    Investment Guidelines.  All monies held in the Settlement Trust shall be invested, subject to the investment limitations and provisions enumerated in the Settlement Trust Agreement.

Q.    Excess Settlement Trust Assets.  To the extent any Settlement Trust Assets remain at such time as the Settlement Trust is dissolved under the terms of the Settlement Trust Documents, any remaining Settlement Trust Assets shall be distributed to Reorganized BSA.

R.    Document Appendix.  Reorganized BSA, the Local Councils, and the Settlement Trust shall enter into the Document Appendix on the Effective Date, substantially in the form contained in the Plan Supplement.  The parties to the Document Appendix shall be bound by the terms thereof.

S.    Privileged Information.  The transfer or assignment of any Privileged Information to the Settlement Trustee shall be subject to the terms of the Document Appendix.

T.    No Liability.  The Protected Parties and the Limited Protected Parties shall neither have nor incur any liability to, or be subject to any right of action by, any Person for any act, omission, transaction, event, or other circumstance in connection with or related to the Settlement Trust, the Settlement Trustee, or the Settlement Trust Documents, including the administration of Abuse Claims and the distribution of Settlement Trust Assets by the Settlement Trust, or any related agreement.

U.    U.S. Federal Income Tax Treatment of the Settlement Trust.  The Settlement Trust shall be a "qualified settlement fund" within the meaning of the Treasury Regulations issued under Section 468B of the Internal Revenue Code.  Reorganized BSA shall make a "grantor trust" election under Treasury Regulation section 1.468B-1(k) with respect to the Settlement Trust for U.S. federal income tax purposes and, to the extent permitted under applicable law, for state and local income tax purposes.  All parties shall report consistently with such grantor trust election. The Settlement Trust shall file (or cause to be filed) statements, returns, or disclosures relating to the Settlement Trust that are required by any Governmental Unit.  The Settlement Trustee shall be responsible for the payment of any taxes imposed on the Settlement Trust or the Settlement Trust

TrustApp0239

Assets, including estimated and annual U.S. federal income taxes in accordance with the terms of the Settlement Trust Agreement.

V.    <u>Institution and Maintenance of Legal and Other Proceedings</u>.  As of the Effective Date, the Settlement Trust shall be empowered to initiate, prosecute, defend, settle, maintain, administer, preserve, pursue, and resolve all legal actions and other proceedings related to any asset, liability, or responsibility of the Settlement Trust, including the Insurance Actions, Abuse Claims, and the Settlement Trust Causes of Action.  Without limiting the foregoing, on and after the Effective Date, the Settlement Trust shall be empowered to initiate, prosecute, defend, settle, maintain, administer, preserve, pursue, and resolve all such actions, in the name of the Debtors or Reorganized BSA, if deemed necessary or appropriate by the Settlement Trust.  The Settlement Trust shall be responsible for the payment of all damages, awards, judgments, settlements, expenses, costs, fees, and other charges incurred on or after the Effective Date arising from, relating to, or associated with any legal action or other proceeding which is the subject of this <u>Article IV.V</u> and shall pay Indirect Abuse Claims, in accordance with the Trust Distribution Procedures, that may arise from deductibles or other charges.  Furthermore, without limiting the foregoing, the Settlement Trust shall be empowered to maintain, administer, preserve, or pursue the Insurance Actions and the Insurance Action Recoveries.

W.    <u>Settlement Trust Discovery</u>.  The Settlement Trust and holders of Direct Abuse Claims are authorized pursuant to Bankruptcy Rule 2004 and/or other applicable discovery rules to obtain information as set forth in the Document Appendix .  For the avoidance of doubt, the authorization of any discovery request pursuant to this provision shall not be construed to deprive the recipient of such discovery request of any applicable privilege or immunity from discovery.  The Settlement Trust and holders of Direct Abuse Claims shall be able to take whatever steps are necessary to enforce such discovery obligations of Chartered Organizations pursuant to Bankruptcy Rule 2004, Civil Rule 45, other court resolution processes, and under bankruptcy law and applicable non-bankruptcy law.

X.    <u>Notation on Claims Register Regarding Abuse Claims</u>.  On the Effective Date, all Abuse Claims filed against the Debtors in the Chapter 11 Cases shall be marked on the Claims Register as "Channeled to the Settlement Trust" and resolved exclusively in accordance with the Trust Distribution Procedures.

<div align="center">

**ARTICLE V.**

**MEANS FOR IMPLEMENTATION OF THE PLAN**

</div>

A.    <u>General</u>.  On and after the Confirmation Date, the Debtors shall be empowered and authorized to take or cause to be taken, prior to the Effective Date, all actions consistent with the Plan as may be necessary or appropriate to enable them to implement the provisions of the Plan before, on, or after the Effective Date, including the creation of the Settlement Trust and the preparations for the transfer of the Settlement Trust Assets to the Settlement Trust.

B.    <u>Operations of the Debtors between Confirmation and the Effective Date</u>.  The Debtors shall continue to operate as debtors and debtors in possession during the period from the Confirmation Date to the Effective Date.

TrustApp0240

C.    BSA Governance Documents.  From and after the Effective Date, Reorganized BSA shall be governed pursuant to the BSA Charter and the Amended BSA Bylaws.  The Amended BSA Bylaws shall contain such provisions as are necessary to satisfy the provisions of the Plan, subject to further amendment thereof after the Effective Date as permitted by applicable law.  Under the BSA Charter, the BSA has no power to issue certificates of stock, its object and purpose being solely of a charitable character and not for pecuniary profit; accordingly, the requirement of section 1123(a)(6) does not apply to the BSA.

D.    Continued Legal Existence of BSA and Delaware BSA.  The BSA shall continue to exist on and after the Effective Date, with all of the powers it is entitled to exercise under applicable law and pursuant to the BSA Charter and the Amended BSA Bylaws, subject to further amendment of the Amended BSA Bylaws after the Effective Date, as permitted by applicable law.  On and after the Effective Date, the Delaware BSA shall be dissolved at the discretion of the Reorganized BSA under any applicable state or federal law.

E.    Reorganized BSA's Directors and Senior Management.  Pursuant to section 1129(a)(5) of the Bankruptcy Code, to the extent that there are anticipated changes in Reorganized BSA's directors and officers, the Debtors will identify any such changes in the Plan Supplement.  On and after the Effective Date, the Amended BSA Bylaws, as such may be amended thereafter from time to time, shall govern the designation and election of directors of Reorganized BSA.

F.    [Reserved]

G.    Due Authorization.  As of the Effective Date, all actions contemplated by the Plan that require corporate action of the Debtors, or either of them, including actions requiring a vote of the National Executive Board or the National Executive Committee of the BSA or the sole member of Delaware BSA, and execution of all documentation incident to the Plan, shall be deemed to have been authorized, approved, and, to the extent taken prior to the Effective Date, ratified in all respects without any requirement of further action by the Bankruptcy Court, members, officers, or directors of the Debtors, Reorganized Debtors, or any other Person.

H.    Reinstatement of Interests.  As of the Effective Date, in accordance with Article III.B.12, Interests in Delaware BSA shall be Reinstated without further action by or order of the Bankruptcy Court, so as to maintain the organizational structure of the Debtors as such structure exists on the Effective Date unless implementation of the restructuring requires otherwise.

I.    Restatement of Indebtedness.

1.    Except as otherwise provided in the Plan, or in any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, and subject to the treatment afforded to holders of Allowed Claims in Class 3A, 3B, 4A, or 4B under Article III, on the Effective Date, all Prepetition Debt and Security Documents, including all agreements, instruments, and other documents evidencing or issued pursuant to the 2010 Credit Facility Documents, the 2019 RCF Documents, the 2010 Bond Documents, the 2012 Bond Documents, or any indebtedness or other obligations thereunder, and any rights of any holder in respect thereof, shall be deemed amended and

TrustApp0241

restated in the form of the Restated Debt and Security Documents on the terms set forth herein.

        2.      Any provision in any document, instrument, lease, or other agreement that causes or effectuates, or purports to cause or effectuate, a default, termination, waiver, or other forfeiture of, or by, the Debtors as a result of the satisfactions, Injunctions, Releases, Discharges and other transactions provided for in the Plan shall be deemed null and void and shall be of no force or effect. Nothing contained herein shall be deemed to cancel, terminate, release, or discharge the obligation of the Debtors or any of their counterparties under any Executory Contract or Unexpired Lease to the extent such Executory Contract or Unexpired Lease has been assumed by the Debtors pursuant to a Final Order of the Bankruptcy Court, including the Confirmation Order.

        J.      <u>Cancellation of Liens</u>. Except as otherwise provided in the Plan, on the Effective Date, any Lien securing any Allowed Secured Claim (other than a Lien securing any Allowed Secured Claim that is Reinstated pursuant to the Plan, including, for avoidance of doubt, the liens securing the Restated Debt and Security Documents) shall be deemed released and the holder of such Allowed Secured Claim shall be authorized and directed to release any collateral or other property of any Debtor (including any cash collateral) held by such holder and to take such actions as may be requested by the Debtors (or Reorganized Debtors, as the case may be) to evidence the release of such Lien, including the execution, delivery, and filing or recording of such releases as may be requested by the Debtors (or Reorganized BSA, as the case may be).

        K.      <u>Effectuating Documents and Further Transactions</u>. The Chief Executive Officer and President, the Chief Financial Officer, and the General Counsel of the BSA are authorized to execute, deliver, file or record such contracts, instruments, releases, indentures, and other agreements or documents and take or direct such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan in the name of and on behalf of Reorganized Debtors, without the need for any approvals, authorizations, actions, or consents except for those expressly required pursuant to the Plan.

        L.      <u>Sources of Consideration for Distributions</u>. Distributions under the Plan shall be funded from the following sources:

        1.      the Debtors shall fund Distributions on account of and satisfy Allowed General Unsecured Claims exclusively from the Core Value Cash Pool;

        2.      the Settlement Trust shall fund distributions on account of and satisfy compensable Abuse Claims in accordance with the Trust Distribution Procedures from the Settlement Trust Assets;

        3.      the Debtors shall satisfy 2010 Credit Facility Claims, 2019 RCF Claims, 2010 Bond Claims, and 2012 Bond Claims in accordance with the terms of the Restated 2010 Bond Documents, the Restated 2012 Bond Documents and the Restated Credit Facility Documents, as applicable; and

TrustApp0242

4.    the Debtors shall fund Distributions on account of and satisfy all other Allowed Claims with Unrestricted Cash and Investments on hand on or after the Effective Date in accordance with the terms of the Plan and the Confirmation Order.

M.    <u>Calculation of Minimum Unrestricted Cash and Investments</u>.  The minimum amount of Unrestricted Cash and Investments to be retained by Reorganized BSA on the Effective Date shall be:

1.    $25,000,000 if the Effective Date occurs on or before September 30, 2021;

2.    $37,000,000 if the Effective Date occurs on or after October 1, 2021 but before November 1, 2021;

3.    $36,000,000 if the Effective Date occurs on or after November 1, 2021 but before December 1, 2021;

4.    $40,000,000 if the Effective Date occurs on or after December 1, 2021 but before January 1, 2022;

5.    $57,000,000 if the Effective Date occurs on or after January 1, 2022 but before February 1, 2022;

6.    $41,000,000 if the Effective Date occurs on or after February 1, 2022 but before March 1, 2022;

7.    $55,000,000 if the if the Effective Date occurs on or after March 1, 2022 but before April 1, 2022; and

8.    $54,000,000 if the Effective Date occurs on or after April 1, 2022 but before May 1, 2022; and

9.    $43,000,000 if the Effective Date occurs on or after May 1, 2022, but before June 1, 2022 and

10.    $34,000,000 if the Effective Date occurs on or after June 1, 2022.

Without limiting the foregoing, in accordance with the Hartford Insurance Settlement Agreement and the Allowance of the Hartford Administrative Expense Claim under the Plan, the Net Unrestricted Cash and Investments shall be reduced on a dollar-for-dollar basis equal to fifty percent (50%) of the Allowed Hartford Administrative Expense Claim, or $1,000,000.

N.    <u>Resolution of Abuse Claims</u>.  All Abuse Claims shall be channeled to and resolved by the Settlement Trust in accordance with the Trust Distribution Procedures; <u>provided</u>, that any Non-Settling Insurance Company may, subject to <u>Article X.M</u>, raise any valid Insurance Coverage Defense in response to a demand by the Settlement Trust, including any right of such Non-Settling Insurance Company to assert any defense that could, but for the Settlement Trust's assumption of the liabilities, obligations, and responsibilities of the Protected Parties for Abuse Claims, have been raised by the Debtors or other applicable Protected Party with respect to such Claim.

79

O.    <u>Funding by the Settlement Trust</u>.  The Settlement Trust shall have no obligation to fund costs or expenses other than those set forth in the Plan or the Settlement Trust Documents, as applicable.

P.    <u>Core Value Cash Pool</u>.  Reorganized BSA shall deposit Cash into the Core Value Cash Pool by making four semi-annual installment payments equal to $6,250,000.  Reorganized BSA shall make the first deposit six (6) months after the Effective Date; the second installment on the first anniversary after the Effective Date; the third installment eighteen (18) months after the Effective Date; and the fourth installment on the second anniversary of the Effective Date.

Q.    <u>Creditor Representative; Disbursing Agent</u>.  The Creditor Representative shall be appointed as of the Effective Date.  The Creditor Representative shall be responsible for assisting Reorganized BSA and its professionals in their efforts to efficiently reconcile Convenience Claims, General Unsecured Claims, and Non-Abuse Litigation Claims.  The identity of the Creditor Representative shall be determined by the Creditors' Committee, with the consent of the Debtors (such consent not to be unreasonably withheld).  The Debtors or Reorganized BSA, as applicable, will use commercially reasonable efforts to assist the Creditor Representative in reconciling Convenience Claims, General Unsecured Claims, and Non-Abuse Litigation Claims on or before the applicable Claims Objection Deadline.  The reasonable fees and actual and necessary costs and expenses of the Creditor Representative shall be paid by Reorganized BSA up to the Creditor Representative Fee Cap, and Reorganized BSA shall have no obligation to compensate or reimburse the costs or expenses of the Creditor Representative beyond the amount of the Creditor Representative Fee Cap.  The Disbursing Agent shall have the rights, powers and responsibilities provided in <u>Article VII</u>.  The reasonable fees and actual and necessary costs and expenses of the Disbursing Agent, if any, shall be paid by Reorganized BSA.

R.    <u>Residual Cash in Core Value Cash Pool</u>.  To the extent any Cash remains in the Core Value Cash Pool after all Allowed General Unsecured Claims have been satisfied in full, such remaining Cash shall: (1) first, on account of any Allowed Non-Abuse Litigation Claims that shall not have elected to be treated as an Allowed Convenience Claim under <u>Article III.B.9</u> to satisfy any deficiency in payments of such Allowed Claims (a) from available insurance coverage, including Abuse Insurance Policies and Non-Abuse Insurance Policies, (b) from applicable proceeds of any Insurance Settlement Agreements, and (c) from co-liable non-debtors (if any) or their insurance coverage; (2) second, to pay interest to holders of Allowed General Unsecured Claims in accordance with <u>Article VII.L</u>; and (3) third irrevocably re-vest in Reorganized BSA.

S.    <u>Compromise and Settlement of Claims, Interests and Controversies</u>.  Pursuant to section 1123(b)(3)(A) of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided under the Plan and the Plan Documents, as of the Effective Date, the provisions of the Plan, including the Abuse Claims Settlement, the Insurance Settlement Agreements, the JPM / Creditors' Committee Settlement, the United Methodist Settlement, the Settlement of Restricted and Core Asset Disputes, and the PSZJ Settlement, set forth in this <u>Article V.S</u>, shall constitute good-faith compromises and settlements of Claims, Interests, and controversies among the parties thereto relating to the contractual, legal, equitable and subordination rights that holders of Claims or Interests may have with respect to any Claim or Interest under the Plan or any Distribution to be made on account of an Allowed Claim.  The Plan shall be deemed a motion, proposed by the Debtors and joined by the parties to the Abuse Claims

TrustApp0244

Settlement, the Insurance Settlement Agreements, the JPM / Creditors' Committee Settlement, the United Methodist Settlement, the Settlement of Restricted and Core Asset Disputes, and the PSZJ Settlement, respectively, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise and settlement of all such Claims, Interests, and controversies among the parties thereto, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates, and holders of such Claims and Interests, and is fair, equitable and reasonable.

1.    <u>Abuse Claims Settlement</u>.    The treatment provided for Abuse Claims, including Post-1975 Chartered Organization Abuse Claims, Pre-1976 Chartered Organization Abuse Claims against the Limited Protected Parties, and Opt-Out Chartered Organization Abuse Claims, under the Plan incorporates and reflects a proposed compromise and settlement of all Scouting Released Claims, including all Abuse Claims against the Protected Parties, all Pre-1976 Chartered Organization Abuse Claims against the Limited Protected Parties, all Post-1975 Chartered Organization Abuse Claims against the Limited Protected Parties and Opt-Out Chartered Organization Abuse Claims against Opt-Out Chartered Organizations (the "<u>Abuse Claims Settlement</u>"), and the Plan constitutes a request for the Bankruptcy Court to authorize and approve the Abuse Claims Settlement.    The following constitute the provisions and conditions of the Abuse Claims Settlement:

a.    <u>Local Council Settlement Contribution</u>.    The Local Councils shall make, cause to be made, or be deemed to have made, as applicable, the Local Council Settlement Contribution.    If a Local Council is unable to transfer its rights, titles, privileges, interests, claims, demands or entitlements, as of the Effective Date, to any proceeds, payments, benefits, Causes of Action, choses in action, defense, or indemnity, now existing or hereafter arising, accrued or unaccrued, liquidated or unliquidated, matured or unmatured, disputed or undisputed, fixed or contingent, arising under or attributable to (i) the Abuse Insurance Policies, the Insurance Settlement Agreements, and claims thereunder and proceeds thereof; (ii) Insurance Actions, and (iii) the Insurance Action Recoveries (the "<u>Local Council Insurance Rights</u>"), then the Local Council shall, at the sole cost and expense of the Settlement Trust: (a) take such actions reasonably requested by the Settlement Trustee to pursue any of the Local Council Insurance Rights for the benefit of the Settlement Trust; and (b) promptly transfer to the Settlement Trust any amounts recovered under or on account of any of the Local Council Insurance Rights; <u>provided</u>, <u>however</u>, that while any such amounts are held by or under the control of any Local Council, such amounts shall be held for the benefit of the Settlement Trust.

b.    <u>Contributing Chartered Organization Settlement Contribution</u>.    The Contributing Chartered Organizations, including the United Methodist Entities, shall make, cause to be made, or be deemed to have made, as applicable, the Contributing Chartered Organization Settlement Contribution, including the United Methodist Settlement Contribution, as applicable.    If a Contributing Chartered Organization is unable to transfer its rights, titles, privileges, interests, claims, demands or entitlements, if any, as of the Effective Date, to any proceeds,

TrustApp0245

payments, benefits, Causes of Action, choses in action, defense, or indemnity, now existing or hereafter arising, accrued or unaccrued, liquidated or unliquidated, matured or unmatured, disputed or undisputed, fixed or contingent, arising under or attributable to (i) the Abuse Insurance Policies, the Settling Insurer Policy Rights, the Insurance Settlement Agreements, and claims thereunder and proceeds thereof, (ii) the Insurance Actions, and (iii) the Insurance Action Recoveries (the "Contributing Chartered Organization Insurance Rights"), then the Contributing Chartered Organization shall, at the sole cost and expense of the Settlement Trust: (a) take such actions reasonably requested by the Settlement Trustee to pursue any of the Contributing Chartered Organization Insurance Rights for the benefit of the Settlement Trust; and (b) promptly transfer to the Settlement Trust any amounts recovered under or on account of any of the Contributing Chartered Organization Insurance Rights; provided, however, that while any such amounts are held by or under the control of any Contributing Chartered Organization, such amounts shall be held for the benefit of the Settlement Trust.

       c.      Participating Chartered Organization Settlement Contribution. The Participating Chartered Organizations shall make, cause to be made, or be deemed to have made, as applicable, the Participating Chartered Organization Settlement Contribution. If a Participating Chartered Organization is unable to transfer its rights, titles, privileges, interests, claims, demands or entitlements, if any, as of the Effective Date, to any proceeds, payments, benefits, Causes of Action, choses in action, defense, or indemnity, now existing or hereafter arising, accrued or unaccrued, liquidated or unliquidated, matured or unmatured, disputed or undisputed, fixed or contingent, arising under or attributable to (i) the Abuse Insurance Policies, the Settling Insurer Policy Rights, the Insurance Settlement Agreements, and claims thereunder and proceeds thereof, (ii) the Insurance Actions, and (iii) the Insurance Action Recoveries (the "Participating Chartered Organization Insurance Rights"), then the Participating Chartered Organization shall, at the sole cost and expense of the Settlement Trust: (a) take such actions reasonably requested by the Settlement Trustee to pursue any of the Participating Chartered Organization Insurance Rights for the benefit of the Settlement Trust; and (b) promptly transfer to the Settlement Trust any amounts recovered under or on account of any of the Participating Chartered Organization Insurance Rights; provided, however, that while any such amounts are held by or under the control of any Participating Chartered Organization, such amounts shall be held for the benefit of the Settlement Trust.

       d.      Claims Deemed Withdrawn with Prejudice. On the Effective Date, any and all Claims that have been asserted in the Chapter 11 Cases by or on behalf of any Local Council, Participating Chartered Organization, Contributing Chartered Organization, or Settling Insurance Company shall be deemed withdrawn with prejudice and irrevocably waived, released and expunged from the Claims Register without any further notice to or action, order, or approval of the Bankruptcy Court, except that any withdrawal, waiver, release or expungement of any Claims asserted by Settling Insurance Companies, and the United Methodist Entities shall be governed by the terms and conditions of the applicable Insurance

TrustApp0246

Settlement Agreements, or the United Methodist Settlement Agreement, respectively. Further, no Local Council, Participating Chartered Organization, Contributing Chartered Organization, or Settling Insurance Company shall file or assert any Claim or Claims against the Debtors or Reorganized BSA arising from any act or omission of the Debtors prior to the Confirmation Date, except as provided otherwise in the Hartford Insurance Settlement Agreement (including with respect to the Hartford Additional Administrative Expense Claim, if applicable).

   e. <u>Entitlement to Become a Protected Party</u>. Notwithstanding anything to the contrary set forth in the Plan or any other document filed with the Bankruptcy Court: (i) no Local Council shall be treated as a Protected Party under the Plan if any part of the Cash or Property Contribution (as defined on <u>Exhibit F</u>) components of the Local Council Settlement Contribution is not contributed to the Settlement Trust on the Effective Date as described on <u>Exhibit F</u>, it being understood that the Property contribution shall be deemed to have been contributed on the Effective Date for Purposes of this provision when all individual Local Councils that are to make a Property Contribution have provided a notice of intent to contribute property to the Settlement Trust in accordance with the terms of the Property Contribution set forth on <u>Exhibit F</u>; (ii) no Contributing Chartered Organization shall be treated as a Protected Party under the Plan until its Contributing Chartered Organization Settlement Contribution shall have been made; (iii) no Settling Insurance Company shall be treated as a Protected Party under the Plan until such Settling Insurance Company shall have made its contribution to the Settlement Trust pursuant to, and as set forth in, an Insurance Settlement Agreement, except that Hartford Protected Parties, the Century and Chubb Companies, the Zurich Insurers and Zurich Affiliated Insurers, and Clarendon shall each be treated as a Settling Insurance Company and Protected Party as set forth in their respective Insurance Settlement Agreements; and (iv) no Participating Chartered Organization shall be treated as a Protected Party solely based on the Participating Chartered Organization Insurance Assignment. Notwithstanding the foregoing, no Chartered Organization that is a debtor in bankruptcy as of the Confirmation Date (including the Archbishop of Agaña, a Corporation Sole) shall be treated as a Participating Chartered Organization unless it advises Debtors' counsel in writing that it wishes to make the Participating Chartered Organization Insurance Assignment, provided, however, that such Chartered Organizations shall be otherwise deemed an Opt-Out Chartered Organization and Opt-Out Chartered Organization Abuse Claims against such Chartered Organizations shall be Channeled to the Settlement Trust.

   f. <u>Entitlement to Become a Limited Protected Party</u>. Notwithstanding anything to the contrary set forth in the Plan or any other document filed with the Bankruptcy Court, no Chartered Organization shall be treated as a Limited Protected Party under the Plan if it objects to Confirmation of the Plan or informs Debtors' counsel in writing on or before the deadline to object to Confirmation of the Plan that it does not wish to make the Participating Chartered Organization Insurance Assignment. Notwithstanding the foregoing, no Chartered Organization that is a debtor in bankruptcy as of the Confirmation Date (including the

TrustApp0247

Archbishop of Agaña, a Corporation Sole) shall be treated as a Participating Chartered Organization unless it advises Debtors' counsel in writing that it wishes to make the Participating Chartered Organization Insurance Assignment, provided, however, that such Chartered Organizations shall be otherwise deemed an Opt-Out Chartered Organization and Opt-Out Chartered Organization Abuse Claims against such Chartered Organizations shall be Channeled to the Settlement Trust.

       g.     Opt-Out Chartered Organizations.

      (i)     Opt-Out Chartered Organizations by definition are not Participating Chartered Organizations, Limited Protected Parties, or Contributing Chartered Organizations. The term "Opt-Out Chartered Organization," on the one hand, and the terms Participating Chartered Organizations, Limited Protected Parties and Contributing Chartered Organizations, on the other hand, are mutually exclusive.

      (ii)     As a condition to the Effective Date (waiver of which shall require the prior written consent of, among others, the Settling Insurance Companies), on the Release Date (as such term is defined in each Insurance Settlement Agreement), any Opt-Out Chartered Organization shall receive the benefit of the Channeling Injunction and the release of all Abuse Claims that are covered under insurance policies issued by the Settling Insurance Companies.

      (iii)     **The Opt-Out Chartered Organizations are barred from asserting rights, claims, liens and interests under and against the Abuse Insurance Policies that were issued by a Settling Insurance Company;, nothing herein, including, without limitation, the Channeling Injunction in <u>Article X.F</u>, shall require an Opt-Out Chartered Organization to provide an assignment or release with respect to its rights under insurance policies issued directly to such organization, including those set forth in Sections 9 and 10 of the Century and Chubb Companies Insurance Settlement Agreement. The rights of the Opt-Out Chartered Organizations provided under insurance policies issued directly to such organization are preserved, <u>provided</u>, <u>that</u> the Settling Insurance Companies and the Opt-Out Chartered Organizations may enforce and rely upon the channeling and release of Abuse Claims against an Opt-Out Chartered Organization as set forth herein, including as set forth in Articles X.F.1 and X.F.3, for all purposes. All rights and defenses of the Settling Insurance Companies under insurance policies issued directly to an Opt-Out Chartered Organization are preserved.**

      (iv)     If, however, a Chartered Organization that is an Opt-Out Chartered Organization wants to become a Contributing Chartered Organization, (i) a financial contribution must be made by or on behalf of such Opt-Out Chartered Organization, (ii) such Chartered Organization

TrustApp0248

must agree to provide the assignments and releases set forth in Sections 9 and 10 in the Century and Chubb Companies Insurance Settlement Agreement, and (iii) if and to the extent required by the BSA, such Chartered Organization must agree to cooperate with the Child Protection Committee.

(v)    For the avoidance of doubt, and by definition, the applicable Abuse Insurance Policies identified in each of the Insurance Settlement Agreements were issued directly to the BSA and the Local Councils and were not issued directly to the Chartered Organizations.

2.    <u>JPM / Creditors' Committee Settlement</u>.  The treatment provided for under the Plan for Allowed 2010 Credit Facility Claims, Allowed 2019 RCF Claims, Allowed 2010 Bond Claims, Allowed 2012 Bond Claims, Allowed Convenience Claims, Allowed General Unsecured Claims, and Allowed Non-Abuse Litigation Claims, together with the terms and conditions of the JPM / Creditors' Committee Term Sheet, reflects a proposed compromise and settlement by and among the Debtors, the Creditors' Committee and JPM (the "<u>JPM / Creditors' Committee Settlement</u>").[5]  The following constitutes the provisions and conditions of the JPM / Creditors' Committee Settlement:

a.    <u>Allowance and Treatment of 2010 Credit Facility Claims, 2019 RCF Claims, 2010 Bond Claims and 2012 Bond Claims</u>.  The 2010 Credit Facility Claims, the 2019 RCF Claims, the 2010 Bond Claims and the 2012 Bond Claims shall be Allowed in the amounts set forth in <u>Article III.B</u> and receive the treatment afforded to such Claims thereunder.  The Debtors acknowledge and agree that the Claims held by JPM (the 2010 Credit Facility Claims, the 2019 RCF Claims, the 2010 Bond Claims and the 2012 Bond Claims), are core to the Debtors' charitable mission and were incurred in furtherance of the Debtors' charitable mission.

b.    <u>Treatment of Convenience Claims, General Unsecured Claims, and Non-Abuse Litigation Claims</u>.  Convenience Claims, General Unsecured Claims, and Non-Abuse Litigation Claims shall receive the treatment afforded to such Claims under <u>Article III.B</u>.  The Debtors acknowledge and agree that General Unsecured Claims, Convenience Claims, and Non-Abuse Litigation Claims are held by creditors who are core to the Debtors' charitable mission or creditors whose Claims in such Classes, if Allowed, were incurred in furtherance of the Debtors' charitable mission; accordingly, payments by Reorganized BSA under the Plan on account of such Allowed Claims, if applicable, will be made from Cash relating to Reorganized BSA's core assets.

c.    <u>Challenge Period</u>.  As of the Effective Date, (i) the Challenge Period (as defined in the Cash Collateral Order) shall be deemed to have expired with respect to the Creditors' Committee; (ii) the Stipulations (as defined in the Cash

---

[5]    In the event of a conflict between the terms and conditions of the Plan, on the one hand, and the terms and conditions of the JPM / Creditors' Committee Term Sheet, on the other hand, the terms of the Plan shall control.

TrustApp0249

Collateral Order) and other admissions, agreements and releases set forth in the Cash Collateral Order shall be final and binding on the Creditors' Committee. The ability of any other party to bring a Challenge Proceeding (as defined in the Cash Collateral Order) shall be governed by the terms and conditions of the Cash Collateral Order.

3.    <u>Settlement of Restricted and Core Asset Disputes</u>.    As a proposed compromise and settlement of any and all disputes concerning the Debtors' restricted and/or core assets, including the claims asserted in the complaint filed by the Tort Claimants' Committee in the adversary proceeding entitled *Official Tort Claimants' Committee of Boy Scouts of America and Delaware BSA, LLC v. Boy Scouts of America and Delaware BSA, LLC*, Adv. Pro. No. 21-50032 (LSS) (the "<u>Settlement of Restricted and Core Asset Disputes</u>"), the Debtors shall: (a) reduce the minimum amount of Unrestricted Cash and Investments to be retained by Reorganized BSA on the Effective Date from $75,000,000 to $25,000,000 (subject to potential variance as set forth in <u>Article V.M</u>); and (b) issue the BSA Settlement Trust Note to the Settlement Trust as of the Effective Date in accordance with <u>Article V.X</u>.    As further consideration in connection with the Settlement of Restricted and Core Asset Disputes, the Debtors have agreed under the Plan to: (i) fund the Core Value Cash Pool, in the amount of $25,000,000; and (ii) make the BSA Settlement Trust Contribution, including all of the Net Unrestricted Cash and Investments. The proceeds of the Foundation Loan, in the amount of $42,800,000 (which Reorganized BSA will use exclusively for working capital and general corporate purposes), will permit the Debtors to contribute to the Settlement Trust a substantial amount of core value consideration in Cash on the Effective Date.

4.    <u>Insurance Settlement Agreements</u>.    The Plan incorporates the Insurance Settlement Agreements, which are attached hereto under <u>Exhibit I</u>, and the Plan shall constitute a motion by the Debtors for the Bankruptcy Court to approve the proposed compromises and settlements and assignment and/or sale of the applicable Insurance Policies as set forth in each such Insurance Settlement Agreement, pursuant to sections 363, 503(b), 507(a)(2), 1123 and 1141 of the Bankruptcy Code, as applicable, and Bankruptcy Rule 9019, including approval of (i) the Insurance Settlement Agreements, (ii) the assignment of the Local Council Insurance Policies issued by Settling Insurance Companies to the Debtors and the Estates, as applicable, (iii) the Participating Chartered Organization Insurance Assignment, (iv) the sale by the Debtors and the Estates, and the purchase by the Settling Insurance Companies of the applicable Insurance Policies, free and clear of all liens, claims, encumbrances, interests and rights of any nature, whether at law or in equity, of any Person or Entity as set forth in the Insurance Settlement Agreements, *except* solely with respect to the interests, if any, of the Archbishop of Agaña, (v) the Allowance of the Hartford Administrative Expense Claim, and (vi) certain other settlements, compromises and releases as set forth in the Insurance Settlement Agreements. The Confirmation Order shall constitute the Bankruptcy Court's approval of such motion pursuant to sections 363, 503(b), 507(a)(2), 1123 and 1141 of the Bankruptcy Code, as applicable, and Bankruptcy Rule 9019 and Allowance of the Hartford Administrative Expense Claim and shall include findings of fact and conclusions of law pertaining to such approval, in form and substance acceptable to the Settling Insurance Companies, as applicable, including findings and conclusions designating the Settling Insurance

TrustApp0250

Companies as good-faith purchasers of the applicable Insurance Policies. Pursuant to the Century and Chubb Companies Insurance Settlement Agreement, upon the release of the Initial Payment (as defined in the Century and Chubb Companies Insurance Settlement Agreement), the Debtors or Reorganized BSA, as applicable, and the Debtors' Estates shall irrevocably release the Prepetition Century and Chubb Companies Claims, even in the case the Confirmation Order is reversed or vacated on appeal following the Effective Date. Pursuant to and subject to the terms of the Hartford Insurance Settlement Agreement, upon Hartford's payment of the Initial Payment (as defined in the Hartford Insurance Settlement Agreement) to the Settlement Trust, the Debtors or Reorganized BSA, as applicable, and the Debtors' Estates shall irrevocably release the Prepetition Hartford Claims, even if the Confirmation Order is reversed or vacated on appeal following the Effective Date.

5.    <u>TCJC</u>.    TCJC is not a Contributing Chartered Organization and shall be a Participating Chartered Organization and shall have all of the rights and obligations associated therewith.

6.    <u>United Methodist Settlement</u>.    The Plan incorporates the United Methodist Settlement Agreement, filed on the docket of the Chapter 11 Cases and attached hereto as <u>Exhibit J-2</u>, and the Plan shall constitute a motion by the Debtors for the Bankruptcy Court to approve all the proposed compromises and settlements set forth in the United Methodist Settlement Agreement other than Section 2(h) therein (the "<u>United Methodist Settlement</u>") pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, including, as provided in the United Methodist Settlement Agreement, payment of the United Methodist Settlement Contribution to the Settlement Trust as a compromise and settlement of all Abuse Claims against United Methodist Entities and certain Claims by United Methodist Entities against the Debtors, Local Councils, and other parties in interest and disputes relating to the Plan. The Confirmation Order shall constitute the Bankruptcy Court's approval of such motion pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019 and shall include findings of fact and conclusions of law pertaining to such approval, in form and substance acceptable to the United Methodist ad hoc committee.

7.    <u>PSZJ Settlement</u>.    The Plan incorporates the compromise and settlement of all claims and disputes the Debtors have, or may have, against the Tort Claimants' Committee and its Representatives, including Pachulski Stang Ziehl & Jones LLP ("<u>PSZJ</u>"), regarding the alleged improper transmittal of communications from Timothy Kosnoff Esq. by PSZJ to thousands of survivors from the official Tort Claimants' Committee's email address, many of whom were not clients of Mr. Kosnoff, and related actions (the "<u>PSZJ Actions</u>"). As part of this compromise and settlement and only upon the Effective Date, (a) the Tort Claimants' Committee and its professionals shall be Exculpated Parties herein and (b) PSZJ shall (i) make a cash contribution of $1,250,000 to the Reorganized BSA to be reserved for the Youth Protection Program and (ii) write-off $750,000 of PSZJ's fees; <u>provided</u>, <u>however</u>, if the Effective Date does not occur, the Debtors and PSZJ reserve all rights and defenses with respect to the PSZJ Actions. The Plan shall constitute a motion by the Debtors for the Bankruptcy Court to approve the proposed PSZJ Settlement pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019. The proposed PSZJ Settlement, with its significant and important $1,250,000 contribution earmarked for the Youth Protection Program, is fair, reasonable and in all parties' best interests.

TrustApp0251

8.    <u>Roman Catholic Settlement</u>.  The Plan incorporates the Roman Catholic Settlement Agreement, attached hereto as <u>Exhibit J-3</u>.  Pursuant to the Roman Catholic Settlement, all Roman Catholic Entities, other than those that have specifically opted out of such treatment (and do not withdraw such opt-out) and other than those that are debtors in bankruptcy as of the Confirmation Date that have not advised Debtors' counsel in writing that they wish to make the Participating Chartered Organization Insurance Assignment, shall be treated as Participating Chartered Organizations.

T.    <u>Payment of Coalition and Pfau/Zalkin Restructuring Expenses.</u>

1.    On or as soon as reasonably practicable after the Effective Date, and subject to the Bankruptcy Court granting a motion filed pursuant to sections 363(b), 1129(a)(4) and 503(b) of the Bankruptcy Code, Bankruptcy Rule 9019, or otherwise applicable bankruptcy and non-bankruptcy law, Reorganized BSA shall reimburse state court counsel for amounts they have paid to the Coalition Professionals for, and/or pay the Coalition Professionals for amounts payable by state court counsel but not yet paid to Coalition Professionals for, reasonable, documented, and contractual professional advisory fees and expenses incurred by the Coalition Professionals (the "<u>Coalition Restructuring Expenses</u>") from the Coalition's inception up to and including the Effective Date, up to a maximum amount equal to the lesser of (x) (a) $950,000 per month for the period from August 16, 2021 up to and including the Effective Date (pro-rated for any partial month), plus (b) $10,500,000 and (y) $21,000,000; <u>provided</u>, <u>however</u>, that, without limiting the foregoing, under no circumstance shall the Debtors or Reorganized BSA have any obligation to (i) pay or reimburse the Coalition, any of its members, or any Persons affiliated with the Coalition for any costs, fees or expenses other than the Coalition Restructuring Expenses or (ii) pay or reimburse any Coalition Restructuring Expenses that constitute transaction, success or similar contingent fees.  The Coalition shall provide the Debtors a reasonable estimate of the total Coalition Restructuring Expenses as of the Effective Date no later than the date that is five (5) Business Days before the anticipated Effective Date.  Notwithstanding anything to the contrary in the Plan, the Coalition Restructuring Expenses shall be subject to the terms of <u>Article II.A.2</u>, with the following modifications: (x) Coalition Professionals shall comply with the procedures and processes set forth in <u>Article II.A.2</u> by filing final fee application(s), which, for attorneys or law firms who are Coalition Professionals, shall include time entry detail, which may be redacted for privilege; and (y) payment or reimbursement of Coalition Restructuring Expenses shall be subject to the review and procedure of the Fee Examiner.  For the avoidance of doubt, the Coalition Professionals shall not be considered retained professionals of the Debtors, the Creditors' Committee, the Tort Claimants' Committee, or the Future Claimants' Representative, and the retention of the Coalition Professionals shall not have been required to satisfy the standards for retention set forth in sections 327, 328 or 1103 of the Bankruptcy Code.  The requirement that a separate motion be filed with the Bankruptcy Court shall not in any way prejudice or limit the payment of the Coalition Restructuring Expenses under the Plan and/or pursuant to sections 363(b), 1129(a)(4) and 503(b) of the Bankruptcy Code, Bankruptcy Rule 9019, or otherwise applicable bankruptcy and non-bankruptcy law or determine what standard should be applied to determine approval of the Coalition Restructuring Expenses; <i>provided</i>, <i>however</i>, that nothing in the Confirmation Order shall make any findings of facts

TrustApp0252

or conclusions of law regarding whether the Coalition Restructuring Expenses should be approved.

2.      On or as soon as reasonably practicable after the Effective Date, and subject to the Bankruptcy Court granting a motion filed pursuant to sections 363(b), 1129(a)(4) and 503(b) of the Bankruptcy Code, Bankruptcy Rule 9019, or otherwise applicable bankruptcy and non-bankruptcy law, the Settlement Trust shall reimburse state court counsel for amounts they have paid to KTBS Law and Michel Horton (the "Pfau/Zalkin Professionals") for, and/or pay the Pfau/Zalkin Professionals for amounts payable by state court counsel but not yet paid to Pfau/Zalkin Professionals for, reasonable, documented, and contractual professional advisory fees and expenses incurred by the Pfau/Zalkin Professionals (the "Pfau/Zalkin Restructuring Expenses"); provided, however, that, without limiting the foregoing, (i) the the Pfau/Zalkin Restructuring Expenses shall be paid from the Settlement Trust Assets and (ii) the Pfau/Zalkin Restructuring Expenses shall be in an aggregate amount not to exceed $3,500,000. Under no circumstance shall the Debtors or Reorganized BSA have any obligation to pay or reimburse, from the Settlement Trust Assets, the Pfau/Zalkin Professionals, any of its members, or any Persons affiliated with the Pfau/Zalkin Professionals or any Pfau/Zalkin Restructuring Expenses that constitute transaction, success or similar contingent fees. The Pfau/Zalkin Professionals shall provide the Settlement Trust a reasonable estimate of the total Pfau/Zalkin Restructuring Expenses as of the Effective Date no later than the date that is five (5) Business Days before the anticipated Effective Date.   Notwithstanding anything to the contrary in the Plan, the Pfau/Zalkin Restructuring Expenses shall be subject to the terms of Article II.A.2, with the following modifications: (x) Pfau/Zalkin Professionals shall comply with the procedures and processes set forth in Article II.A.2 by filing final fee application(s), which, for attorneys or law firms who are Pfau/Zalkin Professionals, shall include time entry detail, which may be redacted for privilege; and (y) payment or reimbursement of Pfau/Zalkin Restructuring Expenses shall be subject to the review and procedure of the Fee Examiner. For the avoidance of doubt, the Pfau/Zalkin Professionals shall not be considered retained professionals of the Debtors, the Creditors' Committee, the Tort Claimants' Committee, the Coalition, or the Future Claimants' Representative, and the retention of the Pfau/Zalkin Professionals shall not have been required to satisfy the standards for retention set forth in sections 327, 328 or 1103 of the Bankruptcy Code. The requirement that a separate motion be filed with the Bankruptcy Court shall not in any way prejudice or limit the payment of the Pfau/Zalkin Restructuring Expenses under the Plan and/or pursuant to sections 363(b), 1129(a)(4) and 503(b) of the Bankruptcy Code, Bankruptcy Rule 9019, or otherwise applicable bankruptcy and non-bankruptcy law or determine what standard should be applied to determine approval of the Pfau/Zalkin Restructuring Expenses; provided, however, that nothing in the Confirmation Order shall make any findings of facts or conclusions of law regarding whether the Pfau/Zalkin Restructuring Expenses should be approved.

U.      Good-Faith Compromise and Settlement.  The Plan (including its incorporation of the Abuse Claims Settlement, the Insurance Settlements, the JPM / Creditors' Committee Settlement, the United Methodist Settlement, the Settlement of Restricted and Core Asset Disputes, and the PSZJ Settlement), the Plan Documents, and the Confirmation Order constitute a good-faith compromise and settlement of Claims, Interests and controversies based upon the

TrustApp0253

unique circumstances of these Chapter 11 Cases. The Plan, the Abuse Claims Settlement, the Insurance Settlements, the JPM / Creditors' Committee Settlement, the United Methodist Settlement, the Settlement of Restricted and Core Asset Disputes, the PSZJ Settlement, the Plan Documents, and the Confirmation Order will be binding as to the matters and issues described therein, but will not be binding with respect to similar matters or issues that might arise in any other litigation or proceeding in which none of the Debtors, Reorganized BSA, the Protected Parties, or the Settlement Trust is a party.

V.    Restated Debt and Security Documents.

1.    On the Effective Date, the Prepetition Debt and Security Documents shall be amended and restated in the form of the Restated Debt and Security Documents, and Reorganized BSA, JPM and Arrow shall, and shall be authorized, to execute, deliver and enter into the Restated Debt and Security Documents as of such date, in principal amounts equal to the Allowed amounts set forth in Article III.B.3, Article III.B.4, Article III.B.5, and Article III.B.6 without the need for any further corporate action or any further notice to or order of the Bankruptcy Court. The Debtors or Reorganized BSA, as applicable, JPM, and Arrow shall take all actions necessary to continue the Debtors' obligations under the Prepetition Debt and Security Documents, as amended and restated by the Restated Debt and Security Documents and to give effect to the Restated Debt and Security Documents, including surrendering any debt instruments or securities that are no longer applicable under the Restated Debt and Security Documents to the Debtors or Reorganized BSA. Entry of the Confirmation Order shall be deemed approval of the JPM Exit Fee, and Reorganized BSA is authorized and directed to pay the JPM Exit Fee to JPM on the Effective Date.

2.    Except as otherwise modified by the Restated Debt and Security Documents, all Liens, mortgages and security interests securing the obligations arising under the Restated Debt and Security Documents that were collateral securing the Debtors' obligations under the Prepetition Debt and Security Documents as of the Petition Date are unaltered by the Plan, and all such Liens, mortgages and security interests are reaffirmed and perfected with respect to the Restated Debt and Security Documents to the same extent, in the same manner and on the same terms and priorities as they were under the Prepetition Debt and Security Documents, except as the foregoing may be modified pursuant to the Restated Debt and Security Documents. All Liens and security interests granted and continuing pursuant to the Restated Debt and Security Documents shall be (a) valid, binding, perfected, and enforceable Liens and security interests in the personal and real property described in and subject to such documents, with the priorities established in respect thereof under applicable non-bankruptcy law; (b) granted in good faith and deemed not to constitute a fraudulent conveyance or fraudulent transfer; and (c) not otherwise subject to avoidance, recharacterization, or subordination (whether equitable, contractual or otherwise) under any applicable law. The Debtors, Reorganized BSA, Arrow, and JPM are authorized to make, and to the extent required by the Restated Debt and Security Documents, the Debtors, Reorganized BSA, Arrow will make, all filings and recordings, and obtain all governmental approvals and consents necessary (but otherwise consistent with the consents and approvals obtained in connection with the Prepetition Debt and Security Documents) to establish, attach and perfect such Liens and security interests under

TrustApp0254

any applicable law (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order and any such filings, recordings, approvals, and consents shall not be required), and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interests to third parties. For purposes of all mortgages and deposit account control agreements that secured the obligations arising under the Prepetition Debt and Security Documents, the Restated Debt and Security Documents are deemed an amendment and restatement of the Prepetition Debt and Security Documents, and such mortgages and control agreements shall survive the Effective Date, shall not be cancelled, and shall continue to secure Reorganized BSA's obligations under the Restated Debt and Security Documents, except as expressly set forth therein.

3.      The definitive terms of the Restated Debt and Security Documents shall be (x) acceptable to JPM and the BSA, (y) reasonably acceptable to the Creditors' Committee, and (z) substantially the same as the Prepetition Debt and Security Documents, except that, as to be specified in the Restated Debt and Security Documents:

a.      the maturity dates under the Restated 2010 Bond Documents, the Restated 2012 Bond Documents, and the Restated Credit Facility Documents will be the Restated Maturity Date;

b.      principal under the Restated 2010 Bond Documents and the Restated 2012 Bond Documents shall be payable in monthly installments, in the same amounts as the prepetition periodic amortization amounts, beginning on the date that is two (2) years after the Effective Date and ending on the Restated Maturity Date; provided, that the scheduled principal amounts payable under the Restated 2010 Bond Documents and the Restated 2012 Bond Documents shall be reduced, on a pro rata basis, by an amount equal to the Excess Cash and Investments, if any, that are remitted to JPM under the Excess Cash Sweep;

c.      interest under the Restated 2010 Bond Documents and the Restated 2012 Bond Documents shall be payable in monthly installments, at the currently applicable existing rates in the 2010 Bond Documents and the 2012 Bond Documents, beginning on the date that is one month after the Effective Date and ending on the Restated Maturity Date;

d.      principal under the Restated Credit Facility Documents shall be payable in quarterly installments, set at 1/40th of the outstanding balance on the Effective Date, beginning on the date that is two (2) years after the Effective Date and ending on the Restated Maturity Date; provided, that the principal amounts payable under the Restated Credit Facility Documents shall be reduced, on a pro rata basis, by an amount equal to the Excess Cash and Investments, if any, that are remitted to JPM under the Excess Cash Sweep;

e.      interest under the Restated Credit Facility Documents shall be payable in quarterly installments at the applicable existing rates in the Prepetition

91

Debt and Security Documents, beginning on the date that is three (3) months after the Effective Date and ending on the Restated Maturity Date;

        f.      all of the obligations of Reorganized BSA under the Restated Debt and Security Documents shall be secured by first-priority liens on and security interests in all of the assets of Reorganized BSA;

        g.      all of the obligations of Reorganized BSA under the Restated Debt and Security Documents shall be guaranteed by Arrow; and

        h.      beginning on December 31 of the calendar year that is two (2) years after the Effective Date and continuing on December 31 of each successive calendar year until December 31 of the calendar year that is immediately prior to the calendar year of the Restated Maturity Date, Reorganized BSA shall remit to JPM, as soon as reasonably practicable but in no case later than thirty (30) days of such date, twenty-five percent (25%) of the Excess Cash and Investments in excess of $75,000,000, if any, as of such date, measured on a pro forma basis after having given effect to the principal payment, if any, due on February 15 of the following year under the BSA Settlement Trust Note, if applicable (the "Excess Cash Sweep"), and JPM shall apply any such amounts on a pro rata basis to the unpaid principal balances under the Restated Debt and Security Documents. For the avoidance of doubt, no payments shall be made on account of the Excess Cash Sweep until the last Distribution is made on account of Allowed General Unsecured Claims.

        4.      Except as provided for in an Insurance Settlement Agreement, neither any provision of the Plan nor the occurrence of the Effective Date shall alter, amend, or otherwise impair the rights and obligations of the Debtors, Reorganized BSA, JPM, or any applicable Insurance Company holding one or more letters of credit issued by JPM to secure obligations arising under one or more BSA Insurance Policies. Without limiting the foregoing, nothing in the Plan or the Confirmation Order shall preclude any such Insurance Company from exercising any applicable rights on any such letter of credit issued, or other security provided, for the benefit of the Insurance Company in accordance with the terms and conditions of the documents governing such letter of credit or other security, or applying amounts therefrom to any Claim secured by such letter of credit or other security, and the Debtors, Reorganized BSA, and JPM reserve any and all rights with respect to such Insurance Company's exercise of any applicable rights.

W.      Foundation Loan.

        1.      On the Effective Date, the Foundation Loan Agreement and any applicable collateral and other loan documents governing the Foundation Loan shall be executed and delivered, and Reorganized BSA shall be authorized to execute, deliver and enter into, the Foundation Loan Agreement and related documentation governing the Foundation Loan without the need for any further corporate action or any further notice to or order of the Bankruptcy Court.

TrustApp0256

2.     As of the Effective Date, upon the granting of Liens in accordance with the Foundation Loan Agreement and any applicable collateral and other loan documents governing the Foundation Loan, all of the Liens and security interests granted thereunder (a) shall be deemed to have been granted, (b) shall be legal, binding, automatically perfected, non-avoidable, and enforceable Liens on, and security interests in, the applicable collateral as of the Effective Date in accordance with the respective terms of the Foundation Loan Agreement and related documentation, subject to the Liens and security interests set forth in the Restated Debt and Security Documents, as permitted under the Foundation Loan Agreement and related documentation.  All Liens and security interests granted pursuant to the Foundation Loan Agreement and related documentation shall be (i) valid, binding, perfected, and enforceable Liens and security interests in the personal and property described in and subject to such documents, with the priorities established in respect thereof under applicable non-bankruptcy law; (ii) granted in good faith and deemed not to constitute a fraudulent conveyance or fraudulent transfer; and (c) not otherwise subject to avoidance, recharacterization, or subordination (whether equitable, contractual or otherwise) under any applicable law.  The Debtors, Reorganized BSA, Arrow, and the Foundation are authorized to make, and to the extent contemplated by the Foundation Loan Agreement and related documentation, the Debtors, Reorganized BSA, Arrow will make, all filings and recordings, and obtain all governmental approvals and consents necessary to establish, attach and perfect such Liens and security interests under any applicable law (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order and any such filings, recordings, approvals, and consents shall not be required), and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interest to third parties.

X.     <u>BSA Settlement Trust Note</u>.  On the Effective Date, Reorganized BSA shall execute, issue and deliver the BSA Settlement Trust Note to the Settlement Trust and execute and deliver any related documentation governing the BSA Settlement Trust Note, including any related security agreement, without the need for any further corporate action or any further notice to or order of the Bankruptcy Court.  The BSA Settlement Trust Note will commence on the Effective Date and will be due ninety-one (91) days after the date that is ten (10) years after the Effective Date and shall bear interest at a rate of 5.5% per annum, payable semi-annually, subject to a payment-in-kind election for the eighteen (18) months immediately following the Effective Date.  The obligations of Reorganized BSA under the BSA Settlement Trust Note shall be secured by second-priority liens on and security interests in inventory, accounts receivable (except the Arrow Intercompany Note), Cash and the Headquarters.  Principal under the BSA Settlement Trust Note shall be payable in annual installments due on February 15 of each year during the term of the BSA Settlement Trust Note, commencing on February 15 of the second year following the Effective Date.  Such annual principal payments shall be equal to the sum of the following calculation: (a) $4,500,000; plus (b) $3.50 multiplied by the aggregate number of Youth Members as of December 31 of the preceding year up to the forecasted number of Youth Members for such year as set forth in the Debtors' five-year business plan; plus (c) $50 multiplied by the aggregate number of High Adventure Base Participants during the preceding calendar year; plus (d) $50 multiplied by the aggregate number of Youth Members in excess of the forecasted number of Youth Members for such year, excluding the portion of the excess that is comprised of members under the ScoutReach program, as set forth in the Debtors' five-year business plan; plus (e) $150

TrustApp0257

multiplied by the aggregate number of High Adventure Base Participants, excluding those attending events with a registration fee of less than $300 (*e.g.*, for non-typical High Adventure Base activities), in excess of the forecasted number of High Adventure Base Participants for such year as set forth in the Debtors' five-year business plan. The forecasted numbers of Youth Members and High Adventure Base Participants referenced in clauses (b), (d) and (e) of the foregoing sentence are included in the Financial Projections attached to the Disclosure Statement. The forecast for years after 2025 shall be deemed to be the forecast for calendar year 2025. The BSA Settlement Trust Note may be prepaid at any time without penalty.

Y.    <u>DST</u>.  The DST shall be established on the Effective Date in accordance with the DST Agreement. The purposes of the DST shall be to: (1) issue the DST Note to the Settlement Trust as of the Effective Date; (2) collect, manage and invest Cash contributed by Local Councils on a monthly basis to an account (and any replacement thereof) owned by the DST in accordance with the DST Note Mechanics; and (3) make annual payments (a) to the Pension Plan or (b) toward principal and interest on the DST Note, as determined in accordance with the DST Note Mechanics and the DST Agreement. In the event of a conflict between the terms or provisions of the Plan and the DST Agreement, the terms of the Plan shall control.

Z.    <u>Pension Plan</u>.  No provision contained in the Plan, Confirmation Order, the Bankruptcy Code (including section 1141 of the Bankruptcy Code), or any other document filed or order entered in the Chapter 11 Cases shall be construed to exculpate, discharge, release or relieve the Debtors, the Local Councils, or any other party, in any capacity, from any liability or responsibility to any Person with respect to the Pension Plan under any law, governmental policy, or regulatory provision. The Pension Plan shall not be enjoined or precluded from enforcing any such liability or responsibility as a result of any of the provisions of the Plan (including those provisions providing for exculpation, satisfaction, release and discharge of Claims against the Debtors), the Confirmation Order, the Bankruptcy Code (including section 1141 of the Bankruptcy Code), or any other document filed or order entered in the Chapter 11 Cases. The Settlement Trust shall not have any liability to any Person on account of the Pension Plan, including liability as a member of a "Controlled Group" as defined in 29 U.S.C. § 1301(a)(14)(A) or on any other basis whatsoever.

As of the Effective Date, Reorganized BSA shall assume and continue the Pension Plan to the extent of its obligations under the Pension Plan and applicable law, including, as applicable, (1) satisfaction of the minimum funding requirements under 26 U.S.C. §§ 412 and 430 and 29 U.S.C. §§ 1082 and 1083, (2) payment of all required Pension Benefit Guaranty Corporation premiums in accordance with 29 U.S.C. §§ 1306 and 1307, and (3) administration of the Pension Plan in all material respects in accordance with the applicable provisions of the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. §§ 1301 *et seq.*, and the Internal Revenue Code. Notwithstanding the foregoing, Reorganized BSA reserves all of its rights under the Pension Plan. All Proofs of Claim filed by the Pension Benefit Guaranty Corporation with respect to the Pension Plan shall be deemed withdrawn on the Effective Date.

AA.    <u>Single Satisfaction of Allowed General Unsecured Claims</u>.  In no event shall any holder of an Allowed General Unsecured Claim recover more than the full amount of its Allowed General Unsecured Claim from the Core Value Cash Pool (plus interest from the Core Value Cash Pool at the federal judgment rate to the extent applicable under the terms hereof), and to the extent

94

that the holder of an Allowed General Unsecured Claim has received, or in the future receives, payment on account of such Allowed General Unsecured Claim from a party that is not a Debtor or Reorganized BSA, such holder shall repay, return, or deliver to the Core Value Cash Pool any Distribution held by or transferred to such holder to the extent the holder's total recovery on account of its Allowed General Unsecured Claim from the third party and from the Core Value Cash Pool exceeds the amount of such holder's Allowed General Unsecured Claim (plus interest from the Core Value Cash Pool at the federal judgment rate to the extent applicable under the terms hereof).

BB.    Exemption from Certain Transfer Taxes and Recording Fees.    To the maximum extent permitted pursuant to section 1146(a) of the Bankruptcy Code and applicable law, any transfers of property pursuant to the Plan, including any transfers to the Settlement Trust by the Debtors, the Local Councils, the Contributing Chartered Organizations, and the Settling Insurance Companies, and payments by Reorganized BSA to or from the Core Value Cash Pool, shall not be taxed under any law imposing a stamp tax or similar tax.

CC.    Non-Monetary Commitments.    The Debtors will not compromise the safety of the youth, volunteers, and employees. The Debtors are dedicated to becoming the Gold Standard in abuse prevention. Because of this commitment, the Debtors are and will always seek to bolster their abuse prevention efforts.  In furtherance of these efforts, the Reorganized BSA shall take the actions set forth in Exhibit L hereto to promote healing and reconciliation and to continue the ongoing efforts to prevent abuse from occurring in Scouting in the future.

## ARTICLE VI.

## EXECUTORY CONTRACTS AND UNEXPIRED LEASES

A.    Assumption and Rejection of Executory Contracts and Unexpired Leases.

1.    On the Effective Date, except as otherwise provided herein, all Executory Contracts and Unexpired Leases shall be deemed assumed by Reorganized BSA without the need for any further notice to or action, order, or approval of the Bankruptcy Court under sections 365 or 1123 of the Bankruptcy Code, except for Executory Contracts or Unexpired Leases: (a) that are identified on the Rejected Contracts and Unexpired Leases Schedule; (b) that previously expired or terminated pursuant to their terms; (c) that the Debtors have previously assumed or rejected pursuant to a Final Order of the Bankruptcy Court; (d) that are the subject of a motion to reject that remains pending as of the Effective Date; (e) as to which the effective date of rejection will occur (or is requested by the Debtors to occur) after the Effective Date; or (f) as to which the Debtors or Reorganized BSA, as applicable, determine, in the exercise of their reasonable business judgment, that the Cure Amount, as determined by a Final Order or as otherwise finally resolved, would render assumption of such Executory Contract or Unexpired Lease unfavorable to Debtors or Reorganized BSA; provided that the Debtors reserve the right to seek enforcement of an assumed or assumed and assigned Executory Contract or Unexpired Lease following the Confirmation Date, including seeking an order of the Bankruptcy Court rejecting such Executory Contract or Unexpired Lease for cause.

TrustApp0259

2.      Entry of the Confirmation Order shall constitute an order of the Bankruptcy Court approving the assumption or rejection, as applicable, of Executory Contracts or Unexpired Leases pursuant to the Plan, pursuant to sections 365 and 1123 of the Bankruptcy Code.  Except as otherwise set forth herein, the assumption or rejection of an Executory Contract or Unexpired Lease pursuant to the Plan shall be effective as of the Effective Date; provided that the rejection of an Unexpired Lease shall be effective as of the later of: (a) the Effective Date; and (b) the date on which the leased premises are unconditionally surrendered to the non-Debtor counterparty to the rejected Unexpired Lease.  Reorganized BSA is authorized to abandon any De Minimis Assets at or on the premises subject to an Unexpired Lease that is rejected pursuant to the Plan, and the non-Debtor counterparty to such Unexpired Lease may dispose of any such De Minimis Assets remaining at or on the leased premises on the applicable lease rejection date.

3.      Each Executory Contract or Unexpired Lease assumed pursuant to the Plan or a Final Order of the Bankruptcy Court shall re-vest in and be fully enforceable by Reorganized BSA in accordance with its terms, except as such terms may have been modified by the provisions of the Plan, the Confirmation Order, or any Final Order of the Bankruptcy Court authorizing and providing for its assumption.  Any motions to assume Executory Contracts or Unexpired Leases pending on the Effective Date shall be subject to approval by a Final Order on or after the Effective Date but may be withdrawn, settled, or otherwise prosecuted by Reorganized BSA.

B.      Rejection Damages Claims.  Unless otherwise provided by a Final Order of the Bankruptcy Court, all Proofs of Claim for Rejection Damages Claims, if any, shall be filed within thirty (30) days after the latest to occur of: (1) the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection; (2) the effective date of the rejection of such Executory Contract or Unexpired Lease; or (3) the Effective Date (as applicable, the "Rejection Damages Bar Date").  Claims arising from the rejection of an Executory Contract or an Unexpired Lease shall be classified as General Unsecured Claims and subject to the provisions of Article VII and the applicable provisions of the Bankruptcy Code and the Bankruptcy Rules.

C.      Cure of Defaults under Executory Contracts and Unexpired Leases.

1.      Any monetary defaults under each Executory Contract and Unexpired Lease to be assumed pursuant to the Plan shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the Cure Amount in Cash on the Effective Date or in the ordinary course of the Debtors' or Reorganized BSA's non-profit operations, subject to the limitation described below.

2.      Except as otherwise provided in the Plan, the Debtors shall, on or before the date of filing of the Plan Supplement, cause the Cure and Assumption Notices to be served on counterparties to Executory Contracts and Unexpired Leases to be assumed pursuant to the Plan.  Any objection by a non-Debtor counterparty to an Executory Contract or Unexpired Lease to the assumption, assumption and assignment, the related Cure Amount, or adequate assurance, must be filed, served, and actually received by the Debtors on or prior to the deadline for filing objections to the Plan (or such later date as may be provided in the applicable Cure and Assumption Notice); provided that each counterparty to an

96

Executory Contract or Unexpired Lease (a) that the Debtors later determine to assume or (b) as to which the Debtors modify the applicable Cure Amount, must object to the assumption or Cure Amount, as applicable, by the earlier of: (i) fourteen (14) days after the Debtors serve such counterparty with a corresponding Cure and Assumption Notice; and (ii) the Confirmation Hearing. **Any counterparty to an Executory Contract or Unexpired Lease that fails to timely object to the proposed assumption of any Executory Contract or Unexpired Lease shall be forever barred, estopped, and enjoined from contesting the Debtors' assumption of the applicable Executory Contract or Unexpired Lease and from requesting payment of a Cure Amount that differs from the amounts paid or proposed to be paid by the Debtors or Reorganized BSA, in each case without the need for any objection by the Debtors or Reorganized BSA or any further notice to or action, order, or approval of the Bankruptcy Court. Reorganized BSA may settle any dispute regarding a Cure Amount without any further notice to or action, order, or approval of the Bankruptcy Court.**

3.      To the maximum extent permitted by law, to the extent any provision in any Executory Contract or Unexpired Lease assumed, or assumed and assigned, pursuant to the Plan restricts or prevents, or purports to restrict or prevent, or is breached or would be deemed breached by, the assumption or assumption and assignment of such Executory Contract or Unexpired Lease (including any change of control or similar provision), then such provision shall be deemed preempted and modified such that neither the Debtors' assumption or assumption and assignment of the Executory Contract or Unexpired Lease nor any of the transactions contemplated by the Plan shall entitle the non-debtor counterparty to terminate or modify such Executory Contract or Unexpired Lease or to exercise any other purported default-related rights thereunder.

4.      **The Debtors' assumption or assumption and assignment of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise, and payment of any applicable Cure Amount in accordance with the procedures set forth in this Article VI.C, shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed, or assumed and assigned, Executory Contract or Unexpired Lease at any time prior to the effective date of assumption. Any and all Proofs of Claim based upon Executory Contracts or Unexpired Leases that have been assumed in the Chapter 11 Cases, including pursuant to the Confirmation Order, shall be deemed Disallowed and expunged as of the later of: (a) the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such assumption; (b) the effective date of such assumption; or (c) the Effective Date, in each case without the need for any objection by the Debtors or Reorganized BSA or any further notice to or action, order, or approval of the Bankruptcy Court.**

D.      <u>Dispute Resolution</u>.  In the event of a timely filed objection regarding: (1) a Cure Amount; (2) the ability of Reorganized BSA or any assignee to provide adequate assurance of future performance within the meaning of section 365 of the Bankruptcy Code under the Executory Contract or Unexpired Lease to be assumed; or (3) any other matter pertaining to assumption or

TrustApp0261

the requirements of section 365(b)(1) of the Bankruptcy Code, such dispute shall be resolved by a Final Order of the Bankruptcy Court (which may be the Confirmation Order) or as may be agreed upon by the Debtors or Reorganized BSA, as applicable, and the counterparty to the Executory Contract or Unexpired Lease. The Debtors or Reorganized BSA, applicable, shall pay the applicable Cure Amount as soon as reasonably practicable after entry of a Final Order resolving such dispute and approving such assumption, or as may otherwise be agreed upon by the Debtors or Reorganized BSA, as applicable, and the counterparty to the Executory Contract or Unexpired Lease. To the extent that a dispute regarding the applicable Cure Amount is resolved or determined unfavorably to the Debtors, the Debtors may, in their discretion, reject the applicable Executory Contract or Unexpired Lease after such determination, which rejection shall supersede, nullify, and render of no force or effect any earlier assumption or assumption and assignment. Under no circumstances shall the status of payment of a Cure Amount required by section 365(b)(1) of the Bankruptcy Code following the entry of a Final Order resolving the dispute and approving the assumption prevent or delay implementation of the Plan or the occurrence of the Effective Date.

   E. <u>Contracts and Leases Entered into After the Petition Date</u>. Contracts and leases entered into after the Petition Date by the BSA, including any Executory Contracts and Unexpired Leases assumed by BSA, will be performed by the BSA or Reorganized BSA in the ordinary course of its charitable non-profit operations. Accordingly, such contracts and leases (including any assumed Executory Contract and Unexpired Leases) shall survive and remain unaffected by entry of the Confirmation Order.

   F. <u>Insurance Policies</u>.

   1. Notwithstanding anything to the contrary herein, all Insurance Policies issued to or entered into by the Debtors prior to the Petition Date shall not be considered Executory Contracts and shall neither be assumed nor rejected by the Debtors; <u>provided</u>, <u>however</u>, that to the extent any Insurance Policy is determined to be an Executory Contract, then, subject to <u>Article IV.V</u>, and notwithstanding anything contained in the Plan to the contrary, the Plan will constitute a motion to assume such Insurance Policy and pay all future obligations, if any, in respect thereof and, subject to the occurrence of the Effective Date, the entry of the Confirmation Order will constitute approval of such assumption pursuant to section 365(a) of the Bankruptcy Code and a finding by the Bankruptcy Court that each such assumption is in the best interests of the Debtors, their respective Estates and all parties in interest. Unless otherwise determined by the Bankruptcy Court pursuant to a Final Order or agreed by the parties thereto prior to the Effective Date, no payments are required to cure any defaults of any Debtor existing as of the Confirmation Date with respect to any Insurance Policy; and prior payments for premiums or other charges made prior to the Petition Date under or with respect to any Insurance Policy shall be indefeasible. Moreover, as of the Effective Date, all payments of premiums or other charges made by the Debtors on or after the Petition Date under or with respect to any Insurance Policy shall be deemed to have been authorized, approved, and ratified in all respects without any requirement of further action by the Bankruptcy Court. Notwithstanding anything to the contrary contained herein, Confirmation shall not discharge, impair or otherwise modify any obligations assumed by the foregoing assumption, and each such obligation shall be deemed and treated as an Executory Contract

TrustApp0262

that has been assumed by the Debtors under the Plan as to which no Proof of Claim need be filed.

2.      Notwithstanding anything to the contrary contained in the Plan, entry of the Confirmation Order shall not discharge, impair, or otherwise modify any indemnity obligations assumed as a result of the foregoing assumption of the Insurance Policies that are D&O Liability Insurance Policies (and related documents) issued to the Debtors, and each such indemnity obligations will be deemed and treated as an Executory Contract that has been assumed by the Reorganized BSA under the Plan as to which no Proof of Claim need be filed.

3.      Other than the permissibility of the Insurance Assignment as provided for in Section IX.A.3.j, or as otherwise provided in the Bankruptcy Code, applicable law, the findings made by the Bankruptcy Court in the Confirmation Order or the findings made by the District Court in the Affirmation Order, the rights and obligations of the parties under the Insurance Policies, including the question of whether any breach has occurred, shall be determined under applicable law.

G.      <u>Compensation and Benefits Programs</u>.      Other than those Compensation and Benefits Programs assumed by the Debtors prior to entry of the Confirmation Order, if any, all of the Compensation and Benefits Programs entered into before the Petition Date and not since terminated shall be deemed to be, and shall be treated as though they are, Executory Contracts under the Plan.  Entry of the Confirmation Order will constitute the Bankruptcy Court's approval of Reorganized BSA's assumption and continued maintenance and sponsorship of each of such Compensation and Benefits Plan under sections 365 and 1123 of the Bankruptcy Code, and the Debtors' and Reorganized BSA's obligations under the Compensation and Benefits Programs shall survive and remain unaffected by entry of the Confirmation Order and be fulfilled in the ordinary course of the Debtors' and Reorganized BSA's non-profit operations.  Compensation and Benefits Programs assumed by the Debtors prior to entry of the Confirmation Order shall continue to be fulfilled in the ordinary course of the Debtors' non-profit operations from and after the date of any order of the Bankruptcy Court authorizing the assumption of such Compensation and Benefits Program.  All Claims filed on account of an amounts asserted to be owed under Compensation and Benefits Programs shall be deemed satisfied and expunged from the Claims Register as of the Effective Date without any further notice to or action, order, or approval of the Bankruptcy Court.

H.      <u>Restoration Plan and Deferred Compensation Plan</u>.      On the Effective Date the Restoration Plan and the Deferred Compensation Plan shall be terminated and, to the extent applicable, shall be deemed rejected by Reorganized BSA pursuant to section 365 of the Bankruptcy Code and this <u>Article VI</u>.  Claims arising from the Debtors' rejection of the Restoration Plan and the Deferred Compensation Plan shall be treated as General Unsecured Claims hereunder.  Holders of Allowed Claims arising from such rejection shall be entitled to a recovery from the Core Value Cash Pool in accordance with the applicable terms of the Plan.

I.      <u>Workers' Compensation Program</u>.      As of the Effective Date, the Debtors and Reorganized BSA shall continue to honor their obligations under: (a) all applicable workers' compensation laws in all applicable states; and (b) the Workers' Compensation Program.  All Proofs of Claims on account of workers' compensation, including the Workers' Compensation

99

Program, shall be deemed withdrawn automatically and without any further notice to or action, order, or approval of the Bankruptcy Court; provided, however, that nothing in the Plan shall limit, diminish, or otherwise alter the Debtors' or Reorganized BSA's defenses, Causes of Action, or other rights under applicable non-bankruptcy law with respect to the Workers' Compensation Programs; provided further, however, that nothing herein shall be deemed to impose any obligations on the Debtors or their insurers in addition to what is provided for under the terms of the Workers' Compensation Programs and applicable state law.

J.    Indemnification Obligations.

1.    Notwithstanding anything in the Plan to the contrary, each Indemnification Obligation shall be assumed by Reorganized BSA effective as of the Effective Date, pursuant to sections 365 and 1123 of the Bankruptcy Code or otherwise, except for any Indemnification Obligation that is or is asserted to be owed to or for the benefit of any Perpetrator.  Subject to the foregoing sentence, each Indemnification Obligation shall remain in full force and effect, shall not be modified, reduced, discharged, impaired, or otherwise affected in any way, and shall survive Unimpaired and unaffected, irrespective of when such obligation arose.  For the avoidance of doubt, this Article VI.J affects only the obligations of the Debtors and Reorganized BSA with respect to any Indemnification Obligations owed to or for the benefit of past and present directors, officers, employees, attorneys, accountants, investment bankers, and other professionals and agents of the Debtors, and shall have no effect on nor in any way discharge or reduce, in whole or in part, any obligation of any other Person owed to or for the benefit of such directors, officers, employees, attorneys, accountants, investment bankers, and other professionals and agents of the Debtors.

2.    All Proofs of Claim filed on account of an Indemnification Obligation to a current or former director, officer, or employee shall be deemed satisfied and expunged from the Claims Register as of the Effective Date to the extent such Indemnification Obligation is assumed (or honored or reaffirmed, as the case may be) pursuant to the Plan, without any further notice to or action, order, or approval of the Bankruptcy Court.

K.    Gift Annuity Agreements and Life-Income Agreements.  The Gift Annuity Agreements and Life-Income Agreements shall be deemed to be, and shall be treated as though they are, Executory Contracts under the Plan, and entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the Debtors' assumption of each of such Executory Contract.

L.    Modifications, Amendments, Supplements, Restatements, or Other Agreements. Unless otherwise provided in the Plan, each Executory Contract or Unexpired Lease that is assumed shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and Executory Contracts and Unexpired Leases related thereto, if any, including easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless the Debtors reject or repudiate any of the foregoing agreements.  Modifications, amendments, and supplements to, or restatements of, prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the

TrustApp0264

prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

M.    <u>Reservation of Rights</u>.    Neither the inclusion of any Executory Contract or Unexpired Lease on the Schedules, a Cure and Assumption Notice, or the Rejected Executory contracts and Unexpired Leases Schedule, nor anything contained in any Plan Document, shall constitute an admission by the Debtors that a contract or lease is in fact an Executory Contract or Unexpired Lease or that Reorganized BSA has any liability thereunder.    If there is a dispute as of the Confirmation Date regarding whether a contract or lease is or was executory or unexpired at the time of assumption, the Debtors, or, after the Effective Date, Reorganized BSA, shall have thirty (30) days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease, including by rejecting such contract or lease *nunc pro tunc* to the Confirmation Date.

N.    <u>Nonoccurrence of Effective Date; Bankruptcy Code Section 365(d)(4)</u>.    If the Effective Date fails to occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to further extend the deadline for assuming or rejecting Unexpired Leases under section 365(d)(4) of the Bankruptcy Code.

## ARTICLE VII.

## PROVISIONS GOVERNING DISTRIBUTIONS

A.    <u>Applicability</u>.    None of the terms or provision of this <u>Article VII</u> shall apply to Abuse Claims, which shall be exclusively processed, liquidated and paid by the Settlement Trust in accordance with the Settlement Trust Documents.

B.    <u>Distributions Generally</u>.    The Disbursing Agent shall make all Distributions to appropriate holders of Allowed Claims in accordance with the terms of the Plan.

C.    <u>Distributions on Account of Certain Claims Allowed as of the Effective Date</u>. Except as otherwise provided in the Plan, on or as soon as practicable after the Effective Date, the Disbursing Agent shall make Distributions in Cash in amounts equal to all Allowed Administrative Expense Claims, Allowed Priority Tax Claims, Allowed Other Priority Claims, Allowed Other Secured Claims, and Allowed Convenience Claims.

D.    <u>Distributions on Account of Allowed General Unsecured Claims</u>.    On each Distribution Date, the Disbursing Agent shall Distribute to each holder of an Allowed General Unsecured Claim an amount equal to such holder's Pro Rata Share of (1) the total balance of the Core Value Cash Pool as of such date, less (2) the balance of the Disputed Claims Reserve.

E.    <u>Distributions on Account of Disputed Claims Allowed After the Effective Date</u>. Distributions on account of any Disputed Claim shall be made to the extent such Claim is Allowed in accordance with the provisions of <u>Article VIII</u>.    Except as otherwise provided in the Plan, the Confirmation Order, another order of the Bankruptcy Court, or as agreed to by the relevant parties, Distributions under the Plan on account of Disputed Claims that become Allowed after the Effective Date shall be made as soon as practicable after the Disputed Claim becomes an Allowed Claim.

TrustApp0265

F.    Rights and Powers of Disbursing Agent.

1.    The Disbursing Agent shall make all Distributions to the appropriate holders of Allowed Claims in accordance with the terms of the Plan, including this Article VII.  Except as otherwise ordered by the Bankruptcy Court, the Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties.

2.    The Disbursing Agent shall be empowered to: (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (b) make all Distributions contemplated hereby; (c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions hereof.  The Disbursing Agent may request an expedited determination of taxes under section 505(b) of the Bankruptcy Code for all returns for all taxable periods through the date on which final Distributions are made.

G.    Delivery of Distributions and Undeliverable or Unclaimed Distributions.

1.    Claims Record Date.  As of the close of business on the Claims Record Date, the various transfer registers for each of the Classes of Claims as maintained by the Debtors or their agents shall be deemed closed for purposes of determining whether a holder of such a Claim is a record holder entitled to a Distribution under the Plan, and there shall be no further changes in the record holders or the permitted designees with respect to such Claims.  The Debtors or Reorganized BSA, as applicable, shall have no obligation to recognize any transfer or designation of such Claims occurring after the close of business on the Claims Record Date.  With respect to payment of any Cure Amounts or assumption disputes, neither the Debtors nor Reorganized BSA shall have any obligation to recognize or deal with any party other than the non-Debtor party to the applicable Executory Contract or Unexpired Lease as of the close of business on the Claims Record Date, even if such non-Debtor party has sold, assigned, or otherwise transferred its Claim for a Cure Amount.

2.    Delivery of Distributions.  If a Person holds more than one Claim in any one Class, in the Disbursing Agent's sole discretion, all such Claims will be aggregated into one Claim and one Distribution will be made with respect to the aggregated Claim.

3.    Special Rules for Distributions to Holders of Disputed Claims.  Except as otherwise provided in the Plan or agreed to by the relevant parties: (a) no partial payments and no partial Distributions shall be made with respect to a Disputed Claim until all such disputes in connection with such Disputed Claim have been resolved by settlement or Final Order; and (b) any Person that holds both an Allowed Claim and a Disputed Claim shall not receive any Distribution on account of the Allowed Claim unless and until all objections to the Disputed Claim have been resolved by settlement or Final Order or the Disputed Claims have been Allowed or expunged.  Any Distributions arising from property Distributed to holders of Allowed Claims in a Class and paid to such holders under the Plan shall also be paid, in the applicable amounts, to any holder of a Disputed Claim in

102

such Class that becomes an Allowed Claim after the date or dates that such Distributions were earlier paid to holders of Allowed Claims in such Class.

H.    Undeliverable and Non-Negotiated Distributions.

1.    Undeliverable Distributions.  If any Distribution to a holder of an Allowed Claim is returned to Reorganized BSA as undeliverable, no further Distributions shall be made to such holder unless and until Reorganized BSA is notified in writing of such holder's then-current address or other necessary information for delivery, at which time such previously undeliverable Distribution shall be made to such holder within ninety (90) days of receipt of such holder's then-current address or other necessary information; provided, however, that any such undeliverable Distribution shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of 180 days after the date of the initial attempted Distribution.  After such date, all unclaimed property or interests in property shall revert to Reorganized BSA automatically and without the need for any notice to or further order of the Bankruptcy Court (notwithstanding any applicable non-bankruptcy escheatment, abandoned, or unclaimed property laws to the contrary), and the right, title, and interest of any holder to such property or interest in property shall be discharged and forever barred; provided that Distributions made from the Core Value Cash Pool and returned as undeliverable shall revert to the Core Value Cash Pool.

2.    Non-Negotiated Distributions.  If any Distribution to a holder of an Allowed Claim is not negotiated for a period of 180 days after the Distribution, then such Distribution shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code and re-vest in Reorganized BSA or re-vest in the Core Value Cash Pool if such Distribution was made from the Core Value Cash Pool.  After such date, all non-negotiated property or interests in property shall revert to Reorganized BSA automatically and without the need for any notice to or further order of the Bankruptcy Court (notwithstanding any applicable non-bankruptcy escheatment, abandoned, or unclaimed property laws to the contrary), and the right, title, and interest of any holder to such property or interest in property shall be discharged and forever barred.

I.    Manner of Payment under the Plan.  Except as otherwise specifically provided in the Plan, at the option of Reorganized BSA, any Cash payment to be made hereunder may be made by a check or wire transfer or as otherwise required or provided in applicable agreements or customary practices of Reorganized BSA.

J.    Satisfaction of Claims.  Except as otherwise specifically provided in the Plan, any Distributions to be made on account of Allowed Claims under the Plan shall be in complete and final satisfaction, settlement, and discharge of and exchange for such Allowed Claims.

K.    Minimum Cash Distributions.  Reorganized BSA shall not be required to make any Distribution of Cash less than twenty dollars ($20) to any holder of an Allowed Claim; provided, however, that if any Distribution is not made pursuant to this Article VII.K, such Distribution shall be added to any subsequent Distribution to be made on behalf of the holder's Allowed Claim.

L.    Postpetition Interest.  Except as provided in the Cash Collateral Order or in the following sentence, interest shall not accrue on Impaired Claims; no holder of an Impaired Claim shall be entitled to interest accruing on or after the Petition Date on any such Impaired Claim, and

TrustApp0267

interest shall not accrue or be paid on any Disputed Claim in respect of the period from the Petition Date to the date a Distribution is made thereon if and after such Disputed Claim becomes an Allowed Claim. Notwithstanding the foregoing, each holder of an Allowed General Unsecured Claim shall accrue interest on the Allowed amount of such Claim at the federal judgment rate applicable on the Effective Date; provided, that such interest shall be payable to each such holder only from the Core Value Cash Pool and only to the extent that the Core Value Cash Pool shall have been sufficient: (1) first, to satisfy the full amount of all Allowed General Unsecured Claims; and (2) second, on account of any Allowed Non-Abuse Litigation Claims that shall not have elected to be treated as an Allowed Convenience Claim under Article III.B.9, to satisfy any deficiency in payments of such Allowed Claims (a) from available insurance coverage, including Abuse Insurance Policies and Non-Abuse Insurance Policies, (b) from applicable proceeds of any Insurance Settlement Agreements, and (c) from co-liable non-debtors (if any) or their insurance coverage. Neither the Debtors nor Reorganized BSA shall have any independent obligation to pay interest for or on account of any Allowed General Unsecured Claims other than from the Core Value Cash Pool in accordance with the terms of this Article VII.L.

M.    Setoffs.   The Debtors and Reorganized BSA may, pursuant to the applicable provisions of the Bankruptcy Code, or applicable non-bankruptcy law, set off against any applicable Allowed Claim (before any Distribution is made on account of such Claim) any and all claims, rights, Causes of Action, debts or liabilities of any nature that the Debtors or Reorganized BSA may hold against the holder of such Allowed Claim; provided, however, that the failure to effect such a setoff shall not constitute a waiver or release of any such claims, rights, Causes of Action, debts or liabilities.

N.    Claims Paid or Payable by Third Parties.

1.    Claims Paid by Third Parties.   A Claim shall be reduced in full, and such Claim shall be Disallowed without an objection to such Claim having to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the holder of such Claim receives payment in full on account of such Claim from a party that is not a Debtor or Reorganized BSA. To the extent a holder of a Claim receives a Distribution on account of such Claim and receives payment from a party that is not a Debtor or Reorganized BSA on account of such Claim, such holder shall repay, return, or deliver any Distribution held by or transferred to such holder to Reorganized BSA to the extent the holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such Distribution under the Plan.

2.    Non-Abuse Litigation Claims Payable from Insurance.   Subject to Article IV.D.3, no Distributions under the Plan shall be made on account of any Allowed Non-Abuse Litigation Claim that is payable pursuant to an Insurance Policy until the holder of such Allowed Non-Abuse Litigation Claim has exhausted all remedies with respect to such insurance policy, including pursuing such insurance through litigation and obtaining entry of a final, non-appealable order. To the extent that one or more of the Insurance Companies satisfies in full or in part an Allowed Non-Abuse Litigation Claim, then immediately upon such satisfaction, the portion of the Claim so satisfied may be expunged from the Claims Register by the Notice and Claims Agent without an objection to such Claim having to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

104

TrustApp0268

O.    Compliance with Tax Requirements and Allocations.

1.    In connection with the Plan and all Distributions hereunder, the Disbursing Agent shall comply with all tax withholding and reporting requirements imposed on them by any federal, state or local taxing authority, and all Distributions pursuant to the Plan shall be subject to such withholding and reporting requirements. Notwithstanding any provision in the Plan to the contrary, the Disbursing Agent shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the Distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding Distributions pending receipt of information necessary to facilitate such Distributions including tax certification forms, or establishing any other mechanisms it believes are reasonable and appropriate.

2.    For tax purposes, Distributions in full or partial satisfaction of Allowed Claims shall be allocated first to the principal amount of Allowed Claims, with any excess allocated to unpaid interest that accrued on such Claim.

# ARTICLE VIII.

## PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED, AND DISPUTED CLAIMS

A.    Applicability.  All Disputed Claims against the Debtors, other than Administrative Expense Claims, shall be subject to the provisions of this Article VIII.  All Administrative Expense Claims shall be determined and, if Allowed, paid in accordance with Article II.  None of the terms or provision of this Article VIII shall apply to Abuse Claims, which shall be exclusively processed, liquidated and paid by the Settlement Trust in accordance with the Settlement Trust Documents.

B.    Allowance of Claims.  After the Effective Date, Reorganized BSA shall have and retain any and all rights and defenses that the Debtors, or either of them, had with respect to any Claim immediately before the Effective Date.  Except as expressly provided in the Plan or in any order entered in the Chapter 11 Cases before the Effective Date (including the Confirmation Order), no Claim shall become an Allowed Claim unless and until such Claim becomes Allowed by Final Order of the Bankruptcy Court or by agreement between the Debtors or Reorganized BSA, on the one hand, and the holder of such Claim, on the other.

C.    Claims Administration Responsibilities.

1.    Except as otherwise expressly provided in the Plan, from and after the Effective Date, Reorganized BSA shall have the authority (a) to file, withdraw, or litigate to judgment objections to Claims; (b) to settle or compromise any Disputed Claim without any further notice to or action, order, or approval by the Bankruptcy Court; and (c) to administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court.

2.    Reorganized BSA shall consult with the Creditor Representative in connection with the reconciliation, settlement and administration of Convenience Claims,

TrustApp0269

General Unsecured Claims and Non-Abuse Litigation Claims and shall use commercially reasonable efforts to resolve such Claims before the applicable Claims Objection Deadline.

D.    <u>Estimation of Claims</u>.  The Debtors (before the Effective Date) or Reorganized BSA (on and after the Effective Date) may at any time request that the Bankruptcy Court estimate any Disputed Claim pursuant to section 502(c) of the Bankruptcy Code regardless of whether an objection was previously filed with the Bankruptcy Court with respect to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to such Claim, including during the pendency of any appeal relating to any such objection.  In the event that the Bankruptcy Court estimates any Disputed Claim, that estimated amount will constitute either the Allowed amount of such Claim or a maximum limitation on such Claim against any Person.  If the estimated amount of a Claim constitutes a maximum limitation on such Claim, the Debtors (before the Effective Date) or Reorganized BSA (on and after the Effective Date) may elect to pursue any supplemental proceedings to object to any ultimate Distribution on such Claim.  All of the objection, estimation, settlement, and resolution procedures set forth in the Plan are cumulative and not necessarily exclusive of one another.  Claims may be estimated and subsequently compromised, objected to, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

E.    <u>No Distributions Pending Allowance</u>.  No Distributions or other consideration shall be paid with respect to any Claim that is a Disputed Claim unless and until all objections to such Disputed Claim are resolved and such Disputed Claim becomes an Allowed Claim by Final Order of the Bankruptcy Court or agreement between the Debtors or Reorganized BSA, on the one hand, and the holder of such Claim, on the other.

F.    <u>Distributions after Allowance</u>.  To the extent that a Disputed Claim (or a portion thereof) becomes an Allowed Claim, Distributions (if any) shall be made to the holder of such Allowed Claim in accordance with the provisions of the Plan.

G.    <u>Disputed Claims Reserve</u>.  The provisions of this <u>Article VIII.G</u> apply only to the extent that any General Unsecured Claims remain Disputed as of any Distribution Date.

1.    If any General Unsecured Claims remain Disputed as of any Distribution Date, the undistributed portion of the Core Value Cash Pool shall be held in a segregated account.  Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary, or the receipt of a determination from the IRS, the Disbursing Agent shall treat the Disputed Claims Reserve as a "disputed ownership fund" governed by Treasury Regulation section 1.468B-9 and, to the extent permitted by applicable law, report consistently with the foregoing for state and local income tax purposes.  All parties (including the Debtors, Reorganized BSA, the Disbursing Agent, and holders of General Unsecured Claims) shall be required to report for tax purposes in a manner consistent with the foregoing.  The Disputed Claims Reserve shall be responsible for payment, out of the assets of the Disputed Claims Reserve, of any taxes imposed on the Disputed Claims Reserve or its assets.

106

2.      The Debtors or Reorganized BSA, as applicable, with the consent of the Creditor Representative, shall determine the amount of the Disputed Claims Reserve, if applicable, as of the initial Distribution Date, based on the least of: (a) the asserted amount of the Disputed General Unsecured Claims in the applicable Proofs of Claim; (b) the amount, if any, estimated by the Bankruptcy Court pursuant to (i) section 502(c) of the Bankruptcy Code or (ii) Article VIII.D if, after the Effective Date, a motion is filed by Reorganized BSA to estimate such Claim; (c) the amount otherwise agreed to by the Debtors (or Reorganized BSA, if after the Effective Date) and the holders of such Disputed General Unsecured Claims; or (d) any amount otherwise approved by the Bankruptcy Court. Upon each Distribution Date, Reorganized BSA shall deposit into the Disputed Claims Reserve an amount of Cash equal to the amount sufficient to make the Distributions to which holders of Disputed General Unsecured Claims would be entitled under the Plan as of the applicable Distribution Date if the Disputed General Unsecured Claims were Allowed Claims as of such date.

3.      If a Disputed General Unsecured Claim becomes an Allowed Claim after the first Distribution Date, the Disbursing Agent shall, on the next Distribution Date after the Disputed General Unsecured Claim becomes an Allowed Claim (or, if the Disputed General Unsecured Claim becomes an Allowed Claim after the final Distribution Date, as soon as practicable after Allowance), Distribute to the holder of such Claim, exclusively from the Disputed Claims Reserve, the amount of Cash that such holder would have received in that Distribution and all prior Distributions (if any) if such holder's General Unsecured Claim had been Allowed as of the Effective Date, net of any allocable taxes imposed thereon or otherwise payable by the Disputed Claims Reserve.

4.      If a Disputed Claim is Disallowed, in whole or in part, then on the Distribution Date next following the date of Disallowance, Cash shall be released from the Disputed Claims Reserve and placed in the Core Value Cash Pool, which Cash shall then be unreserved and unrestricted, and which shall be available for Distribution to holders of Allowed General Unsecured Claims.

5.      If any assets remain in the Disputed Claims Reserve after all Disputed General Unsecured Claims have been resolved, such assets shall be placed in the Core Value Cash Pool and distributed Pro Rata to all holders of Allowed General Unsecured Claims on the next Distribution Date (or, if all Disputed General Unsecured Claims are resolved after the final Distribution Date, as soon as practicable thereafter).

H.      Adjustment to Claims Register without Objection. Any duplicate Proof of Claim that has been paid or satisfied, or any Proof of Claim that is clearly marked as amended or superseded by a subsequently filed Proof of Claim that remains on the Claims Register, may be adjusted or expunged on the Claims Register by the Notice and Claims Agent at the direction of Reorganized BSA upon stipulation between the parties in interest without an objection having to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

I.      Time to File Objections to Claims. Any objections to Claims must be filed on or before the applicable Claims Objection Deadline, as such deadline may be extended from time to time. The expiration of the Claims Objection Deadline shall not limit or affect the Debtors' or

TrustApp0271

Reorganized BSA's rights to dispute Claims asserted in the ordinary course of the Debtors or Reorganized BSA's non-profit operations other than through a Proof of Claim.

J.    <u>Treatment of Untimely Claims</u>.  Except as provided herein or otherwise agreed, any and all creditors that have filed Proofs of Claim after the applicable Bar Date shall not be treated as a creditor with respect to such Claim for the purposes of voting and distribution.

# ARTICLE IX.

## CONDITIONS PRECEDENT TO CONFIRMATION AND EFFECTIVE DATE

A.    <u>Conditions Precedent to Confirmation of the Plan</u>.

Confirmation of the Plan shall not occur unless each of the following conditions precedent has been satisfied or waived in accordance with <u>Article IX.C</u>.

1.    The Bankruptcy Court shall have entered the Disclosure Statement Order, in form and substance reasonably acceptable to the Debtors, the Ad Hoc Committee, the Coalition, the Future Claimants' Representative, Hartford, the Creditors' Committee and JPM.

2.    The Debtors, the Ad Hoc Committee, the Coalition, the Future Claimants' Representative, the Tort Claimants' Committee and the Settling Insurance Companies shall have approved of or accepted the Confirmation Order, and the Creditors' Committee, JPM, and the United Methodist ad hoc committee shall have approved of or accepted the Confirmation Order in accordance with their respective consent rights under the JPM / Creditors' Committee Term Sheet or the United Methodist Settlement Agreement incorporated by reference in <u>Article I.D</u>;

3.    The Bankruptcy Court shall have made such findings and determinations regarding the Plan as shall enable the entry of the Confirmation Order and any other order in conjunction therewith, in form and substance acceptable to the Debtors, in accordance with the requirements of the JPM / Creditors' Committee Term Sheet.[6]  These findings and

---

[6] The findings and determinations set forth in <u>Article IX.A.3.y</u> shall not be binding on the Settling Insurance Companies.  Subject to the preceding sentence of this footnote 6, the findings and determinations set forth in <u>Article IX.A.3.l</u> shall be binding on the Settling Insurance Companies.  The Settling Insurance Companies' agreement in the Insurance Settlement Agreements not to object to entry of such findings and determinations in the Confirmation Order does not indicate the Settling Insurance Companies' support for such findings and determinations, and no party shall argue that the Settling Insurance Companies agreed to or acquiesced in such findings and determinations in any proceeding.  Rather, the Settling Insurance Companies are designated as Protected Parties under the Plan, and as a result, the Settling Insurance Companies take no position on such findings and determinations or on the Trust Distribution Procedures.  The findings and determinations set forth in <u>Article IX.A.3.y</u> shall not be binding on the United Methodist Entities.  The agreement in the United Methodist Settlement Agreement not to object to entry of such findings and determinations in the Confirmation Order does not indicate the United Methodist Entities' support for such findings and determinations, and no party shall argue that the United Methodist Entities agreed to or acquiesced in such findings and determinations in any proceeding.  Rather, the United Methodist Entities are designated as Protected Parties under the Plan, and as a result, the United Methodist Entities take no position on such findings and determinations or on the Trust Distribution Procedures.

TrustApp0272

determinations are designed, among other things, to ensure that the Injunctions, Releases and Discharges set forth in Article X shall be effective, binding and enforceable, subject to footnote 6 herein, and shall, among other things, provide that:

      a.      the Plan complies with all applicable provisions of the Bankruptcy Code, including that the Plan be proposed in good faith and that the Confirmation Order not be procured by fraud;

      b.      the Channeling Injunction and the Insurance Entity Injunction are to be implemented in connection with the Settlement Trust and shall be in full force and effect on the Effective Date;

      c.      upon the Effective Date, the Settlement Trust shall assume the liabilities of (i) the Protected Parties with respect to Abuse Claims, (ii) the Limited Protected Parties with respect to Post-1975 Chartered Organization Abuse Claims and Pre-1976 Chartered Organization Abuse Claims, and (iii) the Opt-Out Chartered Organizations with respect to Opt-Out Chartered Organization Abuse Claims and have exclusive authority as of the Effective Date to satisfy or defend such Abuse Claims;

      d.      the Settlement Trust will be funded with the Settlement Trust Assets;

      e.      the Settlement Trust will use the Settlement Trust Assets to resolve Abuse Claims;

      f.      the terms of the Discharge Injunction, the Channeling Injunction, the Release Injunctions, and the Insurance Entity Injunction, including any provisions barring actions against third parties, are set out in conspicuous language in the Plan and in the Disclosure Statement;

      g.      the Future Claimants' Representative was appointed by the Bankruptcy Court as part of the proceedings leading to the issuance of the Channeling Injunction and the Insurance Entity Injunction for the purpose of, among other things, protecting the rights of persons who might subsequently assert Abuse Claims of the kind that are addressed in the Channeling Injunction and the Insurance Entity Injunction, which will be transferred to and assumed by the Settlement Trust;

      h.      the Plan complies with section 105(a) of the Bankruptcy Code to the extent applicable;

      i.      the Injunctions are essential to the Plan and the Debtors' reorganization efforts;

      j.      (1) the Plan's transfer of rights under BSA Insurance Policies (the "Debtor Policy Assignment") is authorized and permissible notwithstanding any terms of any policies or provisions of applicable law that are argued to prohibit the

109

assignment or transfer of such rights; (2) the Plan's transfer of rights under Local Council Insurance Policies issued by the Settling Insurance Companies (the "Consensual Policy Assignment") is authorized and permissible; (3) the Plan's transfer of rights under any insurance policies, other than BSA Insurance Policies, issued by Non-Settling Insurance Companies (the "Non-Debtor Policy Assignment"), subject to the savings clause set forth in Article V.S.1, is authorized to the extent permitted under state law, and the enforceability of such transfer of rights shall be determined under the state law applicable to each such policy; (4) with respect to any rights transferred to the Settlement Trust pursuant to (a), (b) or (c) above (collectively, the "Assigned Rights"), the Settlement Trust (1) is a proper defendant for Abuse Claims to assert the liability of the Protected Parties, and (2) is a proper defendant for Post-1975 Chartered Organization Abuse Claims to assert the liability of the Limited Protected Parties; (5) the Settlement Trust's rights under any insurance policies issued by Non-Settling Insurance Companies, including the effect of any failure to satisfy conditions precedent or obligations under such policies (other than, in the case of the BSA Insurance Policies, the terms of any policies or provisions of applicable law that are argued to prohibit the assignment or transfer of such rights), shall be determined under the law applicable to each such policy in subsequent litigation;

k.      the Insurance Settlement Agreements are approved and the Abuse Insurance Policies shall be sold to the respective Settling Insurance Companies free and clear of all liens, claims, encumbrances, interests and rights of any nature, whether at law or in equity, of any Person or Entity, *except* solely with respect to the interests, if any, of the Archbishop of Agaña, and each of the Hartford Protected Parties, the Century and Chubb Companies, the Zurich Insurers and Zurich Affiliated Insurers, Clarendon, and any other Insurance Company that has contributed funds, proceeds or other consideration to or for the benefit of the Settlement Trust pursuant to an Insurance Settlement Agreement is designated as a Settling Insurance Company, and such Insurance Settlement Agreements represent a sound exercise of the Debtors' business judgment, are in the best interest of the Debtors' Estates, comply with section 1123 of the Bankruptcy Code, and are approved pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019;

l.      [Reserved];

m.      the JPM / Creditors' Committee Settlement represents a sound exercise of the Debtors' business judgment, is in the best interest of the Debtors' Estates, complies with section 1123 of the Bankruptcy Code, and is approved pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019;

n.      the Settlement of Restricted and Core Asset Disputes represents a sound exercise of the Debtors' business judgment, is in the best interest of the Debtors' estates, complies with section 1123 of the Bankruptcy Code, and is approved pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019;

TrustApp0274

o.    the PSZJ Settlement represents a sound exercise of the Debtors' business judgment, is in the best interest of the Debtors' estates, complies with section 1123 of the Bankruptcy Code, and is approved pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019;

p.    the Hartford Insurance Settlement, including the sale of the Hartford Policies, as set forth in the Hartford Insurance Settlement Agreement, free and clear of all Interests of any person or entity (as such terms are defined in the Hartford Insurance Settlement Agreement), *except* solely with respect to the interests, if any, of the Archbishop of Agaña, and the Allowance of the Hartford Administrative Expense Claim is approved in accordance with sections 363, 503(b), 507(a)(2), 1123 and 1141 of the Bankruptcy Code, Bankruptcy Rule 9019, and the findings of fact and conclusions of law made by the Bankruptcy Court pursuant to Article V.S.4;

q.    the Century and Chubb Companies Insurance Settlement, including the sale of the Century and Chubb Companies Policies, as set forth in the Century and Chubb Companies Insurance Settlement Agreement, free and clear of all liens, claims, encumbrances, interests and rights of any nature, whether at law or in equity, of any person or entity (as such terms are defined in the Century and Chubb Companies Insurance Settlement Agreement), *except* solely with respect to the interests, if any, of the Archbishop of Agaña, is approved in accordance with sections 363, 1123 and 1141 of the Bankruptcy Code, Bankruptcy Rule 9019, and the findings of fact and conclusions of law made by the Bankruptcy Court pursuant to Article V.S.4;

r.    the Zurich Insurance Settlement, including the sale of the Zurich Insurer Policies, as set forth in the Zurich Insurance Settlement Agreement, free and clear of all interests of any Person or Entity (as such terms are defined in the Zurich Insurance Settlement Agreement), *except* solely with respect to the interests, if any, of the Archbishop of Agaña, is approved in accordance with sections 363, 1123 and 1141 of the Bankruptcy Code, Bankruptcy Rule 9019, and the findings of fact and conclusions of law made by the Bankruptcy Court pursuant to Article V.S.4;

s.    the Clarendon Insurance Settlement, including the sale of the Clarendon Policies, as set forth in the Clarendon Insurance Settlement Agreement, free and clear of all interests of any Person or Entity (as such terms are defined in the Clarendon Insurance Settlement Agreement), *except* solely with respect to the interests, if any, of the Archbishop of Agaña, is approved in accordance with sections 363, 1123 and 1141 of the Bankruptcy Code, Bankruptcy Rule 9019, and the findings of fact and conclusions of law made by the Bankruptcy Court pursuant to Article V.S.4;

t.    [Reserved]

TrustApp0275

u.     the United Methodist Settlement is approved in accordance with the findings of fact and conclusions of law made by the Bankruptcy Court pursuant to Article V.S.6;

v.     the PSZJ Settlement is approved in accordance with the findings of fact and conclusions of law made by the Bankruptcy Court pursuant to Article V.S.7;

w.     [Reserved]

x.     [Reserved]

y.     The allowed amount of any Direct Abuse Claim shall be the amount therefor as determined under the Trust Distribution Procedures.  Such allowed amount shall be legally enforceable against the Settlement Trust.  For the avoidance of doubt, the amount of any installment payments, initial payments, or payments based on payment percentages established under the Trust Distribution Procedures or the Settlement Trust Agreement, as determined or as actually paid by the Settlement Trust, are not the equivalent of any Abuse Claimant's allowed amount of its channeled Direct Abuse Claim.  For the further avoidance of doubt, nothing herein determines whether or not any insurer is obligated to pay the amount determined under the Trust Distribution Procedures for an allowed Direct Abuse Claim.

4.     The proceeds of any sale of any Abuse Insurance Policies, including the full settlement amount, shall be contributed to the Settlement Trust "free and clear" of all liens, claims, encumbrances, any other rights of any nature, whether at law or in equity, and other "interest," under sections 363 and 1141 of the Bankruptcy Code, of any additional insured or any other person or Entity in such Abuse Insurance Policies.  Notwithstanding anything to the contrary and for the avoidance of doubt, the Abuse Insurance Policies shall be sold by the Debtors to the applicable Settling Insurance Companies free and clear of all liens, claims, encumbrances, interests or other rights on the Effective Date on the terms and as provided in the applicable Insurance Settlement Agreement.

B.     Conditions Precedent to the Effective Date.

Notwithstanding any other provision of the Plan or the Confirmation Order, the Effective Date shall occur on the first Business Day after entry of the Confirmation Order on which each of the following conditions precedent has been satisfied or waived pursuant to Article IX.C:

1.     (a) the District Court shall have entered the Affirmation Order in form and substance acceptable to (i) the Debtors, the Ad Hoc Committee, the Coalition, the Tort Claimants' Committee, the Future Claimants' Representative, and the Settling Insurance Companies, and (ii) the Creditors' Committee and JPM, consistent with the JPM / Creditors' Committee Term Sheet; (b) no court shall have entered an order staying the occurrence of the Effective Date pending an appeal of the Confirmation Order or the Affirmation Order; and (c) no request for a stay of the occurrence of the Effective Date shall be pending;

112

2.      the Settlement Trust Assets shall, simultaneously with the occurrence of the Effective Date or as otherwise provided herein, be transferred to, vested in, and assumed by the Settlement Trust in accordance with Article IV and Article V;

3.      the Settlement Trust Documents and other applicable Plan Documents necessary or appropriate to implement the Plan shall have been executed, delivered and, if applicable, filed with the appropriate governmental authorities in compliance with the JPM / Creditors' Committee Term Sheet;

4.      the Restated Debt and Security Documents shall have been duly executed and delivered by all of the Entities that are parties thereto and all conditions precedent (other than any conditions related to the occurrence of the Effective Date) to the effectiveness thereof shall have been satisfied or duly waived in writing in accordance with the terms of the Restated Debt and Security Documents, the closing shall have occurred thereunder, and Reorganized BSA shall have paid the JPM Exit Fee to JPM;

5.      the Foundation Loan Agreement and any applicable collateral and other loan documents governing the Foundation Loan shall have been duly executed and delivered by all of the Entities that are parties thereto and all conditions precedent (other than any conditions related to the occurrence of the Effective Date) to the effectiveness thereof shall have been satisfied or duly waived in writing in accordance with the terms of the Foundation Loan Agreement and related documentation, and the closing shall have occurred thereunder;

6.      the Debtors shall have adequately funded the Professional Fee Reserve so as to permit the Debtors to make Distributions on account of Allowed Professional Fee Claims in accordance with Article II;

7.      the Debtors shall have obtained all authorizations, consents, certifications, approvals, rulings, opinions or other documents that are necessary to implement and effectuate the Plan;

8.      all payments required to be made pursuant to the terms of the Cash Collateral Order shall have been paid;

9.      all actions, documents, and agreements necessary to implement and effectuate the Plan shall have been effected or executed;

10.     the transactions to be implemented on the Effective Date shall be materially consistent with the Plan Documents and the JPM / Creditors' Committee Term Sheet; and

11.     the Debtors shall have filed a notice of occurrence of the Effective Date.

C.      Waiver of Conditions Precedent.  To the fullest extent permitted by law, each of the conditions precedent in this Article IX may be waived or modified, in whole or in part, in the sole discretion of the Debtors; provided, however, that (1) the Creditors' Committee's consent (not to be unreasonably withheld) is required to the extent any such waiver or modification by the Debtors impacts the treatment of General Unsecured Claims, Non-Abuse Litigation Claims, or

113

Convenience Claims; (2) the conditions precedent set forth in Article IX.B.4 and Article IX.B.8 may be waived or modified by the Debtors only with the prior written consent of JPM; (3) the conditions precedent set forth in Article IX.A.2, Article IX.A.3.p and Article IX.B.1 may be waived or modified by the Debtors only with the prior written consent of Hartford, the Coalition, the Tort Claimants' Committee, and the Future Claimants' Representative; (4) the conditions precedent set forth in Article IX.A.2, Article IX.A.3.q and Article IX.B.1 may be waived or modified by the Debtors only with the prior written consent of the Century and Chubb Companies, the Coalition, the Tort Claimants' Committee, and the Future Claimants' Representative; (5) the condition precedent set forth in Article IX.A.2, Article IX.A.3.r and Article IX.B.1 may be waived or modified by the Debtors only with the prior written consent of the Zurich Insurers and Zurich Affiliated Insurers, the Coalition, the Tort Claimants' Committee, and the Future Claimants' Representative; (6) the condition precedent set forth in Article IX.A.2, Article IX.A.3.s and Article IX.B.1 may be waived or modified by the Debtors only with the prior written consent of Clarendon, the Coalition, the Tort Claimants' Committee, and the Future Claimants' Representative; (7) the condition precedent set forth in Article IX.A.3.u may be waived or modified by the Debtors only with the prior written consent of United Methodist ad hoc committee, the Coalition, the Tort Claimants' Committee, and the Future Claimants' Representative; (8) for Article IX.A.3.j, Article IX.A.3.k, Article IX.A.3.l, Article IX.A.3.y, and any waiver or modification that impacts the treatment of Abuse Claims or Settlement Trust Assets, the prior written consent of the Coalition, the Tort Claimants' Committee, Pfau/Zalkin, and the Future Claimants' Representative shall be required as a condition to waiver or modification by the Debtors; (9) the conditions precedent in Article IX.B.1 and Article IX.B.6 may be waived or modified by the Debtors only with the prior written consent of the Ad Hoc Committee, the Coalition, the Tort Claimants' Committee, and the Future Claimants' Representative. Any waiver or modification of a condition precedent under this Article IX may be effectuated at any time, without notice, without leave or order of the Bankruptcy Court or the District Court, and without any other formal action other than proceedings to Confirm or consummate the Plan; (10) the condition precedent set forth in Article IX.A.4 may be waived or modified by the Debtors only with the prior written consent of the Tort Claimants' Committee, Pfau/Zalkin, the Coalition, and the Future Claimants' Representative. The failure to satisfy or waive any condition precedent to the Effective Date may be asserted by the Ad Hoc Committee, the Coalition, the Tort Claimants' Committee, Pfau/Zalkin, the Future Claimants' Representative, the Settling Insurance Companies, the Creditors' Committee or JPM regardless of the circumstances giving rise to the failure of such condition to be satisfied or waived.

D.    [Reserved].

E.    *Vacatur* of Confirmation Order; Non-Occurrence of Effective Date. If the Confirmation Order is vacated or the Effective Date does not occur within 180 days after entry of the Confirmation Order (subject to extension by the Debtors in their sole discretion), the Plan shall be null and void in all respects, and nothing contained in the Plan or the Disclosure Statement shall (1) constitute a waiver or release of any Causes of Action by or Claims against or Interests in the Debtors or any Person; (2) prejudice in any manner the rights of the Debtors, any holders of a Claim or Interest or any other Person; (3) constitute an admission, acknowledgment, offer, or undertaking by the Debtors, any holders of a Claim or Interest, or any other Person in any respect; or (4) be used by the Debtors or any other Person as evidence (or in any other way) in any litigation, including with respect to the strengths and weaknesses of positions, arguments or claims of any of the parties to such litigation.

114

# ARTICLE X.

## EFFECT OF PLAN CONFIRMATION

A.    <u>Vesting of Assets in Reorganized BSA</u>.  Except as otherwise expressly provided in the Plan (including with respect to the Core Value Cash Pool and the Restated Debt and Security Documents), on the Effective Date, pursuant to sections 1141(b) and 1141(c) of the Bankruptcy Code, all property comprising the Estates shall vest in Reorganized BSA free and clear of all Liens, Claims, interests, charges, other Encumbrances and liabilities of any kind.  On and after the Effective Date, Reorganized BSA may continue its operations and may use, acquire, or dispose of property, and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval of the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules.

B.    <u>Retention of Certain Causes of Action</u>.  In accordance with section 1123(b)(3) of the Bankruptcy Code, subject to the transfer of the Debtors' Settlement Trust Causes of Action to the Settlement Trust under <u>Article IV.D</u> and the Debtors' and their Estates' release of certain Estate Causes of Action under <u>Article X.J</u>, and except as otherwise provided in the Plan or in any Insurance Settlement Agreements, all Causes of Action that a Debtor may hold against any Person shall vest in Reorganized BSA on the Effective Date.  Thereafter, subject to <u>Article IV.D</u> and <u>Article X.J</u>, Reorganized BSA shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action, whether arising before or after the Petition Date, and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court.  No Person may rely on the absence of a specific reference in the Plan or the Disclosure Statement to any specific Cause of Action as any indication that the Debtors or Reorganized BSA, as applicable, will not pursue any and all available Causes of Action.  The Debtors or Reorganized BSA, as applicable, expressly reserve all rights to prosecute any and all Causes of Action against any Person, except as otherwise expressly provided in the Plan, and, therefore, no preclusion doctrine, including the doctrines of *res judicata*, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise) or laches, shall apply to any Cause of Action upon, after, or as a consequence of Confirmation or the occurrence of the Effective Date.

C.    <u>Binding Effect</u>.  As of the Effective Date, except as expressly set forth herein, all provisions of the Plan, including all agreements, instruments and other documents entered into in connection with the Plan by the Debtors or Reorganized BSA, the Settlement Trust, or the Protected Parties, shall be binding upon the Debtors, the Estates, Reorganized BSA, all holders of Claims against and Interests in the Debtors, each such holder's respective successors and assigns, and all other Persons that are affected in any manner by the Plan, regardless of whether the Claim or Interest of such holder is Impaired under the Plan or whether such holder has accepted the Plan. Except as otherwise expressly provided in the Plan, all agreements, instruments and other documents filed in connection with the Plan shall be given full force and effect and shall bind all Persons referred to therein on and after the Effective Date, whether or not such agreements are actually issued, delivered or recorded on or after the Effective Date and whether or not such Persons have actually executed such agreement.

115

D.    <u>Post-Confirmation Interim Injunction and Stays</u>.  All injunctions and stays arising under or entered during the Chapter 11 Cases, whether under sections 105 or 362 of the Bankruptcy Code or otherwise, and in existence on the Confirmation Date shall remain in full force and effect until the latest to occur of, as applicable: the Effective Date, the Release Date (as defined in the applicable Insurance Settlement Agreement or other settlement agreement), and the Limited Protected Party Injunction Date (which Limited Protected Party Injunction Date shall be no later than one (1) year following the Effective Date except as provided in the Settlement Trust Agreement).  To the extent not otherwise in place, pending the occurrence of the Release Date (as defined in the applicable Insurance Settlement Agreement), the United Methodist Release Effective Date (as defined in the United Methodist Settlement Agreement), or other release date set forth in any other settlement agreement, any Claim that would be released or subject to the Channeling Injunction upon the occurrence of conditions set forth herein and in any applicable settlement agreement (including the occurrence of the Release Date or similar defined term (as defined in the applicable settlement agreement) shall be stayed and enjoined pending satisfaction of such conditions (the "<u>Post-Confirmation Interim Injunction</u>").  To the extent not otherwise in place, until the occurrence of the Limited Protected Party Injunction Date, any Claim against a Participating Chartered Organization shall be stayed and enjoined pending satisfaction of such conditions.  The Post-Confirmation Interim Injunction shall permit the filing, but not the prosecution, of the Abuse Claims.  The injunctions and stays referenced in this <u>Article X.D</u> include the preliminary injunction imposed by the *Consent Order Pursuant to 11 U.S.C. §§ 105(a) and 362 Granting the BSA's Motion for a Preliminary Injunction* entered by the Bankruptcy Court on March 30, 2020 (Adv. Pro. No. 20-50527, Docket No. 54).  Solely with respect to the United Methodist Entities, the Post-Confirmation Interim Injunction shall remain in full force and effect until the earliest to occur of the United Methodist Release Effective Date or the United Methodist Release Termination Date (as those terms are defined in the United Methodist Settlement Agreement).

E.    <u>Discharge</u>.

1.    <u>Discharge of the Debtors</u>.  Except as expressly provided in the Plan or the Confirmation Order, the treatment of Claims under the Plan shall be in exchange for, and in complete satisfaction, settlement, discharge, termination and release of, all Claims and Interests of any nature whatsoever against or in the Debtors or any of their assets or properties based upon any act, omission, transaction, occurrence, or other activity of any nature that occurred prior to the Effective Date, and, as of the Effective Date, each of the Debtors shall be deemed discharged and released, and each holder of a Claim or Interest and any successor, assign, and affiliate of such holder shall be deemed to have forever waived, discharged and released each of the Debtors, to the fullest extent permitted by section 1141 of the Bankruptcy Code, of and from any and all Claims, Interests, rights and liabilities, and all debts of the kind specified in section 502 of the Bankruptcy Code, based upon any act, omission, transaction, occurrence, or other activity of any nature that occurred prior to the Effective Date, in each case whether or not (a) a Proof of Claim based upon such debt is filed or deemed filed under section 501 of the Bankruptcy Code, (b) a Claim based upon such debt is Allowed under section 502 of the Bankruptcy Code, (c) a Claim based upon such debt is or has been Disallowed by order of the Bankruptcy Court, or (d) the holder of a Claim based upon such debt is deemed to have accepted the Plan. Notwithstanding the foregoing, nothing in this <u>Article X.E</u> shall be construed to modify,

116

reduce, impair or otherwise affect the ability of any holder of an Allowed Non-Abuse Litigation Claim to recover on account of such Allowed Claim in accordance with Article III.B.9 and Article IV.D.3.

2. <u>Discharge Injunction</u>.  From and after the Effective Date, except as expressly provided in the Plan or the Confirmation Order, all holders of Claims or Interests of any nature whatsoever against or in the Debtors or any of their assets or properties based upon any act, omission, transaction, occurrence, or other activity of any nature that occurred prior to the Effective Date that are discharged pursuant to the terms of the Plan shall be precluded and permanently enjoined from taking any of the following actions on account of, or on the basis of, such discharged Claims and Interests: (a) commencing or continuing any action or other proceeding of any kind against the Debtors, Reorganized BSA, the Settlement Trust, or its or their respective property; (b) enforcing, attaching, collecting, or recovering by any manner or means of judgment, award, decree or other against the Debtors, Reorganized BSA, the Settlement Trust, or its or their respective property; (c) creating, perfecting or enforcing any Lien or Encumbrance of any kind against the Debtors, Reorganized BSA, the Settlement Trust, or its or their respective property; or (d) commencing or continuing any judicial or administrative proceeding, in any forum and in any place in the world, that does not comply with or is inconsistent with the provisions of the Plan or the Confirmation Order.  The foregoing injunction shall extend to the successors and assigns of the Debtors (including Reorganized BSA) and its and their respective properties and interests in property.  In accordance with the foregoing, except as expressly provided in the Plan or the Confirmation Order, the Confirmation Order shall be a judicial determination of discharge or termination of all Claims, Interests and other debts and liabilities against or in the Debtors pursuant to sections 105, 524 and 1141 of the Bankruptcy Code, and such discharge shall void any judgment obtained against the Debtors at any time to the extent such judgment relates to a discharged Claim or Interest.

F.    **<u>Channeling Injunction.</u>**

1.    **<u>Terms</u>.  Notwithstanding anything to the contrary herein, to preserve and promote the settlements contemplated by and provided for in the Plan, including the Abuse Claims Settlement, the Insurance Settlements, and the United Methodist Settlement, and to supplement, where necessary, the injunctive effect of the Discharge as provided in sections 1141 and 524 of the Bankruptcy Code and as described in this <u>Article X</u>, pursuant to the exercise of the equitable jurisdiction and power of the Bankruptcy Court and the District Court under section 105(a) of the Bankruptcy Code, (a) the sole recourse of any holder of an Abuse Claim against a Protected Party on account of such Abuse Claim shall be to and against the Settlement Trust pursuant to the Settlement Trust Documents, and such holder shall have no right whatsoever at any time to assert such Abuse Claim against any Protected Party or any property or interest in property of any Protected Party, (b) the sole recourse of any holder of a Post-1975 Chartered Organization Abuse Claim against a Limited Protected Party on account of such Post-1975 Chartered Organization Abuse Claim shall be to and against the Settlement Trust pursuant to the Settlement Trust Documents, and such holder shall have no right whatsoever at any time to assert such Post-1975 Chartered Organization Abuse Claim against any Limited Protected Party or any property or**

117

interest in property of any Limited Protected Party, (c) the sole recourse of any holder of an Abuse Claim against a Limited Protected Party if such Abuse Claim is covered under any insurance policy issued by any Settling Insurance Company, shall be to and against the Settlement Trust pursuant to the Settlement Trust Documents, and such holder shall have no right whatsoever at any time to assert such Abuse Claim against any Limited Protected Party or any property or interest in property of any Limited Protected Party, (d) the sole recourse of any holder of an Opt-Out Chartered Organization Abuse Claim against an Opt-Out Chartered Organization on account of such Opt-Out Chartered Organization Abuse Claim shall be to and against the Settlement Trust pursuant to the Settlement Trust Documents, and such holder shall have no right whatsoever at any time to assert such Opt-Out Chartered Organization Abuse Claim against any Opt-Out Chartered Organization or any property or interest in property of any Opt-Out Chartered Organization.  For the avoidance of doubt, the sole recourse for any holder of an Abuse Claim covered by any insurance policy issued by a Settling Insurance Company shall be to and against the Settlement Trust pursuant to the Settlement Trust Documents. Accordingly, on and after the Effective Date, all Persons that have held or asserted, currently hold or assert, or that may in the future hold or assert, any Abuse Claim against the Protected Parties, or any of them, or any Post-1975 Chartered Organization Abuse Claim against the Limited Protected Parties, or any of them, or any Abuse Claim against the Limited Protected Parties (or any of them) if such Abuse Claim is covered under any insurance policy issued by any Settling Insurance Company, or any Opt-Out Chartered Organization Abuse Claim against the Opt-Out Chartered Organizations, or any of them, shall be permanently and forever stayed, restrained and enjoined from taking any action for the purpose of directly, indirectly, or derivatively collecting, recovering, or receiving payment, satisfaction, or recovery from any Protected Party with respect to any such Abuse Claim, or from any Limited Protected Party with respect to any such Abuse Claim if such Abuse Claim is covered under any insurance policy issued by any Settling Insurance Company, or from any Limited Protected Party with respect to any such Post-1975 Chartered Organization Abuse Claim, or from any Opt-Out Chartered Organization with respect to any Opt-Out Chartered Organization Abuse Claim, other than from the Settlement Trust pursuant to the Settlement Trust Documents, including:

     a.    commencing, conducting, or continuing, in any manner, whether directly, indirectly, or derivatively, any suit, action, or other proceeding of any kind (including a judicial, arbitration, administrative, or other proceeding) in any forum in any jurisdiction around the world against or affecting any Protected Party, Limited Protected Party, or Opt-Out Chartered Organization, or any property or interest in property of any Protected Party, Limited Protected Party, or Opt-Out Chartered Organization;

     b.    enforcing, levying, attaching (including any prejudgment attachment), collecting or otherwise recovering, by any manner or means, either directly or indirectly, any judgment, award, decree, or order against or affecting any Protected Party, Limited Protected Party, or Opt-Out Chartered

TrustApp0282

Organization or any property or interest in property of any Protected Party, Limited Protected Party, or Opt-Out Chartered Organization;

c.    creating, perfecting, or otherwise enforcing in any manner, whether directly or indirectly, any Encumbrance of any kind against any Protected Party, Limited Protected Party, or Opt-Out Chartered Organization, or any property or interest in property of any Protected Party, Limited Protected Party, or Opt-Out Chartered Organization;

d.    asserting, implementing or effectuating any setoff, right of reimbursement, subrogation, indemnity, contribution, reimbursement, or recoupment of any kind, in any manner, directly or indirectly, against any obligation due to any Protected Party, Limited Protected Party, or Opt-Out Chartered Organization, or any property or interest in property of any Protected Party, Limited Protected Party, or Opt-Out Chartered Organization; or

e.    taking any act in any manner, and in any place whatsoever, that does not conform to, or comply with, the provisions of the Plan Documents or the Settlement Trust Documents or with regard to any matter that is within the scope of the matters designated by the Plan to be subject to resolution by the Settlement Trust, except in conformity and compliance with the Settlement Trust Documents with respect to any such Abuse Claim, Post-1975 Chartered Organization Abuse Claim, Pre-1976 Chartered Organization Abuse Claim, or Opt-Out Chartered Organization Abuse Claim.

2.    <u>Limited Protected Party Injunction</u>. The Limited Protected Party Injunction shall stay the prosecution of any Abuse Claim that was commenced prior to or after the Effective Date against a Chartered Organization through the later of (a) forty-five (45) days after the resolution of the Abuse Claim that is subject to the Independent Review under the Trust Distributions Procedures or (b) the Limited Protected Party Injunction Date.

3.    Protections for Insureds and Co-Insureds of Settling Insurance Companies.    All Abuse Claims against insureds and co-insureds covered under any insurance policies issued by the Settling Insurance Companies shall be channeled under Article X.F.1 and released under Article X.J.6 as provided in the Insurance Settlement Agreements. Solely for purposes of administering the Channeling Injunctions and releases in this Plan and in the Confirmation Order and not for any other purpose, any liability insurance policy (other than an automobile policy or director's and officer's policy) that was issued by the Settling Insurance Companies shall be automatically deemed to "cover" or provide "coverage" for an Abuse Claim against a Chartered Organization if (i) such policy includes the Chartered Organization, by name or by referring to Chartered Organizations categorically as chartered organizations, charters, sponsoring organizations, or sponsors, as insureds or additional insureds, (ii) such policy was in effect when the alleged Abuse underlying such Abuse Claim allegedly took place; and (iii) such policy does not specifically exclude all abuse or molestation, regardless of state of mind; provided,

119

however, that nothing in the qualifications for coverage specified in subsections (i), (ii), or (iii) of Article X.F.3 of this Plan shall be offered or interpreted as an admission by the Settling Insurance Companies of any fact or issue for any purpose in any other proceeding or litigation or dispute, and shall not be cited as a basis to impose liability on, or increase the liability of, any Settling Insurance Company under any circumstance or any insurance policy. For the avoidance of doubt, nothing herein prevents a Settling Insurance Company or its insureds from seeking to establish that other insurance policies cover Abuse Claims for purposes of applying the Channeling Injunction and Releases. The protections provided under this Article X.F.3 shall apply to all insureds and co-insureds covered under insurance policies that are sold back to the Settling Insurance Companies pursuant to the terms hereof or an Insurance Settlement Agreement.

4.    **Reservations**. **Notwithstanding anything to the contrary in this** **Article X.F, the Channeling Injunction shall not enjoin:**

a.    **the rights of holders of Abuse Claims to assert such Abuse Claims against the Settlement Trust in accordance with the Trust Distribution Procedures, including the ability to pursue the Settlement Trust in the tort system as described in Article XII of the Trust Distribution Procedures;**

b.    **the rights of holders of Abuse Claims to assert such an Abuse Claim against (i) a Limited Protected Party for Abuse Claims that arose prior to January 1, 1976, and are not covered by any insurance policy issued by a Settling Insurance Company and (ii) an Opt-Out Chartered Organization to the extent such Abuse Claim is not covered by any insurance policy issued by a Settling Insurance Company;**

c.    **the rights of holders of Abuse Claims that are not Opt-Out Chartered Organization Abuse Claims to assert such Abuse Claims against any Opt-Out Chartered Organization (unless such Opt-Out Chartered Organization becomes a Protected Party under Article IV.J);**

d.    **the rights of holders of Abuse Claims to assert such Abuse Claims against the Settlement Trust (as to any Abuse Claim) or against the United Methodist Entities (as to any Abuse Claim other than Pre-1976 Chartered Organization Abuse Claim and Post-1975 Chartered Organization Abuse Claims) prior to the United Methodist Release Effective Date (as that term is defined in the United Methodist Settlement Agreement), in each case for the sole purpose of preserving the statute of limitations. For the avoidance of doubt, such actions shall be limited to the commencement of an action against, and serving, as applicable, the Settlement Trust, to which such Claims have been channeled, or the United Methodist Entities;**

e.    **the rights of any Person to assert any Claim, debt, obligation or liability for payment of Settlement Trust Expenses solely against the Settlement Trust in accordance with the Settlement Trust Documents;**

TrustApp0284

      f.     **the Settlement Trust from enforcing its rights under the Plan and the Settlement Trust Documents; or**

      g.     **the rights of the Settlement Trust to prosecute any action against any Non-Settling Insurance Company based on or arising from Abuse Insurance Policies that are not the subject of an Insurance Settlement Agreement, subject to any Insurance Coverage Defenses;**

      h.     **the rights of the United Methodist Entities against the Settlement Trust to enforce the terms of the Channeling Injunction as forth in the applicable settlement agreements; or**

      i.     **the rights of the Settling Insurance Companies to enforce the terms of the Channeling Injunction as otherwise set forth herein and in the Insurance Settlement Agreements.**

G.     <u>Provisions Relating to Channeling Injunction</u>.

      1.     **Abuse Claims Under Policies Issued to Chartered Organizations**. The release by the Participating Chartered Organizations and Contributing Chartered Organizations of the Settling Insurance Companies from all the Claims and Causes of Action as set forth in each of the Insurance Settlement Agreements (and corresponding rights of the Settling Insurance Companies) are subject to the following:[7]

      a.     Such Chartered Organizations are not barred from seeking defense and indemnification for claims that are not Abuse Claims under insurance policies issued by the Settling Insurance Companies directly to such Chartered Organizations, with all parties reserving their rights as to whether such insurance policies apply and to what extent.

      b.     Such Chartered Organizations are not barred from seeking defense and indemnification for that portion of Mixed Claims unrelated to Scouting under insurance policies issued by the Settling Insurance Companies directly to such Chartered Organizations, with all parties reserving their rights as to whether such insurance policies apply and to what extent. All supporting parties to the Plan, as applicable, agree to cooperate to enforce the Post-Confirmation Interim Injunction and the Channeling Injunction to eliminate all or a portion of the Mixed Claims against the applicable Chartered Organizations.

      c.     Such Chartered Organizations are not barred from seeking defense and indemnification under insurance policies issued by the Settling Insurance Companies directly to such Chartered Organizations, pending determination by a court of competent jurisdiction as to whether a Claim is a channeled Abuse Claim,

---

[7] As set forth in Article IV.S.1.g(v) above, the insurance policies issued directly to the BSA and the Local Councils were, by definition, not issued to the Chartered Organizations and are not subject to this Article X.G.1.

TrustApp0285

with all parties reserving their rights as to whether such insurance policies apply and to what extent.

d.    To the extent a court determines that a claim against such Chartered Organizations is not an Abuse Claim or is not subject to the Post-Confirmation Interim Injunction or the Channeling Injunction in the Plan, such Chartered Organizations may seek defense and indemnification of that claim under insurance policies issued by the Settling Insurance Companies directly to such Chartered Organizations, with all parties reserving their rights as to whether such insurance policies apply and to what extent.

e.    To the extent a court determines that a claim against such Chartered Organizations is subject to the Post-Confirmation Interim Injunction or the Channeling Injunction in the Plan, the Settling Insurance Companies shall have no further obligations with respect to such claim. For the avoidance of doubt, Participating Chartered Organizations and Contributing Chartered Organizations retain the right to seek coverage from the Settling Insurance Companies under policies issued directly to such Chartered Organizations for defense costs incurred in connection with the enforcement of the injunction with respect to an Abuse Claim until the time the Abuse Claim is determined to be an Abuse Claim by a court.

f.    The Settlement Trust shall cooperate with any ongoing efforts by such Chartered Organizations and/or the Settling Insurance Companies to establish that the Post-Confirmation Interim Injunction, the Insurance Entity Injunction, and the Channeling Injunction apply.

g.    The Settling Insurance Companies reserve all rights under their policies with respect to any Claim that is not an Abuse Claim (including the non-Scouting component of any Mixed Claim), none of which rights are waived or released hereunder.

2.    <u>Modifications</u>. Subject to post-Effective Date settlements between the Settlement Trustee and Chartered Organizations or Insurance Companies under the applicable provisions of <u>Article IV</u>, there can be no modification, dissolution, or termination of the Channeling Injunction, which shall be a permanent injunction.

3.    <u>Non-Limitation</u>. Nothing in the Plan or the Settlement Trust Documents shall or shall be construed in any way to limit the scope, enforceability, or effectiveness of the Channeling Injunction or the Settlement Trust's assumption of all liability with respect to Abuse Claims.

4.    <u>Bankruptcy Rule 3016 Compliance</u>. The Debtors' compliance with the requirements of Bankruptcy Rule 3016 shall not constitute or be deemed to constitute an admission that the Plan provides for an injunction against conduct not otherwise enjoined under the Bankruptcy Code.

TrustApp0286

5.    <u>Enforcement</u>.  Any Protected Party, Limited Protected Party, or Opt-Out Chartered Organization may enforce the Channeling Injunction as a defense to any Claim (in whole or in part) brought against such Protected Party, Limited Protected Party, or Opt-Out Chartered Organization that is enjoined under the Plan as to such Protected Party, Limited Protected Party, or Opt-Out Chartered Organization and may seek to enforce such injunction in a court of competent jurisdiction.

6.    <u>Contribution Claims</u>.  If a Non-Settling Insurance Company asserts that it has rights, whether legal, equitable, contractual, or otherwise, of contribution, indemnity, reimbursement, subrogation or other similar claims directly or indirectly arising out of or in any way relating to such Non-Settling Insurance Company's payment of loss on behalf of one or more of the Debtors in connection with any Abuse Claim against a Settling Insurance Company (collectively, "<u>Contribution Claims</u>"), (a) such Contribution Claims may be asserted as a defense or counterclaim against the Settlement Trust in any Insurance Action involving such Non-Settling Insurance Company, and the Settlement Trust may assert the legal or equitable rights (if any) of the Settling Insurance Company, and (b) to the extent such Contribution Claims are determined to be valid, the liability (if any) of such Non-Settling Insurance Company to the Settlement Trust shall be reduced by the amount of such Contribution Claims.

7.    <u>No Duplicative Recovery</u>.  In no event shall any holder of an Abuse Claim be entitled to receive any duplicative payment, reimbursement, or restitution from any Protected Party, Limited Protected Party or Opt-Out Chartered Organization under any theory of liability for the same loss, damage, or other Claim that is reimbursed by the Settlement Trust or is otherwise based on the same events, facts, matters, or circumstances that gave rise to the applicable Abuse Claim.

8.    <u>District Court Approval</u>.  To the extent necessary, the Debtors shall seek entry of the Affirmation Order, which affirms (a) the Channeling Injunction and the Settlement Trust's assumption of all liability with respect to Abuse Claims and (b) the releases by holders of Abuse Claims for the benefit of the Protected Parties and the Limited Protected Parties, each as set forth in this <u>Article X</u>.

H.    **<u>Insurance Entity Injunction</u>**.

1.    **<u>Purpose</u>.    To facilitate the Insurance Assignment, protect the Settlement Trust, and preserve the Settlement Trust Assets, pursuant to the equitable jurisdiction and power of the Bankruptcy Court and the District Court under section 105(a) of the Bankruptcy Code, the Bankruptcy Court shall issue the injunction set forth in this <u>Article X.H</u> (the "<u>Insurance Entity Injunction</u>"); provided, however, that the Insurance Entity Injunction is not issued for the benefit of any Non-Settling Insurance Company, and no Non-Settling Insurance Company is a third-party beneficiary of the Insurance Entity Injunction, except as otherwise specifically provided in any Insurance Settlement Agreement.**

2.    **<u>Terms Regarding Claims against Insurance Companies</u>.  Subject to the terms of <u>Article X.E</u> and <u>Article X.F</u>, except for Opt-Out Chartered Organizations**

TrustApp0287

with respect to Non-Settling Insurance Companies and Participating Chartered Organizations with respect to Non-Settling Insurance Companies coverage for Abuse Claims that arose prior to January 1, 1976, all Persons that have held or asserted, that hold or assert, or that may in the future hold or assert any claim or cause of action (including any Abuse Claim or any claim for or respecting any Settlement Trust Expense) against any Insurance Company based upon, attributable to, arising out of, or in any way connected with any Abuse Insurance Policy or other insurance policy issued by a Settling Insurance Company covering Abuse Claims, whenever and wherever arising or asserted, whether in the United States of America or anywhere else in the world, whether sounding in tort, contract, warranty, or any other theory of law, equity, or admiralty, shall be stayed, restrained, and enjoined from taking any action for the purpose of directly or indirectly collecting, recovering, or receiving payments, satisfaction, or recovery with respect to any such claim or cause of action, including:

> a.      commencing, conducting, or continuing, in any manner, directly or indirectly, any suit, action, or other proceeding of any kind (including a judicial, arbitration, administrative, or other proceeding) in any forum with respect to any such claim, demand, or cause of action against any Insurance Company, or against the property of any Insurance Company, with respect to any such claim, demand, or cause of action (including, for the avoidance of doubt, directly pursuing any suit, action or other proceeding with respect to any such claim, demand, or cause of action against any Insurance Company);

> b.      enforcing, levying, attaching, collecting, or otherwise recovering, by any means or in any manner, whether directly or indirectly, any judgment, award, decree, or other order against any Insurance Company, or against the property of any Insurance Company, with respect to any such claim or cause of action;

> c.      creating, perfecting, or enforcing in any manner, directly or indirectly, any Lien or Encumbrance against any Insurance Company, or the property of any Insurance Company, with respect to any such claim or cause of action; and

> d.      except as otherwise specifically provided in the Plan, asserting or accomplishing any setoff, right of subrogation, indemnity, contribution, or recoupment of any kind, directly or indirectly, against any obligation of any Insurance Company, or against the property of any Insurance Company, with respect to any such claim or cause of action;

provided, however, that: (i) the injunction set forth in this Article X.H shall not impair in any way any (a) actions brought by the Settlement Trust against any Non-Settling Insurance Company, (b) actions brought by Local Councils in connection with any Local Council Reserved Rights, (c) any actions brought by any Chartered Organization relating to an Abuse Claim against a Non-Settling Insurance Company that is not channeled to the Settlement Trust; (d) actions brought by holders of Non-Abuse Litigation Claims consistent

124

with **Article IV.D.3**, (e) the rights, if any, of any Opt-Out Chartered Organization under any Abuse Insurance Policy that was issued by a Non-Settling Insurance Company, or (f) except as provided in any applicable Insurance Settlement Agreement, the rights of any co-insured of the Debtors (x) under any Non-Abuse Insurance Policy and (y) as specified under any Final Order of the Bankruptcy Court approving an Insurance Settlement Agreement; and (ii) the Settlement Trust shall have the sole and exclusive authority at any time to terminate, or reduce or limit the scope of, the injunction set forth in this **Article X.H** with respect to any Non-Settling Insurance Company, in accordance with the Settlement Trust Documents, upon express written notice to such Non-Settling Insurance Company, except that the Settlement Trust shall not have any authority to terminate, reduce or limit the scope of the injunction herein with respect to any Settling Insurance Company.

      3.    **Reservations**.  Notwithstanding anything to the contrary in this **Article X.H**, the Insurance Entity Injunction shall not enjoin:

      a.    the rights of any Person to the treatment accorded them under the Plan, as applicable, including the rights of holders of Abuse Claims to assert such Claims, as applicable, in accordance with the Trust Distribution Procedures, and the rights of holders of Non-Abuse Litigation Claims to assert such Claims, as applicable in accordance with **Article IV.D.3**;

      b.    the rights of any Person to assert any claim, debt, obligation, cause of action or liability for payment of Settlement Trust Expenses against the Settlement Trust;

      c.    the rights of the Settlement Trust to prosecute any action based on or arising from Abuse Insurance Policies, except to the extent otherwise released;

      d.    the rights of any Person to assert or prosecute (i) an Abuse Claim against an Opt-Out Chartered Organization to the extent that such Claim is not covered under an insurance policy issued by a Settling Insurance Company, or (ii) an Abuse Claim against a Limited Protected Party for Abuse Claims that arose prior to January 1, 1976, and is not covered under an insurance policy issued by a Settling Insurance Company;

      e.    the rights of the Settlement Trust to assert any claim, debt, obligation, cause of action or liability for payment against a Non-Settling Insurance Company based on or arising from the Abuse Insurance Policies;

      f.    the rights of any Insurance Company to assert any claim, debt, obligation, cause of action or liability for payment against any Non-Settling Insurance Company;

      g.    the claims for reinsurance under reinsurance contracts or claims under retrocessional contracts among the Settling Insurance Companies and other insurance companies; or

TrustApp0289

        h.     **the rights of any Insurance Company to assert any claims for contribution, subrogation, indemnification or other similar Cause of Action against the Settlement Trust for the Settling Insurance Companies' alleged share or equitable share, or to enforce subrogation rights, if any, of the defense and/or indemnity obligation for any Abuse Claim, or for any Cause of Action released in any Insurance Settlements.**

     I.    **Injunction against Interference with Plan.**  Upon entry of the Confirmation Order, all holders of Claims and Interests shall be precluded and enjoined from taking any actions to interfere with the implementation and consummation of the Plan.

     J.    **Releases**.

       1.    **Releases by the Debtors and the Estates**.

         a.    **Releases by the Debtors and the Estates of the Released Parties. As of the Effective Date, except for the rights that remain in effect from and after the Effective Date to enforce the Plan and the Confirmation Order, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, the adequacy of which is hereby confirmed, including the actions of the Released Parties to facilitate and implement the reorganization of the Debtors and the settlements embodied in the Plan, including the Abuse Claims Settlement, the JPM / Creditors' Committee Settlement, the Insurance Settlements, and the United Methodist Settlement as an integral component of the Plan, the Debtors, Reorganized BSA, and the Estates shall, and shall be deemed to, expressly, conclusively, absolutely, unconditionally, irrevocably, and forever release and discharge each and all of the Released Parties of and from any and all Estate Causes of Action that do not constitute Settlement Trust Causes of Action, any and all other Claims, Interests, obligations, rights, demands, suits, judgments, damages, debts, remedies, losses and liabilities of any nature whatsoever (including any derivative claims or Causes of Action asserted or that may be asserted on behalf of the Debtors, Reorganized BSA, or the Estates), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, in law, equity, contract, tort or otherwise, based on or relating to, or in any manner arising from, in whole or in part, any act, omission, transaction, event, or other circumstance taking place or existing on or before the Effective Date (including before the Petition Date) in connection with or related to the Debtors, the Estates, their respective assets and properties, the Chapter 11 Cases, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated by the Plan, the business or contractual arrangements between one or both of the Debtors and any Released Party, the restructuring of any Claim or Interest that is treated by the Plan before or during the Chapter 11 Cases, any of the Plan Documents, the JPM / Creditors' Committee Settlement, the Insurance Settlements, the United Methodist Settlement, or any related agreements, instruments, and other documents created or entered into before or during the Chapter 11 Cases or the**

TrustApp0290

negotiation, formulation, preparation or implementation thereof, the pursuit of Confirmation, the administration and implementation of the Plan, the solicitation of votes with respect to the Plan, the Distribution of property under the Plan, or any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date related or relating to the foregoing. Notwithstanding anything to the contrary in the foregoing, the releases set forth in this **Article X.J.1** shall not, and shall not be construed to: (a) release any Released Party from Causes of Action arising out of, or related to, any act or omission of such Released Party that is a criminal act or that constitutes fraud, gross negligence or willful misconduct; or (b) release any post-Effective Date obligations of any Person under the Plan Documents or any document, instrument, or agreement executed to implement the Plan.

       b.     **Releases by the Debtors and the Estates of Certain Avoidance Actions.**  As of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, including the actions of Creditors' Committee and its members in their respective capacities as such in facilitating and implementing the reorganization of the Debtors, as an integral component of the Plan, the Debtors, Reorganized BSA, and the Estates shall, and shall be deemed to, expressly, conclusively, absolutely, unconditionally, irrevocably, and forever release and discharge each and all holders of General Unsecured Claims, Non-Abuse Litigation Claims, and Convenience Claims of and from any and all Avoidance Actions.

       2.     **Releases by the Debtors and the Estates of the Local Councils, the Contributing Chartered Organizations, the Participating Chartered Organizations, the Opt-Out Chartered Organizations and the Settling Insurance Companies.**  In furtherance of the Abuse Claims Settlement, on the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, the Debtors, on their own behalf and as representatives of their respective Estates, and Reorganized BSA, are deemed to irrevocably and unconditionally, fully, finally, and forever waive, release, acquit, and discharge each and all of the Local Councils, the Contributing Chartered Organizations, the Participating Chartered Organizations, the Opt-Out Chartered Organizations, and the Settling Insurance Companies of and from any and all claims, causes of action, suits, costs, debts, liabilities, obligations, dues, sums of money, accounts, reckonings, bonds, bills, covenants, contracts, controversies, agreements, promises, damages, judgments, executions and demands whatsoever, of whatever kind or nature (including those arising under the Bankruptcy Code), whether known or unknown, suspected or unsuspected, in law or in equity, which the Debtors, their Estates, or Reorganized BSA have, had, may have, or may claim to have: (a) against any of the Local Councils and Contributing Chartered Organizations with respect to any Abuse Claims, (b) against any of the Participating Chartered Organizations with respect to any Post-1975 Chartered Organization Abuse Claims, (c) against any of the Participating Chartered Organizations with respect to any Pre-1976 Chartered Organization Abuse Claims, (d) against any of the Opt-Out Chartered Organizations with respect to any Opt-Out Chartered Organization Abuse Claims, and (e) against any Settling Insurance Company with

127

respect to any coverage for Abuse Claims and all other claims and causes of action specified in the applicable Insurance Settlement Agreements (collectively, the "Scouting Released Claims"). For the avoidance of doubt, the rights of Settling Insurance Companies that are assigned to the Settlement Trust are not released. Notwithstanding anything to the contrary in the foregoing, the releases set forth in this Article X.J.2 shall not, and shall not be construed to release any post-Effective Date obligations of any Person under the Plan Documents or any document, instrument, or agreement executed to implement the Plan. For the avoidance of doubt, in the event of any conflict or inconsistency between this Article X.J.2 and the preceding Article X.J.1, this Article X.J.2 shall control.

       3.      **Releases by Holders of Abuse Claims.** As of the Effective Date, except for the rights that remain in effect from and after the Effective Date to enforce the Plan and the Confirmation Order, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, the adequacy of which is hereby confirmed, including the actions of the Protected Parties and the Limited Protected Parties to facilitate and implement the reorganization of the Debtors, including the settlements embodied in the Plan, including the Abuse Claims Settlement, as an integral component of the Plan, and except as otherwise expressly provided in the Plan or the Confirmation Order, to the maximum extent permitted under applicable law, as such law may be extended subsequent to the Effective Date, all holders of Abuse Claims shall, and shall be deemed to, expressly, conclusively, absolutely, unconditionally, irrevocably, and forever discharge and release: (a) each and all of the Protected Parties and their respective property and successors and assigns of and from all Abuse Claims and any and all Claims and Causes of Action whatsoever, whether known or unknown, asserted or unasserted, derivative or direct, foreseen or unforeseen, in law, equity, or otherwise, whether for tort, fraud, contract, veil piercing or alter-ego theories of liability, successor liability, contribution, indemnification, joint liability, or otherwise, arising from or related in any way to such Abuse Claims; (b) each and all of the Limited Protected Parties and their respective property and successors and assigns of and from all Post-1975 Chartered Organization Abuse Claims and any and all Claims and Causes of Action whatsoever, whether known or unknown, asserted or unasserted, derivative or direct, foreseen or unforeseen, in law, equity, or otherwise, whether for tort, fraud, contract, veil piercing or alter-ego theories of liability, successor liability, contribution, indemnification, joint liability, or otherwise, arising from or related in any way to such Post-1975 Chartered Organization Abuse Claims; (c) each of the Participating Chartered Organizations with respect to any Pre-1976 Chartered Organization Abuse Claims and their respective property and successors and assigns of and from all Pre-1976 Chartered Organization Abuse Claims and any and all Claims and Causes of Action whatsoever, whether known or unknown, asserted or unasserted, derivative or direct, foreseen or unforeseen, in law, equity, or otherwise, whether for tort, fraud, contract, veil piercing or alter-ego theories of liability, successor liability, contribution, indemnification, joint liability, or otherwise, arising from or related in any way to such Pre-1976 Chartered Organization Abuse Claims; and (d) each and all of the Opt-Out Chartered Organizations and their respective property and successors and assigns of and from all Opt-Out Chartered Organization Abuse

TrustApp0292

Claims and any and all Claims and Causes of Action whatsoever, whether known or unknown, asserted or unasserted, derivative or direct, foreseen or unforeseen, in law, equity, or otherwise, whether for tort, fraud, contract, veil piercing or alter-ego theories of liability, successor liability, contribution, indemnification, joint liability, or otherwise, arising from or related in any way to such Opt-Out Chartered Organization Abuse Claims; provided, however, that the releases set forth in this Article X.J.3 shall not, and shall not be construed to: (i) release any post-Effective Date obligations of any Person under the Plan Documents or any document, instrument, or agreement executed to implement the Plan; or (ii) modify, reduce, impair or otherwise affect the ability of any holder of an Abuse Claim to recover on account of such Claim in accordance with Article III.B.10 or Article III.B.11, as applicable. For the avoidance of doubt, holders of Abuse Claims covered by any insurance policy issued by a Settling Insurance Company shall, and shall be deemed to, release and discharge the Settling Insurance Companies for such Claims. The releases in Article X.J.4 shall not, and shall not be deemed to, limit the releases in Article X.J.3.

4.      **Releases by Holders of Claims**. As of the Effective Date, except for the rights that remain in effect from and after the Effective Date to enforce the Plan and the Confirmation Order, for good and valuable consideration, the adequacy of which is hereby confirmed, including the actions of the Released Parties to facilitate and implement the reorganization of the Debtors and the settlements embodied in the Plan, including the JPM / Creditors' Committee Settlement, the Insurance Settlements, and the United Methodist Settlement, as an integral component of the Plan, and except as otherwise expressly provided in the Plan or the Confirmation Order, to the maximum extent permitted under applicable law, as such law may be extended subsequent to the Effective Date, all Releasing Claim Holders shall, and shall be deemed to, expressly, conclusively, absolutely, unconditionally, irrevocably, and forever release and discharge each and all of the Released Parties of and from any and all Claims, Interests, obligations, rights, demands, suits, judgments, damages, debts, remedies, losses and liabilities of any nature whatsoever (including any derivative claims or Causes of Action asserted or that may be asserted on behalf of the Debtors, Reorganized BSA, or the Estates), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, in law, equity, contract, tort or otherwise, based on or relating to, or in any manner arising from, in whole or in part, any act, omission, transaction, event, or other circumstance taking place or existing on or before the Effective Date (including before the Petition Date) in connection with or related to the Debtors, the Estates, their respective assets and properties, the Chapter 11 Cases, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated by the Plan, the business or contractual arrangements between one or both of the Debtors and any Released Party, the restructuring of any Claim or Interest that is treated by the Plan before or during the Chapter 11 Cases, any of the Plan Documents, the JPM / Creditors' Committee Settlement, the Insurance Settlements, the United Methodist Settlement, or any related agreements, instruments, and other documents created or entered into before or during the Chapter 11 Cases or the negotiation, formulation, preparation or implementation thereof, the pursuit of

TrustApp0293

Confirmation, the administration and implementation of the Plan, the solicitation of votes with respect to the Plan, the Distribution of property under the Plan, or any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date related or relating to the foregoing; **provided, however,** that the releases set forth in this **Article X.J.4** shall not, and shall not be construed to: (a) release any Released Party from Causes of Action arising out of, or related to, any act or omission of such Released Party that is a criminal act or that constitutes fraud, gross negligence or willful misconduct; (b) release any post-Effective Date obligations of any Person under the Plan Documents or any document, instrument, or agreement executed to implement the Plan; or (c) modify, reduce, impair or otherwise affect the ability of any holder of an Allowed Non-Abuse Litigation Claim to recover on account of such Allowed Claim in accordance with **Article III.B.9**. Notwithstanding the foregoing or anything to the contrary herein, (i) with respect to holders of Allowed General Unsecured Claims or Allowed Non-Abuse Litigation Claims, nothing in the Plan or the release set forth in **Article X.J.4** shall, or shall be construed to, release any such claims or Causes of Action against any Local Council, Chartered Organization, or Insurance Company (subject to **Article IV.D.3**) and (ii) nothing in the Plan or the release set forth in **Article X.J.4** shall, or shall be construed to, release any claims or Causes of Action asserted by Century and Chubb Companies against Sidley Austin LLP ("**Sidley**") related to Sidley's representation of the Debtors and/or Century and Chubb Companies.

    5.    **Releases Among Contributing Chartered Organizations and Settlement Parties.**

        a.    **In furtherance of the Abuse Claims Settlement, as of the date that the Confirmation Order and Affirmation Order become Final Orders, except for the rights that remain in effect from and after the Effective Date to enforce the Plan, the Confirmation Order, and the terms of the United Methodist Settlement Agreement, for good and valuable consideration, the adequacy of which is hereby confirmed, each of the Contributing Chartered Organizations, including the United Methodist Entities, shall, and shall be deemed to, expressly, conclusively, absolutely, unconditionally, irrevocably, and forever release and discharge the Debtors, Reorganized BSA, the Related Non-Debtor Entities, the Local Councils, the other Protected Parties, the Limited Protected Parties, the Settling Insurance Companies, the Future Claimants' Representative, the Coalition, the Tort Claimants' Committee, the Settlement Trust, and each of its and their respective Representatives (collectively, the "Settlement Parties"), of and from any and all Claims, Interests, obligations, rights, demands, suits, judgments, damages, debts, remedies, losses and liabilities of any nature whatsoever (including any derivative claims or Causes of Action asserted or that may be asserted on behalf of the Debtors, Reorganized BSA, or the Estates), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, in law, equity, contract, tort or otherwise, based on or relating to, or in any manner arising from, in whole or in part, any act, omission, transaction, event, or other circumstance taking place or**

TrustApp0294

existing on or before the date that the Confirmation Order and Affirmation Order become Final Orders (including before the Petition Date) in connection with or related to (i) Abuse Claims, (ii) the Chapter 11 Cases, (iii) the Plan, or (iv) any Claims relating to the Debtors or the Related Non-Debtor Entities that were or could have been asserted by the Contributing Chartered Organizations against the Settlement Parties or any of them.

b.    In furtherance of the Abuse Claims Settlement, as of the date that the Confirmation Order and Affirmation Order become Final Orders, except for the rights that remain in effect from and after the Effective Date to enforce the Plan, the Confirmation Order, and the terms of the United Methodist Settlement Agreement, for good and valuable consideration, the adequacy of which is hereby confirmed, each of the Settlement Parties shall, and shall be deemed to, expressly, conclusively, absolutely, unconditionally, irrevocably, and forever release and discharge each of the Contributing Chartered Organizations, including the United Methodist Entities, of and from any and all Claims, Interests, obligations, rights, demands, suits, judgments, damages, debts, remedies, losses and liabilities of any nature whatsoever, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, in law, equity, contract, tort or otherwise, based on or relating to, or in any manner arising from, in whole or in part, any act, omission, transaction, event, or other circumstance taking place or existing on or before the date that the Confirmation Order and Affirmation Order become Final Orders (including before the Petition Date) in connection with or related to (i) Abuse Claims, (ii) the Chapter 11 Cases, (iii) the Plan, or (iv) any Claims relating to the Debtors or the Related Non-Debtor Entities that were or could have been asserted by the Settlement Parties against the Contributing Chartered Organizations or any of them.

6.    <u>Releases Relating to Settling Insurance Companies</u>.  Notwithstanding anything to the contrary, the releases of Settling Insurance Companies and certain other parties, and the releases by Settling Insurance Companies, each as set forth in the Insurance Settlement Agreements, are incorporated by reference as if fully set forth herein, and control and supplement any release otherwise contained herein. Nothing herein shall reduce the scope of any such releases as set forth in the Insurance Settlement Agreements.  In addition, nothing in this Plan will release claims under reinsurance contracts or retrocessional contracts between or among the Settling Insurance Companies and other insurance companies.

7.    [Reserved].

8.    <u>Releases Relating to the United Methodist Entities</u>.  The releases to the United Methodist Entities, and the releases by the United Methodist Entities, each as set forth in the United Methodist Settlement Agreement, are incorporated by reference as if fully set forth herein and shall not be interpreted as limiting any release, injunction, or similar benefit to the United Methodist Entities set forth herein.

TrustApp0295

K.    **Exculpation.**  **From and after the Effective Date, none of the Exculpated Parties shall have or incur any liability to, or be subject to any right of action by, any Person for any act, omission, transaction, event, or other circumstance occurring on or after the Petition Date up to and including the Effective Date in connection with, relating to or arising out of the Chapter 11 Cases, the negotiation of the Plan Documents, the JPM / Creditors' Committee Settlement, the Insurance Settlements, the United Methodist Settlement Agreement, the Releases and Injunctions, the pursuit of Confirmation of the Plan, the administration, consummation and implementation of the Plan or the property to be Distributed under the Plan, or the management or operation of the Debtors (except for any liability that results primarily from such Exculpated Party's gross negligence, bad faith or willful misconduct).  In all respects, each and all such Exculpated Parties shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under, or in connection with, the matters referenced in the preceding sentence.  Notwithstanding the foregoing or any provision of the Plan to the contrary, Sidley shall not be an Exculpated Party with respect to any claims by Century and the Chubb Companies against Sidley related to Sidley's representation of the Debtors and/or Century and the Chubb Companies.**

L.    **Injunctions Related to Releases and Exculpation.**

1.    **Injunction Related to Releases.  As of the Effective Date, all holders of Claims that are the subject of Article X.J are, and shall be, expressly, conclusively, absolutely, unconditionally, irrevocably, and forever stayed, restrained, prohibited, barred and enjoined from taking any of the following actions against any Released Party or its property or successors or assigns on account of or based on the subject matter of such Claims, whether directly or indirectly, derivatively or otherwise: (a) commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding (including any judicial, arbitral, administrative or other proceeding) in any forum; (b) enforcing, attaching (including any prejudgment attachment), collecting, or in any way seeking to recover any judgment, award, decree, or other order; (c) creating, perfecting or in any way enforcing in any matter, directly or indirectly, any Lien or Encumbrance; and/or (d) setting off, seeking reimbursement or contributions from, or subrogation against, or otherwise recouping in any manner, directly or indirectly, any amount against any liability or obligation that is discharged under Article X.E or released under Article X.J; provided, however, that the injunctions set forth in this Article X.L.1 shall not, and shall not be construed to, enjoin any holder of a Claim that is only the subject of Article X.J.4 (and no other release set forth in Article X.J including Articles X.J.6 and X.J.7 from taking any action arising out of, or related to, any act or omission of a Released Party that is a criminal act or that constitutes fraud, gross negligence or willful misconduct.**

2.    **Injunction Related to Exculpation.  As of the Effective Date, all holders of Claims that are the subject of Article X.K are, and shall be, expressly, conclusively, absolutely, unconditionally, irrevocably, and forever stayed, restrained, prohibited, barred and enjoined from taking any of the following actions against any Exculpated Party on account of or based on the subject matter of such Claims, whether directly or indirectly, derivatively or otherwise: (a) commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding (including any**

TrustApp0296

**judicial, arbitral, administrative or other proceeding) in any forum; (b) enforcing, attaching (including any prejudgment attachment), collecting, or in any way seeking to recover any judgment, award, decree, or other order; and/or (c) creating, perfecting or in any way enforcing in any matter, directly or indirectly, any Lien or Encumbrance; provided, however, that the injunctions set forth in this Article X.L.2 shall not, and shall not be construed to, enjoin any Person that is the subject of Article X.K from taking any action arising out of, or related to, any act or omission of a Exculpated Party that is a criminal act or that constitutes fraud, gross negligence or willful misconduct.  Notwithstanding anything set forth in this paragraph, any set off right with respect to an assumed Executory Contract or Unexpired Lease shall be governed by applicable law, including the terms of such assumed Executory Contract or Unexpired Lease.**

M.      Insurance Provisions.

1.      Except for the Debtor Policy Assignment (and subject to Article IX.A.3.j.5 herein), or as otherwise provided in the Bankruptcy Code, applicable law, the findings made by the Bankruptcy Court in the Confirmation Order, or the findings made by the District Court in the Affirmation Order, nothing in the Plan shall modify, amend, or supplement, or be interpreted as modifying, amending, or supplementing, the terms of any Insurance Policy issued by a Non-Settling Insurance Company or rights or obligations under such Insurance Policy to the extent such rights and obligations are otherwise available under applicable law, and the rights and obligations, if any, of any Non-Settling Insurance Company relating to or arising out of the Plan Documents, including the Plan, the Confirmation Order, and the Affirmation Order, or any provision thereof, shall be determined pursuant to the terms and provisions of the Insurance Policies and applicable law.

2.      No provision of the Plan, other than those provisions contained in the applicable Injunctions contained in Article X of the Plan, shall be interpreted to affect or limit the protections afforded to any Settling Insurance Company by the Channeling Injunction and the Insurance Entity Injunction.

3.      Nothing in this Article X.M is intended or shall be construed to preclude otherwise applicable principles of *res judicata* or collateral estoppel from being applied against any Person.

N.      Judgment Reduction.

1.      Without limiting the Discharges, Releases and Injunctions set forth above, if any Person, including a holder of an Abuse Claim ("Plaintiff"), asserts a Cause of Action against any other Person arising from or relating to Abuse that is the subject of a Proof of Claim filed against the Debtors in the Chapter 11 Cases, regardless of whether such Cause of Action may be asserted pursuant to the Bankruptcy Code or is in the nature of or sounding in contract, tort, warranty or any other theory of law or equity whatsoever (each such Cause of Action, an "Abuse Cause of Action"), and such Abuse Cause of Action results in a determination by the court or tribunal hearing the Abuse Cause of Action

133

(including by a jury empaneled by such court or tribunal) that any Person who is not a Protected Party or a Limited Protected Party (each, a "Specified Person") is liable in damages to Plaintiff, then, prior to final entry of any judgment, order or arbitration award ("Judgment") in such Abuse Cause of Action, Plaintiff shall provide notice and a copy of the Confirmation Order to the Trial Court. Such court or tribunal shall determine whether the Abuse Cause of Action gives rise to any Cause of Action on which any Protected Party or Limited Protected Party would have been liable to Plaintiff in the absence of the Plan and Confirmation Order. The court or tribunal shall reduce any Judgment against a Specified Person by an amount equal to the "Judgment Reduction Amount," which shall equal the greatest amount such Specified Person would be entitled, under applicable non-bankruptcy law, to set off or credit against the Judgment if such Protected Party or Limited Protected Party were not entitled to the benefits of the Discharges, Releases, or Injunctions set forth herein. For the avoidance of doubt, a Limited Protected Party may be a Specified Person entitled to the judgment reduction provided for in this Article X.N with respect to an Abuse Cause of Action arising from or relating to Abuse that is not the subject of a Post-1975 Chartered Organization Abuse Claim.

2.    Nothing herein shall prejudice or operate to preclude the right of any Specified Person to (a) provide notice of the Confirmation Order to any court or tribunal hearing an Abuse Cause of Action, (b) raise any issues, claims or defenses regarding the Judgment Reduction Amount, including the contractual liability and/or relative or comparative fault of any Person, including any Protected Party or Limited Protected Party, in any court or tribunal hearing any Abuse Cause of Action in accordance with applicable law or procedure, or (c) take discovery of Protected Parties or Limited Protected Parties in accordance with applicable law or procedure; provided, however, that nothing herein shall in any way modify or affect the Discharges, Releases or Injunctions. For the avoidance of doubt, nothing herein shall (i) be deemed to entitle a Plaintiff to more than a single satisfaction with respect to any Abuse Cause of Action or (ii) prejudice or operate to preclude the rights of any Specified Person to assert any claims or causes of action that have not been discharged, released, or enjoined under the Plan or Confirmation Order.

3.    Each Plaintiff is hereby enjoined and restrained from seeking relief or collecting judgments against any Specified Person in a manner that fails to conform to the terms of this Article X.N.

4.    If any Plaintiff enters into a settlement with any Person with respect to one or more causes of action based upon, arising from, or related to an Abuse Cause of Action, then such Plaintiff shall cause to be included, and in all events, the settlement shall be deemed to include, a dismissal, release and waiver of any Abuse Cause of Action with respect to such settlement.

O.    Reservation of Rights.  Notwithstanding any other provision of the Plan to the contrary, no provision of this Article X shall be deemed or construed to satisfy, discharge, release or enjoin claims by the Settlement Trust, Reorganized BSA, or any other Person, as the case may be, against (1) the Settlement Trust for payment of Abuse Claims in accordance with the Trust Distribution Procedures, (2) the Settlement Trust for the payment of Settlement Trust Expenses, or (3) any Insurance Company that has not performed under an Insurance Policy (to the extent

TrustApp0298

such Insurance Policy is not the subject of an Insurance Settlement Agreement) or an Insurance Settlement Agreement.

P.     <u>Disallowed Claims</u>.  On and after the Effective Date, the Debtors and Reorganized BSA shall be fully and finally discharged of any and all liability or obligation on any and all Disallowed Claims, and any order Disallowing a Claim that is not a Final Order as of the Effective Date solely because of a Person's right to move for reconsideration of such order pursuant to section 502 of the Bankruptcy Code or Bankruptcy Rule 3008 shall nevertheless become and be deemed to be a Final Order on the Effective Date.

Q.     <u>No Successor Liability</u>.  Except as otherwise expressly provided in the Plan, Reorganized BSA does not, pursuant to the Plan or otherwise, assume, agree to perform, pay or indemnify any Person, or otherwise have any responsibility for any liabilities or obligations of the Debtors relating to or arising out of the operations of or assets of the Debtors, whether arising prior to, on or after the Effective Date.  Neither the Debtors, Reorganized BSA, nor the Settlement Trust is, or shall be deemed to be, a successor to any of the Debtors by reason of any theory of law or equity (except as otherwise provided in <u>Article IV.C</u>), and none shall have any successor or transferee liability of any kind or character; <u>provided</u>, <u>however</u>, that Reorganized BSA and the Settlement Trust shall assume and remain liable for their respective obligations specified in the Plan and the Confirmation Order.

R.     <u>Indemnities</u>.

1.     <u>Prepetition Indemnification and Reimbursement Obligations</u>.  The respective obligations of the Debtors to indemnify and reimburse Persons who are or were directors, officers or employees of the Debtors on the Petition Date or at any time thereafter up to and including the Effective Date, against and for any obligations pursuant to the bylaws, applicable state or non-bankruptcy law, or specific agreement or any combination of the foregoing, shall, except with respect to any Perpetrator: (a) survive Confirmation of the Plan and remain unaffected thereby; (b) be assumed by Reorganized BSA as of the Effective Date; and (c) not be discharged under section 1141 of the Bankruptcy Code, irrespective of whether indemnification or reimbursement is owed in connection with any event occurring before, on or after the Petition Date.  In furtherance of, and to implement the foregoing, as of the Effective Date, Reorganized BSA shall obtain and maintain in full force insurance for the benefit of each and all of the above-indemnified directors, officers and employees, at levels no less favorable than those existing as of the date of entry of the Confirmation Order, and for a period of no less than three (3) years following the Effective Date.

2.     <u>Plan Indemnity</u>.  In addition to the matters set forth above and not by way of limitation thereof, Reorganized BSA shall indemnify and hold harmless all Persons who are or were officers or directors of the Debtors on the Petition Date or at any time thereafter up to and including the Effective Date on account of and with respect to any claim, cause of action, liability, judgment, settlement, cost or expense (including attorneys' fees) on account of claims or Causes of Action threatened or asserted by any third party against such officers or directors that seek contribution, indemnity, equitable indemnity, or any

TrustApp0299

similar claim, based upon or as the result of the assertion of primary claims against such third party by any representative of the Debtors' Estates.

        3.    <u>Limitation on Indemnification</u>.  Notwithstanding anything to the contrary set forth in the Plan or elsewhere, neither the Debtors, Reorganized BSA, the Local Councils, nor the Contributing Chartered Organizations, as applicable, shall be obligated to indemnify or hold harmless any Person for any claim, cause of action, liability, judgment, settlement, cost or expense that results primarily from (i) such Person's bad faith, gross negligence or willful misconduct or (ii) an Abuse Claim.

        S.    <u>The Official Committees and the Future Claimants' Representative</u>.  Except as otherwise described in the Settlement Trust Documents with respect to the Future Claimants' Representative, the Official Committees and the Future Claimants' Representative shall continue in existence until the Effective Date, and after the Effective Date for the limited purposes of prosecuting requests for payment of Professional Fee Claims for services rendered and reimbursement of expenses incurred prior to the Effective Date.  The Debtors shall pay the reasonable fees and actual and necessary expenses incurred by the Official Committees and the Future Claimants' Representative up to the Effective Date, and after the Effective Date solely for the purposes set forth in the preceding sentence, in accordance with the Compensation Procedures Order, the Fee Examiner Order, and the terms of the Plan, including <u>Article II</u>.  As of the Effective Date, subject to continuation of the Official Committees for the limited purposes described above as to Professional Fee Claims and unless extended by order (which may be sought by motion), the members of the Official Committees shall be released and discharged from all further authority, duties, responsibilities, liabilities, and obligations involving the Chapter 11 Cases and the Official Committees shall be dissolved.  Neither the Debtors nor Reorganized BSA have any obligation to pay fees or expenses of any Professional retained by the Official Committees or the Future Claimants' Representative that are earned or incurred before the Effective Date to the extent such fees or expenses (or any portion thereof) qualify as Settlement Trust Expenses, in which case such fees and expenses (or the applicable portion thereof) shall be paid by the Settlement Trust in accordance with the Settlement Trust Documents.

## ARTICLE XI.

## RETENTION OF JURISDICTION

        A.    <u>Jurisdiction</u>.  Until the Chapter 11 Cases are closed, the Bankruptcy Court shall retain the fullest and most extensive jurisdiction that is permissible, including the jurisdiction necessary to ensure that the purposes and intent of the Plan are carried out.  Except as otherwise provided in the Plan or the Settlement Trust Agreement, the Bankruptcy Court shall retain jurisdiction to hear and determine all Claims against and Interests in the Debtors, and to adjudicate and enforce the Insurance Actions, the Settlement Trust Causes of Action, and all other Causes of Action which may exist on behalf of the Debtors.  Nothing contained herein shall prevent Reorganized BSA or the Settlement Trust, as applicable, from taking such action as may be necessary in the enforcement of any Estate Cause of Action, Insurance Action, Settlement Trust Cause of Action, or other Cause of Action which the Debtors have or may have and which may not have been enforced or prosecuted by the Debtors, which actions or other Causes of Action shall survive Confirmation of the Plan and shall not be affected thereby except as specifically

TrustApp0300

provided herein. Nothing contained herein concerning the retention of jurisdiction by the Bankruptcy Court shall be deemed to be a finding or conclusion that (1) the Bankruptcy Court in fact has jurisdiction with respect to any Insurance Action, (2) any such jurisdiction is exclusive with respect to any Insurance Action, or (3) abstention or dismissal of any Insurance Action pending in the Bankruptcy Court or the District Court as an adversary proceeding is or is not advisable or warranted, so that another court can hear and determine such Insurance Action(s). Any court other than the Bankruptcy Court that has jurisdiction over an Insurance Action shall have the right to exercise such jurisdiction.

B.    General Retention. Following Confirmation of the Plan, the administration of the Chapter 11 Cases will continue until the Chapter 11 Cases are closed by a Final Order of the Bankruptcy Court. The Bankruptcy Court shall also retain jurisdiction for the purpose of classification of any Claims and the re-examination of Claims which have been Allowed for purposes of voting, and the determination of such objections as may be filed with the Bankruptcy Court with respect to any Claims. The failure by the Debtors or Reorganized BSA to object to, or examine, any Claim for the purposes of voting, shall not be deemed a waiver of the rights of the Debtors, Reorganized BSA, or the Settlement Trust, as the case may be, to object to or reexamine such Claim in whole or part.

C.    Specific Purposes. In addition to the foregoing, the Bankruptcy Court shall retain jurisdiction over all matters arising out of, or relating to, the Chapter 11 Cases and the Plan, including jurisdiction to:

1.    modify the Plan after Confirmation pursuant to the provisions of the Bankruptcy Code and the Bankruptcy Rules;

2.    correct any defect, cure any omission, reconcile any inconsistency or make any other necessary changes or modifications in or to the Plan, the Trust Documents or the Confirmation Order as may be necessary to carry out the purposes and intent of the Plan, including the adjustment of the date(s) of performance in the Plan in the event the Effective Date does not occur as provided herein so that the intended effect of the Plan may be substantially realized thereby;

3.    assure performance by the Settlement Trust and the Disbursing Agent of their respective obligations to make distributions under the Plan;

4.    enforce and interpret the terms and conditions of the Plan, the Plan Documents, the Settlement Trust Documents, the DST Agreement, and any Insurance Settlement Agreements;

5.    enter such orders or judgments, including injunctions (a) as are necessary to enforce the title, rights and powers of Reorganized BSA and the Settlement Trust, (b) to execute, implement, or consummate the provisions of the Plan, the Confirmation Order, and all contracts, instruments, releases and other agreements or documents created in connection with the Plan or the Confirmation Order, and (c) as are necessary to enable holders of Claims to pursue their rights against any Person that may be liable therefor pursuant to applicable law or otherwise;

6.    hear and determine any and all motions, adversary proceedings, contested or litigated matters, and any other matters and grant or deny any applications involving the Debtors

137

TrustApp0301

that may be pending on the Effective Date (which jurisdiction shall be non-exclusive as to any such non-core matters);

7.    hear and determine any motions or contested matters involving taxes, tax refunds, tax attributes, tax benefits and similar or related matters, including contested matters arising on account of transactions contemplated by the Plan, or relating to the period of administration of the Chapter 11 Cases;

8.    hear and determine all applications for compensation of Professionals and reimbursement of expenses under sections 328, 330, 331, or 503(b) of the Bankruptcy Code;

9.    hear and determine any Causes of Action arising during the period from the Petition Date to the Effective Date, or in any way related to the Plan or the transactions contemplated hereby, against the Debtors, Reorganized BSA, the Settlement Trust, the DST, and their respective Representatives;

10.    hear and determine any and all motions for the rejection, assumption or assignment of Executory Contracts or Unexpired Leases and the Allowance of any Claims resulting therefrom;

11.    hear and determine such other matters and for such other purposes as may be provided in the Confirmation Order;

12.    hear and determine the Allowance and/or Disallowance of any Claims, including Administrative Expense Claims, against or Interests in the Debtors or their Estates, including any objections to any such Claims or Interests, and the compromise and settlement of any Claim, including Administrative Expense Claims, against or Interest in the Debtors or their Estates;

13.    hear and resolve disputes concerning any reserves under the Plan or the administration thereof;

14.    hear and determine all questions and disputes regarding title to the assets of the Debtors, their Estates or the Settlement Trust;

15.    enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason or in any respect modified, stayed, reversed, revoked or vacated, or if distributions pursuant to the Plan or under the Settlement Trust Documents are enjoined or stayed;

16.    hear and determine all questions and disputes regarding, and to enforce, the Abuse Claims Settlement;

17.    hear and determine any Insurance Action, any Settlement Trust Cause of Action and any similar claims, Causes of Action; provided, that (i) this Court's jurisdiction over any such Insurance Action, Settlement Trust Cause of Action, or similar claims, Causes of Action shall be solely to the extent such actions involve bankruptcy issues or issues that are directly related to or arise out of the Plan Documents or Confirmation Order, (ii) such retention of jurisdiction shall not constitute a waiver of any rights of a Non-Settling Insurance Company to seek to remove or withdraw the reference of any Insurance Action filed after the Effective Date; and (iii) any

138

matter involving a Settling Insurance Company shall be governed by the applicable Insurance Settlement Agreement;

18.    hear and determine any other matters related hereto, including the implementation and enforcement of all orders entered by the Bankruptcy Court in the Chapter 11 Cases;

19.    resolve any disputes concerning whether a Person had sufficient notice of the Chapter 11 Cases, the Disclosure Statement, any solicitation conducted in connection with the Chapter 11 Cases, the Bar Date established in the Chapter 11 Cases, or any deadline for responding or objecting to a Cure Amount, in each case, for the purpose of determining whether a Claim or Interest is discharged hereunder or for any other purpose;

20.    enter in aid of implementation of the Plan such orders as are necessary, including the implementation and enforcement of the Injunctions, Releases, and Discharges described herein, including the Channeling Injunction;

21.    hear a petition for relief by a Specified Person or any other party in interest in the event that a court or tribunal hearing an Abuse Cause of Action fails to apply the judgment reduction provisions of Article X.N;

22.    approve any Post-Effective Date Chartered Organization Settlement and determine the adequacy of notice of a motion by the Settlement Trustee to approve such a settlement;

23.    approve any extension of the Insurance Settlement Period, approve any Post-Effective Date Insurance Settlement and determine the adequacy of notice of a Post-Effective Date Insurance Settlement provided by the Settlement Trustee;

24.    hear and determine any questions and disputes pertaining to, and to enforce, the Abuse Claims Settlement, including the Local Council Settlement Contribution, the Contributing Chartered Organization Settlement Contribution, including the United Methodist Settlement Contribution, the Participating Chartered Organization Settlement Contribution, the Hartford Settlement Contribution, the Century and Chubb Companies Settlement Contribution, the Zurich Insurers Settlement Contribution, and the Clarendon Settlement Contribution;

25.    hear and determine any questions and disputes pertaining to, and to enforce, the JPM / Creditors' Committee Settlement;

26.    hear and determine any questions and disputes pertaining to, and to enforce, the Insurance Settlement Agreements;

27.    [Reserved]

28.    hear and determine any questions and disputes pertaining to, and to enforce, the United Methodist Settlement;

29.    hear and determine any questions and disputes pertaining to, and to enforce, the PSZJ Settlement;

TrustApp0303

30.     hear and determine all questions and disputes regarding matters pertaining to the DST Agreement;

31.     hear and determine all questions and disputes regarding matters pertaining to discovery rights of the Settlement Trust and the related agreements that include, but not limited to, the Plan, the Plan Documents, Settlement Trust Agreement, Trust Distribution Procedures, and Document Appendix;

32.     enter a Final Order or decree concluding or closing the Chapter 11 Cases; and

33.     to enter and implement such orders as may be necessary or appropriate if any aspect of the Plan, the Settlement Trust, or the Confirmation Order is, for any reason or in any respect, determined by a court to be inconsistent with, to violate, or insufficient to satisfy any of the terms, conditions, or other duties associated with any Abuse Insurance Policies; provided, however, that (a) such orders shall not impair the Insurance Coverage Defenses or the rights, claims, or defenses, if any, of any Insurance Company that are set forth or provided for in the Plan, the Plan Documents, the Confirmation Order, or any other Final Orders entered in the Debtors' Chapter 11 Cases, (b) this provision does not, in and of itself, grant this Court jurisdiction to hear and decide disputes arising out of or relating to the Abuse Insurance Policies, and (c) all interested parties, including any Insurance Company, reserve the right to oppose or object to any such motion or order seeking such relief.

As of the Effective Date, notwithstanding anything in this Article XI to the contrary, the Restated Debt and Security Documents and any documents related thereto shall be governed by the jurisdictional provisions thereof and the Bankruptcy Court shall not retain jurisdiction with respect thereto.

D.     Courts of Competent Jurisdiction.  To the extent that the Bankruptcy Court is not permitted under applicable law to preside over any of the foregoing matters, the reference to the "Bankruptcy Court" in this Article XI shall be deemed to be replaced by the "District Court." If the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter arising out of the Plan, such abstention, refusal, or failure of jurisdiction shall have no effect upon and shall not control, prohibit, or limit the exercise of jurisdiction by any other court having competent jurisdiction with respect to such matter.

## ARTICLE XII.

## MISCELLANEOUS PROVISIONS

A.     Closing of Chapter 11 Cases.  After each Chapter 11 Case has been fully administered, Reorganized BSA shall file with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court to close such Chapter 11 Case.

B.     Amendment or Modification of the Plan.

1.     Plan Modifications. Subject to the terms of the JPM / Creditors' Committee Term Sheet and the Insurance Settlement Agreements, the Debtors reserve the right, in

TrustApp0304

accordance with the Bankruptcy Code and the Bankruptcy Rules, to amend or modify the Plan prior to the entry of the Confirmation Order, including amendments or modifications to satisfy section 1129(b) of the Bankruptcy Code, and after entry of the Confirmation Order, the Debtors may, upon order of the Bankruptcy Court, amend, modify or supplement the Plan in the manner provided for by section 1127 of the Bankruptcy Code or as otherwise permitted by law, in each case without additional disclosure pursuant to section 1125 of the Bankruptcy Code unless section 1127 of the Bankruptcy Code requires additional disclosure.  In addition, after the Confirmation Date, so long as such action does not materially and adversely affect the treatment of holders of Allowed Claims pursuant to the Plan, the Debtors may remedy any defect or omission or reconcile any inconsistencies in the Plan or the Confirmation Order with respect to such matters as may be necessary to carry out the purposes or effects of the Plan, and any holder of a Claim that has accepted the Plan shall be deemed to have accepted the Plan as amended, modified, or supplemented. All amendments to the Plan (a) must be reasonably acceptable to JPM and the Creditors' Committee to the extent they pertain to the treatment of the 2010 Credit Facility Claims, the 2019 RCF Claims, the 2010 Bond Claims, or the 2012 Bond Claims (in the case of JPM) or Convenience Claims, General Unsecured Claims, or Non-Abuse Litigation Claims (in the case of the Creditors' Committee), (b) shall not be inconsistent with the terms of the Insurance Settlement Agreements, and (c) shall not be inconsistent with the terms of the United Methodist Settlement Agreement.  The designation of Chartered Organizations as Contributing Chartered Organizations or Participating Chartered Organizations and the designation of Non-Settling Insurance Companies as Settling Insurance Companies after the Effective Date in accordance with <u>Article IV.J</u> or <u>Article IV.K</u> shall not be a modification or amendment to the Plan and instead is an act that may be done to effectuate the terms of the Plan.

       2.     <u>Other Amendments</u>.  Before the Effective Date, the Debtors may make appropriate technical adjustments and modifications to the Plan and the documents contained in the Plan Supplement without further order or approval of the Bankruptcy Court.

       C.     <u>Revocation or Withdrawal of Plan</u>.  The Debtors reserve the right to revoke or withdraw the Plan prior to the Effective Date.  If the Plan has been revoked or withdrawn prior to the Effective Date, or if Confirmation of the Plan or the occurrence of the Effective Date does not occur, then: (1) the Plan shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount any Claim or Interest or Class of Claims or Interests), assumption of executory contracts or unexpired leases affected by the Plan, and any document or agreement executed pursuant to the Plan, including the Settlement Trust Documents, shall be deemed null and void (except that the Insurance Settlement Agreements shall remain in full force and effect to the extent provided in such agreements in accordance with their terms); and (3) nothing contained in the Plan shall (i) constitute a waiver or release of any Claim against, or any Interest in, the Debtors or any other Person; (ii) prejudice in any manner the rights of the Debtors or any other Person; or (iii) constitute an admission of any sort by the Debtors or any other Person.

       D.     <u>Request for Expedited Determination of Taxes</u>.  The Debtors and Reorganized BSA, as applicable, shall have the right to request an expedited determination under section 505(b)

141

of the Bankruptcy Code with respect to tax returns filed, or to be filed, for any and all taxable periods ending after the Petition Date to and including the Effective Date.

      E.    <u>Non-Severability of Plan Provisions</u>.  If, before the entry of the Confirmation Order, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court, at the request of the Debtors, shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired or invalidated by such holding, alteration, or interpretation, except as provided in the Insurance Settlement Agreements with respect to the Settling Insurance Companies, as applicable.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is (1) valid and enforceable pursuant to its terms, (2) integral to the Plan and may not be deleted or modified without the consent of the Debtors or Reorganized BSA (as the case may be), and (3) nonseverable and mutually dependent.

      F.    <u>Notices</u>.  All notices, requests, and demands to or upon the Debtors or Reorganized BSA to be effective shall be in writing (including by email transmission) and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered, addressed as follows:

              Boy Scouts of America
              1325 W. Walnut Hill Lane
              Irving, Texas 75015
              Attn:  Joseph Zirkman, General Counsel
              Email: Joseph.Zirkman@scouting.org

              with copies to:

              White & Case LLP
              1221 Avenue of the Americas
              New York, New York 10020
              Attn:  Jessica C. Lauria
              Email:  jessica.lauria@whitecase.com

              – and –

TrustApp0306

White & Case LLP
111 South Wacker Drive, Suite 5100
Chicago, Illinois 60606
Attn: Michael C. Andolina
        Matthew E. Linder
Email: mandolina@whitecase.com
        mlinder@whitecase.com

– and –

Morris, Nichols, Arsht & Tunnell LLP
1201 North Market Street, 16th Floor
P.O. Box 1347
Wilmington, Delaware 19899-1347
Attn: Derek C. Abbott
Email: dabbott@morrisnichols.com

G.    Notices to Other Persons.  After the occurrence of the Effective Date, Reorganized BSA has authority to send a notice to any Person providing that to continue to receive documents pursuant to Bankruptcy Rule 2002, such Person must file a renewed request to receive documents pursuant to Bankruptcy Rule 2002; provided, however, that the U.S. Trustee need not file such a renewed request and shall continue to receive documents without any further action being necessary.  After the occurrence of the Effective Date, Reorganized BSA is authorized to limit the list of Persons receiving documents pursuant to Bankruptcy Rule 2002 to the U.S. Trustee and those Persons that have filed such renewed requests:

H.    Governing Law.  Except to the extent that the Bankruptcy Code or other federal law is applicable, or to the extent an exhibit hereto or a schedule in the Plan Supplement or any other Plan Document provides otherwise, the rights, duties, and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of Delaware, without giving effect to the principles of conflict of laws thereof; provided, however, that governance matters relating to Reorganized BSA shall be governed by the laws of the District of Columbia.

I.    [Reserved].

J.    Timing of Distributions or Actions.  In the event that any payment, Distribution, act or deadline under the Plan is required to be made or performed or occurs on a day that is not a Business Day, then such payment, Distribution, act or deadline shall be deemed to occur on the next succeeding Business Day, but if so made, performed or completed by such next succeeding Business Day, shall be deemed to have been completed or to have occurred as of the required date.

K.    Deemed Acts.  Whenever an act or event is expressed under the Plan to have been deemed done or to have occurred, it shall be deemed to have been done or to have occurred by virtue of the Plan or the Confirmation Order without any further act by any Person.

143

L.    Entire Agreement.  The Plan Documents set forth the entire agreement and undertakings relating to the subject matter thereof and supersede all prior discussions, negotiations, understandings and documents.  No Person shall be bound by any terms, conditions, definitions, warranties, understandings, or representations with respect to the subject matter hereof, other than as expressly provided for in the Plan or the other Plan Documents or as may hereafter be agreed to by the affected parties in writing.

M.    Plan Supplement.  Any and all exhibits, lists, or schedules referred to herein but not filed with the Plan shall be contained in the Plan Supplement to be filed with the Clerk of the Bankruptcy Court prior to the Confirmation Hearing on the Plan, and such Plan Supplement is incorporated into and is part of the Plan as if set forth in full herein.  The Plan Supplement will be available for inspection in the office of the Clerk of the Bankruptcy Court during normal court hours, at the website maintained by the Notice and Claims Agent (https://cases.omniagentsolutions.com/BSA), and at the Bankruptcy Court's website (ecf.deb.uscourts.gov).

N.    Withholding of Taxes.  The Disbursing Agent, the Settlement Trust or any other applicable withholding agent, as applicable, shall withhold from any assets or property distributed under the Plan any assets or property which must be withheld for foreign, federal, state and local taxes payable with respect thereto or payable by the Person entitled to such assets to the extent required by applicable law.

O.    Payment of Quarterly Fees.  All Quarterly Fees due and payable prior to the Effective Date shall be paid on or before the Effective Date.  The Reorganized BSA shall pay all such fees that arise after the Effective Date, but before the closing of the Chapter 11 Cases, and shall comply with all applicable statutory reporting requirements.

P.    Effective Date Actions Simultaneous.  Unless the Plan or the Confirmation Order provides otherwise, actions required to be taken on the Effective Date shall take place and be deemed to have occurred simultaneously, and no such action shall be deemed to have occurred prior to the taking of any other such action.

Q.    Consent to Jurisdiction.  Upon default under the Plan, Reorganized BSA, the Settlement Trust, the Settlement Trustee, the Official Committees, the Future Claimants' Representative, and the Protected Parties, or any successor thereto, respectively, consent to the jurisdiction of the Bankruptcy Court, and agree that it shall be the preferred forum for all proceedings relating to any such default.

*[Remainder of Page Intentionally Left Blank]*

TrustApp0308

Case 20-10343-LSS    Doc 10296    Filed 09/06/22    Page 152 of 498

Dated:  September 6, 2022

Boy Scouts of America
Delaware BSA, LLC

*Roger C. Mosby*
Roger C. Mosby
Chief Executive Officer and President

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

THE FLINTKOTE COMPANY,

      Plaintiff,

      v.                               C.A. No. 1:13-cv-00103-LPS

AVIVA PLC, formerly known as
COMMERCIAL UNION ASSURANCE
COMPANY LTD.,

      Defendant.

## DISCLOSURE PURSUANT TO RULE 7.1

      Pursuant to Federal Rule of Civil Procedure 7.1(a)(1), Defendant Aviva PLC, formerly

known as Commercial Union Assurance Company Ltd., states that it has no corporate parent and

that no publicly held corporation holds ten percent (10%) or more of its stock.

                                         **DILWORTH PAXSON LLP**

Of Counsel:

                                    By: */s/ Thaddeus J. Weaver*

Fred L. Alvarez (admitted PHV)           Thaddeus J. Weaver (Id. No. 2790)
Arthur J. McColgan, II (admitted PHV)    One Customs House
Walker Wilcox Matousek LLP          704 King Street, Suite 500
One North Franklin Street             P.O. Box 1031
Suite 3200                        Wilmington, DE  19801
Chicago, IL  60606                (302) 571-8867 (telephone)
(312) 244-6700 (telephone)        (302) 571-8875 (facsimile)
(312) 244-6800 (facsimile)         tweaver@dilworthlaw.com

                                        Attorneys for Defendant Aviva PLC, formerly
                                        known as Commercial Union Assurance
                                        Company Ltd.

Dated:     April 1, 2013

10686791_1

TrustApp0310

**Seymour, Stephanie R.**

| | |
|---|---|
| **From:** | Bullen, Julia (Allianz Reinsurance America Inc) on behalf of Bullen, Julia (Allianz Reinsurance America Inc) <Julia.Bullen@allianzrm-us.com> |
| **Sent:** | Friday, August 15, 2025 11:52 AM |
| **To:** | Quinn, Kami E. |
| **Subject:** | FW: BSA Settlement Trust - Notice of Lawsuit (SST-324281) - Denial Letter |
| **Attachments:** | Notice of Lawsuit - SST 324281 (MN) - Allianz Denial Letter - 8.15.25.pdf |

Good morning, Ms. Quinn:

In response to your August 1, 2025 email sent on behalf of the BSA Chapter 11 Settlement Trust to unspecified insurers providing notice of claimant SST-324281's tort suit against the Trust, please see the attached correspondence sent on behalf of Allianz and Jefferson.

Should you have any questions, please let me know.

Best,
Julia

Julia M. Bullen  (formerly Nesbitt – please note change in email address*) Claims Specialist – Abuse Allianz Reinsurance America, Inc. (AZRA) California Independent Adjuster License No. 6004666

Letters: P.O. Box 750039, Petaluma, CA 94975-0039
Packages: 1465 North McDowell Blvd, Suite 201, Petaluma, CA 94954
T: 415-899-4111  I  julia.bullen@allianzrm-us.com<mailto:julia.bullen@allianzrm-us.com>

WORKING REMOTELY – Business Hours: Monday – Friday, 8am – 4:30pm Eastern Standard Time

P Please consider the environment before printing this email.   Allianz is striving for a paperless environment.  Please send correspondence electronically only, unless otherwise requested.

From: BSA Trust Insurance Team <BSATrustInsuranceTeam@gilbertlegal.com>
Sent: Friday, August 1, 2025 8:39 AM
Cc: Gilbert Claims Matrix Team <GilbertClaimsMatrixTeam@gilbertlegal.com>; Insurer Support <insurer.support@scoutingsettlementtrust.com>; Sraders, Sarah <SradersS@gilbertlegal.com>
Subject: [EXT] BSA Settlement Trust - Notice of Lawsuit (SST-324281)

This email originated from outside the company. Please exercise caution before clicking links or opening attachments.

Counsel:

As coverage counsel to the BSA Settlement Trust (the "Settlement Trust"), we write to provide supplemental notice of an Abuse Claim for which the claimant, SST-324281, has filed a lawsuit against the Settlement Trust in the tort system.  A copy of the summons and the complaint in Matthew Olson v. Boy Scouts of America Settlement Trust, filed July 9, 2025 in Ramsey County District Court in Minnesota, is attached here.

TrustApp0311

It is our understanding that a copy of the complaint was hand delivered to the office of the Settlement Trust's former counsel on July 24, 2025.  While the Settlement Trust does not view that as effectuating proper service, we are mindful that the Settlement Trust's obligation to respond, if calculated from date of that attempted service, would be August 14, 2025.

As you know, the Settlement Trust previously provided notice of your defense and indemnity obligations, as applicable, for Claimant SST-324281's claim.  As you also know, the Settlement Trust has determined that Claimant SST-324281's claim is potentially covered by your client's policies and has provided you with information regarding the claim via the Claims Matrix portal.  We previously notified you that claimant SST-324281 had informed the Trust that he intended to pursue the "Tort System Alternative" in accordance with Article XII of the TDP.  Pursuant to Article XII, claimants may seek a de novo determination of their Abuse Claim by a court of competent jurisdiction.  Claimant SST-324281 has now filed a complaint in accordance with the TDP.

If you are receiving this notice, the Trust has determined that your client issued at least one policy on Schedule 2 of the Plan ("BSA Insurance Policies") and/or Schedule 3 of the Plan ("Local Council Policies") that1:

  1.  was in effect during the period of abuse identified for the above-referenced claim(s) (for policies containing no first encounter provision),
  2.  was in effect during the first alleged act of molestation for a given claim (for policies containing a first encounter provision), and/or
  3.  post-dates the period of abuse but provides coverage for mental anguish without regard for whether bodily injury occurs during the policy period2 and includes no "first encounter" provision.

For Local Council Policies meeting the above criteria, you are receiving this notice only if you issued a policy to any local council (or its predecessors or successors, as applicable) identified in the Claims Questionnaire or other supporting materials for the above-referenced claim(s).

To the extent your client issued or is responsible for other policies issued to BSA or any of the identified local councils that are required to respond to the claim, this letter shall additionally constitute notice under any such policy.

The Trustee reserves, and does not waive, any other rights and defenses with respect to the foregoing notice, including the right to amend such notice as additional information becomes available.

We look forward to continuing our cooperative and constructive working relationship throughout this process.

Regards,

/s/ Kami E. Quinn

Kami E. Quinn


1 Third Modified Fifth Amended Chapter 11 Plan of Reorganization (With Technical Modifications) for Boy Scouts of America and Delaware BSA, LLC at 342–405 ("Schedule 2 BSA Insurance Policies" and "Schedule 3 Local Council Insurance Policies"), In re Boy Scouts of America, No. 20-10343 (LSS) (Bankr. D. Del. Sept. 6, 2022), ECF No. 10296.


2 Examples of such language include, but are not limited to, the following:  "'Personal injury' (1) means bodily injury, shock, mental injury or mental anguish . . . ."; and "'Personal Injury' means, but is not limited to (1) bodily injury, sickness, disease, disability, and mental anguish . . . ."

TrustApp0312

[cid:image103702.png@D0CD842B.C3ABC26B]<https://www.gilbertlegal.com/>
BSA Trust Insurance Team
BSATrustInsuranceTeam@gilbertlegal.com<mailto:BSATrustInsuranceTeam@gilbertlegal.com>
700 Pennsylvania Ave., SE
Suite 400
Washington, DC  20003
GilbertLegal.com <https://www.gilbertlegal.com/>

This email and any attachments may contain confidential information that is privileged at law. If you are not a named recipient or have received this communication by error, please notify the sender immediately and destroy this email and its attachments, and all copies thereof, without further distributing or copying them.

CONFIDENTIALITY NOTICE: The information in this message, and any files transmitted with it, is confidential, may be legally privileged, and intended only for the use of the individual(s) named above. Be aware that the use of any confidential or personal information may be restricted by state and federal privacy laws. If you are not the intended recipient, do not further disseminate this message. If this message was received in error, please notify the sender and delete it.

TrustApp0313



```
 1                    UNITED STATES DISTRICT COURT
                      NORTHERN DISTRICT OF TEXAS
 2                         DALLAS DIVISION

 3     ****************************************************************

 4     THE HONORABLE BARBARA J.      §
       HOUSER (RET.) IN HER CAPACITY §
 5     AS TRUSTEE OF THE BSA         §
       SETTLEMENT TRUST,             §
 6                                   §
                                     §
 7             Plaintiff,            §
                                     § CASE NO.  3:23-cv-01592-S
 8     VS.                           §
                                     §
 9     ALLIANZ GLOBAL RISKS US       §
       INSURANCE COMPANY, et al.,    §
10                                   §
               Defendants.           §
11

12     ****************************************************************

13                    TRANSCRIPT OF STATUS CONFERENCE
               HEARD BEFORE THE HONORABLE KAREN GREN SCHOLER
14                    UNITED STATES DISTRICT JUDGE

15                         AUGUST 28, 2025

16     ****************************************************************

17

18

19

20

21

22

23

24

25
```

Thu Bui, RMR, CRR    (214) 753-2354

TrustApp0314

1    little more than two weeks from now.  This is not an order yet

2    but this is what I'm thinking, that Plaintiff, through counsel,

3    and -- meet with Defendants on a set of lawyers that makes

4    sense.  Meet and come up with a discovery plan that you can

5    agree on.  I know there's going to be sections that you cannot

6    agree on.

7            It's essentially like the -- I kind of consider

8    this today to be our initial conference, even though this case

9    has been around for two years.  We know a lot more right now.

10   So as far as I'm concerned, it's kind of a brand-new case but

11   not really because, you know, 82,000 claimants are waiting for

12   their claims to be processed, and I'm very aware of that.

13   Okay?

14           I'll do the best I can to make it a priority, but

15   each of those issues that you're throwing out will require

16   reasoned opinions.  I know everything that we're going to do is

17   going to be appealed to the Fifth, to the supremes, so... And I

18   have a brilliant set of law clerks, and I'll pledge to you that

19   I'll work very hard on this, but there's only so much I can do

20   with a full docket.

21           MR. DOREN:  Understand.

22           THE COURT:  Okay?  So I'm kind of worried about that,

23   but we'll see.

24           So let's start -- I'm thinking of you all get

25   together and give the Court what you think makes sense for

TrustApp0315

1    Phase 1 of the plan, maybe even Phase 2.  What I'm thinking of

2    is there's going to be some that the Plaintiff wants that you

3    can't quite agree to, or maybe some of the defendants can't

4    agree to, and maybe you identify those.  And then -- I'm going

5    to tell you whatever you all can agree to is going to be fine

6    with me.

7                MR. DOREN:  All right.

8                THE COURT:  Okay?  So you can memorialize that in a

9    document that you file with the Court, and then I'll sign off

10   on it.

11               And then with respect to those that -- some or

12   all the defendants disagree with the Plaintiff on, we'll just

13   take up either in a context of a motion for leave or a motion

14   to compel because you'll need Court involvement.

15               MR. DOREN:  All right.

16               THE COURT:  Then there's going to be a third group --

17   and I'm talking to Plaintiffs here -- that I think that I'm

18   going to be very disinclined to say you can move forward with

19   and those that -- are those that jeopardize defendants if the

20   law is still they cannot actively pursue discovery.  That's --

21   I'm sympathetic to that argument.  Okay?

22               So I'm thinking agreed.  Herding jurisdictional

23   concerns and other concerns is somewhere in the middle.  If you

24   file your motion to compel this against this particular

25   defendant, I'll probably turn those around within two weeks.

1          MR. DOREN:  Thank you, Your Honor.

2          THE COURT:  So we'll keep going on that.

3          With respect to trial, we're going to get back to

4     trial on these discrete summary judgment issues.  I'll be

5     willing to listen.  I don't know what they are at this point,

6     and we'll talk a little bit more about that in a second on

7     what's already filed and ripe with the Court.

8          You touched on a couple of other things, too.

9          Oh, mediation.  And I'll talk more about that in

10    a little bit.

11         MR. DOREN:  Very well.

12         THE COURT:  Is there anything else that you brought up

13    that you want a response from me at this time?

14         MR. DOREN:  No, Your Honor.  I think you've covered it.

15         THE COURT:  Thank you.

16         MR. DOREN:  Thank you.

17         THE COURT:  With respect to the other defendants, is

18    there anyone that wants to come forward to the podium that

19    has -- either objects to what I'm contemplating or wants to add

20    to that?

21         Okay.  And then please clearly identify yourself

22    and who you represent, sir.

23         MR. JACOBS:  Good afternoon, Your Honor.  I'm Todd

24    Jacobs from Parker Hudson in Chicago.

25         We've got one other threshold issue that I think

1   the Court's already aware -- -

2           THE COURT:  Which defendants do you represent?

3           MR. JACOBS:  National Surety Corporation, Interstate

4   Fire & Casualty, and Firemans Fund Insurance Company.

5           THE COURT:  Okay.  Yes, sir.

6           MR. JACOBS:  National Surety Corporation is the entity

7   that filed the Illinois coverage case in November 2017, and

8   we've got motions to dismiss in front of the court fully

9   briefed on forum non conveniens and abstention principles.

10  It's our view that, at least it's our client's, the case ought

11  to be in Illinois.  And so that's -- we'd ask the Court's

12  guidance today for how you want --

13          THE COURT:  Discretionary?  Forum non conveniens?

14          MR. JACOBS:  I believe the absentia and forum non

15  conveniens are discretionary.

16          THE COURT:  Okay.  Well, I'll look at it, but I think

17  you're probably going to stay here.  I don't know.  I haven't

18  analyzed that yet.  Okay?

19              I'm glad you bring this up before the other

20  defendants come up.

21              I am going to order the Plaintiffs to file an

22  amended complaint.  There's been too much time that has gone by

23  and too much has happened since the -- and I think still it's

24  the original complaint.

25          MR. TILLOTSON:  It is, Your Honor.

TrustApp0318

1                    REPORTER'S CERTIFICATE

2              I, Thu Bui, CRR, RMR, Official Court Reporter,
   United States District Court, Northern District of Texas, do
3  hereby certify that the foregoing is a true and correct
   transcript, to the best of my ability and understanding, from
4  the record of the proceedings in the above-entitled and
   numbered matter.

5

6                              ___/s/ Thu Bui_____
                               Official Court Reporter

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# Civil, Law, Chancery, Domestic Case Search

For your convenience, the Clerk of the Circuit Court offers on-line access to electronic docket information for cases in the Criminal divisions. By using this service, the user agrees and understands that he or she is bound by the on-line access to court records Terms of Agreement.

Case information for case number: **2004CH01708**

Search Again

| Case Number | Calendar | Date Filed | Division |
|---|---|---|---|
| 2004CH01708 | CHCAL2 | 01/29/2004 | District 1 |

| Plaintiff(s) | Case Type | Defendant(s) | Attorney |
|---|---|---|---|

TrustApp0320

| | | |
|---|---|---|
| CONTINENTAL CASUALTY CORP | Declaratory Judgment | BORG WARNER INC |
| COLUMBIA CASUALTY COMPANY | | BURNS INTERNATIONAL SERVIC |
| TRANSPORTATION INSURANCE C | | YORK INTERNATIONAL CORPORA |
| CONTINENTAL INSURANCE COMP | | FLOWSERVE US INC |
| CONTINENTAL CASUALTY CO | | CENTURY INDEMNITY COMPANY |
| TRANSFER TO LAW DIVISION 6/28/21 | | ROYAL INDEMNITYCOMPANY |
| GUNTY & MCCARTHY LTD | | CASUALTY TRAVELERS |

Right column names:

CONTINENTAL CASUALTY
CORP
COLUMBIA CASUALTY
COMPANY
TRANSPORTATION
INSURANCE C
CONTINENTAL INSURANCE
COMP
CONTINENTAL CASUALTY CO
TRANSFER TO LAW DIVISION
6/28/21
GUNTY & MCCARTHY LTD

Declaratory Judgment

BORG WARNER INC
BURNS INTERNATIONAL
SERVIC
YORK INTERNATIONAL
CORPORA
FLOWSERVE US INC
CENTURY INDEMNITY
COMPANY
ROYAL INDEMNITYCOMPANY
CASUALTY TRAVELERS
CERTAIN UNDERWRITERS
LLOYD
LONDON
UNIGARD INSURANCE CO
CASUALTY IMPERIAL
SEATON INSURANCE
ZURICH LIFE INSURANCE
AMERICAN INTERNATIONAL
ALLSTATE INSURANCE
FIRST STATE INSURANCE
TIG INSURANCE COMPANY
SAFETY NATIONALCASUALTY
RISK EXECUTIVE
AMERICAN RE INSURANCE
CO
UNDERWRITERS ALLIANZ
AIU INSURANCE CO
GRANITE STATE INS CO
NATIONAL UNION FIRS INS
AMERICAN HOME
ASSURANCE
LEXINGTON INS CO
FIRE INTERSTATE
REINSURANCE MUNICH
INSURERS EXCESS
CASUALTY TRAVELERS
ARROWOOD INDEMNITY
COMPANY
MEMBER CHARTIS
ALLSTATE INSURANCE
COMPANY
HISCOX INSURANCE
COMPANY
FIRST STATE INS CO
REINSURANCE MUNICH
ZURICH INTERNATIONAL
BORGWARNER MORSE TEC
LLC
AIG
CNA
SHEA ROGAL & ASSOCIATES
DONOHUE BROWN SMYTH
LLC
UNGARETTI & HARRIS

GERBER NEAL
GRIPPO ELDEN LLC
DENA ECONOMOU
OCONNOR COZEN
TABET DIVITO &
ROTHSTEIN
AMUNDSEN DAVIS, LLC
CARROLL MCNULTY&KULL
LLC
STEVEN SEIDMAN
SONNENSCHEIN NATH &
ROSEN
THOMAS CUNNINGHAM
JOHN THIES
DANIEL THIES
MARK ZIMMERMAN
MITCHEL TORRENCE
BRIAN O'KANE
KAREN DEGRAND
CHRISTOPHER CARROLL
BEVIN CARROLL
JOHN LABARBERA
DONNA VOBORNIK

TrustApp0321

**Ad Damnum**

0

**Future Court Activity:**

| **Court Date:** | 12/04/2025 | **Hearing Type:** | Open Call (Judicial Officer:Chupack, Joel,Calendar, 2) | **Time:** | 9:30 AM | **Location:** | Court Room 2601,Richard J Daley Center |
|---|---|---|---|---|---|---|---|
| **Court Date:** | 10/22/2025 | **Hearing Type:** | Open Call (Judicial Officer:Chupack, Joel,Calendar, 2) | **Time:** | 9:00 AM | **Location:** | Court Room 2601,Richard J Daley Center |

**Case Activities:**

| **Activity Date:** | 10/15/2025 | **Event Desc:** | Motion To - Allowed - | **Comments:** | |
|---|---|---|---|---|---|
| **Activity Date:** | 10/14/2025 | **Event Desc:** | Notice Of Appeal Filed | **Comments:** | Third Party Defendant TIG's Notice of Appeal |
| **Activity Date:** | 10/14/2025 | **Event Desc:** | Exhibits Filed | **Comments:** | Exhibit A to TIG's Notice of Appeal |
| **Activity Date:** | 10/14/2025 | **Event Desc:** | Exhibits Filed | **Comments:** | Exhibit B to TIG's Notice of Appeal |
| **Activity Date:** | 10/14/2025 | **Event Desc:** | Exhibits Filed | **Comments:** | Exhibit C to TIG's Notice of Appeal |

10/16/25, 1:13 PM                                    | Clerk of the Circuit Court of Cook County

| **Activity Date:** | 10/14/2025 | **Event Desc:** | Exhibits Filed | **Comments:** | Exhibit D to TIG's Notice of Appeal |
|---|---|---|---|---|---|
| **Activity Date:** | 10/14/2025 | **Event Desc:** | Exhibits Filed | **Comments:** | Exhibit E to TIG's Notice of Appeal |
| **Activity Date:** | 10/14/2025 | **Event Desc:** | Exhibits Filed | **Comments:** | Exhibit F to TIG's Notice of Appeal |
| **Activity Date:** | 10/14/2025 | **Event Desc:** | Answer/Response/Reply | **Comments:** | TIG's Response to Flowserve's Motion to Clarify Supreme Court Rule 304(a) Certification |
| **Activity Date:** | 10/14/2025 | **Event Desc:** | Exhibits Filed | **Comments:** | Exhibit H to TIG's Notice of Appeal |
| **Activity Date:** | 10/14/2025 | **Event Desc:** | Exhibits Filed | **Comments:** | Exhibit M to TIG's Notice of Appeal |
| **Activity Date:** | 10/14/2025 | **Event Desc:** | Exhibits Filed | **Comments:** | Exhibit L to TIG's Notice of Appeal |
| **Activity Date:** | 10/14/2025 | **Event Desc:** | Exhibits Filed | **Comments:** | Exhibit G to TIG's Notice of Appeal |
| **Activity Date:** | 10/14/2025 | **Event Desc:** | Exhibits Filed | **Comments:** | Exhibit J to TIG's Notice of Appeal |

TrustApp0323

| **Activity Date:** | 10/14/2025 | **Event Desc:** | Exhibits Filed | **Comments:** | Exhibit K to TIG's Notice of Appeal |
|---|---|---|---|---|---|
| **Activity Date:** | 10/14/2025 | **Event Desc:** | Exhibits Filed | **Comments:** | Exhibit I to TIG's Notice of Appeal |
| **Activity Date:** | 10/10/2025 | **Event Desc:** | Exhibits Filed | **Comments:** | EXHIBIT 9 (Filed Under Seal) |
| **Activity Date:** | 10/10/2025 | **Event Desc:** | Notice Of Motion Filed | **Comments:** | Notice of Motion Via Zoom Proceeding |
| **Activity Date:** | 10/10/2025 | **Event Desc:** | Motion Filed | **Comments:** | Motion of Flowserve Corporation, Flowserve US Inc. and Flowserve International, Inc. to Clarify Supreme Court Rule 304(a) Certification |
| **Activity Date:** | 10/10/2025 | **Event Desc:** | Exhibits Filed | **Comments:** | EXHIBIT 10 (Filed Under Seal) |
| **Activity Date:** | 10/10/2025 | **Event Desc:** | Exhibits Filed | **Comments:** | EXHIBIT 9 (Filed Under Seal) |
| **Activity Date:** | 10/10/2025 | **Event Desc:** | Reviewing Court Order Received | **Comments:** | Second Amended Protective Order |
| **Activity Date:** | 10/10/2025 | **Event Desc:** | Motion Filed | **Comments:** | MORSE TEC LLC???S MOTION TO FILE UNDER SEAL |

| **Activity Date:** | 10/07/2025 | **Event Desc:** | Declaration | **Comments:** | Declaration in support of opposition |

| **Activity Date:** | 10/07/2025 | **Event Desc:** | Answer/Response/Reply | **Comments:** | Opposition to TIG's motion to dismiss counterclaim No. 12 under the Illinois fraud act and claim No. 5 for prejudgment interest |

| **Activity Date:** | 10/07/2025 | **Event Desc:** | Answer/Response/Reply | **Comments:** | Morse Tec's Opposition To TIG's Motion To Strike Allegations From Morse Tec's Amended Complaint Regarding Phase 1.5. Remedies |

| **Activity Date:** | 09/18/2025 | **Event Desc:** | Memorandum Of Opinion | **Comments:** | |

| **Activity Date:** | 09/18/2025 | **Event Desc:** | Motion To - Allowed - | **Comments:** | |

| **Activity Date:** | 09/18/2025 | **Event Desc:** | Strike Or Withdraw Motion Or Petition - Allowed - | **Comments:** | |

| **Activity Date:** | 09/18/2025 | **Event Desc:** | Case Assigned to Zoom Hearing - Allowed | **Comments:** | 9AM |

| **Activity Date:** | 09/18/2025 | **Event Desc:** | Case Set On Status Call | **Comments:** | 9AM |

TrustApp0325

Case 3:23-cv-01592-S    Document 559    Filed 10/23/25    Page 330 of 1044    PageID 17266
10/16/25, 1:13 PM
| Clerk of the Circuit Court of Cook County

| **Activity Date:** | 09/09/2025 | **Event Desc:** | Motion To - Denied - | **Comments:** | |

| **Activity Date:** | 09/08/2025 | **Event Desc:** | Appearance Filed - Fee Paid - | **Comments:** | Appearance of Donna J. Vobornik of Dentons US LLP |

| **Activity Date:** | 08/29/2025 | **Event Desc:** | Strike Or Withdraw Motion Or Petition - Allowed - | **Comments:** | EXHIBIT A |

| **Activity Date:** | 08/29/2025 | **Event Desc:** | Motion To - Allowed - | **Comments:** | |

| **Activity Date:** | 08/20/2025 | **Event Desc:** | Continuance - Allowed - | **Comments:** | RULING TO BE ISSUED |

| **Activity Date:** | 08/20/2025 | **Event Desc:** | Produce Exhibits OrOtherRecordsOrDocumentsOrPerson- Allowed | **Comments:** | TRANSCRIPT PROVIDED TO COURT TAKEN 8/19/25 |

| **Activity Date:** | 08/20/2025 | **Event Desc:** | Courts Motion This Case Is Taken Under Advisement | **Comments:** | WRITTEN ORDER TO BE ISSUED ON OR BEFORE 9/17 |

| **Activity Date:** | 08/14/2025 | **Event Desc:** | Order Defendant Leave To File Petition | **Comments:** | |

| **Activity Date:** | 08/14/2025 | **Event Desc:** | Answer/Reply/Response - Allowed | **Comments:** | EXCEED PAGE LIMIT |

| **Activity Date:** | 08/14/2025 | **Event Desc:** | Answer/Reply/Response - Allowed | **Comments:** | |

| **Activity Date:** | 08/14/2025 | **Event Desc:** | Set Briefing Schedule - Allowed - | **Comments:** | |

| **Activity Date:** | 08/14/2025 | **Event Desc:** | Order To Seal -Allowed | **Comments:** | 8/6/25 |

| **Activity Date:** | 08/14/2025 | **Event Desc:** | Strike From The Call - Allowed - | **Comments:** | 8/14 STRICKEN |

| **Activity Date:** | 08/14/2025 | **Event Desc:** | Motion To - Allowed - | **Comments:** | 8/6/25 MOTION {UNDER SEAL} |

| **Activity Date:** | 08/14/2025 | **Event Desc:** | Case Assigned to Zoom Hearing - Allowed | **Comments:** | 930AM |

| **Activity Date:** | 08/14/2025 | **Event Desc:** | Clerk Status | **Comments:** | 930AM |

| **Activity Date:** | 08/07/2025 | **Event Desc:** | Amended Notice Filed | **Comments:** | Amended Notice of Motion for TIG's Motion to Strike |

| **Activity Date:** | 08/07/2025 | **Event Desc:** | Exhibits Filed | **Comments:** | Entered Second Amended Protective Order |

| **Activity Date:** | 02/06/2004 | **Event Desc:** | Summons - Retd P.S. | **Comments:** | Litigant: BURNS INTERNATIONAL |
|---|---|---|---|---|---|
| **Activity Date:** | 01/29/2004 | **Event Desc:** | Case Set On Case Management Call | **Comments:** | Court Room: 2405 Court Time: 1030 |
| **Activity Date:** | 01/29/2004 | **Event Desc:** | Declaratory Judgment Complaint Filed | **Comments:** | Litigant: BORG WARNER INC Filing Fee: $271.00 |
| **Activity Date:** | 01/29/2004 | **Event Desc:** | New Case Filing | **Comments:** | |

Please Note:If you do not find a case you are looking for, please contact our Customer Service Call Center at (312) 603-5030 and they can assist you with your search.

PJ Moving Defendants with Insurance Policies Issued to Texas Local Councils

| Defendant Insurer | Insurer that Issued the Policy | Local Council Insured by Policy | Local Council Location | Policy Number (Start Year) |
|---|---|---|---|---|
| National Union Fire Insurance Company of Pittsburgh, PA | National Union Fire Insurance Company of Pittsburgh, PA | Chisholm Trail (561) | Abilene, TX | BE1220201 (1977) |
| National Union Fire Insurance Company of Pittsburgh, PA | National Union Fire Insurance Company of Pittsburgh, PA | Gulf Coast (577) | Corpus Christi, TX | BE1220206 (1977) |
| National Union Fire Insurance Company of Pittsburgh, PA | National Union Fire Insurance Company of Pittsburgh, PA | Buffalo Trail (567) | Midland, TX | BE1220214 (1977) |
| New Hampshire Insurance Company | New Hampshire Insurance Company | Bay Area (574) | Galveston, TX | GLA210276 (1976) |
| New Hampshire Insurance Company | New Hampshire Insurance Company | Comanche Trail (479) | Brownwood, TX | Unknown (1976) |
| New Hampshire Insurance Company | New Hampshire Insurance Company | Chisholm Trail (561) | Abilene, TX | Unknown (1976) |
| New Hampshire Insurance Company | New Hampshire Insurance Company | Capitol Area (564) | Austin, TX | Unknown (1976) |
| New Hampshire Insurance Company | New Hampshire Insurance Company | Buffalo Trail (567) | Midland, TX | Unknown (1976) |
| New Hampshire Insurance Company | New Hampshire Insurance Company | Caddo Area (584) | Texarkana, TX | Unknown (1976) |
| New Hampshire Insurance Company | New Hampshire Insurance Company | Caddo Area (584) | Texarkana, TX | Unknown (1977) |
| New Hampshire Insurance Company | New Hampshire Insurance Company | Chisholm Trail (561) | Abilene, TX | GLA332324 (1977) |
| New Hampshire Insurance Company | New Hampshire Insurance Company | Comanche Trail (479) | Brownwood, TX | Unknown (1975) |
| New Hampshire Insurance Company | New Hampshire Insurance Company | Comanche Trail (479) | Brownwood, TX | Unknown (1975) |
| New Hampshire Insurance Company | New Hampshire Insurance Company | Circle Ten (571) | Dallas, TX | Unknown (1975) |
| New Hampshire Insurance Company | New Hampshire Insurance Company | Bay Area (574) | Galveston, TX | Unknown (1975) |
| New Hampshire Insurance Company | New Hampshire Insurance Company | Bay Area (574) | Galveston, TX | GLA332336 (1977) |
| New Hampshire Insurance Company | New Hampshire Insurance Company | Capitol Area (564) | Austin, TX | Unknown (1977) |
| National Union Fire Insurance Company of Pittsburgh, PA | National Union Fire Insurance Company of Pittsburgh, PA | Comanche Trail (479) | Brownwood, TX | BE1217374 (1976) |
| National Union Fire Insurance Company of Pittsburgh, PA | National Union Fire Insurance Company of Pittsburgh, PA | Chisholm Trail (561) | Abilene, TX | BE1217370 (1976) |
| National Union Fire Insurance Company of Pittsburgh, PA | National Union Fire Insurance Company of Pittsburgh, PA | Capitol Area (564) | Austin, TX | BE1217372 (1976) |
| National Union Fire Insurance Company of Pittsburgh, PA | National Union Fire Insurance Company of Pittsburgh, PA | Buffalo Trail (567) | Midland, TX | BE1217383 (1976) |
| National Union Fire Insurance Company of Pittsburgh, PA | National Union Fire Insurance Company of Pittsburgh, PA | Caddo Area (584) | Texarkana, TX | BE1217389 (1976) |
| National Union Fire Insurance Company of Pittsburgh, PA | National Union Fire Insurance Company of Pittsburgh, PA | Caddo Area (584) | Texarkana, TX | BE1220220 (1977) |
| National Union Fire Insurance Company of Pittsburgh, PA | National Union Fire Insurance Company of Pittsburgh, PA | South Plains (694) | Lubbock, TX | BE1217382 (1976) |
| National Union Fire Insurance Company of Pittsburgh, PA | National Union Fire Insurance Company of Pittsburgh, PA | Circle Ten (571) | Dallas, TX | BE1220207 (1977) |
| National Union Fire Insurance Company of Pittsburgh, PA | National Union Fire Insurance Company of Pittsburgh, PA | South Plains (694) | Lubbock, TX | BE1220213 (1977) |
| National Union Fire Insurance Company of Pittsburgh, PA | National Union Fire Insurance Company of Pittsburgh, PA | Comanche Trail (479) | Brownwood, TX | BE1220205 (1977) |
| National Union Fire Insurance Company of Pittsburgh, PA | National Union Fire Insurance Company of Pittsburgh, PA | Llano Estacado (562) | Amarillo, TX | BE1217371 (1976) |
| National Union Fire Insurance Company of Pittsburgh, PA | National Union Fire Insurance Company of Pittsburgh, PA | Llano Estacado (562) | Amarillo, TX | BE1220202 (1977) |
| National Union Fire Insurance Company of Pittsburgh, PA | National Union Fire Insurance Company of Pittsburgh, PA | Capitol Area (564) | Austin, TX | BE1220203 (1977) |
| National Union Fire Insurance Company of Pittsburgh, PA | National Union Fire Insurance Company of Pittsburgh, PA | Texoma Valley (566) | Sherman, TX | BE1217388 (1976) |
| National Union Fire Insurance Company of Pittsburgh, PA | National Union Fire Insurance Company of Pittsburgh, PA | Texoma Valley (566) | Sherman, TX | BE1220219 (1977) |
| National Union Fire Insurance Company of Pittsburgh, PA | National Union Fire Insurance Company of Pittsburgh, PA | Adobe Walls Area (569) | Pampa, TX | BE1217384 (1976) |
| National Union Fire Insurance Company of Pittsburgh, PA | National Union Fire Insurance Company of Pittsburgh, PA | Adobe Walls Area (569) | Pampa, TX | BE1220215 (1977) |
| National Union Fire Insurance Company of Pittsburgh, PA | National Union Fire Insurance Company of Pittsburgh, PA | Circle Ten (571) | Dallas, TX | BE1217376 (1976) |
| National Union Fire Insurance Company of Pittsburgh, PA | National Union Fire Insurance Company of Pittsburgh, PA | Yucca (573) | El Paso, TX | BE1217377 (1976) |

TrustApp0329

PJ Moving Defendants with Insurance Policies Issued to Texas Local Councils

| Defendant Insurer | Insurer that Issued the Policy | Local Council Insured by Policy | Local Council Location | Policy Number (Start Year) |
|---|---|---|---|---|
| National Union Fire Insurance Company of Pittsburgh, PA | National Union Fire Insurance Company of Pittsburgh, PA | Yucca (573) | El Paso, TX | BE1220208 (1977) |
| National Union Fire Insurance Company of Pittsburgh, PA | National Union Fire Insurance Company of Pittsburgh, PA | Bay Area (574) | Galveston, TX | BE1217379 (1976) |
| National Union Fire Insurance Company of Pittsburgh, PA | National Union Fire Insurance Company of Pittsburgh, PA | Bay Area (574) | Galveston, TX | BE1220210 (1977) |
| National Union Fire Insurance Company of Pittsburgh, PA | National Union Fire Insurance Company of Pittsburgh, PA | Sam Houston Area (576) | Houston, TX | BE1217381 (1976) |
| National Union Fire Insurance Company of Pittsburgh, PA | National Union Fire Insurance Company of Pittsburgh, PA | Sam Houston Area (576) | Houston, TX | BE1220212 (1977) |
| National Union Fire Insurance Company of Pittsburgh, PA | National Union Fire Insurance Company of Pittsburgh, PA | Gulf Coast (577) | Corpus Christi, TX | BE1217375 (1976) |
| National Union Fire Insurance Company of Pittsburgh, PA | National Union Fire Insurance Company of Pittsburgh, PA | Three Rivers (578) | Beaumont, TX | BE1217373 (1976) |
| National Union Fire Insurance Company of Pittsburgh, PA | National Union Fire Insurance Company of Pittsburgh, PA | Three Rivers (578) | Beaumont, TX | BE1220204 (1977) |
| National Union Fire Insurance Company of Pittsburgh, PA | National Union Fire Insurance Company of Pittsburgh, PA | NeTseO Trails (580) | Paris, TX | BE1217385 (1976) |
| National Union Fire Insurance Company of Pittsburgh, PA | National Union Fire Insurance Company of Pittsburgh, PA | NeTseO Trails (580) | Paris, TX | BE1220216 (1977) |
| National Union Fire Insurance Company of Pittsburgh, PA | National Union Fire Insurance Company of Pittsburgh, PA | Alamo Area (583) | San Antonio, TX | BE1217387 (1976) |
| National Union Fire Insurance Company of Pittsburgh, PA | National Union Fire Insurance Company of Pittsburgh, PA | Alamo Area (583) | San Antonio, TX | BE1220218 (1977) |
| National Union Fire Insurance Company of Pittsburgh, PA | National Union Fire Insurance Company of Pittsburgh, PA | East Texas Area (585) | Tyler, TX | BE1217390 (1976) |
| National Union Fire Insurance Company of Pittsburgh, PA | National Union Fire Insurance Company of Pittsburgh, PA | East Texas Area (585) | Tyler, TX | BE1220221 (1977) |
| National Union Fire Insurance Company of Pittsburgh, PA | National Union Fire Insurance Company of Pittsburgh, PA | Northwest Texas (587) | Wichita Falls, TX | BE1217392 (1976) |
| National Union Fire Insurance Company of Pittsburgh, PA | National Union Fire Insurance Company of Pittsburgh, PA | Northwest Texas (587) | Wichita Falls, TX | BE1220223 (1977) |
| National Union Fire Insurance Company of Pittsburgh, PA | National Union Fire Insurance Company of Pittsburgh, PA | Heart O' Texas (662) | Waco, TX | BE1217391 (1976) |
| National Union Fire Insurance Company of Pittsburgh, PA | National Union Fire Insurance Company of Pittsburgh, PA | Longhorn (662) | Hurst, TX | BE1217378 (1976) |
| National Union Fire Insurance Company of Pittsburgh, PA | National Union Fire Insurance Company of Pittsburgh, PA | Heart O' Texas (662) | Waco, TX | BE1220222 (1977) |
| National Union Fire Insurance Company of Pittsburgh, PA | National Union Fire Insurance Company of Pittsburgh, PA | Longhorn (662) | Hurst, TX | BE1220209 (1977) |
| National Union Fire Insurance Company of Pittsburgh, PA | National Union Fire Insurance Company of Pittsburgh, PA | Concho Valley (741) | San Angelo, TX | BE1217386 (1976) |
| National Union Fire Insurance Company of Pittsburgh, PA | National Union Fire Insurance Company of Pittsburgh, PA | Concho Valley (741) | San Angelo, TX | BE1220217 (1977) |
| National Union Fire Insurance Company of Pittsburgh, PA | National Union Fire Insurance Company of Pittsburgh, PA | Rio Grande (775) | Harlingen, TX | BE1217380 (1976) |
| National Union Fire Insurance Company of Pittsburgh, PA | National Union Fire Insurance Company of Pittsburgh, PA | Rio Grande (775) | Harlingen, TX | BE1220211 (1977) |
| St. Paul Fire & Marine Insurance Company | St. Paul Fire and Marine Insurance Company | Buffalo Trail (567) | Midland, TX | Unknown (1977) |
| St. Paul Fire & Marine Insurance Company | St. Paul Fire and Marine Insurance Company | Sam Houston Area (576) | Houston, TX | Unknown (1976) |
| St. Paul Fire & Marine Insurance Company | St. Paul Fire and Marine Insurance Company | Sam Houston Area (576) | Houston, TX | Unknown (1977) |
| St. Paul Fire & Marine Insurance Company | St. Paul Fire and Marine Insurance Company | Alamo Area (583) | San Antonio, TX | 542AG6620 (1968) |
| St. Paul Fire & Marine Insurance Company | St. Paul Fire and Marine Insurance Company | Alamo Area (583) | San Antonio, TX | 542AG6865 (1968) |

TrustApp0330

## <u>List of Defendants that Objected to Bankruptcy Confirmation</u>
### <u>*In re Boy Scouts of America*, No. 20-10343 (Bankr. D. Del.)</u>

<u>The Allianz Insurers' (I) Objection to the Debtors' Disclosure Statement for their Second Amended Chapter 11 Plan of Reorganization and (II) Limited Joinder to Certain Objections, ECF No. 3549 (May 10, 2021)</u>

- Allianz Global Risks US Insurance Company

- National Surety Corporation

- Interstate Fire & Casualty Company

<u>Certain Insurers' Supplemental Objection to Motion for Approval of Debtors' Disclosure Statement, ECF No. 6052 (August 17, 2021)</u>

- Arrowood Indemnity Company

- Columbia Casualty Company

- The Continental Insurance Company

- Indian Harbor Insurance Company, on behalf of itself and as successor in interest to Catlin Specialty Insurance Company

- Munich Reinsurance America, Inc., formerly known as American Re-Insurance Company

- Old Republic Insurance Company

- St. Paul Surplus Lines Insurance Company

- Travelers Casualty and Surety Company, Inc. (f/k/a Aetna Casualty & Surety Company)

- Gulf Insurance Company (n/k/a The Travelers Indemnity Company)

<u>The Allianz Insurers' Joinder to the Certain Insurers' Supplemental Objection to Motion for Approval of Debtors' Disclosure Statement, ECF No. 6055 (August 17, 2021)</u>

- Allianz Global Risks US Insurance Company

- National Surety Corporation

- Interstate Fire & Casualty Company

<u>Certain Excess Insurers' Supplemental Objection to Debtors' Disclosure Statement for Fourth Amended Chapter 11 Plan of Reorganization and Joinder, ECF No. 6056 (August 17, 2021)</u>

- Great American Assurance Company (f/k/a Agricultural Insurance Company)

- Great American E&S Insurance Company (f/k/a Agricultural Excess and Surplus Insurance Company)

1

Joinder and Supplemental Objection of Liberty Mutual Insurance Company to the Disclosure
Statement for The Fourth Amended Chapter 11 Plan of Reorganization for Boy Scouts of
America and Delaware BSA, LLC, ECF No. 6057 (August 17, 2021)

- Liberty Mutual Insurance Company, together with its affiliates and subsidiaries
  (collectively, "Liberty")

Certain Insurers' Superseding Objections to the Disclosure Statement for Debtors' Fourth
Amended Plan, ECF No. 6062 (August 17, 2021)

- Allianz Global Risks US Insurance Company

- Arrowood Indemnity Company

- The Continental Insurance Company

- Columbia Casualty Company

- National Surety Corporation

- Interstate Fire & Casualty Company

- General Star Indemnity Company

Reservation of Rights and Objection of Everest National Insurance Company to Debtors' Second
Modified Fifth Amended Chapter 11 Plan of Reorganization, ECF No. 8672 (February 4, 2022)

- Everest National Insurance Company

Objection of Markel Insurers to Second Modified Fifth Amended Chapter 11 Plan of
Reorganization for Boy Scouts of America and Delaware BSA, LLC, ECF No. 8684 (February 4,
2022)

- Markel Service, Incorporated, Claim Service Manager for Alterra Excess & Surplus and
  Evanston Insurance Company

Munich Reinsurance America, Inc., Formerly Known as American Re-Insurance Company's
Joinder to Certain Objections and Separate Objection to the Plan, ECF No. 8685 (February 4,
2022)

- Munich Reinsurance America, Inc., formerly known as American Re-Insurance Company

Old Republic Insurance Company's (A) Joinder to Certain Insurers' Objection to Confirmation
of Debtors' Chapter 11 Plan; (B) Partial Joinder to Allianz Insurers' Objection to the Plan;
(C) Supplemental Objection to the Plan; and (D) Reservation of Rights, ECF No. 8699 (February
4, 2022)

- Old Republic Insurance Company

Joinder By Travelers Casualty and Surety Company, Inc. (FKA Aetna Casualty & Surety
Company), St. Paul Surplus Line[s] Insurance Company and Gulf Insurance Company to Allianz

2

TrustApp0332

<u>Insurers' Objection to the Second Modified Fifth Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC and Request for Relief from the Plan Discharge and Injunction Provisions, ECF No. 8700 (February 4, 2022)</u>

- Travelers Casualty and Surety Company, Inc. (f/k/a Aetna Casualty & Surety Company)

- St. Paul Surplus Lines Insurance Company

- Gulf Insurance Company (n/k/a The Travelers Indemnity Company)

<u>Joinder of Traders and Pacific Insurance Company, Endurance American Specialty Insurance Company, and Endurance American Insurance Company to Certain Insurers' Objection to Confirmation of Debtors' Chapter 11 Plan, ECF No. 8703 (February 5, 2022)</u>

- Endurance American Specialty Insurance Company

- Endurance American Insurance Company

<u>Joinder and Objection of Liberty Mutual Insurance Company to the Second Modified Fifth Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC, ECF No. 8763 (February 9, 2022)</u>

- Liberty Mutual Insurance Company, together with its affiliates and subsidiaries (collectively, "Liberty")

<u>Allianz Insurers' Objection to the Second Modified Fifth Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC and Request for Relief from the Plan Discharge and Injunction Provisions, ECF No. 8778-1 (February 10, 2022)</u>

- Allianz Global Risks US Insurance Company

- National Surety Corporation

- Interstate Fire & Casualty Company

<u>Certain Insurers' Objection to Confirmation of Debtors' Chapter 11 Plan, ECF No. 8858-1, (February 16, 2022)</u>

- The Continental Insurance Company

- Columbia Casualty Company

- Indian Harbor Insurance Company on behalf of itself and as successor in interest to Catlin Specialty Insurance Company

- Travelers Casualty and Surety Company, Inc. (f/k/a Aetna Casualty & Surety Company)

- St. Paul Surplus Lines Insurance Company

- Arrowood Indemnity Company

3

- Gemini Insurance Company

- National Surety Corporation

- Interstate Fire & Casualty Company

- Allianz Global Risks US Insurance Company

- Argonaut Insurance Company

- Colony Insurance Company

- Liberty Mutual Insurance Company

- General Star Indemnity Company

- Great American Assurance Company (f/k/a Agricultural Insurance Company)

- Great American E&S Insurance Company (f/k/a Agricultural Excess and Surplus Insurance Company)

- Arch Insurance Company

- Gulf Insurance Company (n/k/a The Travelers Indemnity Company)

Supplemental Reservation of Rights and Objection of Everest National Insurance Company to Debtors' Third Modified Fifth Amended Chapter 11 Plan of Reorganization, ECF No. 9020 (February 25, 2022)

- Everest National Insurance Company

Certain Insurers' Supplemental Objection to Confirmation of Debtors' Chapter 11 Plan, ECF No. 9033 (February 25, 2022)

- Great American Assurance Company (f/k/a Agricultural Insurance Company)

- Great American E&S Insurance Company (f/k/a Agricultural Excess and Surplus Insurance Company)

- Allianz Global Risks US Insurance Company

- National Surety Corporation

- Interstate Fire & Casualty Company

- Argonaut Insurance Company

- Colony Insurance Company

- Liberty Mutual Insurance Company

- General Star Indemnity Company

4

- Arch Insurance Company

- Indian Harbor Insurance Company, on behalf of itself and as successor in interest to Catlin Specialty Insurance Company

- Travelers Casualty and Surety Company, Inc. (f/k/a Aetna Casualty & Surety Company)

- St. Paul Surplus Lines Insurance Company

- The Continental Insurance Company

- Columbia Casualty Company

- Endurance American Specialty Insurance Company

- Endurance American Insurance Company

- Arrowood Indemnity Company

- Gemini Insurance Company

- Old Republic Insurance Company

- Munich Reinsurance America, Inc., formerly known as American Re-Insurance Company

- Gulf Insurance Company (n/k/a The Travelers Indemnity Company)

<u>Certain Insurers' Objection to Motion to Amend and Supplement The Findings of Fact and Conclusions of Law in the Confirmation Opinion and Objection to Confirmation of Revised Chapter 11 Plan, ECF No. 10247 (August 24, 2022)</u>

- Allianz Global Risks US Insurance Company

- National Surety Corporation

- Interstate Fire & Casualty Company

- Argonaut Insurance Company

- Colony Insurance Company

- Liberty Mutual Insurance Company

- General Star Indemnity Company

- Great American Assurance Company (f/k/a Agricultural Insurance Company)

- Great American E&S Insurance Company (f/k/a Agricultural Excess and Surplus Insurance Company)

- Arch Insurance Company

5

- Indian Harbor Insurance Company, on behalf of itself and as successor in interest to Catlin Specialty Insurance Company

- Travelers Casualty and Surety Company, Inc. (f/k/a Aetna Casualty & Surety Company)

- St. Paul Surplus Lines Insurance Company

- Gulf Insurance Company (n/k/a The Travelers Indemnity Company)

- Arrowood Indemnity Company

- Gemini Insurance Company

- Munich Reinsurance America, Inc., formerly known as American Re-Insurance Company

- Old Republic Insurance Company

- Endurance American Specialty Insurance Company

- Endurance American Insurance Company

- Markel Service, Incorporated, Claim Service Manager for Alterra Excess & Surplus and Evanston Insurance Company

6

TrustApp0336

**List of Defendants that Objected to Confirmation at the District Court**
***National Union Fire Insurance Co. of Pittsburgh PA et al. v. Boy Scouts of America &***
***Delaware BSA LLC*, No. 22-cv-01237 (D. Del)**

Opening Brief on Appeal of The Liberty Insurers and the Allianz Insurers Regarding Treatment of Class 9 Claims and Related Matters, ECF No. 43 (November 7, 2022)

- Allianz Global Risks US Insurance Company

- Liberty Insurance Underwriters, Inc.

- Liberty Mutual Insurance Company

- Liberty Surplus Insurance Corporation

- The Ohio Casualty Insurance Company

- National Surety Corporation

- Interstate Fire & Casualty Company

Opening Brief of Certain Insurers, ECF No. 45 (November 7, 2022)

- National Union Fire Insurance Company of Pittsburgh, Pa.

- Lexington Insurance Company

- The Insurance Company of the State of Pennsylvania

- Allianz Global Risks US Insurance Company

- National Surety Corporation

- Interstate Fire & Casualty Company

- Arch Insurance Company

- Argonaut Insurance Company

- Colony Insurance Company

- Arrowood Indemnity Company

- The Continental Insurance Company

- Columbia Casualty Company

- Gemini Insurance Company

- General Star Indemnity Company

- Indian Harbor Insurance Company, on behalf of itself and as successor in interest to Catlin Specialty Insurance Company

TrustApp0337

- Great American Assurance Company (f/k/a Agricultural Insurance Company)

- Great American E&S Insurance Company (f/k/a Agricultural Excess and Surplus Insurance Company)

- Munich Reinsurance America, Inc., formerly known as American Re-Insurance Company

- Liberty Mutual Insurance Company

- The Ohio Casualty Insurance Company

- Liberty Underwriters Inc.

- Liberty Surplus Insurance Corporation

- Endurance American Specialty Insurance Company

- Endurance American Insurance Company

- Old Republic Insurance Company

- Travelers Casualty and Surety Company, Inc. (f/k/a Aetna Casualty & Surety Company)

- St. Paul Surplus Lines Insurance Company

- Gulf Insurance Company (n/k/a The Travelers Indemnity Company)

Reply Brief of Certain Insurers, ECF No. 109 (December 21, 2022)

- National Union Fire Insurance Company of Pittsburgh, Pa.

- Lexington Insurance Company

- The Insurance Company of the State of Pennsylvania

- Allianz Global Risks US Insurance Company

- National Surety Corporation

- Interstate Fire & Casualty Company

- Arch Insurance Company

- Argonaut Insurance Company

- Colony Insurance Company

- Arrowood Indemnity Company

- The Continental Insurance Company

- Columbia Casualty Company

8

- Gemini Insurance Company

- General Star Indemnity Company

- Indian Harbor Insurance Company, on behalf of itself and as successor in interest to Catlin Specialty Insurance Company

- Great American Assurance Company (f/k/a Agricultural Insurance Company)

- Great American E&S Insurance Company (f/k/a Agricultural Excess and Surplus Insurance Company)

- Munich Reinsurance America, Inc., formerly known as American Re-Insurance Company

- Liberty Mutual Insurance Company

- The Ohio Casualty Insurance Company

- Liberty Underwriters Inc.

- Liberty Surplus Insurance Corporation

- Endurance American Specialty Insurance Company

- Endurance American Insurance Company

- Old Republic Insurance Company

- Travelers Casualty and Surety Company, Inc. (f/k/a Aetna Casualty & Surety Company)

- St. Paul Surplus Lines Insurance Company

- Gulf Insurance Company (n/k/a The Travelers Indemnity Company)

Reply Brief of The Liberty Insurers and the Allianz Insurers, ECF No. 111 (December 21, 2022)

- Allianz Global Risks US Insurance Company

- Liberty Insurance Underwriters, Inc.

- Liberty Mutual Insurance Company

- Liberty Surplus Insurance Corporation

- National Surety Corporation

- The Ohio Casualty Insurance Company

9

**<u>List of Defendants that Objected to Confirmation at the Third Circuit</u>**
***In re Boy Scouts of America*, No. 23-1664 (3d Cir. 2023)**

***In re Boy Scouts of America*, No. 23-1673 (3d Cir. 2023)**

<u>Opening Brief on Appeal of Appellants the Allianz Insurers, ECF No. 55 (July 24, 2023)</u>

- Allianz Global Risks US Insurance Company

- Interstate Fire & Casualty Company

- National Surety Corporation

***In re Boy Scouts of America*, No. 23-1668 (3d Cir. 2023)**

<u>Opening Brief of Certain Insurers, ECF No. 67 (July 24, 2023)</u>

- National Union Fire Insurance Company of Pittsburgh, Pa.

- Lexington Insurance Company

- The Insurance Company of the State of Pennsylvania

- Arrowood Indemnity Company

- The Continental Insurance Company

- Columbia Casualty Company

- Gemini Insurance Company

- General Star Indemnity Company

- Great American Assurance Company (f/k/a Agricultural Insurance Company)

- Great American E&S Insurance Company (f/k/a Agricultural Excess and Surplus Insurance Company)

- Indian Harbor Insurance Company, on behalf of itself and as successor in interest to Catlin Specialty Insurance Company

- Endurance American Insurance Company

- Endurance American Specialty Insurance Company

- Liberty Mutual Insurance Company

- The Ohio Casualty Insurance Company

- Liberty Insurance Underwriters, Inc.

- Liberty Surplus Insurance Corporation

10

TrustApp0340

- Travelers Casualty and Surety Company, Inc. (f/k/a Aetna Casualty & Surety Company)

- St. Paul Surplus Lines Insurance Company

- Gulf Insurance Company (n/k/a The Travelers Indemnity Company)

- Old Republic Insurance Company

- Arch Insurance Company

- Argonaut Insurance Company

- Colony Insurance Company

TrustApp0341

## List of Defendants That Attempted to Stay the Bankruptcy Proceedings (District Court)
### *National Union Fire Insurance Co. of Pittsburgh PA et al. v. Boy Scouts of America & Delaware BSA LLC*, No. 22-cv-01237 (D. Del)

Motion of the Certain Insurers for Stay of Further Implementation of the Plan Pending Supreme Court Decision in Purdue, ECF No. 235 (September 15, 2023)

- National Union Fire Insurance Company of Pittsburgh, Pa.

- Lexington Insurance Company

- The Insurance Company of the State of Pennsylvania

- Allianz Global Risks US Insurance Company

- National Surety Corporation

- Interstate Fire Casualty Company

- Arch Insurance Company

- Argonaut Insurance Company

- Colony Insurance Company

- The Continental Insurance Company

- Columbia Casualty Company

- Arrowood Indemnity Company

- General Star Indemnity Company

- Gemini Insurance Company

- Indian Harbor Insurance Company, on behalf of itself and as successor in interest to Catlin Specialty Insurance Company

- Great American Assurance Company (f/k/a Agricultural Insurance Company)

- Great American E&S Insurance Company (f/k/a Agricultural Excess and Surplus Insurance Company)

- Endurance American Specialty Insurance Company

- Endurance American Insurance Company

- Liberty Insurance Underwriters Inc.

- Liberty Mutual Insurance Company

- Liberty Surplus Insurance Corporation

12

- The Ohio Casualty Insurance Company

- Travelers Casualty and Surety Company, Inc. (f/k/a Aetna Casualty & Surety Company)

- St. Paul Surplus Lines Insurance Company

- Gulf Insurance Company (n/k/a The Travelers Indemnity Company)

- Old Republic Insurance Company

TrustApp0343

**List of Defendants That Attempted to Stay the Bankruptcy Proceedings (Third Circuit)**
***In re Boy Scouts of America*, No. 23-1664 (3d Cir. 2023)**

Motion of the Certain Insurers for Stay of Further Implementation of the Plan Pending Supreme Court Decision in Purdue, ECF No. 116 (October 10, 2023)

- National Union Fire Insurance Company of Pittsburgh, Pa.

- Lexington Insurance Company

- The Insurance Company of the State of Pennsylvania

- Allianz Global Risks US Insurance Company

- National Surety Corporation

- Interstate Fire & Casualty Company

- Argonaut Insurance Company

- Arch Insurance Company

- Arrowood Indemnity Company

- The Continental Insurance Company

- Columbia Casualty Company

- Gemini Insurance Company

- General Star Indemnity Company

- Indian Harbor Insurance Company, on behalf of itself and as successor in interest to Catlin Specialty Insurance Company

- Great American Assurance Company (f/k/a Agricultural Insurance Company)

- Great American E&S Insurance Company (f/k/a Agricultural Excess and Surplus Insurance Company)

- Endurance American Specialty Insurance Company

- Endurance American Insurance Company

- Liberty Insurance Underwriters Inc.

- Liberty Mutual Insurance Company

- Liberty Surplus Insurance Corporation

- The Ohio Casualty Insurance Company

- Travelers Casualty and Surety Company, Inc. (f/k/a Aetna Casualty & Surety Company)

14

- St. Paul Surplus Lines Insurance Company

- Gulf Insurance Company (n/k/a The Travelers Indemnity Company)

- Old Republic Insurance Company

TrustApp0345

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC,[1] | Case No. 20-10343 (LSS) |
| Debtors. | (Jointly Administered) |
| | **Ref. Docket No. 7832** |

**CERTAIN INSURERS' OBJECTION TO
<u>CONFIRMATION OF DEBTORS' CHAPTER 11 PLAN</u>**

---

[1]    The Debtors in these Chapter 11 Cases, together with the last four digits of each Debtor's federal tax identification number, are as follows: Boy Scouts of America (6300) and Delaware BSA, LLC (4311). The Debtors' mailing address is 1325 West Walnut Hill Lane, Irving, Texas 75038.

TrustApp0346

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................. 1

BACKGROUND ....................................................................................... 8

    A.    Claims Aggregators and Attorney-Signed Proofs of Claim Increase
        Abuse Claims from 275 Prepetition to Over 82,000 ............................. 8

    B.    The Collusive TDPs ........................................................................ 14

        (i)    Inflating Claims Values in Successive Versions of the Claims
                Matrix ............................................................................ 15

        (ii)   Aggravating and Mitigating Scaling Factors at the Discretion of
                the Settlement Trustee .................................................... 17

                1.    No Evidence of Negligence Required ..................... 18

                2.    Statutes of Limitations and Repose as a Mitigating
                      Factor Rather than a Bar to Recovery ..................... 20

                3.    Expedited Distributions Without Any Review of Claims ......... 22

        (iii)  No Vetting of Abuse Claims Through Claimant Interviews or
                Objective Testing of Claimants .......................................... 23

    C.    The Unbridled Discretionary Authority of a Conflicted Settlement
        Trustee ............................................................................................ 23

    D.    Abrogation of Insurance Policy Terms and Elimination of Insurer Rights
        and Defenses .................................................................................. 26

        (i)    Coalition Changes to Limit Insurers' Rights .......................... 27

        (ii)   Proposed Findings Under the Plan Modify Insurers' Contractual
                Rights ............................................................................ 27

    E.    The Mediation ................................................................................ 29

    F.    Evidentiary Record Submitted by the Debtors and Voting Results ......... 30

        (i)    Bates Affirmative Report Justifying Base Matrix Values Based
                Upon Single Abuser Historical Settlements .......................... 30

        (ii)   Less Than 48% of Total Direct Abuse Claimants Vote in Favor
                of the Plan ...................................................................... 31

i

# TABLE OF CONTENTS
### (*continued*)

**Page**

        (iii)     Bates Rebuttal Report Opines that Single Abuser Claims Must be Reduced by 90% From the Base Matrix Value .................................. 33

    G.    Settlements with Local Councils, Chartered Organizations and Certain Insurers. ....................................................................................................... 34

ARGUMENT ........................................................................................................................ 36

  I.    THE PROPOSED CHANNELING INJUNCTION FAILS TO SATISFY THE REQUIREMENTS OF THIRD CIRCUIT LAW. ............................................. 36

    A.    Nonconsensual Third-Party Releases Are Authorized Only in Unusual or Extraordinary Circumstances. ................................................................ 37

    B.    The Impacted Claimants Did Not "Overwhelmingly" Vote to Accept the Plan that Imposes the Channeling Injunction. ................................... 38

    C.    The Claims of Both Class 8 and Class 9 Will Not Be Paid In Full by the Settlement Trust. .......................................................................................... 40

    D.    The Majority of Beneficiaries of the Channeling Injunction Will Not be Making a "Substantial Contribution" to the Settlement Trust. ........................... 43

    E.    The Remaining *Master Mortgage* Factors Either Do Not Support or Are, at the Very Least, Neutral as to the Issue of Whether Approval of the Channeling Injunction Is Appropriate Under These Facts.................................. 47

  II.    THE PLAN MODIFIES CONTRACT RIGHTS IN VIOLATION OF BANKRUPTCY AND NON-BANKRUPTCY LAW..................................................... 48

    A.    The Proposed Plan Seeks to Improperly Determine Coverage Issues Through the Proposed Findings. ......................................................................... 50

    B.    The Plan Alters Certain Insurers' Rights by Materially Increasing Their Liability in a Manner Inconsistent with the Tort System.................................. 58

    C.    The TDPs Render the Plan Unconfirmable, as They Expressly Rewrite Insurance Policy Terms to Eliminate Insurer Rights and Defenses. ................... 61

        (i)     The "No Action Clause" ........................................................................ 62

        (ii)    SIR/Deductible Rights ........................................................................ 65

        (iii)   Indemnification, Contribution, Subrogation and Reinsurance Rights ......................................................................................................... 68

TrustApp0348

## TABLE OF CONTENTS
### (*continued*)

**Page**

D.     The Plan Improperly Assigns Non-Debtor Insurance Contracts to the
       Settlement Trust. ................................................................................................... 69

E.     The Plan Would Abridge Insurers' Constitutional Rights. ............................... 73

III.   GOVERNANCE OF THE SETTLEMENT TRUST IS INCONSISTENT WITH
       PUBLIC POLICY. ............................................................................................... 75

A.     The Settlement Trustee and STAC Lack any Semblance of
       Independence. .................................................................................................... 76

       (i)     Lack of Impartiality .................................................................................. 76

       (ii)    Lack of Fraud Prevention Measures and Disinterested Oversight
               of the Settlement Trust and Settlement Trustee. .................................... 81

IV.    THE PLAN IS NOT PROPOSED IN GOOD FAITH AND CANNOT BE
       CONFIRMED UNDER 11 U.S.C. § 1129(A)(3). .......................................... 83

A.     The Plan Ensures the Payment of Claims Barred by State Law and
       Impermissibly Inflates Insurers' Contractual Liabilities. .................................. 85

B.     The Substantive Defects in the Plan are the Result of Self-Dealing
       Among the Plan Proponents. .............................................................................. 87

CONCLUSION ...................................................................................................................... 89

TrustApp0349

# TABLE OF AUTHORITIES

**Page(s)**

<span style="font-variant: small-caps">CASES</span>

*In re 641 Associates, Ltd.*,
   1993 WL 332646 (Bankr. E.D. Pa. Aug. 26, 1993)....................................................44

*In re 710 Long Ridge Rd. Operating Co., II*,
   Case No. 13-13653 (DHS), 2014 Bankr. LEXIS 863 (Bankr. D.N.J. Mar. 5, 2014) ........39, 41

*In re AbitibiBowater Inc.*,
   418 B.R. 815 (Bankr. D. Del. Oct. 27, 2009) ...........................................44

*In re ACandS, Inc.*,
   311 B.R. 36 (Bankr. D. Del. 2004) ..................................................77, 82, 84, 89

*In re Am. Capital Equip., LLC*,
   688 F.3d 145 (3d Cir. 2012)........................................................76, 77, 79, 80

*Am. Sur. Co. v. Baldwin*,
   287 U.S. 156 (1932)..........................................................................68

*Am. United Mut. Life Ins. Co. v. City of Avon Park, Fla.*,
   311 U.S. 138 (1940)..........................................................................82

*In re Amatex Corp.*,
   107 B.R. 856 (E.D. Pa. 1989) *aff'd*
   908 F.2d 961 (3d Cir. 1990)..................................................................61

*Amatex Corp. v. Aetna Cas. & Sur. Co. (In re Amatex Corp.)*,
   97 B.R. 220 (Bankr. E.D. Pa. 1989), *aff'd sub nom.*,
   *Amatex Corp. v. Stonewall Ins. Co.*,
   102 B.R. 411 (E.D. Pa. 1989) ............................................................44, 45

*In re American Family Enters.*,
   256 B.R. 377 (D. N.J. 2000) .................................................................35

*In re Aov Indus.*,
   253 U.S. App. D.C. 186, 792 F.2d 1140 (1986) ...............................................35

*In re Archdiocese of Saint Paul & Minneapolis*,
   578 B.R. 823 (Bankr. D. Minn. 2017) ........................................................34

*ARTRA 524(g) Asbestos Trust v. Fairmont Premier Co.*,
   2011 WL 4684356 (N.D. Ill. 2011) ...........................................................52

TrustApp0350

**TABLE OF AUTHORITIES**
(*continued*)

**Page(s)**

*In re Blitz U.S.A., Inc.*,
 2013 WL 6825607 (Bankr. D. Del. Nov. 12, 2013) ................................................46

*In re Chatha*,
 2021 WL 3533391 (Bankr. E.D. Cal. Aug. 9, 2021) .............................................49

*Cissel v. Am. Home Assur. Co.*,
 521 F.2d 790 (6th Cir. 1975) ................................................................................44

*In re Combustion Engineering, Inc.*,
 391 F.3d 190 (3d Cir. 2004) ...............................................5, 44, 46, 65, 76, 79

*In re Congoleum Corp.*,
 426 F.3d 675 (3d Cir. 2005) ..................................................................................80

*Covanta Onondaga Ltd. v. Onondaga Cnty. Res. Recovery Agency*,
 318 F.3d 392 (2d Cir. 2003) ..................................................................................49

*In re Crippin*,
 877 F.2d 594 (7th Cir. 1989) .................................................................................44

*In re Cushman*,
 589 B.R. 469 (Bankr. D. M.E. 2018) .....................................................................36

*Deutsche Bank AG, London Branch v. Metromedia Fiber Network, Inc.* (*In re Metromedia Fiber Network, Inc.*),
 416 F.3d 136 (2d Cir. 2005) ..................................................................................34

*In re Digerati Techs., Inc.*,
 Case No. 13-33264, 2014 Bankr. LEXIS 2352 (Bankr. S.D. Tex. 2014) ...................70, 71, 73

*In re Dow Corning Corp.*,
 198 B.R. 214 (Bankr. E.D. Mich. 1996) .................................................................51

*In re Dow Corning Corp.*,
 280 F.3d 648 (6th Cir. 2002) ................................................................................43

*In re Dura Automotive Systems, Inc.*,
 2007 WL 7728109 (Bankr. D. Del. Aug. 15, 2007) ................................................44

*In re Exide Holdings, Inc.*,
 2021 WL 3145612 (D. Del. July 26, 2021) ......................................................76, 82

TrustApp0351

**TABLE OF AUTHORITIES**
(*continued*)

Page(s)

*In re F-Squared Invest. Manag., LLC*,
   546 B.R. 538 (Bankr. D. Del. 2016) ........................................................................36

*Fed. Ins. Co. v. SKMDV Holdings, Inc. (In re Green Jacobson P.C.)*,
   2017 WL 3149333 (Bankr. E.D. Mo. July 24, 2017) .....................................44, 61

*In re Federal-Mogul Glob. Inc.*,
   684 F.3d 355 (3d Cir. 2012)..............................................................................65, 66

*Flintkote Co. v. Aviva PLC (In re Flintkote Co.)*,
   177 F.Supp. 3d 1165 (N.D. Cal. 2016))............................................................48, 52

*In re Flintkote Co.*,
   No. 04-11300 (MFW), 2015 Bankr. LEXIS 2711 (Bankr. D. Del. Aug. 10, 2015)...............35

*Fuller-Austin Insulation Co. v. Highlands Ins. Co.*,
   135 Cal. App. 4th 958 (2006) ..........................................................................48, 52

*Fulton Boiler Works, Inc. v. Am. Motorists Ins. Co.*,
   828 F. Supp. 2d 481 (N.D.N.Y. 2011) ..................................................................67

*In re Genco Shipping & Trading Ltd.*,
   513 B.R. 233 (Bankr. S.D.N.Y. 2014) ...................................................................39

*In re Genesis Health Ventures, Inc.*,
   266 B.R. 591 (Bankr. D. Del. 2001) ......................................................................82

*Gillman v. Cont'l Airlines (In re Cont'l Airlines)*,
   203 F.3d 203 (3d Cir. 2000).............................................................................32, 43

*Glew v. Cigna Group Ins.*,
   590 F. Supp. 2d 395 (E.D.N.Y. 2008) ...................................................................67

*In re Glob. Indus. Techs.*,
   645 F.3d 201 (3d Cir. 2011)......................................................................46, 53, 80

*Granfinanciera, S.A. v. Nordberg*,
   492 U.S. 33, 51-52 (1989)645 F.3d 201 (3d Cir. 2011) ...........................................74

*Gulf Underwriters Ins. Co. v. Burris*,
   674 F.3d 999 (8th Cir. 2012) .................................................................................61

TrustApp0352

**TABLE OF AUTHORITIES**
(*continued*)

**Page(s)**

*In re HWA Props., Inc.*,
   544 B.R. 231 (Bankr. M.D. Fla. 2016) .................................................................39

*Kleenit, Inc. v. Sentry Ins. Co.*,
   486 F. Supp. 2d 121 (D. Mass. 2007) ...............................................................67

*In re Koelbl*,
   751 F.2d 137 (2d Cir. 1984)...............................................................................77

*In re Layton*,
   480 B.R. 392 (Bankr. M.D. Fla. 2012) ..............................................................51

*Lindsey v. Normet*,
   405 U.S. 56 (1972)....................................................................................5, 68

*Longview Power, LLC v. First Am. Title Ins. Co. (In re Longview Power, LLC)*,
   515 B.R. 107 (Bankr. D. Del. 2014) ...................................................................48

*Louisville Joint Stock Land Bank v. Radford*,
   295 U.S. 555 (1935)..........................................................................................68

*In re Lower Bucks Hosp.*,
   488 B.R. 303 (E.D. Pa. 2013) ...........................................................................39

*In re Mahoney Hawkes, LLP*,
   289 B.R. 285 (Bankr. D. Mass. 2002) ...............................................................39

*In re Mallinckrodt PLC*,
   2022 WL 334245 (Bankr. D. Del. Feb. 3, 2022) .................................................35

*In re Master Mortgage Investment Fund*,
   168 B.R. 930 (Bankr. W.D. Mo. 1994)........................................33, 34, 35, 36, 43

*Matsushita Elec. Indus. Co. v. Epstein*,
   516 U.S. 367 (1996)..........................................................................................49

*Menard-Sanford v. Mabey (In re A.H. Robins Co.)*,
   880 F.2d 694 (4th Cir. 1989) .............................................................................35

*Midway Motor Lodge v. Innkeepers' Telemanagement & Equip. Corp.*,
   54 F.3d 406 (7th Cir. 1995) ...............................................................................49

*In re Millennium Lab Holdings II, LLC*,
   575 B.R. 252 (Bankr. D. Del. 2017) ...................................................................32

TrustApp0353

**TABLE OF AUTHORITIES**
(*continued*)

<u>Page(s)</u>

*In re Millennium Lab Holdings II, LLC*,
    945 F.3d 126 (3d Cir. 2019)...................................................................................33, 35

*Moody v. Amoco Oil Co.*,
    734 F.2d 1200 (7th Cir. 1984) ........................................................................................44

*Mt. McKinley Ins. Co. v. Corning Inc*.,
    399 F.3d 436 (2d Cir. 2005).............................................................................................48

*Mullins v. Direct Dig., LLC*,
    795 F.3d 654 (7th Cir. 2015) ..........................................................................................68

*Nat'l Heritage Found., Inc. v. Highbourne Found*.,
    760 F.3d 344 (4th Cir. 2014) ..........................................................................................39

*Northview Motors v. Chrysler Motors Corp*.,
    186 F3d 346 (3d Cir. 1999).............................................................................................50

*Permasteelisa CS Corp. v. Columbia Cas. Co*.,
    377 Fed. App'x 260 (3d Cir. 2010)..................................................................................57

*In re Pittsburgh Corning Corp.*,
    453 B.R. 570 (Bankr. W.D. Pa. 2011) ....................................................................45, 46, 65

*In re Purdue Pharma, L.P.*,
    2021 WL 5979108 (S.D.N.Y. Dec. 16, 2021) ............................................................33, 39, 51

*In re Rickel Home Centers, Inc.*,
    209 F.3d 291 (3d Cir. 2000).............................................................................................44

*In re Roman Catholic Bishop of Stockton*,
    Case No. 14-20371, 2017 Bankr. LEXIS 102 (Bankr. E.D. Cal. Jan. 10, 2017)....................70

*Roman Catholic Diocese of Rockville Centre v. Arrowood Indemnity Co*.,
    2021 WL 1978560 (Bankr. S.D.N.Y May 17, 2021).........................................................48

*Rosciti v. Ins. Co. of Pennsylvania*,
    659 F.3d 92 (1st Cir. 2011)..............................................................................................61

*Rose v. Royal Ins. Co.*,
    2 Cal. App. 4th 709 (1991) ..............................................................................................58

*Sharon Steel Corp. v. Nat'l Fuel Gas Dist. Corp.*,
    872 F.2d 36 (3d Cir. 1989)...............................................................................................44

TrustApp0354

**TABLE OF AUTHORITIES**
(*continued*)

Page(s)

*In re SPM Mfg. Corp.*,
    984 F.2d 1305 (1st Cir. 1993) ................................................................44

*Stern v. Marshall*
    564 U.S. 462 (2011) ................................................................................64

*In re Thorpe Insulation Co.*,
    677 F.3d 869 (9th Cir. 2012) ...................................................45, 47, 53

*In re TK Holdings Inc.*,
    Case No. 17-11375-BLS (Bankr. D. Del. Feb. 21, 2018)..................37, 48

*Travelers v. PG&E*,
    549 U.S. 443 (2007)..........................................................................75, 78

*Matter of U.S. Brass Corp.*,
    110 F.3d 1261 (7th Cir. 1997) .................................................................48

*United States v. Sanford*,
    979 F.2d 1511 (11th Cir. 1992) ...............................................................79

*United States v. Sec. Indus. Bank*,
    459 U.S. 70 (1982).................................................................................68

*In re USA Gymnastics*,
    Case No. 18-09108 (Bankr. S.D. Ind. Dec. 16, 2021) ...........................35

*In re Vista Proppants & Logistics, LLC*,
    Case No. 20-42002, 2020 Bankr. LEXIS 3018 (Bankr. N.D. Tex. Oct. 28, 2020) ................70

*In re Washington Mut., Inc.*,
    461 B.R. 200 (Bankr. D. Del. 2011) .......................................................82

*In re WR Grace & Co.*,
    729 F.3d 332 (3d Cir. 2013).....................................................................77

*In re Zenith Electronics Corp.*,
    241 B.R. 92 (Bankr. D. Del. 1999) .........................................................43

**STATUTES**

11 U.S.C. § 101(14) ....................................................................................71

11 U.S.C. § 365(e)(1)..................................................................................44

TrustApp0355

**TABLE OF AUTHORITIES**
(*continued*)

<u>Page(s)</u>

11 U.S.C. § 365(f)............................................................................................44

11 U.S.C. § 502.................................................................................................79

11 U.S.C. § 1123(a)(7)..................................................................................6, 70

11 U.S.C. § 1129(a)(1)......................................................................................43

11 U.S.C. § 1129(a)(3).........................................................................43, 68, 76

11 U.S.C. § 1129(a)(5)..................................................................................6, 70

28 U.S.C. § 157(b)(5)........................................................................................26

**OTHER AUTHORITIES**

4 Collier on Bankruptcy ¶ 1502.03[2][b] (15th ed. 1984) ............................75

Black's Law Dictionary (9th ed. 2009).........................................................76

*Collier on Bankruptcy* ¶ 1129.02 (15th ed. 1984) .......................................78

Wall Street Journal, *Looting the Boy Scouts* (Mar. 2, 2021) .......................53

18 Wright & Miller, Federal Practice and Procedure § 4413 (3d ed. April 2021 Update)...........49

TrustApp0356

The undersigned insurance carriers (collectively, "Certain Insurers") file this objection

("Objection") to the Debtors' *Second Modified Fifth Amended Chapter 11 Plan of Reorganization*

*for Boy Scouts of America and Delaware BSA* [Docket No. 7832] (the "Plan").[2]  In support of this

Objection, Certain Insurers respectfully submit as follows:

### PRELIMINARY STATEMENT

1.      The Plan represents an unprecedented attempt by certain members of the plaintiffs'

bar to drum up and inflate tens of thousands of abuse claims that would not withstand scrutiny in

the tort system, and then leverage these claims to exploit the bankruptcy process in a manner that

would pay them potentially billions of dollars in contingency fees.  This massive financial windfall

would come primarily at the expense of two groups:  the holders of valid abuse claims, whose

recoveries would be greatly diluted by the payment of invalid claims; and insurance companies,

whose policies would be completely rewritten and whose due process rights would be trampled in

order to provide payment for those same unmeritorious claims.  The proposed Plan, with fatally

flawed Trust Distribution Procedures and Proposed Findings at its center, fails to satisfy binding

requirements for a broad channeling injunction and non-consensual third-party releases,

fundamentally and impermissibly alters the rights and obligations of the insurers under applicable

insurance contracts, and falls far short of satisfying multiple threshold standards of Section 1129

of the Bankruptcy Code.  It cannot be confirmed.

2.      The plaintiffs' law firms understood from the outset of the bankruptcy process that

the 275 known prepetition Abuse Claims would not provide the firms with enough leverage to

control the Debtors' chapter 11 case, increase claim values and payments, or generate a significant

---

[2]      Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Plan or the
Trust Distribution Procedures (the "TDPs"), as applicable.

contingency fee recovery.  Realizing the bankruptcy process presented them a unique opportunity, they promised certain and substantial payouts to sign-up additional potential claimants, and asserted all of those claims to wrest control of the bankruptcy from the Debtors.  The plaintiffs' firms then used that control to draft their own claimant-friendly trust distribution procedures, install their own conflicted Settlement Trustee to implement the TDPs, and to draft and require Court approval of Proposed Findings and other Plan provisions that would eviscerate insurers' contractual rights, and obligate insurers to pay inflated claim amounts based on the Settlement Trustee's claim determinations.

3.      The law firms accomplished this by hiring claims aggregators to run mass advertising campaigns and actively solicit claimants, with little or no vetting of claims.  They drafted proofs of claims, often with those same attorneys (rather than the purported claimants) signing the forms.  Some attorneys were signing literally hundreds of claim forms per day.  One lawyer's photocopied signature was pasted to hundreds of proofs of claim, mere seconds apart.  This assembly-line operation was intended to generate as many claims as possible, without even a cursory review as to the legitimacy of the claims.  And the gambit was wildly successful, resulting in a *30,000%* increase in claims—275 prepetition claims transformed into 82,200—and billions of dollars in additional purported exposure and resulting plaintiff law firm contingency fees.

4.      Once the necessary claimant retentions were obtained, plaintiffs' law firms asserted their control over the Plan process.  Despite the formation of the TCC by the Office of the United States Trustee, several law firms formed a unified coalition (the "Coalition") to exert leverage over the Debtors.  The Coalition left no question as to its aims, declaring that it "controlled 80% of the claims i.e., our coalition controls the case."  With pen in hand, the Coalition made several key changes to the TDPs.  The Coalition greatly increased the Base Matrix Values—the dollar amounts

2

that would serve as the starting points for the Trustee in valuing claims—to a level that is, according to Debtors' *own* expert, Dr. Charles Bates, *ten times* too high. They eliminated the ability of the Settlement Trustee to dismiss claims that would be time-barred in the tort system. And they dispensed with any required showing of negligence by the Boy Scouts, effectively imposing a strict liability standard on the Debtors.

5.    The result is TDPs that, if approved, would inflate claim liability by tens of billions of dollars and allow tens of thousands of claims that would otherwise be barred in the tort system. Together with the Proposed Findings, the Coalition and FCR seek to bind the insurers to the inflated future payouts as determined under the TDPs. By Dr. Bates' estimate, approximately 61% of the claims asserted in the bankruptcy would be barred by the applicable statute of limitations if brought as tort claims. And 87% of the claims would either fail entirely, or should be highly discounted (by a factor of 90% from the Base Matrix Value) as claimants, in the traditional tort system, would likely be unable to prove that the Boy Scouts acted with negligence with respect to single abuser claims. Yet all of these claims would be paid out under the proposed TDPs. In the case of single abuser claims, the claims would be paid with *no* discounts from the Base Matrix Values.

6.    Concurrently, the Coalition and FCR were negotiating with the Local Councils, certain Chartered Organizations and the Settling Insurers to generate a $2.7 billion war chest to pay claimants so they could pursue substantially greater and disproportionate recoveries against the Non-Settling Insurers. However, those settlements necessitated a global release, which meant that the Plan had to incorporate a channeling injunction and third party releases that covered all Boy Scouts' liability, whether it arose at the national, local or chartered organization level. This presented a new level of complexity and legal difficulty for the Plan Proponents. The Third Circuit

3

has a strict test for the imposition of this type of injunction and third party releases, which requires compliance with a number of factors, including that the injunction and third party releases be essential to the reorganization of the debtor, that the Plan be overwhelmingly supported by the affected creditors, that the parties that benefit from the injunction and third party releases make a substantial contribution to the funding of the Plan, and that the Plan pay such creditors in full.  None of these factors are present in the Debtors' case.

7.      As a final exertion of control, the Coalition and FCR seek both to appoint an ally, Professor Eric Green, as the Trustee, and to afford him practically unfettered discretion in allowing and valuing claims, notwithstanding that this Court previously declined to appoint him as a mediator in this very case due to his ties to claimants' counsel.  The plaintiffs' lawyers then created a supervisory board (the "STAC") that would oversee the Trustee, staffed with several of their own ranks, guaranteeing that there would be no independence to any aspect of the Trust's claims-allowance and valuation process.  Through these efforts, claimants' counsel ensured that they would control the determination of claims values by the Trust and that such values would be far in excess of what they would otherwise be entitled to in the tort system.

8.      The result of this process is a proposed Plan that violates numerous provisions of the Bankruptcy Code, governing legal standards, and due process.  It cannot be confirmed, for a host of reasons.

9.      *First*, although the plaintiffs' law firms succeeded in increasing the number of Abuse Claims and in drafting TDPs and related governance mechanisms that facilitate inflated payouts, the Debtors have come up short in obtaining the support required to obtain a channeling injunction and non-consensual third-party releases.  Only 73.57% of Direct Abuse Claimants voted to accept the Plan, which is well below the "overwhelming support" required in the non-asbestos

TrustApp0360

context (where a 90% or greater approval rate is more typical), or even the 75% that would be required in the asbestos context.  The vote proved even worse for Indirect Abuse Claimants, whose acceptance did not even breach a threshold of 70%.  The Debtors' unambiguous failure to secure the necessary support for these key provisions of the Plan precludes its approval.

10.     Given the deficient vote count, the Debtors now argue that the Abuse Claims will be "paid in full." But the only evidence in support of that proposition is Dr. Bates' claim valuation report referenced above.   Dr. Bates values the claims at $2.4 billion to $3.6 billion, and contends that these amounts will be paid in full by the approximately $2.7 billion in promised contributions to the Settlement Trust plus the contribution of unsettled insurance coverage.  But Dr. Bates' valuation range contradicts the proposed TDPs, and it therefore cannot be used as a basis for the contention that Direct Abuse Claims are "paid in full."  As noted, the TDPs start with base values that are *ten times higher* than could be supported by Dr. Bates' valuation range, and does not provide, as is integral to Dr. Bates' valuation, that those Base Matrix Values will be discounted by 90% for the 87% of the claims that are single abuser claims.  That gap will only grow given the TDPs' generous scaling criteria, lax fraud prevention measures, and discretion of a conflicted trustee.  As a result, the Debtors are left with a fatal paradox.  Either the TDPs will improperly value claims, and the Plan cannot be confirmed because it vastly overstates the Debtors actual liability for Abuse Claims.  Or Dr. Bates is wrong, and the Plan cannot be confirmed as it does not provide the "payment in full" for all Direct Abuse Claimants required to support the channeling injunction and third party releases that are a key requirement of the Plan and the contributions to be made to the Settlement Trust.

11.     Dr. Bates opines that the appropriate valuation range is $2.4 billion to $3.6 billion and that range is reflective of the Debtors historic experience in the tort system.  As a result, only

TrustApp0361

by radically reducing the Base Matrix Values, adjusting scaling factors to take account of substantive defenses and procedural safeguards present in the tort system, implementing appropriate fraud prevention measures, and replacing a conflicted governance structure with one that is truly neutral, could the Court approve the TDPs and conclude that the Direct Abuse Claims will be "paid in full."  Absent these adjustments, the Plan simply cannot be confirmed.

12.    Moreover, the additional factors courts in the Third Circuit consider when weighing the propriety of a channeling injunction are similarly absent from this case.  While a "substantial contribution" on the part of a released party may tip the scales in favor of an injunction, here the vast majority of the Chartered Organizations are providing little, if any, of their own contribution. There is also no evidence that the Channeling Injunction is an "essential element" of the Debtors' reorganization, as the Debtors' restructuring advisor previously testified that the prior "Toggle Plan" (which included no third party releases) was fully feasible.  Finally, there is no evidence of an "identity of interest" between the Debtors and the Protected Parties that warrants the extraordinary relief of the Channeling Injunction and third party releases.

13.    *Second*, the Plan and the TDPs impermissibly seek to modify insurer contract rights in contravention of applicable bankruptcy law and due process.  *See, e.g.*, *In re Combustion Engineering, Inc.*, 391 F.3d 190, 245 n.66 (3d Cir. 2004); *Lindsey v. Normet*, 405 U.S. 56, 66 (1972).

14.    Far from being "insurance neutral," the Plan attempts through a variety of measures (including, but not limited to, the Proposed Findings that the Coalition and FCR seek to incorporate into the Confirmation Order) to alter the contract rights of the Debtors' insurers, to adjudicate personal injury claims which this Court has neither the legal authority nor factual record to do, and

TrustApp0362

to bind the non-settling insurers to that adjudication which is neither required nor appropriate for confirmation of a plan of reorganization under the Bankruptcy Code.

15.    If confirmed, the Plan (and its Proposed Findings) would unlawfully modify the Debtors' insurance contracts by, among other things, depriving the non-settling insurers of their contractual rights, in any post-bankruptcy coverage litigation, to:  (i) raise defenses to the abuse claims (particularly claims that are time-barred or otherwise unrecoverable under the tort system, because, for example, the Debtors were not shown to be negligent and therefore are not legally responsible for the abuse); (ii) approve the settlement of abuse claims; (iii) limit liability to only those losses that Debtors (the insureds) are legally obligated to pay; (iv) apply policy exclusions to any losses; (v) require the payment of self-insured retentions or deductibles prior to the application of insurance policies; and (vi) seek contribution or indemnification and reinsurance claims against the settling parties.

16.    The Plan further modifies the non-settling insurers' contracts by artificially inflating the number and value of abuse claims purportedly subject to coverage, materially increasing the insurers' exposure.  Indeed, this is true even apart from the Proposed Findings, as courts adjudicating coverage issues will have to grapple with the fact that the claim determinations made by the Settlement Trust are the product of a chapter 11 plan confirmed by a federal bankruptcy court.  Finally, the Debtors have provided no legal basis for the Plan's purported assignment to the Settlement Trust of insurance agreements with *non-debtor parties* (i.e. Local Councils and Chartered Organizations).

17.    ***Third***, Settlement Trustee Prof. Green's close relationship with plaintiffs' attorneys prevents his service from meeting the "consistent with public policy" standard required by the Bankruptcy Code.  11 U.S.C. §§ 1123(a)(7); 1129(a)(5).  Those concerns are only heightened here,

TrustApp0363

where Prof. Green is overseen by the STAC, which is also dominated by plaintiffs' attorneys, who will siphon from claimants thirty to forty percent of every dollar the Settlement Trust distributes.

18.    **Fourth**, once this scheme to control these bankruptcy proceedings is laid bare, there can be no doubt that the Plan is not proposed in good faith and cannot be confirmed under 11 U.S.C. § 1129(a)(3). Plaintiffs' attorneys improperly seized control of these proceedings, drafted the TDPs to permit outsized payments on largely invalid claims for their own gain (and at the expense of insurers and claimants with valid claims), and then appointed their close ally Prof. Green as the Settlement Trustee. A Plan premised on such an improper foundation is not proposed for a proper bankruptcy purpose and should not be confirmed.

19.    For these reasons and those discussed in more detail below, the Plan neither satisfies the requirements of Sections 1129 and 1123 of the Bankruptcy Code, including without limitation, sections 1129(a)(1), (a)(3), (a)(5), and section 1123(a)(7), nor the Third Circuit's requirements for the approval of nonconsensual third-party releases and issuance of a channeling injunction. The Plan cannot be confirmed.

## BACKGROUND

A.    **Claims Aggregators and Attorney-Signed Proofs of Claim Increase Abuse Claims from 275 Prepetition to Over 82,000.**

20.    On February 18, 2020 (the "Petition Date") the Debtors filed voluntary petitions for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code"). On the Petition Date, BSA was a defendant in 275 sexual abuse lawsuits and was aware of an additional approximately 1,400 claims that had not yet been filed.[3] By the November 16, 2020 bar date, over 95,000 proofs of claim were filed for over 82,000 individual alleged Abuse Claims.

---

[3]    *Debtors' Information Brief* [Docket No. 4] at pg. 3 (Certain Insurers App. 1).

TrustApp0364

21.     This explosion in the number of claims was the direct result of the efforts by certain plaintiffs' lawyers, including a group of plaintiffs' lawyers that founded the Coalition, who pursued an aggressive media advertising campaign with the stated goal of generating a supermajority of claims.  Indeed, Mr. Timothy Kosnoff, one of the founders of the Coalition, acknowledged the goal was to "[k]eep focused on our marketing and media efforts going full tilt in to Nov [2020]" so that "[w]e control 80% of the claims, i.e., our coalition controls the case."[4] Coalition co-founder Mr. Kenneth Rothweiler reiterated that these unprecedented efforts allowed the Coalition to assert control over these Chapter 11 Cases and diminish the importance of the TCC, stating that "the TCC represents about 6,800 survivors.  So they represent 6,800 and we represent 65,000.  And we actually represent more than that when you add all of the survivors and the survivors' lawyers that are not part of the coalition per se but are people that support the coalitions' positions."[5]

22.     The marketing campaign included demonstrably false statements, including that claimants could remain "anonymous," that a recovery was "ensured" and "substantial," and that claimants "will never have to be deposed, appear in Court or otherwise prove their claims,"[6] leading the Court to order a stop to ads containing "false and misleading" information.[7]

---

[4]     *Notice of Filing of Exhibit in Support of the Objection of the Tort Claimants' Committee to Motion of the Coalition of Abused Scouts for Justice for an Order (I) Authorizing the Coalition to File Under Seal Exhibit A to the Amended 2019 Statement and (II) Approving the Sufficiency of the Amended 2019 Statement* [Docket No. 1285] (Ex. 1, Email of Mr. Kosnoff dated June 28, 2020) (Certain Insurers App. 3).

[5]     Sept. 28, 2021 Hearing Tr. at 163:11-17 (Certain Insurers App. 54).

[6]     *Debtors' Motion Pursuant to Section 105(a) of the Bankruptcy Code and ¶ 27 of the Bar Date Order for Entry of an Order (I) Supplementing the Bar Date Order and (II) Granting Related Relief* [Docket No. 1145] (Certain Insurers App. 2).

[7]     *Supplemental Order to Order, Pursuant to 11 U.S.C. § 502(b)(9), Bankruptcy Rules 2002 and 3003(c)(3), and Local Rules 2002-1(e), 3001-1, and 3003-1, (I) Establishing Deadlines for Filing Notice Thereof, (II) Establishing the Form and Manner of Notice Thereof, (III) Approving Procedures for Providing Notice of Bar Date and Other Important Information to Abuse Survivors, and (IV) Approving Confidentiality Procedures for Abuse Survivors* [Docket No. 1331] (Certain Insurers App. 4).

TrustApp0365

23.    The Coalition also requested that the Court allow attorneys, rather than claimants, to sign proofs of claim,[8] and after such relief was opposed by each of the Debtors, the TCC and the insurers, the Coalition promised that "[a]ll claims . . . will be thoroughly vetted."[9]  The Court authorized attorneys to sign proofs of claim only after stating that it was concerned that lawyers would sign "proofs of claim forms where they have not done the due diligence necessary to sign it" and that "if we get a thousand signatures by an attorney on proofs of claim forms filed at the last minute, I think that raises questions. I just think it does and we're going to have to deal with it.  So I don't advise that[.]"[10]  Counsel to the Coalition agreed, stating "[i]f there is improper conduct by any attorney, then they're going to have to face the consequence for those actions."[11]

24.    But these repeated warnings were ignored by each of the law firms that Certain Insurers investigated.[12]  Certain Insurers have deposed seven attorneys at Coalition plaintiffs' firms regarding attorney-signed proofs of claim, which revealed the following:

- **Sean Higgins, *Andrews & Thornton*, 1,019 Proofs of Claim Signed:**[13]  Mr. Higgins issued a blanket authorization to affix his signature to proofs of claim any time his firm could not contact the client—which resulted in his signature being added to 1,019 proofs of claim.  Mr. Higgins relied on others to review the information,[14] and had no

---

[8]    *Motion of Coalition of Abused Scouts for Justice for Order Permitting Filing of Proof of Claim Forms Signed by Authorized Counsel in Accordance with Bankruptcy Code Sections 501 and 502, Bankruptcy Rule 3001, and Official Form 410*  [Docket No. 1388] (Certain Insurers App. 5).

[9]    *Corrected Omnibus Reply of the Coalition of Abused Scouts for Justice to Objections to Motion for Oder Permitting Filing of Proof of Claim Forms Signed by Authorized Counsel in Accordance with Bankruptcy Code Sections 501 and 502, Bankruptcy Rule 3001, and Official Form 410*  [Docket No. 1496] ¶ 41 (Certain Insurers App. 6).

[10]    Oct. 14 Hr'g Tr. at 177:21-23 (Certain Insurers App. 57).

[11]    *Id.* at 189:20-190:18.

[12]    If there had been more time for discovery, even more widespread misconduct may have been uncovered. Certain Insurers expressly reserve the right to supplement this Objection with any new information they uncover.

[13]    Sean Higgins Jan. 25, 2022 Deposition Transcript at 107:15-108:13 (Certain Insurers App. 45).

[14]    *Id.* at 107:3-14; 178:9-23 ("I signed as an authorized agent of the law firm, and the law firm is making the attestation."); 190:3-9.

TrustApp0366

personal knowledge regarding any claim or claimant.[15]  Andrews & Thornton relied on a third party, Legal Conversion Center, Inc. for intake, evaluation and retention of clients.[16]  In some cases Andrews & Thornton had never had any contact with the client before the proof of claim was signed and still have been unable to contact the client, but have not withdrawn the claim.[17]

- **Stewart Eisenberg, *Rothweiler, Winkler, Eisenberg & Jeck, P.C.* ("Eisenberg Rothweiler"), 963 Proofs of Claim Signed:[18]** Mr. Eisenberg relied on others to review the information for the 963 proofs of claim with his signature.[19]  Intake was handled primarily by Eisenberg Rothweiler's co-counsel, AVA Law, and Mr. Eisenberg testified that he did not know the details of their intake process.[20]  Notably, Mr. Eisenberg had no personal contact with any of the claimants for whom he signed proofs of claim.[21]  He affixed his signature to 959 of the 963 forms he signed in the week leading up to the bar date, at times at a pace of three proofs of claim in one minute.[22]

- **Jonathan Schulman, *Slater Slater Schulman LLP*, Approximately 400 Proofs of Claim Signed:** Mr. Schulman signed "approximately 400" proofs of claim, without speaking to the vast majority of claimants.[23]  Notably, Mr. Schulman could not recall if he confirmed that his firm had been retained by the claimants for whom he signed and filed proofs of claim.[24]  For one claimant who Mr. Schulman's firm filed a proof of claim, Mr. Schulman was unable to locate any record of the claimant being a client of his firm.[25]

- **Paul Napoli, *Napoli Shkolnik PLLC*, 672 Proofs of Claim Signed:** Mr. Napoli signed 672 proof of claim forms, over 300 of which were substantially blank.[26]  Although Mr. Napoli testified he performed an investigation into all the claims he signed, when asked

---

[15]  *See, e.g., id.* at 111:3-10 ("[T]he firm reviewed the claim form. I did not, in my individual capacity, review every single claim form."); 136:9-10 ("I don't have a specific knowledge of this specific claim form"); 148:12-13 (same); 162:2-3 (same); 177:10-18 (same).

[16]  *Id.* at 43-45; 61:6-14 (Certain Insurers App. 45).

[17]  *Id.* at 75:6-76:3.

[18]  Declaration of Paul J. Hinton [Docket No. 1975-3] (Certain Insurers App. 82).

[19]  Stewart Eisenberg Jan. 31, 2022 Deposition Transcript at 96:21-97:21 ("Q. Did you ever personally speak to the claimant for whom you were planning to sign a proof of claim form? A. No that was done by other people.") (Certain Insurers App. 43).

[20]  *Id.* at 37:21-39:4.

[21]  *Id.* at 97:18-21.

[22]  *Id.* at 104:1-5.

[23]  Jonathan Schulman Feb. 2, 2022 Deposition Transcript at 104:12-14.

[24]  Schulman Dep. Tr. at 106:5-107:12.

[25]  Schulman Dep. Tr. 222:3 ("Q: So, for one of the claimants, you did not have a retainer agreement. . . .A: We had no record of that being our client.").

[26]  *See* Declaration of Paul Hinton [Docket No. 1975-3] (Certain Insurers App. 82); Declaration of Charles Fox, Docket No. 2211-2, p. 2 (Certain Insurers App. 83).

11

for examples of what he specifically did to investigate each claim, he could not provide any examples.[27]  When asked if he spoke to each of the claimants on whose behalf he signed claims, he testified he did not.[28]

- **(1) Kenneth Rothweiler, *Eisenberg Rothweiler* and (2) Adam Slater, *Slater Slater Schulman LLP*:** Mr. Rothweiler and Mr. Slater were deposed regarding their role on the STAC but each was directed by his counsel not to answer any questions regarding the proofs of claim he signed[29] despite the STAC's role in developing the questionnaire claimants must submit to the trust, *see infra* at 169, and despite the fact that Mr. Slater testified that the STAC's involvement in "the creation of a questionnaire that will be used to assess [his] clients claims . . . could have the appearance" of a conflict of interest.[30]

- **Adam Krause, *Krause & Kinsman LLP*, 2,507 Proofs of Claim Signed:[31]** Mr. Krause's firm relied on four vendors that provided intake services,[32] and then two other vendors for interview and follow-up services.[33]

25.    Despite this Court's clear guidance and the lack of personal knowledge, the attorneys listed above all were willing to attest, in their individual capacities, that (a) "I declare under penalty of perjury that the foregoing statements are true and correct," and (b) "I have examined the information in this Sexual Abuse Survivor Proof of Claim and have a reasonable belief that the information is true and correct"[34]  During their depositions two attorneys, Sean Higgins of Andrews & Thornton and Jonathan Schulman of Slater Slater Schulman, denied that they were personally attesting to anything,[35] and Mr. Higgins even denied that his firm was

---

[27]    *See* Paul Napoli Jan. 31, 2022 Deposition Transcript at 17:17-17:19 ("Q. … Can you provide me with some examples of what that [factual investigation into attorney-signed claims] entailed?  A. Not really, no.") (Certain Insurers App. 84).

[28]    *See* Napoli Dep Tr., at 17:25-18:3 (Q. As part of your investigation, did you speak with each and every one of the claimants? A. No.") (Certain Insurers App. 84).

[29]    Kenneth Rothweiler Jan. 30, 2022 Deposition Transcript at 46:14-48:5 (Certain Insurers App. 49); Adam Slater Feb. 2, 2022 Deposition Transcript at 68:15-71:23; 87:13-87:19 (Certain Insurers App. 86). .

[30]    Slater Dep. Tr. at 68:15-71:23; 87:13-87:19 (Certain Insurers App. 86).

[31]    Declaration of Paul Hinton [Docket No. 1975-3] (Certain Insurers App. 87).

[32]    Adam Krause Jan. 31, 2022 Deposition Transcript at 139:19-141:16 (Certain Insurers App. 85).

[33]    *Id.* at 152:4-156:15.

[34]    Blank Proof of Claim Form Higgins Dep. Tr. Ex. 2 (Certain Insurers App. 45).

[35]    Higgins Dep. Tr. at 107:3-14; 178:9-23 ("I signed as an authorized agent of the law firm, and the law firm is making the attestation."); 190:3-9 ("Q: A – but its you, making the attestation on behalf of the law firm, represents

12

attesting to the "exact truth" or "complete accuracy" of the factual allegations contained in the
proofs of claim that bore his signature, noting that because the alleged incident "happened in
1969 . . . it would be impossible for the firm to vouch for their complete accuracy."[36]

26.     The failure to take seriously the personal attestation led to numerous absurdities.
Mr. Napoli signed a blank proof of claim form for a claimant who had died five months before the
claim was submitted on his behalf.[37]  Mr. Higgins' signature was added to proofs of claim when a
different law firm had submitted a claimant-signed form for the same claimant, often with
inconsistent allegations.[38]  Mr. Schulman's colleague added her signature to proofs of claim for
two brothers, both of whom were listed as deceased, where his firm had a record that it had not
been retained to represent one of the brothers.[39]

27.     Mr. Higgins testified that all of this is "unsurprising" and "fairly typical" in the
mass tort world.[40]  And that, in the "nonbankrutpcy" mass tort context, procedures and safeguards
typically provide for scrutiny into claims where, as here, the claimant cannot be contacted or the
claim lacks any factual basis that lead to their disallowance.[41]  Mr. Napoli testified that resolution

_____

that there were reasonable efforts to ensure that the information was true and correct, right? A. No. The law firm is
making the attestation contained in this document."); 104:8-9 (Certain Insurers App. 45); Schulman Dep. Tr. 123:25
– 125:6 ("Q: You signed three or 400 proof of claim forms in this case personally, right? . . . A: I signed that in my
capacity as a representative of" - -  as an authorized representative of the law firm. . . .Q: So, it's your testimony that
where it states, ["]Print name on this claim form, Jonathan E. Schulman, Esquire, as attorney . . . that that statement
on this proof of claim form is not actually referring to you individually, it's referring to the Slater Slater Schulman
law firm? . . . A: That's what I said. It's referring to me as a representative of the law firm. On behalf of the law firm.
Not in my individual capacity.") (Certain Insurers App. 45).

[36]  Higgins Dep. Tr. at 193:3-7 (Certain Insurers App. 45).

[37]  Napoli Dep. Tr., Ex. 6 (███████████ obituary, identifying ████████ died in June of 2020);
Napoli Dep. Tr. at 46:13 ("A. It's the same ████████, yes.  This is what I was telling you.  Sometimes people die.
And its hard to get ahold of them.") (Certain Insurers App. 84).

[38]  Higgins Dep. Tr. at 182:1-182:19; 197:4-199:6 (Certain Insurers App. 45).

[39]  Schulman Dep. Tr. at 225:25-243:15 (Certain Insurers App. 91).

[40]  Higgins Dep. Tr. at 187:10-188:2 (Certain Insurers App. 45).

[41]  *Id.* at 76:17-79:3 ("[I]n every mass tort, there is a universe of claimants that, for whatever reason, we had
trouble locating or engaging in the continued prosecution of their claim . . . And there are a number of ways that

TrustApp0369

of his remaining attorney-signed, blank proof of claim forms would be "up to the judge" or be resolved through the "process" put in place by the Court.[42]

28.    But Mr. Higgins, and other Coalition-affiliated attorneys, designed TDPs[43] that exclude any of those established procedures.  *See infra* at ¶¶ 29-57.  Accordingly, justifications that the Settlement Trust will eventually vet their factual assertions ring hollow.[44]

### B.    The Collusive TDPs

29.    Throughout this case, the Coalition has sought to leverage its large number of claims to dictate key provisions of the Debtors' Plan and its TDPs.[45]  And they have wielded that control to place before the Court a Plan, drafted with no insurer input, that will establish a Settlement Trust with TDPs that inflate the amount and number of claims, and eviscerate the insurers' rights to investigate and challenge or consent to resolve those claims.

30.



---

typically gets dealt with . . . . at what point have we hit the point of this case, I couldn't say.  But, yes, there is an established methodology in all mass torts to deal with these kinds of claims.").

[42]    Napoli Dep. Tr. at 21:15-16, 21:20-21 (Certain Insurers App. 84).

[43]    Rothweiler Dep. Tr. at 55:4-56:13 (Certain Insurers App. 49).

[44]    *See, e.g.,* Slater Dep. Tr. at 80:15-20 ("I think the post Trust formation procedures will be designed, you know, to – to determine if there are any cases that might fall into the category of [] claims that might not be compensated.") (Certain Insurers App. 86).

[45]    *See, e.g., supra* ¶ 4.

[46]    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Deposition Transcript Ex. 25] (Certain Insurers App. 64).

[47]    Azer Dep. Tr. at 19:5-8; 41:14-20 (Certain Insurers App. 64).

TrustApp0370



### (i)    Inflating Claims Values in Successive Versions of the Claims Matrix

31.    The Debtors, the Coalition and the FCR (the "Plan Proponents") attempt to side-step the fact that the Coalition dominated the drafting of the TDPs by asserting that the TDPs are "evidence-based" rather than "negotiated," and are in accordance with "the debtors' historical settlement practices and experience in the tort system"[53] and, for that reason the insurers should be bound by them.[54] But a review of the record shows that the TDPs are inconsistent with historical settlements, and while drafts were exchanged between the parties, the final version of the TDPs is clearly the product of dominance by the Coalition.

---

[48]    James Patton Nov. 30, 2021 Deposition Transcript at 73:21-74:7 (Certain Insurers App. 48).

[49]    Douglas Kennedy (TCC) Dec. 29, 2021 Deposition Transcript at 365:12-367:7 (Certain Insurers App. 50).

[50]    Anne Andrews Dec. 21, 2021 Deposition Transcript at 52:7-52:23 (Certain Insurers App. 63).

[51]    *Id.* at 145:8-147:13.  The Certain Insurers reject any notion that Brown Rudnick has ever sent anything on their behalf regarding the TDPs in this case.

[52]    ███████████████████████████████████████████████████████████████

[53]    Sept. 28, 2021 Hr'g Tr., at 107:8-108:15, 100:19-101:19 (Eric Goodman) (Certain Insurers App. 54). .

[54]    *Joinder of the Coalition of Abused Scouts for Justice, the Official Committee of Tort Claimants, and the Future Claims Representative to, and Brief in Support of, Debtors' Motion for Entry of an Order, Pursuant to Sections 363(b) and 105(a) of the Bankruptcy Code, (I) Authorizing the Debtors to Enter into and Perform Under the Restructuring Support Agreement, and (II) Granting Related Relief* ("Coalition, FCR and TCC Statement ISO RSA") [Docket No. 5680], at ¶ 40 (Certain Insurers App. 11).

TrustApp0371

32.    The Coalition's statements that the Debtors imposed the TDPs upon them are belied by the changes that occurred to the claims matrix over time, which inflated claims against the Debtors. ███████████████████████████████████████████████████████

███████████ [55]



33.    By contrast, in the current claims matrix,[56] all Base Matrix Values and Maximum Matrix Values have clearly departed from historical experience and increased from the initial claims matrix by orders of magnitude, and the amounts are substantially closer to the amounts included in the initial Coalition TDP term sheet:

| Tier | Type of Abuse | Base Matrix Value | Maximum Matrix Value |
|------|---------------|-------------------|----------------------|
| 1 | Anal or Vaginal Penetration by Adult Perpetrator | $600,000 | $2,700,000 |

---

[55] ████████████████████████████████████████████████████ This chart removes a column from the original that listed examples of cases for each tier.

[56] Plan, Art. VIII.A.  This chart has been abridged in the interest of conserving space.

16

| 2 | Oral Contact by Adult Perpetrator<br><br>Anal or Vaginal Penetration by Youth Perpetrator | $450,000 | $2,025,999 |
|---|---|---|---|
| 3 | Masturbation by Adult Perpetrator<br><br>Oral Contact by a Youth Perpetrator | $300,000 | $1,350,000 |
| 4 | Masturbation by Youth Perpetrator<br><br>Touching of the Sexual or Other Intimate Parts (unclothed) by Adult Perpetrator | $150,000 | $675,000 |
| 5 | Touching of the Sexual or Other Intimate Parts (unclothed) by a Youth Perpetrator<br><br>Touching of the Sexual or Other Intimate Parts (clothed), regardless of who is touching whom and not including masturbation.<br><br>Exploitation for child pornography. | $75,000 | $337,500 |
| 6 | Sexual Abuse – No Touching<br><br>Adult Abuse Claims | $3,500 | $8,500 |

**(ii)    Aggravating and Mitigating Scaling Factors at the Discretion of the Settlement Trustee**

34.    The TDPs require the Settlement Trustee to apply (in his sole discretion) aggravating and mitigating Scaling Factors to the applicable Base Matrix Value, resulting in final Allowed Claim Amounts.[57]  The Debtors claim these factors "are based on evidence regarding the BSA's and other putative Protected Parties' historical abuse settlements, litigation outcomes, and other evidence supporting the Scaling Factors."[58]  But the evidence proves otherwise.  *See infra* at ¶¶ 35-45.

35.    ████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

---

[57]  TDPs, Art. VIII.C.

[58]  *Id.*

TrustApp0373

███████████████████████████████████████████████████████████████

████████████████████████ ■ But negotiations with the Coalition flipped these concepts on their heads: a showing of negligence was no longer required to receive a Base Matrix Value recovery because it was transformed into an aggravating factor, and evidence that a claim was timely was no longer required to recover under the TDPs.  The Coalition also insisted upon, and obtained, a $3,500 "no questions asked" option for *anyone* who asserted a claim.

### 1.    No Evidence of Negligence Required

36.    In the tort system, sexual-abuse plaintiffs have to demonstrate negligence to demonstrate the Debtors' liability.  Under the TDPs, however, a showing of negligence is only an ***aggravating*** factor that results in payouts to the claimant that exceed the applicable Base Matrix Value.[60]  Thus, claimants who would receive ***no payment*** on their claims in the tort system would, under the TDPs, still receive at least the Base Matrix Value recovery on their claims; those who could potentially demonstrate negligence would receive a substantial windfall.

37.    The Debtors' ***own expert***, Dr. Charles Bates, opined that, where a claimant has alleged abuse by a Boy Scout leader who had never been accused of abusing another child (*i.e.* a single abuser), that claimant would have great difficulty demonstrating that the Debtors were negligent given the lack of the Debtors' knowledge of the risk, likely precluding any recovery in the tort system.[61]  Dr. Bates thus lays bare the fallacy of the Plan Proponents' premise that the

---

[59] ████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████

[60] TDPs § VIII.D.(ii)d.

[61] *See* Rebuttal Expert Report of Charles E. Bates, PhD ("Bates Rebuttal Report") ¶ 53 ("The Abuse Claims mostly involve abusers who are identified only once and most told no one of their abuse for years and never told Scouting or the police. . . . the BSA settlements for such cases are lower than the repeat abuser claims. This means the chance of a liability finding against the BSA or the liability share of BSA would also be lower for single victim cases.")

TrustApp0374

TDPs will mimic recoveries outside of bankruptcy: "The vast majority of Abuse Claims would receive no compensation for their abuse but for a trust set up as part of this bankruptcy proceeding, consistent with the fact that so many of the Abuse Claims were never pursued through litigation."[62]

38.    Dr. Bates further opined that in order for the TDPs to be consistent with the tort system, single abuser claims (87% of Abuse Claims) must be reduced by 90% from the base claim value to reflect "BSA's likely low average responsibility for these Abuse Claims."[63]   If they are not, then abuse claims would be overvalued "manyfold," potentially resulting in what the trust will later contend is aggregate abuse claim liability of $25 billion,[64] roughly 700% of the high range of Dr. Bates' claim-liability estimate.

39.    Earlier drafts of the TDPs recognized that evidence of a viable tort claim (*i.e.*, one requiring proof of negligence) was rightfully a prerequisite to allowance of a claim. ████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

---

(Certain Insurers App. 30); *see also*  Charles E. Bates Jan. 28, 2022 Deposition Transcript at 143:13–146:21 (Certain Insurers App. 92).

[62]    Bates Rebuttal Report ¶ 31 (Certain Insurers App. 30); *see also* Bates Dep. Tr. at 119:16-10 ("I believe that the vast majority of these claims would not be pursued and not be economically viable in the tort system.") (Certain Insurers App. 92); Bates Dep. Tr. at 124:1-16 ("But in terms of the process by which existed prior to the – to the bankruptcy, more than 70,000 [claims] would never have been compensated at all . . . if this process here was to fail and they would wind up back in the tort system").

[63]    Bates Rebuttal Report at ¶¶ 53, 97, 98 ("In contrast to the high fraction of settlements involving claims with repeat abusers, only 13% of Abuse Claims involve identifiable repeat abusers. . . . I set a mitigating scalar for all Single Abuser Cases to 10%, reflective of BSA's likely low average responsibility for these Abuse Claims. . . . These levels . . . are reasonable and appropriate for the Trust to properly account for the tort system values of the Abuse Claims.") (Certain Insurers App. 30).

[64]    Bates Rebuttal Report at ¶ 66 (Certain Insurers App. 30).

TrustApp0375



")."[65]

## 2. Statutes of Limitations and Repose as a Mitigating Factor Rather than a Bar to Recovery

40.     In the tort system, untimely claims asserted in "closed states" are subject to dismissal.  Under the TDPs, however, a claimant whose claim would otherwise be barred by a statute of limitations or statute of repose is subject only to a mitigating Scaling Factor based on the ranges set forth in a Schedule 1 attached to the TDPs.[68]

41.     The Coalition has been clear from the outset that it seeks a plan in which Abuse Claimants with time-barred claims are compensated, with Mr. Rothweiler stating:

 "[H]ere is our common goal and mission: No survivor would be left behind. All survivors would be compensated. Philosophically what we thought, Your Honor, is if someone was sexually abused by a Boy Scout leader in New York, which is an open state, and if someone was sexually abused by a scout leader in Alabama, which is a closed state, it shouldn't make a difference."[69]

42.     Indeed, the Coalition aggressively solicited Abuse Claimant support for its Plan on that basis.  For example, in one of many "town hall" style meetings with claimants, leading attorneys for the Coalition have opined that, absent approval of the TDPs, more than 58,000 of the filed claims are not eligible for compensation under tort law.  *See, e.g.*, Oct. 19, 2021 Coalition



[68]  TDPs, Art. VIII.E(iii).
[69]  Sept 28 2021 Hr'g Tr. at 163:21-164:5 (Certain Insurers App. 54).

20

TrustApp0376

Town Hall Recording, https://scoutingabusesurvivors.com/events/, 25:00 (K. Rothweiler: "But you start out with the premise you're in a closed state which means you don't have the right to bring a lawsuit because the statute of limitations doesn't allow you to do it. I'm worried about those 58,473 survivors because if the plan is voted down they're going to have a heck of a time getting any compensation at all."); *id.* at 44:26 (A. Slater: "If [the] plan is not approved . . . the only thing you're left with is the tort system and a substantial likelihood the majority of claims could be dismissed and wind up with $0 . . . .").

43.

 This treatment was slightly modified in the TDPs attached to the Second Amended Plan [Docket No. 2592], filed by the Debtors on April 13, 2021, where time-barred claims were required to be zeroed-out (though the Settlement Trustee was afforded limited discretion to avoid a complete bar where "evidence supporting the Submitted Abuse Claim warrants recovery despite its untimeliness").[71]

The TDPs were accordingly modified and now, under the current TDPs, the Settlement Trustee is prohibited from denying recovery on a conclusively time-barred claim.[73]

---

[70]

[71]    Second Am. Plan, Ex. A, § 5.4 (Certain Insurers App. 8).

[72]

[73]    TDPs, Art. VIII.E(iii).

TrustApp0377

### 3.    Expedited Distributions Without Any Review of Claims



44.    The versions of the TDPs proposed after the Coalition and FCR entered into an RSA with the Debtors, including the current version of the Plan, now offer an "expedited payment of $3,500 to holders of all Direct Abuse Claims," again with no question asked.[75]    Notwithstanding the misleading mass marketing efforts, patently false representations made in plaintiffs' lawyers advertisements, and significant irregularities in the claims filing process, every one of the approximately 82,000 claims would thus be entitled to the expedited payment without supporting documentation.    In essence, the TDPs seek to codify the plaintiffs' law firms' statements that a recovery was "ensured" and that claimants "will never have to be deposed, appear in Court or otherwise prove their claims,"[76] and the Plan seeks to have this Court approve these procedures despite the fact that this Court already concluded that those statements were "false and misleading."[77]

45.    These changes ensure inflated claim values far beyond the Debtors' experience in the tort system.    This was the explicitly articulated goal of the Coalition, expressed by Coalition co-founder Andrews & Thornton when objecting to the ability of the Settlement Trustee to reduce

---

[74] ████████████████████████████████████████████████████████████████

[75]    Plan, Art. VI.A.

[76]    *Debtors' Motion Pursuant to Section 105(a) of the Bankruptcy Code and ¶ 27 of the Bar Date Order for Entry of an Order (I) Supplementing the Bar Date Order and (II) Granting Related Relief* [Docket No. 1145] (Certain Insurers App. 2).

[77]    *Supplemental Order to Order, Pursuant to 11 U.S.C. § 502(b)(9), Bankruptcy Rules 2002 and 3003(c)(3), and Local Rules 2002-1(e), 3001-1, and 3003-1, (I) Establishing Deadlines for Filing Notice Thereof, (II) Establishing the Form and Manner of Notice Thereof, (III) Approving Procedures for Providing Notice of Bar Date and Other Important Information to Abuse Survivors, and (IV) Approving Confidentiality Procedures for Abuse Survivors* [Docket No. 1331] (Certain Insurers App. 4).

TrustApp0378

recoveries below the Base Matrix Value: ████████████████████████████ ████████████████████████████████████████████ The end result is that, if the Plan is approved, the Settlement Trust will compensate "tens of thousands of claims . . . who would never be compensated in the tort [system] and will not receive any compensation should a Settlement Trust not be set up for that purpose."[78]

### (iii)    No Vetting of Abuse Claims Through Claimant Interviews or Objective Testing of Claimants

46.    Despite Coalition attorney Sean Higgins' sworn statement that "the testimony of the survivor is the single most critical piece of evidence of the case" and that "assessing the credibility of those allegations is paramount," Higgins Dep. Tr. at 179:9-23, there is no requirement that the Settlement Trustee interview or otherwise test Abuse Claimants in the process of evaluating their claims despite the significant issues regarding attorney signed claims that the limited discovery insurers have been able to conduct has uncovered.[79]  This ensures that, if the Plan is approved, Abuse Claims, including those where proofs of claim were signed by plaintiffs' attorneys without personal knowledge, will never be vetted.[80]

### C.    The Unbridled Discretionary Authority of a Conflicted Settlement Trustee

47.    The Plan provides that the Settlement Trustee will be solely responsible for reviewing and resolving the approximately 82,200 Direct Abuse Claims, including any late-filed claims deemed timely by the Settlement Trustee in his sole discretion, and any future claims.  He

---

[78]    Bates Rebuttal Report at ¶ 31 (Certain Insurers App. 30).

[79]    *See supra* ¶¶ 20-28.

[80]    *See* Amended Affirmative Report of Eileen C. Treacy, Ph.D. (the "Treacy Report") ¶ 20 ("To deter fraud, all claimants should be interviewed. It is standard clinical practice to conduct interviews in the course of evaluating a sexual abuse allegation, particularly in a civil lawsuit when the allegations are being made many years after the alleged child sexual abuse and when a potential secondary gain motive may be present.") (Certain Insurers App. 31).  The TDPs also do not require any objective testing of Abuse Claimants, which is "core to any psychological assessment of reliability." *Id.* at ¶¶ 27-28.

TrustApp0379

will also have sole discretion to disburse Settlement Trust assets, which could amount to $3 billion or more. Under the TDPs, the Settlement Trustee would have virtually unfettered, unilateral authority and discretion over all Settlement Trust operations, with the only system for oversight carried out by the attorneys representing Direct Abuse Claimants, primarily on a contingency fee basis, and by the FCR, who owes a fiduciary duty to all potential future claimants.[81]

48.     Although the Settlement Trustee "will have the ability to request further information from Abuse Claimants in connection with seeking reimbursement for Insured Abuse Claims," he is not required to do so.[82] The Settlement Trustee is given extremely broad discretion. With whatever documentation (or lack thereof) the Settlement Trustee has and deems sufficient, the Settlement Trustee may assign a value to each Direct Abuse Claim, then seek recovery for potentially insured claims from non-settling insurers for the full amount of that liability.[83] Under the Plan, only Direct Abuse Claimants have the right to seek a *de novo* determination of their Direct Abuse Claims by a court of competent jurisdiction.[84] The Debtors' proposed expert witness has emphasized the importance of having an impartial Settlement Trustee appointed to exercise these broad and wide-ranging powers.[85]

49.     But unfortunately, the Settlement Trustee is not impartial. The proposed Settlement Trustee is Prof. Green, who has already acknowledged his ties to the Coalition and FCR who selected him. Prof. Green is a close friend of Mr. Patton, the FCR;[86] indeed, the two have gone on

---

[81]     TDPs, Art. III.A; BSA Settlement Trust Agreement, §§ 2.1(d), 5.13.

[82]     Plan, Art. X.

[83]     *Id.*

[84]     Plan, Art. XII.

[85]     Michael Burnett Jan. 17, 2022 Deposition Transcript at 93:22-94:24; 269:6-9 ("Q. So whether the trustee is actually a neutral, independent person is pretty important, isn't it? A. Yes) (Certain Insurers App. 42).

[86]     *Amended Disclosure Statement for the Modified Fifth Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC* [Docket No. 6445], Ex. H, at 3 (Certain Insurers App. 18).

TrustApp0380

family vacations together.[87]  Prof. Green served as a future claims representative in six other mass

tort bankruptcies in which he gave work to Mr. Patton by hiring him and his firm for legal

representation.[88]  Prof. Green also retained Mr. Patton to represent him in four matters in which

Prof. Green served as a court-appointed Monitor.[89]  And before the Coalition selected Prof. Green

to serve as the Settlement Trustee,[90] Prof. Green gave work to Coalition counsel by hiring David

Molton and his firm, Brown Rudnick LLP, as legal counsel in other future claims representative

engagements.[91]

50.     The Coalition and FCR were so steadfastly determined to obtain a substantial role

for Prof. Green that they proposed him as Settlement Trustee notwithstanding that this Court had

already determined that Prof. Green's relationship with Mr. Patton created an objective appearance

of partiality that rendered him an unviable mediator.[92]  After the Court refused to appoint Prof.

Green as a mediator, the Coalition pivoted and sought his appointment as the Settlement Trustee.[93]

Ken Rothweiler and (likely) Anne Andrews, two of the three Coalition co-founders, met with him

in order to vet how he planned to administer the Settlement Trust prior to his appointment.[94]

51.     Prof. Green also has stated that he would not be neutral as Settlement Trustee, as

he believes he holds fiduciary duties to only certain trust beneficiaries, i.e. the Direct Abuse

---

[87]   Eric Green Nov. 23, 2021 Deposition Transcript at 69:14-25, 70:1-14 (Certain Insurers App. 44).

[88]   *Id.* at 137:5-10; *Amended Disclosure Statement for the Modified Fifth Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC  [Docket No. 6445], Ex. H., at 2 (Certain Insurers App. 18).*

[89]   *Amended Disclosure Statement for the Modified Fifth Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC* [Docket No. 6445], Ex. H., at 2 (Certain Insurers App. 18).

[90]   Azer Dep. Tr. at 210:18-20; 264:4-265:9 (Certain Insurers App. 64); June 23, 2021 Email Communication by D. Molton, BSA_FCR_005457 (Certain Insurers App. 93).

[91]   Azer Dep. Tr. at 141:14-25, 142:1-12 (Certain Insurers App. 64).

[92]   June 8, 2020 Hr'g Tr. at 55:23-57:24 (Certain Insurers App. 51).

[93]   June 8, 2020 Email from D. Molton to E. Green, RES 5415 (Certain Insurers App. 94).

[94]   Andrews Dep. Tr. at 103:17-20; 104:23-105:4 (Certain Insurers App. 63).

25

TrustApp0381

Claimants.[95]  Indeed, as the settlement trustee in *TK Holdings*, Prof. Green attempted to use the bankruptcy court to impair insurer contractual rights.  *See infra* at ¶ 114.

### D.    Abrogation of Insurance Policy Terms and Elimination of Insurer Rights and Defenses

52.    From the outset, the Coalition and FCR have sought to ensure that the TDPs would bind the insurers and deprive them of their rights to challenge claims asserted against the Debtors and the other Protected Parties. 

53.    The Coalition and FCR's insistence on including provisions designed to accomplish this goal has led to significant—and unnecessary—litigation. ████████████████████

████████████████████████████████████████

██████████████████████████████████[97]  The Plan and TDPs now expressly seek to alter the prepetition rights and obligations of the Debtors' insurers by, among other things: (1) eliminating all insurer rights under their Policies to defend claims in an adversarial proceeding and consent to any settlements reached; and (2) attributing binding claim valuations in derogation of the insurers' rights to assume the defense and litigate claim valuation and/or the reasonableness of any claim settlement.  Attached as **<u>Exhibit A</u>** are examples of key policy provisions that are modified and/or breached by the Plan and TDPs.

---

[95]    Green Dep. Tr. at 135:3-22 (Certain Insurers App. 44).

[96]    ████████████████████████████████████████

[97]    ████████████████████████████████████████
████████████████████████

TrustApp0382

### (i)      Coalition Changes to Limit Insurers' Rights

54.      The claims allowance process established by the Coalition and FCR and agreed to by the Debtors on its face demonstrates the complete exclusion of the insurers from investigating, evaluating, and collaborating with the Settlement Trustee regarding claims. ███████████

████████████████████████████████████████████

███████████  ██████████████████████████████

████████████████████████████████  █

55.      ███████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████  ██  ████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

█████████████████████████████  █

### (ii)     Proposed Findings Under the Plan Modify Insurers' Contractual Rights

56.      The Plan Proponents also seek court findings and determinations (the "Proposed Findings") that purport to bind the insurers to claim values assigned by the Settlement Trustee and deprive them of any means to challenge his unilateral determinations, including:[102]

> r. the Plan Documents (including the Plan) and the Confirmation Order shall be **binding on all parties in interest consistent with applicable legal doctrines,**



[102]   Plan, Art. IX.A.3 (emphasis added).

TrustApp0383

**including the doctrine of res judicata and collateral estoppel**, and section 1141 of the Bankruptcy Code (and related legal authority);

s. (i) the procedures included in the Trust Distribution Procedures pertaining to the allowance of Abuse Claims and (ii) **the criteria included in the Trust Distribution Procedures pertaining to the calculation of the Allowed Claim Amounts, including the Trust Distribution Procedures' Claims Matrix, Base Matrix Values, Maximum Matrix Values, and Scaling Factors (each as defined in the Trust Distribution Procedures), are appropriate and provide for a fair and equitable settlement of Abuse Claims based on the evidentiary record offered to the Bankruptcy Court** as required by and in compliance with section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, provide adequate and proper means for the implementation of the Plan as required by and in compliance with section 1123 of the Bankruptcy Code, comport with the requirements for the issuance of the Channeling Injunction under section 105(a) of the Bankruptcy Code, and otherwise comply with the Bankruptcy Code and applicable law;

t. **the right to payment that the holder of an Abuse Claim has against the Debtors or another Protected Party or a Limited Protected Party is the amount of such Abuse Claim as determined under the Trust Distribution Procedures** and is not (i) the BSA Settlement Trust Contribution, the Local Council Settlement Contribution, the Contributing Chartered Organization Settlement Contribution, the Participating Chartered Organization Settlement Contribution, the Hartford Settlement Contribution, the Century and Chubb Companies Settlement Contribution, the TCJC Settlement Contribution, contributions by other Settling Insurance Companies, or any component(s) of such contributions, or (ii) the initial or supplemental payment percentages established under the Trust Distribution Procedures to make distributions to holders of Abuse Claims provided, however, that nothing herein shall determine that any insurer is obligated to pay the Debtors' or another Protected Party's or a Limited Protected Party's liability so determined under the Trust Distribution Procedures;

u. the Plan **and the Trust Distribution Procedures** were proposed in good faith and are sufficient to satisfy the requirements of section 1129(a)(3) of the Bankruptcy Code.

57.    As a condition precedent to confirmation, the Plan improperly requires a finding by this Court that all Allowed Claim Amounts are "fair and equitable" based on the evidentiary record offered to the Court *at the time of confirmation* and,[103] thereby, purports to prospectively adjudicate Abuse Claims.[104] This finding violates the terms of the insurance policies which,

---

[103]  *See also* 28 U.S.C. § 157(b)(5) (lack of jurisdiction).
[104]  Plan, Art. IX.A.3(s).

TrustApp0384

assuming coverage exists, require insurers to pay only judgments after an actual trial or settlements consummated with insurers' consent.   When combined with the requested finding that the Confirmation Order and Affirmation Order "shall be binding on all parties in interest,"[105] this finding would almost certainly be misused in post-confirmation coverage litigation,[106] which is its intended result.   For example, Mr. Zalkin, of the Zalkin Law Firm, P.C., stated in Court that "[i]t's been represented in meetings held by sponsors of the RSA and the TDP to the plan that . . . confirmation of the plan would be the equivalent of a litigated plan and that the plan confirmation would operate as a judgment enforceable against the insurers."[107]

**E.**

58.



---

[105]   Plan, Art. IX.A.3(r).

[106]   To the extent that this finding is entered by the Court, Certain Insurers hereby reserve their rights to argue that such finding and/or determinations of individual claims made by the Trustee under the TDPs are not binding in any future coverage proceeding and/or give rise to Certain Insurers' rights to deny coverage.   Indeed, certain representatives of plaintiffs that are not members of the Coalition have recognized that the rewriting of insurance contracts that the TDPs and Insurance Assignment seek to effect may vitiate the parties' rights under those contracts, including the right to seek coverage for Abuse Claims.   *See* Docket No. 5682, at ¶ 38 ("By basic operation of logic, if the rights to an insurance policy are transferred or assigned without approval of the insurers, then there is a distinct risk (depending on each state's common law) that such policies could be voided.").   Certain Insurers expressly reserve the right to assert such arguments in any future coverage proceeding.

[107]   July 7, 2021 Hr'g Tr. at 36:23-37:2 (Certain Insurers App. 97); Oct. 25, 2021 Hr'g Tr. at 10:18–21 (The Court: "It does not appear that these findings have a code or a confirmation-related purpose; rather, even as modified, they appear to be more directed at post-confirmation litigation with insurers.") (Certain Insurers App. 58).

[108]   Oct. 25, 2021 Hr'g Tr. at 7:17-19 (Certain Insurers App. 58).

[109]   Dec. 7, 2021 Hearing Tr. at 13:1-8, 14:12-14 (Certain Insurers App. 61).

TrustApp0385

59.    More significantly, as discussed herein, *infra* Section IV, the Plan has not been proposed in good faith within the meaning of section 1129(a)(3).  Among other infirmities, the Debtors' Plan seeks to bind the insurers to inflated recoveries 10 times or more than the estimate the Debtors have provided for purposes of determining the insures' liability, by proposing TDPs that are inconsistent with historical settlement practices and conflicted Settlement Trust governance. *See supra* at 29-51.  Under the totality of the circumstances, the fact of this mediation alone does not help the Plan Proponents show the necessary good faith under Section 1129(a)(3).

**F.    Evidentiary Record Submitted by the Debtors and Voting Results**

**(i)    Bates Affirmative Report Justifying Base Matrix Values Based Upon Single Abuser Historical Settlements**

60.    On December 5, 2021, the Debtors submitted the Affirmative Expert Report of Charles E. Bates, PhD ("Bates Affirmative Report"), which is the only statistical evidence the Debtors have put forward to support their view that the TDPs are consistent with the Debtors' historical settlement practices and experience in the tort system.  *See supra* ¶¶ 36-51  Dr. Bates states in the Bates Affirmative Report that he "was asked to help develop the Matrix values."  Bates Affirmative Report at ¶ 22.  Dr. Bates states further that the "Base Values were generated first with regards to only a subset of the historical resolution values" and that "[t]he historical reference point for Abuse Claims in each tier are ***those that identify a single, as opposed to a repeat abuser***." *Id.* at ¶ 11 (emphasis added).

---

[110]

TrustApp0386

61.    The Bates Affirmative Report then shows Dr. Bates' calculation of historical single-abuser claims compared to the Base Matrix Value for each tier of abuse to provide evidence that he developed the TDP Base Matrix Values based on historical settlement values of single abuser claims:

Figure 35: Mean historical tort resolution values for single abuser claims

| Allegation tier[31] | Average historical resolution | Base Value |
|---|---|---|
| 1-Penetration | $673,500 | $600,000 |
| 2-Oral acts | $411,818 | $450,000 |
| 3-Masturbation | $302,333 | $300,000 |
| 4-Unclothed touching | $180,000 | $150,000 |
| 5-Clothed touching | N/A | $75,000 |
| 6-Other | N/A | $3,500 |

*Id.* at ¶ 117.

62.    The Bates Affirmative Report also attempts to justify only one aggravating scaling factor under the TDPs, the Abuser Profile scaling factor, which he states "was developed by looking at the relative impact that having a repeat abuse[r] had on historical claim values as compared to similar claims involving [a] single abuser that were used for the original Base Values." *Id.* at 121. Dr. Bates opined that, similar to historical settlements, "the average value of repeat abuser penetration claims is . . . nearly double the Base Value for single abuser claims." *Id.*

**(ii)    Less Than 48% of Total Direct Abuse Claimants Vote in Favor of the Plan**

63.    On January 18, 2022, Omni Agent Solutions filed a report [Docket No. 8345] (the "Final Voting Report") that was drafted partially by Omni and partially by counsel to the

31

TrustApp0387

Debtors.[111]  Counsel to the Debtors also assisted Omni with the auditing of ballots and counseled Omni on which ballots to exclude from the Final Voting Report.[112]

64.     Despite Mr. Rothweiler's statements to the Court that the Coalition represented "more than" 65,000 Abuse Claimants, *supra* at ¶ 23, a number he has since increased to "around 70,000,"[113] less than 48% of the approximately 82,200 claimants who have asserted Direct Abuse Claims against BSA (Class 8 under the Plan) voted in favor of the Plan and its broad releases.  *See* Final Voting Report, Ex. A.  Of the 53,596 Class 8 claimants that did vote, only 39,430 or 73.57% of voting creditors voted to accept the Plan.  *Id.*  Accordingly, 42,770 Class 8 claimants have not consented to the proposed non-debtor releases, either by voting no or declining to submit a vote. *Id.*  In addition, 21,174 of the voting Direct Abuse Claimants opted out of the third- party releases contained in the Plan.  *Id.*  At least some of those claimants voted in favor of the Plan, but incorrectly believed that, by opting out of the releases, they retained the ability to pursue their claims against the Protected Parties.[114]  These accepting votes that opted out of the releases would reduce the accepting percentage for purposes of the third party release even further below 73.57%. Of claimants asserting Indirect Abuse Claims (Class 9 under the Plan), only 69.57% of those who voted opted to accept the Plan.  *Id.*

---

[111]   Catherine Nownes-Whitaker Jan. 20, 2022 Deposition Transcript at 58:3-58; 69:17-69:19 (Certain Insurers App. 46).

[112]   *Id.* at 77:19-77:23; 77:23-86:21.

[113]   Rothweiler Dep. Tr. at 53:9-12 (Certain Insurers App. 49).

[114]   *See, e.g., Survivor Letter* [Docket No. 8267] ("Now, I did vote yes on the plan . . . only thing I want noted is that I believe additional charter organizations . . . should be held responsible . . . That is why I x opt out of and reserve my right to file a tort on the church.  I believe my AVA law firm will be handling it, I certainly asking him.") (Certain Insurers App. 28)

TrustApp0388

### (iii) Bates Rebuttal Report Opines that Single Abuser Claims Must be Reduced by 90% From the Base Matrix Value

65.     After the Plan received significantly fewer votes than the Coalition promised, the Debtors reversed course and filed a statement attaching the newly drafted Bates Rebuttal Report and contending that based on Dr. Bates' revised analysis, "the Debtors anticipate payment in full to holders of allowed claims in Class 8 in accordance with the Trust Distribution Procedures." *Debtors' Response to the Official Committee of Tort Claimants' Status Report Re: Second Modified Fifth Amended Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC* [Docket No. 8234] at ¶ 7.

66.     The Bates Rebuttal Report discloses that the Bates Affirmative Report had misclassified numerous repeat abuser settlements as single abuser settlements, and thus only 16 single abuser settlements (with an average settlement value of only $150,000) remained.[115]  Dr. Bates then uses these revised numbers to calculate a range that the Debtors argue results in "payment in full" of all Direct Abuse Claims.

67.     But, while the Bates ***Affirmative*** Report had stated that "claims involving single abuser [] were used for the original Base Values" and sought to show that TDP Base Matrix values were consistent with single abuser historical settlements, the Bates Rebuttal Report does not calculate new reduced Base Matrix Values based on his revised data.

68.     Instead, Dr. Bates pivots and opines that single abuser Abuse Claims (which are 87% of the total Abuse Claims filed) must be reduced ***by 90%*** from the Base Matrix Values "reflective of BSA's likely low average responsibility for these Abuse Claims." Bates Rebuttal Report ¶¶ 53, 97, 98.  The Bates Rebuttal Report includes a TDP simulation showing that, if single

---

[115]    Bates Rebuttal Report at ¶ 15.

TrustApp0389

abuser Abuse Claims are reduced by 90%, aggregate Abuse Claim liability will be $3.45 billion. *Id.* This is despite the fact that, as Dr. Bates previously recognized, there is no mitigating scaling factor for single abuser claims in the TDPs, *supra* at ¶ 5, and the TDPs clearly state that single abuser settlements are "incorporated into the Base Matrix Value."[116]

69.    Because Dr. Bates now opines that single abuser settlements are inconsistent with the Base Matrix Values, the Debtors are left with ***no statistical support*** for the contention that their TDPs are reflective of their historical settlement practices.  As noted, the Bates Affirmative Report was the ***only*** evidentiary support offered for the Base Matrix Values.  But the Bates Rebuttal Report contradicts this key aspect of the Bates Affirmative Report.  When the dust settles, the Debtors are left with only Dr. Bates' conclusion that the Base Matrix Values are approximately ten times higher than the typical single abuser claimant's recovery in the tort system and a bare and unsupportable contention that the Settlement Trustee will somehow "do the right thing" and reduce what will otherwise be over $25 billion in claims (when the TDP Base Matrix Values and scaling factors are applied as written) down to $3.45 billion.[117]

G.    **Settlements with Local Councils, Chartered Organizations and Certain Insurers.**

70.    During the course of the mediation, the Coalition and FCR reached agreements with the Debtors, the Local Councils, Certain Chartered Organizations and Certain of the Insurers, including the following:

- $250 million from BSA, consisting of cash and investment contributions, a promissory note, and other tangible assets;

- $640 million from Local Councils, consisting of cash, unrestricted property and a promissory note;

---

[116]  TDPs Art. VIII.D.(ii).

[117]  Bates Rebuttal Report at ¶ 25.

TrustApp0390

- $250 million in monetary contributions from The Church of Jesus Christ as a Chartered Organization;[118]

- $787 million cash contribution from the Hartford Insurers.[119]

- $800 million cash contribution by Century and the Chubb Companies.[120]

- $30 million cash contribution by the United Methodist Entities.[121]

- $52.5 million cash contribution from American Zurich Insurance Company, American Guarantee & Liability Insurance Company, and Steadfast Insurance Company.[122]

71.    The Coalition and FCR arranged these settlements through a combination of leverage and promises.  For BSA and the Local Councils, the Coalition and FCR leveraged the importance of the vote—which they were ultimately unable to deliver—and promises of cost certainty and continued operations post-bankruptcy.  For the Chartered Organizations and the Settling Insurers, the Coalition leveraged a proposed settlement trustee with unlimited authority, buttressed by highly prejudicial TDPs and Proposed Findings, and promises of a clean slate following application of the Channeling Injunction and third party release.  All of these settlements have one thing in common—the parties left exposed who will make up any difference are the Certain Insurers.

---

[118] *Sixth Mediator's Report* [Docket No.] 6210.

[119] *Id*.

[120] *Seventh Mediator's Report* [Docket No. 7745].

[121] *See Eighth Mediator's Report* [Docket No. 7884].

[122] *See Ninth Mediator's Report* [Docket No. 7928].

TrustApp0391

## ARGUMENT

**I.     THE PROPOSED CHANNELING INJUNCTION FAILS TO SATISFY THE REQUIREMENTS OF THIRD CIRCUIT LAW.**

72.     The Plan's Channeling Injunction (Section X.F) prohibits holders of Abuse Claims from pursuing claims against ***more than 40,000 non-Debtor*** Chartered Organizations, Local Councils and other entities that are not debtors in these chapter 11 cases, and in many cases are principally responsible for such claims.  Such claimants are left with claims against the Settlement Trust as their sole recourse, even though many of the non-Debtor released entities will not pay any substantial consideration to the estate, the TDPs have been drafted in a manner that ensures valid Abuse Claims will never be paid in full, and a substantial number of creditors in the affected classes have refused to vote in favor of the Plan.

73.     This Court has recognized that, under applicable Third Circuit precedent, plans of reorganization that contain nonconsensual third-party releases and channeling injunctions can be confirmed only "if they meet the *Continental* standard of fairness and necessity to the reorganization." *In re Millennium Lab Holdings II, LLC*, 575 B.R. 252, 272 (Bankr. D. Del. 2017). Fairness and necessity to the reorganization are "hallmarks of permissible non-consensual releases." *Gillman v. Cont'l Airlines (In re Cont'l Airlines)*, 203 F.3d 203, 213 (3d Cir. 2000).  In subsequent opinions, the Third Circuit has reiterated the need to subject proposed releases to the "exacting standard" of *Continental*, and has instructed "that courts considering such releases do so with caution."  *In re Millennium Lab Holdings II, LLC*, 945 F.3d 126, 139 (3d Cir. 2019).

74.     A recent decision by the Southern District of New York has called into question whether nonconsensual third-party releases should ***ever*** be permissible.  *In re Purdue Pharma, L.P.*, 2021 WL 5979108 (S.D.N.Y. Dec. 16, 2021).  The *Purdue Pharma* court, however, recognized that *Continental* and *Combustion Engineering* remain good law in the Third Circuit.

36

*Id.* at *79.  Indeed, in confirming the plan in Mallinckrodt, Judge Dorsey stated "I am applying the law of the Third Circuit which has recognized that bankruptcy courts do have statutory and constitutional authority to approve a plan of reorganization that contains non-consensual third-party releases, albeit, only in extraordinary cases" *In re Mallinckrodt PLC*, 2022 WL 334245, at *14 n.69 (Bankr. D. Del. Feb. 3, 2022).  Courts in this Circuit have developed the applicable "exacting standard" primarily by looking to the factors set forth in *In re Master Mortgage Investment Fund*, 168 B.R. 930 (Bankr. W.D. Mo. 1994).  Those factors are:

> (1) Whether there is an "identity of interest between the debtor and the third party, usually an indemnity relationship, such that a suit against the non-debtor is, in essence, a suit against the debtor or will deplete assets of the estate";
>
> (2) Whether the released party has "contributed substantial assets to the reorganization";
>
> (3) Whether "[t]he injunction is essential to the reorganization" and whether "without [ ] it, there is little likelihood of success";
>
> (4) Whether "a substantial majority of the creditors agree to such injunction" and "specifically" whether "the impacted class, or classes, has 'overwhelmingly' voted to accept the proposed plan treatment."; and
>
> (5) Whether "[t]he plan provides a mechanism for the payment of all, or substantially all, of the claims of the class or classes affected by the injunction."

*Id.* at 935 (collectively, the *Master Mortgage* factors).

### A.    Nonconsensual Third-Party Releases Are Authorized Only in Unusual or Extraordinary Circumstances.

75.    Because of the potential for abuse, the Third Circuit has consistently held that nonconsensual, third-party releases should be narrowly tailored and authorized only on rare occasions when extraordinary circumstances require them.  *In re Millennium Lab Holdings II, LLC*, 945 F.3d at 139.  Such releases can be utilized "to operate as a bankruptcy discharge arranged without a filing and without the safeguards of the [Bankruptcy] Code."  *Deutsche Bank AG, London Branch v. Metromedia Fiber Network, Inc.* (*In re Metromedia Fiber Network, Inc.*), 416

TrustApp0393

F.3d 136, 142 (2d Cir. 2005). The "potential for abuse is heightened when releases afford blanket immunity." *Id.*

76.    That concern is especially relevant here, where a bankruptcy filing by two Debtors would allow seven non-Debtor BSA affiliates, hundreds of non-Debtor Local Councils, and tens of thousands of Chartered Organizations to cleanse ***direct***—not derivative—liability without having to file for bankruptcy themselves. And Chartered Organizations' protections are being "bought" by other parties, with the vast majority of Chartered Organizations contributing nothing, showing that the proposed Channeling Injunction is a "device that lends itself to abuse[.]" *Id.*

77.    Moreover, the *Master Mortgage* factors do not support entry of an Order approving the Channeling Injunction, as explained below.

**B.    The Impacted Claimants Did Not "Overwhelmingly" Vote to Accept the Plan that Imposes the Channeling Injunction.**

78.    Garnering overwhelming approval for the Plan is "the single most important factor" when evaluating a channeling injunction. *Master Mortgage*, 168 B.R. at 938. Courts have struck down third-party releases when this factor alone is not met. *See, e.g.*, *In re Archdiocese of Saint Paul & Minneapolis,* 578 B.R. 823, 833 (Bankr. D. Minn. 2017) (refusing to approve third-party releases and channeling injunction based solely on rejection of the plan by sex abuse victims).

79.    Courts interpreting this factor, including several within the Third Circuit, have held that a "substantial majority" or "overwhelming" creditor support means the support of *each* affected creditor class, which in many cases means the support of at least 90 percent of affected creditors:

- *In re Millennium Lab Holdings II, LLC*, 945 F.3d 126, 132 (3d Cir. 2019) (over 93% of pre-petition lenders had agreed to the releases in a prepetition restructuring agreement);

- *In re AOV Indus.,* 792 F.2d 1140, 1143 (D.C. Cir. 1986) (creditors "overwhelmingly" accepted plan with roughly 90% of the creditors in each class voting to accept);

- *Menard-Sanford v. Mabey (In re A.H. Robins Co*.), 880 F.2d 694, 700 (4th Cir. 1989) (94% of tort claimants affected by the injunction voted to accept the plan);

- *In re Flintkote Co.,* No. 04-11300 (MFW), 2015 Bankr. LEXIS 2711, at *26 (Bankr. D. Del. Aug. 10, 2015) (finding the plan was overwhelmingly accepted when between 94% and 99% of affected creditors voted in favor of the plan in Section 524(g) context);

- *In re Mallinckrodt PLC,* 2022 WL 334245, at *20 (approving non-consensual third party releases and noting that "the weight of the evidence before me suggests that these releases are not only necessary and fair, but overwhelmingly supported by the creditor body . . . . the fact is that only one single creditor out of hundreds of thousands actually objected to these releases.");

- *In re American Family Enters.*, 256 B.R. 377, 392 (D. N.J. 2000) ("The creditors have overwhelmingly (100% of Plan Classes 5 and 7 and over 99.99% of Plan Class 6) voted in favor of the Plan, and thereby consented to the Channeling Injunction.");

- *Master Mortgage*, 168 B.R. at 938 (Class 5 to recover in full (other than injunction) and voted in favor at 94.8%.  Other class impacted by injunction (Class 3A) voted in favor of plan by 96.2%);

- *In re USA Gymnastics*, Case No. 18-09108 [Docket No. 1776] ¶¶ Q., II. (Bankr. S.D. Ind. Dec. 16, 2021) (approving channeling injunction and noting that "[h]olders of Class 6 Abuse Claims [] voted unanimously to accept the Plan").

80.     In the present case, the claimants comprising each of Classes 8 and 9—the two classes impacted by the Channeling Injunction—must vote "overwhelmingly" to approve the Plan. But only 73.57% of Class 8 Claimants who submitted votes and 69.57% of Class 9 Claimants who submitted votes voted in favor of the Plan.  *See* Final Voting Report.  These approval rates fall well short of "overwhelming support,"  particularly when (including the approximately 28,600 Abuse Claimants who didn't vote at all)  less than half of the total Abuse Claimants have affirmatively demonstrated their support for such releases.  *See supra* at ¶¶ 63-64.  Indeed, the approval rates for both Class 8 and Class 9 fall short even of the lower 75% threshold that is required for approval of a plan incorporating an asbestos claims channeling injunction pursuant to Section 524(g)(2)(B)(ii)(IV)(bb) of the Bankruptcy Code.

TrustApp0395

81. In addition, there are serious questions about the validity of the Abuse Claims filed by Coalition plaintiffs' attorneys. Facts revealed to date are troubling,[123] and proofs of claim signed by these attorneys may not even be entitled to "prima facie validity."[124] While Certain Insurers are not requesting the designation of votes under section 1126(e) of the Bankruptcy Code as not in good faith at this time, Certain Insurers reserve all rights to move to designate votes in the event the tally in the Final Voting Report is changed.

**C. The Claims of Both Class 8 and Class 9 Will Not Be Paid In Full by the Settlement Trust.**

82. Under *Master Mortgage*, nonconsensual third-party releases are inappropriate unless the plan "provides a mechanism for payment of all, or substantially all, of the claims of the class or classes affected by the injunction." 168 B.R. at 935. In the present case, the projected recoveries of the Class 8 and Class 9 creditors whose claims are enjoined by the Channeling Injunction will fall well short of payment in full, because the TDPs will undoubtedly generate claim values that far exceed the values that could be obtained in the tort system.

83. The Disclosure Statement estimates that recoveries of creditors in Class 8 and Class 9 creditors will be only 10%-21% if such claims total $7.1 billion, with a 31%-63% recovery anticipated if such claims total $2.4 billion. Disclosure Statement, p. 34.[125] On rebuttal, the Debtors' Abuse Claim expert claims he has "re-examined" his analysis and "now believe[s]" that liability for Direct Abuse Claims is "most likely between $2.4 billion and $3.6 billion." *Debtors'*

---

[123] *See supra* at ¶¶ 20-26.

[124] *See, e.g, In re Cushman*, 589 B.R. 469, 492-93 (Bankr. D. M.E. 2018) (explaining that proof of claim forms were "intended to impose a standard of reasonableness upon 'a real, live person' who was to 'take responsibility for assuring the accuracy of a proof of claim'") (citation omitted)); *In re F-Squared Invest. Manag.,* LLC, 546 B.R. 538, 543 (Bankr. D. Del. 2016) ("Consistent with the treatment of the claim as evidence, the Official Form requires the claimant to sign the form under penalty of perjury.").

[125] The Disclosure Statement notes that Class 8 Claimants also will receive insurance rights, which, when combined, could "yield up to a 100% recovery." *Id.* However, neither the Disclosure Statement nor the updated report by Bates White offers any specific quantitative support for the assertion that insurance rights held by the Settlement Trust could result in such creditors receiving a full or substantially-full recovery.

TrustApp0396

*Response to the Official Committee of Tort Claimants' Status Report Re: Second Modified Fifth*
*Amended Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC* [Docket No.
8234] Ex. A.  The Debtors therefore claim that they "anticipate payment in full to holders of
allowed claims in Class 8 in accordance with the Trust Distribution Procedures." *Id.* at ¶ 7.

84.    This conspicuous adjustment of the Debtors' argument is undoubtedly driven by
the fact that their previous argument, that the releases are justified because the Plan will receive
"overwhelming" support, has not panned out well.  They were forced, therefore, to take the new
position that the lack of "overwhelming" support for the Plan can be overcome by the fact that
Class 8 claimants should anticipate a recovery in full.  And, in support of that position, they point
to Judge Brendan Shannon's ruling in In re TK Holdings Inc., Case No. 17-11375-BLS (Bankr.
D. Del. Feb. 21, 2018) [Docket No. 2120].  That case is distinguishable because, although in that
case, just over 75% of the claimants voted to accept the Plan (and the releases and channeling
provisions contained in it), certain plan proponents (including Honda) were "agreeing to pay in
full the value of all [claims] that would be impacted by the Channeling Injunction as it applies to
them." *Memorandum of Law in Support of Confirmation*, TK Holdings (filed Feb. 14, 2018),
[Docket No. 20150], at ¶ 110.

85.    No such guarantee exists here.  If the ultimate liability for Direct Abuse Claims
exceeds Dr. Bates' revised projected range of liability—which is all but a certainty under the
proposed TDPs—no party has agreed to satisfy the difference such that Class 8 claimants will be
paid in full.[126]  Indeed, in his rebuttal report, Dr. Bates states for the ultimate Direct Abuse Claim
liability calculated under the TDPs to equal his adjusted range, ***nearly 87% of all claims would***

---

[126]    There also is no guarantee for payment in full of Class 9 claims, which are also impacted by the Channeling
Injunction.  Even assuming that the updated report by Dr. Bates is accurate, the Debtors do not even attempt to suggest
that Class 9 claims will receive similar treatment.

TrustApp0397

*need to receive a downward adjustment of 90% of their Base Matrix Value*.[127]   And, if substantially all of the Abuse Claims are not reduced, then Abuse Claim liability would be overvalued "manyfold," and aggregate Abuse Claim liability will be approximately $25 billion.[128]

86.     This disconnect between the Bates valuation range and the TDPs is fatal to the proposed channeling injunction.  It simply cannot be the case that the Debtors and tens of thousands of non-Debtor entities receive complete protection from all Abuse Claim liability because Dr. Bates' range (which has a high end of $3.6 billion) serves as the factual basis for finding that all Abuse Claims are paid in full, but the TDP structure (which is designed to deliver $25 billion in claims or more) is not only approved but expressly found binding on the Debtors' insurers.

87.     The Debtors will no doubt argue that the conflicted Settlement Trustee will, in fact, ignore the Base Matrix Values, the scaling factor guidelines, and his (and the STAC members') incentives, and cut 87% of the claims by 90%, bringing the TDPs in line with Dr. Bates' valuation range.  But no such result is likely unless this Court orders significant changes to the Base Matrix values, scaling factors, and governance structure of the Trust.  Absent those changes, the claim amounts generated by application of the procedures and guidelines of the TDPs will greatly exceed the Bates valuation range, and any realistic assessment of the value of the assets available to the Settlement Trust, even including the unsettled insurance coverage.  Direct Abuse Claimants will not be "paid in full."

---

[127]    Bates Rebuttal Report ¶¶ 53, 97, 98 (finding that all but 13% of filed proofs of claim are single abuser claims and setting "a mitigating scalar for all Single Abuser Cases to 10%, reflective of BSA's likely low average responsibility for these abuse claims" and "to properly account for the tort system values of the Abuse Claims.") (Certain Insurers App. 30).

[128]    *Id.* at ¶ 66.

TrustApp0398

88.    Accordingly, the Debtors have not proposed, through the Plan or otherwise, "a mechanism for payment of all, or substantially all, of the claims of" Class 8 or 9, which means the Channeling Injunction and nonconsensual releases cannot be approved as to Class 8 or 9.  Given these facts, it is not even clear that the Plan could begin to satisfy the *Master Mortgage* test.

**D.    The Majority of Beneficiaries of the Channeling Injunction Will Not be Making a "Substantial Contribution" to the Settlement Trust.**

89.    Another egregious aspect of the proposed Channeling Injunction and third-party releases is that they apply to thousands of organizations that are making "compulsory" and not economically cognizable contributions to the Settlement Trust.  Courts have found a "substantial contribution" to the estate "where the contribution consists of most of the assets of the contributing party," *In re HWA Props., Inc.*, 544 B.R. 231, 241 (Bankr. M.D. Fla. 2016), or where the releasing party both foregoes consideration and contributes value.  *See In re Genco Shipping & Trading Ltd.*, 513 B.R. 233, 272 (Bankr. S.D.N.Y. 2014).

90.    ***Each*** released party must make "a cognizable and valid contribution to the debtor as part of the debtor's reorganization."  *Nat'l Heritage Found., Inc. v. Highbourne Found*., 760 F.3d 344, 348 (4th Cir. 2014); *see Purdue Pharma*, 2021 WL 5979108, at *129 n.44 ("It is actually not clear what members of the Sackler family are contributing to the settlement and in what amounts.  The record contains some suggestion that the various trusts that are contributing are for the benefit of all members of the family.").  Nor is it permissible for one party to "buy" the releases of another.  *In re 710 Long Ridge Rd. Operating Co., II,* Case No. 13-13653 (DHS), 2014 Bankr. LEXIS 863, at *59 (Bankr. D.N.J. Mar. 5, 2014) ("It is only fair and logical that the consideration required to satisfy the claims affected must be provided by the party actually receiving the release; it is not sufficient that some creditors receive some extra value from another party."); *In re Lower*

*Bucks Hosp.*, 488 B.R. 303, 325 (E.D. Pa. 2013) (third-party release disallowed because all consideration paid to creditors came from a different party than the releasee).

91.     Whether a contribution is "substantial" is not absolute, but must be judged in the context of the total funds needed for a successful reorganization and the contribution to the reorganization relative to each releasing party's financial ability to contribute.  *In re Mahoney Hawkes, LLP*, 289 B.R. 285, 302 (Bankr. D. Mass. 2002).  Here, neither the Local Councils nor the Contributing Chartered Organizations have contributed "substantial" amounts.

92.     Exhibit F of the Plan notes that the Local Councils would contribute $300 million in cash, properties with an appraised value of $200 million, and a $125 million obligation DST Note requiring payments in favor of the Settlement Trust, along with certain rights under various causes of action and insurance policies.  *See* Plan Art. I.168 and Ex. F.  This amount is a fraction of the assets held by the Local Councils, which hold $3.3 billion in net assets, including $1.87 billion in unrestricted funds. *See* Disclosure Statement, Ex. D-1 at 23.  The Debtors have also acknowledged that payment of the DST Note is "not assured," specifically identifying nonpayment of the note as a risk factor in Article X.A.19 of the Disclosure Statement.[129]

93.     With respect to Contributing Chartered Organizations, TCJC is to make a $250 million cash contribution, along with the assignment of insurance rights under shared insurance policies owned by the Debtors and Local Councils,[130] and the United Methodist Entities propose

---

[129]   The TCC has also challenged the adequacy of the Local Councils' contribution on multiple occasions, asserting that the Local Councils "have the financial wherewithal to contribute several multiples of their contingent $600 million offer without endangering the mission of Scouting." *Motion of Official Committee of Tort Claimants for Entry of an Order Terminating the Debtors' Exclusive Periods to File a Plan and Solicit Acceptances Thereof Pursuant to Section 1121 of the Bankruptcy Code* [Docket No. 6625] ("Motion to Terminate Exclusivity"), ¶ 6 (Certain Insurers App. 20).

[130]   S*ee Sixth Mediator's Report* [Docket No. 6210], p. 2 (Certain Insurers App. 15).

TrustApp0400

to collectively contribute $30 million in cash.[131]  TCJC's contribution of cash and insurance rights

does not account for (i) the immense financial resources of TCJC and (ii) the value of the releases

to an organization that has had "direct involvement in every aspect of the Scouting program for

decades" and thus faces material exposure to Abuse Claims.  *See Motion to Terminate Exclusivity*,

¶ 9.  Similarly, the contribution from the United Methodist Entities cannot currently be assessed

on the current record in light of their potential Abuse Claim liability and unrestricted assets (which

have not been disclosed).

94.     The "contributions" of all other Contributing Chartered Organizations hardly

qualify as "substantial."   With the exception of "Opt-Out Chartered Organizations," the Plan

contemplates granting the full benefits of the Channeling Injunction to ***all*** Chartered

Organizations, despite the "Other Chartered Organizations" contributing few meaningful assets, if

any.[132]   Instead, thousands of Other Chartered Organizations will get full releases so long as (a)

the Local Councils contribute an additional $40 million to the Settlement Trust, (b) the Century

and Chubb Companies (and, presumably any other settling insurer) contribute their settlement

amount, and (c) the Chartered Organization seeking the benefit of the release contributes its rights

to coverage for Boy Scout abuse under its relevant insurance policies to the Settlement Trust (the

"Participating Chartered Organization Insurance Assignment").   And, even Opt-Out Chartered

Organizations receive the benefit of the releases and channeling provisions as to Boy Scout claims

if they have insurance for such claims provided by a settling insurer.

---

[131]   *See Notice of Eighth and Ninth Mediator's Report Regarding United Methodist Term Sheet and Zurich Term Sheet Including Treatment of Chartered Organizations* [Docket No. 7929] (Certain Insurers App. 25).

[132]   *See Seventh Mediator's Report* [Docket No. 7745], Exhibit A, ¶ 16.  The Century and Chubb Companies Insurance Settlement states that Other Chartered Organizations will be entitled to treatment as Contributing Chartered Organizations upon the occurrence of the Supplemental LC Contribution, release of the $800 million settlement amount from the Century and Chubb Companies to the Settlement Trust as contemplated under the Plan and, with respect to Opt-Out Chartered Organizations, a contribution "equivalent in form and Substance" to the Participating Chartered Organization Settlement Contribution.

TrustApp0401

95.     Of these three contributions, the first two will not be made by the Other Chartered Organizations but instead by third parties, a fact that has proved fatal to requests that releases and injunctions shield non-contributing parties.  *See In re 710 Long Ridge Rd. Operating Co.*, 2014 Bankr. LEXIS 863, at *59.  For example, the Seventh Mediator's Report characterizes the $40 million contribution from the Local Councils as having been made "on behalf of" the Chartered Organizations, even though the Chartered Organizations contribute nothing themselves.  Seventh Mediator's Report, p. 2.  The Seventh Mediator's report also claims that the BSA and Local Councils have agreed to contribute, "on behalf of" the Chartered Organizations, an additional $100 million payment attributable to the growth in BSA membership over the coming years "on account of" the Chartered Organizations' continued sponsorship of Scouting units.  See Seventh Mediator's Report, p. 2. This additional $100 million payment must be attributed to the BSA and Local Councils, not the Chartered Organizations, who have agreed to pay nothing.

96.     This leaves the Participating Chartered Organization Insurance Assignment as the sole contribution from the Chartered Organizations in exchange for the Channeling Injunction's releases, which consists of such parties' rights in and to insurance actions, recoveries, claims and proceeds arising from insurance policies pertaining to the Abuse Claims. Plan Art. I.189.  The Debtors rightly characterized these insurance rights as "speculative and limited."[133]  As discussed below, the assignment of the insurance policies (or rights thereunder) is prohibited by applicable law absent the consent of the non-settling insurers—which consent has neither been sought nor is forthcoming based on the proposed Plan and TDPs.

---

[133]  *See Debtors' Omnibus Reply in Support of Debtors' Motion for Entry of an Order (I) Approving the Disclosure Statement and the Form and Manner of Notice, (II) Approving Plan Solicitation and Voting Procedures, (III) Approving Forms of Ballots, (IV) Approving Form, Manner and Scope of Confirmation Notices, (V) Establishing Certain Deadlines in Connection with Approval of the Disclosure Statement and Confirmation of the Plan, and (VI) Granting Related Relief* [Docket No.  4105], ¶¶ 54-55 (Certain Insurers App. 9).

TrustApp0402

E.    **The Remaining *Master Mortgage* Factors Either Do Not Support or Are, at the Very Least, Neutral as to the Issue of Whether Approval of the Channeling Injunction Is Appropriate Under These Facts.**

97.    The remaining *Master Mortgage* factors do not support the Channeling Injunction.

98.    ***First***, the Channeling Injunction is not an essential element of the Debtors' reorganization.  The Debtors previously proposed the BSA Toggle Plan, which lacked any third-party releases and provided for resolution of the Abuse Claims and other Claims only *against the Debtors*.  The Debtors' own advisor testified that the BSA Toggle Plan was a feasible plan of reorganization.  *See* Whittman Dec. 7, 2021 Dep. at 223:7- 225:3.

99.    The same advisor testified that "certain [Chartered Organizations] have made statements outside of mediation that have indicated threats to withdraw from scouting . . . if they are unsatisfied with their treatment under the plan,"  but went on to say that those entities represented a minority of all Chartered Organizations.   Whittman Dec. 7 Dep., p. 97:14-21; 101:23- 102:8.  Indeed, even if many of the Chartered Organizations—such as the Methodist Church or the Catholic Church—withdrew from formally partnering with Scouting, these departures would have an immaterial impact on BSA membership.  *See* Whittman Dec. 13 Dep., pp. 78:9-16; 82:20-83:1.

100.    ***Second***, the Debtors must show an "identity of interest between the debtor and the third party . . . such that a suit against the non-debtor is, in essence a suit against the debtor or will deplete assets of the estate."  *Master Mortgage*, 168 B.R. at 935; *see also In re Dow Corning Corp.,* 280 F.3d 648, 658 (6th Cir. 2002).  There is no evidence that each of the non-debtor entities shares an identity of interest with the Debtors.  Although the Debtors previously asserted that there may be indemnification and contribution claims running from the Debtors, the mere obligation to indemnify is not sufficient to authorize third-party releases. *See Gillman v. Cont'l Airlines (In re Cont'l Airlines)*, 203 F.3d 203, 215 (3d Cir. 2000) ("We also take issue with the District Court's

unsupported conclusion that the [debtors'] obligation to indemnify [the released parties] transforms the release and permanent injunction of Plaintiffs' claims against [the released parties] into a 'key element' of the [debtors'] reorganization.").

## II.    THE PLAN MODIFIES CONTRACT RIGHTS IN VIOLATION OF BANKRUPTCY AND NON-BANKRUPTCY LAW.

101.    A plan cannot be confirmed if it does not "compl[y] with all applicable provisions of this title [11]" or if it is "proposed . . . by any means forbidden by law."[134]  The proposed plan must comply with the Bankruptcy Code itself in addition to any relevant "applicable nonbankruptcy law," including state contract and tort law.[135]

102.    It is a bedrock principle of bankruptcy law that a debtor is not entitled to rewrite prepetition contracts merely because of its status as a debtor in bankruptcy.[136]  Absent express statutory authority providing otherwise, the Debtor may not use the chapter 11 process to renegotiate its bargained-for contractual rights and obligations.[137]

---

[134]  11 U.S.C. § 1129(a)(1), (3).

[135]  *See, e.g.*, *In re Zenith Electronics Corp.*, 241 B.R. 92, 108 (Bankr. D. Del. 1999) ("[T]he Plan must not only comply with the provisions of the Code, but must meet the standards for approval of such a transaction under Delaware corporate law. We agree that section 1129(a)(3) does incorporate Delaware law (as well as any other applicable nonbankruptcy law)."); *In re Amatex Corp.*, 97 B.R. 220, 225-26 (E.D. Pa. 1989) (bankruptcy court cannot "create rights not otherwise available under applicable law" (quotation marks omitted)).

[136]  *See, e.g.*, *In re Crippin*, 877 F.2d 594, 598 (7th Cir. 1989) (holding that "bankruptcy courts do not have the power to rewrite contracts to allow debtors to continue to perform on more favorable terms"); *Moody v. Amoco Oil Co.*, 734 F.2d 1200, 1213 (7th Cir. 1984), *cert. denied*, 469 U.S. 982 (1984) (holding that the Bankruptcy Code is "not intended to expand debtor's rights against others more than they exist at the commencement of the case.") (internal marks omitted); *In re 641 Associates, Ltd.*, 1993 WL 332646 at *8 (Bankr. E.D. Pa. Aug. 26, 1993) ("There is no provision in the Bankruptcy Code allowing a bankruptcy court to disregard state-law contractual rights."); *In re SPM Mfg. Corp.*, 984 F.2d 1305, 1311 (1st Cir. 1993) (bankruptcy courts lack authority to enter orders that "expand the contractual obligations of parties"); *Cissel v. Am. Home Assur. Co.*, 521 F.2d 790, 792 (6th Cir. 1975) (bankruptcy trustee could not obtain recovery from insurer for claims filed against the estate absent a judgment or a written settlement agreement between the policyholder, the claimant, and the insurance company); *Fed. Ins. Co. v. SKMDV Holdings, Inc. (In re Green Jacobson P.C.)*, 2017 WL 3149333 , at *14 (Bankr. E.D. Mo. July 24, 2017) ("Neither the Court nor the parties can rewrite the Policy.").

[137]  Narrow exceptions to this rule exist but are not relevant here.  *See In re Rickel Home Centers, Inc.*, 209 F.3d 291, 298 (3d Cir. 2000) (*ipso facto* clauses under 11 U.S.C. § 365(e)(1)); *In re Dura Automotive Systems, Inc.*, 2007 WL 7728109, at *98 (Bankr. D. Del. Aug. 15, 2007) (certain assignment restrictions under 11 U.S.C. § 365(f)).

TrustApp0404

103.    Rather, the Bankruptcy Code "provide[s] a bankruptcy trustee with the same rights and defenses" under a prepetition contract as those held by the debtor prior to bankruptcy.  *In re Combustion Engineering, Inc.*, 391 F.3d 190, 245 n.66 (3d Cir. 2004).  This well-recognized principle takes a number of forms, including the requirement that executory contracts be assumed *cum onere* or not at all,[138] and the restriction on the ability to modify non-executory contracts to increase the obligations of non-debtor contract counterparties.

104.    Not surprisingly, bankruptcy courts regularly reject debtor efforts to rewrite insurance policy contractual terms.  *See, e.g.*, *In re Combustion Eng'g, Inc.*, 391 F.3d at 218 (a plan must preserve "the pre-petition rights and obligations of both the debtor and the insurers under the Plan by preserving for 'any Entity . . . any and all claims, defenses, rights or causes of action' under the subject insurance policies and settlements.").[139]  And they have done so even where a proposed plan would have the real world effect of rewriting the terms of an insurance policy, whether or not the plan expressly seeks to modify express contract language.  *See In re Thorpe Insulation Co.*, 677 F.3d 869, 885 (9th Cir. 2012) (reversing confirmation of a plan and ordering a new trial on the grounds that the plan would "economically affect [the insurers] in substantial ways.").

105.    Courts and litigants often refer to this principle in a shorthand way as a requirement that a plan be "insurance neutral."  But what matters is the principle not the label:  as this Court

---

[138]    *See, e.g.*, *Sharon Steel Corp. v. Nat'l Fuel Gas Dist. Corp.*, 872 F.2d 36, 39-40 (3d Cir. 1989) (acknowledging "the general principle that a debtor may not reject a  contract but maintain its benefits"); *In re AbitibiBowater Inc.*, 418 B.R. 815, 822-23 (Bankr. D. Del. Oct. 27, 2009) ("An executory contract must be assumed or rejected *in toto* . . . A contract will not be bifurcated into parts that will be rejected and those that will not.") (quotation marks and internal citation omitted)).

[139]    *See also In re Pittsburgh Corning Corp.*, 453 B.R. 570, 604-05 (Bankr. W.D. Pa. 2011) (lack of clarity regarding treatment of insurance claims rendered plan unconfirmable); *Amatex Corp. v. Aetna Cas. & Sur. Co. (In re Amatex Corp.)*, 97 B.R. 220, 221 (Bankr. E.D. Pa. 1989), *aff'd sub nom.* 102 B.R. 411 (Bankr. E.D. Pa. 1989) (refusing to order insurers to make lump sum payments "contrary to the terms of their policies.").

49

TrustApp0405

has recognized, a proposed plan that seeks to modify insurance contract terms is not confirmable as a matter of law.[140]  Yet the Plan here seeks to do just that.

### A.    The Proposed Plan Seeks to Improperly Determine Coverage Issues Through the Proposed Findings.

106.    Bankruptcy courts have long recognized that coverage determinations should be left for other courts appropriately adjudicating coverage issues, and that a plan of reorganization should not affect a debtor's insurance contracts.  In recognition of this principle, most debtors avoid a fight with their insurers entirely and do not seek in any way to modify their insurance contracts.  Instead, they default to "insurance neutral" language in the plan.  Bankruptcy courts thus routinely approve plan language that maintains the status quo and preserves insurer rights and defenses.  In *Combustion Engineering*, for example, the Third Circuit mandated the inclusion of a provision to ensure that insurer rights are protected:

> [N]otwithstanding anything to the contrary in this Order, the Plan or any of the Plan Documents, nothing in this Order, the Plan or any of the Plan documents (including any other provision that purports to be preemptory or supervening), shall in anyway [sic] operate to, or have the effect of, impairing the insurers' legal, equitable or contractual rights, if any, in any respect. The rights of insurers shall be determined under the Subject Insurance Policies or Subject Insurance Settlement Agreements as applicable.[141]

107.    This required language has only been strengthened in recent years.  For example, in *In re Global Industries Technologies, Inc.* ("GIT"), the Third Circuit reversed the confirmation of a plan that contained analogous language to the above provision because the "[p]lan [] triggered [an] explosion of new claims" and thereby created significant administrative costs for the debtors'

---

[140]   *See* May 19, 2021 Hr'g Tr. 168:25-169:3 (The Court: "It's the same as any other contract . . . Certain things the Bankruptcy Code says you can change, like assignability.  Other things, I can't touch a landlord's contract . . . I can't touch an insurance contract . . .  That's contracts."); *Id.* at 228:8-12 ("I don't view an insurance contract any different than any other contract, right?  In the sense that the plan shouldn't do anything to it that the bankruptcy code doesn't say can be done to it.").

[141]   391 F.3d 190, 209 (3d Cir. 2004).

TrustApp0406

insurers.[142]  Thus, the language alone was not sufficient when the plan itself, notwithstanding the insurance neutrality language, changed the risk profile or contractual arrangements of the insurers.

108.    More recent cases in this Circuit have required even more robust protective language.  *See, e.g., In re Blitz U.S.A.*, Inc., 2013 WL 6825607, ⸿ 6.7 (Bankr. D. Del. Nov. 12, 2013) (". . . the Confirmation order . . . shall not have any . . . preclusive effect on, or otherwise prejudice, diminish, impair or affect . . . any Non-Participating Insurer's . . . rights or obligations under any Assigned Blitz Insurance Policies."); *In re Pittsburgh Corning*, 453 B.R. at 585 ("nothing in the Confirmation Order or the Plan . . . shall in any way operate to impair, or have the effect of impairing [the insurers'] legal, equitable, or contractual rights, if any, in any respect").

109.    The current Plan makes no effort to include similar language or protections, and since entry into the RSA, the Plan Proponents have abandoned even the pretext of preserving insurer contract rights.  The Plan's Proposed Findings have no purpose except to require this Court to improperly make binding coverage determinations and prevent Certain Insurers from exercising their right to have a court resolve coverage disputes at the appropriate time.  As this Court has noted, "[i]t does not appear that these findings have a code or a confirmation-related purpose; rather, . . . they appear to be more directed at post-confirmation litigation with insurers."[143]

110.    The Plan's purported "insurance neutrality" provision, in fact, does away with the very concept.  It provides:  "[e]xcept for the Insurance Assignment, or as otherwise provided in the Bankruptcy Code, applicable law, **the findings made by the Bankruptcy Court in the Confirmation Order, or the findings made by the District Court in the Affirmation Order**, nothing in the Plan shall modify, amend, or supplement, or be interpreted as modifying, amending,

---

[142]    *See In re Glob. Indus. Techs.*, 645 F.3d 201, 212-14 (3d Cir. 2011).
[143]    Oct. 25, 2021 Hr'g Tr. 10:18-21 (Certain Insurers App. 58).

TrustApp0407

or supplementing, the terms of any Insurance Policy or rights or obligations under an Insurance

Policy."  Article X(M) of Plan (emphasis added).

111.    As explained above, Proposed Finding (s) requires that the Court determine that the

procedures for claim allowance and criteria for determining "Allowed Claim Amounts" are

"appropriate and provide for a fair and equitable settlement of Abuse Claims based on the

evidentiary record offered to the Bankruptcy Court."  The Plan Proponents intend for a post-

confirmation coverage court to find that the entry of this finding, combined with finding (r), which

expressly provides for *res judicata* and/or collateral estoppel effect, results in an immediate and

improper determination by *this* Court of the amount of loss, if any, that would otherwise be

resolved by the coverage court.  *See Thorpe*, 677 F.3d at 886 (plan not insurance neutral where it

"would not necessarily permit the insurers to challenge settlement amounts as reasonable.").

112.    But 28 U.S.C. § 157(b)(5) makes clear that "[t]he district court shall order that

personal injury tort . . . claims be tried in the district court in which the bankruptcy case is pending,

or the district court in the district in which the claim arose." (emphasis added). Pursuant to section

157(b)(2)(B), this Court does not have jurisdiction to make a finding that claim determinations

with respect to the personal injury claims to be presented to the Trust and resolved pursuant to the

TDPs are "fair and reasonable," determinations that, realistically, could only be made after a trial

of each individual claim.  This point is underscored where, as here, the parties sought to be bound

are insurers whose policies, assuming coverage exists, require a judgment or approved settlement

for each claim on an individualized basis.

113.    Finding (t) is an attempt to determine insurance coverage in a manner that was

rejected by *Fuller-Austin Insulation Co. v. Highlands Ins. Co.*  There, the debtors represented at

confirmation that the insurance carriers "simply do not have any interest as affected by this plan

TrustApp0408

of reorganization . . . all of their rights under those policies are unaffected."[144]  But before the California court in the coverage action, the trustee of the Fuller-Austin trust (supported by the very same Eric Green, as Future Claims Representative, who has been proposed as the Trustee of the Settlement Trust here) argued the opposite:  that, at confirmation, the bankruptcy court had preclusively determined that Fuller-Austin's insurers were liable for the full allowed amount of each covered claim.[145]  On appeal, the California Court of Appeal reversed the California Superior Court and rejected this argument and held that the insurers were liable only for amounts actually paid by the Fuller-Austin trust.  Despite the appellate outcome, the fact that appellate reversal was required to reach this outcome demonstrates the real risk that the claimants' misuse of a confirmation order from this Court is not merely theoretical.

114.    More recently, in *Takata*, Prof. Green, the Coalition's proposed Settlement Trustee, unsuccessfully made a similar attempt to have the bankruptcy court decide coverage issues, which the court declined to do because it required an analysis of "the underlying insurance contracts."[146] The Court should not give the Plan Proponents the opportunity to "end-run" the Court's refusal to determine coverage issues in this fashion.[147]

---

[144]    135 Cal. App. 4th 958, 971 (2006).

[145]    *Id.* at 972.

[146]    *See Eric D. Green v. Mitsui Sumitomo Insurance Company, Lmtd. (In re TK Holdings, Inc.)*, 17-11375-BLS [Docket No. 4608] *Order on Motion to Dismiss Action for Declaratory Judgment*, p. 20 n. 80 (holding that the determination of whether an insurance company was required to pay the liquidated value of a claim or the payment amount required an analysis of the "underlying insurance contracts' payment obligations" rather than being a matter of bankruptcy law) (citing *Flintkote Co.*, 177 F.Supp. 3d at 1176-77 (N.D. Cal. 2016)) (Certain Insurers App. 38).

[147]    Further, coverage disputes are not core proceedings subject to determination by a bankruptcy court.  *See, e.g.*, *Longview Power, LLC v. First Am. Title Ins. Co. (In re Longview Power, LLC)*, 515 B.R. 107, 115 (Bankr. D. Del. 2014) (rejecting attempt to transform a non-core coverage determination into a core matter by making such determination a condition precedent to confirmation and stating "the Court can see no limiting principle to this argument and it would give debtors unfettered license to confer core status to proceedings by requiring their favorable adjudication in order to confirm a plan."); *Mt. McKinley Ins. Co. v. Corning Inc*., 399 F.3d 436, 450 (2d Cir. 2005); *Matter of U.S. Brass Corp.*, 110 F.3d 1261, 1268 (7th Cir. 1997); *Roman Catholic Diocese of Rockville Centre v. Arrowood Indemnity Co*., 2021 WL 1978560, *7 (Bankr. S.D.N.Y May 17, 2021).

TrustApp0409

115.    Furthermore, these findings lack any plausible bankruptcy purpose.  Finding (r), a finding that the Plan and Confirmation Order are binding on all parties in interest, makes reference to 11 U.S.C. § 1141 of the Bankruptcy Code, which merely sets forth the binding nature of a confirmation order.  Section 1141 is also self-executing—a finding providing for its effect is unnecessary and redundant.[148]  But, of course, finding (r) goes well beyond the straightforward impact of section 1141, as it purports to bind parties to all of the "Plan Documents," including the TDPs.[149]  Section 1141 makes no reference to any trust distribution procedures.

116.    One can only then conclude that the purpose of finding (r) is to attempt to give *res judicata* effect to improper findings (s) and (t).  On its face, this is improper, particularly in light of the fact that the Proposed Findings are gratuitous and are not required by section 1129 of the Bankruptcy Code and serve no other bankruptcy purpose.   "A court conducting an action cannot predetermine the *res judicata* effect of the judgment; that effect can be tested only in a subsequent action."  *Matsushita Elec. Indus. Co. v. Epstein*, 516 U.S. 367, 396 (1996) (Souter, J., concurring in part, dissenting in part); *see* C*ovanta Onondaga Ltd. v. Onondaga Cnty. Res. Recovery Agency*, 318 F.3d 392, 398 (2d Cir. 2003) ("The first court does not get to dictate to other courts the preclusion consequences of its own judgment. . . ." (quotation marks omitted));  *Midway Motor Lodge v. Innkeepers' Telemanagement & Equip. Corp.*, 54 F.3d 406, 409 (7th Cir. 1995) ("In the law of preclusion ... the court rendering the first judgment does not get to determine that judgment's effect; the second court is entitled to make its own decision.");  18 Wright & Miller, Federal Practice and Procedure § 4413 (3d ed. April 2021 Update) (noting "general rule that a court cannot

---

[148]    *See, e.g., In re Chatha*, 2021 WL 3533391, at *3 (Bankr. E.D. Cal. Aug. 9, 2021).
[149]    Plan, p. 35, Definition 200.

TrustApp0410

dictate preclusion consequences at the time of deciding a first action," except in limited cases where it seeks to limit the decision's preclusive effect).[150]

117.    With regard to finding (s), the Plan Proponents incorrectly argue that a finding concluding that claim amounts provide for a "fair and equitable settlement" is required by 11 U.S.C. § 1123(b)(6).[151]  But Section 1123(b)(6) merely provides that a plan of reorganization may "include any other appropriate provision not inconsistent with the applicable provisions of this title."   And the reference to the evidentiary record is a transparent attempt to cause a court adjudicating coverage issues to misleadingly conclude that this Court conducted an evidentiary hearing on the allowance of the claims for which insurance coverage is sought – something that this Court has not done and, under the jurisdictional limitations imposed on this Court related to personal injury claims, has no jurisdiction to do.

118.    Further, in Proposed Finding (s), the Plan Proponents seek approval of the TDPs as a settlement under Bankruptcy Rule 9019 and, even more generally, state that the TDPs "otherwise comply with the Bankruptcy Code and applicable law."   But this Court was correct when it informed the Coalition "that I do not believe a plan to be a settlement.  The plan gets imposed on people, it[']s not a settlement."  Sept. 28, 2021 Hr'g Tr. at 104:4-8 (Certain Insurers App. 54).

119.    Bankruptcy Rule 9019 is merely a procedural mechanism and cannot alter the substantive rights of non-consenting parties.  Pursuant to 28 U.S.C. § 2075, which implements the Bankruptcy Rules, no Bankruptcy Rule can "abridge, enlarge, or modify any substantive right." See Northview Motors v. Chrysler Motors Corp., 186 F3d 346, 351, n.4 (3d Cir. 1999) (noting that

---

[150]    To the extent that this finding is entered by the Court, Certain Insurers hereby reserve their rights to argue that such finding and/or determinations made by the Trustee under the TDPs is not binding in any future coverage proceeding and/or gives rise to Certain Insurers' rights to deny coverage.

[151]    See, e.g., Joint Objection of the Coalition of Abused Scouts for Justice and the Future Claims Representative to Certain Insurers' (I) Motion to Modify the Confirmation Scheduling Order and (II) Motion for an Expedited Hearing on Same [Docket No. 7862] (Certain Insurers App. 23).

TrustApp0411

"as a matter of law, Bankruptcy Rule 9019(a), a rule of procedure, cannot, by itself, create a substantive requirement of judicial approval"); *In re Layton,* 480 B.R. 392, 399-400 (Bankr. M.D. Fla. 2012) (explaining how the Bankruptcy Rules may not modify a substantive right); *In re Dow Corning Corp*., 198 B.R. 214, 246 (Bankr. E.D. Mich. 1996) ("Rule 9019, being merely a rule, can do no more than establish a procedural mechanism for exercising a statutory power.").  The Debtors cannot use their Plan to "manufacture" authority that they do not have.  *See Purdue Pharma*, 2021 WL 5979108, at *40.

120.    Proposed Finding (u) asserts that both the Plan and the TDPs are proposed in good faith.  The Coalition and FCR have incorrectly asserted that "[w]hether the TDP is consistent with the Debtors' exposure in the tort system, including their past practices and satisfies the requirements of section 1129(a)(3) are issues that must be litigated in connection with plan confirmation."[152]  That assertion is incorrect.  While section 1129(a)(3) requires that the Plan be proposed in good faith, there is no requirement in that section that a good faith determination be made as to the TDPs and such a determination is unnecessary for confirmation and serves no bankruptcy purpose.  This finding, combined with finding (r), which expressly provides for *res judicata* and/or collateral estoppel effect, invites a determination by this Court, before any Abuse Claims are allowed and paid, that the Settlement Trust will likely later misuse to argue that all future Abuse Claims settlements and payments will be "in good faith" and thereby bind the insurers.  *See* Coalition RSA Joinder at ¶ 39 (arguing that that an insured can settle claims without

---

[152]    Coalition, FCR and TCC Statement ISO RSA at ¶ 45 (Certain Insurers App. 11).  Notably the Plan Proponents have failed their self-imposed test.  According to the Debtors, the TDPs are ***inconsistent*** with "the Debtors' exposure in the tort system, including their past practices,"  precluding a finding the TDPs were proposed in good faith.  *See* Bates Rebuttal Report ¶ 31 (noting that the TDPs and Settlement Trust are designed to compensate "tens of thousands of claims . . . who would never be compensated in the tort and will not receive any compensation should a Settlement Trust not be set up for that purpose.") (Certain Insurers App. 30).

TrustApp0412

insurer consent (and bind insurers) provided claims are "reasonable and were paid *in good faith*") (Certain Insurers App. 11). The Court should reject that invitation.

121. More simply, the very structure of the Plan contradicts the Plan Proponents' argument that the Proposed Findings are necessary for confirmation. All of the Proposed Findings are conditions precedent, which are subject to waiver with the consent of all of the Debtors, the Coalition, and the FCR. *See* Sept 29, 2021 Hr'g Tr. 104:20-105:1 ("The Court: I'm not going to approve it as part of the plan. If it's a condition precedent, somebody better waive it. And I did notice, by the way, because I looked, that all of the conditions precedent, including the five we spoke about yesterday, are waivable under certain circumstances with certain consents . . . ."); Plan Art. IX.C.6. Despite this and other warnings from the Court,[153] the Plan Proponents have refused to remove these improper and premature overtures for coverage determinations.

122. When faced with the need to determine complex coverage issues, bankruptcy courts have deferred such determinations to the relevant coverage courts.[154] This Court should similarly reject the Plan Proponents' transparent attempt to enter the Proposed Findings which are not necessary to confirmation, and which are designed and will be used to bind all parties to inflated TDP amounts.

---

[153] *See, e.g.*, Sept. 22 Hr'g Tr. at 89:10-23 (The Court: "I will tell you, I will be looking carefully at the findings, that the – that the debtors and others are asking me to make, with respect to insurance – to make certain they don't go further than I'm permitted to go as a bankruptcy court . . . So to the extent that the plan proponents, or those in support of the plan, are going – to put it in the vernacular, going from pigs to hogs, then there may be an issue.") (Certain Insurers App. 53); *id.* at 140:7-146:11 (The Court: "I'm hearing it from the coalition, the FCR, are telling me that these findings are necessary for their clients to support the settlement . . .  for certain of these findings there's no reference to the code or any provision of the rules . . . with respect to . . . the right to payment . . . is the allowed amount of such abuse claim, as liquidated in accordance with the distribution procedures . . . this paragraph is probably the one I find most concerning in terms of not knowing how it might be used later on down the line . . . to the extent it has to be in this form that is in this condition precedent is something that I might not feel comfortable with in the way it['|s written . . . to the extent that these particularly findings are gating issues for somebody who is supportive of this plan, you need to give some thought to my comments.").

[154] *See, e.g.*, *Fuller-Austin,* 135 Cal. App. 4th at 997; *Flintkote*, 177 F. Supp. 3d at 1180;  *ARTRA 524(g) Asbestos Trust v. Fairmont Premier Co.*, 2011 WL 4684356, *3 (N.D. Ill. 2011).

TrustApp0413

B.      **The Plan Alters Certain Insurers' Rights by Materially Increasing Their
        Liability in a Manner Inconsistent with the Tort System.**

123.    Even if the adjudication procedures in the TDPs were consistent with the tort

system (which, as discussed below, *infra* Section II.C, they are not), the claims explosion generated

by attorney marketing campaigns—combined with the TDPs' aggressive base values and scaling

factors—would result in a gross inflation of the aggregate claim values, thereby impermissibly and

arbitrarily modifying the Debtors' risk profile.

124.    Under controlling Third Circuit law, the fundamental alteration of a debtor's risk

profile constitutes an impermissible modification of its insurance policies, just as if the debtor

sought to change express contractual language.  In *Global Industry Technologies, Inc.*, the Third

Circuit held that a plan was not insurance neutral because it increased the number of claims from

169 prepetition to 4,700 at confirmation (approximately a 2,700% increase in allegedly covered

claims) and resulted in a "tangible disadvantage" to insurers.[155]

125.    Rather than the "mere" 2,700% increase in *GIT*, these chapter 11 cases have

resulted in an utterly unprecedented 30,000% increase in the number of claims.[156]    This

exponential increase was driven by an aggressive and wide-spread advertising campaign and

significant shift in the filing threshold by certain plaintiff law firms, including those firms that

comprise the Coalition.  That is, numerous plaintiff law firms have been willing to represent and

file proofs of claim for claimants whom they would not have been willing to represent

prepetition.[157]    And, unlike in *GIT* where the plan was at least facially insurance neutral, this

---

[155]   645 F.3d 201, 214 (3d Cir. 2011); *see In re Thorpe Insulation*, 677 F.3d at 885 (finding that it was error to
confirm a plan based on economic effect on the insurers).

[156]   *See* Disclosure Statement § V.N ("there are approximately 82,200 unique, timely Abuse Claims") (Certain
Insurers App. 18); *id.* § III.E (there were "approximately 275 civil actions" as of the Petition Date").

[157]   *See* Rebuttal Expert Report of Charles E. Bates, ¶ 70 ("We also have evidence of the selection bias and a
change filing threshold for plaintiff law firms, i.e. a change in behavior as to what claims they were willing to represent

TrustApp0414

explosion of claims, coupled with the Proposed Findings and the TDPs that run far afield of the tort system, is an attempt to leverage inflated TDP values in exchange for limited contributions by the Debtors and the Local Councils to the Settlement Trust.

126.    Although such an increase in claims is itself grounds to deny the proposed Plan, the TDPs are also designed to radically inflate the value of such claims well beyond what could be expected in the tort system, where damage awards are highly particularized as a result of the need for plaintiffs to prove each element of their claim, including factors that would modify damage awards.  When claims that would otherwise proceed through the tort system settle, they do so against the backdrop of this process, and accordingly reflect the judgment of all of the adversarial parties as to the strengths and weaknesses of their case before a neutral third-party authority.  Such settlements also reflect the possibility of appeal before another impartial third-party.[158]

127.    The TDPs replace these fair procedures with a Claims Matrix, in which each and every Abuse Claim falls into one of six distinct tiers based on the sole discretion of the Settlement Trustee, each with its own base and maximum value.  The Settlement Trustee then applies a number of Aggravating Scaling Factors and Mitigating Scaling Factors.  These Scaling Factors are then multiplied together, resulting in the final Allowed Claim Amount, if accepted by the Abuse Claimant.  But adverse parties have no opportunity to give any input on individual (or aggregate) claims valuations, and only Abuse Claimants have any ability to seek further review of the determination of the Settlement Trustee, who is not neutral or independent.

---

pre- and post-petition in this specific tort and as it relates to claims filed against BSA.") (Certain Insurers App. 30); Wall Street Journal, *Looting the Boy Scouts* (Mar. 2, 2021) (criticizing plaintiff outreach efforts that resulted in this explosion of claims) (Certain Insurers App. 39).

[158]    *See* Expert Report of Karen Y. Bitar, ¶ 55 ("Any settlement in the tort system, however, is negotiated against the backdrop of the adjudicative process and the neutral decision-makers described above. Therefore, when a plaintiff or a defendant values his or her case, that valuation is informed by each side's assessment of (i) how a neutral decision-maker is likely to rule on attempts by the defendant to dismiss the case, and (ii) whether a jury will likely find in the plaintiff's favor.") (Certain Insurers App. 32).

TrustApp0415

128.    The cumulative effect of these factors, including artificially inflated claims and Base Matrix Values, is to grossly overstate BSA's actual liability and that of the non-Debtor Protected Parties.  As Dr. Bates stated in his rebuttal report, in order to achieve results that are remotely consistent with the tort system, single abuser claims (which make up approximately 87% of the filed claims matrix) would need to be discounted from base claims values *by approximately 90%* resulting in an aggregate Abuse Claim valuation of "most likely" between $2.4 billion to $3.6 billion—in contrast to the range of $24.8 billion that is the low end of the TCC's expert's range when no deduction is applied.[159]  In other words, according to Dr. Bates, the base values set forth in the TDPs are approximately *10 times too high*, unless the Settlement Trustee voluntarily discounts the vast majority of the claims by substantially all of their value—an unlikely result under the current TDPs, which contain no Mitigating Factor that contemplates such a reduction and which explicitly state that settlements for single abuser claims are already incorporated into the Base Matrix Values.  And the TCC, unlike Dr. Bates or the Debtors, is proposed to be involved in Settlement Trust governance.  Even assuming the TDPs permitted the reduction Dr. Bates believes is required to accurately value Abuse Claims (which they do not), such a system for valuing claims is not only absurd, it is vulnerable to significant exploitation—and under no circumstances is it "reasonable."  A reasonable system for valuing claims would *start* with the discounted values as the "base values," (which would then capture the vast majority of claims) and then increase the small minority of multi-abuser claims upwards from there.  The TDPs turn that valuation system on its head.[160]

---

[159]    *Compare* Kathryn McNally Feb. 3, 2022 Deposition Transcript at 313:24-25, *with* Bates Rebuttal Report ¶ 12.

[160]    *See* Rebuttal Report of Marc C. Scarcella, M.A., (the "Scarcella Rebuttal Report") at ¶¶ 18-22.

TrustApp0416

**C.      The TDPs Render the Plan Unconfirmable, as They Expressly Rewrite Insurance Policy Terms to Eliminate Insurer Rights and Defenses.**

129.    The proposed Plan is unconfirmable for the additional reason that the TDPs have the impermissible effect of modifying relevant insurance policies.  *See* **Exhibit A**.

130.    As noted by Professor Harrington, "[t]he Plan . . . fundamentally alter[s] the contractual relationship between the Debtors, other Protected Parties, and non-settling insurers. The relationship [is] changed from one of the insured's required assistance and cooperation with insurers in defense and settlement of claims to control costs, to one in which the Settlement Trust, as acting, advised, or controlled by representatives of current and future claimants, seeks to maximize recovery from the non-settling insurers."[161]

131.    Professor Harrington further explains that:

> Overall, the Plan would allow the Settlement Trustee to assert claims against non-settling insurers, including in coverage actions, that the Settlement Trust is entitled to be paid the full Allowed Claim Amount for each Allowed Abuse Claim on the basis that the Bankruptcy Court has determined that the Trust Distribution Procedures are appropriate, fair, equitable, and proposed in good faith, and that the Allowed Claim Amount establishes the amount of the Debtors' or other Protected or Limited Protected Parties' liability. The proviso in condition precedent *s* – that "nothing herein shall determine that any insurer is obligated to pay the . . . liability so determined" – would not preclude the Settlement Trust from making these assertions. Nor would this proviso prevent the Settlement Trust from asserting that non-settling insurers' coverage defenses are constrained by conditions precedent *r*, *s*, and *t*.

*Id.* at pg. 18.

132.    It should be no surprise that the Certain Insurers included in their policies a number of protections to avoid the pitfalls described by Professor Harrington, including:  the right to control the defense of claims, the right to control the settlement of claims, the right to only pay for losses for which the insured is legally liable and coverage exists, the right to apply policy exclusions against any such losses, various rights related to the exhaustion of policies, and the right

---

[161]    Expert Report of Professor Scott E. Harrington, p. 16 (Certain Insurers App. 33).

TrustApp0417

to assert contribution, subrogation, indemnification, offset and reinsurance claims against settling

parties. *See, e.g.*, **Exhibit A**. The Proposed Plan would impermissibly abrogate all of these rights.

133.    In addition, policies routinely contain an "assistance and cooperation" provision

that requires the insured to cooperate in the defense of the claim. Here the first version of the

TDPs that the Debtors filed required the Settlement Trustee to comply with insurance policy

provisions to the extent necessary to maintain insurance coverage.[162] ███████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████ Counsel for the Coalition

promptly deleted this provision as it applied to the insurance policies in its entirety, and the Debtors

never attempted to add it back, thereby ensuring that the Coalition controlled Settlement Trust will

be free to breach the terms of the insurance policies.

### (i)      The "No Action Clause"

134.    The Certain Insurers' contractual defense rights include "no action clauses," which

require that the relevant insurer indemnify the Debtors (assuming coverage exists) only when an

adverse judgment is entered against the insured after an actual trial or when the insurer expressly

consents to a settlement.[164] An example of one such clause is below:

---

[162]    *Second Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC*
[Docket No. 2592] , Ex. A, § 3.4 ("The Settlement Trust shall perform all obligations under the Insurance Policies
issued by the Non-Settling Insurance Companies in order to maintain coverage and obtain the benefit of coverage
under such policies. Such obligations shall include any requirement to share documents, witnesses, or other
information with the Non-Settling Insurance Companies, to the extent required under the relevant insurance policies
(the **"Trust Cooperation Obligations"**).") (Certain Insurers App. 8).

[163]    ███████████████████████████████████

[164]    Such clauses are standard and common in policies of the type relevant here.  *See, e.g., Permasteelisa CS
Corp. v. Columbia Cas. Co*., 377 Fed. App'x 260, 265-66, n.2 (3d Cir. 2010) (holding that insurer was not legally
obligated to cover costs incurred by insured until the entry of "a final judgment of damages or a settlement
agreement . . . involving the insurer as well as the claimant" and that this rule "likely represents the view of a majority
of courts").

TrustApp0418

No action shall lie against [the Company] unless, as a condition precedent thereto, there shall have been full compliance with all the terms of this policy, nor until the amount of the Insured's obligation to pay shall have been fully determined either by judgment against the Insured after actual trial or by written agreement of the Insured, the claimant and [the Company].[165]

135.    These clauses provide insurers with a vital ability to contest the reasonableness of attempts to resolve covered claims without the protections afforded by the tort system or where the resolution is consummated without affected insurers' consent.  Should the insured attempt to resolve a covered claim by settlement without insurer consent, the insured may attempt to litigate the reasonableness of that settlement in coverage court.

136.    The TDPs do not contemplate an actual trial involving an adverse judgment against any party; nor have any of the Certain Insurers consented to any of the payments to Abuse Claimants contemplated under the TDPs.[166]  Instead—in contravention of insurers' bargained-for contractual rights—the TDPs impose a process designed and controlled by representatives of present and future claimants, without any role for the insurers or an independent adjudicator.  And yet, despite the presence of "no action" clauses, the TDPs contemplate payment of abuse claims solely on the basis of such settlements, without any opportunity for Non Settling Insurance Companies to challenge the reasonableness of the settlements reached by the Settlement Trust.[167]

137.    The proposed TDPs fail to satisfy these insurance policy provisions because they deviate radically from litigation in coverage courts.  Such deviations include the following:

- The TDPs seek to replace the tort system's adversarial process, where cases are governed by the rules of civil procedure and evidence, parties have the opportunity to take discovery, the plaintiff bears the burden of proof, and the defense has the opportunity to investigate

---

[165]    *See, e.g.*, Liberty Mutual Insurance Company Policy No. TH1-191-409751-114, 03/01/2004 to 03/01/2005, and, for example, following form policy of Lexington Insurance Company Policy No. 3583264, 03/01/2004 to 03/01/2005 ("It is agreed that this policy, except as herein stated, is subject to all conditions, agreements and limitations of and shall follow the underlying policy/ies in all respects, including changes by endorsement. . . .").

[166]    *Rose v. Royal Ins. Co.*, 2 Cal. App. 4th 709, 716 (1991) (consent judgment did not satisfy the requirement of a "judgment after actual trial," which presupposes "a contest of issues" determined by court or jury).

[167]    *See* TDPs § IX (discussing terms for payment of allowed claims).

TrustApp0419

and to refute allegations through discovery and to interpose and prove affirmative defenses through pleadings, motion practice and trial. The TDPs instead provide for a non-adversarial process often based on self-reported information, in which there is no expectation that any party would be represented by counsel and the Settlement Trustee has sole discretion to allow claims.

- The TDPs negate the tort requirement that sexual abuse claims against an institution require proof of negligence. Under the TDPs, the Abuse Claimant's ability to prove negligence results in an increase in recovery, and the Abuse Claimant's inability to prove negligence does not bar recovery.[168]

- The TDPs dispense with the tort requirement that a claim be timely. In the tort system, but not under the TDPs, sexual abuse claims against institutions often require careful evaluation of the relevant state law statutes of limitations, as untimely claims are barred as a matter of law.

- The TDPs circumvent tort parties' rights to discovery. In the tort system, parties in interest would have the opportunity to seek discovery, including relevant and probative third-party discovery, consistent with procedural rules. Although the TDPs do allow a limited discretionary mechanism for the Settlement Trustee to collect documents not in the Abuse Claimant's immediate possession, nothing allows Non-Settling Insurance parties either to participate in, or to propound, such discovery. Nor is there any requirement or incentive for the Settlement Trustee to pursue discovery, as he appears to have virtually unchecked authority to require as much, or as little, documentation or support as he chooses. And the plaintiffs' attorneys on the STAC will control the scope of information the Settlement Trustee can collect from their clients when the questionnaire to be included with the Trust Claim Submission is developed. Given the Settlement Trustee's ties to the Coalition and FCR, there is no assurance that he will aggressively test the veracity of claim filings.

- The TDPs do not allow any party in interest to seek to disallow legally invalid Abuse Claims. In the tort system, parties may engage in dispositive pretrial motion practice, including by moving for summary judgment. If an Abuse Claim cannot, as a matter of law, succeed on the merits, a motion for summary judgment will be granted.

- The TDPs do not allow parties in interest to present arguments at all. Should an Abuse Claim survive a motion for summary judgment under tort law, the parties proceed to trial, where evidence is presented and arguments are made to an impartial judge or jury. The TDPs instead empower the Settlement Trustee to resolve claims.

- The TDPs eliminate the ability of defendants to appeal adverse rulings. Once a competent court has rendered a final judgment under tort law, the litigants may choose to exercise

---

[168] *See also* Rebuttal Expert Report of Karen Y. Bitar, ¶ 32 (noting that "in the tort system, the plaintiff must come forward with evidence of negligence to prevail on his or her claim. Under the TDPs, evidence of negligence is an Aggravating Scaling Factor, which may increase the recovery on an allowed claim by between 25% and 100%. Because evidence of negligence is a prerequisite to any recovery in the tort system, there is no reason why evidence of negligence should enhance the value of an allowed claim.") (Certain Insurers App. 34).

their right to appeal such judgment.  The TDPs allow *only* Abuse Claimants to seek review of the Settlement Trustee's Final Determination.[169]

- The TDPs permit one party to unilaterally accept an automatic recovery.  Under the TDPs, Abuse Claimants are entitled to forego even the minimal procedural requirements set forth in the TDPs in favor of a $3,500 Expedited Distribution.  In effect, such an Abuse Claimant may adjudicate, solely in their own discretion, the value of their Abuse Claim.  The tort system provides no equivalent procedure whatsoever, and there are serious reasons to doubt it could constitutionally do so.

138.    The tort system procedures and safeguards provide a vital mechanism for identifying claims that are fraudulent, false, or simply not legally cognizable.  The TDPs do not provide adequate procedures to scrutinize Abuse Claims, nor do they incentivize any party entrusted with authority (much less a party that is not neutral or independent) to do so.  The TDP procedures constitute a direct violation of the Certain Insurers' bargained-for "no action" clauses.

### (ii)    SIR/Deductible Rights

139.    The insurance policies at issue contain various self-insured retention ("SIR") and deductible provisions, each of which requires the insured to make certain payments before they may access any insurance in excess of the applicable SIR or deductible.  Both SIR and deductible contract terms provide the insureds with an incentive to investigate and discover invalid claims to avoid making unnecessary out-of-pocket payments.  However, the Plan negates these negotiated protections from the insurance contracts.

140.    With regard to applicable SIRs, the Plan provides the following proviso to the definition of Indirect Abuse Claims: "provided, however, that any retrospective premiums and self-insured retentions arising out of any Abuse Claims under the Abuse Insurance Policies shall not constitute an Indirect Abuse Claim and shall be treated in accordance with Article IV.D.1."[170] For its part, Article IV.D.1. provides that "Notwithstanding the foregoing, the Settlement Trust

---

[169]    *Compare* Expert Report of Karen Y. Bitar, ¶¶ 12-28 *with* ¶¶ 29-44 (Certain Insurers App. 32).

[170]    *See* Plan Art. I.A.142 (emphasis in original).

TrustApp0421

shall satisfy, to the extent required under the relevant policies and applicable law, ***and in***

***accordance with the Trust Distribution Procedures***, any retrospective premiums and self-insured

retentions arising out of any Abuse Claims under the Abuse Insurance Policies."[171]  The TDPs,

however, contemplate that the non-settling insurers will be required to make the upfront SIR

payment and then somehow get reimbursed later through setoff, which is very likely to be an

illusory recovery.[172]  The lack of a clear requirement in the TDPs for the Settlement Trust to satisfy

SIRs renders the purported protections in the Plan illusory and represents yet another

impermissible attempt to modify the non-settling insurer contracts.

141.    An insurer is not required to "drop down" and pay any amounts due within the SIR.

*See, e.g., Gulf Underwriters Ins. Co. v. Burris,* 674 F.3d 999, 1006 (8th Cir. 2012) ("If there is

coverage, [the insurer] will be liable to [the claimant] for any amount above [the retained limit]

within the policy limits, but [the insurer] may not be ordered to 'drop down' and pay [the debtor-

insured's] self-insured portion of the judgment."); *Rosciti v. Ins. Co. of Pennsylvania*, 659 F.3d

92, 100 (1st Cir. 2011) ("If [the claimants] were to eventually win a judgment in an amount less

than [the retained limit], [the insurer] would not be liable for any portion of that judgment."); *In

re Amatex Corp.*, 107 B.R. 856, 871 (E.D.Pa. 1989) *aff'd* 908 F.2d 961 (3d Cir. 1990).

Accordingly, unless the value of a claim exceeds the applicable SIR, no insurance is available for

that claim. Rather than relying on the provisions of the insurance policies at issue, the Plan seeks

to shift onto insurers the obligation to satisfy payment of SIRs.   That renders the Plan

unconfirmable.  *See, e.g., Fed. Ins. Co. v. SKMDV Holdings, Inc. (In re Green Jacobson P.C.)*,

---

[171]    *Id.* Art. IV.D.1 (emphasis added).

[172]    *See* Plan Ex. A, pg. 8 ("In the event that a Non-Settling Insurance Company pays such self-insured retention and is entitled to reimbursement from the Settlement Trust under applicable law, such Non-Settling Insurance Company shall receive that reimbursement in the form of a set-off against any claim for coverage by the Settlement Trust against that Non-Settling Insurance Company with respect to the relevant Abuse Claim.").

TrustApp0422

2017 WL 3149333, at *14 (Bankr. E.D. Mo. July 24, 2017) ("Neither the Court nor the parties can

rewrite the Policy.").

142.    With regard to deductibles, the Plan does not even attempt to exclude these

obligations from the definition of Indirect Abuse Claim.  Rather, the TDPs are clear that "for the

avoidance of doubt, Indirect Abuse Claims may include claims for the payment of defense costs,

deductibles, or indemnification obligations."[173]  As discussed above (*see supra* n. 138), executory

contracts must be assumed *cum onere* or not at all, and a debtor cannot modify non-executory

contracts and increase the obligations of counterparties.  To the extent the Debtors are permitted

to transfer insurance policies to the Settlement Trust over the objection of insurers, the *whole*

contract, with all benefits and burdens, should be transferred.  Accordingly, the Debtors should

continue to be bound by their obligations to satisfy deductible obligations before any liability on

the part of the non-settling insurers should attach.

143.    Even more troubling is that deductible obligations appear to extend to ***non-debtor***

policies.  The term "Indirect Abuse Claim" incorporates the term "Abuse Claim," which—in

turn—contemplates Claims "against a Protected Party, a Limited Protected Party, or an Opt-Out

Chartered Organization…."[174]  Accordingly, claims related to deductibles arising from policies

issued to ***non-debtor*** local councils and chartered organizations are swept into this definition and

afforded Indirect Abuse Claim treatment under the Plan.  Again, this constitutes an impermissible

attempt to rewrite the non-settling insurers' contracts to eliminate negotiated protections, and the

Court lacks the jurisdiction to make any such modifications to non-debtor contracts.  Accordingly,

confirmation of the Plan should be denied.

---

[173]    *See id.*, pg. 6, n. 1.

[174]    *See* Plan Art. I.A.142.

TrustApp0423

### (iii) Indemnification, Contribution, Subrogation and Reinsurance Rights

144. The Plan and TDPs also improperly interfere with indemnification, contribution, and equitable subrogation among the various insurers. Rather than allowing such rights to be resolved through ordinary negotiation among the insurers, the Plan requires Non-Settling Insurance Companies to pursue these rights through wasteful, costly, and time-consuming litigation with the Settlement Trust.

145. As described in detail in the *Allianz Insurers' Objection to the Second Modified Fifth Amended Chapter 11 Plan of Reorganization for the Boy Scouts of America and Delaware BSA, LLC and Request for Relief from the Plan Discharge and Injunction Provisions* (the "Allianz Objection") filed contemporaneously herewith,[175] the definition of Indirect Abuse Claims broadly covers all indemnification, contribution, and equitable subrogation claims that could be brought by non-settling insurers against third party non-debtors, and purports to channel such claims to the Settlement Trust. The TDPs require the non-settling insurers to first pay the full liability of the Direct Abuse Claims, which, by definition, would exceed the portion of liability that could be attributable to such insurers. The TDPs then require the non-settling insurers to seek compensation from the Settlement Trust—which compensation will be available only if the non-settling insurers are capable of meeting certain strict requirements set forth in the TDPs, not the least troubling of which is the requirement that the non-settling insurer has complied with the Bar Date Order. In other words, if a non-settling insurer did not file a proof of claim asserting contingent rights for indemnification, contribution or equitable subrogation against non-debtors by the Bar Date, such non-settling insurer would be on the hook for the entire Direct Abuse Claim liability and yet simultaneously would have its rights to collect on its Indirect Abuse Claim disallowed—even

---

[175] The Certain Insurers hereby join and incorporate as if set forth in full herein the arguments in the Allianz Objection related to Indirect Abuse Claims and reinsurance rights.

TrustApp0424

though its Indirect Abuse Claim could not have arisen until payment was made by the non-settling insurers. Such provisions defy logic, and are clearly designed to impair insurer contractual rights.

146.    Moreover, the Plan inappropriately limits the rights of non-settling insurers to collect contracted-for reinsurance from settling insurance companies. The injunction in Article X.H.2 of the Plan provides that no party (including a non-settling insurer) is permitted to pursue any "claims or causes of action" against Abuse Policies issued by a settling insurer—which provision would appear (improperly) to cover reinsurance rights. Similarly, the injunction in Article X.F.1(d) of the Plan provides that "the sole recourse for any holder of an Abuse Claim [which is broad enough to potentially cover reinsurance claims] covered by an insurance policy issued by a Settling Insurance Company shall be to and against the Settlement Trust pursuant to the Settlement Trust Documents."

147.    The injunction, however, does not prevent pursuit of claims for reinsurance by settling insurers against non-settling insurers,[176] and certain of the Insurance Settlements expressly clarify that such rights are preserved. Stated simply, a settling insurer can pursue reinsurance while a non-settling insurer cannot pursue reinsurance. The Plan's attempt to terminate the contractual rights of non-settling insurers against their reinsurers—two non-debtor entities—is not only an impermissible modification of the non-settling insurers' contracts, but issuing such injunction is beyond the bounds of this Court's jurisdiction. *See Stern v. Marshall* 564 U.S. 462, 502-03 (2011).

**D.    The Plan Improperly Assigns Non-Debtor Insurance Contracts to the Settlement Trust.**

148.    The Plan is unconfirmable for the additional reason that it seeks to assign the contractual rights of non-Debtors, which the Court cannot do under the Bankruptcy Code.

---

[176]    *See* Plan Art. X.H.3(f), providing that "Notwithstanding anything to the contrary in this Article X.H, the Insurance Entity Injunction shall not enjoin…the rights of any Insurance Company to assert any claim, debt obligation, cause of action or liability for payment against any Non-Settling Insurance Company."

TrustApp0425

149.    The Plan purports to assign and transfer to the Settlement Trust "(a) the Insurance Actions, (b) the Insurance Action Recoveries, (c) the Insurance Settlement Agreements, and (d) all other rights, claims, benefits, or Causes of Action of the Debtors, Related Non-Debtor Entities, Local Councils, or Contributing Chartered Organizations under or with respect to the Abuse Insurance Policies (but not the policies themselves), and (y) the Participating Chartered Organization Insurance Assignment."[177]    The Insurance Assignment is purportedly "notwithstanding any terms or provisions of the Abuse Insurance Policies that any Insurance Company asserts or may assert otherwise prohibits the Insurance Assignment."

150.    But the Certain Insurers' policies contain standard provisions preventing assignment of the insurers' policy rights without their consent.  Controlling precedent interpreting the doctrine of federal preemption[178] makes clear that, while anti-assignment clauses precluding the assignment of *debtor* insurance rights may be overridden under certain circumstances to implement a section 524(g) plan,[179] bankruptcy courts have no authority under any circumstance to override anti-assignment clauses covering *non-debtor* insurance rights, even in the same contracts.[180]  Even if section 1123(a)(5) preemption should be extended outside of the context of

---

[177]    Plan, p. 26, Definition 146 ("Insurance Assignment").  *See id.*, § IX A.3.J ("the Insurance Assignment is authorized and permissible as provided in the Plan, notwithstanding any terms of any policies or provisions of non-bankruptcy law that is argued to prohibit the delegation, assignment, or other transfer of such rights, and the Settlement Trust (i) is a proper defendant for Abuse Claims to assert the liability of the Protected Parties to trigger such insurance rights, (ii) is a proper defendant for Post-1975 Chartered Organization Abuse Claims to assert the liability of the Limited Protected Parties to trigger such insurance rights, and (iii) is a proper defendant for Opt-Out Chartered Organization Abuse Claims to assert the liability of the Opt-Out Chartered Organizations to trigger such insurance rights.").

[178]    Section 1123(a)(5)(B) of the Bankruptcy Code requires that the Plan "provide adequate means for the plan's implementation, such as . . . transfer of all or any part of property of the estate to one or more entities."  11 U.S.C. § 1123(a)(5)(B) (emphasis supplied)

[179]    *See In re Federal-Mogul Glob. Inc.*, 684 F.3d 355, 382 (3d Cir. 2012) ("[W]e hold that the anti-assignment provisions in the relevant insurance policies are preempted by § 1123(a)(5)(B) *to the extent they prohibit transfer to a § 524(g) trust*") (emphasis added).

[180]    *See, e.g.*, *Combustion Eng'g*, 391 F.3d at 218-19 (To the extent the subject insurance policies are jointly held by [the debtor] and a non-debtor, . . . the § 541 preemption of anti-assignment provisions applies only to [the debtor's]

TrustApp0426

a section 524(g) trust for **debtor** insurance rights, there is no authority to do so for **non-debtor** rights.  Indeed, the Third Circuit has been clear that it prohibits nonconsensual assignment of **non-debtor** insurance rights and obligations.[181]

151.    In exploring the boundaries of the federal preemption doctrine, the Third Circuit has not articulated a bright-line rule as to when the doctrine can be applied, but it also has explained that *"we do not believe that the scope is limitless*[.]"[182]  It has never recognized that the doctrine is so broad as to achieve the rewriting of contracts or even the assignment of non-debtor insurance rights under contracts that contain anti-assignment clauses.[183]  Even where the doctrine is applied to override certain contractual provisions between a creditor and the **debtor**, the Third Circuit has recognized that a "plan must still comply with all aspects of the Bankruptcy Code and be approved by the bankruptcy court."[184]  Whatever its bounds, the doctrine of "preemption extends only to means that are necessary."[185]

152.    Because of this precedent, the Plan includes a "savings clause" providing that:

If a Local Council is unable to transfer its rights, titles, privileges, interests, claims, demands or entitlements, as of the Effective Date, to any proceeds, payments, benefits, Causes of Action, choses in action, defense, or indemnity, now existing or hereafter arising, accrued or unaccrued, liquidated or unliquidated, matured or unmatured, disputed or undisputed, fixed or contingent, arising under or attributable to (i) the Abuse Insurance Policies, the Insurance Settlement Agreements, and claims thereunder and proceeds

---

interest in the shared policies."); *Pittsburgh Corning*, 417 B.R. at 303 ("Nonetheless, although the insurance is an asset of this estate and will be affected by independent, nonderivative claims against [a non-debtor affiliate], we do not read *Combustion Eng'g* as permitting channeling of those claims.").

[181]    *Fed.-Mogul Glob.*, 684 F.3d at 381 ("Unlike here, the plan at issue in *Combustion Engineering* involved the participation of non-debtor affiliates in the trust in return for a bar against asbestos claims, a provision we ultimately determined exceeded the scope of the  bankruptcy court's jurisdiction.").

[182]    *Federal-Mogul*, 684 F.3d at 374 (emphasis added).

[183]    *Id.*

[184]    *Glob. Indus. Techs.*, 645 F.3d at 381.

[185]    *In re Irving Tanning Co.*, 496 B.R. 644, 663-64 (B.A.P. 1st Cir. 2013) ("[O]nly those means may preempt state law that are sufficient for the implementation of the plan: they must be sufficient to implement the plan, equal to what is required, but also not more than is required.  The requirement of adequacy denies preemptive effect not only to those means that are insufficient but also to those that are superfluous or unnecessary).

TrustApp0427

thereof; (ii) Insurance Actions, and (iii) the Insurance Action Recoveries (the "Local Council Insurance Rights"), then the Local Council shall, at the sole cost and expense of the Settlement Trust: (a) take such actions reasonably requested by the Settlement Trustee to pursue any of the Local Council Insurance Rights for the benefit of the Settlement Trust; and (b) promptly transfer to the Settlement Trust any amounts recovered under or on account of any of the Local Council Insurance Rights; provided, however, that while any such amounts are held by or under the control of any Local Council, such amounts shall be held for the benefit of the Settlement Trust.  Plan, § V.S.1(a).[186]

153.    The proposed "saving clause" is intended to avoid the indisputable fact that this Court lacks the jurisdiction to order an assignment of non-debtor policies, by requiring that the Local Councils and Chartered Organizations pursue their rights under the policies on behalf of the Settlement Trust.  But this is a distinction without a difference.  The Local Councils and Chartered Organizations are not debtors, and the Court has no authority to order them to pursue insurance assets.  The Channeling Injunction has the effect of shifting all Direct Abuse Claims against the Local Councils and Chartered Organizations to the Settlement Trust, leaving no liability with the insured and nothing for the insurers to indemnify.  Stated simply, while the savings clause may have all the trappings of a workable concept, it ultimately fails when one closely examines the underlying mechanics.  The Debtors' attempt to bootstrap liability on the part of the insurers through the savings clause is just another misguided attempt to have the non-settling insurers pay exorbitantly in a manner that is not supported by any law.

154.    Not only does the Plan seek to improperly assign the contractual rights of non-debtors, which the Court cannot do under the Bankruptcy Code, but it also seeks to assign the contractual rights of non-Debtors insurance contracts based on inaccurate and misleading information.  The Plan seeks to transfer all Local Council policies to the Settlement Trust,[187] but

---

[186]    *See also* Plan, § V.S.1 (b), (c) (providing identical savings clauses as to the Contributing Chartered Organizations and the Participating Chartered Organizations).

[187]    *See* Plan, Schedule 3, Local Council Insurance Policies.

TrustApp0428

many of the Local Council policies in the Plan are disputed as to their existence and/or the terms and conditions of the policies.

155.    The Plan contains incorrect, misleading, and unsubstantiated information about Local Council policies that will be contributed to the Settlement Trust.  The Plan fails to disclose that some of the Certain Insurers dispute the existence of many of the policies and further dispute that they have any coverage obligations for any such alleged policies.  Many of the Local Council policies identified in the Plan are based only upon a smattering of secondary evidence which is insufficient to establish the existence and terms of the hundreds of alleged policies.  To prove coverage under a lost policy through secondary evidence, the insured must prove—typically by a preponderance of evidence—both the existence of the policy *and* the terms sufficient to show coverage of the asserted claim. *See, e.g., Fulton Boiler Works, Inc. v. Am. Motorists Ins. Co*., 828 F. Supp. 2d 481, 490 (N.D.N.Y. 2011); *Kleenit, Inc. v. Sentry Ins. Co*., 486 F. Supp. 2d 121, 126 (D. Mass. 2007); *Glew v. Cigna Group Ins*., 590 F. Supp. 2d 395, 411 (E.D.N.Y. 2008).  The Certain Insurers contend the secondary evidence does not prove the existence of the policy or contain policy terms for many of the Local Council policies.

### E.    The Plan Would Abridge Insurers' Constitutional Rights.

156.    While the Bankruptcy Code can authorize impairment of contractual obligations in limited circumstances (which are not present here), it can do so only in a manner that is constitutional, including complying with the Fifth Amendment, which protects against deprivation of property without just compensation and due process of law.  *See, e.g.*, *United States v. Sec. Indus. Bank*, 459 U.S. 70, 74-75 (1982).

157.    Applying the Bankruptcy Code to permit resolution of coverage issues against non-settling insurers through an omnibus plan confirmation would "abridge" the insurers' due-process rights, which require that they receive "'an opportunity to present every available defense.'"

73

*Lindsey v. Normet*, 405 U.S. 56, 66 (1972) (quoting *Am. Sur. Co. v. Baldwin*, 287 U.S. 156, 168 (1932)); *see, e.g.*, *Mullins v. Direct Dig., LLC*, 795 F.3d 654, 669-70 (7th Cir. 2015) ("It is certainly true that a defendant has a due process right not to pay in excess of its liability and to present individualized defenses if those defenses affect its liability.") (internal citations omitted).

158.    Indeed, determining coverage issues through plan confirmation may not only deprive insurers of the right to a jury trial in violation of the Seventh Amendment, *see, e.g., Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 51-52 (1989) (right to jury protected in private contract disputes), but it would deny non-settling insurers basic due process protections that an adversarial litigation system would provide in resolving disputed coverage issues.

159.    Allowing plan proponents to force non-settling insurers to pay insurance proceeds under terms and conditions that contradict the language of the policies—such as abrogation of "no-action clauses," SIRs and deductibles, rights to indemnification and contribution, and non-assignment clauses with non-debtors—would violate the Fifth Amendment by depriving the Certain Insurers of critical, bargained-for contractual rights.  *Louisville Joint Stock Land Bank v. Radford*, 295 U.S. 555, 589-90, 602 (1935) (bankruptcy statute subject to takings protections).

160.    The Bankruptcy Code expressly provides that a plan cannot be confirmed if it is "proposed . . . by any means forbidden by law."  11 U.S.C. § 1129(a)(3).  But regardless, the Court should avoid these serious constitutional questions by rejecting attempts to circumvent and trample the insurers' well-settled rights.  *See Sec. Indus. Bank*, 459 U.S. at 78 (explaining the "cardinal principle" that courts must "ascertain whether a construction of the statute is fairly possible by which the constitutional question may be avoided" (quotation marks omitted)).

TrustApp0430

## III.    GOVERNANCE OF THE SETTLEMENT TRUST IS INCONSISTENT WITH PUBLIC POLICY.

161.    A single Settlement Trustee, selected by the Coalition and FCR, will be responsible for reviewing and resolving over 82,000 Abuse Claims and disbursing nearly $3 billion in trust assets to claimants, using the faulty procedures set forth in the TDPs.  The Settlement Trustee will have unilateral authority over all Settlement Trust operations, with input only from interested representatives of certain trust beneficiaries who devised the TDPs.  *See, e.g.*, TDPs, Art. III.A; BSA Settlement Trust Agreement, §§ 2.1(d), 5.13.  The Settlement Trust represents a classic "fox guards the henhouse" approach whereby the Settlement Trustee is beholden only to the STAC and FCR, each of whom is not disinterested and, in the case of the STAC, has substantial financial incentives to maximize recoveries for only certain of the trust beneficiaries, the Abuse Claimants, to the detriment of others, the insurers and Chartered Organizations holding Indirect Abuse Claims. The Court has already expressed concern regarding this proposed structure:

> THE COURT:  But it does seem curious that the beneficiaries of the trust influence the procedures under which they receive a distribution, if it's binding on others.  And if you go back to just general trust law, a settlor chooses a trustee, a settlor decides the provisions of the trust, and the beneficiary is just a beneficiary.

Sept. 28, 2021 Hr'g Tr. at 73:24-25, 74-1-4 (Certain Insurers App. .  The Court should not permit it now.

162.    This governance structure not only invites potential self-dealing, it also violates sections 1129(a)(5) and 1123(a)(7) of the Bankruptcy Code.  Section 1129(a)(5)(A) requires that the Debtors disclose "the identity and affiliations of any individual proposed to serve, after confirmation of the plan, as director, officer, or voting trustee of . . . a successor to the debtor under the plan" and that such appointments be "consistent . . . with public policy."  Given the language of section 1129(a)(5) tracks closely with the language of section 1123(a)(7) – which allows a plan

75

to contain only "provisions that are consistent with the interests of creditors and equity security holders and with public policy with respect to the manner of selection of any officer, director, or trustee under the plan and any successor to such officer, director, or trustee" (11 U.S.C. § 1123(a)(7)) – it follows that because the Plan fails to comply with section 1129(a)(5), it likewise fails to comply with section 1123(a)(7).  *See In re Digerati Techs., Inc.*, Case No. 13-33264, 2014 Bankr. LEXIS 2352, at *13 n.2 (Bankr. S.D. Tex. May 27 2014).

163.    Because the Settlement Trust is the successor to the Debtors in respect of Abuse Claims,[188] the Settlement Trust and its administration must be consistent with public policy.  *See, e.g.*, *In re Vista Proppants & Logistics, LLC*, Case No. 20-42002, 2020 Bankr. LEXIS 3018, at *30 (Bankr. N.D. Tex. Oct. 28, 2020) (appointment of litigation trustee consistent with public policy under § 1129(a)(5) due to appropriate disclosures); *In re Roman Catholic Bishop of Stockton*, Case No. 14-20371, 2017 Bankr. LEXIS 102, at *12-13 (Bankr. E.D. Cal. Jan. 10, 2017) (appointment of trustee "consistent . . . with public policy" due to lack of interests adverse to the trust).

### A.    The Settlement Trustee and STAC Lack any Semblance of Independence.

### (i)    Lack of Impartiality

164.    The Debtors did not provide meaningful input into the appointment of  proposed Settlement Trustee, Prof. Green.[189]    Rather, he was handpicked by the Abuse Claimant Representatives, with whom he enjoys close personal and professional, fee-generating

---

[188]    *See* Plan, Art. X.Q ("Neither the Debtors, Reorganized BSA, nor the Settlement Trust is, or shall be deemed to be, a successor to any of the Debtors by reason of any theory of law or equity (*except as otherwise provided in Article IV.C* [of the Plan.]")) (emphasis added); *Id.* at Art. IV.C.2 (providing that the Settlement Trust shall (i) have control over the Settlement Trust Causes of Action and the Insurance Actions, (ii) become the estate representative pursuant to section 1123(b)(3)(B) with the exclusive right to enforce the Settlement Trust Causes of Action and the Insurance Actions, (iii) obtain the proceeds of the recoveries on any of the Settlement Trust Causes of Action or the Insurance Actions as property of the Settlement Trust, and (iv) have the right to enforce the Plan and any of the other Plan Documents).

[189]    *See, e.g.*, Daniel Ownby July 19, 2021 Deposition Transcript (Certain Insurers App. 47).

relationships.  At the very least, his appointment results in the appearance of a lack of impartiality.

But Prof. Green has also admitted that he does not view the role of Settlement Trustee as "neutral."

Green Dep. Tr. at 88:23-25, 89:1-6.  *See In re Digerati Techs., Inc.*, Case No. 13-33264, 2014

Bankr. LEXIS 2352, at *21-22 (Bankr. S.D. Tex. May 27 2014) (including whether an individual

is a "disinterested person" among factors to consider as to whether his appointment is "consistent

with public policy" under section 1129(a)(5)).[190]

165.    If appointed, Prof. Green will have considerable discretion under the TDPs to

implement and enforce the Settlement Trust, including the allowance and valuation of each of the

approximately 82,200 filed proofs of claim.  Crucially, this Court already determined that, due to

the objective appearance of a lack of impartiality, Prof. Green was not suited to serve as a mediator

in this case.  June 8, 2020 Hr'g Tr., 55:23–57:4. ("And I am not going to appoint Prof. Green as

requested, and that's not because of any lack of expertise, obviously, or any lack of integrity – he

has both – but having read the cases, it seems clear to me that his relationship with Mr. Patton

would lead a reasonable person to be concerned about his mediating this case.") (Certain Insurers

App. 51).  For the same reason, the Court should not confirm a Plan under which he is the sole

Settlement Trustee.

166.    Prof. Green testified that, although he did not agree that his numerous close

relationships should have precluded him from serving as a mediator because mediation is non-

binding, "[i]f it were arbitration it would be different" and such relationships would constitute a

true conflict because "where you are the decisionmaker . . . with essentially no or very limited

appeal, and you have to hear evidence or make conclusions of law just sitting like a court, as

---

[190]    The Bankruptcy Code defines "disinterested person" as a person that ". . . does not have an interest materially
adverse to the interest of the estate or of any class of creditors or equity security holders, by reason of any direct or
indirect relationship to, connection with, or interest in, the debtor, or for any other reason."  11 U.S.C. § 101(14).

TrustApp0433

opposed to a mediator or an allocator or an administrator subject to review by a court, its quite different."  Green Dep. Tr. at 79:6-80:18 (Certain Insurers App. 44).  But the TDPs are akin to a binding arbitration process imposed on Certain Insurers without their consent, and concerns about an objective appearance of a lack of impartiality are manifestly heightened due to the Settlement Trustee's broad powers.[191]

167.    Prof. Green's apparent conflicts are just one of many issues with the Plan and TDPs.  Even a neutral Settlement Trustee would be tasked and duty bound to apply the TDPs, and they are designed to inflate valid Abuse Claim values and allow and pay legally invalid claims.  Among other issues, the TDPs expressly state that single abuser settlements are "incorporated into the base value" and only allow the Settlement Trustee to increase recoveries from the Base Matrix Value for repeat abuser settlements (or single abuser settlements with evidence of negligence), *supra* at ¶ 68, do not require evidence of negligence on the part of any Protected Party and prohibit the Settlement Trustee from disallowing claims because they are barred by the statute of limitations.  *Supra* at ¶¶ 36-43 .  Accordingly, without material revisions to the TDPs, it appears likely that *any* Settlement Trustee will significantly inflate Abuse Claim liability beyond the Dr. Bates valuation range of $2.4 billion to $3.6 billion.[192]

168.    The STAC is also not independent because it has a vested interest in funding payments to its own clients, the Abuse Claimants.  The five named STAC members—Anne Andrews, Kenneth Rothweiler, Adam Slater, Deborah Levy, and Dennis Reich—essentially

---

[191]    As long as the Plan Proponents continue to seek court approval of the Proposed Findings, the lack of independent oversight of the Settlement Trustee is a paramount concern to Certain Insurers.  But, even if the Proposed Findings were removed, Certain Insurers remain trust beneficiaries, while the parties controlling the trust are not neutral and view Certain Insurers as litigation adversaries rather than trust beneficiaries.

[192]    Scarcella Rebuttal Report at pg. 8 (TDP valuation range "from $13.2 to $20.5 billion depending on how certain Scaling Factors are applied.") (Certain Insurers App. 37); McNally Dep. Tr. at 313:24-25 (low end of valuation range of $24.8 billion) (Certain Insurers App. 100).

TrustApp0434

selected themselves.  These members constitute a supermajority and stand to directly receive the largest distribution from the Settlement Trust due to the number of claims they represent.  The retention agreements of the proposed STAC members provide them an undisclosed contingency fee payable from their clients' recoveries.  If Schedule 1 to the Restructuring Support Agreement is accurate, then these firms represent 37,302 Abuse Claimants.[193]  Mr. Slater testified that, if the 5,000 of 14,170 alleged penetration Abuse Claimants Slater Slater Schulman represents receive the Base Matrix Value under the TDPs, then his firm would be entitled to "approximately $3 billion" in contingency fees for only those Abuse Claims,[194]  making the firm one of the largest recipients of Settlement Trust proceeds.[195]  Mr. Rothweiler, whose firm represents even more Abuse Claimants than Mr. Slater, was clear that waiving or reducing any portion of his firm's contingency fee was not a consideration.[196]  The remaining two members are selected by the TCC, who has fiduciary duties to Direct Abuse Claimants only and values Abuse Claim liability at $24 to $30 billion, or 8 to 10 times Dr. Bates' midpoint value.[197]

169.     And the STAC is not merely a consultative body.  Despite these conflicts, the STAC is provided with a consent right over the information that its clients the Abuse Claimants are required to provide to the Settlement Trust.  The TDPs provide that when an Abuse Claimant makes a Trust Claim submission they are required to complete an undisclosed questionnaire, which

---

[193]  *Debtors' Motion for Entry of an Order, Pursuant to Sections 363(b) and 105(a) of the Bankruptcy Code, (I) Authorizing the Debtors to Enter into and Perform Under the Restructuring Support Agreement, and (II) Granting Related Relief* [Docket No. 5466], Ex. 1, Schedule 1 ((1) Slater Slater Schulman LLP: 14,170 claims, (2) Eisenberg Rothweiler, Winkler, Eisenberg & Jeck, P.C.: 16,869 claims, (3) Andrews & Thornton, AAL, ALC: 3,009 claims, (4) Junell & Associates PLLC: 2,918 claims and (5) Reich & Binstock LLC: 336 claims) (Certain Insurers App. 10).

[194]  Slater Dep. Tr. at 61:16-61:21.

[195]  *Id.* at 62:22-63:17.

[196]  Rothweiler Dep. Tr. at 92:8-14 ("Q: You're not willing to waive your entitlement to a contingency fee in this case given the dramatic facts, correct? A. Well I don't know when you say 'considering the dramatic facts.' You're asking me whether I'm willing to waive my fee from my client. The answer is no.").

[197]  *See supra* at ¶ 128.

will be developed post-confirmation "by the Settlement Trustee and submitted to the STAC and the Future Claimants' Representative for approval."[198]  But, "both the STAC and FCR have no express duty to develop a robust and balanced questionnaire regarding their clients' information about allegations of Abuse."[199]  The Plan Proponents attempt to delay the development of the questionnaire until post-confirmation and cede authority over its contents to the STAC and FCR is but further evidence of the plan proponents' attempt to abuse the bankruptcy system and risks significantly inflating Abuse Claim liability.[200]

170.    This proposed structure creates an opportunity for self-dealing and leads to a significant "moral hazard" because the FCR and STAC represent the very claimants that stand to benefit from higher valuations.[201]  Even proposed STAC member Adam Slater conceded that "the creation of a questionnaire that will be used to assess [his] clients claims . . . could have the appearance" of a conflict of interest in light of both the fiduciary duties owed to his clients and the fact that his firm is one of the largest Settlement Trust beneficiaries.[202]  Moreover, the Settlement Trust does not bear any downside risk of overvaluing claims.  As structured, the Settlement Trustee would have the power to attempt to tender claims determined by the TDPs to Non-Settling Insurance Companies for payment, providing both the Settlement Trust and the STAC an economic incentive to overvalue claims to maximize insurance recoveries.  *See In re Digerati Techs.*, 2014 Bankr. LEXIS 2352 at *21-22 (denying confirmation because plan violated section

---

[198]    TDPs § VII.A.(i).

[199]    Expert Rebuttal Report of Jack F. Williams (the "Williams Report") at ¶ 25 (Certain Insurers App. 98).

[200]    Scarcella Rebuttal Report, at 2.1 ¶ 10 (noting that the "post-confirmation timing" of the development of the questionnaire "exacerbates current uncertainty surrounding the post-confirmation Abuse Claim liability since the parties are not aware of how the Trust Claim Form will be structured nor what information will be required.") (Certain Insurers App. 35).

[201]    Affirmative Expert Report of Marc C. Scarcella, M.A., at 2.4.1 (Certain Insurers App. 36).

[202]    Slater Dep. Tr. at 87:3-12.

TrustApp0436

1129(a)(5) wherein proposed officers had interests materially adverse to equity security holders, and such lack of disinterestedness worked against a finding that their post-confirmation positions were "consistent with public policy—particularly since no new independent officers or directors are being appointed under the Plan").[203]

<div align="center">(ii)    Lack of Fraud Prevention Measures and Disinterested Oversight of the Settlement Trust and Settlement Trustee.</div>

171.    The Settlement Trustee is solely responsible for implementing claims allowance and payment procedures without any meaningful or disinterested oversight.  Any internal control procedures are left to his discretion to develop with very limited checks and balances.  For instance, he will work with a Claims Administrator to institute certain undefined auditing and other procedures to prevent fraud, but he will select the Claims Administrator.  Importantly, not only are these fraud prevention and audit requirements completely undefined, "there is also no role contemplated for an independent entity that is not the Settlement Trustee or an individual selected by the Settlement Trustee in such fraud prevention procedures."  Williams Rebuttal Report at ¶ 26.  Simply put, there is no independent authority that is not the Settlement Trustee or an individual selected by the Settlement Trustee that is responsible for investigating or overseeing him and which procedures he does or does not implement.

172.    This is particularly problematic because the TDPs do not require the Settlement Trust to interview a single Abuse Claimant.[204]  Even Coalition attorney Mr. Higgins concedes that "the testimony of the survivor is the single most critical piece of evidence of the case" and that

---

[203]    Scarcella Rebuttal Report 2.2.2 ("because Abuse Claim valuations will likely be tendered to Remaining Insurers for payment as contemplated in the TDP, the Settlement Trust has an economic incentive to overvalue the Abuse Claims in an attempt to maximize insurance recoveries, subject to and without accounting for the Remaining Insurers' defenses and rights under their policies.") (Certain Insurers App. 36).

[204]    TDPs § VII.B (providing that the Settlement Trustee may, but is not required to, interview any Abuse Claimant).

TrustApp0437

"assessing the credibility of those allegations is paramount." *Supra* at ¶ 46.  On this point, Certain

Insurers and their expert Dr. Eileen Treacy agree.  *Id.*  Further, discovery into the proofs of claim

signed by Coalition plaintiffs' attorneys revealed that every attorney who was deposed signed (or

authorized their signature to be affixed to) proof of claim forms for which they had no personal

knowledge of the factual allegations therein, stating it was up to the Court and/or the Settlement

Trust to determine whether such claims were valid.  *See supra* at ¶ 24.  Accordingly, at a minimum,

the Settlement Trust should be required to interview Abuse Claimants whose attorney signed the

proof of claim form, and a material percentage of the remaining Abuse Claimants.

173.    The current Settlement Trust structure is contrary to the procedures set forth under

the Bankruptcy Code and/or the tort system for investigating and challenging the allowance of

claims asserted against an insured.  The Debtors have established an alternative claims resolution

process that is far afield from these traditional, reliable procedures.  By devising a process designed

to strip away protections that are available—and required—both under the Bankruptcy Code and

in the tort system, the Debtors' claims allowance process is contrary to public policy.  *See, e.g.*,

*Travelers v. PG&E*, 549 U.S. 443, 450 (2007) ("Any defense to a claim that is available outside

of the bankruptcy context is also available in bankruptcy") (citing 4 Collier on Bankruptcy ¶

1502.03[2][b] at 502–22 (15th ed. 1984)).

174.    Finally, a detailed review of the claims by an independent adjudicator that does not

report to representatives of the Abuse Claimants is critical under the unique facts of this case.  Mr.

Higgins of Coalition firm Andrews & Thornton has opined that he did not have to attest to and

have personal knowledge of the information contained in any of the over 1,000 proof of claim

forms including his signature because (according to Higgins) the tort system provides a role for

TrustApp0438

courts and adverse parties to disallow such claims.[205]  But, unlike in the tort system, the governance

structure of the Settlement Trust has been designed to ensure that there is no role for an

independent adjudicator or an adverse party to vet these claims.  Mr. Higgins' partner, Anne

Andrews, and other Coalition plaintiffs' attorneys will control the STAC, and the Coalition's

handpicked Settlement Trustee will have sole authority to do so.

175.    While this case involves over 82,000 known Abuse Claims, a comparison to 20

recent mass tort sexual abuse bankruptcies (the "Comparative Cases") shows the Comparative

Cases involved an average of fewer than 230 abuse claims and fewer than 4,600 abuse claims in

the aggregate.  Williams Rebuttal Report at ¶ 30.  "Given the unprecedented volume of claims and

the fact that the Settlement Trust is not closed, it is highly unlikely that a single Settlement Trustee

can reasonably evaluate the Abuse Claims in this case and give any level of reasonable scrutiny to

each Abuse Claim."  *Id.*  Accordingly, the sheer scope of Abuse Claims that would be channeled

make a truly independent governance structure that is not dominated by certain Settlement Trust

beneficiaries particularly important.

## IV.    THE PLAN IS NOT PROPOSED IN GOOD FAITH AND CANNOT BE CONFIRMED UNDER 11 U.S.C. § 1129(A)(3).

176.    Finally, the reorganization plan in this case cannot be confirmed because it was not

"proposed in good faith."  11 U.S.C. § 1129(a)(3).

177.    Courts evaluating "good faith" consider whether the plan "(1) fosters a result

consistent with the Code's objectives, (2) the plan has been proposed with honesty and good

intentions . . . and (3) there was fundamental fairness in dealing with the creditors."  *In re Exide*

*Holdings, Inc.*, 2021 WL 3145612, at *11 (D. Del. July 26, 2021) (quotation marks omitted).  A

plan is not proposed in good faith if it is the product of, or allows for, collusion, that is: "'[a]n

---

[205]  *See supra* ¶ 25.

agreement to defraud another or to do or obtain something forbidden by law.'"  *In re Am. Capital Equip., LLC,* 688 F.3d 145, 158 (3d Cir. 2012) (quoting Black's Law Dictionary (9th ed. 2009)).

178.    In *American Capital Equipment*, the Third Circuit held that a plan in an asbestos mass-tort case was "patently unconfirmable" because it was not proposed in good faith.  688 F.3d at 161, 164.  The Court emphasized that, as in this case: (1) mass tort claims would be resolved according to procedures that gave the decisionmakers "financial[] incentiv[es] to sabotage [the debtor's] own defense" and maximize claims insurers would be asked to fund through the trust, and (2) the trust distribution procedures would "severely limit[] or eliminat[e] Insurers' ability to take discovery, submit evidence, contest causation, [or] appeal a decision," and otherwise "strip[] Insurers of [their] procedural and substantive rights."  *Id.* at 158-60.

179.    The Plan in this case is similarly not proposed in good faith.  The Proposed Findings have no statutory basis or legitimate bankruptcy purpose, and instead are designed to preclude parties from challenging the inflated claim values at the expense of non-settling insurers and abuse victims with more meritorious claims.  That is because the Plan and the TDPs are the result of a collusive bargain.  Rather than engage in arms-length negotiations, the Coalition and FCR, with the Debtors' tacit support, devised a plan to inflate the Debtors' claim exposure at least ten-fold to fill the coffers of the Coalition's law firms at the insurers' expense.  In exchange, the Debtors were required to make (according to the Coalition and FCR) only a *de minimis* trust contribution.[206]  For his part, the FCR and his attorneys (who, in this case, have a uniquely small constituency)[207] hope

---

[206]  "[T]he contributions of the Debtors and the Local Councils are only a tiny fraction of the value of the Abuse Claims."  Coalition, FCR and TCC Statement ISO RSA ¶ 33 (Certain Insurers App. 11).

[207]  Dr. Bates has opined that "the number of future Abuse Claims is likely to be small,"  Bates Rebuttal Report ¶ 110, and his valuation uncertainty factors show that he considers repressed memory claimants and claimants that are currently minors, the universe or future claims in this case, to number in the "hundreds."  *Id.* at ¶ 74, Figure 7 (Certain Insurers App. 30).

TrustApp0440

to use the unprecedented Proposed Findings to further misuse the bankruptcy process as a springboard for similar findings in other mass tort bankruptcies.

> **A.    The Plan Ensures the Payment of Claims Barred by State Law and Impermissibly Inflates Insurers' Contractual Liabilities.**

180.    As the Plan Proponents know, "the basic federal rule in bankruptcy is that state law governs the substance of claims, Congress having generally left the determination of property rights in the assets of a bankrupt's estate to state law." *Travelers Cas. & Surety Co. of Am.*, 549 U. S. at 451 (quotation marks omitted).  "A claim against the bankruptcy estate, therefore, 'will not be allowed in a bankruptcy proceeding if the same claim would not be enforceable against the debtor outside of bankruptcy.'"  *Combustion Eng'g, Inc.*, 391 F.3d at 245.  This Court must look to applicable state law to determine whether these claims should be allowed.  *See* 11 U.S.C. § 502.

181.    Yet, the TDPs pay claims that would never be paid in the tort system – including claims that are barred by an applicable statute of limitations and claims that do not allege, much less prove, any negligence on the part of the Debtors.  In addition, the TDPs allow claims at amounts far in excess of what those claims would be valued in the tort system.  Finally, the Proposed Findings are expressly designed to improperly bind the insurers to settlements reached by the Settlement Trustee, further stripping the insurers of their rights under state and other law, which conflicts with the Bankruptcy Code's objectives.  *See supra* at Section II.  *See In re Koelbl,* 751 F.2d 137, 139 (2d Cir. 1984) ("Section 1129(a)(3) requires that the proposal of a plan comply with all applicable law, not merely the bankruptcy law" (quotation marks omitted)).

182.    These unlawful objectives hardly "discourag[e] debtor misconduct" or "achiev[e] fundamental fairness and justice."  *In re WR Grace & Co.*, 729 F.3d 332, 346 (3d Cir. 2013) (quotation marks omitted).  As the Third Circuit has repeatedly emphasized, the "integrity of the bankruptcy proceeding is called into question" when, as here, debtors and plaintiffs' lawyers ask

TrustApp0441

a bankruptcy court to approve a plan that would allow invalid claims and then demand insurers pay them, while stripping insurers of the protections that their policies and the Bankruptcy Code require. *GIT*, 645 F.3d at 212-216; *see also In re Congoleum Corp.*, 426 F.3d 675, 692 (3d Cir. 2005) ("careful scrutiny" is required when the "parties . . . seek the court's imprimatur of a reorganization that will free the debtor of all . . . [tort] liability").

183.   As this Court has suggested, the Proposed Findings do not have a code or confirmation purpose but rather are focused on binding the insurers in post-confirmation coverage litigation. Sept. 28 Hr'g Tr. at 145:5–21 (Certain Insurers App. 54); Oct. 25 Hr'g Tr. at 10:18–21 ("It does not appear that these findings have a code or a confirmation-related purpose; rather, even as modified, they appear to be more directed at post-confirmation litigation with insurers.") (Certain Insurers App. 58).  Truer words could not be spoken.  The Proposed Findings represent an unprecedented and brazen attempt to bind the insurers to inflated claim values provided for under the TDPs and preclude them from challenging the valuation of claims in future coverage litigation.

184.   Indeed, Coalition plaintiffs' law firms engaged in extensive marketing to drum up claims without even bothering to verify their legitimacy.  The Coalition then exploited its control over the drafting process by insisting on payment of time-barred and meritless claims, even though Coalition attorneys conceded a "substantial likelihood" that most claims if brought in the tort system would be "dismissed and wind up with $0."  Indeed, according to the Debtors' own expert, the default payments to claimants under the TDPs are ***approximately ten times*** the typical claimant's recovery in the tort system; and those Base Matrix Values can be reduced only at the sole discretion of a Settlement Trustee hand-picked by the Coalition.  *See supra* at ¶¶ 164-70.  The Plan and TDPs thus "materially alter the quantum of liability that the insurers would be called

TrustApp0442

upon to absorb," *Glob. Techs. Indus.*, 645 F.3d at 212, making it all but certain that non-settling insurers will be saddled with risks and liabilities far different from what they bargained for.

185.    The only potential check on the payment of inflated claims is the Settlement Trustee's ability, in his sole discretion, to *consider* reducing claim values on the basis of mitigating factors.  TDPs § VIII.E.  But, this vague provision stands in sharp contrast to the more specific provisions of the TDPs which establish enhanced recovery ranges for proposed aggravating factors such as claims that demonstrate negligence or claims asserted by claimants whose abuser is a repeat offender.  Moreover, the Coalition and FCR's handpicked Settlement Trustee falls far short of the "absolute independence" that the law requires.[208]  Finally, the Plan and TDPs immunize the Settlement Trustee's decisions from judicial review and purport to be binding on all parties other than the Abuse Claimants, who may opt out of the TDPs and litigate in the tort system either before or after receiving a settlement offer.   Under the circumstances, the Plan was hardly proposed "with honesty and good intentions," and cannot be confirmed.  *Exide Holdings, Inc.*, 2021 WL 3145612, at *11.

**B.    The Substantive Defects in the Plan are the Result of Self-Dealing Among the Plan Proponents.**

186.    Nor was the plan born out of "fundamental fairness in dealing."    *Id.*    The Bankruptcy Code's good faith requirement imposes a "responsibility" on the Court to "scrutin[ize][] the circumstances surrounding" plan negotiations, including any "ulterior motives" of plan proponents: "Only after such investigation can the court exercise the informed, independent judgment which is an essential prerequisite for confirmation of a plan."  *Am. United Mut. Life Ins. Co. v. City of Avon Park, Fla.*, 311 U.S. 138, 145-46 (1940) (cleaned up and internal citations omitted).  In deciding whether a plan meets the good faith standard, courts consider the degree of

---

[208]    Sept. 28 Hr'g Tr. at 113:11 (Certain Insurers App. 54).

control that parties exercised over the drafting of plan provisions, *In re Washington Mut., Inc.*, 461 B.R. 200, 240 (Bankr. D. Del. 2011), and hold that a plan is not proposed in good faith where its terms were "largely drafted by, and for the benefit of" a specific faction of creditors to the disadvantage of others. *ACandS, Inc.*, 311 B.R. at 43.

187.    That is precisely the case here.  This Court authorized non-settling insurers to take discovery "regarding the *bona fides* of the mediation" and, in particular, the negotiation and drafting of the TDPs.  *Id.* at 13:9–14:3.  And the results of that discovery were damning.  It revealed that the Coalition—a faction of plaintiffs' lawyers with contingency fee arrangements—dominated the drafting for its own "benefit," dictating a number of material changes to the TDPs.  *ACandS*, 311 B.R. at 43.  Moreover, "[i]t was the [Coalition] that drafted (or more likely directed debtor's counsel in drafting) the prepetition trust, and apparently chose the trustee for the trust . . . and it was the [Coalition] that decided who was going to get what."  *Id.*

188.    [210]  Similarly, the Debtors


[209]
[210]
*Declaration of Samuel P. Hershey in Support of Debtors' Objection to Moving Insurers' Motion to Compel and for Additional Relief and in the Alternative Motion in Limine* [Docket No. 5904-12 at 3 (first entry) (Certain Insurers App. 13).

TrustApp0444

"consistently stated" they would support the TDPs if the Coalition gave "appropriate concessions," such as eliminating the BSA's $80 million settlement note or agreeing to "a Hartford deal."[211]

189.    The totality of the circumstances demonstrate that there is no basis for a finding that the Plan was proposed in good faith.  Certainly the mediation alone does not demonstrate good faith. Moreover, the final terms of the Plan and TDPs reflect the Coalition's and FCR's total domination of the plan process – from the mediation improprieties, to the flawed TDPs and requirement for the Proposed Findings that are designed to pay inflated claims and to bind the insurers to the appointment of a conflicted trustee to administer the TDPs and adoption of governance measures that clearly favor claimants.  All of these factors raise serious doubts about the integrity of the "process of plan development,"  October 25 Hr'g Tr. at 8:22, and should preclude any finding that the Plan was proposed in good faith. *See ACandS*, 311 B.R. at 43 ("Given the unbridled dominance of the [Coalition] in the debtor's affairs and actions . . . and the obvious self-dealing that resulted from control of the debtor, it is impossible to conclude that the plan was consistent with the objectives and purposes of the Bankruptcy Code.").

## CONCLUSION

190.    For the foregoing reasons, the Plan cannot be confirmed.

---

211 

TrustApp0445

Dated:  February 4, 2022

*Respectfully Submitted*

By: */s/ Deirdre M. Richards*

**FINEMAN KREKSTEIN & HARRIS PC**
Deirdre M. Richards (DE Bar No. 4191)
1300 N. King Street
Wilmington, DE 19801
Telephone:    (302) 538-8331
Facsimile:    (302) 394-9228
Email: drichards@finemanlawfirm.com

-and-

**FORAN GLENNON PALANDECH PONZI &
RUDLOFF P.C.**
Susan N.K. Gummow (admitted *pro hac vice*)
222 N. LaSalle St., Suite 1400
Chicago, Illinois 60601
Telephone:   (312) 863-5000
Facsimile:    (312) 863-5009
Email: sgummow@fgppr.com

-and-

**GIBSON, DUNN & CRUTCHER LLP**
Michael A. Rosenthal (admitted *pro hac vice*)
James Hallowell (admitted *pro hac vice*)
Keith R. Martorana (admitted *pro hac vice*)
200 Park Avenue
New York, New York 10166
Telephone:   (212) 351-4000
Facsimile:    (212) 351-4035
Email: mrosenthal@gibsondunn.com
 jhallowell@gibsondunn.com
 kmartorana@gibsondunn.com

-and-

**GIBSON, DUNN & CRUTCHER LLP**
Matthew G. Bouslog (admitted *pro hac vice*)
3161 Michelson Drive
Irvine, California 92612
Telephone:   (949) 451-3800
Facsimile:    (949) 451-4220
Email: mbouslog@gibsondunn.com

*Attorneys for the AIG Companies*

**GOLDSTEIN & MCCLINTOCK LLLP**
Maria Aprile Sawczuk (DE #3320)
501 Silverside Road
Wilmington, DE 19809
302-444-6710
marias@goldmclaw.com

-and-

**LOEB & LOEB LLP**
Laura McNally
Emily Stone
321 N. Clark Street, Suite 2300
Chicago, IL 60654
312-464-3155
lmcnally@loeb.com
estone@loeb.com

*Attorneys for The Continental Insurance Company
and Columbia Casualty Company*

**SMITH, KATZENSTEIN & JENKINS LLP**
Kathleen M. Miller (No. 2898)
1000 West Street, Suite 1501
P.O. Box 410
Wilmington, DE  19899 [Courier 19801]
Telephone: (302) 652-8400
Facsimile: (302) 652-8405
Email: kmiller@skjlaw.com

and

**MOUND COTTON WOLLAN &
GREENGRASS LLP**
Lloyd A. Gura*
Pamela J. Minetto*
One New York Plaza 44th Floor
New York, NY 10004
Tel: (212) 804-4282
Email: lgura@moundcotton.com
pminetto@moundcotton.com
(*Admitted pro hac vice)

TrustApp0447

*Attorneys for Indian Harbor Insurance Company,*
*on behalf of itself and as successor in interest to*
*Catlin Specialty Insurance Company*

**REGER RIZZO & DARNALL LLP**
Louis J. Rizzo, Jr., Esquire (#3374)
1521 Concord Pike, Suite 305
Brandywine Plaza West
Wilmington, Delaware 19803
(302) 477-7100
E-mail: lrizzo@regerlaw.com

*Attorney for Travelers Casualty and Surety*
*Company, Inc. (f/k/a Aetna Casualty & Surety*
*Company), St. Paul Surplus Lines Insurance*
*Company and Gulf Insurance Company*

**JOYCE, LLC**
Michael J. Joyce, Esquire (No. 4563)
1225 King Street, Suite 800
Wilmington, DE 19801
(302)-388-1944
mjoyce@mjlawoffices.com

-and-

**COUGHLIN MIDLIGE & GARLAND, LLP**
Kevin Coughlin, Esquire (*Pro Hac Vice*)
Lorraine Armenti, Esquire (*Pro Hac Vice*)
Michael Hrinewski, Esquire (*Pro Hac Vice*)
350 Mount Kemble Ave.
PO Box 1917
Morristown, NJ 07962
973-267-0058 (Telephone)
973-267-6442 (Facsimile)
larmenti@cmg.law
mhrinewski@cmg.law

-and-

**CARRUTHERS & ROTH, P.A.**
Britton C. Lewis, Esquire (*Pro Hac Vice*)
235 N. Edgeworth St.

P.O. Box 540
Greensboro, NC  27401
(336) 478-1146 (Telephone)
(336) 478-1145 (Facsimile)
bcl@crlaw.com

*Counsel to Arrowood Indemnity Company*

**WERB & SULLIVAN**
Brian A. Sullivan (DE Bar No. 2098)
Legal Arts Building
1225 N. King Street, Suite 600
Wilmington, DE  19801
Telephone: (302) 652-1100
Facsimile: (302) 652-1111
Email: bsullivan@werbsullivan.com

and

**GIEGER LABORDE & LAPEROUSE LLC**
John E.W. Baay II, Esq. (pro hac vice)
701 Poydras Street, Suite 4800
New Orleans, Louisiana 70139
Telephone: (504) 561-0400
Facsimile: (504) 561-0100
Email: jbaay@glllaw.com

and

**KIERNAN TREBACH LLP**
William H. White Jr., Esq. (pro hac vice)
1233 20th Street, NW, 8th Floor
Washington, DC 20036
Direct: 202-712-7042
Fax: 202-712-7100
mail: wwhite@kiernantrebach.com

*Attorneys for Gemini Insurance Company*

**TROUTMAN PEPPER HAMILTON
SANDERS LLP**
David M. Fournier (DE No. 2812)
Marcy J. McLaughlin Smith (DE No. 6184)
Hercules Plaza, Suite 5100
1313 Market Street
P.O. Box 1709
Wilmington, DE 19899-1709
Telephone:  302.777.6500
Facsimile:   302.421.8390

*-and-*

Harris B. Winsberg (admitted *pro hac vice*)
**PARKER, HUDSON, RAINER & DOBBS**
303 Peachtree Street NE
Suite 3600
Atlanta, GA  30308
Telephone:  404.420.4313
Facsimile:   404.522.8409

*-and-*

**BRADLEY RILEY JACOBS PC**
Todd C. Jacobs (admitted *pro hac vice*)
John E. Bucheit (admitted *pro hac vice*)
Paul J. Esker
500 West Madison Street
Suite 1000
Chicago, IL 60661
Telephone:  312.281.0295


*Attorneys for National Surety Corporation and
Interstate Fire & Casualty Company*

**TROUTMAN PEPPER HAMILTON
SANDERS LLP**
David M. Fournier (DE No. 2812)
Marcy J. McLaughlin Smith (DE No. 6184)
Hercules Plaza
1313 Market Street
Suite 5100
P.O. Box 1709
Wilmington, DE 19899-1709
Telephone:   404.885.3000

*-and-*

**PARKER, HUDSON, RAINER & DOBBS**

TrustApp0450

Harris B. Winsberg (admitted *pro hac vice*)
303 Peachtree Street NE
Suite 3600
Atlanta, GA  30308
Telephone:     404.420.4313
Facsimile:     404.522.8409


*-and-*


**McDERMOTT WILL & EMERY LLP**
Margaret H. Warner (admitted *pro hac vice*)
Ryan S. Smethurst (admitted *pro hac vice*)
Alex M. Spisak (admitted *pro hac vice*)
The McDermott Building
500 North Capitol Street, NW
Washington, DC 20001-1531
Telephone:     202.756.8228
Facsimile:     202.756.8087

*Attorneys for Allianz Global Risks US Insurance Company*

**POST & SCHELL, P.C.**
Paul Logan (No. 3339)
300 Delaware Avenue
Suite 1380
Wilmington, DE  19801
Phone:  (302) 251-8856
Fax:  (302) 251-8857
E-mail:  plogan@postschell.com

**IFRAH PLLC**
George R. Calhoun (*pro hac vice*)
1717 Pennsylvania Ave., N.W.
Suite 650
Washington, DC  20006
Phone:  (202) 840-8758
E-mail:  george@ifrahlaw.com

*Attorneys for Argonaut Insurance Company and Colony Insurance Company*

**SEITZ, VAN OGTROP & GREEN, P.A**
R. Karl Hill (Del. Bar No. 2747)
222 Delaware Avenue
Suite 1500

Wilmington, Delaware 19801
Telephone: (302) 888-0600
Email: khill@svglaw.com

-and-

**CHOATE, HALL & STEWART, LLP**
**SEITZ, VAN OGTROP & GREEN, P.A.**
Douglas R. Gooding (admitted *pro hac vice*)
Jonathan D. Marshall (admitted *pro hac vice*)
Samuel N. Rudman (admitted *pro hac vice*)
Two International Place
Boston, MA 02110
Telephone: (617) 248-5000
dgooding@choate.com
jmarshall@choate.com

-and-

**MINTZ, LEVIN, COHN, FERRIS, GLOVSKY**
**AND POPEO PC**
Kim V. Marrkand (admitted *pro hac vice*)
Laura Bange Stephens (admitted *pro hac vice*)
One Financial Center
Boston, MA 0211
Telephone: (617) 542-6000
kmarrkand@mintz.com
lbstephens@mintz.com

*Counsel to Liberty Mutual Insurance Company*


**SMITH, KATZENSTEIN & JENKINS LLP**
Kathleen M. Miller (No. 2898)
1000 West Street, Suite 501
P.O. Box 410
Wilmington, DE 19899
Telephone: (302) 652-8400
Email: kmiller@skjlaw.com

-and-

**WILEY REIN LLP**
Mary E. Borja (admitted *pro hac vice*)
Gary P. Seligman (admitted *pro hac vice*)
Ashley L. Criss (admitted *pro hac vice*)

2050 M Street NW
Washington, DC 20036
Phone: (202) 719-7000
E-mail: mborja@wiley.law,
gseligman@wiley.law,
acriss@wiley.law

*Attorneys for General Star Indemnity Company*

**BODELL BOVÉ, LLC**
Bruce W. McCullough  (No.  3112)
1225 N. King Street, Suite 1000
P.O. Box 397
Wilmington, DE 19899-0397
Telephone: (302) 655-6749,
Facsimile: (302) 655-6827
Email: bmccullough@bodellbove.com

- and -

**CLYDE & CO US LLP**
Bruce D. Celebrezze (pro hac vice)
Four Embarcadero Center, Suite 1350
San Francisco, California 94111
Telephone:  (415) 365-980
Facsimile:  (415) 365-9801
Email:    bruce.celebrezze@clydeco.us

Konrad R. Krebs (pro hac vice)
200 Campus Drive | Suite 300
Florham Park, NJ 07932
Telephone:  (973) 210-6700
Facsimile:  (973) 210-6701
Email:    konrad.krebs@clydeco.us

-and –

**DAVID CHRISTIAN ATTORNEYS LLC**
David Christian (pro hac vice)
105 W. Madison St., Suite 1400
Chicago, IL 60602
Telephone: (862) 362-8605
Email:    dchristian@dca.law

*Attorneys for Great American Assurance*
*Company, f/k/a Agricultural Insurance Company;*

TrustApp0453

*Great American E&S Insurance Company,*
*f/k/a Agricultural Excess and Surplus Insurance*
*Company; and Great American E&S Insurance*
*Company*

**SMITH, KATZENSTEIN & JENKINS LLP**
Kathleen M. Miller (No. 2898)
1000 North West Street
Suite 1501
P.O. Box 410
Wilmington, DE  19899 (courier 19801)
302-652-8400

-and-

**HANGLEY ARONCHICK SEGAL PUDLIN & SCHILLER**
Ronald P. Schiller (admitted *pro hac vice*)
Matthew A. Hamermesh (admitted *pro hac vice*)
Sharon F. McKee (admitted *pro hac vice*)
Elizabeth C. Dolce (admitted *pro hac vice*)
One Logan Square, 27th Floor
Philadelphia, PA 19103
(215) 568 6200
(215) 568 0300 facsimile
rschiller@hangley.com
mhamermesh@hangley.com
smckee@hangley.com
edolce@hangley.com

*Attorneys for Arch Insurance Company*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:  BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC | Chapter 11 |
| Debtors. | Bankruptcy Case No. 20-10343-LSS |
| NATIONAL UNION FIRE INSURANCE CO. OF PITTSBURGH, PA, *et al.*, | (Jointly Administered) |
| Appellants | |
| -v.- | |
| BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC, | Case No. 22-cv-01237-RGA |
| Appellees | |

## OPENING BRIEF OF CERTAIN INSURERS

Theodore J. Boutrous Jr. (*pro hac vice*)
Richard J. Doren (*pro hac vice*)
Blaine H. Evanson (*pro hac vice*)
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, California 90071
tboutrous@gibsondunn.com
rdoren@gibsondunn.com
bevanson@gibsondunn.com

Deirdre M. Richards
(DE Bar No. 4191)
FINEMAN KREKSTEIN
& HARRIS PC
1300 N. King Street
Wilmington, DE 19801
Telephone: (302) 538-8331
drichards@finemanlawfirm.com

Susan Gummow (*pro hac vice*)
FORAN GLENNON
PALANDECH PONZI &
RUDLOFF P.C.
222 N. LaSalle St., Suite 1400
Chicago, Illinois 60601
sgummow@fgppr.com

*Counsel for National Union Fire Insurance Company of Pittsburgh, Pa., Lexington Insurance Company, Landmark Insurance Company, and the Insurance Company of the State of Pennsylvania*

(Additional Parties and Counsel on Inside Cover)

Michael A. Rosenthal (*pro hac vice*)
Mitchell A. Karlan (*pro hac vice*)
James Hallowell (*pro hac vice*)
Keith R. Martorana (*pro hac vice*)
Seth M. Rokosky (*pro hac vice*)
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, New York 10166
mrosenthal@gibsondunn.com
mkarlan@gibsondunn.com
jhallowell@gibsondunn.com
kmartorana@gibsondun.com
srokosky@gibsondunn.com

*Additional Counsel for National Union Fire Insurance Company of
Pittsburgh, Pa., Lexington Insurance Company, Landmark Insurance
Company, and the Insurance Company of the State of Pennsylvania*

David M. Fournier (DE Bar No. 2812)
Marcy J. McLaughlin Smith (DE No. 6184)
TROUTMAN PEPPER HAMILTON SANDERS LLP
Hercules Plaza
1313 Market Street
Suite 5100
P.O. Box 1709
Wilmington, DE 19899-1709
Telephone: 404.885.3000
david.fournier@troutman.com
marcy.smith@troutman.com

-and-

David M. Fournier (DE Bar No. 2812)
Marcy J. McLaughlin Smith (DE No. 6184)
TROUTMAN PEPPER HAMILTON SANDERS LLP
Hercules Plaza, Suite 5100
1313 Market Street
P.O. Box 1709
Wilmington, DE 19899-1709
Telephone: 302.777.6500
Facsimile: 302.421.8390
david.fournier@troutman.com
marcy.smith@troutman.com

-and-

Harris B. Winsberg (*pro hac vice*)
Matthew G. Roberts (*pro hac vice*)
PARKER, HUDSON, RAINER & DOBBS LLP
303 Peachtree Street NE
Suite 3600
Atlanta, GA  30308
Telephone: 404.420.4313
Facsimile: 404.522.8409
hwinsberg@phrd.com
mroberts@phrd.com

-and-

Margaret H. Warner (*pro hac vice*)
Ryan S. Smethurst (*pro hac vice*)
Alex M. Spisak (*pro hac vice*)
McDERMOTT WILL & EMERY LLP
The McDermott Building
500 North Capitol Street, NW
Washington, DC 20001-1531
Telephone: 202.756.8228
Facsimile: 202.756.8087
mwarner@mwe.com
rsmethurst@mwe.com
aspisak@mwe.com

*Counsel for Allianz Global Risks US Insurance Company*

Harris B. Winsberg (*pro hac vice*)
Matthew G. Roberts (*pro hac vice*)
PARKER, HUDSON, RAINER & DOBBS LLP
303 Peachtree Street NE
Suite 3600
Atlanta, GA  30308
Telephone: 404.420.4313
Facsimile: 404.522.8409
hwinsberg@phrd.com
mroberts@phrd.com

-and-

Todd C. Jacobs (*pro hac vice*)
John E. Bucheit (*pro hac vice*)
Paul J. Esker (*pro hac vice*)
BRADLEY RILEY JACOBS PC
500 West Madison Street
Suite 1000
Chicago, IL 60661
Telephone: 312.281.0295
tjacobs@bradleyriley.com
jbucheit@bradleyriley.com
pesker@bradleyriley.com

*Counsel for National Surety Corporation and Interstate Fire & Casualty Company*

Kathleen M. Miller (No. 2898)
SMITH, KATZENSTEIN &
JENKINS LLP
1000 West Street, Suite 501
P.O. Box 410
Wilmington, DE 19899
Telephone: (302) 652-8400
kmiller@skjlaw.com

Ronald P. Schiller (*pro hac vice*)
Matthew A. Hamermesh (*pro hac vice*)
HANGLEY ARONCHICK SEGAL
PUDLIN & SCHILLER
One Logan Square, 27th Floor
Philadelphia, PA 19103
T: (215) 568-6200
F: (215) 568-0300
E: rschiller@hangley.com
mhamermesh@hangley.com

*Counsel for Arch Insurance Company*

Paul Logan (No. 3339)
POST & SCHELL, P.C.
300 Delaware Avenue, Suite 1380
Wilmington, DE  19801
Telephone:  (302) 251-8856
Email:  plogan@postschell.com

John C. Sullivan (*pro hac vice*)
Kathleen K. Kerns (*pro hac vice*)
POST & SCHELL, P.C.
Four Penn Center – 13th Floor
1600 John F. Kennedy Boulevard
Philadelphia, PA  19103
Telephone:  (215) 587-1000
jsullivan@postschell.com
kkerns@postschell.com

-and-

George R. Calhoun (*pro hac vice*)
IFRAH PLLC
1717 Pennsylvania Avenue, N.W. Suite 650
Washington, DC  20006
Telephone:  (202) 840-8758
george@ifrahlaw.com

300 Delaware Avenue, Suite 1380
Wilmington, DE  19801
Telephone:  (302) 251-8856
Email:  plogan@postschell.com

*Counsel for Argonaut Insurance Company and Colony Insurance Company*

Michael J. Joyce (No. 4563)
JOYCE, LLC
1225 King Street, Suite 800
Wilmington, DE 19801
Telephone: (302) 388-1944
Email: mjoyce@mjlawoffices.com

-and-

Kevin Coughlin (*pro hac vice*)
Lorraine Armenti (*pro hac vice*)
Michael Hrinewski (*pro hac vice*)
COUGHLIN MIDLIGE &
GARLAND, LLP
350 Mount Kemble Avenue
PO Box 1917
Morristown, NJ 07962
Telephone: (973) 267-0058
Facsimile: 973-267-6442
kcoughlin@cmg.law
larmenti@cmg.law
mhrinewski@cmg.law

-and-

Britton C. Lewis
John M. Flynn
CARRUTHERS & ROTH, P.A.
235 N. Edgeworth Street
P.O. Box 540
Greensboro, NC 27401
Telephone: (336) 478-1146
Facsimile: (336) 478-1145
jmf@crlaw.com
bcl@crlaw.com

*Counsel for Arrowood
Indemnity Company*

Maria Aprile Sawczuk (DE
#3320)
GOLDSTEIN & MCCLINTOCK
LLP
501 Silverside Road
Wilmington, DE 19809
302-444-6710
marias@goldmclaw.com

-and-

Laura McNally (*pro hac vice*)
Emily Stone (*pro hac vice*)
LOEB & LOEB LLP
321 N. Clark Street, Suite 2300
Chicago, IL 60654
312-464-3155
lmcnally@loeb.com
estone@loeb.com

David Christian (*pro hac vice*)
DAVID CHRISTIAN
ATTORNEYS LLC
105 W. Madison St., Suite 1400
Chicago, IL 60602
Telephone: 312-282-5282
dchristian@dca.law

*Counsel for The Continental
Insurance Company and
Columbia Casualty Company*

Brian A. Sullivan (No. 2098)
WERB & SULLIVAN
LEGAL ARTS BUILDING
1225 N. King Street
Suite 600
Wilmington, Delaware 19801
Telephone: (302) 652-1100
Cell: (302) 757-9932
Facsimile: (302) 652-1111
Email:
bsullivan@werbsullivan.com

John E.W. Baay II (*pro hac vice*)
GIEGER LABORDE &
LAPEROUOSE, LLC
701 Poydras Street
Suite 4800
New Orleans, LA 70139
Tel.: 504-561-0400
Fax: 504-561-1011
Email: jbaay@glllaw.com

-and-

William H. White Jr (*pro hac vice*)
KIERNAN TREBACH LLP
1233 20th Street, NW
8th Floor
Washington, DC 20036
Tel.: 202-712-7000
Fax: 202-712-7100
Email:
wwhite@kiernantrebach.com

*Counsel for Gemini Insurance
Company*

Kathleen M. Miller (DE Bar No.
2898)
SMITH, KATZENSTEIN &
JENKINS LLP
1000 West Street, Suite 501
P.O. Box 410
Wilmington, DE 19899
Telephone: (302) 652-8400
Email: kmiller@skjlaw.com

-and-

Mary E. Borja (*pro hac vice*)
Gary P. Seligman (*pro hac vice*)
Ashley L. Criss (*pro hac vice*)
WILEY REIN LLP
2050 M Street NW
Washington, DC 20036
Phone: (202) 719-7000
Email: mborja@wiley.law
gseligman@wiley.law
acriss@wiley.law

*Counsel for General Star
Indemnity
Company*

Bruce W. McCullough (No. 3112)
BODELL BOVÉ, LLC
1225 N. King Street, Suite 1000
Wilmington, Delaware 19801-
3250
Telephone: (302) 655-6749
bmccullough@bodellbove.com

-and-

Bruce D. Celebrezze (*pro hac vice*)
CLYDE & CO US LLP
150 California Street | 15th Floor
San Francisco, California 94111
Telephone: (415) 365-9800
Facsimile: (415) 365-9801
bruce.celebrezze@clydeco.us

Konrad R. Krebs (*pro hac vice*)
CLYDE & CO US LLP
340 Mt. Kemble Avenue | Suite
300
Morristown, NJ 07960
Telephone: (973) 210-6700
Facsimile: (973) 210-6701
konrad.krebs@clydeco.us

-and-

David Christian (*pro hac vice*)
DAVID CHRISTIAN
ATTORNEYS LLC
105 W. Madison St., Suite 1400
Chicago, Illinois 60602
Telephone: (312) 282-5282
dchristian@dca.law

Kathleen M. Miller (No. 2898)
SMITH, KATZENSTEIN
& JENKINS LLP
1000 West Street, Suite 1501
P.O. Box 410
Wilmington, DE  19899 [Courier
19801]
Telephone: (302) 652-8400
Facsimile: (302) 652-8405
kmiller@skjlaw.com

and

Lloyd A. Gura (*pro hac vice*)
Pamela J. Minetto (*pro hac vice*)
MOUND COTTON WOLLAN &
GREENGRASS LLP
One New York Plaza 44th Floor
New York, NY 10004
Tel: (212) 804-4282
lgura@moundcotton.com
pminetto@moundcotton.com

*Counsel for Indian Harbor
Insurance Company, on behalf of
itself and as successor in interest
to Catlin Specialty Insurance
Company*

TrustApp0461

*Counsel for Great American Assurance*
*Company, f/k/a Agricultural*
*Insurance Company; Great*
*American E&S Insurance*
*Company, f/k/a Agricultural*
*Excess and Surplus Insurance*
*Company; and Great American*
*E&S Insurance Company*

R. Karl Hill (DE Bar No. 2747)
SEITZ, VAN OGTROP &
GREEN, P.A.
222 Delaware Avenue
Suite 1500
Wilmington, DE 19801
Telephone: (302) 888-0600
khill@svglaw.com

-and-

CHOATE, HALL & STEWART
LLP
Douglas R. Gooding (*pro hac vice*)
Jonathan D. Marshall (*pro hac vice*)
Two International Place
Boston, MA 02110
Telephone: (617) 248-5000
dgooding@choate.com
jmarshall@choate.com

-and-

MINTZ, LEVIN, COHN,
FERRIS, GLOVSKY AND
POPEO PC

Thaddeus J. Weaver (DE Bar. No. 2790)
DILWORTH PAXSON LLP
704 N. King Street, Suite 500
P.O. Box 1031
Wilmington, DE  19899-1031
(302) 571-8867 (telephone)
(302) 351-8735 (facsimile)
tweaver@dilworthlaw.com

-and-

William E. McGrath, Jr. (*pro hac vice*)
Dilworth Paxson LLP
2 Research Way, Suite 103
Princeton, NJ  08540
(609) 924-6000 (telephone)
(215) 893-8537 (facsimile)
wmcgrath@dilworthlaw.com

*Counsel for Munich Reinsurance*
*America, Inc., formerly known as*
*American Re-Insurance Company*

TrustApp0462

Kim V. Marrkand (*pro hac vice*)
Laura Bange Stephens (*pro hac vice* forthcoming)
One Financial Center
Boston, MA 02111
Telephone: (617) 542-6000
kvmarrkand@mintz.com
lbstephens@mintz.com

*Counsel for Liberty Mutual Insurance Company, The Ohio Casualty Insurance Company, Liberty Insurance Underwriters, Inc. and Liberty Surplus Insurance Corporation*

Stephen M. Miller (No. 2610)
Carl N. Kunz, III (No. 3201)
Sarah M. Ennis (No. 5745)
MORRIS JAMES LLP
500 Delaware Avenue, Suite 1500
Wilmington, Delaware 19801
Telephone: (302) 888-6800
Facsimile:  (302) 571-1750
smiller@morrisjames.com
ckunz@morrisjames.com
sennis@morrisjames.com

-and-

Margaret M. Anderson
(*pro hac vice*)
Ryan T. Schultz
(*pro hac vice*)
Adam A. Hachikian

Marla S. Benedek (No. 6638)
COZEN O'CONNOR
1201 N. Market Street, Suite 1001
Wilmington, DE 19801
Telephone:  (302) 295-2024
Facsimile:  (302) 250-4498
mbenedek@cozen.com

*Counsel for Traders and Pacific Insurance Company, Endurance American Specialty Insurance Company, and Endurance American Insurance Company*

(*pro hac vice*)
Kenneth M. Thomas
(*pro hac vice*)
FOX SWIBEL LEVIN &
CARROLL LLP
200 W. Madison Street, Suite
3000
Chicago, Illinois 60606
Telephone: (312) 224-1200
Facsimile:  (312) 224-1201
panderson@foxswibel.com
rschultz@foxswibel.com
ahachikian@foxswibel.com
kthomas@foxswibel.com


*Counsel for Old Republic
Insurance Company*

Louis J. Rizzo, Jr. (DE Bar No.
3374)
REGER RIZZO & DARNALL LLP
1521 Concord Pike Suite 305
Brandywine Plaza West
Wilmington DE  19803
Telephone: (302) 477-7100
Facsimile: (302) 652-3620
lrizzo@regerlaw.com

*Counsel for Travelers Casualty
and Surety Company, Inc. (f/k/a
Aetna Casualty & Surety
Company), St. Paul Surplus
Lines Insurance Company and
Gulf Insurance Company*

## CORPORATE DISCLOSURE

Pursuant to Federal Rule of Bankruptcy Procedure 8012, the undersigned Certain Insurers make the following disclosures:

### **AIG**

National Union Fire Insurance Company of Pittsburgh, PA (f/k/a National Union Fire Insurance Company of Pittsburgh, Pa. and successor in interest to Audubon Indemnity Company, Audubon Insurance Company, National Union Fire Insurance Company of Louisiana, and also Landmark Insurance Company), Lexington Insurance Company (successor in interest to Chartis Select Insurance Company (f/k/a AIG Excess Liability Insurance Company Ltd. and also Starr Excess Liability Insurance Company Ltd.)), and the Insurance Company of the State of Pennsylvania are direct, wholly owned subsidiaries of AIG Property Casualty U.S., Inc., which is a wholly owned subsidiary of AIG Property Casualty Inc., which is a wholly owned subsidiary of American International Group, Inc., which is a publicly held corporation.

### **Allianz**

Allianz Global Risks US Insurance Company f/k/a Allianz Insurance Company ("AGR US") is an Illinois corporation. Eighty percent (80%) of the voting common stock of AGR US is held by Allianz

## CORPORATE DISCLOSURE

of America, Inc., which is a wholly-owned subsidiary of Allianz Europe
B.V., which, in turn, is a wholly-owned subsidiary of Allianz SE.  Twenty
percent (20%) of the voting common stock and one hundred percent
(100%) of the non-voting preferred stock of AGR US is held by AGCS
International Holding B.V., which is a wholly-owned subsidiary of
Allianz Global Corporate & Specialty SE, which, in turn, is a wholly-
owned subsidiary of Allianz SE. Allianz SE is publicly held.

Interstate Fire & Casualty Company and National Surety
Corporation are Illinois corporations and wholly owned subsidiaries of
Fireman's Fund Insurance Company ("Fireman's Fund"), an Illinois
corporation. Fireman's Fund, in turn, is a wholly owned subsidiary of
AGR US, an Illinois corporation. Eighty percent (80%) of the voting
common stock of AGR US is held by Allianz of America, Inc., which is a
wholly owned subsidiary of Allianz Europe B.V., a wholly owned
subsidiary of Allianz SE. Twenty percent (20%) of the voting common
stock and one hundred percent (100%) of the non-voting preferred stock
of AGR US is held by AGCS International Holding B.V., a wholly owned
subsidiary of Allianz Global Corporate & Specialty SE, which, in turn, is
a wholly-owned subsidiary of Allianz SE. Allianz SE is publicly held.

# CORPORATE DISCLOSURE

## Arch

Arch Insurance Company is a wholly-owned subsidiary of Arch Reinsurance Company, whose ultimate parent is Arch Capital Group Ltd., a publicly traded company.

## Argonaut and Colony

Argonaut Insurance Company is a wholly owned subsidiary of Argo Group US, Inc.   The ultimate parent of both Argonaut Insurance Company and Argo Group US, Inc. is Argo Group International Holdings, Ltd., a publicly traded company (NYSE:  ARGO).

The parent company of Colony Insurance Company is Argonaut Insurance Company, an indirect subsidiary of Argo Group International Holdings, Ltd., which is a publicly traded corporation.   The parent company of Argonaut Insurance Company is Argo Group US, Inc., an indirect subsidiary of Argo Group International Holdings, Ltd., which is a publicly traded corporation (NYSE:  ARGO).

## Arrowood

Arrowood Indemnity Company, formerly known as Royal Indemnity Company, individually and as successor-in-interest to Royal Insurance Company of America ("Arrowood"), is a United States holding

TrustApp0467

# CORPORATE DISCLOSURE

company organized under the laws of Delaware, with its principal place of business in Charlotte, North Carolina, and it is 100% owned by Arrowpoint Group, Inc., which is 100% owned by Arrowpoint Capital Corp. Neither Arrowpoint Group, Inc. nor Arrowpoint Capital Corp. is a publicly held company, nor is there any publicly held corporation or other corporation that owns 10% or more of Arrowpoint Capital Corp.'s stock.

## <u>Gemini</u>

Gemini Insurance Company is ultimately owned by W.R. Berkley Corporation, which is a publicly-traded company.

## <u>General Star</u>

General Star Indemnity Company is a wholly-owned subsidiary of General Reinsurance Corporation. GenRe Corporation is the parent corporation of General Reinsurance Corporation, and Berkshire Hathaway, Inc. is the parent corporation of GenRe Corporation. Berkshire Hathaway, Inc. owns 10% or more of General Star Indemnity Company.

## <u>Great American</u>

Great American Assurance Company, f/k/a Agricultural Insurance Company; Great American E&S Insurance Company, f/k/a Agricultural

# CORPORATE DISCLOSURE

Excess and Surplus Insurance Company; and Great American E&S Insurance Company hereby makes the following corporate disclosure statement: Great American E&S Insurance Company is a wholly-owned subsidiary of Great American Insurance Company. Great American Assurance Company is also a wholly owned subsidiary of Great American Insurance Company. Great American Insurance Company is a wholly-owned subsidiary of American Financial Group, Inc. Shares of American Financial Group, Inc. are publicly traded on the New York Stock Exchange under the symbol AFG.

## **Indian Harbor**

Indian Harbor Insurance Company ("IHIC"), is a Delaware Corporation with its principal place of business located in Stamford, Connecticut. IHIC is a direct subsidiary of XL Specialty Insurance Company, and is an indirect subsidiary of Greenwich Insurance Company, X.L. America, Inc., XL Financial Holdings (Ireland) Limited, XL Bermuda Ltd, XL Group Ltd, and AXA SA. The ultimate indirect parent of IHIC is AXA SA, a company domiciled in France. AXA SA is a publicly traded company.

# CORPORATE DISCLOSURE

## Liberty

The Ohio Casualty Insurance Company, Liberty Insurance Underwriters, Inc., and Liberty Surplus Insurance Corporation state that 100% of the stock of each entity is owned by Liberty Mutual Insurance Company. Liberty Mutual Group Inc. owns 100% of the stock of Liberty Mutual Insurance Company. No public company owns 10% or more of the stock of The Ohio Casualty Insurance Company, Liberty Insurance Underwriters, Inc., Liberty Surplus Insurance Corporation, or Liberty Mutual Insurance Company.

## Munich Reinsurance

Munich Reinsurance America, Inc., states that it is a wholly-owned indirect subsidiary of Münchener Rückversicherungs-Gesellschaft A.G. (Munich Reinsurance Company). The shares of Munich Reinsurance Company are traded on all stock exchanges in Germany under the symbol: MUVGN.DE.

## Old Republic

Old Republic Insurance Company is owned entirely by Old Republic General Insurance Group, Inc., which is owned entirely by Old Republic International Corporation, a publicly held corporation (NYSE: ORI). No

TrustApp0470

## CORPORATE DISCLOSURE

publicly held corporation owns ten percent or more of the stock of Old
Republic International Corporation.

### Traders & Pacific Insurance Co., Endurance American Specialty Insurance Co., and Endurance American Insurance Co.

Traders and Pacific Insurance Company changed its name to
Endurance American Specialty Insurance Company in 2006.  Endurance
American Specialty Insurance Company is wholly owned by Endurance
American Insurance Company.  In turn, Endurance American Insurance
Company is a wholly owned subsidiary of Endurance Assurance
Corporation, which is a wholly owned subsidiary of Endurance U.S.
Holdings Corp.  Further, Endurance U.S. Holdings Corp. is a wholly
owned subsidiary of Endurance Specialty Insurance Ltd. (Bermuda),
which is a wholly owned subsidiary of Sompo International Holdings Ltd.
(Bermuda).  Sompo International Holdings Ltd. is a wholly owned
subsidiary of Sompo Japan Insurance Inc. (Japan), which is a wholly
owned subsidiary of Sompo Holdings, Inc. (Japan), a holding company
headquartered in Japan.  No entity owns 10% or more of the stock of
Sompo Holdings, Inc.

TrustApp0471

# CORPORATE DISCLOSURE

## Travelers

Travelers Casualty and Surety Company, Inc. (f/k/a Aetna Casualty & Surety Company), St. Paul Surplus Lines Insurance Company, and Gulf Insurance Company are 100% owned by Travelers Casualty and Surety Company, which is 100% owned by Travelers Group Holdings Inc., which is 100% owned by Travelers Property Casualty Corp., which is 100% owned by The Travelers Companies, Inc. The Travelers Companies, Inc. is the only publicly held company in the corporate family. No individual or corporation owns 10% or more of the stock of The Travelers Companies, Inc.

# TABLE OF CONTENTS

*M*

PRELIMINARY STATEMENT ................................................................. 1

JURISDICTIONAL STATEMENT ......................................................... 8

ISSUES PRESENTED ............................................................................ 8

STATEMENT OF THE CASE ............................................................... 9

I.      Statutory Background ................................................................. 9

II.     Factual Background ................................................................... 13

        A.      The Boy Scouts Bankruptcy ....................................... 13

                1........ Sexual Abuse and the Boy Scouts of America      13

                2........ BSA's Insurance Policies                         15

                3........ Plaintiffs' Lawyers Generate an Explosion of Claims  17

                4........ Plaintiffs' Lawyers Seek the "Holy Grail"        23

                        (a)    The Insurance Assignment ................................. 25

                        (b)    Inflated Payments Under the TDPs ................... 25

                        (c)    Impairment of Contracts .................................. 32

                        (d)    Control over the Settlement Trustee ................. 34

                        (e)    Binding Insurers to Claim Awards .................... 37

                        (f)    Collaborating to Further
                               Prejudice the Certain Insurers .......................... 45

TrustApp0473

# TABLE OF CONTENTS

*M*

B.    The Confirmation Hearing and Opinion ............................. 51

C.    The Court Rejects Further Efforts
to Prejudice Insurers and then Confirms the Plan .............. 54

SUMMARY OF ARGUMENT .................................................. 56

ARGUMENT ...................................................................... 58

I.    THE BANKRUPTCY COURT ERRED IN CONFIRMING A
BANKRUPTCY PLAN THAT WAS NOT PROPOSED IN GOOD FAITH........ 59

A.    The Bankruptcy Court Erred in Focusing on the Evidence
Piecemeal, Rather Than Employing a "Totality of the
Circumstances" Approach. .................................................. 59

B.    The Bankruptcy Court Erred in Concluding That Certain
Improvements to the Plan Were Sufficient to Remedy a Lack
of Good Faith. ................................................................ 68

1........ Improving the Plan at the Court's Direction Does Not
Demonstrate Good Faith.                                              69

2........ The Bankruptcy Court's Plan Revisions Do Not Cure
the Plan's Defects.                                                   72

C.    The Bankruptcy Court Inappropriately Relied on the
Testimony of One BSA Witness About His Subjective Beliefs
Regarding the Plan. ......................................................... 75

TrustApp0474

# TABLE OF CONTENTS

*M*

II.    The Plan Abrogates the Certain Insurers' Contractual
       Rights...........................................................................77

       A.    The Plan Cannot Be Confirmed Because It Impermissibly
             Alters the Certain Insurers' Contracts...............................77

       B.    The Bankruptcy Court Wrongly Relied on its Rejection of the
             Proposed Insurance Findings As a Basis to Overlook the
             Impairment of the Insurers' Contracts...............................86

CONCLUSION .......................................................................90

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Amatex Corp. v. Aetna Cas. & Sur. Co. (In re Amatex Corp.),*
    97 B.R. 220 (Bankr. E.D. Pa. 1989) ....................................................78

*American United Mut. Life Ins. Co. v. City of Avon Park, Fla.,*
    311 U.S. 138 (1940) ............................................................................12

*Bell Atlantic Corp. v. Twombly,*
    550 U.S. 544 ......................................................................................64

*Butner v. United States,*
    440 U.S. 48 (1979) ............................................................................12

*Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.,*
    511 U.S. 164 (1994) ..........................................................................64

*Cissel v. Am. Home Assur. Co.,*
    521 F.2d 790 (6th Cir. 1975) ............................................................79

*Davis v. Wells Fargo,*
    824 F.3d 333 (3d Cir. 2016) ............................................................77

*Fuller-Austin Insulation Co. v. Highlands Ins.,*
    38 Cal. Rptr. 3d 716 (Cal. App. 2006) ............................................65

*Hazel-Atlas Glass Co. v. Hartford-Empire Co.,*
    322 U.S. 238 (1944) ......................................................................6, 71

*In re 47 Hops LLC,* 2020
    WL 2485808 (Bankr. E.D. Wash. May 13, 2020) ............................83

*In re 641 Associates, Ltd.,* 1993
    WL 332646 (Bankr. E.D. Pa. Aug. 26, 1993) ..................................79

*In re AbitibiBowater Inc.*,
    481 B.R. 815 (Bankr. D. Del. Oct. 27, 2009) ........................................ 80

*In re ACandS, Inc.*,
    311 B.R. 36 (Bankr. D. Del. 2004) ..................................................... 66

*In re American Cap. Equip., LLC*,
    688 F.3d 145 (3d Cir. 2012) ..................................... 3, 6, 59, 66, 71, 72

*In re Am. Home Mortg. Holdings*,
    402 B.R. 87 (Bankr. D. Del. 2009) ..................................................... 80

*In re Combustion Eng'g, Inc.*,
    391 F.3d 190 (3d Cir. 2004) ............................................ 65, 78, 79, 81

*In re Congoleum Corp.*,
    426 F.3d 675 (3d Cir. 2005) ............................................................. 11

*In re Coram Healthcare Corp.*,
    271 B.R. 228 (Bankr. D. Del. 2001) ................................................... 66

*In re Crippin*,
    877 F.2d 594 (7th Cir. 1989) ............................................................ 78

*In re Diocese of Camden, N.J.*, 2022
    WL 3369087 (Bankr. D.N.J. Aug. 12, 2022) ...................................... 78

*In re Emerge Energy Servs. L.P.*, 2019
    WL 7634308 (D. Del. Dec. 5, 2019) .............................................. 60, 69

*In re Exide Holdings, Inc.*,
    2021 WL 3145612 (D. Del. July 26, 2021) ......................... 3, 12, 59, 75

*In re Federal-Mogul Global Inc.*,
    684 F.3d 355 (3d Cir. 2012) ....................................................... 11, 60

*In re Genesis Health Ventures, Inc.*,
    266 B.R. 591 (Bankr. D. Del. 2001) ................................................... 70

*In re Global Indus. Techs., Inc.*,
    645 F.3d 201 (3d Cir. 2011) ..................................................... 5, 73, 77

*In re Grasso*,
   490 B.R. 500 (Bankr. E.D. Pa. 2013) ................................................. 69

*In re Green Jacobson P.C.*,
   No. 15-41404-705, 2017 Bankr. LEXIS 2059 (Bankr. E.D.
   Mo. July 24, 2017) ....................................................... 79

*In re Italian Cook Oil Corp.*,
   190 F.2d 994 (3d Cir. 1951) ................................................ 82

*In re Kaiser Aluminum Corp.*,
   456 F.3d 328 (3d Cir. 2006) ............................................... 11

*In re Lernout & Hauspie Speech Prods. N.V.*,
   308 B.R. 672, 675 (D. Del. 2005)........................................... 9

*In re Master Mortgage Inv. Fund*,
   168 B.R. 930 (Bankr. W.D. Mo. 1994) .................................... 10

*In re Millennium Lab Holdings II, LLC*,
   242 F. Supp. 3d 322 (D. Del. 2017)........................................ 8

*In re Peabody Energy Corp.*,
   582 B.R. 771 (Bankr. E.D. Mo. 2017) ................................... 76

*In re Pittsburgh Corning Corp.*,
   453 B.R. 570 (Bankr. W.D. Pa. 2011) .................................. 78

*In re RTI Holding Co., LLC*, 2021
   WL 4994414 (Bankr. D. Del. 2021) ..................................... 70

*In re SGL Carbon Corp.*,
   200 F.3d 154 (3d Cir. 1999) ........................................ 6, 60, 67, 70, 72

*In re SPM Mfg. Corp.*,
   984 F.2d 1305 (1st Cir. 1993) ............................................ 79

*In re Stewart Foods, Inc.*,
   64 F.3d 141 (4th Cir. 1995)................................................ 80

*In re Thorpe Insulation Co.*,
   677 F.3d 869 (9th Cir. 2012)............................................... 78

TrustApp0478

*In re Tribune Co.*,
    464 B.R. 126 (Bankr. D. Del. 2011) ............................................. 11, 85

*In re Weinstein Co. Holdings, LLC*,
    997 F.3d 497 (3d Cir. 2021) ............................................................... 82

*In re Weinstein Co. Holdings, LLC*,
    No. 18-50924 (Bankr. D. Del. 2020) ................................................... 82

*In re WR Grace & Co.*,
    729 F.3d 332, 346 (3d Cir. 2013) .......................................................... 8

*Lindsey v. Normet*,
    405 U.S. 56 (1972) ........................................................................ 6, 87

*Louisville Joint Stock Land Bank v. Radford*,
    295 U.S. 555 (1935) .......................................................................... 83

*Mission Prod. v. Tempnology, LLC*,
    139 S. Ct. 1652 (2019) ...................................................... 4, 79, 82, 83

*Moody v. Amoco Oil Co.*,
    734 F.2d 1200 (7th Cir. 1984) ....................................................... 79, 83

*Mullins v. Direct Dig., LLC*,
    795 F.3d 654 (7th Cir. 2015) ............................................................. 87

*Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
    259 F.3d 154 (3d Cir. 2001) ...................................................... 6, 64, 86

*Sharon Steel Corp. v. Nat'l Fuel Gas Dist. Corp.*,
    872 F.2d 36 (3d Cir. 1989) ................................................................ 80

*Thgh Liquidating LLC*, 2020
    WL 5409002 (D. Del. 2020) ............................................................... 76

*Travelers Cas. & Surety Co. of
    Am. v. Pacific Gas & Elec. Co.*,
    549 U.S. 443 (2007) .......................................................................... 79

*United States v. Sec. Indus. Bank*,
    459 U.S. 70 (1982) ...................................................................... 84, 87

*Young v. United States*,
    535 U.S. 43 (2002) ................................................................ 11

**Statutes**

11 U.S.C. § 301 ........................................................................ 8

11 U.S.C. § 363 ...................................................................... 10

11 U.S.C. § 365 ...................................................................... 10

11 U.S.C. § 501 ...................................................................... 10

11 U.S.C. § 1123 .................................................................... 10

11 U.S.C. § 1126 .................................................................... 10

11 U.S.C. § 1128 .................................................................... 11

11 U.S.C. § 1129 ................................................... 10, 11, 77, 83

**Other Authorities**

Restatement (Second) of Contracts § 317:2 (Westlaw 2022) .................. 81

29 Williston on Contracts § 74:10 (Westlaw 4th ed. 2022) .................... 81

2 Bankr. Law Manual § 11:1 (Westlaw 5th ed. 2022) ......................... 9

Modern Law of Contracts § 21:18 (Westlaw 2022) .............................. 81

Modern Law of Contracts § 21:27 (Westlaw 2022) .............................. 81

TrustApp0480

# PRELIMINARY STATEMENT

The bankruptcy court erred in confirming a Chapter 11 reorganization plan for the Boy Scouts of America ("BSA") that was not proposed in good faith and purports to abrogate core rights and obligations in insurance policies issued by the appealing insurers (the "Certain Insurers"), fundamentally altering the economic bargain central to those contracts.

Faced with the prospect of approximately 1,700 claims alleging sexual abuse, BSA sought bankruptcy protection to resolve its liabilities. Mass tort plaintiffs' lawyers, on the other hand, who saw the bankruptcy as an opportunity for a windfall, launched a massive advertising campaign replete with false statements and began enlisting claimants on a contingency-fee basis. The attorneys themselves signed and filed thousands of proofs of claim in the bankruptcy, under penalty of perjury, that had missing or inaccurate information, often without ever reviewing the forms or contacting the claimants.

The result of this effort was a ***6,000% increase*** in the number of abuse claims against BSA—to more than ***82,000 claims***. These new claims bear little resemblance to the lawsuits BSA defended prior to the

bankruptcy.  The vast majority are time-barred, only a third provide an abuser's full name, and, as claimants' own expert recognized, a significant portion are likely fraudulent.  At least 85% face such legal obstacles that they never would have been filed but-for the bankruptcy.

Some of the claimants' attorneys were transparent about their strategy.  One conceded that more than 58,000 of the claims are untimely under applicable statutes of limitation or repose.  Another explained that they were seeking the "Holy Grail" that mass tort plaintiffs' lawyers have been chasing for decades—a bankruptcy plan that would bind insurers in coverage litigation.  With that achieved, insurers would be unable to challenge legally meritless or defensible demands for payment.

In order to garner the necessary votes from claimants to support its reorganization plan, BSA agreed to a "matrix" for valuing claims that is worlds apart from BSA's prepetition claims history, and plan terms that abrogate core obligations of BSA and rights of the insurers under their policies.  The plan that BSA proposed limits BSA's responsibility for decades of abuse, provides an enormous windfall to plaintiffs' lawyers, and leaves insurers holding the bag.

The bankruptcy court modified but ultimately confirmed the plan.
This Court should reverse for two independent reasons.

***First***, the bankruptcy court erroneously concluded that the plan
was proposed in good faith.  *See* 11 U.S.C. § 1129(a)(3).  The claimants'
lawyers generated a pot of claims that bear no resemblance to
prepetition claims, then leveraged those claims to strongarm BSA into
seeking to assign its rights without obligations under its insurance
contracts.  *In re American Cap. Equip.*, 688 F.3d 145, 156, 158 (3d Cir.
2012) (plan must be proposed "with honesty and good intentions").

The bankruptcy court failed to consider the "totality of the
circumstances" surrounding the plan's proposal.  *In re Exide Holdings,
Inc.*, 2021 WL 3145612, at *11 (D. Del. July 26, 2021).  It instead took a
piecemeal approach, determining that no single aspect of the plan, when
viewed in isolation, demonstrated a lack of good faith.  The court then
compounded that error by emphasizing that the plan had improved in
certain respects, placing much emphasis on the court's own decision not
to adopt proposed findings that sought to eviscerate insurers' contractual
rights, the imposition of a respected former bankruptcy judge as a
settlement trustee (in lieu of someone with close ties to lawyers

representing BSA claimants), and testimony by a single BSA attorney that he subjectively believed BSA had acted in good faith. But none of those circumstances comes close to demonstrating that BSA proposed the plan in good faith, and none of them change that a fundamental goal of the plan is to generate claim values that are exponentially larger than BSA's prepetition experience to line the pockets of contingency-fee law firms representing those who asserted claims against BSA. The court should send a clear message that this type of conduct represents a misuse of the bankruptcy process and fails to meet the fundamental requirement that a bankruptcy plan be proposed in good faith.

*Second*, and independent from the manifest lack of good faith in the plan's proposal, the plan impermissibly abrogates insurance contracts. The bankruptcy court declined to engage on this issue because it believed that "insurance neutrality" is merely a "standing concept." But it is a bedrock principle of law that contracts do not expand or contract by "happenstance of bankruptcy." *Mission Prod. v. Tempnology, LLC*, 139 S. Ct. 1652, 1663 (2019). BSA's plan runs afoul of that principle by purporting to assign BSA's *rights* in the insurance contracts, but not BSA's *obligations*. This means, among other things, that the plan does

not permit insurers to exercise their rights to control or participate in the defense of claims, or require BSA to cooperate in such a defense, an outcome designed to lead to claim values that are higher than those that would have been produced in the tort system.

The bankruptcy court attempted to sidestep this issue by concluding that insurers can simply raise these arguments in coverage litigation. But while matters of *insurance law* should indisputably be addressed in coverage litigation, *bankruptcy law* requires BSA to demonstrate that the plan takes prepetition insurance contracts as it finds them, without impermissibly altering rights and obligations that are fundamental to the operative insurance contracts, and leading to inflated claim values that insurers are left to contend with. The confirmed plan harms insurers independent of any coverage litigation.

This Court should not tolerate the bad faith, collusion, and outright fraud by claimants' counsel that resulted in this plan—conduct to which BSA was, at best, willfully blind. The Third Circuit has recognized the "profoundly serious" problem that occurs where, as here, a debtor "sold out [its] insurers" by "setting up a system" in which "ginned-up" claims are paid in exchange for claimants voting for the plan. *In re Global Indus.*

*Techs., Inc.*, 645 F.3d 201, 214 (3d Cir. 2011); *see, e.g.*, *American Cap.*
*Equip.*, 688 F.3d. at 158 ("Collusive plans" not proposed in good faith).

It is plain *why* the plaintiffs' bar is pursuing this playbook in "mass
tort" bankruptcies (a playbook they have been trying—and failing—to
convince courts to adopt for decades).  Pointing an 82,000-claim bazooka
at insurers creates a "hydraulic pressure to settle" that serves no
legitimate purpose.  *Newton v. Merrill Lynch, Pierce, Fenner & Smith,*
*Inc.*, 259 F.3d 154, 164 (3d Cir. 2001).  The confirmed plan inflates the
non-settling insurers' exposure while purporting to gut many of the
rights and defenses they bargained for in their contracts.  This is an
abuse of the bankruptcy system (*In re SGL Carbon Corp.*, 200 F.3d 154,
161-67 (3d Cir. 1999)) and a violation of the insurers' right to due process
(*Lindsey v. Normet*, 405 U.S. 56, 66 (1972)).

The harm from this plan extends far beyond the prejudice to the
Certain Insurers.  The plan inevitably dilutes the claims of the truly
victimized claimants by allowing payments for thousands of invalid and
questionable claims.  And this "tampering with the administration of
justice in the manner indisputably shown here involves far more than an
injury to a single litigant."  *Hazel-Atlas Glass Co. v. Hartford-Empire Co.,*

322 U.S. 238, 246 (1944).  Debtors and claimants working together to strongarm insurers by inflating claims and circumventing core contractual provisions "is a wrong against the institutions set up to protect and safeguard the public, institutions in which fraud cannot complacently be tolerated consistently with the good order of society." *Id.*

The Certain Insurers have every desire that BSA exit bankruptcy and that deserving survivors receive compensation.  But that cannot happen through a plan that unfairly enriches claimants and their counsel at the expense of insurers and the integrity of the bankruptcy process. The purpose of Chapter 11 is to reorganize—not expand—the debtor's assets and to fairly compensate creditors with those assets.  This plan does not do that.  The Court should vacate and remand so that BSA can propose a plan in good faith that does not abrogate insurers' contracts.

## JURISDICTIONAL STATEMENT

The bankruptcy court confirmed the bankruptcy plan on September 8, 2022 with jurisdiction pursuant to 28 U.S.C. §§ 157(b) and 1334. (A. 282-848.)   The Certain Insurers appealed that final judgment on September 21, 2022.   (A. 10016-10506.)   This Court has jurisdiction pursuant to 28 U.S.C. § 158(a)(1) and Federal Rule of Bankruptcy Procedure 8002(a).

## ISSUES PRESENTED

1.     Did the bankruptcy court erroneously conclude that the plan was proposed in good faith and not by any means prohibited by law?

2.     Did the bankruptcy court erroneously confirm the plan even though it seeks to alter the Certain Insurers' contracts to their detriment?

For both questions, this Court "reviews the Bankruptcy Court's legal determinations de novo, its factual findings for clear error, and its exercise of discretion for abuse thereof." *In re Millennium Lab Holdings II, LLC*, 242 F. Supp. 3d 322, 336 (D. Del. 2017).   An appeal from a good-faith determination "presents mixed questions of law and fact." *In re WR Grace & Co.*, 729 F.3d 332, 346 (3d Cir. 2013).   The Court "must accept the Bankruptcy Court's finding of historical or narrative facts unless

clearly erroneous, but exercise[s] plenary review of the trial court's choice and interpretation of legal precepts and its application of those precepts to the historical facts." *In re Lernout & Hauspie Speech Prods. N.V.*, 308 B.R. 672, 675 (D. Del. 2005) (quotation marks omitted).

## STATEMENT OF THE CASE

### I.    STATUTORY BACKGROUND

Chapter 11 of the Bankruptcy Code provides "a means by which financially distressed businesses or individuals may restructure their finances and exit bankruptcy by obtaining confirmation of a plan which provides either a continuation of a business, or retention or orderly sale of assets, and exiting bankruptcy relieved of burdensome debts and obligations." 2 Bankr. Law Manual § 11:1 (5th ed. Westlaw 2022).

The case commences with the filing of a petition, which creates an estate that is "comprised of … all legal or equitable interests of the debtor in property as of the commencement of the case." *In re Combustion Eng'g, Inc.*, 391 F.3d 190, 219 (3d Cir. 2004) (quotation marks omitted). Each creditor may then file a "proof of claim." 11 U.S.C. § 501.

Once the debtor's operations are stabilized, it seeks to resolve creditor claims through a court-approved plan, which sets forth the treatment of all impaired classes of claims and must provide adequate

means for the plan's implementation.  *See* 11 U.S.C. § 1123(a).  The plan

may, among other things:  (a) impair a class of claims; (b) provide for sale

of property in accordance with applicable non-bankruptcy law; (c) provide

for assumption or rejection of executory contracts, subject to conditions;

and  (d) include  other  appropriate  provisions  that  comply  with  the

Bankruptcy Code.  *See* 11 U.S.C. § 1123(b); *id.* §§ 363, 365.

After votes are solicited, more than half of voters (and at least two-

thirds in amount) of each impaired class must vote to accept the plan.  11

U.S.C. § 1126(a), (c)-(d).  Otherwise, the court may "cram down" the plan

on any rejecting class so long as the plan "does not discriminate unfairly"

and "is fair and equitable, with respect to each class of claims or interests

that is impaired under, and has not accepted, the plan."  *Id.* § 1129(b).

In  the  extraordinary  case  where  the  debtor  seeks  a  channeling

injunction and third-party releases, courts consider a number of factors,

including  whether  the  plan  received  "overwhelming"  support  by  those

affected, typically at least 90%; and whether it provides for the "payment

of all, or substantially all, of the claims of the class or classes" affected.

*In re Master Mortg. Inv. Fund, Inc.*, 168 B.R. 930, 935 (Bankr. W.D. Mo.

1994).  (*See* A. 139-140, 156-157.)  Within the framework of asbestos-

related cases—which often are the model for mass-tort bankruptcies—a "cram down" option is not available. When coupled with the need for "overwhelming" support, this can allow creditors to exert undue leverage over a bankruptcy. *See*, *e.g.*, *In re Federal Mogul Global Inc.*, 684 F.3d 355, 361 (3d Cir. 2012).

The bankruptcy court then holds a confirmation hearing. 11 U.S.C. § 1128. The debtor bears the burden of proving that the plan should be confirmed. *See*, *e.g.*, *In re Tribune Co.*, 464 B.R. 126, 151-52 (Bankr. D. Del. 2011), *aff'd in part*, 587 B.R. 606 (D. Del. 2018). "[C]areful scrutiny" is required where, as here, the "parties ... seek the court's imprimatur of a reorganization that will free the debtor of all ... [tort] liability." *In re Congoleum Corp.*, 426 F.3d 675, 692 (3d Cir. 2005). The bankruptcy court sits in "equity" (*Young v. United States*, 535 U.S. 43, 50 (2002)), and seeks to bring about the just result (*see, e.g., In re Kaiser Aluminum Corp.*, 456 F.3d 328, 340 (3d Cir. 2006)).

The Bankruptcy Code provides certain requirements that must be satisfied for confirmation. Among other things, a plan must be "proposed in good faith." 11 U.S.C. § 1129(a)(3). This is because, although bankruptcy "presents an inviting safe harbor" for "companies that face

massive potential liability and litigation costs," "this lure creates the possibility of abuse which must be guarded against to protect the integrity of the bankruptcy system and the rights of all involved in such proceedings." *SGL Carbon*, 200 F.3d at 169.

The good faith requirement imposes a "responsibility" on the court to "scrutin[ize] the circumstances surrounding" plan negotiations. *American United Mut. Life Ins. Co. v. City of Avon Park, Fla.*, 311 U.S. 138, 145-46 (1940). Thus, "[t]he good-faith determination is a factual inquiry into a totality of the circumstances surrounding the plan's proposal." *Exide*, 2021 WL 3145612, at *11 (quotation marks omitted).

A bankruptcy plan also must comply with the applicable provisions of the Bankruptcy Code and may not be proposed by any means forbidden by law. *See* 11 U.S.C. §§ 1129(a)(1), (3). It is well settled that "[p]roperty interests," such as insurance contracts, "are created and defined by state law. Unless some federal interest requires a different result, there is no reason why such interests should be analyzed differently simply because an interested party is involved in a bankruptcy proceeding." *Butner v. United States*, 440 U.S. 48, 55 (1979). In other words, those interests

neither expand nor contract "by happenstance of bankruptcy." *Mission*

*Prod.*, 139 S. Ct. at 1663.

## II.   FACTUAL BACKGROUND

### A.   The Boy Scouts Bankruptcy

#### 1.   Sexual Abuse and the Boy Scouts of America

"BSA is a non-profit corporation with a mission 'to prepare young

people to make ethical and moral choices over their lifetimes by instilling

in them the values of the Scout Oath and Law.'"  (A. 6042 (Whittman).)

BSA charters approximately 250 Local Councils, which recruit Chartered

Organizations like faith-based institutions and civic organizations that

sponsor more than 44,000 scouting units.  (A. 6009 (Desai), 6043-6044

(Whittman).)

Over time, BSA became the subject of lawsuits alleging sexual

abuse.   In the four years preceding its bankruptcy, BSA defended

approximately 350 abuse lawsuits, the majority of which involved abuse

alleged to have occurred more than 30 years ago.  (A. 5940.)

BSA employed a "national coordinating counsel," who hired,

coordinated, and directed local counsel to investigate, defend, and resolve

sexual abuse claims.  (A. 1208, 5939, 5941 (Griggs).) BSA regularly

asserted defenses, including that the perpetrator was not an agent of

BSA, that there was no basis for BSA's liability (e.g., no negligence by BSA was shown), and that the claim was time-barred under a statute of limitations or repose.  (A. 1188-1190, 1213-1215, 1229-30 (Griggs); *see* A. 5945 (Griggs) (statute of limitations or repose presented a "significant hurdle" and had a "substantial chilling effect on claims.").)

To develop and pursue these defenses, BSA took appropriate measures such as seeking affirmative discovery, hiring experts, filing motions *in limine*, and developing a damages model.  (A. 1224-1225, 1230-1235, 5947 (Griggs).)  The purpose was to "evaluate the credibility and value of a claim" and position the case "towards a more favorable settlement, if possible."  (A. 5948 (Griggs); *see* A. 5940 (Griggs) (BSA resolved 250 of the 350 cases).)

Most of the money BSA paid to tort claimants stemmed from cases involving serial abusers of multiple victims because the national organization of BSA was more likely to bear institutional responsibility in such cases.  (A. 2237-2239 (Bates).)  "BSA also faced a small set of claims that involved particularly egregious facts and circumstances … that resulted in particularly high, outlier settlements."  (A. 1238-1242, 5941 (Griggs).  Even in those rare, outlier cases, BSA continued to mount

zealous defenses, including by moving for summary judgment (A. 1210-1211, 5945 (Griggs); *see* A. 11766-11767), demanding a jury, and pursuing appeals where appropriate (A. 1235-1236 (Griggs)).

Approximately 90% of BSA's prepetition settlements involved *multiple-victim* abusers, and their value was significantly higher than settlements involving single-victim abusers because the chance of a liability finding against BSA for a multiple-victim abuser was greater given BSA's perceived institutional responsibility. (*See*, *e.g.*, A. 2414-2423 (Bates).) As explained below, this was the mirror opposite of the sort of claims filed during the bankruptcy.

### 2. BSA's Insurance Policies

Prior to its bankruptcy, BSA's settlements were typically funded by BSA and "its insurance companies." (A. 5952-5953 (Griggs).) BSA has had liability insurance since at least 1935. (A. 2856-2857, 6368 (Gutzler).) Local Councils and Chartered Organizations became additional insureds on some policies, and at times certain Local Councils purchased their own insurance. (A. 6370-6373 (Gutzler).)

These commercial insurance contracts provide "liability protection to business from suits primarily for bodily injury and property damage

Case 1:22-cv-01237-RGA    Document 45    Filed 11/07/22    Page 42 of 125 PageID #:
Case 3:23-cv-01592-S    Document 559    Filed 06/23/25    Page 500 of 1044    PageID 17436
2036

brought within the tort system."  (A. 3477 (Harrington); *see* A. 13383-16334.)  They contain "very important" rights and obligations that are "fundamental" to the bargain.  (A. 3483-89 (Harrington).)  These include:

a.  **Defense Rights:**  Defense rights provide insurers with the right to associate in the defense and investigate claims, as well as the right to defend lawsuits and make any settlements they deem expedient.  (A. 1532-1533 (Burnett), 1677-1678 (Azer), 3483-3485, 3489-3490, 3494-95, 3499 (Harrington); *see* A. 13634, 14502.)  These rights are "integral" to the insurance contract because they counteract the "moral hazard" that insurance creates by reducing the policyholder's incentive to limit its losses.  (A. 3484-3485 (Harrington).).

b.  **Cooperation Obligations:**  Cooperation obligations require the insured to assist and cooperate in the insurer's investigation, defense, and settlement of claims, including by providing relevant materials and testimony.  (A. 3485-3487, 3491, 3494-3496, 3500 (Harrington).); *see* A. 14506; *see also* A. 1529 (Burnett) ("If the insurer wants to defend the case[, t]he policyholder, at a baseline, has to cooperate ....").)  These obligations "support[] the overall rights of insurance companies with regard to defense" and create an "environment where, in principle, the interest of the insured and the insurer become aligned to help control the cost of claims."  (A. 3487 (Harrington).)

c.  **Consent/No Action Obligations:**  Consent obligations require the insured to obtain the insurer's written consent to any settlements (A. 1679 (Azer), 3485-3488, 3492 (Harrington); *see* A. 13638, 14507), and "no-action" conditions obligate the insured to obtain its insurer's consent to a settlement by providing that no action lies against the insurer for breach unless a trial results in a judgment against the insured or the claimant, insured, and insurer have agreed in writing to settle the claim (A. 1535-1538, 3485-3488, 3493, 3496-3497, 3500-3502 (Harrington); *see* A. 13638, 14509.)

Case 1:22-cv-01237-RGA    Document 45    Filed 11/07/22    Page 43 of 125 PageID #:
Case 3:23-cv-01592-S    Document 559    Filed 10/23/25    Page 501 of 1044    PageID 17437
2030

d. **<u>Assignment Obligations:</u>** Assignment obligations require the insured to obtain its insurers' consent to an assignment of the contract. (A. 3485-3486, 3497, 3502 (Harrington); *See* A. 13639. These mitigate the possibility that an assignment may be made to a party that may be less likely to comply with terms regarding defense, cooperation, and consent. (A. 3511-3512 (Harrington).) Insurers underwrite a particular entity; price the coverage for it; and assume it will comply with the rest of their contracts. (A. 3485-3486 (Harrington).). The assignee may not have the same incentives to align with the insurer in defense of tort claims. (A. 3485-3486, 3547-3550 (Harrington).).

The insurers' contracts "anticipate that these claims will be brought within the court system and that they will be adjudicated or settled within the context of the court system." (A. 3488-3489 (Harrington).) BSA contends that, prior to its bankruptcy, it routinely complied with its contractual obligations by communicating with insurers, providing information, permitting them to select counsel, and obtaining consent to settle. (A. 1201-1207, 1276-1277, 5941, 5943, 5948-5949 (Griggs).)

### 3. Plaintiffs' Lawyers Generate an Explosion of Claims

When BSA filed for bankruptcy in February 2020, it was a defendant in approximately 275 pending abuse lawsuits (A. 6053), and was aware of approximately 1,400 additional claimants who had never filed suit. (A. 10543.) But by November 16, 2020, BSA's counsel was

surprised to see an unprecedented *6,000%* increase:  proofs of claim had
been filed for more than *82,000* individual abuse claims.   (A. 3434
(Conte), 6243, 6265-68 (Murray), 6282 (Bates).)

This "explosion" resulted from a massive and misleading
advertising campaign by the plaintiffs' bar, in which the attorneys sought
a multi-billion-dollar payday for themselves by soliciting claimants on a
contingency-fee basis.  (A. 3434-3435 (Conte), 3436-3439 (Slater), 3445-
3446 (Higgins), 3858-3860 (Rothweiler), 3865-3866 (Rothweiler), 3914-
3916 (Stern), 3934 (Babin).)  The campaign included demonstrably false
statements, including that claimants could remain "anonymous,"
"substantial" recovery was "ensured," and claimants "will never have to
be deposed, appear in Court or otherwise prove their claims," leading the
bankruptcy court to prohibit "false and misleading" claims solicitations.
(A. 11376, 11526-11527.)  But by that point, much of the damage had
already been done.

These attorneys were transparent about their aims.  One noted that
their goal was to "keep focused on [the lawyers'] marketing and media
efforts going full tilt" so that "[w]e control 80% of the claims, I.e. [sic] our
coalition controls the case."  (A. 10796.)  Another has explained that the

lawyers opened a "Pandora's Box" of claimants coming forward, with the majority living in states where their claims would be time-barred had they been brought in the tort system.  (A. 3908.)  Another admitted that he represented an astounding 5,000 claimants alleging sexual penetration, which he estimated would yield $1 billion to his firm alone in contingency fees.  (A. 3438-3439 (Slater).)

These attorneys engaged clients in the bankruptcy proceedings whom they never would have accepted outside of bankruptcy court.  (*See* A. 3870-3872 (Rothweiler); *see* A. 3517 (Harrington) ("[B]asic economics … indicates that many of those claims would not have … been brought without the bankruptcy.").)  65% of the new claims are from states where a statute of limitations or repose renders the claim untimely.  (A. 1187-1189, 1194-1195 (Griggs), 2178 (Murray), 3918 (Stern); *see* A. 11742.)  In one townhall event, one of the claimants' lawyers candidly admitted:

> If this bankruptcy doesn't go through and all of the cases go out to the tort system …. 58,473 survivors are in states that have closed statutes.  Here's what I say to those people, good luck, because you have to overcome a lot to open a case in a closed state.  A heck of a lot....  So I'm worried about those 58,473 survivors, because if the plan is voted down, they're going to have a heck of a time getting any compensation at all.

(A. 3900-3901 (Rothweiler).)

According to BSA, at least 85% of the claims face such legal hurdles that, but for the bankruptcy, they would never even have been filed. (A. 2285-2287, 2425, 10797-10811 (Bates) (firm solicited 10,000 claimants whom it initially turned down for statute of limitations reasons).)

Although the proof of claim forms required the signatory to attest to the truth of the claim (*see, e.g.*, A. 11596), plaintiffs' attorneys elected to sign thousands of forms themselves,[1] supposedly only on behalf of "[their] firm,"[2] at times without even bothering to review the forms, speak with their clients, or confirm their accuracy.[3] Despite promising that "[a]ll claims ... will be thoroughly vetted" (A. 8820, 8967), the attorneys often failed to vet them at all.

This led to numerous absurdities and questionable proofs of claim. The attorneys filed thousands of forms with missing or inaccurate

---

[1]  (A. 3710, 3712, 3715 (Schulman) (400), 3873 (Rothweiler) (300), 3920-3922 (Stern) (1,400), 3443-3444 (Slater) (90), 3934 (Babin) (hundreds).)

[2] (A. 3456-3457, 3459 (Higgins), 3712-3713 (Schulman), 3922-3923 (Stern), 3942 (Babin).)

[3] (A. 3449-3463, 3710-3718 (Schulman), 3877-80 (Rothweiler), 3919-3921 (Stern), 3934-3935 (Babin); *see* A. 11596, 11612, 11625.)

*M*

information.[4]  One could not remember any details about duplicative, conflicting claims he had filed.  (A. 3459-3461.)  Another admitted that he tried to contact a client multiple times but, hearing no response, submitted an inaccurate form anyway.  (A. 3716, 3718 (Schulman).)  A third conceded that he signed forms despite—even after sending process servers to *his own purported clients*—being unable to locate them, finding them unwilling to sign, or being instructed to stop all contact.  (A. 3926-3933 (Stern).)

The new claims contain "significant" differences from BSA's historical claims indicating a lower recovery.  (A. 2261 (Bates).)  They are "typically older ... the highest frequency of them come from periods 50, 60 years ago."  (A. 2170-2171 (Bates).)  Only about 33% identify an abuser's full name.  (A. 2170-2171 (Bates).).  87% involve single abusers, which is the "mirror" opposite of claims filed prepetition.  (A. 2426-2427 (Bates); *see* A. 2173 (Murray).).  And for 98%, the "link between the abuser and institutional responsibility is tenuous."  (A. 2425 (Bates).)

---

[4] (A. 3453-3463 (Higgins), 3710-3718 (Schulman), 3919-3933 (Stern), 3934-3944 (Babin).)

Further, a significant portion are likely "fraudulent." (A. 3435-3436 (Conte), 3651 (Treacy); *see*, *e.g.*, A. 3648-3649 (Treacy) (40 to 45% of such allegations generally unreliable); 2179-80 (Murray) (90% or more of claimants never reported abuse to scouting or law enforcement).)

Once a sufficient number of claimants were retained, the plaintiff lawyers asserted considerable leverage over the outcome of the bankruptcy. Despite the U.S. Trustee's formation of the Tort Claimants' Committee ("TCC"), comprised of plaintiffs' attorneys to represent sexual abuse claimants (A. 8124-8125, 8128-8129, 8138), these other claimants' firms formed a "Coalition of Abused Scouts for Justice" (the "Coalition") that collectively represents 65,000 to 70,000 of the alleged 82,000 direct abuse claimants.[5] This permitted these groups, and the individual representing all future claimants (the "FCR," James Patton, Jr.), to speak with a "loud voice" and exert maximum leverage over BSA, regardless of the legitimacy of their claims. (A. 3862-3863 (Rothweiler).)

---

[5] (A. 3863-3864 (Rothweiler); *see* 3436-3437 (Slater) (14,170), 3445 (Higgins) (10,000), 3704 (Schulman) (15,000), 3862, 3864 (Rothweiler) (16,800), 3914 (Stern) (more than 3,000), 3944 (Babin) (more than 1,000).)

*M*

### 4.    Plaintiffs' Lawyers Seek the "Holy Grail"

The plan's centerpiece is the establishment of a settlement trust that will be funded pursuant to the plan and assume liability for abuse claims.  (A. 6303 (Patton).)[6]  A channeling injunction—requiring the "overwhelming" support of claimants (see *supra* at 10-11)—will enjoin all holders of abuse claims from taking any further action on their claims, in exchange for BSA and related entities contributing a relatively small fixed amount to the trust along with other "insurance rights" from those entities, with the hope that those insurance rights will help fund distributions to the claimants.  (A. 6304 (Patton), 6055-6058 (Whittman); *see* A. 474-478 (Plan, Art. X(F); *see also* A. 77-78.)

The trust will implement the plan's trust distribution procedures ("TDPs") which are "a set of procedures … to review, process, and resolve the Channeled Claims" (A. 6305 (Patton); *see* A. 3503, 3506 (Harrington), and then will distribute assets to claimants, in addition to "seek[ing] recovery of allowed claim amounts from applicable insurance companies" (A. 3507 (Harrington)).  (*See* A. 504-505 (TDPs, Art. I).)

---

[6] The plan draws a distinction between Class 8 "direct" abuse claims and Class 9 "indirect" abuse claims.  Unless otherwise specified, further references to "abuse claims" in this brief refer to Class 8 claims.

The TDPs were drafted to serve the interests of the claimants'
representatives at the insurers' expense. (*See*, *e.g.*, A. 3520 (Harrington)
("[W]hat we have is a situation where … two main parties … can design
things to try to increase the size of the pie that can be divided between
them, in some sense, at the expense of other parties who are not given
rights to be involved in the development of the plan.").)

As one attorney explained, the claimant attorneys are seeking the
"holy grail" that "mass tort lawyers have been chasing for many years
and [that] has never been approved"—claim determinations made to
their satisfaction that "will result in individual awards that will be
binding on the insurance carriers." (A. 12297; *see* A. 4203 (Amala)
(strategy was to get binding TDPs and then leverage precedent in other
bankruptcies); *see also, e.g.*, A. 3528 (Harrington) (FCR testified "that all
of these things should bind insurance companies and should not be able
to be relitigated in some subsequent action"); A. 7569-7570 ("It's been
represented in meetings held by sponsors of the [Restructuring Support
Agreement] and the TDP to the plan that … confirmation of the plan
would be the equivalent of a litigated plan and that the plan confirmation
would operate as a judgment enforceable against the insurers.").)

The route to that "Holy Grail" is set forth below.

### (a)    The Insurance Assignment

The plan provides for an "Insurance Assignment," which includes "the assignment and transfer to the Settlement Trust" of *all* "rights, claims, benefits, or Causes of Action of the Debtors, Related Non-Debtor Entities, Local Councils, or Contributing Chartered Organizations under or with respect to the Abuse Insurance Policies (but not the policies themselves)."  (A. 384 (Plan Art. 1.A.157).)  The plan, however, does not assign the entire insurance "policies."  (A. 384, Plan Art. 1.A.157; *see*, *e.g.*, A. 511, TDPs, Art. V.C).)  Nor does it purport to assign any of BSA's contractual *obligations* to its insurers or say anything at all about whether BSA or anyone else remains obligated to comply with those contractual duties.

### (b)    Inflated Payments Under the TDPs

Although the bankruptcy court eventually forced BSA to direct that the Settlement Trustee propose anti-fraud measures (A. 217-219), this was too little too late because the TDPs that BSA proposed contain no requirement to determine the actual merit of the abuse claims.

As explained by Dr. Eileen Treacy, an expert in forensic evaluation

of sex crimes, the proofs of claim alone are inadequate for assessing the
allegations.    (A. 3605-3622, 3625-3641, 3693 (Treacy).)    Properly
assessing reliability would require that claimants be interviewed by an
expert in sexual abuse and tested objectively through standardized
assessments. (A. 3622-3625, 3634-3635, 3641, 3650 (Treacy).) The TDPs
are irreparably unreliable from the outset, however, because they contain
no such independent assessment requirement.

Instead, abuse claimants who do not elect an "expedited payment"
option of $3,500 may pursue recovery by submitting their claim for
allowance and valuation by the Settlement Trustee. (A. 6310 (Patton);
*see* A. 511–517 (TDPs, Art. VI, VII).) The claimant must complete a
simple questionnaire identifying the abuse, alleged abuser, and
connection to scouting, and provide any documentation. (A. 5964, 5966-
5969 (Burnett), 6311 (Patton).)

Unlike in the tort system, claimants will not be required to
plausibly allege, much less prove, that BSA was negligent; they need only
demonstrate by a preponderance of the evidence that BSA "*may* bear
legal responsibility." (A. 3992-3993 (Bitar) (emphasis added).) In other
words, a claimant will receive payment from the trust so long as he has

alleged a "probability" of a possibility that BSA is legally responsible.  (A. 1824-1828 (Azer).)[7]   And unlike in the tort system, the Settlement Trustee cannot refuse to pay on the ground that a claim is time-barred. (*See* A. 523, 539-540 (TDPs, Art. VIII.D.iii, Schedule 1).)

If the Settlement Trustee determines that the claimant has made the requisite minimal showing (*e.g.*, that BSA "may bear" responsibility), the claim is deemed "allowed," and BSA's supposed "liability" is then valued under the Claims Matrix to determine how much the trust will pay in "settlement" of the claim.  (A. 3506-3507 (Harrington), 3999, 4004-4005 (Bitar), 5969 (Burnett).)

To determine claim payment, the Claims Matrix includes six tiers (in descending order of severity) that delineate types of abuse.  (*See* A. 517-519 (TDPs, Art. VIII).)  For instance, the Base Matrix Value for a sexual penetration claim (the highest tier of abuse) is $600,000; and the Maximum Value is $2,700,000.  The Settlement Trustee begins with the

---

Following the Confirmation Opinion, this language was amended to require that BSA "may be negligent or otherwise bear legal responsibility." (A. 514 TDPs, Art. VII (C)(2)(c).)  The plan does not require a showing of probable actual responsibility and diverges indiscriminately from negligence-based causes of action that were the subject of BSA's prepetition litigation.

Base Matrix Value and then (in her sole discretion) makes adjustments

upwards or downwards using certain "Scaling Factors." (A. 2336-2339

(Bates), 5975-5986 (Burnett), 6312 (Patton); A. 519 (TDPs, Art. VIII.B).)

Evidence of BSA's negligence is not a *prerequisite* for liability as it

would be in the tort system; it is only an "aggravating factor" that is

multiplied against the Base Matrix Value to *increase* the claim's value.

(A. 3993, 4005-4006 (Bitar).) A statute of limitations defense is not a *bar*

to recovery; it is merely a mitigating factor that *reduces* a claim award.

(A. 4006 (Bitar); *see* A. 523, (TDPs, Art. VIII.D.iii).) Virtually *every*

claimant is paid under the TDPs; there is no scenario in which a claimant

who satisfies the minimal "may bear" responsibility standard receives $0.

If a claimant is dissatisfied, he may seek a de novo determination in the

tort system. (A. 6312 (Patton).). Insurers have no ability to defend the

claim in the tort system. (A. 4008-4009 (Bitar).)

BSA has claimed that it worked with its consultant, Bates White,

to generate numbers for the Claims Matrix consistent with values the

claims "would have received had they been filed as claims in the tort

system." (A. 1776-1777 (Azer), 2221 (Bates), 6241-6242 (Murray), 6169-

6170 (Azer), 6310 (Patton).) But in reality, the TDPs stem from an

"iterative drafting process" between BSA and claimants' lawyers that never included the Certain Insurers.  (A. 6304 (Patton); *see* A. 6175 (Azer).)  Those "on the [claimants'] side, would draft, and frankly, negotiate among [themselves], and then there would be a negotiation with the debtors."  (A. 2784 (Patton); *see* A. 2553-2554 (Patton) (Coalition was the "scrivener" or "clearinghouse" for TDPs).)

As a result of this claimant-driven process, BSA's justification for the TDPs has shifted throughout the case.  BSA and the claimants initially asserted that the Base Matrix Values are objective and mechanical because they are based on BSA's "historical abuse settlements and litigation outcomes."  (A. 6310 (Patton), 11061; *see* A. 12923 ("The Plan and TDPs are consistent with the Debtors' (and Insurers') historical practices.").).  But because the evidence in the lead up to trial demonstrated that the Base Matrix values were far too high (*see, e.g.*, A. 2440 (Bates)), BSA now claims that the values do not "tell you anything" and were selected solely "for their utility in using the … scalers … to be able to replicate" BSA's prepetition litigation outcomes (A. 2332-2335 (Bates) ("You have to be able to basically start from a point somewhere in the middle of the range … to reflect the fact that … most of

the claims will, to emulate the tort values, be scaled downward from the base matrix value, but that's by design.")).

The plan proponents likewise claimed that the Scaling Factors were "selected and derived based on the Debtors' prepetition experience."  (A. 6312 (Patton); *see, e.g.*, (A. 1776-1777 (Azer), 5953 (Griggs), 5977 (Burnett), 6169-6171 (Azer) (BSA used Bates White to provide guidance on quantifying scaling factors based on historical abuse data).)  The scaling factor for statutes of limitations, however, was not based on historical data (because few time-barred claims were historically brought).  It was "simply the product of the lawyers" negotiating TDPs. (A. 2454 (Bates).)

In any event, it became clear prior to the plan confirmation hearing that the values listed in the Claims Matrix were vastly inflated because conforming claim awards to BSA's prepetition litigation outcomes would require massive discounts to the TDP matrix's base values for essentially all claims.  *See, e.g.*, A. 12822, 12840-12841 (Bates Rebuttal Rep. ¶¶ 53, 97-98); A. 2435-2438, 2440-2441, 2444 (Bates) (Trustee must reduce claim awards for the "vast majority" of single-abuser penetration claims by approximately 90%).  As a result, BSA now contends that the Scaling

Factors were never rooted in prepetition outcomes in the first place and instead were chosen because they permit the Trustee latitude to assign "appropriate values" to make them "consistent with those claims as if they were filed in the tort system."  (A. 2223, 2334, 2337, 2348-2349, 2431, 2449 (Bates).)

The TDPs provide no explanation how the Trustee would assign those values consistent with prepetition litigation outcomes, nor any explicit requirement that she do so.  According to BSA, the Trustee must assume a "high degree of institutional responsibility" as a baseline so that the Base Matrix Values can be scaled significantly downward.  But the TDPs state the contrary—the "hypothetical base case" posits a single-victim abuser.  (A. 2438-2439, 2448 (Bates).)  Moreover, there is no explicit requirement that the Trustee reduce the "vast majority" of single-abuser penetration claims.   Rather than simply update the Claims Matrix to account for proper prepetition values, BSA hopes the Trustee will exercise appropriate discretion pursuant to a catchall factor for "any further limitations on the abuse claimant's recovery in the tort system." (A. 2435-2438, 2440-2441 (Bates).)

### (c)    Impairment of Contracts

Although BSA's insurance contracts contain important provisions designed to align BSA with its insurers in defense and resolution of claims (see *supra* at 15-17), the plan upends the economic bargain by purporting to assign insurance rights without accounting for core elements of the operative insurance contracts.

For example, the plan provides virtually no opportunity for insurers to associate in the defense against abuse claims.  (A. 1532-1534, 1535-1538 (Burnett).)  Nor does it obligate BSA, or even the Settlement Trustee, to cooperate in such a defense.  (A. 1531-1532 (Burnett).)  To the contrary, the plan does not provide for any party, much less insurers, to conduct an actual defense.

The plan further assigns insurance rights for claims that will never be resolved in the tort system, even though the parties' contracts contemplate actions for payment from insurers only after insurers have consented to settle or after a trial in the tort system.  Indeed, the TDPs differ "dramatically" from the tort system.  (A. 3976-3977 (Bitar); *see, e.g.*, A. 1236, 1264-1268 (Griggs) (TDPs provide for none of the "hallmarks of an adversarial system"), A. 3977, 4016-4017 (Bitar) (no "adversarial

system, represented by a zealous counsel"), A. 3978 (Bitar) ("[T]hose are

important procedural safeguards in my view ...."), 2578 (Patton) (The

Plan is "nothing like what happens in a context where there's active

litigation and the Boy Scouts stand on one side ... with an insurer joined

with them and a claimant and his counsel is on the other side").)[8]

There are accordingly no mechanisms for defense attorneys or

insurers to "zealously" defend claims as would be required in the tort

system. (A. 3883-3886 (Rothweiler), 5969 (Burnett).) And claimants will

likely receive greater awards than they would have received in the tort

system. (A. 4016 (Bitar) ("In this particular claim, under the tort system,

the plaintiff would get nothing; and under the TDPs, the plaintiff would

get $300,000.")); *see* A. 4034, 4050 (Bitar) ("[C]ertain claims that should

not go forward go forward, and ... end up costing more because there's not

the rigors of the discovery to make the true valuation known.").)

The result, as Wharton Professor Scott Harrington explained, is a

plan that fundamentally alters the "economic bargain" in the contracts

---

(*See also, e.g.*, A. 1182-1183, 1208-1225, 1230-1238 (Griggs), 1402-
1404, 1406 (Burnett), 3556-3558 (Harrington), 3977-3984, 3987-3989,
3991-3994, 3997-3998, 4000-4003, 4008-4009, 4017 (Bitar).)

issued by the insurers.  (A. 3507 (Harrington); *see* A. 3507 (Harrington)

("They change it from one where the policy provisions are designed to

align the interest of insureds and insurers" in defending against claims

in the tort system to one where "the claim amounts will be determined

by another party without the insurers' assistance—or the insureds'

assistance and cooperation with insurers—and without insurers having

their normal and customary defense rights.").)

### (d)    Control over the Settlement Trustee

The plan also places extraordinary reliance on the independence

and discretion of the Settlement Trustee to perform an array of tasks

funded by the trust.  (A. 1390-1391, 1394-1395, 1408-1414, 1418-1421,

1423, 1427, 1430-1432, 1488, 1519-1523 (Burnett).  BSA, however,

acceded to proposals by the claimants' lawyers to exert dominance over

the Settlement Trustee and other aspects of trust governance.  (*See* A.

3756-3761, 3820-3822 (Williams) (explaining the importance to the trust

of unbiased corporate governance and preventing fraud).)

The claimant attorneys initially proposed Professor Eric Green as

Settlement Trustee.  (A. 11044.)  That proposal was withdrawn after the

Certain Insurers objected to Professor Green's extensive personal and

TrustApp0514

professional connections to the FCR and claimants' counsel. (A. 8834-8836.) The claimant attorneys then could not reach sufficient consensus between two candidates, an impasse that was "clearly not a reflection on the qualifications of the candidates. There was something else afoot." (A. 3771-3772 (Williams), A. 6190 (Azer), A. 1399 (Burnett).) The impasse ultimately led BSA to appoint the Honorable Barbara J. Houser, the retired former Chief United States Bankruptcy Judge in the Northern District of Texas.

The claimant attorneys designed what BSA calls the "Settlement Trust Advisory Committee" (the "STAC"), responsible for overseeing the Trustee and other trust governance, to be comprised of seven plaintiffs' attorneys from the three firms that founded the Coalition and then subsequently agreed that the TCC and another firm would be represented. (A. 2548-2549 (Patton), 3886-3888 (Rothweiler), 1394-1395 (Burnett), 3776 (Williams), 6302-6303 (Patton).)

Unlike the Settlement Trustee, who has a fiduciary duty to the Trust for the benefit of direct and indirect abuse claimants (A. 3765-3766 (Williams); *see* A.588-592 (Trust Agreement, § 2.1(b)), the STAC owes no fiduciary duty to the trust; its duty is only to its own clients who are direct

abuse claimants (A. 3433-A.3441 (Conte), A. 3443  (Slater), 3767-3769 (Williams), 3893-3894 (Rothweiler); *see* A. 612 (Trust Agreement, § 6.2).)

As Professor Jack Williams, an expert in corporate governance, testified at the confirmation hearing, the claimants' attorneys insisted on a number of provisions that permitted the STAC and FCR to control the Settlement Trustee, raising significant governance concerns.  (A. 3761-3762, 3767-3782, 3786-3787, 3810, 3847-3848 (Williams).)  For example, while the plan provides that the Trustee will draft the initial claim questionnaire, the final form would require the STAC's and FCR's consent.  (A. 3786-3787 (Williams), 3987-3988, 4000 (Bitar).)  Thus, the "parties who have a personal interest, as this contingency fee counsel, in having their claims pass through claim review are responsible for establishing what that review will be."  (A. 1482-1484 (Burnett).)

Furthermore, while the plan provided that the Trustee would retain professionals to administer the payment of claims, as well as professionals for her own staff such as legal counsel, those retentions would require supermajority (5/7) consent of the STAC and reasonable consent of the FCR.  (A. 3778-3782 (Williams), 3888-3893 (Rothweiler).)

Finally, while the Plan provided for the Settlement Trustee to propose appointment of neutrals for purposes of the Independent Review Option, those "neutrals" would require consent of a supermajority of the STAC and reasonable consent of the FCR. (A. 1256, 1261-1262 (Griggs), 3775-3778 (Williams), 4001 (Bitar).)

In response to Professor Williams's persuasive testimony, the claimants' attorneys filed proposed revisions to the plan relinquishing some control over the Trustee yet retaining consent and consulting rights over many of the same determinations. (A. 214-215.)

### (e)    Binding Insurers to Claim Awards

BSA and the Coalition were well aware that the TDPs were likely to inflate awards from the trust to the claimants. Indeed, at the request of the Coalition, BSA inserted a number of proposed plan provisions that, combined with the Claims Matrix, were intended to bind non-settling insurers in coverage litigation to inflated claim payments and deprive insurers of any means to challenge the Trustee's determinations.

BSA was not initially aligned with claimants' lawyers. Between February and March 2021, the Coalition proposed that determinations of claim values "shall be binding on Insurers," but Hartford (one of BSA's

largest primary insurers) disagreed.  (A. 1032-1036 (Desai), 1649-1650,
1686-1698 (Azer), 2553 (Patton); *see* A. 11627-11628, 11633.)  BSA claims
it drafted the first set of TDPs, beginning with Hartford's
recommendations, the next month.  (A. 1649-1651, 1702-1705, 6171-6173
(Azer).   That draft incorporated elements from BSA's prepetition
practices: it required a showing of BSA's tort liability and stated that
untimely claims presumptively received no recovery.  (A. 11653.)  BSA
then filed its Second Amended Plan, which included a settlement with
Hartford and a set of TDPs.  (A. 6173 (Azer), 6298 (Patton).)

The plan, at that point, included purported protections for insurers'
rights.  (*See, e.g.*, A. 13124-13125 (TDPs, Art. 7.2) ("[n]othing in the
[TDPs] [] shall affect, impair, or prejudice the rights and defenses of the
Non-Settling Insurance Companies in any manner …."), A. 13117 (Art.
X.M) (plan shall not "in any way operate to, or have the effect of,
impairing, altering, supplementing, changing, expanding, decreasing, or
modifying [] the rights or obligations of any Insurance Company …."))

The Coalition and FCR objected to the plan, seeking
determinations of abuse claim liability that would bind insurers in
coverage litigation.  (A. 7307-7311.)  Insurers objected that the plan could

not abrogate their contractual rights.  (*See* A. 7199; A. 7211; A. 7229-7233; A. 7262-7263.)

BSA knew that aligning with the claimants' lawyers could forestall its bankruptcy.  At a hearing in May 2021, BSA's counsel acknowledged that the plan's "treatment of insurance" gets "to the [heart] of what is happening" and that "[r]emoving that insurance neutrality language and setting this court or the Delaware District Court up for either a binding estimation battle or a binding trust distribution procedure battle," as the claimants' lawyers were seeking, "is setting us up for *the most epic battle these courts have ever seen* between plaintiff lawyers on the one hand and insurers on the other hand."  (A. 7307, 7311 (emphasis added).)

Despite recognizing this fundamental problem, BSA strongly preferred a plan that included a channeling injunction and the broadest possible releases from the abuse claimants, including not only releases for BSA, but also for its local councils and chartered organizations.  (*See, e.g.*, A. 897-898 (Desai), 5237-5248.)  The result of that chosen course would be a requirement that BSA secure the "overwhelming" support of the abuse claimants and their attorneys, with perhaps as many as 90% voting for BSA's plan.

Having made this strategic decision, BSA tossed its insurers overboard and began negotiating with a "particular focus on reaching a consensus with the Abuse Claimants' Representatives." (A. 6168 (Azer), 6298-6299 (Patton); *see* A. 1715 (Azer) ("significant amount of back-and-forth").) BSA contends that it sought to preserve insurers' rights during the drafting of its plan through language that BSA felt was "necessary and appropriate" to protect the insurers. (A. 1656-1657, 1705-1715, 1726-1750, 6175-6180 (Azer); *see* A. 11672-11694.) BSA's proposals, however, were nearly always gutted or removed by the claimants' attorneys. (A. 1655-1656, 1754-1761 (Azer), 3530-3531, 3533-3534 (Harrington); *see* A. 11695-11719.) And BSA allowed this to happen.

By June 5, 2021, BSA had agreed with the claimants, as part of its Restructuring Support Agreement, that its contribution to the Settlement Trust would be fixed at no more than $250 million, and that BSA and local councils would emerge favorably from bankruptcy with their global releases if the plan was confirmed. (A. 974-976 (Desai); *see e.g.*, A.11777-11793); *see also* A. 937 (Desai) (BSA's "strengths" include: "We retained all four High Adventure Bases," and "Our local councils come out of bankruptcy with some balance sheet strength.").

Days after BSA had capped its exposure, it capitulated to the Coalition's demands and scrapped its proposed insurer protections.  (A. 1656-1657 (Azer).)  At the same time, it acceded to the Coalition's demand to make remaining protections in the TDPs available only "to the extent such rights and obligations are otherwise available under applicable law and subject to the Plan and Confirmation Order," purporting to abrogate such protections to the extent they were in conflict with other prejudicial provisions in the plan.  (A. 6179; *see* A. 13144 (Redline, Art. V.B).)

BSA further agreed to add language to Article X.M of the plan stating that the protections in that provision were effective "[e]xcept for the Insurance Assignment" and "as otherwise provided" in the "Bankruptcy Code," "applicable law," or the "findings" made by the Bankruptcy Court or this Court, again purporting to abrogate such protections to the extent that they conflicted with the plan's broad assignment of insurance rights without obligations or with any other prejudicial provisions inserted into the plan.  (A. 1763-1765 (Azer), 3507-3510 (Harrington), 6181-6183 (Azer); *see* A. 490 (Plan, Art. X.M), 13144 (Redline, Art. X.M); *see also*    85 Plan Art. I.A.160 (stating that any "Insurance Coverage Defenses" are "subject to <u>Article X.M</u>").)

BSA further accepted the Coalition's demand to propose findings to be made by the bankruptcy court that the claimants hoped would make claim awards under the TDPs binding on insurers in coverage litigation, notwithstanding the rights and obligations for insurance coverage set forth in its insurance contracts.  (A. 3511-3516 (Harrington).)  These findings included:

- The Plan Documents (including the Plan) and the Confirmation Order shall be **binding on all parties in interest consistent with applicable legal doctrines, including the doctrine of res judicata and collateral estoppel**, and section 1141 of the Bankruptcy Code (and related legal authority);

- The procedures included in the Trust Distribution Procedures pertaining to the allowance of Abuse Claims and (ii) **the criteria included in the Trust Distribution Procedures pertaining to the calculation of the Allowed Claim Amounts, including the Trust Distribution Procedures' Claims Matrix, Base Matrix Values, Maximum Matrix Values, and Scaling Factors (each as defined in the Trust Distribution Procedures), are appropriate and provide for a fair and equitable settlement of Abuse Claims based on the evidentiary record offered to the Bankruptcy Court** as required by and in compliance with section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, provide adequate and proper means for the implementation of the Plan as required by and in compliance with section 1123 of the Bankruptcy Code, comport with the requirements for the issuance of the Channeling Injunction under section 105(a) of the Bankruptcy Code, and otherwise comply with the Bankruptcy Code and applicable law;

- **<u>The right to payment that the holder of an Abuse Claim has against the Debtors or another Protected Party or a Limited Protected Party is the amount of such Abuse Claim as determined under the Trust Distribution Procedures</u>** .... ;

- The Plan **and the Trust Distribution Procedures** were proposed in good faith and are sufficient to satisfy the requirements of section 1129(a)(3) of the Bankruptcy Code.

(A. 13175-13179 (Plan, Art. IX.A.3) (emphasis added); s*ee also* A. 13130-13132 (Redline, Art. IX.A.3).) Inclusion of findings in the plan that the TDPs specifically had been proposed in good faith and were appropriate, fair, equitable, and binding on insurers was, at best, superfluous under the Bankruptcy Code. Indeed, if these findings were adopted, they would have impeded insurers' ability to contest claim awards pursuant to the TDPs in coverage litigation.

Although approval of these findings was a binding "condition precedent" to confirmation, the plan put forward for confirmation made clear that they would *not* apply to parties settling with BSA for fixed amounts prior to confirmation (including any settling insurers). (A. 13175 (Plan, Art. IX.A.3 n.3).)

The claimants' lawyers were transparent as to why they wanted these findings. The FCR testified that they were "essential" to "limit the

insurers' ability" to re-litigate matters such as "the appropriateness of the values set forth in the TDPs or the processes by which the TDPs were negotiated and developed." (A. 6318-6320 (Patton); *see*, *e.g.*, A. 2567 (Patton) (Finding AA necessary to prevent insurers' "abdicat[ing] from their responsibility"), 2601-2602  (Finding W necessary for "no special outs for insurers"), 2605-2606) (Finding Y necessary to avoid a *Fuller-Austin* situation), 2610 (Finding Y necessary to avoid "penalizing" the trust); *see also* (A. 2724 (Patton) (plan proponents seeking to "captur[e] additional insurers").)

Thus, while BSA's plan included generic language arguably purporting to preserve rights and obligations in the insurers' contracts—and claims that it subjectively believed such language was sufficient to protect the rights of insurers "to the extent any such rights exist" (*see*, *e.g.*, A. 6171, 6175, 6183 (Azer))—BSA accepted a number of proposals from the claimant attorneys designed to circumvent those protections.

When the insurers learned that BSA had been negotiating with the claimants, they offered to discuss TDPs that were consistent with their policies (A. 1789-1790, 1794-1795, 6184-6185 (Azer); *see* A. 12901-12905), but BSA responded that doing so would "scuttle the deal between the

debtors and the TCC, coalition, and FCR," and "effectively require the debtors to negotiate a new set of TDPs" (A. 1916, 1658-1660, 1790, 1795-1796 (Azer)).  BSA never meaningfully engaged with the Certain Insurers thereafter.  (A. 6185 (Azer).)  Instead, on June 18, 2021, BSA incorporated the claimant lawyers' demands into the Third Amended Plan.

> ### (f)    Collaborating to Further Prejudice the Certain Insurers

For nearly the next year, BSA acceded to further requests to prejudice non-settling insurers.  In July 2021, BSA filed a Fourth Amended Plan that prohibited the Settlement Trustee from ever denying recovery on a time-barred claim and incorporated the Restructuring Support Agreement, which completed the arrangement between BSA and the claimant representatives.  (A. 6175 (Azer), 6298-6299 (Patton); *see* A. 13162, 13165-13165 (Redline, TDPs Art. VIII(E)(iii), Schedule 1).)  The Fourth Amended Plan required that BSA abandon Hartford and its settlement as well.  (A. 6298-6299 (Patton).)  Hartford objected that the RSA was "collusive" and "designed, at every step, to allow Abuse Claims that would never be allowed—even filed—in the tort system and to force Hartford and the other insurers to pay the wildly inflated bill." (A. 7791.) Other insurers similarly argued that BSA was colluding and seeking to

abrogate insurers' rights.  (*See*, *e.g.*, A. 7612-7789, 7802-7966.)  Hartford

eventually re-settled with BSA after increasing its contribution to the

Settlement Trust, and that settlement was incorporated into the Fifth

Amended Plan filed on September 15, 2021.  (A. 6299-6300 (Patton).)  The

TCC, however, "remained unpersuaded" by the amount of contributions

to the Settlement Trust.  (A. 6300-6302.)

As the Plan moved toward a vote and confirmation hearing, several

additional insurers settled (A. 405 (Plan, Art. I(A)(279)) and BSA

continued to seek the overwhelming support of claimants for its broad

releases under the premise, developed with its expert Bates White, that

"the Base Matrix Value column for each tier [in the TDPs] represents the

*default Allowed Claim Amount* for an Allowed Abuse Claim assigned to

a given tier, *in each case based on historical abuse settlements and

litigation outcomes*."  (A. 11061 (emphasis added); *see* A. 12923.)

BSA was forced to make further concessions, however, when Dr.

Charles Bates reexamined historical data and discovered far fewer

single-victim abuser claims than previously disclosed.  (A. 2306-2311

(Bates).)  Extrapolated into the TDPs, this cut BSA's estimated aggregate

liability on direct abuse claims roughly by *half*.  (A. 2311 (Bates).)  For

single-abuser penetration claims alone, the Settlement Trustee would

need to scale down the Base Matrix Values in the TDPs by *approximately*

*90%* to render claim awards consistent with BSA's historical litigation

outcomes.  (A. 2435 (Bates).)

On January 18, 2022, claims administrator Omni Agent Solutions

reported that of the 53,596 claimants who voted, only 73.6% supported

the Plan (A. 11288 (Nownes-Whitaker)), which was  not a "substantial

majority," *Master Mortg.*, 168 B.R. at 935.  Shortly thereafter, the TCC

filed a report reiterating that the Plan could not be confirmed because

the "nondebtor, third-party releases that form the core of the Plan must

enjoy the overwhelming support of those parties affected by such

releases."  (A. 8244 (citing *Master Mortgage*, 168 B.R. at 930).)

In response, BSA filed a statement attaching a new Bates Rebuttal

Report, noting that Dr. Bates revised his estimated range of aggregate

liability from $2.4 billion to $7.1 billion to a lower, "more likely" range of

between $2.4 and $3.6 billion.  (*See*, *e.g.*, A. 2222 (Bates).)  Given that

refined range, BSA "anticipate[d] *payment in full* to holders of allowed

claims in Class 8 [abuse claims] in accordance with the Trust

Distribution Procedures."  (A. 8277; *see* A. 6399-6400, 6404 (Gutzler).)

This conclusion that claimants were "paid in full"—one of the key factors courts consider when determining whether to approve third-party releases—arguably would allow BSA to exit bankruptcy with the plan's releases intact, without additional support of the TCC or additional claimants. *See*, *e.g.*, *Master Mortg.*, 168 B.R. at 935.

Yet the failure of claimants to overwhelmingly approve the plan presented a material risk to confirmation. (A. 6302 (Patton).) The Coalition and FCR, along with BSA, therefore "negotiated with the TCC" to enlist the support of those holdout abuse claimants. (A. 6302–6303 (Patton), 6029-6033 (Desai).) BSA agreed to consult with the claimants groups about how Dr. Bates would testify and committed to limiting the import of his important testimony. (A. 8545-8546, 8617, 8788.)

BSA also once again agreed to several new plan provisions aimed at the insurers. (A. 6202-6203 (Patton).)

First, BSA agreed to insert an additional "insurance finding" into the Plan, asserting (falsely) that the Base Matrix Values were consistent with BSA's prepetition litigation outcomes despite the fact that the refined Bates analysis contradicted the finding. (A. 1773 (Azer), 3515 (Harrington).) BSA's counsel, who would later testify about the supposed

intent behind various plan provisions, purportedly never read Dr. Bates's reports and was never informed that Dr. Bates concluded that the Base Matrix Values required a significant discount.  (A. 1780-1782 (Azer).)

Second, BSA agreed to amend the Plan to add an "Independent" Review Option ("IRO") for the claimants to access additional insurance proceeds exceeding the matrix's already-inflated valuations.  (A. 6188–6189 (Azer); *see* A. 531-537 (TDPs, Art. XIII); *see also* A. 13373-13379 (Redline, TDPs, Art XII).)

The plan proponents designed the IRO to target "excess" insurers, contrary to BSA's prepetition practice of working with insurers to limit liability as required by duty of cooperation provisions within their policies, and anticipated that the IRO would create further settlement pressure.  (A. 2922 (Gutzler).)

Under the IRO, a third party (the so-called "Neutral") reviews the claim and makes a recommendation to "replicate" what a jury may award in the tort system without the $2.7 million maximum value in the Claims Matrix.  (A-5990 (Burnett), 6188–6189 (Azer).) If the Settlement Trustee agrees, that amount becomes the allowed amount.  If the Settlement Trustee disagrees, the claimant may file a tort suit.  (A. 5990 (Burnett).)

While the IRO provides for certain, limited insurer participation, it does not provide nearly the same rights and involvement that an insurer would have if those claims were brought in the tort system. (A. 3518-3519 (Harrington).) For example, the TDPs do not state that the insurer may be involved in negotiating a settlement, asking questions in an interview or deposition, or supporting defenses raised through investigation or depositions. (A. 3569-35763 (Harrington).)

The only defined rights provided to the insurers under the IRO are the ability to attend, but not to ask questions or conduct any cross-examination at, any interview or deposition, to "review and comment" on the Neutral's evaluation, and to "present any applicable defenses to . . . the Neutral," without the benefit of discovery in support of any defense. (A. 531-532 (TDPs, Art. XIII.A); *see*, *e.g.*, A. 3518–3519 (Harrington).)

Finally, BSA agreed to a so-called "Document Appendix," which requires BSA to turn over extensive information (including troop rosters, lists of perpetrators, and handbooks) (A. 3984-3987 (Bitar), 5966 (Burnett))—troves of information that BSA likely would not just hand over in the tort system—and which permitted abuse claimants and the Trustee to use extraordinary discovery authority under Bankruptcy Rule

2004 against parties other than BSA.  (A. 6190-6191 (Azer).)  These
provisions would permit claimants' attorneys to wield vast discovery
power *before* submitting claims to the trust so they can repair defects and
facilitate recovery for thousands of claims they filed.

### B.    The Confirmation Hearing and Opinion

The bankruptcy court held a six-week trial beginning in March
2022.  The Certain Insurers and BSA, among others, presented testimony
from numerous witnesses, some live and others by declaration or
deposition.  The court issued a confirmation opinion on July 29, 2022,
declining to confirm the plan unless BSA made significant changes.

The court declined to enter the disputed "Insurance Findings,"
which the court recognized were intended "to preclude post-confirmation
litigation on the process embodied in the TDP."  (A. 179-181; *see* A. at
178-196.)   The court repeatedly explained that it would not enter
unnecessary findings and that the legal effect of its ruling would be left
for coverage litigation.  (A. 193-194 ("The *res judicata* or collateral
estoppel effect of any Order I issue confirming the Plan is for a future
court to decide in the context of specific litigation."), A. 194 ("What
insurers are obligated to pay under their policies is an insurance coverage

issue that is not before the court.").)  Because "the allowed amount of a
claim is a matter of bankruptcy law," the court permitted a finding that
"the allowed amount of a claim" is "determined under the TDP," again
cautioning that "[w]hether an insurance coverage court will find any
relevance to [that] Finding is for that court to consider."  (A. 194-195.)

The court nevertheless concluded that the plan was proposed in good
faith.  The facts underlying that ruling are largely undisputed.  But
although the law required the court to consider the totality of the
evidence, *see*, *e.g.*, *Exide*, 2021 WL 3145612, at *11, the court committed
legal error by viewing each of the pieces of evidence supporting a lack of
good faith in siloed fashion.  It reasoned that BSA had not colluded with
claimant representatives when drafting plan provisions on the sole basis
that BSA's counsel testified that he believed that he successfully
negotiated with the claimants to protect insurers' rights.  (A. 220-224.)
And although the court required, without specifics, the imposition of anti-
fraud measures (A. 217-219), the court reasoned that other indications of
wrongdoing, when each was viewed in isolation, such as attorneys'
misconduct, or an agreement to propose prejudicial findings, did not
warrant requiring a new plan (A. 224-242).

TrustApp0532

The court further overruled objections to the proposed assignment of BSA's insurance rights because it believed they merely raised issues that should be left for coverage litigation. The court explained that bankruptcy law permits BSA to "transfer [its] property rights consistent with applicable state law." (A. 259.) Yet the court did not analyze whether the assignment is consistent with state law.

To the extent the court even addressed this objection, it reasoned that the "insurance neutrality" sought by the insurers is merely a "standing concept" that does not permit denial of plan confirmation (A. 223, 238, 255-258; *see* A. 191 (finding no reason to consider how TDPs differ from the tort system)), and that the plan will not "necessarily" lead to increased cost or liability to such insurers in any event because the Trustee's future conduct is uncertain and the court would not anticipate "how an insurance coverage court" would resolve coverage litigation (A. 231, 237-238, 259-260.)

Moving to what the court believed was the "real question" in the case—"what is the consequence" of the proposed assignment—the court declined to answer that question because "the many provisions defining obligations are not uniform nor necessarily governed by the same law."

(A. 258-260.)  The court explained that "[e]ach contract will need to be interpreted under applicable law in the context of a specific dispute." (A. 260.)  "If the obligations form the basis for claims, they will be treated accordingly.  If the obligations are conditions precedent, then the Non-Settling Insurance Companies may be able to assert those conditions as a defense to performance." (A. 260.)  Although the court confirmed the plan, the court never concluded that BSA met its burden of demonstrating that the assignment of insurance rights was permissible.

### C.    The Court Rejects Further Efforts to Prejudice Insurers and then Confirms the Plan

After the court's opinion, BSA conferred with the claimant groups about further plan revisions.  (A. 9129-9130.)  It then filed a motion for "supplemental" findings and confirmation of a revised plan.  (A. 9025.)

Continuing their efforts to limit the import of Dr. Bates's testimony, the new provisions included a "supplemental" finding that would have stated that the court's crediting of Dr. Bates's valuation opinions  was "not intended to limit" the liability of non-settling insurers, and a revised finding prejudging what such insurers would be obligated to pay in coverage. (*See*, *e.g.*, A. 9054.)  BSA provided virtually no justification for these provisions beyond a threadbare mention in an appendix to its reply

brief.  (A. 9029-9042, 9191-202, 9205-9206.)  Instead, the claimant groups supported their inclusion.  (A. 9217-9244.)

The court heard argument and again declined to confirm the plan without further revisions.  D.I. 10288.  All argument regarding the Certain Insurers was advanced by the claimant representatives, rather than BSA.  (A. 9260 ("[Counsel for the FCR] is going to handle the argument with respect to the certain insurers on behalf of the . . . 'plan supporting parties.'").)  The court rejected many such arguments, noting that it would not enter a finding that the "[insurance] assignment is authorized and permissible" "unless we can make sure that it is accurate;" and that the court again had "a problem with" the new insurance findings.  (A. 9282-9283, 9289, 9296-9297.)

Following argument, the parties engaged in mediation to conform the proposed findings to the Confirmation Opinion, narrowing certain disputes.  (A. 995.)  The court then resolved the remaining issues (A. 9948-1001), and entered the Confirmation Order confirming a final plan (A. 282-848).  The Certain Insurers appealed.

## SUMMARY OF ARGUMENT

The bankruptcy court erroneously concluded that the plan was proposed in good faith. The record makes clear that BSA proposed a plan at the claimants' behest that would dramatically inflate claims and provide a windfall at insurers' expense. Although much of the evidence standing in isolation itself is sufficient to demonstrate a lack of good faith, the court failed to consider the "totality of the circumstances" in which the plan was proposed, which clearly demonstrates a lack of good faith, and in doing so committed legal error.

The court then compounded its error by emphasizing that the plan was improved by the removal of prejudicial insurance findings and appointment of a well-regarded Settlement Trustee. But that "no harm, no foul" analysis is not the proper approach for evaluating the plan, as BSA made such improvements only at the direction of the district court and only after it acted with a lack of good faith. Furthermore, the improvements do not cure the harm that will result from confirmation of this plan.

The bankruptcy court also emphasized the testimony of one BSA witness about his subjective beliefs regarding the plan. Whether or not

he believed he was protecting insurers' rights, BSA ultimately joined in claimants' efforts to handicap its insurers, which is not good faith.

Even if this Court were inclined to conclude that the plan was proposed in good faith (and it should not), it should reverse for the separate and independent reason that the plan still seeks to impermissibly abrogate insurance contracts. The bankruptcy court erroneously declined to engage with this issue because it believed "insurance neutrality" is merely a "standing concept." But while courts recognize that insurers can challenge a non-neutral plan, that does not mean that a debtor can simply abrogate contractual rights. To the contrary, it is a bedrock principle of law that contractual rights do not expand or contract by happenstance of bankruptcy.

The plan runs afoul of this principle because it seeks to rewrite insurance policies by eviscerating contractual rights and obligations that would apply in the tort system, which functions in every court in this country as an adversarial system to arrive at a just result, and replaces that system with dispute resolution that aligns BSA with the claimants.

Before capitulating to claimants' counsel, BSA attempted to negotiate a plan that expressly protected insurers' rights, but BSA chose

to remove any such protections at the insistence of the claimants.  The limited "protections" still in the plan are circular and potentially illusory.

The bankruptcy court also erred in declining to consider whether BSA met its burden on such issues.  Whatever the consequences of BSA's proposed assignment may be, they are entirely separate from whether it is permissible under the Bankruptcy Code, consistent with state law, and it is not.  The current plan inflicts harm on the insurers by inflating their potential exposure and gutting contractual rights—harms that would not exist but-for the erroneous confirmation order.

## ARGUMENT

The bankruptcy court erred in confirming the plan because BSA failed to meet its burden of demonstrating that the plan satisfies the requirements of confirmation.  BSA's plan was designed to inflate claim volume and values, to circumvent BSA's contractual obligations, and to deprive insurers of critical rights, and the plan continues to do just that. This Court should reverse.

## I.    THE BANKRUPTCY COURT ERRED IN CONFIRMING A BANKRUPTCY PLAN THAT WAS NOT PROPOSED IN GOOD FAITH.

The plan, proposed by BSA at the insistence of plaintiffs' lawyers seeking to inflate claims and expand insurance coverage, was not proposed in good faith.  11 U.S.C. § 1129(a)(3).

### A.    The Bankruptcy Court Erred in Focusing on the Evidence Piecemeal, Rather Than Employing a "Totality of the Circumstances" Approach.

To satisfy the good faith requirement, a plan must facilitate certain objectives such as "giving debtors a fresh start in life, *discouraging debtor misconduct*, [expeditiously distributing] the bankruptcy estate ... , and achieving *fundamental fairness and justice*."  *In re Exide Holdings, Inc.*, 2021 WL 3145612, at *11 (D. Del. July 26, 2021) (emphases added) (quotation marks omitted).  The plan must also have been proposed "*fairly*" (*In re Am. Capital Equip., LLC,* 688 F.3d 145, 156, 158 (3d Cir. 2012) (quotation marks omitted))—that is, "with honesty and good intentions," and result from "fundamental fairness in dealing with the creditors."  *Exide*, 2021 WL 3145612, at *11 (quotation marks omitted).

Accordingly, "'[g]ood faith is shown when the plan has been proposed for the purpose of ... preserving the value of the bankruptcy estate, and delivering that value to creditors'"; on the other hand, "'[g]ood

faith has been found to be lacking if a plan is proposed with ulterior motives.'" *In re Emerge Energy Servs. L.P.*, 2019 WL 7634308, at *16 (Bankr. D. Del. Dec. 5, 2019) (citations omitted).  Courts analyzing good faith must consider the "totality of the circumstances surrounding the plan's proposal." *Exide*, 2021 WL 3145612, at *11 (quotation marks omitted).

The lack of good faith giving rise to this plan is precisely the sort of "abuse which must be guarded against to protect the integrity of the bankruptcy system and the rights of all involved in such proceedings." *SGL Carbon*, 200 F.3d at 169.  The Third Circuit has recognized the "'profoundly serious'" concerns raised when a debtor has "'sold out [its] insurers'" by "'setting up a system'" in which "'ginned-up'" claims are paid in exchange for claimants voting in favor of that plan.  *Federal-Mogul*, 684 F.3d at 362 (quoting *Global Indus. Techs.*, 645 F.3d at 214).

That is what took place here.  The claimants' lawyers generated an explosion of claims and then leveraged them to strong-arm BSA into proposing a plan designed to dramatically inflate claim payments and provide a windfall to claimants and their counsel at insurers' expense.

**Explosion of Claims.**   Claimants' attorneys viewed the bankruptcy as an opportunity to enrich themselves and aggressively advertised it to drum up tens of thousands of claims that never would have been brought in the tort system.  They filed untold questionable claims generated by sanctionable conduct to control the bankruptcy and generate potentially billions of dollars in fees.  See *supra* at 17-22

Rather than seek disallowance of such claims, or propose a plan that fairly accounted for its actual liability, BSA baked that lack of good faith *into its plan*.  Throwing its insurers overboard, it reached its own favorable settlement capping its own exposure and retained some of its most valuable assets and then used the bankruptcy to obtain third-party releases for its local councils and chartered organizations that required the overwhelming support of the lawyers' "clients."  See *supra* at 39-40. Everyone would win out in the bankruptcy except for the insurers.

**Inflationary TDPs.**  BSA collaborated with claimants' counsel to insert a labyrinth of provisions that would provide that windfall.  BSA proposed a plan that would require a Settlement Trustee to pay thousands of time-barred and meritless claims that BSA never would have faced, let alone settled, in the tort system.   While the plan

proponents were characterizing the TDPs as reflecting BSA's prepetition litigation history, they were proposing to entrust a Settlement Trustee with massive discretion in valuing claims, with enormous discounts required to bring the vast majority of claim awards actually in line with what they would have received in the tort system. See *supra* at 25-31.

**Impairing Contracts.** BSA knew that the plan would disregard contracts with its insurers, including the rights of insurers to defend claims and to consent to settlements, and BSA's obligation to cooperate in a defense. BSA nevertheless proposed a plan that assigned insurance rights, but not the policies or obligations under the insurance contracts. The result would fundamentally alter the economic bargain between the parties. See *supra* at 32-34.

**Controlling the Trustee.** BSA acquiesced in claimants' control over the Settlement Trustee, first acceding to the appointment of a trustee with extensive personal and professional relationships with claimants' counsel, then agreeing to dominance exerted in numerous ways by the STAC and FCR (comprised of claimants' lawyers) over the Settlement Trustee's determinations. See *supra* at 34-37.

TrustApp0542

**Binding Insurers.**  BSA joined the claimants' lawyers' decades-long quest for the "Holy Grail"—insurance findings that had the sole and express purpose of binding insurers who had not settled to inflationary formulas in the TDPs, which, by BSA's own admission, bore no relationship to BSA's prepetition litigation outcomes.  These findings had no legitimate bankruptcy purpose, as even the bankruptcy court found in directing BSA to strike them from the plan.  See *supra* at 23-24, 37-45.

**The TCC Settlement.**  To secure overwhelming claimant support, BSA sought an additional court finding intended to bind insurers to the TDPs; agreed to a so-called "independent" review process that targeted excess insurers with uncapped recoveries; agreed to provide claimants' counsel with extraordinary discovery authority to paper over defects in thousands of claims they had signed and filed; and even agreed to downplay BSA's own expert's testimony at trial regarding the likely low amount of aggregate liability from the claims.  See *supra* at 45-51.

**Further Efforts After the Confirmation Opinion.**  Even after the bankruptcy court had already altered certain aspects of the plan, and struck the insurance findings, BSA proposed still more findings at the claimants' insistence regarding insurers' obligations that were expressly

advocated for by the claimants' attorneys in an attempt to prejudice the insurers.  See also *supra* at 54-55.

<center>* * *</center>

The plan proponents knew that these mounting, sustained efforts would create a "hydraulic pressure" to settle with BSA and thereby fund a trust for abuse claims irrespective of liability.  *Newton*, 259 F.3d at 164; *see*, *e.g.*, *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 189 (1994) ("Because of the uncertainty of the governing rules, entities ... may find it prudent and necessary, as a business judgment, to abandon substantial defenses and to pay settlements in order to avoid the expense and risk of going to trial."); *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 559 (requiring civil plaintiffs to plead plausible claims because "the threat of discovery expense will push cost-conscious defendants to settle even anemic cases").

That pressure is fundamentally inconsistent with the core purpose of the good-faith requirement, which seeks to ensure that a bankruptcy will "*preserv[e]* … ongoing values in a manner which does equity and is fair to rights and interests of the parties affected." *SGL Carbon*, 200 F.3d at 161.  The leverage exerted by the claimants' lawyers from the outset

permitted that constituency to seek a massive windfall and unfairly threaten to strongarm plan objectors into settling before they could ever press their objections at trial. (*See*, *e.g.*, A. 238 (claiming that insurance neutrality is merely a "standing" doctrine because previous precedent had reached that procedural posture).)

This form of conduct follows a playbook that plaintiffs' lawyers have been seeking to implement for years, and will continue to attempt in other mass tort bankruptcies unless halted by the courts. *See*, *e.g.*, *Combustion Eng'g*, 391 F.3d at 216-20 (modification of insurance neutrality provisions); *Fuller-Austin Insulation Co. v. Highlands Ins.*, 38 Cal. Rptr. 3d 716, 724 (Cal. App. 2006) (rejecting assertion that plan confirmation was a final adjudication establishing liability for insurance coverage); A. 4203 (Amala) (strategy was to get binding TDPs and then leverage precedent in other bankruptcies); A. 7311 (BSA conceding that claimant lawyers were setting BSA up "for the most epic battle these courts have ever seen between plaintiff lawyers on the one hand and insurers on the other hand"); *supra* at 34-35 (trustee and claimants).

That is why courts have rejected similar attempts to misuse the bankruptcy process. In *American Capital*, for example, the Third Circuit

held that a plan in an asbestos case was "patently unconfirmable" because it was not proposed in good faith. *See id.* at 159-61, 164. The Court emphasized that (1) the plan provided for tort claims to be paid by a trust funded by an assignment of insurance rights, (2) the claims would be resolved according to procedures that gave decisionmakers "financial[] incentiv[es] to sabotage [the debtor's] own defense" and maximize the claims insurers would be asked to pay, (3) the TDPs would "severely limit[] or eliminat[e] Insurers' ability to take discovery, submit evidence, contest causation, [or] appeal a decision," and otherwise "strip[] Insurers of [their] procedural and substantive rights"; and (4) the case was unlike an asbestos case, where a trust is typically funded by ongoing debtor contributions. *Id.* at 158-61.

Similarly, in *In re ACandS, Inc.*, a court found that a plan had not been proposed in good faith because it had been drafted primarily by and for the benefit of a prepetition committee and memorialized a prepetition settlement to the detriment of other claimants. 311 B.R. 36, 43 (Bankr. D. Del. 2004); *see also In re Coram Healthcare Corp.*, 271 B.R. 228, 233-40 (Bankr. D. Del. 2001) (conflict of interest between a debtor officer and a creditor "easily" precluded a finding of good faith). The Third Circuit

has dismissed cases outright for egregious attempts to use bankruptcies to gain a tactical litigation advantage. *See SGL Carbon*, 200 F.3d at 166-67 (bankruptcy filed to obtain litigation advantage); *In re Integrated Telecom Express, Inc.,* 384 F.3d 108, 120 (3d Cir. 2004) (same).

So too here: BSA repeatedly embraced the demands of claimant representatives who sought to dramatically inflate the number of claims and to bind insurers to gain an advantage in coverage litigation—all in an effort to enrich themselves. While much of this evidence was so egregious that it alone demonstrates a lack of good faith, that bar need not even be cleared because a court must conduct a holistic analysis of the "totality of the circumstances" giving rise to the plan's proposal. *Exide*, 2021 WL 3145612, at *11 (quotation marks omitted).

The bankruptcy court never answered the fundamental question whether the *plan* as proposed was in good faith because it erroneously analyzed the record evidence piecemeal, concluding that certain elements such as the explosion of claims or BSA's proposed findings, did not in isolation demonstrate a lack of good faith. (*See*, *e.g.*, A. 230 ("I reject out-of-hand the notion that this explosion of claims, alone, could be grounds for denial of confirmation."); *see also* A .223, 228-31, 238, 240-41.) In

doing so, the court missed the forest for the trees and confirmed a plan that was likely to inflate the number and value of claims regardless of merit and seeks to hamstring insurers' ability to defend themselves. That is not good faith, and the bankruptcy court committed reversible error in holding otherwise.

BSA did not have to follow this path.  BSA could have sought to disallow fraudulent or meritless claims.  BSA could have proposed a plan that accounted for insurers' rights.  But the strategic decision for BSA to align itself with abuse claimants is no reason to sanction misuse of the bankruptcy process.[9]

## B.    The Bankruptcy Court Erred in Concluding That Certain Improvements to the Plan Were Sufficient to Remedy a Lack of Good Faith.

The bankruptcy court compounded its erroneous analysis by emphasizing that certain individual components of the plan have improved in the period prior to confirmation.  For example, the court repeatedly emphasized that it had rejected the proposed "insurance

---

In addition to the arguments made herein, the Certain Insurers hereby join in the Opening Brief on Appeal of the Liberty Insurers and the Allianz Insurers Regarding Treatment of Class 9 Claims and Related Matters, which is being filed concurrently herewith.

findings," thereby permitting insurers to assert claims and defenses in coverage litigation. (*See* A. 223-224, 227-228, 231-238, 240-242.) The court also noted that the TDPs now would be implemented by a well-respected Settlement Trustee. (*See* A. 223-24, 229, 237-38.)

These changes do not solve the fundamental problem with the proposed plan. The bankruptcy laws require that a debtor *propose* a plan in good faith (11 U.S.C. § 1129(a)(3))—meaning that the proposal must be designed to further the laudable objectives of the bankruptcy system, not to do the minimum that would satisfy the court.

### 1.    Improving the Plan at the Court's Direction Does Not Demonstrate Good Faith.

The bankruptcy court's reliance on removing some of the worst aspects of this plan was legally erroneous. *In re Grasso*, 490 B.R. 500, 511 (Bankr. E.D. Pa. 2013) (rejecting a "no harm, no foul" analysis).

A bankruptcy judge determining whether a plan is proposed in good faith is not tasked with simply *removing* portions of the plan that it finds problematic. If the plan as a whole is proposed with ulterior motives, it should not be confirmed. *See, e.g., In re Emerge Energy Servs. L.P.*, 2019 WL 7634308, at *16 (D. Del. Dec. 5, 2019) ("In determining whether a plan is proposed in good faith, courts … focus[] "'more to the process of

plan development than the content of the plan.'"); *In re RTI Holding Co., LLC*, 2021 WL 4994414, at *9 (Bankr. D. Del. 2021) ("The requirement of § 1129(a)(3) 'speaks more to the process of plan development than to the content of the plan.'" (citation omitted)); *In re Genesis Health Ventures, Inc.*, 266 B.R. 591, 609 (Bankr. D. Del. 2001) ("[G]ood faith looks to the purposes that would be achieved by the plan.").

That is because a Chapter 11 reorganization presents an "inviting safe harbor" for the debtor as well as an opportunity for creditors to preserve assets, but those same benefits create "the possibility of abuse which must be guarded against to protect the integrity of the bankruptcy system and the rights of all involved in such proceedings." *SGL Carbon*, 200 F.3d at 169. The debtor and creditors understandably may seek to benefit their interests, but the point of Chapter 11 is to preserve the debtor's limited estate and distribute it in an equitable manner.

Courts accordingly make clear that even where a plan provides for a fresh start and expeditious property distribution, it cannot satisfy the good faith requirement unless it was proposed "with honesty and good intentions," in "fundamental fairness," and "discourag[es] debtor

misconduct." *Am. Capital Equip., LLC,* 688 F.3d at 156, 158. These requirements combat the temptation to abuse the bankruptcy process.

Such concerns implicate more than the particular details of a single plan. Like patent suits, bankruptcy proceedings do "not concern only private parties. There are issues of great moment to the public." *Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, 322 U.S. 238, 246 (1944). And abuse of the Chapter 11 process for delivering a litigation advantage "involves far more than an injury to a single litigant. It is a wrong against the institutions set up to protect and safeguard the public, institutions in which fraud cannot complacently be tolerated consistently with the good order of society." *Id.* Confirming a plan in which the debtor still has yet to act with good intentions and fundamental fairness would merely encourage further "misconduct." *Am. Capital Equip.*, 688 F.3d at 158.

To be sure, the court in this case *improved* the plan by directing BSA to strike the prejudicial findings and permitting insurers to defend themselves in coverage litigation, just as it did when it required the proposal of ani-fraud measures. But the fact that *the bankruptcy court*, not BSA, rejected some of the most egregious aspects of the plan simply illustrates the problem. Likewise, the fact that BSA ultimately proposed

Judge Houser as Settlement Trustee only after claimants failed to secure the appointment of Professor Green, with whom they had extensive personal and professional relationships, and that BSA continued to acquiesce in their control over the trustee, simply emphasize that BSA has failed to propose a plan that exhibits "fundamental fairness" in dealing with creditors. *Am. Capital Equip., LLC,* 688 F.3d at 156, 158.

The very fact that BSA was forced to improve these and other individual aspects of the plan merely shows that BSA has yet to come to the court with clean hands with respect to the plan as a whole; BSA proposed a plan for illegitimate purposes, and the bankruptcy court was forced to solve (part of) the problem. *See SGL Carbon Corp.*, 200 F.3d at 161 (good faith doctrine stems in part from the "equitable concept of 'clean hands'" because "bankruptcy relief is equitable in nature").

### 2. The Bankruptcy Court's Plan Revisions Do Not Cure the Plan's Defects.

In any event, improvements to the plan have not cured the harm it will inflict if the plan remains confirmed.

Because the chicanery that resulted in tens of thousands of meritless or questionable claims was never addressed in this plan, "[t]here is no getting around the fact that pre-bankruptcy Debtors were

facing a few hundred to 1700 Abuse claims and there are now 82,209 Direct Abuse Claims that must be resolved." (A. 230.)

The confirmed plan vastly inflates the insurers' potential exposure while purporting to gut many of insurers' core contractual rights designed to align BSA with its insurers in defense to these dubious claims. Any coverage litigation will follow assessments of liability that are "very different" from the tort system because tens of thousands of claims that would ordinarily be subject to dismissal or never would have been brought still would receive inflated payouts, and insurers must rely upon the Settlement Trustee to dramatically reduce the value of most claims despite Base Matrix Values and other TDP provisions to the contrary. (A. 3994-3995, 4003-4008, 4013-4015, 4024-4026) (Bitar).)

In the meantime, insurers will have no opportunity to participate in a zealous defense, despite their contractual rights, likely resulting in claims that are "very different" than would have been the case in the tort system. (A. 2326 (Bates), 3516-3520 (Harrington), 3976-3979, 3994-3995) (Bitar).) *See Global Indus. Techs.*, 645 F.3d at 212 (plan materially altered the "quantum of liability that the insurers would be called upon to absorb").

TrustApp0553

All of these circumstances, in their totality, create a "hydraulic pressure" to settle that prejudices insurers as a direct result of the confirmed plan.  See *supra* Pt. I.A.  The good faith requirement was intended to provide a backstop against precisely this sort of abuse.

The bankruptcy court further missed the point that misuse of the bankruptcy process harms individuals who have valid claims in the bankruptcy—here, the bona fide claimants.  As experts on both sides testified, "the truly victimized claimant is put at a disadvantage by the way this has been handled" because the "people who are really deserving are going to end up being hurt by this whole process."  (A. 3435 (Conte)); (*see* A. 3651 (Treacy) (the "real victims in this case deserve to be compensated," but "the people who are fraudulent deserve nothing" and should not be permitted to "dilute" the claim pool at others' expense).)

Put simply: BSA proposed a plan designed not to preserve the value of the estate and deliver value to creditors, but to create a situation where the plan sought insurance payments to the trust for which BSA had never bargained, much of which would line the pockets of the claimants' lawyers.  That is not a good faith plan, and simply removing some of the offending provisions was not enough for this plan to be confirmed.

TrustApp0554

**C.    The Bankruptcy Court Inappropriately Relied on the Testimony of One BSA Witness About His Subjective Beliefs Regarding the Plan.**

The bankruptcy court also erred by emphasizing the testimony of a single BSA lawyer that he intended to protect insurers' rights from the efforts of the claimants' lawyers.  (*See*, *e.g.*, A. 242 ("Mr. Azer testified that the language is meant to include, but not be limited to, theories of negligence.  One would think this would suffice …."].)  That is not the proper standard for evaluating the plan.  (*See*, *e.g.*, A. 1672 (Azer) (conceding that the Plan's language, not counsel's intent, would be "operative" in future coverage litigation).)

"The term 'good faith' is somewhat misleading.  Though it suggests that the debtor's subjective intent is determinative, this is not the case." *SGL Carbon*, 200 F.3d at 165 (quotation marks omitted).  Instead, it "encompasses several, distinct equitable limitations that courts have placed on Chapter 11 filings.  Courts have implied such limitations to deter filings that seek to achieve objectives outside the legitimate scope of the bankruptcy laws."  *Id.* (quotation marks omitted); *see, e.g.*, *Exide,* 2021 WL 3145612, at *11 (plan must result from "fundamental fairness

in dealing with the creditors," achieve "fundamental fairness and justice," and discourage "debtor misconduct" (quotation marks omitted)).

Whether or not BSA's counsel *thought* he was protecting insurers' rights while negotiating with the plaintiffs' attorneys is irrelevant. What matters is that BSA proposed findings that were concocted by the claimants to abrogate such protections, along with taking numerous other steps designed to prejudice the insurers, at least one occasion unbeknownst to that same counsel. *See supra* at 48-49; *infra* Pt. II.

Thus, regardless of whether a BSA attorney subjectively intended to prejudice the insurers at some point, the totality of the circumstances demonstrate that BSA was complicit in a plan to do just that. *See*, *e.g.*, *Thgh Liquidating LLC*, 2020 WL 5409002, at *7 (D. Del. 2020) (considering whether "the plan *proponents* (which included the Debtors' secured lenders and the official committee of unsecured creditors) proposed the Plan in good faith" (emphasis added)); *In re Peabody Energy Corp.*, 582 B.R. 771, 783 (E.D. Mo. 2017) (examining the "process employed by the Debtors *and other Plan proponents*, including the mediation process" (emphasis added)). Such a plan has not been proposed fairly and cannot be confirmed.

II.    **THE PLAN ABROGATES THE CERTAIN INSURERS'
CONTRACTUAL RIGHTS.**

The Court should reverse for the independent reason that the plan
is inconsistent with the Bankruptcy Code because it impermissibly
abrogates the Certain Insurers' contracts.  *See* 11 U.S.C. §§ 1129(a)(1),
(3).  That is a separate legal error requiring reversal.

A.    **The Plan Cannot Be Confirmed Because It
Impermissibly Alters the Certain Insurers' Contracts.**

In its opinion, the bankruptcy court acknowledged nearly two days
of testimony put forward by BSA and the Certain Insurers regarding how
the TDPs differ from the tort system contemplated by the contracts, yet
dismissed that testimony in a footnote.  (A. 191.)  The court erroneously
declined to engage with the plan's real-world impact because the court
believed "insurance neutrality" is merely a "standing concept."  (A. 223,
238, 255-258.)

Of course, courts routinely hold that where a plan is not "insurance
neutral," insurers have standing to challenge the plan.  *See, e.g., Global
Indus. Techs.*, 391 F.3d at 209.  But those cases do not stand for the
proposition that a Chapter 11 debtor's plan can simply abrogate
contractual rights.  *See Davis v. Wells Fargo*, 824 F.3d 333, 348 (3d Cir.
2016) ("standing and merits questions may involve overlapping facts").

To the contrary, courts regularly recognize that insurers are aggrieved when debtors seek to rewrite insurance policy contractual terms. *See, e.g., Combustion Eng'g*, 391 F.3d at 218.[10]  And they have done so consistently where a plan would have the real world effect of rewriting the terms of an insurance policy, whether or not it expressly seeks to modify contractual language. *See In re Thorpe Insulation Co.*, 677 F.3d 869, 885 (9th Cir. 2012) (reversing confirmation on the grounds that the plan would "economically affect [insurers] in substantial ways").

That is because it is a bedrock principle that bankruptcy courts "do not have the power to rewrite contracts to allow debtors to continue to perform on more favorable terms." *In re Crippin*, 877 F.2d 594, 598 (7th Cir. 1989). "Whatever limitation[s] on the debtor's property [apply] outside of bankruptcy ... appl[y] inside of bankruptcy." *Mission Prod.*,

---

[10] *See also, e.g., In re Pittsburgh Corning Corp.*, 453 B.R. 570, 604-05 (Bankr. W.D. Pa. 2011) (lack of clarity regarding treatment of insurance claims rendered plan unconfirmable); *Amatex Corp. v. Aetna Cas. & Sur. Co. (In re Amatex Corp.)*, 97 B.R. 220, 221 (Bankr. E.D. Pa. 1989), *aff'd sub nom.*, 102 B.R. 411 (Bankr. E.D. Pa. 1989) (refusing to order insurers to make lump sum payments "contrary to the terms of their policies"); *In re Diocese of Camden, N.J.*, 2022 WL 3369087, at *3-5 (Bankr. D.N.J. Aug. 12, 2022) (insurers sufficiently alleged that plan "stripped of rights and defenses they hold" under insurance policies).

*M*

139 S. Ct. at 1653 (quotation marks omitted).  And bankruptcy courts generally do not have the power to abrogate state law, including state property and contract law.  *See Travelers Cas. & Surety Co. of Am. v. Pacific Gas & Elec. Co.*, 549 U.S. 443, 451 (2007).[11]

Rather, the Bankruptcy Code provides the debtor "with the same rights and defenses" under a prepetition contract as those held by the debtor before the bankruptcy.  *Combustion Engineering*, 391 F.3d at 245. This well-recognized principle takes a number of forms, including the requirement that executory contracts be assumed and assigned under

---

[11] *See also*, *e.g.*, *Moody v. Amoco Oil Co.*, 734 F.2d 1200, 1213 (7th Cir. 1984) (Bankruptcy Code is "not intended to expand debtor's rights against others more than they exist at the commencement of the case."); *In re 641 Associates, Ltd.*, 1993 WL 332646 at *8 (Bankr. E.D. Pa. Aug. 26, 1993) ("There is no provision in the Bankruptcy Code allowing a bankruptcy court to disregard state-law contractual rights."); *In re SPM Mfg. Corp.*, 984 F.2d 1305, 1311 (1st Cir. 1993) (bankruptcy courts lack authority to enter orders that "expand the contractual obligations of parties"); *Cissel v. Am. Home Assur. Co.*, 521 F.2d 790, 792 (6th Cir. 1975) (bankruptcy trustee could not obtain recovery from insurer for claims filed against the estate absent a judgment or a written settlement agreement between policyholder, claimant, and insurance company); *In re Green Jacobson P.C.*, No. 15-41404-705, 2017 Bankr. LEXIS 2059, at *14 (Bankr. E.D. Mo. July 24, 2017) ("Neither the Court nor the parties can rewrite the Policy.").

*M*

Bankruptcy Code § 365 *cum onere* or not at all,[12] and the restriction on

modifying non-executory contracts through sales under Bankruptcy Code

§ 363 to increase rights and obligations.[13]  Where a plan threatens to

impermissibly modify or impair insurance contracts, some courts refer to

this principle as requiring that a plan be "insurance neutral."  But what

matters is the principle, not the label: a plan that impermissibly modifies

insurance contracts is not confirmable as a matter of law.

In the context of assignments of the debtor's contracts, as in this

plan, it is a foundational contractual principle that an assignment of

rights may not "materially increase the obligor's [e.g., the insurer's]

---

[12] *See, e.g.*, *Sharon Steel Corp. v. Nat'l Fuel Gas Dist. Corp.*, 872 F.2d 36, 39-40 (3d Cir. 1989) (acknowledging "the general principle that a debtor may not reject a contract but maintain its benefits"); *In re AbitibiBowater Inc.*, 418 B.R. 815, 822-23 (Bankr. D. Del. Oct. 27, 2009) ("An executory contract must be assumed or rejected *in toto* ... A contract will not be bifurcated into parts that will be rejected and those that will not.") (quotation marks omitted)).

[13] *See, e.g.*, *In re Stewart Foods, Inc.*, 64 F.3d 141, 145 (4th Cir. 1995) ("Because § 365 applies only to executory contracts, a debtor-in-possession does not have the option of rejecting or assuming non-executory contracts and remains bound by the debtor's obligations under those contracts after the bankruptcy's filing."); *In re Am. Home Mortg. Holdings*, 402 B.R. 87, 98 (Bankr. D. Del. 2009) ("[T]he *cum onere* principle applies equally to the transfer of rights and obligations under a non-executory contract pursuant to § 363 of the Bankruptcy Code as to the assumption and assignment of contracts and leases pursuant to § 365.").

Case 1:22-cv-01237-RGA    Document 45    Filed 11/07/22    Page 107 of 125 PageID #:
Case 3:23-cv-01592-S    Document 559    Filed 10/23/25    Page 565 of 1044    PageID 17501
3601

burden or risk under the contract" (29 Williston on Contracts § 74:10 (Westlaw 4th ed. 2022)) or "materially impair [its] chance of obtaining return performance, or materially reduce its value to [the insurer]" (Restatement (Second) of Contracts § 317:2 (Westlaw 2022)).  Thus, while an assignment "carries with it a presumption that the assignee has assumed the assignor's duties of performance," the "most firmly established principle of the law of assignments is that an assignor remains liable to [the insurer] for performing the assignor's duties under a contract."  Modern Law of Contracts §§ 21:18, 21:27 (Westlaw 2022).

The Bankruptcy Code accounts for such fundamental precepts of contract law.  *See Mission Prod.*, 139 S. Ct. at 1663 (explaining that "[t]he estate cannot possess anything more than the debtor itself did outside bankruptcy").  For example, if a contract is executory, the debtor may "fulfill its obligations" and then assign remaining rights *along with obligations* to another party.  *Id.* at 1658 (11 U.S.C. § 365)).[14]  If the contract is non-executory, the debtor may sell the rights under that contract, and remaining *obligations* will be "fulfill[ed]" by the other party.

---

If BSA instead elects to repudiate the contract, the rejection constitutes a breach, and the obligor has a claim against the estate for damages resulting from the debtor's nonperformance.  *Id.* at 1658.

TrustApp0561

*In re Weinstein Co. Holdings, LLC*, 997 F.3d 497, 505 (3d Cir. 2021) (§ 363)).  In each case, the rights and obligations remain under the contract.

What the debtor may *not* do is assign the rights to executory[15] or non-executory[16] contracts without assuming or assigning corresponding obligations, as BSA seeks to do here.  That would impermissibly modify the debtor's contracts "by happenstance of bankruptcy." *Mission Prod.*, 139 S. Ct. at 1663; *see, e.g., In re 47 Hops LLC*, 2020 WL 2485808, at *4 (Bankr. E.D. Wash. May 13, 2020) ("Although the bankruptcy law regarding executory contracts is broad, the law does not rewrite contracts wholesale.  For example, the estate representative must address any given contract in its entirety and may not forage among favorable or unfavorable components."); *Weinstein*, 997 F.3d at 505-06 ("[T]he [§ 363] buyer must typically fulfill obligations under the contract it bought after the sale closes, just as it would with any other asset or liability.").

---

[15] *See, e.g., In re Italian Cook Oil Corp.*, 190 F.2d 994, 997 (3d Cir. 1951) ("The trustee may not blow hot and cold.  If he accepts the contract he accepts it *cum onere*.  If he receives the benefits he must adopt the burdens.  He cannot accept one and reject the other.").

[16] *In re Weinstein Co. Holdings, LLC*, No. 18-50924, Dkt. 44 at 137:4-11 (Bankr. D. Del. 2020) ("[T]he concept of a sale free and clear of all liens, claims and interests does not mean that you can sell the benefits of a contract, but not its obligations."), *aff'd*, 997 F.3d at 505.

Indeed, the bankruptcy court implicitly recognized these concepts when it rightly rejected the claimants' suggestion that the "transfer of the insurance rights under the Plan is consistent with" case law involving preemption of "provisions in a private contract that prohibit assignment." (A. 257-258 (citing *Federal Mogul*, 684 F.3d at 363).) Among other things, the court in that case did not even "have before it the argument made here: whether the rights can be transferred without the correlative obligations." (A. 258.) But the court's ruling would not have been necessary if insurer protections were merely a "standing" concept.

Congress recognized that construing the Bankruptcy Code to permit the unilateral impairment of contracts without consent would raise serious constitutional concerns. *See Louisville Joint Stock Land Bank v. Radford*, 295 U.S. 555, 589-90, 602 (1935) (bankruptcy statute subject to takings protections). That is why the Bankruptcy Code does not "expand" contractual rights as BSA seeks to do here. *Moody*, 734 F.2d at 1213. In light of these constitutional concerns and the Bankruptcy Code's language forbidding confirmation of a plan proposed by "any means forbidden by law" (11 U.S.C. § 1129(a)(3)), the proper course is to reject the attempt to abrogate insurers' contracts and reverse the plan's

TrustApp0563

confirmation. *See*, *e.g. United States v. Sec. Indus. Bank*, 459 U.S. 70, 78 (1982) (courts must "ascertain whether a construction of the statute is fairly possibly by which the constitutional question may be avoided").

BSA's plan runs afoul of these fundamental principles. The Certain Insurers' insurance policies contemplate resolution of claims through judgments or settlements resulting from an adversarial tort system in which BSA is aligned with its insurers and works with them to mount a zealous defense. (A. 3484-3485, 3487 (Harrington).) But as Professor Harrington, an insurance expert, explained, the plan replaces that system with a mechanism for dispute resolution that "align[s]" BSA with *claimants* and creates an "inherent potential" to benefit them at the insurers' expense (A. 3483, 3487, 3507, 3519 (Harrington)), thereby impairing "key [contractual] rights" (A. 3483, 3485 (Harrington)). See *supra* at 32-34 (impairment of rights and obligations such as insurers' right to defend and insureds' obligations to cooperate in the defense).

The confirmed plan directly prejudices the rights and interests of insurers. It assigns insurance rights without any corresponding obligations, such as BSA's obligation to allow insurers to work with BSA to minimize its liability for abuse claims, whether on statute of

limitations grounds or any other ground arising from the many defects in the plan. While the court observed that the plan seeks to assign rights from policies with differing terms (A. 258), that is because of the extraordinary breadth of the assignment, and it is BSA's burden to demonstrate that its own plan should be confirmed, not the insurers' burden to prove otherwise. *See Tribune Co.*, 464 B.R. at 151-52.

BSA recognized the ramifications of proposing such a plan. (A. 7311; *see* A. 7307 (acknowledging that the plan's "treatment of insurance" gets "to the [heart] of what is happening" here). Before capitulating to claimants' counsel, BSA attempted to negotiate a plan that expressly accounted for such contractual provisions. But the current plan does not. BSA chose to remove any such protections at the insistence of the claimants' attorneys to secure support of the creditors.

The plan's few remaining "protections" are not sufficient to safeguard insurers' rights. Indeed, BSA accepted claimants' proposal to make any such protections *expressly subject to* the "Insurance Assignment"—which seeks to assign the benefits but not the burdens of the contracts—as well as the bankruptcy plan and confirmation order. See *supra* at 25. That change rendered the plan's protective language,

at best, circular and, at worst, illusory.  (*See* A. 1672 (Azer), 3509 (Harrington); *see* A. 490 (Plan, Art. X.M), 511 (TDPs, Art. V.C).)  That BSA and the claimants could have written the plan more clearly merely illustrates how BSA failed to meet its burden to put forth a confirmable plan.

### B.    The Bankruptcy Court Wrongly Relied on its Rejection of the Proposed Insurance Findings As a Basis to Overlook the Impairment of the Insurers' Contracts.

The bankruptcy court again relied on its own rejection of the proposed insurance findings, and resulting ability of insurers to contest issues in coverage litigation, to conclude that the plan is confirmable because the "real question" is not whether the assignment of the debtor's insurance rights contemplated by the plan abrogates the insurer's contract rights, but the extent to which, as a consequence of that clear abrogation, the insurers will actually be harmed.  (A. 258-260.)  The bankruptcy court's logic appears to be that the answer to this second question is "no", because insurers have retained the ability to raise the full panoply of defenses in coverage disputes.  This analysis is flawed.

First, contrary to the bankruptcy court's reasoning, the question in this case is whether the assignment is permissible under the Bankruptcy

Code, consistent with state law. *That* question is properly decided by a bankruptcy court, not by a different court deciding a coverage dispute. (*See*, *e.g.*, A. 3546 (Harrington) (The TDPs "eviscerate those rights....  So it will already have happened at that point.  What will be determined in a coverage court … would be whether or not that breach should, in fact, resolve or allow the parties seeking recovery to get that money from the insurance company despite the breach.").)  The bankruptcy court was required to determine whether the bankruptcy plan is legally permissible before confirming it, but failed to do so.  By focusing instead on the opportunity for insurers to raise coverage defenses, the court failed to address their well-founded objection asserted now in the context of plan confirmation (*Lindsey v. Normet*, 405 U.S. 56, 66 (1972); *Mullins v. Direct Dig., LLC*, 795 F.3d 654, 669-70 (7th Cir. 2015))*,* which  raises significant "due process" concerns. *United States v. Sec. Indus. Bank*, 459 U.S. 70, 74-75 (1982).

Second, the bankruptcy court overlooked the immediate harm that will be caused by the plan's abrogation of the insurers' contract rights, and cannot be undone by coverage rulings.   Regardless of whether the TDPs would bind insurers in other disputes, as BSA proposed, they

TrustApp0567

provide for payment on tens of thousands of claims for which there is no guarantee that insurers will ever be afforded an opportunity to align with their insured and work to effect a proper resolution or defense, as required by their contracts. The result is a plan that, by express design, artificially inflates the Debtor's purported liability, and in doing so, seeks to greatly inflate the insurers' potential exposure and guts their contractual rights, creating a "hydraulic pressure to settle" that exists independent from any outcome in future coverage litigation. *Newton, Inc.*, 259 F.3d at 164. These harms would not exist but-for the erroneous confirmation order and cannot, by definition, be ameliorated by decisions in subsequent coverage disputes. They also explain why the plan, despite the bankruptcy court's rejection of certain of its aspects, continues to enjoy the unanimous support of all the attorneys representing the claimants.

The Court should reverse and remand for BSA to propose a good-faith plan that preserves all rights and obligations under BSA's prepetition insurance contracts. BSA can easily propose a plan that expressly makes clear that it does not affect any rights and obligations in the operative insurance contracts. What BSA may not do, however, is

use the bankruptcy process to rewrite those contracts without insurers'
consent in order to procure the claimants' votes and emerge from
bankruptcy while retaining some of its most valuable assets.  That result
is inconsistent with the Bankruptcy Code and, unless reversed, will set
bad precedent for years to come.

# CONCLUSION

The Court should reverse.

Dated:    Wilmington, Delaware
          November 7, 2022

                                    Respectfully Submitted,

                              By: /s/ Deirdre M. Richards
Theodore J. Boutrous Jr. (*pro hac vice*)    Deirdre M. Richards
Richard J. Doren (*pro hac vice*)            (DE Bar No. 4191)
Blaine H. Evanson (*pro hac vice*)           FINEMAN KREKSTEIN
GIBSON, DUNN & CRUTCHER LLP                  & HARRIS PC
333 South Grand Avenue                       1300 N. King Street
Los Angeles, California 90071                Wilmington, DE 19801
tboutrous@gibsondunn.com                     Telephone: (302) 538-8331
rdoren@gibsondunn.com                        Facsimile: (302) 394-9228
bevanson@gibsondunn.com                      drichards@finemanlawfirm.com


Michael A. Rosenthal (*pro hac vice*)        Susan N.K. Gummow
Mitchell A. Karlan (*pro hac vice*)          (*pro hac vice*)
James Hallowell (*pro hac vice*)             FORAN GLENNON
Keith R. Martorana (*pro hac vice*)          PALANDECH PONZI &
Seth M. Rokosky (*pro hac vice*)             RUDLOFF P.C.
GIBSON, DUNN & CRUTCHER LLP                  222 N. LaSalle St., Suite 1400
200 Park Avenue                              Chicago, Illinois 60601
New York, New York 10166                     sgummow@fgppr.com
mrosenthal@gibsondunn.com
mkarlan@gibsondunn.com
jhallowell@gibsondunn.com
kmartorana@gibsondun.com
srokosky@gibsondunn.com


*Counsel for National Union Fire Insurance Company of Pittsburgh, Pa.,
Lexington Insurance Company, Landmark Insurance Company, and the
Insurance Company of the State of Pennsylvania*

/s/ David M. Fournier
David M. Fournier (DE Bar No.
2812)
Marcy J. McLaughlin Smith (DE
No. 6184)
TROUTMAN PEPPER
HAMILTON SANDERS LLP
Hercules Plaza
1313 Market Street
Suite 5100
P.O. Box 1709
Wilmington, DE 19899-1709
Telephone: 404.885.3000
david.fournier@troutman.com
marcy.smith@troutman.com

-and-

Harris B. Winsberg (*pro hac vice*)
Matthew G. Roberts (*pro hac vice*)
PARKER, HUDSON, RAINER &
DOBBS LLP
303 Peachtree Street NE
Suite 3600
Atlanta, GA 30308
Telephone: 404.420.4313
Facsimile: 404.522.8409
hwinsberg@phrd.com
mroberts@phrd.com

-and-

Margaret H. Warner (*pro hac vice*)
Ryan S. Smethurst (*pro hac vice*)
Alex M. Spisak (*pro hac vice*)

/s/ David M. Fournier
David M. Fournier (DE Bar No.
2812)
Marcy J. McLaughlin Smith (DE
No. 6184)
TROUTMAN PEPPER
HAMILTON SANDERS LLP
Hercules Plaza, Suite 5100
1313 Market Street
P.O. Box 1709
Wilmington, DE 19899-1709
Telephone: 302.777.6500
Facsimile: 302.421.8390
david.fournier@troutman.com
marcy.smith@troutman.com

-and-

Harris B. Winsberg (*pro hac vice*)
Matthew G. Roberts (*pro hac vice*)
PARKER, HUDSON, RAINER &
DOBBS LLP
303 Peachtree Street NE
Suite 3600
Atlanta, GA 30308
Telephone: 404.420.4313
Facsimile: 404.522.8409
hwinsberg@phrd.com
mroberts@phrd.com

-and-

Todd C. Jacobs (*pro hac vice*)
John E. Bucheit (*pro hac vice*)
Paul J. Esker (*pro hac vice*)
BRADLEY RILEY JACOBS PC
500 West Madison Street

McDERMOTT WILL & EMERY
LLP
The McDermott Building
500 North Capitol Street, NW
Washington, DC 20001-1531
Telephone: 202.756.8228
Facsimile: 202.756.8087
mwarner@mwe.com
rsmethurst@mwe.com
aspisak@mwe.com

*Counsel for Allianz Global Risks*
*US Insurance Company*

Suite 1000
Chicago, IL 60661
Telephone: 312.281.0295
tjacobs@bradleyriley.com
jbucheit@bradleyriley.com
pesker@bradleyriley.com

*Counsel for National Surety*
*Corporation and Interstate Fire &*
*Casualty Company*

/s/Kathleen M. Miller
Kathleen M. Miller (No. 2898)
SMITH, KATZENSTEIN &
JENKINS LLP
1000 West Street, Suite 501
P.O. Box 410
Wilmington, DE 19899
Telephone: (302) 652-8400
kmiller@skjlaw.com

Ronald P. Schiller (*pro hac vice*)
Matthew A. Hamermesh (*pro hac*
*vice*)
HANGLEY ARONCHICK SEGAL
PUDLIN & SCHILLER
One Logan Square, 27th Floor
Philadelphia, PA 19103
T: (215) 568-6200
F: (215) 568-0300
E: rschiller@hangley.com
mhamermesh@hangley.com

/s/ Paul Logan
Paul Logan (No. 3339)
POST & SCHELL, P.C.
300 Delaware Avenue, Suite
1380
Wilmington, DE 19801
Telephone: (302) 251-8856
Email: plogan@postschell.com

John C. Sullivan (*pro hac vice*)
Kathleen K. Kerns (*pro hac vice*)
POST & SCHELL, P.C.
Four Penn Center – 13th Floor
1600 John F. Kennedy
Boulevard
Philadelphia, PA 19103
Telephone: (215) 587-1000
jsullivan@postschell.com
kkerns@postschell.com

-and-

George R. Calhoun (*pro hac vice*)

*Counsel for Arch Insurance
Company*

IFRAH PLLC
1717 Pennsylvania Avenue,
N.W. Suite 650
Washington, DC  20006
Telephone:  (202) 840-8758
george@ifrahlaw.com

300 Delaware Avenue, Suite
1380
Wilmington, DE  19801
Telephone:  (302) 251-8856
Email:  plogan@postschell.com

*Counsel for Argonaut Insurance
Company and Colony Insurance
Company*

/s/ Michael J. Joyce
Michael J. Joyce (No. 4563)
JOYCE, LLC
1225 King Street, Suite 800
Wilmington, DE 19801
Telephone:  (302) 388-1944
Email:  mjoyce@mjlawoffices.com

-and-

Kevin Coughlin (*pro hac vice*)
Lorraine Armenti (*pro hac vice*)
Michael Hrinewski (*pro hac vice*)
COUGHLIN MIDLIGE &
GARLAND, LLP
350 Mount Kemble Avenue
PO Box 1917
Morristown, NJ 07962
Telephone:  (973) 267-0058
Facsimile:  973-267-6442
kcoughlin@cmg.law
larmenti@cmg.law

/s/ Maria Aprile Sawczuk
Maria Aprile Sawczuk (DE
#3320)
GOLDSTEIN & MCCLINTOCK
LLP
501 Silverside Road
Wilmington, DE 19809
302-444-6710
marias@goldmclaw.com

-and-

Laura McNally (*pro hac vice*)
Emily Stone (*pro hac vice*)
LOEB & LOEB LLP
321 N. Clark Street, Suite 2300
Chicago, IL 60654
312-464-3155
lmcnally@loeb.com
estone@loeb.com

TrustApp0573

mhrinewski@cmg.law

-and-

Britton C. Lewis
John M. Flynn
CARRUTHERS & ROTH, P.A.
235 N. Edgeworth Street
P.O. Box 540
Greensboro, NC  27401
Telephone:  (336) 478-1146
Facsimile:  (336) 478-1145
jmf@crlaw.com
bcl@crlaw.com

*Counsel for Arrowood
Indemnity Company*

/s / Brian A. Sullivan
Brian A. Sullivan (No. 2098)
WERB & SULLIVAN
LEGAL ARTS BUILDING
1225 N. King Street
Suite 600
Wilmington, Delaware 19801
Telephone: (302) 652-1100
Cell: (302) 757-9932
Facsimile: (302) 652-1111
Email:
bsullivan@werbsullivan.com

John E.W. Baay II (*pro hac vice*)
GIEGER LABORDE &
LAPEROUOSE, LLC
701 Poydras Street
Suite 4800
New Orleans, LA 70139
Tel.: 504-561-0400

David Christian (*pro hac vice*)
DAVID CHRISTIAN
ATTORNEYS LLC
105 W. Madison St., Suite 1400
Chicago, IL 60602
Telephone:  312-282-5282
dchristian@dca.law

*Counsel for The Continental
Insurance Company and
Columbia Casualty Company*

/s/ Kathleen M. Miller
Kathleen M. Miller (DE Bar No.
2898)
SMITH, KATZENSTEIN &
JENKINS LLP
1000 West Street, Suite 501
P.O. Box 410
Wilmington, DE 19899
Telephone: (302) 652-8400
Email: kmiller@skjlaw.com

-and-

Mary E. Borja (*pro hac vice*)
Gary P. Seligman (*pro hac vice*)
Ashley L. Criss (*pro hac vice*)
WILEY REIN LLP
2050 M Street NW
Washington, DC 20036
Phone: (202) 719-7000

TrustApp0574

Fax: 504-561-1011
Email: jbaay@glllaw.com

-and-

William H. White Jr (*pro hac vice*)
KIERNAN TREBACH LLP
1233 20th Street, NW
8th Floor
Washington, DC 20036
Tel.: 202-712-7000
Fax: 202-712-7100
Email:
wwhite@kiernantrebach.com

*Counsel for Gemini Insurance Company*

/s/ Bruce W. McCullough
Bruce W. McCullough (No. 3112)
BODELL BOVÉ, LLC
1225 N. King Street, Suite 1000
Wilmington, Delaware 19801-3250
Telephone: (302) 655-6749
bmccullough@bodellbove.com

-and-

Bruce D. Celebrezze (*pro hac vice*)
CLYDE & CO US LLP
150 California Street | 15th Floor
San Francisco, California 94111
Telephone: (415) 365-9800
Facsimile: (415) 365-9801
bruce.celebrezze@clydeco.us

Konrad R. Krebs (*pro hac vice*)
CLYDE & CO US LLP

Email: mborja@wiley.law
gseligman@wiley.law
acriss@wiley.law

*Counsel for General Star Indemnity Company*

/s/Kathleen M. Miller
Kathleen M. Miller (No. 2898)
SMITH, KATZENSTEIN
& JENKINS LLP
1000 West Street, Suite 1501
P.O. Box 410
Wilmington, DE  19899 [Courier 19801]
Telephone: (302) 652-8400
Facsimile: (302) 652-8405
kmiller@skjlaw.com

and

Lloyd A. Gura (*pro hac vice*)
Pamela J. Minetto (*pro hac vice*)
MOUND COTTON WOLLAN &
GREENGRASS LLP
One New York Plaza 44th Floor
New York, NY 10004
Tel: (212) 804-4282

TrustApp0575

340 Mt. Kemble Avenue | Suite
300
Morristown, NJ 07960
Telephone: (973) 210-6700
Facsimile: (973) 210-6701
konrad.krebs@clydeco.us

-and-

David Christian (*pro hac vice*)
DAVID CHRISTIAN
ATTORNEYS LLC
105 W. Madison St., Suite 1400
Chicago, Illinois 60602
Telephone: (312) 282-5282
dchristian@dca.law

*Counsel for Great American
Assurance
Company, f/k/a Agricultural
Insurance Company; Great
American E&S Insurance
Company, f/k/a Agricultural
Excess and Surplus Insurance
Company; and Great American
E&S Insurance Company*

/s/ R. Karl Hill
R. Karl Hill (DE Bar No. 2747)
SEITZ, VAN OGTROP &
GREEN, P.A.
222 Delaware Avenue
Suite 1500
Wilmington, DE 19801
Telephone: (302) 888-0600
khill@svglaw.com

-and-

lgura@moundcotton.com
pminetto@moundcotton.com

*Counsel for Indian Harbor
Insurance Company, on behalf of
itself and as successor in interest
to Catlin Specialty Insurance
Company*

/s/ Thaddeus J. Weaver
Thaddeus J. Weaver (DE Bar. No.
2790)
DILWORTH PAXSON LLP
704 N. King Street, Suite 500
P.O. Box 1031
Wilmington, DE  19899-1031
(302) 571-8867 (telephone)
(302) 351-8735 (facsimile)
tweaver@dilworthlaw.com

TrustApp0576

-and-

CHOATE, HALL & STEWART
LLP
Douglas R. Gooding (*pro hac
vice*)
Jonathan D. Marshall (*pro hac
vice*)
Two International Place
Boston, MA 02110
Telephone: (617) 248-5000
dgooding@choate.com
jmarshall@choate.com

-and-

MINTZ, LEVIN, COHN,
FERRIS, GLOVSKY AND
POPEO PC
Kim V. Marrkand (*pro hac vice*)
Laura Bange Stephens (*pro hac
vice* forthcoming)
One Financial Center
Boston, MA 02111
Telephone: (617) 542-6000
kvmarrkand@mintz.com
lbstephens@mintz.com

*Counsel for Liberty Mutual
Insurance Company, The Ohio
Casualty Insurance Company,
Liberty Insurance Underwriters,
Inc. and Liberty Surplus
Insurance Corporation*

/s/ Stephen M. Miller
Stephen M. Miller (No. 2610)
Carl N. Kunz, III (No. 3201)
Sarah M. Ennis (No. 5745)

William E. McGrath, Jr. (*pro hac
vice*)
Dilworth Paxson LLP
2 Research Way, Suite 103
Princeton, NJ 08540
(609) 924-6000 (telephone)
(215) 893-8537 (facsimile)
wmcgrath@dilworthlaw.com

*Counsel for Munich Reinsurance
America, Inc., formerly known as
American Re-Insurance Company*

/s/ Marla S. Benedek
Marla S. Benedek (No. 6638)
COZEN O'CONNOR
1201 N. Market Street, Suite 1001

MORRIS JAMES LLP

500 Delaware Avenue, Suite 1500

Wilmington, Delaware 19801

Telephone: (302) 888-6800

Facsimile: (302) 571-1750

smiller@morrisjames.com

ckunz@morrisjames.com

sennis@morrisjames.com

-and-

Margaret M. Anderson

(*pro hac vice*)

Ryan T. Schultz

(*pro hac vice*)

Adam A. Hachikian

(*pro hac vice*)

Kenneth M. Thomas

(*pro hac vice*)

FOX SWIBEL LEVIN & CARROLL LLP

200 W. Madison Street, Suite 3000

Chicago, Illinois 60606

Telephone: (312) 224-1200

Facsimile: (312) 224-1201

panderson@foxswibel.com

rschultz@foxswibel.com

ahachikian@foxswibel.com

kthomas@foxswibel.com

*Counsel for Old Republic Insurance Company*

Wilmington, DE 19801

Telephone: (302) 295-2024

Facsimile: (302) 250-4498

mbenedek@cozen.com

*Counsel for Traders and Pacific Insurance Company, Endurance American Specialty Insurance Company, and Endurance American Insurance Company*

TrustApp0578

/s/ Louis J. Rizzo, Jr.
Louis J. Rizzo, Jr. (DE Bar No.
3374)
REGER RIZZO & DARNALL LLP
1521 Concord Pike Suite 305
Brandywine Plaza West
Wilmington DE  19803
Telephone: (302) 477-7100
Facsimile: (302) 652-3620
lrizzo@regerlaw.com

*Counsel for Travelers Casualty
and Surety Company, Inc. (f/k/a
Aetna Casualty & Surety
Company), St. Paul Surplus Lines
Insurance Company and Gulf
Insurance Company*

TrustApp0579

# National Casualty Company

**ENDORSEMENT NO.** 0000

| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE DATE (12:01 A.M. STANDARD TIME) | NAMED INSURED | AGENT NO. |
|---|---|---|---|
| KKC0000021153300 | 06/20/17 | KNOX TRAIL COUNCIL, INC. (SEE KR-SP-1) | |

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

EMPLOYEES AND VOLUNTEERS AS INSUREDS

This endorsement modifies insurance provided under the following:

BUSINESS AUTO COVERAGE FORM

With respects to coverage provided by this endorsement, the provisions of the Coverage Form apply unless modified by this endorsement.

The following is added to SECTION II - COVERED AUTOS LIABILITY COVERAGE, paragraph A.1., Who Is An Insured provision:

Any "employee" or "volunteer" of yours is an "insured" while using a covered "auto" owned by him or her, by a member of his or her household, or registered to a member of his or her household or to an auto dealership, leasing or rental concern while on "camp or council business"

If the covered "auto" is not owned or registered to the "employee" or "volunteer", then the owner, registrant, or the lessor is also an "insured".

For the purpose of this endorsement the following terms have special meaning:

"Volunteer" means any person other than an "employee" of yours, operating a vehicle on "camp or council business" with your permission and direction.

"Camp or council business" means the transportation of campers, council members or other normal camp or council duties in a private passenger automobile with seating capacity of no more than eight persons.

The following is added to SECTION II - COVERED AUTOS LIABILITY COVERAGE, paragraph B. EXCLUSIONS:

"Bodily injury" or "property damage" arising out of the operations of any "auto" with seating capacity of between nine and fifteen (9-15) persons, unless the "auto" is approved and on file with the company for coverage to apply through this endorsement.

The coverage provided by this endorsement is excess over any other collectible insurance, whether primary, excess, contingent or any other basis. The inclusion herein of any "insured" shall not operate to increase the Limits Of Insurance.

_____   /   _____
AUTHORIZED REPRESENTATIVE                            DATE

**UT-3g (3-92)**

Subject to Protective Order - Confidential

# National Casualty Company

**ENDORSEMENT NO.** _0000_

| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE DATE (12:01 A.M. STANDARD TIME) | NAMED INSURED | AGENT NO. |
|---|---|---|---|
| KKC0000021153300 | 06/20/17 | KNOX TRAIL COUNCIL, INC. (SEE KR-SP-1) | |

MISCELLANEOUS ARTICLES COVERAGE FORM CI-SD-20 (CONTINUED)

| ITEM NO. | DESCRIBED PROPERTY | LIMIT |
|---|---|---|
| | COTS, MATRESSES AND COVERS | $40,000 |
| | HOLLAND TRACTOR | $25,450 |
| | AQUA FIN SAIL BOATS | $13,000 |
| | JOHN DEER GATOR | $ 4,000 |
| | CHAIN SAW/TABLE SAW | $ 1,000 |
| | CHAIN SAW | $   620 |
| | GAS GOLF CART | $ 3,000 |
| | CANOES | $20,000 |

_____    /    _____
AUTHORIZED REPRESENTATIVE                          DATE

**UT-3g (3-92)**

POLICY NUMBER: KKO0000021153300                                    IL 09 85 01 08

**THIS ENDORSEMENT IS ATTACHED TO AND MADE PART OF YOUR POLICY IN RESPONSE TO THE DISCLOSURE REQUIREMENTS OF THE TERRORISM RISK INSURANCE ACT. THIS ENDORSEMENT DOES NOT GRANT ANY COVERAGE OR CHANGE THE TERMS AND CONDITIONS OF ANY COVERAGE UNDER THE POLICY.**

# DISCLOSURE PURSUANT TO TERRORISM RISK INSURANCE ACT

### SCHEDULE

| |
|---|
| Terrorism Premium (Certified Acts)    None |
| **This premium is the total Certified Acts premium attributable to the following Coverage Part(s), Coverage Form(s) and/or Policy(s):** |
| |
| **Additional information, if any, concerning the terrorism premium:** |
| You have rejected the offer of terrorism coverage for Acts of Terrorism that are certified under the Terrorism Risk Insurance Act, extended, as an Act of Terrorism. An exclusion of terrorism losses has been made a part of this policy. |
| In this state, the terrorism exclusion makes an exception for (and thereby provides coverage for) fire losses resulting from an Act of Terrorism, subject to all other provisions of the policy.  The Terrorism Premium shown above is the premium for such fire losses. |
| Information required to complete this Schedule, if not shown above, will be shown in the Declarations. |

**A. Disclosure Of Premium**

In accordance with the federal Terrorism Risk Insurance Act, we are required to provide you with a notice disclosing the portion of your premium, if any, attributable to coverage for terrorist acts certified under the Terrorism Risk Insurance Act. The portion of your premium attributable to such coverage is shown in the Schedule of this endorsement or in the policy Declarations.

**B. Disclosure Of Federal Participation In Payment Of Terrorism Losses**

The United States Government, Department of the Treasury, will pay a share of terrorism losses insured under the federal program. The federal share equals 85% of that portion of the amount of such insured losses that exceeds the applicable insurer retention.

However, if aggregate insured losses attributable to terrorist acts certified under the Terrorism Risk Insurance Act exceed $100 billion in a Program Year (January 1 through December 31), the Treasury shall not make any payment for any portion of the amount of such losses that exceeds $100 billion.

**C. Cap On Insurer Participation In Payment Of Terrorism Losses**

If aggregate insured losses attributable to terrorist acts certified under the Terrorism Risk Insurance Act exceed $100 billion in a Program Year (January 1 through December 31) and we have met our insurer deductible under the Terrorism Risk Insurance Act, we shall not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion, and in such case insured losses up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of the Treasury.

Subject to Protective Order - Confidential                    BSAPolicyEv-00050967

TrustApp0582

# BANNER PAGE

**USER ID:** KMANDUJANO

**USER NAME:** Kristin Mandujano Leisure/Recr

**PRODUCT:** 335

**DIVISION:** Leisure

**DATE ACCEPTED:** 08/21/17 14:00:32

**INSURED:** KNOX TRAIL COUNCIL, INC. (SEE KR-SP-1)

**ENDORSEMENT NO :** 0000

**POLICY NO :** KKO0000021153300

**COPY FOR:**

**POLICY STATE:** MA

**EMAIL:** YES

Subject to Protective Order - Confidential

 insuring the world's fun ®

082617

BETH RILEY
USI COLORADO LLC
6501 SOUTH FIDDLERS GREEN CIR STE 100
GREENWOOD VILLAGE, CO 80111

Re:  Policy Number:  KKO0000021153300
KNOX TRAIL COUNCIL, INC. (SEE KR-SP-1)

Dear Beth,

Thank you for providing the opportunity for K&K Insurance to serve your client's insurance needs.

Enclosed is the insurance coverage document(s). Please carefully review the coverages, limits and exclusions and contact me immediately if changes or additions are necessary. An additional premium or a credit may occur for any changes.

Premium should be remitted to our office in accordance with the payment schedule upon which we have agreed.

Sincerely,

*Kim Fritz*

Kim Fritz
Senior Underwriter

Enclosure

1712 Magnavox Way, P.O. Box 2338
Fort Wayne, IN 46801-2338
800-637-4757 Fax: 260-459-5866
**www.kandkinsurance.com**
California License #0334819

COV6

BSAPolicyEv-00050969
TrustApp0584

BETH RILEY
USI COLORADO LLC
6501 SOUTH FIDDLERS GREEN CIR STE 100
GREENWOOD VILLAGE, CO 80111

THIS SIDE IS FOR MAILING PURPOSES ONLY.

Subject to Protective Order - Confidential

BSAPolicyEv-00050970

TrustApp0585



1712 Magnavox Way  PO Box 2338
Fort Wayne, IN 46801-2338
Phone: (800)237-2917
Fax:  Property & Casualty (312) 381-9079
Fax:  Participant Accident (312) 381-9077
www.kandkinsurance.com  CA #0334819

# INCIDENT REPORTING INSTRUCTIONS & EMERGENCY PROCEDURES

## EMERGENCY PROCEDURES

1. **ACTION:**  Follow your written plan and take appropriate care of all injured persons.

2. **NOTICE:** Incidents can happen anywhere. Advising K&K as soon as practical after an incident occurs surrounding your event, regardless of the location of the incident or whether or not you feel you are responsible for the bodily injury or property damage, is essential. If appropriate, an adjuster will be assigned immediately.

3. **STATEMENT:**  Do not make any statements regarding the cause of the accident. Give no opinions or conjectures to anyone other than your insurance company representative. **DO NOT ADMIT TO LIABILITY. DO NOT INFER OR PROMISE TO PAY.  Use only the acceptable statement: "The accident is under investigation," NOTHING MORE!**

4. **INVESTIGATION:**  Cooperate with your insurance company representative. Let this person make any and all conclusive investigations.

5. **WITNESSES:**  Secure names, addresses and phone numbers (home and work) of witnesses as soon as possible after the accident. NOTHING MORE!

6. **WAIVER & RELEASE:** (If required) If insured person was in restricted area, locate signed Waiver and Release immediately and store in safe place. Send to the insurance company only by request and by registered mail. Retain photocopy of Waiver and Release for your file.

7. **LOCAL AUTHORITIES:**  If the incident is investigated by local authorities, identify to K&K i.e. police, from what town, county and state.

8. **INCIDENT REPORT FORM:**  Complete all information required and available within 24 hours. Minimum information should include facility name and address, date of accident, victim's name, address and phone number; family name and phone number if fatality; and the signature of the person that completed form.

**Mail ASAP – nothing can be handled by the insuring company without this information.**

---

**REMEMBER: NOTIFY K&K OF ALL INCIDENTS, NOT JUST THOSE CATASTROPHIC IN NATURE.**

---

## PREPARE FOR EMERGENCIES

1. Have a qualified person designated to make ALL private, public or media statements. Make all personnel aware that only the designated statement person inquires about a loss.

2. Make a separate qualified person designated for all emergency medical, fire and security operations.

3. Have adequate personnel on site: security, medical, and fire protection services and equipment. "Adequate" means proper and prudent for your anticipated attendance and event activity.

4. Have backup personnel and equipment, including backup power sources, in place to maintain event integrity.

5. Have a written crisis management plan that addresses all "worst scenario" situations, including evacuation.

6. Train and practice all emergency procedures.

7. If policy wording requires it, have adequate supplies of Waiver and Release forms. Have adequate accident reporting forms on site. Those who must sign a Waiver and Release form are those persons practicing and/or participating in any athletic event sponsored by you, as well as anyone entering a restricted area, which is generally defined as any area where admittance to the general public is prohibited.

8. Have the name and number of your Insurance Contact posted prominently. In case of a major spectator loss or fatality, K&K's 24-hour number is 260-459-5000. Have one person responsible for this call. Call K&K direct; do not rely on a Broker, etc. to relay the call.

Page 1 of 1
1010 SD-10 4/09

Subject to Protective Order - Confidential



1712 Magnavox Way P.O. Box 2338
Fort Wayne, Indiana 46801
Ph (800) 237-2917
Fax (312) 381-9079
http://www.kandkinsurance.com

# K&K
# INCIDENT
# REPORT

## (PLEASE PRINT)

**NATURE** ○ BODILY INJURY ○ PROPERTY DAMAGE ○ OTHER: _____

**TIME & PLACE OF INCIDENT**
DATE: _____ TIME: _____ ○ AM ○ PM
EVENT NAME: _____
EVENT TYPE: _____ SANCTIONED BY: _____
LOCATION: _____

**HAPPENED TO**
NAME: _____ SSN: _____
DATE OF BIRTH: _____ SEX ○ Male ○ Female PHONE: ( )
ADDRESS: _____
CITY: _____ STATE: _____ ZIP: _____

**FUNCTION**
AS: ○ ATHLETE ○ PARTICIPANT ○ VOLUNTEER ○ SPECTATOR ○ BYSTANDER ○ OFFICIAL
○ OTHER: _____

**APPARENT INJURY OR DAMAGE**
BODY PART: _____
CONDITION: (Laceration, Concussion, Sprain, Fracture, Etc.): _____
○ ON-SITE CARE ONLY, BY (PHYSICIAN) (EMT) (TRAINER) OTHER: _____
○ AMBULANCE, TAKEN TO: _____ CITY: _____
○ FATALITY

**OCCASION**
WHAT WAS THE SITUATION AND EXACT LOCATION AT THE TIME OF THE INCIDENT? _____
_____
_____
_____
_____

**INCIDENT DESCRIPTION**
DESCRIBE WHAT HAPPENED: _____
_____
_____
_____
_____

**WITNESSES (If known)**
NAME: _____ NAME: _____
ADDRESS: _____ ADDRESS: _____
PHONE: ( ) PHONE: ( )

**INSURED**
NAME OF INSURED: _____ POLICY #: _____
CLUB NAME: _____ PHONE: ( )
CITY: _____ STATE: _____

**INSURED REPRESENTATIVE**
○ COACH ○ OFFICIAL ○ TRAINER ○ PROMOTER ○ TEAM/LEAGUE REPRESENTATIVE ○ OTHER: _____
NAME: _____ PHONE: ( )
TITLE: _____ ORGANIZATION: _____
SIGNATURE: _____ DATE: _____

## COMPLETE ALL SECTIONS AND FAX OR MAIL IMMEDIATELY TO:
## K&K INSURANCE GROUP, INC., P.O. BOX 2338, FORT WAYNE, IN 46801-2338
THIS FORM MUST INCLUDE THE INSURED NAME, POLICY NUMBER, AND SIGNATURE OF THE INSURED/REPRESENTATIVE
BEFORE RETURNING OR PROCESSING MAY BE DELAYED

(NON-PA)1029_3_12

Subject to Protective Order - Confidential

BSAPolicyEv-00050972
TrustApp0587

**APPLICABLE IN ALASKA**

A person who knowingly and with intent to injure, defraud, or deceive an insurance company files a claim containing false, incomplete, or misleading information may be prosecuted under state law.

**APPLICABLE IN ARIZONA**

For your protection, Arizona law requires the following statement to appear on this form. Any person who knowingly presents a false or fraudulent claim for payment of a loss is subject to criminal and civil penalties.

**APPLICABLE IN ARKANSAS, DELAWARE, KENTUCKY, LOUISIANA, MAINE, MICHIGAN, NEW JERSEY, NEW MEXICO, NEW YORK, NORTH DAKOTA, PENNSYLVANIA, SOUTH DAKOTA, TENNESSEE, TEXAS, VIRGINIA, AND WEST VIRGINIA**

Any person who knowingly and with intent to defraud any insurance company or another person, files a statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact, material thereto, commits a fraudulent insurance act, which is a crime, subject to criminal prosecution and [NY: substantial] civil penalties. In LA, ME, TN, and VA, insurance benefits may also be denied.

**APPLICABLE IN CALIFORNIA**

For your protection, California law requires the following to appear on this form: Any person who knowingly presents a false or fraudulent claim for payment of a loss is guilty of a crime and may be subject to fines and confinement in state prison.

**APPLICABLE IN COLORADO**

It is unlawful to knowingly provide false, incomplete, or misleading facts or information to an insurance company for the purpose of defrauding or attempting to defraud the company. Penalties may include imprisonment, fines, denial of insurance, and civil damages. Any insurance company or agent of an insurance company who knowingly provides false, incomplete, or misleading facts or information to a policy holder or claimant for the purpose of defrauding or attempting to defraud the policy holder or claimant with regard to a settlement or award payable from insurance proceeds shall be reported to the Colorado Division of Insurance within the Department of Regulatory Agencies.

**APPLICABLE IN THE DISTRICT OF COLUMBIA**

Warning: It is a crime to provide false or misleading information to an insurer for the purpose of defrauding the insurer or any other person. Penalties include imprisonment and/or fines.

**APPLICABLE IN FLORIDA**

Pursuant to §. 817.234, Florida Statutes, any person who, with the intent to injure, defraud, or deceive any insurer or insured, prepares, presents, or causes to be presented a proof of loss or estimate of cost or repair of damaged property in support of a claim under an insurance policy knowing that the proof of loss or estimate of claim or repairs contains any false, incomplete, or misleading information concerning any fact or thing material to the claim commits a felony of the third degree, punishable as provided in §. 775.082, §. 775.083, or §. 775.084, Florida Statutes.

**APPLICABLE IN HAWAII**

For your protection, Hawaii law requires you to be informed that presenting a fraudulent claim for payment of a loss or benefit is a crime punishable by fines or imprisonment, or both.

**APPLICABLE IN IDAHO**

Any person who knowingly and with the intent to injure, defraud, or deceive any insurance company files a statement of claim containing any false, incomplete or misleading information is guilty of a felony.

**APPLICABLE IN INDIANA**

A person who knowingly and with intent to defraud an insurer files a statement of claim containing any false, incomplete, or misleading information commits a felony.

**APPLICABLE IN MARYLAND**

Any person who knowingly and willfully presents a false or fraudulent claim for payment of a loss or benefit or who knowingly and willfully presents false information in an application for insurance is guilty of a crime and may be subject to fines and confinement in prison.

**APPLICABLE IN MINNESOTA**

A person who files a claim with intent to defraud or helps commit a fraud against an insurer is guilty of a crime.

**APPLICABLE IN NEVADA**

Pursuant to NRS 686A.291, any person who knowingly and willfully files a statement of claim that contains any false, incomplete or misleading information concerning a material fact is guilty of a felony.

**APPLICABLE IN NEW HAMPSHIRE**

Any person who, with purpose to injure, defraud or deceive any insurance company, files a statement of claim containing any false, incomplete or misleading information is subject to prosecution and punishment for insurance fraud, as provided in RSA 638:20.

**APPLICABLE IN OHIO**

Any person who, with intent to defraud or knowing that he/she is facilitating a fraud against an insurer, submits an application or files a claim containing a false or deceptive statement is guilty of insurance fraud.

**APPLICABLE IN OKLAHOMA**

WARNING: Any person who knowingly and with intent to injure, defraud or deceive any insurer, makes any claim for the proceeds of an insurance policy containing any false, incomplete or misleading information is guilty of a felony.

**APPLICABLE IN RHODE ISLAND**

Any person who knowingly presents a false or fraudulent claim for payment of a loss or benefit or knowingly presents false information in an application for insurance is guilty of a crime and may be subject to fines and confinement in prison.

**APPLICABLE IN WASHINGTON**

It is a crime to knowingly provide false, incomplete, or misleading information to an insurance company for the purpose of defrauding the company. Penalties include imprisonment, fines and denial of insurance benefits.

FRAUD CLAIMS (2010/02)

(NON-PA)1029_3_12

BSAPolicyEv-00050973

TrustApp0588



# Background Checks
## Helping you build a better team

**IntelliCorp is pleased to offer K&K Insurance clients the tools to help make responsible and informed hiring decisions. Our comprehensive background check services let you screen applicants to help minimize risk and determine the quality of your new hires.**

An easy-to-use interface provides you with quality and validated criminal results at discounted prices. Experience the difference of our support capabilities, which includes personalized customer service, training, and compliance. You also get the advantage of streamlined processes and paramount privacy and security when it comes to protecting sensitive information. IntelliCorp is a Verisk Analytics company, and has earned formal accreditation through the National Association of Professional Background Screeners (NAPBS).

### K&K Insurance Discounted Background Check Package
We've created the following cost-effective screening package to simplify your background check process. The package uses a combination of multiple sources of criminal record information. In addition, we validate database records by returning to the source to ensure that we have the latest updates regarding your applicant's history. This provides you with a comprehensive screen that helps answer your questions about a candidate's integrity, so you can select the right individuals for your team.

### Package Price: $16.00
- Validated Criminal Database
    - Validated Nationwide Sex Offender
    - Validated Department of Corrections
- Unlimited Single County Searches (7 year address history)*
- SSN Verification w/Address History
- Government Sanctions (Terrorist Search)

**Notes:**
*Some courts charge a mandatory fee. These are treated as pass-through fees to our clients and are clearly highlighted before processing the search.

### Package Add-Ons
In addition to the discounted background check package, you can add other products to your bundle or order individual searches from our sample product list below. This option is designed to meet your specific hiring requirements by allowing you to layer services for different positions as well as various levels of job responsibilities.

- Motor Vehicle Reports
- Employment Verifications
- Education Verifications
- Drug Testing

- I9
- E-Verify
- Credit Reports
- Civil Searches

### Program Benefits:
- Preferred pricing
- System & product training sessions
- Compliance information/online sample forms
- Personalized customer support
- Criminal product validation
- Secure online report ordering & retrieval

### Learn More:
IntelliCorp Sales
800-539-3717
sales@intellicorp.net
www.intellicorp.net

### To Sign-Up:
http://www.intellicorp.net/marketing/RegisterNow.aspx
Complete the first page of the registration process and enter Promotion Code **KKGROUP**.





1374 (01/16)

BSAPolicyEv-00050974
TrustApp0589



**National Casualty Company**



# POLICYHOLDER NOTICE
# JURISDICTIONAL BOILER AND PRESSURE VESSEL INSPECTIONS

If your policy includes Equipment Breakdown coverage for boilers or certain other pressure vessels, jurisdictional inspections may be required by law.

You, the insured, can request this jurisdictional inspection and/or get help with technical questions regarding all of the equipment directly from Hartford Steam Boiler Company by contacting:

**Hartford Steam Boiler's Inspection Hotline**

**Telephone: 1-800-333-INSP (4677)**

**Fax:**      **1-484-582-1811**

**E-mail:**    NSCINSP_HOTLINE@hsb.com

**Inspections will be scheduled promptly!**

NOTX0397CW (4-11)

BSAPolicyEv-00050975
TrustApp0590

# National Casualty Company

Home Office
Madison, Wisconsin
Administrative Office:
8877 North Gainey Center Drive • Scottsdale, Arizona 85258
1-800-423-7675
A STOCK COMPANY

## COMMON POLICY – DECLARATIONS

Policy No.    KKC0000021153300
Previous Policy No.   KKC0000020619800

**NAMED INSURED AND ADDRESS:**
KNOX TRAIL COUNCIL, INC. (SEE KR-SP-1)
2438 WASHINGTON STREET
CANTON, MA 02021

**PRODUCER'S NAME AND ADDRESS:**
**K&K Insurance**
**1712 Magnavox Way**
**P.O. Box 2338**
**Fort Wayne, IN  46801**

**POLICY PERIOD:** From    06/20/17    to    06/20/18
at 12:01 a.m. Standard Time at your mailing address shown above.
**Insurance is afforded by company indicated below:**
**(each a capital stock corporation.)**

( X ) NATIONAL CASUALTY COMPANY
**BUSINESS DESCRIPTION:** SCOUT COUNCILS

In return for the payment of the premium, and subject to all the terms of this policy, we agree with you to provide the insurance as stated in this policy.

This policy consists of the following coverage parts and separate policies for which a premium is indicated. This premium may be subject to adjustment.

PREMIUM



Commercial Property Coverage Part
Commercial General Liability Coverage Part
Commercial Inland Marine Coverage Part
Commercial Crime Coverage Part
Commercial Auto Coverage Part
Liquor Liability Coverage Part
Employee Benefits Liability
Errors and Omission Coverage Part
Employment-Related Practices Liability

Minimum Premium
TOTAL PREMIUM

**FORMS APPLICABLE TO ALL COVERAGE PARTS:**    UT-COVPG(01/08)    KR-SP-1(04/07)
IL0017(11/98)

**COUNTERSIGNED**    06/20/17
_____    **by:** _____
DATE                                          AUTHORIZED REPRESENTATIVE

**KR-D-1**                                                                                     **04/07**

Subject to Protective Order - Confidential

# National Casualty Company

Home Office:
Madison, Wisconsin
Administrative Office:
8877 North Gainey Center Drive • Scottsdale, Arizona 85258
1-800-423-7675
A STOCK COMPANY

In Witness Whereof, the Company has caused this policy to be executed and attested.

Secretary                              President

The information contained herein replaces any similar information contained elsewhere in the policy.

UT-COVPG (1-08)

**Policy No.** KKC0000021153300                                    **Declarations Extension**

The Named Insured, wherever it may appear throughout the policy, shall read as follows:

KNOX TRAIL COUNCIL, INC. BOY SCOUTS OF AMERICA

**KR-SP-1**                                                            **04/07**

Subject to Protective Order - Confidential
BSAPolicyEv-00050978

TrustApp0593

POLICY NUMBER: KKC0000021153300                                        IL 00 17 11 98

# COMMON POLICY CONDITIONS

All Coverage Parts included in this policy are subject to the following conditions.

## A. Cancellation

1. The first Named Insured shown in the Declarations may cancel this policy by mailing or delivering to us advance written notice of cancellation.

2. We may cancel this policy by mailing or delivering to the first Named Insured written notice of cancellation at least:

   a. 10 days before the effective date of cancellation if we cancel for nonpayment of premium; or

   b. 30 days before the effective date of cancellation if we cancel for any other reason.

3. We will mail or deliver our notice to the first Named Insured's last mailing address known to us.

4. Notice of cancellation will state the effective date of cancellation. The policy period will end on that date.

5. If this policy is cancelled, we will send the first Named Insured any premium refund due. If we cancel, the refund will be pro rata. If the first Named Insured cancels, the refund may be less than pro rata. The cancellation will be effective even if we have not made or offered a refund.

6. If notice is mailed, proof of mailing will be sufficient proof of notice.

## B. Changes

This policy contains all the agreements between you and us concerning the insurance afforded. The first Named Insured shown in the Declarations is authorized to make changes in the terms of this policy with our consent. This policy's terms can be amended or waived only by endorsement issued by us and made a part of this policy.

## C. Examination Of Your Books And Records

We may examine and audit your books and records as they relate to this policy at any time during the policy period and up to three years afterward.

## D. Inspections And Surveys

1. We have the right to:

   a. Make inspections and surveys at any time;

   b. Give you reports on the conditions we find; and

   c. Recommend changes.

2. We are not obligated to make any inspections, surveys, reports or recommendations and any such actions we do undertake relate only to insurability and the premiums to be charged. We do not make safety inspections. We do not undertake to perform the duty of any person or organization to provide for the health or safety of workers or the public. And we do not warrant that conditions:

   a. Are safe or healthful; or

   b. Comply with laws, regulations, codes or standards.

3. Paragraphs **1.** and **2.** of this condition apply not only to us, but also to any rating, advisory, rate service or similar organization which makes insurance inspections, surveys, reports or recommendations.

4. Paragraph **2.** of this condition does not apply to any inspections, surveys, reports or recommendations we may make relative to certification, under state or municipal statutes, ordinances or regulations, of boilers, pressure vessels or elevators.

## E. Premiums

The first Named Insured shown in the Declarations:

1. Is responsible for the payment of all premiums; and

2. Will be the payee for any return premiums we pay.

## F. Transfer Of Your Rights And Duties Under This Policy

Your rights and duties under this policy may not be transferred without our written consent except in the case of death of an individual named insured.

If you die, your rights and duties will be transferred to your legal representative but only while acting within the scope of duties as your legal representative. Until your legal representative is appointed, anyone having proper temporary custody of your property will have your rights and duties but only with respect to that property.

Subject to Protective Order - Confidential

BSAPolicyEv-00050979
TrustApp0594

**THE FOLLOWING INTERLINE FORMS APPLY TO THE COVERAGE PART IDENTIFIED:**

**FORM NUMBER**          **COVERAGE PART**

IL0021(09/08)            COMMERCIAL GENERAL LIABILITY

IL0985(01/08)            COMMERCIAL PROPERTY, COMMERCIAL INLAND MARINE

IL0953(01/08)            COMMERCIAL PROPERTY, COMMERCIAL INLAND MARINE

UT-131G(03/92)           COMMERCIAL GENERAL LIABILITY, COMMERCIAL PROPERTY, COMMERCIAL INLAND MARINE

**KR-SP-2**                                                      **04/07**

Subject to Protective Order - Confidential

KR-SP-2

04/07

Subject to Protective Order - Confidential                          BSAPolicyEv-00050981

TrustApp0596

POLICY NUMBER: KKO0000021153300                                      IL 00 21 09 08

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# NUCLEAR ENERGY LIABILITY EXCLUSION ENDORSEMENT
## (Broad Form)

This endorsement modifies insurance provided under the following:

COMMERCIAL AUTOMOBILE COVERAGE PART
COMMERCIAL GENERAL LIABILITY COVERAGE PART
FARM COVERAGE PART
LIQUOR LIABILITY COVERAGE PART
MEDICAL PROFESSIONAL LIABILITY COVERAGE PART
OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE PART
POLLUTION LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART
RAILROAD PROTECTIVE LIABILITY COVERAGE PART
UNDERGROUND STORAGE TANK POLICY

**1.** The insurance does not apply:

**A.** Under any Liability Coverage, to "bodily injury" or "property damage":

  **(1)** With respect to which an "insured" under the policy is also an insured under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters, Nuclear Insurance Association of Canada or any of their successors, or would be an insured under any such policy but for its termination upon exhaustion of its limit of liability; or

  **(2)** Resulting from the "hazardous properties" of "nuclear material" and with respect to which **(a)** any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof, or **(b)** the "insured" is, or had this policy not been issued would be, entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization.

**B.** Under any Medical Payments coverage, to expenses incurred with respect to "bodily injury" resulting from the "hazardous properties" of "nuclear material" and arising out of the operation of a "nuclear facility" by any person or organization.

**C.** Under any Liability Coverage, to "bodily injury" or "property damage" resulting from "hazardous properties" of "nuclear material", if:

  **(1)** The "nuclear material" **(a)** is at any "nuclear facility" owned by, or operated by or on behalf of, an "insured" or **(b)** has been discharged or dispersed therefrom;

  **(2)** The "nuclear material" is contained in "spent fuel" or "waste" at any time possessed, handled, used, processed, stored, transported or disposed of, by or on behalf of an "insured"; or

  **(3)** The "bodily injury" or "property damage" arises out of the furnishing by an "insured" of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any "nuclear facility", but if such facility is located within the United States of America, its territories or possessions or Canada, this exclusion **(3)** applies only to "property damage" to such "nuclear facility" and any property thereat.

**2.** As used in this endorsement:

"Hazardous properties" includes radioactive, toxic or explosive properties.

"Nuclear material" means "source material", "special nuclear material" or "by-product material".

IL 00 21 09 08                    © ISO Properties, Inc., 2007                    Page 1 of 2

Subject to Protective Order - Confidential                    BSAPolicyEv-00050982
TrustApp0597

"Source material", "special nuclear material", and "by-product material" have the meanings given them in the Atomic Energy Act of 1954 or in any law amendatory thereof.

"Spent fuel" means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a "nuclear reactor".

"Waste" means any waste material **(a)** containing "by-product material" other than the tailings or wastes produced by the extraction or concentration of uranium or thorium from any ore processed primarily for its "source material" content, and **(b)** resulting from the operation by any person or organization of any "nuclear facility" included under the first two paragraphs of the definition of "nuclear facility".

"Nuclear facility" means:

    **(a)** Any "nuclear reactor";

    **(b)** Any equipment or device designed or used for **(1)** separating the isotopes of uranium or plutonium, **(2)** processing or utilizing "spent fuel", or **(3)** handling, processing or packaging "waste";

    **(c)** Any equipment or device used for the processing, fabricating or alloying of "special nuclear material" if at any time the total amount of such material in the custody of the "insured" at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235;

    **(d)** Any structure, basin, excavation, premises or place prepared or used for the storage or disposal of "waste";

and includes the site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operations.

"Nuclear reactor" means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material.

"Property damage" includes all forms of radioactive contamination of property.

©ISO Properties, Inc., 2007

IL 00 21 09 08

Subject to Protective Order - Confidential

BSAPolicyEv-00050983
TrustApp0598

POLICY NUMBER: KKO0000021153300

IL 09 53 01 08

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# EXCLUSION OF CERTIFIED ACTS OF TERRORISM

This endorsement modifies insurance provided under the following:

BOILER AND MACHINERY COVERAGE PART
COMMERCIAL INLAND MARINE COVERAGE PART
COMMERCIAL PROPERTY COVERAGE PART
CRIME AND FIDELITY COVERAGE PART
EQUIPMENT BREAKDOWN COVERAGE PART
FARM COVERAGE PART
STANDARD PROPERTY POLICY

## SCHEDULE

The **Exception Covering Certain Fire Losses** (Paragraph **C**) applies to property located in the following state(s), if covered under the indicated Coverage Form, Coverage Part or Policy:

| State(s) | Coverage Form, Coverage Part Or Policy |
|---|---|
| California, Georgia, Hawaii, Iowa, Illinois, Maine, | |
| Massachusetts, Missouri, North Carolina, New Jersey, | See Interline form listing document behind Declarations. |
| New York, Oregon, Rhode Island, Washington, | |
| Wisconsin, West Virginia. | |
| | |
| Information required to complete this Schedule, if not shown above, will be shown in the Declarations. | |

**A.** The following definition is added with respect to the provisions of this endorsement.

"Certified act of terrorism" means an act that is certified by the Secretary of the Treasury, in concurrence with the Secretary of State and the Attorney General of the United States, to be an act of terrorism pursuant to the federal Terrorism Risk Insurance Act. The criteria contained in the Terrorism Risk Insurance Act for a "certified act of terrorism" include the following:

   **1.** The act resulted in insured losses in excess of $5 million in the aggregate, attributable to all types of insurance subject to the Terrorism Risk Insurance Act; and

   **2.** The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

**B.** The following exclusion is added:

**CERTIFIED ACT OF TERRORISM EXCLUSION**

We will not pay for loss or damage caused directly or indirectly by a "certified act of terrorism". Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss.

**C.** **Exception Covering Certain Fire Losses**

The following exception to the exclusion in Paragraph **B.** applies only if indicated and as indicated in the Schedule of this endorsement.

If a "certified act of terrorism" results in fire, we will pay for the loss or damage caused by that fire. Such coverage for fire applies only to direct loss or damage by fire to Covered Property. Therefore, for example, the coverage does not apply to insurance provided under Business Income and/or Extra Expense coverage forms or endorsements which apply to those forms, or to the Legal Liability Coverage Form or the Leasehold Interest Coverage Form.

IL 09 53 01 08

©ISO Properties, Inc., 2007

Page 1 of 2

Subject to Protective Order - Confidential

If aggregate insured losses attributable to terrorist acts certified under the Terrorism Risk Insurance Act exceed $100 billion in a Program Year (January 1 through December 31) and we have met our insurer deductible under the Terrorism Risk Insurance Act, we shall not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion, and in such case insured losses up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of the Treasury.

**D. Application Of Other Exclusions**

The terms and limitations of any terrorism exclusion, or the inapplicability or omission of a terrorism exclusion, do not serve to create coverage for any loss which would otherwise be excluded under this Coverage Part or Policy, such as losses excluded by the Nuclear Hazard Exclusion or the War And Military Action Exclusion.

Subject to Protective Order - Confidential

BSAPolicyEv-00050985

TrustApp0600

# National Casualty Company

**ENDORSEMENT NO.** 0000

| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE DATE (12:01 A.M. STANDARD TIME) | NAMED INSURED | AGENT NO. |
|---|---|---|---|
| KKO0000021153300 | 06/20/17 | KNOX TRAIL COUNCIL, INC. (SEE KR-SP-1) | |

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## ASBESTOS EXCLUSION

The coverage afforded by this policy does not apply to bodily injury, personal injury or property damage arising out of:

1. Inhaling, ingesting or prolonged physical exposure to asbestos or goods or products containing asbestos; or

2. The use of asbestos in construction or manufacturing any good, product or structure; or

3. The removal of asbestos from any good, product or structure; or

4. The manufacture, sale, transportation, storage or disposal of asbestos or goods or products containing asbestos.

The coverage afforded by the policy does not apply to payment for the investigation or defense of any loss, injury or damage or any cost, fine or penalty or for any expense of claim or suit related to any of the above.

_____
AUTHORIZED REPRESENTATIVE                    DATE

UT-131g (3-92)

# National Casualty Company

Home Office
Madison, Wisconsin
Administrative Office:
8877 North Gainey Center Drive • Scottsdale, Arizona 85258
1-800-423-7675
A STOCK COMPANY

**Commercial Property Coverage
Part - Declarations**

Policy No.  KKC0000021153300

**EFFECTIVE DATE**  06/20/17

Replacement  No.  KKC0000020619800

☐  "X" if Supplemental Declarations is attached.

**NAMED INSURED:**  KNOX TRAIL COUNCIL, INC. (SEE KR-SP-1)

## DESCRIPTION OF PREMISES

| PREM. NO. | BLDG. NO. | LOCATION, CONSTRUCTION AND OCCUPANCY |
|---|---|---|
| 0001 | 1 | CUTTERFIELD ROAD, PLYMOUTH, MA 02360 - FRAME - DINING HALL |
| | 2 | FRAME - TRADING POST |
| | 3 | FRAME - ADMIN BLDG / HEALTH LODGE |
| | 4 | FRAME - SHOWER HOUSE |
| | 5 | FRAME - HANDICRAFT BUILDING |

**COVERAGES PROVIDED**  Insurance at the described premises applies only for coverages for which a Limit of Insurance is shown.
(See Reverse For Explanation of Codes)

| PREM. NO. | BLDG.NO. | COVERAGE | LIMIT OF INSURANCE | COVERED CAUSES OF LOSS | COINSURANCE* | RATES |
|---|---|---|---|---|---|---|
| 1-12 | | BLK BI/EE/RV | $ 883,500 | SPECIAL | 90% | Incl. |
| 1-12 | ** | BLKT BPP | $1,512,485 | SPECIAL | 90% | Incl. |
| 1 | 1-29 | BLKT B | $3,776,764 | SPECIAL | 90% | Incl. |
| 2 | 1 | BLKT B | $ 153,000 | SPECIAL | 90% | Incl. |
| 3 | 1-25 | BLKT B | $2,710,002 | SPECIAL | 90% | Incl. |

* If Extra Expense Coverage, limits on Loss Payment

**OPTIONAL COVERAGES**  Applicable only when entries are made in the schedule below.

| | | | AGREED VALUE | | REPLACEMENT COST  (X) | | |
|---|---|---|---|---|---|---|---|
| PREM. NO. | BLDG.NO. | EXP. DATE | COVERAGE | AMOUNT | BUILDING | PERSONAL PROPERTY | INCL. "STOCK" |
| 1-12 | | 06/20/18 | BLK BI/EE/RV | $ 883,500 | | | |
| 1-12 | ** | 06/20/18 | BLKT BPP | $1,512,485 | | X | |
| 1 | 1-29 | 06/20/18 | BLKT B | $3,776,764 | X | | |
| 2 | 1 | 06/20/18 | BLKT B | $ 153,000 | X | | |
| 3 | 1-25 | 06/20/18 | BLKT B | $2,710,002 | X | | |

| INFLATION GUARD (%) | | *MONTHLY LIMIT OF | *MAXIMUM PERIOD | *EXTENDED PERIOD |
|---|---|---|---|---|
| BUILDING | PERSONAL PROPERTY | INDEMNITY (Fraction) | OF INDEMNITY (X) | OF INDEMNITY (Days) |

*Applies to business income only.

KR-PROP-D-1

10/11

Subject to Protective Order - Confidential

## MORTGAGE HOLDERS

| PREM. NO. | BLDG. NO. | MORTGAGE HOLDER NAME AND MAILING ADDRESS |
|-----------|-----------|-------------------------------------------|

### PREMIUM

Premium    $ 

### DEDUCTIBLE

The deductible is    $    5,000

**Exceptions:**        Building
               Business Personal Property
       $    250    Plus Form/Advantage Plus Form

When multiple deductibles apply the larger will prevail.

### FORMS APPLICABLE TO ALL COVERAGES

| | | | | |
|---|---|---|---|---|
| KR-PROP-SP-1(04/07) | KR-PROP-SP-2(04/07) | CP0090(07/88) | CP0010(10/12) | CP1030(10/12) |
| CP0030(10/12) | CP0176(09/06) | CP0411(10/12) | KR-PROP-12(03/15) | KR-PROP-2(10/11) |
| CP1218(10/12) | CP1525(10/12) | CP1532(06/07) | KR-PROP-19(10/11) | KR-PROP-23(01/14) |
| CM0066(01/13) | IH0075(06/14) | IH7502(12/13) | IH0074(12/13) | KR-IM-10(02/15) |
| CR0021(08/13) | CP0109(10/00) | | | |

### FORMS APPLICABLE TO SPECIFIC PREMISES / COVERAGES

| PREM. NO. | BLDG. NO. | COVERAGES | FORM NUMBER |
|-----------|-----------|-----------|-------------|

### COVERAGE KEY

| | | | | | |
|---|---|---|---|---|---|
| BI/EE/RV | = | Business Income (and Extra Expense) including Rental Value | LLBLDG | = | Legal Liability Real Property |
| BI/EE | = | Business Income (and Extra Expense) other than Rental Value | EE | = | Extra Expense |
| | | | B | = | Building |
| RV | = | Rental Value | B & BPP | = | Blanket Building and Business Personal Property |
| BI/RV Value | = | Business Income (without Extra Expense) including Rental Value | BPP | = | Business Personal Property |
| | | | BIDEP | = | Business Income from Dependent Properties |
| BI | = | Business Income (without Extra Expense) other than Rental Value | TIB | = | Tenants Improvements and Betterments |
| | | | PPO | = | Personal Property of Others |
| LEASEHOLD | = | Leaseholder Interest | LLBPP | = | Legal Liability Personal Property |

**KR-PROP-D-1**

**10/11**

Subject to Protective Order - Confidential

# National Casualty Company

Home Office
Madison, Wisconsin
Administrative Office:
8877 North Gainey Center Drive • Scottsdale, Arizona 85258
1-800-423-7675
A STOCK COMPANY

**Commercial Property Coverage
Declarations Extension – Part A**

Policy No. KKC0000021153300

**NAMED INSURED AND ADDRESS:**                             **EFFECTIVE DATE:** 06/20/17

KNOX TRAIL COUNCIL, INC. (SEE KR-SP-1)
2438 WASHINGTON STREET
CANTON, MA 02021

## DESCRIPTION OF PREMISES

| PREM. NO. | BLDG. NO. | LOCATION, CONSTRUCTION AND OCCUPANCY |
|---|---|---|
| 0001 | 6 | FRAME - BLACKFOOT CABIN |
| | 7 | FRAME - DAKOTA CABIN |
| | 8 | FRAME - LYONS NATURE CENTER |
| | 9 | FRAME - CHAPEL |
| | 10 | FRAME - JEFFERSON |
| | 11-29 | ** |
| 0002 | 1 | 2438 WASHINGTON STREET, CANTON, MA 02021 ** |
| 0003 | 1-25 | 75 & 129 HUDSON ROAD, BOLTON, MA 01740 ** |
| 0004 | 1 | 67 NOBSCOT ROAD, SUDBURY, MA 01776 ** |
| 0005 | 1 | 69 NOBSCOT ROAD, SUDBURY, MA 01776 ** |
| 0006 | 1 | 71 NOBSCOT ROAD, SUDBURY, MA 01776 ** |
| 0007 | 1 | 73 NOBSCOT ROAD, SUDBURY, MA 01776 ** |
| 0008 | 1-5 | EDGELL ROAD, FRAMINGHAM, MA 01701 ** |

## COVERAGES PROVIDED    Insurance at the described premises applies only for coverages for which a Limit of Insurance is shown.

| PREM. NO. | BLDG. NO. | COVERAGE | LIMIT OF INSURANCE | COVERED CAUSES OF LOSS | COINSURANCE* | RATES |
|---|---|---|---|---|---|---|
| 4 | 1 | BLKT B | $ 114,566 | SPECIAL | 90% | Incl. |
| 5 | 1 | BLKT B | $ 107,792 | SPECIAL | 90% | Incl. |
| 6 | 1 | BLKT B | $ 96,445 | SPECIAL | 90% | Incl. |
| 7 | 1 | BLKT B | $ 107,626 | SPECIAL | 90% | Incl. |
| 8 | 1-5 | BLKT B | $ 667,005 | SPECIAL | 90% | Incl. |
| 9 | 1-7 | BLKT B | $ 445,915 | SPECIAL | 90% | Incl. |
| 10 | 1 | BLKT B | $ 907,718 | SPECIAL | 90% | Incl. |
| 11 | 1 | BLKT B | $ 300,000 | SPECIAL | 90% | Incl. |
| | | | | | | Incl. |
| | | | | | | Incl. |
| | | | | | | Incl. |
| | | | | | | Incl. |
| | | | | | | Incl. |

*If Extra Expense Coverage, limits in Loss Payment

**NOTE: Commercial Property Coverage Declarations Extension - Part B must be attached to this extension.**

KR-PROP-SP-1                                                                04/07

# National Casualty Company

Home Office
Madison, Wisconsin
Administrative Office:
8877 North Gainey Center Drive • Scottsdale, Arizona 85258
1-800-423-7675
A STOCK COMPANY

**Commercial Property Coverage
Declarations Extension – Part A**

**Policy No.** KKC0000021153300

**NAMED INSURED AND ADDRESS:**

**EFFECTIVE DATE:** 06/20/17

KNOX TRAIL COUNCIL, INC. (SEE KR-SP-1)
2438 WASHINGTON STREET
CANTON, MA 02021

## DESCRIPTION OF PREMISES

| PREM. NO. | BLDG. NO. | LOCATION, CONSTRUCTION AND OCCUPANCY |
|-----------|-----------|--------------------------------------|
| 0009 | 1-7 | EDGELL ROAD, FRAMINGHAM, MA 01701 ** |
| 0010 | 1 | 490 UNION AVENUE, FRAMINGHAM, MA 01701 ** |
| 0011 | 1 | 79 HUDSON STREET, BOLTON, MA 01740 ** |
| 0012 | 1 | 2 MOUNT ROYAL AVENUE, MARLBOROUGH, MA 01752 ** |

**COVERAGES PROVIDED** Insurance at the described premises applies only for coverages for which a Limit of Insurance is shown.

| PREM. NO. | BLDG. NO. | COVERAGE | LIMIT OF INSURANCE | COVERED CAUSES OF LOSS | COINSURANCE* | RATES |
|-----------|-----------|----------|--------------------|-----------------------|--------------|-------|
| | | | | | | Incl. |
| | | | | | | Incl. |
| | | | | | | Incl. |
| | | | | | | Incl. |
| | | | | | | Incl. |
| | | | | | | Incl. |
| | | | | | | Incl. |
| | | | | | | Incl. |
| | | | | | | Incl. |
| | | | | | | Incl. |
| | | | | | | Incl. |
| | | | | | | Incl. |

*If Extra Expense Coverage, limits in Loss Payment

**NOTE:  Commercial Property Coverage Declarations Extension - Part B must be attached to this extension.**

**KR-PROP-SP-1**                                                                                          **04/07**

BSAPolicyEv-00050990
TrustApp0605

# National Casualty Company

Home Office
Madison, Wisconsin
Administrative Office:
8877 North Gainey Center Drive • Scottsdale, Arizona 85258
1-800-423-7675
A STOCK COMPANY

**Commercial Property Coverage
Declarations Extension – Part B**

Policy No.  KKC0000021153300

**NAMED INSURED:** KNOX TRAIL COUNCIL, INC. (SEE KR-SP-1)          **EFFECTIVE DATE:** 06/20/17

## OPTIONAL COVERAGES    Applicable only when entries are made in the schedule below.

| | | | AGREED VALUE | | REPLACEMENT COST | (X) | |
| PREM. NO. | BLDG. NO. | EXPIRATION DATE | COVERAGE | AMOUNT | BUILDING | PERSONAL PROPERTY | INCLUDING "STOCK" |
|---|---|---|---|---|---|---|---|
| 0004 | 1 | 06/20/18 | BLKT B | $114,566 | X | | |
| 0005 | 1 | 06/20/18 | BLKT B | $107,792 | X | | |
| 0006 | 1 | 06/20/18 | BLKT B | $ 96,445 | X | | |
| 0007 | 1 | 06/20/18 | BLKT B | $107,626 | X | | |
| 0008 | 1-5 | 06/20/18 | BLKT B | $667,005 | X | | |
| 0009 | 1-7 | 06/20/18 | BLKT B | $445,915 | X | | |
| 0010 | 1 | 06/20/18 | BLKT B | $907,718 | X | | |
| 0011 | 1 | 06/20/18 | BLKT B | $300,000 | X | | |

| INFLATION GUARD (%) | | *MONTHLY LIMIT OF INDEMNITY (Fraction) | *MAXIMUM PERIOD OF INDEMNITY (X) | *EXTENDED PERIOD OF INDEMNITY (Days) |
| BUILDING | PERSONAL PROPERTY | | | |
|---|---|---|---|---|
| | | | | |

*Applies to business income only.

**MORTGAGE HOLDERS**

| PREM. NO. | BLDG. NO. | MORTGAGE HOLDER NAME AND MAILING ADDRESS |
|---|---|---|
| | | |

**DEDUCTIBLE:**  The deductible is $    5,000 . Exceptions  (See form KR-PROP-D-1)

**FORMS APPLICABLE TO ALL COVERAGES:** (See form KR-PROP-D-1)

**FORMS APPLICABLE TO SPECIFIC PREMISES COVERAGES:**

| PREM. NO. | BLDG. NO. | COVERAGES | FORM NO. |
|---|---|---|---|
| | | | |

**NOTE:  Commercial Property Coverage Declarations Extension - Part A must be attached to this extension.**

KR-PROP-SP-2                                                                            04/07

Subject to Protective Order - Confidential

BSAPolicyEv-00050991
TrustApp0606

**POLICY NUMBER:** KKO0000021153300                                  CP 00 90 07 88

# COMMERCIAL PROPERTY CONDITIONS

This Coverage Part is subject to the following conditions, the Common Policy Conditions and applicable Loss Conditions and Additional Conditions in Commercial Property Coverage Forms.

## A. CONCEALMENT, MISREPRESENTATION OR FRAUD

This Coverage Part is void in any case of fraud by you as it relates to this Coverage Part at any time. It is also void if you or any other insured, at any time, intentionally conceal a misrepresent a material fact concerning:

1. This Coverage Part;
2. The Covered Property;
3. Your interest in the Covered Property; or
4. A claim under this Coverage Part.

## B. CONTROL OF PROPERTY

Any act or neglect of any person other than you beyond your direction or control will not affect this insurance.

The breach of any condition of this Coverage Part at any one or locations will not affect coverage at any location here, at the time of loss or damage, the breach of condition does not exist.

## C. INSURANCE UNDER TWO OR MORE COVERAGES

If two or more of this policy's coverages apply to the same loss or damage, we will not pay more than the actual amount of the loss or damage.

## D. LEGAL ACTION AGAINST US

No one may bring a legal action against us under this Coverage Part unless:

1. There has been full compliance with all of the terms of this Coverage Part; and
2. The action is brought within 2 years after the date on which the direct physical loss or damage occurred.

## E. LIBERALIZATION

If we adopt any revision that would broaden the coverage under this Coverage Part without additional premium within 45 days prior to or during the policy period, the broadened coverage will immediately apply to this Coverage Part.

## F. NO BENEFIT TO BAILEE

No person or organization, other than you, having custody of Covered Property will benefit from this insurance.

## G. OTHER INSURANCE

1. You may have other insurance subject to the same plans, terms, conditions and provisions as the insurance under this Coverage Part. If you do,

we will pay our share of the covered loss or damage. Our share is the proportion that the applicable Limit of Insurance under this Coverage Part bears to the Limits of Insurance of all insurance covering on the same basis.

2. If there is other insurance covering the same loss or damage, other than that described in 1. above, we will pay only for the amount of covered loss or damage in excess of the amount due from that other insurance, whether you can collect on it or not. But we will not pay more than the applicable Limit of Insurance.

## H. POLICY PERIOD, COVERAGE TERRITORY

Under this Coverage Part:

1. We cover loss or damage commencing:
   a. During the policy period shown in the Declarations; and
   b. Within the coverage territory.
2. The coverage territory is:
   a. The United States of America (including its territories and possessions);
   b. Puerto Rico; and
   c. Canada.

## I. TRANSFER OF RIGHTS OF RECOVERY AGAINST OTHERS TO US

If any person or organization to or for whom we make payment under this Coverage Part has rights to recover damages from another, those rights are transferred to us to the extent of our payment. That person or organization must do everything necessary to secure our rights and must do nothing after loss to impair them. But you may waive your rights against another party in writing:

1. Prior to a loss to your Covered Property or Covered Income.
2. After a loss to your Covered Property or Covered Income only if, at time of loss, that party is one of the following:
   a. Someone insured by this insurance;
   b. A business firm:
      (1) Owned or controlled by you; or
      (2) That owns or controls you; or
   c. Your tenant.

This will not restrict your insurance.

Copyright, ISO Commercial Risk Services, Inc., 1983, 1987

Subject to Protective Order - Confidential

POLICY NUMBER: KKO0000021153300

COMMERCIAL PROPERTY
CP 00 10 10 12

# BUILDING AND PERSONAL PROPERTY
## COVERAGE FORM

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this policy, the words "you" and "your" refer to the Named Insured shown in the Declarations. The words "we", "us" and "our" refer to the company providing this insurance.

Other words and phrases that appear in quotation marks have special meaning. Refer to Section **H.** Definitions.

## A. Coverage

We will pay for direct physical loss of or damage to Covered Property at the premises described in the Declarations caused by or resulting from any Covered Cause of Loss.

### 1. Covered Property

Covered Property, as used in this Coverage Part, means the type of property described in this section, **A.1.,** and limited in **A.2.** Property Not Covered, if a Limit Of Insurance is shown in the Declarations for that type of property.

**a. Building,** meaning the building or structure described in the Declarations, including:

**(1)** Completed additions;

**(2)** Fixtures, including outdoor fixtures;

**(3)** Permanently installed:

**(a)** Machinery; and

**(b)** Equipment;

**(4)** Personal property owned by you that is used to maintain or service the building or structure or its premises, including:

**(a)** Fire-extinguishing equipment;

**(b)** Outdoor furniture;

**(c)** Floor coverings; and

**(d)** Appliances used for refrigerating, ventilating, cooking, dishwashing or laundering;

**(5)** If not covered by other insurance:

**(a)** Additions under construction, alterations and repairs to the building or structure;

**(b)** Materials, equipment, supplies and temporary structures, on or within 100 feet of the described premises, used for making additions, alterations or repairs to the building or structure.

**b. Your Business Personal Property** consists of the following property located in or on the building or structure described in the Declarations or in the open (or in a vehicle) within 100 feet of the building or structure or within 100 feet of the premises described in the Declarations, whichever distance is greater:

**(1)** Furniture and fixtures;

**(2)** Machinery and equipment;

**(3)** "Stock";

**(4)** All other personal property owned by you and used in your business;

**(5)** Labor, materials or services furnished or arranged by you on personal property of others;

**(6)** Your use interest as tenant in improvements and betterments. Improvements and betterments are fixtures, alterations, installations or additions:

**(a)** Made a part of the building or structure you occupy but do not own; and

**(b)** You acquired or made at your expense but cannot legally remove;

**(7)** Leased personal property for which you have a contractual responsibility to insure, unless otherwise provided for under Personal Property Of Others.

**c. Personal Property Of Others** that is:

**(1)** In your care, custody or control; and

**(2)** Located in or on the building or structure described in the Declarations or in the open (or in a vehicle) within 100 feet of the building or structure or within 100 feet of the premises described in the Declarations, whichever distance is greater.

CP 00 10 10 12      © Insurance Services Office, Inc., 2011      Page 1 of 14

Subject to Protective Order - Confidential

Subject to Protective Order - Confidential

BSAPolicyEv-00050994

TrustApp0609

## 4. Additional Coverages

### a. Debris Removal

**(1)** Subject to Paragraphs **(2)**, **(3)** and **(4)**, we will pay your expense to remove debris of Covered Property and other debris that is on the described premises, when such debris is caused by or results from a Covered Cause of Loss that occurs during the policy period. The expenses will be paid only if they are reported to us in writing within 180 days of the date of direct physical loss or damage.

**(2)** Debris Removal does not apply to costs to:

**(a)** Remove debris of property of yours that is not insured under this policy, or property in your possession that is not Covered Property;

**(b)** Remove debris of property owned by or leased to the landlord of the building where your described premises are located, unless you have a contractual responsibility to insure such property and it is insured under this policy;

**(c)** Remove any property that is Property Not Covered, including property addressed under the Outdoor Property Coverage Extension;

**(d)** Remove property of others of a type that would not be Covered Property under this Coverage Form;

**(e)** Remove deposits of mud or earth from the grounds of the described premises;

**(f)** Extract "pollutants" from land or water; or

**(g)** Remove, restore or replace polluted land or water.

**(3)** Subject to the exceptions in Paragraph **(4)**, the following provisions apply:

**(a)** The most we will pay for the total of direct physical loss or damage plus debris removal expense is the Limit of Insurance applicable to the Covered Property that has sustained loss or damage.

**(b)** Subject to **(a)** above, the amount we will pay for debris removal expense is limited to 25% of the sum of the deductible plus the amount that we pay for direct physical loss or damage to the Covered Property that has

sustained loss or damage. However, if no Covered Property has sustained direct physical loss or damage, the most we will pay for removal of debris of other property (if such removal is covered under this Additional Coverage) is $5,000 at each location.

**(4)** We will pay up to an additional $25,000 for debris removal expense, for each location, in any one occurrence of physical loss or damage to Covered Property, if one or both of the following circumstances apply:

**(a)** The total of the actual debris removal expense plus the amount we pay for direct physical loss or damage exceeds the Limit of Insurance on the Covered Property that has sustained loss or damage.

**(b)** The actual debris removal expense exceeds 25% of the sum of the deductible plus the amount that we pay for direct physical loss or damage to the Covered Property that has sustained loss or damage.

Therefore, if **(4)(a)** and/or **(4)(b)** applies, our total payment for direct physical loss or damage and debris removal expense may reach but will never exceed the Limit of Insurance on the Covered Property that has sustained loss or damage, plus $25,000.

**(5) Examples**

The following examples assume that there is no Coinsurance penalty.

**Example 1**

| | |
|---|---|
| Limit of Insurance: | $ 90,000 |
| Amount of Deductible: | $ 500 |
| Amount of Loss: | $ 50,000 |
| Amount of Loss Payable: | $ 49,500 |
| | ($50,000 – $500) |
| Debris Removal Expense: | $ 10,000 |
| Debris Removal Expense Payable: | $ 10,000 |
| ($10,000 is 20% of $50,000.) | |

The debris removal expense is less than 25% of the sum of the loss payable plus the deductible. The sum of the loss payable and the debris removal expense ($49,500 + $10,000 = $59,500) is less than the Limit of Insurance. Therefore, the full amount of debris removal expense is payable in accordance with the terms of Paragraph **(3)**.

Subject to Protective Order - Confidential    BSAPolicyEv-00050995
TrustApp0610

**Example 2**

| | | |
|---|---|---|
| Limit of Insurance: | $ | 90,000 |
| Amount of Deductible: | $ | 500 |
| Amount of Loss: | $ | 80,000 |
| Amount of Loss Payable: | $ | 79,500 |
| | ($80,000 – $500) | |
| Debris Removal Expense: | $ | 40,000 |
| Debris Removal Expense Payable | | |
| Basic Amount: | $ | 10,500 |
| Additional Amount: | $ | 25,000 |

The basic amount payable for debris removal expense under the terms of Paragraph **(3)** is calculated as follows: $80,000 ($79,500 + $500) x .25 = $20,000, capped at $10,500. The cap applies because the sum of the loss payable ($79,500) and the basic amount payable for debris removal expense ($10,500) cannot exceed the Limit of Insurance ($90,000).

The additional amount payable for debris removal expense is provided in accordance with the terms of Paragraph **(4)**, because the debris removal expense ($40,000) exceeds 25% of the loss payable plus the deductible ($40,000 is 50% of $80,000), and because the sum of the loss payable and debris removal expense ($79,500 + $40,000 = $119,500) would exceed the Limit of Insurance ($90,000). The additional amount of covered debris removal expense is $25,000, the maximum payable under Paragraph **(4)**. Thus, the total payable for debris removal expense in this example is $35,500; $4,500 of the debris removal expense is not covered.

**b. Preservation Of Property**

If it is necessary to move Covered Property from the described premises to preserve it from loss or damage by a Covered Cause of Loss, we will pay for any direct physical loss or damage to that property:

**(1)** While it is being moved or while temporarily stored at another location; and

**(2)** Only if the loss or damage occurs within 30 days after the property is first moved.

**c. Fire Department Service Charge**

When the fire department is called to save or protect Covered Property from a Covered Cause of Loss, we will pay up to $1,000 for service at each premises described in the Declarations, unless a higher limit is shown in the Declarations. Such limit is the most we will pay regardless of the number of responding fire departments or fire units, and regardless of the number or type of services performed.

This Additional Coverage applies to your liability for fire department service charges:

**(1)** Assumed by contract or agreement prior to loss; or

**(2)** Required by local ordinance.

No Deductible applies to this Additional Coverage.

**d. Pollutant Clean-up And Removal**

We will pay your expense to extract "pollutants" from land or water at the described premises if the discharge, dispersal, seepage, migration, release or escape of the "pollutants" is caused by or results from a Covered Cause of Loss that occurs during the policy period. The expenses will be paid only if they are reported to us in writing within 180 days of the date on which the Covered Cause of Loss occurs.

This Additional Coverage does not apply to costs to test for, monitor or assess the existence, concentration or effects of "pollutants". But we will pay for testing which is performed in the course of extracting the "pollutants" from the land or water.

The most we will pay under this Additional Coverage for each described premises is $10,000 for the sum of all covered expenses arising out of Covered Causes of Loss occurring during each separate 12-month period of this policy.

**e. Increased Cost Of Construction**

**(1)** This Additional Coverage applies only to buildings to which the Replacement Cost Optional Coverage applies.

**(2)** In the event of damage by a Covered Cause of Loss to a building that is Covered Property, we will pay the increased costs incurred to comply with the minimum standards of an ordinance or law in the course of repair, rebuilding or replacement of damaged parts of that property, subject to the limitations stated in **e.(3)** through **e.(9)** of this Additional Coverage.

**(3)** The ordinance or law referred to in **e.(2)** of this Additional Coverage is an ordinance or law that regulates the construction or repair of buildings or establishes zoning or land use requirements at the described premises and is in force at the time of loss.

**(4)** Under this Additional Coverage, we will not pay any costs due to an ordinance or law that:

**(a)** You were required to comply with before the loss, even when the building was undamaged; and

Subject to Protective Order - Confidential

BSAPolicyEv-00050996

TrustApp0611

**(b)** You failed to comply with.

**(5)** Under this Additional Coverage, we will not pay for:

**(a)** The enforcement of or compliance with any ordinance or law which requires demolition, repair, replacement, reconstruction, remodeling or remediation of property due to contamination by "pollutants" or due to the presence, growth, proliferation, spread or any activity of "fungus", wet or dry rot or bacteria; or

**(b)** Any costs associated with the enforcement of or compliance with an ordinance or law which requires any insured or others to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of "pollutants", "fungus", wet or dry rot or bacteria.

**(6)** The most we will pay under this Additional Coverage, for each described building insured under this Coverage Form, is $10,000 or 5% of the Limit of Insurance applicable to that building, whichever is less. If a damaged building is covered under a blanket Limit of Insurance which applies to more than one building or item of property, then the most we will pay under this Additional Coverage, for that damaged building, is the lesser of $10,000 or 5% times the value of the damaged building as of the time of loss times the applicable Coinsurance percentage.

The amount payable under this Additional Coverage is additional insurance.

**(7)** With respect to this Additional Coverage:

**(a)** We will not pay for the Increased Cost of Construction:

**(i)** Until the property is actually repaired or replaced at the same or another premises; and

**(ii)** Unless the repair or replacement is made as soon as reasonably possible after the loss or damage, not to exceed two years. We may extend this period in writing during the two years.

**(b)** If the building is repaired or replaced at the same premises, or if you elect to rebuild at another premises, the most we will pay for the Increased Cost of Construction, subject to the provisions of **e.(6)** of this Additional Coverage, is

the increased cost of construction at the same premises.

**(c)** If the ordinance or law requires relocation to another premises, the most we will pay for the Increased Cost of Construction, subject to the provisions of **e.(6)** of this Additional Coverage, is the increased cost of construction at the new premises.

**(8)** This Additional Coverage is not subject to the terms of the Ordinance Or Law Exclusion to the extent that such Exclusion would conflict with the provisions of this Additional Coverage.

**(9)** The costs addressed in the Loss Payment and Valuation Conditions and the Replacement Cost Optional Coverage, in this Coverage Form, do not include the increased cost attributable to enforcement of or compliance with an ordinance or law. The amount payable under this Additional Coverage, as stated in **e.(6)** of this Additional Coverage, is not subject to such limitation.

**f. Electronic Data**

**(1)** Under this Additional Coverage, electronic data has the meaning described under Property Not Covered, Electronic Data. This Additional Coverage does not apply to your "stock" of prepackaged software, or to electronic data which is integrated in and operates or controls the building's elevator, lighting, heating, ventilation, air conditioning or security system.

**(2)** Subject to the provisions of this Additional Coverage, we will pay for the cost to replace or restore electronic data which has been destroyed or corrupted by a Covered Cause of Loss. To the extent that electronic data is not replaced or restored, the loss will be valued at the cost of replacement of the media on which the electronic data was stored, with blank media of substantially identical type.

**(3)** The Covered Causes of Loss applicable to Your Business Personal Property apply to this Additional Coverage, Electronic Data, subject to the following:

**(a)** If the Causes Of Loss – Special Form applies, coverage under this Additional Coverage, Electronic Data, is limited to the "specified causes of loss" as defined in that form and Collapse as set forth in that form.

Subject to Protective Order - Confidential

BSAPolicyEv-00050997

TrustApp0612

**(b)** If the Causes Of Loss – Broad Form applies, coverage under this Additional Coverage, Electronic Data, includes Collapse as set forth in that form.

**(c)** If the Causes Of Loss form is endorsed to add a Covered Cause of Loss, the additional Covered Cause of Loss does not apply to the coverage provided under this Additional Coverage, Electronic Data.

**(d)** The Covered Causes of Loss include a virus, harmful code or similar instruction introduced into or enacted on a computer system (including electronic data) or a network to which it is connected, designed to damage or destroy any part of the system or disrupt its normal operation. But there is no coverage for loss or damage caused by or resulting from manipulation of a computer system (including electronic data) by any employee, including a temporary or leased employee, or by an entity retained by you or for you to inspect, design, install, modify, maintain, repair or replace that system.

**(4)** The most we will pay under this Additional Coverage, Electronic Data, is $2,500 (unless a higher limit is shown in the Declarations) for all loss or damage sustained in any one policy year, regardless of the number of occurrences of loss or damage or the number of premises, locations or computer systems involved. If loss payment on the first occurrence does not exhaust this amount, then the balance is available for subsequent loss or damage sustained in but not after that policy year. With respect to an occurrence which begins in one policy year and continues or results in additional loss or damage in a subsequent policy year(s), all loss or damage is deemed to be sustained in the policy year in which the occurrence began.

**5. Coverage Extensions**

Except as otherwise provided, the following Extensions apply to property located in or on the building described in the Declarations or in the open (or in a vehicle) within 100 feet of the described premises.

If a Coinsurance percentage of 80% or more, or a Value Reporting period symbol, is shown in the Declarations, you may extend the insurance provided by this Coverage Part as follows:

**a. Newly Acquired Or Constructed Property**

**(1) Buildings**

If this policy covers Building, you may extend that insurance to apply to:

**(a)** Your new buildings while being built on the described premises; and

**(b)** Buildings you acquire at locations, other than the described premises, intended for:

**(i)** Similar use as the building described in the Declarations; or

**(ii)** Use as a warehouse.

The most we will pay for loss or damage under this Extension is $250,000 at each building.

**(2) Your Business Personal Property**

**(a)** If this policy covers Your Business Personal Property, you may extend that insurance to apply to:

**(i)** Business personal property, including such property that you newly acquire, at any location you acquire other than at fairs, trade shows or exhibitions; or

**(ii)** Business personal property, including such property that you newly acquire, located at your newly constructed or acquired buildings at the location described in the Declarations.

The most we will pay for loss or damage under this Extension is $100,000 at each building.

**(b)** This Extension does not apply to:

**(i)** Personal property of others that is temporarily in your possession in the course of installing or performing work on such property; or

**(ii)** Personal property of others that is temporarily in your possession in the course of your manufacturing or wholesaling activities.

**(3) Period Of Coverage**

With respect to insurance provided under this Coverage Extension for Newly Acquired Or Constructed Property, coverage will end when any of the following first occurs:

**(a)** This policy expires;

Subject to Protective Order - Confidential

BSAPolicyEv-00050998

TrustApp0613

**(b)** 30 days expire after you acquire the property or begin construction of that part of the building that would qualify as covered property; or

**(c)** You report values to us.

We will charge you additional premium for values reported from the date you acquire the property or begin construction of that part of the building that would qualify as covered property.

**b. Personal Effects And Property Of Others**

You may extend the insurance that applies to Your Business Personal Property to apply to:

**(1)** Personal effects owned by you, your officers, your partners or members, your managers or your employees. This Extension does not apply to loss or damage by theft.

**(2)** Personal property of others in your care, custody or control.

The most we will pay for loss or damage under this Extension is $2,500 at each described premises. Our payment for loss of or damage to personal property of others will only be for the account of the owner of the property.

**c. Valuable Papers And Records (Other Than Electronic Data)**

**(1)** You may extend the insurance that applies to Your Business Personal Property to apply to the cost to replace or restore the lost information on valuable papers and records for which duplicates do not exist. But this Extension does not apply to valuable papers and records which exist as electronic data. Electronic data has the meaning described under Property Not Covered, Electronic Data.

**(2)** If the Causes Of Loss – Special Form applies, coverage under this Extension is limited to the "specified causes of loss" as defined in that form and Collapse as set forth in that form.

**(3)** If the Causes Of Loss – Broad Form applies, coverage under this Extension includes Collapse as set forth in that form.

**(4)** Under this Extension, the most we will pay to replace or restore the lost information is $2,500 at each described premises, unless a higher limit is shown in the Declarations. Such amount is additional insurance. We will also pay for the cost of blank material for reproducing the records

(whether or not duplicates exist) and (when there is a duplicate) for the cost of labor to transcribe or copy the records. The costs of blank material and labor are subject to the applicable Limit of Insurance on Your Business Personal Property and, therefore, coverage of such costs is not additional insurance.

**d. Property Off-premises**

**(1)** You may extend the insurance provided by this Coverage Form to apply to your Covered Property while it is away from the described premises, if it is:

**(a)** Temporarily at a location you do not own, lease or operate;

**(b)** In storage at a location you lease, provided the lease was executed after the beginning of the current policy term; or

**(c)** At any fair, trade show or exhibition.

**(2)** This Extension does not apply to property:

**(a)** In or on a vehicle; or

**(b)** In the care, custody or control of your salespersons, unless the property is in such care, custody or control at a fair, trade show or exhibition.

**(3)** The most we will pay for loss or damage under this Extension is $10,000.

**e. Outdoor Property**

You may extend the insurance provided by this Coverage Form to apply to your outdoor fences, radio and television antennas (including satellite dishes), trees, shrubs and plants (other than trees, shrubs or plants which are "stock" or are part of a vegetated roof), including debris removal expense, caused by or resulting from any of the following causes of loss if they are Covered Causes of Loss:

**(1)** Fire;

**(2)** Lightning;

**(3)** Explosion;

**(4)** Riot or Civil Commotion; or

**(5)** Aircraft.

The most we will pay for loss or damage under this Extension is $1,000, but not more than $250 for any one tree, shrub or plant. These limits apply to any one occurrence, regardless of the types or number of items lost or damaged in that occurrence.

Subject to Protective Order - Confidential

Subject to all aforementioned terms and limitations of coverage, this Coverage Extension includes the expense of removing from the described premises the debris of trees, shrubs and plants which are the property of others, except in the situation in which you are a tenant and such property is owned by the landlord of the described premises.

**f. Non-owned Detached Trailers**

(1) You may extend the insurance that applies to Your Business Personal Property to apply to loss or damage to trailers that you do not own, provided that:

    (a) The trailer is used in your business;

    (b) The trailer is in your care, custody or control at the premises described in the Declarations; and

    (c) You have a contractual responsibility to pay for loss or damage to the trailer.

(2) We will not pay for any loss or damage that occurs:

    (a) While the trailer is attached to any motor vehicle or motorized conveyance, whether or not the motor vehicle or motorized conveyance is in motion;

    (b) During hitching or unhitching operations, or when a trailer becomes accidentally unhitched from a motor vehicle or motorized conveyance.

(3) The most we will pay for loss or damage under this Extension is $5,000, unless a higher limit is shown in the Declarations.

(4) This insurance is excess over the amount due (whether you can collect on it or not) from any other insurance covering such property.

**g. Business Personal Property Temporarily In Portable Storage Units**

(1) You may extend the insurance that applies to Your Business Personal Property to apply to such property while temporarily stored in a portable storage unit (including a detached trailer) located within 100 feet of the building or structure described in the Declarations or within 100 feet of the premises described in the Declarations, whichever distance is greater.

(2) If the applicable Covered Causes of Loss form or endorsement contains a limitation or exclusion concerning loss or damage from sand, dust, sleet, snow, ice or rain to property in a structure, such limitation or exclusion also applies to property in a portable storage unit.

(3) Coverage under this Extension:

    (a) Will end 90 days after the business personal property has been placed in the storage unit;

    (b) Does not apply if the storage unit itself has been in use at the described premises for more than 90 consecutive days, even if the business personal property has been stored there for 90 or fewer days as of the time of loss or damage.

(4) Under this Extension, the most we will pay for the total of all loss or damage to business personal property is $10,000 (unless a higher limit is indicated in the Declarations for such Extension) regardless of the number of storage units. Such limit is part of, not in addition to, the applicable Limit of Insurance on Your Business Personal Property. Therefore, payment under this Extension will not increase the applicable Limit of Insurance on Your Business Personal Property.

(5) This Extension does not apply to loss or damage otherwise covered under this Coverage Form or any endorsement to this Coverage Form or policy, and does not apply to loss or damage to the storage unit itself.

Each of these Extensions is additional insurance unless otherwise indicated. The Additional Condition, Coinsurance, does not apply to these Extensions.

**B. Exclusions And Limitations**

See applicable Causes Of Loss form as shown in the Declarations.

**C. Limits Of Insurance**

The most we will pay for loss or damage in any one occurrence is the applicable Limit Of Insurance shown in the Declarations.

The most we will pay for loss or damage to outdoor signs, whether or not the sign is attached to a building, is $2,500 per sign in any one occurrence.

Subject to Protective Order - Confidential

BSAPolicyEv-00051000

TrustApp0615

The amounts of insurance stated in the following Additional Coverages apply in accordance with the terms of such coverages and are separate from the Limit(s) Of Insurance shown in the Declarations for any other coverage:

**1.** Fire Department Service Charge;

**2.** Pollutant Clean-up And Removal;

**3.** Increased Cost Of Construction; and

**4.** Electronic Data.

Payments under the Preservation Of Property Additional Coverage will not increase the applicable Limit of Insurance.

**D. Deductible**

In any one occurrence of loss or damage (hereinafter referred to as loss), we will first reduce the amount of loss if required by the Coinsurance Condition or the Agreed Value Optional Coverage. If the adjusted amount of loss is less than or equal to the Deductible, we will not pay for that loss. If the adjusted amount of loss exceeds the Deductible, we will then subtract the Deductible from the adjusted amount of loss and will pay the resulting amount or the Limit of Insurance, whichever is less.

When the occurrence involves loss to more than one item of Covered Property and separate Limits of Insurance apply, the losses will not be combined in determining application of the Deductible. But the Deductible will be applied only once per occurrence.

**Example 1**

(This example assumes there is no Coinsurance penalty.)

| | | |
|---|---|---|
| Deductible: | $ | 250 |
| Limit of Insurance – Building 1: | $ | 60,000 |
| Limit of Insurance – Building 2: | $ | 80,000 |
| Loss to Building 1: | $ | 60,100 |
| Loss to Building 2: | $ | 90,000 |

The amount of loss to Building 1 ($60,100) is less than the sum ($60,250) of the Limit of Insurance applicable to Building 1 plus the Deductible.

The Deductible will be subtracted from the amount of loss in calculating the loss payable for Building 1:

| | |
|---|---|
| $ | 60,100 |
| – | 250 |
| $ | 59,850 Loss Payable – Building 1 |

The Deductible applies once per occurrence and therefore is not subtracted in determining the amount of loss payable for Building 2. Loss payable for Building 2 is the Limit of Insurance of $80,000.

Total amount of loss payable:

$59,850 + $80,000 = $139,850

**Example 2**

(This example, too, assumes there is no Coinsurance penalty.)

The Deductible and Limits of Insurance are the same as those in Example 1.

| | | |
|---|---|---|
| Loss to Building 1: | $ | 70,000 |
| (Exceeds Limit of Insurance plus Deductible) | | |
| Loss to Building 2: | $ | 90,000 |
| (Exceeds Limit of Insurance plus Deductible) | | |
| Loss Payable – Building 1: | $ | 60,000 |
| (Limit of Insurance) | | |
| Loss Payable – Building 2: | $ | 80,000 |
| (Limit of Insurance) | | |
| Total amount of loss payable: | $ | 140,000 |

**E. Loss Conditions**

The following conditions apply in addition to the Common Policy Conditions and the Commercial Property Conditions.

**1. Abandonment**

There can be no abandonment of any property to us.

**2. Appraisal**

If we and you disagree on the value of the property or the amount of loss, either may make written demand for an appraisal of the loss. In this event, each party will select a competent and impartial appraiser. The two appraisers will select an umpire. If they cannot agree, either may request that selection be made by a judge of a court having jurisdiction. The appraisers will state separately the value of the property and amount of loss. If they fail to agree, they will submit their differences to the umpire. A decision agreed to by any two will be binding. Each party will:

**a.** Pay its chosen appraiser; and

**b.** Bear the other expenses of the appraisal and umpire equally.

If there is an appraisal, we will still retain our right to deny the claim.

**3. Duties In The Event Of Loss Or Damage**

**a.** You must see that the following are done in the event of loss or damage to Covered Property:

**(1)** Notify the police if a law may have been broken.

**(2)** Give us prompt notice of the loss or damage. Include a description of the property involved.

**(3)** As soon as possible, give us a description of how, when and where the loss or damage occurred.

Subject to Protective Order - Confidential

**(4)** Take all reasonable steps to protect the Covered Property from further damage, and keep a record of your expenses necessary to protect the Covered Property, for consideration in the settlement of the claim. This will not increase the Limit of Insurance. However, we will not pay for any subsequent loss or damage resulting from a cause of loss that is not a Covered Cause of Loss. Also, if feasible, set the damaged property aside and in the best possible order for examination.

**(5)** At our request, give us complete inventories of the damaged and undamaged property. Include quantities, costs, values and amount of loss claimed.

**(6)** As often as may be reasonably required, permit us to inspect the property proving the loss or damage and examine your books and records.

Also, permit us to take samples of damaged and undamaged property for inspection, testing and analysis, and permit us to make copies from your books and records.

**(7)** Send us a signed, sworn proof of loss containing the information we request to investigate the claim. You must do this within 60 days after our request. We will supply you with the necessary forms.

**(8)** Cooperate with us in the investigation or settlement of the claim.

**b.** We may examine any insured under oath, while not in the presence of any other insured and at such times as may be reasonably required, about any matter relating to this insurance or the claim, including an insured's books and records. In the event of an examination, an insured's answers must be signed.

**4. Loss Payment**

**a.** In the event of loss or damage covered by this Coverage Form, at our option, we will either:

**(1)** Pay the value of lost or damaged property;

**(2)** Pay the cost of repairing or replacing the lost or damaged property, subject to **b.** below;

**(3)** Take all or any part of the property at an agreed or appraised value; or

**(4)** Repair, rebuild or replace the property with other property of like kind and quality, subject to **b.** below.

We will determine the value of lost or damaged property, or the cost of its repair or replacement, in accordance with the applicable terms of the Valuation Condition in this Coverage Form or any applicable provision which amends or supersedes the Valuation Condition.

**b.** The cost to repair, rebuild or replace does not include the increased cost attributable to enforcement of or compliance with any ordinance or law regulating the construction, use or repair of any property.

**c.** We will give notice of our intentions within 30 days after we receive the sworn proof of loss.

**d.** We will not pay you more than your financial interest in the Covered Property.

**e.** We may adjust losses with the owners of lost or damaged property if other than you. If we pay the owners, such payments will satisfy your claims against us for the owners' property. We will not pay the owners more than their financial interest in the Covered Property.

**f.** We may elect to defend you against suits arising from claims of owners of property. We will do this at our expense.

**g.** We will pay for covered loss or damage within 30 days after we receive the sworn proof of loss, if you have complied with all of the terms of this Coverage Part, and:

**(1)** We have reached agreement with you on the amount of loss; or

**(2)** An appraisal award has been made.

**h.** A party wall is a wall that separates and is common to adjoining buildings that are owned by different parties. In settling covered losses involving a party wall, we will pay a proportion of the loss to the party wall based on your interest in the wall in proportion to the interest of the owner of the adjoining building. However, if you elect to repair or replace your building and the owner of the adjoining building elects not to repair or replace that building, we will pay you the full value of the loss to the party wall, subject to all applicable policy provisions including Limits of Insurance, the Valuation and Coinsurance Conditions and all other provisions of this Loss Payment Condition. Our payment under the provisions of this paragraph does not alter any right of subrogation we may have against any entity, including the owner or insurer of the adjoining building, and does not alter the terms of the Transfer Of Rights Of Recovery Against Others To Us Condition in this policy.

© Insurance Services Office, Inc., 2011

CP 00 10 10 12

Subject to Protective Order - Confidential

BSAPolicyEv-00051002

TrustApp0617

**5. Recovered Property**

If either you or we recover any property after loss settlement, that party must give the other prompt notice. At your option, the property will be returned to you. You must then return to us the amount we paid to you for the property. We will pay recovery expenses and the expenses to repair the recovered property, subject to the Limit of Insurance.

**6. Vacancy**

**a. Description Of Terms**

**(1)** As used in this Vacancy Condition, the term building and the term vacant have the meanings set forth in **(1)(a)** and **(1)(b)** below:

**(a)** When this policy is issued to a tenant, and with respect to that tenant's interest in Covered Property, building means the unit or suite rented or leased to the tenant. Such building is vacant when it does not contain enough business personal property to conduct customary operations.

**(b)** When this policy is issued to the owner or general lessee of a building, building means the entire building. Such building is vacant unless at least 31% of its total square footage is:

**(i)** Rented to a lessee or sublessee and used by the lessee or sublessee to conduct its customary operations; and/or

**(ii)** Used by the building owner to conduct customary operations.

**(2)** Buildings under construction or renovation are not considered vacant.

**b. Vacancy Provisions**

If the building where loss or damage occurs has been vacant for more than 60 consecutive days before that loss or damage occurs:

**(1)** We will not pay for any loss or damage caused by any of the following, even if they are Covered Causes of Loss:

**(a)** Vandalism;

**(b)** Sprinkler leakage, unless you have protected the system against freezing;

**(c)** Building glass breakage;

**(d)** Water damage;

**(e)** Theft; or

**(f)** Attempted theft.

**(2)** With respect to Covered Causes of Loss other than those listed in **b.(1)(a)** through **b.(1)(f)** above, we will reduce the amount we would otherwise pay for the loss or damage by 15%.

**7. Valuation**

We will determine the value of Covered Property in the event of loss or damage as follows:

**a.** At actual cash value as of the time of loss or damage, except as provided in **b., c., d.** and **e.** below.

**b.** If the Limit of Insurance for Building satisfies the Additional Condition, Coinsurance, and the cost to repair or replace the damaged building property is $2,500 or less, we will pay the cost of building repairs or replacement.

The cost of building repairs or replacement does not include the increased cost attributable to enforcement of or compliance with any ordinance or law regulating the construction, use or repair of any property.

However, the following property will be valued at the actual cash value, even when attached to the building:

**(1)** Awnings or floor coverings;

**(2)** Appliances for refrigerating, ventilating, cooking, dishwashing or laundering; or

**(3)** Outdoor equipment or furniture.

**c.** "Stock" you have sold but not delivered at the selling price less discounts and expenses you otherwise would have had.

**d.** Glass at the cost of replacement with safety-glazing material if required by law.

**e.** Tenants' Improvements and Betterments at:

**(1)** Actual cash value of the lost or damaged property if you make repairs promptly.

**(2)** A proportion of your original cost if you do not make repairs promptly. We will determine the proportionate value as follows:

**(a)** Multiply the original cost by the number of days from the loss or damage to the expiration of the lease; and

**(b)** Divide the amount determined in **(a)** above by the number of days from the installation of improvements to the expiration of the lease.

If your lease contains a renewal option, the expiration of the renewal option period will replace the expiration of the lease in this procedure.

Subject to Protective Order - Confidential

**(3)** Nothing if others pay for repairs or replacement.

## F. Additional Conditions

The following conditions apply in addition to the Common Policy Conditions and the Commercial Property Conditions:

### 1. Coinsurance

If a Coinsurance percentage is shown in the Declarations, the following condition applies:

**a.** We will not pay the full amount of any loss if the value of Covered Property at the time of loss times the Coinsurance percentage shown for it in the Declarations is greater than the Limit of Insurance for the property.

Instead, we will determine the most we will pay using the following steps:

**(1)** Multiply the value of Covered Property at the time of loss by the Coinsurance percentage;

**(2)** Divide the Limit of Insurance of the property by the figure determined in Step **(1)**;

**(3)** Multiply the total amount of loss, before the application of any deductible, by the figure determined in Step **(2)**; and

**(4)** Subtract the deductible from the figure determined in Step **(3)**.

We will pay the amount determined in Step **(4)** or the Limit of Insurance, whichever is less. For the remainder, you will either have to rely on other insurance or absorb the loss yourself.

### Example 1 (Underinsurance)

| When: | The value of the property is: | $ 250,000 |
|---|---|---|
| | The Coinsurance percentage for it is: | 80% |
| | The Limit of Insurance for it is: | $ 100,000 |
| | The Deductible is: | $ 250 |
| | The amount of loss is: | $ 40,000 |

Step **(1)**: $250,000 x 80% = $200,000
(the minimum amount of insurance to meet your Coinsurance requirements)
Step **(2)**: $100,000 ÷ $200,000 = .50
Step **(3)**: $40,000 x .50 = $20,000
Step **(4)**: $20,000 − $250 = $19,750

We will pay no more than $19,750. The remaining $20,250 is not covered.

### Example 2 (Adequate Insurance)

| When: | The value of the property is: | $ 250,000 |
|---|---|---|
| | The Coinsurance percentage for it is: | 80% |
| | The Limit of Insurance for it is: | $ 200,000 |
| | The Deductible is: | $ 250 |
| | The amount of loss is: | $ 40,000 |

The minimum amount of insurance to meet your Coinsurance requirement is $200,000 ($250,000 x 80%). Therefore, the Limit of Insurance in this example is adequate, and no penalty applies. We will pay no more than $39,750 ($40,000 amount of loss minus the deductible of $250).

**b.** If one Limit of Insurance applies to two or more separate items, this condition will apply to the total of all property to which the limit applies.

### Example 3

| When: | The value of the property is: | |
|---|---|---|
| | Building at Location 1: | $ 75,000 |
| | Building at Location 2: | $ 100,000 |
| | Personal Property at Location 2: | $ 75,000 |
| | | $ 250,000 |
| | The Coinsurance percentage for it is: | 90% |
| | The Limit of Insurance for Buildings and Personal Property at Locations 1 and 2 is: | $ 180,000 |
| | The Deductible is: | $ 1,000 |
| | The amount of loss is: | |
| | Building at Location 2: | $ 30,000 |
| | Personal Property at Location 2: | $ 20,000 |
| | | $ 50,000 |

Step **(1)**: $250,000 x 90% = $225,000
(the minimum amount of insurance to meet your Coinsurance requirements and to avoid the penalty shown below)
Step **(2)**: $180,000 ÷ $225,000 = .80
Step **(3)**: $50,000 x .80 = $40,000
Step **(4)**: $40,000 − $1,000 = $39,000

We will pay no more than $39,000. The remaining $11,000 is not covered.

### 2. Mortgageholders

**a.** The term mortgageholder includes trustee.

**b.** We will pay for covered loss of or damage to buildings or structures to each mortgageholder shown in the Declarations in their order of precedence, as interests may appear.

**c.** The mortgageholder has the right to receive loss payment even if the mortgageholder has started foreclosure or similar action on the building or structure.

Subject to Protective Order - Confidential                                    BSAPolicyEv-00051004

TrustApp0619

d.  If we deny your claim because of your acts or because you have failed to comply with the terms of this Coverage Part, the mortgageholder will still have the right to receive loss payment if the mortgageholder:

    (1) Pays any premium due under this Coverage Part at our request if you have failed to do so;

    (2) Submits a signed, sworn proof of loss within 60 days after receiving notice from us of your failure to do so; and

    (3) Has notified us of any change in ownership, occupancy or substantial change in risk known to the mortgageholder.

    All of the terms of this Coverage Part will then apply directly to the mortgageholder.

e.  If we pay the mortgageholder for any loss or damage and deny payment to you because of your acts or because you have failed to comply with the terms of this Coverage Part:

    (1) The mortgageholder's rights under the mortgage will be transferred to us to the extent of the amount we pay; and

    (2) The mortgageholder's right to recover the full amount of the mortgageholder's claim will not be impaired.

    At our option, we may pay to the mortgageholder the whole principal on the mortgage plus any accrued interest. In this event, your mortgage and note will be transferred to us and you will pay your remaining mortgage debt to us.

f.  If we cancel this policy, we will give written notice to the mortgageholder at least:

    (1) 10 days before the effective date of cancellation if we cancel for your nonpayment of premium; or

    (2) 30 days before the effective date of cancellation if we cancel for any other reason.

g.  If we elect not to renew this policy, we will give written notice to the mortgageholder at least 10 days before the expiration date of this policy.

### G. Optional Coverages

If shown as applicable in the Declarations, the following Optional Coverages apply separately to each item:

1.  **Agreed Value**

    a.  The Additional Condition, Coinsurance, does not apply to Covered Property to which this Optional Coverage applies. We will pay no more for loss of or damage to that property than the proportion that the Limit of Insurance under this Coverage Part for the property bears to the Agreed Value shown for it in the Declarations.

    b.  If the expiration date for this Optional Coverage shown in the Declarations is not extended, the Additional Condition, Coinsurance, is reinstated and this Optional Coverage expires.

    c.  The terms of this Optional Coverage apply only to loss or damage that occurs:

        (1) On or after the effective date of this Optional Coverage; and

        (2) Before the Agreed Value expiration date shown in the Declarations or the policy expiration date, whichever occurs first.

2.  **Inflation Guard**

    a.  The Limit of Insurance for property to which this Optional Coverage applies will automatically increase by the annual percentage shown in the Declarations.

    b.  The amount of increase will be:

        (1) The Limit of Insurance that applied on the most recent of the policy inception date, the policy anniversary date, or any other policy change amending the Limit of Insurance, times

        (2) The percentage of annual increase shown in the Declarations, expressed as a decimal (example: 8% is .08), times

        (3) The number of days since the beginning of the current policy year or the effective date of the most recent policy change amending the Limit of Insurance, divided by 365.

**Example**

If:  The applicable Limit of Insurance is:  $ 100,000
    The annual percentage increase is:  8%
    The number of days since the beginning of the policy year (or last policy change) is:  146
    The amount of increase is:
    $100,000 x .08 x 146 ÷ 365 =  $ 3,200

3.  **Replacement Cost**

    a.  Replacement Cost (without deduction for depreciation) replaces Actual Cash Value in the Valuation Loss Condition of this Coverage Form.

Subject to Protective Order - Confidential

BSAPolicyEv-00051005

TrustApp0620

**b.** This Optional Coverage does not apply to:

　(1) Personal property of others;

　(2) Contents of a residence;

　(3) Works of art, antiques or rare articles, including etchings, pictures, statuary, marbles, bronzes, porcelains and bric-a-brac; or

　(4) "Stock", unless the Including "Stock" option is shown in the Declarations.

　Under the terms of this Replacement Cost Optional Coverage, tenants' improvements and betterments are not considered to be the personal property of others.

**c.** You may make a claim for loss or damage covered by this insurance on an actual cash value basis instead of on a replacement cost basis. In the event you elect to have loss or damage settled on an actual cash value basis, you may still make a claim for the additional coverage this Optional Coverage provides if you notify us of your intent to do so within 180 days after the loss or damage.

**d.** We will not pay on a replacement cost basis for any loss or damage:

　(1) Until the lost or damaged property is actually repaired or replaced; and

　(2) Unless the repair or replacement is made as soon as reasonably possible after the loss or damage.

　With respect to tenants' improvements and betterments, the following also apply:

　(3) If the conditions in **d.(1)** and **d.(2)** above are not met, the value of tenants' improvements and betterments will be determined as a proportion of your original cost, as set forth in the Valuation Loss Condition of this Coverage Form; and

　(4) We will not pay for loss or damage to tenants' improvements and betterments if others pay for repairs or replacement.

**e.** We will not pay more for loss or damage on a replacement cost basis than the least of **(1)**, **(2)** or **(3)**, subject to **f.** below:

　(1) The Limit of Insurance applicable to the lost or damaged property;

　(2) The cost to replace the lost or damaged property with other property:

　　(a) Of comparable material and quality; and

　　(b) Used for the same purpose; or

　(3) The amount actually spent that is necessary to repair or replace the lost or damaged property.

　If a building is rebuilt at a new premises, the cost described in **e.(2)** above is limited to the cost which would have been incurred if the building had been rebuilt at the original premises.

**f.** The cost of repair or replacement does not include the increased cost attributable to enforcement of or compliance with any ordinance or law regulating the construction, use or repair of any property.

**4. Extension Of Replacement Cost To Personal Property Of Others**

**a.** If the Replacement Cost Optional Coverage is shown as applicable in the Declarations, then this Extension may also be shown as applicable. If the Declarations show this Extension as applicable, then Paragraph **3.b.(1)** of the Replacement Cost Optional Coverage is deleted and all other provisions of the Replacement Cost Optional Coverage apply to replacement cost on personal property of others.

**b.** With respect to replacement cost on the personal property of others, the following limitation applies:

　If an item(s) of personal property of others is subject to a written contract which governs your liability for loss or damage to that item(s), then valuation of that item(s) will be based on the amount for which you are liable under such contract, but not to exceed the lesser of the replacement cost of the property or the applicable Limit of Insurance.

**H. Definitions**

**1.** "Fungus" means any type or form of fungus, including mold or mildew, and any mycotoxins, spores, scents or by-products produced or released by fungi.

**2.** "Pollutants" means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

**3.** "Stock" means merchandise held in storage or for sale, raw materials and in-process or finished goods, including supplies used in their packing or shipping.

Subject to Protective Order - Confidential

**POLICY NUMBER:** KKO0000021153300

**COMMERCIAL PROPERTY**
**CP 10 30 10 12**

# CAUSES OF LOSS – SPECIAL FORM

Words and phrases that appear in quotation marks have special meaning. Refer to Section **G.** Definitions.

## A. Covered Causes Of Loss

When Special is shown in the Declarations, Covered Causes of Loss means direct physical loss unless the loss is excluded or limited in this policy.

## B. Exclusions

**1.** We will not pay for loss or damage caused directly or indirectly by any of the following. Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss.

   **a. Ordinance Or Law**

   The enforcement of or compliance with any ordinance or law:

   **(1)** Regulating the construction, use or repair of any property; or

   **(2)** Requiring the tearing down of any property, including the cost of removing its debris.

   This exclusion, Ordinance Or Law, applies whether the loss results from:

      **(a)** An ordinance or law that is enforced even if the property has not been damaged; or

      **(b)** The increased costs incurred to comply with an ordinance or law in the course of construction, repair, renovation, remodeling or demolition of property, or removal of its debris, following a physical loss to that property.

   **b. Earth Movement**

   **(1)** Earthquake, including tremors and aftershocks and any earth sinking, rising or shifting related to such event;

   **(2)** Landslide, including any earth sinking, rising or shifting related to such event;

   **(3)** Mine subsidence, meaning subsidence of a man-made mine, whether or not mining activity has ceased;

   **(4)** Earth sinking (other than sinkhole collapse), rising or shifting including soil conditions which cause settling, cracking or other disarrangement of foundations or other parts of realty. Soil conditions

   include contraction, expansion, freezing, thawing, erosion, improperly compacted soil and the action of water under the ground surface.

   But if Earth Movement, as described in **b.(1)** through **(4)** above, results in fire or explosion, we will pay for the loss or damage caused by that fire or explosion.

   **(5)** Volcanic eruption, explosion or effusion. But if volcanic eruption, explosion or effusion results in fire, building glass breakage or Volcanic Action, we will pay for the loss or damage caused by that fire, building glass breakage or Volcanic Action.

   Volcanic Action means direct loss or damage resulting from the eruption of a volcano when the loss or damage is caused by:

      **(a)** Airborne volcanic blast or airborne shock waves;

      **(b)** Ash, dust or particulate matter; or

      **(c)** Lava flow.

   With respect to coverage for Volcanic Action as set forth in **(5)(a)**, **(5)(b)** and **(5)(c)**, all volcanic eruptions that occur within any 168-hour period will constitute a single occurrence.

   Volcanic Action does not include the cost to remove ash, dust or particulate matter that does not cause direct physical loss or damage to the described property.

   This exclusion applies regardless of whether any of the above, in Paragraphs **(1)** through **(5)**, is caused by an act of nature or is otherwise caused.

   **c. Governmental Action**

   Seizure or destruction of property by order of governmental authority.

   But we will pay for loss or damage caused by or resulting from acts of destruction ordered by governmental authority and taken at the time of a fire to prevent its spread, if the fire would be covered under this Coverage Part.

CP 10 30 10 12                    © Insurance Services Office, Inc., 2011                    Page 1 of 9

Subject to Protective Order - Confidential

**d. Nuclear Hazard**

Nuclear reaction or radiation, or radioactive contamination, however caused.

But if nuclear reaction or radiation, or radioactive contamination, results in fire, we will pay for the loss or damage caused by that fire.

**e. Utility Services**

The failure of power, communication, water or other utility service supplied to the described premises, however caused, if the failure:

**(1)** Originates away from the described premises; or

**(2)** Originates at the described premises, but only if such failure involves equipment used to supply the utility service to the described premises from a source away from the described premises.

Failure of any utility service includes lack of sufficient capacity and reduction in supply.

Loss or damage caused by a surge of power is also excluded, if the surge would not have occurred but for an event causing a failure of power.

But if the failure or surge of power, or the failure of communication, water or other utility service, results in a Covered Cause of Loss, we will pay for the loss or damage caused by that Covered Cause of Loss.

Communication services include but are not limited to service relating to Internet access or access to any electronic, cellular or satellite network.

**f. War And Military Action**

**(1)** War, including undeclared or civil war;

**(2)** Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

**(3)** Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

**g. Water**

**(1)** Flood, surface water, waves (including tidal wave and tsunami), tides, tidal water, overflow of any body of water, or spray from any of these, all whether or not driven by wind (including storm surge);

**(2)** Mudslide or mudflow;

**(3)** Water that backs up or overflows or is otherwise discharged from a sewer, drain, sump, sump pump or related equipment;

**(4)** Water under the ground surface pressing on, or flowing or seeping through:

**(a)** Foundations, walls, floors or paved surfaces;

**(b)** Basements, whether paved or not; or

**(c)** Doors, windows or other openings; or

**(5)** Waterborne material carried or otherwise moved by any of the water referred to in Paragraph **(1)**, **(3)** or **(4)**, or material carried or otherwise moved by mudslide or mudflow.

This exclusion applies regardless of whether any of the above, in Paragraphs **(1)** through **(5)**, is caused by an act of nature or is otherwise caused. An example of a situation to which this exclusion applies is the situation where a dam, levee, seawall or other boundary or containment system fails in whole or in part, for any reason, to contain the water.

But if any of the above, in Paragraphs **(1)** through **(5)**, results in fire, explosion or sprinkler leakage, we will pay for the loss or damage caused by that fire, explosion or sprinkler leakage (if sprinkler leakage is a Covered Cause of Loss).

**h. "Fungus", Wet Rot, Dry Rot And Bacteria**

Presence, growth, proliferation, spread or any activity of "fungus", wet or dry rot or bacteria.

But if "fungus", wet or dry rot or bacteria result in a "specified cause of loss", we will pay for the loss or damage caused by that "specified cause of loss".

This exclusion does not apply:

**(1)** When "fungus", wet or dry rot or bacteria result from fire or lightning; or

**(2)** To the extent that coverage is provided in the Additional Coverage, Limited Coverage For "Fungus", Wet Rot, Dry Rot And Bacteria, with respect to loss or damage by a cause of loss other than fire or lightning.

Exclusions **B.1.a.** through **B.1.h.** apply whether or not the loss event results in widespread damage or affects a substantial area.

**2.** We will not pay for loss or damage caused by or resulting from any of the following:

**a.** Artificially generated electrical, magnetic or electromagnetic energy that damages, disturbs, disrupts or otherwise interferes with any:

© Insurance Services Office, Inc., 2011    CP 10 30 10 12

Subject to Protective Order - Confidential    BSAPolicyEv-00051008
TrustApp0623

**(1)** Electrical or electronic wire, device, appliance, system or network; or

**(2)** Device, appliance, system or network utilizing cellular or satellite technology.

For the purpose of this exclusion, electrical, magnetic or electromagnetic energy includes but is not limited to:

**(a)** Electrical current, including arcing;

**(b)** Electrical charge produced or conducted by a magnetic or electromagnetic field;

**(c)** Pulse of electromagnetic energy; or

**(d)** Electromagnetic waves or microwaves.

But if fire results, we will pay for the loss or damage caused by that fire.

**b.** Delay, loss of use or loss of market.

**c.** Smoke, vapor or gas from agricultural smudging or industrial operations.

**d.(1)** Wear and tear;

**(2)** Rust or other corrosion, decay, deterioration, hidden or latent defect or any quality in property that causes it to damage or destroy itself;

**(3)** Smog;

**(4)** Settling, cracking, shrinking or expansion;

**(5)** Nesting or infestation, or discharge or release of waste products or secretions, by insects, birds, rodents or other animals.

**(6)** Mechanical breakdown, including rupture or bursting caused by centrifugal force. But if mechanical breakdown results in elevator collision, we will pay for the loss or damage caused by that elevator collision.

**(7)** The following causes of loss to personal property:

**(a)** Dampness or dryness of atmosphere;

**(b)** Changes in or extremes of temperature; or

**(c)** Marring or scratching.

But if an excluded cause of loss that is listed in **2.d.(1)** through **(7)** results in a "specified cause of loss" or building glass breakage, we will pay for the loss or damage caused by that "specified cause of loss" or building glass breakage.

**e.** Explosion of steam boilers, steam pipes, steam engines or steam turbines owned or leased by you, or operated under your control. But if explosion of steam boilers, steam pipes, steam engines or steam

turbines results in fire or combustion explosion, we will pay for the loss or damage caused by that fire or combustion explosion. We will also pay for loss or damage caused by or resulting from the explosion of gases or fuel within the furnace of any fired vessel or within the flues or passages through which the gases of combustion pass.

**f.** Continuous or repeated seepage or leakage of water, or the presence or condensation of humidity, moisture or vapor, that occurs over a period of 14 days or more.

**g.** Water, other liquids, powder or molten material that leaks or flows from plumbing, heating, air conditioning or other equipment (except fire protective systems) caused by or resulting from freezing, unless:

**(1)** You do your best to maintain heat in the building or structure; or

**(2)** You drain the equipment and shut off the supply if the heat is not maintained.

**h.** Dishonest or criminal act (including theft) by you, any of your partners, members, officers, managers, employees (including temporary employees and leased workers), directors, trustees or authorized representatives, whether acting alone or in collusion with each other or with any other party; or theft by any person to whom you entrust the property for any purpose, whether acting alone or in collusion with any other party.

This exclusion:

**(1)** Applies whether or not an act occurs during your normal hours of operation;

**(2)** Does not apply to acts of destruction by your employees (including temporary employees and leased workers) or authorized representatives; but theft by your employees (including temporary employees and leased workers) or authorized representatives is not covered.

**i.** Voluntary parting with any property by you or anyone else to whom you have entrusted the property if induced to do so by any fraudulent scheme, trick, device or false pretense.

**j.** Rain, snow, ice or sleet to personal property in the open.

**k.** Collapse, including any of the following conditions of property or any part of the property:

**(1)** An abrupt falling down or caving in;

**(2)** Loss of structural integrity, including separation of parts of the property or property in danger of falling down or caving in; or

Subject to Protective Order - Confidential

**(3)** Any cracking, bulging, sagging, bending, leaning, settling, shrinkage or expansion as such condition relates to **(1)** or **(2)** above.

But if collapse results in a Covered Cause of Loss at the described premises, we will pay for the loss or damage caused by that Covered Cause of Loss.

This exclusion, **k.**, does not apply:

**(a)** To the extent that coverage is provided under the Additional Coverage, Collapse; or

**(b)** To collapse caused by one or more of the following:

**(i)** The "specified causes of loss";

**(ii)** Breakage of building glass;

**(iii)** Weight of rain that collects on a roof; or

**(iv)** Weight of people or personal property.

**l.** Discharge, dispersal, seepage, migration, release or escape of "pollutants" unless the discharge, dispersal, seepage, migration, release or escape is itself caused by any of the "specified causes of loss". But if the discharge, dispersal, seepage, migration, release or escape of "pollutants" results in a "specified cause of loss", we will pay for the loss or damage caused by that "specified cause of loss".

This exclusion, **l.**, does not apply to damage to glass caused by chemicals applied to the glass.

**m.** Neglect of an insured to use all reasonable means to save and preserve property from further damage at and after the time of loss.

**3.** We will not pay for loss or damage caused by or resulting from any of the following, **3.a.** through **3.c.** But if an excluded cause of loss that is listed in **3.a.** through **3.c.** results in a Covered Cause of Loss, we will pay for the loss or damage caused by that Covered Cause of Loss.

**a.** Weather conditions. But this exclusion only applies if weather conditions contribute in any way with a cause or event excluded in Paragraph **1.** above to produce the loss or damage.

**b.** Acts or decisions, including the failure to act or decide, of any person, group, organization or governmental body.

**c.** Faulty, inadequate or defective:

**(1)** Planning, zoning, development, surveying, siting;

**(2)** Design, specifications, workmanship, repair, construction, renovation, remodeling, grading, compaction;

**(3)** Materials used in repair, construction, renovation or remodeling; or

**(4)** Maintenance;

of part or all of any property on or off the described premises.

**4. Special Exclusions**

The following provisions apply only to the specified Coverage Forms:

**a. Business Income (And Extra Expense) Coverage Form, Business Income (Without Extra Expense) Coverage Form, Or Extra Expense Coverage Form**

We will not pay for:

**(1)** Any loss caused by or resulting from:

**(a)** Damage or destruction of "finished stock"; or

**(b)** The time required to reproduce "finished stock".

This exclusion does not apply to Extra Expense.

**(2)** Any loss caused by or resulting from direct physical loss or damage to radio or television antennas (including satellite dishes) and their lead-in wiring, masts or towers.

**(3)** Any increase of loss caused by or resulting from:

**(a)** Delay in rebuilding, repairing or replacing the property or resuming "operations", due to interference at the location of the rebuilding, repair or replacement by strikers or other persons; or

**(b)** Suspension, lapse or cancellation of any license, lease or contract. But if the suspension, lapse or cancellation is directly caused by the "suspension" of "operations", we will cover such loss that affects your Business Income during the "period of restoration" and any extension of the "period of restoration" in accordance with the terms of the Extended Business Income Additional Coverage and the Extended Period Of Indemnity Optional Coverage or any variation of these.

**(4)** Any Extra Expense caused by or resulting from suspension, lapse or cancellation of any license, lease or contract beyond the "period of restoration".

© Insurance Services Office, Inc., 2011

CP 10 30 10 12

Subject to Protective Order - Confidential

BSAPolicyEv-00051010

TrustApp0625

**(5)** Any other consequential loss.

**b. Leasehold Interest Coverage Form**

**(1)** Paragraph **B.1.a.,** Ordinance Or Law, does not apply to insurance under this Coverage Form.

**(2)** We will not pay for any loss caused by:

**(a)** Your cancelling the lease;

**(b)** The suspension, lapse or cancellation of any license; or

**(c)** Any other consequential loss.

**c. Legal Liability Coverage Form**

**(1)** The following exclusions do not apply to insurance under this Coverage Form:

**(a)** Paragraph **B.1.a.** Ordinance Or Law;

**(b)** Paragraph **B.1.c.** Governmental Action;

**(c)** Paragraph **B.1.d.** Nuclear Hazard;

**(d)** Paragraph **B.1.e.** Utility Services; and

**(e)** Paragraph **B.1.f.** War And Military Action.

**(2)** The following additional exclusions apply to insurance under this Coverage Form:

**(a) Contractual Liability**

We will not defend any claim or "suit", or pay damages that you are legally liable to pay, solely by reason of your assumption of liability in a contract or agreement. But this exclusion does not apply to a written lease agreement in which you have assumed liability for building damage resulting from an actual or attempted burglary or robbery, provided that:

**(i)** Your assumption of liability was executed prior to the accident; and

**(ii)** The building is Covered Property under this Coverage Form.

**(b) Nuclear Hazard**

We will not defend any claim or "suit", or pay any damages, loss, expense or obligation, resulting from nuclear reaction or radiation, or radioactive contamination, however caused.

**5. Additional Exclusion**

The following provisions apply only to the specified property:

**Loss Or Damage To Products**

We will not pay for loss or damage to any merchandise, goods or other product caused by or resulting from error or omission by any person or entity (including those having possession under an arrangement where work or a portion of the work is outsourced) in any stage of the development, production or use of the product, including planning, testing, processing, packaging, installation, maintenance or repair. This exclusion applies to any effect that compromises the form, substance or quality of the product. But if such error or omission results in a Covered Cause of Loss, we will pay for the loss or damage caused by that Covered Cause of Loss.

**C. Limitations**

The following limitations apply to all policy forms and endorsements, unless otherwise stated:

**1.** We will not pay for loss of or damage to property, as described and limited in this section. In addition, we will not pay for any loss that is a consequence of loss or damage as described and limited in this section.

**a.** Steam boilers, steam pipes, steam engines or steam turbines caused by or resulting from any condition or event inside such equipment. But we will pay for loss of or damage to such equipment caused by or resulting from an explosion of gases or fuel within the furnace of any fired vessel or within the flues or passages through which the gases of combustion pass.

**b.** Hot water boilers or other water heating equipment caused by or resulting from any condition or event inside such boilers or equipment, other than an explosion.

**c.** The interior of any building or structure, or to personal property in the building or structure, caused by or resulting from rain, snow, sleet, ice, sand or dust, whether driven by wind or not, unless:

**(1)** The building or structure first sustains damage by a Covered Cause of Loss to its roof or walls through which the rain, snow, sleet, ice, sand or dust enters; or

**(2)** The loss or damage is caused by or results from thawing of snow, sleet or ice on the building or structure.

**d.** Building materials and supplies not attached as part of the building or structure, caused by or resulting from theft.

However, this limitation does not apply to:

**(1)** Building materials and supplies held for sale by you, unless they are insured under the Builders Risk Coverage Form; or

Subject to Protective Order - Confidential

BSAPolicyEv-00051011

TrustApp0626

**(2)** Business Income Coverage or Extra Expense Coverage.

**e.** Property that is missing, where the only evidence of the loss or damage is a shortage disclosed on taking inventory, or other instances where there is no physical evidence to show what happened to the property.

**f.** Property that has been transferred to a person or to a place outside the described premises on the basis of unauthorized instructions.

**g.** Lawns, trees, shrubs or plants which are part of a vegetated roof, caused by or resulting from:

**(1)** Dampness or dryness of atmosphere or of soil supporting the vegetation;

**(2)** Changes in or extremes of temperature;

**(3)** Disease;

**(4)** Frost or hail; or

**(5)** Rain, snow, ice or sleet.

**2.** We will not pay for loss of or damage to the following types of property unless caused by the "specified causes of loss" or building glass breakage:

**a.** Animals, and then only if they are killed or their destruction is made necessary.

**b.** Fragile articles such as statuary, marbles, chinaware and porcelains, if broken. This restriction does not apply to:

**(1)** Glass; or

**(2)** Containers of property held for sale.

**c.** Builders' machinery, tools and equipment owned by you or entrusted to you, provided such property is Covered Property.

However, this limitation does not apply:

**(1)** If the property is located on or within 100 feet of the described premises, unless the premises is insured under the Builders Risk Coverage Form; or

**(2)** To Business Income Coverage or to Extra Expense Coverage.

**3.** The special limit shown for each category, **a.** through **d.**, is the total limit for loss of or damage to all property in that category. The special limit applies to any one occurrence of theft, regardless of the types or number of articles that are lost or damaged in that occurrence. The special limits are (unless a higher limit is shown in the Declarations):

**a.** $2,500 for furs, fur garments and garments trimmed with fur.

**b.** $2,500 for jewelry, watches, watch movements, jewels, pearls, precious and semiprecious stones, bullion, gold, silver, platinum and other precious alloys or metals. This limit does not apply to jewelry and watches worth $100 or less per item.

**c.** $2,500 for patterns, dies, molds and forms.

**d.** $250 for stamps, tickets, including lottery tickets held for sale, and letters of credit.

These special limits are part of, not in addition to, the Limit of Insurance applicable to the Covered Property.

This limitation, **C.3.**, does not apply to Business Income Coverage or to Extra Expense Coverage.

**4.** We will not pay the cost to repair any defect to a system or appliance from which water, other liquid, powder or molten material escapes. But we will pay the cost to repair or replace damaged parts of fire-extinguishing equipment if the damage:

**a.** Results in discharge of any substance from an automatic fire protection system; or

**b.** Is directly caused by freezing.

However, this limitation does not apply to Business Income Coverage or to Extra Expense Coverage.

**D. Additional Coverage – Collapse**

The coverage provided under this Additional Coverage, Collapse, applies only to an abrupt collapse as described and limited in **D.1.** through **D.7.**

**1.** For the purpose of this Additional Coverage, Collapse, abrupt collapse means an abrupt falling down or caving in of a building or any part of a building with the result that the building or part of the building cannot be occupied for its intended purpose.

**2.** We will pay for direct physical loss or damage to Covered Property, caused by abrupt collapse of a building or any part of a building that is insured under this Coverage Form or that contains Covered Property insured under this Coverage Form, if such collapse is caused by one or more of the following:

**a.** Building decay that is hidden from view, unless the presence of such decay is known to an insured prior to collapse;

**b.** Insect or vermin damage that is hidden from view, unless the presence of such damage is known to an insured prior to collapse;

**c.** Use of defective material or methods in construction, remodeling or renovation if the abrupt collapse occurs during the course of the construction, remodeling or renovation.

Subject to Protective Order - Confidential

BSAPolicyEv-00051012

TrustApp0627

**d.** Use of defective material or methods in construction, remodeling or renovation if the abrupt collapse occurs after the construction, remodeling or renovation is complete, but only if the collapse is caused in part by:

**(1)** A cause of loss listed in **2.a.** or **2.b.;**

**(2)** One or more of the "specified causes of loss";

**(3)** Breakage of building glass;

**(4)** Weight of people or personal property; or

**(5)** Weight of rain that collects on a roof.

**3.** This **Additional Coverage – Collapse** does **not** apply to:

**a.** A building or any part of a building that is in danger of falling down or caving in;

**b.** A part of a building that is standing, even if it has separated from another part of the building; or

**c.** A building that is standing or any part of a building that is standing, even if it shows evidence of cracking, bulging, sagging, bending, leaning, settling, shrinkage or expansion.

**4.** With respect to the following property:

**a.** Outdoor radio or television antennas (including satellite dishes) and their lead-in wiring, masts or towers;

**b.** Awnings, gutters and downspouts;

**c.** Yard fixtures;

**d.** Outdoor swimming pools;

**e.** Fences;

**f.** Piers, wharves and docks;

**g.** Beach or diving platforms or appurtenances;

**h.** Retaining walls; and

**i.** Walks, roadways and other paved surfaces;

if an abrupt collapse is caused by a cause of loss listed in **2.a.** through **2.d.**, we will pay for loss or damage to that property only if:

**(1)** Such loss or damage is a direct result of the abrupt collapse of a building insured under this Coverage Form; and

**(2)** The property is Covered Property under this Coverage Form.

**5.** If personal property abruptly falls down or caves in and such collapse is **not** the result of abrupt collapse of a building, we will pay for loss or damage to Covered Property caused by such collapse of personal property only if:

**a.** The collapse of personal property was caused by a cause of loss listed in **2.a.** through **2.d.;**

**b.** The personal property which collapses is inside a building; and

**c.** The property which collapses is not of a kind listed in **4.**, regardless of whether that kind of property is considered to be personal property or real property.

The coverage stated in this Paragraph **5.** does not apply to personal property if marring and/or scratching is the only damage to that personal property caused by the collapse.

**6.** This Additional Coverage, Collapse, does not apply to personal property that has not abruptly fallen down or caved in, even if the personal property shows evidence of cracking, bulging, sagging, bending, leaning, settling, shrinkage or expansion.

**7.** This Additional Coverage, Collapse, will not increase the Limits of Insurance provided in this Coverage Part.

**8.** The term Covered Cause of Loss includes the Additional Coverage, Collapse, as described and limited in **D.1.** through **D.7.**

**E.** **Additional Coverage – Limited Coverage For "Fungus", Wet Rot, Dry Rot And Bacteria**

**1.** The coverage described in **E.2.** and **E.6.** only applies when the "fungus", wet or dry rot or bacteria are the result of one or more of the following causes that occur during the policy period and only if all reasonable means were used to save and preserve the property from further damage at the time of and after that occurrence:

**a.** A "specified cause of loss" other than fire or lightning; or

**b.** Flood, if the Flood Coverage Endorsement applies to the affected premises.

This Additional Coverage does not apply to lawns, trees, shrubs or plants which are part of a vegetated roof.

**2.** We will pay for loss or damage by "fungus", wet or dry rot or bacteria. As used in this Limited Coverage, the term loss or damage means:

**a.** Direct physical loss or damage to Covered Property caused by "fungus", wet or dry rot or bacteria, including the cost of removal of the "fungus", wet or dry rot or bacteria;

**b.** The cost to tear out and replace any part of the building or other property as needed to gain access to the "fungus", wet or dry rot or bacteria; and

**c.** The cost of testing performed after removal, repair, replacement or restoration of the damaged property is completed, provided there is a reason to believe that "fungus", wet or dry rot or bacteria are present.

Subject to Protective Order - Confidential

3. The coverage described under **E.2.** of this Limited Coverage is limited to $15,000. Regardless of the number of claims, this limit is the most we will pay for the total of all loss or damage arising out of all occurrences of "specified causes of loss" (other than fire or lightning) and Flood which take place in a 12-month period (starting with the beginning of the present annual policy period). With respect to a particular occurrence of loss which results in "fungus", wet or dry rot or bacteria, we will not pay more than a total of $15,000 even if the "fungus", wet or dry rot or bacteria continue to be present or active, or recur, in a later policy period.

4. The coverage provided under this Limited Coverage does not increase the applicable Limit of Insurance on any Covered Property. If a particular occurrence results in loss or damage by "fungus", wet or dry rot or bacteria, and other loss or damage, we will not pay more, for the total of all loss or damage, than the applicable Limit of Insurance on the affected Covered Property.

   If there is covered loss or damage to Covered Property, not caused by "fungus", wet or dry rot or bacteria, loss payment will not be limited by the terms of this Limited Coverage, except to the extent that "fungus", wet or dry rot or bacteria cause an increase in the loss. Any such increase in the loss will be subject to the terms of this Limited Coverage.

5. The terms of this Limited Coverage do not increase or reduce the coverage provided under Paragraph **F.2.** (Water Damage, Other Liquids, Powder Or Molten Material Damage) of this Causes Of Loss form or under the Additional Coverage, Collapse.

6. The following, **6.a.** or **6.b.,** applies only if Business Income and/or Extra Expense Coverage applies to the described premises and only if the "suspension" of "operations" satisfies all terms and conditions of the applicable Business Income and/or Extra Expense Coverage Form:

   a. If the loss which resulted in "fungus", wet or dry rot or bacteria does not in itself necessitate a "suspension" of "operations", but such "suspension" is necessary due to loss or damage to property caused by "fungus", wet or dry rot or bacteria, then our payment under Business Income and/or Extra Expense is limited to the amount of loss and/or expense sustained in a period of not more than 30 days. The days need not be consecutive.

   b. If a covered "suspension" of "operations" was caused by loss or damage other than "fungus", wet or dry rot or bacteria but remediation of "fungus", wet or dry rot or bacteria prolongs the "period of restoration", we will pay for loss and/or expense sustained during the delay (regardless of when such a delay occurs during the "period of restoration"), but such coverage is limited to 30 days. The days need not be consecutive.

**F. Additional Coverage Extensions**

1. **Property In Transit**

   This Extension applies only to your personal property to which this form applies.

   a. You may extend the insurance provided by this Coverage Part to apply to your personal property (other than property in the care, custody or control of your salespersons) in transit more than 100 feet from the described premises. Property must be in or on a motor vehicle you own, lease or operate while between points in the coverage territory.

   b. Loss or damage must be caused by or result from one of the following causes of loss:

      (1) Fire, lightning, explosion, windstorm or hail, riot or civil commotion, or vandalism.

      (2) Vehicle collision, upset or overturn. Collision means accidental contact of your vehicle with another vehicle or object. It does not mean your vehicle's contact with the roadbed.

      (3) Theft of an entire bale, case or package by forced entry into a securely locked body or compartment of the vehicle. There must be visible marks of the forced entry.

   c. The most we will pay for loss or damage under this Extension is $5,000.

   This Coverage Extension is additional insurance. The Additional Condition, Coinsurance, does not apply to this Extension.

2. **Water Damage, Other Liquids, Powder Or Molten Material Damage**

   If loss or damage caused by or resulting from covered water or other liquid, powder or molten material damage loss occurs, we will also pay the cost to tear out and replace any part of the building or structure to repair damage to the system or appliance from which the water or other substance escapes. This Coverage Extension does not increase the Limit of Insurance.

Subject to Protective Order - Confidential

**3. Glass**

    **a.** We will pay for expenses incurred to put up temporary plates or board up openings if repair or replacement of damaged glass is delayed.

    **b.** We will pay for expenses incurred to remove or replace obstructions when repairing or replacing glass that is part of a building. This does not include removing or replacing window displays.

    This Coverage Extension **F.3.** does not increase the Limit of Insurance.

**G. Definitions**

  **1.** "Fungus" means any type or form of fungus, including mold or mildew, and any mycotoxins, spores, scents or by-products produced or released by fungi.

  **2.** "Specified causes of loss" means the following: fire; lightning; explosion; windstorm or hail; smoke; aircraft or vehicles; riot or civil commotion; vandalism; leakage from fire-extinguishing equipment; sinkhole collapse; volcanic action; falling objects; weight of snow, ice or sleet; water damage.

    **a.** Sinkhole collapse means the sudden sinking or collapse of land into underground empty spaces created by the action of water on limestone or dolomite. This cause of loss does not include:

      **(1)** The cost of filling sinkholes; or

      **(2)** Sinking or collapse of land into man-made underground cavities.

    **b.** Falling objects does not include loss or damage to:

      **(1)** Personal property in the open; or

      **(2)** The interior of a building or structure, or property inside a building or structure, unless the roof or an outside wall of the building or structure is first damaged by a falling object.

**c.** Water damage means:

    **(1)** Accidental discharge or leakage of water or steam as the direct result of the breaking apart or cracking of a plumbing, heating, air conditioning or other system or appliance (other than a sump system including its related equipment and parts), that is located on the described premises and contains water or steam; and

    **(2)** Accidental discharge or leakage of water or waterborne material as the direct result of the breaking apart or cracking of a water or sewer pipe that is located off the described premises and is part of a municipal potable water supply system or municipal sanitary sewer system, if the breakage or cracking is caused by wear and tear.

    But water damage does not include loss or damage otherwise excluded under the terms of the Water Exclusion. Therefore, for example, there is no coverage under this policy in the situation in which discharge or leakage of water results from the breaking apart or cracking of a pipe which was caused by or related to weather-induced flooding, even if wear and tear contributed to the breakage or cracking. As another example, and also in accordance with the terms of the Water Exclusion, there is no coverage for loss or damage caused by or related to weather-induced flooding which follows or is exacerbated by pipe breakage or cracking attributable to wear and tear.

    To the extent that accidental discharge or leakage of water falls within the criteria set forth in **c.(1)** or **c.(2)** of this definition of "specified causes of loss," such water is not subject to the provisions of the Water Exclusion which preclude coverage for surface water or water under the surface of the ground.

Subject to Protective Order - Confidential

POLICY NUMBER: KKO0000021153300

COMMERCIAL PROPERTY
CP 00 30 10 12

# BUSINESS INCOME (AND EXTRA EXPENSE) COVERAGE FORM

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this policy, the words "you" and "your" refer to the Named Insured shown in the Declarations. The words "we", "us" and "our" refer to the company providing this insurance.

Other words and phrases that appear in quotation marks have special meaning. Refer to Section **F.** Definitions.

## A. Coverage

### 1. Business Income

Business Income means the:

**a.** Net Income (Net Profit or Loss before income taxes) that would have been earned or incurred; and

**b.** Continuing normal operating expenses incurred, including payroll.

For manufacturing risks, Net Income includes the net sales value of production.

Coverage is provided as described and limited below for one or more of the following options for which a Limit Of Insurance is shown in the Declarations:

**(1)** Business Income Including "Rental Value".

**(2)** Business Income Other Than "Rental Value".

**(3)** "Rental Value".

If option **(1)** above is selected, the term Business Income will include "Rental Value". If option **(3)** above is selected, the term Business Income will mean "Rental Value" only.

If Limits of Insurance are shown under more than one of the above options, the provisions of this Coverage Part apply separately to each.

We will pay for the actual loss of Business Income you sustain due to the necessary "suspension" of your "operations" during the "period of restoration". The "suspension" must be caused by direct physical loss of or damage to property at premises which are described in the Declarations and for which a Business Income Limit Of Insurance is shown in the Declarations. The loss or damage must be caused by or result from a Covered Cause of Loss. With respect to loss of or damage to personal property in the open or personal property in a vehicle, the described premises include the area within 100 feet of such premises.

With respect to the requirements set forth in the preceding paragraph, if you occupy only part of a building, your premises means:

**(a)** The portion of the building which you rent, lease or occupy;

**(b)** The area within 100 feet of the building or within 100 feet of the premises described in the Declarations, whichever distance is greater (with respect to loss of or damage to personal property in the open or personal property in a vehicle); and

**(c)** Any area within the building or at the described premises, if that area services, or is used to gain access to, the portion of the building which you rent, lease or occupy.

### 2. Extra Expense

**a.** Extra Expense Coverage is provided at the premises described in the Declarations only if the Declarations show that Business Income Coverage applies at that premises.

**b.** Extra Expense means necessary expenses you incur during the "period of restoration" that you would not have incurred if there had been no direct physical loss or damage to property caused by or resulting from a Covered Cause of Loss.

We will pay Extra Expense (other than the expense to repair or replace property) to:

**(1)** Avoid or minimize the "suspension" of business and to continue operations at the described premises or at replacement premises or temporary locations, including relocation expenses and costs to equip and operate the replacement location or temporary location.

**(2)** Minimize the "suspension" of business if you cannot continue "operations".

CP 00 30 10 12

© Insurance Services Office, Inc., 2011

Page 1 of 8

We will also pay Extra Expense to repair or replace property, but only to the extent it reduces the amount of loss that otherwise would have been payable under this Coverage Form.

**3. Covered Causes Of Loss, Exclusions And Limitations**

See applicable Causes Of Loss form as shown in the Declarations.

**4. Additional Limitation – Interruption Of Computer Operations**

**a.** Coverage for Business Income does not apply when a "suspension" of "operations" is caused by destruction or corruption of electronic data, or any loss or damage to electronic data, except as provided under the Additional Coverage, Interruption Of Computer Operations.

**b.** Coverage for Extra Expense does not apply when action is taken to avoid or minimize a "suspension" of "operations" caused by destruction or corruption of electronic data, or any loss or damage to electronic data, except as provided under the Additional Coverage, Interruption Of Computer Operations.

**c.** Electronic data means information, facts or computer programs stored as or on, created or used on, or transmitted to or from computer software (including systems and applications software), on hard or floppy disks, CD-ROMs, tapes, drives, cells, data processing devices or any other repositories of computer software which are used with electronically controlled equipment. The term computer programs, referred to in the foregoing description of electronic data, means a set of related electronic instructions which direct the operations and functions of a computer or device connected to it, which enable the computer or device to receive, process, store, retrieve or send data.

**d.** This Additional Limitation does not apply when loss or damage to electronic data involves only electronic data which is integrated in and operates or controls a building's elevator, lighting, heating, ventilation, air conditioning or security system.

**5. Additional Coverages**

**a. Civil Authority**

In this Additional Coverage, Civil Authority, the described premises are premises to which this Coverage Form applies, as shown in the Declarations.

When a Covered Cause of Loss causes damage to property other than property at the described premises, we will pay for the actual loss of Business Income you sustain and necessary Extra Expense caused by action of civil authority that prohibits access to the described premises, provided that both of the following apply:

**(1)** Access to the area immediately surrounding the damaged property is prohibited by civil authority as a result of the damage, and the described premises are within that area but are not more than one mile from the damaged property; and

**(2)** The action of civil authority is taken in response to dangerous physical conditions resulting from the damage or continuation of the Covered Cause of Loss that caused the damage, or the action is taken to enable a civil authority to have unimpeded access to the damaged property.

Civil Authority Coverage for Business Income will begin 72 hours after the time of the first action of civil authority that prohibits access to the described premises and will apply for a period of up to four consecutive weeks from the date on which such coverage began.

Civil Authority Coverage for Extra Expense will begin immediately after the time of the first action of civil authority that prohibits access to the described premises and will end:

**(1)** Four consecutive weeks after the date of that action; or

**(2)** When your Civil Authority Coverage for Business Income ends;

whichever is later.

**b. Alterations And New Buildings**

We will pay for the actual loss of Business Income you sustain and necessary Extra Expense you incur due to direct physical loss or damage at the described premises caused by or resulting from any Covered Cause of Loss to:

**(1)** New buildings or structures, whether complete or under construction;

**(2)** Alterations or additions to existing buildings or structures; and

**(3)** Machinery, equipment, supplies or building materials located on or within 100 feet of the described premises and:

**(a)** Used in the construction, alterations or additions; or

**(b)** Incidental to the occupancy of new buildings.

Subject to Protective Order - Confidential

If such direct physical loss or damage delays the start of "operations", the "period of restoration" for Business Income Coverage will begin on the date "operations" would have begun if the direct physical loss or damage had not occurred.

c. **Extended Business Income**

(1) **Business Income Other Than "Rental Value"**

If the necessary "suspension" of your "operations" produces a Business Income loss payable under this policy, we will pay for the actual loss of Business Income you incur during the period that:

(a) Begins on the date property (except "finished stock") is actually repaired, rebuilt or replaced and "operations" are resumed; and

(b) Ends on the earlier of:

(i) The date you could restore your "operations", with reasonable speed, to the level which would generate the business income amount that would have existed if no direct physical loss or damage had occurred; or

(ii) 60 consecutive days after the date determined in **(1)(a)** above.

However, Extended Business Income does not apply to loss of Business Income incurred as a result of unfavorable business conditions caused by the impact of the Covered Cause of Loss in the area where the described premises are located.

Loss of Business Income must be caused by direct physical loss or damage at the described premises caused by or resulting from any Covered Cause of Loss.

(2) **"Rental Value"**

If the necessary "suspension" of your "operations" produces a "Rental Value" loss payable under this policy, we will pay for the actual loss of "Rental Value" you incur during the period that:

(a) Begins on the date property is actually repaired, rebuilt or replaced and tenantability is restored; and

(b) Ends on the earlier of:

(i) The date you could restore tenant occupancy, with reasonable speed, to the level which would generate the "Rental Value" that would have existed if no direct physical loss or damage had occurred; or

(ii) 60 consecutive days after the date determined in **(2)(a)** above.

However, Extended Business Income does not apply to loss of "Rental Value" incurred as a result of unfavorable business conditions caused by the impact of the Covered Cause of Loss in the area where the described premises are located.

Loss of "Rental Value" must be caused by direct physical loss or damage at the described premises caused by or resulting from any Covered Cause of Loss.

d. **Interruption Of Computer Operations**

(1) Under this Additional Coverage, electronic data has the meaning described under Additional Limitation – Interruption Of Computer Operations.

(2) Subject to all provisions of this Additional Coverage, you may extend the insurance that applies to Business Income and Extra Expense to apply to a "suspension" of "operations" caused by an interruption in computer operations due to destruction or corruption of electronic data due to a Covered Cause of Loss. However, we will not provide coverage under this Additional Coverage when the Additional Limitation – Interruption Of Computer Operations does not apply based on Paragraph **A.4.d.** therein.

(3) With respect to the coverage provided under this Additional Coverage, the Covered Causes of Loss are subject to the following:

(a) If the Causes Of Loss – Special Form applies, coverage under this Additional Coverage, Interruption Of Computer Operations, is limited to the "specified causes of loss" as defined in that form and Collapse as set forth in that form.

(b) If the Causes Of Loss – Broad Form applies, coverage under this Additional Coverage, Interruption Of Computer Operations, includes Collapse as set forth in that form.

(c) If the Causes Of Loss form is endorsed to add a Covered Cause of Loss, the additional Covered Cause of Loss does not apply to the coverage provided under this Additional Coverage, Interruption Of Computer Operations.

(d) The Covered Causes of Loss include a virus, harmful code or similar instruction introduced into or enacted on a computer system (including

Subject to Protective Order - Confidential

electronic data) or a network to which it is connected, designed to damage or destroy any part of the system or disrupt its normal operation. But there is no coverage for an interruption related to manipulation of a computer system (including electronic data) by any employee, including a temporary or leased employee, or by an entity retained by you or for you to inspect, design, install, maintain, repair or replace that system.

**(4)** The most we will pay under this Additional Coverage, Interruption Of Computer Operations, is $2,500 (unless a higher limit is shown in the Declarations) for all loss sustained and expense incurred in any one policy year, regardless of the number of interruptions or the number of premises, locations or computer systems involved. If loss payment relating to the first interruption does not exhaust this amount, then the balance is available for loss or expense sustained or incurred as a result of subsequent interruptions in that policy year. A balance remaining at the end of a policy year does not increase the amount of insurance in the next policy year. With respect to any interruption which begins in one policy year and continues or results in additional loss or expense in a subsequent policy year(s), all loss and expense is deemed to be sustained or incurred in the policy year in which the interruption began.

**(5)** This Additional Coverage, Interruption Of Computer Operations, does not apply to loss sustained or expense incurred after the end of the "period of restoration", even if the amount of insurance stated in **(4)** above has not been exhausted.

**6. Coverage Extension**

If a Coinsurance percentage of 50% or more is shown in the Declarations, you may extend the insurance provided by this Coverage Part as follows:

**Newly Acquired Locations**

**a.** You may extend your Business Income and Extra Expense Coverages to apply to property at any location you acquire other than fairs or exhibitions.

**b.** The most we will pay under this Extension, for the sum of Business Income loss and Extra Expense incurred, is $100,000 at each location, unless a higher limit is shown in the Declarations.

**c.** Insurance under this Extension for each newly acquired location will end when any of the following first occurs:

**(1)** This policy expires;

**(2)** 30 days expire after you acquire or begin to construct the property; or

**(3)** You report values to us.

We will charge you additional premium for values reported from the date you acquire the property.

The Additional Condition, Coinsurance, does not apply to this Extension.

**B. Limits Of Insurance**

The most we will pay for loss in any one occurrence is the applicable Limit Of Insurance shown in the Declarations.

Payments under the following coverages will not increase the applicable Limit of Insurance:

**1.** Alterations And New Buildings;

**2.** Civil Authority;

**3.** Extra Expense; or

**4.** Extended Business Income.

The amounts of insurance stated in the Interruption Of Computer Operations Additional Coverage and the Newly Acquired Locations Coverage Extension apply in accordance with the terms of those coverages and are separate from the Limit(s) Of Insurance shown in the Declarations for any other coverage.

**C. Loss Conditions**

The following conditions apply in addition to the Common Policy Conditions and the Commercial Property Conditions:

**1. Appraisal**

If we and you disagree on the amount of Net Income and operating expense or the amount of loss, either may make written demand for an appraisal of the loss. In this event, each party will select a competent and impartial appraiser.

The two appraisers will select an umpire. If they cannot agree, either may request that selection be made by a judge of a court having jurisdiction. The appraisers will state separately the amount of Net Income and operating expense or amount of loss. If they fail to agree, they will submit their differences to the umpire. A decision agreed to by any two will be binding. Each party will:

**a.** Pay its chosen appraiser; and

**b.** Bear the other expenses of the appraisal and umpire equally.

If there is an appraisal, we will still retain our right to deny the claim.

Subject to Protective Order - Confidential

**2. Duties In The Event Of Loss**

   **a.** You must see that the following are done in the event of loss:

   **(1)** Notify the police if a law may have been broken.

   **(2)** Give us prompt notice of the direct physical loss or damage. Include a description of the property involved.

   **(3)** As soon as possible, give us a description of how, when and where the direct physical loss or damage occurred.

   **(4)** Take all reasonable steps to protect the Covered Property from further damage, and keep a record of your expenses necessary to protect the Covered Property, for consideration in the settlement of the claim. This will not increase the Limit of Insurance. However, we will not pay for any subsequent loss or damage resulting from a cause of loss that is not a Covered Cause of Loss. Also, if feasible, set the damaged property aside and in the best possible order for examination.

   **(5)** As often as may be reasonably required, permit us to inspect the property proving the loss or damage and examine your books and records.

   Also permit us to take samples of damaged and undamaged property for inspection, testing and analysis, and permit us to make copies from your books and records.

   **(6)** Send us a signed, sworn proof of loss containing the information we request to investigate the claim. You must do this within 60 days after our request. We will supply you with the necessary forms.

   **(7)** Cooperate with us in the investigation or settlement of the claim.

   **(8)** If you intend to continue your business, you must resume all or part of your "operations" as quickly as possible.

   **b.** We may examine any insured under oath, while not in the presence of any other insured and at such times as may be reasonably required, about any matter relating to this insurance or the claim, including an insured's books and records. In the event of an examination, an insured's answers must be signed.

**3. Loss Determination**

   **a.** The amount of Business Income loss will be determined based on:

   **(1)** The Net Income of the business before the direct physical loss or damage occurred;

   **(2)** The likely Net Income of the business if no physical loss or damage had occurred, but not including any Net Income that would likely have been earned as a result of an increase in the volume of business due to favorable business conditions caused by the impact of the Covered Cause of Loss on customers or on other businesses;

   **(3)** The operating expenses, including payroll expenses, necessary to resume "operations" with the same quality of service that existed just before the direct physical loss or damage; and

   **(4)** Other relevant sources of information, including:

   **(a)** Your financial records and accounting procedures;

   **(b)** Bills, invoices and other vouchers; and

   **(c)** Deeds, liens or contracts.

   **b.** The amount of Extra Expense will be determined based on:

   **(1)** All expenses that exceed the normal operating expenses that would have been incurred by "operations" during the "period of restoration" if no direct physical loss or damage had occurred. We will deduct from the total of such expenses:

   **(a)** The salvage value that remains of any property bought for temporary use during the "period of restoration", once "operations" are resumed; and

   **(b)** Any Extra Expense that is paid for by other insurance, except for insurance that is written subject to the same plan, terms, conditions and provisions as this insurance; and

   **(2)** Necessary expenses that reduce the Business Income loss that otherwise would have been incurred.

   **c. Resumption Of Operations**

   We will reduce the amount of your:

   **(1)** Business Income loss, other than Extra Expense, to the extent you can resume your "operations", in whole or in part, by using damaged or undamaged property (including merchandise or stock) at the described premises or elsewhere.

   **(2)** Extra Expense loss to the extent you can return "operations" to normal and discontinue such Extra Expense.

Subject to Protective Order - Confidential

BSAPolicyEv-00051020

TrustApp0635

**d.** If you do not resume "operations", or do not resume "operations" as quickly as possible, we will pay based on the length of time it would have taken to resume "operations" as quickly as possible.

**4. Loss Payment**

We will pay for covered loss within 30 days after we receive the sworn proof of loss, if you have complied with all of the terms of this Coverage Part, and:

**a.** We have reached agreement with you on the amount of loss; or

**b.** An appraisal award has been made.

**D. Additional Condition**

**COINSURANCE**

If a Coinsurance percentage is shown in the Declarations, the following condition applies in addition to the Common Policy Conditions and the Commercial Property Conditions.

We will not pay the full amount of any Business Income loss if the Limit of Insurance for Business Income is less than:

**1.** The Coinsurance percentage shown for Business Income in the Declarations; times

**2.** The sum of:

**a.** The Net Income (Net Profit or Loss before income taxes), and

**b.** Operating expenses, including payroll expenses,

that would have been earned or incurred (had no loss occurred) by your "operations" at the described premises for the 12 months following the inception, or last previous anniversary date, of this policy (whichever is later).

Instead, we will determine the most we will pay using the following steps:

Step **(1):** Multiply the Net Income and operating expense for the 12 months following the inception, or last previous anniversary date, of this policy by the Coinsurance percentage;

Step **(2):** Divide the Limit of Insurance for the described premises by the figure determined in Step **(1);** and

Step **(3):** Multiply the total amount of loss by the figure determined in Step **(2).**

We will pay the amount determined in Step **(3)** or the limit of insurance, whichever is less. For the remainder, you will either have to rely on other insurance or absorb the loss yourself.

In determining operating expenses for the purpose of applying the Coinsurance condition, the following expenses, if applicable, shall be deducted from the total of all operating expenses:

**(1)** Prepaid freight – outgoing;

**(2)** Returns and allowances;

**(3)** Discounts;

**(4)** Bad debts;

**(5)** Collection expenses;

**(6)** Cost of raw stock and factory supplies consumed (including transportation charges);

**(7)** Cost of merchandise sold (including transportation charges);

**(8)** Cost of other supplies consumed (including transportation charges);

**(9)** Cost of services purchased from outsiders (not employees) to resell, that do not continue under contract;

**(10)** Power, heat and refrigeration expenses that do not continue under contract (if Form **CP 15 11** is attached);

**(11)** All payroll expenses or the amount of payroll expense excluded (if Form **CP 15 10** is attached); and

**(12)** Special deductions for mining properties (royalties unless specifically included in coverage; actual depletion commonly known as unit or cost depletion – not percentage depletion; welfare and retirement fund charges based on tonnage; hired trucks).

**Example 1 (Underinsurance)**

When:    The Net Income and operating expenses for the 12 months following the inception, or last previous anniversary date, of this policy at the described premises would have been:    $ 400,000

The Coinsurance percentage is:    50%

The Limit of Insurance is:    $ 150,000

The amount of loss is:    $ 80,000

Step **(1):** $400,000 x 50% = $200,000

(the minimum amount of insurance to meet your Coinsurance requirements)

Step **(2):** $150,000 ÷ $200,000 = .75

Step **(3):** $80,000 x .75 = $60,000

We will pay no more than $60,000. The remaining $20,000 is not covered.

Subject to Protective Order - Confidential

**Example 2 (Adequate Insurance)**

When:   The Net Income and operating
        expenses for the 12 months
        following the inception, or last
        previous anniversary date, of
        this policy at the described
        premises would have been:     $ 400,000
        The Coinsurance percentage is:      50%
        The Limit of Insurance is:    $ 200,000
        The amount of loss is:        $  80,000

The minimum amount of insurance to meet your
Coinsurance requirement is $200,000 ($400,000 x
50%). Therefore, the Limit of Insurance in this example
is adequate and no penalty applies. We will pay no
more than $80,000 (amount of loss).

This condition does not apply to Extra Expense
Coverage.

**E. Optional Coverages**

   If shown as applicable in the Declarations, the
   following Optional Coverages apply separately to
   each item.

   **1. Maximum Period Of Indemnity**

      **a.** The Additional Condition, Coinsurance, does
            not apply to this Coverage Form at the
            described premises to which this Optional
            Coverage applies.

      **b.** The most we will pay for the total of Business
            Income loss and Extra Expense is the lesser
            of:

         **(1)** The amount of loss sustained and
               expenses incurred during the 120 days
               immediately following the beginning of the
               "period of restoration"; or

         **(2)** The Limit Of Insurance shown in the
               Declarations.

   **2. Monthly Limit Of Indemnity**

      **a.** The Additional Condition, Coinsurance, does
            not apply to this Coverage Form at the
            described premises to which this Optional
            Coverage applies.

      **b.** The most we will pay for loss of Business
            Income in each period of 30 consecutive days
            after the beginning of the "period of
            restoration" is:

         **(1)** The Limit of Insurance, multiplied by

         **(2)** The fraction shown in the Declarations for
               this Optional Coverage.

**Example**

When:   The Limit of Insurance is:      $ 120,000
        The fraction shown in the
        Declarations for this Optional
        Coverage is:                         1/4
        The most we will pay for loss in
        each period of 30 consecutive
        days is:                         $  30,000
        ($120,000 x 1/4 = $30,000)
        If, in this example, the actual
        amount of loss is:
        Days 1–30:                       $  40,000
        Days 31–60:                      $  20,000
        Days 61–90:                      $  30,000
                                         $  90,000

        We will pay:
        Days 1–30:                       $  30,000
        Days 31–60:                      $  20,000
        Days 61–90:                      $  30,000
                                         $  80,000
        The remaining $10,000 is not covered.

   **3. Business Income Agreed Value**

      **a.** To activate this Optional Coverage:

         **(1)** A Business Income Report/Work Sheet
               must be submitted to us and must show
               financial data for your "operations":

            **(a)** During the 12 months prior to the date
                  of the Work Sheet; and

            **(b)** Estimated for the 12 months
                  immediately following the inception of
                  this Optional Coverage.

         **(2)** The Declarations must indicate that the
               Business Income Agreed Value Optional
               Coverage applies, and an Agreed Value
               must be shown in the Declarations. The
               Agreed Value should be at least equal to:

            **(a)** The Coinsurance percentage shown in
                  the Declarations; multiplied by

            **(b)** The amount of Net Income and
                  operating expenses for the following
                  12 months you report on the Work
                  Sheet.

      **b.** The Additional Condition, Coinsurance, is
            suspended until:

         **(1)** 12 months after the effective date of this
               Optional Coverage; or

         **(2)** The expiration date of this policy;

            whichever occurs first.

      **c.** We will reinstate the Additional Condition,
            Coinsurance, automatically if you do not
            submit a new Work Sheet and Agreed Value:

Subject to Protective Order - Confidential

**(1)** Within 12 months of the effective date of this Optional Coverage; or

**(2)** When you request a change in your Business Income Limit of Insurance.

**d.** If the Business Income Limit of Insurance is less than the Agreed Value, we will not pay more of any loss than the amount of loss multiplied by:

**(1)** The Business Income Limit of Insurance; divided by

**(2)** The Agreed Value.

**Example**

| When: | The Limit of Insurance is: | $ 100,000 |
| | The Agreed Value is: | $ 200,000 |
| | The amount of loss is: | $ 80,000 |

Step **(1)**: $100,000 ÷ $200,000 = .50
Step **(2)**: .50 x $80,000 = $40,000

We will pay $40,000. The remaining $40,000 is not covered.

**4. Extended Period Of Indemnity**

Under Paragraph **A.5.c., Extended Business Income,** the number 60 in Subparagraphs **(1)(b)** and **(2)(b)** is replaced by the number shown in the Declarations for this Optional Coverage.

**F. Definitions**

**1.** "Finished stock" means stock you have manufactured.

"Finished stock" also includes whiskey and alcoholic products being aged, unless there is a Coinsurance percentage shown for Business Income in the Declarations.

"Finished stock" does not include stock you have manufactured that is held for sale on the premises of any retail outlet insured under this Coverage Part.

**2.** "Operations" means:

**a.** Your business activities occurring at the described premises; and

**b.** The tenantability of the described premises, if coverage for Business Income Including "Rental Value" or "Rental Value" applies.

**3.** "Period of restoration" means the period of time that:

**a.** Begins:

**(1)** 72 hours after the time of direct physical loss or damage for Business Income Coverage; or

**(2)** Immediately after the time of direct physical loss or damage for Extra Expense Coverage;

caused by or resulting from any Covered Cause of Loss at the described premises; and

**b.** Ends on the earlier of:

**(1)** The date when the property at the described premises should be repaired, rebuilt or replaced with reasonable speed and similar quality; or

**(2)** The date when business is resumed at a new permanent location.

"Period of restoration" does not include any increased period required due to the enforcement of or compliance with any ordinance or law that:

**(1)** Regulates the construction, use or repair, or requires the tearing down, of any property; or

**(2)** Requires any insured or others to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of "pollutants".

The expiration date of this policy will not cut short the "period of restoration".

**4.** "Pollutants" means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

**5.** "Rental Value" means Business Income that consists of:

**a.** Net Income (Net Profit or Loss before income taxes) that would have been earned or incurred as rental income from tenant occupancy of the premises described in the Declarations as furnished and equipped by you, including fair rental value of any portion of the described premises which is occupied by you; and

**b.** Continuing normal operating expenses incurred in connection with that premises, including:

**(1)** Payroll; and

**(2)** The amount of charges which are the legal obligation of the tenant(s) but would otherwise be your obligations.

**6.** "Suspension" means:

**a.** The slowdown or cessation of your business activities; or

**b.** That a part or all of the described premises is rendered untenantable, if coverage for Business Income Including "Rental Value" or "Rental Value" applies.

© Insurance Services Office, Inc., 2011

CP 00 30 10 12

Subject to Protective Order - Confidential

BSAPolicyEv-00051023

TrustApp0638

POLICY NUMBER: KKO0000021153300

COMMERCIAL PROPERTY
CP 01 76 09 06

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# MASSACHUSETTS – EXCLUSION OF LOSS DUE TO VIRUS OR BACTERIA

This endorsement modifies insurance provided under the following:

COMMERCIAL PROPERTY COVERAGE PART
STANDARD PROPERTY POLICY

**A.** The exclusion set forth in Paragraph **B.** applies to all coverage under all forms and endorsements that comprise this Coverage Part or Policy, including but not limited to forms or endorsements that cover property damage to buildings or personal property and forms or endorsements that cover business income, extra expense or action of civil authority.

**B.** We will not pay for loss or damage caused by or resulting from any virus, bacterium or other microorganism that induces or is capable of inducing physical distress, illness or disease.

However, this exclusion does not apply to loss or damage caused by or resulting from "fungus", wet rot or dry rot. Such loss or damage is addressed in a separate exclusion in this Coverage Part or Policy.

**C.** With respect to any loss or damage subject to the exclusion in Paragraph **B.,** such exclusion supersedes any exclusion relating to "pollutants".

**D.** The following provisions in this Coverage Part or Policy (including those in Massachusetts – Fungi, Wet Rot, Dry Rot And Bacteria Exclusion And Limitations Endorsement **CP 10 64** applicable to the Causes Of Loss – Special Form if attached to this policy) are hereby amended to remove reference to bacteria:

    **1.** Exclusion of "Fungus", Wet Rot, Dry Rot And Bacteria; and

    **2.** Additional Coverage – Limited Coverage for "Fungus", Wet Rot, Dry Rot And Bacteria, including any endorsement increasing the scope or amount of coverage.

**E.** The terms of the exclusion in Paragraph **B.,** or the inapplicability of this exclusion to a particular loss, do not serve to create coverage for any loss that would otherwise be excluded under this Coverage Part or Policy.

Subject to Protective Order - Confidential                    BSAPolicyEv-00051024
TrustApp0639

**POLICY NUMBER:** KKO0000021153300                                **COMMERCIAL PROPERTY**
**CP 04 11 10 12**

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# PROTECTIVE SAFEGUARDS

This endorsement modifies insurance provided under the following:

COMMERCIAL PROPERTY COVERAGE PART
STANDARD PROPERTY POLICY

### SCHEDULE

| Premises Number | Building Number | Protective Safeguards Symbols Applicable |
|---|---|---|
| 0001 | 0001 | P-9 |
| 0003 | 0003 | P-9 |
|  |  |  |

**Describe Any "P-9":**
PREM. NO. 1, BLDG. NO. 1; DINING HALL - ANSUL SYSTEM
PREM. NO. 3, BLDG. NO. 3; WHITEMAN HALL - ANSUL SYSTEM

Information required to complete this Schedule, if not shown above, will be shown in the Declarations.

**A.** The following is added to the Commercial Property **Conditions:**

**Protective Safeguards**

1. As a condition of this insurance, you are required to maintain the protective devices or services listed in the Schedule above.

2. The protective safeguards to which this endorsement applies are identified by the following symbols:

   **"P-1" Automatic Sprinkler System,** including related supervisory services.

   Automatic Sprinkler System means:

   **a.** Any automatic fire protective or extinguishing system, including connected:

   **(1)** Sprinklers and discharge nozzles;

   **(2)** Ducts, pipes, valves and fittings;

   **(3)** Tanks, their component parts and supports; and

   **(4)** Pumps and private fire protection mains.

   **b.** When supplied from an automatic fire protective system:

   **(1)** Non-automatic fire protective systems; and

   **(2)** Hydrants, standpipes and outlets.

   **"P-2" Automatic Fire Alarm,** protecting the entire building, that is:

   **a.** Connected to a central station; or

   **b.** Reporting to a public or private fire alarm station.

   **"P-3" Security Service,** with a recording system or watch clock, making hourly rounds covering the entire building, when the premises are not in actual operation.

   **"P-4" Service Contract** with a privately owned fire department providing fire protection service to the described premises.

   **"P-5" Automatic Commercial Cooking Exhaust And Extinguishing System** installed on cooking appliances and having the following components:

   **a.** Hood;

   **b.** Grease removal device;

   **c.** Duct system; and

   **d.** Wet chemical fire extinguishing equipment.

   **"P-9",** the protective system described in the Schedule.

CP 04 11 10 12                    © Insurance Services Office, Inc., 2011                  Page 1 of 2

Subject to Protective Order - Confidential

**B.** The following is added to the **Exclusions** section of:

    Causes Of Loss – Basic Form
    Causes Of Loss – Broad Form
    Causes Of Loss – Special Form
    Mortgageholders Errors And Omissions Coverage Form
    Standard Property Policy

We will not pay for loss or damage caused by or resulting from fire if, prior to the fire, you:

**1.** Knew of any suspension or impairment in any protective safeguard listed in the Schedule above and failed to notify us of that fact; or

**2.** Failed to maintain any protective safeguard listed in the Schedule above, and over which you had control, in complete working order.

If part of an Automatic Sprinkler System or Automatic Commercial Cooking Exhaust And Extinguishing System is shut off due to breakage, leakage, freezing conditions or opening of sprinkler heads, notification to us will not be necessary if you can restore full protection within 48 hours.

Subject to Protective Order - Confidential          BSAPolicyEv-00051026

TrustApp0641

# National Casualty Company

**ENDORSEMENT NO.** ___0000___

| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE DATE (12:01 A.M. STANDARD TIME) | NAMED INSURED | AGENT NO. |
|---|---|---|---|
| KKO0000021153300 | 06/20/17 | KNOX TRAIL COUNCIL, INC. (SEE KR-SP-1) | |

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## EQUIPMENT BREAKDOWN COVERAGE ENDORSEMENT

This endorsement modifies insurance provided under the following:

**BUILDING AND PERSONAL PROPERTY COVERAGE FORM CAUSES OF LOSS—SPECIAL FORM**

The following is a summary of Coverages and Limits Of Insurance provided according to the "x" shown in the corresponding box ( ☐ ) in the Schedule below. If no "x" is shown in the corresponding box shown in the Schedule below, then the limits of insurance in the endorsement apply.

### SCHEDULE

| COVERAGE | LIMIT OF INSURANCE | | | |
|---|---|---|---|---|
| Expediting Expenses | ☐ $50,000 | ☐ $75,000 | ☒ $100,000 | ☐ $250,000 |
| Hazardous Substances | ☐ $50,000 | ☐ $75,000 | ☒ $100,000 | ☐ $250,000 |
| Spoilage | ☐ $50,000 | ☐ $75,000 | ☒ $100,000 | ☐ $250,000 |
| Data Restoration | ☐ $50,000 | ☐ $75,000 | ☒ $100,000 | ☐ $250,000 |
| Ice Rink Excavation Costs | ☐ $25,000 | ☐ $50,000 | ☐ $75,000 | ☐ $100,000 | ☐ $250,000 |

The Deductible shown in the Declarations applies unless a Special Deductible is shown below.

| Special Deductibles | | | |
|---|---|---|---|
| Combined, All Coverages | | | |
| Excavation Costs Limitation | | Minimum | |
| Direct Coverage | | | |
| Indirect Coverages | | Days times ADV | |
| Spoilage | | or | % of loss Minimum |

A. The following is added as an **Additional Coverage** to the **Causes of Loss—Special Form**.

**Additional Coverage—Equipment Breakdown**

The term Covered Cause of Loss includes the Additional Coverage Equipment Breakdown as described and limited below.

(1) We will pay for direct physical damage to Covered Property that is the direct result of an "accident." As used in this Additional Coverage, "accident" means a fortuitous event that causes direct physical damage to "covered equipment." The event must be one of the following:

Includes copyrighted material of ISO Properties, Inc., with its permission.
Copyright, ISO Properties, Inc., 2012

Subject to Protective Order - Confidential

BSAPolicyEv-00051027
TrustApp0642

**(a)** Mechanical breakdown, including rupture or bursting caused by centrifugal force;

**(b)** Artificially generated electrical, magnetic or electromagnetic energy, including electric arcing, that damages, disturbs, disrupts or otherwise interferes with any electrical or electronic wire, device, appliance, system or network;

**(c)** Explosion of steam boilers, steam pipes, steam engines or steam turbines owned or leased by you, or operated under your control;

**(d)** Loss or damage to steam boilers, steam pipes, steam engines or steam turbines caused by or resulting from any condition or event inside such equipment; or

**(e)** Loss or damage to hot water boilers or other water heating equipment caused by or resulting from any condition or event inside such boilers or equipment.

If an initial "accident" causes other "accidents," all will be considered one "accident." All "accidents" that are the result of the same event will be considered one "accident."

"Covered equipment" means Covered Property that generates, transmits or utilizes energy, or which, during normal usage, operates under vacuum or pressure, other than the weight of its contents.

"Covered equipment" may utilize conventional design and technology or new or newly commercialized design and technology.

**(2)** Unless otherwise shown in the Schedule above, the following coverages also apply to the direct result of an "accident." These coverages do not provide additional amounts of insurance.

**(a)** Expediting Expenses

With respect to your damaged Covered Property we will pay the reasonable extra cost to:

**(i)** Make temporary repairs; and

**(ii)** Expedite permanent repairs or permanent replacement.

The most we will pay for loss or expense under this coverage is $25,000 unless otherwise shown in the Schedule above.

**(b)** Hazardous Substances

We will pay for the additional cost to repair or replace Covered Property because of contamination by a "hazardous substance." This includes the additional expenses to clean up or dispose of such property.

This does not include contamination of "perishable goods" by refrigerant, including but not limited to ammonia, which is addressed in **(2)(c)(i)ii.** below. As used in this coverage, additional costs mean those beyond what would have been payable under this Equipment Breakdown Coverage had no "hazardous substance" been involved.

"Hazardous substance" means any substance that is hazardous to health or has been declared to be hazardous to health by a governmental agency.

The most we will pay for loss, damage or expense under this coverage, including actual loss of Business Income you sustain and necessary Extra Expense you incur, if shown as covered, is $25,000 unless otherwise shown in the Schedule above.

**(c)** Spoilage

**(i)** We will pay:

    **i.** For physical damage to "perishable goods" due to spoilage;

    **ii.** For physical damage to "perishable goods" due to contamination from the release of refrigerant, including but not limited to ammonia;

    **iii.** Any necessary expenses you incur to reduce the amount of loss under this coverage to the extent that they do not exceed the amount of loss that otherwise would have been payable under this coverage.

Includes copyrighted material of ISO Properties, Inc., with its permission.
Copyright, ISO Properties, Inc., 2012

**KR-PROP-12 (3-15)**             **Page 2 of 7**

**(ii)** If you are unable to replace the "perishable goods" before its anticipated sale, the amount of our payment will be determined on the basis of the sales price of the "perishable goods" at the time of the "accident," less discounts and expenses you otherwise would have had. Otherwise our payment will be determined in accordance with the Valuation condition.

"Perishable goods" means personal property maintained under controlled conditions for its preservation, and susceptible to loss or damage if the controlled conditions change.

The most we will pay for loss, damage or expense under this coverage is $25,000 unless otherwise shown in the Schedule above.

**(d)** Data Restoration

We will pay for your reasonable and necessary cost to research, replace and restore lost "data."

"Data" means information or instructions stored in digital code capable of being processed by machinery.

The most we will pay for loss or expense under this coverage, including actual loss of Business Income you sustain and necessary Extra Expense you incur, if shown as covered, is $25,000 unless otherwise shown in the Schedule above.

**(e)** Service Interruption

Any insurance provided for Business Income, Extra Expense or Spoilage is extended to apply to your loss, damage or expense caused by the interruption of utility services. The interruption must result from an "accident" to equipment, including over- head transmission lines, that is owned by a utility, landlord, a landlord's utility or other supplier who provides you with any of the following services: electrical power, waste disposal, air conditioning, refrigeration, heating, natural gas, compressed air, water, steam, internet access, telecommunications services, wide area networks or data transmission. The equipment must meet the definition of "covered equipment" except that it is not Covered Property.

Service Interruption coverage will not apply unless the failure or disruption of service exceeds twenty-four (24) hours immediately following the "accident." If the interruption exceeds twenty-four (24) hours, coverage will begin at the time of the interruption.

The most we will pay in any one "accident" for loss, damage or expense under this coverage is the applicable limit for Business Income, Extra Expense or Spoilage.

**(f)** Ice Rink Piping

We will pay for loss or damage caused by or resulting from an "accident" to "buried vessels or piping" which forms a part of an ice rink refrigeration and under floor heating system.

"Buried vessels or piping" means any piping or vessel buried or encased in the earth, concrete or other material, whether above or below grade, or in an enclosure which does not allow access for inspection and repair.

**(g)** Ice Rink Excavation Costs

We will pay to excavate "buried vessels or piping" that is part of an ice rink refrigeration and under floor heating system during the repair or replacement following an "accident" to "buried vessels or piping" and to restore the excavated area to the same condition prior to the "accident."

The most we will pay for excavation costs of "buried vessels or piping," including actual loss of Business Income you sustain and necessary Extra Expense you incur, if shown as covered, is $5,000 unless otherwise shown in the Schedule above.

**(h)** Business Income and Extra Expense

Any insurance provided under this coverage part for Business Income or Extra Expense is extended to the coverage provided by this endorsement. However, if a deductible is shown in the Schedule above, then as respects Equipment Breakdown coverage, the

Includes copyrighted material of ISO Properties, Inc., with its permission.
Copyright, ISO Properties, Inc., 2012

Subject to Protective Order - Confidential

"period of restoration" will begin immediately after the "accident," and the deductible shown in the Schedule above will apply.

The most we will pay for loss or expense under this coverage is the applicable limit for Business Income and Extra Expense.

**(3) Exclusions**

All exclusions in the **Causes of Loss—Special Form** apply except as modified below and to the extent that coverage is specifically provided by this Additional Coverage Equipment Breakdown.

**(a)** The following exclusions are modified:

**(i)** The following is added to Exclusion **B.1.g.:**

However, if electrical "covered equipment" requires drying out because of Water, we will pay for the direct expenses of such drying out subject to the applicable Limit of Insurance and deductible for **Building** or **Your Business Personal Property,** whichever applies.

**(ii)** As respects this endorsement only, the last paragraph of Exclusion **B.2.d.** is deleted and replaced with the following:

But if an excluded cause of loss that is listed in **2.d.(1)** through **(7)** results in an "accident," we will pay for the loss, damage or expense caused by that "accident."

**(b)** The following exclusions are added:

**(i)** We will not pay for loss, damage or expense caused by or resulting from:

**i.** A hydrostatic, pneumatic or gas pressure test of any boiler or pressure vessel, or an electrical insulation breakdown test of any type of electrical equipment; or

**ii.** Any of the following:

**a.** Defect, programming error, programming limitation, computer virus, malicious code, loss of "data," loss of access, loss of use, loss of functionality or other condition within or involving "data" or "media" of any kind; or

**b.** Misalignment, miscalibration, tripping off-line, or any condition which can be corrected by resetting, tightening, adjusting or cleaning, or by the performance of maintenance.

However, if an "accident" results, we will pay for the resulting loss, damage or expense caused by that "accident."

"Media" means material on which "data" is recorded, such as magnetic tapes, hard disks, optical disks or floppy disks.

**(ii)** With respect to Service Interruption coverage, we will also not pay for an "accident" caused by or resulting from: "specified causes of loss" (except as specifically provided in **A.(1)(c)** above); falling objects; weight of snow, ice or sleet; freezing; collapse; flood or earth movement.

**(iii)** We will not pay for loss, damage or expense caused directly or indirectly by the following, whether or not caused by or resulting from an "accident": Any mold, fungus, mildew or yeast, including any spores or toxins produced by or emanating from such mold, fungus, mildew or yeast. This includes, but is not limited to, costs arising from clean up, removal, or abatement of such mold, fungus, mildew or yeast, spores or toxins. However, this exclusion does not apply to spoilage of personal property that is "perishable goods," to the extent that spoilage is covered under Spoilage coverage.

**(iv)** We will not pay for any loss or damage to animals.

Includes copyrighted material of ISO Properties, Inc., with its permission.
Copyright, ISO Properties, Inc., 2012

Subject to Protective Order - Confidential

**(c)** None of the following is "covered equipment":

    **(i)** Structure, foundation, cabinet or compartment;

    **(ii)** Insulating or refractory material;

    **(iii)** Sewer piping, "buried vessels or piping," or piping forming a part of a sprinkler or fire suppression system; except as provided under **A.2.(f)** Ice Rink Piping cover- age and **A.2.(g)** Ice Rink Excavation Costs;

        However, "buried vessels or piping" does not mean piping buried in earth, concrete or other material that is part of an ice rink refrigeration and under floor heating system.

    **(iv)** Water piping other than boiler feed water piping, boiler condensate return piping or water piping forming a part of a refrigerating or air conditioning system;

    **(v)** "Vehicle" or any equipment mounted on a "vehicle";

    **(vi)** Satellite, spacecraft or any equipment mounted on a satellite or spacecraft;

    **(vii)** Dragline, excavation or construction equipment; or

    **(viii)** Equipment manufactured by you for sale.

        "Vehicle" means, as respects this endorsement only, any machine or apparatus that is used for transportation or moves under its own power. "Vehicle" includes, but is not limited to, car, truck, bus, trailer, train, aircraft, watercraft, forklift, bull- dozer, tractor or harvester.

        However, any property that is stationary, permanently installed at a covered location and that receives electrical power from an external power source will not be considered a "vehicle."

**B.** Section **D. Deductible** of the **BUILDING AND PERSONAL PROPERTY COVERAGE FORM** is modified as follows:

The Deductible shown on the Commercial Property Coverage Part Declarations applies unless a separate Equipment Breakdown Coverage Deductible is shown in the Schedule above. If a separate Equipment Breakdown Deductible is shown, the following applies:

Only as regards Equipment Breakdown Coverage, section **D. Deductible** is deleted and re-placed with the following:

  **(a)** Deductibles for each Coverage

    **(i)** Unless the Schedule indicates that the Deductible is combined for all coverages, multiple deductibles may apply to any one "accident."

    **(ii)** We will not pay for loss, damage or expense under any coverage until the amount of the covered loss, damage or expense exceeds the Deductible amount indicated for that coverage in the Schedule. We will then pay the amount of loss, damage or expense in excess of the applicable Deductible amount, subject to the applicable limit.

    **(iii)** If Deductibles vary by type of "covered equipment" and more than one type of "covered equipment" is involved in any one "accident," only the highest Deductible for each coverage will apply.

  **(b)** Direct and Indirect Coverages

    **(i)** Direct Coverages Deductibles and Indirect Coverages Deductibles may be indicated in the Schedule above.

    **(ii)** Unless more specifically indicated in the Schedule above:

        **1.** Indirect Coverages Deductibles apply to Business Income and Extra Expense.

        **2.** Direct Coverages Deductibles apply to all remaining loss, damage or expense covered by this endorsement.

Includes copyrighted material of ISO Properties, Inc., with its permission.
Copyright, ISO Properties, Inc., 2012

KR-PROP-12 (3-15)                **Page 5 of 7**

**(c)** Application of Deductibles

    **(i)** Dollar Deductibles

We will not pay for loss, damage or expense resulting from any one "accident" until the amount of loss, damage or expense exceeds the applicable Deductible shown in the Schedule. We will then pay the amount of loss, damage or expense in excess of the applicable Deductible or Deductibles, up to the applicable Limit of Insurance.

Time Deductible

If a Time Deductible is shown in the Schedule, we will not be liable for any loss occurring during the specified number of days immediately following the accident. Each day shall mean twenty-four (24) consecutive hours.

    **(ii)** Multiple of Average Daily Value (ADV)

If a Deductible is expressed as a number times ADV, that amount will be calculated as follows:

The ADV (Average Daily Value) will be the Business Income (as defined in any Business Income coverage form that is part of this policy) that would have been earned had no "accident" occurred during the period of interruption of business divided by the number of working days in that period. No reduction shall be made for the Business Income not being earned, or in the number of working days, be- cause of the "accident" or any other scheduled or unscheduled shutdowns during the period of interruption. The ADV applies to the Business Income value of the entire location, whether or not the loss affects the entire location. If more than one location is included in the valuation of the loss, the ADV will be the combined value of all affected locations. For purposes of this calculation, the period of interruption may not extend beyond the "period of restoration."

The number indicated in the Schedule shall be multiplied by the ADV as deter- mined above. The result shall be used as the applicable Deductible.

    **(iii)** Percentage of Loss Deductibles

If a Deductible is expressed as a percentage of loss, we will not be liable for the indicated percentage of the gross amount of loss, damage or expense (prior to any applicable Deductible or coinsurance) insured under the applicable cover- age. If the dollar amount of such percentage is less than the indicated minimum Deductible, the minimum Deductible will be the applicable Deductible.

**C.** The following conditions are in addition to the Conditions in the **Building and Personal Property Coverage Form**, the **Commercial Property Conditions** and the **Common Policy Conditions.**

    **(a)** Suspension

When any "covered equipment" is found to be in, or exposed to, a dangerous condition, any of our representatives may immediately suspend the insurance against loss from an "accident" to that "covered equipment." We can do this by mailing or delivering a written notice of suspension to:

    **(i)** Your last known address; or

    **(ii)** The address where the "covered equipment" is located.

Once suspended in this way, your insurance can be reinstated only by an endorsement for that "covered equipment." If we suspend your insurance, you will get a pro rata refund of premium for that "covered equipment" for the period of suspension. But the suspension will be effective even if we have not yet made or offered a refund.

    **(b)** Jurisdictional Inspections

If any property that is "covered equipment" under this endorsement requires inspection to comply with state or municipal boiler and pressure vessel regulations, we agree to perform such inspection on your behalf. We do not warrant that conditions are safe or healthful.

Includes copyrighted material of ISO Properties, Inc., with its permission.
Copyright, ISO Properties, Inc., 2012

Subject to Protective Order - Confidential                                    BSAPolicyEv-00051032

TrustApp0647

**(c)**   Environmental, Safety and Efficiency Improvements

If "covered equipment" requires replacement due to an "accident," we will pay your additional cost to replace with equipment that is better for the environment, safer for people or energy or water more efficient than the equipment being replaced.

However, we will not pay more than one hundred fifty percent (150%) of what the cost would have been to replace with like kind and quality. This condition does not increase any of the applicable limits. This condition does not apply to any property to which Actual Cash Value applies.

The most we will pay for loss, damage or expense under this endorsement arising from any one "accident" is the applicable Limit of Insurance in the Declarations unless otherwise shown in the Schedule above. Coverage provided under this endorsement does not provide an additional amount of insurance.

_____   /_____
AUTHORIZED REPRESENTATIVE                                              DATE

Includes copyrighted material of ISO Properties, Inc., with its permission.
Copyright, ISO Properties, Inc., 2012

**KR-PROP-12 (3-15)**                            **Page 7 of 7**

# National Casualty Company

**ENDORSEMENT
NO.** ___0000___

| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE DATE (12:01 A.M. STANDARD TIME) | NAMED INSURED | AGENT NO. |
|---|---|---|---|
| KKO0000021153300 | 06/20/17 | KNOX TRAIL COUNCIL, INC. (SEE KR-SP-1) | |

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## ADDITIONAL COVERED PROPERTY

This endorsement modifies insurance provided under the following:

**BUILDING AND PERSONAL PROPERTY COVERAGE FORM
CONDOMINIUM COMMERCIAL UNIT-OWNERS COVERAGE FORM
STANDARD PROPERTY POLICY**

The following property shown in the Schedule below is withdrawn from **Property Not Covered** and added to **Covered Property** if the item(s) are listed on the Statement of Values when a limit of insurance is shown.

### SCHEDULE*

| Prem. No. | Bldg. No. | Paragraph Reference (Withdrawal of Property Not Covered) | Description of Property | Enter Building or Personal Property** |
|---|---|---|---|---|
| SEE | SCHED | | | ** |

** Coverage will apply to the following types of property when listed on the Statement of Values with a limit shown per item or group of items: Foot bridges, permanently installed bulkheads, pilings, piers, wharves, docks, beach or diving platforms, watercraft less than twenty-six (26) feet in or out of the water at the described premises and their related equipment, personal property while waterborne, outboard motors under thirty (30) horsepower, radio and television antennas, satellite dishes, fences, roadways, paved surfaces, athletic surfaces and enclosures, smokestacks, insured owned above ground transmission lines, pumps, filters, floats, patios, service equipment and pools and amusement equipment including ropes courses, climbing walls/towers, playground equipment, miniature golf and similar types of equipment.

* Information required to complete this Schedule, if not shown on this endorsement, will be shown in the Declarations.

_____
AUTHORIZED REPRESENTATIVE                          DATE

Includes copyrighted material of ISO Properties, Inc., with its permission.
Copyright, ISO Properties, Inc., 2007

**KR-PROP-2 (10-11)**                          Page 1 of 1

Subject to Protective Order - Confidential

POLICY NUMBER: KKO0000021153300

COMMERCIAL PROPERTY
CP 12 18 10 12

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# LOSS PAYABLE PROVISIONS

This endorsement modifies insurance provided under the following:

BUILDERS' RISK COVERAGE FORM
BUILDING AND PERSONAL PROPERTY COVERAGE FORM
CONDOMINIUM ASSOCIATION COVERAGE FORM
CONDOMINIUM COMMERCIAL UNIT-OWNERS COVERAGE FORM
STANDARD PROPERTY POLICY

## SCHEDULE

| Location Number: | Building Number: | Applicable Clause (Enter C.1., C.2., C.3. or C.4.): |
|---|---|---|
| **Description Of Property:** | | |
| **Loss Payee Name:** | AS REQUIRED BY WRITTEN CONTRACT AND ON FILE WITH COMPANY UNLESS SPECIFICALLY DECLINED. | |
| **Loss Payee Address:** | | |
| Location Number: | Building Number: | Applicable Clause (Enter C.1., C.2., C.3. or C.4.): |
| **Description Of Property:** | | |
| **Loss Payee Name:** | | |
| **Loss Payee Address:** | | |
| Location Number: | Building Number: | Applicable Clause (Enter C.1., C.2., C.3. or C.4.): |
| **Description Of Property:** | | |
| **Loss Payee Name:** | | |
| **Loss Payee Address:** | | |
| Information required to complete this Schedule, if not shown above, will be shown in the Declarations. | | |

**A.** When this endorsement is attached to the Standard Property Policy **CP 00 99**, the term Coverage Part in this endorsement is replaced by the term Policy.

**B.** Nothing in this endorsement increases the applicable Limit of Insurance. We will not pay any Loss Payee more than their financial interest in the Covered Property, and we will not pay more than the applicable Limit of Insurance on the Covered Property.

**C.** The following is added to the **Loss Payment** Loss Condition, as indicated in the Declarations or in the Schedule:

**1. Loss Payable Clause**

For Covered Property in which both you and a Loss Payee shown in the Schedule or in the Declarations have an insurable interest, we will:

**a.** Adjust losses with you; and

CP 12 18 10 12

© Insurance Services Office, Inc., 2011

Page 1 of 2

Subject to Protective Order - Confidential

**b.** Pay any claim for loss or damage jointly to you and the Loss Payee, as interests may appear

**2. Lender's Loss Payable Clause**

**a.** The Loss Payee shown in the Schedule or in the Declarations is a creditor, including a mortgageholder or trustee, whose interest in Covered Property is established by such written instruments as:

   **(1)** Warehouse receipts;

   **(2)** A contract for deed;

   **(3)** Bills of lading;

   **(4)** Financing statements; or

   **(5)** Mortgages, deeds of trust, or security agreements.

**b.** For Covered Property in which both you and a Loss Payee have an insurable interest:

   **(1)** We will pay for covered loss or damage to each Loss Payee in their order of precedence, as interests may appear.

   **(2)** The Loss Payee has the right to receive loss payment even if the Loss Payee has started foreclosure or similar action on the Covered Property.

   **(3)** If we deny your claim because of your acts or because you have failed to comply with the terms of the Coverage Part, the Loss Payee will still have the right to receive loss payment if the Loss Payee:

     **(a)** Pays any premium due under this Coverage Part at our request if you have failed to do so;

     **(b)** Submits a signed, sworn proof of loss within 60 days after receiving notice from us of your failure to do so; and

     **(c)** Has notified us of any change in ownership, occupancy or substantial change in risk known to the Loss Payee.

   All of the terms of this Coverage Part will then apply directly to the Loss Payee.

   **(4)** If we pay the Loss Payee for any loss or damage and deny payment to you because of your acts or because you have failed to comply with the terms of this Coverage Part:

     **(a)** The Loss Payee's rights will be transferred to us to the extent of the amount we pay; and

     **(b)** The Loss Payee's rights to recover the full amount of the Loss Payee's claim will not be impaired.

   At our option, we may pay to the Loss Payee the whole principal on the debt plus any accrued interest. In this event, you will pay your remaining debt to us.

**c.** If we cancel this policy, we will give written notice to the Loss Payee at least:

   **(1)** 10 days before the effective date of cancellation if we cancel for your nonpayment of premium; or

   **(2)** 30 days before the effective date of cancellation if we cancel for any other reason.

**d.** If we elect not to renew this policy, we will give written notice to the Loss Payee at least 10 days before the expiration date of this policy.

**3. Contract Of Sale Clause**

**a.** The Loss Payee shown in the Schedule or in the Declarations is a person or organization you have entered into a contract with for the sale of Covered Property.

**b.** For Covered Property in which both you and the Loss Payee have an insurable interest, we will:

   **(1)** Adjust losses with you; and

   **(2)** Pay any claim for loss or damage jointly to you and the Loss Payee, as interests may appear.

**c.** The following is added to the **Other Insurance** Condition:

   For Covered Property that is the subject of a contract of sale, the word "you" includes the Loss Payee.

**4. Building Owner Loss Payable Clause**

**a.** The Loss Payee shown in the Schedule or in the Declarations is the owner of the described building in which you are a tenant.

**b.** We will adjust losses to the described building with the Loss Payee. Any loss payment made to the Loss Payee will satisfy your claims against us for the owner's property.

**c.** We will adjust losses to tenants' improvements and betterments with you, unless the lease provides otherwise.

Subject to Protective Order - Confidential

BSAPolicyEv-00051036

TrustApp0651

**POLICY NUMBER:** KKO0000021153300

<div align="right">

**COMMERCIAL PROPERTY**
**CP 15 25 10 12**

</div>

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

# BUSINESS INCOME CHANGES –
# EDUCATIONAL INSTITUTIONS

This endorsement modifies insurance provided under the following:

BUSINESS INCOME (AND EXTRA EXPENSE) COVERAGE FORM
BUSINESS INCOME (WITHOUT EXTRA EXPENSE) COVERAGE FORM

### SCHEDULE

| |
|---|
| **Premises Number:** 1-12 |
| **Description Of Each School Term In An Annual Period:** |
| |
| **Limited Coverage**  ☐ |
| **Extension Of Recovery Period Option**   12    **Months** |
| **Premises Number:** |
| **Description Of Each School Term In An Annual Period:** |
| |
| **Limited Coverage**  ☐ |
| **Extension Of Recovery Period Option**         **Months** |
| **Premises Number:** |
| **Description Of Each School Term In An Annual Period:** |
| |
| **Limited Coverage**  ☐ |
| **Extension Of Recovery Period Option**         **Months** |
| Information required to complete this Schedule, if not shown above, will be shown in the Declarations. |

**A.** The **Definition** of "period of restoration" is replaced by the following:

**3.** "Period of restoration" means the period of time that:

**a.** Begins:

**(1)** 72 hours after the time of direct physical loss or damage for Business Income coverage; or

**(2)** Immediately after the time of direct physical loss or damage for Extra Expense coverage;

caused by or resulting from any Covered Cause of Loss at the described premises; and

Subject to Protective Order - Confidential

BSAPolicyEv-00051037

TrustApp0652

**b.** Ends on the earlier of:

    **(1)** The day before the opening of the next school term following the date when, with reasonable speed and similar quality, the property at the described premises should be repaired, rebuilt or replaced; or

    **(2)** The date when the school term is resumed at a new permanent location.

"Period of restoration" does not include any increased period required due to the enforcement of or compliance with any ordinance or law that:

**a.** Regulates the construction, use or repair, or requires the tearing down of any property; or

**b.** Requires any insured or others to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of "pollutants".

The expiration date of this policy will not cut short the "period of restoration".

**B.** The **Additional Coverage – Extended Business Income** is replaced by the following. However, if the Extension Of Recovery Period Option applies, in accordance with Section **C.** of this endorsement, then the Extended Business Income Coverage does not apply.

    **d. Extended Business Income**

    If the necessary "suspension" of your "operations" produces a Business Income loss payable under this policy, we will pay for the actual loss of Business Income you sustain during the school term following the date the property is actually repaired, rebuilt or replaced, if that date is 60 days or less before the scheduled opening of the next school term.

    However, Extended Business Income does not apply to loss of Business Income incurred as a result of unfavorable business conditions caused by the impact of the Covered Cause of Loss in the area where the described premises are located.

Loss of Business Income must be caused by direct physical loss or damage at the described premises caused by or resulting from any Covered Cause of Loss.

**C.** If the Extension Of Recovery Period Option is indicated as applicable in the Schedule, then the following applies (instead of the Extended Business Income Coverage in Section **B.** of this endorsement):

**Extension Of Recovery Period**

If the necessary "suspension" of your "operations" produces a Business Income loss payable under this policy, we will pay for the actual loss of Business Income you sustain during the number of months (as indicated in the Schedule) following the end of the "period of restoration".

However, the Extension Of Recovery Period does not apply to loss of Business Income incurred as a result of unfavorable business conditions caused by the impact of the Covered Cause of Loss in the area where the described premises are located.

Loss of Business Income must be caused by direct physical loss or damage at the described premises caused by or resulting from any Covered Causes of Loss.

**D.** If Limited Coverage is indicated by an "X" or other notation in the Schedule, the definition of "operations" is replaced by the following:

"Operations" means:

**a.** Your business activities, occurring at the described premises, which generate tuition and related fees from students, including fees from room, board, laboratories and other similar sources.

    "Operations" does not include:

    **(1)** Bookstores;

    **(2)** Athletic events;

    **(3)** Activity related to research grants; or

    **(4)** Business activities other than those which generate tuition and related fees from students.

**b.** The tenantability of the described premises, if coverage for Business Income including "Rental Value" or "Rental Value" applies.

© Insurance Services Office, Inc., 2011

CP 15 25 10 12

Subject to Protective Order - Confidential

BSAPolicyEv-00051038
TrustApp0653

POLICY NUMBER: KKO0000021153300

COMMERCIAL PROPERTY
CP 15 32 06 07

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# CIVIL AUTHORITY CHANGE(S)

This endorsement modifies insurance provided under the following:

BUSINESS INCOME (AND EXTRA EXPENSE) COVERAGE FORM
BUSINESS INCOME (WITHOUT EXTRA EXPENSE) COVERAGE FORM
EXTRA EXPENSE COVERAGE FORM

**SCHEDULE**

| Premises Number | Building Number | Schedule Part A Coverage Period (Number Of Days) | Schedule Part B Radius (Number Of Miles) |
|---|---|---|---|
| 1-12 | ** | | 10 MILES |
| | | | |
| | | | |
| Information required to complete this Schedule, if not shown above, will be shown in the Declarations. | | | |

**A. Coverage Period**

Under the Additional Coverage – Civil Authority, the four-week coverage period is replaced by the number of days indicated in Part **A** of the Schedule, subject to all other provisions of that Additional Coverage. If there is no entry in Part **A** of the Schedule, the four-week coverage period continues to apply, subject to all other provisions of the Additional Coverage – Civil Authority.

**B. Radius**

The Additional Coverage – Civil Authority includes a requirement that the described premises are not more than one mile from the damaged property. Such one-mile radius is replaced by the number of miles indicated in Part **B** of the Schedule, subject to all other provisions of that Additional Coverage. If there is no entry in Part **B** of the Schedule, the one-mile radius continues to apply, subject to all other provisions of the Additional Coverage – Civil Authority.

**C.** The coverage provided under this endorsement does not increase the applicable Limit of Insurance.

Subject to Protective Order - Confidential

BSAPolicyEv-00051039
TrustApp0654

# National Casualty Company

**ENDORSEMENT NO.** 0000

| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE DATE (12:01 A.M STANDARD TIME) | NAMED INSURED | AGENT NO. |
|---|---|---|---|
| KKO0000021153300 | 06/20/17 | KNOX TRAIL COUNCIL, INC. (SEE KR-SP-1) | |

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## BUSINESS INCOME CHANGES—COMMUNICABLE DISEASE AND FOOD CONTAMINATION EXTENSION

This endorsement modifies insurance provided under the following:

**BUSINESS INCOME (AND EXTRA EXPENSE) COVERAGE FORM**
**BUSINESS INCOME (WITHOUT EXTRA EXPENSE) COVERAGE FORM**

Coverage provided by this endorsement is subject to the terms, exclusions and conditions of the Coverage Form unless modified by this endorsement.

**I.** Section **A. Coverage** is amended to add the following:

We will pay for the actual loss of Business Income you sustain as a result of having your entire "operations" temporarily shut down or suspended by an order or recommendation from any local, state or federal Department of Health or other governmental authority having jurisdiction over your "operations." Such shutdown or suspension of "operations" must be due directly to an outbreak at the insured premises of a "communicable disease" such as, but not limited to, Meningitis, Measles, or Legionnaire's Disease, or to a "food contamination" caused directly by infectious or bacterial organisms such as, but not limited to, infectious Hepatitis, E. Coli bacteria, or Salmonella. An actual business shutdown must occur.

**II.** Limits Of Insurance

**1.** With respect to the coverages provided by this endorsement, the following limits of insurance are added to section **B. Limits Of Insurance**:

| | |
|---|---|
| $  100,000 | Each Location Limit |
| $  100,000 | Each Location Aggregate Limit |
| $  100,000 | Policy Aggregate Limit |

**2.** Subject to the Each Location Aggregate Limit and Policy Aggregate Limit, the most we will pay for loss regardless of the number of occurrences during a policy period is the Each Location Limit.

**3.** Subject to the Policy Aggregate Limit, the Each Location Aggregate Limit is the most we will pay for all loss at each location.

**4.** The most we will pay for all loss during a policy period is the Policy Aggregate Limit.

The aggregate limit applies separately to each consecutive annual period and to any remaining period of less than twelve (12) months, starting with the beginning of the policy period shown in the Declarations.

**III.** Under the Business Income (And Extra Expense) Coverage Form, Section **A.3. Covered Causes Of Loss** is replaced by the following only as respects this endorsement:

A Covered Cause of Loss is an outbreak at the insured premises described in the Declarations as a "communicable disease" or a "food contamination" caused directly by infectious or bacterial organisms, or infestation by animals transmitting the rabies virus either of which causes illness and results in an order or recommendation from a local, state or federal Department of Health or other governmental authority to temporarily shut down or suspend your entire "operations."

KR-PROP-19 (10-11)                    Page 1 of 3

Subject to Protective Order - Confidential

Under the Business Income (Without Extra Expense) Coverage Form, Section **A.2. Covered Causes Of Loss** is replaced by the following only as respects this endorsement:

A Covered Cause of Loss is an outbreak at the insured premises described in the Declarations as a "communicable disease" or a "food contamination" caused directly by infectious or bacterial organisms, or infestation by animals transmitting the rabies virus either of which causes illness and results in an order from a local, state or federal Department of Health to temporarily shut down or suspend your entire "operations."

**IV.** Under the Business Income (And Extra Expense) Coverage Form, Section **A.2. Extra Expense** is amended to add the following as respects a loss under this endorsement:

We will pay any Extra Expense:

**(1)** To clean your equipment per jurisdictional Board of Health requirements;

**(2)** To replace consumable goods declared contaminated by the jurisdictional Board of Health;

**(3)** To administer necessary medical tests and vaccines for affected employees as required by the Board of Health or other government body;

**(4)** To reimburse infected patrons for necessary doctors' care, hospitalization and blood work; or

**(5)** To include extra advertising costs to restore your business reputation, beginning twenty-four (24) hours after the appropriate jurisdictional body shuts down or suspends your operation and ending within thirty (30) days after the governing body certifies that the described premises are habitable and may re-open as fully or partially operational.

The most we will pay for the total of the expenses in items **(1)** through **(5)** above is $10,000.

Under the Business Income (Without Extra Expense) Coverage Form, Section **A.4. Additional Coverages** is amended to add the following as respects a loss under this endorsement:

**Extra Expense**

We will pay any Extra Expense:

**(1)** To clean your equipment per jurisdictional Board of Health requirements;

**(2)** To replace consumable goods declared contaminated by the jurisdictional Board of Health;

**(3)** To administer necessary medical tests and vaccines for affected employees as required by the Board of Health or other government body;

**(4)** To reimburse infected patrons for necessary doctors' care, hospitalization and blood work; or

**(5)** To include extra advertising costs to restore your business reputation, beginning twenty-four (24) hours after the appropriate jurisdictional body shuts down or suspends your "operation" by an order or recommendation and ending within thirty (30) days after the governing body certifies that the described premises are habitable and may reopen as fully or partially operational.

The most we will pay for the total of the expenses in items **(1)** through **(5)** above is $10,000.

**V.** As respects this endorsement, Section **F. Definitions,** subsection **3.,** is replaced by:

**3.** "Period of Restoration" means the period of time that:

**a.** Begins twenty-four (24) hours after the jurisdictional body closes or recommends your "operations" and your premises are evacuated due to illness caused by an outbreak of a "communicable disease" or "food contamination"; and

**b.** Ends on the earlier of:

**(1)** The day before your "operations" resume, either fully or partially; or

**(2)** The day the jurisdictional body certifies that your premises are habitable and may reopen as fully or partially operational.

Subject to Protective Order - Confidential

BSAPolicyEv-00051041

TrustApp0656

"Period of Restoration" does not include any increased period required due to the enforcement of any ordinance or law that:

**a.** Regulates the construction, use or repair, or requires the tearing down of any property; or

**b.** Requires any insured or others to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of "pollutants" as defined herein.

The expiration date of this policy will not shorten the "period of restoration."

**VI.** Under the Business Income (And Extra Expense) Coverage Form, Section **A.5., Additional Coverages,** subsection **c., Extended Business Income,** is deleted as respects this endorsement.

Under the Business Income (Without Extra Expense) Coverage Form, Section **A.4. Additional Coverages** subsection **d., Extended Business Income,** is deleted as respects this endorsement.

**VII.** As respects this endorsement only, Section **F.4.** "Pollutants" is replaced by the following:

**4.** "Pollutants" means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapors, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed. "Pollutants" does not include outbreaks of infectious diseases or "food contamination," such as Salmonella, E. Coli or infectious Hepatitis, any of which results in illness.

**VIII.** As respects this endorsement, the following is added to Section **F. Definitions:**

"Communicable Disease" is an illness, sickness, condition or an interruption or disorder of body functions, systems or organs that is transmissible by infection or contagion directly through human contact or contact with human fluids, waste or similar agent.

"Food Contamination" means the rendering of food as impure, unsuitable, unhealthy or inferior as the result of the introduction of infectious or bacterial organisms. The contamination may be present in food purchased by you or result from contact with one or more of your infected employees.

_____    _____
AUTHORIZED REPRESENTATIVE                          DATE

KR-PROP-19 (10-11)                     Page 3 of 3

Subject to Protective Order - Confidential

BSAPolicyEv-00051042
TrustApp0657

**National Casualty Company**

<div align="right">

ENDORSEMENT
NO. ___0000___
</div>

| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE DATE (12:01 A.M STANDARD TIME) | NAMED INSURED | AGENT NO. |
|---|---|---|---|
| KKO0000021153300 | 06/20/17 | KNOX TRAIL COUNCIL, INC. (SEE KR-SP-1) | |

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## ADVANTAGE PLUS PROPERTY

This endorsement modifies and is subject to the insurance provided under the following:

**BUILDING AND PERSONAL PROPERTY COVERAGE FORM**
**CAUSES OF LOSS—SPECIAL FORM**
**BUSINESS INCOME COVERAGE FORM**
**COMMERCIAL FINE ARTS COVERAGE FORM**
**COMPUTER SYSTEMS COVERAGE FORM**

The following tables provide a summary of the Limits of Insurance for Additional Coverages and Coverage Extensions provided by this endorsement.

These coverages apply separately to each of your premises described in the Declarations.

If you purchase additional limits for any of these coverages at a specified location, the limits shown as Additional Coverages or Coverage Extensions will apply in excess of the insurance purchased separately. We will not pay more under this endorsement than the Limits of Insurance shown below under the Summary of Additional Coverages or Summary of Coverage Extensions.

### Summary of Additional Coverage

| Limits Of Insurance | Subjects Of Insurance |
|---|---|
| $ 5,000 | Automated External Defibrillators (AEDs) |
| $ 100,000 | Business Income with Extra Expense (including Contingent) |
| $ 10,000<br>$ 10,000 | Crime:<br>    Inside the Premises—Theft of Money and Securities<br>    Outside the Premises—Loss of Money and Securities |
| $ 50,000 | Debris Removal |
| $ 10,000 | Electronic Data Replace or Restore |
| $ 25,000 | Emergency Real Estate Consultant Fee |
| $ 25,000 | Fire Department Service Charge |
| $ 25,000 | Identity Theft Exposure |
| $ 50,000 | Key Individual Replacement Cost |
| $ 10,000 | Lease Cancellation Moving Expense |

Includes copyrighted material of ISO Properties, Inc., with its permission.
Copyright, ISO Properties, Inc., 2007

Subject to Protective Order - Confidential

BSAPolicyEv-00051043

TrustApp0658

| Limits Of Insurance | Subjects Of Insurance |
|---|---|
| $ 10,000 | Lessors' Leasehold Interest |
| $ 2,500 | Lock Replacement |
| $ 25,000 | Loss Data Preparation |
| $ 50,000<br>$ 50,000 | Off-Premises Power Failure:<br>    Building and Personal Property<br>    Business Income Coverage |
| Personal Property Limit | Owned Watercraft (Less than twenty-one [21] feet in length) |
| | Personal Property while Airborne |
| | Pair, Set or Parts |
| $ 25,000 | Pollutant Clean Up and Removal |
| $ 10,000 | Reward Reimbursement |
| $ 25,000 | Signs—Attached or Unattached: Indoor and Outdoor |
| $ 25,000 | Temporary Meeting Space |
| $ 25,000 | Terrorism Travel Reimbursement |
| $ 25,000 | Workplace Violence Counseling |

## Summary of Coverage Extensions

| Limits Of Insurance | Subjects Of Insurance |
|---|---|
| $ 50,000 | Accounts Receivable (Including credit or charge card slips) |
| $ 5,000 | Appurtenant Buildings (Building Limit for structures other than garages, carports, storage sheds and pump houses) |
| $ 10,000 | Earthquake Sprinkler Leakage |
| $ 60,000 | Computer Equipment, Data and Media (Including extra expense, transit, personal portable computers and mechanical breakdown) |
| $ 25,000 | Emergency Vacating Expense |
| $ 100,000 | Fine Arts (Including on exhibition at described premises) |
| $ 25,000 | Fire Extinguisher Recharge |
| $ 5,000 | Furs |
| $ 2,500 | Jewelry |
| $1,000,000<br>$ 500,000 | Newly Acquired Locations:<br>    Building (For ninety [90] days)<br>    Business Personal Property (For ninety [90] days) |
| Building Limit | Ordinance or Law—Loss to the Undamaged Portion of the Building |
| $ 500,000 | Ordinance or Law—Demolition and Increased Cost of Construction combined |
| $ 50,000 | Outdoor Property (Including trees, shrubs and plants) |

Includes copyrighted material of ISO Properties, Inc., with its permission.
Copyright, ISO Properties, Inc., 2007

Subject to Protective Order - Confidential                    BSAPolicyEv-00051044
                                                             TrustApp0659

| Limits Of Insurance | Subjects Of Insurance |
|---|---|
| $25,000 per occurrence<br>$ 5,000 per person | Personal Effects |
| $ 5,000 | Precious Metals |
| $ 50,000 | Property In Transit |
| $ 25,000 | Property Of Others |
| $ 500,000 | Property Off Premises—Including Stock |
| $ 25,000 | Property On Exhibition |
| $ 10,000 | Retaining Walls (Not part of building) |
| $ 25,000 | Spoilage |
| $ 100,000 | Valuable Papers and Records (Other than Electronic Data) |
| $ 100,000 | Water Backup or Overflow of Sewers or Drains |

I.   The **BUILDING AND PERSONAL PROPERTY COVERAGE FORM** is amended as follows:

    A.   Under section **A.1. Covered Property,** paragraph **b. Your Business Personal Property** is replaced by:

        **b.   Your Business Personal Property** located in or on the building described in the Declarations or in the open (or in a vehicle) within 2,000 feet of the described premises, consisting of the following unless otherwise specified in the Declarations or on Your Business Personal Property—Separation of Coverage Form:

        **(1)** Furniture and fixtures;

        **(2)** Machinery and equipment;

        **(3)** "Stock";

        **(4)** All other personal property owned by you and used in your business;

        **(5)** Labor, materials or services furnished or arranged by you on personal property of others;

        **(6)** Your use interest as tenant in improvements and betterments. Improvements and betterments are fixtures, alterations, installations or additions:

           **(a)** Made a part of the building or structure you occupy but do not own; and

           **(b)** You acquired or made at your expense but cannot legally remove;

        **(7)** Leased personal property for which you have a contractual responsibility to insure, unless otherwise provided for under Personal Property of Others.

    B.   Section **A. Coverage,** subsection **2. Property Not Covered** is amended as follows:

        **1.** Paragraph **i.** is replaced by:

           **i.** Personal property while waterborne;

        **2.** Paragraph **p.(c)** is replaced by:

           **(c)** Any owned or leased watercraft twenty-one (21) feet or less in length out of water at the described premises; or

Includes copyrighted material of ISO Properties, Inc., with its permission.
Copyright, ISO Properties, Inc., 2007

Subject to Protective Order - Confidential                              BSAPolicyEv-00051045

TrustApp0660

**C.** Subsection **4. Additional Coverages** is amended as follows:

    **1.** Under paragraph **a. Debris Removal,** subparagraph **a.(4)** is replaced by:

        **(4)** We will pay up to an additional **$50,000** as a Limit of Insurance for debris removal expense, for each location, in any one occurrence or physical loss or damage to Covered Property, if one or both of the following circumstances apply:

           **(a)** The total of the actual debris removal expense plus the amount we pay for direct physical loss or damage exceeds the Limit of Insurance on the Covered Property that has sustained loss or damage.

           **(b)** The actual debris removal expense exceeds twenty-five percent (25%) of the sum of the deductible plus the amount that we pay for direct physical loss or damage to the Covered Property that has sustained loss or damage.

        Therefore, if **(4)(a)** and/or **(4)(b)** apply, our total payment for direct physical loss or damage and debris removal expense may reach but will never exceed the Limit of Insurance on the Covered Property that has sustained loss or damage, plus **$50,000.**

    **2.** Paragraph **c. Fire Department Service Charge** is replaced by:

        **c.** When the fire department is called to save or protect Covered Property from a Covered Cause of Loss, we will pay up to **$25,000,** unless a higher limit is shown in the Declarations for your liability for fire department service charges:

        **(1)** Assumed by contract or agreement prior to loss; or

        **(2)** Required by local ordinance.

        No deductible applies to this Additional Coverage.

    **3.** The last paragraph of **d. Pollutant Clean Up and Removal** is replaced by:

        The most we will pay under this Additional Coverage for each described premises is **$25,000** for the sum of all covered expenses arising out of Covered Causes of Loss occurring during each separate twelve (12) month period of this Policy.

    **4.** Paragraph **f.(4) Electronic Data,** is replaced by:

        **(4)** The most we will pay under this Additional Coverage—Electronic Data is **$10,000** as a Limit of Insurance for all loss or damage sustained in any one policy year, regardless of the number of occurrences of loss or damage or the number of premises, locations or computer systems involved. If loss payment on the first occurrence does not exhaust this amount, then the balance is available for subsequent loss or damage sustained in but not after that policy year. With respect to an occurrence which begins in one policy year and continues or results in additional loss or damage in a subsequent policy year(s), all loss or damage is deemed to be sustained in the policy year in which the occurrence began.

**D.** The following are added to subsection **4. Additional Coverages:**

**Reward Reimbursement**

We will pay up to **$10,000** as a Limit of Insurance for information leading to the arrest and conviction of persons responsible for crimes committed against the Insured. This Additional Coverage only applies when loss or damage is covered as a result of loss and only when the person responsible is convicted of the crime. The administration of the reward is completed by an approved, independent organization. No deductible applies to this coverage.

**Automated External Defibrillators**

We will pay up to **$5,000** per occurrence as a Limit of Insurance to cover physical loss or damage caused by a Covered Cause of Loss to Automated External Defibrillators located at each premises described in the Declarations.

Includes copyrighted material of ISO Properties, Inc., with its permission.
Copyright, ISO Properties, Inc., 2007

KR-PROP-23 (1-14)                                     **Page 4 of 15**

**Business Income and Extra Expense**

This Additional Coverage amends the **BUSINESS INCOME (AND EXTRA EXPENSE) COVER-AGE FORM, CP 00 30,** with respect to loss of or damage to personal property in the open or personal property in a vehicle, the described premises include the area within 2,000 feet of the site at which the described premises are located.

1. **Limit of Insurance**

   We will pay up to **$100,000** as a Limit of Insurance in any one occurrence to apply at each premises described in the Declarations to cover loss of Business Income, including "Rental Value," and Extra Expense resulting from a covered cause of loss or damage to property at premises which are described in the Declarations. Payments under the following coverages will not increase the applicable Limit of Insurance under this Additional Coverage:

   a. Civil Authority;

   b. Alterations and New Buildings; or

   c. Extended Business Income.

2. **Extended Business Income**

   a. **Business Income Other Than "Rental Value"**

      Under this Additional Coverage, section **A. Coverage,** paragraph **5.c.(1) Additional Coverages** of **CP 00 30,** is replaced by:

      **(1) Business Income Other Than "Rental Value"**

         If the necessary "suspension" of your "operations" produces a Business Income loss payable under this policy, we will pay the actual loss of Business Income Other Than Rental Value you sustain for a period up to ninety (90) consecutive days after the date you could restore your "operations," with reasonable speed, to the level which would generate the business income amount that would have existed if no direct physical loss or damage had occurred.

         However, Extended Business Income does not apply to loss of Business Income incurred as a result of unfavorable business conditions caused by the impact of the Covered Cause of Loss in the area where the described premises are located.

         Loss of Business Income must be caused by direct physical loss or damage at the described premises caused by or resulting from any Covered Cause of Loss.

   b. **"Rental Value"**

      Under this Additional Coverage, section **A. Coverage,** paragraph **5.c.(2)(b), Additional Coverages** of **CP 00 30,** is replaced by:

      **(b)** We will pay the actual loss of "Rental Value" you sustain for a period up to ninety (90) consecutive days after the date you could restore tenant occupancy with reasonable speed, to the level which would generate the "Rental Value" amount that would have existed if no direct physical loss or damage had occurred.

   c. **Contingent Business Income**

      We will pay the actual loss of Business Income you sustain for period up to ninety (90) consecutive days after the date you restore operations with reasonable speed for income lost due to premises operated by others on whom you depend to:

      **(1)** Deliver materials or services to you or to others for your account (Contributing Locations);

      **(2)** Accept your products or services (Recipient Locations);

      **(3)** Manufacture products for delivery to your customers under contract of sale (Manufacturing Locations); or

      **(4)** Attract customers to your business (Leader Locations).

Includes copyrighted material of ISO Properties, Inc., with its permission.
Copyright, ISO Properties, Inc., 2007

Subject to Protective Order - Confidential                    BSAPolicyEv-00051047

TrustApp0662

This Additional Coverage—Business Income and Extra Expense is subject to the provisions of the **BUSINESS INCOME (AND EXTRA EXPENSE) COVERAGE FORM, CP 00 30. BUSINESS INCOME (AND EXTRA EXPENSE) COVERAGE FORM, CP 00 30**, is made a part of this policy whether or not Business Income and/or Extra Expense coverage is indicated in the Declarations.

## Crime Coverage

**(1) Inside the Premises—Theft of Money and Securities**

We will pay up to **$10,000** as a Limit of Insurance for loss in any one "occurrence" under the Inside the Premises—Theft of Money and Securities Insuring Agreement.

**(2) Outside the Premises**

We will pay up to **$10,000** as a Limit of Insurance for loss in any one "occurrence" under the Outside the Premises Insuring Agreement.

This Additional Coverage is subject to the provisions of **COMMERCIAL CRIME COVERAGE FORM (LOSS SUSTAINED), CR 00 21**, with the exception of the Limit of Insurance provision contained in that Form. **COMMERCIAL CRIME COVERAGE FORM (LOSS SUSTAINED), CR 00 21**, is made a part of this Policy whether or not Commercial Crime coverage is indicated in the Declarations.

## Emergency Real Estate Consultant Fee

We will reimburse you up to **$25,000** in any one policy year for any realtor's fee or real estate consultant's fee required by the Insured's need to relocate due to the loss or damage by a Covered Cause of Loss to the Insured's premises described on the Declarations.

## Identity Theft Expense

**(1) Coverage**

We will pay for reimbursement of any present director or officer of the Named Insured, partner or proprietor for expenses incurred as the direct result of any Identity Theft occurring, discovered and reported during the policy period. No deductible applies to this coverage.

**(2) Limit of Insurance**

We will pay up to **$25,000** as a Limit of Insurance under this Additional Coverage—Identity Theft Expense.

**(3) Identity Theft** means the act of knowingly transferring or using, without lawful authorization, the identity of any officer or director (or spouse thereof) of the Named Insured with the intent to commit, or to aid or abet another to commit, any unlawful activity that constitutes a violation of federal law or a felony under any applicable state or local law.

**(4) Identity Theft Expenses** means:

**(a)** Costs of notarizing documents required by financial institutions or similar creditors as testaments to fraud;

**(b)** Costs for certified mail to law enforcement agencies, credit agencies, financial institutions or similar creditors; or

**(c)** Loan application fees for re-applying for loan(s) when the original application is rejected solely because of incorrect credit information.

Includes copyrighted material of ISO Properties, Inc., with its permission.
Copyright, ISO Properties, Inc., 2007

Subject to Protective Order - Confidential                    BSAPolicyEv-00051048

TrustApp0663

**Key Individual Replacement Expenses**

We will pay up to **$50,000** as a Limit of Insurance per policy year under this Additional Coverage—Key Individual Replacement Expenses for expenses incurred by the Named Insured to replace the Chief Executive Officer or Executive Director if that officer or director suffers an injury during the policy period which results in the loss of life during the policy period. No deductible applies to this coverage. We will not pay this benefit if benefit payment is also available from us on any other policy.

**Key Individual Replacement Expenses** mean:

(1) Costs of advertising the employment position opening;

(2) Travel, lodging, meal and entertainment expenses incurred in interviewing job applicants for the employment position opening; and

(3) Miscellaneous extra expenses incurred in finding, interviewing and negotiating with the job applicants, including, but not limited to, overtime pay, costs to verify the background and references of the applicants and legal expenses incurred to draw up employment contracts.

**Lease Cancellation Moving Expenses**

We will reimburse the Named Insured up to **$10,000** for moving expenses incurred when moving is made necessary by the cancellation of a lease at premises occupied by the Named Insured and described in the Declarations. The cancellation must result from direct physical loss of or damage to your Covered Property at the premises described in the Declarations caused by or resulting from a Covered Cause of Loss during the term of this Policy. No deductible applies for this coverage.

**Lessor's Leasehold Interest**

(1) **Coverage**

We will pay for loss of Covered Leasehold Interest you sustain due to the cancellation of lease contracts by tenants. The cancellation must result from direct physical loss of or damage to your Covered Property at the premises described in the Declarations caused by or resulting from a Covered Cause of Loss during the term of this Policy. No deductible applies for this coverage.

(a) **Covered Leasehold Interest** means:

(i) Rent you were collecting at the described premises prior to the loss; and

(ii) "Rental Value" of the described premises after loss or damage has been repaired or rebuilt.

(b) Covered Leasehold Interest does not include:

(i) Prepaid rent;

(ii) Security or other deposits made by tenants; and

(iii) Insurance, taxes or other payments made on your behalf by tenants.

(2) **Limits of Insurance**

The most we will pay under this Additional Coverage is the least of the following:

(a) Your Covered Leasehold Interest for the twelve (12) months immediately following the "period of restoration" and ending with the normal expiration date of each canceled lease; or

(b) **$10,000** for all Covered Leasehold Interest of all tenants canceling their leases arising out of an occurrence at a premises described in the Declarations.

This Additional Coverage is subject to the provisions of the **BUSINESS INCOME (AND EXTRA EXPENSE) COVERAGE FORM, CP 00 30,** with the exception of the

Includes copyrighted material of ISO Properties, Inc., with its permission.
Copyright, ISO Properties, Inc., 2007

Subject to Protective Order - Confidential                              BSAPolicyEv-00051049

TrustApp0664

Limit of Insurance provision contained in that Form. **BUSINESS INCOME (AND EXTRA EXPENSE) COVERAGE FORM, CP 00 30,** is made a part of this Policy whether or not Business Income and Extra Expense Coverage is indicated in the Declarations.

**Lock Replacement Coverage**

We will pay up to **$2,500** in any one occurrence as a Limit of Insurance to cover the costs due to the theft of your keys used to secure a location described in the Declarations. No deductible applies to this coverage.

We will not pay more than the least of the following:

     **(1)** Re-key the undamaged locks;

     **(2)** Install new lock cylinders;

     **(3)** Provide new master keys; or

     **(4)** Replace existing undamaged locks with new locks of like kind and quality.

**Loss Data Preparation Costs**

We will pay up to **$25,000** as a Limit of Insurance for reasonable costs you incur in preparing loss data required by policy conditions after a covered property loss. This includes the cost of compiling inventories, obtaining appraisals and preparing other data to determine the extent of your loss; but does not include Attorney or Public Adjustor fees.

**Off-Premises Power Failure**

The insurance provided by the **BUILDING AND PERSONAL PROPERTY COVERAGE FORM** and the **BUSINESS INCOME COVERAGE FORM** attached to this policy is extended to include loss or damage that you incur due to the interruption of utility service supplied to the described premises. The interruption must result from direct physical loss or damage by a Covered Cause of Loss to the following types of utility service properties not on your described premises:

     **(1)** Water Supply Services, meaning the following types of property supplying services to the described premises:

         **(a)** Pumping stations; and

         **(b)** Water mains.

     **(2)** Communication Supply Services, meaning property supplying communication services, including telephone, radio, microwave or television services to the described premises, such as:

         **(a)** Communication transmission lines, including optic fiber transmission lines; and

         **(b)** Coaxial cables; and

         **(c)** Microwave radio relays except satellites.

         Communication Supply Service does not include overhead communication lines.

     **(3)** Power Supply Services, meaning the following types of property supplying electricity, steam or gas to the described premises:

         **(a)** Utility generating plants;

         **(b)** Switching stations;

         **(c)** Substations;

         **(d)** Transformers; and

         **(e)** Transmission Lines.

         Power Supply does not include overhead transmission lines.

     We will only pay for loss or damage you sustain after the first twelve (12) hours following

Includes copyrighted material of ISO Properties, Inc., with its permission.
Copyright, ISO Properties, Inc., 2007

Subject to Protective Order - Confidential             BSAPolicyEv-00051050

TrustApp0665

the direct physical loss or damage to the off-premises property to which this Additional Coverage applies. The most we will pay under this Additional Coverage is **$50,000** for losses payable under the **BUILDING AND PERSONAL PROPERTY COVERAGE FORM** and **$50,000** for losses payable under the Business Income Coverage Form.

### Pair, Set or Parts

You may extend the insurance provided by the **BUILDING AND PERSONAL PROPERTY COVERAGE FORM** to:

**(1)** Pair or Set:

In case of lost or damaged article which is part of a pair or set we may:

**(a)** Repair or replace any part to restore the pair or set to its value before the loss or damage; or

**(b)** Pay a reasonable proportion of the value of the entire pair or set. The loss is not considered a total loss of the pair or set.

**(2)** Parts: In case of a loss to any part of a covered item consisting of several parts when it is complete, we will only pay for the value of the lost or damaged part. The value of property does not include antique, historic or sentimental value.

### Temporary Meeting Space

We will reimburse you up to **$25,000** as a Limit of Insurance in any one policy year under this Additional Coverage for expenses incurred due to the temporary unavailability of the Named Insured's primary office space due to the failure of a climate control system, or leakage of a hot water heater, during the policy period. Expenses will be reimbursed only for the rental of temporary meeting space required for meeting with parties who are not insured under this Policy. No deductible applies to this coverage.

### Terrorism Travel Reimbursement

We will reimburse you up to **$25,000** as a Limit of Insurance in any one policy year for "Emergency Travel Expenses" incurred by a director or officer of the Named Insured due to the occurrence of a "Certified Act of Terrorism." No deductible applies to this coverage.

"Emergency Travel Expenses" are additional travel expenses incurred to reschedule comparable transport due to the cancellation of scheduled transport within forty-eight (48) hours of a "Certified Act of Terrorism."

"Certified Act of Terrorism" means an act that is certified by the Secretary of the Treasury, in concurrence with the Secretary of State and the Attorney General of the United States, to be an act of terrorism pursuant to the federal Terrorism Risk Insurance Act. The criteria contained in that Act for a "Certified Act of Terrorism" include the following:

**(1)** The act resulted in insured losses in excess of $5 million in the aggregate attributable to all types of insurance subject to the Terrorism Risk Insurance Act; and

**(2)** The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the Policy or affect the conduct of the United States Government by coercion.

### Workplace Violence Counseling

In the event that an incidence of "workplace violence" occurs at any time on the covered premises during the policy period, we will reimburse you for expenses incurred for the emotional counseling of your employees during the policy period or within six months from the date of the "workplace violence." The limit for this coverage will be **$25,000** per policy period regardless of the number of insureds or claims made. No deductible applies to this coverage.

"Workplace Violence" means the intentional use of, or threat to use deadly force by any person with the intent to cause harm and that results in bodily injury or death of a person while on the Named Insured's premises.

Includes copyrighted material of ISO Properties, Inc., with its permission.
Copyright, ISO Properties, Inc., 2007

Subject to Protective Order - Confidential

**E.** Section **A. Coverage,** subsection **5. Coverage Extensions** is amended as follows:

    **1.** Under paragraph **a. Newly Acquired or Constructed Property,** the last paragraphs of subparagraph **(1) Buildings** and subparagraph **(2)(a) Your Business Personal Property** are replaced by:

        **(a) Buildings**

            The most we will pay for loss or damage under this Extension is **$1,000,000** at each building.

        **(b) Your Business Personal Property**

            The most we will pay for loss or damage under this Extension is **$500,000** at each building.

    **2.** Under paragraph **a. Newly Acquired or Constructed Property,** subparagraph **(3)(b) Period of Coverage** is replaced by:

        **(b)** Ninety (90) days expire after you acquire the property or begin construction of that part of the building that would qualify as covered property; or

    **3.** Paragraph **b. Personal Effects and Property of Others** is replaced by:

      **b. Personal Effects and Property of Others**

      You may extend the insurance that applies to **Your Business Personal Property** to apply to:

      **(1)** Personal effects owned by you, your officers, directors, partners, trustees, managers, employees or individuals in the Insured's care in a group residential facility, while those personal effects are at the premises described in the Declarations.

        The most we will pay for loss or damage under this Extension is **$25,000** per occurrence and **$5,000** for any one person as a Limit of Insurance per occurrence at each described premises. Coverage does not apply if the property is already insured elsewhere.

      **(2)** Personal property of others in your care, custody or control.

        The most we will pay for loss or damage under this Extension is **$25,000** as a Limit of Insurance per occurrence at each described premises. Coverage does not apply if the property is already insured elsewhere.

      Our payment for loss of or damage to personal effects or property of others will only be for the account of the owner of the property. If this coverage extension is used to cover someone else's property, we can settle all losses with you and make all payments to you.

      This extension does not apply to loss or damage by theft.

    **4.** Under paragraph **c. Valuable Papers and Records (Other Than Electronic Data),** sub-paragraph **(4)** is replaced by:

        **(4)** Under this Extension, the most we will pay to replace or restore the lost information is **$100,000** at each described premises. We will also pay for the cost of blank material for reproducing the records (whether or not duplicates exist), and (when there is a duplicate) for the cost of labor to transcribe or copy the records. The costs of blank material and labor are subject to the applicable Limit of Insurance on **Your Business Personal Property** and therefore coverage of such costs is not additional insurance.

    **5.** Under paragraph **d. Property Off-Premises,** subparagraph **(3)** is replaced by:

        **(3)** The most we will pay for loss or damage under this Extension for **Property Off-Premises,** other than Property at a fair, trade show or exhibition is **$500,000.**

        The most we will pay for **Property Off-Premises** at a fair, trade show or exhibition is **$25,000.**

Includes copyrighted material of ISO Properties, Inc., with its permission.
Copyright, ISO Properties, Inc., 2007

Subject to Protective Order - Confidential

6. Under paragraph **e. Outdoor Property,** the last paragraph is replaced by:

The most we will pay for loss or damage under this Extension is **$50,000.** This limit applies to any one occurrence, regardless of the types or numbers of items lost or damaged in that occurrence. The most we will pay for any one tree, shrub, plant or acre of lawn, including debris removal, is **$1,000.**

F. Under section **A. Coverage,** the following are added to subsection **5. Coverage Extensions:**

**Accounts Receivable (Including credit or charge card slips)**

You may extend the insurance that applies to **Your Business Personal Property** to include your records of accounts receivable, including credit or charge card slips.

We will pay up to **$50,000** as a Limit of Insurance for loss or damage in any one occurrence under this Coverage Extension—Accounts Receivable.

This Coverage Extension is subject to the provisions of **Accounts Receivable Coverage Form, CM 00 66,** with the exception of the Limit of Insurance provision contained in that Form. **Accounts Receivable Coverage Form, CM 00 66,** is made a part of this Policy whether or not Accounts Receivable Coverage is indicated in the Declarations.

**Appurtenant Buildings**

(1) You may extend the insurance that applies to **Buildings** to apply to direct physical loss or damage by a Covered Cause of Loss to incidental Appurtenant Buildings or Structures which are at the described premises but not specifically described in the Declarations; and

(2) You may extend the insurance that applies to **Your Business Personal Property,** Personal Property of Others, "Computer Equipment," "Data" and "Media," if any, to apply to direct physical loss or damage by a Covered Cause of Loss to such property located within incidental Appurtenant Buildings or Structures which are at the described premises but not specifically described in the Declarations.

(3) Appurtenant Buildings or Structures include, but are not limited to, storage buildings, garages, carports, pump houses, tent platforms, pavilions, shelters, boat and canoe racks, athletic backstops, permanently installed playground equipment, adventure course structures, climbing walls and above ground tanks. But incidental Appurtenant Buildings or Structures does not include:

(a) Outside signs, whether or not attached to buildings;

(b) Any property to which the **Outdoor Property** Coverage Extension applies; or

(c) Any property excluded under the **Property Not Covered** section.

We will pay up to **$5,000** each for storage buildings, garages, carports and pump houses and the building limit for all other structures identified above as a Limit of Insurance under this Coverage Extension—Appurtenant Buildings.

**Computer Equipment, Data and Media (Including Extra Expense, Transit, Personal Portable Computers and Mechanical Breakdown)**

You may extend the insurance that applies to **Your Business Personal Property** to cover direct physical loss or physical damage to your Computer Equipment, Data and Media. We will pay up to **$60,000** as a Limit of Insurance for loss or damage in any one occurrence under this Coverage Extension—Computer Equipment, Data and Media (Including Extra Expense, Transit, Personal Portable Computers and Mechanical Breakdown). This Coverage Extension is subject to the provisions of **COMPUTER SYSTEM COVERAGE FORM, IH 00 75** and **PORTABLE COMPUTERS COVERAGE FORM, IH 75 02,** with the exception of the Limit of Insurance provision contained in that Form. **COMPUTER SYSTEM COVERAGE FORM, IH 00 75** and **IH 75 02** are made a part of this Policy whether or not Electronic Data Processing Equipment Coverage is indicated in the Declarations.

Includes copyrighted material of ISO Properties, Inc., with its permission.
Copyright, ISO Properties, Inc., 2007

Subject to Protective Order - Confidential          BSAPolicyEv-00051053

TrustApp0668

**Fine Arts**

You may extend the insurance that applies to **Your Business Personal Property** to cover direct physical loss or physical damage to your Fine Arts, including while on exhibit at the described premises. We will pay up to **$100,000** as a Limit of Insurance at each location described in the Declarations for loss or damage in any one occurrence under this coverage extension. This Coverage Extension is subject to the provisions of **COMMERCIAL FINE ARTS COVERAGE FORM, IH 00 74**, with the exception of the Limit of Insurance Provision contained in that Form. **COMMERCIAL FINE ARTS COVERAGE FORM, IH 00 74**, is made a part of this Policy whether or not Fine Arts Coverage is indicated in the Declarations.

With respect to Covered Property does not include property while on exhibition at fairgrounds, found in **IH 00 74**, is deleted.

**Fire Protection Device Recharge**

You may extend the insurance that applies to your **Building** to recharge or refill your fire protective devices that are permanently installed in buildings at the described premises. This Coverage Extension only applies when such devices have been discharged while being used to combat a covered fire. We will pay up to **$25,000** as a Limit of Insurance to recharge or refill fire protective devices under this Coverage Extension—Fire Protection Device Recharge.

**Retaining Walls**

You may extend the insurance that applies to **Building** to cover direct physical loss or physical damage to retaining walls not attached to your **Building.**

We will pay up to **$10,000** in any one occurrence as a Limit of Insurance to apply at each location described in the Declarations under this Coverage Extension—Retaining Walls. However, we will not pay under this Coverage Extension—Retaining Walls for physical loss or physical damage caused by or resulting from tree roots, freezing, thawing or normal deterioration.

**Building Ordinance or Law Coverage**

You may extend the insurance that applies to **Building** to apply to the **Loss to the Undamaged Portion of the Building, Demolition Costs** and **Increased Cost of Construction** due to the enforcement of an Ordinance or Law.

If a Covered Cause of Loss occurs to **Building** at a location described in the Declarations, we will pay:

  **(1) Loss to the Undamaged Portion of the Building**

    For actual cash value of the undamaged portion of the building as a consequence of enforcement of any ordinance or law that:

    **(a)** Requires the demolition of parts of the same property not physically damaged by a covered Cause of Loss;

    **(b)** Regulates the construction or repair of buildings, or establishes zoning or land use requirements at the location of the building that sustained loss and described in the Declarations; and

    **(c)** Is in force at the time of loss.

  **(2) Demolition**

    The cost to demolish and clear the site of undamaged parts of the building that sustained loss as a consequence of enforcement of a law or ordinance that requires demolition of such undamaged property.

  **(3) Increased Cost of Construction**

    The increased cost to repair or reconstruct the damaged portion of the building and/or reconstruct or remodel undamaged portions of the building that sustained covered physical damage when the increased cost is a consequence of enforcement of the minimum requirements of a law or ordinance.

Includes copyrighted material of ISO Properties, Inc., with its permission.
Copyright, ISO Properties, Inc., 2007

Subject to Protective Order - Confidential

The restored or remodeled property must be intended for similar occupancy as the current property, unless such occupancy is not permitted by zoning or land use ordinance or law.

We will not pay for increased construction costs:

**(a)** When Actual Cash Value applies under the Valuation Loss Condition; or

**(b)** Until the property is actually repaired or replaced at the same or another premises.

**(4) Limits of Insurance**

**Loss to the Undamaged Portion of the Building,** is included within the Limit of Insurance applicable to the Covered Building Property. Payment for the undamaged portion of the building will be on the same valuation basis applicable to the physically damaged portion of the building.

For **Demolition and Increased Cost of Construction** combined, the most we will pay is **$500,000** as a Limit of Insurance at each location described in the Declarations for loss under Demolition and Increased Cost of Construction.

**(5) Building Ordinance or Law Coverage Additional Exclusion**

We will not pay under these Ordinance or Law Coverages for the costs associated with the enforcement of any ordinance or law which requires any insured or others to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of "pollutants," "fungus," wet or dry rot or bacteria.

The terms of these Coverages apply separately to each building.

**G.** Under section **C. Limits Of Insurance,** the second paragraph is replaced by:

**Signs**

The most we will pay for loss or damage to outdoor signs, whether or not attached to the buildings or structures inside or outside the Covered Location, is **$25,000** in any one occurrence.

**H.** Under section **F. Additional Conditions,** the following condition is added:

**Other Insurance**

If there is other insurance covering the same loss or damage as would be payable under this endorsement, the additional insurance provided under this endorsement will pay only for the amount of covered loss or damage in excess of the amount due from that other insurance, whether collectable or not.

**I.** Under section **E. Loss Conditions,** the following is added to subparagraph **a. Description Of Terms** of paragraph **6. Vacancy:**

**a.  Description of Terms**

A building is not considered vacant if business personal property has been removed to another building on the same premises or if the removal pertains to the seasonal operation of the premises.

**J.** Under section **G. Optional Coverages,** the following is added to subsection **3. Replacement Cost:**

The cost of repair or replacement includes Architect fees when Architect services are required by law, code or otherwise necessary to reconstruct the damaged property following a loss.

**II.** The **CAUSES OF LOSS—SPECIAL FORM** is amended as follows:

**A.** Under section **B. Exclusions,** the following amendments apply:

Subparagraph **1.b. Earth Movement** is amended by the addition of the following:

We will pay up to **$10,000** for damages resulting from Sprinkler Leakage which is caused by Earth Movement.

Includes copyrighted material of ISO Properties, Inc., with its permission.
Copyright, ISO Properties, Inc., 2007

Subject to Protective Order - Confidential

BSAPolicyEv-00051055

TrustApp0670

Subparagraph **1.e. Utility Services** is replaced by:

**e.  Utility Services**

The failure of power or other utility service supplied to the described premises, however caused, if the failure originates away from the described premises except as provided in the Additional Coverage Extension **Utility Services—Time Element.**

But if the failure of power or other utility service results in a Covered Cause of Loss, we will pay for the loss or damage caused by that Covered Cause of Loss.

**B.**  Under section **C. Limitations,** the following amendments apply:

Subparagraph **3.a.** is replaced by:

**a.  $5,000** for furs, fur garments and garments trimmed with fur.

Subparagraph **3.b.** is replaced by:

**b.  $2,500** for jewelry, watches, watch movements, jewels, pearls, precious and semiprecious stones. This limit does not apply to jewelry and watches worth $100 or less per item.

Under paragraph **3.,** the following special limit is added:

**$5,000** for bullion, gold, silver, platinum and other precious alloys or metals.

**C.**  Under section **F. Additional Coverage Extensions,** subsection **1. Property in Transit,** subparagraph **c.** is replaced by:

**c.**  The most we will pay for loss or damage under this Extension is **$50,000.**

**D.**  The following are added to section **F. Additional Coverage Extensions:**

**Emergency Vacating Expense**

We will pay up to **$25,000** as a Limit of Insurance under this Additional Coverage Extension for reasonable expenses you incur due to the emergency vacating of your premises described in the Declarations when the vacating is necessary due to the imminent danger of loss of life or harm to occupants due to a Covered Cause of Loss.

**Water Backup or Overflow of Sewers or Drains**

You may extend the insurance provided by the **BUILDING AND PERSONAL PROPERTY COVERAGE FORM** to include loss caused by or resulting from water that backs up or overflows or is otherwise discharged from a sewer, drain, sump or sump pump. Under the **CAUSES OF LOSS—SPECIAL FORM,** section **B. Exclusions,** subparagraph **1.g.(3), Water,** is deleted in its entirety. The most we will pay under this extension is $100,000 for any one occurrence, unless a higher limit is shown in the Declarations. As used in this Additional Coverage Extension, occurrence shall mean an event, including repeated and continuous exposure to essentially the same harmful conditions, which occurs during this policy period or occurs into another policy period.

**Spoilage Coverage**

You may extend the insurance that applies to **Your Business Personal Property** to insure against direct physical loss or damage to "perishable stock" caused by or resulting from the Covered Causes of Loss of **Breakdown or Contamination** or **Power Outage.**

We will pay up to **$25,000** as a Limit of Insurance under this Additional Coverage Extension— Spoilage Coverage.

**a.  Covered Property**

**Covered Property** means "perishable stock" owned by you or by others that is in your care, custody or control located at:

**(1)**  The premises described in the Declarations;

Includes copyrighted material of ISO Properties, Inc., with its permission.
Copyright, ISO Properties, Inc., 2007

Subject to Protective Order - Confidential                                    BSAPolicyEv-00051056

TrustApp0671

    **(2)** Premises of a cold storage warehouse; or

    **(3)** Premises of a consignee.

**b.** **"Perishable Stock"** means personal property:

    **(1)** Maintained under controlled conditions for its preservation; and

    **(2)** Susceptible to loss or damage if the controlled conditions change.

**c.** **Covered Causes of Loss**

    **(1)** **Breakdown or Contamination,** meaning:

        **(a)** Change in temperature or humidity resulting from mechanical breakdown or failure of refrigerating, cooling or humidity control apparatus or equipment, only while such equipment or apparatus is at the described premises; and

        **(b)** Contamination by the refrigerant.

    **(2)** **Power Outage,** meaning change in temperature or humidity resulting from complete or partial interruption of electrical power, either on or off the described premises, due to a covered cause of loss.

**d.** **Additional Exclusions**

    **(1)** Only the following exclusions contained in paragraph **B.1.** of the **CAUSES OF LOSS—SPECIAL FORM** applicable to this Coverage Part apply to this Coverage Extension—Spoilage:

        **(b)** **Earth Movement;**

        **(c)** **Governmental Action;**

        **(d)** **Nuclear Hazard;**

        **(f)** **War and Military Action;** or

        **(g)** **Water.**

    **(2)** The following exclusions are added to the **CAUSES OF LOSS—SPECIAL FORM** applicable to this Extension and apply only to the insurance provided under this Additional Coverage Extension—Spoilage:

    We will not pay for loss or damage caused by or resulting from:

        **(a)** The disconnection of any refrigerating, cooling or humidity control system from the source of power.

        **(b)** The deactivation of electrical power caused by the manipulation of any switch or other device used to control the flow of electrical power or current.

        **(c)** The inability of an Electrical Utility Company or other power source to provide sufficient power due to:

            **(i)** Lack of fuel; or

            **(ii)** Governmental order.

        **(d)** The inability of a power source at the described premises to provide sufficient power due to lack of generating capacity to meet demand.

        **(e)** Breaking of any glass that is a permanent part of any refrigerating, cooling or humidity control unit.



AUTHORIZED REPRESENTATIVE          DATE

Includes copyrighted material of ISO Properties, Inc., with its permission.
Copyright, ISO Properties, Inc., 2007

Subject to Protective Order - Confidential          BSAPolicyEv-00051057

TrustApp0672

**POLICY NUMBER:** KKO0000021153300

COMMERCIAL INLAND MARINE
CM 00 66 01 13

# ACCOUNTS RECEIVABLE COVERAGE FORM

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this policy, the words "you" and "your" refer to the Named Insured shown in the Declarations. The words "we", "us" and "our" refer to the company providing this insurance.

Other words and phrases that appear in quotation marks have special meaning. Refer to Section E – Definitions.

## A. Coverage

1. We will pay:

   a. All amounts due from your customers that you are unable to collect;

   b. Interest charges on any loan required to offset amounts you are unable to collect pending our payment of these amounts;

   c. Collection expenses in excess of your normal collection expenses that are made necessary by the loss or damage; and

   d. Other reasonable expenses that you incur to reestablish your records of accounts receivable;

   that result from Covered Causes of Loss to your records of accounts receivable.

2. **Property Not Covered**

   Coverage does not apply to:

   a. Records of accounts receivable in storage away from the "premises" shown in the Declarations; or

   b. Contraband, or property in the course of illegal transportation or trade.

3. **Covered Causes Of Loss**

   Covered Causes of Loss means direct physical loss or damage to your records of accounts receivable except those causes of loss listed in the Exclusions.

4. **Additional Coverage – Collapse**

   The coverage provided under this Additional Coverage – Collapse applies only to an abrupt collapse as described and limited in Paragraphs **a.** through **c.**

a. For the purpose of this Additional Coverage – Collapse, abrupt collapse means an abrupt falling down or caving in of a building or any part of a building with the result that the building or part of the building cannot be occupied for its intended purpose.

b. We will pay for direct physical loss or damage to Covered Property, caused by abrupt collapse of a building or any part of a building that contains Covered Property insured under this Coverage Form, if such collapse is caused by one or more of the following:

   (1) Building decay that is hidden from view, unless the presence of such decay is known to an insured prior to collapse;

   (2) Insect or vermin damage that is hidden from view, unless the presence of such damage is known to an insured prior to collapse;

   (3) Use of defective material or methods in construction, remodeling or renovation if the abrupt collapse occurs during the course of the construction, remodeling or renovation;

   (4) Use of defective material or methods in construction, remodeling or renovation if the abrupt collapse occurs after the construction, remodeling or renovation is complete, but only if the collapse is caused in part by:

      (a) A cause of loss listed in Paragraph **(1)** or **(2)**;

      (b) One or more of the following causes of loss: fire; lightning; windstorm; hail; explosion; smoke; aircraft; vehicles; riot; civil commotion; vandalism; leakage from fire extinguishing equipment; sinkhole collapse; volcanic action; breakage of building glass; falling objects; weight of snow, ice or sleet; water damage; earthquake; all only as insured against in this Coverage Form;

      (c) Weight of people or personal property; or

      (d) Weight of rain that collects on a roof.

CM 00 66 01 13      © Insurance Services Office, Inc., 2011      Page 1 of 4

Subject to Protective Order - Confidential

BSAPolicyEv-00051058
TrustApp0673

**c.** This Additional Coverage – Collapse will not increase the Limits of Insurance provided in this Coverage Form.

**5. Coverage Extension**

**Removal**

If you give us written notice within 10 days of removal of your records of accounts receivable because of imminent danger of loss or damage, we will pay for loss or damage while they are:

**a.** At a safe place away from your "premises"; or

**b.** Being taken to and returned from that place.

This Coverage Extension is included within the Limit of Insurance applicable to the "premises" from which the records of accounts receivable are removed.

**B. Exclusions**

**1.** We will not pay for loss or damage caused directly or indirectly by any of the following. Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss.

**a. Governmental Action**

Seizure or destruction of property by order of governmental authority.

But we will pay for loss or damage caused by or resulting from acts of destruction ordered by governmental authority and taken at the time of a fire to prevent its spread if the fire would be covered under this Coverage Form.

**b. Nuclear Hazard**

Nuclear reaction or radiation, or radioactive contamination, however caused.

But if nuclear reaction or radiation, or radioactive contamination results in fire, we will pay for the direct loss or damage caused by that fire if the fire would be covered under this Coverage Form.

**c. War And Military Action**

**(1)** War, including undeclared or civil war;

**(2)** Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

**(3)** Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

Exclusions **B.1.a.** through **B.1.c.** apply whether or not the loss event results in widespread damage or affects a substantial area.

**2.** We will not pay for loss or damage caused by or resulting from any of the following:

**a.** Delay, loss of use, loss of market or any other consequential loss.

**b.** Dishonest or criminal act (including theft) committed by:

**(1)** You, any of your partners, employees (including temporary employees and leased workers), officers, directors, trustees, or authorized representatives;

**(2)** A manager or a member if you are a limited liability company; or

**(3)** Anyone else with an interest in the property, or their employees (including temporary employees and leased workers) or authorized representatives;

whether acting alone or in collusion with each other or with any other party.

This exclusion applies whether or not an act occurs during your normal hours of operation.

This exclusion does not apply to acts of destruction by your employees (including temporary employees and leased workers) or authorized representatives; but theft by your employees (including temporary employees and leased workers) or authorized representatives is not covered.

**c.** Alteration, falsification, concealment or destruction of records of accounts receivable done to conceal the wrongful giving, taking or withholding of money, securities or other property.

This exclusion applies only to the extent of the wrongful giving, taking or withholding.

**d.** Bookkeeping, accounting or billing errors or omissions.

**e.** Electrical or magnetic injury, disturbance or erasure of electronic recordings that is caused by or results from:

**(1)** Programming errors or faulty machine instructions;

**(2)** Faulty installation or maintenance of data processing equipment or component parts;

Subject to Protective Order - Confidential

BSAPolicyEv-00051059

TrustApp0674

(3) An occurrence that took place more than 100 feet from your "premises"; or

(4) Interruption of electrical power supply, power surge, blackout or brownout if the cause of such occurrence took place more than 100 feet from your "premises".

But we will pay for direct loss or damage caused by lightning.

f. Voluntary parting with any property by you or anyone entrusted with the property if induced to do so by any fraudulent scheme, trick, device or false pretense.

g. Unauthorized instructions to transfer property to any person or to any place.

h. Neglect of an insured to use all reasonable means to save and preserve property from further damage at and after the time of loss.

i. Theft by any person (except carriers for hire) to whom you entrust the property for any purpose, whether acting alone or in collusion with any other party.

This exclusion applies whether or not an act occurs during your normal hours of operation.

3. We will not pay for loss or damage that requires any audit of records or any inventory computation to prove its factual existence.

4. We will not pay for loss or damage caused by or resulting from any of the following. But if loss or damage by a Covered Cause of Loss results, we will pay for the loss or damage caused by that Covered Cause of Loss.

a. Weather conditions. But this exclusion only applies if weather conditions contribute in any way with a cause or event excluded in Paragraph 1. above to produce the loss or damage.

b. Acts or decisions, including the failure to act or decide, of any person, group, organization or governmental body.

c. Faulty, inadequate or defective:

(1) Planning, zoning, development, surveying, siting;

(2) Design, specifications, workmanship, repair, construction, renovation, remodeling, grading, compaction;

(3) Materials used in repair, construction, renovation or remodeling; or

(4) Maintenance;

of part or all of any property wherever located.

d. Collapse, including any of the following conditions of property or any part of the property:

(1) An abrupt falling down or caving in;

(2) Loss of structural integrity, including separation of parts of the property or property in danger of falling down or caving in; or

(3) Any cracking, bulging, sagging, bending, leaning, settling, shrinking or expansion as such condition relates to Paragraph (1) or (2).

This Exclusion d. does not apply to the extent that coverage is provided under the Additional Coverage – Collapse or to collapse caused by one or more of the following: fire; lightning; windstorm; hail; explosion; smoke; aircraft; vehicles; riot; civil commotion; vandalism; leakage from fire extinguishing equipment; sinkhole collapse; volcanic action; breakage of building glass; falling objects; weight of snow, ice or sleet; water damage; earthquake; weight of people or personal property; weight of rain that collects on a roof.

**C. Limits Of Insurance**

The most we will pay for loss or damage in any one occurrence is the applicable Limit Of Insurance shown in the Declarations.

**D. Additional Conditions**

**1. Determination Of Receivables**

General Condition **F. Valuation** in the Commercial Inland Marine Conditions is replaced by the following:

a. If you cannot accurately establish the amount of accounts receivable outstanding as of the time of loss or damage, the following method will be used:

(1) Determine the total of the average monthly amounts of accounts receivable for the 12 months immediately preceding the month in which the loss or damage occurs; and

(2) Adjust that total for any normal fluctuations in the amount of accounts receivable for the month in which the loss or damage occurred or for any demonstrated variance from the average for that month.

Subject to Protective Order - Confidential

**b.** The following will be deducted from the total amount of accounts receivable, however that amount is established:

  **(1)** The amount of the accounts for which there is no loss or damage;

  **(2)** The amount of the accounts that you are able to reestablish or collect;

  **(3)** An amount to allow for probable bad debts that you are normally unable to collect; and

  **(4)** All unearned interest and service charges.

**2. Recoveries**

The following is added to Loss Condition **H. Recovered Property** in the Commercial Inland Marine Conditions:

You will give us the amount of all recoveries you receive for loss or damage paid by us. But any recoveries in excess of the amount we have paid belong to you.

**3.** The following conditions apply in addition to the Commercial Inland Marine Conditions and the Common Policy Conditions:

**a. Coverage Territory**

We cover records of accounts receivable:

  **(1)** Within your "premises"; and

  **(2)** Away from your "premises" while in transit or within premises of others if those premises are located or the transit is within:

    **(a)** The United States of America (including its territories and possessions);

    **(b)** Puerto Rico; and

    **(c)** Canada.

**b. Coinsurance**

If a Coinsurance percentage is shown in the Declarations, the following condition applies.

We will not pay the full amount of any loss if the value of all accounts receivable, except those in transit, at the time of loss times the Coinsurance percentage shown for it in the Declarations is greater than the Limit of Insurance for Coverage Applicable At All Locations.

Instead, we will determine the most we will pay using the following steps:

  **(1)** Multiply the value of all accounts receivable, except those in transit, at the time of loss by the Coinsurance percentage;

  **(2)** Divide the Limit of Insurance for Coverage Applicable At All Locations by the figure determined in Step **(1)**; and

  **(3)** Multiply the total amount of loss by the figure determined in Step **(2)**.

We will pay the amount determined in Step **(3)** or the Limit of Insurance, whichever is less. For the remainder, you will either have to rely on other insurance or absorb the loss yourself.

This condition will not apply to records of accounts receivable in transit, interest charges, excess collection expenses or expenses to reestablish your records of accounts receivable.

**c. Protection Of Records**

Whenever you are not open for business, and except while you are actually using the records, you must keep all records of accounts receivable in receptacles that are described in the Declarations.

**E. Definitions**

"Premises" means that interior portion of the building at the address shown in the Declarations that you occupy for your business.

Subject to Protective Order - Confidential

BSAPolicyEv-00051061

TrustApp0676

**POLICY NUMBER:** KKO0000021153300                        **COMMERCIAL INLAND MARINE**
                                                              **IH 00 75 06 14**

# COMPUTER SYSTEMS COVERAGE FORM

Various provisions in this Policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this Policy, the words "you" and "your" refer to the Named Insured shown in the Declarations. The words "we", "us" and "our" refer to the Company providing this insurance.

Other words and phrases that appear in quotation marks have special meaning. Refer to Section **F.** Definitions.

## A. Coverage

We will pay for direct physical loss of or damage to Covered Property from any of the Covered Causes of Loss.

**1.** Covered Property, as used in this Coverage Form, means:

   **a.** "Computer Equipment", "Data" and "Media" owned by you; and

   **b.** Similar property of others in your care, custody or control.

**2. Property Not Covered**

Covered Property does not include:

   **a.** Property leased or rented to others while away from your premises described in the Declarations;

   **b.** Accounts, bills, evidences of debt, valuable papers, abstracts, records, deeds, manuscripts or other documents, unless converted to "data" and then only in that form;

   **c.** Portable computers, including, but not limited to, laptops, notebooks and tablets;

   **d.** Contraband, or property in the course of illegal transportation or trade; or

   **e.** Stock in trade.

**3. Covered Causes Of Loss**

Covered Causes of Loss means Direct Physical Loss Or Damage to Covered Property except those causes of loss listed in the Exclusions.

**4. Additional Coverages**

   **a. Additional Acquired Premises**

If during the policy period you acquire an additional premises, we will provide coverage for Covered Property at such premises for up to 60 days. The most we will pay for loss or damage is the lesser of:

     **(1)** 25% of the total Limit Of Insurance shown in the Declarations for all individually listed and described items; or

     **(2)** $100,000.

You will report the values of such property to us within 60 days from the date you take possession and will pay any additional premium due. If you do not report such property, coverage will cease automatically 60 days after the date you take possession of the property or at the end of the policy period, whichever occurs first.

   **b. Debris Removal**

     **(1)** We will pay your expenses to remove debris of Covered Property caused by or resulting from a Covered Cause of Loss that occurs during the policy period. The expenses will be paid only if they are reported to us in writing within 180 days of the date of direct physical loss or damage.

     **(2)** The most we will pay under this Additional Coverage is 25% of:

       **(a)** The amount we pay for direct physical loss or damage to Covered Property; plus

       **(b)** The deductible in this Policy applicable to that loss or damage;

     but this limitation does not apply to any additional debris removal limit provided in the Limits Of Insurance section.

Subject to Protective Order - Confidential                               BSAPolicyEv-00051062
TrustApp0677

**c. Preservation Of Property**

If it is necessary to move Covered Property from the premises to preserve it from loss or damage by a Covered Cause of Loss, we will pay for any direct loss or damage to that property:

**(1)** While it is being moved or while temporarily stored at another premises; and

**(2)** Only if the loss or damage occurs within 30 days after the property is first moved.

**d. Recharging The Fire Suppression System**

We will pay up to $10,000 to recharge the fire suppression system protecting your premises if the system, for any reason, discharges.

**e. Virus, Harmful Code Or Similar Instruction**

**(1)** Under this Additional Coverage, electronic data means information, facts or computer programs stored as or on, created or used on, or transmitted to or from computer software (including systems and applications software), on hard or floppy disks, CD-ROMs, tapes, drives, cells, data processing devices or any other repositories of computer software which are used with electronically controlled equipment. The term computer programs, referred to in the foregoing description of electronic data, means a set of related electronic instructions which direct the operations and functions of a computer or device connected to it, which enable the computer or device to receive, process, store, retrieve or send data.

**(2)** Subject to the provisions of this Additional Coverage:

**(a)** We will pay for the cost to replace or restore electronic data which has been destroyed or corrupted by a virus, harmful code or similar instruction; and

**(b)** You may extend insurance that applies to Business Income coverage, if applicable, to apply to a suspension of "operations" caused by an interruption in computer operations due to destruction or corruption of electronic data due to a virus, harmful code or similar instruction;

introduced into or enacted on a computer system (including electronic data) or a network to which it is connected, designed to damage or destroy any part of the system or disrupt its normal operation. But there is no coverage for loss or damage caused by or resulting from manipulation of a computer system (including electronic data) by any employee, including a temporary or leased employee, or by an entity retained by you or for you to inspect, design, install, modify, maintain, repair or replace that system.

**(3)** To the extent that electronic data is not replaced or restored, the loss will be valued at the cost of replacement of the media on which the electronic data was stored, with blank media of substantially identical type.

**(4)** With respect to Business Income coverage, if applicable, this Additional Coverage – Virus, Harmful Code Or Similar Instruction does not apply to loss sustained after the end of the "period of restoration", even if the amount of insurance applicable in Paragraph **(5)** below has not been exhausted.

**(5)** Unless a higher Limit Of Insurance for this coverage is shown in the Declarations, the most we will pay under this Additional Coverage – Virus, Harmful Code Or Similar Instruction is $5,000 for all loss or damage sustained in any one policy year, regardless of the number of occurrences of loss or damage or the number of premises, locations or computer systems involved. If loss payment on the first occurrence does not exhaust this amount, then the balance is available for subsequent loss or damage sustained in but not after that policy year. With respect to an occurrence which begins in one policy year and continues or results in additional loss or damage in a subsequent policy year(s), all loss or damage is deemed to be sustained in the policy year in which the occurrence began.

The $5,000 (or higher) Limit of Insurance applies separately to direct physical loss or damage and to Business Income loss, if applicable.

© Insurance Services Office, Inc., 2014          IH 00 75 06 14

Subject to Protective Order - Confidential          BSAPolicyEv-00051063

TrustApp0678

## B. Exclusions

1. We will not pay for loss or damage caused directly or indirectly by any of the following. Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss or damage.

   **a. Governmental Action**

   Seizure or destruction of property by order of governmental authority.

   But we will pay for loss or damage caused by or resulting from acts of destruction ordered by governmental authority and taken at the time of a fire to prevent its spread if the fire would be covered under this Coverage Form.

   **b. Nuclear Hazard**

   Nuclear reaction or radiation, or radioactive contamination, however caused.

   But if nuclear reaction or radiation, or radioactive contamination results in fire, we will pay for the direct loss or damage caused by that fire if the fire would be covered under this Coverage Form.

   **c. War And Military Action**

   (1) War, including undeclared or civil war;

   (2) Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

   (3) Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

   Exclusions **B.1.a.** through **B.1.c.** apply whether or not the loss event results in widespread damage or affects a substantial area.

2. We will not pay for loss or damage caused by or resulting from any of the following:

   **a.** Delay, loss of use, loss of market or any other consequential loss.

   **b.** Dishonest or criminal act (including theft) committed by:

   (1) You, any of your partners, employees (including temporary employees and leased workers), officers, directors, trustees, or authorized representatives;

   (2) A manager or a member if you are a limited liability company; or

   (3) Anyone else with an interest in the property, or their employees (including temporary employees and leased workers) or authorized representatives;

   whether acting alone or in collusion with each other or with any other party.

   This exclusion applies whether or not an act occurs during your normal hours of operation.

   This exclusion does not apply to acts of destruction by your employees (including temporary employees and leased workers) or authorized representatives; but theft by your employees (including temporary employees and leased workers) or authorized representatives is not covered.

   **c.** Unauthorized instructions to transfer property to any person or to any place.

   **d.** Virus, harmful code or similar instruction introduced into or enacted on a computer system (including "data") or a network to which it is connected, designed to damage or destroy any part of the system or disrupt its normal operation.

   This exclusion applies except to the extent coverage is provided under Additional Coverage **A.4.e.** Virus, Harmful Code Or Similar Instruction.

   **e.** Work upon the property.

   But if work upon the property results in fire or explosion, we will pay for direct loss or damage caused by that fire or explosion if the fire or explosion would be covered under this Coverage Form.

   **f.** Neglect of an insured to use all reasonable means to save and preserve property from further damage at and after the time of loss.

   **g.** Theft by any person (except carriers for hire) to whom you entrust the property for any purpose, whether acting alone or in collusion with any other party.

   This exclusion applies whether or not an act occurs during your normal hours of operation.

3. We will not pay for loss or damage caused by or resulting from any of the following. But if loss or damage by a Covered Cause of Loss results, we will pay for the loss or damage caused by that Covered Cause of Loss.

   **a.** Wear and tear, depreciation.

   **b.** Any quality in the property that causes it to damage or destroy itself, hidden or latent defect, gradual deterioration.

Subject to Protective Order - Confidential

    c. Insects, vermin or rodents.

    d. Corrosion or rust.

**C. Limits Of Insurance**

The most we will pay for loss or damage in any one occurrence is the applicable Limit Of Insurance shown in the Declarations.

Payments under the Debris Removal Additional Coverage will not increase the applicable Limit of Insurance; but if:

**1.** The sum of direct physical loss or damage and debris removal expense exceeds the Limit of Insurance; or

**2.** The debris removal expense exceeds the amount payable under the 25% limitation in Debris Removal Additional Coverage;

we will pay up to an additional $10,000 in any one occurrence under the Debris Removal Additional Coverage.

**D. Deductible**

We will not pay for loss or damage in any one occurrence until the amount of the adjusted loss or damage before applying the applicable Limits of Insurance exceeds the Deductible shown in the Declarations. We will then pay the amount of the adjusted loss or damage in excess of the Deductible, up to the applicable Limit of Insurance.

**E. Additional Conditions**

**1.** The **Valuation** General Condition in the Commercial Inland Marine Conditions is replaced by the following:

    **a.** The value of "computer equipment" will be:

      **(1)** The cost of replacing the equipment with new property functionally identical to the damaged equipment if replaced; or

      **(2)** Actual cash value if the property is not repaired or replaced.

      In the event of partial damage to an item of "computer equipment", we will not pay more than the cost of reasonably restoring the property to its condition immediately prior to the loss.

    **b.** The value of "data" will be the actual cost to reproduce. If the "data" is not replaced or reproduced, we will pay the cost of the value of the "media" with no stored "data".

    **c.** The value of "media" will be the cost to repair or replace the "media" with substantially identical property.

**2.** The following conditions apply in addition to the Commercial Inland Marine Conditions and the Common Policy Conditions:

    **a. Coverage Territory**

      **(1)** We cover property wherever located within:

        **(a)** The United States of America (including its territories and possessions);

        **(b)** Puerto Rico; and

        **(c)** Canada.

      **(2)** We also cover property being shipped by air within and between points in Paragraph **(1).**

    **b. Coinsurance**

    If a Coinsurance percentage is shown in the Declarations, the following condition applies:

    With respect to "computer equipment", we will not pay the full amount of any loss or damage if the value of "computer equipment" at the location where the loss occurred at the time of loss or damage times the Coinsurance percentage shown in the Declarations is greater than the applicable Limit of Insurance for "computer equipment".

    Instead, we will determine the most we will pay using the following steps:

    **(1)** Multiply the value of "computer equipment" at the time of loss or damage by the Coinsurance percentage;

    **(2)** Divide the Limit of Insurance of the property by the figure determined in Step **(1);**

    **(3)** Multiply the total amount of loss or damage, before the application of any deductible, by the figure determined in Step **(2);** and

    **(4)** Subtract the deductible from the figure determined in Step **(3).**

    We will pay the amount determined in Step **(4)** or the Limit of Insurance, whichever is less. For the remainder, you will either have to rely on other insurance or absorb the loss yourself.

     © Insurance Services Office, Inc., 2014      IH 00 75 06 14

Subject to Protective Order - Confidential

BSAPolicyEv-00051065

TrustApp0680

**F.  Definitions**

   **1.** "Computer Equipment" means:

      **a.** Your programmable electronic equipment that is used to store, retrieve and process data. It includes their component parts and air conditioning, fire suppression equipment and electrical equipment used exclusively in your computer operations; and

      **b.** Associated peripheral equipment that provides communication including input and output functions such as printing or auxiliary functions such as data transmission.

   It does not include "data" and "media".

   **2.** "Data" means:

      **a.** Data stored on "media"; and

      **b.** Programming records used for electronic data processing or electronically controlled equipment.

   **3.** "Media" means electronic data processing, recording or storage media such as software, films, tapes, discs, drums or cells.

   **4.** "Period of restoration" means the period of time that:

      **a.** Begins with the date of loss caused by or resulting from a Covered Cause of Loss at a covered location; and

      **b.** Ends on the date when the property at the covered location should be repaired, rebuilt or replaced with reasonable speed and similar quality.

Subject to Protective Order - Confidential

BSAPolicyEv-00051066
TrustApp0681

**POLICY NUMBER:** KKO0000021153300

**COMMERCIAL INLAND MARINE**
**IH 75 02 12 13**

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# PORTABLE COMPUTERS

This endorsement modifies insurance provided under the following:

COMPUTER SYSTEMS COVERAGE FORM

### SCHEDULE

| | |
|---|---|
| **1.** **Description Of Covered Property** | |
| **2.** **Limits Of Insurance** <br>      **a.** **Each Portable Computer** <br><br>      **b.** **Any One Loss**    $60,000 | |
| **3.** **Deductible Applicable To This Endorsement**      $250 | |

Information required to complete this Schedule, if not shown above, will be shown in the Declarations.

**A.** Section **A. Coverage** is amended as follows:

     **1.** The following is added to Paragraph **A.1. Covered Property:**

         **c. Portable Computers**

         **(1)** Portable computers, such as laptops, notebooks and tablets, as described in the Schedule, and including "data" and "media"; and

         **(2)** Related auxiliary equipment;

         that you own or is in your care, custody or control and subject to the Limits Of Insurance and Deductible shown in the Schedule.

     **2.** Paragraph **A.2.c.** is deleted.

**B.** With respect to coverage provided by this endorsement, Paragraph **2.** of Section **E. Additional Conditions** is amended as follows:

     **1.** We cover the property described in Paragraph **A.1.c.**, wherever located.

     **2.** The **Coinsurance** Additional Condition does not apply to this endorsement.

IH 75 02 12 13          © Insurance Services Office, Inc., 2013          Page 1 of 1

Subject to Protective Order - Confidential

POLICY NUMBER: KKO0000021153300                             COMMERCIAL INLAND MARINE
                                                                  IH 00 74 12 13

# COMMERCIAL FINE ARTS COVERAGE FORM

Various provisions in this Policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this Policy, the words "you" and "your" refer to the Named Insured shown in the Declarations. The words "we", "us" and "our" refer to the Company providing this insurance.

## A. Coverage

We will pay for direct physical loss of or damage to Covered Property from any of the Covered Causes of Loss.

### 1. Covered Property

Covered Property, as used in this Coverage Form, means the following property described in the Declarations:

**a.** Your fine arts; and

**b.** Fine arts of others that are in your care, custody or control.

### 2. Property Not Covered

Covered Property does not include:

**a.** Property while on exhibition at fairgrounds or on the premises of any national or international exposition, unless this coverage is added by endorsement and an additional premium is paid; or

**b.** Contraband, or property in the course of illegal transportation or trade.

### 3. Covered Causes Of Loss

Covered Causes of Loss means Direct Physical Loss Or Damage to Covered Property except those causes of loss listed in the Exclusions.

### 4. Additional Coverage

#### Newly Acquired Property

If during the policy period you take possession of additional objects of art, we will cover such objects for up to 60 days, but not beyond the end of the policy period. The most we will pay for loss or damage under this Additional Coverage is the lesser of:

**a.** 25% of the total of the Limits Of Insurance shown in the Declarations for all individually listed and described items; or

**b.** $50,000.

You will report the values of such property to us within 60 days from the date you take possession and will pay any additional premium due. If you do not report such property, coverage will cease automatically 60 days after the date you take possession of the property or at the end of the policy period, whichever occurs first.

The **Coinsurance** Additional Condition does not apply to this Additional Coverage.

## B. Exclusions

### 1.
We will not pay for loss or damage caused directly or indirectly by any of the following. Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss or damage.

**a. Governmental Action**

Seizure or destruction of property by order of governmental authority.

But we will pay for loss or damage caused by or resulting from acts of destruction ordered by governmental authority and taken at the time of a fire to prevent its spread if the fire would be covered under this Coverage Form.

**b. Nuclear Hazard**

Nuclear reaction or radiation, or radioactive contamination, however caused.

But if nuclear reaction or radiation, or radioactive contamination results in fire, we will pay for the direct loss or damage caused by that fire if the fire would be covered under this Coverage Form.

**c. War And Military Action**

**(1)** War, including undeclared or civil war;

**(2)** Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

**(3)** Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

IH 00 74 12 13                    © Insurance Services Office, Inc., 2013                    Page 1 of 3

Subject to Protective Order - Confidential                    BSAPolicyEv-00051068

Exclusions **B.1.a.** through **B.1.c.** apply whether or not the loss event results in widespread damage or affects a substantial area.

**2.** We will not pay for loss or damage caused by or resulting from any of the following:

**a.** Delay, loss of use, loss of market or any other consequential loss.

**b.** Dishonest or criminal act (including theft) committed by:

**(1)** You, any of your partners, employees (including temporary employees and leased workers), officers, directors, trustees, or authorized representatives;

**(2)** A manager or a member if you are a limited liability company; or

**(3)** Anyone else with an interest in the property, or their employees (including temporary employees and leased workers) or authorized representatives;

whether acting alone or in collusion with each other or with any other party.

This exclusion applies whether or not an act occurs during your normal hours of operation.

This exclusion does not apply to acts of destruction by your employees (including temporary employees and leased workers) or authorized representatives; but theft by your employees (including temporary employees and leased workers) or authorized representatives is not covered.

**c.** Breakage of art glass windows, statuary, glassware, bric-a-brac, marble, porcelain and similar fragile property.

But we will pay for loss or damage for such breakage caused directly by fire, lightning, explosion, windstorm, earthquake, flood, vandalism, aircraft, rioters, strikers, theft or attempted theft, or by accident to the vehicle carrying the property, if these causes of loss would be covered under this Coverage Form.

This Breakage Exclusion applies unless otherwise indicated in the Declarations.

**d.** Any repairing, restoration or retouching of the Covered Property.

**e.** Marring, scratching, chipping or denting.

But we will pay for such loss or damage caused directly by fire, lightning, explosion, windstorm, earthquake, flood, vandalism, aircraft, rioters, strikers, theft or attempted theft, or by accident to the vehicle carrying the property if these causes of loss would be covered under this Coverage Form.

**f.** Voluntary parting with any property by you or anyone entrusted with the property if induced to do so by any fraudulent scheme, trick, device or false pretense.

**g.** Unauthorized instructions to transfer property to any person or to any place.

**h.** Neglect of an insured to use all reasonable means to save and preserve property from further damage at and after the time of loss.

**i.** Theft by any person (except carriers for hire) to whom you entrust the property for any purpose, whether acting alone or in collusion with any other party.

This exclusion applies whether or not an act occurs during your normal hours of operation.

**3.** We will not pay for loss or damage caused by or resulting from any of the following. But if loss or damage by a Covered Cause of Loss results, we will pay for the loss or damage caused by that Covered Cause of Loss.

**a.** Wear and tear.

**b.** Any quality in the property that causes it to damage or destroy itself, gradual deterioration.

**c.** Insects, vermin or rodents.

**C. Limits Of Insurance**

The most we will pay for loss or damage in any one occurrence is the applicable Limit Of Insurance shown in the Declarations.

**D. Deductible**

We will not pay for loss or damage in any one occurrence until the amount of the adjusted loss or damage before applying the applicable Limit of Insurance exceeds the Deductible shown in the Declarations. We will then pay the amount of the adjusted loss or damage in excess of the Deductible, up to the applicable Limit of Insurance.

**E. Additional Conditions**

**1.** The **Valuation** General Condition in the Commercial Inland Marine Conditions is replaced by the following:

**a.** The value of each item of property that is individually listed and described in the Declarations is the applicable Limit Of Insurance shown in the Declarations for that item.

**b.** The value of all other Covered Property, including newly acquired property, will be the least of the following amounts:

**(1)** The actual cash value of that property;

Subject to Protective Order - Confidential

**(2)** The cost of reasonably restoring that property to its condition immediately before loss or damage; or

**(3)** The cost of replacing that property with substantially identical property.

In the event of loss or damage, the value of property will be determined as of the time of loss or damage.

**2.** The **Pair, Sets Or Parts** Loss Condition in the Commercial Inland Marine Conditions is replaced by the following:

**a.** In case of total loss of any items that are part of a pair or set that is individually listed and described in the Declarations, we will pay the full Limit Of Insurance shown in the Declarations for that pair or set. You will surrender to us the remaining items of the pair or set.

**b.** In case of loss or damage to any part of a pair or set that is not individually listed and described in the Declarations, we may:

**(1)** Repair or replace any part to restore the pair or set to its value before the loss or damage; or

**(2)** Pay the difference between the value of the pair or set before and after the loss or damage.

**3.** The following conditions apply in addition to the Commercial Inland Marine Conditions and the Common Policy Conditions:

**a. Coverage Territory**

**(1)** We cover property wherever located within:

**(a)** The United States of America (including its territories and possessions);

**(b)** Puerto Rico; and

**(c)** Canada.

**(2)** We also cover property being shipped by air within and between points in Paragraph **(1)**.

**b. Packing And Unpacking**

You agree that Covered Property will be packed and unpacked by competent packers.

IH 00 74 12 13                    © Insurance Services Office, Inc., 2013                    Page 3 of 3

Subject to Protective Order - Confidential

BSAPolicyEv-00051070

TrustApp0685

# National Casualty Company

**ENDORSEMENT**
**NO.** 0000

| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE DATE (12:01 A.M. STANDARD TIME) | NAMED INSURED | AGENT NO. |
|---|---|---|---|
| KKO0000021153300 | 06/20/17 | KNOX TRAIL COUNCIL, INC. (SEE KR-SP-1) | |

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## ADDITIONAL CONDITIONS

This endorsement modifies and is subject to the insurance provided under the following:

### COMMERCIAL FINE ARTS COVERAGE FORM

It is agreed that **Section E. Additional Conditions, Item 1.** is deleted in its entirety and replaced with the following:

**E. Additional Conditions**

   **1.** The Valuation General Condition in the **COMMERCIAL FINE ARTS COVERAGE FORM** is replaced by the following:

      **a.** The value of all Covered Property in any one occurrence is the Limit of Insurance declared in the Summary of Coverage Extensions Schedules of the Advantage Plus Property Endorsement, KR-PROP-23 or the Scout Council Advantage Plus Property Endorsement, KR-PROP-31.

      **b.** The value of all other Covered Property, including newly acquired property, will be the least of the following amounts:

         **(1)** If replaced, the value of Covered Property will be the cost of replacing that property with similar property without depreciation, but not more than the Limit of Insurance shown in the Summary of Coverage Extensions Schedules of the Advantage Plus Property Endorsement, KR-PROP-23 or the Scout Council Advantage Plus Property Endorsement, KR-PROP-31, whichever is applicable.

         **(2)** If not replaced, the value of that property will be the least of the following:

            **(a)** Actual cash value of that property;

            **(b)** Cost of reasonably restoring that property to its condition immediately before loss or damage; or

            **(c)** Cost of replacing that property with substantially identical property.

      **c.** In the event of loss or damage, the value of property will be determined as of the time of loss or damage.

AUTHORIZED REPRESENTATIVE　　　　　　　　　　DATE

KR-IM-10 (2-15)　　　　　　　　　　　**Page 1 of 1**

Subject to Protective Order - Confidential

**POLICY NUMBER:** KKO0000021153300

# COMMERCIAL CRIME COVERAGE FORM
## (LOSS SUSTAINED FORM)

Various provisions in this Policy restrict coverage. Read the entire Policy carefully to determine rights, duties and what is or is not covered.

Throughout this Policy, the words "you" and "your" refer to the Named Insured shown in the Declarations. The words "we", "us" and "our" refer to the company providing this insurance.

Other words and phrases that appear in quotation marks have special meaning. Refer to Section **F.** Definitions.

## A. Insuring Agreements

Coverage is provided under the following Insuring Agreements for which a Limit Of Insurance is shown in the Declarations and applies to loss that you sustain resulting directly from an "occurrence" taking place during the Policy Period shown in the Declarations, except as provided in Condition **E.1.k.** or **E.1.l.**, which is "discovered" by you during the Policy Period shown in the Declarations or during the period of time provided in the Extended Period To Discover Loss Condition **E.1.g.:**

### 1. Employee Theft

We will pay for loss of or damage to "money", "securities" and "other property" resulting directly from "theft" committed by an "employee", whether identified or not, acting alone or in collusion with other persons.

For the purposes of this Insuring Agreement, "theft" shall also include forgery.

### 2. Forgery Or Alteration

**a.** We will pay for loss resulting directly from "forgery" or alteration of checks, drafts, promissory notes, or similar written promises, orders or directions to pay a sum certain in "money" that are:

**(1)** Made or drawn by or drawn upon you; or

**(2)** Made or drawn by one acting as your agent;

or that are purported to have been so made or drawn.

For the purposes of this Insuring Agreement, a substitute check as defined in the Check Clearing for the 21st Century Act shall be treated the same as the original it replaced.

**b.** If you are sued for refusing to pay any instrument covered in Paragraph **2.a.**, on the basis that it has been forged or altered, and you have our written consent to defend against the suit, we will pay for any reasonable legal expenses that you incur and pay in that defense. The amount that we will pay for such legal expenses is in addition to the Limit of Insurance applicable to this Insuring Agreement.

### 3. Inside The Premises – Theft Of Money And Securities

We will pay for:

**a.** Loss of "money" and "securities" inside the "premises" or "financial institution premises":

**(1)** Resulting directly from "theft" committed by a person present inside such "premises" or "financial institution premises"; or

**(2)** Resulting directly from disappearance or destruction.

**b.** Loss from damage to the "premises" or its exterior resulting directly from an actual or attempted "theft" of "money" and "securities", if you are the owner of the "premises" or are liable for damage to it.

**c.** Loss of or damage to a locked safe, vault, cash register, cash box or cash drawer located inside the "premises" resulting directly from an actual or attempted "theft" of, or unlawful entry into, those containers.

### 4. Inside The Premises – Robbery Or Safe Burglary Of Other Property

We will pay for:

**a.** Loss of or damage to "other property":

**(1)** Inside the "premises" resulting directly from an actual or attempted "robbery" of a "custodian"; or

**(2)** Inside the "premises" in a safe or vault resulting directly from an actual or attempted "safe burglary".

© Insurance Services Office, Inc., 2012

Subject to Protective Order - Confidential

BSAPolicyEv-00051072
TrustApp0687

**b.** Loss from damage to the "premises" or its exterior resulting directly from an actual or attempted "robbery" or "safe burglary" of "other property", if you are the owner of the "premises" or are liable for damage to it.

**c.** Loss of or damage to a locked safe or vault located inside the "premises" resulting directly from an actual or attempted "robbery" or "safe burglary".

**5. Outside The Premises**

We will pay for:

**a.** Loss of "money" and "securities" outside the "premises" in the care and custody of a "messenger" or an armored motor vehicle company resulting directly from "theft", disappearance or destruction.

**b.** Loss of or damage to "other property" outside the "premises" in the care and custody of a "messenger" or an armored motor vehicle company resulting directly from an actual or attempted "robbery".

**6. Computer And Funds Transfer Fraud**

**a.** We will pay for:

**(1)** Loss resulting directly from a fraudulent:

**(a)** Entry of "electronic data" or "computer program" into; or

**(b)** Change of "electronic data" or "computer program" within;

any "computer system" owned, leased or operated by you, provided the fraudulent entry or fraudulent change causes, with regard to Paragraphs **6.a.(1)(a)** and **6.a.(1)(b):**

**(i)** "Money", "securities" or "other property" to be transferred, paid or delivered; or

**(ii)** Your account at a "financial institution" to be debited or deleted.

**(2)** Loss resulting directly from a "fraudulent instruction" directing a "financial institution" to debit your "transfer account" and transfer, pay or deliver "money" or "securities" from that account.

**b.** As used in Paragraph **6.a.(1),** fraudulent entry or fraudulent change of "electronic data" or "computer program" shall include such entry or change made by an "employee" acting, in good faith, upon a "fraudulent instruction" received from a computer software contractor who has a written agreement with you to design, implement or service "computer programs" for a "computer system" covered under this Insuring Agreement.

**7. Money Orders And Counterfeit Money**

We will pay for loss resulting directly from your having, in good faith, accepted in exchange for merchandise, "money" or services:

**a.** Money orders issued by any post office, express company or "financial institution" that are not paid upon presentation; or

**b.** "Counterfeit money" that is acquired during the regular course of business.

**B. Limit Of Insurance**

The most we will pay for all loss resulting directly from an "occurrence" is the applicable Limit Of Insurance shown in the Declarations.

If any loss is covered under more than one Insuring Agreement or coverage, the most we will pay for such loss shall not exceed the largest Limit of Insurance available under any one of those Insuring Agreements or coverages.

**C. Deductible**

We will not pay for loss resulting directly from an "occurrence" unless the amount of loss exceeds the Deductible Amount shown in the Declarations. We will then pay the amount of loss in excess of the Deductible Amount, up to the Limit of Insurance.

**D. Exclusions**

**1.** This insurance does not cover:

**a. Acts Committed By You, Your Partners Or Your Members**

Loss resulting from "theft" or any other dishonest act committed by:

**(1)** You; or

**(2)** Any of your partners or "members";

whether acting alone or in collusion with other persons.

Subject to Protective Order - Confidential

BSAPolicyEv-00051073

TrustApp0688

**b. Acts Committed By Your Employees Learned Of By You Prior To The Policy Period**

Loss caused by an "employee" if the "employee" had also committed "theft" or any other dishonest act prior to the effective date of this insurance and you or any of your partners, "members", "managers", officers, directors or trustees, not in collusion with the "employee", learned of such "theft" or dishonest act prior to the Policy Period shown in the Declarations.

**c. Acts Committed By Your Employees, Managers, Directors, Trustees Or Representatives**

Loss resulting from "theft" or any other dishonest act committed by any of your "employees", "managers", directors, trustees or authorized representatives:

**(1)** Whether acting alone or in collusion with other persons; or

**(2)** While performing services for you or otherwise;

except when covered under Insuring Agreement **A.1.**

**d. Confidential Or Personal Information**

Loss resulting from:

**(1)** The disclosure of your or another person's or organization's confidential or personal information including, but not limited to, patents, trade secrets, processing methods, customer lists, financial information, credit card information, health information or any other type of nonpublic information; or

**(2)** The use of another person's or organization's confidential or personal information including, but not limited to, patents, trade secrets, processing methods, customer lists, financial information, credit card information, health information or any other type of nonpublic information.

**e. Data Security Breach**

Fees, costs, fines, penalties and other expenses incurred by you which are related to the access to or disclosure of another person's or organization's confidential or personal information including, but not limited to, patents, trade secrets, processing methods, customer lists, financial information, credit card information, health information or any other type of nonpublic information.

**f. Governmental Action**

Loss resulting from seizure or destruction of property by order of governmental authority.

**g. Indirect Loss**

Loss that is an indirect result of an "occurrence" covered by this insurance including, but not limited to, loss resulting from:

**(1)** Your inability to realize income that you would have realized had there been no loss of or damage to "money", "securities" or "other property";

**(2)** Payment of damages of any type for which you are legally liable. But, we will pay compensatory damages arising directly from a loss covered under this insurance; or

**(3)** Payment of costs, fees or other expenses you incur in establishing either the existence or the amount of loss under this insurance.

**h. Legal Fees, Costs And Expenses**

Fees, costs and expenses incurred by you which are related to any legal action, except when covered under Insuring Agreement **A.2.**

**i. Nuclear Hazard**

Loss or damage resulting from nuclear reaction or radiation, or radioactive contamination, however caused.

**j. Pollution**

Loss or damage caused by or resulting from pollution. Pollution means the discharge, dispersal, seepage, migration, release or escape of any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

**k. War And Military Action**

Loss or damage resulting from:

**(1)** War, including undeclared or civil war;

**(2)** Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

**(3)** Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

Subject to Protective Order - Confidential

BSAPolicyEv-00051074

TrustApp0689

**2.** Insuring Agreement **A.1.** does not cover:

**a. Inventory Shortages**

Loss, or that part of any loss, the proof of which as to its existence or amount is dependent upon:

**(1)** An inventory computation; or

**(2)** A profit and loss computation.

However, where you establish wholly apart from such computations that you have sustained a loss, then you may offer your inventory records and actual physical count of inventory in support of the amount of loss claimed.

**b. Trading**

Loss resulting from trading, whether in your name or in a genuine or fictitious account.

**c. Warehouse Receipts**

Loss resulting from the fraudulent or dishonest signing, issuing, cancelling or failing to cancel, a warehouse receipt or any papers connected with it.

**3.** Insuring Agreements **A.3., A.4.** and **A.5.** do not cover:

**a. Accounting Or Arithmetical Errors Or Omissions**

Loss resulting from accounting or arithmetical errors or omissions.

**b. Exchanges Or Purchases**

Loss resulting from the giving or surrendering of property in any exchange or purchase.

**c. Fire**

Loss or damage resulting from fire, however caused, except:

**(1)** Loss of or damage to "money" and "securities"; and

**(2)** Loss from damage to a safe or vault.

**d. Money Operated Devices**

Loss of property contained in any money operated device unless the amount of "money" deposited in it is recorded by a continuous recording instrument in the device.

**e. Motor Vehicles Or Equipment And Accessories**

Loss of or damage to motor vehicles, trailers or semitrailers or equipment and accessories attached to them.

**f. Transfer Or Surrender Of Property**

**(1)** Loss of or damage to property after it has been transferred or surrendered to a person or place outside the "premises" or "financial institution premises":

**(a)** On the basis of unauthorized instructions; or

**(b)** As a result of a threat including, but not limited to:

**(i)** A threat to do bodily harm to any person;

**(ii)** A threat to do damage to any property;

**(iii)** A threat to introduce a denial of service attack into any "computer system";

**(iv)** A threat to introduce a virus or other malicious instruction into any "computer system" which is designed to damage, destroy or corrupt "electronic data" or "computer programs" stored within the "computer system";

**(v)** A threat to contaminate, pollute or render substandard your products or goods; or

**(vi)** A threat to disseminate, divulge or utilize:

**i.** Your confidential information;

**ii.** Confidential or personal information of another person or organization; or

**iii.** Weaknesses in the source code within any "computer system".

**(2)** But, this exclusion does not apply under Insuring Agreement **A.5.** to loss of "money", "securities" or "other property" while outside the "premises" in the care and custody of a "messenger" if you:

**(a)** Had no knowledge of any threat at the time the conveyance began; or

**(b)** Had knowledge of a threat at the time the conveyance began, but the loss was not related to the threat.

**g. Vandalism**

Loss from damage to the "premises" or its exterior, or to any safe, vault, cash register, cash box, cash drawer or "other property" by vandalism or malicious mischief.

Subject to Protective Order - Confidential

**h. Voluntary Parting Of Title To Or Possession Of Property**

Loss resulting from your, or anyone else acting on your express or implied authority, being induced by any dishonest act to voluntarily part with title to or possession of any property.

**4.** Insuring Agreement **A.6.** does not cover:

**a. Authorized Access**

Loss resulting from a fraudulent:

**(1)** Entry of "electronic data" or "computer program" into; or

**(2)** Change of "electronic data" or "computer program" within;

any "computer system" owned, leased or operated by you by a person or organization with authorized access to that "computer system", except when covered under Insuring Agreement **A.6.b.**

**b. Credit Card Transactions**

Loss resulting from the use or purported use of credit, debit, charge, access, convenience, identification, stored-value or other cards or the information contained on such cards.

**c. Exchanges Or Purchases**

Loss resulting from the giving or surrendering of property in any exchange or purchase.

**d. Fraudulent Instructions**

Loss resulting from an "employee" or "financial institution" acting upon any instruction to:

**(1)** Transfer, pay or deliver "money", "securities" or "other property"; or

**(2)** Debit or delete your account;

which instruction proves to be fraudulent, except when covered under Insuring Agreement **A.6.a.(2)** or **A.6.b.**

**e. Inventory Shortages**

Loss, or that part of any loss, the proof of which as to its existence or amount is dependent upon:

**(1)** An inventory computation; or

**(2)** A profit and loss computation.

**E. Conditions**

The following conditions apply in addition to the Common Policy Conditions:

**1. Conditions Applicable To All Insuring Agreements**

**a. Additional Premises Or Employees**

If, while this insurance is in force, you establish any additional "premises" or hire additional "employees", other than through consolidation or merger with, or purchase or acquisition of assets or liabilities of, another entity, such "premises" and "employees" shall automatically be covered under this insurance. Notice to us of an increase in the number of "premises" or "employees" is not required, and no additional premium will be charged for the remainder of the Policy Period shown in the Declarations.

**b. Concealment, Misrepresentation Or Fraud**

This insurance is void in any case of fraud by you as it relates to this insurance at any time. It is also void if you or any other Insured, at any time, intentionally conceals or misrepresents a material fact concerning:

**(1)** This insurance;

**(2)** The property covered under this insurance;

**(3)** Your interest in the property covered under this insurance; or

**(4)** A claim under this insurance.

**c. Consolidation – Merger Or Acquisition**

If you consolidate or merge with, or purchase or acquire the assets or liabilities of, another entity:

**(1)** You must give us written notice as soon as possible and obtain our written consent to extend the coverage provided by this insurance to such consolidated or merged entity or such purchased or acquired assets or liabilities. We may condition our consent by requiring payment of an additional premium; but

---

CR 00 21 08 13                    ©Insurance Services Office, Inc., 2012                    Page 5 of 15

**(2)** For the first 90 days after the effective date of such consolidation, merger or purchase or acquisition of assets or liabilities, the coverage provided by this insurance shall apply to such consolidated or merged entity or such purchased or acquired assets or liabilities, provided that all "occurrences" causing or contributing to a loss involving such consolidation, merger or purchase or acquisition of assets or liabilities, must take place after the effective date of such consolidation, merger or purchase or acquisition of assets or liabilities.

**d. Cooperation**

You must cooperate with us in all matters pertaining to this insurance as stated in its terms and conditions.

**e. Duties In The Event Of Loss**

After you "discover" a loss or a situation that may result in loss of or damage to "money", "securities" or "other property", you must:

**(1)** Notify us as soon as possible. If you have reason to believe that any loss (except for loss covered under Insuring Agreement **A.1.** or **A.2.**) involves a violation of law, you must also notify the local law enforcement authorities;

**(2)** Give us a detailed, sworn proof of loss within 120 days;

**(3)** Cooperate with us in the investigation and settlement of any claim;

**(4)** Produce for our examination all pertinent records;

**(5)** Submit to examination under oath at our request and give us a signed statement of your answers; and

**(6)** Secure all of your rights of recovery against any person or organization responsible for the loss and do nothing to impair those rights.

**f. Employee Benefit Plans**

The "employee benefit plans" shown in the Declarations (hereinafter referred to as Plan) are included as Insureds under Insuring Agreement **A.1.**, subject to the following:

**(1)** If any Plan is insured jointly with any other entity under this insurance, you or the Plan Administrator is responsible for selecting a Limit of Insurance for Insuring Agreement **A.1.** that is sufficient to provide a Limit of Insurance for each Plan that is at least equal to that required under ERISA as if each Plan were separately insured.

**(2)** With respect to loss sustained or "discovered" by any such Plan, Insuring Agreement **A.1.** is replaced by the following:

We will pay for loss of or damage to "money", "securities" and "other property" resulting directly from fraudulent or dishonest acts committed by an "employee", whether identified or not, acting alone or in collusion with other persons.

**(3)** If the first Named Insured is an entity other than a Plan, any payment we make for loss sustained by any Plan will be made to the Plan sustaining the loss.

**(4)** If two or more Plans are insured under this insurance, any payment we make for loss:

**(a)** Sustained by two or more Plans; or

**(b)** Of commingled "money", "securities" or "other property" of two or more Plans;

resulting directly from an "occurrence", will be made to each Plan sustaining loss in the proportion that the Limit of Insurance required under ERISA for each Plan bears to the total of those limits.

**(5)** The Deductible Amount applicable to Insuring Agreement **A.1.** does not apply to loss sustained by any Plan.

Subject to Protective Order - Confidential

BSAPolicyEv-00051077

TrustApp0692

**g. Extended Period To Discover Loss**

We will pay for loss that you sustained prior to the effective date of cancellation of this insurance, which is "discovered" by you:

**(1)** No later than one year from the date of that cancellation. However, this extended period to "discover" loss terminates immediately upon the effective date of any other insurance obtained by you, whether from us or another insurer, replacing in whole or in part the coverage afforded under this insurance, whether or not such other insurance provides coverage for loss sustained prior to its effective date.

**(2)** No later than one year from the date of that cancellation with regard to any "employee benefit plan".

**h. Joint Insured**

**(1)** If more than one Insured is named in the Declarations, the first Named Insured will act for itself and for every other Insured for all purposes of this insurance. If the first Named Insured ceases to be covered, then the next Named Insured will become the first Named Insured.

**(2)** If any Insured, or partner, "member" or officer of that Insured has knowledge of any information relevant to this insurance, that knowledge is considered knowledge of every Insured.

**(3)** An "employee" of any Insured is considered to be an "employee" of every Insured.

**(4)** If this insurance or any of its coverages are cancelled as to any Insured, loss sustained by that Insured is covered only if it is "discovered" by you:

**(a)** No later than one year from the date of that cancellation. However, this extended period to "discover" loss terminates immediately upon the effective date of any other insurance obtained by that Insured, whether from us or another insurer, replacing in whole or in part the coverage afforded under this insurance, whether or not such other insurance provides coverage for loss sustained prior to its effective date.

**(b)** No later than one year from the date of that cancellation with regard to any "employee benefit plan".

**(5)** We will not pay more for loss sustained by more than one Insured than the amount we would pay if all such loss had been sustained by one Insured.

**(6)** Payment by us to the first Named Insured for loss sustained by any Insured, or payment by us to any "employee benefit plan" for loss sustained by that Plan, shall fully release us on account of such loss.

**i. Legal Action Against Us**

You may not bring any legal action against us involving loss:

**(1)** Unless you have complied with all the terms of this insurance;

**(2)** Until 90 days after you have filed proof of loss with us; and

**(3)** Unless brought within two years from the date you "discovered" the loss.

If any limitation in this condition is prohibited by law, such limitation is amended so as to equal the minimum period of limitation provided by such law.

**j. Liberalization**

If we adopt any revision that would broaden the coverage under this insurance without additional premium within 45 days prior to or during the Policy Period shown in the Declarations, the broadened coverage will immediately apply to this insurance.

**k. Loss Sustained During Prior Insurance Issued By Us Or Any Affiliate**

**(1) Loss Sustained Partly During This Insurance And Partly During Prior Insurance**

If you "discover" loss during the Policy Period shown in the Declarations, resulting directly from an "occurrence" taking place:

**(a)** Partly during the Policy Period shown in the Declarations; and

**(b)** Partly during the policy period(s) of any prior cancelled insurance that we or any affiliate issued to you or any predecessor in interest;

and this insurance became effective at the time of cancellation of the prior insurance, we will first settle the amount of loss that you sustained during this policy period. We will then settle the remaining amount of loss that you sustained during the policy period(s) of the prior insurance.

Subject to Protective Order - Confidential

BSAPolicyEv-00051078

TrustApp0693

**(2) Loss Sustained Entirely During Prior Insurance**

If you "discover" loss during the Policy Period shown in the Declarations, resulting directly from an "occurrence" taking place entirely during the policy period(s) of any prior cancelled insurance that we or any affiliate issued to you or any predecessor in interest, we will pay for the loss, provided:

**(a)** This insurance became effective at the time of cancellation of the prior insurance; and

**(b)** The loss would have been covered under this insurance had it been in effect at the time of the "occurrence".

We will first settle the amount of loss that you sustained during the most recent prior insurance. We will then settle any remaining amount of loss that you sustained during the policy period(s) of any other prior insurance.

**(3)** In settling loss under Paragraphs **k.(1)** and **k.(2):**

**(a)** The most we will pay for the entire loss is the highest single Limit of Insurance applicable during the period of loss, whether such limit was written under this insurance or was written under the prior insurance issued by us.

**(b)** We will apply the applicable Deductible Amount shown in the Declarations to the amount of loss sustained under this insurance. If no loss was sustained under this insurance, we will apply the Deductible Amount shown in the Declarations to the amount of loss sustained under the most recent prior insurance.

If the Deductible Amount is larger than the amount of loss sustained under this insurance, or the most recent prior insurance, we will apply the remaining Deductible Amount to the remaining amount of loss sustained during the prior insurance.

We will not apply any other Deductible Amount that may have been applicable to the loss.

**(4)** The following examples demonstrate how we will settle losses subject to this condition:

**Example Number 1**

The Insured sustained a covered loss of $10,000 resulting directly from an "occurrence" taking place during the terms of Policy **A** and Policy **B.**

**Policy A**

The current policy. Written at a Limit of Insurance of $50,000 and a Deductible Amount of $5,000.

**Policy B**

Issued prior to Policy **A.** Written at a Limit of Insurance of $50,000 and a Deductible Amount of $5,000.

The amount of loss sustained under Policy **A** is $2,500 and under Policy **B,** $7,500.

The highest single Limit of Insurance applicable to this entire loss is $50,000 written under Policy **A.** The Policy **A** Deductible Amount of $5,000 applies. The loss is settled as follows:

**(a)** The amount of loss sustained under Policy **A** ($2,500) is settled first. The amount we will pay is nil ($0.00) because the amount of loss is less than the Deductible Amount (i.e., $2,500 loss - $5,000 deductible = $0.00).

**(b)** The remaining amount of loss sustained under Policy **B** ($7,500) is settled next. The amount recoverable is $5,000 after the remaining Deductible Amount from Policy **A** of $2,500 is applied to the loss (i.e., $7,500 loss - $2,500 deductible = $5,000).

The most we will pay for this loss is $5,000.

**Example Number 2**

The Insured sustained a covered loss of $250,000 resulting directly from an "occurrence" taking place during the terms of Policy **A** and Policy **B.**

**Policy A**

The current policy. Written at a Limit of Insurance of $125,000 and a Deductible Amount of $10,000.

© Insurance Services Office, Inc., 2012

CR 00 21 08 13

Subject to Protective Order - Confidential

### Policy B

Issued prior to Policy **A**. Written at a Limit of Insurance of $150,000 and a Deductible Amount of $25,000.

The amount of loss sustained under Policy **A** is $175,000 and under Policy **B**, $75,000.

The highest single Limit of Insurance applicable to this entire loss is $150,000 written under Policy **B**. The Policy **A** Deductible Amount of $10,000 applies. The loss is settled as follows:

**(a)** The amount of loss sustained under Policy **A** ($175,000) is settled first. The amount we will pay is the Policy **A** Limit of $125,000 because $175,000 loss - $10,000 deductible = $165,000, which is greater than the $125,000 policy limit.

**(b)** The remaining amount of loss sustained under Policy **B** ($75,000) is settled next. The amount we will pay is $25,000 (i.e., $150,000 Policy **B** limit - $125,000 paid under Policy **A** = $25,000).

The most we will pay for this loss is $150,000.

### Example Number 3

The Insured sustained a covered loss of $2,000,000 resulting directly from an "occurrence" taking place during the terms of Policies **A**, **B**, **C** and **D**.

### Policy A

The current policy. Written at a Limit of Insurance of $1,000,000 and a Deductible Amount of $100,000.

### Policy B

Issued prior to Policy **A**. Written at a Limit of Insurance of $750,000 and a Deductible Amount of $75,000.

### Policy C

Issued prior to Policy **B**. Written at a Limit of Insurance of $500,000 and a Deductible Amount of $50,000.

### Policy D

Issued prior to Policy **C**. Written at a Limit of Insurance of $500,000 and a Deductible Amount of $50,000.

The amount of loss sustained under Policy **A** is $350,000; under Policy **B**, $250,000; under Policy **C**, $600,000; and under Policy **D**, $800,000.

The highest single Limit of Insurance applicable to this entire loss is $1,000,000 written under Policy **A**. The Policy **A** Deductible Amount of $100,000 applies. The loss is settled as follows:

**(a)** The amount of loss sustained under Policy **A** ($350,000) is settled first. The amount we will pay is $250,000 (i.e., $350,000 loss - $100,000 deductible = $250,000).

**(b)** The amount of loss sustained under Policy **B** ($250,000) is settled next. The amount we will pay is $250,000 (no deductible is applied).

**(c)** The amount of loss sustained under Policy **C** ($600,000) is settled next. The amount we will pay is $500,000, the policy limit (no deductible is applied).

**(d)** We will not make any further payment under Policy **D**, as the maximum amount payable under the highest single Limit of Insurance applying to the loss of $1,000,000 under Policy **A** has been satisfied.

The most we will pay for this loss is $1,000,000.

**I. Loss Sustained During Prior Insurance Not Issued By Us Or Any Affiliate**

**(1)** If you "discover" loss during the Policy Period shown in the Declarations, resulting directly from an "occurrence" taking place during the policy period of any prior cancelled insurance that was issued to you or a predecessor in interest by another company, and the period of time to discover loss under that insurance had expired, we will pay for the loss under this insurance, provided:

**(a)** This insurance became effective at the time of cancellation of the prior insurance; and

**(b)** The loss would have been covered under this insurance had it been in effect at the time of the "occurrence".

**(2)** In settling loss subject to this condition:

**(a)** The most we will pay for the entire loss is the lesser of the Limits of Insurance applicable during the period of loss, whether such limit was written under this insurance or was written under the prior cancelled insurance.

Subject to Protective Order - Confidential

BSAPolicyEv-00051080

TrustApp0695

**(b)** We will apply the applicable Deductible Amount shown in the Declarations to the amount of loss sustained under the prior cancelled insurance.

**(3)** The insurance provided under this condition is subject to the following:

**(a)** If loss covered under this condition is also partially covered under Condition **E.1.k.**, the amount recoverable under this condition is part of, not in addition to, the amount recoverable under Condition **E.1.k.**

**(b)** For loss covered under this condition that is not subject to Paragraph **l.(3)(a),** the amount recoverable under this condition is part of, not in addition to, the Limit of Insurance applicable to the loss covered under this insurance and is limited to the lesser of the amount recoverable under:

**(i)** This insurance as of its effective date; or

**(ii)** The prior cancelled insurance had it remained in effect.

**m. Other Insurance**

If other valid and collectible insurance is available to you for loss covered under this insurance, our obligations are limited as follows:

**(1) Primary Insurance**

When this insurance is written as primary insurance, and:

**(a)** You have other insurance subject to the same terms and conditions as this insurance, we will pay our share of the covered loss. Our share is the proportion that the applicable Limit Of Insurance shown in the Declarations bears to the total limit of all insurance covering the same loss.

**(b)** You have other insurance covering the same loss other than that described in Paragraph **m.(1)(a),** we will only pay for the amount of loss that exceeds:

**(i)** The Limit of Insurance and Deductible Amount of that other insurance, whether you can collect on it or not; or

**(ii)** The Deductible Amount shown in the Declarations;

whichever is greater. Our payment for loss is subject to the terms and conditions of this insurance.

**(2) Excess Insurance**

**(a)** When this insurance is written excess over other insurance, we will only pay for the amount of loss that exceeds the Limit of Insurance and Deductible Amount of that other insurance, whether you can collect on it or not. Our payment for loss is subject to the terms and conditions of this insurance.

**(b)** However, if loss covered under this insurance is subject to a deductible, we will reduce the Deductible Amount shown in the Declarations by the sum total of all such other insurance plus any Deductible Amount applicable to that other insurance**.**

**n. Ownership Of Property; Interests Covered**

The property covered under this insurance is limited to property:

**(1)** That you own or lease;

**(2)** That is held by you in any capacity; or

**(3)** For which you are legally liable, provided you were liable for the property prior to the time the loss was sustained.

However, this insurance is for your benefit only. It provides no rights or benefits to any other person or organization. Any claim for loss that is covered under this insurance must be presented by you.

**o. Records**

You must keep records of all property covered under this insurance so we can verify the amount of any loss.

**p. Recoveries**

**(1)** Any recoveries, whether effected before or after any payment under this insurance, whether made by us or by you, shall be applied net of the expense of such recovery:

**(a)** First, to you in satisfaction of your covered loss in excess of the amount paid under this insurance;

**(b)** Second, to us in satisfaction of amounts paid in settlement of your claim;

**(c)** Third, to you in satisfaction of any Deductible Amount; and

Subject to Protective Order - Confidential

**(d)** Fourth, to you in satisfaction of any loss not covered under this insurance.

**(2)** Recoveries do not include any recovery:

**(a)** From insurance, suretyship, reinsurance, security or indemnity taken for our benefit; or

**(b)** Of original "securities" after duplicates of them have been issued.

**q. Territory**

This insurance covers loss that you sustain resulting directly from an "occurrence" taking place within the United States of America (including its territories and possessions), Puerto Rico and Canada.

**r. Transfer Of Your Rights Of Recovery Against Others To Us**

You must transfer to us all your rights of recovery against any person or organization for any loss you sustained and for which we have paid or settled. You must also do everything necessary to secure those rights and do nothing after loss to impair them.

**s. Valuation – Settlement**

The value of any loss for purposes of coverage under this insurance shall be determined as follows:

**(1) Money**

Loss of "money" but only up to and including its face value. We will, at your option, pay for loss of "money" issued by any country other than the United States of America:

**(a)** At face value in the "money" issued by that country; or

**(b)** In the United States of America dollar equivalent, determined by the rate of exchange published in The Wall Street Journal on the day the loss was "discovered".

**(2) Securities**

Loss of "securities" but only up to and including their value at the close of business on the day the loss was "discovered". We may, at our option:

**(a)** Pay the market value of such "securities" or replace them in kind, in which event you must assign to us all your rights, title and interest in and to those "securities"; or

**(b)** Pay the cost of any Lost Securities Bond required in connection with issuing duplicates of the "securities". However, we will be liable only for the payment of so much of the cost of the bond as would be charged for a bond having a penalty not exceeding the lesser of the:

**(i)** Market value of the "securities" at the close of business on the day the loss was "discovered"; or

**(ii)** Limit of Insurance applicable to the "securities".

**(3) Property Other Than Money And Securities**

**(a)** Loss of or damage to "other property" or loss from damage to the "premises" or its exterior for the replacement cost of the property without deduction for depreciation. However, we will not pay more than the least of the following:

**(i)** The Limit of Insurance applicable to the lost or damaged property;

**(ii)** The cost to replace the lost or damaged property with property of comparable material and quality and used for the same purpose; or

**(iii)** The amount you actually spend that is necessary to repair or replace the lost or damaged property.

**(b)** We will not pay on a replacement cost basis for any loss or damage to property covered under Paragraph **s.(3)(a):**

**(i)** Until the lost or damaged property is actually repaired or replaced; and

**(ii)** Unless the repair or replacement is made as soon as reasonably possible after the loss or damage.

If the lost or damaged property is not repaired or replaced, we will pay on an actual cash value basis.

**(c)** We will, at your option, pay for loss or damage to such property:

**(i)** In the "money" of the country in which the loss or damage was sustained; or

Subject to Protective Order - Confidential

BSAPolicyEv-00051082

TrustApp0697

   **(ii)** In the United States of America dollar equivalent of the "money" of the country in which the loss or damage was sustained, determined by the rate of exchange published in The Wall Street Journal on the day the loss was "discovered".

  **(d)** Any property that we pay for or replace becomes our property.

**2. Conditions Applicable To Insuring Agreement A.1.**

  **a. Termination As To Any Employee**

   This Insuring Agreement terminates as to any "employee":

  **(1)** As soon as:

    **(a)** You; or

    **(b)** Any of your partners, "members", "managers", officers, directors or trustees not in collusion with the "employee";

    learn of "theft" or any other dishonest act committed by the "employee" whether before or after becoming employed by you; or

  **(2)** On the date specified in a notice mailed to the first Named Insured. That date will be at least 30 days after the date of mailing.

    We will mail or deliver our notice to the first Named Insured's last mailing address known to us. If notice is mailed, proof of mailing will be sufficient proof of notice.

  **b. Territory**

   We will pay for loss caused by any "employee" while temporarily outside the territory specified in Territory Condition **E.1.q.** for a period of not more than 90 consecutive days.

**3. Conditions Applicable To Insuring Agreement A.2.**

  **a. Deductible Amount**

   The Deductible Amount does not apply to legal expenses paid under Insuring Agreement **A.2.**

  **b. Electronic And Mechanical Signatures**

   We will treat signatures that are produced or reproduced electronically, mechanically or by other means the same as handwritten signatures.

  **c. Proof Of Loss**

   You must include with your proof of loss any instrument involved in that loss or, if that is not possible, an affidavit setting forth the amount and cause of loss.

  **d. Territory**

   We will cover loss that you sustain resulting directly from an "occurrence" taking place anywhere in the world. Territory Condition **E.1.q.** does not apply to Insuring Agreement **A.2.**

**4. Conditions Applicable To Insuring Agreements A.4. And A.5.**

  **a. Armored Motor Vehicle Companies**

   Under Insuring Agreement **A.5.**, we will only pay for the amount of loss you cannot recover:

  **(1)** Under your contract with the armored motor vehicle company; and

  **(2)** From any insurance or indemnity carried by, or for the benefit of customers of, the armored motor vehicle company.

  **b. Special Limit Of Insurance For Specified Property**

   We will only pay up to $5,000 for any one "occurrence" of loss of or damage to:

  **(1)** Precious metals, precious or semiprecious stones, pearls, furs, or completed or partially completed articles made of or containing such materials that constitute the principal value of such articles; or

  **(2)** Manuscripts, drawings, or records of any kind, or the cost of reconstructing them or reproducing any information contained in them.

**5. Conditions Applicable To Insuring Agreement A.6.**

  **a. Special Limit Of Insurance For Specified Property**

   We will only pay up to $5,000 for any one "occurrence" of loss of or damage to manuscripts, drawings, or records of any kind, or the cost of reconstructing them or reproducing any information contained in them.

  **b. Territory**

   We will cover loss that you sustain resulting directly from an "occurrence" taking place anywhere in the world. Territory Condition **E.1.q.** does not apply to Insuring Agreement **A.6.**

Subject to Protective Order - Confidential

BSAPolicyEv-00051083

TrustApp0698

## F. Definitions

1. "Computer program" means a set of related electronic instructions, which direct the operation and function of a computer or devices connected to it, which enable the computer or devices to receive, process, store or send "electronic data".

2. "Computer system" means:

   a. Computers, including Personal Digital Assistants (PDAs) and other transportable or handheld devices, electronic storage devices and related peripheral components;

   b. Systems and applications software; and

   c. Related communications networks;

   by which "electronic data" is collected, transmitted, processed, stored or retrieved.

3. "Counterfeit money" means an imitation of "money" which is intended to deceive and to be taken as genuine.

4. "Custodian" means you, or any of your partners or "members", or any "employee" while having care and custody of property inside the "premises", excluding any person while acting as a "watchperson" or janitor.

5. "Discover" or "discovered" means the time when you first become aware of facts which would cause a reasonable person to assume that a loss of a type covered by this insurance has been or will be incurred, regardless of when the act or acts causing or contributing to such loss occurred, even though the exact amount or details of loss may not then be known.

   "Discover" or "discovered" also means the time when you first receive notice of an actual or potential claim in which it is alleged that you are liable to a third party under circumstances which, if true, would constitute a loss under this insurance.

6. "Electronic data" means information, facts, images or sounds stored as or on, created or used on, or transmitted to or from computer software (including systems and applications software) on data storage devices, including hard or floppy disks, CD-ROMs, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

7. "Employee":

   a. Means:

      (1) Any natural person:

         (a) While in your service and for the first 30 days immediately after termination of service, unless such termination is due to "theft" or any dishonest act committed by the "employee";

         (b) Whom you compensate directly by salary, wages or commissions; and

         (c) Whom you have the right to direct and control while performing services for you;

      (2) Any natural person who is furnished temporarily to you:

         (a) To substitute for a permanent "employee", as defined in Paragraph 7.a.(1), who is on leave; or

         (b) To meet seasonal or short-term work load conditions;

         while that person is subject to your direction and control and performing services for you;

      (3) Any natural person who is leased to you under a written agreement between you and a labor leasing firm, to perform duties related to the conduct of your business, but does not mean a temporary "employee" as defined in Paragraph 7.a.(2);

      (4) Any natural person who is:

         (a) A trustee, officer, employee, administrator or manager, except an administrator or manager who is an independent contractor, of any "employee benefit plan"; or

         (b) Your director or trustee while that person is engaged in handling "money", "securities" or "other property" of any "employee benefit plan";

      (5) Any natural person who is a former "employee", partner, "member", "manager", director or trustee retained by you as a consultant while performing services for you;

      (6) Any natural person who is a guest student or intern pursuing studies or duties;

---

©Insurance Services Office, Inc., 2012

Subject to Protective Order - Confidential     BSAPolicyEv-00051084

TrustApp0699

(7) Any natural person employed by an entity merged or consolidated with you prior to the effective date of this Policy; and

(8) Any natural person who is your "manager", director or trustee while:

   (a) Performing within the scope of the usual duties of an "employee"; or

   (b) Acting as a member of any committee duly elected or appointed by resolution of your board of directors or board of trustees to perform specific, as distinguished from general, directorial acts on your behalf.

**b.** Does not mean:

Any agent, broker, factor, commission merchant, consignee, independent contractor or representative of the same general character not specified in Paragraph **7.a.**

**8.** "Employee benefit plan" means any welfare or pension benefit plan shown in the Declarations that you sponsor and that is subject to the Employee Retirement Income Security Act of 1974 (ERISA) and any amendments thereto.

**9.** "Financial institution" means:

**a.** With regard to Insuring Agreement **A.3.:**

(1) A bank, savings bank, savings and loan association, trust company, credit union or similar depository institution; or

(2) An insurance company.

**b.** With regard to Insuring Agreement **A.6.:**

(1) A bank, savings bank, savings and loan association, trust company, credit union or similar depository institution;

(2) An insurance company; or

(3) A stock brokerage firm or investment company.

**10.** "Financial institution premises" means the interior of that portion of any building occupied by a "financial institution".

**11.** "Forgery" means the signing of the name of another person or organization with intent to deceive; it does not mean a signature which consists in whole or in part of one's own name signed with or without authority, in any capacity, for any purpose.

**12.** "Fraudulent instruction" means:

**a.** With regard to Insuring Agreement **A.6.a.(2):**

(1) A computer, telegraphic, cable, teletype, telefacsimile, telephone or other electronic instruction directing a "financial institution" to debit your "transfer account" and to transfer, pay or deliver "money" or "securities" from that "transfer account", which instruction purports to have been issued by you, but which in fact was fraudulently issued by someone else without your knowledge or consent.

(2) A written instruction (other than those covered under Insuring Agreement **A.2.**) issued to a "financial institution" directing the "financial institution" to debit your "transfer account" and to transfer, pay or deliver "money" or "securities" from that "transfer account", through an electronic funds transfer system at specified times or under specified conditions, which instruction purports to have been issued by you, but which in fact was issued, forged or altered by someone else without your knowledge or consent.

(3) A computer, telegraphic, cable, teletype, telefacsimile, telephone or other electronic or written instruction initially received by you, which instruction purports to have been issued by an "employee", but which in fact was fraudulently issued by someone else without your or the "employee's" knowledge or consent.

**b.** With regard to Insuring Agreement **A.6.b.:**

A computer, telegraphic, cable, teletype, telefacsimile, telephone or other electronic, written or voice instruction directing an "employee" to enter or change "electronic data" or "computer programs" within a "computer system" covered under the Insuring Agreement, which instruction in fact was fraudulently issued by your computer software contractor.

**13.** "Manager" means a natural person serving in a directorial capacity for a limited liability company.

**14.** "Member" means an owner of a limited liability company represented by its membership interest who, if a natural person, may also serve as a "manager".

Subject to Protective Order - Confidential

BSAPolicyEv-00051085

TrustApp0700

**15.** "Messenger" means you, or your relative, or any of your partners or "members", or any "employee" while having care and custody of property outside the "premises".

**16.** "Money" means:

  **a.** Currency, coins and bank notes in current use and having a face value;

  **b.** Traveler's checks and money orders held for sale to the public; and

  **c.** In addition, includes:

    **(1)** Under Insuring Agreements **A.1.** and **A.2.**, deposits in your account at any financial institution; and

    **(2)** Under Insuring Agreement **A.6.**, deposits in your account at a "financial institution" as defined in Paragraph **F.9.b.**

**17.** "Occurrence" means:

  **a.** Under Insuring Agreement **A.1.**:

    **(1)** An individual act;

    **(2)** The combined total of all separate acts whether or not related; or

    **(3)** A series of acts whether or not related;

    committed by an "employee" acting alone or in collusion with other persons, during the Policy Period shown in the Declarations, except as provided under Condition **E.1.k.** or **E.1.l.**

  **b.** Under Insuring Agreement **A.2.**:

    **(1)** An individual act;

    **(2)** The combined total of all separate acts whether or not related; or

    **(3)** A series of acts whether or not related;

    committed by a person acting alone or in collusion with other persons, involving one or more instruments, during the Policy Period shown in the Declarations, except as provided under Condition **E.1.k.** or **E.1.l.**

  **c.** Under all other Insuring Agreements:

    **(1)** An individual act or event;

    **(2)** The combined total of all separate acts or events whether or not related; or

    **(3)** A series of acts or events whether or not related;

    committed by a person acting alone or in collusion with other persons, or not committed by any person, during the Policy Period shown in the Declarations, except as provided under Condition **E.1.k.** or **E.1.l.**

**18.** "Other property" means any tangible property other than "money" and "securities" that has intrinsic value. "Other property" does not include "computer programs", "electronic data" or any property specifically excluded under this insurance.

**19.** "Premises" means the interior of that portion of any building you occupy in conducting your business.

**20.** "Robbery" means the unlawful taking of property from the care and custody of a person by one who has:

  **a.** Caused or threatened to cause that person bodily harm; or

  **b.** Committed an obviously unlawful act witnessed by that person.

**21.** "Safe burglary" means the unlawful taking of:

  **a.** Property from within a locked safe or vault by a person unlawfully entering the safe or vault as evidenced by marks of forcible entry upon its exterior; or

  **b.** A safe or vault from inside the "premises".

**22.** "Securities" means negotiable and nonnegotiable instruments or contracts representing either "money" or property and includes:

  **a.** Tokens, tickets, revenue and other stamps (whether represented by actual stamps or unused value in a meter) in current use; and

  **b.** Evidences of debt issued in connection with credit or charge cards, which cards are not issued by you;

  but does not include "money".

**23.** "Theft" means the unlawful taking of property to the deprivation of the Insured.

**24.** "Transfer account" means an account maintained by you at a "financial institution" from which you can initiate the transfer, payment or delivery of "money" or "securities":

  **a.** By means of computer, telegraphic, cable, teletype, telefacsimile, telephone or other electronic instructions; or

  **b.** By means of written instructions (other than those covered under Insuring Agreement **A.2.**) establishing the conditions under which such transfers are to be initiated by such "financial institution" through an electronic funds transfer system.

**25.** "Watchperson" means any person you retain specifically to have care and custody of property inside the "premises" and who has no other duties.

Subject to Protective Order - Confidential

POLICY NUMBER   KKC0000021153300                     COMMERCIAL PROPERTY
                                                      CP 01 09 10 00

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# MASSACHUSETTS CHANGES

This endorsement modifies insurance provided under the following:

COMMERCIAL PROPERTY COVERAGE PART

**A.** When this endorsement is attached to the Standard Property Policy **CP 00 99** the term Coverage Part in this endorsement is replaced by the term Policy.

**B.** If loss or damage is caused by fire or lightning, the **Vacancy** Loss Condition is replaced by the following:

**VACANCY OR UNOCCUPANCY**

If the building where loss or damage occurs, whether intended for occupancy by owner or tenant, has been vacant or unoccupied for more than:

**1.** 60 consecutive days for residential premises of 3 units or less; or

**2.** 30 consecutive days for all other premises;

immediately before that loss or damage, we will not pay for the loss or damage.

A building is vacant when it does not contain enough business personal property to conduct customary operations.

**C.** The **Mortgageholders** Additional Condition is replaced by the following:

We will pay for covered loss of or damage to real estate to each mortgageholder shown in the Declarations, or in an attached schedule, in the order of precedence, as interests may appear.

**D.** Paragraph **3.d.** of the **Replacement Cost** Optional Coverage is replaced by the following:

    **d.** We will not pay on a replacement cost basis for any loss or damage:

        **(1)** Until the lost or damaged property is actually repaired or replaced:

            **(a)** On the described premises; or

            **(b)** At some other location in the Commonwealth of Massachusetts; and

        **(2)** Unless the repairs or replacement are made within a reasonable time, but no more than 2 years after the loss or damage.

With respect to tenants' improvements and betterments, if covered, the following also apply:

        **(3)** If the conditions in **d.(1)** and **d.(2)** above are not met, the value of tenants' improvements and betterments will be determined as a proportion of your original cost, as set forth in the Valuation Condition of the applicable Coverage Form; and

        **(4)** We will not pay for loss or damage to tenants' improvements and betterments if others pay for repairs or replacement.

**E.** The following provisions are added:

    **1.** In spite of any provision of any general or special law:

        **a.** We will not pay for loss or damage to real property caused by any Covered Cause of Loss if the amount of loss is $5,000 or more unless you first submit to us a certificate of municipal liens from the collector of taxes of the city or town where the property is located.

        **b.** We will pay to the city or town any amount outstanding on the certificate of municipal liens arising from the provisions of Massachusetts General Law Chapters 40, 59, 60, 80, 83 and 164, Sections 58B through 58F.

        The payment will not exceed the amount of loss payable under this Coverage Part.

        We will send you and the mortgageholder proof of our payment to the city or town.

        **c.** The claim of the city or town will have priority over the claim of any mortgageholder, assignee, you or any other interested party, except where otherwise provided by the laws of the United States.

CP 01 09 10 00              Copyright, Insurance Services Office, Inc., 1999            Page 1 of 6

**d.** We will not be liable to any city, town, mortgageholder, assignee, you or any other interested party for:

  **(1)** Amounts paid to a city or town; or

  **(2)** Amounts not paid to a city or town based upon a certificate showing that no municipal liens exist.

**e.** Paragraphs **1.a., 1.b., 1.c.,** and **1.d.** above will not apply to any owner-occupied one- to four-family dwelling if the owner of the dwelling lived there when the claim for loss or damage arose.

**2.** We will not pay any claim for:

  **a.** Loss, damage or destruction of $1,000 or more to a building or structure; or

  **b.** Loss, damage or destruction, of any amount, that causes a building or structure to become:

    **(1)** Dangerous to life or limb; or

    **(2)** Unused, uninhabited or abandoned and open to the weather;

  as provided under Massachusetts General Law, Section 6 of Chapter 143;

without giving at least 10 days' written notice before such payment to:

  **c.** The Building Commissioner or the appointed Inspector of Buildings; and

  **d.** The Board of Health or the Board of Selectmen of the city or town where the property is located.

**3.** If at any time before our payment, the city or town notifies us by certified mail of its intent to begin proceedings designed to perfect a lien under Massachusetts General Law:

  **a.** Chapter 143, Section 3A or 9; or

  **b.** Chapter 111, Section 127B;

we will not pay while the proceedings are pending. The proceedings must be started within 30 days after we receive the notice.

Any lien perfected under the Massachusetts General Laws referred to in **3.a.** and **3.b.** above will extend to the city or town and may be enforced by it against the proceeds of this policy.

**4.** We will not be liable to any city, town, mortgageholder, assignee, you or any other interested party for:

  **a.** Amounts paid to a city or town; or

  **b.** Amounts not paid to a city or town;

  under Provisions **2.** and **3.** above.

**F.** The following condition is added and supersedes any provisions to the contrary:

**NONRENEWAL**

This provision applies to coverage on real property which is used predominantly for residential purposes and consists of not more than four dwelling units, and to coverage on personal property of a person residing in such real property:

**1.** Ordinarily we will renew this policy automatically and send you the renewal notice. Our notice will explain what you should do if you do not want to continue this policy.

**2.** We may elect not to renew this policy. We may do so by delivering to you or mailing to you at your last mailing address shown in the Declarations, written notice of nonrenewal, accompanied by the specific reasons for nonrenewal, at least 45 days before the expiration date of this policy. However, if your policy was executed on behalf of us, in whole or in part, by or on behalf of your insurance agent or our insurance broker, we will send such written notice only to the agent or broker. Every insurance agent or broker receiving this notice is required to, within 15 days of its receipt, send a copy to you unless the agent or broker has replaced the insurance.

Copyright, Insurance Services Office, Inc., 1999
CP 01 09 10 00

Subject to Protective Order - Confidential

BSAPolicyEv-00051088

TrustApp0703

**G.** The following is added:

### STANDARD FIRE POLICY PROVISIONS

Your policy contains Legal Action Against Us, Appraisal and Cancellation Provisions. Massachusetts law requires that the Suit, Appraisal and Cancellation Provisions of the Massachusetts Standard Fire Policy supersede any similar provisions contained in your policy. Therefore, all Legal Action Against Us, Appraisal and Cancellation Provisions contained in your policy are void. The Suit, Appraisal and Cancellation Provisions of the Massachusetts Standard Fire Policy shall apply instead.

In consideration of the Provisions and Stipulations Herein or Added Hereto and of the Premium Specified in the Declarations, this company, for the term of years specified in the Declarations from inception date (At 12:01 A.M. Standard Time) to expiration date (At 12:01 A.M. Standard Time) at location of property involved, to an amount not exceeding the amount(s) specified in the Declarations, does insure the Insured named in the Declarations and legal representatives, to the extent of the actual cash value of the property at the time of loss, but in no event for more than the interest of the insured, against all Loss By Fire, Lightning And By Removal From Premises Endangered By The Perils Insured Against In This Policy, Except As Hereinafter Provided, to the property described in the Declarations while located or contained as described in this policy or pro rata for five days at each proper place to which any of the property shall necessarily be removed for preservation from the perils insured against in this policy, but not elsewhere.

Assignment of this policy shall not be valid except with the written consent of this Company.

This policy is made and accepted subject to the foregoing provisions and stipulations and those hereinafter stated, which are hereby made a part of this policy together with such other provisions, stipulations and agreements as may be added hereto, as provided in this policy.

| | |
|---|---|
| **Concealment Fraud** | This entire policy shall be void if, whether before or after a loss, the insured has willfully concealed or misrepresented any material fact or circumstance |

concerning this insurance or the subject thereof, or the interest of the insured therein, or in case of any fraud or false swearing by the insured relating thereto.

| | |
|---|---|
| **Uninsurable And Excepted Property** | This policy shall not cover accounts, bills, currency, deeds, evidences of debt, money or securities; nor, unless specifically named hereon in writing, bullion or manuscripts. |

| | |
|---|---|
| **Perils Not Included** | This Company shall not be liable for loss by fire or other perils insured against in this policy caused, directly or indirectly, by **(a)** enemy attack by armed |

forces, including action taken by military, naval or air forces in resisting an actual or an immediately impending enemy attack; **(b)** invasion; **(c)** insurrection; **(d)** rebellion; **(e)** revolution; **(f)** civil war; **(g)** usurped power; **(h)** order of any civil authority except acts of destruction at the time of and for the purpose of preventing the spread of fire, provided that such fire did not originate from any of the perils excluded by this policy; **(i)** neglect of the insured to use all reasonable means to save and preserve the property at and after a loss, or when the property is endangered by fire in the neighboring premises; **(j)** nor shall this company be liable for loss by theft.

| | |
|---|---|
| **Other Insurance** | Other insurance may be prohibited or the amount of insurance may be limited by endorsement attached hereto. |

Subject to Protective Order - Confidential

BSAPolicyEv-00051089

TrustApp0704

**Conditions Suspending Or Restricting Insurance**

Unless otherwise provided in writing added hereto this company shall not be liable for loss occurring **(a)** while the hazard is increased by any means within the control or knowledge of the insured; or **(b)** while the described premises, whether intended for occupancy by owner or tenant, are vacant or unoccupied beyond a period of sixty consecutive days, for residential premises of three units or less and thirty (30) consecutive days for all other premises, or **(c)** as a result of explosion or riot, unless fire ensue, and in that event for loss by fire only.

**Other Perils Or Subjects**

Any other peril to be insured against or subject of insurance to be covered in this policy shall be by endorsement in writing hereon or added hereto.

**Added Provisions**

The extent of the application of insurance under this policy and of the contribution to be made by this company in case of loss, and any other provision or agreement not inconsistent with the provisions of this policy, may be provided for in writing added hereto, but no provision may be waived except such as by the terms of this policy is subject to change.

**Waiver Provisions**

No permission affecting this insurance shall exist, or waiver of any provision be valid, unless granted herein or expressed in writing added hereto. No provision, stipulation or forfeiture shall be held to be waived by any requirement or proceeding on the part of this company relating to appraisal or to any examination provided for herein.

**Cancellation Of Policy**

This policy shall be cancelled at any time at the request of the insured, in which case this company shall, upon demand and surrender of this policy, refund the excess of paid premium above the customary short rates for the expired time. This policy may be cancelled at any time by this company by giving to the insured a five days written notice of cancellation, and to the mortgagee to whom this policy is payable twenty days written notice of cancellation except where the stated reason for cancellation is nonpayment of premium where, in such instance, this policy may be cancelled at any time by this company by giving to the insured a ten days written notice of cancellation, and the mortgagee a twenty days written notice of cancellation, with or without tender of the excess paid premium above the pro rata premium for the expired time, which excess, if not tendered, shall be refunded on demand. Notice of cancellation shall state that said excess premium (if not tendered) will be refunded on demand and shall state or be accompanied by a statement of the specific reason or reasons for such cancellation. After this policy has been in effect for sixty days, or after sixty days from any anniversary date, no notice of cancellation shall be effective unless it is based on the occurrence, after the effective date of the policy, of one or more of the following: **(1)** nonpayment of premium; **(2)** conviction of a crime arising out of acts increasing the hazard insured against; **(3)** discovery of fraud or material misrepresentation by the insured in obtaining the policy; **(4)** discovery of willful or reckless acts or omissions by the insured increasing the hazard insured against; **(5)** physical changes in the property insured which result in the property becoming uninsurable; or **(6)** a determination by the commissioner that continuation of the policy would violate or place the insurer in violation of the law. Where the stated reason is nonpayment of premium, the insured may continue the coverage and avoid the effect of the cancellation by payment at any time prior to the effective date of cancellation.

Copyright, Insurance Services Office, Inc., 1999

CP 01 09 10 00

Subject to Protective Order - Confidential

BSAPolicyEv-00051090

TrustApp0705

**Mortgagee Interests And Obligations**

Notwithstanding any other provisions of this policy, if this policy shall be made payable to a mortgagee of the covered real estate, no act or default of any person other than such mortgagee or his agent or those claiming under him, whether the same occurs before or during the term of this policy, shall render this policy void as to such mortgagee nor affect such mortgagee's right to recover in case of loss on such real estate; provided, that the mortgagee shall on demand pay according to the established scale of rate for any increase of risk not paid for by the insured; and whenever this company shall be liable to a mortgagee for any sum for loss under this policy for which no liability exists as to the mortgagor, or owner, and this company shall elect by itself, or with others, to pay the mortgagee the full amount secured by such mortgage, then the mortgagee shall assign and transfer to the company interested, upon such payment, the said mortgage together with the note and debt thereby secured.

**Pro Rata Liability**

This company shall not be liable for a greater proportion of any loss than the amount hereby insured shall bear to the whole insurance covering the property against the peril involved.

**Requirements In Case Loss Occurs**

The insured shall give immediate written notice to this company of any loss, protect the property from further damage, forthwith separate the damaged and undamaged personal property, put it in the best possible order, furnish a complete inventory of the destroyed and damaged property, showing in detail the quantity, description, actual cash value and amount of loss claimed; and the insured shall forthwith render to this company a signed, sworn statement in proof of loss which sets forth to the best knowledge and belief of the insured the following: the time and cause of the loss, the interest of the insured and of all others in the property, the actual cash value of each item thereof and the amount of loss thereto, all encumbrances thereon, all other contracts of insurance, whether valid or not, covering any of said property, any changes in the title, use, occupancy, location, possession or exposures of said property, since the issuing of this policy, by whom and for what purpose any building herein described and the several parts thereof were occupied at the time of loss and whether or not it then stood on leased ground, and shall furnish a copy of all the descriptions and schedules in all policies and detailed estimates for repair of the damage. The insured, as often as may be reasonably required, shall exhibit to any person designated by this company all that remains of any property herein described, and submit to examinations under oath by any person named by this company, and subscribe the same; and as often as may be reasonably required, shall produce for examination all books of account, bills, invoices and other vouchers, or certified copies thereof if originals be lost, at such reasonable time and place as may be designated by this company or its representative, and shall permit extracts and copies thereof to be made.

Subject to Protective Order - Confidential        BSAPolicyEv-00051091

TrustApp0706

**When Loss Payable**

In case of any loss or damage, the company within thirty days after the insured shall have submitted a statement, as provided in the preceding clause, shall either pay the amount for which it shall be liable, which amount if not agreed upon shall be ascertained by award of referees as hereinafter provided, or replace the property with other of the same kind and goodness, or it may, within fifteen days after such statement is submitted, notify the insured of its intention to rebuild or repair the premises, or any portion thereof separately covered by this policy, and shall thereupon enter upon said premises and proceed to rebuild or repair the same with reasonable expedition. It is moreover understood that there can be no abandonment of the property described to the company, and that the company shall not in any case be liable for more than the sum insured, with interest thereon from the time when the loss shall become payable, as provided above. The company shall be liable for the payment of interest to the insured at a rate of one percent over the prime interest rate on the agreed figure commencing thirty days after the date an executed proof of loss for such figure is received by the company, said interest to continue so long as the claim remains unpaid.

**Appraisal**

In case of loss under this policy and a failure of the parties to agree as to the amount of loss, it is mutually agreed that the amount of such loss shall be referred to three disinterested men, the company and the insured each choosing one out of three persons to be named by the other, and the third being selected by the two so chosen, and the award in writing by a majority of the referees shall be conclusive and final upon the parties as to the amount of loss or damage, and such reference, unless waived by the parties, shall be a condition precedent to any right of action in law or equity to recover for such loss; but no person shall be chosen or act as a referee, against the objection of either party, who has acted in a like capacity within four months.

**Suit**

No suit or action against this company for the recovery of any claim by virtue of this policy shall be sustained in any court of law or equity in this commonwealth unless commenced within two years from the time the loss occurred; provided, however, that if, within said two years, in accordance with the provisions of the preceding paragraph, the amount of the loss shall have been referred to arbitration after failure of the parties to agree thereon, the limitation of time for bringing such suit or action shall in no event be less than ninety days after a valid award has been made upon such reference or after such reference or award has been expressly waived by the parties. If suit or action upon this policy is enjoined or abated, suit or action may be commenced at any time within one year after the dissolution of such injunction, or the abatement of such suit or action, to the same extent as would be possible if there was no limitation of time provided herein for the bringing of such suit or action.

**Subrogation**

This company may require from the insured an assignment of all right of recovery against any party for loss to the extent that payment therefor is made by this company.

Copyright, Insurance Services Office, Inc., 1999

CP 01 09 10 00

Subject to Protective Order - Confidential

BSAPolicyEv-00051092

TrustApp0707

# National Casualty Company
Home Office
Madison, Wisconsin
Administrative Office:
8877 North Gainey Center Drive • Scottsdale, Arizona 85258
1-800-423-7675
A STOCK COMPANY

**KR-GL-D-1**
**(07/07)**

## COMMERCIAL GENERAL LIABILITY - DECLARATIONS

Policy No.          KKC0000021153300
Replacement No.  KKC0000020619800

Policy Period: 06/20/17    to 06/20/18    12:01 am Standard Time

**NAMED INSURED AND ADDRESS:**

KNOX TRAIL COUNCIL, INC. (SEE KR-SP-1)
2438 WASHINGTON STREET
CANTON, MA 02021

**FORM OF BUSINESS**

☐ Individual                      ☐ Limited Liability Company
☐ Partnership                   ☒ Organization, including a
                                          Corporation (but not including a
                                          Partnership, Joint Venture or Limited
                                          Liability Company)
☐ Joint Venture

**RETROACTIVE DATE:** (CG 00 02 only) This insurance does not apply to "bodily injury" or "property damage" or "personal injury and advertising injury" which occurs before the following Retroactive Date: _____ (Enter date or NONE if no Retroactive Date Applies)

**LIMITS OF INSURANCE**

General Aggregate Limit (Other than Products – Completed Operations)   $ 5,000,000
Products – Completed Operations Aggregate Limit                                     $ 5,000,000
Personal and Advertising Injury Limit                                                        $ 1,000,000
Each Occurrence Limit                                                                             $ 1,000,000
Damage to Premises Rented to You Limit                                                  $ 1,000,000   any one premises
Medical Expense Limit                                                                             EXCLUDED   any one person

NON-OWNED AND HIRED AUTO LIABILITY                INCLUDED

**SCHEDULE OF LOCATIONS:**

0001      CUTTERFIELD ROAD, PLYMOUTH, MA 02360
0002      2438 WASHINGTON STREET, CANTON, MA 02021

**PREMIUM**
Advance Premium for this Coverage Part is    $ 

**ENDORSEMENTS ATTACHED TO THIS COVERAGE PART:**

| | | | | |
|---|---|---|---|---|
| KR-GL-SP-2(04/14) | KR-GL-SP-1(04/07) | CG0001(04/13) | KR-GL-32(04/07) | KR-GL-43(04/07) |
| KR-GL-131(12/09) | KR-GL-53(04/07) | GL-58S(12/93) | KR-GL-151(10/14) | UT-3G(03/92) |
| CG2001(04/13) | CG2026(04/13) | CG2034(04/13) | CG2106(05/14) | CG2135(10/01) |
| CG2147(12/07) | CG2167(12/04) | CG2196(03/05) | CG2407(01/96) | CG2173(01/15) |

Subject to Protective Order - Confidential

BSAPolicyEv-00051093
TrustApp0708

KKCO000021153300

# QUICK REFERENCE
# COMMERCIAL GENERAL LIABILITY COVERAGE PART

Please read your policy carefully.

**DECLARATIONS PAGES**
    Named Insured and Mailing Address
    Policy Period
    Description of Business and Location
    Coverages and Limits of Insurance

**SECTION I - COVERAGES**                                 **Beginning on Page**

    Coverage A -                   Insuring Agreement ...........................................1
        Bodily Injury
        and Property Damage          Exclusions ........................................................2
        Liability
    Coverage B -                   Insuring Agreement ...........................................5
        Personal and
        Advertising                       Exclusions ........................................................6
        Injury Liability
    Coverage C -                   Insuring Agreement ...........................................7
        Medical Payments             Exclusions ........................................................7

**SECTION II - WHO IS AN INSURED**.................................................................................8
**SECTION III - LIMITS OF INSURANCE** ............................................................................9
**SECTION IV - COMMERCIAL GENERAL LIABILITY CONDITIONS**
    Bankruptcy .....................................................................................................10
    Duties In The Event of Occurrence, Claim or Suit .........................................10
    Legal Action Against Us ................................................................................10
    Other Insurance .............................................................................................11
    Premium Audit ...............................................................................................11
    Representations .............................................................................................11
    Separation of Insureds...................................................................................11
    Transfer of Rights of Recovery Against Others To Us ...................................12
    When We Do Not Renew ...............................................................................12
**SECTION V – DEFINITIONS**...........................................................................................12
**COMMON POLICY CONDITIONS**
    Cancellation
    Changes
    Examination of Your Books and Records
    Inspections and Surveys
    Premiums
    Transfer of Your Rights and Duties Under This Policy
**ENDORSEMENTS (If Any)**

KR-GL-SP-2                                                  **04/14**

# LIABILITY SCHEDULE AND PREMIUM RECAP

**POLICY NUMBER:**  KKC0000021153300

| LOC. NO | * DESCRIPTION SUBLINE - CLASS CODE | **PREMIUM BASE ACT. EXPOSURE | RATES | PREMIUMS |
|---|---|---|---|---|
| | | **EXPOSURE, RATES AND PREMIUMS ARE INCLUDED UNLESS OTHERWISE STATED BELOW:** | | |
| 0001 | (334)  Hired Auto Liability | | | |
| 0001 | (347)  Non-Owned Auto Liability | | | |
| 0001 | (334)  Additional to meet Minimum Premium | | | |
| 0001 | (336)  61218 Buildings/Prem.-Bank-Office-Mercantile or Mnfg.-Maintained by Insured (Lessor's Risk Only) | A | | |
| 0002 | (334)  Hired Auto Liability | | | |
| 0002 | (347)  Non-Owned Auto Liability | | | |
| 0002 | (336)  61218 Buildings/Prem.-Bank-Office-Mercantile or Mnfg.-Maintained by Insured (Lessor's Risk Only) | A | | |
| | **TOTAL PREMIUMS** | | | CONTINUED |

*SUBLINE KEY
332 - Liquor Liability
334 - Premises/Operations
335 - Owners/Contractors Protective or Principals Protective
336 - Products/Completed Operations
350 - Pollution Liability
345 - Other Composite Rated/Premises/Operations ONLY
346 - Other Composite Rated/Product/Completed Operations ONLY
347 - Other Composite Rated - BOTH Premises/Operations AND Product/Completed Operations or type in subline

**PREMIUM/EXPOSURE BASE KEY
A  -  Area (per 1,000 square feet)
C  -  Total Cost (per $1,000)
E  -  Admissions (per head)
M  -  Admissions (per 1,000)
P  -  Payroll (per $1,000)
R  -  Receipts (per $100)
S  -  Gross Sales (per $1,000)
U  -  Units (per unit) or type in base

**KR-GL-SP-1**

**04/07**

Subject to Protective Order - Confidential

# LIABILITY SCHEDULE AND PREMIUM RECAP

**POLICY NUMBER:** KKC0000021153300

| LOC. NO | * DESCRIPTION SUBLINE - CLASS CODE | **PREMIUM BASE ACT. EXPOSURE | RATES | PREMIUMS |
|---------|-------------------------------------|------------------------------|-------|----------|
| | | **EXPOSURE, RATES AND PREMIUMS ARE INCLUDED UNLESS OTHERWISE STATED BELOW:** | | |
| 0002 | (334)  61218 Buildings/Prem.-Bank-Office-Mercantile or Mnfg.-Maintained by Insured (Lessor's Risk Only) | A | | |
| | | | TOTAL PREMIUMS | $ |

*SUBLINE KEY
332 - Liquor Liability
334 - Premises/Operations
335 - Owners/Contractors Protective or Principals Protective
336 - Products/Completed Operations
350 - Pollution Liability
345 - Other Composite Rated/Premises/Operations ONLY
346 - Other Composite Rated/Product/Completed Operations ONLY
347 - Other Composite Rated - BOTH Premises/Operations AND Product/Completed Operations or type in subline

**PREMIUM/EXPOSURE BASE KEY
A  -  Area (per 1,000 square feet)
C  -  Total Cost (per $1,000)
E  -  Admissions (per head)
M  -  Admissions (per 1,000)
P  -  Payroll (per $1,000)
R  -  Receipts (per $100)
S  -  Gross Sales (per $1,000)
U  -  Units (per unit) or type in base

KR-GL-SP-1                                                                04/07

**POLICY NUMBER:** KKO0000021153300

# COMMERCIAL GENERAL LIABILITY COVERAGE FORM

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this policy the words "you" and "your" refer to the Named Insured shown in the Declarations, and any other person or organization qualifying as a Named Insured under this policy. The words "we", "us" and "our" refer to the company providing this insurance.

The word "insured" means any person or organization qualifying as such under Section **II** – Who Is An Insured.

Other words and phrases that appear in quotation marks have special meaning. Refer to Section **V** – Definitions.

## SECTION I – COVERAGES

### COVERAGE A – BODILY INJURY AND PROPERTY DAMAGE LIABILITY

**1. Insuring Agreement**

**a.** We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply. We may, at our discretion, investigate any "occurrence" and settle any claim or "suit" that may result. But:

**(1)** The amount we will pay for damages is limited as described in Section **III** – Limits Of Insurance; and

**(2)** Our right and duty to defend ends when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages **A** or **B** or medical expenses under Coverage **C.**

No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments – Coverages **A** and **B.**

**b.** This insurance applies to "bodily injury" and "property damage" only if:

**(1)** The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory";

**(2)** The "bodily injury" or "property damage" occurs during the policy period; and

**(3)** Prior to the policy period, no insured listed under Paragraph **1.** of Section **II** – Who Is An Insured and no "employee" authorized by you to give or receive notice of an "occurrence" or claim, knew that the "bodily injury" or "property damage" had occurred, in whole or in part. If such a listed insured or authorized "employee" knew, prior to the policy period, that the "bodily injury" or "property damage" occurred, then any continuation, change or resumption of such "bodily injury" or "property damage" during or after the policy period will be deemed to have been known prior to the policy period.

**c.** "Bodily injury" or "property damage" which occurs during the policy period and was not, prior to the policy period, known to have occurred by any insured listed under Paragraph **1.** of Section **II** – Who Is An Insured or any "employee" authorized by you to give or receive notice of an "occurrence" or claim, includes any continuation, change or resumption of that "bodily injury" or "property damage" after the end of the policy period.

**d.** "Bodily injury" or "property damage" will be deemed to have been known to have occurred at the earliest time when any insured listed under Paragraph **1.** of Section **II** – Who Is An Insured or any "employee" authorized by you to give or receive notice of an "occurrence" or claim:

**(1)** Reports all, or any part, of the "bodily injury" or "property damage" to us or any other insurer;

**(2)** Receives a written or verbal demand or claim for damages because of the "bodily injury" or "property damage"; or

Subject to Protective Order - Confidential

**(3)** Becomes aware by any other means that "bodily injury" or "property damage" has occurred or has begun to occur.

**e.** Damages because of "bodily injury" include damages claimed by any person or organization for care, loss of services or death resulting at any time from the "bodily injury".

## 2. Exclusions

This insurance does not apply to:

**a. Expected Or Intended Injury**

"Bodily injury" or "property damage" expected or intended from the standpoint of the insured. This exclusion does not apply to "bodily injury" resulting from the use of reasonable force to protect persons or property.

**b. Contractual Liability**

"Bodily injury" or "property damage" for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement. This exclusion does not apply to liability for damages:

**(1)** That the insured would have in the absence of the contract or agreement; or

**(2)** Assumed in a contract or agreement that is an "insured contract", provided the "bodily injury" or "property damage" occurs subsequent to the execution of the contract or agreement. Solely for the purposes of liability assumed in an "insured contract", reasonable attorneys' fees and necessary litigation expenses incurred by or for a party other than an insured are deemed to be damages because of "bodily injury" or "property damage", provided:

**(a)** Liability to such party for, or for the cost of, that party's defense has also been assumed in the same "insured contract"; and

**(b)** Such attorneys' fees and litigation expenses are for defense of that party against a civil or alternative dispute resolution proceeding in which damages to which this insurance applies are alleged.

**c. Liquor Liability**

"Bodily injury" or "property damage" for which any insured may be held liable by reason of:

**(1)** Causing or contributing to the intoxication of any person;

**(2)** The furnishing of alcoholic beverages to a person under the legal drinking age or under the influence of alcohol; or

**(3)** Any statute, ordinance or regulation relating to the sale, gift, distribution or use of alcoholic beverages.

This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in:

**(a)** The supervision, hiring, employment, training or monitoring of others by that insured; or

**(b)** Providing or failing to provide transportation with respect to any person that may be under the influence of alcohol;

if the "occurrence" which caused the "bodily injury" or "property damage", involved that which is described in Paragraph **(1)**, **(2)** or **(3)** above.

However, this exclusion applies only if you are in the business of manufacturing, distributing, selling, serving or furnishing alcoholic beverages. For the purposes of this exclusion, permitting a person to bring alcoholic beverages on your premises, for consumption on your premises, whether or not a fee is charged or a license is required for such activity, is not by itself considered the business of selling, serving or furnishing alcoholic beverages.

**d. Workers' Compensation And Similar Laws**

Any obligation of the insured under a workers' compensation, disability benefits or unemployment compensation law or any similar law.

**e. Employer's Liability**

"Bodily injury" to:

**(1)** An "employee" of the insured arising out of and in the course of:

**(a)** Employment by the insured; or

**(b)** Performing duties related to the conduct of the insured's business; or

**(2)** The spouse, child, parent, brother or sister of that "employee" as a consequence of Paragraph **(1)** above.

This exclusion applies whether the insured may be liable as an employer or in any other capacity and to any obligation to share damages with or repay someone else who must pay damages because of the injury.

© Insurance Services Office, Inc., 2012    CG 00 01 04 13

Subject to Protective Order - Confidential

BSAPolicyEv-00051098

TrustApp0713

This exclusion does not apply to liability assumed by the insured under an "insured contract".

**f. Pollution**

(1) "Bodily injury" or "property damage" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants":

(a) At or from any premises, site or location which is or was at any time owned or occupied by, or rented or loaned to, any insured. However, this subparagraph does not apply to:

(i) "Bodily injury" if sustained within a building and caused by smoke, fumes, vapor or soot produced by or originating from equipment that is used to heat, cool or dehumidify the building, or equipment that is used to heat water for personal use, by the building's occupants or their guests;

(ii) "Bodily injury" or "property damage" for which you may be held liable, if you are a contractor and the owner or lessee of such premises, site or location has been added to your policy as an additional insured with respect to your ongoing operations performed for that additional insured at that premises, site or location and such premises, site or location is not and never was owned or occupied by, or rented or loaned to, any insured, other than that additional insured; or

(iii) "Bodily injury" or "property damage" arising out of heat, smoke or fumes from a "hostile fire";

(b) At or from any premises, site or location which is or was at any time used by or for any insured or others for the handling, storage, disposal, processing or treatment of waste;

(c) Which are or were at any time transported, handled, stored, treated, disposed of, or processed as waste by or for:

(i) Any insured; or

(ii) Any person or organization for whom you may be legally responsible; or

(d) At or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations if the "pollutants" are brought on or to the premises, site or location in connection with such operations by such insured, contractor or subcontractor. However, this subparagraph does not apply to:

(i) "Bodily injury" or "property damage" arising out of the escape of fuels, lubricants or other operating fluids which are needed to perform the normal electrical, hydraulic or mechanical functions necessary for the operation of "mobile equipment" or its parts, if such fuels, lubricants or other operating fluids escape from a vehicle part designed to hold, store or receive them. This exception does not apply if the "bodily injury" or "property damage" arises out of the intentional discharge, dispersal or release of the fuels, lubricants or other operating fluids, or if such fuels, lubricants or other operating fluids are brought on or to the premises, site or location with the intent that they be discharged, dispersed or released as part of the operations being performed by such insured, contractor or subcontractor;

(ii) "Bodily injury" or "property damage" sustained within a building and caused by the release of gases, fumes or vapors from materials brought into that building in connection with operations being performed by you or on your behalf by a contractor or subcontractor; or

(iii) "Bodily injury" or "property damage" arising out of heat, smoke or fumes from a "hostile fire".

Subject to Protective Order - Confidential

**(e)** At or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations if the operations are to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants".

**(2)** Any loss, cost or expense arising out of any:

**(a)** Request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants"; or

**(b)** Claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, "pollutants".

However, this paragraph does not apply to liability for damages because of "property damage" that the insured would have in the absence of such request, demand, order or statutory or regulatory requirement, or such claim or "suit" by or on behalf of a governmental authority.

**g. Aircraft, Auto Or Watercraft**

"Bodily injury" or "property damage" arising out of the ownership, maintenance, use or entrustment to others of any aircraft, "auto" or watercraft owned or operated by or rented or loaned to any insured. Use includes operation and "loading or unloading".

This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by that insured, if the "occurrence" which caused the "bodily injury" or "property damage" involved the ownership, maintenance, use or entrustment to others of any aircraft, "auto" or watercraft that is owned or operated by or rented or loaned to any insured.

This exclusion does not apply to:

**(1)** A watercraft while ashore on premises you own or rent;

**(2)** A watercraft you do not own that is:

**(a)** Less than 26 feet long; and

**(b)** Not being used to carry persons or property for a charge;

**(3)** Parking an "auto" on, or on the ways next to, premises you own or rent, provided the "auto" is not owned by or rented or loaned to you or the insured;

**(4)** Liability assumed under any "insured contract" for the ownership, maintenance or use of aircraft or watercraft; or

**(5)** "Bodily injury" or "property damage" arising out of:

**(a)** The operation of machinery or equipment that is attached to, or part of, a land vehicle that would qualify under the definition of "mobile equipment" if it were not subject to a compulsory or financial responsibility law or other motor vehicle insurance law where it is licensed or principally garaged; or

**(b)** The operation of any of the machinery or equipment listed in Paragraph **f.(2)** or **f.(3)** of the definition of "mobile equipment".

**h. Mobile Equipment**

"Bodily injury" or "property damage" arising out of:

**(1)** The transportation of "mobile equipment" by an "auto" owned or operated by or rented or loaned to any insured; or

**(2)** The use of "mobile equipment" in, or while in practice for, or while being prepared for, any prearranged racing, speed, demolition, or stunting activity.

**i. War**

"Bodily injury" or "property damage", however caused, arising, directly or indirectly, out of:

**(1)** War, including undeclared or civil war;

**(2)** Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

© Insurance Services Office, Inc., 2012

CG 00 01 04 13

Subject to Protective Order - Confidential

BSAPolicyEv-00051100

TrustApp0715

**(3)** Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

**j.  Damage To Property**

"Property damage" to:

**(1)** Property you own, rent, or occupy, including any costs or expenses incurred by you, or any other person, organization or entity, for repair, replacement, enhancement, restoration or maintenance of such property for any reason, including prevention of injury to a person or damage to another's property;

**(2)** Premises you sell, give away or abandon, if the "property damage" arises out of any part of those premises;

**(3)** Property loaned to you;

**(4)** Personal property in the care, custody or control of the insured;

**(5)** That particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the "property damage" arises out of those operations; or

**(6)** That particular part of any property that must be restored, repaired or replaced because "your work" was incorrectly performed on it.

Paragraphs **(1)**, **(3)** and **(4)** of this exclusion do not apply to "property damage" (other than damage by fire) to premises, including the contents of such premises, rented to you for a period of seven or fewer consecutive days. A separate limit of insurance applies to Damage To Premises Rented To You as described in Section **III – Limits Of Insurance.**

Paragraph **(2)** of this exclusion does not apply if the premises are "your work" and were never occupied, rented or held for rental by you.

Paragraphs **(3)**, **(4)**, **(5)** and **(6)** of this exclusion do not apply to liability assumed under a sidetrack agreement.

Paragraph **(6)** of this exclusion does not apply to "property damage" included in the "products-completed operations hazard".

**k.  Damage To Your Product**

"Property damage" to "your product" arising out of it or any part of it.

**l.  Damage To Your Work**

"Property damage" to "your work" arising out of it or any part of it and included in the "products-completed operations hazard".

This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor.

**m.  Damage To Impaired Property Or Property Not Physically Injured**

"Property damage" to "impaired property" or property that has not been physically injured, arising out of:

**(1)** A defect, deficiency, inadequacy or dangerous condition in "your product" or "your work"; or

**(2)** A delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms.

This exclusion does not apply to the loss of use of other property arising out of sudden and accidental physical injury to "your product" or "your work" after it has been put to its intended use.

**n.  Recall Of Products, Work Or Impaired Property**

Damages claimed for any loss, cost or expense incurred by you or others for the loss of use, withdrawal, recall, inspection, repair, replacement, adjustment, removal or disposal of:

**(1)** "Your product";

**(2)** "Your work"; or

**(3)** "Impaired property";

if such product, work, or property is withdrawn or recalled from the market or from use by any person or organization because of a known or suspected defect, deficiency, inadequacy or dangerous condition in it.

**o.  Personal And Advertising Injury**

"Bodily injury" arising out of "personal and advertising injury".

Subject to Protective Order - Confidential

BSAPolicyEv-00051101

TrustApp0716

**p. Electronic Data**

Damages arising out of the loss of, loss of use, of damage to, corruption of, inability to access, or inability to manipulate electronic data.

However, this exclusion does not apply to liability for damages because of "bodily injury".

As used in this exclusion, electronic data means information, facts or programs stored as or on, created or used on, or transmitted to or from computer software, including systems and applications software, hard or floppy disks, CD-ROMs, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

**q. Recording And Distribution Of Material Or Information In Violation Of Law**

"Bodily injury" or "property damage" arising directly or indirectly out of any action or omission that violates or is alleged to violate:

**(1)** The Telephone Consumer Protection Act (TCPA), including any amendment of or addition to such law;

**(2)** The CAN-SPAM Act of 2003, including any amendment of or addition to such law;

**(3)** The Fair Credit Reporting Act (FCRA), and any amendment of or addition to such law, including the Fair and Accurate Credit Transactions Act (FACTA); or

**(4)** Any federal, state or local statute, ordinance or regulation, other than the TCPA, CAN-SPAM Act of 2003 or FCRA and their amendments and additions, that addresses, prohibits, or limits the printing, dissemination, disposal, collecting, recording, sending, transmitting, communicating or distribution of material or information.

Exclusions **c.** through **n.** do not apply to damage by fire to premises while rented to you or temporarily occupied by you with permission of the owner. A separate limit of insurance applies to this coverage as described in Section **III** – Limits Of Insurance.

**COVERAGE B – PERSONAL AND ADVERTISING INJURY LIABILITY**

**1. Insuring Agreement**

**a.** We will pay those sums that the insured

becomes legally obligated to pay as damages because of "personal and advertising injury" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "personal and advertising injury" to which this insurance does not apply. We may, at our discretion, investigate any offense and settle any claim or "suit" that may result. But:

**(1)** The amount we will pay for damages is limited as described in Section **III** – Limits Of Insurance; and

**(2)** Our right and duty to defend end when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages **A** or **B** or medical expenses under Coverage **C**.

No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments – Coverages **A** and **B**.

**b.** This insurance applies to "personal and advertising injury" caused by an offense arising out of your business but only if the offense was committed in the "coverage territory" during the policy period.

**2. Exclusions**

This insurance does not apply to:

**a. Knowing Violation Of Rights Of Another**

"Personal and advertising injury" caused by or at the direction of the insured with the knowledge that the act would violate the rights of another and would inflict "personal and advertising injury".

**b. Material Published With Knowledge Of Falsity**

"Personal and advertising injury" arising out of oral or written publication, in any manner, of material, if done by or at the direction of the insured with knowledge of its falsity.

**c. Material Published Prior To Policy Period**

"Personal and advertising injury" arising out of oral or written publication, in any manner, of material whose first publication took place before the beginning of the policy period.

**d. Criminal Acts**

"Personal and advertising injury" arising out of a criminal act committed by or at the direction of the insured.

© Insurance Services Office, Inc., 2012    CG 00 01 04 13

Subject to Protective Order - Confidential    BSAPolicyEv-00051102
TrustApp0717

**e.   Contractual Liability**

"Personal and advertising injury" for which the insured has assumed liability in a contract or agreement. This exclusion does not apply to liability for damages that the insured would have in the absence of the contract or agreement.

**f.   Breach Of Contract**

"Personal and advertising injury" arising out of a breach of contract, except an implied contract to use another's advertising idea in your "advertisement".

**g.   Quality Or Performance Of Goods – Failure To Conform To Statements**

"Personal and advertising injury" arising out of the failure of goods, products or services to conform with any statement of quality or performance made in your "advertisement".

**h.   Wrong Description Of Prices**

"Personal and advertising injury" arising out of the wrong description of the price of goods, products or services stated in your "advertisement".

**i.   Infringement Of Copyright, Patent, Trademark Or Trade Secret**

"Personal and advertising injury" arising out of the infringement of copyright, patent, trademark, trade secret or other intellectual property rights. Under this exclusion, such other intellectual property rights do not include the use of another's advertising idea in your "advertisement".

However, this exclusion does not apply to infringement, in your "advertisement", of copyright, trade dress or slogan.

**j.   Insureds In Media And Internet Type Businesses**

"Personal and advertising injury" committed by an insured whose business is:

**(1)** Advertising, broadcasting, publishing or telecasting;

**(2)** Designing or determining content of web sites for others; or

**(3)** An Internet search, access, content or service provider.

However, this exclusion does not apply to Paragraphs **14.a., b.** and **c.** of "personal and advertising injury" under the Definitions section.

For the purposes of this exclusion, the placing of frames, borders or links, or advertising, for you or others anywhere on the Internet, is not by itself, considered the business of advertising, broadcasting, publishing or telecasting.

**k.   Electronic Chatrooms Or Bulletin Boards**

"Personal and advertising injury" arising out of an electronic chatroom or bulletin board the insured hosts, owns, or over which the insured exercises control.

**l.   Unauthorized Use Of Another's Name Or Product**

"Personal and advertising injury" arising out of the unauthorized use of another's name or product in your e-mail address, domain name or metatag, or any other similar tactics to mislead another's potential customers.

**m.   Pollution**

"Personal and advertising injury" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants" at any time.

**n.   Pollution-related**

Any loss, cost or expense arising out of any:

**(1)** Request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants"; or

**(2)** Claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, "pollutants".

**o.   War**

"Personal and advertising injury", however caused, arising, directly or indirectly, out of:

**(1)** War, including undeclared or civil war;

**(2)** Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

**(3)** Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

Subject to Protective Order - Confidential

BSAPolicyEv-00051103

TrustApp0718

**p. Recording And Distribution Of Material Or Information In Violation Of Law**

"Personal and advertising injury" arising directly or indirectly out of any action or omission that violates or is alleged to violate:

**(1)** The Telephone Consumer Protection Act (TCPA), including any amendment of or addition to such law;

**(2)** The CAN-SPAM Act of 2003, including any amendment of or addition to such law;

**(3)** The Fair Credit Reporting Act (FCRA), and any amendment of or addition to such law, including the Fair and Accurate Credit Transactions Act (FACTA); or

**(4)** Any federal, state or local statute, ordinance or regulation, other than the TCPA, CAN-SPAM Act of 2003 or FCRA and their amendments and additions, that addresses, prohibits, or limits the printing, dissemination, disposal, collecting, recording, sending, transmitting, communicating or distribution of material or information.

## COVERAGE C – MEDICAL PAYMENTS

**1. Insuring Agreement**

**a.** We will pay medical expenses as described below for "bodily injury" caused by an accident:

**(1)** On premises you own or rent;

**(2)** On ways next to premises you own or rent; or

**(3)** Because of your operations;

provided that:

**(a)** The accident takes place in the "coverage territory" and during the policy period;

**(b)** The expenses are incurred and reported to us within one year of the date of the accident; and

**(c)** The injured person submits to examination, at our expense, by physicians of our choice as often as we reasonably require.

**b.** We will make these payments regardless of fault. These payments will not exceed the applicable limit of insurance. We will pay reasonable expenses for:

**(1)** First aid administered at the time of an accident;

**(2)** Necessary medical, surgical, X-ray and dental services, including prosthetic devices; and

**(3)** Necessary ambulance, hospital, professional nursing and funeral services.

**2. Exclusions**

We will not pay expenses for "bodily injury":

**a. Any Insured**

To any insured, except "volunteer workers".

**b. Hired Person**

To a person hired to do work for or on behalf of any insured or a tenant of any insured.

**c. Injury On Normally Occupied Premises**

To a person injured on that part of premises you own or rent that the person normally occupies.

**d. Workers' Compensation And Similar Laws**

To a person, whether or not an "employee" of any insured, if benefits for the "bodily injury" are payable or must be provided under a workers' compensation or disability benefits law or a similar law.

**e. Athletics Activities**

To a person injured while practicing, instructing or participating in any physical exercises or games, sports, or athletic contests.

**f. Products-Completed Operations Hazard**

Included within the "products-completed operations hazard".

**g. Coverage A Exclusions**

Excluded under Coverage **A**.

## SUPPLEMENTARY PAYMENTS – COVERAGES A AND B

**1.** We will pay, with respect to any claim we investigate or settle, or any "suit" against an insured we defend:

**a.** All expenses we incur.

**b.** Up to $250 for cost of bail bonds required because of accidents or traffic law violations arising out of the use of any vehicle to which the Bodily Injury Liability Coverage applies. We do not have to furnish these bonds.

**c.** The cost of bonds to release attachments, but only for bond amounts within the applicable limit of insurance. We do not have to furnish these bonds.

© Insurance Services Office, Inc., 2012

CG 00 01 04 13

Subject to Protective Order - Confidential

BSAPolicyEv-00051104

TrustApp0719

**d.** All reasonable expenses incurred by the insured at our request to assist us in the investigation or defense of the claim or "suit", including actual loss of earnings up to $250 a day because of time off from work.

**e.** All court costs taxed against the insured in the "suit". However, these payments do not include attorneys' fees or attorneys' expenses taxed against the insured.

**f.** Prejudgment interest awarded against the insured on that part of the judgment we pay. If we make an offer to pay the applicable limit of insurance, we will not pay any prejudgment interest based on that period of time after the offer.

**g.** All interest on the full amount of any judgment that accrues after entry of the judgment and before we have paid, offered to pay, or deposited in court the part of the judgment that is within the applicable limit of insurance.

These payments will not reduce the limits of insurance.

**2.** If we defend an insured against a "suit" and an indemnitee of the insured is also named as a party to the "suit", we will defend that indemnitee if all of the following conditions are met:

**a.** The "suit" against the indemnitee seeks damages for which the insured has assumed the liability of the indemnitee in a contract or agreement that is an "insured contract";

**b.** This insurance applies to such liability assumed by the insured;

**c.** The obligation to defend, or the cost of the defense of, that indemnitee, has also been assumed by the insured in the same "insured contract";

**d.** The allegations in the "suit" and the information we know about the "occurrence" are such that no conflict appears to exist between the interests of the insured and the interests of the indemnitee;

**e.** The indemnitee and the insured ask us to conduct and control the defense of that indemnitee against such "suit" and agree that we can assign the same counsel to defend the insured and the indemnitee; and

**f.** The indemnitee:

  **(1)** Agrees in writing to:

   **(a)** Cooperate with us in the investigation, settlement or defense of the "suit";

   **(b)** Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the "suit";

   **(c)** Notify any other insurer whose coverage is available to the indemnitee; and

   **(d)** Cooperate with us with respect to coordinating other applicable insurance available to the indemnitee; and

  **(2)** Provides us with written authorization to:

   **(a)** Obtain records and other information related to the "suit"; and

   **(b)** Conduct and control the defense of the indemnitee in such "suit".

So long as the above conditions are met, attorneys' fees incurred by us in the defense of that indemnitee, necessary litigation expenses incurred by us and necessary litigation expenses incurred by the indemnitee at our request will be paid as Supplementary Payments. Notwithstanding the provisions of Paragraph **2.b.(2)** of Section I – Coverage **A** – Bodily Injury And Property Damage Liability, such payments will not be deemed to be damages for "bodily injury" and "property damage" and will not reduce the limits of insurance.

Our obligation to defend an insured's indemnitee and to pay for attorneys' fees and necessary litigation expenses as Supplementary Payments ends when we have used up the applicable limit of insurance in the payment of judgments or settlements or the conditions set forth above, or the terms of the agreement described in Paragraph **f.** above, are no longer met.

**SECTION II – WHO IS AN INSURED**

**1.** If you are designated in the Declarations as:

**a.** An individual, you and your spouse are insureds, but only with respect to the conduct of a business of which you are the sole owner.

**b.** A partnership or joint venture, you are an insured. Your members, your partners, and their spouses are also insureds, but only with respect to the conduct of your business.

**c.** A limited liability company, you are an insured. Your members are also insureds, but only with respect to the conduct of your business. Your managers are insureds, but only with respect to their duties as your managers.

Subject to Protective Order - Confidential

**d.** An organization other than a partnership, joint venture or limited liability company, you are an insured. Your "executive officers" and directors are insureds, but only with respect to their duties as your officers or directors. Your stockholders are also insureds, but only with respect to their liability as stockholders.

**e.** A trust, you are an insured. Your trustees are also insureds, but only with respect to their duties as trustees.

**2.** Each of the following is also an insured:

**a.** Your "volunteer workers" only while performing duties related to the conduct of your business, or your "employees", other than either your "executive officers" (if you are an organization other than a partnership, joint venture or limited liability company) or your managers (if you are a limited liability company), but only for acts within the scope of their employment by you or while performing duties related to the conduct of your business. However, none of these "employees" or "volunteer workers" are insureds for:

**(1)** "Bodily injury" or "personal and advertising injury":

**(a)** To you, to your partners or members (if you are a partnership or joint venture), to your members (if you are a limited liability company), to a co-"employee" while in the course of his or her employment or performing duties related to the conduct of your business, or to your other "volunteer workers" while performing duties related to the conduct of your business;

**(b)** To the spouse, child, parent, brother or sister of that co-"employee" or "volunteer worker" as a consequence of Paragraph **(1)(a)** above;

**(c)** For which there is any obligation to share damages with or repay someone else who must pay damages because of the injury described in Paragraph **(1)(a)** or **(b)** above; or

**(d)** Arising out of his or her providing or failing to provide professional health care services.

**(2)** "Property damage" to property:

**(a)** Owned, occupied or used by;

**(b)** Rented to, in the care, custody or control of, or over which physical control is being exercised for any purpose by; you, any of your "employees", "volunteer workers", any partner or member (if you are a partnership or joint venture), or any member (if you are a limited liability company).

**b.** Any person (other than your "employee" or "volunteer worker"), or any organization while acting as your real estate manager.

**c.** Any person or organization having proper temporary custody of your property if you die, but only:

**(1)** With respect to liability arising out of the maintenance or use of that property; and

**(2)** Until your legal representative has been appointed.

**d.** Your legal representative if you die, but only with respect to duties as such. That representative will have all your rights and duties under this Coverage Part.

**3.** Any organization you newly acquire or form, other than a partnership, joint venture or limited liability company, and over which you maintain ownership or majority interest, will qualify as a Named Insured if there is no other similar insurance available to that organization. However:

**a.** Coverage under this provision is afforded only until the 90th day after you acquire or form the organization or the end of the policy period, whichever is earlier;

**b.** Coverage **A** does not apply to "bodily injury" or "property damage" that occurred before you acquired or formed the organization; and

**c.** Coverage **B** does not apply to "personal and advertising injury" arising out of an offense committed before you acquired or formed the organization.

No person or organization is an insured with respect to the conduct of any current or past partnership, joint venture or limited liability company that is not shown as a Named Insured in the Declarations.

**SECTION III – LIMITS OF INSURANCE**

**1.** The Limits of Insurance shown in the Declarations and the rules below fix the most we will pay regardless of the number of:

**a.** Insureds;

**b.** Claims made or "suits" brought; or

**c.** Persons or organizations making claims or bringing "suits".

Subject to Protective Order - Confidential

2. The General Aggregate Limit is the most we will pay for the sum of:

    **a.** Medical expenses under Coverage **C**;

    **b.** Damages under Coverage **A**, except damages because of "bodily injury" or "property damage" included in the "products-completed operations hazard"; and

    **c.** Damages under Coverage **B**.

3. The Products-Completed Operations Aggregate Limit is the most we will pay under Coverage **A** for damages because of "bodily injury" and "property damage" included in the "products-completed operations hazard".

4. Subject to Paragraph **2.** above, the Personal And Advertising Injury Limit is the most we will pay under Coverage **B** for the sum of all damages because of all "personal and advertising injury" sustained by any one person or organization.

5. Subject to Paragraph **2.** or **3.** above, whichever applies, the Each Occurrence Limit is the most we will pay for the sum of:

    **a.** Damages under Coverage **A**; and

    **b.** Medical expenses under Coverage **C**

because of all "bodily injury" and "property damage" arising out of any one "occurrence".

6. Subject to Paragraph **5.** above, the Damage To Premises Rented To You Limit is the most we will pay under Coverage **A** for damages because of "property damage" to any one premises, while rented to you, or in the case of damage by fire, while rented to you or temporarily occupied by you with permission of the owner.

7. Subject to Paragraph **5.** above, the Medical Expense Limit is the most we will pay under Coverage **C** for all medical expenses because of "bodily injury" sustained by any one person.

The Limits of Insurance of this Coverage Part apply separately to each consecutive annual period and to any remaining period of less than 12 months, starting with the beginning of the policy period shown in the Declarations, unless the policy period is extended after issuance for an additional period of less than 12 months. In that case, the additional period will be deemed part of the last preceding period for purposes of determining the Limits of Insurance.

## SECTION IV – COMMERCIAL GENERAL LIABILITY CONDITIONS

**1. Bankruptcy**

Bankruptcy or insolvency of the insured or of the insured's estate will not relieve us of our obligations under this Coverage Part.

**2. Duties In The Event Of Occurrence, Offense, Claim Or Suit**

    **a.** You must see to it that we are notified as soon as practicable of an "occurrence" or an offense which may result in a claim. To the extent possible, notice should include:

        **(1)** How, when and where the "occurrence" or offense took place;

        **(2)** The names and addresses of any injured persons and witnesses; and

        **(3)** The nature and location of any injury or damage arising out of the "occurrence" or offense.

    **b.** If a claim is made or "suit" is brought against any insured, you must:

        **(1)** Immediately record the specifics of the claim or "suit" and the date received; and

        **(2)** Notify us as soon as practicable.

    You must see to it that we receive written notice of the claim or "suit" as soon as practicable.

    **c.** You and any other involved insured must:

        **(1)** Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the claim or "suit";

        **(2)** Authorize us to obtain records and other information;

        **(3)** Cooperate with us in the investigation or settlement of the claim or defense against the "suit"; and

        **(4)** Assist us, upon our request, in the enforcement of any right against any person or organization which may be liable to the insured because of injury or damage to which this insurance may also apply.

    **d.** No insured will, except at that insured's own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without our consent.

**3. Legal Action Against Us**

No person or organization has a right under this Coverage Part:

    **a.** To join us as a party or otherwise bring us into a "suit" asking for damages from an insured; or

    **b.** To sue us on this Coverage Part unless all of its terms have been fully complied with.

Subject to Protective Order - Confidential

A person or organization may sue us to recover on an agreed settlement or on a final judgment against an insured; but we will not be liable for damages that are not payable under the terms of this Coverage Part or that are in excess of the applicable limit of insurance. An agreed settlement means a settlement and release of liability signed by us, the insured and the claimant or the claimant's legal representative.

**4.  Other Insurance**

If other valid and collectible insurance is available to the insured for a loss we cover under Coverages **A** or **B** of this Coverage Part, our obligations are limited as follows:

**a.  Primary Insurance**

This insurance is primary except when Paragraph **b.** below applies. If this insurance is primary, our obligations are not affected unless any of the other insurance is also primary. Then, we will share with all that other insurance by the method described in Paragraph **c.** below.

**b.  Excess Insurance**

**(1)** This insurance is excess over:

**(a)** Any of the other insurance, whether primary, excess, contingent or on any other basis:

**(i)** That is Fire, Extended Coverage, Builder's Risk, Installation Risk or similar coverage for "your work";

**(ii)** That is Fire insurance for premises rented to you or temporarily occupied by you with permission of the owner;

**(iii)** That is insurance purchased by you to cover your liability as a tenant for "property damage" to premises rented to you or temporarily occupied by you with permission of the owner; or

**(iv)** If the loss arises out of the maintenance or use of aircraft, "autos" or watercraft to the extent not subject to Exclusion **g.** of Section **I** – Coverage **A** – Bodily Injury And Property Damage Liability.

**(b)** Any other primary insurance available to you covering liability for damages arising out of the premises or operations, or the products and completed operations,

for which you have been added as an additional insured.

**(2)** When this insurance is excess, we will have no duty under Coverages **A** or **B** to defend the insured against any "suit" if any other insurer has a duty to defend the insured against that "suit". If no other insurer defends, we will undertake to do so, but we will be entitled to the insured's rights against all those other insurers.

**(3)** When this insurance is excess over other insurance, we will pay only our share of the amount of the loss, if any, that exceeds the sum of:

**(a)** The total amount that all such other insurance would pay for the loss in the absence of this insurance; and

**(b)** The total of all deductible and self-insured amounts under all that other insurance.

**(4)** We will share the remaining loss, if any, with any other insurance that is not described in this Excess Insurance provision and was not bought specifically to apply in excess of the Limits of Insurance shown in the Declarations of this Coverage Part.

**c.  Method Of Sharing**

If all of the other insurance permits contribution by equal shares, we will follow this method also. Under this approach each insurer contributes equal amounts until it has paid its applicable limit of insurance or none of the loss remains, whichever comes first.

If any of the other insurance does not permit contribution by equal shares, we will contribute by limits. Under this method, each insurer's share is based on the ratio of its applicable limit of insurance to the total applicable limits of insurance of all insurers.

**5.  Premium Audit**

**a.** We will compute all premiums for this Coverage Part in accordance with our rules and rates.

**b.** Premium shown in this Coverage Part as advance premium is a deposit premium only. At the close of each audit period we will compute the earned premium for that period and send notice to the first Named Insured. The due date for audit and retrospective premiums is the date shown as the due date on the bill. If the sum of the advance and audit premiums paid for the policy period is greater than the earned premium, we will return the excess to the first Named Insured.

Subject to Protective Order - Confidential

BSAPolicyEv-00051108

TrustApp0723

c. The first Named Insured must keep records of the information we need for premium computation, and send us copies at such times as we may request.

**6. Representations**

By accepting this policy, you agree:

a. The statements in the Declarations are accurate and complete;

b. Those statements are based upon representations you made to us; and

c. We have issued this policy in reliance upon your representations.

**7. Separation Of Insureds**

Except with respect to the Limits of Insurance, and any rights or duties specifically assigned in this Coverage Part to the first Named Insured, this insurance applies:

a. As if each Named Insured were the only Named Insured; and

b. Separately to each insured against whom claim is made or "suit" is brought.

**8. Transfer Of Rights Of Recovery Against Others To Us**

If the insured has rights to recover all or part of any payment we have made under this Coverage Part, those rights are transferred to us. The insured must do nothing after loss to impair them. At our request, the insured will bring "suit" or transfer those rights to us and help us enforce them.

**9. When We Do Not Renew**

If we decide not to renew this Coverage Part, we will mail or deliver to the first Named Insured shown in the Declarations written notice of the nonrenewal not less than 30 days before the expiration date.

If notice is mailed, proof of mailing will be sufficient proof of notice.

**SECTION V – DEFINITIONS**

1. "Advertisement" means a notice that is broadcast or published to the general public or specific market segments about your goods, products or services for the purpose of attracting customers or supporters. For the purposes of this definition:

a. Notices that are published include material placed on the Internet or on similar electronic means of communication; and

b. Regarding web sites, only that part of a web site that is about your goods, products or services for the purposes of attracting customers or supporters is considered an advertisement.

2. "Auto" means:

a. A land motor vehicle, trailer or semitrailer designed for travel on public roads, including any attached machinery or equipment; or

b. Any other land vehicle that is subject to a compulsory or financial responsibility law or other motor vehicle insurance law where it is licensed or principally garaged.

However, "auto" does not include "mobile equipment".

3. "Bodily injury" means bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time.

4. "Coverage territory" means:

a. The United States of America (including its territories and possessions), Puerto Rico and Canada;

b. International waters or airspace, but only if the injury or damage occurs in the course of travel or transportation between any places included in Paragraph **a.** above; or

c. All other parts of the world if the injury or damage arises out of:

(1) Goods or products made or sold by you in the territory described in Paragraph **a.** above;

(2) The activities of a person whose home is in the territory described in Paragraph **a.** above, but is away for a short time on your business; or

(3) "Personal and advertising injury" offenses that take place through the Internet or similar electronic means of communication;

provided the insured's responsibility to pay damages is determined in a "suit" on the merits, in the territory described in Paragraph **a.** above or in a settlement we agree to.

5. "Employee" includes a "leased worker". "Employee" does not include a "temporary worker".

6. "Executive officer" means a person holding any of the officer positions created by your charter, constitution, bylaws or any other similar governing document.

Subject to Protective Order - Confidential                    BSAPolicyEv-00051109

TrustApp0724

7. "Hostile fire" means one which becomes uncontrollable or breaks out from where it was intended to be.

8. "Impaired property" means tangible property, other than "your product" or "your work", that cannot be used or is less useful because:

   a. It incorporates "your product" or "your work" that is known or thought to be defective, deficient, inadequate or dangerous; or

   b. You have failed to fulfill the terms of a contract or agreement;

   if such property can be restored to use by the repair, replacement, adjustment or removal of "your product" or "your work" or your fulfilling the terms of the contract or agreement.

9. "Insured contract" means:

   a. A contract for a lease of premises. However, that portion of the contract for a lease of premises that indemnifies any person or organization for damage by fire to premises while rented to you or temporarily occupied by you with permission of the owner is not an "insured contract";

   b. A sidetrack agreement;

   c. Any easement or license agreement, except in connection with construction or demolition operations on or within 50 feet of a railroad;

   d. An obligation, as required by ordinance, to indemnify a municipality, except in connection with work for a municipality;

   e. An elevator maintenance agreement;

   f. That part of any other contract or agreement pertaining to your business (including an indemnification of a municipality in connection with work performed for a municipality) under which you assume the tort liability of another party to pay for "bodily injury" or "property damage" to a third person or organization. Tort liability means a liability that would be imposed by law in the absence of any contract or agreement.

   Paragraph **f.** does not include that part of any contract or agreement:

   (1) That indemnifies a railroad for "bodily injury" or "property damage" arising out of construction or demolition operations, within 50 feet of any railroad property and affecting any railroad bridge or trestle, tracks, road-beds, tunnel, underpass or crossing;

   (2) That indemnifies an architect, engineer or surveyor for injury or damage arising out of:

   (a) Preparing, approving, or failing to prepare or approve, maps, shop drawings, opinions, reports, surveys, field orders, change orders or drawings and specifications; or

   (b) Giving directions or instructions, or failing to give them, if that is the primary cause of the injury or damage; or

   (3) Under which the insured, if an architect, engineer or surveyor, assumes liability for an injury or damage arising out of the insured's rendering or failure to render professional services, including those listed in **(2)** above and supervisory, inspection, architectural or engineering activities.

10. "Leased worker" means a person leased to you by a labor leasing firm under an agreement between you and the labor leasing firm, to perform duties related to the conduct of your business. "Leased worker" does not include a "temporary worker".

11. "Loading or unloading" means the handling of property:

    a. After it is moved from the place where it is accepted for movement into or onto an aircraft, watercraft or "auto";

    b. While it is in or on an aircraft, watercraft or "auto"; or

    c. While it is being moved from an aircraft, watercraft or "auto" to the place where it is finally delivered;

    but "loading or unloading" does not include the movement of property by means of a mechanical device, other than a hand truck, that is not attached to the aircraft, watercraft or "auto".

12. "Mobile equipment" means any of the following types of land vehicles, including any attached machinery or equipment:

    a. Bulldozers, farm machinery, forklifts and other vehicles designed for use principally off public roads;

    b. Vehicles maintained for use solely on or next to premises you own or rent;

    c. Vehicles that travel on crawler treads;

    d. Vehicles, whether self-propelled or not, maintained primarily to provide mobility to permanently mounted:

       (1) Power cranes, shovels, loaders, diggers or drills; or

       (2) Road construction or resurfacing equipment such as graders, scrapers or rollers;

© Insurance Services Office, Inc., 2012                    CG 00 01 04 13

Subject to Protective Order - Confidential                                                                 BSAPolicyEv-00051110

                                                                                                                TrustApp0725

**e.** Vehicles not described in Paragraph **a., b., c.** or **d.** above that are not self-propelled and are maintained primarily to provide mobility to permanently attached equipment of the following types:

  **(1)** Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment; or

  **(2)** Cherry pickers and similar devices used to raise or lower workers;

**f.** Vehicles not described in Paragraph **a., b., c.** or **d.** above maintained primarily for purposes other than the transportation of persons or cargo.

However, self-propelled vehicles with the following types of permanently attached equipment are not "mobile equipment" but will be considered "autos":

  **(1)** Equipment designed primarily for:

    **(a)** Snow removal;

    **(b)** Road maintenance, but not construction or resurfacing; or

    **(c)** Street cleaning;

  **(2)** Cherry pickers and similar devices mounted on automobile or truck chassis and used to raise or lower workers; and

  **(3)** Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment.

However, "mobile equipment" does not include any land vehicles that are subject to a compulsory or financial responsibility law or other motor vehicle insurance law where it is licensed or principally garaged. Land vehicles subject to a compulsory or financial responsibility law or other motor vehicle insurance law are considered "autos".

**13.** "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

**14.** "Personal and advertising injury" means injury, including consequential "bodily injury", arising out of one or more of the following offenses:

**a.** False arrest, detention or imprisonment;

**b.** Malicious prosecution;

**c.** The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies, committed by or on behalf of its owner, landlord or lessor;

**d.** Oral or written publication, in any manner, of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;

**e.** Oral or written publication, in any manner, of material that violates a person's right of privacy;

**f.** The use of another's advertising idea in your "advertisement"; or

**g.** Infringing upon another's copyright, trade dress or slogan in your "advertisement".

**15.** "Pollutants" mean any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

**16.** "Products-completed operations hazard":

**a.** Includes all "bodily injury" and "property damage" occurring away from premises you own or rent and arising out of "your product" or "your work" except:

  **(1)** Products that are still in your physical possession; or

  **(2)** Work that has not yet been completed or abandoned. However, "your work" will be deemed completed at the earliest of the following times:

    **(a)** When all of the work called for in your contract has been completed.

    **(b)** When all of the work to be done at the job site has been completed if your contract calls for work at more than one job site.

    **(c)** When that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project.

  Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed.

**b.** Does not include "bodily injury" or "property damage" arising out of:

  **(1)** The transportation of property, unless the injury or damage arises out of a condition in or on a vehicle not owned or operated by you, and that condition was created by the "loading or unloading" of that vehicle by any insured;

Subject to Protective Order - Confidential     BSAPolicyEv-00051111
TrustApp0726

**(2)** The existence of tools, uninstalled equipment or abandoned or unused materials; or

**(3)** Products or operations for which the classification, listed in the Declarations or in a policy Schedule, states that products-completed operations are subject to the General Aggregate Limit.

**17.** "Property damage" means:

**a.** Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

**b.** Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

For the purposes of this insurance, electronic data is not tangible property.

As used in this definition, electronic data means information, facts or programs stored as or on, created or used on, or transmitted to or from computer software, including systems and applications software, hard or floppy disks, CD-ROMs, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

**18.** "Suit" means a civil proceeding in which damages because of "bodily injury", "property damage" or "personal and advertising injury" to which this insurance applies are alleged. "Suit" includes:

**a.** An arbitration proceeding in which such damages are claimed and to which the insured must submit or does submit with our consent; or

**b.** Any other alternative dispute resolution proceeding in which such damages are claimed and to which the insured submits with our consent.

**19.** "Temporary worker" means a person who is furnished to you to substitute for a permanent "employee" on leave or to meet seasonal or short-term workload conditions.

**20.** "Volunteer worker" means a person who is not your "employee", and who donates his or her work and acts at the direction of and within the scope of duties determined by you, and is not paid a fee, salary or other compensation by you or anyone else for their work performed for you.

**21.** "Your product":

**a.** Means:

**(1)** Any goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by:

**(a)** You;

**(b)** Others trading under your name; or

**(c)** A person or organization whose business or assets you have acquired; and

**(2)** Containers (other than vehicles), materials, parts or equipment furnished in connection with such goods or products.

**b.** Includes:

**(1)** Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your product"; and

**(2)** The providing of or failure to provide warnings or instructions.

**c.** **Does not include vending machines or other property rented to or located for the use of others but not sold.**

**22.** "Your work":

**a.** Means:

**(1)** Work or operations performed by you or on your behalf; and

**(2)** Materials, parts or equipment furnished in connection with such work or operations.

**b.** Includes:

**(1)** Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your work"; and

**(2)** The providing of or failure to provide warnings or instructions.

© Insurance Services Office, Inc., 2012    CG 00 01 04 13

Subject to Protective Order - Confidential    BSAPolicyEv-00051112

TrustApp0727

# National Casualty Company

**ENDORSEMENT NO.** __0000__

| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE DATE (12:01 A.M STANDARD TIME) | NAMED INSURED | AGENT NO. |
|---|---|---|---|
| KKO0000021153300 | 06/20/17 | KNOX TRAIL COUNCIL, INC. (SEE KR-SP-1) | |

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## EARNED PREMIUM

This endorsement modifies insurance provided under the following:

### COMMERCIAL GENERAL LIABILITY COVERAGE PART

The following is effective only when indicated by an "x."

[X] Premium Fully Earned at inception…………………………………… $2,500

[ ] Premium Fully Earned at inception ……………………………………
(Percentage of Policy Term Premium)

[ ] Balance earned ……………………………………………………………
(Indicate when 100% of premium is earned)

[X] Total Premium………………………………………………………… $2,700

[X] 90% of the annual premium is earned during the term of the event or season

[ ] Premium Fully Earned as follows:

_____ of Total Premium is Fully Earned in the event of cancellation prior to _____

Total Policy Premium is Fully Earned in the event of cancellation after _____

[ ] Event Premiums

The following premiums apply to each category of event indicated and are Fully Earned as of the beginning of each event:

| EVENT | PREMIUM PER EVENT |
|---|---|
| | |
| | |
| | |
| | |
| | |
| | |
| | |

_____          _____
AUTHORIZED REPRESENTATIVE                              DATE

KR-GL-43 (4-07)                                     Page 1 of 1

Subject to Protective Order - Confidential

## National Casualty Company

**ENDORSEMENT NO.** _0000_

| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE DATE (12:01 A.M. STANDARD TIME) | NAMED INSURED | AGENT NO. |
|---|---|---|---|
| KKO0000021153300 | 06/20/17 | KNOX TRAIL COUNCIL, INC. (SEE KR-SP-1) | |

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## SEXUAL ABUSE EXCLUSION

This endorsement modifies insurance provided under the following:

**COMMERCIAL GENERAL LIABILITY COVERAGE PART**

1. This coverage part does not apply to any claim, "suit" or cause of action which arises from, or is in any way related to:

   A. The actual, alleged, or threatened sexual abuse, sexual molestation, sexual exploitation, or sexual injury committed by:

      1. Any insureds;

      2. Any employee or servant of any insured;

      3. Any person performing services for or on behalf of any insured; or

      4. Any other person.

   B. Employment practices concerning a person who commits any of the acts cited in paragraph **A.** above, including but not limited to hiring, reference checks, background investigation, improper or inadequate supervision or failure to suspend or terminate;

   C. Failure to report an incident of sexual abuse, sexual molestation, sexual exploitation, or sexual injury to the proper authorities or the withholding of pertinent information concerning same from such authorities.

This exclusion shall apply regardless of the legal form any claim may take by way of negligence, breach of contract or assault.

_____    _____
AUTHORIZED REPRESENTATIVE                    DATE

KR-GL-131 (12-09)                    Page 1 of 1

# National Casualty Company

**ENDORSEMENT**
**NO.** __0000__

| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE DATE (12:01 A.M. STANDARD TIME) | NAMED INSURED | AGENT NO. |
|---|---|---|---|
| KKO0000021153300 | 06/20/17 | KNOX TRAIL COUNCIL, INC. (SEE KR-SP-1) | |

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## LIMITATION OF COVERAGE TO DESIGNATED PREMISES, ACTIVITIES OR OPERATIONS

This endorsement modifies insurance provided under the following:

**COMMERCIAL GENERAL LIABILITY COVERAGE PART**

This insurance applies only to "bodily injury," "property damage," "personal and advertising injury" and medical expenses arising out of:

**1.** The ownership, maintenance or use of the premises shown in the Schedule and operations necessary or incidental to those premises; or

**2.** The activities or operations shown in the Schedule.

**SCHEDULE**

Premises:

Activities or Operations:

OFFICE OPERATIONS AT LOCATIONS SHOWN ON KR-GL-D-1 COMMERCIAL GENERAL LIABILITY DECLARATIONS ONLY

(If no information appears above, information required to complete this endorsement will be shown in the Declarations as applicable to this endorsement.)

_____
AUTHORIZED REPRESENTATIVE                    DATE

KR-GL-32 (4-07)                    **Page 1 of 1**

Subject to Protective Order - Confidential

# National Casualty Company

### ENDORSEMENT NO. 0000

| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE DATE (12:01 A.M. STANDARD TIME) | NAMED INSURED | AGENT NO. |
|---|---|---|---|
| KKO0000021153300 | 06/20/17 | KNOX TRAIL COUNCIL, INC. (SEE KR-SP-1) | |

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## EXCLUSION—DESIGNATED OPERATIONS

This endorsement modifies insurance provided under the following:

**COMMERCIAL GENERAL LIABILITY COVERAGE FORM**

### SCHEDULE

**Description of Designated Operation(s):**
CAMP AND COUNCIL OPERATIONS

**Specified Location (If Applicable):**

(If no entry appears above, information required to complete this endorsement will be shown in the Declarations as applicable to this endorsement.)

The following exclusion is added to **SECTION I— COVERAGES, COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY, 2. Exclusions:**

This insurance does not apply to "bodily injury" or "property damage" arising out of the operations described in the Schedule of this endorsement, regardless of whether such operations are conducted by you or on your behalf or whether the operations are conducted for yourself or for others.

Unless a "location" is specified in the Schedule, this exclusion applies regardless of where such operations are conducted by you or on your behalf. If a specific "location" is designated in the Schedule of this endorsement, this exclusion applies only to the described operations conducted at that "location."

For the purpose of this endorsement, "location" means premises involving the same or connecting lots, or premises whose connection is interrupted only by a street, roadway, water way or right-of-way of a railroad.

---

AUTHORIZED REPRESENTATIVE                    DATE

Includes copyrighted material of ISO Properties, Inc., with its permission.
Copyright, ISO Properties, Inc., 1994.

KR-GL-53 (4-07)                    Page 1 of 1

Subject to Protective Order - Confidential

# National Casualty Company

**ENDORSEMENT NO.** _0000_

| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE DATE (12:01 A.M. STANDARD TIME) | NAMED INSURED | AGENT NO. |
|---|---|---|---|
| KKO0000021153300 | 06/20/17 | KNOX TRAIL COUNCIL, INC. (SEE KR-SP-1) | |

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## LEAD CONTAMINATION EXCLUSION

This endorsement modifies insurance provided under:

**COMMERCIAL GENERAL LIABILITY COVERAGE PART**

This endorsement excludes "occurrences" at or from any premises, site or location which is or was at any time owned or occupied by, or rented or loaned to, any insured; or from the operations of the insured, which result in:

a.  "Bodily injury" arising out of the ingestion, inhalation or absorption of lead in any form;

b.  "Property Damage" arising from any form of lead;

c.  "Personal Injury" arising from any form of lead;

d.  "Advertising Injury" arising from any form of lead;

e.  **Medical Payments** arising from any form of lead;

f.  Any loss, cost or expense arising out of any request, demand or order that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of lead; or

g.  Any loss, cost or expense arising out of any claim or "suit" by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of lead.

_____
AUTHORIZED REPRESENTATIVE                    DATE

GL-58s (12-93)

BSAPolicyEv-00051117
TrustApp0732

# National Casualty Company



**ENDORSEMENT NO.** 0000

| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE DATE (12:01 A.M STANDARD TIME) | NAMED INSURED | AGENT NO. |
|---|---|---|---|
| KKO0000021153300 | 06/20/17 | KNOX TRAIL COUNCIL, INC. (SEE KR-SP-1) | |

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## HIRED AUTO AND NONOWNED AUTO LIABILITY

This endorsement modifies insurance provided under the following:

### COMMERCIAL GENERAL LIABILITY COVERAGE PART

### SCHEDULE

Insurance is provided only with respect to those coverages for which a specific premium charge is shown:

| Coverage | Additional Premium |
|---|---|
| Hired Auto Liability | INCLUDED |
| Nonowned Auto Liability | INCLUDED |

(If no entry appears above, information required to complete this endorsement will be shown in the Declarations as applicable to this endorsement.)

**HIRED AUTO LIABILITY**

The insurance provided under **COVERAGE A (Section I)** applies to "bodily injury" or "property damage" arising out of the maintenance or use of a "hired auto" by you or your "employees" in the course of your business.

**NONOWNED AUTO LIABILITY**

The insurance provided under **COVERAGE A (Section I)** applies to "bodily injury" or "property damage" arising out of the use of any "nonowned auto" in your business by any person other than you.

**With respect to the insurance provided by this endorsement:**

The exclusions, under **COVERAGE A (Section I)**, other than exclusions **a., b., d., f.** and **i.** are deleted and the following exclusions are added:

1.  "Bodily injury":

    **a.** To an "employee" of the insured arising out of and in the course of employment by the insured; or

    **b.** To the spouse, child, parent, brother or sister of that "employee" as a consequence of paragraph **(a)** above.

    This exclusion applies:

    **a.** Whether the insured may be liable as an employer or in any other capacity; and

    **b.** To any obligation to share damages with or repay someone else who must pay damages because of the injury.

Includes copyrighted material of ISO Properties, Inc., with its permission.
Copyright, ISO Properties, Inc., 2013

KR-GL-151 (10-14)                                    Page 1 of 2

Subject to Protective Order - Confidential                BSAPolicyEv-00051118
                                                                        TrustApp0733

This exclusion does not apply to:

a.  Liability assumed by the insured under an "insured contract"; or

b.  "Bodily injury" arising out of and in the course of domestic employment by the insured unless benefits for such injury are in whole or in part either payable or required to be provided under any workers compensation law.

**2.**  "Property damage" to:

a.  Property owned or being transported by, or rented or loaned to the insured; or

b.  Property in the care, custody or control of the insured.

**WHO IS AN INSURED (Section II) is replaced by the following:**

Each of the following is an insured under this insurance to the extent set forth below:

**1.**  You;

**2.**  Any other person using a "hired auto" with your permission;

**3.**  With respect to a "nonowned auto," any partner or executive officer of yours, but only while such "nonowned auto" is being used in your business; or

**4.**  Any other person or organization, but only with respect to their liability because of acts or omissions of an insured under **1., 2.,** or **3.** above.

None of the following is an insured:

**1.**  Any person engaged in the business of his or her employer with respect to "bodily injury" to any co-"employee" of such person injured in the course of employment;

**2.**  Any partner or executive officer with respect to any "auto" owned by such partner or officer or a member of his or her household;

**3.**  Any person while employed in or otherwise engaged in duties in connection with an "auto business," other than an "auto business" you operate;

**4.**  The owner or lessee (of whom you are a sublessee) of a "hired auto" or the owner of a "nonowned auto" or any agent or "employee" of any such owner or lessee; or

**5.**  Any person or organization with respect to the conduct of any current or past partnership, joint venture, or limited liability company that is not shown as a Named Insured in the Declarations.

**The following additional definitions apply:**

"Auto business" means the business or occupation of selling, repairing, servicing, storing or parking "autos."

"Hired auto" means any "auto" you lease, hire, rent or borrow. This does not include any "auto" you lease, hire, rent or borrow from any of your "employee's" or members of their households, or from any partner or executive officer of yours.

"Nonowned auto" means any "auto" you do not own, lease, hire, rent or borrow which is used in connection with your business. However, if you are a partnership a "nonowned auto" does not include any auto owned by any partner.

_____     _____
AUTHORIZED REPRESENTATIVE                                                  DATE

Includes copyrighted material of ISO Properties, Inc., with its permission.
Copyright, ISO Properties, Inc., 2013

KR-GL-151 (10-14)                        Page 2 of 2

Subject to Protective Order - Confidential                        BSAPolicyEv-00051119

TrustApp0734

**POLICY NUMBER:** KKO0000021153300    COMMERCIAL GENERAL LIABILITY
CG 20 01 04 13

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# PRIMARY AND NONCONTRIBUTORY –
# OTHER INSURANCE CONDITION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART

The following is added to the **Other Insurance** Condition and supersedes any provision to the contrary:

**Primary And Noncontributory Insurance**

This insurance is primary to and will not seek contribution from any other insurance available to an additional insured under your policy provided that:

**(1)** The additional insured is a Named Insured under such other insurance; and

**(2)** You have agreed in writing in a contract or agreement that this insurance would be primary and would not seek contribution from any other insurance available to the additional insured.

CG 20 01 04 13    © Insurance Services Office, Inc., 2012    Page 1 of 1

**POLICY NUMBER:** KKO0000021153300             COMMERCIAL GENERAL LIABILITY
CG 20 26 04 13

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# ADDITIONAL INSURED – DESIGNATED PERSON OR ORGANIZATION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

### SCHEDULE

| Name Of Additional Insured Person(s) Or Organization(s): |
|---|
| SPONSORS; CO-PROMOTERS; MANAGERS OR LESSORS OF PREMISES; MORTGAGEES, ASSIGNEES OR RECEIVERS; INTERESTS FROM WHOM LAND HAS BEEN LEASED. WITH RESPECT TO AN ADDITIONAL INSURED OWNER AND/OR LESSOR OF PREMISES, THIS INSURANCE DOES NOT APPLY TO STRUCTURAL ALTERATIONS, NEW CONSTRUCTION OR DEMOLITION OPERATIONS PERFORMED BY OR FOR THAT PERSON(S) OR ORGANIZATION(S); ANY DESIGN DEFECT OR STRUCTURAL MAINTENANCE OF THE PREMISES; OR ANY PREMISES DEFECT. |
| Information required to complete this Schedule, if not shown above, will be shown in the Declarations. |

**A. Section II – Who Is An Insured** is amended to include as an additional insured the person(s) or organization(s) shown in the Schedule, but only with respect to liability for "bodily injury", "property damage" or "personal and advertising injury" caused, in whole or in part, by your acts or omissions or the acts or omissions of those acting on your behalf:

**1.** In the performance of your ongoing operations; or

**2.** In connection with your premises owned by or rented to you.

However:

**1.** The insurance afforded to such additional insured only applies to the extent permitted by law; and

**2.** If coverage provided to the additional insured is required by a contract or agreement, the

insurance afforded to such additional insured will not be broader than that which you are required by the contract or agreement to provide for such additional insured.

**B.** With respect to the insurance afforded to these additional insureds, the following is added to **Section III – Limits Of Insurance:**

If coverage provided to the additional insured is required by a contract or agreement, the most we will pay on behalf of the additional insured is the amount of insurance:

**1.** Required by the contract or agreement; or

**2.** Available under the applicable Limits of Insurance shown in the Declarations;

whichever is less.

This endorsement shall not increase the applicable Limits of Insurance shown in the Declarations.

CG 20 26 04 13           © Insurance Services Office, Inc., 2012           Page 1 of 1

**POLICY NUMBER:** KKO0000021153300

<div align="right">

COMMERCIAL GENERAL LIABILITY
CG 20 34 04 13

</div>

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## ADDITIONAL INSURED – LESSOR OF LEASED EQUIPMENT – AUTOMATIC STATUS WHEN REQUIRED IN LEASE AGREEMENT WITH YOU

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**A. Section II – Who Is An Insured** is amended to include as an additional insured any person(s) or organization(s) from whom you lease equipment when you and such person(s) or organization(s) have agreed in writing in a contract or agreement that such person(s) or organization(s) be added as an additional insured on your policy. Such person(s) or organization(s) is an insured only with respect to liability for "bodily injury", "property damage" or "personal and advertising injury" caused, in whole or in part, by your maintenance, operation or use of equipment leased to you by such person(s) or organization(s).

However, the insurance afforded to such additional insured:

**1.** Only applies to the extent permitted by law; and

**2.** Will not be broader than that which you are required by the contract or agreement to provide for such additional insured.

A person's or organization's status as an additional insured under this endorsement ends when their contract or agreement with you for such leased equipment ends.

**B.** With respect to the insurance afforded to these additional insureds, this insurance does not apply to any "occurrence" which takes place after the equipment lease expires.

**C.** With respect to the insurance afforded to these additional insureds, the following is added to **Section III – Limits Of Insurance:**

The most we will pay on behalf of the additional insured is the amount of insurance:

**1.** Required by the contract or agreement you have entered into with the additional insured; or

**2.** Available under the applicable Limits of Insurance shown in the Declarations;

whichever is less.

This endorsement shall not increase the applicable Limits of Insurance shown in the Declarations.

CG 20 34 04 13                    © Insurance Services Office, Inc., 2012                    Page 1 of 1

Subject to Protective Order - Confidential

**POLICY NUMBER:** KKO0000021153300

**COMMERCIAL GENERAL LIABILITY**
CG 21 06 05 14

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# EXCLUSION – ACCESS OR DISCLOSURE OF CONFIDENTIAL OR PERSONAL INFORMATION AND DATA-RELATED LIABILITY – WITH LIMITED BODILY INJURY EXCEPTION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**A.** Exclusion **2.p.** of **Section I – Coverage A – Bodily Injury And Property Damage Liability** is replaced by the following:

**2. Exclusions**

This insurance does not apply to:

**p. Access Or Disclosure Of Confidential Or Personal Information And Data-related Liability**

Damages arising out of:

**(1)** Any access to or disclosure of any person's or organization's confidential or personal information, including patents, trade secrets, processing methods, customer lists, financial information, credit card information, health information or any other type of nonpublic information; or

**(2)** The loss of, loss of use of, damage to, corruption of, inability to access, or inability to manipulate electronic data.

This exclusion applies even if damages are claimed for notification costs, credit monitoring expenses, forensic expenses, public relations expenses or any other loss, cost or expense incurred by you or others arising out of that which is described in Paragraph **(1)** or **(2)** above.

However, unless Paragraph **(1)** above applies, this exclusion does not apply to damages because of "bodily injury".

As used in this exclusion, electronic data means information, facts or programs stored as or on, created or used on, or transmitted to or from computer software, including systems and applications software, hard or floppy disks, CD-ROMs, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

**B.** The following is added to Paragraph **2. Exclusions** of **Section I – Coverage B – Personal And Advertising Injury Liability:**

**2. Exclusions**

This insurance does not apply to:

**Access Or Disclosure Of Confidential Or Personal Information**

"Personal and advertising injury" arising out of any access to or disclosure of any person's or organization's confidential or personal information, including patents, trade secrets, processing methods, customer lists, financial information, credit card information, health information or any other type of nonpublic information.

This exclusion applies even if damages are claimed for notification costs, credit monitoring expenses, forensic expenses, public relations expenses or any other loss, cost or expense incurred by you or others arising out of any access to or disclosure of any person's or organization's confidential or personal information.

CG 21 06 05 14

© Insurance Services Office, Inc., 2013

Page 1 of 1

Subject to Protective Order - Confidential

**POLICY NUMBER:** KKO0000021153300

COMMERCIAL GENERAL LIABILITY
CG 21 35 10 01

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## EXCLUSION – COVERAGE C – MEDICAL PAYMENTS

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

### SCHEDULE

| Description And Location Of Premises Or Classification: |
|---|
| |

(If no entry appears above, information required to complete this endorsement will be shown in the Declarations as applicable to this endorsement.)

With respect to any premises or classification shown in the Schedule:

1. Section **I** – Coverage **C** – Medical Payments does not apply and none of the references to it in the Coverage Part apply: and

2. The following is added to Section **I** – Supplementary Payments:

   **h.** Expenses incurred by the insured for first aid administered to others at the time of an accident for "bodily injury" to which this insurance applies.

CG 21 35 10 01          ©ISO Properties, Inc., 2000          Page 1 of 1

Subject to Protective Order - Confidential

POLICY NUMBER: KKO0000021153300

COMMERCIAL GENERAL LIABILITY
CG 21 47 12 07

THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

## EMPLOYMENT-RELATED PRACTICES EXCLUSION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**A.** The following exclusion is added to Paragraph **2., Exclusions** of Section **I – Coverage A – Bodily Injury And Property Damage Liability:**

This insurance does not apply to:

"Bodily injury" to:

**(1)** A person arising out of any:

    **(a)** Refusal to employ that person;

    **(b)** Termination of that person's employment; or

    **(c)** Employment-related practices, policies, acts or omissions, such as coercion, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation, discrimination or malicious prosecution directed at that person; or

**(2)** The spouse, child, parent, brother or sister of that person as a consequence of "bodily injury" to that person at whom any of the employment-related practices described in Paragraphs **(a)**, **(b)**, or **(c)** above is directed.

This exclusion applies:

**(1)** Whether the injury-causing event described in Paragraphs **(a)**, **(b)** or **(c)** above occurs before employment, during employment or after employment of that person;

**(2)** Whether the insured may be liable as an employer or in any other capacity; and

**(3)** To any obligation to share damages with or repay someone else who must pay damages because of the injury.

**B.** The following exclusion is added to Paragraph **2., Exclusions** of Section **I – Coverage B – Personal And Advertising Injury Liability:**

This insurance does not apply to:

"Personal and advertising injury" to:

**(1)** A person arising out of any:

    **(a)** Refusal to employ that person;

    **(b)** Termination of that person's employment; or

    **(c)** Employment-related practices, policies, acts or omissions, such as coercion, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation, discrimination or malicious prosecution directed at that person; or

**(2)** The spouse, child, parent, brother or sister of that person as a consequence of "personal and advertising injury" to that person at whom any of the employment-related practices described in Paragraphs **(a)**, **(b)**, or **(c)** above is directed.

This exclusion applies:

**(1)** Whether the injury-causing event described in Paragraphs **(a)**, **(b)** or **(c)** above occurs before employment, during employment or after employment of that person;

**(2)** Whether the insured may be liable as an employer or in any other capacity; and

**(3)** To any obligation to share damages with or repay someone else who must pay damages because of the injury.

Subject to Protective Order - Confidential

BSAPolicyEv-00051125
TrustApp0740

POLICY NUMBER: KKO0000021153300

COMMERCIAL GENERAL LIABILITY
CG 21 67 12 04

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# FUNGI OR BACTERIA EXCLUSION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**A.** The following exclusion is added to Paragraph **2. Exclusions** of **Section I – Coverage A – Bodily Injury And Property Damage Liability:**

**2. Exclusions**

This insurance does not apply to:

**Fungi Or Bacteria**

**a.** "Bodily injury" or "property damage" which would not have occurred, in whole or in part, but for the actual, alleged or threatened inhalation of, ingestion of, contact with, exposure to, existence of, or presence of, any "fungi" or bacteria on or within a building or structure, including its contents, regardless of whether any other cause, event, material or product contributed concurrently or in any sequence to such injury or damage.

**b.** Any loss, cost or expenses arising out of the abating, testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, remediating or disposing of, or in any way responding to, or assessing the effects of, "fungi" or bacteria, by any insured or by any other person or entity.

This exclusion does not apply to any "fungi" or bacteria that are, are on, or are contained in, a good or product intended for bodily consumption.

**B.** The following exclusion is added to Paragraph **2. Exclusions** of **Section I – Coverage B – Personal And Advertising Injury Liability:**

**2. Exclusions**

This insurance does not apply to:

**Fungi Or Bacteria**

**a.** "Personal and advertising injury" which would not have taken place, in whole or in part, but for the actual, alleged or threatened inhalation of, ingestion of, contact with, exposure to, existence of, or presence of any "fungi" or bacteria on or within a building or structure, including its contents, regardless of whether any other cause, event, material or product contributed concurrently or in any sequence to such injury.

**b.** Any loss, cost or expense arising out of the abating, testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, remediating or disposing of, or in any way responding to, or assessing the effects of, "fungi" or bacteria, by any insured or by any other person or entity.

**C.** The following definition is added to the **Definitions** Section:

"Fungi" means any type or form of fungus, including mold or mildew and any mycotoxins, spores, scents or byproducts produced or released by fungi.

CG 21 67 12 04

©ISO Properties, Inc., 2003

Page 1 of 1

Subject to Protective Order - Confidential

POLICY NUMBER: KKO0000021153300

COMMERCIAL GENERAL LIABILITY
CG 21 96 03 05

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# SILICA OR SILICA-RELATED DUST EXCLUSION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**A.** The following exclusion is added to Paragraph **2., Exclusions** of **Section I – Coverage A – Bodily Injury And Property Damage Liability:**

**2. Exclusions**

This insurance does not apply to:

**Silica Or Silica-Related Dust**

a. "Bodily injury" arising, in whole or in part, out of the actual, alleged, threatened or suspected inhalation of, or ingestion of, "silica" or "silica-related dust".

b. "Property damage" arising, in whole or in part, out of the actual, alleged, threatened or suspected contact with, exposure to, existence of, or presence of, "silica" or "silica-related dust".

c. Any loss, cost or expense arising, in whole or in part, out of the abating, testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, remediating or disposing of, or in any way responding to or assessing the effects of, "silica" or "silica-related dust", by any insured or by any other person or entity.

**B.** The following exclusion is added to Paragraph **2., Exclusions** of **Section I – Coverage B – Personal And Advertising Injury Liability:**

**2. Exclusions**

This insurance does not apply to:

**Silica Or Silica-Related Dust**

a. "Personal and advertising injury" arising, in whole or in part, out of the actual, alleged, threatened or suspected inhalation of, ingestion of, contact with, exposure to, existence of, or presence of, "silica" or "silica-related dust".

b. Any loss, cost or expense arising, in whole or in part, out of the abating, testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, remediating or disposing of, or in any way responding to or assessing the effects of, "silica" or "silica-related dust", by any insured or by any other person or entity.

**C.** The following definitions are added to the **Definitions** Section:

1. "Silica" means silicon dioxide (occurring in crystalline, amorphous and impure forms), silica particles, silica dust or silica compounds.

2. "Silica-related dust" means a mixture or combination of silica and other dust or particles.

Subject to Protective Order - Confidential

BSAPolicyEv-00051127

TrustApp0742

**POLICY NUMBER:**  KKO0000021153300

COMMERCIAL GENERAL LIABILITY
CG 24 07 01 96

THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

# PRODUCTS/COMPLETED OPERATIONS HAZARD REDEFINED

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART

## SCHEDULE

**Description of Premises and Operations:**

FOOD AND BEVERAGE DISTRIBUTION

(If no entry appears above, information required to complete this endorsement will be shown in the Declarations as applicable to this endorsement.)

With respect to "bodily injury" or "property damage" arising out of "your products" manufactured, sold, handled or distributed:

1. On, from or in connection with the use of any premises described in the Schedule, or

2. In connection with the conduct of any operation described in the Schedule, when conducted by you or on your behalf,

Paragraph **a.** of the definition of "Products-completed operations hazard" in the DEFINITIONS Section is replaced by the following:

"Products-completed operations hazard":

**a.** Includes all "bodily injury" and "property damage" that arises out of "your products" if the "bodily injury" or "property damage" occurs after you have relinquished possession of those products.

CG 24 07 01 96                Copyright, Insurance Services Office, Inc.,  1994                Page 1 of 1

Subject to Protective Order - Confidential                                                BSAPolicyEv-00051128
TrustApp0743

POLICY NUMBER:  KKO0000021153300                    COMMERCIAL GENERAL LIABILITY
                                                              CG 21 73 01 15

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

# EXCLUSION OF CERTIFIED ACTS OF TERRORISM

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
LIQUOR LIABILITY COVERAGE PART
OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE PART
POLLUTION LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART
RAILROAD PROTECTIVE LIABILITY COVERAGE PART
UNDERGROUND STORAGE TANK POLICY

**A.** The following exclusion is added:

This insurance does not apply to:

**TERRORISM**

"Any injury or damage" arising, directly or indirectly, out of a "certified act of terrorism".

**B.** The following definitions are added:

   **1.** For the purposes of this endorsement, "any injury or damage" means any injury or damage covered under any Coverage Part to which this endorsement is applicable, and includes but is not limited to "bodily injury", "property damage", "personal and advertising injury", "injury" or "environmental damage" as may be defined in any applicable Coverage Part.

   **2.** "Certified act of terrorism" means an act that is certified by the Secretary of the Treasury, in accordance with the provisions of the federal Terrorism Risk Insurance Act, to be an act of terrorism pursuant to such Act. The criteria contained in the Terrorism Risk Insurance Act for a "certified act of terrorism" include the following:

     **a.** The act resulted in insured losses in excess of $5 million in the aggregate, attributable to all types of insurance subject to the Terrorism Risk Insurance Act; and

     **b.** The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

**C.** The terms and limitations of any terrorism exclusion, or the inapplicability or omission of a terrorism exclusion, do not serve to create coverage for injury or damage that is otherwise excluded under this Coverage Part.

CG 21 73 01 15                    © Insurance Services Office, Inc., 2014                    Page 1 of 1

# National Casualty Company

## COMMERCIAL INLAND MARINE COVERAGE PART
## SUPPLEMENTAL DECLARATIONS

Policy No.   KKO0000021153300        Effective Date   06/20/17

                                                                        12:01 A.M. Standard Time

Named Insured:     KNOX TRAIL COUNCIL, INC. (SEE KR-SP-1)           Agent No.

---

**Item 1.** Business Description: SCOUT COUNCILS

**Item 2.** Coverages, Limits of Insurance and Premiums

| COVERAGE FORM | LIMIT OF INSURANCE | PREMIUM |
|---|---|---|
| Miscellaneous Articles Coverage | $   424,970 | $   1,700 |
| Computer Coverage | | NOT COVERED |
| Accounts Receivable Coverage | | NOT COVERED |
| Valuable Papers and Records | | NOT COVERED |
| Theatrical Property Coverage | | NOT COVERED |
| Transportation Coverage | | NOT COVERED |
| Trip Transit Coverage | | NOT COVERED |
| Fine Arts Coverage | | NOT COVERED |
| Sign Coverage | | NOT COVERED |
| Live Animal Coverage | | NOT COVERED |
| **TOTAL INLAND MARINE PREMIUM** | | $   1,700 |

---

**Item 3.** Forms and Endorsements (other than applicable forms and endorsements shown elsewhere in this policy)

Form(s) and Endorsement(s) made a part of this policy at time of issue:

| | | | | |
|---|---|---|---|---|
| CM0001(09/04) | CI-SD-20(01/11) | UT-3G(03/92) | IH0079(12/13) | KR-IM-5(06/13) |
| IH9907(04/03) | IH9922(04/03) | | | |

---

THESE DECLARATIONS ARE PART OF THE POLICY DECLARATIONS CONTAINING THE
NAME OF THE INSURED AND THE POLICY PERIOD.

**KR-IM-SD-1 (10-11)**

Subject to Protective Order - Confidential

**POLICY NUMBER:** KKO0000021153300

COMMERCIAL INLAND MARINE
CM 00 01 09 04

# COMMERCIAL INLAND MARINE CONDITIONS

The following conditions apply in addition to the Common Policy Conditions and applicable Additional Conditions in Commercial Inland Marine Coverage Forms:

## LOSS CONDITIONS

### A. Abandonment

There can be no abandonment of any property to us.

### B. Appraisal

If we and you disagree on the value of the property or the amount of loss, either may make written demand for an appraisal of the loss. In this event, each party will select a competent and impartial appraiser. The two appraisers will select an umpire. If they cannot agree, either may request that selection be made by a judge of a court having jurisdiction. The appraisers will state separately the value of the property and amount of loss. If they fail to agree, they will submit their differences to the umpire. A decision agreed to by any two will be binding. Each party will:

1. Pay its chosen appraiser; and

2. Bear the other expenses of the appraisal and umpire equally.

If there is an appraisal, we will still retain our right to deny the claim.

### C. Duties In The Event Of Loss

You must see that the following are done in the event of loss or damage to Covered Property:

1. Notify the police if a law may have been broken.

2. Give us prompt notice of the loss or damage. Include a description of the property involved.

3. As soon as possible, give us a description of how, when and where the loss or damage occurred.

4. Take all reasonable steps to protect the Covered Property from further damage, and keep a record of your expenses necessary to protect the Covered Property, for consideration in the settlement of the claim. This will not increase the Limit of Insurance. However, we will not pay for any subsequent loss or damage resulting from a cause of loss that is not a Covered Cause of Loss. Also, if feasible, set the damaged property aside and in the best possible order for examination.

5. You will not, except at your own cost, voluntarily make a payment, assume any obligation, or incur any expense without our consent.

6. As often as may be reasonably required, permit us to inspect the property proving the loss or damage and examine your books and records.

   Also permit us to take samples of damaged and undamaged property for inspection, testing and analysis, and permit us to make copies from your books and records.

7. We may examine any insured under oath, while not in the presence of any other insured and at such times as may be reasonably required, about any matter relating to this insurance or the claim, including an insured's books and records. In the event of an examination, an insured's answers must be signed.

8. Send us a signed, sworn proof of loss containing the information we request to settle the claim. You must do this within 60 days after our request. We will supply you with the necessary forms.

9. Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the claim or suit.

10. Cooperate with us in the investigation or settlement of the claim.

### D. Insurance Under Two Or More Coverages

If two or more of this policy's coverages apply to the same loss or damage, we will not pay more than the actual amount of the loss or damage.

### E. Loss Payment

1. We will give notice of our intentions within 30 days after we receive the sworn proof of loss.

2. We will not pay you more than your financial interest in the Covered Property.

3. We may adjust losses with the owners of lost or damaged property if other than you. If we pay the owners, such payments will satisfy your claim against us for the owners' property. We will not pay the owners more than their financial interest in the Covered Property.

4. We may elect to defend you against suits arising from claims of owners of property. We will do this at our expense.

CM 00 01 09 04

© ISO Properties, Inc., 2003

Page 1 of 3

**5.** We will pay for covered loss or damage within 30 days after we receive the sworn proof of loss if you have complied with all the terms of this Coverage Part and:

    **a.** We have reached agreement with you on the amount of the loss; or

    **b.** An appraisal award has been made.

**6.** We will not be liable for any part of a loss that has been paid or made good by others.

**F. Other Insurance**

**1.** You may have other insurance subject to the same plan, terms, conditions and provisions as the insurance under this Coverage Part. If you do, we will pay our share of the covered loss or damage. Our share is the proportion that the applicable Limit of Insurance under this Coverage Part bears to the Limits of Insurance of all insurance covering on the same basis.

**2.** If there is other insurance covering the same loss or damage, other than that described in **1.** above, we will pay only for the amount of covered loss or damage in excess of the amount due from that other insurance, whether you can collect on it or not. But we will not pay more than the applicable Limit of Insurance.

**G. Pair, Sets Or Parts**

**1. Pair Or Set**

In case of loss or damage to any part of a pair or set we may:

    **a.** Repair or replace any part to restore the pair or set to its value before the loss or damage; or

    **b.** Pay the difference between the value of the pair or set before and after the loss or damage.

**2. Parts**

In case of loss or damage to any part of Covered Property consisting of several parts when complete, we will only pay for the value of the lost or damaged part.

**H. Recovered Property**

If either you or we recover any property after loss settlement, that party must give the other prompt notice. At your option, the property will be returned to you. You must then return to us the amount we paid to you for the property. We will pay recovery expenses and the expenses to repair the recovered property, subject to the Limit of Insurance.

**I. Reinstatement Of Limit After Loss**

The Limit of Insurance will not be reduced by the payment of any claim, except for total loss or damage of a scheduled item, in which event we will refund the unearned premium on that item.

**J. Transfer Of Rights Of Recovery Against Others To Us**

If any person or organization to or for whom we make payment under this Coverage Part has rights to recover damages from another, those rights are transferred to us to the extent of our payment. That person or organization must do everything necessary to secure our rights and must do nothing after loss to impair them. But you may waive your rights against another party in writing:

**1.** Prior to a loss to your Covered Property.

**2.** After a loss to your Covered Property only if, at time of loss, that party is one of the following:

    **a.** Someone insured by this insurance; or

    **b.** A business firm:

        **(1)** Owned or controlled by you; or

        **(2)** That owns or controls you.

This will not restrict your insurance.

**GENERAL CONDITIONS**

**A. Concealment, Misrepresentation Or Fraud**

This Coverage Part is void in any case of fraud, intentional concealment or misrepresentation of a material fact, by you or any other insured, at any time, concerning:

**1.** This Coverage Part;

**2.** The Covered Property;

**3.** Your interest in the Covered Property; or

**4.** A claim under this Coverage Part.

**B. Control Of Property**

Any act or neglect of any person other than you beyond your direction or control will not affect this insurance.

The breach of any condition of this Coverage Part at any one or more locations will not affect coverage at any location where, at the time of loss or damage, the breach of condition does not exist.

**C. Legal Action Against Us**

No one may bring a legal action against us under this Coverage Part unless:

**1.** There has been full compliance with all the terms of this Coverage Part; and

**2.** The action is brought within 2 years after you first have knowledge of the direct loss or damage.

© ISO Properties, Inc., 2003    CM 00 01 09 04

Subject to Protective Order - Confidential

BSAPolicyEv-00051132

TrustApp0747

**D. No Benefit To Bailee**

No person or organization, other than you, having custody of Covered Property will benefit from this insurance.

**E. Policy Period, Coverage Territory**

We cover loss or damage commencing:

**1.** During the policy period shown in the Declarations; and

**2.** Within the coverage territory.

**F. Valuation**

The value of property will be the least of the following amounts:

**1.** The actual cash value of that property;

**2.** The cost of reasonably restoring that property to its condition immediately before loss or damage; or

**3.** The cost of replacing that property with substantially identical property.

In the event of loss or damage, the value of property will be determined as of the time of loss or damage.

Subject to Protective Order - Confidential    BSAPolicyEv-00051133

TrustApp0748

# National Casualty Company

## COMMERCIAL INLAND MARINE COVERAGE PART MISCELLANEOUS ARTICLES COVERAGE FORM SUPPLEMENTAL DECLARATIONS

Policy Number:   KKO0000021153300     Effective Date:   06/20/17

                                                                  (12:01 A.M. Standard Time)

              KNOX TRAIL COUNCIL, INC. (SEE KR-SP-1)

Named Insured:                                    Agent Number: _____

**BUSINESS DESCRIPTION:** SCOUT COUNCILS

**LIMITS OF INSURANCE**

Schedule Of Covered Property:

| | |
|---|---|
| PICK UP TRUCK | $ 13,000 |
| CHIPPER | $ 10,000 |
| COYOTE FRONT END LOADER | $ 20,000 |
| CUB CADET LAWN TRACTOR | $ 2,900 |
| MISC EQUIPMENT | $ 5,000 |
| SWIMMING DOCKS | $ 75,000 |
| TENTS AND INTERNAL FRAMES | $150,000 |
| COPE COURSE | $ 17,000 |
| BOATS AND CANOES | $ 25,000 |
| CONTINUED ON UT-3G | |
| All Covered Property In Any One Occurrence | $424,970 |

IF THIS BOX IS CHECKED ☐ , THE THEFT FROM ANY UNATTENDED VEHICLE EXCLUSION DOES NOT APPLY

**DEDUCTIBLE**                                           $ 1,000

**RATES AND PREMIUMS**

Nonreporting:
     Rates per $100
     Premium

Reporting:
     Deposit Premium
     Minimum Premium
     Rates per $100
     Reporting Period ☐ DR (Daily)   ☐ WR (Weekly)   ☐ MR (Monthly)   ☐ QR (Quarterly)   ☐ PR (Policy Year)
     Premium Adjustment Period
     Premium Base _____

**SPECIAL PROVISIONS** (if any):

**FORMS AND ENDORSEMENTS** (Other than applicable Forms and Endorsements shown elsewhere in this policy)

Form(s) and Endorsement(s) applying to this Coverage Form and made part of this policy when issued:
REFER TO DECLARATIONS PAGE KR-IM-SD-1 FOR A LISTING OF APPLICABLE FORMS.

THIS SUPPLEMENTAL DECLARATIONS AND THE COMMON POLICY DECLARATIONS, TOGETHER WITH THE
COMMON POLICY CONDITIONS, COVERAGE FORMS(S) AND ENDORSEMENT(S),
COMPLETE THE ABOVE-NUMBERED POLICY.

Includes copyrighted material of ISO Properties, Inc., with its permission.
Copyright, ISO Properties, Inc. 2007

CI-SD-20 (1-11)                                Page 1 of 1

Subject to Protective Order - Confidential

POLICY NUMBER: KKO0000021153300

COMMERCIAL INLAND MARINE
IH 00 79 12 13

# MISCELLANEOUS ARTICLES COVERAGE FORM

Various provisions in this Policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this Policy, the words "you" and "your" refer to the Named Insured shown in the Declarations. The words "we", "us" and "our" refer to the Company providing this insurance.

Other words and phrases that appear in quotation marks have special meaning. Refer to Section **F.** Definitions.

## A. Coverage

We will pay for loss of or damage to Covered Property from any of the Covered Causes of Loss.

### 1. Covered Property

Covered Property, as used in this Coverage Form, means the property described in the Declarations that:

**a.** You own; or

**b.** Is in your care, custody or control.

### 2. Property Not Covered

Covered Property does not include:

**a.** Real Property;

**b.** Aircraft, Motor Vehicles designed for highway use or Watercraft;

**c.** Property after it is sold and delivered or otherwise disposed of, including property sold under a deferred payment sales agreement; or

**d.** Contraband, or property in the course of illegal transportation or trade.

### 3. Covered Causes Of Loss

Covered Causes of Loss means Direct Physical Loss Or Damage to Covered Property except those causes of loss listed in the Exclusions.

### 4. Additional Acquired Property

If during the policy period you take possession of additional property of a type already covered by this Coverage Form, we will cover such property for up to 30 days, but not beyond the end of the policy period. The most we will pay for loss or damage is the lesser of:

**a.** 25% of the total Limit Of Insurance shown in the Declarations for all individually listed and described items; or

**b.** $10,000 for any one item.

You will report values of such property to us within 30 days after you take possession and will pay any additional premium due. If you do not report such property, coverage will cease automatically 30 days after the date the property is acquired or at the end of the policy period, whichever occurs first.

The **Coinsurance** Additional Condition does not apply to this coverage.

This Additional Coverage does not increase the applicable Limit Of Insurance shown in the Declarations.

## B. Exclusions

### 1. We will not pay for loss or damage caused directly or indirectly by any of the following. Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss or damage.

**a. Governmental Action**

Seizure or destruction of property by order of governmental authority.

But we will pay for loss or damage caused by or resulting from acts of destruction ordered by governmental authority and taken at the time of a fire to prevent its spread if the fire would be covered under this Coverage Form.

**b. Nuclear Hazard**

Nuclear reaction or radiation, or radioactive contamination, however caused.

But if nuclear reaction or radiation, or radioactive contamination results in fire, we will pay for the direct loss or damage caused by that fire if the fire would be covered under this Coverage Form.

**c. War And Military Action**

**(1)** War, including undeclared or civil war;

**(2)** Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

Subject to Protective Order - Confidential

**(3)** Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

Exclusions **B.1.a.** through **B.1.c.** apply whether or not the loss event results in widespread damage or affects a substantial area.

**2.** We will not pay for loss or damage caused by or resulting from any of the following:

**a.** Denting, chipping, marring, scratching.

**b.** Delay, loss of use, loss of market or any other consequential loss.

**c.** Dishonest or criminal act (including theft) committed by:

**(1)** You, any of your partners, employees (including temporary employees and leased workers), officers, directors, trustees, or authorized representatives;

**(2)** A manager or a member if you are a limited liability company; or

**(3)** Anyone else with an interest in the property, or their employees (including temporary employees and leased workers) or authorized representatives;

whether acting alone or in collusion with each other or with any other party.

This exclusion applies whether or not an act occurs during your normal hours of operation.

This exclusion does not apply to acts of destruction by your employees (including temporary employees and leased workers) or authorized representatives; but theft by your employees (including temporary employees and leased workers) or authorized representatives is not covered.

**d.** Breakdown of refrigeration equipment.

But we will pay for such loss or damage caused directly by fire, lightning, explosion, windstorm, vandalism, aircraft, rioters, strikers, theft or attempted theft, or by "accident" to the vehicle carrying the property if these causes of loss would be covered under this Coverage Form.

**e.** Processing or work upon the property.

But if processing or work upon the property results in fire or explosion, we will pay for the direct loss or damage caused by that fire or explosion if the fire or explosion would be covered under this Coverage Form.

**f.** Theft from any unattended vehicle unless at the time of theft its windows, doors and compartments were closed and locked and there are visible signs that the theft was the result of forced entry. But this exclusion does not apply to property in the custody of a carrier for hire.

This Theft From Any Unattended Vehicle Exclusion applies unless otherwise indicated in the Declarations.

**g.** Unexplained disappearance.

**h.** Shortage found upon taking inventory.

**i.** Artificially generated electrical, magnetic or electromagnetic energy that damages, disturbs, disrupts or otherwise interferes with any:

**(1)** Electrical or electronic wire, device, appliance, system or network; or

**(2)** Device, appliance, system or network utilizing cellular or satellite technology;

creating a short circuit or other electric disturbance within an article covered under this Coverage Form.

For the purpose of this exclusion, electrical, magnetic or electromagnetic energy includes, but is not limited to, electrical current, including arcing; electrical charge produced or conducted by a magnetic or electromagnetic field; pulse of electromagnetic energy; electromagnetic waves or microwaves.

But if artificially generated electrical, magnetic or electromagnetic energy, as described above, results in fire or explosion, we will pay for the direct loss or damage caused by that fire or explosion if the fire or explosion would be covered under this Coverage Form.

This exclusion only applies to loss or damage to that article in which the disturbance occurs.

**j.** Voluntary parting with any property by you or anyone entrusted with the property if induced to do so by any fraudulent scheme, trick, device or false pretense.

**k.** Unauthorized instructions to transfer property to any person or to any place.

**l.** Neglect of an insured to use all reasonable means to save and preserve property from further damage at and after the time of loss.

© Insurance Services Office, Inc., 2013    IH 00 79 12 13

Subject to Protective Order - Confidential

BSAPolicyEv-00051136

TrustApp0751

m. Theft by any person (except carriers for hire) to whom you entrust the property for any purpose, whether acting alone or in collusion with any other party.

This exclusion applies whether or not an act occurs during your normal hours of operation.

3. We will not pay for loss or damage caused by or resulting from any of the following. But if loss or damage by a Covered Cause of Loss results, we will pay for the loss or damage caused by that Covered Cause of Loss.

a. Wear and tear, depreciation.

b. Any quality in the property that causes it to damage or destroy itself, hidden or latent defect, gradual deterioration.

c. Mechanical breakdown.

d. Insects, vermin or rodents.

e. Corrosion, rust, dampness, extremes of temperature.

## C. Limits Of Insurance

The most we will pay for loss or damage in any one occurrence is the applicable Limit Of Insurance shown in the Declarations.

## D. Deductible

We will not pay for loss or damage in any one occurrence until the amount of the adjusted loss or damage before applying the applicable Limits of Insurance exceeds the Deductible shown in the Declarations. We will then pay the amount of the adjusted loss or damage in excess of the Deductible, up to the applicable Limit of Insurance.

## E. Additional Conditions

The following conditions apply in addition to the Commercial Inland Marine Conditions and the Common Policy Conditions:

### 1. Coverage Territory

We cover property wherever located.

### 2. Coinsurance

All items must be covered for their total value as of the time of loss or damage or you will incur a penalty.

The penalty is that we will pay only the proportion of any loss or damage to these items that the Limit Of Insurance shown in the Declarations for them bears to their value as of the time of loss or damage. We will use the following steps:

a. Divide the Limit of Insurance of the lost or damaged item of Covered Property by the value of the item at the time of loss or damage;

b. Multiply the total amount of loss or damage, before the application of any deductible, by the figure determined in Step a.; and

c. Subtract the deductible from the figure determined in Step b.

We will pay the amount determined in Step c. or the Limit of Insurance, whichever is less. For the remainder, you will either have to rely on other insurance or absorb the loss yourself.

## F. Definitions

"Accident" means:

1. Upset or overturn of the transporting vehicle; or

2. The violent and accidental contact of the transporting vehicle with another vehicle or object, but not including:

a. The roadbed or curbing;

b. Rails or ties of street, steam or electric railroad; or

c. Any stationary object while backing for loading or unloading purposes.

Subject to Protective Order - Confidential

BSAPolicyEv-00051137
TrustApp0752

# National Casualty Company

**ENDORSEMENT NO.** _0000_

| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE DATE (12:01 A.M STANDARD TIME) | NAMED INSURED | AGENT NO. |
|---|---|---|---|
| KKC0000021153300 | 06/20/17 | KNOX TRAIL COUNCIL, INC. (SEE KR-SP-1) | |

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## ADDITIONAL PROPERTY COVERED—WATERCRAFT

This endorsement modifies insurance provided under the following:

**MISCELLANEOUS ARTICLES COVERAGE FORM**

Subsection **2.b. Property Not Covered** of section **A. Coverage** is replaced by:

**b.** Aircraft or Motor Vehicles designed for highway use;

_____ /_____
AUTHORIZED REPRESENTATIVE          DATE

Includes copyrighted material of ISO Properties, Inc., with its permission.
Copyright, ISO Properties, Inc., 2009

KR-IM-5 (6-13)                        Page 1 of 1

Subject to Protective Order - Confidential

BSAPolicyEv-00051138
TrustApp0753

**POLICY NUMBER:** KKO0000021153300

COMMERCIAL INLAND MARINE
IH 99 07 04 03

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# REPLACEMENT COST

This endorsement modifies insurance under the following:

CONTRACTORS EQUIPMENT COVERAGE FORM
MACHINERY AND EQUIPMENT COVERAGE FORM
MISCELLANEOUS ARTICLES COVERAGE FORM

### SCHEDULE*

| |
|---|
| Replacement cost valuation applies only to the following item number(s): |
| |
| |
| |
| |
| |
| *Information required to complete this Schedule, if not shown on this endorsement, will be shown in the Declarations. |

The **Valuation Commercial Inland Marine Condition** is replaced by the following:

**A.** If replaced, the value of Covered Property will be the cost of replacing that property with similar property without depreciation, but not more than the Limit of Insurance shown in the Declarations.

**B.** If not replaced, the value of that property will be the least of the following:

**1.** Actual cash value of that property;

**2.** Cost of reasonably restoring that property to its condition immediately before loss or damage; or

**3.** Cost of replacing that property with functionally equivalent property.

**C.** In the event of loss, the value of property will be determined at the time of the loss.

IH 99 07 04 03                          © ISO Properties, Inc.,  2003                          Page 1 of 1

Subject to Protective Order - Confidential

**POLICY NUMBER:** KKC0000021153300

COMMERCIAL INLAND MARINE
IH 99 22 04 03

THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

# LOSS PAYABLE

This endorsement modifies insurance provided under the following:

BUILDERS RISK COVERAGE FORM
COMMERCIAL FINE ARTS COVERAGE FORM
COMPUTER SYSTEMS COVERAGE FORM
CONTRACTORS EQUIPMENT COVERAGE FORM
DIFFERENCE IN CONDITIONS COVERAGE FORM
FINE ARTS DEALERS AND GALLERIES COVERAGE FORM
INSTALLATION COVERAGE FORM
INSTALLMENT SALES AND LEASED PROPERTY COVERAGE FORM
MACHINERY AND EQUIPMENT COVERAGE FORM
MOTOR TRUCK CARGO OWNERS COVERAGE FORM
RADIO AND TELEVISION TOWERS AND EQUIPMENT COVERAGE FORM
SCIENTIFIC AND MEDICAL DIAGNOSTIC EQUIPMENT COVERAGE FORM

**SCHEDULE\***

| Prem. No. | Bldg. No. | Description Of Property | Loss Payable |
|---|---|---|---|
| | | | AS REQUIRED BY WRITTEN CONTRACT AND ON FILE WITH COMPANY UNLESS SPECIFICALLY DECLINED. |

\*Information required to complete this Schedule, if not shown on this endorsement, will be shown in the Declarations.

## PROVISIONS

For Covered Property in which both you and a Loss Payee shown in the Schedule or in the Declarations have an insurable interest, we will:

**A.** Adjust losses with you; and

**B.** Pay any claim for loss or damage jointly to you and the Loss Payee, as interest may appear.

IH 99 22 04 03                    ©ISO Properties, Inc.,  2003                    Page 1 of 1

Subject to Protective Order - Confidential

BSAPolicyEv-00051140
TrustApp0755



# QUALITY ASSURANCE FORM

**Help Us To Serve You Better**

Every effort has been made to produce a quality product for you. Please review this transaction, and if it is incorrect list the correction needed in the space provided below and fax this Quality Assurance Form to us at 877-363-8669 .

Questions pertaining to any transaction should be referred to CNA Customer Interaction Center at 800-CNA-HELP,Option 1,Option 2 or   e-mailed to cic@cnacentral.com

Please send routine requests via standard Accord forms through the same method you are using today. The preferred method is by fax to 877-363-8669

**Insured/Account Name:** Calumet Council Inc.

**Policy Number:** B 2097703749          **Line of Business:** CNP

**Agent Name:** DON POWERS AGENCY INC

**Producer code:** 074992          **Branch:** INDIANAPOLIS BRANCH

**Transaction Type:** New Business

**Transaction Effective Date:** 04/23/2007

Your Transaction was processed by Commercial Insurance Center - Maitland, FL
**C ID:** BY M93WEBP

_____ **Transaction Incorrect – See Below.**        _____ **Transaction Processed Correctly**
**Correction needed:**




**END OF COPY**

MEDIATION – CONFIDENTIAL.
Subject to Protective Order - Highly Confidential

Subject to Protective Order – Highly Confidential



# IMPORTANT INFORMATION

## NOTICE TO POLICYHOLDERS
## JURISDICTIONAL INSPECTIONS

Many states and some cities issue certificates permitting the continued operation of certain equipment such as boilers, water heaters, pressure vessels, etc. Periodic inspections are normally required to renew these certificates. In most jurisdictions, insurance company employees who have been licensed are authorized to perform these inspections.

**If:**

- You own or operate equipment that requires a certificate from a state or city to operate legally, and
- We insure that equipment under this Policy, and
- You would like us to perform the next required inspection:

**Then:**

Fill in the form on the next page and mail/fax to the appropriate address/fax number for your account locations (if multiple locations in both territories, please fax to both numbers). Note the following:

- Your jurisdiction(s) may charge you a fee for renewing a certificate. It is your responsibility to pay such a fee.
- All the provisions of the INSPECTION AND SURVEYS condition apply to the inspections described in this notice.

**ADDRESS/FAX NUMBERS:**

**Eastern:**    CNA, Boiler & Machinery
P.O. Box 917
Hunt Valley, MD 21030
877-872-7155

(AL, CT, DC, DE, FL, GA, MA, MD, ME, MS, NC, NH, NJ, NY, PA, RI, SC, TN, VA, VT, WV)

**Western:**    CNA, Boiler & Machinery
600 North Pearl Street
Dallas, TX, 75201
877-872-7154

(AK, AR, AZ, CA, CO, HI, IA, ID, IL, IN, KS, KY, LA, MI, MN, MO, MT, ND, NE, NM, NV, OH, OK, OR, SD, TX, UT, WA, WI, WY)

### REMINDER

If new equipment is installed or old equipment replaced that requires a jurisdictional inspection, please let us know by faxing/mailing the new information to address/fax number listed above.

If this is a renewal and information (locations) has not changed, please disregard this notice.

If inspection and maintenance are outside of your area of responsibility, we would appreciate your forwarding this notice to the appropriate person. **If no response is received, we are assuming there are no jurisdictional objects at your location(s) and no inspections are required.**

SB-146959-A
(Ed. 01/06)



MEDIATION – CONFIDENTIAL.
Subject to Protective Order - Highly Confidential

CNA_BSA0002123
BSAPolicyEv-00015691
TrustApp0758

# REQUEST FOR JURISDICTIONAL INSPECTION

| Insured Name: |
|---|

| Policy Number: | Policy Term: |
|---|---|

| Location Address[1] | City | State | Zip |
|---|---|---|---|
| 1. | | | |
| 2. | | | |
| 3. | | | |
| 4. | | | |

| Contact Person: |
|---|
| Telephone number (including area code): |

| Equipment Type[2,3,4] (Boiler, Pressure Vessel) | Certificate Number (State #) | Certificate Expiration Date |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

**Completed by:**

**Telephone Number:**

**ADDRESS/FAX NUMBERS:**

**Eastern:**   CNA, Boiler & Machinery
P.O. Box 917
Hunt Valley, MD 21030
877-872-7155

(AL, CT, DC, DE, FL, GA, MA, MD, ME, MS, NC, NH, NJ, NY, PA, RI, SC, TN, VA, VT, WV)

**Western:**   CNA, Boiler & Machinery
600 North Pearl Street
Dallas, TX, 75201
877-872-7154

(AK, AR, AZ, CA, CO, HI, IA, ID, IL, IN, KS, KY, LA, MI, MN, MO, MT, ND, NE, NM, NV, OH, OK, OR, SD, TX, UT, WA, WI, WY)

[1]If multiple objects and/or multiple locations, please list all required information on separate page(s).

[2]Boiler is defined as an enclosed vessel heated by fuel or electricity to produce steam or hot water.

[3]Pressure Vessel is defined as an enclosed vessel (tank) greater than 6 cubic feet (18 inches x 40 inches) to store liquid or gas under pressure for use when needed.

[4]LPG (ex: propane, propylene, butane & butylenes) Tank with vapor pressures not exceeding that allowed for commercial propane. California requirement only.

SB-146959-A
(Ed. 01/06)

Page 2 of 2

MEDIATION – CONFIDENTIAL.
Subject to Protective Order - Highly Confidential

CNA_BSA0002124
BSAPolicyEv-00015692
TrustApp0759



**CNA Connect**

New Business Declaration

| POLICY NUMBER | COVERAGE PROVIDED BY | FROM - POLICY PERIOD - TO |
|---|---|---|
| B 2097703749 | NATIONAL FIRE INSURANCE OF HARTFORD | 04/23/2007    04/23/2008 |
| | CNA PLAZA | |
| | CHICAGO, ILLINOIS  60685 | |

INSURED NAME AND ADDRESS
Calumet Council Inc.
8751 Calumet Ave

MUNSTER, IN  46321

| AGENCY NUMBER | AGENCY NAME AND ADDRESS |
|---|---|
| 074992 | DON POWERS AGENCY INC |
| | 911 RIDGE ROAD |
| | P O BOX 3007 |
| | MUNSTER, IN  46321 |
| | Phone Number: (219)836-8900 |

| BRANCH NUMBER | BRANCH NAME AND ADDRESS |
|---|---|
| 370 | INDIANAPOLIS BRANCH |
| | 10503 TIMBERWOOD CIR, STE 200 |
| | LOUISVILLE, KY  40223 |
| | Phone Number: (502)423-5260 |

This policy becomes effective and expires at 12:01 A.M. standard time at your mailing address on the dates shown above.

The Named Insured is a Corporation.

Your policy is composed of this Declarations, with the attached Common Policy Conditions, Coverage Forms, and Endorsements, if any. The Policy Forms and Endorsement Schedule shows all forms applicable to this policy at the time of policy issuance.

The Estimated Policy Premium Is          $3,177.00

**Terrorism Risk Insurance Act Premium**          **$156.00**

Audit Period is Not Auditable

INSURED                                        Page   1 of   6

MEDIATION – CONFIDENTIAL.
Subject to Protective Order - Highly Confidential

| POLICY NUMBER | INSURED NAME AND ADDRESS |
|---|---|
| B 2097703749 | Calumet Council Inc.<br>8751 Calumet Ave<br>MUNSTER, IN  46321 |

**PROPERTY COVERAGE**                                              **LIMIT OF INSURANCE**

The following deductible applies unless a separate deductible is shown on the Schedule of Locations and Coverage.

Deductible:    $1,000

Business Income and Extra Expense Coverage
  Business Income and Extra Expense                    12 Month Loss Sustained

Business Income and Extra Expense - Dependent Properties          $10,000

Employee Dishonesty                                               $100,000

Forgery and Alteration                                            $100,000

**LIABILITY COVERAGE**                                             **LIMIT OF INSURANCE**

Each Occurrence Limit                                            $1,000,000

Medical Expense Limit                                               $10,000

Personal and Advertising Injury                                  $1,000,000

Products/Completed Operations Aggregate                          $2,000,000

General Aggregate                                                $2,000,000

Damage To Premises Rented To You                                   $300,000

INSURED                                   Page    2 of    6

| POLICY NUMBER | INSURED NAME AND ADDRESS |
|---|---|
| B 2097703749 | Calumet Council Inc. |
| | 8751 Calumet Ave |
| | MUNSTER, IN 46321 |

## SCHEDULE OF LOCATIONS AND COVERAGE

**LOCATION   1   BUILDING   1**

8751 Calumet Ave
Munster, IN   46321

Construction: Non Combustible

Class description: Associations - Civic, Not For Profit

    Inflation Guard 2%

| PROPERTY COVERAGE | LIMIT OF INSURANCE |
|---|---|
| Accounts Receivable | $25,000 |
| Building | $1,120,000 |
| Business Personal Property | $435,000 |
| Electronic Data Processing | $50,000 |
| Equipment Breakdown | |
| Fine Arts | $25,000 |
| Ordinance or Law | $25,000 |
| Seasonal Increase: 25% | |
| Sewer or Drain Back Up | $25,000 |
| Valuable Papers & Records | $25,000 |



INSURED               Page   3 of   6

MEDIATION – CONFIDENTIAL.
Subject to Protective Order - Highly Confidential

CNA_BSA0002127
BSAPolicyEv-00015695
TrustApp0762

**POLICY NUMBER**          **INSURED NAME AND ADDRESS**
B 2097703749               Calumet Council Inc.
                           8751 Calumet Ave
                           MUNSTER, IN  46321

**LOSS PAYEE SCHEDULE**

All loss payees as their interests may appear in the Covered Property.

The following provisions apply in accordance with the insurable interest of the loss payee:

Description of Property: Any Covered Property in which a loss payee, creditor or lender holds an interest, including any person or organization you have entered a contract with for the sale of Covered Property.

INSURED                                        Page   4 of   6

MEDIATION – CONFIDENTIAL.
Subject to Protective Order - Highly Confidential

POLICY NUMBER
B 2097703749

INSURED NAME AND ADDRESS
Calumet Council Inc.
8751 Calumet Ave
MUNSTER, IN  46321

## FORMS AND ENDORSEMENTS SCHEDULE

The following list shows the Forms, Schedules and Endorsements by Line of Business that are a part of this policy.

### COMMON

| FORM NUMBER | | FORM TITLE |
|---|---|---|
| SB146932B | 03/2006 | Non-Contractors Blanket Additional Insured |
| SB146942A | 01/2006 | Indiana Changes |
| SB146945A | 01/2006 | Claim Settlement Practices - Indiana |
| SB146959A | 01/2006 | Policyholders Jurisdictional Inspections |
| SB146985A | 01/2006 | Pol Limtn Disclosure Notice Excl - Respirable Dust |
| SB147075A | 01/2006 | Economic and Trade Sanctions Condition |
| SB147082A | 01/2006 | Businessowners Common Policy Conditions |
| SB147086A | 01/2006 | Loss Payable Provisions |
| SB147088A | 01/2006 | Exclusion - Asbestos |
| SB300161A | 01/2006 | Policy Limitation Disclosure Notice Excl - Silica |

### COMMERCIAL PROPERTY

| FORM NUMBER | | FORM TITLE |
|---|---|---|
| SB146801B | 03/2006 | Businessowners Special Property Coverage Form |
| SB146802B | 03/2006 | Business Income and Extra Expense |
| SB146803A | 01/2006 | Seasonal Increase |
| SB146804A | 01/2006 | Arson and Theft Reward |
| SB146805A | 01/2006 | Claim Data Expense |
| SB146806A | 01/2006 | Debris Removal |
| SB146807A | 01/2006 | Employee Dishonesty |
| SB146808A | 01/2006 | Expediting Expenses |
| SB146809A | 01/2006 | Fine Arts |
| SB146810A | 01/2006 | Fire Department Service Charge |
| SB146811A | 01/2006 | Fire Protective Equipment Discharge |
| SB146812A | 01/2006 | Forgery and Alteration |
| SB146813A | 01/2006 | Newly Acquired or Constructed Property |
| SB146814A | 01/2006 | Ordinance or Law |
| SB146815A | 01/2006 | Outdoor Trees, Shrubs, Plants and Lawns |
| SB146816A | 01/2006 | Pollutant Clean Up and Removal |
| SB146817A | 01/2006 | Preservation of Property |
| SB146818A | 01/2006 | Temporary Relocation of Property |
| SB146819A | 01/2006 | Water Damage, Other Liquids, Solder, Molten Damage |
| SB146820A | 01/2006 | Accounts Receivable |
| SB146821A | 01/2006 | Appurtenant Buildings and Structures |
| SB146822A | 01/2006 | Building Glass |
| SB146823A | 01/2006 | Business Income Extra Expense - Dependent Property |
| SB146824A | 01/2006 | Business Income Extra Expense-Newly Acquired Locs |
| SB146825A | 01/2006 | Business Personal Property Off Premises |
| SB146826A | 01/2006 | Civil Authority |
| SB146827B | 03/2006 | Electronic Data Processing |
| SB146828A | 01/2006 | Equipment Breakdown |
| SB146830A | 01/2006 | Money Orders and Counterfeit Paper Currency |
| SB146831A | 01/2006 | Nonowned Detached Trailers |
| SB146832A | 01/2006 | Ordinance or Law-Increased Period of Restoration |
| SB146833A | 01/2006 | Outdoor Property |
| SB146834A | 01/2006 | Personal Effects |
| SB146835A | 01/2006 | Signs |

INSURED                                      Page   5 of   6

MEDIATION – CONFIDENTIAL.
Subject to Protective Order - Highly Confidential

CNA_BSA0002129
BSAPolicyEv-00015697
TrustApp0764

| POLICY NUMBER | INSURED NAME AND ADDRESS |
|---|---|
| B 2097703749 | Calumet Council Inc. |
| | 8751 Calumet Ave |
| | MUNSTER, IN  46321 |

## FORMS AND ENDORSEMENTS SCHEDULE

### COMMERCIAL PROPERTY

| FORM NUMBER | | FORM TITLE |
|---|---|---|
| SB146836A | 01/2006 | Spoilage Consequential Loss |
| SB146837A | 01/2006 | Theft Damage to Rented Property |
| SB146838A | 01/2006 | Valuable Papers and Records |
| SB146839A | 01/2006 | Sewer or Drain Back Up |
| SB146936A | 01/2006 | Inflation Guard |
| SB147002A | 01/2006 | EXCLUSION - WASTE |
| SB147007A | 01/2006 | EXCLUSION - UNDERGROUND STORAGE TANKS |
| SB147084A | 01/2006 | Fungi, Wet Rot, Dry Rot and Microbe Exclusion |
| SB300129A | 03/2006 | TARGETED HACKER ATTACK |
| SB300144B | 10/2006 | Notification Endorsement of Impending Law Change |
| SB300146A | 01/2006 | Cap on Losses From Certified Acts of Terrorism |
| SB300179B | 03/2006 | Choice Endorsement |

### COMMERCIAL GENERAL LIABILITY

| FORM NUMBER | | FORM TITLE |
|---|---|---|
| SB147078A | 01/2006 | Exclusion - Violation of Statutes |
| SB147079A | 01/2006 | War Liability Exclusion |
| SB147080A | 01/2006 | Exclusion - Silica |
| SB147081A | 01/2006 | Exclusion - Respirable Dust |
| SB147083A | 01/2006 | Fungi / Mold / Mildew / Yeast / Microbe Exclusion |
| SB147085A | 01/2006 | Known or Continuing Injury Damage |
| SB147089A | 01/2006 | Employment - Related Practices Exclusion |
| SB300000A | 01/2006 | Businessowners Liability Coverage Form |
| SB300063A | 01/2006 | Exclusion - Fiduciary or Representative Liability |
| SB300073A | 01/2006 | Exclusion - Mortgage Foreclosure |
| SB300081A | 01/2006 | Exclusion of Coverage for Special Events |
| SB300185A | 01/2006 | Property Damage Definition Amendatory Endorsement |

_____

Countersignature

_Chairman of the Board_

_Secretary_

SB-146895-A (Ed. 01/06)                    INSURED                    Page   6 of   6

**CNA**

SB-146801-B
(Ed. 03/06)

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## BUSINESSOWNERS SPECIAL PROPERTY COVERAGE FORM

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this policy the words "you" and "your" refer to the Named Insured shown in the Declarations. The words "we," "us" and "our" refer to the company providing the insurance.

Other words and phrases that appear in quotation marks have special meaning. Refer to **SECTION G – PROPERTY DEFINITIONS, and SECTION H – MALICIOUS CODE, SYSTEM PENETRATION, AND DENIAL OF SERVICE DEFINITIONS.**

### A. COVERAGE

We will pay for direct physical loss of or damage to Covered Property at the premises described in the Declarations caused by or resulting from a Covered Cause Of Loss.

#### 1. Covered Property

Covered Property includes Buildings as described under **a.** below, Business Personal Property as described under **b.** below, or both, depending on whether a Limit of Insurance is shown in the Declarations for the type of property. Regardless of whether coverage is shown in the Declarations for Buildings, Business Personal Property, or both, there is no coverage for property described under Paragraph **A.2.** Property Not Covered.

**a. Buildings**, meaning the buildings and structures at the premises described in the Declarations, including:

(1) Completed Additions;

(2) Fences

(3) Fixtures, including outdoor fixtures;

(4) Retaining walls, whether or not attached;

(5) Permanently installed:

(a) Machinery; and

(b) Equipment;

(1) Outdoor swimming pools;

(2) Personal Property owned by you that is used to maintain or service the building or structure or the premises, including:

(a) Fire extinguishing equipment;

(b) Outdoor furniture;

(c) Floor coverings;

(d) Appliances used for refrigerating, ventilating, cooking, dishwashing or laundering;

(e) Lawn maintenance and snow removal equipment; and

(f) Alarm systems;

(8) If not covered by other insurance:

(a) Alterations and repairs to the building structure;

(b) Materials, equipment, supplies and temporary structures, on or within 1,000 feet of the described premises, used for making alterations or repairs to the building or structure.

**b. Business Personal Property** located in or on the buildings at the described premises or in the open (or in a vehicle) within 1,000 feet of the described premises, including;

(1) Property that you own that is used in your business;

(2) Property of others that is in your care, custody or control;

(3) Your use interest as tenant in improvements and betterments. Improvements and betterments are fixtures, alterations, installations or additions:

(a) Made a part of the building or structure you occupy or lease but do not own; and

(b) You acquired or made at your expense but are not permitted to remove;

(4) Leased personal property for which you have a contractual responsibility to insure, unless otherwise provided for under Paragraph **A.1.b.(2)**.

#### 2. Property Not Covered

Covered Property does not include:

a. Aircraft;



SB-146801-B
(Ed. 03/06)

MEDIATION – CONFIDENTIAL.
Subject to Protective Order - Highly Confidential

CNA_BSA0002131
BSAPolicyEv-00015699
TrustApp0766

SB-146801-B
(Ed. 03/06)

**b.** Automobiles held for sale;

**c.** Vehicles or self-propelled machines that are:

**(1)** Licensed for use on public roads (subject to motor vehicle registration); or

**(2)** Operated principally away from the described premises;

This paragraph does not apply to:

**(1)** Vehicles or self-propelled machines or autos that you manufacture, process or warehouse;

**(2)** Vehicles or self-propelled machines, other than autos, that you hold for sale; or

**(3)** Trailers or semi-trailers, except as provided in the Non-Owned Detached Trailers Coverage.

**d.** Dams or dikes;

**e.** Contraband, or property in the course of illegal transportation or trade;

**f.** The cost of excavating, grading, backfilling or filling (except those costs necessary due to repair of buildings insured under this Coverage Form from a Covered Cause of Loss), reclaiming or restoring land or water;

**g.** Water or land whether in its natural state or otherwise (including land on which the property is located), land improvements, growing crops or standing timber;

**h.** Outdoor trees, shrubs, plants and lawns, other than "stock" except as provided in the Outdoor Trees, Shrubs, Plants and Lawns Additional Coverage;

**i.** The following property while outside of the buildings:

**(1)** Bridges, walks, roadways, patios or other paved surfaces; or

**(2)** Outdoor radio or television antennas (including satellite dishes) and including their lead-in wiring, masts or towers;

Except as provided in the Outdoor Property Coverage Extension;

**j.** Watercraft (including motors, equipment and accessories) while afloat;

**k.** Accounts and bills, except as provided in the Accounts Receivable Coverage Extension;

**l.** "Valuable Papers and Records," except as provided in the Valuable Papers and Records Coverage Extension;

**m.** Property that is covered under another Coverage Form of this or any other policy in which it is more specifically described, except for the excess of the amount due (whether you can collect on it or not) from that other insurance;

**n.** "Fine Arts," except as provided in the Fine Arts Additional Coverage;

**o.** Bullion, gold, silver, platinum and other precious alloys or metals, unless they are used in your "operations" (theft limitation applies);

**p.** "Electronic data processing equipment" and "Electronic media and data" (not including "stock"), except as provided in the Electronic Data Processing Equipment, Electronic Media and Data and Electronic Data (EDP Coverage Form) Coverage Extension, the Business Income And Extra Expense Coverage Extension, the Accounts Receivable Coverage Extension or the Targeted Hacker Attack Coverage Extension;

**q.** Outdoor signs, except as provided in the Signs Coverage Extension.

**3.** **Covered Causes of Loss**

RISKS OF DIRECT PHYSICAL LOSS unless the loss is:

**a.** Excluded in section **B. EXCLUSIONS;**

**b.** Limited in paragraph **A.4. Limitations;** or

**c.** Excluded or limited by other provisions of this policy.

**4.** **Limitations**

**a.** We will not pay for loss of or damage to:

**(1)** The "interior of any building or structure" or to personal property in the building or structure, caused by rain, snow, sleet or ice whether driven by wind or not, unless:

**(a)** The building or structure first sustains actual damage to the roof or walls by wind or hail and then we will pay only for the loss to the "interior of the building or structure" or the personal property in the building or structure that is caused by rain, snow, sleet, sand or dust entering the building(s) or structure(s) through openings in the roof or walls made by direct action of wind; or

MEDIATION – CONFIDENTIAL.
Subject to Protective Order - Highly Confidential

CNA_BSA0002132
BSAPolicyEv-00015700
TrustApp0767

SB-146801-B
(Ed. 03/06)

**(b)** The loss or damage is caused by or results from thawing of snow, sleet or ice on the building or structure.

**(2)** Steam boilers, steam pipes, steam engines or steam turbines caused by or resulting from any condition or event inside such equipment. But we will pay for loss of or damage to such equipment caused by or resulting from an explosion of gasses or fuel within the furnace of any fired vessel or within the flues or passages through which the gasses of combustion pass.

**(3)** Hot water boilers or other water heating equipment caused by or resulting from any condition or event inside such boilers or equipment, other than an explosion.

**b.** We will not pay for loss of or damage to the following types of property unless caused by any of the "specified causes of loss" or building glass breakage

**(1)** Live animals, birds or fish, and then only if they are killed or their destruction is made necessary

**(2)** Fragile articles such as glassware, statuary, marbles, chinaware and porcelains, if broken. This limitation does not apply to:

   **(a)** Glass that is part of the exterior or interior of a building or structure;

   **(b)** Containers or property held for sale; or

   **(c)** Photographic or scientific instrument lenses.

**c.** For loss or damage by theft, the following types of property are covered only up to the limits shown:

**(1)** $2,500 for furs, fur garments, and garments trimmed with fur.

**(2)** $5,000 for jewelry, watches, watch movements, jewels, pearls, precious and semi-precious stones, bullion, gold, silver, platinum and other precious alloys or metals. This limit does not apply to jewelry and watches worth $500 or less per item.

**(3)** $2,500 for patterns, dies, molds and forms.

**d.** We will not pay for any loss or damage caused by any of the following even if they

are Covered Causes of Loss if the building where loss or damage occurs has been "vacant" for more than 60 consecutive days before that loss or damage occurs:

**(1)** Vandalism;

**(2)** Sprinkler leakage, unless you have protected the system against freezing;

**(3)** Building glass breakage;

**(4)** Discharge or leakage of water;

**(5)** "Theft"; or

**(6)** Attempted "theft."

With respect to Covered Causes of Loss other than those listed in **4.d.(1)** through **4.d.(6)** above, we will reduce the amount we would otherwise pay for the loss or damage by 15%.

**5. Additional Coverages**

Additional Coverages may be attached to this Policy (designation would appear in the attached form(s)). Unless otherwise stated, payments made under these Additional Coverages are in addition to the applicable Limits of Insurance.

**6. Coverage Extensions**

Coverage forms may be attached to this Policy and designated as Coverage Extensions (such designation would appear in the attached form(s)). Unless otherwise stated, payments made under these Coverage Extensions are subject to and not in addition to the applicable Limits of Insurance in this Coverage Form.

**B. EXCLUSIONS**

**1.** We will not pay for loss or damage caused directly or indirectly by any of the following. Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss.

**a. Ordinance or Law**

**(1)** The enforcement of any ordinance or law:

   **(a)** Regulating the construction, use or repair of any property; or

   **(b)** Requiring the tearing down of any property, including the cost of removing its debris.

**(2)** This exclusion applies whether the loss results from:

   **(a)** An ordinance or law that is enforced even if the property has not been damaged; or

SB-146801-B
(Ed. 03/06)

Page 3 of 21
(Version 1.1)

MEDIATION – CONFIDENTIAL.
Subject to Protective Order - Highly Confidential

CNA_BSA0002133
BSAPolicyEv-00015701
TrustApp0768

SB-146801-B
(Ed. 03/06)

(b) The increased costs incurred to comply with an ordinance or law in the course of construction, repair, renovation, remodeling or demolition of property, or removal of its debris, following a physical loss to that property.

**b. Earth Movement**

(1) Earthquake, including any earth sinking, rising or shifting related to such event;

(2) Landslide, including any earth sinking, rising or shifting related to such event;

(3) Mine subsidence, meaning subsidence of a man-made mine, whether or not mining activity has ceased;

(4) Earth sinking (other than sinkhole collapse), rising or shifting including soil conditions which cause settling, cracking or other disarrangement of foundations or other parts of realty. Soil conditions include contraction, expansion, freezing, thawing, erosion, improperly compacted soil and the action of water under the ground surface.

But if Earth Movement, as described in Paragraphs (1) through (4) above, results in fire or explosion, we will pay for the loss or damage caused by that fire or explosion.

(5) Volcanic eruption, explosion or effusion. But if volcanic eruption, explosion or effusion results in fire, building glass breakage or volcanic action, we will pay for the loss or damage caused by that fire, or volcanic action.

Volcanic action means direct loss or damage resulting from the eruption of a volcano when the loss or damage is caused by:

(a) Airborne volcanic blast or airborne shock waves;

(b) Ash, dust or particulate matter; or

(c) Lava flow.

All volcanic eruptions that occur within any 168 hour period will constitute a single occurrence.

Volcanic action does not include the cost to remove ash, dust or particulate matter that does not cause direct physical loss of or damage to Covered Property.

**c. Governmental Action**

Seizure or destruction of property by order of governmental authority.

But we will pay for loss or damage caused by or resulting from acts of destruction ordered by governmental authority and taken at the time of a fire to prevent its spread, if the fire would be covered under this policy.

**d. Nuclear Hazard**

Nuclear reaction or radiation, or radioactive contamination, however caused.

But if nuclear reaction or radiation, or radioactive contamination, results in fire, we will pay for the loss or damage caused by that fire.

**e. Power Failure or Fluctuation**

The failure or fluctuation of power or other utility service supplied to the described premises, however caused, if the cause of the failure or fluctuation occurs away from the described premises.

But if the failure or fluctuation of power or other utility service results in a Covered Cause of Loss, we will pay for the loss or damage caused by that covered cause of Loss.

**f. War And Military Action**

(1) War, including undeclared or civil war;

(2) Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

(3) Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

**g. Water**

(1) Flood, surface water, waves, tides, tidal waves, overflow of any body of water, or their spray, all whether driven by wind or not;

(2) Mudslide or mudflow;

(3) Water or sewage that backs up or overflows from a sewer, drain or sump; or

(4) Water under the ground surface pressing on, or flowing or seeping through:

MEDIATION – CONFIDENTIAL.
Subject to Protective Order - Highly Confidential

CNA_BSA0002134
BSAPolicyEv-00015702
TrustApp0769

SB-146801-B
(Ed. 03/06)

(a) Foundations, walls, floors or paved surfaces;

(b) Basements, whether paved or not; or

(c) Doors, windows or other openings.

But if Water, as described in Paragraphs **(1)** through **(4)**, results in fire, explosion or sprinkler leakage, we will pay for the loss or damage caused by that fire, explosion or sprinkler leakage.

**h. Neglect**

Neglect of an insured to use reasonable means to save and preserve property from further damage at and after the time of loss.

**i. Collapse of Buildings**

Collapse of buildings meaning an abrupt falling down or caving in of a building or any part of a building with the result being that the building or part of a building cannot be occupied for its intended purpose.

**(1)** This exclusion does not apply to collapse of buildings if caused only by one or more of the following:

(a) A "specified cause of loss" or breakage of building glass;

(b) Decay, insect or vermin damage that is hidden from view, unless the presence of such decay or insect or vermin damage is known to an insured prior to collapse;

(c) Weight of people or personal property;

(d) Weight of rain that collects on a roof; or

(e) Use of defective material or methods in construction, remodeling or renovation if the collapse occurs during the course of construction, remodeling or renovation; or

(f) Use of defective material or methods in construction, remodeling or renovation if the collapse occurs after construction, remodeling or renovation is complete and is caused in part by a cause of loss listed in Paragraphs **(a)** through **(d)** above.

In the event collapse results in a Covered Cause of Loss, we will only pay for the resulting loss or damage by that Covered Cause of Loss.

**(2)** We will not pay for loss of or damage to the following types of property, if

otherwise covered in this Coverage Form under Paragraphs **(1)(b)** through **(1)(f)** above, unless the loss or damage is a direct result of the collapse of a building:

(a) Awnings, gutters and downspouts;

(b) Outdoor radio or television antennas (including microwave or satellite dishes) and their lead-in wiring, masts or towers;

(c) Fences;

(d) Piers, wharves and docks;

(e) Beach or diving platforms or appurtenances;

(f) Retaining walls;

(g) Walks, roadway and other paved surfaces;

(h) Yard fixtures; or

(i) Outdoor swimming pools.

**(3)** A building or part of a building that:

(a) Is in imminent danger of abruptly falling down or caving in; or

(b) Suffers a substantial impairment of structural integrity;

is not considered to have collapsed but is considered to be in a state of imminent collapse.

**(4)** With respect to buildings in a state of imminent collapse, we will not pay for loss or damage unless the state of imminent collapse first manifests itself during the policy period and is cause only by one or more of the following which occurs during the policy period:

(a) A "specified cause of loss" or breakage of glass

(b) Weight of people or personal property;

(c) Weight of rain that collects on a roof; or

(d) Use of defective material or methods in construction, remodeling or renovation if the state of imminent collapse occurs during the course of construction, remodeling or renovation.

**j. Malicious Code**

Any "malicious code."



MEDIATION – CONFIDENTIAL.
Subject to Protective Order - Highly Confidential

CNA_BSA0002135
BSAPolicyEv-00015703
TrustApp0770

SB-146801-B
(Ed. 03/06)

**k. System Penetration**

Any "system penetration."

**l. Denial of Service**

Any "denial of service."

2. We will not pay for loss or damage caused by or resulting from any of the following:

**a. Electrical Apparatus**

Artificially generated electrical current, including electric arcing, that disturbs electrical devices, appliances or wires.

But if artificially generated electrical current results in fire, we will pay for the loss or damage caused by fire.

**b. Consequential Loss**

Delay, loss of use or loss of market.

**c. Smoke, Vapor, Gas**

Smoke, vapor or gas from agricultural smudging or industrial operations.

**d. Other Types Of Loss**

(1) Wear and tear;

(2) Rust, corrosion, fungus, decay, deterioration, hidden or latent defect or any quality in property that causes it to damage or destroy itself;

(3) Smog;

(4) Settling, cracking, shrinking or expansion;

(5) Nesting or infestation, or discharge or release of waste products or secretions, by insects, birds, rodents or other animals;

(6) Mechanical breakdown, including rupture or bursting caused by centrifugal force.

(7) The following causes of loss to personal property:

(a) Dampness or dryness of atmosphere;

(b) Changes in or extremes of temperature; or

(c) Marring or scratching;

(d) Changes in flavor, color, texture or finish;

(e) Evaporation or leakage; or

(8) Contamination by other than "pollutants."

But if an excluded cause of loss that is listed in Paragraphs (1) through (8) above results in a "specified cause of loss,"

building glass breakage, or "breakdown" to "covered equipment" (only if otherwise a Covered Cause of Loss), we will pay for the loss or damage caused by that "specified cause of loss," building glass breakage or "breakdown" to "covered equipment" (only if otherwise a Covered Cause of Loss).

**e. Steam Apparatus**

Explosion of steam boilers, steam pipes, steam engines or steam turbines owned or leased by you, or operated under your control. But if explosion of steam boilers, steam pipes, steam engines or steam turbines results in fire or combustion explosion, we will pay for the loss or damage caused by that fire or combustion explosion. We will also pay for loss or damage caused by or resulting from the explosion of gases or fuel within the furnace of any fired vessel or within the flues or passages through which the gases of combustion pass.

**f. Seepage**

Continuous or repeated seepage or leakage of water, or the presence of condensation of humidity, moisture or vapor, that occurs over a period of 14 days or more.

**g. Frozen Plumbing**

Water, other liquids, powder or molten material that leaks or flows from plumbing, heating, air conditioning or other equipment (except fire protective systems) caused by or resulting from freezing, unless:

(1) You do your best to maintain heat in the building or structure; or

(2) You drain the equipment and shut off the supply if the heat is not maintained.

**h. Dishonesty**

Dishonest or criminal acts by you, or any of your partners, "members," officers, "managers," "employees" (including leased employees), directors, trustees, authorized representatives or anyone to whom you entrust the property for any purpose:

(1) Acting alone or in collusion with others;

(2) Whether or not occurring during the hours of employment.

This exclusion does not apply to acts of destruction to your property, or your "Electronic data processing equipment," "Electronic media and data," and "Electronic data," by your "employees" (including leased

MEDIATION – CONFIDENTIAL.
Subject to Protective Order - Highly Confidential

CNA_BSA0002136
BSAPolicyEv-00015704
TrustApp0771

SB-146801-B
(Ed. 03/06)

employees); but theft by employees (including leased employees) is not covered, except as provided in the Employee Dishonesty Additional Coverage.

**j.   False Pretense**

Voluntary parting with any property by you or anyone else to whom you have entrusted the property if induced to do so by any fraudulent scheme, trick, device or false pretense.

**k.   Exposed property**

Rain, snow, sand, dust, ice or sleet to personal property in the open, except as provided in the Coverage Extension for Outdoor Property.

**l.   Pollution**

Discharge, dispersal, seepage, migration, release or escape of "pollutants" unless the discharge, dispersal, seepage, migration, release or escape is itself caused by any of the "specified causes of loss." But if the discharge, dispersal, seepage, migration, release or escape of "pollutants" results in a "specified cause of loss," we will pay for the loss or damage caused by that "specified cause of loss"

**m.** Property that is missing, where the only evidence of the loss or damage is a shortage disclosed on taking inventory, or other instances where there is no physical evidence to show what happened to the property. This exclusion does not apply to "money" and "securities"

**n.** Loss of property or that part of any loss, the proof of which as to its existence or amount is dependent on:

**(1)** Any inventory computation; or

**(2)** A profit and loss computation.

**o.** The transfer of property to a person or to a place outside the described premises on the basis of unauthorized instructions.

**p.** Loss of "money" or "securities" caused by or resulting from accounting or arithmetic errors or omissions.

**q.** The cost of correcting or making good the damage to personal property attributable to such property being processed, manufactured, tested, repaired, restored, retouched or otherwise being worked on.

**3.** We will not pay for loss or damage caused by or resulting from any of the following Paragraphs **a.** through **c.** But if an excluded cause of loss that is listed in Paragraphs **a.** through **c.** results in a

Covered Cause of Loss, we will pay for the loss or damage caused by that Covered Cause of Loss.

**a.   Weather Conditions**

Weather conditions. But this exclusion only applies if weather conditions contribute in any way with a cause or event excluded in Paragraph **B.1.** above to produce the loss or damage.

**b.   Acts or Decisions**

Acts or decisions, including the failure to act or decide, of any person, group, organization or governmental body.

**c.   Negligent Work**

Faulty, inadequate or defective:

**(1)** Planning, zoning, development, surveying, siting;

**(2)** Design, specifications, workmanship, repair, construction, renovation, remodeling, grading, compaction;

**(3)** Materials used in repair, construction, renovation or remodeling; or

**(4)** Maintenance;

of part or all of any property on or off the described premises.

If an excluded cause of loss that is listed in Paragraphs **(1)** through **(4)** above results in a Covered Cause of Loss, we will pay for the resulting loss or damage caused by that Covered Cause of Loss. But we will not pay for:

**(1)** Any cost of correcting or making good the fault, inadequacy or defect itself, including any cost incurred to tear down, tear out, repair or replace any part of any property to correct the fault, inadequacy or defect; or

**(2)** Any resulting loss or damage by a Covered Cause of Loss to the property that has the fault, inadequacy or defect until the fault, inadequacy or defect is corrected.

**4.   Business Income and Extra Expense Exclusions**

**a.** We will not pay for:

**(1)** Any Extra Expense, or increase of Business Income loss, caused by or resulting from:

**(a)** Delay in rebuilding, repairing or replacing the property or resuming "operations," due to interference at



SB-146801-B
(Ed. 03/06)

MEDIATION – CONFIDENTIAL.
Subject to Protective Order - Highly Confidential

CNA_BSA0002137
BSAPolicyEv-00015705
TrustApp0772

SB-146801-B
(Ed. 03/06)

the location of the rebuilding, repair or replacement by strikers or other persons; or

**(b)** Suspension, lapse or cancellation of any license, lease or contract. But if the suspension, lapse or cancellation is directly caused by the suspension of "operations," we will cover such loss that affects your Business Income during the "period of restoration."

**b.** Any other consequential loss.

### C. Limits of Insurance

1. Unless otherwise stated, the most we will pay for loss or damage in any one occurrence is the applicable Limit of Insurance shown in the Declarations, Schedules, Coverage Forms, or endorsements.

2. Inflation Guard

   **a.** When a percentage for Inflation Guard is shown in the Declarations, the Limit of Insurance for property to which this coverage applies will automatically increase by that annual percentage.

   **b.** The amount of increase will be:

   **(1)** The Limit of Insurance that applied on the most recent of the policy inception date, the policy anniversary date, or any other policy change amending the Limit of Insurance, multiplied by

   **(2)** The percentage of annual increase shown in the Declarations, expressed as a decimal (example: 5% is .05), multiplied by

   **(3)** The number of days since the beginning of the current policy year or the effective date of the most recent policy change amending the Limit of Insurance, divided by 365.

   Example:

   If:

   The applicable Building limit is                $100,000

   The annual percentage increase is              5%

   The number of days since the beginning of the policy year (or last policy change) is    146

The amount of increase is

$100,000 x .05 x (146/365) =        $2,000

### D. DEDUCTIBLES

1. We will not pay for loss or damage in any one occurrence until the amount of loss or damage exceeds the Businessowners Property Coverage Deductible amount shown in the Declarations. We will then pay the amount of loss or damage in excess of the Deductible up to the applicable Limit of Insurance.

2. Regardless of the amount of the Businessowners Property Coverage Deductible, the most we will deduct from any loss or damage under the Building Glass Coverage Extension in any one occurrence is the Building Glass Deductible shown in the Declarations.

3. The Businessowners Property Coverage Deductible does not apply to any of the following if they are included as part of this policy:

   **a.** Fire Department Service Charge

   **b.** Business Income and Extra Expense

   **c.** Arson and Theft Reward; and

   **d.** Accounts Receivable.

4. If more than one deductible applies to loss or damage in any one occurrence, we will apply each deductible separately. But the total of all deductible amounts applied in any one occurrence will not exceed the largest applicable deductible.

### E. PROPERTY LOSS CONDITIONS

1. **Abandonment**

   There can be no abandonment of any property to us.

2. **Appraisal**

   If we and you disagree on the amount of loss, either may make written demand for an appraisal of the loss. In this event, each party will select a competent and impartial appraiser. The two appraisers will select an umpire. If they cannot agree, either may request that selection be made by a judge of a court having jurisdiction. The appraisers will state separately the amount of loss. If they fail to agree, they will submit their differences to the umpire. A decision agreed to by any two will be binding. Each party will:

   **a.** Pay its chosen appraiser; and

   **b.** Bear the other expenses of the appraisal and umpire equally.

   If there is an appraisal, we will still retain our right to deny the claim.

MEDIATION – CONFIDENTIAL.
Subject to Protective Order - Highly Confidential

CNA_BSA0002138
BSAPolicyEv-00015706

TrustApp0773

SB-146801-B
(Ed. 03/06)

3.  **Duties In The Event Of Loss Or Damage**

   a.  You must see that the following are done in the event of loss or damage to Covered Property:

      (1)  Notify the police if a law may have been broken.

      (2)  Give us prompt notice of the loss or damage. Include a description of the property involved.

      (3)  As soon as possible, give us a description of how, when and where the loss or damage occurred.

      (4)  Take all reasonable steps to protect the Covered Property from further damage, and keep a record of your expenses necessary to protect the Covered Property, for consideration in the settlement of the claim. This will not increase the Limits of Insurance. However, we will not pay for any loss or damage from a cause of loss that is not a Covered Cause of Loss. Also, if feasible, set the damaged property aside and in the best possible order for examination.

      (5)  At our request, give us complete inventories of the damaged and undamaged property. Include quantities, costs, values and amount of loss claimed.

      (6)  As often as may be reasonably required, permit us to inspect the property proving the loss or damage and examine your books and records.

         Also permit us to take samples of damaged and undamaged property for inspection, testing an analysis, and permit us to make copies from your books and records.

      (7)  Send us a signed, sworn proof of loss containing the information we request to investigate the claim. You must do this within 60 days after our request. We will supply you with the necessary forms.

      (8)  Cooperate with us in the investigation or settlement of the claim.

      (9)  Resume all or part of your "operations" as quickly as possible.

   b.  We may examine any insured under oath, while not in the presence of any other insured and at such times as may be reasonably required, about any matter relating to this insurance or the claim, including an insured's books and records. In the event of an examination, an insured's answers must be signed.

4.  **Loss Payment – Building and Personal Property**

   a.  In the event of loss or damage covered by this Coverage Form, at our option, we will either:

      (1)  Pay the value of lost or damaged property;

      (2)  Pay the cost of repairing or replacing the lost or damaged property, subject to **b.** below;

      (3)  Take all or any part of the property at an agreed or appraised value; or

      (4)  Repair, rebuild or replace the property with other property of like kind and quality, subject to b. below.

      We will determine the value of lost or damaged property, or the cost of its repair or replacement, in accordance with the applicable terms of **4.e.** below or any applicable provision which amends or supersedes the value of Covered Property.

   b.  The cost to repair, rebuild or replace does not include the increased cost attributable to enforcement of any ordinance or law regulating the construction, use or repair of any property, except as provided in the Ordinance or Law Additional Coverage.

   c.  We will give notice of our intentions within 30 days after we receive the proof of loss.

   d.  We will not pay you more than your financial interest in the Covered Property.

   e.  We will determine the value of Covered Property as follows:

      (1)  At replacement cost (without deduction for depreciation), except as provided in **(2)** through **(18)** below.

         (a)  You may make a claim for loss or damage covered by this insurance on an actual cash value basis instead of on a replacement cost basis. In the event you elect to have loss or damage settled on an actual cash value basis, you may still make a claim on a replacement cost basis if you notify us of your intent to do so within 180 days after the loss or damage.

         (b)  We will not pay on a replacement cost basis for any loss or damage:



MEDIATION – CONFIDENTIAL.
Subject to Protective Order - Highly Confidential

CNA_BSA0002139
BSAPolicyEv-00015707

TrustApp0774

SB-146801-B
(Ed. 03/06)

**(i)** Until the lost or damaged property is actually repaired or replaced; and

**(ii)** Unless the repairs or replacement are made as soon as reasonably possible after the loss or damage.

With respect to tenants' improvements and betterment's, the following also applies:

**a)** If the conditions in **(b)(i)** and **(b)(ii)** Above are not met, the value of tenants' improvements and betterments will be determined as a proportion of your original cost, as set forth under **4e.(7)** below; and

**b)** We will not pay for loss or damage to tenants' improvements and betterments if others pay for repairs or replacement.

**(c)** We will not pay more for loss or damage on a replacement cost basis than the least of **(i)**, **(ii)**, or **(iii)** Subject to **(d)** below:

**(i)** The Limit of Insurance applicable to the lost or damaged property;

**(ii)** The cost to replace the lost or damaged property with other property:

    **a)** Of comparable material and quality; and

    **b)** Used for the same purpose; or

**(iii)** The amount actually spent that is necessary to repair or replace the lost or damaged property.

If a building is rebuilt at a new premises, the cost described in **(c)(ii)** Above is limited to the cost which would have been incurred if the building had been rebuilt at the original premises.

**(d)** The cost of repair or replacement does not include the increased cost attributable to enforcement of any ordinance or law regulating the construction, use or repair of any property.

**(2)** If the Declarations indicate that Actual Cash Value applies to Buildings or Business Personal Property, paragraph **(1)** above does not apply to the property for which Actual Cash Value is indicated.

**(3)** Property of others at the amount you are liable plus the cost of labor, materials, or services furnished or arranged by you on personal property of others, not to exceed the replacement cost.

**(4)** The following property at actual cash value:

**(a)** Used or second-hand merchandise held in storage or for sale;

**(b)** Household furnishings;

**(c)** Personal effects.

**(5)** "Fine Arts" as follows:

**(a)** If there is a schedule of "fine arts" on file which includes a description and value of the lost or damaged item, we will pay the value as stated in the schedule for that item if there is a total loss to that item. if there is a partial loss to an item, we will pay the cost of reasonably restoring or repairing that item.

**(b)** For "fine arts" without a schedule on file as described in paragraph **(a)** above, the value of "fine arts" will be the least of the following amounts:

**(i)** Market value of the lost or damaged item at the time and place of loss;

**(ii)** The cost of reasonably restoring the lost or damaged item; or

**(iii)** The cost of replacing that lost or damaged item with property substantially the same.

**(6)** Glass at the cost of replacement with safety glazing material if required by law.

**(7)** Tenants' Improvements and Betterments at:

**(a)** Replacement cost if you make repairs promptly.

**(b)** A proportion of your original cost if you do not make repairs promptly. We will determine the proportionate value as follows:

**(i)** Multiply the original cost by the number of days from the loss or damage to the expiration date of the lease; and

MEDIATION – CONFIDENTIAL.
Subject to Protective Order - Highly Confidential

CNA_BSA0002140
BSAPolicyEv-00015708
TrustApp0775

SB-146801-B
(Ed. 03/06)

(ii) Divide the amount determined in (i) above by the number of days from the installation of improvements to the expiration of the lease.

If your lease contains a renewal option, the expiration of the renewal option period will replace the expiration of the lease in this procedure.

(c) Nothing, if others pay for repairs or replacement.

(8) "Valuable Papers and Records" at the cost of restoration or replacement. To the extent that the contents of the "valuable papers and records" are not restored or replaced, the "valuable papers and records" will be valued at the cost of replacement with blank material of substantially identical type.

(9) "Stock" you have sold but not delivered at the selling price less discounts and expenses you otherwise would have had.

(10) Property in transit (other than "stock" you have sold) at the amount of invoice, including your prepaid or advanced freight charges and other charges which may have accrued or become legally due from you since the shipment. If you have no invoice, the actual cash value will apply.

(11) "Money" at its face value.

(12) "Securities" at their value at the close of business on the day the loss is discovered.

(13) Accounts Receivable as follows:

(a) If you cannot accurately establish the amount of Accounts Receivable outstanding as of the time of loss, we will:

(i) Determine the total of the average monthly amounts of Accounts Receivable for the 12 months immediately preceding the month in which the loss occurs; and

(ii) Adjust that total for any normal fluctuations in the amount for Accounts Receivable for the month in which the loss occurred or for any demonstrated variance from the average for that month.

(b) If you can accurately establish the amount of Accounts Receivable

outstanding, that amount will be used in the determination of loss.

(c) The following will be deducted from the total amount of Accounts Receivable, however that amount is established:

(i) The amount of the accounts for which there was no loss;

(ii) The amount of the accounts that you are able to reestablish or collect;

(iii) An amount to allow for probable bad debts that you are normally unable to collect; and

(iv) All unearned interest and service charges.

(14) "Electronic Data Processing Equipment" at replacement cost as of the time and place of loss, without deduction for physical deterioration, depreciation, obsolescence or depletion. However, in the event of replacement of "electronic data processing equipment" with identical property is impossible, the replacement cost will be the cost of items that are similar to the damaged or destroyed equipment and intended to perform the same function, but which may include technological advances.

"Electronic data processing equipment" that is obsolete or no longer used by you will be valued at actual cash value.

(15) "Electronic Media and Data" at the cost of the same or similar blank media.

(16) "Electronic Data":

(a) For which duplicates or back-ups do not exist, will be valued at your cost to research, replace or restore the "electronic data," but only if the "electronic data" is actually replaced or restored.

(b) For which full duplicates or back-ups exist, will be valued at your cost of labor to copy the "electronic data" from such duplicates or back-ups, but only if the "electronic data" is actually copied.

(c) For which partial duplicates or back-ups exist, will be valued at your cost of labor to copy the partial "electronic data" from such duplicates or back-ups, and your cost to research, replace or restore the remaining

MEDIATION – CONFIDENTIAL.
Subject to Protective Order - Highly Confidential

CNA_BSA0002141
BSAPolicyEv-00015709
TrustApp0776

SB-146801-B
(Ed. 03/06)

"electronic data," but only if the "electronic data" is actually copied and replaced or restored.

**(d)** In the event that you are not able to copy "electronic data" from back-ups, or replace or restore, "electronic data" will be valued at your cost of labor up to the point in time that you reach that determination.

**(17)** The value of United States Government Internal Revenue taxes and custom duties and refundable state and local taxes paid or fully determined on the following property held for sale will not be considered in determining the value of Covered Property:

**(a)** Distilled spirits;

**(b)** Wines;

**(c)** Rectified products; or

**(d)** Beer.

**(18)** Lottery tickets at their initial cost to you except for winning tickets at their redeemed value.

**f.** Our payment for loss of or damage to personal property of others will only be for the account of the owners of the property. We may adjust losses with the owners of lost or damaged property, if other than you. If we pay the owners, such payments will satisfy your claims against us for the owners' property. We will not pay the owners more than their financial interest in the Covered Property.

**g.** We may elect to defend you against suits arising from claims of owners of property. We will do so at our expense.

**h.** We will pay for covered loss or damage within 30 days after we receive the sworn proof of loss provided you have complied with all of the terms of this policy; and

**(1)** We have reached agreement with you on the amount of loss; or

**(2)** An appraisal award has been made.

**i.** At our option, we may make a partial payment toward any claims, subject to the policy provisions and our normal adjustment process. To be considered for partial claim payment, you must submit a partial sworn proof of loss with supporting documentation. Any applicable policy deductibles must be satisfied before any partial payments are made.

**5. Loss Payment – Business Income and Extra Expense**

**a.** If the Declarations indicate that Business Income and Extra Expense applies to Buildings or Business Personal Property, the amount of Business Income loss will be determined based on:

**(1)** The Net Income of the business before the direct physical loss or damage occurred;

**(2)** The likely Net Income of the business if no physical loss or damage occurred, but not including any likely increase in Net Income attributable to an increase in the volume of business as a result if favorable business conditions caused by the impact of the Covered Cause of Loss on customers or on other businesses;

**(3)** The operating expenses, including payroll expenses, necessary to resume "operations" with the same quality of service that existed just before the direct physical loss or damage; and

**(4)** Other relevant sources of information, including:

**(a)** Your financial records and accounting procedures;

**(b)** Bills, invoices and other vouchers; and

**(c)** Deeds, liens or contracts.

**b.** The amount of Extra Expense will be determined based on:

**(1)** All reasonable and necessary expenses that exceed the normal operating expenses that would have been incurred by "operations" during the "period of restoration" if no direct physical loss or damage had occurred. We will deduct from the total of such expenses:

**(a)** The salvage value that remains of any property bought for temporary use during the "period of restoration," once "operations" are resumed; and

**(b)** Any Extra Expense that is paid for by other insurance, except for insurance that is written subject to the same plan, terms, conditions and provisions as this insurance; and

**(2)** All reasonable and necessary expenses that reduce the Business Income loss that otherwise would have been incurred.

MEDIATION – CONFIDENTIAL.
Subject to Protective Order - Highly Confidential

CNA_BSA0002142
BSAPolicyEv-00015710
TrustApp0777

SB-146801-B
(Ed. 03/06)

**6.** We will reduce the amount of your:

**(1)** Business Income loss, other than Extra Expense, to the extent you can resume your "operations," in whole or in part, by using damaged or undamaged property (including merchandise or "stock") at the described premises or elsewhere; or

**(2)** Extra Expense loss to the extent you can return "operations" to normal and discontinue such Extra Expense.

**7.** If you do not resume "operations," or do not resume "operations" as quickly as possible, we will pay based on the length of time it would have taken to resume "operations" as quickly as possible.

**8.** We will pay for covered loss or damage within 30 days after we receive your sworn proof of loss provided you have complied with all of the terms of this policy; and

**(1)** We have reached agreement with you on the amount of loss; or

**(2)** An appraisal award has been made.

**9. Vacancy**

**a. Description of Terms**

**(1)** As used in this Vacancy Condition, the term building and the term vacant have the meanings set forth in Paragraphs **(a)** and **(b)** below:

**(a)** When this policy is issued to a tenant, and with respect to that tenant's interest in Covered Property, building means the unit or suite rented or leased to the tenant. Such building is vacant when it does not contain enough business personal property to conduct customary operations.

**(b)** When this policy is issued to the owner or general lessee of a building, building means the entire building. Such building is vacant unless at least 31% of its total square footage is:

**(i)** Rented to a lessee or sub-lessee and used by the lessee or sub-lessee to conduct its customary operations; and/or

**(ii)** Used by the building owner to conduct customary operations.

**(2)** Buildings under construction or renovation are not considered vacant.

**b. Vacancy Provisions**

If the building where loss or damage occurs has been vacant for more than 60 consecutive days before that loss or damage occurs:

**(1)** We will not pay for any loss or damage caused by any of the following even if they are Covered Causes of Loss:

**(a)** Vandalism;

**(b)** Sprinkler leakage, unless you have protected the system against freezing;

**(c)** Building glass breakage;

**(d)** Water damage;

**(e)** Theft; or

**(f)** Attempted theft.

With respect to Covered Causes of Loss other than those listed in paragraphs **(1)(a)** through **(1)(f)** above, we will reduce the amount we would otherwise pay for the loss or damage by 15%.

**10. Recovered Property**

If either you or we recover any property after loss settlement, that party must give the other prompt notice. At your option, you may retain the property. But then you must return to us the amount we paid to you for the property. We will pay the recovery expenses and the expenses to repair the recovered property, subject to the applicable Limit of Insurance.

**11. Noncumulative Limit**

No Limit of Insurance cumulates from policy period to policy period.

**F. COMMERCIAL PROPERTY CONDITIONS**

**1. Concealment, Misrepresentation or Fraud**

This policy is void in any case of fraud by you a it relates to this policy at any time. It is also void if you or any other insured, at any time, intentionally conceal or misrepresent a material fact concerning:

**a.** This policy;

**b.** The Covered Property;

**c.** Your interest in the Covered Property; or

**d.** A claim under this policy.

**2. Control of Property**

Any act or neglect of any person other than you beyond your direction or control will not affect this insurance.



SB-146801-B
(Ed. 03/06)

MEDIATION – CONFIDENTIAL.
Subject to Protective Order - Highly Confidential

CNA_BSA0002143
BSAPolicyEv-00015711
TrustApp0778

SB-146801-B
(Ed. 03/06)

The breach of any condition of this Coverage Form at any one or more premises will not affect coverage at any premises where, at the time of loss or damage, the breach of condition does not exist.

**3. Insurance Under Two or More Coverages**

If two or more of this policy's coverages apply to the same loss or damage, we will not pay more than the actual amount of the loss or damage.

**4. Legal Action Against Us**

No one may bring a legal action against us under this Coverage Form unless:

**a.** There has been full compliance with all of the terms of this Coverage Form; and

**b.** The action is brought within 2 years after the date on which the direct physical loss or damage occurred.

**5. Liberalization**

If we adopt any revision that would broaden the coverage under this policy without additional premium within 45 days prior to or during the policy period, the broadened coverage will immediately apply to this policy.

**6. No Benefit to Bailee**

No person or organization, other than you, having custody of Covered Property will benefit from this insurance.

**7. Other Insurance**

**a.** You may have other insurance subject to the same plan, terms, conditions and provisions as the insurance under this Coverage Form. If you do, we will pay our share of the covered loss or damage. Our share is the proportion that the applicable Limit of Insurance under this Coverage Form bears to the Limits of Insurance of all insurance covering on the same basis.

**b.** If there is other insurance covering the same loss or damage, other than that described in Paragraph a. above, we will pay only for the amount of covered loss or damage in excess of the amount due from that other insurance, whether you can collect on it or not. But we will not pay more than the applicable Limit of Insurance.

**8. Policy Period, Coverage Territory**

Under this Coverage Form:

**a.** We cover loss or damage you sustain through acts committed or events occurring:

**(1)** During the policy period shown in the Declarations; and

**(2)** Within the coverage territory; and

**b.** The coverage territory is:

**(1)** The United States of America (including its territories and possessions);

**(2)** Puerto Rico; and

**(3)** Canada

**9. Transfer of Rights of Recovery Against Others To Us**

Applicable to the Businessowners Property coverage:

If any person or organization to or for whom we make payment under this policy has rights to recover damages from another, those rights are transferred to us to the extent of our payment. That person or organization must do everything necessary to secure our rights and must do nothing after loss to impair them. But you may waive your rights against another party in writing.

**a.** Prior to a loss to your Covered Property or Covered Income; or

**b.** After a loss to your Covered Property only if, at the time of loss, that party is one of the following:

**(1)** Someone insured by this insurance;

**(2)** A business firm:

**(a)** Owned or controlled by you; or

**(b)** That owns or controls you; or

**(3)** Your tenant.

This will not restrict your insurance.

**10. Coinsurance**

If a Coinsurance percentage is shown in the Declarations, the following condition applies.

**a.** We will not pay the full amount of any loss if the value of Covered Property at the time of loss multiplied by the Coinsurance percentage shown for it in the Declarations is greater than the Limit of Insurance for the property

Instead, we will determine the most we will pay using the following steps:

**(1)** Multiply the value of Covered Property at the time of loss by the Coinsurance Percentage;

**(2)** Divide the Limit of Insurance of the property by the figure determined in step **(1)**;

MEDIATION – CONFIDENTIAL.
Subject to Protective Order - Highly Confidential

CNA_BSA0002144
BSAPolicyEv-00015712
TrustApp0779

SB-146801-B
(Ed. 03/06)

**(3)** Multiply the total amount of the covered loss, before the application of any deductible, by the figure determined in step **(2)** above; and

**(4)** Subtract the deductible from the figure determined in step **(3)**

We will pay the amount determined in step **(4)** or the limit of insurance, whichever is less.

For the remainder, you will either have to rely on other insurance or absorb the loss yourself.

**Example No. 1 (Under Insurance):**

When:

| | |
|---|---|
| The value of the property is | $250,000 |
| The coinsurance percent for it is | 90% |
| The Limit of Insurance for it is | $112,500 |
| The Deductible is | $250 |
| The amount of loss is | $40,000 |

Step (1): $250,000 x 90% = $225,000 (the minimum amount of insurance to meet your Coinsurance requirements)

Step (2): $112,500/$225,000 = .50

Step (3): $40,000 x .50 = $20,000

Step (4): $20,000 - $250 = $19,750

We will pay no more than $19,750. The remaining $20,250 is not covered.

**Example No. 2 (Adequate Insurance):**

When:

| | |
|---|---|
| The value of the property is | $250,000 |
| The Coinsurance percentage for it is | 90% |
| The Limit of Insurance for it is | $225,000 |
| The Deductible is | $250 |
| The amount of loss is | $40,000 |

The minimum amount of insurance to meet your Coinsurance requirement is $225,000 ($250,000 x 90%).

Therefore, the Limit of Insurance in this Example is adequate and no penalty applies. We will pay no more than $39,750 ($40,000 amount of loss minus the deductible of $250).

**b.** Coinsurance does not apply to:

**(1)** "Money" and "securities";

**(2)** Additional Coverages;

**(3)** Coverage Extensions; or

**(4)** Loss or damage in any one occurrence totaling less than $2,500.

**11. Mortgageholders**

**a.** The term, mortgageholder, includes trustee.

**b.** We will pay for covered loss of or damage to buildings or structures to each mortgageholder shown in the Declarations in their order of precedence, as interests may appear.

**c.** The mortgageholder has the right to receive loss payment even if the mortgageholder has started foreclosure or similar action on the building or structure.

**d.** If we deny your claim because of your acts or because you have failed to comply with the terms of this Coverage Form, the mortgageholder will still have the right to receive loss payment if the mortgageholder:

**(1)** Pays any premium due under this Coverage Form at our request if you have failed to do so;

**(2)** Submits a signed, sworn proof of loss within 60 days after receiving notice from us of your failure to do so; and

**(3)** Has notified us of any change in ownership or occupancy or substantial change in risk known to the mortgageholder.

All of the terms of this Coverage Form will then apply directly to the mortgageholder.

**e.** If we pay the mortgageholder for any loss or damage and deny payment to you because of your acts or because you have failed to comply with the terms of this Coverage Form:

**(1)** The mortgageholder's rights under the mortgage will be transferred to us to the extent of the amount we pay; and

**(2)** The mortgageholder's rights to recover the full amount of the mortgageholder's claim will not be impaired.

At our option, we may pay to the mortgageholder the whole principal on the mortgage plus any accrued interest. In this event, your mortgage and note will be transferred to us and you will pay your remaining mortgage debt to us.



MEDIATION – CONFIDENTIAL.
Subject to Protective Order - Highly Confidential

CNA_BSA0002145
BSAPolicyEv-00015713

TrustApp0780

SB-146801-B
(Ed. 03/06)

**f.** If we cancel this policy we will give written notice to the mortgageholder at least:

  **(1)** 10 days before the effective date of cancellation if we cancel for your non-payment of premium; or

  **(2)** 30 days before the effective date of cancellation if we cancel for any other reason.

**g.** If we elect not to renew this policy, we will give written notice to the mortgageholder at least 10 days before the expiration date of this policy.

## G. PROPERTY DEFINITIONS

**1.** **"Banking Premises"** means the interior of that portion of any building which is occupied by a banking institution or similar safe depository.

**2.** **"Breakdown"**

  **a.** Means:

   **(1)** Failure of pressure or vacuum equipment;

   **(2)** Mechanical failure, including rupture or bursting caused by centrifugal force; or

   **(3)** Electrical failure including arcing;

   That causes physical damage to "covered equipment" and necessitates its repair or replacement; and

  **b.** Does not mean:

   **(1)** Malfunction, including but not limited to adjustment, alignment, calibration, cleaning or modification;

   **(2)** Leakage at any valve, fitting, shaft seal, gland packing, joint or connection;

   **(3)** Damage to any vacuum tube, gas tube, or brush;

   **(4)** Damage to any structure or foundation supporting the "covered equipment" or any of its parts;

   **(5)** Damage

**3.** **"Communication Supply Services"**

  **a.** Means property supplying communication services, including telephone, radio, microwave or television services to the described premises, such as:

   **(1)** Communication transmission lines, including fiber optic transmission lines;

   **(2)** Coaxial cables; and

   **(3)** Microwave radio relays, except satellites and;

  **b.** Does not mean overhead transmission lines.

**4.** **"Covered Equipment"**

  **a.** Means the following types of equipment:

   **(1)** Equipment designed and built to operate under internal pressure or vacuum other than weight of contents;

   **(2)** Electrical or mechanical equipment that is used in the generation, transmission or utilization of energy;

   **(3)** Fiber optic cable; and

   **(4)** Hoists and cranes;

  **b.** Does not mean any

   **(1)** "Electronic data processing equipment";

   **(2)** "Electronic media and data" or "electronic data";

   **(3)** Part of pressure or vacuum equipment that is not under internal pressure of its contents or internal vacuum;

   **(4)** Insulating or refractory material;

   **(5)** Pressure vessels and piping that are buried below ground and require the excavation of materials to inspect, remove, repair, or replace;

   **(6)** Structure, foundation, cabinet or compartment supporting or containing the "covered equipment" or part of the "covered equipment" including pen-stock, draft tube or well casing;

   **(7)** Vehicle, aircraft, self-propelled equipment or floating vessel, including any equipment mounted on or used solely with any vehicle, aircraft, self-propelled equipment or floating vessel;

   **(8)** Elevator or escalator, but not excluding any electrical machine or apparatus mounted on or used with this equipment; or

   **(9)** Equipment or any part of such equipment manufactured by you for sale.

**5.** **"Diagnostic Equipment"** means any:

  **a.** Equipment; or

  **b.** Apparatus;

  used solely for research, diagnostic, medical, surgical, therapeutic, dental or pathological purposes.

SB-146801-B
(Ed. 03/06)

MEDIATION – CONFIDENTIAL.
Subject to Protective Order - Highly Confidential

CNA_BSA0002146
BSAPolicyEv-00015714
TrustApp0781

SB-146801-B
(Ed. 03/06)

**6. "Electronic Data"**

  **a.** Means information reduced to an electronic format for processing with and storage in "electronic data processing equipment," software and programming records and instructions used for "electronic data processing equipment."

  **b.** Any reference to your "electronic data" means "electronic data" owned or licensed by you and stored on your "electronic data processing equipment."

  **c.** Does not mean "valuable papers and records."

**7. "Electronic Media and Data"**

  **a.** Means physical media on which "electronic data" is stored, and the "electronic data" stored thereon, including without limitation, hard or floppy disks, CD-ROMS, tapes, drives, cells, data processing devices or any other repositories used with electronically controlled equipment.

  **b.** Any reference to your "electronic media and data" means "electronic media and data" owned by you or controlled by you at the described premises.

  **c.** "Electronic media and data" does not mean any "valuable papers & records."

**8. "Electronic Data Processing Equipment"**

  **a.** Means any of the following equipment:

    **(1)** Computers, facsimile machines, word processors, multi-functional telephones and computer servers, and

    **(2)** Any component parts and peripherals of such equipment, including related surge protection devices.

  **b.** "Electronic data processing equipment" does not mean equipment used to operate production type of:

    **(1)** Machinery; or

    **(2)** Equipment.

  **a.** Any reference to your "electronic data processing equipment" means "electronic data processing equipment" used in your "operations" and controlled and operated by you, and includes any "electronic data processing equipment" controlled or operated by a third party on your behalf.

**9. "Employee(s)" means:**

  **a.** Any natural person:

    **(1)** While in your service (and for 30 days after termination of service); and

    **(2)** Whom you compensate directly by salary, wages or commissions; and

    **(3)** Whom you have the right to direct and control while performing services for you.

  **b.** Any natural person employed by an employment contractor while that person is subject to your direction and control and performing services for you excluding, however, any such person while having care and custody of property outside the premises.

  **c.** Your directors or trustees while acting as a member of any of your elected or appointed committees to perform on your behalf specific, as distinguished from general, directorial acts.

But "employee" does not mean any agent, broker, factor, commission merchant, consignee, independent contractor or representative of the same general character.

**10. "Employee Dishonesty"** means only dishonest acts, committed by an "employee," whether identified or not, acting alone or in collusion with other persons, except you, a partner, a "member" or a "manager" with the manifest intent to:

  **a.** Cause you to sustain loss; and also

  **b.** Obtain financial benefit (other than salaries, commissions, fees, bonuses, promotions, awards, profit sharing, pensions or other employee benefits earned in the normal course of employment) for:

    **(1)** The "employee;" or

    **(2)** Any person or organization intended by the "employee" to receive that benefit.

**11. "Fine Arts"**

  **a.** Means paintings, etchings, pictures, tapestries, art glass windows, valuable rugs, statuary, marbles, bronzes, antique furniture, rare books, antique silver, porcelains, rare glass, bric-a-brac, and similar property with historical value, or artistic merit; and

  **b.** Does not mean any glass that is a part of a building or structure.

**12. "Forgery"** means the signing of the name of another person or organization with intent to deceive. "Forgery" does not mean a signature which consists in whole or in part of one's own name signed with or without authority, in any capacity for any purpose.

**13. "Interior of any building or structure"** as used in this policy means all portions of the structure that

SB-146801-B
(Ed. 03/06)

MEDIATION – CONFIDENTIAL.
Subject to Protective Order - Highly Confidential

CNA_BSA0002147
BSAPolicyEv-00015715

TrustApp0782

SB-146801-B
(Ed. 03/06)

are within the exterior skin of the structure's walls and roof, including, but not limited to lathe, sand paper, framing, wallboard and tarpaper.

14. **"Maintenance Fees"** means the regular payment made to you by unit-owners and used to service the common property.

15. **"Manager"** means a person serving in a directorial capacity for a limited liability company.

16. **"Member"** means an owner of a limited liability company represented by its membership interest, who also may serve as a "manager."

17. **"Money"** means currency and coins in current use, bank notes, travelers checks, register checks and money orders held for sale to the public.

18. **"Operations"** means the type of your business activities occurring at the described premises and tenantability of the described premises.

19. **"Period of restoration"** means the period of time that:

   a. Begins with the date of direct physical loss or damage caused by or resulting from any Covered Cause of Loss at the described premises; and

   b. Ends on the earlier of:

      (1) The date when the property at the described premises should be repaired, rebuilt or replaced with reasonable speed and similar quality; or

      (2) The date when business is resumed at a new permanent location.

   "Period of restoration" does not include any increased period required due to the enforcement of any law that:

      (a) Regulates the construction, use or repair, or requires the tearing down of any property; or

      (b) Regulates the prevention, control, repair, clean-up or restoration of environmental damage.

   The expiration date of this policy will not cut short the "period of restoration."

20. **"Pollutants"** means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals, waste, and any unhealthful or hazardous building materials (including but not limited to asbestos and lead products or materials containing lead.). Waste includes materials to be recycled, reconditioned or reclaimed.

21. **"Power Generating Equipment"**

   a. Means the following types of equipment or apparatus:

      (1) Pressure;

      (2) Mechanical; or

      (3) Electrical;

      Used in or associated with the generation of electrical power; and

   b. Does not mean such equipment that is used solely to generate emergency power that is less than or equal to 1000KW

22. **"Power Supply Services"**

   a. Means the following types of property supplying electricity, steam or gas to the described premises:

      (1) Utility generating plants;

      (2) Switching stations;

      (3) Substations;

      (4) Transformers; and

      (5) Transmission Lines; and

   b. Does not mean overhead transmission lines.

23. **"Production Equipment"**

   a. Means any:

      (1) Production machinery; or

      (2) Process machinery that processes, shapes, forms or grinds:

         (i) Raw materials;

         (ii) Materials in process; or

         (iii) Finished products; and

   b. Includes "covered equipment" that is used solely with or forms an integral part of the:

      (1) Production;

      (2) Process; or

      (3) Apparatus.

24. **"Rental Value"** means Business Income that consist of:

   a. Net income (Net Profit or Loss before income taxes) that would have been earned or incurred as rental income from tenant occupancy of the premises described in the Declarations as furnished and equipped by you, including the fair rental value of any portion of the described premises which is occupied by you; and

MEDIATION – CONFIDENTIAL.
Subject to Protective Order - Highly Confidential

CNA_BSA0002148
BSAPolicyEv-00015716
TrustApp0783



b. Continuing normal operating expenses incurred in connection with that premises, including:

    **(1)** Payroll; and

    **(2)** The amount of charges which are the legal obligation of the tenant(s) but would otherwise be your obligations.

**25. "Securities"** means negotiable and nonnegotiable instruments or contracts representing either "money" or other property and includes :

    **a.** Tokens, tickets except lottery tickets, revenue and other non-postage stamps whether or not in current use; and

    **b.** Evidences of debt issued in connection with credit or charge cards, which are not of your own issue;

but does not include "money." Lottery tickets held for sale are not securities.

**26. "Specified causes of loss"** means the following:

Fire; lightning; explosion; windstorm or hail; smoke; aircraft or vehicles; riot or civil commotion; vandalism; leakage from fire extinguishing equipment; sinkhole collapse; volcanic action; falling objects; weight of snow, ice or sleet; water damage.

    **a.** Sinkhole collapse means the sudden sinking or collapse of land into underground empty spaces created by the action of water on limestone or dolomite. This cause of loss does not include:

        **(1)** The cost of filling sinkholes; or

        **(2)** Sinking or collapse of land into man-made underground cavities.

    **b.** Falling objects does not include loss of or damage to:

        **(1)** Personal Property in the open; or

        **(2)** The interior of a building or structure, or property inside a building or structure, unless the roof or an outside wall of the building or structure is first damaged by a falling object.

    **c.** Water damage means accidental discharge or leakage of water or steam as the direct result of the breaking apart or cracking of any part of a system or appliance (other than a sump system including its related equipment and parts) containing water or steam.

**27. "Stock"** means merchandise held in storage or for sale, raw materials and in-process or finished goods, including supplies used in their packing or shipping.

**28. "Suspension"** means:

    **a.** The partial or complete cessation of your business activities; or

    **b.** That a part or all of the described premises is rendered untenantable.

**29. "Theft"** means any act of stealing.

**30. "Vacant"** means the following

    **a.** When this policy is issued to a tenant, and with respect to that tenant's interest in Covered Property, building means the unit or suite rented or leased to the tenant. Such building is vacant when it does not contain enough business personal property to conduct customary operation.

    **b.** When this policy is issued to the owner or general lessee of a building, building means the entire building. Such building is vacant unless at least 31% of its total square footage is:

        **(1)** Rented to a lessee or sub-lessee and used by the lessee or sub-lessee to conduct its customary operations; and/or

        **(2)** Used by the building owner to conduct customary operations.

**31. "Valuable papers and records"** means inscribed, printed or written:

    **a.** Documents;

    **b.** Manuscripts; and

    **c.** Records;

Including abstracts, books, deeds, drawings, films, maps or mortgages.

But "valuable papers and records" does not mean:

    **a.** "Money" or securities";

    **b.** "Electronic data";

    **c.** "Electronic media and data";

**32. "Water Supply Services"** means the following types of property supplying water to the described premises:

    **a.** Pumping stations; and

    **b.** Water mains.

**H. MALICIOUS CODE, SYSTEM PENETRATION AND DENIAL OF SERVICE DEFINITIONS:**

    **1.** **"Denial of Service"** means any failure or inability of any person, user, customer, "electronic data processing equipment," computer system or computer network to communicate with, gain access to, or use, any "electronic data processing

MEDIATION – CONFIDENTIAL.
Subject to Protective Order - Highly Confidential

CNA_BSA0002149
BSAPolicyEv-00015717
TrustApp0784

equipment," computer system, computer network, "electronic media and data" or "electronic data" because an excessive volume of data, requests or communications is sent to, received by or processed by such "electronic data processing equipment," computer system or computer network, and depletes the bandwidth, capacity or computational resources thereof, including without limitation, any business interruption caused by the foregoing.

2. **"Electronic Data Peril" means:**

    **a.** Corruption, unauthorized use, distortion, deletion, damage, destruction or any other harm to, or misappropriation or copying of, "electronic data" or information;

    **b.** Interruption, delay, disruption, suspension, loss of functionality of, inaccessibility to, unauthorized access to or inability to use or communicate with, "electronic data processing equipment," "electronic media and data," "electronic data," computer resources, electronic devices, computer system, computer network or equipment; or

    **c.** Misappropriation, transfer or copying of any property, "money," "securities" or "stock," including without limitation, the use of any computer to cause such misappropriation, transfer or copying;

3. **"Malicious Code"** means any data, computer program, software, firmware or computer code designed to cause or result in, or that does cause or result in (whether designed to do so or not), any "electronic data peril," including without limitation, computer viruses, worms or Trojan horses.

4. **"Mass Attack Malware"** means any "malicious code":

    **a.** Capable of replicating or mutating;

    **b.** Propagating, spreading or moving to other "electronic data processing equipment," "electronic media and data," "electronic data," electronic devices, media, computer systems, equipment or computer networks, including without limitation, by attaching to applications, e-mails, e-mail attachments or otherwise;

    **c.** Designed to exploit a vulnerability that is common to or present on more than one "electronic data processing equipment," "electronic media and data," "electronic data," electronic devices, media, computer systems, equipment or computer networks; or

    **d.** That infects, is stored upon, exists within or resides on more than one "electronic data processing equipment," "electronic media and data," "electronic data," electronic device,

media, computer system, equipment or computer network.

5. **"Mass System Penetration"** means any "system penetration" that:

    **a.** Exploits, or is designed to exploit, a vulnerability that is common to or present on more than one "electronic data processing equipment," "electronic media and data," "electronic data," electronic devices, media, computer systems, equipment or computer networks; or

    **b.** Targets or exploits more than one "electronic data processing equipment," "electronic media and data," "electronic data," electronic device, media, computer system, equipment or computer network.

6. **"System Penetration"** means any access to or use of any "electronic data processing equipment," "electronic media and data," "electronic data," electronic device, computer system, equipment or computer network intended to cause or result in, or that does cause or result in, any "electronic data peril," which is not directly or indirectly enabled by "malicious code" and which is achieved by a person without the use or assistance, directly or indirectly, of "malicious code."

7. **"Targeted Hacker Attack"** means the corruption, distortion, damaging, deletion or destruction of your "electronic data" resulting from "targeted system penetration" or "targeted malware."

8. **"Targeted Malware"** means any "malicious code" that:

    **a.** Is intended by a hacker to specifically infect, or be stored or reside on, only your "electronic data processing equipment";

    **b.** Is incapable of replicating, mutating, propagating, spreading or moving to other "electronic data processing equipment," "electronic media and data," "electronic data," electronic devices, media, computer systems or computer networks;

    **c.** Does not infect or reside on any other "electronic data processing equipment," "electronic media and data," "electronic data," computer system, electronic device, or computer network that is not yours; and

    **d.** Exploits a vulnerability that is unique to, and present on, only your "electronic data processing equipment," and such vulnerability is not common to or present on any other "electronic data processing equipment," computer, electronic device, medium,

MEDIATION – CONFIDENTIAL.
Subject to Protective Order - Highly Confidential

CNA_BSA0002150
BSAPolicyEv-00015718

TrustApp0785

computer system, equipment or computer network.

9. **"Targeted System Penetration"** means "system penetration" that is designed to target and exploit, and that does target and exploit, a vulnerability that is unique to, and present on, only your "electronic data processing equipment," and such vulnerability is not common to or present on any other "electronic data processing equipment," computer, electronic device, medium, computer system, equipment or computer network.



MEDIATION – CONFIDENTIAL.
Subject to Protective Order - Highly Confidential

CNA_BSA0002151
BSAPolicyEv-00015719

TrustApp0786



SB-146802-B
(Ed. 03/06)

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## BUSINESS INCOME AND EXTRA EXPENSE

This endorsement modifies insurance provided under the following:

BUSINESSOWNERS SPECIAL PROPERTY COVERAGE FORM

The following coverage is added to your Businessowners Special Property Coverage Form under Paragraph **A.** Coverage.

**Business Income and Extra Expense**

Business Income and Extra Expense is provided at the premises described in the Declarations when the Declarations show that you have coverage for Business Income and Extra Expense.

### 1. Business Income

  **a.** Business Income means:

    (1) Net Income (Net Profit or Loss before Income taxes) that would have been earned or incurred, including :

      **(a)** "Rental Value"; and

      **(b)** "Maintenance Fees", if you are a condominium association; and

    (2) Continuing normal operating expenses incurred, including payroll.

  **b.** We will pay for the actual loss of Business Income you sustain due to the necessary "suspension" of your "operations" during the "period of restoration". The "suspension" must be caused by direct physical loss of or damage to property at the described premises. The loss or damage must be caused by or result from a Covered Cause of Loss. With respect to loss of or damage to personal property in the open or personal property in a vehicle, the described premises include the area within 1,000 feet of the site at which the described premises are located.

  **c.** With respect to the requirements set forth in Paragraph **b.** above, if you rent, lease or occupy only part of the site at which the described premises are located, the described premises means:

    **(1)** The portion of the building which you rent, lease or occupy; and

    **(2)** Any area within the building or on the site at which the described premises are located, if that area services, or is used to gain access to, the described premises.

### 2. Extra Expense

  **a.** Extra Expense means reasonable and necessary expenses you incur during the "period of restoration" that you would not have incurred if there had been no direct physical loss of or damage to property caused by or resulting from a Covered Cause of Loss.

  **b.** We will pay Extra Expense (other than the expense to repair or replace property) to:

    **(1)** Avoid or minimize the "suspension" of business and to continue "operations" at the described premises or at replacement premises or temporary locations, including relocation expenses and costs to equip and operate the replacement premises or temporary locations; or

    **(2)** Minimize the "suspension" of business if you cannot continue "operations".

  **c.** We will also pay Extra Expense (including Expediting Expenses) to repair or replace the property, but only to the extent it reduces the amount of loss that otherwise would have been payable under Paragraph **1.** Business Income above.

### 3. Extended Business Income

If the necessary "suspension" of your "operations" produces a Business Income loss payable under Paragraph **1.** Business Income above, we will also pay for the actual loss of Business Income you sustain during the period that:

  **a.** Begins on the date property is actually repaired, rebuilt or replaced and "operations" are resumed; and

  **b.** Ends on the earlier of:

    **(1)** The date you could restore your "operations" with reasonable speed, to the level which would generate the Business Income amount that would have existed if no direct physical loss or damage occurred; or

    **(2)** Sixty consecutive days after the date determined in paragraph **(1)** above.

However, this extended Business Income does not apply to loss of Business Income incurred as a result of unfavorable business

SB-146802-B
(Ed. 03/06)

Page 1 of 2
(Version 1.0)

MEDIATION – CONFIDENTIAL.
Subject to Protective Order - Highly Confidential

CNA_BSA0002152
BSAPolicyEv-00015720
TrustApp0787

SB-146802-B
(Ed. 03/06)

conditions caused by the impact of the Covered Cause of loss in the area where the described premises are located.

4.  If the Declarations show for Business Income and Extra Expense:

    a.  Actual loss sustained for 12 consecutive months, then we will pay for loss of Business Income and Extra Expense that occurs within 12 consecutive months following the date of direct physical loss or damage; or

    b.  Actual loss up to 12 consecutive months subject to a maximum dollar limit, then we will pay for loss of Business Income and Extra Expense that occurs within 12 consecutive months following the date of direct physical loss or damage, subject to the limit shown in any one occurrence.

5.  "Electronic Data Processing Equipment" and "Electronic Media and Data"

    a.  "Electronic data processing equipment" and "electronic media and data" shall be considered covered property as referenced in this Coverage Part.

    b.  We shall not be liable for any payment for the Extra Expense you incur, and loss of Business Income you sustain, during the first 12 hours following the start of a necessary "suspension" of your "operations" during the "period of restoration" that is caused by direct physical loss of or damage to "electronic data processing equipment" or "electronic data and media" at the described premises; provided, however, if the Business Income And Extra Expense – 72 Hour Deductible endorsement is part of this policy, the 72 hour deductible stated in that endorsement shall apply with respect to this sub-paragraph **5.b.(2)** instead of the 12 hour deductible set forth above.



30020004020677307408813

SB-146802-B
(Ed. 03/06)

MEDIATION – CONFIDENTIAL.
Subject to Protective Order - Highly Confidential

CNA_BSA0002153
BSAPolicyEv-00015721
TrustApp0788



SB-146803-A
(Ed. 01/06)

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## SEASONAL INCREASE

This endorsement modifies insurance provided under the following:

BUSINESSOWNERS SPECIAL PROPERTY COVERAGE FORM

The following coverage is added to your Businessowners Special Property Coverage Form:

Subject to the Exclusions, Conditions and Limitations of this policy, you may extend this insurance as indicated below.

Unless otherwise stated, payments made under the following coverage will not increase the applicable Limits of Insurance.

1. The Limit of Insurance for Business Personal Property shown in the Declarations will automatically increase by 25%, or the amount shown in the Declarations to provide for seasonal variations.

2. This increase will apply only if the Limit of Insurance shown for Business Personal Property in the Declarations is at least 100% of your average monthly values during the lesser of:

   a. The 12 months immediately preceding the date of the loss or damage occurs; or

   b. The period of time you have been in business at the location where the loss or damage occurs, on the date the loss or damage occurs.

SB-146803-A
(Ed. 01/06)

Page 1 of 1



SB-146804-A
(Ed. 01/06)

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## ARSON & THEFT REWARD

This endorsement modifies insurance provided under the following:

BUSINESSOWNERS SPECIAL PROPERTY COVERAGE FORM

The following coverage is added to your Businessowners Special Property Coverage Form under Section **A.5. Additional Coverages.**

Unless otherwise stated, payments made under the following Additional Coverage is in addition to the applicable Limits of Insurance.

**Arson and Theft Reward**

1.  We will pay for reasonable expenses you incur for rewards that lead to:

    a.  An arson conviction in connection with a covered fire or explosion loss; or

    b.  A "theft" conviction in connection with a covered "theft" loss.

2.  The most we will pay under this Additional Coverage in connection with a particular loss is $5,000.



SB-146804-A
(Ed. 01/06)

Page 1 of 1

CNA_BSA0002155
BSAPolicyEv-00015723
TrustApp0790



SB-146805-A
(Ed. 01/06)

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## CLAIM DATA EXPENSE

This endorsement modifies insurance provided under the following:

BUSINESSOWNERS SPECIAL PROPERTY COVERAGE FORM

The following coverage is added to your Businessowners Special Property Coverage under Section **A.5. Additional Coverages**:

Unless otherwise stated, payments made under the following Additional Coverage is in addition to the applicable Limit of Insurance.

Claim Data Expense

1. We will pay the reasonable expenses you incur in preparing claim data when we require such data to show the extent of loss. This includes the cost of taking inventories, making appraisals, preparing income statements, and preparing other documentation.

2. Under this Additional Coverage, we will not pay for:

    a. Any expenses incurred, directed or billed by or payable to attorneys, insurance adjusters or their associates or subsidiaries;

    b. Any costs in connection with Paragraph **E.2.** Appraisal; or

    c. Any expenses incurred, directed, or billed by or payable to insurance brokers or agents, or their associates or subsidiaries, without our written consent prior to such expenses being incurred.

3. The most we will pay for preparation of claim data under this Additional Coverage in any one occurrence is $5,000 regardless of the number of premises involved.

SB-146805-A
(Ed. 01/06)

MEDIATION – CONFIDENTIAL.
Subject to Protective Order - Highly Confidential

CNA_BSA0002156
BSAPolicyEv-00015724
TrustApp0791



SB-146806-A
(Ed. 01/06)

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## DEBRIS REMOVAL

This endorsement modifies insurance provided under the following:

BUSINESSOWNERS SPECIAL PROPERTY COVERAGE FORM

The following coverage is added to your Businessowners Special Property Coverage Form under Paragraph **A.5. Additional Coverages.**

Unless otherwise stated, payments made under the following Additional Coverage is in addition to the applicable Limit of Insurance.

**Debris Removal**

1. We will pay your expense to remove debris of Covered Property, other than outdoor trees, shrubs, plants and lawns as described in the Outdoor Trees, Shrubs, Plants and Lawns Coverage Extension, caused by or resulting from a Covered Cause of Loss that occurs during the policy period. The expenses will be paid only if they are reported to us within 180 days of the date of direct physical loss or damage

2. Debris Removal does not apply to costs to:

   a. Extract "pollutants" from land or water; or

   b. Remove, restore or replace polluted land or water.

3. Except as provided in Paragraph **4.** below, payment for Debris Removal is included within the applicable Limit of Insurance shown in the Declarations. The most we will pay under this Additional Coverage is 25% of:

   a. The amount we pay for the direct physical loss or damage to Covered Property; plus

   b. The deductible in this Coverage Form applicable to that loss or damage.

4. When the debris removal expense exceeds the 25% limitation in Paragraph **3.** above or when the sum of the debris removal expense and the amount we pay for the direct physical loss of or damage to Covered Property exceeds the applicable Limit of Insurance, we will pay up to an additional $25,000 for debris removal expense in any one occurrence, at each described premises.



SB-146806-A
(Ed. 01/06)

Page 1 of 1

MEDIATION – CONFIDENTIAL.
Subject to Protective Order - Highly Confidential

CNA_BSA0002157
BSAPolicyEv-00015725
TrustApp0792

**CNA**

SB-146807-A
(Ed. 01/06)

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## EMPLOYEE DISHONESTY

This endorsement modifies insurance provided under the following:

BUSINESSOWNERS SPECIAL PROPERTY COVERAGE FORM

The following coverage is added to your Businessowners Special Property Coverage Form under Paragraph **A.5. Additional Coverages**:

Unless otherwise stated, payments under the following Additional Coverage is in addition to the applicable Limit of Insurance.

**Employee Dishonesty**

1. We will pay for loss of or damage to Business Personal Property resulting directly from "Employee Dishonesty."

   We will pay for loss or damage you sustain through acts committed or events occurring during the Policy Period. Regardless of the number of years this insurance remains in force or the number of premiums paid, no Limit of Insurance cumulates from year to year or period to period.

2. Paragraphs **B.2.h.** and **B.2.o.** do not apply to this Additional Coverage.

3. We will not pay for loss resulting from the dishonest acts of any "employee" if coverage for that "employee" was either cancelled or excluded from any previous insurance of yours providing "employee dishonesty" coverage.

4. This Additional Coverage is cancelled as to any "employee immediately upon discovery by:

   a. You; or

   b. Any of your partners, "members," "managers," officers, directors or trustees not in collusion with the "employee,"

   of any fraudulent dishonest act committed by that "employee" before or after being employed by you.

5. We will pay for covered loss or damage only if discovered no later than one year from the end of the Policy Period.

6. The most we will pay for loss under this Additional Coverage in any one occurrence is the limit shown on the Declarations regardless of the number of premises involved.

7. With respect to this Additional Coverage, occurrence means all loss or damage caused by or involving the same "employee(s)" whether the result of a single act or series of acts.

8. If, during the period of any prior "Employee Dishonesty" insurance, you (or any predecessor in interest) sustained loss or damage that you could have recovered under that insurance, except that the time within which to discover loss or damage has expired, we will pay for it under this Additional Coverage, subject to the following:

   a. This insurance became effective at the time of cancellation or termination of the prior insurance; and

   b. The loss or damage would have been covered by this insurance had it been in effect when the acts or events causing the loss or damage were committed or occurred.

9. The insurance provide under paragraph **8.** above is part of, not in addition to the Limit of Insurance described in Paragraph **6.** above and is limited to the lesser of the amount recoverable under:

   a. This Additional Coverage, as of its effective date; or

   b. The prior "Employee Dishonesty" insurance, had it remained in effect.

SB-146807-A
(Ed. 01/06)

Page 1 of 1

MEDIATION – CONFIDENTIAL.
Subject to Protective Order - Highly Confidential



SB-146808-A
(Ed. 01/06)

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## EXPEDITING EXPENSES

This endorsement modifies insurance provided under the following:

BUSINESSOWNERS SPECIAL PROPERTY COVERAGE FORM

The following coverage is added to your Businessowners Special Property Coverage Form under Paragraph **A.5. Additional Coverages.**

Unless otherwise stated, payments made under the following Additional Coverage is in addition to the applicable Limits of Insurance.

**Expediting Expenses**

1. In the event of direct physical loss of or damage to Covered Property caused by or resulting from a Covered Cause of Loss, we will pay for the reasonable and necessary additional expenses you incur to make temporary repairs, expedite permanent repairs, or expedite permanent replacement, at the premises sustaining loss or damage. Expediting expenses include overtime wages and the extra cost of express or other rapid means of transportation. Expediting expenses do not include expenses you incur for the temporary rental of property or temporary replacement of damaged property.

2. With respect to this Additional Coverages, "breakdown" to "covered equipment" will not be considered a Covered Cause of Loss, even if otherwise covered elsewhere in this Policy.

3. The most we will pay under this Additional Coverage in any one occurrence is $25,000, regardless of the number of premises involved.



SB-146808-A
(Ed. 01/06)

Page 1 of 1

MEDIATION – CONFIDENTIAL.
Subject to Protective Order - Highly Confidential

CNA_BSA0002159
BSAPolicyEv-00015727
TrustApp0794

**CNA**

SB-146809-A
(Ed. 01/06)

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## FINE ARTS

This endorsement modifies insurance provided under the following:

BUSINESSOWNERS SPECIAL PROPERTY COVERAGE FORM

The following coverage is added to your Businessowners Special Property Coverage Form under Paragraph **A.5.** Additional Expenses.

Unless otherwise stated, payments made under the following Additional Coverage is in addition to the applicable Limits of Insurance.

**Fine Arts**

1. When a Limit of Insurance is shown in the Declarations for Building or Business Personal Property at any described premises, we will pay for direct physical loss of or damage to "fine arts" which are owned by:

   **a.** You; or

   **b.** Others and in your care, custody or control;

   caused by or resulting from a Covered Cause of Loss, including while on exhibit, anywhere within the Coverage Territory.

2. The breakage limitation under Paragraph **A.5.b.(2)** does not apply to this Additional Coverage.

3. The following exclusions apply to this Additional Coverage:

   **a.** We will not pay for loss or damage caused by or resulting from wear and tear, any quality in the property that causes it to damage or destroy itself, gradual deterioration, insects, birds, rodents or other animals;

   **b.** We will not pay for loss or damage caused by or resulting from dampness or dryness of

   atmosphere, or changes in extremes of temperature;

   **c.** We will not pay for loss or damage cause by or resulting from any repairing, restoration or retouching process;

   **d.** We will not pay for loss or damage caused by or resulting from faulty packing;

   **e.** Paragraph **B.1.b.** Earth Movement;

   **f.** Paragraph **B.1.c.** Governmental Action;

   **g.** Paragraph **B.1.d.** Nuclear Hazard;

   **h.** Paragraph **B.1.f.** War and Military;

   **i.** Paragraph **B.1.g.** Water;

   **j.** Paragraph **B.1.h.** Neglect; and

   **k.** Paragraph **B.2.g.** Frozen Plumbing.

   No other exclusions in Paragraph **B.** Exclusions apply to this Additional Coverage. However, if any exclusions are added by endorsement to this policy, such exclusions will apply to this Additional Coverage.

4. The most we pay for loss or damage under this Additional Coverage in any one occurrence is $25,000, or the amount shown in the Declarations for "fine arts," whichever is greater. This limit applies regardless of the number of premises involved.

SB-146809-A
(Ed. 01/06)

Page 1 of 1

CNA_BSA0002160
BSAPolicyEv-00015728
TrustApp0795



SB-146810-A
(Ed. 01/06)

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## FIRE DEPARTMENT SERVICE CHARGE

This endorsement modifies insurance provided under the following:

BUSINESSOWNERS SPECIAL PROPERTY COVERAGE FORM

The following coverage is added to your Businessowners Special Property Coverage Form under Paragraph **A.5.** Additional Coverages.

Unless otherwise stated, payments made under this following Additional Coverage is in addition to the applicable Limit of Insurance.

When the fire department is called to save or protect Covered Property from a Covered Cause of loss, we will pay up to $25,000 for your liability for fire department service charges:

1.  Assumed by contract or agreement prior to loss; or

2.  Required by local ordinance.



SB-146810-A
(Ed. 01/06)

MEDIATION – CONFIDENTIAL.
Subject to Protective Order - Highly Confidential

CNA_BSA0002161
BSAPolicyEv-00015729
TrustApp0796



SB-146811-A
(Ed. 01/06)

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## FIRE PROTECTIVE EQUIPMENT DISCHARGE

This endorsement modifies insurance provided under the following:

BUSINESSOWNERS SPECIAL PROPERTY COVERAGE FORM

The following coverage is added to your Businessowners Special Property Coverage Form under Paragraph **A.5.** Additional Coverages.

Unless otherwise stated, payments made under the following Additional Coverage is in addition to the Applicable Limits of Insurance.

  1. If fire protective equipment discharges accidentally or to control a Covered Cause of Loss, **we** will pay **your** cost to:

  a. Refill or recharge the system with the extinguishing agents that were discharged; and

  b. Replace or repair faulty valves or controls which caused the discharge.

  2. The most **we** will pay under this Additional Coverage in any one occurrence is $10,000, regardless of the number of premises involved.

SB-146811-A
(Ed. 01/06)

MEDIATION – CONFIDENTIAL.
Subject to Protective Order - Highly Confidential

CNA_BSA0002162
BSAPolicyEv-00015730
TrustApp0797

**CNA**

SB-146812-A
(Ed. 01/06)

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## FORGERY AND ALTERATION

This endorsement modifies insurance provided under the following:

BUSINESSOWNERS SPECIAL PROPERTY COVERAGE FORM

The following coverage is added to your Businessowners Special Property Coverage Form under Paragraph **A.5.** Additional Coverages.

Unless otherwise stated, payment made under the following Additional Coverage is in addition to the applicable Limits of Insurance.

**Forgery and Alteration**

1. We will pay for loss resulting directly from "forgery" or alteration of checks, drafts, promissory notes, or similar written promises, orders or directions to pay a sum certain in money that are made or drawn by one acting as an agent or purported to have been so made or drawn.

   We will consider signatures that are produced or reproduced electronically, mechanically or by facsimile the same as handwritten signatures.

   We will pay for loss that you sustain through acts committed or events occurring during the Policy Period. Regardless of the number of years this insurance remains in force or the number of premiums paid, no Limit of Insurance cumulates from year to year or period to period.

2. We will not pay for loss resulting from any dishonest or criminal acts committed by your or any of your partners, "employees," "members," "managers," officers, directors or trustees whether acting alone or in collusion with other persons.

3. We will pay for covered loss discovered no later than one year from the end of the Policy Period.

4. The most we will pay for loss under this Additional Coverage in any one occurrence is the limit shown on the Declarations regardless of the number of premises involved.

5. With respect to this Additional Coverage, occurrence means all loss caused by any person, or in which that person is concerned or implicated, either resulting from a single act or any number of such acts, whether the loss involves one or more instruments.

6. If, during the period of any prior Forgery or Alteration insurance, you (or any predecessor in interest) sustained loss or damage that you could have recovered under that insurance, except that the time within which to discover loss or damage has expired, we will pay for it under this Additional Coverage provided:

   **a.** This insurance became effective at the time of cancellation or termination of the prior insurance; and

   **b.** The loss would have been covered by this insurance had it been in effect when the acts or events causing the loss were committed or occurred.

7. The insurance provided under Paragraph **6.** above is part of, and not in addition to the limit described in Paragraph **4.** above and is limited to the lesser of the amount recoverable under:

   **a.** This Additional Coverage up to the applicable Limit of Insurance under this Policy, as of its effective date; or

   **b.** The prior Forgery or Alteration insurance, had it remained in effect.

8. If you are sued for refusing to pay any covered instrument described in Paragraph **1.** above on the basis that it has been forged or altered, and you have our written consent to defend against the suit, we will pay any reasonable legal expenses that you incur and pay in that defense. The amount we pay for these legal expenses will be part of and not in addition to the limit described in Paragraph **4.** above.



SB-146812-A
(Ed. 01/06)

Page 1 of 1

MEDIATION – CONFIDENTIAL.
Subject to Protective Order - Highly Confidential

CNA_BSA0002163
BSAPolicyEv-00015731
TrustApp0798

**CNA**

SB-146813-A
(Ed. 01/06)

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# NEWLY ACQUIRED OR CONSTRUCTED PROPERTY

This endorsement modifies insurance provided under the following:

BUSINESSOWNERS SPECIAL PROPERTY COVERAGE FORM

The following coverage is added to your Businessowners Special Property Coverage Form under Paragraph **A.5. Additional Coverages.**

Unless otherwise stated, payments made under the following Additional Coverage is in addition to the applicable Limits of Insurance.

Newly Acquired or Constructed Property

**1. Buildings**

**a.** We will pay for direct physical loss of or damage to the following property caused by or resulting from a Covered Cause of Loss:

**(1)** Your:

**(a)** New buildings while being built on a premises shown in the Declarations;

**(b)** New buildings while being built on newly acquired premises; and

**(i)** intended for similar use as a building described in the Declarations; or

**(ii)** used as a warehouse

**(c)** Materials, equipment, supplies and temporary structures used in connection with such buildings while they are being built; or

**(2)** Buildings you acquire by purchase or lease at any premises, including those premises shown in the Declarations.

**b.** The most we will pay for loss of or damage to newly constructed buildings or newly acquired buildings under this Additional Coverage in any one occurrence is $500,000 at each premises.

**2. Business Personal Property**

**a.** When a Limit of Insurance is shown in the Declarations for Business Personal Property at any described premises, we will pay for direct physical loss of or damage to the following property caused by or resulting from a Covered Cause of Loss:

**(1)** Business Personal Property, including such property that you newly acquire, at a building you acquire by purchase or lease at any premises, including those premises shown in the Declarations; and

**(2)** Business Personal Property that you newly acquire at a described premises.

**b.** The most we will pay for loss of or damage to Business Personal Property under this Additional Coverage in any once occurrence is $250,000 at each premises.

**3. Period of Coverage**

**a.** With respect to insurance under this Additional Coverage, coverage will end when any of the following first occurs:

**(1)** This policy expires;

**(2)** 180 days expire after you acquire the property or begin to construct the property;

**(3)** You report values to us; or

**(4)** The property is more specifically insured.

**b.** We will charge you additional premium for values reported to us from the date construction begins or you acquire the property.

SB-146813-A
(Ed. 01/06)

Page 1 of 1

MEDIATION – CONFIDENTIAL.
Subject to Protective Order - Highly Confidential

CNA_BSA0002164
BSAPolicyEv-00015732
TrustApp0799

**CNA**

SB-146814-A
(Ed. 01/06)

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# ORDINANCE OR LAW

This endorsement modifies insurance provided under the following:

BUSINESSOWNERS SPECIAL PROPERTY COVERAGE FORM

The following coverage is added to your Businessowners Special Property Coverage Form under Section **A.5. Additional Coverages.**

Unless otherwise stated, payments made under the following Additional Coverage is in addition to the applicable Limits of Insurance.

1. In the event of damage by a Covered Cause of Loss to a building that is Covered Property, we will pay for:

   a. Loss in value of the undamaged portion of the building as a consequence of enforcement of the minimum requirements of any ordinance or law that requires the demolition of undamaged parts of the same building;

   b. Demolition cost, meaning the cost to demolish and clear the site of undamaged parts of the same building as a consequence of enforcement of the minimum requirements of any ordinance or law that required demolition of such undamaged property; and

   c. The increased cost of construction, meaning the increased cost to repair, rebuild or reconstruct the property as a consequence of enforcement of the minimum requirements of any ordinance or law. This increased cost of construction coverage applies only if:

      (1) The building is insured for replacement cost;

      (2) The building is repaired, rebuilt or reconstructed; and

      (3) The repaired, rebuilt or reconstructed building is intended for similar occupancy as the current building, unless otherwise required by zoning or land use ordinance or law.

2. The ordinance or law referred to in this Additional Coverage is an ordinance or law that:

   a. Regulates the demolition, construction or repair of buildings, or establishes zoning or land use requirements at the described premises; and

   b. Is in force at the time of the loss.

3. We will not pay under this Additional Coverage for:

   a. Loss due to any ordinance or law that:

      (1) You were required to comply with before the loss, even if the building was undamaged; and

      (2) You failed to comply with; or

   b. Costs associated with the enforcement of any ordinance or law that requires any insured or other to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of "pollutants."

4. Paragraph **B.1.a.** does not apply to this Additional Coverage.

5. Subject to the limit described in Paragraph **6.** below:

   a. The insurance provided under this Additional Coverage for loss in value to the undamaged portion of the building is limited as follows:

      (1) If Replacement Cost Coverage applies and the building is repaired or replaced on the same or another premises, we will not pay more than the lesser of:

         (a) The amount you actually spend to repair, rebuild or reconstruct the undamaged portion of the building; or

         (b) The amount it would cost to restore the undamaged portion of the building on the same premises and to the same height, floor area, style and comparable quality of the original undamaged portion of the building; or

      (2) If Replacement Cost Coverage applies and the building is not repaired or replaced, or if Replacement Cost Coverage does not apply, we will not pay more than the actual cash value of the undamaged portion of the building at the time of loss.

   b. We will not pay more for demolition costs than the amount you actually spend to demolish and clear the site of the described premises.

   c. The insurance provided under this Additional Coverage for increased cost of construction is limited as follows:

      (1) If the building is repaired or replaced at the same premises, or if you elect to rebuild at another premises, the most we will pay is the increased cost of construction at the same premises; or

      (2) If the ordinance or law requires relocation to another premises, the most we will pay is the



SB-146814-A
(Ed. 01/06)

Page 1 of 2

MEDIATION – CONFIDENTIAL.
Subject to Protective Order - Highly Confidential

SB-146814-A
(Ed. 01/06)

increased cost of construction at the new premises.

6. The most we will pay for loss under this Additional Coverage for the total of all coverages described in Paragraph **1.** above in any one occurrence is $25,000 or the limit shown in the Declarations, whichever is greater at each described premises.

MEDIATION – CONFIDENTIAL.
Subject to Protective Order - Highly Confidential

CNA_BSA0002166
BSAPolicyEv-00015734
TrustApp0801



SB-146815-A
(Ed. 01/06)

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## OUTDOOR TREES, SHRUBS, PLANTS AND LAWNS

This endorsement modifies insurance provided under the following:

BUSINESSOWNERS SPECIAL PROPERTY COVERAGE FORM

The following coverage is added to your Businessowners Special Property Coverage Form under Section **A.5.** Additional Coverages.

Unless otherwise stated, payments made under the following Additional Coverage is in addition to the applicable Limits of Insurance.

**Outdoor Trees, Shrubs, Plants and Lawns**

1.  We will pay for direct physical loss of or damage to outdoor trees, shrubs, plants (other than "stock"

of trees, shrubs or plants) and lawns located at the described premises caused by or resulting from a Covered Cause of Loss.

2.  The most we will pay for loss or damage under this Additional Coverage in any one occurrence is $3,000 at each described premises.

3.  Debris removal, because of covered loss or damage to outdoor trees, shrubs, plants and lawns, is included within the limits described in Paragraph **2.** above.



SB-146815-A
(Ed. 01/06)

Page 1 of 1

MEDIATION – CONFIDENTIAL.
Subject to Protective Order - Highly Confidential

CNA_BSA0002167
BSAPolicyEv-00015735
TrustApp0802



SB-146816-A
(Ed. 01/06)

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## POLLUTANT CLEAN UP AND REMOVAL

This endorsement modifies insurance provided under the following:

BUSINESSOWNERS SPECIAL PROPERTY COVERAGE FORM

The following coverage is added to your Businessowners Property Coverage Form under Paragraph **A.5.** Additional Coverages.

Unless otherwise stated, payments made under the following Additional Coverage is in addition to the applicable Limits of Insurance.

**Pollutant Clean Up and Removal**

1.  We will pay your necessary and reasonable expense to extract "pollutants" from land or water at the described premises if the discharge, dispersal, seepage, migration, release or escape of the "pollutants" is caused by or results from "specified causes of loss" that occurs:

    a.  On the described premises;

    b.  To Covered Property; and

    c.  During the policy period.

2.  The expenses will be paid only if they are reported to us in writing within 180 days of the date on which the "specified cause of loss" occurs.

3.  This Additional Coverage does not apply to costs to test for, monitor or assess the existence, concentration or effects of "pollutants." But we will pay for testing which is performed in the course of extracting the "pollutants" from the land or water.

4.  The most we will pay under this Additional Coverage is $25,000 for the sum of all covered expenses arising out of all Covered Causes of Loss occurring during each separate 12 month period of this policy beginning with the effective date of this policy. This amount applies regardless of the number of premises involved.

SB-146816-A
(Ed. 01/06)

MEDIATION – CONFIDENTIAL.
Subject to Protective Order - Highly Confidential

CNA_BSA0002168
BSAPolicyEv-00015736
TrustApp0803



SB-146817-A
(Ed. 01/06)

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## PRESERVATION OF PROPERTY

This endorsement modifies insurance provided under the following:

BUSINESSOWNERS SPECIAL PROPERTY COVERAGE FORM

The following coverage is added to your Businessowners Special Property Coverage Form under Paragraph **A.5.** Additional Coverages.

Unless otherwise stated, payments made under the following Additional Coverage is in addition to the applicable Limits of Insurance.

**Preservation of Property**

1. If it is necessary to move Covered Property from the described premises to preserve it from loss or damage by a Covered Cause of Loss, we will pay for:

   **a.** Any direct physical loss or damage to this property:

   **(1)** While it is being moved; or

   **(2)** Temporarily stored at another location only if the loss or damage occurs within 90 days after the property is first moved; and

   **b.** The costs incurred to:

   **(1)** Remove such property from the described premises; and

   **(2)** Return such property to the described premises.

2. Coverage under this Additional Coverage will end when any of the following first occurs:

   **a.** When the policy is amended to provide insurance at the new location;

   **b.** The property is returned to the original described premises;

   **c.** 90 days expire after the property is first moved; or

   **d.** This policy expires.

3. Payments under this Additional Coverage are subject to and not in addition to the applicable Limit of Insurance.



SB-146817-A
(Ed. 01/06)

Page 1 of 1



SB-146818-A
(Ed. 01/06)

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## TEMPORARY RELOCATION OF PROPERTY

This endorsement modifies insurance provided under the following:

BUSINESSOWNERS SPECIAL PROPERTY COVERAGE FORM

The following coverage is added to your Businessowners Special Property Coverage Form under Paragraph **A.5.** Additional Coverages.

Unless otherwise stated, payments made under the following Additional Coverage is in addition to the applicable Limits of Insurance.

**Temporary Relocation of Property**

1.  If Covered Property is removed from the described premises and stored temporarily at a location you own, lease or operate while the described premises is being renovated or remodeled, we will pay for loss or damage to that stored property:

    **a.** Caused by or resulting from a Covered Cause of Loss;

    **b.** Up to $50,000 at each temporary location; and

    **c.** During the storage period of up to 90 consecutive days but not beyond expiration of this policy.

2.  This Additional Coverage does not apply if the stored property is more specifically insured.

SB-146818-A
(Ed. 01/06)

Page 1 of 1

MEDIATION – CONFIDENTIAL.
Subject to Protective Order - Highly Confidential

CNA_BSA0002170
BSAPolicyEv-00015738
TrustApp0805



SB-146819-A
(Ed. 01/06)

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# WATER DAMAGE, OTHER LIQUIDS, SOLDER OR MOLTEN MATERIAL DAMAGE

This endorsement modifies insurance provided under the following:

BUSINESSOWNERS SPECIAL PROPERTY COVERAGE FORM

The following coverage is added to your Businessowners Special Property Coverage Form under Paragraph **A.5.** Additional Coverages.

Unless otherwise stated, payments made under the following Additional Coverage is in addition to the applicable Limits of Insurance.

**Water Damage, Other Liquids, Solder or Molten Material Damage**

1. If loss or damage caused by or resulting from covered water or other liquid, solder or molten material damage loss occurs, we will also pay the cost to tear out and replace any part of the building or structure to repair damage to the system or appliance from which the water or other substance escapes.

2. We will not pay the cost to repair any defect to a system or appliance from which the water, other liquid, solder or molten material escapes. But we will pay the cost to repair or replace damaged parts of fire extinguishing equipment if the damage:

   a. Results in discharge of any substance from an automatic fire protection system; or

   b. Is directly caused by freezing.

3. Payments made under this Additional Coverage are subject to and not in addition to the applicable Limit of Insurance.



SB-146819-A
(Ed. 01/06)

Page 1 of 1

MEDIATION – CONFIDENTIAL.
Subject to Protective Order - Highly Confidential

CNA_BSA0002171
BSAPolicyEv-00015739
TrustApp0806

**CNA**

SB-146820-A
(Ed. 01/06)

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## ACCOUNTS RECEIVABLE

This endorsement modifies insurance provided under the following:

BUSINESSOWNERS SPECIAL PROPERTY COVERAGE FORM

The following coverage is added to your Businessowners Special Property Coverage Form under Paragraph **A.6.** Coverage Extensions.

Unless otherwise stated, payments made under the following Coverage Extension is subject to and not in addition to the applicable Limits of Insurance.

**Accounts Receivable**

1. When a Limit of Insurance is shown in the Declarations for Business Personal Property at the described premises, you may extend that insurance to apply to loss, as described in Paragraph **2.** below, due to direct physical loss of or damage to your records of accounts receivable (including those on electronic data processing media) caused by or resulting from a Covered Cause of Loss. Credit card company media will be considered accounts receivable until delivered to the credit card company.

2. We will pay for:

   **a.** All amounts due from your customers that you were unable to collect;

   **b.** Interest charges on any loan required to offset amounts you are unable to collect pending our payment of these amounts;

   **c.** Collection expenses in excess of your normal collection expenses that are made necessary by the loss or damage; and

   **d.** Other reasonable expenses that you incur to re-establish your records of accounts receivable.

3. The following exclusions apply to this Coverage Extension:

   **a.** We will not pay for loss caused by or resulting from bookkeeping, accounting or billing errors or omissions;

   **b.** We will not pay for loss that requires an audit of records or any inventory computation to prove its factual existence;

   **c.** We will not pay for loss caused by or resulting from alteration, falsification, concealment or destruction of records of accounts receivable done to conceal the wrongful giving, taking or withholding of money, securities or other property. But this exclusion applies only to the extent of wrongful giving, taking or withholding;

   **d.** Paragraph **B.1.b.** Earth Movement;

   **e.** Paragraph **B.1.c.** Governmental Action;

   **f.** Paragraph **B.1.d.** Nuclear Hazard;

   **g.** Paragraph **B.1.f.** War and Military Action;

   **h.** Paragraph **B.1.g.** Water;

   **i.** Paragraph **B.1.h.** Neglect; and

   **j.** Paragraph **B.2.j.** False Pretense;

   No other exclusions in Paragraph **B.** Exclusions apply to this Coverage Extension. However, if any exclusions are added by endorsement to this Policy, such exclusions will apply to this Coverage Extension.

4. The most we will pay under this Coverage Extension for loss of or damage to records of accounts receivable in any one occurrence while in transit or at a premises other than the described premises is $25,000.

5. The most we will pay under this Coverage Extension for loss of or damage to records of accounts receivable in any one occurrence at each described premises is $25,000 or the amount shown in the Declarations for Accounts Receivable, whichever is greater.

6. Payments made under this Coverage Extension are in addition to the applicable Limits of Insurance.

SB-146820-A
(Ed. 01/06)

Page 1 of 1

MEDIATION – CONFIDENTIAL.
Subject to Protective Order - Highly Confidential

CNA_BSA0002172
BSAPolicyEv-00015740
TrustApp0807



SB-146821-A
(Ed. 01/06)

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## APPURTENANT BUILDINGS AND STRUCTURES

This endorsement modifies insurance provided under the following:

BUSINESSOWNERS SPECIAL PROPERTY COVERAGE FORM

The following coverage is added to your Businessowners Special Property Coverage Form under Paragraph **A.6.** Coverage Extensions.

Unless otherwise stated, payments made under the following Coverage Extension is subject to and not in addition to the applicable Limits of Insurance.

**Appurtenant Buildings and Structures**

1. When a Limit of Insurance is shown in the Declarations for Building at the described premises, you may extend that insurance to apply to direct physical loss of or damage to incidental appurtenant buildings or structures, within 1,000 feet of that described premises, caused by or resulting from a Covered Cause of Loss.

2. When a Limit of Insurance is shown in the Declarations for Business Personal Property at the described premises, you may extend that insurance to apply to direct physical loss of or damage to Business Personal Property within incidental appurtenant buildings or structures within 1,000 feet of that

described premises, caused by or resulting from a Covered Cause of Loss.

3. Incidental appurtenant buildings or structures include:

   **a.** Storage buildings;

   **b.** Carports;

   **c.** Garages;

   **d.** Pump houses; or

   **e.** Above ground tanks;

   Which have not been specifically described in the Declarations.

4. The most we will pay for loss or damage under this Coverage Extension in any one occurrence for any combination of loss of or damage to Building and Business Personal Property is $50,000, regardless of the number of described premises involved.

5. Payments made under this Coverage Extension are in addition to the applicable Limits of Insurance.



SB-146821-A
(Ed. 01/06)

Page 1 of 1

MEDIATION – CONFIDENTIAL.
Subject to Protective Order - Highly Confidential

CNA_BSA0002173
BSAPolicyEv-00015741
TrustApp0808

**CNA**

SB-146822-A
(Ed. 01/06)

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## BUILDING GLASS

This endorsement modifies insurance provided under the following:

BUSINESSOWNERS SPECIAL PROPERTY COVERAGE FORM

The following coverage is added to your Businessowners Special Property Coverage Form under Paragraph **A.6.** Coverage Extensions.

Unless otherwise stated, payments made under the following Coverage Extension is subject to and not in addition to the applicable Limits of Insurance.

**Building Glass**

1. **If:**

   a. You are the building owner; and

   b. A Limit of Insurance is shown in the Declarations for Building at the described premises;

   you may extend that insurance to apply to direct physical loss of or damage to all exterior and interior building glass caused by or resulting from a Covered Cause of Loss, including glass breakage and damage to glass by chemicals accidentally or maliciously applied to glass. If a specific deductible has been selected for building glass as shown on the Declarations we will apply that deductible to any covered loss. If no deductible is selected for building glass, the policy deductible will be applied to covered building glass losses.

2. **If:**

   a. You are a tenant;

   b. A Limit of Insurance shown in the Declarations for Building or Business Personal Property at the described premises; and

   c. You are contractually obligated to repair or replace building glass at the described premises;

   you may extend that insurance to apply to direct physical loss of or damage to all exterior and interior building glass caused by or resulting from a Covered Cause of Loss, including glass

breakage and damage to glass by chemicals accidentally or maliciously applied to glass. If a specific deductible has been selected for building glass as shown on the Declarations we will apply that deductible to any covered loss. If no deductible is selected for building glass, the policy deductible will be applied to covered building glass losses.

3. We will also pay for necessary expenses in connection with loss or damage covered in Paragraphs **1.** or **2.** above, incurred by you to:

   a. Put up temporary plates or board up openings;

   b. Repair or replace encasing frames; and

   c. Remove or replace obstructions.

4. The following exclusions apply to this Coverage Extension:

   a. We will not pay for loss or damage caused by or resulting from:

      (1) Wear and tear;

      (2) Hidden or latent defect;

      (3) Corrosion; or

      (4) Rust;

   b. Paragraph **B.1.b.** Earth Movement;

   c. Paragraph **B.1.c.** Governmental Action;

   d. Paragraph **B.1.d.** Nuclear Hazard;

   e. Paragraph **B.1.f.** War and Military Action; and

   f. Paragraph **B.1.g.** Water.

No other exclusions in Paragraph **B.** Exclusions apply to this Coverage Extension. However, if any exclusions are added by endorsement to this Policy, such exclusions will apply to this Coverage Extension.

SB-146822-A
(Ed. 01/06)

Page 1 of 1

MEDIATION – CONFIDENTIAL.
Subject to Protective Order - Highly Confidential

**CNA**

SB-146823-A
(Ed. 01/06)

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## BUSINESS INCOME AND EXTRA EXPENSE – DEPENDENT PROPERTY

This endorsement modifies insurance provided under the following:

BUSINESSOWNERS SPECIAL PROPERTY COVERAGE FORM

The following coverage is added to your Businessowners Special Property Coverage Form under Paragraph **A.6.** Coverage Extensions.

Unless otherwise stated, payments made under the following Coverage Extension is subject to and not in addition to the applicable Limits of Insurance.

**Business Income and Extra Expense – Dependent Property**

1. When the Declarations show that you have coverage for Business Income and Extra Expense, you may extend that insurance to apply to the actual loss of Business Income you sustain and reasonable and necessary Extra Expense you incur due to the "suspension" of your "operations" during the "period of restoration." The "suspension" must be caused by direct physical loss or damage at the premises of a Dependent Property, caused by or resulting from a Covered Cause of Loss.

2. Dependent Property means property operated by other whom you depend on to:

   a. Deliver materials or services (other than "water supply services," "communication supply services" or "power supply services") to you, or to others for your account (Contributing Locations);

   b. Accept your products or services (Recipient Locations);

   c. Manufacture products for delivery to your customers under contract of sale (Manufacturing Locations); or

   d. Attract customers to your business (Leader Locations).

3. With respect to this Coverage Extension, the "period of restoration":

   a. Begins 24 hours after the time of direct physical loss or damage caused by or

resulting from any Covered Cause of Loss at the premises of the Dependent Property;

   b. Ends on the date when the property at the premises of the Dependent Property should be repaired, rebuilt or replaced with reasonable speed and similar quality; and

   c. Does not include any increased period required due to the enforcement of any ordinance or law that:

      (1) Regulates the construction, use or repair, or requires the tearing down of any property; or

      (2) Requires any insured or others to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of "pollutants."

4. This Coverage Extension:

   a. Applies to Dependent Property premises located within the Coverage Territory; and

   b. Does not apply when you have more specific insurance under any other policy.

5. We will reduce the amount of your Business Income loss, other than Extra Expense, to the extent you can resume "operations" in whole or in part, by using any other available:

   a. Source of materials; or

   b. Outlet for your products.

6. The most we will pay for Business Income and Extra Expense under this Coverage Extension is $10,000, or the limit shown in the Declarations, whichever is higher, regardless of the number of described premises or number of Dependent Properties involved.

7. Payments made under this Coverage Extension are in addition to the applicable Limits of Insurance.




SB-146823-A
(Ed. 01/06)

Page 1 of 1

MEDIATION – CONFIDENTIAL.
Subject to Protective Order - Highly Confidential

CNA_BSA0002175
BSAPolicyEv-00015743
TrustApp0810



SB-146824-A
(Ed. 01/06)

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## BUSINESS INCOME AND EXTRA EXPENSE –
## NEWLY ACQUIRED LOCATIONS

This endorsement modifies insurance provided under the following:

BUSINESSOWNERS SPECIAL PROPERTY COVERAGE FORM

The following coverage is added to your Businessowners Special Property Coverage Form under Paragraph **A.6.** Coverage Extensions.

Unless otherwise stated, payments made under the following Coverage Extension is subject to and not in addition to the applicable Limits of Insurance.

**Business Income and Extra Expense – Newly Acquired Locations**

1.  When the Declarations show that you have coverage for Business Income and Extra Expense, you may extend that insurance to apply to the actual loss of Business Income and necessary Extra Expense you incur due to the "suspension" of your "operations" during the "period of restoration." The "suspension" must be caused by or resulting from a Covered Cause of Loss at any premises you newly acquire by purchase or lease (other than at fairs, trade shows or exhibitions).

2.  The most we will pay under this coverage for the sum of Business Income and Extra Expense incurred is $250,000 at each location.

3.  Insurance under this extension for each newly acquired location will end when any of the following first occurs:

    a. This policy expires;

    b. 90 days expire after you acquire or begin to construct the property;

    c. You report the location to us;

    d. The Business Income or Extra Expense is more specifically insured.

    We will charge you additional premium for locations reported from the date you acquire the property.

4.  Payments made under this Coverage Extension are in addition to the applicable Limits of Insurance.

SB-146824-A
(Ed. 01/06)

MEDIATION – CONFIDENTIAL.
Subject to Protective Order - Highly Confidential

CNA_BSA0002176
BSAPolicyEv-00015744
TrustApp0811



CNA

SB-146825-A
(Ed. 01/06)

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# BUSINESS PERSONAL PROPERTY OFF PREMISES

This endorsement modifies insurance provided under the following:

BUSINESSOWNERS SPECIAL PROPERTY COVERAGE FORM

The following coverage is added to your Businessowners Special Property Coverage Form under Paragraph **A.6.** Coverage Extensions.

Unless otherwise stated, payments made under the following Coverage Extension is subject to and not in addition to the applicable Limits of Insurance.

**Business Personal Property Off Premises**

**1.** When a Limit of Insurance is shown in the Declarations for Business Personal Property at the described premises, you may extend that insurance to apply to direct physical loss of or damage to such property caused by or resulting from a Covered Cause of Loss while:

**a.** In the course of transit to or from the described premises; or

**b.** Temporarily away from the described premises and:

**(1)** At a premises you do not own, lease or operate; or

**(2)** At any fair, trade show or exhibition at a premises you do not own or regularly occupy.

**2.** This Coverage Extension does not apply to property:

**a.** While in the custody of the United States Postal Service;

**b.** Rented or leased to others;

**c.** After delivery to customers;

**d.** In the care, custody or control of your salespersons unless the property is in such care, custody or control at a fair, trade show or exhibition;

**e.** Temporarily at a premises for more than 60 consecutive days, except "money" and "securities" at a "banking premises";

**f.** Otherwise covered under the Fine Arts Additional Coverage; or

**g.** Otherwise covered under the following Coverage Extensions:

**(1)** Accounts Receivable;

**(2)** Electronic Data Processing;

**(3)** Personal Effects; or

**(4)** Valuable Papers and Records.

Subject to Protective Order - Highly Confidential

3002000492097703749825

MEDIATION – CONFIDENTIAL.
Subject to Protective Order - Highly Confidential

CNA_BSA0002177
BSAPolicyEv-00015745
TrustApp0812

SB-146826-A
(Ed. 01/06)

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## CIVIL AUTHORITY

This endorsement modifies insurance provided under the following:

BUSINESSOWNERS SPECIAL PROPERTY COVERAGE FORM

The following coverage is added to your Businessowners Special Property Coverage Form under Paragraph **A.6.** Coverage Extensions.

Unless otherwise stated, payments made under the following Coverage Extension is subject to and not in addition to the applicable Limits of Insurance.

**Civil Authority**

1. When the Declarations show that you have coverage for Business Income and Extra Expense, you may extend that insurance to apply to the actual loss of Business Income you sustain and reasonable and necessary Extra Expense you incur caused by action of civil authority that prohibits access to the described premises. The civil authority action must be due to direct physical loss of or damage to property at locations, other than described premises, caused by or resulting from a Covered Cause of Loss.

2. The coverage for Business Income will begin 24 hours after the time of that action and will apply for a period of three consecutive weeks after coverage begins.

3. The coverage for Extra Expense will begin immediately after the time of that action and will end when your Business Income coverages ends for this Coverage Extension.

MEDIATION – CONFIDENTIAL.
Subject to Protective Order - Highly Confidential

CNA_BSA0002178
BSAPolicyEv-00015746
TrustApp0813



SB-146827-B
(Ed. 03/06)

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# ELECTRONIC DATA PROCESSING EQUIPMENT AND ELECTRONIC MEDIA AND DATA
# (EDP COVERAGE FORM)

This endorsement modifies insurance provided under the following:

BUSINESSOWNERS SPECIAL PROPERTY COVERAGE FORM

The following coverage is added to your Businessowners Special Property Coverage Form under Paragraph **A.6.** Coverage Extensions.

**Electronic Data Processing**

1. When a Limit of Insurance is shown in the Declarations for Electronic Data Processing at the described premises, that insurance applies to:

   **a.** a. Direct physical loss of or damage to your "electronic data processing equipment" caused by or resulting from a Covered Cause of Loss; and

   **b.** Direct physical loss of or damage to your "electronic media and data" caused by or resulting from a Covered Cause of Loss.

2. Worldwide coverage is provided under this Coverage Extension. The coverage territory as described in Paragraph **F.8.b** does not apply to this Coverage Extension.

3. This Coverage Extension does not apply to:

   **a.** "Stock"; or

   **b.** Property that is leased or rented to others.

4. The following exclusions as described in Section **B.,** Exclusions, of the Businessowners Special Property Coverage Form do not apply to the Insuring Agreement set forth in Paragraph **1.a.** or **1.b.** of this Coverage Extension:

   **a.** Paragraph **1.e.**; and

   **b.** Paragraph **2.a.**

   The following exclusion as described in Section **B.,** Exclusions, of the Businessowners Special Property Coverage Form does not apply to the Insuring Agreement set forth in Paragraph **1.a.** of this Coverage Extension: **Paragraph 2.d.(6).**

5. The following additional exclusions apply:

   With respect to this Coverage Extension, we will not pay for loss or damage caused directly or indirectly by any of the following. Such loss or

damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss.

**a.** Programming errors or omissions, or incorrect instructions to a machine, including without limitation, incorrect instructions to "electronic data processing equipment" from a user incorrectly operating with, or committing an error using an input device (including, without limitation, a keyboard, mouse or touchpad) and corrupting, distorting, deleting, damaging or destroying "electronic data"; provided, however, that this exclusion shall not apply to an otherwise covered mechanical breakdown of "electronic data processing equipment" under the Insuring Agreement set forth in Paragraph **1.a.** of this Coverage Extension

**b.** Misappropriation, theft, copying, transfer or unauthorized viewing of any property, proprietary or confidential information, "money," "securities," "stock," "electronic data processing equipment" "electronic media and data" or "electronic data" including without limitation, the use of any computer to cause such misappropriation, transfer or copying.

**c.** Errors or deficiency in design, installation, maintenance, repair or modification of your "electronic data processing equipment," "electronic media and data" or "electronic data" or any "electronic data processing equipment," electronic devices, computer system or network to which your "electronic data processing equipment" "electronic media and data" or "electronic data" is connected or dependent; provided, however, that this exclusion shall not apply to an otherwise covered mechanical breakdown of "electronic data processing equipment" under the Insuring Agreement set forth in Paragraph 1.a. of this Coverage Extension.

**d.** Unexplained or indeterminable failure, malfunction or slowdown of a "electronic data processing equipment" "electronic media and data" or "electronic data."

SB-146827-B
(Ed. 03/06)

Page 1 of 2

MEDIATION – CONFIDENTIAL.
Subject to Protective Order - Highly Confidential

CNA_BSA0002179
BSAPolicyEv-00015747
TrustApp0814



SB-146827-B
(Ed. 03/06)

6. The most we will pay under this Coverage Extension for all direct physical loss of or damage to "electronic data processing equipment" and "electronic media and data" (combined) in any one occurrence while in transit or at a premises other than the described premises is $25,000.

7. The most we will pay under this Coverage Extension for loss of or damage to "Electronic Media and Data" while stored at a separate premises from where your original "Electronic Media and Data" are kept, in any one occurrence, is $25,000.

8. The most we will pay under this Coverage Extension for all direct physical loss or damage to "electronic data processing equipment" and "electronic media and data" (combined) you acquire after the inception date of the policy in any one occurrence is $25,000.

Provided, however, with respect to insurance coverage under this Coverage Extension on any such newly acquired "electronic data processing equipment" or "electronic media and data," coverage will end on the date and time that any of the following first occurs:

a. This policy expires;

b. 180 days after you acquire the "electronic data processing equipment" or "electronic media and data"; or

c. You report values to us.

9. Subject to the Limits of Insurance set forth in paragraphs 6., 7., and 8. of this Coverage Extension, the most we will pay under this Coverage Extension for all direct physical loss of or damage to "electronic data processing equipment" and "electronic media and data" (combined) at the described premises in any one occurrence is the Limit of Insurance shown in the Declarations or $50,000, whichever is greater.

MEDIATION – CONFIDENTIAL.
Subject to Protective Order - Highly Confidential

CNA_BSA0002180
BSAPolicyEv-00015748
TrustApp0815



SB-146828-A
(Ed. 01/06)

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# EQUIPMENT BREAKDOWN

This endorsement modifies insurance provided under the following:

BUSINESSOWNERS SPECIAL PROPERTY COVERAGE FORM

The following coverage is added to your Businessowners Special Property Coverage Form under Paragraph **A.6.** Coverage Extensions.

Unless otherwise stated, payments made under the following Coverage Extension is subject to and not in addition to the applicable Limits of Insurance.

**Equipment Breakdown**

1.  When a Limit of Insurance is shown in the Declarations for Building or Business Personal Property at the described premises, you may extend that insurance to apply to direct physical loss of or damage to Covered Property at the described premises caused by or resulting from a "breakdown" to "covered equipment".

    With respect to otherwise covered Business Income and Extra Expense, "breakdown" to "covered equipment" will be considered a Covered Cause of Loss.

    If an initial "breakdown" causes other "breakdowns", all will be considered one "breakdown". All "breakdowns" that manifest themselves at the same time and are the result of the same cause will also be considered one "breakdown".

2.  Under this Coverage Extension, the following coverages also apply:

    a.  Expediting Expenses

        (1) In the event of direct physical loss of or damage to Covered Property caused by or resulting form a "breakdown" to "covered equipment", we will pay for the reasonable additional expenses you necessarily incur to make temporary repairs to, or expedite the permanent repair or replacement of, the lost or damaged Covered Property.

        (2) Expediting expenses include overtime wages and the extra cost of express or other rapid means of transportation.

        (3) The most we will pay under this Coverage Extension for all Expediting Expenses arising out of any one "breakdown" is $25,000. This limit is part of and not in addition to the Limit of Insurance that

applies to lost or damage Covered Property.

    b.  "Pollutants"

        (1) In the event of direct physical loss of or damage to Covered Property caused by or resulting form a "breakdown" to "covered equipment", we will pay for the additional cost to repair or replace Covered Property because of contamination by "pollutants". This includes the additional expenses to clean up or dispose of such property. Additional costs mean those beyond what would have been required had no "pollutants" been involved.

        (2) The most we will pay under this Coverage Extension for loss or damage to Covered Property caused by contamination by "pollutants" arising out of any one "breakdown" is $25,000. This limit is subject to and not in addition to the Limit of Insurance that applies to lost or damaged Covered Property.

    c.  Service Interruption

        When the Declarations show that you have coverage for Business Income and Extra Expense, you may extend that insurance to apply to loss caused by or resulting from a "breakdown" to equipment that is owned, operated or controlled by a local public or private utility or distributor that directly generates, transmits, distributes or provides the following utility services:

        (1) "Water Supply Services";

        (2) "Communication Supply Services"; or

        (3) "Power Supply Services".

3.  We will not pay under this Coverage Extension for loss or damage caused by or resulting from any of the following tests:

    a.  A hydrostatic, pneumatic or gas pressure test of any boiler or pressure vessel; or

    b.  An insulation breakdown test of any type of electrical equipment.

SB-146828-A
(Ed. 01/06)

Page 1 of 2



MEDIATION – CONFIDENTIAL.
Subject to Protective Order - Highly Confidential

CNA_BSA0002181
BSAPolicyEv-00015749
TrustApp0816

SB-146828-A
(Ed. 01/06)

4.  We will not pay under this Coverage Extension for loss or damage caused by or resulting from a change in:

    **a.**  Temperature; or

    **b.**  Humidity;

    as a consequence of "breakdown" to "covered equipment".

5.  The following limitations in Paragraph **A.4.** do not apply to this Coverage Extension:

    **a.**  Paragraph **a.(2)**; and

    **b.**  Paragraph **a.(3)**.

6.  The following exclusions in Paragraph B. Exclusions do not apply to this Coverage Extension:

    **a.**  Paragraph **2.a.**;

    **b.**  Paragraph **2.d.(6)**; and

    **c.**  Paragraph **2.e.**

7.  With respect to this Coverage Extension, the following condition is added to Paragraph F. Commercial Property Conditions:

    **Suspension**

    If any "covered equipment" is found to be in or exposed to a dangerous condition, any of our

representatives may immediately suspend the insurance provided by this Coverage Form for loss or damage caused by or resulting from a "breakdown" to that "covered equipment". This can be done by delivering or mailing a notice of suspension to:

    **a.**  Your last known address; or

    **b.**  The address where the "covered equipment" is located.

Once suspended in this way, such insurance can only be reinstated by a written endorsement issued by us. If we suspend your insurance, you will get a pro rata refund of premium for that "covered equipment". But the suspension will be effective even if we have not yet made or offered a refund.

8.  The most we will pay under this Coverage Extension for all direct physical loss of or damage to:

    **a.**  "Diagnostic Equipment";

    **b.**  "Power Generating Equipment"; or

    **c.**  "Production Equipment";

caused by or resulting from a "breakdown" to "covered equipment" in any one occurrence is $100,000.

MEDIATION – CONFIDENTIAL.
Subject to Protective Order - Highly Confidential

CNA_BSA0002182
BSAPolicyEv-00015750
TrustApp0817



SB-146830-A
(Ed. 01/06)

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

**MONEY ORDERS AND COUNTERFEIT PAPER CURRENCY**

This endorsement modifies insurance provided under the following:

BUSINESSOWNERS SPECIAL PROPERTY COVERAGE FORM

The following coverage is added to your Businessowners Special Property Coverage Form under Paragraph **A.6.** Coverage Extensions:

Unless otherwise stated, payments made under this Coverage Extension is subject to and not in addition to the applicable Limits of Insurance.

When a Limit of Insurance is shown in the Declarations for Business Personal Property at the described premises, you may extend that insurance to apply to loss due to the good faith acceptance of:

1. Any U.S. or Canadian post office or express money order, issued or claiming to have been issued by any post office or express company, if the money order is not paid upon presentation; or

2. Counterfeit United States or Canadian paper currency.

in exchange for merchandise, "money" or services or as part of a normal business transaction.



SB-146830-A
(Ed. 01/06)

Page 1 of 1

MEDIATION – CONFIDENTIAL.
Subject to Protective Order - Highly Confidential

CNA_BSA0002183
BSAPolicyEv-00015751
TrustApp0818



SB-146831-A
(Ed. 01/06)

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## NON-OWNED DETACHED TRAILERS

This endorsement modifies insurance provided under the following:

BUSINESSOWNERS SPECIAL PROPERTY COVERAGE FORM

The following coverage is added to your Businessowners Special Property Coverage Form under Paragraph **A.6.** Coverage Extensions.

Unless otherwise stated, payments made under the following Coverage Extension is subject to and not in addition to the applicable Limits of Insurance.

1. When a Limit of Insurance is shown in the Declarations for Business Personal Property at the described premises you may extend the insurance that applies to your Business Personal Property to apply to loss or damage to trailers or semi-trailers that you do not own, provided that:

   a. The trailer is used in your business;

   b. The trailer is in your care, custody or control at the premises described in the Declarations; and

   c. You have a contractual responsibility to pay for loss or damage to the trailer.

2. We will not pay for any loss or damage that occurs:

   a. While the trailer is attached to any motor vehicle or motorized conveyance, whether or not the motor vehicle or motorized conveyance is in motion;

   b. During hitching or unhitching operations, or when a trailer becomes accidentally unhitched from a motor vehicle or motorized conveyance.

3. The most we will pay for loss or damage under this Coverage Extension in any one occurrence is $5,000 regardless of the number of described premises, trailers or semi-trailers involved.

4. This insurance is excess over the amount due (whether you can collect on it or not) from any other insurance covering such property.

SB-146831-A
(Ed. 01/06)

MEDIATION – CONFIDENTIAL.
Subject to Protective Order - Highly Confidential

CNA_BSA0002184
BSAPolicyEv-00015752
TrustApp0819



SB-146832-A
(Ed. 01/06)

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# ORDINANCE OR LAW – INCREASED PERIOD OF RESTORATION

This endorsement modifies insurance provided under the following:

BUSINESSOWNERS SPECIAL PROPERTY COVERAGE FORM

The following coverage is added to your Businessowners Special Property Coverage Form under Paragraph **A.6.** Coverage Extensions.

Unless otherwise stated, payments made under the following Coverage Extension is subject to and not in addition to the applicable Limits of Insurance.

**Ordinance or Law – Increased Period of Restoration**

1. When:

   a. A Covered Cause of Loss occurs to property at the described premises; and

   b. The Declarations shown that you have coverage for Business Income and Extra Expense;

   you may extend that insurance to apply to the amount of actual loss of Business Income you sustain and reasonable and necessary Extra Expense you incur during the increased period of "suspension" of "operations" caused by or resulting form the enforcement of any ordinance or law that:

   (1) Regulates the construction, repair or replacement of any property;

   (2) Requires the tearing down or replacement of any parts of property not damaged by a Covered Cause of Loss; and

   (3) Is in force at the time of loss.

2. This Coverage Extension applies only to the period that would be required, with reasonable speed, to reconstruct, repair or replace the property to comply with the minimum requirements of the ordinance or law.

3. This Coverage Extension does not apply to:

   a. Loss due to an ordinance or law that:

      (1) You were required to comply with before the loss, even if the property was undamaged; and

      (2) You failed to comply with; or

   b. Costs associated with the enforcement of any ordinance or law that requires any insured or others to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to or assess the effects of "pollutants."

4. Paragraph **B.1.a.,** does not apply to this Coverage Extension.

5. The most we will pay for loss under this Coverage Extension in any one occurrence is $25,000 at each described premises.

6. Payments made under this Coverage Extension are in addition to the applicable Limits of Insurance.



SB-146832-A
(Ed. 01/06)

Page 1 of 1

MEDIATION – CONFIDENTIAL.
Subject to Protective Order - Highly Confidential

CNA_BSA0002185
BSAPolicyEv-00015753
TrustApp0820



SB-146833-A
(Ed. 01/06)

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## OUTDOOR PROPERTY

This endorsement modifies insurance provided under the following:

BUSINESSOWNERS SPECIAL PROPERTY COVERAGE FORM

The following coverage is added to your Businessowners Special Property Coverage Form under Paragraph **A.6.** Coverage Extensions.

Unless otherwise stated, payments made under the following Coverage Extension is subject to and not in addition to the applicable Limits of Insurance.

**Outdoor Property**

1. When a Limit of Insurance is shown in the Declarations for Building or Business Personal Property at the described premises, you may extend that insurance to apply to direct physical loss of or damage to the following types of outdoor property at that described premises caused by or resulting from a Covered Cause of Loss:

   **a.** Radio or television antennas (including microwave or satellite dishes) and their lead in wiring, masts or towers; or

   **b.** Bridges, walks, roadways, patios and other paved surfaces.

2. The most we will pay for loss or damage under this Coverage Extension in any one occurrence is $10,000 at each described premises.

SB-146833-A
(Ed. 01/06)

MEDIATION – CONFIDENTIAL.
Subject to Protective Order - Highly Confidential

CNA_BSA0002186
BSAPolicyEv-00015754
TrustApp0821



SB-146834-A
(Ed. 01/06)

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

**PERSONAL EFFECTS**

This endorsement modifies insurance provided under the following:

BUSINESSOWNERS SPECIAL PROPERTY COVERAGE FORM

The following coverage is added to your Businessowners Special Property Coverage Form under Paragraph **A.6.** Coverage Extensions.

Unless otherwise stated, payments made under the following Coverage Extension is subject to and not in addition to the applicable Limits of Insurance.

**Personal Effects**

1. When a Limit of Insurance is shown in the Declarations for Building or Business Personal Property at the described premises, you may extend that insurance to apply to direct physical loss of or damage to personal effects owned by:

   a. You; or

   b. Your officers, partners, "members", "managers", "employees", directors or trustees;

   caused by or resulting from a Covered Cause of Loss.

2. Such property must be located at a described premises.

3. The most we will pay for loss or damage under this Coverage Extension in any one occurrence is $25,000 at each described premises.

4. Payments under this Coverage Extension are in addition to the applicable Limits of Insurance.



SB-146834-A
(Ed. 01/06)

Page 1 of 1



SB-146835-A
(Ed. 01/06)

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## SIGNS

This endorsement modifies insurance provided under the following:

    BUSINESSOWNERS SPECIAL PROPERTY COVERAGE FORM

Subject to the Exclusions, Conditions and Limitations of this policy, you may extend this insurance as indicated below.

Unless otherwise stated, payments made under the following coverage will not increase the applicable Limits of Insurance.

Your Building or Business Personal Property insurance is extended to cover outdoor signs attached to the building or on or within 1,000 feet of the described premises.

SB-146835-A
(Ed. 01/06)

Page 1 of 1



SB-146836-A
(Ed. 01/06)

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## SPOILAGE – CONSEQUENTIAL LOSS

This endorsement modifies insurance provided under the following:

BUSINESSOWNERS SPECIAL PROPERTY COVERAGE FORM

The following coverage is added to your Businessowners Special Property Coverage Form under Paragraph **A.6.** Coverage Extensions.

Unless otherwise stated, payments made under the following Coverage Extension is subject to and not in addition to the applicable Limits of Insurance.

**Spoilage – Consequential Loss**

1. When a Limit of Insurance is shown in the Declarations for Business Personal Property at the described premises, you may extend that insurance to apply to consequential loss to your Business Personal Property caused by a change in:

   **a.** Temperature; or

   **b.** Humidity;

   caused by or resulting from a Covered Cause of loss to any of the following types of equipment situated within the building at the described premises:

   **a.** Refrigerating;

   **b.** Cooling;

   **c.** Humidifying;

   **d.** Air conditioning;

   **e.** Heating;

   **f.** Generating or converting power; or

   **g.** Connections, supply or transmission lines and pipes associated with the above equipment.

2. With respect to this Coverage Extension, "breakdown" to "covered equipment" will not be considered a Covered Cause of Loss, even if otherwise covered elsewhere in this Policy.

3. Paragraphs **B.2.d.(7)(a)** and **B.2.d.(7)(b)** do not apply to this Coverage Extension.



SB-146836-A
(Ed. 01/06)

Page 1 of 1

MEDIATION – CONFIDENTIAL.
Subject to Protective Order - Highly Confidential

CNA_BSA0002189
BSAPolicyEv-00015757
TrustApp0824



SB-146837-A
(Ed. 01/06)

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## THEFT DAMAGE TO RENTED PROPERTY

This endorsement modifies insurance provided under the following:

BUSINESSOWNERS SPECIAL PROPERTY COVERAGE FORM

The following coverage is added to your Businessowners Special Property Coverage Form under Paragraph **A.6.** Coverage Extensions.

Unless otherwise stated, payments made under the following Coverage Extension is subject to and not in addition to the applicable Limits of Insurance.

**Theft Damage to Rented Property**

1.  When a Limit of Insurance is shown in the Declarations for Business Personal Property at the described premises, you may extend that insurance to apply to direct physical loss of or damage to the following caused by or resulting by "theft" or attempted "theft":

    a.  That part of a building you occupy, but do not own, which contains Covered Property; and

    b.  Property within such non-owned building used for maintenance or service of such non-owned building.

2.  We will not pay under this Coverage Extension for loss or damage:

    a.  Caused by or resulting from fire or explosion; or

    b.  To glass (other than glass building blocks) or to any lettering, ornamentation or burglar alarm tape on glass.

3.  This Coverage Extension applies only if you are a tenant and you are contractually obligated to insure this exposure.

SB-146837-A
(Ed. 01/06)

MEDIATION – CONFIDENTIAL.
Subject to Protective Order - Highly Confidential

CNA_BSA0002190
BSAPolicyEv-00015758
TrustApp0825

**CNA**

SB-146838-A
(Ed. 01/06)

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## VALUABLE PAPERS AND RECORDS

This endorsement modifies insurance provided under the following:

BUSINESSOWNERS SPECIAL PROPERTY COVERAGE FORM

The following coverage is added to your Businessowners Special Property Coverage Form under Paragraph **A.6.** Coverage Extensions.

Unless otherwise stated, payments made under the following Coverage Extension is subject to and not in addition to the applicable Limits of Insurance.

**Valuable Papers and Records**

1.  When a Limit of Insurance is shown in the Declarations for Business Personal Property at the described premises, you may extend that insurance to apply to loss, as described in Paragraph **2.** below, due to direct physical loss of or damage to "valuable papers and records" that:

    a.  You own; or

    b.  Are owned by others, but in your care, custody or control;

    caused by or resulting from a Covered Cause of loss.

2.  This Coverage Extension includes the cost to research, replace or restore the lost information on "valuable papers and records" for which duplicates do not exist.

3.  The following exclusions apply to this Coverage Extension:

    a.  We will not pay for any loss or damage to "valuable papers and records" caused by or resulting from any errors or omissions in processing or copying. But if errors or omissions in processing or copying results in fire or explosion, we will pay for the resulting

loss or damage caused by that fire or explosion.

    b.  Paragraph **B.1.b.** Earth Movement;

    c.  Paragraph **B.1.c.** Governmental Action;

    d.  Paragraph **B.1.d.** Nuclear Hazard;

    e.  Paragraph **B.1.f.** War and Military Action;

    f.  Paragraph **B.1.f.** Water;

    g.  Paragraph **B.1.h.** Neglect;

    h.  Paragraph **B.2.g.** Frozen plumbing.

    No other exclusions in Paragraph **B.** Exclusions apply to this Coverage Extension. However, if any exclusions are added by endorsement to this Coverage Form, such exclusions will apply to this Coverage Extension.

4.  The most we will pay under this Coverage Extension for loss of or damage to "valuable papers and records" in any one occurrence while in transit or at a premises other than the described premises is $25,000.

5.  The most we will pay under this Coverage Extension for loss of or damage to "valuable papers and records" in any one occurrence at each described premises is $25,000 or the amount shown in the Declarations for Valuable Papers and Records, whichever is greater.

6.  Payments made under this Coverage Extension are in addition to the applicable Limits of Insurance.



SB-146838-A
(Ed. 01/06)

Page 1 of 1

CNA_BSA0002191
BSAPolicyEv-00015759
TrustApp0826



SB-146839-A
(Ed. 01/06)

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## SEWER OR DRAIN BACK UP

This endorsement modifies insurance provided under the following:

BUSINESSOWNERS SPECIAL PROPERTY COVERAGE FORM

The following coverage is added to your Businessowners Special Property Coverage Form:

Subject to the Exclusions, Conditions and Limitations of this policy, you may extend this insurance as indicated below.

Unless otherwise stated, payments made under the following coverage will not increase the applicable Limits of Insurance.

We will pay for loss or damage to covered property caused by water that backs up from a sewer or drain. However, this coverage does not provide coverage for loss or damage due to water emanating from a sump pump, well or similar device designed to prevent overflow, seepage or leakage of subsurface water.

The most we will pay for direct physical damage is the limit of insurance shown in the Declarations for Sewer or Drain Back Up.

SB-146839-A
(Ed. 01/06)

Page 1 of 1

CNA_BSA0002192
BSAPolicyEv-00015760
TrustApp0827



SB-146932-B
(Ed. 03/06)

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# NON-CONTRACTORS BLANKET ADDITIONAL INSURED

This endorsement modifies insurance provided under the following:

BUSINESSOWNERS LIABILITY COVERAGE FORM

Coverage afforded under this extension of coverage endorsement does not apply to any person or organization covered as an additional insured on any other endorsement now or hereafter attached to this Coverage Part.

**1. ADDITIONAL INSURED – BLANKET VENDORS**

WHO IS AN INSURED is amended to include as an additional insured any person or organization (referred to below as vendor) with whom you agreed, because of a written contract or agreement to provide insurance, but only with respect to "bodily injury" or "property damage" arising out of "your products" which are distributed or sold in the regular course of the vendor's business, subject to the following additional exclusions:

1. The insurance afforded the vendor does not apply to:

   **a.** "Bodily injury" or "property damage" for which the vendor is obligated to pay damages by reason of the assumption of liability in a contract or agreement. This exclusion does not apply to liability for damages that the vendor would have in the absence of the contract or agreement;

   **b.** Any express warranty unauthorized by you;

   **c.** Any physical or chemical change in the product made intentionally by the vendor;

   **d.** Repackaging, except when unpacked solely for the purpose of inspection, demonstration, testing, or the substitution of parts under instructions from the manufacturer, and then repackaged in the original container;

   **e.** Any failure to make such inspections, adjustments, tests or servicing as the vendor has agreed to make or normally undertakes to make in the usual course of business, in connection with the distribution or sale of the products;

   **f.** Demonstration, installation, servicing or repair operations, except such operations performed at the vendor's premises in connection with the sale of the product;

   **g.** Products which, after distribution or sale by you, have been labeled or relabeled or used as a container, part or ingredient of any other thing or substance by or for the vendor; or

   **h.** "Bodily injury" or "property damage" arising out of the sole negligence of the vendor for its own acts or omission or those of its employees or anyone else acting on its behalf. However, this exclusion does not apply to:

      **(1)** The exceptions contained in Subparagraphs **d.** or **f.**; or

      **(2)** Such inspections, adjustments, tests or servicing as the vendor has agreed to make or normally undertakes to make in the usual course of business, in connection with the distribution or sale of the products.

   2. This insurance does not apply to any insured person or organization, from whom you have acquired such products, or any ingredient, part or container, entering into, accompanying or containing such products.

   3. This provision **2.** does not apply to any vendor included as an insured by an endorsement issued by us and made a part of this Coverage Part.

   4. This provision **2.** does not apply if "bodily injury" or "property damage" included within the "products-completed operations hazard" is excluded either by the provisions of the Coverage Part or by endorsement.

**2. MISCELLANEOUS ADDITIONAL INSUREDS**

WHO IS AN INSURED is amended to include as an insured any person or organization (called additional insured) described in paragraphs **3.a.** through **3.h.** below whom you are required to add as an additional insured on this policy under a written contract or agreement but the written contract or agreement must be:

1. Currently in effect or becoming effective during the term of this policy; and

2. Executed prior to the "bodily injury," "property damage" or "personal and advertising injury," but

Only the following persons or organizations are additional insureds under this endorsement and


3002004820977027748833
Reproduction Subject to Protective Order – Highly Confidential

SB-146932-B
(Ed. 03/06)

Page 1 of 3
(Version 1.0)

MEDIATION – CONFIDENTIAL.
Subject to Protective Order - Highly Confidential

CNA_BSA0002193
BSAPolicyEv-00015761
TrustApp0828

SB-146932-B
(Ed. 03/06)

coverage provided to such additional insureds is limited as provided herein:

**a.  Additional Insured – Your Work**

That person or organization for whom you do work is an additional insured solely for liability due to your negligence specifically resulting from your work for the additional insured which is the subject of the written contract or written agreement. No coverage applies to liability resulting from the sole negligence of the additional insured.

The insurance provided to the additional insured is limited as follows:

**(1)** The Limits of Insurance applicable to the additional insured are those specified in the written contract or written agreement or in the Declarations of this policy, whichever is less. These Limits of Insurance are inclusive of, and not in addition to, the Limits of Insurance shown in the Declarations.

**(2)** The coverage provided to the additional insured by this endorsement and paragraph **F.9.** of the definition of "insured contract" under **Liability and Medical Expenses Definitions** do not apply to "bodily injury" or "property damage" arising out of the "products-completed operations hazard" unless required by the written contract or written agreement.

**(3)** The insurance provided to the additional insured does not apply to "bodily injury," "property damage," or "personal and advertising injury" arising out of the rendering or failure to render any professional services.

**b.  State or Political Subdivisions**

A state or political subdivision subject to the following provisions:

**(1)** This insurance applies only with respect to the following hazards for which the state or political subdivision has issued a permit in connection with premises you own, rent, or control and to which this insurance applies:

**(a)** The existence, maintenance, repair, construction, erection, or removal of advertising signs, awnings, canopies, cellar entrances, coal holes, driveways, manholes, marquees, hoistaway openings, sidewalk vaults, street banners, or decorations and similar exposures; or

**(b)** The construction, erection, or removal of elevators; or

**(2)** This insurance applies only with respect to operations performed by you or on your behalf for which the state or political subdivision has issued a permit.

This insurance does not apply to "bodily injury," "property damage" or "personal and advertising injury" arising out of operations performed for the state or municipality.

**c.  Controlling Interest**

Any persons or organizations with a controlling interest in you but only with respect to their liability arising out of:

**(1)** Their financial control of you; or

**(2)** Premises they own, maintain or control while you lease or occupy these premises.

This insurance does not apply to structural alterations, new construction and demolition operations performed by or for such additional insured.

**d.  Managers or Lessors of Premises**

A manager or lessor of premises but only with respect to liability arising out of the ownership, maintenance or use of that specific part of the premises leased to you and subject to the following additional exclusions:

This insurance does not apply to:

**(1)** Any "occurrence" which takes place after you cease to be a tenant in that premises; or

**(2)** Structural alterations, new construction or demolition operations performed by or on behalf of such additional insured.

**e.  Mortgagee, Assignee or Receiver**

A mortgagee, assignee or receiver but only with respect to their liability as mortgagee, assignee, or receiver and arising out of the ownership, maintenance, or use of a premises by you.

MEDIATION – CONFIDENTIAL.
Subject to Protective Order - Highly Confidential

CNA_BSA0002194
BSAPolicyEv-00015762
TrustApp0829

SB-146932-B
(Ed. 03/06)

This insurance does not apply to structural alterations, new construction or demolition operations performed by or for such additional insured.

**1. Owners/Other Interests – Land is Leased**

An owner or other interest from whom land has been leased by you but only with respect to liability arising out of the ownership, maintenance or use of that specific part of the land leased to you and subject to the following additional exclusions:

This insurance does not apply to:

**(1)** Any "occurrence" which takes place after you cease to lease that land; or

**(2)** Structural alterations, new construction or demolition operations performed by or on behalf of such additional insured.

**g. Co-owner of Insured Premises**

A co-owner of a premises co-owned by you and covered under this insurance but only with respect to the co-owners liability as co-owner of such premises.

**h. Lessor of Equipment**

Any person or organization from whom you lease equipment. Such person or organization are insureds only with respect to their liability arising out of the maintenance, operation or use by you of equipment leased to you by such person

or organization. A person's or organization's status as an insured under this endorsement ends when their written contract or agreement with you for such leased equipment ends.

With respect to the insurance afforded these additional insureds, the following additional exclusions apply:

This insurance does not apply:

**(1)** To any "occurrence" which takes place after the equipment lease expires; or

**(2)** To "bodily injury," "property damage" or "personal and advertising injury" arising out of the sole negligence of such additional insured.

Any insurance provided to an additional insured designated under paragraphs **a.** through **h.** above does not apply to "bodily injury" or "property damage" included within the "products-completed operations hazard."

**3.** The following is added **to Paragraph H.** of the **BUSINESSOWNERS COMMON POLICY CONDITIONS:**

**H. Other Insurance**

**4.** This insurance is excess over any other insurance naming the additional insured as an insured whether primary, excess, contingent or on any other basis unless a written contract or written agreement specifically requires that this insurance be either primary or primary and noncontributing.



SB-146932-B
(Ed. 03/06)

Page 3 of 3

MEDIATION – CONFIDENTIAL.
Subject to Protective Order - Highly Confidential

CNA_BSA0002195
BSAPolicyEv-00015763
TrustApp0830



SB-146936-A
(Ed. 01/06)

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## INFLATION GUARD

This endorsement modifies insurance provided under the following:

BUSINESSOWNERS SPECIAL PROPERTY COVERAGE FORM

The following coverage is added to your Businessowners Special Property Coverage Form:

**Inflation Guard**

1. The limit of Insurance for Building will be increased by the annual percentage shown in the Declarations, if you choose this optional coverage.

   The limit of Insurance for Business Personal Property will be increased by the annual percentage shown in the Declarations, if you choose this optional coverage.

2. The amount of increase will be:

   a. The limit that applied on the most recent of the policy inception date, the policy anniversary date, or any other policy change amending the limit; times

   b. The percentage of annual increase shown in the Declarations, expressed as a decimal (example: 5% is .05); times

   c. The number of days since the beginning of the current policy year or the effective date of the most recent policy change amending the limit, divided by 365.

   **Example:**

   If: the applicable limit is $100,000.

   The annual increase is 5%.

   The number of days since the beginning of the policy year (or last policy change) is 146.

   The amount of increase is:

   $100,000 x .05 x 146 / 365 = $2,000.

SB-146936-A
(Ed. 01/06)

Page 1 of 1

MEDIATION – CONFIDENTIAL.
Subject to Protective Order - Highly Confidential

CNA_BSA0002196
BSAPolicyEv-00015764
TrustApp0831



SB-146942-A
(Ed. 01/06)

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# INDIANA CHANGES

This endorsement modifies insurance provided under the following:

BUSINESSOWNERS COVERAGE FORM

**A. Liability** is amended as follows:

**1.** The following is added to Paragraph **E.2. Duties In The Event Of Occurrence, Offense, Claim Or Suit** Liability And Medical Expenses General Condition:

**e.** Notice given by or on behalf of the insured to any of our authorized agents in Indiana, with particulars sufficient to identify the insured, shall be considered to be notice to us.

**B. Common Policy Conditions** is amended as follows:

**1.** Paragraph **A.2. Cancellation** is replaced by the following:

**2. Cancellation Of Policies In Effect**

**a. 90 Days Or Less**

If this policy has been in effect for 90 days or less, we may cancel this policy by mailing or delivering to the first Named Insured written notice of cancellation at least:

**(1)** 10 days before the effective date of cancellation if we cancel for nonpayment of premium;

**(2)** 20 days before the effective date of cancellation if you have perpetrated a fraud or material misrepresentation on us; or

**(3)** 30 days before the effective date of cancellation if we cancel for any other reason.

**b. More Than 90 Days**

If this policy has been in effect for more than 90 days, or is a renewal of a policy we issued, we may cancel this policy, only for one or more of the reasons listed below, by mailing or delivering to the first Named Insured written notice of cancellation at least:

**(1)** 10 days before the effective date of cancellation if we cancel for nonpayment of premium;

**(2)** 20 days before the effective date of cancellation if you have perpetrated a fraud or material misrepresentation on us; or

**(3)** 45 days before the effective date of cancellation if:

**(a)** There has been a substantial change in the scale of risk covered by this policy;

**(b)** Reinsurance of the risk associated with this policy has been cancelled; or

**(c)** You have failed to comply with reasonable safety recommendations.

**2.** Paragraph **K.1. Transfer Of Rights Of Recovery Against Others To Us** is replaced by the following:

**1.** Applicable to Businessowners Property Coverage:

If any person or organization to or for whom we make payment under this policy has rights to recover damages from another, those rights are transferred to us to the extent of our payment. Our right to recover damages from another may be enforced even if the person or organization to or for whom we make payment has not been fully compensated for damages.

The person or organization to or for whom we make payment must do everything necessary to secure our rights and must do nothing after loss to impair them. But you may waive your rights against another party in writing:

**a.** Prior to a loss to your Covered Property.

**b.** After a loss to your Covered Property only if, at time of loss, that party is one of the following:

**(1)** Someone insured by this insurance;

**(2)** A business firm:

**(a)** Owned or controlled by you; or

**(b)** That owns or controls you; or

**(3)** Your tenant.

You may also accept the usual bills of lading or shipping receipts limiting the liability of carriers.

This will not restrict your insurance.



MEDIATION – CONFIDENTIAL.
Subject to Protective Order - Highly Confidential

CNA_BSA0002197
BSAPolicyEv-00015765
TrustApp0832

SB-146942-A
(Ed. 01/06)

3.  The following paragraph is added and supersedes any provision to the contrary.

**M. Nonrenewal**

1.  If we elect not to renew this policy, we will mail or deliver to the first Named Insured written notice of nonrenewal at least 45 days before:

    a.  The expiration date of this policy, if the policy is written for a term of one year or less; or

    b.  The anniversary date of this policy, if the policy is written for a term of more than one year.

2.  We will mail or deliver our notice to the first Named Insured's last mailing address known to us. If notice is mailed, proof of mailing will be sufficient proof of notice.

C.  The following paragraph is added to the Businessowners Coverage Form:

**PROVISIONS RELATING TO POLLUTANTS**

In this Policy, any exclusion, limitation, or other provision relating to pollutants ("pollutants"), or any amendment to or replacement of such exclusions, limitations or other provisions, applies whether or not the irritant or contaminant has any function in your business, operations, premises, site or location.

MEDIATION – CONFIDENTIAL.
Subject to Protective Order - Highly Confidential

CNA_BSA0002198
BSAPolicyEv-00015766
TrustApp0833



# IMPORTANT INFORMATION

## CLAIM SETTLEMENT PRACTICES – INDIANA

**We are here to serve you ...**

As our policyholder, your satisfaction is very important to us. Should you have a valid claim, we fully expect to provide a fair settlement in a timely fashion. Should you feel you are not being treated fairly, we want you to know you may contact your agent or CNA.

**If you are not satisfied ...**

If you wish to seek further assistance, you may contact the Department of Insurance, a governmental agency that regulates insurance. Please direct your complaints to:

The Consumer Services Division of Indiana
Indiana Department of Insurance
311 West Washington Street, Suite 300
Indianapolis, IN  46204-2787

Consumer Hotline:  1-800-622-4461
in the Indianapolis area:  1-317-232-2385

If you have any questions, please contact your independent CNA agent.



SB-146945-A
(Ed. 01/06)

Page 1 of 1

MEDIATION – CONFIDENTIAL.
Subject to Protective Order - Highly Confidential



SB-146985-A
(Ed. 01/06)

# POLICY LIMITATION DISCLOSURE NOTICE
## EXCLUSION – RESPIRABLE DUST

This Disclosure Notice is not your policy. READ YOUR POLICY CAREFULLY to determine rights, duties, and what is and is not covered. Only the provisions of your policy determine the extent of your insurance protection.

This policy contains an exclusion of coverage for claims arising out of "respirable dust."

With this endorsement, coverage is excluded for:

1.  "Bodily injury" which arises out of the actual, alleged or threatened respiration or ingestion at any time of "respirable dust";

2.  "Property damage" which arises out of the actual, alleged or threatened presence of "respirable dust"; and

3.  "Personal injury" or "advertising injury" which arises out of the actual, alleged or threatened exposure at any time to or the presence of "respirable dust."

"Respirable dust" means respirable particulate matter in the solid state excluding living organisms which contains any of the following materials including but not limited to: aluminum, antimony, attapulgite, berylium, bentonite, cadmium, cement, chromite, coal, cobalt, erionite, fuller's earth, gypsum, iron, kaolin, manganese, micas, mullite, nepheline, nickel, palygorskite, sepiolite, sillimanite, talc, titanium, tungsten carbide, vermiculite, wollastonite, xirconium, or similar organic or organic substances.

Please read this exclusion carefully.

SB-146985-A
(Ed. 01/06)

Page 1 of 1

MEDIATION – CONFIDENTIAL.
Subject to Protective Order - Highly Confidential

CNA_BSA0002200
BSAPolicyEv-00015768
TrustApp0835



SB-147002-A
(Ed. 01/06)

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# EXCLUSION – WASTE

This endorsement modifies insurance provided under the following:

BUSINESSOWNERS LIABILITY COVERAGE FORM

**A.** The following exclusion is added to **B.1. Exclusions Applicable To Business Liability Coverage:**

This insurance does not apply to "bodily injury" or "property damage" that would not have occurred in whole or in part but for the disposal of waste by or for the insured, or the handling, transportation, treatment or storage of waste disposed of, or in the process of being disposed of, by or for the insured.

**B.** The following exclusion is added to **B.1. Exclusions Applicable To Business Liability Coverage:**

This insurance does not apply to "personal and advertising injury" that would not have occurred in whole or in part but for the disposal of waste by or for the insured, or the handling, transportation, treatment or storage of waste disposed of, or in the process of being disposed of, by or for the insured.



SB-147002-A
(Ed. 01/06)

Page 1 of 1
(Version 1.0)

MEDIATION – CONFIDENTIAL.
Subject to Protective Order - Highly Confidential

CNA_BSA0002201
BSAPolicyEv-00015769
TrustApp0836

**CNA**

SB-147007-A
(Ed. 01/06)

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## EXCLUSION – UNDERGROUND STORAGE TANKS

This endorsement modifies insurance provided under the following:

BUSINESSOWNERS LIABILITY COVERAGE FORM

**A.** The following exclusion is added to **B.1. Exclusions Applicable To Business Liability Coverage:**

This insurance does not apply to "bodily injury" or "property damage" that would not have occurred in whole or in part but for the spilling, leaking or escaping of any of the contents of an "underground storage tank".

**B.** The following exclusion is added to **B.1. Exclusions Applicable To Business Liability Coverage:**

This insurance does not apply to "personal and advertising injury" that would not have occurred in whole or in part but for the spilling, leaking or escaping of any of the contents of an "underground storage tank".

**C.** The following is added to **F. Definitions:**

"Underground storage tank" means:

**(1)** One tank or a combination of tanks, including associated piping, filling and dispensing systems:

**(a)** That is used to contain substances; and

**(b)** The volume of which, including the volume of the underground associated piping, is at least ten percent (10%) beneath the surface of the ground.

**(2)** Any part of the underground piping or dispensing systems associated with a storage tank system that does not otherwise qualify as an "underground storage tank" under paragraph **(1)**.

"Underground storage tank" does not include a storage tank situated in an underground area such as a basement or cellar if at least 90% of the volume of the storage tank and associated piping, filling and dispensing systems are situated upon or above the surface of the floor, but any part of the piping or dispensing systems of such a system that are beneath the surface of the floor are an "underground storage tank".

MEDIATION – CONFIDENTIAL.
Subject to Protective Order - Highly Confidential

CNA_BSA0002202
BSAPolicyEv-00015770
TrustApp0837



SB-147075-A
(Ed. 01/06)

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## ECONOMIC AND TRADE SANCTIONS CONDITION

The following condition is added to the **COMMON POLICY CONDITIONS:**

**ECONOMIC AND TRADE SANCTIONS CONDITION**

In accordance with laws and regulations of the United States concerning economic and trade embargoes, this policy is void **ab initio** (void from its inception) with respect to any term or condition of this policy that violates any laws or regulations of the United States concerning economic and trade embargoes including, but not limited to the following:

1.  Any insured, or any person or entity claiming the benefits of an insured, who is or becomes a Specially Designated National or Blocked Person or who is otherwise subject to U.S. economic or trade sanctions;

2.  Any claim or "suit" that is brought in a Sanctioned Country or by a Sanctioned Country Government, where any action in connection with such claim or suit is prohibited by U.S. economic or trade sanctions;

3.  Any claim or "suit" that is brought by any Specially Designated National or Blocked Person or any person or entity who is otherwise subject to U.S. economic or trade sanctions;

4.  Property that is located in a Sanctioned Country or that is owned by, rented to or in the care, custody or control of a Sanctioned Country Government, where any activities related to such property are prohibited by U.S. economic or trade sanctions; or

5.  Property that is owned by, rented to or in the care, custody or control of a Specially Designated National or Blocked Person, or any person or entity who is otherwise subject to U.S. economic or trade sanctions.

As used in this endorsement a Specially Designated National or Blocked Person is any person or entity that is on the list of Specially Designated Nationals and Blocked Persons issued by the U.S. Treasury Department's Office of Foreign Asset Control (O.F.A.C.) as it may be from time to time amended.

As used in this endorsement a Sanctioned Country is any country that is the subject of trade or economic embargoes imposed by the laws or regulations of the United States of America.



SB-147075-A
(Ed. 01/06)

Page 1 of 1

MEDIATION – CONFIDENTIAL.
Subject to Protective Order - Highly Confidential

CNA_BSA0002203
BSAPolicyEv-00015771
TrustApp0838

**CNA**

SB-147078-A
(Ed. 01/06)

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# EXCLUSION – VIOLATION OF STATUTES THAT GOVERN E-MAILS, FAX, PHONE CALLS OR OTHER METHODS OF SENDING MATERIAL OR INFORMATION

This endorsement modifies insurance provided under the following:

BUSINESSOWNERS LIABILITY COVERAGE FORM

**A.** The following exclusion is added to Section **B. EXCLUSIONS** of the Businessowners Liability Coverage Form:

**q.** This insurance does not apply to:

DISTRIBUTION OF MATERIAL IN VIOLATION OF STATUTES

"Bodily injury" or "property damage" arising directly or indirectly out of any action or omission that violates or is alleged to violate:

**(1)** The Telephone Consumer Protection Act (TCPA), including any amendment of or addition to such law; or

**(2)** The CAN-SPAM Act of 2003, including any amendment of or addition to such law; or

**(3)** Any statute, ordinance or regulation, other than the TCPA or CAN-SPAM Act of 2003, that prohibits or limits the sending, transmitting, communicating or distribution of material or information.

**B.** The following exclusion is added to Section **B. EXCLUSIONS**, Paragraph **p.** Personal and Advertising Injury:

**(15)** This Insurance does not apply to:

DISTRIBUTION OF MATERIAL IN VIOLATION OF STATUTES

"Personal and advertising injury" arising directly or indirectly out of any action or omission that violates or is alleged to violate:

**(1)** The Telephone Consumer Protection Act (TCPA), including any amendment of or addition to such law; or

**(2)** The CAN-SPAM Act of 2003, including any amendment of or addition to such law; or

**(3)** Any statute, ordinance or regulation, other than the TCPA or CAN-SPAM Act of 2003, that prohibits or limits the sending, transmitting, communicating or distribution of material or information.

SB-147078-A
(Ed. 01/06)

Page 1 of 1

MEDIATION – CONFIDENTIAL.
Subject to Protective Order - Highly Confidential

CNA_BSA0002204
BSAPolicyEv-00015772
TrustApp0839



SB-147079-A
(Ed. 01/06)

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## WAR LIABILITY EXCLUSION

This endorsement modifies insurance provided under the following:

BUSINESSOWNERS LIABILITY COVERAGE FORM

**I.** The following provisions are added to the Business Liability Coverage Forms:

**A. War** Exclusion **i.** under Paragraph **B.1., Exclusions – Applicable to Business Liability Coverage** is replaced by the following:

This insurance does not apply to War.

"Bodily injury," "property damage," "personal and advertising injury," however caused, arising, directly or indirectly, out of:

**(1)** War, including undeclared or civil war; or

**(2)** Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government,

sovereign or other authority using military personnel or other agents; or

**(3)** Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

**II.** The following provision is added to the Business Liability Coverage Form:

**A.** Exclusion **h.** under Paragraph **B.2., Exclusions – Applicable To Medical Expenses Coverage** does not apply. Medical Expenses due to war are now subject to Exclusion **g.** of Paragraph **B.2.,** since "bodily injury" arising out of war is now excluded under Paragraph **B.1., Exclusions – Applicable To Business Liability Coverage.**



SB-147079-A
(Ed. 01/06)

Includes copyrighted material of Insurance Services Office, Inc., with its permission.
Copyright, Insurance Services Office, Inc., 2003

Page 1 of 1

MEDIATION – CONFIDENTIAL.
Subject to Protective Order - Highly Confidential

CNA_BSA0002205
BSAPolicyEv-00015773
TrustApp0840



SB-147080-A
(Ed. 01/06)

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## EXCLUSION – SILICA

This endorsement modifies insurance provided under the following:

BUSINESSOWNERS LIABILITY COVERAGE FORM

**A.** The following exclusion is added to **Section B.1. EXCLUSIONS – Applicable to Business Liability Coverage:**

This insurance does not apply to:

**1.** "Bodily injury" arising in whole or in part out of the actual, alleged or threatened respiration or ingestion at any time of "silica"; or

**2.** "Property damage" arising in whole or in part out of the actual, alleged or threatened presence of "silica."

**3.** This insurance does not apply to "personal and advertising injury" arising in whole or in part out of the actual, alleged or threatened exposure at any time to or the presence of "silica."

**B.** The following definition is added:

"Silica" means the chemical compound silicon dioxide ($SiO_2$) in any form, including dust which contains "silica."

SB-147080-A
(Ed. 01/06)

MEDIATION – CONFIDENTIAL.
Subject to Protective Order - Highly Confidential

CNA_BSA0002206
BSAPolicyEv-00015774
TrustApp0841



SB-147081-A
(Ed. 01/06)

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## EXCLUSION – RESPIRABLE DUST

This endorsement modifies insurance provided under the following:

BUSINESSOWNERS LIABILITY COVERAGE FORM

**A.** The following exclusion is added to **Section B.1. EXCLUSIONS – Applicable to Business Liability Coverage:**

This insurance does not apply to:

**1.** "Bodily injury" arising in whole or in part out of the actual, alleged or threatened respiration or ingestion at any time of "respirable dust"; or

**2.** "Property damage" arising in whole or in part out of the actual, alleged or threatened presence of "respirable dust."

**3.** This insurance does not apply to "personal and advertising injury" arising in whole or in part out of the actual, alleged or threatened exposure at any time to or the presence of "respirable dust."

**B.** The following definition is added:

"Respirable dust" means respirable particulate matter but does not include living organisms.



SB-147081-A
(Ed. 01/06)

Page 1 of 1

MEDIATION – CONFIDENTIAL.
Subject to Protective Order - Highly Confidential

CNA_BSA0002207
BSAPolicyEv-00015775
TrustApp0842

**CNA**

SB-147082-A
(Ed. 01/06)

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## BUSINESSOWNERS COMMON POLICY CONDITIONS

This endorsement modifies insurance provided under the following:

BUSINESSOWNERS POLICY

All coverages of this policy are subject to the following conditions.

**A. Cancellation**

1.  The first Named Insured shown in the Declarations may cancel this policy by mailing or delivering to us advance written notice of cancellation.

2.  We may cancel this policy by mailing or delivering to the first Named Insured written notice of cancellation at least:

    **a.** 5 days before the effective date of cancellation if any one of the following conditions exists at any building that is Covered Property in this policy.

    **(1)** The building has been vacant or unoccupied 60 or more consecutive days. This does not apply to:

    **(a)** Seasonal unoccupancy; or

    **(b)** Buildings in the course of construction, renovation or addition.

    Buildings with 65% or more of the rental units or floor area vacant or unoccupied are considered unoccupied under this provision.

    **(2)** After damage by a covered cause of loss, permanent repairs to the building:

    **(a)** Have not started, and

    **(b)** Have not been contracted for,

    within 30 days of initial payment of loss.

    **(3)** The building has:

    **(a)** An outstanding order to vacate;

    **(b)** An outstanding demolition order; or

    **(c)** Been declared unsafe by governmental authority.

    **(4)** Fixed and salvageable items have been or are being removed from the building and are not being replaced. This does not apply to such removal that is necessary or incidental to any renovation or remodeling.

    **(5)** Failure to:

    **(a)** Furnish necessary heat, water, sewer service or electricity for 30 consecutive days or more, except during a period of seasonal unoccupancy; or

    **(b)** Pay property taxes that are owing and have been outstanding for more than one year following the date due, except that this provision will not apply where you are in a bona fide dispute with the taxing authority regarding payment of such taxes.

    **b.** 10 days before the effective date of cancellation if we cancel for nonpayment of premium.

    **c.** 30 days before the effective date of cancellation if we cancel for any other reason.

3.  We will mail or deliver our notice to the first Named Insured's last mailing address known to us.

4.  Notice of cancellation will state the effective date of cancellation. The policy period will end on that date.

5.  If this policy is cancelled, we will send the first Named Insured any premium refund due. If we cancel, the refund will be pro rata. If the first Named Insured cancels, the refund may be less than pro rata. The cancellation will be effective even if we have not made or offered a refund.

6.  If notice is mailed, proof of mailing will be sufficient proof of notice.

**B. Changes**

This policy contains all the agreements between you and us concerning the insurance afforded. The first Named Insured shown in the Declarations is authorized to make changes in the terms of this policy with our consent. This policy's terms can be amended or waived only by endorsement issued by us and made a part of this policy.

**C. Concealment, Misrepresentation Or Fraud**

This policy is void in any case of fraud by you as it relates to this policy at any time. It is also void if you or any other insured, at any time, intentionally conceal or misrepresent a material fact concerning:

SB-147082-A
(Ed. 01/06)

Page 1 of 3

CNA_BSA0002208
BSAPolicyEv-00015776
TrustApp0843

SB-147082-A
(Ed. 01/06)

1. This policy;

2. The Covered Property;

3. Your interest in the Covered Property; or

4. A claim under this policy.

**D. Examination Of Your Books And Records**

We may examine and audit your books and records as they relate to this policy at any time during the policy period and up to three years afterward.

**E. Inspections And Surveys**

We have the right but are not obligated to:

1. Make inspections and surveys at any time;

2. Give you reports on the conditions we find; and

3. Recommend changes.

Any inspections, surveys, reports or recommendations relate only to insurability and the premiums to be charged. We do not make safety inspections. We do not undertake to perform the duty of any person or organization to provide for the health or safety of workers or the public. And we do not warrant that conditions:

1. Are safe or healthful; or

2. Comply with laws, regulations, codes or standards.

This condition applies not only to us, but also to any rating, advisory, rate service or similar organization which makes insurance inspections, surveys, reports or recommendations.

**F. Insurance Under Two Or More Coverages**

If two or more of this policy's coverages apply to the same loss or damage, we will not pay more than the actual amount of the loss or damage.

**G. Liberalization**

If we adopt any revision that would broaden the coverage under this policy without additional premium within 45 days prior to or during the policy period, the broadened coverage will immediately apply to this policy.

**H. Other Insurance**

1. If there is other insurance covering the same loss or damage, we will pay only for the amount of covered loss or damage in excess of the amount due from that other insurance, whether you can collect on it or not. But we will not pay more than the applicable Limit of Insurance.

2. Business Liability Coverage is excess over any other insurance that insures for direct physical loss or damage.

3. When this insurance is excess, we will have no duty under Business Liability Coverage to defend any claim or "suit" that any other insurer has a duty to defend. If no other insurer defends, we will undertake to do so; but we will be entitled to the insured's rights against all those other insurers.

**I. Premiums**

1. The first Named Insured shown in the Declarations:

   a. Is responsible for the payment of all premiums; and

   b. Will be the payee for any return premiums we pay.

2. The premium shown in the Declarations was computed based on rates in effect at the time the policy was issued. On each renewal, continuation or anniversary of the effective date of this policy, we will compute the premium in accordance with our rates and rules then in effect.

3. With our consent, you may continue this policy in force by paying a continuation premium for each successive one-year period. The premium must be:

   a. Paid to us prior to the anniversary date; and

   b. Determined in accordance with Paragraph **2.** above.

   Our forms then in effect will apply. If you do not pay the continuation premium, this policy will expire on the first anniversary date that we have not received the premium.

4. Undeclared exposures or change in your business operation, acquisition or use of locations may occur during the policy period that are not shown in the Declarations. If so, we may require an additional premium. That premium will be determined in accordance with our rates and rules then in effect.

**J. Premium Audit**

1. This policy is subject to audit if a premium designated as an advance premium is shown in the Declarations. We will compute the final premium due when we determine your actual exposures.

2. Premium shown in this policy as advance premium is a deposit premium only. At the close of each audit period we will compute the earned premium for that period. Audit premiums are due and payable on notice to the first Named Insured. If the sum of the advance and audit premiums paid for the policy period is greater than the earned premium, we will return the excess to the first Named Insured.

SB-147082-A
(Ed. 01/06)

Page 2 of 3

MEDIATION – CONFIDENTIAL.
Subject to Protective Order - Highly Confidential

CNA_BSA0002209
BSAPolicyEv-00015777
TrustApp0844

SB-147082-A
(Ed. 01/06)

3. The first Named Insured must keep records of the information we need for premium computation, and send us copies at such times as we may request.

**K. Transfer Of Rights Of Recovery Against Others To Us**

1. Applicable to Businessowners Property Coverage:

   If any person or organization to or for whom we make payment under this policy has rights to recover damages from another, those rights are transferred to us to the extent of our payment. That person or organization must do everything necessary to secure our rights and must do nothing after loss to impair them. But you may waive your rights against another party in writing:

   **a.** Prior to a loss to your Covered Property.

   **b.** After a loss to your Covered Property only if, at time of loss, that party is one of the following:

      **(1)** Someone insured by this insurance;

      **(2)** A business firm:

         **(a)** Owned or controlled by you; or

         **(b)** That owns or controls you; or

**(3)** Your tenant.

You may also accept the usual bills of lading or shipping receipts limiting the liability of carriers.

This will not restrict your insurance.

2. Applicable to Businessowners Liability Coverage:

   If the insured has rights to recover all or part of any payment we have made under this policy, those rights are transferred to us. The insured must do nothing after loss to impair them. At our request, the insured will bring "suit" or transfer those rights to us and help us enforce this condition does not apply to Medical Expenses Coverage.

**L. Transfer Of Your Rights And Duties Under This Policy**

Your rights and duties under this policy may not be transferred without our written consent except in the case of death of an individual Named Insured.

If you die, your rights and duties will be transferred to your legal representative but only while acting within the scope of duties as your legal representative. Until your legal representative is appointed, anyone having proper temporary custody of your property will have your rights and duties but only with respect to that property.

Subject to Protective Order – Highly Confidential

MEDIATION – CONFIDENTIAL.
Subject to Protective Order - Highly Confidential

CNA_BSA0002210
BSAPolicyEv-00015778
TrustApp0845



SB-147083-A
(Ed. 01/06)

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## FUNGI / MOLD / MILDEW / YEAST / MICROBE EXCLUSION AND WATER DAMAGE LIMITATION ENDORSEMENT

This endorsement modifies insurance provided under the following:

BUSINESSOWNERS LIABILITY COVERAGE FORM



**A.** The following exclusion is added to **SECTION B.1., EXCLUSIONS – Applicable to Business Liability Coverage:**

This insurance does not apply to:

**Fungi and Microbes**

**(1)** "Bodily injury" or "property damage" arising out of or relating to, in whole or in part, the actual, alleged or threatened inhalation of, ingestion of, contact with, exposure to, existence of, or growth or presence of any "fungi" or "microbes."

**(2)** Any loss, cost or expense arising out of or relating to the testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, remediating, or disposing of, or in any way responding to or assessing the effects of "fungi" or "microbes" by any insured or by anyone else.

**(3)** "Property damage" caused by water where there also exists any "property damage" arising out of or relating to, in whole or in part, the actual, alleged or threatened inhalation of, ingestion of, contact with, exposure to, existence of, or growth or presence of any "fungi" or "microbes."

This exclusion applies regardless of any other cause or event that contributes concurrently or in any sequence to such injury or damage, loss, cost or expense.

This exclusion does not apply where your business is food processing, sales, or serving, and the "bodily injury" is caused solely by food poisoning in connection with such processing, sales, or serving.

**B.** The following exclusion is added to **SECTION B.1.q. & r., EXCLUSIONS – Applicable to Business Liability Coverage / "Personal and advertising injury":**

This insurance does not apply to:

**Fungi and Microbes**

**(1)** "Personal and advertising injury" arising out of or relating to, in whole or in part, the actual, alleged or threatened inhalation of, ingestion of, contact with, exposure to, existence of, or growth or presence of any "fungi" or "microbes."

**(2)** Any loss, cost or expense arising out of or relating to the testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, remediating, or disposing of, or in any way responding to or assessing the effects of "fungi" or "microbes" by any insured or by anyone else.

This exclusion applies regardless of any other cause or event that contributes concurrently or in any sequence to such injury, loss, cost or expense.

**C.** The following definitions are added to **SECTION F., DEFINITIONS:**

"Fungi" means any form of fungus, including but not limited to, yeast, mold, mildew, rust, smut or mushroom, and including any spores, mycotoxins, odors, or any other substances, products, or byproducts produced by, released by, or arising out of the current or past presence of fungi. But "fungi" does not include any fungi intended by the insured for consumption.

"Microbe(s)" means any non-fungal microorganism or non-fungal, colony-form organism that causes infection or disease. "Microbe" includes any spores, mycotoxins, odors, or any other substances, products, or byproducts produced by, released by, or arising out of the current or past presence of microbes. But "microbe" does not mean microbes that were transmitted directly from person to person.

SB-147083-A
(Ed. 01/06)

Incorporates materials copyrighted by Insurance Services Office, reprinted with their permission.

Page 1 of 1

MEDIATION – CONFIDENTIAL.
Subject to Protective Order - Highly Confidential

CNA_BSA0002211
BSAPolicyEv-00015779
TrustApp0846

**CNA**

SB-147084-A
(Ed. 01/06)

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## FUNGI, WET ROT, DRY ROT AND MICROBE EXCLUSION

This endorsement modifies insurance provided under the following:

BUSINESSOWNERS SPECIAL PROPERTY COVERAGE FORM

I. **Section B.1., EXCLUSIONS,** is amended to add the following provision:

**A. Fungi, Wet Rot, Dry Rot and Microbes**

Presence, growth, proliferation, spread or any activity of "fungi," wet or dry rot, or "microbes."

This exclusion does not apply when "fungi," wet or dry rot or "microbes" result from fire or lightning.

II. **Section B., Subsections (2) and (7), EXCLUSIONS/Other Types of Loss,** are deleted in its entirety and replaced as follows:

(2) Rust, or other corrosion, decay, deterioration, hidden or latent defect or any quality in property that causes it to damage or destroy itself;

(7) The following causes of loss:

(a) Dampness or dryness of atmosphere;

(b) Changes in or extremes of temperature; or

(c) Marring or scratching.

III. **Section B.1.f., EXCLUSIONS/Water,** is amended to add the following provision:

(5) Continuous or repeated discharge, seepage or leakage of water, or the presence or condensation of humidity, moisture or vapor, that occurs over a period of 14 days or more. But if the continuous or repeated seepage or leakage of water results in Equipment Breakdown not otherwise excluded, we will pay for the loss or damage caused by that Equipment Breakdown.

IV. **Section G., DEFINITIONS,** is amended to add the following two (2) definitions:

**"Fungi"** means any form of fungus, including but not limited to, yeast, mold, mildew, rust, smut or mushroom, and including any spores, mycotoxins, odors, or any other substances, products, or byproducts produced by, released by, or arising out of the current or past presence of "fungi." But "fungi" does not include any "fungi" intended by the insured for consumption.

**"Microbe(s)"** means any non-fungal micro-organism or non-fungal, colony-form organism that causes infection or disease. "Microbe" includes any spores, mycotoxins, odors, or any other substances, products, or byproducts produced by, released by, or arising out of the current or past presence of "microbes."

SB-147084-A
(Ed. 01/06)

Includes material copyrighted by Insurance Services Office, Inc.

Page 1 of 1

MEDIATION – CONFIDENTIAL.
Subject to Protective Order - Highly Confidential

CNA_BSA0002212
BSAPolicyEv-00015780
TrustApp0847



SB-147085-A
(Ed. 01/06)

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# AMENDMENT OF INSURING AGREEMENT
# KNOWN OR CONTINUING INJURY OR DAMAGE

This endorsement modifies insurance provided under the following:

BUSINESSOWNERS LIABILITY COVERAGE FORM

**Section A.1.b. (1), COVERAGES / Business Liability,** is amended to add the following provisions:

(c) With respect to "bodily injury" or "property damage" that continues, changes or resumes so as to occur during more than one policy period, both of the following conditions are met:

(i) Prior to the policy period, no "Authorized Insured" knew that the "bodily injury" or "property damage" had occurred, in whole or in part; and

(ii) During the policy period, an "Authorized Insured" first knew that the "bodily injury" or "property damage" had occurred, in whole or in part.

For purposes of this paragraph, **A.1.b.(1) (c)** only, if **(a)** "bodily injury" or "property damage" that occurs during this policy period does not continue, change or resume after the termination of this policy period; and **(b)** no "Authorized Insured" first knows of this "bodily injury" or "property damage" until after the termination of this policy period, then such first knowledge will be deemed to be during this policy period.

(d) "Bodily injury" or "property damage" which occurs during the policy period and was not,

prior to the policy period, known to have occurred by any "Authorized Insured" includes any continuation, change or resumption of that "bodily injury" or "property damage" after the end of the policy period.

(e) "Bodily injury" or "property damage" will be deemed to have been known to have occurred at the earliest time when any "Authorized Insured":

(i) Reports all, or any part, of the "bodily injury" or "property damage" to us or any other insurer;

(ii) Receives a written or verbal demand, claim or "suit" for damages because of the "bodily injury" or "property damage"; or

(iii) Becomes aware by any other means that "bodily injury" or "property damage" has occurred or has begun to occur.

**Section F., DEFINITIONS,** is amended to add the following one (1) definition:

**"Authorized Insured"** means any insured listed under Paragraph **1.** of **Section C., Who Is An Insured,** or any "employee" authorized by such an insured to give or receive notice of an "occurrence" or claim.





SB-147085-A
(Ed. 01/06)

Includes copyrighted material of Insurance Services Office, Inc., with its permission.

Page 1 of 1

MEDIATION – CONFIDENTIAL.
Subject to Protective Order - Highly Confidential

CNA_BSA0002213
BSAPolicyEv-00015781
TrustApp0848



SB-147086-A
(Ed. 01/06)

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# LOSS PAYABLE PROVISIONS

This endorsement modifies insurance provided under the following:

BUSINESSOWNERS POLICY

**\*SCHEDULE**

| Prem. No. | Description of Property | Loss Payee (Name & Address) | Provision Applicable (Indicate Paragraph A, B, or C) |
|---|---|---|---|

**REFER TO LOSS PAYEE SCHEDULE**

\*   Information required to complete this Schedule, if not shown on this endorsement, will be shown in the Declarations.

The following is added to the Businessowners Special Property Coverage Form LOSS PAYMENT Loss Condition, as shown in the Declarations or by an "A," "B" or "C" in the Schedule:

**A. LOSS PAYABLE**

For Covered Property in which both you and a Loss Payee shown in the Schedule or in the Declarations have an insurable interest, we will:

1.  Adjust losses with you; and

2.  Pay any claim for loss or damage jointly to you and the Loss Payee, as interests may appear.

**B. LENDER'S LOSS PAYABLE**

1.  The Loss Payee shown in the Schedule or in the Declarations is a creditor (including a mortgageholder or trustee) with whom you have entered a contract for the sale of Covered Property, whose interest in that Covered Property is established by such written contracts as:

    a.  Warehouse receipts;

    b.  A contract for deed;

    c.  Bills of lading; or

    d.  Financing statements.

2.  For Covered Property in which both you and a Loss Payee have an insurable interest:

    a.  We will pay for covered loss or damage to each Loss Payee in their order of precedence, as interests may appear.

    b.  The Loss Payee has the right to receive loss payment even if the Loss Payee has started foreclosure for similar action on the Covered Property.

    c.  If we deny your claim because of your acts or because you have failed to comply with the

terms of this policy, the Loss Payee will still have the right to receive loss payment if the Loss Payee:

    (1)  Pays any premium due under this policy at our request if you have failed to do so;

    (2)  Submits a signed, sworn proof of loss within 60 days after receiving notice from us of your failure to do so; and

    (3)  Has notified us of any change in ownership, occupancy or substantial change in risk known to the Loss Payee.

    All of the terms of the Businessowners Special Property Coverage Form will then apply directly to the Loss Payee.

    d.  If we pay the Loss Payee for any loss or damage and deny payment to you because of your acts or because you have failed to comply with the terms of this policy:

    (1)  The Loss Payee's rights will be transferred to us to the extent of the amount we pay; and

    (2)  The Loss Payee's right to recover the full amount of the Loss Payee's claim will not be impaired.

        At our option, we may pay to the Loss Payee the whole principal on the debt plus any accrued interest. In this event, you will pay your remaining debt to us.

3.  If we cancel this policy, we will give written notice to the Loss Payee at least:

    a.  10 days before the effective date of cancellation if we cancel for your nonpayment of premium; or

    b.  30 days before the effective date of cancellation if we cancel for any other reason.

SB-147086-A
(Ed. 01/06)

Page 1 of 2

MEDIATION – CONFIDENTIAL.
Subject to Protective Order - Highly Confidential

SB-147086-A
(Ed. 01/06)

4. If we do not renew this policy, we will give written notice to the Loss Payee at least 10 days before the expiration date of this policy.

## C. CONTRACT OF SALE

1. The Loss Payee shown in the Schedule or in the Declarations is a person or organization you have entered a contract with for the sale of Covered Property.

2. For Covered Property in which both you and the Loss Payee have an insurable interest, we will:

a. Adjust losses with you; and

b. Pay any claim for loss or damage jointly to you and the Loss Payee, as interests may appear.

3. The following is added to the OTHER INSURANCE Businessowners Common Policy Condition:

For Covered Property that is the subject of a contract of sale, the word "you" includes the Loss Payee.



MEDIATION – CONFIDENTIAL.
Subject to Protective Order - Highly Confidential

CNA_BSA0002215
BSAPolicyEv-00015783
TrustApp0850



SB-147088-A
(Ed. 01/06)

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## EXCLUSION – ASBESTOS

This endorsement modifies insurance provided under the following:

BUSINESSOWNERS POLICY

This insurance does not apply to:

**(1)** "Bodily injury", "property damage" or "personal and advertising injury" arising out of the actual, alleged or threatened exposure at any time to asbestos; or

**(2)** Any loss, cost or expense that may be awarded or incurred:

    **(a)** by reason of a claim or "suit" for any such injury or damage; or

    **(b)** in complying with a governmental direction or request to test for, monitor, clean up, remove, contain or dispose of asbestos.

Asbestos means the mineral in any form whether or not the asbestos was at any time:

**(1)** airborne as a fiber, particle or dust;

**(2)** contained in, or formed a part of a product, structure or other real or personal property;

**(3)** carried on clothing;

**(4)** inhaled or ingested; or

**(5)** transmitted by any other means.

SB-147088-A
(Ed. 01/06)

MEDIATION – CONFIDENTIAL.
Subject to Protective Order - Highly Confidential

CNA_BSA0002216
BSAPolicyEv-00015784
TrustApp0851



SB-147089-A
(Ed. 01/06)

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## EMPLOYMENT – RELATED PRACTICES EXCLUSION

This endorsement modifies insurance provided under the following:

BUSINESSOWNERS LIABILITY COVERAGE FORM

The following exclusion is added to Section **B. EXCLUSIONS** of the Businessowners Liability Coverage Form:

This insurance does not apply to:

**r.** "Bodily injury" or "personal and advertising injury" to:

**(1)** A person arising out of any;

    **(a)** Refusal to employ that person;

    **(b)** Termination of that person's employment; or

    **(c)** Employment-related practices, policies, acts or omissions, such as coercion, demotion, evaluation, reassignment, discipline, defamation, harassment,

humiliation or discrimination directed at that person; or

**(2)** The spouse, child, parent, brother or sister of that person as a consequence of "bodily injury" or "personal and advertising injury" to that person at whom any of the employment-related practices described in paragraphs **(1)**, **(2)** or **(3)** above is directed.

This exclusion applies:

**a.** Whether the insured may be liable as an employer or in any other capacity; and

**b.** To any obligation to share damages with or repay someone else who must pay damages because of the injury.



SB-147089-A
(Ed. 01/06)

Includes copyrighted material of the Insurance Services Office, Inc., with its permission.
Copyright, Insurance Services Office, Inc., 1996

Page 1 of 1

MEDIATION – CONFIDENTIAL.
Subject to Protective Order - Highly Confidential

CNA_BSA0002217
BSAPolicyEv-00015785
TrustApp0852

**CNA**

SB-300000-A
(Ed. 01/06)

# BUSINESSOWNERS LIABILITY COVERAGE FORM

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this policy the words "you" and "your" refer to the Named Insured shown in the Declarations. The words "we," "us" and "our" refer to the company providing the insurance.

The word "insured" means any person or organization qualifying as such under Section **C. – Who Is An Insured.**

Other words and phrases that appear in quotation marks have special meaning. Refer to SECTION **F – LIABILITY DEFINITIONS.**

**A. Coverages**

**1. Business Liability (Bodily Injury, Property Damage, Personal and Advertising Injury)**

**a.** We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury," "property damage" or "personal and advertising injury" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury," "property damage" or "personal and advertising injury," to which this insurance does not apply. We may at our discretion, investigate any "occurrence" and settle any claim or "suit" that may result. But:

**(1)** The amount we will pay for damages is limited as described in Section **D –** Liability And Medical Expenses Limits Of Insurance; and

**(2)** Our right and duty to defend end when we have used up the applicable limit of insurance in the payment of judgments or settlements or medical expenses to which this insurance applies.

No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Coverage Extension – Supplementary Payments.

**b.** This insurance applies:

**(1)** To "bodily injury" and "property damage" only if:

**(a)** The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory";

**(b)** The "bodily injury" or "property damage" occurs during the policy period; and

**(c)** Prior to the policy period, no insured listed under Paragraph **C.1.** Who Is

An Insured and no "employee" authorized by you to give or receive notice of an "occurrence" or claim, knew that the "bodily injury" or "property damage" had occurred, in whole or in part. If such a listed insured or authorized "employee" knew, prior to the policy period, that the "bodily injury" or "property damage" occurred, then any continuation, change or resumption of such "bodily injury" or "property damage" during or after the policy period will be deemed to have been known before the policy period.

**(2)** To "personal and advertising injury" caused by an offense arising out of your business, but only if the offense was committed in the "coverage territory" during the policy period.

**c.** "Bodily injury" or "property damage" which occurs during the policy period and was not, prior to the policy period, known to have occurred by any insured listed under Section **C.1.** Who Is An Insured or any "employee" authorized by you to give or receive notice of an "occurrence" or claim, includes any continuation, change or resumption of "bodily injury" or "property damage" after the end of the policy period.

**d.** "Bodily injury" or "property damage" will be deemed to have been known to have occurred at the earliest time when any insured listed under Section **C.1.** Who Is An Insured or any "employee" authorized by you to give or receive notice of an "occurrence" or claim:

**(1)** Reports all, or any part, of the "bodily injury" or "property damage" to us or any other insurer;

**(2)** Receives a written or verbal demand or claim for damages because of the "bodily injury" or "property damage"; or

MEDIATION – CONFIDENTIAL.
Subject to Protective Order - Highly Confidential

CNA_BSA0002218
BSAPolicyEv-00015786
TrustApp0853

SB-300000-A
(Ed. 01/06)

**(3)** Becomes aware by any other means that "bodily injury" or "property damage" has occurred or has begun to occur.

**e.** Damages because of "bodily injury" include damages claimed by any person or organization for care, loss of services or death resulting at any time from the "bodily injury."

**f.** **Coverage Extension – Supplementary Payments**

**(1)** In addition to the Limit of Insurance of Liability we will pay, with respect to any claim we investigate or settle, or any "suit" against an insured we defend:

   **(a)** All expenses we incur.

   **(b)** Up to $1,000 for cost of bail bonds required because of accidents or traffic law violations arising out of the use of any vehicle to which Business Liability Coverage for "bodily injury" applies. We do not have to furnish these bonds.

   **(c)** The cost of bonds to release attachments, but only for bond amounts within our Limit of Insurance. We do not have to furnish these bonds.

   **(d)** All reasonable expenses incurred by the insured at our request to assist us in the investigation or defense of the claim or "suit," including actual loss of earnings up to $250 a day because of time off from work.

   **(e)** All costs taxed against the insured in the "suit."

   **(f)** Prejudgment interest awarded against the insured on that part of the judgment we pay. If we make an offer to pay the Limit of Insurance, we will not pay any prejudgment interest based on that period of time after the offer.

   **(g)** All interest on the full amount of any judgment that accrues after entry of the judgment and before we have paid, offered to pay, or deposited in court the part of the judgment that is within our Limit of Insurance.

   These payments will not reduce the Limits of Insurance.

**(2)** If we defend an insured against a "suit" and an indemnitee of the insured is also named as a party to the "suit," we will

defend that indemnitee if all of the following conditions are met:

   **(a)** The "suit" against the indemnitee seeks damages for which the insured has assumed the liability of the indemnitee in a contract or agreement that is an "insured contract";

   **(b)** This insurance applies to such liability assumed by the insured;

   **(c)** The obligation to defend, or the cost of the defense of, that indemnitee, has also been assumed by the insured in the same "insured contract";

   **(d)** The allegations in the "suit" and the information we know about the "occurrence" are such that no conflict appears to exist between the interests of the insured and the interests of the indemnitee;

   **(e)** The indemnitee and the insured ask us to conduct and control the defense of that indemnitee against such "suit" and agree that we can assign the same counsel to defend the insured and the indemnitee; and

   **(f)** The indemnitee:

      **(i)** Agrees in writing to:

         **i.** Cooperate with us in the investigation, settlement or defense of the "suit";

         **ii.** Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the "suit";

         **iii.** Notify any other insurer whose coverage is available to the indemnitee; and

         **iv.** Cooperate with us with respect to coordinating other applicable insurance available to the indemnitee; and

      **(ii)** Provides us with written authorization to:

         **i.** Obtain records and other information related to the "suit"; and

MEDIATION – CONFIDENTIAL.
Subject to Protective Order - Highly Confidential

CNA_BSA0002219
BSAPolicyEv-00015787
TrustApp0854

SB-300000-A
(Ed. 01/06)

ii. Conduct and control the defense of the indemnitee in such "suit."

(3) So long as the above conditions are met, attorneys' fees incurred by us in the defense of that indemnitee, necessary litigation expenses incurred by us and necessary litigation expenses incurred by the indemnitee at our request will be paid as Supplementary Payments. Notwithstanding the provisions of Paragraph **B.1.b.(2)** Exclusions in Section **B - EXCLUSIONS**, such payments will not be deemed to be damages for "bodily injury" and "property damage" and will not reduce the limits of insurance.

Our obligation to defend an insured's indemnitee and to pay for attorneys' fees and necessary litigation expenses as Supplementary Payments ends when:

(a) We have used up the applicable limit of insurance in the payment of judgments or settlements; or

(b) The conditions set forth above, or the terms of the agreement described in **1.** above are no longer met.

**2. Medical Expenses**

a. We will pay medical expenses as described below for "bodily injury" caused by an accident:

(1) On premises you own or rent;

(2) On ways next to premises you own or rent; or

(3) Because of your operations;

provided that:

(a) The accident takes place in the "coverage territory" and during the policy period;

(b) The expenses are incurred and reported to us within one year of the date of the accident; and

(c) The injured person submits to examination, at our expense, by physicians of our choice as often as we reasonably require.

b. We will make these payments regardless of fault. These payments will not exceed the applicable Limit of Insurance. We will pay reasonable expenses for:

(1) First aid administered at the time of an accident;

(2) Necessary medical, surgical, x-ray and dental services, including prosthetic devices; and

(3) Necessary ambulance, hospital, professional nursing and funeral services.

**B. Exclusions**

**1. Applicable To Business Liability Coverage**

This insurance does not apply to:

a. **Expected Or Intended Injury**

"Bodily injury" or "property damage" expected or intended from the standpoint of the insured. This exclusion does not apply to "bodily injury" resulting from the use of reasonable force to protect persons or property.

b. **Contractual Liability**

"Bodily injury" or "property damage" for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement. This exclusion does not apply to liability for damages:

(1) That the insured would have in the absence of the contract or agreement; or

(2) Assumed in a contract or agreement that is an "insured contract," provided the "bodily injury" or "property damage" occurs subsequent to the execution of the contract or agreement. Solely for the purposes of liability assumed in an "insured contract," reasonable attorney fees and necessary litigation expenses incurred by or for a party other than an insured are deemed to be damages because of "bodily injury" or "property damage," provided:

(a) Liability to such party for, or for the cost of, that party's defense has also been assumed in the same "insured contract"; and

(b) Such attorney fees and litigation expenses are for defense of that party against a civil or alternative dispute resolution proceeding in which damages to which this insurance applies are alleged.

c. **Liquor Liability**

"Bodily injury" or "property damage" for which any insured may be held liable by reason of:

(1) Causing or contributing to the intoxication of any person;

MEDIATION – CONFIDENTIAL.
Subject to Protective Order - Highly Confidential

CNA_BSA0002220
BSAPolicyEv-00015788
TrustApp0855

SB-300000-A
(Ed. 01/06)

**(2)** The furnishing of alcoholic beverages to a person under the legal drinking age or under the influence of alcohol; or

**(3)** Any statute, ordinance or regulation relating to the sale, gift, distribution or use of alcoholic beverages.

This exclusion applies only if you are in the business of manufacturing, distributing, selling, serving or furnishing alcoholic beverages.

**d. Workers' Compensation And Similar Laws**

Any obligation of the insured under a workers' compensation, disability benefits or unemployment compensation law or any similar law.

**e. Employer's Liability**

"Bodily Injury" to:

**(1)** An "employee" of the insured arising out of and in the course of:

    **(a)** Employment by the insured; or

    **(b)** Performing duties related to the conduct of the insured's business; or

**(2)** The spouse, child, parent, brother or sister of that "employee" as a consequence of **(1)** above.

This exclusion applies:

**(1)** Whether the insured may be liable as an employer or in any other capacity; and

**(2)** To any obligation to share damages with or repay someone else who must pay damages because of the injury.

This exclusion does not apply to liability assumed by the insured under an "insured contract."

**f. Pollution**

**(1)** "Bodily injury" or "property damage" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants":

    **(a)** At or from any premises, site or location which is or was at any time owned or occupied by, or rented or loaned to, any insured. However, this subparagraph does not apply to:

        **(i)** "Bodily injury" if sustained within a building and caused by smoke, fumes, vapor or soot from equipment used to heat that building;

        **(ii)** "Bodily injury" or "property damage" for which you may be held liable, if you are a contractor and the owner or lessee of such premises, site or location has been added to your policy as an additional insured with respect to your ongoing operations performed for that additional insured at that premises, site or location and such premises, site or location is not and never was owned or occupied by, or rented or loaned to, any insured, other than that additional insured; or

        **(iii)** "Bodily injury" or "property damage" arising out of heat, smoke or fumes from a "hostile fire";

    **(b)** At or from any premises, site or location which is or was at any time used by or for any insured or others for the handling, storage, disposal, processing or treatment of waste;

    **(c)** Which are or were at any time transported, handled, stored, treated, disposed of, or processed as waste by or for:

        **(i)** Any insured; or

        **(ii)** Any person or organization for whom you may be legally responsible; or

    **(d)** At or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations if the "pollutants" are brought on or to the premises, site or location in connection with such operations by such insured, contractor or subcontractor. However, this subparagraph does not apply to:

        **(i)** "Bodily injury" or "property damage" arising out of the escape of fuels, lubricants or other operating fluids which are needed to perform the normal electrical, hydraulic or mechanical functions necessary for the operation of "mobile equipment" or its parts, if such fuels, lubricants or other operating fluids escape from a vehicle part designed to hold, store or receive them. This



MEDIATION – CONFIDENTIAL.
Subject to Protective Order - Highly Confidential

CNA_BSA0002221
BSAPolicyEv-00015789

TrustApp0856

exception does not apply if the "bodily injury" or "property damage" arises out of the intentional discharge, dispersal or release of the fuels, lubricants or other operating fluids, or if such fuels, lubricants or other operating fluids are brought on or to the premises, site or location with the intent that they be discharged, dispersed or released as part of the operations being performed by such insured, contractor or subcontractor;

**(ii)** "Bodily injury" or "property damage" sustained within a building and caused by the release of gases, fumes or vapors from materials brought into that building in connection with operations being performed by you or on your behalf by a contractor or subcontractor; or

**(iii)** "Bodily injury" or "property damage" arising out of heat, smoke or fumes from a "hostile fire."

**(e)** At or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations if the operations are to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants."

**(2)** Any loss, cost or expense arising out of any:

**a.** Request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants"; or

**b.** Claim or "suit" by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, "pollutants."

However, this paragraph does not apply to liability for damages because of

"property damage" that the insured would have in the absence of such request, demand, order or statutory or regulatory requirement or such claim or "suit" by or on behalf of a governmental authority.

**g. Aircraft, Auto Or Watercraft**

"Bodily injury" or "property damage" arising out of the ownership, maintenance, use or entrustment to others of any aircraft, "auto" or watercraft owned or operated by or rented or loaned to any insured. Use includes operation and "loading or unloading."

This exclusion applies even if the claims allege negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by an insured, if the "occurrence" which caused the "bodily injury" or "property damage" involved the ownership, maintenance, use or entrustment to others of any aircraft, "auto" or watercraft that is owned or operated by or rented or loaned to any insured.

This exclusion does not apply to:

**(1)** An aircraft that is:

**(a)** Hired, chartered, or loaned with a paid crew; but

**(b)** Not owned by any insured;

**(2)** A watercraft while ashore on premises you own or rent;

**(3)** A watercraft you do not own that is:

**(a)** Less than 51 feet long; and

**(b)** Not being used to carry persons or property for a charge;

**(4)** Parking an "auto" on, or on the ways next to, premises you own or rent, provided the "auto" is not owned by or rented or loaned to you or the insured;

**(5)** Liability assumed under any "insured contract" for the ownership, maintenance or use of aircraft or watercraft; or

**(6)** Bodily injury" or "property damage" arising out of the operation of any of the following equipment:

**(a)** Cherry pickers and similar devices mounted on automobile or truck chassis and used to raise or lower workers; and

**(b)** Air compressors, pumps and generators, including spraying, welding, building cleaning,

MEDIATION – CONFIDENTIAL.
Subject to Protective Order - Highly Confidential

CNA_BSA0002222
BSAPolicyEv-00015790
TrustApp0857

SB-300000-A
(Ed. 01/06)

geophysical exploration, lighting and well servicing equipment.

**h. Mobile Equipment**

"Bodily injury" or "property damage" arising out of:

**(1)** The transportation of "mobile equipment" by an "auto" owned or operated by or rented or loaned to any insured; or

**(2)** The use of "mobile equipment" in, or while in practice for, or while being prepared for, any prearranged racing, speed, demolition or stunting activity.

**i. War**

"Bodily injury" or "property damage" due to war, whether or not declared, or any act or condition incident to war. War includes civil war, insurrection, rebellion or revolution. This exclusion applies only to liability assumed under a contract or agreement.

**j. Professional Services**

"Bodily injury," "property damage," "personal and advertising injury" caused by the rendering or failure to render any professional service. This includes but is not limited to:

**(1)** Legal, accounting or advertising services;

**(2)** Preparing, approving, or failing to prepare or approve maps, drawings, opinions, reports, surveys, change orders, designs or specifications;

**(3)** Supervisory, inspection or engineering services;

**(4)** Medical, surgical, dental, x-ray or nursing services treatment, advice or instruction;

**(5)** Any health or therapeutic service treatment, advice or instruction;

**(6)** Any service, treatment, advice or instruction for the purpose of appearance or skin enhancement, hair removal or replacement or personal grooming;

**(7)** Optometry or optical or hearing aid services including the prescribing, preparation, fitting, demonstration or distribution of ophthalmic lenses and similar products or hearing aid devices;

**(8)** Body piercing services;

**(9)** Services in the practice of pharmacy;

**(10)** Veterinary medicine services;

**(11)** Mortician services; and

**(12)** Services rendered in connection with the creation and/or development, modification, or repair of "software," including, but not limited to design, specifications, system or "software" configuration and consultation.

**k. Damage To Property**

"Property damage" to:

**(1)** Property you own, rent or occupy, including any costs or expenses incurred by you, or any other person, organization or entity, for repair, replacement, enhancement, restoration or maintenance of such property for any reason, including prevention of injury to a person or damage to another's property;

**(2)** Premises you sell, give away or abandon, if the "property damage" arises out of any part of those premises;

**(3)** Property loaned to you;

**(4)** Personal property in the care, custody or control of the insured;

**(5)** That particular part of real property on which you or any contractor or subcontractor working directly or indirectly on your behalf is performing operations, if the "property damage" arises out of those operations; or

**(6)** That particular part of any property that must be restored, repaired or replaced because "your work" was incorrectly performed on it.

Paragraphs **(1)**, **(3)** and **(4)** of this exclusion do not apply to "property damage" (other than damage by fire or explosion) to premises, including the contents of such premises, rented to you for a period of 7 or fewer consecutive days. A separate limit of insurance applies to Damage To Premises Rented To You as described in Paragraph **D.** Liability And Medical Expenses Limit Of Insurance.

Paragraph **(2)** of this exclusion does not apply if the premises are "your work" and were never occupied, rented or held for rental by you.

Paragraphs **(3)**, **(4)**, **(5)** and **(6)** of this exclusion do not apply to liability assumed under a sidetrack agreement.

Paragraph **(6)** of this exclusion does not apply to "property damage" included in the "products – completed operations hazard."

MEDIATION – CONFIDENTIAL.
Subject to Protective Order - Highly Confidential

CNA_BSA0002223
BSAPolicyEv-00015791
TrustApp0858

**l.   Damage To Your Product**

"Property damage" to "your product" arising out of it or any part of it.

**m.  Damage To Your Work**

"Property damage" to "your work" arising out of it or any part of it and included in the "products – completed operations hazard."

This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor.

**n.   Damage To Impaired Property Or Property Not Physically Injured**

"Property damage" to "impaired property" or property that has not been physically injured, arising out of:

**(1)** A defect, deficiency, inadequacy or dangerous condition in "your product" or "your work"; or

**(2)** A delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms.

This exclusion does not apply to the loss of use of other property arising out of sudden and accidental physical injury to "your product" or "your work" after it has been put to its intended use.

**o.   Recall Of Products, Work Or Impaired Property**

Damages claimed for any loss, cost or expense incurred by you or others for the loss of use, withdrawal, recall, inspection, repair, replacement, adjustment, removal or disposal of:

**(1)** "Your product";

**(2)** "Your work"; or

**(3)** "Impaired property";

if such product, work or property is withdrawn or recalled from the market or from use by any person or organization because of a known or suspected defect, deficiency, inadequacy or dangerous condition in it.

**p.   Personal And Advertising Injury**

"Personal and advertising injury":

**(1)** Caused by or at the direction of the insured with the knowledge that the act would violate the rights of another and would inflict "personal and advertising injury";

**(2)** Arising out of oral or written publication of material, if done by or at the direction of the insured with knowledge of its falsity;

**(3)** Arising out of oral or written publication of material whose first publication took place before the beginning of the policy period;

**(4)** Arising out of a criminal act committed by or at the direction of any insured;

**(5)** For which the insured has assumed liability in a contract or agreement. This exclusion does not apply to liability for damages that the insured would have in the absence of the contract or agreement;

**(6)** Arising out of a breach of contract, except an implied contract to use another's advertising idea in your "advertisement";

**(7)** Arising out of the failure of goods, products or services to conform with any statement of quality or performance made in your "advertisement";

**(8)** Arising out of the wrong description of the price of goods, products or services stated in your "advertisement";

**(9)** Committed by an insured whose business is:

**(a)** Advertising, broadcasting, publishing or telecasting;

**(b)** Designing or determining content of web-sites for others; or

**(c)** An Internet search, access, content or service provider.

However, this exclusion does not apply to Paragraphs **14.a.**, **b.** and **c.** of "personal and advertising injury" under Paragraph **F.** Liability And Medical Expenses Definitions.

For the purposes of this exclusion, the placing of frames, borders or links, or advertising, for you or others anywhere on the Internet, by itself, is not considered the business of advertising, broadcasting, publishing or telecasting.

**(10)** Arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants" at any time.

**(11)** With respect to any loss, cost or expense arising out of any of:

**(a)** Request, demand or order that any insured or others test for, monitor, clean-up, remove, contain, treat,

MEDIATION – CONFIDENTIAL.
Subject to Protective Order - Highly Confidential

CNA_BSA0002224
BSAPolicyEv-00015792

TrustApp0859

SB-300000-A
(Ed. 01/06)

detoxify or neutralize or in any way respond to, or assess the effects of, "pollutants"; or

(b) Claim or "suit" by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing or in any way responding to, or assessing the effects of, "pollutants."

(12) Arising out of an electronic chatroom or bulletin board the insured hosts, owns or over which the insured exercises control.

(13) Arising out of the infringement of copyright, patent, trademark, trade secret or other intellectual property rights.

However, this exclusion does not apply to infringement, in your "advertisement," of copyright, trade dress or slogan.

(14) Arising out of the unauthorized use of another's name or product in your e-mail address, domain name or metatags, or any other similar tactics to mislead another's potential customers.

Exclusions **c., d., e., f., g., h., i., k., l., m., n.** and **o.** in **Section II – Liability** do not apply to damage by fire or explosion to premises while rented to you, or temporarily occupied by you with permission of the owner. A separate Damage To Premises Rented To You Limit of Insurance applies to this coverage as described in Paragraph **D.** Liability And Medical Expenses Limits of Insurance.

2. **Applicable To Medical Expenses Coverage**

We will not pay expenses for "bodily injury":

a. To any insured, except "volunteer workers."

b. To a person hired to do work for or on behalf of any insured or a tenant of any insured.

c. To a person injured on that part of premises you own or rent that the person normally occupies.

d. To a person, whether or not an "employee" of any insured, if benefits for the "bodily injury" are payable or must be provided under a workers' compensation or disability benefits law or a similar law.

e. To a person injured while taking part in athletics.

f. Included within the "products – completed operations hazard."

g. Excluded under Business Liability Coverage.

h. Due to war, whether or not declared, or any act or condition incident to war. War includes civil war, insurrection, rebellion or revolution.

3. Applicable To Both Business Liability Coverage And Medical Expenses Coverage – Nuclear Energy Liability Exclusion

This insurance does not apply:

a. Under Business Liability Coverage, to "bodily injury" or "property damage":

(1) With respect to which an insured under the policy is also an insured under a nuclear energy liability policy issued by the Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters or Nuclear Insurance Association of Canada, or would be an insured under any such policy but for its termination upon exhaustion of its limit of liability; or

(2) Resulting from the "hazardous properties" of "nuclear material" and with respect to which:

(a) Any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof; or

(b) The insured is, or had this policy not been issued would be, entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization.

b. Under Medical Expenses Coverage, to expenses incurred with respect to "bodily injury" resulting from the "hazardous properties" of "nuclear material" and arising out of the operation of a "nuclear facility" by any person or organization.

c. Under Business Liability Coverage, to "bodily injury" or "property damage" resulting from the "hazardous properties" of the nuclear material"; if:

(1) The "nuclear material":

(a) Is at any "nuclear facility" owned by, or operated by or on behalf of, an insured; or

(b) Has been discharged or dispersed therefrom;

MEDIATION – CONFIDENTIAL.
Subject to Protective Order - Highly Confidential

CNA_BSA0002225
BSAPolicyEv-00015793
TrustApp0860

SB-300000-A
(Ed. 01/06)

**(2)** The "nuclear material" is contained in "spent fuel" or "waste" at any time possessed, handled, used, processed, stored, transported or disposed of by or on behalf of an insured; or

**(3)** The "bodily injury" or "property damage" arises out of the furnishing by an insured of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any "nuclear facility"; but if such facility is located within the United States of America, its territories or possessions or Canada, this Exclusion **(3)** applies only to "property damage" to such "nuclear facility" and any property thereat.

**d.** As used in this exclusion:

**(1)** "By-product material" has the meaning given it in the Atomic Energy Act of 1954 or in any law amendatory thereof;

**(2)** "Hazardous properties" include radioactive, toxic or explosive properties;

**(3)** "Nuclear facility" means:

**(a)** Any "nuclear reactor";

**(b)** Any equipment or device designed or used for:

**(i)** Separating the isotopes of uranium or plutonium;

**(ii)** Processing or utilizing "spent fuel"; or

**(iii)** Handling, processing or packaging "waste";

**(c)** Any equipment or device used for the processing, fabricating or alloying of "special nuclear material" if at any time the total amount of such material in the custody of the insured at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235;

**(d)** Any structure, basin, excavation, premises or place prepared or used for the storage or disposal of "waste";

and includes the site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operations;

**(4)** "Nuclear material" means "source material", "special nuclear material" or "by-product material";

**(5)** "Nuclear reactor" means an apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material;

**(6)** "Property damage" includes all forms of radioactive contamination of property.

**(7)** "Source material" has the meaning given it in the Atomic Energy Act of 1954 or in any law amendatory thereof;

**(8)** "Special nuclear material" has the meaning given it in the Atomic Energy Act of 1954 or in any law amendatory thereof;

**(9)** "Spent fuel" means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a "nuclear reactor";

**(10)** "Waste" means any waste material:

**(a)** Containing "by-product material" other than the tailings or wastes produced by the extraction or concentration of uranium or thorium from any one processed primarily for its "source material" content; and

**(b)** Resulting from the operation by any person or organization of any "nuclear facility" included under Paragraph **(a)** and **(b)** of the definition of "nuclear facility."

**C.  Who Is An Insured**

**1.** If you are designated in the Declarations as:

**a.** An individual, you and your spouse are insureds, but only with respect to the conduct of a business of which you are the sole owner.

**b.** A partnership or joint venture, you are an insured. Your members, your partners and their spouses are also insureds, but only with respect to the conduct of your business.

**c.** A limited liability company, you are an insured. Your members are also insureds, but only with respect to the conduct of your business. Your managers are insureds, but only with respect to their duties as your managers.

**d.** An organization other than a partnership, joint venture or limited liability company, you are an insured. Your "executive officers" and directors are insureds, but only with respect to

MEDIATION – CONFIDENTIAL.
Subject to Protective Order - Highly Confidential

CNA_BSA0002226
BSAPolicyEv-00015794
TrustApp0861

their duties as your officers or directors. Your stockholders are also insureds, but only with respect to their liability as stockholders.

**e.** A trust, you are an Insured. Your trustees are also insureds, but only with respect to their duties as trustees.

**2.** Each of the following is also an insured:

**a.** Your "volunteer workers" only while performing duties related to the conduct of your business, or your "employees," other than either your "executive officers" (if you are an organization other than a partnership, joint venture or limited liability company) or your managers (if you are a limited liability company), but only for acts within the scope of their employment by you or while performing duties related to the conduct of your business. However, none of these "employees" or "volunteer workers" are insureds for:

**(1)** "Bodily injury" or "personal and advertising injury":

**(a)** To you, to your partners or members (if you are a partnership or joint venture), to your members (if you are a limited liability company), or to a co-"employee" while in the course of his or her employment or performing duties related to the conduct of your business, or to your other "volunteer workers" while performing duties related to the conduct of your business;

**(b)** To the spouse, child, parent, brother or sister of that co-"employee" as a consequence of Paragraph **(a)** above;

**(c)** For which there is any obligation to share damages with or repay someone else who must pay damages because of the injury described in Paragraphs **(a)** or **(b)**; or

**(d)** Arising out of his or her providing or failing to provide professional health care services.

**(2)** "Property damage" to property:

**(a)** Owned, occupied or used by,

**(b)** Rented to, in the care, custody or control of, or over which physical control is being exercised for any purpose by

you, any of your "employees," "volunteer workers," any partner or member (if you

are a partnership or joint venture), or any member (if you are a limited liability company).

**b.** Any person (other than your "employee" or "volunteer worker"), or any organization while acting as your real estate manager.

**c.** Any person or organization having proper temporary custody of your property if you die, but only:

**(1)** With respect to liability arising out of the maintenance or use of that property; and

**(2)** Until your legal representative has been appointed.

**d.** Your legal representative if you die, but only with respect to duties as such. That representative will have all your rights and duties under this policy.

**3.** With respect to "mobile equipment" registered in your name under any motor vehicle registration law, any person is an insured while driving such equipment along a public highway with your permission. Any other person or organization responsible for the conduct of such person is also an insured, but only with respect to liability arising out of the operation of the equipment, and only if no other insurance of any kind is available to that person or organization for this liability. However, no person or organization is an insured with respect to:

**a.** "Bodily injury" to a co-"employee" of the person driving the equipment; or

**b.** "Property damage" to property owned by, rented to, in the charge of or occupied by you or the employer of any person who is an insured under this provision.

**4.** Any organization you newly acquire or form, other than a partnership or joint venture, and over which you maintain ownership of majority interest, will qualify as a Named Insured if there is no other similar insurance available to that organization. However:

**a.** Coverage under this provision is afforded only until the 90th day after you acquire or form the organization or the end of the policy period, whichever is earlier;

**b.** Bodily Injury and Property Damage coverage does not apply to "bodily injury" or "property damage" that occurred before you acquired or formed the organization; and

**c.** Personal and Advertising Injury coverage does not apply to "personal injury" or "advertising injury" arising out of an offense

MEDIATION – CONFIDENTIAL.
Subject to Protective Order - Highly Confidential

CNA_BSA0002227
BSAPolicyEv-00015795
TrustApp0862


3002000402007037749850

SB-300000-A
(Ed. 01/06)

committed before you acquired or formed the organization.

No person or organization is an insured with respect to the conduct of any current or past partnership, joint venture or limited liability company that is not shown as a Named Insured in the Declarations.

**D. Liability And Medical Expenses Limits Of Insurance**

1. The Limits of Insurance shown in the Declarations and the rules below fix the most we will pay regardless of the number of:

   **a.** Insureds;

   **b.** Claims made or "suits" brought; or

   **c.** Persons or organizations making claims or bringing "suits."

2. The most we will pay for:

   **a.** Injury or damages under the "products completed operations hazard" arising from all "occurrences" during the policy period is the Products-Completed Operations Aggregate Limit shown in the Declarations.

   **b.** All other injury or damages, including medical expenses, arising from all "occurrences" during the policy period is the General Aggregate Limit shown in the Declarations.

   This General Aggregate Limit applies separately to each of your "locations" owned by or rented to you.

   "Location" means premises involving the same or connecting lots, or premises whose connection is interrupted only by a street, roadway or right-of-way of a railroad.

   This aggregate Limit does not apply to "property damage" to premises rented to you arising out of fire, lightning or explosion.

3. Subject to item **2.** above, the most we will pay for the sum of all damages because of all "bodily injury," "property damage" and medical expenses arising out of any one "occurrence" is the Liability and Medical Expense Limit shown in the Declarations.

   The most we will pay for all medical expenses because of "bodily injury" sustained by any one person is the Medical Expenses Limit shown in the Declarations.

4. Subject to item **2.** above, the most we will pay for the sum of all damages because of all "personal and advertising injury" sustained by any one person or organization is the Personal and Advertising Injury Limit shown in the Declarations.

5. The most we will pay under Business Liability Coverage for damages because of "property damage" to premises rented to you, or in the case of fire, while rented to you or temporarily occupied by you with permission of the owner, is the Damage To Premises Rented To You Limit shown in the Declarations.

   The Damage to Premises Rented To You Limit applies to all damage proximately caused by the same event, whether such damage results from fire, lightning, or explosion or any combination of the three.

   If more than one limit of insurance under this policy and any endorsements attached thereto applies to any claim or "suit," the most we will pay under this policy and the endorsements is the single highest limit of liability of all coverages applicable to such claim or "suit." However, this paragraph does not apply to the Medical Expenses limit set forth in paragraph **3.** above.

   The Limits of this policy apply separately to each consecutive annual period and to any remaining period of less than 12 months, starting with the beginning of the policy period shown in the Declarations, unless the policy period is extended after issuance for an additional period of less than 12 months. In that case, the additional period will be deemed part of the last preceding period for purposes of determining the Limits of Insurance.

**E. Businessowners General Liability Conditions**

1. **Bankruptcy**

   Bankruptcy or insolvency of the insured or of the insured's estate will not relieve us of our obligations under this policy.

2. **Duties In The Event Of Occurrence, Offense, Claim Or Suit**

   **a.** You must see to it that we are notified as soon as practicable of an "occurrence" or an offense which may result in a claim. To the extent possible, notice should include:

   **(1)** How, when and where the "occurrence" or offense took place;

   **(2)** The names and addresses of any injured persons and witnesses; and

   **(3)** The nature and location of any injury or damage arising out of the "occurrence" or offense.

   **b.** If a claim is made or "suit" is brought against any insured, you must:

   **(1)** Immediately record the specifics of the claim or "suit" and the date received; and

   **(2)** Notify us as soon as practicable.

MEDIATION – CONFIDENTIAL.
Subject to Protective Order - Highly Confidential

CNA_BSA0002228
BSAPolicyEv-00015796
TrustApp0863

You must see to it that we receive written notice of the claim or "suit" as soon as practicable.

**c.** You and any other involved insured must:

**(1)** Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the claim or "suit";

**(2)** Authorize us to obtain records and other information;

**(3)** Cooperate with us in the investigation, or settlement of the claim or defense against the "suit"; and

**(4)** Assist us, upon our request, in the enforcement of any right against any person or organization that may be liable to the insured because of injury or damage to which this insurance may also apply.

**d.** No insured will, except at that insured's own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without our consent.

**3. Financial Responsibility Laws**

**a.** When this policy is certified as proof of financial responsibility for the future under the provisions of any motor vehicle financial responsibility law, the insurance provided by the policy for "bodily injury" liability and "property damage" liability will comply with the provisions of the law to the extent of the coverage and limits of insurance required by that law.

**b.** With respect to "mobile equipment" to which this insurance applies, we will provide any liability, uninsured motorists, underinsured motorists, no-fault or other coverage required by any motor vehicle law. We will provide the required limits for those coverages.

**4. Legal Action Against Us**

No person or organization has a right under this policy:

**a.** To join us as a party or otherwise bring us into a "suit" asking for damages from an insured; or

**b.** To sue us on this policy unless all of its terms have been fully complied with.

A person or organization may sue us to recover on an agreed settlement or on a final judgment against an insured; but we will not be liable for damages that are not payable under the terms of this policy or that are in excess of the applicable limit of insurance. An agreed settlement means a settlement and release of liability signed by us, the insured and the claimant or the claimant's legal representative.

**5. Separation Of Insureds**

Except with respect to the Limits of Insurance in this policy, and any rights or duties specifically assigned in this policy to the first Named Insured, this insurance applies:

**a.** As if each Named Insured were the only Named Insured; and

**b.** Separately to each insured against whom claim is made or "suit" is brought.

**6. Unintentional Failure to Disclose Hazards**

It is agreed that based on our reliance on your representations as to existing hazards, if unintentionally you should fail to disclose all such hazards at the inception date of your policy, we shall not deny any coverage under this Coverage Form because of such failure.

**F. Liability And Medical Expenses Definitions**

**1.** "Advertisement" means a notice that is broadcast or published to the general public or specific market segments about your goods, products or services for the purpose of attracting customers or supporters. For the purposes of this definition:

**a.** Notices that are published include material placed on the Internet or on similar electronic means of communication; and

**b.** Regarding web-sites, only that part of a web-site that is about your goods, products or services for the purposes of attracting customers or supporters is considered an advertisement.

**2.** "Auto" means a land motor vehicle, trailer or semitrailer designed for travel on public roads, including any attached machinery or equipment. But "auto" does not include "mobile equipment."

**3.** "Bodily injury" means bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time.

**4.** "Coverage territory" means:

**a.** The United States of America (including its territories and possessions), Puerto Rico and Canada;

**b.** International waters or airspace, but only if the injury or damage occurs in the course of travel or transportation between any places included in Paragraph **a.** above; or

Subject to Protective Order - Highly Confidential

3002000492097703749885 1

MEDIATION – CONFIDENTIAL.
Subject to Protective Order - Highly Confidential

**c.** All other parts of the world if the injury or damage arises out of:

    **(1)** Goods or products made or sold by you in the territory described in Paragraph **a.** above;

    **(2)** The activities of a person whose home is in the territory described in Paragraph **a.** above, but is away for a short time on your business; or

    **(3)** "Personal and advertising injury" offenses that take place through the Internet or similar electronic means of communication;

    provided the insured's responsibility to pay damages is determined in a "suit" on the merits in the territory described in Paragraph **a.** above or in a settlement we agree to.

**5.** "Employee" includes a "leased worker." "Employee" does not include a "temporary worker."

**6.** "Executive officer" means a person holding any of the officer positions created by your charter, constitution, by-laws or any other similar governing document.

**7.** "Hostile fire" means one which becomes uncontrollable or breaks out from where it was intended to be.

**8.** "Impaired property" means tangible property, other than "your product" or "your work," that cannot be used or is less useful because:

    **a.** It incorporates "your product" or "your work" that is known or thought to be defective, deficient, inadequate or dangerous; or

    **b.** You have failed to fulfill the terms of a contract or agreement;

    if such property can be restored to use by:

        **(1)** The repair, replacement, adjustment or removal of "your product" or "your work"; or

        **(2)** Your fulfilling the terms of the contract or agreement.

**9.** "Insured contract" means:

    **a.** A contract for a lease of premises. However, that portion of the contract for a lease of premises that indemnifies any person or organization for damage by fire to premises while rented to you or temporarily occupied by you with permission of the owner is not an "insured contract";

    **b.** A sidetrack agreement;

    **c.** Any easement or license agreement, except in connection with construction or demolition operations on or within 50 feet of a railroad;

    **d.** An obligation, as required by ordinance, to indemnify a municipality, except in connection with work for a municipality;

    **e.** An elevator maintenance agreement;

    **f.** That part of any other contract or agreement pertaining to your business (including an indemnification of a municipality in connection with work performed for a municipality) under which you assume the tort liability of another party to pay for "bodily injury" or "property damage" to a third person or organization. Tort liability means a liability that would be imposed by law in the absence of any contract or agreement.

    Paragraph **f.** does not include that part of any contract or agreement:

        **(1)** That indemnifies a railroad for "bodily injury" or "property damage" arising out of construction or demolition operations, within 50 feet of any railroad property and affecting any railroad bridge or trestle, tracks, road beds, tunnel, underpass or crossing;

        **(2)** That indemnifies an architect, engineer or surveyor for injury or damage arising out of:

            **(a)** Preparing, approving or failing to prepare or approve maps, drawings, opinions, reports, surveys, change orders, designs or specifications; or

            **(b)** Giving directions or instructions, or failing to give them, if that is the primary cause of the injury or damage; or

            **(c)** Under which the insured, if an architect, engineer or surveyor, assumes liability for an injury or damage arising out of the insured's rendering or failure to render professional services, including those listed in Paragraph **(2)** above and supervisory, inspection or engineering services.

**10.** "Leased worker" means a person leased to you by a labor leasing firm under an agreement between you and the labor leasing firm, to perform duties related to the conduct of your business. "Leased worker" does not include a "temporary worker."

**11.** "Loading or unloading" means the handling of property:

MEDIATION – CONFIDENTIAL.
Subject to Protective Order - Highly Confidential

CNA_BSA0002230
BSAPolicyEv-00015798
TrustApp0865

SB-300000-A
(Ed. 01/06)

**a.** After it is moved from the place where it is accepted for movement into or onto an aircraft, watercraft or "auto";

**b.** While it is in or on an aircraft, watercraft or "auto"; or

**c.** While it is being moved from an aircraft, watercraft or "auto" to the place where it is finally delivered;

but "loading or unloading" does not include the movement of property by means of a mechanical device, other than a hand truck, that is not attached to the aircraft, watercraft or "auto."

**12.** "Mobile equipment" means any of the following types of land vehicles, including any attached machinery or equipment:

**a.** Bulldozers, farm machinery, forklifts and other vehicles designed for use principally off public roads;

**b.** Vehicles maintained for use solely on or next to premises you own or rent;

**c.** Vehicles that travel on crawler treads;

**d.** Vehicles, whether self-propelled or not, on which are permanently mounted:

(1) Power cranes, shovels, loaders, diggers or drills; or

(2) Road construction or resurfacing equipment such as graders, scrapers or rollers;

**e.** Vehicles not described in Paragraphs **a., b., c.** or **d.** above that are not self-propelled and are maintained primarily to provide mobility to permanently attached equipment of the following types:

(1) Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment; or

(2) Cherry pickers and similar devices used to raise or lower workers;

**f.** Vehicles not described in Paragraphs **a., b., c.** or **d.** above maintained primarily for purposes other than the transportation of persons or cargo.

However, self-propelled vehicles with the following types of permanently attached equipment are not "mobile equipment" but will be considered "autos":

(1) Equipment designed primarily for:

(a) Snow removal;

(b) Road maintenance, but not construction or resurfacing; or

(c) Street cleaning;

(2) Cherry pickers and similar devices mounted on automobile or truck chassis and used to raise or lower workers; and

(3) Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment.

**13.** "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

**14.** "Personal and advertising injury" means injury, including consequential "bodily injury," arising out of one or more of the following offenses:

**a.** False arrest, detention or imprisonment;

**b.** Malicious prosecution;

**c.** The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies, committed by or on behalf of its owner, landlord or lessor;

**d.** Oral or written publication, in any manner, of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;

**e.** Oral or written publication, in any manner, of material that violates a person's right of privacy;

**f.** The use of another's advertising idea in your "advertisement"; or

**g.** Infringing upon another's copyright, trade dress or slogan in your "advertisement."

**15.** "Pollutants" mean any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed

**16.** "Products – completed operations hazard":

**a.** Includes all "bodily injury" and "property damage" occurring away from premises you own or rent and arising out of "your product" or "your work" except:

(1) Products that are still in your physical possession; or

(2) Work that has not yet been completed or abandoned. However, "your work" will be deemed completed at the earliest of the following times:

MEDIATION – CONFIDENTIAL.
Subject to Protective Order - Highly Confidential

CNA_BSA0002231
BSAPolicyEv-00015799
TrustApp0866

SB-300000-A
(Ed. 01/06)

**(a)** When all of the work called for in your contract has been completed.

**(b)** When all of the work to be done at the job site has been completed if your contract calls for work at more than one job site.

**(c)** When that part of the work done at the job site has been put to its intended use by any other person or organization other than another contractor or subcontractor working on the same project.

Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed.

The "bodily injury" or "property damage" must occur away from premises you own or rent, unless your business includes the selling, handling or distribution of "your product" for consumption on premises you own or rent.

**b.** Does not include "bodily injury" or "property damage" arising out of:

**(1)** The transportation of property, unless the injury or damage arises out of a condition in or on a vehicle not owned or operated by you, and that condition was created by the "loading or unloading" of that vehicle by any insured; or

**(2)** The existence of tools, uninstalled equipment or abandoned or unused materials.

**17.** "Property damage" means:

**a.** Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

**b.** Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

For the purposes of this insurance, electronic data is not tangible property.

As used in this definition, electronic data means information, facts or programs stored as, created or used on, or transmitted to or from computer software, including systems and applications software, hard or floppy disks, CD-ROMs, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

**18.** "Software" means:

**a.** Electronic data processing, recording or storage media such as films, tapes, cards, discs, drums or cells; and

**b.** Data and programming records used for electronic data processing or electronically controlled equipment stored on such media; and

**c.** Written or printed data, such as programs, routines, and symbolic languages, essential to the operation of computers; and

**d.** Documents containing information on the operation and maintenance of computers.

**19.** "Suit" means a civil proceeding in which damages because of "bodily injury", "property damage," "personal and advertising injury" to which this insurance applies are alleged. "Suit" includes:

**a.** An arbitration proceeding in which such damages are claimed and to which the insured must submit or does submit with our consent; or

**b.** Any other alternative dispute resolution proceeding in which such damages are claimed and to which the insured submits with our consent.

**20.** "Temporary worker" means a person who is furnished to you to substitute for a permanent "employee" on leave or to meet seasonal or short-term workload conditions.

**21.** "Volunteer worker" means a person who is not your "employee," and who donates his or her work and acts at the direction of and within the scope of duties determined by you, and is not paid a fee, salary or other compensation by you or anyone else for their work performed for you.

**22.** "Your product":

**a.** Means:

**(1)** Any goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by:

**(a)** You;

**(b)** Others trading under your name; or

**(c)** A person or organization whose business or assets you have acquired; and

**(2)** Containers (other than vehicles), materials, parts or equipment furnished in connection with such goods or products.

**b.** Includes:

MEDIATION – CONFIDENTIAL.
Subject to Protective Order - Highly Confidential

CNA_BSA0002232
BSAPolicyEv-00015800
TrustApp0867

SB-300000-A
(Ed. 01/06)

**(1)** Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your product"; and

**(2)** The providing of or failure to provide warnings or instructions.

**c.** Does not include vending machines or other property rented to or located for the use of others but not sold.

**23.** "Your work":

**a.** Means:

**(1)** Work or operations performed by you or on your behalf; and

**(2)** Materials, parts or equipment furnished in connection with such work or operations.

**b.** Includes:

**(1)** Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your work"; and

**(2)** The providing of or failure to provide warnings or instructions.



MEDIATION – CONFIDENTIAL.
Subject to Protective Order - Highly Confidential

CNA_BSA0002233
BSAPolicyEv-00015801

TrustApp0868



SB-300063-A
(Ed. 01/06)

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## EXCLUSION – FIDUCIARY OR REPRESENTATIVE LIABILITY OF FINANCIAL INSTITUTIONS

This endorsement modifies insurance provided under the following:

BUSINESSOWNERS LIABILITY COVERAGE FORM

This insurance does not apply to "bodily injury," "property damage" arising out of the ownership, maintenance or use, including all related operations, of property for which you are acting in a fiduciary or representative capacity.

MEDIATION – CONFIDENTIAL.
Subject to Protective Order - Highly Confidential

CNA_BSA0002234
BSAPolicyEv-00015802
TrustApp0869



<div align="right">
SB-300073-A<br>
(Ed. 01/06)
</div>

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## EXCLUSION – MORTGAGE FORECLOSURE

This endorsement modifies insurance provided under the following:

    BUSINESSOWNERS LIABILITY COVERAGE FORM

This insurance does not apply to "bodily injury," "property damage" or "personal and advertising injury" arising out of the ownership, maintenance or use, including all related operations, of real property acquired by foreclosure.



SB-300073-A
(Ed. 01/06)

<div align="right">Page 1 of 1</div>

MEDIATION – CONFIDENTIAL.
Subject to Protective Order - Highly Confidential

CNA_BSA0002235
BSAPolicyEv-00015803
TrustApp0870

**CNA**

SB-300081-A
(Ed. 01/06)

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## EXCLUSION OF COVERAGE FOR SPECIAL EVENTS

This endorsement modifies insurance provided under the following:

BUSINESSOWNERS LIABILITY COVERAGE FORM

Except as indicated below, this insurance does not apply to "bodily injury," "property damage" or "personal and advertising injury" arising out of any "Special Event" sponsored or organized, in whole or in part, by the insured. This exclusion applies whether the "Special Event" is held on premises owned by the insured or on any other premises.

**A. Non-Scheduled "Special Events"**

1. This exclusion does not apply to the following "Special Events":

   a. Breakfast meetings;

   b. Luncheons;

   c. Dinners or dinner dances;

   d. Bake, craft, book or clothing sales;

   e. Exhibition of members' work or art;

   f. Demonstration of members' work or art;

   g. Lectures and Speakers; and

   h. Bridge tournaments.

2. If you are a "Cultural Institution," this exclusion also does not apply to:

   a. Your Exhibition or Show Openings.

   b. Sponsored trips to similar cultural institutions when transportation is not provided or is provided by contract carrier.

   c. Regular, ongoing, scheduled programming which is a part of a library curriculum such as children's story-time or reading programs.

**B. Scheduled "Special Events"**

This exclusion does not apply to "Special Events" specifically scheduled and described in the declarations and for which a separate premium charge is made.

Scheduled "Special Events" are limited to the following:

1. Parades, with permits;

2. Concerts, however, rock band concerts are excluded;

3. Amateur Plays;

4. Puppet Shows;

5. Exhibition Openings;

6. Musical Performances;

7. Film Showings;

8. Dances;

9. Antique Shows;

10. Casino Nights;

11. Fairs;

12. Athletic Events;

13. Art or Craft Exhibitions and Demonstrations;

14. Collectible Car shows (exhibit only).

**C. Additional Exclusions**

As regards any covered "Special Event" as defined in this endorsement, this insurance does not apply to the following:

1. "Bodily injury" to any person while practicing for or participating in any sports or athletic contest or exhibition; or

2. "Bodily Injury," "property damage" or "personal and advertising injury" arising out of:

   a. The ownership, maintenance, operation, use or entrustment to others of any:

      (1) Mechanically operated amusement devices;

      (2) Aircraft and similar devices including but not limited to balloons, parasails, parachutes, hang gliders and ultralights; or

      (3) any trampoline or gymnastic rebounding device

      owned or operated by or on behalf of or rented to a person(s) or organization(s);

   b. Any fireworks display;

   c. A rock band concert, whether conducted or sponsored, in whole or in part;

   d. Animal related activities;

   e. Auto, Motorcycle or boat races or events;

   f. Biking events;

   g. Bungee jumping;

   h. Water related activities;

SB-300081-A
(Ed. 01/06)

Page 1 of 2

MEDIATION – CONFIDENTIAL.
Subject to Protective Order - Highly Confidential

CNA_BSA0002236
BSAPolicyEv-00015804
TrustApp0871

SB-300081-A
(Ed. 01/06)

i.   Construction activities;

j.   Demonstrations, strikes, protests or rallies;

k.   Traffic control, road closures, route lay-out or planning; or

l.   Provision or arrangement of transportation including any contract to furnish transportation.

**D. Additional Definitions**

As respects this endorsement, the following additional definitions apply:

1.   "Cultural Institution" means a museum, art gallery or library.

2.   "Special Event" means an activity, event, performance, entertainment, fundraiser or exhibition which is:

a.   Open to the public, the insured's membership or invitees, whether or not an admission is charged;

b.   Held for a specified or limited duration of time; and

c.   Separate or distinct from the insured's regular, ongoing operations and designed to promote or benefit the insured or some other cause.



SB-300081-A
(Ed. 01/06)

MEDIATION – CONFIDENTIAL.
Subject to Protective Order - Highly Confidential

CNA_BSA0002237
BSAPolicyEv-00015805
TrustApp0872

**CNA**

SB-300129-A
(Ed. 03/06)

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## TARGETED HACKER ATTACK

This endorsement modifies insurance provided under the following:

BUSINESSOWNERS SPECIAL PROPERTY COVERAGE FORM

The following coverage is added to your Businessowners Special Property Coverage Form under Paragraph **A.6.** Coverage Extensions. Unless otherwise stated, payments made under this Coverage Extension are subject to and not in addition to the applicable Limits of Insurance.

**Targeted Hacker Attack**

1. We will pay up to the Limits of Insurance indicated in Paragraphs **9.** and **10.** below, for the following:

    a. Corruption, distortion, deletion, damage or destruction of your "electronic data" caused by or resulting from a "targeted hacker attack."

    b. Subject to paragraph **8.** below, actual loss of Business Income you sustain due to the necessary "suspension" of your "operations" during the "period of restoration." The "suspension" must be caused by the necessary interruption or suspension of your "electronic data processing equipment" resulting from a "targeted hacker attack" that corrupts, distorts, deletes, damages or destroys your "electronic data."

    c. Subject to paragraph **8.** below, with respect to a "suspension" of your "operations" as described in paragraph **1.b.** above, the "extra expense" (other than the expense to repair or replace property) to:

        (1) Avoid or minimize the "suspension" of business and to continue "operations"; or

        (2) Minimize the "suspension" of business if you cannot continue "operations."

2. Worldwide coverage is provided under this Coverage Extension. The coverage territory as described in Paragraph **F.8.b** does not apply to this Coverage Extension.

3. This Coverage Extension does not apply to:

    a. "Stock"; or

    b. Property that is licensed, leased or rented to others.

4. The following exclusions as described in Section **B.**, Exclusions, of the Businessowners Special Property Coverage Form do not apply to this Coverage Extension:

    a. Paragraph **1.j.**; and

    b. Paragraph **1.k.**

5. The following additional exclusions apply:

    With respect to this Coverage Extension, we will not pay for loss or damage caused directly or indirectly by any of the following. Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss.

    a. Programming errors or omissions, or incorrect instructions to a machine, including without limitation, incorrect instructions to "electronic data processing equipment" from a user incorrectly operating with, or committing an error using, an input device (including, without limitation, a keyboard, mouse or touchpad) and corrupting, distorting, deleting, damaging or destroying "electronic data."

    b. Misappropriation, theft, copying, transfer or unauthorized viewing of any property, proprietary or confidential information, "money," "securities," "stock," "electronic data processing equipment" "electronic media and data" or "electronic data" including without limitation, the use of any computer to cause such misappropriation, transfer or copying.

    c. Errors or deficiency in design, installation, maintenance, repair or modification of your "electronic data processing equipment," "electronic media and data" or "electronic data" or any "electronic data processing equipment," electronic devices, computer system or network to which your "electronic data processing equipment" "electronic media and data" or "electronic data" is connected or dependent; provided, however, this exclusion shall not apply with respect to any such error or deficiency in design, installation, maintenance, repair or modification that is exploited as part of an otherwise covered "targeted hacker attack."

    d. Unexplained or indeterminable failure, malfunction or slowdown of a "electronic data processing equipment" "electronic media and data" or "electronic data."

    e. Suspension, interruption, delay, disruption, loss of functionality of, inaccessibility to, or inability to use or communicate with, any "electronic data

SB-300129-A
(Ed. 03/06)

MEDIATION – CONFIDENTIAL.
Subject to Protective Order - Highly Confidential

CNA_BSA0002238
BSAPolicyEv-00015806

TrustApp0873

SB-300129-A
(Ed. 03/06)

processing equipment," "electronic media and data," "electronic data," computer resource, electronic device, computer system, computer network or equipment.

**f.** "Mass attack malware."

**g.** "Mass system penetration."

**6.** The following definitions apply to this Coverage Extension:

  **a.** Business Income means:

    **(1)** Net Income (Net Profit or Loss before Income taxes) that would have been earned or incurred, including; and

    **(2)** Continuing normal operating expenses incurred, including payroll.

  **b.** Extra Expense means reasonable and necessary expenses you incur during the "period of restoration" that you would not have incurred if there had been no necessary interruption or suspension of your "electronic data processing equipment" resulting from a "targeted hacker attack" that corrupts, distorts, deletes, damages or destroys your "electronic data." Provided, however, that Extra Expense shall not mean the costs you incur to copy, research, replace or restore "electronic data."

**7.** For purposes of this Coverage Extension only, the definition for "period of restoration" as set forth in the Businessowners Special Property Coverage Form is changed to the following (the definition shall remained unchanged with respect to all other parts of the policy):

  **"Period of restoration"** means the period of time that:

  **a.** Begins on the date and time of the necessary interruption or suspension of your "electronic data processing equipment"; and

**b.** Ends on the date and time that the necessary interruption or suspension of your "electronic data processing equipment" ends, or would have ended had you acted with due diligence and dispatch.

Provided, however, that "period of restoration" shall not mean more than, or exceed, thirty (30) days. The expiration date of this policy will not cut short the "period of restoration."

**8.** We shall not be liable for any payment for the "extra expense" you incur, and loss of Business Income you sustain, during the first 12 hours following the date and time the necessary interruption or suspension of your "electronic data processing equipment" begins; provided, however, if the "business income and extra expense" – 72 Hour Deductible endorsement is part of this policy, the "12 hours" reference in this paragraph shall be changed to "72 hours" and the 72 hour deductible stated in that endorsement shall apply with respect to this Coverage Extension.

**9.** The most we will pay in the aggregate under this Coverage Extension and the policy for all corruption, distortion, deletion, damage, destruction or any other harm to "electronic data" (combined) caused by or resulting from a "targeted hacker attack," during each separate 12 month period of this policy beginning with the effective date of this policy, is $25,000.

**10.** The most we will pay in the aggregate under this Coverage Extension and the policy for all "extra expense" and loss of "business income" (combined) during each separate 12 month period of this policy beginning with the effective date of this policy is $25,000.



MEDIATION – CONFIDENTIAL.
Subject to Protective Order - Highly Confidential

CNA_BSA0002239
BSAPolicyEv-00015807
TrustApp0874



SB-300146-A
(Ed. 01/06)

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## CAP ON LOSSES FROM CERTIFIED ACTS OF TERRORISM

This endorsement modifies insurance provided under the following:

BUSINESSOWNERS SPECIAL PROPERTY COVERAGE FORM

**A. Cap On Certified Terrorism Losses**

"Certified act of terrorism" means an act that is certified by the Secretary of the Treasury, in concurrence with the Secretary of State and the Attorney General of the United States, to be an act of terrorism pursuant to the federal Terrorism Risk Insurance Act of 2002. The criteria contained in that Act for a "certified act of terrorism" include the following:

1. The act resulted in aggregate losses in excess of $5 million; and

2. The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals acting on behalf of any foreign person or foreign interest, as part of an effort to coerce the civilian population of the United States or to influence the policy or

affect the conduct of the United States Government by coercion.

With respect to any one or more "certified acts of terrorism" under the federal Terrorism Risk Insurance Act of 2002, we will not pay any amounts for which we are not responsible under the terms of that Act (including subsequent action of Congress pursuant to the Act) due to the application of any clause which results in a cap on our liability for payments for terrorism losses.

**B. Application Of Exclusions**

The terms and limitations of any terrorism exclusion, or the inapplicability or omission of a terrorism exclusion, do not serve to create coverage for any loss which would otherwise be excluded under this Coverage Part or Policy, such as losses excluded by the Nuclear Hazard Exclusion or the War And Military Action Exclusion.

SB-300146-A
(Ed. 01/06)

Includes copyrighted material of Insurance Services Office, Inc., with its permission.

Page 1 of 1

MEDIATION – CONFIDENTIAL.
Subject to Protective Order - Highly Confidential

CNA_BSA0002240
BSAPolicyEv-00015808
TrustApp0875



SB-300161-A
(Ed. 01/06)

## POLICY LIMITATION DISCLOSURE NOTICE
## EXCLUSION – SILICA

This Disclosure Notice is not your policy. READ YOUR POLICY CAREFULLY to determine rights, duties, and what is and is not covered. Only the provisions of your policy determine the extent of your insurance protection.

This policy contains an exclusion of coverage for claims arising out of "silica."

With this endorsement, coverage is excluded for:

1. "Bodily injury" which arises out of the actual, alleged or threatened respiration or ingestion at any time of "silica";

2. "Property damage" which arises out of the actual, alleged or threatened presence of "silica"; and

3. "Personal injury" or "advertising injury" which arises out of the actual, alleged or threatened exposure at any time to or the presence of "silica."

"Silica" means the chemical compound silicon dioxide ($SiO_2$) in any form, including dust which contains "silica."

Please read this exclusion carefully.



SB-300161-A
(Ed. 01/06)

Page 1 of 1

MEDIATION – CONFIDENTIAL.
Subject to Protective Order - Highly Confidential

CNA_BSA0002241
BSAPolicyEv-00015809
TrustApp0876

**CNA**

SB-300179-B
(Ed. 03/06)

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## CHOICE ENDORSEMENT

This endorsement modifies insurance provided under the following:

BUSINESSOWNERS SPECIAL PROPERTY COVERAGE FORM
BUSINESS INCOME AND EXTRA EXPENSE

A. The **BUSINESSOWNERS SPECIAL PROPERTY COVERAGE FORM, BUSINESS INCOME AND EXTRA EXPENSE COVERAGE FORM, ADDITIONAL COVERAGES AND COVERAGE EXTENSIONS** are changed as follows:

1. With respect to Business Income and Extra Expense, the time frame referenced in Paragraph **3.b.(2)** of the Business Income and Extra Expense coverage form is increased from sixty consecutive days to ninety consecutive days.

2. The limit applicable to the Additional Coverage – Claim Data Expense referenced in Paragraph **3.** of the Claim Data Expense coverage form is increased from $5,000 to $10,000.

3. The limit applicable to the Additional Coverage – Newly Acquired or Constructed Property for Business Personal Property referenced in Paragraph **2.b.** of the Newly Acquired or Constructed Property coverage form, is increased from $250,000 to $500,000.

4. The limit applicable to the Additional Coverage – Outdoor Trees, Shrubs, Plants and Lawns referenced in Paragraph **2.** of the Outdoor Trees, Shrubs, Plants and Lawns coverage form is increased from $3,000 to $5,000.

5. With respect to the Additional Coverage – Ordinance or Law, coverage is extended to include tenant's improvements and betterments as described in Paragraph **A.1.b.(3)** of the Businessowners Special Property Coverage form, if:

   a. You are a tenant; and

   b. A limit of Insurance is shown in the Declarations for Business Personal Property at the described premises.

6. The following Additional Coverages are added:

   a. Brands or Labels

   If branded or labeled merchandise that is Covered Property is damaged by a Covered Cause of Loss, we may take all

or part of the property at an agreed or appraised value. If so, you may:

(1) Stamp the word Salvage on the merchandise or its containers, if the stamp will not physically damage the merchandise; or

(2) Remove the brands and labels, if doing so will not physically damage the merchandise or its containers to comply with the law.

We will pay reasonable costs you incur to perform the activity described in Paragraphs (1) and (2) above. The most we will pay for these costs and the value of the damaged property under this Additional Coverage is $25,000.

Payments under this Additional Coverage are subject to and not in addition to the Limits of Insurance.

b. Lost Key Consequential Loss

(1) We will pay for consequential loss to keys and locks if a master or grand master key is lost or damaged from a Covered Cause of Loss. We will pay for:

(a) The actual cost of keys, and

(b) Adjustment of locks to accept new keys, or

(c) If required, new locks including cost of their installation.

(2) Loss or damage must be caused by or result from a Covered Cause of Loss including mysterious disappearance.

(3) The most we will pay for loss or damage under this Additional Coverage is $500 at each described premises.

c. Unauthorized Business Card Use

We will pay for your loss of money or charges and costs you incur that result directly from the unauthorized use of

Includes copyrighted material of the Insurance Services Office, Inc., with its permission.
Copyright, Insurance Services Office, Inc., 2003

MEDIATION – CONFIDENTIAL.
Subject to Protective Order - Highly Confidential

CNA_BSA0002242
BSAPolicyEv-00015810
TrustApp0877

SB-300179-B
(Ed. 03/06)

credit, debit or charge cards issued in your business name, including:

(1) Fund transfer cards;

(2) Charge plates; or

(3) Telephone cards.

The most we will pay under this Additional Coverage in any one occurrence is $5,000.

**d.** Utility Services – Direct Damage

(1) We will pay for loss of or damage to Covered Property caused by the interruption of services to the described premises. The interruption must result from direct physical loss or damage by a Covered Cause of Loss to the following Property not on the described premises:

(a) "Water Supply Services";

(b) "Communication Supply Services"; or

(c) "Power Supply Services"

(2) The most we will pay for loss or damage under this Additional Coverage in any one occurrence is $2,500 at each described premises.

(3) Payments under this Additional Coverage are subject to and not in addition to the applicable Limit of Insurance.

**7.** The following Coverage Extensions are changed as follows:

**a.** The limits applicable to the Coverage Extension – Accounts Receivable are changed as follows:

(1) The limit applicable to records of accounts receivable while in transit or at a premises other than the described premises is increased by $100,000.

(2) The limit applicable to records of accounts receivable at each described premises is increased by $100,000.

**b.** The limit applicable to the Coverage Extension – Business Income and Extra Expense From Dependent Property is increased by $15,000.

**c.** The limit applicable to the Coverage Extension – Business Income and Extra

Expense – Newly Acquired Premises is increased from $250,000 to $500,000.

**d.** The limit of insurance set forth in paragraph **6.** of the Electronic Data Processing Equipment and Electronic Media and Data Coverage Extension is deleted and replaced with the following:

The most we will pay under this Coverage Extension for all direct physical loss of or damage to "electronic data processing equipment" and "electronic media and data" (combined) in any one occurrence while in transit or at a premises other than the described premises is $50,000.

**e.** The limit applicable to the Coverage Extension – Ordinance or Law – Increased Period of Restoration is increased from $25,000 to $50,000.

**8.** The following Coverage Extensions are added:

**a.** Computer Fraud

(1) When a Limit of Insurance is shown in the Declarations for Business Personal Property at the described premises, that insurance shall apply to loss of or damage to Business Personal Property resulting directly from the use of any computer to fraudulently cause a transfer of that property from inside the building at the described premises or banking premises:

(a) To a person outside those premises; or

(b) To a place outside those premises.

(2) Paragraph **B.2.o.** of the Businessowners Special Property Coverage Form does not apply to this Coverage Extension.

(3) The most we will pay under this Coverage Extension in any one occurrence is $5,000, regardless of the number of premises involved.

(4) The "System Penetration" exclusion described in Paragraph **1.k.** of Section **B.**, Exclusions, of the Businessowners Special Property Coverage Form, does not apply to this Coverage Extension.

(5) With respect to this Computer Fraud Coverage Extension. We will not pay for loss or damage caused directly or

SB-300179-B
(Ed. 03/06)

Includes copyrighted material of the Insurance Services Office, Inc., with its permission.
Copyright, Insurance Services Office, Inc., 2003

Page 2 of 3
(Version 1.0)

MEDIATION – CONFIDENTIAL.
Subject to Protective Order - Highly Confidential

CNA_BSA0002243
BSAPolicyEv-00015811
TrustApp0878

SB-300179-B
(Ed. 03/06)

indirectly by any "mass system penetration." Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss.

**b.** Limited Building Coverage – Tenant Obligation

**(1)** If, at the described premises:

**(a)** You are a Tenant; and

**(b)** You are contractually obligated to repair or replace that part of a building you occupy as a tenant, and

**(c)** A Limit of Insurance is shown in the Declarations for Business Personal Property:

This insurance applies to direct physical loss of or damage to that part of a building you occupy as a tenant caused by or resulting from a Covered Cause of Loss other than theft or attempted theft.

**(2)** This Coverage Extension does not apply to any otherwise covered:

**(a)** Building glass; or

**(b)** Tenants improvements and betterments as described in Paragraph **A.1.b.(3),** of the Businessowners Special Property Coverage Form.

**(3)** The most we will pay under this Coverage Extension in any one occurrence is $5,000 at each described premises.

**c.** Utility Services – Time Element

**(1)** When the Declarations show that you have coverage for Business Income and Extra Expense, that insurance shall apply to the loss of Business Income or Extra Expense caused by the interruption of service to the described premises. The interruption must result from direct physical loss or damage by a Covered Cause of Loss to the following property not on the described premises:

**(a)** "Water Supply Services";

**(b)** "Communication Supply Services"; or

**(c)** "Power Supply Services."

**(2)** We will pay the actual loss sustained from the initial time of service(s) failure at the described premises but only when the service interruption at the described premises exceeds 24 hours immediately following the direct physical loss or damage. Coverage does not apply to any reduction of income after service has been restored to your premises.

**(3)** The most we will pay for loss under this Coverage Extension in any one occurrence is $2,500 at each described premises.

SB-300179-B
(Ed. 03/06)

Includes copyrighted material of the Insurance Services Office, Inc., with its permission.
Copyright, Insurance Services Office, Inc., 2003

Page 3 of 3
(Version 1.0)

MEDIATION – CONFIDENTIAL.
Subject to Protective Order - Highly Confidential

CNA_BSA0002244
BSAPolicyEv-00015812
TrustApp0879



SB-300185-A
(Ed. 01/06)

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# PROPERTY DAMAGE DEFINITION
# AMENDATORY ENDORSEMENT

This endorsement modifies insurance provided under the following:

BUSINESSOWNERS LIABILITY COVERAGE FORM

**Section F., DEFINITIONS,** related to **"Property Damage"** is amended by adding the following provisions:

For the purposes of this insurance, electronic data is not tangible property.

As used in this definition, electronic data means information, facts, or programs stored as, created or used on, or transmitted to or from computer software, including systems and applications software, hard or floppy disks, CD-ROMs, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.



SB-300185-A
(Ed. 01/06)

Includes copyrighted material of Insurance Services Office, Inc. with its permission.

Page 1 of 1

MEDIATION – CONFIDENTIAL.
Subject to Protective Order - Highly Confidential

CNA_BSA0002245
BSAPolicyEv-00015813
TrustApp0880



# IMPORTANT INFORMATION

## NOTICE – OFFER OF TERRORISM COVERAGE NOTICE – INFORMATION REGARDING DISCLOSURE OF PREMIUM

The Terrorism Risk Insurance Act established a federal program within the Department of the Treasury, under which the federal government shares, with the insurance industry, the risk of loss from future terrorist attacks. The program was scheduled to terminate on December 31, 2005, but was extended through December 31, 2007, by the Terrorism Risk Insurance Extension Act of 2005 ("TRIEA").

TRIEA applies when the Secretary of the Treasury certifies that an event meets the definition of an act of terrorism. TRIEA provides that, to be certified, an act of terrorism must cause losses of at least five million dollars and must have been committed by an individual or individuals acting on behalf of any foreign person or foreign interest to coerce the government or population of the United States.

In accordance with TRIEA, we are required to offer you coverage for losses resulting from an act of terrorism that is certified under the federal program. The policy's other provisions will still apply to such an act. The premium for this coverage is included as part of the terrorism premium charge shown separately on your policy Declarations, and is also included in the total premium.

DISCLOSURE OF FEDERAL PARTICIPATION IN PAYMENT OF TERRORISM LOSSES:

The United States Government, Department of the Treasury, will pay a share of terrorism losses insured under the federal program. The federal share equals 90% of that portion of the amount of such insured losses that exceeds the applicable insurer retention. This federal share will decrease to 85% in 2007. If the federal program is extended beyond 2007, the applicable percentage will be shown separately on your Policy Declarations at that time.

LIMITATION ON PAYMENT OF TERRORISM LOSSES (applies to policies which cover terrorism losses insured under the federal program, including those which only cover fire losses):

The provisions of the TRIEA can limit our maximum liability for payment of losses from certified acts of terrorism. That determination will be based on a formula set forth in the law involving the national total of federally insured terrorism losses in an annual period and individual insurer participation in payment of such losses. If one or more certified acts of terrorism in an annual period causes the maximum liability for payment of losses from certified acts of terrorism to be reached, and we have satisfied our required level of payments under the law, then we will not pay for the portion of such losses above that maximum. However, that is subject to possible change at that time, as Congress may, under TRIEA, determine that payment above the cap will be made.

IN THE EVENT OF TERMINATION OR MODIFICATION OF THE FEDERAL PROGRAM:

All of these same conditions will apply if the Terrorism Risk Insurance Act is extended by the federal government to continue past December 31, 2007. However, if the program is not extended, or the program is modified to increase our statutory percentage deductible, reduce the federal government's statutory percentage, or redefine terrorism subject to provisions or requirements different from those that apply to other types of events or occurrences under this policy, coverage for terrorism will still be provided. There may be no federal participation in payment of terrorism losses that occur after that date. Also, there may be no cap placed on the aggregate of all losses the Company may be required to pay for all covered losses resulting from single or multiple acts of terrorism.

SB-300144-B
(Ed. 10/06)

Page 1 of 1

MEDIATION – CONFIDENTIAL.
Subject to Protective Order - Highly Confidential

CNA_BSA0002246
BSAPolicyEv-00015814
TrustApp0881



CNA Plaza
Chicago, Illinois 60685

| Policy Number | From | Policy Period | To | Coverage Is Provided By | Agency |
|---|---|---|---|---|---|
| B2097703749 | 04/23/07 | | 04/23/08 | National Fire Insurance of Hartford | 074992370 |

| Named Insured And Address | Agent |
|---|---|
| CALUMET COUNCIL INC.<br>8751 Calumet Ave<br>MUNSTER, IN  46321 | DON POWERS AGENCY INC<br>911 RIDGE ROAD<br>P O BOX 3007<br>MUNSTER, IN 46321 |



**    PAYMENT PLAN SCHEDULE  **


THE BILLING FOR THIS POLICY WILL BE
FORWARDED TO YOU DIRECTLY FROM CNA.


THE PREMIUM AMOUNT FOR THIS TRANSACTION
IS     $3,177.00 .


THIS PREMIUM WILL BE INVOICED BY CNA ON
A SEPARATE STATEMENT ACCORDING TO THE
PAYMENT OPTION YOU SELECT.


ISSUE DATE 04/17/07

CNA_BSA0002247
BSAPolicyEv-00015815
TrustApp0882

**END OF COPY**

MEDIATION – CONFIDENTIAL.
Subject to Protective Order - Highly Confidential

CNA_BSA0002248
BSAPolicyEv-00015816
TrustApp0883

| Policy Issued by | BUCKEYE UNION INSURANCE CO. | | A Stock Company 43 | Policy No. 70 CBP 06051512-93 |
|---|---|---|---|---|
| Producer's Name and Address | ATEN MENNETTI INS AGENCY INC<br>P O BOX 397<br>MANSFIELD        OH 44901 0397 | | General Offices 180 Maiden Lane NY NY 10038 | |
| | | | Producer's Code<br>34 459 25 5 | Renewal of<br>70 CBP 06051512-92 |
| Named Insured Mailing Address | BOY SCOUTS OF AMERICA, INC.<br>445 W. LONGVIEW<br>AVENUE<br>MANSFIELD        OH 44905 | | | |
| Policy Period | From JANUARY 22, 1992      to JANUARY 22, 1993      at<br>12:01 Standard Time at your mailing address shown above | | | 911128<br>Common Policy Declarations<br>Comprehensive Business Policy<br>Daily Report. |

Business Description:
    BOY SCOUT COUNCIL OFFICE
THIS COMPANY HAS ISSUED A POLICY OF INSURANCE AS FOLLOWS:
IN RETURN FOR THE PAYMENT OF THE PREMIUM, AND SUBJECT TO ALL THE TERMS OF THIS POLICY,
WE AGREE WITH YOU TO PROVIDE THE INSURANCE AS STATED IN THIS POLICY. THIS POLICY CONSISTS
OF THE FOLLOWING COVERAGE PARTS FOR WHICH A PREMIUM IS INDICATED. THIS PREMIUM MAY BE
SUBJECT TO ADJUSTMENT.

| Coverage Part | Premium |
|---|---|
| Commercial Property Coverage Part | $      INCLUDED |
| Boiler and Machinery Coverage Part | $      EXCLUDED |
| Commercial Inland Marine Coverage Part | $      INCLUDED |
| Commercial Crime Coverage Part | $      EXCLUDED |
| Commercial Auto Coverage Part | $      EXCLUDED |
| Commercial General Liability Coverage Part | $      INCLUDED |
| Additional Coverage Part(s) | $      EXCLUDED |
| | $ |
| | $ |
| | $ |

| BUSINESS TEAM: 70K | Premium for this policy | $      2272 |
|---|---|---|
| | Add for attached companion policies | $ |
| | Total premium | $      2272 |

Premium shown is payable: $ _____ 2272.00 at inception; $ _____ each anniversary.

Any premium shown in the Declarations for a Policy Period extending beyond one year was computed based
on rates in effect at the time the policy was issued. On each renewal, continuation, or anniversary of the
effective date of this policy, we will compute the premium for each Coverage Part in accordance with our
rates and rules then in effect. Exceptions, in any, are: _____

Audit required for: ☐ GL    ☐ Auto    ☐ Inland Marine    ☐ Other _____
Annual or ☐

Form(s) and Endorsement(s) applicable to all Coverage Parts and made a part of this policy at time of issue:
SIL 0017 1185    IL 0021 1185    IL 0244 0689

COUNTERSIGNED _____    BY _____
              (Date)                      (Authorized Representative)

THESE DECLARATIONS TOGETHER WITH THE COMMON POLICY CONDITIONS, COVERAGE PART
DECLARATIONS, COVERAGE FORM(S) AND FORMS AND ENDORSEMENTS, IF ANY, ISSUED TO FORM A
PART THEREOF, COMPLETE THE ABOVE NUMBERED POLICY.

SDEC 1 DR Ed. 11/85          BRANCH COPY          AGENT COMMISSION 16.5%

DEC. 3 1 1991

MEDIATION – CONFIDENTIAL.
    Subject to Protective Order - Highly Confidential

CNA_BSA0001308
BSAPolicyEv-00014833
TrustApp0884

| Policy Issued by | BUCKEYE UNION INSURANCE CO. | | A Stock Company 43 | Policy No. 70 CBP 06051512-93 |
|---|---|---|---|---|
| Producer's Name and Address | ATEN MENNETTI INS AGENCY INC P O BOX 397 MANSFIELD          OH 44901 0397 | | General Offices 180 Maiden Lane NY NY 10038 | |
| | | | Producer's Code 34  459 255 | Renewal of 70 CBP 06051512-92 |
| Named Insured Mailing Address | BOY SCOUTS OF AMERICA, INC. 445 W. LONGVIEW AVENUE MANSFIELD          OH 44905 | | **Common Policy Declarations** **Comprehensive Business Policy** **Daily Report** | |
| Policy Period | From JANUARY   22, 1992  to  JANUARY   22, 1993  at 12:01 Standard Time at your mailing address shown above | | | |

## NAMED INSURED

DBA JOHNNY APPLESEED AREA COUNCIL

Subject to Protective Order - Highly Confidential

MEDIATION – CONFIDENTIAL.
Subject to Protective Order - Highly Confidential

Endorsement R~ me

| Name of Insured | Boy Scouts of America, Inc. | 1/22/92 m'/22/93 | | Policy No. CBP 605 1512 | | Original Inst. Amt. # 2272 |
|---|---|---|---|---|---|---|

| End. No. | Effective Date | Part | Description of Change | Cash | Inst. Change | New Inst. Amt. |
|---|---|---|---|---|---|---|
| 1 | -22·92 | Prop. | Add fine Hycr | 21 | | |
| 2 | 7-20·92 | Prop | Add Copier / CP 1218 | NC | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

CBP 1885-F

CNA_BSA0001310
BSAPolicyEv-0001835

STAMP RESUME

CLP [ ]        CBP [ ✓ ]

POLICY NO. ＲＦ 60.51512

AUDIT

BOILER

BROKERAGE

CLAIMS MADE

CTEK CONTINUOUS SERVICE

CUM. CLAIMS        INSURED'S NUMBER _____

ELEVATOR

OCCURRENCE

_Yes_    PIF

PREMIUM FINANCED

REGIONAL REVIEW

REINSURANCE:  FACULTATIVE G.L. [ ]  AUTO [ ]  CRIME [ ]
              PROPERTY [ ]  SLT [ ]  MOAC [ ]  AGENCY [ ]

RENEWED BY POLICY NUMBER _____

REPORTING FORM AUTO PHY [ ]   PROPERTY [ ]

SPECIAL FILINGS

    STATE FILING _____    SPECIAL HAULING PERMIT _____

    ICC _____   BOBTAIL _____   OTHER _____

TRANSITION YEAR  1 [ ]  2 [ ]  3 [ ]  4 [ ]  5 [ ]

UMBRELLA

OTHER

ACCOUNT CLEARANCE _____  ACCOUNT NO. _____

| COMMISSION SCALE | | | |
|---|---|---|---|
| PROP. | 10.5 % | % | % | % |
| B & M | % | % | % | % |
| I.M. | 11.5 % | % | % | % |
| CRIME | % | % | % | % |
| AUTO | % | % | % | % |
| G.L. | 10.5 % | % | % | % |
| UMBRELLA | % | % | % | % |
| | % | % | % | % |
| | % | % | % | % |

(B1-18 REVISED 5/91)

Subject to Protective Order Highly Confidential

AGENTS INFORMATION SHEET

ACCOUNT CURRENT COMMISSION

DATA ENTRY

COMMERCIAL LINES
POLICY (CLP)

| COMMISSION | |
|---|---|
| LINE | RATE |
| PROP. | _____ % |
| B&M | _____ % |
| I.M. | _____ % |
| CRIME | _____ % |
| AUTO LIAB. | _____ % |
| AUTO PHY. | _____ % |
| G.L. | _____ % |
| UMBRELLA | _____ % |
| | _____ % |
| | _____ % |
| | _____ % |

**See Declaration
Pages for premium
by line.**

COMPREHENSIVE
BUSINESS POLICY (CBP)

| COMMISSION | | |
|---|---|---|
| $ _2272_ | PREMIUM AT | _16.5_ % |
| $ _____ | PREMIUM AT | _____ % |
| $ _____ | PREMIUM AT | _____ % |

GENERAL LIABILITY SUBJECT TO:

TRANSITION PROGRAM YES [ ]  NO [X]

TRANSITION YEAR 1 [ ]  2 [ ]  3 [ ]  4 [ ]  5 [ ]

POLICY NO. _CBP 6051512_

(B1-17)

MEDIATION – CONFIDENTIAL.
Subject to Protective Order - Highly Confidential

CNA_BSA0001312
BSAPolicyEv-00014837
TrustApp0888

## Commercial Property Coverage Part Declarations

### Daily Report

Policy No. **70 CBP 06051512-93**    Effective Date **01 / 22/ 92**    Page No. **1** of **4** Page(s)

| Prem. No. | Item No. | Descripton of Premises - Location (Enter "same" if same as mailing address) Construction and Occupancy | Covered Property Symbol* | Coinsurance Percentage | Limit(s) of Insurance | Deductible Exceptions** |
|---|---|---|---|---|---|---|
| 001/001 | 1 | SAME JOISTED MASONRY OFFICES | A | 90% | $147900 | STD ** W/H ** TFT ** |
| XXX XXX | | Premises not described above - each premises Aggregate - all premises not described | B B | XXX XXX | | |
| XXX XXX XXX XXX | | Property in transit | | XXX XXX XXX XXX | | |
| | | Mortgage holders name and address | | | | |

* Covered Property Symbols A, B, C, D, E, F, G (See Declarations - Page 2 for explanation of symbols.)
** Deductible **$250**, Except as otherwise specifically indicated above or as follows:

Other separate deductibles apply to various optional coverages and causes of loss when such options are applicable.

**Causes Of Loss Form**                                    Applicable to Premises Numbers Shown Below
☐ Basic Form, SCP 10 10
   ☐ Basic Broad Form Endorsement SCP 10 20 _____
☒ Special Form SCP 10 30C **1091**                          001/001 **1, 2**
   ☐ Including Theft Exclusion
   ☐ Including Flood ###
   ☐ Including Earthquake ###
☐ Earthquake Form, CP 10 40 _____
# See Declarations - Continued for Limits of Insurance and Deductibles applicable to Optional Causes of Loss.

**Other Forms Applicable:** To All Premises:
   **SEE ATTACHED SCHEDULE**

To Specific Premises/Coverages:

| Prem. No. | Item No. | Form Nos. |
|---|---|---|
| | | |

SDEC 59 DR Ed. 11/85                              **BRANCH COPY**

MEDIATION – CONFIDENTIAL.
Subject to Protective Order - Highly Confidential

CNA_BSA0001313
BSAPolicyEv-00014838

TrustApp0889

**Commercial Property Coverage Part**
**Declarations - Continued**
**Daily Report**

Policy No. 70 CBP 06051512-93    Effective Date 01 / 22/ 92          Page No.    2 of    4 Page(s

| Prem. No. | Item No. | Descripton of Premises - Location (Enter "same" if same as mailing address) Construction and Occupancy | Covered Property Symbol* | Coinsurance Percentage | Limit(s) of Insurance | Deductible Exceptions** |
|---|---|---|---|---|---|---|
| 001/001 | 2 | SAME JOISTED MASONRY OFFICES | B | 90% | $36000 | STD ** W/H ** TFT ** |

Covered Property Symbols A,B,C,D,E,F,G (see Declarations - Page 2 for explanations of symbols.)
Deductible $250. Except as otherwise specifically indicated above or as follows:

Otherwise separate deductibles apply to various optional coverages and causes of loss when such options are applicable

**SDEC 60 DR Ed. 11/85**                    **BRANCH COPY**

MEDIATION – CONFIDENTIAL.
Subject to Protective Order - Highly Confidential

**Commercial Property Coverage Part
Declarations**
**Daily Report**

| Policy No. 70 CBP 06051512-93 | Effective Date 01 /22/ 92 | Page No. | 3 of | 4 Page(s |

Covered Property Symbols
   A  -   Real Property
   B  -   Your Personal Property
   C  -   Personal Property Of Others
   D  -   Personal Property in transit in your vehicles
   E  -   Personal Property in custody of carrier for hire
   F  -   Personal Property in custody of your salesmen away from premises
   G  -   Personal Property in transit other than D, E, and F.

Other Forms Applicable:

To All Coverages
SCP 0010C 1091   SCP 0090A 0289   SCP 1030C 1091   SDEC 61 1185

**To Specific Premises/Coverages:**

| Prem. No. | Item No. | Form Nos. |
|-----------|----------|-----------|
|           |          |           |

**SDEC 59 CONTINUED**

MEDIATION – CONFIDENTIAL.
Subject to Protective Order - Highly Confidential

CNA_BSA0001315
BSAPolicyEv-00014840

TrustApp0891

**Commercial Property Coverage Part
Declarations - Continued**
Daily Report

Policy No 70 CBP 06051512-93   Effective Date 01/22/92        Page No.    4of      4 Page(s)

Options Applicable Only When Entries Are Made in Schedule Below:

| Prem. No. | Item No. | Agreed Value | | Inflation Guard Percentage | Replacement Cost ☒ |
|---|---|---|---|---|---|
| | | Value | Expiration | | |
| 001/001 | 1 | | | | X |
| | 2 | | | | X |

**Causes of Loss - Special Form
Optional Causes of Loss**

The Optional Causes of Loss apply as indicated elsewhere in these Commercial Property Coverage Part Declarations. The Limits of Insurance and Deductible applicable to these Optional Causes of Loss are as stated below. No entry indicates no coverage.

1.   Earthquake and Volcanic Eruption

| Prem. No. | Item No. | Deductible ($ or %) | Including Masonry Veneer ☒ |
|---|---|---|---|
| | | | |

Limit of Insurance any one occurrence:      $ _____
Limit of Insurance any one policy year:     $ _____

2.   Flood and Water Damage

Limit of Insurance any one occurrence:      $ _____
Limit of Insurance any one policy year:     $ _____
Deductible: $            applicable at Prem. Nos. _____
Deductible: $            applicable at Prem. Nos. _____

**SDEC 61 DR Ed. 11/85**                    **BRANCH COPY**

**Commercial Inland Marine
Coverage Part Declarations
Electronic Data And
Word Processing Equipment**
Daily Report
Policy No. ___CBP 605 1512___

If two Limits of Insurance are shown below, only the larger limit will apply.

Loss is Payable to the insured and

as interest may appea

| Valuation of Equipment | Coinsurance Percentage | | Deductible | |
|---|---|---|---|---|
| ☒ Replacement Cost | ☒ 90% | ☐ 100% | Breakdown | Other |
| ☐ Actual Cash Value | | | $ 1,000. | $ 250. |

| | Covered Property | Limit of Insurance | Increased Limit of Insurance |
|---|---|---|---|
| **Location # 1** | Equipment | $ (4050) 68 · | XXXXXXXXXXXX |
| | Data & Media | $10,000 or | $ |
| | Extra Expense | $10,000 or | $ |
| | Newly Acquired Equipment | $50,000 or | $ |
| **Location # 2** | Equipment | $ | XXXXXXXXXXXX |
| | Data & Media | $10,000 or | $ |
| | Extra Expense | $10,000 or | $ |
| | Newly Acquired Equipment | $50,000 or | $ |
| **Location # 3** | Equipment | $ | XXXXXXXXXXXX |
| | Data & Media | $10,000 or | $ |
| | Extra Expense | $10,000 or | $ |
| | Newly Acquired Equipment | $50,000 or | $ |
| **Newly Acquired Locations** | Equipment | $50,000 or | $ |
| | Data & Media | $10,000 or | $ |
| | Extra Expense | $10,000 or | $ |
| **Property In Transit** | Equipment | $50,000 or | $ |
| | Data & Media | $10,000 or | $ |
| | Extra Expense | $10,000 or | $ |
| **Debris Removal** | XXXXXXXXXXXX | $10,000 or | $ |
| **Business Income** | Daily Amount $ | Limit of Insurance $ | |
| | Deductible $ | or        Day(s) | |

Special Provisions, if any:
See Endorsement No. SCM99 507 when entries are indicated below:

Additional Exclusions: ☐ Water Exclusion; ☒ Earth Movement Exclusion
Equipment Not Covered:

Protective Safeguards: Location #1
                       Location #2
                       Location #3

Other Forms:    SCM0001 3/90    SCM99507 11/85    SCM00510 11/85

SDEC 16 DR Ed. 11/85                                    Printed in U.S.A.

**Commercial Inland Marine**
**Coverage Part Declaration**
Daily Report

Policy No. ___CBP 605 1512___

INSURANCE APPLIES ONLY TO THOSE COVERAGES DESIGNATED BY AN X OPPOSITE SUCH COVERAGE, FOR WHICH A PREMIUM AND LIMIT OF INSURANCE IS SHOWN IN THE SPACES PROVIDED BELOW.

☐ Contractors Equipment

Rate $ _____                                    Premium $ _____

| Schedule of Property | Limit of Insurance | Description |
|---|---|---|
| | $• | • |
| | | • |
| | | • |
| | | • |
| | | • |
| | | • |
| | | • Any One Unscheduled Item |
| | | • Limit per Occurrence |
| **New Acquisitions** | $• | or _____ % of the Limit per Occurrence, whichever is less. |
| **Rental Expense** | $• | Daily Rental Expense |
| | • | All Rental Expense |

**Deductible (A or B)**

Deductible Amount
A. $
B. 250•   % of the Limit of Insurance on the item, or the largest Limit of Insurance if two or more items are involved in the same loss, but not less than $_____ , nor more than $_____ .

**Extensions**    Insurance applies only to those Extensions designated by an X in the box next to them.
☐ Additional Covered Property
☐ Crane and Derrick Boom Extensions
☐ Limited Replacement Cost

Rate $ __INCL.__                    ☐ Portable Equipment
                                    ☑ Miscellaneous Equipment          Premium $ __INCL.__

| Schedule of Property | Limit of Insurance | Description |
|---|---|---|
| | $• | • |
| | . 54,243. | • PER SCHEDULE ON FILE WITH CO. |
| | • | • |
| | | • |
| | • | • |
| | | • |

**Deductible**    Deductible Amount
$

FORMS APPLICABLE:    SCM0001 3/90    SCM00514 11/85

SDEC 64 DR Ed. 11/85

BRANCH OFFICE COPY

Printed in U.S.

MEDIATION – CONFIDENTIAL.
Subject to Protective Order - Highly Confidential

CNA_BSA0001318
BSAPolicyEv-00014843

TrustApp0894

**Commercial General Liabilit**
**Coverage Part Declarations**
**Daily Report**

Policy No. 70 CBP 06051512-93

**Limits of Insurance**
**THIS POLICY CONTAINS AGGREGATE LIMITS: REFER TO SECTION III - LIMITS OF INSURANCE FOR DETAILS**

| | | |
|---|---|---|
| General Aggregate Limit (Other Than Products--Completed Operations | $ | 500000 |
| Products--Completed Operations Aggregate Limit | $ | 500000 |
| Personal and Advertising Injury Limit | $ | 500000 |
| Each Occurrence Limit | $ | 500000 |
| Fire Damage Limit | $ | 50000 Any One Fire |
| Medical Expense Limit | $ | 5000 Any One Person |

**Retroactive Date (For Claims Made Coverage Only)**
Coverage A of this Insurance does not apply to "bodily injury" or "property damage" which occurs before the Retroacti
Date, if any, shown below:

Retroactive Date: _____
(Enter date or "None" if no Retroactive Date applies.)

**Form of Business and Location of all Premises**
( ) Individual                         ( ) Joint Venture                         ( ) Partnership
(X) Organization (Other than Partnership or Joint Venture)
Location of All Premises You Own, Rent or Occupy:
445 W. LONGVIEW      AVENUE            MANSFIELD            OH 44905

**Premium**

Classification

| Loc #<br>Bldg # | Code<br>No. | Premium<br>Basis* | Products./<br>Compl. Ops. | Rate*<br>All<br>Other | Advance Premium<br>Products/<br>Compl. Ops. | All<br>Other |
|---|---|---|---|---|---|---|
| 001/001 | 61224 | A) 2093 | VRS | VRS | INCLUDED | INCLUDED |

CLASSIFICATION : BUILDINGS OR PREMISES - OFFICE - OTHER THAN NOT FOR
PROFIT "INCLUDING PRODUCTS AND/OR COMPLETED OPERATIONS"

Total Advance Premium $ INCLUDED

*Premium Basis—Rate. Indicate:

"(a)" for Area (per 1,000 sq. ft.)          "(c)" for Total Cost                        "(t)" for Each
"(p)" for Payroll (per $1,000 of payroll)   "(m)" for Admission (per 1,000 admissions)
"(s)" for Gross Sales (per $1,000 of gross sales)   "(u)" for Units (each unit)

**Forms and Endorsements**
Forms and Endorsements applying to this Coverage Part and made part
of this policy at time of issue:
CG 0001 1188       CG 2147 0989       SCG 22503A 0689

SDEC 20 DR Ed. 11/85                    BRANCH COPY

MEDIATION – CONFIDENTIAL.
Subject to Protective Order - Highly Confidential

CNA_BSA0001319
BSAPolicyEv-00014844

TrustApp0895

## General Change Endorsemen

| | |
|---|---|
| Policy No: | CBP 605 1512 -93 |
| Policy Change No.: | 1 |
| Policy Change(s) Effective Date: | 2/22/  19̲92 |

Named Insured and Address: **BOY SCOUTS OF AMERICA, INC.    445 W. LONGVIEW AVENUE MANSFIELD, OHIO 44905**

Coverage Part(s) Affected:

**COMMERCIAL: ALL COVERAGE PARTS, INLAND MARINE**

Producer: **AYLW BENNETTI INSURANCE AGENCY, INC.     MANSFIELD, OHIO 44901**

Loss Payee and Address:

**Note To Designated Loss Payee, If Any:**
This Document signed by an authorized representative of the company will constitute certification of physical damage insurance in accordance with standard policy provisions and statutory or appropriate Loss Payable Clause, until policy expiration date indicated:
Policy Expiration Date: _____

Description of Change(s)

COMMERCIAL INLAND MARINE:

EDP IS BEING AMENDED TO SHOW COVERAGE BEING ADDED TO CHANGE TOTAL TO: $6,827.

MISC EQUIPMENT IS BEING AMENDED TO REDUCE LIMIT BY $1,977.

| | | |
|---|---|---|
| ALL COVERAGE PARTS | $0 | A/P |
| COMMERCIAL INLAND MARINE | $49 | A/P |

Premium Recapitulation:  **$2223**                    PRO-RATA FACTOR: 1.000

| | Additional Premium | Return Premium |
|---|---|---|
| Due at Endorsement Effective Date Deferred | $ | $ 49.00 |
| | $ | $ |

2/25/92/
HH

Signature of Authorized Representative

Copyright, The Continental Corp. 1988
SIL 12 500 (1288)

**General Change Endorsement**

| Policy No: | CPP 605 1612 |
|---|---|
| Policy Change No.: | 1 |
| Policy Change(s) Effective Date: | 1/22/ 19 92 |

**Named Insured and Address:** — BOYS OF AMERICA
INC DBA JOHNY PELLS AREA COUNCIL
445 W. LONGVIEW AVE., MANSFIELD, OHIO 44905

**Coverage Part(s) Affected:**
CO CIAL PROPERTY

**Producer:** AMMO INSUR A CO INC. — A ST D, O IO 44901

**Loss Payee and Address:**

**Note To Designated Loss Payee, If Any:**
This Document signed by an authorized representative of the company will constitute certification of physical damage insurance in accordance with standard policy provisions and statutory or appropriate Loss Payable Clause, until policy expiration date indicated:
Policy Expiration Date:

**Description of Change(s)**

COMMERCIAL PROPERTY IS HEREBY AMENDED TO ADD: (121 .

**Premium Recapitulation:**

|  | Additional Premium | Return Premium |
|---|---|---|
| Due at Endorsement Effective | $ | $ |
| Deferred | $ | $ |

3/12/92/b'

Signature of Authorized Representative



Copyright, The Continental Corp. 1988
SIL 12 500 (1288)

POLICY NUMBER: CBP 605 5112                                    COMMERCIAL PROPERTY

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# LOSS PAYABLE PROVISIONS

This endorsement modifies insurance provided under the following:

BUILDING AND PERSONAL PROPERTY COVERAGE FORM
BUILDERS' RISK COVERAGE FORM
CONDOMINIUM ASSOCIATION COVERAGE FORM
CONDOMINIUM COMMERCIAL UNIT-OWNERS COVERAGE FORM
STANDARD PROPERTY POLICY

### SCHEDULE

| | | | | Provisions Applicable | | |
|---|---|---|---|---|---|---|
| Prem. No. | Bldg. No. | Description of Property | Loss Payee (Name & Address) | Loss Payable | Lender's Loss Payable | Contract Of Sale |
| 001 | 001 | RICOH 07 FAX MACHINE | LEASE AMERICA CORP. C/O LEASE INS. AGENCY 1756 114 TH AVENUE S.E.- SUITE 230 BELLEVUE, WA. 98004 | X | | |

**A. When** this endorsement is attached to the STANDARD PROPERTY POLICY CP 00 99 the term Coverage Part in this endorsement is re-placed by the term Policy.

The following is added to the LOSS PAYMENT Loss Condition, as indicated in the Declarations or by an "X" in the Schedule:

**B. LOSS PAYABLE**

For Covered Property in which both you and a Loss Payee shown in the Schedule or in the Declarations have an insurable interest, we will:

**1.** Adjust losses with you; and

CP 12 18 07 88        Copyright, ISO Commercial Risk Services, Inc., 1983, 1987        Page 1 of 2

MEDIATION – CONFIDENTIAL.
  Subject to Protective Order - Highly Confidential

CNA_BSA0001322
BSAPolicyEv-00014847

TrustApp0898

Page  01

## General Change Endorsement

| Policy No: 70 CBP  06051512-93 | | |
|---|---|---|
| Policy Period 01/22/92 - 01/22/93 | | Policy Change No:  0002 |
| Business Team:    70K | Policy Change(s) Effective Date:    07/20/92 | |

**Named Insured and Address:**

BOY SCOUTS OF AMERICA, INC.
445 W. LONGVIEW
AVENUE
MANSFIELD        OH 44905

**Coverage Part(s) Affected:**

COMMERCIAL: ALL COVERAGE PARTS,
PROPERTY

**Producer Name and Address:**

ATEN MENNETTI INS AGENCY INC
P O BOX 397
MANSFIELD        OH 44901 0397

Producer No.        34459255

**Loss Payee and Address:**

NOTE To Designated Loss Payee, If Any:
This Document signed by an authorized representative of the company will constitute certification of physical damage insurance in accordance with standard policy provisions and statutory or appropriate Loss Payable Clause, until policy expiration date indicated.
Policy Expiration Date: _____

**Description of Change(s)**

ADD CANON NP-6650II COPIER, SER #CYR15562 TO OFFICE
EQUIPMENT SCHEDULE


ALL COVERAGE PARTS                          $0        A/P

COMMERCIAL PROPERTY                         $0        A/P

ADDED FORMS:
    CP 1218 1091

Premium Recapitulation:        $2223                    Pro-Rata Factor:   0.510

| | Additional Premium | Return Premium |
|---|---|---|
| Due at Endorsement | $0 | |
| Effective Date Deferred | | |

Copyright, The Continental Corp. 1988

Signature of Authorized Representative

_____

SIL 12 500 12 88

MEDIATION – CONFIDENTIAL.
  Subject to Protective Order - Highly Confidential

POLICY NUMBER:    70 CBP 06051512-93                                      COMMERCIAL PROPERTY

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

### LOSS PAYABLE PROVISIONS

This endorsement modifies insurance provided under the following:

BUILDING AND PERSONAL PROPERTY COVERAGE FORM
BUILDERS' RISK COVERAGE FORM
CONDOMINIUM ASSOCIATION COVERAGE FORM
CONDOMINIUM COMMERCIAL UNIT-OWNERS COVERAGE FORM
STANDARD PROPERTY POLICY

### SCHEDULE

| Provisions Applicable | | |
|---|---|---|
| Loss Payable | Lender's Loss Payable | Contract Of Sale |
| X | | |

| Prem. No. | Bldg. No. | Description of Property | Loss Payee (Name & Address) |
|---|---|---|---|
| 001 | 001 | CANON NP-6650II COPIER S#CYR15562 | MADISON LEASING CO. P.O. BOX 1129 MADISON WI      53701 |

**A.** When this endorsement is attached to the STANDARD PROPERTY POLICY **CP 00 99** the term Coverage Part in this endorsement is replaced by the term Policy.

The following is added to the LOSS PAYMENT Loss Condition, as indicated in the Declarations or by an "X" in the Schedule:

**B. LOSS PAYABLE**

For Covered Property in which both you and a Loss Payee shown in the Schedule or in the Declarations have an insurable interest, we will:

1. Adjust losses with you; and

CP 12 18 10 91            Copyright, ISO Commercial Risk Services, Inc., 1990            Page 1 of 2

MEDIATION – CONFIDENTIAL.
Subject to Protective Order - Highly Confidential

CNA_BSA0001324
BSAPolicyEv-00014849
TrustApp0900

# CERTIFICATE OF INSURANCE

00249    ISSUE DATE 07/27/92

**PRODUCER**

ATEN & MENNETTI INS AGCY
P.O. BOX 397
MANSFIELD OH 44901

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW.

## COMPANIES AFFORDING COVERAGE

| COMPANY LETTER A | CONTINENTAL INSURANCE |
| COMPANY LETTER B | |
| COMPANY LETTER C | |
| COMPANY LETTER D | |
| COMPANY LETTER E | |

**INSURED**

BOY SCOUTS OF AMERICA
JOHNNY APPLESEED AREA
445 WEST LONGVIEW AVENUE
MANSFIELD, OH 44905

## COVERAGES

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED, NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| CO LTR | TYPE OF INSURANCE | POLICY NUMBER | POLICY EFFECTIVE DATE (MM/DD/YY) | POLICY EXPIRATION DATE (MM/DD/YY) | ALL LIMITS IN THOUSANDS | |
|---|---|---|---|---|---|---|
| A | **GENERAL LIABILITY** X COMMERCIAL GENERAL LIABILITY CLAIMS MADE [X] OCC. R. OWNER'S & CONTRACTOR'S PROT | CBP06051512 | 01/22/92 | 01/22/93 | GENERAL AGGREGATE | $ 500 |
| | | | | | PRODUCTS—COMP/OPS AGGR | $ 500 |
| | | | | | PERSONAL & ADVERTISING INJURY | $ 500 |
| | | | | | EACH OCCURRENCE | $ 500 |
| | | | | | FIRE DAMAGE (Any one fire) | $ 50 |
| | | | | | MEDICAL EXPENSE (Any one person) | $ 5 |
| | **AUTOMOBILE LIABILITY** ANY AUTO ALL OWNED AUTOS SCHEDULED AUTOS HIRED AUTOS NON–OWNED AUTOS GARAGE LIABILITY | | | | COMBINED SINGLE LIMIT | $ |
| | | | | | BODILY INJURY (Per person) | $ |
| | | | | | BODILY INJURY (Per acc) | $ |
| | | | | | PROPERTY DAMAGE | $ |
| | **EXCESS LIABILITY** OTHER THAN UMBRELLA FORM | | | | EACH OCCUR. | AGGREGATE |
| | | | | | $ | $ |
| | **WORKER'S COMPENSATION AND EMPLOYERS' LIABILITY** | | | | STATUTORY | |
| | | | | | $ (EACH ACCIDENT) | |
| | | | | | $ (DISEASE–POLICY LIMIT) | |
| | | | | | $ (DISEASE–EACH EMPLOYEE) | |
| A | OTH. PROPERTY | CBP06051512 | 01/22/92 | 01/22/93 | | |

RECEIVED JUL 28 1992

**DESCRIPTION OF OPERATIONS/LOCATIONS/VEHICLES/SPECIAL ITEMS**

CANON NP-6650II COPIER, SER #CYR15562

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| MADISON LEASING CO. P.O. BOX 1129 MADISON, WI 53701 | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, THE ISSUING COMPANY WILL ENDEAVOR TO MAIL ____ DAYS WRITTEN NOTICE TO THE CERTIFICATE HOLDER NAMED TO THE LEFT, BUT FAILURE TO MAIL SUCH NOTICE SHALL IMPOSE NO OBLIGATION OR LIABILITY OF ANY KIND UPON THE COMPANY, ITS AGENTS OR REPRESENTATIVES. AUTHORIZED REPRESENTATIVE *Mark W. Stoll* |

INSURNET 25-S (3/88)    INSURNET, INC. 1988

Subject to Protective Order - Highly Confidential

MEDIATION – CONFIDENTIAL.
    Subject to Protective Order - Highly Confidential

CNA BSA0001325
BSAPolicyEv-0014850

TrustApp0901

| Policy Issued by | BUCKEYE UNION INSURANCE CO. | | A Stock Company 43 | Policy No. 70 CBP 06051512-96 |
|---|---|---|---|---|
| Producer's Name and Address | ATEN MENNETTI INS AGENCY INC P O BOX 397 MANSFIELD          OH 44901 0397 | | General Offices 180 Maiden Lane NY NY 10038 | |
| | | | Producer's Code 34 459 255 | Renewal of 70 CBP 06051512-95 |
| Named Insured Mailing Address | BOY SCOUTS OF AMERICA, INC. 445 W. LONGVIEW AVE. MANSFIELD          OH 44903 | OPTIBIL P | | |
| Policy Period | From  JANUARY    22, 1995  to  JANUARY    22, 1996  at 12:01 A.M. Standard Time at your mailing address shown above | | | 950105 **Common Policy Declarations Comprehensive Business Policy Daily Report** |

Business Description
        BOY SCOUT COUNCIL OFFICE
THIS COMPANY HAS ISSUED A POLICY OF INSURANCE AS FOLLOWS:
IN RETURN FOR THE PAYMENT OF THE PREMIUM, AND SUBJECT TO ALL THE TERMS OF THIS POLICY,
WE AGREE WITH YOU TO PROVIDE THE INSURANCE AS STATED IN THIS POLICY. THIS POLICY CONSISTS
OF THE FOLLOWING COVERAGE PARTS FOR WHICH A PREMIUM IS INDICATED. THIS PREMIUM MAY BE
SUBJECT TO ADJUSTMENT.

| Coverage Part | Premium | |
|---|---|---|
| Commercial Property Coverage Part | $ | INCLUDED |
| Boiler and Machinery Coverage Part | $ | EXCLUDED |
| Commercial Inland Marine Coverage Part | $ | INCLUDED |
| Commercial Crime Coverage Part | $ | EXCLUDED |
| Commercial Auto Coverage Part | $ | EXCLUDED |
| Commercial General Liability Coverage Part | $ | INCLUDED |
| Additional Coverage Part(s) | $ | EXCLUDED |
| | $ | |
| | $ | |
| | $ | |
| Premium for this policy | $ | 2148 |
| Add for attached companion policies | $ | |
| Total premium | $ | 2148 |

BUSINESS
TEAM: 70K
R/C: 827

Premium shown is payable: $ _____ 2148.00 at inception; $_____ each anniversary.
Any premium shown in the Declarations for a Policy Period extending beyond one year was computed based
on rates in effect at the time the policy was issued. On each renewal, continuation, or anniversary of the
effective date of this policy, we will compute the premium for each Coverage Part in accordance with our
rates and rules then in effect. Exceptions, if any, are: _____
_____
_____

Audit required for: ☐  GL    ☐  Auto    ☐    Inland Marine    ☐ Other  _____
Annual or ☐ _____

Form(s) and Endorsement(s) applicable to all Coverage Parts and made a part of this policy at time of issue:
IL 0021 1185    IL 0244 0689    SIL 0017 1185

COUNTERSIGNED _____    BY _____
               (Date)                    (Authorized Representative)

THESE DECLARATIONS TOGETHER WITH THE COMMON POLICY CONDITIONS, COVERAGE PART
DECLARATIONS, COVERAGE FORM(S) AND FORMS AND ENDORSEMENTS, IF ANY, ISSUED TO FORM A
PART THEREOF, COMPLETE THE ABOVE NUMBERED POLICY.

SDEC 1 DR Ed. 11/85              BRANCH COPY

MEDIATION – CONFIDENTIAL.
Subject to Protective Order - Highly Confidential

CNA_BSA0001326
BSAPolicyEv-00014851
TrustApp0902

| Policy Issued by | . BUCKEYE UNION INSURANCE CO. | | A Stock Company 43 | Policy No. 70  CBP 06051512-96 |
|---|---|---|---|---|
| Producer's Name and Address | ATEN MENNETTI INS AGENCY INC P O BOX 397 MANSFIELD          OH 44901 0397 | | General Offices 180 Maiden Lane NY NY 10038 | |
| | | | Producer's Code 34  459 255 | Renewal of 70 CBP 06051512-95 |
| Named Insured Mailing Address | BOY SCOUTS OF AMERICA, INC. 445 W. LONGVIEW AVE. MANSFIELD          OH 44903 | | **Common Policy Declarations** **Comprehensive Business Policy** **Daily Report** | |
| Policy Period | From JANUARY   22, 1995  to  JANUARY   22, 1996  at 12:01 A.M. Standard Time at your mailing address shown above | | | |

**NAMED INSURED**

DBA JOHNNY APPLESEED AREA COUNCIL

*Subject to Protective Order - Highly Confidential*

SDEC 01 DR CONTINUED                BRANCH COPY

MEDIATION – CONFIDENTIAL.
Subject to Protective Order - Highly Confidential

| Policy Issued by | . BUCKEYE UNION INSURANCE CO. | | A Stock Company 43 | Policy No. 70 CBP 06051512-96 |
|---|---|---|---|---|
| Producer's Name and Address | ATEN MENNETTI INS AGENCY INC P O BOX 397 MANSFIELD       OH 44901 0397 | | General Offices 180 Maiden Lane NY NY 10038 | |
| | | | Producer's Code 34 459 255 | Renewal of 70 CBP 06051512-95 |
| Named Insured Mailing Address | BOY SCOUTS OF AMERICA, INC. 445 W. LONGVIEW AVE. MANSFIELD       OH 44903 | | | |
| | | | | 950105 |
| Policy Period | From JANUARY   22, 1995  to  JANUARY   22, 1996  at 12:01 A.M. Standard Time at your mailing address shown above | | Common Policy Declarations Comprehensive Business Policy Daily Report | |

## COMMISSIONS

| | |
|---|---|
| CBP | 16.6% |
| INLAND MARINE | |
| MISCELLANEOUS EQUIPMENT | 16.6% |
| ELECTRONIC DATA PROCESSING | 16.6% |

SDEC 01 DR CONTINUED                    **BRANCH COPY**

MEDIATION   CONFIDENTIAL
Subject to Protective Order - Highly Confidential

CNA_BSA0001328

BSAPolicyEv-00014853

TrustApp0904

## Commercial Property Coverage Part Declarations

### Daily Report

Policy No. 70 CBP 06051512-96    Effective Date 01 / 22/ 95    Page No    1    of    5 Page(s)

| Prem No | Item No | Description of Premises - Location (Enter "same" if same as mailing address) Construction and Occupancy | Covered Property Symbol* | Coins.rance Percentage | Limit(s) of Insurance | Deductible Except ons** |
|---------|---------|---------|---------|---------|---------|---------|
| 001/001 | 1 | 445 W. LONGVIEW AVENUE MANSFIELD OH 44903-4155 Joisted Masonry Offices | A | 90% | $158536 | STD ** W/H ** TFT ** |
| XXX XXX XXX XXX | | Premises not descr bed above - each prem ses Aggregate - all prem ses not described | B B | XXX XXX XXX XXX | | |
| XXX XXX XXX XXX | | Property in transit | | XXX XXX XXX XXX | | |

Mortgage holders name and address

\*   Covered Property Symbols A, B, C, D, E, F, G (See Declarations - Page 2 for explanation of symbols.)
\*\*  Deductible $250, Except as otherwise specifically indicated above or as follows:

Other separate deductibles apply to various optional coverages and causes of loss when such options are applicable

**Causes Of Loss Form**              Applicable to Premises Numbers Shown Below
☐ Basic Form. SCP 10 10 _____   _____
  ☐ Basic Broad Form Endorsement SCP 10 20  _____
☒ Special Form SCP 10 30 _____    SEE ATTACHED SCHEDULE
  ☐ Including Theft Exclusion _____
  ☐ Including Flood ### _____
  ☐ Including Earthquake ### _____
☐ Earthquake Form. CP 10 40 _____
\#  See Declarations - Continued for Limits of Insurance and Deductibles applicable to Optional Causes of Loss.

**Other Forms Applicable To All Premises:**
    SEE ATTACHED SCHEDULE

To Specific Premises/Coverages

| Prem. No. | Item No | Form Nos. |
|-----------|---------|-----------|
| 001/001 | 1 | SCP 0010C 1091  SCP 1030C 1091 |
| 001/001 | 2 | SCP 0010C 1091  SCP 1030C 1091 |

**SDEC 59 DR Ed. 11/85**                    **BRANCH COPY**

MEDIATION – CONFIDENTIAL.
Subject to Protective Order - Highly Confidential

CNA_BSA0001329
BSAPolicyEv-00014854
TrustApp0905

## Commercial Property Coverage Part
## Declarations - Continued
### Daily Report

Policy No. 70 CBP 06051512-96    Effective Date  01 / 22/ 95    Page No.    2    of    5 Page(s)

| Prem. No. | Item No. | Description of Premises - Location (Enter "same" if same as mailing address) Construction and Occupancy | Covered Property Symbol* | Coinsurance Percentage | Limit(s) of Insurance | Deductible Exceptions** |
|---|---|---|---|---|---|---|
| 001/001 | 2 | 445 W. LONGVIEW AVENUE MANSFIELD OH 44903-4155 Joisted Masonry Offices | B | 90% | $36000 | STD ** W/H ** TFT ** |

* Covered Property Symbols A,B,C,D,E,F,G (see Declarations - Page 2 for explanations of symbols.)
** Deductible $250. Except as otherwise specifically indicated above or as follows:

Otherwise separate deductibles apply to various optional coverages and causes of loss when such options are applicable.
**SDEC 60 DR Ed. 11/85**                    **BRANCH COPY**

MEDIATION – CONFIDENTIAL.
Subject to Protective Order - Highly Confidential

**Commercial Property Coverage Part Declarations**
**Daily Report**

| Policy No. 70 CBP 06051512-96 | Effective Date 01 / 22/ 95 | Page No. 3 of 5 Page(s) |

Covered Property Symbols
A - Real Property
B - Your Personal Property
C - Personal Property Of Others
D - Personal Property in transit in your vehicles
E - Personal Property in custody of carrier for hire
F - Personal Property in custody of your salesmen away from premises
G - Personal Property in transit other than D, E, and F.

Other Forms Applicable:

To All Coverages

CP 1218 1091    SCP 0010C 1091    SCP 0090A 0289    SCP 1030C 1091

**To Specific Premises/Coverages:**

| Prem. No. | Item No. | Form Nos. |
|-----------|----------|-----------|
|           |          |           |

**SDEC 59 CONTINUED**

MEDIATION – CONFIDENTIAL.
Subject to Protective Order - Highly Confidential

CNA_BSA0001331
BSAPolicyEv-00014856
TrustApp0907

**Commercial Property Coverage Part Declarations**
**Daily Report**

| Policy No. 70 CBP 06051512-96 | Effective Date 01 / 22/ 95 | Page No    4    of    5 Page(s) |
|---|---|---|

**Causes Of Loss Form**                    Applicable to Premises Numbers Shown Below

SPECIAL    FORM    SCP    10 30C 1091 :      001/001   1,   2

**SDEC 59 CONTINUED**

MEDIATION – CONFIDENTIAL.
Subject to Protective Order - Highly Confidential

CNA_BSA0001332
BSAPolicyEv-00014857
TrustApp0908

POLICY NUMBER: 70 CBP 06051512-96                           COMMERCIAL PROPERTY

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## LOSS PAYABLE PROVISIONS

This endorsement modifies insurance provided under the following:

BUILDING AND PERSONAL PROPERTY COVERAGE FORM
BUILDERS' RISK COVERAGE FORM
CONDOMINIUM ASSOCIATION COVERAGE FORM
CONDOMINIUM COMMERCIAL UNIT-OWNERS COVERAGE FORM
STANDARD PROPERTY POLICY

### SCHEDULE

| Provisions Applicable | | |
|---|---|---|
| Loss Payable | Lender's Loss Payable | Contract Of Sale |
| X | | |

| Prem. No. | Bldg. No. | Description of Property | Loss Payee (Name & Address) |
|---|---|---|---|
| 001 | 001 | CANON NP-665011 COPIER S#CYR15562 | MADISON LEASING CO. P.O. BOX 1129 MADISON WI 53701 |

A. When this endorsement is attached to the STANDARD PROPERTY POLICY **CP 00 99** the term Coverage Part in this endorsement is replaced by the term Policy.

The following is added to the LOSS PAYMENT Loss Condition, as indicated in the Declarations or by an "X" in the Schedule:

B. **LOSS PAYABLE**

For Covered Property in which both you and a Loss Payee shown in the Schedule or in the Declarations have an insurable interest, we will:

1. Adjust losses with you, and

CP 12 18 10 91          Copyright, ISO Commercial Risk Services, Inc., 1990          Page 1 of 2

MEDIATION – CONFIDENTIAL.
Subject to Protective Order - Highly Confidential

CNA_BSA0001333
BSAPolicyEv-00014858
TrustApp0909

POLICY NUMBER: 70 CBP 06051512-96                    COMMERCIAL PROPERTY

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## LOSS PAYABLE PROVISIONS

This endorsement modifies insurance provided under the following:

BUILDING AND PERSONAL PROPERTY COVERAGE FORM
BUILDERS' RISK COVERAGE FORM
CONDOMINIUM ASSOCIATION COVERAGE FORM
CONDOMINIUM COMMERCIAL UNIT-OWNERS COVERAGE FORM
STANDARD PROPERTY POLICY

### SCHEDULE

**Provisions Applicable**

| Loss Payable | Lender's Loss Payable | Contract Of Sale |
|---|---|---|
| X | | |

| Prem. No. | Bldg. No. | Description of Property | Loss Payee (Name & Address) |
|---|---|---|---|
| 001 | 001 | PERSONAL PROPERTY | BANK ONE MANSFIELD<br>PARK AVE WEST<br>MANSFIELD<br>OH    44902 |

A. When this endorsement is attached to the STANDARD PROPERTY POLICY **CP 00 99** the term Coverage Part in this endorsement is replaced by the term Policy.

The following is added to the LOSS PAYMENT Loss Condition, as indicated in the Declarations or by an "X" in the Schedule:

B. **LOSS PAYABLE**

For Covered Property in which both you and a Loss Payee shown in the Schedule or in the Declarations have an insurable interest, we will:

1. Adjust losses with you; and

CP 12 18 10 91          Copyright, ISO Commercial Risk Services, Inc., 1990          Page 1 of 2

MEDIATION – CONFIDENTIAL.
Subject to Protective Order - Highly Confidential

CNA_BSA0001334
BSAPolicyEv-00014859
TrustApp0910

**Commercial Property Coverage Part**
**Declarations - Continued**
**Daily Report**

Policy No. 70 CBP 06051512-96    Effective Date 01 / 22/ 95    Page No. 5 of 5 Page(s)

Options Applicable Only When Entries Are Made in Schedule Below:

| Prem. No. | Item No. | Agreed Value | | Inflation Guard Percentage | Replacement Cost ☒ |
|---|---|---|---|---|---|
| | | Value | Expiration | | |
| 001/001 | 1 | | | | X |
| | 2 | | | | X |

**Causes of Loss - Special Form**
**Optional Causes of Loss**

The Optional Causes of Loss apply as indicated elsewhere in these Commercial Property Coverage Part Declarations. The Limits of Insurance and Deductible applicable to these Optional Causes of Loss are as stated below. No entry indicates no coverage.

1.  Earthquake and Volcanic Eruption

| Prem. No. | Item No. | Deductible ($ or %) | Including Masonry Veneer ☒ |
|---|---|---|---|
| | | | |

Limit of Insurance any one occurrence:    $ _____
Limit of Insurance any one policy year:    $ _____

2.  Flood and Water Damage

Limit of Insurance any one occurrence:    $ _____
Limit of Insurance any one policy year:    $ _____
Deductible $ _____    applicable at Prem. Nos. _____
Deductible $ _____    applicable at Prem. Nos. _____

**SDEC 61 DR Ed. 11/85**    **BRANCH COPY**

MEDIATION – CONFIDENTIAL.
Subject to Protective Order - Highly Confidential

CNA_BSA0001335
BSAPolicyEv-00014860
TrustApp0911

Commercial Inland Marine
Coverage Part Declarations
Electronic Data And
Word Processing Equipment

Policy No. CBP 6051412-95

If two Limits of Insurance are shown below, only the larger limit will apply.
Loss is payable to the insured and

as interests may appear.

| | | | |
|---|---|---|---|
| Coinsurance Percentage 80% unless otherwise shown __90_% | | Deductible Breakdown $ _1,000_     Other $ ___250_ | |
| Location #1 | Covered Property | Limit of Insurance | Increased Limit of Insurance |
| | Equipment Data & Media Extra Expense | $   8,827. $ 10,000 or $ 10,000 or | XXXXXXXXXXX $ $ |
| Location #2 | Equipment Data & Media Extra Expense | $ $ 10,000 or $ 10,000 or | XXXXXXXXXXX $ $ |
| Temporary Locations | Equipment Data & Media Extra Expense | Same limits as location where normally located $ 10,000 or | |
| Storage of Duplicate Data and Media | XXXXXXXXXX | $ 50,000 or | $ |
| Newly Acquired Equipment | | $100,000 or | $ |
| Newly Acquired Locations | Equipment Data & Media Extra Expense | $100,000 or $ 10,000 or $ 10,000 or | $ $ $ |
| Property in Transit | Equipment Data & Media Extra Expense | $ 50,000 or $ 10,000 or $ 10,000 or | $ $ $ |
| Business Income | Daily Amount $ Deductible $ | Limit of Insurance $          or          Day(s) | |

Special Provisions: The following apply when checked or information is entered.
Additional Extensions        ☐ Functional Valuation (SCM99 526)
                             ☐ Undamaged Dependent Equipment (SCM99 525)
                             ☐ Off-Premises Overhead Transmission Lines (SCM99 524)

☐  Combination Endorsement (SCM99 507)
    Additional Exclusions ☒ Water Exclusion ☒ Earth Movement Exclusion ☐ Off Premises Services Exclusion

Equipment Not Covered:

Protective Safeguards:        Location #1
                              Location #2
Other Forms:
    SCM0001 0390 SCM99507 1185 SCM00510 1185

SDEC 16A Ed. 6-92

Printed in U.S.A.

MEDIATION – CONFIDENTIAL.
Subject to Protective Order - Highly Confidential

CNA_BSA0001336
BSAPolicyEv-00014861
TrustApp0912

**Commercial Inland Marine
Coverage Part Declarations**
**Daily Report**

Policy No. _____ ℰBP  6051512-96 _____

INSURANCE APPLIES ONLY TO THOSE COVERAGES DESIGNATED BY AN X OPPOSITE SUCH COVERAGE, FOR WHICH
A PREMIUM AND LIMIT OF INSURANCE IS SHOWN IN THE SPACES PROVIDED BELOW.

☐ Contractors Equipment

Rate $ _____                                         Premium $ _____

| Schedule of Property | Limit of Insurance | Description |
|---|---|---|
| | $• | • |
| | • | • |
| | • | • |
| | • | • |
| | • | • |
| | • | • |
| | • | Any One Unscheduled Item |
| | • | Limit per Occurrence |
| **New Acquisitions** | $• | or _____ % of the Limit per Occurrence, whichever is less. |
| **Rental Expense** | $• | Daily Rental Expense |
| | • | All Rental Expense |

**Deductible Amount**

**Deductible (A or B)**    A. $
B. _____ % of the Limit of Insurance on the item, or the largest Limit of Insurance if two or more items are involved in the same loss, but not less than $_____ , nor more than $ _____ .

**Extensions**    Insurance applies only to those Extensions designated by an X in the box next to them.
☐ Additional Covered Property
☐ Crane and Derrick Boom Extensions
☐ Limited Replacement Cost

☐ Portable Equipment
☒ Miscellaneous Equipment

Rate $ _____ Incl. _____                                    Premium $ _____ Incl. _____

| Schedule of Property | Limit of Insurance | Description |
|---|---|---|
| | $•  52,266. | • per schedule on file with Company |
| | • | • |
| | • | • |
| | • | • |
| | • | • |
| | | • |

**Deductible**    **Deductible Amount**
$  250
SCM0001 0390 SCM00514 1185

SDEC 64 DR Ed. 11/85                    BRANCH OFFICE COPY                    Printed in U.S.A.

MEDIATION – CONFIDENTIAL.
Subject to Protective Order - Highly Confidential

CNA_BSA0001337
BSAPolicyEv-00014862
TrustApp0913

## Commercial General Liability
## Coverage Part Declarations
### Daily Report

Policy No. 70 CBP 06051512-96

**Limits of Insurance**
**THIS POLICY CONTAINS AGGREGATE LIMITS: REFER TO SECTION III - LIMITS OF INSURANCE FOR DETAILS**

| | | |
|---|---|---|
| General Aggregate Limit (Other Than Products--Completed Operations | $ | 500000 |
| Products--Completed Operations Aggregate Limit | $ | EXCLUDED |
| Personal and Advertising Injury Limit | $ | EXCLUDED |
| Each Occurrence Limit | $ | 500000 |
| Fire Damage Limit | $ | 50000 Any One Fire |
| Medical Expense Limit | $ | 5000 Any One Person |

**Retroactive Date (For Claims Made Coverage Only)**
Coverage A of this insurance does not apply to "bodily injury" or "property damage" which occurs before the retroactive Date, if any, shown below.

Retroactive Date:
(Enter date or "None" if no Retroactive Date applies.)

**Form of Business and Location of all Premises**
( ) Individual          ( ) Joint Venture          ( ) Partnership
( x) Organization (Other than Partnership or Joint Venture)
Location of All Premises You Own, Rent or Occupy:

445 W. LONGVIEW    AVENUE              MANSFIELD         OH 449034155

**Premium**
Classification                              Rate*          Advance Premium

| Loc #<br>Bldg # | Code<br>No. | Premium<br>Basis* | Products./<br>Compl. Ops. | All<br>Other | Products/<br>Compl. Ops. | All<br>Other |
|---|---|---|---|---|---|---|
| 001/001 | 61224 | A) 2093 | EXCLUDED | VRS | EXCLUDED | INCLUDED |

CLASSIFICATION : BUILDINGS OR PREMISES - OFFICE - PREMISES OCCUPIED BY
EMPLOYEES OF THE INSURED - OTHER THAN NOT FOR PROFIT

Total Advance Premium  $ INCLUDED

***Premium Basis--Rate. Indicate:**
"(a)" for Area (per 1,000 sq. ft.)                    "(c)" for Total Cost                         "(t)" for Each
"(p)" for Payroll (per $1,000 of payroll)         "(m)" for Admission (per 1,000 admissions)
"(s)" for Gross Sales (per $1,000 of gross sales)   "(u)" for Units (each unit)

**Forms and Endorsements**
Forms and Endorsements applying to this Coverage Part and made part
of this policy at time of issue.

SEE ATTACHED SCHEDULE

**SDEC 20 DR Ed. 11/85**                              **BRANCH COPY**

MEDIATION – CONFIDENTIAL.
Subject to Protective Order - Highly Confidential

CNA_BSA0001338
BSAPolicyEv-00014863
TrustApp0914

## Commercial General Liability
## Coverage Part Declarations
### Daily Report

Policy No. 70 CBP 06051512-96

**Forms and Endorsements**

Forms(s) and Endorsement(s) applicable to this Coverage Part and made a part of this policy at time of issue:

| | | | |
|---|---|---|---|
| CG 0001 1093 | CG 0043 0592 | CG 2100 1185 | CG 2104 1185 |
| CG 2147 1093 | SCG 22501A 0691 | SCG 22503A 0689 | SCG 22510 0191 |
| SDIS 123 0294 | SDIS 83 1292 | | |

**SDEC 20 CONTINUED**

MEDIATION – CONFIDENTIAL.
Subject to Protective Order - Highly Confidential

CNA_BSA0001339
BSAPolicyEv-00014864
TrustApp0915

POLICY NUMBER:                                          COMMERCIAL GENERAL LIABILITY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## EXCLUSION - ALL HAZARDS IN CONNECTION WITH
## DESIGNATED PREMISES

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART.

**SCHEDULE**

**Description and Location of Premises:**

(If no entry appears above, information required to complete this endorsement will be shown in the Declarations as applicable to this endorsement.)

This insurance does not apply to "bodily injury," "property damage," "personal injury," or "advertising injury" arising out of

1. The ownership, maintenance or use of the premises shown in the Schedule or any property located on these premises;

2. Operations on those premises shown in the Schedule or any property located on these premises; or

3. Goods or products manufactured at or distributed from those premises.

CG 21 00 11 85          Copyright, Insurance Services Office, Inc., 1984

## General Change Endorsement

Policy No: **70 CBP 06051512-96**
Policy Period: **01/22/95 - 01/22/96**
Policy Change No: **0001**

Policy Change(s)
Effective Date: **04/18/95**

Named Insured and Address:
**BOY SCOUTS OF AMERICA, INC.
445 W. LONGVIEW AVE.
MANSFIELD          OH 44903 4155**

Coverage Part(s) Affected:
**COMMERCIAL: ALL COVERAGE PARTS,
GENERAL LIABILITY**

Producer:
**ATEN MENNETTI INS AGENCY INC
P O BOX 397
MANSFIELD          OH 44901 0397**

**950517**
Producer Code: **34459255**
Business Team: **70K**
R/C:          **812**

Description of Change(s):

**THE GENERAL LIABILITY COVERAGE PART IS AMENDED AS FOLLOWS:
FORM CG 2018 IS ADDED.**

| | | |
|---|---|---|
| **ALL COVERAGE PARTS** | **$0** | **A/P** |
| **COMMERCIAL GENERAL LIABILITY** | **$0** | **A/P** |

**ADDED FORMS:
CG 2018 1185**

Revised Annual Premium:     **$2148**          Pro-Rata Factor:  **0.764**

|  | Additional Premium | Return Premium |
|---|---|---|
| Due at Endorsement | **$0** | |
| Effective Date Deferred | | |

Signature of Authorized Representative

Copyright, The Continental Corp. 1988
SIL 12 500 12 88

BRANCH COPY     **MAY 1 8 1995**


**Continental Insurance.**
Page 01

MEDIATION – CONFIDENTIAL.
Subject to Protective Order - Highly Confidential

CNA_BSA0001341
BSAPolicyEv-00014866
TrustApp0917

POLICY NUMBER:  70 CBP 06051512-96                    COMMERCIAL GENERAL LIABILITY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## ADDITIONAL INSURED -
## MORTGAGEE, ASSIGNEE, OR RECEIVER

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

### SCHEDULE

**Name of Person or Organization:**

   MADISON LEASING COMPANY            P.O. BOX 1129
   MADISON, WI  53701

**Designation of Premises:**

   445 W. LONGVIEW AVENUE
   MANSFIELD                    OH      44905

(If no entry appears above, information required to complete this endorsement will be shown in the Declarations as applicable to this endorsement)

1. WHO IS AN INSURED (Section II) is amended to include as an insured the person(s) or organization(s) shown in the Schedule but only with respect to their liability as mortgagee, assignee, or receiver and arising out of the ownership, maintenance, or use of the premises by you and shown in the Schedule.

2. This insurance does not apply to structural alterations, new construction and demolition operations performed by or for that person or organization.

CG 20 18 11 85            Copyright, Insurance Services Office, Inc., 1984

MEDIATION – CONFIDENTIAL.
Subject to Protective Order - Highly Confidential

CNA_BSA0001342
BSAPolicyEv-00014867
TrustApp0918

# General Change Endorsement

Policy No: **70 CBP 06051512-96**
Policy Period: **01/22/95 - 01/22/96**
Policy Change No: **0002**

Policy Change(s)
Effective Date: **05/17/95**

| Named Insured and Address: | Coverage Part(s) Affected: |
|---|---|
| **BOY SCOUTS OF AMERICA, INC.**<br>**445 W. LONGVIEW AVE.**<br>**MANSFIELD        OH 44903 4155** | **COMMERCIAL:**<br>**PROPERTY** |

| Producer: | |
|---|---|
| **ATEN MENNETTI INS AGENCY INC**<br>**P O BOX 397**<br>**MANSFIELD        OH 44901 0397** | **950606**<br>Producer Code: **34459255**<br>Business Team: **70K**<br>R/C:        **812** |

Description of Change(s):

THE PROPERTY COVERAGE PART IS AMENDED AS FOLLOWS:

BANK ONE IS DELETED AS LOSS PAYEE.

COMMERCIAL PROPERTY                                    $0        A/P

| Revised Annual Premium: | **$2148** | | Pro-Rata Factor: **0.685** |
|---|---|---|---|

| | Additional Premium | Return Premium |
|---|---|---|
| Due at Endorsement | $0 | |
| Effective Date Deferred | | |

Signature of Authorized Representative

Copyright, The Continental Corp. 1988
SIL 12 500 12 88

**BRANCH COPY**      JUN 0 7 1995



Continental
Insurance.
Page 01

MEDIATION — CONFIDENTIAL.
Subject to Protective Order - Highly Confidential

CNA_BSA0001343
BSAPolicyEv-00014868
TrustApp0919

# CERTIFICATE OF INSURANCE

00249

**ISSUE DATE** 04/18/95

**PRODUCER**

ATEN & MENNETTI INS AGCY
P.O. BOX 397
MANSFIELD OH 44901

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS
NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AMEND,
EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW

**COMPANIES AFFORDING COVERAGE**

| COMPANY LETTER | A | CONTINENTAL INSURANCE |
|---|---|---|
| COMPANY LETTER | B | |
| COMPANY LETTER | C | |
| COMPANY LETTER | D | |
| COMPANY LETTER | E | |

**INSURED**

BOY SCOUTS OF AMERICA
JOHNNY APPLESEED AREA
445 WEST LONGVIEW AVENUE
MANSFIELD, OH 44905

## COVERAGES

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD
INDICATED, NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS
CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS,
EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| CO LTR | TYPE OF INSURANCE | POLICY NUMBER | POLICY EFFECTIVE DATE (MM/DD/YY) | POLICY EXPIRATION DATE (MM/DD/YY) | ALL LIMITS IN THOUSANDS | |
|---|---|---|---|---|---|---|
| A | **GENERAL LIABILITY** | CBP06051512 | 01/22/95 | 01/22/96 | GENERAL AGGREGATE | $ 500 |
| | COMMERCIAL GENERAL LIABILITY | | | | PRODUCTS–COMP/OPS AGGR | $ |
| | CLAIMS MADE [X] OCCUR | | | | PERSONAL & ADVERTISING INJURY | $ |
| | OWNER'S & CONTRACTOR'S PROT | | | | EACH OCCURRENCE | $ 500 |
| | | | | | FIRE DAMAGE (Any one fire) | $ 50 |
| | | | | | MEDICAL EXPENSE (Any one person) | $ 5 |
| | **AUTOMOBILE LIABILITY** | | | | COMBINED SINGLE LIMIT | $ |
| | ANY AUTO | | | | BODILY INJURY (Per person) | $ |
| | ALL OWNED AUTOS | | | | | |
| | SCHEDULED AUTOS | | | | BODILY INJURY (Per acc) | $ |
| | HIRED AUTOS | | | | | |
| | NON–OWNED AUTOS | | | | PROPERTY DAMAGE | $ |
| | GARAGE LIABILITY | | | | | |
| | **EXCESS LIABILITY** | | | | EACH OCCUR. | AGGREGATE |
| | OTHER THAN UMBRELLA FORM | | | | $ | $ |
| | **WORKER'S COMPENSATION AND EMPLOYERS' LIABILITY** | | | | STATUTORY | |
| | | | | | $ (EACH ACCIDENT) | |
| | | | | | $ (DISEASE–POLICY LIMIT) | |
| | | | | | $ (DISEASE–EACH EMPLOYEE) | |
| OTH. | PROPERTY | CBP06051512 | 01/22/95 | 01/22/96 | | |

**DESCRIPTION OF OPERATIONS/LOCATIONS/VEHICLES/SPECIAL ITEMS**

CANON NP-6650II COPIER, SER #CYR15562        ORIGINAL VALUE $15,869.59
LEASE AGREEMENT #398481
MADISON LEASING IS LOSS PAYEE AND ADDITIONAL INSURED

| **CERTIFICATE HOLDER** | **CANCELLATION** |
|---|---|
| MADISON LEASING CO.<br>P.O. BOX 1129<br>MADISON, WI 53701 | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, THE ISSUING COMPANY WILL ENDEAVOR TO MAIL **30** DAYS WRITTEN NOTICE TO THE CERTIFICATE HOLDER NAMED TO THE LEFT, BUT FAILURE TO MAIL SUCH NOTICE SHALL IMPOSE NO OBLIGATION OR LIABILITY OF ANY KIND UPON THE COMPANY, ITS AGENTS OR REPRESENTATIVES |
| | **AUTHORIZED REPRESENTATIVE** |

SURNET 25-S (3/88)        INSURNET, INC. 1988

MEDIATION – CONFIDENTIAL.
Subject to Protective Order - Highly Confidential

CNA_BSA0001344
BSAPolicyEv-00014869
TrustApp0920

PAGE 1 of 2

**TheTravelers**

The Travelers Insurance Companies
*(Each a Stock Insurance Company)*
Hartford, CT 06183-4040

POLICY NO.  650-198J177-A-IND-88

BUSINESS: SCOUT COUNCIL

OFFICE PAC                    (160) DELUXE

NAMED INSURED AND MAILING ADDRESS     ISSUE DATE: 02/11/88
    FIRST BANK OF RAPID CITY AS TRUSTEE
    AND AS PER 8000(1)
    P.O. BOX 2931
    RAPID CITY, SD          57709-2931

Effective from 02/15/88 TO 02/15/89  12:01 A.M. Standard Time at the Named
                                            Insured's mailing address.

LOC.  BLDG.  OCCUPANCY              ADDRESS
NO.   NO.

  1     1    OFFICE               140-144 NORTH ST
                                  RAPID CITY, SD            57701

The Named Insured is a CORPORATION

-------------------------------------------------------------------

POLICY SECTIONS AND INSURING COMPANY
    The Travelers agrees with the Named Insured to provide insurance under
    a section of this policy as designated by an "*" and in the company
    (each a stock company) for which an abbreviation is shown.
    Section                         Insuring Company
    *  I --- Property                   IND
    *  II -- General Liability          IND
       III - Automobile Liability
       IV -- Automobile Physical Damage
       V --- Crime

-------------------------------------------------------------------

DECLARATIONS, FORMS AND ENDORSEMENTS
    The declarations, forms and endorsements for which symbol numbers are
    entered on the Forms List on page two are made part of the policy.

-------------------------------------------------------------------

PREMIUM SUMMARY
    Provisional Premium     $    761        _____
    Payable at inception    $    761        AUTHORIZED AGENT
    Payable at the end of
    each    month period                    -------------------------
                                            COUNTERSIGNATURE DATE

    Office: OMAHA   -155   Dist: 01  KM  Down
    Producer: KLUTHE & LANE ASSOC.    Code: 48885

                        INSURED        SYMBOL 002A(09/83)

MP200   88042  0323 88043 0253

BSAPolicyEv-00024079
TrustApp0921

Subject to Protective Order - Highly Confidential

BSAPolicyEv-00024080
TrustApp0922

The**Travelers**

The Travelers Insurance Companies
*(Each a Stock Insurance Company)*
Hartford, CT 06183-4040

```
                                                    002A
                                          PAGE 2 OF 2

POLICY NO.    650-198J177-A-IND-88

OFFICE PAC                    (160) DELUXE

ISSUE DATE: 02/11/88


         DECLARATIONS, FORMS AND ENDORSEMENTS LIST


SECTION        DECLARATIONS              FORMS/ENDORSEMENTS

GENERAL  002 A     MP100            0280A     003        MP0240
                                    MP125     MP101-2    GEN53
                                    8000(1)   BU01260786

     I                              MP1116    PR146      PR70

  I(IM)

     II                             MP110-1   35962

   '4 IV

      V
```

MP200   68042   0324 88043 0253
Subject to Protective Order - Highly Confidential

BSAPolicyEv-00024081
TrustApp0923

Subject to Protective Order - Highly Confidential

BSAPolicyEv-00024082
TrustApp0924



The Travelers Insurance Companies
*(Each a Stock Insurance Company)*
Hartford, CT 06183-4040

MP 100
PAGE 01 of 01

POLICY NO.    650-198J177-A-IND-88

OFFICE PAC                    (160) DELUXE

ISSUE DATE: 02/11/88

DECLARATIONS
(Applicable to Sections I, II and V)

   Coverages and Limits of Liability: Insurance applies only to an
item for which a limit or "included" is shown.

PROPERTY AND INCOME - SECTIONS I & V        Limits of Liability
                Coverage              Location No. 1   Location No.
    A   Building                        $   202,000
    B   Personal Property               $         1
    C   Income - Included (up to 12 months)

a. Earthquake - Coverage A,B, and C        EXCLUDED

b. Deductible Amount-Coverages A or B (Except as indicated Below)-$  250
    Glass Deductible Eliminated at the following
    Loc. Bld.          Loc. Bld.          Loc. Bld.
    1    1

GENERAL LIABILITY - SECTION II
                Coverage                    Limits of Liability
    A Bodily Injury Liability           $1,000,000 Each Occurrence
    B Property Damage Liability         $1,000,000 Aggregate
    P Personal Injury, Incidental Medical
      Malpractice, Advertising Injury

    E Premises Medical Payments             $ 5,000 Each Person
                                            $25,000 Each Accident

ED (09/83)

Subject to Protective Order - Highly Confidential

BSAPolicyEv-00024083
TrustApp0925

Subject to Protective Order - Highly Confidential

BSAPolicyEv-00024084
TrustApp0926

**TheTravelers**
The Travelers Insurance Companies
*(Each a Stock Insurance Company)*
Hartford, CT 06183-4040

POLICY NO.  650-198J177-A-IND-88

OFFICE PAC                    (160) DELUXE

ISSUE DATE: 02/11/88

AMENDATORY ENDORSEMENT

8000(1)

NAMED INSURED TO READ:   FIRST BANK OF RAPID CITY AS TRUSTEE
DBA: BLACK HILLS AREA COUNCIL BOY SCOUTS
OF AMERICA AND BLACK HILLS GIRL SCOUT
COUNCIL

MP200    88042  0326 88043 0253

Subject to Protective Order - Highly Confidential

BSAPolicyEv-00024085
TrustApp0927

Subject to Protective Order - Highly Confidential

BSAPolicyEv-00024086
TrustApp0928

The Travelers
Commercial Policies

**EFFECTIVE TIME ENDORSEMENT**
(Applicable to Sections I through V)

Symbol 0280A
Page 1 of 1

The time of inception and the time of expiration or termination of the policy or Certificate of Insurance and of any schedule, declaration or endorsement forming a part of such policy or Certificate of Insurance shall be 12:01 A.M. Standard Time, at the Named Insured's mailing address shown in the GENERAL DECLARATIONS, subject to the exception hereunder.

To the extent that coverage in the policy replaces coverage in other policies terminating noon Standard Time on the inception date of the policy, coverage under the policy shall not become effective until such other coverage has been terminated.

Any other provision of the policy pertaining to time of inception and time of expiration or termination is hereby replaced by this endorsement.

CP-2074 7-77 Printed in U.S.A.

BSAPolicyEv-00024087
TrustApp0929

Subject to Protective Order - Highly Confidential

BSAPolicyEv-00024088
TrustApp0930



The Travelers Insurance Companies
One Tower Square, Hartford, CT 06115

Symbol 003

## EXECUTION CLAUSE

**IN WITNESS WHEREOF,** each company designated on the **POLICY DECLARATIONS** or the **GENERAL DECLARATIONS** for the sections of this policy for which such company is designated as insurer has executed and attested these presents, but this policy shall not be valid unless countersigned by the duly authorized Agent of such company.

THE TRAVELERS INDEMNITY COMPANY (IND)
THE TRAVELERS INDEMNITY COMPANY OF AMERICA (TIA)
THE TRAVELERS INDEMNITY COMPANY OF ILLINOIS (TIL)
THE TRAVELERS INDEMNITY COMPANY OF RHODE ISLAND (TRI)

THE TRAVELERS INSURANCE COMPANY (INS)
THE PHOENIX INSURANCE COMPANY (PHX)
THE CHARTER OAK FIRE INSURANCE COMPANY (COF)

Secretary

Chairman and
Chief Executive Officer

CP-3018  1-83  Printed in U.S.A.

Symbol 003

Page 1 of 1

BSAPolicyEv-00024089
TrustApp0931

Subject to Protective Order - Highly Confidential

BSAPolicyEv-00024090
TrustApp0932

The Travelers
Master Pac

**GENERAL PROVISIONS FORM**
(Applicable to Sections I through IV)

Symbol MP-0240
Page 1 of 6

## A. GENERAL CONDITIONS

1. **Application of this Form** — This form applies to all forms and endorsements, including the declarations pertaining to them, under Sections I through IV unless otherwise specified.

2. **Application of Limits of Liability — Sections II and III** — If this policy is issued for a period in excess of one year, any limit of The Travelers' liability stated in the declarations as "aggregate" shall apply separately to each consecutive annual period thereof.

3. **Assignment** — Assignment of interest under this policy shall not bind The Travelers until its consent is endorsed on this policy; if, however, the Named Insured shall die, such insurance as is afforded by this policy shall apply: (a) to the Named Insured's legal representative, as the Named Insured, but only while acting within the scope of his duties as such; and (b) with respect to the property of the Named Insured, to the person having proper temporary custody of such property, as Insured, but only until the appointment and qualification of the legal representative.

4. **Cancellation**

   a. **By the Named Insured** — This policy may be canceled by the Named Insured by mailing or delivering to The Travelers written notice stating when thereafter the cancellation shall be effective.

   b. **By The Travelers** — This policy or any section (Section I, II, III or IV) or part thereof may be canceled by The Travelers by mailing or delivering to the Named Insured at the mailing address shown in this policy written notice stating when not less than 30 days thereafter such cancellation shall be effective, provided that if the Named Insured fails to pay the premium for this policy or any instalment thereof, this policy may be canceled by The Travelers by mailing or delivering to the Named Insured at the mailing address shown in this policy written notice stating when not less than 10 days thereafter such cancellation shall be effective.

   When a section or part of this policy is canceled, the cancellation shall apply to all insurance provided under such section or part.

   A copy of such notice shall be mailed or delivered to any mortgagee, trustee or loss payee designated under a section of this policy when such section is to be canceled.

   The mailing of such notice shall be sufficient proof of notice. This policy, section or part thereof (as specified in such notice) shall terminate on the effective date and hour of cancellation stated in such notice.

   c. **Premium Adjustment** — If the Named Insured cancels, earned premium shall be computed in accordance with the customary short rate table and procedure. If The Travelers cancels, earned premium shall be computed pro rata. Premium adjustment may be made either at the time cancellation is effected or as soon as practicable after cancellation becomes effective, but payment or tender of unearned premium is not a condition of cancellation.

5. **Changes** — Notice to any agent or knowledge possessed by any agent or by any other person shall not effect a waiver or a change in any part of this policy or estop The Travelers from asserting any right under the provisions of this policy; nor shall the provisions of this policy be waived or changed, except by endorsement issued to form a part of this policy; provided, however, changes may be made in the written portion of the declarations by a manager of The Travelers when initialed by such manager.

6. **Company Designation** — The rights and duties expressed in a section of this policy are the rights and duties of the company designated in the declarations as the insurer for such section. Reference in this policy to the "company" or "The Travelers" means the company so designated.

7. **Concealment or Fraud** — This policy shall be void if, whether before or after a loss, the Named Insured has willfully concealed or misrepresented any material fact or circumstance concerning this insurance or its subject, or the interest of the Named Insured therein, or in case of any fraud or false swearing by the Named Insured relating thereto.

8. **Duplicate Insurance Under This Policy** — In the event that there is duplicate insurance for the same loss or claim under this policy, The Travelers shall not be liable in the aggregate for more than the actual loss or claim.

9. **Financial Responsibility Laws — Sections II and III** — When this policy is certified as proof of financial responsibility for the future under the provisions of any motor vehicle financial responsibility law, such insurance as is afforded by this policy for bodily injury liability or for property damage liability shall comply with the provisions of such law to the extent of the coverage and limits of liability required by such law. The Named Insured agrees to reimburse The Travelers for any payment made by The Travelers which it would not have been obligated to make under this policy except for the agreement contained in this provision.

10. **Inspection, Audit and Premiums**

    a. **Inspection** — The Travelers shall be permitted but not obligated to inspect the Named Insured's property and operations at any time. Neither The Travelers' right to make inspections nor the making thereof nor any report thereon shall constitute an undertaking, on behalf of or for the benefit of the Named Insured or others, to determine or warrant that such property or operations are safe or healthful, or are in compliance with any law, rule or regulation.

    b. **Audit** — The Travelers may examine and audit the Named Insured's books and records at any time during the policy period and within three years after policy termination, as far as they relate to the subject matter of this insurance.

    c. **Premiums**

       (1) **Named Insured's Records** — The Named Insured shall maintain records of such information as is necessary for premium computation, and shall send copies of such records to The Travelers at the close of the policy period and at such times during the policy period, as The Travelers may direct.

       (2) **Applicable to Sections II, III and IV — Adjustable Premiums Subject to Audit** — The premium for each section is provisional. The earned premium shall be determined at the close of each annual period. If, however, the policy period exceeds one year, at the option of The Travelers, the entire earned premium may be determined at policy termination. If the earned premium exceeds the provisional premium,

CR-1788  5-75  Printed in U.S.A.

The Travelers
Master Pac

GENERAL PROVISIONS FORM
(Applicable to Sections I through IV)

Symbol MP-0240
Page 2 of 6

upon notice to the Named Insured, the additional premium for the excess shall become due and payable to The Travelers. If the earned premium is less than the provisional premium, The Travelers shall refund to the Named Insured the excess paid.

(3) Policy Written for a Period Exceeding One Year — Premiums for any PROFESSIONAL LIABILITY ENDORSEMENT under Section II and premiums for Sections III and IV shall be recomputed as of each policy anniversary in accordance with the then current rules, rates and rating plans in use by The Travelers.

11. **Legal Action Against The Travelers** — No action shall lie against The Travelers under any section of this policy unless, as a condition precedent thereto, there shall have been full compliance with all provisions of this policy applicable to such section, subject to the following:

a. **Section I** — Such action shall commence within 12 months next after inception of the loss, except as respects loss resulting from theft, such action shall not commence until 90 days after the required proof of loss has been filed with The Travelers, nor at all unless commenced within two years from the date when the Named Insured discovers the loss. However, if under the laws of the state within which the policy is issued such limitations are invalid, then the shortest limit of time permitted by the laws of such state shall apply.

b. **Sections II and III** — Such action shall not commence until the amount of the insured's obligation to pay shall have been finally determined either by judgment against the insured after actual trial or by written agreement of the insured, the claimant, and The Travelers.

Any person or organization or the legal representative thereof who has secured such judgment or written agreement shall thereafter be entitled to recover under these sections to the extent of the insurance afforded by these sections. No person or organization shall have any right under these sections to join The Travelers as a party to any action against the Insured to determine the insured's liability, nor shall The Travelers be impleaded by the Insured or his legal representative. Bankruptcy or insolvency of the Insured or of the Insured's estate shall not relieve The Travelers of any of its obligations hereunder.

c. **Section IV** — Such action shall not commence until 30 days after proof of loss is filed and the amount of loss is determined.

12. **Liberalization Clause** — If during the period that insurance is in force under this policy, or within 45 days prior to its inception date, on behalf of The Travelers there be adopted or filed with and approved or accepted by the insurance supervisory authorities, in conformity with law, any changes in the forms or endorsements forming a part of this policy by which this policy could be extended or broadened, without additional premium charge, by endorsement or substitution of form, then such extended or broadened insurance shall inure to the benefit of the Named Insured as though such endorsement or substitution of form had been made.

13. **Named Insured's or Insured's Duties in the Event of Loss or an Occurrence or Suit which may Give Rise to Claim**

a. **Section I**

(1) The Named Insured shall protect the property from further loss. Any such further loss due to the Named Insured's failure to protect the property is not recoverable unless such failure was beyond the control of the Named Insured.

(2) The Named Insured shall: (a) give notice of the loss to The Travelers or its authorized representative as soon as practicable; (b) immediately notify the police of any loss resulting from a violation of the law, except this requirement does not apply as respects loss resulting from theft by an employee or forgery; and (c) furnish The Travelers or its authorized representative a complete inventory of damaged and undamaged property as soon as practicable, showing in detail quantities, costs and actual cash value.

(3) The Named Insured shall also file a sworn proof of loss with The Travelers within 60 days after discovery of loss, stating: (a) the time and origin of loss; (b) the interest of the Named Insured and of all others in the property and, with respect to loss of income, such interest in the business; (c) the identity of all other insurance, whether valid or otherwise, covering the property or loss of income; (d) the actual cash value of all property and amount of claim for each item; and (e) the actual amount of loss of income and loss claimed, accompanied by detailed exhibits of all values, costs and estimates upon which such amount is based.

For a forgery loss, the instrument which is the basis of claim for such loss shall be attached to such proof of loss, or, if it shall be impossible to secure such instrument, the affidavit of the Named Insured or the Named Insured's bank of deposit setting forth the amount and cause of loss shall be accepted in lieu thereof.

(4) As often as may be reasonably required, the Named Insured shall: (a) exhibit to any person designated by The Travelers all that remains of any property; (b) submit to examinations under oath at request of The Travelers; and (c) produce for examination all pertinent records and documents and cooperate with The Travelers in all matters pertaining to loss or claim.

b. **Sections II and III**

(1) **All Coverages**

(a) The Insured or someone on his behalf shall give written notice to The Travelers or its authorized representative as soon as practicable, including in the notice particulars sufficient to identify the Insured and also reasonably obtainable information respecting the time, place and circumstances of the occurrence, the names and addresses of the injured and of available witnesses.

(b) The Insured shall immediately forward to The Travelers every demand, notice, summons, or other process received by him or his representative, if claim is made or suit is brought against the Insured.

(c) The Insured shall cooperate with The Travelers and, upon The Travelers' request, assist in making settlements, in the conduct of suits and in enforcing any right of contribution or indemnity against any person or organization who may be liable to the Insured because of injury or damage with respect to which insurance is afforded under these sections; and the Insured shall attend hearings and trials and assist in securing and giving evidence and obtaining the attendance of witnesses. The Insured shall not, except at his own cost, voluntarily make any payment, assume any obligation or incur any expense other than for first aid to others at the time of accident.

(2) **Medical Payments Coverages — Sections II and III** — As soon as practicable the injured person or someone on his behalf shall give to The Travelers written proof of claim, under oath if required, and shall, after each request from The Travelers, execute authorization to enable

BSAPolicyEv-00024092
TrustApp0934

The Travelers
Master Pac

**GENERAL PROVISIONS FORM**
(Applicable to Sections I through IV)

Symbol MP-0240
Page 3 of 6

The Travelers to obtain medical reports and copies of records. The injured person shall submit to physical examination by physicians selected by The Travelers when and as often as The Travelers may reasonably require. The Travelers may pay the injured person or any person or organization rendering services and the payment shall reduce the amount payable for such injury. Payment shall not constitute an admission of liability of any person or, except hereunder, of The Travelers.

c. **Section IV** -- The Named Insured shall:

(1) protect the covered automobile, whether or not this insurance applies to the loss, and any further loss due to the Named Insured's failure to protect shall not be recoverable under this section; reasonable expenses incurred in affording such protection shall be deemed incurred at The Travelers' request;

(2) give notice of the loss as soon as practicable to The Travelers or any of its authorized representatives and also, in the event of theft or larceny, to the police;

(3) file with The Travelers, within 91 days after loss, his sworn proof of loss in such form and including such information as The Travelers may reasonably require and, upon The Travelers' request, shall exhibit the damaged property and submit to examination under oath; and

(4) cooperate with The Travelers and, upon The Travelers' request, shall assist in making settlements, in the conduct of suits and in enforcing any right of contribution or indemnity against any person or organization who may be liable to the Named Insured because of loss with respect to which this section applies; and shall attend hearings and trials and assist in securing and giving evidence and obtaining the attendance of witnesses;

but the Named Insured shall not, except at his own cost, voluntarily make any payment, assume any obligation, offer or pay any reward for recovery of stolen property or incur any expense other than as specifically provided in this section.

14. **Other Insurance**

a. **Section I** — The insurance afforded by this section is excess over any other insurance whether prior or subsequent hereto, and by whomsoever effected, directly or indirectly covering loss insured hereunder, and The Travelers shall be liable only for the excess of such loss beyond the amount due from such other insurance, whether collectible or not, but not to exceed the applicable limit of liability under this section.

b. **Sections II and III** — The insurance afforded by these sections is primary insurance, except when stated to apply in excess of or contingent upon the absence of other insurance. When this insurance is primary and the Insured has other insurance which is stated to be applicable to the loss on an excess or contingent basis, the amount of The Travelers' liability under these sections shall not be reduced by the existence of such other insurance. When both this insurance and other insurance apply to the loss on the same basis, whether primary, excess or contingent, The Travelers shall not be liable under these sections for a greater proportion of the loss than that stated in the applicable contribution provision below:

(1) **Contribution by Equal Shares** — If all of such other valid and collectible insurance provides for contribution by equal shares, The Travelers shall not be liable for a greater proportion of such loss than would be payable if each insurer contributes an equal share until the share of each insurer equals the lowest applicable limit of liability under any one policy or the full amount of the loss is paid, and with respect to any amount of loss not so paid the remaining insurers then continue to contribute equal shares of the remaining amount of the loss until each such insurer has paid its limit in full or the full amount of the loss is paid.

(2) **Contribution by Limits** — If any of such other insurance does not provide for contribution by equal shares, The Travelers shall not be liable for a greater proportion of such loss than the applicable limit of liability under these sections for such loss bears to the total applicable limit of liability of all valid and collectible insurance against such loss.

c. **Section IV** — If the Named Insured has other insurance against a loss covered by this section, The Travelers shall not be liable under this section for a greater proportion of such loss than the applicable limit of liability stated in the declarations bears to the total applicable limit of liability of all valid and collectible insurance against such loss. However, with respect to any covered automobile newly acquired during the period this section is in effect and not described in the declarations for this section, this insurance shall not apply to any loss against which the Named Insured has other valid and collectible insurance.

15. **Policy Period**

a. **Sections I and IV** — This policy applies to loss occurring only during the policy period except as provided under the "Prior Bond or Policy of Fidelity or Forgery Insurance" Extension in the Special Form under Section I.

b. **Sections II and III** — This policy applies during the policy period as described in such sections.

c. **Sections I through IV** — Wherever this policy provides an effective or termination date, it shall mean as respects such date 12 noon, Standard Time, at the Named Insured's mailing address shown in the GENERAL DECLARATIONS; however to the extent that insurance in this policy replaces insurance in other policies terminating at 12:01 A.M. (Standard Time) on the inception date of this policy, this policy shall be effective for such other insurance 12:01 A.M. (Standard Time) instead of at noon Standard Time.

16. **Provisions of Policy Conformed to Statute** — The provisions of this policy which are in conflict with the statutes of the territory where this policy is issued are hereby amended to conform to such statutes.

17. **Subrogation**

a. **Section I (Except Property in Due Course of Transit) and Sections II, III and IV** — In the event of any payment under this policy The Travelers shall be subrogated to all the Insured's rights of recovery therefor against any person or organization and the Insured shall execute and deliver instruments and papers and do whatever else is necessary to secure such rights. The Named Insured may waive such rights prior to a loss, but shall do nothing after loss to prejudice such rights.

The Travelers
Master Pac

GENERAL PROVISIONS FORM
(Applicable to Sections I through IV)

Symbol MP-0240
Page 4 of 6

b. **Section I — Property in Due Course of Transit**

   (1) **Impairment of Recovery Rights** — Any act or agreement by the Named Insured before or after loss whereby any right of the Named Insured to recover in whole or in part for loss to property against any carrier for hire, bailee or other party liable therefor, is released, impaired or lost, shall render the insurance null and void, but The Travelers' right to retain or recover the premium shall not be affected. The Named Insured, however, may, without prejudice to this insurance, accept the ordinary bills of lading issued by carriers for hire. The Travelers is not liable for any loss which, without its written consent, has been settled or compromised by the Named Insured.

   (2) **Subrogation or Loan** — If in the event of loss the Named Insured shall acquire any right of action against any individual, firm or corporation for loss to property, the Named Insured shall, if requested by The Travelers, assign and transfer such claim or right of action to The Travelers or, at The Travelers' option, execute and deliver to it the customary form of loan receipt upon receiving an advance of funds in respect of the loss and shall subrogate The Travelers to, or shall hold in trust for it, all such rights of action to the extent of the amount paid or advanced, and shall permit suit to be brought in the Named Insured's name under the direction of and at the expense of The Travelers.

18. **Territory** — This policy applies only to loss, bodily injury or property damage which occurs, or to an offense committed, within the United States of America, its territories or possessions, Puerto Rico and Canada; and

    (a) with respect to Section I: (1) coverage for loss resulting from acts of theft, other than forgery, by employees applies only to loss sustained by the Named Insured through such acts committed by any of the employees engaged in the regular service of the Named Insured within the territory designated above or while such employees are elsewhere for a limited period; and (2) coverage for loss resulting from forgery applies to loss sustained anywhere in the world;

    (b) with respect to Section II: (1) within international waters or air space, provided the bodily injury or property damage or offense does not occur in the course of travel or transportation to or from any other country, state or nation; or (2) anywhere in the world for damages because of bodily injury or property damage arising out of a product which was sold for use or consumption within the United States of America, its territories or possessions, Puerto Rico or Canada, provided the original suit for damages is brought within such territory;

    (c) with respect to Section III, within international waters or air space, provided the bodily injury or property damage does not occur in the course of travel or transportation to or from any other country, state or nation;

    (d) with respect to Section IV, between ports of the United States of America, its territories or possessions, Puerto Rico and Canada.

**B. NUCLEAR ENERGY PROVISIONS**

1. **Section I**

   a. **Exclusions**

      (1) Except with respect to loss under the STANDARD, BROAD or SPECIAL FORM, Section I does not apply to loss by nuclear reaction or nuclear radiation or radioactive contamination, all whether controlled or uncontrolled, and whether such loss be direct or indirect, proximate or remote, or be in whole or in part caused by, contributed to, or aggravated by the peril(s) insured against; however, subject to the foregoing and all provisions of this policy, direct loss by fire resulting from nuclear reaction or nuclear radiation or radioactive contamination is insured against.

      (2) With respect to loss (except loss by fire or lightning) under the STANDARD, BROAD or SPECIAL FORM, Section I does not apply to loss by nuclear reaction or nuclear radiation or radioactive contamination, all whether controlled or uncontrolled, or due to any act or condition incident to any of the foregoing, whether such loss be direct or indirect, proximate or remote, or be in whole or in part caused by, contributed to or aggravated by any of the peril(s) insured against; and nuclear reaction or nuclear radiation or radioactive contamination all whether controlled or uncontrolled, is not "explosion" or "smoke".

   b. **Nuclear Clause** — With respect to the STANDARD, BROAD or SPECIAL FORM, loss by "fire" is not intended to and does not embrace nuclear reaction or nuclear radiation or radioactive contamination, all whether controlled or uncontrolled, and loss by nuclear reaction or nuclear radiation or radioactive contamination is not intended to be and is not insured against, whether such loss be direct or indirect, proximate or remote, or be in whole or in part caused by, contributed to, or aggravated by "fire" or any other peril(s) insured against; however, direct loss by "fire" resulting from nuclear reaction or nuclear radiation or radioactive contamination is insured against.

2. **Sections II and III**

   a. **Exclusion** — Sections II and III do not apply:

      (1) under any liability coverage, to bodily injury or *property damage* —

         (a) with respect to which an Insured under these sections is also an Insured under a nuclear energy liability policy issued by the Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters or Nuclear Insurance Association of Canada, or would be an Insured under any such policy but for its termination upon exhaustion of its limit of liability; or

         (b) resulting from the *hazardous properties* of *nuclear material* and with respect to which: (i) any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof; or (ii) the Insured is, or had this policy not been issued would be, entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization;

      (2) under any medical payments coverage, or under any Supplementary Payments provision relating to first aid, to expenses incurred with respect to bodily injury resulting from the *hazardous properties* of *nuclear material* and arising out of the operation of a *nuclear facility* by any person or organization;

The Travelers
Master Pac

**GENERAL PROVISIONS FORM**
**(Applicable to Sections I through IV)**

Symbol MP-0240
Page 5 of 6

(3) under any liability coverage, to bodily injury or *property damage* resulting from the *hazardous properties* of *nuclear material*, if: (a) the *nuclear material* (i) is at any *nuclear facility* owned by, or operated by or on behalf of, an Insured or (ii) has been discharged or dispersed therefrom; (b) the *nuclear material* is contained in *spent fuel* or *waste* at any time possessed, handled, used, processed, stored, transported or disposed of by or on behalf of an Insured; or (c) the bodily injury or *property damage* arises out of the furnishing by an Insured of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any *nuclear facility*, but if such facility is located within the United States of America, its territories or possessions, Puerto Rico or Canada, this subdivision (c) applies only to *property damage* to such *nuclear facility* and any property thereat.

b. **Definitions**

(1) **"Hazardous properties"** includes radioactive, toxic or explosive properties.

(2) **"Nuclear facility"** means:

    (a) any *nuclear reactor;*

    (b) any equipment or device designed or used for: (i) separating the isotopes of uranium or plutonium, (ii) processing or utilizing *spent fuel,* or (iii) handling, processing or packaging *waste;*

    (c) any equipment or device used for the processing, fabricating or alloying of *special nuclear material* if at any time the total amount of such material in the custody of the Insured at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or more than 250 grams of uranium 235;

    (d) any structure, basin, excavation, premises or place prepared or used for the storage or disposal of *waste;*

    and includes the site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operations.

(3) **"Nuclear material"** means *source material, special nuclear material* or *byproduct material.*

(4) **"Nuclear reactor"** means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material.

(5) **"Property damage"** includes all forms of radioactive contamination of property.

(6) **"Source material"**, **"special nuclear material", and "byproduct material"** have the meanings given them in the Atomic Energy Act of 1954 or in any law amendatory thereof.

(7) **"Spent fuel"** means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a *nuclear reactor.*

(8) **"Waste"** means any waste material: (a) containing *byproduct material* and (b) resulting from the operation by any person or organization of any *nuclear facility* included within the definition of nuclear facility under paragraph (a) or (b) thereof.

3. **Section IV — Exclusion** — Section IV does not apply to loss due to radioactive contamination.

**C. STATE EXCEPTIONS — APPLICABLE TO THE STATES INDICATED**

1. **California and Oregon** — With respect to a policy issued, or issued for delivery, in California or Oregon, in the "Policy Period" Condition, Provision c. is replaced by the following:

    "Section I through IV — Wherever this policy provides an effective or termination date, it shall mean as respects such date 12:01 A.M., Standard Time, at the Named Insured's mailing address; however to the extent only that the insurance afforded by this policy is also provided by other insurance terminating at noon on the inception date of this policy, insurance under this policy shall not become effective until such other insurance has terminated."

2. **Kansas**

    a. **Section I** — In Provision a. of the "Legal Action Against The Travelers" Condition, "12 months" and "two years" are amended to read "60 months".

    b. **Section II** — The "Subrogation" Condition does not apply to any premises medical payment insurance afforded under this section.

    c. **Section IV** — In the "Named Insured's or Insured's Duties in Event of Loss or an Occurrence or Suit which may Give Rise to Claim" Condition, Provision c. (1) is amended to read:

        "(1) use every reasonable means to protect the covered automobile (whether or not this insurance applies to the loss) from further loss; reasonable expenses incurred in affording such protection shall be deemed incurred at The Travelers' request;"

3. **Maine — Section I** — In Provision a. of the "Legal Action Against The Travelers" Condition, "12 months" is amended to read "two years".

4. **Massachusetts**

    a. **Sections I through IV** — In Provision b. of the "Cancellation" Condition, "10 days" is amended to read "20 days".

    b. **Section I** — As respects the STANDARD, BROAD or SPECIAL FORM, in the "Legal Action Against The Travelers" Condition, Provision a. is replaced by the "Suit" provision in the STANDARD FIRE POLICY PROVISIONS FORM.

    c. **Section II** — In Provision b. of the "Legal Action Against The Travelers" Condition, the phrase "nor shall The Travelers be impleaded by the Insured or his legal representative" does not apply to any right of impleader under Section 4B of Chapter 231 of the General Laws of Massachusetts Chapter 696, Acts of 1964.

BSAPolicyEv-00024095
TrustApp0937

The Travelers
Master Pac

GENERAL PROVISIONS FORM
(Applicable to Sections I through IV)

Symbol MP-0240
Page 6 of 6

5. **Minnesota** — **Section I** — As respects the STANDARD, BROAD or SPECIAL FORM, the "Concealment or Fraud" Condition; Provision a. of the "Legal Action Against The Travelers" Condition; and Provision a. of the "Subrogation" Condition are replaced by the "Concealment, fraud"; "Suit"; and "Subrogation" provisions in the STANDARD FIRE POLICY PROVISIONS FORM.

6. **Missouri** — **Section I** — As respects the STANDARD, BROAD or SPECIAL FORM, Provision b. of the "Cancellation" Condition is replaced by the following:

   "b. **By The Travelers** — The STANDARD, BROAD or SPECIAL FORM may be canceled (except as stated below), not renewed, reduced in amount or adversely modified at any time by The Travelers by giving to the Named Insured a 30 days' written notice of cancellation, non-renewal, reduction in amount or adverse modification with or without tender of the excess of paid premium above the pro rata premium for the expired time, which excess, if not tendered, shall be refunded on demand.

   If the Named Insured fails to pay the premium for this policy or any installment thereof, the STANDARD, BROAD or SPECIAL FORM may be canceled at any time by The Travelers by giving to the Named Insured written notice stating when not less than 10 days thereafter such cancellation shall be effective.

   A copy of such cancellation notice shall be given to any mortgagee, trustee or loss payee designated in the declarations for the STANDARD, BROAD or SPECIAL FORM when such forms are to be canceled."

7. **New York — Nuclear Provisions**

   a. **Section I** — In the "Nuclear Energy Provisions", Provisions 1.a. and 1.b. are replaced by the following:

      "**Nuclear Clause** — This policy does not cover loss or damage caused by nuclear reaction or nuclear radiation or radioactive contamination, all whether directly or indirectly resulting from an insured peril under this policy."

   b. **Section III** — In the "Nuclear Energy Provisions", Provision 2. does not apply under Section III to insured premises located or automobiles principally garaged in New York.

8. **North Carolina** — **Section I** — In Provision a. of the "Legal Action Against The Travelers" Condition, "12 months" is amended to read "three years".

9. **North Dakota** — **Section I** — In Provision a. of the "Legal Action Against The Travelers" Condition, "12 months" is amended to read "36 months".

10. **South Carolina** — **Sections II and III** — With respect to premises located in South Carolina and for which general liability insurance is provided under this policy, that part of the alcoholic beverage exclusion which relates to the selling, serving or giving of any alcoholic beverage: (a) to a person under the influence of alcohol; or (b) which causes or contributes to the intoxication of any person, is deleted.

11. **Vermont** — **Sections II and III** — If this policy affords a liability coverage with respect to a premises located or an automobile principally garaged in Vermont, this policy is amended in the following particulars with respect to such coverage:

    This policy, including this provision, is issued and delivered subject to the Laws of Vermont and particularly to Title 8, Chapter III, Section 4203 of the Vermont Statutes, annotated, including the following statutory requirements forming a part of such Chapter:

    The Travelers shall pay and satisfy any judgment that may be recovered against the Insured upon any claim covered by this policy to the extent and within the limits of liability assumed thereby, and shall protect the Insured against the levy of any execution issued upon any such judicial judgment or claim against the Insured. No limitation of liability in this policy shall be valid if, after a judgment has been rendered against the Insured in respect to his legal liability for damages in a particular instance, The Travelers continues the litigation by an appeal or otherwise, unless the Insured shall stipulate with The Travelers, agreeing to continue such litigation.

    No action shall lie against The Travelers to recover for any loss under this policy, unless brought within one year after the amount of such loss is made certain either by judgment against the Insured after final determination of the litigation or by agreement between the parties with the written consent of The Travelers.

    The insolvency or bankruptcy of the Insured shall not release The Travelers from the payment of damages for injury sustained or loss occasioned during the life of this policy, and in case of such insolvency or bankruptcy an action may be maintained by the injured person or claimant against The Travelers under the terms of this policy for the amount of any judgment obtained against the Insured not exceeding the limits of this policy.

    Payment of any judicial judgment or claim by the Insured for any of The Travelers' liability hereunder shall not bar the Insured from any action or right of action against The Travelers. In case of payment of loss or expense under this policy, The Travelers shall be subrogated to all rights of the Insured against any party, as respects such loss or expense, to the amount of such payment, and the Insured shall execute all papers required and shall cooperate with The Travelers to secure to The Travelers such rights.

D. **SECTION V**

If a form or endorsement is described as being part of Section V, the provisions of this GENERAL PROVISIONS FORM applicable to Section I shall also apply to such form or endorsement.

The Travelers
Office Pac

**AMENDATORY PROVISIONS**
**(Applicable to Sections I and II)**

MP 125

Insurance afforded by the forms indicated below is amended as follows:

I. **SECTION I**

A. **STANDARD AND SPECIAL FORMS**

**Lobby or Hallway Furnishings**—Building Coverage is extended to include lobby or hallway furnishings owned by the Named Insured.

B. **SPECIAL FORM** (applicable when the Named Insured is a physician, surgeon or dentist)

1. **Equipment**—As respects property of the Named Insured consisting of medical, surgical and dental equipment and instruments (including tools, materials, supplies and scientific books) used by the Named Insured in the medical or dental profession and, at the option of the Named Insured, such property belonging to others and used in the Named Insured's profession:

(a) "Coverage B—Personal Property" is extended to include insurance on such property while on or away from the **premises; and**

(b) the "Off Premises" extension under "Extensions of Coverage" is deleted.

2. **Radium**—The following exclusion is added under "Coverage B—Personal Property": "Coverage B does not apply to: radium;"

3. **Precious Metals**—The limitation in the policy applicable to "bullion, gold, silver, platinum and other precious metals" is amended to read "$2,500".

II. **SECTION II—SPECIAL GENERAL LIABILITY FORM**

**Additional Exclusion**—With respect to real estate agents, insurance applies only to **bodily injury, property damage** and personal injury arising out of the ownership, maintenance or use of:

a. such part of any premises used by the **Insured** for general office purposes; and

b. premises listed with the **Insured** for sale or rental, provided that such premises are not owned, operated, managed by, rented to, or in the care, custody or control of the **Insured**, or as to which the **Insured** acts as agent for the collection of rents or in any supervisory capacity.

CP-284.1   8-82   Printed in U.S.A.

MP 125

Page 1 of 1

BSAPolicyEv-00024097
TrustApp0939

Subject to Protective Order - Highly Confidential

BSAPolicyEv-00024098
TrustApp0940

The Travelers       **AMENDATORY ENDORSEMENT**       MP 101-2
(Applicable to Section I and II)

Insurance afforded by the forms indicated below is amended as follows:

I. **SECTION I**

  A. **STANDARD AND SPECIAL FORMS**

    1. **Debris Removal**—The Travelers will pay up to 10 percent of the values or limits of liability (whichever is less) applicable to the property to which an insured loss occurs as an additional amount of insurance for debris removal expense but not to exceed $25,000 in any one occurrence.

    2. **Proof of Loss Expense**—The Travelers will pay up to $1,000 for reasonable expenses incurred in preparation of a proof of loss, inventory, or any other loss exhibits when required by The Travelers. This is an additional amount of insurance.

    3. **Water Damage Exclusion**—This form does not insure under Coverage A and C against loss or damage to the interior of a **building** caused by rain, snow, sand or dust, whether driven by wind or not, unless: (a) the **building** shall first sustain an actual damage to roof or walls by the direct action of wind or hail, and then The Travelers shall be liable only for direct loss to the interior of the **building** through openings in the roof or walls made by direct action of wind or hail; or (b) such loss results directly from fire, lightning, collapse of building, weight of snow, ice or sleet, aircraft, vehicles, explosion, riot or civil commotion, vandalism or malicious mischief, provided, and to the extent, that such perils are insured against in this policy.

    4. **Extra Expense**—The $1,000 limitation for **extra expense** under "Coverage C—Income" is deleted.

    5. **Tenant's Improvements & Betterments**—Loss to **tenant's improvements and betterments** repaired or replaced at the expense of the Named Insured shall be valued at **replacement cost** rather than **actual cash value**, subject to all other provisions of the policy relating to the Replacement Cost Provision.

    6. **Rental Income**—The following is added to the policy under "Definitions":

    "**Rental Income**" is the sum of the: (a) total anticipated gross rental income from tenant occupancy of the **premises** as furnished and equipped by the Named Insured; (b) amount

of all charges which are the legal obligation of the tenants and which would otherwise be obligations of the Named Insured; and (c) fair rental value of any portion of the **premises** which is occupied by the Named Insured.

In determining rental income, due consideration shall be given to the Named Insured's rental experience before the date of loss and the probable experience thereafter at the **premises** had no loss occurred.

    7. **Power Failure**—The exclusion pertaining to off premises power failure is deleted and replaced by the following:

    "caused directly or indirectly by the failure, fluctuation or interruption of power or other utility service furnished to the **premises** if the cause of such failure, fluctuation or interruption occurs away from the premises; however, if loss by a peril not otherwise excluded ensues at the **premises**, The Travelers will be liable only for such ensuing insured loss;"

  B. **SPECIAL FORM**

    1. The following is added to the policy under "EXCLUSIONS":

    "caused by continuous or repeated seepage or leakage of water or steam from within a plumbing, heating or air conditioning system or domestic appliance which occurs over a period of weeks, months or years."

    2. **Jewelry and Fur**—With respect to furs or articles containing fur, jewelry, bullion, gold, silver, platinum and other precious metals, The Travelers shall not be liable for more than $1,000 in any one loss for loss caused by **theft**.

    Jewelry means watches, necklaces, bracelets, gems, precious or semiprecious stones, articles containing one or more gems and articles of gold, silver and platinum.

  C. **STANDARD FORM**—The following is added to the policy under "EXCLUSIONS":

    "caused by, resulting from, contributed to or aggravated by earth movement, including but not limited to earthquake, landslide, mudflow, earth sinking, earth rising or shifting; except for an ensuing insured loss by fire or explosion."

MP 101-2
CP-3302  10-83  Printed in U.S.A.

Subject to Protective Order - Highly Confidential

**The Travelers**

**AMENDATORY ENDORSEMENT**
**(Applicable to Section I and II)**

MP 101-2

II. **SECTION II—SPECIAL GENERAL LIABILITY FORM**

A. **AMENDATORY ENDORSEMENT**—The exclusion relating to **bodily injury** to any employee of the **insured** is deleted and replaced by the following:

This insurance does not apply:

(1) to **bodily injury** to any employee of the **insured** arising out of and in the course of their employment by the **insured** for which the **insured** may be held liable as an employer or in any other capacity;

(2) to any obligation of the **insured** to indemnify or contribute with another because of damages arising out of the **bodily injury;** or

(3) to **bodily injury** sustained by the spouse, child, parent, brother, or sister of an employee of the **insured** as a consequence of **bodily injury** to such employee arising out of and in the course of their employment by the **insured;**

This exclusion applies to all claims and suits by any person or organization for damages because of such **bodily injury** including damages for care and loss of services.

This exclusion does not apply to liability assumed by the **insured** under an **incidental contract.**

MP 101-2

Page 2 of 2

Subject to Protective Order - Highly Confidential

The Travelers                SOUTH DAKOTA AMENDATORY ENDORSEMENT                GEN 53
                                    (Sections I, II and V)

As respects the COMMON PROVISIONS and GENERAL PROVISIONS:

    **Cancellation**—under "Cancellation-By The Company", "10" days is amended to "20 days".

Subject to Protective Order - Highly Confidential

GEN 53
CP-3295  New 10-83  Printed in U.S.A.

Subject to Protective Order - Highly Confidential

BSAPolicyEv-00024101
TrustApp0943

Subject to Protective Order - Highly Confidential

BSAPolicyEv-00024102
TrustApp0944

BU 01 26
(Ed. 07-86)

**BUSINESSOWNERS
SOUTH DAKOTA
AMENDATORY
ENDORSEMENT**

A.   GENERAL CONDITIONS 2., Cancellation, is deleted and replaced by the following:

**2.   CANCELLATION**

The **named insured** may cancel this policy by mailing to the Company written notice stating when thereafter such cancellation shall be effective.

This policy may be cancelled by the Company for reasons of other than nonpayment of premium by mailing to the **named insured** and mortgagee at the mailing address shown in the Declarations, written notice stating when, not less than thirty (30) days thereafter, such cancellation shall be effective. Such notice shall be accompanied by a written explanation of the specific reasons for cancellation. The mailing or delivery of notice as aforesaid shall be sufficient proof of notice.

After sixty days from the effective date of policy issuance a notice of cancellation may not be issued by the Company unless it is based upon at least one of the following reasons:

(a)   Nonpayment of premium;

(b)   Discovery of fraud or material misrepresentation made by or with the knowledge of the **named insured** in obtaining the policy, continuing the policy, or in presenting a claim under the policy;

(c)   Discovery of acts or omissions on the part of the **named insured** which increase any hazard insured against;

(d)   The occurrence of a change in the risk which substantially increases any hazard insured against after insurance coverage has been issued;

(e)   A violation of any local fire, health, safety, building or construction regulation or ordinance with respect to any insured property or the occupancy thereof which substantially increases any hazard insured against; or

(f)   A determination by the director of insurance that the continuation of the policy would jeopardize the Company's solvency or would place the Company in violation of the insurance laws of South Dakota;

(g)   Violation or breach by the **insured** of any policy terms or conditions; or

(h)   Such other reasons as are approved by the director of insurance.

In the event of such cancellation the returned premium shall be computed as follows:

(1)   If the Company cancels, for reasons other than nonpayment, the return premium shall be computed pro rata; and

(2)   If the **named insured** cancels, the return premium shall be ninety percent (90%) of the unearned premium computed on a pro rata basis.

Premium adjustment may be made at the time cancellation is effected and, if not then made, shall be made as soon as practicable after cancellation becomes effective. The Company's check or the check of its representative mailed or delivered as aforesaid shall be a sufficient tender of any refund of premium due to the **insured** but payment or tender of unearned premium is not a condition of cancellation.

If the **insured** fails to make payment of the premium for this policy or any installment payment, whether payable directly to the Company or its agent or indirectly under any premium finance plan or extension of credit, this policy may be cancelled by mailing to the **insured** written notice stating that not less than twenty (20) days thereafter, such cancellation shall be effective.

In the event of such cancellation the earned premium shall be computed pro rata.

BU 01 26 (Ed. 07 86)      Copyright, Insurance Services Offices, Inc., 1985, 1986      **Page 1 of 2**

Subject to Protective Order - Highly Confidential

BSAPolicyEv-00024103

TrustApp0945

**B.** The following Condition is added:

**NONRENEWAL**

1. If this Company elects not to renew this policy, it shall mail or deliver to the **named insured** written notice of nonrenewal at least 45 days prior to:

   **(a)** The expiration date; or

   **(b)** The anniversary date if it is a continuous policy.

2. Any notice of nonrenewal will be mailed or delivered to the **named insured's** last known address. If notice is mailed, proof of mailing will be sufficient proof of notice.

BU 01 26 (Ed. 07 86)        Copyright, Insurance Services Offices, Inc., 1985, 1986        **Page 2 of 2**

Subject to Protective Order - Highly Confidential

BSAPolicyEv-00024104

TrustApp0946

The Travelers
Master Pac

SPECIAL FORM
(Forming part of Section I)

Symbol MP-111G
Page 1 of 8

## A. INSURING AGREEMENT

The Travelers insures against all risks of direct physical loss, including loss by:

fire, lightning, windstorm, explosion, riot, civil commotion, smoke, vehicles or aircraft;

collapse of buildings, earthquake, sonic boom, vandalism and malicious mischief, water damage (but not *flood*) and perils of transportation;

*theft* (including fraudulent or dishonest acts of *employees, forgery* and extortion);

and all other risks of direct physical loss;

except as otherwise provided.

## B. PROPERTY AND INCOME INSURED

1. **Coverage A — Building —** This coverage applies to *buildings* and structures on the *premises* and includes while on or within 100 feet of the *premises*:

   (a) *building equipment*, exterior signs and yard fixtures;

   (b) materials, supplies and temporary structures to be used for repairs or alterations to such *buildings*;

   (c) walks, roadways, paved surfaces outside in the open, fences, retaining walls and lawns; and

   (d) trees, shrubs and plants not grown for commercial purposes for an amount not exceeding $250 on any one tree, plant or shrub nor more than $1,000 (including expenses incurred in removing their debris) in any one occurrence.

   **Coverage A does not apply to** bridges, dams, outdoor swimming pools, beach or diving platforms, wharves, docks, growing crops and land; unless the policy is so endorsed.

2. **Coverage B — Personal Property —** This coverage applies to the following property while on or within 100 feet of the *premises* consisting of:

   (a) business personal property (including exterior signs) owned by the Named Insured; at the option of the Named Insured, personal property of others while in his care, custody or control; and *tenants improvements and betterments;* all usual or incidental to the Named Insured's business;

   (b) personal effects and household furniture of the Named Insured and, at his option, personal effects of his officers, partners, or employees, which are not usual or incidental to the Named Insured's business for an amount not exceeding $250 for any one person or $1,000 in any one occurrence; but this coverage does not apply to loss by *theft.*

   **Coverage B does not apply to:**

   (a) aircraft; or watercraft (other than rowboats or canoes) unless held for sale, service or repair on land;

   (b) motor vehicles; or any other self-propelled vehicle unless it is not required to be licensed for highway use; or

   (c) animals, birds or fish against loss by: (1) sickness or disease; (2) injury or death except by a peril not otherwise excluded which results directly in death or necessary destruction.

3. **Coverage C — Income —** This coverage applies to loss of *income* resulting directly from the necessary interruption of business or untenantability of a *building* caused by loss to a *building* or personal property on the *premises* by a peril insured against by this form.

   Such insurance as is afforded by Coverage C also applies to:

   (a) actual loss sustained for a period not exceeding two consecutive weeks when access to the *premises* is specifically prohibited by order of civil authority as a direct result of a loss insured against to property adjacent to the *premises;*

   (b) expenses necessarily incurred to reduce the actual loss, but not exceeding in the aggregate the amount by which the loss is reduced; and

   (c) any continued reduction in *income* for up to 30 consecutive days beyond the *period of indemnity* for such additional time as may be required with the exercise of due diligence and dispatch to restore the business to the condition that would have existed had no loss occurred to the property.

   Coverage is also provided for the necessary *extra expense* incurred by the Named Insured to continue as nearly as practicable the normal operation of his business following a loss to a *building* or personal property on the *premises* for an amount not exceeding $1,000 in any one occurrence.

   **Coverage C does not apply to:**

   (a) any increase of loss resulting from the suspension, lapse or cancellation of any lease, license, contract or order, unless such suspension, lapse or cancellation results directly from the interruption of business or untenantability of the *premises* from a loss insured against, and then The Travelers shall be liable for only such loss as affects the Named Insured's *income* during, and limited to, the *period of indemnity* covered under the policy; or any other consequential or remote loss; or

   (b) any increase of loss resulting from interference at the *premises* by strikers or other persons with rebuilding, repairing or replacing the property or with the resumption or continuation of business or with the restoration of the *premises* to a tenantable condition.

CP 1786 5-75 Printed in U.S.A.

BSAPolicyEv-00024105

TrustApp0947

The Travelers
Master Pac

SPECIAL FORM
(Forming part of Section I)

Symbol MP-1116
Page 2 of 8

## C. EXCLUSIONS

This form does not insure against loss:

**Under Coverages A, B and C**

(1) due to any fraudulent, dishonest or criminal act or omission except *theft* by any person (other than the Named Insured or a partner) but this exclusion does not apply to an ensuing direct loss by a peril not otherwise excluded if such loss arises from an act or omission by a person other than the Named Insured or a partner;

*(2) by or resulting from freezing (except to fire protective systems) while the building is *vacant* or *unoccupied* unless the Named Insured shall have exercised due diligence with respect to maintaining heat in the *building* or unless all equipment and appliances had been drained and the water supply shut off during vacancy or unoccupancy;

*(3) by any condition or occurrence within: (a) steam boilers or steam pipes, except direct loss resulting from explosion of accumulated gases or unconsumed fuel within the fire box or combustion chamber of any fired vessel or within the flues or passages which conduct the gases of combustion therefrom; or (b) hot water boilers or other equipment for heating water, except explosion; but these exclusions apply only to the object itself;

*(4) by work upon property; or by faulty workmanship or materials;

(5) by:  (a) default on any credit sale, loan or similar transaction; (b) unexplained or mysterious disappearance of property, the proof of which, either as to its factual existence or amount is solely dependent upon an inventory computation or a profit and loss computation; or (c) voluntary parting with title or possession of any property by the Named Insured or others to whom the property may be entrusted if induced to do so by any fraudulent scheme, trick, device or false pretense perpetrated by any person who is not an *employee*, but exclusion (c) does not apply to property in custody of a carrier for hire;

(6) by deterioration, inherent vice, latent defect, wear and tear; rust or corrosion; mold, mildew, wet or dry rot; contamination; insects or vermin; smog; smoke, vapor or gas from agricultural or industrial operations;

*(7) by failure or breakdown of machinery or equipment; or by electrical currents artificially generated;

*(8) by any legal proceeding or threat thereof; or enforcement of any ordinance or law regulating the construction, repair or demolition of any *building;*

*(9) caused by or resulting from *flood,* unless loss by fire or explosion ensues, and then The Travelers shall be liable only for such ensuing insured loss;

*(10) caused by or resulting from erosion; landslide; mudflow; earth sinking, rising or shifting; settling, cracking, shrinkage, bulging or expansion of pavements, retaining walls, foundations, walls, floors, roofs or ceilings; all unless loss by fire or explosion ensues and then The Travelers shall be liable only for such ensuing insured loss; however, this exclusion does not apply to direct loss by earthquake unless otherwise indicated in the declarations;

*(11) caused by or resulting from power, heating or cooling failure, interruption or fluctuation, unless such failure, interruption or fluctuation results from physical damage to power, heating or cooling equipment on the *premises* and is directly caused by a peril not otherwise excluded;

(12) by *war;*

**Under Coverages B and C —**

(13) due to accounting or arithmetical errors or omissions with respect to *money* or *securities;* or

(14) by: (a) marring or scratching; (b) dampness or dryness of atmosphere or changes in temperature; or (c) loss of market or delay;

however, with respect to all exclusions in this Part C, if a loss ensues which is not otherwise excluded or for which coverage is not more specifically limited, The Travelers shall then be liable for such ensuing loss.

## D. DEDUCTIBLE — COVERAGES A AND B

The Travelers shall be liable in any one occurrence only for the amount of loss in excess of the deductible amount specified in the declarations.

As respects *theft* by *employees* or *forgery,* the phrase "any one occurrence" means any loss through acts or defaults committed at any time by any person or in which such person is concerned or implicated.

This deductible does not apply to loss insured by the extension "Money Orders and Counterfeit Paper Currency".

## E. EXTENSIONS OF COVERAGE

Such insurance as is afforded by this form also applies as described below, but unless otherwise specified these extensions do not increase the limit of liability.

1. **Coverage A or B applies to:**

   (a) **Building Damage Resulting From Theft** — damage to a *building* resulting from *theft,* provided the Named Insured is owner of the *building* or liable for such damage;

   (b) **Debris Removal** — expenses incurred in the removal of debris of the insured property occasioned by a loss insured against;

   (c) **Exterior Building Glass** — loss to exterior *building* glass, including encasing frames and all lettering or ornamentation; and to the expense of boarding up damaged openings, installing temporary plates and removing or replacing obstructions when necessary; however this extension applies only if Coverage A is insured or, if so indicated in the declarations, for Coverage B;

---

*These exclusions do not apply to loss to property in transit, exterior *building* glass, *money* or *securities.*

Subject to Protective Order - Highly Confidential

The Travelers
Master Pac

SPECIAL FORM
(Forming part of Section I)

Symbol MP-1116
Page 3 of 8

(d) **Newly Acquired Property** — property newly acquired by the Named Insured during the policy period and used for his business for a total amount not exceeding $50,000 in any one occurrence, as described below:

(1) **under Coverage A** — additions and *buildings* under construction or *buildings* acquired; or

(2) **under Coverage B** — property acquired at premises owned or controlled by the Named Insured except at a location designated in the declarations;

however, this extension ceases: (a) 30 days from the date construction begins; (b) 30 days from the date the property is acquired; (c) the date the values of such construction or acquisition are reported to The Travelers; or (d) the date the policy is terminated; whichever occurs first; and additional premium is due and payable for values so reported from the date construction begins on the date of acquisition;

(e) **Prior Fidelity or Forgery Insurance** — loss which would have been recoverable under prior fidelity or *forgery* insurance provided:

(1) there is no lapse in coverage between such prior insurance and insurance under this form;

(2) such loss would have been recoverable under this form had this form been in effect when the acts causing such loss occurred; and

(3) the time within which to discover loss under such prior insurance had expired;

however, the amount of insurance under this extension shall not exceed the limit applicable to Coverage B in the amount for which it was written as of the time such prior insurance was replaced; or the amount recoverable under such prior insurance, if the latter be smaller;

(f) **Property Removal** — direct loss by removal of property from *premises* endangered by a peril not otherwise excluded, including coverage pro rata for 30 days at each proper place to which the property is necessarily removed for preservation from or repair of damage caused by such peril.

2. **Coverage B also applies:**

(a) **Money Orders and Counterfeit Paper Currency** — to loss due to the acceptance in good faith of money orders not paid upon presentation, or of counterfeit paper currency;

(b) **Off Premises** — to property temporarily at premises not owned or leased or operated by the Named Insured, and to property in due course of transit; but this extension does not apply to property:

(1) while in the custody of the United States Postal Service;

(2) at a premises for more than 60 consecutive days except *money* or *securities* at a banking premises; or

(3) rented or leased to others or after delivery to customers;

(c) **Seasonal Automatic Increase** — for an additional limit of 25% of the limit of liability specified for Coverage B at the *premises* to provide for seasonal variations; however, this increase shall not apply: (1) unless such limit of liability shall be equal to 100% of the Named Insured's average monthly values for the 12 months immediately preceding the date of loss or, in the event the Named Insured has been in business for less than 12 months, for such shorter period of time; or (2) to loss resulting from *theft* by *employees* or forgery; and

(d) **Valuable Papers and Records** — to the cost of research and other expenses necessarily incurred to reproduce, replace or restore *valuable papers and records* and *recording or storage media*, located on the *premises* for an amount not exceeding $1,000 in any one occurrence.

## F. BASIS OF LOSS PAYMENT

1. **Coverages A and B — Determination of Value of That Part of the Property Sustaining Loss**

a. **Replacement Cost** — The property shall be valued at its *replacement cost* but not exceeding the lesser of the following amounts:

(1) the *replacement cost* of the property equivalent to the property sustaining the loss and intended for the same occupancy and use and on the same *premises*; or

(2) the amount actually and necessarily expended in repairing or replacing the property.

The Named Insured may elect to disregard this provision and make claim on an *actual cash value* basis. However, further claim for any additional amount on a *replacement cost* basis may then be made, provided The Travelers is notified in writing within 180 days after the date of loss of such intention.

This provision does not apply:

(a) if the declarations specify loss is to be adjusted on an *actual cash value* basis only;

(b) unless and until the property sustaining the loss is actually repaired or replaced within a reasonable period of time; if not repaired or replaced, the property shall be valued on an *actual cash value* basis;

(c) to *money*, household furnishings, personal effects, personal property of others, articles of art, rarity or antiquity; and

(d) to property described under "Actual Cash Value" below.

b. **Actual Cash Value** — When the "Replacement Cost" provision does not apply, property shall be valued at its *actual cash value*, except for the following property where the *value* shall be determined as described:

(1) **Personal Property Owned by Persons Other Than Named Insured** — not to exceed the sum of:

(a) the least of the following: (i) the amount stipulated in the Named Insured's receipt issued to customers; or (ii) the *actual cash value*; and

(b) the value of services performed by the Named Insured.

The Travelers
Master Pac

SPECIAL FORM
(Forming part of Section I)

Symbol MP-1116
Page 4 of 8

(2) **Personal Property Sold But Not Delivered** — The Named Insured's net selling price.

(3) **Property in Transit** — The amount of invoice, including any cost for prepaid or advanced freight and such other charges as may have accrued and become legally due since the shipment. In the absence of an invoice, its *actual cash value* at point of shipment.

(4) **Recording or Storage Media** — Not to exceed the cost of such media in unexposed or blank form, except as provided in the "Valuable Papers and Records" extension.

(5) **Securities** — *Actual cash value* at the close of business on the business day prior to the day on which the loss was discovered.

(6) **Tenant's Improvements and Betterments**

(a) If repaired or replaced at the expense of the Named Insured and within a reasonable time after loss, the *actual cash value*.

(b) If not repaired or replaced within a reasonable time after loss, that proportion of the original cost of the property which the un-expired term of the lease or rental agreement, whether written or oral, and in effect at the time of loss, bears to the periods from the date the improvements and betterments were made to the expiration date of the lease.

(c) If repaired or replaced at the expense of others, The Travelers shall not be liable for the loss.

(7) **Valuable Papers and Records** — The cost of blank books, blank cards or other blank materials, plus the cost of labor incurred by the Named Insured for transcribing or copying such records, except as provided in the "Valuable Papers and Records" extension.

c. **Coinsurance** — This provision does not apply unless it is so indicated in the declarations.

(1) The Travelers shall not be liable for a greater proportion of any loss to the property insured than the applicable limit of liability bears to the amount produced by multiplying the *value* of such property to which such limit applies by the coinsurance percentage specified in the declarations. The *value* of the property shall be determined in accordance with the preceding provisions under "Basis of Loss Payment".

(2) This provision does not apply to:

(a) the cost of foundations, pilings or other supports for the building or its equipment which are below the undersurface of the lowest basement floor, or where there is no basement, which are below the surface of the ground;

(b) property insured under "Extensions of Coverage"; or

(c) loss resulting from *theft* by *employees*, *forgery*, extortion or loss of *money* or *securities*.

d. **Waiver of Inventory** — If the total claim for any loss is both less than $10,000 and less than 5% of the applicable limit of liability, no special inventory or appraisement of the undamaged property shall be required, but this shall not be construed to waive the application of the "Coinsurance" provision, if applicable.

e. **Limits of Liability**

1. The Travelers shall not be liable in any one loss for more than the interest of the Named Insured in the property (except personal property owned by others for which coverage is specifically provided) or the limit specified in the declarations or in this or any other form or endorsement; whichever is less.

2. As respects *theft*, the total liability of The Travelers for all loss caused by acts or omissions of any person or in which such person is concerned or implicated is limited to the limit of liability applicable to Coverage B.

The liability of The Travelers for loss sustained by any or all of the Named Insured shall not exceed the amount for which The Travelers would be liable had all such loss been sustained by any one of the Named Insured.

Regardless of the number of years this form shall be in force, The Travelers' total limit of liability shall not be cumulative.

If this form is substituted for any prior fidelity or *forgery* insurance issued by any of The Travelers Companies and the discovery period of such prior insurance has not expired, The Travelers Companies shall not be liable for more in the aggregate than the limit applicable to such prior coverage or the limit applicable to Coverage B, whichever is greater.

2. **Coverage C** — The Travelers' liability for loss shall be determined in accordance with the following:

(a) The actual loss sustained by the Named Insured during the *period of indemnity* but not to exceed the reduction in *income* less charges and expenses which do not necessarily continue during this period.

(b) In determining such loss, due consideration shall be given to the:

(1) continuation of normal charges and expenses, including payroll expense, to the extent necessary to resume operations with the same quality of service which existed immediately preceding the loss;

(2) experience of the Named Insured's business, including rental income if any, before the date of loss and the probable experience there-after had no loss occurred; and

(3) 30 days extension beyond the *period of indemnity* for any continued reduction in *income*.

(c) As soon as practicable after any loss, the Named Insured shall resume business or operations, in whole or in part, and shall use every avail-able means to reduce the amount of loss, including the use of merchandise, equipment or supplies or other property at the insured *premises* or other premises or the use of substitute facilities or services where practicable.

(d) The *period of indemnity* for which The Travelers is liable shall not exceed 12 consecutive months from the date of loss to the proper-ty insured.

The Travelers
Master Pac

SPECIAL FORM
(Forming part of Section I)

Symbol MP-1116
Page 5 of 8

3. **Coverages A, B and C**

   a. **Abandonment —** There can be no abandonment to The Travelers of any property.

   b. **Appraisal —** In case the Named Insured and The Travelers shall fail to agree as to the *actual cash value* or the amount of loss, then, on the written demand of either, each shall select a competent and disinterested appraiser and notify the other of the appraiser selected within 20 days of such demand. The appraisers shall first select a competent and disinterested umpire; and, failing for 15 days to agree upon such umpire, then, on request of the Named Insured or The Travelers, such umpire shall be selected by a judge of a court of record in the state in which the property covered is located. The appraisers shall then appraise the loss, stating separately *actual cash value* and loss to each item; and, failing to agree, shall submit their differences only to the umpire. An award in writing, so itemized, of any two when filed with The Travelers shall determine the amount of *actual cash value* and loss. Each appraiser shall be paid by the party selecting him and the expenses of appraisal and umpire shall be paid by the parties equally.

   c. **Options of The Travelers —** It shall be optional with The Travelers to take all, or any part, of the property at the agreed or appraised value, and also to repair, rebuild or replace the property to which the loss occurred with other of like kind and quality within a reasonable time on giving notice of its intention so to do within 30 days after the receipt of the proof of loss.

   d. **Payment for Property of Others —** At the option of The Travelers, any loss to property of others may be adjusted with and paid to the owners of such property.

   e. **When Loss Payable —** The amount of loss for which The Travelers may be liable shall be payable 60 days after proof of loss is received by The Travelers and ascertainment of the loss is made either by agreement between the Named Insured and The Travelers expressed in writing or by the filing with The Travelers of an award.

## G. CONDITIONS

1. **Benefit to Bailee —** This insurance shall not inure directly or indirectly to the benefit of any carrier or other bailee.

2. **Discovery Period —** Loss by *theft* is covered only if discovered not later than one year from the end of the policy period.

3. **Divisible Contract —** When property is insured at two or more *buildings*, the breach of any policy condition at any one *building* shall not prejudice the Named Insured's right to recover for loss occurring at a *building* where at the time of loss a breach of such condition does not exist.

4. **Earthquake —** Each loss by earthquake shall constitute a single claim hereunder; however, if more than one earthquake shock shall occur within any period of 72 hours during the period insurance is in effect, such earthquake shocks shall be deemed to be a single earthquake within this meaning. The Travelers shall not be liable for any loss caused by any earthquake shock occurring before the effective date and time of this insurance nor for any loss occurring after the termination date and time of this insurance.

5. **Increase of Hazard —** The Travelers shall not be liable for loss occurring while the hazard is increased by any means within the control or knowledge of the Named Insured, but this insurance shall not be prejudiced by: (a) any act or neglect of any person (other than the Named Insured), when such act or neglect is not within the control of the Named Insured; or (b) repairs or alterations or the erection of additions or new *buildings* on a *premises*.

6. **Losses —** Any payment for loss shall not reduce the limit of liability with respect to subsequent losses.

7. **Mortgagee Provision —** Loss to *buildings* shall be payable to the mortgagee (or trustee) named in the declarations as interest may appear under all present or future mortgages upon the property herein described in which the aforesaid may have an interest as mortgagee (or trustee), in order of precedence of said mortgages, and this insurance as to the interest of the mortgagee (or trustee) only therein, shall not be invalidated by any act or neglect of the mortgagor or owner of the within described property, nor by any foreclosure or other proceedings or notice of sale relating to the property, nor by any change in the title or ownership of the property, nor by the occupancy of the *premises* for purposes more hazardous than are permitted by this form; provided, that in case the mortgagor or owner shall neglect to pay any premium due under the policy, the mortgagee (or trustee) shall, on demand, pay the same.

   Provided also, that the mortgagee (or trustee) shall notify The Travelers of any change of ownership or occupancy or increase of hazard which shall come to the knowledge of said mortgagee (or trustee) and, unless permitted by this form, it shall be noted thereon and the mortgagee (or trustee) shall, on demand, pay the premium for such increased hazard for the term of the use thereof; otherwise this form shall be null and void.

   The Travelers reserves the right to cancel the policy at any time as provided in the GENERAL PROVISIONS FORM, and The Travelers shall have the right, on like notice, to cancel this provision.

   Whenever The Travelers shall pay the mortgagee (or trustee) any sum for loss under this form, and shall claim that, as to the mortgagor or owner, no liability therefore existed, The Travelers shall, to the extent of such payment, be thereupon legally subrogated to all rights of the party to whom such payment shall be made, under all securities held as collateral to the mortgage debt, or may at its option pay to the mortgagee (or trustee) the whole principal due or to grow due on the mortgage, with interest accrued thereon to the date of such payment, and shall thereupon receive a full assignment and transfer of the mortgage and of all such other securities; but no subrogation shall impair the right of the mortgagee (or trustee) to recover the full amount of said mortgagee's (or trustee's) claim.

8. **Mortgagee's Obligations in Case of Loss —** If the Named Insured fails to render proof of loss, the mortgagee (or trustee), named in the declarations, upon notice shall render proof of loss in the form specified in the GENERAL PROVISIONS FORM within 60 days thereafter and shall be subject to the provisions of the policy relating to the appraisal and time of payment and of bringing suit.

9. **Permits and Use —** In case of loss, the Named Insured may make reasonable repairs, temporary or permanent, provided the repairs are confined solely to the protection of the property from further loss and provided further that the Named Insured shall keep an accurate record of such

The Travelers
Master Pac

**SPECIAL FORM**
(Forming part of Section I)

Symbol MP-1116
Page 6 of 8

repair expenditures. The cost of any such repairs directly attributable to a loss insured against shall be included in determining the amount of loss. Nothing contained herein is intended to modify the policy requirement that, in case loss occurs, the Named Insured shall protect the property from further loss.

10. **Section I Provisions Form** — Any reference made to the SECTION I PROVISIONS FORM in any form or endorsement shall apply to the provision of the same or comparable title in this form. Provisions equivalent to those of the SECTION I PROVISIONS FORM are included in this form.

11. **Theft by Employees** — The coverage of this form for loss resulting from *theft* by *employees* shall be deemed canceled as to any *employee:*

    (a) from the time that the Named Insured or any partner or officer thereof not in collusion with such *employee* has knowledge or information that such *employee* has committed any fraudulent or dishonest act in the service of the Named Insured or otherwise whether such act is committed before or after the date of employment by the Named Insured;

    (b) on the effective date of the policy if such *employee* was previously canceled from any prior bond or policy of fidelity insurance issued to the Named Insured; or

    (c) on the effective date specified in written notice mailed or otherwise delivered to the Named Insured, such date to be not less than 15 days after the date of mailing or delivery.

12. **Vacancy and Unoccupancy** — The Travelers shall not be liable for loss occurring while the *premises* are *vacant* or *unoccupied* (unless such unoccupancy is usual to the operation of the Named Insured's business) for more than 60 consecutive days immediately preceding the loss.

## H. DEFINITIONS

1. **"Actual Cash Value"** means *replacement cost* less depreciation (including obsolescence) of that part of the property sustaining loss at the time and place of loss, but not exceeding the cost to repair or replace with material of like kind and quality within a reasonable time after the loss.

2. **"Building"** includes structures and additions and extensions attached thereto; and also includes foundations, pilings or other supports for the building or its equipment.

3. **"Building Equipment"** means:

    (a) fixtures, machinery, piping, flues, drains and equipment constituting a permanent part of and pertaining to the service of a *building;* and

    (b) personal property used for the maintenance or service of a *building* including fire extinguishing, refrigerating, ventilating, cooking, dishwashing and laundering equipment; floor coverings and shades; but does not include other furniture or furnishings in apartments or rooms provided by the Named Insured as landlord.

4. **"Employee"** means any natural person (except a director or trustee of the Named Insured, if a corporation, who is not also an officer or *employee* of the corporation in some other capacity): (a) while in the regular service of the Named Insured; (b) whom the Named Insured compensates by salary, wages or commissions and has the right to govern and direct in the performance of such service; and (c) who works at or out of the *premises;* but does not mean any independent contractor or agent by whatever title known. The words "while in the regular service of the Named Insured" shall include the first 30 days after regular service ends unless the policy or this section is terminated or coverage of this form for acts of *theft* by employees is canceled as to any *employee.*

5. **"Extra Expense"** means the excess (if any) of the total cost incurred during the *period of indemnity* chargeable to the operation of the Named Insured's business, over and above the total cost that would normally have been incurred to conduct the business during the same period had no loss occurred but does not include loss of *income.* Any salvage value of property obtained for temporary use during the same *period of indemnity* which remains after the resumption of normal operations shall be taken into consideration in the adjustment of any loss.

6. **"Flood"** means waves, tidal water or tidal waves, mudflow, overflow of streams or other bodies of water or spray from any of the foregoing, release of water impounded by a dam or other water from natural sources whether on or below ground.

7. **"Forgery"** means forgery or alteration of, on or in any check, draft, promissory note, bill of exchange, or similar written promise, order or direction to pay a sum certain in money, made or drawn by or drawn upon the Named Insured, or made or drawn by one acting as agent of the Named Insured or purporting to have been made or drawn as hereinbefore set forth, including:

    (a) any check or draft made or drawn in the name of the Named Insured, payable to a fictitious payee and endorsed in the name of such fictitious payee;

    (b) any check or draft procured in a face to face transaction with the Named Insured, or with one acting as agent of the Named Insured, by anyone impersonating another and made or drawn payable to the one so impersonated and endorsed by anyone other than the one so impersonated; and

    (c) any payroll check, payroll draft or payroll order made or drawn by the Named Insured, payable to bearer as well as to a named payee and endorsed by anyone other than the named payee without authority from such payee;

    whether or not any such endorsement be a forgery within the law of the place controlling the construction thereof. Mechanically reproduced facsimile signatures are treated the same as handwritten signatures.

    Should suit be brought against the Named Insured to enforce payment of any covered instrument which the Named Insured alleges to be forged or altered and refuses to pay and The Travelers gives written consent to the defense of such suit, any reasonable attorneys' fees, court costs or similar legal expenses paid by the Named Insured in defense of such suit shall be construed to be loss by forgery. The liability of The Travelers for such expenses shall be in addition to any other liability under Coverage B.

8. **"Income"** is the sum of total net profit, payroll expense, taxes, interest, rents, all other operating expenses earned by the business; and rental income if any.

The Travelers
Master Pac

SPECIAL FORM
(Forming part of Section I)

Symbol MP-1116
Page 7 of 8

9. **"Money"** means currency and coins in current use, bank notes, bullion, travelers checks, register checks and money orders held for sale to the public.

10. **"Period of Indemnity"** means the length of time required with the exercise of due diligence and dispatch to rebuild, repair or replace that part of the property sustaining loss, commencing with the date of the loss but not limited by the termination of this insurance.

11. **"Premises"**, unless otherwise modified, means a location designated in the declarations.

12. **"Recording or Storage Media"** means film, tape, discs, drums, cells and media for, or programming records pertaining to, electronic or electro-mechanical data processing or electronically controlled equipment, including the data therein.

13. **"Replacement Cost"** means the full cost of repair or replacement at the time and place of loss without deduction for depreciation.

14. **"Securities"** means all negotiable and non-negotiable instruments or contracts representing either *money* or other property and includes revenue or other stamps in current use, tokens, tickets, and credit card slips for sales made by the Named Insured and held by him for reimbursement from companies issuing credit cards; but does not include *money*.

15. **"Tenant's Improvements and Betterments"** means the Named Insured's use interest in fixtures, alterations, installations or additions comprising a part of the *building* occupied but not owned by the Named Insured and made or acquired at the expense of the Named Insured exclusive of rent paid by the Named Insured, but which are not legally subject to removal by him.

16. **"Theft"** means any act of stealing, including fraudulent or dishonest acts of *employees, forgery* and extortion.

17. **"Unoccupied"** refers to a *building* which contains property pertaining to the occupancy, but in which operations or other customary activities are suspended. A suspension of operations or period of inactivity during part of the year which is usual and incidental to the occupancy of the *building* shall not be deemed an unoccupancy.

18. **"Vacant"** refers to a *building* which contains no property pertaining to operations or activities customary to occupancy of the *building*.

19. **"Valuable Papers and Records"** means written, printed or otherwise inscribed documents and records pertaining to the Named Insured's business, including books, maps, drawings, abstracts, deeds, mortgages and manuscripts, but does not mean *money, securities, recording or storage media*, or property held as samples or for sale or for delivery after sale.

20. **"Value"**, unless otherwise specified, means the value at the time and place of loss.

21. **"War"** means any or all of the following:

(a) with respect to loss by fire caused directly or indirectly by (1) enemy attack by armed forces, including action taken by military, naval or air forces in resisting an actual or an immediately impending enemy attack; (2) invasion; (3) insurrection; (4) rebellion; (5) revolution; (6) civil war; (7) usurped power; or (8) order of any civil authority except acts of destruction at the time and for the purpose of preventing the spread of fire, provided that such fire did not originate from any of the perils excluded by this form;

(b) with respect to loss by any peril other than fire caused directly or indirectly by:

(1) hostile or warlike action in time of peace or war, including action in hindering, combating or defending against an actual, impending or expected attack by: (i) any government or sovereign power (de jure or de facto); or any authority maintaining or using military, naval or air forces; (ii) military, naval or air forces; or (iii) an agent of any such government, power, authority or forces, it being understood that any discharge, explosion or use of any weapon of war employing nuclear fission or fusion shall be conclusively presumed to be such a hostile or warlike action by such a government, power, authority or forces; or

(2) insurrection, rebellion, revolution, civil war, usurped power, or action taken by governmental authority in hindering, combating or defending against such an occurrence; seizure or destruction under quarantine or customs regulations, confiscation by order of any government or public authority, or risks of contraband or illegal transportation or trade.

## I. STATE EXCEPTIONS — APPLICABLE TO THE STATES INDICATED

1. **Alabama and South Carolina** — The condition "Losses" under "Additional Conditions" is replaced by the following:

   **"Losses** — If a loss is paid, this insurance shall indemnify the Named Insured for loss of the pro rata unearned premium on the amount of such loss payment. The Travelers, however, may elect by written notice within 60 days after date of loss to reinstate the amount of such loss and, in consideration of such reinstatement, make no payment to the Named Insured as provided by this provision."

2. **California, Massachusetts and Minnesota** — As respects loss by fire or lightning, the words "all risks of direct physical loss" and "direct loss" wherever used in this form are replaced by "all loss".

3. **Florida** — When insurance is written subject to coinsurance, the rate charged for the insurance is based upon the use of a coinsurance provision, with the consent of the Named Insured.

4. **Massachusetts**

   a. The provisions "Abandonment", "Appraisal" and "When Loss Payable" under "Basis of Loss Payment" are replaced by the provisions "Reference" and "When loss payable" in the STANDARD FIRE POLICY PROVISIONS FORM.

   b. The provision "Options of The Travelers" under "Basis of Loss Payment" is deleted.

   c. The conditions "Mortgage Provision" and "Mortgagee's Obligation in Case of Loss" are replaced by the following:

   **"Loss Payable Provision —** If a mortgage, or mortgagees, is named in the declarations or by endorsement to the policy, loss, if any, on real estate is payable to such mortgagee, or mortgagees, as the interests of such mortgagee, or mortgagees, may appear in order of their priority under any present or future mortgage, or mortgages, of the within described real estate (but in no event to exceed the amount of insurance

BSAPolicyEv-00024111

TrustApp0953

The Travelers
Master Pac

SPECIAL FORM
(Forming part of Section I)

Symbol MP-111G
Page 8 of 8

specified in the declarations). It is a condition of this contract, that any notice relative thereto, that is delivered to the address set forth for any of the mortgagees mentioned, shall be considered as being in full compliance with any and all requisites relative to the delivery of such notice."

5. **Minnesota**

   a. The provisions "Appraisal", "Options of The Travelers" and "When Loss Payable" under "Basis of Loss Payment" are replaced by the provisions "Appraisal", "Company's options" and "When loss payable" in the STANDARD FIRE POLICY PROVISIONS FORM.

   b. The conditions "Mortgage Provision" and "Mortgagee's Obligations in Case of Loss" under "Additional Conditions" are replaced by the provision "Mortgagee interest and obligations" in the STANDARD FIRE POLICY PROVISIONS FORM.

   c. In the event of total loss to a *building* under Coverage A the amount of loss payable shall be the insurable value for the *building* specified in the declarations.

6. **Nebraska** — With respect to the perils of fire, lightning or tornado, the amount of insurance written on real property under Coverage A shall be taken conclusively to be the true value of the property and the true amount of loss and measure of damage when such property is wholly destroyed without criminal fault on the part of the Named Insured or his assignee.

7. **New Hampshire**

   a. **Basis of Loss Payment**

      (1) If a *building* insured for a specified amount under Coverage A, whether under a separate policy or under a policy also covering other *buildings,* is totally destroyed by fire or lightning without criminal fault on the part of the Named Insured or his assignee, the sum for which such *building* is insured shall be taken to be the value of the Named Insured's interest therein unless over-insurance thereon was fraudulently obtained.

      (2) If a *building* insured under Coverage A is only partially destroyed by fire or lightning, the Named Insured shall be entitled to the actual loss sustained, not exceeding the sum insured.

      (3) Nothing contained in provisions (1) and (2) above shall be construed as prohibiting the use of coinsurance or agreed amount.

      (4) When a *building* is insured under Coverage A, not for a specified amount but under a blanket form with one amount covering two or more *buildings* or one or more *buildings* and personal property, provision (1) above shall not apply.

   b. **Losses** — The condition "Losses" under "Additional Conditions" is replaced by the following:

      "Losses

      (1) **Applicable to buildings**

         (a) Any payment for a loss for a *building* shall not reduce the applicable limit of liability with respect to subsequent losses except to the extent that the *building* has not been repaired or replaced at the time of subsequent losses.

         (b) In lieu of reinstatement as provided above, the Named Insured may elect, at the time the amount of loss is agreed upon, to be re-imbursed for the loss of the pro-rata unearned premium on the amount of the loss payment.

      (2) **Applicable to property other than buildings** — Any payment for a loss shall not reduce the applicable limit of liability with respect to subsequent losses."

8. **South Carolina; and in Florida for properties located in the Counties of Broward, Dade, Martin, Monroe and Palm Beach, and in all areas East of the West Bank of the Inter-Coastal Waterway in the Counties of Indian River and St. Lucie** — This form does not insure against loss caused in any manner by windstorm to paint or waterproofing material applied to the exterior of a *building*. The value of such paint or waterproofing material shall not be included in the determination of *value* when applying the Coinsurance Provision, if applicable, to loss from windstorm.

9. **South Carolina** — With respect to the perils of fire and lightning, the Named Insured and The Travelers agree that the value of a *building*, when insured under Coverage A and when completed, is — and hereby fix the amount of insurance to be carried on such *building* (including this policy) — respectively, as specified in the declarations (or schedule attached thereto).

10. **Wisconsin** — In Exclusion 8. under "Additional Exclusions", the words "or demolition" are deleted.

Subject to Protective Order - Highly Confidential

The Travelers

# AMENDATORY ENDORSEMENT—PROPERTY
## (Section I)

PR 146

The following forms are amended as follows:

### I. COMMON PROVISIONS and PROPERTY PROVISIONS

**Subrogation**—The "Subrogation" provisions applicable to Section I—Property Coverage are replaced by the following:

"**Subrogation** (Applicable unless otherwise specified in other forms or endorsements).

1. In the event of any payment for loss under Section I—Property Coverage of this policy, the Company shall be subrogated to all the Insured's right of recovery against any person or organization and the Insured shall execute and deliver instruments and papers and do whatever else is necessary to secure these rights. The Insured shall do nothing after loss to prejudice these rights except as provided below.

2. As respects insurance provided under Section I—Property Coverage, this insurance shall not be invalidated should the Insured waive in writing any or all right of recovery against any party for loss. However, in the event the Insured waives only a part of these rights against any particular third party, the Company shall be subrogated with respects to all rights of recovery which the Insured may retain against any such third party for a loss insured against to the extent that payment for the loss is made by the Company; all subject to the following additional provisions.

   a. This provision does not apply to Boiler and Machinery, Inland Marine or Glass coverage written under Section I—Property Coverage of this policy;

   b. This agreement, if made before loss has occurred, may run in favor of any third party;

   c. This agreement, if made after loss has occurred, may run only in favor of a third party falling within one of the following categories at the time of loss:

      (1) a third party insured under this policy, or

      (2) a corporation, firm, or entity: (i) owned or controlled by the Named Insured or in which the Named Insured owns capital stock or other proprietary interest or (ii) owning or controlling capital stock or other proprietary interest in the Named insured; or

      (3) a tenant of the Named Insured.

3. Except as provided in Item 2. above, the Company shall not be bound to pay any loss

if the Insured has impaired any right of recovery for loss. However, it is agreed that the Insured may, as respects property in transit, accept such bills of lading, receipts or contracts of transportation as are ordinarily issued by carriers containing a limitation as to the value of such goods or merchandise."

### II. STANDARD, BROAD or SPECIAL FORM

A. **Volcanic Eruption Exclusion**—The following additional exclusion applies:

The Standard, Broad or Special form, whichever applies, does not insure against loss or damage caused directly or indirectly by volcanic eruption.

Volcanic eruption includes but is not limited to:

1. explosion;

2. volcanic action meaning:

   a. airborne shock waves;

   b. ash, dust or particulate matter; or

   c. lava flow;

3. other expelled matter;

4. earth movement, earthquake, landslide, mudflow, earth sinking, earth rising or shifting; or

5. flood, surface water, waves, tidal water or tidal wave, overflow of streams or other bodies of water, release of water impounded by a dam, or spray from any of the foregoing;

resulting from the eruption of a volcano.

However, this exclusion does not apply to an ensuing insured loss by:

1. fire; or

2. the breakage of building glass or safety glazing material if breakage of building glass is an insured peril or is not otherwise excluded.

   The Company shall not be liable for more than those limits specified for building glass under "Restricted Limits of Liability".

B. The Increase of Hazard Condition is replaced by the following:

1. a. **Permits and Use**—Permission is granted for increased hazards and for change in use or occupancy.

   b. **Error in Description**—This insurance shall not be prejudiced by error in stating the name, number, street or location of any building insured under this

PR 146   Amendatory Endorsement-Property

CP-3118   4-83   Printed in U.S.A

The Travelers                **AMENDATORY ENDORSEMENT—PROPERTY**                    PR 146
                                      **(Section I)**

policy, or of buildings and personal property if insured under a single item of insurance, where there is no willful concealment or misrepresentation.

C. **Property Insured**—Under "Personal Property of the Insured", the following words are deleted:

"usual or incidental to the Insured's occupancy as specified in the GENERAL DECLARATIONS."

CP-3118  4-83  Printed in U.S.A.

PR 146    Amendatory Endorsement-Property

Subject to Protective Order - Highly Confidential

The Travelers          **ENVIRONMENTAL DAMAGE**          PR 70
                                      **ENDORSEMENT**

The provisions of this endorsement are added to the Standard, Broad and Special Forms, and the Buildings Under Construction Standard, Broad and Special Forms.

A. Insurance does not apply to loss:

    1. To water.

    2. Incurred in reclaiming or restoring land or water, except as specified under **POLLUTANTS CLEANUP AND RE-MOVAL** below.

    3. Caused by the release, discharge or dispersal of pollutants, unless the release, discharge or dispersal is itself caused by fire, lightning, aircraft, explosion, riot, civil commotion, smoke, vehicles, windstorm or hail, vandalism, malicious mischief or fire protective equipment damage. But if loss by any of the preceding twelve perils ensues, then this Company shall be liable only for loss caused by the ensuing peril.

B. Insurance under the **DEBRIS REMOVAL** Coverage Extension does not apply to the cost of extracting pollutants from land or water or removing, restoring or replacing polluted land or water.

C. **POLLUTANTS CLEANUP AND REMOVAL**—This Coverage Extension covers costs of extracting pollutants from land or water at the described premises if the release, discharge or dispersal of pollutants is caused by or results from a covered loss by any of the twelve perils in A.3. above during the policy period. Such costs must be reported to the Company within 180 days of the date of direct physical loss or damage.

The Company will pay no more than $10,000 in total for incurred costs of all such losses occurring in any one policy year commencing with policy inception. This amount is an additional amount of insurance.

Pollutants means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

D. **APPLICABLE ONLY TO COVERAGE FOR BUSINESS INTERRUPTION, RENTAL VALUE, EXTRA EXPENSE OR OTHER CONSEQUENTIAL LOSS**—This insurance shall not pay for any additional loss due to an increase in the time required to rebuild, repair or replace the property or resume operations, when such increase results from the enforcement of any law regulating the prevention, control, repair, cleanup or restoration of environmental damage.

Subject to Protective Order - Highly Confidential

BSAPolicyEv-00024115
TrustApp0957

Subject to Protective Order - Highly Confidential

BSAPolicyEv-00024116
TrustApp0958

The Travelers      **SPECIAL COMPREHENSIVE GENERAL LIABILITY FORM**      MP 110-1
(Section II)

THIS FORM IS A CONSOLIDATION OF THE COMPREHENSIVE GENERAL LIABILITY FORM, THE BROAD FORM GENERAL LIABILITY ENDORSEMENT, THE LIABILITY PROVISIONS AND THE ADDITIONAL LIABILITY PROVISIONS. ANY REFERENCES IN THE POLICY TO THE AFOREMENTIONED FORMS ARE ALSO APPLICABLE TO THIS FORM.

## COVERAGES

### COVERAGE A—BODILY INJURY LIABILITY

### COVERAGE B—PROPERTY DAMAGE LIABILITY

The Company will pay on behalf of the **Insured** all sums which the **Insured** shall become legally obligated to pay as damages because of

Coverage A—**bodily injury** or
Coverage B—**property damage**

to which this insurance applies, caused by an **occurrence**, and the Company shall have the right and duty to defend any suit against the **Insured** seeking damages on account of such **bodily injury** or **property damage**, even if any of the allegations of the suit are groundless, false or fraudulent, and may make such investigation and settlement of any claim or suit as it deems expedient, but the Company shall not be obligated to pay any claim or judgment or to defend any suit after the applicable limit of the Company's liability has been exhausted by payment of judgments or settlements.

**EXCLUSIONS**—This insurance does not apply:

(a) to liability assumed by the **Insured** under any contract or agreement except an **incidental contract**; but this exclusion does not apply to a warranty of fitness or quality of the **Named Insured's products** or a warranty that work performed by or on behalf of the **Named Insured** will be done in a workmanlike manner;

(b) to **bodily injury** or **property damage** arising out of the ownership, maintenance, operation, use, loading or unloading of
  (1) any **automobile** or aircraft owned or operated by or rented or loaned to any **Insured**, or
  (2) any other **automobile** or aircraft operated by any person in the course of employment by any **Insured**;
  but this exclusion does not apply to the parking of an **automobile** on premises owned by, rented to or controlled by the **Named Insured** or the ways immediately adjoining, if such **automobile** is not owned by or rented or loaned to any **Insured**;

(c) to **bodily injury** or **property damage** arising out of (1) the ownership, maintenance, operation, use, loading or unloading of any **mobile equipment** while being used in any prearranged or organized racing, speed or demolition contest or in any stunting activity or in practice or preparation for any such contest or activity or (2) the operation or use of any snowmobile or trailer designed for use therewith;

(d) to **bodily injury** or **property damage** arising out of and in the course of the transportation of **mobile**

equipment by an **automobile** owned or operated by or rented or loaned to any **Insured**;

(e) to **bodily injury** or **property damage** arising out of the ownership, maintenance, operation, use, loading or unloading of
  (1) any watercraft owned or operated by or rented or loaned to any **Insured**, or
  (2) any other watercraft operated by any person in the course of employment by any **Insured**;
  but this exclusion does not apply to watercraft while ashore on premises owned by, rented to or controlled by the **Named Insured** or to any watercraft under 26 feet in length provided such watercraft is neither owned by the **Named Insured** nor being used to carry persons or property for a charge;

(f) to **bodily injury** or **property damage** arising out of any emission, discharge, seepage, release or escape of any liquid, solid, gaseous or thermal waste or pollutant if such emission, discharge, seepage, release or escape is either expected or intended from the standpoint of any **Insured** or any person or organization for whose acts or omissions any **Insured** is liable;

(g) to **bodily injury** or **property damage** due to war, whether or not declared, civil war, insurrection, rebellion or revolution or to any act or condition incident to any of the foregoing, with respect to
  (1) liability assumed by the **Insured** under an **incidental contract** or
  (2) expenses for first aid under the Supplementary Payments provision;

(h) to **bodily injury** or **property damage** for which the **Insured** or the **Insured's** indemnitee may be held liable
  (1) as a person or organization engaged in the business of manufacturing, distributing, selling or serving alcoholic beverages, or
  (2) if not so engaged, as an owner or lessor of premises used for such purposes, if such liability is imposed
    (i) by, or because of the violation of, any statute, ordinance or regulation pertaining to the sale, gift, distribution or use of any alcoholic beverage, or
    (ii) by reason of the selling, serving or giving of any alcoholic beverage to a minor or to a person under the influence of alcohol or which causes or contributes to the intoxication of any person;
  but part (ii) of this exclusion does not apply with respect to liability of the **Insured** or the **Insured's** in-

Subject to Protective Order - Highly Confidential

The Travelers    **SPECIAL COMPREHENSIVE GENERAL LIABILITY FORM**    MP 110-1
(Section II)

demnitee as an owner or lessor described in (2) above;

(i) to any obligation for which the **Insured** or any carrier as the **Insured's** insurer may be held liable under any workers' compensation, unemployment compensation or disability benefits law, or under any similar law;

(j) to **bodily injury** to any employee of the **insured** arising out of and in the course of their employment by the **insured** for which the **insured** may be held liable as an employer or in any other capacity;

(k) to any obligation of the **insured** to indemnify or contribute with another because of damages arising out of the **bodily injury;** or

(l) to **bodily injury** sustained by the spouse, child, parent, brother, or sister of an employee of the **insured** as a consequence of **bodily injury** to such employee arising out of and in the course of their employment by the **insured;**

exclusions j, k and l apply to all claims and suits by any person or organization for damages because of such **bodily injury** including damages for care and loss of services however, these exclusions do not apply to liability assumed by the **insured** under an **incidental contract;**

(m) to **property damage**

(1) to property owned or occupied by or rented to the **Insured,** or, except with respect to the use of **elevators,** to property held by the **Insured** for sale or entrusted to the **Insured** for storage or safekeeping,

(2) except with respect to liability under a written sidetrack agreement or the use of **elevators**

(a) to property while on premises owned by or rented to the **Insured** for the purpose of having operations performed on such property by or on behalf of the **Insured,**

(b) to tools or equipment while being used by the **Insured** in performing the **Insured's** operations,

(c) to property in the custody of the **Insured** which is to be installed, erected or used in construction by the **Insured,**

(d) to that particular part of any property, not on premises owned by or rented to the **Insured,**

(i) upon which operations are being performed by or on behalf of the **Insured** at the time of the **property damage** arising out of such operations, or

(ii) out of which any **property damage** arises, or

(iii) the restoration, repair or replacement of which has been made or is necessary by reason of faulty workmanship thereon by or on behalf of the **Insured;**

(n) to **property damage** to premises alienated by the **Named Insured** arising out of such premises or any part thereof;

(o) to loss of use of tangible property which has not been physically injured or destroyed resulting from

(1) a delay in or lack of performance by or on behalf of the **Named Insured** of any contract or agreement, or

(2) the failure of the **Named Insured's products** or work performed by or on behalf of the **Named Insured** to meet the level of performance, quality, fitness or durability warranted or represented by the **Named Insured;**

but this exclusion does not apply to loss of use of other tangible property resulting from the sudden and accidental physical injury to or destruction of the **Named Insured's products** or work performed by or on behalf of the **Named Insured** after such products or work have been put to use by any person or organization other than an **Insured;**

(p) to **property damage** to the **Named Insured's products** arising out of such products or any part of such products;

(q) with respect to the **completed operations hazard** and with respect to any classification stated in the policy or in the Company's manual as ''including completed operations'', to **property damage** to work performed by the **Named Insured** arising out of such work or any portion thereof, or out of such materials, parts or equipment furnished in connection therewith;

(r) to damages claimed for the withdrawal, inspection, repair, replacement or loss of use of the **Named Insured's products** or work completed by or for the **Named Insured** or of any property of which such products or work form a part, if such products, work or property are withdrawn from the market or from use because of any known or suspected defect or deficiency therein;

(s) to **bodily injury, property damage** or **personal injury** due to the rendering of or failure to render any professional service unless this policy is endorsed otherwise.

---

## ADDITIONAL COVERAGES

### COVERAGE E—PREMISES MEDICAL PAYMENT COVERAGE

The Company will pay to or for each person who sustains **bodily injury** caused by accident all reasonable **medical** expense incurred within one year from the date of the accident on account of such **bodily injury,** provided such **bodily injury** arises out of (a) a condition in the **insured premises** or (b) operations with respect to which the

MP 110-1    **Page 2 of 11**

Subject to Protective Order - Highly Confidential

The Travelers    SPECIAL COMPREHENSIVE GENERAL LIABILITY FORM
(Section II)    MP 110-1

**Named Insured** is afforded coverage for **bodily injury** liability under the policy.

**EXCLUSIONS**—This insurance does not apply:

(A) to **bodily injury**

(1) arising out of the ownership, maintenance, operation, use, loading or unloading of

(a) any **automobile** or aircraft owned or operated by or rented or loaned to any **Insured,** or

(b) any other **automobile** or aircraft operated by any person in the course of employment by any **Insured;**

but this exclusion does not apply to the parking of an **automobile** on the **insured premises**, if such **automobile** is not owned by or rented or loaned to any **Insured;**

(2) arising out of

(a) the ownership, maintenance, operation, use, loading or unloading of any **mobile equipment** while being used in any prearranged or organized racing, speed or demolition contest or in any stunting activity or in practice or preparation for any such contest or activity, or

(b) the operation or use of any snowmobile or trailer designed for use therewith;

(i) owned or operated by or rented or loaned to any **Insured,** or

(ii) operated by any person in the course of employment by any **Insured;**

(3) arising out of the ownership, maintenance, operation, use, loading or unloading of

(a) any watercraft owned or operated by or rented or loaned to any **Insured,** or

(b) any other watercraft operated by any person in the course of employment by any **Insured;**

but this exclusion does not apply to watercraft while ashore on the **insured premises;**

(4) arising out of and in the course of the transportation of **mobile equipment** by an **automobile** owned or operated by or rented or loaned to the **Named Insured;**

(B) to **bodily injury**

(1) included within the **completed operations hazard** or the **products hazard;**

(2) arising out of operations performed for the **Named Insured** by independent contractors other than

(a) maintenance and repair of the **Insured premises,** or

(b) structural alterations at such premises which do not involve changing the size of or moving buildings or other structures;

(3) resulting from the selling, serving or giving of any alcoholic beverage

(a) in violation of any statute, ordinance or regulation,

(b) to a minor,

(c) to a person under the influence of alcohol, or

(d) which causes or contributes to the intoxication of any person,

if the **Named Insured** is a person or organization engaged in the business of manufacturing, distributing, selling or serving alcoholic beverages, or if not so engaged, is an owner or lessor of premises used for such purposes, but only part (a) of this exclusion (B) (3) applies when the **Named Insured** is such an owner or lessor;

(4) due to war, whether or not declared, civil war, insurrection, rebellion or revolution, or to any act or condition incident to any of the foregoing;

(C) to **bodily injury** to

(1) the **Named Insured,** any partner thereof, any tenant or other person regularly residing on the **Insured premises** or any employee of any of the foregoing if the **bodily injury** arises out of and in the course of their employment therewith;

(2) any other tenant if the **bodily injury** occurs on that part of the **Insured premises** rented from the **Named Insured** or to any employee of such a tenant if the **bodily injury** occurs on the tenant's part of the **Insured premises** and arises out of and in the course of their employment for the tenant;

(3) any person while engaged in maintenance and repair of the **Insured premises** or alteration, demolition or new construction at such premises;

(4) any person if any benefits for such **bodily injury** are payable or required to be provided under any workers' compensation, unemployment compensation or disability benefits law, or under any similar law;

(5) any person practicing, instructing or participating in any physical training, sport, athletic activity or contest whether on a formal or informal basis;

(6) any member of the **Named Insured,** if the **Named Insured** is a club;

(7) any guest of the **Named Insured,** if the **Named Insured** is a hotel, motel or tourist court;

(D) to any **medical expense** for services by the **Named Insured,** any employee thereof or any person or organization under contract to the **Named Insured** to provide such services.

**COVERAGE P—INCIDENTAL MEDICAL MALPRACTICE LIABILITY, PERSONAL INJURY AND ADVERTISING INJURY LIABILITY**

**INCIDENTAL MEDICAL MALPRACTICE LIABILITY COVERAGE**

The definition of **bodily injury** is amended to include **Incidental Medical Malpractice Injury.**

MP 110-1    Page 3 of 11

Subject to Protective Order - Highly Confidential

The Travelers

**SPECIAL COMPREHENSIVE GENERAL LIABILITY FORM**
**(Section II)**

MP 110-1

**Incidental Medical Malpractice Injury** means injury arising out of the rendering of or failure to render, during the policy period, the following services:

(A) medical, surgical, dental, x-ray or nursing service or treatment or the furnishing of food or beverages in connection therewith; or

(B) the furnishing or dispensing of drugs or medical, dental or surgical supplies or appliances.

**EXCLUSIONS**—This insurance does not apply to:

(1) expenses incurred by the **Insured** for first aid to others at the time of an accident and the "Supplementary Payments" provision and the "Insured's Duties in the Event of Occurrence, Claim or Suit" Condition are amended accordingly; or

(2) any **Insured** engaged in the business or occupation of providing any of the services described under (A) and (B) above; or

(3) injury caused by any indemnitee if such indemnitee is engaged in the business or occupation of providing any of the services described under (A) and (B) above.

**PERSONAL INJURY AND ADVERTISING INJURY LIABILITY COVERAGE**

The Company will pay on behalf of the **Insured** all sums which the **Insured** shall become legally obligated to pay as damages because of **personal injury** or **advertising injury** to which this insurance applies, sustained by any person or organization and arising out of the conduct of the **Named Insured's** business, within the **policy territory,** and the Company shall have the right and duty to defend any suit against the **Insured** seeking damages on account of such injury, even if any of the allegations of the suit are groundless, false or fraudulent, and may make such investigation and settlement of any claim or suit as it deems expedient, but the Company shall not be obligated to pay any claim or judgment or to defend any suit after the applicable limit of the Company's liability has been exhausted by payment of judgments or settlements.

**EXCLUSIONS—This insurance does not apply:**

(1) to liability assumed by the **Insured** under any contract or agreement;

(2) to **personal injury** or **advertising injury** arising out of the willful violation of a penal statute or ordinance committed by or with the knowledge or consent of the **Insured;**

(3) to **personal injury** or **advertising injury** arising out of a publication or utterance of a libel or slander, or a publication or utterance in violation of an individual's right of privacy, if the first injurious publication or utterance of the same or similar material by or on behalf of the **Named Insured** was made prior to the effective date of this insurance;

(4) to **personal injury** or **advertising injury** arising out of libel or slander or the publication or utterance of defamatory or disparaging material concerning any person or organization or goods, products or services, or in violation of an individual's right of privacy, made by or at the direction of the **Insured** with knowledge of the falsity thereof;

(5) to **personal injury** or **advertising injury** arising out of the conduct of any partnership or joint venture of which the **Insured** is a partner or member and which is not designated in the declarations of the policy as a **Named Insured;**

(6) to **advertising injury** arising out of

(a) failure of performance of contract, but this exclusion does not apply to the unauthorized appropriation of ideas based upon alleged breach of implied contract, or

(b) infringement of trademark, service mark or trade name, other than titles or slogans, by use thereof on or in connection with goods, products or services sold, offered for sale or advertised, or

(c) incorrect description or mistake in advertised price of goods, products or services sold, offered for sale or advertised;

(7) with respect to **advertising injury**

(a) to any **Insured** in the business of advertising, broadcasting, publishing or telecasting, or

(b) to any injury arising out of any act committed by the **Insured** with actual malice.

**CONTRACTUAL LIABILITY COVERAGE**

The definition of **incidental contract** is extended to include any oral or written contract or agreement relating to the conduct of the **Named Insured's** business.

**EXCLUSIONS**—

(A) The insurance afforded with respect to liability assumed under an **incidental contract** is subject to the following exclusions:

(1) to **bodily injury** or **property damage** for which the **Insured** has assumed liability under any **incidental contract,** if such injury or damage occurred prior to the execution of the **incidental contract;**

(2) if the **Insured** is an architect, engineer or surveyor, to **bodily injury** or **property damage** arising out of the rendering of or the failure to render professional services by such **Insured,** including

(a) the preparation or approval of maps, drawings, opinions, reports, surveys, change orders, designs or specifications, and

(b) supervisory, inspection or engineering services;

(3) if the indemnitee of the **Insured** is an architect, engineer or surveyor, to the liability of the indemnitee, their agents or employees, arising out of

(a) the preparation or approval of or the failure to prepare or approve maps, drawings, opinions,

MP 110-1

Page 4 of 11

Subject to Protective Order - Highly Confidential

The Travelers

# SPECIAL COMPREHENSIVE GENERAL LIABILITY FORM
## (Section II)

MP 110-1

reports, surveys, change orders, designs or specifications, or

(b) the giving of or the failure to give directions or instructions by the indemnitee, their agents or employees, provided such giving or failure to give is the primary cause of the **bodily injury** or **property damage;**

(4) to any obligation for which the **Insured** may be held liable in an action on a contract by a third party beneficiary for **bodily injury** or **property damage** arising out of a project for a public authority; but this exclusion does not apply to an action by the public authority or any other person or organization engaged in the project;

(5) to **bodily injury** or **property damage** arising out of construction or demolition operations, within 50 feet of any railroad property, and affecting any railroad bridge or trestle, tracks, road beds, tunnel, underpass or crossing; but this exclusion does not apply to sidetrack agreements.

(B) All exclusions applicable to Coverages A **(Bodily Injury)** and B **(Property Damage)** apply to Contractual Liability Coverage except for the following: (b), (c)(2), (d) and (e).

### FIRE LEGAL LIABILITY COVERAGE—REAL PROPERTY

With respect to **property damage** to structures or portions thereof rented to or leased to the **Named Insured,** including fixtures permanently attached thereto, if such **property damage** arises out of fire;

(A) All of the exclusions of the policy, other than the Nuclear Energy Liability Exclusion (Broad Form), are deleted and replaced by the following:

This insurance does not apply to liability assumed by the **Insured** under any contract or agreement.

(B) The limit of **property damage** liability as respects this Fire Legal Liability Coverage—Real Property is $50,000 each **occurrence** unless otherwise stated in the declarations.

### HOST LIQUOR LAW LIABILITY COVERAGE

Exclusion (h) does not apply with respect to liability of the **Insured** or an indemnitee of the **Insured** arising out of the giving or serving of alcoholic beverages at functions incidental to the **Named Insured's** business, provided the **Named Insured** is not engaged in the business of manufacturing, distributing, selling or serving of alcoholic beverages.

### NON-OWNED AUTOMOBILE COVERAGE

Such insurance as is afforded by **Bodily Injury** and **Property Damage** Coverage also applies to the use in the **Named Insured's** business of a non-owned **private passenger automobile** by any person other than the **Named Insured** or a non-owned commercial automobile used occasionally or infrequently by an employee of the **Named Insured.** The exclusion pertaining to automobiles in such form is amended accordingly.

This insurance does not apply to the owner of a **non-owned automobile** or any agent or employee of such owner and shall be excess over any other valid and collectible insurance available to the **Named Insured.**

---

## PERSONS INSURED

Each of the following is an **Insured** under this insurance to the extent set forth below:

(a) if the **Named Insured** is designated in the declarations as an individual, the person so designated but only with respect to the conduct of a business of which the **Named Insured** is the sole proprietor, and the spouse of the **Named Insured** with respect to the conduct of such a business;

(b) if the **Named Insured** is designated in the declarations as a partnership or joint venture, the partnership or joint venture so designated and any partner or member thereof but only with respect to their liability as such;

(c) if the **Named Insured** is designated in the declarations as other than an individual, partnership or joint venture, the organization so designated and any executive officer, director or stockholder thereof while acting within the scope of their duties as such;

(d) any person (other than an employee of the **Named Insured**) or organization while acting as real estate manager for the **Named Insured;** and

(e) with respect to the operation, for the purpose of locomotion upon a public highway, of **mobile equipment** registered under any motor vehicle registration law,

   (i) an employee of the **Named Insured** while operating any such equipment in the course of employment, and

   (ii) any other person while operating with the permission of the **Named Insured** any such equipment registered in the name of the **Named Insured** and any person or organization legally responsible for such operation, but only if there is no other valid and collectible insurance available, either on a primary or excess basis, to such person or organization;

provided that no person or organization shall be an **Insured** under this paragraph (e) with respect to:

(1) **bodily injury** to any fellow employee of such person injured in the course of employment, or

(2) **property damage** to property owned by, rented to, in charge of or occupied by the **Named In-**

Subject to Protective Order - Highly Confidential

BSAPolicyEv-00024121
TrustApp0963

The Travelers       **SPECIAL COMPREHENSIVE GENERAL LIABILITY FORM**      MP 110-1
(Section II)

sured or the employer of any person described in subparagraph (ii).

(f) As respects **bodily injury, property damage** and **advertising injury** and **personal injury** coverages, the following are added as **Insureds:**

(1) Spouse-Partnership—if the **Named Insured** is a partnership, the spouse of a partner but only with respect to the conduct of the business of the **Named Insured;**

(2) Employee—any employee (other than executive officers) of the **Named Insured** while acting within the scope of their duties as such, but the insurance afforded to such employee does not apply:

(a) to **bodily injury** or **personal injury** to another employee of the **Named Insured** arising out of or in the course of employment;

(b) to **personal injury** or **advertising injury** to the **Named Insured** or, if the **Named Insured**

is a partnership or joint venture, any partner or member thereof, or the spouse of any of the foregoing;

(c) to **property damage** to property owned, occupied or used by, rented to, in the care, custody or control of or over which physical control is being exercised for any purpose by another employee of the **Named Insured,** or by the **Named Insured** or, if the **Named Insured** is a partnership or joint venture, by any partner or member thereof, or by the spouse of any of the foregoing.

This insurance does not apply to **bodily injury** or **property damage** arising out of the conduct of any partnership or joint venture of which the **Insured** is a partner or member and which is not designated in this policy as a **Named Insured.**

---

## LIMITS OF LIABILITY

### COVERAGE A AND COVERAGE B

Regardless of the number of (1) **Insureds** under this policy, (2) persons or organizations who sustain **bodily injury** or **property damage,** or (3) claims made or suits brought on account of **bodily injury** or **property damage,** the Company's liability is limited as follows:

A. **Occurrence Limits**—Combined Coverage A and Coverage B—The limit of liability stated in the declarations as applicable to "each **occurrence**" is the total limit of the Company's liability for all damages because of **bodily injury** and **property damage** sustained by one or more persons or organizations as the result of any one **occurrence.**

For the purpose of determining the limit of the Company's liability, all **bodily injury** and **property damage** arising out of continuous or repeated exposure to substantially the same general conditions shall be considered as arising out of one **occurrence.**

B. **Aggregate Limits.** If there is an aggregate limit stated in the Liability Coverage Declarations, then, under

1. **Coverage A**—Subject to provision A. respecting "each **occurrence**", the total liability of the Company for all damages because of (a) all **bodily injury** included within the **completed operations hazard** and (b) all **bodily injury** included within the **products hazard** shall not exceed the limit of **bodily injury** liability stated in the declarations as "aggregate".

2. **Coverage B**—Subject to provision A. respecting "each **occurrence**", the total liability of the Company for all damages because of all **property damage** to which this coverage applies and described in any of the subparagraphs below shall

not exceed the limit of **property damage** liability stated in the declarations as "aggregate":

(a) all **property damage** arising out of premises or operations rated on a remuneration basis or contractor's equipment rated on a receipts basis, including **property damage** for which liability is assumed under any **incidental contract** relating to such premises or operations, but excluding **property damage** included in subparagraph (b) below;

(b) all **property damage** arising out of and occurring in the course of operations performed for the **Named Insured** by independent contractors and general supervision thereof by the **Named Insured,** including any such **property damage** for which liability is assumed under any **incidental contract** relating to such operations, but this subparagraph (b) does not include **property damage** arising out of maintenance or repairs at premises owned by or rented to the **Named Insured** or structural alterations at such premises which do not involve changing the size of or moving buildings or other structures;

(c) all **property damage** included within the **products hazard** and all **property damage** included within the **completed operations hazard;**

(d) all **property damage** liability assumed under an **incidental contract.**

Such aggregate limit shall apply separately to the **property damage** described in subparagraphs (a), (b), (c) and (d) above, and under subparagraphs (a), (b), (c) and (d), separately with respect to

MP 110-1                                                       Page 6 of 11

Subject to Protective Order - Highly Confidential

The Travelers     SPECIAL COMPREHENSIVE GENERAL LIABILITY FORM     MP 110-1
(Section II)

each project away from premises owned by or rented to the **Named Insured.**

**COVERAGE E**
The limit of liability for Premises Medical Payments Coverage is $1,000 each person unless otherwise stated in the declarations. The limit of liability applicable to "each person" is the limit of the Company's liability for all **medical expense** for **bodily injury** to any one person as the result of any one accident; but subject to the above provision respecting "each person", the total liability of the Company under Premises Medical Payments Coverage for all **medical expense** for **bodily injury** to two or more persons as the result of any one accident shall not exceed the limit of **bodily injury** liability stated in the declarations as applicable to "each **occurrence**", or the combined single limit of liability stated in the declarations as applicable to "each **occurrence**".

When more than one medical payments coverage afforded by the policy applies to the loss, the Company shall not be liable for more than the amount of the highest applicable limit of liability.

**COVERAGE P**
Regardless of the number of (1) **Insureds** hereunder, (2) persons or organizations who sustain injury or damage, or (3) claims made or suits brought on account of **personal injury** or **advertising injury** the total limit of the Company's liability under this coverage for all damages shall not exceed the limit of liability stated in the declarations as "aggregate".

## POLICY TERRITORY

This insurance applies only to **bodily injury** or **property damage** which occurs within:

(1) the United States of America, its territories or possessions, or Canada, or

(2) international waters or air space, provided the **bodily injury** or **property damage** does not occur in the course of travel or transportation to or from any other country, state or nation, or

(3) anywhere in the world with respect to damages because of **bodily injury** or **property damage** arising out of a product manufactured or sold in the territory described in paragraph (1) above, provided the original suit for such damages is brought within such territory;

(4) anywhere in the world with respect to **bodily injury, property damage, personal injury** or **advertising injury** arising out of the activities of any **Insured** permanently domiciled in the United States of America though temporarily outside the United States of America, its territories and possessions or Canada, provided the original suit for damages because of any such injury or damage is brought within the United States of America, its territories or possessions or Canada.

Such insurance as is afforded by paragraph (4) above shall not apply:

(a) to **bodily injury** or **property damage** included within the **completed operations hazard** or the **products hazard;**

(b) to Premises Medical Payments Coverage.

## PROVISIONS

A. **ACTION AGAINST THE COMPANY**—No action shall lie against the Company unless, as a condition precedent thereto, there shall have been full compliance with all of the provisions of this Section nor until the amount of the **Insured's** obligation to pay shall have been finally determined either by judgment against the **Insured** after actual trial or by written agreement of the **Insured,** the claimant and the Company.

Any person or organization or the legal representative of either who has secured such judgment or written agreement shall thereafter be entitled to recover under this Section to the extent of the insurance afforded by this Section. No person or organization shall have any right to join the Company as a party to any action against the **Insured** to determine the **Insured's** liability, nor shall the Company be impleaded by the **Insured** or the **Insured's** legal representative. Bankruptcy or insolvency of the **Insured** or of the **Insured's** estate shall not relieve the Company of any of its obligations.

B. **ANNUAL AGGREGATE**—If this policy is issued for a period in excess of one year, any limit of the Company's liability stated in the declarations as "aggregate" shall apply separately to each consecutive annual period or part thereof.

C. **ARBITRATION**—The Company shall be entitled to exercise all of the **Insured's** rights in the choice of arbitrators and in the conduct of any arbitration proceeding.

D. **DECLARATIONS**—By acceptance of the insurance afforded by Section II, the **Named Insured** agrees that statements in the declarations are the **Named Insured's** agreements and representations, that such insurance is issued in reliance upon the truth of such

MP 110-1                                                                 **Page 7 of 11**

The Travelers

**SPECIAL COMPREHENSIVE GENERAL LIABILITY FORM**
**(Section II)**

MP 110-1

representations and that such insurance embodies all agreements existing between the **Named Insured** and the Company or any of its agents relating to this insurance.

E. FINANCIAL RESPONSIBILITY LAWS—When insurance under Section II is certified as proof of financial responsibility for the future under the provisions of any motor vehicle financial responsibility law, such insurance as is afforded for **bodily injury** liability or for **property damage** liability shall comply with the provisions of such law to the extent of the coverage and limits of liability required by such law. The **Named Insured** agrees to reimburse the Company for any payment made by the Company which it would not have been obligated to make under such insurance except for the agreement contained in this provision.

F. INSURED'S DUTIES IN THE EVENT OF OCCURRENCE, CLAIM OR SUIT

1. In the event of an **occurrence,** written notice containing particulars sufficient to identify the **Insured** and also reasonably obtainable information with respect to the time, place and circumstances of the **occurrence,** and the names and addresses of the injured and of available witnesses, shall be given by or for the **Insured** to the Company or any of its authorized agents as soon as practicable.

2. If claim is made or suit is brought against the **Insured,** the **Insured** shall immediately forward to the Company every demand, notice, summons or other process received by the **Insured** or the **Insured's** representative.

3. The **Insured** shall cooperate with the Company and, upon the Company's request, assist in making settlements, in the conduct of suits and in enforcing any right of contribution or indemnity against any person or organization who may be liable to the **Insured** because of injury or damage with respect to which insurance is afforded under this Section; and the **Insured** shall attend hearings and trials and assist in securing and giving evidence and obtaining the attendance of witnesses. The **Insured** shall not, except at the **Insured's** own cost, voluntarily make any payment, assume any obligation or incur any expense other than for first aid to others at the time of accident.

G. LIMITS OF LIABILITY—TWO OR MORE POLICIES— In the event of an injury, damage or loss covered by this policy and any other policy containing this provision or a similar provision issued by the Company to the **Named Insured,** the maximum that will be paid under all such policies combined for such injury, damage or loss is the highest applicable limit of liability of any one of such policies. This provision does not apply with respect to any policy issued by the Company which has a policy number containing the letters CUP, EX or XS.

H. MEDICAL REPORTS; PROOF AND PAYMENT OF CLAIM—As soon as practicable the injured person or

someone on their behalf shall give to the Company written proof of claim, under oath if required, and shall, after each request from the Company, execute authorization to enable the Company to obtain medical reports and copies of records. The injured person shall submit to physical examination by physicians selected by the Company when and as often as the Company may reasonably require. The Company may pay the injured person or any person or organization rendering the services and the payment shall reduce the amount payable hereunder for such injury. Payment hereunder shall not constitute an admission of liability of any person or, except hereunder, of the Company.

I. OTHER INSURANCE—The insurance afforded by this Section is primary insurance, except when stated to apply in excess of or contingent upon the absence of other insurance. When this insurance is primary and the **Insured** has other insurance which is stated to be applicable to the loss on an excess or contingent basis, the amount of the Company's liability under this Section shall not be reduced by the existence of such other insurance.

When both this insurance and other insurance apply to the loss on the same basis, whether primary, excess or contingent, the Company shall not be liable under this Section for a greater proportion of the loss than that stated in the applicable contribution provision below:

1. **Contribution by Equal Shares**—If all of such other valid and collectible insurance provides for contribution by equal shares, the Company shall not be liable for a greater proportion of such loss than would be payable if each insurer contributes an equal share until the share of each insurer equals the lowest applicable limit of liability under any one policy or the full amount of the loss is paid, and with respect to any amount of loss not so paid the remaining insurers shall then continue to contribute equal shares of the remaining amount of the loss until each such insurer has paid its limit in full or the full amount of the loss is paid.

2. **Contribution by Limits**—If any of such other insurance does not provide for contribution by equal shares, the Company shall not be liable for a greater proportion of such loss than the applicable limit of liability under this section for such loss bears to the total applicable limit of liability of all valid and collectible insurance against such loss.

3. **EXCEPTIONS**—(a) This insurance shall be excess insurance over any valid and collectible property insurance (including any deductible portion thereof) available to the **Insured,** such as, but not limited to, Fire, Extended Coverage, Builder's Risk Coverage or Installation Risk Coverage. (b) As respects to non-owned watercraft under 26 feet in length, there shall be no contribution or participation by the Company on the basis of excess, contributing, deficiency, concurrent, or double insurance or otherwise, where the **Insured** has other insurance which would respond in the absence of this insurance.

MP 110-1

**Page 8 of 11**

BSAPolicyEv-00024124
TrustApp0966

**The Travelers**    SPECIAL COMPREHENSIVE GENERAL LIABILITY FORM    MP 110-1
(Section II)

J. **PREMIUM**—Premium designated in this Section as "advance premium" is a deposit premium only which shall be credited to the amount of the earned premium due at the end of the policy period. At the close of each period (or part thereof terminating with the end of the policy period) designated in the declarations as the audit period the earned premium shall be computed for such period and, upon notice thereof to the **Named Insured**, shall become due and payable. If the total earned premium for the policy period is less than the premium previously paid, the Company shall return to the **Named Insured** the unearned portion paid by the **Named Insured.**

K. **SUPPLEMENTARY PAYMENTS**

The Company will pay, in addition to the applicable limit of liability:

(1) all expenses incurred by the Company, all costs taxed against the **Insured** in any suit defended by the Company and all interest on the entire amount of any judgment therein which accrues after entry of the judgment and before the Company has paid or tendered or deposited in court that part of the judgment which does not exceed the limit of the Company's liability thereon;

(2) premiums on appeal bonds required in any such suit, premiums on bonds to release attachments in any such suit for an amount not in excess of the applicable limit of liability of this Section, and the cost of bail bonds required of the **Insured** because of accident or traffic law violation arising out of the use of any vehicle to which this Section applies, not to exceed $250 per bail bond, but the Company shall have no obligation to apply for or furnish any such bonds;

(3) expenses incurred by the **Insured** for first aid to others at the time of an accident for **bodily injury** to which this Section applies;

(4) reasonable expenses incurred by the **Insured** at the Company's request in assisting the Company in the investigation or defense of any claim or suit, including actual loss of earnings not to exceed $25 per day.

**NUCLEAR ENERGY LIABILITY EXCLUSION (BROAD FORM)**

I. This Section does not apply:

A. Under any Liability Coverage, to **bodily injury** or **property damage** .

(1) with respect to which an **Insured** under this Section is also an **Insured** under a nuclear energy liability policy issued by the Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters or Nuclear Insurance Association of Canada, or would be an **Insured** under any such policy but for its termination upon exhaustion of its limit of liability; or

(2) resulting from the hazardous properties of nuclear material and with respect to which (a) any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof, or (b) the **Insured** is, or had this policy not been issued would be, entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization.

B. Under any Medical Payments Coverage, or under any Supplementary Payments provision relating to first aid, to expenses incurred with respect to **bodily injury** resulting from the **hazardous properties of nuclear material** and arising out of the operation of a **nuclear facility** by any person or organization.

C. Under any Liability Coverage, to **bodily injury** or **property damage** resulting from the **hazardous properties of nuclear material,** if

(1) the **nuclear material** (a) is at any **nuclear facility** owned by, or operated by or on behalf of, an **Insured** or (b) has been discharged or dispersed therefrom;

(2) the **nuclear material** is contained in **spent fuel** or **waste** at any time possessed, handled, used, processed, stored, transported or disposed of by or on behalf of an **Insured;** or

(3) the **bodily injury** or **property damage** arises out of the furnishing by an **Insured** of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any **nuclear facility,** but if such facility is located within the United States of America, its territories or possessions or Canada, this exclusion (3) applies only to **property damage** to such **nuclear facility** and any property thereat.

II. As used in this exclusion:

"**Hazardous properties**" include radioactive, toxic or explosive properties;

"**Nuclear material**" means **source material, special nuclear material** or **byproduct material;**

"**Source material**", "**special nuclear material**", and "**byproduct material**" have the meanings given them in the Atomic Energy Act of 1954 or in any law amendatory thereof;

"**Spent fuel**" means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a **nuclear reactor;**

"**Waste**" means any waste material (1) containing **byproduct material** and (2) resulting from the operation by any person or organization of any **nuclear facility** included within the definition of **nuclear facility** under paragraph (a) or (b) thereof;

MP 110-1

Page 9 of 11

Subject to Protective Order - Highly Confidential

The Travelers    **SPECIAL COMPREHENSIVE GENERAL LIABILITY FORM**
(Section II)    MP 110-1

"Nuclear facility" means

(a) any **nuclear reactor,**

(b) any equipment or device designed or used for (1) separating the isotopes of uranium or plutonium, (2) processing or utilizing **spent fuel,** or (3) handling, processing or packaging **waste,**

(c) any equipment or device used for the processing, fabricating or alloying of **special nuclear material** if at any time the total amount of such material in the custody of the **Insured** at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235,

(d) any structure, basin, excavation, premises or place prepared or used for the storage or disposal of **waste,**

and includes the site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operations;

"Nuclear reactor" means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material;

"Property damage" includes all forms of radioactive contamination of property.

**III.** This exclusion modifies the provisions of the policy relating to all General Liability and Medical Payments Insurance other than Comprehensive Personal and Farmer's Comprehensive Personal Insurance.

## DEFINITIONS

When used in this Section (including endorsements forming a part hereof):

"Advertising Injury" means injury arising out of an offense committed during the policy period occurring in the course of the **Named Insured's** advertising activities, if such injury arises out of libel, slander, defamation, violation of right of privacy, unfair competition, or infringement of copyright, title or slogan;

"Automobile" means a land motor vehicle, trailer or semitrailer designed for travel on public roads (including any machinery or apparatus attached thereto), but does not include **mobile equipment;**

"Bodily injury" means bodily injury, sickness or disease sustained by any person which occurs during the policy period, including death at any time resulting therefrom;

"Completed operations hazard" includes **bodily injury** and **property damage** arising out of operations or reliance upon a representation or warranty made at any time with respect thereto, but only if the **bodily injury** or **property damage** occurs after such operations have been completed or abandoned and occurs away from premises owned by or rented to the **Named Insured.** "Operations" include materials, parts or equipment furnished in connection therewith. Operations shall be deemed completed at the earliest of the following times:

(1) when all operations to be performed by or on behalf of the **Named Insured** under the contract have been completed,

(2) when all operations to be performed by or on behalf of the **Named Insured** at the site of the operations have been completed, or

(3) when the portion of the work out of which the injury or damage arises has been put to its intended use by any person or organization other than another con-

tractor or subcontractor engaged in performing operations for a principal as a part of the same project.

Operations which may require further service or maintenance work, or correction, repair or replacement because of any defect or deficiency, but which are otherwise complete, shall be deemed completed.

The **completed operations hazard** does not include **bodily injury** or **property damage** arising out of

(a) operations in connection with the transportation of property, unless the **bodily injury** or **property damage** arises out of a condition in or on a vehicle created by the loading or unloading thereof,

(b) the existence of tools, uninstalled equipment or abandoned or unused materials, or

(c) operations for which the classification stated in the policy or in the Company's manual specifies "including completed operations";

"Elevator" means any hoisting or lowering device to connect floors or landings, whether or not in service, and all appliances thereof including any car, platform, shaft, hoistway, stairway, runway, power equipment and machinery; but does not include an **automobile** servicing hoist, or a hoist without a platform outside a building if without mechanical power or if not attached to building walls, or a hod or material hoist used in alteration, construction or demolition operations, or an inclined conveyor used exclusively for carrying property or a dumbwaiter used exclusively for carrying property and having a compartment height not exceeding four feet;

"Hired automobile" means an **automobile** not owned by the **Named Insured** which is used under contract in behalf of, or loaned to, the **Named Insured,** provided such **automobile** is not owned by or registered in the name of (a) a partner or executive officer of the **Named Insured** or (b) an employee or agent of the **Named In-**

MP 110-1    Page 10 of 11

The Travelers    SPECIAL COMPREHENSIVE GENERAL LIABILITY FORM    MP 110-1
(Section II)

sured who is granted an operating allowance of any sort for the use of such **automobile.**

**"incidental contract"** means any written (1) lease of premises, (2) easement agreement, except in connection with construction or demolition operations on or adjacent to a railroad, (3) undertaking to indemnify a municipality required by municipal ordinance, except in connection with work for the municipality, (4) sidetrack agreement, or (5) **elevator** maintenance agreement;

**"Insured"** means any person or organization qualifying as an **Insured** in the "Persons Insured" provision of the applicable insurance coverage. The insurance afforded applies separately to each **Insured** against whom claim is made or suit is brought, except with respect to the limits of the Company's liability;

The word **Insured** shall include as **Named Insured** any organization which is acquired or formed by the **Named Insured** and over which the **Named Insured** maintains ownership or majority interest, other than a joint venture, provided this insurance does not apply to **bodily injury, property damage, personal injury** and **advertising injury** with respect to which such new organization under this policy is also an **Insured** under any other similar liability or indemnity policy or would be an **Insured** under any such policy but for exhaustion of its limits of liability. The insurance afforded hereby shall terminate 90 days from the date any such organization is acquired or formed by the **Named Insured;**

**"Insured premises"** means all premises owned by or rented to the **Named Insured** with respect to which the **Named Insured** is afforded coverage for **bodily injury** liability under this policy, and includes the ways immediately adjoining on land;

**"Loading or unloading",** with respect to an **automobile,** means the handling of property after it is moved from the place where it is accepted for movement into or onto an **automobile** or while it is in or on an **automobile** or while it is being moved from an **automobile** to the place where it is finally delivered, but "loading or unloading" does not include the movement of property by means of a mechanical device (other than a hand truck) not attached to the **automobile;**

**"Medical expense"** means expenses for necessary medical, surgical, x-ray and dental services, including prosthetic devices, and necessary ambulance, hospital, professional nursing and funeral services;

**"Mobile equipment"** means a land vehicle (including any machinery or apparatus attached thereto), whether or not self-propelled, (1) not subject to motor vehicle registration, or (2) maintained for use exclusively on premises owned by or rented to the **Named Insured,** including the ways immediately adjoining, or (3) designed for use principally off public roads, or (4) designed or maintained for the sole purpose of affording mobility to equipment of the following types forming an integral part of or permanently attached to such vehicle: power cranes, shovels, loaders, diggers and drills; concrete mixers (other than the mix-in-transit type); graders, scrapers, rollers and other road

construction or repair equipment; air-compressors, pumps and generators, including spraying, welding and building cleaning equipment; and geophysical exploration and well servicing equipment;

**"Named Insured"** means the person or organization named in the declarations of this policy;

**"Named Insured's products"** means goods or products manufactured, sold, handled or distributed by the **Named Insured** or by others trading under the **Named Insured's** name, including any container thereof (other than a vehicle), but **"Named Insured's products"** shall not include a vending machine or any property other than such container, rented to or located for use of others but not sold;

**"Non-Owned Automobile"** means an **automobile** which is neither owned nor **hired** by the **Named Insured;**

**"Occurrence"** means an accident, including continuous or repeated exposure to conditions, which results in **bodily injury or property damage** neither expected nor intended from the standpoint of the **Insured;**
The definition of **occurrence** includes any intentional act by or at the direction of the **Insured** which results in **bodily injury,** if such injury arises solely from the use of reasonable force for the purpose of protecting persons or property;

**"Personal Injury"** means injury arising out of one or more of the following offenses committed during the policy period:

(1) false arrest, detention, imprisonment or malicious prosecution;

(2) wrongful entry or eviction or other invasion of the right of private occupancy;

(3) a publication or utterance

    (a) of a libel or slander or other defamatory or disparaging material, or

    (b) in violation of an individual's right of privacy;

except publications or utterances in the course of or related to advertising, broadcasting, publishing or telecasting activities conducted by or on behalf of the **Named Insured** shall not be deemed **personal injury;**

**"Private Passenger Automobile"** means a four wheel private passenger or station wagon type **automobile;**

**"Products hazard"** includes **bodily injury** and **property damage** arising out of the **Named Insured's products** or reliance upon a representation or warranty made at any time with respect thereto, but only if the **bodily injury** or **property damage** occurs away from premises owned by or rented to the **Named Insured** and after physical possession of such products has been relinquished to others;

**"Property damage"** means (1) physical injury to or destruction of tangible property which occurs during the policy period, including the loss of use thereof at any time resulting therefrom, or (2) loss of use of tangible property which has not been physically injured or destroyed provided such loss of use is caused by an **occurrence** during the policy period.

MP 110-1    Page 11 of 11

Subject to Protective Order - Highly Confidential

BSAPolicyEv-00024128
TrustApp0970

This endorsement modifies such insurance as is afforded by the provisions of the policy relating to:

**COMPREHENSIVE GENERAL LIABILITY INSURANCE**
**COMPLETED OPERATIONS AND PRODUCTS LIABILITY INSURANCE**
**CONTRACTUAL LIABILITY INSURANCE**
**FARM-RANCH COMPREHENSIVE PERSONAL LIABILITY FORM**
**MANUFACTURER'S AND CONTRACTORS' LIABILITY INSURANCE**
**OWNER'S AND CONTRACTORS' PROTECTIVE LIABILITY INSURANCE**
**OWNER'S, LANDLORDS' AND TENANTS' LIABILITY INSURANCE**
**SPECIAL GENERAL LIABILITY FORM**
**THE CATASTROPHE UMBRELLA POLICY**
**THE ENDEAVOR XS POLICY**

### Total Exclusion—Wastes and Pollutants

It is agreed that the exclusion relating to the emission, discharge, seepage, release or escape of any liquid, solid, gaseous or thermal waste or pollutant is replaced by the following:

(1) to **bodily injury** or **property damage** arising out of the actual, alleged or threatened discharge, dispersal, release or escape of **pollutants**:

    (a) at or from premises the **named insured** owns, rents or occupies,

    (b) at or from any site or location used by or for the **named insured** or others for the handling, storage, disposal, processing or treatment of waste,

    (c) which are at any time transported, handled, stored, treated, disposed of, or processed as waste by or for the **named insured** or any person or organization for whom the **named insured** may be legally responsible, or

    (d) at or from any site or location on which the **named insured** or any contractors or subcontractors working directly or indirectly on the **named insured's** behalf are performing operations:

        (i) if the pollutants are brought on or to the site or location in connection with such operations, or

        (ii) if the operations are to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize the pollutants;

(2) to any loss, cost or expense arising out of any governmental direction or request that the **named insured** test for, monitor, clean up, remove, contain, treat, detoxify or neutralize pollutants:

**Pollutants** means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

Subparagraphs (a) and (d) (i) of paragraph (1) of this exclusion do not apply to **bodily injury** or **property damage** caused by heat, smoke or fumes from a hostile fire. As used in this exclusion, a hostile fire means one which becomes uncontrollable or breaks out from where it was intended to be.

CP-3864   New 7-86   Printed in U.S.A.

35962

Subject to Protective Order - Highly Confidential

BSAPolicyEv-00024130
TrustApp0972

| Defendant | Key Known Contacts with Texas | | | | |
|---|---|---|---|---|---|
| | Registered Texas Insurer, per NAIC | Location(s) and/or Agent(s) in Texas[i] | Website Targets and/or Highlights Texans[ii] | Invoked &/or Consented to Jurisdiction in Other Texas Case(s)[iii] | Entered into Consent Order(s) with Texas Dep't of Insurance[iv] |
| American Home Assurance Co. | X | | | X | X |
| American Casualty Company of Reading, PA. | X | | | X | X |
| Arrowood Indemnity Co. | X | | | X | X |
| Aviva plc | | | | | |
| Charter Oak Fire Ins. Co. | X | | | X | X |
| Cincinnati Ins. Co. | X | | | X | X |
| Continental Insurance Company | X | X | | X | X |
| Continental Casualty Company | X | X | | X | X |
| Erie & Niagara Ins. Ass'n | | | | | |
| Erie Family Life | | | | | |
| Erie Ins. Exchange | | | | | |
| Jefferson Ins. Co. | X | | | | X |
| Nationwide Mutual Ins. Co. | X | X | X | X | X |
| National Casualty Co. | X | | | X | X |
| National Fire Insurance Company of Hartford | X | | | X | X |

| | | | | |
|---|---|---|---|---|
| National Union Fire Ins. Co. of Pittsburgh, Pa. | X | | | X | X |
| New Hampshire Ins. Co. | X | | | X | X |
| The Phoenix Ins. Co. | X | | | X | X |
| Scottsdale Ins. Co. | X | | | X | |
| Security Mutual Insurance Company | | | | | |
| SPARTA Ins. Co. | X | | | X | |
| St. Paul Fire & Marine Ins. Co. | X | | | X | |
| St. Paul Mercury Ins. Co. | X | | | X | |
| Travelers Casualty & Surety Co. | X | | | X | X |
| The Travelers Companies, Inc. | | | | X | |
| The Travelers Indemnity Co. | X | | X | X | X |
| United States Fidelity and Guaranty Company | X | | | X | |
| Wausau General Ins. Co. | X | | | | |

---

[i] The following websites were last accessed by Plaintiff on October 22, 2025: https://agents.allstate.com/usa/tx; https://agency.nationwide.com/tx.

[ii] The following websites were last accessed by Plaintiff on October 22, 2025: https://www.allstate.com/auto-insurance/texas-car-insurance-coverages; https://www.nationwide.com/personal/insurance/auto/state/texas/; https://www.travelers.com/car-insurance/state-coverages/texas; *See* https://www.cna.com/about/locations/us (listing Texas locations for CNA, the parent of Continental Insurance Company and Continental Casualty Company).

[iii] A quick search for cases in PACER and opinions in Westlaw revealed the following cases. This list does not include cases filed in Texas state court that did not include an appellate court decision, as those are not available on Westlaw (nor, to the undersigned's knowledge, in any other centralized database), and in the interests of brevity, it only includes one example for each defendant, rather than all of the dozens and dozens of cases found: *Allstate Ins. Co. v. Weishiemer*, No. H-20-3116 (S.D. Tex.); *Am. Home Assur. Co. v. Medina*, No. 1:21-CV-001236-LY-SH (W.D. Tex.); *American Cas. Co. of Reading, PA v. Jones*, No. 3:09-cv-00337 (W.D. Tex. Sept. 14, 2009); *Arrowood Indemn. Co. v. Gulf Underwriters Ins. Co.*, Nos. EP-04-CV-432 & EP-08-CV-285-DB (W.D. Tex.); *Charter Oak*

*Fire Ins. Co. v. Shamrock Steel Sales, Inc.*; *Cincinnati Ins. Co. v. RBP Chem. Tech., Inc.*, No. 1:07-CV-699 (E.D. Tex.); *Valley Forge Ins. Co. v. DA Def. Logistics HQ, LLC*, No. 3:24-cv-00078 (W.D. Tex. Mar. 6, 2024); *Continental Cas. Co. v. Pierce R&B LLC*, No. 6:24-cv-00412 (E.D. Tex. Oct. 30, 2024); *Nationwide Mut. Ins. Co. v. Choi*, No. 4:22-cv-01231 (S.D. Tex.); *Nat'l Cas. Co. v. KT2 LLC*, No. 3:19-CV-1926-E (N.D. Tex.); *Valley Forge Ins. Co. v. DA Def. Logistics HQ, LLC*, No. 3:24-cv-00078 (W.D. Tex. Mar. 6, 2024); *Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Bacarella Transp. Servs., Inc.*, No. 3:19-CV-01364-X (N.D. Tex.); *N.H. Ins. Co. v. Dominguez*, No. 1:12-CV-107 (S.D. Tex.); *Phoenix Ins. Co. v. Kennedy et al.*, 4:24-cv-00550 (S.D. Tex. 2024); *Scottsdale Ins. Co. v. Discovering Me Academy, LLC*, No. 4:20-CV-2449 (S.D. Tex.); *Sparta Ins. Co. v. Copper Solutions and Services, LLC*, 5:14-CV-00067-C (N.D.. Tex. 2014); *St. Paul Fire & Marine Ins. Co. v. Flexrod Sales & Servs., Inc.*, No. MO-16-CV-00085-DCG (W.D. Tex.); *St. Paul Mercury Ins. Co. v. Lewis-Quinn Constr.*, No. H-10-5146 (S.D. Tex.); *Travelers Cas. & Sur. Co. of Am. v. Padron*, No. 5:15-CV-200-DAE (W.D. Tex.); *Unlimited Servs., LLC v. Anadarko Petroleum Corp.*, No. 4:19-CV-4414 (S.D. Tex.) (third-party defendant Travelers Companies); *Travelers Prop. Cas. Co. of Am. v. Craigen Marine Contractors, LLC*, 1:21-CV-62-DAE (W.D. Tex.) (Travelers Indem. Co. also a plaintiff); *United States Fid. And Guar. Co. v. Clayton Homes Inc.*, No. 4:05-cv-01811 (S.D. Tex. May 20, 2005).

[iv] In the interests of brevity, this list only includes one example from each defendant, though many have entered into multiple Texas consent orders: No. 2022-7662, available at https://www.tdi.texas.gov/wc/orders/documents/dwc227662.pdf (Nat'l Union Fire Ins. Co. of Pittsburgh, PA); No. 2024-8922, available at https://www.tdi.texas.gov/wc/orders/documents/dwc248922.pdf (American Casualty Co. of Reading, PA); No. 2022-7394, available at https://www.tdi.texas.gov/wc/orders/documents/dwc227394.pdf (N.H. Ins. Co.); No. 2023-7926, available at https://www.tdi.texas.gov/wc/orders/documents/dwc237926.pdf (The Phoenix Ins. Co.); No. 2023-7753, available at https://www.tdi.texas.gov/wc/orders/documents/dwc237753.pdf (Travelers Cas. & Sur. Co.); No. 2022-7208, available at https://www.tdi.texas.gov/wc/orders/documents/dwc227208.pdf (Arrowood Ins. Co.); No. 2023-8059, available at https://www.tdi.texas.gov/wc/orders/documents/dwc238059.pdf (Charter Oak Fire Ins. Co.); No. 2018-5698, available at Texas Dep't of Ins., Disciplinary Order No. 20185698 (Nov. 5, 2018), archived (Mar. 9, 2023) at https://web.archive.org/web/20230309043846/https://www.tdi.texas.gov/commissioner/disciplinary-orders/documents/20185698.pdf (last visited Oct. 22, 2025) (Cincinnati Ins. Co.); No. 2023-8104, available at, https://www.tdi.texas.gov/wc/orders/documents/dwc238104.pdf (Continental Ins. Co.); No. 2025-9443, available at https://www.tdi.texas.gov/wc/orders/documents/dwc259443.pdf (Continental Casualty Co.); No. 2018-5408, available at Texas Dep't of Ins., Disciplinary Order No. 20185408 (Feb. 22, 2018), archived (Oct. 11, 2023) at https://web.archive.org/web/20231011072534/https://tdi.texas.gov/commissioner/disciplinary-orders/documents/20185408.pdf (last visited Oct. 22, 2025) (Jefferson Ins. Co.); No. 2023-8166, available at https://www.tdi.texas.gov/wc/orders/documents/dwc238166.pdf (Nat'l Cas. Co.); No. 2024-8647, available at https://www.tdi.texas.gov/wc/orders/documents/dwc248647.pdf (National Fire Ins. Co. of Hartford) No. 2021-6656, available at https://www.tdi.texas.gov/commissioner/disciplinary-orders/documents/20216656.pdf (Nationwide Mut. Ins. Co.); No. 2021-6949, available at https://www.tdi.texas.gov/wc/orders/documents/dwc216949.pdf (Travelers Indem. Co.).



CNA Plaza
Chicago, Illinois 60685

For All the Commitments You Make®

DECLARATIONS
YOUR SERVICE INDUSTRY PACKAGE

RENEWAL DECLARATION

| Policy Number | From Policy Period To | Coverage Is Provided By | Agency |
|---|---|---|---|
| B1 67481043 | 03/26/99  03/26/00 | NATL FIRE INS. CO. OF HARTFORD | 005618610 |
| **Named Insured And Address** | | **Agent** | |
| SCOUT HUT - BOY/GIRL SCOUTS<br>ATTN K BOYER BSA PACK 4<br>831 ERIE<br>SHREVEPORT, LA 71106 | | HARRIS LEARY & COMPANY INC<br>2525 YOUREE DR - STE<br>P O BOX 44084<br>SHREVEPORT  LA  71134 | |

COMMERCIAL PROPERTY COVERAGE PART - DECLARATIONS

(   ) "X" IF SUPPLEMENTAL DECLARATIONS IS ATTACHED

NAMED INSURED IS: (   ) INDIVIDUAL     (   ) PARTNERSHIP  (   ) CORPORATION
(   ) JOINT VENTURE  ( X ) OTHER:  ASSOCIATION

POLICY PERIOD:  THIS POLICY BECOMES EFFECTIVE AND EXPIRES AT 12:01 A.M.
STANDARD TIME AT YOUR MAILING ADDRESS SHOWN ABOVE.

IN RETURN FOR THE PAYMENT OF THE PREMIUM, AND SUBJECT TO ALL THE TERMS
CONTAINED HEREIN, WE AGREE WITH YOU TO PROVIDE THE INSURANCE AS STATED.

DESCRIPTION OF PREMISES

PREM. BLDG.  LOCATION, CONSTRUCTION AND OCCUPANCY
NO.   NO.
001   001    800(804) THORA BLVD ; SHREVEPORT , LA 71106
             JOISTED MASONRY  MEETING HALL - BOY/GIRL SCOUTS

COVERAGES PROVIDED - INSURANCE AT THE DESCRIBED PREMISES APPLIES ONLY FOR
COVERAGES FOR WHICH A LIMIT OF INSURANCE IS SHOWN.

| PREM. NO. | BLDG. NO. | COVERAGE | LIMIT OF INSURANCE | COVERED CAUSES OF LOSS | +COINSURANCE |
|---|---|---|---|---|---|
| 001 | 001 | BUILDING | 21,200 | SPECIAL | 90% |
| | | PERS PROP INSURED | 1,050 | BASIC | 90% |

+ IF EXTRA EXPENSE COVERAGE, LIMITS ON LOSS PAYMENT.



Chairman of the Board

Secretary

AGENT

MEDIATION – CONFIDENTIAL.
Subject to Protective Order - Highly Confidential



CNA Plaza
Chicago, Illinois 60685

For All the Commitments You Make®

DECLARATIONS
YOUR SERVICE INDUSTRY PACKAGE

RENEWAL DECLARATION

| Policy Number | From Policy Period To | Coverage Is Provided By | Agency |
|---|---|---|---|
| B1 67481043 | 03/26/99  03/26/00 | NATL FIRE INS. CO. OF HARTFORD | 005618610 |

| Named Insured And Address | Agent |
|---|---|
| SCOUT HUT - BOY/GIRL SCOUTS<br>ATTN K BOYER BSA PACK 4<br>831 ERIE<br>SHREVEPORT, LA  71106 | HARRIS LEARY & COMPANY INC<br>2525 YOUREE DR - STE<br>P O BOX 44084<br>SHREVEPORT  LA  71134 |

OPTIONAL COVERAGE - APPLICABLE ONLY WHEN ENTRIES ARE MADE IN THE SCHEDULE BELOW

AGREED VALUE

| PREM. NO. | BLDG. NO. | EXPIRATION DATE | COVERAGE | AMOUNT |
|---|---|---|---|---|
| ----- | ----- | ---------- | -------------------------------- | ------------ |
| | | | | |

REPLACEMENT COST IS INDICATED BY (X)  INFLATION GUARD (PERCENTAGE)
------------------------------------------------------------------

| PREM. NO. | BLDG. NO. | BUILDING | PERSONAL PROPERTY | PERSONAL PROPERTY INCLUDING "STOCK" | BUILDING | PERSONAL PROPERTY |
|---|---|---|---|---|---|---|
| ----- | ----- | -------- | -------- | ---------------- | -------- | -------- |
| 001 | 001 | ( X ) | ( ) | ( ) | 6% | |
| 001 | 001 | ( ) | ( X ) | ( ) | | |
| | | ( ) | ( ) | ( ) | | |

| PREM. NO. | BLDG. NO. | * MONTHLY LIMIT OF INDEMNITY (FRACTION) | * MAXIMUM PERIOD OF INDEMNITY (X) | * EXTENDED PERIOD OF INDEMNITY (DAYS) |
|---|---|---|---|---|
| ----- | ----- | ----------------------- | ---------------- | ------------------ |
| | | | ( ) | |
| | | | ( ) | |
| | | | ( ) | |

MORTGAGE HOLDER(S)                              * APPLIES TO BUSINESS INCOME ONLY

PREMISES NO.  BUILDING NO.  MORTGAGE HOLDER NAME AND MAILING ADDRESS

AGENT

CNA_BSA0003622
BSAPolicyEv-00007110
TrustApp0977



CNA Plaza
Chicago, Illinois 60685

*For All the Commitments You Make*®

DECLARATIONS
YOUR SERVICE INDUSTRY PACKAGE

RENEWAL DECLARATION

| Policy Number | From | Policy Period | To | Coverage Is Provided By | Agency |
|---|---|---|---|---|---|
| B1 67481043 | 03/26/99 | | 03/26/00 | NATL FIRE INS. CO. OF HARTFORD | 005618610 |

| Named Insured And Address | Agent |
|---|---|
| SCOUT HUT - BOY/GIRL SCOUTS<br>ATTN K BOYER BSA PACK 4<br>831 ERIE<br>SHREVEPORT, LA  71106 | HARRIS LEARY & COMPANY INC<br>2525 YOUREE DR - STE<br>P O BOX 44084<br>SHREVEPORT  LA  71134 |

DEDUCTIBLE

$ 250    EXCEPTIONS:  $250

FORMS AND ENDORSEMENTS APPLICABLE AT TIME OF ISSUANCE:

APPLICABLE TO  ALL COVERAGES:
  SEE ATTACHED SCHEDULE OF FORMS AND ENDORSEMENTS

APPLICABLE TO SPECIFIC PREMISES/COVERAGES:
  PREM.   BLDG.
  NO.     NO.          COVERAGES               FORM NUMBER

PREMIUM FOR THIS COVERAGE PART: PREMIUM PAYABLE AT INCEPTION $     171.00

COUNTERSIGNED:_____    BY_____
              DATE                            AUTHORIZED AGENT

THESE DECLARATIONS AND THE GENERAL DECLARATIONS, IF APPLICABLE, TOGETHER WITH
THE COMMON POLICY CONDITIONS, COVERAGE FORM(S) AND FORMS AND ENDORSEMENTS, IF
ANY, ISSUED TO FORM A PART THEREOF, COMPLETE THE ABOVE NUMBERED POLICY.

P-55161-B  (11/90 ED.)

*Chairman of the Board*          *Secretary*

AGENT

MEDIATION – CONFIDENTIAL.
Subject to Protective Order - Highly Confidential

CNA_BSA0003623
BSAPolicyEv-00007111
TrustApp0978



CNA Plaza
Chicago, Illinois 60685

| Policy Number | From | Policy Period | To | Coverage Is Provided By | Agency |
|---|---|---|---|---|---|
| B1 67481043 | 03/26/99 | 03/26/00 | | NATL FIRE INS. CO. OF HARTFORD | 005618610 |

| Named Insured And Address | Agent |
|---|---|
| SCOUT HUT - BOY/GIRL SCOUTS<br>ATTN K BOYER BSA PACK 4<br>831 ERIE<br>SHREVEPORT, LA  71106 | HARRIS LEARY & COMPANY INC<br>2525 YOUREE DR - STE<br>P O BOX 44084<br>SHREVEPORT  LA  71134 |

POLICY FORMS AND ENDORSEMENTS SCHEDULE

        FORM NUMBER          FORM TITLE

*** PROPERTY FORMS AND ENDORSEMENTS ***
        CP0010      06/95   Building and Personal Property Coverage Form
        CP0090      07/88   Commercial Property Conditions
        CP0116      10/91   Louisiana Changes
        CP1010      06/95   Causes of Loss - Basic Form
        CP1030      06/95   Causes of Loss - Special Form
        CP9993      10/90   Tentative Rate
        G129948A    03/98   Exclusion Of Coverage For Date-Related Costs
        G132246A    07/98   Important Notice To Policyholders
        G55601E     07/92   Encompass II TCP Services Program Extension Endt.
        IL0017      11/85   Common Policy Conditions
        IL0277      02/94   Louisiana Changes - Cancellation and Nonrenewal

P 55738 A   01/86



AGENT

MEDIATION – CONFIDENTIAL.
Subject to Protective Order - Highly Confidential

CNA_BSA0003624
BSAPolicyEv-00007112
TrustApp0979

COMMERCIAL PROPERTY
CP 00 10 06 95

# BUILDING AND PERSONAL PROPERTY COVERAGE FORM

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this policy the words "you" and "your" refer to the Named Insured shown in the Declarations. The words "we," "us" and "our" refer to the Company providing this insurance.

Other words and phrases that appear in quotation marks have special meaning. Refer to SECTION H -- DEFINITIONS.

## A. COVERAGE

We will pay for direct physical loss of or damage to Covered Property at the premises described in the Declarations caused by or resulting from any Covered Cause of Loss.

### 1. Covered Property

Covered Property, as used in this Coverage Part, means the type of property described in this section, **A.1.**, and limited in **A.2.**, Property Not Covered, if a Limit of Insurance is shown in the Declarations for that type of property.

**a. Building,** meaning the building or structure described in the Declarations, including:

**(1)** Completed additions;

**(2)** Fixtures, including outdoor fixtures;

**(3)** Permanently installed:

**(a)** Machinery and

**(b)** Equipment;

**(4)** Personal property owned by you that is used to maintain or service the building or structure or its premises, including:

**(a)** Fire extinguishing equipment;

**(b)** Outdoor furniture;

**(c)** Floor coverings; and

**(d)** Appliances used for refrigerating, ventilating, cooking, dishwashing or laundering;

**(5)** If not covered by other insurance:

**(a)** Additions under construction, alterations and repairs to the building or structure;

**(b)** Materials, equipment, supplies and temporary structures, on or within 100 feet of the described premises, used for making additions, alterations or repairs to the building or structure.

**b. Your Business Personal Property** located in or on the building described in the Declarations or in the open (or in a vehicle) within 100 feet of the described premises, consisting of the following unless otherwise specified in the Declarations or on the Your Business Personal Property – Separation of Coverage form:

**(1)** Furniture and fixtures;

**(2)** Machinery and equipment;

**(3)** "Stock";

**(4)** All other personal property owned by you and used in your business;

**(5)** Labor, materials or services furnished or arranged by you on personal property of others;

**(6)** Your use interest as tenant in improvements and betterments. Improvements and betterments are fixtures, alterations, installations or additions:

**(a)** Made a part of the building or structure you occupy but do not own; and

**(b)** You acquired or made at your expense but cannot legally remove;

**(7)** Leased personal property for which you have a contractual responsibility to insure, unless otherwise provided for under Personal Property of Others.

**c. Personal Property of Others** that is:

**(1)** In your care, custody or control; and

**(2)** Located in or on the building described in the Declarations or in the open (or in a vehicle) within 100 feet of the described premises.

However, our payment for loss of or damage to personal property of others will only be for the account of the owner of the property.

### 2. Property Not Covered

Covered Property does not include:

**a.** Accounts, bills, currency, deeds, food stamps or other evidences of debt, money, notes or securities. Lottery tickets held for sale are not securities;

**b.** Animals, unless owned by others and boarded by you, or if owned by you, only as "stock" while inside of buildings;

1

Copyright, ISO Commercial Risk Services, Inc., 1994

MEDIATION – CONFIDENTIAL.
Subject to Protective Order - Highly Confidential

CNA_BSA0003625
BSAPolicyEv-00007113
TrustApp0980

COMMERCIAL PROPERTY
CP 00 10 06 95

c.   Automobiles held for sale;

d.   Bridges, roadways, walks, patios or other paved surfaces;

e.   Contraband, or property in the course of illegal transportation or trade;

f.   The cost of excavations, grading, backfilling or filling;

g.   Foundations of buildings, structures, machinery or boilers if their foundations are below:

   (1)   The lowest basement floor; or

   (2)   The surface of the ground, if there is no basement;

h.   Land (including land on which the property is located), water, growing crops or lawns;

i.   Personal property while airborne or waterborne;

j.   Bulkheads, pilings, piers, wharves or docks;

k.   Property that is covered under another coverage form of this or any other policy in which it is more specifically described, except for the excess of the amount due (whether you can collect on it or not) from that other insurance;

l.   Retaining walls that are not part of a building;

m.   Underground pipes, flues or drains;

n.   The cost to research, replace or restore the information on valuable papers and records, including those which exist on electronic or magnetic media, except as provided in the Coverage Extensions;

o.   Vehicles or self-propelled machines (including aircraft or watercraft) that:

   (1)   Are licensed for use on public roads; or

   (2)   Are operated principally away from the described premises.

   This paragraph does not apply to:

   (1)   Vehicles or self-propelled machines or autos you manufacture, process or warehouse;

   (2)   Vehicles or self-propelled machines, other than autos, you hold for sale; or

   (3)   Rowboats or canoes out of water at the described premises;

p.   The following property while outside of buildings:

   (1)   Grain, hay, straw or other crops;

   (2)   Fences, radio or television antennas (including satellite dishes) and their lead-in wiring, masts or towers, signs (other than signs attached to buildings), trees, shrubs or plants (other than "stock" of trees, shrubs or plants), all except as provided in the Coverage Extensions.

**3.   Covered Causes Of Loss**

See applicable Causes of Loss Form as shown in the Declarations.

**4.   Additional Coverages**

**a.   Debris Removal**

   (1)   We will pay your expense to remove debris of Covered Property caused by or resulting from a Covered Cause of Loss that occurs during the policy period. The expenses will be paid only if they are reported to us in writing within 180 days of the date of direct physical loss or damage.

   (2)   The most we will pay under this Additional Coverage is 25% of:

      (a)   The amount we pay for the direct physical loss of or damage to Covered Property; plus

      (b)   The deductible in this policy applicable to that loss or damage.

      But this limitation does not apply to any additional debris removal limit provided in the Limits of Insurance section.

   (3)   This Additional Coverage does not apply to costs to:

      (a)   Extract "pollutants" from land or water; or

      (b)   Remove, restore or replace polluted land or water.

**b.   Preservation of Property**

If it is necessary to move Covered Property from the described premises to preserve it from loss or damage by a Covered Cause of Loss, we will pay for any direct physical loss or damage to that property:

   (1)   While it is being moved or while temporarily stored at another location; and

   (2)   Only if the loss or damage occurs within 30 days after the property is first moved.

**c.   Fire Department Service Charge**

When the fire department is called to save or protect Covered Property from a Covered Cause of Loss, we will pay up to $1,000 for your liability for fire department service charges:

   (1)   Assumed by contract or agreement prior to loss; or

2

MEDIATION – CONFIDENTIAL.
Subject to Protective Order - Highly Confidential

CNA_BSA0003626
BSAPolicyEv-00007114

TrustApp0981

**(2)** Required by local ordinance.

No Deductible applies to this Additional Coverage.

**d. Pollutant Clean Up and Removal**

We will pay your expense to extract "pollutants" from land or water at the described premises if the discharge, dispersal, seepage, migration, release or escape of the "pollutants" is caused by or results from a Covered Cause of Loss that occurs during the policy period. The expenses will be paid only if they are reported to us in writing within 180 days of the date on which the Covered Cause of Loss occurs.

This Additional Coverage does not apply to costs to test for, monitor or assess the existence, concentration or effects of "pollutants." But we will pay for testing which is performed in the course of extracting the "pollutants" from the land or water.

The most we will pay under this Additional Coverage for each described premises is $10,000 for the sum of all covered expenses arising out of Covered Causes of Loss occurring during each separate 12 month period of this policy.

**5. Coverage Extensions**

Except as otherwise provided, the following Extensions apply to property located in or on the building described in the Declarations or in the open (or in a vehicle) within 100 feet of the described premises.

If a Coinsurance percentage of 80% or more or, a Value Reporting period symbol, is shown in the Declarations, you may extend the insurance provided by this Coverage Part as follows:

**a. Newly Acquired or Constructed Property**

**(1)** You may extend the insurance that applies to Building to apply to:

**(a)** Your new buildings while being built on the described premises; and

**(b)** Buildings you acquire at locations, other than the described premises, intended for:

**(i)** Similar use as the building described in the Declarations; or

**(ii)** Use as a warehouse.

The most we will pay for loss or damage under this Extension is $250,000 at each building.

**(2)** You may extend the insurance that applies to Your Business Personal Property to

apply to that property at any location you acquire other than at fairs or exhibitions.

The most we will pay for loss or damage under this Extension is $100,000 at each building.

**(3)** Insurance under this Extension for each newly acquired or constructed property will end when any of the following first occurs:

**(a)** This policy expires.

**(b)** 30 days expire after you acquire or begin to construct the property; or

**(c)** You report values to us.

We will charge you additional premium for values reported from the date construction begins or you acquire the property.

**b. Personal Effects and Property of Others**

You may extend the insurance that applies to Your Business Personal Property to apply to:

**(1)** Personal effects owned by you, your officers, your partners or your employees. This extension does not apply to loss or damage by theft.

**(2)** Personal property of others in your care, custody or control.

The most we will pay for loss or damage under this Extension is $2,500 at each described premises. Our payment for loss or damage to personal property of others will only be for the account of the owner of the property.

**c. Valuable Papers and Records – Cost of Research**

You may extend the insurance that applies to Your Business Personal Property to apply to your costs to research, replace or restore the lost information on lost or damaged valuable papers and records, including those which exist on electronic or magnetic media, for which duplicates do not exist. The most we will pay under this Extension is $2,500 at each described premises, unless a higher limit is shown in the Declarations.

**d. Property Off-Premises**

You may extend the insurance provided by this Coverage Form to apply to your Covered Property, other than "stock," that is temporarily at a location you do not own, lease or operate. This Extension does not apply to Covered Property:

**(1)** In or on a vehicle;

**(2)** In the care, custody or control of your salespersons; or

3

MEDIATION – CONFIDENTIAL.
Subject to Protective Order - Highly Confidential

CNA_BSA0003627
BSAPolicyEv-00007115
TrustApp0982

(3)  At any fair or exhibition.

The most we will pay for loss or damage under this Extension is $10,000.

**e.  Outdoor Property**

You may extend the insurance provided by this Coverage Form to apply to your outdoor fences, radio and television antennas (including satellite dishes), signs (other than signs attached to buildings), trees, shrubs and plants (other than "stock" of trees, shrubs or plants), including debris removal expense, caused by or resulting from any of the following causes of loss if they are Covered Causes of Loss:

**(1)**  Fire;

**(2)**  Lightning;

**(3)**  Explosion;

**(4)**  Riot or Civil Commotion; or

**(5)**  Aircraft.

The most we will pay for loss or damage under this Extension is $1,000, but not more than $250 for any one tree, shrub or plant. These limits apply to any one occurrence, regardless of the types or number of items lost or damaged in that occurrence.

Each of these Extensions is additional insurance. The Additional Condition, Coinsurance, does not apply to these Extensions.

**B.  EXCLUSIONS AND LIMITATIONS**

See applicable Causes of Loss Form as shown in the Declarations.

**C.  LIMITS OF INSURANCE**

The most we will pay for loss or damage in any one occurrence is the applicable Limit of Insurance shown in the Declarations.

The most we will pay for loss or damage to outdoor signs attached to buildings is $1,000 per sign in any one occurrence.

The limits applicable to the Coverage Extensions and the Fire Department Service Charge and Pollutant Clean Up and Removal Additional Coverages are in addition to the Limits of Insurance.

Payments under the following Additional Coverages will not increase the applicable Limit of Insurance:

**1.**  Preservation of Property; or

**2.**  Debris Removal; but if:

**a.**  The sum of direct physical loss or damage and debris removal expense exceeds the Limit of Insurance; or

**b.**  The debris removal expense exceeds the amount payable under the 25% limitation in the Debris Removal Additional Coverage;

we will pay up to an additional $10,000 for each location in any one occurrence under the Debris Removal Additional Coverage.

**D.  DEDUCTIBLE**

We will not pay for loss or damage in any one occurrence until the amount of loss or damage exceeds the Deductible shown in the Declarations. We will then pay the amount of loss or damage in excess of the Deductible, up to the applicable Limit of Insurance, after any deduction required by the Coinsurance condition or the Agreed Value Optional Coverage.

When the occurrence involves loss to more than one item of Covered Property and more than one Limit of Insurance applies, the Deductible will reduce the total amount of loss payable if loss to at least one item is less than the sum of (1) the Limit of Insurance applicable to that item plus (2) the Deductible.

Example No. 1:

(This example assumes there is no coinsurance penalty.)

Deductible: $250

| | |
|---|---|
| Limit of Insurance – Bldg. 1: | $60,000 |
| Limit of Insurance – Bldg. 2: | $80,000 |

| | |
|---|---|
| Loss to Bldg. 1: | $60,100 |
| Loss to Bldg. 2: | $90,000 |

The amount of loss to Bldg. 1 ($60,100) is less than the sum ($60,250) of the Limit of Insurance applicable to Bldg. 1 plus the Deductible.

The Deductible will be subtracted from the amount of loss in calculating the loss payable for Bldg. 1:

$60,100
-    250
$59,850    Loss Payable -- Bldg. 1

The Deductible applies once per occurrence and therefore is not subtracted in determining the amount of loss payable for Bldg. 2. Loss payable for Bldg. 2 is the Limit of Insurance of $80,000.

Total amount of loss payable: $59,850 + 80,000 = $139,850

Example No. 2:

(This example, too, assumes there is no coinsurance penalty.)

The Deductible and Limits of Insurance are the same as those in Example No. 1.

| | | |
|---|---|---|
| Loss to Bldg. 1: | $70,000 | (exceeds Limit of Insurance plus Deductible) |
| Loss to Bldg. 2: | $90,000 | (exceeds Limit of Insurance plus Deductible) |

Copyright, ISO Commercial Risk Services, Inc., 1994

MEDIATION – CONFIDENTIAL.
Subject to Protective Order - Highly Confidential

CNA_BSA0003628
BSAPolicyEv-00007116
TrustApp0983

COMMERCIAL PROPERTY
CP 00 10 06 95

Loss Payable -- Bldg. 1: $ 60,000  (Limit of Insurance)
Loss Payable -- Bldg. 2: $ 80,000  (Limit of Insurance)
Total amount of
        loss payable: $140,000

## E.  LOSS CONDITIONS

The following conditions apply in addition to the Common Policy Conditions and the Commercial Property Conditions.

### 1.  Abandonment

There can be no abandonment of any property to us.

### 2.  Appraisal

If we and you disagree on the value of the property or the amount of loss, either may make written demand for an appraisal of the loss. In this event, each party will select a competent and impartial appraiser. The two appraisers will select an umpire. If they cannot agree, either may request that selection be made by a judge of a court having jurisdiction. The appraisers will state separately the value of the property and amount of loss. If they fail to agree, they will submit their differences to the umpire. A decision agreed to by any two will be binding. Each party will:

**a.**  Pay its chosen appraiser; and

**b.**  Bear the other expenses of the appraisal and umpire equally.

If there is an appraisal, we will still retain our right to deny the claim.

### 3.  Duties In The Event Of Loss Or Damage

**a.**  You must see that the following are done in the event of loss or damage to Covered Property:

(1)  Notify the police if a law may have been broken.

(2)  Give us prompt notice of the loss or damage. Include a description of the property involved.

(3)  As soon as possible, give us a description of how, when and where the loss or damage occurred.

(4)  Take all reasonable steps to protect the Covered Property from further damage, and keep a record of your expenses necessary to protect the Covered Property, for consideration in the settlement of the claim. This will not increase the Limit of Insurance. However, we will not pay for any subsequent loss or damage resulting from a cause of loss that is not a Covered Cause of Loss. Also, if feasible, set the damaged property aside

and in the best possible order for examination.

(5)  At our request, give us complete inventories of the damaged and undamaged property. Include quantities, costs, values and amount of loss claimed.

(6)  As often as may be reasonably required, permit us to inspect the property proving the loss or damage and examine your books and records.

Also permit us to take samples of damaged and undamaged property for inspection, testing and analysis, and permit us to make copies from your books and records.

(7)  Send us a signed, sworn proof of loss containing the information we request to investigate the claim. You must do this within 60 days after our request. We will supply you with the necessary forms.

(8)  Cooperate with us in the investigation or settlement of the claim.

**b.**  We may examine any insured under oath, while not in the presence of any other insured and at such times as may be reasonably required, about any matter relating to this insurance or the claim, including an insured's books and records.  In the event of an examination, an insured's answers must be signed.

### 4.  Loss Payment

**a.**  In the event of loss or damage covered by this Coverage Form, at our option, we will either:

(1)  Pay the value of lost or damaged property;

(2)  Pay the cost of repairing or replacing the lost or damaged property, subject to **b.** below;

(3)  Take all or any part of the property at an agreed or appraised value; or

(4)  Repair, rebuild or replace the property with other property of like kind and quality, subject to **b.** below.

**b.**  The cost to repair, rebuild or replace does not include the increased cost attributable to enforcement of any ordinance or law regulating the construction, use or repair of any property.

**c.**  We will give notice of our intentions within 30 days after we receive the sworn proof of loss.

**d.**  We will not pay you more than your financial interest in the Covered Property.

**e.**  We may adjust losses with the owners of lost or damaged property if other than you. If we

5

MEDIATION – CONFIDENTIAL.
Subject to Protective Order - Highly Confidential

CNA_BSA0003629
BSAPolicyEv-00007117
TrustApp0984

pay the owners, such payments will satisfy your claims against us for the owners' property. We will not pay the owners more than their financial interest in the Covered Property.

**f.** We may elect to defend you against suits arising from claims of owners of property. We will do this at our expense.

**g.** We will pay for covered loss or damage within 30 days after we receive the sworn proof of loss, if you have complied with all of the terms of this Coverage Part and:

(1) We have reached agreement with you on the amount of loss; or

(2) An appraisal award has been made.

**5. Recovered Property**

If either you or we recover any property after loss settlement, that party must give the other prompt notice. At your option, the property will be returned to you. You must then return to us the amount we paid you for the property. We will pay recovery expenses and the expenses to repair the recovered property, subject to the Limit of Insurance.

**6. Vacancy**

**a.** Description of Terms

(1) As used in this Vacancy Condition, the term building and the term vacant have the meanings set forth in **(1)(a)** and **(1)(b)** below:

(a) When this policy is issued to a tenant, and with respect to that tenant's interest in Covered Property, building means the unit or suite rented or leased to the tenant. Such building is vacant when it does not contain enough business personal property to conduct customary operations.

(b) When this policy is issued to the owner of a building, building means the entire building. Such building is vacant when 70% or more of its square footage:

(i) Is not rented; or

(ii) Is not used to conduct customary operations.

(2) Buildings under construction or renovation are not considered vacant.

**b.** Vacancy Provisions

If the building where loss or damage occurs has been vacant for more than 60 consecutive days before that loss or damage occurs:

(1) We will not pay for any loss or damage caused by any of the following even if they are Covered Cause of Loss:

(a) Vandalism;

(b) Sprinkler leakage, unless you have protected the system against freezing;

(c) Building glass breakage;

(d) Water damage;

(e) Theft; or

(f) Attempted theft.

(2) With respect to Covered Causes of Loss other than those listed in **b.(1)(a)** through **b.(1)(f)** above, we will reduce the amount we would otherwise pay for the loss or damage by 15%.

**7. Valuation**

We will determine the value of Covered Property in the event of loss or damage as follows:

**a.** At actual cash value as of the time of loss or damage, except as provided in **b., c., d., e.** and **f.** below.

**b.** If the Limit of Insurance for Building satisfies the Additional Condition, Coinsurance, and the cost to repair or replace the damaged building property is $2,500 or less, we will pay the cost of building repairs or replacement.

The cost of building repairs or replacement does not include the increased cost attributable to enforcement of any ordinance or law regulating the construction, use or repair of any property.

However, the following property will be valued at the actual cash value even when attached to the building:

(1) Awnings or floor coverings;

(2) Appliances for refrigerating, ventilating, cooking, dishwashing or laundering; or

(3) Outdoor equipment or furniture.

**c.** "Stock" you have sold but not delivered at the selling price less discounts and expenses you otherwise would have had.

**d.** Glass at the cost of replacement with safety glazing material if required by law.

**e.** Tenant's Improvements and Betterments at:

(1) Actual cash value of the lost or damaged property if you make repairs promptly.

(2) A proportion of your original cost if you do not make repairs promptly. We will determine the proportionate value as follows:

MEDIATION – CONFIDENTIAL.
Subject to Protective Order - Highly Confidential

CNA_BSA0003630
BSAPolicyEv-00007118
TrustApp0985

**(a)** Multiply the original cost by the number of days from the loss or damage to the expiration of the lease; and

**(b)** Divide the amount determined in **(a)** above by the number of days from the installation of improvements to the expiration of the lease.

If your lease contains a renewal option, the expiration of the renewal option period will replace the expiration of the lease in this procedure.

**(3)** Nothing if others pay for repairs or replacement.

**f.** Valuable Papers and Records, including those which exist on electronic or magnetic media (other than prepackaged software programs), at the cost of:

**(1)** Blank materials for reproducing the records; and

**(2)** Labor to transcribe or copy the records when there is a duplicate.

**F. ADDITIONAL CONDITIONS**

The following conditions apply in addition to the Common Policy Conditions and the Commercial Property Conditions.

**1. Coinsurance**

If a Coinsurance percentage is shown in the Declarations, the following condition applies.

**a.** We will not pay the full amount of any loss if the value of Covered Property at the time of loss times the Coinsurance percentage shown for it in the Declarations is greater than the Limit of Insurance for the property.

Instead, we will determine the most we will pay using the following steps:

**(1)** Multiply the value of Covered Property at the time of loss by the Coinsurance percentage;

**(2)** Divide the Limit of Insurance of the property by the figure determined in step **(1)**;

**(3)** Multiply the total amount of loss, before the application of any deductible, by the figure determined in step **(2)**; and

**(4)** Subtract the deductible from the figure determined in step **(3)**.

We will pay the amount determined in step **(4)** or the limit of insurance, whichever is less. For the remainder, you will either have to rely on other insurance or absorb the loss yourself.

**Example No. 1** (Underinsurance):
When:

| | |
|---|---|
| The value of the property is | $250,000 |
| The Coinsurance percentage for it is | 80% |
| The Limit of Insurance for it is | $100,000 |
| The Deductible is | $250 |
| The amount of loss is | $40,000 |

Step (1):  $250,000 x 80% = $200,000 (the minimum amount of insurance to meet your Coinsurance requirements)

Step (2): $100,000 ÷ $200,000 = .50

Step (3): $40,000 x .50 = $20,000

Step (4): $20,000 - $250 = $19,750

We will pay no more than $19,750. The remaining $20,250 is not covered.

**Example No. 2** (Adequate Insurance):
When:

| | |
|---|---|
| The value of the property is | $250,000 |
| The Coinsurance percentage for it is | 80% |
| The Limit of Insurance for it is | $200,000 |
| The Deductible is | $250 |
| The amount of loss is | $40,000 |

The minimum amount of insurance to meet your Coinsurance requirement is $200,000 ($250,000 x 80%). Therefore, the Limit of Insurance in this Example is adequate and no penalty applies. We will pay no more than $39,750 ($40,000 amount of loss minus the deductible of $250).

**b.** If one Limit of Insurance applies to two or more separate items, this condition will apply to the total of all property to which the limit applies.

**Example No. 3:**
When:

| | |
|---|---|
| The value of property is: | |
| Bldg. at Location No. 1 | $75,000 |
| Bldg. at Location No. 2 | $100,000 |
| Personal Property at Location No. 2 | $75,000 |
| | $250,000 |
| The Coinsurance percentage for it is | 90% |
| The Limit of Insurance for Buildings and Personal Property at Location Nos. 1 and 2 is | $180,000 |
| The Deductible is | $1,000 |
| The amount of loss is: | |
| Bldg. at Location No. 2 | $30,000 |

MEDIATION – CONFIDENTIAL.
Subject to Protective Order - Highly Confidential

CNA_BSA0003631
BSAPolicyEv-00007119
TrustApp0986

COMMERCIAL PROPERTY
CP 00 10 06 95

Personal Property at
Location No. 2.                    $20,000
                                   $50,000

Step (1):  $250,000 x 90% = $225,000 (the minimum amount of insurance to meet your Coinsurance requirements and to avoid the penalty shown below)

Step (2):  $180,000 ÷ $225,000 = .80

Step (3):  $50,000 x .80 = $40,000.

Step (4):  $40,000 - $1,000 = $39,000.

We will pay no more than $39,000. The remaining $11,000 is not covered.

**2.  Mortgageholders**

**a.**  The term mortgageholder includes trustee.

**b.**  We will pay for covered loss of or damage to buildings or structures to each mortgageholder shown in the Declarations in their order of precedence, as interests may appear.

**c.**  The mortgageholder has the right to receive loss payment even if the mortgageholder has started foreclosure or similar action on the building or structure.

**d.**  If we deny your claim because of your acts or because you have failed to comply with the terms of this Coverage Part, the mortgageholder will still have the right to receive loss payment if the mortgageholder:

**(1)**  Pays any premium due under this Coverage Part at our request if you have failed to do so;

**(2)**  Submits a signed, sworn proof of loss within 60 days after receiving notice from us of your failure to do so; and

**(3)**  Has notified us of any change in ownership, occupancy or substantial change in risk known to the mortgageholder.

All of the terms of this Coverage Part will then apply directly to the mortgageholder.

**e.**  If we pay the mortgageholder for any loss or damage and deny payment to you because of your acts or because you have failed to comply with the terms of this Coverage Part:

**(1)**  The mortgageholder's rights under the mortgage will be transferred to us to the extent of the amount we pay; and

**(2)**  The mortgageholder's right to recover the full amount of the mortgageholder's claim will not be impaired.

At our option, we may pay to the mortgageholder the whole principal on the mortgage plus any accrued interest. In this event, your mortgage and note will be transferred to us and you will pay your remaining mortgage debt to us.

**f.**  If we cancel this policy, we will give written notice to the mortgageholder at least:

**(1)**  10 days before the effective date of cancellation if we cancel for your nonpayment of premium; or

**(2)**  30 days before the effective date of cancellation if we cancel for any other reason.

**g.**  If we elect not to renew this policy, we will give written notice to the mortgageholder at least 10 days before the expiration date of this policy.

**G.  OPTIONAL COVERAGES**

If shown in the Declarations, the following Optional Coverages apply separately to each item.

**1.  Agreed Value**

**a.**  The Additional Condition, Coinsurance, does not apply to Covered Property to which this Optional Coverage applies. We will pay no more for loss of or damage to that property than the proportion that the Limit of Insurance under this Coverage Part for the property bears to the Agreed Value shown for it in the Declarations.

**b.**  If the expiration date for this Optional Coverage shown in the Declarations is not extended, the Additional Condition, Coinsurance, is reinstated and this Optional Coverage expires.

**c.**  The terms of this Optional Coverage apply only to loss or damage that occurs:

**(1)**  On or after the effective date of this Optional Coverage; and

**(2)**  Before the Agreed Value expiration date shown in the Declarations or the policy expiration date, whichever occurs first.

**2.  Inflation Guard**

**a.**  The Limit of Insurance for property to which this Optional Coverage applied will automatically increase by the annual percentage shown in the Declarations.

**b.**  The amount of increase will be:

**(1)**  The Limit of Insurance that applied on the most recent of the policy inception date, the policy anniversary date, or any other policy change amending the Limit of Insurance, times

8

MEDIATION – CONFIDENTIAL.
Subject to Protective Order - Highly Confidential

CNA_BSA0003632
BSAPolicyEv-00007120
TrustApp0987

COMMERCIAL PROPERTY
CP 00 10 06 95

(2) The percentage of annual increase shown in the Declarations, expressed as a decimal (example: 8% is .08), times

(3) The number of days since the beginning of the current policy year or the effective date of the most recent policy change amending the Limit of Insurance, divided by 365.

**Example:**

If:

| | |
|---|---|
| The applicable Limit of Insurance is | $100,000 |
| The annual percentage increase is | 8% |
| The number of days since the beginning of the policy year (or last policy change) is | 146 |

The amount of increase is
$100,000 x .08 x 146 ÷ 365 =     $3,200

**3.    Replacement Cost**

a. Replacement Cost (without deduction for depreciation) replaces Actual Cash Value in the Loss Condition, Valuation, of this Coverage Form.

b. This Optional Coverage does not apply to:

(1) Personal property of others;

(2) Contents of a residence;

(3) Manuscripts;

(4) Works of art, antiques or rare articles, including etchings, pictures, statuary, marbles, bronzes, porcelains and bric-a-brac; or

(5) "Stock," unless the Including "Stock" option is shown in the Declarations.

c. You may make a claim for loss or damage covered by this insurance on an actual cash value basis instead of on a replacement cost basis. In the event you elect to have loss or damage settled on an actual cash value basis, you may still make a claim for the additional coverage this Optional Coverage provides if

you notify us of your intent to do so within 180 days after the loss or damage.

d. We will not pay on a replacement cost basis for any loss or damage:

(1) Until the lost or damaged property is actually repaired or replaced; and

(2) Unless the repairs or replacement are made as soon as reasonably possible after the loss or damage.

e. We will not pay more for loss or damage on a replacement cost basis than the least of (1), (2) or (3), subject to f. below:

(1) The Limit of Insurance applicable to the lost or damaged property;

(2) The cost to replace, on the same premises, the lost or damaged property with other property:

(a) Of comparable material and quality; and

(b) Used for the same purpose; or

(3) The amount you actually spend that is necessary to repair or replace the lost or damaged property.

f. The cost of repair or replacement does not include the increased cost attributable to enforcement of any ordinance or law regulating the construction, use or repair of any property.

**H.    DEFINITIONS**

1. **"Pollutants"** means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

2. **"Stock"** means merchandise held in storage or for sale, raw materials and in-process or finished goods, including supplies used in their packing or shipping.

CP 00 10 06 95            Copyright, ISO Commercial Risk Services, Inc., 1994

MEDIATION – CONFIDENTIAL.
Subject to Protective Order - Highly Confidential

CNA_BSA0003633
BSAPolicyEv-00007121
TrustApp0988

CP 00 90 07 88

# COMMERCIAL PROPERTY CONDITIONS

This Coverage Part is subject to the following conditions, the Common Policy Conditions and applicable Loss Conditions and Additional Conditions in Commercial Property Coverage Forms.

**A. CONCEALMENT, MISREPRESENTATION OR FRAUD**

This Coverage Part is void in any case of fraud by you as it relates to this Coverage Part at any time. It is also void if you or any other insured, at any time, intentionally conceal or misrepresent a material fact concerning:

1. This Coverage Part;

2. The Covered Property;

3. Your interest in the Covered Property; or

4. A claim under this Coverage Part.

**B. CONTROL OF PROPERTY**

Any act or neglect of any person other than you beyond your direction or control will not affect this insurance.

The breach of any condition of this Coverage Part at any one or more locations will not affect coverage at any location where, at the time of loss or damage, the breach of condition does not exist.

**C. INSURANCE UNDER TWO OR MORE COVERAGES**

If two or more of this policy's coverages apply to the same loss or damage, we will not pay more than the actual amount of the loss or damage.

**D. LEGAL ACTION AGAINST US**

No one may bring a legal action against us under this Coverage Part unless:

1. There has been full compliance with all of the terms of this Coverage Part; and

2. The action is brought within 2 years after the date on which the direct physical loss or damage occurred.

**E. LIBERALIZATION**

If we adopt any revision that would broaden the coverage under this Coverage Part without additional premium within 45 days prior to or during the policy period, the broadened coverage will immediately apply to this Coverage Part.

**F. NO BENEFIT TO BAILEE**

No person or organization, other than you, having custody of Covered Property will benefit from this insurance.

**G. OTHER INSURANCE**

1. You may have other insurance subject to the same plan, terms, conditions and provisions as the insurance under this Coverage Part. If you do, we

will pay our share of the covered loss or damage. Our share is the proportion that the applicable Limit of Insurance under this Coverage Part bears to the Limits of Insurance of all insurance covering on the same basis.

2. If there is other insurance covering the same loss or damage, other than that described in 1. above, we will pay only for the amount of covered loss or damage in excess of the amount due from that other insurance, whether you can collect on it or not. But we will not pay more than the applicable Limit of Insurance.

**H. POLICY PERIOD, COVERAGE TERRITORY**

Under this Coverage Part:

1. We cover loss or damage commencing:

   a. During the policy period shown in the Declarations; and

   b. Within the coverage territory.

2. The coverage territory is:

   a. The United States of America (including its territories and possessions);

   b. Puerto Rico; and

   c. Canada.

**I. TRANSFER OF RIGHTS OF RECOVERY AGAINST OTHERS TO US**

If any person or organization to or for whom we make payment under this Coverage Part has rights to recover damages from another, those rights are transferred to us to the extent of our payment. That person or organization must do everything necessary to secure our rights and must do nothing after loss to impair them. But you may waive your rights against another party in writing:

1. Prior to a loss to your Covered Property or Covered Income.

2. After a loss to your Covered Property or Covered Income only if, at time of loss, that party is one of the following:

   a. Someone insured by this insurance;

   b. A business firm:

      (1) Owned or controlled by you; or

      (2) That owns or controls you; or

   c. Your tenant.

This will not restrict your insurance.

---

CP 00 90 07 88        Copyright, ISO Commercial Risk Services, Inc., 1983, 1987

MEDIATION – CONFIDENTIAL.
Subject to Protective Order - Highly Confidential

CNA_BSA0003634
BSAPolicyEv-00007122
TrustApp0989

CP 01 16 10 91

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# LOUISIANA CHANGES

This endorsement modifies insurance provided under the following:

COMMERCIAL PROPERTY COVERAGE PART

**A.** When this endorsement is attached to the STANDARD PROPERTY POLICY **CP 00 99**, the term Coverage Part in this endorsement is replaced by the term Policy.

**B.** The following is added when a Coinsurance percentage is shown in the Declarations:

The rate of premium for your policy is based on the use of a Coinsurance percentage that is shown in the Declarations.

**C.** The **TRANSFER OF RIGHTS OF RECOVERY AGAINST OTHERS TO US** Condition is replaced by the following:

If any person or organization to or for whom we make payment under this Coverage Part has rights to recover damages from another, those rights are transferred to us to the extent of our payment. That person or organization must do everything necessary to secure our rights and must do nothing after loss to impair them. But you may waive your rights against another party in writing:

**1.** Prior to a loss to your Covered Property or Covered Income.

**2.** After a loss to your Covered Property or Covered Income only if, at time of loss, that party is one of the following:

**a.** Someone insured by this insurance;

**b.** A business firm:

**(1)** Owned or controlled by you; or

**(2)** That owns or controls you;

**c.** Your employee or employer;

**d.** The owner, lessor or tenant of the:

**(1)** Described premises; or

**(2)** Premises where loss or damage occurred;

including their employees, partners and stockholders; or

**e.** Your relative by blood or marriage.

If you waive your rights against another party in writing after a loss, we can recover from you any amount you received for that waiver. But we cannot recover more than the amount we paid you for that loss.




CP 01 16 10 91            Copyright, ISO Commercial Risk Services, Inc., 1990

COMMERCIAL PROPERTY
CP 10 10 06 95

# CAUSES OF LOSS – BASIC FORM

**A. COVERED CAUSES OF LOSS**

When Basic is shown in the Declarations, Covered Causes of Loss means the following:

1. **Fire.**

2. **Lightning.**

3. **Explosion,** including the explosion of gases or fuel within the furnace of any fired vessel or within the flues or passages through which the gases of combustion pass. This cause of loss does not include loss or damage by:

    **a.** Rupture, bursting or operation of pressure relief devices; or

    **b.** Rupture or bursting due to expansion or swelling of the contents of any building or structure, caused by or resulting from water.

4. **Windstorm or Hail,** but not including:

    **a.** Frost or cold weather;

    **b.** Ice (other than hail), snow or sleet, whether driven by wind or not; or

    **c.** Loss or damage to the interior of any building or structure, or the property inside the building or structure, caused by rain, snow, sand or dust, whether driven by wind or not, unless the building or structure first sustains wind or hail damage to its roof or walls through which the rain, snow, sand or dust enters.

5. **Smoke** causing sudden and accidental loss or damage. This cause of loss does not include smoke from agricultural smudging or industrial operations.

6. **Aircraft or Vehicles,** meaning only physical contact of an aircraft, a spacecraft, a self-propelled missile, a vehicle or an object thrown up by a vehicle with the described property or with the building or structure containing the described property. This cause of loss includes loss or damage by objects falling from aircraft.

    We will not pay for loss or damage caused by or resulting from vehicles you own or which are operated in the course of your business.

7. **Riot or Civil Commotion,** including:

    **a.** Acts of striking employees while occupying the described premises; and

    **b.** Looting occurring at the time and place of a riot or civil commotion.

8. **Vandalism,** meaning willful and malicious damage to, or destruction of, the described property.

    We will not pay for loss or damage:

    **a.** To glass (other than glass building blocks) that is part of a building, structure, or an outside sign; but we will pay for loss or damage to other property caused by or resulting from breakage of glass by vandals.

    **b.** Caused by or resulting from theft, except for building damage caused by the breaking in or exiting of burglars.

9. **Sprinkler Leakage,** meaning leakage or discharge of any substance from an Automatic Sprinkler System, including collapse of a tank that is part of the system.

    If the building or structure containing the Automatic Sprinkler System is Covered Property, we will also pay the cost to:

    **a.** Repair or replace damaged parts of the Automatic Sprinkler System if the damage:

    **(1)** Results in sprinkler leakage; or

    **(2)** Is directly caused by freezing.

    **b.** Tear out and replace any part of the building or structure to repair damage to the Automatic Sprinkler System that has resulted in sprinkler leakage.

    Automatic Sprinkler System means:

    **(1)** Any automatic fire protective or extinguishing system, including connected:

    **(a)** Sprinklers and discharge nozzles;

    **(b)** Ducts, pipes, valves and fittings;

    **(c)** Tanks, their component parts and supports; and

    **(d)** Pumps and private fire protection mains.

    **(2)** When supplied from an automatic fire protective system:

    **(a)** Non-automatic fire protective systems; and

    **(b)** Hydrants, standpipes and outlets.

10. **Sinkhole Collapse,** meaning loss or damage caused by the sudden sinking or collapse of land into underground empty spaces created by the action of water on limestone or dolomite. This cause of loss does not include:

    **a.** The cost of filling sinkholes; or

    **b.** Sinking or collapse of land into man-made underground cavities.

CP 10 10 06 95                    Copyright, ISO Commercial Risk Services, Inc., 1994

MEDIATION – CONFIDENTIAL.
Subject to Protective Order - Highly Confidential

CNA_BSA0003636
BSAPolicyEv-00007124
TrustApp0991

11. **Volcanic Action,** meaning direct loss or damage resulting from the eruption of a volcano when the loss or damage is caused by:

   **a.** Airborne volcanic blast or airborne shock waves;

   **b.** Ash, dust or particulate matter; or

   **c.** Lava flow.

All volcanic eruptions that occur within any 168-hour period will constitute a single occurrence.

This cause of loss does not include the cost to remove ash, dust or particulate matter that does not cause direct physical loss or damage to the described property.

**B. EXCLUSIONS**

1. We will not pay for loss or damage caused directly or indirectly by any of the following. Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss.

   **a. Ordinance or Law**

   The enforcement of any ordinance or law:

   **(1)** Regulating the construction, use or repair of any property; or

   **(2)** Requiring the tearing down of any property, including the cost of removing its debris.

   This exclusion, Ordinance or Law, applies whether the loss results from:

   **(1)** An ordinance or law that is enforced even if the property has not been damaged; or

   **(2)** The increased costs incurred to comply with an ordinance or law in the course of construction, repair, renovation, remodeling or demolition of property, or removal of its debris, following a physical loss to that property.

   **b. Earth Movement**

   **(1)** Any earth movement (other than sinkhole collapse), such as an earthquake, landslide, mine subsidence or earth sinking, rising or shifting. But if earth movement results in fire or explosion, we will pay for the loss or damage caused by that fire or explosion.

   **(2)** Volcanic eruption, explosion or effusion. But if volcanic eruption, explosion or effusion results in fire or Volcanic Action, we will pay for the loss or damage caused by that fire or Volcanic Action.

   **c. Governmental Action**

   Seizure or destruction of property by order of governmental authority.

   But we will pay for loss or damage caused by or resulting from acts of destruction ordered by governmental authority and taken at the time of a fire to prevent its spread, if the fire would be covered under this Coverage Part.

   **d. Nuclear Hazard**

   Nuclear reaction or radiation, or radioactive contamination, however caused.

   But if nuclear reaction or radiation, or radioactive contamination, results in fire, we will pay for the loss or damage caused by that fire.

   **e. Utility Services**

   The failure of power or other utility service supplied to the described premises, however caused, if the failure occurs away from the described premises.

   But if the failure of power or other utility service results in a Covered Cause of Loss, we will pay for the loss or damage caused by that Covered Cause of Loss.

   This exclusion does not apply to the Business Income coverage or to Extra Expense coverage. Instead, the Special Exclusion in paragraph **B. 3.a.(1)** applies to these coverages.

   **f. War and Military Action**

   **(1)** War, including undeclared or civil war;

   **(2)** Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

   **(3)** Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

   **g. Water**

   **(1)** Flood, surface water, waves, tides, tidal waves, overflow of any body of water, or their spray, all whether driven by wind or not;

   **(2)** Mudslide or mudflow;

   **(3)** Water that backs up or overflows from a sewer, drain or sump; or

   **(4)** Water under the ground surface pressing on, or flowing or seeping through:

CP 10 10 06 95      Copyright, ISO Commercial Risk Services, Inc., 1994

MEDIATION – CONFIDENTIAL.
Subject to Protective Order - Highly Confidential

CNA_BSA0003637
BSAPolicyEv-00007125
TrustApp0992

COMMERCIAL PROPERTY
CP 10 10 06 95

**(a)** Foundations, walls, floors or paved surfaces;

**(b)** Basements, whether paved or not; or

**(c)** Doors, windows or other openings.

But if Water, as described in **g.(1)** through **(4)** above, results in fire, explosion or sprinkler leakage, we will pay for the loss or damage caused by that fire, explosion or sprinkler leakage.

**2.** We will not pay for loss or damage caused by or resulting from:

**a.** Artificially generated electrical current, including electric arcing, that disturbs electrical devices, appliances or wires.

But if artificially generated electrical current results in fire, we will pay for the loss or damage caused by that fire.

**b.** Rupture or bursting of water pipes (other than Automatic Sprinkler Systems) unless caused by a Covered Cause of Loss.

**c.** Leakage or discharge of water or steam from any part of a system or appliance containing water or steam (other than an Automatic Sprinkler System), unless the leakage or discharge occurs because the system or appliance was damaged by a Covered Cause of Loss.

**d.** Explosion of steam boilers, steam pipes, steam engines or steam turbines owned or leased by you, or operated under your control.

But if explosion of steam boilers, steam pipes, steam engines or steam turbines results in fire or combustion explosion, we will pay for the loss or damage caused by that fire or combustion explosion.

**e.** Mechanical breakdown, including rupture or bursting caused by centrifugal force.

But if mechanical breakdown results in a Covered Cause of Loss, we will pay for the loss or damage caused by that Covered Cause of Loss.

**3. Special Exclusions**

The following provisions apply only to the specified Coverage Forms.

**a. Business Income (And Extra Expense) Coverage Form, Business Income (Without Extra Expense) Coverage Form, or Extra Expense Coverage Form.**

We will not pay for:

**(1)** Any loss caused directly or indirectly by the failure of power or other utility service supplied to the described premises, however caused, if the failure occurs outside of a covered building.

But if the failure of power or other utility service results in a Covered Cause of Loss, we will pay for the loss resulting from that Covered Cause of Loss.

**(2)** Any loss caused by or resulting from:

**(a)** Damage or destruction of "finished stock"; or

**(b)** The time required to reproduce "finished stock."

This exclusion does not apply to Extra Expense.

**(3)** Any loss caused by or resulting from direct physical loss or damage to radio or television antennas (including satellite dishes) and their lead-in wiring, masts or towers.

**(4)** Any increase of loss caused by or resulting from:

**(a)** Delay in rebuilding, repairing or replacing the property or resuming "operations," due to interference at the location of the rebuilding, repair or replacement by strikers or other persons; or

**(b)** Suspension, lapse or cancellation of any license, lease or contract. But if the suspension, lapse or cancellation is directly caused by the suspension of "operations," we will cover such loss that affects your Business Income during the "period of restoration."

**(5)** Any Extra Expense caused by or resulting from suspension, lapse or cancellation of any license, lease or contract beyond the "period of restoration."

**(6)** Any other consequential loss.

**b. Leasehold Interest Coverage Form**

**(1)** Paragraph **B.1.a.**, Ordinance or Law, does not apply to insurance under this Coverage Form.

**(2)** We will not pay for any loss caused by:

**(a)** Your cancelling the lease;

**(b)** The suspension, lapse or cancellation of any license; or

**(c)** Any other consequential loss.

**c. Legal Liability Coverage Form**

**(1)** The following Exclusions do not apply to insurance under this Coverage Form:

3

MEDIATION – CONFIDENTIAL.
Subject to Protective Order - Highly Confidential

CNA_BSA0003638
BSAPolicyEv-00007126
TrustApp0993

(a) Paragraph **B.1.a.,** Ordinance or Law;

(b) Paragraph **B.1.c.,** Governmental Action;

(c) Paragraph **B.1.d.,** Nuclear Hazard;

(d) Paragraph **B.1.e.,** Utility Services; and

(e) Paragraph **B.1.f.,** War and Military Action.

(2) The following additional exclusions apply to insurance under this Coverage Form:

(a) **Contractual Liability**

We will not defend any claim or "suit," or pay damages that you are legally liable to pay, solely by reason of your assumption of liability in a contract or agreement. But this exclusion does not apply to a written lease agreement in which you have assumed liability

for building damage resulting from an actual or attempted burglary or robbery, provided that:

(i) Your assumption of liability was executed prior to the accident; and

(ii) The building is Covered Property under this Coverage Form.

(b) **Nuclear Hazard**

We will not defend any claim or "suit," or pay any damages, loss, expense or obligation, resulting from nuclear reaction or radiation, or radioactive contamination, however caused.

**C. LIMITATION**

We will pay for loss of animals only if they are killed or their destruction is made necessary.



CP 10 10 06 95          Copyright, ISO Commercial Risk Services, Inc., 1994

MEDIATION – CONFIDENTIAL.
Subject to Protective Order - Highly Confidential

CNA_BSA0003639
BSAPolicyEv-00007127
TrustApp0994

COMMERCIAL PROPERTY
CP 10 30 06 95

# CAUSES OF LOSS – SPECIAL FORM

Words and phrases that appear in quotation marks have special meaning. Refer to Section **F.** -- Definitions.

**A. COVERED CAUSES OF LOSS**

When Special is shown in the Declarations, Covered Causes of Loss means RISKS OF DIRECT PHYSICAL LOSS unless the loss is:

**1.** Excluded in Section **B.,** Exclusions; or

**2.** Limited in Section **C.,** Limitations;

that follow.

**B. EXCLUSIONS**

**1.** We will not pay for loss or damage caused directly or indirectly by any of the following. Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss.

**a. Ordinance or Law**

The enforcement of any ordinance or law:

**(1)** Regulating the construction, use or repair of any property; or

**(2)** Requiring the tearing down of any property, including the cost of removing its debris.

This exclusion, Ordinance or Law, applies whether the loss results from:

**(1)** An ordinance or law that is enforced even if the property has not been damaged; or

**(2)** The increased costs incurred to comply with an ordinance or law in the course of construction, repair, renovation, remodeling or demolition of property, or removal of its debris, following a physical loss to that property.

**b. Earth Movement**

**(1)** Any earth movement (other than sinkhole collapse), such as an earthquake, landslide, mine subsidence or earth sinking, rising or shifting. But if earth movement results in fire or explosion, we will pay for the loss or damage caused by that fire or explosion.

**(2)** Volcanic eruption, explosion or effusion. But if volcanic eruption, explosion or effusion results in fire, building glass breakage or Volcanic Action, we will pay for the loss or damage caused by that fire, building glass breakage or Volcanic Action.

Volcanic action means direct loss or damage resulting from the eruption of a volcano when the loss or damage is caused by:

**(a)** Airborne volcanic blast or airborne shock waves;

**(b)** Ash, dust or particulate matter; or

**(c)** Lava flow.

All volcanic eruptions that occur within any 168 hour period will constitute a single occurrence.

Volcanic action does not include the cost to remove ash, dust or particulate matter that does not cause direct physical loss or damage to the described property.

**c. Governmental Action**

Seizure or destruction of property by order of governmental authority.

But we will pay for loss or damage caused by or resulting from acts of destruction ordered by governmental authority and taken at the time of a fire to prevent its spread, if the fire would be covered under this Coverage Part.

**d. Nuclear Hazard**

Nuclear reaction or radiation, or radioactive contamination, however caused.

But if nuclear reaction or radiation, or radioactive contamination, results in fire, we will pay for the loss or damage caused by that fire.

**e. Utility Services**

The failure of power or other utility service supplied to the described premises, however caused, if the failure occurs away from the described premises.

But if the failure of power or other utility service results in a Covered Cause of Loss, we will pay for the loss or damage caused by that Covered Cause of Loss.

This exclusion does not apply to the Business Income coverage or to Extra Expense coverage. Instead, the Special Exclusion in paragraph **B.4.a.(1)** applies to these coverages.

**f. War And Military Action**

**(1)** War, including undeclared or civil war;

**(2)** Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any

1

Copyright, ISO Commercial Risk Services, Inc., 1994

MEDIATION – CONFIDENTIAL.
Subject to Protective Order - Highly Confidential

CNA_BSA0003640
BSAPolicyEv-00007128

TrustApp0995

government, sovereign or other authority using military personnel or other agents; or

**(3)** Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

**g. Water**

**(1)** Flood, surface water, waves, tides, tidal waves, overflow of any body of water, or their spray, all whether driven by wind or not;

**(2)** Mudslide or mudflow;

**(3)** Water that backs up or overflows from a sewer, drain or sump; or

**(4)** Water under the ground surface pressing on, or flowing or seeping through:

**(a)** Foundations, walls, floors or paved surfaces;

**(b)** Basements, whether paved or not; or

**(c)** Doors, windows or other openings.

But if Water, as described in **g.(1)** through **g.(4)** above, results in fire, explosion or sprinkler leakage, we will pay for the loss or damage caused by that fire, explosion or sprinkler leakage.

**2.** We will not pay for loss or damage caused by or resulting from any of the following:

**a.** Artificially generated electrical current, including electric arcing, that disturbs electrical devices, appliances or wires.

But if artificially generated electrical current results in fire, we will pay for the loss or damage caused by that fire.

**b.** Delay, loss of use or loss of market.

**c.** Smoke, vapor or gas from agricultural smudging or industrial operations.

**d. (1)** Wear and tear;

**(2)** Rust, corrosion, fungus, decay, deterioration, hidden or latent defect or any quality in property that causes it to damage or destroy itself;

**(3)** Smog;

**(4)** Settling, cracking, shrinking or expansion;

**(5)** Nesting or infestation, or discharge or release of waste products or secretions, by insects, birds, rodents or other animals.

**(6)** Mechanical breakdown, including rupture or bursting caused by centrifugal force. But if mechanical breakdown results in

elevator collision, we will pay for the loss or damage caused by that elevator collision.

**(7)** The following causes of loss to personal property:

**(a)** Dampness or dryness of atmosphere;

**(b)** Changes in or extremes of temperature; or

**(c)** Marring or scratching.

But if an excluded cause of loss that is listed in **2.d.(1)** through **(7)** results in a "specified cause of loss" or building glass breakage, we will pay for the loss or damage caused by that "specified cause of loss" or building glass breakage.

**e.** Explosion of steam boilers, steam pipes, steam engines or steam turbines owned or leased by you, or operated under your control. But if explosion of steam boilers, steam pipes, steam engines or steam turbines results in fire or combustion explosion, we will pay for the loss or damage caused by that fire or combustion explosion. We will also pay for loss or damage caused by or resulting from the explosion of gases or fuel within the furnace of any fired vessel or within the flues or passages through which the gases of combustion pass.

**f.** Continuous or repeated seepage or leakage of water that occurs over a period of 14 days or more.

**g.** Water, other liquids, powder or molten material that leaks or flows from plumbing, heating, air conditioning or other equipment (except fire protective systems) caused by or resulting from freezing, unless:

**(1)** You do your best to maintain heat in the building or structure; or

**(2)** You drain the equipment and shut off the supply if the heat is not maintained.

**h.** Dishonest or criminal act by you, any of your partners, employees (including leased employees), directors, trustees, authorized representatives or anyone to whom you entrust the property for any purpose:

**(1)** Acting alone or in collusion with others; or

**(2)** Whether or not occurring during the hours of employment.

This exclusion does not apply to acts of destruction by your employees (including leased employees); but theft by employees (including leased employees) is not covered.

2

MEDIATION – CONFIDENTIAL.
Subject to Protective Order - Highly Confidential

CNA_BSA0003641
BSAPolicyEv-00007129
TrustApp0996

i.   Voluntary parting with any property by you or anyone else to whom you have entrusted the property if induced to do so by any fraudulent scheme, trick, device or false pretense.

j.   Rain, snow, ice or sleet to personal property in the open.

k.   Collapse, except as provided below in the Additional Coverage for Collapse. But if collapse results in a Covered Cause of Loss at the described premises, we will pay for the loss or damage caused by that Covered Cause of Loss.

l.   Discharge, dispersal, seepage, migration, release or escape of "pollutants" unless the discharge, dispersal, seepage, migration, release or escape is itself caused by any of the "specified causes of loss." But if the discharge, dispersal, seepage, migration, release or escape of "pollutants" results in a "specified cause of loss," we will pay for the loss or damage caused by that "specified cause of loss".

3.   We will not pay for loss or damage caused by or resulting from any of the following, **3.a.** through **3.c.** But if an excluded cause of loss that is listed in **3.a.** through **3.c.** results in a Covered Cause of Loss, we will pay for the loss or damage caused by that Covered Cause of Loss.

a.   Weather conditions. But this exclusion only applies if weather conditions contribute in any way with a cause or event excluded in paragraph **1.** above to produce the loss or damage.

b.   Acts or decisions, including the failure to act or decide, of any person, group, organization or governmental body.

c.   Faulty, inadequate or defective:

(1) Planning, zoning, development, surveying, siting;

(2) Design, specifications, workmanship, repair, construction, renovation, remodeling, grading, compaction;

(3) Materials used in repair, construction, renovation or remodeling; or

(4) Maintenance;

of part or all of any property on or off the described premises.

4.   **Special Exclusions**

The following provisions apply only to the specified Coverage Forms.

a.   **Business Income (And Extra Expense) Coverage Form, Business Income (Without Extra Expense) Coverage Form, or Extra Expense Coverage Form**

We will not pay for:

(1) Any loss caused directly or indirectly by the failure of power or other utility service supplied to the described premises, however caused, if the failure occurs outside of a covered building.

But if the failure of power or other utility service results in a Covered Cause of Loss, we will pay for the loss resulting from that Covered Cause of Loss.

(2) Any loss caused by or resulting from:

(a) Damage or destruction of "finished stock"; or

(b) The time required to reproduce "finished stock."

This exclusion does not apply to Extra Expense.

(3) Any loss caused by or resulting from direct physical loss or damage to radio or television antennas (including satellite dishes) and their lead-in wiring, masts or towers.

(4) Any increase of loss caused by or resulting from:

(a) Delay in rebuilding, repairing or replacing the property or resuming "operations," due to interference at the location of the rebuilding, repair or replacement by strikers or other persons; or

(b) Suspension, lapse or cancellation of any license, lease or contract. But if the suspension, lapse or cancellation is directly caused by the suspension of "operations," we will cover such loss that affects your Business Income during the "period of restoration."

(5) Any Extra Expense caused by or resulting from suspension, lapse or cancellation of any license, lease or contract beyond the "period of restoration."

(6) Any other consequential loss.

b.   **Leasehold Interest Coverage Form**

(1) Paragraph **B.1.a.** Ordinance or Law, does not apply to insurance under this Coverage Form.

(2) We will not pay for any loss caused by:

(a) Your cancelling the lease;

CP 10 30 06 95          Copyright, ISO Commercial Risk Services, Inc., 1994

MEDIATION – CONFIDENTIAL.
Subject to Protective Order - Highly Confidential

CNA_BSA0003642
BSAPolicyEv-00007130
TrustApp0997

**(b)** The suspension, lapse or cancellation of any license; or

**(c)** Any other consequential loss.

**c. Legal Liability Coverage Form**

**(1)** The following Exclusions do not apply to insurance under this Coverage Form:

**(a)** Paragraph **B.1.a.**, Ordinance or Law;

**(b)** Paragraph **B.1.c.**, Governmental Action;

**(c)** Paragraph **B.1.d.**, Nuclear Hazard;

**(d)** Paragraph **B.1.e.**, Utility Services; and

**(e)** Paragraph **B.1.f.**, War and Military Action.

**(2)** The following additional exclusions apply to insurance under this Coverage Form:

**(a) Contractual Liability**

We will not defend any claim or "suit," or pay damages that you are legally liable to pay, solely by reason of your assumption of liability in a contract or agreement. But this exclusion does not apply to a written lease agreement in which you have assumed liability for building damage resulting from an actual or attempted burglary or robbery, provided that:

**(i)** Your assumption of liability was executed prior to the accident; and

**(ii)** The building is Covered Property under this Coverage Form.

**(b) Nuclear Hazard**

We will not defend any claim or "suit," or pay any damages, loss, expense or obligation, resulting from nuclear reaction or radiation, or radioactive contamination, however caused.

**C. LIMITATIONS**

The following limitations apply to all policy forms and endorsements, unless otherwise stated.

**1.** We will not pay for loss of or damage to property, as described and limited in this section. In addition, we will not pay for any loss that is a consequence of loss or damage as described and limited in this section.

**a.** Steam boilers, steam pipes, steam engines or steam turbines caused by or resulting from any condition or event inside such equipment. But we will pay for loss of or damage to such equipment caused by or resulting from an explosion of gases or fuel within the furnace of

any fired vessel or within the flues or passages through which the gases of combustion pass.

**b.** Hot water boilers or other water heating equipment caused by or resulting from any condition or event inside such boilers or equipment, other than an explosion.

**c.** The interior of any building or structure, or to personal property in the building or structure, caused by or resulting from rain, snow, sleet, ice, sand or dust, whether driven by wind or not, unless:

**(1)** The building or structure first sustains damage by a Covered Cause of Loss to its roof or walls through which the rain, snow, sleet, ice, sand or dust enters; or

**(2)** The loss or damage is caused by or results from thawing of snow, sleet or ice on the building or structure.

**d.** Building materials and supplies not attached as part of the building or structure, caused by or resulting from theft.

However, this limitation does not apply to:

**(1)** Building materials and supplies held for sale by you, unless they are insured under the Builders Risk Coverage Form; or

**(2)** Business Income coverage or Extra Expense coverage.

**e.** Property that is missing, where the only evidence of the loss or damage is a shortage disclosed on taking inventory, or other instances where there is no physical evidence to show what happened to the property.

**f.** Gutters and downspouts caused by or resulting from weight of snow, ice or sleet.

**g.** Property that has been transferred to a person or to a place outside the described premises on the basis of unauthorized instructions.

**2.** We will not pay more than $500 in any one occurrence for loss of or damage to glass that is part of a building or structure, regardless of the number of panes, plates or similar units of glass. Subject to this $500 aggregate, we will not pay more than $100 for any one pane, plate, multiple plate insulating unit, radiant or solar heating panel, jalousie, louver or shutter.

However, this limitation does not apply to:

**a.** Loss or damage by the "specified causes of loss", except vandalism; or

**b.** Business Income coverage or Extra Expense coverage.

**3.** We will not pay for loss of or damage to the following types of property unless caused by the

4020056188100012076585017R

4

CP 10 30 06 95                    Copyright, ISO Commercial Risk Services, Inc., 1994

CNA_BSA0003643
BSAPolicyEv-00007131
TrustApp0998

"specified causes of loss" or building glass breakage:

**a.** Valuable papers and records, such as books of account, manuscripts, abstracts, drawings, card index systems, film, tape, disc, drum, cell or other data processing, recording or storage media, and other records.

**b.** Animals, and then only if they are killed or their destruction is made necessary.

**c.** Fragile articles such as glassware, statuary, marbles, chinaware and porcelains, if broken. This restriction does not apply to:

**(1)** Glass that is part of a building or structure;

**(2)** Containers of property held for sale; or

**(3)** Photographic or scientific instrument lenses.

**d.** Builders' machinery, tools, and equipment owned by you or entrusted to you, provided such property is Covered Property.

However, this limitation does not apply to:

**(1)** If the property is located on or within 100 feet of the described premises, unless the premises is insured under the Builders Risk Coverage Form; or

**(2)** To Business Income coverage or to Extra Expense coverage.

**4.** The special limit shown for each category, **a.** through **d.**, is the total limit for loss of or damage to all property in that category. The special limit applies to any one occurrence of theft, regardless of the types or number of articles that are lost or damaged in that occurrence. The special limits are:

**a.** $2,500 for furs, fur garments and garments trimmed with fur.

**b.** $2,500 for jewelry, watches, watch movements, jewels, pearls, precious and semi-precious stones, bullion, gold, silver, platinum and other precious alloys or metals. This limit does not apply to jewelry and watches worth $100 or less per item.

**c.** $2,500 for patterns, dies, molds and forms.

**d.** $250 for stamps, tickets, including lottery tickets held for sale, and letters of credit.

These special limits are part of, not in addition to, the Limit of Insurance applicable to the Covered Property.

This limitation, **C.4.**, does not apply to Business Income coverage or to Extra Expense coverage.

**5.** We will not pay the cost to repair any defect to a system or appliance from which water, other liquid, powder or molten material escapes. But we will

pay the cost to repair or replace damaged parts of fire extinguishing equipment if the damage:

**a.** Results in discharge of any substance from an automatic fire protection system; or

**b.** Is directly caused by freezing.

However, this limitation does not apply to Business Income coverage or to Extra Expense coverage.

**D. ADDITIONAL COVERAGE – COLLAPSE**

The term Covered Cause of Loss includes the Additional Coverage – Collapse as described and limited in **D.1** through **D.5.** below.

**1.** We will pay for direct physical loss or damage to Covered Property, caused by collapse of a building or any part of a building insured under this Coverage Form, if the collapse is caused by one or more of the following:

**a.** The "specified causes of loss" or breakage of building glass, all only as insured against in this Coverage Part;

**b.** Hidden decay;

**c.** Hidden insect or vermin damage;

**d.** Weight of people or personal property;

**e.** Weight of rain that collects on a roof;

**f.** Use of defective material or methods in construction, remodeling or renovation if the collapse occurs during the course of the construction, remodeling or renovation. However, if the collapse occurs after construction, remodeling or renovation is complete and is caused in part by a cause of loss listed in **D.1.a.** through **D.1.e.**, we will pay for the loss or damage even if use of defective material or methods, in construction, remodeling or renovation, contributes to the collapse.

**2.** If the direct physical loss or damage does not involve collapse of a building or any part of a building, we will pay for loss or damage to Covered Property caused by the collapse of personal property only if:

**a.** The personal property which collapses is inside a building; and

**b.** The collapse was caused by a cause of loss listed in **D.1.a.** through **D.1.f.** above.

**3.** With respect to the following property:

**a.** Outdoor radio or television antennas (including satellite dishes) and their lead-in wiring, masts or towers;

**b.** Awnings, gutters and downspouts;

**c.** Yard fixtures;

**d.** Outdoor swimming pools;

MEDIATION – CONFIDENTIAL.
Subject to Protective Order - Highly Confidential

CNA_BSA0003644
BSAPolicyEv-00007132
TrustApp0999

**e.** Fences;

**f.** Piers, wharves and docks;

**g.** Beach or diving platforms or appurtenances;

**h.** Retaining walls; and

**i.** Walks, roadways and other paved surfaces;

if the collapse is caused by a cause of loss listed in **D.1.b.** through **D.1.f.,** we will pay for loss or damage to that property only if:

**a.** Such loss or damage is a direct result of the collapse of a building insured under this Coverage Form; and

**b.** The property is Covered Property under this Coverage Form.

**4.** Collapse does not include settling, cracking, shrinkage, bulging or expansion.

**5.** This Additional Coverage, Collapse, will not increase the Limits of Insurance provided in this Coverage Part.

**E. ADDITIONAL COVERAGE EXTENSIONS**

**1.** **Property in Transit.** This Extension applies only to your personal property to which this form applies.

**a.** You may extend the insurance provided by this Coverage Part to apply to your personal property (other than property in the care, custody or control of your salespersons) in transit more than 100 feet from the described premises. Property must be in or on a motor vehicle you own, lease or operate while between points in the coverage territory.

**b.** Loss or damage must be caused by or result from one of the following causes of loss:

**(1)** Fire, lightning, explosion, windstorm or hail, riot or civil commotion, or vandalism.

**(2)** Vehicle collision, upset or overturn. Collision means accidental contact of your vehicle with another vehicle or object. It does not mean your vehicle's contact with the road bed.

**(3)** Theft of an entire bale, case or package by forced entry into a securely locked body or compartment of the vehicle. There must be visible marks of the forced entry.

**c.** The most we will pay for loss or damage under this Extension is $1000.

This Coverage Extension is additional insurance. The Additional Condition, Coinsurance, does not apply to this Extension.

**2.** **Water Damage, Other Liquids, Powder or Molten Material Damage.** If loss or damage caused by or resulting from covered water or other liquid, powder or molten material damage loss occurs, we will also pay the cost to tear out and replace any part of the building or structure to repair damage to the system or appliance from which the water or other substance escapes.

**F. DEFINITIONS**

"Specified Causes of Loss" means the following: Fire; lightning; explosion; windstorm or hail; smoke; aircraft or vehicles; riot or civil commotion; vandalism; leakage from fire extinguishing equipment; sinkhole collapse; volcanic action; falling objects; weight of snow, ice or sleet; water damage.

**1.** Sinkhole collapse means the sudden sinking or collapse of land into underground empty spaces created by the action of water on limestone or dolomite. This cause of loss does not include:

**a.** The cost of filling sinkholes; or

**b.** Sinking or collapse of land into man-made underground cavities.

**2.** Falling objects does not include loss or damage to:

**a.** Personal property in the open; or

**b.** The interior of a building or structure, or property inside a building or structure, unless the roof or an outside wall of the building or structure is first damaged by a falling object.

**3.** Water damage means accidental discharge or leakage of water or steam as the direct result of the breaking apart or cracking of any part of a system or appliance (other than a sump system including its related equipment and parts) containing water or steam.

6

MEDIATION – CONFIDENTIAL.
Subject to Protective Order - Highly Confidential

CNA_BSA0003645
BSAPolicyEv-00007133

TrustApp1000

CP 99 93 10 90

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# TENTATIVE RATE

The rates used in the development of the premium for the Commercial Property Coverage Part are tentative. We will adjust the premium effective from the inception date of this Coverage Part once the rates are promulgated. If this is a renewal of a policy previously issued by us, we will adjust the premium effective from the renewal date of this Coverage Part once the rates are promulgated.

CP 99 93 10 90          Copyright, ISO Commercial Risk Services, Inc., 1983, 1989

MEDIATION – CONFIDENTIAL.
Subject to Protective Order - Highly Confidential

**CNA**
*For All the Commitments You Make®*

G-55601-E
(Ed. 07/92)

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## ENCOMPASS II TAILORED COMMERCIAL PROGRAM
### SERVICES PROGRAM EXTENSION ENDORSEMENT

This endorsement amends the coverage provided under the following forms:

1. The following changes apply to the **Building and Personal Property Coverage Form:**

   **A.** Item **b.** of paragraph **A.1.(5)** is replaced by:

   **b.** Materials, equipment, supplies and temporary structures on or within 1,000 feet of the described premises, used for making additions, alterations or repairs to the building or structure.

   **B.** Paragraph **A.1.b. – Your Business Personal Property** is replaced by:

   **b.** Your Business Personal Property located in or on the building described in the Declarations or in the open (or in a vehicle) within 1,000 feet of the described premises, consisting of the following unless otherwise specified in the Declarations or on Your Business Personal Property Separation of Coverage Form:

   **C.** The following is added to paragraph **1.b. Covered Property:**

   Personal Property which will become a part of your installation, fabrication or erection project while (not subject to the 1,000 feet of premises condition):

   **a.** At the site of installation, fabrication or erection;

   **b.** While in temporary storage awaiting installation, fabrication or erection.

   The most we will pay for loss or damage caused by a covered cause of loss is $10,000.

   If there is no superseding limit of insurance for this additional coverage, the limit provided applies. The limit provided or any superseding limit, whichever applies, shall be the exclusive limit and no other limit or combination of limit shall apply.

   **D.** Paragraph **A.1.c.(2)** is replaced by:

   **(2)** Located in or on the building described in the Declarations or in the open (or in a vehicle) within 1,000 feet of the described premises.

   **E.** The following is added to paragraph **1.c. – Covered Property:**

   This coverage also includes property sold under an installation agreement where your responsibil-

ity continues until the property is accepted by the buyer.

   **F.** Item **a.** of paragraph **2. Property Not Covered** is replaced by:

   **a.** Accounts, bills, currency, deeds, food stamps or other evidence of debt, money, notes or securities (lottery tickets held for sale are not securities), except as provided in the Coverage Extensions.

   **G.** Item **p.(2)** of paragraph **2. Property Not Covered** is replaced by:

   **p. (2)** Signs (other than signs attached to buildings), trees, shrubs, or plants, other than "stock" of trees, shrubs or plants, all except as provided in the Coverage Extensions.

   **H.** Item **b.** of paragraph **4. Additional Coverages** is replaced by:

   **b. Preservation of Property**

   If it is necessary to move Covered Property from the described premises to preserve it from, or for repair of, loss or damage by a Covered Cause of Loss, we will pay for any direct physical loss or damage to that property;

   **(1)** While it is being moved or while temporarily stored at another location; and

   **(2)** Only if the loss or damage occurs within 30 days after the property is first moved.

   **I.** Item **c.** of paragraph **4. Additional Coverage** is replaced by:

   **c.** When the fire department is called to save or protect Covered Property from a Covered Cause of Loss, we will pay up to $10,000 for your liability for Fire Department Service Charges.

   **J.** The following coverages are added to paragraph **4. Additional Coverages:**

   **e. Building Glass**

   **(1)** We will pay for direct physical loss of or damage to all building glass, including all lettering and ornamentation, located at the described premises:

G-55601-E
(Ed. 07/92)

Page 1 of 6



MEDIATION – CONFIDENTIAL.
Subject to Protective Order - Highly Confidential

CNA_BSA0003647
BSAPolicyEv-00007135
TrustApp1002

G-55601-E
(Ed. 07/92)

**(a)** Owned by you; or

**(b)** Owned by others but in your care, custody or control;

**(2)** We will also pay for necessary:

**(a)** Expenses incurred to put up temporary plates or board up openings;

**(b)** Repair or replacement of encasing frames; and

**(c)** Expenses incurred to remove or replace obstructions.

**f.** **Brands and Labels**

If your stock is damaged by a Covered Cause of Loss, you have two options when you do not want to sell your damaged stock under your brand or label even through the damaged stock has a salvage value: remove the brand or label and then re-label the stock to comply with the law; or label the damaged stock as "salvage" but, in doing so, cause no further damage to the damaged stock.

We will pay the cost of removing and re-labeling your stock.

In either case, we will pay the difference between the salvage value of the damaged stock with the brand and label attached and the salvage value of the damaged stock with the brand and label removed.

The most we will pay for loss or damage covered under this **Additional Coverage** is $10,000.

If there is no superseding limit of insurance for this **Additional Coverage,** the limit provided applies. The limit provided or any superseding limit, whichever applies, shall be the exclusive limit and no other limit or combination of limit shall apply.

**g.** **Inventory and Appraisals**

In the event of loss or damage caused by a Covered Cause of Loss, we will pay reasonable expenses incurred by you at our request to assist us in the determination of the amount of loss such as taking inventory and appraisals.

We will not pay for the following:

**(1)** Expenses incurred under Section **E.** Loss Conditions, subparagraph **2.** Appraisal;

**(2)** Public adjusters' fees.

The most we will pay under this **Additional Coverage** is $5,000.

If there is no superseding limit of insurance for this **Additional Coverage,** the limit provided applies. The limit provided or any superseding limit, whichever applies, shall be the exclusive limit and no other limit or combination of limit shall apply.

**h.** **Consequential Damage**

Consequential damage means a part or parts of your product are physically lost or damaged by a covered cause of loss causing the part or parts that are undamaged to be unmarketable as a complete product.

You may extend the insurance that applies to Your Business Personal Property to apply to the consequential loss of your undamaged product part or parts.

The most we will pay for loss or damage under this **Coverage Extension** is $10,000.

If there is no superseding limit of insurance for this **Additional Coverage,** the limit provided applies. The limit provided or any superseding limit, whichever applies, shall be the exclusive limit and no other limit or combination of limit shall apply.

**K.** Item **a.** of paragraph **5. Coverage Extensions** is replaced by:

**a.** **Newly Acquired or Constructed Property**

**(1)** You may extend the insurance that applies to Covered Property to apply to:

**(a)** Your new building(s) while being built on the described premises;

**(b)** Building(s) you acquire at locations, other than the described premises within the Coverage Territory, intended for:

**1.** Similar use as the building described in the Declarations; or

**2.** Use as a warehouse;

**(c)** Your Business Personal Property at any location you acquire.

**(2)** You may extend the insurance that applies to Buildings to apply to:

**(a)** New buildings being built on your described premises; and

**(b)** Buildings you acquire at any premises not described in the policy;

The most we will pay for loss or damage caused by a Covered Cause of Loss in any one occurrence under this **Coverage Extension** is $500,000.

G-55601-E
(Ed. 07/92)

MEDIATION – CONFIDENTIAL.
Subject to Protective Order - Highly Confidential

CNA_BSA0003648
BSAPolicyEv-00007136
TrustApp1003

G-55601-E
(Ed. 07/92)

**(3)** You may extend the insurance that applies to Your Business Personal Property to apply to property at any premises you acquire within the Coverage Territory other than at any fair or exhibition.

The most we will pay for loss or damage caused by a Covered Cause of Loss in any one occurrence under this **Coverage Extension** is $250,000.

**(4)** Insurance under this **Coverage Extension** for each newly acquired or constructed property will end when any of the following occurs:

**(a)** This policy expires;

**(b)** 90 days expire after you acquire or begin to construct the property; or

**(c)** You report values to us.

We will charge you additional premium for values reported from the date construction begins or you acquire the property.

**L.** Item **b.** of paragraph **5. Coverage Extensions** is replaced by:

**b.    Personal Effects and Property of Others**

You may extend the insurance that applies to Your Business Personal Property to apply to:

**(1)** Personal effects owned by you, your officers, your partners or your employees. The most we will pay for loss or damage by a Covered Cause of Loss under this **Coverage Extension** is $15,000 at each described premises;

**(2)** Personal Property of others in your care, custody or control. The most we will pay for loss or damage caused by a Covered Cause of Loss under this **Coverage Extension** is $15,000 at each described premises. Our payment for loss of or damage to personal property of others will only be for the account of the owner of the property.

**M.** Item **c.** of paragraph **5. Coverage Extensions** is amended as follows:

The most we will pay for loss or damage by a Covered Cause of Loss under this **Coverage Extension, Valuable Papers and Records – Cost of Research** is $15,000 at each described premises.

**N.** Item **d.** of paragraph **5. Coverage Extensions** is replaced by:

**d.    Property Off-Premises**

You may extend coverage to apply to your **Covered Property**, that is temporarily at a location you do not own, lease or operate, in the care, custody or control of a salesperson, or at any fair or exhibition. This **Coverage Extension** applies only if loss or damage is caused by a Covered Cause of Loss. This **Coverage Extension** does not apply to Covered Property in or on a vehicle.

The most we will pay for loss or damage under this **Coverage Extension** is:

**(1)** $15,000 for property at a temporary location;

**(2)** $1,000 for property in the care, custody or control of a salesperson;

**(3)** $15,000 for property at any fair or exhibition.

**O.** Item **e.** of paragraph **5. Coverage Extensions** is replaced by:

**e.    Trees, Shrubs, Plants and Signs**

You may extend coverage to apply to your signs (other than signs attached to your buildings); outdoor trees, shrubs and plants, other than "stock" of trees, shrubs or plants including Debris Removal expenses. This **Coverage Extension** is subject to the following:

**(1)** Signs (other than signs attached to your buildings). The most we will pay for loss or damage caused by a Covered Cause of Loss is $5,000 at each described premises;

**(2)** Outdoor trees, shrubs and plants (other than "stock" of trees, shrubs and plants). The most we will pay for loss or damage caused by a Covered Cause of Loss is $10,000 at each described premises, but not more than $500 for any one tree, shrub or plant. We will not pay for loss or damage to outdoor trees, shrubs, and plants resulting from the following causes of loss: windstorm or hail; vehicles; vandalism; disease.

**P.** The following Extensions of Coverage are added to paragraph **5. Coverage Extensions**:

**1.    Extra Expense**

You may extend the insurance that applies to your Covered Property to cover the extra expenses necessarily incurred by you to continue normal services and operations which

G-55601-E
(Ed. 07/92)

Page 3 of 6

MEDIATION – CONFIDENTIAL.
Subject to Protective Order - Highly Confidential

CNA_BSA0003649
BSAPolicyEv-00007137

TrustApp1004

G-55601-E
(Ed. 07/92)

are interrupted due to loss or damage caused by a Covered Cause of Loss to the premises described. This **Coverage Extension** is subject to the following:

**(1)** You will exercise due diligence and dispatch to restore normal services and operations; and

**(2)** The most we will pay under this **Coverage Extension** is $25,000.

**g.  Accounts Receivable**

You may extend the insurance that applies to your Covered Property to cover the following loss and expenses which are the direct result of loss or damage caused by a Covered Cause of Loss to accounts receivable records:

**(1)** All sums due you from customers, provided you are unable to effect collection;

**(2)** Interest charges on any loan to offset impaired collections pending repayment of such sums made uncollectible by loss or damage;

**(3)** Collection expenses in excess of normal collection cost made necessary because of loss or damage;

**(4)** Other reasonable expenses incurred by you in re-establishing records of accounts receivable following such loss or damage.

The most we will pay under this **Coverage Extension** is $25,000 at each described premises.

**h.  Money and Securities**

**(1)** We will pay for loss of money and securities used in your business while at a bank or savings institution, within your living quarters or the living quarters of your partners or any employee having use and custody of the property, at the described premises, or in transit between any of these places, resulting directly from:

**(a)** Theft, meaning any act of stealing;

**(b)** Disappearance; or

**(c)** Destruction.

**(2)** In addition to the Limitations and Exclusions applicable to property coverage, we will not pay for loss:

**(a)** Resulting from accounting or arithmetical errors or omissions;

**(b)** Due to the giving or surrendering of property in any exchange or purchase; or

**(c)** Of property contained in any money-oriented device unless the amount of money deposited in it is recorded by a continuous recording instrument in the device.

**(3)** The most we will pay for loss in any one occurrence is:

**(a)** $5,000 Inside the Premises for money and securities while:

**1.**  In or on the described premises; or

**2.**  Within a bank or savings institution; and

**(b)** $2,500 Outside the Premises for money and securities while anywhere else.

**(4)** All loss:

**(a)** Caused by one or more persons; or

**(b)** Involving a single act or series of related acts;

is considered one occurrence.

**(5)** You must keep records of all money and securities so we can verify the amount of any loss or damage.

**(6)** In the event of loss or damage we will determine the value as follows:

**(a)** Money at its face value; and

**(b)** Securities at their value at the close of business on the day the loss is discovered.

**i.  Fine Arts**

You may extend coverage that applies to Covered Property to cover loss or damage to paintings, etchings, pictures, tapestries, art glass windows and other bona fide works of art of rarity, historical value or artistic merit. This **Coverage Extension** is subject to the following:

**(1)** Loss or damage was caused by a Covered Cause of Loss; and

**(2)** The most we will pay under this **Coverage Extension** is $10,000 at each described premises.

**j.  Arson Reward**

We will pay up to $5,000 for information which leads to an arson conviction in connection with a covered fire loss. Regardless of the number of persons involved in providing information our liability under this **Coverage Extension** will not be increased.

G-55601-E
(Ed. 07/92)

Page 4 of 6

MEDIATION – CONFIDENTIAL.
Subject to Protective Order - Highly Confidential

CNA_BSA0003650
BSAPolicyEv-00007138

TrustApp1005

G-55601-E
(Ed. 07/92)

**k.  Fire Extinguisher Recharge**

We will pay up to an amount not exceeding $2,500 in any one occurrence for the cost of recharging your Underwriter's Laboratories listed or Factory Mutual approved type ABC (multipurpose) fire extinguishers or dry chemical fixed pipe fire extinguishing systems after being used in fighting a fire on your premises or on adjoining premises.

The following applies to **Coverage Extensions K.** through **P.** above:

If there is no superseding limit of insurance for the above **Coverage Extensions K.** through **P.,** the indicated **Coverage Extension** limit of insurance applies. The limit(s) provided or any superseding limit(s), whichever applies, shall be the exclusive limit and no other limit or combination of limit shall apply.

**Q.**  Paragraph **C. Limits of Insurance** is replaced by:

**C.  Limits of Insurance**

The most we will pay for loss or damage in any one occurrence is the applicable Limits of Insurance shown in the Declarations.

The Limits of Insurance applicable to the Coverage Extensions, and the Fire Department Service Charge and Pollutant Clean Up and Removal Additional Coverages are in addition to the Limits of Insurance shown in the Declarations.

Payment under the following Additional Coverages will not increase the applicable Limit of Insurance:

**(1)**  Preservation of Property; or

**(2)**  Debris Removal; but if:

**a.**  The sum of loss or damage and Debris Removal expense exceeds the Limit of Insurance; or

**b.**  The Debris Removal expense exceeds the amount payable under the 25% Debris Removal Additional Coverage.

We will pay up to an additional $25,000 for each location in any one occurrence under the Debris Removal Additional Coverage.

**2.**  The following changes apply to the **Causes of Loss – Special Form:**

**A.**  Item **1.** of paragraph **C. Limitations** is amended by adding:

**h.**  Radio or television antennas, including their lead-in wiring, masts or towers when loss or

damage is caused by windstorm, hail, rain, sleet, snow, ice or weight of ice.

**B.**  Items **2.** and **4.c.** of paragraph **C. Limitations** are deleted.

**C.**  Item **1.** of paragraph **E. Additional Coverage Extensions** is replaced by:

**1.  Property in Transit.** This Coverage Extension applies only to your personal property to which this form applies.

**a.**  You may extend coverage to apply to Your Business Personal Property in transit more than 1,000 feet from the described premises. Property must be in or on a motor vehicle you own, lease or operate while between points in the Coverage Territory;

**b.**  **(1)**  Loss or damage must be caused by or resulting from a Covered Cause of Loss or one of the following additional covered causes of loss: Flood, meaning the rising of rivers and streams; earthquake; collision; derailment or overturn of transporting vehicles; collapse of bridges, culverts, docks, or wharves;

**(2)**  Loss or damage by theft must be caused by or resulting from the theft of an entire bale, case, or package by forced entry (of which there must be visible evidence) into the properly locked body or compartment of the vehicle;

**c.**  The most we will pay in any one occurrence for loss or damage under this **Coverage Extension** is:

**(1)**  $15,000 for property in transit;

**(2)**  $1,000 for property in the care, custody or control of your salesperson while in transit.

Loss or damage due to theft of property from a vehicle is subject to the following: that vehicles will be properly locked even when garaged in a public or private garage (the doors of the private garage will be locked). Properly locked means all vehicle doors, compartments, and windows are closed and locked.

This coverage is additional insurance. The Coinsurance Condition does not apply to this **Coverage Extension.**

**D.**  The following is added under Paragraph **E. Additional Coverage Extensions:**

MEDIATION – CONFIDENTIAL.
Subject to Protective Order - Highly Confidential

CNA_BSA0003651
BSAPolicyEv-00007139
TrustApp1006

G-55601-E
(Ed. 07/92)

3.  **Back Up of Sewer or Drain Water Damage.**

We will pay for loss or damage to covered property caused by water that backs up from a sewer or drain. However, this **Coverage Extension** does not provide coverage for loss or damage due to water emanating from a sump pump well or similar device designed to pre-vent overflow, seepage or leakage of subsur-face water.

The most we will pay for loss or damage un-der this **Coverage Extension** is $2,500.

This Coverage Extension is additional in-surance. The Coinsurance Condition does not apply to this **Coverage Extension**.

MEDIATION – CONFIDENTIAL.
Subject to Protective Order - Highly Confidential

CNA_BSA0003652
BSAPolicyEv-00007140
TrustApp1007

 CNA Plaza
Chicago, Illinois 60685
For All the Commitments You Make®

DECLARATIONS
YOUR SERVICE INDUSTRY PACKAGE

RENEWAL DECLARATION

| Policy Number | From Policy Period To | Coverage Is Provided By | Agency |
|---|---|---|---|
| B1 67481043 | 03/26/99  03/26/00 | NATL FIRE INS. CO. OF HARTFORD | 005618610 |

| Named Insured And Address | Agent |
|---|---|
| SCOUT HUT - BOY/GIRL SCOUTS<br>ATTN K BOYER BSA PACK 4<br>831 ERIE<br>SHREVEPORT, LA  71106 | HARRIS LEARY & COMPANY INC<br>2525 YOUREE DR - STE<br>P O BOX 44084<br>SHREVEPORT  LA  71134 |

COMMERCIAL GENERAL LIABILITY COVERAGE PART DECLARATIONS

ITEM

2.  POLICY PERIOD:  THIS POLICY BECOMES EFFECTIVE AND EXPIRES AT 12:01 A.M.
                    STANDARD TIME AT YOUR MAILING ADDRESS SHOWN ABOVE.

    IN RETURN FOR THE PAYMENT OF THE PREMIUM, AND SUBJECT TO ALL TERMS
    CONTAINED HEREIN, WE AGREE WITH YOU TO PROVIDE THE INSURANCE AS STATED.

3.  AUDIT PERIOD IS ANNUAL, UNLESS OTHERWISE STATED.   NOT-APPLICABLE

4.  LIMITS OF INSURANCE
        EACH OCCURRENCE LIMIT                      $    100000
        PERSONAL AND ADVERTISING INJURY LIMIT      $
        MEDICAL EXPENSE LIMIT                      $      5000  ANY ONE PERSON
        FIRE DAMAGE LIMIT                          $     50000  ANY ONE FIRE
        PRODUCTS-COMPLETED OPERATIONS              $    200000
           AGGREGATE LIMIT

        GENERAL AGGREGATE LIMIT (OTHER THAN        $    200000
        PRODUCTS-COMPLETED OPERATIONS)

5.  NAMED INSURED IS:
        (  ) INDIVIDUAL    (  ) JOINT VENTURE    (  ) PARTNERSHIP
        (  ) CORPORATION
        ( X ) OTHER   ASSOCIATION

    BUSINESS DESCRIPTION:
    MEETING HALL - BOY/GIRL SCOUTS

    LOCATION OF ALL PREMISES YOU OWN, RENT OR OCCUPY:

        001  800(804) THORA BLVD ; SHREVEPORT , LA 71106

*Subject Protective Order - Highly Confidential* (watermark)

AGENT

MEDIATION – CONFIDENTIAL.
Subject to Protective Order - Highly Confidential

CNA_BSA0003653
BSAPolicyEv-00007141
TrustApp1008



CNA Plaza
Chicago, Illinois 60685

DECLARATIONS
YOUR SERVICE INDUSTRY PACKAGE

RENEWAL DECLARATION

| Policy Number | From | Policy Period | To | Coverage Is Provided By | Agency |
|---|---|---|---|---|---|
| B1 67481043 | 03/26/99 | | 03/26/00 | NATL FIRE INS. CO. OF HARTFORD | 005618610 |

| Named Insured And Address | Agent |
|---|---|
| SCOUT HUT - BOY/GIRL SCOUTS<br>ATTN K BOYER BSA PACK 4<br>831 ERIE<br>SHREVEPORT, LA  71106 | HARRIS LEARY & COMPANY INC<br>2525 YOUREE DR - STE<br>P O BOX 44084<br>SHREVEPORT  LA  71134 |

6.  FORMS AND ENDORSEMENTS APPLICABLE AT TIME OF ISSUANCE:                  PREMIUM

        SEE ATTACHED SCHEDULE OF FORMS AND ENDORSEMENTS            $
                                                                   $
                                                                   $
                                                                   $
                                                                   $

7.  YEAR IN TRANSITION PROGRAM:  0

8.  PREMIUM FOR THIS COVERAGE PART:  PREMIUM PAYABLE AT INCEPTION $    137.00

9.  THESE DECLARATIONS AND THE GENERAL DECLARATIONS, IF APPLICABLE, TOGETHER
    WITH THE COMMON POLICY CONDITIONS, COVERAGE FORM(S) AND FORMS AND ENDORSE-
    MENTS, IF ANY, ISSUED TO FORM A PART THEREOF, COMPLETE THE ABOVE NUMBERED
    POLICY.

COUNTERSIGNED_____        BY_____
                 DATE                                   AUTHORIZED AGENT

P-55170-A (1/86 ED.)

AGENT

MEDIATION – CONFIDENTIAL.
Subject to Protective Order - Highly Confidential

CNA_BSA0003654
BSAPolicyEv-00007142
TrustApp1009



CNA Plaza
Chicago, Illinois 60685

For All the Commitments You Make®

RENEWAL DECLARATION

| Policy Number | From | Policy Period | To | Coverage Is Provided By | Agency |
|---|---|---|---|---|---|
| B1 67481043 | 03/26/99 | | 03/26/00 | NATL FIRE INS. CO. OF HARTFORD | 005618610 |

| Named Insured And Address | Agent |
|---|---|
| SCOUT HUT - BOY/GIRL SCOUTS<br>ATTN K BOYER BSA PACK 4<br>831 ERIE<br>SHREVEPORT, LA  71106 | HARRIS LEARY & COMPANY INC<br>2525 YOUREE DR - STE<br>P O BOX 44084<br>SHREVEPORT  LA  71134 |

### GENERAL LIABILITY SCHEDULE

THE ADDITIONAL DECLARATIONS AND SCHEDULE BELOW ARE AN EXTENSION OF THOSE ISSUED
IN CONNECTION WITH COMMERCIAL GENERAL LIABILITY INSURANCE.

### LIMITS OF INSURANCE

| | | |
|---|---|---|
| EACH OCCURRENCE LIMIT | $ REFER TO | |
| PERSONAL & ADVERTISING INJURY LIMIT | $ DECLAR- | |
| MEDICAL EXPENSE LIMIT | $ ATION | ANY ONE PERSON |
| FIRE DAMAGE LIMIT | $ | ANY ONE FIRE |
| PRODUCTS-COMPLETED OPERATIONS AGGREGATE LIMIT | $ | |
| GENERAL AGGREGATE LIMIT | $ | |
| (OTHER THAN PRODUCTS-COMPLETED OPERATIONS) | | |

### SCHEDULE

| DESCRIPTION OF HAZARDS<br>(AND LOCATION IF DIFFERENT<br>FROM ADDRESS SHOWN IN ITEM<br>1 OF DECLARATIONS) | CODE<br>NO. | PREMIUM<br>BASES AS<br>DESCRIBED<br>IN THE<br>SCHEDULE | RATES<br><br>PROPERTY<br>DAMAGE<br>& BODILY<br>INJURY | ADVANCE PREMIUMS<br><br>PROPERTY<br>DAMAGE<br>& BODILY<br>INJURY |
|---|---|---|---|---|
| PREMISES\OPERATIONS | | * (A)<br>* (P)<br>* (S) | ** (A)<br>** (P)<br>** (S) | |
| LOCATION 001<br>BOY OR GIRL SCOUT COUNCILS<br>INCLUDING PRODUCTS AND/OR<br>COMPLETED OPERATIONS | 41001 | 10<br>(SC) | 0.766 | 8 |
| ADDITIONAL CHARGE FOR SUBLINE | | | | 129 |
| MINIMUM | | | | |

AGENT



CNA Plaza
Chicago, Illinois 60685

RENEWAL DECLARATION

| Policy Number | From | Policy Period | To | Coverage Is Provided By | Agency |
|---|---|---|---|---|---|
| B1 67481043 | 03/26/99 | | 03/26/00 | NATL FIRE INS. CO. OF HARTFORD | 005618610 |

| Named Insured And Address | Agent |
|---|---|
| SCOUT HUT - BOY/GIRL SCOUTS<br>ATTN K BOYER BSA PACK 4<br>831 ERIE<br>SHREVEPORT, LA  71106 | HARRIS LEARY & COMPANY INC<br>2525 YOUREE DR - STE<br>P O BOX 44084<br>SHREVEPORT  LA  71134 |

| DESCRIPTION OF HAZARDS<br>(AND LOCATION IF DIFFERENT<br>FROM ADDRESS SHOWN IN ITEM<br>1 OF DECLARATIONS) | CODE<br>NO. | PREMIUM<br>BASES AS<br>DESCRIBED<br>IN THE<br>SCHEDULE | RATES<br><br>PROPERTY<br>DAMAGE<br>& BODILY<br>INJURY | ADVANCE PREMIUMS<br><br>PROPERTY<br>DAMAGE<br>& BODILY<br>INJURY |
|---|---|---|---|---|
| PRODUCTS/COMPLETED OPERATIONS | | * (P)<br>* (S) | ** (P)<br>** (S) | |
| | | TOTAL | | 137 |

```
        *                                     **
   PREMIUM BASES                             RATES

(A) = AREA                      (A) = PER 1,000 SQUARE FEET OF AREA

(P) = PAYROLL                   (P) = PER $1,000 OF PAYROLL

(S) = GROSS SALES               (S) = PER $1,000 OF GROSS SALES
```

P-55172-A (1/86 ED.)

AGENT

MEDIATION – CONFIDENTIAL.
Subject to Protective Order - Highly Confidential

CNA_BSA0003656
BSAPolicyEv-00007144
TrustApp1011



CNA Plaza
Chicago, Illinois 60685

| Policy Number | From | Policy Period | To | Coverage Is Provided By | Agency |
|---|---|---|---|---|---|
| B1 67481043 | 03/26/99 | 03/26/00 | | NATL FIRE INS. CO. OF HARTFORD | 005618610 |

| Named Insured And Address | Agent |
|---|---|
| SCOUT HUT - BOY/GIRL SCOUTS<br>ATTN K BOYER BSA PACK 4<br>831 ERIE<br>SHREVEPORT, LA 71106 | HARRIS LEARY & COMPANY INC<br>2525 YOUREE DR - STE<br>P O BOX 44084<br>SHREVEPORT LA 71134 |

POLICY FORMS AND ENDORSEMENTS SCHEDULE

FORM NUMBER       FORM TITLE

*** LIABILITY FORMS AND ENDORSEMENTS ***
P55172A      01/86     Commercial General Liability Schedule
CG0001       01/96     Commercial General Liability Coverage Form
CG0054       03/97     Amndt of Poll. Excl Exception for Bldg/Htg Eqpt.
CG0055       03/97     Amendment of Other Ins. Condition (Occurrence Ver)
CG0108       11/85     Alabama and Louisiana Changes - Who Is An Insured
CG0118       03/96     Louisiana Changes - Legal Action Against Us
CG0125       08/97     Louisiana Changes - Insuring Agreement
CG2147       10/93     Employment-Related Practices Exclusion
CG2640       03/96     Louisiana Changes - Non-Binding Arbitration
G55157B      02/88     Premium Bases
IL0017       11/85     Common Policy Conditions
IL0021       11/94     Nuclear Energy Liab Exclusion Endt (Broad Form)
IL0277       02/94     Louisiana Changes - Cancellation and Nonrenewal

P 55738 A   01/86



AGENT

MEDIATION – CONFIDENTIAL.
Subject to Protective Order - Highly Confidential

CNA_BSA0003657
BSAPolicyEv-00007145
TrustApp1012

COMMERCIAL GENERAL LIABILITY
CG 00 01 01 96

# COMMERCIAL GENERAL LIABILITY COVERAGE FORM

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this policy the words "you" and "your" refer to the Named Insured shown in the Declarations, and any other person or organization qualifying as a Named Insured under this policy. The words "we", "us" and "our" refer to the company providing this insurance.

The word "insured" means any person or organization qualifying as such under WHO IS AN INSURED (SECTION II).

Other words and phrases that appear in quotation marks have special meaning. Refer to DEFINITIONS (SECTION V).

## SECTION I – COVERAGES

## COVERAGE A. BODILY INJURY AND PROPERTY DAMAGE LIABILITY

**1. Insuring Agreement.**

**a.** We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply. We may, at our discretion, investigate any "occurrence" and settle any claim or "suit" that may result. But:

    **(1)** The amount we will pay for damages is limited as described in LIMITS OF INSURANCE (SECTION III); and

    **(2)** Our right and duty to defend end when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages A or B or medical expenses under Coverage C.

No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under SUPPLEMENTARY PAYMENTS – COVERAGES A AND B.

**b.** This insurance applies to "bodily injury" and "property damage" only if:

    **(1)** The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory"; and

    **(2)** The "bodily injury" or "property damage" occurs during the policy period.

**c.** Damages because of "bodily injury" include damages claimed by any person or organization for care, loss of services or death resulting at any time from the "bodily injury".

**2. Exclusions.**

This insurance does not apply to:

**a. Expected or Intended Injury**

"Bodily injury" or "property damage" expected or intended from the standpoint of the insured. This exclusion does not apply to "bodily injury" resulting from the use of reasonable force to protect persons or property.

**b. Contractual Liability**

"Bodily injury" or "property damage" for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement. This exclusion does not apply to liability for damages:

    **(1)** that the insured would have in the absence of the contract or agreement; or

    **(2)** assumed in a contract or agreement that is an "insured contract", provided the "bodily injury" or "property damage" occurs subsequent to the execution of the contract or agreement. Solely for the purposes of liability assumed in an "insured contract", reasonable attorney fees and necessary litigation expenses incurred by or for a party other than an insured are deemed to be damages because of "bodily injury" or "property damage", provided:

        **(a)** liability to such party for, or for the cost of, that party's defense has also been assumed in the same "insured contract"; and

        **(b)** such attorney fees and litigation expenses are for defense of that party against a civil or alternative dispute resolution proceeding in which damages to which this insurance applies are alleged.

**c. Liquor Liability**

"Bodily injury" or "property damage" for which any insured may be held liable by reason of:

    **(1)** Causing or contributing to the intoxication of any person;

    **(2)** The furnishing of alcoholic beverages to a person under the legal drinking age or under the influence of alcohol; or

    **(3)** Any statute, ordinance or regulation relating to the sale, gift, distribution or use of alcoholic beverages.

CG 00 01 01 96        Copyright, Insurance Services Office, Inc., 1994

MEDIATION – CONFIDENTIAL.
Subject to Protective Order - Highly Confidential

CNA_BSA0003658
BSAPolicyEv-00007146
TrustApp1013

COMMERCIAL GENERAL LIABILITY
CG 00 01 01 96

This exclusion applies only if you are in the business of manufacturing, distributing, selling, serving or furnishing alcoholic beverages.

**d. Workers Compensation and Similar Laws**

Any obligation of the insured under a workers compensation, disability benefits or unemployment compensation law or any similar law.

**e. Employer's Liability**

"Bodily injury" to:

**(1)** An "employee" of the insured arising out of and in the course of:

**(a)** Employment by the insured; or

**(b)** Performing duties related to the conduct of the insured's business; or

**(2)** The spouse, child, parent, brother or sister of that "employee" as a consequence of paragraph **(1)** above.

This exclusion applies:

**(1)** Whether the insured may be liable as an employer or in any other capacity; and

**(2)** To any obligation to share damages with or repay someone else who must pay damages because of the injury.

This exclusion does not apply to liability assumed by the insured under an "insured contract".

**f. Pollution**

**(1)** "Bodily injury" or "property damage" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of pollutants:

**(a)** At or from any premises, site or location which is or was at any time owned or occupied by, or rented or loaned to, any insured;

**(b)** At or from any premises, site or location which is or was at any time used by or for any insured or others for the handling, storage, disposal, processing or treatment of waste;

**(c)** Which are or were at any time transported, handled, stored, treated, disposed of, or processed as waste by or for any insured or any person or organization for whom you may be legally responsible; or

**(d)** At or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations:

**(i)** If the pollutants are brought on or to the premises, site or location in

connection with such operations by such insured, contractor or subcontractor; or

**(ii)** If the operations are to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of pollu- tants.

Subparagraph **(d)(i)** does not apply to "bodily injury" or "property damage" arising out of the escape of fuels, lubricants or other operating fluids which are needed to perform the normal electrical, hydraulic or mechanical functions necessary for the operation of "mobile equipment" or its parts, if such fuels, lubricants or other operating fluids escape from a vehicle part designed to hold, store or receive them. This exception does not apply if the fuels, lubricants or other operating fluids are intentionally discharged, dispersed or released, or if such fuels, lubricants or other operating fluids are brought on or to the premises, site or location with the intent to be discharged, dispersed or released as part of the operations being performed by such insured, contractor or subcontractor.

Subparagraphs **(a)** and **(d)(i)** do not apply to "bodily injury" or "property damage" arising out of heat, smoke or fumes from a hostile fire.

As used in this exclusion, a hostile fire means one which becomes uncontrollable or breaks out from where it was intended to be.

**(2)** Any loss, cost or expense arising out of any:

**(a)** Request, demand or order that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of pollutants; or

**(b)** Claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of pollutants.

Pollutants means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

**g. Aircraft, Auto or Watercraft**

"Bodily injury" or "property damage" arising out of the ownership, maintenance, use or entrustment to others of any aircraft, "auto" or watercraft owned or operated by or rented or loaned to any insured. Use includes operation and "loading or unloading".

2

MEDIATION – CONFIDENTIAL.
Subject to Protective Order - Highly Confidential

CNA_BSA0003659
BSAPolicyEv-00007147
TrustApp1014

COMMERCIAL GENERAL LIABILITY
CG 00 01 01 96

This exclusion does not apply to:

**(1)** A watercraft while ashore on premises you own or rent;

**(2)** A watercraft you do not own that is:

**(a)** Less than 26 feet long; and

**(b)** Not being used to carry persons or property for a charge;

**(3)** Parking an "auto" on, or on the ways next to, premises you own or rent, provided the "auto" is not owned by or rented or loaned to you or the insured;

**(4)** Liability assumed under any "insured contract" for the ownership, maintenance or use of aircraft or watercraft; or

**(5)** "Bodily injury" or "property damage" arising out of the operation of any of the equipment listed in paragraph **f.(2)** or **f.(3)** of the definition of "mobile equipment".

**h.   Mobile Equipment**

"Bodily injury" or "property damage" arising out of:

**(1)** The transportation of "mobile equipment" by an "auto" owned or operated by or rented or loaned to any insured; or

**(2)** The use of "mobile equipment" in, or while in practice for, or while being prepared for, any prearranged racing, speed, demolition, or stunting activity.

**i.   War**

"Bodily injury" or "property damage" due to war, whether or not declared, or any act or condition incident to war. War includes civil war, insurrection, rebellion or revolution. This exclusion applies only to liability assumed under a contract or agreement.

**j.   Damage to Property**

"Property damage" to:

**(1)** Property you own, rent, or occupy;

**(2)** Premises you sell, give away or abandon, if the "property damage" arises out of any part of those premises;

**(3)** Property loaned to you;

**(4)** Personal property in the care, custody or control of the insured;

**(5)** That particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the "property damage" arises out of those operations; or

**(6)** That particular part of any property that must be restored, repaired or replaced because "your work" was incorrectly performed on it.

Paragraph **(2)** of this exclusion does not apply if the premises are "your work" and were never occupied, rented or held for rental by you.

Paragraphs **(3), (4), (5)** and **(6)** of this exclusion do not apply to liability assumed under a sidetrack agreement.

Paragraph **(6)** of this exclusion does not apply to "property damage" included in the "products-completed operations hazard".

**k.   Damage to Your Product**

"Property damage" to "your product" arising out of it or any part of it.

**l.   Damage to Your Work**

"Property damage" to "your work" arising out of it or any part of it and included in the "products-completed operations hazard".

This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor.

**m.   Damage to Impaired Property or Property Not Physically Injured**

"Property damage" to "impaired property" or property that has not been physically injured, arising out of:

**(1)** A defect, deficiency, inadequacy or dangerous condition in "your product" or "your work"; or

**(2)** A delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms.

This exclusion does not apply to the loss of use of other property arising out of sudden and accidental physical injury to "your product" or "your work" after it has been put to its intended use.

**n.   Recall of Products, Work or Impaired Property**

Damages claimed for any loss, cost or expense incurred by you or others for the loss of use, withdrawal, recall, inspection, repair, replacement, adjustment, removal or disposal of:

**(1)** "Your product";

**(2)** "Your work"; or

**(3)** "Impaired property";

if such product, work, or property is withdrawn or recalled from the market or from use by any person or organization because of a known or suspected defect, deficiency, inadequacy or dangerous condition in it.

Exclusions **c.** through **n.** do not apply to damage by fire to premises while rented to you or temporarily occupied by you with permission of the owner. A separate limit of insurance applies to this coverage as described in LIMITS OF INSURANCE (Section **III**).

3

CG 00 01 01 96                Copyright, Insurance Services Office, Inc., 1994

MEDIATION – CONFIDENTIAL.
Subject to Protective Order - Highly Confidential

CNA_BSA0003660
BSAPolicyEv-00007148
TrustApp1015

COMMERCIAL GENERAL LIABILITY
CG 00 01 01 96

**COVERAGE B. PERSONAL AND ADVERTISING INJURY LIABILITY**

**1. Insuring Agreement.**

a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "personal injury" or "advertising injury" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "personal injury" or "advertising injury" to which this insurance does not apply. We may, at our discretion, investigate any "occurrence" or offense and settle any claim or "suit" that may result. But:

   (1) The amount we will pay for damages is limited as described in LIMITS OF INSURANCE (SECTION III); and

   (2) Our right and duty to defend end when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverage A or B or medical expenses under Coverage C.

   No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under SUPPLEMENTARY PAYMENTS – COVERAGES A AND B.

b. This insurance applies to:

   (1) "Personal injury" caused by an offense arising out of your business, excluding advertising, publishing, broadcasting or telecasting done by or for you;

   (2) "Advertising injury" caused by an offense committed in the course of advertising your goods, products or services;

   but only if the offense was committed in the "coverage territory" during the policy period.

**2. Exclusions.**

This insurance does not apply to:

a. "Personal injury" or "advertising injury":

   (1) Arising out of oral or written publication of material, if done by or at the direction of the insured with knowledge of its falsity;

   (2) Arising out of oral or written publication of material whose first publication took place before the beginning of the policy period;

   (3) Arising out of the willful violation of a penal statute or ordinance committed by or with the consent of the insured;

   (4) For which the insured has assumed liability in a contract or agreement. This exclusion does not apply to liability for damages that the

insured would have in the absence of the contract or agreement; or

   (5) Arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of pollutants at any time.

b. "Advertising injury" arising out of:

   (1) Breach of contract, other than misappropriation of advertising ideas under an implied contract;

   (2) The failure of goods, products or services to conform with advertised quality or performance;

   (3) The wrong description of the price of goods, products or services; or

   (4) An offense committed by an insured whose business is advertising, broadcasting, publishing or telecasting.

c. Any loss, cost or expense arising out of any:

   (1) Request, demand or order that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of pollutants; or

   (2) Claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of pollutants.

   Pollutants means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

**COVERAGE C. MEDICAL PAYMENTS**

**1. Insuring Agreement.**

a. We will pay medical expenses as described below for "bodily injury" caused by an accident:

   (1) On premises you own or rent;

   (2) On ways next to premises you own or rent; or

   (3) Because of your operations;

   provided that:

   (1) The accident takes place in the "coverage territory" and during the policy period;

   (2) The expenses are incurred and reported to us within one year of the date of the accident; and

   (3) The injured person submits to examination, at our expense, by physicians of our choice as often as we reasonably require.

b. We will make these payments regardless of fault. These payments will not exceed the applicable

4

MEDIATION – CONFIDENTIAL.
Subject to Protective Order - Highly Confidential

CNA_BSA0003661
BSAPolicyEv-00007149
TrustApp1016

COMMERCIAL GENERAL LIABILITY
CG 00 01 01 96

limit of insurance. We will pay reasonable expenses for:

(1) First aid administered at the time of an accident;

(2) Necessary medical, surgical, x-ray and dental services, including prosthetic devices; and

(3) Necessary ambulance, hospital, professional nursing and funeral services.

**2.  Exclusions.**

We will not pay expenses for "bodily injury":

**a.** To any insured.

**b.** To a person hired to do work for or on behalf of any insured or a tenant of any insured.

**c.** To a person injured on that part of premises you own or rent that the person normally occupies.

**d.** To a person, whether or not an "employee" of any insured, if benefits for the "bodily injury" are payable or must be provided under a workers compensation or disability benefits law or a similar law.

**e.** To a person injured while taking part in athletics.

**f.** Included within the "products-completed operations hazard".

**g.** Excluded under Coverage A.

**h.** Due to war, whether or not declared, or any act or condition incident to war. War includes civil war, insurrection, rebellion or revolution.

**SUPPLEMENTARY PAYMENTS – COVERAGES A AND B**

We will pay, with respect to any claim we investigate or settle, or any "suit" against an insured we defend:

**1.** All expenses we incur.

**2.** Up to $250 for cost of bail bonds required because of accidents or traffic law violations arising out of the use of any vehicle to which the Bodily Injury Liability Coverage applies. We do not have to furnish these bonds.

**3.** The cost of bonds to release attachments, but only for bond amounts within the applicable limit of insurance. We do not have to furnish these bonds.

**4.** All reasonable expenses incurred by the insured at our request to assist us in the investigation or defense of the claim or "suit", including actual loss of earnings up to $250 a day because of time off from work.

**5.** All costs taxed against the insured in the "suit".

**6.** Prejudgment interest awarded against the insured on that part of the judgment we pay. If we make an offer to pay the applicable limit of insurance, we will not pay any prejudgment interest based on that period of time after the offer.

**7.** All interest on the full amount of any judgment that accrues after entry of the judgment and before we have paid, offered to pay, or deposited in court the part of the judgment that is within the applicable limit of insurance.

These payments will not reduce the limits of insurance.

If we defend an insured against a "suit" and an indemnitee of the insured is also named as a party to the "suit", we will defend that indemnitee if all of the following conditions are met:

**a.** The "suit" against the indemnitee seeks damages for which the insured has assumed the liability of the indemnitee in a contract or agreement that is an "insured contract";

**b.** This insurance applies to such liability assumed by the insured;

**c.** The obligation to defend, or the cost of the defense of, that indemnitee, has also been assumed by the insured in the same "insured contract";

**d.** The allegations in the "suit" and the information we know about the "occurrence" are such that no conflict appears to exist between the interests of the insured and the interests of the indemnitee;

**e.** The indemnitee and the insured ask us to conduct and control the defense of that indemnitee against such "suit" and agree that we can assign the same counsel to defend the insured and the indemnitee; and

**f.** The indemnitee:

(1) agrees in writing to:

(a) cooperate with us in the investigation, settlement or defense of the "suit";

(b) immediately send us copies of any demands, notices, summonses or legal papers received in connection with the "suit";

(c) notify any other insurer whose coverage is available to the indemnitee; and

(d) cooperate with us with respect to coordinating other applicable insurance available to the indemnitee; and

(2) provides us with written authorization to:

(a) obtain records and other information related to the "suit"; and

(b) conduct and control the defense of the indemnitee in such "suit".

So long as the above conditions are met, attorneys fees incurred by us in the defense of that indemnitee, necessary litigation expenses incurred by us and necessary litigation expenses incurred by the indemnitee at our request will be paid as Supplementary Payments. Notwithstanding the provisions of paragraph **2.b.(2)** of COVERAGE A – BODILY INJURY AND PROPERTY DAMAGE LIABILITY (Section I – Coverages), such payments will not be deemed to be

CG 00 01 01 96                Copyright, Insurance Services Office, Inc., 1994

MEDIATION – CONFIDENTIAL.
Subject to Protective Order - Highly Confidential

CNA_BSA0003662
BSAPolicyEv-00007150
TrustApp1017

COMMERCIAL GENERAL LIABILITY
CG 00 01 01 96

damages for "bodily injury" and "property damage" and will not reduce the limits of insurance.

Our obligation to defend an insured's indemnitee and to pay for attorneys fees and necessary litigation expenses as Supplementary Payments ends when:

**a.** We have used up the applicable limit of insurance in the payment of judgments or settlements; or

**b.** The conditions set forth above, or the terms of the agreement described in paragraph **f.** above, are no longer met.

**SECTION II – WHO IS AN INSURED**

**1.** If you are designated in the Declarations as:

**a.** An individual, you and your spouse are insureds, but only with respect to the conduct of a business of which you are the sole owner.

**b.** A partnership or joint venture, you are an insured. Your members, your partners, and their spouses are also insureds, but only with respect to the conduct of your business.

**c.** A limited liability company, you are an insured. Your members are also insureds, but only with respect to the conduct of your business. Your managers are insureds, but only with respect to their duties as your managers.

**d.** An organization other than a partnership, joint venture or limited liability company, you are an insured. Your "executive officers" and directors are insureds, but only with respect to their duties as your officers or directors. Your stockholders are also insureds, but only with respect to their liability as stockholders.

**2.** Each of the following is also an insured:

**a.** Your "employees", other than either your "executive officers" (if you are an organization other than a partnership, joint venture or limited liability company) or your managers (if you are a limited liability company), but only for acts within the scope of their employment by you or while performing duties related to the conduct of your business. However, none of these "employees" is an insured for:

**(1)** "Bodily injury" or "personal injury":

**(a)** To you, to your partners or members (if you are a partnership or joint venture), to your members (if you are a limited liability company), or to a co-"employee" while that co-"employee" is either in the course of his or her employment or performing duties related to the conduct of your business;

**(b)** To the spouse, child, parent, brother or sister of that co-"employee" as a consequence of paragraph **(1)(a)** above;

**(c)** For which there is any obligation to share damages with or repay someone else who must pay damages because of the injury described in paragraphs **(1)(a)** or **(b)** above; or

**(d)** Arising out of his or her providing or failing to provide professional health care services.

**(2)** "Property damage" to property:

**(a)** Owned, occupied or used by,

**(b)** Rented to, in the care, custody or control of, or over which physical control is being exercised for any purpose by

you, any of your "employees", any partner or member (if you are a partnership or joint venture), or any member (if you are a limited liability company).

**b.** Any person (other than your "employee"), or any organization while acting as your real estate manager.

**c.** Any person or organization having proper temporary custody of your property if you die, but only:

**(1)** With respect to liability arising out of the maintenance or use of that property; and

**(2)** Until your legal representative has been appointed.

**d.** Your legal representative if you die, but only with respect to duties as such. That representative will have all your rights and duties under this Coverage Part.

**3.** With respect to "mobile equipment" registered in your name under any motor vehicle registration law, any person is an insured while driving such equipment along a public highway with your permission. Any other person or organization responsible for the conduct of such person is also an insured, but only with respect to liability arising out of the operation of the equipment, and only if no other insurance of any kind is available to that person or organization for this liability. However, no person or organization is an insured with respect to:

**a.** "Bodily injury" to a co-"employee" of the person driving the equipment; or

**b.** "Property damage" to property owned by, rented to, in the charge of or occupied by you or the employer of any person who is an insured under this provision.

**4.** Any organization you newly acquire or form, other than a partnership, joint venture or limited liability company, and over which you maintain ownership or majority interest, will qualify as a Named Insured if there is no other similar insurance available to that organization. However:

6

Copyright, Insurance Services Office, Inc., 1994

MEDIATION – CONFIDENTIAL.
Subject to Protective Order - Highly Confidential

CNA_BSA0003663
BSAPolicyEv-00007151
TrustApp1018

a. Coverage under this provision is afforded only until the 90th day after you acquire or form the organization or the end of the policy period, whichever is earlier;

b. Coverage A does not apply to "bodily injury" or "property damage" that occurred before you acquired or formed the organization; and

c. Coverage B does not apply to "personal injury" or "advertising injury" arising out of an offense committed before you acquired or formed the organization.

No person or organization is an insured with respect to the conduct of any current or past partnership, joint venture or limited liability company that is not shown as a Named Insured in the Declarations.

## SECTION III – LIMITS OF INSURANCE

1. The Limits of Insurance shown in the Declarations and the rules below fix the most we will pay regardless of the number of:

   a. Insureds;

   b. Claims made or "suits" brought; or

   c. Persons or organizations making claims or bringing "suits".

2. The General Aggregate Limit is the most we will pay for the sum of:

   a. Medical expenses under Coverage C;

   b. Damages under Coverage A, except damages because of "bodily injury" or "property damage" included in the "products-completed operations hazard"; and

   c. Damages under Coverage B.

3. The Products-Completed Operations Aggregate Limit is the most we will pay under Coverage A for damages because of "bodily injury" and "property damage" included in the "products-completed operations hazard".

4. Subject to 2. above, the Personal and Advertising Injury Limit is the most we will pay under Coverage B for the sum of all damages because of all "personal injury" and all "advertising injury" sustained by any one person or organization.

5. Subject to 2. or 3. above, whichever applies, the Each Occurrence Limit is the most we will pay for the sum of:

   a. Damages under Coverage A; and

   b. Medical expenses under Coverage C

   because of all "bodily injury" and "property damage" arising out of any one "occurrence".

6. Subject to 5. above, the Fire Damage Limit is the most we will pay under Coverage A for damages because of "property damage" to premises, while rented to you or

temporarily occupied by you with permission of the owner, arising out of any one fire.

7. Subject to 5. above, the Medical Expense Limit is the most we will pay under Coverage C for all medical expenses because of "bodily injury" sustained by any one person.

The Limits of Insurance of this Coverage Part apply separately to each consecutive annual period and to any remaining period of less than 12 months, starting with the beginning of the policy period shown in the Declarations, unless the policy period is extended after issuance for an additional period of less than 12 months. In that case, the additional period will be deemed part of the last preceding period for purposes of determining the Limits of Insurance.

## SECTION IV – COMMERCIAL GENERAL LIABILITY CONDITIONS

1. **Bankruptcy.**

   Bankruptcy or insolvency of the insured or of the insured's estate will not relieve us of our obligations under this Coverage Part.

2. **Duties In The Event Of Occurrence, Offense, Claim Or Suit.**

   a. You must see to it that we are notified as soon as practicable of an "occurrence" or an offense which may result in a claim. To the extent possible, notice should include:

      (1) How, when and where the "occurrence" or offense took place;

      (2) The names and addresses of any injured persons and witnesses; and

      (3) The nature and location of any injury or damage arising out of the "occurrence" or offense.

   b. If a claim is made or "suit" is brought against any insured, you must:

      (1) Immediately record the specifics of the claim or "suit" and the date received; and

      (2) Notify us as soon as practicable.

      You must see to it that we receive written notice of the claim or "suit" as soon as practicable.

   c. You and any other involved insured must:

      (1) Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the claim or "suit";

      (2) Authorize us to obtain records and other information;

      (3) Cooperate with us in the investigation or settlement of the claim or defense against the "suit"; and

      (4) Assist us, upon our request, in the enforcement of any right against any person or

CG 00 01 01 96        Copyright, Insurance Services Office, Inc., 1994

MEDIATION – CONFIDENTIAL.
Subject to Protective Order - Highly Confidential

CNA_BSA0003664
BSAPolicyEv-00007152
TrustApp1019

COMMERCIAL GENERAL LIABILITY
CG 00 01 01 96

organization which may be liable to the insured because of injury or damage to which this insurance may also apply.

**d.** No insured will, except at that insured's own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without our consent.

**3. Legal Action Against Us.**

No person or organization has a right under this Coverage Part:

**a.** To join us as a party or otherwise bring us into a "suit" asking for damages from an insured; or

**b.** To sue us on this Coverage Part unless all of its terms have been fully complied with.

A person or organization may sue us to recover on an agreed settlement or on a final judgment against an insured obtained after an actual trial; but we will not be liable for damages that are not payable under the terms of this Coverage Part or that are in excess of the applicable limit of insurance. An agreed settlement means a settlement and release of liability signed by us, the insured and the claimant or the claimant's legal representative.

**4. Other Insurance.**

If other valid and collectible insurance is available to the insured for a loss we cover under Coverages A or B of this Coverage Part, our obligations are limited as follows:

**a. Primary Insurance**

This insurance is primary except when **b.** below applies. If this insurance is primary, our obligations are not affected unless any of the other insurance is also primary. Then, we will share with all that other insurance by the method described in **c.** below.

**b. Excess Insurance**

This insurance is excess over any of the other insurance, whether primary, excess, contingent or on any other basis:

**(1)** That is Fire, Extended Coverage, Builder's Risk, Installation Risk or similar coverage for "your work";

**(2)** That is Fire insurance for premises rented to you or temporarily occupied by you with permission of the owner; or

**(3)** If the loss arises out of the maintenance or use of aircraft, "autos" or watercraft to the extent not subject to Exclusion **g.** of Coverage A (Section **I**).

When this insurance is excess, we will have no duty under Coverages A or B to defend the insured against any "suit" if any other insurer has a duty to defend the insured against that "suit". If no other

insurer defends, we will undertake to do so, but we will be entitled to the insured's rights against all those other insurers.

When this insurance is excess over other insurance, we will pay only our share of the amount of the loss, if any, that exceeds the sum of:

**(1)** The total amount that all such other insurance would pay for the loss in the absence of this insurance; and

**(2)** The total of all deductible and self-insured amounts under all that other insurance.

We will share the remaining loss, if any, with any other insurance that is not described in this Excess Insurance provision and was not bought specifically to apply in excess of the Limits of Insurance shown in the Declarations of this Coverage Part.

**c. Method of Sharing**

If all of the other insurance permits contribution by equal shares, we will follow this method also. Under this approach each insurer contributes equal amounts until it has paid its applicable limit of insurance or none of the loss remains, whichever comes first.

If any of the other insurance does not permit contribution by equal shares, we will contribute by limits. Under this method, each insurer's share is based on the ratio of its applicable limit of insurance to the total applicable limits of insurance of all insurers.

**5. Premium Audit.**

**a.** We will compute all premiums for this Coverage Part in accordance with our rules and rates.

**b.** Premium shown in this Coverage Part as advance premium is a deposit premium only. At the close of each audit period we will compute the earned premium for that period. Audit premiums are due and payable on notice to the first Named Insured. If the sum of the advance and audit premiums paid for the policy period is greater than the earned premium, we will return the excess to the first Named Insured.

**c.** The first Named Insured must keep records of the information we need for premium computation, and send us copies at such times as we may request.

**6. Representations.**

By accepting this policy, you agree:

**a.** The statements in the Declarations are accurate and complete;

**b.** Those statements are based upon representations you made to us; and

**c.** We have issued this policy in reliance upon your representations.

8

Copyright, Insurance Services Office, Inc., 1994

MEDIATION – CONFIDENTIAL.
Subject to Protective Order - Highly Confidential

CNA_BSA0003665
BSAPolicyEv-00007153
TrustApp1020

COMMERCIAL GENERAL LIABILITY
CG 00 01 01 96

**7. Separation Of Insureds.**

Except with respect to the Limits of Insurance, and any rights or duties specifically assigned in this Coverage Part to the first Named Insured, this insurance applies:

**a.** As if each Named Insured were the only Named Insured; and

**b.** Separately to each insured against whom claim is made or "suit" is brought.

**8. Transfer Of Rights Of Recovery Against Others To Us.**

If the insured has rights to recover all or part of any payment we have made under this Coverage Part, those rights are transferred to us. The insured must do nothing after loss to impair them. At our request, the insured will bring "suit" or transfer those rights to us and help us enforce them.

**9. When We Do Not Renew.**

If we decide not to renew this Coverage Part, we will mail or deliver to the first Named Insured shown in the Declarations written notice of the nonrenewal not less than 30 days before the expiration date.

If notice is mailed, proof of mailing will be sufficient proof of notice.

**SECTION V – DEFINITIONS**

**1.** "Advertising injury" means injury arising out of one or more of the following offenses:

**a.** Oral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;

**b.** Oral or written publication of material that violates a person's right of privacy;

**c.** Misappropriation of advertising ideas or style of doing business; or

**d.** Infringement of copyright, title or slogan.

**2.** "Auto" means a land motor vehicle, trailer or semitrailer designed for travel on public roads, including any attached machinery or equipment. But "auto" does not include "mobile equipment".

**3.** "Bodily injury" means bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time.

**4.** "Coverage territory" means:

**a.** The United States of America (including its territories and possessions), Puerto Rico and Canada;

**b.** International waters or airspace, provided the injury or damage does not occur in the course of travel or transportation to or from any place not included in **a.** above; or

**c.** All parts of the world if:

**(1)** The injury or damage arises out of:

**(a)** Goods or products made or sold by you in the territory described in **a.** above; or

**(b)** The activities of a person whose home is in the territory described in **a.** above, but is away for a short time on your business; and

**(2)** The insured's responsibility to pay damages is determined in a "suit" on the merits, in the territory described in **a.** above or in a settlement we agree to.

**5.** "Employee" includes a "leased worker". "Employee" does not include a "temporary worker".

**6.** "Executive officer" means a person holding any of the officer positions created by your charter, constitution, by-laws or any other similar governing document.

**7.** "Impaired property" means tangible property, other than "your product" or "your work", that cannot be used or is less useful because:

**a.** It incorporates "your product" or "your work" that is known or thought to be defective, deficient, inadequate or dangerous; or

**b.** You have failed to fulfill the terms of a contract or agreement;

if such property can be restored to use by:

**a.** The repair, replacement, adjustment or removal of "your product" or "your work"; or

**b.** Your fulfilling the terms of the contract or agreement.

**8.** "Insured contract" means:

**a.** A contract for a lease of premises. However, that portion of the contract for a lease of premises that indemnifies any person or organization for damage by fire to premises while rented to you or temporarily occupied by you with permission of the owner is not an "insured contract";

**b.** A sidetrack agreement;

**c.** Any easement or license agreement, except in connection with construction or demolition operations on or within 50 feet of a railroad;

**d.** An obligation, as required by ordinance, to indemnify a municipality, except in connection with work for a municipality;

**e.** An elevator maintenance agreement;

**f.** That part of any other contract or agreement pertaining to your business (including an indemnification of a municipality in connection with work performed for a municipality) under which you assume the tort liability of another party to pay for "bodily injury" or "property damage" to a third person or organization. Tort liability means a

9



MEDIATION – CONFIDENTIAL.
Subject to Protective Order - Highly Confidential

CNA_BSA0003666
BSAPolicyEv-00007154
TrustApp1021

COMMERCIAL GENERAL LIABILITY
CG 00 01 01 96

liability that would be imposed by law in the absence of any contract or agreement.

Paragraph **f.** does not include that part of any contract or agreement:

**(1)** That indemnifies a railroad for "bodily injury" or "property damage" arising out of construction or demolition operations, within 50 feet of any railroad property and affecting any railroad bridge or trestle, tracks, road-beds, tunnel, underpass or crossing;

**(2)** That indemnifies an architect, engineer or surveyor for injury or damage arising out of:

  **(a)** Preparing, approving, or failing to prepare or approve, maps, shop drawings, opinions, reports, surveys, field orders, change orders or drawings and specifications; or

  **(b)** Giving directions or instructions, or failing to give them, if that is the primary cause of the injury or damage; or

**(3)** Under which the insured, if an architect, engineer or surveyor, assumes liability for an injury or damage arising out of the insured's rendering or failure to render professional services, including those listed in **(2)** above and supervisory, inspection, architectural or engineering activities.

**9.** "Leased worker" means a person leased to you by a labor leasing firm under an agreement between you and the labor leasing firm, to perform duties related to the conduct of your business. "Leased worker" does not include a "temporary worker".

**10.** "Loading or unloading" means the handling of property:

  **a.** After it is moved from the place where it is accepted for movement into or onto an aircraft, watercraft or "auto";

  **b.** While it is in or on an aircraft, watercraft or "auto"; or

  **c.** While it is being moved from an aircraft, watercraft or "auto" to the place where it is finally delivered;

but "loading and unloading" does not include the movement of property by means of a mechanical device, other than a hand truck, that is not attached to the aircraft, watercraft or "auto".

**11.** "Mobile equipment" means any of the following types of land vehicles, including any attached machinery or equipment:

  **a.** Bulldozers, farm machinery, forklifts and other vehicles designed for use principally off public roads;

  **b.** Vehicles maintained for use solely on or next to premises you own or rent;

  **c.** Vehicles that travel on crawler treads;

  **d.** Vehicles, whether self-propelled or not, maintained primarily to provide mobility to permanently mounted:

   **(1)** Power cranes, shovels, loaders, diggers or drills; or

   **(2)** Road construction or resurfacing equipment such as graders, scrapers or rollers;

  **e.** Vehicles not described in **a., b., c.** or **d.** above that are not self-propelled and are maintained primarily to provide mobility to permanently attached equipment of the following types:

   **(1)** Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment; or

   **(2)** Cherry pickers and similar devices used to raise or lower workers;

  **f.** Vehicles not described in **a., b., c.** or **d.** above maintained primarily for purposes other than the transportation of persons or cargo.

  However, self-propelled vehicles with the following types of permanently attached equipment are not "mobile equipment" but will be considered "autos":

   **(1)** Equipment designed primarily for:

    **(a)** Snow removal;

    **(b)** Road maintenance, but not construction or resurfacing; or

    **(c)** Street cleaning;

   **(2)** Cherry pickers and similar devices mounted on automobile or truck chassis and used to raise or lower workers; and

   **(3)** Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment.

**12.** "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

**13.** "Personal injury" means injury, other than "bodily injury", arising out of one or more of the following offenses:

  **a.** False arrest, detention or imprisonment;

  **b.** Malicious prosecution;

  **c.** The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies by or on behalf of its owner, landlord or lessor;

  **d.** Oral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services; or

MEDIATION – CONFIDENTIAL.
Subject to Protective Order - Highly Confidential

CNA_BSA0003667
BSAPolicyEv-00007155
TrustApp1022

COMMERCIAL GENERAL LIABILITY
CG 00 01 01 96

**e.** Oral or written publication of material that violates a person's right of privacy.

**14.** "Products-completed operations hazard":

**a.** Includes all "bodily injury" and "property damage" occurring away from premises you own or rent and arising out of "your product" or "your work" except:

**(1)** Products that are still in your physical possession; or

**(2)** Work that has not yet been completed or abandoned. However, "your work" will be deemed completed at the earliest of the following times:

**(a)** When all of the work called for in your contract has been completed.

**(b)** When all of the work to be done at the job site has been completed if your contract calls for work at more than one job site.

**(c)** When that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project.

Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed.

**b.** Does not include "bodily injury" or "property damage" arising out of:

**(1)** The transportation of property, unless the injury or damage arises out of a condition in or on a vehicle not owned or operated by you, and that condition was created by the "loading or unloading" of that vehicle by any insured;

**(2)** The existence of tools, uninstalled equipment or abandoned or unused materials; or

**(3)** Products or operations for which the classification, listed in the Declarations or in a policy schedule, states that products-completed operations are subject to the General Aggregate Limit.

**15.** "Property damage" means:

**a.** Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

**b.** Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

**16.** "Suit" means a civil proceeding in which damages because of "bodily injury", "property damage", "personal injury" or "advertising injury" to which this insurance applies are alleged. "Suit" includes:

**a.** An arbitration proceeding in which such damages are claimed and to which the insured must submit or does submit with our consent; or

**b.** Any other alternative dispute resolution proceeding in which such damages are claimed and to which the insured submits with our consent.

**17.** "Temporary worker" means a person who is furnished to you to substitute for a permanent "employee" on leave or to meet seasonal or short-term workload conditions.

**18.** "Your product" means:

**a.** Any goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by:

**(1)** You;

**(2)** Others trading under your name; or

**(3)** A person or organization whose business or assets you have acquired; and

**b.** Containers (other than vehicles), materials, parts or equipment furnished in connection with such goods or products.

"Your product" includes:

**a.** Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your product"; and

**b.** The providing of or failure to provide warnings or instructions.

"Your product" does not include vending machines or other property rented to or located for the use of others but not sold.

**19.** "Your work" means:

**a.** Work or operations performed by you or on your behalf; and

**b.** Materials, parts or equipment furnished in connection with such work or operations.

"Your work" includes:

**a.** Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your work"; and

**b.** The providing of or failure to provide warnings or instructions.

CG 00 01 01 96                Copyright, Insurance Services Office, Inc., 1994

MEDIATION – CONFIDENTIAL.
Subject to Protective Order - Highly Confidential

CNA_BSA0003668
BSAPolicyEv-00007156
TrustApp1023

COMMERCIAL GENERAL LIABILITY
CG 00 54 03 97

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# AMENDMENT OF POLLUTION EXCLUSION – EXCEPTION FOR BUILDING HEATING EQUIPMENT

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE PART

Subparagraph **(1)(a)** of the **Pollution** exclusion under Paragraph **2., Exclusions** of Bodily Injury And Property Damage Liability Coverage **(Section I – Coverages)** is replaced by the following:

This insurance does not apply to:

**POLLUTION**

**(1)** "Bodily injury" or "property damage" arising out of the actual, alleged or threatened discharge,

dispersal, seepage, migration, release or escape of pollutants:

**(a)** At or from any premises, site or location which is or was at any time owned or occupied by, or rented or loaned to, any insured.

However, Subparagraph **(a)** does not apply to "bodily injury" if sustained within a building and caused by smoke, fumes, vapor or soot from equipment used to heat that building.

CG 00 54 03 97                    Copyright, Insurance Services Office, Inc., 1996

COMMERCIAL GENERAL LIABILITY
CG 00 55 03 97

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# AMENDMENT OF OTHER INSURANCE CONDITION (OCCURRENCE VERSION)

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART (OCCURRENCE VERSION)

Paragraph **4.b.** of the **Other Insurance** Condition – **(Section IV – Commercial General Liability Conditions)** is replaced by the following:

**4.   Other Insurance**

**b.   Excess Insurance**

This insurance is excess over:

**(1)** Any of the other insurance, whether primary, excess, contingent or on any other basis:

**(a)** That is Fire, Extended Coverage, Builder's Risk, Installation Risk or similar coverage for "your work";

**(b)** That is Fire insurance for premises rented to you or temporarily occupied by you with permission of the owner; or

**(c)** If the loss arises out of the maintenance or use of aircraft, "autos" or watercraft to the extent not subject to Exclusion **g.** of COVERAGE **A** (SECTION I).

**(2)** Any other primary insurance available to you covering liability for damages arising out of the premises or operations for which you have

been added as an additional insured by attachment of an endorsement.

When this insurance is excess, we will have no duty under COVERAGES **A** or **B** to defend the insured against any "suit" if any other insurer has a duty to defend the insured against that "suit". If no other insurer defends, we will undertake to do so, but we will be entitled to the insured's rights against all those other insurers.

When this insurance is excess over other insurance, we will pay only our share of the amount of the loss, if any, that exceeds the sum of:

**(1)** The total amount that all such other insurance would pay for the loss in the absence of this insurance; and

**(2)** The total of all deductible and self-insured amounts under all that other insurance.

We will share the remaining loss, if any, with any other insurance that is not described in this Excess Insurance provision and was not bought specifically to apply in excess of the Limits of Insurance shown in the Declarations of this Coverage Part.




CG 00 55 03 97            Copyright, Insurance Services Office, Inc., 1996

MEDIATION – CONFIDENTIAL.
Subject to Protective Order - Highly Confidential

CNA_BSA0003670
BSAPolicyEv-00007158
TrustApp1025

CG 01 08 11 85

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# ALABAMA AND LOUISIANA CHANGES –
# WHO IS AN INSURED

This endorsement modifies insurance provided under the following:

    COMMERCIAL GENERAL LIABILITY COVERAGE PART
    LIQUOR LIABILITY COVERAGE PART
    OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE PART
    POLLUTION LIABILITY COVERAGE PART
    PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART
    RAILROAD PROTECTIVE LIABILITY COVERAGE PART

In WHO IS AN INSURED (Section II) the term "executive officer" means only a person holding any of the officer positions created by your charter, constitution or by laws.

CG 01 08 11 85            Copyright, Insurance Services Office, Inc., 1984

CNA_BSA0003671
BSAPolicyEv-00007159
TrustApp1026

COMMERCIAL GENERAL LIABILITY
CG 01 18 03 96

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# LOUISIANA CHANGES – LEGAL ACTION AGAINST US

This endorsement modifies insurance provided under the following:

    COMMERCIAL GENERAL LIABILITY COVERAGE PART
    LIQUOR LIABILITY COVERAGE PART
    OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE PART
    POLLUTION LIABILITY COVERAGE PART
    PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART
    RAILROAD PROTECTIVE LIABILITY COVERAGE PART

The LEGAL ACTION AGAINST US Condition (Section **IV** – Conditions) is replaced by the following:

**Legal Action Against Us**

A person or organization may bring a "suit" against us including, but not limited to, a "suit" to recover on an agreed settlement or on a final judgment against an insured; but we will not be liable for damages that are not payable under the terms of this Coverage Part or that are in excess of the applicable limit of insurance. An agreed settlement means a settlement and release of liability signed by us, the insured and the claimant or the claimant's legal representative.



CG 01 18 03 96        Copyright, Insurance Services Office, Inc., 1995

MEDIATION – CONFIDENTIAL.
Subject to Protective Order - Highly Confidential

COMMERCIAL GENERAL LIABILITY
CG 01 25 08 97

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# LOUISIANA CHANGES – INSURING AGREEMENT

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**A.** Paragraph **1.a.** of **Section I – Coverages, Coverage A – Bodily Injury And Property Damage Liability** is replaced with the following:

**1. Insuring Agreement**

**a.** We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. We may, at our discretion, investigate any "occurrence" and settle any claim or "suit" that may result. But:

**(1)** The amount we will pay for damages is limited as described in Section III – Limits Of Insurance; and

**(2)** Our right and duty to defend end when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverage **A** or **B** or medical expenses under Coverage **C.**

No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments – Coverages **A** And **B.**

**B.** Paragraph **1.a.** of **Section I – Coverages, Coverage B – Personal And Advertising Injury Liability** is replaced with the following:

**1. Insuring Agreement**

**a.** We will pay those sums that the insured becomes legally obligated to pay as damages because of "personal injury" or "advertising injury" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. We may, at our discretion, investigate any "occurrence" or offense and settle any claim or "suit" that may result. But:

**(1)** The amount we will pay for damages is limited as described in Section III – Limits Of Insurance; and

**(2)** Our right and duty to defend end when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages **A** or **B** or medical expenses under Coverage **C.**

No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments – Coverages **A** And **B.**

CG 01 25 08 97          Copyright, Insurance Services Office, Inc., 1997

CNA_BSA0003673
BSAPolicyEv-00007161
TrustApp1028

CG 21 47 10 93

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# EMPLOYMENT-RELATED PRACTICES EXCLUSION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**A.** The following exclusion is added to paragraph 2., Exclusions of COVERAGE A – BODILY INJURY AND PROPERTY DAMAGE LIABILITY (Section I – Coverages):

This insurance does not apply to:

"Bodily injury" to:

**(1)** A person arising out of any:

    **(a)** Refusal to employ that person;

    **(b)** Termination of that person's employment; or

    **(c)** Employment-related practices, policies, acts or omissions, such as coercion, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation or discrimination directed at that person; or

**(2)** The spouse, child, parent, brother or sister of that person as a consequence of "bodily injury" to that person at whom any of the employment-related practices described in paragraphs **(a)**, **(b)** or **(c)** above is directed.

This exclusion applies:

**(1)** Whether the insured may be liable as an employer or in any other capacity; and

**(2)** To any obligation to share damages with or repay someone else who must pay damages because of the injury.

**B.** The following exclusion is added to paragraph 2., Exclusions of COVERAGE B – PERSONAL AND ADVERTISING INJURY LIABILITY (Section I – Coverages):

This insurance does not apply to:

"Personal injury" to:

**(1)** A person arising out of any:

    **(a)** Refusal to employ that person;

    **(b)** Termination of that person's employment; or

    **(c)** Employment-related practices, policies, acts or omissions, such as coercion, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation or discrimination directed at that person; or

**(2)** The spouse, child, parent, brother or sister of that person as a consequence of "personal injury" to that person at whom any of the employment-related practices described in paragraphs **(a)**, **(b)** or **(c)** above is directed.

This exclusion applies:

**(1)** Whether the insured may be liable as an employer or in any other capacity; and

**(2)** To any obligation to share damages with or repay someone else who must pay damages because of the injury.




CG 21 47 10 93          Copyright, Insurance Services Office, Inc., 1992

CNA_BSA0003674
BSAPolicyEv-00007162
TrustApp1029

COMMERCIAL GENERAL LIABILITY
CG 26 40 03 96

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# LOUISIANA CHANGES – NON-BINDING ARBITRATION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
LIQUOR LIABILITY COVERAGE PART
OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE PART
POLLUTION LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART
RAILROAD PROTECTIVE LIABILITY COVERAGE PART

If we and the insured do not agree whether coverage is provided under this Coverage Part for a claim made against the insured, both parties may, by mutual consent, agree in writing to arbitration of the disagreement.

In this event, each party will select an arbitrator. The two arbitrators will select a third. If they cannot agree within 30 days, both parties must request that selection be made by a judge of a court having jurisdiction. Each party will:

1. Pay the expenses it incurs; and

2. Bear the expenses of the third arbitrator equally.

Unless both parties agree otherwise, arbitration will take place in the parish in which the address shown in the Declarations is located. Local rules of law as to procedure and evidence will apply.

CG 26 40 03 96          Copyright, Insurance Services Office, Inc., 1995



CNA
*For All the Commitments You Make*

G-55157-B
(Ed. 02/88)

# PREMIUM BASES
## To be used with the General Liability Schedule

| | | |
|---|---|---|
| A | = Area | (Per 1,000 Sq. ft.) |
| AC | = Acres | (Each) |
| AN | = Animals | (Each) |
| AP | = Airports | (Each) |
| AT | = Attendants | (Each) |
| B | = Bodies | (Each) |
| BE | = Beaches | (Each) |
| BO | = Boats | (Each) |
| C | = Total Cost | (Per $1,000 of Total Cost*) |
| CD | = Camper Days | (Each Camper Day) |
| CN | = Contestants | (Each) |
| CU | = Convention Days | (Each) |
| DB | = Drawbridges | (Each) |
| DM | = Dams | (Each) |
| DW | = Dwellings | (Each) |
| E | = Each | (Per Entity Described) |
| EX | = Exhibitions | (Each) |
| FG | = Fairgrounds | (Each) |
| FM | = Faculty Members | (Each) |
| FP | = Fishing Piers | (Each) |
| G | = Graduates | (Each) |
| GA | = Games | (Each) |
| GS | = Grandstands/Bleacher | (Each) |
| HQ | = Headquarters | (Each) |
| HO | = Hoists | (Each) |
| K | = Kennels | (Each) |
| LD | = Locations Days | (Each) |
| LE | = Lessees | (Each) |
| LO | = Locations | (Each) |
| LR | = Lakes/Reservoirs | (Each) |

| | | |
|---|---|---|
| M | = Admissions | (Per 1,000 Admissions) |
| ME | = Members | (Each) |
| MI | = Miles | (Each) |
| MH | = Model Homes | (Each) |
| O | = Operators | (Each) |
| OE | = Operating Expenditures | (Per $1,000 of Operating Expenditures) |
| P | = Payroll | (Per $1,000 of Payroll*) |
| PD | = Passenger Days | (Per 1,000 Passenger Days) |
| PP | = Parks/Playgrounds | (Each) |
| PR | = Parades | (Each) |
| PS | = Persons | (Each) |
| PG | = Picnic Grounds | (Each) |
| PU | = Pupils | (Each) |
| R | = Receipts | (Per $1,000 of Receipts) |
| RG | = Registrants | (Each) |
| RN | = Range | (Each) |
| S | = Gross Sales | (Per $1,000 of Gross Sales*) |
| SC | = Scouts | (Each) |
| SE | = Seats | (Each) |
| SP | = Swimming Pools | (Each) |
| ST | = Stations | (Each) |
| TE | = Teams | (Each) |
| TO | = Towers | (Each) |
| U | = Unit | (Per Dwelling Unit) |
| VE | = Vehicles | (Per 1,000 Vehicles) |
| VO | = Volunteers | (Each) |
| Z | = Zoos | (Each) |

G-55157-B
(Ed. 02/88)

Page 1 of 1

MEDIATION – CONFIDENTIAL.
Subject to Protective Order - Highly Confidential

CNA_BSA0003676
BSAPolicyEv-00007164
TrustApp1031



**CNA**
*For All the Commitments You Make®*

G-129948-A
(Ed. 03/98)

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## EXCLUSION OF COVERAGE FOR DATE-RELATED COSTS

This endorsement modifies insurance provided under the following:

BOILER AND MACHINERY COVERAGE PART
COMMERCIAL CRIME COVERAGE PART
COMMERCIAL INLAND MARINE COVERAGE PART
COMMERCIAL PROPERTY COVERAGE PART
STANDARD PROPERTY POLICY

**A.** We will not pay any costs or expenses you or others directly or indirectly incur to:

  **1.** Assess, design, identify, inspect, install, maintain, modify, monitor, rectify, repair, replace, reprogram or test any equipment, systems, software, or any components thereof, as described in Section **B.** of this endorsement:

    **a.** Because of the manner which such equipment, systems, software, or any components thereof recognize, interpret, process or differentiate dates or times, or are unable to recognize, interpret, process or differentiate dates or times; or

    **b.** In anticipation of the manner in which such equipment, systems, software, or any components thereof may recognize, interpret, process or differentiate dates or times, or may be unable to recognize, interpret, process or differentiate dates or times; or

  **2.** Obtain advice or consultation with respect to **A.1.** above.

Without limiting the breadth or scope of the foregoing, one example of the type of cost or expense excluded hereunder is any cost or expense to modify or test equipment, systems, software, or any components thereof, because of the manner in which they recognize, interpret, process or differentiate, dates or times as a consequence of the date change from 1999 to 2000.

**B.** Equipment, systems, software, or any components thereof include, but are not limited to, the following, whether belonging to any insured or to others:

  **1.** Computer hardware;

  **2.** Computer software;

  **3.** Computer firmware meaning computer programs contained in a hardware device as a read-only memory;

  **4.** Computer operating systems and related software;

  **5.** Computer networks;

  **6.** Microprocessors or micro chips, whether or not part of any computer or computerized system;

  **7.** Any other computerized or electronic equipment, components or circuitry; or

  **8.** Any other products, equipment, services, data or functions that directly or indirectly incorporate, use or rely upon, in any manner, any of the items listed in paragraph **B.1.** through **B.7.** above.

**C.** With respect to any insurance provided for loss of Business Income or Extra Expense, we will not pay for any loss or expense directly or indirectly incurred due to the period of time required to:

  **1.** Assess, design, identify, inspect, install, maintain, modify, monitor, rectify, repair, replace, reprogram or test any equipment, systems, software, or any components thereof, as described in Section **B.** of this endorsement:

    **a.** Because of the manner which such equipment, systems, software, or any components thereof recognize, interpret, process or differentiate dates or times, or are unable to recognize, interpret, process or differentiate dates or times; or

    **b.** In anticipation of the manner in which such equipment, systems, software, or any components thereof may recognize, interpret, process or differentiate dates or times, or may be unable to recognize, interpret, process or differentiate dates or times; or

  **2.** Obtain advice or consultation with respect to **C.1.** above.

G-129948-A
(Ed. 03/98)

Page 1 of 1

MEDIATION – CONFIDENTIAL.
Subject to Protective Order - Highly Confidential

CNA_BSA0003677
BSAPolicyEv-00007165
TrustApp1032

IL 00 17 11 85

# COMMON POLICY CONDITIONS

All Coverage Parts included in this policy are subject to the following conditions.

**A. CANCELLATION**

1. The first Named Insured shown in the Declarations may cancel this policy by mailing or delivering to us advance written notice of cancellation.

2. We may cancel this policy by mailing or delivering to the first Named Insured written notice of cancellation at least:

   a. 10 days before the effective date of cancellation if we cancel for nonpayment of premium; or

   b. 30 days before the effective date of cancellation if we cancel for any other reason.

3. We will mail or deliver our notice to the first Named Insured's last mailing address known to us.

4. Notice of cancellation will state the effective date of cancellation. The policy period will end on that date.

5. If this policy is cancelled, we will send the first Named Insured any premium refund due. If we cancel, the refund will be pro rata. If the first Named Insured cancels, the refund may be less than pro rata. The cancellation will be effective even if we have not made or offered a refund.

6. If notice is mailed, proof of mailing will be sufficient proof of notice.

**B. CHANGES**

This policy contains all the agreements between you and us concerning the insurance afforded. The first Named Insured shown in the Declarations is authorized to make changes in the terms of this policy with our consent. This policy's terms can be amended or waived only by endorsement issued by us and made a part of this policy.

**C. EXAMINATION OF YOUR BOOKS AND RECORDS**

We may examine and audit your books and records as they relate to this policy at any time during the policy period and up to three years afterward.

**D. INSPECTIONS AND SURVEYS**

We have the right but are not obligated to:

1. Make inspections and surveys at any time;

2. Give you reports on the conditions we find; and

3. Recommend changes.

Any inspections, surveys, reports or recommendations relate only to insurability and the premiums to be charged. We do not make safety inspections. We do not undertake to perform the duty of any person or organization to provide for the health or safety of workers or the public. And we do not warrant that conditions:

1. Are safe or healthful; or

2. Comply with laws, regulations, codes or standards.

This condition applies not only to us, but also to any rating, advisory, rate service or similar organization which makes insurance inspections, surveys, reports or recommendations.

**E. PREMIUMS**

The first Named Insured shown in the Declarations:

1. Is responsible for the payment of all premiums; and

2. Will be the payee for any return premiums we pay.

**F. TRANSFER OF YOUR RIGHTS AND DUTIES UNDER THIS POLICY**

Your rights and duties under this policy may not be transferred without our written consent except in the case of death of an individual named insured.

If you die, your rights and duties will be transferred to your legal representative but only while acting within the scope of duties as your legal representative. Until your legal representative is appointed, anyone having proper temporary custody of your property will have your rights and duties but only with respect to that property.

IL 00 17 11 85                    Copyright, Insurance Services Office, Inc., 1982, 1983

MEDIATION – CONFIDENTIAL.
Subject to Protective Order - Highly Confidential

CNA_BSA0003678
BSAPolicyEv-00007166
TrustApp1033

IL 00 21 11 94

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# NUCLEAR ENERGY LIABILITY EXCLUSION ENDORSEMENT
## (Broad Form)

This endorsement modifies insurance provided under the following:

BUSINESSOWNERS POLICY
COMMERCIAL AUTO COVERAGE PART
COMMERCIAL GENERAL LIABILITY COVERAGE PART
FARM COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART
LIQUOR LIABILITY COVERAGE PART
POLLUTION LIABILITY COVERAGE PART
OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE PART
RAILROAD PROTECTIVE LIABILITY COVERAGE PART
SPECIAL PROTECTIVE AND HIGHWAY LIABILITY POLICY NEW YORK DEPARTMENT OF TRANSPORTATION
UNDERGROUND STORAGE TANK POLICY

1.  The insurance does not apply:

    **A.** Under any Liability Coverage, to "bodily injury" or "property damage":

    **(1)** With respect to which an "insured" under the policy is also an insured under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters, Nuclear Insurance Association of Canada or any of their successors, or would be an insured under any such policy but for its termination upon exhaustion of its limit of liability; or

    **(2)** Resulting from the "hazardous properties" of "nuclear material" and with respect to which (a) any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof, or (b) the "insured" is, or had this policy not been issued would be, entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization.

    **B.** Under any Medical Payments coverage, to expenses incurred with respect to "bodily injury" resulting from the "hazardous properties" of "nuclear material" and arising out of the operation of a "nuclear facility" by any person or organization.

    **C.** Under any Liability Coverage, to "bodily injury" or "property damage" resulting from "hazardous properties" of "nuclear material", if:

    **(1)** The "nuclear material" (a) is at any "nuclear facility" owned by, or operated by or on behalf of, an "insured" or (b) has been discharged or dispersed therefrom;

    **(2)** The "nuclear material" is contained in "spent fuel" or "waste" at any time possessed, handled, used, processed, stored, transported or disposed of, by or on behalf of an "insured"; or

    **(3)** The "bodily injury" or "property damage" arises out of the furnishing by an "insured" of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any "nuclear facility", but if such facility is located within the United States of America, its territories or possessions or Canada, this exclusion (3) applies only to "property damage" to such "nuclear facility" and any property thereat.

2.  As used in this endorsement:

    "Hazardous properties" includes radioactive, toxic or explosive properties.

    "Nuclear material" means "source material", "Special nuclear material" or "by-product material".

    "Source material", "special nuclear material", and "by-product material" have the meanings given them in the Atomic Energy Act of 1954 or in any law amendatory thereof.

    "Spent fuel" means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a "nuclear reactor".

    "Waste" means any waste material (a) containing "by-product material" other than the tailings or wastes produced by the extraction or concentration of uranium or thorium from any ore processed primarily for its "source material" content, and (b) resulting from the operation by any person or organization of any "nuclear facility" included under the first two paragraphs of the definition of "nuclear facility".

1

IL 00 21 11 94                 Copyright, Insurance Services Office, Inc., 1994



MEDIATION – CONFIDENTIAL.
Subject to Protective Order - Highly Confidential

CNA_BSA0003679
BSAPolicyEv-00007167
TrustApp1034

IL 00 21 11 94

"Nuclear facility" means:

(a) Any "nuclear reactor";

(b) Any equipment or device designed or used for (1) separating the isotopes of uranium or plutonium, (2) processing or utilizing "spent fuel", or (3) handling, processing or packaging "waste";

(c) Any equipment or device used for the processing, fabricating or alloying of "special nuclear material" if at any time the total amount of such material in the custody of the "insured" at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or

uranium 233 or any combination thereof, or more than 250 grams of uranium 235;

(d) Any structure, basin, excavation, premises or place prepared or used for the storage or disposal of "waste";

and includes the site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operations.

"Nuclear reactor" means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material.

"Property damage" includes all forms of radioactive contamination of property.

IL 00 21 11 94                    Copyright, Insurance Services Office, Inc., 1994

MEDIATION – CONFIDENTIAL.
Subject to Protective Order - Highly Confidential

CNA_BSA0003680
BSAPolicyEv-00007168
TrustApp1035

IL 02 77 02 94

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# LOUISIANA CHANGES – CANCELLATION AND NONRENEWAL

This endorsement modifies insurance provided under the following:

BOILER AND MACHINERY COVERAGE PART
BUSINESSOWNERS POLICY
COMMERCIAL AUTO COVERAGE PART
COMMERCIAL CRIME COVERAGE PART*
COMMERCIAL GENERAL LIABILITY COVERAGE PART
COMMERCIAL INLAND MARINE COVERAGE PART
COMMERCIAL PROPERTY COVERAGE PART
FARM COVERAGE PART
LIQUOR LIABILITY COVERAGE PART
POLLUTION LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART

\*    This endorsement does not apply to coverage provided for employee dishonesty (Coverage Form A) or public employee dishonesty (Coverage Forms O and P).

**A.** Paragraphs **2.** and **5.** of the CANCELLATION Common Policy Condition are replaced by the following:

**2. NOTICE OF CANCELLATION**

    **a.** CANCELLATION OF POLICIES IN EFFECT FOR FEWER THAN 60 DAYS AND NOT RENEWALS

    If this policy has been in effect for fewer than 60 days and is not a renewal of a policy we issued, we may cancel this policy for any reason, subject to the following:

      **(1)** Cancellation for nonpayment of premium

      We may cancel this policy by mailing or delivering to the first Named Insured written notice of cancellation at least 10 days before the effective date of cancellation.

      **(2)** Cancellation for any other reason

      We may cancel this policy by mailing or delivering to the first Named Insured written notice of cancellation at least 60 days before the effective date of cancellation.

    **b.** CANCELLATION OF RENEWAL POLICIES AND NEW POLICIES IN EFFECT FOR 60 DAYS OR MORE

    If this policy has been in effect for 60 days or more, or is a renewal of a policy we issued, we may cancel only for one or more of the following reasons:

      **(1)** Nonpayment of premium;

      **(2)** Fraud or material misrepresentation made by you or with your knowledge in obtaining the policy, continuing the policy, or in presenting a claim under the policy;

      **(3)** Activities or omissions by you which change or increase any hazard insured against;

      **(4)** Change in the risk which increases the risk of loss after we issued or renewed this policy including an increase in exposure due to regulation, legislation, or court decision;

      **(5)** Determination by the Commissioner of Insurance that the continuation of this policy would jeopardize our solvency or would place us in violation of the insurance laws of this or any other state;

      **(6)** The insured's violation or breach of any policy terms or conditions; or

      **(7)** Any other reasons that are approved by the Commissioner of Insurance.

      We will mail or deliver written notice of cancellation under this item **2.b.**, to the first Named Insured at least:

      **(a)** 10 days before the effective date of cancellation if we cancel for nonpayment of premium; or

      **(b)** 20 days before the effective date of cancellation if we cancel for a reason described in **2.b. (2)** through **(7)** above.

**5. PREMIUM REFUND**

If this policy is cancelled, we will send the first Named Insured any premium refund due, subject to paragraphs **5.a.** and **5.b.** The cancellation will be effective even if we have not made or offered a refund.

    **a.** If we cancel, the refund will be pro rata.

    **b.** If the first Named Insured cancels, the refund may be less than pro rata, and will be sent to



**1**

Copyright, Insurance Services Office, Inc., 1993
Copyright, ISO Commercial Risk Services, Inc., 1993

IL 02 77 02 94

MEDIATION – CONFIDENTIAL.
Subject to Protective Order - Highly Confidential

CNA_BSA0003681
BSAPolicyEv-00007169
TrustApp1036

IL 02 77 02 94

the first Named Insured within 30 days after the effective date of cancellation.

**B.** Paragraph **f.** of the MORTGAGE HOLDERS Condition in the Businessowners Policy and Commercial Property Coverage Part and paragraph **4.(f)** of the Mortgage Holders Condition in the Farm Coverage Part is replaced by the following:

If we cancel this policy, we will give written notice to the mortgage holder at least:

**(1)** 10 days before the effective date of cancellation, if we cancel for nonpayment of premium; or

**(2)** 20 days before the effective date of cancellation, if we cancel for any other reason.

**C.** The following is added and supersedes any other provision to the contrary:

**NONRENEWAL**

**1.** If we decide not to renew this policy, we will mail or deliver written notice of nonrenewal to the first Named Insured, at least 60 days before its expiration date, or its anniversary date if it is a policy written for a term of more than one year or with no fixed expiration date.

**2.** We need not mail or deliver this notice if:

**a.** We or another company within our insurance group have offered to issue a renewal policy; or

**b.** You have obtained replacement coverage or have agreed in writing to obtain replacement coverage.

**3.** Any notice of nonrenewal will be mailed or delivered to the first Named Insured at the last mailing address known to us. If notice is mailed, proof of mailing will be sufficient proof of notice.

2

Copyright, Insurance Services Office, Inc., 1993
Copyright, ISO Commercial Risk Services, Inc., 1993

IL 02 77 02 94

MEDIATION – CONFIDENTIAL.
Subject to Protective Order - Highly Confidential

CNA_BSA0003682
BSAPolicyEv-00007170
TrustApp1037



G-132246-A
(Ed. 07/98)

For All the Commitments You Make®

# Important Notice To Policyholders
## Property, Crime, Inland Marine and Boiler and Machinery Coverage Parts
### (Attachment of G-129948-A, Exclusion of Coverage For Date Related Costs)

This notice is designed to give you an overview of how the Property, Inland Marine, Crime or Boiler Machinery Coverage Part or your policy addresses date related claims. This notice is **not** your policy. READ YOUR POLICY CAREFULLY to determine rights, duties, and what is and is not covered. Only the provisions of your policy determine the scope of your insurance protection.

If your policy contains a Property, Inland Marine, Crime or Boiler Machinery Coverage Part, **G-129948-A**, Exclusion of Coverage For Date Related Costs will be attached to your policy. This new exclusion endorsement specifically reinforces that there is no coverage under the Commercial Property, Inland Marine, Crime and Boiler and Machinery Coverage Parts of your policy for:

- Costs or expenses incurred to assess, design, identify, inspect, install, maintain, modify, monitor, rectify, repair, replace, reprogram or test any equipment, systems, software or their components due to the manner, or in anticipation of the manner, in which equipment, systems, software, or their components recognize, interpret, process or differentiate dates or times, or are unable to recognize, interpret, process or differentiate dates or times; or

- Loss of business income or extra expense incurred due to the period of time required to assess, design, identify, inspect, install, maintain, modify, monitor, rectify, repair, replace, reprogram or test any equipment, systems, software or their components due to the manner, or in anticipation of the manner, in which equipment, systems, software, or their components recognize, interpret, process or differentiate dates or times, or are unable to recognize, interpret, process or differentiate dates or times.

Please note that this exclusion endorsement is **not a reduction** in the coverage provided under the existing policy forms. Physical loss or damage is a prerequisite to coverage under all first party property damage and time element coverages, as set forth clearly in your policy. In the majority of cases, it is anticipated that date-related incidents will not result in direct physical loss or damage, but will instead result in dissatisfaction with the manner in which equipment, systems, software, or their components recognize, interpret, process or differentiate dates or times, even though the property is operating as it was designed or programmed to operate.

For example, if the equipment is programmed to only accept the last two digits of any year (e.g. XX) and the programming is also designed to recognize the first two digits of the year as 19, the equipment will correctly recognize the year 2001 as 1901, as designed. It may not be the result that the user is looking for, but there is no direct physical loss or damage to the equipment, as it is performing exactly as it was designed.

In the event direct physical loss or damage does result from a date related incident, we will rely on our existing policy provisions and exclusions in determining whether or not there is coverage for the resulting loss or damage.



G-132246-A
(Ed. 07/98)

Page 1 of 1

MEDIATION – CONFIDENTIAL.
Subject to Protective Order - Highly Confidential

CNA_BSA0003683
BSAPolicyEv-00007171
TrustApp1038



CNA Plaza
Chicago, Illinois 60685

| Policy Number | From Policy Period To | Coverage Is Provided By | Agency |
|---|---|---|---|
| B1 67481043 | 03/26/99  03/26/00 | NATL FIRE INS. CO. OF HARTFORD | 005618610 |

| Named Insured And Address | Agent |
|---|---|
| SCOUT HUT - BOY/GIRL SCOUTS<br>ATTN K BOYER BSA PACK 4<br>831 ERIE<br>SHREVEPORT, LA  71106 | HARRIS LEARY & COMPANY INC<br>2525 YOUREE DR - STE<br>P O BOX 44084<br>SHREVEPORT  LA  71134 |

```
            **  PAYMENT PLAN SCHEDULE  **


        THE BILLING FOR THIS POLICY WILL BE
        FORWARDED TO YOU DIRECTLY FROM CNA.


        THE PREMIUM AMOUNT FOR THIS TRANSACTION
        IS      $308.00 .


        THIS PREMIUM WILL BE INVOICED BY CNA ON
        A SEPARATE STATEMENT ACCORDING TO THE
        PAYMENT OPTION YOU SELECT.
```

| PREMIUM | COMMISSION RATE | COMMISSION DOLLARS |
|---|---|---|
| $308.00 | 20.0 | $61.60 |

ISSUE DATE 02/22/99

MEDIATION – CONFIDENTIAL.
Subject to Protective Order - Highly Confidential

**END OF COPY**

MEDIATION – CONFIDENTIAL.
Subject to Protective Order - Highly Confidential

CNA_BSA0003685
BSAPolicyEv-00007173
TrustApp1040